<u>**Exhibit B**</u>

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KENNETH REAVES,            )
                          )
          Plaintiff,      )
                          ) CIVIL ACTION FILE
     vs.                  )
                          ) NO. 1:11-CV-4138-RLV
GMAC MORTGAGE, LLC and    )
U.S. BANK NATIONAL        )
ASSOCIATION,              )
                          )
          Defendant.      )

---

DEPOSITION OF KENNETH REAVES
APRIL 27, 2012
1:30 P.M.

---

## Page 2

INDEX TO EXHIBITS

| EXHIBIT | | PAGE |
|---|---|---|
| 1 | Verified Complaint for Wrongful Foreclosure, Damages, Punitive Damanges and Attorneys Fees | 27 |
| 2 | Adjustable Rate Note | 29 |
| 3 | Security Deed | 34 |
| 4 | Default Notice | 84 |

* * *

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

     David P. Rachel, Esq.

On behalf of Defendants:

     Teah N. Glenn, Esq.

Also present:
     Joe Edlin (via telephone)
* * *
     MS. GLENN:  This is the deposition of
Kenneth Reaves taken pursuant to notice and
agreement of the parties on behalf of the
defendant, GMAC Mortgage, LLC, for all purposes
provided for under the Georgia Civil Practice
Act.

## Page 3

1          KENNETH REAVES,
2  having been first duly sworn, was deposed and testified as
3  follows:
4             EXAMINATION
5  BY MS. GLENN:
6     Q   Mr. Reaves, could you please state and
7  spell your name for the record?
8     A   Kenneth Reaves, last name spelled R-E-A-V
9  as in valentine E-S.
10    Q   Mr. Reaves, do you go by any other names?
11    A   No.
12    Q   Do you have any nicknames?
13    A   No.
14    Q   Ken?  Kenny?
15    A   My mother likes Kenny.
16    Q   No problem.  I'm Teah Glenn.  I'm with
17  Troutman Sanders.  As you're aware, I represent
18  GMAC.  Have you been deposed before, Mr. Reaves?
19    A   Yes, I have.
20    Q   So you understand that you're under oath?
21    A   Yes, I do.
22    Q   You understand that you're providing sworn
23  testimony?
24    A   Yes, I do.
25    Q   Just a few of my own personal ground rules

## Page 4

1  and general ground rules for depositions typically.
2  I'm just here to figure out what happened.
3         While in general conversation, a lot of
4  times people finish each other other's sentences,
5  talk over one another.  Just for purposes of the
6  transcript, we can't do that.
7         So if you don't mind, if you could let me
8  get my question out entirely, I can let you get your
9  answer out entirely and that way we'll have a clean
10  record.
11        For purposes of the court reporter, I need
12  all your responses to be verbal.  I do that as well,
13  and sometimes I don't always catch it.  So I really
14  need your help with this one.
15        Nods and body language does not transfer
16  to paper.  So I need verbal answers, yes or no.
17  Nodding of the heads and shaking of the heads won't,
18  again, allow for a clean record.
19        I ask that if you don't understand my
20  question or any word that I use -- sometimes I might
21  use industry lingo, just stop me.
22        I'm not doing it intentionally.  I'm not
23  playing hide the ball.  I don't mean to confuse you.
24  I ask that if I say something that doesn't make any
25  sense or that you don't understand, just let me

Page 5

1  know.
2      A   Understood.
3      Q   So that way, if you answer my question, I
4  can assume you understood it.
5      A   Okay.
6      Q   All right.  If you need to take a break at
7  any point to use the restroom, to get a drink,
8  that's fine.
9      All that I ask is that if there's a
10  question pending on the table, that you answer it.
11  If there's a line of questioning, just as you saw
12  with Ms. Bowers' deposition, I might ask that you
13  let me wrap up my line of questioning.  But
14  typically you can take a break whenever you need
15  one.
16      A   Understood.
17      MS. GLENN:  Mr. Rachel, will we read and
18  sign?
19      MR. RACHEL:  Do you want to.
20      THE WITNESS:  Yes.
21      MR. RACHEL:  Yes, we can.
22  BY MS. GLENN:
23      Q   All right.  Mr. Reaves, are you feeling
24  okay today?
25      MR. RACHEL:  We're going to waive

Page 6

1  objections except as to form of the question.
2  BY MS. GLENN:
3      Q   Mr. Reaves, are you feeling okay today?
4      A   I'm fine.
5      Q   Are you currently taking any medications
6  or substances that would affect your memory?
7      A   Negative.
8      Q   Or your ability to tell the truth?
9      A   No.
10      Q   Okay.  What did you do to prepare for this
11  deposition?
12      A   Review my extensive documents and notes
13  that I have taken heretofore pertaining to this
14  incident.
15      Q   Did you speak with your attorney?  And let
16  me be clear, I'm not asking you, if you did speak
17  with your attorney, what you talked about.
18      I'm just asking if you spoke with your
19  attorney in preparation for the deposition today?
20      A   Yes.
21      Q   Okay.  When did you speak with Mr. Rachel?
22      A   As late as this morning, then also
23  yesterday and last Wednesday, if I remember.
24      Q   So you had about three prep sessions?
25      A   Let me make this very clear.  In the past,

Page 7

1  from the point in time I retained his law firm, we
2  have constantly been in constant communication
3  pertaining to this matter that's before us today.
4      So for me to say that or to agree with
5  your statement put forth that I've only spoken with
6  him the last three days would be a misnomer.
7      There's been an accumulation of
8  conferences and interaction between me and my
9  counsel pertaining to this very serious matter.
10      Q   Certainly.  And that makes sense.  I guess
11  let me clarify.  I'm just speaking specifically with
12  regard to prepping for the deposition.
13      A   That's been ever since we gave your law
14  firm that we wanted to have -- ever since we decided
15  that we wanted to depose certain persons to get to
16  the truth of the matter.
17      So, once again, I'm not trying to be
18  vague, but there have been several conversations
19  pertaining to notes, accuracy of notes, reviewing
20  different things, looking at the chronological
21  events and validating secrets of orders that have
22  brought us here today with regards to this matter.
23      Q   I understand.  Do you have any documents
24  with you today?
25      A   I have some notes.

Page 8

1      Q   Okay.
2      MS. GLENN:  Are those notes that have been
3  produced, David?
4      MR. RACHEL:  No.  That's just his personal
5  notes.  He just made timelines of what
6  happened.
7      MS. GLENN:  Okay.  Did he do that at your
8  instruction?
9      MR. RACHEL:  No.
10      MS. GLENN:  Then can you produce those
11  notes for us?
12      MR. RACHEL:  I probably can.
13      MS. GLENN:  Okay.  I'd appreciate that, if
14  you could give us a copy.
15  BY MS. GLENN:
16      Q   Did you meet with anyone else in
17  preparation for your deposition?
18      A   Negative.
19      Q   Have you ever been a party to a lawsuit
20  before?
21      A   Never.
22      Q   A civil lawsuit?
23      A   Never.
24      Q   Never been a witness in a civil lawsuit?
25      A   Yes, I've been asked to testify --

Page 9

```
 1      Q   Did you testify?
 2      A   -- as a witness in other person's
 3  lawsuits.  Yes.
 4      Q   What type of lawsuit was that?
 5      A   Would you consider a divorce case?
 6      Q   Yes, sure.
 7      A   Yes, a divorce case.
 8      Q   Have you ever filed for bankruptcy?
 9      A   Never, negative.
10      Q   Have you ever been -- okay.  Now you
11  mentioned you've been deposed before?
12      A   Yes.
13      Q   How many times?
14      A   Twice.
15      Q   Okay.  Tell me about those times.
16      A   As I indicated, they were on -- one had to
17  do with a divorce and then one had to do with a
18  civil litigation.
19         It was a lawsuit where this one firm was
20  suing another firm and the plaintiff asked me to
21  testify on their behalf.
22      Q   Mr. Reaves, what is your birthday?
23      A   10-7-60.
24      Q   And that would make you how old today?
25      A   Fifty-one.
```

Page 10

```
 1      Q   Are you currently employed?
 2      A   Yes.
 3      Q   Where are you employed, Mr. Reaves?
 4      A   ATW, Inc.
 5      Q   What type of company is that?
 6      A   It's a community based educational firm
 7  that educates people along various investment
 8  paradigms and strategies.
 9      Q   You educate people on investments?
10      A   Paradigms and strategies.
11      Q   Tell me what you mean by "investment
12  paradigms and strategies"?
13      A   Case in point, both macro and micro
14  economic conditions, weighs and means.  I'm a
15  formally trained economist.
16         And so -- Counselor, let me get back on
17  track.  Are you asking me what the company does or
18  what I do with the company?
19      Q   Well, I'd like to hear about both.
20      A   Okay.  So as I was saying, pertaining to
21  this, let's look at the wider picture, what the
22  company does.
23         So what the company does, in and of
24  itself, is it looks at both macro and micro economic
25  conditions and then makes recommendations pertaining
```

Page 11

```
 1  to the various strategies and paradigms that are
 2  applicable to that.
 3         As you know, both macro and micro economic
 4  conditions change based upon global economies.  My
 5  duties -- as relates to my duties, I'm an economist
 6  at ATW, Inc.
 7      Q   How long have you been there?
 8      A   Fifteen years plus.
 9      Q   And where were you prior to ATW, Inc.?
10      A   Omni Credit Alliance, Inc.
11      Q   Do you remember your approximate dates of
12  employment?
13      A   Not right offhand.  I'm sorry, I don't.
14      Q   That's okay.  Could you estimate about how
15  long you were at Omni Credit?
16      A   Oh, at least ten years.  At least ten
17  years.
18      Q   And what did you do there?  What was your
19  job title first of all?
20      A   I was what is called an Investment
21  Strategist.  That was my official title.
22      Q   And what did your job duties entail?
23      A   Well, we did capital placements for
24  venture capital firms in private placement
25  memorandums, PPMs.
```

Page 12

```
 1      Q   At present, is your only source of income
 2  your salary at ATW, Inc.?
 3      A   Counselor, from time to time I get asked
 4  to speak at speaking engagements and things of that
 5  nature.  So I do have residual income that comes in
 6  from speaking engagements.
 7      Q   Do you speak in your capacity as an
 8  economist?
 9      A   Yes, ma'am.
10      Q   About how frequently would you say
11  you have these speaking engagements?
12      A   Maybe once a quarter.
13      Q   Do you have a standard rate?
14      A   No.  It depends upon the organization.
15  Sometimes it's a church.  Sometimes it is a formal
16  investment club or group or it may be an investment
17  conference where I'm called to come as a keynote
18  speaker or sit on the panel.  So it varies.
19      Q   Estimate the range of fees that you might
20  charge for your speaking engagements or you have
21  charged in the past?
22      A   Multi day or single day?
23      Q   Let's just speak in general.  Let's lump
24  all of them together, from sitting on a panel for
25  one hour to maybe speaking at a multi-day
```

Page 13

```
 1   conference.
 2         What's the range that we're talking about
 3   here, 100 to 10,000 or 500 to 15,000?  What's the
 4   range of fees that you've collected in the past, to
 5   the best of your knowledge or recollection?
 6      A   Okay.  If I may, let me give you a couple
 7   scenarios.  Let's say it's a one day conference and
 8   I'm just on a panel of persons, okay and this is not
 9   including my per diem and, you know, all of my other
10   sources of fees.
11         But my honorarium would be something in
12   the realm of, say, 500 to $1,000.
13      Q   So that's on the low end?
14      A   Yes, exactly.
15      Q   What's on the high end, like, say for a
16   multi-day conference, where you might be the
17   keynote?
18      A   It would be 7,000 -- my rate is $7,500 an
19   hour.  So that's if I'm a keynote with corresponding
20   Q and A thereafter.
21         So that would encompass me being the
22   keynote at the event.  Then afterwards I have to go
23   to the workshops and then I'm spearheading the
24   corresponding interaction with the other economists
25   and things of that nature.
```

Page 14

```
 1         (Whereupon, a discussion ensued off the record.)
 2   BY MS. GLENN:
 3      Q   What's your annual income at ATW, Inc.?
 4      A   I make a little bit -- I make $3,100 a
 5   month.
 6      Q   Did you report both your salary at ATW
 7   Inc. and your periodic residual income from speaking
 8   engagements on your loan mod application last year?
 9      A   The -- that was the year -- the numbers,
10   they are listed and the numbers are very, very low
11   because I was ill.
12         That's what caused me to get behind on my
13   payments, period, because of my illness.  So my
14   residual or supplemental income that comes from my
15   speaking engagements and whatnot was cut
16   drastically, I dare say almost 100 percent, because
17   I was unable to work, unable to tour, speak.
18      Q   How do organizations learn about as you a
19   potential speaker for conferences or events?  Do you
20   have a Website or do you have a company that you set
21   up individually?
22         How do they reach out to you as a
23   potential speaker?  How do they come to learn about
24   you, rather?
25      A   Well, multiple ways.  I'm the host of a
```

Page 15

```
 1   nationally syndicated radio broadcast called Ask The
 2   Wiz, and so -- I mean we have listeners worldwide.
 3         And then the other -- you know, people
 4   hear about me.  They go to the Website.  They see --
 5   you know, see me on the Website, look at my articles
 6   that I've published in journals and things of that
 7   nature.
 8      Q   Is there any income associated with your
 9   syndicated broadcast?
10      A   No, ma'am.
11      Q   Okay.  What's your current address,
12   Mr. Reaves?
13      A   3481 Oak Run Drive, Lithonia, Georgia
14   30038.
15      Q   Is that the same property that's the
16   subject of your lawsuit?
17      A   Yes, ma'am.
18      Q   What county is that in?
19      A   DeKalb County.
20      Q   It's a freestanding home?  Townhome?
21      A   Yes, ma'am.
22      Q   It's a single family home?
23      A   Single family detached dwelling.
24      Q   How long have you lived there?
25      A   Wow.  Well, over -- don't hold me to this,
```

Page 16

```
 1   but I think, plus or minus, 15 to 17 years, ma'am.
 2      Q   And you own that home, correct?
 3      A   Own what home?  The 3481 Oak Run Drive?
 4      Q   No, it's been foreclosed on.
 5      A   Don't own that one.
 6      Q   Do you own any other homes?  I'm sorry.
 7      A   I have vested interest in other
 8   properties.  Let me clarify something with you, and
 9   I say this on my radio broadcast often.
10         If person has a mortgage on a home, they
11   don't own a home.  I hate that misnomer where people
12   say homeowner.  Okay.  So I'm not -- once again, I'm
13   not trying to be vague.  But do I have vested
14   interest in other properties, yes.  Do I own them,
15   no.
16      Q   Okay.  Well, let's use the term -- have
17   you heard the term own outright, meaning there's no
18   mortgage.  Okay.
19         When you say you have a vested interest in
20   a home, that means you don't own any homes outright
21   but you do have mortgage loans on various other
22   properties?
23      A   Yes.
24      Q   Okay.  I'm sorry.  That's what I meant to
25   ask about.  The home that you live in now was
```

Page 17

1    foreclosed on. You're correct. That's why we're
2    here today.
3         Let's talk about the other homes that, as
4    you say, you have a vested interest in. Can you
5    tell me how many other homes you have a vested
6    interest in?
7    A    One.
8    Q    Okay. And by vested interest, you just
9    mean you have a mortgage loan on that property?
10   A    Yes, ma'am.
11   Q    You don't own it outright?
12   A    No, ma'am.
13   Q    And tell me the address of that property.
14   A    3649 Trinity Place, Lithonia, Georgia
15   30038.
16   Q    Is there anyone else who has a vested
17   interest in that property?
18   A    No.
19   Q    Your name is the only name on the
20   mortgage?
21   A    Yes, ma'am.
22   Q    Are you current on that mortgage loan?
23   A    Yes.
24   Q    Do you rent out that property?
25   A    Yes.

