1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x

            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            December 16, 2015

            10:02 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2   Doc# 9364, 9311 Status Conference on ResCap Borrower Claims

3   Trust's Seventy-Fifth Omnibus Objection to Claims (No Liability

4   Borrower Claims) Solely as it relates to the Claim Filed by

5   Rhonda Gosselin.

6

7   (CC: Doc# 9355, 9359) Motion for Relief from Stay.

8

9   (CC: Doc# 9280, 9328, 9393) Hearing RE: ResCap Borrowers Claim

10   Trust's Objection to Claim Nos. 4757, 4758, 4762, and 4764

11   Filed By Patricia McNerney and Susan Gray.

12

13   (CC: Doc# 9334) Motion to Strike Affidavit of Sara Lathrop

14   Filed in Support of Objections to Claims 4757, 4758, 4762, 4764

15   Filed in Document 9280.

16

17   (CC: Doc# 9333) Motion to Strike Affidavit of David Wallace

18   Filed in Support of Objection to Claims 4757, 4758, 4762, and

19   4764 as Document Number 9280.

20

21

22

23

24

25

1

2  (CC: Doc# 9296) ResCap Borrower Claims Trust's Ninetieth

3  Omnibus Objection to Claims ((I) No Liability Borrower Claims,

4  (II) Reduce and Allow Borrower Claims, and (III) Allowed in

5  Full Borrower Claim) Reset for 1/21/2016 at 10:00 a.m. as to

6  Claim Filed by Mary R. Biancavilla.  The hearing as to all

7  other claims will be going forward.

8

9  (CC: Doc# 9310) ResCap Borrower Claims Trust's Objection to

10  Proof of Claim No. 5857.

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Aliza Chodoff

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

```
 1
 2   A P P E A R A N C E S :
 3   MORRISON & FOERSTER LLP
 4        Attorneys for ResCap Borrower Claims Trust
 5        250 West 55th Street
 6        New York, NY 10019
 7
 8   BY:   JORDAN A. WISHNEW, ESQ.
 9        JESSICA J. ARETT, ESQ.
10
11
12   CARPENTER LIPPS & LELAND LLP
13        Attorneys for ResCap Liquidating Trust
14        280 North High Street
15        Suite 1300
16        Columbus, OH 43215
17
18   BY:   DAVID A. WALLACE, ESQ. (TELEPHONICALLY)
19
20
21
22
23
24
25
```

1

2   SUSAN M. GRAY, ATTORNEY AT LAW

3        Attorney for Patricia McNerney

4        22255 Center Ridge Road

5        Suite 210

6        Rocky River, OH 44116

7

8   BY:   SUSAN M. GRAY, ESQ.

9

10

11    MCINTYRE THANASIDES BRINGGOLD ELLIOTT GRIMALDI & GUITO, P.A.

12        Attorneys for Mary McDonald

13        501 East Kennedy Boulevard

14        Suite 1900

15        Tampa, FL 33602

16

17  BY:   JOHN HIGHTOWER, JR., ESQ. (TELEPHONICALLY)

18

19

20  ALSO PRESENT:

21        RHONDA L. GOSSELIN, Party Pro Se (TELEPHONICALLY)

22        SARA M. LATHROP, Senior Claims Analyst, ResCap Borrower

23           Claims Trust (TELEPHONICALLY)

24

25

RESIDENTIAL CAPITAL, LLC, et al.                    6

1                      P R O C E E D I N G S

2            THE COURT:  All right, please be seated.

3            We're here in Residential Capital, number 12-12020.

4            Mr. Wishnew.

5            MR. WISHNEW:  Good morning, Your Honor.  Jordan

6    Wishnew, Morrison & Foerster, for the ResCap Borrower Claims

7    Trust.

8            Your Honor, I'm happy to report, as your chambers has

9    acknowledged, that the Connecticut HFA matter has been

10   resolved.  So with those -- that order entered, we are going to

11   save ourselves a lot of paper going forward on future agendas,

12   as well as the Court's time.

13           So that brings us to the first matter going forward

14   this morning, the case management and the status conference for

15   the ResCap Borrower Claims Trust seventy-fifth omnibus

16   objection to claims as it pertains to the plaintiff Rhonda

17   Gosselin.  It's at the bottom of page 8 of today's agenda.  I

18   believe Ms. Gosselin is on the phone.

19           THE COURT:  Ms. Gosselin, are you on the phone?

20           MS. GOSSELIN:  Yes, this is Rhonda Gosselin.

21           THE COURT:  Thank you.

22           MR. WISHNEW:  Your Honor, this is a matter which I

23   know the Court is familiar with.  It is a claim that was

24   res -- where there's a prior decision issued by the Court

25   sustaining in part and overruling in part the Borrower Trust

1   Claims objection to Ms. Gosselin's claim.

2          We had served discovery on Ms. Gosselin's counsel,

3   Laird Heal, back --

4          THE COURT:  Yes.

5          MR. WISHNEW:  -- in the beginning of September.

6   Subsequently, he was removed from the practice of law in

7   Massachusetts and unable to represent Ms. Gosselin.  For

8   reasons I won't get into, we haven't been able to have a status

9   conference until today.  We have -- we, the Borrower Claims

10  Trust, had made an initial settlement offer to Ms. Gosselin,

11  which she respectfully declined.  So at this point, we are

12  looking for the Court's guidance as to how to move forward most

13  efficiently to bring this matter to a resolution.

14         THE COURT:  Okay.  Ms. Gosselin, have you been able to

15  obtain new counsel?

16         MS. GOSSELIN:  Rhonda Gosselin.  No, I haven't.

17         THE COURT:  Are you going to proceed without counsel?

18         MS. GOSSELIN:  Rhonda Gosselin.  No.

19         THE COURT:  I guess I don't understand your response.

20  I mean, Mr. Heal, who was your counsel, had to withdraw, and

21  that's occurred.  So you're now -- unless you get new counsel,

22  you're appearing on your own.  That's okay.  You're permitted

23  to do that.  It's unquestionably difficult for borrowers to

24  proceed without counsel.  Going back in time, the Trust had

25  objected to your claim, and I had entered a written opinion and

RESIDENTIAL CAPITAL, LLC, et al.                    8

1   order sustaining in part and overruling in part the Trust Claim

2   objection to your claim.  So part of your claim survives.

3        The question is how we go forward.  If you want to

4   move forward and try and prevail on your claim, you're going to

5   have to do it either on your own or with a new lawyer.  At this

6   stage, obviously, I'm not -- settlement is entirely voluntary.

7   It -- I don't force anybody to enter into settlements.  And I

8   know you've -- that's been pursued with the Trust, I assume,

9   and it's been unsuccessful at this point.

10       So I need to enter a scheduling order to move forward.

11   So I mean, it's your call, Ms. Gosselin, as to -- do you wish

12   to proceed with your remaining claim against the Trust?  Are

13   you going to abandon the claim if you're going to proceed on

14   your own, which you're entirely permitted to do.  I'll enter a

15   scheduling order, we'll move forward.  I don't know whether

16   there are any discovery issues that you want to raise, Ms.

17   Gosselin, or Mr. Wishnew, that you want to raise.

18       MR. WISHNEW:  Your Honor, we had previously served

19   counsel with discovery in the form of request for admissions,

20   some document requests, and those went -- we received no

21   responses in a timely manner.  So we would propose to reissue

22   those, but would willing to move forward expeditiously with a

23   truncated discovery --

24       THE COURT:  Sure.

25       MR. WISHNEW:  -- schedule.

1          THE COURT:  So Ms. Gosselin, tell me, what do you want

2     to do?

3          MS. GOSSELIN:  Rhonda Gosselin.  I don't understand

4     the -- everything fully.  Laird Heal was my fifth attorney.  I

5     guess I'm unable to find an attorney to really represent

6     me -- my case.  I don't agree with a lot of it, so I don't know

7     if it should go forward to a different court.  This is what I

8     don't understand.  But I'll --

9          THE COURT:  You -- Ms. Gosselin --

10         MS. GOSSELIN:  -- I have no idea of --

11         THE COURT:  -- Ms. Gosselin, it's going forward before

12    me.  I mean, that's -- you filed a proof of claim in the ResCap

13    bankruptcy.  The Trust objected to the claim.  I overruled

14    their objection in part and sustained it in part, so

15    there -- do you have a copy of my written opinion?

16         MS. GOSSELIN:  Rhonda Gosselin.  Yes, I do.  I have

17    some information, but I don't know if I'm missing information.

18    I don't know.  I've been really sick, so Laird hasn't kept in

19    touch with me that much --

20         THE COURT:  Okay.

21         MS. GOSSELIN:  -- on the details.

22         THE COURT:  Sure.  Well, what I'm -- let me ask this.

23    And I'm -- I didn't realize that you had been through so many

24    counsel before Mr. Heal.  Mr. Heal appeared before me in some

25    other ResCap matters as well so -- that were also affected by

1  the fact that he had to withdraw.  I just want to be clear on

2  this.  I think you've answered it clearly.  But are you making

3  any effort to find replacement counsel?

4          MS. GOSSELIN:  I -- Rhonda Gosselin.  I have been

5  searching for counsel for -- since 2009 --

6          THE COURT:  Okay.

7          MS. GOSSELIN:  -- basically.  And the only ones I

8  found me that helped me the most was Laird Heal.

9          THE COURT:  Yeah.

10         MS. GOSSELIN:  At this moment, I don't have the money

11 to hire the right attorney to take -- handle this matter.

12 There's more going on than what you're seeing.  It's really

13 complicated -- to me, it's very complicated.

14         THE COURT:  Sure.

15         Mr. Wishnew, what are the remaining factual or legal

16 issues with respect to Ms. Gosselin's surviving claim?

17         MR. WISHNEW:  Your Honor, one moment.  The surviving

18 claims deal with the issue of wrongful foreclosure, whether

19 there's a claim under Chapter 93(a) of the Massachusetts

20 General Laws, as well as a claim under another Massachusetts

21 consumer debt statute.

22         THE COURT:  All right.  Mr. Wishnew, submit a proposed

23 case management and scheduling order that includes ninety days

24 for fact discovery, forty-five days for expert discovery, get a

25 date from Deanna for the next case management and scheduling

1    conference.  It should occur shortly before -- find it -- if

2    there are omnibus hearing dates, a few weeks before the close

3    of the fact discovery period.

4              Ms. Gosselin, I -- at this stage, I have no choice but

5    to move forward.  I'm actually being maybe more generous than I

6    otherwise would with the amount of time that I'm permitting.

7    And it's certainly no fault of yours that Mr. Heal had to

8    withdraw as counsel.  I'm -- I just want to make clear -- and

9    if you're able to find other counsel, the sooner the better.

10   But the matter has to go forward.  I can't continue to carry it

11   longer without action.  It's important that the remaining

12   ResCap matters get resolved.  Distributions to all borrowers

13   with allowed claimed depends upon closing as many of the

14   borrower matters as possible.  And a lot of time has passed

15   already.

