USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/23/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

In re RESIDENTIAL CAPITAL, LLC, *et al.*,    :
                                             :
                          Debtors.    :
                                             :
_____    :         1:15-cv-2375-GHW
                                             :
FRANK REED and CHRISTINA REED,    :         MEMORANDUM OPINION
                                             :              AND ORDER
                          Appellants,    :
                                             :
              -v-                            :
                                             :
RESCAP BORROWER CLAIMS TRUST,    :
                                             :
                          Appellee.    :
------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

This bankruptcy appeal is the most recent episode in seven years of litigation involving

Frank and Christina Reed and their former mortgage loan servicer, GMAC Mortgage, LLC

("GMACM"). In 2012, GMACM, along with approximately 50 affiliated entities, filed chapter 11

bankruptcy petitions. The Reeds filed claims in the bankruptcy proceeding based on previous state

court litigation between GMACM and the Reeds, and the Bankruptcy Court ultimately allowed

some, but not all, of their claimed damages. The Reeds now appeal from the October 6, 2014,

Memorandum Opinion and Order Determining the Amount of Allowed Claim of Frank and

Christina Reed (the "Final Order"), arguing that their allowed claim should have been higher.

Because the Bankruptcy Court categorically excluded evidence that may support additional allowable

damages under New Jersey law, I REVERSE the ruling limiting the scope of damages evidence

permitted, AFFIRM the remainder of the Bankruptcy Court's decisions, and REMAND for further

proceedings consistent with this opinion.

I.      **Background**[1]

   A.      *The Reeds' Loan and the Pre-Petition Lawsuits*

The Reeds are in the business of "buying, improving, and selling homes."  Appellants' Br. 9; Bankr. Doc. 7560 ("Sept. 15 Hr'g") 42:14-16.[2]  They reside in some of their properties for a period of time, others are rental properties.  Sept. 15 Hr'g 42:19-24.  On May 31, 2006, the Reeds took out a $1,000,000.00 loan (the "Loan") from Metrocities Mortgage, LLC ("Metrocities"), evidenced by a note (the "Note") and secured by a mortgage (the "Mortgage") on property located at 817 Matlack Drive, Moorestown, New Jersey (the "Property").  Final Order 6.  They made their last monthly payment on the Loan on January 4, 2008, and defaulted on the Loan in March 2008 after they had failed to make their payments for thirty days.  *Id.*

The Loan was, at various times, owned by one entity but serviced by another.  Metrocities conveyed ownership of the Loan to GMAC Bank; Residential Funding Corporation ("RFC") later acquired the Loan from GMAC Bank; and on February 6, 2013 RFC transferred ownership of the Loan to 21st Mortgage Corporation.[3]  Final Order 6.  GMACM began servicing the Loan on June 27, 2006; the Mortgage, however, was not assigned to GMACM until May 22, 2008; and GMACM never owned the Note.  *Id.* at 6, 8.  GMACM continued servicing the Loan until February 15, 2013, when Ocwen Loan Servicing, LLC ("Ocwen") took over servicing; Ocwen, in turn, transferred servicing to 21st Mortgage Corporation on October 1, 2013.  *Id.* at 6.  On October 6, 2014, when the Bankruptcy Court issued the Final Order, 21st Mortgage Corporation both owned and serviced the Loan.  *Id.*

---

[1] The facts in this section are taken from the record designated by the parties and are limited to those necessary to decide this appeal.

[2] Documents designated as part of the record in this matter are referred to by their docket number in the bankruptcy proceedings.

[3] GMACM and RFC are Debtors in these bankruptcy proceedings, GMAC Bank is a non-debtor entity.

On May 19, 2008, GMACM, then the servicer of the Loan, initiated a foreclosure action (the "Foreclosure Action") in the Superior Court of New Jersey. *Id.* at 8. On May 28, 2008, GMACM recorded a *lis pendens* on the Property.[4] *Id.* The Superior Court dismissed the Foreclosure Action without prejudice on February 9, 2009 because GMACM could not prove that it had sent the Reeds a Notice of Intent to Foreclose ("NOI") as required under the New Jersey Fair Foreclosure Act (the "FFA") and the terms of the Mortgage. The Reeds spent $5,823.00 on attorneys' fees to defend against the Foreclosure Action. *Id.* at 14.

Although it was not a basis for the Superior Court's decision to dismiss the Foreclosure Action, the Bankruptcy Court noted that GMACM also lacked standing to bring the Foreclosure Action. In its motion for summary judgment in the Foreclosure Action, GMACM claimed that it was the holder of the Note and Mortgage. *Id.* at 8. But GMACM was never the noteholder, and had not yet been assigned the Mortgage on May 19, 2008, when it filed the lawsuit. *Id.* at 12. Furthermore, the May 22, 2008 assignment falsely stated that the Note had been transferred to GMACM, and GMACM did not demonstrate that it had the authority to bring the Foreclosure Action on behalf of the noteholder. *Id.* Thus, the Bankruptcy Court concluded that GMACM's lack of standing would have been fatal to its efforts to foreclose on the Property even if it had complied with the FFA. *Id.* Neither ResCap nor the Reeds dispute this.

Despite the fact that the Foreclosure Action was dismissed in February 2009, and for reasons unknown to this Court or the Bankruptcy Court, final judgment was not entered in the Foreclosure Action until August 9, 2013. *Id.* at 13. Nor was the *lis pendens* recorded by GMACM in connection with the Foreclosure Action discharged after the dismissal of that action. *Id.* At some point before the five-year term of GMACM's *lis pendens* expired, Ocwen, the loan servicer that

---

[4] A recording of a *lis pendens* on real property "is constructive notice of a pending action concerning that real estate, and a purchaser or mortgagee takes [the property] subject to the outcome of the lawsuit." *Trus Joist Corp. v. Treetop Associates, Inc.*, 477 A.2d 817, 822 (N.J. 1984) (citing N.J.S.A. 2A:15-7).

succeeded GMACM, recorded its own *lis pendens*, and later 21st Mortgage Corporation recorded a *lis pendens* in connection with a new foreclosure action that it had filed against the Reeds. *Id.* Thus, there has been a recorded notice of *lis pendens* on the Property continuously since May 28, 2008.

