**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re:       :

      :

      :

       RESIDENTIAL CAPITAL, LLC, *et. al.*       :       Chapter 11

      :       Case No. 12-12020 (MG)

      :

          Debtors,       :

---------------------------------------------------------------x

      :

THE RESCAP BORROWER CLAIMS,       :

     TRUST,       :

      :

          Objector,       :

      :

       - against -       :

      :

WILLIAM J. FUTRELL,       :       JOINT PRETRIAL ORDER

      :

          Claimant.       :

      :

---------------------------------------------------------------x

      The Borrower Trust, having attempted to confer with Claimant's counsel, and having conferred with the Court pursuant to Fed. R. Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order herein.

I.       NATURE OF THE CASE

      **A.**       **Borrower Trust's Description of Nature of the Case**

      William J. Futrell (the "Claimant") obtained a loan from Aegis Mortgage Corporation d/b/a UC Lending ("Aegis") pursuant to the terms of a Note dated February 23, 2001 (the "Note"). The Note was secured by a Mortgage (the "Mortgage" and, together with the Note, the "Loan") in favor of Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for Aegis and its successors and assigns. Homecomings Financial, LLC, one of the debtors in the above captioned chapter 11 cases (collectively, the "Debtors"), began servicing the loan on March 9, 2001.

      The Loan went into default when Claimant failed to remit the Loan installment payment of principal and interest that became due on December 1, 2007. In June 2009, after a prior loss mitigation attempt had failed, Claimant sought a loan modification. On June 19, 2009, Homecomings set up a three-month HAMP loan modification trial plan in connection with Claimant's Loan account. As part of the process of approving Claimant for a trial loan modification, Homecomings set up an

escrow account associated with the Loan.  Due to an inadvertent typographical error, the escrow analysis projected a disbursement of $1,352.53 from Claimant's escrow account in November 2009 to pay for fire insurance covering the Property, although the estimated November payment should have been approximately $352.53.

Also during mid-June 2009, GMAC Mortgage, LLC ("GMAC Mortgage") and Homecomings each sent Claimant a letter informing Claimant that the servicing of the Loan account would be transferred to GMAC Mortgage, effective July 1, 2009.

Claimant subsequently completed the trial plan that had been set up by Homecomings in June 2009, and a permanent loan modification was approved by GMAC Mortgage on October 8, 2009.  The permanent loan modification documents reflected that Claimant's interest rate would be reduced from 9.75% to 7.75%, resulting in monthly payments for principal, interest, taxes and insurance of $730.42 commencing on November 1, 2009. The letter informed Claimant that "[t]o accept this offer, you must sign and return both copies of the Modification Agreement to us in the enclosed, pre-paid envelope by **10/22/2009**," although the deadline to accept the permanent loan modification was subsequently extended by GMAC Mortgage.

Claimant asserts that (i) his counsel sent five letters dated October 30, 2009 (the "October 30, 2009 Letter"), October 31, 2009 (the "October 31, 2009 Letter"), November 13, 2009 (the "November 13, 2009 Letter"), December __, 2009 (the "December 2009 Letter"), and October 23, 2011 (the "October 23, 2011 Letter" and, collectively with the October 30, 2009 Letter, October 31, 2009 Letter, the November 13, 2009 Letter, the December 2009 Letter, the "Letters") and (ii) the Letters served as Qualified Written Requests ("QWR") to GMAC Mortgage, as servicer, pursuant to 12 U.S.C. § 2605(e).  The Letters generally inquired about the proposed permanent loan modification and the escrow account associated with the Loan.  Claimant contends that GMAC Mortgage did not respond to the Letters as required by the Real Estate Settlement Procedures Act ("RESPA").

In his responses to the Borrower Trust's discovery requests, Claimant conceded that none of the Letters, other than the October 30, 2009 letter, were sent to the proper address identified on Claimant's monthly mortgage statements from GMAC Mortgage for submission of QWRs.

GMAC Mortgage sent letters (i) to Claimant on November 13, 2009 and December 3, 2009 and (ii) to Claimant's counsel on November 13, 2009 and January 12, 2010, in response to inquiries regarding Claimant's Loan account.

On January 29, 2010, GMAC Mortgage denied Claimant's pending loan modification, having not received an executed copy from Claimant.  Claimant was thereafter provided with a new traditional loan modification trial plan.  GMAC Mortgage subsequently offered to make the loan modification permanent and, on June 3, 2010, GMAC Mortgage received an executed copy of a permanent loan modification from Claimant. Under the terms of the June 2010 permanent loan

modification, the Loan was brought current and his monthly interest rate was reduced from 9.75% to 8.50%, resulting in a monthly principal, interest and escrow payment of $705.53.

Claimant asserts that as a result of GMAC Mortgage's alleged failure to respond to the Letters in accordance with RESPA, he suffered "actual damages."

**B.      Claimant's Description of the Nature of the Case**

The position of the Trust made statement, including the *inadvertent typographical error* from the June 17, 2009. That *inadvertent typographical error* was stated to have been timely addressed, where the matter was addressed OCWEN letter of April 4, 2013. There were issues with the manner how the Futrell account was handled, including the stated matter.

