**Exhibit 3**

**Shaham Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒

**DECLARATION OF YARON SHAHAM IN SUPPORT OF RESCAP
BORROWER CLAIMS TRUST AND RESCAP LIQUIDATING
TRUST'S JOINT OBJECTION TO CLAIM NOS. 2535 AND 3577 FILED BY
HAYOMYOM LLC AND SYGMUND ZYGELMAN, RESPECTIVELY**

I, Yaron Shaham, hereby declare as follows:

1.      I am an attorney at Severson & Werson, P.C.  My firm represents Debtor,

GMAC Mortgage, LLC ("GMAC Mortgage") in connection with a case filed by Hayomyom

LLC, captioned *Hayomyom v. GMAC Mortgage, LLC et. al.*, Case No. BC 465215 (Cal. Sup.

Ct.) (the "State Court Action").  I am a member of the Bars of the States of California and Texas

and have been admitted to practice before this Court *pro hac vice*.  I submit this declaration in

support of the joint objection of the ResCap Borrower Claims Trust and the ResCap Liquidating

Trust to (i) Proof of Claim No. 2535 filed by Hayomyom LLC against GMAC Mortgage and

(ii) Proof of Claim No. 3577 filed by Sygmund Zygelman against GMAC Mortgage.

2.      During the course of my firm's involvement in the State Court Action, my

firm engaged in the discovery process on behalf of certain defendants in the State Court Action,

including GMAC Mortgage.  Among other things, my firm defended a deposition of former

GMAC Bank (n/k/a Ally Bank) employee Robbie Robertson.  Although I did not personally

defend the deposition, the deposition was defended by another attorney in my office who has

since left the firm.  Attached hereto as **Exhibit A** is a true and correct copy of a transcript of the

1

deposition of Robbie Robertson taken on May 17, 2012 in connection with the State Court

Action, which I located and obtained from GMAC Mortgage's case file maintained within my

firm's centralized electronic storage database.

        3.      Attached hereto as **Exhibit B** is a true and correct copy of an email

correspondence introduced during Mr. Robertson's May 17, 2012 deposition by counsel for

Sygmund Zygelman, a defendant and cross-complainant in the State Court Action, which was

also obtained from the electronic case file my firm maintains on behalf of GMAC Mortgage.

        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated:  January 11, 2016

                                 /s/ Yaron Shaham, Esq.
                                 Yaron Shaham, Esq.

## Exhibit A

# ORIGINAL

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA
     FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

2

3    Hayomyom LLC,                        )
                                          )
4              Plaintiff,                 )
                                          )
5              -vs-                       )        CASE NO. BC465215
                                          )
6    GMAC Mortgage, LLC; f/k/a            )
     GMAC Mortgage Corporation,           )
7    GMAC Bank; Robbie Robertson;         )
     Sigmund Zygelman; and                )
8    DOES 1 through 10, inclusive,        )
                                          )
9              Defendants.                )
     _____)

10

11

12   _____

13   VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

14              ROBBIE ROBERTSON

15   May 17, 2012
     _____

16

17

18

19

20

21

22

23

24

25

1

1    A-P-P-E-A-R-A-N-C-E-S:

2         FOR THE PLAINTIFF HAYOMYOM LLC:

3             MR. SCOTT BARBAG

4             Attorney at Law

5             The Law Office of Scott Barbag

6             3580 Wilshire Blvd., Suite 1260

7             Los Angeles, California 90010

8

9

10        FOR DEFENDANT AND CROSS-COMPLAINANT SIGMUND ZYGELMAN:

11            MR. WILLIAM (BILL) D. KOEHLER

12            Attorney at Law

13            Law Offices of William D. Koehler

14            12522 Moorpark Street, Suite 103

15            Studio City, California 91604-1390

16

17

18        FOR DEFENDANTS GMAC MORTGAGE, LLC; f/k/a GMAC MORTGAGE

19            CORPORATION, GMAC BANK; ROBBIE ROBERTSON:

20            MR. DAVID M. LIU

21            Attorney at Law

22            Law Offices of Severson & Werson

23            19100 Von Karman Avenue, 7th Floor

24            Irvine, California 92612

25

2

1   VIDEO OPERATOR:

2           MR. JORDAN DONOVAN

3           Owner/Operator

4           Current Media

5           120 Prospect Street, Suite 2

6           Bellingham, Washington 98225

7

8   COURT REPORTER:

9           MR. PAUL W. RODE

10          Certified Court Reporter

11          Offices of Paul W. Rode & Associates

12          720 East Casino Road

13          Everett, Washington 98203

14

15

16

17

18

19

20

21

22

23

24

25

                                                            3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>INDEX</u>

<u>EXAMINATION</u>                                              <u>PAGE NO.</u>

      DIRECT

            BY MR. KOEHLER                          11

            BY MR. BARBAG                           96

            BY MR. KOEHLER                         166

                                                          4

                              INDEX

 EXHIBITS        DESCRIPTION                         PAGE NO.


    1       Plaintiff's Notice of Taking Deposition      19

              of Robbie Robertson and Request for

              Production of Documents at Time of

              Deposition dated April 27, 2012 (8 pages)


    2       Cross-Complaint (40 pages)                   36


    3       The Only One One-Close Fixed Rate        WITHDRAWN

              Construction/Permanent Mortgage Loan

              Program Fixed Rate Loan Commitment,

              Unsigned (24 pages)


    3       The Only One One-Close Fixed Rate            45

              Construction/Permanent Mortgage Loan

              Program Fixed Rate Loan Commitment,

              Signed, BATE STAMP ROBERTSON000001

              through ROBERTSON000009 (9 pages)


    4       Construction Loan Agreement dated           45

              February 29, 2008, Signed, BATE STAMP

              ROBERTSON000010 through ROBERTSON000019

              (10 pages)

                                                          5

INDEX

| EXHIBITS | DESCRIPTION | PAGE NO. |
|---|---|---|
| 5 | Defendant Sigmund Zygelman's Special Interrogatories Propounded to Defendant GMAC Mortgage, LLC, f/k/a GMAC Mortgage Corporation Set One (32 pages) | 68 |
| 6 | Cross-Defendant GMAC Mortgage, LLC, f/k/a GMAC Mortgage Corporation's Responses to Cross-Complainant's Special Interrogatories, Set One (1) (13 pages) | 70 |
| 7 | GMAC Mortgage Account Statement, Sigmund Zygelman, Statement Date April 19, 2010 (1 page) | 72 |
| 8 | E-mail dated Dec. 28, 2011 from Sigmund to Bill K. with "Attached Message" dated 26 Aug 2009 from Robertson, Robbie to Sigmund (1 page) | 75 |
| 9 | E-mail dated August 18, 2009 from Robertson, Robbie to Sigmund (1 page) | 76 |

6

                                        INDEX

EXHIBITS          DESCRIPTION                              PAGE NO.


     10      E-mail dated August 12, 2009 from                80

             Mark Taylor to robbie.robertson

             (1 page)


     11      Letter dated September 22, 2008 from             86

             Richard J. Smith, Senior Vice President,

             GMAC Bank, to "Dear GMAC Bank/Mortgage

             Customer" (1 page)


     12      "GMAC Mortgage, LLC, f/k/a GMAC Mortgage         106

             Corporation's Responses to Plaintiff's

             Special Interrogatories, Set One (1),"

             Responses No. 7, No. 8, No. 9 (5 pages)


     13      E-mail dated July 1, 2009 from Robertson,        138

             Robbie to Sigmund (1 page)


     14      Bank of the West Statement, Statement            144

             Period 05/14/09 through 06/11/09 (1 page)

7

INDEX

| EXHIBITS | DESCRIPTION | PAGE NO. |
|----------|-------------|----------|
| 15 | Letter dated June 29, 2009 from Jeffrey D. Harter, Vice President, Bank of the West, To Kim Pacini, Lyons Realty (1 page) | 144 |
| 16 | Residential Purchase Agreement and Joint Escrow Instructions (And Receipt For Deposit) dated 6/7/09 (10 pages) | 145 |
| 17 | Addendum to Purchase Agreement Dated 06-07-2009 (1 page) | 146 |
| 18 | E-mail dated June 8, 2009, from Robertson, Robbie to Sigmund; e-mail dated June 8, 2009, from Sigmund to Robertson, Robbie (1 page) | 148 |
| 19 | "Attached Message" e-mail dated 17 Aug 2009 from Robertson, Robbie to Sigmund; "Attached Message" dated 15 Aug 2009 from Robertson, Robbie to Sigmund (1 page) | 155 |

8

1    BE IT REMEMBERED, that on the 17th day

2  of May, 2012, commencing at the hour of 10:34 a.m. of said

3  day, the Videotaped Deposition Upon Oral Examination of

4  ROBBIE ROBERTSON was taken upon behalf of the Plaintiff at

5  Hoyt Legal Offices, 3014 Hoyt Avenue, in the city of

6  Everett, county of Snohomish, state of Washington, before

7  Paul W. Rode, Certified Court Reporter and Notary Public in

8  and for the State of Washington;

9    WHEREUPON, the following proceedings

10  were had and testimony given, to-wit:

11  //

12  //

13    THE VIDEOGRAPHER: We're on the record.

14    This is the videotape portion in the deposition of

15    Robbie Robertson. My name is Jordan Donovan and I'm

16    the videographer employed by Current Media. Current

17    Media will retain the master and certify and make

18    copies. The Court Reporter is Paul Rode. This

19    deposition is being recorded on the 17th day of May,

20    2012. The time is now approximately 10:34 a.m. We

21    are located at 3014 Hoyt Avenue, Everett, Washington

22    98201. This deposition is being recorded in the

23    matter of *Hayomyom LLC, Plaintiff vs GMAC Mortgage,*

24    *LLC; f/k/a GMAC Mortgage Corporation, GMAC Bank;*

25    *Robbie Robertson; Sigmund Zygelman; and DOES 1 through*

9

PAUL W. RODE & ASSOCIATES
CERTIFIED COURT REPORTERS
720 EAST CASINO ROAD
EVERETT, WASHINGTON 98203
TELEPHONE (425) 258-2703

1   *10, inclusive, Defendants.*  The Case Number is

2   BC465215 in the Superior Court of the State of

3   California, for the County of Los Angeles, Central

4   District.

5       Counsel and all present please identify

6   yourselves for the record and then the witness will be

7   sworn.

8           MR. KOEHLER: Good Morning.  Bill

9   Koehler for Defendant and Cross-Complainant Sigmund

10  Zygelman.

11          MR. BARBAG: Good Morning.  Scott Barbag

12  for Plaintiff Hayomyom LLC.

13          MR. LIU: Good Morning.  David Liu,

14  L-I-U, for Defendants and Cross-Plaintiffs GMAC

15  Mortgage, LLC and GMAC Bank, and special appearing for

16  Robbie Robertson on his two Motions to Quash.

17          THE COURT REPORTER: Please raise your

18  right hand.

19  //

20  //

21  ROBBIE ROBERTSON,    called as a witness on behalf of the

22              PLAINTIFF, after being first duly sworn

23              was examined and testified as follows:

24  //

25  //

                                                    10

<u>DIRECT EXAMINATION</u>

QUESTIONING BY MR. KOEHLER:

Q    Good morning, Mr. Robertson.  Please state your full
     name for the record.

A    My name's Robbie Robertson.

Q    Mr. Robertson, you may have just heard, my name is
     Bill Koehler and I represent Defendant and
     Cross-Complainant Sigmund Zygelman in this matter.
     Have you ever had your deposition taken before?

A    Yes.

Q    On how many occasions?

A    Twice.

Q    When was the most recent?

A    What year, this is -- 13, 14 years ago, its been some
     time.

Q    Well, then let me run through the procedure that
     you're going to be subjected to this morning.  The
     gentleman at your far right is a Court Reporter who
     will take down all the questions that I ask you and
     all of your answers and you are under oath just like
     if you were testifying in a court of law.  And upon
     completion of your deposition in a couple weeks time
     he will provide you with a booklet of my questions and
     your answers, and we will request for you to review
     that to make sure that the information that you

                                                          11

1    testified to is accurate; however, if you find that

2    there are any inaccuracies or changes you wish to make

3    you have the opportunity to do so.  You will be

4    signing the transcript under penalty of perjury.  I do

5    want to caution you though that in the event you make

6    any major changes that that could affect your

7    credibility should this matter go to trial and so we

8    ask that you give your best testimony here this

9    morning.

10        Do you understand that?

11   A    Yes.

12   Q    We ask that your answers be audible.  When we're

13       sitting around talking to our wives and children and

14       friends we use nods of heads and gestures and that in

15       lieu of spoken statements, and those are hard to

16       interpret; so that we have a clear record we ask that

17       your answers be audible.

18        Do you understand that?

19   A    Yes.

20   Q    From time to time I may ask you your estimate

21       regarding something, but on the other hand we do not

22       want you to guess because a guess doesn't do anybody

23       any good.  With that in mind, do you understand the

24       distinction between a guess and an estimate?

25   A    Yes.

12

1   Q    If I ask a question that you've kind of dozed off on

2        or you don't understand, please ask me to restate the

3        question, be happy to, because if you answer the

4        question we'll assume that you understood the question

5        and you were responding to that question.

6             Fair enough?

7   A    Yes.

8   Q    So far you're doing good in making your answers

9        audible and keeping your voice up, and it's important

10       though that only one talk at a time so that we have a

11       clear record.  So if you'll allow me to complete my

12       question, I will provide the same courtesy to you in

13       your answer.  If for any reason you need to take a

14       break, want to use the restroom, you want to confer

15       with Mr. Liu, just say so and we'll go off the record

16       and take a break.

17            Do you understand all of those admonitions?

18  A    Yes.

19  Q    Is there any reason you cannot give us your best

20       testimony here this morning?

21  A    As of right at this moment, no, there's no reason.

22       However, I am under some fairly substantial

23       medications that do cause me to be fatigued very

24       easily and get very tired, so I may as this thing goes

25       on I may end up asking you to repeat other things just

                                                            13

1    because of the simple fact that it slows me down

2    enough that I have to think about things.

3  Q   What medications are you taking currently, sir?

4  A   There's -- well, let me -- let me -- I'd like to ask

5    because medical issues are private, aren't they? (To

6    Mr. Liu)

7                MR. LIU: They are, but it's a fair

8    question.

9                THE DEPONENT: All right.

10  //

11  A   The first one is Interferon, Pegasys, and I think it's

12    called a 2a, and that's 120 units a week by virtue of

13    shot.  And then 800 to 1200 milligrams of Ribavirin

14    daily.  And I just completed a thousand milligrams a

15    day three month treatment of -- excuse me, four month

16    treatment of Incivek.

17  Q   (by Mr. Koehler) Have you taken each of those

18    medications today?

19  A   The Ribavirin.  The shot I only take once a week.

20  Q   The medication that you take does it have an effect

21    upon your memory, to your knowledge?

22  A   I'm going to have to say yes in that it just takes a

23    little bit longer for recall.

24  Q   Other than that does it have any other effect upon

25    your memory that you're aware of?

                                                        14

1   A   Not that I'm aware of.

2   Q   Does it affect your ability to think clearly?

3   A   I'm going to say no, but it does affect my ability to

4       maintain a long term train of thought.

5   Q   I would ask then if you find yourself becoming

6       fatigued and it affecting your recall, if at that

7       point you would ask to take a break because we'd like

8       to have you fresh for your deposition.  Fair enough?

9   A   Sure.  Yes.

10  Q   Have you ever been convicted of a felony?

11  A   No.

12  Q   Are you currently employed?

13  A   Yes.

14  Q   And by whom?

15  A   Whidbey Island Bank.

16  Q   Would you spell the name of that?

17  A   W-H-I-D-B-E-Y, I-S-L-A-N-D, B-A-N-K.

18  Q   And where are they located?

19  A   My office is located at 16710 Smokey Point Boulevard,

20      Suite 401, Arlington, Washington 98223.

21  Q   And how long have you been employed by Whidbey Bank?

22  A   I've been employed with -- Whidbey Island Bank is an

23      acquiring institution of a failed institution that I

24      had been employed with, so when they asked me to stay

25      on after the purchase my employment date carried

                                                              15

1    through with me, although Whidbey Island Bank did not

2    acquire North County Bank, the previous failed

3    institution, until September 24th, 2010, that's when I

4    became an employee of Whidbey Island Bank because of

5    the transfer.  But prior to that I started with North

6    County Bank and that was on February 28th, 2010.

7  Q    And when you started with -- you said North County

8    Bank?

9  A    Yes, sir.

10  Q    What was your job title?

11  A    When I started with them it was Manager, Special

12    Credits.

13  Q    And what are the duties assigned to the Manager in

14    Special Credits?

15  A    To dispose of nonperforming assets by virtue of the

16    sale of foreclosed real estate property, to begin

17    foreclosure litigation, to do forbearance workouts,

18    negotiations, callbacks, those kind of things on loans

19    and borrowers that were in trouble.

20  Q    And did those duties change when Whidbey Island Bank

21    took over?

22  A    The duties were essentially the same.  The policies

23    changed because I was now working under FDIC Purchase

24    and Assumption Agreement and FDIC Whidbey Island Bank

25    Loss Share Agreement.

16

1   Q    Would you give us your educational background starting

2        with high school.

3   A    High school?  Graduated high school.  I've attended

4        numerous colleges without a degree; National Mortgage

5        Bankers Association which took me to University of

6        Alabama at Huntsville, Ohio State University and

7        Northwestern University; attended Shoreline Community

8        College in Real Estate Finance, Real Estate Appraisal,

9        Real Estate Law; attended US -- UCSD had a number of

10       courses back in the '70s on plastic technology

11       primarily dealing with carbon graphite, prepregs and

12       those other advanced composite materials; numerous

13       college seminars and professional study seminars

14       throughout the last 30 years, so ...

15  Q    How many units of college work did you complete?

16  A    I don't recall.

17  Q    And did I hear you correct when you said you have not

18       obtained any degree?

19  A    Correct.

20  Q    Do you hold any professional licenses?

21  A    No.

22  Q    Have you ever held any professional licenses?

23  A    A Real Estate Broker's license that was relinquished

24       about 28 years ago, at the time I could not carry a

25       real estate license and also be involved in the

17

1    banking and mortgage lending.

2  Q    And that license was issued by whom?

3  A    I actually had one with the State of Washington.

4  Q    And your reason for relinquishing?

5  A    Because I could not hold a real estate license and

6       also be a mortgage banker and banker (sic), and my

7       employer at the time asked me to relinquish it so that

8       there would be no conflict.

9  Q    We're here today pursuant to a Notice of Taking

10      Deposition which I'm going to hand to you.  (Handing)

11      Now, this Notice asked you to bring documents with

12      you.  And have you brought documents with you that are

13      responsive to this Notice?

14 A    I have no documents in my possession from my time at

15      GMAC Bank.  All the documents that I brought with me

16      today were served upon me by either yourself or

17      Mr. Barok -- did I pronounce that correctly?

18             MR. BARBAG: Mr. Zipp or Barbag, my

19      name is Barbag.

20             THE DEPONENT: (Interposing) I

21      assume that you as his attorney was the one that

22      served it.

23             MR. LIU: I'm sorry, just so it will be

24      clear, are we doing the depo Notice as Exhibit "1"?

25             MR. KOEHLER: Yes.  I'm sorry, yes.

                                                    18

1    (Exhibit No. "1" marked for

2    identification by Reporter.)

3    //

4    Q    (by Mr. Koehler) So you do have documents here today

5         responsive to the Request?

6    A    No.  I have documents that you folks presented to us

7         and that's -- but as far as in response -- I don't

8         have any documents from GMAC other than what you have

9         provided in the ...

10   Q    What I was going to do if there were documents, since

11        this is Mr. Barbag's Notice I was going to have him

12        review the documents, if you have any questions

13        regarding those.  So I will pass on that for the time

14        being and maybe at a break if Mr. Barbag wishes to

15        review, instruct me to regurgitate ...

16   A    He can look at it now if you want.

17   Q    No, I really don't.  So let's move on.

18        Prior to your deposition here this morning did

19        you review any documents in preparation for your

20        deposition?

21   A    Just, well, let's see.  Actually yes.

22   Q    And what documents did you review?

23   A    Let's see here.  The One-Close Fix Rate

24        Construction/Permanent Mortgage Loan Program

25        documentation, that was the subject of the loan to

19

1      Mr. Zygelman.  The Deed of Trust that was recorded,

2      again ...

3                  MR. LIU: If I could interrupt, just so

4      we can speed this along, the documents that we

5      reviewed are the documents that were produced this

6      morning, BATE STAMP ROBINSON000001 through

7      ROBINSON000123.

8   //

9   Q    (by Mr. Koehler) Those were the documents then that

10      you reviewed prior to your deposition.

11  A    Correct.

12  Q    Thank you.  And when did you review these documents?

13  A    Yesterday.

14  Q    And your purpose for reviewing them?

15  A    Just so I could see what I was going to be talking

16      about.

17  Q    Now, other than conversations you may have had with

18      Mr. Liu, did you talk to anyone else regarding your

19      testimony here this morning?

20  A    Another attorney with GMAC Bank.

21  Q    Other than that attorney did you talk to any other

22      individual pertaining to your deposition?

23  A    (Interposing) No.

24  Q    In the year 2008 were you employed?

25  A    Yes.

                                                        20

1    Q    By whom?

2    A    GMAC Bank.

3    Q    Was that your sole employer?

4    A    No.  I'm also an elected public official, Public

5         Utility Commissioner in Skagit County, Washington

6         which is essentially water treatment and distribution

7         to about a hundred and twenty thousand citizens in

8         Skagit County.

9    Q    In the year 2008 were you also employed by GMAC

10        Mortgage, LLC?

11   A    I don't think so.  And forgive me if that sounds --

12        let me try to explain that.

13   Q    Please.

14   A    Hired in at GMAC Bank, and GMAC Mortgage was

15        intrinsically integrated with the bank operation and I

16        didn't -- so while most all of my work was done with

17        GMAC Mortgage, the employer was actually GMAC Bank.

18        And so ...

19             MR. LIU: And if I can just interject

20        and just to be clear, I've advised counsel for

21        Plaintiff and Cross-Complainant that GMAC Mortgage

22        filed for Chapter 11 Bankruptcy protection, so we

23        can't do or conduct any discovery as to GMAC Mortgage;

24        however, you know, as it relates to Mr. Robertson's

25        employment, you know any question is fine.

                                                        21

1          MR. KOEHLER: And it is my understanding

2     that the bankruptcy filing was only as to GMAC

3     Mortgage and not GMAC Bank ...

4          MR. LIU: That's right.

5          MR. KOEHLER: (Continuing) ... which I

6     understand is now Ally Bank.

7          MR. LIU: That's correct.

8  //

9  Q     (by Mr. Koehler) Who wrote your paychecks?

10 A     GMAC Bank.

11 Q     And when did you start with GMAC Bank?

12 A     April 1st, 2007.

13 Q     And what was your job title?

14 A     When I first started it was Regional Construction

15       Sales Manager.

16 Q     And during your term of employment with GMAC Bank did

17       your job title change?

