# EXHIBIT 2

## to Declaration

**MAYER · BROWN**

# Do Class Actions Benefit Class Members?
*An Empirical Analysis of Class Actions*

*By Mayer Brown LLP*

## Executive Summary

This empirical study of class action litigation—one of the few to examine class action resolutions in any rigorous way—provides strong evidence that class actions provide far less benefit to individual class members than proponents of class actions assert.

The debate thus far has consisted of competing anecdotes. Proponents of class action litigation contend that the class device effectively compensates large numbers of injured individuals. They point to cases in which class members supposedly have obtained benefits. Skeptics respond that individuals obtain little or no compensation and that class actions are most effective at generating large transaction costs—in the form of legal fees—that benefit both plaintiff and defense lawyers. They point to cases in which class members received little or nothing.

Rather than simply relying on anecdotes, this study undertakes an empirical analysis of a neutrally-selected sample set of putative consumer and employee class action lawsuits filed in or removed to federal court in 2009.[1]

Here's what we learned:

- In our entire data set, ***not one of the class actions ended in a final judgment on the merits for the plaintiffs***. And none of the class actions went to trial, either before a judge or a jury.

- The vast majority of cases produced ***no benefits to most members of the putative class***—even though in a number of those cases the lawyers who sought to represent the class often enriched themselves in the process (and the lawyers representing the defendants always did).

  — ***Approximately 14 percent of all class action cases remained pending four years after they were filed***, without resolution or even a determination of whether the case could go forward on a class-wide basis. In these cases, class members have not yet received any benefits—and likely will never receive any, based on the disposition of the other cases we studied.

  — ***Over one-third (35%) of the class actions that have been resolved were dismissed voluntarily by the plaintiff***. Many of these cases settled on an individual basis, meaning a payout to the individual named plaintiff and the lawyers who brought the suit—***even***

## Do Class Actions Benefit Class Members?

---

>    *though the class members receive nothing*. Information about who receives what in such settlements typically isn't publicly available.

>    — *Just under one-third (31%) of the class actions that have been resolved were dismissed by a court on the merits*—again, meaning that class members received *nothing*.

- One-third (33%) of resolved cases were settled on a class basis.

>    — This *settlement rate is half the average for federal court litigation,* meaning that a class member is far less likely to have even a chance of obtaining relief than the average party suing individually.

>    — *For those cases that do settle, there is often little or no benefit for class members*.

>    — What is more, *few class members ever even see those paltry benefits—particularly in consumer class actions*. Unfortunately, because *information regarding the distribution of class action settlements is rarely available*, the public almost never learns what percentage of a settlement is actually paid to class members. But of the six cases in our data set for which settlement distribution data was public, *five delivered funds to only miniscule percentages of the class: 0.000006%, 0.33%, 1.5%, 9.66%, and 12%.* Those results are consistent with other available information about settlement distribution in consumer class actions.

>    — Although some cases provide for automatic distribution of benefits to class members, automatic distribution almost never is used in consumer class actions—only *one of the 40* settled cases fell into this category.

>    — Some class actions are settled without even the potential for a monetary payment to class members, with the settlement agreement providing for *payment to a charity or injunctive relief that, in virtually every case, provides no real benefit to class members*.

**The bottom line: The hard evidence shows that class actions do not provide class members with anything close to the benefits claimed by their proponents, although they can (and do) enrich attorneys.** Policymakers who are considering the efficacy of class actions cannot simply rest on a theoretical assessment of class actions' benefits or on favorable anecdotes to justify the value of class actions. Any decision-maker wishing to rest a policy determination on the claimed benefits of class actions would have to engage in significant additional empirical research to conclude—contrary to what our study indicates—that class actions actually do provide significant benefits to consumers, employees, and other class members.

Do Class Actions Benefit Class Members?

## Results

### Overall Outcomes

Of the 148 federal court class actions we studied that were initiated in 2009, 127 cases (or nearly 86 percent) had reached a final resolution by September 1, 2013, the date when the study closed.



**Figure 1: Outcomes in 148 cases**

*Zero* cases resulted in a judgment on the merits. Of the 148 cases in our sample set**, *not one had gone to trial***—either before a judge or jury. And, as of the closing date of our study, ***not one resulted in a judgment for the plaintiffs on the merits***.

Unlike ordinary (non-class) disputed cases, some of which end with a judgment on the merits in favor of the plaintiffs or defendants, class actions end without any determination of the case's merits. The class action claims that make it past the pleadings stage and class-certification gateway virtually always settle—regardless of the merits of the claims.

Do Class Actions Benefit Class Members?



**Figure 2: Outcomes in 127 resolved cases**

Indeed, Justice Ruth Bader Ginsburg has recognized that "[a] court's decision to certify a class * * * places pressure on the defendant to settle even unmeritorious claims."[2] Then-Chief Judge Richard Posner of the U.S. Court of Appeals for the Seventh Circuit explained that certification of a class action, even one lacking in merit, forces defendants "to stake their companies on the outcome of a single jury trial, or be forced by fear of the risk of bankruptcy to settle even if they have no legal liability."[3] And Judge Diane Wood of the Seventh Circuit has explained that certification "is, in effect, the whole case."[4] That may be why another study of class actions reported that "[e]very case in which a motion to certify was granted, unconditionally or for settlement purposes, resulted in a class settlement."[5]

**Fourteen percent of the class actions filed remain unresolved.** Even though our study period encompassed more than 44 months since the filing of the last case in our sample (and 55 months from the filing of the first case), a significant number of cases—21 of the 148 in our sample, or 14%— remained pending with no resolution, let alone final judgment on the merits.[6]

And there is no reason to believe that these cases are more likely to yield a benefit for class members than the cases that have been resolved thus far. In 15 of these cases either no motion for class certification has been filed or the court has not yet ruled on the motion, and in another 2 the court denied certification. In a significant proportion of these pending cases, it seems likely that class

## Do Class Actions Benefit Class Members?

certification will be denied or never ruled upon before the case is ultimately dismissed. After all, prior studies indicate that nearly 4 out of every 5 lawsuits pleaded as class actions are not certified.[7]

**Over one-third of the class actions that have been resolved were dismissed voluntarily by the named plaintiff and produced no relief at all for the class.** Forty-five cases were voluntarily dismissed by the named plaintiff who had sought to serve as a class representative or were otherwise resolved on an individual basis. That means either that the plaintiff (and his or her counsel) simply decided not to pursue the class action lawsuit, or that the case was settled on an individual basis, without any benefit to the rest of the class. These voluntary dismissals represent 30 percent of all cases studied, or 35 percent of cases that reached a resolution by the beginning of September 2013.[8]

In fourteen of the cases that were voluntarily dismissed—approximately one-third of all voluntary dismissals in the data set—the dismissal papers, other docket entries, or contemporaneous news reports made clear that the parties were settling the claim on an individual basis, although the terms of those settlements were not available. Many of the remaining voluntary dismissals also may have resulted from individual settlements.

These settlements often provide that the plaintiff—and his or her attorney—receive recoveries themselves, even though the rest of the class that they sought to represent receive **nothing**. When parties settle cases on an individual basis, those settlements often are confidential, and the settlement agreements therefore are not included on the court's public docket.[9]

**Just under one-third of the class actions that have been resolved were dismissed on the merits**. In addition to the 45 cases dismissed voluntarily by plaintiffs, 41 cases were dismissed outright by federal courts, through a dismissal on the pleadings or a grant of summary judgment for the defendant. The courts in these cases concluded that the lawsuits were meritless before even considering whether the case should be treated as a class action. These represented 27 percent of all cases studied, and 31 percent of resolved cases.

