# EXHIBIT 3

## to Declaration

NERA
ECONOMIC CONSULTING

22 July 2014

# Consumer Class Action Settlements: 2010 – 2013
# Settlements Increasing, With a Focus on Privacy



By **Dr. Stephanie Plancich**, **Adam Augustson**, and **Wendy Magoronga**

## Executive Summary

Last year Skechers USA Inc., a company that designs and markets footwear, reached a $45 million settlement to resolve a class action claiming that the company had falsely advertised the health benefits of its toning shoes without enough proof to validate its claims. In 2012, PNC Bank agreed to pay over $90 million when it became one of several banks to reach a settlement with a class of consumers for allegedly using a computer software scheme to illegally collect excessive overdraft fees from customers' checking accounts. Such consumer class actions—cases where plaintiffs purchased a product or service from a defendant and allege some kind of fraud, product defect, or other information failure—have become ubiquitous. Actions are filed against defendants each week, with dozens of cases settling each year. Many large settlements have been reached across a wide variety of industries, with hundreds of millions of dollars earmarked for settlement funds each year.

NERA has created a proprietary database tracking these settlements from 2010 to 2013, using public information to identify settlements and collect case characteristics. We observe an increase in the number of settlement funds established each year in this data. The majority of these cases had a settlement fund value less than $20 million, and the median settlement was $9 million. Very large settlements also occurred, however: a dozen cases settled for more than $150 million over the four-year period, bringing the average settlement to $56.5 million.

Some settlement funds consisted entirely of monetary payments to plaintiffs; others included non-monetary payments "in-kind", including product replacements, vouchers or coupons. Still others included contributions to charity.

Insight in Economics™

Consumer class action settlements were associated with a wide variety of allegations, including consumer fraud, antitrust-related claims such as price fixing, false advertising, or product liability claims. Both on average and at the median, antitrust-related settlements were the most expensive (with a median settlement value of $20.3 million), while false advertising cases had the lowest median settlement value, at $5.7 million.

In recent years, an increasing number of settlements related to allegations of violations of consumer privacy were made across a number of defendant industries. These cases typically fall into two categories: cases alleging unlawful collection of personal information, and those relating to unsolicited SPAM. In these cases, SPAM is defined as unwanted and unsolicited contact via telephone, text message, mail or fax. While the number of such cases has been trending upward, the average settlement value for these privacy cases has yet to show an increasing trend.

## Data and Methodology

Using public data sources, we identified 479 consumer class actions for which either a preliminary settlement was reached or the final settlement was approved by a judge between January 1, 2010 and December 31, 2013. For this study, we defined consumer class actions as cases in which a class of consumers had purchased a product or service from the defendant(s) and that included at least one of the following types of allegations:

- **False Advertising/ Misrepresentation:** Defendant allegedly misrepresented their product, usually through allegedly misleading advertisements or labeling.

- **Product Liability:** Defendant is allegedly liable because of some problem or defect with their product.

- **Violation of Consumer Privacy:** Defendant allegedly violated the privacy of individuals, for example by contacting persons or sharing individuals' private information with a third party without obtaining prior consent.

- **Inadequate Information/ Warning:** Defendant allegedly failed to adequately warn or inform consumers about the product. For example, allegations in this category include failing to inform consumers of hidden fees or dangers associated with a product.

- **Fraud:** Defendant's actions were allegedly fraudulent. For example, this category includes cases with allegations related to unauthorized and/or misleading charges paid by consumers.

- **Antitrust:** Defendant was allegedly involved in anti-competitive practices such as price fixing or false patent suits.

Because class actions may include multiple types of allegations, some of the consumer class actions in our data fall into more than one category. Our data does not include labor or employment class actions—such as cases with allegations of unpaid overtime or off-the-clock work—or securities class actions.

To identify consumer class action settlements, we reviewed articles published on *law360.com*, searching for key words to identify relevant articles and then reviewing these articles to identify settlements.[1] As a check on this list, we compared it to settlements provided on a website designed to provide consumers with information about class action settlements, *topclassactions.com*, supplementing our list where appropriate. The resulting database includes both preliminary and final settlements.[2]

For this list of settlements, we collected detailed case-specific information from news articles, press releases, settlement websites, and court documents.[3] We defined "settlement year" as the year the settlement agreement was published on *law360.com* or *topclassactions.com*; where multiple articles discussing the settlement were published on *law360.com*—for example because a settlement was revised or finalized—the last date was used. We defined "settlement fund value" as the aggregate amount paid by the settling defendant(s), which includes the value of the benefits to class members (actual or approximate), the amount paid to class counsel and/or a charitable donation, where applicable.

