UNITED STATES BANKRUTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE

RESIDENTIAL CAPITAL LLC et all         Chapter11
                                       Case no. 12-12020 (MG)
Debtors

---

THE RECAP BORROWERS CLAIMS TRUST

Objector

Against

WILLIAM J FUTRELL

Claimant

## DIRECT TESTIMONY OF ALICIA FUTRELL

1. There was a mortgage obtained by Futrell, with regard to the real estate located at 8391 N 550 W, Bryant IN 47326.

2. The mortgage was subsequently transferred to Homecomings Financial, a GMAC company, in/about 2009.

3. The mortgage was with AEGIS and the monthly payment was $657.25.

4. The obligation was being addressed, along with the other obligations of the Futrell, where he was employed and no discernable issues with the mortgage and/or the terms and conditions for the mortgage.

5. There was the Initial escrow Account Disclosure Statement from Homecomings Financial, dated June 17, 2009.

6. There was the problem with an escrow shortage for the mortgage, when there was not.

7. The basis, in part, was with the insurance, noting the amount of $1,352.53.

8. There was the "1" that was added by the mortgage servicer.



RECEIVED
JAN 12 2016
U.S. BANKRUPTCY COURT
SO DIST OF NEW YORK

9. That was stated to be a *typo*, which was timely corrected by the mortgage servicer.

10. That was raised with the servicer in QWRs', including the one dated October 30, 2009.

11. That was raised in the QWR dated October 23, 2009, and the content of that QWR was incorporated into the QWR of October 30, 2009.

12. There were the numerous requests for the explanation, based on the figures, where the shortages came from, including a *229* escrow shortage.

13. The matter of the *typo* was stated in the April 4, 2013, letter from OCWEN addressed to counsel.

14. There was the problem with the escrow shortage that began there and was not addressed, and remained a problem the time Homecomings Financial and/or GMAC Mortgage handles either mortgage servicing or any loan modification.

15. On the June 17, 2009, there was also the stated escrow shortage of $1,248.71.

16. This was part of the escrow shortage claimed by the Homecomings and/or GMAC throughout the period they had the mortgage.

17. There are the servicing notes for the servicer, where there was the statement of a shortage of $1,541.69 for June 17, 2009.

18. The issue of the escrow shortage stated by Homecomings and/or GMAC were not resolved by them, where the mortgage was subsequently transferred to OCWEN.

19. The ongoing mistakes, errors and failures of GMAC were cumulative, where OCWEN stated on their April 4, 2013 letter that from July 2011 through April 2013, including late charges, the sum of $16,415.14, was due and owing by Futrell.

20. There was the forced placed insurance, and the problems with the recording keeping by the servicer and the continuous problems throughout the period they had the mortgage.

21. There were multiple efforts to address and resolve the issues of the record keeping and the escrow shortages that were never explained and not addressed.

22. There were fees assessed by the mortgage service, which included the multiple property inspections done by them for several specific dates.

23. There were the *Repayment Agreements* offered by GMAC, in 2009 and 2010.

24. There was the agreement in 2010 for the three (3) payments of $355, where the payments were made.

25. GMAC unilaterally cancelled the offer, returned a check for $355 dated 2/22/10, and never accounted for the reason, where the money that they retained went from that Repayment Agreement.

26. There was the agreement in 2009, where the stated money was paid in a timely manner, and that was cancelled.

27. GMAC unilaterally cancelled that offer, and never accounted for the reason, where the money that they retained went from that Repayment Agreement.

28. The subject of a loan modification was raised, where that was when we were within thirty (30) days in arrears, and needed to be ninety (90) days in arrears under that program.

29. There was the statement that the loan modification was not wanted, but the representatives of GMAC stated that it would bring (us) current.

30. They stopped and/or refused to accept payments, and that created new problems for the shortages and the arrearage for the mortgage.

31. GMAC was told more than once that (we) did not want any loan modification, and they did not listen and/or honor the statement.

32. There were loan modification that were offered, but there were problems and the statement that the documents would not be signed.

33. There was the demand from the representatives of GMAC that (we) sign and return a false document in/about *

34. There was the statement of the desire for an escrow analysis, and told that one could not be done where there was a pending loan modification.

