## **Exhibit 1**

**Supplemental Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, et al., ) | Chapter 11 |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |

**DECLARATION OF SARA LATHROP IN SUPPORT OF THE RESCAP BORROWER CLAIMS TRUST'S OMNIBUS REPLY IN SUPPORT OF ITS NINETIETH OMNIBUS OBJECTION TO CLAIMS ((I) NO LIABILITY BORROWER CLAIMS, (II) REDUCE AND ALLOW BORROWER CLAIM, AND (III) ALLOWED IN FULL BORROWER CLAIM) AS TO CLAIM NO. 4397**

I, Sara Lathrop, hereby declare as follows:

1. I serve as Senior Claims Analyst for the ResCap Borrower Claims Trust (the "Borrower Trust"), established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030] confirmed in the above-captioned Chapter 11 Cases. During the Chapter 11 Cases, I served as Regulatory Compliance Manager and Loss Mitigation Manager in the loan servicing department of Residential Capital, LLC ("ResCap"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "Debtors"). I began my association with ResCap in June 2006 working as an associate in the Default Division of the loan servicing operation of GMAC Mortgage, LLC ("GMACM"). In 2008, I became a Default Quality Control Specialist, a position that I held until I became a Supervisor in the Default Division in 2009. In 2011, I became a Supervisor in the Loss Mitigation Division of GMACM's loan servicing operation, and in February 2012, I became a Manager in that division. In this role, I oversaw

1

GMACM associates in their efforts to provide borrowers with loss mitigation options and assisted in the development of GMACM's loss mitigation policies. In January of 2013, I became the Regulatory Compliance Manager for ResCap. I became Senior Claims Analyst for ResCap in July 2013 and continued in this role when the ResCap Liquidating Trust (the "Liquidating Trust") was established in December 2013. In my current position as Senior Claims Analyst to the Borrower Trust, among my other duties, I continue to assist the Borrower Trust in connection with the claims reconciliation process.[1] I am authorized to submit this declaration (the "Declaration") in support of the *ResCap Borrower Claims Trust's Omnibus Reply in Support of Its Ninetieth Omnibus Objection To Claims ((I) No Liability Borrower Claims, (II) Reduce And Allow Borrower Claim, And (III) Allowed In Full Borrower Claim) As To Claim No. 4397* (the "Reply").[2]

    2.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, information learned from my review of relevant documents and information I have received through my discussions with other former members of the Debtors' management or other former employees of the Debtors, the Liquidating Trust, and the Borrower Trust's professionals and consultants. If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

    3.    In my capacity as Senior Claims Analyst, I am intimately familiar with the claims reconciliation process in these Chapter 11 Cases with regard to Borrower Claims. Except as otherwise indicated, all statements in this Declaration are based upon my familiarity with the

---

[1] The ResCap Liquidating Trust and the ResCap Borrower Claims Trust are parties to an Access and Cooperation Agreement, dated as December 17, 2013, which, among other things, provides the Borrower Trust with access to the books and records held by the Liquidating Trust and Liquidating Trust's personnel to assist the Borrower Trust in performing its obligations.
[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Reply.

Debtors' Books and Records kept in the course of their regularly conducted business activities (the "Books and Records") as well as the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), my review and reconciliation of claims, and/or my review of relevant documents. I or my designee at my direction have reviewed and analyzed the proof of claim form and supporting documentation filed by the Claimants. Since the Plan went effective and the Borrower Trust was established, I, along with members of the Liquidating Trust's management or employees of the Liquidating Trust have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same. In connection with such review and analysis, where applicable, I or Liquidating Trust personnel, together with professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the Schedules, (iv) other filed proofs of claim, and/or (vi) the official claims register maintained in the Debtors' Chapter 11 Cases.

4. On or around November 9, 2012, the Respondent filed a proof of claim against Debtor Residential Capital, LLC ("ResCap"), designated as Claim No. 4397 (the "Claim"), asserting a general unsecured claim in the amount of $144,000.[3] See Exhibit A attached hereto.[4]

5. According to the Debtors' books and records, Debtor Homecomings Financial Network, Inc. ("Homecomings") originated a loan in the amount of $144,000 to the Respondent on December 16, 2005 (the "Loan"), secured by a mortgage on property located at

---

[3] Through the Objection, the Borrower Trust also seeks to redesignate the Claim as a claim against Debtor GMAC Mortgage, LLC ("GMACM") because the allegations in the claim relate to actions by GMACM while it was servicing the Loan (defined below).

[4] The Respondent also responded to the Borrower Trust's request for additional information. A copy of that response is attached as Exhibit B to the Supp. Decl.

3

ny-1218933

341 Oak Drive, New Cumberland, PA 17070.  See Note, attached hereto as Exhibit C, and Mortgage, attached hereto as Exhibit D.  Debtor Residential Funding Company, LLC purchased the Loan from Homecomings and transferred its interest when the Loan was securitized on or about February 1, 2006 where US Bank, NA was appointed as Trustee.

