1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


         Debtors.


- - - - - - - - - - - - - - - - - - - -x


         United States Bankruptcy Court

         One Bowling Green

         New York, New York


         January 21, 2016

         10:04 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2 (CC: Doc# 9296) ResCap Borrower Claims Trust's Ninetieth

3 Omnibus Objection to Claims ((I) No Liability Borrower Claims,

4 (II) Reduce and Allow Borrower Claims, and (III) Allowed in

5 Full Borrower Claim).

6 Going Foward as to Claim(s) Filed by Mary R. Biancavilla and

7 Thomas G. and Catherine D. Cooper.

8

9 (CC: Doc# 9402, 9492) ResCap Borrower Claims Trust's Objection

10 to Proof of Claim No. 3695 Filed on Behalf of Rosalind

11 Alexander-Kasparik.

12

13

14

15

16

17

18

19

20 Transcribed by:  Penina Wolicki

21 eScribers, LLC

22 700 West 192nd Street, Suite #607

23 New York, NY 10040

24 (973)406-2250

25 operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4         Attorneys for The ResCap Borrower Claims Trust

5         250 West 55th Street

6         New York, NY 10019

7

8  BY:   JORDAN A. WISHNEW, ESQ.

9

10

11  CATE LEGAL GROUP

12         Attorneys for Rosalind Alexander-Kasparik

13         7710 Balboa Avenue

14         Suite 316

15         San Diego, CA 92111

16

17  BY:   ALLAN O. CATE, ESQ. (TELEPHONICALLY)

18

19

20  MARY R. BIANCAVILLA (TELEPHONICALLY)

21         PRO SE

22

23

24

25

1                   P R O C E E D I N G S

2              THE COURT:  Please be seated.  All right, we're here

3       in Residential Capital, 12-12020.  Mr. Wishnew?

4              MR. WISHNEW:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. WISHNEW:  Jordan Wishnew, Morrison & Foerster for

7       the ResCap Borrower Claims Trust.  Your Honor, the first

8       matter --

9              THE COURT:  Could you bear with me.  I left one thing

10      on my desk.

11             MR. WISHNEW:  Absolutely.

12             THE COURT:  Okay, thank you.

13             MR. WISHNEW:  Jordan Wishnew, Morrison & Foerster, for

14      the ResCap Borrower Claims Trust.  Your Honor, two matters that

15      were scheduled for today have been resolved.  Those are

16      identified under section 2 of today's agenda.  So the first

17      matter going forward is under section 3 on page 4, two claims

18      carried over from the earlier hearing on the ResCap Borrower

19      Claims Trust's ninetieth omnibus claims objection.  The two

20      claims deal with those of Thomas and Catherine Cooper, claim

21      number 6720, and Mary Biancavilla.  I believe Ms. Biancavilla

22      is on the phone today.

23             THE COURT:  Ms. Biancavilla, are you on the phone?

24             MS. BIANCAVILLA:  Yes, I am, Your Honor.  Good

25      morning.

1          THE COURT:  Thank you.  Good morning to you.

2          MR. WISHNEW:  I'm going to take the --

3          MS. BIANCAVILLA:  Thank you.

4          MR. WISHNEW:  -- Cooper claim first, and then I'll go

5     to Ms. Biancavilla's claim.

6          THE COURT:  Okay.  Is anyone on the phone for Cooper?

7          Just bear with me a second, Mr. Wishnew.

8          Your basic argument on Cooper is that it's time

9     barred, statute of limitations.

10          MR. WISHNEW:  Correct.  In addition, also waiver, Your

11    Honor.

12          THE COURT:  Right.  And just lay out for me the

13    statute of limitations.

14          MR. WISHNEW:  Your Honor, the statute of limitations

15    for breach of contract in New Hampshire is three years.  The

16    alleged attempt to close the HELOC was in May of 2005.  So any

17    claim for breach of contract would have expired in May 2008,

18    four years before the petition date.

19          THE COURT:  Okay, all right.  I'm going to take it

20    under submission.

21          MR. WISHNEW:  Thank you, Your Honor.

22          THE COURT:  Okay.

23          MR. WISHNEW:  Your Honor, that brings us to Ms.

24    Biancavilla's claim.  This is a claim in which the Borrower

25    Trust seeks to reduce and allow the claim in a modified amount

1  against GMAC Mortgage.

2          Briefly, the background of this claim is that Ms.

3  Biancavilla sought a loan modification from the debtors.  A

4  loan modification was given, however the problem was that -- or

5  the mistake made by the debtors was that --

6          THE COURT:  Two mistakes.

7          MR. WISHNEW:  Well, two mistakes -- was that they

8  offered her a HAMP trial plan.  She completed the HAMP trial

9  plan and then when the loan was reviewed for -- to be put into

10  a permanent plan, they recognized that she couldn't qualify

11  under HAMP, and so offered her a traditional --

12          THE COURT:  She couldn't qualify under HAMP according

13  to the letter, because her income was insufficient.

14          MR. WISHNEW:  That's correct, Your Honor.

15          THE COURT:  Okay.  So instead, you offered her a more

16  expensive loan modification.

17          MR. WISHNEW:  Correct, Your Honor.  And so what we

18  were trying to do is make her whole by offering her the

19  difference in payment for what we are saying would have been

20  the HAMP terms versus the terms she was actually offered.  And

21  we calculate that -- originally in our objection we had

22  quantified the claim as approximately 24,000 dollars and

23  change.  Upon further review, and as recognized in our reply,

24  we would suggest the claim is actually $29,840.32.

25          THE COURT:  Let me focus on that, okay?

1            MR. WISHNEW:  Sure.

2            THE COURT:  And then I'll obviously give Ms.

3    Biancavilla a chance to respond.  So your reply, which is ECF

4    9510, in paragraph 26 on page 10 --

5            MR. WISHNEW:  Yes, Your Honor.

6            THE COURT:  And Ms. Biancavilla, I don't know whether

7    you have it so I'll read it so you know what I'm talking about,

8    okay?

9            MS. BIANCAVILLA:  I appreciate that, thank you.

10           THE COURT:  So it says, "The respondent's

11   calculation," referring to Ms. Biancavilla, "is also flawed,

12   because she uses the monthly payment under the trial HAMP

13   modification as the amount that her monthly principal and

14   interest payment would have been under a permanent HAMP

15   modification.  However, this assumes that the respondent's

16   interest rate under a permanent HAMP modification would have

17   been fixed at 0.6377 percent.  However, as stated in paragraph

18   17 supra, given that the permanent traditional modification

19   executed by the respondent included a step-rate interest rate,

20   a permanent HAMP modification more likely than not would have

21   also included a step-rate interest rate."

22           So that's the argument that you make.  And then you

23   include -- that gets you to your -- you do a comparison of what

24   the difference in payments would be.

25           MR. WISHNEW:  That's right.

1          THE COURT:  So when I look at -- just bear with me

2   now.

3          So Exhibit F to the reply --

4          MR. WISHNEW:  Um-hum.

5          THE COURT:  -- includes the trial plan that Ms.

6   Biancavilla countersigned.

7          MR. WISHNEW:  Correct, Your Honor.

8          THE COURT:  Okay.  And so in paragraph 2, it says what

9   the amount of the initial trial payments would be:  $679.83.

10         MR. WISHNEW:  Um-hum.

11         THE COURT:  And below those three payments it says,

12  "The trial period payment is an estimate of the payment that

13  will be required under the modified loan terms, which will be

14  finalized in accordance with section 3 below."

