1

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 Case No. 12-12020-mg

5 - - - - - - - - - - - - - - - - - - - -x

6 In the Matter of:

7

8 RESIDENTIAL CAPITAL, LLC, et al.,

9

10          Debtors.

11

12 - - - - - - - - - - - - - - - - - - - -x

13

14          United States Bankruptcy Court

15          One Bowling Green

16          New York, New York

17

18          January 25, 2016

19          9:03 AM

20

21 B E F O R E:

22 HON. MARTIN GLENN

23 U.S. BANKRUPTCY JUDGE

24

25

1

2  (CC: Doc. No. 9224) Trial Re:  Regarding Remaining Portion of

3  Claim Number 1083 filed by Elda and Maria Thompson

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Hana Copperman

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4        Attorneys for the ResCap Borrower Claims Trust

5        250 West 55th Street

6        York, NY 10019

7

8   BY:   JORDAN A. WISHNEW, ESQ.

9

10

11   ELDA M. THOMPSON (TELEPHONICALLY)

12   MARIA M. THOMPSON (TELEPHONICALLY)

13        Parties Pro Se

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                              4

1                        P R O C E E D I N G S

2            THE COURT:  Please be seated.  We're here in

3    Residential Capital, 12-12020.  This is the scheduled trial

4    with respect to the ResCap Borrower Liquidation Trust's

5    objection to claim number 1083 filed by Elda M. and Maria M.

6    Thompson.

7            This trial was previously scheduled for another date,

8    and was rescheduled for today.

9            Ms. Thompson, I understand you're on the telephone.

10   Is that correct?

11           MS. E. THOMPSON:  Yes, I am.

12           THE COURT:  Because there are two Thompson, are you

13   both on the phone?

14           MS. E. THOMPSON:  Well, my mother's here as well.

15   She's --

16           MS. M. THOMPSON:  Yes, I am.

17           THE COURT:  All right.  I need --

18           MS. E. THOMPSON:  She's here as well.

19           THE COURT:  Identify yourselves for the record.  Go

20   ahead, Ms. Thompson.

21           MS. E. THOMPSON:  Elda M. Thompson.

22           MS. M. THOMPSON:  Maria M. Thompson.

23           THE COURT:  Okay.  How come you're not in court?  This

24   is the trial.  You have to be here.

25           MS. E. THOMPSON:  Well, we received a letter that it

RESIDENTIAL CAPITAL, LLC, ET AL.                    5

1  stated that it was on a phone.  By phone.

2          THE COURT:  You didn't receive --

3          MS. E. THOMPSON:  That the --

4          THE COURT:  You -- you --

5          MS. E. THOMPSON:  The trial was going to be by phone.

6          THE COURT:  You didn't -- you --

7          MS. E. THOMPSON:  We received it Friday.

8          THE COURT:  You didn't receive a letter saying the

9  trial was by phone.

10         Who sent you a letter saying --

11         MS. E. THOMPSON:  Is there another Thompson?

12         THE COURT:  -- the trial was by telephone?

13         MS. E. THOMPSON:  Morrison & Foerster.  It says:

14  "Notice regarding telephonic participation in the trial

15  scheduled for January 25, 2016."

16         MR. WISHNEW:  Your Honor, that's the same no --

17         MS. E. THOMPSON:  And my names --

18         THE COURT:  Mr. Wishnew?

19         MR. WISHNEW:  Your Honor, that's the same notice we

20  send out with every agenda.

21         THE COURT:  Well, you shouldn't have told them that

22  they could participate by telephone.

23         MR. WISHNEW:  I'm sorry?

24         THE COURT:  You shouldn't have told them that they

25  could participate by telephone.

RESIDENTIAL CAPITAL, LLC, ET AL.                            6

1          MR. WISHNEW:  It's a general notice sent to all
2    parties, Your Honor.
3          THE COURT:  But you sent it to the Thompsons.
4          MR. WISHNEW:  But the Thompsons were well aware of
5    that.  They never inquired about telephonic appearance, Your
6    Honor.
7          THE COURT:  Yes.  That's correct.  Because I got an
8    inquiry this morning from my courtroom deputy that Thompsons
9    wanted to call in.  They had not made previous arrangements to
10   participate by telephone.
11         Ms. Thompson, you can't participate -- you can't --
12   trials are in court, not by telephone.  The Trust has brought a
13   witness from Iowa to be here.
14         MS. E. THOMPSON:  We were ready to go, but there's
15   another problem.  I'm in a wheelchair, and there's a lot of
16   snow.
17         THE COURT:  There's a lot of snow here too, and I was
18   in early this morning.
19         MS. E. THOMPSON:  Okay.
20         THE COURT:  All right.
21         MS. E. THOMPSON:  You guys -- you don't have to travel
22   with a wheelchair.
23         THE COURT:  All right.  We're going forward.
24         MS. E. THOMPSON:  Through the snow that's on the
25   sidewalk.

1          THE COURT:  Despite my usual --

2          MS. E. THOMPSON:  We received a letter that it was by

3     phone.  I --

4          THE COURT:  Stop.  Ms. Thompson.  Quiet.  Quiet.

5     Despite my very clear direction that trials takes place in

6     court -- the Trust has brought its witness from -- as I

7     understand it from Iowa.  Is that correct?

8          MR. WISHNEW:  Correct, Your Honor.  She got onto a

9     plane yesterday at 6 a.m. and arrived last evening at 9 p.m.

10         THE COURT:  We're going forward with the trial.

11         MS. E. THOMPSON:  Okay.

12         THE COURT:  Ms. Thompson, the only issue that remains

13    for this trial, because -- let me back up.

14         MS. E. THOMPSON:  Is their interest rate.

15         THE COURT:  Just a second.  Okay.

16         On July 1, 2015 the Court entered its memorandum

17    opinion and order sustaining in part and overruling in part the

18    ResCap Borrower Claims Trust's seventy-sixth omnibus objection

19    to claims, no liability borrower claims, as to claim number

20    1083 filed by Maria M. and Elda M. Thompson.

21         That opinion is at ECF docket number 8823.

22         In that opinion, that order, the Court sustained the

23    Trust's objection as to all claims except for the Thompsons'

24    claim regarding -- reading from page 31 of the opinion --

25         "As to the Thompsons' remaining allegation that GMACM

1   charged them a higher interest rate than what was stated on the

2   billing statements, the objection is overruled.  The Thompsons

3   argue that their monthly principal and interest payments were

4   $1,227.71 and that the annual interest rate was 5.990 percent

5   with a margin of 2.75 percent.  The Thompsons presented a

6   'forensic review report' that indicates the annual percentage

7   rate actually charged was 6.6554 percent, rather than 5.990

8   percent, and that the margin was 2.75 percent.  The Trust

9   responds that the Thompsons' mortgage is an adjustable rate

10   mortgage and that GMACM 'correctly charged, collected and

11   applied payments in accordance with' the note, mortgage, and

12   letters reflecting the adjustable interest rate terms that were

13   sent to the Thompsons in June and December each year from 2009

14   through 2012.  The Trust, however, has failed to provide the

15   Court with copies of these letters."

16          So that's the -- and then on page 32 of the opinion I

17   said:

18          "But without copies of the letters notifying the

19   Thompsons of the change in their interest rate, there are

20   disputed issues of fact whether GMACM properly calculated,

21   applied, and charged interest on the Thompsons' Loan account.

22   As such, the Trust has not met its burden of proof and, to that

23   extent only, the Objection is overruled without prejudice."

24          That's at page 32 of prior memorandum, opinion, and

25   order.

1           So the only issue for today's evidentiary hearing is

2    whether the Trust -- is whether GMACM properly charged the

3    Thompsons the interest rate adjusted as the Trust says.

4           Ms. Thompson, what evidence do you have to offer that

5    they did not correctly charge you interest on your loan?

6           MS. E. THOMPSON:  I sent in the evidence in October,

7    when it was requested for the evidence to turn in, which I

8    turned in the letters from 2007 to about 2013.  And I even have

9    current letters that it -- it always stated at 5.99.  The only

10   time it went to 6 it was during December, and in the same month

11   it went back to 5.999.

12          THE COURT:  What evidence are you specifically

13   referring to, Ms. Thompson?

14          MS. E. THOMPSON:  The letters.  The letters that I

15   sent.

16          THE COURT:  Don't tell me letters.  You've got to be

17   very specific about what exhibits you're offering.

18          MS. E. THOMPSON:  Okay.  The monthly statements that

19   they have sent stated that their interest rate was 5.99.

20          THE COURT:  Ms. Thompson, if you're going to offer

21   evidence. you have to be very specific about what evidence

22   you're offering.  What letters are you offering in evidence?

23          MS. E. THOMPSON:  Okay.  Do you have the file that I

24   sent the evidence?

25          THE COURT:  I have all of the documents here.  So tell

1  me specifically what --

2        MS. E. THOMPSON:  Okay.

3        THE COURT:  -- what exhibits you're offering.

4        MS. E. THOMPSON:  The letters that are in my file that

5  I have sent for the evidence clearly state that the charges

6  were 5.99, not 6.654, which it runs from 2007 to 2013.  I have

7  sent all the copies.

8        I have sent all the copies stating, for every single

9  month, and even the copies that I had requested from the

10 mortgage company asking for the itemized bill they -- it still

11 stated at 5.99 percent.

12       Every single letter that I have sent them, they -- the

13 amount of the interest rate.  And even on their own testimony,

14 which the young lady is giving, she also state that it was at

15 5.99 percent.  And all the letters that they have sent me in

16 their evidence also state that it was 5.99.

17       So the forensic audit stated that it was at 6.66 --

18 yeah -- with the interest rate.  So it was 6 and change.

19       And that's the whole argument.  They never send a

20 letter stating that it was 6.6554.

21       THE COURT:  Well, your forensic account --

22       MS. E. THOMPSON:  They, you know, they working --

23 okay.

24       THE COURT:  Ms. Thompson, the forensic accounting

25 report is not in evidence, and it's hearsay.  It can't be

RESIDENTIAL CAPITAL, LLC, ET AL.                    11

1    introduced in evidence.

2          If you've got letters that you say show a different

3    interest rate --

4          What we're going to do, Mr. Wishnew, while it's highly

5    irregular, we're going to proceed in this way, because I'm

6    going to -- I want the evidence in the record.  And while the

7    ultimate burden of proof remains with the Thompsons, I'm going

8    to have the Trust go forward first with its evidence to

9    establish what interest rate the Thompsons were charged on the

10   loan, when it changed, what notice the Trust was given.

11         So we're going to go forward, because the Thompsons do

12   not have an attorney, and the Court wants to be satisfied that

13   the evidence establishes what interest rate the Thompsons were

14   charged on their loan, when the interest rate changed, if at

15   all, and what, if any, notice the Thompsons were given

16   regarding the change in interest rates.

17         So, Ms. Thompson, what we're going to proceed to do --

18         Mr. Wishnew, call your first witness, and let's go

19   through and introduce your exhibits.

20         MR. WISHNEW:  Absolutely.

21         THE COURT:  Okay?

22         MR. WISHNEW:  Thank you.  Your Honor, Jordan Wishnew,

23   Morrison & Foerster, for the ResCap Borrower Claims Trust.  I'd

24   like to call to the stand Ms. Lathrop

25         THE COURT:  Okay.  Ms. Lathrop, come on up, please.

RESIDENTIAL CAPITAL, LLC, ET AL.                    12

1        When you get up to the witness stand, if you would

2   raise your right hand you'll be sworn.   Okay?

3        (Witness sworn)

4        THE COURT:  All right.  Thank you, Ms. Lathrop.

5   Please have a seat.

6        All right.  Let's make sure.  I want to make sure the

7   Thompsons are able to hear your testimony.  So just pull the

8   microphone a little bit over in front of you.  Thank you very

9   much.

