UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

RESIDENTIAL CAPITAL, LLC, et al.,
   Post-Effective Date Debtors                      Chapter 11
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
RESCAP BORROWER CLAIMS TRUST,         Case No. 12-12020-mg
   Objector
v.
TIA DANIELLE SMITH,
    Creditor-Beneficiary

_____

MOTION FOR REINSTATEMENT OF LEAVE TO APPEAR
TELEPHONICALLY AT THE ADJOURNED PRE-TRIAL CONFERENCE NOW SET FOR
FEBRUARY 1, 2016 PURSUANT TO FED. R. BANK. P. 1001 AND 9024

_____

     **NOW COME** Tia Danielle Smith, by her attorney, Wendy Alison Nora of ACCESS LEGAL SERVICES, and Wendy Alison Nora, in her individual capacity, respectfully moves the Court to reinstate her telephone privileges for the adjourned Final Pre-Trial Conference now set for February 1, 2016 at 9:00 a.m. pursuant to Fed. R. Bankr. P. 1001 and 9024 and shows the Court:

    1.  The factual basis for this Motion is set forth in the attached Declaration and the Exhibits attached thereto.  The Exhibits attached to the Declaration support the merits of Ms. Smith's claim that the California Unfair Competition Law (UCL) at California Business and Professions Code sec. 17200, et seq., specifically at sec. 17203, has been violated by the securitization scheme employed by the RESCAP Debtors, which included the instruction to Ms. Smith that she would not be eligible for a loan modification, unless she was three (3) months past due in her mortgage payments, which is the issue before this Court.

    2.  Ms. Smith's case is meritorious and warrants the relief requested herein, so as not to require Ms. Smith's attorney to incur travel expenses as a punishment for not being able to participate in the telephone conference and putting her under threat of contempt, for circumstances which were not anticipated when she sought to comply with the rescheduled time for the hearing.

    3.  Fed. R. Bankr. P. 1001 provides: " . . . These rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding."

1

4.   Fed. R. Bankr. P. 9024 provides:

Rule 60 F. R. Civ. P. applies in cases under the Code except that (1) a motion to reopen a case under the Code or for the reconsideration of an order allowing or disallowing a claim against the estate entered without a contest is not subject to the one year limitation prescribed in Rule 60(c), (2) a complaint to revoke a discharge in a chapter 7 liquidation case may be filed only within the time allowed by §727(e) of the Code, and (3) a complaint to revoke an order confirming a plan may be filed only within the time allowed by §1144, §1230, or §1330. In some circumstances, Rule 8008 governs post-judgment motion practice after an appeal has been docketed and is pending.

5.   Fed. R. Civ. P. 60(b)(1) provides:

(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
(1) mistake, inadvertence, surprise, or excusable neglect; . . .

6.   Counsel for Ms. Smith's neglect to appear at the telephonic Final Pre-Trial Conference on January 27, 2016,  which had been rescheduled on January 26, 2016 to a later time at which she had a conflict and which she notwithstanding the conflict, made arrangements to be available and attempted to appear, was due to excusable neglect because she was unable to obtain an internet connection from the location at which she attempted to appear, so as to avoid the timing conflict.

7.   It appears that this Court was unaware of the good faith efforts counsel for Ms. Smith had made to appear at the rescheduled time for the Final Pre-Trial Conference, when it entered its Order of January 27, 2016 at 2:49 p.m.  Messages left for the Courtroom Deputy Deanna Anderson and Law Clerk Sean Mitchell between 2:00 p.m. and 2:15 p.m. might not have been retrieved.

8.   The facts set forth in the Declaration in Support of this Motion demonstrate that good faith efforts were made to appear and had the time for the conference not been set forward by an hour, there would have been no difficulties in making the telephone appearance.

9.   Movants believe that the punitive nature of the requirement that Attorney Nora must appear personally for the adjourned Final Pre-Trial Conference is unjustified, because the inadvertent failure to appear was the result of technical difficulties resulting from the sudden rescheduling of the time of the conference call and the Attorney Nora's mistaken assumption that a law library would have WI-FI access.

10.   If the reason that the hearing time as set forward on January 27, 2016 was a precursor to the punitive Order entered on the event of an inadvertent failure by Attorney Nora to appear,

2

despite substantial efforts, is because the Court is displeased with Ms. Smith's litigation posture in this case, those issues can be addressed telephonically on February 1, 2016 and in person, when Movants appear personally on February 9, 2016, for which they have made economical travel arrangements.

11.  The Declaration in support of this Motion summarizes some of the merits of Ms. Smith's UCL claim.

12.  It is Ms. Smith's legally supportable position that her interest in her Homestead cannot be lawfully be taken from her on the basis of fraudulent documents.

**WHEREFORE**, the Movants seek relief from the Order of January 27, 2016 (Doc. 9564) and the reinstatement of Attorney Nora's privilege to appear telephonically for the adjourned Final Pre-Trial Conference.

Dated at Madison, Wisconsin this 28th day of January, 2016.

*/s/ Wendy Alison Nora*

_____
Wendy Alison Nora
ACCESS LEGAL SERVICES
310 Fourth Avenue South, Suite 5010
Minneapolis, Minnesota 55415
VOICE (612) 333-4144
FAX (612) 206-3170
accesslegalservices@gmail.com
Wisconsin Attorney ID #1017043
Minnesota Bar #165906

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

RESIDENTIAL CAPITAL, LLC, et al.,
   Post-Effective Date Debtors                          Chapter 11
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
RESCAP BORROWER CLAIMS TRUST,            Case No. 12-12020-mg
   Objector
v.
TIA DANIELLE SMITH,
    Creditor-Beneficiary

_____

DECLARATION OF WENDY ALISON NORA
IN SUPPORT OF MOTION FOR REINSTATEMENT OF LEAVE TO APPEAR
TELEPHONICALLY AT THE ADJOURNED PRE-TRIAL CONFERENCE NOW SET FOR
FEBRUARY 1, 2016 PURSUANT TO FED. R. BANK. P. 1001 AND 9024

_____

Wendy Alison Nora declares under penalty of perjury pursuant to 28 U.S.C. sec. 1726:

1.   Your Declarant is the attorney for Tia Danielle Smith in the above-captioned contested matter.

2.   This Court's Case Management and Scheduling Order set the Final Pre-Trial Conference in the matter for January 27, 2016 at 2:00 p.m. Eastern Time (Doc. 9257 at ¶7.)

