UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

RESIDENTIAL CAPITAL, LLC, et al.,
    Post-Effective Date Debtors                         Chapter 11
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
RESCAP BORROWER CLAIMS TRUST,                     Case No. 12-12020-mg
    Objector
v.
TIA DANIELLE SMITH,
    Creditor-Beneficiary

---

DECLARATION UNDER PENALTY OF PERJURY
AS DIRECT TESTIMONY OF M. NAWAZ RAJA
AND OFFER OF PROOF BY EXPERT TESTIMONY

---

M. Nawaz Raja declares, under penalty of perjury pursuant to 28 U.S.C. sec. 1746:

1. I am over the age of eighteen years and qualified to make this affidavit. I have no direct or indirect interest in the outcome of the case at bar for which I am offering my observations, analysis, and testimony. Any opinions offered herein are submitted as Offers of Proof and appear in bold font, because I have been informed that this Court has not permitted expert testimony in this contested claims proceeding.   Other than the opinion evidence submitted as Offer of Proof, all statements in this Declaration are based on my own personal knowledge from my own research and investigation and are primarily founded public records and official publications, which are submitted as upon judicially noticeable adjudicative facts under Fed. R. Evid. 201 or certain documents have been stipulated between the parties as being authentic and/or authentic and admissible in these proceedings.

2.   I am a Mortgage Forensic Auditor. My resume is attached and incorporated herein. **My area of expertise, based upon knowledge, training, and experience is in the field of securities, the securities industry, derivative securities, securities regulation, special purpose vehicles, structured investment vehicles, creation of trusts pooling agreements, issuance of asset backed securities and specifically mortgage backed securities by special purpose vehicles in which an entity is named as trustee for the holders of certificates of mortgage backed securities. The Trustee Disclaims any economic interest in the mortgage loans the economics of securitized residential mortgages, securitization of mortgage loans, accounting in the context of said securitizations and REMIC vehicles and pooling and servicing of securitized loans.**

1

**3. I have knowledge, training and experience of various precursor asset protection strategies, including minimization of tax liability, which also are constructed to be made bankruptcy remote in commercial and real estate settings.**

**4. I have knowledge, training and experience in loan originations, underwriting and the assignment and assumption of securitized residential mortgage loans.**

**5. I also have knowledge, training and experience, including the areas of securities, real property, Internal Revenue Code as applicable to REMICs and Uniform Commercial Code. I also have knowledge, training and experience in the practices prevalent during the period of 2001-2009 that enabled the accumulation and availability of an overwhelming abundance of investment dollars, made possible because the derivatives sold to investors were made to appear that they contained both exceptional growth and zero risk, back the history of mortgage success up to that point in time had been high, and because these instruments were in addition made to appear undeniably and excessively guaranteed by 3rd party sources.**

**6. I also have knowledge, training and experience that this abundance of funding was one of the direct and inevitable causes of violations against homeowners and purchasers pertaining to funding of mortgage loans for purchase and refinancing, including predatory lending practices and Truth in Lending Act Violations.**

7. All factual testimony made by me is true and correct to the best of my knowledge and belief. **All opinion testimony made by me is beyond a reasonable degree of probability in my area of expertise, which is set forth in the above paragraph and in my resume.**

8. I have no direct or indirect interest in the outcome of the case at Bar for which I am offering observations, analysis, opinions and testimony.

9. I have been asked to testify to the facts sets forth herein and **would render opinions pertaining to the above case**, in which Claimant was the Homeowner and is identified as the Borrower on the the Mortgage Note ("Note") and held title to the subject real estate until title was purportedly conveyed by Cal-Western Reconveyance Corporation, as grantor, to Aurora Loan Services, LLC as grantee on November 16, 2011.

10. The original nominal Lender according to said documents is American Mortgage Network, Inc.

11. I am personally familiar with the public records and official publications, which are submitted as upon judicially noticeable adjudicative facts under Fed. R. Evid. 201 or certain documents have been stipulated between the parties as being authentic and/or authentic and admissible in these proceedings.

**12.  I have evaluated the materials identified herein for my statements of fact and have reviewed other materials, facts and data in basing my opinions and inferences. Each of these documents and other materials, facts and data are of the type that expertise in my field would customarily rely upon in forming opinions and inferences.**

13.  The information sources I have reviewed were authentic, reliable, admissible (subject to objections) and are sufficient for me to testify as to the facts recited herein.

14.  Where additional information was considered it was considered as the basis for express opinions on further subject matter I have so stated.

15.  The documents were presented to me by Claimant's counsel for review, analysis and where expressly stated, opinion.

16.  The chain of transfers which have been documented in Claimant's case are flawed on their face and are plainly observable to the ordinary person.  The legal consequences of the flaws are left to the Court's determination, as I do not presently have permission from this Court to provide my opinion as it might bear on legal determinations and Claimant's counsel will not presently argue the issue of whether any witness can claim to be an expert in matters of law and she will object if any witness for the Objector attempts to express such an opinion.

17.   Counsel for the Claimant will present her argument to the Court as to the legal consequences of all evidence to be submitted in these proceedings.

18.  Concerns about securitization of Claimant's collateral documents (Note and Deed of Trust) raise issues of chain of title and effects the validity of the title to the real estate where she presently resides and which was her Homestead and may yet be returned to her by a proper adjudication by a court with the subject matter jurisdiction.  If the collateral documents were not properly transferred under lawful authority or make false claims to the beneficial interest in the subject real estate located in Los Angeles County, California, then the participants in the nonjudicial foreclosure process may not have lawfully foreclosed Claimant's interests in the subject real estate.

19.  In the present case, the "Nominal Lender" American Mortgage Network, Inc. sold the Claimant's collateral documents to Wachovia Bank, N.A. (Wachovia), now known as Wells Fargo Bank, N.A., by merger) for a sales commission.  Wachovia purportedly sold the collateral documents to Residential Funding Company, LLC (RFC) for liquid funds to be transmitted by wire,  which then purportedly sold the collateral documents to Residential Accredit Loans, Inc., which purportedly exchanged the collateral documents with Deutsche Bank Trust Company Americas for certificates of beneficial interest in the RALI Series 2007-QO1 Trust.  Those securities were sold it to presently unidentified third party investment banks, who marketed the securities to Investors through dealers and agents.   At each stage liquid funds were received for the collateral documents, which was not disclosed to the Claimant at closing or after the closing

3

until the date of this Declaration.

20.  It is apparent from the judicially noticeable records and stipulated documents in these proceedings that the collateral documents were was sold prior to her settlement on December 2, 2006 to be used as collateral for an Asset Backed Security.

21.  The securitization process is complicated, requires several properly executed transfers and then recording in the County Lands Records. If at any point the required legal steps are not followed to the letter, then the party attempting to enforce the Note and Deed of Trust would be without a recourse to the subject real estate, absent equitable relief from a court with subject matter jurisdiction, and the ownership of the beneficial interests in the subject real estate would be subject to challenges by those whose title prior to securitization would be superior, such a Claimant in this case.

22.  The Homeowner Claimant signed a Promissory Note and the Investor received a "BOND," both are not the same, having the different terms, and Claimant was not the party in the "Bond" deal.  Claimant's identity, personal information, Homestead, credit rating, was earning capacity was electronically transferred for the benefit of third parties and for their profit, without disclosure and with Claimant's knowledge, consent and permission.

