1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


          Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          January 26, 2016

          10:37 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

1

2    (CC: Doc# 9494 and Doc# 9124, 8315) Trial Regarding Claim

3    Number 725 Filed by William J. Futrell

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Hana Copperman

3

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4        Attorneys for the ResCap Borrower Claims Trust

5        250 West 55th Street

6        New York, NY 10019

7

8  BY:   JORDAN A. WISHNEW, ESQ.

9        JAMES A. NEWTON, ESQ.

10

11

12  THOMAS D. MARGOLIS, ATTORNEY AT LAW

13        Attorney for William J. Futrell

14        125 East Charles Street

15        Suite 214

16        Muncie, IN 47305

17

18  BY:   THOMAS MARGOLIS, ESQ.

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                    4

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.

3          All right.  We're here in Residential Capital, number

4    12-12020.  We're here in connection with the trial of the

5    contested matter, the ResCap Borrower Claims Trust's objection

6    to proof of claim number 725 filed by William J. Futrell.

7          My I get the appearances, please?

8          MR. WISHNEW:  Good morning, Your Honor.  Jordan

9    Wishnew and James Newton of Morrison & Foerster for the ResCap

10   Borrower Claims Trust.

11         MR. MARGOLIS:  Thomas Margolis for William J. Futrell,

12   the claimant.

13         THE COURT:  Have I been mispronouncing your name?

14         MR. MARGOLIS:  It's okay.

15         MR. WISHNEW:  I pronounce it Futrell, and they

16   pronounce it Futrell, so it works.

17         THE COURT:  Okay.  All right.  I apologize if I --

18         MR. FUTRELL:  Okay.  Not a problem.

19         THE COURT:  All right.  Just give me a second.

20         All right.  So before we begin, I'm concerned about

21   the time, because -- and I understand that you were staying in

22   New Jersey and took the bus in and had difficulties.

23         This is scheduled as a timed trial.  I don't know

24   whether we're going to be able to get this done.  We're just

25   going to have to see where we get to.

1        We have to break for lunch at about 12:30, because I

2   have to be at a meeting at the City Bar at 1 o'clock.  They put

3   me first on the agenda for this meeting, and I will come back,

4   but I think it's likely to be a quarter after 2 when we resume.

5        And then, to make it clear to all of you, I teach on

6   Tuesday afternoon at Columbia Law School.  My class begins at

7   4:20.  And so I need to get up there.  We'll see exactly what

8   time we break for that.

9        We'll see how far we get.  There are two alternatives.

10  Counsel can talk about it in the break.

11       I know, Mr. Wishnew, one was Ms. Lathrop planning to

12  go home to Iowa.

13       MR. WISHNEW:  Thank you, Your Honor.  Jordan Wishnew,

14  Morrison & Foerster, for the ResCap Borrower Claims Trust.

15       Ms. Lathrop is scheduled to be on a 10:30 a.m. flight

16  tomorrow --

17       THE COURT:  Okay.

18       MR. WISHNEW:  -- out of LaGuardia, so --

19       THE COURT:  All right.  And --

20       MR. WISHNEW:  She would have to testify today.

21       THE COURT:  Okay.  And, Mr. Margolis, when are you

22  scheduled to return home?

23       MR. MARGOLIS:  At this point we plan to come and leave

24  directly.

25       MS. FUTRELL:  Yeah.  I have to be to work tomorrow

1    morning at 8.

2              THE COURT:  How long -- you drove here from Indiana?

3              MS. FUTRELL:  Yes.

4              THE COURT:  How long was the drive?

5              MS. FUTRELL:  About twelve hours.

6              THE COURT:  Well, let's see where we get to.

7              MR. WISHNEW:  Your Honor, in an effort to try and

8    expedite some matters, we have stipulated to certain exhibits.

9    I can --

10             THE COURT:  Well, let me raise this issue about the

11   exhibits.  I certainly want to -- I don't want to prejudice any

12   parties' rights, but I've spent a lot of time preparing.  And

13   I'd like to dispense with opening statements.

14             With respect to the exhibits, I know I entered an

15   order raising a question, Mr. Margolis, about many of your

16   exhibits.  The more I prepared after that, I think more of the

17   exhibits may meet even my stringent test for admission.  Unless

18   the parties disagree, I would just suggest both of you agree

19   all your exhibits come in.  I'll give them such weight as

20   they're, you know, obviously, they're entitled to.  But I'm not

21   going to preclude --

22             Mr. Wishnew, I want to be clear.  I'm not preventing

23   you from -- if you've got objections, to do that, but you've

24   all seen each other's exhibits.  I don't know.

25             MR. WISHNEW:  Your Honor, with regards to your

1    proposal, I think we're generally fine with that.  I would say

2    this, that we -- I would say have concerns about a significant

3    number of the claimant's exhibits on the grounds of relevance,

4    but to the extent Your Honor decides to give them whatever

5    weight you want to, then I think we get to the same point.

6          THE COURT:  Look, I'll give them such weight as I

7    think they're entitled to.

8          MR. WISHNEW:  Right.

9          THE COURT:  And certainly no more than that.

10         What's your view, Mr. Margolis?

11         MR. MARGOLIS:  I would concur.

12         THE COURT:  All right.  Let's see which exhibits get

13   used.

14         So, Mr. Wishnew, you've provided the direct written

15   testimony of Ms. Lathrop in the form of a declaration.

16         Mr. Margolis, you provided witness statements of your

17   two clients, but they're not under oath.  Neither of them --

18   ordinarily, it needs to be a declaration under oath.  28 U.S.C.

19   Section 1746 is the -- it seems to me that that can be cured by

20   having your clients, when they take the witness stand, affirm

21   under oath that whatever they've said in their witness

22   statement is true and correct.

23         Ordinarily, Mr. Margolis -- Mr. Wishnew knows this

24   because we've had other trials in ResCap.  Where it's written

25   narrative direct you put your witness on, and you're going to

1  start off, because you're the claimant.  They take the oath.

2  And then you would need to indicate that they affirm what

3  they've said in their written statements, and then we start

4  with the cross-examination.

5          MR. MARGOLIS:  Okay.

6          THE COURT:  I don't know what you envisioned about it,

7  but that's how we -- you do get a chance to do a redirect.

8          MR. MARGOLIS:  Okay.  Sure.

9          THE COURT:  Mr. Wishnew, what's your view on this?

10         MR. WISHNEW:  I'm fine with that procedure, Your

11  Honor.

12      THE COURT:  Okay.  And I take it you intend, at the

13  appropriate time, to offer Ms. Lathrop's declaration, submit

14  her for cross-examination at that point.

15         MR. WISHNEW:  Yes, Your Honor.

16         THE COURT:  Okay.  All right.  So let's dispense with

17  the opening statements.  I really have spent a lot of time

18  reviewing this matter.

19         Let me make some other preliminary comments, perhaps

20  to focus the questioning and the evidence.

21         So the pre-trial order that you both signed and that I

22  entered makes clear that the three issues for trial all relate

23  to the October 30, 2009 letter from Mr. Margolis.  Counsel for

24  the Trust has agreed that it satisfies the requirements of a

25  qualified written request under RESPA, and that's the focus of

1   the evidence.

2           There is a dispute as to whether the Trust responded,

3   timely responded, to the QWR.  The Trust's position has been

4   that -- and cites case authority in support -- that there

5   certainly were written responses after that October 30th

6   letter.  I think the November 13th one refers to an October 23

7   letter.  And the Trust's position is that that -- I think it's

8   November 13 was the date -- provides a written response to the

9   questions raised by the October 30, 2009 qualified written

10  request.

11          The question in my mind, Mr. Wishnew, is whether the

12  November 13th letter accurately factually responds to the

13  October 30, 2009 QWR.  And, to be more specific, the records

14  which I've seen indicate that Ms. Futrell, in particular, had

15  raised, on numerous occasions, questions about the accuracy of

16  the amount of any escrow shortage, and the Trust acknowledges

17  what it believes was an inadvertent typographical error,

18  essentially adding 1,000 dollars to the amount required for the

19  escrow.
            That's not disputed.  I mean, it's not disputed that

20  there was a mistake.

21          MR. WISHNEW:  Um-hum.

22          THE COURT:  Okay?  What I'm going to want to hear -- I

23  mean, it looks to me that the November 13th letter perpetuates

24  the mistake.  What I mean, perpetuates --

25          I think you understand what I mean, Mr. Wishnew.  When

1    I say it perpetuates the mistake, it, once again, included the

2    incorrect amount for the escrow.

3         And so assuming that I consider that the November 13th

4    letter should be considered as a response to the October 30,

5    2009 QWR, it appears -- I'm not making a finding with it -- it

6    appears to be inaccurate on what Ms. Futrell had been

7    questioning since June.

8         And so that raises the question, was GMAC liable for a

9    violation of Section 6(e) of RESPA for failing accurately to

10   respond to the question that was raised in the October 30, 2009

11   QWR.  And if that was a violation -- I'm not saying it was --

12   I'm saying but if it was a violation then the issue shifts, I

13   think, to what are actual damages, because the statute permits

14   a borrower who -- or where the borrower or the borrower's

15   representative sends what is a QWR, which we've acknowledged

16   the October 30th letter to be, the borrower is entitled to

17   recover actual damages.

18        And my biggest questions are really about that.  What

19   are the actual damages that can be recovered?

20        And I won't say more now, but I just want to set the

21   framework, particularly since we're short on time.  That's what

22   I -- and you'll make -- I'm not going to hamstring you in your

23   presentations of the evidence, but I wanted you all to know, as

24   we start out, what I've been thinking about.  Okay?

25        So, Mr. Margolis, call your first witness.

RESIDENTIAL CAPITAL, LLC, ET AL.                    11

1          MR. MARGOLIS:  I'd call Alicia Futrell.

2          THE COURT:  Okay.  Come on.  Come on up.  You'll come

3    up and you'll be sworn.  And there's water up there in a cup if

4    you need water.  Okay?

5          MS. FUTRELL:  Okay.

6          THE COURT:  Just go ahead up there, and you'll raise

7    your right hand, and you'll be asked to swear or affirm that

8    your testimony is truthful.

9        (Witness sworn)

10         THE COURT:  All right.  Please have a seat.  Okay?  If

11   you want to take some water you can fill a cup with it or --

12   leave that up to you.

13         And the system, we don't have a court reporter that

14   takes stenography, but it's a voice recording system.  So we

15   have to make sure that you speak loud enough and into the

16   microphone so that we get an accurate record.  Okay?

17         THE WITNESS:  Okay.

18         THE COURT:  Thank you very much.

19         Go ahead, Mr. Margolis.

20         MR. MARGOLIS:  Thank you.

21   DIRECT EXAMINATION

22   BY MR. MARGOLIS:

23   Q.  Please state your name for the record.

24   A.  Alicia Futrell.

25   Q.  And you are the wife of William J. Futrell?

RESIDENTIAL CAPITAL, LLC, ET AL.                    12

1   A.  Yes.

2   Q.  And at this point there was a mortgage you had.

3           THE COURT:  Mr. Margolis, I guess the -- ordinarily,

4   because I have the written statement --

5           MR. MARGOLIS:  Right.  Okay.

6           THE COURT:  -- is you need to get her to affirm --

7           MR. MARGOLIS:  Okay.

8           THE COURT:  -- that it's truthful.

9           MR. MARGOLIS:  Okay.

10          THE COURT:  Are you just going to cover what's in the

11  statement?

12          MR. MARGOLIS:  Yes.

13          THE COURT:  Okay.  So ordinarily what happens with

14  these trials is we have written direct testimony.

15          MR. MARGOLIS:  Okay.

16          THE COURT:  And then the witness -- Mr. Wishnew or Mr.

17  Newtown can cross-examine.  And then if you have a redirect

18  examination you can do that.

19          MR. MARGOLIS:  Okay.

20          THE COURT:  If you have a problem with that approach,

21  tell me now.

22          MR. MARGOLIS:  I will defer to the Court.

23          THE COURT:  Well, let's start by getting you to -- let

24  me ask you this.  Do you have your written witness statement in

25  front of you?

RESIDENTIAL CAPITAL, LLC, ET AL.                    13

1              THE WITNESS:  I don't.

2              THE COURT:  Could you give her her witness statement?

3              MR. MARGOLIS:  Yes.  I'm going to that right now.

4         (Pause)

5              THE COURT:  Okay.  I have it in front of me.

6              Go ahead, Mr. Margolis.

7              MR. MARGOLIS:  Okay.

8    BY MR. MARGOLIS:

9    Q.  We've prepared a summary of your direct testimony.

10   Correct?

11   A.  Correct.

12   Q.  Okay.  And I'm just going to hit the salient points.  Okay?

13             THE COURT:  Before you -- let me.

14             Do you have it in front of you?

15             THE WITNESS:  Yes, I do.

16             THE COURT:  Have you reviewed it previously?

17             THE WITNESS:  I have.

18             THE COURT:  Is everything contained in your witness

19   statement true according to the best of your knowledge?

20             THE WITNESS:  Yes.

21             THE COURT:  Okay.  If you want to cover some limited

22   additional questions, you're going to get a chance on redirect

23   but --

24             MR. MARGOLIS:  Okay.

25             THE COURT:  Go ahead.

1   Q.  Okay.  There was a point where Homecomings Financial had

2   it, and then it was transferred to GMAC.

3   A.  Correct.

4   Q.  Okay.  And we came to the June 17, 2009 analysis.

5   A.  Correct.

6   Q.  Okay.  And the two problems there were the insurance, where

7   the 352.53 , where the 1 was added.

8   A.  Yes.

9   Q.  Okay.  Was that ever corrected?

10  A.  That was corrected, but the shortage was not.

11  Q.  Okay.  The shortage being 1,247 and change.

12  A.  Yes.

13  Q.  Okay.

14          THE COURT:  Twelve hundred and forty-seven dollars?

15          MR. MARGOLIS:  Yes.

16          THE WITNESS:  And, like, seventy-one cents, I believe.

17          THE COURT:  Okay.

18          MR. WISHNEW:  49.71.

19  Q.  Okay.  Now, that's what the June 17th document said, but

20  the servicing notes indicated that the amount was in the sum

21  of --

22  A.  Fifteen hundred --

23  Q.  -- $1,541.69.

24  A.  Yes.

25  Q.  Okay.  So there was a shortage immediately.

RESIDENTIAL CAPITAL, LLC, ET AL.                    15

1   A.   Yes.  It showed up on our July 1st statement.

2   Q.   Okay.  Was that ever corrected by GMAC, any agent and/or

3   employee?

4   A.   No.

5   Q.   What was the net effect of that for you?

6   A.   It caused us extreme -- I mean, it's -- basically severed

7   our credit.  We couldn't get any credit from anyone, because it

8   was showing up that we were missing payments at 886.36, when

9   our payment was 657.25.

10  Q.   Okay.  What efforts did you make to get this matter

11  resolved?

12  A.   They would call on a daily basis, and every time they would

13  call I would explain the exact same thing over and over again,

14  because they would transfer me from one department to another.

15      They would say oh, you need Loss Mitigation.  No, you need

16  Escrow.  No, you need Modification.  It was never-ending.  And

17  no one person in the departments would ever say the same thing.

18  Q.   Please identify who they were?

19  A.   There were so many -- a few that stick out were Romeo.  He

20  was the first one that I spoke to, and actually convinced us to

21  stay with the modification.  I called and tried to make a July

22  payment, but they told me I couldn't make the payment until

23  August.  So they essentially made us skip another payment.

24  Q.   Why did they say that?

25  A.   Because we had to be ninety days delinquent in order to

1   qualify for a HAMP modification.

2   Q.  At that point in time, were you in arrears?

3   A.  We were one month.  We tried to stay thirty days behind

4   always, so as to avoid foreclosure.

5   Q.  And could you -- and what was the time frame for this?

6   A.  That I started telling them?

7   Q.  No, no, no.  When they said you are one month, and they

8   wanted, basically, to tell you stop making payments.  Correct?

9   A.  Correct.  Like, two months.  We missed June and July.

10  Q.  Okay.  And so what --

11          THE COURT:  June and July of 2009?

12          THE WITNESS:  9.  Correct.  Because the modification

13  trial didn't start until August.

14  Q.  So what was the direct and proximate result of that

15  happening?

16  A.  They reported that we weren't paying our mortgage to the

17  credit bureaus.

18  Q.  And was that a problem?

19  A.  Yes.

20  Q.  Why?

21  A.  Well, it's still continuing today.  It's still showing up

22  on our credit.

23  Q.  Okay.  There was -- and I refer to Exhibit number 20.

24          MR. MARGOLIS:  May I approach, Your Honor?

25          THE COURT:  Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    17

1    A.  Okay.  I have the USDA letter.

2    Q.  Yes.  Okay.

3           MR. MARGOLIS:  For the record, that was dated August

4    10, 2011.

5    A.  Correct.

6    Q.  Okay.  And on the second page --

7           THE COURT:  Mr. Wishnew, do you have any objections to

8    Exhibit 20 coming into evidence?

9           MR. WISHNEW:  One moment, Your Honor.

10          THE COURT:  Is it the USDA letter, Your Honor?

11          MR. WISHNEW:  Yes.

12          THE WITNESS:  Um-hum.

13          MR. WISHNEW:  Your Honor, if I can reserve until after

14   Ms. Futrell is done testifying?  I have concerns about

15   relevance.

16          THE COURT:  Fine.  Go ahead, Mr. Margolis.

17          MR. MARGOLIS:  Okay.

18   Q.  Now, on page 2, does that indicate anything about missed

19   payments and/or referrals?

20   A.  Yes.  It has the eleven missed mortgaged payments, which

21   some of those were ones that we were trying to make, and the

22   other ones were from when they wanted us to sign a legally

23   binding document that was incorrect and wouldn't -- they

24   kept --

25          THE COURT:  Who wanted you to sign?

RESIDENTIAL CAPITAL, LLC, ET AL.                    18

1         THE WITNESS:  GMAC and their representatives.  They

2   said we had a special payment plan.  There was no special

3   payment plan.  When I called back, I wanted our original

4   mortgage.  Romeo had said we could opt out at the end of the

5   trial if we wanted to.  We tried to opt out.  We tried all the

6   way up until January something.  We kept waiting for them to

7   stop the modification, and they never did.

8         And so throughout all that time they were wanting a

9   payment of 886.36, when our original mortgage payment was

10  657.25.  We couldn't come up with the additional money to make

11  the 657.25.  That's why we wanted the modification.  So to add

12  that 229.11 onto our payment back in July, and they -- that's

13  what shows up on our credit report.  They wouldn't let us out

14  of the modification.  We didn't want it.

15  Q.  Okay.  And what was -- did the premises deteriorate,

16  worsen --

17  A.  Yes.  Because we couldn't get the credit to fix it.

18  Q.  Okay.  Now, before I get to the USDA letter, does that make

19  reference to the condition of the premises --

20  A.  It does.

21  Q.  -- in August of '11?

22  A.  It does.

23  Q.  Okay.  And could you summarize what that would be --

24  A.  Because of the condition of the house they were only

25  willing to loan 10,000 on the actual house, because the other

1    20 needed to be used to bring the house up to the USDA Code.

2    Q.  Does the USDA letter point out the problems, notably with

3    the condition of the real estate, that it was reported to the

4    credit bureau --

5    A.  Yes.

6    Q.  -- and, just generally, the situation you were in at the

7    time?

8    A.  Yes.  I actually had to appeal that, and won, because of

9    our credit --

10           THE COURT:  Appeal what?

11   A.  -- with that.

12           THE WITNESS:  The USDA decision.  They denied it at

13   first.  And I appealed it, and Anthony Kirkland, the director

14   in Indianapolis, approved -- approved it.  And I actually

15   called GMAC --

16           THE COURT:  Approved what?

17           THE WITNESS:  The loan.  He was going to lend us money

18   on the house.

19           THE COURT:  Okay.

20           THE WITNESS:  And he said I could try to call GMAC and

21   see if they would basically do a short sale back to us.  I

22   called, and I spoke to -- I believe his name was Jones -- no,

23   not Jonesy -- Jeremiah.  And he said that they could do that.

24           And I called Anthony Kirkland back.  I got all the

25   information.

RESIDENTIAL CAPITAL, LLC, ET AL.                    20

1          And when I called back, they told me that he had been

2     fired, and there was absolutely no way they would ever sell it

3     to anybody but a third party.

4          THE COURT:  Go ahead, Mr. Margolis.

5     Q.  Where you underwater with this mortgage?

6     A.  Yes.

7     Q.  Okay.  And did they appraise the real estate at 30,000

8     dollars?

9     A.  Yes.

10    Q.  And the mortgage was --

11         THE COURT:  Who's the they?  Who's the they?

12         THE WITNESS:  The people that -- the USDA got an

13    appraiser, and they came out, and they did the appraisal for

14    the USDA loan.

15         THE COURT:  Of 30,000 dollars.

16         THE WITNESS:  Of 30,000.  Yes.

17    Q.  And the mortgage that you got was for 76?

18    A.  Correct.

19         THE COURT:  The mortgage, the original mortgage --

20         THE WITNESS:  The original mortgage.

21         THE COURT:  -- for 76,000.

22         THE WITNESS:  Yes.

23         MR. MARGOLIS:  Your Honor, for the record, I move for

24    the admission of number 20.

25         MR. WISHNEW:  Your Honor, I renew my objection on the

RESIDENTIAL CAPITAL, LLC, ET AL.                21

 1  grounds of relevance.

