1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x

                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                February 9, 2016

                8:33 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2    Trial Regarding UCL Claim (Tia Smith)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Hana Copperman

1

2   A P P E A R A N C E S :

3   MORRISON & FOERSTER LLP

4        Attorneys for the ResCap Borrower Claims Trust

5        250 West 55th Street

6        New York, NY 10019

7

8   BY:   JORDAN A. WISHNEW, ESQ.

9        JESSICA J. ARETT, ESQ.

10

11

12   ACCESS LEGAL SERVICES

13        Attorneys for Tia Smith

14        310 Fourth Avenue South

15        Suite 5010

16        Minneapolis, MN 55415

17

18   BY:   WENDY ALISON NORA, ESQ.

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE COURT:  Please be seated.

3          We're here in Residential Capital, number 12-12020.

4  This is the trial of the contested matter concerning the claims

5  of Tia Smith.

6          Before we begin, now that we're on the record, I want

7  to make clear, Ms. Nora, I heard that you were also at the

8  table of my law clerks looking at what papers they had as well

9  as looking at the bench.  If you come into the well without the

10 permission of the Court, I will have the court security

11 officer, who's in the back, escort you out of the courtroom,

12 and you'll be gone.  Do you understand?

13         I don't know where you practice.  I know you're from

14 Wisconsin.  But in this court you do not, under any

15 circumstances, look at the papers or binders on my clerk's

16 bench or on this bench.

17         Your behavior throughout the ResCap bankruptcy has, at

18 times, defied my belief.  We will go forward with this trial

19 today, but you're on very thin ice, Ms. Nora.

20         MS. NORA:  Your Honor, may I respond?  I did not --

21         THE COURT:  No.  Do not respond.

22         MS. NORA:  I did not look at the law clerk's bench at

23 all.  I was speaking to this gentleman and asking about

24 exhibits.

25         THE COURT:  May I have the appearances, please?

1          THE CLERK:  You looked at the judge's papers right

2     here.

3          MS. NORA:  I was talking to you, though.

4          THE CLERK:  You came up here, and you looked at his

5     vitae and I asked you that you cannot do that.

6          MS. NORA:  And I stopped.

7          THE COURT:  Okay.  Enough.

8          Any preliminary matters you wish to take up, Ms.

9     Nora --

10          MS. NORA:  Yes.

11          THE COURT:  -- other than your behavior?

12          MS. NORA:  Your Honor, I still would like to correct

13     the record.  I did not --

14          THE COURT:  Is there anything you wish to take up

15     now --

16          MS. NORA:  Yes.  The --

17          THE COURT:  -- preliminary to the trial?

18          MS. NORA:  Yes.  The order of evidence, the burdens of

19     proof, and the admissibility of exhibits, Your Honor.

20          THE COURT:  All right.  You want to make an opening

21     statement.  Go ahead.  Please stand at the podium.

22          MS. NORA:  Thank you, Your Honor.

23          THE COURT:  I understand you also tried to move the

24     podium, which you don't do in my courtroom either.

25          Go to the podium.

RESIDENTIAL CAPITAL, LLC, ET AL.                           6

1        MS. NORA:  Thank you.  Ms. Smith is here on four

2   claims against Residential Funding Company, LLC, Residential

3   Accredit Loans, Inc., Homecomings Financial, LLC, and GMAC

4   Mortgage, LLC

5        As a preliminary matter, Your Honor, we would like to

6   indicate to the Court that the burden of proof initially on the

7   validity of the claims should be that of the objectors, that

8   they must put in some evidence that the claims are invalid or

9   Ms. Smith's claims are entitled to the presumption of prima

10  facie validity.

11       I know that the objectors took the position that Ms.

12  Smith has the burden of proof, but it's my understanding that

13  the initial burden is that of the objectors to put in some

14  evidence that the claims are invalid.

15       And it is our position that no such evidence has been

16  produced.  The declaration of Sara Lathrop, we believe, is

17  inadmissible, for the reasons stated in our objections.  And

18  the exhibits upon which the objectors rely are likewise

19  inadmissible.

20       So what I would like first from the Court is if you

21  would instruct whether the first witness should be Ms. Smith or

22  whether or not the Court will rule on --

23       THE COURT:  No.  You have the burden of going forward.

24  This is your client's claims.  You call Ms. Smith.

25       MS. NORA:  Okay.  And then the reason that we are here

1    is that this Court has allowed the single claim under the

2    California Unfair Competition Law to go forward at this time

3    for actions taken by the ResCap debtors, which were identified

4    as -- by Ms. Smith -- as being likely to deceive the public.

5         That involves her -- the fact that she was told that

6    she did not have to make three monthly payments if she wanted a

7    loan modification.  In other words, if she wanted a loan

8    modification, she would not be eligible for a loan modification

9    unless she skipped three monthly payments.  When she skipped

10   the monthly payments, she was then held to be in default.  Her

11   loan documents were sold to Aurora, and eventually foreclosure

12   was commenced, which has resulted in her present loss of title

13   to her homestead.

14        So our position is that the fraudulent representation

15   that she was not eligible for a mortgage modification unless

16   she missed three monthly payments was the kind of fraudulent

17   misconduct that is covered by the California Unfair Competition

18   Law that allows restitution, and among the items of restitution

19   are all of her out-of-pocket expenses and the value of the

20   title to her home.

21        THE COURT:  Okay.  You wish to make an opening

22   statement?

23        MR. WISHNEW:  Your Honor, we'll waive our opening

24   statement.

25        THE COURT:  Okay.  Call your first witness, Ms. Nora.

RESIDENTIAL CAPITAL, LLC, ET AL.                          8

1          MS. NORA:  Thank you.  I call Tia Danielle Smith.

2          THE COURT:  Okay.  Ms. Smith, come on up.

3          MS. NORA:  Your Honor, may I assist Ms. Smith with

4    carrying the evidence binders?

5          THE COURT:  Absolutely.

6          MS. NORA:  Thank you.

7          MR. WISHNEW:  Your Honor, may I ask one question of

8    procedure?

9          THE COURT:  Go ahead.

10         MR. WISHNEW:  The parties submitted objections to the

11   respective declarations.  How are those objections being

12   addressed?

13         THE COURT:  I'm going to rule on the objections.

14   Let's let Ms. Smith get sworn, and then we'll deal with that.

15   Okay?

16         MR. WISHNEW:  Thank you, Your Honor.

17         THE COURT:  Okay.  Ms. Smith, if you'd raise your

18   right hand you'll be sworn.  Okay?

19      (Witness sworn)

20         THE COURT:  All right.  Have a seat.

21         There's water there.  There should be cups there if

22   you'd like to get some water.

23         THE WITNESS:  Thank you.

24         THE COURT:  Okay?  And we have to make sure that you

25   pull the microphone towards you, that we get your voice.  Okay?

RESIDENTIAL CAPITAL, LLC, ET AL.                    9

1        THE WITNESS:  Can you hear me?  Can you hear me?

2        THE COURT:  I can.

3        THE WITNESS:  Okay.

4        THE COURT:  And if you want water, go ahead and take.

5        THE WITNESS:  Thank you.

6        THE COURT:  Okay.  Ms. Nora, are you offering Ms.

7   Smith's declaration?

8        MS. NORA:  Yes, I am, Your Honor.  And I did make hard

9   copy print of the declarations for -- I did not include them in

10  the evidence binders.

11       THE COURT:  I have it.

12       MS. NORA:  May I provide Ms. Smith with a hard copy?

13       THE COURT:  Absolutely.  Sure.

14       MS. NORA:  And Mr. Wishnew?

15       THE COURT:  Mr. Wishnew, do you need one or do you

16  have it?

17       MR. WISHNEW:  We have, Your Honor.

18       THE COURT:  Okay.

19       MS. NORA:  Thank you.

20       THE COURT:  Go ahead.

21       THE CLERK:  Yes, Your Honor.

22       MS. NORA:  Okay.  Thank you.  Okay.

23       THE COURT:  All right.  Ms. Nora has offered the

24  declaration, under penalty of perjury, as direct testimony of

25  Tia Danielle Smith.  The Trust filed objections to portions of

RESIDENTIAL CAPITAL, LLC, ET AL.                    10

1  the declaration.  What I will do is I will rule on those

2  objections now.  I think most of the objections relate to

3  relevance.  There may be a few as to foundation that I'll give

4  you an opportunity, if you wish, to try and -- if I sustain the

5  objection -- to see if you can resolve it.  But let me go

6  through by paragraph number and address the objections.

7          As background, in prior hearings recently the Court

8  made clear that the only issues for this trial relate to the

9  events in November, 2007 of -- or with respect to Ms. Smith's

10 efforts to obtain a loan modification, and that's the basis for

11 the California Unfair Competition Law claim.

12         The Court's prior decision sustaining in part and

13 overruling in part objections, the Trust's objections to the

14 Smith claim, is reported at 518 B.R. 720.  It's dated October

15 1, 2014.

16         So with respect to the objections to the declaration,

17 the objections to paragraph 5, 6, 7, 10, and 11 on relevance

18 grounds are sustained.  The objection to paragraph 32 is

19 overruled.  The objections to paragraphs 33, 34, 35, 36, 37 are

20 sustained.  The objection to paragraph 42 is overruled.  The

21 objection to paragraph 44 is overruled.  The objections to

22 paragraph 45, 46, 47, 48, 49 and 50 are sustained.  The

23 objection to paragraph 54 is sustained.

24         The objection to paragraph 58 is sustained on the

25 grounds of lack of foundation, not relevance, and you may be

1  able to cure that, Ms. Nora.

2          MS. NORA:  Thank you, Your Honor.

3          THE COURT:  Objection to paragraph 60, 61, 62 are

4  sustained.  The objection to paragraph 65 is sustained.

5          With respect to paragraph 58, Ms. Nora, if you're --

6  are you offering the GMAC RFC 2007 Selling and Servicing Guide?

7          MS. NORA:  I am, Your Honor.

8          THE COURT:  Is that marked as an exhibit?

9          MS. NORA:  It is, Your Honor.

10          THE COURT:  What exhibit is it?

11          MS. NORA:  If you would give me just a moment, I am

12  working by electronic documents, because my hope was that I'd

13  be able to get access to one of the chamber's sets of exhibits.

14  So I can look this up electronically, if you would just give me

15  a moment.

16          THE COURT:  Go ahead.

17          MS. NORA:  I am faster on paper, as an older lawyer,

18  than I am electronically, so please bear with me.

19          It is in the index of exhibits identified by the

20  objector in its response to request for production of

21  documents.

22          THE COURT:  The question is whether you have it marked

23  as an exhibit, Ms. Nora.

24          MS. NORA:  I do, Your Honor, but the foundation is

25  also in.

1          THE COURT:  Okay.  But just give me the exhibit

2     number.

3          MS. NORA:  Thank you.  I'm trying to get there.

4          THE WITNESS:  May I offer some assistance?

5          MS. NORA:  She's got the hard copy, Your Honor, if she

6     could.

7          THE WITNESS:  Your Honor?

8          THE COURT:  Yes.  Sure.

9          THE WITNESS:  Do you want the --

10          THE COURT:  Just --

11          THE WITNESS:  -- Servicer Guide or the Seller and

12     Servicer Contract?

13          THE COURT:  Well, she had it listed as one.  Are there

14     separate documents, Ms. Smith?

15          THE WITNESS:  Yes.

16          THE COURT:  Why don't you give me the exhibit?

17          THE WITNESS:  Exhibit 3 is the GMAC RFC Servicer Guide

18     from --

19          THE COURT:  Okay.

20          THE WITNESS:  And Exhibit 4 is the Seller/Servicer

21     Contract?

22          THE COURT:  Okay.

23          THE CLERK:  Let me --

24          MS. NORA:  And, Your Honor, that would be Exhibit 3

25     would be the RFC GMAC Servicer Guide --

RESIDENTIAL CAPITAL, LLC, ET AL.                    13

1          THE COURT:  Okay.  Just a second.

2          MS. NORA:  -- that we have presented for the Court.

3     And then in Exhibit 2, in responses to requests for production

4     of documents, it has been identified as what it is by the

5     objector.

6          THE COURT:  Mr. Wishnew, do you have objections to

7     Plaintiff's Exhibits 3 and 4?

8          MR. WISHNEW:  One moment, Your Honor.

9        (Pause)

10         MR. WISHNEW:  Your Honor, we have no objection.

11    (GMAC RFC Servicer Guide was hereby received into evidence as

12    Claimant's Exhibit 3, as of this date.)

13    (Seller/Servicer Contract was hereby received into evidence as

14    Claimant's Exhibit 4, as of this date.)

15       (Pause)

16         THE COURT:  Well, coming back to paragraph 58 of Ms.

17    Smith's testimony, it doesn't point to specific -- I'm going to

18    overrule the objection for now.  I'm not sure it really -- she

19    refers to the selling and servicing guide.  They're two

20    separate exhibits, Exhibits 3 and 4.  It doesn't point to

21    specific provisions in it, but I'm going to overrule the

22    objection to paragraph 58, and we'll see what's going on.  It's

23    going to be the best evidence of it.  Okay.

24         Do you have any limited questions you want to ask your

25    client, Ms. Nora?

RESIDENTIAL CAPITAL, LLC, ET AL.                    14

1          MS. NORA:  Yes, Your Honor.  Thank you.

2   DIRECT EXAMINATION

3   BY MS. NORA:

4   Q.  Ms. Smith, could you --

5          THE COURT:  And you will get a chance to do a

6   redirect, but if there's some --

7          MS. NORA:  I appreciate it.

8          THE COURT:  -- questions now you want, go ahead.

9          MS. NORA:  Thank you.

10  Q.  Ms. Smith, what was the purpose of you communicating with

11  what you thought was this mortgage servicer in November of

12  2007?

13  A.  In -- when I contacted Homecomings in November of 2007 I

14  was interested in obtaining a loan modification.  I wanted to

15  lower my monthly expenses.

16  Q.  And who did you speak to?

17  A.  I spoke to a representative by the name of Miriam.

18  Q.  And what did Miriam tell you?

19  A.  Miriam told me that I needed -- because I was current on my

20  mortgage, I needed to skip at least three monthly payments in

21  order to qualify and be considered for a loan modification.

22  Q.  Who did you believe was the lender to you at that time?

23  A.  I believed Homecomings was the noteholder.

24  Q.  Could you explain to the Court why you believed that?

25  A.  In December of 2006 I refinanced my home, and I executed a

1    promissory note and a deed of trust in favor of American

2    Mortgage Network.  And American Mortgage Network said -- well,

3    they didn't tell me verbally, but in the document it stated

4    that they would probably sell my loan.  And I believe I

5    received a letter from American Mortgage Network dated December

6    30th saying that my mortgage had been transferred to

7    Homecomings Financial and that they were going to -- they were

8    entitled to collect my monthly mortgage payments.  So I

9    believed that Homecomings was the noteholder, since my

10   promissory note states that whoever receives the payments is

11   the lender/noteholder.  So I thought Homecomings was the owner

12   of the note.

13   Q.  And do you have an exhibit that supports your position that

14   you were notified that this loan had been sold?  Could you look

15   at the index of exhibits, please?

16   A.  Sure.

17   Q.  And I direct your attention to Exhibit 12.

18   A.  12.

19   Q.  I believe that would be in the second evidence binder.

20       (Pause)

21   A.  Okay.  I'm at 12.

22   Q.  Could you identify that document for the record, please?

23   A.  This is a letter I received from Homecomings Financial.

24   The letter is dated January 16, 2007.

25   Q.  And is that the letter that you referred to in your earlier

1   testimony that you believed was your notice that Homecomings

2   was your lender?

3   A.   Yes.  The first letter I referred to was the American

4   Mortgage Network letter, but this one came after.

5   Q.   And you did receive that letter?

6   A.   Yes.  I did.

7   Q.   Okay.  I'm trying to help you -- help me find the

8   American --

9           THE COURT:  I can't hear you.  You have to --

10          MS. NORA:  I'm sorry.

11  Q.   Did you receive a letter dated on or about December 30,

12  2007 to which you have referred in your testimony?

13  A.   I received a letter dated --

14  Q.   Oh, sorry.  2006.  Sorry.

15  A.   Yes, I did.

16  Q.   You received a letter dated December 30, 2006?

17  A.   Yes, I did.

18  Q.   And that was from what company?

19  A.   It was from American Mortgage Network.

20  Q.   And what did that letter tell you?

21          THE COURT:  Is the letter marked?

22          MS. NORA:  Your Honor, I'm looking for it.

23          THE WITNESS:  Would you like me to answer?

24          THE COURT:  Is it -- do you --

25          THE WITNESS:  Oh, no.  I'm saying do you want me to

 1  answer the question?

 2          THE COURT:  I was asking Ms. Nora, but if you know

 3  where it is.

 4          MR. WISHNEW:  Your Honor, it's Exhibit BT-H, as in

 5  Harry, in the Borrower's Trust exhibits.

 6          MS. ARETT:  May I approach?

 7          MR. WISHNEW:  Your Honor, may Ms. Arett approach with

 8  a binder of the Borrower's Trust exhibits?

 9          THE COURT:  Sure.

10          MS. ARETT:  This is going to be --

11          MS. NORA:  Thank you.

12      (Pause)

13          THE COURT:  What was the Exhibit again, Mr. Wishnew?

14          MR. WISHNEW:  H as in Harry, Your Honor.

15  Q.  Have you had a moment to look at the binder of exhibits

16  from the objector, Ms. Smith?

17  A.  Yes, I have.

18  Q.  Have you located Exhibit BT-H?

19  A.  I have.

20  Q.  Is that the letter that you were referring to that --

21  A.  Yes, it is.

22  Q.  Okay.  And what in that letter indicates that American

23  Mortgage Network had transferred your mortgage to Homecomings?

24  A.  In the first paragraph it says you are hereby notified that

25  the servicing of your mortgage loan, that is the right to

1  collect payment from you, is being assigned, sold, or

2  transferred from American Mortgage Network, Inc. to Homecomings

3  Financial, effective February 1, 2007.

4  Q.  And because you were informed from your collateral

5  documents that your mortgage loan could be sold, please explain

6  to the Court why you interpreted this letter as being a change

7  in the identity of your lender.

8  A.  Just for the reasons why he stated, because American

9  Mortgage Network did say that they were going to sell the loan.

10  Q.  Okay.  And so you anticipated the sale.

11  A.  Yes, I did.

12  Q.  And after you received this letter, what did you do with

13  your payments, starting February 1st?

14  A.  I sent my payment to Homecomings Financial.

15  Q.  At the address provided to you?

16  A.  Yes.

17  Q.  And of those payments, how many did you make to Homecomings

18  Financial?

19      MR. WISHNEW:  Objection, Your Honor.  What period of

20  time are we referring to?

21      THE COURT:  Overruled.

22  A.  I made the February payment, 2007.  I made March, 2007,

23  April, 2007, May, 2007, June, 2007, July, 2007, August, 2007,

24  September, 2007, October, 2007, November, 2007, and December,

25  2007.  I think I covered --

RESIDENTIAL CAPITAL, LLC, ET AL.                    19

1  Q.  So you made eleven payments in 2007 to Homecomings

2  Financial.

3  A.  Yes, I did.

4  Q.  And what led you to want to discuss a loan modification?

5  A.  At that time the economy was pretty much tanking, and I was

6  self-employed.  I owned a hair salon, and that's a pampering.

7  I offered pampering services actually, and a lot of times

8  that's the first thing people cut back on, customers, when

9  they're trying to save money.  I also owned income property out

10 of state, and my tenants had stopped paying rent.  And I had --

11 I think I had a couple of vacancies.  And so I needed to reduce

12 my monthly expenses.

13 Q.  And how did you know that a loan modification might be a

14 possibility?

15 A.  They were talking about -- I heard about it on the news.

16 On the news.  CNBC, MSNBC.

17 Q.  And so you contacted Homecomings about a loan modification

18 in what month?

19 A.  The first time I contacted I just -- I called in September

20 of 2007 to inquire about a loan modification.

21 Q.  And did you make any notes that were contemporaneous with

22 that phone call as to who you spoke to in September of 2007?

23 A.  I did.  I just made some basic notes on one of their

24 mortgage statements.  I noted who I spoke with.

25 Q.  And who did you speak with?

RESIDENTIAL CAPITAL, LLC, ET AL.                    20

1  A.  Amerivan.

2  Q.  And did you make any note of what Amerivan told you at that

3  time?

4  A.  Actually, no, I did not.

5  Q.  Just that you spoke to him.

6  A.  Yes.

7        THE COURT:  It was a he or a she?

8        THE WITNESS:  I don't really know.  I couldn't tell.

9  Q.  And what was the next time that you spoke to Homecomings

10  about anything?

11  A.  The next time I called Homecomings was in October, the

12  following month, and I did not -- I don't recall the

13  representative's name, but I called to tell them that I did not

14  receive my October statement, and I was told that they would

15  mail me out another copy.

16  Q.  Okay.  And did you receive a copy of the October statement?

17  A.  No, I did not.

18  Q.  Okay.  When was the next time you spoke to Homecomings?

19  A.  I had called the following month, which was in November,

20  and I spoke with Miriam, and I inquired again about a loan

21  modification, and I also told Miriam that I had not received my

22  October or my November monthly statement.

23  Q.  And did you make a contemporaneous note of that

24  conversation?

25  A.  I wrote Miriam's name down.  However, I didn't make -- I

1  didn't note -- notate what she had told me.

2  Q.  Okay.  And when you spoke to Miriam in November of 2007,

3  did you ask her anything about loan modifications?

4  A.  I did.

5  Q.  And could you describe that conversation, to the best of

6  your recollection, to the Court?

7  A.  I told Miriam that I was interested in obtaining a loan

8  modification, and she basically reiterated what Amerivan had

9  told me in the month of September, because I was current that I

10  needed to skip at least three monthly mortgage payments to be

11  considered for a modification.

12  Q.  Did you describe any of your financial circumstances to

13  Miriam in November of 2007?

14  A.  I did.

15  Q.  Could you tell the judge what you recall telling Miriam?

16  A.  I told Miriam that I needed to reduce my monthly expenses

17  because of the stock market, because of my real estate

18  investments.  And I mentioned that my mother had just moved

19  out.  She had relocated.  She was living with me, and she had

20  contributed to the household income.

21  Q.  After November, 2007, did you ever have any further

22  telephonic communications with Homecomings?

23  A.  I called Homecomings again in December and stated that I

24  still hadn't received any of my monthly mortgage statements.  I

25  still hadn't received October, November, and I did not receive

1   December.

2   Q.  Okay.  Did you have any telephonic communications with

3   Homecomings in 2008?

4   A.  No, I did not.

5           THE COURT:  May I just interrupt for a second?  You

6   had testified earlier that you -- the payments that you made in

7   2007 included your monthly payments for September, October,

8   November, and December.  And you've just told me that you

9   hadn't received any mortgage statements.  How did you make your

10  payments?

11          THE WITNESS:  How did I make them?

12          THE COURT:  Yes.

13          THE WITNESS:  Actually, I don't know if I made them

14  online or if I paid by check.  I don't remember.

15          THE COURT:  But even though you hadn't received a

16  statement, you made the payments?

17          THE WITNESS:  Yes.

18          THE COURT:  Okay.  Go ahead.

19          MS. NORA:  Thank you.

20  Q.  Ms. Smith, at what point did you skip a monthly payment?

21  A.  I began to skip in January, 2008.

22  Q.  Okay.  So you skipped January, 2008.

23  A.  That's correct.

24  Q.  Did you skip any other payments?

25  A.  I did.  I skipped February and March of 2008.  Oh, excuse

RESIDENTIAL CAPITAL, LLC, ET AL.                                23

1   me.  2007.  No.

2           THE COURT:  2008.

3   A.  2008.  Sorry about that.

4           THE COURT:  You're sure it was 2008, right?

5           THE WITNESS:  Yes.  2008.

6           THE COURT:  Okay.

7           THE WITNESS:  2008.

8           THE COURT:  All right.  So January, February, March,

9   you didn't make those payments?  2008, you didn't make those

10  payments?

11          THE WITNESS:  That's correct.

12          THE COURT:  Okay.

13  Q.  And did anything happen through correspondence in early

14  2008 that is of importance to your belief that you have been

15  victimized by fraudulent trade practices?

16  A.  Well, in March of -- March of 2008 I received a letter from

17  Aurora Loan Services stating that Homecomings had transferred

18  my mortgage to Aurora, and Aurora was now entitled to collect

19  my monthly mortgage payments.

20  Q.  Now, again with respect to this idea of "entitled to

21  collect monthly payments", could you tell the judge what you

22  believed that meant at the time?

23  A.  I believed if someone was entitled to collect my monthly

24  mortgage payments that indicated -- that meant that they were

25  the owner of my mortgage, that they were the noteholder,

1  because that's what my promissory note -- that's how I

2  interpreted my promissory note.

3  Q.  Okay.  And directing your attention to Exhibit -- I'm

4  sorry.  Hold on a second.

5      I believe it's Exhibit 5?  I'm sorry.  Exhibit 8.  Could

6  you identify that document to the Court, please?

7  A.  Exhibit 8?

8  Q.  Exhibit 8 of your exhibits.

9  A.  This is the adjustable rate note, the promissory note.

10  Q.  And that's -- when you refer to the note, that's the note

11  to which you are referring.

12  A.  Yes, it is.

13  Q.  Okay.  And where did that copy of the note that appears as

14  Exhibit 8 in your volumes of exhibits, where did that come

15  from?

16  A.  This was produced by Aurora Loan Services.

17  Q.  And is it your intention that the Court should allow you to

18  admit Exhibit 8 for purposes of the content thereof?

19  A.  Yes.

20  Q.  Now, what happened after you received the transfer of what

21  you thought was your mortgage loan to Aurora?  What happened

22  next?

