UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | NOT FOR PUBLICATION |
|  | ) |  |
|  | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) |  |
|  | ) | Chapter 11 |
| Debtors. | ) |  |
|  | ) | (Jointly Administered) |

**MEMORANDUM OPINION AND ORDER SUSTAINING THE RESCAP BORROWER
CLAIMS TRUST'S OBJECTION TO CLAIMS NOS. 4757, 4758, 4762 AND 4764
FILED BY PATRICIA MCNERNEY AND SUSAN GRAY**

*A P P E A R A N C E S :*

MORRISON & FOERSTER LLP
*Attorneys for the ResCap Borrower Claims Trust*
250 West 55th Street
New York, New York 10019
By:     Jordan A. Wishnew, Esq.
         Jessica J. Arett, Esq.

SUSAN GRAY
*Attorney for Patricia McNerney*
22255 Center Ridge Road, Suite 210
Rocky River, Ohio 44116
By:     Susan M. Gray, Esq.

**MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the ResCap Borrower Trust's (the "Trust") objection (the

"Objection," ECF Doc. # 9280)[1] to (i) claims numbers 4762 and 4764 (the "McNerney Claims")

filed by Patricia McNerney ("McNerney") and (ii) claims numbers 4757 and 4758 (the "Gray

Claims," and, together with the McNerney Claims, the "Claims") filed by Susan Maria Gray,

Esq. ("Gray," and together with McNerney, the "Claimants"). The bases for the Claims are (i)

counterclaims filed against the Debtors in a foreclosure action that the Debtors initiated against

---

[1]     The Objection is supported by the declaration of Sara Lathrop (the "Lathrop Declaration," Obj. Ex. 2) and
the declaration of David A. Wallace (the "Wallace Declaration," Obj. Ex. 3)

McNerney—which has since been dismissed—and (ii) a request for attorney's fees owed to Gray on account of defending the foreclosure action and prosecuting the counterclaims. The Objection seeks to disallow and expunge the Claims on the basis that they fail to state a basis for liability against the Debtors.

The Claimants filed an opposition (the "Opposition," ECF Doc. # 9328). The Trust thereafter filed a reply (the "Reply," ECF Doc. # 9393).[2] The Court held a hearing on December 16, 2015 and took the matter under submission.

As explained below, the Court concludes that the counterclaims (the "District Court Counterclaims") fail as a matter of law and, thus, fail to state a basis for liability against the Debtors. Since the Gray Claims are based on the success of the McNerney Claims, the Gray Claims also fail. Therefore, the Objection is **SUSTAINED** and the Claims are **DISALLOWED** and **EXPUNGED**.

## I.    BACKGROUND

On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code. The second joint amended chapter 11 plan proposed by the Debtors and the Official Committee of Unsecured Creditors (the "Plan," ECF Doc. # 6065) was confirmed on December 11, 2013 and became effective on December 17, 2013. (*See* ECF Doc. # 6137.)

### A.    The Loan History

On December 27, 2002, McNerney obtained a $108,000 loan (the "Loan") from Homecomings Financial LLC ("Homecomings") evidenced by a note (the "Note") secured by a mortgage (the "Mortgage") on property located at 1241 Thoreau Road, Lakewood, Ohio (the

---

[2]    The Reply is supported by the supplemental declaration of Sarah Lathrop (the "Supplemental Lathrop Declaration," Reply Ex. 1).

"Property"). (Obj. ¶ 13.) The Mortgage named Homecomings as the lender and Mortgage

Electronic Registration Systems, Inc. ("MERS") as the mortgagee and nominee for

Homecomings and Homecomings' successors and assigns. (*Id.*) The Note and Mortgage were

assigned to GMAC Mortgage ("GMACM") on December 31, 2007, and again assigned from

GMACM back to Homecomings on October 14, 2008, with a corrective assignment filed on

October 29, 2008 to amend the date of the notary's signature. (*Id.*)

Homecomings serviced the Loan from December 27, 2002 until servicing was transferred

to GMACM on January 1, 2003. (*Id.* ¶ 14) GMACM serviced the Loan until February 16, 2013.

(*Id.*)

The Loan refinanced a prior loan (the "Household Loan") that McNerney and her then

husband had with Household Realty Corporation. (*Id.* ¶ 15.) The Household Loan required the

McNerneys to pay monthly principal and interest of $985.00 and taxes and insurance of $261.81,

for a total monthly payment of $1,245.81. (*Id.*) The interest rate on the Household Loan was

13%. (*Id.*) After McNerney and her husband divorced, the divorce decree required McNerney to

refinance the Household Loan. (*Id.*)

McNerney retained a local mortgage broker, Ohio Mortgage Company, Inc., d/b/a OMC

Lending ("OMC"), to work on her behalf to obtain the Loan. (*Id.* ¶ 16.) OMC assisted

McNerney in preparing a loan application (the "Application"). OMC submitted the Application

to Homecomings. (*Id.*) A broker agreement between OMC and Homecomings (the "Broker

Lender Agreement") provided that OMC was an independent contractor and only the agent of

Homecomings for purpose of delivering notices. (*Id.*; Lathrop Decl. Ex. G.) In relevant part, the

Broker Lender Agreement states:

> Broker/Lender shall conduct all business with Homecomings as a
> non-exclusive independent contractor, and not as an agent, partner

> or affiliate of Homecomings . . . . This Broker/Lender Agreement
> is Broker/Lender's authorization to act as Homecomings' agent for
> the purpose of delivering notices of action taken as required by the
> Equal Credit Opportunity Act and its Regulation B.

(Broker Lender Agreement.)

Before signing the Loan documents, McNerney had no contact with Homecomings; indeed, McNerney was not aware that Homecomings had any involvement with the Loan before the closing. (Obj. ¶ 16; *see* the "Trial Transcript," Wallace Decl. Ex. A at 203, 275.[3])

Homecomings received the Application from OMC, and analyzed the information in the Application with an automated underwriting program. Homecomings determined that McNerney had a loan to income ratio of 34% and a debt to income ratio of 46%, both of which were within the approved limits. (Obj. ¶ 17; Lathrop Decl. Ex. H.) McNerney contends that this information was incorrect. (*See* Opp'n at 17.)[4]

At the loan closing, Homecomings gave McNerney a Truth in Lending Statement, a Notice of the Right to Cancel, a HUD-1 Settlement Statement, a First Payment Notice, and a disclosure regarding private mortgage insurance. (Obj. ¶ 18.)

The Loan proceeds were used to pay off the $98,349.94 balance of the Household Loan, $5,847.18 of past due taxes, and $4,533.16 of credit card debt. (*Id.* ¶ 19.) The Loan required monthly payments of principal and interest of $792.47, and of escrow payments of $230.81 for real estate taxes and $31.00 for insurance. (*Id.*) Additionally, McNerney had to pay $178.20 each month for private mortgage insurance until the loan to value ratio declined to 80%. (*Id.*) The total monthly payment under the Loan was $1,232.28 with an interest rate of 8% (as

---

[3]     The Trial Transcript referred to in this Opinion was prepared following a bench trial in the Ohio State Court in December 2008 in the First Foreclosure Action. For reasons explained later in this Opinion, the state court dismissed the First Foreclosure Action without prejudice without reaching a decision.

