**Hearing Date: March 22, 2016 at 10:00 A.M. (ET)**

MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Norman S. Rosenbaum
Jordan A. Wishnew
Jessica J. Arett

*Counsel for the ResCap Borrower Claims Trust*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------
)
In re:                                              )    Case No. 12-12020 (MG)
                                                    )
RESIDENTIAL CAPITAL, LLC, et al.,                   )    Chapter 11
                                                    )
                            Debtors.                )    Jointly Administered
                                                    )
------------------------------------------------------------------

**RESCAP BORROWER CLAIMS TRUST'S OMNIBUS REPLY IN SUPPORT OF ITS NINETY-SECOND OMNIBUS OBJECTION TO CLAIMS ((I) NO LIABILITY BORROWER CLAIMS AND (II) ALLOWED IN FULL BORROWER CLAIM) AS TO CLAIM NO. 3484**

ny-1224807

The ResCap Borrower Claims Trust (the "Borrower Trust"), established pursuant to the terms of the Plan[1] filed in the above-captioned Chapter 11 Cases, as successor in interest to the above-captioned Debtors with respect to Borrower Claims, by and through its undersigned counsel, hereby submits this reply (the "Reply") and the Supplemental Declaration of Sara Lathrop, Senior Claims Analyst to the Borrower Trust (the "Supp. Decl."), annexed hereto as Exhibit 1, to the response filed by Lynn C. Greene and James Cassidy (the "Respondents") [Docket No. 9745] (the "Response") to the *ResCap Borrower Claims Trust's Ninety-Second Omnibus Objection to Claims ((I) No Liability Borrower Claim and (II) Allowed in Full Borrower Claim* [Docket No. 9486] (the "Objection"). The Trust respectfully states as follows:

**PRELIMINARY STATEMENT**

1.    The Borrower Trust examined the Response and the statements submitted in support thereof. For purposes of this Reply and the Objection, the Borrower Trust takes these statements at face value. If the Court is not prepared to rule on the Objection with respect to the Respondents, then the Borrower Trust reserves the right to take discovery from the Respondents.

2.    As described herein and in the Supplemental Declaration, the Borrower Trust thoroughly examined the Debtors' books and records that were prepared and kept in the course of their regularly conducted business activities (the "Books and Records") in an effort to validate the accuracy of the allegations made in the Response and the claim at issue, and for the reasons described herein, the Books and Records do not show any liability due and owing to the Respondents.

3.    Moreover, as the Objection shifted the burden of proof back to the Respondents, the Respondents must demonstrate a valid claim against the Debtors' estates by a preponderance of the evidence. For the reasons set forth in the Objection, this Reply, and the Supplemental

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Objection.

ny-1224807

Declaration, the Respondents have failed to assert a valid claim because they have failed to support their allegations of wrongdoing with any evidence, and the Books and Records contradict their allegations. Therefore, the Respondents have failed to meet their burden of proof, and the relief sought in the Objection should be granted with respect to the Respondents.

## BACKGROUND

4. In connection with the claims reconciliation process, the Borrower Trust identified certain claims filed by Borrowers that it believed did not constitute valid liabilities of the Debtors (together, the "No Liability Borrower Claims"). See Supp. Decl. ¶ 4.

*Background Facts*

5. On or around November 7, 2012, the Respondents filed a proof of claim against Debtor GMAC Mortgage, LLC ("GMACM"), designated as Claim No. 3484 (the "Claim"), asserting an administrative priority claim in the amount of $28,800.00. See Exhibit A to the Supp. Decl.

6. According to the Debtors' books and records, non-Debtor Clarion Mortgage Capital, Inc. ("Clarion") originated a loan in the amount of $399,500.00 to the Respondents on December 16, 2005 (the "Loan"), secured by a deed of trust on property located at 6526 Wauconda Drive, Larkspur, CO 80118 (the "Property"). See Note, attached to the Supp. Decl. as Exhibit B, and Deed of Trust, attached to the Supp. Decl. as Exhibit C. Non-Debtor GMAC Bank purchased the loan from Clarion and transferred its interest in the Loan to Fannie Mae. See Supp. Decl. ¶ 5.

7. GMACM serviced the Loan from January 3, 2006 until the loan was paid off on March 31, 2011. See Supp. Decl. ¶ 6.

8. At the time the Loan was originated, Clarion calculated the initial escrow balance to be $1,208.60 and required that this amount be deposited at origination. Clarion also calculated

an initial monthly escrow payment of $172.66 (for a total initial monthly payment of $2,472.41). See Initial Escrow Disclosure, attached to the Supp. Decl. as Exhibit D. However, this calculation underestimated the amount of the Respondents' taxes, as demonstrated by the fact that Douglas County (the "County") assessed $3,011.00 in taxes for the first half of 2006. See Servicing Notes, attached to the Supp. Decl. as Exhibit E, at 4. This was in part due to a failure on the part of Clarion to include an annual assessment for a country club (the "Country Club Lien") when it did its initial escrow analysis.[2] See HUD-1, attached to the Supp. Decl. as Exhibit F. Thus, after the County assessed $3,011.00 in taxes for the first half of 2006, the $1,208.60 that was held at closing pursuant to the escrow disclosure was insufficient, making the Respondents' escrow account in arrears by $1,802.40 when the assessment was disbursed on January 31, 2006 (the "Escrow Shortage"). See Servicing Notes, at 5.

