**Exhibit 1**

**Supplemental Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) ) | Chapter 11 |
| Debtors. | ) ) ) | Jointly Administered |

**DECLARATION OF SARA LATHROP IN SUPPORT OF THE RESCAP BORROWER CLAIMS TRUST'S OMNIBUS REPLY IN SUPPORT OF ITS NINETY-SECOND OMNIBUS OBJECTION TO CLAIMS ((I) NO LIABILITY BORROWER CLAIMS AND (II) ALLOWED IN FULL BORROWER CLAIM) AS TO CLAIM NO. 3484**

I, Sara Lathrop, hereby declare as follows:

      1.      I serve as Senior Claims Analyst for the ResCap Borrower Claims Trust (the "<u>Borrower Trust</u>"), established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030] confirmed in the above-captioned Chapter 11 Cases. During the Chapter 11 Cases, I served as Regulatory Compliance Manager and Loss Mitigation Manager in the loan servicing department of Residential Capital, LLC ("<u>ResCap</u>"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "<u>Debtors</u>"). I began my association with ResCap in June 2006 working as an associate in the Default Division of the loan servicing operation of GMAC Mortgage, LLC ("<u>GMACM</u>"). In 2008, I became a Default Quality Control Specialist, a position that I held until I became a Supervisor in the Default Division in 2009. In 2011, I became a Supervisor in the Loss Mitigation Division of GMACM's loan servicing operation, and in February 2012, I became a Manager in that division. In this role, I oversaw

1

ny-1225792

GMACM associates in their efforts to provide borrowers with loss mitigation options and assisted in the development of GMACM's loss mitigation policies. In January of 2013, I became the Regulatory Compliance Manager for ResCap. I became Senior Claims Analyst for ResCap in July 2013 and continued in this role when the ResCap Liquidating Trust (the "Liquidating Trust") was established in December 2013. In my current position as Senior Claims Analyst to the Borrower Trust, among my other duties, I continue to assist the Borrower Trust in connection with the claims reconciliation process.[1] I am authorized to submit this declaration (the "Declaration") in support of the *ResCap Borrower Claims Trust's Omnibus Reply In Support of Its Ninety-Second Omnibus Objection To Claims ((I) No Liability Borrower Claims and (II) Allowed In Full Borrower Claim) As To Claim No 3484* (the "Reply").[2]

       2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations, information learned from my review of relevant documents and information I have received through my discussions with other former members of the Debtors' management or other former employees of the Debtors, the Liquidating Trust, and the Borrower Trust's professionals and consultants. If I were called upon to testify, I could and would testify competently to the facts set forth in the Objection on that basis.

       3. In my capacity as Senior Claims Analyst, I am intimately familiar with the claims reconciliation process in these Chapter 11 Cases with regard to Borrower Claims. Except as otherwise indicated, all statements in this Declaration are based upon my familiarity with the Debtors' Books and Records kept in the course of their regularly conducted business activities

---

[1] The ResCap Liquidating Trust and the ResCap Borrower Claims Trust are parties to an Access and Cooperation Agreement, dated as December 17, 2013, which, among other things, provides the Borrower Trust with access to the books and records held by the Liquidating Trust and Liquidating Trust's personnel to assist the Borrower Trust in performing its obligations.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Reply.

(the "Books and Records") as well as the Debtors' schedules of assets and liabilities and statements of financial affairs filed in these Chapter 11 Cases (collectively, the "Schedules"), my review and reconciliation of claims, and/or my review of relevant documents. I or my designee at my direction have reviewed and analyzed the proof of claim form and supporting documentation filed by the Claimants. Since the Plan went effective and the Borrower Trust was established, I, along with members of the Liquidating Trust's management or employees of the Liquidating Trust have consulted with the Borrower Trust to continue the claims reconciliation process, analyze claims, and determine the appropriate treatment of the same. In connection with such review and analysis, where applicable, I or Liquidating Trust personnel, together with professional advisors, have reviewed (i) information supplied or verified by former personnel in departments within the Debtors' various business units, (ii) the Books and Records, (iii) the Schedules, (iv) other filed proofs of claim, and/or (vi) the official claims register maintained in the Debtors' Chapter 11 Cases.

