**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | **NOT FOR PUBLICATION** |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Case No. 12-12020 (MG) |
| Debtors. | Chapter 11 |
|  | Jointly Administered |

## MEMORANDUM OPINION AND ORDER AFTER TRIAL OF THE REMAINING CLAIM NO. 725 OF WILLIAM J. FUTRELL

*A P P E A R A N C E S :*

MORRISON & FOERSTER LLP
*Attorneys for ResCap Borrower Claims Trust*
250 West 55th Street
New York, New York 10019
By:    Norman S. Rosenbaum, Esq.
       Jordan A. Wishnew, Esq.
       James A. Newton, Esq.

THOMAS D. MARGOLIS, ESQ.
*Attorney for William J. Futrell*
125 E. Charles Street
Suite 214
Muncie, Indiana 47305
By:    Thomas D. Margolis, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

   The ResCap Borrower Claims Trust (the "Trust") objects to Claim Number 725 (the

"Claim," ECF Doc. # 8528-2) filed by William J. Futrell ("Futrell").  (*See* the "Objection," ECF

Doc. # 8315.)[1]  Futrell's Claim asserts an unliquidated general unsecured claim against debtor

---

[1]   The Objection is supported by the declaration of Kathy Priore (the "Priore Decl.," ECF Doc. # 8315-3).

GMAC Mortgage LLC ("GMACM") and debtor Residential Capital, LLC ("ResCap").[2]  (*See*

Claim at 2.)  The asserted basis for the Claim is "mortgage servicing by GMAC[M]/RESPA and

other bas[e]s . . . ."  (*Id.*)

In a prior Opinion in this matter, the Court sustained in part and overruled in part the

Trust's Objection.  *See Memorandum Opinion and Order Sustaining in Part and Overruling in*

*Part the ResCap Borrower Claims Trust's Objection to Proof of Claim No. 2267 filed by William*

*J. Futrell* (the "Prior Opinion," ECF Doc. # 8887).  Familiarity with the Prior Opinion is

assumed.  Only one of Futrell's theories of liability survived the Objection—namely, Futrell's

claim that GMACM violated the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §

2601, *et seq.*, when GMACM either failed to respond or responded inaccurately to a Qualified

Written Request ("QWR") submitted on Futrell's behalf.  (*See* Prior Op. at 19–26, 34.)  Debtor

Homecomings Financial, LLC ("Homecomings") serviced Futrell's mortgage loan from March

9, 2001 until July 1, 2009, when servicing was transferred to GMACM.  (*See* Obj. ¶¶ 13–14.)

GMACM serviced the mortgage loan from July 1, 2009 until February 15, 2013, when servicing

was transferred to non-debtor Ocwen Loan Servicing, LLC ("Ocwen").  (*See id.* ¶¶ 14, 18.)

RESPA provides that a borrower may submit a QWR to its loan servicer for "information

relating to the servicing" of its loan.  12 U.S.C. § 2605(e)(1)(A).  Upon receipt of a QWR, the

servicer is required to provide a written response.  *Id.*  At the time the QWR was sent, the

servicer had 20 days after receipt of a QWR (excluding legal public holidays, Saturdays, and

Sundays) to acknowledge receipt of the QWR and 60 days to correct any errors identified by the

borrower or, after conducting an investigation, to provide the borrower with a written response

---

[2]        Because none of the allegations underlying the Claim related to ResCap, the Claim proceeded against
GMACM only.

setting forth why the servicer believes that its determination regarding the borrower's account is correct or why the servicer cannot obtain the information requested by the borrower.  *Id.* § 2605(e)(2).  Failure to comply with any provision of section 6 subjects a servicer to liability for "actual damages to the borrower as a result of the failure" and "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000."  *Id.* § 2605(f)(1).

Futrell originally contended that he or his lawyer sent seven QWRs to Homecomings or GMACM, beginning on October 23, 2009 and ending on March 4, 2013.  (*See* Prior Op. at 10). Based on the Court's Prior Opinion, and the Joint Pretrial Conference Order (ECF Doc. # 9476), the parties proceeded to trial based on a single QWR—an October 30, 2009 letter (the "October 30 QWR") from Futrell's attorney, Thomas D. Margolis, Esq., that was properly addressed to GMACM at the address specifically identified by GMACM in monthly account statements for mailing of a QWR.  No response to the October 30 QWR was sent to Futrell or Margolis, but the Trust introduced into evidence a letter, dated November 13, 2009, from GMACM to Margolis (the "November 13 Letter"), which stated that it was in response to an earlier October 23, 2009 letter from Margolis.  (Tr. Ex. S.)  The Trust contends, however, that the November 13 Letter provides a response to the questions raised in the October 30 QWR from Margolis, and therefore satisfies the requirements of RESPA.  (*See* Obj. ¶ 59.)  As explained below, however, assuming that the November 13 Letter is a timely response to the October 30 QWR (an issue that is unnecessary to decide), the information included in the November 13 Letter was *inaccurate*. GMACM's error was easily avoidable, and it most certainly was easily correctable if GMACM's employees had simply checked the accuracy of its determination of the amount of the tax and

insurance escrow payments GMACM required Futrell to make.  The Futrells were persistent in calling and writing GMACM questioning the mistake that GMACM had made, all to no avail.[3]

The Court concludes that GMACM violated section 6 of RESPA.  The more difficult issue here is determining the relief Futrell is entitled to receive.

