# **Exhibit B**

Identifier: ▮7097    Doc Type: NOTE

12-12020-mg    Doc 9796-6    Filed 04/01/16    Entered 04/01/16 12:58:32    Decl.
Exhibit B    Pg 2 of 8

Loan No.: ▮2421

# HOME EQUITY LINE OF CREDIT AGREEMENT
# AND DISCLOSURE STATEMENT

MIN: ▮4219

OCTOBER 13, 2006        TACOMA            WASHINGTON
[Date]                  [Title City]      [Title State]

7918 RAY NASH DRIVE NW, GIG HARBOR, WASHINGTON 98335
[Property Address]

| | | | |
|---|---|---|---|
| Credit Limit | $200,000.00 | Draw Period | 60 Months |
| Initial Advance | $ 50,000.00 | Repayment Period | 120 Months |
| Minimum Advance | $    100.00 | Minimum Balance | $0.00 |
| Margin | .750 % | | |
| Initial ANNUAL PERCENTAGE RATE | 7.250 % | | |

- Other FINANCE CHARGES (due at closing)

| | |
|---|---|
| Loan Origination Fee | $ 2,000.00 |
| Loan Discount Fee | $ |
| Underwriting Fee | $ |
| Other Admin Fee | $ 505.00 |
| Other Settlement Fee | $ 544.00 |
| Other Notary Fee | $ 200.00 |
| Other EMAIL DOCS | $ 27.20 |
| Other Messenger Fee | $ 25.02 |
| Other | $ |
| Other | $ |

- Other Loan Fees and Charges
  (due at closing)

| | |
|---|---|
| Appraisal | $ 575.00 |
| Other Title Insurance Premium | $ 190.40 |
| Other Recording Fees | $ 60.00 |
| Other | $ |
| Other | $ |
| Other | $ |
| Other | $ |

(due when incurred)
| | |
|---|---|
| Stop Payment Charge | $ 15.00 |
| Returned Check Charge | $ 15.00 |
| Withdrawal Over Line Charge | $ .00 |

[X] Discounted Initial Rate: Fixed for 3 Months. The initial Daily Periodic Rate (as defined in Section 5 below) is 0.01986 % ("Initial Daily Periodic Rate"), which corresponds to the Initial ANNUAL PERCENTAGE RATE indicated above. The Initial Daily Periodic Rate is fixed and will be effective until JANUARY 13, 2007 ("Discount Period"). After this date and in accordance with Section 5 below, the ANNUAL PERCENTAGE RATE may change and will be determined by adding the Margin described above to the Index (as defined in Section 1 below). During the Discount Period the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will not be based on the calculation used to determine later adjustments to the Daily Periodic Rate and corresponding ANNUAL PERCENTAGE RATE. Had they been so based, the Initial Daily Periodic Rate would have been 0.02466 % and the corresponding Initial ANNUAL PERCENTAGE RATE would have been 9.000 %.

[ ] Initial Rate Not Discounted. The Daily Periodic Rate is ____ %, which corresponds to the Initial ANNUAL PERCENTAGE RATE indicated above. The ANNUAL PERCENTAGE RATE may change and will be determined by adding the Margin described above to the Index (as defined in Section 1 below).

1. DEFINITIONS:
   (A) "Agreement" means this document.
   (B) "You" or "Your" is MARY E. PERKINS WHITE

Your address is 7918 RAY NASH DRIVE NW, GIG HARBOR, WASHINGTON 98335

   (C) "Lender" is UNITED PACIFIC MORTGAGE
Lender's address is 21600 OXNARD STREET, #1900, WOODLAND HILLS, CALIFORNIA 91367
   (D) "Holder" is Lender or any person or entity who takes this Agreement by transfer and is entitled to receive payments under this Agreement.
   (E) "Account" means your home equity line of credit account with Holder.

