**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE RESIDENTIAL CAPITAL, LLC, *et al.* ) | No. 12-12020 |
| ) | |
| D.B. STRUCTURED PRODUCTS, INC., *et al.*, ) | |
| ) | |
| Movant-Defendants, ) | No. 15-mc-410-P1 |
| ) | |
| v. ) | |
| ) | |
| ALLY FINANCIAL, INC., ) | |
| ) | |
| Respondent. ) | |

**DECLARATION OF JASON R. PARISH IN SUPPORT OF ALLY FINANCIAL, INC.'S
SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO
COMPEL COMPLIANCE WITH SUBPOENA ISSUED TO ALLY FINANCIAL, INC.**

JASON R. PARISH, under penalty of perjury, declares and states as follows:

1.     I am a partner of the firm Kirkland & Ellis LLP, counsel for Ally Financial, Inc.

("AFI") in the above-captioned matter. I submit this Declaration in support of Ally Financial,

Inc.'s Supplemental Memorandum of Law in Opposition to Motion to Compel Compliance with

Subpoena Issued to Ally Financial, Inc. The facts stated herein are based on my examination of

the documents cited below.

2.     Attached hereto as Exhibit 1 is a true and correct copy of a Subpoena for Rule

2004 Examination to Ally Financial, Inc., dated June 11, 2012.

3.     Attached hereto as Exhibit 2 is a true and correct copy of a Schedule of

Documents Requested by Examiner to Ally Financial, Inc., dated September 4, 2012.

4.     Attached hereto as Exhibit 3 is a true and correct copy of a Schedule of

Documents Requested by Examiner to Ally Financial, Inc., dated September 13, 2012.

5.     Attached hereto as Exhibit 4 is a true and correct copy of a Schedule of Documents Requested by Examiner to Ally Financial, Inc., dated September 28, 2012.

6.     Attached hereto as Exhibit 5 is a true and correct copy of a Confidentiality Agreement Regarding Examiner Submission Paper, dated February 15, 2013.

7.     In response to Exhibits 1 through 4, AFI produced to the Bankruptcy Examiner approximately 105,000 documents totaling approximately 948,000 pages.    Of these, approximately 4,760 documents totaling approximately 44,403 pages were produced in response to the Examiner's requests for documents concerning RMBS claims against Residential Capital, LLC and its direct and indirect subsidiaries.

Executed this 5th day of April, 2016 at Washington, D.C.

By: _____
Jason R. Parish

2

# EXHIBIT 1

B254 (Form 254 – Subpoena for Rule 2004 Examination) (12/07)

# UNITED STATES BANKRUPTCY COURT

## Southern District of New York

In re
Residential Capital, LLC, et al.,

**SUBPOENA FOR RULE 2004 EXAMINATION**

Debtors.

Case No. 12-12020(MG)

Chapter 11

To:
Ally Financial, Inc.
c/o Kirkland & Ellis
Attn: Ray C. Schrock
    Richard M. Cieri
601 Lexington Avenue
New York, NY 10022

☐ YOU ARE COMMANDED to appear and testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure, at the place, date, and time specified below. A copy of the court order authorizing the examination is attached.

| PLACE OF TESTIMONY | DATE AND TIME |
|---|---|
|  |  |

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Exhibit A

| PLACE | DATE AND TIME |
|---|---|
| Kramer Levin Naftalis & Frankel<br>Attn: Barry H. Berke, Esq.<br>1177 Avenue of the Americas<br>New York, NY 10036 | The parties shall meet and confer on or before June 16, 2012 regarding the timing of document productions. |

| ISSUING OFFICER SIGNATURE AND TITLE | DATE |
|---|---|
| /s/ Barry H. Berke | June 11, 2012 |

ISSUING OFFICER'S NAME, ADDRESS, AND PHONE NUMBER
Barry H. Berke, Esq.
Kramer Levin Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

B254 (Form 254 – Subpoena for Rule 2004 Examination) (12/07)

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| **SERVED** |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
|  |  |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
|  |  |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____        _____
                        DATE                                         SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2007, made applicable in cases under the Bankruptcy Code by Rule 9016, Federal Rules of Bankruptcy Procedure:

(c) Protecting a Person Subject to a Subpoena.
    (1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
    (2) Command to Produce Materials or Permit Inspection.
        (A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
        (B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
            (i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
            (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
    (3) Quashing or Modifying a Subpoena.
        (A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
            (i) fails to allow a reasonable time to comply;
            (ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
            (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
            (iv) subjects a person to undue burden.
        (B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
            (i) disclosing a trade secret or other confidential research, development, or commercial information;
            (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
            (iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
        (C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
            (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
            (ii) ensures that the subpoenaed person will be reasonably compensated.
(d) Duties in Responding to a Subpoena.

    (1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
        (A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
        (B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
        (C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
        (D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
    (2) Claiming Privilege or Protection.
        (A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
            (i) expressly make the claim; and
            (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
        (B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

(e) Contempt.
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## EXHIBIT A

## DEFINITIONS

1.      Pursuant to Local Civil Rule 26.3(a) of the United States District Court for the Southern District of New York (the "**Local Civil Rules**"), the full text of the definitions and rules of construction set forth in Local Civil Rule 26.3(c) and (d) are incorporated herein by reference. In addition, the definitions described herein apply.

2.      "**AFI**" shall mean Ally Financial Inc., f/k/a GMAC LLC, and all of its current and former, direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors (including without limitation Evercore), attorneys (including without limitation Kirkland & Ellis LLP and Mayer Brown LLP), and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors, except for ResCap.

3.      "**AFI Claims Subcommittee**" shall mean the subcommittee of ResCap's board of directors comprising Jonathan Ilany and John E. Mack, which is referred to on pages 34 through 38 of the May 14, 2012 Transcript, and all of its employees, representatives, agents, attorneys (including without limitation Morrison Cohen LLP), and advisors, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

4.      "**AFI Settlement and Plan Sponsor Agreement**" shall mean the agreement dated as of May 14, 2012, entered into by the Debtors and AFI, which is attached as Exhibit 8 to the First Day Affidavit.

5.      "**Ally Bank**" shall mean the Utah bank f/k/a GMAC Bank and all of its direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys,

and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

6.    "**Ally Investment Management**" shall mean Ally Investment Management LLC f/k/a GMAC Investment Management LLC.

7.    "**Board Materials**" shall mean all documents (including any drafts) provided to or considered by the directors of the boards of AFI, or any members, committees, or subcommittees thereof, including without limitation (a) documents related to the assets, debts, dealings, operations, and/or businesses of AFI; and (b) documents related to advice by counsel and/or financial advisors concerning the assets, debts, dealings, operations, and/or businesses of AFI.

8.    "**Board Minutes**" shall mean all written or recorded (by any means including without limitation tape recording, video recording, or otherwise) consents, resolutions, minutes, transcriptions, or notes of any meetings, decisions, deliberations, discussions, or actions of the boards of directors of AFI, or of any members, committees, or subcommittees thereof, including without limitation all drafts of any such materials.

9.    "**Cerberus**" shall mean Cerberus Capital Management, L.P. and all of its direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors, including without limitation Cerberus FIM, LLC; Cerberus FIM Investors LLC; and FIM Holdings LLC.

10.    "**Committee**" shall mean the Official Committee of Unsecured Creditors of Residential Capital, LLC, et al. in the case captioned in the annexed subpoena.

11.    "**Debtors**" shall mean ResCap and its direct and indirect subsidiaries that have filed voluntary petitions commencing a case under Chapter 11 of the Bankruptcy Code, and are debtors and debtors-in-possession on behalf of each such entity and its estate in the case captioned in the annexed subpoena, and all of their employees, representatives, agents, advisors, attorneys (including without limitation Morrison & Foerster LLP), and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

12.    "**First Day Affidavit**" shall mean the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, In Support of Chapter 11 Petitions And First Day Pleadings, dated May 14, 2012 [ECF Doc. 6].

13.    "**GMAC Bank**" shall mean the Utah Bank n/k/a Ally Bank and all of its direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

14.    "**GMAC Bank Transfer**" shall mean all contemplated or consummated transactions, agreements, or events among the Related Parties concerning (a) the transfer of the assets of or interests in Old GMAC Bank; (b) the transfer of the assets of or interests in Ally Bank and/or IB Finance; (c) the issuance and/or conversion of preferred membership interests in ResCap; and (c) the issuance, conversion, and/or remarketing of common and preferred membership interests in IB Finance, including without limitation the transactions, agreements, and events referenced, described, or disclosed in ResCap SEC Forms 8-K dated November 20, 2006; March 31, 2008; June 3, 2008, and January 30, 2009.

15.    "**IB Finance**" shall mean the IB Finance Holding Company, LLC, the holding company for Ally Bank, and all of its employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

16.    "**Junior Secured Noteholders**" shall mean the Consenting Holders and the Ad Hoc Group, as each is defined in the Junior Secured Noteholders Plan Support Agreement, and all of their direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors (including without limitation Houlihan Lokey), and attorneys (including without limitation White & Case LLP), and each of their predecessors and successors.

17.    "**Junior Secured Noteholders' Plan Support Agreement**" shall mean the agreement entered into as of May 13, 2012, by and among the Debtors, AFI, the Consenting Holders, and the Ad Hoc Group (each of which is defined in such agreement), which is attached as Exhibit 9 to the First Day Affidavit.

18.    "**May 14, 2012 Transcript**" shall mean the transcript of the proceedings of May 14, 2012, before the U.S. Bankruptcy Court for the Southern District of New York in the case captioned in the annexed subpoena.

19.    "**Mortgage-Related Legal Proceedings**" shall mean all claims and legal actions, or governmental or regulatory investigations, pending, ongoing or threatened against ResCap and/or AFI as of the Petition Date (including without limitation all civil actions; arbitrations; mediations; governmental, regulatory, or criminal investigations; proceedings; or settlements) concerning any mortgage or mortgage-backed security, including without limitation all claims and legal actions concerning the robo-signing allegations relating to foreclosure documents and the other matters referenced in paragraph 85 of the First Day Affidavit, and the

Representation and Warranty Claims, Monoline Insurer Representation and Warranty Litigations, and Securities Litigations referenced in paragraphs 100 through 103 of the First Day Affidavit.

20.    "**Old GMAC Bank**" shall mean the federal savings bank n/k/a National Motors Bank FSB and all of its direct and indirect subsidiaries, employees, representatives, agents, advisors, and attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

21.    "**Petition Date**" shall mean May 14, 2012.

22.    "**Prepetition Related Party Agreements**" shall mean all verbal or written agreements or contracts between ResCap on the one hand and any of AFI, Cerberus, IB Finance, or Ally Bank on the other hand, including without limitation all agreements concerning transfers of cash, assets, property, stock, contracts, or other items of value.

23.    "**Prepetition Related Party Transactions**" shall mean: (a) Related Party payments, including without limitation dividends and capital contributions; (b) Related Party loans; (c) Related Party debt, including without limitation the transfer, repayment, or forgiveness of such debt; (d) Related Party claims, including without limitation all payments made on account of such claims; (e) Related Party transfers of cash, assets, property, stock, contracts, or other items of value; and (f) the Specified Transactions.

24.    "**Related Party**" shall mean between ResCap on the one hand and any of AFI, Cerberus, IB Finance, and/or Ally Bank on the other hand.

25.    "**ResCap**" shall mean Residential Capital, LLC and all of its current and former, direct and indirect subsidiaries, employees, representatives, agents, advisors, attorneys,

- 5 -

and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

26.    "**Restricted Stock Units**" shall mean any compensation provided to employees, management, and/or directors of ResCap in connection with the Ally Financial Inc. Long-Term Equity Compensation Plan; the Residential Capital, LLC Annual Plan; the ResCap Reward and Recognition Program and Sign-on Bonus Program; or any discretionary variable pay plans involving ResCap.

27.    "**RMBS Plan Support Agreement**" shall mean the agreement entered into as of May 13, 2012, by and between the Debtors, AFI, and the Consenting Claimants (defined in such agreement), which is attached as Exhibit 10-A to the First Day Affidavit.

28.    "**RMBS Trust Settlement Agreement**" shall mean the agreement entered into as of May 13, 2012, by and between the Debtors and the Institutional Investors (defined in such agreement), which is attached as Exhibit 10-B to the First Day Affidavit.

29.    "**Shareholder Materials**" shall mean: (a) all written or recorded (by any means including without limitation tape recording, video recording, or otherwise) consents, resolutions, minutes, transcriptions, or notes of any meetings, decisions, deliberations, discussions, or actions of the direct or indirect shareholders of AFI, or of any members, committees, or subcommittees thereof, including without limitation all drafts of any such materials; and (b) all documents (including any drafts) provided to or considered by the direct or indirect shareholders of AFI, or any members, committees, or subcommittees thereof, including without limitation (a) documents related to the assets, debts, dealings, operations, and/or businesses of AFI; and (b) documents related to advice by counsel and/or financial advisors concerning the assets, debts, dealings, operations, and/or businesses of AFI.

