1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              March 1, 2016

19              8:59 AM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1

2    Trial of the Rescap Borrower Claims Trust's Objection to Claim

3    Number 2055 filed by Michael and Kristin Karmazyn

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Sharona Shapiro

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

A P P E A R A N C E S :

MORRISON & FOERSTER LLP

      Attorneys for ResCap Borrower Claims Trust

      250 West 55th Street

      New York, NY 10019


BY:   JORDAN A. WISHNEW, ESQ.

      JESSICA J. ARETT, ESQ.



APPEARING PRO SE:

KRISTIN KARMAZYN, Pro Se

1                    P R O C E E D I N G S

2          THE COURT:  All right.  Please be seated.  Good

3  morning.  We're here in Residential Capital, number 12-12020.

4  This is an evidentiary hearing in connection with a contested

5  matter concerning the claim 2055 as it was filed by Michael and

6  Kristin Karmazyn.

7          May I have the appearances, please?

8          MR. WISHNEW:  Good morning, Your Honor.  Jordan

9  Wishnew and Jessica Arett of Morrison & Foerster for the ResCap

10  Borrower Claims Trust.

11          THE COURT:  Thank you.

12          Ms. Karmazyn?  You can do it from there.  You don't

13  have to --

14          MS. KARMAZYN:  Kristin Karmazyn.

15          THE COURT:  Thank you.  How do you pronounce your last

16  name, [Kar-may'-zyn]?

17          MS. KARMAZYN:  [Kar'-may-zyn].

18          THE COURT:  Okay.  Thank you.

19          All right.  So for purposes of this contested hearing,

20  the parties prepared a joint pre-trial order which the Court

21  entered on December 17th, 2015.  The pre-trial order contains

22  thirty-one numbered paragraphs of stipulated facts, and on page

23  10 and 11 it lists the issues to be tried.

24          Both parties submitted binders with their proposed

25  trial exhibits.  The one thing that I would note is that Ms.

1    Karmazyn lettered her exhibits.  They should have been

2    numbered.  We'll just renumber them as we go along.  But the

3    claimant uses numbers; the Trust, in responding, uses letters.

4    So I want to make sure we have -- each exhibit that comes into

5    evidence is uniquely identified.  That's easy enough to solve.

6            Ms. Karmazyn, if you wish to make an opening

7    statement, you can do so now.

8            MS. KARMAZYN:  Your Honor, it's been six years since

9    I've been dealing with this.

10           THE COURT:  Just pull the microphone up.  You can stay

11   over there, but just straighten it up so that we -- okay?

12           MS. KARMAZYN:  Is that better?

13           THE COURT:  Yes, it is.

14           MS. KARMAZYN:  It's been six years since I've been

15   dealing with this situation, so I appreciate the time that

16   you're giving me to end this -- to try to end this.  I do not

17   have an attorney.  There are reasons I don't have an attorney,

18   so I will be representing myself, which I have the legal right

19   to.  Obviously, they're much smarter than I am, but I am going

20   to give you the facts, Your Honor.

21           THE COURT:  I don't know whether they're smarter than

22   you are, but they're lawyers --

23           MS. KARMAZYN:  Well --

24           THE COURT:  -- and you're not.

25           MS. KARMAZYN:  -- they can refer to, you

RESIDENTIAL CAPITAL, LLC, et al.                               6

1  know -- anyway, you are the trier of facts, so I am going to

2  give you the facts.

3              THE COURT:  Sure.

4              MS. KARMAZYN:  I have the evidence that I have given

5  you and the evidence they've given you, and that's what I'm

6  going to use as -- the evidence they have submitted to show you

7  where they had breached the contract and the deception between

8  all of the evidence within the years.

9              THE COURT:  Okay.  So I'm going to give Mr. Wishnew a

10  chance -- you can stay -- a chance to make an opening statement

11  if he wishes to.  With a pro se such as yourself, someone

12  without a lawyer, when you testify, you'll have to come up to

13  the witness stand, which is up here, and you'll be sworn.  And

14  obviously you don't have a lawyer to ask you questions, so what

15  I do is I permit a person without a lawyer, who is the

16  claimant, to testify in what I refer to as the narrative form.

17  It is -- tell me -- you explain to me what you believe the

18  facts are.  And testimony has to be about the facts and not

19  about legal theories.  And I try to be sure that, in

20  particular, people without lawyers have a fair opportunity; the

21  rules still apply, but they're modified to some extent.  So

22  I'll give you some leeway in what you testify to, okay?  And

23  I'll give you a chance -- you can bring any notes that you wish

24  to use, and you'll come up and be sworn and give your

25  testimony.  And then Mr. Wishnew or Ms. Arett will have an

1    opportunity to cross-examine.  So there's only two witnesses

2    today:  yourself and Ms. Lathrop, who's sitting in the

3    courtroom as well, on behalf of the Trust.

4           Do you have any questions before we begin?

5           MS. KARMAZYN:  No.

6           THE COURT:  Okay.

7           MS. KARMAZYN:  Understood.

8           THE COURT:  Mr. Wishnew, do you wish to make an

9    opening statement?

10          MR. WISHNEW:  Your Honor, I'll waive an opening

11   statement.

12          THE COURT:  Okay.  All right.  Ms. Karmazyn, do you

13   want to come up and be sworn and give your testimony?

14          MS. KARMAZYN:  Yes.

15          THE COURT:  As I say, bring any notes or documents

16   that you wish to use.  I have a binder with your exhibits, and

17   as I said in the preliminaries, you labeled them Exhibits A

18   through K.  We'll just renumber them as you go through, okay?

19   Come on up.

20          If you just -- you can put your binder down and raise

21   your right hand.

22       (Witness sworn)

23          THE COURT:  All right.  Please have a seat.  There's a

24   water pitcher there; there should be cups.

25          MS. KARMAZYN:  Okay.

1        THE COURT:  Feel free to take some.

2        MS. KARMAZYN:  Thank you.

3        THE COURT:  It's not the most spacious --

4        MS. KARMAZYN:  No, it's all right.  I'm done.  Okay.

5        THE COURT:  All right.  I should have added in the

6   preliminaries that on April 1st, 2015, the Court entered an

7   order overruling the ResCap Borrower Claims Trust's objection

8   to claim number 2055 filed by Michael and Kristin Karmazyn.

9   And that order explained what issues the Court believed were

10  contested and required this evidentiary hearing.  So I have

11  that.  Go ahead.

12  DIRECT NARRATIVE TESTIMONY

13  BY MS. KARMAZYN:

14        MS. KARMAZYN:  All right.  Your Honor, I think the

15  most important evidence in the exhibit we have here is on

16  Exhibit D from the Trust, and that is the modification that was

17  signed and notarized and filed with Arapahoe County Assessor's

18  Office on 2/1/2009.  This started everything; this started all

19  the problems, and almost the law of karma; it started the chain

20  reaction event.  Nowhere in this modification did it say I had

21  to send certified funds.  So as soon as we signed this,

22  notarized it, and filed it with the State, it should have been

23  followed.  Once it wasn't followed, it started everything after

24  that.  It nowhere, in this modification, said I had to send

25  certified funds, so every time we started returning them, that

RESIDENTIAL CAPITAL, LLC, et al.                    9

1    was the breach of contract.  It started the chain reaction.  If

2    this has been followed, none of this would have happened; we'd

3    still be in the house.

4             We have statement after statement regarding this

5    modification where you said they returned my payments, which

6    some of them were returned, some of them weren't.  I do have

7    the bank statements, which I have submitted as evidence, but

8    there also was a secondary bank account which I cannot get

9    copies of because they were in my husband's name.  They were

10   with United Airlines.

11            So this piece -- this exhibit deed from the Trust is

12   the biggest piece of evidence we have out there because it was

13   not followed.  It was notarized, it was signed, it was

14   submitted to the Arapahoe County Assessor's Office, and as soon

15   as I sent that 4,000-dollar payment in, he returned it because

16   it wasn't certified funds.  And it never said in this

17   modification we agreed to that it had to be certified funds.

18   So that payment should have never been returned.  It started a

19   chain reaction event that it's so confusing I can't make heads

20   or tails.  And the evidence is different from 2013 to '14 to

21   '15 to '16 of all this evidence.

22            So you just want me to go through each one?  That's

23   fine?

24            THE COURT:  Yeah, whatever you want.

25            MS. KARMAZYN:  We have all day.

 1           THE COURT:  This is -- let me just explain.

 2           MS. KARMAZYN:  Okay.

 3           THE COURT:  This is your chance to --

 4           MS. KARMAZYN:  Okay.

 5           THE COURT:  -- to put in whatever evidence you believe

 6   supports your claim.

 7           MS. KARMAZYN:  Okay.  So I'll --

 8           THE COURT:  And the Trust will have a chance to

 9   resp -- you know, cross-examine --

10           MS. KARMAZYN:  Okay.

11           THE COURT:  -- and respond.

12           MS. KARMAZYN:  We have two days.  Okay.

13           THE COURT:  I can only rule on what comes into

14   evidence.

15           MS. KARMAZYN:  That's fine.  I got it.  Thank you.

16           Exhibit B --

17           THE COURT:  You're looking at the Trust's exhibits?

18           MS. KARMAZYN:  Yeah, I'm going to use theirs.

19           THE COURT:  Okay.

20           MS. KARMAZYN:  That's fine with me.

21           THE COURT:  That's fine.

22           MS. KARMAZYN:  Exhibit A is just the original loan,

23   which I don't think has anything to do with this case.  Same

24   with Exhibit C; it was the deed of trust.

25           We go to the statements on Exhibit C, which I'd like

1   to discuss, but I can't ask questions to Jordan now?

2           THE COURT:  I'm sorry?

3           MS. KARMAZYN:  This is not my time to ask him --

4           THE COURT:  No.  You'll have a chance to cross-examine

5   Ms. Lathrop --

6           MS. KARMAZYN:  All right.  Well --

7           THE COURT:  -- if she testifies to this.

8           MS. KARMAZYN:  Exhibit C is the statement that the

9   Trust just filed with you, but it has eighty-two line -- fifty-

10  four line items that are blanked out, which I have no -- I

11  don't understand what they are.  Obviously they could show my

12  payments.  When they submitted this in January 28, 2015, these

13  items weren't blacked out.  I have the original statement here

14  that they submitted.  But now they're blacking out fifty-four

15  line items, which I'd like to know why.

16          There's also four missing pages from the statement

17  they submitted on 1/28 to the statement they put in this book.

18  So these statements do not match.  I'd like to show the Court

19  the deficiencies in these two statements.

20          We go to --

21          THE COURT:  So if you're looking at Exhibit C --

22          MS. KARMAZYN:  Yes.

23          THE COURT:  -- I guess the pages aren't numbered, but

24  there's a "transaction added" date; do you see that in the

25  second column?

RESIDENTIAL CAPITAL, LLC, et al.                        12

1          MS. KARMAZYN:  Yes.

2          THE COURT:  And so if you want to point me to a

3   specific --

4          MS. KARMAZYN:  Go to transaction date 11/25.

5          MR. WISHNEW:  Your Honor, I don't mean to disrupt Ms.

6   Karmazyn, but we do have numbered page copies of the servicing

7   notes, if that would be helpful.

8          THE COURT:  Okay.  Why don't you bring a copy up to

9   Ms. Karmazyn and give a copy to me?

10          Mr. Wishnew, other than the pages being numbered, is

11   it your representation that the document is exactly the same as

12   what you've included in the binder as Exhibit C?

13          MR. WISHNEW:  Yes, Your Honor.

14          THE COURT:  Okay.  Do you see where the pages are in

15   the lower right-hand?

16          MS. KARMAZYN:  That's fine.

17          THE COURT:  Okay.

18          MS. KARMAZYN:  All right.  So now I have to find it.

19          THE COURT:  If you have yours marked, you just tell me

20   the transaction date.

21          MS. KARMAZYN:  Okay.  The transaction date 11/25/2008,

22   "picked up firm Cassel (ph.)".  That's the first entry.

23          THE COURT:  Hang on.  Just -- okay, the entries for

24   11/25/2008.

25          MS. KARMAZYN:  Page 42 of 71.

1          THE COURT:  Okay.  Page 42, I'm there.  Go ahead.

2          MS. KARMAZYN:  Okay.  So if you look at this, Your

3    Honor, and you look at the same statement they gave us on 1/28,

4    document 8038-1, page 2434, this page is missing.  This page is

5    not in the document they put in on 1/28.  And I don't

6    understand why line items are blacked out.  How do we know

7    that's not my payments?

8          THE COURT:  Well, what they just handed me, nothing's

9    blacked out.

10         MS. KARMAZYN:  Okay.  So why is this one blacked out?

11         THE COURT:  Well, let's deal with -- what is it that

12   you're --

13         MS. KARMAZYN:  Well, what I'm trying to show you is

14   the --

15         THE COURT:  I know, but let's deal with -- what's

16   the -- you now have a document in front of you with nothing

17   blacked out.

18         MS. KARMAZYN:  Okay.

19         THE COURT:  Okay?

20         MS. KARMAZYN:  So we're going to use this one.

21         THE COURT:  So if you've got questions about specific

22   items you can share them and --

23         MS. KARMAZYN:  I do.

24         THE COURT:  Okay.

25         MS. KARMAZYN:  So --

1          THE COURT:  So we're on page 42 of 71.

2          MS. KARMAZYN:  So if you go to page 42 of 71, and you

3    go to the same document they submitted on 1/28, page 42 of 71

4    is not in this packet.

5          THE COURT:  Okay.

6          MS. KARMAZYN:  So they've modified this statement.

7          THE COURT:  Well, I don't know if they've modified it;

8    it's got a page here that you say is not in the --

9          MS. KARMAZYN:  Well, I --

10         THE COURT:  -- what you previously received.

11         MS. KARMAZYN:  Right.

12         THE COURT:  Is there an entry that you want to focus

13   on?

14         MS. KARMAZYN:  Well, this whole page from 11/25 to

15   11/24 is new.

16         THE COURT:  Just bear with me a second, okay?

17         MS. KARMAZYN:  Yeah.

18      (Pause)

19         THE COURT:  Let me ask you, Ms. Karmazyn, did they

20   send you one of the binders with their exhibits?

21         MS. KARMAZYN:  I did -- I have -- that's what I'm

22   looking at -- I'm referring to.

23         THE COURT:  Because in the binder I have, nothing's

24   blacked out.

25         Can you explain that, Mr. Wishnew?

1           MR. WISHNEW:  I'm sorry, Your Honor?

2           THE COURT:  In the binder that you sent to my

3      chambers --

4           MR. WISHNEW:  Yes.

5           THE COURT:  -- there is nothing blacked out.  But Ms.

6      Karmazyn is showing me the copy she received, and there's stuff

7      that's blacked out.

8           MR. WISHNEW:  The reason that it would have been

9      blacked out, Your Honor, would be if there were privileged

10     communications with counsel.

11          THE COURT:  Well, why did you give me one -- I should

12     have the same exhibit she has, and I don't.  Why is that?

13          MR. WISHNEW:  It was more a matter of just protecting

14     privilege, Your Honor, between --

15          THE COURT:  Well, are you -- if you give it to me then

16     you're not protecting the privilege.  Why did you give me an

17     unredacted exhibit when you gave her a redacted exhibit?

18          MR. WISHNEW:  Beyond the preservation of privilege,

19     Your Honor, I don't have an additional response.

20          THE COURT:  It's completely improper to have given me

21     a set of exhibits that you didn't give to the witness -- that

22     you didn't give to the claimant.  I don't know what you

23     redacted out in her version and what you didn't or what it

24     relates to.

25          Can I see your redacted copy, Ms. Karmazyn?

1        MS. KARMAZYN:  There's fifty-four line items blacked

2   out.

3      (Pause)

4        THE COURT:  Look at page 36 of 71, Mr. Wishnew.

5        MR. WISHNEW:  Yes, Your Honor.

6        THE COURT:  Starting with the entry on the seventh

7   line, in the unredacted copy it says, "e owners Association nor

8   can we guarantee the Homeowners' Association will respond to an

9   inquiry".

10        MR. WISHNEW:  Okay.

11        THE COURT:  In the copy you gave Ms. Karmazyn, you

12   blacked it out.  Why?  I don't see anything privileged.

13        MR. WISHNEW:  This would be a communication between

14   the debtor and its outside foreclosure counsel.

15        THE COURT:  How do I know that?

16        MR. WISHNEW:  Based on, I believe, the transaction

17   code, FOR.

18        THE COURT:  That transaction code appears on this

19   entire page, and most of it's not blacked out.  So if it's

20   communication with foreclosure counsel, why did you black out

21   some of the entries in what you gave to Ms. Karmazyn?

22        MR. WISHNEW:  Certain --

23        THE COURT:  Now you've given her the unredacted copy.

24        MR. WISHNEW:  Certain of the entries are marked

25   substantive and detail what was said between counsel and the

RESIDENTIAL CAPITAL, LLC, et al.                    17

1   debtor, whereas others are more simply process notations, such

2   as "system updated for the following event".

3           MS. KARMAZYN:  Your Honor, can I look at my definition

4   book?

5           THE COURT:  I'll give it to you in a --

6           MS. KARMAZYN:  No, on my desk.

7           THE COURT:  Oh, sure; go ahead and get it.

8       (Pause) Until 21:44

9           THE COURT:  On page 37 of 71, which is all December

10  18th, 2008, on the copy you gave Ms. Karmazyn, you blacked out

11  a portion of an entry.  A little over halfway down the page,

12  there's an entry.  Obviously the "c" for "comments" is left

13  out, so it's "omments:  our loss mitigation".  Do you see where

14  that is --

15          MR. WISHNEW:  Um-hum.

16          THE COURT:  -- Mr. Wishnew?

17          MR. WISHNEW:  I do, Your Honor.

18          THE COURT:  You left "our loss mitigation", and then

19  you blacked out, "Department handles workout requests by calls

20  from the borrower.  Foreclosure cannot make any decision."

21  What's privileged about that?

22          MR. WISHNEW:  Your Honor, I can only assume that that

23  was a conversation that loss mitigation --

24          THE COURT:  I don't want any assumptions.  Are you

25  asserting that that was privileged?  Who did the privilege

1  review on this?

2        MR. WISHNEW:  It was done collaboratively between my

3  firm and the clients, and we sought to include those

4  communications that were between counsel and the loss

5  mitigation group.

6        (Pause)

7        THE COURT:  I really am fairly shocked that you would

8  send this witness a copy of the exhibits with redactions and

9  you would give me an unredacted copy.  If Ms. Karmazyn hadn't

10  said anything, I would have no knowledge whatsoever that you

11  didn't provide her -- I mean, you were required to provide her

12  with the exhibits; you were required to provide the Court with

13  a copy of the exhibits.  You didn't provide the two of us, Ms.

14  Karmazyn and myself, with the same exhibits, because you gave

15  her redacted copies and you gave me unredacted copies.  And you

16  put an unredacted copy in front of her now.  This exhibit alone

17  is 71 pages of very fine print with entries.

18        MS. KARMAZYN:  We have two days, right?  I can go

19  through this tonight?

20        THE COURT:  You certainly can.

21        MS. KARMAZYN:  So I --

22        THE COURT:  But let me make clear, Ms. Karmazyn, I may

23  not admit this into evidence because of what the Trust did.

24  But I'll give you -- I'm not going to decide that right now.

25  But so why don't you go on with your testimony, and I'll

1    decide --

2            MS. KARMAZYN:  Okay.

3            THE COURT:  -- what, if anything, I'm going to do

4    about it.

5            MS. KARMAZYN:  All right.

6            THE COURT:  Okay?

7            MS. KARMAZYN:  So we'll skip over Exhibit C and

8    revisit that?

9            THE COURT:  Sure.

10           MS. KARMAZYN:  Okay.

11           THE COURT:  Okay.  If there are entries in Exhibit C,

12   in the redacted copy they gave you, that you want to talk

13   about, you can do that now.

14           MS. KARMAZYN:  Well, that was --

15           THE COURT:  If you have any --

16           MS. KARMAZYN:  That was the main thing.

17           THE COURT:  -- questions about the things that they

18   blacked out --

19           MS. KARMAZYN:  Yeah.  I mean, but they -- my main

20   question was that I wanted to show you was the deficiency from

21   what they submitted on 1/28 to you, on this document, and the

22   difference in this document.  They're not the same statements.

23           THE COURT:  Okay.  All right.  You've made that point.

24           MS. KARMAZYN:  Okay.  Or whatever, okay.  So I'd like

25   to go to Exhibit D.  Again, this has been notarized.

1        THE COURT:  Right.

2        MS. KARMAZYN:  Modification on 2/1 where it said -- it

3   did not state I had to send certified funds.  So if this had

4   been followed, we would not have the chain reaction we've had

5   through 2009.

6        We go to Exhibit F, which they say they returned check

7   1/09/3 2,000, if you go to --

8        THE COURT:  Refers to check 1115.

9        MS. KARMAZYN:  On, I'm sorry, Exhibit E.  Okay?

10        THE COURT:  Okay.

11        MS. KARMAZYN:  If you go to their statements they have

12   submitted, this 2,000 on the -- on the Homecoming statement was

13   not returned to me, but on the GMAC statement it was returned

14   to me.  I cannot verify if it was returned to me or not.  It

15   could have been --

16        THE COURT:  Well, let me -- bear with me a second,

17   okay?

18        What's the date of the payment?

19        MS. KARMAZYN:  The date?  1/09/3.  It was the -- this

20   was the --

21        THE COURT:  January 30th, 2009 is the date of the

22   letter?

23        MS. KARMAZYN:  Correct, but this was before the

24   modification on 2/2.  So --

25        THE COURT:  Yeah, but from the prior opinion -- prior

1   order, on page 3, it provides that the debtor Homecomings

2   Financial, Inc. serviced the loan from October 1, 2005 until it

3   transferred servicing rights to GMACM on July 1, 2009.  Well, I

4   guess it should have been -- and what you're saying is that --

5           MS. KARMAZYN:  There was no modification in --

6           THE COURT:  I understand that, but -- okay, so this

7   letter is from Homecomings who was servicing the loan at that

8   time.

9           MS. KARMAZYN:  They serviced it from January 2009 to

10  July 1st, 2009.

11          THE COURT:  Right, okay.  And so this letter is from

12  Homecomings.

13          MS. KARMAZYN:  Correct.

14          THE COURT:  And I guess my question is:  is there

15  somewhere, in either your records or the records you received

16  from them, that shows -- that you believe shows that they

17  deposited that check and didn't return it to you?

18          MS. KARMAZYN:  If you go to their statement,

19  Homecomings' statement, not GMAC's statement, if you go to

20  Homecomings' statement that was submitted -- I'm sorry, if you

21  go to GMAC that was submitted, "2009 history" --

22          THE COURT:  Yes.

23          MS. KARMAZYN:  -- it shows the 2,000-dollar check as a

24  miscellaneous receipt, not a payment.

25          THE COURT:  Where are you looking now?  Is that an

RESIDENTIAL CAPITAL, LLC, et al.                    22

1  exhibit?

2        MS. KARMAZYN:  Yes, it is.  I put it -- let me just go

3  back to this statement and see; it'll show it right

4  there -- that they'd submitted.  If you go to on -- let me go

5  to the ones where there's page numbers now.

6        THE COURT:  Okay.

7        MS. KARMAZYN:  So if we go to page 2 of 71 --

8        THE COURT:  Yes.

9        MS. KARMAZYN:  -- that shows -- that starts showing my

10 2008 payments.

11       THE COURT:  Yes.

12       MS. KARMAZYN:  So we go to --

13       THE COURT:  Page 2 of 71?

14       MS. KARMAZYN:  Um-hum.

15       THE COURT:  Yes, okay.

16       MS. KARMAZYN:  So I have the payment there, SRO

17 payment, the 2,000.  And if you go back -- go down --

18       THE COURT:  Hold on.  Hold on.

19       MS. KARMAZYN:  -- I have another 2,000.

20       THE COURT:  So what I'm --

21       MS. KARMAZYN:  Your Honor, if you go to page 471, we

22 start at January of 2008.  Our payment was $2,880.28.  That

23 was -- that's what we paid.  So if you go to January, February,

24 March, April, May, that's when this 2,000-dollar payment

25 they're referring to hit.  It had nothing to do with January.