Page 18

1    Q    Okay. So you have rental income that
2    comes in from that property?
3    A    Let me back up and clarify that. I have
4    family members, nieces and nephews, who -- I don't
5    want to call them renters or rental income, okay.
6         To the extent that they can pay their
7    uncle, it's okay. But when they miss a payment it's
8    not like I'm going to foreclose on them or evict
9    them. I didn't use the proper term. So --
10   Q    You kind of have an informal tenant
11   arrangement with your nieces and nephews?
12   A    Yes, that's just how our family is.
13        MR. RACHEL: They basically will pay the
14   mortgage. He doesn't actually charge them
15   anything extra. So if they don't pay it, he
16   pays it.
17   BY MS. GLENN:
18   Q    I understand. So there's no income --
19   A    Exactly.
20   Q    -- but they are current on the mortgage?
21   A    To the best of my knowledge, yes.
22   Q    Okay. Do you receive the mortgage
23   statements?
24   A    Yes.
25   Q    They come to your address at 3481 --

Page 19

1    A    No, no. They come to our PO Box address
2    for security reasons, because I don't want things
3    sitting out in the mailbox.
4    Q    I understand. So certainly, if you were
5    behind you would get default notices to your PO Box,
6    right?
7    A    Uh-huh.
8    Q    Okay. What is the mortgage, the monthly
9    mortgage on that property, to the best -- if you
10   don't know exactly?
11   A    I don't know to the penny, but that
12   payment is, plus or minus, and I may be high on this
13   one. So I'm going to err to the high side, okay.
14   $2,800 a month.
15   Q    Approximately $2,800 per month?
16   A    Yes, ma'am.
17   Q    How much was the home purchased for or
18   what was the -- what was the purchase price?
19   A    Once again, plus or minus, okay, because I
20   can't remember to the penny. But it was --
21   Q    That's fine.
22   A    It was 650,000.
23   Q    Approximately 650,000?
24   A    Yes, ma'am.
25   Q    Okay. And how long ago was that home

Page 20

1    purchased?
2    A    Be coming up on -- it was six to seven
3    years ago, six to seven years ago.
4    Q    Did you ever live in that home?
5    A    No, no. Now, okay, define "live." I
6    mean, have I ever stayed in there a week at a time
7    or not?
8    Q    I'll define it for you. Has that ever
9    been your primary residence?
10   A    No, ma'am. 3481 is my primary residence.
11   Q    And has been for the last, you say, 15 to
12   17 years approximately?
13   A    Uh-huh.
14   Q    Where did you live prior to 3481 Oak Run
15   Drive?
16   A    I had a condo downtown, highrise.
17   Q    Condo downtown. Did you sell it?
18   A    Yes.
19   Q    You sold it prior to purchasing 3481?
20   A    Yes. Let me explain that. The prior
21   owner of 3481 was my sister and then prior to that
22   my mother bought the home for my sister.
23        So a long term goal of our family is to
24   keep that house in the family. When I decided to --
25   when my sisters bought a home in Conyers, Georgia,

Page 21

1    then I sold my condo downtown and then I bought the
2    home for my sisters.
3        Q    Okay.  Question for you:  When you say
4    your "family wanted to keep that home in the
5    family", you're referring to the home on Oak Run?
6        A    I'm sorry.  3481 Oak Run Drive.
7        Q    Okay.  But the condo is still in the
8    family, as well.  You said your mother purchased it?
9        A    No, no.  3481 Oak Run Drive, that home was
10    purchased -- once again, not purchased.  A mortgage
11    was obtained by my mom for my sister, okay.
12        Then -- and then during that period, I was
13    living in my own condo downtown, downtown Atlanta.
14    Subsequent to that, my sister bought a home in
15    Conyers, Georgia, which then, in the spirit of
16    continuing to keep the house in the family, I sold
17    my condo downtown in Atlanta, then bought the home
18    from my sister, which the records will show, okay.
19    And when I bought the home from my sister that
20    mortgage was obtained by GMAC, okay.
21        And so I've been living there ever since
22    at 3481 Oak Run Drive.
23        Q    Was GMAC the lender or does GMAC service
24    the loan?
25        A    You know -- let me say this:  I know they

Page 22

1    weren't the originator, yes, but I don't know
2    whether or not they're servicing or the lender.  I
3    don't know.
4        Q    But 3481 Oak Run Drive, you make your
5    payments to GMAC?
6        A    Yes, ma'am.
7        Q    Okay.  For as long as you can remember?
8        A    Yes, ma'am.
9        Q    I want to take a detour for just a second.
10    Aside from any traffic violations, have you ever
11    been charged with a crime?
12        A    I think there was a misdemeanor for a bad
13    check that I didn't know anything about.  I had
14    moved and a notice had been sent, and my brother had
15    written a check.  But since it was on my account ...
16        Q    Okay.  And just to be clear, I'm talking
17    about charges, not convictions.  So is that
18    misdemeanor charge the only one out there?
19        A    Yes.  That's the only one I'm aware of.
20        Q    Okay.  So you were charged.  Were you
21    convicted on that misdemeanor charge?
22        A    Yes, I had to go ahead and pay it, because
23    the check that my brother wrote was over $500.  So
24    they said that that was -- anything over $500 was a
25    crime or something.

Page 23

1        Q    Okay.  What was the approximate date of
2    that incident?
3        A    That was over 25 years ago.
4        Q    Okay.  So you've stayed out of trouble for
5    a long time or at least your brother has stayed out
6    of trouble?
7        A    Yes.  I gave him a check and -- to keep
8    and he wrote it for property taxes and I didn't know
9    about it.
10        Q    I understand.
11        A    And they sent the notice, but they sent it
12    to my old address.  So I never got the notice to go
13    back down and pay it.
14        Q    I got it.  Are you married, Mr. Reaves?
15        A    No.
16        Q    Have you ever been married?
17        A    No, ma'am.
18        Q    Do you have any children?
19        A    Yep.  Yes, yes.
20        Q    Yes, yes.  Multiple children?
21        A    Yes.
22        Q    All right.  Tell me about them.  Let's
23    start with the oldest.
24        A    Keir, spelled K-E-I-R.  And what do you
25    want to know about them?

Page 24

1        Q    Age and gender.
2        A    Female, 26 years old.
3        Q    All right.
4        A    And the next is Kenneth Reaves II, and he
5    is 17 years old.  That's it.
6        Q    Keir and Kenneth?
7        A    Uh-huh.
8        Q    Now, tell me why Kenneth is not a junior.
9        A    He's the second.
10        Q    He's a second.  You are Kenneth Reaves?
11        A    The first.
12        Q    The first.  And he is Kenneth Reaves II?
13        A    The second.
14        Q    I got you.  17 years old.  Are your
15    children in Georgia?
16        A    Keir is and then Kenneth is in Florida.
17        Q    Okay.  Do you have any other family
18    members in Georgia?  I know you mentioned your
19    sister, your mom?
20        A    I got a whole tribe here.
21        Q    A tribe, okay.  Let's talk about siblings
22    and parents.  Any siblings and parents in Georgia?
23        A    Yes, I have two sisters.  Marilyn Reaves,
24    she's the prior owner of 3481 Oak Run Drive.  Jean
25    Humphries, spelled H-U-M-P-H-R-I-E-S, and then

Page 25

1    Rogers, R-O-G-E-R-S, Reaves Jr.
2        Q   All right.  Your parents?
3        A   They're both deceased.  Peace and blessing
4    be upon them.
5        Q   I'm so sorry to hear that, Mr. Reaves.
6    Can we talk about your educational background.  I
7    know you said that you are a trained economist.
8            Let's start -- let's talk about your
9    education starting with high school.  Where did you
10   finish high school?
11       A   Baldwin High School in Milledgeville,
12   Georgia.
13       Q   I'm assuming you continued your education?
14       A   Uh-huh.
15       Q   Where did you go next?
16       A   Undergrad degree from Morehouse College,
17   graduate studies at Emory University here, School of
18   Economics.
19       Q   You graduated from Morehouse.
20       A   Yes.
21       Q   With a degree in?
22       A   Premed and clinical psych, dual degree.
23       Q   Premed and clinical psyche.  And then tell
24   me what now about Emory?
25       A   Graduate studies.  Emory University

Page 26

1    Graduate School of Economics.
2        Q   What degree did you obtain?
3        A   I'm currently wrapping up my Ph.D. there.
4    All I have to do there is my doctorial
5    dissertation -- defense.
6        Q   When did you enter Emory?
7        A   '96.
8        Q   So will this be your second degree from
9    Emory?
10       A   Yes.  It's one program.  You matriculate
11   all the way through when you're a doctoral
12   candidate.
13       Q   Okay.  Now I remember you said you had
14   some medical problems that substantially affected
15   your income a few years back.
16           I don't want to get into that, but I just
17   want to know if any of those medical problems would
18   have affected your memory, for instance, stroke or
19   amnesia?
20       A   No, ma'am.
21       Q   So nothing would have affected your
22   ability to recall incidents?
23       A   No, ma'am.
24       Q   Okay.  Well, let's get to it.  Let's
25   discuss the property that is the subject of your

Page 27

1    complaint.
2        A   Counsel?
3        Q   Yes.
4        A   It's 3:30.  Can I just have seven to ten
5    minutes to make this one quick phone call.
6        Q   Yes, let's take a break.  This is a
7    perfect breaking time.  I've got all the background
8    stuff and then we can get right into the good stuff.
9    Or the awful stuff.
10           (Whereupon, a brief recess was taken.)
11   BY MS. GLENN:
12       Q   Let's talk about the subject of your
13   complaint.
14       MS. GLENN:  David, I'm going to let you
15   look at that first.
16           (Whereupon, marked by the court
                 reporter for identification
17               purposes, Exhibit No. 1.)
18   BY MS. GLENN:
19       Q   Would you mind reviewing that and just let
20   me know when you've had an opportunity to fully
21   review it.
22       A   Okay, Counsel, I'm ready for you.
23       Q   Do you recognize this document?
24       A   Yes, ma'am, I do.
25       Q   Have you reviewed it before?

Page 28

1        A   Yes, ma'am, I have.
2        Q   Can you tell me what this document is?
3        A   This document appears to set forth my
4    complaint pertaining to the wrongful foreclosure
5    that was perpetrated on my property -- well, on the
6    property, 3481 Oak Run Drive.
7        Q   Okay.  So this is the complaint filed by
8    your attorney?
9        A   It appears to be, ma'am.  Yes, ma'am.
10       Q   In Gwinnett County?
11       A   Yes, ma'am.
12       Q   Okay.  And Page 11, is that your signature
13   on the verification?
14       A   Yes, ma'am, it is.
15       Q   But this property is located in DeKalb
16   County, right?
17       A   Yes, it is in DeKalb County.  Yes, ma'am.
18       Q   Okay.
19       MS. GLENN:  Stop, David.
20       MR. RACHEL:  What?
21       MS. GLENN:  Writing notes.
22       MR. RACHEL:  I'm not actually writing him
23   a note.  I'm writing myself a note.  This one I
24   am.
25

Page 29

```
 1           (Whereupon, marked by the court
             reporter for identification
 2           purposes, Exhibit No. 2.)
 3    BY MS. GLENN:
 4      Q   Could you review the second set of
 5    documents I've handed to you?
 6      A   Uh-huh.
 7      Q   And let me know when you've had an
 8    opportunity to fully review it.
 9      A   Okay, Counsel.  I've had a chance to
10    review it.
11      Q   Okay.  What is this document I've handed
12    you?
13      A   It appears to be a copy of an adjustable
14    rate note and the terms and conditions set forth or
15    contained therein.
16      Q   Okay.  Does it relate to the property
17    that's the subject of your lawsuit?
18      A   Yes, ma'am.  3481 Oak Run Drive, Lithonia,
19    Georgia 30038.
20      Q   Okay.  These appear to be your initials on
21    the bottom of the each page; is that correct?
22      A   Yes, ma'am.
23      Q   It also appears to be your full signature
24    on -- looks like the fourth page; is that correct?
25      A   Yes, ma'am.
```

Page 30

```
 1      Q   The fourth page and the fifth page; is
 2    that also correct?
 3      A   Yes, ma'am.
 4      Q   And it looks to be dated December 27,
 5    2005?
 6      A   I didn't write that.  That's not my -- I
 7    didn't put the date in but that is my signature.
 8      Q   No problem.  Do you have any reason to
 9    dispute the accuracy of the date?
10      A   No, I don't.  No, ma'am.
11      Q   Okay.  And it appears that this note is
12    for $103,875?
13      A   Yes, ma'am.  Repeat that again.
14      Q   $103,875?
15      A   Yes, ma'am.  It does appear to be for that
16    amount.
17      Q   Now, is this the loan you used to purchase
18    the property or is this a refinance?
19      A   Counsel, I'm not sure.
20      Q   Now, I remember you mentioning you've
21    lived in the home for about 15 to 17 years, right?
22      A   Uh-huh.
23      Q   Now, if you obtained this loan in 2005,
24    that means one of two things that I can think of,
25    and maybe there's a scenario I'm missing.
```

Page 31

```
 1           Either you were living in the home before
 2    you had obtained a loan for it or possibly it was
 3    owned outright when you moved in and then you
 4    subsequently obtained this mortgage in 2005 or you
 5    refinanced an initial loan that you had on the
 6    property in December of 2005?
 7      A   That's a good observation.  When I say
 8    that I lived in the house for over 17 years -- let
 9    me clarify that.
10           Family ownership, if you go back and check
11    the deeds, family being defined as me, my sister, my
12    mother, goes back 17 years, okay.
13           And I think that -- whatever is the start
14    date for the GMAC interaction on the mortgage that
15    is assigned to 3481 Oak Run Drive, that's the
16    mortgage that assigns itself with me, Kenneth
17    Reaves.
18           I have not had that house mortgage with
19    any other entity other than GMAC.  So I didn't
20    refinance it, you know, with XYZ -- I didn't have an
21    original mortgage with XYZ or hypothetical XYZ
22    mortgage company and then went to GMAC to get a
23    refi, no.
24           The initial mortgage, as relates --
25    falling under the auspices of my servicing, my debt
```

Page 32

```
 1    obligation, has and from the onset and continues --
 2    well, no longer -- has always been with GMAC.
 3           That's my only mortgage company on 3481
 4    Oak Run Drive.  So to add credence and accuracy to
 5    when I technically became responsible for 3481, you
 6    can align it directly with my closing date with
 7    GMAC.
 8           Does that make sense?  I'm trying to make
 9    it abundantly clear.
10      Q   This note appears to be -- it appears to
11    say that you have acquired -- that you've borrowed
12    $103,875 from GMFS, LLC.
13      A   Who then --
14      Q   Now, GMAC may have serviced your loan from
15    the beginning, but this is when the indebtedness
16    became your responsibility?
17      A   My responsibility, yes, ma'am.
18      Q   This is when the payments for the home --
19    this is when you took over paying for the home?
20      A   That's -- there was a mortgage in the
21    public domain made to me.
22      Q   To your name?
23      A   Yes, ma'am.
24      Q   Was there a mortgage prior to this one?
25      A   Not to me, but to my sisters.
```

Page 33

1    Q   Okay.  You said one that your mother had
2    taken out for your sisters?
3    A   Okay.  When you go back and check the deed
4    chain, you'll see my mom bought the house.  Then my
5    sister, Marilyn Reaves, R-E-A-V-E-S, when you check
6    you'll see that she took out a mortgage on the
7    house.
8       Then when I bought it with this note,
9    okay, this note paid off my big sister and then I
10   became the person.
11   Q   Okay.  Is this also when you moved into
12   the home?
13   A   No, I was in the home off and on prior to
14   that.  That's why I said, just a few minutes ago,
15   I'm in and out of the house, between staying in the
16   condo down here, et cetera, et cetera.
17      But when my sister bought the house in
18   Conyers, then I said "okay, then, look, you know,
19   we're not going to sell it to anybody else.  We want
20   to keep it in the family."
21      So I went and sold my condo here and then
22   took out this mortgage.
23   Q   This is the only mortgage loan that you've
24   taken out on 3481 Oak Run Drive?
25   A   Yes.  No seconds or anything else.