16             As I say, I recognize it's through no fault of your

17   own that Mr. Heal had to withdraw.  But you'll get a

18   copy -- I'll make sure -- Mr. Wishnew, make sure that Ms.

19   Gosselin -- do you have your address, Mr. --

20             MR. WISHNEW:  I do, Your Honor.

21             THE COURT:  Okay.  That she gets a copy of this

22   proposed -- of the case management and scheduling order.  I am

23   going to enter it.

24             MR. WISHNEW:  Okay.

25             THE COURT:  And we'll move forward from there.

1      Ms. Gosselin, I -- you'll -- if you're going to

2  litigate, you can litigate on your own.  You can find new

3  counsel.  It's important when I enter this order that counsel

4  know those dates aren't going to be changed at this point.  And

5  after the discovery period, the case will be set for trial.

6  You'll have to be here for the trial.  It has to be done in

7  person.  I don't do those over the phone.  I'm certainly --

8  will permit you to appear at any case management conference by

9  telephone, not having to come down here.  And when I set a

10  trial date -- if we set a trial date -- I try to do it

11  as -- dates that are mutually convenient to both sides.  So I

12  won't sort of unilaterally do that without you having a say in

13  it.  But in terms of the discovery period, that's got to go

14  forward now.

15      I encourage you, Ms. Gosselin, to continue to try to

16  resolve the matter through settlement with the Trust.  But

17  that's completely -- I don't strong-arm anybody into

18  settlement.  You're entitled to your day in court.  And when

19  Mr. Heal was representing you, you were at least partially

20  successful, because part of your claim survived.  Issues under

21  the Massachusetts statutes that remain in play -- 93(a) and a

22  consumer protection statute -- are complicated issues.  I don't

23  dispute that, but that's what we're going to have to do.

24      So you'll get a copy of the order.

25      Mr. Wishnew, I encourage you to continue to try and

1  talk to Ms. Gosselin and see whether you can resolve it.

2  You'll keep me posted if -- not on the details of any

3  settlement --

4          MR. WISHNEW:  Of course.

5          THE COURT:  -- obviously, but if you're able to

6  resolve it.  And I'll enter the case management scheduling

7  order, and we'll move forward on that basis.  And --

8          MR. WISHNEW:  Thank you, Your Honor.

9          THE COURT:  -- I'm just making clear, I'm not at this

10  stage, given the amount of time that's passed, those dates are

11  going to stick.

12          MR. WISHNEW:  Understood, Your Honor.

13          THE COURT:  Okay?

14          MR. WISHNEW:  Yeah.

15          THE COURT:  All right.  Ms. Gosselin, thank you very

16  much for participating by telephone today.

17          MS. GOSSELIN:  Rhonda Gosselin.  Thank you.

18          THE COURT:  Okay.

19          MR. WISHNEW:  Your Honor, the next matter on today's

20  calendar is under page 10 under Section 4 of the agenda,

21  Contested Matters.  It's the petition of Patricia McNerney and

22  Susan Gray, preliminary relief from the automatic stay.  I

23  believe Ms. Gray's in the courtroom.

24          THE COURT:  Come on up, Ms. Gray.

25          MS. GRAY:  Good morning, Your Honor.  I'm Susan Gray.

RESIDENTIAL CAPITAL, LLC, et al.                    14

1    I'm representing Patricia J. McNerney with regard to two claims

2    and also attorney fee claims that, under Ohio law, belong to

3    the attorney.  And therefore, I filed separate claims for those

4    just to avoid any concern about the hypertechnicality of the

5    claims process, that --

6              THE COURT:  Okay.

7              MS. GRAY:  -- those claims would have been lost.  So

8    I'm here on a motion for relief from stay and also on the Trust

9    objection to our claims and on two --

10             THE COURT:  Well, let me deal first with the motion

11   for relief from stay.  I've read all the papers.  They're quite

12   voluminous on everything.  And the motion from relief from stay

13   is denied.  I've gone through -- in this circuit, we apply the

14   Sonnax case from the Second Circuit with twelve factors.  I've

15   gone through, reviewed the pleadings, reviewed the history of

16   the litigation in the Northern District of Ohio.

17             When your client and you filed a proof of claim in

18   this court, the law is quite clear.  You submit to the

19   equitable jurisdiction of the bankruptcy court to resolve those

20   claims as part of the claims allowances process.  It's only in

21   fairly rare circumstances that I will lift the stay to permit

22   litigation to be resolved elsewhere, even to fix the amount of

23   the claims, which is what you're asking to be able to do.

24             One of the things that neither party had called to my

25   attention is that Judge Lesley Wells, the district judge in the

1   Northern District of Ohio, before whom the matter has been

2   pending, retired from the bench in early October 2015.

3            MS. GRAY:  News to me, Your Honor.

4            THE COURT:  Okay.  So the history of this case, as

5   I've looked carefully, there was the prior litigation first in

6   state court.

7            MS. GRAY:  Correct.

8            THE COURT:  And I guess it was a trial, but no

9   decision.

10            MS. GRAY:  Exact, Your Honor.

11            THE COURT:  And then, that was the first foreclosure

12   action, and you had counterclaims -- your client -- you filed

13   counterclaims on that on behalf of your client.  That was

14   ultimately dismissed.  The second foreclosure action was filed

15   in federal court in the Northern District of Ohio.  It was

16   before Judge Wells.  You filed counterclaims again.  You added

17   some additional counterclaims.  The debtor, before bankruptcy,

18   filed a motion for judgment on the pleadings and a motion for

19   summary judgment.

20            While those matters were briefed, before there was any

21   decision, the debtors filed their Chapter 11 case here.  The

22   case in the Northern District of Ohio was stayed as a result of

23   the bankruptcy.  I guess Judge Wells was a senior judge when

24   the matter before him (sic) was pending.

25            MS. GRAY:  Her, Your Honor.

1        THE COURT:  And he'd been a senior judge for about

2   seven or eight years, but he retired -- Judge Wells retired

3   from the bench, I think it was either October 2nd or 5th, 2015.

4   So there is nobody in that court with familiarity about any of

5   these proceedings.

6        Your motion papers that you filed here, your response

7   to the objection essentially duplicates the pleadings in what

8   were the pending motions before Judge Wells at the time that

9   the bankruptcy interceded.  So I've considered each of the

10  twelve Sonnax factors and concluded that they weigh heavily in

11  favor of the McNerney and Gray claims being adjudicated here as

12  part of the claims allowance process.  One of the things you

13  argue is, mistakenly, that Ms. McNerney would be entitled to a

14  jury trial.  And that's not correct.

15       MS. GRAY:  I agree, Your Honor.

16       THE COURT:  Okay, that when you file a proof of claim

17  you submit to the equitable jurisdiction --

18       MS. GRAY:  Right.

19       THE COURT:  -- and there is no jury.

20       So I'll simply enter an order, and ask Mr. Wishnew to

21  prepare it, that for the reasons stated the motion to lift the

22  stay is denied.  But I do want to go on and hear argument with

23  respect to the Trust objection to the claims.

24       On that score, we'll let Mr. Wishnew argue first, and

25  then you'll have a chance to respond, okay?

RESIDENTIAL CAPITAL, LLC, et al.                          17

1          MS. GRAY:  Thank you, Your Honor.  May I ask one

2   question, though --

3          THE COURT:  Sure, go ahead.

4          MS. GRAY:  -- with regards to the lift from the stay?

5   In the -- with regard to the underlying issues, there is one

6   witness who is a hostile witness, who is located in Ohio.  And

7   I guess if we go to trial, we'll have to do it by video or

8   something.

9          THE COURT:  No, we don't do any -- I don't -- there's

10  one of two things.  You're assuming you're going to get to

11  trial.  We'll see whether you get to trial.  The -- you can

12  take the witness' deposition.  You can take it as a video

13  deposition.  And when I have a trial, it's not uncommon to have

14  witness testimony presented by deposition, designations,

15  counterdesignations, et cetera, including video depositions.

16  And so that's -- I can't -- if the witness is outside the

17  subpoena power of the Court, the witness can't be forced to

18  attend in court.  But that doesn't prevent you from taking the

19  deposition and taking a video deposition, if that's what you

20  choose to do.  So --

21         MS. GRAY:  We'll work it out, Your Honor.

22         THE COURT:   I mean, that's not uncommon.

23         MS. GRAY:  Okay.

24         THE COURT:  Okay?

25         MS. GRAY:  Thank you.

1          THE COURT:  All right, thanks very much.

2          Mr. Wishnew?

3          MR. WISHNEW:  Thanks, Your Honor.

4          THE COURT:  Let me just make a note, okay?

5          Okay.

6          MR. WISHNEW:  Thank you, Your Honor.  Jordan Wishnew,

7    Morrison & Foerster for the ResCap Borrower Claims Trust.

8          The next matter on today's agenda is under Section 5

9    of the agenda on page 10, item 6, which is the ResCap Borrower

10   Claims Trust objection to claim numbers 4757, 4758, 4762, and

11   4764, filed by Patricia McNerney and Susan Gray, docket number

12   9280.  The Borrower Trust -- sorry, Ms. McNerney or the

13   claimants filed a response to the objection at docket number

14   9328.  The Borrower Trust filed a reply in support of the

15   objection at docket number 9393.  The Borrower Trust's reply

16   also addressed to motions to strike that were filed by the

17   claimants, which were filed at docket numbers 9333 and 9334.

18         Your Honor, through the objection, after thoroughly

19   examining the debtors' books and records, the Borrower Trust

20   seeks to expunge the claimants' proofs of claim because they do

21   not sufficiently allege how the debtors' actions gave rise to

22   liability for the stated causes of action.  In support of the

23   objection and the reply, the Borrower Trust submitted a

24   declaration of Sara Lathrup, senior claims analyst to the

25   Borrower Trust, as well as the declaration of David Wallace,

1  co-counsel to the ResCap Liquidating Trust.  Both Mr. Wallace

2  and Ms. Lathrup are on the phone today and available to answer

3  any questions the Court may have.

4          The claimant asserts eleven causes of action related

5  to alleged wrongdoing that occurred during the brokering and

6  origination of Ms. McNerney's loan in December 2002.  I

7  recognize the Court has thoroughly read all the submissions, so

8  I will not repeat our arguments as to why each cause of action

9  is devoid of merit.  However, I do want to address one point

10  that relates to a majority of the causes of action.  Seven of

11  eleven causes of action are premised on the wrongdoing of Ms.

12  McNerney's mortgage broker, OMC Lending, not the actions of

13  Homecomings.

14          The claimants assert that Homecomings' alleged

15  liability for these seven causes of action derive from the

16  claimants' mistaken legal theory that Homecomings is

17  responsible for the actions of OMC because OMC was purportedly

18  acting as Homecomings' agent.  However, this argument fails, as

19  a matter of law, as there is no evidence of either an expressed

20  or implied agency relationship between OMC and Homecomings with

21  regard to the origination of loans.