On May 10, 2010, the Reeds filed a five-count lawsuit (the "Reed Action") in New Jersey state court claiming that (1) GMACM acted negligently and/or recklessly when it filed the Foreclosure Action and recorded the *lis pendens* without first sending them an NOI; (2) GMACM breached its contract by failing to send them an NOI before initiating the Foreclosure Action; (3) RFC, as GMACM's successor in interest, inherited GMACM's liability for its actions; (4) GMACM's and RFC's agents and employees were liable for failing to provide the Reeds with an NOI; and (5) GMACM, RFC, and any other successor in interest should be estopped from instituting another foreclosure action against the Reeds. *Id.* at 14. In January 2012, the Reeds amended their complaint to add claims for economic and non-economic losses resulting from the Foreclosure Action, punitive damages for malicious acts, and fraud under the New Jersey Consumer Fraud Act (the "CFA"). *Id.* at 15. Shortly after amending their complaint, the Reeds moved to stay or dismiss the Reed Action so that they could participate in a foreclosure review process coordinated by the Federal Reserve Board. *Id.* The New Jersey court granted their motion to dismiss the complaint without prejudice on February 9, 2012. *Id.*

## B.    *Bankruptcy Court Proceedings Prior to the Evidentiary Hearing*

On May 14, 2012, GMACM, Residential Capital, LLC, and approximately 50 affiliated entities (together the "Debtors") filed chapter 11 bankruptcy petitions in the Southern District of New York. Bankr. Doc. 1. The Second Amended Joint Chapter 11 Plan (the "Plan"), confirmed by the Bankruptcy Court in December 2013, established the Residential Capital Borrowers Claims Trust ("ResCap" or the "Trust") as the successor in interest to the Debtors for purposes of resolving borrower claims. *See* Bankr. Doc. 6065 and 6137. The Trust is responsible for processing and paying claims of persons who are or were mortgagors under a mortgage loan originated,

4

serviced, or purchased by one or more of the Debtors.  Plan at 67.  The Trust is also responsible for
prosecuting objections to borrower claims.  *Id.*

The Reeds filed proofs of claim against GMACM and RFC based on alleged causes of action
similar to those asserted in the Reed Action.[5]  *See* Bankr. Doc. 7246, July 11, 2014 Order 2.  ResCap
objected to the Reeds' claims, and the Bankruptcy Court held a hearing on the objection on July 9,
2014.  On July 11, 2014, the Bankruptcy Court issued an order sustaining ResCap's objections as to
four of the Reeds' claims, including their claim for malicious use of process.  *Id.*  It also sustained an
objection to the breach of contract claim with respect to RFC because RFC did not own the Loan
until after the Foreclosure Action was initiated, but overruled an objection to the breach of contract
claim against GMACM.  *Id.* at 6.  Finally, the Bankruptcy Court sustained in part and overruled in
part ResCap's objection to the CFA claim, and allowed the claim to go forward on the limited
ground that GMACM misrepresented its ownership of the Note during the Foreclosure Action.  *Id.*
at 8.  The deadline for the completion of discovery was set for August 22, 2014, and an evidentiary
hearing on the surviving claims was scheduled for September 15 and 16, 2014.

The Reeds filed a motion for partial reconsideration of the July 11, 2014 Order, arguing that
the Bankruptcy Court should reconsider its decision sustaining ResCap's objection to the Reeds'
claim for malicious use of process.  Bankr. Doc. 7317.  The Bankruptcy Court denied that motion
on July 30, 2014.  Bankr. Doc. 7319.

On July 28, 2014, the Bankruptcy Court held a conference regarding a series of
discovery disputes between the Reeds and ResCap.  At that hearing, the Bankruptcy Court
confronted a proposal by the Reeds to call 27 fact witness and three expert witnesses that left it
"aghast."  Bankr. Doc. 7320 ("July 28 Hr'g") 16:7.  The Bankruptcy Court rejected the Reeds' "very

---

[5] Mr. and Mrs. Reed each filed a claim against Residential Funding Corporation and a claim against GMACM, for a total
of four claims.  *See* Bankr. Doc. 7619, Final Order 4 n.3.  The Bankruptcy Court disallowed the claims against RFC, and
because the claims against GMACM were duplicative the Bankruptcy Court allowed the claim filed by Mr. Reed and
disallowed the claim filed by Mrs. Reed.  *Id.*  The Reeds do not appeal these rulings.

expansive" view of the damages that they were entitled to claim.  Instead, as illustrated by the

following comments, the Bankruptcy Court limited the damages that the Reeds could pursue to

economic damages directly related to the Property.

> THE COURT:  [W]hen I read your papers before there was a decision, you seemed
> to be taking the position that you would be entitled to recover damages not limited
> to the one property as to which GMACM commenced foreclosure but to other
> business ventures, opportunities, things of that nature, *none of which in my view can you
> recover any damages for. . . .*  It was in light of the alleged wrongful foreclosure that the
> Consumer Fraud Act claim survived.  Arguably a punitive damage claim survived.
> *But all of that focuses solely upon this one property.*  I can't conceive of how you could have
> twenty-seven fact witnesses who would testify with respect to this one property and
> the alleged wrongful foreclosure action that was commenced.

July 28 Hr'g, 12:6-11; 20-25; 13:1 (emphasis added).

Mr. Reed protested the Bankruptcy Court's decision to limit damages to direct economic

harm with respect to the Property.  July 28 Hr'g, 14:8-10 ("Your Honor . . . where is the where is the

limitation and forgive my ignorance but where is it confined to this property? I don't understand

that.")  The court responded to Mr. Reed's objection, stating

> THE COURT:  I'm telling you now that I am not going to permit you to put on
> evidence relating to other business opportunities, lost or otherwise.  What your
> claims survive with respect to are wrongful foreclosure with respect to this property,
> if it gives rise to a Consumer Fraud Act claim-- it may and it may not.  And if it gives
> rise to a breach of contract claim, we'll see whether there's a contract.  You say there
> is.  The debtor, at least told me there wasn't and then you correctly pointed to the
> place in their foreclosure complaint where they said there was.  *But it all relates to this
> one specific property.*  To the extent you are arguing that you suffered economic loss
> with respect to this property, as a result of the debtors' actions, yes, I believe that is a
> proper subject for this hearing and your effort to recover damages, but that is
> economic damages relating to this specific property, not to other business ventures
> known or unknown, imagined or unimagined.  *This trial relates to this property. . . .*  I'm
> not precluding you from seeking economic losses that focus--if you can demonstrate
> that you suffered economic loss relating to this property as a result of wrongful
> conduct of the defendant, you can seek to recover it . . . .  What I am not going to
> permit you to do is to try and bring in--and I read this in some of your earlier papers
> before I ruled on the objection, that you were claiming that this put a cloud--this
> wasn't the term you used--it affected your credit, thereby preventing you from
> engaging in other business opportunities.  That's not going to be part of
> this trial.