This position of the Claimant is based on RESPA, where the purpose of the law was in part, *to protect borrowers against certain abusive practices, such as kickbacks…*

There is the provision of RESPA, 3500.21, which covers Qualified Written Requests. There is the prescribed method for an acknowledgement in twenty (20) days and the specified action with sixty (60) days to address the issues. There was the Qualified Written Request of October 30, 2009, with the second Trust objection, paragraphs 59-60, stated the response was made on November 13, 2009.

The Trust stated November 13, 3009, response to the said request from Claimant, from GMAC expressly stated that "*This letter serves as our response to your Qualified Written Request dated October 23, 2009 and received November 2, 2009*".

RESPA contains key provisions that are applicable in the in the instant matter, including but not limited to GFE 3500.7, Escrow 3500.17, Transfer of Servicing 3500.17(e), and Record Keeping 3500.17(l).  The issues for the mortgage servicing and any proposed loan modification were actions GMAC/Homecomings.  The issues were presented to them in the Qualified Written Request of October 30, 2009, and others before and after, and the issues were never addressed, pursuant to the controlling law and principles.

Claimant assert that as a result of the documented commissions and omissions of Homecomings/GMAC with regard to the Futrell account, there was proximate harm and actual damages.

II.      BASIS FOR JURISDICTION, WHETHER THE CASE IS CORE OR NON-CORE, AND WHETHER THE BANKRUPTCY JUDGE MAY ENTER FINAL ORDERS OR JUDGMENT

This Court has core jurisdiction to hear and decide this matter under 28 U.S.C. sections 1334(a), 1334(b), 157(a), 157(b)(1), 157(b)(2)(B), 157(c)(2) (if needed), by consent of the parties and the Amended Standing Order of Reference in Case No. 12

3

MISC 00032 (filed February 1, 2012, Dkt. No. 1).  *See also Eriksen v. Residential Capital, LLC*, No. 14- CV-7205 (S.D.N.Y. Dec. 18, 2014) (holding that the presence of a claim for emotional distress damages does not convert a matter into one governed by 28 U.S.C. section 157(b)(5)).  The Borrower Trust submits that this is a core matter with respect to which the bankruptcy court may enter final orders.

III.    STIPULATED FACTS

The Borrower Trust has been unable to obtain a response or comments to a proposed form of Joint Pretrial Order circulated to Claimant's counsel on October 28, 2015. Consequently, all facts alleged by the Borrower Trust are set forth in section IV.B. Below

1.    On June 19, 2009, Homecomings set up a three month HAMP loan modification trial plan requiring the payment of $730.76 due on the first of each of August, September and October of 2009 (the "2009 Hamp Trial Plan").

2.    In connection with Claimant's approval for the 2009 HAMP Trial Plan, Homecomings established an escrow account for the Loan and prepared an Initial Escrow Disclosure Statement, dated June 17, 2009 (the "June 17 Escrow Statement").

3.    Due to a typographical error, the escrow analysis projected a disbursement of $1,352.53 from Claimant's escrow account in November 2009 to pay for fire insurance covering the Property, although the estimated November payment should have only been approximately $352.53.

4.    The Claimant contacted a representative with the mortgage servicer, on or about June 22, 2009, to raise the concerns regarding the calculations for the escrow account associated with the loan.

5.    On February 17, 2010, Claimant was set up with a temporary stop gap plan requiring the payment of $355 per month on the first of each of March, April and May of 2010 to avoid referral of the Loan to foreclosure.

IV.    PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties:

A.    **Claimant's Contentions**

1.    The Claimant dealt with Homecomings Financial and GMAC, GMAC companies, for the mortgage servicing of the underlying debt and subsequently the issue for any loan modification. There was no desire for a loan modification and that was communicated to the representatives several times, where representatives convinced the Claimant to complete a loan modification trial, at which point there was an opt out option, from the representatives of the servicer. See 7/2/09 of servicing notes. That was the reason why the servicer never

4

received any signed and notorized copy any loan modification proposal in their pre paid envelope.

2.  The amount of the state escrow shortage in the servicing notes was $1.541.69 for 6/17/09, where the 6/17/09 escrow document sent to the Claimant from the servicer stated the escrow shortage amount of $1,248.71. Escrow with the Claimant's account remained an issue throughout their servicing of the mortgage and any proposed loan modification, which was raised in the Claimant's October 30, 2009, QWR. GMAC Mortgage failed to respond as required by law, with adverse credit reporting.

3.  There was the immediate impact for the Claimant for the July 2009 statement where there was the demand for the payment of $886.36.

4.  The Claimant the mortgage servicer on multiple times and for multiple issues, and spoke to numerous representatives regarding issues, including but not limited to insurance placement matters and escrow.

5.  There were Qualified Written Requests from the claimant that addressed these issues, where the servicer did not address those and other issues, including October 23, 2009, October 30, 2009.