18 A     Yes.

19 Q     And what did it change to?

20 A     It changed to District Risk Manager.

21 Q     Were there any other job title changes?

22 A     No.

23 Q     As a Regional Construction Sales Manager what were

24       your duties?

25 A     To train and educate loan officers on retail GMAC

                                                    22

1    Mortgage side as well as wholesale brokers to the use

2    of the GMAC Construction Lending Programs which was

3    what they referred to as their All-In-One and their

4    Two-Step; to counsel with the loan officers on the use

5    of the tools and equipment that was designed and used

6    by GMAC Mortgage in the preparation of their

7    construction loan, things like: the builders package

8    and documentation that's needed, the cost breakdown,

9    the description of materials, all those things that

10   are associated building a house.  You had to sort of

11   explain the documentation and teach the loan officers

12   what a Description of Materials was and the parameters

13   of the loan program, what, you know, the length of

14   time that you had for construction lending and those

15   kind of educational issues.

16   Q   Do you recall the inclusive dates that your title was

17       Regional Construction Sales Manager?

18   A   I believe -- well, it was from when I started April 1

19       of '07 and I believe it was sometime in June of 2009

20       -- excuse me, when did we change that to -- no, it

21       would have been in around July of 2008 that it changed

22       to District Risk Manager.

23   Q   And --

24   A   (Interposing) No, excuse me.  Excuse me.  Excuse me.

25       I'm going to say August.  It was somewhere in that

                                                              23

1    July/August 2008.

2 Q    And that's when it changed from Regional Construction

3    Sales Manager to District Risk Manager?

4 A    Correct.

5 Q    And what was the reason for the job title change?

6 A    GMAC shut down the Construction Lending Department in

7    light of the economic calamities that were befalling

8    this country and the financial difficulties that GMAC

9    Mortgage was having relative to secondary marketing.

10 Q    And when did GMAC shut down their real estate

11    construction --

12    MR. LIU: (Interposing) I'm going to

13    interrupt right there.  The deposition here is only

14    for Mr. Robertson's Motion to Quash.  I don't think

15    any questions relative to why GMAC closed down its

16    construction lending is relevant, it's outside the

17    scope of his contacts with California.  I'm going to

18    object and instruct him not to answer.

19    MR. BARBAG: I don't know that our

20    deposition Notice was limited to that and I have a

21    concern about that because we were only entitled to

22    one deposition, so unless you're allowing us to depose

23    him multiple times.

24    MR. LIU: We will permit Mr. Robertson

25    to be deposed again as to the allegations in the

24

1  Complaint and Cross-Complaint if the Motion to Quash

2  the Summons is denied.  So right now the only scope of

3  this deposition is through our Motion to Quash and if

4  I let the questions go outside the scope of Motion to

5  Quash then I'm waiving his objections as to you know

6  what he can get deposed on.

7       MR. KOEHLER: Well, quite frankly this

8  catches me aback because it was my understanding that

9  because you didn't want Mr. Robertson to have to go

10 through multiple deposition that we would do one

11 deposition as opposed to each of us having to the

12 ability to do one deposition.  And I'm not recalling

13 that there was any limitations put on what the subject

14 of that deposition would be.

15      MR. BARBAG: That's my understanding as

16 well.  There's no objection to the deposition Notice

17 and since he is a party to this he's already responded

18 to other discovery outside the scope.  So ...

19      MR. LIU: He has not responded to

20 discovery outside the scope.  And the deposition

21 Notice is only limited to, as to the document

22 requests, are only limited to his Motion to Quash and

23 his contacts with California.

24      MR. BARBAG: I would disagree.  The

25 formal Interrogatories that were sent to him were not

                                                  25

1    sent just exclusively for whether he was part of

2    California, he was answering that as a party to the

3    suit.

4            MR. LIU: We can probably take a break

5    if you want.  I don't recall that he's answered any

6    formal Interrogatories.

7            MR. BARBAG: Sure.

8            THE VIDEOGRAPHER: Please stand by.  The

9    time is now approximately 10:58 a.m., we're off the

10    record.

11            (Off the record.)

12    //

13            THE VIDEOGRAPHER: We are on the record.

14    The time is now approximately 11:05 a.m.

15            MR. KOEHLER: We had a discussion off

16    the record regarding the scope of this deposition.

17    And I'm going to ask the Court Reporter to read back

18    the question on the record and the response from

19    Mr. Liu if you would please.

20            (Question and objection

21            read by Reporter.)

22    //

23            MR. KOEHLER: Just so we have a clear

24    record and what the scope is today: If we are limited

25    to asking Mr. Robertson questions pertaining to the

26

1    issues relevant to his Motion to Quash, there may be

2    questions -- should his Motion be denied, there may

3    very well be questions that he has the ability to

4    respond to which would require a second deposition.

5    And I would like Mr. Liu to verify on the record that

6    he's aware of that and he will permit a second

7    deposition of Mr. Robertson in the event

8    Mr. Robertson's Motion to Quash is unsuccessful.

9             MR. LIU: No, I agree.  And we will make

10   Mr. Robertson available assuming that his Motion to

11   Quash and Service and Summons are denied, then he'll

12   be available to respond to discovery as it relates to

13   the allegations in the Complaint and Cross-Complaint.

14             MR. BARBAG: I would also put on the

15   record that I think that right now as the deposition

16   Notice stands we're entitled to ask about relevant

17   issues with regard to the Complaint and you're saying

18   you disagree, unless I'm misstating.

19             MR. LIU: No, no.  I'm saying with

20   respect to Hayomyom's Complaint obviously you know if

21   he made any statements to Hayomyom or its principal

22   Mr. Zipp in California.

23             MR. BARBAG: All right.  I guess we'll

24   see where it goes.

25   //

27

1    Q    (by Mr. Koehler) So as I understand, Mr. Robertson,

2         your title changed from Regional Construction Sales

3         Manager to District Risk Manager sometime in

4         July/August of 2008.

5    A    Correct.

6    Q    Did your duties as a District Risk Manager change from

7         those of a Regional Construction Sales Manager?

8    A    Yes.

9    Q    What were the new duties that you were charged with?

10   A    To do -- to help those borrowers that were in

11        declining markets or what having struggles keeping up

12        with their payments on their construction loan or

13        completion of loan and so that our focus was to make

14        sure that we got all the construction loans in the

15        portfolio closed out in a timely manner.

16   Q    And you were performing those duties as an employee of

17        GMAC Bank?

18   A    Correct.

19   Q    Now, prior to your employment with GMAC Bank what was

20        your most recent prior employment?

21   A    Prior to that it was Frontier Bank.

22   Q    Do you recall the dates of service?

23   A    Wait a second, I was at Frontier that would have been

24        January of 2006 through I believe August of 2006.

25   Q    Okay.  Where was or is Frontier Bank?

                                                              28

1   A   Frontier Bank was seized by the Department of

2       Financial Institution, State of Washington.  The

3       assets were assigned to the Federal Deposit Insurance

4       Corporation which subsequently entered into a Purchase

5       and Assumption Agreement with Union Bank, so Frontier

6       Bank no longer exists.

7   Q   What was your job title with Frontier Bank?

8   A   Commercial Loan Officer.

9   Q   What were your duties?

10   A   To originate within lending limits commercial loans

11       and service the bank customers in a lending

12       environment.

13   Q   Between August of 2006 and April of 2007 were you

14       employed?

15   A   Yes, well, let me think about that here.  Yes, with

16       Skagit PUD.

17   Q   I'm sorry?

18   A   Skagit Public Utility District as Commissioner.  But

19       as formally with a bank or, no, not until I went with

20       GMAC.

21   Q   Your reason for leaving Frontier Bank?

22   A   It was just not a good fit and -- just was not a good

23       fit.

24   Q   Did you resign your position or --

25   A   (Interposing) Yes.

29

1    Q    You were doing real good up until that point.

2    A    Yes.

3    Q    Let me finish the question before you answer.

4    A    (Interposing) Oh, I'm sorry.  Excuse me.

5    Q    So you're now at an A-.  Prior to Frontier Bank did

6         you work in the banking industry?

7    A    Yes.

8    Q    With whom prior to Frontier Bank?

9    A    Well, you want me to go through my entire history, is

10        that what you want?

11   Q    No, your most recent prior to ...

12   A    Prior to Frontier Bank it was a conglomeration of

13        three different companies that had been known as Home

14        One Two Three Mortgage -- I should have brought my

15        resume -- Home One Two Three, RBC Mortgage, and New

16        Century Mortgage.  And just for clarification, there

17        was not starting and stopping with three separate

18        different people and organizations, there was mergers

19        and acquisitions that occurred and so that we had no

20        control over who the actual employer was, there was

21        mergers and acquisitions.  You have the same job, same

22        office, same people; just different name of the

23        company.

24   Q    Who hired you for your position at GMAC Bank?

25   A    Tom Webster.

                                                        30

1    THE VIDEOGRAPHER: Excuse me.  Mr.

2    Robertson, I could tell that your microphone's just

3    about to fall off, so if you can just give it a better

4    grip on your tie.

5  //

6  Q    (by Mr. Koehler) Is that W-E-B-S-T-E-R?

7  A    Webster, correct.

8  Q    And what was Mr. Webster's job title?

9  A    Regional Construction Lending Sales Manager.

10 Q    I'm sorry, say that again?

11 A    Regional Construction Sales Manager.

12 Q    And to your knowledge is Mr. Webster still with GMAC

13   Bank?

14 A    No.

15 Q    Do you know when he left?

16 A    No.

17    MR. LIU: Objection, irrelevant to the

18   scope and Motion to Quash.

19 //

20 Q    (by Mr. Koehler) At the time of your employment were

21   you given any written instructions relative to your

22   job description?

23 A    I don't understand the question.

24 Q    At the time you were hired were you provided with some

25   type of a manual or book explaining what your job

31

1      duties are?

2   A   No.

3   Q   How were your job duties then conveyed to you?

4   A   Verbally through Tom Webster and there was a Policies

5       and Procedures Handbook that was being drafted to be

6       implemented into the Construction Program that

7       Mr. Webster provided me.

8   Q   Was that after you were already employed by GMAC Bank?

9   A   Correct.

10  Q   And did that Policies and Procedures Manual provide a

11      description of what your duties were?

12  A   In a general outline, yes.

13  Q   Other than Mr. Webster was there anyone else that

14      described to you what your job duties would be?

15  A   Yes.

16  Q   Who?

17  A   Rick Smith.

18  Q   And what was his job title?

19  A   He was also at the time was called Regional

20      Construction Lending Manager.

21          If I can for clarification: Mr. Webster was

22      Western Regional, Mr. Smith was the Central and

23      Northeastern Regional.

24  Q   And to your knowledge is Mr. Smith still employed by

25      GMAC Bank?

                                                        32

1            MR. LIU: Objection, outside the scope

2    of the Motion to Quash, instruct him not to answer.

3    //

4    Q    (by Mr. Koehler) Mr. Robertson, are you familiar with

5    an organization by the name of GMAC Mortgage, LLC?

6            MR. LIU: Objection, outside the scope

7    of the Motion to Quash, instruct him not to answer.

8    //

9    Q    (by Mr. Koehler) Were you ever employed by GMAC

10    Mortgage, LLC?

11    A    Not to my knowledge.

12    Q    Now, the duties that you provided to GMAC Bank first

13    as a Regional Construction Sales Manager, did you work

14    from an office?

15    A    Yes.

16    Q    And where was that office located?

17    A    There was the main office in this area was located in

18    Lynnwood, Washington and I had shared office space

19    with the folks of GMAC Mortgage in Lynnwood and then

20    they had opened up an office in Mount Vernon,

21    Washington of GMAC Mortgage of which then I moved my

22    office up and shared with the folks in GMAC Mortgage

23    in Mount Vernon.

24    Q    At the time you were employed by GMAC Bank were you

25    aware of what the business relationship was with GMAC

        33

1      Mortgage, LLC?

2              MR. LIU: Objection, outside the scope

3      of Motion to Quash, instruct him not to answer.

4  //

5  Q   (by Mr. Koehler) Mr. Robertson, are you familiar with

6      an individual by the name of Sigmund Zygelman?

7  A   Yes.

8  Q   And how did you come to know or be acquainted with

9      this gentleman?

10 A   Mr. Zygelman had an active construction loan with GMAC

11     Bank.

12 Q   Did you ever meet Mr. Zygelman face to face?

13 A   No.

14 Q   Was one of your job duties to oversee the loan that

15     Mr. Zygelman had with GMAC?

16 A   I think I need a clarification on that, I'll try and

17     answer it.  I have --

18             MR. LIU: (Interposing) Do you

19     understand the question?

20             THE DEPONENT: No.

21 //

22 A   If you could, because there's a big difference between

23     a loan and a construction contract.

24 Q   (by Mr. Koehler) Okay.  Did you oversee the

25     construction contract that was between Mr. Zygelman

                                                        34

1    and GMAC Mortgage?

2                MR. LIU: Objection, no foundation that

3    the construction loan was with GMAC Mortgage.

4                MR. BARBAG: That isn't to the form of

5    the question though.  Foundation.

6    //

7    Q    (by Mr. Koehler) Tell me again how you first became

8    acquainted with Mr. Zygelman?

9    A    I was I believe it was in June of 2008 when I sent an

10    e-mail to Mr. Zygelman and his contractor at the time,

11    I believe his name is Mark Thomas, introducing myself

12    as the new account representative that would be

13    handling the draws, the monthly draw inspections for

14    the construction.

15    Q    What were your job duties as it related to

16    Mr. Zygelman's construction contract?

17    A    To monitor the -- basically to take the draw requests

18    on a monthly basis, coordinate the ordering of the

19    draw inspection by a construction inspection firm, a

20    validation of the completed inspection and the

21    preparation of sending lien waiver documents along

22    with line item draws that were available to be

23    disbursed to the contractor, and upon their signatures

24    of acceptance then I would submit those for payment.

25    Q    Other than yourself was there anyone else providing

35

1    any of the duties that you just testified to with

2    respect to Mr. Zygelman's construction contract?

3  A    Yes.

4  Q    Who?

5  A    I don't recall all of the names, but it was the

6    Construction Lending Staff of GMAC Bank located in

7    Fort Washington, Pennsylvania.

8  Q    Were there any staff members that Mr. Zygelman

9    interacted with that were located in California?

10  A    No.

11  Q    At any time did you maintain an office in California?

12  A    No.

13  Q    And you were providing those duties on behalf of GMAC

14    Bank?

15  A    Yes, sir.

16  Q    Now, you're aware Mr. Zygelman has filed a

17    Cross-Complaint in this action.  I'm going to provide

18    you with a copy.  (Handing) We'll mark as Exhibit "2".

19                        (Exhibit "2" marked for

20                        identification by Reporter.)

21  //

22  Q    (by Mr. Koehler) Have you seen this Cross-Complaint

23    before?

24  A    I believe so, yes.

25  Q    Have you had an opportunity before today to read the

                                                          36

1      allegations as they pertain to you?

2  A    Yes.

3  Q    At any time during your employment with GMAC Bank did

4      you maintain any type of a satellite office in the

5      state of California?

6  A    No.

7  Q    Did GMAC Bank have any offices in the state of

8      California for the purpose of servicing construction

9      contracts?

10  A    I honestly don't know.  Oh, well, excuse me.  Wait a

11      second.  Now, servicing contracts, if you can clarify

12      that.  And "servicing" meaning disbursement of moneys

13      or someone in my position?

14  Q    Okay, fair enough.  For the purpose of disbursing

15      funds to Mr. Zygelman pursuant to the construction

16      contract did GMAC Bank maintain any offices in

17      California?

18  A    No.

19  Q    The payments that were made to Mr. Zygelman or his

20      contractor pursuant to his construction contract,

21      where did those payments originate?

22  A    Fort Washington, Pennsylvania.

23  Q    Did you have any staff members or any individual that

24      reported to you?

25  A    Further clarification: In my duties here on the west

                      37

1    coast, no; did I have one individual that was assigned

2    to process the draw requests for the Western Region,

3    yes.

4  Q  And who was that?

5  A  A lady -- there was several, but the primary one was a

6    lady by the name of Patty Costello, and her immediate

7    supervisor Sue Young.  And there had been another

8    individual, his name escapes me, that was at one point

9    in time was Sue Young's immediate supervisor and then

10    he for whatever reasons he left the company.

11  Q  Do you remember who that individual was?

12  A  No, I don't recall his name.  He was only there a

13    short while.

14  Q  And where did Patty Costello work?

15  A  Fort Washington, Pennsylvania.

16  Q  And where did Sue Young work?

17  A  Fort Washington.

18  Q  Which is in Pennsylvania?

19  A  (Interposing) Pennsylvania.

20  Q  Was part of your duties to go out and observe the

21    construction that was being done by Mr. Zygelman as it

22    relates to his construction contract with GMAC?

23  A  No.

24  Q  Were you ever to the premises that was being

25    constructed by Mr. Zygelman in conjunction with the

                                                          38

1    construction contract he obtained from GMAC?

2  A   No.

3  Q   Did you ever instruct anyone on your behalf to go out

4    and observe the premises that was being constructed by

5    Mr. Zygelman in conjunction with the construction

6    contract he obtained from GMAC?

7             MR. LIU: Objection, vague and

8    ambiguous.  Are you asking as a GMAC employee or as

9    like an independent contractor?

10  //

11  Q   (by Mr. Koehler) As an employee.

12  A   Did I instruct someone?  I placed orders for draw

13    inspections.

14  Q   Okay.  And what is a draw inspection?

15  A   A draw inspection is whereby an independent third

16    party goes out and does a full inspection of the

17    property looking for percentage of completion, work

18    completion, materials onsite, takes pictures of the

19    subject property and makes a determination of the

20    percentage of completion of the project at that point

21    in time and which line items were available to be

22    disbursed if the customer so chose.

23  Q   For purposes of this deposition I will refer to this

24    person as the Inspector.  Fair enough?

25  A   Yes.

39

1   Q    Was this Inspector an employee of GMAC Bank?

2   A    No.

3   Q    Was this Inspector an independent contractor?

4   A    I have no idea.

5   Q    Was there an individual that performed these

6        inspections, one individual, or would there be various

7        individuals?

8   A    There was various individuals so I don't know how

9        many, but it was never the same -- there's more than

10       one inspector.

11  Q    To your knowledge were these inspectors employed by

12       some third party company?

13  A    Yes.

14  Q    Do you recall what the name of that company was?

15  A    Granite Construction Inspection Services, Denver,

16       Colorado.

17  Q    And to your knowledge did they maintain offices in

18       California?

19  A    No.

20  Q    The inspectors that they had to come out to inspect

21       the Zygelman construction site were these individuals

22       to your knowledge that resided in the state of

23       California?

24  A    I have no knowledge.

25  Q    How did you go about requesting such an inspection?

40

1   A   There was two steps that occurred and I'll begin with

2       the one that was in place prior to the change of

3       title.   There was two different ways that a draw could

4       be requested.   Generally draws would be disbursed on a

5       monthly basis and the contractor and/or the borrower

6       would request an inspection from us, we would order

7       the inspection, validate the findings, let the

8       customer know whether or not their request that they

9       made was viable and was going to be payable based upon

10      the terms of the inspection.

11  Q   Who would he make that request to, "he" being

12      Mr. Zygelman?

13  A   He could either contact me through direct e-mail or he

14      would contact Fort Washington and the individuals back

15      in Fort Washington to begin that process.

16  Q   Do you recall on any occasion Mr. Zygelman contacting

17      you by e-mail?

18  A   For what purposes?

19  Q   Requesting an inspection.

20  A   No.

21  Q   Do you recall Mr. Zygelman ever telephoning you to

22      initiate an inspection?

23  A   No.

24  Q   Do you recall Mr. Zygelman using any mode of

25      communication to request of you an inspection?

41

1   A    To request an inspection.  No.

2   Q    Did you have any direct employees or individuals

3        employed by GMAC Bank that reported to you?

4                    MR. LIU: Objection, asked and answered.

5        You can answer.

6   //

7   A    Indirectly, but as a direct reporting, no.

8   Q    (by Mr. Koehler) Indirectly?

9   A    Indirectly.

10  Q    Who?

11  A    Patty Costello.

12  Q    That's the Patty Costello that was back in

13       Pennsylvania.

14  A    Correct.

15  Q    Anybody in the state of Washington?

16  A    No.

17  Q    Now, with respect to Exhibit "2," the Cross-Complaint,

18       have you discussed its contents with anyone other than

19       your lawyer?

20  A    No.

21  Q    Other than lawyers working for GMAC Mortgage or GMAC

22       Bank did you contact any employees of either GMAC

23       Mortgage or GMAC Bank with respect to the allegations

24       contained in Exhibit "2"?

25  A    No.

                                                           42

1           MR. KOEHLER: I'm going to show you a

2  document we're going to mark Exhibit "3".

3      I thought I had made enough copies.

4          MR. BARBAG: So far I haven't needed to

5  see them.

6          MR. KOEHLER: Right.  And I'll show you

7  it.

8          MR. BARBAG: I think I've seen these.

9              (Exhibit No. "3" marked for

10                 identification by Reporter.)

11  //

12  Q    (by Mr. Koehler) Mr. Robertson, I've handed you a

13      document entitled The Only One One-Close Fixed Rate

14      Construction/Permanent Mortgage Loan Program.

15      (Handing)  Have you seen this document before?

16  A    Yes.

17  Q    So you're familiar with this Loan Program entered into

18      with Mr. Zygelman?

19  A    Yes.

20  Q    Are you familiar with the terms and conditions of this

21      Loan Commitment?

22  A    As it relates to the construction of the home, yes.

23          MR. LIU: And I'll object to the extent

24      that Exhibit "3" is not signed by Mr. Zygelman.

25          MR. KOEHLER: Let's go off the record

                            43

1      for a second.

2                      THE VIDEOGRAPHER: Stand by.  Go off the

3      record?

4                      MR. KOEHLER: Yes, off the record.

5                      THE VIDEOGRAPHER: The time is now

6      approximately 11:34 a.m., we are off the record.

7                               (Off the record.)

8    //

9                      THE VIDEOGRAPHER: We are on the record.

10     The time is now approximately 11:36 a.m.

11   //

12   Q   (by Mr. Koehler) Mr. Robertson, I'm going to hand you

13       a document that was produced by Mr. Liu this morning,

14       it's entitled The Only One One-Close Fixed Rate

15       Construction/Permanent Mortgage Loan Program with the

16       borrower Sigmund Zygelman and it's BATE STAMPED

17       ROBERTSON000001 through 000019.  Do you have a copy of

18       that document?

19   A   Yes, sir.

20                      MR. LIU: I'm sorry, I'm going to

21       object.  It appears that The Only One One-Close Fixed

22       Rate goes from ROBERTSON 1 to 9, then starting on

23       ROBERTSON 10 it's a separate Construction Loan

24       Agreement.

25                      MR. KOEHLER: Okay.

                                                              44

1       THE DEPONENT: That's correct.

2  //

3  Q    (by Mr. Koehler) With respect to the document entitled

4       The Only One One-Close Fixed Rate

5       Construction/Permanent Mortgage Loan Program BATE

6       STAMP 000001 through 000009, do you have that document

7       in front of you?