In other words, ***in over half of all putative class actions studied—and nearly two-thirds of all resolved cases studied—members of the putative class received <u>zero</u> relief.*** These results are depicted in Figures 1 and 2, which appear below. And these results are broadly consistent with other empirical studies of class actions. If anything, for reasons explained in Appendix C, abusive, illegitimate class actions are probably under-represented in our sample, and the sample therefore probably significantly **overstates** the extent to which class members benefit from the class action. For comparison, another study found that ***84% of class actions ended without any benefit to the class***.[10]

**Fewer than thirty percent of the cases filed were settled.** All of the remaining class actions that have been concluded were settled on a class-wide basis: The parties reached settlements in 40 cases—28% of all cases studied, or 33% of all resolved cases.[11]

Do Class Actions Benefit Class Members?

This subset of class actions is the only one in our study in which it is possible that absent class members could possibly receive any benefit at all. As we next discuss, however, the benefits claimed to be associated with such settlements are largely illusory.

## Class Settlements

**Class actions have a significantly lower settlement rate than other federal cases.** The settlement rate for our sample of cases—33% of resolved cases—is much lower than for federal court litigation as a whole. One study of federal litigation estimated that "the aggregate settlement rate across case categories" for two districts studied was "66.9 percent in 2001-2002."[12] Even the least frequently settled case category in that study—constitutional litigation—had a higher settlement rate (39%) than the 33% for the class action cases we studied.[13]

Thus, ***class actions are significantly less likely to produce settlements, and therefore significantly less likely to produce any benefit to class members, than other forms of litigation***. Settlement is the only resolution that produces even the possibility of a benefit to class members, because class actions are virtually never resolved though judgments on the merits, a fact that our study corroborates. And the settlement rate in our sample set is not an outlier: a study of class actions brought in California state court in 2009 reported a similarly low settlement rate of 31.9%.[14]

Moreover, the fact that 40 of our sample cases were settled says nothing about the extent of the benefit, if any, that those settlements conferred on class members.

**Many class settlements—and virtually all settlements of consumer class actions—produce negligible benefits for class members.** It is a notoriously difficult exercise to assess empirically how class members benefit from class action settlements. These settlements fall generally into three basic categories:

- **"Claims-made" settlements**, under which class members are bound by a class settlement—and thereby release all of their claims—but only obtain recoveries if they affirmatively request to do so, usually through use of a claims form.[15] Funds not distributed to claimants are returned to the defendant or, in some cases, distributed to a charity via the *cy pres* process (which creates significant additional problems, as we discuss below). They are not given to class members. Most settlements fall into this category.

- **Injunctive relief/*cy pres* settlements**, in which the relief provided to settling class members involves only injunctive relief (which may provide little or no benefit to class members) or *cy pres* distributions (in which money is paid to charitable organizations rather than class members).

- **"Automatic distribution" settlements**, in which each class member's settlement is distributed automatically to class members whose eligibility and alleged damages could be ascertained and calculated—such as retirement-plan participants in ERISA class actions.

## Do Class Actions Benefit Class Members?

*The parties typically have no meaningful choice among these methods of structuring a settlement*. Automatic distribution settlements are feasible only if the parties have the names and current addresses of class members as well as the ability to calculate each class member's alleged damages. But companies typically lack the information needed to settle cases using an automatic distribution mechanism— especially in consumer cases, where purchase records may be incomplete or unavailable, and/or class members' claimed injuries may vary widely and unpredictably.

*Thus, consumer class actions are almost always resolved on a claims-made basis, and the actual amount of money delivered to class members in such cases almost always is a miniscule percentage of the stated value of the settlement.* That is because, in practice, relatively few class members actually make claims in response to class settlements: many class members may not believe it is not worth their while to request the (usually very modest) awards to which they might be entitled under a settlement. And the claim-filing process is often burdensome, requiring production of years-old bills or other data to corroborate entitlement to recovery.

**The class members' actual benefit from a settlement—if any—is almost never revealed**. Remarkably, the public almost never has access to settlement distribution data. One study found that settlement distribution data were available in "fewer than one in five class actions in [the] sample."[16] Companies and their defense lawyers are hesitant to reveal how much a company has been required to pay out to class members, and plaintiffs' counsel have strong incentives to conceal the information because requests for attorneys' fees based on a settlement's face value will appear overstated when compared to the actual value. Judges are often happy to have the case resolved, and therefore have little to no interest in requiring transparency in the settlement distribution process.

While third-party claims administrators often possess direct information about claims rates, they are routinely bound by contract to maintain the confidentiality of that information in the absence of party permission, a court order, or other legal authority.[17] This may be a function of the incentive shared by class counsel and defense counsel to avoid facilitating grounds for a class member to object that a settlement was unfair because it provided too little tangible benefit to the class.[18] Indeed, "[h]ow many people were actually members of this class, how many of these class members actually submitted a claim form, and how much they were actually paid appear to be closely held secrets between the class counsel and the defendant."[19]

**In rare cases in which class-settlement distribution data was available, few class members received any benefit at all**. In our data set, *18 cases were resolved by claims-made settlements*—44% of the total. *We were able to obtain meaningful data regarding the distribution of settlement proceeds in only six of the 18 cases*, which is not surprising given the well-established and widespread lack of publically available information regarding the extent to which class members actually benefit from settlements. *Five of the six cases resulted in miniscule claims rates: 0.000006%, 0.33%, 1.5%, 9.66%, and 12%.*[20] These extremely small claim-filing rates are consistent with the few other reports of claim rates in class action settlements that have come to light.

## Do Class Actions Benefit Class Members?

As one federal court observed, "'claims made' settlements regularly yield response rates of 10 percent or less."[21] In fact, the claims rate frequently is **much lower**—in the single digits. Appendix A contains a list of more than 20 additional cases for which information about distributions is available, all of which involved distributions to less than seven percent of the class and many of which involved distributions to less than one percent of the class.

There is thus ample evidence to infer that **the extremely small claims rates for cases in our sample is representative of what happens in class actions generally, and particularly in consumer class actions**.[22] And although documents filed in the remaining 12 of the 18 claims-made settlements lacked information about claims rates, there is every reason to believe that class members made claims at the small rates ordinarily observed in such cases. While some may argue that parties should use automatic distribution mechanisms instead of "claims-made" settlements to resolve class actions, the reality is that automatic distribution is difficult, if not impossible, to achieve in many (perhaps most) consumer class actions.

**Only *one* consumer class action settlement was resolved through automatic distribution.** Of the remaining 22 settled cases in our sample, 13 involved **settlements with automatic distribution of settlement proceeds**. Ten of these 13 involved claims by retirement plan participants in ERISA class actions, in which the class members' eligibility and alleged damages could be easily ascertained and calculated based on their investment positions. The plans of distribution in these 10 cases generally involved lump-sum payments to the plan, which would then be allocated directly to plan members' accounts.