In many cases, the aggregate settlement value was not reported at the time of settlement because the total size would ultimately depend on the number and value of individual claims that emerged during the claim process and/or the total value of the settlement fund was not capped. In other instances, the total settlement value was unreported because benefits received by class members were difficult to value. We found that the aggregate value of the settlement fund was reported for 321 of the 479 cases in our data, while the documents we reviewed did not provide an aggregate value of the settlement fund for the remaining 158 settlements.

## Consumer Class Action Settlements Have Been Increasing from 2010 to 2013

Our data show a steady increase in consumer class action settlements from 2010 to 2013. This trend holds for all cases, as well as for those with a reported settlement fund value.

Exhibit 1.  **Settled Cases by Settlement Year**
Settlements Increased From 2010 To 2013



Over this period, the aggregate value of the settlement funds for the 321 cases with a
reported value was approximately $18 billion. Aggregate settlement values varied from year
to year, ranging from $1.7 billion in 2010 up to $9.7 billion in 2012.

Two very large settlement funds of more than $1 billion topped the distribution of
individual case settlements. In 2012, Visa Inc. and MasterCard Inc. paid $7.25 billion
to settle with persons, businesses or other entities that accepted their payment cards,
resolving a case alleging excessive and anti-competitive swipe fees.[4] In 2013, Toyota Motor
Corp. established a $1.6 billion settlement fund to resolve a proposed class of roughly
23 million customers over recalls for defects in vehicles that caused sudden unintended
acceleration. If we exclude these two very large settlements, the total aggregate amounts
paid by settling defendants in consumer class actions exhibited a gradually increasing trend
from 2010 to 2013.

Exhibit 2.  **Total Settlement Fund Value by Settlement Year**
Billions of Dollars Were Paid in Total Settlements Each Year



Substantial variation existed in the size of these settlement funds. The majority were
settled for less than $20 million, while roughly half of the cases with a reported settlement
value settled for less than $10 million. Fewer than 5 percent—just 12 settlements—had
settlement funds valued at more than $150 million.

Exhibit 3.  **Distribution of Settlement Fund Value**
The Majority of  Settlements Were Under $20 Million,
But a Dozen Settlements Were Over $150 Million



Nearly three-quarters of all consumer class actions were settled in five states, with
approximately half of the cases clustered in California. The other states with substantial
numbers of settlements were Florida, Illinois, New Jersey and New York.

Exhibit 4.  **Settled Cases by State**
Majority of Settled Cases Were In
California, Florida, Illinois, New Jersey and New York



Settling defendants came from a wide range of industries, including banking/finance,
cosmetics/pharmaceuticals, and retail.

The banking/finance sector had both the most **cases settled** and also roughly half of the
aggregate **settlement dollars**, driven by the $7.25 billion Visa/ Mastercard settlement
noted above. Similarly as a result of the $1.6 billion Toyota settlement, more than 10% of
the aggregate settlement funds were related to the motor vehicle industry. If these two
large settlements are excluded, the settlements become more evenly distributed across
industries, although five industries—banking/finance, building materials/industrial products,
business/consumer services, cosmetics/pharmaceuticals and electronics—had more than 10
percent of aggregate settlement dollars each. Two industries—entertainment/social media
and telecommunications—accounted for a relatively small share, with less than 1 percent of
aggregate settlements in each.

Exhibit 5.  **321 Settled Cases with Reported Settlement Fund Value
by Industry of Settling Defendant(s)**
Most of the Settlement Fund Dollars Were Concentrated in the Banking/Finance Industry,
While the Distribution of Settled Cases Was More Even



We also looked by allegation. The most common allegation in our data is fraud, with false
advertising/misrepresentation the second most frequent. Limiting to the 321 cases with a
reported settlement fund value, fraud remains the most common allegation while antitrust
cases become the second most frequent.

While most of the **cases settled** had allegations of fraud or false advertising, most of
the **settlement dollars**—56 percent of the total—were related to antitrust cases. Again,
the large Visa/MasterCard settlement is driving this pattern. Excluding the two very large
settlements, we find that approximately 63 percent of the total settlement dollars in our
data were paid to resolve fraud and antitrust class actions.