35. Other employees were asked for the escrow analysis, and did not state that an escrow analysis could be gotten.

36. The servicing notes has information of the process, including the internal requests for an escrow analysis.

37. An escrow analysis was never performed.

38. GMAC refused to accept payments of $657.25 in July 2009 and October 2009 through January 2010.

39. The representative, Romeo, said (we) could opt out of the loan modification, but that was a lie.

40. GMAC would make representations to (us) and they were false.

41. That included the escrow shortage in the June 17, 2009, analysis, where it was really either $1,541.69, or $1,249.71 as the difference between what they put on paper and what they put in the servicing notes.

42. Other false statements include

43. GMAC would not release (us) from the loan modification process, and it worsened the situation, affecting everything and everyone in the household.

44. The escrow shortage was never resolved, the mortgage never paid down, and the stated amount that was owed under the mortgage was a constant problem that

45. The QWR's, including the October 30, 2009 QWR, was not handled, based on RESPA, including their obligation to acknowledge it in twenty (20) days and respond in sixty (60).

46. There was the reporting to the credit agencies by GMAC, which further compounded the problem.

47. The *real estate* has deteriorated since there was GMAC that assumed the mortgage.

48. The value was about $65,000 in 2009, and I the opinion of the present value is $10,000.

49. I don't have an appraisal, but the *government assessment* for property taxes has gone down.

50. We took pictures, and they are representative of the conditions and the need for repairs just to bring it up to code.

51. There were requests from others for the money, but we were denied based on the condition of the *real estate*.

52. One request was the USDA, and they stated problems with the house, an appraised value of $30,000, and that the value of the house was less than the mortgage.

53. GMAC offered a payoff for $27,000 in 2011, and their statements had an amount in the $70,000's.

54. There was the estimate for $47,000 for the work, and as I understand it, that would bring it up to code.

55. The income is not what it was in 2009, and the need to make do with what is there.

56. There is the LTD, and some additional income, where the position GMAC placed (us) in is at the heart of the problem.

57. (Bill) had a heart attack in 2011, where the actions from GMAC, notably the demands, was a major source of the stress.

58. There were the bills, including the one for $68,000.

59. It was compounded by the fact that there was the post period and the need for the prescriptions, follow up as need; and the issues went on with GMAC.

60. GMAC did not address the escrow shortages and the other issues raised, notably in the QWR dated October 30, 2009.

61. There was financial impact that was compounded by the demands from GMAC and the fact there was never a straight answer.

62. They were presented in the QWR, and the issues raised on the October 30, 2009, with no response from GMAC, based on their obligations under RESPA.

63. The demands and actions from GMAC had the financial impact.

64. There was a 401k from his employment, and there had to be a loan, from that, which was paid back in every paycheck.

65. The employment stopped and the LTD and the money that was in the 401k had to be used, til there was nothing.

66. The other money issues included late fees and bad check charges, at minimum.

67. The law was to provide a process by which (we) would get accurate information in the accountings, and able to believe their record keeping was accurate.

68. The actual damages, will be explained and elaborated on, as needed, and the direct connection between the damages and the commissions and omissions of GMAC.

69. That did not happen, and RESPA was violated, and we have those actual damages ro be compensated under RESPA.

70. The testimony include the multiple attempts to sort out the issues, erroneous designations, issues with the escrow (shortages), reporting of the false delinquencies to credit reporting agency, and the refusal to correct and straighten out the account; where there were the QWRs', specifically including the October 30, 2009.

## DIRECT TESTIMONY OF WILLIAM J FUTRELL

1. There was the mortgage on the *real estate* at 8391 N 550 W Bryant IN 47326.

2. It started out with one mortgage company, AEGIS, and thereafter went to Homecomings/Gmac in/about 2009.

3. The mortgage was with AEGIS and the monthly payments were $657.25.

4. We were less than thirty (30) days in arrears on the mortgage, when the problems began with GMAC.

5. The terms of the mortgage were acceptable and it worked with the income from the employment.

6. The June 17, 2009, analysis had mistakes, and they were presented to Homecomings/GMAC, where they were not resolved and the different representatives said different things.

7. It was a problem for (me) to be able to work and deal with them, and (my wife) did the majority of that direct contact with them.

8. There was the loan modification that was mentioned by them, where it was represented as something that was good for our position with the mortgage and to better address it.