6.     The initial terms of the Loan included an interest rate of 5.75%, adjustable after January 2013, with a ceiling of 11.75%.  See Note.  For the first ten years of the Loan, the Respondent's monthly payments would be interest-only, with an initial monthly payment of $690.00.  The first payment that would have included both principal and interest would have been the payment due January 1, 2016.  See Note, Section 4.G.

7.     On November 18, 2009, GMACM approved the Respondent for a HAMP trial modification (the "Trial HAMP Modification').  See Servicing Notes, attached hereto as Exhibit E, at 10 of 32.  The first monthly payment under the Trial HAMP Modification was due on January 1, 2010.[5]  Additionally, per its regular business practice, GMACM suspended any reports of the Respondent's account to any credit reporting agency.[6]  See Servicing Notes at 11 of 32.  In order to avoid duplicate payments, it was GMACM's standard business practice to suspend any auto draft payment on a customer's account after a customer was approved for a loan modification.

8.     On December 23, 2009, the Respondent executed the Trial HAMP Modification with GMACM.  See Trial HAMP Modification, attached hereto as Exhibit F.  Pursuant to the Trial HAMP Modification, the Respondent was responsible for making payments in the amount of $679.83 on January 1, February 1, and March 1 2010 (the "Trial Payments").

---

[5] Because the Trial HAMP Modification was approved more than half way through the month of November, pursuant to GMACM's business practice, the first payment under the modification was due January 1, 2010 rather than December 1, 2009 to give the Respondent time to review and return the modification papers.

[6] It was GMACM's regular business practice to suspend credit reporting during any period that a Borrower's account was being reviewed for a loan modification.

4

ny-1218933

See id. The Trial Payments were intended to estimate the amount that the Respondent would pay under a permanent loan modification, including estimated principal, interest, and escrow for taxes and insurance.

9. On February 1, 2010, GMACM mistakenly drew a $1,038 payment from the Respondent's bank account. See Payment History, attached hereto as Exhibit G at 3 of 4. The payment was reversed off the account on February 12, 2010 and returned to the Respondent. See id.

10. The Respondent made all of the Trial Payments. However, a permanent HAMP modification could not be offered within the HAMP guidelines. See Denial Letter, attached hereto as Exhibit H. The Debtors sent the Respondent a letter informing her that she was denied for a permanent HAMP modification because she had insufficient income. This is because HAMP guidelines did not permit a loan modification to be offered with an interest rate less than two percent. Additionally, HAMP required that monthly payments could not exceed 31% of a borrower's monthly income. As a result, if the Debtors were not able to provide the Respondent with a modification where the monthly payment that included an interest rate higher than two percent without the monthly payment being larger than 31% of her income, the Debtors would deny a permanent HAMP modification due to insufficient income.

11. Because a permanent HAMP modification could not be offered, on or around April 5, 2010, the Respondent was offered (and accepted) a permanent, non-HAMP modification (the "Permanent Traditional Modification"). See Permanent Traditional

5

ny-1218933

Modification, attached hereto as <u>Exhibit I</u>. The Permanent Traditional Modification provided the Respondent with a step-rate mortgage.[7] <u>See</u> id.

12. Section 3 of the Permanent Traditional Modification states, "The amounts indicated in this paragraph do not include any required escrow payments for items such as hazard insurance or property taxes; if such escrow payments are required the monthly payments will be higher and may change as the amounts required for escrow items change." <u>See</u> Permanent Traditional Modification at section 3.

13. The initial monthly payment required under the Permanent Traditional Modification was $830.62, which included an escrow payment of $185.47 for insurance and taxes (the "<u>Escrow Payment</u>"). <u>See</u> Permanent Traditional Modification. On January 1, 2011, the Respondent's monthly payment increased to $839.92 due to an increase in the escrow portion of her payment. There were additional increases on January 1, 2012 to $852.78, and January 1, 2013 to $874.41. <u>See</u> Escrow Analyses, attached hereto as <u>Exhibit J</u>.

14. After the Permanent Traditional Modification was executed, the Respondent made every monthly payment, and the Loan was current at the time servicing of the Loan was transferred to Ocwen. <u>See</u> Payment History. From the time of the Trial HAMP Modification through the date servicing of the Loan transferred to Ocwen, GMACM never reported the Respondent's account as being in default to any credit reporting agency. <u>See</u> Servicing Notes.