15         So section 3 is on page 4 of 4 of this exhibit.

16         MR. WISHNEW:  Um-hum.

17         THE COURT:  And it's called -- that section is headed

18  "The Modification".  And there's nothing here about a step-rate

19  increase.  So what my question really is, is the assumption

20  that you've made in paragraph 26 and was the basis for your

21  calculation of the differential, you acknowledge this assumes

22  that respondent's interest rate under the permanent HAMP

23  modification would have been fixed, however as stated, given

24  that the permanent traditional modification executed by the

25  respondent included a step-rate increase, you went ahead and

1   applied a -- you assumed -- and you had to -- how you got the

2   numbers, I'm not quite sure, but you assumed a step-rate

3   increase.  What is it that supports -- other than your

4   assumption, which is unsupported by evidence, what is it that

5   would support your view that there's a -- does a HAMP

6   modification -- do you have some evidentiary support that HAMP

7   modifications have step-rate increases?

8            MR. WISHNEW:  We would rely upon, Your Honor, the

9   statements made in the supplemental declaration set forth in

10  footnote 7 --

11           THE COURT:  Let me look at it.  Hold on.

12           MR. WISHNEW:  Sure.

13           THE COURT:  What page?

14           MR. WISHNEW:  Page 6 --

15           THE COURT:  Okay.

16           MR. WISHNEW:  -- of docket number 9510, footnote 7,

17  the -- I'll read it as stated:  "The HAMP program permitted

18  step-rate modifications, and since the initial interest rate is

19  already lower than what would have been permitted by HAMP, the

20  Borrower Trust felt this assumption was appropriate," and we

21  incorporate Ms. Lathrop's declaration where she makes that

22  statement.

23           THE COURT:  Sure.  So show me again -- here's the

24  point.  Footnote 7 is on the sentence, "The permanent

25  traditional modification provided the respondent with a step-

1  rate mortgage."  Yes, I agree, it did.  Okay.  And then the

2  footnote talks about the step-rate increase on the permanent

3  modification.  Okay?

4          But my question to you is, where's the evidence that

5  on a HAMP modification, that a step-rate increase would apply?

6  I don't see any evidence -- I searched through this and I

7  didn't find any evidence.  I may have missed it.

8          MR. WISHNEW:  Sure.

9          THE COURT:  You make an assumption --

10         MR. WISHNEW:  Yeah.

11         THE COURT:  -- but I don't see any evidence.

12         MR. WISHNEW:  So I'll also reference Your Honor to

13  Exhibit K to, I believe, the supplemental declaration.

14         THE COURT:  Sure.

15         MR. WISHNEW:  Docket number 9510-12 --

16         THE COURT:  Yes.

17         MR. WISHNEW:  -- page 9.

18         THE COURT:  Let me get there, hold on.  Page 9 of 39

19  or page 9 of the --

20         MR. WISHNEW:  Oh, I apologize.  Page 10 of 39, Your

21  Honor.  That's page 9 in the bottom right-hand corner.

22         THE COURT:  Okay.  Yes, what are you pointing to?

23         MR. WISHNEW:  Okay.  So in the middle of the page,

24  Step 2, it says:  "Reduce the interest rate".  And I'll go --

25  I'll start at the second paragraph which starts, "Reducing the

1    starting interest rate in increments of .125 percent to get as

2    close as possible to the target monthly mortgage payment ratio.

3    The interest rate floor in all cases is 2 percent."

4         And then subpoint, "If the resulting rate is below the

5    Interest Rate Cap, this reduced rate will be in effect for the

6    first five years followed by annual increases of one percent

7    per year (or such lesser amount as may be needed) until the

8    interest rate reaches the Interest Rate Cap, at which time it

9    will be fixed for the remaining loan term."

10        So Your Honor, I would suggest that the approach taken

11   in the chart on paragraph 17 of our reply is consistent with

12   the rate being in effect for the first five years and then

13   stepping up one percent thereafter.

14        THE COURT:  And what's the interest rate cap?

15        MR. WISHNEW:  The interest rate cap, Your Honor --

16        THE COURT:  It says it's the Freddie -- I'm looking --

17        MR. WISHNEW:  The Freddie Mac --

18        THE COURT:  -- the last paragraph under "Step 2".

19        MR. WISHNEW:  Right.  The interest rate cap --

20        THE COURT:  The rate for thirty-year fixed rate

21   conforming loans --

22        MR. WISHNEW:  Rounded to the nearest eighth percent as

23   of the date the agreement is prepared.

24        THE COURT:  And what would have been the interest rate

25   cap for a HAMP modification for Ms. Biancavilla at the date

1  that she entered into the trial plan?

2          MR. WISHNEW:  I'm not certain, Your Honor.

3          THE COURT:  I'm going to ask a question that

4  doesn't -- I want to make clear, it's not a suggestion that

5  that would be the ultimate outcome if this matter is resolved

6  by the Court.  But can you tell me if -- what the differential

7  would be for Ms. Biancavilla between the rates in the permanent

8  modification that was approved and a HAMP modification, if it

9  remained fixed as it was at the start, and you didn't step up?

10         MR. WISHNEW:  Well, I guess the answer would be the

11 difference between 5 percent and 0.6377, Your Honor.  I'm

12 referring to paragraph --

13         THE COURT:  Look, let me -- what I'm concerned -- I

14 understand that you endeavored to settle the matter and you've

15 been unsuccessful.

16         MR. WISHNEW:  Correct, Your Honor.

17         THE COURT:  Okay.  And I don't impose settlements.

18 Settlements have to be consensual.

19         MR. WISHNEW:  Yep.

20         THE COURT:  It seems to me that solely on the issue of

21 damages, because the Trust for purposes of this claim, whether

22 it would be -- whether it had to or not, the Trust has conceded

23 liability for breach of contract.

24         MR. WISHNEW:  Correct, Your Honor.

25         THE COURT:  You agree with that?

1     MR. WISHNEW:  I do, Your Honor.

2     THE COURT:  Okay.  So the issue is, what are Ms.

3  Biancavilla's recoverable damages?

4     MR. WISHNEW:  Yeah.

5     THE COURT:  And there're disputed issues as to that.

6  And it may be necessary, therefore, if the matter is not

7  resolved consensually, for the Court to go forward, I think,

8  with a very short trial, on the issue of damages alone.

9     MR. WISHNEW:  Um-hum.

10     THE COURT:  And it may be that you have the much more

11  persuasive side.  I'm not -- and that isn't a comment that you

12  do.  You may or Ms. Biancavilla may.  Okay?

13        I think without deciding the point, I think one of the

14  points you argue is that the only recoverable damages deal with

15  the differential in monthly payments for principal and interest

16  that the escrow obligations -- because Ms. Biancavilla had

17  included the escrow payments --

18     MR. WISHNEW:  Correct, Your Honor.

19     THE COURT:  -- in her calculation.

20     MR. WISHNEW:  Yes.

21     THE COURT:  And I'll give you a chance to talk to

22  this, Ms. Biancavilla.  And I'm not deciding anything today,

23  but --

24     MS. BIANCAVILLA:  Thank you.

25     THE COURT:  -- but it seems to me, the Trust has the

1  better side of the argument that what -- because this comes up

2  quite often.  They have no control over what your taxes and

3  insurance premiums are.

4        MS. BIANCAVILLA:  Sure, um-hum.

5        THE COURT:  And so that's got to come out of your

6  calculation.