10       Mr. Wishnew, go ahead.

11       MR. WISHNEW:  Thank you, Your Honor.

12   DIRECT EXAMINATION

13   BY MR. WISHNEW:

14   Q.  Good morning, Ms. Lathrop.

15   A.  Good morning.

16   Q.  My name is Jordan Wishnew.  I represent the ResCap Borrower

17   Claims Trust.  We're here today in connection with a claim

18   objection that Borrower Trust filed against Elda and Maria

19   Thompson, former borrowers of GMAC Mortgage, LLC.

20       Judge Glenn has directed that we have the opportunity to

21   ask you some questions concerning GMAC Mortgage's records

22   regarding the Thompsons' loan.  I'd like to start with some

23   background information.

24       If you could state your full name for the record.

25   A.  Sara Lathrop.

RESIDENTIAL CAPITAL, LLC, ET AL.                    13

1    Q.   And could you briefly describe your educational background?

2    A.   I have a BA in business marketing that I got from Upper

3    Iowa University.

4    Q.   Okay.   Would you also just briefly describe your employment

5    history with GMAC Mortgage?

6    A.   I started in June, 2006 as a default associate in the call

7    center.   I worked my way up to the quality assurance team.   I

8    was there for about a year.   From there I was a default call

9    center supervisor.   I did that for two and a half years.   Moved

10   into loss mitigation short sales and liquidation.   Did that for

11   approximately four months.   And then moved into a triage

12   management position dealing with loss mitigation, loan

13   modification workouts.

14   Q.   Okay.   And what is your current position?

15   A.   I'm currently a senior analyst for the ResCap Borrower

16   Claims Trust.

17   Q.   Okay.   And what is your responsibility in that position?

18   A.   I help with the reconciliation of the different claims that

19   have been filed against the estate.

20   Q.   Okay.   As part of your employment with the Borrower Trust,

21   do you have access to GMAC Mortgage's business records?

22   A.   Yes.

23   Q.   Okay.   And what kind of records do you generally have

24   access to?

25   A.   I have access to the servicing notes that were handled

RESIDENTIAL CAPITAL, LLC, ET AL.                    14

1  within the system as well as payment history, documents that

2  were sent to the borrower as well as documents that were

3  received from, and then -- as well as some internal information

4  that was dealt with between departments.

5  Q.  And those records that you referenced, were maintained

6  electronically by the debtors?

7  A.  Yes.

8  Q.  And what were some of the systems that were used to house

9  those records?

10  A.  Fiserv, also known as Loan Service 1 (ph.).  That was the

11  main system that housed, and that's how we incorporated all of

12  the information for the loan.  So payment history as well as

13  recording documents being received and sent, conversations,

14  internal documents, payment history, all that was handled

15  through there.

16      I also have access to Looking Glass, which is for documents

17  or image that were received from the borrower, Xnet, which is

18  where documents or image that were sent to the borrower.

19  Looking Glass also has documents that were sent to the

20  borrower.  LPS, which is our system of record for the

21  foreclosure attorney.  That's the majority.

22  Q.  Okay.  Thank you very much.  And, generally, were documents

23  entered into GMAC Mortgage's servicing system at or near the

24  time when information -- I'm sorry -- at or near the time, by

25  someone who had knowledge of the preparation or receipt of that

1  information?

2  A.  They were usually entered in at the time that they were

3  prepared or sent, but depending on the time of day it could

4  have been delayed twenty-four hours.

5  Q.  Okay.  So someone, let's say, spoke with a borrower on

6  January 1st.  There would be a record in the servicing notes

7  either January 1st or January 2nd, in other words.

8  A.  Yup.  Unless, of course, it was, like, a Friday end of day,

9  then it may be delayed until Monday.

10  Q.  Okay.  Thank you.  Turning to the Thompsons' loan, are you

11  familiar with this loan?

12  A.  Yes.

13  Q.  Okay.  And are you aware the Thompsons filed a proof of

14  claim against GMAC Mortgage in the ResCap Chapter 11 cases?

15  A.  Yes.

16  Q.  Okay.  And are you aware that Borrower Claims Trust filed

17  an objection against the allowance of the Thompsons' proof of

18  claim in these cases?

19  A.  Yes.

20  Q.  Okay.  And have you reviewed that objection?

21  A.  Yes, I have.

22  Q.  And when did you review the objection?

23  A.  I began at the beginning of last year, beginning of 2015.

24  Q.  Okay.  And were you asked to execute any declarations in

25  connection with the objection?

1    A.  Yes.

2    Q.  Okay.  There's a binder of exhibits before you, which is

3    marked Thompson Exhibits BT1-BT17.  Would you mind putting that

4    in front of you?  Okay.

5         There's a document designated as Exhibit BT-A.  Do you

6    recognize this document?

7    A.  Yes.

8    Q.  And have you seen it before today?

9    A.  Yes, I have.

10   Q.  And what is this document?

11   A.  It is my declaration.

12   Q.  And what does this declaration concern?

13   A.  The Thompson file.

14   Q.  Okay.  And are you generally familiar with the content of

15   this declaration?

16   A.  Yes, I am.

17   Q.  Could you just briefly describe the statements you've made

18   in this declaration?

19   A.  My statements --

20            THE COURT:  Just stop for just a second.

21            Ms. Thompson, do you have the exhibits in front of

22   you?  These were served on you.

23            MS. E. THOMPSON:  No, I don't have them in front of

24   me.

25            THE COURT:  Well, then get them in front of you.  You

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1    were served with a copy of the binder.

2             MS. E. THOMPSON:  That's what I'm looking --

3             THE COURT:  If you want to look at --

4             MS. E. THOMPSON:  I didn't get a binder.

5             THE COURT:  Mr. Wishnew?

6             MR. WISHNEW:  Prior to the November hearing she would

7    have been served with the binder of our exhibits.

8             MS. E. THOMPSON:  But I am listening.

9             THE COURT:  Go ahead, Mr. Wishnew.

10            MR. WISHNEW:  Thank you, Your Honor.

11   Q.  And, to your knowledge, is everything in this declaration

12   true and correct?

13   A.  Yes.

14   Q.  Okay.  And when was this declaration prepared?

15   A.  Give me one second.  I can't remember the specific date.

16            THE COURT:  On page 9 it's dated October 6, 2015.

17            THE WITNESS:  Thank you, Your Honor.

18            THE COURT:  All right.

19   A.  October 6, 2015.

20   Q.  Thank you.  And do you believe everything in the

21   declaration to be true and accurate?

22   A.  Yes, I do.

23   Q.  Okay.

24            MR. WISHNEW:  Your Honor, I'd like to move this

25   declaration into evidence as BT-A.

1      THE COURT:  All right.  BT-A is in evidence.

2   (Sara Lathrop's declaration dated 10/6/15 was hereby received

3   into evidence as BT's Exhibit A, as of this date.)

4   Q.  Okay.  Turning now, Ms. Lathrop, to Exhibit BT-1.

5      THE COURT:  What I -- I want to -- I've admitted it

6   into evidence, and that's going to do -- the Court's ruling.

7   But when you get to the substantive, when you want to cover

8   substantive things, I do want you to do it on the record, even

9   though it's in the declaration.  Okay?

10      MR. WISHNEW:  Understood, Your Honor.

11      THE COURT:  All right.

12      MR. WISHNEW:  Absolutely.

13      THE COURT:  Go ahead.

14   Q.  Okay.  So turning to BT-1, do you recognize this document?

15   A.  Yes.

16   Q.  And what is this document?

17   A.  This is the payment history and loan servicing notes for

18   the Thompson loan.

19   Q.  Okay.  And these were maintained in GMAC Mortgage's

20   records?

21   A.  Yes.  It was maintained through the LoanServ system, and

22   then we were able to access them through our business object

23   system.

24   Q.  Okay.  And what time period do these servicing notes cover?

25   A.  Give me one second.  It covers approximately December, 2005

RESIDENTIAL CAPITAL, LLC, ET AL.                    19

1   through the tran -- the servicing transfer to Ocwen in

2   February, 2013.

3   Q.  Okay.  And even though I believe you mentioned this in the

4   outset, what type of information -- I'm sorry.

5       As part of GMAC Mortgage's regular business practices, what

6   types of information would have been maintained in the

7   servicing notes?

8   A.  The servicing notes would have had any letters that were

9   sent or received.  It would have had conversations.  It also

10  would have had just any internal information as far as work

11  done on the account.  And then the payment history would have

12  been reflected also.

13  Q.  Okay.  And when a letter is sent to a borrower, how is it

14  recorded?

15      Let me rephrase.

16      When a letter is recorded -- I'm sorry.

17      When a letter is sent to a borrower, how is it recorded in

18  the GMAC Mortgage's business records?

19  A.  When it is sent to the borrower it would be recorded the

20  same day, and it would be listed with a generic name saying

21  what type of letter was sent the majority of the time.

22  Q.  Okay.

23      MR. WISHNEW:  Your Honor, I'd like to introduce the

24  Thompson servicing notes and payment history into evidence,

25  marked as Exhibit BT-1.

1          THE COURT:  Ms. Lathrop, let me ask you.  Some of the

2     entries are redacted or blacked out.  Can you tell me what was

3     blacked out?

4          THE WITNESS:  Looking at it, the majority of the

5     information blacked out is post the Ocwen transfer, as we don't

6     have access or approval from Ocwen to be able to submit their

7     information, as they're not our company.  That transfer,

8     technically, is February 15, 2013.  So I believe all the

9     information redacted from these notes is post that.

10          THE COURT:  Well, let me look.  I'm looking at page

11     151 and 162.

12          THE WITNESS:  All right.  Let me get there.

13          THE COURT:  There are redactions on that page that

14     relate to July, 2007.

15          MR. WISHNEW:  Your Honor, may I ask one question of

16     the witness?

17          THE COURT:  Not yet.  Let her find what I'm looking

18     at.

19          THE WITNESS:  One --

20          THE COURT:  Go ahead, Ms. --

21          THE WITNESS:  It appears that it would be related to

22     the foreclosure records that would have been conversations

23     between the foreclosure attorney and GMACM.

24          As the account shows, it was active foreclosure, and

25     that information must have been deemed as attorney-client.

RESIDENTIAL CAPITAL, LLC, ET AL.                        21

1              THE COURT:  Go ahead, Mr. Wishnew.

2              MR. WISHNEW:  No need for the question, Your Honor.

3    Ms. Lathrop addressed the point I wanted to try and refresh her

4    on.

5              THE COURT:  Okay.

6              MS. E. THOMPSON:  Excuse me.  May I say something?

7              THE COURT:  Not yet.  Go ahead, Mr. Wishnew.

8              MR. WISHNEW:  Thank you, Your Honor.

9              THE COURT:  All right.  Exhibit --

10             Go ahead, Ms. Thompson.  What do you want to say?

11             MS. E. THOMPSON:  Well, the -- all the foreclosures

12   that were tried from 2007 to 2016, because they tried again,

13   all were dismissed by the court.  And I just received a copy

14   on, yup, Friday, that all of them were -- how do you say --

15   because of lack of prosecution they were dismissed by the

16   Court.  So there's actually no foreclosure.

17             THE COURT:  Okay.  The objection is overruled.  BT-1

18   is in evidence.

19             Go ahead, Mr. Wishnew.

20   (Thompson servicing notes and payment history was hereby

21   received into evidence as BT's Exhibit 1, as of this date.)

22             MR. WISHNEW:  Thank you very much, Your Honor.

23   BY MR. WISHNEW:

24   Q.  Ms. Lathrop, if you could take a look at the exhibit marked

25   BT-2.  Do you recognize this document?

RESIDENTIAL CAPITAL, LLC, ET AL.                    22

1   A.  Yes.

2   Q.  And what is this document?

3   A.  The adjustable rate note for the Thompson loan.

4   Q.  Okay.  And have you seen it before today?

5   A.  Yes, I have.

6   Q.  And when is it dated?

7   A.  It is dated June 25, 2005.

8   Q.  Okay.

9        MR. WISHNEW:  Your Honor, I'd like to introduce the

10  note into evidence marked as BT-2.