3.   Your Declarant requested and was granted leave to appear by telephone at the Final Pre-Trial Conference.

4.   Your Declarant informed the Court that she had a possible scheduling conflict with another matter set for January 27, 2016 at 1:30 p.m. Central Time, which would be 2:30 p.m. Eastern Time and requested that the Final Pre-Trial Conference be set forward to 1:00 p.m., if counsel for the Objector would agree.

5.   Your Declarant's request was conditionally granted, subject to the agreement of counsel for the Objector and counsel for the Objector agreed to have the Pre-Trial Conference scheduled for 1:00 p.m. on January 27, 2016 at 1:00 p.m. Eastern Time.

6.   On January 21, 2016, counsel for the Objector and your Declarant stipulated that the date and time for the Final Pre-Trial Conference would be January 27, 2016 at 1:00 p.m. Eastern Time (Doc. 9533 at Section XII).

1

7.   On the morning of January 26, 2016, your Declarant received a telephone call from Deanna Anderson, Courtroom Deputy for Judge Glenn, informing your Declarant that the Final Pre-Trial Conference would not be held on January 27, 2016 at 1:00 p.m. Eastern Time as jointly agreed, but would be held on January 27, 2016 at 2:00 p.m. Eastern Time, the time which your Declarant had advised the Court presented a potential scheduling conflict.

8.   A Notice of Final Pre-Trial Conference was served upon the Declarant's office on January 27, 2016 by the Objector via Federal Express overnight delivery before 8:00 a.m. Central Time, to which the Declaration of Sara Lathrop and the Objector's Pre-Trial Memorandum was attached.   That Notice was also served by the Objector via Federal Express overnight delivery upon Ms. Smith.

9.   Your Declarant arranged to be physically present at a remote location at the Oneida County Courthouse in Rhinelander, Wisconsin where her other matter set for 1:30 p.m. Central Time was set for hearing.

10.   Your Declarant obtained access to the law library in the Oneida County Courthouse and prepared to call in for the conference set for 1:00 p.m. Central Time (2:00 p.m. Eastern Time).

11.   The telephone number arranged for your Declarant to call in for the Final Pre-Trial Conference had been emailed to your Declarant, who emailed the call in number to Claimant, on January 26, 2016.

12.  When your Declarant was situated in the law library at the Oneida County Courthouse, she was surprised to find there was no remote internet access in the Oneida County Courthouse and she was unable to retrieve the call in number from her email.

13.   Your Declarant first tried to call Jessica Arett, one of the attorneys for the Objector, because she knew the telephone number of Morrison & Foerster by memory, but there was no answer; she then obtained directory assistance and was connected to the Clerk of the United States Bankruptcy Court for the Southern District of Wisconsin and transferred to Judge Glenn's chambers; she left a message for the Courtroom Deputy, Deanna Anderson, informing her that your Declarant was unable to call in for the conference because she could not access the telephone number; she called again and left a message for Law Clerk Sean Mitchell; she then called Jessica Arett again and left the message that she did not have access to the call in number.

14.   Your Declarant's legal assistant was not available to access your Declarant's email because he had a medical appointment at the time set for the Pre-Trial Conference.

15.   Your Declarant acknowledges that one of Objector's attorneys attempted to contact your Declarant by telephone to her main office telephone number (Attorney Jordan Wishnew did not have your Declarant's cellular phone number) at the very same time your Declarant was

2

attempting to contact Attorney Jessica Arett from a remote location.

16.   Attorney Wishnew also sent an email to your Declarant at 2:06 p.m. Eastern Time on January 27, 2016, which your Declarant did not receive because she could not access the internet.

17.   With no internet access, on either her laptop or her cellular telephone, she searched her incoming call log and found the single telephone call from Claimant which had been made to her cellular telephone and called the Claimant.  Claimant informed your Declarant that this matter had been adjourned to February 1, 2016 at 9:00 a.m. Eastern Time and that your Declarant was required to appear in person, or she will be held in contempt of this Court.

18.   Your Declarant has a deposition set for February 1, 2016 in Edina, Minnesota in another matter, which has been rescheduled twice before, first, from January 13, 2016 to January 19, 2016 because your Declarant had just appeared in the case on the day before the Deposition and, second, from January 19, 2016 to February 1, 2016 because your Declarant had become ill on January 15, 2016 and had not sufficiently recovered by January 19, 2016.  Your Declarant is currently seeking to have another attorney appear with her Minnesota client at the Deposition on February 1, 2016 so that she will be able to comply with the Order of this Court entered yesterday as Doc. 9564.

19.   Your Declarant did not ignore the rescheduled time for the Pre-Trial Conference from 1:00 p.m. Eastern Time to 2:00 p.m. Eastern Time on January 27, 2016, was diligently attempting to call in for the conference, but was unable to retrieve the call in number because she was unable to access the internet in order to obtain the call in number from her email.

20.   Had the time for the Pre-Trial Conference not been changed on January 26, 2016 from 1:00 p.m.  Eastern Time to 2:00 p.m. Eastern Time, your Declarant's original plan to appear from a location with a known internet accessibility would have guaranteed her appearance without difficulty, as she had planned to do until the morning of January 26, 2016.