**23.  The issues in the mortgage securitization process are highly technical, but they are extremely serious. At best they present problems of fraud on the court, fraud on borrowers and clouded title to property.**

24.  The issues are no more technicalities than the necessity of have a Homeowner's signature on a Note and Deed of Trust.  Cutting corners only improved the speed of the securitization process, may have temporarily created economic efficiencies, but it undermines its legal viability.

25.  Deutsche Bank Trust Company Americas was hired to manage the Trust by the Depositor, Residential Accredit Loans, Inc. (RALI), an affiliate of Residential Funding Company, LLC (RFC) and the duties of the Trustee are just the administrative as per section 8.01 of the Standard Pooling and Servicing Agreement (PSA) for the RALI Series 2007-QO1 Trust, referenced in the Prospectus filed with the SEC on January 31, 2007 . by the securitization partners, who have admitted therein that the collateral documents have been sold to various parties for cash.

26.  According to the "PSA" section 8.01 Deutsche Bank Trust Company Americas has acted and is still acting ultra-vires because the True Sale is from Depositor (Residential Accredit Loans, Inc., an affiliate of Residential Funding Company, LLC.) to the Securities underwriters, which are presently unknown, in this case, and not to the Trustee, "Deutsche Bank Trust Company Americas" in this case.  The transaction between the issuer of the securities, the RALI Series 2007-QO1 Trust (the Trust) and RALI was an exchange of the collateral documents

depicted on a spreadsheet produced by RALI for certificates of beneficial interest in the Trust.

27.  The events of payments of Credit Default Swaps, the AIG Bail-Out,  payments from various forms of insurance were trigger events which caused the Trust to dissolve (if it was ever created by Declaration, as required) and Deutsche Bank Trust Company Americas is no longer acting as Trustee of the Trust, RALI Series 2007-QO1 Trust.

28.   If irregularities in the foreclosure process reflect deeper failures to properly document changes of ownership as collateral documents were securitized, then it is possible that Treasury is dealing with the wrong parties in the course of the Home Affordable Modification Program (HAMP).  That would  mean that Homeowners either received or were denied modifications improperly.

29. I use the following definition of "Creditor" taken from research in cases, the Bankruptcy Code and the Uniform Commercial Code. A "Creditor" is a legal entity that has advanced funds, goods or services in consideration of the right to payment, or has purchased the right to be paid. A "Creditor" is an entity that had a Claim against Debtor before the case was filed. 11 U.S.C  101(10). A "Claim" is a right to payment. § 101(5). Only a Creditor may file a Proof of Claim. § 501(a). The "Official Form 10 reflects this requirement by describing the Name of Creditor as "the person or other entity to whom the debtor owes money or property."

30. In the context of securitized residential mortgages (including the one in the instant case), a "Creditor" is a legal entity or group of entities or persons under the law who have advanced money for the funding of mortgage loans and who are owed money from those mortgage loans.

**31. The party entitled to enforce the Note/owner of the beneficial interest in the Deed of Trust in the a securitized mortgage transactioncan be generically described as an Investor, (which Claimant reports has not been disclosed to her in spite of repeated requests). An Investor, as defined under the rules and regulations of the Securities and Exchange Commission, is one who has paid money to an intermediary in a chain of securitization that resulted in the funding of one or most residential loan transactions; the promise to pay is from an entity usually referred to as a Special Purpose Vehicle (SPV) which is the frequently erroneously referred to as a Trust with a "Trustee," in this case is Deutsche Bank Trust Company America.**

32. The creditor/Investor receives an instrument which is generically referred to as a Mortgage Backed Asset Certificate/Bond ("Certificate/ Bond"). The Certificate/Bond incorporates terms by which the promise to pay interest and principal is made by the issuing SPV and the manager for this is Deutsche Bank Trust Company Americas in the present case.

33.  The Investor purchases an "Asset-Backed Security" or Certificate/Bond which is not an obligation of the Homeowners whose collateral documents sold multiple times in the

securitization process, even if all stages were correctly and successfully performed— there were parties, documents, agreements and corresponding duties and obligations existing in the UNDISCLOSED MIDDLE.

34. The promise to pay the Certificates/Bonds is conditioned upon several terms, including but not limited to the performance of pool of loans, the obligations of third parties, credit enhancements, including, in this case, fraud and hazard insurance policies, as well as the receipt of insurance proceeds triggered by partial non-performance of the pool of assets allocated to the SPV.

35. The SPV pool is carved out of other pools created by Aggregators employed by investment banking firms. The Aggregators are parties to Pooling and Service Agreements and Assignment and Assumption Agreements, which are Securitization documents that predate the funding of the loans in any of the Pools. The Certificate/Bond issued to the Investor conveys a percentage interest in the Pool of assets that is allocated to the SPV.

36. I am usually asked to render an opinion as to the factual basis pertinent to the issue of Standing, but and make the following Offer of Proof:  As relates to Constitutional Standing, my opinion is premised on the following definition:

> Constitutional standing under Article III requires, at a minimum, that a party must have suffered some actual or threatened injury as a result of the other party's conduct, that the injury be traced to the challenged action, and that it is likely to be redressed by a favorable decision.

37. My presumption, in the context of that question, is that standing requires that a party will suffer financial loss derived from non-performance (i.e., non-payment) of the subject contract, which in this case is the obligation that arose when the subject loan was funded on behalf of a Homeowner. Since the funding occurred out of a pool of money received by the investment banker from the investors, the investors are creditors, which in the present case were not disclosed to the Claimant. By the way indenture (usually incorporation a prospectus) the investors agreed to an operating plan that defined the functions of the conduit which was used to funnel funds to the investor from the pool. This operating plan is loosely and erroneously referred to as a trust ("RALI Series 2007-QO1 Trust" in this case), with the manager referred to as a Trustee ("Deutsche Bank Trust Company Americas" in this case). However, the collateral documents are required to remain static in the conduit which is defined under the Internal Revenue Code as REMIC (Real Estate Mortgage Investment Conduit) 26 U.S.C. sec. 860D. The REMIC is referred to in the world of finance as an SPV (Special Purpose Vehicle). I presume the words "conduit" and "vehicle" convey the fact that no actual business events of taxable or monetary significance takes place in the REMIC. I conclude that this corroborates my opinion that the investors, which have not been disclosed to the Claimant, are the creditors, having been the only parties to advance funds from which the subject loan was funded.

6

38.   In this case, I would have been rendered an opinion that Aurora Loan Services, LLC was not the beneficiary of the Deed of Trust, being only the servicing agent for the investment pool.

39.   In my expert opinion, having researched, analyzed and studied the MERS® System for many years and having instructed lawyers and judicial officers on the MERS® System at their request, Mortgage Electronic Registration Systems, Inc. could not assign Claimant's Note, even if it was actually capable of authorizing the Assignment of Deed of Trust, because it holds no notes and receives no payments.

40. The Notes signed and the Certificates/Bonds accepted by the Investors who purchased said security are both evidence of the obligation.

41.   The Mortgage/Deed of Trust is incident to the Note and and might arguable be incident to the "BOND," if the chain of title was perfected, which is not perfected in this case, as mentioned above.

42. The Payees on the Notes and the Payees of the Certificate/Bond are different parties.

43.   The bonds were issued with three principal indentures:

(1) Repayment of principal non-recourse based upon the payments by obligors under the terms of notes and mortgages in the pool;

(2) Payment of interest under the same conditions; and

(3) The conveyance of a percentage ownership in the pool of loans, out of what is collectively 100% of the entire pool of loans, usually represented only by data on spreadsheets.