 2          THE COURT:  Overruled.  Exhibit 20 is in evidence.

 3          I urge counsel to both agree that we consider all of

 4  the exhibits, but we'll do it one by one if we have to.  Okay?

 5  So the objection to Exhibit 20 is overruled.  It's in evidence.

 6  (USDA letter to the Futrells dated 8/10/2011 was hereby

 7  received into evidence as Futrells' Exhibit 20, as of this

 8  date.)

 9  Q.  Okay.  Now, talking about the real estate, to your

10  knowledge, did it lose value?

11  A.  Yes.

12  Q.  And I'd like to refer you to Exhibit 18 of this.  Please

13  look at that document.

14  A.  Yeah.

15  Q.  Okay.  What is it?

16  A.  It's our property assessment from our trustee.

17  Q.  Well, who was your --

18  A.  The Jackson Township trustee at Jay County courthouse.

19  Q.  Okay.  A governmental entity --

20  A.  Yes.

21  Q.  And is this something that they did on a regular and

22  routine basis?

23  A.  Yes.

24  Q.  That's part of their job and function in local government.

25  A.  Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    22

1  Q.   What was the value in 2016, the appraised value from them,

2  and when they started in, I believe, 2009?

3  A.  I have to check.  I think the 42.  The 42,600.

4  Q.  Okay.  And that --

5         THE COURT:  I'm sorry.  I don't understand what you're

6  according to.  What year?

7  Q.  Okay.  It looks like for the year of 2011, what was the

8  appraised improvements?

9  A.  Forty-nine thousand, three hundred.

10  Q.  Okay.  And for 2012?

11  A.  Forty-three, four.

12  Q.  And for 2013?

13  A.  Forty-six.  Forty thousand, six hundred.

14  Q.  And for 2014?

15  A.  Forty-two thousand, seven hundred.

16  Q.  And for 2016?

17  A.  Forty-two thousand, six hundred.

18  Q.  The --

19         THE COURT:  Is that 2015 or 2016?

20         MR. MARGOLIS:  2015.  I'm sorry.

21  Q.  Okay.  The --

22         THE COURT:  Oh, I see.  It's the same for 2016.  I'm

23  sorry.

24  Q.  The value of the property for property taxes was decreased?

25  A.  Correct.

RESIDENTIAL CAPITAL, LLC, ET AL.                23

1    Q.   Now, did you take photographs?

2    A.   We did.

3    Q.   Okay.   When were those taken?

4    A.   I believe they were taken in August or September of this

5    year.

6    Q.   Okay.

7    A.   Or of last year, actually.

8    Q.   Okay.   Now --

9         THE COURT:   August/September of 2015?

10        THE WITNESS:   2015.   Yes, sir.

11   Q.   Okay.   Now, I have opened this.   There are several

12   photographs.

13        Okay.   I have opened 1-A and 1-B.

14   A.   Correct.

15   Q.   Could you please state for the record what these picture

16   indicate?

17   A.   Those are the hole in my ceiling in our kitchen, where the

18   roof fell in from the roof leaking.

19   Q.   Okay.   Is there a before and after here?

20   A.   There is.

21   Q.   And just to --

22   A.   The top one is before, where it's just a crack, and the

23   bottom one is where the plaster fell in.

24   Q.   And the second page, picture C, what does that show?

25   A.   That is my son's bedroom on the outside wall where mold is

RESIDENTIAL CAPITAL, LLC, ET AL.                                        24

1   growing.  The black on the bottom is mold.

2   Q.  What about D?

3   A.  D is my son's room also, and that's his ceiling right by

4   his heater vent where the ceiling is starting to come in from

5   the roof leaking.

6   Q.  And what about E?

7   A.  That's the kitchen again, where it fell in.

8   Q.  And what about F?

9   A.  That's also the kitchen where it fell in.

10  Q.  What else did G show?

11  A.  G shows the roof, and you really can't see it in this

12  picture, but it has a big dip where it's starting to bow.

13  Q.  And H?

14  A.  H shows the biggest concern that the USDA had.  You can see

15  the front part of the house that doesn't have any siding on it.

16  That part was built -- when they built the foundation, they

17  didn't dig a -- is it a header?

18          UNIDENTIFIED SPEAKER:  Footer.

19  A.  A footer.  Sorry.  They didn't dig a footer.  And so you

20  can see on the next page where the foundation is literally

21  floating on the ground.  And so the two sections of house are

22  starting to separate, and that's why the USDA would only loan

23  10,000, because the front part of the house has to be

24  completely torn down.

25  Q.  What was the impact of your contact with GMAC relative to

RESIDENTIAL CAPITAL, LLC, ET AL.                        25

1  the condition of the house?

2  A.  They didn't care.

3  Q.  But what impact did it have on the condition of the real

4  estate?

5  A.  It deteriorated.  It continued to go down.

6  Q.  Were you able to do any remedial actions?

7  A.  No.  That was what our -- USDA was our only hope on that

8  one.

9  Q.  Were you able to use credit for alternate means?

10  A.  No.

11  Q.  Okay.  Now, I approached you with I and J.  Okay?

12       Now, what does I depict?

13  A.  I is where the house is starting to separate.  You can see

14  the two sections of house.

15  Q.  Okay.  And J?

16  A.  J is the foundation where the cracks and you -- you can

17  barely see it, but there's the dark spot.  That's actually

18  where the concrete -- the ground has moved down away from the

19  concrete, and you can see the grass where they poured the

20  concrete originally.

21  Q.  Okay.  And K?  What does that depict?

22  A.  K is where the foundation is cracking and moving --

23  starting to move away.

24  Q.  L?

25  A.  L is another big -- my husband can fit his foot under --

RESIDENTIAL CAPITAL, LLC, ET AL.                    26

1   that's the foundation.  That's the corner of the house.  And my

2   husband can fit his foot underneath there.

3   Q.  And M?

4   A.  That's another crack where it's start --

5   Q.  Okay.

6   A.  It's just different cracks, where it's all a moving part.

7   Q.  Okay.  Do you have an opinion with regard to the value of

8   the house?

9   A.  Now?

10  Q.  Yes.

11  A.  The value of the land and maybe the well that's on it.  The

12  structure of the house is not worth anything.

13  Q.  Okay.  In 2009 did, or do you have an opinion what the

14  value of the house was?

15  A.  In '09?  That's when this first started.  It -- probably

16  about 60,000.

17  Q.  Okay.

18  A.  We had had an appraisal.  We had actually tried to

19  refinance through GMAC, and they had done an appraisal and

20  appraised it at sixty-five.

21  Q.  Okay.

22  A.  And that was in 2007.

23  Q.  Does the house require remedial work?

24  A.  Yes.

25  Q.  And was there an estimate gotten for that purpose?

RESIDENTIAL CAPITAL, LLC, ET AL.                    27

1  A.  There was.

2  Q.  And, for the record, that's number 19.  Let me show you

3  that.  Is that the estimate?

4  A.  Yes, it is.  It's Leander.

5  Q.  Okay.  Who gave you this estimate?

6  A.  Leander Schwartz.  He's actually one of the Amish crew that

7  worked on the house when they did -- when we had the community

8  home -- Minor Home Repair.  He came in and he did work with his

9  crew in 2005.

10  Q.  And he does this for a living?

11  A.  Correct.

12  Q.  Okay.  And was this estimate to bring it up to Code?

13  A.  Yes.  And that's all it was is to bring it up to Code.

14  Q.  Okay.  And that was for 47,000 dollars?

15  A.  Yes.

16  Q.  Now, when you were addressing this, what was the connection

17  to that and the actions of GMAC?

18          THE COURT:  I don't understand your question.

19  A.  I don't know.

20  Q.  Okay.  Well, was there a correlation between the house and

21  the actions of GMAC?

22  A.  Yes.  They --

23  Q.  Okay.

24  A.  They ruined my husband's credit.  There was no way to fix

25  it.  And the one chance we had of the USDA, they destroyed

RESIDENTIAL CAPITAL, LLC, ET AL.                              28

 1  that, and then shortly after the USDA -- they denied the USDA

 2  short sale -- they offered to sell it to us for 27,000.

 3  Q.  Okay.  What --

 4  A.  So I feel they knew the house was not worth anything.

 5  Q.  Was there any explanation above and beyond their

 6  correspondence?

 7  A.  I'm sorry?

 8  Q.  Did anyone call you, or did you call them and did they say

 9  we're going to do this because of such and such reason?

10  A.  You mean GMAC or just in general, like debtors in general?

11  Q.  Well, with GMAC.  With --

12  A.  They threatened to foreclose all the time.  And eventually

13  it got to the point where I told them do it.  Do it, please.  I

14  would love to have a federal judge hear this.

15  Q.  What --

16  A.  Please foreclose.

17  Q.  When did they start threatening foreclosure?

18  A.  Oh, gosh.  They had all -- they always threatened

19  foreclosure.  That's why we stayed -- we went only one month

20  behind up until my husband had his heart attack, and then after

21  that it -- I got tired of fighting them.  It wasn't worth the

22  hassle.  And that's when I started telling them, foreclose.  Do

23  it.

24  Q.  How frequently would -- would they say it frequently?

25  A.  Yes.  Every time they would call.

RESIDENTIAL CAPITAL, LLC, ET AL.                    29

1   Q.  The same person, different person?

2   A.  Different person.

3   Q.  And did that have the -- one moment.

4       How did that affect your resources?

5   A.  Tremendously.

6   Q.  How?

7   A.  Because when we were trying to keep from losing a house,

8   because we bought the house from my father, so I have a

9   sentimental attachment to the property, which is the only

10  reason I fought this long to keep it.

11      It had a tremendous impact on every aspect of life.  Every

12  one.  Because we were trying to pour everything that we had

13  into keeping the house, but it wasn't ever enough.  And the

14  late fees were starting to build, so that's why we asked for

15  the modification.  But that didn't work up.  That made it --

16  that made it worse.

17  Q.  Let's talk about that for the moment.  Who brought up the

18  modification?

19  A.  We did.

20  Q.  Okay.  Was there anything said about opting out?

21  A.  When I -- when we received the first July statement, July,

22  2009, which was right around the same time that we received the

23  June 17, 2009 escrow analysis, the July payment said that they

24  wanted 886.36, so immediately upon receiving that statement in

25  the mail --

1    Q.  July of what year?

2    A.  Of 2009.  I called to find out why there was $229.11 added

3    onto our mortgage payment.  And they said that it was for

4    escrow and an escrow shortage.

5        And so from that point on they wanted 886.36.  It was like

6    the 657.25 payment was gone.  It was -- they wouldn't accept

7    657.25 --

8    Q.  What steps --

9    A.  -- from July on.

10   Q.  What steps did you take to try and address this with GMAC?

11   A.  Daily calls to try -- to several different departments to

12   try to get it fixed.  And Romeo said that if we did the

13   modification, we did the trial, become current, all the late

14   fees would disappear, and we could opt out of the escrow.

15             THE COURT:  Let me just ask you a couple of questions.

16             THE WITNESS:  Yeah.

17             THE COURT:  When your payments were the 657.25, the

18   original mortgage, there was no escrow for taxes and insurance.

19             THE WITNESS:  Correct.  There never had been.

20             THE COURT:  And it was when you were being considered

21   for a modification that GMACM told you that you'd also have to

22   have an escrow for taxes and insurance.  Am I correct?

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.  So you don't dispute, if I'm

25   reading the papers correctly, you're not disputing that it was

1  appropriate for GMAC to require an escrow for the amount that

2  would reflect one-twelfth of the amount of the taxes and

3  insurance.

4            THE WITNESS:  Correct.

5            THE COURT:  Okay.  Go ahead, Mr. Margolis.

6            MR. MARGOLIS:  Okay.

7  Q.  Okay.  So did there reach a point when you wanted to opt

8  out?

9  A.  Yes.

10           THE COURT:  Opt out of what?

11  Q.  When was that rel --

12           THE COURT:  Mr. Margolis, I don't understand your

13  question.

14           MR. MARGOLIS:  Okay.

15           THE COURT:  Opt out of what?

16           MR. MARGOLIS:  The loan modification.

17           THE COURT:  Go ahead.

18  A.  Yes.

19  Q.  Okay.  When did that occur, approximately?

20  A.  We tried to opt out before the modification even began.

21  Q.  Put a time frame on it, please.

22  A.  Let's say between June 24th and 27th, because that's when

23  we would have received our monthly statement for July.  When

24  I --

25           THE COURT:  You're talking about 2009?

RESIDENTIAL CAPITAL, LLC, ET AL.                                    32

1        THE WITNESS:  2009.

2    A.   When I saw the 886.36, and saw that they had already

3    changed -- they changed it, even though their paperwork in

4    their contract said it wouldn't change until after the

5    modification was signed and completed.  Our statement in July

6    showed 886.36, and when we received that in the mail I called

7    and wanted to opt out then.

8        Romeo talked me into going ahead and doing the trial mod

9    through October and opting out of it then.  So we paid our last

10   payment -- we paid our October payment early, so that we could

11   start working on opting out.  And that was at the -- that was

12   in October.  They didn't finally get rid of that modification

13   until January.  So all of that time that we were trying to opt

14   out and pay our original payment of 657.25, they wanted 886 or

15   $836.86 or 886.36.

16       THE COURT:  I think it was 886.36.

17       THE WITNESS:  Eight eighty-six.  I'm sorry.  I'm

18   starting to get flustered.

19   A.   They wanted the 886.36 from July on.

20   Q.   What was the situation with regard to any escrow shortage?

21   A.   They ignored me.

22   Q.   But did it exist?

23       THE COURT:  May I ask you this?  Were you paying the

24   taxes and insurance yourself?

25       THE WITNESS:  Yes.  We actually walked in to pay our

RESIDENTIAL CAPITAL, LLC, ET AL.                    33

1  spring tax -- we actually walked in to pay our taxes in August

2  of 2009, before the modification was ever supposed to have been

3  finalized.

4          THE COURT:  Right.  Yes.

5          THE WITNESS:  They'd already paid them.  And at that

6  point our escrow shortage would have been eighty-two dollars.

7  Not what they said it was.  And there was no way we would have

8  had an escrow shortage payment of over 104 dollars.

9          THE COURT:  Right.

10          THE WITNESS:  Because we never had an escrow.  The

11  escrow balance was zero.

12  Q.  That triggers a conversation about insurance.  Was there

13  force-placed insurance put on you?

14  A.  Yes.

15  Q.  With regard to Balboa.

16  A.  Correct.

17  Q.  And did GMAC attach some cost to that?

18  A.  Yes.

19          MR. MARGOLIS:  May I approach, Your Honor?

20          THE COURT:  Go ahead.

21  Q.  In reference to Exhibit number 9, please state what --

22  there are two exhibits.  State what they are for the record.

23  A.  This is our Mutual Fire Insurance declaration page.

24  Q.  Okay.  And at this point there are two of them.  And is

25  there any marking on --

RESIDENTIAL CAPITAL, LLC, ET AL.                                      34

1  A.  Yes.  Arlene Stump (ph.).  She's -- that's --

2           THE COURT:  I'm sorry.  I can't hear you.

3           THE WITNESS:  I'm sorry.

4  A.  Arlene Stump would be his secretary.  And she remembers --

5  she still remembers to this day having to call and fax in our

6  information to try to get that force-placed insurance off of

7  our account.

8  Q.  Okay.  Does it indicate a year?

9  A.  2 -- 2/11 of '09?

10 Q.  No, no.

11 A.  Up here?

12 Q.  On the fax part.

13 A.  October 30, '09.

14 Q.  And then on the other one, is it basically the same

15 document?

16 A.  Yeah, but this was our bill.

17 Q.  Okay.  And does this indicate a fax marking?

18 A.  10/20 of '14.

19 Q.  And does that go to anyone in particular?

20 A.  Morrison & Foerster.

21 Q.  Was there any actual termination by GMAC of the forced-

22 place insurance, to your knowledge?

23 A.  No.  Whenever we would call Balboa was the only insurance

24 company that would get brought up, which concerned me, because

25 we've never had Balboa as our insurance.  It's always been --

RESIDENTIAL CAPITAL, LLC, ET AL.                    35

1   I'm sorry?  State Farm.

2         UNIDENTIFIED SPEAKER:  Well, when this was --

3   A.  Jim Wright.

4         UNIDENTIFIED SPEAKER:  -- State Farm.

5         THE COURT:  No, no, no, no.  You can't --

6   A.  It was Jim Wright, which is who my father had as an

7   insurance agent, and then we switched over to Mel Burkhart, but

8   we were with Mel Burkhart before Homecomings went to GMAC.

9         THE COURT:  Let me just make sure I understand what --

10  Exhibit 9, the Mutual Fire Insurance Co., is the insurance that

11  you believe you had in place at this time period of June, 2009.

12        THE WITNESS:  Yes.  It's the one we did have in place.

13        THE COURT:  All right.  Okay.

14        THE WITNESS:  And we had had that same policy --

15        THE COURT:  All right.  I understand.

16        THE WITNESS:  -- for years.

17        THE COURT:  Go ahead.

18  Q.  Okay.  Was that conveyed to the agent and employees of

19  GMAC?

20  A.  Several times.

21  Q.  Do you recall any names?

22  A.  Oh, gosh.  Shipalla (ph.)  And I think one was named Mary.

23  Q.  Do you recall time frames?  From when to when?

24  A.  From October, the beginning of Oct -- well, I started

25  questioning the forced-place insurance from the very beginning,

RESIDENTIAL CAPITAL, LLC, ET AL.                        36

1    from June of '09.  But it was when I had contacted a --

2          THE COURT:  May I ask you?  When did you understand

3    that GMACM put the forced-place insurance on the property,

4    covered the property with the forced-place insurance?

5          THE WITNESS:  I didn't discover that until -- I didn't

6    discover exactly what that was.  I knew the charge was there,

7    but I didn't understand why.

8          THE COURT:  Okay.

9          THE WITNESS:  I had called one of the HOPE NOW, and

10   they put me in contact with a gentleman named Mike Davis, who

11   had been an underwriter, and he said -- which is how Arlene

12   Stump got involved -- he said that what he thought happened was

13   when it transferred from Homecomings to GMAC the homeowners

14   insurance information didn't get transferred with it.

15         And he said a quick remedy would be to have our

16   insurance agent send in the declaration page, which is -- we

17   thought that would fix it.  And it didn't.  And that's when

18   Balboa's name started popping it.

19         THE COURT:  Go ahead, Mr. Margolis.

20   Q.  Okay.  Now, when you were talking to them, did the various

21   employees of GMAC make representations to you?

22   A.  Yes.  Some of them did.  I actually spoke to people in

23   Balboa's insurance department.

24   Q.  Okay.  Like what were you told by GMAC?

25         THE COURT:  Well, Balboa is not the same as GMAC, Mr.

1    Margolis.

2            MR. MARGOLIS:  GMAC.  I'm sorry.

3    Q.  What did GMAC tell?

4    A.  They would transfer me to a different department.  They

5    would say it was loss mitigation.  Because nobody could figure

6    it out.

7    Q.  What -- okay.

8    A.  Their own people were confused.

9            MR. WISHNEW:  Your Honor, objection to this line of

10   questioning.

11           THE COURT:  Overruled.

12   Q.  What topics were covered?

13   A.  Loss mitigation, escrow, homeowners insurance, and I would

14   get bounced back and forth between all those different

15   departments.

16   Q.  And was escrow an ongoing conversation?

17   A.  Yes.

18   Q.  Was there any conversation about repayment agreements?

19   A.  The only repayment agreement we had was with Jenna Williams

20   for 355, and they broke that.  They broke that agreement.

21   Q.  Okay.

22           MR. MARGOLIS:  May I approach, Your Honor?

23           THE COURT:  Go ahead.

24   Q.  I refer you to Exhibit number 5.  Please look at that, and

25   please state for the record what that is.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    38

1   A.  It's the re -- excuse me.  It's the repayment agreement and

2   the check that they sent back.

3   Q.  Okay.  So based on this, GMAC said you pay 355 for 3

4   months, and we'll do whatever for you.

5   A.  Well, that was at the end of the typo debacle, and I was

6   working -- actually Dick Lugar got involved.  Fannie Mae got

7   involved.

8           THE COURT:  Senator Lugar?

9           THE COURT:  Yes.  Senator Lugar.  I'm sorry.  Senator

10  Lugar got involved.  And we got in touch with Jenna Williams

11  and the -- I don't -- she was, like, a special office.  She was

12  our contact person.

13          THE COURT:  At GMAC?

14          THE WITNESS:  At GMAC, yes.

15  A.  And so when Jenna Williams got involved, and we discovered

16  the typo, which wasn't until December of 2009.  It was late.

17  We were behind.  Because they had been wanting 886.36, and we

18  couldn't afford to pay that.  So the 355 special payment came

19  when -- because she was working with Fannie Mae.  She was

20  working with Joe Scott.  I was contacting Joe Scott and Jenna

21  at the same time.

22       She set up the 355 payment until Bill could get back to

23  work, because he had just had surgery.  And so that was -- he

24  was supposed to go to back to work at the end of May, and so

25  that last payment in May was --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    39

1          THE COURT:  End of May, 2010?

2          THE WITNESS:  Of 2010.  It was supposed to help us

3    until he started getting a full paycheck again, because he was

4    just getting the short-term disability, which had they not done

5    the typo, this would have all been taken care of, and wouldn't

6    have had disability income to worry about, at this point.

7          But she -- she set up the 355.  We made those

8    payments.  We paid bills in May.  They sent the check back and

9    demanded 700 -- almost 800 dollars.  And when that happened,

10   she said that, you know, she couldn't guarantee that we would

11   get any other offers and that we would be subject to

12   foreclosure.  And again, we still wanted to save the property.