23  A.  Aurora orally told me that I was in default.  And I

24  explained to them what Homecomings had told me, and Aurora

25  stated that they didn't have any notes to that effect.  And I

1    told them that my situation, that I needed to reduce my monthly

2    mortgage payments, and then they took my financial information

3    over the phone and said that they could -- that I -- well, they

4    set me up for a repayment agreement.

5    Q.  And is one of your exhibits in these proceedings that first

6    repayment agreement?

7    A.  Yes.

8    Q.  Could you identify that document for the Court, please?

9    A.  I believe it is Exhibit --

10   Q.  The index is at the beginning.

11   A.  Oh.  So that would be Exhibit 34?

12   Q.  Thank you.  And could you give the Court an indication of

13   what the date of that agreement --

14        THE COURT:  Or just hold on.  Just a second.

15      (Pause)

16        THE COURT:  Ms. Nora, when I open Exhibit 34 the first

17   page is a cover sheet that says Exhibit O.  There is a

18   document -- is the repayment agreement, is that --

19        MS. NORA:  Yes, it is, Your Honor.  You see, what

20   happened was when we were putting together the proposed final

21   pretrial order, Ms. Arett suggested that we number the exhibits

22   that were lettered and attached to the third amended complaint

23   of Ms. Smith's.

24        THE COURT:  Okay.

25        MS. NORA:  And so that's why the Exhibit O shows that

1  it was O to the third amended complaint as --

2          THE COURT:  Okay.  All right.  That's fine.

3          MS. NORA:  Thank you.

4          THE COURT:  So Exhibit 34 is the repayment agreement

5  dated April 30, 2008.

6          MS. NORA:  April 30 of 2008.  Okay.

7          THE WITNESS:  That's correct.

8          THE COURT:  Okay.  Go ahead.

9  Q.  Did you enter into any other repayment agreements with

10  Aurora?

11  A.  I did.  I think, maybe, four more.

12  Q.  Okay.  With respect to exhibits that you have asked the

13  Court to consider, could you identify what Exhibit 35 is?

14  A.  Exhibit 35 is the June 17, 2008 repayment agreement.

15  Q.  Okay.  What is Exhibit 36?

16  A.  Exhibit 36 is the January 8, 2009 workout agreement.

17  Q.  And what is Exhibit 37?

18  A.  37 is the January 15, 2010 workout agreement.

19  Q.  So where's -- the index for Exhibit 37 says Exhibit S to

20  the third amended complaint is a workout agreement with Aurora

21  dated January, 2009.  If you could look at the index, that's a

22  typographical error.  It should be January, 2010 according to

23  the content of Exhibit 37.

24          THE COURT:  January 15, 2010.  Let's give it a bit.

25  Q.  Is it your desire to correct the index to conform to the --

1          THE COURT:  Don't worry about the index.  I got the

2  exhibit.

3          MS. NORA:  Thank you, Your Honor.

4  Q.  Ms. Smith, are Exhibits 34, 35, 36, and 37 true and correct

5  copies of what you are representing to the Court they appear to

6  be, that is copies of repayment agreements and workout

7  agreements with Aurora?

8  A.  Yes.

9  Q.  And when we talk about Aurora, what entity are we speaking

10  of?  Aurora --

11  A.  Loan Services LLC.

12  Q.  And what, in March of 2008, did you think Aurora Loan

13  Services LLC was with respect to your loan?

14  A.  I thought they were the owner of the loan.

15  Q.  And why did you think that Aurora Loan Services was your

16  lender?

17  A.  Well, for one, the letter that they sent me said that the

18  mortgage was transferred to them.  And in each one of these

19  agreements they state that they are the lender.

20  Q.  Okay.  Ultimately, did Aurora Loan Services take any

21  enforcement action to obtain accelerated payments of your note?

22          MR. WISHNEW:  Objection, Your Honor.

23          THE COURT:  Overruled.

24  A.  Yes, they did.

25  Q.  And could you tell the Court what ultimately occurred?

RESIDENTIAL CAPITAL, LLC, ET AL.                          28

1  A.   In September, 2009 Cal-Western Reconveyance Corporation

2  recorded a notice of default and an election to sell.  And

3  maybe a month later -- no, October 1, 2009 -- Aurora Loan

4  Services, pretending to be a officer of Mortgage Electronic

5  Registration Systems, Inc., assigned all beneficial interest in

6  my mortgage to itself.

7        And on November, 2011 -- excuse me, November 16, 2011 --

8  there was a foreclosure sale, and Aurora -- the trustee's deed

9  upon sale states that Aurora Loan Services was the foreclosing

10 beneficiary, and it purchased the property with the credit bid.

11 So my home was foreclosed on.

12 Q.   Okay.  Now, with respect to the notice of default to which

13 you referred, is that Exhibit 25 in your exhibits that you

14 would like the Court to consider, being Exhibit E to the third

15 amended complaint, having been renumbered for purposes of these

16 proceedings?

17 A.   Yes, it is.

18 Q.   And is there anything that you would like to have the Court

19 consider with respect to the notice of default from Aurora that

20 is additionally a part of how you were misled in these

21 transactions?

22        THE WITNESS:  Objection, Your Honor.

23        THE COURT:  Sustained.

24 Q.   When you say that Aurora put a bid in at the foreclosure

25 sale, do you know whether or not that was a bid for actual

RESIDENTIAL CAPITAL, LLC, ET AL.                              29

1   United States currency or what is known as a credit bid?  Do

2   you have any personal knowledge of that?

3   A.  Yes.  I attended the trustee's sale, and Aurora Loan

4   Services was not present, and so a credit bid was made over the

5   phone.  And there were no other bidders, and so the credit bid

6   was the winning bid.

7   Q.  And what was your understanding of the credit bid being

8   accepted at that time?

9   A.  I understand that a credit bid is only valid if it is made

10  by the noteholder.

11  Q.  Had you begun to investigate these circumstances of these

12  transactions at any point after you stopped making your

13  payments?

14  A.  No, I had not.  Not until -- I didn't start researching or

15  suspect any foul play until June of 2011.

16  Q.  Okay.  And when was the nonjudicial foreclosure sale for a

17  credit bid?  When was that accomplished again?

18  A.  That was November 16, 2011.

19  Q.  So could you tell the Court what led you to begin to

20  investigate these transactions?

21          MR. WISHNEW:  Objection, Your Honor.

22          THE COURT:  Overruled.

23  A.  For -- since Aurora had come into the picture in March of

24  '08, up until, I believe, June of 2011, I had tried diligently

25  to obtain a modification, and I believed that Aurora was my

1    noteholder at certain points in time.

2        I would be denied for a modification sometimes where

3    allegedly they didn't receive documents, and I would be denied,

4    and then they would tell me to reapply.

5        Then I would reapply, and they would deny me for excessive

6    forbearance, and then they would say it was said that the --

7    your investor will not approve excessive forbearance.  And that

8    was puzzling to me, because I thought Aurora Loan Services was

9    the investor/owner/noteholder.  It wasn't until Nov -- excuse

10    me -- October, 2009 I had -- there's this program to help

11    homeowners achieve loan modifications.  It's called NACA.  And

12    I had went to this --

13            THE COURT REPORTER:  Could you spell that for the

14    record, please?

15            THE WITNESS:  It's N -- it's N as in Nancy, A as in

16    apple, C as in Charlie, A as in apple.  And I don't know.  It's

17    an acronym.  I'm sorry.  I don't know.  Neighborhood something

18    or other.

19    A.  I had gone to this -- it's kind of like a convention, a

20    conference, and I went there and stayed all day, and once I

21    spoke to one of the representatives they had encouraged me to

22    do a qualified written request to Aurora Loan Services.  And so

23    I did that.  I did it the next day.  I wrote a -- I just went

24    online and did -- copied a generic qualified written request,

25    because I didn't know what that was.  And I mailed it out.  And

1  I believe I faxed it over October 6, 2009.

2      And all I wanted to know was who the investor was.  But in

3  the letter it asked for all loan documents.  But I didn't care

4  about that.  I just wanted the investor's name.  And so I

5  received their -- Aurora Loan Service's response and there was

6  probably -- their response was dated, I believe, November 9th,

7  2009, but I didn't receive it until mid-November.

8      And I believe on the first page of the response it said

9  that Deutsche Bank Trust Company Americas as trustee was the

10  owner of the debt.

11      THE COURT:  Ms. Nora?  I've let you do these

12  questions, but this is two years past the events that are at

13  issue in this trial.  Unless you tie specifically what Ms.

14  Smith saw in 2009 that relates specifically to the one

15  remaining claim in this proceeding, I'm not going to allow you

16  to go further with it.

17      MS. NORA:  Thank you, Your Honor.

18      THE COURT:  I've given you some leeway.  But unless

19  you link it back to specifically to the events of November 2009

20  (sic), I'm not going to permit you to go further with it.

21      MS. NORA:  I do appreciate it, Your Honor, and you've

22  been very patient.  This is background.  We're now going to go

23  into the issues that lead up the misrepresentations that were

24  made to Ms. Smith based on other exhibits.

25      But if I may quickly, Your Honor, just have Ms. Smith

RESIDENTIAL CAPITAL, LLC, ET AL.                    32

1   identify which exhibit is the qualified written request

2   response that refers to Deutsche Bank Trust Companies (sic)

3   Americas as trustee being the investor.

4   Q.  I'm thinking it's Exhibit 37?

5   A.  I think it's 38.

6   Q.  38?  Oh, I'm sorry, yes.  Exhibit 38.

7          MS. NORA:  And Your Honor, we would like to move the

8   admission of the exhibits that have been referred to in Ms.

9   Smith's testimony up to this point:  Exhibit 12, Trustee

10  Exhibit --

11         THE COURT:  Well, let me go through my notes, because

12  we had Exhibits 3 and 4, the servicing guide, and the seller's

13  servicing contract, Mr. Wishnew said earlier he didn't object.

14  So they're in evidence.  Okay?

15         Exhibit 12?

16         MR. WISHNEW:  No objection, Your Honor.

17         THE COURT:  All right, it's in evidence.

18  (1/16/07 letter to Ms. Smith was hereby received into evidence

19  as Claimant's Exhibit 12, as of this date.)

20         THE COURT:  Exhibit BT-H?

21         MS. NORA:  Yes, we move the admission of --

22         MR. WISHNEW:  We would move for the admission of the

23  exhibit, Your Honor.

24         THE COURT:  I'm sorry?

25         MR. WISHNEW:  We would move for the admission of the

RESIDENTIAL CAPITAL, LLC, ET AL.                            33

1  exhibit.

2          THE COURT:  Well, there's no objection, then.  Exhibit

3  BT-H is in evidence.

4  (12/30/06 letter to Ms. Smith was hereby received into evidence

5  as Borrowers Trust's Exhibit BT-H, as of this date.)

6          THE COURT:  The next exhibit that was referred to is

7  Exhibit 8, the adjustable rate promissory note from American

8  Mortgage.

9          MR. WISHNEW:  No objection, Your Honor.

10          THE COURT:  All right, Exhibit 8 is in evidence.

11  (Adjustable rate promissory note was hereby received into

12  evidence as Claimant's Exhibit 8, as of this date.)

13          THE COURT:  All right, then we had Exhibits 34, 35,

14  36, and 37.

15          MR. WISHNEW:  Objections on relevance grounds, Your

16  Honor.

17          THE COURT:  Overruled.

18  (4/30/08 Aurora repayment agreement was hereby received into

19  evidence as Claimant's Exhibit 34, as of this date.)

20  (6/17/08 repayment agreement was hereby received into evidence

21  as Claimant's Exhibit 35, as of this date.)

22  (1/8/09 workout agreement was hereby received into evidence as

23  Claimant's Exhibit 36, as of this date.)

24  (1/15/10 workout agreement was hereby received into evidence as

25  Claimant's Exhibit 37, as of this date.)

1          THE COURT:  Exhibit 25?

2          MR. WISHNEW:  Also objection on relevance grounds,

3    Your Honor.

4          THE COURT:  Overruled.

5    (Notice of default was hereby received into evidence as

6    Claimant's Exhibit 25, as of this date.)

7          THE COURT:  And finally Exhibit 38?

8          MR. WISHNEW:  Objection on relevance grounds, Your

9    Honor.

10         THE COURT:  What in Exhibit 38 do you believe is

11   relevant to the claim in the case, Ms. Nora?

12         MS. NORA:  It identifies the investor which relates to

13   the activities of the subservicers who are debtors in this

14   action.

15         THE COURT:  Show me where that is?  I don't see that.

16         THE WITNESS:  It's on page 2 in the box.

17         THE COURT:  One second.  Objection sustained.

18         MS. NORA:  Relevance grounds?

19         THE COURT:  Yes.

20         MS. NORA:  Thank you.

21   BY MS. NORA:

22   Q.  With respect to your quest to find the investor in your

23   loan, having believed that Homecomings was your lender, did you

24   conduct any investigation into the identity of this RALI trust?

25         MR. WISHNEW:  Objection, Your Honor.  What period of

1   time are we referring to?

2           MS. NORA:  After the QWR -- the two -- Exhibit 38.

3           MR. WISHNEW:  Objection on relevance grounds, Your

4   Honor.

5           THE COURT:  Sustained.

6   Q.  Have you reviewed any documents that are publicly recorded

7   with the Securities and Exchange Commission that pertain to the

8   RALI 2007 Series Q01 Trust?

9   A.  I have.

10  Q.  And are those exhibits -- certain select exhibits provided

11  to the Court as Exhibit 1 and its subsections?

12  A.  Yes.

13  Q.  And among those exhibits, are there any public filings

14  which would admit that Homecomings Financial was not your

15  lender, as you believed?

16  A.  Yes.

17  Q.  And would that be, for example, anything in the prospectus

18  filed on January 31st, 2007, as Exhibit 1-B in this record?

19  A.  Yes.

20  Q.  Is there anything in the prospectus that would indicate

21  that Homecomings was not your lender?

22  A.  Yes.

23  Q.  And is there anything in the prospectus filed --

24          THE COURT:  Your binder doesn't have Exhibit 1 in it.

25  It starts with Exhibit 2.

1          MR. WISHNEW:  I think it's Volume 1 of 3, Your Honor.

2          THE COURT:  Okay.  All right, I have it.

3          Ms. Nora, is there a specific page in Exhibit 1-B that

4    you want to point the Court to?

5          MS. NORA:  Actually, Your Honor, it would be the

6    entire prospectus I'm having her identify that contains --

7          THE COURT:  Is there a specific page in Exhibit 1-B

8    that you believe identifies the investor in Ms. Smith's note?

9          MS. NORA:  Yes, Your Honor.  But I would need --

10         THE COURT:  Just point me to the page, Ms. Nora.

11         MS. NORA:  I have to -- I have to get the electronic

12   copy of that.

13         THE COURT:  Do you know where it is, Ms. Smith?

14         THE WITNESS:  No, I don't, sorry.

15         MS. NORA:  It is Bates stamp numbered, Your Honor.

16         THE COURT:  If you'd tell me where to go, I will go to

17   and look at it.

18         MS. NORA:  Thank you.  Your Honor, I'd like the Court

19   to take judicial notice of page 001, as Bates stamp numbered

20   for Exhibit 1-B, which identifies the RALI 2007 Series --

21   Series 2007 Q01 Trust --

22         THE COURT:  Where in this document does it identify

23   Ms. Smith's note as being owned by the RALI Trust?

24         MS. NORA:  Your Honor, it will take the introduction

25   of two exhibits accomplish that.

1    THE COURT:  Ms. Nora, is there someplace in Exhibit

2  1-B that identifies Ms. Smith's loan as being owned by the RALI

3  Trust?

4    MS. NORA:  That would probably be in the next exhibit

5  which --

6    THE COURT:  Well, then the -- okay.

7    MS. NORA:  Okay.

8    THE COURT:  So you're acknowledging now that there's

9  nothing in Exhibit 1-B that shows that Ms. Smith's loan was

10  owned by the RALI Trust.  Is that correct?  Am I right?

11    MS. NORA:  Well, specifically, Your Honor, these are a

12  series of filings, but yes --

13    THE COURT:  I'm not letting you dump SEC filings in

14  unless you show the relevance.  And my question, specifically:

15  do you agree now that there is nothing in Exhibit 1-B that

16  shows that Ms. Smith's loan was owned by the RALI Trust?

17    MS. NORA:  Nothing in -- as an attachment to 1-B.

18  That would be 1-D, Your Honor.

19    THE COURT:  So let's take one point at a time.

20  There's nothing in 1-B that shows that Ms. Smith's loan was

21  owned by the RALI Trust, correct?

22    MS. NORA:  Nothing that specifically identifies Ms.

23  Smith's loan, correct.

24    THE COURT:  Okay.  Is there anything in 1-D that shows

25  that Ms. Smith's loan was owned by the RALI Trust?

RESIDENTIAL CAPITAL, LLC, ET AL.                    38

1          MS. NORA:  Yes, Your Honor.

2          THE COURT:  Where?  What page?

3          MS. NORA:  It's a 773-page-long exhibit.  But I'm

4    getting there.

5    BY MS. NORA:

6    Q.  Ms. Smith you could assist if you could tell me the loan

7    number I should be searching for in Exhibit 99, which is --

8    A.  I don't know if I have that account number accessible at

9    this minute.  But it looks --

10   Q.  We could also search for the value of 556,000?

11         THE COURT:  You could search for whatever you want,

12   but unless you show me that Ms. Smith's loan is identified in

13   Exhibit 1-D, it's not coming into evidence.

14         MS. NORA:  Sure, Your Honor.  Thank you.

15     (Pause)

16         MS. NORA:  It would be on page -- Bates stamp page

17   500, Your Honor.  And it's loan number 11208073.

18         THE COURT:  It's listed by -- each one of the loans is

19   listed by a location.  Which one of the locations is it?

20         MS. NORA:  On page 500 --

21         THE COURT:  I'm on page 500.

22         MS. NORA:  Okay.  It's Los Angeles, California.

23         MR. WISHNEW:  Second from the bottom, Your Honor.

24         THE COURT:  Mr. Wishnew, do you agree that that's the

25   Smith loan?

1          MR. WISHNEW:  Yes, Your Honor.  The Borrower Trust

2   acknowledges the entry the second from the bottom on Bates

3   stamped page 500 as the Tia Smith loan.

4          THE COURT:  Okay.  You're offering Exhibit 1-D?

5          MS. NORA:  I am, Your Honor.

6          THE COURT:  Okay, Exhibit 1-D is in evidence,

7   specifically -- it's in evidence.  Ms. Nora has pointed to

8   Bates page 500, the second loan from the bottom as being Ms.

9   Smith's loan.  So Exhibit 1-D as in David is in evidence.

10  (SEC filing identifying Ms. Smith's loan was hereby received

11  into evidence as Claimant's Exhibit 1-D, as of this date.)

12         MS. NORA:  And because the Smith loan is identified as

13  being in the RALI Series 2007-Q01 Trust, we would also offer

14  Exhibit 1-B to show the interrelationship between the parties

15  as set forth in the prospectus dated January 31st, 2007.

16         THE COURT:  What does that have to do with the claim?

17         MS. NORA:  It has to do with the fact that the

18  servicing rights were -- the master servicer was Residential

19  Funding Company, which creates an agency relationship between

20  Homecomings Financial LLC as subservicer, which as other

21  documents will show in the SEC filing, transferred as a result

22  of RFC's determination, the Homecomings servicing rights to

23  GMAC Mortgage LLC, which all created confusion in terms of Ms.

24  Smith's ability to locate the investor and work on the

25  modification of her loan.

RESIDENTIAL CAPITAL, LLC, ET AL.                    40

1          MR. WISHNEW:  Objection, Your Honor.

2          THE COURT:  Sustained.

3          MS. NORA:  The relevance is, Your Honor, that --

4          THE COURT:  Don't argue once I've ruled.

5          MS. NORA:  Thank you.  I would like to make another

6     offer --

7          THE COURT:  Don't argue once I've ruled.

8          MS. NORA:  With respect to the 8-K filings, which have

9     not yet been offered, I would like to offer Exhibit 1-E, which

10    reports the replacement of Homecomings with GMAC Mortgage --

11         THE COURT:  Where?  Show me --

12         MS. NORA:  -- by RFC.

13         THE COURT:  -- where?

14         MS. NORA:  That's what the content of the 8-K is.

15         THE COURT:  Well, point out to me where in the

16    document it shows that.

17       (Pause)

18         THE COURT:  Are you looking at item 6.02 "Change of

19    Servicer or Trustee"?

20         MS. NORA:  Yes.  Yes, Your Honor.

21         THE COURT:  Mr. Wishnew?

22         MR. WISHNEW:  Your Honor, we would object.  If Ms.

23    Nora's offering it for the same purpose as the prior -- as 1-B.

24         THE COURT:  Well, it just shows the change of

25    servicer.  The objection is overruled.

1          MR. WISHNEW:  Well, Your Honor --

2          THE COURT:  Objection is overruled.  Exhibit 1-E is in

3     evidence.

4     (8-K filings was hereby received into evidence as Claimant's

5     Exhibit 1-E, as of this date.)

6          MS. NORA:  Thank you, Your Honor.  And then with

7     respect to Exhibit 1-G, which is the recorded transfer of

8     servicing through Aurora Loan Services, LLC, again, this is the

9     8-K that reports the change of the identity of the servicer,

10    again, item 6.02, and shows that it was not the loan that was

11    sold or transferred, but only the servicing rights to the loan,

12    which all relates to the previously indicated confusion about

13    whom is --

14         THE COURT:  Leave the editorial out.

15         MS. NORA:  Thank you, Your Honor.  I'd move the

16    admission of Exhibit 1-G indicating that RFC one of the debtors

17    against whom the claim has been made here, did indeed transfer

18    the servicing rights, which are at issue in the unfair

19    commercial conduct alleged.

20         THE COURT:  Mr. Wishnew, do you agree that this

21    reflects the transfer of the servicing rights to Aurora -- the

22    servicing rights for Ms. Smith's loan?

23         MR. WISHNEW:  Yes, Your Honor.

24         THE COURT:  Okay.  Exhibit 1-G is in evidence.

25    (8-K filings was hereby received into evidence as Claimant's

1  Exhibit 1-G, as of this date.)

2          MS. NORA:  Thank you, Your Honor.  I understand,

3  though, that Exhibit 1-B has been --

4          THE COURT:  Is not.

5          MS. NORA:  Is not.  Okay.  And with respect to Exhibit

6  1-F, the purpose of this exhibit for which judicial notice has

7  been requested is to demonstrate that no further reports were

8  filed with the SEC based on the 15(d) exception.  And the

9  reason that that's important, we believe, is that no further

10  information was then available to the public.

11          MR. WISHNEW:  Objection, Your Honor, relevance.

12          THE COURT:  Sustained.

13          MS. NORA:  Thank you.  That was a for specific type

14  of --

15          THE COURT:  What's your next question, Ms. Nora?

16          MS. NORA:  Okay.  With respect to Exhibit 1 -- sorry.

17          I'm looking for 1-G.  I'm having trouble locating it.

18  Oh, 1-G has been admitted.  I'm sorry, Your Honor.

19  BY MS. NORA:

20  Q.  With respect to your desire, Ms. Smith, to find who you

21  could work on a loan modification with, did you do any other

22  kind of investigation with the assistance of NACA?

23          MR. WISHNEW:  Objection, Your Honor.

24          THE COURT:  What time period are you talking about,

25  Ms. Nora?

RESIDENTIAL CAPITAL, LLC, ET AL.                    43

1   Q.  After Aurora became the servicing agent?

2        MR. WISHNEW:  Objection, Your Honor.

3        THE COURT:  Objection's sustained.

4   Q.  Have you attempted to recover the title to your home by

5   litigation in California, Ms. Smith?

6        MR. WISHNEW:  Objection, Your Honor.

7        THE COURT:  Overruled.

8   A.  Yes, I have.

9   Q.  And could you describe to the Court the efforts that you

10  have made to do that?

11  A.  In July 15, 2011, I filed a civil action to prevent a

12  wrongful foreclosure.  However, I guess it was a few months

13  later, November 2011, the home was sold through a foreclosure,

14  so I had to amend my complaint so I could get relief for a

15  wrongful foreclosure.

16      And I have been litigating, representing myself, for I

17  guess it's close to five years now.

18        THE COURT:  Are you still -- because you had named --

19  I know you had named some of the debtors in your lawsuit.  But

20  you'd also named Aurora in this?

21        THE WITNESS:  I did.

22        THE COURT:  Yeah.  Is that still going on?

23        THE WITNESS:  Actually, the demurrer -- their demurrer

24  was sustained without leave to amend, and they received a

25  judgment of dismissal in their favor.  And I appealed it.  I

1    took it to -- I actually petitioned the California Supreme

2    Court.  I petitioned the United States Supreme Court.  And they

3    were all denied.

4           THE COURT:  When did Aurora's demurrer -- when was it

5    sustained without leave?

6           THE WITNESS:  August 16th, 2013.  And judgment of

7    dismissal was entered September 16, 2013.

8           THE COURT:  Do you have these dates down?

9           THE WITNESS:  Yeah.  And I actually just filed a

10   motion to set aside the judgment because it was procured by

11   fraud.

12          THE COURT:  Yeah?

13          THE WITNESS:  Yeah.  And so I've also had to -- Aurora

14   Bank had filed an unlawful detainer against me that lasted for

15   about thirteen months --

16          THE COURT:  Are you still in the house?

17          THE WITNESS:  I am, praise God.  And they finally --

18   after thirteen months, they dismissed the action.  And in March

19   of 2014 a new entity came into -- on the scene and said that

20   they were the new owner and --

21          THE COURT:  New owner of the note?

22          THE WITNESS:  No, of the property.

23          THE COURT:  Oh, okay.

24          THE WITNESS:  Since this was after the foreclosure.

25   And they filed an unlawful detainer.  I had a jury trial.  I

RESIDENTIAL CAPITAL, LLC, ET AL.                    45

1  lost.  And now I'm on appeal.  I'm appealing that.