[4]     Specifically, McNerney argues that Homecomings included her child support payments.

compared to her monthly payment under the Household Loan of $1,245.81).[5]  (*Compare id.* ¶ 19

with ¶ 15.)

### B.    Foreclosure Actions

#### 1.    *First Foreclosure Action*

In November 2003, MERS filed a foreclosure action (the "First Foreclosure Action") in

the Cuyahoga Court of Common Pleas (the "Ohio State Court") against McNerney because

McNerney's account was past due from June 1, 2003.  (Obj. ¶ 21.)  McNerney filed an answer on

June 16, 2004, asserting affirmative defenses and counterclaims against MERS and

Homecomings.  (*Id.*)  In November 2006, McNerney filed an amended answer and

counterclaims, and a third-party complaint asserting causes of actions against OMC and

GMACM (the "Amended State Court Counterclaims").  (*Id.*)

While the Loan was in default, the Debtors periodically had property inspections

performed by third party contractors to determine whether the property was vacant or occupied.

(*Id.* ¶ 22.)  Photographs of the Property were sometimes taken during these drive-by inspections.

(*Id.*)  McNerney claims that she and her family were harassed during these inspections.  (Opp'n

at 10.)

In January 2008, GMACM was substituted as plaintiff in the foreclosure action.  (Obj. ¶

23.)  In October 2008, the Note and Mortgage were assigned by GMACM back to

Homecomings, with a corrective assignment filed in October 2008 to amend the date of the

notary's signature.  (*Id.*)  In November 2008, Homecomings was substituted as plaintiff for

GMACM.  (*Id.*)

The Ohio State Court held a bench trial in the First Foreclosure Action in December

2008.  Before the Ohio State Court reached a decision, however, the Eighth District Court of

---

[5]    Nothing in this Opinion addresses issues concerning the liability, if any, of OMC based on its own conduct.

Appeals in Ohio ruled in *Wells Fargo Bank v. Jordan N.A.*, No. 91675, 2009 WL 625560 (Ohio Ct. App. Mar. 12, 2009), that to establish standing to sue in a foreclosure action, a plaintiff must demonstrate that at the time the case was filed, it was both the mortgagee or assignee of the mortgagee *and* the holder of the note. (Obj. ¶ 24.) As a result, the Ohio State Court ordered Homecomings to provide evidence that the initial plaintiff, MERS, was the holder of the Note at the time the First Foreclosure Action was filed. (*Id.*) The Ohio State Court dismissed the case without prejudice in September 2009 when no evidence was submitted,. (*Id.*)

McNerney appealed the Ohio State Court decision, challenging the dismissal without prejudice. (*Id.* ¶ 25.) In December 2009, McNerney's appeal was dismissed by the Eighth District Court of Appeals; the Ohio Supreme Court declined jurisdiction to hear a further appeal. (*Id.*)

> ### 2.    *Second Foreclosure Action*

Homecomings refiled the foreclosure action (the "Second Foreclosure Action") in the United States District Court for the Northern District of Ohio (the "Ohio District Court") in October 2009. (*Id.* ¶ 26.) McNerney moved to dismiss for lack of standing to sue; the motion was denied in September 2010. (*Id.*)

In January 2011, McNerney filed an answer and counterclaims. (*Id.* ¶ 27.) She asserted the same claims asserted in the First Foreclosure Action, as well as claims against Homecomings for violation of the Ohio Consumer Sale Protection Act, breach of privacy, and a new count for civil conspiracy (the "District Court Counterclaims," Wallace Decl. Ex. I). (*Id.*)

In September 2011, Homecomings filed motions for judgment on the pleadings and for summary judgment. (*Id.* ¶ 28.) McNerney opposed the motions. (*Id.*) Before the court decided the motions, Homecomings filed a notice of bankruptcy; the Ohio District Court stayed the case because of the commencement of the chapter 11 cases. (*Id.*)

### C.    Waste and Condemnation of the Property

In November 2010, after the Second Foreclosure Action was filed, the Debtors

discovered that the City of Lakewood had condemned the house located on the Property.  (*Id.* ¶

29.)  The Debtors learned that McNerney had not lived in the Property for some time and that the

inside of the house had deteriorated, rendering the house uninhabitable.  (*Id.*)  As a result, the

collateral securing the Loan was worthless.  (*Id.*)

Homecomings was contacted by a local civic group, Lakewood Alive, which was

interested in facilitating restoration of the Property, which was located in a historic and

architecturally significant area of Lakewood, Ohio.  (*Id.* ¶ 30.)  Lakewood Alive requested that

Homecomings release its lien on the Property so that the Property could be donated to the

Cuyahoga County Land Reutilization Corporation (the "Local Land Bank"), thus permitting

restoration and rehabilitation of the Property instead of demolition.  (*Id.*)

McNerney deeded the Property to the Local Land Bank in April 2011; the deed was

recorded in May 2011.  (*Id.* ¶ 31.)  Homecomings released its lien in July 2011.  (*Id.*)

Releasing the lien left McNerney still obligated on the debt, but the Loan was identified

as eligible for extinguishment under the terms of a nationwide settlement by GMACM.  (*Id.* ¶

32.)  Homecomings offered to extinguish the debt; McNerney accepted the offer; Homecomings

then moved to dismiss the foreclosure related claims in the Second Foreclosure Action.  (*Id.*)

The Ohio District Court granted the motion in August 2013.  (*Id.*)  As a result, only the District

Court Counterclaims remained pending in the Ohio District Court.  (*Id.*)

### D.    McNerney Claims

On November 14, 2012, McNerney filed proofs of claim numbers 4762 and 4764 against

Homecomings and GMACM, respectively, each for $600,000.  (Obj. Ex. 4.)  An addendum to

the proofs of claim asserted the District Court Counterclaims as the basis for the McNerney

Claims.  (*Id.*)  The District Court Counterclaims alleged the following claims against the

Debtors:

- violation of the Truth in Lending Act ("TILA").  (Dist. Ct. Countercls. ¶¶ 126–51.)
- violation of the Real Estate Settlement Procedures Act ("RESPA").  (*Id.* ¶¶ 152–59.)
- breach of fiduciary duty.  (*Id.* ¶¶ 168–79, 270–79.)
- negligence and improvident lending.  (*Id.* ¶¶ 160–67, 180–87.)
- intentional and negligent misrepresentation.[6]  (*Id.* ¶¶ 188–203, 235–69.)
- unconscionability.  (*Id.* ¶¶ 204–06.)
- civil conspiracy.  (*Id.* ¶¶ 207–12, 288–92, 303–16.)
- violation of the Ohio Mortgage Loan Broker Act ("OMBA").  (*Id.* ¶¶ 213–31.)
- failure to engage in loss mitigation.  (*Id.* ¶¶ 232–34.)[7]
- violations of the Ohio Consumer Sales Practices Act ("CSPA").  (*Id.* ¶¶ 280–87, 308–16, 322–31.)
- fraud on the court.  (*Id.* ¶¶ 293–302.)
- breach of privacy.  (*Id.* ¶¶ 317–21.)

McNerney's claims for (i) breach of fiduciary duty, (ii) negligence and improvident

lending, (iii) intentional and negligent misrepresentation, (iv) violation of the OMBA and (v)

violation of the CSPA, are all premised on an alleged agency relationship between OMC and

Homecomings—with OMC as the agent and Homecomings as the principal.  The Trust disputes

the existence of a broad agency relationship.