9. As a result of the deficient escrow estimate, each one of the Respondents' monthly payments were unable to sufficiently cover the amount necessary to make the semi-annual escrow payments, thereby increasing the amount of the Escrow Shortage. For the Court's convenience, the Borrower Trust has attached a summary of the payments made to and from the Respondents' escrow account from January 3, 2006 to January 15, 2009 (the "Escrow Account Summary", attached to the Supp. Decl. as Exhibit G), which reflects the payments as they are listed in the Servicing Notes.

10. On May 7, 2007, the Respondents spoke to a representative of GMACM via phone, at which time the Respondents stated the amount being used for taxes was incorrect. See Servicing Notes at 34-35. GMACM's representative advised the Respondents to call the County

---

[2] While the HUD-1 contains a line item for county tax, there is nothing indicated in the line item "Annual Assessments." See Supp. Decl. 7 n.3. It also appears that the HUD-1 underestimated the Respondents' regular property tax assessment, as the difference between the amount assessed and the estimated amount is more than the semi-annual payment for the Country Club Lien. See Supp. Decl. ¶ 7 n.3.

3

ny-1224807

to confirm the amount of the annual taxes that needed to be paid and call them back to process a new escrow analysis. See id.

11. As of May 10, 2007, the Respondents' escrow account had a shortage of $7,218.69. See Escrow Account Summary. On May 16, 2007, the Debtors conducted an escrow analysis, which estimated that as of June 1, 2007 (after the next County tax payment would be due), the Respondents' escrow shortage would be $11,139.45. See June 2007 Escrow Analysis, attached to the Supp. Decl. as Exhibit H. As a result, in order to make up the shortage and prevent it from happening in the future, their new monthly payment would be $3,436.13, which included an escrow payment of $1,136.38 (the "June 2007 Escrow Payment"). See id. The Debtors informed the Respondents of this change in a letter sent May 16, 2007. See Servicing Notes at 34. The June 2007 Escrow Payment included a regular monthly escrow payment of $672.24 and an additional escrow payment to compensate for the shortage of $464.14 (which spread the Respondents' payment of the shortage over two years).[3]

12. On June 1, 2007, the Respondents spoke to a representative of GMACM via phone, at which time the Respondents stated that there was an error with the calculation of the tax shortage. See Servicing Notes at 34. The representative advised her to send a written explanation to GMACM's tax department. See id.

13. A representative of GMACM inquired with the County tax office regarding the tax issue, and confirmed that the Country Club Lien could not be separated from the Respondents' other taxes. See Servicing Notes at 34. GMACM attempted to contact the

---

[3] The Respondents' regular monthly payment was calculated after the Debtors estimated that their 2007 taxes that would be payable in 2008 included $4,475.37, plus payments on the Country Club Lien of $2,929.50, for a total of $7,404.87 due in semi-annual payments of $3,703.44. See Servicing Notes at 31. This amounts to a monthly payment for taxes of $617.07. The remainder of the Respondents' regular monthly escrow payment was for insurance.

4

Respondents on June 19, 2007 to discuss the issue; a voicemail was left after there was no answer. See Servicing Notes at 33.

14. On July 12, 2007, the Respondents spoke to a representative of GMACM and requested that the payment for the Country Club Lien be removed from escrow because it is not a tax. See Servicing Notes at 31. As a result, GMACM submitted the issue for research. On July 16, 2007, GMACM completed the research and determined that the escrow account had been calculated correctly because the payment for the Country Club Lien was included on the Respondents' tax bill and GMACM was required to pay the tax bill in full under the terms of the Deed of Trust. See Servicing Notes at 30.

15. GMACM completed a new escrow analysis that would spread the Escrow Shortage over 34 months (rather than the previous 24), reducing the Respondents' monthly escrow payment to $972.57 beginning with the August 9, 2007 payment. See Servicing Notes at 29. On August 3, 2007, GMACM sent the Respondents a letter advising them of the change. See id.

16. GMACM conducted another escrow analysis on April 1, 2008 that would be effective with the June 1, 2008 payment. The analysis showed a shortage amount of $8,730.81, resulting in the Respondents' monthly escrow payment increasing to $1,120.56, increasing their total monthly payment to $3,420.31. See June 2008 Escrow Analysis, attached to the Supp. Decl. as Exhibit I.

17. On December 12, 2008, the Respondents spoke to a representative of GMACM via phone regarding the Escrow Shortage and stated that they will fax a copy of their current tax and insurance bills to have the escrow payment reanalyzed. See Servicing Notes at 19.

5

ny-1224807

18. GMACM reviewed the Respondents' escrow account and confirmed that the payment for the Country Club Lien was included on their regular tax bill and that the payment on the lien for the first half of 2009 would be $1,397.79. See Servicing Notes at 19.