4. On or around November 7, 2012, the Respondents filed a proof of claim against Debtor GMAC Mortgage, LLC ("GMACM"), designated as Claim No. 3484 (the "Claim"), asserting an administrative priority claim in the amount of $28,800.00. See Exhibit A attached hereto. In connection with the claims reconciliation process, the Borrower Trust identified certain claims filed by Borrowers that it believed did not constitute valid liabilities of the Debtors (together, the "No Liability Borrower Claims"), including the Claim.

5. According to the Debtors' books and records, non-Debtor Clarion Mortgage Capital, Inc. ("Clarion") originated a loan in the amount of $399,500.00 to the Respondents on December 16, 2005 (the "Loan"), secured by a deed of trust on property located at 6526 Wauconda Drive, Larkspur, CO 80118 (the "Property"). See Note, attached hereto as

3

Exhibit B, and Deed of Trust, attached hereto as Exhibit C.  Non-Debtor GMAC Bank purchased the loan from Clarion and transferred its interest in the Loan to Fannie Mae.

6. GMACM serviced the Loan from January 3, 2006 until the loan was paid off on March 31, 2011.

7. At the time the Loan was originated, Clarion calculated the initial escrow balance to be $1,208.60 and required that this amount be deposited at origination.  Clarion also calculated an initial monthly escrow payment of $172.66 (for a total initial monthly payment of $2,472.41).  See Initial Escrow Disclosure, attached hereto as Exhibit D.  However, this calculation underestimated the amount of the Respondents' taxes, as demonstrated by the fact that Douglas County (the "County") assessed $3,011.00 in taxes for the first half of 2006.  See Servicing Notes, attached hereto as Exhibit E, at 4.  This was in part due to a failure on the part of Clarion to include an annual assessment for a country club (the "Country Club Lien") when it did its initial escrow analysis.[3]  See HUD-1, attached hereto as Exhibit F.  Thus, after the County assessed $3,011.00 in taxes for the first half of 2006, the $1,208.60 that was held at closing pursuant to the escrow disclosure was insufficient, making the Respondents' escrow account in arrears by $1,802.40 when the assessment was disbursed on January 31, 2006 (the "Escrow Shortage").  See Servicing Notes at 5.

8. As a result of the deficient escrow estimate, each one of the Respondents' monthly payments were unable to sufficiently cover the amount necessary to make the semi-annual escrow payments, thereby increasing the amount of the Escrow Shortage.  For the Court's convenience, the Borrower Trust has attached a summary of the payments made to and from the

---

[3] While the HUD-1 contains a line item for county tax, there is nothing indicated in the line item "Annual Assessments."  It also appears that the HUD-1 underestimated the Respondents' regular property tax assessment, as the difference between the amount assessed and the estimated amount is more than the semi-annual payment for the Country Club Lien.

4

ny-1225792

Respondents' escrow account from January 3, 2006 to January 15, 2009 (the "Escrow Account Summary", attached hereto as Exhibit G), which reflects the payments as they are listed in the Servicing Notes.

9. On May 7, 2007, the Respondents spoke to a representative of GMACM via phone, at which time the Respondents stated the amount being used for taxes was incorrect. See Servicing Notes at 34-35. GMACM's representative advised the Respondents to call the County to confirm the amount of the annual taxes that needed to be paid and call them back to process a new escrow analysis. See id.

10. As of May 10, 2007, the Respondents' escrow account had a shortage of $7,218.69. See Escrow Account Summary. On May 16, 2007, the Debtors conducted an escrow analysis, which estimated that as of June 1, 2007 (after the next County tax payment would be due), the Respondents' escrow shortage would be $11,139.45. See June 2007 Escrow Analysis, attached hereto as Exhibit H. As a result, in order to make up the shortage and prevent it from happening in the future, their new monthly payment would be $3,436.13, which included an escrow payment of $1,136.38 (the "June 2007 Escrow Payment"). See id. The Debtors informed the Respondents of this change in a letter sent May 16, 2007. See Servicing Notes at 34. The June 2007 Escrow Payment included a regular monthly escrow payment of $672.24 and an additional escrow payment to compensate for the shortage of $464.14 (which spread the Respondents' payment of the shortage over two years).[4]