Specifically, the Joint Pretrial Order provided for trial of the following issues:

(1)    Whether GMACM complied with the controlling law and the relevant provisions with regard to the October 30 QWR;

(2)    Whether GMACM sent one or more letters to Futrell meeting the requirements of 12 U.S.C. § 2605(3)(2) with respect to the October 30 QWR; and

(3)    Whether GMACM's alleged failure to address the October 30 QWR actually caused damage to Futrell and whether such damages were the foreseeable result of GMACM's actions.

(Joint Pretrial Order at 14.)

The Court conducted a trial of this contested matter concerning Futrell's remaining claim on January 26, 2016.  Futrell and his wife, Alicia Futrell, testified in support of the Claim.  Sara Lathrop, a Senior Claims Analyst for the Trust, testified for the Trust.  The Court admitted in evidence numerous exhibits offered by the parties.  This Opinion includes the Court's findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52, made applicable here by FED. R. BANKR. P. 7052.

---

[3]    This case brings to mind a very old proverb that with variations apparently dates back to the Fifteenth Century:

*For want of a nail the shoe was lost;*
*For want of a shoe the horse was lost;*
*For want of a horse the battle was lost;*
*For the failure of battle the kingdom was lost—*
*All for the want of a horse-shoe nail.*

# I.    FINDINGS OF FACT

Most of the facts contained in this section of the Opinion are uncontroverted and are taken from the Prior Opinion; they are included here to provide context to the contested factual issues that were the subject of the trial.  No trial transcript was prepared, but the facts adduced at trial are not in dispute, except for the issue damages.  The Court has relied on its recollection and notes from the trial on any disputed issues of fact.

Futrell obtained a $76,500 home mortgage loan (the "Loan") from non-debtor Aegis Mortgage Corporation d/b/a UC Lending ("Aegis") in February 2001.  (Obj. ¶ 12.)  The Loan was evidenced by a note (the "Note," Priore Decl. Ex. A) secured by a mortgage (the "Mortgage," *id.* Ex. B) encumbering real property located in Bryant, Indiana (the "Property").  (Obj. ¶ 12.)  The Note was endorsed in blank and transferred to debtor Residential Funding Company, LLC ("RFC").  (*Id.* ¶ 16; *see* Priore Decl. Ex. A at 5.)  The Note was subsequently transferred from RFC to non-debtor Bank One National Association ("Bank One"), as trustee for the RASC 2001-KS1 securitization trust, in connection with the March 2001 securitization of the Loan.  (*See* Obj. ¶ 16; Priore Decl. Ex. A at 5.)  As already stated, Homecomings serviced the Loan from March 9, 2001 until July 1, 2009, when servicing was transferred to GMACM.  GMACM serviced the Loan from July 1, 2009 until February 15, 2013, when servicing was transferred to non-debtor Ocwen Loan Servicing, LLC ("Ocwen").  (*See* Obj. ¶¶ 13–14, 18.)

In 2007, Futrell and his wife were financially stretched.  Futrell's original Loan did not include a requirement for monthly payments to an escrow for taxes and insurance premiums.  Futrell timely paid the taxes and insurance premiums.  The Futrells were struggling to make their monthly mortgage payments and to meet their other financial obligations.  The Loan first went into default in December 2007, and the Futrells struggled thereafter.  (Obj. ¶ 19.)  In 2009,

Futrell sought relief from Homecomings, initially obtaining a repayment plan, but the monthly payments remained too high given the Futrells' limited income. (*See id.* ¶¶ 20–21.) In April 2009, Futrell requested a loan modification, hopefully to reduce his monthly payments. (*Id.* ¶ 22.) Homecomings and GMACM, as was common, required a borrower applying for a loan modification to pay monthly into an escrow account with the loan servicer an amount equal to 1/12 of the estimated payments for taxes and insurance premiums.

As it turned out, the escrow account requirement imposed by GMACM was the start of Futrell's problems with GMACM that became the focus of the current dispute. The Prior Opinion recounted:

> On June 17, 2009, GMACM conducted an escrow analysis on the Loan. Due to an inadvertent typographical error, the escrow analysis projected a $1,352.53 disbursement from Futrell's escrow account in November 2009 to pay for fire insurance covering the Property. According to the Trust, the estimated November 2009 payment should have been approximately $352.53, rather than $1,352.53. As a result of GMACM's error, the escrow analysis indicated that, beginning on August 1, 2009, the principal, interest, and escrow portions of Futrell's monthly mortgage payment would increase from $657.25 to $886.36 if Futrell did not pay the anticipated $1,249.71 escrow deficiency in advance. GMACM sent Futrell a copy of the escrow analysis along with a notice indicating that he could pay the anticipated escrow deficiency in advance, in which case his monthly principal, interest, and escrow payment would only increase to $782.22, beginning August 1, 2009.

(Prior Op. at 5 (internal citations omitted).)

It was GMACM's "typographical error"—increasing Futrell's monthly payments from $657.25 to $886.36—and, more significantly, as will be explained below, GMACM's refusal to fix or timely acknowledge the mistake despite repeated calls and letters from the Futrells while their loan modification application was being considered, that resulted in the violation of RESPA.