WASHINGTON HELOC Agreement
Residential Funding Corporation
© 2005 Middleberg, Riddle & Gianna

Form Filled Using DocMagic
800-649-1362 www.docmagic.com    For Office Use Only: Review Code

6/05    (Page 1 of 7 Pages)
WALOCRA

Loan No.: ▮▮▮▮2421

(F) "Loan" or "Loans" means any money advanced to you by Holder when you access the Account.
(G) "Credit Limit" means the maximum aggregate amount of principal of the Loans that Holder will allow you to owe under this Agreement, unless otherwise agreed. The Credit Limit is indicated above.
(H) "Account Balance" means the total of the unpaid principal of the Loans, plus earned but unpaid FINANCE CHARGES, fees, and credit insurance premiums.
(I) "Minimum Balance" means the minimum amount of principal of all Loans that you must maintain under the Account. The Minimum Balance is indicated above.
(J) "Initial Advance" means the amount of the Loan that you must accept to open the Account. The Initial Advance is indicated above.
(K) "Minimum Advance" means the minimum amount of a Loan that you must request by any means other than the credit card or cards that Holder furnishes to you to make purchases or receive advances, if any ("Credit Card"). The Minimum Advance is indicated on page 1 above.
(L) "Draw Period" means the period of time during which you may request Loans and must make payments on your Account Balance. The Draw Period is indicated on page 1 above.
(M) "Repayment Period" means the period of time beginning at the end of the Draw Period during which you no longer may request Loans and must repay the Account Balance. The Repayment Period is indicated on page 1 above.
(N) "Billing Statement" means a statement furnished by Holder each Billing Cycle (as defined in subsection (O) below) that shows, among other things, Loans, FINANCE CHARGES, other charges, payments made, other credits, the previous Account Balance, the current Account Balance, and the required payment for the Account during the Billing Cycle.
(O) "Billing Cycle" means the regular period or interval between the days or dates of the Billing Statements during which FINANCE CHARGES accrue and that will be used to determine the amount of your payment and when your payment is due. The Billing Cycle is monthly.
(P) "Index" means the highest base rate on corporate loans at large U.S. money center commercial banks that "The Wall Street Journal" publishes as the prime rate.

2. OPENING YOUR ACCOUNT

The Account will be opened when you have signed and delivered in acceptable form all documents considered necessary by Holder and Holder makes the Initial Advance to you. Each of you who signs this Agreement is jointly and individually obligated to keep all of the promises made in this Agreement, and, as such, Holder may require any of you to pay all amounts due under this Agreement. Each of you agrees not to give Holder conflicting instructions under this Agreement.

3. ACCESSING YOUR ACCOUNT

You may access the Account after any right you have to cancel this Agreement expires and all of Holder's conditions have been met. You may access the Account initially only for an amount equal to the Initial Advance. Thereafter, you may access the Account only for an amount equal to or greater than the Minimum Advance; the foregoing Minimum Advance requirement does not apply when you access the Account using a Credit Card. Holder at Holder's option may without obligation make a Loan in an amount that is less than the Minimum Advance; by doing so, however, Holder does not waive the right to later refuse to make such a Loan.

You may access the Account by: (a) using a Credit Card, if permitted and not cancelled by Holder, subject to Holder's terms specified from time to time; (b) writing a check using one of the checks that Holder furnishes to you ("Checks"); (c) authorizing Holder to pay a third party or account; or (d) any other method acceptable to Holder. Each of you who signs this Agreement may access the Account jointly or individually, and Holder may rely on instructions from any one of you with regard to this Agreement.

You may not use any Loan provided by Holder to make payments on the Account. In addition, Holder reserves the right not to honor a Check under the following circumstances: (a) the Check is post-dated (if a post-dated Check is paid and as a result any other Check is returned, Holder will not be responsible); (b) a Check or Checks have been reported lost or stolen; (c) the Check is not signed by one of you; or (d) the Account has been terminated or suspended as provided in this Agreement or may be so terminated or suspended if Holder pays the Check. Dishonor of a Check by Holder for any reason provided in this Agreement will not constitute wrongful dishonor. Holder's liability otherwise for wrongful dishonor, if any, of a Check is limited to your actual damages.