- 6 -

30.    **Specified Transactions**" shall mean: (a) ResCap's reported sale of its

healthcare lending business to GMAC Commercial Finance, LLC, as described in ResCap Form

8-K, dated August 27, 2007; (b) ResCap's entry into a secured credit agreement with AFI (as

lender and agent), to provide ResCap with a revolving credit facility in connection with its resort

finance business, as described in ResCap Form 8-K, dated November 10, 2008 (p. 41); (c) the

reported sale of ResCap's resort finance business to GMAC Commercial Finance, LLC, as

described in ResCap Form 10-Q, dated November 10, 2008 (p. 71); (d) ResCap's entry into a

loan and security agreement (and amendments thereto) with AFI to fund mortgage servicing

rights, as described in ResCap Form 10-Q, dated August 8, 2008 (p. 73); (e) ResCap's entry into

a secured revolving and term loan credit agreement (and amendments thereto) with AFI for

general working capital, as described in ResCap Form 8-K, dated June 3, 2008; (f) ResCap's

issuance of secured notes in exchange for unsecured notes to AFI and other participating holders,

as described in ResCap Form 8-K, dated June 6, 2008 (p. 1); (g) ResCap's factoring

arrangements with AFI relating to servicing advances of delinquent mortgage loans, as described

in ResCap Form 8-K, dated June 23, 2008; (h) ResCap's sale of equity interests in certain

Canadian subsidiaries to AFI, as described in ResCap Form 8-K, dated November 20, 2008;

(i) ResCap's entry into a loan agreement with AFI (as lender) (and amendments thereto) for

short-term secured loans to ResCap, as described in ResCap Form 8-K, dated November 20,

2008; (j) GMAC's exchange offer for ResCap notes, as described in ResCap Form 8-K, dated

November 20, 2008; (k) AFI's extension of loans and lines of credit (including amendments

thereto) to certain ResCap subsidiaries, as described in ResCap Form 8-K, dated June 12, 2009;

(l) ResCap's posting of two litigation bonds and the holding of restricted cash in connection with

the *Mitchell* case, as described in ResCap Form 10-K, dated February 27, 2009 (pp. 50 and

Schedule 1.01-19) and ResCap Form 10-Q/A, dated August 25, 2009 (pp. 22-23); (m) ResCap's

entry into agreements with Ally Investment Management involving foreign exchange and

interest rate hedging transactions, as described in ResCap Form 10-Q, dated March 31, 2009 (p.

45); (n) ResCap's reported sale of broker-dealers to AFI, as described in ResCap Form 10-Q,

dated March 31, 2009 (p. 62); (o) ResCap's entry into an amended and restated line of credit

facility (with amendments thereto) with AFI, as described in the ResCap Consolidated Financial

Statements for the Year Ended December 31, 2009, dated February 26, 2010 (p. 43);

(p) ResCap's entry into a management agreement with AFI, pursuant to which management fees

were payable, as described in ResCap Form 10-K, dated February 27, 2008 (p. 155); (q) AFI's

entry into and performance under the "Consent Order", "DOJ/AG Settlement" and "CMP", each

as defined and described in paragraphs 86 through 90 of the First Day Affidavit; and (r)

ResCap's transfer and assignment of real property interests as described in paragraph 92 of the

First Day Affidavit.

## INSTRUCTIONS

1.    In addition to the instructions herein, AFI shall comply with the terms of

the Order Authorizing The Official Committee of Unsecured Creditors to Issue Subpoenas

Compelling The Production of Documents And Provision of Testimony By The Debtors And

Others Pursuant To Federal Rule of Bankruptcy Procedure 2004, dated June 5, 2012 [ECF Doc.

217] (the "**Rule 2004 Order**").

2.    These requests encompass all documents in the AFI's possession, custody,

or control, whether or not such documents were prepared by or for AFI. Where documents in

AFI's possession, custody, or control are requested or inquired of, such request or inquiry

includes documents in the possession, custody, or control of each of AFI's current and former

direct and indirect affiliates, subsidiaries, predecessors, successors, employees, directors, agents,

- 8 -

accountants, attorneys, auditors, representatives, consultants, advisors, all other persons or entities acting or purporting to act on behalf of AFI, and any other persons or entities from which AFI could obtain documents.

      3.     If AFI contends that no documents exist relating to all or part of a request, AFI shall state this contention and respond as fully as possible to all parts of the request for which documents exist.

      4.     If AFI claims that any privilege or protection excuses production of any document or part thereof, AFI must expressly make such claim in writing consistent with Local Civil Rule 26.2 and the Rule 2004 Order.

      5.     In the event that any document covered hereunder has been destroyed, discarded, or lost, AFI shall inform the Committee of this in writing and provide a general description of the categories of documents destroyed or lost and the circumstances of their destruction or loss.

      6.     If any document cannot be produced in full, it shall be produced to the maximum extent possible and AFI shall specify in writing the reasons for their inability to produce the remainder.

      7.     Each document is to be produced with all non-identical copies and drafts thereof in their entirety without abbreviation or redaction (other than for a claim of privilege, consistent with Local Civil Rule 26.2 and the Instructions herein).

      8.     All documents shall be produced in native electronic format together with standard-format load files (indicating any parent/child attachment relationships, Bates designation cross-reference table if applicable, and MD5HASH values), and shall be produced together with all original metadata and searchable text.

9.      Unless stated otherwise, the time period applicable to the documents called for is from January 1, 2004, through the date of the document requests (the "**Relevant Period**"), subject to AFI's ongoing obligations to supplement responses under the applicable rules.

## DOCUMENT REQUESTS

1.      All Board Minutes; Board Materials; and Shareholder Materials, to the extent that they discuss or relate to ResCap; the Debtors; the AFI Claims Subcommittee; the AFI Settlement and Plan Sponsor Agreement; Ally Bank, GMAC Bank, Old GMAC Bank, or IB Finance; the GMAC Bank Transfer; Cerberus; the Junior Secured Noteholders; the Junior Secured Noteholders' Plan Support Agreement; the Mortgage-Related Legal Proceedings; the Prepetition Related Party Agreements; the Prepetition Related Party Transactions; the RMBS Plan Support Agreement; the RMBS Trust Settlement Agreement; the Specified Transactions; or any of the document requests herein.

2.      All documents depicting organizational charts for AFI, including without limitation documents sufficient to show any changes in those organizational charts throughout the Relevant Period.

3.      All documents describing or reflecting the corporate relationships between ResCap, AFI, Cerberus, IB Finance, and/or Ally Bank, including without limitation documents describing or reflecting how those relationships have changed during the Relevant Period.

4.      Documents sufficient to show the extent to which members of management, directors, employees, and/or shareholders of ResCap, AFI, Cerberus, IB Finance, and/or Ally Bank overlap amongst these corporate entities, and all documents and communications reflecting or discussing such overlap.

- 10 -

5.      All documents and communications concerning AFI's decision to create ResCap and/or its direct and indirect subsidiaries.

6.      All documents and communications concerning AFI's decision to create IB Finance.

7.      All documents and communications concerning the business purpose for forming each of the Debtors, respectively.

8.      Documents sufficient to identify any administrative services provided by AFI to ResCap, or ResCap to AFI; payments or transfers by ResCap to AFI, or by AFI to ResCap, for such administrative services; and the pricing for any administrative services provided to ResCap by any entity other than AFI.

9.      All documents and communications concerning the pricing or cost for any administrative services provided by AFI to ResCap.

10.     Documents sufficient to identify any agreements between ResCap and AFI concerning the operation of any aspect of ResCap or AFI's businesses (including without limitation their mortgage-related businesses), and all copies of such agreements (including current, previous, and draft forms), including without limitation: (a) all agreements concerning origination activities; underwriting activities; sales or brokerage activities; securitization or hedging activities; servicing activities; and/or activities relating to the processing or funding of prepetition mortgage loan commitments; and (b) the Amended and Restated Servicing Agreement dated as of May 11, 2012; the Amended and Restated Master Mortgage Loan Purchase and Sale Agreement dated May 1, 2012; the Pledge and Security Agreement dated as of April 25, 2012; and the Master Securities Forward Transaction Agreement dated as of April 30, 2012.

11.    All documents and communications concerning the GMAC Bank Transfer, including without limitation all valuations or appraisals of, or fairness opinions on, any aspects of the GMAC Bank Transfer, and all communications with ResCap, Cerberus, IB Finance, Ally Bank, financial advisers, investment bankers, valuation experts or consultants, and/or government regulators or officials related to the GMAC Bank Transfer.

12.    All documents and communications concerning any secured lending transaction entered into with any Debtor and/or the collateral for any such transaction, including without limitation all valuations, appraisals, or fairness opinions, and all communications with ResCap, Cerberus, IB Finance, and/or Ally Bank related to any such transaction.

13.    All documents and communications concerning the Prepetition Related Party Agreements and/or the Prepetition Related Party Transactions, including without limitation: (a) AFI's accounting, journal entries, or support; (b) all valuations, appraisals, or fairness opinions (including without limitation related to mortgage servicing rights); (c) loan tapes; (d) any impairment testing (including without limitation underlying forecasts and assumptions and/or any rationale for changes in assumptions); and (e) all communications with ResCap, Cerberus, IB Finance, Ally Bank, and/or government regulators or officials concerning the Prepetition Related Party Agreements and/or the Prepetition Related Party Transactions; (f) all alternative transactions considered, including without limitation attempts to sell assets to other buyers; (g) the ultimate disposition of assets received from ResCap; (h) the historical performance of assets before and after being transferred from ResCap to AFI or from AFI to ResCap; (i) fees and expenses, including documents and communications supporting (i) the shared services charges, including without limitation employee time records, (ii) the tax sharing arrangement between ResCap and AFI, (iii) servicing and/or origination agreements between

ResCap and AFI, Ally Bank, Ally Investment Management and/or any other affiliates or subsidiaries, and/or (iv) other fees and charges between ResCap and AFI; and (j) the purchase by AFI of ResCap debt, including (i) the acquisition price of ResCap debt, (ii) the ultimate disposition of any ResCap debt acquired, and (iii) all reconciliations or analyses of any ResCap debt acquired.

14.    Any accounting entries relating to intercompany charges between ResCap and AFI, and all related analyses.

15.    All documents or communications concerning the receipt of Troubled Asset Relief Program (hereinafter "**TARP**") money, including without limitation documents and communications reflecting any constraints or requirements imposed by TARP, and any analyses underlying any request for or receipt of TARP funding.

16.    All documents and communications concerning any valuation adjustments recorded at AFI relating to assets transferred from ResCap to AFI, including without limitation adjustments that occurred before or after the transfer of any assets.

17.    All documents and communications concerning the AFI Settlement and Plan Sponsor Agreement, including without limitation all valuations, appraisals, and fairness opinions, and all communications with ResCap, Cerberus, IB Finance, or Ally Bank related to the AFI Settlement and Plan Sponsor Agreement.

18.    All documents and communications concerning the Junior Secured Noteholders' Plan Support Agreement, including without limitation (a) all communications with ResCap, Cerberus, IB Finance, Ally Bank, or the Junior Secured Noteholders concerning the Junior Secured Noteholders' Plan Support Agreement; and (b) all communications with the

Junior Secured Noteholders concerning the allocation of the proceeds of any asset sales and of any settlements.

19.    All documents and communications concerning the RMBS Trust Settlement Agreement, including without limitation all valuations, appraisals, or fairness opinions concerning any aspect or term of the RMBS Trust Settlement Agreement, and all communications with ResCap, Cerberus, IB Finance, Ally Bank, the Investors, Institutional Investors (as each is defined in the RMBS Trust Settlement Agreement) and/or trustees, and each of their attorneys or advisors (including without limitation Gibbs & Bruns, LLP; Ropes & Gray LLP; and Kelly Drye & Warren LLP), related to the RMBS Trust Settlement Agreement.

20.    All documents and communications concerning the RMBS Plan Support Agreement, including without limitation all valuations, appraisals, or fairness opinions concerning any aspect or term of the RMBS Plan Support Agreement, and all communications with ResCap, Cerberus, Ally Bank, IB Finance, the Consenting Claimants (as each is defined in the RMBS Plan Support Agreement) and/or trustees, and each of their attorneys or advisors (including without limitation Gibbs & Bruns, LLP; Ropes & Gray LLP; and Kelly Drye & Warren LLP), related to the RMBS Plan Support Agreement.

21.    All documents and communications concerning any contemplated AFI initial public offering, including without limitation any draft registration materials for such an initial public offering and any documents or communications relating to ResCap or the Debtors in connection with such an initial public offering.

22.    All documents and communications concerning the Mortgage-Related Legal Proceedings, including without limitation any analysis or discussion of the merits of any such proceeding, all tolling agreements, and all communications with ResCap, Cerberus, IB

Finance, Ally Bank, and/or governmental authorities, related to the Mortgage-Related Legal Proceedings.

23.     All communications of each respective member of AFI's board of directors concerning: (a) the GMAC Bank Transfer; (b) the Prepetition Related Party Agreements or the Prepetition Related Party Transactions; (c) the AFI Settlement and Plan Sponsor Agreement; (d) the Junior Secured Noteholders' Plan Support Agreement; (e) the RMBS Trust Settlement Agreement and RMBS Plan Support Agreement; and/or (f) the Mortgage-Related Legal Proceedings.

24.     All presentations and/or materials prepared in connection with presentations to any governmental or regulatory agency or entity, including without limitation the FDIC or the Treasury Department, concerning ResCap, AFI, IB Finance, and/or Ally Bank.

25.     Documents and communications with the FDIC or other regulators concerning AFI's role as a source of strength for GMAC Bank, GMAC Bank's capital requirements, and/or AFI's other support for GMAC Bank.