RESIDENTIAL CAPITAL, LLC, et al.                          23

1          THE COURT:  I don't see a 2,000-dollar payment.

2          MS. KARMAZYN:  On page 2 of 71 --

3          THE COURT:  Yes, I see 2,000-dollar payments for --

4          MS. KARMAZYN:  That's what I'm showing you.

5          THE COURT:  I'm seeing a transaction date of June 2,

6   2009.

7          MS. KARMAZYN:  Right.  That's what I'm showing you,

8   that our payment in January was 2,880.  This 2,000-dollar

9   payment was never returned.  It was never -- I don't know what

10  the payment is.  It was never returned to us.  I show no

11  evidence of this payment.  It doesn't make sense that there

12  would be a -- on Jan --

13         THE COURT:  Well, it shows "payment" and it shows

14  "unapplied".

15         MS. KARMAZYN:  Right, but I made the payment in

16  January of 2008 for 2,880 dollars.

17         THE COURT:  But this is not an entry for January 2008

18  or January 2009.  The entries you're pointing to -- the only

19  entries of 2,000 dollars that I see on page 2 of 71 --

20         MS. KARMAZYN:  Correct.  That's what I'm showing you.

21  It makes no sense.  There was no 2,000.

22         THE COURT:  Well, what you're saying

23  is that -- because you pointed me to Exhibit E --

24         MS. KARMAZYN:  Right, I'm showing --

25         THE COURT:  -- which is a letter of January 30th,

RESIDENTIAL CAPITAL, LLC, et al.                    24

1   2009, and indicates, in substance, that they returned a check

2   for 2,000 dollars to you.

3           MS. KARMAZYN:  Correct.

4           THE COURT:  And the entries that you pointed to on

5   page 2 of 71 are not from that time period.

6           MS. KARMAZYN:  Absolutely.  That's what I'm showing

7   you.  It makes no sense.  There was no -- it came out of the

8   blue, this -- I've never seen this one.  So I'm just going

9   through the exhibits, that this makes no sense, because I made

10  the payment in January of 2009, and they accepted it.

11          THE COURT:  Hold on.  When I look at the payment

12  history for 2009, Ms. Karmazyn, which is on page 3 of 71 --

13          MS. KARMAZYN:  Correct.

14          THE COURT:  -- I don't see receipt of a 2,000 -- I

15  don't see whether they received and deposited 2,000 dollars.

16          MS. KARMAZYN:  Right.

17          THE COURT:  The letter, Exhibit E, says they returned

18  it to you.  And I don't see an entry where they deposited it.

19          MS. KARMAZYN:  Correct.  The only entries I see for

20  2,000 dollars are in May and June.  So this has no bearing on

21  the case.

22          THE COURT:  No, they say they received a check for

23  2,000 dollars from you and returned it because it wasn't in

24  certified funds.  And the payment history -- you're contending

25  they got your payment and deposited it.  The payment history

1   doesn't show that.

2          MS. KARMAZYN:  I'm contending that I don't know where

3   this -- what this applied to.

4          THE COURT:  Okay.

5          MS. KARMAZYN:  I don't --

6          THE COURT:  We'll see what the Trust witness has to

7   say.  All right.  Go ahead.

8          MS. KARMAZYN:  If we go to Exhibit F, and that is:

9   "Enclosed find a personal check for 1115 in the amount of 4,000

10  dollars."

11         THE COURT:  Yes.

12         MS. KARMAZYN:  On the statements they do show this

13  4,000 dollars was deposited and not returned.

14         THE COURT:  Well, let me --

15         MS. KARMAZYN:  If you go to their new statement -- now

16  I have to find it on this one; there are page numbers.  If you

17  go to page 3 of 71 --

18         THE COURT:  Yes.

19         MS. KARMAZYN:  -- it shows my payment of 4,000 dollars

20  as RPL, not a payment, but that is my 4,000.

21         THE COURT:  Hold on.  Let me find it, okay?  Okay.

22         MS. KARMAZYN:  So it did not -- was not returned to

23  me.  It was cashed and it was applied to this statement.

24         If you go to their Exhibit on document 8038, filed on

25  1/28, they state, on paragraph 9, that they did receive this

1  and they did cash it -- well, I'm sorry -- they did receive it

2  and they did return it to me because it was a personal check.

3  But if you go to Exhibit -- document 8410, submitted on 4/1,

4  this one says that they did receive my money and cash it.  But

5  the statement does show that they did receive my money and

6  cashed it and they did not return it to me.  And that was a

7  personal check; I have the bank statements that I submitted as

8  evidence.

9          THE COURT:  Okay.  Well, which is the bank statement?

10 Show me.  What exhibit that you've marked?

11         MS. KARMAZYN:  It's on the table.  I have to go get

12 it.

13         THE COURT:  Just watch your step.  Take your time.

14      (Pause)

15         THE COURT:  I'm looking at your exhibits, what you

16 have labeled as Exhibit B, and I'm going to change to Exhibit

17 2.  It's a copy of a bank statement.

18         THE WITNESS:  Yeah, that would be it.

19         THE COURT:  But I don't see --

20         THE WITNESS:  It was a 4,000-dollar --

21         THE COURT:  -- an entry for March of 2009.  On a page

22 that's headed at the top March 11 through April 9, 2009, page 4

23 of 8.  This is not a complete statement that you attached.

24         THE WITNESS:  It shows 4,000 dollars --

25         THE COURT:  It doesn't show -- it doesn't show any

RESIDENTIAL CAPITAL, LLC, et al.                    27

1    4,000-dollar check in March for 2009.

2              THE WITNESS:  Does it show a 4,000 entry?

3              THE COURT:  I'm sorry?

4              THE WITNESS:  Does it show as 4,000 entry anywhere?

5              THE COURT:  The only 4,000-dollar entry I see is for

6    March 23rd, withdrawal made in a branch store, 4,008 dollars.

7              THE WITNESS:  That was a -- that was an Albertsons

8    cashier's check, then.

9              THE COURT:  So I don't see --

10             THE WITNESS:  That was the entry then.

11             THE COURT:  I'm sorry?

12             THE WITNESS:  That was the entry then.  My fault.  It

13   wasn't a check.  It was a 4,000-dollar cashier from Western

14   Union from Albertsons.

15             THE COURT:  But the date of that is March 23rd.  You

16   say they returned -- the letter from them saying they returned

17   your 4,000-dollar personal check.  They don't say a money

18   order; they say you were returned a personal check number 1115

19   in the amount of 4,000 dollars.  And their letter is dated

20   March 11th, 2009.

21             THE WITNESS:  Right.  But if you go to the document

22   8038 on March 24th, they received a payment of 4,000 dollars

23   and accepted it.

24             THE COURT:  Let me see which document you're looking

25   at.

RESIDENTIAL CAPITAL, LLC, et al.                    28

1              THE WITNESS:  So that should be counted as a payment,

2    not as a miscellaneous receipt and applied to my principal,

3    which it was not, per their statement.

4              THE COURT:  Well, let me ask -- I'm not sure what

5    you're reading from, because I don't have the beginning of it.

6    But what you handed me shows that on March 20th, 2009, they

7    received a 4,000-dollar contribution payment via certified

8    funds on March 24.

9              THE WITNESS:  Right.

10             THE COURT:  So --

11             THE WITNESS:  But you're -- they're not --

12             THE COURT:  -- that's not a returned payment.  They

13   acknowledged they received -- had you sent a personal check,

14   and then after it was returned to you, sent a check with

15   certified funds?

16             THE WITNESS:  I can assume that's what he did.

17             THE COURT:  Okay.

18             THE WITNESS:  But my question here is on their

19   statement.  They received it, but they never applied it as a

20   payment.

21             THE COURT:  Let's see.

22             THE WITNESS:  If you go to page 3 of 71.  And that's

23   been one of my biggest arguments with them, that the money they

24   did receive, they acknowledged they never assigned it as

25   payments to my account.  And that was questions I had for their

1  witness.

2          THE COURT:  Okay.  What you're -- I think what you're

3  telling me is that the payment history doesn't show receipt and

4  application of the 4,000 dollars on March 20th.  Is that --

5          THE WITNESS:  Well, it shows that you received it, but

6  they didn't apply it as a payment.  They applied it as a

7  miscellaneous receipt.  And it never -- if you look at my

8  escrow -- my principal, it was never deducted from my

9  statement.  They took this money and never applied it to my

10 account.

11         THE COURT:  All right.  We'll hear what the Trust's

12 witness has to say.

13         THE WITNESS:  Yeah.

14         THE COURT:  Go ahead.

15         THE WITNESS:  Okay.  So we go to their Exhibit G,

16 which is another modification, which my husband and I both

17 signed and agreed to.

18         THE COURT:  May I ask you, when did you husband pass

19 away?

20         THE WITNESS:  October 2013.  Which I agree with,

21 there's nothing wrong with that.  Exhibit H again, we go back

22 to these 2,000-dollar payments.  Their statement does show that

23 they returned it.  Per my bank statements, it does look that

24 they did return this one.  I do have a credit in my bank

25 statement for this 2,000, so there's no contest on that one.

RESIDENTIAL CAPITAL, LLC, et al.                    30

1            THE COURT:  Well, may I ask you this?  When they

2    returned it to you, did you send a new payment in certified

3    funds?

4            THE WITNESS:  Per the statements, we did.  I didn't.

5    Mike -- per their statement, it looks like that they received

6    the 2,000, reversed it, and then received another 2,000.

7            THE COURT:  And did they apply the --

8            THE WITNESS:  They applied it as a miscellaneous

9    unapplied payment, UFU, not as a payment.

10           THE COURT:  Okay.  Let me -- just so I'm clear.  I'm

11   focusing on Exhibit H.  It's their letter of April 21, 2009.

12   And in substance, the letter says they returned the 2,000-

13   dollar check to you -- personal check to you, because it wasn't

14   in certified funds.  And just so I'm clear, did you then pay

15   that same 2,000 dollars in certified funds?

16           THE WITNESS:  It looks like we did.

17           THE COURT:  Okay.  All right, go ahead.  We'll see

18   what the cross-examination is.

19           THE WITNESS:  It looks -- per the statement.  It looks

20   like they did.  I can't argue that.  I don't --

21           THE COURT:  Let me ask this.  So when you -- you

22   obviously have a disagreement with the Trust as to whether it

23   had to be certified funds or not.  Okay?  I'm not -- my only

24   question is, going back to Exhibit E, where they say -- it's

25   the letter of January 30th, 2009, saying that they returned the

1   personal check of 2,000 dollars because it wasn't in certified

2   funds; after receiving the letter, did you send a new check in

3   certified funds, either a money order or a cashier's check?

4           THE WITNESS:  Not for this one.  Because our payment

5   was 2,680.  This -- there was no modifications at 1/30.  This

6   was our regular -- regular --

7           THE COURT:  So did you send a check for 2,000 dollars?

8           THE WITNESS:  No, I can't find any -- any -- we made a

9   payment for January, for this payment of 2,680.

10          THE COURT:  Okay.

11          THE WITNESS:  There -- I have no record of a 2,000-

12  dollar check.  But this --

13          THE COURT:  And --

14          THE WITNESS:  -- January 30th, Your Honor, was our

15  regular mortgage.  There was no modifications.  There was no

16  problem.  So I don't know where this came from.

17          THE COURT:  Well, we'll see what the Trust -- how they

18  deal with that.

19          THE WITNESS:  Yeah, just --

20          THE COURT:  Exhibit F, the March 11th, 2009 letter,

21  where they say the returned the 4,000-dollar check to you,

22  personal check; after receiving it, did you send 4,000 dollars

23  in certified --

24          THE WITNESS:  Yes.  That's what I showed you on page

25  3.

1          THE COURT:  Understood.  I just want --

2          THE WITNESS:  Yeah.

3          THE COURT:  -- just trying to be clear.

4          THE WITNESS:  Yeah, no, no.  They returned that.

5   We -- Mike turned around and sent them 4,000 --

6          THE COURT:  All right.  And then Exhibit H, the April

7   21, 2009 letter where they said they returned a 2,000-dollar

8   personal check because it wasn't certified funds; did you then

9   send certified funds?

10         THE WITNESS:  It shows on their statement, we did.

11         THE COURT:  Okay.  All right.  Okay, go ahead.

12         THE WITNESS:  So --

13         THE COURT:  And I -- let me make clear.  I'm only

14  asking questions because I'm trying to clarify things.

15         THE WITNESS:  I had --

16         THE COURT:  If you want to just go on with your

17  testimony, that's fine.

18         THE WITNESS:  No, I like it.  That's fine with me.

19         THE COURT:  All right, go ahead.

20         THE WITNESS:  So we're good with Exhibit I.  Now we're

21  going to go to Exhibit J, which is a huge piece in this case,

22  because this was another modification that was signed and

23  submitted, which is what we signed and agreed to.

24         Then you go to J, and that's when things started

25  getting really messed up again.  So we signed this on July

1    29th.

2                THE COURT:  Which is the exhibit that you signed?

3                THE WITNESS:  Exhibit J.  I do remember signing this.

4                THE COURT:  No, Exhibit J -- okay, hold on.

5                THE WITNESS:  This was our next modification.

6                THE COURT:  Okay.

7                THE WITNESS:  And they said the payments needed to be

8    1,528.92, paid no later than monthly.  So it was telling us to

9    pay it any time in that month.  So you go to Exhibit K, when

10   things started --

11               THE COURT:  Hang on.  Let me read it to myself.

12               THE WITNESS:  Yeah.

13               THE COURT:  Okay, and Exhibit K?

14               THE WITNESS:  They -- they returned our payment

15   because they said they did not receive it on the payment due

16   date.  But what we agreed to was to pay the 1,528.92 no later

17   than monthly.  We paid it on -- I assume we paid it after the

18   5th, but that -- that agreement that we signed did not say that

19   it had to be in on the 5th.  It said "monthly".

20               So they returned that payment to us, which was a

21   certified check.  So then we called them, which it shows on the

22   exhibits they filed as document 8410, which shows the

23   conversations we had and why they returned it because it was

24   not received on time for September.

25               THE COURT:  Let me ask you this.  How much was the

RESIDENTIAL CAPITAL, LLC, et al.                    34

1   payment you sent them?

2           THE WITNESS:  The payment we sent was 1,000 -- per my

3   notes, 1,528, because it does show it on this statement, I'm

4   going to show you right now, on the statement they submitted.

5   They reversed -- we sent in -- they received 1,525, it looks

6   like, in September, right here, but as a miscellaneous receipt,

7   again, and not a payment, but a miscellaneous receipt.  And

8   they returned it to us --

9           THE COURT:  Do you have a bank record showing how much

10  you actually paid?

11          THE WITNESS:  No, these were certified funds.  These

12  were cashier checks.

13          THE COURT:  Do you have a copy of the check or

14  anything to show?  Because one of the things that the Exhibit

15  K --

16          THE WITNESS:  They --

17          THE COURT:  All right.  The only thing they check is

18  that the payment was not received by the payment due date.

19          THE WITNESS:  Right.  And that's what they say in

20  their sworn testimony here, that it was not received in time.

21          THE COURT:  Okay.

22          THE WITNESS:  But --

23          THE COURT:  And you say you paid it when?

24          THE WITNESS:  Your Honor, it looks to me like they

25  received it on September 8th, per the GMAC statement.

1          So again, we paid it per the agreement, but they
2      returned it for their reasons.

3          If we go to Exhibit L --

4          THE COURT:  Just give me a second --

5          THE WITNESS:  Okay.

6          THE COURT:  -- to continue to look at this.

7      (Pause)

8          THE COURT:  So on Exhibit J, there's a handwritten
9      note at the bottom.  Is that in your writing or --

10          THE WITNESS:  That's my writing.

11          THE COURT:  And what does it say?

12          THE WITNESS:  15th -- 15th of each month, called on
13      9/10/2009.

14          THE COURT:  And what does that mean?

15          THE WITNESS:  It was just a note after -- per my
16      research.  I just added it.

17          THE COURT:  What's the 15th of each month mean?

18          THE WITNESS:  Probably when we paid it.  I can't -- I
19      don't really know.

20          THE COURT:  Is that September 10th or July 10th that
21      you wrote?

22          THE WITNESS:  Yes, September 10th.

23          THE COURT:  Does that note indicate that you called
24      GMAC on September 10th, 2009 --

25          THE WITNESS:  Yes.

1          THE COURT:  -- and spoke to someone --

2          THE WITNESS:  Yes.

3          THE COURT:  -- that told you the payment was due on

4    the 15th of each month?

5          THE WITNESS:  It could have.  I don't remember.

6          THE COURT:  Because on the top of the second page of

7    that exhibit, it says, "Note:  there is no grace period during

8    this agreement.  Pursuant to your request and in order to cure

9    the default in this account, all payments must be received on

10   or before the due date."

11         THE WITNESS:  When's the due date?

12         THE COURT:  I'm sorry?

13         THE WITNESS:  When is the due date?

14         THE COURT:  Well, that's what I'm questioning about

15   your handwriting note about --

16         THE WITNESS:  Okay.

17         THE COURT:  -- the 15th of each month.

18         THE WITNESS:  Well, regardless, they received it.

19   They wrote me a letter on 9/17 saying --

20         THE COURT:  Well, that's not the 15th, that's the

21   17th.

22         THE WITNESS:  Okay, but then if you to go Exhibit L,

23   they returned it because it wasn't the right amount, not

24   because they didn't receive it in time, which is untrue.  It

25   was -- and this was a certified check.  You see the certified

RESIDENTIAL CAPITAL, LLC, et al.                    37

1  check number right there?

2           They asked me to pay 1,528.92.  We sent them a

3  certified check of 1,530 --

4           THE COURT:  Right.  Okay.

5           All right, go ahead.

6           THE WITNESS:  Okay, so that is September.  If you go

7  to Exhibit M, October, when they foreclosed on us, we signed

8  another agreement.  And in this agreement it was certified

9  funds we were supposed to send.  And we agreed to send the

10 1,244.65, monthly.  And they received this, they -- well, it's

11 never -- for six years, never been a question when they

12 received it, because through the documents they all -- they

13 acknowledge they received it on the 3rd, but now --

14          THE COURT:  No, they don't.  They don't.

15          THE WITNESS:  They do.

16          THE COURT:  They say they received it on the 7th.  And

17 that's a key issue for this trial.  And --

18          THE WITNESS:  Okay.

19          THE COURT:  -- that's -- let me -- just stop, okay?

20          And I really do want to focus on whatever evidence

21 there is --

22          THE WITNESS:  Um-hum.

23          THE COURT:  -- because your contention earlier in the

24 case when I wrote the original order was that you -- that they

25 received it on October 3rd.  Okay?  They say they didn't

RESIDENTIAL CAPITAL, LLC, et al.                    38

1  receive it until October 7th.  The agreement provided it had to

2  be received by October 5th.

3           THE WITNESS:  And where was that agreement?

4           THE COURT:  Well, we'll see what they have to say.

5           THE WITNESS:  Well, I have it in Exhibit J.

6  Exhibit -- I'm sorry, Exhibit M, received no later than

7  monthly.

8           THE COURT:  Okay.  And we'll see what evidence they

9  offer.  They say that they --

10          THE WITNESS:  Well --

11          THE COURT:  -- either told you or wrote you that it

12 had to be received by October 5th.  The foreclosure sale was

13 scheduled for October 7th.  And it's been your contention that

14 you paid it and they received it on October 3rd.  And they say

15 they didn't receive it until October 7th, and October 5th was

16 the deadline.  We'll see whether that's right or not.

17          But what I -- do you have any evidence to offer that

18 you paid it on October 3rd, 2009?

19          THE WITNESS:  Well, I have their evidence that this

20 shows that this went to imaging on 10/5 to send back to me.  So

21 if they got it on the 7th --

22          THE COURT:  What are you looking at?

23          THE WITNESS:  One of their documents in this --

24          THE COURT:  I need to know what --

25          THE WITNESS:  I know.  I'm getting it now.  I have to

RESIDENTIAL CAPITAL, LLC, et al.                    39

1  go back to this -- what they just handed me to show you.  This

2  document is document 7967-11 filed on 2019.  But it's in this

3  same document they just sent me, so I have to go back to it.

4  There's no way they would have had it to send to imaging to

5  send back to me if they got it on the 7th.

6              THE COURT:  Okay, let me find it.

7          (Pause)

8              THE COURT:  Okay.  So what you've shown me is the same

9  as page 15 of 71.  I'll give you your pages back.  Here's your

10 pages.

11             THE WITNESS:  Thank you.

12             THE COURT:  So --

13             THE WITNESS:  So --

14             THE COURT:  -- I don't see where it shows a payment.

15 It shows -- what you've shown me is that the entry -- that on

16 October 5th, 2009 GMAC received the repayment forbearance trial

17 agreement.  Do you see that entry?

18             THE WITNESS:  Yeah.

19             THE COURT:  But I don't see an entry about the

20 payment.  And I think their position is that yes, they received

21 the agreement, but they didn't receive payment.

22             THE WITNESS:  Yean, but on their document,

23 they -- this for five years it's never been an issue.  They've

24 already received it.

25             THE COURT:  Well, it was certainly an issue at the

RESIDENTIAL CAPITAL, LLC, et al.                    40

1    time of when I heard the claim objection.

2            THE WITNESS:  Okay, so --

3            THE COURT:  The opinion -- just stop.  My order

4    clearly indicates the dispute.  It's been your position

5    throughout that you made the payment on October 3rd.  It's been

6    their position that it was due on or before October 5th and

7    they didn't receive it before October 7th.  That's been their

8    position.  And --

9            THE WITNESS:  For the past --

10           THE COURT:  -- the entries on page 15 of 71 appear to

11   show that they received -- and we'll have to hear testimony

12   about it -- but they received the signed agreement on October

13   5th, and then there's the entry for October 5th:  "Promised

14   plan 17 broken 10/5/09.  Promised DT 10/5/09."  I'm not going

15   to -- they'll have to testify about what that meant.

16           And then there's the entry for October 7th, 2009,

17   "Repay plan cancelled manually."

18           THE WITNESS:  Correct.  But they also acknowledge here

19   on 10/7 that the amount 1,244.65, which is on the modification,

20   was returned because it was not enough to reinstate the

21   account.  On the letter they sent me on Exhibit N, exact same

22   reason:  "These funds do not represent the full amount."

23           THE COURT:  This is when they cancelled.  But they

24   say -- well, we'll hear what they have to say.

25           THE WITNESS:  Correct.

1          THE COURT:  I'm not going to argue with you about it.

2          THE WITNESS:  And I'm not trying to argue, Your Honor.

3  But --

4          THE COURT:  I'm just -- let me just -- look, here's

5  what I want to focus on specifically, okay, and give you a

6  chance to address.  They can have -- their own witness can

7  testify about what their notes show.  Okay.

8          I want to give you a chance to address the issue of

9  when you made the payment.  Okay?  You said -- this was

10  reflected in my earlier order when I ruled on the -- overruled

11  their objection, that you paid it on October 3rd.

12          THE WITNESS:  They received it on October 3rd.

13          THE COURT:  And that's what I don't have any evidence

14  to show they received it on October 3rd.  They say they didn't

15  receive it until October 7th; that it had to be received by

16  October 5th.  I want -- okay.  I want to give you a chance.

17          If you have any bank statements or any documents or

18  anything that shows -- and you can testify to it.  I'm

19  not -- but if you have any documents, I'd like to see

20  them -- that shows that you actually paid the amount on October

21  3rd, 2009?

22          THE WITNESS:  It was paid.  Because it was five years

23  later, I have a statement from the UPS office that they cannot

24  pull the records, because of five years.  I have a statement

25  from them.  But because this was never an issue, we never went

RESIDENTIAL CAPITAL, LLC, et al.                    42

1  back and got that documentation.

2         It was certified funds.  It was paid per this

3  modification, 124465, no later than monthly.  We paid

4  it -- regardless if they received it on the 3rd or 7th.

5  This --

6         THE COURT:  Well, but they told -- okay, I understand.

7  We'll hear what they have to say.  Okay.

8         THE WITNESS:  But --

9         THE COURT:  Go ahead.

10         THE WITNESS:  -- that's -- they're changing their

11  story five years later.

12         THE COURT:  Okay, I --

13         THE WITNESS:  You can't -- it's not right.

14         THE COURT:  -- just -- so if --

15         THE WITNESS:  Whatever.

16         THE COURT:  -- I understand correctly, for whatever

17  reason, we don't have a piece of paper that shows you paid it

18  on October 3rd?