Page 34

1    Q   All right.  I am showing you another set
2    of documents, and I'll represent to you that this is
3    the security deed associated with this mortgage
4    loan.  You review it and let me know if you have any
5    reason to dispute that.
6       This is a filed copy, so there may be
7    scribblings on here that you don't recognize.  But
8    if you could just review the document in totality
9    and let me know once you've had an opportunity to do
10   that.
11         (Whereupon, marked by the court
12         reporter for identification
           purposes, Exhibit No. 3.)
13   A   Okay.  Counsel, I've had ample time to
14   review it and it appears to be the security deed
15   that associates itself with the note at 3481 Oak Run
16   Drive, Lithonia, Georgia 30038.
17   Q   Okay.  It appears to have the same date,
18   December 27, 2005?  The same date as the note?
19   A   Yes, the 27th.  Yes, ma'am.
20   Q   All right.  It looks like Kenneth Reaves
21   is identified as the borrower on the very first
22   page?
23   A   Yes, ma'am.
24   Q   Looks like one, two, three, four, five,
25   five sentences down and then it looks like MERS,

Page 35

1    Mortgage Electronic Registration Systems, Inc., is
2    the grantee under this security deed.
3    A   Okay.
4    Q   Is that accurate?
5    A   Yes, ma'am.
6    Q   That merges the grantee under the security
7    deed?
8    A   Yes, ma'am.
9    Q   It also appears that your signature is at
10   the bottom right-hand corner of each of these pages?
11      MR. RACHEL:  Initials.
12      MS. GLENN:  I'm sorry, you're right.
13   BY MS. GLENN:
14   Q   Your initials, KR?
15   A   Yes, ma'am.
16   Q   And then towards the end --
17   A   Yes.
18   Q   -- there's your full signature?
19   A   Yes, ma'am.
20   Q   All right.  We'll mark that as Exhibit 3.
21   Now it looks like you obtained this mortgage loan in
22   2005.  At some point you defaulted under the loan,
23   correct?
24   A   Uh-huh.  Yes, ma'am.
25   Q   Do you recall when?

Page 36

1    A   Not offhand.  It would be easy for me, if
2    I had the chance to research it, just to align it
3    with my illness.
4    Q   When did you fall ill?
5    A   Oh.  I've been told by my medical team
6    that it's been a latent illness that's been with me
7    for well over 20 years.  It's just manifested
8    itself.
9    Q   When do you think it manifested itself?
10   A   See, that's just it.  The symptoms have
11   been ongoing for well over 30 years and I've just
12   been discounting them.
13      And so my primary care physician and the
14   specialist have indicated that that is what is
15   causing now, when it flares up, I'm totally
16   incapacitated and therefore I have no way to
17   generate revenue and income.
18      But since August of last year, of 2011,
19   the medical regime that they have me on has been
20   working supremely well, and so I haven't had any
21   complications, you know, whatsoever.  We're moving
22   forward.
23   Q   This incapacity that you speak of, do you
24   recall when it began affecting you, your lifestyle
25   and your income?

Page 37

1    A    To be honest with you, Counselor, I do not
2  know.  It was intermittent.  You know, ever since
3  I've had this particular mortgage there would be
4  bits in time where I'd be fine for two or three
5  months and then all of the sudden it would be the
6  flare-up and then I'm not sure as to -- wasn't sure
7  as to what was causing it.
8        And then, you know, I'd be out of work, et
9  cetera, et cetera.  Sort of be back and forth.  But
10  to say okay, it started on this date and moving
11  forward, no, I don't.
12    Q    So you don't remember when you fell into
13  default on the mortgage loan?
14    A    No, I don't have those records in front of
15  me.  No, I don't know.
16    Q    Do you remember if you fell into default
17  several different times?
18    A    Counselor, I think that the record would
19  show, if we were to research it, it may have been
20  two times, and at each time I would regain my health
21  and I paid the reinstatement fee.
22        There's no way I was going to let this
23  house go into foreclosure.  So on every time I'd
24  call in and I'd get the pay-off and that would be
25  it.  But I don't remember.

Page 38

1    Q    But you don't remember how many times that
2  occurred?
3    A    No, ma'am.  No, ma'am.
4    Q    But you do recall at least two times that
5  you fell into default and then reinstated your loan?
6    A    Yes, ma'am.  That's including this time.
7    Q    Okay.
8    A    But this time it inadvertently went to
9  foreclosure.  And then there was one other time that
10  I remember where I reinstated it.
11    Q    When you say "this time", you're talking
12  about the incident giving rise to your complaint?
13    A    Yes, ma'am.
14    Q    And you were seeking a loan modification,
15  correct?
16    A    No, ma'am.  Never wanted a loan
17  modification.  When I initially contacted Ms.
18  Bowers, GMAC, I had called GMAC because I had
19  regained my health and I had the money sitting in my
20  account all the while to go ahead and reinstate.
21        I called GMAC.  They indicated that I was
22  to contact Carita Bowers and they gave me her phone
23  number.  That's how I got her phone number.
24        When I contacted Ms. Bowers, I indicated
25  to her that I wanted to go ahead and get a

Page 39

1  reinstatement amount because I wanted to go ahead
2  and reinstate my loan.
3        I had the money and I wanted to go ahead
4  and reinstate.  And I said "well, what is the
5  amount?"  And then she gave me the number to a law
6  firm and she said I should call them and they, in
7  turn, would go ahead and give me the reinstatement
8  amount.
9        And when I called the law firm, they
10  indicated that they didn't have it ready right then,
11  to give them 72 hours and they would call me back
12  with the reinstatement amount and send me a copy of
13  the reinstatement amount.
14        They subsequently did that and --
15    Q    When you say "they"?
16    A    The law firm.
17    Q    Are you referring to McCurdy and Candler?
18    A    Yes.
19        MR. RACHEL:  The foreclosing law firm.
20        THE WITNESS:  Yes, it was McCurdy and
21  Candler.
22  BY MS. GLENN:
23    Q    And so, within 72 hours of you contacting
24  McCurdy and Candler they sent you the reinstatement
25  figure?

Page 40

1    A    Yes, ma'am.
2    Q    What was that figure?
3    A    And the initial figure was 7,000, and, in
4  fact, on June the 24th, Friday at 1:32 p.m, I
5  spoke with Penny there.
6        And then I received a phone call back
7  saying that by the June the 27th, Monday, I would
8  receive a phone call from Manuel.
9        I did receive that phone call at 2:39 p.m.
10  Eastern Standard Time, at which time he indicated
11  that my pay-off is $7,895.33.
12        He gave me the exact address to go ahead
13  and make the payments.  I could bring up a certified
14  check by -- at 3525 Piedmont Road, Atlanta, Georgia
15  30035, Suite 600.
16        And I indicated okay, I'd come down with
17  the cashiers check, but I needed to have a
18  breakdown, you know.
19        And so he said he would go ahead and fax
20  it to me.  And then when he faxed the breakdown to
21  me, I looked at it and I saw this strange thing
22  called miscellaneous corporate advance that was
23  almost 50 percent of the reinstatement.
24        I then indicated to him, I said "you know,
25  define this", and he said I needed to call GMAC back

Page 41

1    to find out what that, quote/unquote, miscellaneous
2    corporate advance actually consisted of.
3        And then when I did that, from 6-24 --
4    excuse me. 6-27 all the way through the middle of
5    July, the week before the 4th of July, nobody -- and
6    I have records of everybody that I talked to, nobody
7    in GMAC could define this mystical magical
8    miscellaneous corporate advance.
9        So then I ended up calling the law firm
10   back and I was told that now there was -- because 30
11   days has passed, and, you know, I'm waiting for
12   people to call me back.
13       I'm calling every three days to ascertain
14   can somebody tell me what this means, and they said
15   well, we'll have a supervisor call you back.
16       Then when I speak with the supervisor,
17   they tell me they have to research it, give them a
18   week to research it, they will call me back with
19   regards to what were the miscellaneous corporate
20   advances.
21       Because I simply wanted it to be line
22   itemed out so I know exactly what I'm paying for.
23   Because it just seemed very bizarre that that fee
24   was at or more than 50 percent of the cumulative
25   amount that would be needed to go ahead and

Page 42

1    reinstate my loan.
2        And so, ultimately, when no one could
3    define what miscellaneous corporate advances were,
4    then I indicated that I had the funds ready and I
5    would go ahead and make -- reinstate the loan.
6        And I was told I needed to call Carita
7    Bowers. When I called Carita Bowers, I asked her
8    pointedly "what are the miscellaneous corporate
9    advance fees and can you find out what they are?"
10       And she told me give her a week. She was
11   going to be traveling. She would call me back with
12   what the miscellaneous corporate advance fees were,
13   okay.
14       Now all of that time of me trying to do
15   due diligence to ascertain exactly what this
16   miscellaneous corporate advance fee took more than
17   30 days, as I idly sat by waiting for people from
18   GMAC to call me back with the associative
19   definition.
20       So then I was told that my previous
21   reinstatement amount was revised. I needed to call
22   back to the law firm again to get a new
23   reinstatement amount.
24       Thus I got a second reinstatement amount,
25   which now was more than the first reinstatement

Page 43

1    amount, because additional late fees and penalties
2    were being tacked on, as I'm waiting to just get a
3    line item definition of miscellaneous corporate
4    advances.
5        And so then at that point, when I spoke
6    with Ms. Bowers after she asked for her week of time
7    to do due diligence, and so now I'm into the second
8    week of the second month of me waiting for my
9    initial attempt to go ahead and reinstate the loan
10   with just paying the amount, she said "you know,
11   Mr. Reaves, what you need to do is to get a loan
12   modification."
13       I said "I don't need a loan modification.
14   The terms and conditions are fine. I just want to
15   go ahead and pay what I need to pay and start making
16   my payments."
17       She said "if you send a payment in and
18   don't send in the miscellaneous corporate advance
19   fees, they're going to send the money back. So what
20   my advice to you is is to go ahead and apply for a
21   loan modification. Once you apply for the loan
22   modification, okay, that staves off the foreclosure,
23   and then what you can do is the miscellaneous
24   corporate advance fees, we will go ahead and roll
25   that into the modified loan and then you just go

Page 44

1    ahead and make your payments."
2        And then that's when I told Ms. Bowers
3    "okay, I'm not objectionable to paying the
4    miscellaneous corporate advance fees, but if they
5    are 50 percent of my reinstatement fees, I would be
6    remiss in not trying to inquire as to what are these
7    fees."
8        Q   Did you ever find out what the fees are?
9        A   No, to this day sitting, here now. And I
10   beseeched GMAC to present a document to me and my
11   counsel that identifies and line items out what I've
12   been asking for all the way since June of 2011, what
13   are the miscellaneous corporate advance fees.
14       Q   Since June?
15       A   June of 2011.
16       Q   June -- around the end of June 2011 until
17   your home went --
18       A   On September the 9th, went into
19   foreclosure.
20       Q   -- went into foreclosure on September the
21   9th, 2011, were any payments made to GMAC?
22       A   No, and let me tell you why, and we have
23   this on record. Ms. Bowers told me point blank not
24   to submit any payments.
25       I indicated to her the money is sitting in

Page 45

1   my checking account, the 7,000 plus.  What do you
2   want me to do with it.  She said hold it.
3       Q   When you say you "have this on record",
4   what are you referring to?
5       A   Both in my written notes and we do have
6   some tape recordings, yes.
7       Q   Tell me -- go ahead and finish telling me
8   what you have on record.
9       A   Where Ms. Bowers told me point blank do
10  not send in any money.  Apply for the loan
11  modification.
12          And I indicated to her point blank I do
13  not need the loan modification.  If you define to me
14  what the miscellaneous corporate advance fees are,
15  then I can govern myself accordingly as to whether
16  or not I want to dispute those or whether or not I
17  want to go ahead and just pay it, and like you
18  advised me, Ms. Bowers it would be rolled over into
19  the loan modification, you know, amount and move
20  forward.
21          And I need to know which one, because I'm
22  not interested in having it rolled over into the
23  loan modification amount, if that's what you want to
24  try to move forward with me on.
25      Q   Question.

Page 46

1       A   Okay.
2       Q   Were you familiar with loan modifications
3   before you spoke with Ms. Bowers?
4       A   Familiar being defined as intimately
5   knowledgeable of them, no.  Been exposed to them,
6   yes.
7       Q   Had you ever had a loan modification
8   before?
9       A   I think -- did we do a loan mod.  No, have
10  not.  We did a repayment plan.  We may be using
11  nomenclature.  Excuse my ignorance.
12          But to my recollection we did a repayment
13  plan with GMAC, but I may be wrong.
14      Q   Okay.  Was all correspondence from GMAC
15  sent to the property address?
16      A   No, I think -- I think they were sent to
17  the property address and/or the PO Box address.  I'm
18  not sure.
19      Q   But you would receive correspondence from
20  GMAC?
21      A   Yes, ma'am.
22      Q   So from June, the end of June 2011 to
23  September, were you receiving default notices from
24  GMAC?
25      A   No.  Well, I received a notice of

Page 47

1   foreclosure from the law firm, yes, ma'am.
2       Q   But you didn't receive any notices from
3   GMAC letting you know that you were in default?
4       A   You know, I'm thinking of them all in a
5   congruent manner.  I think that we were receiving
6   the notices, yes, ma'am.
7       Q   And to the best of your recollection, this
8   was the second time that this particular mortgage
9   loan had fallen into default?
10      A   Yes, ma'am.
11      Q   Okay.  So tell me -- other than the fact
12  that these miscellaneous fees would have been rolled
13  or potentially rolled into a loan modification, tell
14  me why you were disinterested in a loan modification
15  generally or is that the only reason why you weren't
16  interested in a loan modification?
17      A   Counselor, not to sound too altruistic and
18  whatnot, but the terms and conditions of the loan
19  were fine.  I can make my payments.  Save me being
20  ill, it's not a problem.
21      Q   What was your payment?
22      A   It was, what $815 a month, plus or minus,
23  yes.  So I'm saying Ms. Bowers, I don't need a loan
24  mod.  I don't want a loan mod.
25          Give me clarity on this reinstatement

Page 48

1   amount.  I will wire the money or submit a cashiers
2   check downtown to the foreclosing law firm
3   immediately.
4           Tell me what that number is.  And she told
5   me "I don't clearly know what the corporate
6   miscellaneous advance fees are."
7           And then I told her -- I said "do you know
8   somebody from GMAC told me that that money that has
9   to go to the investors."
10          I said "what are the investors.  I thought
11  GMAC was the one that had my mortgage."  She said
12  "Mr. Reaves, I've never heard that before, but let
13  me research that, too."
14          And that was during that week time frame
15  that she said to give her to research it, and then
16  in the interim period -- and then the next time when
17  I asked for my reinstatement and it went up and she
18  and I chatted, one of the numerous times we chatted,
19  I said "look, me waiting like the lady at the altar
20  is costing me money, okay."
21          I had more than enough money in my account
22  back in June to go ahead and reinstate this amount.
23  But each time the research on GMAC's side takes long
24  and longer.
25          It gets rolling into 30-day cycles, which

Page 49

1    means I got to get a new reinstatement figure which
2    is always higher, each 30 days, which is costing me
3    more money.
4         So please, somebody just tell me what this
5    miscellaneous corporate advance fee is and then, you
6    know, we'll line item it out, and if it's fair and
7    equitable, I'll go ahead and make my payment.
8         Or, and I asked her this, let me go ahead
9    and make the payment to reinstate everything except
10   this miscellaneous corporate advance, because they
11   had listed payments, accrued late charges, BPO
12   forward/inspections, attorney fees and cost, and
13   then the miscellaneous corporate advance.
14        So I submitted to Ms. Bowers -- I said
15   "look, let me pay all the other fees except the one
16   in question, miscellaneous corporate advance fees,
17   and what I'll do is I will even agree to put that
18   face value amount of miscellaneous corporate advance
19   fees into escrow of the foreclosing attorney until
20   you-all tell me exactly what this is and we can work
21   it out.  Because I don't want to unilaterally say,
22   just rollover into this loan modification you're
23   recommending, because then I'm still agreeing to pay
24   for something that I still don't know what it is."
25        And then she said "no, don't do that.