22          And just for completeness, Your Honor, the seven

23  causes of action, based upon the allegations made in the

24  claimants' pleadings, tie to the agency principal arguments are

25  breach of fiduciary duty, negligence, improvident lending, the

1   Ohio Consumer Sales Practice Act, the Ohio Mortgage Broker

2   Act --

3            THE COURT:  Just a second.  I want to make some notes.

4            MR. WISHNEW:  I'm sorry.  I'll start over.

5            THE COURT:  No, I'm with you so far.

6            MR. WISHNEW:  Okay.  Ohio Mortgage Broker Act, fraud,

7   intentional misrepresentation, and negligent misrepresentation.

8            THE COURT:  Okay.

9            MR. WISHNEW:  The --

10           THE COURT:  So that's where I -- I mean, I -- yes, it

11  appears to me that each of those causes of action depends on

12  whether OMC was Homecomings' agent, either on actual authority,

13  apparent authority, agent by estoppel.  So one of the things

14  that I've tried to focus on and ask both counsel to address is

15  what does the -- and again, there hasn't been an evidentiary

16  hearing.  But because claim objections involving a shift --

17  involve a shifting burden, and while a properly prepared proof

18  of claim is prima facie evidence of validity and amount, if the

19  objecting party, here, the Trust comes forward with evidence

20  that refutes at least one essential element of the claim, the

21  burden shifts to the claimant to come forward with evidence of

22  equal or greater force.

23           You've put forward in your papers, Mr. Wishnew, a

24  written agreement between Homecomings and OMC which disclaims

25  an agency relationship.

1          MR. WISHNEW:  Correct, for a very limited purpose,

2    Your Honor.

3          THE COURT:  Well, it's an -- OMC was an agent for --

4          MR. WISHNEW:  I'm sorry, yes.

5          THE COURT:  -- for what --

6          MR. WISHNEW:  Yes.

7          THE COURT:  -- for a limited purpose.

8          MR. WISHNEW:  Correct, correct.

9          THE COURT:  And that limited purpose was what?

10          MR. WISHNEW:  Only for the notice.  So referring Your

11    Honor to Exhibit G -- let me just make sure I'm referring to

12    the right declaration.  So it's Exhibit G to the Lathrop

13    declaration at docket number 9280-2.

14          THE COURT:  Just let -- let me turn, okay?

15          Okay.

16          MR. WISHNEW:  Paragraph 1, titled Relationship of

17    Parties on --

18          THE COURT:  Wait.  I'm in the wrong Exhibit G.  Give

19    me a second, okay?  It's a big binder.

20          MR. WISHNEW:  I understand, Your Honor.

21          THE COURT:  Okay, I'm with you.

22          MR. WISHNEW:  Okay.  Paragraph 1, titled Relationship

23    of Parties, "Broker-Lender", which is Ohio Mortgage Company,

24    Inc. -- "Broker-Lender shall conduct all business with

25    Homecomings as a nonexclusive independent contractor, and not

RESIDENTIAL CAPITAL, LLC, et al.                          22

1   as an agent, partner or affiliate of Homecomings, and shall not

2   use Homecomings' name in any advertising without Homecomings'

3   express written consent.

4           "This broker-lender agreement is broker-lender's

5   authorization to act as Homecomings' agent for the purpose of

6   delivering notices of action taken as required by the Equal

7   Credit Opportunity Act and its Regulation B."

8           THE COURT:  Okay.

9           MR. WISHNEW:  So Your Honor, very clearly, Homecomings

10  did not have an exclusive arrangement with OMC.  OMC could have

11  brokered to any number of potential lenders.  OMC was Ms.

12  McNerney's agent, not Homecomings.

13          THE COURT:  Yes, so I read a portion of the state

14  court trial transcript.  It's attached to the declaration.  And

15  the portion of the transcript I read was the cross-examination

16  of Ms. McNerney.  And she, in that testimony, acknowledged that

17  she reached out to OMC in her effort to find a replacement

18  loan.  She had to refinance because of a divorce, as I

19  remember.

20          MR. WISHNEW:  Right.  So the fact of the matter is,

21  Your Honor, Ms. McNerney went to OMC.  It's obvious from the

22  arguments that she was very displeased with how OMC performed,

23  but there's no connection --

24          THE COURT:  Well, she's --

25          MR. WISHNEW:  -- there's --

RESIDENTIAL CAPITAL, LLC, et al.                    23

1              THE COURT:  -- unhappy now.  If she was then, I don't

2   know.

3              MR. WISHNEW:  Right.  And the fact is there's no

4   connection or there's no facts to suggest that somehow

5   Homecomings ever held itself out as OMC's principal.  So the

6   facts just don't exist.  And so to the extent claimant is

7   trying to tie liability for these seven causes of action under

8   the principal agency theory, it fails, Your Honor.

9              THE COURT:  Well, I didn't see -- and Ms. Gray will

10  point out to me if there is any -- I didn't see anything in

11  that state court trial transcript of Ms. McNerney's examination

12  where she said that either OMC said it was acting on behalf of

13  Homecomings or where she testified in any other way -- she

14  said -- I think she said she had no contact with Homecomings.

15             MR. WISHNEW:  That's correct, absolutely.

16             THE COURT:  So what is it in the record that could

17  refute the contractual language where the only thing that OMC

18  was an agent for Homecomings was for delivery of notices?

19             MR. WISHNEW:  I don't believe --

20             THE COURT:  I guess the focus of the claims, as I

21  understand it is, is that OMC may have used Homecomings'

22  application software to fill in information that was submitted

23  with the loan application.

24             MR. WISHNEW:  That's right, but that's after the fact.

25  And really, the nucleus of operative facts we're dealing with

1  here in which claimant is trying to tie liability to

2  Homecomings is everything that took place during the

3  application process, when Ms. McNerney was dealing with

4  Homecoming -- sorry, when Ms. McNerney was dealing with OMC,

5  she was not dealing with -- as Your Honor pointed out, she was

6  not dealing with Homecomings; she was dealing with OMC.  And so

7  there's nothing in the record to our -- in our position, that

8  suggests that she knew of the Homecomings-OMC relationship,

9  that it was in any way exclusive.

10          In fact, the argument -- the agreement says just

11  the contrary.

12          THE COURT:  Well, that could be -- I mean, it doesn't

13  have to be exclusive for OM -- for OMC to have been

14  Homecomings' agent in connection with this loan wouldn't

15  require that OMC be the exclusive -- have an exclusive

16  relationship with --

17          MR. WISHNEW:  Right.

18          THE COURT:  -- with Homecomings.

19          MR. WISHNEW:  But I mean, clearly, Ms. McNerney had

20  absolutely no knowledge of a relationship.  And so it was her

21  seeking out the assistance of OMC, her dealing with OMC, and

22  then, subsequently, OMC reaching out to Homecomings to see if

23  they would accept the loan.  That's the extent of the

24  connection between the three parties.

25          There's not a sufficient connection between OM -- I'm

1   sorry, between Ms. McNerney and Homecomings to warrant any sort

2   of finding that OMC was Homecomings' agent.

3          Your Honor, I'm not sure -- I mean, I can go through

4   the different causes of action and highlight our principal

5   arguments, unless you just want to ask questions you might have

6   as to the --

7          THE COURT:  Well, I -- Ms. Gray cites in her brief the

8   Sixth Circuit's decision in Brainard v. American Skandia Life

9   Assurance Corp., 432 F.3d 655 (6th Cir. 2005).  And the Court

10  there, at pages 661 through 663, dealing exclusively with Ohio

11  law, which is the applicable set of legal principles that I

12  need to apply here -- and this really -- and the court in

13  Brainard relies on Ohio State Court decisions and also, I

14  think, some federal court decisions as well.  And the court

15  goes through and talks about an agency relationship may arise

16  pursuant to several theories.

17         First, actual agency occurs where a consensual

18  relationship exists between the agent and the principal.

19  Agency relationships may also arise from apparent agency or

20  agency by estoppel.  And I won't go through it, but the court

21  goes through analyzes each of those and sets out what has to be

22  shown.  The agency by estoppel, the court deals with in

23  footnote 4.  And while Ms. Gray -- to argue on it, I mean, that

24  seems clearly inapplicable here, the agency by estoppel theory.

25         But I do want you, Mr. Wishnew, to talk about apparent

1    agency, because what does -- what is it that Ms. McNerney would

2    have to establish --

3              MR. WISHNEW:  Sure.

4              THE COURT:  -- to show apparent agency?

5              MR. WISHNEW:  Sure.  And the court -- the Brainard

6    court addresses that, Your Honor, on 662 and 663.  This is at

7    headnotes 8 and 9, where it says, "For similar reasons, no

8    parent authority agency" -- I'm sorry, let me skip ahead.

9              THE COURT:  Don't read headnotes.

10             MR. WISHNEW:  Yeah.

11             THE COURT:  Read the opinion.

12             MR. WISHNEW:  "For an agent to bind the principal in

13   the context of apparent authority, the presented evidence must

14   reflect '(1) that the principal held the agent out to the

15   public as possessing sufficient authority to embrace the

16   particular act in question, or knowingly permitted him to act

17   as having such authority, and (2) that the person dealing with

18   the agent knew of the facts and ... in good faith had reason to

19   believe and did believe that the agent possessed the necessary

20   authority.'"  And I'll omit the citations, Your Honor.

21             Your Honor, with regards to these two elements, it's

22   our position that -- the Trust's position that the facts in the

23   record support neither element.  The fact of the matter is that

24   we've not seen any evidence that Homecomings held OMC out to

25   the public as possessing sufficient authority to embrace the

1   particular act in question or even knowingly permitted OMC to

2   act as having such authority; and two, that Ms. McNerney, who

3   dealt with OMC, clearly has said she did not know of the OMC-

4   Homecomings relationship.  So I think it's fairly evident from

5   the fact --

6             THE COURT:  This is a little different than I often

7   have, because here, there was the state court trial.  It didn't

8   result in a decision, but there's a transcript, which is --

9   which I do have in front of me, which I have read.

10             MR. WISHNEW:  Right, Your Honor.  And so I think the

11   facts that are gleaned from that transcript suggest that Ms.

12   McNerney lack of knowledge clearly argues against a finding of

13   apparent authority.

14             THE COURT:  Okay.  So is there anything else you want

15   to say?  I understand that in your brief you talk a little bit

16   more than just the agency theory.  But as to those causes of

17   action that are linked to finding that -- would require a

18   finding that OMC was Homecomings' agent.

19             MR. WISHNEW:  Um-hum.

20             THE COURT:  Are there any other arguments you want to

21   make with respect to that, other than the agency argument?

22             MR. WISHNEW:  I mean, Your Honor, I'm happy to reply

23   upon the arguments --

24             THE COURT:  Okay.

25             MR. WISHNEW:  -- in both our objection and reply.

RESIDENTIAL CAPITAL, LLC, et al.                    28

1          THE COURT:  All right.  So what about the other causes

2   of action?