July 28 Hr'g, 14:14-25; 15:1-7; 19-25; 16:1-6 (emphasis added).

Later during the conference, in response to a request by Mr. Reed for the legal basis of the

limitation on damages that it had imposed, the Bankruptcy Court further expanded on its views, as

follows:

> THE COURT:  In my view, Mr. Reed, any other damages would be speculative and
> not recoverable in this action--in this claim.  This relates to alleged wrongful
> foreclosure with respect to a specific property.  Any other--in my view, any other
> business opportunities you may have had, and maybe you did, and I hope you did, is
> far too speculative to permit recovery on the claims that survive on the basis they've
> survived.

July 28 Hr'g, 26:22-25; 27:1-4.

Critically for my analysis of the issue, the Bankruptcy Court did not engage in a specific

evaluation of the proof that Mr. Reed proposed to offer when it concluded that damages other than

direct damages related to the property would be speculative.  Instead, the court's limitation was

categorical, based, apparently, on a view of the scope of damages permitted by law.

That the Bankruptcy Court viewed its categorical limitation of prospective damages to be

mandated by law was expressly articulated in the order memorializing its ruling the following day.

There, the court wrote that

> [T]here is no basis for Reed to call 30 witnesses at the hearing, and he will not be
> permitted to do so.  Witness testimony will only be permitted regarding the one
> specific property owned by the Reeds that was the subject of the New Jersey
> foreclosure action and any damages the Reeds suffered directly relating to the alleged
> wrongful foreclosure—the Reeds may not recover damages relating to any other
> properties or lost business opportunities that the Reeds assert they lost because of
> the foreclosure action.  *The Court concludes as a matter of law that such other damages, if any,*
> *are speculative and not foreseeable, and are not recoverable on the Reeds' surviving claims.*

Bankr. Doc. 7314, July 29 Order 1-2 (emphasis added).

On September 8, 2014, the Bankruptcy Court held a final pretrial conference in advance of

the evidentiary hearing.  Prior to the conference ResCap filed motions *in limine* seeking to exclude

the testimony of the Reeds' three expert witnesses.  Docs. 7459, 7460, and 7461.  The experts were

permitted to testify regarding economic damages, and Christy Donati, the Reeds' expert regarding

foreclosure practices, was permitted to testify regarding New Jersey foreclosure custom, practice, and procedure. *Id.* at 24.

During this conference, the parties also discussed two letters from TD Bank that Mr. Reed wanted to offer as evidence. ResCap informed the Bankruptcy Court that it planned to object to the letters on authenticity grounds, and the Bankruptcy Court told Mr. Reed that he needed to obtain a declaration or affidavit from TD Bank to authenticate the letters. *Id.* at 30-33. Neither ResCap nor the Bankruptcy Court raised other grounds for excluding the letters at the September 8 conference.

### C.    *The Evidentiary Hearing*

At the evidentiary hearing held on September 15 and 16, 2014, Mr. Reed strove to prove that as a result of the improperly filed Foreclosure Action, and the associated notice of *lis pendens*, the Reeds had been unable to sell the Property, unable to refinance the Property, and that the value of the Property had declined. Mr. Reed called four witnesses: himself, Ms. Donati, Evan Hendricks, who testified regarding the effect of a notice of *lis pendens* on selling or refinancing property, and Drew Murdock, a friend of the Reeds.[6] ResCap called Lauren Graham Delehey, Chief Litigation Counsel of the Trust. Both parties also introduced documentary evidence. Consistent with the Bankruptcy Court's pre-hearing rulings, the Reeds' proof was limited to economic damages directly linked to the Property.

### 1.    Attempts to Sell

The Reeds attempted to sell the Property several times—before, during, and after the Foreclosure Action. In December 2007, prior to defaulting on the Loan, the Reeds entered into an agreement with Scott and Traci Jacobs to sell the house to the Jacobs for $2.04 million. Final Order 20. That sale never closed. *Id.* The Jacobs informed the Reeds in January 2008 that they were unable to obtain financing after an appraisal indicated that the value of the property was less than

---

[6] Christina Reed was not deposed during discovery leading up to the evidentiary hearing and did not testify at the evidentiary hearing.

the purchase price.  Doc. 7561 ("Sept. 16 Hr'g") 84:9-18.  The Reeds obtained a second appraisal
that supported the purchase price, but the Jacobs did not accept the revised appraisal.  Final Order
20-21.

As discussed above, the Reeds did not make a mortgage payment in February 2008, and
three months later GMACM initiated the Foreclosure Action.  After the Foreclosure Action was
filed, the Reeds relisted the Property, and in August 2008 they entered into an agreement to sell the
Property to Mark Weaver for $1.8 million.  *Id.* at 21.  When Mr. Weaver was unable to pay the Reeds
for the property outright, the Reeds and Mr. Weaver entered into a lease/purchase agreement and
Mr. Weaver moved into the house.  *Id.*  Mr. Weaver, however, never made any of his rental
payments.  *Id.* at 22-23.  The Reeds were ultimately forced to bring an eviction action against him—
they served him while he was in jail for writing bad checks—and listed the Property again in
September or October of 2009.  Sept. 15 Hr'g 90:1-11; 97:18-24.

In March 2010, Frank and Gina Roccisano offered the Reeds $1.3 million for the Property.
Final Order 23.  The Reeds rejected their offer.  *Id.*  Mr. Reed testified that he and his wife had
rejected the offer because it was not high enough for the Reeds to pay off the Loan, which had
continued to accumulate interest since their March 2008 default.  *Id.*  In June 2010 the Roccisanos
made a second offer for $1.45 million, but they later withdrew their offer.  *Id.* at 24.  A July 1, 2010
email from Frank Roccisano to his attorney stated that they needed to "discontinue any
negotiations" because the Roccisanos were moving back to Louisville where Mr. Roccisano would
resume his old job.  Doc. 7766-13, ResCap Ex. EE.  Mr. Reed testified that he understood that Mr.
Roccisano was choosing between two positions, and that the decision to take the position in
Louisville was influenced in part, by the Roccisanos' ability to purchase the Property—and that after
the Roccisanos "found out [the Reeds] had filed litigation, it [was] like they didn't want to bother
anymore."  Sept. 15 Hr'g 173:2-7; 175:14-22.