6.  The matter of the insurance typo was stated to have been resolved by the servicer, where it was mentioned in correspondence from a subsequent servicer, OCWEN, in 2013, making reference to the same.

7.  There was imposition of insurance from the servicer, from Balboa Insurance, where the claimant dealt with other insurance companies, noted in the servicing notes for 6/16/09.

8.  There was a notation in the servicing notes for 11/19/09, where the new premium for the insurance was $352.37. The Claimant caused their insurance agent to fax the information that the Claimant had Mutual Fire Insurance Co, and there was no need for the forced placement of insurance of Balboa Insurance and assessing the Claimant additional cost and expense from GMAC Mortgage.

9.  The servicer noted on 1/29/10 of the claimant's contact with Jenna Williams, stating that the stated escrow shortage was due to the forced placement by the servicer.

10.  The claimant caused their insurance agent to send in the necessary documents to the servicer on multiple occasions, where the servicer took no action there.

11.  There was the matter of the escrow and stated shortages from the servicer.

12.  There was more than one entry in the servicing notes, that the borrower does not agree with the escrow calculation, including but not limited to 2/3/10, where

Lynn Jones from Hamp raised the issue with the mortgage servicer, by the servicer representative, Jenna Jackson and Jessica Daman.

13.    The servicer did not address the issue with the claimant, where the service notes reflect on 10/3/09 that "…for breakdown of escrow, $1550 added to end of loan…"

14.    The claimant required but did not receive a breakdown of the escrow, with the notation in the notes made 10/30/09.

15.    The issues were not address by the servicer, where they remained when OCWEN assumed the mortgage in 2014.

16.    There was the matter of any loan modification from the servicer, where any document were presented, and the changes were nominal, notably any interest on the obligation.

17.    GMAC/Homecomings made offers to the claimant, including but not limited trial.

18.    The claimant tendered the payments in a timely manner, where the servicer voided any agreement, and returned a check for the sum of $355, dated 2/22/10.

19.    There were the assessments and charges made by the servicer, with multiple inspections, notably for the dates of 5/1/09, 7/1/09, 1/10/11, and 6/1/11.

20.    The "stop gap" offer was addressed in the service notes, where the 2/17/09 entry stated the borrower would be permitted to do that.

21.    The service notes reflect the $355 was returned on 5/3/10 with no explanation.

22.    There was the letter from Homecomings for June 10, 2009, and the statement of the balance of $71,251.99, and the GMAC validation letter for June 10, 2009, and the statement of the balance of $73,341.47.

23.    These were part of the issues that were presented to the servicer.

24.    There were the multiple contacts with numerous agents and employees of the servicer, where they extended the offer of a "Trial Period" in **2009**, to the Claimant in June **2009**, to begin in August 2009, under HAMP modification program. The Claimant was thirty (30) days behind at the time, and the HAMP program required the borrower be at least 90 days in arrears. The actions of servicer placed the Claimant further behind and further in arrears, with no rationale explanations forthcoming from any agent or employee of the servicer to offset the intentional harm to the Claimant. They said, do the modification, become current, and then refinance into a better loan, become current and opt out of escrow.

6

25.   The servicer misrepresented the offer and its terms, where the Claimant wanted out of any modification, wanting the former status quo with original mortgage. There was the statement that there would be further costs and obligations, if the Claimant did not proceed with the proposed modification.  At this time, others were brought into the process to assist the Claimant, as possible.  That was followed by the **2010** "Trial Period" that was accepted by the Claimant and the $355 paid as required. (16&19) The servicer cancelled the "Trial Period", where a check was returned, no explanation of why, no accounting for the retained Claimant's proceeds, placing the Claimant further exacerbating the delinquency and the need for the Claimant to take extraordinary measures to address GMAC Mortgage, including using all resources available to them.

26.   There was the statement that Homecoming spoke to the claimant on June 2, 2009, where the service notes reflect a message was left.

27.   There was the statement that the servicer responded to the October 30, 2009, QWR, noting the response on November 13, 2009.

28.   The November 13, 2009, response from the servicer was specifically identified as the response to the Claimant's QWR of October 30, 2009. That letter from the servicer specifies that it was a response to the Claimant's QWR of October 23, 2009. There were additional Claimant's QWR's that were sent, but not sent to the designated address. GMAC Mortgage handled and/or processed them, including the August 31, 2012 QWR..  Those Claimant's QWR's restated issues that were not addressed following the October 30, 2009 QWR. and not otherwise addressed by GMAC Mortgage.

29.   The servicer engaged in a course of conduct, where statements and agreements would be made, and not kept by them with the claimant.

30.   There were issues with the mortgage servicing and the proposed loan modification that were not addressed by agents and employees of the servicer, including but not limited to Jenna Williams; that included the forced place of insurance, modification, special repayment plans, and decisions that directly adversely impacted the Claimant and family. The servicer failed to comply with its obligations to the Claimant under the controlling law, resulting in their direct harm in all areas.

31.   Issues with the mortgage servicing, loan modification or other issues were not resolved by Jenna Williams, or others at GMAC/Homecomings, leaving the claimant in the worse position.