8  A    Yes.

9  Q    Okay.  And have you seen this document before?

10 A    Yes.

11          MR. KOEHLER: I'm going to withdraw what

12      we had previously marked as Exhibit "3" and we will

13      mark this as Exhibit "3".

14                          (New Exhibit "3" to be

15                          marked by Reporter.)

16 //

17 Q    (by Mr. Koehler) And I have a Construction Loan

18      Agreement BATE STAMP ROBERTSON000010 through 000019.

19      Do you have that document before you?

20 A    (Interposing) Yes.

21          MR. KOEHLER) We'll go ahead and mark

22      that as Exhibit "4".

23                          (Exhibit No. "4" to be

24                          marked by Reporter.)

25 //

                                                            45

1    Q    (by Mr. Koehler) Now, with respect to Exhibit "3," are

2         you familiar with this document as it pertains to

3         Mr. Zygelman?

4    A    If you can get a little more clear on the question.

5              And if I can, I was not in ...

6                        MR. LIU: And I'll stop you.  Have him

7         just ask the question.

8                        THE DEPONENT: I'm sorry, yeah.

9    //

10   Q    (by Mr. Koehler) Well, obviously you've seen this

11        document before today?

12   A    (Interposing) Oh, I've seen the document, yes.

13   Q    Okay.  And is this the Loan Program that Mr. Zygelman

14        had with -- this document reflect the Loan Program

15        Mr. Zygelman had with GMAC?

16   A    To the best of my knowledge.

17   Q    Okay.  And was it one of your duties to oversee

18        Mr. Zygelman's adherence to the terms and conditions

19        of this The Only One Loan Program?

20                       MR. LIU: Objection, vague and

21        ambiguous as to adherence.

22                       THE DEPONENT: Yeah.

23                       MR. KOEHLER: You can answer the

24        question.

25                       MR. LIU: You can answer, so you

                                                              46

1    understand.

2                    THE DEPONENT: Okay.

3  //

4  A   Yeah, it's -- within the normal course of

5      construction, yes; beyond that, no.  I had very

6      limited decision capacity outside of policy and

7      anything around that was considered an exception it

8      would have to be addressed by Mr. Webster and

9      Mr. Smith.

10  Q   (by Mr. Koehler) Did you ever have any conversations

11      with Mr. Zygelman pertaining to the terms and

12      conditions of this Agreement?

13  A   Yes.

14  Q   With respect to Exhibit "4," have you seen this

15      document before today?

16  A   Yes.

17  Q   Okay.  And did you have any conversations with

18      Mr. Zygelman regarding the terms and conditions of

19      this Construction Loan Agreement?

20  A   Yes.

21  Q   How did these conversations take place?  First of all

22      let's start, I'm sorry, with respect to Exhibit "3"

23      how did those conversations take place?

24  A   There was a -- well, I believe in around December of

25      2008 there was a phone conversation followed up with

                                           47

1    e-mails explaining to Mr. Zygelman that GMAC Bank was

2    not able to fund jumbo loans in that the Bank was very

3    helpful or trying to be helpful to help locate renewed

4    permanent takeout financing because at that time the

5    secondary market for jumbo loans -- "jumbo loan" being

6    anything over four hundred and seventeen thousand

7    dollars -- collapsed throughout the entire country and

8    there was no conduit for jumbo loans.  And so I had

9    that conversation with Mr. Zygelman in December of

10   2008 I believe, late November/early December of 2008,

11   somewhere in there.

12   Q    And was that telephone conversation or was that by

13        e-mail or some other means of communication?

14   A    (Interposing) They were both.

15   Q    And the call was, what, originated by you or by

16        Mr. Zygelman?

17   A    By me.

18   Q    Okay.  You being here in the state of Washington?

19   A    Correct.

20   Q    And Mr. Zygelman --

21   A    (Interposing) Well, excuse me.  Yes.  Yes, that

22        occurred when I was in Washington.

23   Q    And Mr. Zygelman was in the state of California?

24   A    I don't know.

25   Q    Was it to a phone number that Mr. Zygelman had

                                                        48

1      provided to you?

2  A    Yes.

3  Q    And do you have any records with you today that

4      reflect what that phone number was?

5  A    No.

6  Q    Was there one telephone call or more than one

7      telephone call that you had with Mr. Zygelman

8      pertaining to The Only One Mortgage Loan Program?

9  A    There was more than one conversation.

10  Q    Telephonic?

11  A    Yeah, yeah, more than one telephone call, yes.

12  Q    And were each of those calls initiated by you?

13  A    Correct.

14  Q    And were each of those calls initiated by you here in

15      the state of Washington?

16  A    I believe so.  It is possible that I spoke to him when

17      I was in Fort Washington in February or March of 2009,

18      but I'm not a hundred percent certain if I was in Fort

19      Washington or in Washington state on that

20      conversation.

21  Q    Did you have any e-mail communications with

22      Mr. Zygelman pertaining to The Only One Mortgage Loan

23      Program?

24  A    Yes.

25  Q    And those were initiated by you here in the state of

49

1      Washington?

2  A   Yes.

3  Q   And to an e-mail address that Mr. Zygelman had

4      provided to you?

5  A   Correct.  Well, not provided to me, but provided to

6      GMAC Bank.

7  Q   Fair enough.  Are you familiar with the terms and

8      conditions contained in The Only One Mortgage Loan

9      Program?

10 A   Correct.

11 Q   With respect to Exhibit "4," the Construction Loan

12     Agreement, did you have any conversations with

13     Mr. Zygelman regarding this Loan Agreement?

14 A   How to answer this.  The conversations that I had with

15     Mr. Zygelman were inclusive so if I was talking about

16     the construction loan it was the Construction Loan

17     Commitment, the Construction Loan Agreement, and so

18     yes.

19 Q   During your conversations be they oral or be it e-mail

20     that you had with Mr. Zygelman in 2008 and beyond, is

21     it fair to say that you treated Exhibit "3" and "4" as

22     one document?

23 A   No.  It's not fair to say.

24 Q   But you had conversations with Mr. Zygelman in 2008

25     and beyond regarding both Exhibit "3" and Exhibit "4"?

                                                      50

1    A    Yes.

2    Q    And at the time were you familiar with the terms and

3         conditions contained in Exhibit "4," the Construction

4         Loan Agreement?

5    A    Yes.

6              MR. KOEHLER: I don't believe,

7         Mr. Reporter, that that is the correct Exhibit "3," I

8         didn't want you to pick up the wrong document. Since

9         we're going to be one short, I'll provide you with one

10        later. Let me get this out of the way so we don't

11        inadvertently have you pick it up.

12   //

13   Q    (by Mr. Koehler) During the time when you were

14        communicating with Mr. Zygelman regarding The Only One

15        Mortgage Loan Program which was marked Exhibit "3"

16        were you overseeing any other such agreements?

17   A    Yes.

18   Q    And do you recall how many?

19   A    Specifically in the state of California or ...?

20   Q    I'm sorry, yes, in the state of California.

21   A    I don't specifically remember the exact number, but it

22        was probably somewhere around 25, 26.

23   Q    Okay.  Is that your best estimate?

24   A    Yes.

25   Q    Okay.  Were you also overseeing any like loan programs

                                                              51

1    in states other than California?

2  A    Yes.

3  Q    And can you give me your best estimate as to the

4    number of those loans?

5        MR. LIU: Objection, it's irrelevant to

6    Mr. Robertson's contacts in California, I'll instruct

7    him not to answer.

8  //

9  Q    (by Mr. Koehler) I'm sorry, again, your best estimate

10    as to the number that you were overseeing in the state

11    of California?

12  A    Total, yes.

13  Q    I'm sorry, what was that number again?

14  A    About 25, 26, somewhere in there.

15        Now, clarification: Were all of those the

16    One-Close Fixed Rate Construction Loan, jumbo loans,

17    no.

18  Q    Okay.  How many were The Only One One-Close Fixed Rate

19    Construction/Permanent Mortgage Loan Program?

20  A    (Interposing) I don't recall.

21  Q    But were there others other than Mr. Zygelman's?

22  A    Oh, yes.  Yes.

23  Q    Can you give me your best estimate as to the number?

24  A    All-in-one jumbos?

25  Q    Yes.

                                                          52

1    A    Probably maybe five.  Six.  Maybe six.

2    Q    Now, when you contacted Mr. Zygelman I believe you

3         said it was either in November or December of 2008 to

4         discuss this I think you called it an "all-in-one

5         jumbo"?

6    A    Correct.

7    Q    What was the purpose of you reaching out to him at

8         that time?

9    A    To make Mr. Zygelman aware that GMAC Bank was going to

10        have difficulties finding a jumbo takeout loan on his

11        construction and that they had lost the conduit for

12        the secondary market for jumbo loans, the entire jumbo

13        loan market in the United States collapsed at that

14        time.

15   Q    Now, these five to six other all-in-one jumbo loans

16        that you were overseeing at the time, did you contact

17        those people?

18   A    Yes.

19   Q    And was it for the same purpose?

20   A    Yes.

21   Q    Now, with respect to Exhibit "3" you indicated you're

22        familiar with the terms and conditions of this

23        Agreement, is there anywhere in the Agreement that

24        you're aware of that would allow GMAC to not provide

25        the fixed rate loan that this program calls for?

53

1   A   (Interposing) Yes.  I'm sorry, I answered before you

2       were finished.

3   Q   That's okay.

4   A   Yes.

5   Q   Okay.  And where is that in this Agreement?

6   A   Page one, 1.8, "Important Please Note" and paragraph 9

7       and 10 which is on page 00004, and page 00006 it

8       indirectly is involved Item No. 15.

9   Q   When you say "Item 15" --

10  A   (Interposing) Well, I'm looking at Number 15, yes.

11  Q   Okay.  Anywhere else?

12  A   Yeah, there is in here, that would be -- and then page

13      00008, Number 25.1, Letter B, sub 1 and subset 2.

14  Q   Anywhere else?

15  A   No.  Not that I can see.

16  Q   With respect to Section 1.8, take a moment and read

17      it.  And let me know when you complete it.

18  A   Okay.

19  Q   What language or provision contained in 1.8 do you

20      believe provided GMAC the authority not to make the

21      permanent loan to Mr. Zygelman?

22  A   "If you do not complete the construction and meet all

23      of the applicable loan terms to our satisfaction by

24      the construction completion date, Lender shall have

25      the right to charge you a 'delayed construction (sic)

54

1    surcharge' and/or exercise any of lender's other

2    rights as set forth in Paragraphs 9 and 10 below,

3    including the right to treat the failure to complete

4    construction by such date as a default. Please read

5    these paragraphs carefully." That speaks to it.

6  Q  Are you saying that -- what is the completion date?

7  A  I believe the scheduled completion date according to

8    the Contract was, what, March 29th -- March 28th -- or

9    excuse me, completion date would have been

10    March 29th, 2009.

11  Q  Okay.  So in November or December of 2008 that

12    construction completion date had not arrived yet.

13    Correct?

14  A  Correct.

15  Q  So it would appear that that would not be an

16    applicable reason for denying the permanent loan.

17    Correct?

18  A  In December of 2008 we weren't denying the permanent

19    loan.  At least I wasn't.  I was providing information

20    from the bank to the customers.

21  Q  (Interposing) Telling them --

22  A  (Interposing) There would not be jumbo financing

23    available.  With the market condition and the jumbo

24    market, secondary market hadn't collapsed, no one knew

25    what was going to happen.

                                                        55

1    Q    But you told him in that November or December 2008

2         conversation that GMAC would not be making the

3         permanent loan to him.  Correct?

4    A    Yes.

5    Q    Okay.  Is there anything else in Section 1.8 that

6         would support GMAC's position not to make the

7         permanent loan to Mr. Zygelman?

8    A    Not that I'm aware of.

9              MR. KOEHLER: Let's take a break.

10             THE VIDEOGRAPHER: The time is now

11    approximately 11:58 a.m., we are off the record.

12                   (A brief recess was taken.)

13   //

14                   (Exhibits "3" and "4" marked

15                    for identification.)

16   //

17             THE VIDEOGRAPHER: We are on the record,

18    the time is now approximately 12:09 p.m.  This is the

19    beginning of Tape Two on the Deposition of Robbie

20    Robertson.

21   //

22   Q    (by Mr. Koehler) Mr. Robertson, referring again to

23        Exhibit "3," Paragraph 9, what language in Paragraph 9

24        do you believe would allow GMAC not to make the

25        permanent loan to Mr. Zygelman?

                                              56

1    A    Nothing in this one.  It's referenced -- the reason I

2         called it out is because it's referenced in 1.8.

3    Q    And what language in Paragraph 10 you believe would

4         support GMAC's position not to allow the permanent

5         loan to Mr. Zygelman?

6              MR. LIU: I'm going to object.  He is

7         currently testifying as to what he told or discussed

8         with Mr. Zygelman back in 2008, 2009, and he's not

9         GMAC Bank or GMAC Mortgage employee and he's not

10        making any representations on behalf of either entity

11        as to why or why not the loan was not converted.

12   //

13   Q    (by Mr. Koehler) You testified though that when you

14        contacted Mr. Zygelman in November/December 2008 you

15        told him that GMAC was not going to make the permanent

16        loan to him.  Correct?

17   A    What I told Mr. Zygelman was that at that time that

18        GMAC Bank could no longer fund jumbo loans and that

19        his jumbo takeout loan would need to be refinanced

20        elsewhere.

21   Q    Because they were not going to make it?

22   A    Because they could not.  It wasn't ...

23              MR. KOEHLER: Now, would you read back

24        my question with regard to Paragraph 10.  Or I'll just

25        go ahead and restate it.

57

1   Q   (by Mr. Koehler) With respect to Paragraph 10 of

2       Exhibit "3" what language in Paragraph 10 do you

3       believe supports GMAC not having an obligation to make

4       the permanent loan to Mr. Zygelman?

5   A   It was referenced in 1.8, so the specific of Number 10

6       I have no opinion on.

7   Q   With respect to Paragraph 15, what language in

8       Paragraph 15 do you believe supports the position that

9       GMAC did not have an obligation or need not make the

10      permanent loan to Mr. Zygelman?

11  A   No, this was -- and if I said 15 I was erroneous.

12      Number 15 deals with secondary financing meaning if

13      someone who was going to put a second mortgage on the

14      property.

15  Q   And Mr. Zygelman was not doing that.  Correct?

16  A   Not that I was aware of.

17  Q   Next with Paragraph 25.1, B as in boy, subparagraph

18      (1), what language in that provision do you believe

19      allowed GMAC not to make the permanent loan to

20      Mr. Zygelman?

21  A   B (1)?

22  Q   B (1).

23  A   "The failure of the loan to fully convert to

24      amortization as described in the commitment letter and

25      in the loan documents through the Lender's CPP ..." --

                                                    58

1    which is Construction Permanent Program --

2    "... Department for any reason."  It spells out pretty

3    simple.

4  Q  What language in Paragraph 25.1, B as in boy, sub (2)

5    do you believe gave the authority for GMAC not making

6    the permanent loan to Mr. Zygelman?

7         MR. LIU: Objection, the document speaks

8    for itself.

9       You may answer.

10        MR. KOEHLER: I'm waiting for your

11   answer.

12        MR. LIU: You may answer.

13        THE DEPONENT: Oh, I'm sorry.  Oh, I'm

14   sorry.

15 //

16 A  I'm sorry, can you repeat that because I heard

17   "objection."

18 Q  (by Mr. Koehler) Paragraph 25.1, B, sub (2).

19 A  Yeah.  "The failure of the Borrower to comply with any

20   of the requirements of the Lender necessary to

21   complete disbursement of all of the proceeds under the

22   Note and loan documents or (ii) to permit Lender to

23   successfully deliver the loan for sale in the

24   secondary mortgage market for any reason."

25 Q  At the time you first contacted Mr. Zygelman in

                                                    59

1      November or December of 2008 had Mr. Zygelman failed

2      to comply with any of the requirements of the lender

3      at that point in time?

4   A  Not that I'm aware of.

5   Q  Now, with respect to the five or six other loans, I

6      think you called them all-in-one jumbos.

7   A  Uh-huh.

8                   THE COURT REPORTER: Please answer yes

9      or no.

10                  THE DEPONENT: I'm sorry.

11  //

12  A  Yes.

13                  MR. KOEHLER: Thank you.

14  //

15  Q  (by Mr. Koehler) Is there a record somewhere of who

16     the borrowers were of those five to six loans?

17  A  I'm sure there is.

18                  MR. LIU: I'll object to the extent

19     that -- no, I'll withdraw my objection.

20  //

21  Q  (by Mr. Koehler) And do you know where those documents

22     would be?

23  A  No.

24  Q  When did you leave the employment of GMAC?

25  A  (Interposing) December -- excuse me.  You need to

                                                        60

1   finish, I'm sorry.

2   Q   When did you leave the employment of GMAC?

3   A   December 31st, 2009.

4   Q   And at that point in time do you know who took over

5       your duties, if anybody?

6   A   Yes.

7   Q   Who?

8   A   Tom Webster and Rick Smith.

9   Q   Now, looking again at Exhibit "3," when was this loan

10      made to Mr. Zygelman?

11  A   According to the document it funded at Commitment

12      Acceptance Date is March 15th, 2008.  Or it could

13      possibly have been the Commitment Expiration Date is

14      3/28/08.  So sometime in that time frame.

15  Q   Now, at that time are you aware if GMAC had any

16      written advertisements available to the public

17      regarding this what you referred to is all-in-one

18      jumbo loan?

19              MR. LIU: Objection, exceeds the scope

20      of the discovery with respect to the Motion to Quash.

21      I instruct him not to answer.

22              MR. KOEHLER: If there are provisions in

23      the other loan commitments or provisions as to the

24      Bank's commitment and those advertisements, I would

25      think we would have the right to see those at this

61

1    point in time because it might discuss how loans were

2    made, were they being made in California, were they

3    being made in Oregon, were they a national program, a

4    regional program.

5              MR. LIU: No, I disagree.  I think

6    whatever GMAC Bank did as a policy as a business has

7    no bearing on Mr. Robertson's connection with

8    California.  If the question was what Mr. Robertson

9    may have advertised individually, personally, on

10   behalf of GMAC Bank I think that would be a more fair

11   question.

12             MR. KOEHLER: Now, Mr. Robertson, I know

13   Mr. Liu is appearing specially here for you today and

14   for this limited purpose as your attorney and I know

15   he has instructed you not to answer certain questions,

16   but I want to make you aware if at a later time we

17   want to take what will be the second installment of

18   your deposition and for any reason there is a refusal,

19   we have the right to make a Motion to Compel and as

20   part of that Motion to Compel we have the right to

21   seek monetary sanctions.  So with that in mind are you

22   still prepared not to answer the question?

23             MR. LIU: I will maintain my objection

24   and ask Mr. Robertson not to answer the question as

25   currently phrased.

                                                    62

1                 MR. KOEHLER: Is that your position,

2    Mr. Robertson?

3                 THE DEPONENT: According to the

4    attorney, I will rely on the advice of my attorney.

5    //

6    Q    (by Mr. Koehler) Now, during the course of your

7          employment with GMAC did you see any advertisements

8          regarding this One jumbo loan?

9    A    Can you clarify "advertisements"?

10   Q    Newspaper articles, ...

11   A    No.

12   Q    (Continuing) ... flyers?

13   A    No.

14   Q    Any written propaganda from GMAC to people like

15         yourselves that were servicing these loans?

16   A    I'm not -- can you rephrase it or clarify it, I'm not

17         sure what you're trying to get at here.

18   Q    In 2008 how would one know of this type of loan that

19         was being made by GMAC; when I say "this type of loan"

20         I'm referring to such as that as Exhibit "3"?

21   A    GMAC had a national GMAC mortgage retail lending

22         operation and loan officers who did regular mortgage

23         loans and also construction loans.

24               MR. LIU: I'll object again that the

25    question goes to GMAC Bank's policies and business

                            63

1    practices which aren't within the scope of the

2    Complaint or the Cross-Complaint and it's outside the

3    scope of the Motion to Quash and on that basis, on

4    those bases, I'll instruct Mr. Robertson not to

5    answer.

6  //

7  Q    (by Mr. Koehler) Were any of these offices in

8    California?

9  A    Yes.

10 Q    And did you see any advertisement type material that

11   they were providing to potential borrowers?

12          MR. LIU: I'm going to assert the exact

13   same objection so I won't have to repeat it.

14      And instruct you not to answer.

15          MR. KOEHLER: Again, we're talking about

16   California, advertisements circulated in California.

17          MR. LIU: If there were phone calls or

18   advertisements that Mr. Robertson himself made within

19   the state of California, that's fair, but not as to

20   GMAC Bank or GMAC Mortgage as a whole.

21          MR. KOEHLER: Well, I respectfully

22   disagree.  And I mean if you're going to instruct him

23   not to answer, I can't force him to answer.

24      But you know there can be repercussions for your

25   failure to answer.

                                                    64

1    THE DEPONENT: Well, I have to go with

2    the advice of my attorney.

3 //

4 Q    (by Mr. Koehler) During the course of employment with

5    GMAC did you ever make an all inclusive One jumbo

6    loan?

7 A    No.

8 Q    The five to six other all inclusive One jumbo loans

9    that you oversaw, had those loans already been made at

10    the time that you became employed at GMAC?

11 A    I have no idea.

12 Q    Did you make any of those loans?

13 A    No.

14 Q    During your employment with GMAC did you maintain any

15    type of a manual as to how the One jumbo loans were to

16    be administered?

17 A    Yes.

18 Q    And what was that document called?

19 A    The Construction Lending Manual.

20 Q    And was that a manual to your understanding specific

21    to a Regional Construction Sales Manager in the state

22    of Washington or was that for retail construction

23    sales managers nationwide?

24 A    Nationwide.

25 Q    Do you know if that Construction Lending Manual still

65

1    exists?

2  A   I have no idea.

3  Q   Now, per the terms of Exhibit "3" aside from your

4      conversations that you had with Mr. Zygelman in

5      November/December 2008, this type of loan was designed

6      to convert a construction loan to a permanent loan?

7  A   Correct.

8  Q   And what were the terms of that permanent loan, such

9      as what were the number of years: Are we talking about

10     a 10 year loan, a 20 year loan?

11               MR. LIU: And I'll object to the extent

12     that you know it's a general question as to all loans.

13     He can answer with respect to Mr. Zygelman's loan.

14               MR. KOEHLER: That's what I'm talking

15     about, Mr. Zygelman's loan.

16               MR. LIU: He can answer.

17  //

18  A   If I can clarify.  Mr. Zygelman had a 30-year fixed

19     rate jumbo loan commitment with a 12 month

20     construction term at the front of the loan which mean

21     that upon the completion of the house or completion of

22     the project within that one year period the loan would

23     then convert to its permanent financing for the

24     remaining 29 years.  So the amortization of the

25     amortized payment would be based on 29 years.