The other three automatic-distribution settlements were reached in consumer and employment class actions. In each case—atypical of most class actions—the defendant was in a position to ascertain and calculate class members' eligibility and alleged damages:

- In one, an employer settled claims that it conspired with health care providers and insurers to dictate medical treatment provided to about 13,764 employees injured on the job, whose identities were readily known to the defendant employer; employees who were treated by one health-care provider received a check for $520, while injured employees treated by another provider received a check for $50.[23]

- In a second settlement, a credit-card issuer settled claims that it improperly raised the minimum monthly payment and added new fees in connection with promotional loan offers.  The defendant issued class members a flat-rate payment of $25, plus (for certain customers) a share of the remaining settlement fund calculated by taking into account the ways the class member had used the promotional loan and had been charged fees.[24]

- Finally, as we explain in more detail below, a third settlement resolved privacy claims against a mobile-phone gaming app developer in exchange for 45 in-game "points" that were automatically distributed to users so they could advance through the game's levels.[25]

## Do Class Actions Benefit Class Members?

Thus, only two consumer cases involved automatic distributions, and in one the distribution involved "game points." *Only a single settled consumer class action—one of 127 class actions resolved— conveyed real benefits to anything more than a small percentage of the class.*

*Cy pres* **awards and injunctive relief serve primarily to inflate attorney's fee awards—and benefit third parties with little or no ties to the putative class.** The final group of 9 settled cases largely involved *injunctive relief or cy pres distributions*. Because these cases involve no monetary compensation to class members, it is difficult for outsiders to assess the claimed benefit. Certainly, *in many cases "injunctive relief" has little or no real-world impact on class members, but is used to provide a basis for claiming a "benefit" to class members justifying an award of attorneys' fees to class counsel* (as we detail below). The injunctive-relief-only settlements we reviewed included the following:

- Plaintiff subscribers of America Online ("AOL") claimed that it embedded advertisements at the bottom of the subscribers' email messages without their permission. After an early settlement was vacated on appeal for improper *cy pres* awards to unrelated charities, the parties again settled the claims, with AOL promising to tell subscribers how to opt out of email advertisements if it restarted the challenged practice.[26]

- In a class action involving claims that a social-networking app developer failed to protect properly the personally identifiable information of 32 million customers from a data security breach, the settlement provided that the defendant will undergo two audits of its information security policies with regard to maintenance of consumer records, to be made by an independent third party.  The settlement explicitly reserves the rights of the plaintiff class to sue for monetary relief.[27]

- Plaintiffs brought false advertising claims against Unilever, contending that it had misrepresented the health or nutritional characteristics of "I Can't Believe It's Not Butter." As part of the settlement, Unilever was to remove all partially hydrogenated vegetable oils from its soft spreads by December 31, 2011, and from its stick products by December 31, 2012, and keep those ingredients out of those products for 10 years. Although they did not receive monetary compensation, class members released all monetary and equitable claims other than claims for personal injury.[28]

- Finally, in a class action alleging the violation of consumer protection laws arising out of the marketing of Zicam supplements (sold as a way of combating the common cold), the parties provided for a number of non-pecuniary "benefits"—all in the form of labeling changes. These include: (1) indicating that the FDA has not approved the supplements; (2) disclosing that customers with zinc allergies or sensitivities should consult a doctor; (3) informing customers that the products are not intended to be effective for the flu or for allergies; and (4) removing language recommending that customers continue to use the products for 48 hours after cold symptoms subside. If the court approves the settlement and requested attorneys' fees, the

## Do Class Actions Benefit Class Members?

defendant will pay plaintiff's counsel up to $1.75 million in fees in one case, and another $150,000 in a related MDL proceeding.[29]

Like injunctive relief settlements, **the cy pres doctrine is being used by plaintiffs' lawyers to inflate artificially the purported size of the benefit to the class in order to justify higher awards of attorney's fees to the plaintiffs' lawyers**. In four of the cases we examined, the settlement provided that one or more charitable organizations would receive either all monetary relief, or any remaining monetary relief after claims made were paid out.

Courts often assess the propriety of an attorneys' fee award in the settlement context by comparing the percentage of the settlement paid to class members or charities with the percentage of the settlement allocated to class counsel.[30] That approach has been endorsed by the Manual for Complex Litigation.[31] If no funds are allocated to the class, or a small portion of the amount ostensibly allocated to the class is actually distributed and the remainder of the funds returned to the defendants, the relative percentages could be disturbing to a court reviewing the fairness of the settlement. But if the amount not collected by class members is contributed to a charity that can be claimed to have some tenuous relationship to the class, then the percentage allocated to attorneys' fees may appear more acceptable.

The result, as one district court has warned, is that attorney fee awards "determined using the percentage of recovery" will be "exaggerated by *cy pres* distributions that do not truly benefit the plaintiff class."[32] As Professor Martin Redish has noted, the *cy pres* form confirms that "[t]he real parties in interest in…class actions are…the plaintiffs' lawyers, who are the ones primarily responsible for bringing th[e] proceeding."[33] One district court has noted that when a consumer class action results in a *cy pres* award that "provide[s] those with individual claims no redress," where there are other "incentives" for bringing individual suits, the class action fails the requirement that the class action be "superior to other available methods" of dispute resolution.[34]

**Lawyers (as opposed to class members) were the principal beneficiaries of the remaining settlements in our study**. For the "*cy pres*" settlements in our data set, and the "claims made" settlements for which there is no distribution data, publicly available information provides further support for the conclusion that little in the way of benefit flows to class members. Examples from our data set include:

- **Disproportionate allocation of settlement funds to attorneys' fees.** Plaintiffs brought a class action alleging that the defendants improperly interfered with the medical care of injured employees in violation of Colorado law.[35] Under the settlement agreement, the defendants (who denied wrongdoing) were required to make an $8 million fund available to compensate more than 13,500 class members. But class counsel received over $4.5 million out of the $8 million—more than 55 percent of the fund.[36]

- **Named plaintiffs object to the settlement**. In a class action against the National Football League, retired players alleged that the league was using their names and likenesses without compensation to promote the league. The NFL and some players settled the class-wide claims

## Do Class Actions Benefit Class Members?

under federal competition law and state right of publicity laws. But the original named plaintiffs who spearheaded the litigation objected to the settlement, arguing that it provided **no direct payout to the retired players**.[37] Rather, it created an independent organization that would fund charitable initiatives related to the health and welfare of NFL players—and would create a licensing organization that would help fund the independent organization. Meanwhile, "[p]laintiffs' lawyers would receive a total of $7.7 million under the proposed agreement."[38]

- **Low recovery for class members.** Plaintiffs alleged in eight consolidated class actions that their employer, a bank, violated the federal Employee Retirement Income Security Act (ERISA) by offering its own stock as a retirement plan investment option while hiding the true extent of the bank's losses in the mortgage crisis.[39] The class settlement established a $2.5 million common fund that was ostensibly designed to compensate the employees for their losses arising from the bank's alleged breach of fiduciary duty.[40] But commentators note that, when all of the allegations in the various complaints were taken into account, plaintiffs had alleged more than $50 million in losses, meaning that class members would recover no more than five cents on the dollar.[41] And according to the plan of allocation, members of the settlement class who were calculated to have suffered damages less than $25 would receive *nothing*[42]—meaning that their claims were released without even the opportunity to receive something in exchange. Meanwhile, the plaintiffs' attorneys received a fee award amounting to 26% of the common fund ($645,595.78), plus $104,404.22 in expenses.[43]

- **Settlement requires further use of defendant's services.** A plaintiff filed a class action alleging that certain mobile-phone gaming apps were improperly collecting and disseminating users' mobile phone numbers.[44] Under the terms of the settlement agreement, class members were not entitled to any monetary payment. Instead, they were slated to receive 45 in-game "points" (with an approximate cash value of $3.75) per mobile device owned; the points could be used to advance through the gaming apps' levels.[45] These points could be redeemed or used only within the defendant's apps.[46] Unsurprisingly, the plaintiffs' counsel were not paid in points, but instead were awarded $125,000 in attorneys' fees.

- **Attorneys seek fees far exceeding class recovery**. Class counsel in a case involving allegedly faulty laptops found their fee request chopped down from $2.5 million to $943,000.[47] The settlement resulted in a recovery of $889,000 to claimants, plus $500,000 in additional costs for administering the settlement—meaning that the attorneys were seeking just under **three times** the amount that would have gone directly to the class—and even after the fees were cut down, they still represented 106 percent of the class's direct recovery.

These characteristics are not unique to the sample cases. To the contrary, results are consistent with a significant number of class action settlements that produce minimal benefits for the class members themselves. We summarize additional examples of such settlements—taken from outside our data set—in Appendix B.