Exhibit 6.    **321 Settled Cases With Reported Settlement Fund Value by Type of Allegation**
While Only 22 Percent of Cases Had Antitrust Allegations,
Over Half of the Settlement Fund Dollars Were Related to Antitrust Cases



## Composition of Settlements: Cash, In-Kind, or Charitable Donation

Broadly, we find that benefits paid out by defendants in consumer class action settlements fell into one of three categories: monetary compensation to plaintiffs, non-monetary compensation to plaintiffs and charitable donations. We define monetary compensation as direct payments to plaintiffs that could be dispersed as checks or credits to a plaintiff's account with the defendant. Non-monetary, "in kind" compensation is defined to include vouchers, repairs to or replacements of defective products, or other types of special offers. Some settlements may have included more than one type of compensation.

The vast majority of settlements in our data included a monetary component. Of the 321 settlements with a reported settlement value, 84 percent included a monetary payment to plaintiffs as at least one component of the settlement. Only 26 percent included a non-monetary payment as at least one component of the settlement, while only 6 percent included a donation to a charity as a major component of the settlement. For example, plaintiffs alleged that Netflix had, in a violation of the Video Privacy Act, retained customers' personal and financial information, including viewing history, even after they canceled their accounts. While no cash was paid to plaintiffs, the 2013 settlement called for approximately $6.4 million to be distributed to independent nonprofits that committed to use the money to expand privacy rights.

These different types of benefits were not mutually exclusive, and settlements sometimes
provided more than one type of benefit. For example, 17 percent of these same 321
settlements included both a monetary and non-monetary payment. In one case, under a
settlement reached in 2011 with customers who alleged Ticketmaster tricked them into
buying more expensive concert tickets from a scalping website it owned, the company
agreed to compensate each class member with either (1) a one-time rebate on a ticket
purchase that was to take the form of a promotional code entered at the time of purchase,
or (2) a one-time cash payment of $10. Under another settlement, reached in 2012
between health food maker Sensible Foods and a class of consumers claiming the company
deceived them about the fat and caloric content of its products, plaintiffs were fully
reimbursed for the products at issue. However, in the event that the total refunds paid out
to class members fell short of $1.35 million, Sensible Foods agreed to offer discounts of at
least $1 off selected products for a limited period of time.

Exhibit 7. **Composition of Settlements for 321 Settled Cases With
Reported Settlement Fund Value**
64% Included Only a Monetary Component



In 30 percent of cases where the aggregate settlement value was not reported, a monetary
payment was included as the only form of compensation. Another 27 percent of these
settlements included only non-monetary, in-kind compensation, and 33 percent included
both monetary and non-monetary forms of compensation.

As noted above, the aggregate settlement value in many cases was not reported because
the total size of the settlement would ultimately depend heavily on the number and
value of individual claims that emerged during the claim process and/or the total value of
the settlement fund was not capped. For example, the settlement reached with Radiant
Technology and its successor Uponor Inc. in 2012 did not include a dollar cap on class
members' claims and called for the companies to repair, and possibly replace, allegedly
faulty plumbing systems. The settlement noted that the parties were unable to estimate
how many homes or buildings contained the plumbing systems at issue but that the parties
agreed there were thousands of potential class members.

In other instances, the total settlement value in many cases was unreported because
benefits received by class members were difficult to value. Settlements with non-monetary
components were more often difficult to value, and as a result, were more likely to be
missing a settlement fund value in our data. Specifically, while 26 percent of the 321
settlements with a reported settlement value included a non-monetary component,
60 percent of the 158 settlements with an unreported settlement value included a
non-monetary component. For example, a settlement reached in 2010 between AT&T and
a class of mobile customers resolved a dispute alleging that AT&T had violated the law
by locking cell phone handsets to make it more difficult for customers to switch service
providers. The settlement, which included only a non-monetary award, called for AT&T to
unlock its customers' devices.

Exhibit 8. **Composition of Settlements for 158 Settled Cases With Unreported Settlement Fund Value**
30% Include Only a Monetary Component




The type of benefit paid out by defendants also varied depending on the type of allegations at issue in the case. More than half of the settlements with allegations of false advertising/misrepresentation, violation of consumer privacy, fraud and antitrust included a monetary payment as the only component of the settlement. However, product liability and inadequate information/warning cases were more likely to have part or all of the settlement as non-monetary.