9. GMAC offered their first *loan modification*, under HAMP, where escrow was increased.

10. The problems included the fact that there was an initial error with the escrow as handled by GMAC, and they did not listen or do anything to correct the problem.

11. There was another *loan modification* offered, and the same wrong information, notably with the escrow was still present.

12. There was the contact initiated with Sen Richard Lugar and the Treasury Department, where that started a conversation with GMAC, including dealing with the wrong escrow figures.

13. There was the process of sending QWRs' to GMAC when the problems began, where GMAC did not address them.

14. The problems were there, and it just got more and more complicated.

15. There was the contact with Jena Williams, where she was in a different office.

16. The necessary documents were sent more than once, and Jena Williams stated she was working on the problems.

17. The *typo* of the "1" was presented to her, where she stated the escrow problem was taken care of by GMAC.

18. That was a false statement, where the escrow shortage problem never went away.

19. Jena Williams did not provide an explanation of why that did not happen.

20. There was the problem with the *forced* insurance, where (we) had Mutual Fire Insurance Co in place, and GMAC put in Balboa insurance, where there was no need.

21. There was no accounting, explanation or understanding from them as to the *forced* insurance, either.

22. The matters were put before GMAC through the representative over the telephone and through QWRs'.

23. She was one of the many GMAC representatives that were presented with the *record keeping and escrow*, at minimum.

24. All the problems, certainly the escrow problem from the start, were not addressed, and there was RESPA that provided the guides.

25. There were charges that included frequent property inspections that took place in one day, and others.

26. Those costs, expenses and charges were part of the inquiries to GMAC and they never explained them.

27. Explanations, notably for the escrow issues, where their figure are going to addressed, where they were wrong and never corrected.

28. There was a statement that there were the frequent property inspections, where they would not be charged.

29. The others that were not explained as to *what they were, and why they were assessed* were not explained or accounted for by GMAC.

30. There were the *Repayment Agreements*, and GMAC cancelled them, with no explanation.

31. GMAC sent back a check for $355 in 2010, and no explanation and no accounting where the money they retained was applied.

32. GMAC was paid the money for the 2009 *Repayment Agreement*, and no explanation and no accounting where the money they retained was applied.

33. None of the QWR's were responded to by GMAC, whatever address that they were sent to.

34. There were other QWR's, where they acknowledged them (August 2012), but no changes and nothing happened to address the mortgage servicing and/or loan modification issues.

35. The demands for the payments and the actions that was a problem.

36. GMAC contacted the credit reporting agency and that compounded the problems

37. The credit was ruined by the actions of GMAC and the stress was a serious reason for the 2011 heart attack.

38. The service notes from GMAC show that the disability income was acceptable income at one time, and then not at another.

39. The financial strain they caused was compounded.

40. The damages, including the financial damages, will be addressed and the direct connection with the commissions and omissions of GMAC.

41. A problem created by GMAC was that there were periods where the choice had to be made how to satisfy them, and the needs of the myself and the entire family.

42. The condition of the house worsened, and the demands from GMAC did not stop.

43. The ability for (me) to work at my former job had the effect to have an income problem, where STD and LTD were there, but less.

44. The financial resources were dwindled to $0.00, the demands from GMAC did not stop.

45. The household suffered, where the real estate and its value have deteriorated.

46. The condition of the house suffered, where unable to obtain assistance to bring the house up to code, maintain it, the loss of the value of the house.

47. There was the August 2011 from the USDA for the $30,000 appraisal on the house that is less than the mortgage.

48. The *assessment* from the county for the purposes of property tax shows the improvements have gone down.

49. There are the recent picture that show a portion of the interior and exterior.

50. GMAC said (we) may opt out of the *loan modification* process, but that was a false statement.

51. If (we) were able to opt out, the revenue from the STD and LTD would have been able to pay the original mortgage of $657.25.

52. The *loan modifications* presented had term and conditions that were more, and GMAC did not address the escrow shortage that was always present.

53. RESPA is the controlling law and GMAC violated it, and we have actual damages that followed that.

54. The testimony to include the multiple attempts to sort out the issues, erroneously and unexplained payments, refusal to accept payment, false and inaccurate escrow, reporting false delinquencies to credit reporting