### B. *Explanation of the Borrower Trust's Calculation of Damages*

15. According to the Debtors' books and records, the Respondent was erroneously approved for the Trial HAMP Modification, which is the reason the permanent

---

[7] Under the Permanent Modification, the interest rate was set to increase as follows: (i) 2.875% from June 1, 2010 through May 1, 2014; (ii) 3.875% from June 1, 2014 through May 1, 2015; (iii) 4.875% from June 1, 2015 through May 1, 2016; and (iv) 5.000% from June 1, 2016 through January 1, 2036.

modification could not be offered within the HAMP guidelines. The Borrower Trust concedes, however, that by offering the Trial HAMP Modification, it entered into a contract to provide the Respondent with a permanent HAMP modification in the event the Trial HAMP Modification was completed. Thus, the Respondent is entitled to the difference between her payments under a permanent HAMP modification and the Permanent Traditional Modification.

16. In Exhibit B to the Proposed Order, the Borrower Trust identified the terms of a permanent HAMP modification (the "Estimated Permanent HAMP Modification") if such loan was offered to the Respondent in April 2010. This was determined by subtracting the Escrow Payment listed on the Permanent Traditional Modification from the trial payments under the Trial HAMP Modification to determine the likely monthly principal and interest payment under the Estimated Permanent HAMP Modification (the "HAMP P&I Payment"). The Borrower Trust then looked at the principal balance owing on the Loan and determined what interest rate would have applied to achieve the HAMP P&I Payment, which was 0.6377%. The Borrower Trust used this interest rate even though such interest rate would not have been approved under the HAMP program because it is too low. See HAMP Guidelines, attached hereto as Exhibit K.

17. The Borrower Trust then determined what the interest rate would have been over the life of a permanent HAMP modification, with the assumption that since the Respondent was approved for a step-rate traditional modification, she would most likely have been approved for a step-rate HAMP modification.[8] The Borrower Trust followed the step rate schedule permitted under the HAMP guidelines, only increasing the interest rate by 1% a year,

---

[8] The HAMP program permitted step-rate modifications, and since the initial interest rate is already lower than what would be permitted by HAMP, the Borrower Trust felt that this assumption was appropriate.

7

ny-1218933

the increase permitted under the HAMP guidelines.[9]  See id.  A summary of the differences between the terms of the Estimated Permanent HAMP Modification and the Permanent Traditional Modification are as follows, resulting in a difference over the life of the loan of $29,840.32:

| Borrower Trust's Calculation of Damages | | | | | | | |
|---|---|---|---|---|---|---|---|
| Estimated HAMP P&I Payment (Step-Rate) | Approved Traditional Payment P&I (Step-Rate) | Timeframe | Estimated Interest Rate HAMP | Interest Rate Traditional | # of Payments | Difference in Payment Amount | Total Estimated Difference |
| $494.32 | $ 645.15 | 6/1/10 through 5/1/14 | 0.6377% | 2.875% | 48 | $ 150.83 | $7,239.84 |
| $494.32 | $ 709.73 | 6/1/14 through 5/1/15 | 0.6377% | 3.875% | 12 | $ 215.41 | $2,584.92 |
| $546.10 | $ 775.09 | 6/1/15 through 5/1/16 | 1.6377% | 4.875% | 12 | $ 228.99 | $2,747.88 |
| $596.44 | $ 783.15 | 6/1/16 through 5/1/17 | 2.6377% | 5.00% | 12 | $ 186.71 | $2,240.52 |
| $649.02 | $ 783.15 | 6/1/17 through 5/1/18 | 3.6377% | 5.00% | 12 | $ 134.13 | $1,609.56 |
| $677.35 | $ 783.15 | 6/1/18 through 5/1/19 | 4.6377% | 5.00% | 12 | $ 105.80 | $1,269.60 |
| $722.41 | $ 783.15 | 6/1/19 through 1/1/36 | 5.00% | 5.00% | 200 | $ 60.74 | $12,148.00 |
| TOTAL | | | | | | | $29,840.32 |

18.    The Borrower Trust's calculation of damages includes only the difference between the Respondent's monthly principal and interest payment under the Estimated Permanent HAMP Modification and the Permanent Traditional Modification.  It does not include any increase in the monthly payment caused by increases to the Respondent's escrow obligations.  As stated in the Permanent Traditional Modification, the escrow portion of the Respondent's payment was dependent on the amount she owed in insurance and property tax, which is outside the Debtors' control.  This portion of her monthly payment would have increased by the same amount even if a Permanent HAMP Modification rather than the Permanent Traditional Modification had been executed.

---

[9] In the Objection, the Borrower Trust calculated the damages using the step-rate schedule from the Permanent Traditional Modification rather than from the HAMP guidelines.  The Borrower Trust has adjusted the damages award to reflect the proper schedule.

19.  All increases to the Respondent's monthly payment under the Permanent Traditional Modification during the period the Loan was serviced by the Debtors are all the result of increases to the escrow portion of her payment, as the principal and interest portion of her payment did not increase during this time.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 15, 2016

/s/ Sara Lathrop
Sara Lathrop
Senior Claims Analyst for the ResCap
Borrower Claims Trust