7        MS. BIANCAVILLA:  Right.

8        THE COURT:  To me, the issue is what's the

9  appropriate -- the recoverable damages are most likely going to

10  be the differential between what you would have paid if a HAMP

11  modification had been approved -- you made -- you signed the

12  agreement, they signed the agreement for the trial plan.  You

13  successfully made the three trial payments.  And for purposes

14  of this proceeding, the Trust agrees you should have been given

15  that permanent modification.  It may have been a mistake,

16  whatever, but they agree for purposes of this proceeding --

17  they might not in another matter -- but for purposes of this

18  proceeding, they're agreeing they should have done it.  They

19  didn't.  Your recoverable damages -- and I think you

20  essentially argue the same thing -- is how much more you had to

21  pay under the permanent traditional modification that was

22  approved.  And so that really the dispute is how you calculate

23  it.

24        MS. BIANCAVILLA:  Yes.

25        THE COURT:  But let me give you a chance to address

1  whatever you want to -- whatever you want to talk about.  Go

2  ahead.

3          MS. BIANCAVILLA:  Okay.  So just to that point, and

4  then I want to back up a little bit, my understanding from the

5  telephone reps -- and the unfortunate part of this process was

6  that most of the information that was given wasn't actually by

7  way of documentation that was intelligible or to the points

8  that you're requesting information on the phone.  There was a

9  great deal of confusion in this entire process to include the

10  reason I originally called was only to get information about

11  the loans that were being offered by this new administration,

12  because there was an awful lot of to-do about all these

13  foreclosures were happening, and it seemed like it might be a

14  national catastrophe.

15          And I knew that I had a mortgage that I was going to

16  be doing something about in the upcoming years, and I knew

17  that, you know, the economy was getting tight, and that it was

18  a place for me to, you know, pick up the phone, make a phone

19  call, see what kind of products were being offered.

20          By where I was looking for a fixed rate loan, because

21  when you're trying to manage a situation with a limited budget,

22  you must keep your budget in mind.  And so the amount of

23  payments you're going to, you know, be making every month on a

24  mortgage is the most important thing, and then you look at the

25  interest rate and see, when you're shopping a mortgage, if you

1    can buy down points in order to bring it even, you know, better

2    within your budget.

3            So to my surprise, the people on the phone told me

4    that there was no way they could give me any information about

5    any of the programs that were being set forth, that it was

6    going to be based entirely on my financials.  And I said, well,

7    that's odd.  Usually you don't, you know, take the financials

8    until after the person decides on a product.  And they said

9    well, there's a number of different products being developed,

10   and so we don't know.

11           And I thought it was odd, and I thought well, okay,

12   this administration is new and so maybe they were still

13   developing some of these things.  So but I made it clear to

14   all, and I believe the reason that this documentation has not

15   been put forth in this very large package from the counsel for

16   ResCap that it's not included, my original application

17   information must have said -- I'm sure I have it here

18   somewhere, but I didn't know I was going to have to lay all

19   this out today -- that this was not an application to the loan

20   that it was merely I'm looking for information.

21           So imagine my surprise when they did not collect my

22   payment in December of '09, telling me that I was eligible for

23   the trial.

24           All of these things that you just discussed with the

25   attorney regards to the internal information about these loans

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1   were never given to anybody as far as I know.  I certainly

2   didn't get any of it.  If anyone told me in advance that this

3   would be what I would end up in, I would have hung up the phone

4   on them after thanking them very much, no thank you.

5          THE COURT:  Well, you still wound up with --

6          MS. BIANCAVILLA:  But -- yeah, I didn't get the

7   opportunity to do that.  Because once they defaulted my loan

8   and I called and I said, I'm sorry, I think there was a

9   mistake, I don't know why you did not draft my December payment

10  and I need to rectify that; but you're eligible for this, you

11  know, modification.  And we're going to move into it, and let's

12  move quickly.  And I'm like, well, I need documentation in

13  order to be able to decide, you know, what the terms are before

14  I, you know, move forward.

15         So they said well, you know, this is your opportunity.

16  If you don't take it now, you know -- and I said, but I'm

17  concerned about my late payment, and I can't fall behind on

18  anything, because you know, as you can probably see from my

19  financials, my situation is tight.

20         And so moving forward, that's what happened, and I

21  ended up with -- I have submitted -- I'm sure you received

22  also, a copy of the GMAC "what I needed to catch up with" so

23  that I didn't get pushed into the step rate.  They wanted 4,415

24  dollars over three months, of taking me through this trial

25  thing, and then they told me that I was not eligible.

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1          There was no way I had that kind of money.  I was

2     pretty much strong-armed into having to sign on to this step

3     rate, because otherwise there would have been foreclosure.

4          THE COURT:  Let me just stop you there.  So I don't

5     give anybody legal advice; let me make clear.  But the HAMP

6     program, which I've obviously dealt with a lot, when you say

7     they wouldn't tell you what your payments would be until you

8     provided financials --

9          MS. BIANCAVILLA:  Oh, I did get by phone -- I'm sorry,

10    by phone -- and not to interrupt -- and this is where I was

11    going to start at, and I got on a different train.  I was told

12    by phone that it would be thirty-one percent of the income that

13    I was reporting.  And I was reporting income as I was advised

14    by the representative by phone.  And if you look at the log of

15    phone calls and things, it's huge.  I mean, I was constantly in

16    contact with these people talking to someone on the phone.

17         If there was a record of everything that we discussed,

18    it would be very time consuming.  We discussed many points and

19    many things, and I was upset about many points and many things.

20    But what I got from this is that the HAMP trial payment was

21    supposed to -- was supposed to be what -- would include the

22    escrows, okay, and that my new fixed rate moving out of the

23    trial into the permanent loan would be that amount, the 679 and

24    change, or less.  And then as things progressed, I was told

25    that it was going to be thirty-one percent of what my reported

1    income was.

2            THE COURT:  So --

3            MS. BIANCAVILLA:  And somewhere along the line --

4            THE COURT:  Ms. Biancavilla.

5            MS. BIANCAVILLA:  -- somebody told me.

6            THE COURT:  Ms. Biancavilla, just stop for a minute.

7            MS. BIANCAVILLA:  Sure.

8            THE COURT:  The HAMP program, which is a federal

9    program, is designed to reduce a borrower's principal and

10   interest payments --

11           MS. BIANCAVILLA:  Right.

12           THE COURT:  -- to no greater than thirty-one percent

13   of their income.  And what it does is it moves the written

14   mortgage -- whatever your existing mortgage was, down in

15   quarter-percent increments to see if it can get down to thirty-

16   one percent.

17           Now, there are floors and ceilings, and it can't

18   always be done, but -- okay?  So --

19           MS. BIANCAVILLA:  All right.

20           THE COURT:  -- what you're saying is that's not -- the

21   HAMP program was not a GMAC program.  It was a federal

22   government program designed to try and help homeowners in

23   financial distress by reducing their mortgage payments.  But it

24   covers principal and interest.  What your taxes and your

25   insurance are, your taxes and insurance are.  I mean, it

 1  obviously varies.

 2          MS. BIANCAVILLA:  Right.

 3          THE COURT:  Okay.  And then the formula gets more

 4  complicated because they have to determine, if they move you

 5  down to that point, is the net present value of the loan more

 6  than the foreclosure value.  But we don't have to get -- that

 7  doesn't apply here.  Okay?  So but the issue about whether

 8  there are step increases or not -- and you heard my questions

 9  to Mr. Wishnew -- because the trial plan document which you

10  signed, which is a contract, is certainly silent about whether

11  there are step-ups or not.

12          MS. BIANCAVILLA:  Right.

13          THE COURT:  Mr. Wishnew points to the Exhibit K -- was

14  it?