11       THE COURT:  All right.  BT-2 is in evidence.

12  (Adjustable rate note for the Thompson loan was hereby received

13  into evidence as BT's Exhibit 2, as of this date.)

14  Q.  Ms. Lathrop, is the Thompson loan governed by an adjustable

15  interest rate?

16  A.  Yes, it is.

17  Q.  And how do you know this?

18  A.  It is -- well, the loan document itself is labeled as

19  adjustable rate note, as well as Section 4 of the note states

20  the interest rate and monthly payment changes.

21  Q.  Okay.  And what was the initial interest rate under the

22  note?

23  A.  The initial interest rate was -- give me one second to find

24  it -- 5.99.

25  Q.  Okay.  And how long did this initial interest rate last?

RESIDENTIAL CAPITAL, LLC, ET AL.                    23

1  A.  The first payment change was set as August of 2008.

2  Q.  Okay.  And --

3          THE COURT:  Where do I find that?

4          THE WITNESS:  That is listed under Section 4(a).

5          THE COURT:  Thank you.

6          THE WITNESS:  Thank you.

7  Q.  Okay.  And does the note indicate how often the interest

8  rate could adjust?

9  A.  Under Section 4(b) it states that it could adjust every six

10 months.

11 Q.  Okay.  Does the note indicate how the interest rate was

12 calculated on each change date?

13 A.  Yes.  Under Section 4(c) of the note -- and I'll just read

14 this verbatim.  It says:

15     "Before each change date the noteholder will calculate my

16 new interest rate by adding 2.75 percent points to the current

17 index, and the noteholder will then round the result of the

18 addition to the nearest one-eighth of 1 percent or 1.25

19 percent."

20 Q.  Okay.  Just to correct the record, was that .125 percent?

21 A.  Yes.  I'm sorry.

22 Q.  That's okay.

23 A.  .125.

24 Q.  Thank you.  And is there a minimum interest rate on this

25 loan?

RESIDENTIAL CAPITAL, LLC, ET AL.                               24

1    A.  Yes, there is.

2    Q.  And what is that rate?

3    A.  Under Section 4(d) of the note it states that the interest

4    rate will no longer -- will not be less than 5.99 percent.

5    Q.  Thank you very much.  And is there a maximum interest rate

6    on the loan?

7    A.  Yes.  Under the same section it states 11.99 percent as the

8    ceiling.

9    Q.  Okay.  And under the terms of the note, what was the

10   initial monthly payment?

11   A.  Under Section 3(b), labeled "Payments of the Mortgage

12   Note", it states that the principal and interest payment would

13   be $1,227.77.

14   Q.  Okay.  Thank you.  During your review of the Thompsons'

15   claim, did you confirm that this monthly payment was the

16   correct amount based on the interest rate of 5.99 percent?

17   A.  Yes.

18   Q.  And how did you confirm this?

19   A.  I reviewed what was listed in the payment history as

20   payments that posted on the account, and those payments

21   matched, accordingly, with the adjustable rate note.

22   Q.  Okay.  I'd like to turn your attention to Exhibit BT-3.

23           THE COURT:  Before you do that, Mr. Wishnew.

24           MR. WISHNEW:  Sure.

25           THE COURT:  When the interest rate would adjust in

1  accordance with the terms of the note, what, if any, notice was

2  required to be given to the borrower?

3          THE WITNESS:  A letter would be sent out forty-five

4  days prior to the date rate change --

5          THE COURT:  I'm looking --

6          THE WITNESS:  -- would take effect.

7          THE COURT:  I'm looking at paragraph 4(f), "Notice of

8  Changes".  Is that the provision that deals with the notice

9  that's supposed to be required to the borrower?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  All right.  And just tell me again, when

12  would notice of the change be sent?

13          THE WITNESS:  According to Section 4(b) of the note,

14  it says:

15          "The noteholder will deliver or mail a notice of

16  changes in my interest rate and the amount of my monthly

17  payment before the effective date of any change.  The notice

18  will include information required by law to be given to me and

19  also the title and telephone number of a person to answer

20  questions I may have regarding the notice."

21          MR. WISHNEW:  Okay.  Ms. Lathrop, was that 4(b) or

22  4(f)?

23          THE WITNESS:  4(f).

24          MR. WISHNEW:  Thank you.

25          THE COURT:  Go ahead, Mr. Wishnew.

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1        MR. WISHNEW:  Thank you, Your Honor.

2  BY MR. WISHNEW:

3  Q.  Ms. Lathrop, if you can turn to Exhibit BT-3.  Do you

4  recognize this document?

5  A.  Yes.

6  Q.  And can you describe this document?

7  A.  This is a amortization schedule that we created through

8  myAmortizationChart.com to try and validate that the correct

9  interest rate was recorded on the loan.

10  Q.  Okay.  And is it the ordinary business practice of the

11  Borrower Trust to use public amortization calculators for this

12  purpose?

13  A.  Yes.  It's one of our only real tools to be able to

14  validate.

15  Q.  Okay.  And what is the monthly payment listed on this

16  schedule?

17  A.  It shows it as $1,227.76.

18  Q.  Okay.  And that's in the box marked "Payment Summary" on

19  the top of the first page?

20  A.  Yes.

21  Q.  Okay.

22        MR. WISHNEW:  Your Honor, I'd like to introduce the

23  amortization schedule into evidence.

24        THE COURT:  Exhibit BT-3 is in evidence.

25  (Amortization schedule was hereby received into evidence as

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1   BT's Exhibit 3, as of this date.)

2           MR. WISHNEW:   Thank you, Your Honor.

3   Q.  Ms. Lathrop, let's turn to the first time the Thompsons'

4   interest rate changed pursuant to the note's terms.  Did the

5   debtors ordinarily communicate a rate change to a borrower?

6   A.  Yes.

7   Q.  And how did they do that?

8   A.  Through a letter that was sent to the borrower prior to the

9   date rate change.

10  Q.  Okay.  And how often did the debtor send these letters to

11  the Thompsons?

12  A.  Under their mortgage not, it stated that it was going to

13  change every six months, so the letter would be mailed out to

14  them forty-five days prior to the date rate change.

15  Q.  And did the debtors send these rate change letters even if

16  the rate did not actually change?

17  A.  Yes.

18  Q.  Okay.  If I can ask you to take a look at the exhibit

19  marked BT-4.  Do you recognize this document?

20  A.  I do.

21  Q.  And what is this document?

22  A.  This is the first date rate -- this is the first interest

23  rate change letter that was mailed to the Thompsons.

24  Q.  Okay.  And was this document maintained in GMAC Mortgage's

25  systems of record?

RESIDENTIAL CAPITAL, LLC, ET AL.                    28

1   A.  Yes, it was.

2   Q.  Specifically, which system?

3   A.  This was housed in our Xnet system.

4   Q.  Okay.  And is this a business record that was maintained in

5   the ordinary course of GMAC Mortgage's business?

6   A.  Yes, it was.

7   Q.  Okay.  What information is contained in this letter?

8   A.  This letter just states the upcoming rate change.  This is

9   the first one to occur for the Thompsons.

10  Q.  Um-hum.

11  A.  So this just records what the new interest rate was being

12  based off of as far as what the index was along with the margin

13  of change that was set within accordance of the mortgage note

14  and the effective date of the change.

15  Q.  Okay.  And did the interest rate change on the Thompsons'

16  loan?

17  A.  The interest rate slightly changed.  It went from 5.99

18  percent to 6 percent.

19  Q.  Okay.  Thank you.  And is the mailing of this letter

20  reflected in GMAC Mortgage's records?

21  A.  Yes.  It's in the servicing notes.

22  Q.  Okay.  Would you mind pointing me -- I think the servicing

23  notes are at BT-1.  Can you point me to the specific spot in

24  the servicing notes that you're referring to?

25  A.  Yup.  Just give me one second to get there.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    29

1          MS. E. THOMPSON:  Oh, everything organized.

2   A.  I show it on page 95 of the servicing notes.

3          THE COURT:  Is this 95 of 162?

4          THE WITNESS:  Yes, sir.  Yes, Your Honor.

5          THE COURT:  Okay.

6   A.  It is dated June 24th -- oh, I apologize, I'm in 2011.

7   Let me go back to 2008.

8       The correct page for the first letter from 2008 is

9   actually page 135 of 162.  It's dated June 20th, 2008 at the

10  top of that page.

11         THE COURT:  Okay.

12  Q.  Okay.  And the transaction message, this is the first line

13  on 135, where the transaction message reads:  "ARM change

14  notice scheduled"?

15  A.  Yes.

16  Q.  Okay.

17  A.  That's where we requested the change, though the actual

18  note for it showing it being mailed out is on page 134 of 162,

19  where it says:  "ARM notice sent by mail-merge".

20  Q.  Thank you very much.

21         THE COURT:  I'm sorry.  Just point out to me where on

22  134 that was?

23         THE WITNESS:  On 134, it's at the bottom of the page.

24         THE COURT:  The last entry on the page?

25         THE WITNESS:  The very last one for Renee Davidson.

RESIDENTIAL CAPITAL, LLC, ET AL.                    30

1          THE COURT:  For June 24th, 2008?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  "ARM notice sent by mail-merge."

4          THE WITNESS:  And that says "RD/ARMS".

5          THE COURT:  What does that mean?

6          THE WITNESS:  I would just be an abbreviation for it

7    being the ARM notice letter for the --

8          THE COURT:  ARM is adjustable rate mortgage?

9          THE WITNESS:  Yeah.

10         THE COURT:  Okay.  Go ahead, Mr. Wishnew.

11         MR. WISHNEW:  Thank you, Your Honor.  Your Honor, I'd

12   like to introduce into evidence Exhibit BT-4.

13         THE COURT:  Exhibit BT-4 is in evidence.

14   (First interest rate change letter was hereby received into

15   evidence as BT's Exhibit 4, as of this date.)

16         MR. WISHNEW:  Thank you, Your Honor.

17   BY MR. WISHNEW:

18   Q.  Ms. Lathrop, if I could turn your attention to Exhibit

19   BT-5; specifically the third page of that exhibit.  Can you

20   generally describe what this document is?

21   A.  This is an excerpt from The Wall Street Journal.

22   Q.  Okay.

23   A.  Dated June 17th, 2008.

24   Q.  Okay.  And on the left-hand page of the third -- sorry,

25   the left-hand side of the third page, there's a heading marked

RESIDENTIAL CAPITAL, LLC, ET AL.                    31

1    "Borrowing Benchmarks"?

2    A.  Yes, sir.

3    Q.  Okay.  And beneath that heading, within the left-hand side

4    of the third page, is there a specific section that is relevant

5    to our discussion today?

6    A.  Yes.  According to the mortgage note, we had to base the

7    margin off of the LIBOR that was provided.

8    Q.  Um-hum.

9    A.  So under the London Interbank Offered Rate, or LIBOR, it's

10   the middle -- bottom middle of that section of borrowing

11   benchmarks, it lists under the six-month section of that, the

12   interest rate margin that we put for the Thompson loan.

13   Q.  Okay.  And that's 3.24 percent?

14   A.  Yes, sir.

15   Q.  Thank you very much.

16          MR. WISHNEW:  Your Honor, I'd like to -- excuse me.

17   I'd like to introduce Exhibit BT-5 into evidence.

18          THE COURT:  Just explain for me, Ms. Lathrop, what's

19   the six-month benchmark?

20          THE WITNESS:  The six-month?

21          THE COURT:  Yes.

22          THE WITNESS:  According to the Thompson's note, we

23   had --

24          THE COURT:  Yes, but what is it?  I'm having trouble

25   reading it.

1          THE WITNESS:  Oh, I'm sorry.  It is a little fuzzy,

2    isn't it?  The -- what is the borrowing benchmarks?

3          THE COURT:  Yes.

4          THE WITNESS:  Is that the question?  That would be

5    what is the interest rate that we're supposed to base the

6    information off of.