21.   That location is a hotel in Wausau, Wisconsin where she has been allowed Wi-Fi access en route between Minneapolis, Minnesota or Madison, Wisconsin and communities in the Wausau, Wisconsin environs.  Rhinelander, Wisconsin is one hour distant from Wausau, Wisconsin and the 1:30 p.m. Central Time (2:30 p.m. Eastern Time)  proceeding set in Rhinelander, Wisconsin was likely to be delayed until at least 2:00 p.m. Central Time (3:00 p.m. Eastern Time), based on your Declarant's experience with the Court, because initial criminal case appearances are heard at 1:15 p.m. Central Time and civil matters (for which your Declarant was scheduled) are set for 1:30 p.m., but do not usually commence before 2:00 p.m Central Time the criminal docket is cleared.  Furthermore, she could have advised the civil court clerk that she was on her way and the civil matter would not be called until she arrived, as long as she arrived as soon as possible.

22.   Your Declarant contacted the Court and counsel for the Objector to advise them of

3

the circumstances that she was unable to access her email where the call in number had been stored between 1:00 p.m. and 1:15 p.m. Central Time (2:00 p.m.-2:15 p.m.). She finally located Claimant's telephone number and called the Claimant at approximately 1:19 p.m. Central Time.

23.   Your Declarant apologizes to the Court for the technical difficulties she encountered in attempting to call in for the telephone conference on January 27, 2016 at 2:00 p.m. Eastern Time. No disrespect was intended and no finding of disrespect or intentional violation of court processes occurred.

24.   Your Declarant understands that this Court is displeased with the substantive approach taken in the prosecution of the contested claim proceedings, but the substantive issues must be viewed separately from the Declarant's inability to call in to the Court at 2:00 p.m. Eastern Time due to the unavailability of internet access, which she did not anticipate, but for which she had a back up plan: to call in to the Court through its chambers telephone numbers, which was unsuccessful.

25.   While your Declarant is informed and believes that the Court stated that your Declarant had been granted leave to appear telephonically as a courtesy, your Declarant believes that Fed. R. Bankr. P. 1001 provided the basis for the telephonic appearance:

The Bankruptcy Rules and Forms govern procedure in cases under title 11 of the United States Code. The rules shall be cited as the Federal Rules of Bankruptcy Procedure and the forms as the Official Bankruptcy Forms. These rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding.

26.   Ms. Smith has filed an application for in forma pauperis status in these proceedings and on appeal to the United States District Court for the Southern District of Wisconsin.

27.   Your Declarant is paying her own travel costs and expenses for the privilege of representing Ms. Smith in these proceedings as well as the costs of preparing and delivering the evidence binders and all other related out-of-pocket expenses.

28.   The Exhibits attached hereto are true and correct copies of what they purport to be and are offered to briefly demonstrate the merits of Ms. Smith's litigation posture.

29.   Your Declarant has chosen to represent Ms. Smith because Ms. Smith is in danger of losing possession of her Homestead, based on a quit claim deed from Aurora Loan Services, LLC to Nationstar Mortgage, LLC (Nationstar) and from Nationstar to IH4 Property West, LLC dated March 26, 2014, which is ineffective to transfer Ms. Smith's superior interest in the subject real estate because Aurora Loan Services, LLC succeeded only to the servicing rights in the Note and Deed of Trust from GMAC Mortgage, LLC (GMACM), which was the undisclosed successor to the servicing rights of Homecomings Financial, LLC (Homecomings).   See Partial Chain of Title (Exhibit A: Partial Chain of Title) and the 8-K filed with the Securities and Exchange

4

Commission (SEC) on September 28, 2007, executed by Darsi Meyer, in her capacity as a Director of RFC on September 27, 2007. (Exhibit B.)

30. The Note secured by Ms. Smith's Deed of Trust appears to bears a fraudulent, stamped endorsement displaying the signature of Judy Faber, in the capacity as Vice President of Residential Funding Company, LLC (RFC) (Exhibit C: Endorsed Note). Judy Faber was never employed by RFC, much less an officer of RFC. See Exhibit D, the employment record of Judy Faber, produced as Document 15 in the Objector's Production of Documents.

31. The discovery of Exhibit D is new evidence of the violation of California Business and Professions Code sec. 17200, et seq., specifically at sec. 17200, because the use of a fraudulent document to take title to real estate is a fraudulent business act of practice, inextricably intertwined with the concealment of the identity of the party entitled to payments for the purported loan made to Ms. Smith, to which the instruction to Ms. Smith that her loan could not be modified unless she missed three (3) monthly payment was related because the instruction was intended to create a default for the purpose of obtaining third party payments.

32. Ms. Smith's Homestead appears to have been sold at a Trustee's Sale for a credit bid which was based on the debt obligation represented by the fraudulent, stamped endorsement by which Judy Faber, who was a GMACM document manager in the Imaging Department, pretended to be a Vice President of RFC.

33. It would have been expensive to obtain airline tickets and travel between airports and to the Court, as well as a substantial expenditure of time spent traveling.

34. It will be expensive to obtain airline tickets on short notice and obtain other counsel to appear at the Minnesota deposition, for which lawful Notice of Deposition had previously been served, as well as the expenditure of time spent traveling between airports and the Court.

35. There was no disrespect or disregard of the Court's verbal rescheduling of the January 27, 2016 Pre-Trial Conference or the Objector's written Notice rescheduling the hearing and your Declarant makes this Declaration for the purpose of explaining the excusable neglect which led to her inability to participate telephonically in the Pre-Trial Conference on January 27, 2016 at 2:00 p.m., despite substantial, but ineffective, efforts.