44.   The Homeowner signed a Note and the actual, not "nominal," Lender received  a Bond in certificated or uncertificated form. Those are two different commercial instruments. Homes are literally being given to servicing agents and others who never put a dime into the "mortgage loan" (collateral documents) which acquired in the names of unlicensed securities dealers ("Nominal Lenders") to be sold to the undisclosed funding source for a commission.

45.   The "METHOD OF DISTRIBUTION" offered to Investors is generally standardized and provides ordinarily includes, at a minimum:

(1) Repayment of principal non-recourse based upon the payments by obligors under the terms of notes and mortgages in the pool

(2) Payment of interest under the same conditions and

(3) The conveyance of a percentage ownership in the pool of loans and

(4) Various credit enhancements, including, but not limited to some of all of overcollateralization and insurance policies, and may include swaps.

46.   None of the known participants in the subject securitization chain, including but not limited to entities mentioned above herein, has suffered any financial loss relating to the loan, nor are they threatened with any future loss even if foreclosure never occurs, except those with the repurchase obligation and they must repurchase the collateral documents for value first.

47.   None of the known securitization participants has ever been the real party in interest as a lender or financial institution underwriting a loan while funding the same with respect to the loan, except those with the repurchase obligation and they must repurchase the collateral documents first.

48.   None of the known securitization participants will suffer any monetary loss through nonperformance of the loan, except those with the repurchase obligation set forth in the Trust Prospectuses, Supplemental Prospectuses and Pooling and Servicing Agreements (PSA) and those with the repurchase obligation would be required to repurchase the collateral documents first.

49.   All of the known securitization participants received fees and profits relating to the loans.

50.   The existence and identity of the real parties in interest are withheld from the Homeowners who are being sued for foreclosure, receiving notices of Trustee's sales or are seeking loan modifications.

51.   All of the known securitization participants fail to meet one or more of the following two tests required for Holder in Due Course ("HDC") status:

(1) Without actual knowledge of defects; and/or

(2) Without notice of facts constituting the Note-makers' claims and defenses;

(3) In good faith, meaning a legitimate belief that the loan had been transferred to them old, based upon the information they had at the time of purchase of the Note.

52. Specifically, pursuant to the materials I have reviewed, which I have been asked to assume includes all evidence presented to the Court and the judicially noticeable documents, along with my knowledge and experience involving securitized mortgages, and my training and knowledge and experience involving securitized mortgages, and my training and experience, it is

certain that none of the parties who have been disclosed to Claimant in her search for a loan modification or in defense of her Homestead because any of them were

(A) Holder of the Note;

(B) Owner of the Note; or

C) Party with the right to enforce the Note.

52.  Except for misleading documents created without lawful authority and capacity, none of the following held any interest at all in the Property, Note nor Mortgage/ Deed of Trust at the default was created by instructions to Claimant to skip three (3) monthly payments or any time thereafter:

1. American Mortgage Network (December 2, 2006 Note)

2. RALI 2007-QO1 (April 11, 2008 letter from Aurora, Exhibit H, Smith Third Amended Complaint (TAC)

3.  Aurora Loan Services, LLC (on multiple loan modifications proposals transmitted by Aurora, Exhibits O-S, TAC)

4. Deutsche Bank Trust Company Americas, as Trustee (for an unidentified trust) (November 9, 2009, Response to QWR, TAC, Exhibit T)

5. Deutsche Bank National Trust Company Americas, as Trustee (for an unidentified trust) (August 23, 2011, Exhibit W)

6. Aurora Bank, FSB which issued a 1099-A to Claimant, which she received between December, 2011-January, 2012 (TAC, Exhibit N)

7. Deutsche Bank National Trust Company Americas, as Trustee (a nonexistent entity) (retrieved, June 19, 2012 from the MERS® System database, TAC, Exhibit M)

8.  Aurora Loan Services, LLC (per October 25, 2012 judicial admission of Laurie Howell, Attorney for Aurora Loan Services,  who states that "Deutsche Bank" is the investor who provided the funds for the loan, not the Lender or Beneficiary for purposes of the Note and Deed of Deed)

9.  Wachovia, first identified in the electronic document production as Doc. 39 on January 13, 2016 as the entity which owned the Note and Deed of Trust on December 18, 2006 and which was arranging to sell the collateral documents to RFC through JP Morgan Chase, demonstrating the RFC had contracted to purchase the collateral

9

documents

10.  RALI, according to SEC filings, purportedly purchased the collateral documents for "deposit" into the RALI 2007-QO1 Trust

53.  Due to major trigger events, which involved having too many loans in default for more than 90 days to meet the distribution requirements, the AIG Bailout and insurance proceeds from "MBIA", "Ambac," "FGIG" and many other insurance companies, it is more likely than not that the Trust has been dissolved.

54.  The Investor is still the Creditor if the investor has not sold, transferred or alienated the hybrid mortgage backed security and if the investor has not been directly or indirectly paid through credit default swaps, with or without subrogation, or paid through a federal program with or without subrogation. Since no such instruments appear on record, any right of subrogation would appear to be equitable.

55.  These Investors are generally not been identified and servicing agents frequently claim to be Lenders, a practice has been intentional, in my opinion, based on overwhelming commonality of this obvious reoccurring failure, and other overwhelming evidence.

56.  The THIRD PARTY SOURCES of funding that could conceivably lose as result of Claimant being advised not to make three (3) payments, which triggered claims for payment by the RESCAP Debtors, who would have paid value prior to default or notice of default, fall within one or more of the following classifications:

1.  The Certificate/Bond Investors;

2.  Insurers that paid some party on behalf of said investor;

3.  Counterparties on Credit Default Swap;

4.  Conveyance or constructive trusts arising by operation of law through cross collateralization and over collateralization within the aggregate asset pools or later within the Special Purpose Vehicle tranches ("tranches" is an industry term of art referring to the types of division within a Special Purpose Vehicle);

5.  The US Treasury Department through the Troubled Assets Relief Program in which approximately $ 600 Billion of $ 700 Billion has been authorized and paid to purchase or pay the obligation on "TROUBLED" (non performing) assets of the loans are part of the class of assets targeted by "TARP;"

6. The United States Treasury on obligations to the Federal Reserve Banks, almost always the Federal Reserve Bank of New York, which have extended credit on said troubled

assets and has exercised options to purchase said troubled assets, through the Maiden
Lane LLC, Maiden Lane II, LLC and Maiden Lane III, LLC

7.  Any other party that has traded in Mortgage Backed Securities ("MBS") from the
aggregated pools or securitized tranches containing interests in the Notes and Mortgages.