13   So we let all those checks bounce that we had already paid out,

14   just to make sure that GMAC got the full -- even though it was

15   supposed to be 355.

16   BY MR. MARGOLIS:

17   Q.  Okay.  They returned the check for 355?

18   A.  Yeah.  Out of -- out of the blue.

19   Q.  Okay.  And they kept the two other checks for 355,

20   correct?

21   A.  Yes.  Yes, they did.

22   Q.  Did GMAC ever account for those, say how they were

23   applied, anything like that?

24   A.  No, they never accounted for any of the --

25         THE COURT:  What does this have to do with the RESPA

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

1    claim?

2            MR. MARGOLIS:  It goes to the damages and the

3    financial impact and pressure they put on them.

4            THE COURT:  Let's get through this stuff.

5            MR. MARGOLIS:  Okay.

6            THE COURT:  I don't think this is really connected to

7    the RESPA claim.

8            MR. MARGOLIS:  Okay.

9    Q.  With regard to medical issues, were there medical issues

10   with your husband?

11   A.  Yes.

12   Q.  And what were they?

13   A.  He had a heart attack the day he made his last payment.

14           THE COURT:  Say that again?

15           THE WITNESS:  He had a heart attack the night that he

16   made his last payment to GMAC.

17           THE COURT:  When was that?

18           THE WITNESS:  May 14th, 2011.  Well, it would've been

19   early morning, May 15th.

20   Q.  Okay.  At this point I would like to show you medical

21   bills.  I'm asking you to look at Exhibit number 23?  That

22   is -- is that the main bill?

23   A.  Yes.

24   Q.  Okay.  And that's -- and that was for how much?

25   A.  Which one, the 68-?

RESIDENTIAL CAPITAL, LLC, ET AL.                    41

1   Q.  Yes.

2   A.  68,194.

3   Q.  And were there other bills that were associated with that

4   heart attack?

5   A.  Yes.  1,322.  There would have been the ambulance rides.

6   Q.  And was there a radiology bill?

7   A.  Yes.  He had to have a stent put in.  I mean, there's

8   still his medication that he has to take.

9   Q.  Right.  And was there another bill?

10  A.  Um-hum.

11          THE COURT:  If you're referring to exhibits, you

12  better tell everybody what exhibits you're referring to --

13          MR. MARGOLIS:  Okay.

14          THE COURT:  -- Mr. Margolis.

15          MR. MARGOLIS:  I'm sorry.  It's -- that was Exhibit

16  26, 25, and 24.

17  Q.  Is it your opinion that the actions of GMAC were

18  proximately the cause for your husband's heart attack?

19  A.  Yes.

20  Q.  Explain that?

21  A.  They would get him so worked up.  I mean, he -- because

22  they had lied so much in the past, he got tired of dealing with

23  them, so I dealt with them.  It was constant stress; constant.

24  Every day they would call.  And I never -- whenever I was home,

25  I would answer the phone and I would go through the whole thing

1    again about the escrow shortage not being correct, about all of

2    it.

3    Q.  Okay.  Did it do any good?

4    A.  No.  Once we got -- I mean, with after the Jenna, in 2010,

5    we -- we took the modification because we didn't think we had

6    any other choice.  And we stayed current until December.  And

7    life happened.  And we were one month behind.  And I called

8    them and I asked them to -- because we were going to -- we were

9    borrowing from the rest of what my husband had left in

10   retirement to get them caught up.  I told them we had to wait

11   until a specific date, and I would call in -- and you can look

12   at the servicing notes -- I called in that day and I caught it

13   up.  But they -- they said they wouldn't report us to the

14   credit bureaus, but they did anyway.  Because they kept saying

15   stay current, stay current, you can refinance into a better

16   loan.  Stay current.

17       So we fought to stay current, and we were trying to

18   refinance through GMAC, but the water -- the mortgage was

19   underwater and they wouldn't do it.  And so that let us through

20   until my husband had the heart attack.  And after he had the

21   heart attack and the medications were so -- because he had to

22   be on Plavix for so long afterwards because of the stent.

23   That's when I applied for the Rural Development loan.  It was

24   denied.  I appealed it, and I won.  But --

25           THE COURT:  Did you ever take -- did you ever get a

RESIDENTIAL CAPITAL, LLC, ET AL.                    43

1    loan from --

2            THE WITNESS:  They wouldn't let us.  GMAC wouldn't

3    short sell it back to us.  So they wouldn't.  They didn't want

4    to take the 10,000 that Rural Home Development was offering.

5    Q.  Was there an adverse effect on your husband's pension

6    retirement?

7    A.  Yes, it's gone.

8    Q.  Please tell the judge what happened?

9    A.  Well, the first -- the first one was a while back; but all

10   of that went to GMAC to keep them from foreclosing before we

11   asked for the modification.

12   Q.  Was that the loan that was taken out?

13   A.  That would've been the first one.  And the second one

14   was --

15   Q.  Okay.  Okay.

16           MR. MARGOLIS:  May I approach?  I'd like to show

17   Exhibit 10.

18   Q.  And is that the document to which you refer?

19   A.  The one -- this one is the second one.  We had to take out

20   that because they had shot our credit so bad, our van blew up

21   and we needed to get a new vehicle, because we had small

22   children.  And we had to -- we had to take all the money out of

23   the retirement to purchase a vehicle because we couldn't get

24   credit.

25   Q.  How much was that?

1   A.  It was 10,000.

2   Q.  Okay.

3   A.  And not all of that went to the vehicle.  That went to

4   other bills and to catch GMAC up when -- what I was just

5   explaining, in December, when they said that they wouldn't

6   report us, and they did.  So part of that went to GMAC.  Part

7   of it went to buy a vehicle and to pay -- to pay bills and to

8   try to get caught back -- because those insufficient check

9   fees, they -- they were there for a long time.  It was really

10  hard to get rid of all of the negative impact that those

11  brought.

12  Q.  Now, at page 2 of Exhibit 10 shows a zero balance on the

13  total investment account?

14  A.  Yes.

15  Q.  And it also shows $26,227.40 that was gone.  Please tell

16  the judge what happened?

17  A.  We had to use it to survive.  We couldn't get credit

18  anywhere else.

19  Q.  How was that tied to the actions of GMAC and their agents

20  and employees?

21  A.  They were real -- well, they wouldn't let us make a

22  mortgage payment.  That was a big one.  Them not letting us

23  make a mortgage payment and not letting us make our original

24  mortgage payment, the real mortgage payment.  I had one

25  representative ask me well, can't you pay the 886.36?  And I

1  said no, we can't.  We couldn't afford the 657.25, we sure

2  can't afford 886.36.  But more importantly, I refused to agree

3  to something that I knew was incorrect.  I knew it wasn't

4  right, and there was no way they were going to get me to pay

5  886 and basically say okay, I know you're wrong, but I'm going

6  to pay you anyway, at the detriment to my kids.

7      We had already had to go to the trustee for clothes and

8  food and electric.

9  Q.  How did the actions of GMAC create and/or compound that

10 situation?

11 A.  The insufficient check funds were really a big thing.

12 That -- that did a lot of damage.  And it was at that point

13 that we had to go to the trustee for the electric and the food

14 and --

15         THE COURT:  What trustee?

16         THE WITNESS:  Jackson Township Trustee in the County.

17         THE COURT:  Okay.

18 Q.  And okay.  Now, did GMAC ever refuse payments from you?

19 A.  Yes.

20 Q.  When?

21 A.  June, July, November, December --

22         THE COURT:  What year?

23 A.  -- January, February -- June, July of 2009.  December of

24 2009.  January of 2010.  And February of 2010.  It wasn't until

25 we started making the special payment agreement that we had

1   with Jenna for 355, that we made another payment.  And they

2   refused the 657 all that time, even though Romeo said at the

3   very beginning we could opt out.  They refused to let us opt

4   out, and they refused to let us make our mortgage payment.

5   Q.  Did you ask and seek a resolution of this problem?

6   A.  Yes, we wanted to get rid of the modification.  And I had

7   one gentleman tell me that if we got rid of the modification,

8   all of the late fees would be due, the escrow shortage would be

9   due immediately, which didn't exist, and the payment would go

10  back to 886.36.  And I said wait a minute, the payment was

11  never 886.36.

12  Q.  Okay.  So in all this time, was the escrow shortage ever

13  addressed?

14  A.  No.

15  Q.  Was it ever corrected, modified, changed, altered,

16  whatever?

17  A.  No.

18  Q.  And that -- okay.  I'd like to show you Exhibit 8.  Please

19  state what that is for the record?

20  A.  That is a qualified written request from Ocwen in 2013,

21  which shows this exact same information that GMAC was -- was

22  giving us back in 2009.

23  Q.  Was it your -- so did GMAC ever resolve this issue?

24  A.  I don't believe so.  No.

25  Q.  And then -- and then the issues you raised in the October

RESIDENTIAL CAPITAL, LLC, ET AL.                                    47

1    30th, 2009 qualified written request, were they ever dealt with

2    affirmatively and just eliminated?

3    A.  No, they never addressed the escrow shortage that didn't

4    exist.

5    Q.  In the subsequent qualified written request, did you

6    repeat those?

7    A.  Yes.

8    Q.  Did it do any good?

9    A.  No.

10        MR. WISHNEW:  Your Honor, objection as to form.  Mr.

11   Margolis said a "qualified written request".  Which ones are we

12   talking about?

13        MR. MARGOLIS:  Oh, oh.

14        THE COURT:  There's only one in issue in this trial,

15   Mr. Margolis.

16        MR. MARGOLIS:  I understand.

17        THE COURT:  And that's the October 30th, 2009 letter.

18        MR. MARGOLIS:  Yes.  Okay.

19   Q.  But the issues that were raised, that specifically

20   included the escrow shortage.  Was that ever resolved?

21   A.  No.

22   Q.  When GMAC sent you a statement or whatever, do you believe

23   that's true, accurate, and correct?

24   A.  No, because it reflected the 886.36 payment that never

25   existed.

RESIDENTIAL CAPITAL, LLC, ET AL.                    48

1   Q.  What about the escrow shortage?

2   A.  That was included in the 886.  It was --

3   Q.  Was there -- were there fees and costs and other things

4   that were included?

5   A.  The late fees that were accruing, yes.

6   Q.  Okay.  Did you inquire with GMAC for an explanation what

7   those were?

8   A.  Yes.  And I also asked GMAC to show me where the trial

9   period money went, because according to their contract, 150

10  dollars of it was supposed to be set aside specifically for

11  escrow.

12  Q.  What was the response?

13  A.  I still don't know what they did with that money.

14  Q.  Well, what -- did any agent or employee of GMAC call

15  you --

16  A.  No.

17  Q.  -- and say we did X, Y, and Z?

18  A.  No.

19          THE COURT:  How does that relate to the RESPA request,

20  the October 30th, 2009 letter?  I don't see these --

21          THE WITNESS:  It would --

22          THE COURT:  -- issues addressed in that letter, Mr.

23  Margolis.

24          THE WITNESS:  It would have been in the history -- the

25  payment history.  It didn't show the 150 dollars going to

RESIDENTIAL CAPITAL, LLC, ET AL.                    49

1    escrow.  It showed zero dollars going to the escrow.

2           THE COURT:  Let's go, Mr. Margolis.

3           MR. MARGOLIS:  Okay.

4    Q.  At this time, what's your current situation as far as

5    GMAC?

6    A.  We don't have -- I mean, we don't have anything other than

7    this case right here, nothing.

8    Q.  Okay.  In December of '14, there was a transfer to Ocwen.

9           MR. WISHNEW:  Objection, Your Honor.

10           THE COURT:  It's the wrong date, Mr. Margolis.

11    Q.  Okay.

12           MR. WISHNEW:  It was February 2013, which explains

13    why -- I won't testify, Your Honor.

14           THE COURT:  In February 2013, Ocwen closed on the

15    purchase of the ResCap loan servicing platform.  Servicing

16    rights were transferred.  I don't want to hear about this,

17    Mr. --

18           MR. MARGOLIS:  Okay.  All right.

19           THE COURT:  -- Mr. Margolis.

20           MR. MARGOLIS:  All right.

21    Q.  So we've covered damages for financial, correct?

22    A.  Yes.

23    Q.  We've covered damages with regard to the diminishment of

24    the value of the property?

25    A.  Yes.

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1   Q.  We've covered damages with regards to medical issues that

2   were caused with regard specifically to the heart attack?

3   A.  Yes.

4           THE COURT:  Could I ask you this?  Did you have health

5   insurance?

6           THE WITNESS:  I'm sorry?

7           THE COURT:  Did you have health insurance?

8           THE WITNESS:  We did have health insurance.

9           THE COURT:  So how much of the hospital and doctor

10  bills did you and your husband -- were you actually charged?

11          THE WITNESS:  We were getting like twenty percent.

12  We -- they paid eighty.

13          THE COURT:  Yeah, I mean, I don't know the exact

14  figure, but it looked to me in total it was less than 5,000

15  dollars you were actually charged?

16          THE WITNESS:  It was probably closer to 10-, because

17  he --

18          MR. WISHNEW:  Your Honor --

19          THE WITNESS:  -- went to different hospitals.

20          THE COURT:  Well, I'll see what Mr. Wishnew wants --

21  if he wants to cover this, but --

22          MR. WISHNEW:  I'll bring it out in cross.

23          THE COURT:  Okay.  Go ahead, Mr. Margolis.

24          MR. MARGOLIS:  Okay.

25  BY MR. MARGOLIS:

RESIDENTIAL CAPITAL, LLC, ET AL.                    51

1  Q.  Based on the actions with regard to the October 30th,

2  qualified written request and those specific items, and the

3  content and the figures that we have put forth, are you aware

4  of any other actual damages suffered as a direct and proximate

5  cause from GMAC's actions following the October 30th, 2009

6  letter?

7  A.  Monetarily, no.

8  Q.  Has that affected you in a nonmonetary way?

9  A.  Yes.  Every day.

10 Q.  Please explain that?

11 A.  My kids -- well, it's horrible to have a five and a three-

12 year-old watch you cry because you can't get people to

13 understand that they are wrong.  They're wrong.  There was

14 never an escrow shortage and our payment never 886.36.  And to

15 have people knocking on the door doing property inspections

16 with my kids there.  They didn't understand what was going on.

17 To them, they thought they were coming to kick us out of the

18 house.

19 Q.  Now, as I understand it, the -- when Ocwen assumed it the

20 amount was now, 90,000 dollars?

21 A.  And that's not -- it's not correct.

22 Q.  But --

23 A.  Yes.

24 Q.  -- Ocwen is simply saying it's --

25 A.  Somewhere in the area.

1  Q.  -- saying the amount is 90,000, correct?

2  A.  Correct.

3  Q.  Okay.  Have you -- did you ever receive the information to

4  address that with Ocwen from GMAC --

5       THE COURT:  I don't understand your question.

6       MR. MARGOLIS:  Okay.

7  Q.  Did GMAC ever explain what they did prior to them

8  transferring the mortgage?

9  A.  No.  I still, to this day, don't know how they came up

10  with the escrow shortage amount.

11  Q.  Has that carried over to Ocwen and whoever else --

12  A.  If you --

13       MR. WISHNEW:  Objection, Your Honor.

14  A.  -- look at it --

15       THE COURT:  Sustained.

16       MR. MARGOLIS:  Okay.

17  Q.  Okay.  The October 30th -- it embraced problems with their

18  record-keeping, correct?

19  A.  Yes.

20  Q.  Okay.  And that included their June 10th, letters to you,

21  the two of them?

22  A.  Yes.

23  Q.  Okay.

24       THE COURT:  Go ahead.  Let's go.

25  Q.  Okay.  There are two --

RESIDENTIAL CAPITAL, LLC, ET AL.                    53

1          THE COURT:  You're going to be here for days at the
2   rate you're going, Mr. Margolis.
3   A.  Yes, I --
4          THE COURT:  I'm just telling you.
5   Q.  Okay.  There are two -- one is Homecoming and one is --
6   A.  One is GMAC.
7   Q.  -- GMAC.  And one says "as of" --
8          THE COURT:  What exhibit are you looking at?
9          MR. MARGOLIS:  Okay.  And then --
10         THE WITNESS:  What exhibit?
11         THE COURT:  What exhibit, Mr. Margolis?
12         MR. MARGOLIS:  It's 3.
13  Q.  And then you have another one with only GMAC --
14         THE COURT:  If you're going to identify exhibits,
15  you've got to identify them by exhibit number.  I can't read
16  your mind, and I have to have a clear record.
17         THE WITNESS:  What's this number?
18         THE COURT:  What exhibit are you looking at?
19         MR. MARGOLIS:  Oh, I'm at 3.  It's two debt validation
20  letters.
21         THE COURT:  Okay.
22  Q.  The content of these do not match?
23  A.  Correct.
24  Q.  Homecomings was a GMAC company?
25  A.  It was actually in their objection where they explained

RESIDENTIAL CAPITAL, LLC, ET AL.                    54

1   the difference in the two amounts.  So I know today what

2   those -- the differences is between the two.  But it wasn't

3   until this court got involved that they put the discovery in

4   and explained that it was the G -- the Homecomings didn't have

5   the late fees that GMAC showed.

6   Q.  Well, but same database, correct?

7   A.  Yes.

8           MR. WISHNEW:  Objection, Your Honor.

9           THE COURT:  Well, you don't know that.  Come on, now.

10          MR. MARGOLIS:  I -- okay.

11  Q.  But the one with Homecomings and GMAC, this shows a zero

12  escrow balance --

13  A.  It does show zero escrow.

14  Q.  -- and the other one shows late charges, et cetera?

15  A.  Yes.  The zero escrow, yes.

16          MR. MARGOLIS:  Thank you.  I think that covers it.

17          THE COURT:  All right.  Cross-examination?

18          MR. WISHNEW:  Thank you, Your Honor.  Your Honor, if I

19  could approach?  I have a binder.

20          THE COURT:  Yes, go ahead.

21          MR. WISHNEW:  Thank you.

22  CROSS-EXAMINATION

23  BY MR. WISHNEW:

24  Q.  Good morning, Ms. Futrell.

25  A.  Good morning.

RESIDENTIAL CAPITAL, LLC, ET AL.                    55

1  Q.  My name is Jordan Wishnew, I'm counsel to the ResCap

2  Borrower Claims Trust, who is the successor-in-interest to

3  Residential Capital and its subsidiaries, which included GMAC

4  Mortgage and Homecomings.

5      Just a few questions about your testimony with Mr.

6  Margolis.

7  A.  Okay.

8  Q.  Were you -- did you file a proof of claim in this

9  bankruptcy?

10  A.  Yes.  My husband did.

11  Q.  Your husband did, but not you?

12  A.  Yes.

13  Q.  Okay.  And is your name -- are you a signatory to the note

14  for this underlying loan?

15  A.  No.  But I was the one home and I was the one that

16  spoke --

17          THE COURT:  I can't hear you.  I'm sorry.  You have to

18  speak a little louder.

19  A.  I was the one at home, and I'm the one that spoke with

20  GMAC.

21  Q.  Okay.  Are you a signatory to the underlying mortgage for

22  this loan?

23  A.  No.

24  Q.  All right.  Are you a medical doctor?

25  A.  No.

RESIDENTIAL CAPITAL, LLC, ET AL.                    56

1  Q.  Do you have any medical training?

2  A.  I'm a mother.

3  Q.  Okay.  I respect that, absolutely.

4      With regards to the cause of your husband's heart attack,

5  is there any report being offered to substantiate the reasons

6  for his heart attack?

7  A.  There are several reports that show stress kills.

8  Q.  Are they before the Court today?

9  A.  No.

10 Q.  Okay.  What is your and your husband's occupation?

11 A.  I am a kindergarten aide/teacher.

12 Q.  And your husband's occupation?

13 A.  He's disabled, he doesn't work.

14 Q.  Okay.  And how long hasn't he worked?

15 A.  Since 2011 or -- no -- yeah.  2012.

16 Q.  Is that subsequent to his heart attack, he was on

17 disability?

18 A.  It was after his heart attack.

19 Q.  Okay.  And so prior to his heart attack, what was his

20 occupation?

21 A.  Steel fabrication.

22 Q.  Steel fabrication?

23 A.  Um-hum.

24 Q.  Would you say that's a stressful job?

25 A.  Not really.  Strenuous.

RESIDENTIAL CAPITAL, LLC, ET AL.                    57

1  Q.  Not at all?

2  A.  Strenuous, but not stressful.

3  Q.  Strenuous?

4  A.  Strenuous, but not stressful.

5  Q.  But strenuous can cause stress, correct?

6  A.  Is it before the Court to --

7  Q.  I'm sorry?

8  A.  Is it before the Court today?

9  Q.  Is what before the Court?

10 A.  Whether it can cause -- can cause stress?  You asked me

11 the same question.

12 Q.  You've opined today that GMAC mortgage was the cause of

13 your husband's heart attack.  I'm trying to explore the basis

14 for your opinion.  So my question is, your testimony is that

15 your husband was a steel fabricator?

16 A.  Yes.

17 Q.  It was strenuous?

18 A.  It was strenuous.

19 Q.  And so my question is, could that strain be a factor

20 contributing to a heart attack?

21 A.  It could.

22 Q.  Okay.  And life in general with a family, children, is

23 also strenuous, correct, and stressful?