2          THE COURT:  When did that trial end?

3          THE WITNESS:  That was November 17th, 2014.

4          THE COURT:  And where is it, in the Intermediate

5  Appellate Court in California?

6          THE WITNESS:  It's in the Appellate Division of the

7  Superior Court.  I -- their responsive brief was actually due

8  on the 3rd, and they didn't respond.  So I'm waiting for that.

9          THE COURT:  Thank you.

10         THE WITNESS:  Yeah.

11         THE COURT:  Go ahead, Ms. Nora.

12 BY MS. NORA:

13 Q.  So Ms. Smith, just so that the judge understands, you

14 consistently brought your timely appeals to avoid the

15 implication of res judicata until this most recent denial of

16 the writ of certiorari -- petition for writ of certiorari from

17 the United States Supreme Court.  Is that correct?

18 A.  Yes.

19 Q.  Okay, but wait, I'm so sorry, you did miss a deadline with

20 the California Supreme Court on one of these cases?

21 A.  That is correct.  I was one day late in filing my petition

22 to the California Supreme Court.  And I forgot one thing, that

23 once the new entity came in and said that they were the owner,

24 they kind of basically said unless I started paying them rent,

25 they were going to evict me.  And I filed an action against

RESIDENTIAL CAPITAL, LLC, ET AL.                           46

1  them.  So I have a related action pending.

2           THE COURT:  Who is the -- who claims to be the owner

3  now?

4           THE WITNESS:  IH4 Property West LP.

5  Q.  Okay, so when did the United States Supreme Court deny

6  your petition for writ of certiorari?

7  A.  January 11th of this year.

8  Q.  Okay.  And --

9           THE COURT:  2016?

10           THE WITNESS:  Yes.

11  Q.  As a result of that denial of your petition for writ of

12  certiorari, have you then taken other action for relief from

13  the underlying judgment?

14  A.  Yes.  I recently filed a motion to set aside the August

15  16th, 2013 judgment and the September 16th, 2013 judgment of

16  dismissal.

17  Q.  And again, the bases for those -- that relief?

18  A.  That it was procured by fraud.

19  Q.  Specifically, would you inform the Court what you believe

20  to be the fraud in those instances?

21  A.  I believe that Aurora Loan Services, Mortgage Electronic

22  Registration Systems, Inc., and Deutsche Bank Trust Company

23  Americas as trustee, misrepresented their status in relation to

24  my mortgage loan, and also misrepresented -- well, allegedly

25  said that I didn't have standing to -- under my own collateral

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1    documents.  So they prevented me from having -- from fully and

2    fairly adjudicating my claims.

3    Q.  And has the filing of the ResCap bankruptcy in this court

4    had any effect on your ability to obtain a full and fair

5    hearing in the California courts?

6            MR. WISHNEW:  Objection, Your Honor.

7            THE COURT:  Overruled.

8    A.  During discovery in this action I have discovered what I

9    believe to be conclusive evidence that Aurora Loan Services

10   never had any right to service my loan at all, and that

11   Deutsche Bank Trust Company Americas as trustee was never -- I

12   don't want to say they weren't the trustee for the trust, but I

13   have discovered through discovery here that the trust does not

14   exist.  And so in that case, then, my promissory note and deed

15   of trust are invalid and that the endorsements on my promissory

16   note are invalid, as one of the endorsements was made by a Judy

17   Faber --

18           THE COURT:  Okay, I'm going to stop you here, because

19   this is not relevant to the claim that remains in the case.

20   I've given you some leeway, Ms. Nora, but let's get back to

21   what this about.

22           MS. NORA:  Sure, Your Honor.  However, I do believe

23   that it's important for this Court to entertain --

24           THE COURT:  Is there something about my ruling you

25   didn't understand?

RESIDENTIAL CAPITAL, LLC, ET AL.                    48

1          MS. NORA:  No, I was moving on.

2          THE COURT:  Then ask a question.

3          MS. NORA:  Thank you.

4          THE COURT:  Not a speech.

5          MS. NORA:  Thank you, Your Honor.

6   Q.  Ms. Smith, have you had the opportunity to review and --

7          MS. NORA:  May I approach counsel and the Court?

8          THE COURT:  Yes.

9          MS. NORA:  Just to -- thank you.

10         THE COURT:  Go ahead.

11         MS. NORA:  And you're welcome.

12         THE COURT:  Is this something that's been pre-marked

13  as an exhibit?

14         MS. NORA:  It has not, Your Honor.  Well, actually, it

15  was pre-marked as pending Exhibits 14 and 15.  They were just

16  produced yesterday, due to a thorough search at the Minnesota

17  Secretary of State's Office.  These items were reserved.

18         THE COURT:  Are you marking this as an exhibit?

19         MS. NORA:  Your Honor, I would like the certificate of

20  no record to be Exhibit 14, which was pending; and the

21  trust --spreadsheet of all trusts registered in the State of

22  Minnesota, certified on the reverse side by the Secretary of

23  State of the State of Minnesota as Exhibit 14 -- I'm sorry 14

24  and 15.  Let me make sure I have the right numbers here

25  pending.  Yes, 15 would be -- I'm sorry, the certified copy of

RESIDENTIAL CAPITAL, LLC, ET AL.                    49

1   the nonregistration of the RALI Trust, and 14 was intended to

2   be the declaration of trust which is required to be registered

3   by the State of Minnesota.  Since it doesn't exist --

4           THE COURT:  Stop.  I'm confused.

5           MS. NORA:  I'm sorry.

6           THE COURT:  You handed me two documents.

7           MS. NORA:  Yes, Your Honor.

8           THE COURT:  I'm only asking what exhibits they are,

9   what exhibit numbers they are?

10          MS. NORA:  Okay.  I would like the certificate of no

11  record to be Exhibit 15.

12          THE COURT:  Okay.

13          MS. NORA:  Because that was marked as -- and then --

14  and in lieu of the nonexistent declaration of trust, which was

15  to be Exhibit 14, the spreadsheet of all registered trusts in

16  the State of Minnesota to be Exhibit 14.

17          THE COURT:  I'm going to call that 14-A just so we --

18  (Spreadsheet of all trusts in Minnesota was hereby marked for

19  identification as Claimant's Exhibit 14-A, as of this date.)

20          MS. NORA:  Thank you, Your Honor.

21          THE COURT:  And what's the relevance of 14 and 14-A?

22          MS. NORA:  It demonstrates that there was no trust for

23  which Homecomings and GMAC Mortgage were the subservicers, nor

24  was RFC the master servicer of a trust, nor did RALI

25  Residential Credit Loans, Inc. deposit any collateral documents

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1    into an existing trust.  And if the Court would allow Ms. Smith

2    to identify Exhibit 1-A in her binder, that is the index of all

3    filings with the SEC for the RALI 2007 Series Q01 Trust, which

4    indicates that it is a Minnesota trust.

5            MR. WISHNEW:  Objection, Your Honor.

6            THE COURT:  Sustained.  So the objection to Exhibits

7    14 and 14-A is sustained.

8            MS. NORA:  Thank you, Your Honor.  May I approach?

9            THE COURT:  Yes.

10           MS. NORA:  Thank you.  These exhibits were already --

11           THE COURT:  You have to pre-mark it.  What exhibit is

12   it?

13           MS. NORA:  We're going to have to mark it as an

14   exhibit subsequent to our listed exhibits.

15           THE COURT:  What's your exhibit number?

16           MS. NORA:  I believe it's 43.  So this would be 44 and

17   45, Your Honor.

18           THE COURT:  You handed me one document.

19           MS. NORA:  Oh.  I'm sorry.

20           THE COURT:  Is this -- unless you have them combined.

21   I don't know.

22           MS. NORA:  There's a document that is the totals of

23   trusts that are supposed to be registered in the State of

24   Minnesota, and there's just the SEC filing --

25           THE COURT:  Just tell me what you're giving me, Ms.

1   Nora.  I just want -- exhibits have to be numbered.  They have

2   to be marked so we have a complete record.  You've handed me

3   one document stapled together.

4            MS. NORA:  Yes.  Exhibit 44 would be the search

5   results for the companies with names mentioning RALI, R-A-L-I;

6   that would be 44.

7   (Search results for RALI was hereby marked for identification

8   as Claimant's Exhibit 44, as of this date.)

9            MS. NORA:  And then --

10            THE COURT:  What's the relevance to the claim at

11   issue?

12            MS. NORA:  It shows --

13            THE COURT:  Go to the microphone.  I want to be sure

14   we have a complete record.

15            MS. NORA:  I'm sorry.

16            THE COURT:  What's the relevance of Exhibit 44 to the

17   claim at issue?

18            MS. NORA:  The claim at issue is fraudulent

19   misrepresentation of the --

20            THE COURT:  With the --

21            MS. NORA:  -- transaction that Ms. Smith was involved

22   in.

23            THE COURT:  No, it isn't.  It is not.  The claim at

24   issue is specifically alleged fraud in connection with Ms.

25   Smith's request for a loan modification in November 2007.

RESIDENTIAL CAPITAL, LLC, ET AL.                    52

 1 | That's the claim at issue.  Does Exhibit 44 relate to the
 2 | unfair -- California Unfair Competition claim relating to Ms.
 3 | Smith's effort to obtain a loan modification in November 2007?
 4 |         MS. NORA:  Yes, Your Honor.  According to Ms. Smith,
 5 | this is because the entity who told her that she had to skip
 6 | three monthly payments was not lawfully the subservicer of the
 7 | collateral documents.
 8 |         MR. WISHNEW:  Objection, Your Honor.
 9 |         THE COURT:  Sustained.
10 |         MS. NORA:  So then --
11 |         THE COURT:  What's next?
12 |         MS. NORA:  45 would have been the --
13 |         THE COURT:  If you want to mark 45, I need a copy of
14 | it.  Okay?  You can -- I'm permitting you to mark whatever you
15 | want.  And then if there are objections I'll rule on them.
16 | But --
17 |         All right, what is 45?
18 |         MS. NORA:  45 is the total value of the RALI Trust
19 | listed out of Exhibit 44 that had not been registered in the
20 | State of Minnesota.  And it's over seventy-four billion
21 | dollars' worth of collateral documents.
22 | (Total value of RALI Trust was hereby marked for identification
23 | as Claimant's Exhibit 45, as of this date.)
24 |         MR. WISHNEW:  Objection, Your Honor.
25 |         THE COURT:  Sustained.

1   BY MS. NORA:

2   Q.  Ms. Smith, are you familiar with a certain action in the

3   United States District Court for the District of Minnesota in

4   which Residential Funding Company is the plaintiff against

5   American Mortgage Network?

6           MR. WISHNEW:  Objection, Your Honor.

7           THE COURT:  Sustained.

8           MS. NORA:  Offer of proof, Your Honor?

9           THE COURT:  Go ahead.

10          MS. NORA:  Exhibit 20 in Ms. Smith's exhibits is

11  relevant in saying exactly --

12          THE COURT:  Let me find it.  Let me find it.

13          MS. NORA:  Thank you.

14          THE COURT:  All right, I have Exhibit 20 in front of

15  me.  What's the relevance?

16          MS. NORA:  The relevance is, Your Honor, that RFC

17  through the Liquidating Trust, in these proceedings, is suing

18  to recover one hundred percent of the face value of Ms. Smith's

19  note, which appears on Exhibit C attached to the pleadings

20  as -- it's the last page.  Her loan number is listed 556,000

21  dollars in value, showing that RFC is laying claim to these

22  collateral documents, once again, having claimed to have sold

23  it to RALI, deposited it into a nonexistent trust, and is now

24  trying to recover face value in litigation.

25          MR. WISHNEW:  Objection, Your Honor.

1        THE COURT:  Okay.  Objection -- are you offering
2   Exhibit 20?

3        MS. NORA:  I am, Your Honor.

4        THE COURT:  Okay.  The objection is sustained.

5        MS. NORA:  Your Honor, may we take a short break?

6        THE COURT:  Okay.  It's three minutes after 10.  We
7   started at 8:30.  This is a timed trial.  You have an hour-and-
8   a-half.  You have three hours.  You have used an hour and
9   thirty-three minutes.  Ten minute recess.

10        MS. NORA:  Thank you.

11        THE COURT:  You can step down.

12     (Recess from 10:03 a.m. until 10:15 a.m.)

13        THE COURT:  All right, please be seated.  Ms. Smith,
14   come on up.

15        Go ahead, Ms. Nora.

16        MS. NORA:  Thank you.

17   BY MS. NORA:

18   Q.  Ms. Smith, prior to discovery in this case, did you know
19   that Judy Faber was not an officer of Residential Funding
20   Company?

21   A.  No, I did not.

22        MR. WISHNEW:  Objection, Your Honor.

23        THE COURT:  Sustained.  Before you go on, Ms. Nora.
24   One second.

25        At the start of the hearing I sustained the objections

1   to paragraphs 47, 48, 49, and 50 to Ms. Smith's declaration

2   direct testimony.  All of those relate to Judy Faber.  The

3   Court has already ruled.  So let's move on.

4          MS. NORA:  Thank you, Your Honor.

5   Q.  How does the issue of whether or not the entity that you

6   communicated with about a loan modification affect your right

7   to relief in California, if you could tell the Court?

8          MR. WISHNEW:  Objection, Your Honor, as to form.

9          THE COURT:  Sustained.

10  Q.  Ms. Smith, had you known that Homecomings was not the

11  subservicer of your loan in 2007, what action would you have

12  taken?

13         MR. WISHNEW:  Objection, Your Honor.

14         THE COURT:  Sustained.

15  Q.  Ms. Smith were you confused by the identification of

16  Homecomings Financial as your mortgage -- as the entity

17  entitled to receive your payments?  Were you confused by the

18  representation that Homecomings Financial was the entity

19  entitled to collect your payments?

20         MR. WISHNEW:  Objection, Your Honor.

21         THE COURT:  Overruled.

22  A.  Not at the time.  Not in -- not during November 2007, I

23  was not.  I believed that Homecomings was entitled.

24  Q.  Okay.  And so when you found out that they might not have

25  been, what affect did that have on your ability to maintain

RESIDENTIAL CAPITAL, LLC, ET AL.                    56

1   your position in your home?

2           MR. WISHNEW:  Objection, Your Honor.

3           THE COURT:  Sustained.

4   Q.  How does it make any difference to you whether Homecomings

5   or GMAC Mortgage was the servicer of your loan, now that you

6   understand what a servicer is?

7   A.  Well, it matters to me that I believed that they -- that

8   Homecomings led me to believe that they were my servicer and

9   that they were not.  And so by that misrepresentation, it led

10  me to skip certain payments in order to achieve something that

11  Homecomings could not invariably give me at all, which -- and

12  then it goes to that if Homecomings was not my servicer as they

13  had alleged, then they had no right to sell the rights -- the

14  servicing rights to another entity, who then later foreclosed

15  on me.

16  Q.  And again, with respect to this distinction between

17  servicer and lender, you did not know that there was a

18  difference in 2007, correct?

19  A.  No, I did not.

20  Q.  As we are here today, do you know who the party is who is

21  entitled to receive the proceeds of the foreclosure of your

22  home?

23          MR. WISHNEW:  Objection, Your Honor.

24          THE COURT:  Sustained.

25  Q.  Did you investigate the members of MERS Corp. Holdings to

RESIDENTIAL CAPITAL, LLC, ET AL.                    57

1    ascertain who might be the investor in your loan?

2    A.  I did.

3          MR. WISHNEW:  Objection, Your Honor.

4          THE COURT:  Sustained.

5    Q.  Did you seek to locate Americas Mortgage Network in order

6    to locate the investor on your loan?

7          MR. WISHNEW:  Objection, Your Honor.

8          THE COURT:  Sustained.

9          MS. NORA:  Your Honor, we would like to offer for the

10   consideration of the Court the Exhibit 16, which is the MERS

11   Corp. member list, which does not list a RALI Trust or American

12   Mortgage Network or any of the participants, Aurora Loan

13   Servicing LLC.

14         THE COURT:  This is a list as of December 23, 2014?

15         MS. NORA:  It is, Your Honor.

16         MR. WISHNEW:  Objection, Your Honor.

17         THE COURT:  Sustained.

18         MS. NORA:  Thank you.  We would also like to offer

19   Exhibit 30, which is the results of Ms. Smith's Internet search

20   for American Mortgage Network on the California Secretary of

21   State Web site.

22         THE COURT:  Just a minute.

23         MS. NORA:  Which would have been Exhibit J to the

24   third amended complaint.

25         (Pause)

1        THE COURT:  What's the relevance of Exhibit 30?

2        MS. NORA:  Exhibit 30 shows that at the time that Ms.

3   Smith retrieved the exhibit there was no way for her to contact

4   what she thought was her original lender.

5        MR. WISHNEW:  Objection, Your Honor.

6        THE COURT:  Sustained.

7        MS. NORA:  With respect to Exhibit 32, we would like

8   to offer Exhibit 32 to show that the MERS registered trademark

9   system, that's MERS "R" with a circle around it system showed,

10  I believe, RFC as the investor, that would be Residential

11  Funding.

12        THE COURT:  Where is that?

13        MS. NORA:  Exhibit -- it's Exhibit 32, which is

14  Exhibit M to the amend --

15        THE COURT:  Yes.  But where?  I'm looking at Exhibit

16  32.  I don't see anything about ResCap or --

17        THE WITNESS:  Can I --

18        THE COURT:  -- RFC.

19        THE WITNESS:  -- offer?  It says the investor is

20  Deutsche Bank National Trust Company Americas as trustee.

21        THE COURT:  Ms. Smith, where is that?

22        THE WITNESS:  On the second page, it says --

23        THE COURT:  Yes.

24        THE WITNESS:  -- page 1 of 1 actually.  So --

25        THE COURT:  Yes.

1          THE WITNESS:  -- 32 there's Exhibit M, then the first

2    page and the second page.  So it's at the bottom.  It's right

3    above where it says --

4          THE COURT:  Yeah, I see where it says Deutsche Bank.

5    We'll just make sure I have the exhibit.

6    BY MS. NORA:

7    Q.  Did you investigate --

8          THE COURT:  Just stop a second, Ms. Nora.

9          MS. NORA:  All right.

10      (Pause)

11         THE COURT:  Tell me what this is, Ms. Smith?  What's

12   your understanding of this document, Exhibit 32?

13         THE WITNESS:  This is --

14         THE COURT:  You did a search, right?

15         THE WITNESS:  Yes.

16         THE COURT:  Okay.  And what -- tell me what you did?

17         THE WITNESS:  You go to the MERS servicer ID, because

18   MERS is the nominee for the lender.

19         THE COURT:  Yes.

20         THE WITNESS:  And you go to their Web site.  And if

21   you punch in -- well, you enter in your address, your Social

22   Security number, and then you'll let you know -- they'll

23   identify the servicer and the investor of the loan.  And this

24   is the only way you can get this information from the MERS

25   system.

RESIDENTIAL CAPITAL, LLC, ET AL.                    60

1          THE COURT:  As of what date was this?

2          THE WITNESS:  This -- in the corner, it says June 19,

3     2012.

4          THE COURT:  Okay.

5          THE WITNESS:  It's kind of cut off.

6          THE COURT:  I see it at the bottom of the second page,

7     June 19th, 2012.

8          What's the relevance of whether Deutsche Bank was the

9     investor in June 2012?  It shows the servicer as Aurora Bank,

10    FSB, and it lists the investor as Deutsche Bank National Trust

11    Company Americas as trustee.  And the date is June 19th, 2012.

12    What does that have to do with the events in November 2007?

13         MS. NORA:  Only offered, Your Honor, with respect to

14    the confusion caused by the original subservicing issues.

15         MR. WISHNEW:  Objection, Your Honor.

16         THE COURT:  Sustained.  The objection is sustained.

17         MS. NORA:  Thank you.

18    BY MS. NORA:

19    Q.  Ms. Smith, with respect to Exhibit 5, could you explain to

20    the Court why it was important for you to locate the

21    transmittal and bailment letter of December 18th, 2006?  That's

22    Exhibit 5.  Not that you knew when that letter was written, but

23    you were searching for such documentation, were you not?

24         THE COURT:  What is this, Ms. Nora?

25         MS. NORA:  This is the transmittal of the collateral

1   documents from JPMorgan Chase as custodian for Wachovia to RFC

2   in December of 2006.

3            THE COURT:  Is there anything in Exhibit 5 that shows

4   this relates to Ms. Smith's loan?

5            MS. NORA:  Yes.  It is the -- it is our understanding

6   that this is --

7            THE COURT:  I don't want your understanding.  I want

8   evidence.  Is there anything to show that Exhibit 5 relates

9   specifically to Ms. Smith's loan?

10            MS. NORA:  One moment, Your Honor.

11            THE COURT:  I don't see anything.

12            MS. NORA:  It was produced in discovery to our request

13   for the documents related to Ms. Smith's mortgage loan

14   documents or collateral documents.

15            THE COURT:  But that doesn't establish a foundation.

16   What is it?  Do you know where it is, Mr. Wishnew?

17            MR. WISHNEW:  One moment, Your Honor.

18            THE COURT:  Because obviously it has the Trust's Bates

19   stamp on it.

20            More to the point, Ms. Nora, what relevance does it

21   have to the events of November 2007?

22            MS. NORA:  Well --

23            THE COURT:  That's what at issue here.

24            MS. NORA:  Sure.  And it places -- it places the

25   collateral documents in the custody of Residential Funding

RESIDENTIAL CAPITAL, LLC, ET AL.                        62

1  Company as of this date, consistent with the representations to

2  the SEC in the supplemental prospectus, Exhibit 1-B, and also

3  Exhibit 1-D, which is in evidence, which would show that RFC

4  acquired the collateral documents from Chase, and then

5  according to the prospectus, would have conveyed those

6  documents to RALI, also one of the targets of the complaint.

7         THE COURT:  Okay, I've heard enough.

8         MR. WISHNEW:  Your Honor, while we produced it as part

9  of our loan file --

10        THE COURT:  Just, do you have an objection?

11        MR. WISHNEW:  Relevance, Your Honor.

12        THE COURT:  Sustained.

13        MS. NORA:  Recognizing the Court's ruling on the

14 irrelevance of the Faber endorsements --

15        THE COURT:  Just ask the question.  Just ask the

16 question.

17 BY MS. NORA:

18 Q.  With respect to Exhibit 9, Ms. Smith, is that a true and

19 correct copy of your note specially endorsed by Judy Faber,

20 with an allonge?

21 A.  Yes, it is.

22 Q.  And why did you want the Court to consider that evidence?

23 A.  Because I believe it to be a forgery of --

24        MR. WISHNEW:  Objection, Your Honor.

25        THE COURT:  Overruled.  Go ahead, Ms. Smith.

1  A.  I believe it to be a forgery.

2           THE COURT:  Of what?

3           THE WITNESS:  Of -- well, I don't want to say this

4  isn't my signature, but I believe there's another promissory

5  note that we admitted into evidence.  It may be Exhibit --

6           MS. NORA:  Offered -- we offered --

7           THE COURT:  Hold on.  No, Exhibit 8 is in evidence.

8  Hold on.

9           Do you have Exhibit 8 in front of you, Ms. Smith?

10          THE WITNESS:  Yes.  Yes, I do.  So I believe that --

11          THE COURT:  Just hang on, just one second --

12          THE WITNESS:  Okay.

13          THE COURT:  -- okay?  So I'm looking at page 4 of each

14  of the notes, Exhibit 8 and Exhibit 9.

15          THE WITNESS:  Yes.

16          THE COURT:  And your signature appears to be identical

17  on both.

18          THE WITNESS:  Yeah, it appears to be identical.

19  However, there are two dashes on Exhibit 8 that are not on

20  Exhibit 9.

21          THE COURT:  On which part of 9?

22          THE WITNESS:  Right in front of my signature.

23          THE COURT:  Are your -- okay, go ahead.

24          THE WITNESS:  So there are two dashes.  When I signed,

25  when the notary came by, and I was to sign my name, she put

RESIDENTIAL CAPITAL, LLC, ET AL.                    64

1  dashes next to each signature line where I was supposed to

2  sign.

3         So on the Exhibit 8, the dashes are there.  However on

4  Exhibit 9's note, the dashes have been removed.  And also,

5  there -- it looks like my signature was maybe transferred

6  somehow.  Because the signature line goes through my name --

7  through my signature.

8         THE COURT:  It does on both Exhibits, 8 and 9.  If you

9  look at --

10        THE WITNESS:  Like there's a gap in the --

11        THE COURT:  I see.  There's a -- one of the -- go

12  ahead.

13        THE WITNESS:  And --

14        THE COURT:  It looks to me that the signatures are

15  identical in both documents.  I see the dashes that you're

16  pointing to, but the signatures seem to be identical.

17        THE WITNESS:  Well, you do see the dashes are removed,

18  right?

19        THE COURT:  I see the dashes that you're pointing to

20  on Exhibit 8.

21        THE WITNESS:  Um-hum.  And they're not on --

22        THE COURT:  And they're not on Exhibit 9.

23        THE WITNESS:  Right.  And again --

24        THE COURT:  And on Exhibit 8 there is an endorsement.

25        THE WITNESS:  Yeah, there's an endorsement and blank.

1      THE COURT:  And that also -- the first endorsement

2  also appears on Exhibit 9.  There's a second endorsement.

3      THE WITNESS:  Right, Exhibit 8 is --

4      THE COURT:  Okay.

5      THE WITNESS:  -- endorsed and blank, and then Exhibit

6  9 are specially endorsed.

7      THE COURT:  Yes.

8      THE WITNESS:  And the allonge also is supposed to be

9  attached to the document.  And -- which would make it an

10  endorsement.  It's supposed to be a face --

11      THE COURT:  Are you offering Exhibit 9, Ms. Nora?

12      MS. NORA:  Yes, Your Honor.

13      MR. WISHNEW:  No objection.

14      THE COURT:  All right.  Exhibit 9 is in evidence.

15  (Tia Smith's note endorsed by Judy Faber was hereby received

16  into evidence as Claimant's Exhibit 9, as of this date.)