### E.    Gray Claims

On November 14, 2012, Gray filed proofs of claim numbers 4757 and 4758 against

Homecomings and GMACM, respectively, each for $122,481.59.  (Obj. Ex. 4.)  The Gray

Claims are for attorney's fees arising under TILA, RESPA, OMBA, and CSPA, and/or punitive

damages.  (Obj. Ex. 4; Opp'n at 42.)

---

[6]       In the Opposition and in the District Court Counterclaims, McNerney includes fraud, along with intentional and negligent misrepresentation, but further allegations of fraud are absent.

[7]       Because Homecomings abandoned the foreclosure related claims and these claims were dismissed in the Second Foreclosure Action, loss mitigation is moot.

## II.    DISCUSSION

### A.    Legal Standard

Correctly filed proofs of claim "constitute[] prima facie evidence of the validity [and

amount] of the claim.  To overcome this prima facie evidence, the objecting party must come

forth with evidence which, if believed, would refute at least one of the allegations essential to the

claim."  *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000) (internal

citations omitted).  By producing "evidence equal in force to the prima facie case," an objector

can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant

to "prove by a preponderance of the evidence that under applicable law the claim should be

allowed."  *Creamer v. Motors Liquidation Co. GUC Tr. (In re Motors Liquidation Co.)*, No. 12

Civ. 6074 (RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks

omitted).  If the objector does not "introduce[] evidence as to the invalidity of the claim or the

excessiveness of its amount, the claimant need offer no further proof of the merits of the claim."

4 COLLIER ON BANKRUPTCY ¶ 502.02 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

Bankruptcy Code section 502(b)(1) provides that claims may be disallowed if

"unenforceable against the debtor and property of the debtor, under any agreement or applicable

law."  11 U.S.C. § 502(b)(1).  To determine whether a claim is allowable by law, bankruptcy

courts look to "applicable nonbankruptcy law."  *In re W.R. Grace & Co.*, 346 B.R. 672, 674

(Bankr. D. Del. 2006).

Federal pleading standards apply when assessing the validity of a proof of claim.  *See,

e.g.*, *In re Residential Capital, LLC*, 518 B.R. 720, 731 (Bankr. S.D.N.Y. 2014); *In re DJK

Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party

has met their burden in connection with a proof of claim, bankruptcy courts have looked to the

pleading requirements set forth in the Federal Rules of Civil Procedure." (citations omitted)).

Accordingly, a claimant must allege "enough facts to state a claim for relief that is *plausible* on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (emphasis in original) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal citation and quotation marks omitted). Plausibility "is not akin to a probability requirement," but rather requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal citation and quotation marks omitted). The court must accept all factual allegations as true, discounting legal conclusions clothed in factual garb. *See, e.g.*, *id.* at 677–78; *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true" (citing *Iqbal*, 556 U.S. at 678)). The court must then determine if these well-pleaded factual allegations state a "plausible claim for relief." *Iqbal*, 556 U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (citation omitted). A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). A claim that pleads only facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement. *Id.* at 678 (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

(citation omitted).  "The pleadings must create the possibility of a right to relief that is more than

speculative."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008)

(citation omitted).

### B.    Purported Agency Relationship Between Homecomings and OMC

An agency relationship may be established pursuant to several theories.  *Brainard v. Am.*

*Skandia Life Assurance Corp.,* 432 F.3d 655, 661 (6th Cir. 2005); *Chevrolet v. Calhoun,* No.

03AP-816, 2004 WL 397140, at *2 (Ohio Ct. App. Mar. 4, 2004).  Actual agency occurs when

there is "a consensual relationship between the agent and the principal."  *Calhoun*, 2004 WL

397140, at *2 (citation omitted).  Such an agency relationship can be informally created but the

parties must give their consent which can be either express or implied.  *Brainard,* 432 F.3d at

661.  Express authority is authority which is directly granted to or conferred upon the agent in

express terms by the principal, and "it extends only to such powers as the principal gives the

agent in direct terms . . . ."  *Damons' Missouri, Inc. v. Davis*, 590 N.E.2d 254, 257 (Ohio 1992)

(citation omitted).

To establish an apparent agency relationship, a plaintiff must plead and prove "(1) that

the principal held the agent out to the public as possessing sufficient authority to embrace the

particular act in question, or knowingly permitted him to act as having such authority, and (2)

that the person dealing with the agent knew of the facts and acting in good faith had reason to

believe and did believe that the agent possessed the necessary authority."  *Master Consol. Corp.*

*v. BancOhio Nat'l Bank*, 575 N.E. 2d 817, 822 (Ohio 1991) (citation omitted).  The focus is on

"the acts of the principal and whether those actions manifested a conveyance of authority to the

agent."  *Brainard,* 432 F.3d at 663.  Agency can also be established by the principal's ratification

of the unauthorized acts of another.  *Calhoun,* 2004 WL 397140, at *2; *Brainard,* 432 F.3d at

661.

McNerney argues that an agency relationship existed between Homecomings and OMC. (Opp'n at 16–18; *see generally* Dist. Ct. Countercls.)  McNerney notes that the Broker Lender Agreement created a limited express agency relationship and that the Broker Lender Agreement attempted to limit the agency relationship to OMC acting as Homecomings' agent for the sole and limited purpose of delivering notices of action taken as required by the Equal Credit Opportunity Action and Regulation B.  (Opp'n at 17.)  McNerney contends that the Trust does not provide evidence that either Homecomings or OMC informed her that their agency relationship was limited to the extent stated in the Broker Lender Agreement.  (*Id.*)  Rather, she alleges, Homecomings allowed OMC to gather information on its behalf, entered underwriting data on its behalf into the Federal National Mortgage Association ("Fannie Mae") desktop underwriting software,[8] and presented documents to McNerney with Homecomings' name stated on them.  (*Id.*)  McNerney maintains that Homecomings created an implied or apparent agency relationship, and that Homecomings' and OMC's attempts to limit the agency relationship through the Broker Lender Agreement are not controlling.  (*Id.*)  Further, McNerney contends that not only did OMC purposefully input incorrect and fraudulent information into the Fannie Mae desktop underwriting program to make it appear that McNerney qualified for the Loan, but Homecomings was aware that the information OMC input was incorrect and Homecomings failed to correct it.  (*Id.*)  McNerney contends that Homecomings' actions amounted to ratification, and, as such, an agency relationship existed.  (*Id.* at 18.)

McNerney fails to show that a wide-ranging actual agency agreement existed between OMC and Homecomings; the express terms of the agreement between OMC and Homecomings expressly delineated and, thus, limited the terms of their arrangement.  (*See* Broker Lender

---

[8]     McNerney contends that the underwriting software was Fannie Mae's, but the Trust refers to this underwriting program simply as the "automatic underwriting program."

Agreement.)  McNerney's argument that OMC had an apparent agency relationship with Homecomings also fails.  Before the Loan closed, McNerney did not know about Homecomings.  She fails to provide any specific act that Homecomings (as the purported principal) did to hold OMC out as its agent to McNerney.  (Trial Tr. at 203, 275.)  McNerney points to no interactions between McNerney and Homecomings that would give rise to the appearance of an actual or apparent agency relationship.