19. On December 29, 2008, the Respondents spoke with a representative of GMACM via phone, at which time the Respondents stated that they were considering paying off the Country Club Lien in full. See Servicing Notes at 18. At that time, the GMACM representative advised the Respondents that if they did pay off the lien, they would need to provide proof so that their escrow payment could be adjusted. See id.

20. On January 5, 2009, a representative of GMACM spoke to the County tax office over the phone and was informed that the Country Club Lien had been paid in full by the Respondents, and as a result the Respondents' annual tax assessment would be reduced to $4,457.68. See Servicing Notes at 18. As a result, GMACM reduced the escrow portion of the Respondents' monthly payment to $640.67, which is reflected in the lower monthly payment made by the Respondents on January 15, 2009. See Servicing Notes at 3.

21. The Respondents paid off the remaining loan balance, including the Escrow Shortage, on March 31, 2011, at which time GMACM ceased servicing. See Servicing Notes at 5.

**REPLY**

22. A filed proof of claim is "deemed allowed, unless a party in interest … objects." 11 U.S.C. § 502(a). Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law…." 11 U.S.C. § 502(b)(1). As noted previously by the Court, claims objections have a shifting burden of proof. Pursuant to Federal Rule of Bankruptcy Procedure 3001(f), a Respondents establishes a prima facie case

against a debtor upon filing a proof of claim alleging facts sufficient to support the claim. The objecting party is thereafter required to produce evidence equal in force to that provided by the Respondents to rebut the presumption of the Respondents' prima facie case. In re Residential Capital, LLC, 507 B.R. 477, 490 (Bankr. S.D.N.Y. 2014). See also Allegheny Int'l, Inc. v. Snyder (In re Allegheny Int'l, Inc.), 954 F.2d 167, 173-74 (3d Cir. 1992).

23. Once an objection refutes an essential allegation of the claim, the burden of persuasion is on the holder of a proof of claim to establish a valid claim against a debtor by a preponderance of the evidence. Residential Capital, 507 B.R at 490; Feinberg v. Bank of N.Y. (In re Feinberg), 442 B.R. 215, 220-22 (Bankr. S.D.N.Y. 2010); In re Oneida Ltd., 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), aff'd sub nom., Peter J. Solomon Co. v. Oneida Ltd., No. 09-cv-2229 (DC), 2010 U.S. Dist. LEXIS 6500 (S.D.N.Y. Jan. 22, 2010).

24. In the Response, the Respondents states that (1) the Country Club Lien was not designed to be repaid through property tax and was not paid that way by the Respondents, (2) the arrangement to repay the Escrow Shortage was improper because it paid the Country Club Lien too quickly, (3) GMACM did not make payments on the Country Club Lien, and (4) the Respondents paid off the Country Club Lien on advice from GMACM; however, their monthly payment was not reduced as a result. See Response. None of these allegations have merit.

25. As is demonstrated by the facts in ¶¶ 14-15 *supra*, GMACM confirmed on numerous occasions that the Country Club Lien was part of the Respondents' regular tax bill. Additionally, GMACM cannot be responsible for paying the Country Club Lien too quickly, as it was merely making the payments that were determined by the County tax office to ensure that the Respondents' tax obligations were provided for, as it was required to do under the terms of the Deed of Trust. See Deed of Trust, section 3. Furthermore, the Respondents have failed to

provide any evidence to support their assertion that the portion of their escrow payment that paid the Country Club Lien was higher than was necessary.

26. Regarding the allegations that GMACM did not make the escrow payments to the County tax office, the Respondents do not point to any evidence to support this allegation, and GMACM's servicing notes show that such payments were made every six months.[4] Additionally, there is nothing in the Books and Records to indicate that the County tax office ever reported a tax delinquency to the Debtors or attempted to obtain a tax lien on the Property.

27. Finally, the Respondents' allegation that their monthly payment was not reduced after they paid off the Country Club Lien is without merit. As was stated in ¶ 21 *supra*, after GMACM was informed that the Country Club Lien was paid in full, it reduced the Respondents monthly mortgage payment to account for the removal of that portion of their payment.[5]

## CONCLUSION

28. WHEREFORE, the Borrower Trust respectfully submits that the relief requested in the Objection should be granted in its entirety, and the Claim should be disallowed and expunged from the Claims Register.

---

[4] Pursuant to GMACM's standard business practices, when a payment was made on a tax bill, it would be reflected in the payment history as "Escrow Disb-Tax County."

[5] At the time the Respondents paid off the remaining amount of the Country Club Lien, they were still making payments on the Escrow Shortage, as the shortage had been spread over a period of 34 months beginning in August 2007. As a result, their monthly escrow payment continued to reflect their monthly payment to repay the shortage even after the Country Club Lien was paid in full. See Supp. Decl. ¶ 20.

|  |  |
|---|---|
| Dated: March 18, 2016<br>New York, New York | /s/ Norman S. Rosenbaum<br>Norman S. Rosenbaum<br>Jordan A. Wishnew<br>Jessica J. Arett<br>MORRISON & FOERSTER LLP<br>250 West 55th Street<br>New York, New York 10019<br>Telephone: (212) 468-8000<br>Facsimile: (212) 468-7900<br><br>*Counsel for the ResCap Borrower Claims Trust* |