11. On June 1, 2007, the Respondents spoke to a representative of GMACM via phone, at which time the Respondents stated that there was an error with the calculation of

---

[4] The Respondents' regular monthly payment was calculated after the Debtors estimated that their 2007 taxes that would be payable in 2008 included $4,475.37, plus payments on the Country Club Lien of $2,929.50, for a total of $7,404.87 due in semi-annual payments of $3,703.44. See Servicing Notes at 31. This amounts to a monthly payment for taxes of $617.07. The remainder of the Respondents' regular monthly escrow payment was for insurance.

the tax shortage. See Servicing Notes at 34. The representative advised her to send a written explanation to GMACM's tax department. See id.

12. A representative of GMACM inquired with the County tax office regarding the tax issue, and confirmed that the Country Club Lien could not be separated from the Respondents' other taxes. See Servicing Notes at 34. GMACM attempted to contact the Respondents on June 19, 2007 to discuss the issue; a voicemail was left after there was no answer. See Servicing Notes at 33.

13. On July 12, 2007, the Respondents spoke to a representative of GMACM and requested that the payment for the Country Club Lien be removed from escrow because it is not a tax. See Servicing Notes at 31. As a result, GMACM submitted the issue for research. On July 16, 2007, GMACM completed the research and determined that the escrow account had been calculated correctly because the payment for the Country Club Lien was included on the Respondents' tax bill and GMACM was required to pay the tax bill in full under the terms of the Deed of Trust. See Servicing Notes at 30.

14. GMACM completed a new escrow analysis that would spread the Escrow Shortage over 34 months (rather than the previous 24), reducing the Respondents' monthly escrow payment to $972.57 beginning with the August 9, 2007 payment. See Servicing Notes at 29. On August 3, 2007, GMACM sent the Respondents a letter advising them of the change. See id.

15. GMACM conducted another escrow analysis on April 1, 2008 that would be effective with the June 1, 2008 payment. The analysis showed a shortage amount of $8,730.81, resulting in the Respondents' monthly escrow payment increasing to $1,120.56,

6

ny-1225792

increasing their total monthly payment to $3,420.31.  See June 2008 Escrow Analysis, attached hereto as Exhibit I.

   16. On December 12, 2008, the Respondents spoke to a representative of GMACM via phone regarding the Escrow Shortage and stated that they will fax a copy of their current tax and insurance bills to have the escrow payment reanalyzed.  See Servicing Notes at 19.

   17. GMACM reviewed the Respondents' escrow account and confirmed that the payment for the Country Club Lien was included on their regular tax bill and that the payment on the lien for the first half of 2009 would be $1,397.79.  See Servicing Notes at 19.

   18. On December 29, 2008, the Respondents spoke with a representative of GMACM via phone, at which time the Respondents stated that they were considering paying off the Country Club Lien in full.  See Servicing Notes at 18.  At that time, the GMACM representative advised the Respondents that if they did pay off the lien, they would need to provide proof so that their escrow payment could be adjusted.  See id.

   19. On January 5, 2009, a representative of GMACM spoke to the County tax office over the phone and was informed that the Country Club Lien had been paid in full by the Respondents, and as a result the Respondents' annual tax assessment would be reduced to $4,457.68.  See Servicing Notes at 28.  As a result, GMACM reduced the escrow portion of the Respondents' monthly payment to $640.67, which is reflected in the lower monthly payment made by the Respondents on January 15, 2009.  See Servicing Notes at 3.

   20. At the time the Respondents paid off the remaining amount of the Country Club Lien, they were still making payments on the Escrow Shortage, as the shortage had been spread over a period of 34 months beginning in August 2007.  As a result, their monthly escrow

7

payment continued to reflect their monthly payment to repay the shortage even after the Country Club Lien was paid in full.

21. The Respondents paid off the remaining loan balance, including the Escrow Shortage, on March 31, 2011, at which time GMACM ceased servicing. See Servicing Notes at 5.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 18, 2016

/s/ Sara Lathrop
Sara Lathrop
Senior Claims Analyst for the ResCap
Borrower Claims Trust

8

ny-1225792