While Homecomings was servicing the Loan, it offered Futrell a repayment plan in February 2009 that would have brought the Loan current by the end of March 2009.  (Obj. ¶ 20.) Homecomings cancelled the repayment plan after Futrell failed to make the second required payment.  (*Id.* ¶ 20–21.)   In April 2009, Futrell contacted Homecomings, advising it that he could not afford the repayment plan, and requesting a loan modification.  (*Id.* ¶ 22.)  In June 2009, Homecomings set up a five-month special forbearance plan intended to provide Futrell with time to complete and return a workout package for a loan modification.  (*Id.* ¶ 23.)  This plan required Futrell to make five monthly payments of $657.25.  (*Id.*)  On June 10, 2009, Homecomings received a workout package from Futrell via facsimile.  (*Id.*)

On June 10, 2009, Homecomings also sent Futrell a letter advising that servicing of the Loan would be transferred from Homecomings to GMACM, effective July 1, 2009.  (*Id.* ¶ 14.) The letter informed Futrell that the "principal balance" of his Loan as of June 4, 2009 was $71,251.99, with an escrow balance of $0.00.  (*Id.*)  In connection with the transfer of servicing, GMACM sent Futrell a debt validation letter, dated June 10, 2009, informing him that GMACM would become his Loan's new servicer as of July 1, 2009.  (*Id.* ¶ 15.)  GMACM's letter said that the "total amount of the debt" outstanding as of June 4, 2009 was $73,341.47, which may include interest, late charges, legal costs and fees, and other charges.  (*Id.*)

On June 17, 2009, GMACM conducted an escrow analysis on the Loan.  (*Id.* ¶ 38.) Because of the typographical error, the escrow analysis projected a $1,352.53 disbursement from Futrell's escrow account in November 2009 to pay for fire insurance covering the Property.  (*Id.*) The Trust acknowledged at trial that the November 2009 payment should have been approximately $352.53, rather than $1,352.53.  Because of GMACM's error, the escrow analysis indicated that, beginning on August 1, 2009, the principal, interest, and escrow portions of

Futrell's monthly mortgage payment would increase from $657.25 to $886.36. (Obj. ¶ 38.) For a family struggling to make ends meet, the $229.11 increase in monthly payments was a mountain too high for Futrell to climb. It was also a serious mistake.

After receiving Futrell's workout package, Homecomings began the loan modification review process in June 2009. (*Id.* ¶ 24.) On June 19, 2009, Homecomings set up a three-month HAMP loan modification trial plan (the "HAMP Trial Plan") that replaced the repayment plan then in effect. (*Id.*) The HAMP Trial Plan required payments of $730.76 on the first day of August, September, and October 2009. (*Id.*) Alicia Futrell contacted GMACM on July 2, 2009 to challenge the June 2009 escrow analysis. (*Id.* ¶ 39; Priore Decl. Ex. D at 116.) A GMACM employee told Mrs. Futrell that the loan modification review process had to be completed before a new escrow analysis could be conducted. (Obj. ¶ 39.) That answer was repeated by GMACM employees on multiple occasions as the Futrells and their lawyer continued to press the point— now admitted by the Trust—that the escrow analysis was wrong. When asked at trial to explain why GMACM employees would not review the escrow analysis to determine whether GMACM or the Futrells were correct, Sara Lathrop testified that the reason was a GMACM computer system limitation—the system was "locked" and prevented anyone at GMACM from reviewing the matter while a loan modification was under review.

Futrell made the required payments under the HAMP Trial Plan. (Obj. ¶ 25.) On October 8, 2009, GMACM approved Futrell for a permanent loan modification (the "Permanent Plan"), with a first payment due on November 1, 2009. (*Id.*) The Permanent Plan reduced the Loan's interest rate from 9.75% to 7.75%, resulting in monthly payments of $730.42 for principal, interest, taxes, and insurance. (*Id.*) GMACM sent Futrell an October 14, 2009 letter

advising that he was approved for the Permanent Plan and directing him to execute and return an enclosed agreement. (*Id.* ¶ 26; *see* Priore Decl. Ex. F.)

The Futrells continued to complain to GMACM that the escrow analysis—and the substantially increased resulting monthly payment—was wrong. GMACM sent Futrell a December 3, 2009 letter advising that, *due to restrictions imposed by the Loan's investor*, a new escrow analysis could not be done until GMACM had completed its review of Futrell's June 2009 loan modification request. (Obj. ¶ 39; *see* ECF Doc. # 5484 Ex. 22.) In light of Lathrop's trial testimony that a computer system limitation prevented a review of the escrow analysis, the reason given in the December 3, 2009 letter appears to have been inaccurate.[4] On January 8, 2010, Alicia Futrell spoke with GMACM and was again told that an escrow analysis could only be conducted once loan modification review was completed. (Obj. ¶ 39.) At that time, the Permanent Plan documents were pending Futrell's execution and return. (*Id.*) In a January 12, 2010 letter, GMACM also advised Futrell's counsel that an escrow analysis could not be conducted until loan modification review had been completed. (*Id.*)

Both William and Alicia Futrell testified at trial that Futrell refused to sign the Permanent Plan documents because the documents required Futrell to make monthly payments of $886.36—which they believed (correctly) was inaccurate, and the amount was also more than they could afford. The Court finds that the testimony of William and Alicia Futrell about the reason for not signing and returning the Permanent Plan was truthful. GMACM's error may have resulted from an innocent typographical error, but the GMACM's refusal to check whether the borrower was correct was inexcusable. The October 30 QWR required GMACM to respond

---

[4]     The Trust did not introduce any evidence at trial that "investor guidelines" prevented a review of the escrow analysis while an application for a loan modification was under review.

within 30 days and to correct any errors identified by the borrower. *See* 12 U.S.C. § 2605(e)(2).