4. AVAILABILITY OF LOANS

You may access the Account and receive a Loan during the Draw Period, subject to the provisions of this Agreement and applicable law. Holder at Holder's option may extend the Draw Period. During the Draw Period, you may borrow against the Account, repay any portion of the Account Balance, and re-borrow such portions up to the Credit Limit.

You may not access the Account so as to cause the Account Balance to exceed the Credit Limit. However, Holder at Holder's option may make a Loan that causes the Account Balance to exceed the Credit Limit; by doing so, however, Holder does not waive the right to later refuse to make such a Loan. If Holder agrees to make a Loan that causes the Account Balance to exceed the Credit Limit, such a Loan may be unsecured and you agree to repay the amount in excess of the Credit Limit on Holder's demand or execute additional security documents.

5. FINANCE CHARGES

In addition to the amount of any Loans made to you, you agree to pay Holder a FINANCE CHARGE ("FINANCE CHARGE" or "FINANCE CHARGES") on the Account Balance. The Account Balance for each day is determined by taking the Account Balance at the beginning of that day and (a) subtracting any unpaid FINANCE CHARGE, fees, and credit

WASHINGTON HELOC Agreement
Residential Funding Corporation
© 2005 Middleberg, Riddle & Gianna
Form Filled Using DocMagic
800-649-1362 www.docmagic.com
For Office Use Only: Review Code
6/05  (Page 2 of 7 Pages)
WALOCRA

Loan No.: ████2421

insurance premiums that are due; (b) subtracting the portion of any payments or credits received by Holder that day that apply to the repayment of the Loans; and (c) adding any Loans made that day.

The FINANCE CHARGE on a Loan begins to accrue immediately from the time Holder makes the Loan to you. There is no "free ride period" during which FINANCE CHARGES will not accrue.

The FINANCE CHARGE is determined for each day by applying a daily periodic rate ("Daily Periodic Rate") to the Account Balance for that day; the Daily Periodic Rate is 1/365th of the ANNUAL PERCENTAGE RATE applicable to that day. The total FINANCE CHARGE for each Billing Cycle is determined by adding together the FINANCE CHARGE for the actual number of days during the Billing Cycle.

The Initial ANNUAL PERCENTAGE RATE is indicated on the first page of this Agreement. The manner in which the ANNUAL PERCENTAGE RATE will change will be determined by the box marked on the first page of this Agreement.

The ANNUAL PERCENTAGE RATE will increase or decrease if the Index increases or decreases; the corresponding increase or decrease in the Daily Periodic Rate will be determined as described above. An increase or decrease in the ANNUAL PERCENTAGE RATE will result in a corresponding increase or decrease in the FINANCE CHARGE and may result in a corresponding increase or decrease in your monthly payment. The Index may change daily; however, the Index in effect on the day the ANNUAL PERCENTAGE RATE is adjusted will be used to determine the new ANNUAL PERCENTAGE RATE. Any change in the ANNUAL PERCENTAGE RATE will take effect on the first day of the Billing Cycle and will not increase more than once per Billing Cycle.

The ANNUAL PERCENTAGE RATE will never exceed the lesser of   18.000   % or the highest allowable rate for this type of Agreement as determined by applicable state or federal law ("Maximum ANNUAL PERCENTAGE RATE"). The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