26.     All documents relating to any involvement by AFI or any AFI employees in the origination, purchase, or securitization by ResCap of residential mortgages, including without limitation all documents relating to: (a) AFI's role in preparing or approving the offering materials used in any Mortgage-Related Legal Proceeding; or (b) AFI's role in setting, monitoring, or changing any credit, audit, quality control, due diligence, underwriting, or any other risk-related policies applicable to any of the mortgage loans in any Mortgage-Related Legal Proceeding.

27.     All communications concerning any of the Mortgage-Related Legal Proceedings, or any of the offerings or mortgage loans related to those proceedings.

28.    All communications concerning prospective purchasers of some or all of the Debtors' assets or AFI's equity interests in the Debtors.

29.    All documents and communications relating to any efforts to sell ResCap or ResCap's assets, including all unsuccessful attempts.

30.    All documents relating to any decision, discussion or consideration of whether the Debtors should file for relief under the United States Bankruptcy Code at any time between 2004 and the present, including without limitation any communications with any governmental or regulatory agencies or any shareholders, officers, or directors of AFI.

31.    All documents and communications concerning any director or officer of the Debtors and their continued service on the board of directors or as a member of management of the Debtors, or any such director or officer's continuing benefits (including compensation in any form) during the proceedings in the Chapter 11 case captioned in the annexed subpoena or thereafter.

32.    All documents concerning AFI's involvement, if any, in setting forth the salary, benefits, deferred compensation, Restricted Stock Units, and any other compensation of each past and present director and officer of ResCap, including without limitation any severance benefit to which they may be entitled upon their separation from ResCap.

33.    All documents and communications concerning a ResCap director or officer's ownership interest in AFI or its direct or indirect affiliates' stock and/or equity, including without limitation Restricted Stock Units, including without limitation the sale or disposition of any such interest.

34.    All documents and communications concerning an AFI director or officer's ownership interest in ResCap or its direct or indirect affiliates' stock and/or equity, including without limitation the sale or disposition of any such interest.

35.    All documents and communications concerning any insurance policy covering or related to any liability of the current or former directors or officers of the Debtors.

36.    All documents and communications concerning: (a) the appointment of Jonathan Ilany and John E. Mack to the board of directors of any of the Debtors; and (b) Jonathan Ilany or John E. Mack's relationships or involvement with the Debtors (including without limitation each of the Debtors' current or former directors or officers); AFI (including without limitation each of AFI's current or former directors or officers); Cerberus (including without limitation each of Cerberus's current or former directors or officers); IB Finance (including without limitation each of IB Finance's current or former directors or officers); and/or Ally Bank (including without limitation each of Ally Bank's current or former directors or officers), prior to such appointment.

37.    All documents and communications concerning AFI's knowledge of and/or involvement in efforts by Jonathan Ilany, John E. Mack, or the AFI Claims Subcommittee to engage any attorneys or advisors, including without limitation any communications with any potential or engaged attorneys or advisors in connection with the Debtors, and any engagement letters or agreements with any such attorneys or advisors.

38.    All documents and communications concerning AFI's knowledge of and/or involvement in the AFI Claims Subcommittee and/or its activities, including without limitation all: (a) communications with or among members of the Debtors' management or boards of directors or their advisors or attorneys; (b) communications among the members of the

- 17 -

AFI Claims Subcommittee; (c) communications with or among the AFI Claims Subcommittee's attorneys or advisors; (d) writings, reports, conclusions, presentations, or opinions (including all drafts) provided or communicated to, or created or obtained by, the AFI Claims Subcommittee; and (e) writings, reports, conclusions, presentations, or opinions (including all drafts) provided or communicated to any person or entity other than the AFI Claims Subcommittee.

39.    All documents and communications concerning AFI's knowledge of or involvement in the AFI Claims Subcommittee's negotiations, discussions, and analyses of the AFI Settlement and Plan Sponsor Agreement, including without limitation: (a) communications with or among members of the Debtors' management or boards of directors or their advisors or attorneys; (b) communications among the members of the AFI Claims Subcommittee; (c) communications with or among the AFI Claims Subcommittee's attorneys or advisors; (d) writings, reports, conclusions, presentations, or opinions (including all drafts) provided or communicated to, or created or obtained by, the AFI Claims Subcommittee; and (e) writings, reports, conclusions, presentations, or opinions (including all drafts) provided or communicated to any person or entity other than the AFI Claims Subcommittee.

40.    All documents and communications between AFI, including without limitation its advisors or attorneys, and the AFI Claims Subcommittee.

41.    All documents and communications concerning the work and activities of Kirkland & Ellis, LLP with or without Morrison & Foerster LLP and/or Morrison Cohen LLP, in connection with the activities of the AFI Claims Subcommittee.

42.    All documents and communications concerning the AFI Settlement and Plan Sponsor Agreement, as referenced in the May 14, 2012 Transcript.

43.    All internal reports of AFI concerning: (a) valuations of the Debtors' assets; (b) pricing of the Debtors' assets; (c) overall financial condition of the Debtors; (d) the Debtors' relationship with AFI, Cerberus, IB Finance, and/or Ally Bank; and/or (e) the GMAC Bank Transfer.

44.    All documents and communications concerning: (a) ResCap's ability to operate and continue as a going concern; (b) ResCap's solvency, liquidity, or cash flow limitations, including without limitation any solvency analyses; (c) ResCap's ability to take on debt, or to repay any loan from any lender; (d) the possibility of ResCap filing for bankruptcy protection; (e) the sale or potential sale of ResCap assets; (f) the failure or inability of ResCap to sell assets; and/or (g) the sufficiency of ResCap's capital.

45.    Documents sufficient to demonstrate the financial condition of each of the Debtors for each month, quarter, and year between the period January 1, 2004 through the Petition Date, including without limitation: (a) financial statements, including without limitation consolidated and consolidating (i) balance sheets, (ii) statements of income, (iii), statements of cash flow, (iv) statements of changes in equity, and (v) supporting notes to financial statements; (b) general ledgers, including without limitation (i) transaction level electronic data, and journal entries and journal entry support documentation; (c) internal accounting policy manuals, including without limitation charts of accounts; and (d) off-balance sheet debt, including without limitation contingent liabilities, guaranties, leases, and receivable securitizations.

46.    All documents and communications concerning AFI's plans for any ResCap business, including business plans, projections, cash and other forecasts, strategic plans, and operating plans, including without limitation underlying assumptions and/or any rationale for changes in assumptions, between the period January 1, 2004 through the Petition Date.

- 19 -

47.    All documents and communications concerning the Debtors' liquidity and capital, including but not limited to revolver availability, undrawn credit facilities, ability to refinance, maturing debt, unencumbered and/or non-core assets, the ability to monetize unencumbered and/or non-core assets, and the ability to raise equity or debt capital, between the period January 1, 2004 through the Petition Date.

48.    All documents and communications provided to lenders and credit rating agencies concerning the financial condition of the Debtors, including without limitation service quality ratings.

# EXHIBIT 2

## SCHEDULE OF DOCUMENTS
## REQUESTED BY EXAMINER

**Directed to:**          **Ally Financial, Inc.**

**Date of Request:**      **September 4, 2102**

### DEFINITIONS

1.      The full text of the definitions and rules of construction set forth in
Rules 26.3(c) and (d) of the Local Civil Rules of the United States District Court for the
Southern District of New York (the "Local Civil Rules") are incorporated herein by reference.
In addition, the definitions described herein apply.

2.      "**AFI**" shall mean Ally Financial Inc., f/k/a GMAC LLC, and all of its
current and former, direct and indirect affiliates, subsidiaries, employees, representatives, agents,
advisors (including without limitation Evercore), attorneys (including without limitation
Kirkland & Ellis LLP and Mayer Brown LLP), and all other persons or entities acting or
purporting to act on their behalf or under their control, and each of their predecessors and
successors, except for ResCap.

3.      "**AFI Claims Subcommittee**" shall mean the subcommittee of ResCap's
board of directors comprising Jonathan Ilany and John E. Mack, which is referred to on pages 34
through 38 of the May 14, 2012 Transcript, and all of its employees, representatives, agents,
attorneys (including without limitation Morrison Cohen LLP), and advisors, and all other persons
or entities acting or purporting to act on their behalf or under their control, and each of their
predecessors and successors.

4.      "**AFI Settlement and Plan Sponsor Agreement**" shall mean the
agreement dated as of May 14, 2012, entered into by the Debtors and AFI, which is attached as
Exhibit 8 to the First Day Affidavit.

5.    "**Ally Bank**" shall mean the Utah bank f/k/a GMAC Bank and all of its direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

6.    "**Board Materials**" shall mean all documents (including any drafts) provided to or considered by the directors of the boards of ResCap, or any members, committees, or subcommittees thereof, including without limitation (a) documents related to the assets, debts, dealings, operations, and/or businesses of ResCap; and (b) documents related to advice by counsel and/or financial advisors concerning the assets, debts, dealings, operations, and/or businesses of ResCap,

7.    "**Board Minutes**" shall mean all written or recorded (by any means including without limitation tape recording, video recording, or otherwise) consents, resolutions, minutes, transcriptions, or notes of any meetings, decisions, deliberations, discussions, or actions of the boards of directors of ResCap, or of any members, committees, or subcommittees thereof, including without limitation all drafts of any such materials.

8.    "**Cerberus**" shall mean Cerberus Capital Management, L.P. and all of its direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors, including without limitation Cerberus FIM, LLC; Cerberus FIM Investors LLC; FIM Holdings LLC, and CMH Holdings, LLC.

9.    "**Chapter 11 Cases**" shall mean In re Residential Capital, LLC, et al., Case No. 12-12020 (MG), pending in the United States Bankruptcy Court for the Southern District of New York.

2

10.    "**Committee**" shall mean the Official Committee of Unsecured Creditors of Residential Capital, LLC, et al. in the Chapter 11 Cases.

11.    "**Court**" shall mean the United States Bankruptcy Court for the Southern District of New York, and in particular the United States Bankruptcy Judge to whom the Chapter 11 Cases have been assigned.

12.    "**Debtors**" shall mean ResCap and its direct and indirect subsidiaries that have filed voluntary petitions commencing a case under Chapter 11 of the Bankruptcy Code, and are debtors and debtors-in-possession on behalf of each such entity and its estate in the case captioned in the annexed subpoena, and all of their employees, representatives, agents, advisors, attorneys (including without limitation Morrison & Foerster LLP), and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.[1]

13.    "**Examiner**" shall mean Arthur J. Gonzalez, the Court-appointed Examiner for the Debtors in the Chapter 11 Cases, appointed July 3, 2012.

14.    "**First Day Affidavit**" shall mean the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, In Support of Chapter 11 Petitions And First Day Pleadings, dated May 14, 2012, filed as Docket No. 6 in the Chapter 11 Cases.

---

[1]    The names of the Debtors in the Chapter 11 Cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings, filed with the Court in the Chapter 11 Cases on May 14, 2012. Additional subsidiaries and affiliates of the Debtors may file Chapter 11 petitions on a rolling basis. As used herein, the term "Debtors" includes any such entities.

3

15.    "**GMAC Bank**" shall mean the Utah Bank n/k/a Ally Bank and all of its direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

16.    "**GMAC Bank Transfer**" shall mean all contemplated or consummated transactions, agreements, or events among the Related Parties concerning (a) the transfer of the assets of or interests in Old GMAC Bank; (b) the transfer of the assets of or interests in Ally Bank and/or IB Finance; (c) the issuance and/or conversion of preferred membership interests in ResCap; and (c) the issuance, conversion, and/or remarketing of common and preferred membership interests in IB Finance, including without limitation the transactions, agreements, and events referenced, described, or disclosed in ResCap SEC Forms 8-K, dated November 27, 2006, April 4, 2008, June 9, 2008, and February 3, 2009.

17.    "**IB Finance**" shall mean the IB Finance Holding Company, LLC, the holding company for Ally Bank, and all of its employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

18.    "**Junior Secured Noteholders**" shall mean the Consenting Holders and the Ad Hoc Group, as each is defined in the Junior Secured Noteholders Plan Support Agreement, and all of their direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors (including without limitation Houlihan Lokey), and attorneys (including without limitation White & Case LLP), and each of their predecessors and successors.

19.    "**Junior Secured Noteholders' Plan Support Agreement**" shall mean the agreement entered into as of May 13, 2012, by and among the Debtors, AFI, the Consenting

4

Holders, and the Ad Hoc Group (each of which is defined in such agreement), which is attached
as Exhibit 9 to the First Day Affidavit.

20.    "**Legal Proceedings**" shall mean all claims and legal actions, or
governmental or regulatory investigations, pending, ongoing or threatened against ResCap as of
the Petition Date (including without limitation all civil actions; arbitrations; mediations;
governmental, regulatory, or criminal investigations; proceedings; or settlements), except for the
Mortgage-Related Legal Proceedings.

21.    "**May 14, 2012 Transcript**" shall mean the transcript of the proceedings
of May 14, 2012, before the Court in the Chapter 11 Cases.