19         THE WITNESS:  No, it's five years later.

20         THE COURT:  Okay, that's fine.

21         THE WITNESS:  I can't pull the records.

22         THE COURT:  Okay, go ahead.  All right, go ahead with

23  your testimony.

24         THE WITNESS:  So that's huge.  I mean, I'll have to

25  talk to their witness too.  But that's all I have.

1        THE COURT:  Okay, anything else you want to tell me?

2        THE WITNESS:  No.

3        THE COURT:  So you do need to address the issue of

4   your damages, if you're going to -- you're seeking to recover

5   damages.  I need testimony about it.  I can't -- okay.

6        So earlier -- here's what -- this is what's reflected

7   in my earlier order when I overruled their objection.  You

8   asserted that you and your husband suffered loss of credit and

9   paid a total of 39,000 dollars in rent and deposits, 12,130

10  dollars for mental health care for your eight-year-old

11  daughter, who allegedly suffered severe depression from being

12  forced to move, and that you were also seeking 125,000 for lost

13  equity in your home, and 250,000 in emotional distress damages

14  resulting from strain on your marriage.  That's what you had

15  alleged.  What I just read to you comes from my earlier

16  opinion.

17        THE WITNESS:  Um-hum.

18        THE COURT:  If you're seeking to recover damages, I

19  need to have testimony, or whatever, that supports you -- what

20  you said at the earlier stage, that was your contention.  Now I

21  have to rule based on evidence.  So whatever evidence you want

22  to offer with respect to your damages, now's the time to do it.

23  Okay?

24        THE WITNESS:  Well, I submitted what the value of the

25  house is, in the notebook that I submitted.

1          THE COURT:  Show me what your -- okay.  You have to

2   offer things in evidence in order for me to consider it in

3   evidence.  Okay?  I'm not trying to create roadblocks for you,

4   and I can't give you legal advice --

5          THE WITNESS:  No.

6          THE COURT:  -- but I have to base my ruling on

7   evidence at this evidentiary hearing.  So if there's any

8   exhibits that you wish to offer to support your testimony,

9   point those out.  You can offer them.  We'll see whether the

10  Trust has an objection to it.

11         THE WITNESS:  The only thing I -- I submitted to them

12  was the value of the house now.

13         THE COURT:  Tell me, what was the evidence that you

14  submitted on the value of the house?

15         THE WITNESS:  We just had an appraisal done last year.

16  Well, six months ago, for -- so the house is at 341,000 now.

17         THE COURT:  Tell me about -- do I have the appraisal?

18         THE WITNESS:  Yeah, it was in my notebook that I sent

19  you.

20         THE COURT:  Okay.

21         THE WITNESS:  It should be in there.

22         THE COURT:  Tell me where it is, okay?  I've got your

23  notebook.

24         THE WITNESS:  It was the last evidence that I

25  submitted.  I think it was H.

1       THE COURT:  That's not what I have.  What you listed

2   as Exhibit H was an October 7th, 2009 letter from GMAC.

3       THE WITNESS:  It might be on my desk.  I can get it.

4   But what was the last exhibit on there you have, I'm asking and

5   all that?

6       THE COURT:  The last exhibit in here is a death

7   certificate.  Well, now there's a page after that, it's not

8   labeled.  2008 detail by transaction.

9       THE WITNESS:  No, that was GMAC.

10       THE COURT:  I'm looking through your binder with your

11   exhibits, and I don't see anything that looks like an

12   appraisal.

13       THE WITNESS:  All right.  Well, I'm going to go down

14   and get my phone and pull it up for you.  Will they let me

15   bring my phone up?  I have to go back to my e-mail.

16       THE COURT:  Well, I can't -- you were required -- let

17   me look at the pre-trial order.  You list as Exhibit 9, 2015

18   house appraisal.  I don't seem to have that.

19       Mr. Wishnew, do you have it?

20       MR. WISHNEW:  No, Your Honor.

21       THE WITNESS:  Can I go get it?

22       THE COURT:  When we take a break, you can go get it.

23   Okay?

24       THE WITNESS:  Yeah, I'll go get it.  Will they let me

25   get my phone back?

1          THE COURT:  I'll make sure you get your phone back.

2          THE WITNESS:  Okay.

3          THE COURT:  But I -- okay.  What other evidence do you

4    have of what you believe are your damages?

5          THE WITNESS:  That was it, other than the pain and the

6    suffering; and I don't know how to give you evidence on that.

7          THE COURT:  Your contentions -- this was reflected in

8    the earlier opinion -- earlier order -- that you suffered loss

9    of credit, paid a total of 39,000 in rent and deposits, do you

10   have any evidence of that?

11         THE WITNESS:  I have the rent agreement.  We paid

12   1,900 dollars a month in rent.

13         THE COURT:  Where is that?  Do I have that?

14         THE WITNESS:  No, it's on the phone.  I have to go get

15   it off for you.  Our mortgage was 1,300, and we now pay 1,900

16   dollars in rent.  And there's all my credit; to this day, I

17   cannot get a credit card.  The foreclosure's on my credit.

18         THE COURT:  You didn't list any rental agreement among

19   your exhibits.

20         THE WITNESS:  Okay.

21         THE COURT:  Tell me where you rented and what the

22   monthly rent was?

23         THE WITNESS:  We rent privately from someone, a house

24   in the same school district, for 1,900 dollars a month.

25         THE COURT:  And when did you rent that house?

1          THE WITNESS:  2010.  We went to an apartment first,

2    but we got kicked out because my husband was too loud walking

3    up to the third floor.  So we got kicked out, and we rented a

4    house in the same school district for my kids.  We've been

5    there for six years now -- well, five-and-a-half years.

6          THE COURT:  When did you move there?

7          THE WITNESS:  February 2010.  We were in the apartment

8    for five or six months.

9          THE COURT:  And so you've been in the same house, and

10   the rent is 1,900 dollars --

11         THE WITNESS:  Correct.

12         THE COURT:  -- since February 2010?

13         THE WITNESS:  Correct.

14         THE COURT:  And you had identified mental healthcare

15   for your daughter?

16         THE WITNESS:  She's still in mental healthcare.  We

17   paid with Detmer (ph.) Mental Health.  I have the receipts, if

18   you need to see them.  But she's still in mental health for

19   depression.  This started at -- it's not the whole thing, but

20   this started it.  And this was a contributing factor in my

21   husband's death.

22         THE COURT:  Do you have any -- you don't have a doctor

23   who's testifying.  What evidence do you have that this was a

24   contributing factor -- your husband died of esophageal cancer.

25   Is that right?

RESIDENTIAL CAPITAL, LLC, et al.                    48

1        THE WITNESS:  Right.  He started being treated for

2   acid -- stress induced acid reflux and sleep apnea in October

3   2009.  He was treated for three years, and the acid reflux

4   turned into Barrett's Syndrome, which is cancer.  Primary was

5   esophageal cancer.  Secondary was cancer to the brain and

6   spinal cord and the liver.

7        THE COURT:  Where are you reading form?

8        THE WITNESS:  I was just reading from the death

9   certificate.

10        THE COURT:  Okay.

11        THE WITNESS:  But we did bring him to Moffitt Cancer

12   treatment to University Hospital -- that it was all caused by

13   the stress --

14        THE COURT:  I don't see anything in the death

15   certificate that says -- it says what he died from, but it

16   doesn't say --

17        THE WITNESS:  Well, no, I was just reading esophageal.

18        THE COURT:  All right.  Any other evidence of damages?

19        THE WITNESS:  No.  I just want to --

20        THE COURT:  Okay.  Is there anything else -- any other

21   evidence you want to give me?  Now's the time to do it.

22        THE WITNESS:  No.

23        THE COURT:  All right.  It's 10:14.  Let's take a ten-

24   minute recess.  Then if you want the restroom, they're down the

25   hall.

1            THE WITNESS:  I'm going to go get my phone.

2            THE COURT:  Okay.

3            THE WITNESS:  Can I tell that man you said it was all

4    right?

5            THE COURT:  I'll make sure that -- I'll have my

6    courtroom deputy call downstairs and make sure that they allow

7    you to bring your phone up.  Okay?

8            All right, we'll take a fifteen-minute recess.  All

9    right?  We'll resume at 10:30.

10        (Recess at 10:14 a.m. until 10:43 a.m.)

11            THE COURT:  All right, court's back in session.

12            During the break, and the reason it was a little

13    extended, is we were making copies of documents that Ms.

14    Karmazyn had on her phone, specifically, the 2015 house

15    appraisal.  It is identified on the claimant's exhibit list on

16    page 11 of the pre-trial order.  I'm not admitting it yet, but

17    I'll have my law clerks give you copies of what was just

18    printed out.

19            THE WITNESS:  Thank you.

20        (Pause)

21            THE COURT:  The 2015 house appraisal should be marked

22    for identification as Exhibit 9.

23    (2015 appraisal was hereby marked for identification as

24    Claimant's Exhibit 9, as of this date.)

25            THE COURT:  I guess there were multiple parts to the

RESIDENTIAL CAPITAL, LLC, et al.                    50

1  appraisal.  I haven't looked at, but that's what I understand.

2  I'm being handed a copy of it.  I've been given -- there are

3  three parts to it.  First is -- and I'm going to mark my copy

4  as Exhibit 9.  It's Claimant's Exhibit 9.

5       The first is comparative market analysis.  And then

6  there are two other parts to it that are -- first is property

7  detail.  The first address on it is 5153 South Ukraine Street,

8  Aurora, Colorado.  And the last part is -- I guess it's also

9  5153 South Ukraine Street, Aurora, Colorado, but it's -- okay.

10  They're marked for identification.

11       Ms. Karmazyn, do you want to come back up to the

12  witness stand?

13       The other thing that she gave my law clerks and they

14  printed is a one-page letter dated June 26, 2015 from the UPS

15  store at 6140 South Gun Club Road, Suite K6, Aurora, Colorado.

16  It's a letter addressed "To whom it may concern", indicating

17  that paperwork and records prior to May 2013, including all

18  records from 2009, were destroyed.  It's not an exhibit.

19       THE COURT:  Okay, Ms. Karmazyn, you're still under

20  oath.

21  RESUMED DIRECT NARRATIVE TESTIMONY

22  BY MS. KARMAZYN:

23       THE WITNESS:  Okay.

24       THE COURT:  Okay.  So when we broke, I had asked

25  you -- told you, you needed to introduce whatever evidence that

RESIDENTIAL CAPITAL, LLC, et al.                    51

1    you wanted to introduce with respect to damages.  And you said

2    that you had an appraisal.  It wasn't in the binder, but it is

3    listed in your -- in the pre-trial order as Exhibit 9.  Tell me

4    what it is -- what Exhibit 9 is?

5              THE WITNESS:  It's the appraisal of the house as of

6    2015, for the amount of --

7              THE COURT:  What's the "as of" date of the appraisal?

8    Do you know what I mean by that?  Usually appraisals are as of

9    a particular date.

10             THE WITNESS:  Just a minute.  October 24th, 2015.

11             THE COURT:  And where in the document does it show

12   what you believe is the value of your house as of that date?

13             THE WITNESS:  Adjusted price on CMA price adjustments:

14   374 --

15             THE COURT:  What page?

16             THE WITNESS:  Page 2.

17             THE COURT:  Okay, at the bottom of page 2, you're

18   pointing to adjusted price, 374,350 dollars?

19             THE WITNESS:  Um-hum.

20             THE COURT:  And what -- to the right of that, there's

21   a number of 324,300 dollars.  What is that supposed to be, do

22   you understand?

23             THE WITNESS:  That's the house next door.  That's --

24             THE COURT:  What's the address -- what was the address

25   of your home?

RESIDENTIAL CAPITAL, LLC, et al.                    52

1            THE WITNESS:  5153 South Ukraine Street.

2            THE COURT:  And what do you believe the relevance of

3    an appraisal as of 2015 is to -- your home was foreclosed in

4    October 2009.

5            THE WITNESS:  Um-hum.

6            THE COURT:  And what's the relevance of the appraisal

7    in 2015?

8            THE WITNESS:  Because the price of the housing went

9    up.  The equity in the house went up.  The market changed.

10            THE COURT:  All right.  What you need to do, Ms.

11    Karmazyn, is any exhibits that you want to offer into evidence,

12    you need to identify them for me specifically now, so I

13    can -- and I'll hear if there are any objections, then I'll

14    rule on the objections.

15            THE WITNESS:  Mark of the house --

16            THE COURT:  Well, let me ask this first.  The Trust

17    had, in their binder, had Exhibits A through S.  And

18    that's -- mostly you went through their Exhibits.  Do you have

19    any objections to any of the Trust's exhibits?

20            THE WITNESS:  I have objections to Exhibit C not being

21    the same statement.

22            THE COURT:  Okay.  I'm going to reserve -- other than

23    Exhibit C?

24            THE WITNESS:  No, everything else is correct.  I

25    mean --

RESIDENTIAL CAPITAL, LLC, et al.                    53

1              THE COURT:  Okay.  Are you going to offer everything

2     else, Mr. Wishnew?

3              MR. WISHNEW:  I'm sorry, Your Honor?

4              THE COURT:  Are you going to offer all the exhibits in

5     your binder?

6              MR. WISHNEW:  One moment, Your Honor.  I don't think

7     we'll need to introduce Q, R, or S.  But we would otherwise

8     intend to introduce all the other exhibits.

9              THE COURT:  Let me see what those were.

10             So Exhibit Q, I thought you were relying on the

11    absence of response to requests for admissions.  Q is the

12    request for admissions.

13             MR. WISHNEW:  One moment, Your Honor.

14             THE COURT:  You argued in your brief that the

15    claimant, by failing to respond to the request for admissions

16    has admitted the facts.

17             MR. WISHNEW:  My apologies, Your Honor.  I misspoke

18    earlier.  I meant I did want to introduce Q for the point that

19    you raise about untimely or nonresponse to --

20             THE COURT:  So I just want to know right now what

21    you're offering and what you're excluding.  You're excluding R

22    and S?  You just need to tell me what you're offering.

23             THE WITNESS:  So they are keeping Q?

24             THE COURT:  Well, let's wait and see, okay?  Hold on.

25             MR. WISHNEW:  Your Honor, the only exhibit we would

1  not offer is Exhibit S.

2          THE COURT:  Okay.  All right.  Do you have any

3  objection -- well, with respect to Exhibit C, I'm going to

4  reserve ruling.  Exhibit C is the loan payment history and

5  servicing notes.  And the reason I'm reserving ruling is that

6  the copy of Exhibit C that was previously provided to the

7  claimant is not the exhibit that you've marked.  You've

8  redact -- we went through this earlier.  You redacted

9  materials, although you gave me unredacted without telling me

10  that you had given the claimant redacted.  Today, you've

11  provided a different version of Exhibit C with the pages

12  numbered 1 through 71 in the lower right corner.

13          First I'm going to -- well, I'm going to give Ms.

14  Karmazyn an opportunity this afternoon or tonight to review the

15  exhibit, specifically because of the redactions that you made.

16  She didn't have an opportunity to review it.  And you can tell

17  me in the morning, or we'll see what time we finish today, and

18  you can tell me today or tomorrow morning.  I'm not -- by

19  tomorrow morning you can tell me, okay?

20          THE WITNESS:  Okay.  All right.

21          THE COURT:  If you've already concluded your answer by

22  today, you can tell me that too.

23          THE WITNESS:  Okay.

24          THE COURT:  I'm just not putting you on the spot.

25          THE WITNESS:  Okay.

1          THE COURT:  Okay.  So I'm reserving ruling with

2    respect to Exhibit C.  All other exhibits that are offered by

3    the Trust, except for Exhibit S -- so it's A through R with the

4    exception of C, as to which the Court is reserving, without

5    objection, are being admitted into evidence.

6    (Various documents were hereby received into evidence as

7    Trust's Exhibit A, B, D to R, as of this date.)

8          THE COURT:  And let me ask you now, are there other

9    exhibits that are in your binder or now I've provided you with

10   a copy that you gave us, of and I've had printed out of the

11   appraisal.  Is there anything else that you wish to offer?

12         THE WITNESS:  No.

13         THE COURT:  Okay.

14         THE WITNESS:  Not at this time.

15         THE COURT:  So you do want to offer, I take it, the

16   appraisal?

17         THE WITNESS:  Correct.

18         THE COURT:  That's Exhibit 9.

19         Mr. Wishnew?

20         MR. WISHNEW:  Your Honor, I have concerns about its

21   relevance, since it's dated 2015 and we're talking about the

22   value of the property as of 2009.  So we would object on

23   relevance grounds, but would not object to it coming in, again,

24   provided the Court gives it whatever weight it feels is

25   appropriate.

RESIDENTIAL CAPITAL, LLC, et al.                    56

1          THE COURT:  All right.  I'm going to admit

2   Exhibit -- Claimant's Exhibit 9 in evidence, and reserving

3   decision with respect to relevance.

4   (2015 appraisal was hereby received into evidence as Claimant's

5   Exhibit 9, as of this date.)

6          THE COURT:  The issue about relevance is it's an

7   appraisal of the home as of 2015, and the Trust has objected on

8   relevance grounds.  I'm going to reserve ruling on relevance,

9   and I'm going to admit it subject to the relevance objection,

10  which I'll deal with in due course.  Okay?

11         Cross examination.

12         You can leave your -- you have their binder with you,

13  right?

14         THE WITNESS:  Yeah.  Well, I have the new one.  So

15  I'm -- I have the new one.

16         THE COURT:  Okay.  That's fine.

17         MR. WISHNEW:  Your Honor, may I make one statement

18  concerning servicing notes or --

19         THE COURT:  Yes, please.

20         MR. WISHNEW:  Okay.  Just to be clear for the Court's

21  benefit, the intention of the Trust was never in any way to

22  mislead Ms. Karmazyn about the content of the servicing notes.

23  As I mentioned earlier, it was an effort to protect

24  perceived -- protect privileged communications between GMAC

25  Mortgage, Homecomings, and its outside foreclosure counsel.

RESIDENTIAL CAPITAL, LLC, et al.                    57

1          The efforts were made to give the Court an unredacted

2    copy simply so that the Court had the benefit of seeing what

3    was held back.

4          THE COURT:  I wouldn't know that, would I?  Because I

5    didn't know what you held back and what you didn't hold back.

6    I had everything.  But let's move on, okay?

7          MR. WISHNEW:  Okay.

8    CROSS-EXAMINATION

9    BY MR. WISHNEW:

10   Q.   Ms. Karmazyn, with regards to the appraisal that you have

11   introduced into evidence -- well, I'm going to -- there's a

12   picture -- we were given three documents.  The document I'm

13   referring to has a picture of the house.  It looks like there

14   might be snow on the ground.  The street address is in the top

15   left-hand corner in smaller font.  Do you see that document?

16   A.   Yes.

17   Q.   Okay.  In the top it says "MLS 837653".  The next line is

18   "list date 12/31/09."  Do you have that in front of you?

19   A.   Okay.  Yes.

20   Q.   Okay.  And the next date is "sold date, February 26,

21   2010".  What's the sold price?

22   A.   If I'm reading it correctly, 265.  It was sold three times

23   since our house.

24   Q.   Okay.  And why, in your opinion, is the value of the

25   property of 2015 more relevant or more persuasive than the

RESIDENTIAL CAPITAL, LLC, et al.                    58

1   price it was sold at just a few months after the October 2009

2   foreclosure sale?

3   A.    I'm not an appraiser.  But I can tell you that real estate

4   cost had gone up tremendously in Denver, Colorado -- Aurora,

5   Colorado.  So I would assume that's why.

6           MR. WISHNEW:  Your Honor, I have no more questions for

7   the witness.

8           THE COURT:  Okay.  You're excused.  You can step down,

9   Ms. Karmazyn.  He's going to call his witness, and you'll have

10  a chance to cross-examine.

11          MS. KARMAZYN:  Oh, I will?

12          THE COURT:  Yeah.

13          MS. KARMAZYN:  Will have a chance to cross-examine

14  him?

15          THE COURT:  Yes, absolutely.

16          MS. KARMAZYN:  Oh, okay.

17          THE COURT:  Not him.

18          MR. WISHNEW:  No, not me.

19          MS. KARMAZYN:  All right.

20          THE COURT:  Not the lawyer.

21          MS. KARMAZYN:  Oh, okay.

22          THE COURT:  But he has to put a witness on.

23          MS. KARMAZYN:  Oh, but I can't question him on some of

24  the documents?

25          THE COURT:  No, you can't.  No, you can't.  But you

RESIDENTIAL CAPITAL, LLC, et al.                    59

1  can save it for -- you can ask your questions of the witness.

2  Okay?

3          MS. KARMAZYN:  Okay, I will.  Thank you.  Thank you.

4          THE COURT:  It's kind of a technical question I'm

5  asking you, Ms. Karmazyn.  Do you rest -- you've put in

6  whatever -- subject to this issue about the payment history of

7  loan servicing notes, have you put in all your evidence, then?

8          MS. KARMAZYN:  Yes.

9          THE COURT:  Okay.  All right.  So the claimant rests.

10         All right.  Mr. Wishnew?

11         MR. WISHNEW:  Your Honor, the ResCap Borrower Claims

12  Trust would like to call Ms. Sara Lathrop to the stand.

13         THE COURT:  Come on up, Ms. Lathrop.  And if you would

14  be sworn.

15

16         THE CLERK:  Ms. Lathrop, is your last name L-A-T-H --

17         MS. LATHROP:  R-O-P.

18         THE CLERK:  Okay.  And it's Sara-H?

19         MS. LATHROP:  No "H."

20

21     (Witness sworn)

22         THE COURT:  All right.  Please have a seat.

23         MR. WISHNEW:  Ms. Lathrop, do you have binders in

24  front of you.

25         THE WITNESS:  No, I don't.

1          MR. WISHNEW:  Your Honor, may I approach the witness?

2          THE COURT:  Yes, please.

3          THE WITNESS:  Thank you.

4    DIRECT EXAMINATION

5    BY MR. WISHNEW:

6    Q.    Morning, Ms. Lathrop.

7    A.    Good morning.

8    Q.    My name is Jordan Wishnew.  I represent the ResCap

9    Borrower Claims Trust.  We're here today in connection with a

10   claim objection the Borrower Trust filed against Michael and

11   Kristin Karmazyn, former borrowers of GMAC Mortgage LLC and

12   Homecomings.  I'd like to ask you some questions concerning the

13   company's records relating to the Karmazyns' loan.  First, some

14   general background information.  If you could state your full

15   name for the record.

16   A.    Sara Lathrop.

17   Q.    Okay.  And would you, briefly, describe your educational

18   background?

19   A.    I have a business marketing degree from Upper Iowa

20   University.

21   Q.    Okay.  And would you also briefly describe your employment

22   history?

23   A.    I began at GMAC Mortgage in June 2006 as a default

24   associate in the call center.  From there, I moved on to

25   quality assurance in the same department, and then a supervisor

RESIDENTIAL CAPITAL, LLC, et al.                    61

1   in that same default department, moving on to -- after about

2   three years or so in that position, moved on to loss mitigation

3   short sale as a supervisor, and then became a manager in triage

4   under loss mitigation where I helped with the back of house

5   review of loan modification workout packages.

6          And once the -- GMAC was sold to Ocwen, I actually

7   transitioned with the ResCap estate to be a regulatory

8   compliance manager to help with the IFR project, the

9   foreclosure review that took place in 2013.

10  Q.   Thank you.  And what is your current position?

11  A.   I'm currently a senior claims analyst for the Borrower

12  Claims Trust.

13  Q.   And what's your responsibility in that position?

14  A.   I help reviewing in claims against the trust to review

15  documentation, and any kind of claim against to see if there's

16  relevance, if there's any proof of that, and then providing

17  detail and evidence to back the findings.

18  Q.   Okay.  And as part of your employment with the Borrower

19  Claims Trust, do you have access to the debtors' business

20  records?

21  A.   Yes, sir.

22  Q.   Okay.  And what kind of records do you have access to?

23  A.   I have access to the payment history and servicing notes,

24  as well as documents that may have been sent to or received

25  from borrowers and claimants.

1   Q.   Okay.  And were those records maintained electronically by

2   the debtors?

3   A.   Yes.

4   Q.   Okay.  And were there computer programs, or systems on

5   which these records were maintained?

6   A.   Yes.  The servicing notes and payment history were

7   maintained through Fiserv or LoanServ -- it changed names

8   during servicing -- and then those were housed and archived

9   within BusinessObjects which is where we pull servicing notes

10  through at this point.