Page 50

1    Don't send in a payment, because if you send that
2    money in and it doesn't have all of these categories
3    paid, which would include miscellaneous corporate
4    advance, they're going to send it back.  So what you
5    need to do right now is apply for a loan
6    modification."
7         (Whereupon, a discussion ensued off the record.)
8    BY MS. GLENN:
9         Q   Now, if you were willing to put the
10   questionable fees into escrow with McCurdy and
11   Candler, did you ever consider paying the
12   reinstatement amount and then continuing to
13   investigate, hoping that GMAC would return any funds
14   that were inappropriately charged to you?
15        A   Counselor, the only reason I wouldn't
16   consider that is because I don't want to be in the
17   collection business.
18        Q   I understand.
19        A   You see.  And if I have to ask for that
20   money, then all the sudden I am, you know, hat in
21   hand asking them to -- let me put it to you this
22   way:  There would be no incentive for them to
23   explain it to me because they've got my money now.
24   Okay.  So then ultimately I would be in the
25   collection business.

Page 51

1         Q   Why would McCurdy have had an incentive to
2    give you back those funds and not GMAC?
3         A   Well, McCurdy, correct me if I'm wrong,
4    represents GMAC.
5         Q   Exactly.
6         A   So their vested interest would lie with
7    GMAC.  They're not going to release those funds
8    based upon my gesture.
9         So McCurdy has a vested interest for GMAC,
10   so they wouldn't release those funds back to me --
11   we're just speaking hypothetically now -- unless
12   GMAC duly authorized them to do so.
13        And so based upon what I had gone through
14   all the way from June up until that point, where I
15   can't even get an answer to a line item that they
16   list, "they" being GMAC.
17        I didn't have much faith in giving them
18   "X" amount of dollars and then expecting to get it
19   back.  So I didn't want to be in the collection
20   business.
21        Q   But let me -- I understand when you say
22   you didn't feel comfortable giving the funds to
23   GMAC.  But you said you felt comfortable giving the
24   funds to McCurdy and Candler to hold?
25        A   Yes, ma'am.

Page 52

1         Q   And I guess my question is:  Why is it
2    that you felt that McCurdy would return the funds
3    but not GMAC, if, for whatever reason, they actually
4    were inappropriately charged to you?  Because
5    McCurdy is an agent of GMAC.
6         A   And you can rest assured that I would have
7    had counsel draw up an associative letter that would
8    have went with those funds, to be placed with those
9    escrow funds, that said if I didn't have a line item
10   by "X" amount of days, those funds would revert back
11   to me.
12        If I didn't have a line item description
13   of the miscellaneous corporate advance fees, that
14   those funds would automatically revert back to me.
15        Q   I understand.  So you would have had
16   counsel draft --
17        A   Oh, you definitely believe that.
18        Q   -- an agreement?
19        A   That's right.
20        Q   Okay.  Let's go back.  Tell me how you
21   ultimately ended up submitting a loan modification
22   application, because you ultimately did, correct?
23        A   Yes.  Ms. Bowers advised me to do so and
24   then she faxed me the loan modification.
25        Q   Do you remember around what time she sent

Page 53

1    you the application?
2        A    I can tell you exactly when I submitted it
3    back to her.  Can we move backwards from that date?
4    Because I didn't have the information three days
5    before I sent it back to her.
6        MR. RACHEL:  Are you saying it took you
7    three days to get the information?
8        THE WITNESS:  Yes, and I'm talking about
9    three calendar days.  Like, if you check your
10    records or check Ms. Bowers's records, you'll
11    see she submitted the information, the
12    application, to me like on a Friday, she had it
13    Monday.
14        So three calendar days, Saturday, Sunday
15    and then Monday I had it back to her.
16    BY MS. GLENN:
17        Q    Do you remember the date that you
18    submitted the completed application to Ms. Bowers?
19        A    That's when I submitted everything, except
20    one thing she didn't have in the application that
21    she apologized for it, something called the
22    Dodd-Frank Act form.
23        And so I'm calling her like on that
24    Monday, three days after --
25        MR. RACHEL:  Hold on one second.  Look

Page 54

1    through your things and get the date.  She
2    needs the date that you submitted it.
3        THE WITNESS:  I got it right here.  It's
4    on top.  Okay.  The fax date that she actually
5    got it was 8-17-2011 at -- which was a
6    Wednesday, at 11:15 a.m.
7    BY MS. GLENN:
8        Q    And tell me, when you say she got "it",
9    what's "it"?  What did you submit on 8-17-2011?
10        A    The loan modification package, and it was
11    submitted to Carita Bowers, fax number (866)794-3526
12    on August the 17th, 2011, Wednesday.
13        Q    You're saying on that date you submitted
14    everything except for the Dodd-Frank certification?
15        A    Yes, uh-huh.
16        Q    Read to me what that document is.
17        A    The Dodd-Frank?
18        Q    Yes.  What is that?
19        A    "It's a request by the federal government
20    in accordance with the Dodd-Frank" --
21        Q    No, no.  Don't read the document.  Just
22    tell me what it's entitled.
23        A    The Dodd-Frank certification.
24        Q    Dodd-Frank certification?
25        A    Yes, ma'am.

Page 55

1        Q    What date did you submit that document?
2        A    I'll tell you exactly.  That was submitted
3    on 8-30, August the 30th, 2011, and it was
4    submitted at 5:00 p.m. Eastern Standard Time.
5        Q    Now, this is the time -- this is --
6    8-30-2011 is the date that you submitted the
7    completed application -- the completed loan mod
8    application to Ms. Bowers, correct?  The final piece
9    to the application, correct?
10        A    She contacted -- can I --
11        MR. RACHEL:  You need to explain that.
12        THE WITNESS:  After --
13    BY MS. GLENN:
14        Q    Answer my question first and then explain
15    away, feel free.  But it's a yes-or-no question, so
16    I want to make sure I'm clear.
17        So August the 30th of 2011 is the date
18    that you sent the final piece of information to Ms.
19    Bowers so that GMAC now had a completed loan mod
20    application on August 30th, 2011; is that correct?
21        A    I'm not -- let me tell you why I'm
22    hesitant.  I'm not sure on that.
23        Q    Okay.  Tell me why.
24        A    Because first of all, Ms. Bowers gave me
25    her E-mail address, okay.

Page 56

1        Q    Okay.
2        A    And so I, you know, scanned the document.
3        Q    What document?
4        A    The Frank Dodd -- Dodd-Frank certification
5    and sent it to her E-mail address.  Now -- and I'm
6    calling her every other day.  Now, that was right
7    after because -- let me find out how we found out
8    that the Dodd-Frank certification wasn't in the
9    packet.
10        That's because I was checking.  After I
11    sent her the original loan modification with
12    everything in it, except for the Dodd-Frank Act
13    certification, which I didn't know anything about
14    because I filled out everything she sent to me,
15    okay.
16        I'm calling back on the 18th, after I
17    submitted the loan application modification without
18    the Dodd-Frank, unbeknownst to me.
19        I'm calling back on the 19th.  Ms.
20    Bowers says she has everything.  She doesn't need
21    anything else, okay.
22        Then I call that following Monday and Ms.
23    Bowers said "Mr. Reaves, everything is fine.  We're
24    processing it."
25        And I said "look, when I called the law

Page 57

1  firm" -- now -- and we got to keep up with these
2  timelines now because this is very important.
3      Q   You said "Monday".  What's the date of
4  this Monday that you're talking to?
5      A   Okay.  So Wednesday was August the 17th.
6  So we'd go -- I don't have a 2011 calendar in front
7  of me.  But the following Monday after August the
8  17th, 2011.
9      So I call Ms. Bowers, let's back up, on
10  August the 18th.  She confirmed receipt of the
11  loan modification package, did not mention anything
12  about the Dodd-Frank certification, okay.
13      So I filled out everything that she has
14  submitted to me.  She said she had everything she
15  needed.  She didn't need anything else.
16      So then, that Friday, on the 19th, I
17  called Ms. Bowers back and she was short with me on
18  the phone.
19      She said "Mr. Reaves, you don't need to
20  keep calling me back.  I told you that I have
21  everything I need, okay, and if I need anything else
22  I'll call you back."  I said "okay, then, fine."
23      All right.  Monday, that next Monday after
24  August the 17th, I called back down to the law
25  firm where I had previously got in -- received my

Page 58

1  reinstatement amounts.
2      They told me that the property was still
3  slated to be foreclosed upon the first Tuesday in
4  September, and that's the next month.
5      Now I'm less than, plus or minus, 20 days
6  from foreclosure, because I'm into the third to
7  fourth week of August, okay.
8      So I, in turn, call Ms. Bowers back --
9  Carita Bowers back, and I said "I don't know what's
10  going on, but when I call the law firm they tell me
11  that my property is still slated for foreclosure on
12  September the 9th.  You're telling me you have
13  everything that I need -- that you need" -- excuse
14  me -- "for the loan modification."
15      This is -- and I remember it like it was
16  five minutes ago.  I said "this is living very, very
17  precariously.  I don't want to wait until the
18  midnight hour.  I need something in writing saying
19  that the foreclosure date has been postponed."
20      She said "Mr. Reaves, I've told you that
21  your loan modification package is in.  We don't need
22  anything else.  We're processing it."
23      And she said "it has been my experience
24  that literally the day before or the date of the
25  foreclosure the foreclosure gets pulled if we have

Page 59

1  the appropriate documents."
2      And I told Ms. Bowers, I said "that may be
3  fine, but I don't want that to be the case with
4  regards to my situation, okay."
5      So she said "I'll tell you what I'll do.
6  Let me go ahead and get a postponement, a reset for
7  the foreclosure date, because we have everything and
8  that will allow us to go ahead and process your loan
9  modification."  I said "fine."
10      Now it's very important that we remember
11  this is that next week after I've called the law
12  firm, the foreclosing law firm.  Then that next
13  Thursday --
14      Q   Do you have a date?
15      A   No, I don't have a calendar.  But the
16  reason I remember it was on a Thursday because I
17  called Ms. Bowers after I got off the radio, and I'm
18  on the air Tuesdays and Thursdays.  So that's how I
19  have a mnemonic device pertaining to it.
20      And I said "Ms. Bowers, is there something
21  else that's going on that I don't know about?"
22      And she said "Mr. Reaves, I'm about -- I
23  have to do some traveling.  I told you I will call
24  you if there's anything else."  And I said "fine."
25      That next day, Friday morning, she called

Page 60

1  me.  She said "the package doesn't have something
2  called the Dodd-Frank certificate."  I said "what is
3  that?"
4      She said -- and she explained to me that
5  it was something that said -- I think it was
6  something like you haven't been convicted of real
7  estate fraud or something like that.
8      So I said "okay, then.  Fine.  Where do I
9  get that document?"  So she told me a specific
10  Website to go to to pull it down.
11      Now, this -- now I'm all the way to August
12  the 30th, okay.  So I immediately pull it down,
13  print it, fax it to her immediately.
14      And she called me back to confirm that she
15  received it, and it's telling me here that was on a
16  Monday, yes.  So, okay, like I said, that Friday she
17  called me back.  So it's Monday, August the 30th.
18      Q   Let's slow down.  You said at some point
19  you E-mailed the Dodd-Frank certification to Ms.
20  Bowers?
21      A   That's right.  That first Friday, because
22  I spoke with her on that Friday.
23      Q   When you faxed the documentation --
24      A   That was afterwards when she told me she
25  hadn't gotten the E-mail.