3          MR. WISHNEW:  So Your Honor, with regards to the other

4   causes of action, you have Ms. -- with regards to the causes of

5   action for TILA and RESPA, it's our position that those causes

6   of action are barred by the applicable statutes of limitation.

7   Ms. McNerney's cause of action for unconscionability fails

8   because she's not demonstrated the loan was either procedurally

9   or substantively unconscionable.

10         With regards to the claim for fraud in the court,

11  courts in Ohio have opined that this does not give rise to a

12  private cause of action.

13         For the cause of action for breach of privacy, the

14  allegations with regards to this claim demonstrate neither the

15  disclosure of private information nor a wrongful intrusion on

16  her seclusion.

17         Finally, the claim for civil conspiracy fails because

18  there's not been any evidence of an actual agreement between

19  OMC and Homecomings to commit a wrongful act.

20         So for the reasons discussed throughout the objection

21  and reply and the supporting declarations, we'd ask that the

22  objection be granted and the four claims at issue be stricken

23  entirely from the debtors' claims registry.

24         THE COURT:  All right.

25         Ms. Gray.

1        MS. GRAY:  Thank you, Your Honor.  Starting first with

2   the agency theory, the evidence in this case is not fully

3   before the Court.  I was not actually anticipating a full

4   evidentiary hearing today, but I --

5        THE COURT:  Well, it's not -- this is not an

6   evidentiary hearing.

7        MS. GRAY:  Okay.  And --

8        THE COURT:  I want to make that clear.

9        MS. GRAY:  Okay.

10       THE COURT:  But what the standard on claim

11  objections -- I can't count the number of opinions I've issued

12  in ResCap where I lay out, basically, the so-called shifting

13  burden with respect to claim objections.  So a properly

14  prepared proof of claim may be entitled to prima -- it's prima

15  facie as to validity and amount.  The objector then must rebut

16  at least one essential element of the claim here of each of the

17  causes of action.  And if they do so, then the burden shifts to

18  the claimant to come forward with evidence of equal or greater

19  weight.

20       MS. GRAY:  That is --

21       THE COURT:  So with respect to -- at least with

22  respect to the actual agency argument, here, properly, in my

23  view, the Trust has come forward with the written agreement

24  between OMC and Homecomings, which disclaims an agency

25  relationship sufficient to encompass the claims that have been

1  asserted here by your client.

2           For better or worse, I have the trial transcript from

3  the state court first foreclosure action, when your client was

4  examined.  And she very forthrightly said she didn't have any

5  contact with Homecomings.  She didn't -- there's nothing to

6  indicate that OMC said that they were acting for Homecomings.

7  She went to them as a mortgage broker.  They inputted her

8  information.  I know you say that they -- that the information

9  they input was inaccurate, purposely or otherwise.  I can't

10 speak to that.  Your client got the loan.

11          What's the evidence -- how have you rebutted the

12 Trust's showing that OMC was not Homecomings' agent in

13 connection with arranging for a loan for Ms. McNerney?

14          MS. GRAY:  Several things.  One is the trial testimony

15 also showed -- and this is the section having to do with

16 whether Homecomings gave a kickback, which would be a violation

17 of RESPA.  Homecomings paid OMC Lending a lot of money to make

18 this loan.  And in support of the allegation that it was not a

19 kickback, Homecomings brought out testimony that OMC Lending

20 did all this work for Homecomings and on behalf of Homecomings,

21 thereby --

22          THE COURT:  They did a lot of work to complete an

23 application that was submitted to Homecomings --

24          MS. GRAY:  On behalf of Homecomings, thereby

25 justifying --

RESIDENTIAL CAPITAL, LLC, et al.                    31

1          THE COURT:  Show me that --

2          MS. GRAY:  -- the fee.

3          THE COURT:  -- show me that testimony, okay?  Because

4   that's -- my recollection is not the way you've just described

5   it.

6          MS. GRAY:  That --

7          THE COURT:  Just stop for a second.  Paying OM -- OMC

8   wasn't doing this gratis.  There's no question about it.  But

9   paying them a fee in connection with the loan that Homecomings

10  made to your client is not inconsistent with an independent

11  contractor relationship between a mortgage broker and a lender.

12  Is it?  Do you have any case --

13         MS. GRAY:  Yes.

14         THE COURT:  -- that supports the notion that paying

15  a -- you call it a kickback; I don't call it a kickback, but

16  that's besides the point for now -- is there -- do you have any

17  case that would say that by paying OMC a fee in connection with

18  the loan that Homecomings made to McNerney that that makes OMC

19  Homecomings' agent?

20         MS. GRAY:  The RESPA regulations -- I read that --

21         THE COURT:  Don't talk to me about RESPA.  You have --

22  we'll talk about RESPA separately, because you've got statute

23  of limitations problems with respect to RESPA, okay?  Let's

24  deal with your fiduciary duty, Consumer Fraud Act, all of

25  negligence, fraud.  Do you have any case authority that would

1  support that the payment of a fee by Homecomings to OMC makes

2  OMC Homecomings' agent?

3           MS. GRAY:  I think the payment of the fee --

4           THE COURT:  Maybe you didn't hear what I said.

5           MS. GRAY:  Well, Your Honor, maybe --

6           THE COURT:  Let me ask it one more time.  Do you have

7  any case authority -- I don't want to -- I'll let you argue,

8  but when I ask you a question specifically whether you have any

9  case authority that supports the argument you're making, I

10  expect an answer to that.

11           MS. GRAY:  Your Honor --

12           THE COURT:  And then I'll let you go on and argue.

13  Tell me, do you have a case that supports your argument?

14           MS. GRAY:  Other than what is in my brief, Your Honor,

15  no.

16           THE COURT:  Well, what case in your brief supports

17  your argument?  Most of your brief was taken up with arguing

18  about whether I should lift the stay.  You did address the

19  merits as well, but most of the brief was taken up with whether

20  the stay should be lifted, which I've already ruled on.

21           Point to me to a case or cases in your brief that you

22  believe establishes -- supports the position that OMC was

23  Homecomings' agent by virtue of Homecomings paying a fee.

24           MR. WISHNEW:  I think that's part -- the Brainard -- I

25  guess I'm just relying on the Brainard case.  That's part of

1  the constellation of events.  And the important part of that

2  constellation has to do with the fact that, in completing the

3  desktop underwriter data and sending it to Homecomings for

4  approval, along with all of the underlying backup factual

5  information, Homecomings ratified the act of --

6          THE COURT:  Your argument -- you're straying into

7  outer space on this now.

8          MS. GRAY:  OMC --

9          THE COURT:  I mean, the Brainard case, at page 661, on

10  the actual authority discussion, "Simply stated, 'express

11  authority is that authority which is directly granted to or

12  conferred upon the agent or employee in express terms by the

13  principal, and it extends only to such powers as the principal

14  gives the agent in direct terms[.]'" citing the Davis case, an

15  Ohio case.  So I don't read Brainard supporting your argument

16  at all with respect to the actual authority point.

17          What language in Brainard are you pointing to?  You're

18  talking about a constellation of facts.  Brainard's very clear,

19  and it rejects the actual authority argument because there was

20  nothing -- there was no agreement between the parties creating

21  actual authority.  That seems to me pretty closely on point to

22  this case.

23          Here, there is a writing, and it disclaims an agency

24  relationship except with respect to giving a notice.  And

25  Brainard shows you can be an agent for some purposes and not

RESIDENTIAL CAPITAL, LLC, et al.                    34

1     for others.  You need to be able to make OMC Homecomings' agent

2     for purposes of making the loan, not just notices.

3                  Go ahead.  Do you have any other case, or Brainard's

4     the only case you're relying on?

5                  MS. GRAY:  I think that even if -- and of course, this

6     agency contract was never shown to Ms. McNerney or the

7     limitation was never shown --

8                  THE COURT:  But she didn't even know about

9     Homecomings.

10                 MS. GRAY:  -- to Ms. McNerney.  However, even if they

11    were just the agent for giving notices, they didn't give proper

12    notices.  They did not give a proper notice of right to cancel.

13    They did not give a proper Truth in Lending disclosure

14    statement.  They did not --

15                 THE COURT:  Well, the problem you have with the TILA

16    and RESPA claims -- and I'll address that separately -- is the

17    statute of limitations.

18                 MS. GRAY:  Your Honor I will happily address that.

19                 THE COURT:  These facts are old, and the Trust makes

20    the argument that those claims -- having nothing to do with

21    agency -- but those claims are barred by the applicable

22    statutes of limitations.

23                 But let's just -- let's finish talking about --

24                 MS. GRAY:  Okay.

25                 THE COURT:  And I do want you to address those

1    arguments.

2              MS. GRAY:  Okay.  A fair -- but --

3              THE COURT:  But let's just finish up on --

4              MS. GRAY:  Okay.

5              THE COURT:  Let me ask you this:  do you have anything

6    else that you believe points to actual -- an actual authority-

7    agency relationship between OMC and Homecomings?

8              MS. GRAY:  Yes, I would just like to finish that if

9    they were, in fact, the agent for giving notices, they

10   negligently gave notices.  They negligently gave -- every

11   notice that they gave was backdated, was inaccurate, and failed

12   to fulfill their duty to accurately give notices.  They gave

13   wrong notices.  And the fact of giving wrong --

14             THE COURT:  Which causes of action deal with wrong

15   notices?

16             MS. GRAY:  All of the --

17             THE COURT:  Do they really?

18             MS. GRAY:  All of the agency --

19             THE COURT:  Oh, come on.

20             MS. GRAY:  All of the agency causes of action deal

21   with the negligent and intentional misrepresentation in the

22   delivery of those notices and delivery of information about the

23   loan, including the false information in the desktop

24   underwriter, which would have disqualified --

25             THE COURT:  That's not notice.

1          MS. GRAY:  -- her for the loan.

2          THE COURT:  That's not a notice.  What's a notice that

3     was sent to your client that you believe was false or

4     fraudulent?

5          MS. GRAY:  Truth in Lending disclosure statement, the

6     notice --

7          THE COURT:  Okay.

8          MS. GRAY:  -- of right to cancel.

9          THE COURT:  And your TILA claims, they argue, are time

10    barred.  And I'm going to let you argue -- I want to try and

11    keep these things -- these arguments separately, okay?  I'm

12    dealing first with the causes of action that clearly do hinge

13    on OMC being determined to be Homecomings' agent.  That's not

14    the case for TILA and RESPA.

15         MS. GRAY:  While that is true, Your Honor.  Those are

16    the notices that they were required to deliver in fulfillment

17    of their agency, and therefore part of their agency --

18         THE COURT:  Okay.  If you got a TILA claim or a RESPA

19    claim, I'm going to ask you to address whether -- whether the

20    notices they gave were correct or not correct, TILA and RESPA

21    have statutes of limitations.  The Trust has argued that the

22    statute of limitations bars those claims.  Stick with the other

23    causes of action.  We'll come to the TILA and RESPA claims.