After negotiations with the Roccisanos fell through, the Reeds at first lowered the listing price, but later, around Thanksgiving of 2010, the Reeds took the house off of the market and moved back in. *Id.* at 173:10-16; 174:1-7.

In May 2011, the Reeds received an offer from Kris and Nina Singh. *Id.* at 174:1-15, 20-24; Doc. 7766-14, ResCap Ex. FF. The Reeds rejected the Singhs offer of $1.1 million because, like the Roccisanos' first offer, it was not high enough to allow the Reeds to pay off the Loan and convey clear title to the Singhs. Sept. 15 Hr'g 174:20-175:4.[7] The Reeds have not listed the Property since the Singhs' offer. Final Order 25.

### 2.    Attempts to Refinance

In addition to offering evidence that he had attempted to sell the Property, at the hearing Mr. Reed offered evidence that he had attempted to refinance the Property but had been unable to obtain financing because of the Foreclosure Action. Specifically, he testified that he thought he had options for refinancing in place, but that both Commerce Bank and Allied Mortgage ultimately refused him refinancing due to the Foreclosure Action. Sept. 15 Hr'g 80:19-25 (Commerce Bank); Sept. 16 Hr'g 99:14-100:11 (Allied Mortgage).

Mr. Reed did not fill out written applications for refinancing from either bank. *See* Sept. 15 Hr'g 47:8-16, 48:4-9; Sept. 16 Hr'g 98:7-16. The evidence presented at the evidentiary hearing regarding whether Mr. Reed ever even sought refinancing from Allied Mortgage was, at best, inconclusive. Mr. Reed introduced a letter dated November 20, 2010, from Thomas J. Tartamosa, a former Allied Mortgage loan officer, that stated that Mr. Reed qualified for a number of loan programs in March of 2008, but that those options became "null and void when [Reed's] property at

---

[7] Mr. Reed testified that the Singhs "wanted issues with the mortgage company to be resolved" prior to entering an agreement. Sept. 16 Hr'g 97:6-9. In an email to Louise Carter, the Reeds real estate agent, Nina Singh requested "a full description of what the legal dealings are with the bank and seller, as this may affect the closing." Bankr. Doc. 7766-14, Ex. FF. It is unclear exactly what Ms. Singh was referring to; at the time of the Singhs' offer, the Foreclosure Action had been dismissed, although a *lis pendens* was still on record, and the Reed Action was pending in New Jersey Court. Regardless, it is undisputed that the Reeds rejected the $1.1 million offer.

817 Matlack Dr. Moorestown NJ 08057 was placed into foreclosure." Doc. 7767-20. ResCap,

however, introduced an affidavit from Stuart Shilling, a Vice President at Allied Mortgage,

confirming that Allied Mortgage had searched its records and had found no record of any

application by Mr. Reed. Bankr. Doc. 7766-16.

    With respect to Commerce Bank, the parties agree that Mr. Reed sought financing, but

disagree both as to why Mr. Reed wanted a loan from Commerce and why the transaction was never

consummated. At the hearing, Mr. Reed sought to introduce two letters from Commerce Bank's

successor, TD Bank. The first letter, written in 2012, stated that Mr. Reed had been denied

financing in 2008 because of the foreclosure proceedings. Bankr. Doc. 7153-8. The second, written

in 2014, stated that the 2012 letter was provided pursuant to the Equal Credit Opportunity Act.[8]

The Bankruptcy Court did not consider either letter in its factual findings because it determined that

the letters were inadmissible hearsay, a decision that Mr. Reed appeals and that is addressed in more

depth below.

    ResCap also introduced testimony from Mr. Reed's 2009 deposition in which he testified

that he had applied to Commerce Bank to refinance the second mortgage on the Property (not the

Mortgage at issue here) and the loan "wasn't disapproved," but the "process kind of died" because

Mr. Reed planned to sell the house to the Jacobs. Sept. 16 Hr'g 109:3-15. The Bankruptcy Court

did not find Mr. Reed's explanation of the discrepancies between his 2009 deposition and his

testimony at the evidentiary hearing credible, and concluded that he had not established that he was

denied refinancing due to the Foreclosure Action. Final Order 26-27.

### 3.    The Property's Decline in Value

    In addition to claiming that their ability to sell or refinance the Property had been impaired

---

[8] The 2014 TD letter has not been included as part of the record in this case. However, during the September 8, 2014 status conference, counsel for ResCap described the 2014 letter as clarifying that the first letter was provided pursuant to the Equal Credit Opportunity Act, and the Court relies upon that description here. Bankr. Doc. 7557, Sept. 8, Hr'g 29:17-21.

by the improperly filed Foreclosure Action, the Reeds contended that the value of the Property had

declined over time because of the Foreclosure Action.  The evidence that Mr. Reed offered in

support of this argument focused on the decreasing amount that prospective purchasers offered the

Reeds, as well as his own testimony about contemporaneous sales in his neighborhood.

As discussed above, the Reeds had reached an agreement to sell the Property to the Jacobs

for $2.04 million dollars prior to the Foreclosure Action.  The next offer, from Mr. Weaver in the

fall of 2008, was for $1.8 million.  Approximately a year and a half later, in March of 2010, the

Roccisanos offered $1.3 million, and then, in June of 2010, they increased their offer to $1.45

million.  A year after the Roccisanos' offer, in May 2011, the Singhs offered $1.1 million.

Mr. Reed also testified that during the 2008-2011 time period, two other homes in his

neighborhood were sold.  A house "similar in size" to the Property sold for over two million dollars

in 2009, and in 2010 a home on the Reeds' street sold for $1.465 million.  Sept. 16 Hr'g 16:21-17:3;

17:15-18:5.  Mr. Reed noted that the sale price of the house sold in 2010 was above the Roscianos'

first offer despite the fact that the Reeds' property was, in his opinion, qualitatively different from—

and more valuable than—that house.  *Id.* 18:5-15.

Mr. Reed testified that he believed that each of the offers after the initial offer from the

Jacobs had been adversely impacted by the Foreclosure Action.  At the time Mr. Weaver made his

offer of $1.8 million, Mr. Reed said that he thought that the Property was worth closer to $1.9

million.  *Id.* 22:5-8.  He also estimated that, had the Property not been affected by the Foreclosure

Action, it would have been worth $1.75 to $1.8 million in 2010 and 2011.  *Id.* 19:16-23, 22:24-25.