32.   The actions of the servicer, where they did not respond to the October 30, 2009, QWR.

33.   The servicers commissions and omissions were contrary to RESPA and its purpose to protect borrowers against certain abusive practices that are detrimental to the borrower. There were the several Qualified Written Requests,

where the October 30, 2009, was sent to the designated address from the servicer, where that and the others contained the issues that the servicer failed and refused to address. It included the question of where the monies sent by the Claimant to the servicer for "Trial Period" payments, that was not accounted for by the servicer by any representative and/or document generated by them and provided to the Claimant.

34. The servicer's actions proximately caused the matter of the claimant's property to deteriorate, by their demands for the satisfaction of the mortgage and their non responsiveness to the issues.

35. It was the reason they were unable to obtain assistance with the condition of the premises, from USDA, in 2011.

36. The value of the property dropped from the time that Homecomings/GMAC to $30,000, from $41,800 in 2009, from the property tax valuation.

37. The actions of the servicer adversely affected Claimant's health, where the added stress from the servicer's actions, at minimum, contributed to the medical event.

38. There was the need to use the resources available to the claimant to satisfy the servicer, and their pension/401K was exhausted, with that and other damages incurred by the claimant.

39. On 7/2/09  Sandwip Mukherjee, was in contact with Futrell, *...that the loan modification review process had to be completed before a new escrow analysis could be conducted.* The Claimant  got the information from the *representative from GMAC that the Claimant could opt out of the  escrow at that time.*

40. It was months after the commencement of the loan modification process from, 7/2/09, that the Claimant was encouraged to follow, where agents of the servicer. That included Jenna Williams (Jackson), that a new escrow analysis could not done until the modification was complete.

41. On 11/19/09, a representative of the servicer, Shelia Checketts, received a request from the Claimant for a new escrow analysis, and insurance cost. There were the requests for a new escrow analysis to/by other servicer's representatives, where none of the others stated there could be no new escrow analysis, until the loan modification was completed. (servicing notes 11/16/09)

**B.    Borrower Trust's Contentions**

*Loan Origination, Ownership and Servicing*

1. On or about February 23, 2001, Claimant obtained a home loan from Aegis in the principal amount of $76,500, represented by a Note in favor of Aegis.

2.    The Note was secured by a Mortgage in favor of MERS, as nominee for Aegis and its successors and assigns.

3.    Debtor Homecomings Financial, LLC began servicing the loan on March 9, 2001.

4.    Ownership of the Loan eventually was transferred to The Bank of New York Mellon Trust Company, National Association, fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A., successor by Merger to Bank One National Association, as Trustee for RASC 2001-KS1.

5.    Claimant defaulted under the Note and Mortgage when he failed to timely remit the installment payment of principal and interest due on December 1, 2007.

6.    On July 1, 2009, servicing of Claimant's Loan account was transferred from Homecomings to GMAC Mortgage.

7.    On February 15, 2013, servicing of the Loan transferred from GMAC Mortgage to Ocwen Loan Servicing, LLC.

*Loss Modification Efforts, the Escrow Account and the Letters*

8.    At least since October 2009, Thomas D. Margolis has acted as counsel for Claimant.

9.    On April 16, 2009, Claimant contacted Homecomings to request a loan modification.

10.    Homecomings employee, Charles Moreno, advised Claimant to obtain a workout package from the Debtors' website and submit it as soon as possible.

11.    On or about June 10, 2009, Homecomings received a workout package from Claimant by facsimile.

12.    Homecomings contacted Claimant by phone on June 10, 2009 to advise him that the workout package was missing documentation, including an income tax return.

13.    After receiving the requested documentation, Homecomings commenced the loan modification review process and, on June 19, 2009, set up the 2009 HAMP Trial Plan.

14.    In connection with Claimant's approval for the 2009 HAMP Trial Plan, Homecomings established an escrow account for the Loan and prepared an Initial Escrow Disclosure Statement, dated June 17, 2009 (the "June 17, 2009 Escrow Analysis").

15.   Due to an inadvertent typographical error, the escrow analysis projected a disbursement of $1,352.53 from Claimant's escrow account in November 2009 to pay for fire insurance covering the Property, although the estimated November payment should have been approximately $352.53.

16.   On July 2, 2009, Claimant and Alicia Futrell, Claimant's wife and an authorized party on the Loan account, contacted GMAC Mortgage with inquiries regarding the June 17, 2009 Escrow Analysis.

17.   Claimant and his wife were informed by GMAC Mortgage employee, Sandwip Mukherjee, that they would be able to cancel the escrow after the loan modification process was completed.

18.   Claimant completed the 2009 HAMP Trial Plan and a permanent loan modification was approved by GMAC Mortgage on October 8, 2009, subject to Claimant fulfilling certain conditions.

19.   The permanent loan modification would have provided for a reduction of Claimant's interest rate from 9.75% to 7.75%, resulting in monthly payments for principal, interest, taxes and insurance of $730.42 commencing on November 1, 2009.