66

1    Q    (by Mr. Koehler) Other than the provisions in

2         Exhibit "3" that you have already testified to is

3         there any other language in the one -- I'm sorry, I

4         forget what you referred to it -- all inclusive One

5         jumbo that would preclude this loan converting from a

6         construction loan to a permanent loan?

7                        MR. LIU: Objection, the document speaks

8         for itself.

9              You can answer.

10   //

11   A    In the Commitment, Fixed Rate Loan Commitment, is this

12        the one we're referencing there?  We'll go to page

13        0004, Section 8, Delays In Completion, line 8.5,

14        "Lender may determine instead that it does not wish to

15        permit more time for construction, and it shall have

16        no obligation to do so.  If Lender determines not to

17        extend the time for completion, it shall be a material

18        and actionable default under the loan documents which

19        may result in acceleration of the loan balance and

20        foreclosure."

21   Q    (by Mr. Koehler) And that is ...

22   A    8.5.

23   Q    And that pertains to if there is a delay in

24        completion.

25   A    Correct.

                                                              67

1  Q    What was the completion date of this loan?

2  A    When was the house completed?

3  Q    No.  What was the completion date stated for this

4       loan?

5  A    3/29, I believe, of 2009.

6  Q    Did you oversee Mr. Zygelman's loan from its date of

7       inception?

8  A    No.

9  Q    Who was your predecessor in overseeing this loan?

10 A    I have no idea.  And the individual, I don't remember,

11      I believe his name was Jim but I don't recall his last

12      name.

13               THE VIDEOGRAPHER: Mr. Robertson, please

14      be mindful of the microphone.

15 //

16 Q    (by Mr. Koehler) I will provide you with what we'll

17      mark as Exhibit "5".  (Handing)

18                        (Exhibit No. "5" marked for

19                         identification by Reporter.)

20 //

21 Q    (by Mr. Koehler) What I've handed you are Special

22      Interrogatories that were propounded by Mr. Zygelman

23      to GMAC Mortgage, LLC and formerly known as GMAC

24      Mortgage Corp, and direct your attention to Question

25      Number One.

                                                        68

1    MR. LIU: I'm going to object that this

2    Exhibit is with respect to discovery propounded on

3    GMAC Mortgage, LLC which currently is bankrupt and

4    he's not going to respond to any discovery and it

5    appears -- this is not directed to Mr. Robertson and

6    it appears to be outside the scope of his Motion to

7    Quash.

8    MR. KOEHLER: I can ask.

9    MR. LIU: But please, if you want to ask

10   a followup question.

11   MR. KOEHLER: I will.

12   //

13   Q    (by Mr. Koehler) Would you read Number One.

14   A    "Is it your contention that, pursuant to the terms of

15   Cross-Complainant's One-Close Fixed Rate

16   Construction/Permanent Mortgage Loan Agreement, a copy

17   of which is attached hereto as Exhibit '1', you had no

18   obligation to convert Cross-Complainant's construction

19   loan to a conventional jumbo loan upon completion of

20   construction?"

21   MR. LIU: And I'll object again that

22   this Exhibit and any definition of "your" relates to

23   GMAC Mortgage, LLC and not to Robbie Robertson.  And I

24   guess we'll see where the next question goes.

25   //

69

1   Q   (by Mr. Koehler) Next I'm going to show you what is

2      Exhibit "6," Responses to that.

3                    (Exhibit No. "6" marked for

4                        identification by Reporter.)

5   //

6            MR. LIU: And I'm going to object again

7      that Exhibit "6" is Defendant GMAC Mortgage, LLC's

8      responses to Mr. Zygelman's Special Interrogatories

9      Number One, they're not directed at Mr. Robertson and

10     Mr. Robertson did not verify these discovery

11     Responses.

12           MR. KOEHLER: So noted.

13   //

14  Q   (by Mr. Koehler) Go ahead and read to yourself the

15      response to Special Interrogatory No. 1.  Let me know

16      when you're done.

17  A   Okay.

18           MR. LIU: I'm going to object.  The

19     Interrogatory Response is by GMAC Mortgage, he has no

20     personal knowledge, he did not verify this, did not

21     sign the document, has absolutely no personal

22     knowledge of the Response made by GMAC Mortgage.  And

23     I'll see what the next question is.

24           MR. KOEHLER: Okay.

25   //

                                        70

1   Q   (by Mr. Koehler) Mr. Robertson, do you concur in

2       GMAC's response that the loan did not convert due to

3       the fact that Mr. Zygelman was in default in that he

4       did not complete construction by February 26, 2009?

5   A   I agree that he did not complete construction by

6       February 26, 2009.

7   Q   And that was after the date in which you first

8       notified him that GMAC was not going to make the

9       permanent loan.   Correct?

10  A   Correct.   February came after December.

11  Q   On any of these One Fixed jumbo loans that you handled

12      were any of them completed?

13  A   Yes.

14  Q   And how many?

15          MR. LIU: Objection, it goes outside the

16      scope of Mr. Robertson's Motion to Quash.

17          MR. KOEHLER: For the record, any

18      questions that are objected to and/or Mr. Liu has

19      instructed the deponent not to respond I certainly do

20      not waive the right to re-ask that question when and

21      if there is a second session of Mr. Robertson's

22      deposition.

23          MR. LIU: I understand and I'm

24      instructing him not to respond because it's outside

25      the scope of the Motion to Quash at this time.

                                                      71

1    　　　　　THE DEPONENT: Can I retract that last

2    "Yes" because the word that he used was not correct.

3    　　　　　MR. LIU: We'll leave it right now and

4    if Mr. Koehler wants to rephrase his question or seek

5    clarification he may.

6    //

7    Q    (by Mr. Koehler) Next I'll show you what we'll mark as

8    Exhibit "7".

9    　　　　　　　　　(Exhibit No. "7" marked for

10   　　　　　　　　　identification by Reporter.)

11   //

12   Q    (by Mr. Koehler) Mr. Robertson, does this appear to be

13   a GMAC Mortgage Statement for 4/19/10?   (Handing)

14   A    That's what it appears to be, yes.

15   　　　　　MR. LIU: Objection, the document speaks

16   for itself.

17   //

18   Q    (by Mr. Koehler) Was Mr. Zygelman in default at this

19   point in time?

20   A    I'm not aware.  Well, I'm not aware, I wasn't an

21   employee at the time.

22   Q    I'm sorry, when did you leave employment of --

23   A    (Interposing) December 31, 2009.

24   Q    How did you become aware that GMAC was no longer going

25   to make permanent loans such as that stated in

　　　　　　　　　　　　　　　　　　　　　　　　　72

1    Exhibit "3"?

2              MR. LIU: And objection to the extent

3    that it would invade any attorney-client privilege.

4         You can answer, but don't answer with respect to

5    any information you received from GMAC's inside or

6    outside counsel.

7    //

8    A    Could you restate the question please?

9    Q    Sure.

10             MR. KOEHLER: Mr. Reporter.

11                       (Question read by Reporter:

12                       "Question: How did you

13                       become aware that GMAC was

14                       no longer going to make

15                       permanent loans such as that

16                       stated in Exhibit '3'?")

17   //

18             MR. LIU: I reassert the same objection.

19        Be careful not to respond with any communications

20   you had with GMAC inside or outside counsel; but if

21   there are any communications you had with any GMAC

22   non-legal people, then you can answer.

23   //

24   A    Oh, Rick Smith informed us that there was going to be

25   discussions regarding the continuance of the

                                                        73

1        Construction Lending Programs.

2  Q   (by Mr. Koehler) And did he convey this to you orally

3      or in writing?

4  A   Orally.

5  Q   Was it followed up with any type of written

6      memorandum?

7  A   No.

8  Q   And when did he inform you so orally?

9  A   I don't remember.

10  Q   Can you give me your best estimate?

11  A   Probably sometime around -- it had to be sometime

12      around June or July of 2008.  Could have been as early

13      as August.  I just honestly don't recall.

14  Q   Is there some reason then that you waited until

15      November 2008 to inform Mr. Zygelman that GMAC was not

16      going to convert the construction loan to a permanent

17      loan?

18  A   My conversations with Mr. Smith were not definitive

19      that GMAC Bank was going to close down the

20      Construction Lending Department.  I had discussions

21      with him that there was concerns about the

22      construction lending relative to -- excuse me --

23      relative to the economic downturn across the United

24      States.

25  Q   When did it become determinative?

        74

1   A    And I believe that was -- it had in that August -- no,

2        let's see, it had to have been October/November, yeah,

3        it had to have been sometime around October/November.

4        I honestly don't remember the dates, that was a long

5        time ago.

6   Q    And how did you become aware that it was

7        determinative?

8   A    Orally by through Rick Smith.

9   Q    And did he follow it up with any type of written

10       memorandum?

11  A    Not that I can recall.

12                              (Exhibit No. "8" marked for

13                                identification by Reporter.)

14  //

15  Q    (by Mr. Koehler) I'm going to direct your attention to

16       the e-mail dated August 26th, 2009, appears to be from

17       you to Mr. Zygelman.  Do you recall this

18       communication?

19  A    (Interposing) Yes.  Yes.

20  Q    Would you look at the second sentence.

21              THE VIDEOGRAPHER: Is that marked as

22       Exhibit "8"?

23              MR. KOEHLER: I'm sorry, yes,

24       Exhibit "8".

25  //

                                                            75

1    A    Okay.

2    Q    (by Mr. Koehler) It refers to conversations with

3         Mr. Zygelman commencing September 2008 that he needed

4         to secure financing elsewhere.  Does that maybe

5         refresh your memory as to when you first --

6    A    (Interposing) Yeah.  Yeah, that's probably about

7         correct.

8    Q    Again, let me finish my question.  For the most part

9         you're doing good.  So just keep that in mind.

10        Do you recall when in September that you may have

11        notified him?

12   A    No.

13   Q    Do you believe that to be the first date that you

14        notified him that GMAC was not going to be converting

15        the construction loan to a permanent loan?

16   A    In September of 2008, it states and it says here that

17        that's when it was and my memory is going to rely on

18        my e-mail.

19   Q    And Mr. Zygelman was not in default to your knowledge

20        of his construction loan at that time?

21   A    No.

22   Q    Next show you a document we'll mark as Exhibit "9".

23                           (Exhibit "9" marked for

24                            identification by Reporter.)

25   //

                                                        76

1    Q    (by Mr. Koehler) This e-mail appears to be dated

2         August 18th, '09 and it appears to be from you to

3         Mr. Zygelman.  Do you recall this?

4    A    Yes.

5                   MR. LIU: And I'll object to the extent

6         that the document is not complete.  At the bottom of

7         the page of Exhibit "9" there is an e-mail and it

8         appears to be from Mr. Zygelman to Mr. Robertson, the

9         text of that e-mail is not contained within

10        Exhibit "9".

11                  MR. KOEHLER: Right.  There is no

12        question intended as to that incomplete portion.  The

13        question only is to the August 18th, 2009

14        correspondence.

15                  MR. LIU: You can answer.

16   //

17   A    I'm sorry, I was spacing out.  Could you repeat that

18        please.

19                  MR. KOEHLER: I'm not sure I completed

20        the question.

21            Go ahead and read it.

22                              (Last question and answer

23                               read by Court Reporter.)

24   //

25   Q    (by Mr. Koehler) Now, it appears from this e-mail that

                                                              77

1    you were explaining to him that in November of '08

2    GMAC was not converting the loan due to the fact that

3    there was no longer a secondary market.  Correct?

4  A  Correct.

5  Q  So the reason for not converting it was not because he

6    was in default but because there was no secondary

7    market?

8  A  I'm not qualified to answer that.  That's a policy

9    issue that I'm not qualified to make.

10 Q  Well, I mean you told him that there was no secondary

11   market.

12 A  Correct.  And in response if the Bank hadn't been able

13   to secure and the economy turned and the jumbo market

14   came back and the Bank came back and said otherwise.

15   So it becomes a company policy issue, not a decision

16   on my part.

17 Q  But at that point in time, November of '08, GMAC had

18   taken a position that they were not going to convert

19   Mr. Zygelman's construction loan to a permanent loan.

20   Correct?

21           MR. LIU: Objection, the document speaks

22   for itself.

23        You can answer.

24 //

25 A  Yes.  GMAC made the determination that they would not

                                                    78

1    have a secondary market for their jumbo loan

2    conversions.

3    Q    (by Mr. Koehler) Now, during that period let's say

4    from September to November of 2008 what was the real

5    estate market like for obtaining loans for new homes

6    which let's say had a loan amount of over one million

7    dollars?

8                MR. LIU: Objection, that calls for an

9    expert opinion.

10                MR. KOEHLER: He's an expert, that's

11    what he did.

12                MR. LIU: I don't agree.

13                THE DEPONENT: I don't think so.  I mean

14    I'm not a loan officer.  I did not make the loans.  I

15    managed construction projects.

16                MR. KOEHLER: Okay.

17    //

18    Q    (by Mr. Koehler) And you oversaw loans.  Correct?

19    A    No, sir.

20    Q    You oversaw construction contracts.

21    A    Yes, sir.

22    Q    Okay.  Now, do you know what the market was like in

23    September to November of 2008?

24                MR. LIU: Same objection, that's asking

25    for expert testimony.

                                                    79

1    A      It was a declining market.

2    Q    (by Mr. Koehler) And the reason why there was no

3          secondary market?

4    A      I do not know.

5    Q    Now, do you recall advising Mr. Zygelman that upon him

6          obtaining Certificate of Occupancy upon the completion

7          of the home you would disburse $11,000 to him from his

8          Construction Loan Account?

9    A      No.  That was never stated.

10   Q    I'll show you a document we'll mark as Exhibit "10".

11                     THE DEPONENT: (to Mr. Liu) This is

12         bogus.

13                          (Exhibit No. "10" marked for

14                           identification by Reporter.)

15   //

16   Q    (by Mr. Koehler) Have you reviewed it looks to be an

17         e-mail from a Mark Taylor to you dated

18         August 12th, 2009; do you recall who Mark Taylor was?

19   A      Yes.

20                     MR. LIU: I'll object, the document

21         speaks for itself.

22   //

23   Q    (by Mr. Koehler) Who was Mark Taylor?

24   A    Mark Taylor was the contractor that pounded the nails

25         in the house.

                                                              80

1  Q    And after reviewing this document does it change your

2       recollection as to what you may or may not have said

3       to Mr. Robertson (sic) concerning the release of

4       $11,000 from his construction loan?

5  A    Absolutely.  Because one of the things you're

6       forgetting here, Counsel, is the followup e-mail in

7       which I dispute Mr. Taylor's assertions because he did

8       not hear the conversation.  The conversation directly

9       related to the final draw would be disbursed upon

10      completion of the house and a Certificate of Occupancy

11      which is spelled out very clearly in the Construction

12      Loan Agreement.  Completion of the house and

13      Certificate of Occupancy; not completion or

14      Certificate.  Both.

15 Q    And are you saying that both did not occur?

16 A    Correct.

17 Q    Which did not occur?

18 A    The completion of the house.

19 Q    But the Certificate of Occupancy was issued.  Correct?

20 A    Yes.

21 Q    Now, is it your contention that this conversation with

22      Mr. Zygelman pertaining to the release of $11,000 did

23      not occur?

24 A    No.  No, it occurred but it's not being framed

25      correctly.  If you go into the documents you will see

                                                        81

1    clearly completion of the house and Certificate of

2    Occupancy.  A Certificate of Occupancy deals with

3    health, safety and environment.  So you can have a lot

4    of work that's not completed in a job that does not

5    reference health, environment or welfare and that was

6    the case, house wasn't completed.

7  Q    And how do you know this?

8  A    Final inspection performed by Granite Inspection

9    Company with pictures.

10 Q    And do you have any recollection as to what was not

11   completed?

12 A    Yeah, I don't have the construction draws and line

13   items in front of me, but -- so I don't know how to

14   answer that because I'm not a hundred percent certain.

15 Q    Okay.  To the best of your recollection what was not

16   complete?

17 A    I can't answer because I honestly don't recall, but

18   just my knowledge of construction more than likely

19   trim finishing work, installation of carpets, tiles,

20   this kind of thing, appliances, doorknobs, hardware,

21   screens, you know.

22          MR. LIU: I'll just assert an objection.

23   It sounds like Mr. Robertson is speculating, he

24   doesn't have any personal knowledge with respect to

25   the Zygelman residence.

                                                        82

1  Q    (by Mr. Koehler) I believe the question was to the

2       best of your recollection.

3  A    And like I said I'm not a hundred percent certain.

4  Q    But the fact of the matter is the $11,000 was never

5       released to Mr. Zygelman?

6  A    I was not aware of that.  It was not disbursed on the

7       final draw.  Had it ever been disbursed to him, I'm

8       not aware of it whether it was or wasn't.

9  Q    Now, was Mr. Webster your direct supervisor or was it

10      Mr. Smith, or both?

11 A    Both.

12 Q    And I'm sorry, you said Mr. Smith is no longer with

13      the Bank?

14 A    Correct.

15 Q    And do you know if he's still in the banking industry?

16 A    I have no idea.

17             MR. LIU: (Interposing) Objection,

18      irrelevant, exceeds the scope of the Motion to Quash

19      and I'll instruct him not to answer.

20             MR. KOEHLER: Well, actually it is

21      relevant because Mr. Smith or Mr. Webster may be able

22      to provide testimony regarding what Mr. Robertson's

23      duties were as it pertains to California real estate,

24      California loans and contacts that he had contrary to

25      what Mr. Robertson may be telling us.  So I think

                                                        83

1    based upon that, that is relevant.

2                    MR. LIU: Then that's fine.

3        You may answer.

4    //

5    A    And the question was again?

6    Q    (by Mr. Koehler) To your knowledge is Mr. Smith still

7        in the banking industry?

8    A    I don't know.

9    Q    Did you have any type of social relationship with

10       Mr. Smith?

11                    MR. LIU: Objection, I don't see the

12       relevance of that question.

13                    MR. KOEHLER: That's a foundational

14       question.

15   //

16   A    You mean like did we go out to lunch or out to dinner

17       after work?

18   Q    (by Mr. Koehler) Yes.

19   A    Yeah.

20   Q    Did you stay in contact with Mr. Smith?

21   A    No.

22   Q    Do you know where he resides?

23   A    I'm assuming he's in Massachusetts, that's where he

24       lived; I don't know where, but I'm assuming he's still

25       back there.

84

| | | |
|---|---|---|
| 1 | Q | I think you referred to him as Rick Smith? |
| 2 | A | Correct. |
| 3 | Q | Would his first name actually be Richard? |
| 4 | A | I would assume so, but I'm not a hundred percent |
| 5 | | certain. |
| 6 | Q | Okay.  Mr. Webster no longer works for GMAC? |
| 7 | A | As far as I know, yes, he no longer works. |
| 8 | Q | Do you know when he left? |
| 9 | A | No. |
| 10 | Q | Did you maintain any type of social relationship with |
| 11 | | Mr. Webster? |
| 12 | A | No. |
| 13 | Q | Do you know where Mr. Webster resides? |
| 14 | A | When I left GMAC he was living down in Arizona and I'm |
| 15 | | assuming he's still in Arizona. |
| 16 | Q | Do you know where in Arizona? |
| 17 | A | No, sir.  I'm sure it's in the Greater Phoenix area |
| 18 | | somewhere. |
| 19 | Q | Now, at the time that you informed Mr. Zygelman that |
| 20 | | his construction loan was not going to be converted to |
| 21 | | a permanent loan I believe you told him that the Bank |
| 22 | | would waive the charge of him going to an outside |
| 23 | | lender.  Correct? |
| 24 | A | Absolutely.  Yes. |
| 25 | Q | And who authorized this? |

85

1    MR. LIU: And I'll object.

2    And just be careful not to make any statement or

3    release any information with respect to any

4    conversation you may have had with any inside or

5    outside counsel with GMAC.

6    THE DEPONENT: Correct.

7    //

8    A    The waiver, that was verbally related to me by Tom

9    Webster via -- from what I'm assuming -- via Rick

10    Smith.

11    Q    (by Mr. Koehler) Now, was Rick Smith Tom Webster's

12    immediate superior?

13    A    Correct.

14    Q    I'm going to next show you a document we'll mark as

15    Exhibit "11" and ask if you've seen this before?

16    (Handing)

17    A    Correct.

18    (Exhibit No. "11" marked for

19    identification by Reporter.)

20    //

21    Q    (by Mr. Koehler) Now, looking at the second bullet

22    point -- do you know what I mean by "bullet point"?

23    Do you know what I mean by when I refer to as "second

24    bullet point"?

25    A    Yeah.

86

1   Q    Okay.  If you would look at the second bullet point.

2        Now, is this referring to the permanent loan that was

3        referenced in Mr. Zygelman's Only One Loan?

4              MR. LIU: I'll object.  This letter is

5        not from Mr. Robertson to anyone and it's not

6        addressed to Mr. Zygelman, so it looks -- I assume

7        Mr. Zygelman received it, but it looks like a document

8        from GMAC Bank and not from Mr. Robertson.

9   //

10  Q    (by Mr. Koehler) Had you seen this document prior to

11       today?

12  A    No.  Well, no, let me see, I think it came in your --

13       it came in some of your legal documents.

14  Q    Let me rephrase the question.

15            During the time that you were employed at GMAC

16       did you see this document?

17  A    No.  No, I didn't.

18  Q    Prior to your being notified in and around September

19       of 2008 that GMAC would not convert Mr. Zygelman's

20       construction to a permanent loan to your knowledge was

21       GMAC committed to making that permanent loan?

22  A    I'm sorry, you're going to have to clarify that one

23       please.

24  Q    Actually let me withdraw it, that wasn't a very good

25       question.

87

1        Prior to September of 2008 when you were notified

2    by your superior that Mr. Zygelman's construction loan

3    would not be converted to a permanent loan were there

4    any reasons that would have precluded GMAC from making

5    the permanent loan to Mr. Zygelman?

6  A  Well, first of all I was never informed of a specific

7    client or a specific customer who would not be

8    converted.  It was a blanket policy established by

9    GMAC Bank.  So I never had a direct reference by GMAC

10   Bank to specifically address Mr. Zygelman's loan.

11 Q  I may have asked you this before.  Did Mr. Smith

12   maintain an office?

13 A  Yes.

14 Q  Where was his office?

15 A  Fort Washington.

16 Q  Pennsylvania?

17 A  Pennsylvania, yes.

18 Q  And did Mr. Webster maintain an office?

19 A  Yes.

20 Q  And where was his office?

21 A  Phoenix, Arizona.

22 Q  To your knowledge did Mr. Webster during the course of

23   your employment with GMAC travel to California to

24   interact with any borrowers?

25           MR. LIU: Objection, it appears

88

1  irrelevant to the allegations in the Complaint and

2  Cross-Complaint and clearly outside the Motion to

3  Quash with respect to any conduct by Mr. Webster to

4  any GMAC borrower located in California.  If that's a

5  foundational question, if you've something to followup

6  with, but I don't see how Mr. Webster's conduct would

7  be relevant.