## Do Class Actions Benefit Class Members?

Other studies of class settlements and attorneys' fees confirm that these examples are not outliers: Such settlements commonly produce insignificant benefits to class members and outsize benefits to class counsel. A RAND study of insurance class actions found that attorneys' fees amounted to ***an average of 47% of total class-action payouts***, taking into account benefits actually claimed and distributed, rather than theoretical benefits measured by the estimated size of the class. "In a quarter of these cases, the effective fee and cost percentages were 75 percent or higher and, in 14 percent (five cases), the effective percentages were over 90 percent."[48]

In other words, for practical purposes, counsel for plaintiffs (and for defendants) are frequently the only real beneficiaries of the class actions.

## Conclusion

This study confirms that class actions rarely benefit absent class members in whose interest class actions are supposedly initiated. The overwhelming majority of class actions are dismissed or dropped with ***no recovery*** for class members. And those recoveries that class settlements achieve are typically minimal—and obtained only after long delays. To be sure, not every class action is subject to these criticisms: a few class actions do achieve laudable results. But virtually none of those were consumer class actions. Certainly our analysis demonstrates—at a bare minimum—that the vast majority of class actions in our sample set cannot be viewed as efficient, effective, or beneficial to class members.

Do Class Actions Benefit Class Members?

---

# Appendix A: Additional Examples of Settlements With Payments to a Very Small Percentage of Class Members

- The Seventh Circuit vacated an order approving a class action settlement so that the district court could "evaluate whether the settlement is fair to class members," where (among other problems with the settlement) only "a *paltry* three percent" of the quarter-million-wide proposed class "had filed proofs of claim."[49] And the Third Circuit recently noted that "consumer claim filing rates *rarely* exceed seven percent, even with the most extensive notice campaigns."[50]

- One affidavit analyzed 13 cases for which data had been disclosed (and in which the settlement was approved). The median claims rate was 4.70%. The highest claims rate in those cases was 5.98%, and the lowest non-zero claims rate was 0.67%. In two cases, the claims rate was 0%—reflecting that not a single class member obtained the agreed-on recovery.[51]

- A class action alleging antitrust claims in connection with compact disc "music club" marketing settled, with only 2% of the class making claims for vouchers (valued at $4.28) for CDs.[52]

- Indeed, in many cases, the claims rate may be well under 1 percent.

  — Fair Credit Reporting Act case: court noted that "less than one percent of the class chose to participate in the settlement."[53]

  — Case alleging that a software manufacturer sold its customers unnecessary diagnostic tools: court approved settlement despite the fact that only 0.17% of customers made claims for a $10 payment, because "the settlement amount is commensurate with the strength of the class' claims and their likelihood of success absent the settlement."[54]

  — Case involving product liability claims related to alleged antenna problems with Apple's iPhone 4: court approved settlement noting that the "number of claims represents somewhere between 0.16% and 0.28% of the total class."[55]

  — Class action alleging fraud in the procurement of credit-life insurance: Supreme Court of Alabama noted that "only 113 claims" had been made in a class of approximately 104,000—or a response rate of 0.1%.[56]

  — Action alleging that restaurant chain had printed credit-card expiration dates on customers' receipts: "approximately 165 class members" out of 291,000—or fewer than 0.06% of the class—"had obtained a voucher" for one of four types of menu items worth no more than $4.78.[57]

## Do Class Actions Benefit Class Members?

— Class action alleging that Sears had deceptively marketed automobile-wheel alignments: "only 337 valid claims were filed out of a possible class of 1,500,000"—a take rate of just over 0.02%.[58]

— Class action alleging that video game manufacturer had improperly included explicit sexual content in the game: ***one fortieth of one percent*** of the potential class (2,676 of 10 million) made claims.[59]

— Class action involving allegations that a Ford Explorer was prone to dangerous rollovers: only 75 out of "1 million" class members—or ***less than one hundredth of one percent***— participated in the class settlement.[60]

Do Class Actions Benefit Class Members?

# Appendix B: Additional Examples of Settlements
## Providing Negligible Benefits
## to Class Members

- ***Class members receive extended membership in buying club.*** In a class action against
  DirectBuy—a club for which customers pay a membership fee to purchase goods at lower
  prices—the plaintiffs alleged that the defendant had misrepresented the nature of the discounts
  that were available through the club.[61] The settlement afforded class members nothing other
  than discounts for renewal or extension of their memberships in the very club that was alleged
  to have tricked them into joining in the first place. Meanwhile, the attorneys for the class "could
  receive between $350,000 and $1 million."[62]

- ***$21 million for the lawyers, pennies and coupons for the class members.*** One Missouri class
  settlement in a case against a brokerage house alleging breaches of fiduciary duties provided
  $21 million to class counsel, but only $20.42 to each of the brokerage's former customers and
  three $8.22 coupons to each current customer. And most of the coupons are unlikely to be
  redeemed.[63]

- ***Class members receive right to request $5 refund, lawyers take (and fail to disclose
  sufficiently) $1.3 million in fees.*** Under the settlement of a class action in which the plaintiffs
  alleged that Kellogg's had misrepresented that Rice Krispies are fortified with antioxidants, class
  members could request $5 refunds for up to three boxes of cereal purchased between June 1,
  2009, and March 1, 2010.[64] Class counsel sought $1.3 million in attorneys' fees on a claim fund
  valued at $2.5 million to be paid out to class members.[65]

- ***Class receives opportunity to attend future conferences.*** In a 2009 settlement in the District of
  Columbia, a court approved a settlement against a conference organizer that failed to deliver
  promised services to those who had paid to attend. The settlement provides class members with
  nothing other than coupons to attend future events put on by the same company alleged to
  have bilked them in the first place; class counsel will take $1.4 million in fees.[66]

- ***Class members receive nothing, class counsel take $2.3 million.*** In a $9.5 million settlement of a
  class action against Facebook over the disclosure to other Facebook users of personal
  information about on-line purchases through Facebook's "Beacon" program, the class members
  received no remedy whatever for the invasions of their privacy and were barred from making
  future claims for any remedy. Instead, approximately $6.5 million went to create and fund a
  new organization that would give grants to support projects on internet privacy; a few thousand
  dollars went to each of the named plaintiffs as "incentive payments"; and class counsel received
  more than $2.3 million.[67] Meanwhile, although Facebook agreed to end the Beacon program—
  which it had actually already ended months before—it remained free to reinstitute the program

## Do Class Actions Benefit Class Members?

as long as it didn't use the name "Beacon."[68] As one federal appellate judge put it (in a dissent from a decision upholding the settlement):

> The majority approves ratification of a class action settlement in which class members get no compensation at all. **They do not get one cent**. They do not get even an injunction against Facebook doing exactly the same thing to them again. **Their purported lawyers get millions of dollars**. Facebook gets a bar against any claims any of them might make for breach of their privacy rights. The most we could say . . . is that in exchange for giving up any claims they may have, the exposed Facebook users get the satisfaction of contributing to a charity to be funded by Facebook, partially controlled by Facebook, and advised by a legal team consisting of Facebook's counsel and their own purported counsel whom they did not hire and have never met.[69]

The Supreme Court ultimately declined to review the Ninth Circuit's decision approving the settlement. As Chief Justice Roberts explained in a rare statement addressing the court's denial of certiorari, the objectors had challenged "the particular features of the specific *cy pres* settlement at issue," but in his view had not addressed "more fundamental concerns surrounding the use of such remedies" and the standards that should govern their use.  Such concerns, he pointed out, would have to await a future case.[70]

- **Court reduced attorneys' fees because of lack of benefit to class members.** The Sixth Circuit upheld a district court's decision to reduce class counsel's requested fees from $5.9 million to $3.2 million in a settlement of a class action involving auto-insurance benefits.[71] In affirming the decision, the Sixth Circuit pointed out that the district court "did not believe that the class members received an especially good benefit [because] Class Counsel chose to pursue a relatively insignificant claim" as opposed to "other potential claims, …and [they] agreed to a settlement mechanism which yielded a low claims rate[.]"[72] Although the court noted that "the settlement makes available a common fund of $27,651,288.83 less any attorney fee award, costs, and administrative expenses," for individual class member benefits up to a maximum of $199.44, "only a small percent of eligible class members have made claims" totaling approximately $4 million—or 14% of the total common fund available.[73] What is more, class counsel represented in their fee motion that they provided notice to 189,305 class members and received "well over 12,000" claims—in other words, a claims-made rate of just over six percent.[74]

Do Class Actions Benefit Class Members?