Exhibit 9.    **321 Cases With Reported Settlement Fund Value by Type of Allegation**
The Majority of Cases Had Only a Monetary Payment, But Inadequate Warning/Information and Product Liability Cases Were More Likely to Have a Non-Monetary Component



## Size of Settlement Funds

For cases with reported settlement fund values, the average settlement fund value across all years in our data was $56.5 million. The average varied substantially from year to year, driven in large part by the Visa/MasterCard and Toyota settlements. If these very large settlements are excluded, the annual averages showed a slightly decreasing trend over the four-year period.



Exhibit 10. **Average and Median Settlement Fund Values for 321 Cases with Reported Settlement Fund Value**
Annual Median Settlement Fund Value Was More Stable than Annual Averages

The median settlement amount, or the value of the settlement at the 50th percentile, was not affected by either high or low outlier cases. Over the four-year period, the overall median settlement was $9 million, and the annual median was very stable, ranging between $9 and $10 million each year.

We also observe substantial variability in the average settlement fund amount by industry of the defendant. While most industries had averages under $50 million, the motor vehicles and banking/finance industries stood out with average settlement fund values above $50 million, again affected by the two settlements over $1 billion. Median settlements showed less variability by industry, but the motor vehicles and transportation industries had median settlements that were more than twice as large as medians in any of the other industries.

Exhibit 11. **Average and Median Settlement Fund Value by Industry of Settling Defendant(s)**
Median and Average Settlement Fund Value Were Highest in Motor Vehicle Industry



Average settlement fund values also varied by type of allegation. Again, the two settlements over $1 billion affected the averages and caused the product liability and antitrust average settlements to be more than two times the size of settlement averages for other types of cases. Cases alleging a violation of consumer privacy had the lowest average settlement at only $8.1 million. As expected, the median settlements by allegation type showed less extreme variation, ranging from about $6 million to about $20 million. At the median, as well as at the average, antitrust settlement funds were the most expensive.

Exhibit 12. **Average and Median Settlement Fund Value by Type of Allegation**
Median and Average Settlement Fund Value Were Highest in Cases with Antitrust Allegations



## Products, Industries and Allegations in Settlements

Certain product/allegation pairs showed up relatively frequently in consumer class actions. For example, the majority of products involved in false advertising/ misrepresentation cases were drugs and food products. Product liability cases mostly involved automotive products, building materials and electronics, and fraud cases predominately involved checking accounts and loans, mortgages or insurance products. See Table 1.

Similarly, certain industry/allegation pairs were more common. For example, 37 percent and 34 percent of the defendants named in false advertising/ misrepresentation cases were in the cosmetics/pharmaceuticals and food products industries, respectively. 24 percent of the defendants named in violation of consumer privacy cases were in the retail industry. 57 percent of the defendants named in fraud cases were in the banking/finance industry. See Table 2.

Looking more closely at these common industry/allegation pairs, we find that:

- For the false advertising/ misrepresentation cases that named defendants in the cosmetics/ pharmaceuticals industry, 35 percent of the cases involved cosmetics and 52 percent involved drugs.

- For the violation of consumer privacy cases that named defendants in the retail industry, 69 percent involved the defendants' unlawful collection of customers' personal information and 31 percent related to allegations of SPAM.

- For fraud cases that named defendants in the banking/finance industry, about half involved checking accounts; other cases involved products such as credit cards (14 percent) and loans/ mortgage/ insurance (32 percent).

Table 1. **Distribution of Products Involved in Settled Consumer Class Actions by Type of Allegation**
**For the 321 Cases with Reported Settlement Fund Value**
The Top Product for Each Type of Allegation is Boxed