15          MR. WISHNEW:  Yes, Your Honor.

16          THE COURT:  Exhibit K in the supplement which is not a

17  GMAC document, it's the HAMP document.  It describes the Home

18  Affordable Modification Program, supplemental directive 09-01

19  April 6, 2009.  And all I can tell you is, there were constant

20  updates of these HAMP guidelines, as the program evolved.

21          But Mr. Wishnew is pointing to, on page 9 of that

22  document, what happens with the reduction in interest rates,

23  and whether it increases after five years.  So he answered my

24  question with respect to whether under a HAMP permanent

25  modification, whether there would be a step-up from the

 1   original -- the starting interest rate.  And he points to the

 2   language what's under Step 2 on page 9 of the HAMP directive.

 3            MS. BIANCAVILLA:  Right.

 4            THE COURT:  So --

 5            MS. BIANCAVILLA:  Yes.

 6            THE COURT:  -- I don't know whether you ever got that.

 7   I'm not saying they had to give it to you.

 8            MS. BIANCAVILLA:  No.  No details -- no details on --

 9   this was given me before the process.

10            THE COURT:  Right.

11            MS. BIANCAVILLA:  So how do you say no to a process

12   where you're being told this is good, you will be happy, this

13   trial payment of 679 and change is the amount we're testing

14   your ability to be able to pay over the next three months, and

15   that's what's in the document I signed.  It will include your

16   escrows and there's --

17            THE COURT:  Well, the document -- stop, for a second.

18   Because let me go back to the document.  Bear with me a second,

19   okay?  Because this issue about the escrow payments is an

20   important one, okay?

21            MS. BIANCAVILLA:  Yeah, it says it in there.

22            THE COURT:  Well, hold on.  Let me --

23            MS. BIANCAVILLA:  Okay.  I'm looking at Exhibit A --

24            THE COURT:  Okay.

25            MS. BIANCAVILLA:  -- page 13.

1    THE COURT:  Okay.  It says -- you're looking on --

2  they have it attached as -- maybe in a couple places.  But I'm

3  looking at -- let me find -- there was another copy of it in

4  here.  Hold on, bear with me.

5    MS. BIANCAVILLA:  Yeah, it is in a couple of places.

6  You're right.

7    THE COURT:  Yeah, just bear with me.  Okay?

8    Okay.  Exhibit F to the supplement that the Trust

9  submitted, it's signed by you on December 23, 2009.  And in

10  paragraph 2 the loan --

11    MS. BIANCAVILLA:  The loan workout plan?

12    THE COURT:  -- workout plan.

13    MS. BIANCAVILLA:  Um-hum.

14    THE COURT:  Mr. Wishnew it does say, "On or before

15  each of the following dates, I will pay the Lender the amount

16  set forth below," which includes payment for escrow items.

17    MS. BIANCAVILLA:  That's right.

18    THE COURT:  So what's your response to that?  It does

19  say that, Mr. Wishnew.

20    MR. WISHNEW:  You're right.

21    THE COURT:  And it says "including real estate taxes,

22  insurance premiums and other fees."  And Ms. Biancavilla says

23  you sent her a letter -- not you obviously -- your client --

24    MR. WISHNEW:  Yes.

25    THE COURT:  -- sent a letter --

1          MR. WISHNEW:  Yes.

2          THE COURT:  -- telling her that her payments are

3    679.83 and that includes real estate taxes, insurance, and

4    other fees, if any.

5          MR. WISHNEW:  Um-hum.

6          THE COURT:  So she's right about that?

7          MR. WISHNEW:  She's right that for the purposes of the

8    trial plan, the trial plan included escrow amounts, Your Honor.

9          THE COURT:  So but where -- when I look at paragraph

10   3, the modification --

11         MR. WISHNEW:  Um-hum.

12         THE COURT:  -- I don't see anything -- I see that the

13   amounts may be adjusted:  "The final amounts of unpaid interest

14   an any other delinquent amounts (except late charges) to be

15   added to my loan balance, and after deducting from my loan

16   balance any remaining money held at the end of the Trial Period

17   under Section 2D above, the Lender will determine the new

18   payment amount."

19         It doesn't say anything about adding to it the escrow

20   payments, does it?

21         MR. WISHNEW:  One minute, Your Honor.  Your Honor,

22   section -- I'll refer the Court to section 4B --

23         THE COURT:  Okay.

24         MR. WISHNEW:  -- a little further down the page:

25   Additional Agreements.  "I" -- and that would be the

1    borrower -- "agree to the following".  Section B:  "To comply,

2    except to the extent that they are modified by this Plan, with

3    all covenants, agreements, and requirements of Loan Documents,

4    including my agreement to make all payments of taxes, insurance

5    premiums, assessments, Escrow items, impounds, and all other

6    payments, the amounts of which may change periodically over the

7    term of my loan."

8            THE COURT:  Okay, so let me ask you this.  I think Ms.

9    Biancavilla has an argument -- I'm not saying it's the winning

10   argument, I'm not saying it's not the winning argument -- that

11   okay, the 679.83 includes taxes and insurance escrow.  Okay.

12   And you're pointing to paragraph 4B which refers to the escrow

13   items, and say the amount may change periodically over the term

14   of my loan.  Okay?

15           So I guess you'd have a good argument that to the

16   extent that her tax payments and insurance increased from when

17   this is signed, she's on the hook for that incremental

18   increase, but not for the entire amount of the taxes and

19   insurance.

20           So hypothetically, if her taxes started out as 2,000

21   dollars a year --

22           MR. WISHNEW:  Right.

23           THE COURT:  -- and increased to 2,500 dollars a year,

24   you point to paragraph -- it would seem to me that she has the

25   argument that reading paragraph 2 and paragraph 4B, she's on

RESIDENTIAL CAPITAL, LLC, ET AL.                    25

1   the hook for that incremental amount.  So if it increased 500

2   dollars a year, you divide it by twelve and that would -- that

3   could be added to her monthly payments.  But not the entire --

4   how do you get to your argument that this contract permits you

5   to add to the 679 the entire amount of taxes and insurance as

6   opposed to any adjustment, because taxes and insurance

7   increased?  The hypothetical I gave you --

8          MR. WISHNEW:  Well --

9          THE COURT:  -- if the taxes and insurance

10  hypothetically increased 500 dollars a year --

11         MR. WISHNEW:  Sure.

12         THE COURT:  -- okay, you've got the argument that 4B

13  says okay, that gets added on.

14         MR. WISHNEW:  Right.

15         THE COURT:  But not the 2,000.

16         MR. WISHNEW:  Well, see, I think -- I would read 4B

17  Your Honor, to say that she agrees to comply with the existing

18  obligation to make all payments of taxes, insurance,

19  assessments, escrow items, impounds and other payments, which

20  could change.  So it's not that we are agreeing to say to cap a

21  number of set a number, and then say if it increases, well,

22  then you're responsible only for the increase.

23         The fact of the matter is, we were working with her to

24  modify principal and interest.  We don't -- as the Court

25  recognized and as we argued in our papers, we don't control

1   these different categories of items.  So we have control of

2   principal and interest, and that's what we agreed to modify.

3   The underlying loan documents require her to pay taxes,

4   insurance premiums --

5          THE COURT:  But how do you reconcile that argument

6   with paragraph 2 --

7          MR. WISHNEW:  Well --

8          THE COURT:  -- which says -- stop -- that the trial

9   period payment includes payment for escrow items?

10         MR. WISHNEW:  Well, I think you have to bifurcate the

11  two, Your Honor.  Paragraph 2 clearly sets forth a fixed

12  trial -- a fixed payment for the trial period.  It then

13  distinguishes between the trial period and the permanent

14  period.  And so in 3 and 4 it says, okay, if you succeed with

15  trial, then you get the permanent.  And then on -- and you have

16  the obligation to address these additional items.