7          THE COURT:  Yeah, I understand that.  But I see

8    1.24063 percent.  What is that?

9          THE WITNESS:  I apologize, Your Honor.  I don't see

10   what you're looking at.

11         THE COURT:  In the box headed London Interbank Offered

12   Rate or LIBOR --

13         THE WITNESS:  Okay.

14         THE COURT:  There's a one-month, three-month, six-

15   month and one-year.

16         THE WITNESS:  Yes.

17         THE COURT:  Okay.  And you were supposed to use the

18   six-month?

19         MS. THOMPSON:  Yes, sir.

20         THE COURT:  And what does it show as the sixth month?

21         THE WITNESS:  It shows as 3.24063.

22         THE COURT:  That's what I was having difficulty

23   reading.

24         THE WITNESS:  Okay.

25         THE COURT:  I see.  3.2 --

RESIDENTIAL CAPITAL, LLC, ET AL.                    33

1           THE WITNESS:  It is fuzzy.  It's somewhat difficult to

2    read.

3           MR. WISHNEW:  3.24063.

4           THE COURT:  Okay, I see it.  I'm sorry.

5           THE WITNESS:  Okay.

6           THE COURT:  Go ahead.  Go ahead, Mr. Wishnew.

7           MR. WISHNEW:  We'd like to introduce Exhibit BT-5 into

8    evidence, Your Honor.

9           THE COURT:  BT-5 is in evidence.

10   (Wall Street Journal excerpt was hereby received into evidence

11   as BT's Exhibit 5, as of this date.)

12          MR. WISHNEW:  Thank you, Your Honor.

13   BY MR. WISHNEW:

14   Q.  Turning back to Exhibit BT-4, the interest rate provided

15   in the first rate adjustment letter, what did you indicate that

16   that rate was, Ms. Lathrop?

17   A.  The total interest rate was being adjusted to six percent.

18   Q.  Okay.  And how is the six percent calculated?

19   A.  What we -- what the debtors did is took the margin that

20   was within the mortgage note of 2.75 and added that to the

21   LIBOR that was listed in The Wall Street Journal on June 17th,

22   as 3.24.  And then we rounded that up to the nearest eighth-

23   percent, which has brought us to 6 percent.

24   Q.  Okay.  So 2.75 plus 3.24 equals 5.99.  Rounding to nearest

25   eighth gets you to 6.00?

RESIDENTIAL CAPITAL, LLC, ET AL.                    34

1   A.  Yes.

2   Q.  Got it.  Thank you very much.

3       I'd like to turn your attention to BT-6.  Do you recognize

4   this document?

5   A.  Yes.

6   Q.  Okay.  And could you generally describe this document?

7   A.  This is the amortization schedule.

8   Q.  Okay.  And what is this amortization schedule based on?

9   Is there a certain --

10          MR. WISHNEW:  Let me rephrase.

11  Q.  Is this amortization schedule based on certain outstanding

12  principal amounts?

13  A.  This is based on a total unpaid principal balance of

14  $196,957.78.

15  Q.  Okay.  And what was -- if I could turn your attention back

16  to BT-4 momentarily, what was the principal balance after the

17  August 1st, 2008 payment, for the Thompsons' loan?

18  A.  The projected principal balance was $196,957.78.

19  Q.  Okay.  And what is the payment listed on the amortization

20  schedule?

21  A.  That payment listed under the amortization schedule was

22  $1,228.99.

23  Q.  Okay.  And where did this amortization schedule come from?

24  A.  This came from myAmortizationChart.com.

25  Q.  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    35

1          MR. WISHNEW:  Your Honor, I'd like to introduce the

2   second amortization schedule marked as BT-6 into evidence.

3          THE COURT:  In evidence.  It's in evidence.

4   (Second amortization schedule was hereby received into evidence

5   as BT's Exhibit 6, as of this date.)

6          MR. WISHNEW:  Thank you, Your Honor.

7          MS. E. THOMPSON:  Your Honor, can I ask a question

8   real quick?

9          THE COURT:  No.  Well, yes.  Sure, go ahead.  Ask your

10  question.

11         MS. E. THOMPSON:  You calculated everything on the

12  Internet?

13         THE COURT:  Did you calculate --

14         MS. E. THOMPSON:  On the Web site?  Was it done on the

15  Web or was it done by hand?

16         THE WITNESS:  The -- the amortization schedule used

17  was pulled from the Internet, because in order to calculate how

18  the interest rate would affect the principal, we would use a

19  calculator of this nature to do that.

20         THE COURT:  Okay.

21         MS. E. THOMPSON:  No, I understand.  I have an

22  engineering degree.  What my question is, I don't understand

23  how that is allowed but a forensic audit is not allowed from a

24  third party?

25         THE COURT:  Because I've got a witness testifying from

RESIDENTIAL CAPITAL, LLC, ET AL.                    36

1    the stand --

2              MS. E. THOMPSON:  It had no --

3              THE COURT:  Ms. Thompson, if you've got an objection

4    to this exhibit, raise your objection to this exhibit.  I don't

5    want to hear about your forensic --

6              MS. E. THOMPSON:  I object to the exhibit.  I object

7    to the exhibit.

8              THE COURT:  Overruled.  It's in evidence.

9              Go ahead.  Next?

10             MR. WISHNEW:  Thank you, Your Honor.

11   BY MR. WISHNEW:

12   Q.  Ms. Thompson --

13             MS. E. THOMPSON:  Why is it overruled?  I don't

14   understand.  I'm sorry, but I --

15             THE COURT:  Ms. Thompson, once I rule -- once I rule,

16   Ms. Thompson --

17             MS. E. THOMPSON:  I don't understand why a forensic

18   audit is not allowed.

19             THE COURT:  Ms. Thompson --

20             MS. E. THOMPSON:  That seems completely wrong.

21             THE COURT:  Ms. Thompson, once I rule, you remain

22   silent.  Okay?  Do you have a witness in the courtroom to offer

23   a forensic accounting report?  I don't see anybody here.

24   You've never had one here before.

25             MS. E. THOMPSON:  I was informed that the forensic

RESIDENTIAL CAPITAL, LLC, ET AL.                    37

1  audit was going to be -- wasn't good enough.  I was just told

2  on the phone.  If I would've been told back in November and

3  back in September that the forensic audit that I sent was not

4  allowed because I needed a witness here, I would have had a

5  witness there.

6          THE COURT:  Okay.  Your objection is overruled.

7          Continue.

8          I don't want to hear anything else from you at this

9  point, Ms. Thompson.  You'll have your chance.

10         Go ahead, Mr. Wishnew.

11         MR. WISHNEW:  Thank you, Your Honor.

12 BY MR. WISHNEW:

13 Q.  Ms. Lathrop, if I could ask you to turn to Exhibit BT-7?

14 Do you recognize this document?

15 A.  Yes.

16 Q.  Okay.  And what is this document?

17 A.  This is the interest rate change from -- that was sent out

18 December 26th, 2008.

19 Q.  Okay.  And was this document maintained in GMAC Mortgage's

20 systems of records?

21 A.  Yes.  This is also maintained in our Xnet system.

22 Q.  Okay.  And as with the prior rate change letter, was this

23 a record maintained in the ordinary course of GMAC Mortgage's

24 business?

25 A.  Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1    Q.  Okay.  And what information is contained in this letter?

2    A.  This is very similar to the last letter.  It shows the

3    previous index value and the current interest rate on the loan,

4    as well as what the new index value is and what the interest

5    rate's adjusting to.

6    Q.  Okay.  And what was the existing interest rate, at that

7    point in time?

8    A.  The interest rate at the time of the change was a total of

9    six percent.

10   Q.  And what did it change to?

11   A.  It changed to point -- it changed to 5.99 percent.

12   Q.  Okay, thank you.

13        THE COURT:  So what you're saying is that on --

14   effective March 1st, 2009, the interest rate was reduced from 6

15   percent to 5.99 percent?

16        THE WITNESS:  Yes, Your Honor.

17        THE COURT:  And the payment was reduced -- the monthly

18   payment became $1,227.77?

19        THE WITNESS:  Yes, Your Honor.

20        THE COURT:  Go ahead, Mr. Wishnew.

21   Q.  And was this rate change letter sent to Ms. Thompson?

22   A.  Yes.

23   Q.  Okay.  And can you point me to where in the servicing

24   notes that is reflected?

25   A.  Yeah.  Give me one moment.

1    On page 131 of 162, it's dated December 26, 2008.  The

2  entry states:  "Sent manual ARM adjustment letter," under Diane

3  Kohrs.

4  Q.  Okay.

5  A.  It's about the middle of the page.

6          MR. WISHNEW:  I think it's thirteen or fourteen lines

7  from the top, Your Honor.

8          THE COURT:  Okay.  Go ahead.

9          MR. WISHNEW:  Okay.  Your Honor, I'd like to introduce

10  Exhibit BT-7 into evidence.

11          THE COURT:  BT-7 is in evidence.

12  (Rate change letter was hereby received into evidence as BT's

13  Exhibit 7, as of this date.)

14          MR. WISHNEW:  Thank you.

15  Q.  And Ms. Lathrop, just to confirm, was -- what was the

16  lowest rate provided for in Ms. Thompson's note?

17  A.  Under section 4 of the note, it states that the floor of

18  that would be 5.99 percent.

19  Q.  Okay.  If I could ask you to take a look at Exhibit BT-8?

20  Do you recognize this document?

21  A.  Yes.

22  Q.  And what is this document?

23  A.  This is the interest rate change letter sent June 24th,

24  2009.

25  Q.  Okay.  And this would be for the payments -- this would be

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

1  effective with the September 1st payment, correct?

2  A.  Yes.

3  Q.  Okay.  And was the interest rate scheduled to change?

4  A.  No, the interest rate itself was going to remain the same.

5  Q.  Okay.  And was this maintained in GMAC Mortgage's systems

6  of record?

7  A.  Yes.

8  Q.  Okay.   And was this letter sent to the Thompsons?

9  A.  Yes, it was.

10  Q.  Okay.  And can you point me to where in the servicing

11  notes that's reflected?

12  A.  Just give me one moment to find it.

13      It's listed on page 127 of 162, dated June 24th, 2009:

14  "Sent manual ARM adjustment letter."  It's probably eight lines

15  down from the top of the page.

16  Q.  Right.  And the user name is Diane Kohrs, K-O-H-R-S?

17  A.  Yes.

18  Q.  Okay.  Thank you very much.

19          MR. WISHNEW:  Your Honor, I'd like to introduce BT-8

20  into evidence.

21          THE COURT:  All right.  It's in evidence.

22  (Rate change letter was hereby received into evidence as BT's

23  Exhibit 8, as of this date.)

24          MR. WISHNEW:  Thank you.

25  Q.  If I could ask you, Ms. Lathrop, to turn to Exhibit BT-9?

RESIDENTIAL CAPITAL, LLC, ET AL.                                41

1              THE COURT:  Ms. Thompson, please be quiet.

2    Q.  Do you recognize this document?

3    A.  I do.

4    Q.  Okay.  And what is this document?

5    A.  This is the interest rate change letter sent December

6    24th, 2009.

7    Q.  Okay.  And have you -- this is addressed to the Thompsons.

8    Was this document also maintained in GMAC's business records?

9    A.  Yes.  This is also housed in Xnet.

10   Q.  Okay.  And according to the terms of this letter, was the

11   interest rate scheduled to change?

12   A.  No.  It shows the new interest rate and the current

13   interest rate as the same.

14   Q.  Which is?

15   A.  5.99 percent.

16   Q.  Okay.  And was this letter sent to the Thompsons?

17   A.  Yes.

18   Q.  And when was it sent?

19   A.  According to the note it was issued on the 24th of

20   December 2009.

21   Q.  Okay.  And what page of the servicing notes is that

22   referenced on?

23   A.  Just one second.  On -- on page 126 of 162, it shows ARM

24   notice created on December 25th, 2009.