36. The Order entered on January 27, 2016 requiring the personal appearance of your Declarant appears to have been entered upon a misapprehension that your Declarant had disregarded the Objector's Notice of the rescheduled time for the Pre-Trial Conference or had otherwise disrespected the processes of this Court, when she did not do so and her neglect to appear is excusable.

37. This Declaration is made in the interests of justice pursuant to Fed. R. Bankr. P. 1001 and in support of the Motion for Relief from this Court's Order of January 27, 2016 (Doc. 9564)

5

pursuant to Fed. R. Bankr. P. 9024, by which the Movants request reinstatement of your Declarant's privilege to appear telephonically for the adjourned Pre-Trial Conference on February 1, 2016 at 9:00 a.m. Eastern Time.

FURTHER YOUR DECLARANT SAYETH NAUGHT.


*/s/ Wendy Alison Nora*

_____
Wendy Alison Nora

# EXHIBIT A

**This page is part of your document - DO NOT DISCARD**



## 20111590675



Pages:
0003

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**11/23/11 AT 08:00AM**

| | | |
|---|---|---|
| FEES: | | 18.00 |
| TAXES: | | 0.00 |
| OTHER: | | 0.00 |
| PAID: | | 18.00 |



**L E A D S H E E T**



201111230260004

00004992655

003638185

**SEQ:**
**19**

DAR - Title Company (Hard Copy)



000304

**THIS FORM IS NOT TO BE DUPLICATED**

T35

2

WHEN RECORDED MAIL TO:

AURORA BANK, FSB
2617 COLLEGE PARK DRIVE
SCOTTSBLUFF NE 69361-2294



11/23/2011

*20111590675*

TRA #    000067
Trust No. 1241071-14

---

MAIL TAX STATEMENT TO:

Same as above

Space Above This Line For Recorder

Documentary Transfer Tax $.00
Grantee was/was not the foreclosing beneficiary.
consideration $362,500.00
unpaid debt $685,480.47
non exempt amount $
___Computed on the consideration or value of
property conveyed.
___Computed on the consideration of value less
liens or encumbrances remaining at time of sale.

Signature of Declarant or Agent
AP# 5033-016-023    **Kolette Modlin**

---

## TRUSTEE'S DEED UPON SALE

09012405570

**CAL-WESTERN RECONVEYANCE CORPORATION** (herein called trustee)
does hereby grant and convey, but without covenant or warranty, express or implied to
**AURORA LOAN SERVICES LLC** (herein called Grantee) the real property in the county of **LOS
ANGELES**, State of California described as follows:

**LOT 23 OF TRACT 11193, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE
OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 202, PAGES 18 AND 19 OF MAPS,
RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID LOS ANGELES COUNTY.**
The street address and other common designation, if any, of the real property described above is purported to be:
**4011 HUBERT AVENUE
LOS ANGELES CA  90008**

This conveyance is made pursuant to the authority and powers vested in said Trustee, as Trustee, or Successor
Trustee, or Substituted Trustee, under that certain Deed of Trust executed by
**TIA DANIELLE SMITH, AN UNMARRIED WOMAN** as Trustor, recorded December 08, 2006, as
Document No. 20062729009, in Book XX, page XX, of Official Records in the Office of the Recorder of LOS
ANGELES County, California; and pursuant to the Notice of Default recorded September 24, 2009, as
Document No. 09-1452803 in Book XX, page XX of Official Records of said County, Trustee having complied
with all applicable statutory requirements of the State of California and performed all duties required by said
Deed of Trust, including, among other things, as applicable, the mailing of copies of notices or the publication of
a copy of the notice of default or the personal delivery of the copy of the notice of default or the posting of
copies of the notice of sale or the publication of a copy thereof.

TDUSCA.DOC

This _____ _____ _____ recorded as an
ACC_____ _____ with no
P_____ _____ _____ upon file"

Page 1 of 2

000302  14

3

TRA #    000067
Trust No.  124107I-14

At the place fixed in the Notice of Trustee's Saie, said Trustee did sell said property above described at public auction on **November 16, 2011** to said Grantee, being the highest bidder therefore, for **$362,500.00** cash, lawful money of the United States, in satisfaction pro tanto of the indebtedness then secured by said Deed of Trust.

CAL-WESTERN RECONVEYANCE CORPORATION

Dated:  November 16, 2011

Susan Smothers, A.VP.

State of California )
County of San Diego)

Rosalyn Hall

On ___NOV 17 2011___ before me, _____,
a Notary Public, personally appeared ____Susan Smothers, A.VP.____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal                              (Seal)

Signature _____

ROSALYN HALL
COMM. #1793727
Notary Public - California
San Diego County
My Comm. Expires Mar. 16, 2012

TDUSCA.DOC                                                      Page 2 of 2

000303

This page is part of your document - DO NOT DISCARD

## 20140346619




**Pages:**
**0004**

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

**04/07/14 AT 08:00AM**

| | |
|---|---|
| FEES: | 40.00 |
| TAXES: | 2,842.00 |
| OTHER: | 0.00 |
| PAID: | 2,882.00 |



LEADSHEET



201404070170003

00009037361



005119157

SEQ:
08

DAR - Title Company (Hard Copy)





THIS FORM IS NOT TO BE DUPLICATED

000237

t21

**Fidelity National Title Company**

RECORDING REQUESTED BY
Prominent Escrow Services, Inc
Order No 56386-998
Escrow No 8061-SAT
Parcel No 5083-016-023

AND WHEN RECORDED MAIL TO

NATIONSTAR MORTGAGE,
350 HIGHLAND DRIVE
LEWISVILLE, TX 76067



*20140346619*

## QUITCLAIM DEED

$2293.75

THE UNDERSIGNED GRANTOR(S) DECLARE(S) THAT DOCUMENTARY TRANSFER TAX IS $858.25 and CITY $——

☒ Computed on the consideration or value of property conveyed, OR
☐ Computed on the consideration or value less liens or encumbrances remaining at the time of sale
  unincorporated area    ☒ Los Angeles    and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