**57. Thus for purposes of this declaration, the unknown and undisclosed Investors
constitutes the only Creditor presumed to exist until the undersigned is presented with
contrary evidence of the type that an expert in my field of expertise would normally take
into account in forming opinions and conclusions.**

**58. In the case at bar, it is my opinion based upon a reasonable degree of financial
analytical certainty, that the total fees and profits generated were actually in excess of the
principal stated on the note which is to say that investors unknowingly placed money at
risk the amount of which vastly exceeding the funding on the loan to the borrower.**

**59. The only way this could be accomplished was by preventing both the
Homeowner/Claimant  in this case and the Investor (undisclosed) from accessing the true
information, which is why the industry practice of the strawman nominees and
beneficiaries (like Mortgage Electronic Registration Systems, Inc.) has been deployed,
when Mortgage Electronic Registration Systems, Inc. was not Creditor.  Even where
Mortgage Electronic Registration Systems, Inc. is not specifically named in the originating
documents presented to the Homeowner at the "closing" it was industry practice from
2001-2009 to utilize MERS® System-like "Services," or to implement practices similar to
those utilized by MERS.**

60.   The transaction was made to appear to be a mortgage loan was part of a two-way
transaction in which the two parties at each end thereof each purchased a "FINANCIAL
PRODUCT."  On one side, the home buyer or the refinancer was "sold" a residential home loan.
On the other end, the Mortgage Bond was sold to an investor. In my opinion, both financial
products were securities (Unregistered and unregulated Security). As mentioned in the
Prospectus 424(b) 5, "THESE SECURITIES HAVE NOT BEEN APPROVED OR
DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE
SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE
COMMISSION OR ANY STATE SECURITIES COMMISSION", therefore the parties were
selling the unregistered and unregulated securities.

61. Neither set of securities were properly registered or regulated, and the information
that would reveal the identity of the "LENDER" is in the sole care, custody and control of the
loan servicer or another intermediary conduit in the securitization chain, including but not limited
to the trustee or depositor for the special purpose vehicle ("SPV") that re-issued the
Homeowner's Note and Mortgage or Deed of Trust as a "DERIVATIVE HYBRID DEBT
INSTRUMENT " ("BOND") and equity instrument (Ownership of percentage share of pool

assets, of which the subject loan was one such asset in said pool.

62. Said Security, the Bond, that was sold to an investor was done by use of borrower's identity and obligation without permission. **In my opinion, it is equally probable that the investors were kept unaware that a maximum of only 2/3 of their investment was actually going to be used to finance the mortgage loans for Claimant and other similarly situated, with the excess being used to create instant income for participants.**

63. Claimant unaware that such large profits or premiums were being generated by virtue of her identity and signature on the purported loan documents.

**64. It is also my opinion, that there is a very high probability that all or part of the Homeowner's Note was paid in whole or in part by the third parties, based upon the industry practice, my personal review of hundreds of similar transactions including the one at bar, and the published reports. Until such time the identity of the creditor, the document trail, and precise money pertaining to payments by third party sources is disclosed, neither Affiant, nor the court will be able to determine the amounts of Homeowner's equity in the property that has been taken by false foreclosure actions brought by mortgage servicing agents or in the name of Mortgage Electronic Registration Systems, Inc., the latter only up to July, 2011.**

65. Claimant's "OBLIGATION" is the amount of the money owed to the creditor, which are none of the entities involved in this case. The obligation originated with the advance of capital by the investor who purchased mortgage backed securities and ended with the promise to pay by the homeowner who is borrower in the transaction. The securitization chain obscures the fact that the Investor was the Creditor of the Homeowner, which can only sue in the name of the Trust, through its Trustee, whose servicing agent must disclose the identities, capacities and relationships between the parties.

**66. Further, based upon repeated interactions with servicers across the country and specific documents reviewed in this case, it is highly unlikely that any of the current parties in litigation have or desire to have any knowledge of third party debits or credit transaction in the securitization chain of the transaction originated from the subject of this action.**

**67. Hence, based upon the industry practice, it is my opinion that it is far more likely than not they would be ignorant of the true status of the amount of principal or interest due, if any on the subject obligation.**

68. Whether the Homeowner's Note is or ever was in default, a fact that can only be known by the real creditor, the investment bank that is the party in charge of the securitization management decisions. Based upon experience with the parties claiming an interest in the financial product sold to the homeowner in this case and their behavior and method of operating

12

as demonstrated in other case, it is my opinion that none of the participants, with whom the borrower had contact, individually or collectively, has knowledge, or has done due diligence to determine the existence of a default as to the creditor, nor whether as a factual matter, the Note, Mortgage/Deed of Trust or obligation has been extinguished or paid in whole or in part by co-obligors, insurers, Federal Bailouts and / or etcetera.

**69. The reason "as a factual matter" is emphasized is that Investment Bank in charge of the entire security, never intended to credit any Homeowner accounts for payments by these third parties sources. Considering the fact that Declarant is aware of many dozens of times in which there is a pending action to enforce a mortgage and to foreclose upon the home in which information providing the identity of the creditor and the fact that third Party payments have been made on behalf of Homeowner's obligation, it is my opinion that this behavior is intentional and designed to obscure the facts long enough for the court to presume that the action taken to collect on the debt or foreclose on the home was reasonable and proper.**

70. I have also reviewed published financial accounting standards obviously intended for auditors involved in auditing and rendering opinions on the financial statements of entities involved in securitization, securities issuance and securities sale and trading. If the known parties in securitization scheme followed the rules, they did not post the instant transaction as a loan receivable. The transaction most likely was posted on their ledgers as fee income or profit which was later reported on their income statement in combination with all other such transactions. These rules explain how and why the transaction was posted on or off the books of the ledger originating entity. These entities adopted the use of the name Mortgage Electronic Registration Systems, Inc. As nominee/beneficiary although the name of Mortgage Electronic Registration Systems, Inc. doe not appear as Lender's agent on the Note.

71. The REMIC Trusts, prior to dissolution by trigger events, is for the current receivables and when the loan is in default it is removed from the Trust.

**72. The standard industry practice of creating a yield spread premiums between the warehouse line of credit provider and originator was extended in the case of securitization chain such that in this case, in my opinion, it is highly probable, for beyond 50% probability that the collateral documents rights to receive payments thereunder were sold or presold to the investors at a gross profit to the participants in the securitization chain of at least 35% of the total principal balance of the note. It is also my opinion that this was done without full disclosure to the investors.**

**73. In my opinion, the investors were and remain completely unaware of the multiple sales of the collateral documents and that, in many cases most of the money they supplied was used to fund fees for the participants in the securitization chain, with the rest used to fund bloated mortgage loans based upon inflated appraisals by companies that had a less than an arm length relationship with the originator and others involved in obtaining**

13

**approval for the loan. These yield spread premiums far exceed those ever paid prior to the securitization of the residential mortgages. With yield spread premiums such as these, there was no way that there could ever be a legitimate profit made by any Investor under ordinary circumstances, with the exception of those in upper tranches, whose profit was insured from the start, no matter how lacking in viability were these investment vehicles on the whole, because of the way payments to the Investors were prearranged.**

**74. It is my opinion that the overall security was planned by the aggregator and other participants to fail from the start. The reason for the intended failure of the overall pool in my opinion was to better insure that the fraud perpetrated on the Investors would be less likely to be discovered and to make it so that additional unearned profit could be made by the aggregators and the other participants, based on the third party payments discussed above that were payable only when there was a declaration of default by the pool, often called a "trigger event."**

75.  A large number of loans doomed to fail from the start, especially the option ARMS and the subprime teaser rate products (such as that offered to Claimant) the designer of the unregulated securities offering and major participants could be certain that the mortgage pools as whole would fail, because:

a. Homeowners paid as much as double what the homes were actually worth, due to a real estate market that was artificially inflated because of the wealth of investment dollars looking for a home following the bursting of the dot.com bubble, followed by what amount to an economic depression for the working poor.

b. Homeowners could not upward-adjusted payments and they were losing their homes, and the unbelievable abundance of foreclosures shows the extent to which any defect in character they may have in common to large numbers of persons.