24 A.  It is when your mortgage company says that you owe but you

25 don't.  So --

RESIDENTIAL CAPITAL, LLC, ET AL.                    58

1   Q.  Okay.  If I could take you to the medical bill that Mr.

2   Margolis testified -- sorry, mentioned.  I think it's Exhibit

3   22 in the spiral binder.

4   A.  Yes.

5   Q.  So --

6          THE COURT:  Hmm.  I don't think so.  23, 24, 25, and

7   26 are the --

8          MR. WISHNEW:  I apologize, Your Honor.

9   Q.  If I could ask you to --

10          MR. WISHNEW:  If I could approach for a moment?

11   A.  Is it 23?  Yeah.

12   Q.  So this is the Lutheran Hospital invoice, due date on the

13   top of it is July 8th, 2011?

14   A.  Um-hum.

15   Q.  Okay.

16          THE COURT:  You have to answer yes or no.  You

17   can't --

18   A.  Yes.

19          THE COURT:  Thank you.

20   Q.  Okay.  And on the left-hand side, middle of the page, what

21   is the total charges?

22          THE COURT:  I can read it.  Come on.  Let's --

23          MR. WISHNEW:  I'm sorry.

24          THE COURT:  The total charge is $68,194.68

25   Q.  The bottom line is, would you agree that there were

RESIDENTIAL CAPITAL, LLC, ET AL.                    59

1  insurance payments of 15,048 dollars and change?

2  A.  Yes, our -- it says pay this amount, it's 3,762.

3  Q.  Okay.  So the out-of-pocket cost to you and your

4  husband -- I'm sorry, the out-of-pocket cost to your husband

5  was $3,762.16?

6  A.  Just for the room, yes.  That wasn't for the procedures.

7  Q.  Okay.  And the second page of that same exhibit dated

8  September 21st, 2011 --

9          THE COURT:  I only have one page in this exhibit.  Are

10  there two pages to this exhibit?  Wait, let me just double -- I

11  only have one page.  Hold on.

12          Go ahead.  My law clerk has given me her copy of it.

13  My copy only has the one page.  But go ahead.

14          MR. WISHNEW:  I apologize for the mix-up, Your Honor.

15  Q.  Is the amount under "Please pay this amount:  $1,322.58"?

16  A.  Yes, that would've been for the cardio and --

17  Q.  Okay.

18  A.  -- and his EKGs.

19  Q.  Okay, very good.  And it was your testimony that GMAC

20  Mortgage did not resolve the escrow issue going back to June

21  2009, correct?

22  A.  Correct, yes.

23  Q.  Okay.  If I could ask you to turn to Exhibit J in the hard

24  binder?

25  A.  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    60

1    Q.  Have you seen this document before today?

2    A.  Is it dated 5/20/2010?

3    Q.  Yes.  It's addressed -- it's a document from GMAC Mortgage

4    addressed to your husband, William J. Futrell?

5    A.  Yes.

6    Q.  Okay.  And if I could ask you to turn to the last page of

7    that exhibit?  Is that your husband's signature?

8    A.  Not really.  No.

9    Q.  Not really?

10   A.  No, he doesn't have the underlined little loop in there.

11   Q.  I'm sorry, the loop where?

12   A.  On his F.  That F, it looks like.

13   Q.  Okay.  Let's see.

14       (Pause)

15   Q.  If I could ask you to turn to Exhibit DD in the hard

16   binder?  This is the response to interrogatories from the

17   ResCap Borrower Claims Trust executed on September 25th, 2015

18   by William J. Futrell.

19   A.  Okay.  I see the last page.  Yes, that's my husband's

20   signature.

21   Q.  That's your husband's signature?

22   A.  Um-hum.

23   Q.  And you're telling me that the signature on Exhibit J is

24   not the same --

25           THE COURT:  Let's not spend time on it.

RESIDENTIAL CAPITAL, LLC, ET AL.                    61

1          MR. WISHNEW:  Okay.

2          THE COURT:  I'll conclude after comparing the

3    signatures if they're the same.

4          MR. WISHNEW:  Fair enough, Your Honor.

5    Q.  If I could take you to the USDA letter dated August 10th,

6    2011?  I believe it's Exhibit 20 in the spiral binder.

7    A.  Okay.

8    Q.  So --

9          MR. MARGOLIS:  Excuse me.  May I approach with a copy

10   of --

11         THE WITNESS:  I've got it.

12         THE COURT:  She has it.

13         MR. MARGOLIS:  Oh, I'm sorry.

14   Q.  According to this letter, were there more than one

15   reason -- was there more than one reason for the USDA denying

16   your Rural Development Assistance?

17   A.  The -- yeah, there were two.

18   Q.  Was there two, or were there three?  I refer you to the

19   second and third paragraph of that letter:   "1) After

20   carefully analyzing the appraisal of the property, we are

21   unable to take favorable action.  The specific reasons for our

22   decision are:  the property appraised at 30,000 dollars?"

23   A.  Right.  The mortgage was --

24         THE COURT:  No, no, no.

25         Ask your question.

RESIDENTIAL CAPITAL, LLC, ET AL.                      62

1        MR. WISHNEW:  Thank you.  I'll continue, Your Honor.

2   Q.  "2) the property is not eligible; 3) your credit history

3   was not acceptable."  So clearly there was more than one reason

4   beyond the credit history that the USDA denied your rural

5   assistance, correct?

6   A.  Correct, but they all went back to GMAC.

7   Q.  Sorry -- and how was GMAC responsible for the value of the

8   appraisal of your property?

9   A.  It was underwater.  And we couldn't get any credit to fix

10  it, which is what --

11  Q.  Okay.  Do you contest that -- your testimony earlier that

12  the house was worth 60,000 dollars, when was that -- when was

13  the house purportedly worth 60,000 dollars?

14  A.  In 2007.

15  Q.  Okay.  But the balance of your loan was 76,000 dollars?

16  A.  Yes, it was underwater.

17  Q.  Okay.  So it was underwater in 2007, and continued to

18  remain underwater through 2011, correct?

19  A.  Yes.

20  Q.  Okay.  Thank you.

21  A.  It deteriorated.

22  Q.  Okay.

23  A.  The cost -- the value of the property was way less than

24  what we owed on it.

25  Q.  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    63

1   A.  We didn't take out any more money on it.

2   Q.  Just generally, in --

3         MR. WISHNEW:  I won't go very far into this, Your

4   Honor.

5   A.  And just to clarify, when we got the 2007 appraisal, GMAC

6   told me that it was because of the -- all the surrounding

7   houses that had gone into foreclosure.  So it wasn't something

8   that we did to make it that way.

9   Q.  Right.  So in -- all the surrounding houses going into

10  foreclosure in 2007 --

11  A.  Brought it down to 65 --

12  Q.  -- was because were on the preci --

13        THE COURT:  Let him -- stop, stop, stop.

14        Ms. Futrell?

15        THE WITNESS:  Yes.

16        THE COURT:  When Mr. Wishnew's asking a question, you

17  wait until he finishes, and then you can answer the question.

18  Don't interrupt.  I know you think you know what the question

19  is and you want to answer it right away, but courtesy and court

20  rules require you wait until Mr. Wishnew has finished his

21  question, and then you can respond.  I'm not going to let him

22  interrupt you.  Okay?

23        THE WITNESS:  Okay.

24        THE COURT:  Go ahead, Mr. Wishnew.

25        MR. WISHNEW:  Thank you, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1  Q.  So going -- in 2007, would you agree with me that the
2  country as a whole was on the precipice of economic collapse,
3  and property values were generally going down?
4  A.  Yes.
5  Q.  Okay.  So then your town was no different than anywhere
6  else in America?
7  A.  Correct.  And I --
8  Q.  Okay.  Okay.
9        MR. WISHNEW:  Let's see.
10       Just one moment to confer with my colleague, Your
11  Honor?
12       Your Honor, I have no more questions for the witness.
13  I'll address the issues on direct of Ms. Lathrop.
14       THE COURT:  Okay, any further questions?
15       MR. MARGOLIS:  Just one, Your Honor.
16       THE COURT:  Go ahead.
17  REDIRECT EXAMINATION
18  BY MR. MARGOLIS:
19  Q.  With regard to the question on the USDA and the credit,
20  has the issues that have flowed from the credit and the impact
21  of GMAC had an impact?
22  A.  They're not over.  We're still dealing with them.  Getting
23  better, but we're still dealing with them.
24  Q.  So is it a fair statement that the value and the condition
25  are two separate conversations?

RESIDENTIAL CAPITAL, LLC, ET AL.                    65

1    A.  Yes.

2    Q.  Thank you.

3            THE COURT:  I just want to ask you a few questions.

4    From what I've read, it looks like you missed a first payment

5    in December of 2007?

6            THE WITNESS:  Um-hum.

7            THE COURT:  Was that true?

8            THE WITNESS:  Yes.

9            THE COURT:  And I didn't go through the entire payment

10   history, but you said you always tried to stay just one payment

11   behind.  Were you making payments after December 2007?

12           THE WITNESS:  Yes, every month.

13           THE COURT:  And in June of 2009, how many payments

14   were you behind?

15           THE WITNESS:  One.

16           THE COURT:  All right.  I have no further questions.

17   Thank you.  You can go back to the table over there.  Thank

18   you.

19           Just leave the exhibits there.  Leave everything

20   there.

21           All right, Mr. Margolis, call your next witness.

22           MR. MARGOLIS:  I'd call William Futrell to the stand.

23           THE COURT:  Okay, Mr. Futrell, come on up.  If you

24   would turn and face the reporter and raise your right hand,

25   you'll be sworn, okay?

RESIDENTIAL CAPITAL, LLC, ET AL.                    66

1      (Witness sworn)
2          THE COURT:  Okay, you could have a seat.  If you'd
3  like some water in the pitcher?
4          Go ahead, Mr. Margolis.
5          MR. MARGOLIS:  Thank you.
6          THE COURT:  Let's start by getting him to affirm that
7  his witness statement is true and correct, okay?
8          MR. MARGOLIS:  Yes.
9  DIRECT EXAMINATION
10  BY MR. MARGOLIS:
11  Q.  Is the summary that was prepared and executed and
12  proffered to the Court true, accurate, and correct?
13  A.  Yes, they are.
14          THE COURT:  Okay.  Go ahead, Mr. Margolis.
15          MR. MARGOLIS:  Okay.
16  Q.  Okay, so the first contact you had with Homecomings/GMAC
17  was in what year?
18  A.  Okay.  It was around 2001, I got it through Aegis, and
19  they automatically sold it to Homecomings.  So around 2001,
20  beginning of the year, I believe.
21  Q.  Okay.  And your payments were what?
22  A.  657.25 monthly.
23  Q.  Okay.  At what point did it commence with Homecomings/GMAC
24  about a loan mod?
25  A.  Homecomings/GMAC transferred servicing rights, I believe,

RESIDENTIAL CAPITAL, LLC, ET AL.                    67

1    in '09, and I was at work most of the time.

2            THE COURT:  I'm sorry, you were at work?

3    A.   I worked.  I worked at a factory.  I set molds and worked

4    on presses.  And so I spent a lot of my time there.  And I --

5    once they took over, I would make my payments, and if I -- I

6    knew that in my heart that I sent the payment in within three

7    weeks' time, so they should have gotten it on time.  But I

8    started getting late fees.  And that --

9            THE COURT:  When was --

10   A.   -- was the beginning of the problem --

11           THE COURT:  -- just tell me when that was,

12   approximately?

13           THE WITNESS:  I'm not sure.  I'm assuming 2008, 2009,

14   2010.  I'm not real good on time, because most of my time was

15   at the factory.

16   Q.   How would you send the payments to GMAC/Homecomings?

17   A.   Well, when I -- when I sent in a payment, and I saw that I

18   was getting a late fee for it, because it wasn't there on time,

19   and I knew that it had plenty of time to get there, I started

20   sending them certified receipt requested mail, and it cost me

21   extra money, but at least I didn't have to worry about that

22   late fee.

23       And eventually I got to the point where I could call in to

24   the mortgage company and use their service to pay online or on

25   phone which the service -- and I didn't know this at the time,

RESIDENTIAL CAPITAL, LLC, ET AL.                      68

1  but I figured it out through doing it, I knew it cost, but it

2  was $7.50 to make a payment by phone, but the thing is, that

3  saved me money, because that was less than the certified

4  payments I was making to the post office.

5       But the thing is, if some individual would open --

6  operate -- worked there would pick up the phone, it cost me

7  $12.50.  It cost me an additional five dollars just to talk to

8  the person to make my payment.  And I had no control over if I

9  talked to them or not.  So I could not save that extra five

10 dollars just by talking to a machine.  But I felt I had no

11 recourse but to make sure that the payment got there.

12         THE COURT:  Mr. Margolis, this is a trial about the

13 October 30th, 2009 --

14         MR. MARGOLIS:  Okay.

15         THE COURT:  -- RESPA request.

16         MR. MARGOLIS:  Okay.

17 Q.  Okay.  The issue really became a problem in '09 with the

18 June 17th, '09?

19 A.  Yeah -- just -- yeah.

20 Q.  And it was in that document where there was the issue of

21 the escrow shortage?

22 A.  Yes, this -- the escrow shortage was a major problem and

23 still is.

24 Q.  And the 12.97 stated on the document and the 15-whatever,

25 it's stated in the service notes, correct?

1   A.   Yes.

2   Q.   And was that ever resolved?

3   A.   No.

4   Q.   What efforts did you personally make to seek to get that

5   resolved?

6   A.   Well, when this became an issue, and I was having problems

7   with the escrow amount, we tried to get a modica --

8   modification.  And the whole point was, they wanted 150 dollars

9   a month for escrow.  Okay.  That's over 1,500 dollars a year.

10  I paid like 600, and I know this, and I tried to convince this

11  to them that hey, this is a problem.  And they still won't

12  listen.

13       They come up with these numbers that the 1,249.71, you

14  divide that by twelve months, it's over 100 dollars a month.

15  We'd just established that I paid 40 a month, okay.  This had

16  been going on for some time.  I tried to get them to

17  understand, and they sent it back and regurgitated another one

18  with the same type of escrow.

19       Ended up, sometime we spoke with you, and I believe it was

20  you who spoke to Senator Richard Lugar, who then called the

21  U.S. Treasury Department and spoke with Mrs. or Ms. Lynn Jones

22  (ph.), who then got us in touch with a Jenna Williams of the

23  executive offices of Homecomings, or GMAC -- same people,

24  whatever -- and that's where they decided, oh, there's a typo.

25  Well, that typo was a "one" in front of a "352.53".  But if you

RESIDENTIAL CAPITAL, LLC, ET AL.                      70

1    look closely, the one -- there's a 37 -- it's either 37 cents

2    or 53 cents on the back of 352 that I paid for insurance.  So

3    there was three digits wrong, not just the one.  But that was

4    their answer.  There's a typo.

5        They had me pay 325 a month for three months.  I paid them

6    early.  That third payment, they sent back.  But that is the

7    first chance, by doing those things, that I got their attention

8    to hey, there's something wrong.  Their opinion was that it was

9    a typo.  My opinion is, they're trying to charge me money I

10   don't owe.

11   Q.  What is --

12   A.  And a --

13   Q.  Was the matter of the insurance and the "one" was that

14   resolved within sixty days?

15   A.  No.

16   Q.  Do you know how long it took?

17   A.  It's still ongoing, as far as I can tell, I mean.

18   Q.  And did that have something to do with the force-placed

19   insurance?

20   A.  There was a lot going on, then.  Yes.  The force-placed

21   insurance was brought up.  I believe that they denied it.  And

22   I didn't keep up with this.  It was too much for me.  I was

23   working, and I had a responsible job.  I was lead maintenance

24   man, and I was in charge of other guys having to set presses to

25   keep people working.  And so I was -- I let my wife take care

RESIDENTIAL CAPITAL, LLC, ET AL.                    71

1  of that, because I had enough on my plate.

2      I mean, if it weren't to the point that it was, where it

3  was so -- so extreme and so many things going wrong, it might

4  have been easier for -- easy enough where I could have dealt

5  with it, but I was getting mad.  I was -- I even told people,

6  hey, I want to deal with somebody face-to-face.  I want -- what

7  do I do?  How do I get out of this?  And I wasn't getting any

8  satisfaction.

9  Q.  Did -- I'm sorry.

10 A.  And I -- as you notice, I'm more primal than my wife.  But

11 I'm fine.

12          THE COURT:  Take it easy.  Relax.

13 Q.  Okay.  Were you aware of efforts to get GMAC to address

14 these issues?

15 A.  Yeah.  My wife was on the phone daily.  And there were

16 times they would call me daily.  When I'd come home, they'd

17 call any hour of the night, every day of the week, a different

18 person every time.  I could talk to two different people in

19 that organization in the same day.  And I even asked them,

20 don't you people talk to one another?  Don't you know what's

21 going on in your own company?  I mean, and that's what I saw,

22 because the -- it was like nobody knew what was going on.

23 Nobody could give me an answer.  And that's kind of why we're

24 here, because nobody gave me an answer.

25 Q.  With regards to the repayment agreement in 2010 for the

RESIDENTIAL CAPITAL, LLC, ET AL.                        72

1 three payments of 355, were you ever provided an explanation
2 for what happened to the other two payments of 355?
3 A.   No.   I wasn't even -- when that was paid, I was expected
4 to go in to pay my mortgage and have all this nonsense that
5 we've been dealing with, gone.   And it never happened.   It
6 just -- that 355 payment ended, a check came back, never heard
7 why.   Don't know what they did with the money.   And I know that
8 my mortgage never changed for the better.   I mean, I still have
9 no sense, coming out of it.
10 Q.   What about the content of the loan modifications?   Were
11 there issues that bothered you?
12 A.   Yeah, the first -- first couple was the excessive amounts
13 of escrow and the fact that I could not get it through to them
14 that this was wrong.   And eventually, they figured out, oh,
15 yeah, okay, it's like forty a month, so they started -- on
16 the -- on a payment of -- it came out to like 705 that I had
17 been paying, out of that 705, 48 of that, I believe, was for
18 escrow, which 40 of it was for escrow, and the other 8 was for
19 a back escrow shortage, which I never had.
20      Granted, I know for an escrow they have to have money, and
21 I could have that shortage, if I don't put it up.   And I get
22 that's where that's coming from.   But these amounts, the
23 figures were always extreme and never answered.
24 Q.   To your knowledge, did GMAC ever acknowledge and/or
25 explain why the service notes had a different escrow shortage

RESIDENTIAL CAPITAL, LLC, ET AL.                          73

1    than the June 17th document?

2    A.  By that time I -- no, they never explained to me.  But by

3    that time, I don't think they would have, if I would have

4    tried.  I was pretty well fit to be tied, and unfortunately, I

5    pushed it off on my wife rather than dealing with it myself.

6    Q.  Okay.  And let's talk about the damages flowing from this.

7    There was your pension 401(k)?

8    A.  Yes, that's gone.

9    Q.  Okay.  What -- what was your -- what was the effect of

10   GMAC's actions on your pension 401(k)?

11   A.  Well, the fact that none of this ever got resolved, no

12   answers to why money went here or where my money was going and

13   why I wasn't getting anywhere, and not knowing what was going

14   on, my money went to pay them when they needed it.  Just -- I

15   jumped through hoops for them.  I thought, okay, we're going to

16   get this mortgage, we're going to pay for it, we're going to --

17   I didn't want to worry about my kids.  Let's face it.  My dad's

18   ninety-two.  He gave me and my family a house all my life, and

19   I want to do the same for mine.  And it looked like it wasn't

20   happening.  And I didn't like it.

21   Q.  Okay.

22   A.  And I did what I could to keep my children in a house.  So

23   I spent money the way I felt I needed to do to keep -- to keep

24   them alive.

25   Q.  Was there ever a refusal to sign a loan mod?

RESIDENTIAL CAPITAL, LLC, ET AL.                          74

1   A.   From me?  Oh, yeah.

2   Q.   Why?

3   A.   I wasn't going to pay 150 dollars a mortgage -- for

4   escrow, when I only paid 40.

5   Q.   Were those issues brought forward to GMAC agents and

6   employees?

7   A.   Repeatedly, by me and my wife.

8   Q.   What was their response?

9   A.   My response?

10  Q.   What was their response?

11  A.   I never got any real response from them about it.  They

12  would transfer me from one person to another.  I remember one

13  call in particular, a little off the subject -- it's still the

14  same subject but a little off.  I was going to make a mortgage

15  payment.  I couldn't tell you the date or anything I called.

16  And as soon as I called, they sent me to guy who says hi, I'm

17  Jonathan from loan counseling.  I said wait a minute, I don't

18  want to talk to you, I want to make a payment.  I couldn't make

19  a payment.

20      I had no choice in that.  I called them, they transferred

21  me to another man, and I couldn't get away from him.  And I

22  was -- I was livid, so I hung up and I -- yeah.

23  Q.   Has this affected the value of the property?

24  A.   Oh, indeed.  Yeah.

25  Q.   How?

1   A.   The house if pretty much past the point that a few minor

2   repairs here and there on a regular basis are going to get it

3   back to shape.  Now it's going to take major reconstruction,

4   plain and simple.

5   Q.   There were pictures previously shown.  Are they -- did

6   they pretty much represent how the house looks today?

7   A.   It's an indication of what it's started to -- what it came

8   to look as, yes.

9   Q.   Okay.  And at this point, how has the actions of GMAC

10  affected your credit and your ability to do any of this?

11  A.   Well, largely, when they wouldn't accept payments, as my

12  wife had said, my mortgage was always 657.25.  And they

13  demanded 886.36, which is $229.11 more.  I don't know exactly

14  where they came up with that figure.  I mean, but it doesn't

15  compute into what any numbers are from my escrow in any sort,

16  so I'm still lost there.