17      THE COURT:  The Court will make its own decision as to

18  whether it bears Ms. Smith's signature, if that's an issue.

19      MS. NORA:  Your Honor, and with respect to the stamp

20  that appeared from American Mortgage Network, as it

21  subsequent -- on Exhibit 8, as it subsequently appears on

22  Exhibit 9, did you make any observations about --

23      THE COURT:  I observed everything I'm looking at here.

24  Ask your next question.  Both exhibits are in evidence.

25      MS. NORA:  Thank you, Your Honor.  I was going to just

RESIDENTIAL CAPITAL, LLC, ET AL.                    66

1   ask Ms. Smith for any other observations she made, if I may?

2            THE COURT:  Go ahead.

3            THE WITNESS:  I noticed that the endorsement wasn't

4   stamped.  My assumption -- or it appears as though the stamps

5   were made on the back of the promissory note and the ink bleeds

6   through some.

7            THE COURT:  I'm sorry; say that again.

8            THE WITNESS:  When you stamp the back of the

9   promissory note, it bled through to the other side.  And so

10  between the two different notes, the bleed-through has been

11  kind of -- it's in a different section.  So it looks like it's

12  just been tampered with and played with.  And then the stamps

13  also are kind of in alignment with one another on Exhibit 9, as

14  opposed to 8, where it's kind of slanted, the endorsement.

15  BY MS. NORA:

16  Q.  And where did you get a copy of Exhibit 9, Ms. Smith?

17  A.  I got a copy of Exhibit 9 from Aurora Loan Services.

18  Q.  Is that with the QWR?

19  A.  Yes, I did another -- I probably did three or four QWRs

20  with Aurora, and however -- yeah, I think the third QWR they

21  sent me the specially endorsed promissory note.  The first two

22  times they sent me the promissory note endorsed and blank.

23  Q.  With no endorsement by Judy Faber?

24  A.  Correct.

25  Q.  Could you tell the Court, if the Court allows you to have

1   restitution under the California Unfair Competition Law, what
2   your expenses and out-of-pocket expenses and what your losses
3   have been?  And you've produced some documentary evidence, so
4   let's go through Exhibit 43, starting with 43-A.  Would you
5   tell the Court what that is?
6   A.  43-A is a residential lease agreement.  This is one of my
7   boarders.  I rent rooms in my home.  I have not collected rent
8   since the unlawful detainer, so --
9          THE COURT:  Let me ask you; is your tenant still
10  living with you?
11         THE WITNESS:  They do.  However, they do not pay.
12         THE COURT:  How come?
13         THE WITNESS:  They don't pay me rent.
14         THE COURT:  Why not?
15         THE WITNESS:  Because of the eviction.  It's like --
16         THE COURT:  Why do you let them live there if they
17  don't pay you rent?
18         THE WITNESS:  Why do I let them live there?  For
19  humane reasons.
20         THE COURT:  How much rent were they paying?
21         THE WITNESS:  And they pay utilities right now.
22         THE COURT:  How much rent were they paying?
23         THE WITNESS:  One tenant is paying 700 and the other
24  750.
25         THE COURT:  A month?

1          THE WITNESS:  Yes.

2          THE COURT:  Neither tenant is paying rent anymore?

3          THE WITNESS:  No, they -- they just take care of the

4  household expenses since I'm not working.  So --

5          THE COURT:  When did this happen?

6          THE WITNESS:  October 2014 was the last time they

7  paid, right before the verdict for the unlawful detainer.

8          THE COURT:  Go ahead, Ms. Nora.

9          MS. NORA:  Thank you.

10  BY MS. NORA:

11  Q.  So would you identify Exhibit 43-A for the Court, please?

12  A.  43-A is Stanley Barnett's (ph.) residential lease

13  agreement with myself.

14  Q.  Okay.  And that lease agreement would have been in effect

15  for what period?

16  A.  It initially started from August 1st, 2011 through July

17  31st, 2014.  However, there's an addendum that extends --

18  automatically extends his lease, if he chooses to, for another,

19  I believe, thirty-six months.

20  Q.  And for the reasons you stated, you are no longer

21  receiving that rent?

22  A.  Correct.

23  Q.  How do you believe that that relates to the representation

24  that you should not make your mortgage payments if you wanted

25  to qualify for a loan modification in November of 2007?

RESIDENTIAL CAPITAL, LLC, ET AL.                      69

1   A.  Well, I believe that because of Homecomings'

2   misrepresentations to me and their inducement for me to stop

3   making payment, which inevitably led to a wrongful foreclosure,

4   caused all subsequent harm -- the harm caused by the wrongful

5   foreclosure.

6           THE COURT:  May I ask you this; when did Mr. Barnett

7   move in?

8           THE WITNESS:  In 2011.

9           THE COURT:  And this lease is dated August 1.  It

10  shows the first month is August 1, 2011.  That's when he moved

11  in?

12          THE WITNESS:  Yes.

13  Q.  So the lease agreement was entered into before the

14  foreclosure sale?

15  A.  Correct.

16          THE COURT:  Can I ask you; when did you make your last

17  mortgage payment?

18          THE WITNESS:  I believe it was July 2010.

19  Q.  Could you identify Exhibit 43-B for the Court, please?

20  A.  43-B is the lease agreement between Sandra Deloche (ph.)

21  and myself.

22  Q.  And what is the term for that?

23  A.  It's the same; it's August -- well, it's not the same.

24  It's August 1st, 2011 until July 31st, 2016.  And she's a

25  senior.  And she also has an option to renew automatically at

1  the end.

2  Q.  What do you mean by "she's a senior"?

3  A.  She's a senior citizen.

4  Q.  And how does the residential lease agreement with Sandie

5  Deloche relate to your contention that you're entitled to

6  restitution of your losses as a result of the November 2007

7  misrepresentation by Homecomings?

8  A.  For the same reasons the first -- that I just stated

9  before, because of Homecomings' misrepresentations to me led to

10 the wrongful foreclosure.  And I just wanted to add that Ms.

11 Deloche was a tenant prior to Mr. Barnett.  However, when I

12 signed the lease agreement with Mr. Barnett when he moved in,

13 it changed, basically, the rental amount that Ms. Deloche was

14 paying since there was another party in the home.  So she had

15 actually moved in in 2010, I believe.

16 Q.  Could you identify Exhibit 43-C for the Court, please?

17 A.  43-C -- 43-C is my business profit and loss for the year

18 January through December 2010 and January through June 2011.

19 Q.  And when was that document created?

20 A.  I believe it was created in July of 2011.

21 Q.  And why?

22 A.  For loan modification purposes.

23       THE COURT:  You submitted this to Aurora?

24       THE WITNESS:  Yes.  I actually -- you asked me before,

25 Your Honor, when was the last time I paid; July 2010.  I

1   would -- Aurora would set me up in these agreements and then

2   they would tell me, okay, don't -- don't pay; stop paying until

3   we get back with you.  And then -- so that's why I stopped

4   paying.  And then -- and that was July 2010.  In December --

5   excuse me, November 2010, I found out that I was denied, and

6   then maybe six days later there was a sale.

7           THE COURT:  But you had -- Exhibit 35 was the first

8   repayment agreement; that was from June 17th, 2008 with Aurora.

9   It's in evidence.  Were you making payments under that

10  repayment agreement?

11          THE WITNESS:  Yes.  That's the first one --

12          THE COURT:  Yes.

13          THE WITNESS:  -- you're referring to?

14          THE COURT:  Yes.

15          THE WITNESS:  Yes, the first one I entered into, I was

16  kind of -- it was -- I entered in it kind of under duress, and

17  I agreed to make -- I think the first payment was 3,100

18  dollars.  And I couldn't -- that was too strenuous for me, so

19  right after I made that first payment I called them back and

20  asked them for a better plan.  So they set me up with a

21  second --

22          THE COURT:  That was the second one.  The date was

23  June 8th, 2009; it's almost a year later.

24          THE WITNESS:  No, there was another one.

25          THE COURT:  The three that Ms. Nora marked were

RESIDENTIAL CAPITAL, LLC, ET AL.                    72

1    Exhibits 35, 36, and 37.  At least I wrote down the first one's

2    date was June 17th, 2008, the second one June 8th, 2009, and

3    the third one June 15th, 2010.

4            THE WITNESS:  April -- June 17th, 2008 was the second

5    one.

6            THE COURT:  That's the second one?

7            THE WITNESS:  Yes.

8            THE COURT:  What's the first one?

9            THE WITNESS:  The first one was the April.

10           THE COURT:  Oh, I didn't -- what exhibit is that?

11           THE WITNESS:  That's 34.

12           THE COURT:  Okay.  I see.  April 20th, 2008.  Okay, I

13   see that.  All right.  And then so you went from April 20th,

14   2008; then you got a June 17th, 2008.

15           THE WITNESS:  Right, and --

16           THE COURT:  Okay.  I had missed the first one.  I see

17   it now.

18           THE WITNESS:  Right, and I don't know if you noticed

19   this, but there was four payment plans.  And the representative

20   told me to make the first three; after I make the third

21   payment, then to apply for the loan modification, and don't

22   make the fourth payment because the fourth payment was a

23   balloon payment.  And they knew that I couldn't pay that;

24   that's why I was applying.  So she told me not to make a

25   payment until I was contacted.

RESIDENTIAL CAPITAL, LLC, ET AL.                    73

1        THE COURT:  This is from Aurora?

2        THE WITNESS:  Yes, this is from Aurora.  And so then I

3    didn't pay for two, three months until they denied me and then

4    told me to start over again.  So that happened a couple of

5    times.

6        THE COURT:  Can I -- did you submit a loan

7    modification package to Homecomings?

8        THE WITNESS:  No, I did not.

9        THE COURT:  Go ahead, Ms. Nora.

10       MS. NORA:  Yes, thank you, Your Honor.

11   BY MS. NORA:

12   Q.  Could you identify Exhibit 43-D for the Court?

13   A.  43-D is a medical receipt, a receipt that I paid for an

14   exam.  Since this -- actually, since I've been fighting, I

15   suffer -- I have skin rashes and the like.  So this is one of

16   my doctor visits.

17       THE COURT:  All right.

18   Q.  Do you have more than one doctor bill?

19   A.  I -- that -- not that I submitted.

20   Q.  Right.

21   A.  Yeah.

22   Q.  So you have one medical visit for skin rashes that you

23   believe are related to the stress of the --

24       THE COURT:  Don't testify for her, Ms. Nora.

25       MS. NORA:  I'm sorry, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                    74

1   Q.  Could you explain?

2   A.   Yes.  I started, I believe, suffering from psoriasis.  The

3   first time I went to the physician, I believe it was in 2013.

4   However, I wasn't -- I was unable to locate that bill.  So

5   it's -- the doctor said it was related to stress.  This last

6   time I went to the ear, nose, and throat doctor because I had a

7   really bad ear infection.  And when I went to the -- and the

8   doctor told me it was stress-related that I had the psoriasis.

9   And --

10           THE COURT:  This Exhibit D -- 43-D is from November

11   2015?

12           THE WITNESS:  Yes.

13           THE COURT:  Okay.

14           THE WITNESS:  Yes.

15           MR. WISHNEW:  Your Honor, the ear, nose and throat, is

16   that in evidence?  Is she referring to a document?

17           THE COURT:  Well, she's referring to Exhibit 43-D.

18           MR. WISHNEW:  But is that for the --

19           THE COURT:  It's not in evidence yet.

20           MR. WISHNEW:  Is D for the psoriasis or for the ear,

21   nose and throat?

22           THE WITNESS:  That's the same thing.

23           MR. WISHNEW:  It's all one doctor?

24           THE WITNESS:  He said I had psoriasis in my ear.

25           MR. WISHNEW:  Oh.

1        THE COURT:  Go ahead, Ms. Nora.

2        MS. NORA:  Thank you.  Move the admission of Exhibit

3   43-D.

4        THE COURT:  Which exhibit?

5        MS. NORA:  43-D, the medical --

6        THE COURT:  Are you -- you haven't -- what are you

7   doing with 43-A, B, C?  You haven't moved any of those.

8        MS. NORA:  Oh, then thank you, Your Honor.  I'd like

9   to move the admission of Exhibits 43-A, B, C, and D.

10       MR. WISHNEW:  Objection, Your Honor.  Relevance.

11  Causation.

12       THE COURT:  I'm going to overrule the objection, but

13  I'm going to give it such weight as I can ultimately conclude

14  it's entitled to.  These bills don't, in themselves, establish

15  causation.  They are what they appear to -- you know, do you

16  have any doubt that they are what they appear to be, Mr.

17  Wishnew?

18       MR. WISHNEW:  No, I don't, Your Honor.

19       THE COURT:  Okay.  All right.

20       MR. WISHNEW:  I just -- also, Your Honor, this is

21  dated November 2015.

22       THE COURT:  Oh, I know that.

23       MR. WISHNEW:  All right.

24       THE COURT:  I already pointed that out.

25       MR. WISHNEW:  Okay.

 1  (Tia Smith residential lease agreement with Stanley Barnett was

 2  hereby received into evidence as Claimant's Exhibit 43-A, as of

 3  this date.)

 4  (Tia Smith residential lease agreement with Sandra Deloche was

 5  hereby received into evidence as Claimant's Exhibit 43-B, as of

 6  this date.)

 7  (Tia Smith's business profit and loss 2010-11 was hereby

 8  received into evidence as Claimant's Exhibit 43-C, as of this

 9  date.)

10  (Tia Smith's receipt from doctor exam was hereby received into

11  evidence as Claimant's Exhibit 43-D, as of this date.)

12  BY MS. NORA:

13  Q.  Could you identify Exhibit 43-E for the Court, please?

14  A.  E?  It's the receipt for the medical -- for the

15  prescription for the psoriasis.

16          MS. NORA:  Move to admit 43-E on the same

17  circumstances the Court has just agreed to consider.

18          THE COURT:  I'm going to admit it into evidence, but

19  I'm not ruling now whether it gets any weight.  These are bills

20  from November 2015.  We're dealing here with a claim that

21  relates to November 2007, but I'll let it in.

22  (Tia Smith's prescription receipt was hereby received into

23  evidence as Claimant's Exhibit 43-E, as of this date.)

24          MS. NORA:  Thank you, Your Honor.

25  Q.  Could you identify Exhibit 43-F?

RESIDENTIAL CAPITAL, LLC, ET AL.                    77

1  A.  43-F is postage and shipping expenses that I have incurred

2  from litigating the wrongful foreclosure and the unlawful

3  detainer action.

4  Q.  And why are you seeking restitution for those

5  out-of-pocket payments?

6  A.  Because I believe they all stem from the

7  misrepresentations of Homecomings.

8  Q.  Could you explain how they stemmed from the

9  misrepresentation?

10  A.  Had Homecomings not misrepresented their status and

11  instruction in how to obtain a loan modification, I would not

12  have -- had I known their true status, I would not have

13  followed their instructions.  And I do not -- I mean, you would

14  probably say this is speculation, but I don't believe that I

15  would be here today had I not done that.

16  Q.  Okay.  Did you total the postage and shipping expenses?

17  A.  I did.

18  Q.  And what did that come to?

19  A.  Off -- I don't have that in front of me, I don't believe.

20  Q.  Directing your attention to Exhibit 43 --

21          THE COURT:  Are you offering it?

22          MS. NORA:  Oh, yes.

23          THE COURT:  43-F?

24          MS. NORA:  Thank you, Your Honor.

25          MR. WISHNEW:  Objection, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                78

1        THE COURT:  The objection to 43-F is sustained.

2   Q.  Identify, please, Exhibit 43-G.

3   A.  43-G are supplies:  printing, ink, paper, everything,

4   costs to litigate here and in California, those expenses.

5        MS. NORA:  Move to admit Exhibit 43-G for restitution,

6   Your Honor.

7        MR. WISHNEW:  Objection, Your Honor.

8        THE COURT:  Objection sustained.  These receipts are

9   from 2015.

10  Q.  Please identify Exhibit 43-H.

11  A.  43-H are dental expenses.  Because of the stress that I

12  have endured, because of the wrongful foreclosure and trying to

13  get the modification -- so it all started, the stress started

14  with the modification for the three years, which led to the

15  wrongful foreclosure -- I have -- I grind my teeth when I

16  sleep, and so these are expenses, dental expenses.

17        MS. NORA:  I offer Exhibit 43-H, Your Honor.

18        MR. WISHNEW:  Objection, Your Honor.

19        THE COURT:  I'm going to overrule the objection with

20  the same limitation as with the other medical expenses.  I'm

21  not making a determination about causation.

22  (Tia Smith's receipt for dental expenses was hereby received

23  into evidence as Claimant's Exhibit 43-H, as of this date.)

24  Q.  Ms. Smith, I call your attention to Exhibit 43-I, and the

25  first part of 43-I, could you identify that for the Court,

1  please?

2  A.  43-I is a market analysis of my property -- of my home.

3  Q.  Prepared by whom?

4  A.  Prepared by Demetrius Kaleb (ph.) of LRG Realty Group, so

5  he's a licensed realtor in the State of California.

6  Q.  And what does he conclude is the value of your home?

7  A.  I think this one --

8  Q.  It's okay if it's a range; why don't you tell me?

9  A.  Okay.  The range -- he says it's anywhere between 322,000

10  and 679,000.

11          THE COURT:  What is the as-of date?

12          THE WITNESS:  That was December 3rd, 2015.

13  Q.  And I'll direct your attention to Exhibit 43 --

14          THE COURT:  Are you moving it into evidence?

15          MS. NORA:  Yes, Your Honor, I was going to move both

16  at the same time, but I'll do it separately.  43-I, first

17  analysis, move to admit.

18          MR. WISHNEW:  Objection, Your Honor.

19          THE COURT:  Objection sustained.  There's no

20  foundation.  Whoever prepared it's not here.  And the range

21  wouldn't -- that he lists its value wouldn't meet the

22  requirements of appraiser's standards that have to -- objection

23  sustained.  Wrong as-of date.

24          Next?

25  Q.  Please identify Exhibit 43-I, the second exhibit.

RESIDENTIAL CAPITAL, LLC, ET AL.                    80

1         THE COURT:  Didn't we just deal with 43-I?

2         MS. NORA:  This is one, and that is -- there's a

3   second one.

4         MR. WISHNEW:  It's part two, Your Honor.

5         THE COURT:  I'm sorry?

6         MR. WISHNEW:  There's a part two.

7         THE COURT:  Where does that appear?  What page?  How

8   far back, Ms. Nora?

9         MS. NORA:  It's concurrent.  It's the -- the first one

10  was December 3rd, 2015.  The second one is December 4th, 2015.

11        THE COURT:  Okay.  Is that the one by Tyler Barker

12  (ph.)?

13        THE WITNESS:  Yes.

14        THE COURT:  When did Mr. Barker prepare the report for

15  you?  It has December 4th, 2015 written on the bottom of each

16  page.

17        THE WITNESS:  Yeah, that's --

18        THE COURT:  And he's given you a value as of December

19  2015, is that right?

20        THE WITNESS:  December 2015, yes.

21        MR. WISHNEW:  Same objection, Your Honor.

22        THE COURT:  Objection sustained.

23     (Pause)

24        THE COURT:  I'll let you go on, Ms. Nora, but be aware

25  you've already used two-and-a-half hours of time.

RESIDENTIAL CAPITAL, LLC, ET AL.                    81

1          MS. NORA:  Yes, Your Honor.  I was trying to decide

2    whether I should make the Court aware of the current status of

3    Mr. Raja, because a lot of what we've been covering here today

4    would have been --

5          THE COURT:  Sure.

6          MS. NORA:  -- covered with Mr. Raja.

7          THE COURT:  Are you finished with your questions for

8    Ms. Smith?

9          MS. NORA:  No, I do want to finish with her.  Thank

10   you, Your Honor.

11         THE COURT:  So let's finish with Ms. Smith and then

12   we'll talk about Mr. Raja.

13         MS. NORA:  Okay.

14   BY MS. NORA:

15   Q.  Ms. Smith, are all the exhibits that you proposed to the

16   Court, to the best of your knowledge, true and correct copies

17   of what they purport to be?

18   A.  Yes.

19         MR. WISHNEW:  Objection.

20         THE COURT:  Look, whatever's come in has come in.  You

21   don't have to deal with foundation on what's been admitted.

22   And what I've sustained objections to, it wasn't because of

23   that.  Let's move on.

24   Q.  Ms. Smith, what relief would you like from the Court?

25   A.  I ultimately would like title back to my property and

 1    restitution for money spent, mortgage payments paid to

 2    Homecomings, who was not entitled to accept mortgage payments,

 3    and my costs for defending my title and my home from a wrongful

 4    foreclosure.

 5    Q.  You --

 6          THE COURT:  Hold on.  You've already testified to

 7    this.  All of the litigation in California you lost, right?  I

 8    mean, you've been up to the U.S. Supreme Court already.  You

 9    testified about some new proceedings you filed, but every other

10    lawsuit that you commenced you were unsuccessful.

11          THE WITNESS:  Yes, but it was not on the merits.

12          THE COURT:  Go ahead, Ms. Nora.

13    Q.  How do you believe that the four ResCap debtors that you

14    have named in your claims caused a wrongful foreclosure?

15          MR. WISHNEW:  Objection, Your Honor.

16          THE COURT:  Overruled.

17    A.  I believe each debtor misrepresented their status in

18    relation to my loan.

19          THE COURT:  Ms. Smith, I know you feel strongly about

20    this.  The only claim that we're here on today, as to which you

21    contested on, is the California Unfair Competition Law claim

22    relating to alleged misrepresentations about whether you have

23    missed payments to modify the loan.  So that's what's at issue

24    at this trial.  I don't doubt that you feel very strongly about

25    all the other issues as well.

RESIDENTIAL CAPITAL, LLC, ET AL.                                83

1              THE WITNESS:  Um-hum.

2              THE COURT:  But that's what we're here for.

3              THE WITNESS:  Okay.  So I can only -- so should I just

4     direct it to the --

5              THE COURT:  You should.

6              THE WITNESS:  -- November 2007?

7              THE COURT:  Yeah, you testified about some

8     conversations in September, so it's really September 2007, and

9     you talked about October and November.  So we're talking about

10    that time period; I'm not limiting to a specific date, but

11    I'm -- the Unfair Competition claim that survived all relates

12    to what you were told about what you had to do to qualify for a

13    loan modification.

14             THE WITNESS:  Um-hum.

15             THE COURT:  Okay?  That's what your testimony needs to

16    focus on.

17    A.   Okay.  So in November of 2007, when I called Homecomings,

18    Homecomings represented that they were -- they had the ability

19    to consider me for a loan modification.  However, that is not

20    true, based on the SEC filing and the servicer guideline that

21    was effective --

22             THE COURT:  You never submitted a loan modification

23    request to Homecomings?

24             THE WITNESS:  No, I didn't.  It's -- I didn't submit

25    an application.  However, I inquired about receiving a loan

1    modification, and the representative told me that I could not

2    obtain one without skipping three months' payments.

3          THE COURT:  Okay.  So Ms. Nora asked another question.

4          MS. NORA:  Yes.

5    Q.  You were going to call the Court's attention to the

6    servicer guide that was produced in discovery, which you

7    believe indicates that Homecomings could not have granted a

8    loan modification to you.

9          MR. WISHNEW:  Objection as to formula.  Ms. Nora is

10   testifying in her question --

11         MS. NORA:  Sure.

12         MR. WISHNEW:  -- and leading the witness.

13   Q.  Could you please --

14         THE COURT:  I'm going to overrule.  We're running out

15   of time here.  So if you want to point her to the guide, point

16   her to the guide.

17   Q.  Yes, at the -- in RFC-GMAC servicer guide, which I believe

18   is Exhibit 12, you indicated --

19         THE COURT:  Servicer guide is Exhibit 3.

20         MS. NORA:  Oh, I'm sorry.  Exhibit --

21         THE COURT:  Unless you've got a different exhibit.

22         MS. NORA:  No.

23         THE COURT:  That's what we went through this morning.

24   It's in evidence.

25         MS. NORA:  Thank you, Your Honor.

RESIDENTIAL CAPITAL, LLC, ET AL.                    85

1  Q.  Exhibit 3, could you indicate where it states that

2  Homecomings did not have the authority to consider you for a

3  loan modification?

4  A.  On page -- on page 1 -- page 1 of the servicer guide, the

5  last line of the page, it says, "Updated address and changed

6  legal name from Homecomings to GMAC Mortgage throughout".  And

7  this was effective November 1st, 2007.  So Homecomings could

8  not have told me to skip three payments if they no longer were

9  the servicer according to the servicer guideline.

10         THE COURT:  Tell me this, Ms. Smith; is there

11  something in the servicer guide that you believe indicates that

12  a borrower has to miss three payments in order to be

13  considered?

14         THE WITNESS:  No, Your Honor.

15  Q.  And with respect to Exhibit 1-E, have you reviewed that

16  exhibit, which pertains to the servicing of the loans in the

17  RALI series 2007-Q01 trust, does that indicate whether or not

18  Homecomings was the servicer as of November 2007?

19  A.  1-E?

20  Q.  1-E.

21  A.  Yes, 1-E states that as of September 24th -- it says

22  there's a change of servicer or trustee for the RALI trust --

23  for the RALI 2007-Q01 trust, which Homecomings claims to

24  service my loan under or on behalf of.  And it says, as of

25  November -- excuse me, September 24th, 2007, Homecomings

RESIDENTIAL CAPITAL, LLC, ET AL.                    86

1   transferred its servicing platform to GMAC, and after September

2   24th, 2007, Homecomings no longer serviced any loan within that

3   trust.

4   Q.  And you believe that's a misrepresentation that was made

5   to you?

6   A.  I do.

7   Q.  And as a result of that misrepresentation, what did you

8   do?

9   A.  I stopped; I skipped three payments in order to qualify

10  for this loan modification that Homecomings represented to me

11  with the -- that I would be eligible for if I did.