Finally, McNerney's argument that an agency relationship existed because Homecomings ratified OMC's acts likewise fails.  McNerney relies on *Brainard*, but the argument fails because there is no unauthorized act of OMC that Homecomings failed to disaffirm.  *See Brainard*, 432 F.3d at 661 ("The principal's ratification of the unauthorized acts of another may also establish an agency relationship." (citation omitted)).  OMC's act of passing information to Homecomings in the Loan origination process—purportedly incorrect information which McNerney alleges that Homecomings was aware of and failed to correct—while objectionable was not *unauthorized* and, furthermore, OMC's passing information to Homecomings was not meant to bind Homecomings.  *See Gomez v. Huntington Tr. Co., N.A.*, No. 3:98CV7436, 2001 WL 1112690, at *3 (N.D. Ohio Aug. 28, 2001) ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." (citation omitted)).  As such, McNerney fails to establish that an agency relationship existed between OMC and Homecomings.

### C.    Breach of Fiduciary Duty Claim

To establish a claim for breach of fiduciary duty, a plaintiff must prove "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom."  *Evans v. Chambers Funeral Homes*, No. 89900, 2008 WL

2766173, at *3 (Ohio Ct. App. July 17, 2008) (citation omitted). "The elements of an action for

breach of fiduciary duty are similar to those for ordinary negligence, with the difference being a

need to establish that the duty arose out of a fiduciary relationship." *Id.* (citation omitted).

Ohio courts have held that a lender does not ordinarily owe a fiduciary duty to a

borrower:

> Generally, the relationship between a creditor and debtor is not a
> fiduciary one, but is one governed by freedom of contract. A
> fiduciary relationship exists when a special confidence and trust is
> reposed in the integrity and fidelity of another and there is a
> resulting position of superiority or influence, acquired by virtue of
> this special trust. Such a relationship arises out of an informal
> relationship where both parties understand that a special trust or
> confidence has been reposed.

*Needham v. Provident Bank*, 675 N.E.2d 514, 521 (Ohio Ct. App. 1996) (internal quotation

marks and citations omitted); *see also Umbaugh Pole Bldg. Co, Inc. v. Scott*, 390 N.E.2d 320,

323 (Ohio 1979) ("The relationship of debtor and creditor without more is not a fiduciary

relationship."). "[A] fiduciary relationship cannot be unilaterally created by one party in the

creditor/debtor relationship. Rather, the debtor asserting such a relationship must demonstrate

that the creditor understood that the debtor was placing special trust or confidence in the

relationship." *Needham*, 675 N.E.2d at 522 (citations omitted).

McNerney asserts claims for breach of fiduciary duty against Homecomings, both on the

alleged acts of Homecomings and OMC. (*See* Dist. Ct. Countercls. ¶¶ 168–79, 270–79.) Since

McNerney has failed to establish an agency relationship between OMC and Homecomings

(beyond giving required notices), McNerney's breach of fiduciary duty claim against

Homecomings for the actions of OMC fails. Next, McNerney's breach of fiduciary duty claim

for the alleged acts of Homecomings also fails because McNerney is unable to establish that a

special trust and confidence was placed in Homecomings by McNerney. *See Needham*, 675

N.E.2d at 522.  McNerney had no contact with Homecomings and did not know of

Homecomings' involvement in the Loan prior to the closing date.  (Trial Tr. at 203, 275.)  There

could not have been a special relationship between Homecomings and McNerney—giving rise to

a duty for Homecomings to act in McNerney's best interest—since McNerney did not know of

Homecomings' involvement.  Therefore, McNerney's claim for breach of fiduciary duty fails.

Accordingly, the Objection is **SUSTAINED** with respect to McNerney's breach of

fiduciary claim.

### D.    Negligence and Improvident Lending Claims

To establish a claim for negligence, a plaintiff must demonstrate (1) the existence of a

duty from the defendant to the plaintiff, (2) breach of that duty, and (3) damages proximately

resulting from that breach.  *See Jeffers v. Olexo*, 539 N.E.2d 614, 616 (Ohio 1989); *Mills v. Best

Western Springdale*, No. 08AP-1022, 2009 WL 1710765, at *3 (Ohio Ct. App. June 18, 2009).

"The tort of negligence requires the existence of a duty of care . . . Whether a duty exists in any

particular case is a question of law."  *Provident Bank v. Adriatic, Inc.*, No. CA2005-12-108,

2005 WL 2840741, at *4 (Ohio Ct. App. Oct. 31, 2005).  Ohio courts have held that lenders do

not owe borrowers a duty of care.  *Id.* at *4; *425 Beecher, L.L.C. v. Unizan Bank, N.A.*, 927 N.E.

2d 46, 59 (Ohio Ct. App. 2010).

McNerney alleges negligence based on Homecomings' alleged failure to exercise

reasonable care "in the loan processing process."  (Dist. Ct. Countercls. ¶¶ 180–87.)  Here,

Homecomings dealt with McNerney at arm's-length during the loan process and had no contact

with McNerney prior to the closing of the Loan.  In fact, McNerney was not aware that

Homecomings had any involvement with the Loan prior to the closing.  (*See* Trial Tr. at 203,

275.)  As such, McNerney cannot establish that Homecomings, as her lender, owed her a duty of

care.  *See 425 Beecher, L.L.C.*, 927 N.E. 2d at 59 (noting that "the relationship of debtor and

creditor, without more, is not a fiduciary relationship and a bank and its customers stand at arm's

length in negotiating terms and conditions of a loan." (internal quotation marks and citation

omitted)).  To the extent that McNerney contends that Homecomings is liable for OMC's alleged

negligence, that too fails as McNerney has failed to demonstrate that OMC was Homecomings'

agent.

     Additionally, McNerney asserts a claim for improvident lending against Homecomings.

(Dist. Ct. Countercls. ¶¶ 160–67.)  This claim fails because such claims are not recognized under

Ohio law.  *See Price v. EquiFirst Corp.*, No. 08-CV-1860, 2009 WL 917950, at *8 (N.D. Ohio

Apr. 1, 2009) (holding that a claim for improvident lending is not recognized under Ohio law).

     Accordingly, the Objection is **SUSTAINED** with respect to McNerney's negligence and

improvident lending claims.

### E.    Intentional and Negligent Misrepresentation Claims

     The elements of an intentional misrepresentation claim in Ohio are:

> (a) a representation, or, where there is a duty to disclose,
> concealment of a fact; (b) which is material to the transaction at
> hand; (c) made falsely, with knowledge of its falsity, or with such
> utter disregard and recklessness as to whether it is true or false that
> knowledge may be inferred; (d) with the intent of misleading
> another into relying upon it; (e) justifiable reliance upon the
> representation; and (f) a resulting injury proximately caused by the
> reliance.

*Nichols v. Schwendeman*, No. 07AP-433, 2007 WL 4305718, at *7 (Ohio Ct. App. Dec. 11,

2007) (citation omitted).

     To successfully assert a claim for negligent misrepresentation, a plaintiff must establish

the existence of:

> One who, in the course of his business, profession or employment,
> or in any other transaction in which he has a pecuniary interest,
> supplies false information for the guidance of others in their
> business transactions, is subject to liability for pecuniary loss

16

> caused to them by their *justifiable reliance* upon the information, if
> he fails to exercise reasonable care or competence in obtaining or
> communicating the information.