Even if GMACM's November 13 Letter was a response to the October 30 QWR, the November

13 Letter simply perpetuated the error that the Futrells had been complaining about since July 2,

2009, when Alicia Futrell first complained about the escrow analysis.

The Trust argued at trial that Futrell should have signed the documents obligating him to

pay $886.36 per month because the figure could be corrected at some time in the future. The

Court rejects that argument. No responsible borrower should be expected to sign a contract with

a material error that on its face required the borrower to make inflated monthly payments in the

hope that the loan servicer would somehow get it right later.

On January 29, 2010, GMACM denied the Permanent Plan because Futrell had not

signed and returned the applicable agreement. (Obj. ¶ 26.) GMACM informed Futrell of the

denial in a February 3, 2010 letter. (*Id.* ¶ 27.)

After denying the Permanent Plan, GMACM finally conducted a new escrow analysis on

February 3, 2010. (*Id.* ¶ 40.) Based on this second escrow analysis, Futrell's escrow payment

was corrected and reduced from $229.11 to $50.83, decreasing his total principal, interest, and

escrow payment from $886.367 to $708.08 each month. (*Id.*) But importantly, GMACM did not

renew its loan modification offer contained in the Permanent Plan.

On February 12, 2010, GMACM received a new HAMP workout package from Futrell.

(Obj. ¶ 28.) On February 16, 2010, an employee in GMACM's customer advocacy group spoke

with Alicia Futrell, informing her that Futrell would not qualify for a HAMP loan modification at

the time because he was deriving income from short-term disability benefits. (*Id.*) The

GMACM employee also informed Alicia Futrell that GMACM could establish a temporary "stop

gap" plan (the "Stop Gap Plan") to suspend foreclosure while exploring a long-term solution.

(*Id.*)  GMACM also advised Futrell of the HAMP modification denial in a February 17, 2010

letter.  (*Id.* ¶ 29; *see* Priore Decl. ¶ 19, Ex. D at 97, Ex. H.)  On February 17, 2010, GMACM set

up the Stop Gap Plan, which required a $355.00 monthly payment due on the first day of March,

April, and May 2010 in order to avoid foreclosure. (Obj. ¶ 29).

On February 18, 2010, a GMACM employee spoke with Futrell by telephone, advising

him that his Loan was being considered for a non-HAMP (*i.e.*, traditional) loan modification.

(*Id.* ¶ 30.)  The following day, Futrell was approved for a traditional loan modification trial plan

(the "Trial Traditional Plan"), which required a monthly payment of $704.23 to be made on the

first day of April, May, and June 2010.  (*Id.*)  In connection with the approval of the Trial

Traditional Plan, GMACM cancelled the Stop Gap Plan.  (*Id.*)

On April 8, 2010, GMACM—through another sloppy error—mistakenly cancelled the

Trial Traditional Plan because it believed it had not received the required loan modification

paperwork.  (*Id.* ¶ 31.)  GMACM sent Futrell an April 14, 2010 letter cancelling that plan.  (*Id.*)

In fact, Futrell had executed and returned the required paperwork for the Trial Traditional Plan

on March 30, 2010.  (*Id.*)  Also on April 14, 2010, Futrell's authorized representative contacted

an employee in GMACM's customer advocacy group inquiring about the status of the Trial

Traditional Plan.  (*Id.* ¶ 32.)  Futrell's representative told GMACM's employee that the first

payment required under the Trial Traditional Plan had been made and that the required loan

modification documents had been executed and returned.  (*Id.*)   After confirming the accuracy

of this information, GMACM reinstated the Trial Traditional Plan for the remaining two

payments and informed Futrell's representative that Futrell should continue to remit the Trial

Traditional Plan payments on the first day of May and June 2010.  (*Id.*)

A May 20, 2010 letter from GMACM to Futrell informed him that, subject to certain conditions set forth in the letter, he was approved for a permanent, traditional loan modification (the "Permanent Traditional Plan"). (*Id.* ¶ 33.) As set forth in this letter, Futrell was required to execute and return an enclosed loan modification agreement and pay a $704.23 "contribution amount" by June 1, 2010. (*Id.*) The Permanent Traditional Plan reduced the interest rate on the Loan to 8.50% and would bring his account current, resulting in a $705.53 monthly payment of principal, interest, and escrow.[5] (*Id.*) On May 21, 2010, GMACM also told Futrell by telephone that the Permanent Traditional Plan was approved and that the loan modification agreement and contribution amount were required to be returned by June 1, 2010. (*Id.* ¶ 34.)