6. **PAYMENTS**
You promise to pay to Holder any amounts owed under this Agreement as follows:
(A) Draw Period
During the Draw Period, no later than the payment date specified in your Billing Statement, you must pay at least the Minimum Monthly Draw Period Payment. The "Minimum Monthly Draw Period Payment" is the greatest of:
(1) ONE                        percent (   1.000   %) of your Loan Account Balance on the last day of the Billing Cycle; (2) ONE HUNDRED                    ($ 100.00           );
or (3) the amount of FINANCE CHARGES that accrued on the outstanding balance during the preceding Billing Cycle. The Minimum Monthly Draw Period Payment will also include: (a) any amounts past due on your Account; (b) late charges and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by Lender under the Security Instrument; and (c) premiums for any optional credit life insurance you may decide to obtain through Lender. If, however, the unpaid balance in your Account is less than the Minimum Monthly Draw Period Payment, your Minimum Monthly Draw Period Payment will be equal to the balance in your Account. Minimum Monthly Draw Period Payments will not fully repay the principal of the Loans.

(B) Repayment Period
During the Repayment Period, no later than the payment date specified in your Billing Statement you must pay at least the Minimum Monthly Repayment Period Payment. The "Minimum Monthly Repayment Period Payment" is equal to the amount of any accrued FINANCE CHARGES and credit insurance premiums plus        .8333   % of the Account Balance at the end of the Draw Period.

(C) Final Payment
On the last day of the Repayment Period ("Maturity Date"), you must pay the entire Account Balance.

(D) General Payment Terms
If the Account Balance on any payment date is less than the required minimum payment, you must pay the entire Account Balance. You must make all payments in U.S. dollars at the address shown on the Billing Statement. Your payment will be due on the date shown in your Billing Statement.

(E) Prepayment
You may prepay all or any portion of the Account Balance at any time without penalty; however, if your prepayment does not fully repay the entire Account Balance, you must continue to make the required minimum monthly payments.

7. **FEES AND CHARGES**
You agree to pay the following additional fees and charges to the extent not prohibited by applicable law:
(A) Annual Charge
An annual charge of $   15.00                  . Holder will add this amount to the Account Balance each year on the anniversary date of the Account.

(B) Late Charge
A late charge on any monthly payment not paid within   15   calendar days from the date the payment is due. The amount of the charge will be       5.000   % of the payment; provided, however, Holder may not charge this late charge to the extent prohibited by applicable law.

(C) Other FINANCE CHARGES
The Other FINANCE CHARGES indicated on the first page of this Agreement.

WASHINGTON HELOC Agreement
Residential Funding Corporation
© 2005 Middleberg, Riddle & Gianna

Form Filled Using *DocMagic*
800-649-1362  www.docmagic.com

6/05    (Page 3 of 7 Pages)
WALOCRA
For Office Use Only: Review Code

Identifier: 7097    Doc Type:NOTE

Loan No.: 2421

(D) Other Loan Fees and Charges
The Other Loan Fees and Charges indicated on the first page of this Agreement.
(E) Payment of Holder's Costs and Expenses
If you are in default, all costs and expenses, including without limitation reasonable attorneys' fees, Holder incurs in enforcing this Agreement.

## 8. NOTICES

Unless applicable law requires a different method, any notice that must be given to you under this Agreement will be given by delivering it or mailing it by first class mail to the Property Address above or at a different address if you give Holder a notice of your different address. Any notice that must be given to Holder under this Agreement will be given by delivering it or mailing it by first class mail to Holder at the address stated in Section 1(C) above or at a different address if you are given a notice of that different address.

## 9. SECURITY

The Account will be secured by a lien taken against your home pursuant to a separate Mortgage, Deed of Trust, or Security Deed ("Security Instrument") dated the same date as this Agreement. The Security Instrument requires you to take certain actions to protect your home, which is located at the address shown above ("Property"). You could lose the Property and your home if you do not meet the conditions of this Agreement or the Security Instrument. Some of the conditions of the Security Instrument are described as follows:

   **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 11, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

   If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of the Secured Debt. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 8 within which Borrower must pay the Secured Debt in full. If Borrower fails to pay the Secured Debt in full prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

   You also agree to obtain and maintain such insurance on the Property as Holder may require; you agree to maintain such insurance in the amounts and for the periods Holder requires. Unless prohibited by applicable law, the Account will be secured as well by proceeds of such insurance. You may obtain such insurance from the carrier of your choice, subject to Holder's right to disapprove your choice, which right will not be exercised unreasonably.