22.    "**Mortgage-Related Legal Proceedings**" shall mean all claims and legal
actions, or governmental or regulatory investigations, settled, pending, ongoing or threatened
against ResCap or AFI as of the Petition Date (including without limitation all civil actions;
arbitrations; mediations; governmental, regulatory, or criminal investigations; proceedings; or
settlements) concerning any mortgage or mortgage-backed security, including without limitation
(a) all claims and legal actions concerning the robo-signing allegations relating to foreclosure
documents and the other matters referenced in paragraph 85 of the First Day Affidavit, or
concerning any related claims and legal actions involving AFI, or concerning MERSCORP, Inc
and/or the Mortgage Electronic Registration Systems, Inc.; and (b) the Representation and
Warranty Claims, Monoline Insurer Representation and Warranty Litigations, and Securities
Litigations referenced in paragraphs 100 through 103 of the First Day Affidavit, and any related
claims and legal actions involving AFI.

23.    "**Old GMAC Bank**" shall mean the federal savings bank n/k/a National
Motors Bank FSB and all of its direct and indirect subsidiaries, employees, representatives,

5

agents, advisors, and attorneys, and all other persons or entities acting or purporting to act on

their behalf or under their control, and each of their predecessors and successors.

      24.     "**Petition Date**" shall mean May 14, 2012.

      25.     "**Prepetition Related Party Agreements**" shall mean all verbal or written

agreements or contracts between ResCap on the one hand and any of AFI, Cerberus, or Ally

Bank on the other hand, including without limitation all agreements concerning transfers of cash,

assets, property, stock, contracts, or other items of value.

      26.     "**Prepetition Related Party Transactions**" shall mean: (a) Related Party

payments, including without limitation dividends and capital contributions; (b) Related Party

loans; (c) Related Party debt, including without limitation the transfer, repayment, or forgiveness

of such debt; (d) Related Party claims, including without limitation all payments made on

account of such claims; (e) Related Party transfers of cash, assets, property, stock, contracts, or

other items of value; and (f) the Specified Transactions.

      27.     "**Postpetition Transactions**" shall mean: (a) the AFI Settlement and Plan

Sponsor Agreement; (b) the Junior Secured Noteholders' Plan Support Agreement; (c) the

RMBS Plan Support Agreement; and (d) the RMBS Trust Settlement Agreement.

      28.     "**Related Party**" shall mean between ResCap on the one hand and any of

AFI, Cerberus, and/or Ally Bank on the other hand.

      29.     "**ResCap**" shall mean Residential Capital, LLC and all of its current and

former, direct and indirect subsidiaries, employees, representatives, agents, advisors, attorneys,

and all other persons or entities acting or purporting to act on their behalf or under their control,

and each of their predecessors and successors.

6

30.     "**RMBS Plan Support Agreement**" shall mean the agreement entered into as of May 13, 2012, by and between the Debtors, AFI, and the Consenting Claimants (defined in such agreement), which is attached as Exhibit 10-A to the First Day Affidavit.

31.     "**RMBS Trust Settlement Agreement**" shall mean the agreement entered into as of May 13, 2012, by and between the Debtors and the Institutional Investors (defined in such agreement), which is attached as Exhibit 10-B to the First Day Affidavit,

32.     "**Shareholder Materials**" shall mean: (a) all written or recorded (by any means including without limitation tape recording, video recording, or otherwise) consents, resolutions, minutes, transcriptions, or notes of any meetings, decisions, deliberations, discussions, or actions of the direct or indirect shareholders of ResCap, or of any members, committees, or subcommittees thereof, including without limitation all drafts of any such materials; and (b) all documents (including any drafts) provided to or considered by the direct or indirect shareholders of ResCap, or any members, committees, or subcommittees thereof, including without limitation (a) documents related to the assets, debts, dealings, operations, and/or businesses of ResCap; and (b) documents related to advice by counsel and/or financial advisors concerning the assets, debts, dealings, operations, and/or businesses of ResCap.

33.     "**Specified Transactions**" shall mean:

a)    ResCap's reported sale of its healthcare lending business to GMAC Commercial Finance, LLC, as described in ResCap Form 8-K, dated August 31, 2007;

b)    ResCap's entry into a secured credit agreement with AFI (as lender and agent), to provide ResCap with a revolving credit facility in connection with its resort finance business, as described in Res Cap Form 8-K, dated July 9, 2008 and ResCap Form 10-Q for the quarterly period ended September 30, 2008 (p. 41);

c)    the reported sale of ResCap's resort finance business to GMAC Commercial Finance, LLC, as described in ResCap Form 10-Q for the quarterly period ended September 30, 2008 (p. 71);

7

d)   ResCap's entry into a loan and security agreement (and amendments thereto) with AFI to fund mortgage servicing rights, as described in ResCap Form 10-Q for the quarterly period ended June 30, 2008 (p. 73);

e)   ResCap's entry into a secured revolving and term loan credit agreement (and amendments thereto) with AFI for general working capital, as described in ResCap Form 8-K, dated June 9, 2008;

f)   ResCap's issuance of secured notes in exchange for unsecured notes to AFI and other participating holders, as described in ResCap Form 8-K, dated June 11, 2008 (p. 1);

g)   ResCap's reported sale of model home and lot option assets to Cerberus and/or a Cerberus affiliate, as described in ResCap Form 8-K, dated June 2, 2008 (p.3-5) and/or ResCap Form 10-Q for the quarterly period ended June 30, 2008 (p. 37) and/or ResCap Form 8-K, dated October 6, 2008;

h)   ResCap's factoring arrangements with AFI relating to servicing advances of delinquent mortgage loans, as described in ResCap Form 8-K, dated June 23, 2008;

i)   ResCap's reported sale of mortgage loans, mortgage-backed securities and model home assets to Cerberus, as described in ResCap Form 8-K, dated October 6, 2008;

j)   ResCap's sale of equity interests in certain Canadian subsidiaries to AFI, as described in ResCap Form 8-K, dated November 20, 2008;

k)   ResCap's entry into a loan agreement with AFI (as lender) (and amendments thereto) for short-term secured loans to ResCap, as described in ResCap Form 8-K, dated November 20, 2008;

l)   GMAC's exchange offer for ResCap notes, as described in ResCap Form 8-K, dated November 20, 2008;

m)   AFI's extension of loans and lines of credit (including amendments thereto) to certain ResCap subsidiaries, as described in ResCap Form 8-K, dated June 18, 2009;

n)   ResCap's posting of two litigation bonds and the holding of restricted cash in connection with the Mitchell case, as described in ResCap Form 10-K for the fiscal year ended December 31, 2008 (pp. 50 and Schedule 1.01-19) and ResCap Form 10-Q/A for the quarterly period ended June 30, 2009 (pp. 22-23);

o)   ResCap's entry into derivative transactions with AFI, including (i) foreign exchange and interest rate hedging, (ii) sale of certain mortgage backed securities on a forward basis, (iii) master netting agreement across derivative agreements, line of credit, and (iv) with respect to mortgage servicing rights and

8

any held for sale or pipeline portfolio, including but not limited to as described in ResCap Form 10-Q for the quarterly period ended March 31, 2009 (p. 45, 57), and in footnote 29 of the First Day Affidavit;

p)   ResCap's reported sale of broker-dealers to AFI, as described in ResCap Form 10-Q for the quarterly period ended March 31, 2009 (p. 62);

q)   ResCap's entry into an amended and restated line of credit facility (with amendments thereto) with AFI, as described in the ResCap Consolidated Financial Statements for the Year Ended December 31, 2009, dated February 26, 2010 (p, 43);

r)   ResCap's entry into any management agreement with AFI, pursuant to which management fees were payable, including but not limited to as described in ResCap Form 10-K for the fiscal year ended December 31, 2007 (p. 155);

s)   ResCap's (and, if applicable, AFI's) entry into and performance under: (a) the settlements referenced in paragraph 84 and footnotes 34 and 35 of the First Day Affidavit; (b) the "DOJ/AG Settlement" referenced in paragraph 86 of the First Day Affidavit; (c) the Consent Order with the Federal Reserve Board and FDIC referenced in paragraph 87 of the First Day Affidavit; (d) the settlement with the Department of Justice and Attorneys General referenced in paragraph 89 of the First Day Affidavit; and (e) the "CMP" referenced in paragraph 90 of the First Day Affidavit;

t)   ResCap's transfer and assignment of real property interests as described in paragraph 92 of the First Day Affidavit

u)   The sale of securities backed by excess servicing rights on Freddie Mac and Fannie Mae Loans to Cerberus on July 30, 2008 as described in the ResCap 8-K, dated August 5, 2008;

v)   AFI guarantees of ResCap, including but not limited to, by letters dated October 5, 2011, April 1, 2011 and May 11, 2012;

w)   The Letter Agreement regarding Mortgage Loan Sale Process dated December 5, 2011 and/or the Pledge and Security Agreement dated as of April 25, 2012;

x)   The Master Mortgage Loan Purchase and Sale Agreement set forth at http://www.sec.gov/Archives/edgar/data/1332815/000119312509105708/dex10 27.htm, and any amendments thereto;

y)   The determination of the amounts in aggregate of, and the allocation as between AFI and its subsidiaries, including ResCap, of reserves, or payments (including defense costs), or settlement compliance obligations, arising out of or relating to the Mortgage-Related Legal Proceedings (including without limitation the settlements or agreements referenced in item "(s)" above;

9

z)    The Servicing Agreement between GMAC Mortgage and Ally Bank, including as amended May 11, 2012, and which is the subject of Debtors' Motion to Continue Performing Under Ally Bank Servicing Agreement [Docket No. 47 in the Chapter 11 Cases] and the Declaration of Thomas Marano [Docket No. 793 in the Chapter 11 Cases];

aa)    ResCap's 2006 Operating Agreement and any AFI or ResCap indemnity obligations relating thereto;

bb)    Any obligation or agreement of AFI to indemnify the officers or directors of ResCap; and

cc)    Any Directors and Officers insurance coverage obtained, procured or provided by AFI in respect of any officer or director of ResCap.

34.    "**Supplemental Specified Transactions**" shall mean:

(a)    The sale in or about August 2010 of ResCap's UK and Continental European Mortgage Platform to Fortress; and

(b)    The Partial Servicing Advance Reimbursement Term Sheet with Fannie Mae in August 2010 and any related agreements.

35.    "**Transactions Under Review**" shall mean: the GMAC Bank Transfer;

any secured lending transaction entered into by any Debtor and/or the collateral for any such transaction; the Prepetition Related Party Agreements; the Prepetition Related Party Transactions; the Supplemental Specified Transactions; the Postpetition Transactions; and/or the Mortgage-Related Legal Proceedings.

36.    "**You**" and "**Your**" shall mean and refer to the person or entity to whom this request for documents has been propounded by the Examiner, whether through a subpoena issued pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure or on a voluntary or cooperative basis.

## INSTRUCTIONS

1.    These requests encompass all documents in Your possession, custody, or control, whether or not such documents were prepared by or for You. Where documents in Your

10

possession, custody, or control are requested or inquired of, such request or inquiry includes documents in the possession, custody, or control of each of Your current and former direct and indirect affiliates, subsidiaries, predecessors, successors, employees, directors, agents, accountants, attorneys, auditors, representatives, consultants, advisors, all other persons or entities acting or purporting to act on behalf of You, and any other persons or entities from which You could obtain documents.

2.      If You contend that no documents exist relating to all or part of a request, You shall state this contention and respond as fully as possible to all parts of the request for which documents exist.

3.      If You claim that any privilege or protection excuses production of any document or part thereof, You shall, consistent with Local Civil Rule 26.2, expressly make such claim in writing and provide a general description of the categories of documents being withheld and the basis for doing so, in sufficient detail for the Examiner to determine whether there is an adequate basis for invoking privilege or protection.

4.      In the event that any document covered hereunder has been destroyed, discarded, or lost, You shall inform the Examiner of this in writing and provide a general description of the categories of documents destroyed or lost and the circumstances of their destruction or loss.

5.      If any document cannot be produced in full, it shall be produced to the maximum extent possible and You shall specify in writing the reasons for Your inability to produce the remainder.

6.      Requested documents which You contend need to be produced with confidentiality protections shall be produced consistent with the procedures set forth in the

11

Uniform Protective Order for Examiner Discovery that was approved by the Court in the

Chapter 11 Cases by order dated August 20, 2012 (Docket No. 1223-1).

      7.     Each document is to be produced with all non-identical copies and drafts

thereof in their entirety without abbreviation or redaction (other than for a claim of privilege,

consistent with Local Civil Rule 26.2 and the Instructions herein).

      8.     The production of documents and their associated metadata shall be made

in accordance with the "Examiner's Instructions for ESI and Documents Produced in Electronic

Format" dated August 13, 2012, previously provided to You. To the extent that documents are

produced to the Examiner on physical media (i.e., as opposed to via FTP link), production media

needs to be provided to the Examiner in duplicate to enable timely posting in the Document

Depository for the Chapter 11 Cases that was established by the Order (I) Granting Examiner

Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination

of Persons and Entities, (II) Establishing Procedures for Responding to Those Subpoenas,

(III) Approving Establishment of a Document Depository and Procedures to Govern Use, and

(IV) Approving Protective Order in the Chapter 11 Cases, dated August 20, 2012 (Docket No.

1223).

      9.     Unless stated otherwise, the time period applicable to the documents

called for is from January 1, 2004, through the date of the document requests (the "Relevant

Period"), subject to any ongoing obligations You may have to supplement responses under the

applicable rules.