11       And then Looking Glass is where we would house

12  documentation, or letters that were mailed to the customer as

13  well as received from a customer, and XNet which would house

14  letters that were sent to a customer.

15  Q.   Thank you.  Would you say you're generally familiar with

16  the debtors' recordkeeping systems?

17  A.   Yes.

18  Q.   Okay.  Generally, were documents entered into the debtors'

19  servicing system at or near the time by someone with knowledge

20  of their preparation of receipt?

21  A.   Yeah.  They were entered in the same day, or within a

22  business day, depending on the time that it was received.

23  Q.   Okay.  Are you familiar with the Karmazyns' loan?

24  A.   Yes.

25  Q.   Okay.  Are you aware that Ms. Karmazyn filed a claim

RESIDENTIAL CAPITAL, LLC, et al.                63

1  against the debtors in this bankruptcy case?

2  A.   Yes.

3  Q.   Okay.  And that the Borrowers Trust filed an objection to

4  the allowance of that claim?

5  A.   Yes, sir.

6  Q.   Okay.  And you reviewed that objection?

7  A.   Yes, sir.

8  Q.   Okay.  And were you asked to execute any declarations in

9  connection with that objection?

10  A.   Yes.

11  Q.   Okay.  There's an exhibit before you marked Exhibit R in

12  the binder.

13  A.   Yes.

14  Q.   Do you recognize this document?

15  A.   Yes, this is my declaration.

16  Q.   Okay.  Have you seen it before today?

17  A.   Yes.

18  Q.   Okay.  And are you familiar with the content of this

19  declaration?

20  A.   Yes.

21  Q.   At the time you attested to the statements in this

22  declaration, did you believe them to be true and accurate?

23  A.   Yes, sir.

24  Q.   Okay.  I left a binder of exhibits up there for you, if

25  you could turn to -- let's see -- can you turn to Exhibit C?

1          THE COURT:  All right.  And let's use the one with the

2    page numbers --

3          MR. WISHNEW:  Okay.

4          THE COURT:  -- that you handed out today.

5          MR. WISHNEW:  Okay.

6          THE COURT:  Okay?

7          THE WITNESS:  I have that one.

8          THE COURT:  All right.

9          THE WITNESS:  It's in here.

10         MR. WISHNEW:  Okay.

11   Q.   Do you recognize this document?

12   A.   Yes, it's the payment history and servicing notes for the

13   Karmazyn loan.

14   Q.   Okay.  And have you see it before today?

15   A.   Yes, sir.

16   Q.   Okay.  And was this document maintained in the debtors'

17   system of business records?

18   A.   Yes.

19   Q.   Okay.  And to the best of your knowledge, as part of the

20   debtors' regular business practices, what types of information

21   were typically included in the servicing notes and payment

22   history?

23   A.   The payment history would have recorded payments received,

24   as well as any kind of fees that may have assessed to the

25   account or escrow action that would have occurred on the

1  account.

2      The servicing notes would have recorded communication,

3  whether it be written or verbal with a customer, as well as

4  internal information or letters that were mailed out.  There

5  would be just a brief explanation of what the letter was.

6  Q.   Okay.  And when was information, typically, entered into

7  those servicing notes?

8  A.   It was usually the same day, or it could have been within

9  a business day, depending on the time.

10 Q.   Okay.  And would that business day be, for example --

11 well, can you explain to me why it would be within a business

12 day?

13 A.   Well, if we had received something later in the day on a

14 Friday, it may not be entered until the following Monday just

15 due to backlog in business.

16 Q.   Okay.

17 A.   It may not have been reached.

18 Q.   And if a letter was sent to a borrower, was that recorded

19 in the servicing notes?

20 A.   Yes, it would have been recorded with a general

21 explanation of what the letter was.

22 Q.   Okay.  And do you know when it would have been recorded?

23 A.   With the same timeline; either the same day or within a

24 business day.

25 Q.   Okay.  And if a payment is received from a borrower, how

RESIDENTIAL CAPITAL, LLC, et al.                    66

1   is that recorded in these notes?

2   A.   If the payment's received and applied, it would have

3   reflected within the payment history as the amount and where

4   the money went.  If it was received but returned, it would be

5   recorded in the servicing notes with an explanation of why it

6   was returned.

7   Q.   Okay.

8            MR. WISHNEW:  Your Honor, just to confirm, subject to

9   the Court's reservation, Exhibit C, are all other Borrower

10  Trust exhibits in evidence at this point?

11           THE COURT:  Yes, they are.

12           MR. WISHNEW:  Okay.

13           THE COURT:  And you can use Exhibit C, but I'm

14  reserving ruling on it.  I've got lots of questions myself from

15  Exhibit C --

16           MR. WISHNEW:  I know.

17           THE COURT:  -- but I'm reserving ruling on.

18           MR. WISHNEW:  Understood, Your Honor.  Okay.

19  Q.   If we could turn to the Karmazyns' payment history on this

20  loan, did the Karmazyns become delinquent on their loan

21  payments in 2008?

22           THE COURT:  Before you go there, am I correct that the

23  payment history is pages 1 through 4?

24           THE WITNESS:  It technically starts at the very top of

25  page 5.  There's just one line.

RESIDENTIAL CAPITAL, LLC, et al.                    67

1              THE COURT:  Okay.

2              THE WITNESS:  Otherwise, yes, it would be --

3              THE COURT:  So --

4              THE WITNESS:  -- just 1 through --

5              THE COURT:  -- page 1 of 71 through the first line of

6      5 of 71 --

7              THE WITNESS:  Yes, sir.

8              THE COURT:  -- is the payment history?

9              THE WITNESS:  Yes.

10             THE COURT:  Okay.  Go ahead, Mr. Wishnew.

11             MR. WISHNEW:  Thank you, Your Honor.

12             THE COURT:  And Ms. Karmazyn, if there -- if you're

13     having any difficult following, just let me know, okay?

14             MS. KARMAZYN:  I will.

15             THE COURT:  Okay.  I want to be sure that you're

16     seeing the same thing that they're talking about, okay?  Go

17     ahead.  Go ahead, Mr. Wishnew.

18             MR. WISHNEW:  Thank you, Your Honor.

19     BY MR. WISHNEW:

20     Q.   Ms. Lathrop, did the Karmazyns become delinquent on their

21     loan payments in 2008?

22     A.   Yes, sir.

23     Q.   And based on your review of the payment history, can you

24     identify, specifically, when they became delinquent and were

25     not able to become current?

RESIDENTIAL CAPITAL, LLC, et al.                    68

1   A.   It appears, looking at the payment history, that the

2   account fell behind when the April 1st payment wasn't received

3   within the month of April.

4   Q.   Um-hum.

5   A.   And it --

6           THE COURT:  What page are you on now?

7           MS. KARMAZYN:  Was that 2008 or '09.

8           MR. WISHNEW:  2008.

9           THE WITNESS:  2008, ma'am.

10          MS. KARMAZYN:  '08?

11          THE COURT:  What -- yes, '08.  What page are you on?

12          THE WITNESS:  I'm basing it off of page 4 of 71

13  looking at -- and then moving into 3 of 71, just looking at

14  that payment history for when payments posted.  It just doesn't

15  show that the April due -- the April payment posted until May

16  5th, 2008 which is line 3 of page 3, and the lack of their

17  showing a payment posting for April and the month of --

18          THE COURT:  When you say line 3; from the bottom?

19          THE WITNESS:  From the bottom, yes.  I apologize.

20          THE COURT:  And what -- explain to me, again, what it

21  shows.

22          THE WITNESS:  It shows a payment of $2,675.09 being

23  received on May 5th, 2008.  And if we look at the third column,

24  it shows 4/1/2008 which shows April 1, 2008 payment posting to

25  the account or rolling forward.

RESIDENTIAL CAPITAL, LLC, et al.                    69

1          MR. WISHNEW:  If I can make one clarifying question

2      just for the record?

3      BY MR. WISHNEW:

4      Q.   If we go to page 1 of 71, and in the middle of the page

5      you see there are column headers in the middle of the page,

6      this second column reads, "Trans added date."  What does that,

7      specifically, mean?

8      A.   That's the transaction date, the date that it was added

9      for the transaction taking place.

10     Q.   So if, hypothetically, there was a payment on -- received

11     on January 1st, the transaction added date would be --

12     A.   January 1st.

13     Q.   -- 1/1/2009?

14     A.   Yes.

15     Q.   And the column to the right of that says, "Date interest

16     paid current."  What does that column mean?

17     A.   That would be showing what payment is paid up-to-date as

18     of that date.  So it's going to show the most recent payment

19     that's been fulfilled on the account.

20     Q.   Um-hum.

21     A.   And then what that would mean, is the following payment

22     that's not reflected.  So in this case, with April, it shows

23     April 1st, 2008 payment received on 5/5/2008 on page 3.

24     Q.   Um-hum.

25     A.   That would mean the account was due for May 1st, 2008

RESIDENTIAL CAPITAL, LLC, et al.                    70

1  payment as of that date.

2  Q.    Okay.

3  A.    Does that make sense?

4            THE COURT:  April -- I thought April 1st.

5            THE WITNESS:  No, they paid April 1st on that date.

6            THE COURT:  On that -- okay.

7            THE WITNESS:  But they paid it in the month of May --

8            THE COURT:  Yes.

9            THE WITNESS:  -- which would have made it a month

10  late.

11            THE COURT:  Okay.  And even though it was received

12  late, it was applied?

13            THE WITNESS:  Yes, it was applied, sir.

14            THE COURT:  Go ahead, Mr. Wishnew.

15            MR. WISHNEW:  Thank you, Your Honor.

16  Q.    Ms. Lathrop, once the borrowers became delinquent, do the

17  servicing notes reflect the debtors informing them of options

18  for curing the delinquency?

19  A.    I believe so.  We'd have to go back through the servicing

20  history to -- I know there were breach letters, and options

21  letters, but I couldn't recite --

22  Q.    Okay.

23  A.    -- specific dates off the top of my head.

24  Q.    If I could refer you to page 43 of 71?

25  A.    Yes, sir.

1   Q.   Were there communications in November 2008 concerning

2   curing without delinquency?

3   A.   It shows that there was a blanket permanent modification

4   approved on November 1st, 2008.  It's right in the middle of

5   the page.

6   Q.   So that's the line item -- the first line item where you

7   see "Stop" in the second left-hand column?

8   A.   Yes.

9   Q.   Okay.  And what were the terms of that modification?

10  A.   Based on what's noted here, it states that it was approved

11  with $1,979.14 due back by December 19th, 2008.  That explains

12  how the funds would be applied to the account once it was

13  received.  And it says, "ARM info should be modified as

14  follows.  The new rate would be 8." -- sorry; I

15  apologize -- "4.85 percent, with a new margin of 2.35, and no

16  change to the ceiling that was listed within the origination

17  documents."

18  Q.   Okay.

19  A.   And the new ARM change date's effective -- next adjustable

20  rate change would not take place until January 1st, 2014.

21  Q.   Um-hum.

22  A.   With the effective rate date taking place with the first

23  payment due with the new rate with the modification was January

24  1st, 2009.

25  Q.   Um-hum.

 1   A.   And then right below it, it just goes into more detail as

 2   far as what the mod -- not the modification -- but the loan

 3   itself would look like.

 4        So the new unpaid principal balance would be $2,095 -- 2;

 5   I can't talk -- $2,905 -- I can't speak.  I apologize --

 6   $295,856.05, and they would be capping $9,943.19 in delinquent

 7   interest.

 8   Q.   Um-hum.

 9   A.   Meaning that it would be added back into the mortgage,

10   which is why that unpaid principal balance would be increasing.

11   Q.   Um-hum.

12   A.   The old interest rate was 9.1 percent, and the new

13   interest rate was 8. -- was 4.85 percent -- excuse me.

14        I don't believe the maturity date changed.  It says the

15   maturity date of the loan was September 1st, 2035.  The old

16   principal and interest payment was $2,371.76, and the modified

17   principal and interest payment was $1,649.47.

18   Q.   Okay.  Did the Karmazyns make the necessary payments under

19   this loan modification?

20   A.   I don't show that we received anything, no.

21   Q.   Okay.  And --

22           THE COURT:  Before you go on, could I take you back to

23   page 3 of 71?

24           THE WITNESS:  Yes.  Let me get there, sir.

25           THE COURT:  Okay.

1          THE WITNESS:  Okay.

2          THE COURT:  And I'm focusing on the entries for

3    5/5/2008.

4          THE WITNESS:  Yes.

5          THE COURT:  And you pointed out the payment that was

6    received on May 5th that was for the April 1st payment, right?

7          THE WITNESS:  Yes.

8          THE COURT:  That was when it was due.  If you go up

9    four lines, there's another payment, also, from May 5th -- from

10   March 1st, and it's in brackets $2,675.09.  Why are all those

11   numbers in brackets there?

12         THE WITNESS:  If you look -- if we start at the very

13   beginning of 5/5/2008 --

14         THE COURT:  Yes.

15         THE WITNESS:  -- or the highest one, I guess, is the

16   best way to say it, and then we go over to the line that shows

17   PR1.

18         THE COURT:  Yes.

19         THE WITNESS:  That means that there's a payment

20   reversal for nonsufficient funds for $2,880.28.

21         THE COURT:  Yes.

22         THE WITNESS:  Well, due to that payment reversal, we'd

23   have to go back into the notes, honestly, to be able to explain

24   which payment was that was reversed.  But what they would have

25   to do then is reverse off all payments that applied after the

RESIDENTIAL CAPITAL, LLC, et al.                    74

1    payment reversal date, and then reapply them.

2            So if this was reversed, then the PR0 that took place,

3    which is referring to that May 1st, 2008 payment that you

4    looked at --

5            THE COURT:  Yes.

6            THE WITNESS:  -- that would be it being reversed off

7    do two more, less of, a necessary reversal to correct the

8    account from the payment reversal that took place due to the

9    nonsufficient funds.

10           THE COURT:  When you say nonsufficient funds, what was

11   the payment amount supposed to be?

12           THE WITNESS:  Based on -- this is just looking at the

13   payment history -- the amount that was supposed to be received

14   was 2,880.28, and it just came back that there was not the

15   funds in the bank to fulfill the payment that was sent in.  So

16   that was reversed off.

17           THE COURT:  Reversed because of insufficient funds?

18           THE WITNESS:  Yes.

19           THE COURT:  Is there -- just focusing on those so I

20   can make sure I understand how this works, can you go to the

21   servicing notes, and are there entries --

22           THE WITNESS:  Yes.

23           THE COURT:  -- for those dates that explain?

24           THE WITNESS:  Give me one second, Your Honor.

25           THE COURT:  Sure.

1           THE WITNESS:  I apologize.  I didn't, honestly, look

2    over this part.  So it's on page 55 of 71.

3           THE COURT:  Give me a chance -- give everybody a

4    chance to get there.

5           THE WITNESS:  Definitely.

6           THE COURT:  Okay.  All right.

7           THE WITNESS:  Let's see here.  And probably the

8    easiest place to start would be the very first notation from

9    May 5th, 2008 just below the middle of the page --

10          THE COURT:  Yes.

11          THE WITNESS:  -- where it says, "Check number EBPP2,

12   check dated 4/25/08 for 2,892.78 returned NSF."

13          THE COURT:  Okay.  In other words, you -- GMAC

14   received that check.

15          THE WITNESS:  Yes.

16          THE COURT:  Euphemistically it balanced.

17          THE WITNESS:  Yes.

18          THE COURT:  And that's why the payment was reversed

19   back in the payment history?

20          THE WITNESS:  Yes.  And then it also does

21   appear -- looking at this that she must have been -- that

22   she -- I apologize -- that account was on a repayment plan at

23   that point.  So due to a reverse check, it canceled whatever

24   payment arrangement was taking place at that point.

25          THE COURT:  All right.  Okay.  Go ahead, Mr. Wishnew.

RESIDENTIAL CAPITAL, LLC, et al.                    76

1           MR. WISHNEW:  Thank you, Your Honor.

2   BY MR. WISHNEW:

3   Q.    Subsequent to the November 2008 approval for a blanket

4   permanent modification, did the debtors have additional

5   communications with the Karmazyns concerning a loan

6   modification?

7   A.    I'm sorry; I just got back to --

8   Q.    I apologize.

9   A.    -- the payment history.

10  Q.    Sure, sure, sure, sure.

11          THE COURT:  I diverted her.

12  Q.    All right.  So going back to the servicing notes --

13          THE COURT:  Servicing notes or payment history?

14  Which --

15          MR. WISHNEW:  Servicing notes, Your Honor.

16          THE COURT:  Okay.

17          THE WITNESS:  Okay.

18          THE COURT:  What page?

19          MR. WISHNEW:  Looking at the entries for January 12th,

20  2009.

21          THE COURT:  Which page of 71?

22          MR. WISHNEW:  One moment, Your Honor.

23          Page 33 of 71, Your Honor.

24          THE COURT:  All right.  Let's give everybody a chance

25  to get there.

RESIDENTIAL CAPITAL, LLC, et al.                              77

1  BY MR. WISHNEW:

2  Q.   Ms. Lathrop, can you briefly describe --

3           THE COURT:  Wait till -- wait for Ms. Karmazyn.

4           MS. KARMAZYN:  I got it.

5           THE COURT:  You got -- okay, we're all there.

6           MS. KARMAZYN:  Thank you.

7           THE COURT:  Go ahead, Mr. Wishnew.

8  Q.   Can you briefly describe what communications took place

9  between the borrowers and the debtors on January 12th 2009?

10 A.   It appears that there was a conversation between the

11 borrowers on the account, and the debtors.  They spoke with two

12 different people on January 12th, 2009 via phone.

13 Q.   Okay.

14          THE COURT:  What am I supposed to -- what am I

15 supposed to do?  Look up from the first entry -- the lowest

16 entry and work up?  What am I -- tell me what I'm --

17          THE WITNESS:  Well, the easiest way to decipher this

18 is the middle of the page you see where it says, "Action

19 results CB change from LMDC to OAAI" on it?

20          THE COURT:  Yes, I do.

21          THE WITNESS:  Right below that, it says, "IB/TTB2,"

22 that's the beginning of the conversation.  For whatever reason,

23 the way that the servicing notes used to be added due to the

24 system, it was from the bottom up.  So that's where the

25 conversation would start.

1          THE COURT:  All right.  So "IB/TTB2," what does that

2     mean?

3          THE WITNESS:  Inbound, talked to borrower 2.

4          THE COURT:  Borrower 2 called?

5          THE WITNESS:  It appears that means that the

6     borro -- the borrower -- well, honestly -- inbound.  Yes, so

7     borrower 2 called.

8          THE COURT:  All right.  And what's "VI"?

9          MR. WISHNEW:  "VI" would be verified information.  So

10    the account contact information, to make sure it was correct.

11         THE COURT:  All right.  And what's "STTD"?

12         THE WITNESS:  Hold on.  I got to get back to where I

13    was.  Stated.

14         THE COURT:  And what's --

15         MS. KARMAZYN:  I'm sorry; what was that?

16         THE WITNESS:  Stated.  STTD.  They removed the vowels.

17         THE COURT:  And what's "CLD"?

18         THE WITNESS:  CLD, I believe it's called, but I'd have

19    to look at the contents.  What line are you looking at, Your

20    Honor?

21         THE COURT:  I thought I was looking at the line,

22    "IB/TTB2" --

23         THE WITNESS:  Okay.

24         THE COURT:  -- "V1 STTD CLD."

25         THE WITNESS:  So if you'd like, Your Honor --

1          THE COURT:  Translate, please.

2          THE WITNESS:  -- can I just read it for you?

3          THE COURT:  Yes, you can.

4          THE WITNESS:  All right.  It states, "Inbound, talked

5    to borrower 2, verified info, stated call to follow-up on loan

6    mod.  Advised account foreclosure, late fees, grace period,

7    negative credit reporting.  Advised of breach date and provided

8    number of attorney.  Advised of loan mod pending and info dated

9    on November 21st, 2008.  Borrower 2 stated never received

10   information."  And then the "RFD" meaning the reason for

11   default was provided at that point seeing that borrower 1 was

12   out of work as of January 2007 until February 2008.  "Loss of

13   income 642 dollars less a month and rate increase, 700."  I'll

14   be honest, I don't know what the rate increase piece is

15   referring to.

16          To move on in the conversation, we would want to

17   venture up to the very top of Carol Shaw's notes dated that

18   same day.

19          THE COURT:  Okay.

20          THE WITNESS:  Then it states, "Attempt to get home

21   refinance June 2008, and also August, but unsuccessful due to

22   negative credit reporting.  Unable to reinstate.  Stated can

23   make payment by January 19th, 2009 for 2,800.  Advised need

24   funds to be certified."

25          I don't know what the "T/F" means.  It may mean to

1  fulfill.  "Loan mod pending, added info."  And that's the end

2  of that specific conversation.

3           THE COURT:  All right.  Just hold on a minute.  All

4  right.  Go ahead.

5           THE WITNESS:  Then it shows that there was a second

6  conversation with Pradene Paul (ph.) on that same date, January

7  12th, 2009.  It's right above what we just looked at.  And it

8  states, "Borrower 2 called to inform that she did not get the

9  mod docs yet.  Mod approved on November 21st, 2008.  The down

10 payment was" -- it says it was "on December 19th, 2009" which

11 it looks like in the notes stated that that's the date that the

12 down payment was due on.  And the first installment was as of

13 February 1st, 2009, and it says, "E-mailed mod rep stating

14 there are no changes in financial and request to reset the

15 modification."

16          So since the down payment was due as of December 19th,

17 and GMAC had been informed that she didn't receive the

18 documents, and this date had passed, they actually reset that

19 modification.  And right above these notes, it shows the

20 modification being reset to include all payments that were not

21 originally included within the mod while keeping the same

22 payment terms that had been originally offered on the November

23 21st, 2008 permanent blanket modification.

24          THE COURT:  Does it say when the first payment was

25 due?

RESIDENTIAL CAPITAL, LLC, et al.                    81

1          THE WITNESS:  Give me one second; I will look.  It

2    looks like -- if we look at page 32, dated January 15th, 2009,

3    the very first note, it states the down payment -- that the

4    contribution amount was 1,979.14 due on January 25th, 2009.

5          Let me see if it gives you the date of that.

6          THE COURT:  Does that change to February 1st?

7          THE WITNESS:  I believe that the first payment was due

8    February 1st, but we would have to look at the permanent

9    modification documents to confirm that.

10          THE COURT:  All right.  Okay.  Go ahead, Mr. Wishnew.

11          MR. WISHNEW:  Thank you.

12    BY MR. WISHNEW:

13    Q.   Ms. Lathrop, one clarification concerning Ms. Shaw's

14    entry, it says -- in the middle of the page it says, "ADV"

15    which I believe you said is "advise," "funds need to be

16    certified."  What is that -- who's advising whom in that

17    context?

18    A.   The associate would have been advising the customer.

19    Q.   So it's Ms. Shaw advising Ms. Karmazyn?

20    A.   Yes.

21    Q.   Okay.

22    A.   Well, I believe --

23          THE COURT:  And that's --

24    A.   -- it was Ms. Karmazyn, based on the notes.

25          THE COURT:  And that's on January 12th, 2009?

RESIDENTIAL CAPITAL, LLC, et al.                                    82

1           THE WITNESS:  Yes, that conversation.

2           MS. KARMAZYN:  Conversation, but no letter.

3           THE WITNESS:  Yes.  Based on the notes, I don't show a

4   letter.

5           MR. WISHNEW:  Okay.

6   Q.   Did the borrowers execute the loan modification we just

7   discussed?

8   A.   I believe it shows that the signed documents were received

9   on January 30th, 2009 --

10  Q.   Okay.

11  A.   -- but I don't show that the modification was executed.

12  Q.   Okay.  If you can take a look at what's been marked

13  Exhibit D, as in dog.  What is this document?

14  A.   This was the blanket permanent loan modification that we

15  discussed from the servicing notes.

16  Q.   Okay.  And who is this document signed by?

17  A.   Michael Karmazyn and Kristin Karmazyn.

18  Q.   Okay.

19          THE WITNESS:  And Your Honor, just to answer your

20  question from earlier, it looks like the first payment due was

21  March 1st, 2009.  It's on the first page of that document at

22  the bottom of --

23          THE COURT:  First page of Exhibit D?

24          THE WITNESS:  Of Exhibit D, Section 3.

25          THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    83

1   Q.   Did the February 2009 loan modification require initial

2   contribution?