Page 61

1    Q   Do you have a copy of the E-mail with the
2    Dodd-Frank certification attached to Ms. Bowers?
3    A   I'm sure we can pull that, yes, ma'am.
4    Because this -- this fax copy came subsequent to
5    that.  But, once again, me calling back and checking
6    with her again on that Monday after that Friday, and
7    she saying let me check my E-mails.
8        I'm saying, yes, you need to check your
9    E-mail.  And then she says "no, I don't have it."  I
10   said "sit right there.  I'm faxing it to you.  I'm
11   printing it off and I'm going to fax it to you."
12       And that's when I faxed it to her at
13   5:00 p.m. Eastern Standard Time on August the
14   30th, Monday.
15       MS. GLENN:  David, in discovery we
16   requested all correspondence and copies of
17   correspondence, and I don't have any copies of
18   an E-mail sent to Ms. Bowers.
19       MR. RACHEL:  And I will get a copy of that
20   E-mail.  I apologize.  He had mentioned an
21   E-mail, but since he had faxed everything, it
22   was my understanding it was done on the same
23   day.
24       I didn't know he had did it prior.  So I
25   will get a copy of that E-mail.  We'll forward

Page 62

1    to you the E-mail.
2        MS. GLENN:  Let's do that.  If you could
3    forward it me or print it out or however you
4    want to give it to me, that's perfect.
5        MR. RACHEL:  If you will forward it to me,
6    I'll forward it directly to her.
7    BY MS. GLENN:
8        Q   Why is it that you ultimately decided to
9    complete the loan modification packet if you had
10   initially been so adverse to it?
11       A   Think about it, Counselor.  I had no other
12   choice.  A, the GMAC representative is saying don't
13   send in any money.  All right.
14       B, I've got a foreclosure date that's
15   already set for September the 9th.  So C, the only
16   option she presented to me as a GMAC representative
17   was a loan modification.
18       Q   Did she also explain the benefits, because
19   this had -- she had been proposing a loan
20   modification for several weeks, right, as a
21   solution?  Since what, June of 2011?
22       A   Whenever it was the first time I spoke
23   with her.
24       Q   So she had been proposing a loan
25   modification for a while, correct?  And it wasn't

Page 63

1    until the -- let's get an answer on the record.
2        She had been proposing a loan modification
3    as a potential solution for almost two months;
4    correct?
5        A   No, my records are showing here that the
6    first time I spoke with Ms. Bowers on this matter
7    was October the -- excuse me.  August the 1st, 2011,
8    Monday.
9        Q   Okay.  So for the past -- it looks like
10   for about the previous four weeks, a month or so,
11   Ms. Bowers had been presenting the option of a loan
12   modification to you?
13       A   Uh-huh.  Which I wasn't interested in
14   because I didn't need it.  I just needed to know how
15   much money to send in to reinstate my loan.  That's
16   all I wanted to do.
17       Q   Did she explain to you the benefits of a
18   loan modification?
19       A   Outside of being able to possibly roll
20   this miscellaneous corporate advance fee into, you
21   know, an ongoing payment plan, because, you know, as
22   you make your payments over the life of the
23   mortgage, there was no other.
24       Q   So there were no other benefits to
25   exploring a loan modification, such as a reduced

Page 64

1    interest rate or lower monthly payment?
2        A   No, ma'am.  The only other redeeming
3    feature that she mentioned was -- is that if your
4    loan is formally in a loan modification, this is
5    what she told me, it would not be foreclosed on.
6        Because she said while they're reviewing
7    the pack, okay, they will not foreclose on the
8    property.  And that's what she told me point blank.
9        Q   Okay.  Let's talk about your recorded
10   conversations with Ms. Bowers.  How many recorded
11   conversations do you have with Ms. Bowers?
12       A   I would venture to say, ma'am, plus or
13   minus, 12.
14       Q   Did you record every conversation you had
15   with Ms. Bowers?
16       A   No, not every one.  Because many more than
17   12 conversations I've had with her.
18       Q   From August 1st until sometime in
19   September?
20       A   Yes.  Counselor, you have to understand, I
21   was calling Ms. Bowers so much she asked me to
22   refrain from calling her.
23       Q   At what point did she ask you to stop
24   calling her?
25       A   At the point in time that I had submitted

Page 65

1    the loan modification.
2       Q   Did you record that conversation?
3       A   It may be in one of them, yes.
4       Q   When is the last time you've listened to
5    your recorded conversations with Ms. Bowers?
6       A   Might have -- about a month-and-a-half
7    ago.
8       Q   Okay.  What medium did you use to record
9    your conversations with Ms. Bowers?
10      A   It's on individual microcassettes that are
11   hooked up to my phone system.
12      Q   Did you make Ms. Bowers aware that you
13   were recording your conversations with her?
14      A   She asked me on one occasion -- excuse me.
15   She's asked me on several occasions, and on this one
16   particular occasion I indicated to her, yes, Ms.
17   Bowers.
18          And I told her to rule out
19   miscommunication, and then that's when -- at that
20   point in time she said "well, the conversation is
21   over with."
22          And prior to that she had asked me, as a
23   precursor, "are you recording this conversation,
24   Mr. Reaves, because I don't want to lose my job."
25          And then that's when I told her, yes, to

Page 66

1    rule out miscommunication, and it's my house -- I
2    said "this is not just a file in your office.  This
3    is where my family sleeps, okay.  Yes, I'm recording
4    this conversation."
5       Q   Were your children living with you at the
6    home at that time?
7       A   Little Kenny was up there, yes.
8       Q   Okay.  When Ms. Bowers had asked you
9    previously if you were recording the conversations,
10   what did you tell her?
11      A   I told her that, you know, in the state of
12   Georgia I can record a conversation as long as one
13   party is aware of that, and I, being the party, the
14   person that's instituting the recording, according
15   to my understanding of the law.
16          But then I said "I'm not an attorney."
17   But I said "but why is that important?"
18          And then she says, that you'll hear on one
19   of the recordings, "Mr. Reaves, you are very
20   meticulous."  She said "I know that you are taking
21   serious notes", and I said "well, yes, to protect my
22   interest."
23          And see the point is, Counselor -- the
24   point is, with Ms. Bowers being my only contact with
25   regards to GMAC and my situation, I did not, at any

Page 67

1    time, want to waive my legal rights and/or access to
2    remedies as relates to the property.
3           There's no way I was going to let that
4    property go into foreclosure.  If I had known that
5    that September 9th foreclosure date was still
6    valid and applicable, okay, I either, A, would have
7    went ahead and quickly retained counsel to draw up
8    the side letter and submit my funds to the escrow,
9    which would have included the miscellaneous
10   corporate advance fees or, I've never done this
11   before, but I understand -- it was brought to my
12   attention, you know, bankruptcy was a possibility.
13          There were several other remedies, but I
14   inadvertently, unknowingly waived, you know, my
15   rights to those remedies as a result of me relying
16   on the information that the duly authorized
17   representative of GMAC, Carita Bowers was telling me
18   to abide by, which was, A, don't send any money in,
19   B, file for the loan modification, you know --
20      Q   Look at me.
21      A   And, C --
22      Q   Because I'm trying to keep you on pace.
23      A   C, don't do anything else.  And what was
24   very alarming to me was -- is the way and means in
25   which she found out that the property had been

Page 68

1    foreclosed upon.
2       Q   Which is how?
3       A   I phoned her.  And the way I found out was
4    I got a letter on or about and -- I don't have it in
5    front of me now -- September the 19th or
6    thereabouts, might have been a little bit later,
7    from the insurance division of GMAC telling me that
8    the house has been foreclosed on.
9       Q   Okay.
10          MS. GLENN:  David, let's talk about
11   discovery where we requested every medium of
12   recorded communications or correspondence
13   between Mr. Reaves and GMAC.
14          MR. RACHEL:  I did not know he had the
15   recorded conversations until today, so I could
16   not supply those to you.
17          MS. GLENN:  Mr. Reaves, did you not know
18   you had the recorded conversations until today?
19          MR. RACHEL:  When I spoke to him, he said
20   he didn't understand that that's what that
21   meant.  He thought it meant things recorded on
22   paper.
23          THE WITNESS:  Yes.  Written documents and
24   things of that nature.  Not electronic mediums.
25   BY MS. GLENN:

Page 69

1     Q   So you had never communicated to your
2   counsel that you had recorded conversation between
3   yourself and Ms. Bowers?
4     A   No, ma'am.
5       MR. RACHEL:  But we can get them to you.
6   I didn't know.  You can have them.  I don't
7   even have a copy.  But I'll get a copy.
8       MS. GLENN:  Thank you, David.  I
9   appreciate that.
10  BY MS. GLENN:
11    Q   Let's go back to August 30th.  You
12  submitted the final piece of documentation via fax
13  to Mrs. Bowers.
14      What happened next?
15    A   I phoned.  She said she had it and that --
16  and then I was real queasy because now it's August
17  the 30th, okay.
18      And the property was slated to be
19  foreclosed upon on September the 9th.  I said "Ms.
20  Bowers, okay, you can get curt if you want to on the
21  phone, but I need to know that the foreclosure date
22  has been postponed, modified, adjusted.  I don't
23  care."
24      She said, "okay, then, Mr. Reaves, I'll
25  get back in contact with you.  But you don't need to

Page 70

1   call me back."
2       I said, "ma'am, with all due respect, I
3   will be calling you back in 24 hours.  I need to
4   know."
5     Q   Was that conversation recorded?
6     A   I think that one is, yes, ma'am also.
7     Q   When did you begin recording your
8   conversations with Ms. Bowers?
9     A   Probably the second week in August.
10    Q   Are your conversations -- at least are the
11  tape recordings dated?
12    A   I say the dates and times --
13    Q   I'm sorry.
14    A   I say the dates and times on them before I
15  call them.
16    Q   I understand.
17    A   So -- so, Counselor --
18    Q   I'm sorry.  Pick back up after --
19    A   So she called me back, "she" being Ms.
20  Bowers, and said "Mr. Reaves, no worries.  The
21  postponed foreclosure date, we have everything we
22  need.  We got it in on time."
23      Okay.  I said "the Dodd-Frank doc?"  She
24  said "yes, we have everything in on time", as she
25  stated previously in her testimony today with the

Page 71

1   deposition.
2       And I said "so I've met all the criteria."
3   I purposefully asked her these questions, just like
4   my counsel did during the deposition earlier today,
5   because I wanted it on tape.
6       I said "So I have met all the criteria set
7   forth by you, by both my actions and via the
8   critical timeline, because I understand that GMAC
9   has to have everything in by a week or nine days
10  before", et cetera, et cetera.
11      I said "I met all those deadlines."  She
12  said "yes, Mr. Reaves, everything is fine and I've
13  got you a postponed -- a revised foreclosure date."
14      I said "what date is that?"  She said
15  "October the 6th."  I said "okay, so the first
16  Tuesday of September my house is not going to be
17  foreclosed upon?"
18      She said -- and this is how she talked.
19  She said "I just told you that.  The revised date is
20  October the 6th."  I said "okay, then, fine.  So is
21  there anything else I need to do?"  She says "no."
22  I said "okay, then, fine."
23    Q   Was Ms. Bowers the only person who had
24  told you that the foreclosure date was postponed?
25    A   There may have been, Counselor, somebody

Page 72

1   at the law firm too because I think I double backed
2   and called the law firm just to make sure.
3     Q   Did you record your conversations with the
4   law firm?
5     A   No, I did not.
6     Q   Are the only recorded conversations of any
7   GMAC employee -- excuse me.  Is Ms. Bowers the only
8   GMAC employee that you've recorded your
9   correspondence and communications with?
10    A   Yes, ma'am.
11    Q   Okay.  Because you mentioned that she was
12  your only point of contact with GMAC, but you had,
13  at some point, spoken with another GMAC
14  representative, correct?
15    A   And good point.  If you go back to the
16  beginning of these events, of events going back to
17  June and July, yes, I spoke to many GMAC persons,
18  none of which could tell me what these miscellaneous
19  corporate -- I'm glad you're bringing that up, okay.
20      But then from August on, and I don't know
21  if you would construe the law firm as being an
22  employee of GMAC or, you know, or whatever, but my
23  contact and the only person I was speaking with was
24  Carita Bowers.
25      Then, after I found out through me getting

Page 73

1    that letter from the insurance company of the
2    insurance division of GMAC, that the house had been,
3    you know, foreclosed on on September the 9th, okay,
4    then the GMAC employees come back into play.
5        The people that work in the insurance
6    department, a Kitty Harris.
7        Q   Tell me about communications with Kitty
8    Harris.
9        (Whereupon, a brief recess was taken.)
10   BY MS. GLENN:
11       Q   Let's talk about you communications with
12   Kitty Harris.
13       A   Yes.
14       Q   Tell me about your first conversation with
15   her?
16       A   Okay.  On or about September the 19th,
17   which was the date that I received the letter from
18   the insurance company, the insurance division, shall
19   I say, of GMAC, indicating that the insurance had
20   been dropped on the property at 3481 Oak Run Drive,
21   and it was dropped because the property was
22   foreclosed upon.
23       It was now REO property.  I then
24   immediately, in the insurance -- when I was speaking
25   with insurance division of GMAC, I asked who should

Page 74

1    I call.
2        And they said I needed to call the loss
3    mitigation department of GMAC and asked to speak to
4    a supervisor.
5        So I did that and worked my way up the
6    chain until I got to Kitty Harris.  And Kitty Harris
7    indicated that this had actually happened to her
8    home and that, because GMAC had actually technically
9    bought the mortgage back or bought the house back,
10   that it could be a possibility that they could go
11   ahead, and she used the term "rework" the situation.
12       And she said, you know, give me -- she
13   wanted to know my account number and I gave it to
14   her.
15       And she pulled it up and she said she need
16   to speak to Carita Bowers about the situation and
17   she would call me back in 24 hours, "she", being
18   Kitty Harris, would call me back in 24 hours.
19       And I'm going to give you -- okay, that
20   phone call -- and I need to revise that date from
21   September the 19th to September the 14th at
22   5:52 p.m.
23       So once again, it's revised from September
24   the 19th to September the 14th, which was a
25   Wednesday.

Page 75

1        Q   Okay.  Slow down just a little bit.  So
2    September the 14th was your first communication
3    with Kitty Harris?
4        A   Yes, ma'am.
5        Q   Okay.
6        A   All right.
7        Q   And Kitty Harris referred you back to
8    Carita Bowers?
9        A   No.  She indicated that she would be
10   speaking to Carita Bowers and she, Kitty Harris,
11   would call me back.
12       Q   Okay.  Did that happen?
13       A   Yes.  She confirmed all the notes and
14   stated -- she confirmed all the notes and stated
15   that the property was bought back by them, "them"
16   being defined as GMAC.
17       She stated that she would address the file
18   first thing in the morning, which was Thursday,
19   September the 15th, 2011 and would call me back.
20       Okay.  She didn't call me back until -- I
21   didn't hear back from her on a Thursday.  So I
22   called back on September the 16th, 2011, Friday at
23   9:40 a.m.
24       The phone number that I reached Ms. Harris
25   at was (214)874-6757.  Ms. Harris indicated that she

Page 76

1    had just spoken with Carita Bowers and Ms. Bowers
2    was going to speak with her supervisor to rescind
3    the sale.
4        Ms. Harris was to notify Ms. Bowers
5    that -- Ms. Harris notified Ms. Bowers that people
6    were coming by the property at 3481 Oak Run Drive,
7    and as a result of that Ms. Harris said that she
8    would work diligently with Ms. Bowers to start the
9    resolution process.
10       Q   Did you record this conversation with Ms.
11   Harris?
12       A   No.
13       Q   Did you record any conversations with Ms.
14   Harris?
15       A   No, ma'am.  Then I, at 1:55 p.m. on
16   September the 16th, 2011, Friday, I called Carita
17   Bowers just to confirm that communication was indeed
18   underway pertaining to my situation between her and
19   Ms. Harris.
20       She was not available.  However, on that
21   same day, September the 16th, 2011, Friday at
22   2:40 p.m., I received a call from Ms. Bowers stating
23   that she had just gotten off a flight and that she
24   would address corrective measures on Monday,
25   September the 19th, 2011, and that she would call

Page 77

1   me back with a status update before the end of the
2   business day on September the 20th.
3       I did not hear back from Ms. Bowers on
4   Monday.  So on September the 20th, Tuesday, at
5   10:55 a.m., I called Ms. Bowers back, Carita Bowers.
6       Ms. Bowers indicated that she had no
7   update and that the error was done on the -- on
8   other properties as well.  She stated that she would
9   request a hold.
10  Q   When you say "other properties as well",
11  she means other properties went to foreclosure in
12  September of 2011 that should not have?
13  A   No.  You're asking me to speculate on what
14  she meant by that.
15  Q   You're not sure what she meant?
16  A   I'm not sure.  I just know that's what she
17  said.  I have that in quotation marks.
18  Q   Did you take those notes immediately after
19  speaking with Ms. Bowers?
20  A   Yes.  Well, while I'm talking to her.
21  Q   While you were talking to her?
22  A   Yes.
23  Q   Did you also record the conversation?
24  A   Oh, yeah, I got all of these.
25  Q   Okay.