24         MS. GRAY:  Your Honor, in mortgage loan origination

25    case, the most important notices are the notices of right to

RESIDENTIAL CAPITAL, LLC, et al.                    37

1    cancel, and those are the notices that were the express

2    obligation of the agent to deliver.

3              THE COURT:  Required under --

4              MS. GRAY:  So they are --

5              THE COURT:  -- required under what law?

6              MS. GRAY:  Required under the law of Truth in

7    Lending -- required in any mortgage loan -- RESPA --

8              THE COURT:  Okay.  So all you want to talk about is

9    TILA and RESPA.  We'll come to that.  I'm going to listen to

10   you in TILA and RESPA.  But right now, Ms. Gray -- I don't know

11   how many times I have to ask the same question to get an answer

12   from you.  You want to --

13             MS. GRAY:  I believe --

14             THE COURT:  -- talk about TILA and RESPA.  I'll get to

15   TILA and RESPA.  What I want you to address now are the other

16   causes of action.  TILA and RESPA do not depend -- the

17   objection to the TILA and RESPA claim does not depend on

18   whether OMC was Homecomings' agent or not.

19             MS. GRAY:  That is true.

20             THE COURT:  So would you address the ones that do

21   depend on the agency relationship?

22             MS. GRAY:  The negligence, the breach of fiduciary

23   duty, and failure to give proper --

24             THE COURT:  Okay.

25             MS. GRAY:  -- notices, including notices regarding

RESIDENTIAL CAPITAL, LLC, et al.                    38

1    what the loan was about, what the terms would be, all -- not

2    just the Truth in Lending disclosure statement, not just the

3    notice of right to cancel, but all notice regarding what the

4    terms of the loan would be, when the closing would be, what the

5    first payment would be, all that information that the broker

6    was required to give and did not give.

7            THE COURT:  Okay.  This says that "This broker-lender

8    agreement is broker-lender's authorization to act as

9    Homecomings' agent for the purposes of delivering notices and

10   action taken as required by the Equal Credit Opportunity Act

11   and its Regulation B."  Okay?  Tell me what notices -- I didn't

12   see anything in your claim stating that the notices required by

13   the Equal Credit Opportunity Act and its Regulation B were not

14   delivered.

15           MS. GRAY:  The agency was not limited just to that

16   notice, Your Honor.

17           THE COURT:  What does it say?  You're saying that --

18           MS. GRAY:  But I'm also saying what happened.  I'm

19   also saying the facts, the facts that they gave a HUD-1

20   statement showing Homecomings as the lender, that they showed

21   that -- that Homecomings approved the HUD-1 statement --

22           THE COURT:  All right.

23           MS. GRAY:  -- and, in fact, created --

24           THE COURT:  I'm giving you one last chance.  Is there

25   anything else you want to tell me about the agency theory that

1    supports anything other than the notices that you want to

2    complain about?  Last chance.

3              MS. GRAY:  No, I think I'm done.

4              THE COURT:  All right.  Now, let's go on.  You want to

5    talk about the notices, let's talk about this -- I want to hear

6    from you about the statute of limitations for TILA and RESPA

7    claims.

8              MS. GRAY:  All right.  The important -- there are

9    several important statutes of limitations.  One is the one-year

10   statute of limitation for failure to properly disclose.  The

11   other is the three-year statute of limitations for the right to

12   rescind.  Ms. McNerney rescinded well within the three-year

13   period.

14             THE COURT:  When did she seek to rescind?

15             MS. GRAY:  She rescinded when she filed her

16   counterclaim in the county court, and I do refer Your Honor to

17   Jesinoski v. Countrywide, which is a United States Supreme

18   Court unanimous decision, 1/13/15, that says, "A borrower need

19   only give notice in writing.  They do not" -- "she need not

20   file suit within three years" --

21             THE COURT:  Give me the cite again.

22             MS. GRAY:  It's J-E-S-I-N-O-S-K-Y (sic) v.

23   Countrywide.  It's a 2015 case.  It's a slip opinion issued

24   1/13/15, and a unanimous Supreme Court.

25             THE COURT:  All right.  All right.

1          MS. GRAY:  So --

2          THE COURT:  So tell me --

3          MS. GRAY:  -- she rescinded well within --

4          THE COURT:  Stop.

5          MS. GRAY:  -- that three-year period.

6          THE COURT:  Stop, stop.  I want the dates.  When --

7    the loan closed on what date?

8          MS. GRAY:  January 3, 2003.

9          THE COURT:  And when did she seek to rescind, in your

10   view?

11         MS. GRAY:  She rescinded.

12         THE COURT:  When?

13         MS. GRAY:  On -- the case was filed on 11/10/2003.

14   She answered within twenty-eight days of that period, and that

15   is when she rescinded.

16         THE COURT:  And the Countrywide decision deals with

17   rescission under which statute?

18         MS. GRAY:  15 U.S.C. 1635(b), the Truth in Lending

19   Act.

20         THE COURT:  Okay.  What is the statute -- what's the

21   applicable statute of limitations for RESPA?

22         MR. WISHNEW:  One year -- one year.

23         THE COURT:  And do you agree that the statute of

24   limitations have run on the RESPA claim?

25         MS. GRAY:  No, because it relates to the date of the

1  complaint.  It did not --

2          THE COURT:  It does not -- was it in the -- did you

3  assert a RESPA claim?

4          MS. GRAY:  In the counterclaim?  Yes.  Yes.

5          THE COURT:  In the counterclaim?  When was the

6  counterclaim filed?

7          MS. GRAY:  The counterclaim was filed twenty-eight

8  days after 11/10/2003.

9          THE COURT:  And what was the RESPA violation?

10         MS. GRAY:  We asserted a kickback.

11         THE COURT:  And what was the TILA violation?

12         MS. GRAY:  The TILA violation was that they failed to

13  deliver clear and conspicuous notices of right to cancel, that

14  they failed to deliver two copies of the notice of right to

15  cancel, and that the notice of right to cancel did not clearly

16  and conspicuously disclose the time to cancel it and the

17  opportunity to cancel it, especially given that the expiration

18  date on the notice of right to cancel was the 29th of December,

19  and the loan closed on January 3rd, about five days later.

20         THE COURT:  Okay.  Just bear with me a second, okay?

21      (Pause)

22         THE COURT:  Is there anything else you want to say

23  about either the TILA or RESPA claims?

24         MS. GRAY:  The time limit for rescission may be found

25  in 1635(f), which says, "In all regards, right of rescission

1    shall expire three years after the date of consummation."  So

2    that -- I had -- I hadn't mentioned that quoted citation.  It's

3    15 U.S.C. 1635(f).

4            1635(b) states the roadmap for rescission, and 1635(f)

5    states the time for the exercise of the right to rescind.

6            THE COURT:  So who owns the loan now?

7            MS. GRAY:  The testimony in the trial is that

8    Homecomings owned it and that --

9            THE COURT:  Well, it doesn't anymore, but --

10           MS. GRAY:  -- they owned it all along.  I have no

11   idea.  They may not; I have no idea.

12           THE COURT:  How get you rescission if they don't own

13   the loan?

14           MS. GRAY:  The borrower has already rescinded, and

15   every act after that is subject to damages, every act that

16   relates to her effort to enforce her right to rescind.  I have

17   no reason to doubt that Homecomings or its successor-in-

18   interest, which is the ResCap Liquidation Trust, owns this.

19   And up until the time, Ms. McNerney had accumulated substantial

20   damages, and that's what her claim is about.  The rescission is

21   over.  That's what the Jesinoski case says.  It's over.

22   Everything after that is her damages.

23           THE COURT:  Is it correct that the negligence in fraud

24   claims against Homecomings both seek to impose by curious

25   liability on agency theory?  The fraud that you've alleged is a

RESIDENTIAL CAPITAL, LLC, et al.                    43

1    fraud by OMC --

2            MS. GRAY:  And in act --

3            THE COURT:  -- for which you say Homecomings was

4    liable because OMC was its agent.

5            MS. GRAY:  The trial transcript discloses actual fraud

6    by Homecomings.

7            THE COURT:  What fraud?

8            MS. GRAY:  Actual fraud in failing to change, failing

9    to accurately input the desktop information -- the desktop

10   underwriter information.  Every -- and this is what -- I think

11   her name was Theresa Harrington (ph.) from Homecomings

12   testified to that:  I looked at the divorce decree, and I knew

13   how long she was going to get child support.  I looked at the

14   verbal information of employment.  I looked at her tax returns,

15   and I looked at her paystubs, and I looked at the fact that the

16   supposedly liquid asset is, in fact, an IRA.  And I knew those

17   things were entered wrong.  And I didn't change it.

18           THE COURT:  Okay.

19           MS. GRAY:  And she wouldn't have qualified for the

20   loan if I had done it right.

21           THE COURT:  All right.  Tell me again, whose testimony

22   was that?

23           MS. GRAY:  I think it was Theresa Harrington who -- or

24   whoever came in for Homecomings, the person --

25           THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    44

1           MS. GRAY:  -- who testified for Homecomings --

2           THE COURT:  So that --

3           MS. GRAY:  -- in the trial.

4           THE COURT:  So you believe that those -- what you've

5  just described reflects both -- assuming a duty -- would

6  reflect both negligence and fraud on the part of Homecomings,

7  not vicariously, because of OMC's conduct, but directly because

8  of Homecomings' own conduct?

9           MS. GRAY:  That's -- yes, Your Honor.

10          THE COURT:  Okay.  So that's what, both as to the

11  negligence and fraud claims?

12          MS. GRAY:  Yes, Your Honor.

13          THE COURT:  Okay.  What about your fraud on the court

14  argument?  I don't understand -- I frankly don't understand

15  your argument, how you've alleged fraud on the court with

16  respect to Homecomings, or how that's cognizable here.  I mean,

17  I think the Trust comes forward with case law from Ohio that

18  it's not a separate cause of action.

19          MS. GRAY:  That's true.  It's not clear in Ohio.  It's

20  not clear that it's not.

21          THE COURT:  Do you have any cases in Ohio that say

22  it's a separate cause of action?

23          MS. GRAY:  I think the law is evolving, Your Honor,

24  and that is not -- it's a question that probably should be

25  submitted to the Ohio Supreme Court at this time.

RESIDENTIAL CAPITAL, LLC, et al.                    45

1          THE COURT:  Well, I don't submit it.  I decide.

2          MS. GRAY:  Okay.

3          THE COURT:  You can appeal to second -- you can appeal

4     to the district court if you don't like my decision.

5          Let me ask again, the Trust has come forward with case

6     law saying that fraud on the court does not create a separate

7     cause of action in Ohio.  Do you have any case law to the

8     contrary?