### D.    *The Bankruptcy Court's Final Order and the Instant Appeal*

In its Final Order, the Bankruptcy Court held that GMACM had breached its contract with

the Reeds by failing to send an NOI before bringing the Foreclosure Action, and that GMACM had

violated the CFA when it misrepresented in the Foreclosure Action that it owned the Note, and that

as a result it had standing to foreclose.  Final Order 37, 50.  The court concluded that the Reeds had

not prevailed on their negligence claim or their claim for punitive damages based upon actual malice.

*Id.* at 35, 44.

Based on the CFA violation, the Bankruptcy Court allowed the Reeds' claim for

$17,469.000—triple the amount of the attorneys' fees that the Reeds incurred to defend against the

Foreclosure Action.  *Id.* at 50.  The Bankruptcy Court determined that the Reeds had not proven

that they were entitled to any damages under the breach of contract claim, because they had not

demonstrated either that they were unable to sell or refinance the Property due to the Foreclosure

Action, or that the Foreclosure Action had caused the Property to decline in value.  *Id.* at 37-41.

The Bankruptcy Court also concluded that the Reeds were unable to recover attorneys' fees based

on their breach of contract claim, although, as noted above, it awarded attorneys' fees under the

CFA claim.  *Id.* at 42.

On appeal, the Reeds argue that the Bankruptcy Court erred in a series of decisions that

shaped the evidentiary hearing:  (1) in sustaining ResCap's objection to their claim for malicious use

of process, and (2) in limiting the scope of damages evidence the Reeds were permitted to introduce

at the evidentiary hearing.  They also argue that the Bankruptcy Court erred during the evidentiary

hearing by (3) excluding the two letters from TD bank.  Finally, the Reeds assert that the Bankruptcy

Court erred in its Final Order by (4) holding that the notice of *lis pendens* was absolutely privileged

under New Jersey law, (5) incorrectly weighing the damages evidence presented by Mr. Reed with

respect to the valuation of the Property, and (6) finding that the Reeds' only ascertainable loss was

the amount of fees incurred in defending against the Foreclosure Action.[9]

---

[9] The Reeds' opening brief listed nine issues, but three were not included in the argument section of their brief and so are waived.  Federal Rule of Bankruptcy Procedure 8014(a) requires an Appellant's brief to contain both a statement of issues and argument.  Rule 8014(a) is derived from Federal Rule of Appellate Procedure 28, and accordingly "simply stating an issue does not constitute compliance" with the rule, rather "an appellant or cross-appellant must state the issue and advance an argument" in order for the claim to be considered.  *Frank v. United States*, 78 F.3d 815, 833 (2d Cir. 1996) *vacated on other grounds*, 521 U.S. 1114 (1997).

II.    **Standard of Review**

A district court reviews a bankruptcy court's finding of facts for clear error, its conclusions of law *de novo*, and its evidentiary rulings for an abuse of discretion. *In re Bayshore Wine Prods. Corp.*, 209 F.3d 100, 103 (2d Cir. 2000)) (findings of fact and conclusions of law); *Manley v. AmBase Corp.*, 337 F.3d 237, 247 (2d Cir. 2003) (evidentiary rulings). A finding of fact is clearly erroneous when the reviewing court is "left with the definite and firm conviction that a mistake has been made." *In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 426 (2d Cir. 2009) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

III.    **Discussion**

A.    *Malicious Use of Process*

The Reeds claim that the Bankruptcy Court erred in sustaining the objection to their malicious use of process claim. In order to prove a claim for malicious use of process under New Jersey law, a plaintiff must show that the original lawsuit (1) was brought without probable cause; (2) was motivated by malice; (3) terminated favorably to plaintiff; and (4) caused the plaintiff to suffer a special grievance. *Baglini v. Lauletta*, 768 A.2d 825, 834 (N.J. Super. Ct. App. Div. 2001).

Appellant's argument focuses on the Bankruptcy Court's statement that GMACM had "the absolute right to commence a foreclosure" during the July 9, 2014 objection hearing. Bankr. Doc. 7259 84:13-14. They argue that GMACM did not have the "absolute right" to commence the proceeding because it lacked standing, and also because it was obligated to comply with certain contractual and statutory obligations. As a result, the Reeds claim that the Bankruptcy Court's statement was error that requires remand.

As ResCap points out, however, when the Bankruptcy Court's statement is read in context it is clear that the court meant that GMACM had a good-faith basis for instituting foreclosure proceedings, not that it had an inviolate right to do so. The Bankruptcy Court's complete statement was:

14

> Commencing a foreclosure action against somebody who hadn't paid their mortgage
> is not a malicious use of process. They couldn't – the foreclosure action was
> dismissed without prejudice because they didn't satisfy the technical requirement of
> the foreclosure act, not that they didn't have the absolute right to commence a
> foreclosure against you.

Bankr. Doc. 7259, Transcript of July 9, 2014 Objection Hearing, 84:9-14. The Reeds are correct that

GMACM failed to take certain required steps before filing the Foreclosure Action. The Bankruptcy

Court acknowledged that fact in its Final Order when it held that the Reeds had proven their breach

of contract claim. Bankr. Doc. 7619 at 37. Failure to meet those "technical requirements,"

however, does not mandate the conclusion that the foreclosure proceedings were motivated by

anything besides the uncontested fact that the Reeds had defaulted on their mortgage. The record

does not support the contention that the foreclosure action was motivated by malice. The

Bankruptcy Court's order sustaining ResCap's objection to the Reeds' malicious use of process claim

is affirmed.

**B.**    ***Limitation on the Scope of Damages Evidence***

The remainder of the Reeds' arguments on appeal concern legal rulings and factual findings

related to their damages. I will first address the Reeds' primary contention on appeal—that the

Bankruptcy Court erred when, during the July 28 telephone conference and in its July 29 order, it

limited the scope of damages that the Reeds were entitled to recover to direct economic losses

related to the Property, and, therefore, constrained the evidence that the Reeds were permitted to

introduce at trial.[10]

**1.  The Allowed Damages**

In its Final Order, the Bankruptcy Court held that the Reeds had established that GMACM

was liable under both their CFA claim and their breach of contract claim. The CFA requires a

---

[10] Because, as set forth further below, I agree with the Reeds' argument that the Bankruptcy Court's categorical exclusion
of certain damages evidence as a matter of law was in error, I do not reach their due process argument.

private plaintiff to establish "(1) an unlawful practice, (2) an 'ascertainable loss,' and (3) 'a causal relationship between the unlawful conduct and the ascertainable loss . . . ." *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1115 (N.J. 2011) (quoting *Lee v. Carter-Reed Co.*, 4 A.3d 561, 576 (N.J. 2010)). The Bankruptcy Court found that GMACM's misrepresentation during the Foreclosure Action—submitting the assignment that falsely stated that GMACM was assigned both the Note and the Mortgage—was an unlawful act that violated the CFA.  Final Order 48.  The Bankruptcy Court also determined that GMACM had breached the Mortgage when it failed to comply with the FFA's notice requirements, which were incorporated into the contract.  The Bankruptcy Court's determination that GMACM was liable with respect to both causes of action is not at issue in this appeal.