20.   GMAC Mortgage informed Claimant that he had been approved for a permanent loan modification by letter dated October 14, 2009.  The correspondence from GMAC Mortgage to Claimant informing him that he had been approved for a permanent loan modification stated "[t]o accept this offer, you must sign and return both copies of the Modification Agreement to us in the enclosed, pre-paid envelope by **10/22/2009**."

21.   Claimant did not execute and return the permanent loan modification agreement by October 22, 2009.

22.   On November 16, 2009, Alicia Futrell contacted GMAC Mortgage customer care to raise concerns regarding the calculations for the escrow account associated with the loan.

23.   During each month between September 2009 and January 2010, Claimant received monthly mortgage account statements from GMAC Mortgage, which contained the following statement on the back side of the monthly statement:

> **Qualified Written Request** – Under the Real Estate Settlement Procedures Act, a qualified written request is a written correspondence, other than notice on your payment coupon or other payment medium supplied by us, regarding the servicing of your loan which includes your name, account number and your reasons for the requests.  Any qualified written request you wish to submit must be sent to: GMAC Mortgage, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-1330.

24.    Claimant failed to deliver the October 31, 2009 Letter, if any, to GMAC Mortgage, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-1330.

25.    Claimant failed to deliver the November 13, 2009 Letter to GMAC Mortgage, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-1330.

26.    Claimant failed to deliver the December 2009 Purported QWR to GMAC Mortgage, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-1330.

27.    GMAC Mortgage sent letters (i) to Claimant on November 13, 2009 and December 3, 2009 and (ii) to Claimant's counsel on November 13, 2009 and January 12, 2010, in each case in response to inquiries regarding Claimant's Loan account.  Through GMAC Mortgage's letters and conversations with both Claimant and his counsel, GMAC Mortgage provided responses regarding the subject matter of each of the inquiries contained in each of the October 30, 2009 Letter, the November 13, 2009 Letter and the December 2009 Letter.

28.    GMAC Mortgage's December 3, 2009 responsive letter to Claimant stated that:

> This is in response to your request for a new escrow analysis to be performed on the above-referenced loan. Since your loan is being reviewed for a possible loan modification, we are unable to comply with this request. Once the loan modification process is completed, a new analysis may be requested.

29.    GMAC Mortgage's January 12, 2010 responsive letter to Claimant's counsel stated that:

> This letter is in response to your loan modification and escrow inquiry on the above-referenced account.
>
> Please be advised, under the investor guidelines, an escrow account is required to be established when the loan is modified. A new escrow analysis can not be completed because the account is handled by our Loss Mitigation Department and a loan modification is pending.
>
> The borrower may refuse the pending loan modification and reapply for other loss mitigation options if they do not wish to accept the current agreement. However, there is no guarantee any further options will be available. If you have any questions you may contact our Loss Mitigation Department at 1-800-850-4622.

30.    Claimant was also advised by telephone by GMAC Mortgage customer care representatives on December 9, 2009, December 10, 2009, January 8, 2010 and January 26, 2010 that a new escrow analysis could not be conducted while the loan modification application was pending, but could be conducted once the loan modification agreement had been executed and returned.

31. GMAC Mortgage sent a follow-up letter, dated December 17, 2009, regarding Claimant's approval for a permanent loan modification, having not received an executed copy of the permanent loan modification agreement by that date.

32. GMAC Mortgage's December 17, 2009 letter stated "[t]o accept this offer, you must sign and return both copies of the Modification Agreement to us in the enclosed, pre-paid envelope by **1/1/2010**."

33. Claimant did not execute and return the permanent loan modification agreement by January 1, 2010.

34. GMAC Mortgage denied Claimant's pending permanent loan modification request on January 29, 2010, having not received an executed permanent loan modification agreement by that date.

35. GMAC Mortgage informed Claimant of the permanent loan modification denial by letter dated February 3, 2010. Also on February 3, 2010, GMAC Mortgage conducted a new escrow analysis, correcting the typo contained in the June 17, 2009 escrow analysis, and Claimant's monthly escrow payment was reduced from $229.11 to $50.83, thereby decreasing Claimant's total principal, interest and escrow payment from $886.36 (the amount due under the June 2009 escrow analysis) to $708.08.

36. On February 12, 2010, GMAC Mortgage received a facsimile from Claimant containing a new HAMP workout package.

37. On February 16, 2010, an employee of GMAC Mortgage's customer advocacy group spoke with Claimant's wife and advised her that Claimant would not be able to qualify for a HAMP loan modification at that juncture because he was deriving income from short term disability.

38. Claimant was formally advised of the HAMP modification denial by letter dated February 17, 2010.

39. On February 18, 2010, GMAC Mortgage spoke with Claimant by phone and advised him that his Loan was being considered for a non-HAMP (or traditional) loan modification.

40. On February 19, 2010, Claimant was approved for a traditional loan modification trial plan, requiring payments of $704.23 on each of April 1, May 1 and June 1, 2010.

41. By letter dated May 20, 2010, Claimant was informed that, subject to certain conditions set forth in the letter, he had been approved for a permanent, traditional loan modification (the "2010 Loan Modification").