8        MR. KOEHLER: Okay.  Your objection is

9  noted.

10       You can go ahead and answer the question.

11  //

12  A  I'm not aware, I don't know if he had any interaction

13     with clients or not.

14  Q  (by Mr. Koehler) During your tenure with GMAC Mortgage

15     did you ever communicate with Mr. Webster during any

16     period he may have been in California?

17  A  No.

18  Q  During your tenure with GMAC did you have any

19     communication with Mr. Smith where he may have been in

20     California?

21  A  Excuse me, if I can back up to the previous question

22     about Mr. Webster.

23  Q  Mr. Webster?

24  A  In 2007 we did a training program with about a hundred

25     loan officers in which Mr. Webster and I were both in

89

1      attendance, but that was down in Irvine, California.

2      And that was in 2007.

3  Q   And you traveled to Irvine, California for the purpose

4      of putting on this training program?

5  A   Correct.

6  Q   So you were one of the trainers?

7  A   Correct.

8  Q   On behalf of GMAC.

9  A   Correct.

10  Q   And Mr. Webster was there as well?

11  A   Correct.

12  Q   And who were you training?

13  A   Retail loan officers that were selected by GMAC

14      Mortgage to attend it.

15  Q   And were these loan officers that would be making the

16      loans such as the One-Close Fixed Rate

17      Construction/Permanent Mortgage Loan?

18  A   Well, it would be within their purview to do so, yes.

19  Q   And how long was this --

20  A   (Interposing) One day.

21  Q   (Continuing) -- conference?

22  A   One day.  Oh, excuse me, one-and-a-half days, I did

23      stay the night and we had a followup session in the

24      morning, so one-and-a-half days.

25  Q   Other than that event during your tenure with GMAC

90

1   Mortgage did you ever travel to California to either

2   to attend any conferences or conventions involving

3   GMAC Mortgage -- GMAC?

4 A (Interposing) No.  No.

5 Q What was the conversion date for Mr. Zygelman's loan?

6 A The contracted?

7 Q Yes.

8 A He was to have converted, he was to have had the home

9   completed, completed, and the Certificate of Occupancy

10   and the final closeout of paperwork on or before

11   March 29, 2009.

12 Q If you will look at Exhibit "3," Paragraph 14.1, and

13   in particular the first sentence?

14 A I'm sorry ...

15 Q 14.1?

16 A Hazardous materials?

17 Q No.

18 A I'm sorry, I'm looking at the wrong one.

19 Q This one (indicating).

20 A That's the one, I'm sorry.  You guys cut enough trees

21   down to do all this.

22     MR. LIU: I have two objections: One,

23   the document speaks for itself; and, Two, again

24   Mr. Robertson can only testify to his personal

25   knowledge, he did not draft or enter into this

91

1        agreement personally with Mr. Zygelman.

2                    MR. KOEHLER: I understand that,

3        Counsel.

4                    MR. LIU: You may answer.

5   //

6   A    "You agree that the value of the property may be

7        re-certified prior to the conversion of the loan to

8        the Amortization Period at Lender's option."

9   Q    (by Mr. Koehler) Do you know what the Lender is

10       referring to when they speak of "conversion of the

11       loan to the Amortization Period"?

12  A    Yes.

13  Q    What is that?

14  A    As I previously mentioned these loans are in this case

15       a 30-year loan with a 12-month construction period,

16       thereby leaving an Amortization Period for the full

17       repayment of the debt of 29 years.

18  Q    Was Mr. Zygelman granted any extensions of this loan?

19  A    Yes.

20  Q    Okay.  Do you recall when the first such extension

21       took place?

22  A    March 29th, 2009, I believe, it was either that or

23       right close to that date.  It appears like that was

24       executed on the 10th of -- excuse me, were signed by

25       the borrower on March 6th of 2009.

                                                            92

1   Q   Again looking at Paragraph 14 of Exhibit "3," the term

2       "re-certified," do you know what that means?

3   A   Yes.

4   Q   What?

5   A   We have the appraiser that did the original appraisal

6       for value consideration go out and re-certify it

7       through market analysis that the value remains the

8       same or better, or if not then there's no

9       re-certification.

10   Q   Would this be done one time during the loan period or

11       multiple times?

12   A   No, it would be done at completion and conversion at

13       the lender's option.

14   Q   Regarding GMAC's policy not to convert construction

15       loans to permanent loans such as that given to

16       Mr. Zygelman, was there ever anything put in writing

17       regarding that policy?

18             MR. LIU: Objection to the extent that

19       it seeks a broad policy that affects other borrowers

20       other than Mr. Zygelman.  But if he knows of any

21       written policy with respect to Mr. Zygelman, he may

22       answer.

23   //

24   A   I have no knowledge.

25   Q   (by Mr. Koehler) During your employment with GMAC did

         93

1      you have occasion to come to California regarding any

2      business on behalf of GMAC?

3  A   Yes.

4  Q   Other than the conferences that you attended?

5  A   Yes.

6  Q   How many times?

7  A   Once.

8  Q   When was that?

9  A   I believe it was in latter part of June of 2008.

10  Q   And the purpose for your trip?

11  A   Was to do site inspections on several abandoned

12      construction properties and a couple of properties

13      that were in severe default.

14  Q   Were they in any specific geographic location?

15  A   Forgive me on the names, Brownville, is that north of

16      Sacramento?  Brownsville or something.  There was one

17      north of Sacramento, a couple over in Petaluma, one in

18      Santa Rosa, and three in the San Jose area with one --

19      I can never remember the name, it starts with an "A"

20      somewhere between San Jose and San Francisco that was

21      just a raw piece of land.  So that's it.

22  Q   Do you recall about how many sites that you looked at?

23  A   Six or seven.

24  Q   And how long were you in California?

25  A   One day.  Well, excuse me, one day and a morning, so I

94

1  stayed the night, and stayed the night in Petaluma and

2  went to Oakland the next morning, did my final

3  inspection and took a plane home.

4  Q  And did anyone accompany you?

5  A  No.

6  Q  When again was that trip?

7  A  I believe it was in June of -- the latter part of June

8  2008.

9  Q  While in California did you have any communication

10  with Mr. Zygelman?

11  A  No.

12  Q  Did you have occasion to visit the site of the

13  Zygelman construction site?

14  A  No.

15  Q  At the time that you left employment of GMAC do you

16  recall how much money, if any, was left in the

17  Zygelman Construction Loan Account?

18  A  No.

19              MR. KOEHLER: I think at this time I'll

20  pass to Mr. Barbag.

21  //

22  //

23  //

24  //

25  //

                                                        95

1    QUESTIONING BY MR. BARBAG:

2    Q    Mr. Robertson, as I introduced earlier, my name is

3    Scott Barbag, I represent Hayomyom.  How are you

4    doing?

5    A    I'm very well, thank you.

6    Q    I'm going to try not to repeat Counsel's questions but

7    I might and I apologize if I do.  While working for

8    GMAC did you ever create any documents from business

9    dealings in California?

10   A    I'm sorry, did I what?

11   Q    Create any documents.

12   A    Create any documents?  No.

13   Q    Okay.  And I was using that term a little bit broadly

14   so let me define it.  When I'm saying "documents" I'll

15   say e-mails, facsimile, any other correspondence that

16   you may have, any of that.  Let me re-ask again.

17         Did you ever send any e-mails to California while

18   you worked for GMAC?

19   A    Yes.

20   Q    Okay.  Can you estimate approximately how many?

21   A    No.  I have no idea.

22   Q    Would you say it's over 500?

23   A    No.

24   Q    You worked for GMAC approximately two and

25   three-quarter years?

                                                          96

1   A    Correct.

2   Q    Would you say the number of e-mails sent to California

3        were over 100?

4   A    Possibly.

5   Q    So less than 500, over 100.  Can you narrow the range

6        a little bit?

7   A    I'm sorry, I have no knowledge of how many e-mails I

8        sent three years ago, four years ago, I really don't.

9        It would be -- I will answer it this way: It would be

10       a limited number be as I mentioned already previously

11       on draw inspections, okay, I would send e-mail to the

12       customer and the builder on a monthly basis letting

13       them know the results of the inspection, sending

14       copies of a Lien Waiver form, sending copies of the

15       validated site inspection so that we would have a

16       record of what line items were going to be drawn out.

17       So each month I probably sent an e-mail to each

18       customer at least.

19  Q    And there are at least 25 customers?

20  A    Well, somewhere around 25.

21  Q    Were those customers throughout your entire tenure

22       while you were with GMAC?

23  A    No.

24  Q    What was the smallest amount of customers you had at

25       any one time in California while you were working with

                                                            97

1       GMAC?

2  A    The smallest amount?  I have no idea.  The smallest

3       amount?  I don't know.  I honestly don't know.

4  Q    Did you ever have less than 10 customers in California

5       while with GMAC?

6  A    (Interposing) I don't believe so.

7  Q    So it's fair to say that if you were sending monthly

8       e-mails to these people in California you sent at

9       least 120 e-mails.

10  A    I'll accept that.

11  Q    Would that be the same for facsimile or other mailed

12       correspondence?  Would you followup your e-mails with

13       a facsimile?

14  A    Not as a general rule, no.

15  Q    Would you followup your e-mails with mailed

16       correspondence?

17  A    As a general rule, no.

18  Q    So generally when corresponding with people in

19       California it would be either telephonic or e-mail.

20  A    Correct.

21  Q    Okay.  Do you know who would have a copy of any of

22       your e-mails that you sent to California?

23  A    (Interposing) I have no idea.

24  Q    And as I recall your answer to Counsel's question, you

25       were in California during your tenure with GMAC for

98

1  business purposes with GMAC only twice.  Is that

2  correct?

3 A Correct.

4 Q And again, I prepared in anticipation of some answers

5  and so I'm trying to not repeat some questions.  And

6  in 2007 you stayed about one-and-a-half days.  Is that

7  right?

8 A Correct.

9 Q During the 2007 loan construction training were you

10  one of the trainers for the entire time, for the full

11  one-and-a-half days, or were you part of the audience

12  during that time?

13 A Well, there was four -- how do I explain this.  There

14  was a training seminar at which there was four of us

15  presenters that each took specific parts of the

16  Construction Loan Program to highlight the training

17  on.  So if I wasn't presenting, I was probably sitting

18  in the back of the room.

19 Q And what you specifically taught the people who were

20  being trained, was it how to sell mortgage --

21 A (Interposing) No.

22 Q (Continuing) -- or what were you training them to do?

23 A During that my specific process was the completion of

24  the draw requests, how to, what a Lien Waiver form

25  looks like and the proper procedures for issuing a

99

1    draw.

2  Q    And in 2008 you said you performed site inspection on

3    seven properties.  Is that correct?

4  A    Approximately seven.  It might have been six.

5  Q    Did you ever go to California on behalf of GMAC

6    business in 2009?

7  A    No.

8  Q    For the 2008 site visit were you a District Risk

9    Manager at that time?

10  A   No.  It was just -- well, let's see -- no.  It was

11    just -- no, not yet.  It was because I had been

12    assigned the Northern California marketplace but they

13    were still actively -- GMAC Mortgage was still

14    actively doing loans.

15  Q   Okay.

16  A   So, no.  It was shortly thereafter that everything

17    changed.

18  Q   And is that why you were no longer doing site visits

19    in the latter part of 2008 and 2009?

20  A   There was a -- yeah, there was a curtailment and there

21    was not a need for us to be going down there, there

22    wasn't a need.

23  Q   Now, the 2008 site inspections, I believe you

24    indicated they were tied to distressed loans.  Is that

25    correct?

100

1   A   Correct.

2   Q   Could you define for me since I'm not familiar what a

3       distressed loan is, can you tell me?

4   A   Sure.  A distressed loan could be any number of

5       reasons that a loan goes into breach or default: Not

6       making your payments, not completing the home on time,

7       fraudulent activities, misrepresentations, there's all

8       kinds of numbers of reasons why a loan would be

9       distressed, an audit being done on the credit file and

10      being found that the credit information that was

11      supplied to the bank wasn't correct.  So a number of

12      reasons.

13  Q   Okay.  And for the loans, for the properties that you

14      were inspecting in 2008 did you have any dealing with

15      approving those loans?

16  A   No.

17  Q   While you were at GMAC at any given time what was the

18      largest number of loan officers that you oversaw?

19  A   I'm going to say probably close to 60.

20  Q   And where were they located?

21  A   In my region.

22  Q   Your region included Washington, Oregon, Idaho,

23      Hawaii, Alaska and California?

24  A   Correct.

25  Q   Were they equally divided in each state?

                                                        101

1    A    No.

2    Q    Okay.  How many people were in California

3         approximately?

4    A    How many people, loan officers?

5    Q    Yes.

6    A    I don't recall.

7    Q    Would you say it was more than 15?

8    A    Yes.  Well, let me back up.  More than 15 certified

9         construction lending officers, no.

10   Q    Okay.  Did you oversee people for GMAC other than loan

11        officers?

12   A    No.

13   Q    So I'm only talking about people you oversaw whether

14        they're certified or not.

15   A    No.  And I did not oversee in a managerial manner as

16        you're implying that were loan officers either.  They

17        worked for GMAC Mortgage.

18   Q    All right.  Because I thought I had a Response from

19        GMAC indicating you oversaw loan officers.

20              MR. BARBAG: Its been indicated to me

21        that we have less than five minutes left on the tape.

22        We're going to take a break now.

23              THE VIDEOGRAPHER: The time is now

24        approximately 1:26 p.m., this marks the end of Tape

25        Number Two.  We are off the record.

                                                      102

1              (Lunch recess taken from

2          1:26 p.m. to 2:06 p.m.)

3    //

4              THE VIDEOGRAPHER: We are on the record.

5    The time now is approximately 2:06 p.m., starts the

6    beginning of Tape Number Three.

7    //

8    Q    (by Mr. Barbag) Okay, Mr. Robertson, we're back on the

9         record, we're back from lunch.  You understand you're

10        still under oath.  Right?

11   A    Yes.

12   Q    And everything else that was set forward earlier this

13        morning as far as giving verbal answers, that still

14        applies.

15   A    Yes.

16   Q    Now, at recess I believe we were discussing your

17        oversight of loan officers in California.  I'm going

18        to present to you a document that was provided to us

19        from GMAC in response to our questions today.  It's a

20        five-page document and it has a Proof of Service dated

21        November 30, 2011, from GMAC's office in response to

22        Special Interrogatories, Set One, and I'm going to

23        direct your attention specifically to page 7 which

24        responds to Special Interrogatory No. 8.  And I'm

25        going to direct you to read lines 1 through 9 to

                                                  103

1    yourself.  Now, this is the only copy that I have so

2    I'm going to ask you not to write on it.  We're going

3    to make this as Exhibit "12" and we'll give it to the

4    Reporter before we leave.  I'm going to hand it to you

5    and you can have your counsel look at it.  (Handing)

6              MR. LIU: I'm sorry what are we looking

7    at again?

8              MR. BARBAG: We're looking at Special

9    Interrogatory No. 8 and the Response thereto.

10             MR. LIU: I'll just state my objection

11   then.  Obviously this is a discovery Request to GMAC

12   Mortgage and responded to by GMAC Mortgage and not

13   Mr. Robertson.

14             MR. BARBAG: Okay.

15             MR. LIU: With that, he can answer.

16             MR. BARBAG: Sure.

17   //

18   A    Okay.

19   Q    (by Mr. Barbag) All right.  Do you agree with that

20        description of your duties?

21   A    With the description of my duties, yes.

22   Q    Okay.

23   A    The time frame, no.

24   Q    Okay.  What part of the time frame do you disagree

25        with?

                                                    104

1  A    You are saying or somebody's saying in here that, what

2       was it, in 2008 -- let's see, I've got to find it

3       again.

4  Q    We're only talking about Special Interrogatory No. 8.

5  A    Oh, I was reading 5, excuse me.  My apologies.

6  Q    That's fine.  Let's try this again.

7            With regard to Special Interrogatory No. 8 and

8       the Response thereto, if you could read that again to

9       yourself and when you're done let me know.

10  A    Okay.

11  Q    So would you agree with this description of your

12       duties?

13  A    It's pretty close.

14  Q    Would you change it?

15  A    Would I change it?

16  Q    Because you said "It's pretty close," I just want to

17       make sure.

18  A    For general purposes this is fine.

19  Q    So there's nothing incorrect they've written?

20  A    No.

21            MR. LIU: So we're going to mark this as

22       Exhibit "12"?

23            MR. BARBAG: As Exhibit "12," yes.

24       And I'll hand this to the Reporter to be marked

25       as "12."

                                                    105

1                       (Exhibit No. "12" marked for

2                       identification by Reporter.)

3  //

4  Q   (by Mr. Barbag) So in that description of your duties

5      you indicated that you had oversight of certified loan

6      officers.

7  A   Right.

8  Q   And what does that mean to you when it says oversight?

9  A   That they would prepare a package based on the

10     training that they would have received from me or

11     another sales manager, they would present a package,

12     we would review it for quality control purposes, for

13     completion and then make the determination whether or

14     not the project was going to be acceptable or not.

15  Q   I see.  So a loan officer would present a potential

16     loan to you ...

17  A   No, sir.

18  Q   Well, you said "package," I'm not sure what you're

19     talking about.

20  A   Do you understand the process?

21  Q   Maybe you can explain.

22  A   Do you have an hour?

23  Q   I don't.

24  A   I did not do loans.  PERIOD.  Had nothing to do with

25     loans.  The only thing that I was responsible for was

                                                             106

1    the construction project.  The credit approvals, the

2    borrower, all of the borrower credit package,

3    financial information, all the rest of that was

4    handled by the GMAC Mortgage Underwriting Department

5    and Loan Officers.  So the Construction Department had

6    nothing to do with the loan.

7  Q    So your oversight of the loan officers entailed what?

8  A    The construction project and making sure that if they

9    did do a credit application package with the intent of

10    doing a construction loan that the project met the

11    policies and criteria as required by GMAC.

12  Q    And how many loan officers in California would present

13    packages to you while you worked for GMAC?

14  A    None.

15  Q    None?

16  A    None.

17  Q    How many loan officers would present packages to you

18    while you worked with GMAC whether or not they were in

19    California?

20  A    Probably 25 to 40 at the most.

21  Q    Since there were about 25 or 26 loans in California

22    relating to construction, were you overseeing the loan

23    officers that issued those loans?

24  A    No.

25  Q    You didn't.

107

1    A    No.

2    Q    Who was overseeing them?

3    A    When a construction loan closes Loan Officer's paid

4         and they're out of the picture.  Okay.  The

5         Construction Department then oversees the project.  So

6         the Loan Officer is not involved.

7    Q    Okay. So during your tenure with GMAC no loans were

8         originated in California?

9    A    Correct.  Well, excuse me.  There was no -- there was

10        loans closed during my tenure at GMAC, but I was not

11        the representative for the California market.

12   Q    I see.

13   A    Does that make sense, I mean do you understand how

14        that worked?

15   Q    Well, I understand that your district was part of

16        Northern California.  Is that right?

17   A    Correct.

18   Q    So was that just in case loans that occurred in that

19        area?

20   A    Correct.  Well, I mean when I took over the Northern

21        California marketplace, okay, I believe that was in

22        like late June/early July, in August is when they shut

23        down residential -- GM Mortgage residential shop.  You

24        don't have loan officers, you're not going to

25        originate loans.

108

1    Q    And your duties then were in Northern California

2         seeing those construction loans through until they

3         were finalized?

4    A    Seeing the construction projects through is correct.

5    Q    And you already described that meant site inspectors

6         and making sure draws were issued properly and going

7         over the line items.

8    A    Correct.

9    Q    How often would loan officers receive training?

10              MR. LIU: Objection, it's outside the

11        scope of his Motion to Quash.  But I mean if you have

12        a followup question related to the Zygelman loan.

13              MR. BARBAG: Sure.  You're objecting,

14        are you going to --

15              MR. LIU: (Interposing) I'll instruct

16        him not to answer.

17    //

18    Q    (by Mr. Barbag) Now, with regard processing monthly

19        construction draws, can you describe that process to

20        me?

21    A    There's two processes that we encountered.  The first

22        one was that the original loans were set up to qualify

23        for monthly draws meaning that each month an

24        inspection would be performed on the subject property,

25        a determination would be made by the inspector of the

                                                    109

1    completion of the work and they would then fill out

2    the line items letting us know what percentage of the

3    line item or what portion of the project could be paid

4    for during that particular draw cycle.

5  Q    Right.

6  A    The inspector -- well, so the customer or the

7    contractor would fill out a Draw Request form and

8    either fax it or mail that to Fort Washington for

9    processing.  I would then or my counterparts would

10   then validate the inspection, meaning that the

11   inspector's saying that there's $5,000 that can be

12   drawn out of a particular line item but we may have

13   already paid out $2500 on that line item, so that the

14   client would only get 2500.  And so you go through

15   that validation process.  Then I would send an e-mail

16   to the contractor and/or the borrower explaining that

17   this is what the project is qualified to be able to be

18   disbursed this month; if you agree, sign a Lien Waiver

19   form, let me know and we'll go ahead and disburse the

20   funds.  That was the typical standard way of doing it.

21        When the economy collapsed GMAC took the position

22   that: You know what, a lot of people are getting hurt,

23   so let's make this a little bit easier so you're not

24   going to have to wait a month for each draw cycle and

25   we will go ahead -- because the customer had to pay

                                                    110

1    for the draws, draw inspections.  So we went ahead and

2    said: You know what, we're going to set it up on an

3    every two week basis, we're going to automatically

4    have the inspector go out to the job site whether or

5    not the customer wants or needs the draw.  Now that's

6    going to serve a couple purposes: One is it's going to

7    let us know if work is continuing; and, Two, it takes

8    a lot of pressure off the borrower and the contractor

9    because they know that they've got the opportunity to

10   receive funds every two weeks if work is being

11   completed.  But it also gave me some -- gave us as

12   Risk people some oversight which meant we weren't

13   necessarily going to have to be going out into the

14   field doing progress inspections because we've got an

15   inspector out there every two weeks.  Okay.  That was

16   instituted by policy by Rick Smith and Tom Webster I

17   believe it was somewhere in that August of 2008

18   period, might have been, it could have been then

19   September but that's when we started our two a month

20   inspections.  Customer didn't have to take the money

21   on a two week basis, but it gave them options.

22  Q   So prior to this institution of what I'm going to call

23      the second plan, the every two weeks an inspector

24      going out, progress inspections were done.

25  A   Correct.  By request, by a draw request.

                                                        111

1    Q    I see.  What would cause a progress inspection to be

2         done if there was a draw request because not all the

3         time you would do a progress inspection, would you?

4    A    Absolutely.  Anytime there's a draw request there's an

5         inspection.  You're not going to pay out funds unless

6         you have verification that the work's been done.

7    Q    The only reason why I ask that is because you

8         indicated sometimes the inspector would say release

9         $5,000 on the line item, but you had already found out

10        2500 was paid.