# Appendix C: Study Design and Methodology

## Identifying the Study Sample

The first step in studying putative class actions was to select a suitable pool of cases. Identifying every putative class action filed during 2009 would be impracticable—not least without extensive resources and staff support.[75] We instead used two commercial publications—the *BNA Class Action Litigation Reporter* and the *Mealey's Litigation Class Action Reporter*—to identify cases for inclusion in the study. These publications cover a wide array of developments in class action litigation, and therefore provide a diverse sample of filed class action complaints. The publications have an incentive to report comparatively more significant class actions out of all class actions filed, without wasting readers' time and attention on minor or obviously meritless suits. If anything, the sample would be skewed in favor of more significant class actions filed by prominent plaintiffs' attorneys—which should be *more meritorious on average* than a sample generated randomly from all class actions filed.

We reviewed issues of BNA and Mealey's published between December 2008 and February 2010 in order to identify cases filed in 2009. The reason for that limitation was the importance of analyzing "modern" cases that were filed after the passage of the Class Action Fairness Act of 2005, but long enough ago to track how the cases have actually progressed and whether they have been resolved. From those publications, we identified a pool of putative class actions brought by private plaintiffs that were either filed in federal court or were removed to federal court from state court in 2009. To begin with, because data about state court cases is much more difficult to obtain, we excluded a number of cases, such as those brought in state court initially (where the BNA or Mealey's report did not mention that the case was removed). We also excluded one case that was removed to federal court and then remanded to state court. This left us with 188 cases.

Nineteen of these eventually became part of eleven other consolidated cases that were also part of our data set—whether under the multidistrict litigation ("MDL") procedure, 28 U.S.C. § 1407, or otherwise (for example, cases are often consolidated when they are pending in the same federal district court). When multiple putative class actions appearing in our data set were consolidated, we treated the consolidated case as a single action to avoid the risk of "overcounting" lawsuits.[76] And when a case in our data set was consolidated with other cases not in our data set, we considered activity reflected on the docket of the "lead" consolidated case that was attributable to the individual case as filed. If after consolidation the case was resolved together with the "lead" case—such that we could not trace outcomes for the individual case separate from the "lead" case—we considered activity attributable to the "lead" case. This approach dovetails with the practical mechanics of consolidation: After cases are consolidated into an MDL, for example, the judge to whom the MDL proceeding is assigned will resolve pretrial motions presented in all the consolidated cases. And more generally, to the extent that courts treat a number of separately filed cases together as a single unit for purposes of adjudication, we have

## Do Class Actions Benefit Class Members?

---

followed the courts' lead.[77] Excluding the cases that became part of other consolidated cases in our data set left us with 169 cases.

Our next goal was to identify a set of class actions consisting of claims resembling those asserted by consumers—because that is the area under study by the CFPB. We therefore excluded three non-Rule-23 putative class actions brought by the Equal Employment Opportunity Commission.[78] We also excluded nine Fair Labor Standards Act cases.[79] Finally, we excluded nine securities cases, because the stakes and nature of those claims are very different from the claims asserted in consumer class actions, and because they are litigated in a different manner because of the procedural checks imposed by federal laws governing securities litigation.[80] Excluding these 21 EEOC, securities, and FLSA cases had next to no effect on the statistical results of our study.[81]

Accordingly, the statistics about the total number of class actions filed in 2009 are based on a set of 148 putative class actions.

## Constructing the Data Set

We identified and coded a number of variables about each case. Using the federal courts' Public Access to Court Electronic Records ("PACER") system, we evaluated the filings on each case's docket. Where criteria for a case could be coded in more than one way, we scrutinized the underlying filings and rulings to determine whether the criteria better fit one or another category. For administrative purposes, we treated September 1, 2013, as the date on which our study period closed. We did not code filings and events that were entered onto the docket after that date.

Among the data collected for each case were: jurisdiction; date filed; plaintiffs' firm; assigned judge; cause of action (as reported by PACER); nature of suit (as reported by PACER); whether the case was a lead or related case (if it was in a consolidated action);[82] whether the court granted class certification; whether the case was voluntarily dismissed,[83] settled, settled but on appeal, dismissed, otherwise disposed of, or still pending; the current posture of the case;[84] and the date of the last action on the case.

For cases involving settlements, we also collected information about the date of dismissal or final settlement approval; the terms of the settlement agreement; any attorneys' fees, expenses, and incentive payments to lead plaintiffs; and the presence of any *cy pres* provision in the settlement agreement.

There are, of course, limitations to the data we collected. First, our conclusions are based on the cases that we reviewed. While there is good reason to believe that generalizations can be made to all class actions, the sample is undoubtedly smaller than the total number of class actions filed in 2009. Attempting to estimate that number reliably—let alone to examine those cases—would have exceeded the scope of our review. On the other hand, the sample includes cases from across the country and is drawn from sources that are likely to report on significant class actions—those that are of comparatively

## Do Class Actions Benefit Class Members?

greater importance or quality than those actions that neither BNA nor Mealey's considered worth reporting. Because the BNA and Mealey's reporters do not present a random sample of all class actions filed in 2009, it would not be useful to calculate a margin of error or otherwise attempt to quantify the extent to which the sample differs randomly from the population of all class actions filed in 2009.

## Endnotes

[1] For information about our methodology, see Appendix C.

[2] *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 445 n.3 (2010) (Ginsburg, J., dissenting).

[3] *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1299 (7th Cir. 1995).

[4] Hon. Diane Wood, Circuit Judge, Remarks at the FTC Workshop: Protecting Consumer Interests in Class Actions (Sept. 13–14, 2004), in *Panel 2: Tools for Ensuring that Settlements are "Fair, Reasonable, and Adequate,"* 18 Geo. J. Legal Ethics 1197, 1213 (2005).

[5] Emery G. Lee III et al., *Impact of the Class Action Fairness Act on the Federal Courts: Preliminary Findings from Phase Two's Pre-CAFA Sample of Diversity Class Actions* at 11 (Federal Judicial Center 2008), http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/Preliminary%20Findings%20from%20Phase%20Two%20Class%20Action%20Fairness%20Study%20%282008%29.pdf  (discussing 30 such cases).

[6] These results are broadly consistent with other studies of class actions. *See, e.g., id.* at 6 (noting that 9% of cases remained pending after at least 3.5 years).

[7] *See* Thomas E. Willging & Shannon R. Wheatman, *Attorney Choice of Forum in Class Action Litigation: What Difference Does it Make?*, 81 Notre Dame L. Rev. 591, 635-36, 638 (2006).

[8] In one of the cases we studied, the court compelled arbitration of the named plaintiff's claims—a determination that almost always precludes class treatment of the case.