| Type of Product (1) | Type of Allegation | | | | | | |
|---|---|---|---|---|---|---|---|
| | False Advertising/ Misrepresentation (2) | Product Liability (3) | Violation of Consumer Privacy (4) | Inadequate Warning/ Information (5) | Fraud (6) | Antitrust (7) | Multiple Allegations (8) |
| Apparel | 10% | 0% | 0% | 0% | 0% | 0% | 0% |
| Appliances | 3% | 8% | 0% | 0% | 0% | 4% | 0% |
| Automotive | 0% | 21% | 0% | 0% | 1% | 3% | 10% |
| Building Material | 0% | 33% | 0% | 0% | 0% | 4% | 0% |
| Checking Accounts | 0% | 0% | 0% | 0% | 31% | 0% | 0% |
| Cosmetics | 13% | 0% | 0% | 9% | 0% | 0% | 5% |
| Credit Cards | 2% | 0% | 0% | 0% | 9% | 1% | 14% |
| Drugs | 24% | 0% | 0% | 0% | 3% | 14% | 24% |
| Electronics | 2% | 25% | 0% | 0% | 3% | 17% | 0% |
| Food Products | 32% | 4% | 0% | 9% | 0% | 14% | 0% |
| Loan/Mortgage/Insurance | 2% | 0% | 2% | 0% | 23% | 3% | 14% |
| Other | 10% | 4% | 0% | 45% | 16% | 25% | 10% |
| Personal Information | 0% | 0% | 49% | 0% | 0% | 0% | 5% |
| Professional Services | 0% | 0% | 2% | 9% | 9% | 11% | 0% |
| Spam | 0% | 0% | 47% | 0% | 0% | 0% | 0% |
| Telecommunication | 2% | 0% | 0% | 0% | 5% | 0% | 14% |
| Toys | 0% | 0% | 0% | 0% | 0% | 3% | 0% |
| Vouchers | 2% | 4% | 0% | 27% | 0% | 0% | 5% |
| **All Products** | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Table 2. **Distribution of Settling Defendant(s) Industry in Settled Consumer Class Actions by Type of Allegation**
**For the 321 Cases with Reported Settlement Fund Value**
The Top Defendants' Industry for Each Type of Allegation is Boxed

| Industry of Settling Defendant(s) (1) | Type of Allegation | | | | | | |
|---|---|---|---|---|---|---|---|
| | False Advertising/ Misrepresentation (2) | Product Liability (3) | Violation of Consumer Privacy (4) | Inadequate Warning/ Information (5) | Fraud (6) | Antitrust (7) | Multiple Allegations (8) |
| Banking/Finance | 3% | 0% | 18% | 9% | 57% | 1% | 19% |
| Building Materials/ Industrial Products | 5% | 29% | 4% | 0% | 3% | 24% | 10% |
| Business/Consumer Services | 2% | 0% | 22% | 18% | 16% | 11% | 5% |
| Cosmetics/Pharmaceuticals | 37% | 0% | 0% | 18% | 3% | 17% | 19% |
| Electronics | 3% | 25% | 7% | 18% | 4% | 15% | 5% |
| Entertainment/Social Media | 0% | 0% | 7% | 0% | 5% | 0% | 5% |
| Food Products | 34% | 4% | 5% | 9% | 0% | 11% | 5% |
| Insurance | 0% | 4% | 4% | 9% | 5% | 1% | 10% |
| Motor Vehicles | 0% | 21% | 2% | 0% | 0% | 3% | 5% |
| Retail | 15% | 13% | 24% | 9% | 3% | 4% | 10% |
| Telecommunications | 2% | 0% | 5% | 9% | 5% | 0% | 10% |
| Transportation | 0% | 4% | 2% | 0% | 0% | 11% | 0% |
| All Industries | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

## Characteristics of Consumer Class Action Settlements without a Reported Settlement Fund Value

A comparison of the cases with and without a total settlement value in our data shows some differences in the characteristics of the two groups.

Exhibit 13. **Distribution of Cases by Type of Allegation**
A Higher Percentage of Cases with Unreported Settlement Fund Value Included Allegations Related to Product Liability than of Cases with Reported Settlement Value



First, settlements without a reported value were relatively likely to be associated with allegations related to product liability. 32 percent of settlements with an unreported settlement value were associated with allegations related to product liability while only 7 percent of settlements with a reported settlement value were related to this type of allegation. On the other hand, cases with a reported settlement value were relatively more likely to have allegations in the fraud and antitrust categories: 24 percent of cases with reported settlement values fell into the fraud category (vs. 16 percent of cases with unreported settlement values) and 22 percent of cases with reported settlement values fell into the antitrust category (vs. just 5 percent of cases with unreported settlement values).

Approximately 84 percent of cases with a reported settlement value included a monetary payment, compared to just 66 percent of cases for which the settlement value is unreported. Conversely, the cases in our data for which settlement value was unreported were much more likely to include a non-monetary component to the settlement (60 percent versus just 26 percent of the cases with a reported settlement).