17         So the idea is the trial payment was an estimate of

18  essentially an all-in payment.  And then assuming that she's

19  shown an ability to make that all-in payment, she would then

20  get modded into a modified principal and interest amount, but

21  still have the existing -- but still maintain her existing

22  obligation to cover these additional items, which included

23  escrow.

24         THE COURT:  Going to 4B, it says "to comply, except to

25  the extent that they are modified by this plan."

RESIDENTIAL CAPITAL, LLC, ET AL.                          27

1       MR. WISHNEW:  Um-hum.

2       THE COURT:  Okay.  So paragraph 2, which says the

3  679.83 includes payment for escrow items.  Why doesn't that

4  modify the plan?

5       MR. WISHNEW:  My argument would be, Your Honor, that

6  the paragraph 2 only modifies for the purposes of a trial

7  period.

8       THE COURT:  Where's it say that?

9       MR. WISHNEW:  It's at -- well, it defines -- Your

10  Honor, in the second line of paragraph 2, it defines the three

11  itemized items as the "trial period payment".  The trial period

12  payment -- and then I go to the second paragraph of section 2:

13  "The Trial Period Payment is an estimate of the payment that

14  will be required under the modified loan terms, which will be

15  finalized in accordance with Section 3."

16       Section 3 then says --

17       THE COURT:  But you don't argue that the 679 had to be

18  adjusted because of the final amount of unpaid interest and any

19  other delinquent amounts after deducting my loan balance and

20  any remaining held at the end."  So you haven't argued that

21  that language came into play?

22       You've essentially -- well, I mean, you haven't, have

23  you?

24       MR. WISHNEW:  I don't believe so, Your Honor.

25       THE COURT:  Okay.  Well, look, I think we've gotten as

1  far as I can get to -- is there anything -- Ms. Biancavilla, is

2  there anything you want to add now.

3          MS. BIANCAVILLA:  I don't even know where to go with

4  this.  Because this is -- it's beyond me.  That's why I like

5  fixed loans.

6          THE COURT:  Yeah, I'm sure, but you know.

7          MS. BIANCAVILLA:  Yeah.  I understand there's a lot of

8  things going on here that attorneys have hard times working

9  through.  And so --

10         THE COURT:  So do judges.

11         MS. BIANCAVILLA:  I'm trying -- I see.  And I

12 appreciate all that you're doing in order to try to help me get

13 to a place that makes sense.

14         THE COURT:  Look, here's what I want you both to do,

15 okay.  You need to go back and try to settle this again.  And I

16 don't force settlements, Ms. Biancavilla, okay, I don't; but

17 let me just tell you what -- if you don't settle it, we're

18 going to have a trial on damages.  Where do you live?

19         MR. WISHNEW:  Pennsylvania.

20         MS. BIANCAVILLA:  Me?

21         THE COURT:  Yes.

22         MS. BIANCAVILLA:  I live in the State of Pennsylvania.

23         THE COURT:  Okay, where in Pennsylvania are you?

24         MS. BIANCAVILLA:  I'm in the Harrisburg area, near

25 Cumberland.

1         THE COURT:  Okay, yeah.  Okay.  So look, if you can't

2    settle it, we're going to have a trial on damages.  The Trust

3    has agreed -- I mean, having read all the papers, the only

4    issue that's separating you and the trust is what your damages

5    are.  Whether they had to do it or not, they've acknowledged

6    that once that trial plan was signed, they agree that's a

7    contract.  Whether it was right or wrong, they figure they've

8    got to live by it, and you're entitled to the differential

9    between what you'd pay under a permanent HAMP modification and

10   what you were paying over with the non-HAMP modification.

11        They do make the point that if it's not settled -- and

12   I think they're probably right about this -- they're going to

13   seek to discount to present value, because they tried to

14   calculate over the life of the loan, what the differential is.

15   If it goes to trial, they're entitled to at least offer

16   evidence of what the discounted amount would be, because 29,000

17   or 100,000 over twenty years, is not worth 100,000 dollars

18   today.  Okay?  All right.  But that's not before me today.

19   Okay.

20         MS. BIANCAVILLA:  Yes, so --

21         THE COURT:  So just let me finish.  Okay?

22         MS. BIANCAVILLA:  I'm sorry.

23         THE COURT:  So if it goes to trial, I'll set a date

24   where I attempt to try to be convenient to you, because you're

25   going to have to come to New York for it.  We don't do trials

1    over the phone.  You're going to have to offer your evidence of

2    your damage calculation.  I think that we've identified today

3    some issues where I think you have a genuine dispute with the

4    trust.  I think what you -- we'll have to see what the answer

5    is as to whether your escrow payments should or shouldn't be

6    included.  I'm not deciding that today.  I think I understand

7    better the arguments about it under the contract.

8              But Mr. Wishnew, I'm not trying to persuade you to --

9    it's going to cost you more -- it's going to cost your client

10   more to try this case than I think you can settle this case

11   for.

12             MR. WISHNEW:  I know I'm not supposed to disclose --

13   I'm not going to get --

14             THE COURT:  I don't want to know the amount.  Okay.

15             MR. WISHNEW:  I'm just going to say it's greater than

16   what we're seeking to allow the claim at right now.

17             THE COURT:  I'm sorry?

18             MR. WISHNEW:  We made offers --

19             THE COURT:  Okay.

20             MR. WISHNEW:  -- to Ms. Biancavilla greater than what

21   we're talking about as an allowed claim.

22             THE COURT:  Okay.

23             MR. WISHNEW:  So --

24             THE COURT:  Look --

25             MR. WISHNEW:  -- I don't know where to go.

1          THE COURT:  -- Ms. Biancavilla --

2          MS. BIANCAVILLA:  Um-hum.  Yes.

3          THE COURT:  -- where we are at this point is that when

4    I set a trial in these matters, I enter a scheduling order that

5    requires each side to exchange their trial exhibits, whatever

6    paper -- whatever exhibits you have that you want to introduce

7    at trial, you're going to be required to number them; each have

8    a unique exhibit number.  They'll have to give you their

9    documents; you have to give them yours.

10          We're going to set a trial date.  I don't even think

11   you want her deposition, do you, Mr. Wishnew?  I mean, this is

12   really --

13          MR. WISHNEW:  This is really, I think, just putting

14   the evidence in, Your Honor.

15          THE COURT:  It is.  And I'm going to set a --

16          MS. BIANCAVILLA:  Is the --

17          THE COURT:  -- I'm going to set a trial date and

18   you're going to have to come to New York.  It seems to me, this

19   is at most a half-day trial, because it's a pretty -- one, I've

20   got to interpret the dispute about the contract, whether escrow

21   payments are included or not included, and whether they're

22   entitled to step-up in a HAMP modification.  They point to the

23   HAMP guidelines.  You ought to look at that,

24          Mr. Wishnew you ought to -- I know it's in your

25   exhibit, but maybe you ought to -- you ought to have some more

1  conversations with Ms. Biancavilla, send her that document

2  again --

3            MR. WISHNEW:  Okay.

4            THE COURT:  -- okay -- so she can see what you're

5  pointing to as the authority for the Trust, even with a

6  permanent HAMP modification, after five years, to step up the

7  interest rate.

8            After how many years was it stepped up here?

9            MR. WISHNEW:  I think it was five, Your Honor.

10           THE COURT:  Was it?  Okay.

11           MR. WISHNEW:  Yeah.

12           THE COURT:  Look, you'll either settle it or not.  And

13  if you don't talk about a schedule, see if you can work out a

14  scheduling order --

15           MR. WISHNEW:  Yeah.

16           THE COURT:  -- as to exchange of exhibits, and find

17  out -- Ms. Biancavilla, do you work?