25   Q.  Okay.  That's approximately twelve lines from the top, Ms.

RESIDENTIAL CAPITAL, LLC, ET AL.                          42

1    Lathrop?

2    A.  Yes, that's about right.

3    Q.  Okay.  Thank you very much.

4            MR. WISHNEW:  Your Honor, I'd like to introduce

5    Exhibit BT-9 into evidence.

6            THE COURT:  All right, it's in evidence.

7    (Rate change letter was hereby received into evidence as BT's

8    Exhibit 9, as of this date.)

9            MR. WISHNEW:  Thank you.

10   Q.  Ms. Lathrop, if I could ask you to turn to Exhibit BT-10?

11   Do you recognize this document?

12   A.  Yes.

13   Q.  And is this also an interest rate adjustment letter?

14   A.  Yes, it is.

15   Q.  And was this document maintained like the others in GMAC's

16   business records?

17   A.  Yes, it was.

18   Q.  Okay.  And was the interest rate on the Thompsons' loan

19   scheduled to change according to this letter?

20   A.  No, it was remaining the same.

21   Q.  Okay.  And was this notice mailed to the Thompsons?

22   A.  Yes, it was.

23   Q.  And do you know when it was -- approximately when it was

24   mailed?

25   A.  The date on the letter is June 23rd, 2010.

RESIDENTIAL CAPITAL, LLC, ET AL.                     43

1  Q.  Okay.  And is the mailing of this letter reflected in the

2  servicing notes?

3  A.  Yes, it would have been.

4  Q.  Could you point me to where in the servicing notes,

5  please?

6  A.  Just give me one moment to get to the page.

7      It's noted on page 119 of 162, just above the middle of

8  the page on June 24th, 2010:  "ARM change notice created."

9  It's a system ID note.

10 Q.  Okay, thank you very much.

11          MR. WISHNEW:  Your Honor, I'd like to introduce

12 Exhibit BT-10 into evidence.

13          THE COURT:  All right, it's in evidence.

14 (Rate change letter was hereby received into evidence as BT's

15 Exhibit 10, as of this date.)

16          MR. WISHNEW:  Thank you.

17 Q.  Ms. Lathrop, if I could turn your attention to Exhibit

18 BT-11?  Do you recognize this document?

19 A.  Yes.

20 Q.  And what is this document?

21 A.  This is another interest rate change.

22 Q.  Okay.  And when is this dated?

23 A.  December 24th, 2010.

24 Q.  And according to this letter, is the interest rate

25 scheduled to change?

RESIDENTIAL CAPITAL, LLC, ET AL.                    44

1   A.   No.  It remained the same.

2   Q.   Okay.  And as with the other letters, was it sent to the

3   borrowers?

4   A.   Yes.

5   Q.   And was it also maintained in the company's books and

6   records?

7   A.   Yes.  It would have been in Xnet, and it also would have

8   been documented.

9   Q.   Okay.  And when, approximately, was it sent to the

10  borrowers?

11  A.   The -- the note on the letter states December 24th, 2010.

12  Q.   Okay.  If I could ask you to turn back, again, to the

13  servicing notes and just identify where in the servicing notes

14  the mail is reflected?

15  A.   Just one moment.  According to the note on page 106 of

16  162, it's dated December 27th, 2010, and reads:  "ARM change

17  notice created letter."  It's a system ID just above the middle

18  of the page.

19  Q.   Thank you very much.

20        MR. WISHNEW:  Your Honor, I'd like to introduce

21  Exhibit BT-11 into evidence.

22        THE COURT:  All right.  It's in evidence.

23  (Rate change letter was hereby received into evidence as BT's

24  Exhibit 11, as of this date.)

25        MR. WISHNEW:  Thank you.

RESIDENTIAL CAPITAL, LLC, ET AL.                    45

1  Q.  Ms. Lathrop, if I could take you -- ask you to look at

2  BT-12?  Do you recognize this document?

3  A.  Yes, it's another interest rate change letter.

4  Q.  And when is this document dated?

5  A.  June 23rd, 2011.

6  Q.  Okay.  And was this maintained in GMAC's systems and

7  records?

8  A.  Yes.

9  Q.  And according to this letter, did the interest rate

10  change?

11  A.  No, it remained at 5.99.

12  Q.  Okay.  And would this letter have been mailed to the

13  Thompsons, like the other letters?

14  A.  Yes.

15  Q.  Okay.  And approximately when was it mailed?

16  A.  It would have been right around that June 23rd, 2011 date.

17  Q.  Okay.  If I could ask you to just turn back briefly to the

18  servicing notes and identify where in the servicing notes it's

19  reflected?

20  A.  It's noted on June 24th, 2011, page 95 of 162.

21         THE COURT:  Give me that --

22  A.  It just says --

23         THE COURT:  -- just give me that page again?

24         THE WITNESS:  Yeah, it's 95.

25         THE COURT:  Thank you.

1    A.  And it's probably about eight lines up from the bottom of

2    the page.

3    Q.  Thank you very much.

4         MR. WISHNEW:  Your Honor, I'd like to introduce

5    Exhibit BT-12 into evidence.

6         THE COURT:  All right, it's in evidence.

7    (Rate change letter was hereby received into evidence as BT's

8    Exhibit 12, as of this date.)

9    Q.  Ms. Lathrop, if I could turn your attention to Exhibit

10   BT-13?  Do you recognize this document?

11   A.  Yes.

12   Q.  And what is this document?

13   A.  This is an interest rate change letter sent December 26,

14   2011.

15   Q.  And according to this letter, was the interest rate

16   scheduled to change?

17   A.  No, it remained at 5.99.

18   Q.  Okay.  And was this document maintained in GMAC's systems

19   and records?

20   A.  Yes.

21   Q.  And was this letter mailed to the Thompsons?

22   A.  Yes, it would have been.

23   Q.  Okay.  Could you point me to the point in the servicing

24   notes that reflects the mailing to the Thompsons?

25   A.  Yeah, just one second to get to that page.

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1  Q.  Of course.

2  A.  It's recorded on page 81 of 162, noted on December 27th,

3  2011:  "ARM change notice letter created."  It's a system ID in

4  the bottom, probably, fourth of the page, or so.

5  Q.  Approximately ten lines or so from the bottom of the page?

6  A.  That's about right.

7  Q.  Okay, thank you very much.

8        MR. WISHNEW:  Your Honor, I'd like to introduce BT-13

9  into evidence.

10        THE COURT:  It's in evidence.

11  (Rate change letter was hereby received into evidence as BT's

12  Exhibit 13, as of this date.)

13  Q.  Ms. Lathrop if I could ask you to turn your attention to

14  BT-14?  Do you recognize this document?

15  A.  Yes.

16  Q.  What is this document?

17  A.  This is an interest rate change letter that was issued on

18  June 25th, 2012.

19  Q.  Okay.  And according to this letter, did the interest rate

20  change?

21  A.  No, it remained at 5.99.

22  Q.  Okay.  And was this letter maintained in GMAC's business

23  records?

24  A.  Yes.

25  Q.  Okay.  And was this letter also sent to the borrowers?

RESIDENTIAL CAPITAL, LLC, ET AL.                    48

1   A.  Yes, it would have been.

2   Q.  Okay.  Can you point me to the point in the servicing

3   notes where it's reflected?

4   A.  Yep.  Just another second.

5        It's recorded on page 64 of 162.  It is noted on June

6   22nd, 2012, almost right in the middle of the page.  It reads:

7   "ARM change notice scheduled for June 25th, 2012."

8   Q.  Thank you.

9        MR. WISHNEW:  Your Honor, I'd like to introduce

10  Exhibit BT-14 into evidence.

11       THE COURT:  All right, it's in evidence.

12  (Rate change letter was hereby received into evidence as BT's

13  Exhibit 14, as of this date.)

14       MR. WISHNEW:  Thank you.

15  Q.  Ms. Lathrop, if I could ask to turn your attention to

16  BT-15?  Do you recognize this document?

17  A.  Yes.

18  Q.  And what is this document?

19  A.  This is an ARM -- excuse me -- an interest rate change

20  letter dated December 24th, 2012.

21  Q.  Okay.  And according to this letter, did the interest rate

22  change?

23  A.  No, it remained at 5.99.

24  Q.  Okay.  And was this document maintained in GMAC's business

25  records?

1    A.  Yes.

2    Q.  Okay.  And was this letter -- would this letter have also

3    been sent to the Thompsons?

4    A.  Yes, it would've been.

5    Q.  Okay.  And is the mailing of the letter reflected in the

6    company's servicing notes?

7    A.  I believe it is.

8    Q.  Okay.  If I could ask you to just identify where?

9    A.  It's on page 53 of 162, dated December 25th, 2012, and

10   reads:  "ARM change notice, created letter," and it has a

11   system ID, approximately in the middle of the page.

12   Q.  Thank you very much.

13          MR. WISHNEW:  Your Honor, I'd like to introduce

14   Exhibit BT-15 into evidence.

15          THE COURT:  All right, it's in evidence.

16   (Rate change letter was hereby received into evidence as BT's

17   Exhibit 15, as of this date.)

18          MR. WISHNEW:  Thank you very much.

19   Q.  Ms. Lathrop, based on the rate change letters we just went

20   through, is it your understanding that the monthly payment the

21   Thompsons were required to make was calculated using either an

22   interest rate of 5.99 percent or 6.00 percent?

23   A.  Depending on the time of the loan, yes.

24   Q.  Okay.  To the best of your knowledge, is there anything in

25   the debtors' books and records to indicate that an interest

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1   rate higher than the rate reflected in the rate change letters

2   was charged to the Thompsons?

3   A.  No.

4   Q.  Okay.  Based on your review of the loan documents and the

5   rate change letters, do you believe GMAC Mortgage properly

6   calculated, applied, and charged interest on the Thompsons'

7   loan, between August 1st, 2008 and the time GMAC Mortgage

8   transferred servicing of the loan?

9   A.  Yes, sir.

10          MR. WISHNEW:  Your Honor, I have no more questions for

11  Ms. Lathrop.

12          THE COURT:  All right.  You want to cross-examine?

13          MS. THOMPSON:  Yes.

14          THE COURT:  Go ahead.

15          MS. E. THOMPSON:  I wanted to know if I can bring a

16  rebuttal witness?

17          THE COURT:  No, you can't.  This is the trial.  Now is

18  the time.

19          MS. E. THOMPSON:  But that's my --

20          THE COURT:  Ms. Thompson --

21          MS. E. THOMPSON:  -- you did not inform me that you

22  were not accepting that as evidence.  And I had turned that

23  evidence in early last year.

24          THE COURT:  Ms. Thompson --

25          MS. E. THOMPSON:  And I was never told that --

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

1          THE COURT:  -- Ms. Thompson --

2          MS. E. THOMPSON:  -- forensic audit was not accepted.

3          THE COURT:  Ms. Thompson, do you wish to cross-examine

4  Ms. Lathrop?  That's the only thing that's proper to do at this

5  point.  If you have questions for her about her testimony, you

6  can do that now.

7          MS. E. THOMPSON:  Okay.

8  CROSS-EXAMINATION

9  BY MS. THOMPSON:

10 Q.  I have a question.  What -- how long do you have to record

11 a mortgage?

12         THE COURT:  Ms. Thompson, the only issue that this

13 hearing relates to is whether you were properly --

14         MS. E. THOMPSON:  I understand --

15         THE COURT:  -- stop.  Do not interrupt me.  Do not

16 interrupt me.  You should be in this courtroom today, and

17 you're not.  Okay?

18         MS. E. THOMPSON:  Listen --

19         THE COURT:  Listen to me.  Ms. --

20         MS. E. THOMPSON:  No, no, no.  I'm disabled.  I am

21 disabled.  That goes for -- where you are.  If you're telling

22 me that I'm supposed to go through two-and-a-half feet of snow

23 to try to get there in a wheelchair, that is being insensitive

24 and respectfully wrong.