Aurora Loan Services LLC

hereby REMISE, RELEASE AND QUITCLAIM to

Nationstar Mortgage, LLC

the real property in the City of Los Angeles County of Los Angeles, State of California, described as

LOT 23 OF TRACT NO. 11193, IN THE CITY OF LOS ANGELES COUNTY OF LOS ANGELES, STATE
OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 202, PAGES 18 AND 19 OF MAPS, IN THE
OFFICE OF THE COUNTY RECORDED OF SAID COUNTY

Dated    3-26-14

Aurora Loan Services, LLC

By  *Laura McCann*
Name  *Laura McCann*
Title  *Vice President*

STATE OF ~~CALIFORNIA~~ Colorado,
COUNTY OF Douglas      } s s

On  3-26-14      before me,  Karen R Buland Notary Public
personally appeared  Laura McCann - VP.
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies) and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted executed the instrument

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct

WITNESS my hand and official seal

Signature  *Karen Buland*      (Seal)

---

KAREN R BULAND
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20054008735
MY COMMISSION EXPIRES JUNE 12, 2017

---

000233

Mail Tax Statements to Return Address Above

See exhibit B for clarity
8C.

3

**Fidelity National Title Company**

RECORDING REQUESTED BY:
Prominent Escrow Ser ices, Inc.
Order No. 56536-995
Escrow No. 8061-KM
Parcel No. 5033-016-023

AND WHEN RECORDED MAIL TO:

**NATIONSTAR MORTGAGE**
**350 HIGHLAND DRIVE**
**LEWISVILLE, TX 76067**

*Exhibit B*

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## QUITCLAIM DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S) THAT DOCUMENTARY TRANSFER TAX IS ~~$~~ and CITY # ~~~~
$2,263.18

☒ Computed on the consideration or value of property conveyed; OR
☐ Computed on the consideration or value less liens or encumbran es remaini g at the time of sale.
☐ unincorporated area:          ☒ Los Angeles          and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

*(44)*

**Aurora Loan Services LLC**

hereby REMISE, RELEASE AND QUITCLAIM to

**Nationstar Mortgage, LLC**

the real property in the City of Los Angeles County of Los Angeles, State of California, described as:

LOT 23 OF TRACT NO. 11193, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE
OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 202, PAGES 18 AND 19 OF MAPS, IN THE
OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

Dated _____

**Aurora Loan Services, LLC**

By: _____
    Name: _____
    Title: _____

STATE OF CALIFORNIA         }
COUNTY OF _____         }S.S

On _____, before me, _____,
personally appeared _____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _____          (Seal)

000234

I certify under penalty of perjury that the forgoing is true and correct.

_4 , 4 , 14_
Date

A.RUIZ / DPS   Agent

Executed in Norwalk CA.

000235

This is a true and certified copy of the record
if it bears the seal, imprinted in purple ink,
of the Registrar-Recorder/County Clerk

NOV 03 2014

*Dean C. Logan* REGISTRAR-RECORDER/COUNTY CLERK
LOS ANGELES COUNTY, CALIFORNIA

000236

RECORDING REQUESTED BY:

Prominent Escrow Services
Escrow Number: 8061-KM
Parcel No : 5033-016-023

RETURN RECORDED DOCUMENT TO:

IH$ Properties West, L.P.
6320 Canoga Ave, Suite 150 Box 26
Woodland Hills, CA 91367

```
COPY of Document Recorded
2014
03426620       4/7/14
Has not been compared with original.
Original will be returned when
processing has been completed.
LOS ANGELES COUNTY REGISTRAR - RECORDER
```

The above space reserved for the Recorder's Office.

County Transfer Tax: $558.25
City Transfer Tax: ~~$2,282.10~~ 2283.75

## QUITCLAIM DEED

FOR CONSIDERATION, the receipt and sufficiency of which are hereby acknowledged, **Nationstar Mortgage, LLC** ("Grantor").

hereby remises, releases and forever quitclaims to

**IH4 Property West, L.P., a Delaware Limited Partnership**

its successors and assigns, all of Grantor's right, title, and interest to that certain real property in the City of **Los Angles**, County of **Los Angeles**, State of California, as more particularly described on Exhibit "A" attached hereto and incorporated by reference herein.

IN WITNESS WHEREOF, said Grantor has caused this instrument to be executed this ___28___ day of __March__ , 20_19_ .

Nationstar Mortgage, LLC

By: _Gloria A. DeGrosse_
Name: _Gloria A. DeGrosse-Price_
Title: _Asst. Secretary_

DB2/20108664.1

000229    9C

## CERTIFICATE OF ACKNOWLEDGMENT

STATE OF _Colorado_                            )
                                               )
COUNTY OF _Douglas_                            )

On _March 26, 2014_, ~~2010~~, before me, _Florika Baldwin_,
Notary          Public,          personally          appeared
_Gloria A. DelGrosa-Price_ _____ who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s). or the entity upon behalf of which the person(s) acted. executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of
_Colorado_ _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ [SEAL]

```
FLORIKA BALDWIN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20004015689
MY COMMISSION EXPIRES AUGUST 21. 2016
```

DB2/20108664 1

000230

EXHIBIT "A"

LOT 23 OF TRACT NO. 11193, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES,
STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 202, PAGES 18 AND 19 OF
MAPS, IN THE OFFICE OF THE COUNTY RECORDED OF SAID COUNTY.