c. Appraisal values were often over-inflated even above the artificially high values provided by the market and appraisers were advised they would not receive further business unless they cooperated.

d. Homeowners were misled as to what the monthly payments would be a few years into the loans.

e. In more extreme cases, borrowers were often offered teaser rates that they qualified for, but which greatly increased within a very short period of time.

f.  There was so much investment money looking for someone to borrow it that could sign a note during this time, that loans were pushed at people with persuasive and high pressure tactics.

g.  Some targets  were advised that they could afford much more home then they really

could. It appears hard to resist a home that is much nicer than one thought they could afford, when someone that appears to be reputable professional assures them they can afford. Optimism and wishful thinking overpower reason.

h. Loan brokers were pushed to offer loans that were on worse terms than the applicants borrowers could qualify for. Sometimes they received higher commissions, often in secret (Yield Spread Premiums "YSP"), for getting people to take out loans on terms that were less beneficial than a loan that borrowers would have qualified for. And sometimes the only loan products that loan brokers had available to them were those containing unfavorable terms.

i. Homeowners were advised that they did not have to worry about the payments being unaffordable in the future, because they would be definitely be able to refinance again at that point, because was so solid.

j. Underwriters were pushed by their supervisors to pass through bad loans, many of which were obviously doomed to fail from the start.

76. These undisclosed yield spread premiums ("YSP Tier-I, II and III") are a liability of the participants in the securitization chain, including the loan originator and all participants owed to Homeowner /Borrower. In my opinion, this disclosure does not appear on any of the Homeowner's documents identifying the parties participating in fee – splitting or yield spread premiums nor the amounts involved as required and other Federal and State laws. Further, no information appears in Homeowner's closing documents that would have caused him or her to inquire about such a premium.

**77. Accordingly, the only potential party to a foreclosure wherein the purported creditor alleges financial injury and therefore a right to collect the obligation, enforce the note or Mortgage/Deed of Trust is either a party who has actually advanced cash and stands to lose money or an authorized representative who is required to disclose its principal in civil litigation (Cf. Fed. R. Civ. P. 17), provide proof of service or notice and show such express, unequivocal and complete authority to perform all acts and make all decisions without condition.**

**78. In my opinion, any condition placed upon the trustee to act for the MBS Pool Certificate Holders, including the power to enter into any compromise, makes the Trustee, "Deutsche Bank Trust Company Americas" something less than a Real Party in interest on behalf of the Certificateholders.**

**79. A real party in interest  must be present that is answerable to the claims, affirmative defenses and counter claims of the homeowners for such causes of action or defenses as might be applicable or they would be blocked potentially by collateral estoppel if the court determined that the foreclosing party was acting within the scope of its agency for principal, the Certificateholders.**

80. Otherwise, the participants in the securitization scheme, including servicers and pool trustees, in my opinion, are interlopers or imposters whose design is to take title to the property they have no right to claim, and to enforce a Note which is evidence of an obligation that is not owed to them but rather to another. The details of this information, whether the Special Purpose Vehicle still exists, whether the investor has been paid in full through "THIRD PARTY PAYMENTS" are known only to these securitization participants and therefore undisclosed Investors. And the participants have demonstrated time and time again that they are not credible.

81. In my opinion the attorneys for the known securitizations participants do not have any authority to represent the creditor, and could not represent them due to the obvious conflict of interest, to wit: the Investor upon learning that a substantial amount of their advance of cash was pocketed by the intermediaries and now is left with the mortgage whose nominal value is far below what was paid, and whose fair market value is far below the nominal value, would have potential substantial claims against the securitization participants for fraud, conversion, breach of contract, and other claims.

82. Fraud upon investors in relevant to Homeowners because it is additional evidence of an overall fraud and conversion scheme against Homeowners, because it tends to show motive and intent in the fraud and conversion claims by the Homeowners.

a.    The actual money trail representing the WHOLE accounting for every penny that went in and every penny that went out that related to each loan or was attributable to each loan — for which there is no accounting in existence because if it existed it would need to be produced and if it was produced it would be discovered that two things are true:

(1) that the balance owed on the obligation of the homeowner had been paid down by resort to undisclosed funds created from the transaction between the borrower and the investor-lenders and

(2) that as a whole far more money went into the system than went out, leaving the intermediaries richer and the investor-lenders and homeowners poorer.

b.    The creation of the bogus mortgage bonds was a mere accounting trick in which the typical loan receivable account was transformed into a security. The way the securitization participants played it, they asserted ownership and control over the loans and the bonds until they were done wringing the last cent out of them. All told, they appear to have received $17 trillion in aid on a total of only $13 trillion in loans, in which there were only $2.6 trillion in defaulted principal and half of that was the actual loss. Of course they didn't give the $17 trillion to the investors because that would pay off all the loans, so they claimed the loss of the investors as their own and received $17 trillion in bailouts. They also received money in insurance, and credit default swaps.

16

c.  The average Homeowner's collateral document were was sold an average of 15-20 times. So that $556,000.00 collateral loan of borrower was worth $8,340,000.00 to $11,120,000.00, as long as the loan pool was declared in default — even if a given Homeowner's payment were current.

d.  In most instances, the pool declared in default never existed, because it was never funded, and never treated as though it was a separate entity except when it suited the banks who were routinely stealing identities of the investors and borrower.

e.  Despite the fictional nature of these transactions, they were treated as real in the financial world. So securitization participants received trillions of dollars for loans that were in default and all the loans that were not in default.

f.  If loans were modified in any large volume, all the Trillions of dollars received would be refundable to the insurers and counterparts to the credit default swaps and the bailouts. And the Investors' losses will be cut, thus exposing the fake losses declared by the Master Servicer, in Claimant's case, RFC. Money would flow in large waves back to pension funds and homeowners.

83.  The plethora of Suspensions of the Duty to Report Forms 15-D (in Claimant's case the 15-D was filed on January 22, 2008, showing 4 or fewer Investors remaining) and consolidation of the balance sheets of mortgage servicers is indicative of the falsity of foreclosures. After the fact assignments are made to Trusts which have reached their trigger events. Mezzaine Tranches are locked out long before their time, the market collapsed due to the trigger events peaked when cumulative losses on the mortgage are higher than the certain level and delinquency event occurred.  As a result, credit default swaps payments were executed, senior tranches were paid and nothing remained for the Mezzaine Tranches, who were already getting nothing as these were locked out, and the Trusts suspended their duties to report.

84.  The Maiden Lane Transactions, Maiden Lane LLC, Maiden Lane II LLC, Maiden Lane III LLC are described in the  Federal Reserve Statistical Release by the  Federal Reserve Bank of New York August 10, 2010. http://www.federalreserve.gov/releases/h41/Current/, "SIGTARP Report 10-003 - Factors Affecting Efforts to Limit Payments, which provides:

 Maiden Lane III LLC (a Special Purpose Vehicle consolidated by the Federal Reserve Bank of New York) (the "LLC") is a Delaware limited liability company that was formed on October 14, 2008 to acquire Asset-Backed Security Collateralized Debt Obligations ("ABS CDOs") from certain third-party counterparties(Banks) of AIG Financial Products Corp. ("AIGFP"). In connection with the acquisitions, the third-party counter parties (Banks) agreed to terminate their related credit derivative contracts with AIGFP.