17      But because this was never resolved or never where we

18  could find an amicable solution to work through this, I've not

19  been able to fix the house.  My credit's shot because they

20  would not let me make payments.  And since I've lost my job due

21  to health reasons, and with my age, I'll not be able to -- I

22  don't know what I'm going to do.  I mean, it's going to be a

23  tough road.

24  Q.   Since you were not able to opt out based on what you were

25  told by, I believe Romeo, what are the consequences for you?

1    A.  Well, I'm stuck with a mortgage payment -- or a mortgage,

2    rather, that started out at 70,000-some, and is now over

3    90,000.  And most of the figures involved in that are

4    questionable.

5          THE COURT:  May I ask you this?  When's the last time

6    you made a mortgage payment?

7          THE WITNESS:  My last mortgage payment was on --

8    actually there were two, but my last one before -- my second to

9    last was May 15th, 2011, and early the next morning I had a

10   heart attack.  And that check was the last payment I had made

11   to them.  And after the heart attack, I thought, it's not worth

12   it, and I quit paying.

13         THE COURT:  How much did you pay on May 15, 2011?

14         THE WITNESS:  I think it was 705.53 or thereabouts,

15   which I had been paying 705-something a month.  But then

16   shortly after that, a week or so later, they wanted another

17   payment, and they talked me into it.  So I jumped through that

18   other hoop, with the hopes that something good would come out

19   of it.  I made another payment, and nothing good ever came out

20   of it.

21         THE COURT:  You made a payment after May 15th, 2011?

22         THE WITNESS:  I made one after May 15th.  That was --

23   it may have been June or July.  I really don't know when it

24   was.  But they -- they talked me into making one more payment,

25   and I put out enough hope that maybe something would come from

RESIDENTIAL CAPITAL, LLC, ET AL.                    77

 1   it, but nothing did.

 2          THE COURT:  Okay, go ahead.

 3   BY MR. MARGOLIS:

 4   Q.  The reason that the number of qualified written requests

 5   were submitted regardless of whether they were in or out, was

 6   because you were having these ongoing problems with GMAC?

 7   A.  Oh, correct.  Nobody was answering any qualified written

 8   requests, so we authorized you to help us get answers, and you

 9   sent to any address you could to try to glean some information

10   and get some answers, and it never happened.

11          THE COURT:  May I ask you this?  Have you paid any

12   attorneys' fees to Mr. Margolis?

13          THE WITNESS:  Pardon?

14          THE COURT:  Have you paid any attorneys' fees?

15          THE WITNESS:  Sure.

16          THE COURT:  How much have you paid?

17          THE WITNESS:  I don't know.  I've paid 50 here, 100

18   here, 150 here.  I mean, it's been several years.  So I may

19   have paid 1,000, I may have paid more.  I really don't know

20   what I've paid.

21          THE COURT:  The reason I'm asking the question is, if

22   Mr. Futrell prevails on a RESPA claim, there is a provision in

23   the statute for attorneys' fees, and that's why I'm asking the

24   question.  I haven't seen anything in any of the exhibits about

25   it, but -- go ahead, ask your next question.

1  Q.  Okay.  With regard to just your situation, you are on

2  short-term or long-term disability periodically, correct?

3  A.  Yeah.  I -- since 2008 till 2015, I had seven or eight

4  different operations.

5  Q.  Okay.

6          THE COURT:  Over what period?  I'm sorry.

7          THE WITNESS:  Over -- starting in 2008 I had a hernia

8  surgery, and I basically had a surgery a year through 2014.

9  Q.  Okay.  So if you would have been able to opt out of the

10  loan mod, would your disability, be it short- or long-term,

11  enabled you to have carried on without the loan mod?

12  A.  Yeah, I could have probably -- probably made the 657, not

13  with the short-term, because when they set me up with that,

14  the -- my factory and their -- my factory was sold three times

15  in this process, and so I had different controlling entities

16  for the insurance.  One out of Illinois put me on a short term,

17  took twenty-five percent of that right away.  They taxed me

18  twenty-five percent.  I didn't know this.

19      But anyway, with that, no, I couldn't have made it,

20  because I was bringing home 281 dollars a week and 81 of that

21  was going to insurance, so I was living on 200 a week when I

22  was on my short-term disability.  Long-term disability, yeah, I

23  could have lived on that and paid 657.25 a month.

24  Q.  You never got the option?

25  A.  No.  I mean, the whole point was, I was wanting to try to

1  make it better so I could better afford my home to give my

2  children a better life, and do things that needed to be done

3  and should be done.  But I never paid less.  I paid 657.25 a

4  month, and dealing with them and their modifications, always

5  made me pay more, always.  I never gained.  What the whole

6  point was, was to modify my loan.

7       I looked at this, okay, I've been paying on it for eleven

8  years.  I figure, okay, I owe you nineteen years.  Stretch that

9  out to thirty, bring my payment down, bring my interest rate

10 down, we're good to go.  But I'm here because that didn't

11 happen.  I'm here because they apparently thought they could

12 get more money out of me that I didn't have for whatever

13 reason, because they never showed me where my money's gone, so

14 I feel that for whatever reason they took my money; I don't

15 know.  I don't see where it went.

16      And I think if they would have let me opt out and left me

17 alone and got rid of that nonsense, let me work the 657.25 a

18 month, I would have made it work one way or another.

19 Q.  The Exhibit number 21, the November 17, 2011 -- where they

20 put 27,000 on the table just to wipe it?

21 A.  Well, okay.  December -- I got that November 17th it was

22 dated, and they needed to know back December 15th.  So less

23 than a month later, they wanted to know, and that was in '11,

24 correct?  January 3rd of 2012, I was due to have hand surgery.

25 I had that hand surgery.  I the trapezium bone removed from my

1  right hand, because of my left thumb -- the bone was shot, and

2  they took the -- and so that one -- in March they did my left.

3      So when they offered to sell me the house for 27,000

4  dollars, me knowing I'm getting ready to have two surgeries,

5  there was nothing I could do to do that.  So it was more to

6  me -- it seemed to me like a slap in the face, because I

7  couldn't do anything.  I knew I was getting ready to go to

8  surgery.  And going into surgery is not going to show them that

9  I can pay it back.

10 Q.  Did you convey that to anyone at GMAC?

11 A.  I don't know.  I don't know if I did.  I believe I did,

12 and I'm pretty sure my wife did.  Oftentimes I was so mad at

13 them I just -- I let her deal with it.  But I do know on the

14 top of every page, not all the correspondence from them, they

15 said there's a problem call us.  We'll help.  We'll work --

16 yeah, okay.

17     From my experience, I never got any help --

18     THE COURT:  Mr. Margolis, I'm going to give you

19 another eight minutes.  We're recessing at 12:30.  You're going

20 to finish with your --

21     MR. MARGOLIS:  If it --

22     THE COURT:  -- you're going to finish with your

23 examination, and Mr. Wishnew is going to resume after lunch

24 with his cross-examination.

25     MR. MARGOLIS:  If it please the Court, I'm done.

RESIDENTIAL CAPITAL, LLC, ET AL.                    81

1          THE COURT:  Okay.  All right.

2          Do you want to start your cross-examination, Mr.

3  Wishnew?

4          MR. WISHNEW:  I do.  I don't -- I'm going to do my

5  best to finish in eight minutes, Your Honor.

6          THE COURT:  Go ahead.  I'll give you ten.

7          MR. WISHNEW:  I appreciate that, Your Honor.

8  CROSS-EXAMINATION

9  BY MR. WISHNEW:

10  Q.  Good afternoon, Mr. Futrell.

11  A.  Good afternoon.

12  Q.  Mr. Futrell, if I could ask you, there's two binders

13  before you.  I think you have the hard copy open.  I'd like you

14  to ask you to turn to Exhibit J?

15  A.  Well, I am at Exhibit J.

16  Q.  Okay.  And you testified just a few minutes ago that you

17  were paying 705.53 on a monthly basis, correct?

18  A.  Something like that.  That --

19  Q.  Okay.

20  A.  -- the last payments I was making.

21  Q.  In the middle of the first page, is the total payment --

22  the total payment says 705.53, correct?

23  A.  I think -- yeah, that looks correct as to what I had been

24  paying there at the end.  And like I mentioned, they said 48

25  was going to be the escrow, and 8-something was --

RESIDENTIAL CAPITAL, LLC, ET AL.                                    82

```
 1   Q.  Sure.
 2   A.  -- for a shortage that didn't exist --
 3   Q.  Sure.
 4   A.  -- but I didn't fight it.  I wanted to pay so I didn't
 5   lose my house.
 6   Q.  Right.
 7   A.  And the other 40 was for my escrow.
 8   Q.  Okay.  And the top of the page under your name it says
 9   "Congratulations, your request for a loan modification has been
10   approved," correct?
11   A.  I've seen -- yes, but I've seen many.
12   Q.  Okay.  The last page of that document --
13   A.  Um-hum.
14   Q.  -- is that your signature?
15   A.  Well, it does look like it.
16   Q.  Okay, that's it.
17   A.  But under my capital F for my name, it looks as though
18   somebody had drawn a "2" and I -- I would -- I don't know that
19   I did -- I'm just saying, I don't know that I signed over that.
20   Q.  But you said --
21           THE COURT:  I resolved this issue to my satisfaction.
22           MR. WISHNEW:  Okay, Your Honor.
23           THE COURT:  Ask your next question.
24           MR. WISHNEW:  I apologize.
25   Q.  You mentioned that you had multiple operations during the
```

RESIDENTIAL CAPITAL, LLC, ET AL.                          83

1  period 2008 to 2011?

2  A.  2008 to 2014.

3  Q.  Okay.  You also mentioned that your company was going

4  through corporate turnovers?

5  A.  Well, the -- yeah, the company I worked for had been owned

6  by the same man in Ohio for over thirty years.

7  Q.  Right.

8  A.  He sold it, and we didn't know.

9  Q.  And when did he sell it?

10  A.  It would have probably been 2011, and the company he --

11  Q.  That was stressful?

12  A.  No, not really, because the company that bought us out, I

13  was one of the guys being in maintenance, I'd go up there and

14  start tearing presses down, I spent a couple days up in

15  Michigan City up north --

16  Q.  But you said you --

17  A.  -- get to tear presses down and get paid for it.

18  Q.  -- you said you -- I apologize, I talked over you.

19  A.  Pardon.

20  Q.  I said I apologize --

21        THE COURT:  He interrupted, and he apologized for

22  interrupting you.

23        THE WITNESS:  Okay.  I don't hear well.  I worked

24  steel fabrication many years of my life --

25        THE COURT:  Well, let's just get back to the

RESIDENTIAL CAPITAL, LLC, ET AL.                    84

1    questions --

2          THE WITNESS:  -- with air blowing, and I don't hear

3    well.

4          THE COURT:  -- and answers.  Go ahead.  As your

5    question again.

6    A.  But no, that didn't stress me, no.  I didn't lose

7    anything.  I did get the opportunity to go up northern part of

8    the state and tear presses apart.

9    Q.  Right.

10   A.  And get paid for it.  And get -- you know, so it wasn't a

11   bad deal.

12   Q.  But did you also testify you were bringing home less

13   money?

14   A.  I still brought home the same amount of money per hour on

15   an hourly wage.

16   Q.  Right.  But were you working less hours?

17   A.  I -- yeah, I didn't get as many -- much overtime.

18   Q.  Okay.  So between medical procedures, being the lead

19   maintenance man at a company experiencing a turnover, working

20   less hours, could potentially create some stress, correct?

21   A.  I didn't -- well, actually, I had my hernia in '08.  Had

22   my heart attack in '11.  Had both my thumbs done in 2012.  I

23   was off work so much, there was stress.  But I was on so many

24   narcotics for over a year, I didn't really feel the stress that

25   I would have had otherwise.

RESIDENTIAL CAPITAL, LLC, ET AL.                          85

1  Q.  Okay.  Would you agree with me that not making a payment

2  under a contractual obligation such as a note or a mortgage is

3  going to hurt your credit?

4  A.  Well, yes.

5  Q.  Okay.  And you said that the last payment you made to GMAC

6  Mortgage was on or about May 15th, 2011?

7  A.  That, and then I made one more after that, yes.

8  Q.  Okay.

9        MR. WISHNEW:  Your Honor, that's all the questions I

10  have for Mr. Futrell.

11        THE COURT:  All right.   Mr. Margolis?

12        MR. MARGOLIS:  Just one.

13  REDIRECT EXAMINATION

14  BY MR. MARGOLIS:

15  Q.  There was the -- there was the point with regard to you

16  and your actions with regards to --

17        MR. MARGOLIS:  Strike that.

18  Q.  Okay.  The question --  okay, when GMAC did not respond to

19  the October 30th, 2009 qualified written request, and reported

20  you to the creditor reporting agencies, I believe, since '09

21  you missed eleven payments, was that a problem for you?

22  A.  Yeah, it still is.

23  Q.  And that was in the content of the USDA letter?

24  A.  I believe so, yes.

25        MR. MARGOLIS:  Thank you.  Nothing else.

RESIDENTIAL CAPITAL, LLC, ET AL.                    86

 1            THE COURT:  All right.  We're going to take a recess
 2    until 2:15.  Here is my operative plan.  Actually you only have
 3    one witness.  You have no other witnesses, correct?
 4            MR. MARGOLIS:  I'm done.
 5            THE COURT:  All right.  So we'll start with Ms.
 6    Lathrop when you come back.  I think, one way or another, we're
 7    going to be done today.  If necessary, we're going to go this
 8    evening.  You both want to have your people go home.  I hope
 9    that won't be necessary; I hope we'll get done.
10            MR. WISHNEW:  I would suspect my examination of Ms.
11    Lathrop should take approximately forty-five minutes, Your
12    Honor.
13            THE COURT:  Okay.  Well, you have the written direct.
14            MR. WISHNEW:  I do, but I want to bring out --
15            THE COURT:  Okay.  All right.  But I want to see Mr.
16    Wishnew and Mr. Margolis very briefly in chambers, okay?
17            And so you're excused.  You're --
18            THE WITNESS:  Thanks.
19            THE COURT:  Okay?  You'll knock on the first door.
20    I'm going to let you in.
21        (Recess from 12:29 p.m. until 2:20 p.m.)
22            THE COURT:  All right.  Please be seated.  We're back
23    on the record in Residential Capital 12-12020.
24            Mr. Wishnew?
25            MR. WISHNEW:  Thank you, Your Honor.  Jordan Wishnew,

RESIDENTIAL CAPITAL, LLC, ET AL.                              87

1   Morrison & Foerster, for the ResCap Borrower Claims Trust.  The
2   Trust would like to call Ms. Sara Lathrop to the stand.
3            THE COURT:  Okay.  Ms. Lathrop, come on up.
4            MR. WISHNEW:  Your Honor, if I could approach?  Ms.
5   Lathrop's declaration wasn't in the binder because I think it
6   was filed after the binder got submitted, so --
7            THE COURT:  Okay.  Thank you.
8            MR. WISHNEW:  Exhibit EE.
9            THE COURT:  EE?
10           All right.  If you'd raise your right hand and be
11   sworn, Ms. Lathrop?
12           Thank you.
13        (Witness sworn)
14           THE COURT:  All right.  Please have a seat.
15   DIRECT EXAMINATION
16   BY MR. WISHNEW:
17   Q.  Good afternoon, Ms. Lathrop.
18   A.  Hello.
19   Q.  We're here today in connection with the ResCap Borrower
20   Claims Trust objection to claim 725 by William Futrell against
21   GMAC Mortgage.  I'd like to ask you some questions concerning
22   GMAC Mortgage's records regarding Mr. Futrell's loan.
23           THE COURT:  Let me ask you first; are you offering the
24   Exhibit EE?
25           MR. WISHNEW:  We are offering Exhibit EE into

RESIDENTIAL CAPITAL, LLC, ET AL.                              88

1    evidence, Your Honor.

2           THE COURT:  All right.  Any objection?

3           MR. MARGOLIS:  No.

4           THE COURT:  All right.  Exhibit EE is in evidence.

5    (Ms. Lathrop's declaration was hereby received into evidence as

6    Debtors' Exhibit EE, as of this date.)

7           MR. WISHNEW:  Okay.

8           THE COURT:  All right.  Go ahead.

9           MR. WISHNEW:  And with that, I will skip ahead, Your

10   Honor.

11   Q.  So Ms. Lathrop, are you familiar with the Futrell loan?

12   A.  Yes, I am.

13   Q.  Okay.  And are you aware that Mr. Futrell filed a proof of

14   claim against GMAC Mortgage in the Chapter 11 case?

15   A.  Yes, I am.

16   Q.  Okay.  And that the Borrower Claims Trust filed an

17   objection to that proof of claim?

18   A.  Yes.

19   Q.  Okay.  And are you generally familiar with that Borrower

20   Claims Trust objection?

21   A.  Yes, I am.

22   Q.  Okay.  If I could ask you to look at Exhibit D in the hard

23   binder before you.

24          THE COURT:  Before you proceed, I just want to see

25   where we are on exhibits.  I had suggested to both sides this

1  morning -- they simply agreed -- that all the exhibits could be

2  admitted into evidence and be given such weight as the Court

3  deems appropriate.  But I never really had a response from

4  either side with respect to that.

5        MR. WISHNEW:  Look, as I noted this morning, Your

6  Honor, we have relevance concerns, but to the extent Your Honor

7  is going to give them whatever weight he finds appropriate, I

8  think it gets to the same point.  So we're okay stipulating to

9  the evidence coming in.

10       THE COURT:  Okay.  Counsel?

11       MR. MARGOLIS:  The same.

12       THE COURT:  All right.  So we can short circuit that;

13  all exhibits that have been premarked and are in the binders

14  are admitted into evidence.

15 (All premarked exhibits were hereby received into evidence, as

16 of this date.)

17       THE COURT:  I recognize that there are relevance

18  objections.  I think I had entered an order before the trial

19  that addressed some of that in the courtroom, giving them such

20  weight as I deem appropriate.

21       Go ahead, Mr. Wishnew.

22       MR. WISHNEW:  Thank you, Your Honor.

23 BY MR. WISHNEW:

24 Q.  All right.  Prior to GMAC Mortgage transferring servicing

25 of this loan to Ocwen, was this document the servicing note

RESIDENTIAL CAPITAL, LLC, ET AL.                              90

1   that is maintained in the business records for Homecomings and

2   GMAC Mortgage?

3   A.   Yes.

4   Q.   Okay.  And were there certain systems in which it was

5   located?

6   A.   It was located within our LoanServ, also known as our

7   Fiserv system.  And we're also able to access them through our

8   business objects program.

9   Q.   Okay.  And what sorts of information were included in the

10  servicing notes?

11  A.   The servicing notes themselves would have included

12  conversations between the GMAC or Homecomings and any debtor so

13  for the call -- not debtor; excuse me -- borrower, or anyone

14  who called in regarding the account, correspondence to or from

15  the borrower, as well as internal interactions.

16  Q.   And when would GMAC Mortgage employees typically enter

17  such information into the servicing notes?

18  A.   It would usually be entered the same day or within

19  twenty-four hours.  There would be sometimes a delay due to a

20  weekend.

21  Q.   Right.

22  A.   So if it happened end of day Friday, it may not be updated

23  till the following Monday or business day.

24  Q.   Okay.  And if a letter was sent to a borrower, how was

25  that recorded?

1  A.  It would be recorded in the same accordance, the same day

2  or the next business day, with just a generic explanation of

3  what the letter was.

4  Q.  And would the same methodology be used if a letter was

5  received from the borrower?

6  A.  Yes.

7  Q.  If a Homecomings or a GMAC Mortgage representative called

8  the borrower, how was that recorded -- or I'm sorry, was that

9  recorded?

10  A.  Yes, it would be recorded.

11  Q.  And how would it be recorded?

12  A.  It would have been recorded -- if an actual conversation

13  took place, it would have been recorded with a summary of the

14  call.

15  Q.  Um-hum.

16  A.  If no phone call interaction took place, say a message was

17  left or there was no answer, it would usually just record as

18  zeros.

19  Q.  Okay.  And so would the same methodology go if the

20  borrower called into GMAC Mortgage or Homecomings?

21  A.  Yep.  There would have been a summary of the conversation.

22  Q.  Okay.  And if a payment on account of a loan was received

23  by GMAC Mortgage or Homecomings, how was that -- was that

24  recorded?

25  A.  Yes, it would have been recorded in the payment history.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    92

1    Q.   And the payment history is a part of the loan servicing

2    notes?

3    A.   Yes.

4    Q.   Okay.

5    A.   That's a part of the exhibit we have.

6    Q.   Okay.  Did Homecomings receive a loss mitigation or

7    financial workout package from Mr. Futrell in 2009?

8    A.   Yes.

9    Q.   Okay.  Do you recall what month it was?

10   A.   I believe it was June 2009.

11   Q.   Okay.  And what did Homecomings do after it received that

12   package?

13   A.   They began reviewing the workout package that was

14   received, as far as what information and what documents were

15   available inside it to see if it was complete.

16   Q.   Okay.  And prior to the time Mr. Futrell was approved for

17   June 2009 trial modification, did his loan account have an

18   escrow account -- an escrow associated with it?

19   A.   No, there was no escrow prior to the loan mod request.

20   Q.   Did Homecomings or GMAC Mortgage at some point create an

21   escrow associated with the loan?

22   A.   Yes, there was a escrow analysis completed on June 17,

23   2009, due to the request for a loan mod received.