12  Q.  Thank you.

13          MS. NORA:  No further questions.

14          THE COURT:  Okay.  Mr. Wishnew, cross-examination?

15          MR. WISHNEW:  Thank you, Your Honor.

16  CROSS-EXAMINATION

17  BY MR. WISHNEW:

18  Q.  Good morning, Ms. Smith.  How are you?

19  A.  Good morning.  I'm fine.

20  Q.  My name is Jordan Wishnew.  I'm counsel to the ResCap

21  Borrower Claims Trust.  Just a couple questions for you about

22  your testimony.  We were just discussing the servicer guide.

23  In November 2007, when you purportedly spoke with a Homecomings

24  representative, had you reviewed the servicing guide at that

25  point in time?

1  A.  I had not.

2  Q.  Okay.  Ms. Nora also identified, in certain of the

3  exhibits that are in evidence, some SEC filings.  Had you

4  reviewed those SEC filings in November 2007 when you were

5  speaking with the Homecomings representative?

6  A.  I had not.

7  Q.  Okay.  Your testimony is that a Homecomings representative

8  purportedly told you to skip three months' payments, is that

9  correct?

10  A.  Yes.

11  Q.  Is it possible that the representative said that in order

12  to be considered for a loan modification you had to be behind

13  in your loan payments?

14  A.  No.

15  Q.  It's not possible?

16  A.  I mean, it's -- it -- in essence, it sounds like the same

17  thing, but that's not what she said.

18  Q.  Got it.  And at the time you were speaking with the

19  Homecomings representative, you were current on your loan,

20  correct?

21  A.  Correct.

22  Q.  Okay.  You testified that there were certain notes you

23  made on your September 2007 mortgage statement.  Are those

24  notes being offered into evidence today?

25  A.  I don't believe I said that it was on that exact

1   statement, because I don't remember exactly which statement it

2   is.  But I don't believe that they were offered.

3   Q.  Okay.  And you filed four claims today?

4          MR. WISHNEW:  I'm sorry.  Strike that.

5   Q.  You filed four claims in the ResCap Chapter 11 cases,

6   correct?

7   A.  I initially filed eight, and then I think four were

8   duplicative.

9   Q.  Okay.

10  A.  And so, yeah, four.

11  Q.  Of the four remaining claims, are any one of them against

12  Aurora Loan Services?

13  A.  No.

14  Q.  Okay.

15         THE COURT:  Nor could they be.

16         MR. WISHNEW:  Correct, Your Honor.

17  Q.  Assuming, for your testimony, that the Homecomings

18  representative told you to skip payments, did you have the

19  ability -- excuse me -- did you have the financial ability to

20  make the monthly mortgage payments on your loan in January,

21  February, and March 2008?

22  A.  Yes, I did.

23  Q.  You did?  Okay.  At that time, did you -- how did you

24  manage your --

25         MR. WISHNEW:  Strike that.

RESIDENTIAL CAPITAL, LLC, ET AL.                    89

1   Q.  At that time, did you have active bank accounts?

2   A.  Yes.

3   Q.  Okay.  And the payments that were made to Homecomings,

4   were those made from those bank accounts?

5   A.  Some were, yes.

6   Q.  If they weren't made from the bank accounts, how did you

7   have the funds to make the payments to Homecomings?

8   A.  If they weren't made from the bank accounts?

9   Q.  Correct.

10  A.  I -- like I said, that I was self-employed, and in my

11  business I received more cash --

12  Q.  Okay.

13  A.  -- than checks, so a lot of times I had cash.

14  Q.  And so how did you deliver the cash to Homecomings?

15  A.  Sometimes I would pay online or mail the payments in.

16  Q.  So were you actually mailing cash to Homecomings?

17  A.  No.

18  Q.  Okay.  Were you depositing the money into your bank

19  accounts and then drawing on those funds to pay Homecomings?

20  A.  Yes, and I may have made some cashier's checks or money

21  orders as well.

22  Q.  Okay.  But the money to pay the cashier's check or the

23  money orders, where would that have been drawn from?

24  A.  I could have used cash or a check.

25  Q.  Okay.  Was it your testimony earlier this morning that in

RESIDENTIAL CAPITAL, LLC, ET AL.                    90

1   November 2007, when you purportedly spoke with a Homecomings'

2   representative, that you were having financial issues?

3   A.   I said -- I don't necessarily recall saying I had

4   financial issues; I said I wanted to reduce my monthly expenses

5   because of some circumstances.

6   Q.   Such as your mom moving out?

7   A.   That was one of them, yes.

8   Q.   And she had contributed to your ability to make the

9   monthly mortgage payment?

10  A.   No.  I said she contributed to the household.

11  Q.   How did she contribute to the household?

12  A.   How did she contribute to the household?  She paid a

13  certain amount of money --

14  Q.   Um-hum.

15  A.   -- and I disbursed it where needed.

16  Q.   What other monthly expenses did you need to reduce?

17  A.   All of my monthly expenses:  car note; the other mortgage

18  payments on the other property; the utilities.

19  Q.   And why did you need to reduce those monthly expenses?

20  A.   Because of the downturn of the economy.

21  Q.   And how did the downturn of the economy force you to -- or

22  necessitate you to reduce your expenses?

23  A.   Well, I saw that the way my business was -- as far as my

24  clients were, they were cutting back.

25  Q.   Um-hum.

RESIDENTIAL CAPITAL, LLC, ET AL.                    91

1  A.  And my investment properties, tenants had lost -- tenants

2  had lost their jobs, and there were a couple of vacancies.

3  Q.  Okay.

4  A.  And my daughter was getting ready to graduate from high

5  school and I needed to have money for her college.

6  Q.  Okay.  At that time, do you recall having a checking

7  account with Bank of America?

8  A.  Yes.

9  Q.  Okay.

10      (Pause)

11  Q.  Ms. Smith, if I could ask you to turn to Exhibit BT-J in

12  the white binder before you.  Have you seen this document

13  before today?

14  A.  I have.

15  Q.  Okay.  And this is the -- this is your initial response to

16  the Borrower's Trust for a set of interrogatories, correct?

17  A.  Yes.

18  Q.  Okay.  And did you assist in the preparation of the

19  responses to these interrogatories?

20  A.  I did.

21  Q.  Okay.  And if I could ask you to turn to page 14; look at

22  the eighth line from the top.

23        THE COURT:  Let her read it.  Are you looking at her

24  response to number 16?

25        MR. WISHNEW:  Yes, Your Honor.

1           THE COURT:  Starts on page 13.  Why don't you read it

2     to yourself before you respond, okay?

3           (Pause)

4     Q.  I'd like to draw your attention to the eighth line on the

5     top on page 14.  The prior sentence began, "Claimant began to

6     protest because the meeting was reporting that President Obama

7     was encouraging homeowners to seek loan modifications from

8     their lenders even if they were not delinquent in their

9     payments."

10          Now, just if you can bear with me for a little bit of

11    history, when was President Obama actually elected?

12    A.  In 2008.

13    Q.  Okay.  And as of November 2008, correct?

14    A.  Yeah.

15    Q.  And so he was sworn in January 2009 and became president

16    in 2009?

17    A.  That is correct.

18    Q.  So he wasn't actually President Obama until 2009, correct?

19    A.  That's correct.

20    Q.  Okay.  And so how is that President Obama is encouraging

21    homeowners to seek loan modifications?

22    A.  He wasn't.  That was a mistake.  I believe we offered an

23    amendment to this statement.

24          THE WITNESS:  Can I confirm with my attorney, Your

25    Honor, regarding --

RESIDENTIAL CAPITAL, LLC, ET AL.                    93

1         THE COURT:  No, it is -- answer the questions the best

2   you can and --

3         THE WITNESS:  Okay.

4   A.  Yeah, this was a mistake.  I did not mean to say President

5   Obama, and I -- in my amendment, I said that I believe I heard

6   Obama during his campaign say that homeowners should contact

7   their owners of their loan to modify their loans.

8   Q.  Okay.  But as you testified earlier, you didn't actually

9   apply for a loan modification from Homecomings, correct?

10  A.  No, but -- no.

11  Q.  Okay.

12  A.  But I inquired.

13  Q.  You inquired.

14  A.  And I was told because I was current, I could not apply

15  until I was not current.

16  Q.  Okay.

17  A.  Yeah.

18        MR. WISHNEW:  One moment, Your Honor?

19        THE COURT:  Yes.

20  Q.  Ms. Smith, is it your testimony that Aurora --

21        MR. WISHNEW:  Strike that, Your Honor.

22  Q.  Is Aurora Loan Services the entity that foreclosed on you?

23  A.  Yes.

24  Q.  Okay.  And is it Aurora Loan Services that denied you the

25  modifications?

1  A.  Aurora Loan Services said they were operating on behalf of

2  the RALI Trust.

3  Q.  Where is that in evidence?

4         THE COURT:  She just testified to it.

5         MR. WISHNEW:  Okay.

6  Q.  Is the RALI Trust a debtor in these Chapter 11 cases?

7  A.  No, they're a claimant, I believe.

8  Q.  Okay.

9         MR. WISHNEW:  Your Honor, I have no further questions

10  for Ms. Smith.

11         THE COURT:  Okay.  Any redirect?

12         MS. NORA:  Yes, real quickly.

13         THE COURT:  You have to stand.

14         MS. NORA:  Oh.

15  REDIRECT EXAMINATION

16  BY MS. NORA:

17  Q.  One exhibit that I forgot to ask you to identify --

18         THE COURT:  Could you stand?

19         MS. NORA:  Oh, yes.  Oh, I'm sorry; thank you.

20  Q.  Except that I don't know where it is, the exhibit that

21  pertains to the 1099-A, could you quickly find that so that we

22  can offer it.

23         MS. NORA:  And this is, Your Honor, redirect to the

24  reference --

25         THE COURT:  That's fine.

1        MS. NORA:  Thank you.

2        THE COURT:  Where's the document?

3        MS. NORA:  I think it's Claimant B, if I --

4        MS. NORA:  Exhibit 33?  Is it Exhibit 33?

5        THE WITNESS:  Yes.

6  Q.  Could you identify that for the Court?

7        THE COURT:  Let me find it, okay?

8        All right.  Exhibit 33 is a 2011 1 -- 1099-A.

9  Q.  Could you -- did you receive that in the mail?

10 A.  I did.

11 Q.  And what is it?

12 A.  It's a 1099-A form.  It's an acquisition for abandonment

13 of secured property which is -- was filed with the Internal

14 Revenue Service.

15 Q.  Okay.  And who purportedly filed that with the Internal

16 Revenue Service?

17 A.  Aurora Bank as the lender.

18 Q.  Okay.  Had you ever had any dealings with Aurora Bank as

19 the lender?

20 A.  No, not as the lender, no.

21 Q.  Okay.

22        MS. NORA:  Move to admit Exhibit 33, Your Honor.

23        MR. WISHNEW:  Objection, Your Honor.

24        THE COURT:  Overruled.  Exhibit 33 is in evidence.

25 (1099-A form was hereby received into evidence as Claimant's

RESIDENTIAL CAPITAL, LLC, ET AL.                    96

1  Exhibit 33, as of this date.)

2          MS. NORA:  And I have no --

3          THE COURT:  Okay.

4          MS. NORA:  -- redirect.

5          THE COURT:  You're excused.

6          THE WITNESS:  Thank you.

7          THE COURT:  Thank you very much.

8          All right.  Do you have any other witnesses to call,

9  Ms. Nora?

10          MS. NORA:  Your Honor, we --

11          THE COURT:  Let's wait for Ms. Smith to -- you can

12  leave everything up here.

13          THE WITNESS:  Okay.  All right.

14          THE COURT:  Thank you for your testimony, Ms. Smith.

15          Go ahead, Ms. Nora.

16          MS. NORA:  Thank you, Your Honor.  Our fact witness,

17  M. Nawaz Raja, was hospitalized, according to what he told me

18  on Saturday.  He was hospitalized on January 31st and had not

19  been released from the hospital as of the date we spoke on

20  February 6th.  I know that we've used up our three-hour time --

21  trial time.

22          THE COURT:  Well, you haven't yet.

23          MS. NORA:  Oh.  Well, I would have wanted Mr. Raja to

24  go over the SEC filings, and he has knowledge of the

25  securitization transactions as to how they affect the

RESIDENTIAL CAPITAL, LLC, ET AL.                    97

1    perception of the person who is considered to be the borrower

2    in proceedings.  I thought that his testimony would be

3    factually based on the review of the SEC filings and would be

4    an assistance to the Court in determining the UCL claim as to

5    its basis in unfair, fraudulent or unlawful conduct by the

6    ResCap debtors.  Unfortunately, he is unable to be here.

7            THE COURT:  And you did file a motion to postpone his

8    cross-examination?  You had written direct.  But let me hear

9    from Mr. Wishnew first, okay?

10           MS. NORA:  Thank you, Your Honor.

11           THE COURT:  And the Trust did file objections to most

12   of the Raja testimony?

13           MR. WISHNEW:  Your Honor, as you just noted, we did

14   file an objection to substantially all of the Raja testimony.

15   If we were able to file a motion in limine, I would have sought

16   to strike Mr. Raja's declaration in its entirety.  We believe

17   it's entirely irrelevant here, and the only evidentiary basis

18   we would see for this to come in would be as a lay opinion

19   testimony.  However, under Federal Rule of Evidence 701, lay

20   opinion testimony must be "rationally based on the witness's

21   perception; helpful to clearly understanding the witness's

22   testimony or determining a fact at issue; and not based on

23   scientific, technical, or other specialized knowledge."

24           Mr. Raja's knowledge purports to be based upon his

25   review of public securitization documents, a large portion of

RESIDENTIAL CAPITAL, LLC, ET AL.                    98

1  which are entirely irrelevant to the very limited fact issue in

2  this matter.

3          Mr. Raja does not purport to have any personal

4  knowledge of the facts being testified to.  His statements deal

5  entirely with the practice of loan securitization which is,

6  again, an issue entirely irrelevant to the limited scope of

7  this matter, of this evidentiary hearing.

8          The statements have nothing to do with what transpired

9  between the debtors and client in late 2007-2008 before

10  servicing the loan transfer to Aurora, and as Mr. Raja readily

11  admits in the open paragraphs of his declaration, and as noted

12  in his curriculum vitae attached to the amended declaration, he

13  often provides expert testimony on securitization issues and

14  possesses specialized and technical knowledge of such

15  practices.

16          His testimony would not help determine a limited,

17  disputed fact, and his specialized knowledge is entirely

18  irrelevant to this proceeding; therefore, since he was not

19  personally involved in 2007 and 2008 with Ms. Smith, we would

20  assert that his testimony should not permitted in this

21  proceeding.

22          THE COURT:  All right.  Ms. Nora, do you want to

23  respond?

24          MS. NORA:  Yes, Your Honor.  Thank you.

25          Being mindful of the Court's ruling of October 1st,

1   2014, much of Mr. Raja's testimony was highlighted in bold and

2   made as an offer of proof to preserve our record, and also the

3   expert testimony portion was bold highlighted in order to

4   preserve the issue of whether expert testimony should have been

5   allowed because Ms. Smith was presently unrepresented when this

6   scheduling order went into effect.

7          Nevertheless, the two points that Mr. Raja -- that the

8   objector did not challenge Mr. Raja on are the known fact that

9   the nominal lender was American Mortgage Network, and that the

10  creditor has to be defined as the party who is owed money, and

11  that would be helpful to the explanation of Ms. Smith's

12  confusion as a result of the transactions that we're trying to

13  explore here.

14         THE COURT:  All right.  The motion to exclude -- I

15  take Mr. Wishnew's having made an oral motion to exclude the

16  testimony of Mr. Raja -- the motion is granted.  Mr. Raja's

17  testimony is not relevant to the limited issues that are at

18  issue in this contested matter.

19         Second, Mr. Raja is not here, and the Court only

20  permits witnesses to testify when they're present in court for

21  cross-examination.  So his written declaration -- objection to

22  the written declaration is sustained.  A, he's not here and not

23  available for cross-examination, and two, his testimony is not

24  relevant.  Okay.

25         You ready to proceed?

RESIDENTIAL CAPITAL, LLC, ET AL.                    100

1          Do you have any other witnesses, Ms. Nora?

2          MS. NORA:  No, Your Honor.

3          THE COURT:  All right.  Well, let's take a -- we'll

4    take a ten-minute recess.  Why don't you put up whatever -- you

5    can all remove whatever exhibit binders you don't need up

6    there, put up whatever exhibit binders you do need up there,

7    and then we'll resume with the testimony of Ms. Lath -- you're

8    calling Ms. Lathrop, correct?

9          MR. WISHNEW:  Yes, Your Honor.

10          THE COURT:  That's your only witness?

11          MR. WISHNEW:  Yes, Your Honor.

12          THE COURT:  Okay.  All right.  Ten-minute recess.

13          MS. NORA:  Your Honor, off the record.

14          THE COURT:  Yes.

15          MS. NORA:  Just wanted to know your schedule.  You

16    indicated --

17          THE COURT:  We're going until 12:30.  I have an

18    inequitable hearing at 12:30.

19          MS. NORA:  Yes.  Okay.  Thank you.  And then I --

20          THE COURT:  Then we're resuming at 1:30.

21          MS. NORA:  Thank you.  Just wanted to be reminded.  We

22    can leave them up there?

23          THE COURT:  You can leave everything -- you'll just

24    take what you want back from the -- this is off the record.

25          (Recess from 11:33 a.m. until 11:45 a.m.)

1        THE COURT:  Please be seated.  Just bear with me.

2        MR. WISHNEW:  Yes, Your Honor.

3        THE COURT:  All right.  We're back on the record.  Mr.

4    Wishnew?

5        MR. WISHNEW:  Thank you, Your Honor.  Jordan Wishnew,

6    Morrison & Foerster for ResCap Borrower Claims Trust.  I'd like

7    to call Sara Lathrop to the stand.

8        THE COURT:  All right.  Ms. Lathrop, come on up.

9        MS. NORA:  I apologize; I thought I had that off, but

10   it's not.

11       THE COURT:  That's okay, Ms. Nora.

12       If you would raise your right hand and be sworn.

13   Thank you.

14       (Witness sworn)

15       THE COURT:  Thank you.  There is water in there, if

16   you need.

17       THE WITNESS:  Thank you.

18   DIRECT EXAMINATION

19   BY MR. WISHNEW:

20   Q.  Good morning, Ms. Lathrop.

21   A.  Good morning.

22   Q.  Ms. Lathrop, we're here today in connection with a claim

23   objection Borrower Trust filed against Ms. Smith, a former

24   borrower of Homecomings Financial.  I'm going to ask you some

25   questions concerning Homecomings' records --

RESIDENTIAL CAPITAL, LLC, ET AL.                    102

1        MS. NORA:  Objection to the form of the question.

2   There is nothing in evidence that shows that --

3        THE COURT:  Ms. Nora, he's about to ask her questions.

4   I allowed you to do a direct examination of your own client.

5   I'm allowing Mr. Wishnew to do a direct examination of his

6   witness.  If he asks questions and you have a specific

7   objection to a question, you will object and I'll rule.

8        Go ahead, Mr. Wishnew.

9        MR. WISHNEW:  Thank you, Your Honor.

10  Q.  Ms. Lathrop, can you state your full name for the record?

11  A.  Sara Lathrop.

12  Q.  Thank you.  And what is your current position?

13  A.  I'm currently a senior claims analyst for the Borrower

14  Claims Trust.

15  Q.  Is that the ResCap Borrower Claims Trust?

16  A.  Yes, sir.

17  Q.  Thank you.  And what is your responsibility in that

18  position?

19  A.  I currently review claims that were submitted under the

20  bankruptcy for ResCap, and just see what kind of validity there

21  is in preparing the summary in the evidentiary documents.

22  Q.  And as part of your employment with the Borrower Claims

23  Trust, do you have access to Homecomings' business records?

24  A.  Yes.

25  Q.  Okay.  And what kind of records do you have access to?

RESIDENTIAL CAPITAL, LLC, ET AL.                          103

1   A.   I have access to payment history, servicing notes,

2   documents that may have been mailed to or received from

3   borrowers, and internal notes.

4   Q.   And were those records maintained electronically by the

5   debtors?

6   A.   Yes.

7   Q.   Okay.  And what is the name of the computer programs or

8   systems on which the records were kept?

9   A.   They were kept with -- well, they were maintained within

10  our Fiserv system as far as the servicing history and the

11  payment history which were able to be pulled also through our

12  BusinessObjects system.

13  Q.   Um-hum.

14  A.   That was just a system that archived that kind of

15  information.  Any kind of documents that may have been mailed

16  to, or received from, the claimant would have been imaged with

17  Looking Glass, and then any documents that may have been mailed

18  to the claimant may have also been housed within XNet.  Those

19  are the main ones I have access to.

20  Q.   And would you say that you're generally familiar with the

21  Homecomings' recordkeeping systems?

22  A.   Yes.

23  Q.   Okay.  Generally, were documents entered into Homecomings'

24  servicing system at or near the time of a conversation with the

25  borrower by someone who had knowledge of their preparation?

1          MS. NORA:  Objection.  Foundation.

2          THE COURT:  Lay a foundation.

3          MR. WISHNEW:  Sure.

4   Q.  Ms. Lathrop, if a Homecomings' representative spoke with

5   the borrower, would they document, electronically, those

6   conversations?

7          MS. NORA:  Objection.  Foundation.

8          THE COURT:  Okay.  Let me ask Ms. Lathrop; are you

9   familiar with the policies and procedures that Homecomings or

10  GMAC employed in recordkeeping in the 2007 -- in September

11  through December of 2007?

12         THE WITNESS:  Yes.

13         THE COURT:  And how are you familiar with that?

14         THE WITNESS:  Actually, during that time, I was an

15  associate on the floor in the call centers.

16         THE COURT:  Okay.

17         THE WITNESS:  So I actually had to know and act out

18  those procedures.

19         THE COURT:  Okay.  Go ahead, Mr. Wishnew.

20  Q.  And can you briefly explain to me the procedures that

21  would be followed when a borrower called into Homecomings?

22  A.  If a borrower called into Homecomings, then a summary of

23  that phone call would have been documented within the Fiserv

24  system --

25  Q.  Um-hum.

1    A.  -- and saved as a part of the permanent notes.

2    Q.  Okay.

3    A.  But it would have just been a summary, obviously.  It

4    wouldn't have been a full conversation.

5    Q.  Right.  So it would not be word for word, but would be a

6    summary of conversation?

7    A.  Yeah.

8    Q.  Okay.  As we -- I noted in the beginning we're here to

9    talk about Ms. Smith's loan; are you generally familiar with

10   this loan?

11   A.  Yes.

12   Q.  Okay.  And are you aware that Ms. Smith filed proofs of

13   claim against the debtors in the ResCap bankruptcy cases?

14   A.  Yes, I am.

15   Q.  Okay.  And are you also aware the ResCap Borrower Claims

16   Trust filed an objection to the allowance of those proofs of

17   claim?

18   A.  Yes.

19   Q.  Okay.  And are you generally familiar with the objection

20   that was filed by the ResCap Borrower Claims Trust?

21   A.  Yes.

22   Q.  Okay.  Were you asked to execute any declarations in

23   connection with this claims objection?

24   A.  Yes, I was.

25   Q.  Okay.  There's an exhibit before you designated as Exhibit

1   BT-A.

2   A.  Yes.

3   Q.  Do you recognize this document?

4   A.  Yes, I do.

5   Q.  Have you seen this document before today?

6   A.  Yes.

7   Q.  And what is this document?

8   A.  This is my declaration.

9   Q.  And what is this -- what does the declaration generally --

10  what does this declaration generally say?

11          THE COURT:  Well, "I would generally say" is not --

12          MR. WISHNEW:  I'll go through it, Your Honor.

13  Q.  At the time you attested to the statements made in the

14  declaration, did you believe them to be true and accurate?

15  A.  Yes, sir.

16  Q.  Okay.  If I could ask you to turn to Exhibit BT-B, as in

17  boy.  Do you recognize this document?

18  A.  Yes, I do.

19  Q.  And what is this document?

20  A.  This is the payment history and servicing notes for Ms.

21  Smith's loan.

22  Q.  Okay.  Have you seen this before today?

23  A.  Yes, I have.

24  Q.  Okay.  And was this document maintained at Homecomings'

25  system of business records?

1   A.  Yes, it would have been maintained through the Fiserv

2   system and accessible through our BusinessObjects system.

3   Q.  Okay.  And the Fiserv system, was that used in 2007?

4   A.  I believe it was, yes.

5   Q.  Okay.  And when were these notes -- when were these

6   servicing notes retrieved by the ResCap Borrower Claims Trust?

7   A.  According to the date on the top right-hand corner of the

8   page, it says March 6th, 2014.

9   Q.  Okay.  And do you know where the servicing notes have been

10  stored since they were retrieved?

11  A.  Within the Secure-24 system used by the Borrower Claims

12  Trust.  It's also known as our team room system.

13  Q.  Okay.  And generally, when was information contained in

14  the servicing notes entered into the servicing notes?

15  A.  The information would have been entered on the date that

16  it was completed or within a business day.

17  Q.  Okay.  And if a letter is sent to a borrower, is that

18  recorded -- is the mailing of the letter recorded in the

19  servicing notes?

20        MS. NORA:  Objection.  Foundation.

21        THE COURT:  Overruled.

22  A.  Yes, it would have been on the same basis as a

23  conversation.

24  Q.  Okay.  If a payment is received from a borrower, is that

25  recorded in the servicing notes?

RESIDENTIAL CAPITAL, LLC, ET AL.                    108

1   A.  It would have been recorded in the payment history.

2   Q.  Right.

3   A.  Unless for some reason the payment was returned, then it

4   would have been recorded within the servicing notes.

5   Q.  And is the payment history included at Exhibit BT-B?

6   A.  Yes.  It's the first page-and-a-half.

7   Q.  Okay.  Thank you.

8        MR. WISHNEW:  Your Honor, I'd like to introduce into

9   evidence the Tia Smith servicing notes and payment history.