*Delman v. City of Cleveland Heights*, 543 N.E.2d 835, 838 (Ohio 1989) (emphasis in original)

(internal quotation marks and citation omitted).  "A core requirement in a claim for negligent

misrepresentation is a special relationship under which the defendant supplied information to the

plaintiff for the latter's guidance in its business transaction."  *Ford v. New Century Mortg. Corp.*,

797 F. Supp. 2d 862, 872 (N.D. Ohio 2011) (internal quotation marks and citation omitted).

McNerney asserts claims for intentional and negligent misrepresentation.  (Dist. Ct.

Countercls. ¶¶ 188–203, 235–69.)  These claims are all based on allegations that OMC, and

Homecomings through OMC, misrepresented to McNerney that she qualified for the Loan,

including the monthly payment under the Loan.  (*Id.*)  Because McNerney has failed to

demonstrate an agency relationship between OMC and Homecomings, OMC's actions cannot

create liability for the Debtors' estates.  Additionally, there could have been no direct

misrepresentations from Homecomings to McNerney because McNerney had no contact with

Homecomings prior to the closing.  (Trial Tr. at 203, 275.)

Accordingly, the Objection is **SUSTAINED** with respect to McNerney's intentional and

negligent misrepresentation claims.

### F.    OMBA Claim

The OMBA only applies to mortgage brokers; mortgage lenders are not subject to the act.

*See* Ohio Rev. Code Ann. § 1322.01(G) (West 2015) (defining "mortgage broker"); *Keating v.*

*Am. Wholesale Lender*, No. 11-CV-593, 2011 WL 2471732, at *2 (N.D. Ohio June 21, 2011)

("Under the OMBA, the lender is not a 'mortgage broker' for purposes of the Act." (citation

omitted)).

McNerney contends that Homecomings is liable for OMC's alleged violation of the OMBA because OMC is its agent. (Dist. Ct. Countercls. ¶¶ 213–31.) However, as previously discussed, McNerney failed to demonstrate an agency relationship. As such, McNerney cannot state a claim for violation of the OMBA and this claim fails.

Accordingly, the Objection is **SUSTAINED** with respect to McNerney's OMBA claim.

### G.    CSPA Claim

The CSPA prohibits unfair or deceptive acts and unconscionable acts by suppliers in connection with "consumer transactions." Ohio Rev. Code Ann. §§ 1345.02(A), 1345.03(A) (West 2015); *Anderson v. Barclay's Capital Real Estate, Inc.*, 989 N.E.2d 997, 999 (Ohio 2013). The CSPA is subject to a two year statute of limitations. *See* Ohio Rev. Code Ann. § 1345.10(C) (West 2015) ("An action under sections 1345.01 to 1345.13 of the Revised Code may not be brought more than two years after the occurrence of the violation which is the subject of suit . . . .").

McNerney asserts claims for violation of the CSPA, premised on three sets of allegations. (Dist. Ct. Countercls. ¶¶ 280–87, 308–16, 322–31.) First, McNerney alleges that OMC (Homecomings' purported agent) violated the CSPA in connection with the origination of the Loan, and, thus, Homecomings (OMC's purported principal) is liable for its agent's CSPA violation. (Opp'n at 31–32; *see* Dist. Ct. Countercls. ¶¶ 280–87.) Second, McNerney contends that Homecomings and GMACM violated the CSPA in connection with their debt collection efforts by, among other things, filing a foreclosure action with no loss mitigation, using "false front entities," committing active fraud in prosecution of its purportedly false claims, and harassing McNerney and her family in their home. (Dist. Ct. Countercls. ¶¶ 308–16.) Third, McNerney argues that Homecomings' demand for attorney's fees in the complaint filed in the Second Foreclosure Action constitutes a violation of the CSPA. (*Id.* ¶¶ 328–30.)

18

McNerney's first CSPA claim—premised on allegations of actions occurring in connection with the origination of the Loan—is barred by the statute of limitations. Since the allegations that form the basis of the claim that OMC violated the CSPA (and that Homecomings was liable for its purported agent's CSPA violation) all arise from the origination of the Loan on December 27, 2002, the statute of limitations expired well before the District Court Counterclaims were filed in 2011. *See* Ohio Rev. Code Ann. § 1345.10(C) (West 2015).

McNerney's second and third CSPA claims—premised on the Homecomings and GMACM's foreclosure-related actions—fail because mortgage servicing, including the prosecution of the foreclosure process, is not subject to the CSPA. *See Anderson*, 989 N.E.2d at 999–1002 (holding that mortgage servicing is excluded from the CSPA since it is a "collateral service" associated with pure real estate transactions which are excluded from the CSPA);[9] *Glazer v. Chase Home Fin., L.L.C.*, Nos. 99875, 99736, 2013 WL 7869273, at *11 (Ohio Ct. App. Dec 19, 2013) (holding that the CSPA did not apply to allegations of misrepresentations in a foreclosure complaint concerning the ownership of a note and mortgage).

Accordingly, the Objection is **SUSTAINED** with respect to McNerney's CSPA claims.

### H.        Fraud on the Court Claim

There is no private cause of action for fraud on the court. *See Anderson v. Smith*, 964 N.E.2d 468, 473 (Ohio Ct. App. 2011) (stating that "[w]hile perjury, subornation of perjury, and conspiracy to commit perjury are punishable under criminal statues, they may not, for public policy reasons, form the basis of a civil lawsuit . . . ." (citation omitted)). The witness immunity rule provides that "judges, counsel, parties, and witnesses are absolutely immune from civil suits

---

[9]        In 2007, the CSPA was amended so that "consumer transactions" includes "transactions in connection with residential mortgages between loan officers, mortgage brokers, or nonbank mortgage lenders and their customers." *Anderson*, 989 N.E.2d at 1002. However, subsequent to this revision, the Ohio Supreme Court held that the CSPA has no application in a "pure" real estate transaction, relying on one of its pre-revision decisions. *Id.* at 999.

for remarks made during the course of and relevant to a judicial proceeding." *DeBrosse v. Jamison*, No. 91-CA-26, 1992 WL 5851, at *2 (Ohio Ct. App. Jan. 14, 1992) (citation omitted). As such, "the statements of witnesses are privileged and cannot be a basis for a subsequent civil action." *Id.*  Such immunity includes affidavits and other court filings.  *See, e.g.*, *Forsyth v. Hall*, No. 16024, 1997 WL 165432 (Ohio Ct. App. Mar. 14, 1997) (holding that the witness immunity rule applies to false statements made by affidavit).

McNerney asserts a cause of action for fraud on the court predicated on allegations that the Debtors filed fraudulent assignments and affidavits in the First Foreclosure Action claiming that MERS was the owner of the Note when in fact Homecomings was always the holder of the Note.  (Dist. Ct. Countercls. ¶¶ 293–302.)  Here, since McNerney's fraud on the court claim is based on allegations of false statements made in the First Foreclosure Action by parties to the action, she is barred from bring civil claims for damages premised on such allegations.  As such, McNerney cannot state a claim for fraud on the court and, thus, her claim fails.