GMACM received the executed loan modification for the Permanent Traditional Plan and the required contribution amount on June 3, 2010. (*Id.* ¶ 35.) After Futrell entered into the Permanent Traditional Plan, at various points in June 2010, Futrell submitted additional workout packages or loss mitigation requests, each of which was considered by GMACM. (*Id.* ¶ 36.) GMACM denied the loan modification requests on several occasions during 2011 because, among other reasons, Futrell did not have sufficient income to make the modified Loan payments. (*Id.*) Additionally, GMACM offered to allow Futrell to pay off the Loan for approximately 35% of the Loan's principal balance, or $27,000. (*Id.*) William and Alicia Futrell testified that after the Permanent Plan was denied in January 2009, the condition of their home, already in very poor repair, continued to deteriorate. Because of the further damage to their credit history as a result of GMACM's conduct, they testified that they could not borrow the

---

[5]    It is important to note that the Trial Plan that Futrell was initially offered in June 2009 and the Permanent Plan offered on October 8, 2009 would have reduced the interest rate on Futrell's Loan to 7.75% from 9.75%. (Obj. ¶ 25; Priore Decl. Ex. F.) GMACM denied the Permanent Plan on January 29, 2010 because Futrell did not sign and return the erroneous documents. (*See id.* ¶ 26.) The Permanent Traditional Plan included an interest rate of 8.50%. (*Id.* ¶ 33.)    The Court finds that Futrell was damaged by the higher interest rate in the Permanent Traditional Plan.

funds to make the necessary repairs.  By the time GMACM offered to accept $27,000 in full

satisfaction of the Loan, the Futrells testified that they did not have the money or the ability to

borrow the funds to pay off the Loan and perform the needed repairs.  They seek damages for the

diminution in the value of the property resulting from the deteriorating condition of their home.

The issue is addressed below.

Futrell was approved for subsequent trial loan modifications in April and November

2012; those modifications would have required monthly payments of $529.75 and $693.25,

respectively; in each case, however, the trial modification plan was cancelled after Futrell failed

to make the first required payment.  (Obj. ¶ 37.)  According to the Trust, if Futrell had completed

these trial modification plans and obtained approval for a permanent loan modification, Futrell

would have cured his delinquencies, and all outstanding fees and charges, including late charges,

would have been eliminated.  (*Id.*)  Those offers were too little too late to avoid damages for the

RESPA violation that the Court has found.

On September 13, 2012, the Mortgage was assigned to The Bank of New York Mellon

Trust Company, National Association f/k/a The Bank of New York Trust Company, N.A.

("BONY"), as successor to JPMorgan Chase Bank N.A. ("JPM"), successor by merger to Bank

One. (Obj. ¶ 17; *see* Priore Decl. Ex. C at 2.)  GMACM transferred servicing rights to the Loan

to Ocwen on February 15, 2013.  (*Id.* ¶ 18.)

## II.    CONCLUSIONS OF LAW

### A.    RESPA Section 6 – Servicing of Mortgage Loans and Administration of Escrow Accounts

The legal principles applicable to claims under section 6(e) of RESPA were discussed at

length in the Prior Opinion.  That analysis is incorporated by reference and will not be repeated

here.  As already stated above, after receiving a QWR, a loan servicer is liable for damages if it

fails to timely provide a borrower with a written response setting forth why the servicer believes

that its determination regarding the borrower's account is correct or explains why the servicer

cannot obtain the information requested by the borrower.  12 U.S.C. § 2605(e)(2).  Failure to

comply with any provision of section 6 subjects a servicer to liability for "actual damages to the

borrower as a result of the failure" and "any additional damages, as the court may allow, in the

case of a pattern or practice of noncompliance with the requirements of this section, in an

amount not to exceed $2,000."  *Id.* § 2605(f)(1).

Only the October 30 QWR from Margolis to GMACM is at issue here.  The Trust admits

that the October 30, 2009 letter qualifies as a QWR.  The Trust contends that GMACM

responded to the October 30 QWR by letter dated November 13, 2009.  (*See* Obj. ¶ 59.)  While

not artfully drafted, the Court finds that the October 30 QWR requested that GMACM address

Futrell's contention that GMACM incorrectly determined the amount of Futrell's monthly

payment for the escrow for taxes and insurance.  The October 30 QWR states:

> [The HAMP Trial Plan] was followed by a permanent agreement
> that was dated 10/14/09 . . . [that stated] the interest rate is 7.750%
> . . . monthly principal [is] 579.75, escrow [is] $150.66, for a total
> payment of $730.42 . . .
>
> That has been followed up with the current statement . . . [in wich]
> [a]n escrow of $229.11 is noted.
>       . . . .
> Please provide an explanation for the difference between the
> escrow of $229.11 and the current escrow of $147.12

(Claimant Ex. 6 at 1–2 (emphasis omitted).)

GMACM certainly understood the October 30 QWR to be inquiring about the escrow

payment amount.  The November 13 Letter stated:

> Under the loan modification agreement, an escrow account needed
> to be added for taxes and homeowners insurance. Therefore any
> taxes and insurance due will be paid from the escrow which may

> cause a negative balance or shortage in the escrow account. The
> escrow monthly portion of $229.11 consists of the yearly taxes and
> insurance divided by 12 and the escrow shortage of $1,249.71
> divided by 12 and added to the monthly payment.

(Tr. Ex. S at 1.)

At the time the October 30 QWR was drafted, section 6(e) provided that a servicer had 20

days to send a borrower written acknowledgement of its receipt of a QWR (unless the requested

action is taken within such period) and 60 days to take responsive action with respect to the

QWR.  *See* Dodd-Frank Act, Pub. L. No. 111-203, § 1400(c), 124 Stat. 1376 (2010) (amending

section 6(e) of RESPA).  Assuming for purposes of this Opinion that the November 13 Letter

should be considered as a response to the October 30 QWR, GMACM timely responded to the

QWR.  The problem here is that the response was inaccurate.