   If you fail to keep the insurance required under this Section, Holder may obtain such insurance coverage at Holder's option and your expense. Holder is under no obligation to purchase any particular type or amount of coverage; as such, you, your equity in the Property, or the contents of the Property may not be protected to the extent you desire. Any amount paid by Holder under this Section will be added as a Loan under this Agreement and be subject to the **FINANCE CHARGE**.

## 10. CREDIT AND PROPERTY INFORMATION

You agree to furnish personal financial information and information about the Property and your occupation of the Property reasonably requested by Holder from time to time. Such information must be furnished to Holder within a reasonable time but in no event later than 30 days after Holder's request. In addition, you authorize Holder, at Holder's expense, to make or have made credit inquiries, and you authorize any person to whom Holder makes such inquiries to furnish Holder with the requested information. You also authorize Holder to release information regarding the status and history of the Account to third persons, including without limitation credit bureaus, merchants, and financial institutions, to the extent permitted by applicable law.

## 11. ASSIGNMENT

Holder may assign or transfer this Agreement and the Security Instrument without notice to you. You may not assign or transfer your rights and obligations under this Agreement without Holder's written authorization; however, this Agreement is binding upon your heirs, successors, and legal representatives.

## 12. TAX DEDUCTIBILITY

You should consult a tax advisor regarding the deductibility of interest and charges under the Account.

## 13. DEFAULT

You will be in default under this Agreement if:
(A) You engage in fraud or material misrepresentation in connection with the Account or with any aspect of the Account, including without limitation your application for the Account and your occupancy of the Property;

WASHINGTON HELOC Agreement
Residential Funding Corporation
© 2005 Middleberg, Riddle & Gianna

Form Filled Using DocMagic
800-649-1362 www.docmagic.com    For Office Use Only: Review Code

6/05    (Page 4 of 7 Pages)
WALOCRA

Loan No.: 2421

(B) You do not meet the repayment terms under this Agreement;
(C) Your action or inaction adversely affects the collateral for the Account (including without limitation the Property) or Holder's rights in the collateral under the Security Instrument, including without limitation: (i) your failure to maintain insurance as required under the Security Instrument; (ii) your transfer of the Property as provided in the Security Instrument; (iii) your failure to maintain the Property or use of the Property in a destructive manner; (iv) your commission of waste of the Property; (v) your failure to pay taxes due on the Property or your failure to act such that a lien superior to Holder's lien is filed against the Property; (vi) the death of all of you; (vii) the Property is taken by condemnation or eminent domain; (viii) a judgment is filed against you that subjects the Property to action that adversely affects Holder's interest in the Property; (ix) the creation of a lien on the Property without Holder's permission; or (x) a superior lien holder forecloses on the Property such that Holder's interest in the Property is adversely affected.

**14. REMEDIES FOR DEFAULT**

If you are in default, Holder may terminate the Account, require you to pay the entire outstanding Account Balance, and charge a termination fee and any collection fees unless otherwise prohibited from doing so by applicable law. Holder at Holder's option also may take one or more lesser actions. Such lesser actions may include without limitation reducing the Credit Limit. Holder may take action under this Section only after complying with any notice or cure provisions required under applicable law. In the event Holder elects not to terminate the Account or take lesser action when you are in default, Holder does not forfeit or waive Holder's right to do so at a later time or to do so if you are in default again.