12

## DOCUMENT REQUESTS

1.      Documents sufficient to provide all internal financial and treasury management reports used by management to operate or oversee ResCap's businesses or operations.

2.      All documents and communications (including without limitation presentations to the Board or to management, workpapers, projections, historical financial information, business or asset descriptions, reports, memoranda, supporting calculations or similar documents) concerning any valuation or appraisal of, or fairness opinions concerning, or any other similar analysis however denominated, concerning the Transactions Under Review or their projected or actual financial implications, without regard to whether prepared or presented prior to, contemporaneously with, of subsequent to, the date any such Transactions Under Review were entered into.

3.      In connections with any AFI or ResCap credit facilities or other borrowing requiring such certificates, all documents and communications comprising, or relating to the preparation of, any certificates regarding or demonstrating: (a) compliance with any covenants in respect of such borrowing; or (b) the valuation of the borrowing base in respect of such borrowing.

4.      In connections with any AFI or ResCap credit facilities or other borrowing requiring such certificates, all documents and communications comprising, or relating to the preparation of, any certificates regarding or demonstrating compliance with any covenants in respect of such borrowing.

5.      All documents and communications concerning any formal or informal presentations made to ratings agencies concerning the historical and/or anticipated performance

13

of the company relevant to establishing, reviewing , or modifying a rating on the company's securities.

      6.     All documents and communications concerning the decision or decisions to convert the then GMAC Bank of Midvale, Utah from an industrial loan company to a commercial bank falling with the definition of a "bank" under the Bank Holding Company Act, and for GMAC LLC and IB Finance to become bank holding companies under the Bank Holding Company Act, or concerning the implementation of such decision or decisions, including without limitation: (a) the reasons for such a decision and any alternative considered; (b) all communications with the Federal Reserve Board, the Treasury, and/or state or federal regulators; (c) any anticipated adverse or negative effects or compliance costs to ResCap, AFI and/or Cerberus and all planning and actions taken to mitigate such effects or costs.

      [To Cerberus]  All documents and communications concerning any anticipated adverse or negative effects or compliance costs to Cerberus, including without limitation all planning and actions taken to mitigate such effects or costs, arising out of the conversion of the then GMAC Bank of Midvale, Utah from an industrial loan company to a commercial bank falling with the definition of a "bank" under the Bank Holding Company Act, and/or of GMAC LLC and IB becoming bank holding companies under the Bank Holding Company Act.

      7.     All documents and communications concerning any shared services agreement between any portion of AFI and any portion of ResCap, or any other agreement providing for any portion of AFI to provide services or employees to any portion of ResCap or providing for any portion of ResCap to provide services or employees to any portion of ResCap, including without limitation all documents and communications concerning (a) the amounts paid

14

or payable under any such agreement; (b) any negotiations or any internal or third party analysis, financial or otherwise, relating to any such agreement; (c) any modifications to any such agreement; or (d) any decision to move any employee or officer that provided or performed any shared services from the payroll (or any other indicia that such person was an employee or officer) of AFI to the payroll (or any other indicia that such person was an employee or officer) of ResCap, or *vice versa.*

8.      All documents and communications concerning any shared services agreement between any portion of AFI and any other portion of AFI, or any other agreement providing for any portion of AFI to provide services or employees to any other portion of AFI, including without limitation all documents and communications concerning the amounts paid or payable under any such agreement, or concerning any negotiations or any internal or third party analysis, financial or otherwise, relating to any such agreement.

9.      All documents and communications concerning a ResCap director or officer's ownership interest in Cerberus, or General Motors Company or its direct or indirect affiliates,' stock and/or equity, including without limitation restricted stock units, and including without limitation the sale or disposition of any such interest.

10.     All documents and communications, including models and supporting workpapers, used for or relating to the valuation or appraisal of (a) mortgage servicing rights (either primary or master); (b) mortgage pools; or (c) allowances or reserves for loan or mortgage losses.

11.     Documents sufficient to provide all tax filings, returns, schedules and attachments in respect of ResCap and AFI federal, state taxes applicable to fiscal years beginning on or after January 1, 2006 ("Tax Filings") and all workpapers prepared in connection with such

15

Tax Filings, including without limitation all in respect of all tax attribute carryforward and carryback schedules, including net operating loss, capital loss, and income tax credit calculations and carryforwards, each by corporate entity.

12.     All documents and communications concerning any tax sharing agreement between any portion of AFI and any portion of ResCap, or any other agreement providing for the sharing or allocation of tax liabilities or benefits between any portion of AFI and any portion of ResCap, including without limitation all documents and communications concerning any negotiations or any internal or third party analysis, financial or otherwise, relating to any such agreement.

13.     Documents sufficient to provide consolidating financial statements for AFI and ResCap, including individual statements for each legal entity comprising AFI and ResCap with consolidating entries and eliminations and workpapers, supporting calculations, and other documents and communications concerning the preparation of the foregoing.

14.     All documents and communications concerning any investigation, analysis, appraisal, or valuation of the Mortgage-Related Legal Proceedings and the circumstances alleged therein, including without limitation, (a) any internal investigations; (b) any independent investigations; (c) any investigation by at the request of any governmental agency or regulator; (d) any workpapers or models (including each iteration thereof, and the output over time thereof) used for or relating to the valuing of potential liabilities arising out of the Mortgage-Related Legal Proceedings and the circumstances alleged therein; and (e) the allowances or reserves recorded over time in respect of potential liabilities arising out of the Mortgage-Related Legal Proceedings and the circumstances alleged therein.

16

15.     All documents comprising or sufficient to demonstrate intercompany (for

AFI or ResCap or between any part of AFI and any part of ResCap) account detail and activity or

netting concerning any of the Transactions Under Review.

16.     All financials statements for the Mortgage Division of Ally Bank covering

any portion of the Relevant Period.

17.     All documents and communications, including valuations, fairness

opinions, and other analysis concerning:

   a) ResCap's entry into agreements with the then GMAC Investment
      Management LLC involving foreign exchange and interest rate hedging
      transactions, including as described in ResCap's 8-K, dated March 24, 2009;

   b) the agreement or agreements whereby, beginning in or about 2008, mortgage
      loans formerly originated through ResCap were instead brokered through GMAC
      Mortgage or others; and

   c) the Citibank MSR Facility referenced in paragraph 62 of the First Day Affidavit;

18.     All documents and communications concerning communications with the

Federal Deposit Insurance Corporation, or any regulator, concerning any derivative, swap, or

hedging transactions by or between AFI and ResCap, and any analysis (including workpapers) of

such transactions, including fairness opinions, valuations, or analysis as to whether such terms

reflected arms-length, market terms.

19.     All documents and communications concerning internal or intercompany

audit plans and workpapers relating to capital markets and treasury operations, including trading

and hedge execution.

20.     All documents and communications concerning confirmations under or

relating to derivative, swap, or hedging transactions.

17

21.     In respect of any portion of the Relevant Period, the following reports and

their equivalents if otherwise titled, including any attachments and any supporting documents,

calculations or analysis:

a) Liquid Cash Balance Rollforwards;

b) Executive Liquidity Reports; and

c) Daily Cash Rollforwards.

22.     All documents and communications concerning analysis undertaken or

obtained, including without limitation by FTI Consulting or internally, concerning:

a) which AFI or ResCap companies, businesses or business units or divisions, were or were not profitable;

b) valuing and tracking of values of assets for possible sale;

c) valuing or validation of intercompany claims;

d) solvency of AFI and/or ResCap; and

e) restructuring options, including bankruptcy, including any related projections or scenarios.

23.     All documents or communications concerning reporting or other

information provided to the Federal Deposit Insurance Corporation in connection with reporting

requirements, including without limitation Call Reports and Thrift Financial Reports and

including any supporting materials.

24.     All documents or communications concerning any earnings calls held by

AFI or ResCap and presentations or materials presented therein, including without limitation any

preparation materials, any prepared remarks or talking points, any notes taken, and any

transcripts or recordings.

25.     Documents sufficient to provide general ledger data for intercompany

accounts between or among Cerberus, AFI and/or ResCap.

18

# EXHIBIT 3

## SCHEDULE OF DOCUMENTS
## REQUESTED BY EXAMINER

**Directed to:**      **Ally Financial Inc.**

**Date of Request:**   **September 13, 2012**

## DEFINITIONS

1.      The full text of the definitions and rules of construction set forth in
Rules 26.3(c) and (d) of the Local Civil Rules of the United States District Court for the
Southern District of New York (the "Local Civil Rules") are incorporated herein by reference.
In addition, the definitions described herein apply.

2.      "**AFI**" shall mean Ally Financial Inc., f/k/a GMAC LLC, and all of its
current and former, direct and indirect affiliates, subsidiaries, employees, representatives, agents,
advisors (including without limitation Evercore), attorneys (including without limitation
Kirkland & Ellis LLP and Mayer Brown LLP), and all other persons or entities acting or
purporting to act on their behalf or under their control, and each of their predecessors and
successors, except for ResCap.

3.      "**AFI Claims Subcommittee**" shall mean the subcommittee of ResCap's
board of directors comprising Jonathan Ilany and John E. Mack, which is referred to on pages 34
through 38 of the May 14, 2012 Transcript, and all of such subcommittee's employees,
representatives, agents, attorneys (including without limitation Morrison Cohen LLP), and
advisors, and all other persons or entities acting or purporting to act on their behalf or under their
control, and each of their predecessors and successors.

4.      "**AFI Settlement and Plan Sponsor Agreement**" shall mean the
agreement dated as of May 14, 2012, entered into by the Debtors and AFI, which is attached as
Exhibit 8 to the First Day Affidavit.

5.     "**Ally Bank**" shall mean the Utah bank f/k/a GMAC Bank and all of its direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

6.     "**Board Materials**" shall mean all documents (including any drafts) provided to or considered by the directors of the boards of ResCap, or any members, committees, or subcommittees thereof, including without limitation (a) documents related to the assets, debts, dealings, operations, and/or businesses of ResCap; and (b) documents related to advice by counsel and/or financial advisors concerning the assets, debts, dealings, operations, and/or businesses of ResCap,

7.     "**Board Minutes**" shall mean all written or recorded (by any means including without limitation tape recording, video recording, or otherwise) consents, resolutions, minutes, transcriptions, or notes of any meetings, decisions, deliberations, discussions, or actions of the boards of directors of ResCap, or of any members, committees, or subcommittees thereof, including without limitation all drafts of any such materials.

8.     "**Cerberus**" shall mean Cerberus Capital Management, L.P. and all of its direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors, including without limitation Cerberus FIM, LLC; Cerberus FIM Investors LLC; FIM Holdings LLC, and CMH Holdings, LLC.

9.     "**Chapter 11 Cases**" shall mean In re Residential Capital, LLC, *et al*., Case No. 12-12020 (MG), pending in the United States Bankruptcy Court for the Southern District of New York.

2

10.      "**Committee**" shall mean the Official Committee of Unsecured Creditors of Residential Capital, LLC, et al. in the Chapter 11 Cases.

11.      "**Court**" shall mean the United States Bankruptcy Court for the Southern District of New York, and in particular the United States Bankruptcy Judge to whom the Chapter 11 Cases have been assigned.

12.      "**Debtors**" shall mean ResCap and its direct and indirect subsidiaries that have filed voluntary petitions commencing a case under Chapter 11 of the Bankruptcy Code, and are debtors and debtors-in-possession on behalf of each such entity and its estate in the case captioned in the annexed subpoena, and all of their employees, representatives, agents, advisors, attorneys (including without limitation Morrison & Foerster LLP), and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.[1]

13.      "**Examiner**" shall mean Arthur J. Gonzalez, the Court-appointed Examiner for the Debtors in the Chapter 11 Cases, appointed July 3, 2012.

14.      "**First Day Affidavit**" shall mean the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, In Support of Chapter 11 Petitions And First Day Pleadings, dated May 14, 2012, filed as Docket No. 6 in the Chapter 11 Cases.

---

[1]   The names of the Debtors in the Chapter 11 Cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings, filed with the Court in the Chapter 11 Cases on May 14, 2012. Additional subsidiaries and affiliates of the Debtors may file Chapter 11 petitions on a rolling basis. As used herein, the term "Debtors" includes any such entities.

3

15.     "**GMAC Bank**" shall mean the Utah Bank n/k/a Ally Bank and all of its direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

16.     "**GMAC Bank Transfer**" shall mean all contemplated or consummated transactions, agreements, or events among the Related Parties concerning (a) the transfer of the assets of or interests in Old GMAC Bank; (b) the transfer of the assets of or interests in Ally Bank and/or IB Finance; (c) the issuance and/or conversion of preferred membership interests in ResCap; and (c) the issuance, conversion, and/or remarketing of common and preferred membership interests in IB Finance, including without limitation the transactions, agreements, and events referenced, described, or disclosed in ResCap SEC Forms 8-K, dated November 27, 2006, April 4, 2008, June 9, 2008, and February 3, 2009.

17.     "**IB Finance**" shall mean the IB Finance Holding Company, LLC, the holding company for Ally Bank, and all of its employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

18.     "**Junior Secured Noteholders**" shall mean the Consenting Holders and the Ad Hoc Group, as each is defined in the Junior Secured Noteholders Plan Support Agreement, and all of their direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors (including without limitation Houlihan Lokey), and attorneys (including without limitation White & Case LLP), and each of their predecessors and successors.