3   A.   Based on the servicing notes, yes.

4   Q.   Okay.  And what was the acceptable form of payment for

5   that contribution?

6   A.   Within the servicing notes it stated "certified funds."

7   Q.   Okay.

8            THE COURT:  Where do I find that?

9            THE WITNESS:  That was what we just referenced on --

10           THE COURT:  It's on page 33 of 71?

11           THE WITNESS:  Page 33 of 71 on January 12th, 2009 with

12   Carol Shaw.

13           THE COURT:  Okay.  Ms. Karmazyn points out that

14   there's nothing in Exhibit D that says that payments have to be

15   made in certified funds.

16           THE WITNESS:  That's correct.

17           THE COURT:  You agree with that.  And you believe that

18   information was orally conveyed on January 12th, 2009?

19           THE WITNESS:  Based on the servicing notes, yes.

20   Q.   And did the Karmazyns attempt to make the payments -- the

21   contribution payments?

22   A.   Just one second.  On page 32 of 71, there's a notation on

23   January 30th, 2009 -- excuse me -- with a "CSH" note next to

24   it.

25   Q.   Um-hum.

RESIDENTIAL CAPITAL, LLC, et al.                    84

1   A.   It states, "Returning personal check number 1093 for

2   2,000.  Cust needs certified funds."  So I believe that that

3   was their attempt to make the contribution payment.

4   Q.   Okay.  "CF" stands for "certified"?

5   A.   Yes.

6   Q.   Okay.

7   A.   I'm sorry.

8   Q.   No, no.

9        THE COURT:  Could you just -- when a personal check is

10  received, when it's supposed to be certified funds in your

11  view, is there any entry made in the payment history?

12       THE WITNESS:  Usually, no.  Usually, the only time

13  that there's a payment in the payment history when there's a

14  payment returned is due to the earlier payment we discussed

15  from May 5th, 2008 where we receive it in good faith and post

16  it to the account, and then are later notified of --

17       THE COURT:  Insufficient --

18       THE WITNESS:  -- insufficient funds or a stop payment

19  or something like that.

20       THE COURT:  All right.

21  Q.   If I could ask you, Ms. Lathrop, to turn to Exhibit E, as

22  in elephant.

23  A.   Yes.

24  Q.   And do you recognize this document?

25  A.   Yes, this is a returned payment letter.

RESIDENTIAL CAPITAL, LLC, et al.                    85

1   Q.   Okay.  And what is the date of this document?

2   A.   January 30th, 2009.

3   Q.   Okay.  And what's provided for in this document?

4   A.   This document reflects what we just discussed from the

5   servicing notes.  The check number, 1093, in the amount of

6   2,000 was being returned, and then box number 2 is checked

7   stating that, "Our records show payments on your account are

8   required to be paid by certified funds."  So -- then it

9   explains what the certified funds orders would be acceptable.

10  Q.   And consistent with the Court's question, does the payment

11  history reflect whether the contribution payment of 2,000

12  dollars was applied to the Karmazyn's account?

13  A.   I'll double-check the history --

14  Q.   Okay.

15  A.   -- just to make sure I didn't miss anything.

16          THE WITNESS:  Just so you know, Your Honor, I'm

17  looking at page 3 of 71 in the payment history because that's

18  where the date of January 30th, shows up.

19  A.   And I don't show any entries around January 30th, 2009 for

20  payments being received or reversed off of the account.

21  Q.   Got it.  Thank you.

22       Did the Karmazyns, based on your review of the payment

23  history, did the Karmazyns attempt to make other payments on

24  the loan modification agreements?

25  A.   On the permanent mod that was offered?

RESIDENTIAL CAPITAL, LLC, et al.                    86

1    Q.    Yes.

2    A.    I don't believe so.

3    Q.    Okay.  Was there a personal check received on or about

4    March 11th, 2009 based on your review of the payment history?

5    A.    Give me just a second to get there.

6          The notes do show that a personal check --

7               THE COURT:  Tell me what page you're looking.

8               THE WITNESS:  I apologize.  On page 30 of 71 dated

9    March 11th, 2009 with the word "Stop" next to it near -- bottom

10   fourth of the page.

11              THE COURT:  Hold on.  Okay.

12              THE WITNESS:  It does show a personal check number

13   1115 for 4,000 sent to customer -- says "Customer's required to

14   send certified funds."

15              MR. WISHNEW:  Okay.  Thank you.

16              THE COURT:  Is there any indication in the servicing

17   notes with a payment history that a replacement payment of

18   4,000 dollars in certified funds was ever received?

19              THE WITNESS:  I'll review it very quickly for you,

20   Your Honor.

21              On page 28 of 71 in the servicing notes, middle of the

22   page with an "LMT" note next to it, it's on March 26th, 2009

23   there's an MT note that states "Repaid.  Deposit received."

24              And then let me look at the payment history, on page 3

25   of 71 in the payment history on March 24th, 2009, it's probably

RESIDENTIAL CAPITAL, LLC, et al.                    87

1   eight lines from the top of the page, shows, "RPL payment of

2   4,000 applied to the account."

3            THE COURT:  So what does that tell you?  That a

4   replacement --

5            THE WITNESS:  "RPL" would stand for -- there would

6   have been some kind of repayment plan arrangement set up at

7   that point.  And I believe on -- if we go through the account

8   notes related to this, there was a three-month trial

9   modification -- trial plan set up on this account.  It's on

10  page 29 of 71 that references it, dated March 20th, 2009.  It

11  states a three-month trial modification consisting of down

12  payment of 4,000.  A monthly contribution of 2,035 was set up

13  on that date.  So that would have been where the -- I assume,

14  the 4,000 came in.

15           THE COURT:  Go ahead, Mr. Wishnew.

16           MR. WISHNEW:  Okay.

17  BY MR. WISHNEW:

18  Q.   Let's go back to -- well, let's follow up on your last

19  point.  In March 2009, was there additional payment agreements

20  between the debtors and the Karmazyns?

21  A.   Yes.  The trial modification we just discussed that's on

22  March 20th, 2009, page 29 of 71, top of that page.

23  Q.   Gotcha.  If I could ask you to take a look at Exhibit G,

24  as in guy.

25  A.   Excuse me.

RESIDENTIAL CAPITAL, LLC, et al.                                      88

1   Q.    There's some water next to you if you need it.

2         Do you recognize this document?

3   A.    Yes, this is a repayment agreement -- this -- it's a trial

4   agreement that was set up on March 23rd, 2009.

5   Q.    Okay.  And does the document describe whatever repayments

6   are required to be made by certified funds?

7   A.    Just give me a second.

8         On the second page of the document, or the back of the

9   document --

10  Q.    Um-hum.

11  A.    -- underneath the date and amount graph that's there --

12  Q.    Um-hum.

13  A.    -- or chart that's there, it says, "All payments remitted

14  under this trial plan must be in the form of certified funds."

15  Q.    Okay.  And according to this agreement, when was the first

16  payment required under this repayment plan?

17  A.    It states March 20th, 2009 for 4,000.

18  Q.    Okay.

19             THE COURT:  Where do I find that?

20             THE WITNESS:  That's under that chart on that same

21  page, under date and amount, shows March 20th, 2009 for 4,000.

22             THE COURT:  Is there a grace period?

23             THE WITNESS:  Give me a second.  Point one states,

24  "Payments must be received on or before this due date of the

25  agreement or the agreement will be null."  It's on the first

RESIDENTIAL CAPITAL, LLC, et al.                                89

1   page of that.

2          THE COURT:  Okay.

3   Q.   And did the Karmazyns make the first payment for 4,000

4   dollars?

5   A.   Yes.  It posted on the account.  I think we discussed that

6   one, but I can pull up the page again just so it's there.  On

7   page 3 of 71 in the payment history, it's the fourth line

8   from -- well, further down, like, the eighth line from the top

9   of the page shows the payment of 4,000 being received on March

10  24th, 2009.

11  Q.   Um-hum.

12  A.   And we know that's fulfilling that trial agreement,

13  because if we look in the interest paid date column --

14  Q.   Um-hum.

15  A.   -- the one right next to the transaction date, it shows

16  March 20th, 2009.

17  Q.   Um-hum.

18  A.   And whenever an account was set up on an arrangement like

19  this, whether it was a repay, a trial, or a forbearance, it's

20  going to show the fulfillment date of that due date to show

21  that -- what it correlates to.

22  Q.   So the March 20th, 2009 date in column three corresponds

23  to the date of the agreement?

24  A.   Yes.

25  Q.   Got it.  Okay.  And when was the -- according to the

RESIDENTIAL CAPITAL, LLC, et al.                    90

1  payment plan agreement, when was the next payment due?

2  A.    I believe it was April 20th.

3  Q.    Okay.  And did the Karmazyns make a payment around that

4  time?

5  A.    Give me just a second.  There's nothing in the payment

6  history from April 20th, but let me check the servicing notes

7  really quick.  On page 27 of 71 --

8  Q.    Um-hum.

9  A.    -- in the servicing notes, dated April 21st, 2009, it's

10 probably ten lines or so up from the bottom of the page,

11 there's a "Stop MT" note.

12 Q.    Right.

13 A.    Stating "Returning personal check number 119 in the amount

14 of 2,000.  Certified funds required."

15 Q.    Got it.  Thank you.  If I could ask you to take a look at

16 Exhibit H, as in horse.

17 A.    Yes, sir.

18 Q.    Do you recognize this document?

19 A.    Yes, this is a payment return letter.

20 Q.    Okay.  For the payment that was being returned because of

21 noncertified funds being received?

22 A.    Yes, it's dated April 21st, '09, and it references check

23 number 1194 in the amount of 2,000.  And it looks like the box

24 checked is, "Our records show payment on your account are

25 required to be paid by certified funds."

RESIDENTIAL CAPITAL, LLC, et al.                91

1  Q.   Okay.  And based on your review of the servicing notes,

2  was -- this payment was or was not applied to the account?

3  A.   This payment of 2,000?

4  Q.   Yes.

5  A.   Based on what I just looked at no, there wasn't a payment

6  applied on April 21st, 2009.

7  Q.   Okay.  Based on your review of the servicing notes, did

8  the debtors discuss with Ms. Karmazyn the reason for returning

9  the April 21st check?

10  A.   I believe I saw something when we looked at this.

11      On that same page, 27 out of 71 in the servicing notes --

12  Q.   Um-hum.

13  A.   -- dated May 4th, 2009.

14  Q.   Um-hum.

15  A.   It's near the top of the page.  It states, "Borrower

16  called in to say that the check was sent back as the payment

17  should be through certified funds that shouldn't" -- looks like

18  they may have repeated themselves there.  She said that "No one

19  informed her and she will make the payment today, in the

20  afternoon, and would call back with the MTCN number" which

21  would be a MoneyGram reference number.

22  Q.   Okay.  And did the debtors receive other payments under

23  the March 2009 payment plan from the borrowers?

24  A.   I believe that that MoneyGram payment that was just

25  referenced posted to the account.

RESIDENTIAL CAPITAL, LLC, et al.                    92

1   Q.   Okay.

2   A.   Give me just a second to look at the servicing -- or the

3   payment history.

4           THE COURT:  Let me just be sure that I understand,

5   these payments were pursuant to Exhibit G, the repayment

6   agreement --

7           THE WITNESS:  Yes.

8           THE COURT:  -- made as of March 23rd, 2009.

9           THE WITNESS:  Yes, Your Honor.

10          THE COURT:  Okay.  And you pointed out on the second

11  page where it says in bold, "All payments remitted under this

12  trial plan must be in the form of certified funds."

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  Okay.  Go ahead, Mr. Wishnew.

15          THE WITNESS:  Sorry, I'll answer his question quickly.

16          MR. WISHNEW:  Sure.

17  A.   On the top of page 3 --

18  Q.   Um-hum.

19  A.   -- it shows May 4th, 2009 in the payment history --

20  Q.   Um-hum.

21  A.   -- and it shows a reflection of that 2,000 dollars coming

22  in.

23  Q.   Okay.

24          THE COURT:  What's "UFU"?

25          THE WITNESS:  "UFU" is one of the suspense buckets

RESIDENTIAL CAPITAL, LLC, et al.                               93

1    that was used.  So if there wasn't enough to advance the due

2    date, or if it was -- mainly, if there wasn't enough to advance

3    the due date for payments it would be held there until there

4    was enough received to apply a payment to the account unless

5    there was for some reason other notes to state why funds should

6    not be applied at that point.

7    Q.    The 2,000 dollar payment we just discussed, was this

8    enough to constitute a full payment required under the March

9    2009 repayment plan?

10   A.    It looks like it was thirty-five dollars short.

11   Q.    Okay.

12   A.    But I'd have to look at the payment history to see if that

13   resulted in the plan canceling or not.

14   Q.    Well, let me ask one question first, was the 2,000-dollar

15   payment, based on your review of the payment history, was the

16   2,000-dollar payment applied to the borrowers' account?

17   A.    Yes.

18   Q.    Was it placed -- how was it credited to the account?

19   A.    It was just credited as a payment of 2,000 received.  It

20   was -- it doesn't reflect as a repayment plan payment being

21   fulfilled.

22   Q.    Did it go into some --

23   A.    It went into UFU.

24   Q.    And UFU is what again?

25   A.    The suspense bucket.

RESIDENTIAL CAPITAL, LLC, et al.                    94

1   Q.   Okay.

2           THE COURT:  So if I understand what you're saying is

3   that Exhibit G is the repayment plan, and the April 20th

4   payment was supposed to be 2,035 dollars and GMAC received

5   2,000 dollars?

6           THE WITNESS:  Yes, Your Honor.

7           THE COURT:  And so it was put in suspense?

8           THE WITNESS:  Yes, instead of being returned.

9           THE COURT:  Okay.  Go ahead, Mr. Wishnew.

10          MR. WISHNEW:  Thank you, Your Honor.

11  Q.   If I could ask you to take a look at Exhibit I, as in ice.

12  A.   Yes, sir.

13  Q.   Do you recognize this document?

14  A.   Yes.

15  Q.   And what is this document?

16  A.   This is a document dated May 14th, 2009 referring to the

17  repayment plan that was cancelled.

18  Q.   And is the repayment plan the March 2009 repayment plan

19  we've been discussing?

20  A.   Yes, sir.

21  Q.   Okay.  And is the mailing of this letter reflected in the

22  debtors' records?

23  A.   Give me one moment.  On page 26 of 71 --

24  Q.   Um-hum.

25  A.   -- dated May 14th, 2009, probably seven lines or so from

1   the bottom of the page, it says, "OL repay plan cancelled" and

2   "OL" would have been referring to the online letter being

3   generated for that to go out.

4   Q.   Okay.  Got it.  Okay.

5        After the March plan was cancelled, did the debtors

6   received additional payments from the Karmazyns?

7   A.   Just looking at the servicing notes on this page --

8   Q.   Um-hum.

9   A.   -- it does show that there was another payment returned on

10  page 26 of 71 --

11  Q.   Um-hum.

12  A.   -- dated June 2nd, 2009.

13  Q.   Um-hum.

14  A.   Literally, the top of the page it states, "Stop" as the

15  code.  "Return Western Union for 2,000 as zero of nine payments

16  due."

17  Q.   Okay.  And do you know --

18            THE COURT:  What does that mean?

19            THE WITNESS:  It means that --

20            MS. KARMAZYN:  I'm sorry; where was that?

21            THE COURT:  Right at the top; the first line of the

22  page.

23            THE WITNESS:  The top of page 26 of 71, dated June

24  2nd, 2009.

25            And zero of nine means it wasn't even enough to post

RESIDENTIAL CAPITAL, LLC, et al.                    96

1   one payment -- or wasn't an acceptable amount to apply payment

2   to the account.

3   Q.   Did the debtors attempt to set up additional forbearance

4   or repayment plans on this account?

5   A.   I believe they did.

6   Q.   Okay.  If I could ask you to look to servicing notes --

7          THE COURT:  Can I just stop you for a minute?

8          THE WITNESS:  Yes.

9          THE COURT:  How much had to be received before it

10  would be posted to the account?

11         THE WITNESS:  At this point --

12         THE COURT:  Yes.

13         THE WITNESS:  -- the account was due for nine

14  payments.  Usually it would have been a minimum of half the

15  total amount due.

16         THE COURT:  So this is a payment received after the

17  cancellation --

18         THE WITNESS:  Of the repayment.

19         THE COURT:  -- of the repayment plan.

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Go ahead, Mr. Wishnew.

22         MR. WISHNEW:  Thank you, Your Honor.

23  Q.   If I ask you to turn to the servicing notes for July 29th,

24  2009.

25  A.   It's page --

RESIDENTIAL CAPITAL, LLC, et al.                    97

1  Q.   It's page 20 of 71.

2  A.   There -- yes, this -- on July 29th, 2009, there's an "HMP"

3  note.

4  Q.   Um-hum.

5  A.   And it shows -- probably three lines in the middle of that

6  note that a five-month plan is set up in the amount of

7  $1,528.92.

8  Q.   Um-hum.

9  A.   And this is referred to as a special forbearance.

10  "Customer was unemployed.  Lost income" is the reason why the

11  plan was set up.

12  Q.   Okay.  And --

13         THE COURT:  Before you go on -- can I take you back to

14  back to page 26 of 71?

15         THE WITNESS:  Give me one moment, Your Honor.  Yes,

16  sir.

17         THE COURT:  There was -- up from the bottom, there are

18  three LMT entries.  Can you explain what that is?

19         THE WITNESS:  Dated May 14th, 2009?

20         THE COURT:  Yes.

21         THE WITNESS:  Okay.  I'll start from the bottom, just

22  that way it's in chronological order.  It says, "Trial mod

23  failed" which was referring to that March 24th, 2009 agreement.

24  And then above, it explains why it failed, so "Loss mit denied.

25  Borrower refuses to contribute."  That's related to not

RESIDENTIAL CAPITAL, LLC, et al.                    98

1    receiving the amount that was agreed upon that was due.

2              THE COURT:  Okay.

3              THE WITNESS:  And then above that, the third line is

4    "File closed" meaning the loss mitigation efforts for review

5    have closed out due to that cancellation.

6              THE COURT:  Go ahead, Mr. Wishnew.

7              MR. WISHNEW:  Thank you, Your Honor.

8    BY MR. WISHNEW:

9    Q.    Concerning the July 29th, forbearance plan, if the plan

10   was completed, would it have brought the account current at the

11   end of the five-month period?

12   A.    No, this was a special forbearance.

13   Q.    Okay.

14             THE COURT:  What does that mean?

15             THE WITNESS:  In 2009, part of HAMP that had come out

16   was also the unemployment forbearance, which would have allowed

17   customers to pay less than their regular monthly payments for a

18   period of time to allow the opportunity to maybe turn around

19   their financial situation, get additional income, but not

20   allowing foreclosure to take place during that period of time.

21             So there was no promise of a final resolution.  It was

22   just more we can't approve you for something right now, so

23   we're going to do this to try and help you, to give you time to

24   get the financials, or the expenses in order, to get you,

25   hopefully, approved for something, or get you back on track.

1            THE COURT:  Could you -- looking at the July 29th,

2    2009 entry, just tell me what it says and means.

3            THE WITNESS:  The conversation?

4            THE COURT:  Yes.

5            THE WITNESS:  Okay.  The conversation with Lauren

6    Scott (ph.) -- just want to make sure it's the right entry.

7            THE COURT:  Yes.

8            MS. KARMAZYN:  Can you tell me the page, please; I'm

9    sorry.

10           THE WITNESS:  Yes, I apologize.  Page 20 of 71.

11   And --

12           THE COURT:  Let's make sure that Ms. Karmazyn is

13   there.

14           MS. KARMAZYN:  I got it.  Thank you.

15           THE WITNESS:  Yeah.

16           THE COURT:  Go ahead.

17           THE WITNESS:  It says, "Borrower 1 called in.  Advised

18   of the negative credit reporting and late charges; advised of

19   the due date; and advised to send in and make sure on time.  No

20   grace period.  Advise five month plan set up."  "UPL" would be

21   unemployment.  I can't remember what the "O" stands for, but

22   it's referring to unemployment plan with balloon, meaning that

23   since it wasn't bringing the account current, at the end of the

24   five months the plan is going to show a total lump sum due,

25   because that's how the system worked.  It didn't mean that she

RESIDENTIAL CAPITAL, LLC, et al.                    100

 1  had to pay that, or he had to pay that.

 2          "Advised of the foreclosure and the foreclosure sale

 3  date; advised of the MoneyGram; and advised to call back with

 4  confirmation number."  And then it goes into the RFD, reason

 5  for default, "Customer lost income and advised missing docs to

 6  fax in for a mod.  Unemployment docs."

 7          The phone number, I believe, is a fax number, but I'm

 8  not totally sure of that, and that's the end of that note, sir.

 9          THE COURT:  All right.  Go ahead, Mr. Wishnew.

10          MR. WISHNEW:  Thank you, Your Honor.

11  BY MR. WISHNEW:

12  Q.   Ms. Lathrop, if you could turn to Exhibit J, as in Jack.

13  A.   Yes.

14  Q.   Do you recognize this document?

15  A.   Yes.  This is the unemployment agreement that we just

16  discussed.

17  Q.   Okay.  Does the document -- does anywhere on the document

18  reference the need for certified funds?

19  A.   The document in here, it's labeled as page 4, it's the

20  back of the page.

21  Q.   Um-hum.

22  A.   At the very top it states, "Certified funds only" --

23  Q.   Okay.

24  A.   -- with little stars next to it.

25  Q.   Got it.  Thank you.

1           MS. KARMAZYN:  Where was that?  I'm sorry.

2           THE WITNESS:  On Exhibit J, the back of the page, top

3    of the page.

4           MS. KARMAZYN:  Okay.

5           THE WITNESS:  It states, "Certified funds only."

6           MR. WISHNEW:  Above your signature.

7           MS. KARMAZYN:  I don't see it.

8           THE COURT:  Why don't you go over and show her, Mr.

9    Wishnew?

10           MS. KARMAZYN:  Oh, I see what you're saying.  Okay.

11   Thank you.

12           THE COURT:  Thank you very much.

13   Q.   Ms. Lathrop, did the Karmazyns make a payment under this

14   plan?

15   A.   Give me just a second.  On page 19 of 71 --

16   Q.   Um-hum.

17   A.   -- August 7th, 2009, it's just below the middle of the

18   page.  It says, "Repaid deposit received."  Give me a second to

19   look at the payment history because it should be in there also.

20   On page 2 of 71 in the payment history --

21   Q.   Um-hum.

22   A.   -- dated August 4th, 2009 --

23   Q.   Um-hum.

24   A.   -- the very first entry -- so the lowest entry on that

25   page for August 4th -- shows transaction date 8/4/09 with an

RESIDENTIAL CAPITAL, LLC, et al.                    102

1   interest paid date of 8/5/09 which would be referencing the due

2   date for the plan, shows a payment of 1,525 being received on

3   that day.

4   Q.   Okay.  Did the Karmazyns make another payment under this

5   plan?

6   A.   Just one moment.  I don't show anything in the payment

7   history, but give me a second to look at the notes.  There was

8   a payment received on page 17 of 71 dated September 23rd, 2009

9   with a "Stop" next to the notes --

10  Q.   Um-hum.

11  A.   -- stating "Returning official check number 6365504983 in

12  the amount of 1,530, not enough to reinstate.

13  Q.   Okay.

14          THE COURT:  How much was required to reinstate?

15          THE WITNESS:  As of that point, the account would have

16  been due -- one second -- the account would have been due for

17  November 2008 through September of 2009 payments.  So to

18  reinstate, would mean to bring the account completely current.

19  So it would have been all of those payments.

20          THE COURT:  So there was no repayment plan in effect

21  at that time?

22          THE WITNESS:  No.  I believe the plan had cancelled

23  prior to that.

24          MR. WISHNEW:  That's the next line of questioning,

25  Your Honor.

1          THE COURT:  Go ahead.

2    Q.   Ms. Lathrop, if I could ask you to turn to Exhibit K, as

3    in kite.

4    A.   Yes, sir.

5    Q.   Do you recognize this document?

6    A.   Yes, it's the repay cancellation letter.

7    Q.   And what is the reason for the cancellation?

8    A.   It states, "The payment was not received by the payment

9    due date as specified in the signed agreement."