Page 78

1       A   She stated that she would request a hold
2   on all eviction procedures.  And then I said "I need
3   that in writing", and she said "I'm not going to
4   give that to you in writing, Mr. Reaves."
5   Q   She refused to put in writing that she was
6   going to hold eviction proceedings?
7   A   That she was going to request a hold.  She
8   did not lead me to believe that she had the
9   unilateral authority to stop eviction procedures.
10      She said she was going to request a hold
11  on eviction procedures, because people were coming
12  by the house.
13  Q   Have you been served with any
14  dispossessory paperwork?
15  A   No, because I immediately called counsel
16  and I indicated, you know, what was going on, and
17  then counsel gave me a card and said if they come by
18  or whatever, call immediately.
19      But praise be to God nobody has come by.
20  MR. RACHEL:  And they probably won't.
21      McCurdy -- you-all have -- that foreclosure was
22      McCurdy and Candler.  And McCurdy and Candler
23      are pretty good about not trying to jump in.
24      If it was McCullough they would have
25      already -- I have issues with them.  But they

Page 79

1   won't do that as long as you're in a lawsuit,
2   unless you tell them.  They actually will
3   call you and verify what needs to happen.
4       MS. GLENN:  Okay.
5       THE WITNESS:  Then, during that same
6   conversation, Ms. Bowers indicated that this
7   would take some time.
8       Once again "this", I guess, was -- she
9   was -- I don't want to speculate.  She said
10  that this would take some time.
11  BY MR. RACHEL:
12  Q   You assumed she meant fixing this
13  situation?
14  A   Addressing it, yes.  Addressing, fixing,
15  yes.  And then she asked that I phone back tomorrow,
16  which was September the 21st, Wednesday 2011,
17  between 10:00 and 12:00 noon.
18      Then she said "I cannot tell you something
19  that would jeopardize my job.  You have the right to
20  go to court if you are served with an eviction
21  notice."
22      And then, right after she said that, she
23  said "hold on, Mr. Reaves.  I just received an
24  E-mail about your file", okay.
25  Q   Did she say who the E-mail was from?

Page 80

1   A   No.
2   Q   Did she forward you the E-mail?
3   A   No.
4   Q   What did the E-mail say?
5   A   She said that the E-mail was from Kitty
6   Harris, okay.  And she said "Mr. Reaves, I'll call
7   you back."
8       Now, keep in mind this conversation
9   started 10:55 a.m.  At 11:04 I called Kitty Harris
10  at (214)874-6757 and she didn't pick up.  So I take
11  it the two of them were talking, okay.
12      Then on September the 21st, 2011,
13  Wednesday --
14  Q   Slow down.
15  A   At 10:35 a.m. that next day I called
16  Carita Bowers at (678)855-7061, no answer.  I then
17  tried to call her at (404)227-1220, no answer.
18  Q   Where did you get these two separate
19  numbers from?  Is one an office phone and one a cell
20  phone?
21  A   I think so, Counselor.  I got them both
22  from Ms. Bowers.  And then at 10:41 a.m. I tried --
23  after trying to reach Ms. Bowers at 10:35 a.m., I
24  tried to call Kitty Harris at (214)874-6757, no
25  answer, okay.

Page 81

1  Q  So what's your next communication and with
2  whom?
3  A  Okay.  September the 26th, 2011, Monday
4  at 1:51 p.m., Ms. Bowers nor Ms. Harris was
5  available.  I then turned right around and called
6  Ms. Bowers a second time and she picked up at
7  1:52 p.m., and she said that she had already
8  submitted, once again the date is important,
9  September the 26th, that she had submitted a
10  request to rescind and she had also pursued and she
11  said "something to stop the eviction procedures",
12  okay.
13  And then she said "Mr. Reaves, something
14  may be going on that I cannot see because I'm not in
15  that office", okay.
16  Oh, here we go.
17  Q  When she said "that office", do you know
18  what office she was referring to?
19  A  No, I don't.  I don't know if she meant
20  Katie Harris' office or what.
21  Q  When you say Katie you mean Kitty?
22  A  Kitty Harris.  Then she stated she's
23  "going to go over the head of the person she was
24  submitting everything to."
25  Q  Which is whom?

Page 82

1  A  I don't know.  She never gave me that
2  name.  In fact, today those two names that she
3  submitted to during her dep, I've never heard of.
4  I've never talked to those people.  I don't know who
5  they are.
6  Q  Okay.
7  MR. RACHEL:  It's possible that that's
8  what she was talking about, but we don't know.
9  MS. GLENN:  Okay.
10  THE WITNESS:  Now the one person at the
11  law firm, Rasheed -- you call her Allen but I
12  think her name is Austin, I did speak to her
13  one time, okay.
14  So back to September the 26th, 2011,
15  Monday, my conversation with Carita Bowers.
16  She stated that she didn't know how things were
17  going to pan out.  In her opinion a
18  postponement should have been granted.
19  She asked that I call back on Friday,
20  September the 30th, 2011, at 10:30 a.m.,
21  okay, and that was the -- that was my last
22  correspondence with her.
23  At that point, it was evident that when
24  she said -- and the thing that pushed me to go
25  ahead at that time and get counsel is that she

Page 83

1  said, and I quote and we recorded, she stated
2  that she "didn't know how things were going to
3  pan out."
4  And that was the first time, in all of my
5  communications with Ms. Bowers, that she ever
6  indicated that the situation was out of her
7  hands and she was having to yield to another
8  source or person to come to some type of
9  resolution.
10  Up to that point, it was Mr. Reaves, I
11  have everything.  You don't have to do
12  anything.  In fact, quit calling me because
13  it's taken care of, da da da da da da.
14  But then, at this point, when she said
15  that, I said "no, I have to protect my
16  interest."
17  BY MR. RACHEL:
18  Q  She instructed you to call back on
19  September the 30th.  So you didn't do that?
20  A  Yes, I called back on September the
21  30th, but not at 10:30 a.m.  I have down here 4:15
22  to 4:12.
23  Q  And what happened?
24  A  At that point in time, she asked me, which
25  I have on tape, "have you spoken with an attorney?"

Page 84

1  And I told her "yes, I have."  And then she said
2  "okay, then I can't talk to you.  I can't speak with
3  you any longer."
4  Q  Did you try to call her again?
5  A  No.
6  Q  Did you call Kitty Harris again?
7  A  Yes, tried to contact Kitty Harris and
8  never got a phone call back, never, you know, got a
9  return, you know, to my phone calls or whatnot.
10  And then I found out through my counsel
11  that she no longer was with GMAC.  So September must
12  have been her last month there.  I don't know.
13  Q  Okay.  Is Mr. Rachel the first attorney
14  you spoke with?
15  A  Yes.  Well, one of my -- a friend of mine
16  who's an attorney referred me to Mr. Rachel.
17  Q  Okay.  Mr. Reaves, I want to show you
18  another set of documents.
19  (Whereupon, marked by the court
20  reporter for identification
20  purposes, Exhibit No. 4.)
21  BY MR. RACHEL:
22  Q  Mr. Reaves, flip through those documents
23  and let me know when you've had the opportunity to
24  completely review them.
25  A  Yes, Counsel.

Page 85

1     Q   Do you recognize these documents?
2     A   They have my name on them.  Not right
3   offhand.  This is the first time I've seen them.
4   But they appear to be aligned with the property in
5   question, 3481 Oak Run Drive, and myself.
6     Q   Is that your PO Box?  PO Box 1163,
7   Lithonia, Georgia 30058?
8     A   Yes, ma'am.
9     Q   You don't recognize any of these
10  documents?
11    A   I'm not saying that I've never seen them
12  before nor am I saying that I did see them before.
13  But I'm just --
14        MR. RACHEL:  Apparently he can't recall
15  whether he's seen them.
16        Just say it like that.
17  BY MS. GLENN:
18    Q   What do these documents appear to be to
19  you?
20    A   Notices of default.
21    Q   Okay.  Let's look at the first one.  It's
22  dated November 12th, 2007.  Looks like that's
23  about just under two years after you obtained the
24  mortgage loan?
25    A   Uh-huh.

Page 86

1     Q   It looks like you had fallen behind and
2   need pay 212384, $2,123.84 --
3     A   Uh-huh.
4     Q   -- to become current again?
5     A   Uh-huh.
6     Q   Do you recall paying that amount?
7     A   I'm sure I did.
8     Q   Now, it looks like the beginning of 2009
9   you fell behind again on your mortgage loan?
10    A   Uh-huh.
11    Q   Looks like February the 2nd, 2009 GMAC
12  sent you a default notice saying that $1,718.52 was
13  due?
14    A   Uh-huh.
15    Q   Do you recall this default?
16    A   As I indicated, ma'am, I don't -- I'm sure
17  that these occurred because you're presenting them
18  and it aligns itself with my medical condition as
19  well.
20        But in each instance I went ahead and
21  reinstated, paid whatever the amount was.  It's not
22  a problem.  So I see where you have all of these.
23        I'm not saying that I didn't see these or
24  whatever the case may be.  They're evident that
25  these eventually did occur.  In each instance I went

Page 87

1   ahead and paid the amount as soon as I was notified.
2     Q   There's another on April the 2nd, 2009.
3   Looks like $1,658.52 was due.
4     A   Hm-mh.
5     Q   Okay.  Just make sure I have these amounts
6   correct.  And if there are any instances of default
7   that you remember from these notices or if any of
8   these refresh your recollection, just let me know.
9         I'm looking at the notice from
10  August 14th, 2009 to your PO Box.  Looks like
11  you've fallen -- you had fallen four months behind.
12        Do you recall four months in 2009 where
13  you weren't able to pay your mortgage?
14    A   Once again, it aligns itself with my
15  medical condition.  As I said, honestly in this
16  deposition, there are times when I -- because of the
17  medical condition flaring up, I was unable to work
18  for four, six months at a time.
19        But every time I got -- if you notice, and
20  I'm sure your records will reflect this, every time
21  I got this notice of default, I paid it.
22        I didn't ask for loan modification,
23  nothing like that.  I reinstated.  I paid whatever I
24  owed, okay.
25        MR. RACHEL:  Sounds like a track record.

Page 88

1   BY MS. GLENN:
2     Q   Okay.  So it looks like $5,114.71 --
3     A   Yes, ma'am.
4     Q   -- were the arrears in August of 2009.  It
5   looks like you made a payment in June of 2009 but
6   that was the last payment you made through -- let's
7   see.  There's a notice dated December 21st, 2009
8   and you hadn't made a payment since June 1.
9         So $6,748.68 was due.  Now there are a lot
10  of fees that are associated with these defaults.
11  For instance, there's a late charge and then there
12  are fees, costs and other amounts accrued to date
13  that are hefty portions of the amounts due.
14        Did you always pay these fees?
15    A   Yes, Counselor, and also I'm glad that you
16  brought that up, because I was going to do that.  In
17  any of these notices of defaults that you just
18  submitted to me, that you tendered to me for my
19  review, do any of the fees equate to 50 percent of
20  the payments.
21    Q   No, none that I've seen just yet.  Let's
22  continue going through and see if we see anything
23  that gets heftier.  Let's look at the notice in --
24    A   May.
25    Q   -- May 11th, 2010.  It looks like there

Page 89

1  hadn't been a payment -- it looks like there had not
2  been a payment on your loan since September 1st,
3  2009.
4        So $7,049.30 cents is due and looks like
5  about $3,000 in fees?
6     A  I beg to differ.  If you look at the fees,
7  fees, costs and other amounts accrued to date, and
8  that would be the most vague of the line item.
9        I want to bring your attention to that.
10 That only equals 2,400 and some change.  But it's
11 still not 50 percent of my payments.
12    Q  I understand.  But let's add 234.56 plus
13 approximately 2,500 plus $702.44.  All those fees
14 add up to about $3,000, correct?
15    A  Counselor, as I indicated before, I was
16 never in a argument pertaining to the late
17 charges or suspense -- that's fine.
18       It's the vague area.  If you notice in
19 these notices, which is interesting -- I didn't get
20 to ask you this.
21       We don't see any miscellaneous -- we don't
22 see a vague categorization of miscellaneous
23 corporate advances in any of these notices of
24 default which state my reinstatements.
25       That's why when I saw it all of the

Page 90

1  sudden, miscellaneous corporate advances, it was a
2  category that was mysterious and unknown to me,
3  because I've never seen it here before.
4        And once again, it, in and of itself, was
5  more than 50 percent.  If you look at all of these
6  notices that you're submitting, I bring to your
7  attention the fees, costs and other amounts accrued.
8        If we take that out as a separate line
9  item, as I was requesting there this mysterious
10 miscellaneous corporate advances, in no instance, as
11 a stand-alone, is that line item 50 percent or more
12 than my payments, and that's what caused me pause.
13    Q  Well, let's keep going.  May, the total
14 amount due on your loan was 9,000 -- this is May of
15 2010.  The total amount due was $9,041.15.
16       Do you see that?
17    A  May of 2010?
18    Q  Yes.  May 11, 2010.  And it's broken down
19 into the payments that are due, the late charges,
20 fees, costs and other amounts accrued, suspense and
21 total amount due.
22       What was your understanding of the
23 suspense charge?  Was that explained to you?
24    A  No.
25    Q  Did you question the suspense charge?

Page 91

1     A  I may have called to ask about that and I
2  think that had to do something with escrow or taxes.
3  I vaguely remember that.  I'm not sure.
4     Q  All right.  We're almost done.  It looks
5  like there's September -- there's one dated
6  September 8, 2010.
7        Now in September of 2010 your loan was due
8  for February of 2010.  So there's about 7 months of
9  payments that you're due for, and it looks like
10 $9,366.05 is due.
11       And these fees are getting pretty
12 substantial.
13    A  Mh-huh.
14    Q  Now, finally in May -- in May of 2011 the
15 fees have accrued to over $3,000?
16    A  Yes.  And it's over the payment amount.
17 That's when I said wait a minute.  So when I did
18 regain my health in June, okay, after I received
19 this, I immediately wanted to go ahead and
20 reinstate, send the funds.
21       And that's -- and I won't belabor you with
22 this.  It's already on record here.  That's when
23 they told me I had to call in and get the
24 reinstatement fee, which was not 5,000.
25       Now it was 7,000 and some change.  Which I

Page 92

1  went ahead and I had that money available.
2     Q  This is May.  By the time June rolled
3  around another payment was due, more late fees.
4  Additional fees had accrued at that point, so it was
5  even more?
6     A  Yes, ma'am.
7     Q  But I guess it appears -- would you
8  categorize this as a pattern of default on your
9  loan?
10    A  You know, Counselor, as a result of my
11 medical condition -- you know, I don't know what you
12 would categorize it as a default.
13       And I'm not trying to be vague, because on
14 each instance, the other side of that is every
15 single time those payments were made within the
16 timeline that's set forth in the notice, you see.
17       So while I was ill and unable to go ahead
18 and generate the revenue that I normally did, I
19 always put a set aside to be able to -- because by
20 no stretch of the imagination did I want my home to
21 go into foreclosure.
22       So I always made sure I earmarked enough
23 capital to pay and catch up and reinstate, and
24 that's what I did on each one of those notices that
25 you submit.