9          MS. GRAY:  No, I do not.

10         THE COURT:  Okay.  Let's deal with the Ohio Consumer

11    Sales Practices Act claim.  The Trust argues that the claim

12    fails as a matter of law because the granting of a mortgage is

13    considered a pure real estate transaction not subject to the

14    Ohio Consumer Sales Practices Act claim.

15         MS. GRAY:  That is not Ohio law, Your Honor.

16         THE COURT:  Do you -- what case?  Could you point me

17    to a case?

18         MS. GRAY:  Not off the top of my head --

19         THE COURT:  The Trust --

20         MS. GRAY:  -- Your Honor.

21         THE COURT:  Well, you know, top of your head -- you

22    filed --

23         MS. GRAY:  Yes, I did.

24         THE COURT:  -- an opposition to the -- a response to

25    the objection.  The Trust cites, in support of its position,

RESIDENTIAL CAPITAL, LLC, et al.                    46

1    Brown v. Liberty Clubs, Inc., 543 N.E.2d 783 at page 785, Ohio

2    (1989):  "All parties correctly agree that the Consumer Act has

3    no application in a pure real estate transaction."  Pure real

4    estate transaction is a term of art in Ohio.

5            The Trust also cites Hanlin, H-A-N-L-I-N v. Ohio

6    Builders and Remodelers, Inc., 212 F.Supp.2d 752 at 757 (S.D.

7    Ohio 2002), granting summary judgment to a lender under

8    borrower's CSPA claims because the loan was a pure real estate

9    transaction.

10           So let me ask you again --

11           MS. GRAY:  May I file a supplemental brief on this,

12   Your Honor?

13           THE COURT:  No.  No.  I got -- you see this mountain

14   of paper I have?

15           MS. GRAY:  Yes, I do.  Yes.  And I got a mountain of

16   paper just like that and I'm --

17           THE COURT:  No, you didn't.

18           MS. GRAY:  -- doing my best.

19           THE COURT:  This is all my hearings in ResCap today.

20           MS. GRAY:  I got --

21           THE COURT:  You had your chance.  Can you point me to

22   a case in Ohio that would say that a mortgage transaction such

23   as the one here does not fit this term of art "pure real estate

24   transaction" that's not covered by the Ohio Consumer Sales

25   Practices Act?

RESIDENTIAL CAPITAL, LLC, et al.                    47

1          MS. GRAY:  So, a case then comes to mind, Bridge v.

2     Ocwen, I could get it for you, Your Honor, in a short time.  I

3     don't -- and I don't even know if that's the one I need.  It's

4     something involving Ocwen.  But it has to do with the fact that

5     where there is a broker involved and where there -- and where

6     it's a loan origination and they're violate -- and their

7     misrepresentations in the course of the transaction, it comes

8     under the CSPA.  It does -- it is not -- it is definitely not a

9     pure real estate transaction.

10         THE COURT:  What do you think the name of the case is?

11         MS. GRAY:  The name Bridge comes to mind, but

12    honestly, Your Honor, I can't give it to you without looking it

13    up.

14         THE COURT:  I'll give you until tomorrow at noon to

15    submit a letter with --

16         MS. GRAY:  Okay.

17         THE COURT:  -- the name of the case and citation.

18         MS. GRAY:  Okay, thank you.

19         THE COURT:  What's deal with your Ohio Mortgage Broker

20    Act claim?  The Trust contends that the Ohio Mortgage Broker

21    Act only applies to mortgage brokers and that mortgage lenders

22    are not subject to the claim.  And Ohio Revised Code annotates

23    Section 1322.01(G) defines a mortgage broker.  Keating v.

24    America's Wholesale Lender, 2011 WL 2471732 at *2, Northern

25    District of Ohio, June 21, 2011 says:  "Under the OMBA, the

RESIDENTIAL CAPITAL, LLC, et al.                    48

1    lender is not a mortgage broker for purposes of the act."

2           Do you have any case law that would support

3    Homecomings falling -- as the lender, falling under the Ohio

4    Mortgage Broker Act?

5           MS. GRAY:  Your Honor, I think it is question of fact

6    whether Homecomings was, in fact, the lender.  This loan

7    was -- and that's in the testimony at the trial, too.  This

8    loan was set up to be sold to Fannie Mae and it was sold.

9           THE COURT:  They were the lender.  They may have sold

10   it.

11          MS. GRAY:  No, they sold it to Fannie Mae.

12          THE COURT:  I'm finding right now they were the --

13   that argument was frivolous.  Homecomings was the lender.  They

14   subsequently secured ties to the loan.  OMC was the mortgage

15   broker.  Do you have any case law that supports -- you didn't

16   cite any.  Do you have a case that supports your position that

17   Homecomings, as a lender, is subject to the Ohio Mortgage

18   Broker Act.

19          MS. GRAY:  I'm going to waive that argument, Your

20   Honor.

21          THE COURT:  You agree that your loss mitigation

22   argument is moot?

23          MS. GRAY:  Loss mitigation?  There's no possibility

24   for it, right?  They -- right?

25          THE COURT:  Address your unconscionability claim.  So

1   what I understand from Ohio case law, specifically Cheap Escape

2   Co. v. Crystal Windows & Doors Corp., 2010 WL 4018693 at *2,

3   Ohio Court of Appeals, October 14th, 2010:  "Unconscionability

4   includes an absence of meaningful choice on the part of one to

5   a contract combined with contract terms that are unreasonably

6   favorable to the other party."  It doesn't seem to me that

7   you've alleged any facts in the claim or in response to the

8   objection that would satisfy the requirements under Ohio law

9   for unconscionability of a claim -- an unconscionability claim.

10          MS. GRAY:  The objection to claims stated that the

11   claims failed as a matter of law.

12          THE COURT:  Substantive unconscionability depends on

13   whether the terms of the contract were unfair or unreasonable.

14   Homecomings made the loan to McNerney.  The monthly payments --

15   they lowered her monthly payments, including escrow and

16   insurance, and paid off her unsecured debts.  And she wound up

17   with a lower monthly payment than she had before.  How can that

18   be unconscionable?

19          MS. GRAY:  It was unconscionable because it was still

20   a payment that she could not afford, that everybody knew she

21   could not afford it, and she was not hit with information about

22   private mortgage insurance or that she would have to cash in

23   her IRA until the closing date.  At that point, she was on a

24   train.  She was on a coaster.  She didn't know that she had --

25   she didn't know that she had a right to rescind.  She didn't

RESIDENTIAL CAPITAL, LLC, et al.                    50

1    know that she had the right to cancel.

2          They buried that document -- a single document on page

3    59 of a huge stack of documents.

4          THE COURT:  Buried what document?

5          MS. GRAY:  Her notice of right to cancel.

6          THE COURT:  Oh.  So you acknowledge she got a notice

7    of right to --

8          MS. GRAY:  She got one.

9          THE COURT:  -- cancel?

10         MS. GRAY:  She got one notice of right to cancel and

11   it did not -- and it -- and the cancellation date was five days

12   before the date of the closing.  She did -- they did not

13   comply.  Truth in Lending requires two notices of right to

14   cancel and it requires that the notice clearly and

15   conspicuously state the deadline to cancel.

16         THE COURT:  Okay.  Let's address your breach of

17   privacy claim.  What's the basis for that claim?  You've had

18   no -- you've submitted nothing to show that Homecomings

19   disclosed any information about Ms. McNerney.

20         MS. GRAY:  They sent people out to the house to take

21   pictures of the house.  And the people who came and took

22   pictures called up to them and told them to pay their bills,

23   and told them to smile for the cameras, and drew attention to

24   the fact that the house is in foreclosure to the neighbors to

25   the right and the left.  I believe that states intentional

RESIDENTIAL CAPITAL, LLC, et al.                    51

1  breach of privacy, Your Honor.

2          THE COURT:  Anything else you want to address?

3          MS. GRAY:  No, Your Honor.  Thank you.

4          THE COURT:  Okay.  Mr. Wishnew?

5          MR. WISHNEW:  Thank you, Your Honor.  Just briefly, a

6  few facts --

7          THE COURT:  Why hasn't Ms. Gray refuted your argument

8  that applicable statutes of limitations bar the TILA and RESPA

9  claims?

10         MR. WISHNEW:  Sure, Your Honor.  And that's exactly

11 where I was going.  There's one significant factual

12 misstatement by Ms. Gray in her presentation, and I refer the

13 Court to Exhibit E to the Wallace declaration.  This is at

14 docket number 9280-4.  It's been marked page 30 of 222.

15         THE COURT:  I'll have to look at it after -- I'm

16 not -- what is it?

17         MR. WISHNEW:  So it is -- this is at the Ohio State

18 Court docket, Your Honor.  And Ms. Gray, in her presentation,

19 suggested that the answer was filed within thirty days of the

20 complaint being filed.  That's not correct.

21         THE COURT:  When was it filed?

22         MR. WISHNEW:  It was filed -- answer and counterclaim

23 was filed June 16th, 2004, well over a year --

24         THE COURT:  Hold on, do you --

25         MR. WISHNEW:  -- well over a year past the

1  origination.

2        THE COURT:  Let me ask you this, do you agree that the

3  counterclaim asserted the right to rescind?

4        MR. WISHNEW:  Yes, Your Honor.

5        THE COURT:  And what was the closing date of the loan?

6        MR. WISHNEW:  I believe --

7        THE COURT:  Ms. Gray said June 3rd, 2003.

8        MS. GRAY:  January 5th.

9        MR. WISHNEW:  It's January 5th.

10        THE COURT:  I'm sorry, I'm reading my own notes wrong.

11  I wrote down January.  January 3, 2003, do you agree with that?

12        MR. WISHNEW:  That's -- I believe that's correct, Your

13  Honor.

14        THE COURT:  All right.  And you agree that the statute

15  of limitations for rescission was three years?

16        MR. WISHNEW:  If she did not get notice, and our

17  assertion is that she got notice based upon the statements we

18  make at paragraph 18 of our objection.

19        THE COURT:  So your position is that -- and what's the

20  notice you believe Ms. McNerney received?

21        MR. WISHNEW:  Truth in Lending statement, a notice of

22  right to cancel, her HUD-1 settlement statement, the first

23  payment notice and a disclosure regarding PMI insurance.

24        THE COURT:  And what did they say about the right to

25  rescind?

RESIDENTIAL CAPITAL, LLC, et al.                    53

1          MR. WISHNEW:  Give me one moment, Your Honor.  Let me

2     just look at the exhibit.  These are Exhibits I, J, K, L and M

3     to the Lathrop declaration at nine -- docket 9280-2.  One

4     moment, Your Honor.

5          Your Honor, I refer to Exhibit J of the Lathrop

6     declaration.  It looks like it's page 101 of 113.  It states:

7     "You are entering into a transaction that will result in a

8     mortgage on your home.  You have a legal right under the

9     federal law to cancel this transaction, without cost, within

10    THREE BUSINESS DAYS from whichever of the following events

11    occurs last: (1) the date of the transaction" -- which is

12    December 27, 2002 -- "or the date you received your Truth in

13    Lending Disclosure, or the date your receive this notice of

14    your right to cancel."