After determining that GMACM was liable under the CFA and that it breached the Mortgage, the Bankruptcy Court considered the damages, if any, to which the Reeds were entitled. It held that GMACM's misrepresentation caused the Reeds' to incur attorneys' fees to defend against the Foreclosure Action, and accordingly allowed the Reeds' claim for treble the amount they spent on attorneys' fees.  *Id.* at 50.  The Bankruptcy Court found, however, that the Reeds had not proven that they were entitled to recover any damages based on their breach of contract claim. Final Order at 42.  Specifically, the Bankruptcy Court found the Reeds had not established (1) that they were denied refinancing based on the Foreclosure Action, (2) that they were unable to sell the Property as a result of the Foreclosure Action and *lis pendens*, (3) that the decline in the value of the Property was caused by the Foreclosure Action, or (4) that they were entitled to attorneys' fees (although, as discussed above, it allowed damages based on attorneys' fees under the CFA).  *Id.* at 37-42.

Consistent with its previous ruling, the Bankruptcy Court only considered damages evidence that concerned the Property specifically when determining the allowable damages.  The issue,

therefore, is whether the Bankruptcy Court's limitation on the presentation and development of

damages evidence was appropriate.

### 2. The Excluded Evidence

The Reeds argue that the categorical exclusion of damages outside of the value and

alienability of the Property and cost of defending the Foreclosure Action prevented them from

recovering the full amount of damages they are entitled to under New Jersey law.  For example, the

Reeds claim that a long-term tenant of their rental properties chose not to renew its lease due to the

Foreclosure Action.  Appellants' Br. 19; *see* Bankr. Doc. 7153-13.  The Court agrees that the

categorical exclusion of all evidence of loss not specifically tied to the Property was not supported

by New Jersey law. [11]

Under the CFA, the Reeds are entitled to recover "ascertainable losses" directly related to

GMACM's CFA violation.  The New Jersey Supreme Court has explained that an "ascertainable

loss" within the meaning of the CFA must be "an actual loss" that is "quantifiable or measureable"

and not "hypothetical or illusory."  *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 792-93

(N.J. 2005).  Where, as here, a case involves breach of contract or misrepresentation, "either out-of-

pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and

will set the stage for establishing the measure of damages."  *Id.* at 792 (citing *Furst v. Einstein Moomjy,*

*Inc.*, 860 A.2d 435, 441-42 (N.J. 2004)).

In New Jersey, "a party who breaches a contract is liable for all of the natural and probable

consequences of the breach of that contract."  *Pickett v. Lloyd's*, 621 A.2d 445, 454 (N.J. 1993) (citing

*Donovan v. Bachstadt*, 453 A.2d 160 (N.J. 1982)).  Such damages, however, must be reasonably

---

[11] ResCap responded to the Reeds argument, in part, by arguing that the Bankruptcy Court's decision to limit the
testimony of the Reeds' expert witnesses was a proper exercise of its authority under Rule 16, and, as an evidentiary
ruling should be reviewed for abuse of discretion.  But the Reeds' argument is that the Bankruptcy Court erred in
reaching its legal conclusion that damages not directly related to the Property were too speculative to be recoverable
without evaluating the evidence at the hearing—the limitation on the scope of expert testimony is just one of multiple
evidentiary rulings that resulted from that legal determination, which the Court reviews *de novo*.

foreseeable. *Id.* "Loss of profits, where based on sound fact and not on mere opinion evidence without factual support, is recognized as a proper measure of damages if 'capable of being estimated with a reasonable degree of certainty.'" *Stanley Co. of Am. v. Hercules Powder Co.*, 108 A.2d 616, 626 (N.J. 1954) (citing *Rempfer v. Deerfield Packing Corp.*, 72 A.2d 204, 208 (N.J. 1950)).

The Bankruptcy Court did not clearly adhere to these principles of New Jersey law when it categorically limited the damages that the Reeds could recover to direct economic losses related to the Property. The court excluded "damages relating to any other properties or lost business opportunities . . . ," because "as a matter of law" "such damages are speculative and not foreseeable . . . ." July 29 Order 1-2. Critically, however, the record does not reflect that the court evaluated any of the Reeds' evidence, or even received a proffer regarding its content, before imposing its restriction on the scope of the Reeds' damages. As a result, I do not have a basis to construe the Bankruptcy Court's ruling as reflecting its considered judgment of the proffered evidence. Instead, I am confronted with the more basic question of whether damages that are not directly related to the relevant property and non-economic damages must be excluded, as the Bankruptcy Court held, "as a matter of law." The answer to that bare question is that they are not.

As outlined above, New Jersey law requires that the Reeds' damages be "ascertainable" or "foreseeable." But the law does not support the exclusion of indirect damages, such as lost profits, so long as they meet those requirements. The court's conclusory culling of a category of damages prior to the evidentiary hearing created the possibility that an ascertainable or foreseeable loss directly caused by the Foreclosure Action was overlooked.[12] I have sympathy for the Bankruptcy Court's desire to establish limitations on the evidence presented—particularly given the volume of submissions in this case—and I take no position regarding whether the evidence that the Reeds seek to introduce will meet the standard required for the Reeds to recover. However, I believe that New

---

[12] This possibility is why, contrary to ResCap's arguments, the error is not harmless.

Jersey law requires some evaluation of the proffered evidence to determine whether it meets that standard.

The Bankruptcy Court's decision limiting the scope of damages evidence is therefore reversed, and the case is remanded for further proceedings to determine whether the Reeds suffered any cognizable damages caused by the Foreclosure Action, but not directly related to the Property.

### C.    *Exclusion of the TD Letters*

The Reeds contend that the Bankruptcy Court improperly sustained ResCap's objection to two letters from TD Bank that Mr. Reed sought to introduce at the evidentiary hearing.  They argue that during the September 8, 2014 telephone conference, the Bankruptcy Court said that the letters would be admitted if Mr. Reed could provide affidavits authenticating them, and that it was improper to then exclude the authenticated letters on hearsay grounds given that the Bankruptcy Court had not previously suggested that hearsay could be an independent basis to exclude the letters. Appellants' Br. 27.