42. Subject to certain conditions precedent, the 2010 Loan Modification would reduce the interest rate on Claimant's Loan from 9.75% to 8.50%, bring his

Loan account current, and adjust Claimant's monthly principal, interest and escrow payments to $705.53 commencing on August 1, 2010.

43. At the time Claimant was approved for the 2010 Loan Modification, his Loan account was past due for October 2009 through May 2010 payments.

44. Alicia Futrell was also informed by telephone on May 21, 2010 of the approval for the 2010 Loan Modification and was advised of the upcoming payment amount and due date.

45. On June 3, 2010, GMAC Mortgage received the executed permanent loan modification agreement and a contribution payment required under the terms of the 2010 Loan Modification.

46. Claimant subsequently defaulted under the terms of the 2010 Loan Modification.

47. Claimant contends that on or about October 23, 2011, his counsel sent the October 23, 2011 Letter.

48. During each month between September 2011 and November 2011, Claimant received monthly mortgage account statements from GMAC Mortgage, which contained the following statement on the back side of the monthly statement:

> **Qualified Written Request** – Under the Real Estate Settlement Procedures Act, a qualified written request is a written correspondence, other than notice on your payment coupon or other payment medium supplied by us, regarding the servicing of your loan which includes your name, account number and your reasons for the requests. Any qualified written request you wish to submit must be sent to: GMAC Mortgage, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-1330.

49. Claimant failed to deliver the October 23, 2011 Letter to GMAC Mortgage, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-1330.

50. By letter dated November 17, 2011, GMAC Mortgage offered Claimant the ability to pay-off the Loan for approximately 35% of the Loan's principal balance, or $27,000.

51. Claimant was approved for further trial loan modification plans in April and November 2012, pursuant to which his monthly payments would have been $529.75 and $693.25, respectively. These trial loan modification plans were cancelled in each case as a result of Claimant's failure to make the first trial plan payment.

52. To the extent that the Court permits Claimant to submit a statement of his contentions subsequent to the November 12, 2015 deadline for submission of a

Joint Pretrial Order, the Borrower Trust reserves the right to submit supplemental and/or additional contentions as necessary.

V.    ISSUES TO BE TRIED

1.    Whether GMAC Mortgage complied with the controlling law and the relevant provisions with regard to the Qualified Written Request, dated October 30, 2009.

2.    Whether GMAC Mortgage sent one or more letters to Claimant meeting the requirements of 12 U.S.C. § 2605(e)(2) with respect to the October 30, 2009 Letter.

3.    Whether GMAC Mortgage's alleged failure to address the Qualified Written Request, dated October 30, 2009, actually caused damage to the Claimant and whether such damages were the foreseeable result of GMAC Mortgage's actions.