11   A    Right.

12   Q    So how does that happen?

13   A    Oh, let's say for instance you've got $5,000 in tile,

14        okay, specialty item type of a thing.  In order to

15        place the order the supplier wants 50 percent deposit

16        or a 30 percent deposit.  Okay.  Typically the builder

17        or the customer would come and say "Gee, we need to

18        get paid for this because I can't order my tile unless

19        I have the deposit."  Our policy was that if the

20        supplier supplied us with an invoice, okay, we would

21        go ahead and pay up to 50 percent if that's what the

22        requirement was.  Okay.  But that draw check would be

23        paid directly to the supplier not to the builder or

24        the homeowner.  Okay.  It was a quality control checks

25        and balances.

                                                          112

1   Q    Okay.  Please correct me if I'm wrong, maybe I'm

2        misstating your testimony, it's not intentional if I

3        am.  But while you were working with GMAC you had

4        about 25 or 26 properties that you oversaw in

5        California.  Is that right?

6   A    Correct.

7   Q    And you inspected about six or seven.  Is that right?

8                    MR. LIU: Objection, misstates his

9        testimony as to whether he inspected the property or

10       not.

11  //

12  Q    (by Mr. Barbag) Oh, I'm sorry, I thought you said in

13       2008 that you inspected six or seven properties; is

14       that not correct?

15  A    I had site visits.

16  Q    Site visits.  I apologize.

17  A    It's not inspections.  Entirely different.

18  Q    Okay.  Right.  Because you're not certified as an

19       inspector --

20  A    (Interposing) Right.

21  Q    (Continuing) -- but you could visit the sites.

22  A    Right.

23  Q    I apologize.

24                   MR. LIU: And objection again, he didn't

25       visit the sites.

                                                      113

1      THE DEPONENT: My trip to California?

2      MR. LIU: Oh, that's what you're talking

3  about.  I'm sorry.

4  //

5  Q  (by Mr. Barbag) You also indicated that of those 25 or

6  26 properties five to six of them were jumbo loans.

7  Is that correct?

8  A  Correct.

9  Q  And when GMAC decided or couldn't -- I'm not making

10  any -- but decided jumbo loans were no longer going to

11  be done ...

12  A  Right.

13  Q  (Continuing) ... did you meet with any of those people

14  in person?

15  A  No.

16  Q  How did you contact them?

17  A  Typically through either a phone call or e-mail.

18  Q  Did you have to contact them more than one time?

19  A  There was a few of them that probably I talked to more

20  than once.

21  Q  About how many times?

22  A  (Interposing) I honestly don't know.  In course of

23  business, you know, you call someone.  Do you remember

24  every single phone call?  You know you guys do because

25  you fill out in 15 minute increments for a 6-minute

114

1      phone call.

2  Q   My contracts are a little different, but that's not up

3      for debate here today.

4          So one to three phone calls you would say about.

5  A   Yes.

6  Q   You mentioned earlier Mark Taylor, I believe, he was

7      the person actually constructing this site.  Is that

8      correct?

9  A   Correct.

10 Q   And you corresponded with him through e-mails.  Is

11     that right?

12 A   With Mr. Taylor it was through e-mails and he would

13     then call Fort Washington because he did not agree

14     with our draw policies.

15 Q   Did you ever have any discussions with Hayomyom or

16     Steve Zipp?

17 A   No.

18 Q   No conversations?

19 A   None.  Well, not that I can verify.

20              MR. LIU: I'll object.

21          Do you understand the question?

22              THE DEPONENT: Did I have any

23     conversations.  No, that I can ...

24 //

25 Q   (by Mr. Barbag) Before this lawsuit had you ever heard

                                                    115

1       of the company named Hayomyom?

2  A    Yes.

3  Q    And when did you first hear?

4  A    Probably the latter part of June or the beginning part

5       of June 2009 possibly and that was only after -- yeah,

6       probably June.  I know it's June, but I can't be

7       specific about the date.

8  Q    Okay.  And under what circumstances did you hear about

9       Hayomyom?

10  A    Mr. Zygelman presented me a facsimile copy of the

11       Purchase and Sale Agreement that had Hayomyom on the

12       document.

13  Q    Are you familiar with the property located at

14       6225 Gobernadores -- I'll spell that,

15       G-O-B-E-R-N-A-D-O-R-E-S -- Lane in Carmichael,

16       California?

17  A    According to all the documents here that's the subject

18       property.

19  Q    Okay.  And when did you first become acquainted with

20       that property?

21  A    I'm sorry?

22  Q    When did you first become acquainted with that

23       property?

24  A    Can you define "become acquainted"?

25  Q    Sure.  When did you first learn about the property's

116

1       existence?

2   A   Oh.  Probably that would have been probably June,

3       latter part of June 2008.

4   Q   And you found out about the property through Zygelman?

5   A   No.

6   Q   How did you find out about it?

7   A   I was -- the California representative left the

8       company and so the state was cut in half and I was

9       assigned the accounts from Fresno north.

10   Q   And so your review of the files that you were

11       overtaking you found out about it.

12   A   Yes.

13   Q   And when you were reviewing the files you discovered

14       that GMAC's interest was in that property.  Right?

15   A   I'm not sure what ...

16   Q   How much they had loaned?

17   A   Okay.  Yes.

18   Q   Were you ever introduced to Steve Zipp?

19   A   No.

20   Q   Did you ever become aware that the subject property

21       was to be sold to Hayomyom?

22   A   Based upon a facsimile Purchase and Sale Agreement

23       that was supplied to me by Mr. Zygelman.

24   Q   And that was around June 2009.  Is that right?

25   A   I believe so.  I may be off on the dates on that.

117

1   Q   And Zygelman was the seller of the property?

2   A   Based upon the facsimile copy that Zygelman presented

3       to me he represented as his sale, yes.

4   Q   If you know, was there going to be any financing of

5       that property?

6   A   According to the facsimile copy of the Purchase and

7       Sale Agreement there was a call for financing in the

8       purchase which created a red flag for me.

9   Q   Okay.  Why did that create a red flag?

10  A   Because you can't finance an LLC.

11  Q   And you were under the impression that Hayomyom was an

12      LLC?

13  A   It said right on the Purchase and Sale Agreement,

14      Hayomyom LLC.

15  Q   And how come LLC's are not --

16  A   (Interposing) LLC's are not living entities.

17                  MR. LIU: Let him finish his question.

18                  THE DEPONENT: Yeah, I'm sorry.

19                  MR. BARBAG: You got the answer out,

20      that's fine.

21  //

22  Q   (by Mr. Barbag) Who was supposed to finance that

23      subject property, if you know?

24  A   I have no idea.

25  Q   Do you know what the terms of the financing was

                                                        118

1        supposed to be?

2   A    No.

3   Q    Do you know if that financing ever took place?

4   A    No.

5   Q    I asked that question pretty bad.  You said "No," so

6        that could mean either you don't know or you know it

7        wasn't taking place.

8   A    I don't know.

9   Q    If it took place?

10  A    Let's start this one over, I want to make sure your

11       question is correct.

12  Q    Was any money ever financed on this property to

13       Hayomyom?

14  A    No.

15  Q    Do you know why?

16  A    No.

17  Q    When you worked for GMAC were you required to keep

18       track of your hours?

19  A    What do you mean keep track of my hours?

20  Q    Well, you brought out the fact that attorneys bill by

21       the hour.

22  A    (Interposing) Oh.  No.  No.  No, I was on the track

23       24/7.  You have to remember I had Hawaii which is

24       three hours behind me and dealing with Fort

25       Washington, Pennsylvania which is three hours ahead of

                                                    119

1    me, so I had a six hour time spread between Hawaii and

2    there.  I also have Alaska that's an hour behind us.

3    So I mean I'm dealing with three different time zones.

4    And so yeah.

5    Q    So there would be no documentation about what hours

6    you put in to each project?

7    A    No.

8    Q    And since you mentioned that you had no conversations

9    with Mr. Zipp I just want to make sure that it also

10    includes no e-mail and no facsimile or any

11    correspondence.

12    A    No correspondence at all.

13         Need some WD40 on this chair.

14    Q    If he remembers, Steve Zipp remembers a conversation

15    with you, he would be mistaken?

16    A    Absolutely.

17    Q    Other than the initial facsimile from Mr. Zygelman to

18    you regarding Steve Zipp did you have any

19    conversations about Hayomyom or Steve Zipp with anyone

20    else?

21    A    No.

22    Q    No?

23    A    No.

24    Q    Do you know if Mr. Zipp ever put money in an escrow

25    account for the subject property?

120

1   A    I have no direct knowledge of that although I have

2        seen based on documentation provided by Mr. Zygelman's

3        counsel a copy of an earnest -- essentially an earnest

4        money check for $37,500 was made out to Wilshire

5        Escrow.

6   Q    In 2009 did GMAC own the subject property?

7   A    Well, given that state of California is a Title 30

8        state, they hold the title.  Right?

9   Q    That's a yes.  Right?

10  A    Yes.

11  Q    Thank you.

12  A    Well, because it has to be clarified because here in

13       the state of Washington we're a lien theory state

14       where the lender does not own the title.  Okay.  Each

15       state is different.

16  Q    If you know, in 2009 how much money had GMAC loaned

17       out on that property?

18  A    I have no recollection.

19  Q    Do you know who was responsible for making the

20       decision to loan the funds?

21  A    I'm sorry?

22  Q    Do you know who was responsible for making the

23       decision to loan those funds?

24  A    You mean the credit?

25  Q    Yes.

                                                        121

1  A   I'm assuming that it was an underwriter for GMAC

2      Mortgage.

3  Q   And what about the draws, were the draws your

4      responsibility or someone else's?

5  A   Well, they were someone else's responsibility until I

6      came in to the picture after that individual left.

7  Q   And do you recall of the draws for that property how

8      much you had released?

9  A   I mean I imagine we could try and rebuild it, but I

10     honestly don't know.

11  Q   As a District Risk Manager in 2009 what was your

12     responsibility regarding the construction loan

13     outstanding on the subject property?

14  A   The construction loan, the responsibility I had was to

15     ensure that the draw -- excuse me, that the

16     inspections were done according to the way we had them

17     set up, and this is after we changed over to an every

18     two week automatic inspection, that the inspections

19     were validated and that the communication was sent to

20     the builder and the borrower letting them know that

21     they were eligible for "X" amount of dollars on that

22     particular draw.

23  Q   Did you have any responsibility making sure the draws

24     would ever be repaid?

25  A   I'm not sure I understand your question.  Draws be

122

1    repaid?  If I disburse a draw to a contractor, the

2    contractor's not going to repay the draw.

3  Q   I understand that.  But based on the inspection

4    reports that you received there is a belief that there

5    is something worth that you're releasing the draw for.

6    Right?

7  A   Were completed.

8  Q   And as a result you were expecting repayment on that

9    eventually.  Correct?

10 A   I'm not sure your question's making a lot of sense and

11   I apologize if I'm a little slow on this one, but if a

12   guy borrows 1.2 million dollars from me and I've drawn

13   out $9,000 on one month draw I'm assuming that that

14   $9,000 is going to get repaid over the amortized

15   portion of this takeout loan.  I mean it's the loan

16   that he borrowed and we're just holding those funds in

17   the escrow account, Construction Lending Department.

18 Q   In 2009 do you know what documents GMAC required for

19   approving a buyer on a property?

20 A   Again you're going to have to clarify your question.

21 Q   Okay.  In particular this property.

22 A   Okay.

23 Q   Do you know what kind of documents GMAC would require

24   from a potential buyer?

25 A   Okay.  Depends on what side of the fence you're

123

1       talking.  If you're asking me about a credit financial

2       package, no.  If you're asking me about a construction

3       project, yes.

4   Q   I see.  Do you know why Zygelman would have sent you

5       the Purchase and Sale Agreement regarding this

6       property?

7   A   Yes.  Zygelman knew that he was running out of

8       extensions.  He knew that he wanted to get the thing

9       closed, processed out, and by his own admission he

10      could not qualify for additional financing.  And he

11      had indicated to me that he was going to try and sell

12      the property.

13  Q   Okay.  And if he was trying to sell the property, that

14      would have allowed you confidence that you would get

15      the draws back?

16  A   I'm not getting draws back and you need to make sure

17      we clarify that because that's a misleading statement.

18  Q   Okay.

19  A   You have construction funds, in this case 1.19 million

20      dollars.  All right.  Those construction funds are set

21      aside into a construction lending account.  We draw

22      from that account and each month the customer pays

23      interest only on those funds that they have drawn,

24      interest only.  At the end when the loan converts they

25      start making their amortized payments thereby repaying

                                                       124

1    a portion of the principal back.  So to repay a draw

2    is not the proper context to put that in.

3  Q    I guess my question is: Do you know why Zygelman would

4    have felt he would have gotten more draw out of you if

5    he showed you a Purchase and Sale Agreement?

6  A    It wasn't more draw.  It was another extension.

7  Q    Extension.

8  A    And it was continued cooperation.  He was looking to

9    us to make sure that we went ahead and extended him

10    another time and he told me he was going to sell the

11    property.  Then when he told me he sold it, and I

12    asked for over a month and a half to get a copy of the

13    Purchase and Sale Agreement and never got it.  Then I

14    finally got a faxed copy of an incomplete Purchase and

15    Sale Agreement.

16  Q    And the Purchase and Sale Agreement that you

17    anticipated receiving, what about that would allow you

18    to give him the extension that he requested?

19  A    Validation and verification that we had a legitimate

20    transaction.

21  Q    Okay.  Before you left GMAC do you know how many

22    properties were left uncompleted that had construction

23    loans attached to them?

24  A    I have no idea.

25  Q    Do you know how many that you were supposed to oversee

                                                      125

1    that were left uncompleted?

2  A    I have -- I don't know.  I don't know.

3  Q    What would have happened if Mr. Zygelman was unable to

4    finish the construction on the subject property?

5  A    As far as I was concerned, as far as I know, he didn't

6    complete the construction.

7  Q    And I don't want to get into that.

8  A    No, I understand.  I understand.  But that's the way

9    it goes.

10  Q    So what is the normal procedure if that happens?

11  A    With GMAC I would turn it over to Legal for beginning

12    of the NOD process.

13  Q    And that's foreclosure?

14  A    Well, it's a Notice of Default.

15  Q    Okay.

16  A    So they would send out a breach letter and then it

17    would be up to the Legal Department and GMAC Bank to

18    make determinations on how to proceed.

19  Q    In your experience with GMAC would they often

20    foreclose in that kind of climate?

21  A    I can't answer that.  That's not my -- that was not my

22    venue.

23            MR. LIU: I object, it doesn't go to the

24    allegations in the Complaint and the Cross-Complaint

25    and as to the Motion to Quash.

126

1    Q    (by Mr. Barbag) Once the property is foreclosed on

2         doesn't the Bank typically take a loss on it?

3                        MR. LIU: Objection again, same

4         objection.  It's speculative, it's not relevant to the

5         Complaint, the Cross-Complaint and not to the Motion

6         to Quash.

7              Instruct you not to answer.

8    //

9    Q    (by Mr. Barbag) Would GMAC ever allow another company

10        to loan on the same construction project on which they

11        were loaning?

12                       MR. LIU: Objection, same objection.

13             Instruct not to answer.

14                       MR. BARBAG: Are you going to follow

15        your counsel's advice?

16                       THE DEPONENT: Absolutely follow

17        Counsel's advice.

18   //

19   Q    (by Mr. Barbag) Did you ever have any conversations

20        with Mr. Zygelman that his loan extension would only

21        be approved if he had a bonafide purchaser for the

22        property?

23   A    That was not the -- I had a conversation with

24        Zygelman, but that was not the gist of the

25        conversation.

                                                         127

1    Q    Okay.  Could you tell me the gist?

2    A    Sure.  I'll tell you exactly what it was.  Zygelman

3         called and said "I got a potential buyer on the house

4         and he wants some improvements done and can we load

5         those into the construction loan."  I said "No."  He

6         says "Well, what if the buyer wants to pay for those."

7         I said "Well, here's what happens and I'll take a

8         moment to explain.  You have a construction loan.

9         Lenders only lend on work that has been completed, in

10        place, you can't have it onsite, its got to be

11        installed completed and then it qualifies to be paid."

12   Q    Unless they get the tile for the 50 percent.

13   A    Unless you have an invoice for a special type of thing

14        that we agree to do.

15             Excuse me, I'm having one of my short brain farts

16        here.

17   Q    Take your time.

18   A    So if a buyer came in and said: You know what, I want

19        to improve or do these additional things that are

20        outside of the real estate contract, the real estate

21        loan -- or the Construction Loan Contract and the

22        Construction Loan Agreement; then as a lender what

23        we're going to want is we're going to say: Okay, if

24        that's what you guys want to do, I want the contractor

25        to provide me with cost breakdown line item for every

                                                        128

1    one of those improvements that that buyer says that

2    they want to have done and then we will have our

3    appraiser go out and take a look to see if those

4    improvements are going to increase the value, maintain

5    the value or decrease the value of the property.  If

6    everything's okay, then we say: Okay, we'll go ahead

7    and allow you to do that, however those funds that the

8    borrower would be putting up to pay for those

9    improvements would then have to be placed into a

10    separate construction lending account with the lender

11    and we would draw those funds out upon the required

12    inspections.  So that the Bank is always in control of

13    the funds.  You always spend the customer's funds

14    first, it's called protecting your security.

15    But that's an exception.  And as I stated earlier

16    with Mr. Zygelman's attorney, that I had limited

17    decision making authority only with inside of the

18    policy.  Anything that stepped outside of policy was

19    an exception that would have had to have been approved

20    by someone else at GMAC Bank, at a minimum level Rick

21    Smith.

22  Q    I see.

23  A    Okay.  So there's a system in play.

24  Q    Do you know if Rick Smith ever approved that on this

25    project?

129

1   A   Not that I'm -- yeah, not when I was involved in it.

2       No one ever knew about it.

3   Q   The conversation that you had with Mr. Zygelman about

4       this issue, did that get commemorated in an e-mail or

5       it was just telephonic?

6   A   It was telephonic.

7   Q   With regard to your position as District Risk Manager

8       who trained you for that?

9   A   Well, without being facetious, 33 years of doing

10      construction lending has a little bit of training

11      background to it.  You know a lot of mediation work,

12      resolution dispute settlements, those kind of things.

13  Q   Did you ever have to do Continuing Education on it?

14  A   Not that I was supposed to, but voluntarily I did do

15      my own seminars and what have you.

16  Q   How many times while you were at GMAC did you go to a

17      seminar for that?

18  A   While I was at GMAC?  That was of my own volition?

19      None.

20  Q   How about not of your own volition?

21  A   We may have had two or three meetings type of thing

22      where construction techniques and technologies and

23      product lines and what have you were discussed.

24  Q   And where did those take place?

25  A   Generally either on conference call or in Fort

                                                        130

1       Washington.

2    Q   And if it was on a conference call you were in

3        Everett, Washington while that call was made or where

4        were you located?

5    A   I don't know.  You know honestly I could have been in

6        Montana, I could have been in Oregon, I could have

7        been in ...

8    Q   California?

9    A   No.  No, I was only in California one time on site

10       inspections and I didn't have any phone calls.

11   Q   What about this Construction Lending Manual, did you

12       ever utilize that in your capacity?

13   A   Yes.

14   Q   Do you still have a copy of that manual?

15   A   I have nothing from my employment with GMAC.

16   Q   Do you know who would have a copy of that?

17   A   I have no idea.

18   Q   And with the Purchase and Sale Agreement that you

19       received from Zygelman did you send that off to anyone

20       else?

21   A   Oh, yeah, everything gets sent back to Fort

22       Washington.

23   Q   Would Mr. Webster or Mr. Smith also have reviewed

24       that?

25   A   I don't know.

                                                            131

1   Q   Do you know who in Fort Washington may have reviewed

2       that?

3   A   No.  Because there's so many people back there.

4   Q   There wasn't any one person that you dealt with for a

5       particular state?

6   A   No.

7   Q   If I wanted to find out who dealt with that, do you

8       know who I should ask?

9   A   I'm sorry?

10  Q   Who I should ask might have dealt with it?

11  A   I haven't been at GMAC in three years, I don't know

12      anything in that regard.

13  Q   And before this lawsuit you didn't know that Mr. Zipp

14      or Hayomyom had provided funds to Mr. Zygelman for the

15      subject property.  Is that correct?

16  A   That's absolutely correct.  Well, excuse me.  Excuse

17      me.  Before the lawsuit?  No.  No.  Before the

18      lawsuit, no.  Since then you guys sent me documents

19      that referenced it.

20  Q   In addition to the Purchase and Sale Agreement do you

21      remember receiving any documents from Wilshire Escrow?

22  A   None.

23  Q   Do you remember having any conversations with anyone

24      from --

25  A   (Interposing) Yes.

                                                            132

1  Q     (Continuing) -- Wilshire?

2                    MR. LIU: Again, please wait until he is

3        finished.

4                    THE DEPONENT: I'm sorry.

5  //

6  Q     (by Mr. Barbag) About how many conversations?

7  A     One.

8  Q     And with who?

9  A     I have no idea.

10 Q     Was it commemorated by e-mail?

11 A     No.

12 Q     What was the conversation about?

13 A     Do we have a legitimate purchase and sale, and I was

14       informed by Wilshire Escrow that the deal that I was

15       calling on had died a couple weeks earlier.

16 Q     Do you recall when you made that call?

17 A     It was about the day -- I think it was probably the

18       day after I received the facsimile Purchase and Sale

19       Agreement from Zygelman, it's part of my diligence,

20       it's my job to validate.

21 Q     You never told Mr. Zipp that GMAC would directly

22       reimburse the funds they --

23 A     (Interposing) Absolutely --

24 Q     (Continuing) -- had released?

25 A     Absolutely not.

133

1          MR. LIU: I'm sorry, there was an

2     interruption.  Do you want to ask that again because

3     he might have cut off.

4          MR. BARBAG: That's fine.

5  //

6  Q    (by Mr. Barbag) You never told Mr. Zipp that GMAC

7     would reimburse him for the funds he released to

8     Mr. Zygelman?

9  A    Absolutely not.

10 Q    Do you know why Mr. Zipp would have released these

11    kind of funds without the protection of GMAC?

12 A    Having never met Mr. Zipp, having never had any

13    conversations with Mr. Zipp, having no disclosures of

14    who Mr. Zipp is, I have no idea.

15 Q    Do you think it's a smart business decision to release

16    those kind of funds without some sort of promise?

17 A    That's an opinion that, you know, smart business

18    decision without getting -- without taking the

19    security and the diligence that a lender would

20    require, yeah it was a stupid decision.

21 Q    So you wouldn't release the funds if you were in his

22    position?

23 A    Absolutely not, unless I had something in writing with

24    agreements from the lender who has the first lien

25    because if I give money to someone in that situation

                                              134

1      and I'm getting behind a construction loan, my

2      goodness gracious then I'm basically putting myself

3      into a jeopardized second lien position.  So, yeah, if

4      I'm going to give someone $30,000 I'm going to want to

5      make darn sure that my $30,000 is legally protected.