[9] Unlike class settlements under Federal Rule of Civil Procedure 23, which must be publicly disclosed and approved by the court, individual settlements of lawsuits in federal court need not be disclosed publicly, nor is court approval required. Typically, parties that agree to settle claims on an individual basis in a lawsuit pending in federal court—whether or not those claims are part of a class action—enter into confidential settlement agreements, a condition of which is that the named plaintiff will voluntarily dismiss his or her individual claims with prejudice; remaining claims that were purported to have been brought on behalf of a class may be dismissed without prejudice with respect to other class members, who may or may not assert the claim in subsequent litigation.

[10] *See, e.g.,* Lee et al., *supra* note 5, at 6 (noting that in cases not remanded, 55% of cases were voluntarily dismissed without class certification or class settlement, and another 29% were dismissed by the court).

[11] This category includes one case in which the parties have announced a class settlement and sought preliminary approval; five cases in which the court has granted preliminary approval (but has not yet finally approved it); one case that resulted in a settlement to fewer than all plaintiff class members; and two cases in which appeals are pending.

[12] Theodore Eisenberg and Charlotte Lanvers, *What is the Settlement Rate and Why Should We Care?*, 6 J. Empir. Leg. Stud. 111, 115 (2009).

[13] *Id.* at 133.

[14] Hilary Hehman, *Class Certification in California: Second Interim Report from the Study of California Class Action Litigation*, Judicial Council of California: Administrative Office of the Courts, at Tables D1-D2 (Feb. 2010), http://www.courts.ca.gov/documents/classaction-certification.pdf (observing that 410 of 1294 resolved cases were settled); *see also* Patricia Hatamyar Moore, *Confronting the Myth of "State Court Class Action Abuses" Through an Understanding of Heuristics and a Plea for More Statistics*, 82 UMKC L. Rev. 133, at 165 & n.192 (2013).

## Do Class Actions Benefit Class Members?

---

[15] *See* 4 *Newberg on Class Actions* § 12:35 (4th ed. 2013) ("[A] common formula in class actions for damages is to distribute the net settlement fund after payment of counsel fees and expenses, ratably among class claimants according to the amount of their recognized transactions during the relevant time period. A typical requirement is for recognized loss to be established by the filing of proofs of claim. . . .").

[16] Nicholas M. Pace & William B. Rubenstein, *How Transparent are Class Action Outcomes? Empirical Research on the Availability of Class Action Claims Data* at 3, RAND Institute for Civil Justice Working Paper (July 2008), billrubenstein.com/Downloads/RAND%20Working%20Paper.pdf.

[17] *Id.* at 31-32 (explaining that in a survey of class action participants, only 25% of "chief executive officers" at settlement administrators responded to the survey, and even those only "did so solely to inform [the researchers] that the information that they held was 'proprietary' to their clients, namely the attorneys that had hired them to oversee the class action claiming process"); *cf.* Deborah R. Hensler, et al., *Class Action Dilemmas: Pursuing Public Goals for Private Gain* 163-64 (2000) (noting difficulty in obtaining "information about the claiming process and distribution" from a "settlement administrator," who "declined to share distribution figures, suggesting that we talk to the attorneys involved with the case," and noting further that the plaintiffs' and defense attorneys had agreed between themselves "not to discuss or divulge matters related to . . . the actual distribution to the class").

[18] *See* Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 93 (2007) (explaining that when a "notice do[es] not estimate the size of the class, . . . class members are unable to calculate their own individual recoveries" and therefore lack "sufficient bases for objecting to the proposed settlement"); *see also Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 744-45 (7th Cir. 2008) (Posner, J.) ("The defendants in class actions are interested in minimizing the sum of the damages they pay the class and the fees they pay the class counsel, and so they are willing to trade small damages for high attorneys' fees. . . . The result of these incentives is to forge a community of interest between class counsel, who control the plaintiff's side of the case, and the defendants. . . . The judge . . . is charged with responsibility for preventing the class lawyers from selling out the class, but it is a responsibility difficult to discharge when the judge confronts a phalanx of colluding counsel.") (citations omitted).

[19] Hensler, *supra* note 17, at 165.

[20] The lone outlier—a case with a 98.72% claims rate—involved the settlement of an ERISA case involving claims about the Bernie Madoff Ponzi scheme for which potentially enormous claims could be made. The math explains why an "astonishing 98.72%" of the 470 members of the damages class filed claims in this $1.2165 billion settlement. Final Order at 11, *In re Beacon Assoc. Litig.*, No. 09-cv-777 (S.D.N.Y. May 9, 2013), PACER No. 77-2. Because each class member's individual claim was worth, on average, over $2.5 million, it is unsurprising that over 460 of the class members decided to submit a claim. Needless to say, virtually no consumer or employment class actions settle for anything approaching such a large amount per class member.

[21] *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005).

[22] Some earlier studies purported to assess the benefits received by class members, but they examined "only what defendants *agreed to pay*" in settlements, rather than "the amounts that defendants *actually paid* after the claims administration process concluded." Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 826 (2010) (emphasis added); *see also* Theodore Eisenberg & Geoffrey Miller, *Attorney's Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 258-59 (2010) (using same approach).

Moreover, because Fitzpatrick studied only settlements (*see* 7 J. Empirical Legal Stud. at 812), his study failed to take into account that most putative class actions are dismissed or otherwise terminated without any benefits for class members. And Eisenberg and Miller ignored settlements that promised *only* nonpecuniary relief (such as coupons or injunctive relief) to class members. An earlier version of their study—which laid the methodological groundwork for the later expanded study in 2010 (*see id.* at 252)—appears to have counted cases involving such "soft relief" only when it was "included" along with pecuniary relief. Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27, 40 (2004).

[23] Plaintiffs' Unopposed Motion for Order Preliminarily Approving Class Action Settlement at 8, *Gianzero v. Wal-Mart Stores, Inc.*, No. 09-cv-00656 (D. Colo. Nov. 21, 2011), PACER No. 464 ("*Gianzero* Preliminary Approval Motion").

[24] Plaintiffs' Motion for Preliminary Approval of Class Settlement at 5-7, *In re Chase Bank USA, N.A. "Check Loan" Contract Litigation*, No. 09-md-2032 (N.D. Cal. July 23, 2012), PACER No. 338.

[25] *See* notes 44–46 and accompanying text.

## Do Class Actions Benefit Class Members?

---

26    Revised Class Action Settlement Agreement ¶¶ 20-22, *Bronster v. AOL, LLC*, No. 09-cv-3568 (C.D. Cal. July 31, 2013), PACER No. 66-10. The settlement also proposes a *cy pres* award to a more related charitable organization. *Id.* ¶ 23.

27    Settlement Agreement and Release at 4, *Claridge v. RockYou, Inc.*, No. 09-cv-6032 (N.D. Cal. Dec. 15, 2011), PACER No. 55-1.

28    Notice of Joint Motion for Final Approval of Class Settlement and Memorandum of Points and Authorities in Support Thereof at 4, *Red v. Unilever United States, Inc.*, No. 10-cv-387 (N.D. Cal. June 6, 2011), PACER No. 153.

29    Plaintiffs' Memorandum in Support of Motion for Final Approval of Class Action Settlement at 4-5, *Hohman v. Matrixx Initiatives, Inc.*, No. 09-cv-3693 (N.D. Ill. May 26, 2011), PACER No. 81.

30    *See, e.g., Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 851 (5th Cir. 1998) (affirming the district court's decision to compare the "actual distribution of class benefits" against the potential recovery, and adjusting the requested fees to account for the fact that a "drastically" small 2.7 percent of the fund was distributed); *see also Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223, 1223 (2000) (O'Connor, J., respecting the denial of certiorari) (noting that fee awards disconnected from actual recovery "decouple class counsel's financial incentives from those of the class," and "encourage the filing of needless lawsuits where, because the value of each class member's individual claim is small compared to the transaction costs in obtaining recovery, the actual distribution to the class will inevitably be small").

31    *See* Federal Judicial Center, *Manual for Complex Litigation (Fourth)* § 27.71 (2004).