Exhibit 14. **Percentage of Settlements that Included a Non-Monetary Component**
Settlements for Cases with Unreported Settlement Fund Value Were More Likely to Include a Non-Monetary Component



# Trend in Consumer Class Action Settlements: Growth of Privacy Violation Cases

Our data indicate that the number of settlements related to cases in which plaintiffs alleged a violation of privacy increased over the 2010 to 2013 period. These cases can be classified into two categories: SPAM and improper handling/collection of personal information. SPAM allegations typically included unwanted phone calls or text messages—allegedly sent in violation of the Telephone Consumer Protection Act (TCPA)—and also may have included faxes. Other cases in this category related to the improper use and/or collection of customers' personal information. Our data include 84 actions with allegations of violations of consumer privacy.

Exhibit 15. **Settled Cases that Alleged a Violation of Consumer Privacy by Settlement Year**
Settlements for Cases that Alleged a Violation of Consumer Privacy
Increased From 2010 to 2013



For these 84 cases, the split between type of allegation—SPAM vs. personal information—was skewed towards alleged misuse of personal information, with almost twice as many settlements related to cases that alleged improper handling of personal information. The mix of allegation type varied by industry, however. Settlements in the retail, business/consumer services and entertainment/social media industries were more likely to be related to improper use of personal information than to SPAM.

Settlements in the banking/finance and telecommunications industries were more likely to be related to SPAM.



Exhibit 16. **Settled Cases that Alleged a Violation of Consumer Privacy by Type of Allegation**
In Banking/Finance, Business/Consumer Services, Entertainment/Social Media, Retail
and Telecommunications Industries

*Cases with Defendants in the Retail, Business/Consumer Services and Entertainment/Social Media Industries
Were More Likely to Include Allegations Related to Misuse of Personal Information than SPAM*



*Cases with Defendants in the Banking/Finance and Telecommunications Industries Were More Likely to Include
Allegations Related to SPAM than the Misuse of Personal Information*



We found that two types of cases—those that alleged violations of consumer privacy
and those that alleged false advertising/misinformation—were the most likely to include
a charitable donation as a principal part of the settlement. A similar percentage of the
settlements for these two types of cases included a charitable donation. A charitable
donation was the only component of the settlement in just six cases in our data and five of
these six cases alleged a violation of consumer privacy.

The cases where a charitable donation was the only component of the settlement included
the following:

- In 2013, Google reached an $8.5 million settlement over an alleged violation of privacy rights. The settlement resolved a case brought over allegations that Google illegally divulged search query information to third parties via the URL from its search engine results page. With a class estimated to include over 100 million consumers, the sheer size of the class made direct payments to plaintiffs impractical.

- Also in 2013, Netflix reached a $9 million settlement to resolve claims that it violated the Video Privacy Protection Act by storing the financial information and viewing history of former customers who had canceled their accounts. After payment of attorneys' fees and incentives to class representatives, the settlement was distributed to *cy pres* recipients, which the agreement defines as "not-for-profit organizations, institutions or programs that educate users, regulators and enterprises regarding issues relating to the protection of privacy, identity and personal information through user control."

- In 2011, Say Media reached an $825,000 settlement in a class action alleging that its predecessor, advertising network VideoEgg, used flash cookies to bypass individuals' computer browser privacy controls and track their internet activity without their knowledge or consent. The defendant will set up a cash settlement fund of $825,000 to be distributed to nonprofit organizations and educational institutions to fund research and promote consumer awareness about privacy and security of electronic information.

In 2012, another cluster of settlements involved allegations alleging that defendants in the banking/finance industry violated the Telephone Consumer Protection Act—for example by placing calls to cellphones without "prior express consent". Four cases were settled, with fund values ranging from $9 million to $24 million. In two of these cases, plaintiffs' recoveries were established as cash payments ranging from $25-$500 per class member.

There is evidence that litigation related to alleged violations of consumer privacy will continue to grow. In a July 2013 article published in the *New York Law Journal*, Lawrence Gresser and Karen Bromberg noted that "[h]istorically, plaintiffs have had a difficult time showing that they have sustained damages from alleged privacy violations, and this has frustrated most attempts to bring privacy class actions." However, the authors point out that "[t]he comScore decision and other recent decisions allowing privacy cases to proceed in the absence of actual damages suggest that the legal landscape may be changing, and that privacy could be the next significant frontier in consumer class action litigation."[5] Other observers also suggest that lawsuits and settlements related to consumer privacy issues will continue during 2014. In a January 17, 2014 article, Michael J. Mueller and Emily Burkhardt Vicente predict that in 2014 "Plaintiffs' counsel will continue to file consumer fraud and privacy class actions. Some of these cases will be based on corporate data breaches that have filled the headlines in recent years… Other cases will be privacy cases alleging the use of putative class members' data without their consent, such as the ones currently pending against Google Inc., LinkedIn Corp., and Yahoo Inc."[6] If so, the increasing trend of settlements for such cases is also likely to continue into 2014.