18           MR. WISHNEW:  Yes, Your Honor.

19           MS. BIANCAVILLA:  Yeah.  And my schedule is not

20  regular.  It's different every week.

21           THE COURT:  Okay, well I want to -- within limits, I

22  try to accommodate your schedule and my schedule, obviously.

23  And you've obviously got to come from the Harrisburg area to

24  New York for it.  We don't do trials over the phone.

25           MS. BIANCAVILLA:  Right.

1        THE COURT:  And we'll -- talk to Mr. Wishnew about a

2   date that's the least inconvenient for you and that works with

3   the Court's schedule and with the Trust's counsel's schedule.

4        MS. BIANCAVILLA:  May I inject something here about

5   settlement?

6        THE COURT:  Sure.  Go ahead.

7        MS. BIANCAVILLA:  Okay.  We actually had a settlement

8   on the table that I was okay with.  The problem that I ran into

9   is that a question that I had asked was never answered until a

10  couple of weeks before we went into all of this.

11       THE COURT:  Okay.

12       MS. BIANCAVILLA:  And I had stated, by e-mail, that I

13  didn't have enough time to deal with it at that time, because

14  there were other things going on, and I couldn't jump in right

15  here, right now.

16       THE COURT:  Okay.

17       MS. BIANCAVILLA:  What I was asking of that last

18  settlement amount is whether or not that would be a lump sum or

19  they were going to drag it out.

20       THE COURT:  Well, I'm not going to get -- because I

21  have to be the one, if it goes to trial, Ms. Biancavilla, I

22  can't get in the middle of your settlement talks.  I want

23  you --

24       MS. BIANCAVILLA:  Yeah.

25       THE COURT:  -- and Mr. Wishnew to have a discussion

RESIDENTIAL CAPITAL, LLC, ET AL.                                    34

1    and see whether you can come to a resolution.

2              MS. BIANCAVILLA:  Right.

3              THE COURT:  Mr. Wishnew, what I would ask is, within

4    two weeks, to send me a status report.

5              MR. WISHNEW:  Okay.

6              THE COURT:  And if you can't settle it, talk to Ms.

7    Biancavilla about a schedule, and we'll try and accommodate

8    both sides for a date for trial.  I think, looking at what I've

9    seen, this is probably like a half a day trial.

10             Realistically, Harrisburg is far enough away that

11   you're probably going to have to stay overnight, either before

12   the trial or after the trial, so -- but talk to Mr. Wishnew;

13   see what you can work out.  I hope you can resolve it.  If you

14   can't, I mean, I'm here to decide disputes, but frequently the

15   best result is one both -- the best settlements are one that

16   neither side is entirely happy with but it just makes the most

17   sense for both of them.  Okay?

18             MS. BIANCAVILLA:  Yeah.  I'm sorry.  I thought I had

19   middle ground working with the 679 number because in the

20   calculations of the thirty-one percent of the amount that would

21   have been in the HAMP file of my income, as reported, it would

22   have been, like, 200 dollars less.

23             THE COURT:  All right.  Let's --

24             MS. BIANCAVILLA:  And so --

25             THE COURT:  Let's -- I don't want to get into the --

1    talk to Mr. Wishnew and -- or --

2                MS. BIANCAVILLA:  Yeah.

3                THE COURT:  -- or I don't know -- are you going to

4    have this discussion directly, Mr. Wishnew?

5                MR. WISHNEW:  Yes, Your Honor.

6                THE COURT:  Okay.  All right.  So get in touch with

7    Ms. Biancavilla, see whether you can get it resolved, give me a

8    status letter within two weeks.  If not, get a schedule done.

9    You can get a date for trial from Deanna.  It does seem to me

10   like a half a day.  And see -- work with Ms. Biancavilla as to

11   whether morning or afternoon is more convenient.

12               How long is the drive from Harrisburg to -- or from

13   where you are to New York?

14               MS. BIANCAVILLA:  Me?

15               THE COURT:  Yes.

16               MS. BIANCAVILLA:  I haven't been there in a lot of

17   years.

18               THE COURT:  Okay.

19               MS. BIANCAVILLA:  I know my car won't make it; I will

20   have to rent a vehicle.

21               THE COURT:  Okay.  Well, look, I -- Mr. Wishnew will

22   talk to you about it, and I'm going to try and accommodate, but

23   there are limits to what I can do on that, okay?

24               MS. BIANCAVILLA:  Yeah.

25               THE COURT:  Okay.

1          MS. BIANCAVILLA:  I appreciate your time today and

2   looking into details that I had no idea were even there.

3          THE COURT:  Okay.

4          MS. BIANCAVILLA:  So it's been a pleasure, and I want

5   to thank you for your generosity in allowing me to enter in on

6   the live line and at no cost.

7          THE COURT:  Okay.

8          MS. BIANCAVILLA:  So I appreciate that.

9          THE COURT:  All right.  Let's see; hopefully you'll

10  get it resolved.  If not, we'll go ahead and try it.  And I

11  think -- I have the papers that were filed for today's hearing.

12  It may be that the Trust and maybe you were going to want to

13  file something further.  I've at least explored what issues I

14  see in interpreting the contract and computing damages, and

15  let's see where we get to.

16         Thanks very much, Ms. Biancavilla.  Okay.  You

17  don't --

18         MS. BIANCAVILLA:  Okay.

19         THE COURT:  You can stay on the phone or not; it's up

20  to you.  Okay?  We're going to move onto another matter in this

21  case, okay?

22         MS. BIANCAVILLA:  Okay.  Thank you so much.

23         THE COURT:  Thanks.  Okay.

24         Kasparik.

25         MR. WISHNEW:  Thank you, Your Honor.  The last matter

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1   on today's calendar is item six, on page 5, the Borrower Claims

2   Trust objection to proof of claim number 3695, filed on behalf

3   of Rosalind Alexander-Kasparik.

4           THE COURT:  Okay.  Are they -- is anyone for Ms.

5   Kasparik on the phone?

6           MR. CATE:  Good morning, Your Honor.  Allan Cate on

7   behalf of claimant Rosalind Alexander-Kasparik.

8           THE COURT:  Okay.  Go ahead, Mr. Wishnew.

9           MR. WISHNEW:  Thank you, Your Honor.  Your Honor, the

10  Borrower Claims Trust filed its objection at docket number

11  9465.  Claimant filed their response at docket number 9464.

12  And we followed up with our reply at 9492.

13          Your Honor, this matter derives from a complaint which

14  was amended multiple times.  It was filed against Freddie Mac

15  and GMAC Mortgage in 2012.  It's been the subject of multiple

16  [de-mu-ers] --

17          THE COURT:  Demurrers.

18          MR. WISHNEW:  -- demurrers.  Two-and-a-half years and

19  I still can't get it right.

20          THE COURT:  Yeah, you still can't get it right.

21          MR. WISHNEW:  -- in the California courts, which

22  claimant participated in on each occasion.  The claimant has

23  made multiple claims against both defendants, but has never

24  distinguished between the defendants.  All allegations are

25  against "the defendants", being both Freddie Mac and GMAC

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1   Mortgage.  So it's the Trust's position that the claimant's

2   prosecution of the claim in the California courts -- I'm

3   sorry -- that the claimant's prosecution of the claim in the

4   bankruptcy court is nothing more than a duplication of prior

5   court proceedings in which it fully participated.