25         THE COURT:  Ms. Thompson, I'm giving you a chance to

1    cross-examine --

2            MS. E. THOMPSON:  Where -- I need to file a complaint.

3            THE COURT:  I am giving you a chance to cross-examine

4    this witness.

5            MS. E. THOMPSON:  No, you're not.  You're yelling at

6    me.  You're yelling at me and telling me that I should have run

7    through the snow, where I have two braces in my legs.  I have

8    braces in my back.

9            THE COURT:  Ms. Thompson.

10           MS. E. THOMPSON:  I cannot do the snow.

11           THE COURT:  Ms. Thompson.

12           MS. E. THOMPSON:  Okay.  And for you to sit there and

13   you saw me -- for you to sit there and saying I can travel

14   through that snow --

15           THE COURT:  Ms. Thompson.

16           MS. E. THOMPSON:  -- it's just insensitive.

17           THE COURT:  Ms. Thompson.

18           MS. E. THOMPSON:  It's very insensitive.

19           THE COURT:  If you wish to cross-examine Ms. Lathrop

20   about the interest rate you were charged on the loan, that has

21   been the testimony, that's the subject of the exhibits that

22   were introduced into evidence.  If you have questions for her

23   in cross-examination about the evidence she's given in court,

24   I'm permitting you to examine her.

25           You have to confine your questions to the subject

RESIDENTIAL CAPITAL, LLC, ET AL.                          53

1   that's relevant to this hearing, which is the interest rate you

2   were charged and her testimony.  Go ahead and ask her your

3   questions.

4   BY MS. E. THOMPSON:

5   Q.  My question is, how reliable is the Web site that you used

6   to calculate the loan?  Because I went through a private

7   lender.  Now, I'm going to have to appeal this case, because

8   I'm sorry, but I don't understand how you came up with one

9   number and they came up with another.  I will have to calculate

10  that myself, because I need an itemized copy, then.  Did you

11  itemize it and have a -- into evidence, the calculations?

12  A.  According to the amortization chart that we used, we

13  specifically took your -- your loan information as far as your

14  unpaid interest and then the terms of the loan and used the

15  calculator to determine what the payment would be, just as they

16  would have at -- at any time of origination.  So it -- it would

17  be very accurate to what you would receive from any originator

18  or anyone in the mortgage industry.

19          THE COURT:  Ms. Lathrop, let me make sure I

20  understand.

21  Q.  Well, what I have --

22          THE COURT:  Stop for a second, Ms. Thompson.  Stop.

23  Listen.

24          You used the amortization chart to calculate that for

25  one six-month period, her principal and interest payment rose

1  from $1,227.77 to $1,228.98.  That's the purpose for which you

2  used it?

3          THE WITNESS:  Yeah, just to ensure that that 0.1

4  percent change in interest was accurately recorded.

5          THE COURT:  Okay.  So for one six-month period, the

6  Thompsons' monthly mortgage payment rose $1.21?

7          THE WITNESS:  Yes.

8          THE COURT:  And after that one six-month period, that

9  was the only six-month period in which the rate rose from 5.99

10 percent to 6 percent.  Is that correct?

11         THE WITNESS:  Yes.  The remaining amount it was 5.99.

12         THE COURT:  And then after that --

13         MS. E. THOMPSON:  No, excuse me.

14         THE COURT:  Just a second.

15         MS. E. THOMPSON:  I have --

16         THE COURT:  Just a second.

17         And then after that, her interest rate declined to

18 5.99 percent?

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  Go ahead and ask your questions, Ms.

21 Thompson.

22 BY MS. E. THOMPSON:

23 Q.  In February was the only month that it went up to 6

24 percent, and then the next day we received a letter saying it

25 was back to 5.99 percent.  So it was only 6 percent for like a

1   month.

2           THE COURT:  For how long was --

3   Q.  And so -- excuse me?

4           THE COURT:  No, go ahead, Ms. Thompson.

5   Q.  And it also stated on the -- on the -- because I have the

6   same letters that he put into evidence.  Those are all stated

7   on the -- on the letters.  During the same month, in February,

8   it went to 5.99.  Then it went up to 6, and then the next day

9   we received a letter saying it was back to 5.99.

10     I just wish I would have an itemized copy of the

11  calculations that you made.

12          THE COURT:  That's what the evidence that's just been

13  introduced shows, and you were sent a copy of the exhibits

14  and --

15          MS. E. THOMPSON:  No, I --

16          THE COURT:  -- you've acknowledged that you --

17          MS. E. THOMPSON:  -- looked at the evidence, and there

18  is nothing --

19          THE COURT:  -- you acknowledged that you have a copy

20  of the change letters.

21          MS. E. THOMPSON:  -- itemized here involving interest

22  rates.  There's nothing itemized there about the interest rate.

23  There's absolutely nothing itemized.

24          THE COURT:  Okay.  Ask her --

25          MS. E. THOMPSON:  She did it from a computer.

RESIDENTIAL CAPITAL, LLC, ET AL.                        56

1          THE COURT:  -- if you have questions, go ahead and ask

2    your questions.

3    Q.  What -- is the Web site that you used reliable?

4          MR. WISHNEW:  Asked --

5    A.  I believe it is.

6          THE COURT:  Why do you believe it's reliable?

7    Q.  You believe it is.  Did you check the Web site?

8    A.  It's a Web site that I've -- I have used on many occasions

9    in reviewing loans similar to this, and it matches the

10   amortization schedules that I've looked at.

11   Q.  Okay.  Why don't you -- what is the Web site?  Can you

12   give me the Web site?

13   A.  It's www.myAmortizationChart.com.

14   Q.  My what?

15   A.  MyAmortizationChart.

16   Q.  My ammo?  Spell that?  I didn't understand what you said.

17         THE COURT:  Spell it for her slowly.

18         MR. WISHNEW:  Spell it out.

19         THE WITNESS:  It's spelled as:  M as in Mary, Y-A-M as

20   in Mary, O-R as in Robert, T-I-Z as in zebra, A-T-I-O-N as in

21   Nancy, C-H-A-R as in Robert, T, dot.com.

22   Q.  Wow, okay.  So you don't know the reputation of the -- of

23   the Web site you used?

24         MS. E. THOMPSON:  I don't understand how that can go

25   into evidence when you used it -- we're talking about -- you

1  didn't do it by hand, and it was done through a computer.  The

2  computer, the program can have errors in the program.

3          THE COURT:  Ask your questions, Ms. Thompson.

4  Q.  My question is, do you know if the Web site is reliable?

5  A.  I believe it --

6  Q.  Did you check the Web site before you used it?

7          MR. WISHNEW:  Objection, Your Honor.  Asked and

8  answered.

9          THE COURT:  Overruled.  Go ahead and answer the

10 question.

11 A.  I believe it to be reliable just based on I've compared it

12 to other Web sites --

13 Q.  No, I'm not saying --

14         THE COURT:  Don't interrupt her when she's -- Ms.

15 Thompson, don't interrupt her when she's answering a question.

16         For how long have you used this Web site?

17         THE WITNESS:  Approximately a year.

18         THE COURT:  Okay.  Ask your next question.

19 Q.  My question is did you check the --

20         MS. E. THOMPSON:  She didn't answer my question.

21 Q.  Did she check that reliability of the Web site before she

22 used it.  Because then we're talking about -- we're talking

23 about a third party, something that was done through the

24 system, through a program that you know nothing about, when

25 you've only been using that for a year, and how long have you

1   been working there?

2          THE COURT:  Now is the time for you to ask questions,

3   not make arguments.

4          MS. E. THOMPSON:  I'm not making arguments, I'm asking

5   a question.  I know you have problems with my disability, and

6   you're upset that I am not there, but you have to let me ask

7   the questions, because just like you have demanded respect, so

8   do I.  And I'm sorry that I'm disabled and ill, and couldn't

9   get through the weather.  Okay?

10          THE COURT:  Ask your --

11          MS. E. THOMPSON:  I'm not going to break my back and

12   end up in the hospital again after two months.  That's --

13          THE COURT:  Ask your next --

14          MS. E. THOMPSON:  -- not going to happen.

15          THE COURT:  Ask your next question, Ms. Thompson.

16   BY MS. E. THOMPSON:

17   Q.  Do you have an itemized statement stating everything that

18   was calculated?

19          THE COURT:  That's what's come into evidence, Ms.

20   Thompson.  That's exactly what the --

21          MS. E. THOMPSON:  I --

22          THE COURT:  That's what the exhibits --

23          MS. E. THOMPSON:  I don't see an itemized statement

24   with the numbers.

25          THE COURT:  That's what's just come into evidence --

RESIDENTIAL CAPITAL, LLC, ET AL.                    59

1          MS. E. THOMPSON:  With the numbers --

2          THE COURT:  -- Ms. Thompson.  That's what they've

3    introduced and I've admitted in evidence.

4          MS. E. THOMPSON:  I didn't see that in my -- in the

5    file that he gave me.  I have everything from the articles and

6    all the letters, but I do not have anything stating that it's

7    an itemized --

8          THE COURT:  Oh, so now, you're acknowledging you

9    received all of the exhibits from Mr. Wishnew, are you?

10         MS. E. THOMPSON:  I also -- I put -- I sent them to

11   you -- I sent them same letters to you.  My -- my issues

12   wasn't -- wasn't the letters.  See you're not -- you're not

13   even paying attention to the case.  My issue was the interest

14   rate at 6.6554 which they several at times in the e-mail

15   admitted that it was wrong, and now all of a sudden it's right?

16   I have the e-mails.  They admitted that it was wrong.

17         THE COURT:  Ms. --

18         MS. E. THOMPSON:  And now all of a sudden it's wrong.

19   And now all of a sudden my forensic audit can't go in.  And

20   I'm -- I'm being told today, instead of being told when I

21   turned it in, back in November -- back in September I turned

22   that in, several times.

23         THE COURT:  Ask your next question.

24         MS. E. THOMPSON:  And it was never explained to --

25         THE COURT:  Ask your next question.

1    MS. E. THOMPSON:  I don't have any more questions.  I

2    don't have any more questions.

3         THE COURT:  Okay.

4         MS. E. THOMPSON:  Because you're not going to let me

5    answer -- you're not going to let me ask the questions.  You're

6    not letting me ask questions.

7         THE COURT:  I am letting you ask questions.  If you

8    have a question --

9         MS. E. THOMPSON:  No, you're not.  You're being

10   biased.  You're being biased, and you're not letting me ask her

11   the questions.  So I'm done.

12        THE COURT:  Do you have a question for Ms. -- do you

13   have any questions for Ms. Lathrop?

14        I have a question for you, Ms. Lathrop.  Have you seen

15   any exhibits that GMAC charged the Thompsons 6.65 percent

16   interest?

17        THE WITNESS:  I personally have not, no.

18        THE COURT:  You've reviewed the file and you didn't

19   find any?

20        THE WITNESS:  Correct.

21        THE COURT:  Do you have any other questions, Mr.

22   Wishnew?

23        MR. WISHNEW:  No, Your Honor.

24        THE COURT:  All right, the witness is excused.

25        Do you have any other witnesses, Mr. Wishnew?

RESIDENTIAL CAPITAL, LLC, ET AL.                    61

1       MR. WISHNEW:  No, Your Honor.

2       THE COURT:  Ms. Thompson do you have any witnesses to

3  put on?

4       MS. E. THOMPSON:  I'm done.  I'm filing an appeal.

5  I'm done.

6       THE COURT:  Do you have any --

7       MS. E. THOMPSON:  I'm filing an appeal and a

8  complaint.

9       THE COURT:  If you wish to test --

10       MS. E. THOMPSON:  I'm filing a complaint and appeal.

11       THE COURT:  If you wish to --

12       MS. E. THOMPSON:  Because you have treated me very

13  poorly over the phone.  You have yelled at me and treated me

14  like I'm your child.  And I'm sorry, you -- Your Honor, you

15  deserve respect, but you -- you're also supposed to give

16  respect.  And those comments that I'm supposed to travel in the

17  snow because somebody -- because the witness flew in, I'm

18  sorry, that I'm sick, but I'm not going to break my back.  I

19  was already in the hospital for falling in the snow for two

20  months, learning how to walk again.