DB2/20108664.1

A-1

# EXHIBIT B

8-K 1 rali_2007qo1-8k.htm

# UNITED STATES

## SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C. 20549

### FORM 8-K

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of the

### Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported):** September 27, 2007

**Commission File Number of issuing entity:**
333-131213-38

### RALI Series 2007-QO1 Trust

(Exact name of issuing entity)

**Commission File Number of depositor:**
333-131213

### Residential Accredit Loans, Inc.

(Exact name of depositor as specified in its charter)

### Residential Funding Company, LLC

(Exact name of sponsor as specified in its charter)

| DELAWARE | None |
|---|---|
| **(State or other jurisdiction of incorporation)** | **(I.R.S. employer identification no.)** |

8400 Normandale Lake Blvd., Suite 250, Minneapolis, MN        55437
**(Address of principal executive offices)**        **(Zip code)**

Registrant's telephone number, including area code (952) 857-7000

**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions.

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12(b) under the Exchange Act (17 CFR 240.14a-12(b))

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Item 6.02. <u>Change of Servicer or Trustee</u>.

On January 30, 2007 (the "Closing Date"), RALI Series 2007-QO1 Trust (the "Issuing Entity") issued and sold Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QO1. As of the Closing Date, Homecomings Financial, LLC ("Homecomings") and GMAC Mortgage, LLC ("GMACM"), each an affiliate of the master servicer, Residential Funding Company, LLC, and the depositor, Residential Accredit Loans, Inc., acted as subservicers of approximately 85.7% and 14.3%, respectively, by principal balance of the mortgage loans owned by the Issuing Entity.

Residential Capital, LLC ("ResCap"), which owns indirectly all of the equity of both Homecomings and GMACM, has restructured the operations of Homecomings and GMACM. As a result of such restructuring, on September 24, 2007, Homecomings transferred its servicing platform and certain employees responsible for the servicing function to its affiliate GMACM.

Subsequent to the transfer of the servicing platform and employees from Homecomings to GMACM, GMACM became the subservicer for all of the mortgage loans owned by the Issuing Entity, and Homecomings will no longer service any of the mortgage loans. In addition, GMACM will be servicing all of the GMACM and Homecomings servicing portfolios, which will consist of the aggregate of the amounts set forth below under the headings "GMAC Mortgage LLC Primary Servicing Portfolio" and "Homecomings Financial, LLC Servicing Portfolio."

GMACM is a Delaware limited liability company and a wholly-owned subsidiary of GMAC Residential Holding Company, LLC, which is a wholly owned subsidiary of ResCap. ResCap is a Delaware limited liability company and a wholly-owned subsidiary of GMAC Mortgage Group, LLC, which is a wholly-owned subsidiary of GMAC LLC. On August 24, 2007, Fitch Ratings reduced GMACM's residential primary subservicer rating and residential primary servicer rating for Alt-A product from RPS1 to RPS1- and placed the servicer ratings on Rating Watch Negative.

GMACM began acquiring, originating and servicing residential mortgage loans in 1985 through its acquisition of Colonial Mortgage Service Company, which was formed in 1926, and the loan administration, servicing operations and portfolio of Norwest Mortgage, which entered the residential mortgage loan business in 1906. These businesses formed the original basis of what is now GMACM.

---

GMACM maintains its executive and principal offices at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034. Its telephone number is (215) 734-5000.

In addition, GMACM purchases mortgage loans originated by GMAC Bank, which is wholly-owned by IB Finance Holding Company, LLC, a subsidiary of ResCap and GMAC LLC, and which is an affiliate of GMACM. Formerly known as GMAC Automotive Bank, GMAC Bank, a Utah industrial bank was organized in 2001. As of November 22, 2006, GMAC Bank became the successor to substantially all of the assets and liabilities of GMAC Bank, a federal savings bank.

GMACM generally retains the servicing rights with respect to loans it sells or securitizes, and also occasionally purchases mortgage servicing rights from other servicers or acts as a subservicer of mortgage loans (and does not hold the corresponding mortgage servicing right asset).

As of the six months ended June 30, 2007, GMACM acted as primary servicer and owned the corresponding servicing rights on approximately 2,271,474 of residential mortgage loans having an aggregate unpaid principal balance of approximately $284 billion, and GMACM acted as subservicer (and did not own the corresponding servicing rights) on approximately 334,864 loans having an aggregate unpaid principal balance of over $70.5 billion.

The following tables set forth the dollar amount of mortgage loans serviced by GMACM for the periods indicated, and the number of such loans for the same period. GMACM was the servicer of a residential mortgage loan

portfolio of approximately $153.6 billion, $13.9 billion, $17.6 billion and $7.0 billion during the year ended December 31, 2003 backed by prime conforming mortgage loans, prime non-conforming mortgage loans, government mortgage loans and second-lien mortgage loans, respectively. GMACM was the servicer of a residential mortgage loan portfolio of approximately $211.5 billion, $32.0 billion, $18.2 billion and $22.8 billion during the six months ended June 30, 2007 backed by prime conforming mortgage loans, prime non-conforming mortgage loans, government mortgage loans and second-lien mortgage loans, respectively. The percentages shown under "Percentage Change from Prior Year" represent the ratio of (a) the difference between the current and prior year volume over (b) the prior year volume.