85.  Claimant's obligation, from prior to its inception:

a. Was destined for a transition to a Mortgage Backed Security. (This was never disclosed to Claimant.)

b. Was never conveyed so that the obligation was going to be converted to bond and forever separated from the security (Title) that Claimant gave as collateral.

86.   Some of the features of the unregulated securitization which were never disclosed to Claimant, include, but are not limited to:

a.  It never disclosed that future assignments and sales would not be recorded in the Los Angeles County Lands Record.

b. It was never disclosed that the Nominal Lender had been involved in this securitization scheme for several years prior to Claimant signing the Note and that all the undisclosed actors were already in place.

**c.  It is quite possible, given the number and frequency of the MBS offerings by RFC and RALI that this loan was a "table funded loan," where the Nominal Lender, American Mortgage Network, Inc. never even put up any funds and the loan was pre-funded by the bond offering. (Money was aggregated first) This "pre-funding" being something is addressed in the Prospectus issued by Depositor, Residential Accredit Loans, Inc., an affiliate of Residential Funding Company, LLC.**

**87. Based on the fact that the Note and Deed of Trust were dated November 13, 2006, it appears obligation was sold before the collateral documents were executed and prior to Claimant's  first scheduled loan payment was due on January 1, 2007, it is easy to surmise the intent to use the collateral for a securities offering was in-place prior to closing of the purported loan transaction.**

**88.  Given the sequence with which Claimant's collateral documents were transferred by the various actors involved in the bond offering of the RALI Series 2007-QO1 Trust, it is easy to apply the step-transaction doctrine to see that this was the intent from the very beginning and should have been disclosed to Claimant before she signed the documents on December 2, 2006.**

89.   Step-transaction doctrine is a principle applicable to Taxation laws. According to this principle effect should be given to the substance, rather than the form, of a transaction, by ignoring for tax purposes steps of an integrated transaction that when taken separately are without substance. In short, the tax liability should be determined by viewing the transaction as a whole, disregarding one or more non substantive, intervening transactions taken to achieve the final result.

90.  The step-transaction doctrine expresses the familiar principle that in applying the

18

income tax laws, the substance rather than the form of the transaction is controlling. The U.S. Supreme Court has expressly sanctioned the step transaction doctrine in many cases, noting that interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction.

91.    Courts generally enunciate three basic tests that define the criteria upon which application of the step transaction doctrine applies:

  a.  The interdependence test,
  b.  The end result test,
  c.  The binding commitment test.

92.    The interdependence test requires an inquiry as to whether the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series. The end result test examines whether it appears that separate transactions were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result. The binding commitment test examines whether there was a binding commitment to undertake the later step in a series of transactions. [*Falconwood Corp. v. United States*, 422 F.3d 1339 (Fed. Cir. 2005)]

93.    Because of the IRS Rules and Regulations at 26 CFR and Title 26 sec. 860A, et seq., it is a necessary for the various actors in the securitization process to de-recognize the assets (obligation) and through  a TRUE sale of the obligation. This is also a requirement of General Acceptable Accounting Practices (GAAP) as well as FASB Statement No.140.

**94. First, the act of closing a loan wherein the lender is not revealed invalidates or destroys the Note even though acceptance of the money creates an obligation. The question is to whom that obligation is owed. Second, by securitizing the receivable according to terms far different than the note ever recited, the description contained in the note becomes increasingly remote from a proper description of the obligation, which keeps changing as the receivable, not the Note, moves up the securitization chain. Thus the receivable — the actual obligation that the Note purported to describe — keeps changing while the note remains the same and the original note never moves physically by delivery, transfer documents (endorsement, assignment etc.)**

95. The formation of the Maiden Lane LLCs in 2008 occurred during a time of severe economic distress in the United States. The sharp deterioration in the U.S. housing market in 2007, led to a loss of confidence in the value of mortgage-related products and in the financial institutions with exposures to these products. The ensuing funding pressures on a range of financial institutions and strained liquidity conditions across the financial system led the Federal Reserve to take a series of unprecedented policy actions to contain the broader risks the financial crisis posed to the economy. Among these actions, the Federal Reserve Board authorized the Federal Reserve Bank of New York (New York Fed) to form three limited liability companies

under Section 13(3) of the Federal Reserve Act to facilitate lending in support of specific institutions.

a.  Maiden Lane I LLC-- Purpose: ML LLC was created to facilitate the merger of JP Morgan Chase & Co. (JPMC) and Bear Stearns Companies, Inc. (Bear Stearns) by purchasing approximately $30 billion in assets from the mortgage desk at Bear Stearns. The New York Federal Reserve Act loaned Maiden Lane I LLC approximately $28.82 billion.

b. Maiden Lane II, LLC--Purpose: ML II LLC was created to alleviate capital and liquidity pressures on American International Group Inc. (AIG) stemming from its securities lending program by purchasing $20.5 billion in residential mortgage-backed securities (RMBS) from several of U.S. insurance subsidiaries of the American International Group (AIG). The New York Federal Reserve Bank loaned Maiden Lane  II LLC approximately $19.5 billion

c.  Maiden Lane III, LLC--Purpose: ML III LLC was created to alleviate capital and liquidity pressures on American International Group Inc. (AIG) stemming from credit default swap contracts by purchasing $29.3 billion in multi-sector collateralized debt obligations from certain counterparties of AIG Financial Products Corp. (AIGFP), enabling AIGFP to terminate the associated CDS. The New York Federal Reserve Bank loaned Maiden Lane III LLC approximately $24.3 billion.

96. The U.S. Treasury is reported to own $4.6 TRILLION in mortgage bonds, which would make it the creditor in millions of homes that:

 (a) have already been "foreclosed"

(b) are in "foreclosure;" or

( c) are going to be foreclosed.

97.  Yet not once in any court action is the U.S. Treasury named as the Creditor or having any interest in any mortgage. The U.S. Treasury paid 100 cents on the dollar to save Deutsche Bank AG and many more on Wall Street (ignoring the smaller players who were forced into mergers or failed).

98.  Why the government's programs have been so anemic in confronting the fraudulent, illicit and immoral behavior of Deutsche Bank AG and its subidiaries and many more on Wall Street and the mortgage servicing agents, like GMAC Mortgage, LLC which there foreclosed on homes they never financed, the answer is that  $4.6 TRILLION that the United States Treasury was holding in mortgage-backed bonds in 2012 are backed by fatally defective and fraudulent Notes and Mortgages or Deeds of Trust.

**99.  If the U.S. Treasury and the Federal Reserve System were to honestly address**

20

one of the reasons why QE-1 was followed by QE-2 and QE-3, they would have to admit that:

(a) Under the best case scenario they spent 100 cents when the speculative value was only 2-3 cents and

(b) There is something fundamentally wrong with the mortgage backed bonds and the underlying fatally defective, fraudulent mortgages and notes.

**THAT WOULD AMOUNT TO ADMISSION THAT THE TAXPAYERS GIFTED $4.6 TRILLION TO WALL STREET.**

100. To put this into perspective: by the end of 2011 as many as seven (7) million homes had been fraudulently sold at auction on credit bids submitted by non-creditors. Not one penny was paid at these auctions or any money before that because the bidder never lent any money nor did they purchase the receivable. The bidder was paid as a stand-in for the undisclosed and potentially unknowable creditor just like the "loan originator" was paid to stand in as the Lender.