24   Q.   Okay.  And that was in connection with the HAMP trial loan

25   modification?

RESIDENTIAL CAPITAL, LLC, ET AL.                    93

1  A.  Yes, it was -- it was because of it being received in, we

2  had to have a escrow account in accordance with HAMP

3  guidelines.

4  Q.  Got it.  Okay.

5  A.  Go ahead.

6  Q.  And you mentioned that an escrow analysis was done on this

7  account?

8  A.  Yes.

9  Q.  Okay.  And is that escrow analysis referenced in the

10 servicing notes, Exhibit D?

11 A.  It should be.  I can flip to a page to show you.

12 Q.  If I could reference page 120 of 162 within Exhibit D.  Do

13 you see the reference there?

14 A.  Yes, I show, "The online escrow analysis sent to print

15 vendor note on June 17th", on that page; it's about ten lines

16 down from the top.

17 Q.  And that was by -- the transaction user name was Camille

18 Weiland, W-E-I-L-A-N-D?

19 A.  Yes.

20 Q.  Thank you.  And while preparing for today's hearing, did

21 you check whether the analysis that was done on June 17th was

22 accurate?

23 A.  Yes, I -- I checked.

24 Q.  And was that analysis accurate?

25 A.  No, it was not correct.

RESIDENTIAL CAPITAL, LLC, ET AL.                    94

1   Q.   What was wrong with it?

2   A.   The amount used for fire insurance was wrong.

3   Q.   Okay.  And I think, as we've discussed earlier this

4   morning, there was an extra thousand dollars placed on it, so

5   the cost of 352.53 was -- am I correct that it was 1,352.53?

6   A.   It was approximately 1,000.

7   Q.   Okay.  Did Mr. Futrell make all three payments required of

8   the June 2009 trial plan?

9   A.   Yes.

10  Q.   Was he --

11  A.   There --

12  Q.   Was he thereafter offered a permanent loan modification?

13  A.   Yes.

14  Q.   Okay.  If I could ask you to turn to Exhibit E.  Do you

15  recognize this document?

16  A.   Yes.

17  Q.   And what is this document?

18  A.   This is the HAMP permanent loan modification offered on

19  October 14th, 2009.

20  Q.   All right.  And was this sent to Mr. Futrell?

21  A.   Yes, the address is on the top.

22  Q.   Okay.  What were the terms of the permanent loan

23  modification offered in the letter?

24  A.   According to Section 3 of the permanent loan modification,

25  it lists the terms.  It shows that the maturity date remained

RESIDENTIAL CAPITAL, LLC, ET AL.                    95

1  the same at March 1st, 2031.

2  Q.  Um-hum.

3  A.  The interest rate was reduced to 7.75 percent, starting

4  with the November 1st, 2009 payment.  And this -- and this

5  reduced the monthly principal balance.

6  Q.  Okay.

7           THE COURT:  Which exhibit is this?

8           MR. WISHNEW:  This is Exhibit --

9           THE WITNESS:  Exhibit E.

10          MR. WISHNEW:  -- E.

11          THE COURT:  Where does it set forth the amounts?

12          THE WITNESS:  It's listed under section 3(c).  It's

13  the back of the second page.

14          THE COURT:  I have a blank back of the second page.

15          THE WITNESS:  Oh.

16          MR. WISHNEW:  Let me give you my copy, Your Honor.

17          THE COURT:  This is not even the same document.  It's

18  not the same document.

19          Okay.  I've been handed what's been marked as Exhibit

20  E.  This may be not --

21          MR. WISHNEW:  It's it a different volume, Your Honor.

22          THE COURT:  Yeah, it is.  Let me hand it back to you.

23  I apologize.  I'm looking in the wrong -- I'm looking at

24  Exhibit E but in the wrong binder.  Sorry for my confusion.

25  Okay.  Just orient me again where the page --

1          MR. WISHNEW:  It's the fourth page of that exhibit,

2    Your Honor.  There's a chart laying out the --

3          THE WITNESS:  It's section 3(c).

4          THE COURT:  Okay.  I'm there.  Thank you.

5          MR. WISHNEW:  Okay.

6    BY MR. WISHNEW:

7    Q.  Ms. Lathrop, did the monthly payment amount reflect the

8    mistaken June 17, 2009 escrow analysis insurance payment of

9    approximately 1,350 dollars?

10   A.  Yes, it lists the total escrow payment as $150.66, and

11   that was incorrect.

12   Q.  Okay.  And did Mr. Futrell execute and return the

13   permanent loan modification?

14   A.  No.

15   Q.  Okay.  If Mr. Futrell had executed the permanent loan

16   modification, would he have been responsible for the inflated

17   monthly escrow portion of the payment amount?

18   A.  No.

19         THE COURT:  Does it say that somewhere?

20         THE WITNESS:  I'll be honest; I don't bel --

21         THE COURT:  I don't see that.

22         THE WITNESS:  I don't believe it says that, no.

23         THE COURT:  So how was he supposed to know he wasn't

24   going to be responsible for the amount that you set forth --

25   you didn't do it; I understand that.

RESIDENTIAL CAPITAL, LLC, ET AL.                    97

1           THE WITNESS:  I know what you mean.

2           THE COURT:  In my question was an inadvertent error,

3    but he gets the document, a modification agreement, and it

4    includes an amount of monthly payment -- monthly escrow payment

5    amount, and it doesn't say anything about, well, this number is

6    wrong; you're not obligated to do it.  So on what basis do you

7    say he would -- if they signed this agreement, this isn't what

8    they were obligated to pay?

9           THE WITNESS:  Just from my prior business knowledge

10   and business practice, because I worked in, actually, a

11   department related to this, a new escrow analysis would have

12   been completed at the execution.

13          THE COURT:  How is a borrower supposed to know that?

14   If they read this document --

15          THE WITNESS:  I agree.

16          THE COURT:  -- and it says this is how much you're

17   supposed to pay; sign it; they wouldn't know that, would they?

18          THE WITNESS:  Correct.

19          THE COURT:  Go ahead, Mr. Wishnew.

20          MR. WISHNEW:  Okay.

21   BY MR. WISHNEW:

22   Q.  I'd like to go through some of the servicing notes from

23   December 2009 to January 2010.  Did GMAC Mortgage receive

24   written inquiries from Mr. Futrell and his counsel, during the

25   period of October 2009 and January 2010, concerning the

RESIDENTIAL CAPITAL, LLC, ET AL.                    98

1  mistaken escrow calculation?

2  A.  I believe so.

3  Q.  Okay.  And do the servicing notes reflect receipt of Mr.

4  Margolis' October 30th, 2009 inquiry which we've referred to

5  today as the QWR?

6  A.  Hold on one second.  There's nothing specifically on

7  October 30th.

8  Q.  Correct.

9  A.  There is a note on November 2nd, 2009 that shows that

10  there was a fax received, qualified written request.  And

11  that's on page 113 of 162 of the servicing notes --

12  A.  Okay.

13  Q.  -- about five lines down from the top.

14  Q.  Okay.  And in preparing for your testimony today, did you

15  happen to check what day of the week November 2nd was?

16  A.  November 2nd was a Monday.

17  Q.  Okay.  And so --

18        THE COURT:  I'm sorry; it was what?

19        THE WITNESS:  It was a Monday; it was the beginning of

20  the week.

21  Q.  And so October 30th then would have been Friday?

22  A.  Correct.

23  Q.  And so consistent with your earlier testimony, based on

24  these servicing notes, it's possible that GMAC Mortgage

25  received an inquiry on Friday December (sic) 30th, but it was

RESIDENTIAL CAPITAL, LLC, ET AL.                     99

1   marked in the servicing notes as November 2nd?

2   A.  Yes.

3   Q.  All right.  And to the best of your knowledge, did GMAC

4   Mortgage send Mr. Futrell's counsel correspondence in November

5   of 2009?

6   A.  Yes, I believe there was correspondence sent on November

7   13th.

8   Q.  Okay.  And is that reflected in the servicing notes?

9   A.  Yes, they're on page 112.

10  Q.  Okay.

11  A.  It shows --

12          THE COURT:  May I ask you; before you turn the page,

13  at page 113 --

14          THE WITNESS:  Yes, sir.

15          THE COURT:  -- the entry "escrow account disclosure

16  statement forwarded to"; who is that forwarded to?

17          THE WITNESS:  I believe it says -- you're looking at

18  the top -- the most top entry from November 2nd?

19          THE COURT:  No.

20          THE WITNESS:  No?

21          MR. WISHNEW:  There's --

22          THE COURT:  I see several of those entries.

23          MR. WISHNEW:  There's two entries, Your Honor.

24          THE COURT:  I'm looking at the one -- yeah, so how

25  come there are two entries for it?

Pg 100 of 147

1          THE WITNESS:  Reading through it, it says -- the first

2   entry that's listed, which is the one that's actually lower,

3   says that the fax was received.  And then right above it, it

4   says, "Please ignore the previous LMT note".  If we look off to

5   the left-hand side, they're labelled as LMT.  And then if we

6   look at the one above it, it shows that they corrected an

7   e-mail address.

8          THE COURT:  Okay.

9          THE WITNESS:  So it appears that that's why there's

10  two of almost an identical note there.

11         THE COURT:  Who was it forwarded to?

12         THE WITNESS:  Initially it looks like they imaged it

13  as a workout, and then they corrected it and imaged it as new

14  correspondence, which is what the "corr" stands for.

15  BY MR. WISHNEW:

16  Q.  And Ms. Lathrop, just to follow up on Judge Glenn's

17  question, looking seven lines from the top, it says -- and then

18  continuing on to the eighth line, it says "over to loss mit

19  correspondence", is that correct?

20  A.  Yes.

21  Q.  Okay.  So when the Court asked who it was forwarded to, as

22  far as a loss mit correspondence?

23  A.  Yes, sir.

24  Q.  Okay.  And that's what the image -- where it says imaged

25  as "corr.glee1@2863", that all relates to loss mit

operations@escribers.net | www.escribers.net

RESIDENTIAL CAPITAL, LLC, ET AL.                    101

1   correspondence?

2   A.  I would assume yes; I don't know those e-mails by heart.

3           THE COURT:  What is an escrow account disclosure

4   statement?

5           THE WITNESS:  I'll be honest; I -- I can't answer

6   fully what all would have been in that.

7           THE COURT:  Okay.

8           THE WITNESS:  But as far as -- it would have just been

9   explaining an escrow account, to my knowledge.

10          THE COURT:  I don't know why the disclosure statement

11  is at that point.

12          THE WITNESS:  I -- I agree.

13          THE COURT:  Go ahead, Mr. Wishnew.

14          MR. WISHNEW:  Thank you.

15  Q.  Ms. Lathrop, can you briefly take me through the servicing

16  notes concerning the preparation and delivery of the November

17  13th response to the October 30th QWR?

18  A.  Sure.  Would you like me to just start from November 2nd

19  or --

20  Q.  If you could just briefly summarize what Ms. Alejandra

21  Diaz is saying on 112 of 162.

22  A.  The first note from Alejandra Diaz is dated November 11th,

23  2009.  It's approximately five, six lines from the bottom.  It

24  just states, "E-mailed loss mit for assistance.  Waiting in

25  response to finish letter".  I assume that they were looking

1   for an update to be able to finish the request.  Then above

2   that, on the -- excuse me; let me make sure I understand what

3   I'm reading.  Above that, on November 11th, from Denise

4   Walgreen (ph.), on the same date, it states, "Duplicate

5   request; gave correspondence to A. Diaz.  She will respond once

6   she hears back from loss mit".  So they're just once again

7   reiterating waiting on that information to come in from the

8   other department.  It looks like the next real entry is from

9   November 13th, 2009, and this is related to a QWR request.

10         THE COURT:  What's the entry on November 11th?  "Tsk

11  type 241 QWR request"?

12         THE WITNESS:  It looks like it's just related to the

13  closing of the CIT 241, which would have been a work order that

14  was used to interact between departments.  Because if we look

15  directly below that Tsk, it shows the 016 closing CIT 241, and

16  it looks like the task type 241 above is just explaining what

17  that task was that was being closed out.

18         THE COURT:  What was being closed out?

19         THE WITNESS:  The -- the work order that had been

20  opened.

21         THE COURT:  What do you mean a "work order"?

22         THE WITNESS:  I'm trying to think of the best way to

23  explain.  In order to try and clearly communicate between

24  different departments, the CITs, also known as work orders,

25  would be opened, in order to track and log them to make sure

RESIDENTIAL CAPITAL, LLC, ET AL.                      103

1  they were worked.  So this one is labelled as a 241, but the

2  016 next to it is the very beginning of the entry.  So we can

3  track when it was initially opened, which was on November 5th,

4  2009, so like the top of the prior page, on page 113.  It was

5  opened on that date, and then the task type that we see being

6  closed out on the 11th is showing that specific work order

7  being closed out after they had fulfilled whatever task needed

8  to be done related to it.

9            THE COURT:  Go ahead, Mr. Wishnew.

10           MR. WISHNEW:  Thank you.

11  BY MR. WISHNEW:

12  Q.  Ms. Lathrop, if I could ask you to take a look at what's

13  been marked as Exhibit S, as in Sam.  Have you seen this letter

14  before today?

15  A.  Yes.

16  Q.  Okay.  And what is this letter?

17  A.  This is a letter from GMAC Mortgage to Thomas D. Margolis.

18  Q.  Okay.  And let me ask; is it possible -- sorry.  Do the

19  servicing notes reflect receipt of an October 23rd, 2009 letter

20  on November 2nd?

21  A.  I'd have to look at the servicing notes again.

22  Q.  Okay.  It's page 113.

23  A.  I don't show a specific letter date.  Give me a moment to

24  make sure I am not missing it.  I don't see anything on that

25  page that specifically references that, no.

RESIDENTIAL CAPITAL, LLC, ET AL.                    104

1  Q.  Okay.  And what we said before it's possible that an

2  inquiry that was received on October 30th, which is a Friday,

3  would be logged on Monday, November 2nd, correct?

4  A.  Yes, that -- that would be in accordance with how

5  documents would come in.

6  Q.  Okay.  So a copy of an inquiry from Mr. Margolis dated

7  October 30th could very well be the inquiry dated November 2nd

8  in the notes?

9  A.  Yes, that's possible.

10        THE COURT:  What's the transaction type "Nt"?

11        THE WITNESS:  "Nt"?  Note.  It would have just been a

12  shorthand for the word note.

13        THE COURT:  Okay.

14  Q.  Is it possible that GMAC Mortgage's November 13th letter

15  responded to the October 30th inquiry from Mr. Margolis, but

16  due to a scrivener's error, the letter indicated that an

17  October 23rd letter was received on November 2nd?

18        THE COURT:  Anything's possible, Mr. Wishnew.  Come

19  on.  The letter says it responds to the October 23rd letter.

20  The entry on page 112 says, "This is in response to QWR dated

21  10/23/09 enclosed."

22        MR. WISHNEW:  I'll move on, Your Honor.

23  Q.  Ms. Lathrop, can you direct your attention, in the

24  servicing notes, to December 3rd, 2009?  So it's on page 108 of

25  the servicing notes.

RESIDENTIAL CAPITAL, LLC, ET AL.                105

1    A.  Okay.

2    Q.  And specifically, an entry by Wendy Chapman (ph.).

3    A.  Yes.

4    Q.  Okay.  And can you please briefly summarize what that

5    entry reflects?

6    A.  The entry specifically says, "Closing CAT 130.  Unable to

7    process analysis.  Loan is in loss mit with loan mod pending"

8    and "Sent letter."

9    Q.  Okay.

10   A.  And the letter's identified as 2:02.

11   Q.  And when Ms. Chapman says "unable to process analysis", is

12   she referring to -- what type of analysis is she referring to?

13   A.  Based on the task type above that states "manual escrow"

14   above it, I would assume it's the escrow analysis, if that's

15   what the workout is.

16   Q.  If I could ask you to turn to Exhibit U, as in umbrella?

17   Is this letter -- is the content of this letter consistent with

18   the servicing note entry we just discussed?

19   A.  Yes, I believe it is.

20   Q.  Okay.  If I could ask you to direct your attention to the

21   servicing notes by Ms. Elizabeth Milare, M-I-L-A-R-E, on

22   December 9th, 2009, page 107 of the notes.

23   A.  Okay.

24   Q.  Okay.  What does this entry reflect?

25   A.  The one on December 9th reflects a conversation between

RESIDENTIAL CAPITAL, LLC, ET AL.                    106

1   Elizabeth and Mrs. Futrell.

2   Q.  Okay.  And during that conversation, did Ms. Futrell

3   request an escrow analysis be conducted?

4   A.  It would appear so from the summary.

5   Q.  Okay.  And what was she told by GMAC Mortgage?  That is,

6   what was Ms. Futrell informed by GMAC Mortgage?

7   A.  According to the shorthand here, it says, "Advice cannot

8   be processed because account is under loss mit department.  The

9   system already shows an insurance payment of 352.37, but cannot

10  process the escrow analysis due to status of the loan.  And the

11  account is being reviewed for loan mod."

12  Q.  So internally, the insurance amount was corrected to

13  352.37, but it couldn't actually be effectuated because the

14  loan was still in a loan mod process?

15  A.  That -- that's what this says.

16  Q.  Okay.  If I could direct your attention to the notes by

17  Candice Buchanan on January 8th, 2010, pages 104 to 105 of the

18  servicing notes.

19  A.  Okay.

20  Q.  And what does this entry reflect?

21  A.  This reflects a conversation, also, between GMAC Mortgage,

22  and it says with -- "authorized by the borrower"; I assume it's

23  Mrs. Futrell.

24  Q.  Um-hum.

25  A.  The notes specifically state, "Advise the final escrow

RESIDENTIAL CAPITAL, LLC, ET AL.                    107

1    analysis cannot be done on account until the permanent mod has

2    been applied and updated, which would require the docs being

3    signed and sent back, but refused to sign docs before placed

4    insurance on her account is not going to pay".

5    Q.  And is this -- if I could direct your attention to the

6    servicing notes by Luke Reingart (ph.) on January 12th, 2010.

7    Does that reflect a similar type of conversation with Ms.

8    Futrell and a similar message being delivered by GMAC Mortgage?

9    A.  On page 104?

10   Q.  Yes, please.

11   A.  It looks like it was a letter that was mailed to the

12   attorney advising "no escrow analysis can be done because the

13   loan mod is pending.  If they do not agree with the option,

14   then they can refuse and reapply.  And they were advised that

15   they could call loss mit for potential options but there may be

16   no further options available."

17          THE COURT:  Ms. Lathrop, was it GMAC's policy, that if

18   they made a mistake in the escrow analysis, that it couldn't be

19   corrected until the borrower signed an incorrect document?

20   That's what you're say -- that's basically what you're

21   telling -- you're reading these notes --

22          THE WITNESS:  Yeah.

23          THE COURT:  -- as saying it doesn't matter whether we,

24   GMAC, have made a mistake; we can't fix it.  Was that the

25   policy?

1            THE WITNESS:  I don't want to say that it's the

2    policy, but it was a system limitation.  When we would --

3            THE COURT:  Really?  Is that an exception to RESPA?

4            THE WITNESS:  I personally don't know RESPA, so I

5    can't answer that.  But I can tell you, from working with the

6    loans and the LoanServ system that we use, it would essentially

7    lock those numbers in, and then that's why a final escrow

8    analysis would have to be done at the end, to make sure that

9    the correct projected numbers were used.

10           THE COURT:  So you're telling me that GMAC built a

11   system that wouldn't allow for a correction of an error that

12   GMAC made?  That's what you're telling me?

13           THE WITNESS:  While in process, yes.  Though it would

14   allow them to correct it before anything was finite or final.

15           THE COURT:  Really?  You asked -- not you personally;

16   I understand that.  GMAC asked the Futrells to sign a document

17   that said that they would pay 154 dollars in escrow value.

18   That, you acknowledge, was incorrect.

19           THE WITNESS:  Yes.

20           THE COURT:  And where that resulted from an error, not

21   because taxes may have changed --

22           THE WITNESS:  Correct.

23           THE COURT:  -- or insurance premiums changed, it

24   couldn't be fixed unless they signed and agreed to pay the

25   incorrect amount.

RESIDENTIAL CAPITAL, LLC, ET AL.                    109

1        THE WITNESS:  It -- while the loan modification was in

2    process, yes.  And I -- I totally agree that the system

3    limitations were not great, but at least there was that

4    failsafe --

5        THE COURT:  Are the borrowers supposed to suffer

6    because GMAC built a system that wasn't great?

7        THE WITNESS:  I don't know if the bor -- in the --

8        THE COURT:  I'm not fault -- I want to make clear I'm

9    not faulting you.

10        THE WITNESS:  Oh, no; I totally -- I understand.  I

11    totally understand the question.  I worked in -- I worked in

12    the default department for five and a half years.  Trust me; I

13    totally understand the question.  But to me that's why, while

14    the numbers were wrong, and I totally admit to that those

15    numbers are wrong, there was the effort to make sure that

16    before a penny came in with the permanent modification, that a

17    new escrow was completed to make sure that the valid numbers

18    were used.  And the permanent mod that was offered was meant to

19    only adjust the actual principal and interest because --

20        THE COURT:  Does it say that?

21        THE WITNESS:  -- that's all that it --

22        THE COURT:  Does it say that?

23        THE WITNESS:  It only changes the terms of the

24    original mortgage.