10       MS. NORA:  Objection, Your Honor.  We would move to

11  exclude the servicing notes.  They are unreliable.  There's

12  insufficient testimony here to show that this is a printout of

13  regularly conducted business activity.  The witness has not

14  established that she is familiar with the way that this

15  document was prepared and particularly, whether or not this

16  document can be altered.

17       Also, calling the Court's attention to the fact that

18  there is nothing on this exhibit that suggests that this is

19  GMAC Mortgage prepared documents.

20       THE COURT:  Ms. Nora, I gave directions previously

21  that no speaking objections are allowed.  What is your

22  objection to the exhibit?

23       MS. NORA:  Move to exclude as unreliable and it isn't

24  what it purports to be.

25       THE COURT:  All right.  The objection is overruled.

RESIDENTIAL CAPITAL, LLC, ET AL.                    109

1  Exhibit BT-B is admitted in evidence.

2  (Ms. Smith's servicing notes and payment history was hereby

3  received into evidence as Borrower Claims Trust's Exhibit BT-B,

4  as of this date.)

5          THE COURT:  So that the record is clear, the Court

6  expressly finds that Rule 803(6) has been satisfied.  The

7  witness' testimony establishes that BT-B is a record made at or

8  near the time by someone with knowledge; that the record was

9  kept in the course of a regularly conducted business activity;

10 and that the making of the record was a regular practice of

11 that activity.

12         Furthermore, the Court finds that Ms. Lathrop is a

13 qualified witness to testify about the foundation for this

14 business record as required by Rule 803(6).  So the objection

15 to Exhibit BT-B is overruled, and the exhibit is in evidence.

16         MR. WISHNEW:  Thank you, Your Honor.

17    (Pause)

18 BY MR. WISHNEW:

19 Q.  Ms. Lathrop, if I could turn your attention to Exhibit BT-

20 G.

21 A.  Yes, sir.

22 Q.  Do you recognize this document?

23 A.  Yes.  This is a good-bye letter that was sent to Ms. Smith

24 on March 14th, 2008.

25         MS. NORA:  Objection.  No foundation.

RESIDENTIAL CAPITAL, LLC, ET AL.                110

1          THE COURT:  Overruled.

2          That's the date on it, but if you want to establish

3   that it was a letter that was sent, you're going to have to

4   establish the foundation for that.

5          MR. WISHNEW:  Sure, Your Honor.

6   Q.  Have you seen this letter before today, Ms. Lathrop?

7   A.  Yes, sir.

8   Q.  And to your knowledge, was the document maintained in

9   Homecomings' systems of records?

10  A.  Yes.

11  Q.  And where would it have been maintained?

12  A.  This would have been maintained in the XNet system that

13  was used for imaging.

14  Q.  Okay.  And is this letter a record that was maintained in

15  the ordinary course of Homecomings' servicing business?

16  A.  Yes, sir.

17  Q.  Okay.  And what is the -- what does the information

18  contained in this letter say?

19  A.  This letter is just informing Ms. Smith that the account

20  was transferring to Aurora Loan Servicing effective at the

21  April 1st, 2008 date.

22  Q.  Okay.  And is the mailing of this letter reflected in

23  Homecomings' records?

24  A.  There would have been a note of the letter going out

25  within the servicing notes.

1          THE COURT:  Is it there?

2          MR. WISHNEW:  If I can --

3          THE WITNESS:  Yes, sir.  Give me a moment; I can give

4    you the page.

5          THE COURT:  Thank you.  Would that be Exhibit B, is

6    that it?

7          MR. WISHNEW:  Yes, Your Honor.

8          THE WITNESS:  Yes.  It'd be in BT-B, I believe.

9          THE COURT:  Yes.

10         THE WITNESS:  There's a note at the top of page 3 of

11   15.  It's the second --

12         THE COURT:  Let me get there, okay.

13         THE WITNESS:  I apologize.

14         THE COURT:  That's okay.  Okay.

15         THE WITNESS:  It's page 3 of 15, the second note from

16   the top of the page labeled, "S&A good-bye letter."  I don't

17   know what the S&A stands for, but the good-bye letter would be

18   referencing the letter that was mailed.

19         THE COURT:  Okay.

20         MR. WISHNEW:  Thank you.  Your Honor, I'd like to move

21   Exhibit BT-G into evidence.

22         MS. NORA:  Your Honor, Ms. Smith objects for all the

23   reasons stated in our objection that was filed on February 5th.

24         THE COURT:  Objection is overruled.  Rule 803(6) has

25   been satisfied.

RESIDENTIAL CAPITAL, LLC, ET AL.                     112

1  (Good-bye letter sent to Ms. Smith 3/14/08 was hereby received

2  into evidence as Borrowers Trust's Exhibit BT-G, as of this

3  date.)

4  Q.  Ms. Lathrop, if I could ask you to turn to the payment

5  history in BT -- Exhibit BT-B?

6  A.  Okay.

7  Q.  At any point in time, did Ms. Smith become delinquent on

8  her loan payments?

9  A.  Yes, sir.

10 Q.  And according to the payment history, when did she first

11 become delinquent?

12 A.  Sorry; just looking to confirm.  Looks like the first

13 payment that fell delinquent was the January 1st, 2008 payment

14 when it wasn't received within the month due.

15        THE COURT:  What is the page you're referring?

16        THE WITNESS:  I apologize.  It is page 1 of 15.

17 It's -- the absence of a payment is showing as received in

18 January -- would have -- we show -- four lines from the bottom,

19 a payment came in December 31st, 2007, and then the next

20 notation is in March 2008.  So the lack of a payment being

21 received in January reflects that nothing was received.

22 Q.  Thank you.  Besides for the January payment, did Ms. Smith

23 fail to make any other monthly loan payments?

24        MS. NORA:  Objection.  Foundation.

25        THE COURT:  Overruled.

1    A.   There also shows an absence of payment received in the

2    month of February.

3    Q.   Okay.  Did the debtor speak to Ms. Smith about the

4    delinquency?

5            MS. NORA:  Objection.  Foundation.

6            THE COURT:  Overruled.

7    A.   It appears that there were conversations in the month of

8    February 2008 as referred to on pages 4 and -- well, I

9    apologize; on pages 3, 4, and 5 of 15 in the servicing notes.

10           THE COURT:  Give me those pages again; I'm sorry.

11           THE WITNESS:  Page 3, page 4, and page 5.

12           THE COURT:  Okay.

13           THE WITNESS:  I can give you the specific dates if

14   you'd like them, sir.

15           THE COURT:  Yes, please.

16           THE WITNESS:  Okay.  I show there was a

17   conversation --

18           THE COURT:  Give me the page -- oh, okay.

19           THE WITNESS:  I'll give it to you.

20           THE COURT:  It's on page 3, 4, and 5; okay.

21           THE WITNESS:  I'll start on page 5 just so you can get

22   them chronologically.

23           THE COURT:  Sure.

24           THE WITNESS:  It appears the first conversation in

25   2008 was on February 1st, 2008, which is just below the middle

 1  of the page, on page 5.

 2          The next conversation that's recorded was on

 3  February --

 4          THE COURT:  That's the -- "Called B1?

 5          THE WITNESS:  Yes.  The one that says, "Called B1.

 6  Advised not able to make any payments today."  And then she

 7  provided an RFD, which is known as a "reason for default" that

 8  business was slow.  Then she was advised of potential late

 9  charges, credit, and that calls and letters could be sent in

10  regards to the account.

11          MS. NORA:  Your Honor, may I just have a standing

12  objection to foundation for purposes of appeal?

13          THE COURT:  Yes.  No, you can't.  You have an

14  objection, you got to state your objection.  We don't do

15  standing objections in my court.

16          MS. NORA:  Okay.  Objection.  Foundation.

17          THE COURT:  Overruled.

18          You don't have personal knowledge of the conversation?

19          THE WITNESS:  No.

20          THE COURT:  What you've testified is what the entry on

21  page 5 of 15 of Exhibit B?

22          THE WITNESS:  Yes.  All I'm referring to is what the

23  servicing notes state.  I wasn't present for any of the

24  conversations.

25          THE COURT:  And Tammy Moyer (ph.), who is that?

1        THE WITNESS:  She would have been a servicing

2   associate in the default department.

3        THE COURT:  She was the one who made the entry?

4        THE WITNESS:  Yes, sir.

5        THE COURT:  Okay.  Go ahead, Mr. Wishnew.

6   BY MR. WISHNEW:

7   Q.  And when a borrower misses a monthly payment, does -- did

8   Homecomings -- was it Homecomings' practice to send a

9   notification letter to a borrower?

10  A.  When a payment is missed?

11  Q.  Yes.

12  A.  It would have been sent after -- depending on what stage

13  of delinquency.

14  Q.  Okay.  If I can refer you to --

15       THE COURT:  Before you do that, because Ms. Lathrop

16  had said there were entries on pages 3, 4, and 5.

17       THE WITNESS:  Yes, sir.

18       THE COURT:  She's now given me the entry for February

19  1st, 2008 on page 5; what were the other conversations?

20       THE WITNESS:  Also on page 5, just above the entry on

21  February 1st, 2008, there was one on February 8th, 2008 as made

22  by Kashei Butler (ph.).  That one states that she spoke with

23  borrower 1 and advised that the total amount due, credit

24  reporting, late charges.  And the borrower stated the reason

25  for default is that she has her own business and it's really

RESIDENTIAL CAPITAL, LLC, ET AL.                    116

1    slow and she can't make a payment until March 13th.  So she was

2    advised to make -- to call back when she was able to make that

3    payment.

4          The next conversation that's notated is on February

5    11th, 2008 which is also on page 5, just above the conversation

6    we just reviewed.  That one states that the claimant spoke with

7    Jaquine Martelli (ph.), and the summary of those notes state --

8          THE COURT:  "TT" is telephone?

9          THE WITNESS:  Talked to.

10         THE COURT:  Talked to, and "B1" is the borrower?

11         THE WITNESS:  Yes, sir.  And the "VI" stands for

12    "Verified Information" which would have been the contact

13    information on the account.

14         She was advised of total amount due.  Said, "I can't

15    make any payments until March 15th and can't make partial

16    payments."  Advised to call back as soon as funds are available

17    and again, it states the RFD.  The one listed here is due to

18    loss of income and she's alone paying the mortgage, no savings,

19    and she was advised again of potential late charges, credit

20    reporting that could occur, and calls and letters that could be

21    made.  There are a few more phone calls.  You want me to

22    continue?

23         THE COURT:  Yes.

24         THE WITNESS:  Okay.  The next one, actually, goes

25    between page 4 and page 5.  It occurred on February 13th, 2008

1   as made by Jessica Andopar (ph.), I believe, is how you

2   pronounce it.  Once again, it says, "Talked to borrower 1.

3   Verified information.  Advised of total amount due, late fees,

4   credit reporting.  Borrower stated that she has been receiving

5   several phone" -- it says "phones"; I'm sure it means phone

6   calls -- "from us and is tired of repeating herself."  So it

7   looks like she was given the same information over and over

8   again.

9        Her reason for default listed was "self-employed as

10  having a problem with business for about a year now."  She

11  stated she's "not able to make any payments at this time" and

12  that was the end of that phone conversation.

13       MS. NORA:  Objection.  Foundation to anything more

14  than that these are what the records are noted as saying; not

15  that she's a witness to these conversations or that these are

16  even accurate records.  Again, won't object every minute

17  because the Court asked, but --

18       THE COURT:  The business records are admitted in

19  evidence.  The statements recorded that include what Ms. Smith

20  said to whoever called her is admissible under 801 -- Rule

21  801(d), statements that are not hearsay; 801(d)(2), an opposing

22  party statement.

23       The statement is offered against an opposing party,

24  and even so, being in was made by the party in the individual

25  representative capacity.  So to the extent that the business

1   record records statements made by Ms. Smith, they are made

2   admissible -- they're not inadmissible as hearsay because of

3   Rule 801(d)(2)(A).

4           Go ahead, Mr. Wishnew.

5           MR. WISHNEW:  Thank you, Your Honor.

6           THE WITNESS:  Would you like me to finish giving you

7   those calls, sir?

8           THE COURT:  Yes.  That would be helpful if you would.

9           THE WITNESS:  Okay.  The next one is on page 4;

10  probably about ten lines down from the top of the page is where

11  it starts on February 22nd, 2008.  It states, "Called borrower

12  1.  Verified information.  Advised letters, calls, late

13  charges, and credit reporting could continue.  Borrower 1

14  refused funds" which would have been a way of her saying refuse

15  making payments -- but wants to stay there in the home.

16  "Advised to call back when has funds" -- or have funds.  And

17  the reason for default listed was just poor investments."  I

18  don't know beyond that.  Looks like that was made with Amanda

19  Lincoln (ph.) was the associate.

20          Later that same day, in a conversation listed right

21  above on the same page, page 4, on February 22nd, 2008, it

22  looks like the claimant spoke with Daniel Ebit (ph.), I believe

23  is how you say it.  And it states, "Talked to borrower 1.

24  Verified information.  Advised months owing.  Called in

25  regarding arrangement.  Wanted to have reduction.  Advised late

1    charges, credit reporting, and offered a payment over the phone

2    within five days and by end of month."  And customer stated,

3    "Funds will be available on March 15th."  And she was advised

4    to call back.

5          The reason for default listed was "Poor investment.

6    Mother who was helping her pay mortgage moved out", and she was

7    advised of collection calls and letters according to the notes.

8          THE COURT:  All right.

9    BY MR. WISHNEW:

10   Q.  On page 3, was there another --

11   A.  Yep.  It looks like there is a final conversation that

12   took place on March 10th, 2008, about a third of the way down

13   the page or so, with Barbara Jones (ph.), and those notes just

14   read, "Talked to borrower 1.  Verified information.  Reason for

15   default, borrower 1 made foreign investments in stock market;

16   lost money.  In December, lost clientele.  Declining ongoing

17   since September 6000."  I don't know exactly what that's

18   referring to.

19        "In 2007, Mom was living with her and she relocated in

20   October.  Took financials negative.  Was able to set up her

21   payment plan and took CSI" -- would have referred to our pay-

22   by-phone system -- "for down and verified bank info given and

23   confirmation number."

24   Q.  Thank you very much.  In addition to speaking with the

25   borrower over the phone, was it Homecomings' practice --

RESIDENTIAL CAPITAL, LLC, ET AL.                    120

1          MS. NORA:  Objection to form.

2          THE COURT:  Could you wait until he asks his question?

3          MS. NORA:  Thank you, Your Honor.

4          THE COURT:  Go ahead, Mr. Wishnew.

5          MR. WISHNEW:  Thank you, Your Honor.

6  Q.  Ms. Lathrop, were there other means by which Homecomings

7  communicated with the borrower?

8  A.  There -- I believe there was an option to avoid

9  foreclosure letter and a breach of contract letter mailed.

10  Q.  Okay.  May I ask you to look at Exhibit BT-E?

11  A.  Yes, sir.

12  Q.  Do you recognize this document?

13  A.  Yes, sir.

14  Q.  Can you describe this document?

15  A.  This would have been an option to avoid foreclosure letter

16  that was mailed in February of 2008.

17  Q.  Okay.  And mailed by whom?

18  A.  I believe it was Homecomings Financial.

19  Q.  Okay.  And was this letter maintained in Homecomings

20  Financial's business records?

21  A.  Yes.  This is actually pulled from our XNet system.

22  Q.  Okay.  And this would be a record maintained in the

23  ordinary course of Homecomings' business?

24  A.  Yes.

25          MS. NORA:  Objection.  Leading.

1          THE COURT:  Overruled.

2    Q.  And is the mailing of this letter reflected in the

3    servicing notes?

4    A.  I believe it is.  I think I saw it when I was going

5    through.

6    Q.  Would you mind pointing the Court to the entry within the

7    servicing notes?

8    A.  Just one moment to find it.  On page 5 of 15 in the

9    servicing notes, it's about five lines down from the top of the

10   page on February 12th, 2008, it shows an options to avoid

11   foreclosure letter as being sent.

12   Q.  Thank you very much.

13          If I could ask you to turn --

14          MR. WISHNEW:  Your Honor, I'd like to move Exhibit BT-

15   E into evidence.

16          THE COURT:  Exhibit BT-E is in evidence.

17          MR. WISHNEW:  Thank you.

18   (Avoid foreclosure letter 2/12/08 was hereby received into

19   evidence as Borrowers Trust's Exhibit BT-E, as of this date.)

20   Q.  Ms. Lathrop, if I could ask you to turn to Exhibit BT-F.

21   A.  Yes.

22   Q.  Do you recognize this document?

23   A.  Yes, I do.

24   Q.  And what is this document?

25   A.  This was a breach of contract letter dated March 3rd,

RESIDENTIAL CAPITAL, LLC, ET AL.                    122

1    2008.

2    Q.  Okay.  And was this document maintained in Homecomings'

3    business records?

4    A.  Yes, this was also in the XNet system.

5    Q.  Okay.  And is this a type of -- is this a letter that

6    would have been maintained in the ordinary course of

7    Homecomings' business?

8    A.  Yes, sir.

9    Q.  Okay.  And is the mailing of this letter reflected in

10   Homecomings' servicing notes?

11   A.  I believe I saw it when I was going through the phone

12   conversations.  Just give me a moment and I can tell you where.

13       On the top of page 4, first line on March 4th, 2008, it

14   shows "Breach letter."

15   Q.  Thank you, very much.

16           MR. WISHNEW:  Your Honor, I'd like to move Exhibit BT-

17   F into evidence.

18           MS. NORA:  Objection.  No foundation.

19           THE COURT:  Overruled.  BT-F is in evidence.

20   (Breach of contract letter 3/3/08 was hereby received into

21   evidence as Borrower Trust's Exhibit BT-F, as of this date.)

22   Q.  Ms. Lathrop, do the servicing notes reflect --

23           MR. WISHNEW:  Strike that.

24   Q.  Ms. Lathrop, if a foreclosure proceeding were commenced

25   against -- were commenced by a debtor against a borrower, would

RESIDENTIAL CAPITAL, LLC, ET AL.                              123

1   that be reflected in the servicing notes?

2   A.  Yes, it would.  There would have been a notation in the

3   notes if foreclosure had become activated.

4   Q.  Okay.  And do the servicing notes from Ms. Smith's loan

5   indicate that a foreclosure proceeding was ever initiated

6   against Ms. Smith while her loan was being serviced by

7   Homecomings?

8   A.  I don't show anything reflecting foreclosure action.

9   Q.  Okay.  Ms. Smith has testified today that she was

10  purportedly instructed by a Homecomings' employee to skip three

11  monthly payments.  Is there anything in the servicing notes

12  reflecting a Homecomings' employee instructing Ms. Smith to

13  skip three monthly payments?

14  A.  Let me just double-check the notes to make sure I didn't

15  miss anything.

16  Q.  Sure.

17     (Pause)

18  A.  I don't see anything noted, no.

19  Q.  Okay.  Prior to -- were there any entries in the servicing

20  notes to indicate that Ms. Smith spoke to a representative of

21  the debtors in October, November, or December 2007?

22  A.  One more second.  There was a conversation notated on page

23  7 of 15 about -- it starts about six or seven lines down from

24  the top of the page on December 31st, 2007.  It looks like

25  borrower states, "Borrower 1 called in and made a payment

1    through the Web site that day in the amount of $1,918.17."

2    That looks like that was the entirety of the phone call.

3    Q.  I thought our question dealt with October, November,

4    December.  If I could ask the same question concerning

5    September; is there any record of conversations between

6    Homecomings and Ms. Smith in September of 2007?

7    A.  September?  One second.

8        I don't see phone conversations for the month of

9    September, no.

10   Q.  Thank you very much.  You testified earlier that you

11   previously worked in the call center --

12   A.  Yes, sir.

13   Q.  -- for the debtors.  And so during your employment, did

14   you ever talk to customers that were experiencing financial

15   difficulties and close to defaulting on their loans?

16          MS. NORA:  May I object to the form of plural debtors?

17   Which debtor?

18          THE COURT:  Sustained.  Rephrase.

19   Q.  Ms. Lathrop, with which debtors -- of which of the ResCap

20   debtors were you previously employed?

21   A.  I was employed under GMAC Mortgage.

22   Q.  And during your employment with GMAC Mortgage, did you

23   ever talk to customers that were experiencing financial

24   difficulties and close to defaulting on their loan?

25   A.  That was a daily thing, yes.

1  Q.  Okay.  In those situations, was it the practice to offer a

2  loan modification if a borrower was current on their mortgage?

3  A.  No, sir.

4  Q.  Okay.  Why not?

5  A.  A modification is a means to -- is a foreclosure

6  alternative.  So if the account is in threat of going to

7  foreclosure, meaning it's delinquent and it could resume

8  foreclosure activity or be referred to it, then a modification

9  would be offered or brought up as an option to a borrower.

10  Q.  Okay.  Is there anything -- earlier we were referring to

11  the GMAC-RFC Servicing Guide; is there anything in that

12  servicing guide to support your prior statement?

13  A.  I'd have to look at the guide.

14  Q.  All right.  If you look at the black binder, volume 2 of

15  3, Exhibit 3 in that binder.

16  A.  One second.  Sorry; I'm getting caught up.  Okay.  One

17  second.

18      I'm going to be honest; I'm not familiar with where

19  everything is located in this guide.  It looks like it's quite

20  expansive.

21  Q.  If I could ask you to look at page 109, which is marked in

22  the bottom right-hand corner, it's Bates stamped BT000430.

23  A.  Okay.  Yes, I see Section -- or sorry, page 109.

24  Q.  Okay.  Does Section 434 address my question?

25  A.  Give me one second to read it.

1      I believe it explains -- well, can I just read it --

2   Q.  Yes, of course.

3   A.  -- if you need me to explain it, I can.  The second

4   sentence of Section -- under 434, Loss Mitigation Workouts on

5   page 109 --

6   Q.  Um-hum.

7   A.  -- second sentence begins, "If the servicer's evaluation

8   of the individual circumstances of the borrower reveals that it

9   is unlikely the loan can be brought current, the servicer must

10  aggressively pursue a workout option as an alternative to

11  foreclosure, that the servicer is determined that the

12  collection efforts have failed and all appropriate relief

13  measures have been taken, that one of the following options may

14  be selected."  So it could be "a short sale, deed in lieu, loan

15  modifications, write-off, or note of sale."

16  Q.  All right.  So loss mitigation occurred when the loan was

17  not current?

18  A.  Correct.

19  Q.  Okay.

20      THE COURT:  Before you go on, back in the servicing

21  notes, on page 7 of 15, you referred to the entry for December

22  31, 2007 --

23      THE WITNESS:  Yes, sir.

24      THE COURT:  -- that a payment being made via the Web

25  site today.  Do you know for what month that payment was made?

RESIDENTIAL CAPITAL, LLC, ET AL.                    127

1          THE WITNESS:  Give me one moment to look at the

2    history.

3          THE COURT:  Sure.

4          THE WITNESS:  On page 1 of the servicing notes and

5    payment history, the fourth line from the bottom of the page

6    shows that that payment of $1,918.87 posted, and under the

7    third column labeled as "date interest payment current", it

8    shows that it was paid toward the December 1st, 2007 payment.

9          THE COURT:  So was that payment late?

10         THE WITNESS:  Since it was received within the month

11   due, it still would have been deemed as a current account

12   because they had not yet fallen thirty days delinquent to the

13   next month.

14         THE COURT:  All right.  Thank you.

15   BY MR. WISHNEW:

16   Q.  Ms. Lathrop, when you were working at the call center, did

17   you ever advise a borrower to purposely default on their loan?

18         MS. NORA:  Objection.  Irrelevant.

19         THE COURT:  Overruled.

20   A.  No, I never would have advised a -- I don't recall ever

21   advising a borrower to fall behind.

22   Q.  Okay.

23         THE COURT:  Is there a policy that how many months

24   behind a borrower had to be before they would be considered for

25   a loan modification?

RESIDENTIAL CAPITAL, LLC, ET AL.                    128

1        THE WITNESS:  That honestly would have been all

2   dependent on who the investor of the loan was and what their

3   policy was at that time, because investors seem to always be

4   updating what their modification guidelines were.

5        THE COURT:  Do you know who the investor for this loan

6   was in November, December, January, February, March --

7   November, December of 2007, January, February, March 2008?

8        THE WITNESS:  I believe it was RFC or one of the

9   divisions under RFC, because on page 1 of the servicing guide,

10  under "investor info", it lists Residential Funding Corp.

11       THE COURT:  And did RFC have a policy about how far --

12  how many months in default a borrower had to be before they

13  could be considered for a loan modification?

14       THE WITNESS:  Yeah, they would have, but I can't

15  recall the specific number of months.

16       THE COURT:  There was a policy?

17       THE WITNESS:  There would have been, yes.

18       THE COURT:  Go ahead, Mr. Wishnew.

19       MR. WISHNEW:  Okay.

20  BY MR. WISHNEW:

21  Q.  Turning back to the servicing guide for a moment, can you

22  explain why it says, "GMAC-RFC" and not Homecomings?

23  A.  GMAC-RFC would have been the name of the master servicer.

24  Q.  Um-hum.

25  A.  Homecomings was a subservicer.

RESIDENTIAL CAPITAL, LLC, ET AL.                          129

 1  Q.  Okay.  So Homecomings subserviced, RFC master serviced?

 2  A.  Underneath that umbrella, yes.

 3  Q.  Okay.  And at a certain point in 2007, did GMAC -- to the

 4  best of your knowledge, did GMAC Mortgage and Homecomings

 5  merge?

 6  A.  I believe the merger occurred that year or began that

 7  year, yes.

 8  Q.  Okay.  And was the subservicing of loans that Homecomings

 9  serviced transferred at that point in time?

10  A.  Can you -- can you repeat the question?  I don't know if I

11  understood it.

12  Q.  Notwithstanding a merger between GMAC Mortgage and

13  Homecomings, did Homecomings continue to service -- subservice

14  these loans?