In an attempt to rescue her fraud on the court claim, McNerney cites *Pratt v. Payne* for the proposition that an Ohio court has contemplated an exception to the witness immunity rule where there exists a larger scheme to defraud.  794 N.E.2d 723, 729 (Ohio Ct. App. 2003). However, in *Pratt*, the court stated that it is not clear whether Ohio recognizes this exception, but if it did, such an exception would apply only where the cause of action is premised on more than perjury.  *Id.*  McNerney's fraud on the court claim is based on the Debtors' filing of alleged fraudulent assignments of mortgage in the First Foreclosure Action.  (*See* Dist. Ct. Countercls. ¶¶ 293–302.)  McNerney does not allege anything else to tie these alleged fraudulent acts with the other fraudulent acts that she alleges, except that they were all committed by the Debtors.  As a result, McNerney fails to allege that the alleged fraudulent assignments were part of a "scheme to

defraud," and, therefore, *Pratt* does not support an exception to Ohio's fraud on the court cause

of action.  *See Pratt*, 794 N.E.2d at 728.

Accordingly, the Objection is **SUSTAINED** with respect to McNerney's fraud on the

court claim.

### I.    TILA Claim

For purposes of TILA, "[a] violation occurs on the date of the transaction and the

limitation period begins to run at that time.  There is no continuing violation of the statute."

*Sutliff v. Cty. Savs. and Loan Co.*, 533 F. Supp. 1307, 1310 (N.D. Ohio 1982) (citations omitted).

Claims brought under TILA for actual or statutory damages must be brought within one year

from the date of occurrence of the violation.  *See* 15 U.S.C. § 1640(e).

McNerney alleges two violations of TILA by Homecomings: (i) an improper disclosure

claim and (ii) a failure to rescind claim.  (Dist. Ct. Countercls. ¶¶ 126–142, 143–51.)  McNerney

premises her improper disclosure TILA claim on allegations that Homecomings failed to provide

her with the necessary and accurate disclosures required by TILA, and, based on these

allegations, McNerney seeks statutory and actual damages, as well as a rescission of the Loan

against Homecomings.  (*Id.*)  McNerney's failure to rescind TILA claim is premised on

allegations that Homecomings failed to rescind her loan after she claims she exercised her right

to rescind on June 16, 2004 by filing her first set of counterclaims in the First Foreclosure

Action.  (Dist. Ct. Countercls. ¶¶ 131, 143–51.)

McNerney's first TILA claim—the improper disclosure claim—relates to disclosures

required to be provided at the origination of the loan on December 27, 2002.  As a result, the

statute of limitations period ran one year later, by December 27, 2003, before the counterclaims

were raised in either the First or Second Foreclosure Action.  *See* 15 U.S.C. § 1640(e).

McNerney also asserts a TILA rescission claim based upon the disclosures required to be

provided at the origination of the loan.  Under TILA, a borrower typically has three business

days to rescind a transaction.  15 U.S.C. § 1635(a).  Certain violations of TILA, including a

lender's failure to provide certain TILA disclosures, may extend an obligor's rescission period,

but only up to a maximum of "3 years after the occurrence giving rise to the right of rescission,

or upon transfer of all of the consumer's interest in the property, or upon sale of the property,

whichever occurs first."  12 C.F.R. § 226.15(a)(3); 15 U.S.C. § 1635(f).  Even if the disclosures

provided to McNerney at loan origination were inadequate, McNerney's ability to rescind the

Loan—based on purported inadequate disclosures provided at loan origination—expired on

December 27, 2005.  McNerney did not pursue a TILA claim based on failure to rescind until

November 2006.

McNerney's second TILA claim—the failure to rescind claim—is premised on

Homecomings' alleged failure to rescind her loan after she purportedly exercised her right to

rescind on June 16, 2004 by filing her first set of counterclaims in the First Foreclosure Action.

McNerney's claim under a failure to rescind theory expired one year from the date of the alleged

failure to rescind, or June 16, 2005; however, she did not assert a TILA claim based on a failure

to rescind until November 2006 when she filed the Amended State Court Counterclaims.  As

such, McNerney's TILA claims fail.

McNerney argues that her TILA claims are not barred by the statute of limitations

because (i) they relate back to the date that the First Foreclosure Action was initiated in

November 2003 (which, if correct, would bring her TILA claims within the one year statute of

limitations) and (ii) the statute of limitations was equitably tolled.  The relation back argument

fails because the commencement of an action will toll a statute of limitations for defensive

counterclaims such as recoupment or setoff, but not for counterclaims seeking affirmative relief.

*Riley v. Montgomery*, 463 N.E.2d 1246, 1249 (Ohio 1984) ("The general rule is that statutes of

limitations bar affirmative counterclaims, but do not affect claims offered in defense or

recoupment, arising from the same transaction that forms the basis for the plaintiff's complaint."

(citations omitted)).  Here, since there is no pending foreclosure action against McNerney and

the Loan was forgiven, McNerney's claims seek affirmative relief against the Debtors, which is

subject to the one year statute of limitations which ran on December 27, 2003, well before

McNerney filed her first set of counterclaims in the First Foreclosure Action on June 16, 2004.

McNerney's equitable tolling argument also fails.  McNerney contends that since her

TILA claims were timely in the First Foreclosure Action due to the relation back doctrine, her

TILA claims should benefit from equitable tolling after the First Foreclosure Action was

dismissed.  (Opp'n at 21.)  As explained above, relation back is inapplicable to her claims, and,

thus, her equitable tolling argument fails.

Accordingly, the Objection is **SUSTAINED** with respect to McNerney's TILA claims.

### J.    RESPA Claim

The requirements for providing settlement statements and good faith estimates fall under

12 U.S.C. § 2603.  There is no private right of action under this section of RESPA.  *See*

*Morrison v. Brookstone Mortg. Co., Inc.*, 415 F. Supp. 2d 801, 806 (S.D. Ohio 2005) (holding

that section 2603 does not include a remedy for a private cause of action); *Price v. Equifirst*

*Corp.*, No. 1:08-CV-1860, 2009 WL 917950, at *5 (N.D. Ohio Apr. 1, 2009) (same).  12 U.S.C.

§ 2607 sets forth statutory prohibitions against payment of certain "kickbacks" by lenders in

connection with loan transactions.  RESPA claims are subject to a one year limitation period,

which begins to run on the date of the occurrence of the alleged violation.  *See* 12 U.S.C. § 2614

(providing that a plaintiff may bring a claim under section 2607 within one year "from the date

of the occurrence of the violation"); *Collier v. Ocwen Loan Servicing, LLC*, No. 5:12CV2937, 2013 WL 3715699, at *4 (N.D. Ohio July 15, 2013).

McNerney alleges two RESPA violations by Homecomings: (i) failure to provide settlement statements and good faith estimates, and, (ii) payment of an impermissibly large yield spread premium to OMC. (Dist. Ct. Countercls. ¶¶ 152–59.) McNerney's claim premised on the first alleged RESPA violation fails because there is no private cause of action under section 2603. *See Morrison*, 415 F. Supp. 2d at 806. McNerney's claim premised on the second alleged RESPA violation fails because it is time barred. The second alleged violation occurred at the closing of the loan on December 27, 2002, with a resulting statute of limitations expiring on December 27, 2003, more than six months before McNerney brought the first set of counterclaims in the First Foreclosure Action in June 2004. As such, McNerney's RESPA claims fail.[10]

Accordingly, the Objection is **SUSTAINED** with respect to McNerney's RESPA claim.