While not specifically applicable to the section 6(e) claim, it is instructive to also

examine section 10(a) of RESPA.  That section provides that a lender may not require a

borrower

> to deposit in any escrow account which may be established in
> connection with such loan for the purpose of assuring payment of
> taxes, insurance premiums, or other charges with respect to the
> property, in connection with the settlement, an aggregate sum (for
> such purpose) in excess of a sum that will be sufficient to pay such
> taxes, insurance premiums and other charges attributable to the
> period beginning on the last date on which each such charge would
> have been paid under the normal lending practice of the lender and
> local custom . . . .

12 U.S.C. § 2609(a)(1).  Additionally, section 10(b) requires the loan servicer to "notify the

borrower not less than annually of any shortage of funds in the escrow account."  *Id.* § 2609(b).

The majority of circuit courts that have considered the issue have held that no private right of

action exists under section 10.  *See Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1360 (11th

Cir. 2006); *Clayton v. Raleigh Fed. Sav. Bank*, No. 96-1696, 1997 WL 82624, at *1 (4th Cir.

Feb. 27, 1997) (unpublished table decision); *accord Louisiana v. Litton Mortg. Co.*, 50 F.3d

1298, 1301 (5th Cir. 1995); *Allison v. Liberty Sav.*, 695 F.2d 1086, 1087–91 (7th Cir. 1982); *but

see Vega v. First Fed. Sav. & Loan Ass'n of Detroit*, 622 F.2d 918, 925 n.8 (6th Cir. 1980)

("While the Act does not expressly provide for [private] . . . causes of action, we believe, based

on the legislative history, that Congress intended to create a private remedy for violations of the

Act." (citations omitted)).   Additionally, the majority of lower courts in the Second Circuit that

have addressed the issue have likewise held that section 10 of RESPA provides no private right

of action.  *See, e.g., Dolan v. Fairbanks Capital Corp.*, 930 F. Supp. 2d 396, 418 (E.D.N.Y.

2013) ("This Court . . . agrees with the reasoning of other courts within this Circuit that have

concluded that there is no private right of action under [section 10 of RESPA]." (citations

omitted)); *Johnson v. Scala*, No. 05 Civ. 5529 (LTS)(KNF), 2007 WL 2852758, at *5 (S.D.N.Y.

Oct. 1, 2007) (concluding, without analysis, that private causes of action can be raised only

under RESPA sections 6, 7, and 9); *McAnaney v. Astoria Fin. Corp.*, 357 F. Supp. 2d 578, 591

(E.D.N.Y. 2005) ("In addition to the well-reasoned opinions of the Fifth and Seventh Circuits in

*Litton* and *Allison*, RESPA is clear on its face when it comes to private remedies."); *but see

Heller v. First Town Mortg. Corp.*, No. 97 Civ. 8575 (JSM), 1998 WL 614197, at *4 (S.D.N.Y.

Sept. 14, 1998) (holding that a private right of action exists under section 10(a) of RESPA

"despite the considerable case law to the contrary").

The Court concurs with the majority of courts holding that no private right of action

exists under section 10 of RESPA.  The Court previously sustained the Trust's objection to

Futrell's asserted claim under section 10 of RESPA.  The Court refers to that section here only to

the extent that it explains how to compute permissible escrow payments.  Through its

typographical error and refusal promptly to fix it, GMACM obviously failed to correctly

determine the amount of the permissible escrow payment that it could collect from Futrell.

### B.    Relief as a Result of GMACM'S RESPA Violation

The difficult issue in this case is the remedy that Futrell is entitled to receive as a result of

GMACM's section 6(e) RESPA violation.  Section 6(f) of RESPA provides that a servicer is

liable for *actual damages* to a borrower as a result of the servicer's failure "to comply with any

provision of [the] section." 12 U.S.C. § 2605(f).  In the case of an individual borrower, damages

for a violation of that provision are defined in section 2605(f) to include:

> an amount equal to the sum of—
>
> (A) any actual damages to the borrower as a result of the failure;
> and
>
> (B) any additional damages, as the court may allow, in the case of
> a pattern or practice of noncompliance with the requirements of
> this section, in an amount not to exceed $2,000.

*Id.*  Although RESPA permits recovery of both actual and statutory damages, "proof of actual

damages is mandatory to recover on a § 2605(e) violation, and [ ] a § 2605(e) claim cannot stand

on statutory damages alone*.*"  *Bonadio v. PHH Mortg. Corp.*, No. 12 CV 3421 VB, 2014 WL

522784, at *5 (S.D.N.Y. Jan. 31, 2014), *appeal dismissed* (Sept. 5, 2014) (citing to *Selman v.

CitiMortgage, Inc.*, No. CIV.A. 12-0441-WS-B, 2013 WL 838193, at *9 n.10 (S.D. Ala. Mar. 5,

2013)).