**15. SUSPENSION OF ACCOUNT AND REDUCTION OF CREDIT LIMIT**

Unless otherwise prohibited from doing so by applicable law, Holder may temporarily suspend the Account or reduce the Credit Limit if:
(A) The value of the Property declines significantly below the Property's appraised value for purposes of the Account;
(B) Holder reasonably believes you will not be able to meet the repayment requirements under this Agreement due to a material change in your financial circumstances;
(C) You are in default of a material obligation of this Agreement or the Security Instrument; for purposes of this Agreement a material obligation will include without limitation your obligation to supply Holder with the credit and property information required under Section 10 of this Agreement;
(D) A governmental action prevents Holder from imposing the ANNUAL PERCENTAGE RATE or impairs Holder's security interest under the Security Instrument such that the value of the security interest is less than 120 percent of the Credit Limit;
(E) A regulatory agency has notified Holder that continued advances would constitute an unsafe practice;
(F) The ANNUAL PERCENTAGE RATE reaches the maximum rate permitted under this Agreement; or
(G) Any of you requests to do so; provided, that Holder may require that any such request be in writing and sent to Holder by certified mail, and that Holder may require that any request to reinstate the Account also be in writing and sent by all of you.

If Holder suspends the Account or reduces the Credit Limit, Holder will send you notice of Holder's decision as provided in Section 8 of this Agreement. Any request by you to reinstate the Account or the Credit Limit must be in writing and sent to Holder as provided in Section 8 of this Agreement.

**16. CHANGING THE TERMS OF THIS AGREEMENT**

Holder may not change the terms of this Agreement except under the following circumstances:
(A) Holder may change the Index and Margin if the original Index or any replacement index is no longer available. Any new Index must have a historical movement similar to the original Index and together with a new Margin must result in an ANNUAL PERCENTAGE RATE substantially similar to the ANNUAL PERCENTAGE RATE in effect at the time the original Index or replacement index became unavailable.
(B) Holder may make changes that you agree to in writing.
(C) Holder may make changes that unequivocally benefit you throughout the remaining term of the Account.
(D) Holder may make changes to insignificant terms of this Agreement.

Unless otherwise prohibited from doing so by applicable law, Holder may refuse to make additional Loans or reduce the Credit Limit whenever the Maximum ANNUAL PERCENTAGE RATE is reached.

**17. CANCELING THE ACCOUNT**

You may cancel the Account at any time by notifying Holder in writing as provided in Section 8 above. Cancellation of the Account by any of you will cancel the Account for all of you. However, Holder may release any of you from your obligations under this Agreement without releasing the remainder of you from your obligations.

If the Account is canceled or terminated for any reason, you will not be entitled to a refund of or a credit for any initial annual fees or other fees and charges payable under the Account, unless otherwise required by applicable law. In addition, you must return to Holder the Checks, Credit Cards, and any other devices you may have to access the Account. Any further use of such devices may be considered fraudulent. Regardless of such cancellation or termination, you will remain obligated to repay the Account Balance in full, including any money advanced to you after the Account has been canceled or terminated.

WASHINGTON HELOC Agreement
Residential Funding Corporation
© 2005 Middleberg, Riddle & Gianna
Form Filled Using DocMagic
800-649-1362 www.docmagic.com
6/05   (Page 5 of 7 Pages)
WALOCRA
For Office Use Only: Review Code

Identifier: 7097    Doc Type: NOTE

12-12020-mg    Doc 9796-6    Filed 04/01/16    Entered 04/01/16 12:58:32    Decl.
Exhibit B    Pg 7 of 8

Loan No.: 2421  

### 18. LOAN CHARGES

If this Agreement is subject to a law that sets maximum Loan charges, and that law is finally interpreted so that the FINANCE CHARGE or other Loan charges collected or to be collected in connection with the Account exceed the permitted limits, then: (a) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from you that exceeded permitted limits will be refunded to you. Holder may choose to make this refund by reducing the principal owed under the Account or by making a direct payment to you. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge. Your acceptance of any such refund made by direct payment to you will constitute a waiver of any right of action you might have arising out of such overcharge.

### 19. SEVERABILITY

In the event that any provision or clause of this Agreement or the Security Instrument conflicts with applicable federal, state, or local law, such provision or clause will be considered changed to the extent permissible and necessary to comply with such law. Otherwise, such conflict will not affect other provisions of this Agreement or the Security Instrument that can be given effect without the conflicting provision.