19.     "**Junior Secured Noteholders' Plan Support Agreement**" shall mean the agreement entered into as of May 13, 2012, by and among the Debtors, AFI, the Consenting

4

Holders, and the Ad Hoc Group (each of which is defined in such agreement), which is attached
as Exhibit 9 to the First Day Affidavit.

20.     "**Legal Proceedings**" shall mean all claims and legal actions, or
governmental or regulatory investigations, pending, ongoing or threatened against ResCap as of
the Petition Date (including without limitation all civil actions; arbitrations; mediations;
governmental, regulatory, or criminal investigations; proceedings; or settlements), except for the
Mortgage-Related Legal Proceedings.

21.     "**May 14, 2012 Transcript**" shall mean the transcript of the proceedings
of May 14, 2012, before the Court in the Chapter 11 Cases.

22.     "**Mortgage-Related Legal Proceedings**" shall mean all claims and legal
actions, or governmental or regulatory investigations, settled, pending, ongoing or threatened
against ResCap or AFI as of the Petition Date (including without limitation all civil actions;
arbitrations; mediations; governmental, regulatory, or criminal investigations; proceedings; or
settlements) concerning any mortgage or mortgage-backed security, including without limitation
(a) all claims and legal actions concerning the robo-signing allegations relating to foreclosure
documents and the other matters referenced in paragraph 85 of the First Day Affidavit, or
concerning any related claims and legal actions involving AFI, or concerning MERSCORP, Inc
and/or the Mortgage Electronic Registration Systems, Inc.; and (b) the Representation and
Warranty Claims, Monoline Insurer Representation and Warranty Litigations, and Securities
Litigations referenced in paragraphs 100 through 103 of the First Day Affidavit, and any related
claims and legal actions involving AFI.

23.     "**Old GMAC Bank**" shall mean the federal savings bank n/k/a National
Motors Bank FSB and all of its direct and indirect subsidiaries, employees, representatives,

5

agents, advisors, and attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

24.      "**Petition Date**" shall mean May 14, 2012.

25.      "**Prepetition Related Party Agreements**" shall mean all verbal or written agreements or contracts between ResCap on the one hand and any of AFI, Cerberus, or Ally Bank on the other hand, including without limitation all agreements concerning transfers of cash, assets, property, stock, contracts, or other items of value.

26.      "**Prepetition Related Party Transactions**" shall mean: (a) Related Party payments, including without limitation dividends and capital contributions; (b) Related Party loans; (c) Related Party debt, including without limitation the transfer, repayment, or forgiveness of such debt; (d) Related Party claims, including without limitation all payments made on account of such claims; (e) Related Party transfers of cash, assets, property, stock, contracts, or other items of value; and (f) the Specified Transactions.

27.      "**Postpetition Transactions**" shall mean: (a) the AFI Settlement and Plan Sponsor Agreement; (b) the Junior Secured Noteholders' Plan Support Agreement; (c) the RMBS Plan Support Agreement; and (d) the RMBS Trust Settlement Agreement.

28.      "**Related Party**" shall mean between ResCap on the one hand and any of AFI, Cerberus, and/or Ally Bank on the other hand.

29.      "**ResCap**" shall mean Residential Capital, LLC and all of its current and former, direct and indirect subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

6

30.    "**RMBS Plan Support Agreement**" shall mean the agreement entered into as of May 13, 2012, by and between the Debtors, AFI, and the Consenting Claimants (defined in such agreement), which is attached as Exhibit 10-A to the First Day Affidavit.

31.    "**RMBS Trust Settlement Agreement**" shall mean the agreement entered into as of May 13, 2012, by and between the Debtors and the Institutional Investors (defined in such agreement), which is attached as Exhibit 10-B to the First Day Affidavit,

32.    "**Shareholder Materials**" shall mean: (a) all written or recorded (by any means including without limitation tape recording, video recording, or otherwise) consents, resolutions, minutes, transcriptions, or notes of any meetings, decisions, deliberations, discussions, or actions of the direct or indirect shareholders of ResCap, or of any members, committees, or subcommittees thereof, including without limitation all drafts of any such materials; and (b) all documents (including any drafts) provided to or considered by the direct or indirect shareholders of ResCap, or any members, committees, or subcommittees thereof, including without limitation (a) documents related to the assets, debts, dealings, operations, and/or businesses of ResCap; and (b) documents related to advice by counsel and/or financial advisors concerning the assets, debts, dealings, operations, and/or businesses of ResCap.

33.    "**Specified Transactions**" shall mean:

a)    ResCap's reported sale of its healthcare lending business to GMAC Commercial Finance, LLC, as described in ResCap Form 8-K, dated August 31, 2007;

b)    ResCap's entry into a secured credit agreement with AFI (as lender and agent), to provide ResCap with a revolving credit facility in connection with its resort finance business, as described in Res Cap Form 8-K, dated July 9, 2008 and ResCap Form 10-Q for the quarterly period ended September 30, 2008 (p. 41);

c)    the reported sale of ResCap's resort finance business to GMAC Commercial Finance, LLC, as described in ResCap Form 10-Q for the quarterly period ended September 30, 2008 (p. 71);

7

d)     ResCap's entry into a loan and security agreement (and amendments thereto) with AFI to fund mortgage servicing rights, as described in ResCap Form 10-Q for the quarterly period ended June 30, 2008 (p. 73);

e)     ResCap's entry into a secured revolving and term loan credit agreement (and amendments thereto) with AFI for general working capital, as described in ResCap Form 8-K, dated June 9, 2008;

f)     ResCap's issuance of secured notes in exchange for unsecured notes to AFI and other participating holders, as described in ResCap Form 8-K, dated June 11, 2008 (p. 1);

g)     ResCap's reported sale of model home and lot option assets to Cerberus and/or a Cerberus affiliate, as described in ResCap Form 8-K, dated June 2, 2008 (p.3-5) and/or ResCap Form 10-Q for the quarterly period ended June 30, 2008 (p. 37) and/or ResCap Form 8-K, dated October 6, 2008;

h)     ResCap's factoring arrangements with AFI relating to servicing advances of delinquent mortgage loans, as described in ResCap Form 8-K, dated June 23, 2008;

i)     ResCap's reported sale of mortgage loans, mortgage-backed securities and model home assets to Cerberus, as described in ResCap Form 8-K, dated October 6, 2008;

j)     ResCap's sale of equity interests in certain Canadian subsidiaries to AFI, as described in ResCap Form 8-K, dated November 20, 2008;

k)     ResCap's entry into a loan agreement with AFI (as lender) (and amendments thereto) for short-term secured loans to ResCap, as described in ResCap Form 8-K, dated November 20, 2008;

l)     GMAC's exchange offer for ResCap notes, as described in ResCap Form 8-K, dated November 20, 2008;

m)     AFI's extension of loans and lines of credit (including amendments thereto) to certain ResCap subsidiaries, as described in ResCap Form 8-K, dated June 18, 2009;

n)     ResCap's posting of two litigation bonds and the holding of restricted cash in connection with the Mitchell case, as described in ResCap Form 10-K for the fiscal year ended December 31, 2008 (pp. 50 and Schedule 1.01-19) and ResCap Form 10-Q/A for the quarterly period ended June 30, 2009 (pp. 22-23);

o)     ResCap's entry into derivative transactions with AFI, including (i) foreign exchange and interest rate hedging, (ii) sale of certain mortgage backed securities on a forward basis, (iii) master netting agreement across derivative agreements, line of credit, and (iv) with respect to mortgage servicing rights and

8

<div style="margin-left: 2em;">

any held for sale or pipeline portfolio, including but not limited to as described in ResCap Form 10-Q for the quarterly period ended March 31, 2009 (p. 45, 57), and in footnote 29 of the First Day Affidavit;

p)   ResCap's reported sale of broker-dealers to AFI, as described in ResCap Form 10-Q for the quarterly period ended March 31, 2009 (p. 62);

q)   ResCap's entry into an amended and restated line of credit facility (with amendments thereto) with AFI, as described in the ResCap Consolidated Financial Statements for the Year Ended December 31, 2009, dated February 26, 2010 (p, 43);

r)   ResCap's entry into any management agreement with AFI, pursuant to which management fees were payable, including but not limited to as described in ResCap Form 10-K for the fiscal year ended December 31, 2007 (p. 155);

s)   ResCap's (and, if applicable, AFI's) entry into and performance under: (a) the settlements referenced in paragraph 84 and footnotes 34 and 35 of the First Day Affidavit; (b) the "DOJ/AG Settlement" referenced in paragraph 86 of the First Day Affidavit; (c) the Consent Order with the Federal Reserve Board and FDIC referenced in paragraph 87 of the First Day Affidavit; (d) the settlement with the Department of Justice and Attorneys General referenced in paragraph 89 of the First Day Affidavit; and (e) the "CMP" referenced in paragraph 90 of the First Day Affidavit;

t)   ResCap's transfer and assignment of real property interests as described in paragraph 92 of the First Day Affidavit

u)   The sale of securities backed by excess servicing rights on Freddie Mac and Fannie Mae Loans to Cerberus on July 30, 2008 as described in the ResCap 8-K, dated August 5, 2008;

v)   AFI guarantees of ResCap, including but not limited to, by letters dated October 5, 2011, April 1, 2011 and May 11, 2012;

w)   The Letter Agreement regarding Mortgage Loan Sale Process dated December 5, 2011 and/or the Pledge and Security Agreement dated as of April 25, 2012;

x)   The Master Mortgage Loan Purchase and Sale Agreement set forth at http://www.sec.gov/Archives/edgar/data/1332815/000119312509105708/dex10 27.htm, and any amendments thereto;

y)   The determination of the amounts in aggregate of, and the allocation as between AFI and its subsidiaries, including ResCap, of reserves, or payments (including defense costs), or settlement compliance obligations, arising out of or relating to the Mortgage-Related Legal Proceedings (including without limitation the settlements or agreements referenced in item "(s)" above;

</div>

9

z)     The Servicing Agreement between GMAC Mortgage and Ally Bank, including as amended May 11, 2012, and which is the subject of Debtors' Motion to Continue Performing Under Ally Bank Servicing Agreement [Docket No. 47 in the Chapter 11 Cases] and the Declaration of Thomas Marano [Docket No. 793 in the Chapter 11 Cases];

aa)     ResCap's 2006 Operating Agreement and any AFI or ResCap indemnity obligations relating thereto;

bb)     Any obligation or agreement of AFI to indemnify the officers or directors of ResCap; and

cc)     Any Directors and Officers insurance coverage obtained, procured or provided by AFI in respect of any officer or director of ResCap.

    34.     "**Supplemental Specified Transactions**" shall mean:

(a)     The sale in or about August 2010 of ResCap's UK and Continental European Mortgage Platform to Fortress; and

(b)     The Partial Servicing Advance Reimbursement Term Sheet with Fannie Mae in August 2010 and any related agreements.

    35.     "**Transactions Under Review**" shall mean: the GMAC Bank Transfer;

any secured lending transaction entered into by any Debtor and/or the collateral for any such

transaction; the Prepetition Related Party Agreements; the Prepetition Related Party

Transactions; the Supplemental Specified Transactions; the Postpetition Transactions; and/or the

Mortgage-Related Legal Proceedings.

    36.     "**You**" and "**Your**" shall mean and refer to the person or entity to whom

this request for documents has been propounded by the Examiner, whether through a subpoena

issued pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure or on a voluntary or

cooperative basis.

    37.     "**Your First-Wave Subpoena**" shall mean and refer to the Subpoena for

Rule 2004 Examination served upon You on behalf of the Committee dated June 11, 2012.

10

## INSTRUCTIONS

1.     These requests encompass all documents in Your possession, custody, or control, whether or not such documents were prepared by or for You.  Where documents in Your possession, custody, or control are requested or inquired of, such request or inquiry includes documents in the possession, custody, or control of each of Your current and former direct and indirect affiliates, subsidiaries, predecessors, successors, employees, directors, agents, accountants, attorneys, auditors, representatives, consultants, advisors, all other persons or entities acting or purporting to act on behalf of You, and any other persons or entities from which You could obtain documents.

2.     If You contend that no documents exist relating to all or part of a request, You shall state this contention and respond as fully as possible to all parts of the request for which documents exist.

3.     If You claim that any privilege or protection excuses production of any document or part thereof, You shall, consistent with Local Civil Rule 26.2, expressly make such claim in writing and provide a general description of the categories of documents being withheld and the basis for doing so, in sufficient detail for the Examiner to determine whether there is an adequate basis for invoking privilege or protection.

4.     In the event that any document covered hereunder has been destroyed, discarded, or lost, You shall inform the Examiner of this in writing and provide a general description of the categories of documents destroyed or lost and the circumstances of their destruction or loss.

11

5.    If any document cannot be produced in full, it shall be produced to the maximum extent possible and You shall specify in writing the reasons for Your inability to produce the remainder.

6.    Requested documents which You contend need to be produced with confidentiality protections shall be produced consistent with the procedures set forth in the Uniform Protective Order for Examiner Discovery that was approved by the Court in the Chapter 11 Cases by order dated August 20, 2012 (Docket No. 1223-1).

7.    Each document is to be produced with all non-identical copies and drafts thereof in their entirety without abbreviation or redaction (other than for a claim of privilege, consistent with Local Civil Rule 26.2 and the Instructions herein).