10   Q.   Okay.  And then we just referred to the fact that there

11   was a payment of 1,530 dollars on or about September 23rd,

12   2009.  Did the debtors accept this payment?

13   A.   No, it was -- I believe it was returned, but let me go

14   back to that.  No, on page 17 of 71 it states that it was being

15   returned, and right below that note on that -- that stop note

16   on that page it shows the online letter going out with a return

17   payment.

18          THE COURT:  I'm sorry, where is the letter shown?

19          THE WITNESS:  Right below that stop note.

20          THE COURT:  Yes.

21          THE WITNESS:  And then the very next line says, "OL

22   payment process return payment to customer" --

23          THE COURT:  Okay.

24          THE WITNESS:  -- by Kimberly Matthews (ph.).

25          THE COURT:  I see it.

RESIDENTIAL CAPITAL, LLC, et al.                    104

1    Q.    If I could ask you turn to Exhibit L.

2    A.    Yes, sir.

3    Q.    And what is this document?  Or have you seen this document

4    before today?

5    A.    Yes.

6    Q.    And what is this document?

7    A.    This is the payment return letter dated September 23rd,

8    2009.

9    Q.    Okay.  Based on your review of the servicing notes, where

10   there communications between the Karmazyns and the debtors

11   after the September 23rd letter was sent??

12   A.    Just a moment.  On page 16 of 71?

13   Q.    Um-hum.

14   A.    Middle of the page, dated September 24th, 2009?

15   Q.    Um-hum.

16   A.    It states -- and I'll just read them verbatim, "Talked to

17   borrower 2, verified information, call" -- and then it says

18   "late charges credit foreclosure sales of October 7th, 2009".

19   That's what they would've advised the customer.  "Borrower 2

20   states, not sure why last payment complete did not work.

21   Advised payment returned and need complete financial package",

22   and they updated DTI at that point.  They would take income and

23   compare it to the -- what the customer would provide as total

24   monthly income and compare it to the monthly mortgage payment

25   to find what the current debt-to-income ratio was as the first

1    step of modification review.

2    Q.    Um-hum.

3    A.    So that's what that was.  And they set up a trial with

4    1,030 due on October --

5          THE COURT:  1,530?

6    A.    Oh, I'm so sorry.  It's 1,530 due on October 5th, 2009 and

7    they advised of the Website to obtain the workout package to be

8    completed.

9    Q.    Okay.  If I could ask you to take a look at Exhibit M?

10   A.    Yes.

11   Q.    Okay.  Do you recognize this document?

12   A.    Yes.  This is -- this looks like it's the agreement that

13   was just discussed and the conversation.

14   Q.    Okay.  And is this a special forbearance plan?  Or I guess

15   that's --

16   A.    It's listed as a trial in the notes.

17   Q.    Okay.

18   A.    So I believe it's a trial plan.

19   Q.    Okay.

20   A.    They used the same document in 2009 for repayment plans,

21   trials and forbearances, so --

22   Q.    Thank you.  And would this account -- oh, sorry.  Would

23   this plan -- assuming that the plan was fully performed, would

24   this have brought the account current at the end of the period?

25   A.    No, it wouldn't have brought it current.

RESIDENTIAL CAPITAL, LLC, et al.                    106

1    Q.    Okay.  So is this plan just meant to try and improve the

2    claimant's -- or the borrower's financial situation?

3    A.    This was set up to allow the borrower time to submit a new

4    workout package for potential loan modification review.

5    Q.    Okay.  And what was the payment required under this plan?

6    A.    According to the document, under Section 5, page 1 --

7    Q.    Um-hum.

8    A.    It's $1,244.65.

9    Q.    Okay.

10            THE COURT:  And when was the payment due?

11            THE WITNESS:  I don't believe that it's listed in the

12   document, but there would've usually been a repayment -- a

13   schedule provided on the back page, but I don't show that

14   that's a part of this attachment.  I will tell you that after

15   reviewing loans like this, it's a bit unfortunate that for

16   whatever reason, they didn't image the schedule when they put

17   the letters in, but I don't show we have a copy of whatever the

18   repayment plan schedule was.

19   Q.    And does the document describe the method by which

20   payments are to be made?

21   A.    Let me go back.  Under Section 7 on page 2 of that trial

22   agreement --

23   Q.    Um-hum.

24   A.    -- Exhibit M --

25   Q.    Um-hum.

1  A.   -- it states all payments under this agreement, including

2  the regular monthly payments, shall be made in certified funds

3  or cashier's check.

4  Q.   Okay.

5          THE COURT:  I want to understand -- so Ms. Karmazyn

6  points out that in paragraph 5, it just says that when the

7  payment's due -- no later than monthly.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  And you haven't seen a schedule attached

10 to this document, have you?

11         THE WITNESS:  No.  I have not been able to locate a

12 schedule.

13         THE COURT:  All right, Mr. Wishnew?

14 Q.   Ms. Lathrop, to go back to page 16 of 71, the servicing

15 notes, is there a conversation around the same time of this

16 repayment plan agreement between the debtors and the Karmazyns

17 concerning the payment due date under this plan?

18 A.   Yeah.  We reviewed that earlier.

19 Q.   Um-hum.

20 A.   I believe that the repayment plan schedule that was -- not

21 the schedule, but the agreement sent out was referring to the

22 conversation which would have had the October 5th, 2009 date as

23 the due date.

24 Q.   Got it.  Based on your review of both the payment history

25 and the servicing notes, did the debtors receive the required

RESIDENTIAL CAPITAL, LLC, et al.                    108

1    payment under the September 2009 repayment agreement by the

2    October 5th deadline?

3    A.    No.  On page 15 of 71 on the servicing notes, bottom third

4    of the page, it stated October 5th, 2009, there's a DM note

5    that states promise plan 17 broken, 10/5/09 promise date

6    10/5/09.

7              THE COURT:  What page are you on?  I'm sorry.

8              THE WITNESS:  15 of 71.

9              THE COURT:  Okay.

10             THE WITNESS:  The note I'm looking at is right above

11   the RG -- the AGRMT note.

12             THE COURT:  Go ahead.

13             THE WITNESS:  And that shows that that money didn't

14   come in on the 5th.

15   Q.    Okay.  When does -- do you know what -- did they actually

16   receive a payment after October 5th?

17   A.    According to the servicing notes on that same page, page

18   15, there's a stop note --

19   Q.    Um-hum.

20   A.    -- on October 7th, '09, that states, "returning official

21   check number 6365505039 in the amount of 1,244.65 as not enough

22   to reinstate".

23   Q.    Okay.

24             THE COURT:  Let me ask you, the entry on 15 of 71, for

25   October 7th, 2009 --

1       THE WITNESS:  Yes, Your Honor?

2       THE COURT:  Was it, "borrower refused to contribute;

3  borrower didn't call back"?  Read that whole entry for me, if

4  you would.

5       THE WITNESS:  The FOR note?

6       THE COURT:  Yes.

7       THE WITNESS:  Okay.

8       THE COURT:  What's an FOR?

9       THE WITNESS:  It would've been added -- the account

10  was in active foreclosure at that point so it would've been

11  referencing that -- enough -- whenever we see these notes, it

12  was because it was manually added usually.

13       So it looks like Lauren Hartman (ph.) added the note

14  on the 7th, and it says, "Borrower refuses to contribute;

15  borrower did not call back with confirmation number of payment.

16  Property will go to sale on October 7th, repayment plan was

17  manually canceled."

18       THE COURT:  Okay.  So was this entry -- does the

19  system only permit -- does it show the date of the entry as the

20  actual date when it's entered or can someone backdate it or

21  forward-date it?

22       THE WITNESS:  I'm not aware of a way to be able to

23  manipulate the date.  It would be added the day that it was put

24  in or occurred.

25       THE COURT:  Okay.  Go ahead, Mr. Wishnew.

```
 1  BY MR. WISHNEW:

 2  Q.   Ms. Lathrop, if you could turn to Exhibit N?

 3  A.   Yes, sir.

 4  Q.   Do you recognize this document?

 5  A.   Yes.  This is the October 7th, '09 letter sent regarding

 6  the payment that was re -- excuse me -- the payment that was

 7  returned.

 8  Q.   Okay.  And why was the -- why were the funds returned?

 9  A.   It states it was returned due to it not being enough to

10  reinstate the amount due on the account at that time.

11  Q.   Okay.  And as we just noted, the mailing of this letter

12  was reflected in the debtors' records?

13  A.   Yes, on page 15 of 71, on October 7th, 2009.

14  Q.   Okay.  And to the best of your knowledge, was there a

15  foreclosure sale on this property?

16  A.   Yes.  It occurred that day, on October 7th.

17  Q.   If I could ask you to turn to Exhibit O?

18  A.   Yes, sir.

19  Q.   And what is this document?

20  A.   The public trustee's certificate of purchase.

21  Q.   Okay.  And have you seen this before today?

22  A.   Yes.

23  Q.   Okay.  And was this recorded in the county records office?

24  A.   Yes.  At the top of the page, it shows date recorded,

25  October 13th, 2009.
```

RESIDENTIAL CAPITAL, LLC, et al.                    111

1   Q.   All right.  And based upon your review of this document,

2   does it indicate that the notice of sale was mailed to the

3   borrowers?

4   A.   I believe in that first paragraph, where it starts with

5   "pursuant", it states, "any and all persons required to be

6   notified that that occurred".  I first mailed a combined notice

7   of sale and right to cure and redeem the original grantors.

8   Q.   Okay.  And does that same notice also talk about

9   publication of the sale?

10  A.   Yes.  It's in that same paragraph.  It says, "I further

11  published the combined notice of sale and right to cure

12  redeemed in a newspaper of general circulation in the Arapahoe

13  County, as described by law."

14  Q.   All right.

15       THE COURT:  So who's the public trustee?  Isn't the

16  public trustee someone employed by GMAC?

17       THE WITNESS:  I'm going to be honest, I don't -- I

18  don't enough about this piece of the process to tell you --

19       THE COURT:  All right.

20       THE WITNESS:  -- if it would've been a GMAC employee

21  or not.

22       THE COURT:  Go ahead, Mr. Wishnew.

23       MR. WISHNEW:  Thank you, Your Honor.  I'm just trying

24  to see if there's anything in the document to address your

25  questions.  I only note for the record, Your Honor, that the

RESIDENTIAL CAPITAL, LLC, et al.                              112

1   trustee, who is identified as Ana Maria Peters-Ruddick, public

2   trustee signs this as a representative of public trustee at

3   Arapahoe County, State of Colorado.  There doesn't appear to be

4   any sort of representation of an affiliation with any of the

5   debtors.

6              THE COURT:  Okay.

7   Q.   Ms. Lathrop, if you could turn to Exhibit P, as in Peter?

8   A.   Yes, sir.

9   Q.   Do you recognize this document?

10  A.   Yes.  This is a broker's price opinion.

11  Q.   And was this something that was maintained in the

12  borrower's books and records?

13  A.   Yes.  This would've been available through our looking

14  gri -- Looking Glass application.

15  Q.   Okay.  And what is the date of this broker -- this BPO?

16  A.   According to the inspection date under that order

17  information at the top, it state July 1st, 2009.

18  Q.   Okay.  And what is the estimated sale price of the

19  property, according to this document?

20  A.   At the bottom of the page, under marketing strategy, it

21  states estimated sale price is 225,000.

22  Q.   Okay.  That's in Section 5, on the bottom of the page?

23  A.   Yes, bottom of the page.

24  Q.   Briefly, if a check was received -- based on your

25  experience with the debtors, if a check was received from a

RESIDENTIAL CAPITAL, LLC, et al.                    113

1   borrower that could not be accepted, was it the debtor's

2   business practice to return the check the same day?

3   A.   It would be returned the same day or within a business

4   day.

5   Q.   Okay.  And based upon the payments that we've gone through

6   today, would you agree with me that all the payments that were

7   not accepted were returned the same day they were received?

8   A.    I believe that they all were returned, based on the

9   servicing notes and the date on the letters.

10  Q.   Okay.  And the last payment from the Karmazyns that we

11  discussed was sent back to them on October 7th?

12  A.   Yes.

13  Q.   Okay.

14        MR. WISHNEW:  One moment, Your Honor.

15  Q.   Ms. Lathrop, one last question.  What was the -- at the

16  time of the foreclosure sale, what was the outstanding balance

17  on the borrower's loan?

18  A.   As of October 2009?

19  Q.   Yes, please.

20  A.   The account would've been due for November 2008 through

21  October 2009 payment, so it would've been roughly, I believe

22  thirteen months of payments -- twelve or thirteen months.

23  Q.   That was the -- that would be the amount to be brought

24  current, but what was the total outstanding balance on the

25  loan?  In other words, if they wanted to pay off the loan in

RESIDENTIAL CAPITAL, LLC, et al.                    114

1    its entirety --

2    A.    The loan in its entirety, meaning the unpaid principal

3    balance?  I apologize, I misunderstood.

4    Q.    That's okay.

5    A.    Based on -- I'll just take this off of the payment history

6    on page 2.

7    Q.    Um-hum.

8    A.    On October 7th, 2009 --

9    Q.    Um-hum.

10   A.    -- the fourth column --

11   Q.    Um-hum.

12   A.    -- that's the unpaid principal balance column, so whenever

13   something was applied, it would deduct money from unpaid

14   principal balance, if that kind of money was received.

15   Q.    Um-hum.

16   A.    So as of that date, it shows $285,480.45 in unpaid

17   principal balance.

18           MR. WISHNEW:  Okay.  Your Honor, I have no more

19   questions for Ms. Lathrop.

20           THE COURT:  All right.  So it's about 12:15.  Let's

21   take a lunch break, give you a chance to think about what

22   questions you want to ask.

23           MS. KARMAZYN:  I appreciate it.

24           THE COURT:  We'll start up at 1:15, okay?

25           MS. KARMAZYN:  Well, that --

1     THE COURT:  We'll start at 1:15.

2     MS. KARMAZYN:  That's fine.

3     THE COURT:  Okay.

4     MS. KARMAZYN:  Can I leave my stuff here?

5     THE COURT:  You absolutely can.

6     All right.  We're in recess and you're excused.

7     MR. WISHNEW:  Thank you, Your Honor.

8     (Recess from 12:13 p.m. until 1:18 p.m.)

9     THE COURT:  All right.  Please be seated.

10    Ms. Lathrop, you're still under oath.

11    THE WITNESS:  Yes, sir.

12    THE COURT:  All right, Ms. Karmazyn, it's your chance

13  to cross-examine.

14  CROSS-EXAMINATION

15  BY MS. KARMAZYN:

16  Q.   I do have a lot of questions, so I apologize, but you're a

17  witness for GMAC on the account statement?

18  A.   I am the expert witness.

19  Q.   Expert witness for GMAC?

20  A.   For ResCap, yes.

21  Q.   Okay.  Did you ever work for Homecoming Financial?

22  A.   After the merger took place in 2007, Homecomings and GMAC

23  were essentially the same entity, so --

24  Q.   What was that date?

25  A.   It -- it was sometime in 2007.  I -- I don't remember it

1   off the top of my head.

2   Q.   Okay.  So the information that came from Homecoming that

3   went into the GMAC statement is 100 percent accurate, then?

4   A.   I believe it is, yes.

5   Q.   Have you ever compared the two -- the Homecoming Financial

6   statement was submitted and the GMAC statement that was

7   submitted?

8   A.   I don't know what you're referring to; I'm sorry.

9   Q.   Back in January of 2015, the trust submitted a Homecoming

10  Financial statement.

11  A.   I -- I would have to look at it.  I don't want to give you

12  false information.

13  Q.   Okay, but --

14  A.   So I'd have to look at the document to make sure.

15  Q.   Okay.  Does someone look at that to tell me that it's 100

16  percent accurate -- the information on the two statements?  Is

17  that looked at?

18          MR. WISHNEW:  Your Honor, if Ms. Karmazyn could refer

19  to a specific exhibit, it might help Ms. Lathrop.

20          MS. KARMAZYN:  Okay.

21  Q.   Docket 79672, Homecoming Financial 2008 statement.

22          THE COURT:  I don't know what -- you have to refer

23  to -- the only thing that's before the Court are things that

24  have been marked as exhibits for the trial.

25          MS. KARMAZYN:  Okay.  So I can't pull what was sent

1  in -- past evidence?

2          THE COURT:  You've got to -- no, you've got to --

3          MS. KARMAZYN:  Okay, that's fine.

4          THE COURT:  That was the purpose of pre-trial order --

5          MS. KARMAZYN:  Okay, that's fine.

6          THE COURT:  -- for each side to submit its exhibits.

7  Q.   Okay.  Let's move on, then.

8  A.   Okay.

9  Q.   Let's go to Exhibit L, please.

10  A.   Okay.

11  Q.   This is the letter that I received saying that you

12  returned the Western -- or the official check for the amount of

13  1,530.  What should that payment have been?  You returned it

14  because it wasn't the right amount, so what should the payment

15  have been?

16  A.   Well, based on the note here, it says it not enough to

17  reinstate your account at this time, so this would have been

18  looking for an amount to receive the total amount due on the

19  account that was delinquent.  It doesn't look like it's

20  referring to a -- like an arrangement payment.  I'd have to

21  look at the notes, though, around that to really give you more

22  of a definitive answer.

23  Q.   Okay.  So the 1,530 was not the correct payment because it

24  was more?  So if you go back to Exhibit -- the modification, it

25  was actually more that I owed?

RESIDENTIAL CAPITAL, LLC, et al.                    118

1   A.   No.  Hold -- hold on one second.

2   Q.   Okay.

3   A.   Let me find the notes.  I don't want to -- don't want to

4   say something wrong here for you.

5   Q.   No, no.

6   A.   It looks like the letter was sent to you on the 23rd of --

7        THE COURT:  Why don't you tell us what you're looking

8   at, okay?

9   A.   I'm going back to the notes.  The letter date you're

10  referring to is the 23rd --

11       THE COURT:  This is the loan servicing notes, which

12  were part of Exhibit C.

13  A.   Yeah, so --

14       THE COURT:  What page?

15       THE WITNESS:  I'm looking for it right now, Your

16  Honor.

17  A.   So on page 17 of 71 in the servicing notes, under Exhibit

18  C, that's where it shows the letter going out on September

19  23rd, 2009 that -- that you're referring to.

20  Q.   Right.

21  A.   If we go back to page 18 of 71 --

22  Q.   Okay.

23  A.   I'm sorry, excuse me.  On September 17th, 2009 -- it's

24  just below the middle of the page --

25  Q.   Um-hum.

1    A.    -- there's a LMT (ph.) note that states "broken repay, no

2    payment sent, denial letter enclosed".  So -- and below that,

3    on 9/15/2009, there's a DM note that says "repay plan

4    cancelled, automatic" from Lauren Scott.

5          So the arrangement that had been set up was no longer

6    active due to it showing no payment coming in.  So when the

7    payment came in on the 23rd of -- well, the -- the letter that

8    was sent out on the 23rd of September, 2009, as referenced on

9    page 17 of 71 in the servicing notes, and it's being returned

10   due to not enough to reinstate, it would be because at this

11   time, there's no arrangement set up.  The account's just due

12   for November 2008 through September 2009 payments.  So the

13   1,530 dollars would not have been enough to bring the total

14   amount current.  Does that make sense?

15   Q.    Yes.

16   A.    It's a lot to follow.

17   Q.    No, I -- I -- but if you go back to Exhibit J --

18   A.    Hold on.  Yes, ma'am?

19   Q.    -- it said no later than monthly, "1,528.92, no later than

20   monthly".  So at what point did that switch to being more than

21   1,528?  Where was the notification that I owed more than that?

22   A.    I'm -- I'm -- I think I'm confused at your question.

23   The -- the 1,528 was just a settled upon payment from --

24   Q.    Okay.

25   A.    -- the unemployment plan that you were set up on, not

RESIDENTIAL CAPITAL, LLC, et al.                    120

1   referring to the total amount --

2   Q.   Okay.

3   A.   -- due to bring the account current.

4   Q.   Okay.

5   A.   Does that answer your question?

6   Q.   Sort of.  I just don't understand where you returned it

7   because it wasn't the right amount.  Where you told me -- how

8   did I know what the right amount was if that plan was

9   cancelled, when you did accept a payment in August -- August

10  4th, of 1,525.

11  A.   Give me one second to go back to Exhibit C.  I mean, it's

12  lets us pull back when that payment -- because I believe from

13  when I went through direct with the trust earlier, I believe it

14  was August 4th, so one second.

15       So on page -- I apologize, one moment for me.  On August

16  7th, 2009, on page 19 of 71, there's a note that says "repay

17  deposit received", which, according to the payment history on

18  page 2 of 71, shows that payment of 1,525 coming in on August

19  4th, 2009.

20  Q.   Right.

21  A.   So that -- and if we follow just that first line from

22  August 4th, 2009, it shows it was an RPL payment, meaning it

23  was a payment to fulfill a repayment plan.  And the third

24  column shows 8/5/2009, which is the date that that payment was

25  fulfilling.  So it was due for the August 5th, 2009

1   unemployment plan payment that was due.  So that's the date of

2   that plan posting.

3   Q.    Okay.  This you accepted, right, on August 5th?

4   A.    Which it shows being accepted on August 4th, yes.

5   Q.    Okay.  So --

6   A.    It was due on August 5th.

7   Q.    So if you go up for about six lines, why did you start the

8   foreclosure on August 14th if you accepted that payment?  It

9   says "delinquent 180 days", but you just accepted that payment.

10  A.    Oh, I'm sorry, you're back in the notes.

11  Q.    I'm on 19 -- page 19 of 71.

12  A.    That is not a -- a starting of foreclosure.  If you look

13  next to it, there's a CBR code next to it.

14  Q.    Um-hum.

15  A.    And according to the requirements of business, GMAC had to

16  report to the Credit Bureau, accurately, what the status of the

17  account was at that point.  So this is what was reported to the

18  Credit Bureau at this time, that the account was delinquent

19  over 180 days and that foreclosure had begun on the account.

20  So at this point, foreclosure had not stopped.  It was more or

21  less postponed because of the unemployment plan that had been

22  set up on July 29th, 2009.

23  Q.    Right, and you received the payment?

24  A.    Yeah.  And that payment was received on August 4th,

25  according to this --

1   Q.   Right.

2   A.    -- the payment history and it's notated on August 7.

3   Now, if we go up on page 19 of 71, Your Honor, on September

4   7th, 2009 -- on that same page -- it shows "promise plan

5   broken, 9/7/09; promise date was 9/5/09".  It's probably the

6   sixth or seventh line from the top of the page in the servicing

7   notes.  That was the date that it looks like that payment was

8   due.

9           THE COURT:  Could I ask you a couple of questions?

10          THE WITNESS:  Yes, Your Honor.

11          THE COURT:  If I look at Exhibit J --

12          THE WITNESS:  One moment.

13          THE COURT:  -- which Ms. Karmazyn showed you.  It's

14   the July 29th, 2009 foreclosure repayment plan.

15          THE WITNESS:  Yes.

16          THE COURT:  And if I look at paragraph 4 --

17          THE WITNESS:  Yes, Your Honor?

18          THE COURT:  -- tell me what the import of that

19   paragraph is.

20          THE WITNESS:  What about the paragraph?

21          THE COURT:  So that says, "lender has instituted

22   foreclosure proceedings against the property securing the

23   mortgage indebtedness, which proceedings will continue until

24   the defaults described herein is/are brought current under the

25   terms of the mortgage or otherwise cured as provided for in

RESIDENTIAL CAPITAL, LLC, et al.                    123

1   this agreement."  So you looked at it in the loan servicing

2   notes -- the reference to foreclosure proceedings.  Explain

3   what happens.

4            THE WITNESS:  When a plan like this would be set up on

5   an account, it would be, essentially -- foreclosure activity

6   would pretty much be postponed.  So it's not going to be closed

7   out --

8            THE COURT:  It's not closed, it's on hold?

9            THE WITNESS:  -- but it will be suspended or --

10           THE COURT:  Okay.

11           THE WITNESS:  -- on hold until either an arrangement

12   brings the account current or if -- that way, if the

13   arrangement is not fulfilled, foreclosure can pick up where it

14   left off.

15           THE COURT:  Okay.  So this Exhibit J required the

16   payments of $1,528.92 monthly.  And -- so if this foreclosure

17   repayment agreement is cancelled, what happens then?

18           THE WITNESS:  When -- once it's cancelled, foreclosure

19   process would just resume as normal.