Page 93

1    Q   Okay.  There were instances in which the
2  fees were not paid in a timely manner and the loan
3  was actually referred to foreclosure; isn't that
4  correct?
5    A   The only other time, ma'am, as I
6  indicated -- all I know of was the two times as we
7  talked about earlier.
8    Q   Okay.
9    A   The only time that I recall, two times.
10             (Whereupon, marked by the court
                    reporter for identification
11                  purposes, Exhibit No. 5.)
12  BY MR. RACHEL:
13    Q   Take a look at those two notices and let
14  me know when you've had an opportunity to read them.
15  Is that the correct address, Mr. Reaves?
16    A   For the PO -- for the property?
17    Q   The property and the PO Box where the
18  notice is sent.
19    A   Uh-huh.
20    Q   Okay.  Now both of these notices are in
21  2010, correct?
22    A   Uh-huh.
23    Q   And what do these notices communicate to
24  you?
25    A   They indicated that I've been previously

Page 94

1  notified of the default and this was a demand for
2  reinstatement, but it indicated that -- it doesn't
3  indicate that the property is in foreclosure.
4         It said it may be sent to foreclosure but
5  it's not in foreclosure.  It says in the second
6  paragraph, and I quote, "because you have failed to
7  reinstate, your account may be sent to an attorney
8  to initiate foreclosure action".
9    Q   And go ahead and read that next sentence
10  for me.
11    A   "Upon referral, you may incur substantial
12  fees and costs and the foreclosure status will be
13  reported to your credit agency."
14    Q   So these notices communicate that a
15  referral to a foreclosure law firm cost GMAC money
16  and, in turn, that cost has to be passed on to the
17  borrower who's in default, correct?
18    A   This says "upon referral you may incur
19  substantial fees and costs and the foreclosure
20  status will be" -- I take that, and excuse me.  I'm
21  not -- you know, I don't know anything about
22  jurisprudence, whatever, but I take that as a line
23  item of attorney fees.
24    Q   Okay.
25    A   So when I saw that -- I mean, you guys are

Page 95

1  attorneys.  You've got to get paid.  I never said I
2  wouldn't pay attorney's fees.
3         It's just that vague category,
4  miscellaneous corp, what is that?
5    Q   And fees were parsed out from that
6  category?  Attorney's fees were a separate category?
7    A   Yes, exactly.  On the reinstatements, yes.
8    Q   Now, you mentioned every time you fell
9  into default you would pay.  You never explored
10  other loss mitigation options, correct?  You just
11  continued to reinstate the loan?
12    A   I think I indicated beforehand -- we can
13  ask the stenographer to pull it -- that I don't
14  remember.  I think one time there was a repayment
15  plan that was done, but I'm not sure.
16    Q   That's fine.  Let's take a look at these
17  documents and see if they help you at all.  Just
18  kind of review those and see if it helps to refresh
19  your recollection.
20         Let me know when you've had the
21  opportunity to review it.
22             (Whereupon, marked by the court
                    reporter for identification
23                  purposes, Exhibit No. 6.)
24    A   Okay.  I've had a chance to review it.
25    Q   Okay.  What does that appear to be to you,

Page 96

1  this document I've handed to you, which is Exhibit
2  No. 6?
3    A   A loan modification agreement.
4    Q   Okay.  Does reviewing that document
5  refresh your recollection as to entering into a loan
6  modification agreement with GMAC?
7    A   It's not with -- a Homecomings Financial,
8  a GMAC company.  Okay, I see that up top there.
9  This appears to be my signature and everything on
10  it.
11         It doesn't draw my memory any more, but it
12  does reflect my current payment that I quoted to you
13  earlier when you asked me about $800-something.
14         So this must be the one, I mean the
15  modification, as I indicated.  I wasn't confirming
16  or not that I had it.
17         This makes sense 'cause that's the payment
18  I quoted you earlier and these terms and conditions
19  that you see listed on that first page were
20  palatable me.
21         Thus, is probably why, on an ongoing basis
22  I didn't want to go for another loan modification.
23  Don't need to.
24    Q   Okay.  Because you were fine with the
25  terms of your previously modified loan?

Page 97

```
1        A   The one that we're looking at now?
2        Q   Yes.
3        A   Exhibit 6.  Yes, ma'am.
4        Q   And this was entered into on or about
5   December 15th or 16th, 2008.
6        A   It appears, yes, ma'am.
7        Q   But then shortly after this loan
8   modification I see another default notice --
9        A   Yes, if I became ill --
10       Q   -- for the beginning of 2009.  So it looks
11  like the very next month you fell into default
12  again?
13       A   How could I do that if this is active
14  on -- may I see that default notice?
15       Q   Sure.  It's February 2nd, 2009.  It says
16  "your account is due for January 1, 2009".  It looks
17  like you immediately fell into default again.
18       A   All I'd have to do is check my medical
19  records.  If I got sick right afterwards and deduct
20  it.  And then I immediately paid it.
21       Q   So again, based on -- and no one is saying
22  that there is not a reason that underlies this.  If
23  you are not in a physical condition to work, then
24  there's no income coming in, but there's still
25  expenditures, right?
```

Page 98

```
1        A   Concurrently, the expenditures upon notice
2   of default are paid in each one of these instances.
3        Q   Don't misunderstand what I'm saying.  I'm
4   saying that it's understandable that, if you're in a
5   condition of incapacity and you're not able to
6   generate income, meaning no speaking engagements,
7   not able go to work.
8        If you're not able to generate income and
9   you still have expenditures, you're going to fall
10  behind on your bills, right?
11       So no one is saying it's not
12  understandable, but based on your medical condition
13  and the extent to which it would prohibit you from
14  earning income, there's a corresponding default on
15  your mortgage loan, correct?
16       A   I mean, is that a question, an opinion
17  or --
18       Q   It's a question.  You would say that -- is
19  it accurate to say that your medical condition
20  preventing you from working corresponds with the
21  defaults on your mortgage loan?
22       A   Definitely.  You'll see a direct
23  correlation to my medical records.
24       Q   So there's a pattern of these flare-ups in
25  your medical condition, right?
```

Page 99

```
1        A   Uh-huh.
2        Q   And then there's a corresponding pattern
3   of default in your mortgage loan, correct?
4        A   With me making the payment to correct it
5   immediately.
6        Q   Okay.
7        A   I want to make that very clear, as well.
8        Q   No, that -- I understand that.  So
9   ultimately you did submit another loan modification
10  application, and I want to make sure that we have
11  that entire document on the record.
12       And a part of that, I believe, was
13  produced by your counsel.
14            (Whereupon, marked by the court
                reporter for identification
15              purposes, Exhibit No. 7.)
16  BY MR. RACHEL:
17       Q   Part of that was produced by your counsel
18  in discovery.  But I want you to review this and let
19  me know when you've had the opportunity to look at
20  it completely.  And we're almost done.
21       A   Yes, ma'am.  I've had opportunity to
22  review it.
23       Q   Okay.  What does this appear to be?
24       A   The loan modification packet that Carita
25  Bowers asked me to fill out and submit to her.
```

Page 100

```
1        Q   Okay.  And then you subsequently submitted
2   this completed packet to Carita Bowers?
3        A   Yes, ma'am.
4        Q   And this looks to be a complete and
5   accurate representation of what you submitted to Ms.
6   Bowers?
7        A   Yes, ma'am.  It is.
8        Q   All right.
9        A   And if you would -- go ahead.  I'm sorry.
10       Q   Okay.
11            MR. RACHEL:  There's several pages of
12  that, Teah.  That was all the same.
13            MS. GLENN:  All right.  Well, they're for
14  different months.
15            MR. RACHEL:  Oh, okay.
16            MS. GLENN:  You see, like one is
17  June 2011, July 2011, August.
18  BY MS. GLENN:
19       Q   Looks like they're breakdowns of your
20  monthly income, correct?
21       A   Yes.  The withholdings, yes.
22       Q   All right.  And I just wanted to make sure
23  that that's the complete -- that's the complete
24  application.
25            You've mentioned some repayment plans?
```

Page 101

1      MR. RACHEL:  I think he mentioned he may
2  have had a repayment plan.
3  BY MS. GLENN:
4      Q   What do you recall about repayment plans?
5      MR. RACHEL:  I think now what he's talking
6  about is this, because he mentioned that he
7  thought he had repayment.  He didn't think it
8  was a modification.
9      But it appears that that repayment that he
10  was talking about actually was modification.
11  BY MS. GLENN:
12      Q   Okay.
13      A   But -- no.  There is another repayment
14  plan, if I remember correctly, that we entered into.
15  I may be wrong.
16      Q   Take a look at those and see if you
17  recognize those.  I know, I'm sorry, I didn't have
18  anymore.  But now I really mean it.  I really don't
19  have anymore.
20      (Whereupon, marked by the court
21      reporter for identification
        purposes, Exhibit No. 8.)
22      A   Okay.  Counselor, can you ask your
23  question, please?
24      Q   Sure.  Do these refresh your recollection?
25  Do you remember any --

Page 102

1      A   I don't know -- see, I got a document from
2  GMAC, Counselor, that laid out the payments when
3  they were due for the repayment plan and then the
4  payment would revert back to 815 or thereabouts.
5      But that's not this document.  So if you
6  could check your records and we'll check ours.
7  There's another repayment document sent by your
8  client, GMAC.
9      MR. RACHEL:  And this may be a part of it.
10  BY MS. GLENN:
11      Q   Now, repayment plans are different from
12  modifications.
13      A   Yes, it wasn't a mod.  It was a repayment
14  plan.
15      Q   And it looks like -- if you look at these
16  documents, it appears that in August of 2009, May of
17  2010 and then again in September of 2010 you'd
18  entered into repayment agreements with GMAC and then
19  those agreements were breached for failure to make
20  timely payments under those repayment plans?
21      A   I beg to differ with you, and if you could
22  check, I think it's one repayment plan that had to
23  be done before August the 17th, this first notice.
24      And each one of these notices are
25  indicating to me that I have not made the subsequent

Page 103

1  payments that were outlined in the repayment plan
2  that precedes these documents.
3      So if -- what we could do on our side is
4  check from July, which would be the seventh month,
5  which would stand to reason I entered into a
6  repayment plan, and then if I got ill and payments
7  weren't made on the eighth, which would be August --
8  no.  You got to go back further.  This is May.
9      Hold on.  I'd get a notice.  And these are
10  just notices that those payments, per the original
11  payment plan, were not made.  That's what I
12  remember.  I may be wrong, but I think that's what
13  we need to check.
14      Q   Okay.
15      A   So, for lack of a better term, there was
16  a -- just as an example, an umbrella payment plan
17  that was entered on day X and then, when I got ill,
18  then I missed Y, Z payment, these get generated to
19  notify me, per this umbrella payment plan, you
20  haven't made the payments, Mr. Reaves.
21      Q   So you're saying the repayment plan
22  spanned from August -- you're saying one repayment
23  plan spanned from August 2009 to September 2010?
24      A   No.  The payments were supposed to be made
25  every month, and I think, Counselor, and I'll pull

Page 104

1  my records, that repayment plan spanned nine months
2  to a year then, and you can't miss any payments, and
3  then after that it reverts back to 815.
4      And then when I call into GMAC, they told
5  me way back then if you have any, you know,
6  mitigating circumstances, you know, like medical or
7  you get transferred overseas to Afghanistan, you
8  know, they gave me a list of things, then, you know,
9  you could go ahead and catch the payments up.  And
10  so -- but like I said, I think this is reflective of
11  the overall plan.
12      MR. RACHEL:  Depending on how far you're
13  behind, I believe repayment plans are typically
14  six months to a year.
15      MS. GLENN:  But my understanding is
16  similar to Mr. Reaves, that once you breach a
17  payment on a repayment plan it's over.
18      THE WITNESS:  And Counselor, you're right.
19  They told me that if you breach it, it's at the
20  sole discretion of GMAC as to whether or not
21  they would go ahead and continue it or -- and
22  then they also said if you send your payment in
23  after that and you breach just one payment,
24  it's at their sole discretion to accept it or
25  send it back.

1     That's exactly what they told me.  But
2   then they also told me in that same
3   conversation that if you have, you know,
4   extreme circumstances, like illness, et cetera,
5   et cetera, you get transferred out of the
6   country and you're active duty and all that
7   kind of stuff.
8   BY MS. GLENN:
9     Q   So you're saying that, even though you
10  missed these payments, they didn't drop you out of
11  the repayment plan?
12    A   No.  No, ma'am.  Not that I'm aware of.
13  Now if they did --
14        MR. RACHEL:  I don't think they could have
15  because your payments -- when he was getting
16  ready to go to foreclosure, was still 815.
17        THE WITNESS:  815, yes, ma'am.
18        MR. RACHEL:  So he couldn't have --
19        THE WITNESS:  Because I would always
20  send -- my payments would be back over 1,000.
21  BY MS. GLENN:
22    Q   815, those are the payments under the loan
23  modification, not the repayment plan.  Repayment
24  plans are sometimes forbearance agreements where you
25  don't even pay your full mortgage, sometimes.

1     But 815 -- just because he had a mortgage
2   payment of 815 at the time of the foreclosure
3   doesn't mean he was under a repayment plan.
4         In fact, it indicates the opposite, that
5   he wasn't.  But I just wanted to see if you had any
6   recollection of what those documents were or what
7   they meant or whether you recalled entering into any
8   such agreements with GMAC.
9         I want to wrap up by going back to your
10  complaint, because this is a complaint for damages.
11        What are you seeking from this lawsuit,
12  Mr. Reaves?
13    A   Ma'am, it has been wholly Hades ever since
14  September the 9th.  Every time a car drives up the
15  street or somebody turns in the driveway like
16  they're going to turn around, you know, they may
17  just be turning around, you know, my family members
18  are like is that, you know, somebody that's coming
19  to look at the house.
20        Two persons during this span have actually
21  come to the house, knocked on the door saying that
22  they understood the house was REO and they wanted to
23  come and walk through the house.
24        MR. RACHEL:  Are you asking him what
25  amount he's asking or what are you asking him?

1         MS. GLENN:  If he's seeking an amount, I
2   would like that, but I would like to know what
3   his damages are.
4         THE WITNESS:  I don't know.  I mean, what
5   amount do you put on sleeping every night and
6   not knowing whether the marshal is going to
7   show up.
8   BY MS. GLENN:
9     Q   Now, when you say your "family members",
10  who are you speaking of?
11    A   My daughter, myself, little Kenny when
12  he's here, which is every other week, you know, or
13  sometimes there's some breaks in those weeks and
14  whatnot, my grandchild or any of my other family
15  members.
16        You know, you're sitting there watching a
17  football game on Sunday, a real estate agent comes
18  and knocks on the door.
19        You know, it's just -- it's just -- it's
20  crazy.  One time -- there's a fence around the back
21  of the house and this was during the winter months
22  of this year when it gets dark about 5:00 o'clock in
23  the afternoon, 5:00 or 6:00, and two people are
24  walking around in the back yard because they
25  understood that the house was a REO listing and they

1   were thinking about trying to buy it from the bank,
2   you know.
3         And you don't want to be rude to those
4   people.  They're just going by what's public record
5   and public record shows that property has been
6   foreclosed on.
7         So it's just a very, very stressful way to
8   live day in and day out.
9     Q   Do you want the home back?
10    A   Certainly.  Definitely.  That's what we've
11  been saying from day one.
12    Q   You want to stay in the property?
13    A   Beyond a shadow of a doubt.  I want to
14  make that abundantly clear.  And make our payments.
15  As I indicated to you, I have -- now I have my
16  access one clinical diagnosis.  The medical
17  treatments have been working, you know, very, very
18  well.
19        And, you know, we're ready to go ahead
20  and, you know, keep the home, if that is possible,
21  you know, because you want to keep it in the family.
22  And we just want to go ahead and move forward.
23    Q   What exactly are you seeking from this
24  lawsuit?  You want the home back and what else?  Do
25  you want anything else?