15         THE COURT:  And when did she receive the notice of

16    right to cancel?

17         MR. WISHNEW:  Your Honor, it's dated December 27th,

18    2002.

19         THE COURT:  All right.  So your position is she

20    doesn't -- she didn't -- because she received that notice, she

21    didn't have three years to rescind?

22         MR. WISHNEW:  Correct, Your Honor.  And also then,

23    Your Honor, to the extent that you were to find to the

24    contrary, the rescission does not occur until there's judicial

25    determination.

RESIDENTIAL CAPITAL, LLC, et al.                54

1          THE COURT:  Well, actually the Supreme Court decided

2     otherwise.  I've read Countrywide, because I've had this issue

3     before in ResCap before the Supreme Court decided.

4          MR. WISHNEW:  Okay.

5          THE COURT:  You don't need a judicial determination.

6     That was the split in authority.  Do you disagree with what I

7     just said?

8          MR. WISHNEW:  I don't, Your Honor.  One other

9     point -- factual point for the record, Your Honor?  Ms. Gray,

10    in her presentation, suggested that Homecomings still owned the

11    loan.  In fact, the loan was extinguished as we set forth in --

12         THE COURT:  Oh, yes.  Now, I know the history.  The

13    house was condemned.  They --

14         MR. WISHNEW:  That's exactly right.  In paragraph 31

15    of our objection, we state Homecomings learned that Ms.

16    McNerney had agreed to deed the property to a local land bank

17    at the request of Lakewood Alive and the deed was --

18         THE COURT:  No, I'm familiar with those facts.

19         MR. WISHNEW:  Okay.  So at that point, the lien was

20    extinguished and so -- and we dismissed our claims.  So at this

21    point, the only thing --

22         THE COURT:  You're not seeking to recover --

23         MR. WISHNEW:  No, the --

24         THE COURT:  -- the loan amount as a personal

25    liability?

 1          MR. WISHNEW:  Exactly, Your Honor.  So there's no

 2   defensive counterclaims here.  At this point, it's only

 3   affirmative claims of Ms. McNerney and Ms. Gray.

 4          THE COURT:  The damages claim.

 5          MR. WISHNEW:  Exactly, Your Honor, yes.

 6          THE COURT:  That's true.  All right, anything else you

 7   want to add?

 8          MR. WISHNEW:  No.  I believe the -- I'll reply on our

 9   objections, Your Honor.

10          THE COURT:  Right.  I'm going to take the matter under

11   submission.  Thank you.

12          MR. WISHNEW:  Thank you, Your Honor.

13          THE COURT:  Thank you, Ms. Gray.

14          MS. GRAY:  Thank you, Your Honor.

15          MR. WISHNEW:  Your Honor, two more matters on today's

16   calendar.  Your Honor, the first -- the next matter is item 7

17   on page 11 on today's agenda.  This deals with a borrowers'

18   trust ninetieth omnibus objection to claims, no liability

19   claims, docketed at docket number 9296, filed on October 30th,

20   2015.

21          Your Honor, through the ninetieth omnibus claims

22   objection, the borrower trust seeks to expunge any proofs of

23   claim that do not represent valid pre-petition claims against

24   the debtors if they do not prove by a preponderance of the

25   evidence any specific wrongdoing by the debtors.  The borrower

1  trust thoroughly examined the various books and records in an

2  effort to validate the accuracy of the allegations made in the

3  responses in the claims at issue, and determined the books and

4  records do not show any liability owing to the respondents.

5       The borrower trust determined that one claim should be

6  allowed in the filed amounts, which is reflected on Exhibit B,

7  and another amount should be asserted in an amount

8  lesser -- oh, I'm sorry -- also determined that one claim is

9  asserted in an amount greater than that for which the estate is

10  liable, and the hearing on that claim has been adjourned to

11  January 21st, 2016.  That's the Mary Biancavilla claim.

12       THE COURT:  Biancavilla's been adjourned?

13       MR. WISHNEW:  Yes, Your Honor.  There was -- it was

14  reflected on the agenda --

15       THE COURT:  That's fine.  Okay.

16       MR. WISHNEW:  -- and there's a notice of adjournment

17  also filed.

18       THE COURT:  Now, it's --

19       MR. WISHNEW:  Apologies, Your Honor.

20       THE COURT:  Okay, All right.  So Biancavilla is

21  adjourned.

22       MR. WISHNEW:  Correct.  There were two responses we

23  received, Your Honor; one by Lori Tammaro at docket number

24  9398, one by Thomas and Catherine Cooper at docket number 9379.

25  I believe Mr. Cooper may have reached out to chambers

1    yesterday.

2                    THE COURT:  He did.

3                    MR. WISHNEW:  He spoke with me.  So we have agreed to

4    push that to January 21st --

5                    THE COURT:  Okay.  So --

6                    MR. WISHNEW:  -- as well.

7                    THE COURT:  Okay.

8                    MR. WISHNEW:  I'm not --

9                    THE COURT:  The Coopers filed an opposition to the

10   objection, and the Cooper opposition is at 9379.

11                   MR. WISHNEW:  That's correct, Your Honor.

12                   THE COURT:  And we understand -- because illness or --

13   in his family?

14                   MR. WISHNEW:  His wife just fell ill and -- yes.

15                   THE COURT:  Right.  So I appreciate your agreeing

16   to --

17                   MR. WISHNEW:  No problem, Your Honor.

18                   THE COURT:  -- adjourn that.

19                   MR. WISHNEW:  So at this point, Your Honor,

20   the -- there are certain uncontested claims and one contested

21   claim by Lori Tammaro that are going forward.  The Cooper claim

22   and the Biancavilla claim are going forward on January 21st.

23                   THE COURT:  Um-hum.

24                   MR. WISHNEW:  And Ms. Biancavilla's response deadline

25   is December 30th, which we agreed to.  So --

1              THE COURT:  And --

2              MR. WISHNEW:  -- I'll pause for appearances.  I'm not

3      sure if Ms. Tammaro has appear --

4              THE COURT:  Ms. Tammaro, are you on the phone?

5              No response.  Okay, no response from Ms. Tammaro.

6      Just bear with me a second, okay?

7              MR. WISHNEW:  Sure.

8              THE COURT:  All right, since Ms. Tammaro is not -- did

9      file a response to the objection but has not appeared, I'm not

10     going to hear argument and I'll resolve it in a written order.

11             MR. WISHNEW:  Okay, very good, Your Honor.  So that

12     then -- I guess with that, I'd ask for the Court to also

13     approve the uncontested claims in omnibus ninety for the

14     reasons set forth --

15             THE COURT:  Okay.

16             MR. WISHNEW:  -- that we addressed in Exhibit A.

17        (Pause)

18             THE COURT:  All right, so with the exception of those

19     portions of the objection which have been adjourned until

20     January, the Trust's objections are sustained.  I do want to

21     note with respect to the claim filed by Charles T. Clark, which

22     is listed in the claims register as a general unsecured claim

23     against GMACM, the Trust has determined that the claim should

24     be allowed as a general unsecured claim against GMACM in the

25     filed amount of 19,712 dollars.  As I understand it, the Trust

1  advised Mr. Clark that his claim would be allowed in full and

2  provided him with a form of stipulation to acknowledge his

3  agreement.  Clark informed the Trust that he would not agree to

4  sign the stipulation because he was not willing to accept the

5  treatment of his claim as provided in Article IIID2(f) of the

6  plan even though his claim would receive the same treatment as

7  similarly situated creditors.

8           As a result, the Trust requests that the Court enter

9  an order allowing the claim in the asserted amount so that it

10 will receive the treatment of an allowed claim against GMACM

11 debtors as provided in Article IIID2(f) of the plan.

12          The Trust's objection seeking to allow the Clark claim

13 in full is sustained, and that claim will be allowed as in the

14 manner provided in the objection.

15          MR. WISHNEW:  Thank you very much, Your Honor.

16          THE COURT:  Okay.  Does that dispose of everything for

17 today?

18          MR. WISHNEW:  One more matter.

19          THE COURT:  One more, okay.  Oh, yes, I've got the

20 other one.  Go ahead.  Sorry.

21          MR. WISHNEW:  It's okay.  Your Honor, the last matter

22 is an uncontested objection that the borrower trust filed

23 against claim 5857 of Mary McDonald individually and as

24 personal representative of the estate of Anthony McDonald.

25          Your Honor, this --

RESIDENTIAL CAPITAL, LLC, et al.                    60

1          THE COURT:  Before you go on, I've just been handed a

2   note that a Mr. John Hightower is on the phone on behalf of

3   Mary McDonald.  Is that correct?

4          MR. HIGHTOWER:  Yes, Your Honor.  John Hightower is

5   here.

6          THE COURT:  Are you an attorney?

7          MR. HIGHTOWER:  Yes, sir.

8          THE COURT:  You're Ms. McDonald's attorney?

9          MR. HIGHTOWER:  That is correct.  I represented Mrs.

10  McDonald in the filing of the original complaint against GMAC

11  and The Law Office of David Stern.

12         THE COURT:  Okay.

13         MR. HIGHTOWER:  And then when GMAC -- when ResCap

14  filed bankruptcy, obviously, it was moved to here.

15         THE COURT:  And as I -- but you did not file any

16  response to the objection, correct?

17         MR. HIGHTOWER:  I did not.  I was not aware that I was

18  required to.  I -- I'm just --

19         THE COURT:  Do you think you just show up at

20  a -- there was an objection deadline shown on the objection.

21  You didn't file a response.  You think you just show up at a

22  hearing by phone and -- well, let me hear -- what is it -- let

23  me ask you, Mr. Hightower, what is that you're -- what are you

24  planning to do today?

25         MR. HIGHTOWER:  I wasn't sure.  The notice of the

RESIDENTIAL CAPITAL, LLC, et al.                61

1   hearing was only sent to me on Monday.  It didn't give an

2   indication as to what action will be taken on the matter.

3   I -- my -- based on experience, I'd assumed that it just might

4   be some type of case management conference where we would take

5   some direction as to planning out how the remainder of the

6   contested matter would be addressed and taking discovery, et

7   cetera.

8           THE COURT:  It is not a contested matter if you don't

9   file a response to the objection to claim.

10          MR. HIGHTOWER:  I --

11          THE COURT:  Your client was served with -- well, I'll

12  check with Mr. Wishnew.

13          Was --

14          MR. WISHNEW:  So Ms. --

15          THE COURT:  -- Ms. McDonald served with the objection

16  to claim?

17          MR. WISHNEW:  Mr. Hightower was served by e-mail on

18  November 10th -- I'm referring, Your Honor, to the affidavit of

19  service docketed at 9315.  Mr. Hightower was served by e-mail

20  on November 10th and also, we served Mr. Hightower by overnight

21  mail at the address specifically included on the proof of

22  claim, 201 East Kennedy, Suite 1000, Tampa, Florida 33602.