"[P]ro se status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.3d 90, 95 (2d Cir. 1983)).  The hearsay exception for records of a regularly conducted activity requires that the record at issue be "made at or near the time" of the act or event recorded.  Federal Rule of Evidence 803(6).  The letters at issue were written in 2012 and 2014, and concern the alleged denial of refinancing to Mr. Reed in 2008.  Given the significant delay between the event records and the preparation of the documents, the Bankruptcy Court clearly did not abuse its discretion in excluding the letters.

Further, it is apparent from the record that the Bankruptcy Court went out of its way to devise a solution that would comply with the Rules of Evidence and be fair to the Reeds.  After the letters were excluded on September 15, Mr. Reed told the Bankruptcy Court that Mr. Curley, the author of the letters, would be able to come to court to testify the next day.  Sept. 15 Hr'g 163:3-5.

Despite the fact that Mr. Curley was not listed on the witness list, the Bankruptcy Court agreed to

permit Mr. Curley to testify on the second day of the hearing "[i]n fairness to Mr. Reed, a non-

lawyer," who "could not have anticipated the Court's ruling in refusing to admit into evidence the

letters." *Id.* 196:1-15.[13]  Mr. Reed failed to produce Mr. Curley the next day, despite the Bankruptcy

Court's expressed willingness to allow the testimony.  The court's exclusion of the TD letters is

affirmed.[14]

>    **D.**    ***The Notice of Lis Pendens***

The Reeds next argue that the Bankruptcy Court erred in ruling that GMACM's filing of a

notice of *lis pendens* enjoyed absolute privilege under New Jersey law.  The Reeds appeal can be

construed to raise two distinct, but related, issues:  (1) whether the initial filing of the *lis pendens* was

privileged under New Jersey law, and (2) if the original filing was privileged, whether the privilege

ceased when the Foreclosure Action was dismissed and GMACM failed to withdraw the notice of *lis

pendens*.

"The public policy rationale for the litigation privilege has not changed in half a

millennium."  *Loigman v. Twp. Comm. of Twp. of Middletown*, 889 A.2d 426, 434 (N.J. 2006).  "Certain

statements, such as those made in judicial, legislative, or administrative proceedings, are absolutely

privileged because the need for unfettered expression is crucial to the public weal."  *Dairy Stores, Inc.

v. Sentinel Pub. Co., Inc.*, 516 A.2d 220, 226 (N.J. 1986) (citing *Rainier's Diaries v. Raritan Valley Farms,

Inc.*, 117 A.2d 889 (N.J. 1955).  Under New Jersey law, the filing of a notice of *lis pendens* is part of a

---

[13] The Court further notes that the Bankruptcy Court was generally solicitous of Mr. Reed's status as a *pro se* litigant.  In addition to agreeing to permit Mr. Curley to testify, the Bankruptcy Court pointed out when Mr. Reed might wish to offer exhibits into evidence, *see, e.g.*, Sept. 15 Hr'g 52-53, and assisted in rephrasing Mr. Reed's questions for Mr. Hendricks.  *Id.* 143-144.

[14] The Reeds assert, in their reply brief before this Court, that the Bankruptcy Court would not allow them the opportunity to bring Mr. Curley in at another time.  This argument is unavailing.  The Bankruptcy Court noted that Mr. Reed could "seek to obtain some relief" if he believed he "timely served [Mr. Curley] with reasonable notice of a subpoena to appear" but that he would need to do so outside of the evidentiary hearing.  Sept. 16 Hr'g, 43:20-44:5.  There is no evidence in the record before this Court that Mr. Reed ever requested such relief or raised the issue after the September 16, 2014 hearing.

judicial proceeding, and, as such, is an absolutely privileged act which cannot give rise to liability for

slander of title. *Wendy's of South Jersey, Inc., v. Blanchart Mgmt. Corp. of New Jersey*, 406 A.2d 1337, 1340

(N.J. Super. 1979). The Reeds argue that privilege cannot attach when the lawsuit of which the *lis*

*pendens* gives notice was "wrongfully filed," and that, in any event, it applies *only* to claims for slander

of title. Appellants' Br. 25. Neither proposition is supported by New Jersey law.

First, the *Wendy's* court confronted the concern that "the cloak of an absolute privilege will

result in the filing of notice of Lis pendens with impunity and utter disregard for the severe harm

which can result," and upheld the privilege. *Wendy's*, 406 A.2d at 1340. Instead of abrogating the

privilege, the *Wendy's* court noted "that the law does offer some protection to a property owner from

the baseless filing of a notice of Lis pendens through the application of such procedural devices as a

motion to dismiss, or a motion for summary judgment, to the action itself." *Id.* (internal citations

and citations omitted). Similarly, in considering the constitutionality of the New Jersey *lis pendens*

statute the Third Circuit has observed that property owners were "not totally without protection

against frivolous or unmeritorious claims" because of the limited circumstances in which a notice of

*lis pendens* can be filed, and because "remedies of malicious prosecution and abuse of process are

likely to be available in New Jersey to provide some protection against improper utilization of lis

pendens." *Chrysler Corp. v. Fedders Corp.*, 670 F.2d 1316, 1329.[15] The courts have thus considered the

risk that a notice of *lis pendens* could be filed in a meritless lawsuit and concluded that even

considering the risk that notices of *lis pendens* may be filed "with impunity," the privilege applies.

Second, contrary to the Reeds' assertion, the litigation privilege applies to claims beyond

slander of title. The *Wendy's* court recognized that slander of title is just one species of the general

---

[15] The Reeds claim that filing a notice of *lis pendens* is, in and of itself, a 'taking of property' and cite the district court's decision in *Chrysler Corp. v. Fedders Corp.*, 519 F.Supp. 1252 (D.N.J. 1981). On appeal, however, the Third Circuit declined to determine whether the notice of *lis pendens* does or does not entail a taking, and instead decided "merely that the degree of deprivation caused by a filing of a notice of *lis pendens* warrants reaching the due process issue." 670 F.2d at 1324-25. The Third Circuit went on to hold that the New Jersey statute afforded sufficient due process to property owners against whom a notice of *lis pendens* was filed and so was constitutional. *Id.* at 1331.

tort of injurious falsehood, and that "the same privileges which apply to the torts of personal

defamation apply to the tort of injurious falsehood." *Wendy's*, 406 A.2d at 1338 (citations omitted).