VI.    CLAIMANT'S EXHIBITS

1.    Photographs of the Claimant's residence at issue

2.    June 17, 2009 analysis

3.    June 10, 2009 Homecoming letter

4.    June 10, 2009 GMAC letter

5.    November 13, 2009 GMAC QWR response

6.    "Stop gap" agreement

7.    Return check copy

8.    April 4, 2013 Ocwen letter

9.    Mutual Fire Insurance Co statement of premium

10.   Claimant pension/retirement documents

11.   2012 1099R

12.   Tax warrants (4)

13.   Bank statement – overdraft fees incurred

14.   Disability documentation

15.   Valuation of real estate

16.    USDA August 10, 2011 letter

17.    GMAC November 17, 2011 offer to satisfy mortgage

18.    OCWEN statement noting balance of $90,656.94 of 5/22/14

19.    Estimate to address real estate issues

20.    Claimant's hospital bill 2011

21.    Radiology bill

22.    Related bill to #20

23.    Related bill to #20

24.    Paystub with 401k payment deductions from gross income

25.    Servicing notes pages 87/159, 96/159, 98/159, 99/159, 100/159, 110/159,
       111/159, 117/159, 120/159

26.    October 30, 2009 Futrell QWR

VII.    BORROWER TRUST'S EXHIBITS

A.    Note, dated February 23, 2001

B.    Mortgage, dated February 23, 2001

C.    Assignment of Mortgage, dated September 13, 2012

D.    Loan History (i.e., Servicing Notes) for Loan account

E.    October 14, 2009 Letter from GMAC Mortgage to Claimant Containing
      Permanent Loan Modification Agreement

F.    December 17, 2009 Letter from GMAC Mortgage to Claimant Containing
      Permanent Loan Modification Agreement

G.    February 3, 2010 Letter from GMAC Mortgage to Claimant Regarding Denial
      of Loan Modification

H.    February 17, 2010 Letter from GMAC Mortgage to Claimant Regarding Denial
      of Loan Modification

I.    May 20, 2010 Letter from GMAC Mortgage to Claimant Containing Permanent
      Loan Modification Agreement

J.    Executed Fixed Rate Loan Modification Agreement dated July 1, 2010

K.    February 3, 2010 Initial Escrow Account Disclosure Statement

L.    Monthly Mortgage Statement for Claimant's Loan account, dated March 19, 2012

M.    Monthly Mortgage Statement for Claimant's Loan account, dated April 18, 2012

N.    Monthly Mortgage Statement for Claimant's Loan account, dated July 18, 2012

O.    Monthly Mortgage Statement for Claimant's Loan account, dated August 20, 2012

P.    Monthly Mortgage Statement for Claimant's Loan account, dated April 20, 2009

Q.    Monthly Mortgage Statement for Claimant's Loan account, dated May 18, 2009

R.    June 17, 2009 Initial Escrow Disclosure Statement

S.    November 13, 2009 Letter from GMAC Mortgage to Thomas D. Margolis

T.    November 13, 2009 Letter from GMAC Mortgage to William J. Futrell

U.    December 3, 2009 Letter from GMAC Mortgage to William J. Futrell

V.    January 12, 2010 Letter from GMAC Mortgage to Thomas D. Margolis

W.    November 17, 2011 Letter from GMAC Mortgage to William J. Futrell

X.    April 3, 2013 Letter from Ocwen Loan Servicing, LLC to Thomas Margolis

Y.    ResCap Borrower Claims Trust's First Set of Interrogatories in Connection With the Borrower Trust Objection, dated September 10, 2015

Z.    ResCap Borrower Claims Trust's Requests for Admissions in Connection With the Borrower Trust Objection, dated September 10, 2015

AA.    ResCap Borrower Claims Trust's First Set of Requests for Production of Documents in Support of the Borrower Trust Objection, dated September 10, 2015 (the "RFPs")

BB.    Claimant's Response to Requests for Admissions from Trust, dated September 25, 2015

CC.    Claimant's Response to Requests for Production from Trust, dated September 25, 2015

DD.    Claimant's Response to Interrogatories from Trust, dated September 25, 2015

No exhibit not listed by Claimant or the Borrower Trust may be used at trial except (a) for cross-examination purposes or (b) if good cause for its exclusion from the pretrial order is shown.

## VIII.    STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS

A.    The Parties Stipulate to the Authenticity and Admissibility of the Following Exhibits:

1.    N/A

B.    Claimant's Objections to Borrower Trust's Exhibits

General objections to be Trust's exhibits to be determined with its submission to the Court.

Claimant's Response to Trust's Objections below: FRE 401, and 807 (a)(1-4) include the response with regard to the Trust's objections,  where (b) the evidence has heretofore been proffered to them, submitted prior to the October 2, 2015 deadline.

C.    Borrower Trust's Objections to Claimant's Exhibits

### *General Objections*

The Borrower Trust objects to the Claimant's introduction during the hearing of any exhibits not produced during discovery. The fact discovery deadline for this matter was October 12, 2015.  At the October 15, 2015 status conference regarding this matter, the Borrower Trust raised its concern regarding the lack of responsive documents produced by the Claimant prior to the expiration of fact discovery, and the Court informed Mr. Margolis that he would not be able to use any documents not produced in response to a proper request.  Mr. Margolis indicated that he was diligently pursuing additional potential documents; however, the Borrower Trust has not received any additional documents since the October 15, 2015 hearing.  Consistent with the Court's directive, the Borrower Trust objects to the proposed introduction into evidence of any exhibits responsive to the Borrower Trust's RFPs that have not previously been produced to the Borrower Trust.

The Borrower Trust also reserves the right to object, on hearsay grounds, to the admission of any documents prepared by third parties to the extent such documents are not introduced through testimony by an appropriate declarant or witness.

### *Objections to Specific Exhibits*

In preparing these Objections, the Borrower Trust has reviewed the copies of documents provided (i) in response to the Borrower Trust's Requests for Production of Documents, dated September 10, 2015 and (ii) by Claimant's counsel by facsimile on December 31, 2015.  The

Objections contained herein are limited to documents produced, and the Borrower Trust reserves the right to object to any other documents that Claimant may seek to introduce at trial on any basis.

> Exhibit 1 – Proposed Exhibit 1 was not produced in connection with discovery despite being responsive to one or more of the Borrower Trust's requests for production of documents.  Instead, it was produced for the first time on December 31, 2015.  The Borrower Trust objects to the admission of Exhibit 1 on this basis.  The Borrower Trust also objects to the admission of proposed Exhibit 1 on relevance grounds.  The Borrower Trust further objects to the admission of Exhibit 1 because the copies provided on December 31, 2015 are poor, black and white photocopies of photographs that cannot be reviewed in a manner that would permit the consideration and formulation of additional objections.

> Exhibit 2-4 – Relevance

> Exhibit 6-7 - Relevance

> Exhibit 8 - Relevance.

> Exhibit 9-12 – Relevance

> Exhibit 13 – Claimant produced only an incomplete copy of a single document meeting this description in connection with discovery, despite requests to supplement his production with a complete document.  The Borrower Trust objects to the admission of Exhibit 13 on this basis.  The Borrower Trust also objects to the admission of proposed Exhibit 13 on relevance grounds.