6  Q   Once you have approved a construction draw release, if

7      I'm saying that correctly, how long would it take to

8      get the funds in to a person who is going to receive

9      them?

10 A   It depends on the way that it was set up.  Some

11     customers would take a wire directly to their account.

12     Other customers would authorize the release to be

13     wired directly to the building account.  Other

14     customers would decide that they would want a dual

15     payee check made out to both them and the builder.  So

16     it really depends on the customer and the decisions

17     they make.

18 Q   And for this subject property in particular,

19     approximately what was the turnaround?

20 A   After -- turnaround time from when?

21 Q   Well, say from inspection.

22 A   Okay, from inspection it would generally take probably

23     three days for me to get the inspection report after

24     that, another depending on workload let's say a

25     maximum of 24 hours for me to validate and then send

                                                          135

1    out the notification to the builder and the borrower

2    asking for the lien releases to be signed and sent

3    back to me or they could send them directly back to

4    Fort Washington.  So again, timing really varied based

5    upon the contractor and the borrower.

6  Q  Okay.  Once Fort Washington received the lien releases

7    how long would it take them in this particular

8    property to release those funds?

9  A  I don't know.  I don't have any recollection of how

10    long it took.  It was only a matter of a day or two or

11    three at the most.

12  Q  So two weeks would be an excessively long time?

13  A  Two weeks would not be the normal turnaround.

14  Q  Was there a release to Mr. Zygelman in about July

15    2009?

16  A  I'm sorry?

17  Q  Was there a release or draw --

18  A  (Interposing) A draw?

19  Q  (Continuing) -- to Mr. Zygelman in July 2009?

20  A  Yeah, that would have been his next to last, so yes

21    there was probably one in July.

22  Q  And the entire amount went to him?

23  A  Yeah.  I mean, yes, I can't recall of any invoices

24    that were being paid separately.

25  Q  Do you know what documents would show that

136

1    disbursement?

2  A    Well, Mr. Zygelman would have a copy of the

3    distribution sheet and a copy of the cancelled check

4    and a copy of the check receipt that goes along with

5    every one of them.  Where GMAC has it I don't know.

6  Q    And GMAC never issued any funds to Mr. Zipp or

7    Hayomyom.  Is that correct?

8  A    Not that I'm aware of.

9  Q    Did Mr. Zipp ever call you directly?

10 A    No.

11 Q    Not even in August 2009?

12 A    Not even in August 2009.

13 Q    Do you know why GMAC did not foreclose on the subject

14    property?

15        MR. LIU: Objection, irrelevant, outside

16    the scope of the Complaint, Cross-Complaint and Motion

17    to Quash.

18      Instruct him not to answer.

19        MR. BARBAG: I presume you're going to

20    follow the advice?

21        THE DEPONENT: Of my attorney.

22        MR. BARBAG: I think we are going to

23    have to share.  I believe we're up to Exhibit No. "13"

24    at this point.

25 //

137

1                              (Exhibit No. "13" marked for

2                              identification by Reporter.)

3    //

4    Q    (by Mr. Barbag) I'm going to show your counsel and

5        then when he's done with it I'll ask him to pass it to

6        you, it's an e-mail dated July 1st, 2009, and it's

7        from you to a person named Sigmund.  And I'll ask you

8        to read it to yourself.  I'm only addressing that top

9        e-mail, nothing else on that page.

10   A    Okay.

11   Q    Okay.  Now, I just want to clarify.  Is Sigmund also

12       known as Mr. Zygelman?

13   A    Mr. Zygelman, correct.

14   Q    I just wanted that clarified.  And the first sentence

15       refers to a "buyers loan approval."  Do you see that?

16   A    Yes.

17   Q    Who was the buyer to which the loan approval referred?

18   A    I am not a hundred percent certain.  Mr. Zygelman and

19       Mr. Mesika had sent me a number of different documents

20       and they could not validate, and if I can't validate I

21       don't accept them.  This case, the July, we were going

22       up to the last extension.  Zygelman had paid for an

23       extension, okay, the Bank decided he was going to pay

24       for that last extension.  He was in agitated state

25       because he knew he was running out of time.  And I

                                            138

1    said "You get me a Purchase and Sale Agreement that I

2    can validate, okay, and I will go ahead and process

3    the one more last extension." So it was really he

4    knew that if he didn't have a sale he wasn't going to

5    get an extension. Okay. "Jacob" is Jacob Mesika.

6    And since I received those documents I started the

7    extension paperwork and that last one we didn't charge

8    him with the additional, I could have hit him for

9    another $4800 for the last 30 day extension but we

10    didn't do that. So, yeah, I'm not a hundred percent

11    certain because I don't have any documents, I don't

12    recall.

13  Q    I'm sorry to interrupt you, I don't want to interrupt

14      the rest of your answer.

15  A    No, that's fine, I'm done.

16  Q    Okay. Were there multiple potential buyers on this

17      property?

18  A    I believe there was three instances where Mr. Zygelman

19      said he had a sale.

20  Q    Okay.

21  A    But that went from December or January of 2008/2009 to

22      September of 2009.

23  Q    And each of those three --

24  A    (Interposing) None of them could validate.

25  Q    Couldn't validate. Except for this last one which

139

1        that's why the extension paperwork began.

2    A    (Interposing) Right.

3    Q    Would it be fair to say that the buyer was Hayomyom?

4    A    I -- it's possible, but I can't guarantee that without

5        seeing documents.

6    Q    Now, you mentioned validating the documents and I'm

7        not sure what you mean by that.

8    A    Well, validating documents is usually in a real estate

9        purchase transaction.  You open up an escrow and the

10        escrow company then orders a Preliminary Title Report

11        and then there are preliminary -- what are called

12        Preliminary HUD One Settlement Statements that are

13        prepared, there is information on the lender or how

14        the thing is being financed.  So I could call the

15        title company and ask if a Preliminary Title Report

16        has been ordered, has one been issued, I can call the

17        escrow company, have them verify that they have escrow

18        funds on account, that yes they have an escrow

19        established for the persons that are supposed to be

20        named.  If they say no and I can't validate it, I'm

21        not accepting it.

22    Q    Going back to this Exhibit "13," who did you receive

23        confirmation of the buyer's loan approval from?

24    A    It was a fax -- well, I'm getting all my -- everything

25        was done through fax so I'm not -- if it's -- you know

                                                140

1        what, I honestly can't recall the specifics, I'm

2        sorry.

3   Q   That's fine.  That's a valid answer.  I'm going to see

4        if I can maybe jog your memory.  Do you know who might

5        have given you that approval?

6   A   Well, it would have come from Zygelman.  No, excuse

7        me.  Zygelman and/or Mesika, okay, because Mesika was

8        the primary contact for Mr. Zygelman.

9   Q   And that's who you would have received confirmation on

10       the buyer loan approval?

11  A   Well, no, no.  The confirmation would have come from

12       -- and I don't even know if there's a loan approval to

13       be honest with you, it could have been a cash sale and

14       someone provide bank statements to show that they've

15       got enough cash to cover the sale.  Yeah, so I mean --

16       I understand, I understand.  But I honestly -- show me

17       the documents that will help me refresh my memory.

18  Q   Which document would we look at?

19  A   Well, whatever, receive confirmation about his loan

20       approval?

21  Q   Yes.

22  A   Okay.  If I had that, but I ...

23  Q   So if we showed you the confirmation ...

24  A   That may help me with jogging the memory.

25  Q   Do you know who would have that confirmation?

141

1  A    I would imagine Mr. Zygelman.

2  Q    I see.  All right.  Do you know if anyone in GMAC

3       would have had a copy of that loan approval or

4       confirmation of buyer's loan approval?

5  A    As I mentioned before, everything gets forwarded back

6       to Fort Washington so someone back there would have

7       received it.

8  Q    I am going to show you another document that we're

9       going to mark as Exhibit "14" and I'd just like you to

10      take a look at it.   (Handing)  And your counsel to

11      look at it as well of course.  And I just want to know

12      have you ever seen this document?

13                              (Exhibit No. "14" marked for

14                              identification by Reporter.)

15 //

16                THE DEPONENT: (to Mr. Liu) Is this

17      Zygelman's bank statement?  There was a bank statement

18      but I'm not sure if this is the same one.

19 //

20 A    I don't know.

21 Q    (by Mr. Barbag) I didn't mean to eavesdrop, but you

22      talked to your counsel a little bit, I think I

23      overheard that there was a bank statement in

24      Zygelman's package of loan documents.

25 A    No.  You didn't hear that.

                                                        142

1    Q    Okay.  That's why I wanted to ask.

2    A    No.  It was in Mr. Zygelman's Responses to Ally Bank.

3    Q    Okay.  So other than those Responses you haven't seen

4         this?

5    A    Not that I recall.

6    Q    And you wouldn't have asked for a copy of this.  Is

7         that correct?

8    A    What do you mean I wouldn't have asked for a copy?

9    Q    For a copy of his bank statement?

10   A    I wouldn't because this was he's saying he had

11        $466,000 and it wasn't enough to validate what we

12        would assume is going to be a sales price of at least

13        equal to the loan amount.  So, and that wouldn't have

14        been enough.

15   Q    Oh, it wouldn't have been enough, but --

16   A    (Interposing) But it wouldn't have been enough to

17        confirm.

18   Q    Right.  Definitely I understand that it wouldn't have

19        been enough to confirm, but someone may have presented

20        to you thinking it might have been sufficient

21        documentation.

22   A    I can't speculate on what someone would think.

23   Q    Has that happened in the past where people have given

24        you bank statements?

25                  MR. LIU: Objection, vague.

                                                      143

1          Do you understand the question?

2                    THE DEPONENT: Well, I'm not sure.

3     //

4   A    You know give me bank statements for what?

5   Q    (by Mr. Barbag) Well, for something similar to what

6        Mr. Zygelman was attempting.

7   A    While at GMAC, no.  No.

8   Q    While at GMAC did you receive bank statements from

9        potential purchasers at all?

10  A    Again I did not deal with the credit side of the

11       thing.

12  Q    I'm going to show you what we'll mark as Exhibit "15,"

13       I'm going to show your counsel first and then when he

14       has a moment he'll pass it to you.  It's a letter from

15       Bank of the West dated June 29, 2009 from the Vice

16       President.  I will let you have a moment.

17                          (Exhibit "15" marked for

18                              identification by Reporter.)

19  //

20  A    Okay.  This is -- I have seen this.

21  Q    (by Mr. Barbag) Okay.

22  A    And this was in the package that I received from

23       Mr. Zygelman and his attorney.

24  Q    So outside of what you received from Mr. Zygelman and

25       his attorney had you ever seen this document?

                                                      144

1    A    I had not seen this one, not until then.

2    Q    I see.

3    A    Or I can't recall and I think I would have recalled

4         because I notice this was addressed to Kim Pacini,

5         Lyons Realty.

6    Q    Correct.

7    A    So it wasn't addressed to me and I don't know where it

8         would have come from.

9    Q    I'm going to have marked as Exhibit "16" a Residential

10        Purchase Agreement and Joint Escrow Instructions, it's

11        a 10 page document.  I'm going to present it to your

12        attorney and when he has a moment after reviewing it

13        I'll ask him to pass it to you for review.

14                              (Exhibit No. "16" marked for

15                               identification by Reporter.)

16   //

17   A    Okay.

18   Q    (by Mr. Barbag) Now, you had referred to a faxed

19        Purchase and Sale Agreement by Mr. Zygelman and I'm

20        wondering if this is that Purchase and Sale Agreement?

21   A    (Interposing) I believe so.

22   Q    Okay.  And was it presented to you the same day?  I

23        see here there's a date at the top.

24   A    (Interposing) No.  No.

25   Q    Do you know approximately when it was presented?

                                                         145

1    A     It was sometime around June 29th, I believe the last

2           day or two in June because I had -- because, okay.

3           Something refreshed memory.  Zygelman called, said

4           that he had a potential buyer and I said "Then send me

5           a copy of the Purchase and Sale Agreement and the

6           information we need."  And I had to ask two or three

7           times for that -- that should also be in his e-mails

8           -- that we never got a response to until the end of

9           June.

10    Q     Okay.  So your recollection is approximately

11           June 29th, somewhere around there?

12    A     Somewhere around there, yes.

13    Q     I'm going to present to your attorney and have marked

14           as Exhibit "17" and ask that your attorney review,

15           pass it on to you, a document labeled Addendum to

16           Purchase Agreement Dated June 7, 2009.

17                             (Exhibit No. "17" marked for

18                               identification by Reporter.)

19    //

20    A     Okay.  I have seen this.  This was never transmitted

21           to GMAC.

22    Q     (by Mr. Barbag) So this was not attached to the --

23    A     (Interposing) No.

24    Q     (Continuing) -- Residential Purchase Agreement,

25           Exhibit "16"?

                                                      146

1   A      Correct.

2                  MR. KOEHLER: When you say "Correct" you

3       mean no it was not?

4                  THE DEPONENT: No, it was not.

5   //

6   Q      (by Mr. Barbag) So the first time you saw this

7       document was when?

8   A      When I received Mr. Zygelman's Responses.

9              And --

10                 MR. KOEHLER: There's no question

11      pending.

12  //

13  Q      (by Mr. Barbag) Oh, no, please, feel free.  What were

14      you going to say?

15                 MR. LIU: No, there's no question

16      pending.

17  //

18  Q      (by Mr. Barbag) I guess my question is: What were you

19      going to say?

20                 MR. LIU: (to the Deponent) Don't.

21      We'll just let it go.

22  //

23  Q      (by Mr. Barbag) I'm going to have marked as

24      Exhibit "18," and present to your attorney and ask him

25      to present it to you after review, an e-mail dated

                                                        147

1    June 8, 2009, from you to Sigmund who we've

2    established is Mr. Zygelman.   And I apologize for the

3    quality that you have, it may be tough to read.   I'm

4    addressing both on that page, it's BATE STAMPED

5    000160.

6                              (Exhibit No. "18" marked for

7                               identification by Reporter.)

8  //

9  A    Okay.

10  Q    (by Mr. Barbag) So the bottom of that page is an

11    e-mail from Sigmund, Mr. Zygelman, to you indicating

12    that $30,000 was released from the buyer.   Is that

13    correct?

14  A    That's what it says.

15  Q    And at that time, unless you have other information

16    Hayomyom was the buyer.

17  A    Well, at that point in time on June 8th I have no

18    recollection because we didn't have a copy of the

19    Purchase and Sale Agreement, so I didn't know who the

20    buyer was.

21  Q    I understand.   And based on Exhibit "16" where it says

22    Hayomyom LLC and that's the Purchase and Sale

23    Agreement dated June 7, 2009, that would put this

24    e-mail in context on Exhibit "18" that Hayomyom was

25    that buyer.   Is that right?

                                                      148

1   A    If you say so.

2   Q    Now, from the e-mail that you sent to Mr. Zygelman on

3        that same date, June 8, 2009, you indicate that a copy

4        of the Purchase and Sale Agreement with contact

5        information for the escrow company would help

6        facilitate the final draw of construction funds.  Was

7        that accurate?

8   A    Certainly.  Because I could then do my validation.

9        But up to that point I don't know if I've got a

10       legitimate buyer, I don't have an escrow, I don't have

11       title, I don't have anything.

12  Q    So in addition to an extension the draw was also

13       contingent upon a potential buyer?

14  A    No, you're able to draw if you're still within your

15       construction term.

16  Q    I guess I'm confused with the terminology in the

17       e-mail then because it says a Purchase and Sale

18       Agreement with contact information of the escrow

19       company would help facilitate a final draw down.  How

20       would that help facilitate?

21  A    (Interposing) Well, because we now have -- if I know

22       that I have a legitimate Purchase and Sale Agreement,

23       okay, and I know that I'm going to need to extend it,

24       okay, by having the validated information it makes the

25       extension go that much easier because all extensions

149

1    had to be approved by someone other than myself.

2    Okay.  So you bring me -- you're running out of time,

3    you bring me a Purchase and Sale Agreement and I'm

4    saying you'd send me an e-mail to say that "Oh, I've

5    sold the place" and I'm saying "Send me the

6    documentation so that it will help facilitate."

7    That's a common event in the real estate industry, not

8    just construction.

9  Q  And I understand that it would help facilitate the

10    extension, but why would it help to facilitate a draw?

11  A  Because that would allow him to get his last extension

12    and then we're allowing him to get a draw.  If he

13    expired, his construction term expired without an

14    extension, there's no draws.  He has a buyer and he's

15    telling me that he needs another 30 days to finish.

16    I'm saying: Send me something that I can validate so

17    we can get you an extension which will facilitate your

18    final draw.

19          MR. BARBAG: The Videographer has

20    indicated that we have five minute left, so now would

21    be a good time to take a break.

22          THE VIDEOGRAPHER: The time is now

23    approximately 3:24 p.m., this marks the end of Tape

24    Number Three, we are off the record.

25          (A brief recess was taken.)

150

1          THE VIDEOGRAPHER: We are on the record.

2     The time is now approximately 3:33 p.m. and this marks

3     the beginning of Tape Number Four.

4  //

5  Q   (by Mr. Barbag) Okay, we're back from our break and

6     again the same admonitions apply, still under oath.

7     We were discussing Exhibit "18" and it was an e-mail

8     of June 8, 2009.  And at the very bottom there's an

9     assertion from Mr. Zygelman that $30,000 was released

10    by the buyer.  Then up top you ask for a copy of the

11    Purchase and Sale Agreement.  Exhibit "16" indicates

12    the Purchase and Sale Agreement was dated June 7, 2009

13    but you recall receiving that document approximately

14    June 29, 2009.  Did Mr. Zygelman ever give you an

15    explanation for the delayed response?

16 A   (SHAKING HEAD)

17 Q   No.

18 A   No.

19 Q   Did you ask him for an explanation?

20 A   I inquired two or three times as to when I'm going to

21    get a copy of the Purchase and Sale Agreement and

22    never -- and quite frankly didn't get a response.

23 Q   You sent an e-mail asking?

24 A   Yes.  Well, let me back up on that because I asked --

25    I also inquired of Jacob Mesika, "Jacob, please make

                                                        151

1        sure Mr. Zygelman gets that to us because it's going

2        to affect your draws if you run out of time and don't

3        get another extension."

4  Q    And then Exhibit "17" which was the Addendum to

5        Purchase Agreement Dated June 7, 2009, indicates there

6        will be a release of $30,000 by the buyer, but you've

7        indicated you never received that.

8  A    Never received it.

9  Q    I'm going to direct your attention to 1A of that

10       document, Exhibit "17," where it says "Money will be

11       put back into escrow from the note holder/bank from

12       the first monies to be released for completion of work

13       on the home."  Did GMAC ever agree to that?

14  A    Absolutely not.

15  Q    Why not?

16  A    Because as I tried to explain earlier that if they --

17       in the conversations and everything -- if that was

18       what they were going to want to do, that was an

19       exception to their construction loan, they would have

20       to provide a full line item cost breakdown of all

21       those improvements and upgrades that were going to be

22       done.  That would then be validated then through a

23       re-certified appraisal to make sure that those moneys

24       that are being invested or not are not diminishing the

25       security for the Bank.  Then that would go to GMAC for

152

1   exception approvals which at that time then they would

2   have required that the funds be deposited into a GMAC

3   Construction Account to be drawn first.  There is no

4   way that GMAC Bank or any other construction lender

5   would just say: Oh, yeah, go right ahead and release

6   funds to a buyer and the bank's going to pay you back.

7   That's just -- I'm sorry, but I've been in this for 33

8   years and I've never heard of anything like that.

9 Q Was that ever explained to Mr. Zygelman or no?

10 A Absolutely.  And as a matter of fact it was explained

11   to Mr. Zygelman in a phone conversation with Jacob

12   Mesika, so it was Mr. Mesika and Mr. Zygelman.  And it

13   was Mesika who was asking most of the questions and

14   pushing for it.  Because I think I got the impression

15   that Mr. Zygelman really wasn't a hundred percent sure

16   of what they were doing.  And that could have been the

17   stress of his wife being in the hospital or what, so

18   it was a little bit of ...

19 Q Could you spell Mr. Mesika's name, if you know.

20 A It's Jacob Mesika, M-E-S-  I think it's  -I-C-A-K.

21   That's probably not right.

22 Q Okay.  I appreciate your attempt.  Thank you.

23   In your conversation with the escrow officer on

24   this subject property did that escrow officer ever

25   request from you a Certificate of Occupancy?

                  153

1  A   No.  Because when I called Wilshire Escrow to

2      validate, they told me that the deal was dead.  And

3      remember I didn't get this Purchase and Sale Agreement

4      till about the 29th.

5  Q   Okay.  So they didn't ask you about any clouds or

6      liens?

7  A   No.

8  Q   I'm going to have marked as Exhibit "19" an e-mail

9      dated August 17th, 2009, and I'm going to show it to

10     your attorney and I'll ask him to present it to you.

11     The copy on this is of poor quality.  If you have

12     trouble reading it, let me know.  I have a better copy

13     of it.  But I'd like you to review it and see if it

14     refreshes your recollection.

15           MR. LIU: Can we just stop for a second,

16     that's really hard to read.

17           MR. BARBAG: Sure.

18           MR. LIU: I think I have a copy of it.

19     I could show you to make sure that it's the same.

20           MR. BARBAG: Sure.  That's fair.  It's

21     BATE scanned 000150.

22       Don't strain your eyes, Mr. Robertson.  If you

23     can't find it, I'll get a clearer copy to you.

24       Let's go off the record for a moment.

25           THE VIDEOGRAPHER: The time is now

154

1    approximately 3:40 p.m., we are off the record.

2                        (Off the record.

3   //

4                        THE VIDEOGRAPHER: The time is now

5    approximately 3:43 p.m.

6   //

7                        (Exhibit No. "19" marked for

8                        identification by Reporter.)

9   //

10  Q    (by Mr. Barbag) Okay.  Now, Mr. Robertson, you've had

11       a moment to review this Exhibit "19," does it refresh

12       your recollection?

13  A    Well, not really, but I mean there's a fog there

14       because I note that the bottom on August 15th, which

15       is a Saturday, that states "Are you now trying to tell

16       me that there is no sale of the property?"  This is a

17       Saturday.

18  Q    Correct.

19  A    On the 17th apparently I did have a discussion with an

20       escrow officer and I honestly can't remember who it

21       was or what escrow company because everything was

22       being scrambled at that time because Mesika was

23       calling the Bank two or three times that day and Mark

24       Thomas was calling because we couldn't do the final

25       draw -- or do a final, a disbursal, of that $11,000

                                                    155

1    because the project wasn't completed.  And I think

2    that's -- I'm going to have to take a couple of

3    minutes here to try and recall just exactly, but I'm

4    sure that it was Zygelman probably either e-mailed me

5    or Jacob e-mailed me and gave me the name of the

6    escrow officer to call to validate, which it seems

7    kind of silly to me that a Preliminary Title Report

8    hadn't been ordered.  I mean again there was just so

9    many validations that weren't in place here.