32    *SEC v. Bear Stearns & Co.*, 626 F. Supp. 2d 402, 415 (S.D.N.Y. 2009).

33    Testimony of Martin H. Redish at 7, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on the Constitution, *Hearing: Class Actions Seven Years After the Class Action Fairness Act* (June 1, 2012), available at http://judiciary.house.gov/hearings/Hearings%202012/Redish%2006012012.pdf.

34    *Hoffer v. Landmark Chevrolet Ltd.*, 245 F.R.D. 588, 601-04 (S.D. Tex. 2007) (Rosenthal, J.). In one of the cases in our sample, the same district judge cautioned that *cy pres* awards "'violat[e] the ideal that litigation is meant to compensate individuals who were harmed,'" but ultimately approved the award because prior court precedents had authorized the use of *cy pres*. *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1076 (S.D. Tex. 2012) (Rosenthal, J.).

35    *Gianzero* Preliminary Approval Motion at 4.

36    *Id.* at 10.

37    The Dryer Plaintiffs' Opposition to Preliminary Approval of the Proposed Settlement Class, *Dryer v. Nat'l Football League*, No. 09-cv-2182 (D. Minn. Mar. 20, 2013), PACER No. 264.

38    Alison Frankel, Retired NFL stars reject settlement of their own licensing class action, Reuters (Mar. 25, 2013), available at http://blogs.reuters.com/alison-frankel/2013/03/25/retired-nfl-stars-reject-settlement-of-their-own-licensing-class-action/.

39    Class Action Complaint at 2, 24-25, *In re Colonial Bancgroup, Inc. ERISA Litig.*, No. 2:09-cv-792 (M.D. Ala. Aug. 20, 2009), PACER No. 1.

40    *See, e.g.*, Final Judgment at 2-3, *In re Colonial Bancgroup, Inc. ERISA Litig.*, No. 2:09-cv-792 (M.D. Ala. Oct. 12, 2012), PACER No. 207 ("*Colonial Bancgroup* Final Judgment").

41    Bill Donahue, *Colonial Bank Execs Pay $2.5m to Dodge ERISA Claims*, Law360 (June 18, 2012), available at http://www.law360.com/articles/350930

42    Plan of Allocation at 3, *In re Colonial Bancgroup, Inc. ERISA Litig.*, No. 2:09-cv-792 (M.D. Ala. Sept. 14, 2012), PACER No. 192-1.

43    *Colonial Bancgroup* Final Judgment at 8.

44    First Amended Complaint at 2, *Turner v. Storm8, LLC*, No. 4:09-cv-05234 (N.D. Cal. June 22, 2010), PACER No. 27.

45    Motion for Final Approval of Class Action Settlement Agreement at 3, *Turner v. Storm8, LLC*, No. 4:09-cv-05234 (N.D. Cal. Nov. 11, 2010), PACER No. 32.

46    Settlement Agreement at 8, *Turner v. Storm8, LLC*, No. 4:09-cv-05234 (N.D. Cal. June 22, 2010), PACER No. 26-1.

47    Attorney's Fees Slashed in Faulty Laptop Class Action, *BNA Class Action Litigation Report*, 14 Class 1497 (Oct. 25, 2013), available at http://news.bna.com/clsn/CLSNWB/split_display.adp?fedfid=37476946&vname=classnotallissues&jd=a0e2t3w1f0&split=0. This case was among the ones we studied, but the court's decision awarding a reduced amount of attorneys' fees was issued after the closing date of our study.

## Do Class Actions Benefit Class Members?

[48]    Nicholas M. Pace et al., *Insurance Class Actions in the United States*, Rand Inst. for Civil Just., xxiv (2007), http://www.rand.org/pubs/monographs/MG587-1.html. Another RAND study similarly found that in three of ten class actions, class counsel received more than the class. *See* Deborah R. Hensler et al., *Class Action Dilemmas: Pursuing Public Goals for Private Gain* (Executive Summary), Rand Inst. for Civil Just., 21 (1999), http://www.rand.org/pubs/monograph_reports/MR969.html.

[49]    *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 648, 650 (7th Cir. 2006) (emphasis added).

[50]    *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 329 n. 60 (3d Cir. 2011) (en banc) (emphasis added; quotation marks omitted).

[51]    Declaration of Kevin Ranlett in Support of Defendants' Amended Motion to Compel Arbitration at 8, *Coneff v. AT&T Corp.*, No. 2:06-cv-00944 (W.D. Wash. May 27, 2009), PACER No. 199. Mr. Ranlett is a Mayer Brown lawyer.

[52]    *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F. Supp. 2d 320, 321 (D. Me. 2005).

[53]    *Yeagley v. Wells Fargo & Co.*, 2008 WL 171083, at *2 (N.D. Cal. Jan. 18, 2008), *rev'd*, 365 F. App'x 886 (9th Cir. 2010).

[54]    *LaGarde v. Support.com, Inc.*, 2013 WL 1283325, at *6 (N.D. Cal. Mar. 26, 2013). The court approved a proposed modified settlement under which the class members "who made a claim" after having been "offered a $10 cash payment * * * will now receive a $25 cash payment, rather than $10." *Id.* at *4.

[55]    *In re Apple iPhone 4 Prods. Liab. Litig.*, 2012 WL 3283432, at *1 (N.D. Cal. Aug. 10, 2012).

[56]    *Union Fid. Life Ins. Co. v. McCurdy*, 781 So. 2d 186, 188 (Ala. 2000).

[57]    *Palamara v. Kings Family Rests.*, 2008 WL 1818453, at *2 (W.D. Pa. Apr. 22, 2008).

[58]    *Moody v. Sears, Roebuck & Co.*, 2007 WL 2582193, at *5 (N.C. Super. Ct. May 7, 2007), *rev'd*, 664 S.E.2d 569 (N.C. Ct. App. 2008).

[59]    *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139 (S.D.N.Y. 2008).

[60]    Cheryl Miller, "Ford Explorer Settlement Called a Flop," *The Recorder* (July 13, 2009), http://www.law.com/jsp/article.jsp?id=1202432211252.

[61]    Michelle Singletary, *Class-action Coupon Settlements are a No-Win for Consumers*, Wash. Post, Apr. 28, 2011 at A14.

[62]    *Id.*

[63]    *See* Stipulation of Settlement of Class Action, *Bachman v. A.G. Edwards, Inc.*, No. 22052-01266-03 (Mo. Cir. Ct. St. Louis Feb. 18, 2010), http://www.agedwardsclassactionsettlement.com/bach_20100219094521.pdf; *see also* Daniel Fisher, *Lawyer Appeals Judge's Award of $21 Million in Fees, $8 Coupons for Clients*, Forbes.com (Jan. 10, 2011), http://blogs.forbes.com/danielfisher/2011/01/10/lawyer-appeals-judges-award-of-21-million-in-fees-8-coupons-for-clients ("The judge didn't even see fit to inquire into the lawyers' valuation of the coupon portion of the settlement, despite strong evidence that less than 10% of coupons in such cases are ever redeemed").

[64]    Stipulation of Settlement at 2-8, *Weeks v. Kellogg*, No. 2:09-cv-8102 (C.D. Cal. Jan. 10, 2011), PACER No. 121.

[65]    Memorandum of Law in Support of Plaintiffs' Motion for Award of Attorneys' Fees, Expenses, and Plaintiff Service Awards at 4, *Weeks v. Kellogg*, No. 2:09-cv-8102 (C.D. Cal. July 18, 2011), PACER No. 135-1.

[66]    *See* Memorandum Opinion at 3-5, 8, *Radosti v. Envision EMI, LLC*, No. 1:09-cv-887 (D.D.C. June 8, 2010), PACER No. 40; Order at 1-2, *Radosti v. Envision EMI, LLC*, No. 1:09-cv-887 (D.D.C. Jan. 19, 2011), PACER No. 45.