## NERA's Consumer Class Action Experience

NERA experts are experienced in producing rigorous economic and statistical analyses to assess whether Rule 23 requirements are met in class certification. We also regularly evaluate the analyses produced by opposing experts and assess whether they meet the Daubert criteria for admissibility. NERA has analyzed issues related to class certification in personal injury class actions, in cases alleging product defects, and in cases involving misrepresentations of product features or performance, tailoring our analyses based on the claims at issue.

## NERA's case experience includes:

- In a product defect consumer class action against Toyota, NERA experts analyzed customer data to help the Company analyze issues related to certification of the class. NERA also developed models to estimate the potential diminution of value of the product related to the alleged claims. Our analysis was submitted as testimony in the matter.

- In a class action lawsuit alleging a tobacco company owed medical treatments for illnesses associated with smoking, NERA experts provided statistical evidence on issues of commonality of the proposed class across a number of states. The analysis incorporated demographic patterns and their relation to smoking behaviors, using large, complex data sets from multiple sources including the US Census.

- For a large mortgage servicer, NERA experts analyzed complex financial product data related to mortgage modifications as part of a Multi District Litigation (MDL).

- In a consumer class action lawsuit filed against Sprint and other major wireless carriers accusing them of "locking" the handsets, with software preventing consumers from porting their handset to other carriers' networks, plaintiffs offered a survey in support of their claim. NERA's survey and sampling experts testified to serious flaws in the survey and sampling conducted by plaintiffs, and ultimately the opposing expert's testimony was excluded.

NERA experts also use quantitative analysis, including applied statistics and econometric techniques, to evaluate potential damages in consumer class action cases under alternative theories of liability. These analyses have been used in litigation and as the basis for consumer class action settlements.

## Notes

[1] The list of articles used to identify settled consumer class actions was generated by a general search on law360.com for the terms [Class Action, Class Member, Settlement (Court, OR Approval, OR Plaintiff, Or Judge, OR Litigation) NOT (Overtime, Workers, Employees)].

[2] Preliminary settlements reached before December 31, 2013 are excluded from the data if we found evidence that the final settlement was approved in 2014, and settlements finalized after December 31, 2013 may show up as preliminary settlements in our data.

[3] Case specific information was collected from the following sources: articles published on Law360.com, news articles available through Factiva, case details available on TopClassActions.com, legal documents available through Law360.com, and individual settlement websites. Data on defendant industry obtained from Factiva and Bloomberg LP.

[4] Our data includes settlements where the class includes businesses or other entities as long as the definition of the class indicates that it also includes "persons" or "individuals".

[5] Gresser, Lawrence T. and Karen H. Bromberg, "Privacy: The Next Frontier In Consumer Class Actions?", July 15, 2013, New York Law Journal.

[6] Mueller, Michael J. and Emily Burkhardt Vicente, "The Class Action Hurricane: Where Is the Storm Heading?", January 17, 2014, Law360.com.

**NERA**
ECONOMIC CONSULTING

## About NERA

NERA Economic Consulting (**www.nera.com**) is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal challenges. For over half a century, NERA's economists have been creating strategies, studies, reports, expert testimony, and policy recommendations for government authorities and the world's leading law firms and corporations. We bring academic rigor, objectivity, and real world industry experience to bear on issues arising from competition, regulation, public policy, strategy, finance, and litigation.

NERA's clients value our ability to apply and communicate state-of-the-art approaches clearly and convincingly, our commitment to deliver unbiased findings, and our reputation for quality and independence. Our clients rely on the integrity and skills of our unparalleled team of economists and other experts backed by the resources and reliability of one of the world's largest economic consultancies. With its main office in New York City, NERA serves clients from more than 25 offices across North America, Europe, and Asia Pacific.

## Contact

For further information and questions, please contact the author:

**Dr. Stephanie Plancich**
Vice President
+1 212 345 7719
stephanie.plancich@nera.com

*The opinions expressed herein do not necessarily represent the views of NERA Economic Consulting or any other NERA consultant. Please do not cite without explicit permission from the author.*