6           Accordingly, the Borrowers Trust brings its objection

7   to disallow and expunge the claim on the basis of collateral

8   estoppel arising from a spring 2015 judgment in defendant's

9   favor, and to the extent the Court does not agree with the

10  collateral estoppel argument, also provides reasons why each

11  substantive cause of action lacks merit and should be

12  disallowed.

13          Claimant filed its reply, but its only argument was

14  that a recent dismissal, at the end of 2015, of GMAC Mortgage,

15  somehow precludes or does not allow for --

16          THE COURT:  Well, it was vacated.  The judgment was

17  vacated.

18          MR. WISHNEW:  Right, the judgment as to GMAC Mortgage

19  was vacated.  However, the claimant has misinterpreted the

20  Borrowers Trust objection and, in our opinion, the objection,

21  as filed, stands largely uncontested.  The allegations in

22  plaintiff's complaint are against both Freddie Mac and GMAC

23  Mortgage, and as I mentioned, do not distinguish --

24          THE COURT:  Actually, they weren't; they were against

25  Ally, and the Severson firm, who appeared on behalf of GMAC, I

1  think, regularly footnoted that it was misnamed as Ally and it

2  was actually GMAC Mortgage.

3          MR. WISHNEW:  Correct, Your Honor.  I was actually

4  going to make that exact point.  Yeah.  So --

5          THE COURT:  You agree, I take it, that, despite the

6  caption, that GMAC Mortgage was a party to the California

7  litigation?

8          MR. WISHNEW:  I do, absolutely, Your Honor.

9          So the fact of the matter is, is that the rulings in

10 favor of Freddie Mac, in the underlying California litigation,

11 apply equally in favor of GMAC Mortgage.

12         THE COURT:  Well, let me drill down a little bit.

13 Okay.  So the demurrers to the complaint -- first amended

14 complaint and second amended complaint were all sustained.

15 When the Court sustained the demurrer to the second amended

16 complaint --

17         MR. WISHNEW:  Yeah.

18         THE COURT:  -- it was with prejudice as to all causes

19 of action, except leave to amend was granted to allege a

20 negligence claim and promissory estoppel claim, correct?

21         MR. WISHNEW:  Correct, Your Honor, yes.

22         THE COURT:  And that applied as to GMAC as well?

23         MR. WISHNEW:  Correct, Your Honor.

24         THE COURT:  Okay.  And so Kasparik filed a third

25 amended complaint --

1           MR. WISHNEW:  Right.

2           THE COURT:  -- which Freddie Mac alone demurred to?

3           MR. WISHNEW:  Correct, Your Honor.

4           THE COURT:  And the Court sustained the demurrer to

5   the third amended complaint, which has only two causes of

6   action:  negligence and promissory estoppel.

7           MR. WISHNEW:  Um-hum.

8           THE COURT:  And the Court, initially, in its judgment,

9   applied it as to GMAC as well, correct?

10          MR. WISHNEW:  Correct, Your Honor.

11          THE COURT:  And then Kasparik moved to vacate the

12  judgment as to GMAC because it hadn't filed a demurrer,

13  correct?

14          MR. WISHNEW:  Correct, Your Honor.

15          THE COURT:  And the Court vacated the judgment as to

16  GMAC.

17          MR. WISHNEW:  Um-hum.

18          THE COURT:  Correct?

19          MR. WISHNEW:  Correct, Your Honor.

20          THE COURT:  Okay.  So one of the things you say in

21  your objection is you seem to -- and I want you to tell me

22  why -- that Kasparik's claim is limited to what was alleged in

23  the original complaint, not the first amended, second amended,

24  the third amended complaint.  When I look at the proof of

25  claim --

RESIDENTIAL CAPITAL, LLC, ET AL.                    41

1           MR. WISHNEW:  Right.

2           THE COURT:  -- which is attached as Exhibit A to the

3   supplemental declaration of Ms. Lathrop --

4           MR. WISHNEW:  Um-hum.

5           THE COURT:  -- under "basis for claim", it says,

6   "wrongful foreclosure", and it has a case number.  And the case

7   number is the case that went through the complaint, first

8   amended complaint, second amended complaint, and then third

9   amended complaint.

10          MR. WISHNEW:  Right, Your Honor.

11          THE COURT:  So it seemed to me that the Trust was on

12  notice, because it participated in the litigation --

13          MR. WISHNEW:  Right.

14          THE COURT:  -- that the claim was what was in the

15  complaint, first amended complaint, second amended complaint,

16  third amended complaint.

17          MR. WISHNEW:  Right.

18          THE COURT:  So the third amended complaint, judgment

19  of which has been vacated as to GMAC, has this negligence and

20  promissory estoppel claim.

21          MR. WISHNEW:  Um-hum.

22          THE COURT:  And those survive.  Do you agree or

23  disagree?

24          MR. WISHNEW:  I agree.

25          THE COURT:  Okay.  What I don't have in your binder

1   is -- at least I didn't see it -- is the Freddie Mac demurrer

2   to the third amended complaint.  And I don't know whether

3   there's a transcript or a minute order.  The California state

4   courts -- Mr. Cates (sic throughout), I used to practice in

5   California, so I'm familiar with the tentative ruling.  I don't

6   know, was there -- maybe you can tell me, Mr. Cates, was there

7   a tentative ruling on the demurrer to the third amended

8   complaint?

9           MR. CATE:  Yes, Your Honor.  There was a detailed

10  tentative ruling, two pages, maybe, single-spaced, and it was

11  adopted as part of the order of dismissal --

12          THE COURT:  It's not --

13          MR. CATE:  -- and judgment and included in those

14  documents also.  So --

15          THE COURT:  Well, Mr. Wishnew has it.  Do you have any

16  objection to him showing me the tentative?

17          MR. CATE:  No, Your Honor.

18          THE COURT:  Why don't you bring that up here?

19          So where I'm -- look, here's what's going through my

20  mind about this.  The judgment dismissing all the causes of

21  action in the second amended complaint as anything other than

22  negligence and promissory estoppel, that's final.  It was fully

23  litigated, same issues, same parties, and it seems to me res

24  judicata, collateral estoppel is going to apply as to the

25  dismissal of all of the causes of action asserted in the second

RESIDENTIAL CAPITAL, LLC, ET AL.                    43

1    amended complaint.

2           What remains are the two causes of action in the third

3    amended complaint.  And so then the issue for me becomes, on

4    the merits, has the Trust properly argued that those claims

5    should be expunged.  It's essentially a motion-to-dismiss

6    standard.  Okay?  And because I didn't have either the moving

7    papers on -- you know, what I'd like to see is, okay, so you

8    argue that the sustaining of the demurrer to the third amended

9    complaint, without leave to amend, didn't apply as to GMAC.

10   But I sure would like to see what the arguments were that

11   Freddie Mac made, and what you made, Mr. Cates, and what the

12   basis for the Court's ruling.

13          So let's stop for a minute.  I'm going to read the

14   tentative, okay?

15       (Pause)

16          THE COURT:  Okay.  I've read it, and I'm going to

17   return it to Mr. Wishnew.  What -- give me a second, Mr.

18   Wishnew.  Let's see if I can find this.

19       (Pause)

20          THE COURT:  So Mr. Wishnew, what I'm looking at is the

21   Trust's objection to the Kasparik claim.  And what I'm not

22   seeing is a legal argument why the negligence and promissory

23   estoppel claims fail on the merits, why they should be expunged

24   on the merits.  You've got a twenty-five-page brief, but it

25   doesn't seem to address that.