21       THE COURT:  If you --

22       MS. E. THOMPSON:  And I'm not going through that

23  because you feel that since everybody else that's not disabled

24  was there, you're being biased.  You don't care what I say and

25  what I do, you already have everything set in mind.

RESIDENTIAL CAPITAL, LLC, ET AL.                    62

1          THE COURT:  Ms. Thompson.

2          MS. E. THOMPSON:  You're eliminating that now, because

3    you should have eliminated it back in June, when you wrote

4    that -- the objection.  You overruled the thing.

5          THE COURT:  Ms. Thompson.

6          MS. E. THOMPSON:  So you're not listening or attending

7    anything I say.

8          THE COURT:  Ms. Thompson.

9          MS. E. THOMPSON:  You just took off my main evidence,

10   and I'm just going to write an appeal.

11         THE COURT:  Ms. Thompson.

12         MS. E. THOMPSON:  So you already made your decision.

13   So there's nothing I have to say.

14         THE COURT:  Ms. Thompson, if you wish --

15         MS. E. THOMPSON:  You already made a decision.

16         THE COURT:  If you wish to testify, I will have you

17   sworn and I will permit you to testify on the telephone now.

18   Do you wish to testify?

19         MS. E. THOMPSON:  You already made up your mind.

20   You --

21         THE COURT:  Ms. Thompson.

22         MS. E. THOMPSON:  -- treated me rudefully (sic) and

23   you -- and I messed up the whole thing by being disabled.  And

24   I'm filing a complaint against that.  You are biased.

25         THE COURT:  Do you --

RESIDENTIAL CAPITAL, LLC, ET AL.                    63

1            MS. E. THOMPSON:  And what you say is --

2            THE COURT:  Do you --

3            MS. E. THOMPSON:  -- extremely biased.

4            THE COURT:  Ms. Thompson, I'm giving you an

5    opportunity to testify by telephone.  If you wish --

6            MS. E. THOMPSON:  You -- no you're not.  No, you're

7    not.  You was rude when I got on the phone, and refused the

8    letter.  It's not my fault that he sent the letter saying you

9    could do it by the phone.

10           THE COURT:  Ms. Thompson.

11           MS. E. THOMPSON:  That's not my fault.

12           THE COURT:  I've give --

13           MS. E. THOMPSON:  Because otherwise I would have

14   called last week.  It's not my fault --

15           THE COURT:  I've give --

16           MS. E. THOMPSON:  -- that it snowed outside.  And you

17   don't want to hear anything I have to say.

18           THE COURT:  I do.

19           MS. E. THOMPSON:  You already took out all the

20   evidence that I have.

21           THE COURT:  I --

22           MS. E. THOMPSON:  So you already made up your mind.

23           THE COURT:  I wish --

24           MS. E. THOMPSON:  You -- you already made up your

25   mind.  I'm just going to file a complaint.

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1          THE COURT:  Ms. Thompson, I --

2          MS. E. THOMPSON:  I'm going to file an appeal and a

3  complaint.  Because you're not -- you're being biased and you

4  don't care what I have to say.

5          THE COURT:  I want to hear your testimony.  You can be

6  sworn.

7          MS. E. THOMPSON:  No, you don't.  No, you don't.  No,

8  you don't.

9          THE COURT:  Okay, Ms. Thompson.

10          MS. E. THOMPSON:  You're being very rude and nasty.

11          THE COURT:  Ms. Thompson.

12          MS. E. THOMPSON:  I'm sorry, but you are being very

13  rude and nasty.  I have a severe heart condition, and you could

14  care less.

15          THE COURT:  Ms. Thompson.

16          MS. E. THOMPSON:  Because you, you're expecting me to

17  go running through the snow.  And that statement at all is

18  wrong.

19          THE COURT:  If you wish to testify, you will be sworn

20  and you will testify by telephone now.  Do you wish to be sworn

21  and give testimony?

22          MS. E. THOMPSON:  You already made up your mind.

23          THE COURT:  I'm giving you the opportunity --

24          MS. E. THOMPSON:  It doesn't matter what I say, you

25  already made up your mind.

1          THE COURT:  I'm giving you --

2          MS. E. THOMPSON:  So I'll be waiting for the appeal.

3          THE COURT:  I am giving you the opportunity now.  You

4    have the opportunity --

5          MS. E. THOMPSON:  No, you're not.  No, you're not.

6          THE COURT:  -- to offer testimony --

7          MS. E. THOMPSON:  No, you're --

8          THE COURT:  -- under oath.  If you wish to testify --

9          MS. E. THOMPSON:  Talk to yourself.  You're biased.

10         THE COURT:  -- say so and you will be sworn and you

11   will be given --

12         MS. E. THOMPSON:  No -- okay.

13         THE COURT:  -- Ms. Thompson, do you wish to --

14         MS. E. THOMPSON:  I'm filing a complaint.  You are --

15   you are biased today and that was extremely wrong.  I'm filing

16   a complaint.

17         THE COURT:  I'm giving you the opportunity now to

18   testify --

19         MS. E. THOMPSON:  No, you're not.  No, you're not.

20         THE COURT:  -- under oath.

21         MS. E. THOMPSON:  No, you're not.

22         THE COURT:  By telephone.

23         MS. E. THOMPSON:  No, you're not.  You didn't listen

24   to anything I had to say.

25         THE COURT:  Do you wish --

RESIDENTIAL CAPITAL, LLC, ET AL.                      66

1          MS. E. THOMPSON:  If you did, you wouldn't have been

2    nasty.  Because I couldn't make --

3          THE COURT:  Do you wish --

4          MS. E. THOMPSON:  -- it in the snow and everybody else

5    did.  Well, everybody else there has feet and can walk.  I have

6    to walk with braces on my legs and on my back.  And in the

7    wheelchair.

8          THE COURT:  Do you wish to offer testimony now by

9    telephone under oath?  If so you will be sworn, and I will

10   listen to your testimony.

11         MS. E. THOMPSON:  Okay.

12         THE COURT:  All right?

13         MS. E. THOMPSON:  You can swear me in.

14         THE COURT:  Give her the oath.

15       (Witness sworn)

16         THE COURT:  Ms. Thompson, you have to respond.

17         MS. E. THOMPSON:  I'm sorry, yes.  I -- I'll tell the

18   truth, the whole truth, and nothing but the truth.

19         THE COURT:  Okay, go ahead and testify.

20   DIRECT NARRATIVE TESTIMONY

21   BY MS. E. THOMPSON:

22         THE WITNESS:  Okay.  I am -- I don't think that

23   computer -- the Internet that you used is correct.  I think the

24   whole thing is wrong.  I received a lot of e-mails where they

25   agreed that it was wrong and tried to do a settlement.  And now

1  in the trial, here comes the witness saying that it's wrong.

2        I'm sorry, but I have -- I have ten years of

3  experience at -- I have a bachelor's in engineering --

4  electrical engineering.  Math is my -- is my everyday thing.

5  Okay?  And I think the math on that -- on this -- on the

6  mortgage is wrong.  It's completely wrong.  That's why it

7  wasn't recorded the first time that it was supposed to be

8  recorded, because all the papers were not sent, and it violated

9  six New Jersey regulations.  That all violated six violations

10 from the State of New Jersey, alone, besides the interest rate.

11       And I think it is at 6.654.  And I'm going to have to

12 file an appeal, because I'm going to have to bring the person

13 in and show that they -- that they were completely wrong.

14       And with all her experience and all her college

15 degrees, that's fine.  I have my engineering degree, and I

16 stand by my math.  I'm a student and I get 100 every time I do

17 a math report.  So I want an itemized -- not from the

18 computer -- by hand, which was the way it was done when I

19 received the whole mortgage.

20       I don't understand how a third party -- the mortgage

21 forensic audit done by a third party -- that should have been

22 notified to me from the beginning when I sent in that evidence.

23 That evidence has been there for over a year, and now all of a

24 sudden it's not accepted because the person's not there, when I

25 wasn't told that I have to bring somebody in for a forensic

RESIDENTIAL CAPITAL, LLC, ET AL.                    68

1   audit.

2         So this whole thing was just completely messed up.

3   Excuse me.

4         THE COURT:  How much was your monthly --

5         THE WITNESS:  My heart rate is going up -- my heart

6   rate is going up and I have to take a pill.  But this whole

7   thing is completely -- is completely messed up.  They know they

8   overcharged on that loan.  That loan is so messed up, it's not

9   even funny.  That's why the court here keeps rejecting it.

10  That foreclosure, they've been filing it since 2007, and I have

11  all the copies from the court.  I even went to the court, and

12  they said it wasn't approved because it wasn't recorded on

13  time.  Okay?

14        So to them, the mortgage doesn't exist, so they can't

15  do anything with the house, because legally I can't refinance

16  that loan, because I already tried to refinance, and they said

17  that if the mortgage is not registered, they cannot use it.  I

18  tried by -- buying -- my own -- which also went through the

19  mortgage and also stated that because it's not legal tender, it

20  cannot be used to do a refinance.

21        So that mortgage is in the air and I can't do anything

22  about it.  I'm -- today, I'm in two different courts.  I'm in

23  this court and I'm also in -- in foreclosure court, because

24  they keep sending it in.  And now, they sent it in by the -- by

25  the president of -- let's see -- Crawford Charles (ph.), which

1  he was the vice president of GMAC until 2013, you know, until

2  they went "bankrupt", and then now -- now he also works for

3  Ocwen.

4          So everybody at GMAC now works in Ocwen.  So I don't

5  see how -- how to tell the difference, because it's still under

6  Citigroup or NA Bank.  It still shows as the owner.  So I don't

7  know how many owners does the loan have.

8          According to the mortgage, you can't have a third

9  party.  And as far as I know, Bank NA owns the loan.  Chase is

10  claiming the loan.  And there's another third party claiming

11  the loan besides you guys.  So everybody's claiming that they

12  own the loan, and -- and nobody is doing anything about it.

13          But I'm sorry, I think she's wrong.  It is a 6.6554.

14  That was done -- I paid over two grand to get that done, to get

15  it done correctly, because I wanted to make sure it was

16  correctly, because as soon as I read the loan, I knew that

17  something was wrong.  And they went over everything, detail by

18  detail.

19          So to not have such a report in evidence that details

20  everything, literally details -- I don't see a detailed

21  evidence there about the finance -- the notes.  My report has

22  detailed math in it.  It shows me the math.  It shows correctly

23  the lines.  It shows you everything that was done.

24          I don't see -- she didn't do one like that.  She just

25  went through the computer and -- and did the shortcut, which

1    I'm sorry, but the shortcut doesn't agree with me.  That's a

2    certain -- that way theirs is a third party, because she

3    doesn't know who made up the program, and she does not keep the

4    legal tender.  I'm sorry.  That should -- if she was there to

5    testify that whole idea that she had should have been properly

6    documented as -- as an audit or an itemized list.  There's

7    nothing itemized in the package that was received.

8           Okay?  And I am tired of hearing that the -- that

9    they're covering it up now with their, oh, it was 5.99.  That's

10   not what they were saying in the e-mails.  And then they put it

11   under a law.  I looked up the law, and it stated that -- it

12   stated that I cannot discuss everything that was in the e-

13   mails.  But if it's -- if it's crucial to the -- to the case,

14   then it can be included -- included, according to that law that

15   they posted themselves in the e-mail that they sent me.

16          So I don't know how you can have one face in court and

17   another one behind Your Honor.  That's just wrong.  It doesn't

18   make any sense to me.

19          So I'm sorry, but I need to bring a rebuttal witness,

20   because she is completely wrong.  She went to the computer,

21   went to the easy way.  We're not even allowed to do that in

22   engineering.  We have to write out the program so it can be

23   seen so the details could be seen.  One number, one number,

24   interest rate, everything.  Write it down.