### GMAC MORTGAGE, LLC PRIMARY SERVICING PORTFOLIO
### ($ IN MILLIONS)

| | Year Ended December 31, | | | | Six Months Ended June 30, |
| --- | --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| Prime conforming mortgage loans | | | | | |
| No. of Loans | 1,308,284 | 1,323,249 | 1,392,870 | 1,455,919 | 1,485,410 |
| Dollar Amount of Loans | $153,601 | $165,521 | $186,364 | $203,894 | $211,462 |
| Percentage Change from Prior Year | 2.11% | 7.76% | 12.59% | 9.41% | |
| Prime non-conforming mortgage loans | | | | | |
| No. of Loans | 34,041 | 53,119 | 69,488 | 67,462 | 68,062 |
| Dollar Amount of Loans | $13,937 | $23,604 | $32,385 | $32,220 | $32,035 |
| Percentage Change from Prior Year | 11.12% | 69.36% | 37.20% | (0.51)% | |
| Government mortgage loans | | | | | |
| No. of Loans | 191,023 | 191,844 | 181,679 | 181,563 | 175,588 |
| Dollar Amount of Loans | $17,594 | $18,328 | $18,098 | $18,843 | $18,166 |
| Percentage Change from Prior Year | (16.91)% | 4.17% | (1.25)% | 4.12% | |
| Second-lien mortgage loans | | | | | |
| No. of Loans | 282,128 | 350,334 | 392,261 | 514,085 | 542,414 |
| Dollar Amount of Loans | $7,023 | $10,374 | $13,034 | $20,998 | $22,778 |
| Percentage Change from Prior Year | 5.36% | 47.71% | 25.64% | 61.10% | |
| Total mortgage loans serviced | | | | | |
| No. of Loans | 1,815,476 | 1,918,546 | 2,036,298 | 2,219,029 | 2,271,474 |
| Dollar Amount of Loans | $192,155 | $217,827 | $249,881 | $275,955 | 284,441 |
| Percentage Change | | | | | |

from Prior Year          0.71%          13.36%          24.92%          10.43%

## HOMECOMINGS FINANCIAL, LLC SERVICING PORTFOLIO

Homecomings Servicing Portfolio. The following table sets forth the aggregate principal amount of mortgage loans serviced by Homecomings for the past five years and for the six months ended June 30, 2007. The percentages shown under "Percentage Change from Prior Year" represent the ratio of (a) the difference between the current and prior year volume over (b) the prior year volume.

**First Lien Mortgage Loans**

| Volume by Principal Balance | Year Ended December 31, | | | | | Six Months Ended June 30, |
|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Prime Mortgages[1] | $27,343,774,000 | $29,954,139,212 | $31,943,811,060 | $44,570,851,126 | $67,401,832,594 | $72,144,802,385 |
| Non-Prime Mortgages[2] | $27,384,763,000 | $39,586,900,679 | $44,918,413,591 | $52,102,835,214 | $49,470,359,806 | $43,013,399,177 |
| Total | $54,728,537,000 | $69,541,039,891 | $76,862,224,651 | $96,673,686,340 | $116,872,192,400 | $115,158,201,562 |
| Prime Mortgages[1] | 49.96% | 43.07% | 41.56% | 46.10% | 57.67% | 62.65% |
| Non-Prime Mortgages[2] | 50.04% | 56.93% | 58.44% | 53.90% | 42.33% | 37.35% |
| Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| **Percentage Change from Prior Year[3]** | | | | | | |
| Prime Mortgages[1] | 7.09% | 9.55% | 6.64% | 39.53% | 51.22% | - |
| Non-Prime Mortgages[2] | 60.71% | 44.56% | 13.47% | 15.99% | (5.05)% | - |
| Total | 28.55% | 27.07% | 10.53% | 25.78% | 20.89% | - |

**Junior Lien Mortgage Loans**

| Volume by Principal Balance | Year Ended December 31, | | | | | Six Months Ended June 30, |
|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |

| | | | | | |
|---|---|---|---|---|---|
| Prime Mortgages[1] | $7,627,424,000 | $7,402,626,296 | $7,569,300,685 | $7,442,264,087 | $11,418,858,741 | $11,134,597,105 |
| Non-Prime Mortgages[2] | - | - | - | - | - | - |
| Total | $7,627,424,000 | $7,402,626,296 | $7,569,300,685 | $7,442,264,087 | $11,418,858,741 | $11,134,597,105 |
| Prime Mortgages[1] | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Non-Prime Mortgages[2] | - | - | - | - | - | - |
| Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| **Percentage Change from Prior Year[3]** | | | | | | |
| Prime Mortgages[1] | (4.94)% | (2.95)% | 2.25% | (1.68)% | 53.43% | |
| Non-Prime Mortgages[2] | - | - | - | - | - | |
| Total | (4.94)% | (2.95)% | 2.25% | (1.68)% | 53.43% | |

**First Lien Mortgage Loans**

| **Volume by Number of Loans** | **Year Ended December 31,** | | | | | **Six Months Ended June 30,** |
|---|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006** | **2007** |
| Prime Mortgages[1] | 125,209 | 143,645 | 150,297 | 187,773 | 252,493 | 264,077 |
| Non-Prime Mortgages[2] | 257,077 | 341,190 | 373,473 | 394,776 | 361,125 | 316,998 |
| Total | 382,286 | 484,835 | 523,770 | 582,549 | 613,618 | 581,075 |
| Prime Mortgages[1] | 32.75% | 29.63% | 28.70% | 32.23% | 41.15% | 45.45% |
| Non-Prime Mortgages[2] | 67.25% | 70.37% | 71.30% | 67.77% | 58.85% | 54.55% |
| Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| **Percentage Change from Prior Year[3]** | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Prime Mortgages [1] | (6.30)% | 14.72% | 4.63% | 24.93% | 34.47% |
| Non-Prime Mortgages [2] | 52.85% | 32.72% | 9.46% | 5.70% | (8.52)% |
| Total | 26.66% | 26.83% | 8.03% | 11.22% | 5.33% |

## Junior Lien Mortgage Loans

| Volume by Number of Loans | Year Ended December 31, | | | | | Six Months Ended June 30, |
|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Prime Mortgages [1] | 217,031 | 211,585 | 210,778 | 199,600 | 266,900 | 255,804 |
| Non-Prime Mortgages [2] | - | - | - | - | - | - |
| Total | 217,031 | 211,585 | 210,778 | 199,600 | 266,900 | 255,804 |
| Prime Mortgages [1] | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| Non-Prime Mortgages [2] | - | - | - | - | - | - |
| Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |
| **Percentage Change from Prior Year [3]** | | | | | | |
| Prime Mortgages [1] | (5.20)% | (2.51)% | (0.38)% | (5.30)% | 33.72% | |
| Non-Prime Mortgages [2] | - | - | - | - | - | |
| Total | (5.20)% | (2.51)% | (0.38)% | (5.30)% | 33.72% | |

[1] Product originated under the Jumbo, Alt A, High Loan to Value First Lien programs and Closed End Home Equity Loan and Home Equity Revolving Credit Line Loan Junior Lien programs.