101. Applying the $4.6 TRILLION from the U.S. Treasury to cover losses to Investors and Homeowners caused by fraudulent appraisals, fraudulent ratings, and deceptive lending practices, (instead of giving the money to RFC, GMACM, Homecomings and other subsidiaries of Ally Financial, Inc., as well as subsidiares of Deutsche Bank AG, like Deutsche Bank Trust Company Americas et al and many more on Wall Street) would have allowed an average of $657,142 to be applied on each so-called mortgage transaction providing more than enough to provide substantial relief to investors, and correcting the bogus loans to fair market value levels, thus leaving the investors where they intended to be and the homeowners where they intended to be.

102. U.S. Treasury maintains the illusion of authenticity of the mortgage bonds and the mortgages, obscures the identity of creditors in foreclosures, and continues to indirectly prop up balance sheets of mega institutions on Wall Street. The true value of the group is not as reported but more like a negative figure.

103.  As part of the securitization process which was undisclosed to Claimant, but was known to American Mortgage Network, (dubbed "loan originator," but actually an unlicensed securities dealer) acquiring collateral for re-sale multiple times at a profit to all participants in the securitization process, except Claimant (who was never informed that the unidentified third parties would profit from the sale of the collateral documents without her participation in the proceeds).

104.  In order to conceal the identities of the participants in the undisclosed securitization process, the Deed of Trust contained verbiage which purported to name Mortgage Electronic

21

Registration Systems, Inc. (MERS-III) as nominee for AMN and its successors and assigns. MERS-III is the third iteration of a Delaware corporation created as a bankruptcy-remote, special purpose vehicle at the behest of ratings agencies in order to obtain favorable ratings of the securities to be offered on behalf of the REMIC Trusts. If MERS-III had not been created by its parent company, MERSCORP, Inc. (now known as MERSCORP Holdings, Inc.), effective January 1, 1999, the securities offered by REMIC Trusts in which MERS-III was named as nominee of the "Lender" would not have been eligible for the AAA rating necessary for the sale of certificates of beneficial interests to pension and retirement funds. See Deposition Testimony of William C. Hultman in the Superior Court of New Jersey, Chancery Division, Atlantic County, Docket No. F-10209-08, entitled *Bank of New York as Trustee for the Certificate Holders CWABS,Inc. Asset-backed Certificates, Series 2005-AB3 v. Ukpe, et al. v. Bank of New York as Trustee for the Certificate Holders CWABS,Inc. Asset-backed Certificates, Series 2005-AB3, et al.* on April 7, 2010.

105. The involvement of MERS-III as nominee for AMN, its successors and assigns, is pertinent to these contested claims proceedings because MERS-III was designed and has been used to conceal the disclosure of the multiple sales of the collateral documents, the pledging of the collateral documents to unidentified third parties, the re-hypothecation of the collateral documents and the creation of various derivative financial instruments emanating from the face value of the collateral documents.

107. MERS-III has no employees, no income, no assets and is a name-only, shell corporation, wholly owned by MERSCORP Holdings, Inc. (MERSCORP). MERSCORP owns and operates the MERS® System and receives all income from the operation of the MERS® System. MERSCORP sells "memberships" to entities involved in the securitization process and claims that MERS-III is the common agent for all of its "members" The MERS® System includes access to a proprietary computer data base, solely owned by MERSCORP, into which MERSCORP "members" voluntarily input data supposedly representing the beneficial interest in the collateral documents on each individual collateral account, identified by a MIN number and referencing the underlying Notes and Mortgages or Deeds of Trust executed and granted by homeowners who believed that they had entered into a conventional mortgage loan transaction and who were never informed that their collateral documents would be electronically sold, traded, exchanged, pledged, re-hypothecated, and used for the creation of derivative obligation for profit behind the veil of the MERS® System. Ms. Smith did not consent to the electronic transfer of her collateral documents as required by E-sign at15 U.SC. Chapter 96, esp. 15 U.S.C. sec. 7001(c), or the California Uniform Electronic Transfers Act (UETA) at Civil Code Section 1633.1-1633.17. The sale, trade, exchange, pledge, re-hypothecation, or use of Ms. Smith's collateral documents, bearing her signature, in electronic format (electronic transactions), are unenforceable, 15 U.S.C. 7001 and there is no evidence that RFC, RALI or DBTCA controlled the collateral documents as required by 15 U.S.C. sec. 7021.

108. Part of the securitization scheme described herein involved creating an alleged default on the underlying obligation represented by the collateral documents, so that claim could

be made by the participants in the scheme against third parties who guaranteed payments through mortgage insurance, credit default swaps, collateralized debt obligations and other forms of unregulated derivatives.   It was necessary to the participants in the securitization scheme to conceal the facts that the collateral documents were not conveyed by delivery to the RALI 2007-QO1 Trust ("RALI Trust") and that the pension and retirement funds which had purchased certificates of beneficial interest in the RALI Trust were collateralized as represented in the RALI Trust's Prospectus.  In order to collect multiple times on the various credit enhancements, an alleged "default" in payments on the underlying obligations was engineered by enticing the primary obligors on the underlying obligations into seeking loan modifications which were claimed to be only available if payments were not made for a period of 90 days.

109. I have reviewed the publicly recorded documents, the Securities and  Exchange Commission filings, and the documents stipulated as authentic and authentic and admissible in these contested claim proceeding. I also performed independent searches as to Securitization Documents available to the public online at http://www.sec.gov/.  Most of the testimony in this Declaration was plainly clear from review of identified materials.  Except where highlighted in bold font, the statements in this Declaration are statements of fact based on the evidence described.  Where my opinions are highlighted in bold font, an offer of proof is made.

FURTHER YOUR DECLARANT SAYETH NAUGHT.

Dated this 26th day of January, 2016.

*/s/ M. Nawaz Raja*
_____
M. Nawaz Raja

# M Nawaz Raja

# 42907 Park Brooke Ct.   Broad lands VA 20148 (540) 687-0004

therajafamily@gmail.com

---

*Over 20 years of experience developing and implementing financial systems, strategies, processes and controls that significantly improve P&L scenarios. Expert in establishing, reviewing and auditing accounting functions, systems and best practices; cost-reduction; fraud detection. Computer skills include proficiency in Excel, QuickBooks, Lotus 1-2-3 and MS Office.*

---

# Education

**University of Punjab Lahore (Pakistan) L.L.B. (Bachelor of Law)**     **1991**

**College of Electrical and Mechanical Engineering Rawalpindi,**     **1990**
    **Master in Engineering (Equipment)**

**TABANI'S School of Accountancy, University of Karachi (Pakistan)**
    **Financial Accounting, Taxation and Cost Accounting**     **1988**
    **Modular Foundation Course and Certificate (MFC)**

    ***Association of Chartered Certified Accountants (ACCA)***     **1989**

**NED University of Engineering and Technology Karachi (Pakistan),**     **1984**
    **B.E. (Mechanical)**

**Pakistan Military Academy (Kakul), B.A. (History, Political Science,**     **1980**
    **Subspecialty in Accounting)**

    *a) **Certified Mortgage Forensic Auditor***
    *b) **Certified Fraud Examiner (ACFE)***
    *c) **Member American College of Forensic Examiners Institute***
    *d) **Member American Society of Mechanical Engineering (USA)***
    *e) **Member Institute of Engineers (UK)***
    *f) **Member Pak Engineering Society (MPEC, PE)***
    *g)* **Training, and experience is in the field of securities, the securities**