25        THE COURT:  No, it also -- the original --

RESIDENTIAL CAPITAL, LLC, ET AL.                    110

1           THE WITNESS:  It adds an escrow.

2           THE COURT:  The original mortgage had no escrow at

3    all; you've acknowledged that.

4           THE WITNESS:  Correct.

5           THE COURT:  The testimony has established that; it had

6    no escrow at all.  So the escrow was being established with the

7    loan modification.

8           THE WITNESS:  Yes.

9           THE COURT:  The permanent modification offer

10   specifically had language about 150 dollars a month that they

11   were supposed to pay in escrow, which is acknowledged to be

12   incorrect.  Okay.

13          THE WITNESS:  Yes.

14          THE COURT:  So you understand my frustration?

15          THE WITNESS:  I totally understand.

16          THE COURT:  Go ahead, Mr. Wishnew.

17          MR. WISHNEW:  Sure.

18   BY MR. WISHNEW:

19   Q.  Ms. Lathrop, was the borrower's only choice to sign the

20   permanent modification, or could they have said to GMAC

21   Mortgage, please cancel the modification, in which case it

22   would -- the process would restart and the escrow analysis

23   would be redone?

24   A.  I don't know if I understand what you mean by "restart".

25   Q.  So would a new -- if the loan modification process, if

RESIDENTIAL CAPITAL, LLC, ET AL.                    111

1  they said we're not signing the permanent modification --

2  A.  Okay.

3  Q.  -- at that point in time, was GMAC Mortgage able to

4  undertake a new estimated escrow analysis?

5  A.  If they had requested for the loan mod process to just

6  stop --

7  Q.  Yes.

8  A.  -- we don't want it; close it out --

9  Q.  Right.

10  A.  -- there could have been two different outcomes from that.

11  They could have chosen to keep the escrow account on the

12  loan --

13  Q.  Um-hum.

14  A.  -- and at that point a new escrow analysis could have been

15  completed.

16  Q.  Right.

17  A.  Or the escrow would have been completely wiped, as it was

18  only added as a part of the HAMP requirements for the

19  modification.

20  Q.  Okay.

21  A.  That was common practice.

22  Q.  Okay.  So am I correct that Mr. Futrell was denied a

23  permanent loan modification after he failed to return the

24  executed agreement?

25  A.  Related to the one that was offered in October?

RESIDENTIAL CAPITAL, LLC, ET AL.                           112

1   Q.  Correct, yes.

2   A.  I believe on January 29th, 2010, it was officially denied.

3   Q.  Okay.  And is that reflected in the servicing notes?

4   A.  Yes.  Give me one second to give you a location.  It would

5   have been on page 102 of 162, probably about ten lines down

6   from the page, on January 29th, 2010.

7   Q.  Okay.

8   A.  It shows "denial letter due to the permanent mod docs not

9   being returned".

10  Q.  After Mr. Futrell was denied permanent loan modification

11  on January 29th, was the mistaken escrow calculation contained

12  in the June 17th, 2009 escrow analysis corrected?

13  A.  Yes.

14  Q.  And when was that?

15  A.  On February 3rd, 2010.

16  Q.  If I could ask you to turn to Exhibit K, as in kite?  Do

17  you recognize this document?

18  A.  This is an escrow analysis.

19  Q.  Okay.  And this is -- the analysis date is February 3rd,

20  2010, correct?

21  A.  Yes.

22  Q.  Okay.

23  A.  This is what would have been sent to the borrower.

24  Q.  Okay.  And how was the escrow analysis corrected?

25  A.  According to this escrow analysis, it shows that the only

RESIDENTIAL CAPITAL, LLC, ET AL.                    113

1    disbursement that had been made, or that was set to come off,

2    was for taxes.  And then it broke out the next twelve-month

3    period of what they projected to be paid out.

4    Q.  Okay.  Was this escrow analysis sent to Mr. Futrell?

5    A.  Yes, it has his address on it, and this was something that

6    was usually sent out at the time that it was generated.

7    Q.  Okay.  And is the delivery of this reflected in the

8    servicing notes?

9    A.  I'll have to check those.

10   Q.  Okay.

11   A.  On page 101 of the servicing notes --

12   Q.  Um-hum.

13   A.  -- dated February 3rd, 2010, it's maybe the fourth line

14   from the top, it shows it was sent to be printed with our

15   vendor so it could go out.

16   Q.  Okay.  After denial of the permanent loan modification in

17   late January, did Mr. Futrell seek approval for a new loan

18   modification?

19   A.  I believe there was a new one received in the month of

20   February, but I'd have to look through to find the specific

21   date.

22   Q.  Okay.

23   A.  It looks like the voice of the department received a new

24   workout package on February 12th, 2010.  It's on page 100 of

25   the servicing notes, middle of the page.

1  Q.  Okay.  Did GMAC Mortgage conduct a review to determine Mr.

2  Futrell's eligibility for a HAMP trial loan modification?

3  A.  They reviewed him for it, but they determined he did not

4  qualify for a new HAMP.

5  Q.  Okay.  And that's reflected in the servicing notes as

6  well?

7  A.  Yes.  Give me a second to give you the specific location.

8  It's page 99 --

9  Q.  Um-hum.

10  A.  -- dated February 16th, 2010, Amber Shue (ph.).

11  Q.  Um-hum.

12  A.  It says, "Customer denied for HAMP due to no verifiable

13  income.  Borrower is on short-term disability, and for HAMP

14  guidelines we're unable to use short-term."

15  Q.  And did GMAC Mortgage speak with Mr. Futrell about this

16  denial?

17  A.  It appears that Mr. Futrell spoke with Jenna Jackson

18  (ph.), is who she's listed as --

19  Q.  Um-hum.

20  A.  -- on the 16th of February, 2010.

21  Q.  And was Mr. Futrell also advised of the denial in writing?

22  A.  Hold on.  I don't recall.

23  Q.  Okay.  If I could direct your attention to Exhibit H, as

24  in Harry.  Would this have been the letter that Mr. Futrell

25  would have been sent concerning his denial?

RESIDENTIAL CAPITAL, LLC, ET AL.                    115

1   A.  Yes, this would have -- this would be a denial letter for

2   loan modification.

3   Q.  Okay.  If I could just turn your attention back to page 97

4   on the servicing notes, does that -- is there mention of

5   communications in writing?

6   A.  Oh, I apologize.  I looked over it.  It's listed as the

7   denial letter on February 17th, 2010, about, maybe, twelve

8   lines from the top of the page.

9   Q.  Okay, and is that the author Kent Hurlburt?

10  A.  Yes.

11  Q.  Okay.  Was Mr. Futrell's loan account considered for a

12  nonHAMP or a traditional loan modification at that time?

13  A.  In February?

14  Q.  Yes.

15  A.  I believe they began a review for a traditional --

16  Q.  All right --

17  A.  -- yes.

18  Q.  -- okay.  And did GMAC Mortgage representatives speak with

19  him about that process -- the traditional loan modification

20  process?

21  A.  I apologize.  I'm just reading through the notes to make

22  sure I answer correctly.  I don't show a specific conversation

23  around time that review began --

24  Q.  Um-hum.

25  A.  -- that they were being reviewed, but it -- it began

1   automatically as a part of process as --

2   Q.  What --

3   A.  -- HAMP was denied, for trial -- traditional review to

4   begin.

5   Q.  Okay.  One question:  so the second -- we're referring to

6   page 96 of 162, February 19th, second line from the top, it

7   says "approved for LMT, 2/19" -- "2/19/10".  What does that

8   entry mean?

9   A.  That just shows that they've been approved for a

10  traditional loan modification.

11  Q.  Okay.

12  A.  That's an internal note.

13  Q.  Got it.  And did --

14  A.  And I -- I apologize, let me correct myself.  I said a

15  loan modification?

16  Q.  Um-hum.

17  A.  They'd been approved for the continued review --

18  Q.  Okay.

19  A.  -- not for one specifically.

20  Q.  Okay.  So was there a trial modification plan at that

21  point in time?

22  A.  It looks like they were in process of calculating what a

23  trial plan would do.  That's what that first notes indicates.

24  Q.  Um-hum.

25  A.  And later on, on the same date, it looks like, on page 94

RESIDENTIAL CAPITAL, LLC, ET AL.                    117

1  of 162, the entry at the bottom of the page shows the nonHAMP

2  trial modification --

3  Q.  Um-hum.

4  A.  -- agreement for three months.

5  Q.  Okay.  And did this trial modification payment account for

6  the corrected escrow calculation?

7  A.  It would appear it does, as if you look at the top of page

8  95 --

9  Q.  Um-hum.

10  A.  -- it's the finishing piece of that note.  It shows the

11  escrow payment as $46.49.

12  Q.  Okay.

13         THE COURT:  Do you know whether GMAC considered -- in

14  light of the fact that they now recognize the mistake, whether

15  they considered offering the Futrells a modification under the

16  terms of the original permanent -- HAMP permanent loan

17  modification 57976 of principal and interest with the corrected

18  escrow?  By my calculation, that would have resulted in a

19  monthly payment of $630.59 versus the $730.42 that was being

20  offered, since it was GMAC's mistake?

21         THE WITNESS:  I'll be honest, I don't think I can

22  answer that --

23         THE COURT:  There's nothing in --

24         THE WITNESS:  -- specifically.

25         THE COURT:  -- the notes that would reflect that

RESIDENTIAL CAPITAL, LLC, ET AL.                    118

1    anybody even thought about it?

2              THE WITNESS:  I -- it doesn't say that it was ever

3    discussed, as far as sending corrected permanent modification

4    documents correcting escrow, no.

5              THE COURT:  Um-hum.

6              THE WITNESS:  But the permanent modification would

7    have only had impact in influencing the mortgage to either

8    note, which would only lock in the terms of the interest rate

9    and the P&I payment.  I know it adds escrow, but technically it

10   doesn't dictate the escrow.

11             THE COURT:  Actually it would be less than that

12   630.59.  I'm looking at -- first, I'm looking at Exhibit E that

13   shows the modified monthly principal and interest at $579.76.

14             THE WITNESS:  Um-hum.

15             THE COURT:  But in the May 10th, 2010 letter, Exhibit

16   J, it shows the escrow amount at $48.67?

17             THE WITNESS:  Yes.

18             THE COURT:  So the basic point --

19             THE WITNESS:  There's a drastic difference.

20             THE COURT:  There -- yeah, there's a real drastic

21   difference, and GMAC acknowledged they made a mistake, but they

22   didn't do anything to correct the impact on the Futrells for

23   it.

24             THE WITNESS:  That's -- it's difficult for me to say.

25             THE COURT:  You weren't there?

RESIDENTIAL CAPITAL, LLC, ET AL.                    119

1          THE WITNESS:  I -- I wasn't there, but also just

2    knowing that this -- that it would have been corrected through

3    a final escrow analysis once they'd agreed to the terms of the

4    P&I payment change.  It -- it's just hard for me to -- to say

5    that.

6          THE COURT:  All right, just so I correct my own math:

7    the principal and interest have been, as in the permanent loan

8    mod that's shown in Exhibit E, and then with the $48.67 escrow,

9    as shown in Exhibit J, that would total $625.43 a month as the

10   payment as opposed to the $730.42 that was being proposed?

11   Okay.

12         Go ahead, Mr. Wishnew.

13         MR. WISHNEW:  Thank you, Your Honor.

14   BY MR. WISHNEW:

15   Q.  Ms. Lathrop, was the client -- was Mr. Futrell offered a

16   permanent loan modification at the end of the trial

17   modification period?

18   A.  Yes, at the end of the traditional trial period, there was

19   a -- a permanent traditional modification offered.

20   Q.  Okay.  And was that communicated to the claimant?

21   A.  Yes, there were documents sent.

22   Q.  Okay.  If I could turn your attention to Exhibit J, as in

23   Jordan?  Is this the permanent trial modification?

24         MR. WISHNEW:  I'm sorry, let me rephrase.

25   Q.  Is this the permanent modification?

RESIDENTIAL CAPITAL, LLC, ET AL.                    120

1   A.  Yes, this is the permanent tra -- traditional modification

2   that was offered on May 20th, 2010.

3   Q.  Okay.  Was a signed copy of the modification received by

4   GMAC Mortgage?

5   A.  Yes, this document was signed.

6   Q.  Okay, and subsequent to it being signed, did GMAC Mortgage

7   receive a signed copy, according to its servicing notes?

8   A.  Oh, you would like me to show you when the document was

9   received in the servicing notes?

10  Q.  Exactly.  I apologize for that.

11  A.  It looks like the notes on page 82 of 162 --

12  Q.  Um-hum.

13  A.  -- show received documents and funds for loan mod on June

14  3rd, 2010.

15  Q.  Okay.

16  A.  It's about the middle of the page.

17  Q.  Thank you very much.  At the time Mr. Futrell was approved

18  for the permanent loan modification, was his loan delinquent?

19  A.  At the time that he was approved for this one?  Yes.

20  Q.  Yes.  And which payments are outstanding under -- under

21  the terms of the loan?

22  A.  As in, which specific date?

23  Q.  As of August 1st, 2010 -- as of the August 1st, 2010

24  effective date?

25  A.  So you would like to know what the account was due for as

RESIDENTIAL CAPITAL, LLC, ET AL.                    121

1  of August 1st, 2010?

2  Q.  Yes, thank you very much.

3  A.  The account would have been current as of August 1st,

4  2010.

5  Q.  Well, it would be brought current, but would there have

6  been past due amounts prior to it being brought current?

7  A.  On the date that the loan modification was added to the

8  account --

9  Q.  Um-hum.

10  A.  -- on June 8th, 2010 --

11  Q.  Um-hum.

12  A.  -- the account was due for October 1st, 2009 through that

13  current month, and then the loan modification included the June

14  and July payments, with the first payment due August 1st, 2010.

15        THE COURT:  I'm sorry, give me the period -- October

16  1st, 2009 through what date?

17        THE WITNESS:  August 1st, 2009 through June 1st, 2010

18  were delinquent at the time of the loan mod being received, but

19  then it wrapped in the June and July payments as a part of the

20  modifications, so the first payment was due August 1st.

21        THE COURT:  Um-hum.

22  Q.  Ms. Lathrop, you testified earlier that in February of

23  2010, the escrow analy -- the June 2009 escrow analysis was

24  corrected, right?

25  A.  Yeah, it showed that they had accounted for the

RESIDENTIAL CAPITAL, LLC, ET AL.                                     122

1   insurance --

2   Q.  Prior --

3   A.  -- correctly.

4   Q.  Prior to the escrow issue being corrected, did the

5   Futrells payments under the June 2009 trial modification plan

6   incorporate the incorrect escrow amount?

7   A.  I don't know if I understand the question.

8   Q.  So when they were doing the trial plan in July, I believe,

9   of 2009 -- or August of 2009, they made three payments in the

10  approximate amount of 700-some-odd dollars?

11  A.  Oh, at the trial plan payments of 730?

12  Q.  Yes, exactly, thank you.

13  A.  Okay.

14  Q.  Did those payments include the incorrect escrow estimate

15  amounts in them?

16  A.  Yes, it did.

17  Q.  Okay.  And what happened to those amounts after they were

18  received by GMAC Mortgage?  That is, the incorrect escrow

19  amounts?

20  A.  What happened with the excess funds?

21  Q.  Yes.

22  A.  If -- let me look at the payment history to see how that

23  happened.  It appears that the first payment that came in for

24  the trial, for instance --

25  Q.  Um-hum.

RESIDENTIAL CAPITAL, LLC, ET AL.                        123

1   A.  -- is on page 7 of the payment history out of 162.

2   Q.  So you're referring to Exhibit D?

3   A.  Exhibit D, I apologize, yes.

4   Q.  Okay.

5          THE COURT:  I'm sorry, page 7?

6          THE WITNESS:  Page 7, yes, sir.

7   A.  Dated July 3rd, 2009, it's just below the middle of the

8   page.

9   Q.  Um-hum.

10  A.  So we show the $730.76 coming in, and then of that,

11  $657.25 of that was applied as regular payment.

12  Q.  Um-hum.

13  A.  And the remaining -- let me look at the specific number --

14  $73.51 was applied to bucket UFF, which was his expense account

15  used for holding funds until there's enough to complete a

16  payment or to apply as it was meant to be.

17  Q.  Okay.

18  A.  and then it appears that's how that payment was posted, as

19  well as -- let me look.  Do you want me to give you the futures

20  or are you good with just that one?

21  Q.  No, that's good for that.

22  A.  Okay.

23  Q.  So were those amounts ever paid out for insurance or

24  property tax payments?

25  A.  The -- the money that was in that UFF bucket?

RESIDENTIAL CAPITAL, LLC, ET AL.                                124

1   Q.  Correct.

2   A.  It doesn't show that that money ever came out and was used

3   in the escrow account, no.

4   Q.  To the best of your knowledge, what was the disposition of

5   those funds?

6   A.  Let me just follow the history.  It looks like, at the

7   conclusion of the trial, the total came to $220.53.

8   Q.  Um-hum.

9   A.  Because the trial was no longer active, it got moved to

10  bucket UFU, which was just a standard suspense bucket.

11  Q.  Um-hum.

12  A.  Let me see what happened with those funds.  It appears, on

13  February 1st, 2010, that $220.53 was taken out and applied

14  toward fees --

15  Q.  Um-hum.

16  A.  -- that were due on the account.

17  Q.  Okay.

18          THE COURT:  Check -- where is that, if you could,

19  please?

20          THE WITNESS:  I apologize.  It is on page 6 of 162.

21          THE COURT:  Yes.

22          THE WITNESS:  It's probably seven lines down or so.

23  It's the FE note with teller ID number 31204.

24          THE COURT:  Yes

25          THE WITNESS:  And prior to that, I do show that the

RESIDENTIAL CAPITAL, LLC, ET AL.                          125

1    money did move from UFU to bucket UFN, and then moved from UFN

2    to be applied towards fees.

3            THE COURT:  What fees?

4            THE WITNESS:  It -- it doesn't itemize out for me how

5    those fees were applied.

6            THE COURT:  What fees could it be applied to?

7            THE WITNESS:  It could have been applied to property

8    inspection fees or it could have been applied to a BPO fee that

9    may have been taken on --

10           THE COURT:  Broker's --

11           THE WITNESS:  -- the account.

12           THE COURT:  Broker's price opinion?

13           THE WITNESS:  Yes, sir.

14           THE COURT:  Go ahead.

15   BY MR. WISHNEW:

16   Q.  Ms. Lathrop, this morning, Mr. Futrell and Mrs. Futrell

17   testified were burdensome to them.  They also testified that

18   they aim to stay no more than thirty days behind on their

19   mortgage payments.  In your experience with GMAC Mortgage, if a

20   borrower stays thirty days behind, they will be charged a late

21   payment, correct?

22   A.  Yes, in accordance with the mortgage note.

23   Q   Okay, so then, in my -- is it accurate that the late

24   charges that were recurring on a regular basis were simply the

25   result of the Futrells' choice to remain thirty days behind?

1   A.  The -- the -- I suppose.

2   Q.  Okay.

3        MR. WISHNEW:  Your Honor, I have no more questions for

4   Ms. Lathrop.

5        THE COURT:  All right, cross examination.

6        MR. MARGOLIS:  Thank you.

7   CROSS-EXAMINATION

8   BY MR. MARGOLIS:

9   Q.  Please repeat for me how you prepared for your -- the

10  testimony?

11  A.  How I prepared for --

12  Q.  What did you --

13  A.  -- this?

14  Q.  What did you look at?  What did you -- what documents,

15  what exhibits, what pleadings?

16  A.  I reviewed the servicing notes, the payment history,

17  the -- I mean, the majority of the documents that are listed

18  here.  I reviewed the loan modifications that were submitted.

19  I reviewed multiple documents.  I --

20  Q.  Was it inclusive of the second objection of the trust?

21  A.  I -- I honestly don't recall.

22  Q.  Okay.  Okay, now, you say that, with regard to the June

23  17th, which is Exhibit Number 4 for the claimant, that the --

24  that there was a typo, and that there was this one added, so

25  that instead of 352, it was 1,352, correct?

RESIDENTIAL CAPITAL, LLC, ET AL.                    127

1  A.  I -- I admit that the insurance used -- used in the

2  analysis was incorrect, yes.

3  Q.  Okay.  Why did it -- did it take from June 17th '09 to

4  February 2 -- February 3rd, '10 to correct the error?

5  A.  Based on the servicing notes, it shows that the account

6  was showing an inactive loan modification, which kept the

7  system in -- locked up.  It was a system limitation that did

8  not allow the system to update until either it was executed or

9  the loan modification process ended.

10  Q.  So a system limitation?

11  A.  Yes, sir.

12  Q.  Okay.  Now, the question that counsel asked with regard to

13  the -- I guess not -- it's not an excess, but the 220.53?

14  A.  Yes, sir.

15  Q.  And it went to the -- to the bucket?

16  A.  The suspense --

17  Q.  I'm not --

18  A.  -- bucket?

19  Q.  -- sure.  I asked it quizzically.

20  A.  Oh, okay.  Are you asking about specific dates, or --

21  Q.  Yes -- well, yes.  Okay, that 220.53, that went to the

22  bucket or whatever, correct?  Within the GMAC system?

23  A.  It moved several times.  I -- so I just want to make sure

24  I answer appropriately.

25  Q.  If I -- was there -- was there ever an accounting to the

RESIDENTIAL CAPITAL, LLC, ET AL.                    128

1  Futrells over that money?

2  A.  I -- I can't answer that question.  I don't have bank --

3  not a bank statement, I'm sorry, a monthly account statement,

4  and I don't know what time period.  Do you -- are you talking

5  about regarding the payment history itself?  Or --

6  Q.  Well, I'm asking if they were provided with an explanation

7  of what happened to this $220.53?