15  A.  My recollection of that time was GMAC bought out

16  Homecomings Financial --

17  Q.  Um-hum.

18  A.  -- and with that, brought in its portfolio.

19  Q.  Um-hum.

20  A.  But all of the loans under that portfolio did not merge

21  under the GMAC umbrella, or the GMAC name completely until, I

22  believe, 2009.  So some of them still would have been under the

23  heading of Homecomings Financial, but were actually being

24  serviced, I guess you could say, by GMAC because of the merger

25  being completed.

RESIDENTIAL CAPITAL, LLC, ET AL.                    130

1   Q.  Okay.  But with regards to Ms. Smith's loan, was it always

2   merg -- was it -- to the best of your knowledge, was it always

3   being subserviced by Homecomings up until the servicing was

4   transferred to Aurora?

5          MS. NORA:  Objection.  Leading and foundation.

6          THE COURT:  Overruled.

7   A.  I believe yes, it was always handled by Homecomings under

8   that umbrella, because we don't show any kind of a transfer

9   letter letting her know that it was being moved over to the

10  GMAC umbrella.

11         THE COURT:  You're basing it on the loan servicing?

12         THE WITNESS:  On the servicing notes; the absence of

13  that.

14  Q.  And so if there was a --

15         THE COURT:  The absence of it.  You believe there

16  would be an entry in the loan servicing notes --

17         THE WITNESS:  Showing that there was a letter sent to

18  her informing her of GMAC taking it over, yes.  I apologize for

19  not being clear.

20         THE COURT:  Can I ask you how much longer you have on

21  direct?

22         MR. WISHNEW:  Maybe five or ten minutes, Your Honor.

23  I'm willing to stop now.

24         THE COURT:  Yes.  We'll resume at 1:30.  You can

25  complete your direct and Ms. Nora, you should be prepared

RESIDENTIAL CAPITAL, LLC, ET AL.                    131

1   promptly to commence your cross-examination.

2          MS. NORA:  With enthusiasm, Your Honor.  Thank you.

3          THE COURT:  I'm sorry?

4          MS. NORA:  With enthusiasm.  Thank you, Your Honor.

5          THE COURT:  Yes.  And just so -- Ms. Nora, you've used

6   two hours and forty minutes -- forty-one minutes of your three

7   hours of allotted time, just so you have track of how much time

8   you have left.  We're going to take a ten-minute recess and --

9          MR. WISHNEW:  I can put our stuff --

10         THE COURT:  I'm sorry?

11         MR. WISHNEW:  I can just put our stuff over there,

12  Your Honor, if you --

13         THE COURT:  I think you can leave your -- just close

14  out -- cover over any sensitive notes you have.  Otherwise, you

15  can leave your papers on the counsel table, okay?

16         MR. WISHNEW:  Thank you, Your Honor.

17         THE COURT:  All right.

18      (Recess from 12:27 p.m. until 1:30 p.m.)

19         THE COURT:  Please be seated.

20         All right.  Ms. Lathrop, you know you're still under

21  oath.

22         Go ahead, Mr. Wishnew.

23         MR. WISHNEW:  Thank you, Your Honor.

24  CONTINUED DIRECT EXAMINATION

25  BY MR. WISHNEW:

RESIDENTIAL CAPITAL, LLC, ET AL.                    132

1  Q.  Good afternoon, Ms. Lathrop.

2  A.  Hello.

3  Q.  Prior to the break, we discussed -- or you had noted

4  multiple conversations between Homecomings and Ms. Smith.  If I

5  could --

6          MS. NORA:  Objection to form.

7          THE COURT:  He didn't ask a question yet.  I don't

8  know where you practice law, Ms. Nora.

9          Ask your question.

10          MR. WISHNEW:  Thank you, Your Honor.

11  Q.  Was there a discussion between the debtors -- between

12  Homecomings and Ms. Smith on March 10th, 2008?

13          MS. NORA:  Objection to form.

14          THE COURT:  Overruled.

15  A.  Yes, on page 3 of the servicing notes, there's a

16  conversation on March 10th, 2008 with Barbara Jones.

17  Q.  And what was the subject of that conversation?

18          MS. NORA:  Objection to form.

19          THE COURT:  Overruled.

20  A.  The summary that's noted in the servicing notes states

21  that they discussed the reason for default, where she stated

22  made several -- sorry, made foreign investments in stock

23  market, lost money in December, lost clientele, declining

24  ongoing since September, 6000 (sic).  2007, Mom was living with

25  her and she relocated in October, and financial information was

1   taken.  It looks like it was negative since it shows NEG after

2   that.  I was able to set up her payment plan and took CSI for

3   down, which would have been a payment over the phone.

4   Q.  And so when you say was able to set up repayment plan, are

5   you refereeing to the line where it says -- it's a Barbara

6   Jones entry where it says "RPP", does that mean repayment plan?

7   A.  Yeah.  It's the -- I think the fourth line -- or the

8   second line from the bottom of that conversation.

9   Q.  Okay.

10          THE COURT:  Is RPP a repayment plan?

11          THE WITNESS:  Yes, sir.

12  Q.  Do the servicing notes or the payment history indicate

13  whether Ms. Smith made any payments under the repayment plan?

14  A.  Give me a second to look at the payment history.

15  Q.  Thank you.

16  A.  It looks like on page 1 of the payment history -- in

17  servicing notes, excuse me, on March 17th, 2008, it shows a

18  payment of $2,062.78 was received.

19  Q.  Okay.

20  A.  There is also a note on page 2 --

21  Q.  Um-hum.

22  A.  -- of 15 on the servicing notes --

23  Q.  Um-hum.

24  A.  -- that shows a pay-by-phone letter was mailed out on

25  March 18th, it's the third line from the bottom --

RESIDENTIAL CAPITAL, LLC, ET AL.                    134

1  Q.  Um-hum.

2  A.  -- and those letters would have been mailed out whenever a

3  payment off the phone was made by a customer, or on behalf of

4  the loan.

5  Q.  Okay.  And --

6          THE COURT:  Is there a written repayment plan?

7          THE WITNESS:  I honestly don't show record as far as

8  the actual letter or a copy of the plan.  When I look through

9  the notes, all I see is on page 3 of 15, on March 10th, 2008,

10  there's a note that says, "On-line repayment schedule", and

11  above that shows an OL, an on-line letter, middle of the page.

12          THE COURT:  Wait a minute, let me -- let me just --

13  tell me again where that is.

14          THE WITNESS:  Page 3 of 15, middle of the page dated

15  March 10th.  It says, "On-line repayment schedule" --

16          THE COURT:  Yes.

17          THE WITNESS:  -- under Barbara Jones.  Then right

18  above it shows OL, which would stand for on-line letter

19  repayment arrangements, which would have been a repayment

20  letter that was mailed regarding those arrangements.  However,

21  I could not locate a copy of that.

22  Q.  And servicing of this loan was --

23          MR. WISHNEW:  Strike that.

24  Q.  To the best of your knowledge, when was servicing of this

25  loan transferred out of Homecomings?

RESIDENTIAL CAPITAL, LLC, ET AL.                    135

1   A.  According to the payment history, it shows service release

2   on page 1 of 15 --

3   Q.  Um-hum.

4   A.  -- dated April 1st, 2008, which would have shown those

5   funds being reversed off of the Homecomings' files and moved on

6   to the new invest -- the new servicer, excuse me.

7           MR. WISHNEW:  Thank you very much, Ms. Lathrop.

8           I have no further questions, Your Honor.

9           THE COURT:  Did you search the computer records to see

10  if there was a repayment schedule -- written repayment

11  schedule?

12          THE WITNESS:  I looked through what we had available,

13  and I could not find the copy of the plan or of the letter.

14          THE COURT:  Okay, all right.  Cross-examination.

15          MS. NORA:  Thank you, You Honor.  Ms. Smith asked me

16  to clarify that cross-examination takes place in the objector's

17  case, and is not counted against the time for her.

18          THE COURT:  Of course it is; you get -- I made crystal

19  clear you had three hours -- it's a total of six hours for the

20  trial.  Mr. Wishnew has used less than his time; you have

21  twenty-four minutes left.  Of course, I made clear that the

22  time allocation is for all aspects of the trial.  Ask your

23  questions, let's go.

24          MS. NORA:  Thank you, Your Honor.

25  CROSS-EXAMINATION

RESIDENTIAL CAPITAL, LLC, ET AL.                          136

1   BY MS. NORA:

2   Q.  Could you please look in the first gray binder, Ms.

3   Lathrop, at Exhibit 1-B?

4   A.  Okay.

5   Q.  I'm sorry, I misspoke, Exhibit 2-B.  That's probably in

6   the second binder, sorry.

7   A.  One second.  Okay.

8   Q.  Could you look at Exhibit 2-B, please.

9   A.  Yes.

10  Q.  Are you familiar with that document?

11  A.  I believe it's the response to interrogatories.

12  Q.  Yes.  Could you go to the last page, or second to last

13  page, of Exhibit 2-B?

14  A.  Yes, ma'am.

15  Q.  Is that your signature?

16  A.  Yes, ma'am.

17  Q.  And you signed that under penalty of perjury, or under

18  oath, according to the law?

19  A.  Yes, ma'am.

20  Q.  All right.  Could you please look at interrogatory number

21  15?  I believe it's on page 12; I'm just guessing because I

22  don't have a hard copy of the binders.

23  A.  I have page 10.

24  Q.  10, okay.  Do you see your response to interrogatory

25  number 15, that the party that was the owner of the mortgage

1    loan during the time that Homecomings -- these interrogatories

2    were directed to Homecomings -- was servicing the loan was

3    DBCTA, as trustee of the RALI Trust.

4    A.  Yes, that's what it states.

5    Q.  Did you review any books and records of Homecomings in

6    making that statement?

7    A.  I would have reviewed the endorsed promissory note.  I

8    really would try to see if there were any other documents, but

9    the most clear and concise one we could locate was our

10   promissory note.

11   Q.  Okay.  How does your statement at interrogatory 15, under

12   oath, compare to your statement under oath earlier today, where

13   you indicated that the servicing notes show that the investor

14   in Ms. Smith's loan was RFC?  And that would be --

15   A.  That was when I --

16   Q.  -- Borrower Trust Exhibit B -- BT-B.

17   A.  Can you repeat the question just one more time please?

18   Q.  Okay.  How does your response to interrogatory 15 compare

19   with your statement here today that RFC was the investor in the

20   loan, according to the servicing notes which is Borrower Trust

21   Exhibit B?

22   A.  According to the investor name that we have listed on file

23   within the servicing record, it would have been called

24   ResCap -- Res -- I apologize, ResCap Res -- I can't talk --

25   ResCap -- not ResCap -- Residential Funding Corp.  That

1   explains why that sentence didn't make sense.  However, if you

2   look under the investor number of 90615, the line right above

3   that, that would have shown what portion underneath -- which I

4   don't have those numbers memorized; I couldn't answer which

5   trustee that would have been under based on what I had in front

6   of me for the servicing information.

7   Q.  Okay.  So isn't it a fact that you did not rely on the

8   servicing notes to determine who the investor or owner of Ms.

9   Smith's collateral documents was when you answered the

10  interrogatories?

11       MR. WISHNEW:  Objection, Your Honor.

12       THE COURT:  Overruled.

13  A.  Correct.

14  Q.  Okay.  So do you often look for information outside of the

15  servicing notes to determine matters such as who the investor

16  is, and who the servicers are?  I mean, is there other

17  information elsewhere that you go to for these -- those kind of

18  questions?

19  A.  Yes.

20  Q.  Okay.  And what is not in the servicing notes that were

21  introduced as Borrower Trust Exhibit B -- what else did you

22  review in terms of preparing for your testimony today?

23  A.  What portion?

24  Q.  Any portion.

25  A.  I would have reviewed any documents that we had available

RESIDENTIAL CAPITAL, LLC, ET AL.                    139

1   in regard to correspondence received from or sent to the

2   servicing origination documents, and then the servicing notes

3   and payment history.

4   Q.  Okay.  So you don't know from the servicing notes who the

5   owner of the Smith collateral documents was during the time

6   that the servicing was being handled by what you've identified

7   as Homecomings, correct?

8          MR. WISHNEW:  Objection, Your Honor.

9          THE COURT:  Overruled.

10  A.  I couldn't answer specifically what portion of Residential

11  Trustee handled it, no.  I would have to go further in to get

12  the specifics.

13  Q.  What is Residential Trustee?

14  A.  I didn't mean Residential Trustee.  Residential Funding

15  Corp. would have had multiple different trustees under it,

16  which is why we would have to pull it off of a different

17  document.

18  Q.  Okay.  And what do you mean by a Residential Funding

19  Corporation or Company has trustees under it, what does that

20  mean?

21  A.  There would have been several different -- it's getting

22  very -- let me think of a good way of saying it.

23  Q.  If you know.

24  A.  I'm trying to think of a way to make sense of it for you.

25  It would have been just based on which trustee was being

1  handled.  The best way I can explain it is based off the

2  endorsements that were on the promissory note, which would have

3  been a trustee underneath Residential Funding Corp.  Beyond

4  that I wouldn't have been able to decipher, beyond my

5  endorsements, and who it was.  But I really can't give you a

6  further explanation.

7  Q.  Now, where do you find the endorsed copies of the

8  promissory notes in your records?

9  A.  I believe we actually had to take that from what was

10  submit (sic) by your evidence, ma'am.

11  Q.  So you got that information from Ms. Smith?

12  A.  I believe we did get that file from Ms. Smith, because we

13  just had the originator's copy.

14  Q.  Okay.  Now, directing your attention to Borrower Trustee

15  Exhibit B, where on that exhibit does it show who the

16  subservicer was from who was making these notes into the

17  record?

18  A.  You mean the name?

19  Q.  Yes.

20  A.  I don't show a name, ma'am.

21  Q.  Okay.  So it could be Homecomings, it could be GMAC

22  Mortgage, it could be Aurora?

23  A.  No, it could not be Aurora.

24  Q.  Okay.  Please explain how it could be Homecomings, since

25  there's no notation of any identity of a subservicer on the

RESIDENTIAL CAPITAL, LLC, ET AL.                    141

1   servicing notes?

2   A.   Since GMAC and Homecomings merged in 2007, all of those

3   records would have been available to GMAC.  But only those that

4   would have been submit under Homecomings or GMAC Mortgage, as

5   they were now essentially one company after the merger.

6   Q.   Okay.  So how do you know that these servicing records

7   were maintained by Homecomings?

8   A.   Because they were entered into Homecomings service of

9   record through Fiserv, and then pulled out through

10   BusinessObjects, where they were archived.

11   Q.   Where does it say that on this printout?

12   A.   It doesn't say that on the printout.

13   Q.   How do you know that?

14   A.   Because I honestly can't remember if it was me or my

15   counterpart who pulled these through our BusinessObjects

16   system, but I know the only way that we're able to access those

17   is through the method I just described.  We don't have another

18   form available, or another application available to get this

19   information.

20   Q.   So either you or someone you worked with printed out this

21   data?

22   A.   Yes, from our BusinessObjects system.

23   Q.   And what is the name of that person?

24   A.   Her name is Cindy.

25   Q.   Does she have a last name?

RESIDENTIAL CAPITAL, LLC, ET AL.                          142

1    A.  Oh, I apolo -- Cindy Stewart (ph.).

2    Q.  Okay.  And does she work in the offices in Waterloo?

3    A.  No, ma'am.

4    Q.  Where does she work?

5    A.  She worked in Pennsylvania; I couldn't tell you her

6    specific location because she worked from the Pennsylvania

7    office there.  I believe it was near Philadelphia, but I can't

8    give you a specific --

9    Q.  Are you talking about Fort Washington, Pennsylvania?

10   A.  I don't know if she worked there, or if she worked from

11   home.  I can't answer her specific whereabouts, I didn't ask.

12   Q.  Okay.  But who does she work for?

13   A.  At the time that these were pulled, it would have been for

14   the Borrower Claims Trust.

15   Q.  Who signs your paychecks?

16          MR. WISHNEW:  Objection, Your Honor.

17          THE COURT:  Overruled.

18   A.  The Borrower Claims Trust.

19   Q.  And so you get hard copy of checks, and it's signed by the

20   Borrower Claims Trust?

21   A.  Yes, ma'am.

22   Q.  Okay.  And what is the address of the Borrower Claims

23   Trust in Waterloo?

24   A.  I don't believe there's -- there's one located in

25   Waterloo; I don't know their address, ma'am, off the top of my

1   head.

2   Q.  So where do you physically work?

3   A.  From my home, ma'am.

4   Q.  You work entirely from home?

5   A.  Yes, ma'am.

6   Q.  Entirely remotely?

7   A.  Yes, ma'am.

8   Q.  You --

9   A.  Unless I get called in for something like this.

10  Q.  And have you -- oh, so you get called into courts, but not

11  into an office?

12  A.  Yes, ma'am.

13  Q.  Okay.  So how do we know that this document that's

14  Borrower Claims Trust Exhibit B, how do we know that that was

15  not created entirely by GMAC Mortgage?

16  A.  I don't know how to answer that question, ma'am.  I know

17  how the records are pulled, and I know what system is used.

18  Other than telling you how it's done, I really don't know how I

19  can prove it to you, ma'am.

20  Q.  Okay.  But, no, I just want to know if there's anything on

21  here that will tell me that -- as I look at it, as I look at

22  this exhibit that you have introduced, saying that this is a

23  reliable data printout for Homecomings, how I could tell that

24  GMAC Mortgage didn't do this?

25  A.  The only thing that I can point to is that it has all the

1    specific account information at the bottom of each page, it

2    labels it as ResCap history purged, to show that it was purged

3    information, meaning that it was no longer available on a

4    system, and it was archived.

5    Q.  And how does that relate to whether it's Homecomings or

6    GMAC's data -- GMAC Mortgage, excuse me; there are lots of

7    GMACs, but GMAC Mortgage?

8    A.  I don't know if I fully understand the question to answer

9    it, I'm sorry.

10   Q.  How can I identify this exhibit as having been created by

11   Homecomings?

12   A.  Homecomings didn't exist after 2009, so I don't -- I

13   pulled the information, or me or Cindy pulled the information

14   in 2014, so I can't really answer that question specifically,

15   I'm sorry.  It would have been pulled out of the archived data,

16   that's really all I can -- I can answer that with.  I can tell

17   you what system, I can tell you the methods we're pulling

18   through the system, I can't tell you anything beyond.

19   Q.  But you can't tell me even that you did this; it could

20   have been you or Cindy?

21   A.  Yes, ma'am, I didn't double-check to see which one of us

22   pulled this information.

23   Q.  And ResCap history purged is the only identifying feature

24   of this data printout that would associate it with having been

25   part of the records of either Homecomings or GMAC Mortgage?

RESIDENTIAL CAPITAL, LLC, ET AL.                    145

1    A.   That I can see, yes.

2    Q.   Okay.  When did Homecomings, according to your records or

3    any other form of knowledge upon which you would base your

4    answer, when did Homecomings begin servicing the collateral

5    documents in Ms. Smith's case?

6    A.   I don't know if I understand -- do you mean, when did they

7    begin servicing the loan or --

8          THE COURT:  We don't understand your question; ask

9    another question.

10         MS. NORA:  Okay.

11   Q.   When did Homecomings begin servicing Ms. Smith's loan?

12   A.   I would have to double-check when the transfer took place.

13   I believe it was in 2007, but I can't recall.

14         THE COURT:  Why don't you look?

15   A.   My notes only go back to May, because we only have seven

16   years of notes available.  But I don't recall if we submit a

17   welcome letter of any kind, to be honest.

18   Q.   So the notes that have been converted into a printout only

19   go back to May of --

20   A.   2007.

21   Q.   -- 2007, why?

22   A.   Because data was only housed for about seven years, as far

23   as the printouts and the payment history and servicing notes

24   go.

25   Q.   So if there were payments made before May of 2007, you

RESIDENTIAL CAPITAL, LLC, ET AL.                    146

1   would not have access to that data seven years later?

2   A.  Not through this file, no, ma'am.

3   Q.  What protections are in place to make sure that data in

4   this computer network is not altered?

5   A.  It's within the BusinessObjects system; it's a read-only

6   option.  I don't have an option to modify or adjust any

7   information in that.

8   Q.  That's for printout, but what about for data entry?

9   A.  I don't have an option for data entry; that was closed

10  out -- I can't even recall.  And as far as BusinessObjects

11  goes, it literally pulls from the Fiserv system, it doesn't

12  allow you to modify anything once it's been input into the

13  BusinessObjects system.  It's literally just for archiving.

14  Q.  Sure.  But I'm talking about when the people who are

15  supposedly talking to my client -- and she denies that she got

16  these phone calls --

17  A.  Okay.

18  Q.  -- what was in place in 2008 that would prevent

19  modifications from being made to those data points of entry?

20          MR. WISHNEW:  Objection, Your Honor, asked and

21  answered.

22          THE COURT:  Overruled.

23  A.  Sorry, can you ask it one more time?  I'm trying to figure

24  out what piece you're talking about.

25  Q.  What system was in place to prevent anyone from altering

RESIDENTIAL CAPITAL, LLC, ET AL.                    147

1    the data at any point before the system was closed out; what

2    protocol was in place?

3    A.   There was a quality assurance team in place that had view

4    of the screen recording phone calls, and would have viewed to

5    see and make sure that agents were recording accounts and

6    conversations that took place accurately and completely, and

7    that they weren't falsifying anything in that regard.

8    Q.   And so that was compared to the actual data entry in real

9    time?

10   A.   Yes.  I actually worked on the quality team in 2008.

11   Q.   And was that spot-checked?  It wasn't like every single

12   entry, it was just --

13   A.   No, it was a portion.

14   Q.   Okay.  So who's Barbara Jones?

15   A.   She would have been an associate.

16   Q.   Do you know Barbara Jones?

17   A.   I don't recall.

18   Q.   Do you know Jaquine Martelli?

19   A.   I don't believe so; I can't answer for any of the

20   associates listed in here, if I know them by name.

21   Q.   You don't know any of them, you don't know the quality of

22   their work?

23   A.   No, ma'am.

24   Q.   Or even whether they were employed by Homecomings or GMAC

25   Mortgage?

RESIDENTIAL CAPITAL, LLC, ET AL.                    148

1   A.   I can answer for Tammy Moyer, she worked in my office, and

2   she was a very good agent.

3   Q.   Okay.  And who did she work for?

4   A.   She worked for GMAC Mortgage.

5   Q.   Okay.  So why would GMAC Mortgage be making the alleged

6   phone calls on behalf of Homecomings in 2008?

7   A.   At that point, GMAC Mortgage and Homecomings had merged,

8   so they just hadn't moved all of the loans under the GMAC

9   umbrella.  So GMAC employees were handling Homecomings' loans

10  until all had been merged over.  That's how it was explained to

11  us as associates, as far as why we would answer for both

12  Homecomings and GMAC.

13  Q.   Okay.  But there was no Homecomings business operation

14  after -- I could give you a date -- September 24th, 2007?

15  A.   I couldn't say if that's correct or not; it sounds right,

16  but I don't know it specifically, ma'am.

17  Q.   Okay.  If you would examine Exhibit 1-E in -- that's the

18  first binder?

19  A.   Sorry, it's going to be just a second.  Okay.

20  Q.   Do you have access to those types of records in your work

21  for the Borrower Claims Trust?

22  A.   Not readily available.  If I needed something like this,

23  I'd have to reach out to someone else.

24  Q.   Okay.  So you've never seen Exhibit 1-E before?

25  A.   I don't recall it.

1    Q.  Okay.  Does Exhibit 1-E indicate that there was a date

2    upon which Homecomings was no longer servicing any loans?

3    A.  I don't know, I haven't reviewed the documents.

4    Q.  Could you look at page 14 of Borrower Trust Exhibit B --

5            THE COURT:  Okay, I'm going to alert you now, Ms.

6    Nora, you have used your three hours of allotted time.  In the

7    joint pre-trial conference order, which you negotiated with the

8    Borrowers Trust counsel, in Section XIII(B), which appears on

9    page 24, it reads "The trial will be a timed trial, with a

10   maximum of six trial hours during the course of one day.  Each

11   side will be allocated a maximum of three trial hours to use

12   for opening statement, all direct, cross-examination and

13   redirect examinations, and summation.  Counsel is responsible

14   for having her or his witnesses present and ready to testify

15   without any delays or gaps in testimony."

16           So you have used your allotted three hours of time.

17   And I will give you an additional ten minutes to use how you

18   wish.

19           MS. NORA:  Thank you, Your Honor.

20   BY MS. NORA:

21   A.  I'm sorry, can you repeat where you wanted me to go?

22   Q.  On page 14 of the Borrower Trust Exhibit B, entry on May

23   25th.

24   A.  Yes, ma'am.

25   Q.  Reads "Purchase loan servicing date equals 12/29/06".

RESIDENTIAL CAPITAL, LLC, ET AL.                    150

1   A.  Yes, ma'am.

2   Q.  What does that mean?

3   A.  That would have been something that was reported to the

4   credit bureau.  I can't answer exactly what that one would

5   mean.  That's why there's the CBR next to it.

6   Q.  A credit bureau report is what CBR means?

7   A.  Yes, ma'am.

8   Q.  And that means that you started reporting, or someone

9   started reporting, to the credit bureau as of the purchased

10  loan servicing date?

11  A.  Not necessarily, ma'am.  Like I said, I don't know that

12  one specifically.

13  Q.  Are there telephone recordings of every phone call that is

14  made from GMAC mortgage to someone that they're collecting

15  mortgage payments from?

16  A.  At this point in time, no.  It would have been sporadic.

17          THE COURT:  At which point in time?  At which point in

18  time?

19          THE WITNESS:  In 2007, 2008, it would have been

20  sporadic.  I believe they didn't go to recording everything

21  until around 2012.  But that's just a rough estimate.