### K.    Civil Conspiracy Claim

To establish a claim of civil conspiracy, a plaintiff must prove: (1) a malicious combination, (2) involving two or more persons, (3) causing injury to person or property, and (4) the existence of an unlawful act independent from the conspiracy itself. *Boomershine v. Lifetime Capital, Inc.*, No. 22179, 2008 WL 54803, at *3 (Ohio Ct. App. Jan. 4, 2008). "The malice portion of the tort is that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Id.* (internal quotation marks and citations omitted). An underlying unlawful act is required before a civil conspiracy claim can be successful. *McCauley v. PDS Dental Labs., Inc.*, No. 90086, 2008 WL 2350892, at *5

---

[10]    McNerney makes the same same relation back and equitable tolling arguments to save her RESPA claims that she does for her TILA claims. For the same reasons these arguments fail with respect to her TILA claims, they fail with respect to her RESPA claims.

(Ohio Ct. App. June 1, 2008).  The element of malicious combination does not require a showing

of an express agreement between defendants, but only a common understanding or design, even

if tacit, to commit an unlawful act.  *Godsen v. Louis*, 687 N.E.2d 481, 498 (Ohio Ct. App. 1996)

(citing *Pumphrey v. Quillen*, 141 N.E.2d 675, 679–80 (Ohio Ct. App. 1955), *aff'd*, 135 N.E.2d

328 (Ohio 1956)).

McNerney asserts three claims for civil conspiracy against the Debtors, two of which

relate to the actions of Homecomings and OMC during the origination of the Loan.  (Dist. Ct.

Countercls. ¶¶ 207–12, 288–92.)  The third claim relates to alleged fraudulent conduct of the

Debtors prior to the First Foreclosure Action.  (*Id.* ¶¶ 303–16.)

The first two civil conspiracy claims are premised on breach of fiduciary duty, fraud,

intentional misrepresentation, and negligent misrepresentation.  (*See* Dist. Ct. Countercls. ¶¶ 208,

209, 290.)  All of the allegations underlying these first two civil conspiracy claims relate to

OMC's actions.  To maintain a civil conspiracy claim on these allegations, McNerney must

sufficiently allege that Homecomings had an agreement to participate in OMC's purported

wrongful activity.  While McNerney alleges that Homecomings and OMC "acted in concert," the

only allegation that McNerney advances to support this alleged agreement is that Homecomings

knew that McNerney's loan application contained incorrect information.  (*See* Dist. Ct.

Countercls. ¶ 209.)  A "meeting of the minds" is insufficient to indicate a common understanding

between the parties.  *See In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d 287, 329–30

(S.D. Ohio 2007) (holding that allegations that outside directors gave a "blind seal of approval"

to audits by an accounting firm, without allegations of an agreement to enter into a malicious

combination to injury the plaintiff, were not sufficient to support a claim for civil conspiracy).

Further, except the allegation that Homecomings knew that McNerney's loan application

contained incorrect information, McNerney alleges no facts that would suggest an agreement, even tacit, that could support a civil conspiracy claim.  (*See* Dist. Ct. Countercls. ¶ 208.)  As such, with respect to the first two civil conspiracy claims, McNerney's claim fails.  *See id.* (citing *Behrins Campbell & Young, Inc.*, 828 F. Supp. 216, 225 (S.D.N.Y. 1993) ("[A]mong the factors a fact finder may consider in inferring a conspiracy are the relationship of the parties, proximity in time and place of the acts, and the duration of the actors' joint activity.")).

McNerney's third civil conspiracy claim—premised on the Debtors' actions in filing various documents in the First Foreclosure Action—fails because it is barred by the witness immunity doctrine (as discussed earlier).  *See, e.g.*, *DeBrosse v. Jamison*, No. 91-CA-26, 1992 WL 5851, at *2 (Ohio Ct. App. Jan. 14, 1992).

Accordingly, the Objection is **SUSTAINED** with respect to McNerney's civil conspiracy claims.

### L.    Unconscionability Claim

"Unconscionability is generally recognized to include an absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party."  *Cheap Escape Co., Inc. v. Crystal Windows & Doors Corp.*, No. 93739, 2010 WL 4018693, at *3 (Ohio Ct. App. Oct. 14, 2010) (internal quotation marks and citation omitted).  In order to prevail on a claim for unconscionability, a plaintiff must demonstrate that a contract was both procedurally and substantively unconscionable.  *Id.* Substantive unconscionability concerns the actual terms of the contract and whether the terms are unfair or unreasonable.  *Id.*  Procedural unconscionability involves the circumstances surrounding the execution of the contract between the two parties and occurs where no voluntary meeting of the minds was possible.  *Id.* at *3.  "In determining procedural unconscionability, a court should consider factors bearing on the relative bargaining position of the contracting

parties—including age, education, intelligence, business acumen, and experience in similar transactions." *Id.* (citation omitted).

McNerney asserts a claim for unconscionability premised on the origination of and the terms of the Loan. (Dist. Ct. Countercls. ¶¶ 204–06.) McNerney alleges that only by falsifying data could Homecomings obtain approval from Fannie Mae and that, even with the false facts, the loan was viewed as high risk. (Opp'n at 39.) McNerney contends that her default and the foreclosure proceedings were the inevitable result of the unsustainable loan and that the Loan left McNerney worse off. (*Id.* at 39–40.) However, McNerney concedes that her payment under the Loan was "essentially the same" as the payment under the Household Loan. (*Id.* at 40.)

Here, examining substantive unconscionability, the Loan involved standard loan terms. (*See* Lathrop Decl. Ex. B.) Moreover, the Loan refinanced the prior Household Loan and lowered McNerney's interest rate from 13% to 8%. (*See* Dist. Ct. Countercls. ¶¶ 66–67.) Additionally, McNerney concedes that her payment under the Loan was "essentially the same" as the payment under the Household Loan (which the Loan refinanced). (Opp'n at 40.)

Further, the Loan was not procedurally unconscionable either. Examining the relative bargaining position of the contracting parties, McNerney was a high school graduate, who worked as a librarian at the time the loan was issued. (*See* Trial Tr. at 189; the "McNerney Deposition," Wallace Decl. Ex. C at 6.) McNerney said she understood the terms of the loan, including her monthly payment, the total amount of the loan, and acceleration clause in the event of a default. (Trial Tr. at 204–05; McNerney Dep. at 22–24.) These uncontested facts show that McNerney was not unsophisticated, nor were the bargaining positions so mismatched as to support a claim for unconscionability. As such, McNerney's claim for unconscionability fails.

Accordingly, the Objection is **SUSTAINED** with respect to McNerney's claim for unconscionability.

### M.    Breach of Privacy Claim

The right of privacy is the right of a person to be left alone, to be free from unwarranted publicity, and to live without unwarranted interference by the public in matters with which the public is not necessarily concerned.  *Sustin v. Fee*, 431 N.E.2d 992, 993 (Ohio 1982).  The Ohio Supreme Court has recognized three theories for the tort of invasion of privacy: (1) the unwarranted appropriation or exploitation of one's personality, (2) the publicizing of one's private affairs with which the public has no legitimate concern, or (3) the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.  *Id.*

McNerney makes a claim for breach of privacy, alleging that Homecomings and GMACM's conduct "in sending to Ms. McNerney's home to harass and intimidate her and her family in the presence of hearing neighbors, without Ms. McNerney's authorization or consent" was a violation of McNerney's right to privacy.  (Dist. Ct. Countercls. ¶¶ 317–21.)  McNerney alleges that throughout the first foreclosure proceeding and even after its dismissal, agents from Homecomings came by the home and publically humiliated McNerney and her children.  (*Id.* ¶ 104.)  McNerney alleges that the agents came by in cars to take pictures.  (*Id.* ¶ 105.)  McNerney further alleges that the agents got out of their car, came onto the property, called out to the family, heckling them while the family was on their front balcony, calling out in loud voices, that the family should stand up and wave and smile for the cameras.  (*Id.* ¶ 106.)