In addition to actual and statutory damages, in the case of any successful action under

section 6(f) of RESPA, a servicer may be liable for the costs of the action, together with any

attorney's fees incurred in connection with such action as the court may determine to be

reasonable under the circumstances.  12 U.S.C. § 2605(f).

a.  Actual Damages

The statute does not define "actual damages"—some courts have interpreted it to allow for emotional distress damages, while others have only allowed for recovery of economic losses. *Compare Ploog v. Homeside Lending, Inc.*, 209 F. Supp. 2d 863, 869–70 (N.D. Ill. 2002) ("RESPA's actual damages provision includes recovery for emotional distress.") *with In re Tomasevic*, 273 B.R. 682, 687 (Bankr. M.D. Fla. 2002) ("Actual damages [in RESPA] are limited to economic pecuniary injury.").  The courts that allow for recovery of emotional distress damages note that RESPA has remedial purposes. *See, e.g.*, *Rawlings v. Dovenmuehle Mortg. Inc.*, 64 F. Supp. 2d 1156, 1165 (M.D. Ala. 1999) ("The court finds that . . . Congress intended RESPA to be a remedial consumer-protection statute.").  This Court has held that the "actual damages" provision of the RESPA is broad enough to allow for recovery of emotional distress damages in appropriate cases.  *In re Residential Capital, LLC*, 513 B.R. 446, 465–66 (Bankr. S.D.N.Y. 2014).

A plaintiff seeking actual damages under section 6(f) of RESPA "must allege [and prove] that the damages were *proximately caused* by the defendant's violation of RESPA." *Gorbaty v. Wells Fargo Bank, N.A.*, No. 10-CV-3291 NGG SMG, 2012 WL 1372260, at *5 (E.D.N.Y. Apr. 18, 2012) (emphasis added) (internal citations omitted).  Mere allegations of damages—including fees assessed, negative credit reporting, sustaining a reduction in property value and emotional distress—are insufficient to establish a causal link between alleged RESPA violations and a borrower's claimed damages.  *See, e.g.*, *Hopson v. Chase Home Fin. LLC*, 14 F. Supp. 3d 774, 788 (S.D. Miss. 2014), *aff'd sub nom.*, *Hopson v. Chase Home Fin., L.L.C.*, 605 F. App'x 267 (5th Cir. 2015); *Durland v. Fieldstone Mortg. Co.*, No. 10CV125, 2011 WL 805924, at *3 (S.D. Cal. Mar. 1, 2011).  Rather, a borrower must establish "factual allegation[s] linking her

alleged harms to [the defendant's] failure to timely respond to her QWRs." *Gorbaty*, 2012 WL 1372260, at *5.

Futrell's alleged damages stemming from the RESPA violation include the following: (i) diminution in the value of the Property resulting from the deteriorating condition of the home, (ii) the denial of a loan from the United States Department of Agriculture ("USDA"), (iii) Futrell's medical issues, and (iv) the depletion of Futrell's 401K account funds. (Joint Pretrial Order at 8.) As detailed below, Futrell has failed to establish a causal link between the RESPA violation and any of those alleged damages. However, the Court finds that Futrell was damaged by the higher interest rate in the Permanent Traditional Plan in the amount of $14,646.38 *plus* $5,000 in attorney's fees.

<u>First</u>, Futrell seeks damages for the diminution in the value of the Property resulting from the deteriorating condition of his home. William and Alicia Futrell testified that after the Permanent Plan was denied in January 2009, the condition of their home, already in very poor repair, continued to deteriorate. Because of the damage to their credit history as a result of GMACM's conduct, they testified that they could not borrow the funds necessary to make the repairs. However, Futrell's inability to obtain financing did not cause the Property deterioration. Based on the testimony and the evidence submitted, the deteriorating condition of Property was caused by significant structural problems.

At trial, Alicia Futrell testified that the Property has significant problems with the house's foundation resulting from poor construction.[6] She testified that a proper foundation footer was never constructed to support the weight of the Property. Instead, the Property was built in direct

---

[6]     In addition, Mrs. Futrell testified that the Property has other issues, including: mold, roof leaking and roof caving.

contact with the earth.  As a result, the two sections of the house are starting to separate.  Alicia

Futrell also testified that a part of the Property does not contain siding, which would shed water

and protect the walls from the effects of weather.  These structural issues are the proximate cause

of the deterioration of the Property, not GMACM's conduct.

Second, Futrell seeks damages for his inability to obtain a USDA loan due to his credit

history as a result of GMACM's actions.  However, Futrell has not established that the loan

denial was proximately caused by GMACM's conduct.  Based on the testimony and the evidence

submitted at trial, it appears that loan denial was primarily due to the condition of the Property.[7]

Alicia Futrell testified that the "biggest concern that the USDA had" in determining whether to

extend financing was that the Property was starting to separate.  This structural issue was "why

USDA would only loan $10,000."

Third, Futrell argues that his heart attack was caused by the RESPA violation.  Alicia

Futrell testified that her husband's heart attack occurred around the same time that he made his

last payment to GMACM and that she believed that GMACM's actions were the proximate

cause of the heart attack.  However, Futrell has not submitted a medical report or expert

testimony to support this allegation.  Futrell's heart attack occurred in May 2011, over a year

after the escrow analysis mistake was corrected.  (*See* Lathrop Decl. ¶ 39.)  Based on the

evidence and the testimony presented at trial, numerous factors may have contributed to Futrell's

heart attack including: Futrell's strenuous occupation for many years; the numerous medical

operations that Futrell underwent from 2008 to 2014 and the medication that he was prescribed

---

[7]    In addition to the issues associated with the physical condition of the Property, the letter denying the rural development assistance from the USDA also cited to Futrell's payment delinquencies on multiple accounts as one basis for denial.  (Claimant Ex. 24).

during that time; and the fact that the company that employed Futrell had a change in ownership. As such, Futrell fails to establish that GMACM's actions proximately caused his heart attack.