### 20. YOUR BILLING RIGHTS-KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and Holder's responsibilities under the Fair Credit Billing Act.

#### Notify Holder In Case of Errors or Questions About Your Bill

If you think the Billing Statement is wrong, or if you need more information about a transaction on the Billing Statement, write Holder at the address listed on the Billing Statement. Write to Holder as soon as possible. Holder must hear from you no later than 60 days after Holder sent you the first Billing Statement on which the error or problem appeared. You can telephone Holder, but doing so will not preserve your rights.
In your letter, give Holder the following information:
    (A) Your name and account number.
    (B) The dollar amount of the suspected error.
    (C) Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized Holder to pay the Account automatically from your savings, checking, or other account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach Holder three business days before the automatic payment is scheduled to occur.

#### Your Rights and Holder's Responsibilities After Holder Receives Your Written Notice

Holder must acknowledge your letter within 30 days, unless Holder has corrected the error by then. Within 90 days, Holder must either correct the error or explain why Holder believes the Billing Statement was correct.

After Holder receives your letter, Holder cannot try to collect any amount you question or report you as delinquent. Holder can continue to bill you for the amount you question, including FINANCE CHARGES, and Holder can apply any unpaid amount against the Credit Limit. You do not have to pay any questioned amount while Holder is investigating, but you are still obligated to pay the parts of the Billing Statement that are not in question.

If Holder finds that Holder made a mistake on the Billing Statement, you will not have to pay any FINANCE CHARGES related to any questioned amount. If Holder did not make a mistake, you may have to pay FINANCE CHARGES, and you will have to make up any missed payments on the questioned amount. In either case, Holder will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that Holder thinks you owe, Holder may report you as delinquent. However, if Holder's explanation does not satisfy you and you write to Holder within ten days telling Holder that you still refuse to pay, Holder must tell anyone Holder reports you to that you have a question about the Billing Statement. And Holder must tell you the name of anyone Holder reported you to. Holder must tell anyone Holder reports you to that the matter has been settled between you and Holder when it finally is.

If Holder does not follow these rules, Holder can't collect the first $50.00 of the questioned amount, even if the Billing Statement was correct.

#### Special Rule for Credit Card Purchases

If you have a problem with the quality of property or services that you purchased with the Credit Card and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:
    (A) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and
    (B) The purchase price must have been more than $50.00.

These limitations do not apply if Holder owns or operates the merchant or if Holder mailed you the advertisement for the property or services.

WASHINGTON HELOC Agreement
Residential Funding Corporation
© 2005 Middleberg, Riddle & Gianna

Form Filled Using *DocMagic*
800-649-1362 www.docmagic.com    For Office Use Only: Review Code

6/05    (Page 6 of 7 Pages)
WALOCRA

Loan No.: ▇2421

## 21. LIABILITY FOR UNAUTHORIZED USE OF A CREDIT CARD

You may be liable for the unauthorized use of the Credit Card. You will not be liable for unauthorized use that occurs after you notify Holder, orally (as provided in the Billing Statement) or in writing (as provided in Section 8 above), of the loss, theft, or possible unauthorized use. In any case, your liability will not exceed $50.00.

By signing below, you agree to the terms of this Agreement. You also acknowledge and agree that you received a completed copy of this Agreement.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
MARY E. PERKINS WHITE    -Borrower                              -Borrower

_____ (Seal)      _____ (Seal)
                         -Borrower                              -Borrower

_____ (Seal)      _____ (Seal)
                         -Borrower                              -Borrower

[Sign Original Only]

WASHINGTON HELOC Agreement
Residential Funding Corporation
© 2005 Middleberg, Riddle & Gianna

Form Filled Using *DocMagic*
800-649-1362  www.docmagic.com     For Office Use Only: Review Code

6/05  (Page 7 of 7 Pages)
WALOCRA