8.    The production of documents and their associated metadata shall be made in accordance with the "Examiner's Instructions for ESI and Documents Produced in Electronic Format" dated August 13, 2012, previously provided to You. To the extent that documents are produced to the Examiner on physical media (i.e., as opposed to via FTP link), production media needs to be provided to the Examiner in duplicate to enable timely posting in the Document Depository for the Chapter 11 Cases that was established by the Order (I) Granting Examiner Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities, (II) Establishing Procedures for Responding to Those Subpoenas, (III) Approving Establishment of a Document Depository and Procedures to Govern Use, and (IV) Approving Protective Order in the Chapter 11 Cases, dated August 20, 2012 (Docket No. 1223).

9.    Unless stated otherwise, the time period applicable to the documents called for is from January 1, 2004, through the date of the document requests (the "Relevant

12

Period"), subject to any ongoing obligations You may have to supplement responses under the applicable rules.

## DOCUMENT REQUESTS

1.        To the extent not already produced, all documents that would be responsive to any one or more of the requests set forth in Your First-Wave Subpoena if the Definitions set forth in this Schedule were applied to the individual requests in Your First-Wave Subpoena in lieu of those definitions that had been specified in Your First-Wave Subpoena:

2.        To the extent not already produced in response to request 1 of Your First-Wave Subpoena, all Board Minutes, Board Materials and Shareholder Materials, to the extent that they discuss or relate to the Transactions under Review or any of the document requests herein.

3.        To the extent not already produced in response to request 13 of Your First-Wave Subpoena, all documents concerning the Transactions Under Review, including without limitation: (a) AFI' s accounting, journal entries, or support; (b) all valuations, appraisals, or fairness opinions (including without limitation related to mortgage servicing rights); (c) loan tapes; (d) any impairment testing (including without limitation underlying forecasts and assumptions and/or any rationale for changes in assumptions); and (e) all communications with ResCap, Cerberus, IB Finance, Ally Bank, and/or government regulators or officials concerning the Transactions Under Review; (f) all alternative transactions considered, including without limitation attempts to sell assets to other buyers; (g) the ultimate disposition of assets received from ResCap; (h) the historical performance of assets before and after being transferred from ResCap to AFI or from AFI to ResCap; (i) fees and expenses, including documents and communications supporting (i) the shared services charges, including without limitation

13

employee time records, (ii) the tax sharing arrangement between ResCap and AFI, (iii)

servicing and/or origination agreements between ResCap and AFT, Ally Bank, Ally Investment

Management and/or any other affiliates or subsidiaries, and/or (iv) other fees and charges

between ResCap and AFI; and (j) the purchase by AFI of ResCap debt, including (i) the

acquisition price of ResCap debt, (ii) the ultimate disposition of any ResCap debt acquired, and

(iii) all reconciliations or analyses of any ResCap debt acquired.

4.     To the extent not already produced in response to request 23 of Your First-

Wave Subpoena, all communications of each respective member of AFI's boards of directors

concerning the Transactions Under Review.

5.     All documents concerning any tolling agreement, any standstill agreement,

any agreement or covenant not to sue, or any agreement settling or holding in abeyance (however

denominated), entered into by, or under consideration by, You concerning any claim, demand,

suit, cause of action, action, or judgment, arising out of or relating to, or alleged to have arisen

out of or to relate to, any of the Transactions Under Review or the circumstances thereof.

6.     In respect of (a) the unsecured line of credit that was provided by AFI to

GMAC Mortgage Group LLC in or about January 2011, or (b) any unsecured financing lines or

facilities whereby ResCap borrowed other than on a Related Party basis:  all documents

(including without limitation presentations to the Board or to management, workpapers,

projections, historical financial information, business or asset descriptions, reports, memoranda,

supporting calculations or similar documents) concerning any such lines or facilities and any

valuation, appraisal, or fairness opinion, concerning such lines or facilities, or any other similar

analysis however denominated, concerning such lines or facilities or their projected or actual

14

financial implications, without regard to whether prepared or presented prior to,

contemporaneously with, of subsequent to, the date such lines or facilities were entered into.

# EXHIBIT 4

## SCHEDULE OF DOCUMENTS
## REQUESTED BY EXAMINER

**Directed to:**    **Ally Financial Inc.**

**Date of Request:**    **September 28, 2012**

### DEFINITIONS

1.    The full text of the definitions and rules of construction set forth in Rules 26.3(c) and (d) of the Local Civil Rules of the United States District Court for the Southern District of New York (the "<u>Local Civil Rules</u>") are incorporated herein by reference. In addition, the definitions described herein apply.

2.    "**AFI**" shall mean Ally Financial Inc., f/k/a GMAC LLC, and all of its current and former, direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors (including without limitation Evercore), attorneys (including without limitation Kirkland & Ellis LLP and Mayer Brown LLP), and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors, except for ResCap.

3.    "**AFI Claims Subcommittee**" shall mean the subcommittee of ResCap's board of directors comprising Jonathan Ilany and John E. Mack, which is referred to on pages 34 through 38 of the May 14, 2012 Transcript, and all of such subcommittee's employees, representatives, agents, attorneys (including without limitation Morrison Cohen LLP), and advisors, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

4.    "**AFI Settlement and Plan Sponsor Agreement**" shall mean the agreement dated as of May 14, 2012, entered into by the Debtors and AFI, which is attached as Exhibit 8 to the First Day Affidavit.

5.      "**Ally Bank**" shall mean the Utah bank f/k/a GMAC Bank and all of its direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.

6.      "**Board Materials**" shall mean all documents (including any drafts) provided to or considered by the directors of the boards of ResCap, or any members, committees, or subcommittees thereof, including without limitation (a) documents related to the assets, debts, dealings, operations, and/or businesses of ResCap; and (b) documents related to advice by counsel and/or financial advisors concerning the assets, debts, dealings, operations, and/or businesses of ResCap,

7.      "**Board Minutes**" shall mean all written or recorded (by any means including without limitation tape recording, video recording, or otherwise) consents, resolutions, minutes, transcriptions, or notes of any meetings, decisions, deliberations, discussions, or actions of the boards of directors of ResCap, or of any members, committees, or subcommittees thereof, including without limitation all drafts of any such materials.

8.      "**Cerberus**" shall mean Cerberus Capital Management, L.P. and all of its direct and indirect affiliates, subsidiaries, employees, representatives, agents, advisors, attorneys, and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors, including without limitation Cerberus FIM, LLC; Cerberus FIM Investors LLC; FIM Holdings LLC, and CMH Holdings, LLC.

9.      "**Chapter 11 Cases**" shall mean In re Residential Capital, LLC, *et al.*, Case No. 12-12020 (MG), pending in the United States Bankruptcy Court for the Southern District of New York.

2

10.    "**Committee**" shall mean the Official Committee of Unsecured Creditors of Residential Capital, LLC, et al. in the Chapter 11 Cases.

11.    "**Court**" shall mean the United States Bankruptcy Court for the Southern District of New York, and in particular the United States Bankruptcy Judge to whom the Chapter 11 Cases have been assigned.

12.    "**Debtors**" shall mean ResCap and its direct and indirect subsidiaries that have filed voluntary petitions commencing a case under Chapter 11 of the Bankruptcy Code, and are debtors and debtors-in-possession on behalf of each such entity and its estate in the case captioned in the annexed subpoena, and all of their employees, representatives, agents, advisors, attorneys (including without limitation Morrison & Foerster LLP), and all other persons or entities acting or purporting to act on their behalf or under their control, and each of their predecessors and successors.[1]

13.    "**Examiner**" shall mean Arthur J. Gonzalez, the Court-appointed Examiner for the Debtors in the Chapter 11 Cases, appointed July 3, 2012.

14.    "**First Day Affidavit**" shall mean the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, In Support of Chapter 11 Petitions And First Day Pleadings, dated May 14, 2012, filed as Docket No. 6 in the Chapter 11 Cases.

---

[1]    The names of the Debtors in the Chapter 11 Cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings, filed with the Court in the Chapter 11 Cases on May 14, 2012. Additional subsidiaries and affiliates of the Debtors may file Chapter 11 petitions on a rolling basis. As used herein, the term "Debtors" includes any such entities.

3

# EXHIBIT 5

## CONFIDENTIALITY AGREEMENT REGARDING
## EXAMINER SUBMISSION PAPER

This agreement (the "Agreement"), effective as of February 15, 2013, is made by and among AIG Asset Management (U.S.), LLC and Allstate Life Insurance Company (collectively "Allstate"); Massachusetts Mutual Life Insurance Company ("MassMutual"); Prudential Insurance Company of America ("Prudential"); Financial Guaranty Insurance Company ("FGIC"); the Talcott Franklin Group Investors ("Talcott Franklin"); Federal Home Loan Bank of Chicago, Federal Home Loan Bank of Boston, and Federal Home Loan Bank of Indianapolis (collectively, the "FHLBs"); the Steering Committee Group of RMBS Holders (collectively, "RMBS Steering Committee"); Wilmington Trust, National Association, as Indenture Trustee for the Senior Unsecured Notes Issued by Residential Capital, LLC ("Wilmington Trust"); MBIA Insurance Corporation ("MBIA"); the Ad Hoc Group of Junior Secured Noteholders ("Junior Secured Noteholders"); the Official Committee of Unsecured Creditors (the "Unsecured Creditors Committee"); Residential Capital, LLC, and certain of its subsidiaries and affiliated entities (collectively "Debtors"); Ally Financial Inc., Ally Bank, and Ally Securities, LLC (collectively "Ally"); Arthur J. Gonzalez (the "Examiner"), the examiner appointed in the Debtors' chapter 11 bankruptcy proceedings (the "Chapter 11 Proceedings"), which are currently pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and any other person that executes a joinder to this Agreement as provided in paragraph 4 of this Agreement (together with each other signatory to this Agreement, the "Parties," or individually, a "Party").

WHEREAS, on May 14, 2012, the Debtors filed a petition for bankruptcy and commenced the Chapter 11 Proceedings, which are currently pending in the Bankruptcy Court.

WHEREAS, on July 3, 2012 the Bankruptcy Court appointed the Examiner to conduct an investigation (the "Investigation") and prepare a report (the "Report") pursuant to that certain Order Approving Appointment of Arthur J. Gonzalez, Esq. as Examiner [Doc. No. 674] and that certain Order Approving Scope of Investigation of Arthur J. Gonzalez, Examiner [Doc. No. 925] (collectively, the "Appointment Orders"). The scope of the Investigation includes, *inter alia*, an investigation into and analysis of claims or causes of action the Debtors propose to release, or are to be released, as part of their plan of reorganization, including claims held by third parties (the "Third-Party Claims") against current and former directors and officers of the Debtors and against Ally. The Appointment Orders contemplate that the Examiner will solicit the Parties' views concerning the Third-Party Claims.

WHEREAS, by letter dated September 21, 2012, the Examiner requested that various parties in interest submit a paper setting forth any arguments, analysis, and supporting documents that such parties believe may bear on the Third-Party Claims and requested that Ally and the Debtors submit responses (collectively "Submission Papers").

WHEREAS, each party has prepared and submitted or may prepare and submit a Submission Paper to the Examiner.

WHEREAS, the Parties wish to share Submission Papers, once submitted to the Examiner, pursuant to certain terms and conditions ensuring the confidentiality of the Submission Papers.

WHEREAS, the Parties desire to establish certain procedures governing the confidentiality and use of their Submission Papers.

NOW, THEREFORE, the Parties agree as follows:

1.    Except as otherwise provided herein, the Submission Papers, including their content, (a) shall be and shall remain confidential, (b) shall not be disclosed to any other person, including, without limitation, to the Bankruptcy Court or any judicial, arbitral, or administrative body, and (c) shall not be admissible for any purpose, including as evidence in any judicial, arbitral, or administrative proceeding.

2.    Nothing herein restricts the use for any purpose by the Examiner, the Parties, or a Recipient of any information or content contained in the Submission Papers that is or was publicly available, or was otherwise disclosed without ensuring its confidentiality.

3.    Nothing herein restricts the Examiner's use of the Submission Papers in the course of preparing and publishing the Report.

4.    Without limiting the Examiner's right referenced in Paragraph 3 above to use the Parties' Submission Papers in the course of preparing and publishing the Report, the Examiner may disclose the Submission Papers or their content to (a) counsel, accountants, financial advisors or other professionals employed by the Examiner, provided that such retention has been approved by the Bankruptcy Court (the "Examiner's Professionals"), (b) counsel to the Parties, and (c) any person that has executed an *Acknowledgement and Agreement to be Bound by the Uniform Protective Order for Examiner Discovery* and that (i) has signed a joinder to this Agreement, in the form attached hereto as Addendum A (a "Joinder"), prior to receiving the Submission Paper, and (ii) transmits true and correct copies of such Joinder to the Examiner and to each of the Parties (persons identified in clause (c) are collectively referred to as "Additional Parties" or individually as an "Additional Party").

5.    Counsel for each of the Parties and Additional Parties may share Submission Papers that it has received from the Examiner pursuant to Paragraph 4 above with its client and client's accountants, financial advisors, other professionals, and regulators.[1]    Counsel for the Unsecured Creditors Committee may share the Submission Papers with the Unsecured Creditors Committee's constituent members, *provided, however*, that any such constituent members have executed a Joinder to this Agreement as provided in Paragraph 4 above.

---

[1]    Regulators include the New York State Department of Financial Services, the New York Liquidation Bureau, and the Superintendent of Financial Services of the State of New York, the Federal Reserve Board, the Federal Depository Insurance Corporation, and the Utah Department of Financial Institutions. Regulators may share the Submission Papers with their counsel and other advisors and professionals, if required, and each of them shall be informed of this Agreement and shall maintain the confidentiality of the Submission Papers.

6.     Every person who receives a Submission Paper pursuant to Paragraphs 4 and 5 above is referred to herein as a "Recipient".

7.     Each Party and Recipient shall hold each Submission Paper as confidential, shall not disclose any Submission Paper or its contents to any person or entity who is not a Party or Recipient, and shall not use any Submission Paper for any purpose beyond the Chapter 11 Proceedings.

8.     Each Party and Recipient reserves all rights with respect to the Chapter 11 Proceedings and any other proceeding, and nothing in the Submission Papers shall be taken as binding or limiting in any way the position of any Party. Moreover, nothing contained in the Submission Papers shall be construed as a waiver or modification of or a forbearance from exercising any rights, powers, remedies, and privileges of any Party, at law or in equity, all of which rights, powers, remedies, and privileges are hereby expressly reserved by the Parties.

9.     Each Party and Recipient acknowledges and agrees that the execution of the Agreement or the submission of the Submission Papers shall not constitute a modification or waiver of any rights or claims that the Parties may have, on the date hereof, against any Party, including without limitation any Recipient.

10.     Responses to Subpoenas or Other Process.    If any Party or Recipient (a) is subpoenaed in another action, (b) is served with a demand in another action to which it is a party, or (c) is served with any other legal process by a person not a party to this litigation, and is requested to produce or otherwise disclose material covered by this Agreement, the party subpoenaed or served as referred to in this paragraph shall object to production of such information and shall give prompt written notice to each Party or Additional Party whose Submission Paper was subpoenaed or otherwise demanded. If the person seeking access to such information takes action against the party to this Agreement to enforce such a subpoena, demand, or other legal process, that party shall respond by setting forth the existence of this Agreement. Nothing in this Agreement requires the Parties to this Agreement or any Recipient to challenge or appeal any order requiring production of Submission Papers covered by this Agreement.

11.     Inadvertent or Unauthorized Disclosure.    If a Party to this Agreement or any Recipient learns that, by inadvertence or otherwise, it has disclosed information covered by this Agreement to any person or entity under circumstances not authorized under this Agreement, that party must immediately: (a) notify the party whose Submission Paper was disclosed of all such unauthorized disclosures or uses; (b) use its best efforts to retrieve all copies of the information; (c) inform the person or persons to whom unauthorized disclosures were made of all of the terms of this Agreement, and (d) request such person or persons to execute the Joinder that is attached hereto as Addendum A. Nothing in this Paragraph in any way limits the ability of any party whose Submission Paper was disclosed to seek immediate remedy and relief in an appropriate fashion or in any way limits any party's liability for unauthorized disclosure.

12.     Violations of Agreement.    Any violation of this Agreement may constitute a contempt of court and may be punishable as such, and may subject the offending party to such additional and further remedies as may be available to the aggrieved party. Each Party and Recipient acknowledges and agrees that money damages are not an appropriate remedy for any

3

breach of the Agreement and, accordingly, the aggrieved party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for any such breach. Such remedy shall not be deemed to be the exclusive remedy for the breach or threatened breach of the Agreement, but shall be in addition to all other remedies available at law or in equity.

13.     Jurisdiction. The Bankruptcy Court shall have and retain jurisdiction to enforce the terms of this Agreement.

14.     Modifications. This Agreement may be modified or amended by further order of the Court for good cause shown or by written agreement of the Parties.

15.     By execution of this Agreement each of the Parties represents that it has the full power and authority and has been duly authorized to execute this Agreement in the capacity set forth next to their signatures and to be bound hereto.

16.     This Agreement may be executed in one or more counterparts by the Parties, each of which shall be an original and all of which together shall constitute a single agreement. Copies of fully executed counterparts of this Agreement shall be binding on the Parties in the same manner as original counterparts.

17.     This Agreement supersedes any confidentiality agreements entered into by a Party with any parties in interest in connection with the Submission Papers.

18.     Notwithstanding any other provision of this Agreement, (a) material in MBIA's Submission that was designated "confidential" or "highly confidential" in pre-petition state court litigation between MBIA, Residential Funding Company, LLC, and GMAC Mortgage, LLC shall retain that status, (b) the exhibits to the MBIA Submission and the exhibits to the Debtors' Submission (which include confidential or highly confidential materials and expert reports filed in the prepetition state court litigation referenced in subpart (a) to this paragraph) shall not be distributed to any Party other than MBIA, AFI and the Debtors.

19.     All notices, requests, and demands to or upon the Parties to be effective shall be in writing (including by facsimile transmission or email communication) and shall be deemed to have been duly given when delivered by hand, or when sent by facsimile transmission or email communication, or on the first business day after delivery to any overnight delivery service, freight prepaid, or three (3) business days after being sent by certified or registered mail, return receipt requested, postage prepaid, and addressed as follows, or to such other address as may be hereafter notified by the respective Parties:

4

[NEWYORK 2693206_5]

If to Ally, then to:

Timothy A. Devine, Esq.
Chief Counsel - Litigation
Ally Financial Inc. Legal Staff
200 Renaissance Center
M/C: 482-B09-B11
Detroit, MI 48265
Telephone: (313) 656-3477
E-Mail: timothy.devine@ally.com

and

Jeffrey S. Powell, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, NW, Suite 1200
Washington, DC 20005
Telephone: (202) 879-5000
E-Mail: jeff.powell@kirkland.com

If to AIG, Allstate, MassMutual, and/or
Prudential, then to:

Susheel Kirpalani
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
E-Mail: susheelkirpalani@quinnemanuel.com

If to FGIC, then to:

Richard L. Wynne and Howard F. Sidman
Jones Day
222 East 41st Street
New York, NY 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
E-Mail: rlwynne@jonesday.com
E-Mail: hfsidman@jonesday.com

If to Talcott Franklin, then to:

Talcott J. Franklin
Talcott Franklin P.C.
208 Market Street, Suite 200
Dallas, TX 75202
Telephone: (214) 736-8730
Facsimile: (877) 577-1356
E-Mail: tal@talfrnaklin.com

If to the FHLBs, then to:

Derek W. Loeser and Amy Williams-Derry
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
E-Mail: dloeser@kellerrohrback.com
E-Mail: awilliams-derry@kellerrohrback.com

If to the RMBS Steering Committee, then to:

Kathy D. Patrick, Esq. and Robert J. Madden, Esq.
Gibbs & Bruns LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903
E-Mail: kpatrick@gibbsbruns.com
E-Mail: rmadden@gibbsbruns.com

If to Wilmington Trust, then to:

Thomas J. Moloney and Sean A. O'Neal
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
E-Mail: tmoloney@cgsh.com
E-Mail: soneal@cgsh.com

If to MBIA, then to:

Gregory M. Petrick, Esq. and Jonathan M. Hoff
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
E-Mail: gregory.petrick@cwt.com
E-Mail: jonathan.hoff@cwt.com

If to the Junior Secured Noteholders, then to:

J. Christopher Shore and Harrison L. Denman
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-Mail: cshore@whitecase.com
E-Mail: hdenman@whitecase.com

| | |
|---|---|
| If to the Unsecured Creditors Committee, then to: | Kenneth H. Eckstein and Douglas Mannal<br>Kramer Levin Naftalis & Frankel LLP<br>1177 Avenue of the Americas<br>New York, NY 10036<br>Telephone: (212) 715-9100<br>Facsimile: (212) 715-8100<br>E-Mail: keckstein@kramerlevin.com<br>E-Mail: dmannal@kramerlevin.com |
| If to Debtors, then to: | Gary S. Lee<br>Morrison & Foerster LLP<br>1290 Avenue of the Americas<br>New York, NY 10104<br>Telephone: (212) 468-8000<br>Facsimile: (212) 468-7900<br>E-Mail: glee@mofo.com |
| If to the Examiner, then to: | Seven Rivera, Esq.<br>Chadbourne & Parke LLP<br>30 Rockefeller Plaza<br>New York, NY 10112<br>Telephone No.: 212-408-5100<br>Facsimile No.: 212-541-5369 |

*[The remainder of this page has been intentionally left blank.]*

IN WITNESS WHEREOF, the Parties, by their counsel have executed this Agreement:

The Examiner, by Chadbourne & Parke LLP

By: _____     Date: _____

Ally Financial, Inc., Ally Bank, and Ally Securities, LLC, by Kirkland & Ellis LLP

By: _____     Date: _____

AIG Asset Management (U.S.), LLC and Allstate Life Insurance Company, by Quinn Emanuel Urquhart & Sullivan LLP

By: _____     Date: _____

Massachusetts Mutual Life Insurance Company, by Quinn Emanuel Urquhart & Sullivan LLP

By: _____     Date: _____

Prudential Insurance Company of America, by Quinn Emanuel Urquhart & Sullivan LLP

By: _____     Date: _____

Financial Guaranty Insurance Company, by Jones Day

By: _____     Date: _____

The Talcott Franklin Group Investors, by Talcott Franklin P.C.

By: _____     Date: _____

Federal Home Loan Bank of Chicago, Federal Home Loan Bank of Boston, and Federal Home Loan Bank of Indianapolis, by Keller Rohrback L.L.P.

By: _____     Date: _____

The Steering Committee Group of RMBS Holders, by Gibbs & Bruns LLP

By: _____     Date: _____

Wilmington Trust, National Association, as Indenture Trustee for the Senior Unsecured Notes Issued by Residential Capital, LLC, by Cleary Gottlieb Steen & Hamilton LLP

By: _____     Date: _____

MBIA Insurance Corporation, by Cadwalader, Wickersham & Taft LLP

By: _____     Date: _____

8

The Ad Hoc Group of Junior Secured Noteholders, by White & Case LLP

By: _____     Date: _____

The Official Committee of Unsecured Creditors, by Kramer Levin Naftalis & Frankel LLP

By: _____     Date: _____

Debtor Residential Capital, LLC, and Its Debtor Subsidiaries and Affiliated Debtor Entities, by Morrison & Foerster LLP

By: _____     Date: _____

9

## ADDENDUM A

## JOINDER TO CONFIDENTIALITY AGREEMENT REGARDING
## EXAMINER SUBMISSION PAPER

WHEREAS, reference is made to that certain Agreement dated as of February 15, 2013 (attached hereto as Annex 1, the "Agreement"), by and among AIG Asset Management (U.S.), LLC and Allstate Life Insurance Company (collectively "Allstate"); Massachusetts Mutual Life Insurance Company ("MassMutual"); Prudential Insurance Company of America ("Prudential"); Financial Guaranty Insurance Company ("FGIC"); the Talcott Franklin Group Investors ("Talcott Franklin"); Federal Home Loan Bank of Chicago, Federal Home Loan Bank of Boston, and Federal Home Loan Bank of Indianapolis (collectively, the "FHLBs"); the Steering Committee Group of RMBS Holders (collectively, "RMBS Steering Committee"); Wilmington Trust, National Association, as Indenture Trustee for the Senior Unsecured Notes Issued by Residential Capital, LLC ("Wilmington Trust"); MBIA Insurance Corporation ("MBIA"); the Ad Hoc Group of Junior Secured Noteholders ("Junior Secured Noteholders"); the Official Committee of Unsecured Creditors (the "Unsecured Creditors Committee"); Residential Capital, LLC, and certain of its subsidiaries and affiliated entities (collectively "Debtors"); Ally Financial Inc., Ally Bank, and Ally Securities, LLC (collectively "Ally"); Arthur J. Gonzalez (the "Examiner"), the examiner appointed in the Debtors' chapter 11 bankruptcy proceedings (the "Chapter 11 Proceedings"), which are currently pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and any other person that executes a joinder to this Agreement as provided in paragraph 4 of the Agreement (and together with each other signatory to this Agreement, the "Parties"). Each capitalized term used but not defined herein shall have the meaning given to it in the Agreement.

WHEREAS, the undersigned has read the Agreement in its entirety and understands all of the provisions therein.

NOW, THEREFORE, the undersigned agrees as follows:

1.    By executing this Joinder, the undersigned shall become a party to the Agreement and, as of the date hereof, agrees to be bound as a "Recipient" by the terms and provisions of the Agreement.

2.    Except as otherwise provided herein, the Submission Papers, including their content, (a) shall be and shall remain confidential, (b) shall not be disclosed to any other person, including, without limitation, to the Bankruptcy Court or any judicial, arbitral, or administrative body, and (c) shall not be admissible for any purpose, including as evidence in any judicial, arbitral, or administrative proceeding. The undersigned agrees to hold in confidence and not to disclose the Submission Papers or their content to any person not a Recipient under the terms of the Agreement.

3.    In addition to the foregoing, the undersigned understands and agrees to be subject to the jurisdiction of the Bankruptcy Court for the purposes of enforcing the Agreement.

4.    In addition to the foregoing, the undersigned understands and agrees that a violation of the Agreement may constitute a contempt of court and may be punishable as such,

[NEWYORK 2693206_5]

10

and may subject the undersigned to such additional and further remedies as may be available to the aggrieved party.

[Signatory]

By: _____    Date: _____