20           THE COURT:  What about the amount that's due?  Does it

21   affect the amount that's due?

22           THE WITNESS:  The amount that's due would just reflect

23   at whatever it was at the time that it stopped, as far as the

24   total payments --

25           THE COURT:  The full contract balance of all payments?

RESIDENTIAL CAPITAL, LLC, et al.                     124

1   I don't mean that -- the full amount that was due under the

2   applicable note would then be -- that were unpaid, would be

3   due?

4          THE WITNESS:  Under the foreclosure -- if foreclosure

5   was completed, then they could call for the total unpaid

6   principal and everything.  But under this, for reinstatement,

7   it just would've been the default or delinquent payments.

8          THE COURT:  Okay.  So if this agreement, Exhibit J, is

9   cancelled, how much would the Karmazyns be obligated to pay to

10  bring their account current?

11         THE WITNESS:  To bring it current, it would've been

12  November 2008 through the day that it cancelled, which they

13  could have obtained through calling in or speaking with the

14  foreclosure attorney.  It also does look like, Your Honor, on

15  Exhibit J, under Section 3, it does provide the amount

16  necessary to cure the default as $38,782.23 as of July 29th,

17  '09.

18         THE COURT:  All right.  So as of -- if the agreement

19  was cancelled, the amount due would be the $38,782.23 plus

20  whatever any arrears in the months after?

21         THE WITNESS:  Any additional payments, yes.

22         THE COURT:  Okay.  Go ahead, Ms. Karmazyn.

23  BY MS. KARMAZYN:

24  Q.   So under Exhibit J, this wasn't cancelled, because you did

25  receive my payment on August 4th?

RESIDENTIAL CAPITAL, LLC, et al.                    125

1  A.   As of August 4th, it was not cancelled.

2  Q.   Right.  So this J means nothing because it wasn't

3  cancelled, right?

4           THE COURT:  It was cancelled later, she just --

5  A.   It was cancelled in September.

6  Q.   Right, and that's what I'm saying.  So it wasn't canceled

7  in August; it was cancelled in September?

8  A.   Correct.

9  Q.   Okay.  There's something I'd like to bring up and I'd like

10  the judge -- Your Honor, to allow me to put evidence in tonight

11  after I get it, but if you look at page 1 of 1, can you tell me

12  what the payment -- what "PT" means for $7,678.72?

13  A.   Are you talking about Exhibit C, ma'am?

14  Q.   Yeah.  What does "PT" mean under transaction type?

15  A.   One -- one moment.

16           THE COURT:  I don't see where you are.

17           MS. KARMAZYN:  On page of 1 of 1 -- 1 of 71.

18           THE COURT:  The next to the -- the second from the

19  bottom --

20           MS. KARMAZYN:  Yeah.

21           THE COURT:  -- row?

22           MS. KARMAZYN:  "Payment, $7,678.72".

23  A.   I -- I can't answer off the top of my head what that PT

24  would stand for.  I'm sorry.

25  Q.   Well, I can tell you --

RESIDENTIAL CAPITAL, LLC, et al.                    126

1          THE COURT:  No, you can't tell her.

2          MS. KARMAZYN:  I can't tell you?

3          THE COURT:  I'm not justifying that.  What are you --

4     you could suggest to her what you think it means.

5          MS. KARMAZYN:  Oh, what I -- let me tell you where I'm

6     going with this.  My husband and I are being sued for $7,389.77

7     in Arapahoe County from Roof Co. (ph.) for our new roof on the

8     house from the tornado six months prior.  GMAC never paid the

9     roofing company out of the insurance, but you've taken that

10    money and applied it as a payment, instead of paying the roof

11    company.  So I called Arapahoe County to e-mail me all the

12    documents.

13         THE COURT:  We'll see.  We'll see whether --

14    A.   Where does it -- I'm sorry.  I don't see it applying as

15    payment.

16    BY MS. KARMAZYN:

17    Q.   It says "payment".

18    A.   But the payment due date didn't advance.  It looks like

19    the money is just in the escrow account.

20    Q.   Right, but that's the exact money that we're being sued

21    from the roofing company.

22    A.   Okay.  I'm -- I'm just --

23    Q.   Okay.

24    A.   I'd want to make sure --

25    Q.   Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    127

1    A.   It doesn't show applied to payment.

2    Q.   Okay.

3    A.   It just shows it remained in the escrow account.

4    Q.   Okay.

5           THE COURT:  You're restricted to the issues that are

6    raised in the pre-trial order --

7           MS. KARMAZYN:  Oh, I know.  I didn't --

8           THE COURT:  -- Ms. Karmazyn.

9           MS. KARMAZYN:  -- see that before until I was sitting

10   there.

11          THE COURT:  Yeah.  You're restricted to what's in the

12   pre-trial order.

13   Q.   So Exhibit M --

14   A.   One second.

15   Q.   -- is September --

16   A.   Yes, ma'am?

17   Q.   This is -- from what I gather, this is where you said the

18   contract was broken.  The foreclosure went into effect because

19   of this September 24th.

20   A.   The foreclosure sale?

21   Q.   Yeah.

22   A.   It -- it happened after this date.

23   Q.   Okay.  Okay.  So I did send the 1,244.65, which everybody

24   acknowledged that we got it at some point, but it says "no

25   later than monthly".  You referred to a back page that

RESIDENTIAL CAPITAL, LLC, et al.                    128

1  should've said the dates on this one?

2  A.   It was business practice for there to be a repayment

3  schedule, but I could not locate it and I could not find an

4  image of it.

5  Q.   Yeah, and I went through all the past exhibits; there was

6  never one in there.  So is it safe to assume that I never got

7  that?

8  A.   I -- I don't think it's safe to assume that it was never

9  received.  I know that it's never been imaged and in other

10  instances, it's not usually imaged with this.  It's usually

11  just the agreement, but I --

12  Q.   Would it be signed?

13  A.   -- I can't answer for yours specifically.  What?

14  Q.   Are they usually signed?

15  A.   The repayment schedule?

16  Q.   Yeah.

17  A.   I don't believe so.

18  Q.   Okay.

19  A.   It would've just been the agreement.

20  Q.   Okay.

21        THE COURT:  But it would've been attached to the

22  letter?

23        THE WITNESS:  It would've been, like, the back page of

24  this letter.

25        THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    129

1          THE WITNESS:  It would've been -- honestly, it

2   would've looked like a screen print from the Fiserv system that

3   outlined the payments that were due.

4          THE COURT:  All right.

5   Q.   And this is just so I understand, but before, you said

6   that -- at one point, you said there were no payments in 2009.

7   Then you said I was behind nine payments, I think, in 2008-

8   2009.  But then we acknowledged you accepted a 4,000 on 3/20, a

9   2,686 on 3/19, a 2,000 on June 1st, a 1,525 dollars on August

10  4th for the amount of 10,311.  So where does that payments

11  (sic) get applied if I was behind nine months?

12  A.   The -- I don't believe I said we didn't receive payments

13  in 2009.  I -- we will --

14  Q.   Did you say I was behind nine payments in 2009?

15  A.   Yes.  The account was delinquent, but that's not because

16  we didn't receive money from you.  We didn't receive money to

17  advance the due date.

18  Q.   So --

19  A.   If you want, you can let me know where you'd like me to

20  look at.

21  Q.   Well, the 4,320.

22  A.   Okay.

23  Q.   That was a payment that you accepted.  We all agreed that

24  you received it.  So that was in March; you foreclosed in

25  October.  So March, April, May, June, July, August -- that's

RESIDENTIAL CAPITAL, LLC, et al.                    130

1  only six months, so how I can be nine months behind?

2  A.   Well, that would've been -- any money that would've been

3  applied to payments, would've been applied to the last -- the

4  most delinquent payment owing on the account.  So looking at

5  when the March 24th, 2009 payment was received, on page 3 of 71

6  in the payment history, it looks like -- I'll just start from

7  the bottom and I can see where this money went.

8      The 4,000 was received and was recorded as fulfilling the

9  payment due for -- the repayment plan payment due March 20th,

10 2009.  And then it appears that it was applied toward the

11 September 1st, 2008 payment that was outstanding on the account

12 at that point.  And the remaining $1,313.42 was applied into a

13 suspense bucket, as it wasn't enough to complete a full payment

14 at that time.

15 Q.   What's a suspense bucket?

16 A.   That's -- it's a bucket that would hold those funds until

17 there was enough to be able to -- there was enough additional

18 received to post as another payment on the account.

19      THE COURT:  You don't post partial payments, only full

20 payments?

21      THE WITNESS:  Correct, because it wouldn't advance the

22 due date if a partial came in.

23 Q.   So the payments that we did and we all agree on, the

24 10,000 dollars, that's just a loss?  It didn't apply to any of

25 my payments to the principal?

1    A.   I -- I don't believe so.  I showed that money was applied

2    to the principal, based on that column 4.  It shows your

3    principal balance goes down from -- yeah.  I mean, it showed

4    that money was applied to principal during that period of time

5    on page 2 of 71.  The bottom of the page shows it as

6    $285,709.27.  And at the top of the page -- the most recent one

7    on 2 of 71 -- shows it as $285,480.45.  So it does show that

8    there was payment posted during that period.

9    Q.   Okay.  So then I wasn't nine months behind if you posted

10   those payments?

11   A.   Well, you have to keep in mind that during this period of

12   time, additional months are accruing as every month passes.  So

13   in March, when that first payment posted for September --

14   Q.   Um-hum.

15   A.    -- 1st, 2008, the account was due for Mar -- for

16   September 1st, 2008 through March 1st, 2009.  And then since we

17   got September on that day, it would've left the account due for

18   October 1st, 2008 through March 1st, 2009, as of March 24th.

19         Then we have April that goes by and May that goes by and

20   so each time, an additional month is being added until that

21   next payment posted on August 4th, 2009.  It shows the October

22   1st, 2008 payment applied, so at that point -- prior to that

23   payment posting, the account would've been due for October 1st,

24   2008 through August 1st, 2009 payments.  Then when October

25   posted on the 4th of August, 2009 -- on page 2 -- then the

RESIDENTIAL CAPITAL, LLC, et al.                    132

1  account would've been due for November 1st, 2008 through August

2  1st, 2009.

3  Q.   Okay.

4  A.   So then we have September that comes and October that

5  comes in 2009, leaving the account due at the time of

6  foreclosure for November 1st, 2008 through October 1st, 2009

7  payments.  Does that make sense, I -- I hope.

8  Q.   It's not you; it's me.  It's not you.

9         THE COURT:  What you're telling us, when a payment is

10  received, if it's in an amount sufficient, it's applied first

11  to the oldest month for which there was an unpaid amount?

12         THE WITNESS:  Yes, sir.  And that would leave the

13  remaining payments due.

14  Q.   So if that's the case, then the modification I signed in

15  2001, really, was back paying everything and it wasn't my

16  monthly payments.  It was back paying.

17  A.   What -- what modification?

18  Q.   Those ones that we signed and was filed with the State on

19  2/1 -- I'm sorry, Exhibit D, that we paid the 4,000.  This is

20  the one with the 4,000 that we paid.  So really, this isn't a

21  modification going forward; this is just back payments.

22  A.   The modification would've just bring -- been bringing the

23  account current through the date of the effective date.  I

24  believe on this mod, it would've had the first payment due

25  March 1st, 2009 so it would've brought it current.

RESIDENTIAL CAPITAL, LLC, et al.                    133

1   Q.   I understand that, but --

2           THE COURT:  Let her --

3   Q.   -- where does that say that on the modification?

4           THE COURT:  Let her finish that.  Go ahead and explain

5   that.

6   A.   It would've brought the account current through February

7   1st, 2009 so the first payment would be due March 1st, 2009 for

8   the agreed-upon amount of -- it looks like Section 3 of Exhibit

9   D states the principal and interest payment would be 1,665.76

10  due March 1st, '09.  But yes, you're right.  It would've left

11  March 1st due.  It would've have had any effect on paying

12  forward any future payments.  You would've -- the account

13  would've been due for that payment.

14  Q.   And that's the same with the other modifications that we

15  signed, that it's always back paying and not paying forward?

16  A.   What modifications?

17  Q.   So if we go to the modification that we did in

18  September --

19  A.   Exhibit J?  No, not Exhibit J.  Exhibit --

20  Q.   The foreclosure repayment plan, so that 1,528 is actually

21  a back payment.  It's not my new monthly payment?

22  A.   That's not a modification.

23  Q.   Okay.

24  A.   That's just a -- this one -- at this point --

25          THE COURT:  Which exhibit are you looking at?

RESIDENTIAL CAPITAL, LLC, et al.                    134

1            MS. KARMAZYN:  J.

2            THE WITNESS:  This one, Your Honor, is Exhibit J that

3    I have in front of me.

4            THE COURT:  All right.

5    A.   This one, I believe, after we went through the servicing

6    notes, was the unemployment repayment plan.  There was the

7    unemployment forbearance plan, allowing payments less than

8    regular amounts be paid to allow opportunity to improve the

9    financial situation, whether that was additional income or

10   changing expenses someplace else.

11           And then I believe you're referring to Exhibit M for the

12   foreclosure repayment plan from September 24th, 2009, which

13   once again, that was -- I believe in the notes, it stated that

14   that was a new trial plan because they were waiting for a new

15   workout package to come in to review for a potential

16   modification.  And that's on page 16 of 71 in the servicing

17   notes, dated September 24th, '09, where that one is discussed.

18           So those ones have been modifications.  Those would've

19   been forbearance or a trial agreement.

20   Q.   So we can talk about October and then I'll be done.

21           MS. KARMAZYN:  Sorry, I have to go to the new packet.

22           THE COURT:  That's okay.

23   Q.   So if we go to page 15 of 71 in Exhibit M, if you would,

24   please?

25   A.   It's -- I'm sorry.  Which exhibit?

1   Q.   M --

2            THE COURT:  15 of 71 in Exhibit C, is that what this

3   is?

4            MS. KARMAZYN:  M.

5            THE COURT:  M?

6            MS. KARMAZYN:  M.

7   A.   That's the foreclosure repayment plan agreement.

8   Q.   Yeah, so this was the agreement signed on September 29th.

9   It states here that you needed to have 1,244.65 in a certified

10  check or Western Union, no later than monthly.  So you did

11  receive that money -- correct -- you're saying on 10/7, right?

12  A.   Hold on.  I'm --

13  Q.   Okay.

14  A.   -- I'm confused.  Are you --

15           THE COURT:  Looking at Exhibit M.

16  A.   All right.  So we're talking about Exhibit M, so it's page

17  15 --

18           THE COURT:  In paragraph 5 --

19           THE WITNESS:  Got it.

20           THE COURT:  She's referring to the fact that it

21  requires a payment of $1,244.65 --

22           THE WITNESS:  No later --

23           THE COURT:  -- no later than monthly.

24           THE WITNESS:  Yes, now --

25           THE COURT:  So ask your next question.

1  Q.   So when you go to page 15 of 71, line item about halfway

2  up, it says the Western Union number in the amount of 1.244.65

3  is not enough.  So are you saying I should have sent you the

4  41,000 and that would've been accepted?

5  A.   Yes.

6  Q.   Okay, because you received it on 10/7, you're saying the

7  contract was broken?

8  A.   Based on the notes on page 15, below this --

9  Q.   Um-hum.

10 A.   -- there's the DM note that says, "repay plan cancelled

11 manually".

12 Q.   What does that mean?

13 A.   The repay -- that means that that trial agreement was no

14 longer active --

15 Q.   Okay.

16 A.   -- as of the beginning of -- or as of that time.  And

17 above, it says, "borrower refuses to contribute; buyer" --

18 excuse me, "borrower did not call back with confirmation number

19 of payment.  Property will go to sale."  And then it shows that

20 money coming in and being refused, not -- for not being enough

21 to reinstate, which would've -- at that point, the plan's not

22 active so it would've been referring to the total amount due on

23 the account at that time, not the --

24 Q.   Okay.

25 A.   -- arrangement agreement.

1  Q.   Okay.  So where on this agreement did you have to have it

2  by the 5th?  It says "monthly".

3  A.   I believe --

4  Q.   What does "monthly" mean?

5  A.   I -- I agree that right here in Section 5, it doesn't give

6  you a date --

7  Q.   Okay.  So --

8  A.   -- which is why I stated, usually there would be that

9  repayment plan schedule on the back page.  But I -- I totally

10  agree that in the document, it doesn't give you a date.

11  Q.   Okay.  So but you do acknowledge that I sent in a

12  certified check for the amount 1,244.65, which was on this

13  plan?

14  A.   Yes, ma'am, I do.

15  Q.   Okay.

16            THE COURT:  Who is R. Kesha Johnson (ph.)?  I'm back

17  on page 16 of 71 --

18            THE WITNESS:  Um --

19            THE COURT:  -- for September 24th, 2009 entries.

20            THE WITNESS:  She would've been an associate.  I

21  couldn't tell you her location or anything.

22      (Pause)

23            THE COURT:  I have another question for you.

24            THE WITNESS:  Yes, sir?

25            THE COURT:  In Exhibit M, it indicates the amount of

1    the payment was to be $1,244.65.

2             THE WITNESS:  Yes, sir.

3             THE COURT:  When I look at page 16 of 71 of the

4    servicing notes for those September 24th entries that I was

5    referring to --

6             THE WITNESS:  Yes, sir.

7             THE COURT:  Could you read it again?  I mean, there's

8    a 1,530-dollar number there showing October 5, 2009.  It

9    doesn't correspond to the amount that Exhibit M --

10            THE WITNESS:  Yeah, I totally agree.  It doesn't

11   match.

12            THE COURT:  So we -- and I think I had you do this

13   before, but read that September 24th entry into the record.

14            THE WITNESS:  Definitely.  It says, "Talked to

15   borrower 2, verified all income, late charges, credit,

16   foreclosure sale on October 7th, 2009.  Borrower states not

17   sure why last payment completed didn't work.  Advised payment

18   returned in the complete financial package, updated DTI set up,

19   trial for 1,530, October 5th, 2009.  Advised of Website to

20   obtain workout package."

21            And then below, it shows the -- the forbearance and

22   trial being set up and it actually shows below that the special

23   forbearance was set up 1,244.65.

24            THE COURT:  Where is that?

25            THE WITNESS:  The very last line has the SFPW note

RESIDENTIAL CAPITAL, LLC, et al.                           139

1  next to it on September 24th, 2009.

2            THE COURT:  Okay.

3            THE WITNESS:  So it looks like they advised her for

4  1,530, but then they actually ended up setting up for a lower

5  payment.

6            THE COURT:  What's the reference to online repayment

7  schedule?

8            THE WITNESS:  That would've been the repayment plan

9  schedule and the agreement being generated that was mailed to

10  Ms. and Mr. Karmazyn.

11            THE COURT:  What does it mean "online repayment

12  schedule"?

13            THE WITNESS:  It's kind of -- that's just what it was

14  internally referred to, because it was all housed through the -

15  - the Fiserv system.  I really can't give you an answer beyond

16  that.  It's just --

17            THE COURT:  Is that the schedule that you say should

18  have been attached to Exhibit M?

19            THE WITNESS:  Yes.

20            THE COURT:  Go ahead, Ms. Karmazyn.

21  BY MS. KARMAZYN:

22  Q.   I just have one more and I don't mean to harp on this, but

23  on page 1 of 71, when it says "payment", you don't know the PT

24  description is transmitted -- transaction type?

25  A.   No, not off the top of my head.  I don't.

1   Q.   Is that possible it could have been a payment of mine?

2   A.   What -- what do you mean?

3   Q.   Is it possible my husband made a payment of 7,678 dollars

4   and I don't know it because it says "payment".

5   A.   I don't believe so, but give me -- because it looks like

6   right below --

7           THE COURT:  Um-hum.

8   A.   -- the positive, there's a negative, and it shows money

9   kind of moving around.  So I -- I'll be honest, I didn't

10  research all of this to really be able to give you any kind of

11  definitive --

12          THE COURT:  Okay, well it --

13  A.   -- answer, but I don't believe it shows --

14          THE COURT:  The last two entries on the page, one

15  seems to reverse the other.

16          MS. KARMAZYN:  Yeah, but Your Honor, if you go to page

17  2 of 71 --

18          THE COURT:  Yes.

19          MS. KARMAZYN:  -- and you go ten up, the same amount's

20  there under a payment -- two payments.

21          THE COURT:  Which page are you looking at?

22          MS. KARMAZYN:  2 of 71.

23          THE COURT:  Yes.

24          MS. KARMAZYN:  The same payments are there for

25  the -- September, so one is a payment SR $7,389.77.  One is an

1   unapplied UFL.

2   Q.  My question is, again, did my husband make a payment that

3   we're unaware -- unaware of?

4   A.  I can tell you that UFL stands for unapplied funds loss,

5   which would have been from a cl -- an insurance claimant --

6   Q.  Um-hum.

7   A.  -- an insurance claim payment, excuse me, coming in and

8   being applied to the account.  So that would have been money

9   coming in from an insurance check or something, I'm sure.  But

10  once again, I -- I didn't research this completely, so I'd have

11  to go back through notes and everything to confirm that.

12  Q.  When your statement says "payment", is that usually just a

13  customer making a payment, or could there be other payments --

14  A.  It would --

15  Q.  -- in the statement?

16  A.  It would -- it could be something else.

17  Q.  It could?

18  A.  It could be other funds coming in or positive funds moving

19  around, not always a monthly --

20  Q.  It doesn't mean --

21  A.  -- payment.

22  Q.  -- always mean a customer's payment?

23  A.  Correct.

24  Q.  It could be something else?  Okay.

25          MS. KARMAZYN:  That's all I have, Your Honor.

 1              THE COURT:  Okay.

 2              Mr. Wishnew?

 3              MR. WISHNEW:  Your Honor, I have no questions for Ms.

 4   Lathrop.

 5              THE COURT:  All right, you're excused, Ms. Lathrop.

 6              THE WITNESS:  Thank you.

 7              THE COURT:  Mr. Wishnew, do you rest?

 8              MR. WISHNEW:  We rest, Your Honor.

 9              THE COURT:  Ms. Karmazyn, do you wish to have more

10   time to review that Exhibit C, the unredacted copy?

11              MS. KARMAZYN:  What I'd like is --

12              THE COURT:  I'm more than happy to give you the time.

13   I --

14              MS. KARMAZYN:  I do.  I'd like to have a new book to

15   compare both books.

16              THE COURT:  Well, I don't know about a new book,

17   but --

18              MS. KARMAZYN:  Well --

19              THE COURT:  -- yeah, I think --

20              MS. KARMAZYN:  Well, I can't -- if one's different,

21   how do I know other things aren't different?

22              THE COURT:  well, you have -- you have what they gave

23   you before, and they gave you the unredacted one today, didn't

24   he?

25              MS. KARMAZYN:  He took it back.

RESIDENTIAL CAPITAL, LLC, et al.                    143

 1            THE COURT:  Oh, give it back.

 2            MR. WISHNEW:  It's some of what it said, Your Honor.

 3            THE COURT:  Okay, we'll get it back to you.

 4            Stay there.

 5            MS. KARMAZYN:  Okay.

 6            THE COURT:  Mr. Wishnew -- go ahead, Mr. Wishnew, and

 7    get it.

 8            I'm going to give you the time you want to look at it.

 9    I'm --

10            MS. KARMAZYN:  Okay.

11            THE COURT:  Let's do this:  let's take a half-hour

12    recess.  Start to review it.  If you want until tomorrow, I'm

13    going to give you until tomorrow.  Okay, I want to make

14    clear --

15            MS. KARMAZYN:  I don't need until tomorrow.  Just give

16    me a half-hour, I'll be fine.

17            THE COURT:  So take the half-hour.  See if you want to

18    ask more questions of the witness about it.  We'll do it.  If

19    you decide you need overnight, you'll get overnight.  Okay?

20            MS. KARMAZYN:  Okay, so you decided to allow this as

21    evidence?

22            THE COURT:  I didn't decide yet.

23            MS. KARMAZYN:  Okay.

24            THE COURT:  I want --

25            MS. KARMAZYN:  I was just wondering.

1          THE COURT:  I wasn't going to decide whether to admit

2     until you've had a chance to review --

3          MS. KARMAZYN:  Okay.

4          THE COURT:  -- what was blacked out in your copy.

5     Okay?

6          MS. KARMAZYN:  Thank you.

7          THE COURT:  So we'll recess until 2:30.  I'll come

8     back on the bench.  If you -- if at that point, you believe you

9     need more time, I'll give you overnight.

10         MS. KARMAZYN:  Okay.

11         THE COURT:  Okay?

12         MS. KARMAZYN:  Thank you.

13         THE COURT:  I'm going to give you what time you think

14    you need to review it, okay?

15         MS. KARMAZYN:  Thank you.

16         THE COURT:  All right.  We're in recess.

17       (Recess from 1:57 p.m. until 2:32 p.m.)

18         THE COURT:  All right, please be seated.

19         Ms. Karmazyn, do you wish to further examine Ms.

20    Lathrop on the --

21         MS. KARMAZYN:  Yes, I do.  I --

22         THE COURT:  Okay.

23         MS. KARMAZYN:  I'd like to go over two more pages.

24         THE COURT:  Okay.

25         Okay, Ms. Lathrop, why don't you come on back up?

1            MS. KARMAZYN:  I'm sorry.

2            THE WITNESS:  No, that's fine.

3            MS. KARMAZYN:  Do you want this book back?

4            THE WITNESS:  Yeah, I don't think there's one.  Thank

5    you.

6            MS. KARMAZYN:  Thank you.

7            THE COURT:  You're still under oath, Ms. Lathrop.

8            THE WITNESS:  Yes.

9    RESUMED CROSS-EXAMINATION

10   BY MS. KARMAZYN:

11   Q.  I'd like to go to Exhibit C, page 12 of 71 and 13 of 71?

12            THE COURT:  Sure.

13   Q.  I'm glad I took the time, because this part, I think,

14   will --

15   A.  Okay.

16   Q.  -- show more evidence that they received the October

17   payment.  Can you go from -- on page 13, four down, and start

18   reading up and explain this conversation that I had with GMAC?

19   A.  Where on page 13?

20   Q.  So we'll start on -- go five down from page -- on page 13,

21   that says "MERS notified of foreclosure complete".

22   A.  Okay.

23   Q.  So MERS is GMAC?

24            THE COURT:  No.

25   A.  No.

1  Q.  No?

2  A.  That's the Mortgage --

3  Q.  So MERS had my --

4          THE COURT:  Let --

5  A.  -- Electronic Rec --

6          THE COURT:  Let her explain to you, okay?

7          MS. KARMAZYN:  Okay.

8  A.  It's Mor -- Mortgage Electronic Recording Services.

9  It -- it's a third party who helped in the recording of

10 mortgages.  It wasn't GMAC.

11 Q.  Okay.  So could we go up -- one, two, three, four, five --

12          THE COURT:  What is MFC?

13          THE WITNESS:  I -- I honestly --

14          THE COURT:  You don't know?

15          THE WITNESS:  -- don't know.

16          THE COURT:  Okay.

17 Q.  One, two, three, four, five six, seven.  Can we go to page

18 12 of 71, and go up about ten, where it says:  thanks on 10-9

19 CIT?

20 A.  Yes.

21 Q.  And then it says:  my note teller.  If you go up, it

22 says -- four up, it says, "Well, I have supervisor to FU".

23 What does "FU" mean?

24 A.  Follow up.

25 Q.  Follow up advance?

RESIDENTIAL CAPITAL, LLC, et al.                    147

1    A.  Advise to allow twenty-four to forty-eight hours.

2    Q.  Okay, Waterloo.  So there's my UPS tracking number.  And

3    then it says:  were signed for on 10/2 at 9:23 by Mo N. (ph.).

4    So I can assume that's GMAC signing for my --

5    A.  For the UPS.

6    Q.  -- UPS tracking number?

7    A.  I -- I believe that's what --

8    Q.  Okay.

9    A.  -- that would be referring to.

10   Q.  Right.  As it -- and this is the exact conversation I had

11   with them that we all agreed on until now.  And then it says:

12   and bor only sent one --

13           THE COURT:  Time --

14   Q.  -- thousand --

15           THE COURT:  Time out.  Sorry.  Stop for a second.

16           What's Waterloo?

17           THE WITNESS:  Waterloo is -- Waterloo is actually the

18   office I work in.  It's located in Iowa.

19           THE COURT:  Okay.

20           Go ahead, Ms. Karmazyn.

21   Q.  Was signed for on 10/2 at 9:23 by Mo N.  And it says:  and

22   the borrower only sent $1,244.65.

23   A.  Hold on.

24   Q.  Is that correct?

25   A.  Give me one second, just to start from the -- I just --

1  Q.  Okay.

2  A.  -- want to start at the top of the conversation to make

3  sure I totally understand.

4          THE COURT:  Where does this -- top of the

5  conversation?

6          THE WITNESS:  It looks like where it says:  Shenetra

7  Culpepper (ph.) on line --

8          THE COURT:  Yeah.

9          THE WITNESS:  -- the very top one, where it says:

10  talked to V --

11          THE COURT:  Why don't you read the whole thing?

12          THE WITNESS:  Okay.  So talked to borrower, verified

13  all information.  She states third party came to home today and

14  advised they had purchased the home in foreclosure sale.

15  Advised borrower that the home was sold on October 7th due to

16  the funds not being received on time.  They were short.  The

17  down payment was 1,530, and borrower only sent $1,422.65.

18  Q.  Can we go back?

19  A.  She --

20  Q.  Because you skipped a couple lines.  Can you start again --

21  A.  What --

22  Q.  -- at:  were signed for on 10/2, 9:23 by Mo, and go up?

23          THE COURT:  That's what --

24  A.  That's --

25          THE COURT:  -- she did.

RESIDENTIAL CAPITAL, LLC, et al.                    149

1    A.  I'm starting at the --

2    Q.  I'm sorry.

3    A.  -- top of the conversation and coming down.

4    Q.  Oh, okay.  I'm sorry.

5           THE COURT:  You --

6    A.  So we're --

7           THE COURT:  You see where it says --

8    Q.  Okay, go ahead.

9    A.  -- getting there.

10          THE COURT:  The first line was Shenetra Culpepper.

11          THE WITNESS:  Well, it says:  talk -- T-T-B-O-R-R-B-A-

12   I.

13   Q.  Okay.

14   A.  That's where I'm --

15   Q.  I'm sorry.

16   A.  -- starting at.

17   Q.  Okay.

18   A.  And then it says:  and borrower only sent $1,244.65.  I

19   don't know what the O/N stands for, to be honest.  She

20   something funds, and they were signed for on 10/2 at 9:23 a.m.

21   by Mo in Waterloo UPS tracking.  And then it provides the

22   number.  Advise while supervisor follow up.

23          THE COURT:  Do you know who Mo is?

24          THE WITNESS:  I don't know who Mo is.  I honestly

25   don't remember a Mo that worked at that front desk.

1          THE COURT:  Okay.

2    A.  But that's that conversation.

3    Q.  Okay, so --

4    A.  Did you --

5    Q.  -- they are saying they received my payment on 10/02 at

6    9:4- -- :23 a.m. for the amount of $1,244.65?

7    A.  I don't know if they're saying that they received the

8    payment.  They're saying that they received a UPS tracking, and

9    that it was signed for.  And then, above, it says that -- I

10   don't understand what the -- I wish I knew what that O/N stood

11   for.  She O/N funds and they were signed for on this date.  So

12   I don't know if this is referring to --

13         THE COURT:  Well, it says borrower only sent

14   $1,244.65.  How would they know that if they didn't open up

15   the --

16         MS. KARMAZYN:  Right.

17         THE COURT:  -- envelope and see that's what was sent?

18         THE WITNESS:  I -- I agree.  But this is also post the

19   payment being returned on 10/7, so I don't --

20   Q.  So if we go back to Exhibit --

21         THE COURT:  You don't even have to go back in the

22   Exhibit.

23         MS. KARMAZYN:  Okay.

24         THE COURT:  Look at -- look at page 16 of 71.

25         THE WITNESS:  16?

1          MS. KARMAZYN:  No, I don't --

2          THE WITNESS:  Where it says the 1,530?

3          THE COURT:  For 9/24/2009.  You've already read this

4    entry into the record about a telephone conversation --

5          THE WITNESS:  Yes.

6          THE COURT:  -- with Ms. Karmazyn, and it has the

7    reference to 1,530 dollars in it.  I think you acknowledged

8    that that wasn't the amount that a --

9          THE WITNESS:  Yes.

10          THE COURT:  -- the plan was set up for.  It was set up

11    for $1,244.65.

12          THE WITNESS:  Yes.

13          THE COURT:  So I'm -- you can understand why

14    I'm -- when I look at what you've read on page 12 that refers

15    to receiving $1,244.65 on October 2nd, but they -- what it

16    says, that they were short the down payment of 1,530, that's

17    just wrong, isn't it?

18          THE WITNESS:  I -- I agree.  It -- the --

19          THE COURT:  It's wrong?

20          THE WITNESS:  It should --

21          THE COURT:  You agree?

22          THE WITNESS:  I agree that they referred to the wrong

23    payment amount; that they shouldn't have referred to it as

24    1,530.

25          THE COURT:  Go ahead.  Go ahead, Ms. Karmazyn.

RESIDENTIAL CAPITAL, LLC, et al.                              152

1   BY MS. KARMAZYN:

2   Q.  Okay, so my numbers aren't page -- my pages aren't

3   numbered, so I've got to go update -- look again.  So we go

4   back to 12 of 71.  We've already gone through that.  You

5   received my payment on 10/2 at 9:23 a.m. for $1,244.65, exactly

6   what the agreement was on exhibit --

7            MR. WISHNEW:  Objection, Your Honor.  I don't believe

8   that the testimony of Ms. Lathrop was that the borrowers

9   received it on 10/2, it's what the notations talk about a

10  reference to --

11           THE COURT:  Whoa.  Whoa, wait a second.  Come on, Mr.

12  Wishnew.  It says it was signed for on 10/2.

13           MR. WISHNEW:  Right, but Your Honor, I don't

14  know -- and I'd like to ask Ms. Lathrop this

15  question -- whether this was Ms. Culpepper taking notes of what

16  Ms. Karmazyn was telling her on that date, or if that was --

17           THE COURT:  Okay.

18           MR. WISHNEW:  -- signed --

19           THE COURT:  Well, let's --

20           MR. WISHNEW:  And I'd like to look --

21           THE COURT:  Let's look -- let's look through

22  the -- you can do redirect.

23           MS. KARMAZYN:  How would I know who Mo was?  How would

24  I be able to tell the trust -- or GMAC that Mo, your employee,

25  signed for my package?  And this is the first time that we've

RESIDENTIAL CAPITAL, LLC, et al.                    153

1    ever been able to get the UPS tracking number.  This --

2            THE COURT:  Can --

3            MS. KARMAZYN:  This page --

4            THE COURT:  Can I ask something, Ms. Karmazyn?  Was

5    that blacked out on the copy you were given?

6            MS. KARMAZYN:  No, it was not.

7            THE COURT:  Okay.  All right.

8            THE WITNESS:  I believe if you were to look up the UPS

9    tracking number, it would provide who signed for it and when it

10   was signed for.

11           MS. KARMAZYN:  Absolutely.  But I didn't --

12           THE WITNESS:  But other than that --

13           MS. KARMAZYN:  -- put that into evidence because we

14   didn't have it at the time.  So can I do that now?

15           THE COURT:  Do you have it?

16           MS. KARMAZYN:  I'll call UPS and get it.

17           THE COURT:  No, you can't do that now.

18           MS. KARMAZYN:  It's the first time we've had the

19   tracking number.

20           THE WITNESS:  I -- if I may, Your Honor?  I did --

21           THE COURT:  Go ahead.

22           THE WITNESS:  -- try to actually look up the

23   tracking --

24           THE COURT:  Yes.

25           THE WITNESS:  -- number during research, and I

RESIDENTIAL CAPITAL, LLC, et al.                    154

1    couldn't pull anything through UPS.

2              THE COURT:  Okay.  All right.

3              THE WITNESS:  Because I wanted to confirm if we could

4    see when it came in, and we weren't able to pull the

5    information through them.  But --

6              THE COURT:  All right, I'll draw my own conclusions

7    from the entry.  I don't think -- well, let's go on.

8              Go ahead, Ms. Karmazyn.

9    BY MS. KARMAZYN:

10   Q.  So I mean, the last thing I have, if you go back to Exhibit

11   M that we've all talked about, the $1,244.65 is due no later

12   than monthly.  I go back to this information from you -- the

13   evidence from the trust, and it shows -- I think it shows --

14             THE COURT:  Well, don't make your argument.  I

15   understand your argument.

16             MS. KARMAZYN:  Okay.

17             THE COURT:  You can ask questions.

18             MS. KARMAZYN:  Then I'm done.

19             THE COURT:  Okay.

20             MS. KARMAZYN:  I'm done.

21             THE COURT:  All right.

22             Mr. Wishnew?

23             MR. WISHNEW:  Thank you, Your Honor.  So I have just a

24   few questions.  Jordan Wishnew, Morrison & Foerster for the

25   ResCap Borrower Claims Trust.

RESIDENTIAL CAPITAL, LLC, et al.                    155

1   REDIRECT EXAMINATION

2   BY MR. WISHNEW:

3   Q.  Ms. Lathrop, just a few questions concerning Exhibit C,

4   pages 12 of 71, and the same entry we're talking about,

5   Shanetra Culpepper on October 9th of 2009.  Starting with the

6   first line of Ms. Culpepper's entry:  T-T BORROWER B-A-I, is

7   this an inbound call from the borrower to the debtors?

8   A.  I don't know.

9   Q.  Okay.  Based upon your review of this entry, is it -- does

10  it appear Ms. Culpepper is recording what she's being told by

11  the borrower?

12  A.  What do you mean?

13  Q.  So -- I'll go directly to the point.  The argument -- or

14  the statement --

15          THE COURT:  Mr. Wishnew, I hate to interrupt you, but

16  it says:  advised borrower the home was sold on 10/7.  That

17  couldn't be what --

18          MR. WISHNEW:  No, I --

19          THE COURT:  -- Ms. Karmazyn said.

20          MR. WISHNEW:  No, I recognize that, and I should have

21  been more clear in my -- in my question.  So I'm going to a

22  specific portion of Ms. Culpepper's entry.

23  Q.  Where it says:  and borrower only sent $1,244.65.  She O/N

24  funds, and they were signed for on 10/2 at 9:3- -- 9:23 by Mo

25  in Waterloo, and then the U.S. -- UPS tracking number follows.

RESIDENTIAL CAPITAL, LLC, et al.                    156

1   Based on your review of this entry, does that appear to be

2   information that Ms. Culpepper is taking down based on what Ms.

3   Karmazyn is telling her at that point in time?

4            THE COURT:  Don't speculate.

5            THE WITNESS:  I'm trying to just --

6            THE COURT:  It's a --

7            THE WITNESS:  I mean --

8            THE COURT:  -- leading question, and it calls for

9   speculation, Mr. Wishnew.

10            THE WITNESS:  I mean, reading it, it just says that

11   the supervisor is going to follow up.  For me, if I was an

12   associate, I can tell you how I would have -- how I would read

13   it based on the notes, but I don't know if you --

14            THE COURT:  Tell me how --

15            THE WITNESS:  -- want me to do that.

16            THE COURT:  -- you would read it.

17            THE WITNESS:  Based on, if I were the associate who

18   had taken this phone call, I would read it as providing

19   information to my supervisor to follow up.  But that's just

20   because it's --

21            THE COURT:  That was your practice?

22            THE WITNESS:  -- very specific.

23            THE COURT:  Yeah.

24            THE WITNESS:  And it's very -- the fact that it refers

25   to "she said" -- she was -- I really wish I knew what that O/N

 1   stood for -- but the funds, and they were signed for on this

 2   date at this time by this person in Waterloo, and here's the

 3   tracking number.  To me, this really shows that I'm taking down

 4   information as the associate to get to my supervisor and say

 5   maybe we need to pull back this foreclosure.  But I'm not the

 6   associate, so.

 7   BY MR. WISHNEW:

 8   Q.  Right, but based upon your experience, did the -- Ms.

 9   Culpepper had to essentially verify the information she was

10   being told with her supervisor?  She was not specifically

11   acknowledging --

12   A.  She was --

13   Q.  Okay.

14   A.  Based on how I'm reading it, no, they weren't agreeing --

15   Q.  Okay.

16   A.  -- to it.  I assume that's what you're trying to say --

17           THE COURT:  Wait a second.  Ms. --

18   A.  -- was said.

19           THE COURT:  Ms. Lathrop --

20           THE WITNESS:  I apologize.

21           THE COURT:  Maybe I misunderstood you, then.

22           THE WITNESS:  I still see my notes.

23           THE COURT:  What is the "she O/N funds and they were

24   signed for on 10/2 at 9:23 by Mo"?  How do you read that?

25           THE WITNESS:  I -- I have no clue what the O/N stands

1    for.  She -- I really wish I knew what it was -- funds --

2              THE COURT:  Okay.

3              THE WITNESS:  -- and they were signed for on this

4    date.  That's why I said all I can really say is if I were the

5    one taking the notes, I would read it as being writing down

6    information from my customer, and then sending it on to my

7    supervisor for them to research to see if the foreclosure

8    should be --

9              THE COURT:  Is there any indication in the servicing

10   notes that a supervisor reviewed whether foreclosure should be

11   reversed?

12             THE WITNESS:  Let me see.  I show a CIT at 963 right

13   below these notes from Shantra Culpepper that states:  please

14   follow regarding -- follow in R-E -- in review to foreclosure

15   sale on 10/7.  See my note.

16             And it provides all of that.  Let me see if there's a

17   follow-up to that CIT.  015.  It looks like, on page 11 of

18   71 --

19             THE COURT:  Actually, one of my law clerks suggests

20   that the O/N is "overnight".

21             THE WITNESS:  Oh, that would make sense.

22             THE COURT:  It came by UPS, right?

23             THE WITNESS:  Yeah, that would totally make sense.

24             THE COURT:  So --

25             MR. WISHNEW:  So to --

1          THE WITNESS:  She overnighted funds and they were

2  signed for.  That would make sense.

3  BY MR. WISHNEW:

4  Q.  But to clarify again, this was Ms. Culpepper --

5          THE COURT:  You don't know who -- well, you don't know

6  whether Ms. Culpepper was reporting what Ms. Karmazyn said or

7  whether she learned that a check for $1,244.65 was signed for

8  in Waterloo on October 2nd at 9:23.  You just don't know.

9          THE WITNESS:  No, looking at it -- I mean, let me just

10 read it one more time to -- she overnight funds and they were

11 signed for on -- I mean, like I said, to me, if I were the

12 associate, I would read it as I was taking information.

13         THE COURT:  Would --

14         THE WITNESS:  But --

15         THE COURT:  Would it matter to you if a borrower told

16 you that she had overnighted the funds and they were signed for

17 in Waterloo on October 2nd?

18         THE WITNESS:  It would matter to me because the

19 account had gone to foreclosure, so I would --

20         THE COURT:  Okay.

21         THE WITNESS:  -- want to get this to someone to

22 review.

23         THE COURT:  And do the notes reflect that it was

24 reviewed?

25         THE WITNESS:  That's where I was trying to -- to go

1    further on, to see if, by chance, there was a notation of

2    review or not.  Which, on page 11 of 71 --

3              THE COURT:  Yes.

4              THE WITNESS:  About seven lines from the bottom of the

5    page, there's a CIT note, 05 --

6              THE COURT:  Um-hum.

7              THE WITNESS:  -- that 01 -- I'm sorry, 015, which

8    matches the CIT 963 that was opened.  It says:  attempted to

9    contact borrower on all numbers listed.  No answer on either

10   number.  Closing CIT.  It -- but it doesn't show me what the

11   findings were.  So that shows just the roundabout of the --

12             THE COURT:  Could you go up to the 10/13/2009, the DM?

13   What is that entry?

14             THE WITNESS:  From Sholanda (ph.)?

15             THE COURT:  Yeah --

16             THE WITNESS:  Or from --

17             THE COURT:  Yes.

18             THE WITNESS:  -- in --okay.

19             THE COURT:  Yes.

20             THE WITNESS:  Okay.  The conversation says:  talked to

21   borrower to verify all information.  Foreclosure sale date.

22   Property was sold.  Transferred customer to customer care as

23   she called to request a copy of statements from January through

24   current.

25             THE COURT:  Okay.

1       THE WITNESS:  So they were providing a payment

2   history, it looks like, which the above note shows Randolph

3   (ph.) providing the payment history.  It says enhanced history

4   letter faxed on the 13th, right above that.

5       THE COURT:  Okay.  Anything else?

6       THE WITNESS:  I didn't know --

7       THE COURT:  Okay.

8       Mr. Wishnew, go ahead.

9       MR. WISHNEW:  No other questions, Your Honor.

10      THE COURT:  Okay.  Thanks.

11      THE WITNESS:  It's confusing.

12      THE COURT:  It is.

13      I would just note for the record I actually checked in

14  October 2 -- well, October 3 -- October 2 is Friday, right?

15      UNIDENTIFIED SPEAKER:  Let me just look at this

16  calendar, here.

17      THE COURT:  Octob -- October 2, 2009 was a Friday.

18  October 3, 4, were Saturday, Sunday.  October 5 is Monday.  The

19  foreclosure was on Wednesday that week.  All right.

20      Do you rest, Mr. Wishnew?

21      MR. WISHNEW:  Yes, Your Honor.

22      THE COURT:  Okay.  Ms. Karmazyn, do you wish make

23  that -- a closing statement?

24      MS. KARMAZYN:  No, Judge.

25      THE COURT:  Mr. Wishnew?

RESIDENTIAL CAPITAL, LLC, et al.                    162

1              MR. WISHNEW:  Very briefly, Your Honor.

2              THE COURT:  Go ahead.

3              MR. WISHNEW:  Your Honor, the evidence introduced

4    today demonstrates that the debtors made numerous efforts

5    throughout 2009 to assist the claimants with their

6    delinquencies, and when payments were not accepted, they were

7    promptly returned to the borrowers.  The evidence further

8    demonstrates the claimants were told by the debtors of the

9    October 5th deadline under the September plan.  And in the pre-

10   trial order, the claimants stipulated to this fact, as

11   well -- stipulated contention number 30.

12             Moreover, as a result of the claimant's failure to

13   timely respond to the trust's request for admissions, the

14   claimant acknowledged the debtors received the payments on

15   October 7th.  The uncontested evidence also shows that notice

16   was properly provided to the claimants of the foreclosure sale,

17   and Ms. Lathrop's testimony demonstrates that payments were

18   accepted by the debtors -- sorry, that those payments that were

19   accepted by the debtors were properly applied toward the

20   account.

21             If the debtors were accep -- were responsible to the

22   claimants for damages, there's no evidence to show that

23   medical-related damages were foreseeable at the time of the

24   alleged breach or caused by the breach.

25             In addition, the evidence further demonstrates the

1    value of the property at the time of the foreclosure sale was

2    less than the loan balance at that time.  Most importantly,

3    other than the appraisal, whose relevance is questionable, no

4    evidence has been proffered to substantiate and quantify the

5    claimant's damages.

6            Therefore the Borrower Trust would ask that the

7    claim -- the claims be expunged and disallowed.

8            THE COURT:  Okay.  I'm going to take it under

9    submission.  Okay.  Taking it under submission.  Okay, we're

10   adjourned.

11           MR. WISHNEW:  Thank you, Your Honor.

12       (Whereupon these proceedings were concluded at 2:54 PM)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          I N D E X

3

4   WITNESS                EXAMINATION BY        PAGE

5   Kristin Karmazyn    (by proffer)         8

6   Kristin Karmazyn    Mr. Wishnew          57

7   Sara Lathrop        Mr. Wishnew          60

8   Sara Lathrop        Ms. Karmazyn        115

9   Sara Lathrop        Mr. Wishnew         155

10

11                          EXHIBITS

12  CLAIMANT'S           DESCRIPTION         I.D.     Evid.

13  9                    2015 appraisal      49       56

14  TRUST'S

15  A, B, D to R    Various documents             55

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T I O N

3

4   I, Sharona Shapiro, certify that the foregoing transcript is a

5   true and accurate record of the proceedings.

6

7

8

9

10  _____

11  SHARONA SHAPIRO

12  AAERT Certified Electronic Transcriber CET**D 492

13

14  eScribers

15  700 West 192nd Street, Suite #607

16  New York, NY 10040

17

18  Date:  March 2, 2016

19

20

21

22

23

24

25