Page 109

1    A   Well --
2        MR. RACHEL:  He probably wants some
3    damages, but I'll get with you on that.
4        THE WITNESS:  Because it's --
5        MS. GLENN:  David, I want to know what he
6    values --
7        THE WITNESS:  Well, I can't put a monetary
8    amount on that, Counselor. that would be
9    imprudent at this time.  But what I will say
10   this is this --
11   BY MS. GLENN:
12    Q   What would be a prudent time, because it
13   looks like you filed your lawsuit in November of
14   last year.
15       Have you thought about, since November of
16   last year, what it is that you want out of your
17   lawsuit?
18    A   And you're talking specifically monetary
19   numbers?
20    Q   I want to know exactly what it is you're
21   seeking out of this lawsuit, everything.  What is it
22   that you want?  You said you want to stay in the
23   property.
24    A   Yes.  That's first and foremost.  And then
25   also, you know, we've had to move things.  I've had

Page 110

1    to lock up storage because I didn't know whether the
2    marshal was going to show up at any given time.
3        I've been told that that's still a
4    possibility, although the law firm, I understand,
5    doesn't have a reputation of doing that, that was
6    handling the foreclosure, as my counsel indicated
7    earlier.
8        MR. RACHEL:  Not much.
9        THE WITNESS:  But through this roller
10   coaster ride, I don't trust anybody, okay.  The
11   other side of it is is that I've had to go out
12   and try to seek an alternate residence, because
13   if the marshal show up -- hear me out -- that's
14   not a time to be negotiating with the sergeant
15   or the commanding officer.
16       That's one house on his list that he's
17   making.  They're going to put our stuff out on
18   the street.  So I have to -- I'm concurrently
19   having to maintain another property, because my
20   family is not going to live on the street.
21       And if one of my children call me and tell
22   me that the marshal is out there, they know
23   exactly where to go to the alternate address.
24       So I'm having to carry that particular
25   expense on an ongoing basis, as well.

Page 111

1    BY MS. GLENN:
2     Q   Do you have a tenant in the property?
3     A   No, I live in the house.
4     Q   No, in the alternative property.  Is it
5    just sitting vacant?
6     A   No, no.  We went ahead -- we have some of
7    the furnishings we took out of 3481 Oak Run Drive we
8    put over there.
9        And then my daughter is -- the 25, 26 year
10   old, she's in and out of that property, you know,
11   because we don't want to make it look like its
12   vacant because, you know, vandals or whatnot.
13       I'm having to handle that ongoing expense
14   plus the utilities over there across that location
15   and 3481.  Literally, 3481 Oak Run Drive, it's like
16   living day-to-day, because you don't know what's
17   going to happen.
18    Q   Why do you say you would get no notice if
19   the sheriffs were to come.  There is a proceeding.
20   You have to have notice.  They would have to
21   institute dispossessory proceedings.
22       Why would you feel like it would be a
23   surprise if they showed up and put you out, so to
24   speak?
25    A   Okay.  Like I said, I don't know.  I've

Page 112

1    never been put out on the street.  I've seen people
2    who, peace and blessing be upon them, that's
3    happened to.  So I don't know the formal process
4    because it's never happened to me.  So excuse, my
5    ignorance.
6     Q   No, I understand.
7     A   All I'm saying is I've never been in this
8    type of situation where the property has gone to
9    foreclosure, and I just want to go ahead and be able
10   to sleep at night knowing, okay, everything is on
11   par.
12       My health is where it needs to be at now.
13   You know, we've got my -- my access one diagnosis
14   has been confirmed.  Medical treatment is fine.  And
15   I just want to go back to normalcy in life.
16       MS. GLENN:  Just one second.
17       MR. RACHEL:  Just to elaborate on what he
18   said, I haven't spoke to him about the
19   dispossessory.  I haven't had any reason to
20   speak to him about dispossessory proceedings.
21       You or the other gentlemen, John, I
22   believe, GMAC hasn't made any representation of
23   a dispossessory.  So I haven't had a reason to
24   speak to him about this.
25       MS. GLENN:  I understand.

Page 113

1  BY MS. GLENN:
2      Q   So your actual out-of-pocket damages, you
3  believe, are, you said -- did you say storage?
4      A   No, I just list them.  I didn't give the
5  monetary amounts.
6      Q   No, no, no.  Not asking for monetary
7  amounts if you don't know them.  But you said you're
8  out of pocket damages include -- did you say
9  storage?
10     A   Storage.  Another home altogether,
11 maintaining that.  The corresponding utilities with
12 regards to that.  Then I had to get insurance on
13 that property to insure the items that we moved over
14 there in that other property.
15     Q   Is that your daughter's primary residence
16 at this time?
17     A   No, no.
18     Q   Are you renting that property from
19 someone?
20     A   No.
21         MR. RACHEL:  He's not renting it because
22 he's afraid that he's going to get kicked out.
23 BY MS. GLENN:
24     Q   No, no.  Are you renting the property from
25 someone?

Page 114

1      A   Yes, yes.  Exactly.
2      Q   And how much is your rent?
3      A   It's a lease purchase.
4      Q   It's a lease purchase for how much a
5  month?
6      A   I got to pull it.
7      Q   Give me an estimate.
8      A   It's plus or minus --
9      Q   1,000?  2000?  3,000?
10     A   It's a little more than 2000, and the
11 reason I'm saying that is is because -- when I think
12 in my mind, I look at my expenditures on a
13 particular situation in and of itself.
14         So when I look at the alternate property,
15 my insurance, my utilities and everything costs me
16 plus or minus $2000 just to carry that as an
17 alternate location.
18     Q   That's over twice as much as the mortgage.
19     A   Who you telling.  We agree.  So -- you
20 know, not discounting we wanting to keep 3481 in the
21 family, you know, and me keep the mortgage.
22         But it would be in my best interest to go
23 ahead and keep 3481.  But I have to go ahead and
24 make accommodations at another location if need be.
25     Q   But not if there's not a dispossessory

Page 115

1  pending?
2      A   Once again, I mean --
3         MR. RACHEL:  Dispossessory, technically,
4  if you file it in state court, take
5  approximately 15 days.  Once they serve --
6         MS. GLENN:  They need 30 days notice?
7         MR. RACHEL:  Not with dispossessory.  You
8  can go file a dispossessory today.  You don't
9  have to give a 30-day notice.
10        MS. GLENN:  No.  You file it.  You have
11 seven days to answer, right?  And then there's
12 a hearing set.
13        MR. RACHEL:  Which is about seven days
14 from that.  Then the judge can only give you
15 seven days, they're issuing seven days.  So
16 technically I would say 25 days you're gone
17 literally.
18 BY MS. GLENN:
19     Q   You don't believe you could find another
20 property in 25 days?
21     A   Not with my schedule, as well, because
22 then what do I have to do, Counselor.  I have to
23 take off work, which means I don't get paid, okay.
24         Then I've got to vet several properties.
25 I got to look at where they are in connection to --

Page 116

1  with regard to my granddaughter and her schooling,
2  et cetera, et cetera.
3         I'm on the air every Tuesday and Thursday.
4  I teach Monday, Wednesdays and Fridays.  Where am I
5  going to be able to find a home, okay, that is of
6  the quality of life that I want my family to be able
7  to live in 25 days.
8         I mean, that -- so I have to make prudent
9  decisions, you know, for my family so that I can
10 move realtime in the event that, you know, the
11 marshals show up.
12        MS. GLENN:  Let's go off the record.  I
13 just need a few minutes to make sure I got
14 everything.
15        (Whereupon, a brief recess was taken.)
16 BY MS. GLENN:
17     Q   What do you estimate the value of the
18 property to be currently on Oak Run Drive?
19     A   Plus or minus $65,000.  You can check that
20 yourself.
21     Q   What do you believe the value of the
22 property was September of last year?
23     A   $65,000.
24     Q   And how much is owed on the property?
25     A   I think it's 100 -- 102, 103.

Page 117

1    Q   So you have no equity in that property?
2    A   None.
3    Q   Question:  You allege in your complaint
4  that the cost for wrongful -- one of your causes --
5  excuse me.  One of your causes for the wrongful
6  foreclosure allegation is that the sale was not
7  properly advertised by defendants.
8        Why do you say that?  What was
9  improper about the -- let me him answer, David.
10   A   And once again, I'm not an attorney.
11   Q   I understand that.
12   A   But --
13   Q   But this is a complaint that you verified,
14  and I want to understand what your allegation is
15  with regard to the impropriety of --
16   A   I understand that there's an ongoing
17  publication that law firms or whatever are supposed
18  to publish their foreclosures or notices or
19  whatever.
20       And I researched it.  I couldn't find it.
21  Okay, because what I'm saying to you is this:  My
22  inference with regards to Carita Bowers, if I had
23  known on that Monday before the first Tuesday of
24  September that that property was still slated to be
25  foreclosed upon, by virtue of me seeing it in that

Page 118

1  public notification or whatever the case may be,
2  because I would have called back -- I would have
3  called the editor to confirm that.
4        If Ms. Bowers wouldn't have reassured me
5  and said "Mr. Reaves, there's nothing else you can
6  do.  Your foreclosure date has been moved.  It has
7  been postponed to October the 6th."
8        Had I not governed myself pertaining to
9  that, I would have done whatever I needed to do to
10  go ahead and pay whatever those fees were, okay,
11  while I was still waiting for them to work out
12  whatever that definition was and what we were going
13  to do with that miscellaneous corporate fees.
14   Q   But you did receive the foreclosure notice
15  from McCurdy and Candler, correct?
16   A   Yes, ma'am.
17   Q   If you had known the foreclosure sale was
18  going forward, would you have gone to the sale?
19   A   Yes.
20   Q   You would have been at the sale?
21   A   Yes.
22       MS. GLENN:  David, he's all yours.
23       THE WITNESS:  I sure would have.
24              EXAMINATION
25  BY MR. RACHEL:

Page 119

1    Q   Let me just clarify a couple things.  The
2  Frank Dodd -- Dodd-Frank certification, you did not
3  send -- I believe you stated you did not send the
4  Frank Dodd in the original package because she did
5  not send it to you?
6    A   Exactly.  She forwarded me the loan
7  modification package and indicated that I was to
8  fill out everything inside of that.
9        I'd never heard of a Dodd-Frank or Frank
10  Dodd certification, and when I sent everything back
11  to her, she told me everything was filled out.  I
12  didn't need to submit anything else.
13       And then it was several days afterwards
14  she said oh, I forgot to submit the Frank Dodd Act.
15  Mr. Reaves, you need to get that in to me.
16   Q   Now, you testified, just want to clarify,
17  that you had no intentions on obtaining a loan
18  modification.  You were happy with your payment?
19   A   Yes, sir.
20   Q   You only wanted to reinstate your loan?
21   A   Yes, sir.
22   Q   But Ms. Bowers told you to do the loan
23  modification?
24   A   Exactly.  She said to go ahead and do the
25  loan modification and then work out what the

Page 120

1  miscellaneous corporate fees were.
2    Q   When did she tell you to get an attorney?
3    A   When I notified her -- when I called her
4  after speaking with the insurance company of GMAC,
5  the insurance division.  I'm sorry.
6        And I had received the letter that my --
7  the insurance on the property had been dropped.  And
8  when I call her, she said that, you know, this had
9  been occurring frequently.  That's what she said.
10  And she said "do what you need to do."
11       And then I said well, and she said you
12  need to get you an attorney.
13   Q   Now the opposing counsel has shown you
14  some default notices.  Now on those default notices,
15  did you reinstate every one of the default notices?
16  Every time you've ever been in default on this loan,
17  have you reinstated it?
18   A   Every single time.  Every time I received
19  notice of default I went ahead and paid the
20  reinstatement amount.
21   Q   Is it your statement your intention on
22  this one was to pay the reinstatement?
23   A   Absolutely.  In fact, I told Ms. Bowers
24  that on several occasions, offered to go ahead and
25  tender the payment.  Upon her advice, she told me

Page 121

1    don't do it.
2        Q   Do you believe that GMAC has a record of
3    all your payments, even if they were in default, and
4    a record of where you immediately cured the default?
5        A   Certainly, I think that they should have,
6    because the payments were made directly to GMAC.
7        Q   In any of the defaults that opposing
8    counsel showed you, did you see a line item called
9    corporate advance or something to that --
10       A   Corporate expenses.  Miscellaneous
11   corporate advance.
12       Q   Miscellaneous corporate advance in any of
13   the documents that she showed you?
14       A   No, I did not.
15       Q   So this is the first time that you've ever
16   seen that miscellaneous corporate advance?
17       A   Exactly.  And that's why I wanted clarity
18   on it.
19       Q   You testified that you still do not have
20   the clarity of that; is that correct?
21       A   To this day, as I sit before you at 10
22   minutes to 6:00 on April the 27th, 2012, still
23   don't know.
24       Q   Okay.  Now opposing counsel asked if you
25   would characterize your payment history as a default

Page 122

1    history, I believe she said --
2        MS. GLENN:  I said a pattern of default.
3    BY MR. RACHEL:
4        Q   Pattern of default.  Would you
5    characterize what has happened to you, based on the
6    conversations with Ms. Bowers, as a pattern of
7    foreclosure, wrongful foreclosure by GMAC?
8        A   I think that it would not be unrealistic
9    to hypothesize that your statement is accurate.
10       MS. GLENN:  I would object as to personal
11   knowledge and foundation, improper lay opinion
12   and speculation.
13   BY MR. RACHEL:
14       Q   Would you say that the default on your
15   mortgage, would they have anything to do with GMAC
16   wrongfully foreclosing on you?
17       Q   Would the default -- would you -- even if
18   you had a pattern of default, would that have
19   anything whatsoever to do with GMAC wrongfully
20   foreclosing on you?
21       A   Okay, Counselor.  Rephrase that.
22       Q   Okay.  If you had been in default six
23   times --
24       A   Okay.
25       Q   -- previously and you come up now and GMAC

Page 123

1    wrongfully forecloses on you -- they tell you
2    they're not going to foreclose and then they
3    foreclose and, according to Ms. Bowers, wrongfully
4    foreclose, do you believe those have anything to do
5    with each other?
6        A   No, I mean they're two separate
7    occurrences.
8        MR. RACHEL:  That's all I have.
9        MS. GLENN:  We're all done.
10       (Deposition Concluded)
11

_____
12       KENNETH REAVES
13   Sworn to and subscribed before me,
     this the _____ day of _____, 2012.
14
15                                 _____
         Notary Public
16       My commission expires:
17
18
19
20
21
22
23
24
25

Page 124

1        C E R T I F I C A T E
2        - - - - - - - - - - -
3    STATE OF GEORGIA:
4    FULTON COUNTY:
5        I hereby certify that the foregoing
6    transcript was  taken down as stated in the caption,
7    and the questions and answers thereto were reduced
8    to typewriting under my direction; that the
9    foregoing pages 1 through 123 represent a true and
10   correct transcript of the evidence given upon said
11   hearing, and I further certify that I am not a
12   relative or employee or attorney or counsel of any
13   of the parties, nor am I a relative or employee of
14   such attorney or counsel, nor am I financially
15   interested in the action.
16       This the 6th day of May, 2012.
17
18                                 _____
         KELLY A. EMERY, CCR-B-941
19
20
21
22
23
24
25