23          THE COURT:  And what is it you served him with,

24  because I got voluminous papers here?

25          MR. WISHNEW:  We would serve --

1      MR. HIGHTOWER:  Your Honor, I'll just shortcut.  I

2  don't contest that I've been served.  I don't want to waste the

3  Court's time.  But the -- I -- unfortunately, this was all -- I

4  mean, very unfortunately, was overlooked as to the requirement

5  of filing a response.  And the only thing I can do is just

6  submit to the Court's mercy to allow us an opportunity to file

7  the response.

8      One of the reasons why I was lured -- not

9  intentionally lured, but I wasn't aware that I needed to file a

10  response because I was engaged in settlement discussions with

11  counsel for GMAC well, well past the time that would've been

12  required for filing the response, then -- which certainly

13  indicated to me that there wasn't an uncontested objection,

14  given that we were engaged in these settlement discussions --

15      THE COURT:  Well, look --

16      MR. HIGHTOWER:  -- well past that deadline.

17      THE COURT:  I don't know what we -- stop.  I don't

18  know whether you were engaged in settlement discussions or not.

19  I prepare for a hearing.  I have read all these papers, okay?

20  There was no response filed.  There was a deadline shown for

21  filing a response.  You didn't contact the Court and ask to

22  have it adjourned.

23      I go through all this work in preparing for a hearing

24  today, reading every scrap of paper that was filed in

25  connection with the objection to the McDonald claim, and you

RESIDENTIAL CAPITAL, LLC, et al.                    63

1    think you can just get on the phone and say oh, I didn't know I

2    was supposed to file anything?

3              MR. HIGHTOWER:  I -- and I'm very sorry that it comes

4    off as disrespectful, Your Honor.  It is certainly --

5              THE COURT:  Mr. Hightower?

6              MR. HIGHTOWER:  -- not my intent.

7              THE COURT:  Mr. Hightower, at the very top of the

8    notice of the ResCap borrower claims trust objection to proof

9    of claim number 5857 filed by Mary McDonald, et cetera, is the

10   following:  Hearing date:  December 16, 2015 at 10 a.m.

11   Response deadline:  December 3, 2015 at 4 p.m.  That's on --

12             MR. HIGHTOWER:  December 3, 2015 was the deadline for

13   the response?

14             THE COURT:  Yes.  Yeah.

15             MR. HIGHTOWER:  What is that document?  I'm sorry,

16   Your Honor, I --

17             THE COURT:  Mr. Hightower?

18             MR. HIGHTOWER:  -- do not recall seeing that.

19             THE COURT:  It's the notice of ResCap borrower claims

20   trust objection to proof of claim number 5857 filed by Mary

21   McDonald, individually and as personal representative of the

22   estate of Anthony McDonald.  It's ECF docket number 9310-1

23   filed on November 10th, 2015.  Okay?  And attached to it is

24   about an inch-and-a -- about two inches of paper, every piece

25   of which I've read, that relates to this.  And right at the

1  very top of the first page, it has hearing date, December 16th,

2  2015 at 10 a.m. and response deadline, December 3, 2015 at 4

3  PM.  And --

4          MR. HIGHTOWER:  That document, Your Honor, I do not

5  believe I was served, and maybe that's what counsel is

6  addressing, so I apologize if I jumped the gun on that one.

7  But that document, I do not believe I was served, and I

8  certainly wasn't served it through an ECF --

9          THE COURT:  That's the objection.  That's what we're

10 here on, the text of it, I said, it -- the top of the first

11 page, it says it.  On page 2 of the notice, it also

12 says -- I'll leave words out -- responses, if any, to the

13 objection must be made in writing -- I'll leave a lot of words

14 out -- filed and served so as to be received no later than

15 December 3, 2015 at 4 p.m.

16         MR. HIGHTOWER:  I did not receive that document, Your

17 Honor.  I'm --

18         THE COURT:  Mr. Wishnew, can you respond to that?

19         MR. WISHNEW:  Your Honor, we -- the docket and the

20 affidavit of service indicating that Mr. Hightower was served

21 by both e-mail to hightower@mcintyrefirm.com,

22 M-C-I-N-T-Y-R-E-F-I-R-M dot com.  He was served on November

23 10th by e-mail with this document, as well as served by

24 overnight mail at the address included on the subject proof of

25 claim.  And both forms of service were effectuated.

RESIDENTIAL CAPITAL, LLC, et al.                    65

1          THE COURT:  Are you registered on ECF, Mr. Hightower?

2          MR. HIGHTOWER:  Not for this case, Your Honor.  If I

3    may ask counsel, what was the -- who was the sender of the

4    e-mail service?

5          MR. WISHNEW:  It would've been Legal Vision Consulting

6    Group, who acts as the servicing agent for the ResCap Borrower

7    Claims Trust.

8          MR. HIGHTOWER:  Is there an address that I can use to

9    search to identify whether I received it?

10          MR. WISHNEW:  I don't know the specific sender e-mail

11    address, but I can say it was sent November 10th or

12    11th -- November 10th.

13          MR. HIGHTOWER:  Yeah, I'm looking through my November

14    10th  -- it's in my junk e-mail box.

15          THE COURT:  That's nice.

16          MR. HIGHTOWER:  So it is there.  I don't know if it

17    was a mass sending and maybe that's the reason it was collected

18    in my junk e-mail, or --

19          MR. WISHNEW:  It was not a mass sending.

20          MR. HIGHTOWER:  -- what the case may be.

21          MR. WISHNEW:  Very limited number of servers --

22          MR. HIGHTOWER:  I'm moving it over now.

23          THE COURT:  And they also say they served you by mail.

24          MR. WISHNEW:  Overnight mail, Your Honor.

25          THE COURT:  Overnight mail.

1          MR. HIGHTOWER:  I have -- I don't have a response to

2    that one, Your Honor.  I haven't seen it.  I don't know if it

3    just -- well, what was the address it was sent to, I'm sorry?

4          MR. WISHNEW:  It was the same address on the file

5    proof of claim, which is McIntyre, Panzarella, Thanasides,

6    Bringgold & Todd, P.L., 201 East Kennedy, Suite 1000, Tampa,

7    Florida 33602.

8          MR. HIGHTOWER:  Oh, that's an old address.  And

9    I -- admittedly, you know, I should've updated the mailing

10   address, removed -- of course, the claim was filed, I don't

11   know, maybe three years ago.  Quite frankly, this kind of fell

12   off my attention as far as updating the address.  We moved a

13   couple years ago.

14         MR. WISHNEW:  Your Honor, I'd like to also address one

15   point.  If I could direct a question to Mr. Hightower?

16         THE COURT:  All right.

17         MR. WISHNEW:  He indicates that he had

18   conversations -- held discussions with counsel for GMAC

19   Mortgage.  It would've been someone at my firm, presumably, and

20   I've not spoken with Mr. Hightower.  I'm not sure if he spoke

21   with maybe possibly our co-counsel at Bradley Arant.

22         THE COURT:  Who have you spoken to, Mr. Hightower?

23         MR. HIGHTOWER:  This was the attorney who originally

24   represented GMAC in the litigation hearing in the Middle

25   District of Florida.  I cannot recall his name.  He did

1  not -- part of the firm -- he was not a part of the

2  representation of ResCap at all.  The representation he made to

3  me was that he was in discussions with counsel for ResCap and

4  there's -- carrying messages back and forth between them to me.

5          MR. WISHNEW:  I'm sorry, who was this individual?

6          MR. HIGHTOWER:  I can't --

7          THE COURT:  Do you have a name?

8          MR. HIGHTOWER:  I'm trying to remember.  Let me see if

9  I can search my e-mails real quick.  It was a firm out of

10 Alabama, I believe.

11         THE COURT:  Bradley Arant.  On the pleading -- on the

12 front of the pleading from Bradley Arant, it shows Ethan T.

13 Tidmore.

14         MR. HIGHTOWER:  Tidmore, yes.  I believe that's who it

15 was.

16         THE COURT:  All right.

17         MR. HIGHTOWER:  It was either Mr. Tidmore or someone

18 else in his firm.  I believe there were a couple of attorneys

19 who were on that case at the time.

20         THE COURT:  Very reluctantly, Mr. -- because look, Mr.

21 Hightower, I believe in resolving matters on the merits, not by

22 default.  I'm going to adjourn this claim objection.  What's

23 the next hearing date, Mr. --

24         MR. WISHNEW:  January 21st, Your Honor.

25         THE COURT:  January -- to January 21st.  Bear with me

RESIDENTIAL CAPITAL, LLC, et al.                    68

1   a second.  I'm going to require any written response to the

2   objection by Thursday, January 7th, 2016 at 5 p.m., and nay

3   reply from the Trust to Friday -- to Thursday, January 14th at

4   5 p.m.

5          MR. WISHNEW:  Okay.

6          MR. HIGHTOWER:  I appreciate that very much, Your

7   Honor, and I hate that I've made a really bad first impression.

8   I just submit my sincere apologies and hope the Court will give

9   me an opportunity to make it up.

10          THE COURT:  May I ask, where are you located?

11          MR. HIGHTOWER:  Tampa, Florida.

12          THE COURT:  Mr. Wishnew, do you have any objection to

13   counsel appearing by telephone at the next hearing?

14          MR. WISHNEW:  No, Your Honor.

15          THE COURT:  All right.  I'll permit you to appear by

16   telephone.  You need to arrange through CourtCall to do that.

17   It's --

18          MR. HIGHTOWER:  Understood.

19          THE COURT:  It's usually not my preference to hear

20   argument by telephone, but I do -- I mean, we extensively use

21   CourtCall for this.  But you're in Florida.  I'm not going to

22   make you come up here for it.  May I ask you this?

23          MR. HIGHTOWER:  I appreciate that.

24          THE COURT:  Have you been able to recover any money

25   from The Law Offices of Stern?

1        MR. HIGHTOWER:  No, Your Honor.  We -- about two weeks

2   before trial, they stipulated to a judgment of 1.5 million

3   dollars, which was basically a reflection that they believe

4   that they're uncollectable.

5        THE COURT:  Okay.  Anything else for today, Mr.

6   Wishnew?

7        MR. WISHNEW:  That's it, Your Honor.

8        THE COURT:  All right.  We're adjourned.

9        MR. WISHNEW:  Thank you for your time.

10       MR. HIGHTOWER:  Thank you, Your Honor.

11      (Whereupon these proceedings were concluded at 11:39 AM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                            I N D E X

3

4                            RULINGS

5                                        PAGE      LINE

6   Motion for relief from stay denied      14        14

7   The Trust's objection seeking to        59        14

8   allow the Clark claim in full is sustained

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Aliza Chodoff, certify that the foregoing transcript is a
true and accurate record of the proceedings.

_____

ALIZA CHODOFF

AAERT Certified Electronic Transcriber CET**D-634

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  December 17, 2015