Based on this same privilege, courts have also dismissed claims for malicious interference with one's

business, intentional interference with contractual relations, and intentional interference with

economic advantage. *Rainier's Dairies*, 117 A.2d at 895 (malicious interference with business); *Lone v.

Brown*, 489 A.2d 1192, 1196 (N.J. Super. Ct. 1985) (intentional interference with contractual relations

and economic advantage). This is a logical conclusion, because "[i]f the policy, which in defamation

actions affords an absolute privilege or immunity to statements made in judicial and quasi-judicial

proceedings is really to mean anything then we must not permit its circumvention by affording an

almost equally unrestricted action under a different label." *Rainier's Dairies*, 117 A.2d at 895; *see also*,

*Loigman*, 889 A.2d at 436 ("In New Jersey, the litigation privilege protects attorneys not only from

defamation actions, but also from a host of other tort-related claims.").

Like the New Jersey courts, this Court cannot permit an end-run around the litigation

privilege because the Reeds have not labelled their claim "slander of title." They are, in substance,

claiming that they were injured by a statement made in a judicial proceedings—the notice of *lis

pendens*—that limited their ability to alienate their property. I hold that the *lis pendens* filed by

GMACM was privileged and, therefore, affirm the decision of the Bankruptcy Court—to do

otherwise would contradict the public policy underlying the privilege as explained by the *Rainier's

Dairies* court.

Having determined that GMACM's original recording of the *lis pendens* was privileged, I must

briefly consider whether the privilege ceased after the Foreclosure Action was dismissed and

GMACM failed to discharge the *lis pendens*. It did not. At the evidentiary hearing, the Reeds

provided evidence, through the testimony of an attorney experienced in foreclosure cases, that a

notice of *lis pendens* is typically withdrawn by the plaintiff-mortgagee when a foreclosure action is

dismissed. Sept. 15 Hr'g 116:22-117:6, 119:3-21. But even crediting the testimony that that is the

typical practice, the Reeds have not provided—and the Court's research has not identified—any

legal authority supporting the proposition that the plaintiff who recorded a notice of *lis pendens* has

an affirmative obligation to have it discharged when the plaintiff's case is dismissed.  Furthermore,

as the Bankruptcy Court noted, there is no suggestion that the Reeds sought to remove the *lis*

*pendens*, despite the fact that there were multiple avenues available for them to do so.  Final Order

40.  The original notice of *lis pendens* filed in the Foreclosure Action was privileged, and it did not

lose that status simply because the parties failed to discharge it in a timely fashion.

Because the notice of *lis pendens* was privileged, the only possible means by which the Reeds

might recover damages based on the notice of *lis pendens* is by bringing a successful claim for

malicious prosecution or abuse of process.  *See Chrysler*, 670 F.3d at 1330, *Wendy's*, 406 A.2d at 1340.

As discussed above, however, these claims fail here given the lack of evidence that GMACM acted

with malice in instituting the Foreclosure Action and recording the notice of *lis pendens*.

### E.    *Findings of Fact Regarding the Value of the Property*

The Reeds contend that the Bankruptcy Court incorrectly weighed the evidence Mr. Reed

presented with respect to the decline in value of the Property over time.  In short, Mr. Reed argues

that his was the only evidence of the Property's value presented at the evidentiary hearing, and,

therefore, that the Bankruptcy Court's factual findings with respect to the value of the Property

went against the weight of the evidence.  Mr. Reed is incorrect.

As an initial matter, a claim is not automatically allowed in the amount the claimant alleges

simply because the Bankruptcy Court determines that the claimant has a valid claim for *some* amount.

Rather, the Bankruptcy Court has an independent obligation to "determine the amount" of each

claim "as of the date of the filing of the petition . . . ."  11 USC § 502(b).

Moreover, while it is true, as the parties stated in their briefs, that a correctly filed proof of

claim is *prima facie* evidence of the validity and amount of the claim, the burden shifts to the objector

to produce evidence sufficient to negate prima facie validity, and that if the objector does so the

burden of proof returns to the claimant to establish the validity of the claim, *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992), this simplified recitation misses two significant points. First, in order to shift the burden to the objector in the first place the filed claim must allege facts sufficient to support the claim,[16] and second, the burden of persuasion is always on the claimant. *Id.*

With this framework in mind, it is easy to understand how the Reeds failed to meet their ultimate burden of persuasion—even in a situation in which the only evidence as to the value of the Property was offered by the Reeds, the onus remained on them to convince their fact-finder, the Bankruptcy Court, to view those facts in the way that favored their claim. In the context of the Reeds' claim that they were entitled to damages to compensate them for the decrease in the value of the Property over time, they had to convince the Bankruptcy Court not only that the Property declined in value, but that it declined in value *because of the Foreclosure Action*.

The Bankruptcy Court considered Mr. Reed's evidence regarding the value of the Property, and found that the value diminished over time. Final Order 41. This Court's review of the record confirms that the Bankruptcy Court did not err in concluding that the Reeds failed to show that the decrease in value was a result of the Foreclosure Action. Therefore, the decision of the Bankruptcy Court on this point is affirmed.

### F.    *Whether the Reeds Are Entitled to Greater Damages*

Finally, the Reeds makes a general assertion that the Bankruptcy Court erred in not awarding them greater damages. For the same reasons discussed in Section III.E, *supra*, the Court affirms the Bankruptcy Court's rulings with the respect to the category of damages that it considered, namely, those directly related to the Property. As discussed in Section III.B, *supra*, the Court remands this case to the Bankruptcy Court to determine whether the Reeds sustained any cognizable damages as a

---

[16] It is impossible for the Court to evaluate whether the Reeds' original claims met the standard for sufficiency in establishing the amount of their claim because neither party designated the Reeds' original claims as part of the record on appeal. *See* Designation of Bankruptcy R. on Appeal, ECF No. 2, and Counter Designation of Bankruptcy R. on Appeal, ECF No. 3.

direct result of the Foreclosure Action beyond the damages relating to the Property on which the

Bankruptcy Court has already heard and evaluated the evidence.

## IV.    Conclusion

For the foregoing reasons, the decision of the Bankruptcy Court is affirmed in part, reversed

in part, and remanded.  The Clerk of Court is instructed to enter judgment accordingly and to close

the case.

SO ORDERED.

Dated:  December 23, 2015
New York, New York

_____
GREGORY H. WOODS
United States District Judge