> Exhibit 14-17 – Relevance

> Exhibit 18 – Relevance.

> Exhibit 19 – Relevance, Hearsay

> Exhibit 20 – 23 – Relevance.

> Exhibit 24 – Relevance.

> Exhibit 25 – The Borrower Trust reserves the right to object to specific entries on relevance grounds.

Any objections not set forth herein will be considered waived absent good cause shown.  The parties shall set forth any stipulations with respect to the authenticity and admissibility of exhibits and indicate all objections to exhibits and the grounds therefor.

IX.    CLAIMANT'S WITNESS LIST

1. William J. Futrell
2. Alicia Futrell

X.    BORROWER TRUST'S WITNESS LIST

1. Sara Lathrop

The witnesses listed may be called at trial.  No witness not identified herein shall be permitted to testify on either party's case in chief absent good cause shown.  Each party shall list the witnesses it intends to call on its case in chief and, if a witness's testimony will be offered by deposition, shall designate by page and line numbers the portions of the deposition transcript it intends to offer.  Each party shall set forth any objections it has to deposition testimony designated by the other and the basis therefor.

XI.    RELIEF SOUGHT

The Claimant shall set forth the precise relief sought, including each element of damages.

The Claimant seeks the losses incurred as a result of the actions of Homecomings/GMAC, that are inclusive of the economic loss, the loss in the value of the real estate, address the impact of the then medical condition of the claimant flowing from the matter.

XII.    DEADLINES AND HEARING DATE

The Borrower Trust proposes the following pretrial deadlines:

- Written direct testimony for each witness that the parties intend to call at trial shall be exchanged **not later than January 12, 2016**.  Two courtesy copies of each witness's written direct testimony shall be provided to chambers concurrently with the parties' exchange.  Neither party shall be permitted to call any witness to testify at trial (except rebuttal witnesses, if any) unless such witness's direct testimony has been provided to the opposing party by January 12, 2016.

- Pretrial memoranda of law, which shall include a statement of the elements of each claim or defense involving such party, together with a summary of the facts relied upon to establish each element, and addressing any evidentiary issues anticipated to arise during evidentiary hearing on this matter (the "Trial"), shall be filed **not later than January 12, 2016**.

- **Not later than 5:00 p.m. prevailing Eastern Time on January 19, 2016**, each party shall provide to the Court with (but not file) two copies of (i) the respective party's final witness and exhibit lists and (ii) pre-marked exhibits (Claimant to identify his exhibits with numbers, e.g., 1, 2, 3, etc.; the Borrower Trust to identify its exhibits with letters, e.g., A, B, C, etc.), assembled sequentially in notebooks and tabbed, or, if too voluminous, with each exhibit placed in a separate manila folder with number or letter

visible on the lip, and the folder placed in a suitable container or box for ready reference. Each exhibit list shall include a description of each exhibit.  One copy of the witness and exhibit lists and one set of exhibits should be provided to opposing counsel.  No witnesses or exhibits that are not listed in the witness and exhibit lists may be used at the Trial.

The Trial shall take place on **January 26, 2016 at 9:00 a.m. prevailing Eastern Time**.

XIII.    EVIDENTIARY HEARING PROCEDURES

A.    **Use of Exhibits During Trial**

Counsel is responsible for marking his or her own exhibits. Counsel must identify for the Court and opposing counsel, and give a copy to the witness, each exhibit before using it at the Trial. All exhibits that will be shown to a witness should, if possible, be placed before the witness at the start of counsel's witness examination. Questions and arguments should be delivered from the lectern, but counsel may approach the witness without asking leave whenever it is necessary. And, if counsel is standing near the witness for the purpose of pointing something out on an exhibit, opposing counsel may also be present to observe first-hand what is being pointed out.

B.    **"Timed" Trial**

The Trial will be a "timed trial," with a maximum of 6-trial hours during the course of 1 day. Each side will be allocated a maximum of 3-trial hours to use for opening statement, all direct, cross-examination and redirect witness examinations, and summation. Counsel is responsible for having her or his witnesses present and ready to testify without any delays or gaps in testimony.

C.    **Status Report**

**Not later than 5:00 p.m. prevailing Eastern Time on January 19, 2016**, counsel shall submit a written status report to the Court, identifying any issues that must be resolved before the Trial starts, and also whether counsel believe the case may be resolved by settlement before the Trial begins.

20

Dated: January 4, 2016                                      /s/ Thomas D. Margolis
                                                      Thomas D. Margolis
Attorney at Law
309 North High Street
Muncie, Indiana 47305
Telephone:  (765) 288-0600
Facsimile:  (765) 289-6064

*Counsel for William J. Futrell*

Dated: January 4, 2016                                        /s/ Jordan A. Wishnew
Norman S. Rosenbaum
Jordan A. Wishnew
James A. Newton
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900

*Counsel for the ResCap Borrower Claim*

**IT IS SO ORDERED.**

Dated:  January 5, 2016
        New York, New York

**/s/Martin Glenn**
MARTIN GLENN