10        So obviously I sent Mr. Zygelman an e-mail on the

11    17th as I sent him one on the 15th questioning as I

12    sent him one the week previous as: You don't have to

13    tell me you don't have a sale anymore because they

14    tell me you didn't have a sale.  This is after I had

15    talked to the escrow company and the real estate

16    agent, they said the deal died.  Then apparently

17    Zygelman had to have contacted me to give me the name

18    of an escrow officer to talk to.

19  Q   So there may have been more than one conversation with

20    an escrow?

21  A   Yeah, but I'm not sure who the escrow company would

22    have been.

23        Because again I think if you look through your

24    records you'll find that back in June there was a

25    disbursal -- there was a request from -- oh, there was

156

1       an e-mail from Wilshire Escrow to -- I'm not sure who

2       it was -- but basically saying: Well, you'll have to

3       get your money from Mr. Zygelman.  And that tells me

4       that there was a deal that died at that point in time.

5       So what happened is he may have had another -- I

6       honestly don't know.  So it got a little confusing at

7       the end there.

8    Q  So in June you thought you may have received an e-mail

9       from the escrow agent or maybe you had been cc'd on it

10      from the escrow agent about getting money from

11      Mr. Zygelman?

12   A  Yes.  And that's in Mr. Zygelman's response.

13   Q  Okay.  So in June you knew there was funds or you were

14      told that funds had been disbursed on this project by

15      Hayomyom through the escrow agent.

16   A  No.  No.  Well, not that they disbursed to anybody,

17      no.  What I have seen is a copy of a check made out to

18      Wilshire and then an e-mail from Wilshire telling

19      someone to go get the money from Zygelman.

20   Q  And you saw that --

21   A  (Interposing) When I got the statements here.

22   Q  I understand.

23   A  I'm sorry.

24   Q  I think we were both at fault on that one.

25           Do you know approximately how long it usually

                                                        157

1     takes an escrow company to release funds once they

2     have that permission to release it?

3  A   No.

4  Q   Do you know who Susan Young is?

5  A   Yes.

6  Q   And who is she?

7  A   She is or was kind of like the manager of the

8     processing staff in Fort Washington, Pennsylvania.

9  Q   Do you know if she worked in that capacity in 2009?

10  A   Yes.

11  Q   And in 2010 as well?

12  A   I don't know.

13  Q   Do you know if she ever had the title of Credit Risk

14     Manager?

15  A   Not when I was there.

16  Q   Do you know what her duties were in 2009?

17  A   Not -- I couldn't, I can't quote you what her duties

18     were, no.  She was the Manager and overseeing the

19     staff that worked back there.

20  Q   The staff for processing.  Is that right?

21  A   Yeah.  Like I had mentioned Patty Costello, Patty

22     answered to Sue.

23  Q   And they would process what in particular?

24  A   Well, anything that had to do with the construction

25     loan paperwork relative to once they got the release

158

1    or the okay from me or my counterparts I was okay to

2    go ahead and release a draw, then they would go ahead

3    and do all of the inputting and doing what they had to

4    do to ensure that the checks or the wires were taken

5    care of.  If there was a Title Date Down Endorsement

6    that needed to be done, they would call the title

7    company and get the Date Down Endorsements.  If there

8    was insurance lapsing, they would call the customer

9    and make sure the insurance didn't lapse or at least

10    premiums were paid or what have you.  So I mean a lot

11    of that kind of detail work.

12  Q    Do you know if she was attempting to facilitate the

13    purchase of a Note held by GMAC --

14  A    (Interposing) I have no idea.

15              THE COURT REPORTER: Counsel, would you

16    please repeat that question.

17              MR. BARBAG: Sure.

18              THE COURT REPORTER: Thanks.

19  //

20  Q    (by Mr. Barbag) Do you know if Susan Young had been

21    attempting to facilitate the purchase of a Note held

22    by GMAC on the subject property?

23  A    No.

24  Q    You don't know?

25  A    I have no idea.

159

1    Q    Over the course of the construction on the subject

2        property approximately how many conversations did you

3        have with Mr. Zygelman?

4    A    Probably less than ten.

5    Q    Okay.  Are you including e-mails in that as well?

6    A    You said conversations.

7    Q    That's true.  I didn't define it.  So you're

8        considering those ten telephonic.  Is that right?

9    A    Correct.

10    Q    How about e-mail conversations?

11    A    I honestly don't know how many.  As a for instance you

12        can see on Exhibit "17" (sic) it was a one liner, it

13        just says: Are you trying to tell me that there's no

14        sale of the property?  And that's an e-mail.

15    Q    I believe that's "19"?

16    A    "19," excuse me, yeah.  So, you know, that's

17        considered an e-mail.  I don't know how, you know, ...

18    Q    Hundreds probably?

19    A    Well, I don't know about hundreds.

20                MR. LIU: Objection, misstates his

21        testimony.

22                MR. BARBAG: Okay, I'm just trying to

23        jog his memory.

24    //

25    Q    (by Mr. Barbag) Over a hundred?

                                            160

1   A   To Mr. Zygelman?

2   Q   Yes.

3   A   No, I don't think it would be that many.  I don't

4       think it would be over a hundred.

5   Q   But close to it?

6   A   I don't think so because most of my conversations and

7       most of my dealings were with Mesika, Mr. Zygelman did

8       not want to deal with it.

9   Q   Okay.  How many telephone conversations did you have

10      with Mr. Mesika?

11  A   Oh, probably 20 or more.

12  Q   And approximately how many e-mails?

13  A   Jacob, I don't know, less than -- well, let's see

14      here, less than 50.

15  Q   Did you consider Mr. Zygelman your client?

16  A   Can you clarify that when you say my client.

17  Q   Sure.  You were providing services to him.

18  A   I was providing services for GMAC Bank to the client

19      Mr. Zygelman, yes.

20  Q   And he never directed you to release any funds to

21      Mr. Zipp or Hayomyom?

22  A   Never.

23  Q   I think I asked this before, I'm sorry if I have.

24  A   That's okay.

25  Q   You only learned about the release -- you only learned

161

1        about Mr. Zygelman receiving funds from Mr. Zipp

2        and/or Hayomyom due to this lawsuit.  Is that correct?

3  A   Correct.

4  Q   What was the reason that you decided to leave GMAC?

5  A   My contract was up, portfolio was reduced to a

6        manageable level for closeout.

7  Q   Did they ask you to resign?

8  A   It was not a resignation.  I was under a contract.

9  Q   How long was that contract supposed to be for?

10  A   The last phase of the contract was from I believe

11        June 1st, 2009 to December 31st, 2009.

12  Q   So you had six month contractual increments?

13  A   No.

14  Q   When did you first have a contract with GMAC?

15  A   When they changed our titles and positions from

16        Regional Sales -- or District Sales Managers to

17        District Risk Managers, at that time they had

18        anticipated that it would take us about a year to

19        close out the portfolio.  They made a determination

20        then in '09 that there was four of us, that we could

21        probably finish out the last six months with only two

22        of us; I was one of the two that were kept on.

23  Q   While you were working at GMAC about how many times

24        per year was your job performance evaluated?

25  A   I was not evaluated.

162

1   Q    Were you ever disciplined while you were working at

2        GMAC?

3                    MR. LIU: Objection, irrelevant to the

4        Complaint, Cross-Complaint, outside the scope of the

5        Motion to Quash.

6             Instruct not to answer.

7   //

8   Q    (by Mr. Barbag) Were you ever disciplined as a result

9        of the subject property while working at GMAC?

10  A    No.

11  Q    So you never received any demotion as a result of

12       dealing with the subject property?

13                   MR. LIU: Objection, asked and answered.

14            You can answer.

15                   THE DEPONENT: I can?

16                   MR. LIU: You can.

17  //

18  A    No.

19  Q    (by Mr. Barbag) You mentioned you had two other

20       depositions previous to this one.  Was it related to

21       your work at GMAC?

22  A    No.

23  Q    You indicated you left Frontier because it wasn't a

24       good fit.  Could you expand on that?

25                   MR. LIU: Objection, it's irrelevant,

                                                            163

1    it's outside the scope, it's outside the relevancy of

2    the Complaint, Cross-Complaint, has nothing to do with

3    the current loan of any promises that were made to

4    Hayomyom.

5         MR. KOEHLER: Not outside the purview of

6    the Complaint or Cross-Complaint in that how he had

7    handled previous loans for other lenders may show a

8    course of conduct in this situation, so I think it is

9    relevant to that purpose.

10        MR. LIU: Then I think we need to

11   establish a foundation that Frontier made loans in

12   California first.

13        MR. KOEHLER: You may be right.

14   //

15   Q    (by Mr. Barbag) Did Frontier ever make loans in

16        California?

17   A    Not that I'm aware of.

18   Q    Okay.  Did they have any association with California

19        customers?

20   A    Not that I'm aware of.

21   Q    Do you recall receiving service of the Summons and

22        Complaint in this matter?

23   A    Yes.

24   Q    Do you recall telling the person who was serving you

25        that you didn't know who Robertson was?

164

1     MR. LIU: Objection, it's irrelevant.

2     MR. BARBAG: Goes to harassment.

3 //

4 A No, I don't recall that.

5    I can recall that I was not the most gracious of

6  someone who is trespassing on my rural country

7  property we don't know and up here you don't just

8  trespass on a man's property.

9 Q So you didn't --

10 A (Interposing) So I wasn't greeting him with open arms,

11  no.

12 Q And you didn't deny that you were in fact --

13 A (Interposing) I didn't deny who I was.  He was trying

14  to force a piece of paper on me, I wouldn't take it.

15 Q Okay.  And you never denied that you were Robbie

16  Robertson?

17 A No.

18    I mean it's real obvious on my house.  My name's

19  on my mailbox, my wife's out in the yard with me,

20  she's standing right there, you know, come on.

21 Q There's no way for this person to know who your wife

22  is, is there?

23 A So I would imagine there's no way for that person to

24  know who I am.

25 Q Exactly.  And if you denied who you were, it would be

               165

1    much more difficult.

2    A    No.

3            MR. BARBAG: I'm going to review my

4    notes, but I'm going to pass to Counsel and see if he

5    has any other questions.

6            MR. KOEHLER: Yes, I've got just a few

7    followup questions.

8    //

9    //

10   QUESTIONING BY MR. KOEHLER:

11   Q    Mr. Robertson, I believe earlier in the afternoon you

12   indicated that when the California rep left in about

13   June of '08 the California accounts were divided up

14   and you got the accounts from Fresno north?

15   A    Correct.

16   Q    Is that a correct statement?

17   A    That's correct.

18   Q    And we're talking again about the construction

19   contracts?

20   A    Correct.

21   Q    Okay.  Who took the Southern California accounts, the

22   accounts south of Fresno?

23   A    A gentleman by the name of Brian -- what's Brian's

24   last name.  I can't recall his last name at this time,

25   but he had been the Nevada/Arizona rep.

                                                         166

1  Q   So Brian whatever his last name is had accounts in

2      Nevada, Arizona and then California south of Fresno --

3  A   (Interposing) Correct.

4  Q   (Continuing) -- after that date?  Did he cover any

5      other areas?

6  A   I don't -- he probably did because you know it's 50

7      states and there's only 4 of us, but I can't recall

8      the ones that he had.

9  Q   Prior to him assuming those construction contracts in

10     around June of '08 do you know if he had serviced any

11     -- had he previously serviced any California

12     construction contracts?

13 A   Not that I'm aware.

14 Q   You indicated that during the course of the Zygelman

15     construction loan Mr. Zygelman represented to you on

16     about three occasions that he had a buyer or he had a

17     sale?

18 A   Correct.

19 Q   Can you remember when the first instance was?

20 A   December 2008 when we had our conversation of that's

21     when he said he was going to -- he had some people

22     over interested in buying it and he would probably

23     just end up having to sell it because he couldn't

24     qualify for any takeout financing.

25 Q   Well, now did he say he had people interested in

                                                        167

1       buying or did he say he had a sale?

2  A   He said he had people interested in buying it.  The

3      home wasn't completed at the time.

4  Q   Okay.  And did he ever present to you any type of

5      sales agreement with respect to that December of '08

6      conversation?

7  A   No.

8  Q   Did you ever ask for any sales documentation regarding

9      that December '08 conversation?

10  A   I informed him at that time: If you get a sale on the

11      property, please provide us with the copy of the

12      executed Purchase and Sale Agreement.

13  Q   And was that communication orally or was it --

14  A   (Interposing) Oral.

15  Q   Oral.  Okay.  When was the second occasion that

16      Mr. Zygelman indicated to you that he had a sale on

17      the property?

18  A   That's I'm a little cloudy on the dates on that.  I'm

19      thinking that that was going to be somewhere around

20      April, March or April of 2009, but I'm not a hundred

21      percent certain if that's a correct date.

22  Q   Okay.  Did he tell you that he had a sale or he had

23      people that were interested in the house?

24  A   He said that he was pretty confident that he had a

25      sale, but he needed to get the house done before they

168

1    would execute.

2  Q    And did he tell you who he thought he had a sale with?

3  A    No.

4  Q    During the December of '08 conversation did he tell

5       you who he --

6  A    (Interposing) No.  I'm sorry.

7  Q    Who was interested in the house or who he had a sale

8       with?

9  A    No.

10  Q    The conversation regarding the third instance in which

11       he said he had a sale, when was that?

12  A    That would have been first part of June.

13  Q    Of '09?

14  A    '09.

15  Q    And did he tell you with whom he had a sale?

16  A    No.

17  Q    Did you ask?

18  A    I told him to send me a copy of the Purchase and Sale

19       Agreement.

20  Q    Now, you indicated that at sometime, I believe you

21       said in June, that you had a conversation with an

22       escrow company wherein you were told that the sale had

23       been cancelled?

24  A    Correct.

25  Q    Okay.  Was that Wilshire Escrow?

169

1  A    Correct.

2  Q    Okay.  And who was it at Wilshire Escrow?

3  A    I do not recall.

4  Q    And do you recall when in June that was?

5  A    It's going to have to be when I had a copy of that

6       Purchase and Sale Agreement, so that's going to be the

7       end of June.

8  Q    So it's your best recollection the end of June of

9       2009.

10 A    Correct.

11 Q    And this conversation with somebody at Wilshire Escrow

12      you were told that the escrow had been cancelled?

13 A    Yes.

14         Which seems to be confirmed by the e-mails sent

15      from Wilshire Escrow.

16                   MR. BARBAG: Motion to strike.

17                   MR. KOEHLER: Move to strike, there's no

18      question pending.

19         Does anybody have a copy of Exhibit "17"?

20                   MR. BARBAG: (Handing)  You want another

21      Exhibit?

22                   MR. KOEHLER: No, I wasn't sure which.

23 //

24 Q    (by Mr. Koehler) Now, Mr. Robertson, you made a

25      statement earlier that you can't finance an LLC.  Were

                                                          170

1       you speaking on behalf of GMAC or is that what your

2       understanding is of the statutes in the state of

3       California regarding --

4  A  (Interposing) That is based upon secondary market

5       underwriting requirements, national.

6  Q  (Interposing) For GMAC?  National?

7  A  National.  That's through FANNIE MAE, Federal National

8       Mortgage Association or Federal Home Loan Mortgage

9       Corporation, FREDDIE MAC.

10          And if I can clarify that up again.  That only

11       goes to residential mortgage loans, does not apply to

12       commercial loans.

13  Q  Of the five to six other jumbo loans that you were

14       handling for California properties was construction

15       completed on all of those residences?

16  A  By the time I left I think there was only one left at

17       that time and that was -- no, there wasn't -- no, no,

18       all the jumbos were closed out.

19  Q  When you say "closed out" do you mean construction was

20       completed?

21  A  Construction was completed and loans were off the

22       books.

23  Q  And were any of those loans converted to permanent?

24  A  Not with GMAC.  With other secondary lenders.

25  Q  Is that pursuant to the policy that had been

                            171

1       instituted by GMAC that they would not make permanent

2       jumbo loans?

3  A   Yes.

4  Q   Did you happen to see the loan agreements on any of

5       those permanent loans that those five to six

6       individuals obtained?

7  A   I'm not sure when you say "loan agreements".

8  Q   Okay, fair enough, let me restate it.

9       You indicated that the five to six construction

10      loans that you were handling on behalf of GMAC were

11      completed and closed out and the individuals that had

12      those construction loans obtained permanent financing

13      somewhere else.

14  A   Correct.

15  Q   Okay.  Those loan agreements between those individuals

16      and I'll call it a third party lender, ...

17  A   Okay.

18  Q   (Continuing) ... did you ever happen to see those

19      contracts?

20  A   No.

21           MR. KOEHLER: I think that's about all I

22      have.

23           MR. BARBAG: Counsel, do you have any

24      questions?

25           MR. LIU: None.

172

1            MR. BARBAG: That kind of concludes it.

2            MR. KOEHLER: Can we go off the record a

3    second?

4            MR. BARBAG: Yes.

5            THE VIDEOGRAPHER: Without ending the

6    deposition?

7            MR. KOEHLER: Without ending it.

8            THE VIDEOGRAPHER: Okay.  Stand by.  The

9    time is now approximately 4:10 p.m., we are off the

10   record.

11                        (Off the record.)

12   //

13            THE VIDEOGRAPHER: We are on the record,

14   the time is now approximately 4:12 p.m.

15            MR. KOEHLER: Off the record counsel had

16   a conversation as how we were going to get the

17   transcript to Mr. Robertson for him to read, review,

18   sign.  It was agreed and we've been led to believe

19   that it is not contrary to any statutory Washington

20   law that when completed the Court Reporter will mail

21   the original transcript to Mr. Liu, counsel for

22   Mr. Robertson, who will see to it that Mr. Robertson

23   reads, reviews, signs under penalty of perjury within

24   30 days and that any corrections that Mr. Robertson

25   makes to the deposition transcript Counsel will advise

                                                      173

1    all of the counsel in writing within 10 days of

2    receipt of those changes as to the nature of those

3    changes; that upon Mr. Robertson signing the

4    transcript under penalty of perjury he shall forward

5    it to Mr. Liu for safekeeping; Mr. Liu will advise all

6    other counsel the date in which it is signed.  Mr. Liu

7    will be the custodian of the original for all purposes

8    and will produce it at any hearing, mediation,

9    arbitration, trial upon reasonable notice and his

10   failure to do so, a certified copy can be used in lieu

11   thereof for all purposes.

12            MR. LIU: So stipulated.

13            MR. BARBAG: I would just like to add:

14   And if it's not signed, then it's deemed signed after

15   30 days.

16            MR. LIU: So stipulated.

17            MR. BARBAG: So stipulated.

18            MR. KOEHLER: Thank you, Mr. Robertson.

19            THE VIDEOGRAPHER: I'm going to have a

20   quick statement to go off the record.  The time is now

21   approximately 4:14 p.m., this marks the end of Tape

22   Number Four as well as marks the end of the deposition

23   of Robbie Robertson on May 17, 2012.  We're off the

24   record.

25            MR. KOEHLER: Excuse me, the first

                                                      174

1    volume of Mr. Robertson's deposition.

2                        THE VIDEOGRAPHER: Okay.  We're off the

3    record.

4                                   (VIDEOTAPED DEPOSITION UPON

5                                   ORAL EXAMINATION OF ROBBIE

6                                   ROBERTSON WAS ADJOURNED

7                                   AT 4:14 P.M. ON

8                                   MAY 17, 2012)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        175

## S I G N A T U R E

I, ROBBIE ROBERTSON, declare under penalty of perjury under the laws of the State of Washington and the State of California that I have read my deposition transcript and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the Correction Sheet.  Signed in _____, Washington on the _____ day of _____, 2012.

_____
ROBBIE ROBERTSON

176

```
 1   STATE OF WASHINGTON )
                       : ss          CERTIFICATE
 2   COUNTY OF SNOHOMISH )

 3       I, PAUL W. RODE, Certified Court Reporter and Notary

 4   Public in and for the State of Washington, do certify:

 5       That the Videotaped Deposition Upon Oral Examination

 6   of ROBBIE ROBERTSON was taken stenographically before me

 7   and reduced to typewritten form;

 8       That all objections made at time of said deposition to

 9   my qualifications or the manner of taking the deposition

10   have been noted by me upon said deposition transcript;

11       That I am not a relative or employee or attorney or

12   counsel of any of the parties or attorneys to said action,

13   and that I am not financially interested in the said action

14   or the outcome thereof;

15       That ROBBIE ROBERTSON was duly sworn before testimony

16   was taken to testify to the truth, the whole truth and

17   nothing but the truth;

18       That the transcript is a true record of the testimony

19   given by the deponent ROBBIE ROBERTSON;

20       IN WITNESS WHEREOF, I have hereunto set my hand and

21   affixed my official seal this 28th day of May, 2012.

22

23                                  _____
                                    PAUL W. RODE, CCR, NOTARY PUBLIC
24                                  My commission expires 11/26/13.
                                    CCR# 299-06
25

                                                         177
```

## Exhibit B

Message                                                                              Page 1 of 2

8

## Sigmund

**From:**  Robertson, Robbie - PA [robbie.robertson@gmacbank.com]
**Sent:**  Thursday, February 05, 2009 08:01
**To:**  Sigmund
**Subject:** RE: Home Owners Insurance

Mr Zygelman
Assuming that you draw your complete construction loan amount, the balance owing to GMAC is
$1,190,000. Also, as we had discussed a number of months ago, GMAC is not doing Jumbo loans any
longer and you would need to secure financing from another outside source. I had also agreed to waive
the non conversion penalty  that is called for in the construction loan documents. As the project is nearing
completion, we have ordered a new appraisal for bank internal purposes. I will let you know the results of
the updated appraised value and will work with your chosen take out lender in assisting them with any
property or loan payoff information they might need. If you can let me know who the lender will be I will
reach out to them with my offer of assistance.

Thank you

*Robbie Robertson*
*GMAC Bank*
*Construction Lending*
*District Risk Manager*
*WA,OR,ID,HI,AK,CA*
*19664 E Conway Hill Lane*
*Mount Vernon, WA 98274*
*cell - 360.770.0444*
*fax - 866-303-8284*
robbie.robertson@gmacbank.com

*All correspondence concerning customers __must__ be sent using the GMAC NAMING*
*CONVENTION (lastnamefirstnameloan#) on the subject line. Please notify your borrowers*
*and contacts if they are sending emails or documents directly to the construction department.*

*The information contained in this communication is confidential and privileged proprietary information intended only for the*
*personal and confidential use of the individual or entity to whom it is addressed. If you are not the addressee indicated in*
*this message (or an agent responsible for delivery of the message to such person), you are hereby notified that you have*
*received this communication in error and that any review, dissemination, copying or unauthorized use of this message is*
*strictly prohibited. In such case, you should destroy this message and kindly notify the sender by reply e-mail.*

---

**From:** Sigmund [mailto:csez@ix.netcom.com]
**Sent:** Wednesday, February 04, 2009 5:42 PM
**To:** Robertson, Robbie - PA
**Subject:** RE: Home Owners Insurance

Have already received invoice from Travelers insurance and mailed them payment check for
continuation.

On an other note: please inform of total principal amount due to GMAC upon completion of
construction loan.

6/16/2011