[67]    *Lane v. Facebook, Inc.*, 696 F.3d 811 (9th Cir.), *reh'g en banc den.* 709 F.3d 791 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 8 (2013).

[68]    Petition for Certiorari at 11-13, *Marek v. Lane*, No. 13-136 (filed July 26, 2013), 2013 WL 3944136.

[69]    *Lane*, 696 F.3d at 835 (Kleinfeld, J., dissenting) (emphasis added).

[70]    *Marek*, 134 S. Ct. at 9 (Roberts, C.J., respecting the denial of certiorari).

[71]    *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496 (6th Cir. Aug. 26, 2011).

[72]    *Id.* at 500.

[73]    Opinion and Order at 10-11, *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, No. 1:08-cv-605 (N.D. Ohio, Apr. 30, 2010), PACER No. 308.

[74]    Class Counsel's Supplemental Memorandum in Support of Class Counsel's Motion for Award of Attorney's Fees and Reimbursement of Litigation Expenses at 3-4, 7, *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, No. 1:08-cv-605 (N.D. Ohio Mar. 19, 2010), PACER No. 296

## Do Class Actions Benefit Class Members?

---

[75]   *See, e.g.,* Deborah Hensler, et al., *Class Action Dilemmas: Pursuing Public Goals for Private Gain* § 4.60 (RAND Institute for Civil Justice, Monograph MR-969/1-ICJ) (1999) ("Enormous methodological obstacles confront anyone conducting research on class action litigation. The first obstacle is a dearth of statistical information. No national register of lawsuits filed with class action claims exists. Until recently, data on the number of federal class actions were substantially incomplete, and data on the number and types of state class actions are still virtually nonexistent. Consequently, no one can reliably estimate how much class action litigation exists or how the number of lawsuits has changed over time. Incomplete reporting of cases also means that it is impossible to select a random sample of all class action lawsuits for quantitative analysis.").

[76]   By way of example, four cases—*Sansom v. Heartland Payment Sys., Inc.* No. 09-cv-335 (D.N.J.); *Lone Summit Bank v. Heartland Payment Sys., Inc.* No. 09-cv-581 (D.N.J.); *Tricentury Bank v. Heartland Payment Sys., Inc.* No. 09-cv-697 (D.N.J.), and *Kaissi v. Heartland Payment Sys., Inc.* No. 09-cv-540 (D.N.J.)—eventually were consolidated into *In re: Heartland Payment Sys., Inc., Customer Data Security Breach Litigation*, No. 4:09-md-02046 (S.D. Tex.).

[77]   The decision to treat these consolidated cases along with the lead case had little effect on our data. A comparison of statistics on outcomes reveals that, if anything, treating consolidated class actions as a single action rather than separately tended to overstate the benefits of class actions.

In our full 188-case sample set (including the consolidated cases), 99 cases (54%) were dismissed, whether on the merits by the court, by the plaintiff voluntarily, or as an inferred settlement on an individual basis; 31 cases (16%) remain pending; 55 cases (29%) were settled on a class-wide basis; and 3 cases (2%) were dismissed after the court granted a motion to compel arbitration. By comparison, in the 169-case sample set (excluding the consolidated cases), 99 cases (57%) were dismissed, whether on the merits by the court, by the plaintiff voluntarily, or as an inferred settlement on an individual basis; 23 cases (14%) remained pending; 47 cases (28%) were settled on a class-wide basis; and 1 (1%) was dismissed after the court granted a motion to compel arbitration.

Similarly, this methodology ensures that me-too actions—cases filed by other attorneys after a complaint in a different case, raising materially identical claims—that are routinely dismissed after consolidation without any award or settlement will instead be treated as sharing in any benefits to class members that were actually obtained.

[78]   The Supreme Court has held that the EEOC may pursue enforcement actions under Title VII § 706 without being certified as a class representative under Federal Rule of Civil Procedure 23. *See Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 US. 318 (1980). The Supreme Court's reasoning would appear to apply equally outside the context of Title VII. Because the EEOC does not need to pursue a Rule 23 class, the dynamics of EEOC class-wide enforcement actions differ markedly from those in Rule 23 actions.

[79]   Class actions under the FLSA are certified conditionally as "opt-in" classes. Section 216(b) of the FLSA permits a right of action against an employer by an employee on behalf of "other employees similarly situated," who must have opted in by providing and filing with the court "consent in writing" to become a plaintiff. 29 U.S.C. § 216(b). These cases present different incentives for plaintiffs' counsel than consumer class actions, because they typically involve statutory attorneys' fees to prevailing plaintiffs and may involve large backpay and overtime pay awards.

[80]   As one academic study explained, securities class actions "are managed under a set of class action rules distinct from those used for other Rule 23(b)(3) classes—and…the plaintiffs with the largest losses have a significant role in the litigation (including choosing class counsel and defining the terms of the settlement) and can hardly be thought of [as] an 'absent' class member." Pace & Rubenstein, *supra* note 16, at 20; *see, e.g.,* Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-76, 109 Stat. 737 (1995); Securities Litigation Uniform Standards Act of 1998, Pub. L. No. 105-353, 112 Stat. 3227 (1998).

[81]   Recall that our 169-case sample set, which included these cases, resulted in 57% of cases dismissed, 14% pending, 28% settled on a class-wide basis, and 1% dismissed after an order compelling arbitration. *See supra* note 77. After excluding them, our 148-case sample set resulted in 57% of cases dismissed, 14% pending, 28% settled on a class-wide basis, and 1% dismissed after an order compelling arbitration. *See* Figure 1.

[82]   If a case was a related case in a consolidated action, we collected information based on what happened in the lead case.

[83]   If a case was voluntarily dismissed, we attempted to discern from filings (and from sources external to the docket) whether the dismissal should be attributed to a settlement on an individual basis—such as when the filings refer to a settlement, or when the named plaintiff sought to dismiss her own claims with prejudice but without prejudice to absent members of the putative class. On one hand, this is likely to understate the rate at which individual plaintiffs settle their claims individually, which in any event results in no recovery to other absent members of the putative class unless another lawsuit moves forward. On the other hand, we were often not able to discern whether the claims in a lawsuit dismissed voluntarily would continue to be litigated (or settled) by another named plaintiff under a different case caption. Thus our decision to select a readily accessible

# Do Class Actions Benefit Class Members?

sample of class actions may understate the extent to which members of a putative class may have their claims dismissed on the merits, or alternatively settled, in a class action under a different docket.

84 The data set includes two certified class actions in which motions for summary judgment are pending. The data set also includes an additional certified class action in which the court granted summary judgment to the plaintiffs on their claim for injunctive relief, and granted summary judgment to the defendants on all remaining claims. At the time our study closed, on September 1, 2013, the parties proposed text for an injunctive order that would resolve the parties' remaining claims on a class-wide basis.

Mayer Brown is a global legal services provider comprising legal practices that are separate entities (the "Mayer Brown Practices").  The Mayer Brown Practices are: Mayer Brown LLP and Mayer Brown Europe-Brussels LLP, both limited liability partnerships established in Illinois USA; Mayer Brown International LLP, a limited liability partnership incorporated in England and Wales (authorized and regulated by the Solicitors Regulation Authority and registered in England and Wales number OC 303359); Mayer Brown, a SELAS established in France; Mayer Brown JSM, a Hong Kong partnership and its associated entities in Asia; and Tauil & Chequer Advogados, a Brazilian law partnership with which Mayer Brown is associated. "Mayer Brown" and the Mayer Brown logo are the trademarks of the Mayer Brown Practices in their respective jurisdictions.