1         I would note, for both parties, in the judge's

2  decision sustaining the demurrer to the second amended

3  complaint, in his discussion of breach of fiduciary duty -- and

4  then of course he allows an amended to assert the two causes of

5  action:  negligence and promissory estoppel -- the judge

6  distinguished one of Mr. Cate's arguments.  And he cited

7  Alvarez v. BAC Home Loans Servicing LP, 228 Cal.App 4th 941

8  (2014).  And he says, in one sentence, he distinguishes it

9  because it's a negligence case.  So that's a negligence case.

10  One of the things -- I didn't do exhaustive research, but I did

11  see that in Garcia -- you may want to take a note of this -- in

12  Garcia v. PNC Mortgage, 2015 WL 5461563, (N.D. Cal.), September

13  16, 2015, the district court, in its order granting the motion

14  to dismiss -- it's District Judge Phyllis Hamilton in the

15  Northern District -- has a discussion of the negligence claim,

16  and notes that -- not notes; it's in the text.

17         I'll read it: "In the third cause of action, plaintiff

18  alleges the claim for negligence based on PNC's handling of

19  'mortgage assistance and foreclosure prevention services' for

20  his loan, including the handling of the loan modification

21  application" -- applications, plural.  "The dispute here is as

22  to whether a loan servicer owes a duty of care to a borrower.

23  There is a split of authority in the California Court of

24  Appeal.  See Lueras v. BAC Home Loans Servicing, LP, 221

25  Cal.App.4th 49, 67-78 (2013)(no duty of care); Alvarez v. Home

1  Loans Servicing, 228 Cal.App 4th 941, 945-950 (2014)(duty of

2  care)."  And what Judge Hamilton says is, "In the absence of

3  some guidance from the Ninth Circuit, this court finds the

4  reasoning in the Lueras decision to be more persuasive, and

5  finds that a servicer, as any financial institution, owes no

6  duty of care to a borrower in the provision of ordinary

7  financial services such as loan modifications."

8          So my research wasn't necessarily exhaustive, but -- I

9  didn't look at the promissory estoppel law, but -- so here's

10 what I want from both sides.  I want -- so look, Mr. Cates, I

11 do conclude that res judicata and collateral estoppel apply to

12 all of the causes of action which were dismissed on the merits

13 by the California trial court, as to which no appeal was taken.

14 And so you're blocked from pursuing any of those elements of

15 the claim.  But the negligence and promissory estoppel claim,

16 because of the vacating of the judgment, remain live.  And I'm

17 going to consider them on the merits.  And so I'm going to

18 give -- how much time, Mr. Cates, do you want to submit a

19 brief -- well, here's what we ought to do.

20         Mr. Wishnew, how much time do you want to submit a

21 brief in support of dismissal of those claims, those two

22 claims, on the merits?

23         MR. WISHNEW:  Two weeks, Your Honor.

24         THE COURT:  Okay.  And Mr. Cates, is two weeks enough,

25 after you get that brief, to respond to the brief?

1          MR. CATE:  That's just fine, Your Honor.

2          THE COURT:  Okay.  So Mr. Wishnew, what I want you to

3    do is confirm a schedule with Mr. Cates, that two weeks/two

4    weeks is right.  It seems to me you can have three business

5    days to do a reply brief, if you want, after that.  Put it in a

6    letter.  The two of you agree on the schedule.  Put it in a

7    letter to me.  Put it on -- talk to Mr. Cates.  Put it on the

8    calendar for an omnibus hearing date.  And I'm going to go

9    ahead and decide whether those claims -- the remaining claims

10   should be expunged.

11         So am I correct, Mr. Cates, that when the court

12   vacated the judgment it stayed the action, so the California

13   court is not anxious to go ahead and decide those two remaining

14   causes of action; is that a fair statement?

15         MR. CATE:  Yes, Your Honor, the action is stayed.

16         THE COURT:  Okay.  All right.  So I'm going to go

17   ahead and deal with it.

18         And Mr. Wishnew, talk to Mr. Cates, finalize this

19   briefing schedule.  I'm sure you've got some omnibus hearing

20   dates coming up.  Talk to Mr. Cates.

21         Mr. Cates, I'll let you appear by telephone.

22         MR. CATE:  I appreciate that, Your Honor.  Thank you.

23         THE COURT:  And what we're going to do is we're going

24   to have a -- it's going to be a merits argument as to those two

25   remaining causes of action.

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1          And what I'd ask in the meantime, Mr. Wishnew --

2          MR. WISHNEW:  Um-hum.

3          THE COURT:  -- before you even file the briefs --

4          MR. WISHNEW:  Yeah.

5          THE COURT:  -- I would ask that you not -- you don't

6     have to -- well, go ahead and file it.  I would like the

7     demurrer -- the Freddie Mac demurrer -- Mr. Cates, I assume he

8     filed an opposition to it, and the tentative that you showed

9     me.  File them all together as a single -- with the exhibits to

10    a single pleading.

11         MR. WISHNEW:  Okay.

12         THE COURT:  All right?

13         MR. CATE:  Yes, Your Honor.

14         THE COURT:  Is there anything else that relates to the

15    sustaining of the demurrer to the third amended complaint,

16    other than the Freddie Mac brief, your brief, and the

17    tentative, that I ought to see?  Obviously I have the judgment

18    and the vacating of the judgment.

19         MR. CATE:  I don't think so, Your Honor.

20         THE COURT:  Okay.  All right.  I just -- all right, so

21    Mr. Wishnew's going to put that together and obviously serve

22    you with a copy of it.  Okay?  Don't wait for your brief -- I

23    want to see that even before I get the briefs from both sides.

24         MR. WISHNEW:  All right.

25         THE COURT:  Okay?  All right.

1          MR. CATE:  Very good.

2          THE COURT:  So I'm not going to enter a written order

3   today, but I'm so-ordering the transcript; I'm sustaining the

4   Trust's objection to all causes of action other than negligence

5   and promissory estoppel, on the basis of res judicata and

6   collateral estoppel.  The California judgment is final as to

7   those other causes of action.

8          Okay.  Anything else you want to add, Mr. Cates?

9          MR. CATE:  No, Your Honor.  That's all.  Thank you.

10          THE COURT:  Okay.  Mr. Wishnew, anything you want to

11   add on this?

12          MR. WISHNEW:  That's it for Your Honor.

13          THE COURT:  Okay.  Is that it for today?

14          MR. WISHNEW:  That's it.

15          THE COURT:  Thank you very much.

16          MR. WISHNEW:  Thank you.

17          THE COURT:  When's our next hearing?  Well, we've got

18   a trial next week.

19          MR. WISHNEW:  We have a very brief hearing Monday, a

20   second trial Tuesday, a status conference later in the week,

21   and then I think we're back on the omnibus mid-February --

22          THE COURT:  Okay.

23          MR. WISHNEW:  -- but there's also a trial February

24   9th.

25          THE COURT:  Okay.  Thanks very much.  All right, we're

1    adjourned.

2              MR. WISHNEW:  Thank you, Your Honor.

3         (Whereupon these proceedings were concluded at 11:13 AM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                    **I N D E X**

3

4                                    RULINGS

5                                                          PAGE      LINE

6  ResCap Borrowers Claims Trust's objections     48          2

7  sustained as to all causes of action other

8  than negligence and promissory estoppel

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4   I, Penina Wolicki, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8   *Penina Wolicki*

9

10  _____

11  PENINA WOLICKI

12  AAERT Certified Electronic Transcriber CET**D-569

13

14  eScribers

15  700 West 192nd Street, Suite #607

16  New York, NY 10040

17

18  Date:  January 22, 2016

19

20

21

22

23

24

25