25          The same way it was in the report, I'm sorry, but I

1  can't accept it.  That -- from my experience she should've had

2  an itemized report like my forensic audit.  My forensic audit

3  is better than what she said.  It speaks to everything.  Each

4  law that was broken, it would stick to them, and everything

5  else -- I'm sorry -- and everything that wasn't included in the

6  file that was supposed to be from the man that we signed that

7  was never included.

8        So I do not agree with the interest rate, and I think

9  I have the right to bring someone in to be heard --

10       THE COURT:  What was --

11       THE WITNESS:  -- for replying --

12       THE COURT:  -- what -- how much were you monthly --

13  how much were your monthly payments under this loan when you

14  originally obtained it?

15       THE WITNESS:  It was -- it never changed.  It was

16  1,227.  It always stayed the same.  The only month that it

17  changed was in February.  In February it went up to 6 percent

18  and then went down to 5.99 according to them.  But when I --

19  the first time that I noticed something was wrong in 2010, when

20  they tried to do the loan modification.  And that's when I

21  found out through our lawyer that the loan was never

22  registered.  And then they tried to register it seven years

23  later, which the courts here are rejecting, because according

24  to them, it was supposed to be registered immediately after the

25  loan was -- was signed and they give you a certain amount of

RESIDENTIAL CAPITAL, LLC, ET AL.                    72

 1  time to do that, not seven years.

 2          You can't register a loan seven years later and then

 3  claim that you had a loan.  I'm sorry.  This whole thing is

 4  just unfair.  Completely unfair, and it doesn't make any sense.

 5  Because if they claim that, yeah, okay, we charged that on the

 6  e-mail, but then in person they have a woman saying a totally

 7  different thing.

 8          THE COURT:  What e-mail are you referring to?

 9          THE WITNESS:  Excuse me?

10          THE COURT:  What e-mail are you referring to?

11          THE WITNESS:  The e-mails that I -- that they -- that

12  ResCap sent me.

13          THE COURT:  What's the date of the e-mail?

14          THE WITNESS:  Okay, hold on.  I'm looking them up

15  right now.  I have one -- this was from Richie Lynn (ph.) in --

16          THE COURT:  What's the date --

17          THE WITNESS:  -- October 2007.  I have the one in

18  September -- there's a lot of them, so give me one second.  We

19  went backwards writing back and forth.

20      (Pause)

21          THE WITNESS:  We sent e-mail to -- from July when I

22  was in the hospital, we sent e-mails back and forth.  And in

23  August 6th, it was about four e-mails.  September 1st --

24          THE COURT:  Ms. Thompson I have your -- I have a

25  binder with the exhibits that you marked for this hearing.  And

RESIDENTIAL CAPITAL, LLC, ET AL.                    73

1    I don't see any e-mails in them.  And --

2           THE WITNESS:  I didn't include the e-mails, because I

3    thought the forensic audit proved enough that it was 6.6554.

4    But I didn't know that the forensic audit wasn't going to be

5    allowed into evidence.

6           THE COURT:  Read --

7           THE WITNESS:  When I turned in the evidence, that

8    should've been told to me that that was not acceptable, so I

9    could get the person that did the audit.

10          THE COURT:  Read me the e-mail --

11          THE WITNESS:  I also have --

12          THE COURT:  Read me the e-mail.  You say that there's

13   an e-mail from October 2007.

14          THE WITNESS:  Okay.

15          THE COURT:  Who is it from?

16          THE WITNESS:  Hold on a second.  Hold on a second.

17   Sorry.  Sorry, I have to go to the list of e-mails.  Hold on.

18       (Pause)

19          THE WITNESS:  I'm sorry.  Give me one second.

20          Okay, I have an e-mail from October 23 --

21          THE COURT:  2007?

22          THE WITNESS:  -- and it states -- excuse me?

23          THE COURT:  From 2007?

24          THE WITNESS:  No, from -- from October 23rd, 2013.

25          THE COURT:  From whom?

RESIDENTIAL CAPITAL, LLC, ET AL.                    74

1           THE WITNESS:  From --

2           THE COURT:  GMAC wasn't servicing --

3           THE WITNESS:  -- from --

4           THE COURT:  -- GMAC wasn't servicing the loan then.

5           THE WITNESS:  Excuse me?

6           THE COURT:  GMAC wasn't servicing your loan in October

7  2013.  Who is the e-mail from?

8           THE WITNESS:  From the lawyer that's in court right

9  now.

10          THE COURT:  Mr. Wishnew?  Tell me what it says.

11          THE WITNESS:  Pursuant to the terms of the Court's

12 September 21st order, the Trust is required to provide the

13 court with said letter by the close of business Wednesday

14 concerning the disputed matter.  Previously you declined the

15 Trust's offer of 10,000 dollars for your general unsecured

16 claim and reasserted your full claim amount, even though only

17 one element of the claim remains unresolved, and the balance of

18 your claim has been disallowed by the Court."

19          MR. WISHNEW:  Your Honor --

20          THE COURT:  What does that have to do with the proper

21 interest rate?

22          THE WITNESS:  Well, the other e-mail that I have to

23 look for stated that they were offering me that because of the

24 interest rate difference, that they calculated from 2005 to

25 2013.

1          THE COURT:  Ms. Thompson, if they wanted to settle

2    with you --

3          THE WITNESS:  They added 10,000 dollars --

4          THE COURT:  -- settlement talks are not relevant to

5    what I have to decide.  The issue before me --

6          THE WITNESS:  This is going to the interest rate.  The

7    whole -- the whole e-mail is about the interest rate.

8          MR. WISHNEW:  Your Honor, objection --

9          THE WITNESS:  They offered 10,000 dollars for the

10   interest rate difference between 2005 and 2013.  It's all about

11   the interest rate.  How can you say that that's not about the

12   interest rate?

13         MR. WISHNEW:  Your Honor, objection.

14         THE COURT:  All right, Mr. Wishnew, your objection is

15   what?

16         MR. WISHNEW:  My objection, Your Honor, is that I

17   believe what Ms. Thompson's referencing is a settlement

18   communication protected by Federal Rule of Evidence 408.

19         THE COURT:  Sustained.  Ms. Thompson do you have any

20   evidence in any e-mails where you say that anyone from GMAC

21   acknowledged that you were charged the incorrect interest rate?

22   Not what may have been discussed as settlement.  Do you have --

23   you referred to e-mails from GMAC that indicated you were

24   charged the wrong interest rate.  Do you have such an e-mail?

25         THE WITNESS:  I will find each e-mail.  I will find

1   each single e-mail.

2          THE COURT:  You haven't -- in your exhibits that you

3   marked for this hearing, there are no e-mails.  What you

4   attached --

5          THE WITNESS:  There are no e-mails because the

6   forensic audit should have been good enough.  That's an audit

7   by a reputable -- reputable place.  That's not by a computer

8   program that's on the Internet that I'm just going to use to

9   use as reference and I know nothing about the program.

10          THE COURT:  Do you have any other --

11          THE WITNESS:  I know everything about that audit, and

12   I know it was a law firm in Philadelphia did everything; and it

13   took a month.

14          THE COURT:  Do you have any other testimony you wish

15   to offer in support of your claim?

16          THE WITNESS:  No, that's it.

17          THE COURT:  All right.

18          THE WITNESS:  That's it.  I know I have to do an

19   appeal, for --

20          THE COURT:  Mr. Wishnew, do you wish to cross-examine?

21          MR. WISHNEW:  No questions, Your Honor.

22          THE COURT:  All right.  Do you have any other evidence

23   that you wish to offer, Ms. Thompson?

24          MS. E. THOMPSON:  No, I'm going to offer them in an

25   appeal.

1          THE COURT:  You can't offer evidence on appeal.  Now

2    is the time.  Anything that you wish to introduce into evidence

3    you --

4          MS. E. THOMPSON:  I wanted to introduce the e-mails,

5    but I have to look through them, because I was just informed

6    today that that -- that that forensic audit wasn't good enough,

7    that I will have to bring somebody.  I should've been informed

8    when I turned that in, back in November.

9          THE COURT:  That was not an evidentiary hearing, Ms.

10   Thompson.

11         MS. E. THOMPSON:  That was in the packet.  Nobody

12   stated that that -- that that was going to be rejected or

13   refused.  And it was in several packages that I had sent to

14   them since the forensic audit was done.

15         THE COURT:  Okay, in a September 20 --

16         MS. E. THOMPSON:  So I'm sorry, but --

17         THE COURT:  -- in a Sep --

18         MS. E. THOMPSON:  -- I think you're being biased, and

19   you're not -- you could care less what happens in this case.

20         THE COURT:  In an order --

21         MS. E. THOMPSON:  Because I -- that number is not

22   wrong.  The interest rate is charging at 6.6554.

23         THE COURT:  In an --

24         MS. E. THOMPSON:  Just because she looked up on a

25   program on the Internet that she knows nothing about the

RESIDENTIAL CAPITAL, LLC, ET AL.                    78

1  program, I'm supposed to accept that.  I'm sorry.

2          THE COURT:  In an order --

3          MS. E. THOMPSON:  But I have evidence that refutes

4  what she's saying.

5          THE COURT:  All right.  In an order entered on

6  September 21, 2015, the Court provided, in paragraph number 2,

7  the Thompsons may file and serve any response to the Trust's

8  evidence and any evidence that the Thompsons intend to offer in

9  support of their response on or before 5 p.m. October 21, 2015.

10          The Court will not consider --

11          MS. E. THOMPSON:  And I sent it in --

12          THE COURT:  -- any evidence that the Thompsons did not

13  provide by that deadline of October 21, 2015.  There are no

14  e-mails that have been provided by the Thompsons as purported

15  evidence in respect of the matter that remains in dispute.

16          All right.  The evidence is closed.  The Court will

17  take the matter under advisement.  The hearing is adjourned.

18          MS. E. THOMPSON:  I'm waiting for your decision. I'm

19  writing an appeal, and I'm reporting you for the -- to the

20  discrimination.

21          THE COURT:  We're adjourned.

22          MR. WISHNEW:  Thank you for your time, Your Honor.

23          (Whereupon these proceedings were concluded at 10:32 a.m.)

24

25

1

2                          I N D E X

3

4    WITNESS                EXAMINATION BY      PAGE

5    Sara Lathrop           Mr. Wishnew         12

6    Sara Lathrop           Ms. Thompson        51

7    Elda Thompson          By proffer          66

8

9                          EXHIBITS

10   BT'S                   DESCRIPTION         PAGE

11   A                      Sara Lathrop's      18

12                          declaration dated

13                          10/6/15

14   1                      Thompson servicing  21

15                          notes and payment

16                          history

17   2                      Adjustable rate     22

18                          note for the

19                          Thompson loan

20   3                      Amortization        26

21                          schedule

22   4                      First interest      30

23                          rate change letter

24   5                      Wall Street         33

25                          Journal excerpt

| | | | |
|---|---|---|---|
| 1 | | | |
| 2 | 6 | Second | 35 |
| 3 | | amortization | |
| 4 | | schedule | |
| 5 | 7 | Rate change letter | 39 |
| 6 | 8 | Rate change letter | 40 |
| 7 | 9 | Rate change letter | 42 |
| 8 | 10 | Rate change letter | 43 |
| 9 | 11 | Rate change letter | 44 |
| 10 | 12 | Rate change letter | 46 |
| 11 | 13 | Rate change letter | 47 |
| 12 | 14 | Rate change letter | 48 |
| 13 | 15 | Rate change letter | 49 |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

81

1

2                          C E R T I F I C A T I O N

3

4    I, Hana Copperman, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    *Hana Copperman*

10

11   _____

12   HANA COPPERMAN

     AAERT Certified Electronic Transcriber CET**D 487

13

14

15   eScribers

16   700 West 192nd Street, Suite #607

     New York, NY 10040

17

18

19   Date:  January 26, 2016

20

21

22

23

24

25