[2] Product originated under the Subprime and Negotiated Conduit Asset programs. Subprime Mortgage Loans secured by junior liens are included under First Lien Mortgage Loans—Non-Prime Mortgages because these types of loans are securitized together in the same mortgage pools.

[3] Represents year to year growth or decline as a percentage of the prior year's volume.

*Billing and Payment Procedures.* As servicer, GMACM collects and remits mortgage loan payments, responds to borrower inquiries, accounts for principal and interest, holds custodial and escrow funds for payment of property

taxes and insurance premiums, counsels or otherwise works with delinquent borrowers, supervises foreclosures and property dispositions and generally administers the loans. GMACM sends monthly invoices or annual coupon books to borrowers to prompt the collection of the outstanding payments. Borrowers may elect for monthly payments to be deducted automatically from bank accounts on the same day every month or may take advantage of on demand ACH payments made over the internet or via phone. GMACM may, from time to time, outsource certain of its servicing functions, such as contacting delinquent borrowers, property tax administration and hazard insurance administration, although any such outsourcing will not relieve GMACM of any of its responsibilities or liabilities as a servicer.

---

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**RALI SERIES 2007-QO1 TRUST**
(Issuing Entity)

By: Residential Funding Company, LLC, as Master Servicer

By:___/s/ Darsi Meyer_____
       Name:     Darsi Meyer
       Title:      Director

Dated: September 27, 2007

---

# EXHIBIT C

LOAN NO.   206-989130

**ADJUSTABLE RATE NOTE**          MIN:  1001310-2060989130-2

(MTA-Twelve Month Average Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

| NOVEMBER 13, 2006 | LOS ANGELES | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

4011 HUBERT AVENUE
LOS ANGELES, CALIFORNIA 90008-2621
[Property Address]

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $   556,000.00   (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed ( ONE HUNDRED FIFTEEN PERCENT        ) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is   AMERICAN MORTGAGE NETWORK, INC., A DELAWARE CORPORATION                         .
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

**(A)   Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   1.500  %.  The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)   Interest Rate Change Dates**

The interest rate I will pay may change on the       1ST        day of    JANUARY, 2007   , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C)   Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D)   Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 400/1000        percentage point(s)    3.400  % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than    9.950  %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.    PAYMENTS**

**(A)   Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the    1ST           day of each month beginning on JANUARY 01, 2007 .  I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on DECEMBER 01, 2036      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   P. O. BOX 85302
                                     ATTN:  CASHIER'S DEPT., SAN DIEGO, CA 92186
or at a different place if required by the Note Holder.

LOAN NO. 206-989130

**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S.
$ 1,918.87 unless adjusted under Section 3 (F).

**(C) Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the 1ST day of JANUARY, 2008 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.
I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E) Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to 115 percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G) Required Full Payment**
On the TENTH Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are **greater** than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:
    (i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
    (ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
    (iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.

**PayOption ARM Note - MTA Index**
FE-5312 (0511)                Page 2 of 4

LOAN NO.   206-989130

**4.   NOTICE OF CHANGES**
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.
I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**
**(A)   Late Charges for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00   % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

**(B)   Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)   Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)   No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)   Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

LOAN NO.   206-989130

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

   **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

   If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

   To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

   If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

RIDER TO THE NOTE AND SECURITY INSTRUMENT ATTACHED AND MADE A PART HEREOF.

_____ (Seal)
TIA DANIELLE SMITH                                -Borrower

_____ (Seal)
                                                  -Borrower

_____ (Seal)
                                                  -Borrower

_____ (Seal)
                                                  -Borrower

Pay to the Order of:

RESIDENTIAL FUNDING COMPANY, LLC
Without recourse,

American Mortgage Network, Inc.,
a Delaware Corporation

By: _____

Name: Tiffany Rice

Title: Funder


PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Company, LLC

BY _____

Judy Faber, Vice President

NOTE ALLONGE
==================================

For purposes of further endorsement of the following described
Note, this Allonge is affixed and becomes a permanent part of
said Note:

Loan #: 0021796453

Executing Mortgagor:  TIA DANIELLE SMITH

Original Mortgage Amount: $556,000.00

Original Lender: AMERICAN MORTGAGE NETWORK, INC., A DELAWARE
CORPORATION.

Loan Date:  NOVEMBER 13, 2006

Property Address: 4011 HUBERT AVENUE, LOS ANGELES, CA 90008-2621

Pay to the order of: AURORA LOAN SERVICES LLC

Without Recourse

By: _____

Name: _____

Title: _____

Company: Deutsche Bank Trust Company Americas as Trustee FKA
Bankers Trust Company, as Trustee by Residential Funding
Company, LLC FKA Residential Funding Corporation, it's Attorney
in Fact

# EXHIBIT D

| ID | Name | DeptID | Dept | Function Descr | Job Title | Mgr Level | Bus. Desc. | Hire Date | Rehire Dt |
|---|---|---|---|---|---|---|---|---|---|
| █████ | Faber,Judy A | █████ | Imaging Services | Servicing/Operations | Mgr Document | Manager | GMAC Mortgage | | 3/25/1997 |

P:\Bankruptcy\73214-1\Tia Smith Document Production\Judy Faber Employment Information.docx

BT 000865