1

industry, derivative securities, securities regulation, special purpose vehicles, structured investment vehicles, creation of trusts pooling agreements, issuance of asset backed securities and specifically mortgage backed securities by special purpose vehicles

h) **Have knowledge, training and experience, including the areas of securities, real property, Internal Revenue Code as applicable to REMICs and Uniform Commercial Code. I also have knowledge, training and experience in the practices prevalent during the period of 2001-2009 that enabled the accumulation and availability of an overwhelming abundance of investment dollars, made possible because the derivatives sold to investors were made to appear that they contained both exceptional growth and zero risk, back the history of mortgage success up to that point in time had been high, and because these instruments were in addition made to appear undeniably and excessively guaranteed by 3rd party sources.**

## *Languages*: *English, Urdu, Hindi, Punjabi Eastern & Western, Hindco, Saraiky, Arabic, Spanish, Pashto, and Persian*

# Experience

**Data Never Lost & Falcon Syndicate– <u>Partner, November 2009 – Present</u>**

As part of a team, I provide support to companies and legal teams through use of forensic accounting methods and data retrieval.   Clients are provided with expertise and analysis through:

- Utilizing an understanding of business information, financial reporting, accounting and auditing standards and procedures,

- Financial and data evidence gathering and investigative techniques,

- Substantial knowledge of the litigation processes and procedures,

- Data retrieval

- Risk reduction by designing and performing extended procedures and creating processes.

- Mortgage Forensic Securitization Analysis

**U.S. Naval Base Guantanamo Bay (Cuba) – <u>Senior Supervisor/ IDT Specialist</u>
<u>April 2009 – November 2009</u>**

Responsible for provision of security, safety, assets protection, loss prevention, shipping and receiving and customer service, directly responsible

2

for payrolls. Supervisory Role Investigation and document translation, worked with FBI and CIA. Oversaw financial audits, fixed-asset accounting in accordance with GAAP standards

**Allied Barton Security – <u>Senior Supervisor Security, August 2007 - April 2009</u>**

Served as Senior Supervisor/Account Manager and responsible for provision of security, safety, assets protection, loss prevention, shipping and receiving and customer service   Directly responsible for discipline, recruiting and payrolls

**Mascot Petroleum (Sunoco) – <u>Facility Manager, April 2002 - April 2008</u>**

Directly responsible for functioning of the facility, hiring, managing of customer service representatives, their training and annual reviews other responsibilities included inventory control, Accounting, minimizing waste, control labor and increased profit.

**Guards Mark LLC – <u>Senior Supervisor, January 2002 - August 2007</u>**

Directly responsible for discipline, annual reviews and pay rolls for the security officers and supervisors Oversaw financial analysis, financial audits, G/L, A/R, A/P and fixed-asset accounting in accordance with GAAP standards.   Developed and managed external financial relationships (e.g., banks, insurers, auditors) and constantly sought means to strengthen overall financial performance.   Financial Fraud investigation Improved forecast precision and standardizes reporting procedures.

**Dallah Group (Saudi Arabia) – <u>Manager, July 1993 - October 1998.</u>**

Supervised repair and maintenance of 10,000-vehicle fleet and workshop equipment Managed, trained and directed a staff of 1,100 employees that included 125 supervisors.   Other responsibilities included inventory control, managed procurement and purchase of parts and other miscellaneous supplies.   Accounting and financial Audits on a quarterly basis   Completed comprehensive valuation analysis and credit review of business acquisition.

**Mech-N-Tech (Islamabad Pakistan) – <u>General Manager Technical, September 1991 - July 1993</u>**

Directly responsible for research, development and production of mechanical equipment Introduced business process improvements Took over factory at its lowest production, improved its efficiency by 200%, and increased sales by 100%.   Processed monthly accruals; prepared checks, and reconciled bank statements

3

**Army in the Corps of Electrical and Mechanical Engineering (Pakistan) –**
**Mechanical Engineer, June 1976 - May 1991.**

Commanded various workshops in different parts of the country,   Various appointments of management, teaching, technical, staff, administration and logistics, instructional, inventory control, purchase and procurement of spare parts, accounting financial audits and supervision of various projects. Financial audit responsibility of various units, supervised staff of five junior accountants.   Anti-dacoit operation specialist, Retired in good standing.

# Personal

**Place of Birth:**        **Bhaun, Chakwal, Pakistan**

**Date of Citizenship:**   **2005**

4

# EXPERT EXPERIENCE

- *Furqan Case*   Fauquier County General District Court (2010) (Forensic Accounting – Commercial Lease)

- *Walls Case* Fairfax County Circuit Court (2010) (Forensic Accounting – foreclosure)

- Helen Case US Bankruptcy Court Central District California (2010) (Forensic Accounting – foreclosure)

- Caballero Case Prince William County General District Court (2011) (Forensic Accounting – foreclosure)

- Ms. Rudean Thomas Case in Halifax County Virginia

- *Testimony before US Congress on Mortgage and Securitization Fraud*

- *Testimony before Financial Committee on Mortgage and Securitization Fraud*

- *Presentation to FBI on Mortgage and Securitization Fraud*

- *Written and presented to Congress Man Mr. Frank Wolf "Mortgage Fraud Investigation" and "Robo-Signers"*

- *Other cases pending;*

  1.       Kathleen Munive
  2.       Yaneth Isabel Pena Linares
  3.       Syed Kazmi
  4.       Iffat K. Raja
  5.       Mario L. Jones and Dora M. Jones
  6.       Dianna Wittenberg
  7.       Abdul Farid Khair
  8.       Jeffrey L. Brown
  9.       David E Wilder
  10.      Victor Radisi (Three Cases)
  11.      Mr. Lorenso Pasillas & Mrs. Amelia Pasillas
  12.      Ashok Kumar
  13.      PJ Yearwood
  14.      Gil Ziter
  15.      Lynne O Taylor

16.     John M. Perseo
17.     Mark Klee man
18.     Ms. Michelle Brazeau
19.     Simkins
20.     Patrick
21.     Sonia
22.     Pedro Santos
23.     Mary Ann Guerrieri
24.     Dennis
25.     Ms. Yolanda Bond
26.     Ms. Zan E. Green
27.     Caren J. Wilson
28.     Ms. Rudean Thomas
29.     Ms. Lorraine Mainzer

30.     Mr. Jeffrey L. Garner
31.     Mr. Edgar Johnson
32.     Ms. Anita G. Vera
33.     Ms. Priscilla J. Yearwood
34.     Shamrock Investment Properties, LLC
35.     Mr. Mian   Saleem
36.     Mr. David E. Wilder
37.     Mr. Victor Radisi
38.     Mrs. Amelia Pasillas
39.     MS. Sonia N. Alami
40.     Ms. Alicia Corona
41.     Ms. Elizabeth A. Radisi
42.     Ms. Rube Aftab
43.     Mr. Grubb
44.     Mr. Obed Cantor
45.     Mr. Habeeb
46.     Mr. Carl
47.     Mr. Epperson
48.     Mr. Robert W. Bean Jr.
49.     Mr. Roberto Marron
50.     Ms. Mayra Martinez
51.     Mr. Fredy Alvarado
52.     Ms. Herminia
53.     Ms. Margarita
54.     Mr. Monreno
55.     Ms. Alba Rodriguez
56.     Ms. Adela Linares
57.     Ms. Anita Garsia
58.     Ms. Lorren Aroma
59.     Carl E. Pertuset

6