8  A.  I -- I believe it would have been reflected on the account

9  statement post the February 1st, 2010 transaction.

10 Q.  Do you know that to be a fact, or do you just believe that

11 to be so?

12 A.  I believe that, sir.

13 Q.  You haven't --

14 A.  I don't have the --

15 Q.  You haven't seen the statement --

16 A.  -- actual account statement to review it.  But according

17 to business practice and the way the system worked, anything

18 that happened between account statements with money would have

19 been reflected on the monthly account statement.

20 Q.  Okay.  Okay, referring to the 1,247 escrow shortage on the

21 lower half of that June 17th document, you didn't mention that?

22         THE COURT:  I'm sorry --

23 A.  Which document?

24 Q.  What --

25         THE COURT:  -- I don't understand your question.

RESIDENTIAL CAPITAL, LLC, ET AL.                    129

1  Q.  Okay.  Was the 1,247 dollars and change noted on the June

2  17th escrow analysis?  Was that an accurate statement of their

3  escrow shortage?

4          MR. WISHNEW:  Your Honor, objection.  If counsel has a

5  specific question related to a specific document, I ask that he

6  reference the --

7          THE COURT:  Sustained.

8          MR. WISHNEW:  -- documents.

9          MR. MARGOLIS:  Okay, that's fine.  Okay.

10 Q.  I'd like to refer you to --

11         MR. MARGOLIS:  One moment.

12 Q.  To page 117 of 159.

13         THE COURT:  Of 162?

14         MR. MARGOLIS:  Yes, I'm sorry.

15 A.  The payment history and --

16 Q.  Yeah.

17 A.  -- servicing notes?

18 Q.  No, no, no, no.  It's the service notes.

19 A.  Oh, the service notes?  And I'm sorry, can you say the

20 page one --

21 Q.  Sure.

22 A.  -- more time?

23 Q.  117.  And go -- and go to the 6/17/09 and the person that

24 made the entry was Camille Weiland.

25 A.  Sorry, I'm on the wrong page.

RESIDENTIAL CAPITAL, LLC, ET AL.                    130

1    Q.  That's fine.

2            THE COURT:  I don't see where you're pointing.  What

3    page?

4            MR. MARGOLIS:  It's 117.

5            THE COURT:  Yes.  And what's the entry?

6            MR. MARGOLIS:  And it's -- it's 6/17 --

7            THE COURT:  There's no 6/17 dates on there.

8            THE WITNESS:  I believe he means 1/20, Your Honor.

9    Q.  1/20.  It indicates a shortage amount of $1,541.69 for

10   that date?

11   A.  I -- I do see that note.

12   Q.  Okay, now, was the escrow shortage the 1541.69 or the 1247

13   and change?

14   A.  I -- I personally can't answer that question.  I didn't

15   work in escrow and I didn't do this analysis.

16   Q.  Okay, but that --

17   A.  I believe -- I mean, if you want me to go off of what we

18   have --

19   Q.  No, no, no.

20   A.  -- it would have been --

21   Q.  At this point -- the point is, you have -- you have the

22   escrow analysis here and the service notes here, and they're

23   different?

24   A.  They do appear to conflict, I agree.

25   Q.  Okay.  At this time, I -- okay, are the entries in the

RESIDENTIAL CAPITAL, LLC, ET AL.                    131

1  service notes true, accurate, and correct?

2  A.  They should be, yes.

3  Q.  Okay.

4  A.  But -- oh, no, never mind, I'm sorry.

5  Q.  Go ahead.

6  A.  Go ahead.

7  Q.  Oh, okay.  Okay, do you know a Kathy Priore?

8  A.  A --

9  Q.  Well, okay.  And obviously, she did a supporting affidavit

10  for the same objection.

11  A.  Okay.

12  Q.  It's paragraph 14, and she -- and she wrote:  on June 2nd,

13  2009, claimant spoke with Homecomings regarding his account.

14  And as a result of that conversation, Homecomings set up a five

15  month special forbearance plan intended to provide claimant

16  with some time to complete and return workout package.  Got it?

17  Now --

18          MR. WISHNEW:  Your Honor, objection.  Is there a

19  specific --

20          MR. MARGOLIS:  Yes.

21          MR. WISHNEW:  -- exhibit being referenced?

22          MR. MARGOLIS:  Yes.

23  Q.  Now, could you please check --

24          THE COURT:  Were you reading from a specific exhibit

25  when you gave her --

RESIDENTIAL CAPITAL, LLC, ET AL.                    132

1          MR. MARGOLIS:  Well, it --

2          THE COURT:  -- that information?

3          MR. MARGOLIS:  It's not in an exhibit, it was the

4    second objection to their pleading.

5          THE COURT:  Okay.  All right.  What page?

6          MR. MARGOLIS:  It was page 6 of 13.

7          THE COURT:  Okay.

8          MR. MARGOLIS:  I'm sorry.

9          THE COURT:  That's okay, I just want to make sure

10   everybody knows what you're -- what you're looking at.

11         MR. WISHNEW:  Your Honor, one clarification:  what

12   docket number, please?

13         THE COURT:  What --

14         MR. MARGOLIS:  That's 8315-3.

15      (Pause)

16         MR. MARGOLIS:  Got it?

17   BY MR. MARGOLIS:

18   Q.  Oh, yes --

19   A.  I -- I don't --

20   Q.  -- of course.

21   A.  I don't have that.

22   Q.  Okay, now I refer you to the service notes, page 120, and

23   for the date 6/2/09.

24   A.  I think your numbers don't match mine.

25   Q.  Okay.  It's page 123.

RESIDENTIAL CAPITAL, LLC, ET AL.                                    133

1   A.  Okay.

2   Q.  And again, the date is 6/2/09.

3   A.  Yes, sir.

4   Q.  And that entry reads:  6/2/09 DMD, 6/2/09 13:19:08 message

5   to voice, Daybox (ph.) incoming system.

6   A.  Yes, sir?

7   Q.  So is -- so how could anyone have spoken to them if they

8   left a message?

9   A.  Is it -- I suppose I'm confused, sir.  I show --

10  Q.  Well --

11  A.  -- a conversation on 6/2/09 with Laura Perez on that same

12  page that says:  talked to borrower 1.  So I -- I do show there

13  was a conversation regarding the forbearance plan on that date.

14  Q.  How far -- how far down -- okay.  Rang customer, special

15  forbearance plan --

16          THE COURT:  Don't talk to yourself --

17          MR. MARGOLIS:  I'm sorry --

18          THE COURT:  -- on the record --

19          MR. MARGOLIS:  -- Your Honor.

20          THE COURT:  If you've --

21          MR. MARGOLIS:  I'm --

22          THE COURT:  -- got a question, ask the question.

23          MR. MARGOLIS:  I'm sorry.  Okay.

24  Q.  But there is an entry that it went to -- went to message,

25  correct?

1    A.  The one with the Daybox incoming --

2    Q.  Yes.

3    A.  -- file?

4    Q.  Yes.

5    A.  I do show that on the servicing notes, yes, sir.

6    Q.  Okay, now, do the GMAC employees know each other?  I mean,

7    and they have these servicing records that all have access to?

8    A.  I can't say they know each other.  There's offices

9    everywhere.  As far -- I shouldn't say "everywhere", but

10   multiple sites.

11   Q.  They're --

12   A.  They --

13   Q.  -- readily available?

14   A.  They would -- they would have access to the records

15   through the LoanServ system, though.

16   Q.  Well, I'd like to refer you to the sate 1/29/10.  And the

17   entry was made by Samuel McCough (ph.).

18          THE COURT:  What page?

19          MR. MARGOLIS:  I have page 99, and they're checking.

20   A.  The date 1/29/10, January 29th?

21   Q.  Yes.

22          THE COURT:  I don't see that on page 99.  All the

23   dates on page 99 are February dates.

24          MR. MARGOLIS:  It's 102, based on the other sheets.

25   A.  which entry from the 29th, sir?

RESIDENTIAL CAPITAL, LLC, ET AL.                    135

1    Q.  Okay, it's 1/29/10, the entry's made by Samuel McCough,

2    were he wrote:  they have never spoken with anyone named Jenna,

3    who was the last person to note the account about the problem.

4    Got it?

5    A.  Yes, sir, I see that.

6    Q.  Now, I refer you to --

7           MR. MARGOLIS:  My mistake.

8    Q.  To page -- the date is 1/26/10, 103.

9    A.  Yes, sir.

10   Q.  And you look on the right, the name Jenna Jackson appears

11   for several entries for several entries, correct?

12   A.  Yes, sir, I see that that's her complete note for that

13   day.

14   Q.  I understand.  But Samuel McCough says they never spoke to

15   a Jenna, correct?

16   A.  He says that he spoke with -- I assume Mrs. Futrell is who

17   B-2 is -- states that she did not do that, yes.

18   Q.  Okay.

19          THE COURT:  Mr. Margolis?

20          MR. MARGOLIS:  Yes?

21          THE COURT:  We are going to stop at twenty minutes --

22          MR. MARGOLIS:  Okay.

23       THE COURT:  -- to four.  I'm just telling you.  If --

24          MR. MARGOLIS:  Okay.

25          THE COURT:  -- you're not done, that's fine.  We'll

RESIDENTIAL CAPITAL, LLC, ET AL.                    136

1   resume at 6:15 pm --

2           MR. MARGOLIS:  Okay.

3           THE COURT:  -- tonight, if that's what you want to do.

4   But we're going to finish tonight, one way or --

5           MR. MARGOLIS:  Yes.

6           THE COURT:  -- the other.

7           MR. MARGOLIS:  That's fine with me.

8           THE COURT:  You're also -- you can go on if you want,

9   but I -- your point is being missed by me.  Your points are

10  being missed by me.

11          MR. MARGOLIS:  Well, if it -- okay.

12          THE COURT:  But go ahead.

13          MR. MARGOLIS:  Okay, fine.  Okay.

14  Q.  Who cancelled the 355 repayment plan?  Do you know?

15  A.  I -- I'd have to look at the servicing notes, sir.  Do you

16  have a -- do you have a date, just so I can get to it quicker?

17  Q.  Oh, okay.  Okay.  Okay, based on policy, who would have

18  made that decision?

19  A.  It would have been dependent on what was going on with the

20  account, sir.

21  Q.  Can you be a tad more specific?

22  A.  Honestly, without looking at it and reviewing, it would be

23  very difficult for me to be specific.  Do you want me to review

24  the servicing notes quickly --

25  Q.  No, that's --

RESIDENTIAL CAPITAL, LLC, ET AL.                    137

1   A.  -- to see what happened?

2   Q.  No, that's okay.  Okay, now, it's your testimony that

3   the -- that the correcting the typo of the one had been

4   resolved, correct?

5   A.  Yeah, I show that the escrow analysis was completed

6   February --

7   Q.  Okay.

8   A.  -- 3rd, 2010.

9   Q.  So could -- so could you please explain to me why it was

10  contained in Exhibit 8, which is the April 4th, 2013 opt-in

11  letter?

12  A.  Just give me a second to --

13  Q.  No --

14  A.  -- look at this --

15  Q.  -- it's fine.

16  A.  -- please?  Are you referring to them specifically talking

17  about the June 2009 analysis or is there a -- I just want to

18  make sure I'm looking at the right thing.

19  Q.  Well, excuse me.  I misspoke.  What should have been the

20  question is the -- is the shortage of $1,249.71.

21          MR. WISHNEW:  Your Honor, objection.  Shortage as to

22  what?

23          THE COURT:  Sustained.

24          MR. MARGOLIS:  I'll just finish up with this.

25  Q.  Okay, you relied your testimony, your conclusions on

RESIDENTIAL CAPITAL, LLC, ET AL.                    138

1    examining the record, correct?

2    A.  On examining the documents and the --

3    Q.  Right, the --

4    A.  -- servicing notes and --

5    Q.  Right.

6    A.  -- payment history, yes.

7    Q.  That's right.  Okay.  And at this point, do you concede

8    that, between the system irregularities and the entries,

9    they're not exactly accurate all the time?

10          THE COURT:  I don't -- I --

11   A.  I don't understand you.

12          THE COURT:  I'm sorry, I lost your question.

13          MR. MARGOLIS:  Okay.

14   Q.  Do you acknowledge inaccuracies in the --

15          THE COURT:  Again, she already acknowledged

16   inaccuracies.

17          MR. MARGOLIS:  Okay.

18          THE COURT:  And she already said it was the system

19   issue --

20          MR. MARGOLIS:  Okay.

21          THE COURT:  -- you couldn't correct it while it was

22   in --

23          MR. MARGOLIS:  Okay.

24          THE COURT:  So that's clear to me.

25          MR. MARGOLIS:  Okay.  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    139

1          THE COURT:  That's not disputed.

2          MR. MARGOLIS:  Okay.  Oh, okay.  One last question?

3          THE COURT:  Sure, go ahead.

4          MR. MARGOLIS:  Okay.

5    Q.  Now, there were the statements -- and you indicated it

6    went to pay the fees.  When there was the statement with regard

7    to just the fees and the costs, were they explained to the

8    Futrells as a borrower?

9    A.  I --

10         MR. WISHNEW:  Objection, Your Honor.  Fees and costs

11   when and limited to --

12         THE COURT:  Sustained.

13         MR. MARGOLIS:  Well, okay.

14         THE COURT:  They were charged -- their account was

15   charged for BPOs, broker -- broker price opinions.  Do you know

16   whether there -- anyone from GMAC explained to the Futrells

17   that they were being charged for BPOs or inspection fees?

18         THE WITNESS:  I -- without reviewing them right now, I

19   couldn't answer off --

20         THE COURT:  Okay.

21         THE WITNESS:  -- the top of my head.

22         THE COURT:  That's fine.  So there's your que --

23   there's your answer to your question.

24         MR. MARGOLIS:  Okay.

25   Q.  And on the statement dated July 18, 2012, there is a --

RESIDENTIAL CAPITAL, LLC, ET AL.                    140

1        THE COURT:  What exhibit number?

2        MR. MARGOLIS:  Oh, I'm sorry.  It's N.

3        THE WITNESS:  N?  So one second so I can get there?

4   Q.  I'm sorry.

5   A.  Okay.

6   Q.  The Corp ADVJDDSR (ph.).  Was that -- was that fee ever

7   explained to the Futrells?

8   A.  I -- I don't know without looking at the servicing notes,

9   sir.

10  Q.  Okay.  Would it have been in practice to explain that to

11  them?

12  A.  If it was questioned, most definitely.

13       THE COURT:  Can I ask you?  I'm looking at Exhibit N.

14       THE WITNESS:  N --

15       THE COURT:  The "Corp" --

16       THE WITNESS:  Go ahead.

17       THE COURT:  -- "ADV", I assume that's the corporate

18  advance?

19       THE WITNESS:  Yes, sir.

20       THE COURT:  What's DRN?

21       THE WITNESS:  I -- I can't answer for the acronym.

22       THE COURT:  All right.

23       Next question.

24  Q.  When is it disclosed to a borrower that if they use

25  Speedpay fee pay that there is a charge of 7.50?  And I refer

1  to Exhibit P, which is statement April 20, '09.

2          MR. WISHNEW:  Objection, Your Honor.  What does this

3  have to do with October 30th QWR?

4          MR. MARGOLIS:  It goes to the accuracy --

5          THE COURT:  Overruled.

6          MR. MARGOLIS:  -- of the records to --

7          THE COURT:  Overruled.

8          MR. MARGOLIS:  Okay.

9          THE COURT:  Overruled.

10  A.  The Speedpay fee would have been disclosed at the time

11  that the payment was being made.  It appears the 7.50 was the

12  automated system, so it should have been advised through the

13  automated system.

14  Q.  So there's no advance notice and you call and you say, do

15  you use the service?  And you say, by the way, it's 7.50?

16  A.  You have to confirm that you're to pay the 7.50, but yes,

17  it would advise you, and then give you the option to end your

18  connection if you don't want to pay it.

19  Q.  Thank you.

20          THE COURT:  Okay.

21          Redirect?

22          MR. WISHNEW:  One moment, Your Honor.

23      (Pause)

24  REDIRECT EXAMINATION

25  BY MR. WISHNEW:

RESIDENTIAL CAPITAL, LLC, ET AL.                    142

1    Q.  Ms. Lathrop, going back to Exhibit D, the servicing notes,

2    specifically page 123, at the top of the page.  There was some

3    testimony about the transaction user name Dat Devox (ph.)

4    Incoming File and Lolita Perez (ph.).  Are those two separate

5    entries?

6    A.  Are you talking about the one with the HA

7    MP note next to it versus the one that says that just the DM

8    with no note next to it?

9    Q.  That is correct, yes.

10   A.  It would have been, technically separate.  One probably

11   would have occurred to reflect any phone call or conversation,

12   and the other would have been follow-up work or additional

13   notes on the account.

14   Q.  Okay.  If I could ask you to turn briefly to Exhibit J,

15   the May 20th, 2010 letter.

16   A.  J?

17   Q.  J, yes.  On the first page, in the middle of the page,

18   right before the text box, there's a -- can you review the last

19   bullet point where it starts off, "All miscellaneous fees and

20   costs excluding late charges, may not have been included in a

21   loan modification and will remain as standing."  Does that

22   notation indicate that if this modification is executed, then

23   late fees will be waived?

24   A.  Yes, sir.

25   Q.  Okay.

RESIDENTIAL CAPITAL, LLC, ET AL.                    143

1          MR. WISHNEW:  No further questions, Your Honor.

2          THE COURT:  All right.  Thank you very much, Ms.

3    Lathrop.

4          Let me suggest this:  you want to come back at 6:15

5    and do closings, we could do that.  If you would prefer, I will

6    let the two of you work out a time, and we'll do the closings,

7    and Mr. Margolis can do it by phone.

8          If you want to do it by phone, you can, too, Mr.

9    Wishnew.

10          Actually, you probably should both do it by phone.

11          MR. WISHNEW:  Okay.

12          MR. MARGOLIS:  Okay.

13          THE COURT:  Nobody's going to have the advantage of

14    being in the courtroom -- or the disadvantage.

15          MR. WISHNEW:  I'll take that option, Your Honor.

16          MR. MARGOLIS:  If it please the Court, I would waive

17    final and defer to the Court.

18          THE COURT:  Mr. Wishnew?

19          MR. WISHNEW:  I'm willing to waive the closing

20    statement.

21          THE COURT:  Okay.  All right, so both sides agree to

22    waive closing argument.  Do both --

23          Mr. Margolis, do you rest?

24          MR. MARGOLIS:  I do.

25          THE COURT:  Mr. Wishnew, do you rest?

RESIDENTIAL CAPITAL, LLC, ET AL.                    144

1           MR. WISHNEW:  Yes, Your Honor.

2           THE COURT:  All right.  The matter's going to be taken

3    under submission.

4           MR. WISHNEW:  Thank you very much for your time.

5           THE COURT:  Okay.

6           MR. MARGOLIS:  Thank you.

7           THE COURT:  Thank you.  And I'm sorry.  You know, we

8    got a late start, the weather and traffic and all of that, and

9    just the commitments I get.  So I want to be sure -- I don't

10   mind coming back.

11          MR. MARGOLIS:  Yeah.

12          THE COURT:  If either side felt that they didn't get

13   to do what they wanted to do, I would be back.  All right.

14   Safe trip home, okay?

15          IN UNISON:  Thank you.

16          THE COURT:  All right.

17          MR. WISHNEW:  Have a good day at school.

18          THE COURT:  Thank you.  To have thought, at this point

19   in my life, and I'm going back to school?

20          MR. WISHNEW:  I've just recently done that.

21          UNIDENTIFIED SPEAKER:  Knowledge --

22          MR. WISHNEW:  That's what --

23          UNIDENTIFIED SPEAKER:  -- is power.

24          MR. WISHNEW:  -- I do.  That's what I do for now.

25          THE COURT:  All right.  Safe trip home.

RESIDENTIAL CAPITAL, LLC, ET AL.                    145

1          MR. WISHNEW:  Thank you, Your Honor.

2          THE COURT:  Thank you, everybody.

3       (Whereupon these proceedings were concluded at 3:37 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              **I N D E X**

3

4  WITNESS              EXAMINATION BY     PAGE

5  Alicia Futrell      Mr. Margolis       11

6  Alicia Futrell      Mr. Wishnew        54

7  Alicia Futrell      Mr. Margolis       64

8  William Futrell     Mr. Margolis       66

9  William Futrell     Mr. Wishnew        81

10  William Futrell     Mr. Margolis       85

11  Sara Lathrop        Mr. Wishnew        87

12  Sara Lathrop        Mr. Margolis       126

13  Sara Lathrop        Mr. Wishnew        141

14

15                         EXHIBITS

16  FUTRELLS'            DESCRIPTION        PAGE

17  20                   USDA letter to the 21

18                       Futrells dated

19                       8/10/2011

20  DEBTORS'

21  EE                   Ms. Lathrop's      88

22                       Declaration

23  ALL PARTIES

24  --                   All premarked      89

25                       exhibits

1

2                           C E R T I F I C A T I O N

3

4    I, Hana Copperman, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9          *Hana Copperman*

10

11   _____

12   HANA COPPERMAN

     AAERT Certified Electronic Transcriber CET**D 487

13

14

     eScribers

15

     700 West 192nd Street, Suite #607

16

     New York, NY 10040

17

18

     Date:  January 27, 2016

19

20

21

22

23

24

25