22  Q.  What does the abbreviation BRSS mean?

23  A.  Can --

24          MR. WISHNEW:  Your Honor, objection.  To where is Ms.

25  Nora --

RESIDENTIAL CAPITAL, LLC, ET AL.                    151

1           THE COURT:  Overruled.

2  A.  Can -- what are --

3  Q.  It just happens to be on --

4  A.  -- you referring to?

5  Q.  -- page 15 -- 5 of 15.  It appears more --

6  A.  Okay.

7  Q.  -- than once, but it's at February 1st, 2008, and it says,

8  about two-thirds of the way down the page:  actions/results, CD

9  changes from BRSS to BRUN.  What does BRUN mean?

10 A.  BRSS to BRUN.  So that would have been BRUN -- borrower

11 unsuccessful.  That would have categorized it as there was not

12 an arrangement set up for payment to come in.

13 Q.  And what does BRSS mean?

14 A.  That would have meant that the prior conversation would

15 have resulted in some kind of an arrangement being discussed or

16 a payment being received.

17         MS. NORA:  We renew our motion to exclude the

18 testimony of this witness.  She lacks sufficient personal

19 knowledge.

20         THE COURT:  Overruled.

21         MS. NORA:  No further cross examination.

22         THE COURT:  All right.

23         Mr. Wishnew?

24         MR. WISHNEW:  Just a few questions, Your Honor.

25 REDIRECT EXAMINATION

1  BY MR. WISHNEW:

2  Q.  Ms. Lathrop, could any individual other than a Homecomings

3  or GMAC Mortgage employee enter data into the loan servicing

4  aps?

5  A.  I don't believe so.

6  Q.  Okay.  And to the best of your knowledge and based upon

7  your experience working with the debtors, are you aware of any

8  instances where entries into the servicing notes occurred

9  concerning calls that never took place?

10  A.  I'm not aware of them, no.

11  Q.  Okay.

12       MR. WISHNEW:  No more questions, Your Honor.

13       THE COURT:  Let me ask you a couple of questions, Ms.

14  Lathrop?

15       THE WITNESS:  Yes, ma'am -- sir.

16       THE COURT:  Near the end of Ms. Nora's questions, you

17  indicated that, until 2012, all conversations with a borrower

18  were not recorded in the loan servicing notes?  Did I

19  understand that correctly?

20       THE WITNESS:  Oh, no, I apologize.  I meant --

21       THE COURT:  I guess I misunderstood, then.  Tell me --

22  explain to me.

23       THE WITNESS:  What I meant by that, sir, was when the

24  quality assurance team was reviewing loans, there was an

25  automated system that would record those conversations, as well

RESIDENTIAL CAPITAL, LLC, ET AL.                    153

1  as the actions on --

2          THE COURT:  Voice --

3          THE WITNESS:  -- an associate's screen, yes.

4          THE COURT:  Voice record?

5          THE WITNESS:  Voice record, yes, sir.

6          THE COURT:  Okay.

7          THE WITNESS:  I apologize for not --

8          THE COURT:  Let --

9          THE WITNESS:  -- clarifying --

10         THE COURT:  Let --

11         THE WITNESS:  -- that.

12         THE COURT:  Let me -- was it the practice and policy

13  of Homecomings and GMAC to make entries in the loan servicing

14  notes for each conversation that a representative had with the

15  borrower?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  Okay.

18         Any further questions?

19         MR. WISHNEW:  No further questions, Your Honor.

20         MS. NORA:  No, Your Honor.

21         THE COURT:  All right, you're excused.  Thank you.

22         Do you have any other witnesses?

23         MR. WISHNEW:  No more witnesses, Your Honor.

24         UNIDENTIFIED SPEAKER:  No.

25         THE COURT:  Ms. Nora, do you rest?

RESIDENTIAL CAPITAL, LLC, ET AL.                    154

1        MS. NORA:  With -- if I could have a few minutes for a

2    closing statement, Your Honor?

3        THE COURT:  I'm just trying to see whether the

4    evidence is closed.

5        MS. NORA:  Yes, the evidence is --

6        THE COURT:  Do you --

7        MS. NORA:  -- closed.

8        THE COURT:  -- rest?

9        MS. NORA:  Yes.

10       THE COURT:  Mr. Wishnew, do you rest?

11       MR. WISHNEW:  We do, Your Honor.

12       THE COURT:  Okay, I'm going to give each side fifteen

13   minutes for closings.  We'll take a recess now until 2:15, so

14   you can all collect your thoughts.  But I'm -- despite the fact

15   that Ms. Nora's time has been used up, the Court would benefit

16   from hearing brief closings, and so I will permit that.  So

17   we'll resume at 2:15.

18       You can have up to fifteen minutes for closing.

19       And then you can have fifteen minutes for closing.

20       All right?  All right.  We're at short recess.

21     (Recess from 2:02 p.m. until 2:20 p.m.)

22       THE CLERK:  All rise.

23       THE COURT:  All right, please be seated.

24       Ms. Nora?

25       MS. NORA:  Ms. Smith has introduced evidence that she

1    communicate with an entity that she believed to be her lender

2    on a mortgage loan that she transacted with America's

3    Mortgage -- American Mortgage Network on December 2nd, 2006.

4    Her evidence is her own personal knowledge of communications

5    that she had with Amerivan, who she contacted through a

6    telephone number belonging to Homecomings, and with Miriam at

7    that same number.

8          She's also introduced evidence that between the time

9    she communicated with Amerivan and Miriam, the loan servicing

10   was transferred internally by Residential Funding Company to --

11   from Homecomings to GMAC Mortgage.  She was never informed of

12   this servicing change.  For years, she sought identification of

13   the entity who was the holder of her note.

14         We have heard the testimony of Sara Lathrop whom

15   indicates that the records that she relied on do not go back

16   any further than seven years prior to the date on inquiry,

17   which was done remotely into the -- what has to be the GMAC

18   Mortgage computer system.  The printout from the computer

19   system does not identify whether it was Homecomings or GMAC

20   Mortgage that was maintaining these records.  The records do

21   not go back to the inception of the servicing transaction,

22   which cannot be correct, despite the good faith from which Ms.

23   Lathrop is testifying, because it is not possible that records

24   would be purged retroactive to a date after the commencement of

25   payments being received.  It's simply not credible.

1           The information that we have provided to the Court

2      shows that there was substantial confusion created by the

3      processing of payments and communications with Ms. Smith that

4      led her to believe that she could skip -- or was actually

5      required to skip three monthly payments in order to qualify for

6      a loan modification.  When she did so --

7           THE COURT:  May I --

8           MS. NORA:  -- she was --

9           THE COURT:  May I ask this?  Was she told that she had

10     to skip three payments to be considered for a loan

11     modification?  Because there's no guarantee you'd get a loan

12     modification.

13          MS. NORA:  Understood, Your Honor.

14          THE COURT:  You agree with that?

15          MS. NORA:  I absolutely do.  In order to request a

16     loan modification, which was her goal, she was told that she

17     had to be three months behind.  There is testimony consistent

18     with that representation, and there is the manual that was

19     submitted as Exhibit 3 in these proceedings, which indicates

20     that there's -- you know, in order to have loss mitigation

21     become involved, there has to be a shortage of payments.

22          THE COURT:  Yeah, I had that page open.  I'm looking

23     at Exhibit 3, page 109, under -- it's section 434 of the

24     manual, Loss Mitigation Workouts.  And just to quote part of

25     it:  "if the servicer's evaluation of the individual

RESIDENTIAL CAPITAL, LLC, ET AL.                    157

1    circumstances of the borrower reveals that it is unlikely that

2    the loan can be brought current, the servicer must aggressively

3    pursue a workout option as an alternative before closure.  If

4    the servicer has determined that all collection efforts have

5    failed and all appropriate relief measures have been taken, one

6    of the following workout options may be selected".  It goes on

7    from there.

8              MS. NORA:  Um-hum.

9              THE COURT:  So let me assume that Ms. Smith's

10   recollection is correct, that she had the conversations with

11   one or more people from Homecomings, and that they told her

12   that she had to be three months in arrears to be considered.

13   Why would that statement be false or why would that give rise

14   to a Deceptive Practices Act claim?  I mean, the manual itself

15   doesn't say three months, but it talks about the evaluation has

16   to reveal that it's "unlikely that the loan can be brought

17   current".

18             So at the time -- Ms. Smith's testimony is:  at the

19   time she had the conversations with Homecomings, she was

20   current on her loan.  So why would it have been a false or

21   misleading or unfair statement to tell her that to be

22   considered for a loan modification, she had to be in arrears?

23             MS. NORA:  The misrepresentation includes the identity

24   of the party with whom she was communicating, which seems to

25   have effected Ms. Smith's ability to negotiate the ultimate

1  loan modification, because she was led to believe that

2  Homecomings was her lender, and then Aurora was her lender, as

3  we have --

4       THE COURT:  The letters that you marked -- I'm not

5  doubting Ms. Smith's testimony that she was confused by who

6  owned the note, but -- for example, Exhibit 12, which is from

7  Homecomings to Ms. Smith, says in the -- it's addressed to her

8  and it's dated January 16th, 2007.  It says in the first line:

9  "Welcome to Homecomings Finance, your new mortgage servicer.

10  Effective February 1, 2007, your mortgage transfers to

11  Homecomings Financial from American Mortgage Network."

12       So they told her that they were the servicer, so why

13  is it deceptive?  She communicated with them.  She's testified

14  that someone from Homecomings told her that to be considered,

15  she had to be three months in arrears.  What's deceptive about

16  that?  She went on to testify she never -- she never sent a

17  modification application to Homecomings GMAC.

18       MS. NORA:  Well, yes, so then I believe the inference

19  from her testimony is that she had not yet been the requisite

20  amount of time behind --

21       THE COURT:  Right.

22       MS. NORA:  -- and then the quote we understand today

23  as the servicing rights being transferred, she understood -- in

24  early 2007, she didn't know what a servicer was.

25       THE COURT:  Um-hum.

1        MS. NORA:  This is not a word that's defined in the

2    common English dictionary.

3        THE COURT:  But when it -- when servicing transferred

4    to Aurora, she spoke to Aurora, and they -- there were, at

5    least, I think, four agreements.  I at first said three, but I

6    think there were -- there were four.

7        MS. NORA:  We introduced four --

8        THE COURT:  You did.

9        MS. NORA:  -- Your Honor.

10        THE COURT:  It was Exhibits 34, 35, 36, and 37.  The

11    first repayment agreement was dated April 20th, 2008.  The next

12    was June 17th, 2008.  The next was -- I can't read my own

13    handwriting, whether it was July.  June 8th, 2009, and then

14    June 15th, 2010.  So Ms. Smith, once servicing transferred to

15    Aurora, she dealt with Aurora.  And she may not have been

16    satisfied with the agreements that she entered into, but she

17    signed each of them.

18        So what I'm trying to understand is:  let -- I'll

19    assume, for purposes of this discussion, that she was told that

20    she had to be three months in arrears to be considered for a

21    loan modification, but servicing gets transferred to Aurora

22    before she's ever submitted a modification application to

23    Homecomings.  After it transfers to Aurora, she deals with

24    Aurora about modification, repayment.  So what I want to know

25    is:  what's the unfair act or practice that violates California

1  UCL?

2        MS. NORA:  With respect to the narrow issue presented

3  to the Court under its decision of October 1st, 2014, it is our

4  position that the representation that she needed to skip the

5  payments in order to qualify for a loan modification put her in

6  a position of having her loan be in default at the time it was

7  transferred to Aurora, which need not have ever occurred.

8        THE COURT:  Okay.  Is there something -- is there a

9  statute or regulation, a case that you believe supports your

10  position that the borrower did not have to be in default of a

11  loan serviced by Homecomings in order to be considered for a

12  modification?

13        MS. NORA:  Actually, their own manual indicates that

14  they do -- that you would have to be in default.

15        THE COURT:  I know, and what I'm asking you is whether

16  there's any statute -- state or federal statute, regulation,

17  state or federal, case law?  What is it that supports your

18  argument that telling her -- telling Ms. Smith that she had to

19  be three months in arrears to be considered for a loan

20  modification would represent unf -- you know, violated the

21  California Unfair Competition Law?

22        MS. NORA:  It created a situation where she was put

23  into default without knowing that she was going to be placed in

24  default.  She thought she was complying, and so that she was

25  actually being prevented from making her current payments by a

 1   representation that she needed to skip the payments in order to

 2   qualify for the modification.  So that would be --

 3          THE COURT:  What was -- I didn't hear any testimony

 4   that, if she skipped the payments, that she wouldn't be in

 5   default.  There was no forbearance agreement that was signed.

 6   She was current in her payments, and we saw -- I had a question

 7   at the last one, the December 31, 2007 payment.  We saw the

 8   record about that.  And then there was testimony that she

 9   missed January, February, March.  Okay?  I didn't hear anything

10   from Ms. Smith or Ms. Lathrop that a borrower would not be in

11   default of his or her obligations to make payments if they

12   skipped payments.

13          The section of the servicing guide that you point to,

14   it doesn't talk about three months, but it says "unlikely the

15   loan can be brought current".  Well, thus it has to be in

16   arrears in order to have the discussion.  But I -- so I'm --

17   that's -- the part I'm struggling with here is --

18          MS. NORA:  Um-hum.

19          THE COURT:  -- is why would it be an unfair practice?

20   Fraudulent or -- it doesn't have to be fraud under the

21   California UCL.  What is it about telling a borrower that they

22   have to be three months in arrears to be considered for a loan

23   modification?

24          The borrower then has to make the choice:  am I going

25   to -- I -- you know, I can't continue to make these payments,

1   and I'm -- you know, I'm not going to pay three months.  I'm

2   going to apply; I'm going to put in an application for a loan

3   modification.  So by the time she gets around to seeking a

4   modification, Aurora's servicing her.  And --

5         MS. NORA:  Well, I --

6         THE COURT:  So I don't deal with Aurora.  Okay?

7   That -- you tried that -- not you.  You weren't involved as her

8   counsel.  That's been litigated through the California courts.

9   Whether it's final or not, I'm -- that's not my problem, but

10  somebody will determine that ultimately.

11        MS. NORA:  Your Honor, I would direct the Court's

12  attention to the Common Law principles of waiver and estoppel.

13  That is, if someone indicates that in order to continue with a

14  certain negotiation, it would be our position that indicating

15  that you have to be three months behind in order to qualify for

16  a loan modification when you know that that party wants a loan

17  modification is a -- would estop the party enticing that from

18  arguing that that is a default.

19        THE COURT:  Go on with your --

20        MS. NORA:  So I would just indicate that I think that

21  estoppel -- Common Law estoppel applies.

22        THE COURT:  You didn't brief this, but go on.

23        MS. NORA:  I'm sorry?

24        THE COURT:  I didn't see that in any briefs, but go on

25  with your argument.

1          MS. NORA:  Well, we did offer to --

2          THE COURT:  Go on with your argument.

3          MS. NORA:  Thank you.  But you know, when an agent for

4    an unidentified principal indicates that in order to take

5    certain information to that principal -- which she, of course,

6    thought that she was dealing with the principal, which is part

7    of the fraud that we contend was ongoing -- that she would have

8    to miss these payments -- and she believed she was talking to

9    the party who had the authority to tell her that -- then when

10   it was subsequently used to hold her in default, that would

11   have been the fraudulent practice that -- and unfair trade

12   practice that we are asking the Court to provide us with

13   restitution.

14          Since the title is not here in this Court's

15   jurisdiction at this time in this action, we are asking for

16   restitution for the value of the property.  The Court has

17   indicated that the evidence on that point is not sufficient,

18   but then we would ask the Court to consider that we wanted to

19   provide expert testimony, and that we were precluded, and so we

20   have an offer of proof with respect to the range of values of

21   that property.

22          And she would like to acquire the title back, and as

23   the ResCap debtors created this default -- which was not

24   disclosed to her as it would be a default -- by telling her

25   that she didn't have to make the payments, thereby --

RESIDENTIAL CAPITAL, LLC, ET AL.                              164

1          THE COURT:  That's not what she said.  She never said

2     they told her she didn't have to make the payments.  She

3     testified that she was told that she had to miss three payments

4     before she would be considered for a loan modification.  That's

5     very different.

6          MS. NORA:  I'm just thinking of how a person would

7     commonly construe that if someone is saying you -- if you want

8     a loan modification, you have to miss three payments, and you

9     think you're dealing with the principal in charge of that

10    decision, that that would constitute a waiver of those

11    payments --

12         THE COURT:  Okay.

13         MS. NORA:  -- Your Honor.

14         THE COURT:  Anything else you want to argue?

15         MS. NORA:  Just that there's been a great deal of

16    suffering caused to Ms. Smith and her business and her income,

17    that we have introduced evidence for restitution that we would

18    like the Court to consider.  And also, with respect to Ms.

19    Lathrop's testimony, that I have argued this and I have

20    presented it, just that, you know, there is not personal

21    knowledge by Ms. Lathrop that makes any of the statements from

22    those servicing notes admissible, Your Honor.

23         THE COURT:  Mr. Wishnew?

24         MR. WISHNEW:  Thank you, Your Honor.  Just briefly.

25    Jordan Wishnew, Morrison & Foerster, for the ResCap Borrower

1  Claims Trust.

2         Your Honor, the scope of this evidentiary hearing is

3  very limited.  Do the alleged communications between the

4  claimants and the debtors in late 2007 amount to an unlawful,

5  unfair, or fraudulent business act or practice?  Evidence that

6  has been present -- the evidence presented today demonstrates

7  the debtors maintain contemporaneous records of their

8  conversations with borrowers, and have no record of a

9  conversation asserted by Ms. Smith in November of 2007.

10        The evidence further demonstrates that Ms. Smith's

11  failure to make her payments in January and February of 2008

12  was a result of her own actions.  She lacks the necessary

13  financial resources.

14        THE COURT:  Well, I don't think you put in any

15  evidence of that.  You had marked exhibits about bank

16  statements, and you didn't offer any, so --

17        MR. WISHNEW:  That's true --

18        THE COURT:  -- what --

19        MR. WISHNEW:  -- Your Honor.

20        THE COURT:  -- what you have is Ms. Smith's testimony

21  that she could have made the payments.

22        MR. WISHNEW:  We also have the servicing notes, Your

23  Honor, which talks about reasons --

24        THE COURT:  I --

25        MR. WISHNEW:  -- why she's behind.

1          THE COURT:  I think we have the servicing notes.

2          MR. WISHNEW:  Okay.

3          THE COURT:  Ms. Lathrop -- Ms. Lathrop testified that

4  even if such a conversation had occurred in November of 2007,

5  the debtors would not have instructed a borrower to default.

6  Rather, the borrower would only be told that assistance can --

7  that assistance can only be provided to them if they are in

8  arrears on their loan.

9          THE COURT:  Did Ms. --

10          MR. WISHNEW:  The borrower --

11          THE COURT:  Did -- I don't think Ms. Lathrop said

12  that, did she?

13          MR. WISHNEW:  She said that, based upon her practice

14  in the -- in the call center, that she would not -- a loan

15  modification would not be offered to someone who was current

16  with their mortgage, but they had to be in arrears.

17          Moreover, the debtors would not have promised the

18  borrower that they were entitled to a loan modification.

19  Rather, they would only be evaluated for a modification, and

20  approval would be subject to the underlying loan investors

21  guidelines.  It is uncontested that Ms. Smith never applied for

22  a loan modification with any of the debtors.

23          Moreover, Ms. Lathrop clearly explained that after the

24  September 2007 merger, Homecomings continued servicing the loan

25  and, most importantly, Ms. Smith testified that she was not

RESIDENTIAL CAPITAL, LLC, ET AL.                    167

1  confused in November of 2007 as to who to make her monthly

2  mortgage payments to.  The record is clear, Your Honor.  There

3  is no evidence of any misrepresentation during the relevant

4  time period, and any purported confusion by Ms. Smith occurred

5  well after the fact -- or well after the relevant time period

6  at issue.

7           Therefore, Ms. Smith's own misunderstanding of what

8  allegedly was said does not amount to an unlawful, unfair, or

9  fraudulent business act or practice.  And as a result, the

10  debtors' statements do not create legal liability for the --

11  for them, the causation of future damages fails to exist, and

12  that -- and Ms. Smith is not entitled to an allowed claim

13  pursuant to California's Unfair Competition Law.

14          Therefore, we would ask the Court to disallow the

15  remaining elements of Ms. Smith's four claims, and expunge the

16  four claims against the debtors in their entirety.

17          THE COURT:  Okay.

18          MS. NORA:  Your Honor, a brief rebuttal from Ms. Smith

19  on a California statute --

20          THE COURT:  Go ahead.

21          MS. NORA:  -- which relies -- California Code Section

22  5 -- 1510 indicates that performance --

23          THE COURT:  Which Code are you looking at?

24          MS. NORA:  Cal -- the California --

25          THE COURT:  No, no.  The California Code -- there's a

1    Civil Code, there's a Civil --

2              MS. NORA:  Civ -- I'm sorry.

3              THE COURT:  -- Procedure Code --

4              MS. NORA:  Cali -- California Civil Code, she's got --

5    her note says CCC, that would be California Civil Code, Section

6    15 --

7              THE COURT:  Actually, CCP is the Code of Civil

8    Procedure, but --

9              MS. NORA:  CCC -- three --

10             THE COURT:  Okay.

11             MS. NORA:  -- Cs.

12             THE COURT:  All right.

13             MS. NORA:  The California Civil --

14             THE COURT:  Yes.

15             MS. NORA:  -- Code.  Performance is excused if the

16   lender induced the party not to perform.

17             THE COURT:  Is that what it says?

18             MS. NORA:  That's what she contends it says.

19             THE COURT:  Do you know what it says?

20             MS. NORA:  I have looked it up in the past, and --

21             THE COURT:  And what does it say?

22             MS. NORA:  I can't quote it verbatim, but I call the

23   Court's attention to this provision.

24             THE COURT:  All right.

25             MS. NORA:  Thank you.

1          THE COURT:  Thank you.

2          All right, the matter's under submission.

3          MS. NORA:  Thank you, Your Honor.

4          MR. WISHNEW:  Thank you, Your Honor.

5          MS. SMITH:  Thank you, Your Honor.

6          THE COURT:  Thank you, Ms. Smith.  You going to

7   spend -- get to spend any time in New York, Ms. Smith?

8          MS. SMITH:  No, I fly out in the morning.

9          UNIDENTIFIED SPEAKER:  Excuse me, Your Honor?

10         THE COURT:  Yes?  Did anybody -- somebody else?

11         UNIDENTIFIED SPEAKER:   -- on CourtCall.

12         THE COURT:  Oh.  You can hang up.  Thank you.

13         UNIDENTIFIED SPEAKER:  Thank you, have a good day.

14         THE COURT:  Thank you.

15      (Whereupon these proceedings were concluded at 2:42 PM)

16

17

18

19

20

21

22

23

24

25

1

2                                    I N D E X

3

4   WITNESS              EXAMINATION BY      PAGE

5   Tia Smith            Ms. Nora           14

6   Tia Smith            Mr. Wishnew        86

7   Tia Smith            Ms. Nora           94

8   Sara Lathrop         Mr. Wishnew        101

9   Sara Lathrop         Ms. Nora           136

10  Sara Lathrop         Mr. Wishnew        152

11

12

13                                  EXHIBITS

14  CLAIMANT'S            DESCRIPTION        PAGE

15  3                    GMAC RFC Servicer  13

16                       Guide

17  4                    Seller/Servicer    13

18                       contract

19  12                   1/16/07 letter     32

20                       to Ms. Smith

21  8                    Adjustable rate    33

22                       promissory note

23  34                   4/30/08 Aurora     33

24                       repayment agreement

25

```
 1
 2   35              6/17/08 repayment   33
 3                   agreement
 4   36              1/8/09 workout      33
 5                   agreement
 6   37              1/15/10 workout     33
 7                   agreement
 8   25              Notice of default   34
 9   1-D             SEC filing          39
10                   identifying Ms.
11                   Smith's loan
12   1-E             8-K filings         41
13   1-G             8-K filings         42
14   14-A            Spreadsheet of all  49
15                   trusts in
16                   Minnesota
17   44              Search results for  51
18                   RALI
19   45              Total value of      52
20                   RALI Trust
21   9               Tia Smith's note    65
22                   endorsed by Judy
23                   Faber
24
25
```

1

2   43-A              Tia Smith            76

3                     residential lease

4                     agreement with

5                     Stanley Barnett

6   43-B              Tia Smith            76

7                     residential lease

8                     agreement with

9                     Sandra Deloche

10  43-C              Tia Smith's          76

11                    business profit

12                    and loss 2010-11

13  43-D              Tia Smith receipt    76

14                    from doctor exam

15  43-E              Tia Smith            76

16                    prescription

17                    receipt

18  43-H              Tia Smith receipt    78

19                    for dental

20                    expenses

21  33                1099-A form          96

22

23

24

25

1

2    BORROWERS TRUST'S:

3    BT-H            12/30/06 letter    33

4                  to Ms. Smith

5    BT-B            Ms. Smith's       109

6                  servicing notes

7                  and payment

8                  history

9

10   BT-G           Good-bye letter    112

11                 sent to Ms. Smith

12                 3/14/08

13   BT-E           Avoid foreclosure   121

14                 letter 2/12/08

15   BT-F           Breach of contract 122

16                 letter 3/3/08

17

18

19                      RULINGS

20                             PAGE    LINE

21   Rulings on objections to Tia Smith's      10        6

22   declaration

23   Objection to paragraph 58 is overruled    13      18

24   Exclusion of M. Nawaz Raja testimony     99      16

25   granted

1

2                          **C E R T I F I C A T I O N**

3

4    I, Hana Copperman, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    *Hana Copperman*

10

11   _____

12   HANA COPPERMAN

     AAERT Certified Electronic Transcriber CET**D 487

13

14

15   eScribers

     700 West 192nd Street, Suite #607

16

     New York, NY 10040

17

18

     Date:  February 10, 2016

19

20

21

22

23

24

25