In so pleading, McNerney alleges a cause of action under the second and third theories of breach of privacy: (1) the publicizing of one's private affairs with which the public has no legitimate concern and (2) the wrongful intrusion into one's private activities in such a manner as

to outrage and cause mental suffering, shame, or humiliation to a person of ordinary sensitivities.

(*See* Opp'n at 41.)  Under either theory, McNerney's claim for breach of privacy fails.

### 1.    *Publication Theory*

In order to establish a claim for publication of another's private affairs, a plaintiff must

plead the following five elements:

> (1) There must be publicity; the disclosure of a public nature, not private. "Publicity" means communicating the matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge as opposed to 'publication' as that term of art is used in connection with liability for defamation as meaning any communication by the defendant to a third person.
> (2) The facts disclosed must be those concerning the private life of an individual, not his public life.
> (3) The matter publicized must be one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.
> (4) The publication must have been made intentionally, not negligently.
> (5) The matter publicized must not be a legitimate concern to the public

*Quintile v. Medina County*, No. 1:07CV2413, 2008 WL 2484173, at *9–10 (N.D. Ohio June 17,

2008) (citing *Killilea v. Sears, Roebuck & Co.*, 499 N.E.2d 1291, 1294–95 (Ohio Ct. App.

1985)).

Here, McNerney makes no allegation of a disclosure of any private information.  Instead,

McNerney alleges that the agents told McNerney and her family to "stand up and smile for the

cameras."  (Dist. Ct. Countercls. ¶ 106.)  Additionally, McNerney fails to allege facts to support

a finding of publication.  McNerney alleges that Homecomings' agents, among others,

publicized her affairs by harassing and intimidating her and her family "in the presence and

hearing of neighbors."  (*Id.* ¶ 318.)  These alleged facts are not sufficient to establish that

anything was disclosed to "the public at large," which is a required element of this theory.  *See,*

*e.g.*, *Yoder v. Ingersoll-Rand Co.*, 172 F.3d 51 (6th Cir. 1998) (holding that the disclosure of a private fact to a small group of people did not qualify as "the public at large"); *Quintile*, 2008 WL 2484173 (holding that statements made to other employees was not sufficient to establish publication to the "public at large"). As such, McNerney's claim for invasion of privacy under the publication of private affairs theory fails.

> 2.    *Wrongful Intrusion Theory*

Under the wrongful intrusion theory of the breach of privacy tort, "[t]he defendant is subject to liability . . . only when he has intruded into a private place, or has otherwise invaded a private seclusion." *Jackson v. Playboy Enters., Inc.*, 574 F. Supp. 10, 13–14 (S.D. Ohio 1983) (quoting Restatement (Second) of Torts § 652B, comment c (1977)). Additionally, the wrongful intrusion tort requires a showing of an intentional intrusion "upon the solitude or seclusion of another . . . if the intrusion would be highly offensive to a reasonable person." *Roe ex rel. Roe v. Heap*, No. 03AP–586, 2004 WL 1109849, at *18 (Ohio Ct. App. May 11, 2004) (citation omitted). "The intrusion must be wrongful, as well as done in a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Id.* (citation omitted). For an intrusion to be wrongful, it must "shock the ordinary person to the point of emotional distress." *Id.* (citation omitted).

McNerney's claim for breach of privacy claim under a wrongful intrusion theory fails because the alleged actions occurred while she and her family were in a public place. *See York v. Gen. Elec. Co.*, 759 N.E.2d 865, 868 (Ohio Ct. App. 2001) (holding that no wrongful intrusion occurred where unauthorized video recordings were taken of plaintiff while he was on his porch and in his yard, places that are "outside and in public view"). McNerney contends that the actions of the Homecoming agents are similar to the actions from *Housh* where the court found an invasion of privacy occurred. *See Housh v. Perth*, 133 N.E.2d 340, 344 (Ohio 1956).

However, *Housh* is distinguishable.  In *Housh*, the court found that the defendant engaged in a "systematic campaign of harassment," where the defendant, in an attempt to collect a debt, called the plaintiff every day for three weeks, sometimes late at night and sometimes at her place of employment.  *See id.*  Further, the defendant informed the plaintiff's employer of the debt, putting her employment in jeopardy.  *See id.*  Here, among other things, the wrongful activity that McNerney alleges involved, at most, a few occurrences, unlike the "systemic harassment" in *Housh*.  Additionally, the essence of the actions alleged by McNerney is clearly distinguishable from the actions taken by the defendant in *Housh*.  As such, McNerney's invasion of privacy under the wrongful intrusion theory claim fails.

Accordingly, the Objection is **SUSTAINED** with respect to McNerney's claims for breach of privacy.

### N.    Issue Preclusion is Inapplicable

McNerney notes that the Ohio State Court denied the motion for summary judgment in the First Foreclosure Action and that many of the arguments that the Trust advances now were the arguments that MERS advanced.  (Opp'n at 23.)  McNerney argues that summary disposition of the Claims now is inappropriate because the Ohio State Court denied the motion for summary judgment in the First Foreclosure Action and the facts have not changed.  (*Id.*)

Issue preclusion does not apply to non-appealable orders such as orders denying motions for summary judgment.  *See Bradley v. Reno*, 749 F.3d 553, 557 (6th Cir. 2014) (holding that the Ohio Supreme Court would likely follow the generally accepted rule that non-appealable orders do not have a preclusive effect); *see also Sagenich v. Erie Ins. Group*, No. 2003-T-0144, 2003 WL 22952586, at *1 (Ohio Ct. App. Dec. 12, 2003) ("It is well established that the denial of a motion for summary judgment is generally not a final appealable order." (citing *State ex rel. Overmeyer v. Walinski*, 222 N.E.2d 312 (Ohio 1966))).

McNerney's argument is unavailing since the Ohio State Court's denial of the motion for summary judgment was a non-appealable order, and, as such, issue preclusion is inapplicable. *See, e.g.*, *Bradley v. Reno*, 749 F.3d at 557.

**O.    Gray's Claim for Attorney's Fees**

The CSPA, TILA, RESPA and OMBA permit recovery of attorney's fees, but only if the party bringing the cause of action prevails. *See* Ohio Rev. Code Ann. § 1345.09(F) (West 2015) (stating the rule under the CSPA); 12 U.S.C. § 2605(f) (stating the rule under RESPA); 15 U.S.C. § 1640(a)(3) (stating the rule under TILA); Ohio Rev. Code Ann. § 1322.11 (West 2015) (stating rule under the OMBA). Since McNerney's claims under all of these causes of action fail, Gray's claim for attorney's fees also fails.

Accordingly, the Objection is **SUSTAINED** with respect to Gray's claim for attorney's fees.

## III.    CONCLUSION

For the above reasons, the Objection is **SUSTAINED** and the Claims are **DISALLOWED** and **EXPUNGED**.

**IT IS SO ORDERED.**

Dated:    February 29, 2016
         New York, New York

*Martin Glenn*
MARTIN GLENN
United States Bankruptcy Judge