Fourth, Futrell seeks damages for the withdrawals made from, and the ultimate depletion of, his 401K account. Futrell argues that GMACM's actions damaged his credit history and inhibited his ability to obtain the financing necessary to support his family. As a result, Futrell was forced to turn to his 401K account to support his financial needs. The Futrells testified that they used the 401K proceeds to purchase a vehicle, make payments to GMACM, and pay various insufficient check fees and general expenses.

Futrell has not established that the RESPA violation was the proximate cause of all of the negative reporting on his credit report. It is unclear whether other factors existed that contributed to his damaged credit report. As such, the Court cannot determine that—absent the negative credit reporting that resulted from GMACM's actions—Futrell would have obtained the financing he desired. This issue is compounded by the fact that the Futrells conceded that they were enduring financial hardship during the relevant time period.

However, while the effect of GMACM's negative credit reporting is undeterminable, it is evident that GMACM's actions damaged Futrell's credit report. GMACM refused to accept Futrell's mortgage payments because they did not provide for the payment of the higher amount due as a result of the typographical error. GMACM then reported these events as payment delinquencies on Futrell's credit report. Futrell should never have been required to pay the higher amount that was calculated based on a typographical error. Due to GMACM's actions— or the lack thereof—the typographical error was not discovered promptly. As such, the Court directs the Trust to use reasonable best efforts to remove the payment delinquencies, and any other related credit report entries, from Futrell's credit report(s).

21

Finally, the Court finds that Futrell was damaged by the higher interest rate in the Permanent Traditional Plan in the amount of $14,646.38 *plus* $5,000 in attorney's fees.

On October 8, 2009, GMACM approved the Permanent Plan. The Permanent Plan reduced the Loan's interest rate from 9.75% to 7.75% and was subject to monthly principle and interest payments in the amount of $579.76.[8] (Tr. Ex. E.) The Permanent Plan matured on March 1, 2031. (*Id.*) During this time, the Futrells made inquiries regarding the escrow problem, but GMACM refused to complete a new escrow analysis. Ultimately, Futrell refused to sign the Permanent Plan documents because the documents required Futrell to make the incorrect escrow payment—which the Futrells believed (correctly) was inaccurate.

On May 20, 2010, following the correction of the typographical error, GMACM sent a letter to Futrell advising him that he had been approved for a permanent loan modification (the "Permanent Traditional Plan"). (Trust Ex. I.) The Permanent Traditional Plan had an interest rate of 8.50%, matured on March 1, 2031 and was subject to monthly principle and interest payments in the amount of $656.86.[9] (*Id.*)

Futrell would have accepted the Permanent Plan, with the interest rate of 7.75%, if not for GMACM's refusal to complete a new escrow analysis. After the typographical error was corrected, GMACM offered Futrell a loan with a higher interest rate of 8.50%. The Court finds that Futrell was damaged by the higher interest rate in the Permanent Traditional Plan. Futrell suffered actual damages equal to the difference between the payments due under the two plans (*e.g.*, $656.86. and $579.76) calculated from November 1, 2009 to March 1, 2031 and adjusted to

---

[8]    The monthly payment amount does not include taxes and insurance.

[9]    The monthly payment amount does not include taxes and insurance.

present value using a reasonable interest rate.  These damages amount to $14,646.38.  In

addition, the Court awards Futrell attorney's fees in the amount of $5,000.

      b.  <u>Statutory Damages</u>

In order to obtain statutory damages, a plaintiff must establish "a pattern or practice of

noncompliance with the requirements" of section 6(f) of RESPA.  12 U.S.C. § 2605(f)(1).

"Pattern or practice" means "a standard or routine way of operating." *Gorbaty*, 2012 WL

1372260, at *5 (internal citations omitted).  A handful of violations are insufficient to establish a

servicer had "standard or routine way of operating" or a "wide-ranging and institutionalized

practice" that warrants statutory damages.  *Id.* (finding that the borrower failed to proof that the

servicer had a "pattern of practice of noncompliance," within the meaning of section 6(f) of

RESPA, where the "two of the Defendants [were] alleged to have committed, at most, two

violations of § 2605 each.").  Futrell is not entitled to statutory damages because he has not

established a pattern of noncompliance.  A single RESPA violation does not amount to a pattern

of noncompliance.

## III.    <u>CONCLUSION</u>

The RESPA violation by GMACM was inexcusable.  A loan servicer's sloppiness can

cause serious harm to people least able to bear it.  The unwillingness of a loan servicer to even

check whether it had made an error called to its attention by a borrower cannot be excused.  But

the law understandably limits recoverable damages, and here the Futrells' proof of damages

proximately caused by GMACM's RESPA violation was limited.

The Trust's Objection is **OVERRULED** and the Claim is **ALLOWED** in the amount of

$19,646.38.  Further, the Court **DIRECTS** the Trust to use reasonable best efforts to remove the

payment delinquencies, and any other related credit report entries resulting from GMACM's

conduct, from Futrell's credit report(s).

**IT IS SO ORDERED.**

Dated:    March 28, 2016
          New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge