1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 12-12020-mg

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              March 23, 2016

19              4:03 PM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

1

2    Telephone Conference, on the Record, Regarding Discovery

3    Dispute

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Aliza Chodoff

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

1

2  A P P E A R A N C E S :  (TELEPHONIC)

3  QUINN EMANUEL URQUHART & SULLIVAN, LLP

4         Attorneys for Residential Funding Company, LLC

5         51 Madison Avenue

6         22nd Floor

7         New York, NY 10010

8

9  BY:   JOHN P. SULLIVAN, ESQ.

10         ISAAC NESSER, ESQ.

11

12

13  BUCKLEYSANDLER LLP

14         Attorneys for PNC Bank, N.A.

15         100 Wilshire Boulevard

16         Suite 1000

17         Santa Monica, CA 90401

18

19  BY:   FREDRICK S. LEVIN, ESQ.

20         MICHAEL A. ROME, ESQ.

21

22

23

24

25

1

2 PATTERSON BELKNAP WEBB & TYLER LLP

3        Attorneys for MBIA Insurance Corp.

4        1133 Avenue of the Americas

5        New York, NY 10036

6

7 BY:   MICHELLE W. COHEN, ESQ.

8        STEPHANIE TEPLIN, ESQ.

9

10

11 WILLIAMS & CONNOLLY LLP

12        Attorneys for HSBC Mortgage Corporation (USA)

13        725 Twelfth Street, N.W.

14        Washington, DC 20005

15

16 BY:   MATTHEW V. JOHNSON, ESQ.

17

18

19 ALSO PRESENT:

20        JONATHAN HARRIS, ESQ., Deputy General Counsel,

21          MBIA Insurance Corp.

22

23

24

25

1               P R O C E E D I N G S

2         THE COURT:  All right, this is Judge Glenn.  We're

3    here in the Residential Capital.  The main case in this court

4    is 12-12020.

5         We're here in connection with a miscellaneous matter

6    that was filed in the District Court for the Southern District

7    of New York.  The number there was 16-mc-00063.  Pursuant to

8    the stipulation and order dated March 11th, 2016, Judge Batts

9    transferred the miscellaneous matter to this Court.  And I will

10   go into the terms.  Her order has her other provisions.

11        I gather this is a discovery dispute between some of

12   the defendants in the actions pending in Minnesota District

13   Court seeking to enforce a subpoena duces tecum to MBIA

14   Insurance Corp., the subpoena, I guess, issued in the Southern

15   District of New York, and enforcement is sought of the

16   subpoena.

17        After logging on to the District Court ECF system, I

18   read the memorandum of law in support of defendant's motion to

19   compel compliance with third party subpoena issued to MBIA

20   Insurance Corp.  I also read the letters filed with this court

21   by Quinn Emanuel and the second letter -- that was, I guess,

22   dated today, March 23rd, 2016.  And recently, I received and

23   read the letter filed by Fredrick Levin relating to the motion.

24        I have the list of appearances in front of me.  Who's

25   going to argue for the moving parties?

1          MR. LEVIN:  I believe Mr. Johnson has a few words of

2   introduction, and then -- this is Mr. Levin -- I will carry the

3   main part of the argument.

4          THE COURT:  Okay.

5          MR. JOHNSON:  Good afternoon, Your Honor.  It's Matt

6   Johnson, and I don't have really any comments other than to

7   simply introduce Mr. Levin.  And I'm solely on the line not for

8   substantive purposes, but just for the sake of continuity given

9   the plaintiffs have appeared in front of Your Honor, as have I.

10  But I don't think Mr. Levin has in the past.

11         THE COURT:  Okay, thanks a lot.

12         Go ahead, Mr. Levin.

13         MR. LEVIN:  Yeah, thank you, Your Honor.  There are

14  really two issues presented by our motion to compel.  One is

15  the production of MBIA's examiner submissions, and the second

16  is the production of certain e-mails that were the product of

17  some string searches run over the accounts of three MBIA

18  custodians.  I'm going to address each in turn.

19         First off, both issues have been subject of extensive

20  meet-and-confer discussions over a very long period of time

21  with MBIA in which we attempted to resolve both of these

22  issues.  With respect to the examiner submissions of MBIA, as

23  to MBIA, I believe we have reached a stipulation with agreement

24  on language of the stipulation, the gist of which is that MBIA

25  will not oppose production of its examiner submissions subject

1    to an appropriate order from this Court.

2              So the real issue there is the objections of RFC and

3    the Liquidating Trust to the production of MBIA's examiner

4    submissions.  Until very shortly before the opposition -- the

5    formal opposition to our motion, we had not heard anything from

6    RFC on this issue, though they were notified of the issuance of

7    this subpoena and months and months went on.

8              It was not until this morning, when RFC submitted its

9    letter to the Court, that we learned fully what the basis of

10   their opposition is.  And it seems to be the existence of a

11   confidentiality agreement entered at the time of the examiner

12   submissions.

13             However, the letter cites no case law to the effect

14   that a mere confidentiality agreement that has not become an

15   order of a court, which, this one has not become an order of

16   the Court, can shield otherwise proper discovery from

17   production.  In fact, there's a number of cases which we cited

18   to the Court which hold just the opposite, which is that a mere

19   confidentiality agreement cannot shield proper discovery from

20   production.

21             The second point for which they also don't cite any

22   case law is the idea that the standards applicable to a

23   mediation order like the one this Court has entered should

24   somehow apply here.  And the two situations are really very

25   different.  The examiner submission -- the examiner process is

1  adversarial; it's public.  In this case, it produced a public

2  report from the examiner which cites submissions from the

3  parties to the examiner in its public document.  Obviously,

4  mediation is different.  It's entirely private.  It's

5  entirely -- the mediation is itself consensual, and it's

6  protected by a court order, which this Court has enforced.

7          So those two situations are different, and the

8  standard for producing submission -- the standard governing

9  mediation orders like the In Re:  Telligent case would not

10 apply here.  It would be the standard -- the usual relevancy

11 standard.

12         And then, the only other argument that was raised by

13 RFC has to do with the idea that we already have received other

14 information that would somehow obviate the need for us to have

15 the submission papers, and essentially making a relevance

16 argument.  But as I set out in our letter, the submission

17 papers are directly relevant to the issue of the proper

18 allocation of the allowed claim in the underlying litigation.

19 And one of the factors that will be relevant is the strength

20 assigned to the various claims by the parties to the underlying

21 litigation.  And so the submission papers, as we understand

22 them, are likely to yield directly relevant evidence to that

23 allocation issue.

24         So given the relevance, given that there is no order

25 of Court protecting it, given that the submission papers would

1   be produced subject to the protective order in the Minnesota

2   court and, therefore, would never become public, and given that

3   the absence of case law requiring that a different standard

4   apply, we think the submission papers should be ordered to be

5   produced.

6         Turning to the e-mail issue, the e-mail issue was also

7   the subject of significant meet-and-confer and resulted -- that

8   meeting -- meet-and-confer process resulted in a search string

9   being run by MBIA to determine the scope of what the production

10  would entail.  MBIA added into the search string terms designed

11  to capture and identify potentially privileged documents:

12  documents subject both to ordinary claims of privilege and also

13  to this Court's mediation order.

14        In the meet-and-confer process, we agreed that they

15  could initially withhold all of the documents identified in

16  that search, subject to privilege, and all of the documents

17  that they claim are potentially subject to the mediation order.

18  What that resulted in is ten gigabyte of data that would not

19  fall into the either potentially privileged or potentially

20  subject to the mediation order category.

21        THE COURT:  Well, just say that again.

22        MR. LEVIN:  I don't --

23        THE COURT:  Is the ten gigabytes the nonprivileged

24  documents or the volume that they contend is privileged?

25        MR. LEVIN:  It happens that that number works for both

1  things.  There's a total -- the search strings produced a total

2  of twenty gigabyte of data.  Ten gigabytes do not fall into the

3  category of potentially privileged in any sense of the word.

4       THE COURT:  Okay.

5       MR. LEVIN:  Ten gigabytes fall into the potentially

6  privileged category.

7       And the argument that has been raised by MBIA is

8  solely and undue burden argument.  And so the offer that I made

9  was produce the ten gigabytes that are not arguably subject to

10  claims of privilege under the search that they did and subject

11  to a very broad, nonwaiver claw-back agreement, such that if

12  any of -- if privileged documents, either in the mediation

13  sense or the attorney-client or work product sense, were

14  inadvertently produced in the ten gigabyte set that did not get

15  identified as potentially privileged, that they would not be

16  waiving any rights and could claw that document back.

17       And the basis on which that offer was made is, of

18  course, the recent changes to the Federal Rules of Evidence

19  Rule -- I believe it's 502, in which they recognize -- and the

20  comments to the rule recognize that in modern litigation

21  involving, especially, electronic discovery, the use of quick

22  peek and inadvertent disclosure agreements, to avoid the kind

23  of undue burden claim that MBIA is making is entirely

24  appropriate.  And there a number of courts -- and we can

25  provide the authorities to this Court -- that have recognized

1   that when an offer like the one that I have made to MBIA has

2   been made, then the claim of undue burden fails.

3           THE COURT:  Mr. Levin, let me --

4           MR. LEVIN:  And I'm not saying --

5           THE COURT:  Mr. Levin, have you reached an agreement

6   with MBIA regarding preparation of the privilege log?

7           MR. LEVIN:  No, we have not.  And in fact, that's

8   really the issue.  Their position is that they shouldn't be

9   required to produce a privilege log under any circumstance, and

10  that's really, in my thinking, the principal disagreement

11  between us, which is I --

12          THE COURT:  Okay.

13          MR. LEVIN:  -- said I'm open to a discussion of what

14  information should be provided and what that privilege log

15  should look like.  But I'm not open to the idea that they

16  should not have to do anything to substantiate that the

17  privileged category that they've identified, the ten gigabyte

18  of potentially privileged documents, are actually privileged.

19          And the reason that I took that position is, in part,

20  is the very broad type of search that they did.  Basically,

21  they categorized as potentially privileged any documents that

22  had a lawyer's name in it anywhere and any document generated

23  between the petition -- I'm sorry, from any time after the

24  appointment of the mediator.  So it was a very broad search.

25  And my way of thinking -- what I was trying to do here was to

1  cut through the issues and offer a way to avoid the undue

2  burden that they claim by agreeing in the first instance that

3  they didn't have to produce the ten gigabyte of privileged

4  documents subject to an appropriate privilege log that the

5  parties would either agree upon or this Court would decide what

6  would be appropriate under the circumstances.  And that

7  agreement was not acceptable to MBIA.

8          So the gist of it, Your Honor, is -- our view is that,

9  though we're not entitled to require MBIA to forgo advance

10 review of the production to the extent that they claim undue

11 burden, which is the only issue that we discussed in meet-and-

12 confers, as I'm aware, with respect to the e-mails, that claim

13 fails in light of their ability under the techniques recognized

14 in the amendment to the Rules of Evidence to give us an advance

15 peek pursuant to a claw-back agreement.

16         THE COURT:  Mr. Levin --

17         MR. LEVIN:  That's where that issue sits.

18         THE COURT:  Okay.  Mr. Levin, I believe I have the

19 authority, since MBIA -- and I understand that -- I read your

20 brief before Judge Batts, and I understand that MBIA -- and I

21 certainly remember well -- they had a very large allowed claim

22 in the ResCap bankruptcy case.  But they are a third party

23 insofar as the actions pending in Minnesota are concerned.

24         And so I believe I have the authority, if I deem it

25 appropriate, to shift the cost to the moving parties who've

RESIDENTIAL CAPITAL, LLC, et al.                    13

1    subpoenaed the documents.  And specifically, what I have in

2    mind here -- I certainly will ask MBIA's counsel how many

3    documents comprise the ten gigabytes of potentially privileged

4    documents.  But it's a very -- it would appear to me to be a

5    very large quantity, and the cost of preparing a privilege log

6    could be very, very expensive for -- and in particular when

7    we're dealing with a nonparty.  And I'm not saying yet whether

8    I'm going to impose it.  What I have in mind -- you should be

9    aware of -- is that if I order production, and if I order the

10   preparation of the privilege log, I'm going to reserve the

11   right upon a further showing after production to shift all or

12   some of the costs of preparation of the privilege log to your

13   client.

14           You want to respond to that?

15           MR. LEVIN:  Yes, Your Honor.  I guess the first part

16   of my response, I understand the Court's position.  I think the

17   issue of whether cost shifting is appropriate is one that

18   should be at least subject to briefing.  It is not something,

19   by the way, that --

20           THE COURT:  Well, let me ask you first.  Mr. Levin, do

21   you -- Mr. Levin, let me ask you a question first.  Do you

22   agree that under the Federal Rules of Procedure and the Rules

23   of Evidence that I can shift the cost to the moving party for

24   all or some of the costs of their responding to your subpoena

25   and, in particular, with respect to preparation of a privilege

1    log?  Do you agree that the Court has that authority?

2              MR. LEVIN:  The short answer is I'm not prepared to

3    say at this time that the Court doesn't have that authority.  I

4    think, as a general proposition, the Court has discretion in

5    these areas.

6              THE COURT:  Okay.  I think what's going to happen, Mr.

7    Levin, is -- well, let me listen to the rest of the arguments

8    first.  I don't think it's at all unclear about my authority to

9    shift the costs, but I understand you don't seem to be prepared

10   to acknowledge that at this point.

11             MR. LEVIN:  Well, no -- no, I'm -- that was --

12             THE COURT:  That may result in me not ruling on

13   your -- stop -- that may result in me not moving -- ruling on

14   your motion at this point.  But let me hear -- is there

15   anything else you want to say?

16             MR. LEVIN:  Yeah, yeah.  I just -- I wanted to be

17   clear.  I was not disagreeing with you, and I didn't mean to be

18   heard to be disagreeing with you.  What I was saying is I have

19   not looked -- I think, in general, that is -- what Your

20   Honor has said is correct.  What I haven't looked at is whether

21   that has changed with the amendments to Rule 501.  I just don't

22   know the answer to that, but I believe that, in general, the

23   Court does have that discretion.

24             THE COURT:  I don't think it's the Rules of Evidence

25   that are going to control this.  I think it's Rule 45 on

1    responding to a subpoena.  Here, we have a third party.

2              But let me hear from MBIA's counsel first -- next.

3              MS. COHEN:  Yes, Your Honor, this is Michelle Cohen

4    from Patterson Belknap on behalf of MBIA.

5              I will start with the e-mail issue first.  MBIA's

6    position all along has been one of burden based on two

7    factors -- or three factors, really, the overarching one being

8    privilege.  The categories of documents and the time periods

9    for which the defendants are seeking documents from MBIA are

10   the periods after the litigation has been filed against RFC.

11   During that time period, from 2009 to 2013, MBIA's business was

12   focused largely on managing that litigation.

13             At that point in time, MBIA was not issuing new

14   policies.  The only structured finance business that they were

15   doing was seeking remediation on the policies that already

16   existed.  The only relationship that they had with RFC at that

17   point was as a litigation adversary.

18             And on a daily basis, the individuals -- the three

19   individuals whose e-mails MBIA searched as part of this search

20   string that Mr. Levin has referred to, were in constant contact

21   on a daily basis with not just the counsel for the RFC

22   litigation, but also counsel for other litigation that MBIA was

23   involved in, as well as the litigation consultants who were

24   supporting those efforts by outside counsel.

25             In the search string that we did for Mr. Levin, we

RESIDENTIAL CAPITAL, LLC, et al.                          16

1  came up with approximately 43,000 documents.  Of those 43,000

2  documents, 22,000 of them hit on either an attorney's name or

3  the name of one of the litigation consultants that had been

4  hired by outside counsel.  And of that 22,000, 17,000 of them

5  had attorneys in the "to" or the "from" line of the actual

6  e-mail.  That puts aside a portion of the e-mails that are

7  during the mediation period, which Mr. Levin didn't touch on in

8  his discourse previously.

9          Of the remaining approximately 21,000 e-mails, it is

10 our contention and belief that the vast majority of them are

11 privileged even if they do not directly reference or include a

12 lawyer on the communication.  And that is because, as I

13 mentioned earlier, the vast majority of the business that MBIA

14 was doing at that point was monitoring its litigation and the

15 securities underneath those litigations.  So the idea that just

16 because there wasn't a lawyer on the e-mail that the e-mails

17 were not privileged, is simply not true.

18         And while we appreciate Mr. Levin's offer that we

19 could turn the documents over without review subject to claw-

20 back, that is not a position my client is willing to take.  The

21 privilege issues here are complex, and even for us to avail

22 ourselves of the claw-back, we would have to, at some level,

23 review the documents even if we did it after we produced the

24 documents.

25         We have made clear to Mr. Levin that this is an

1  extremely costly endeavor.  In the underlying RFC litigation,

2  MBIA elected to use Cadwalader firm attorneys to do the

3  underlying document review and generation of privilege log.

4  Given the privilege issues here, MBIA would do the same thing.

5  And using a very sort of back-of-the-envelope rush calculation

6  and being very generous to defendant in terms of the time

7  commitment that would be involved in reviewing those documents,

8  we estimate that the review of all 45,000 documents and logging

9  all of them would cost upwards of 350,000 dollars.

10         We have told Mr. Levin all along that if his client is

11  willing to bear the cost of our review and logs, we will go

12  ahead and produce those documents.  But where we're sitting

13  today, this is an undue burden to place on MBIA which is a

14  third party to this litigation.

15         I think it's also helpful for Your Honor to understand

16  the vast majority at their -- or the vast information already

17  at the defendant's disposal.  The Trust and MBIA combined have

18  already produced every single document that was produced in the

19  MBIA/RFC litigation.  In addition to that, we've produced

20  dozens of party deposition transcripts, all of the expert

21  reports that we produced, as well as the attachments to MBIA's

22  examiner's submissions.  In addition to that, the defendants

23  have access to the very voluminous proof of claim that MBIA

24  filed in the bankruptcy.

25         So given the breadth of information that they already

1  have and the extreme burden on my client in producing

2  documents, we just don't think, at this point, that is a burden

3  that should be placed on third parties.  In addition to all of

4  that, we have a very grave concern about the relevance of any

5  remaining communications.  Given how much information the

6  defendants already have, it's not clear to us why the documents

7  that they seek now from this four-year period after the

8  litigation was filed are even relevant, and up until now,

9  they've been unable to articulate any argument of relevance.

10         THE COURT:  Ms. Cohen, let me stop you there.  I don't

11  know if this is ships passing in the night or not, but Mr.

12  Levin started his presentation by saying that he's reached an

13  agreement with MBIA for production subject to order of the

14  Court, and you seem to be disputing that, that there is no

15  agreement as to what would be produced.

16         Tell me, is there an agreement?

17         MS. COHEN:  We've reached an agreement with respect to

18  the examiner's submission.  It is MBIA's position that the

19  examiner's submission is subject to the confidentiality

20  agreement that Mr. Levin mentioned.  Pursuant to that

21  confidentiality agreement, MBIA provided notice to all of the

22  signatories to that confidentiality agreement, informing them

23  that they had received a subpoena from the defendant seeking

24  production of the examiner's submission and allowing the

25  signatories to that agreement, pursuant to the agreement, to

1  object if they had an objection to MBIA's production of the

2  examiner's submission.

3          RFC and the Liquidating Trust did have an objection

4  and so we reached an agreement with the defendant that subject

5  to the Court's ruling on RFC's objection, we would produce the

6  examiner's submission.

7          THE COURT:  All right.  So --

8          MS. COHEN:  That is only --

9          THE COURT:  Stop.  As I understand what you've just

10 told me, MBIA is not asserting an objection of its own to the

11 production of the submission to -- of its submission to the

12 examiner; is that correct?

13         MS. COHEN:  That is correct.

14         THE COURT:  Okay.  And so is your objection solely to

15 the production of e-mails?

16         MS. COHEN:  That is correct.

17         THE COURT:  Are you object -- I assume there are

18 probably e-mails with the examiner.  Are there?  Would that be

19 true?  The examiner or his professionals?

20         MS. COHEN:  Yes.

21         THE COURT:  And --

22         MS. COHEN:  It's my understanding that there would be.

23 If not the examiner, his professionals.

24         THE COURT:  Okay.  Are you objecting to the search for

25 and production of e-mails between MBIA or its advisors and the

1  examiner and his professionals?

2          MS. COHEN:  Yes.  What they have requested are

3  both -- are any communications from the three custodial files

4  during the four-year period from 2009 to 2013.  We are

5  objecting both to the communication that MBIA was having with

6  external individuals, as well as the internal communications

7  within MBIA.

8          THE COURT:  No, that wasn't my question.  Are you

9  objecting to the search for and production of e-mails between

10  MBIA and its professionals with the examiner or his

11  professionals?  In other words, if MBIA or its advisors or

12  attorneys communicated by e-mail with the examiner or

13  Chadbourne, or I guess Mesirow was the financial advisor to the

14  examiner -- are you objecting to that?  And if so, on what

15  basis?

16          MS. COHEN:  It's not an issue, Your Honor, that's come

17  up in the negotiations that we have had back and forth.

18          THE COURT:  I'm asking a very specific question, Ms.

19  Cohen.  Is MBIA objecting to searching for and producing

20  electronic communications with the examiner or the examiner's

21  professionals?  It's not a trick question.

22          MS. COHEN:  We are not objecting to the production of

23  those documents within reason, understanding at this point I

24  don't understand the scope in terms of the burden on MBIA of

25  reviewing and logging those communications.

1        THE COURT:  All right.  Let me hear from RFC or the

2   Trust counsel.

3        MR. NESSER:  Good afternoon, Your Honor.  It's Isaac

4   Nesser at Quinn Emanuel.  I wanted to make just a few points.

5        First, just as a procedural matter, I wanted to make

6   certain that Your Honor is aware that there is a parallel

7   motion to compel that the same group of defendants filed

8   against Ally.  That motion was filed in the Southern District

9   and was referred to Your Honor as well.  And I raise that just

10  in the event that Your Honor believes it appropriate to

11  coordinate the disposition of those motions in some fashion.

12       THE COURT:  Has that -- let me ask you, Mr. Nesser,

13  because I was not aware of that, to which district judge was

14  that assigned?

15       MR. NESSER:  John?  I'm not certain.  John Sullivan, I

16  believe, is on the line with me and would know the answer.

17       MR. SULLIVAN:  Yes, this is John Sullivan at Quinn

18  Emanuel.  It was also a miscellaneous proceeding in TARP 1.  I

19  believe the judge who signed the order was Engelmayer.

20       THE COURT:  Okay.  And has it been referred to me?

21       MR. SULLIVAN:  The ECF docket indicates that it was

22  sent -- transmitted to the case opening's clerk a couple weeks

23  ago.

24       THE COURT:  Okay.

25       MR. NESSER:  So, Your Honor, that was the first point.

1        On substance, I want to really make two points.
2   First, there's -- and we outlined them in the letter, so I
3   won't belabor it because I know Your Honor has read it.  But
4   the first is that the documents are confidential.  Contrary to
5   the argument counsel was making, this is not a confidentiality
6   agreement between two parties in a business negotiation.  This
7   was a confidentiality agreement signed by the examiner and
8   dozens and dozens of participants to that process.  And if I
9   just -- I think the analogy the defendants are trying to make
10  is, respectfully, not apt.

11       On the issue -- and then secondly, Your Honor, and
12  it's not -- and I don't know that this point came through
13  clearly, but Your Honor's question to counsel really puts its
14  finger on part of what's going on here, which is I had
15  understood that we were talking only about a request to produce
16  the actual submission by MBIA to the examiner.  I had not
17  understood that we had ever been asked to consent to the
18  production of e-mails or other examiner's submissions that
19  might be subject to the confidentiality agreement in the
20  examiner process.

21       And that's, in fact, a significant fact on its own,
22  but I think it's significant also because if what we are going
23  to be producing here, if what MBIA is being asked to produce
24  here is the actual submission to the examiner, we're going to
25  be left in a position --

1          THE COURT:  I don't think you're being asked to -- Mr.

2    Nesser, you're not being asked to produce anything.

3          MR. NESSER:  Well, we were, in fact, asked to produce

4    the documents, and we objected, and for reasons that are

5    unclear to me, counsel made a determination to file two motions

6    to compel in New York, rather than resolve it in Minnesota.

7    But I agree and we are being -- we have been asked to consent

8    to MBIA's production of the documents.

9          And I guess what I'm trying to make clear is that if

10   all that is being produced is the briefs, right, the actual

11   submission, what we're going to wind up with is a one-sided

12   presentation in the deposition or in trial, or otherwise.  And

13   so -- and that's not fair and I don't think that's appropriate.

14         And so really what we then start to talk about is a

15   situation in which we're going to have to be making requests

16   for all sorts of other documents that were provided to the

17   examiner and exchanges with the examiner, and discussions with

18   the examiner, and who knows what else.

19         And so the notion that we can just do this as a one-

20   off and just say, oh, it's only one document, I think is not

21   correct.  And it's importantly not correct because if we have

22   to now go and get consents from dozens of signatories to the

23   agreement and all sorts of other documents, it all of a sudden

24   becomes a pretty significant undertaking.

25         THE COURT:  Mr. Nesser?  Mr. Nesser, you argued a few

RESIDENTIAL CAPITAL, LLC, et al.                    24

1   minutes ago that you didn't understand that e-mails were

2   involved.  I'm looking at the brief that was filed in support

3   of the motion to compel in the district court, and I see,

4   specifically on page 8 for example, that it says in the first

5   full paragraph, part of it in particular:  "Defendants offer to

6   limit the subject matter in temporal scope of the requested

7   production; (2) limit the number of custodians, e-mail account

8   holders, select individuals; (3) narrowly tailor the list of

9   search terms and; (4) discuss bearing some of the costs of

10  production."

11          There are other places in the brief where they

12  specifically mentioned e-mails so it can come --

13          MR. NESSER:  Right.

14          THE COURT:  -- as no surprise that they're seeking

15  e-mails.  That was the reason --

16          MR. NESSER:  Your Honor?  I think --

17          THE COURT:  Stop.  That was the reason for my focus on

18  the question whether -- just specifically because I didn't see

19  it so narrowed, were they seeking production of e-mails between

20  MBIA and its advisors or professionals and the examiner and his

21  professionals.  So --

22          MR. NESSER:  Your Honor, I think the answer is -- and

23  I think this is also perhaps why MBIA's counsel was a little

24  caught off guard by the question -- as I understand it, the

25  negotiations and the briefing, and all of the conversations

1    have really treated the e-mail issue as really a sort of

2    separate category in a separate bucket, a separate conversation

3    versus the examiner's submission confidentiality issue.

4              In other words, MBIA got a request from the defendants

5    to produce all sorts of things, having nothing to do with the

6    examiner's report, as well as the examiner's report, as well as

7    who knows what else.  They just got an omnibus subpoena.  They

8    objected to the omnibus subpoena on the basis of overbreadth

9    and burdensomeness and all of the rest.

10             And then in addition to that, we have a separate

11   objection just to the portion of it that deals with the

12   examiner's submission on the basis of confidentiality.  And

13   what I -- the point that I was trying to make, Your Honor, is

14   when -- I believe, and I could be wrong about this, but I

15   believe that when we were asked by MBIA, pursuant to the

16   confidentiality agreement, whether we would consent to their

17   production of the examiner report, that that's what we were

18   asked.  Will you consent to the production of the examiner

19   report?  I don't believe we were asked whether we would consent

20   to the production of e-mails as between MBIA and the examiner.

21             And my understanding, Your Honor, is that that was

22   because MBIA and the defendants had reached an agreement that

23   they would resolve this portion of the subpoena pursuant to

24   agreement under which the defendants would make do merely with

25   the examiner submission and give up the ability to obtain all

1    of the surrounding e-mails, that that was the deal.  And MBIA

2    said, well, look, so long as I can get consents from everybody,

3    I will agree to produce the actual submission and you will

4    agree that nobody will be producing all of these e-mails.

5            And so that's the context, as I understand it.  And I

6    was prepared -- and am prepared -- but was expecting that this

7    conversation today was just on the question of whether we are

8    producing the examiner report itself.  If all of a sudden

9    that --

10           THE COURT:  Mr. Nesser?

11           MR. NESSER:  -- what I had understood to be the prior

12   agreement --

13           THE COURT:  Mr. Nesser?

14           MR. NESSER:  -- between MBIA and defendants is

15   not existing, then we have a different discussion

16           THE COURT:  Mr. Nesser, you keep saying "we produce".

17   This is not a subpoena to your client.  MBIA is being asked to

18   produce.

19           MR. NESSER:  I --

20           THE COURT:  Are you representing MBIA?

21           MR. NESSER:  I am not, Your Honor.  I am not.  This

22   was a request that was made to us to consent to their

23   production of the document and I apologize for having

24   misspoken.  So --

25           THE COURT:  Mr. Nesser, the other thing I would ask is

1   that the MBI -- the moving party filed its brief in the

2   district court on February 16th, 2016, and when I reviewed the

3   docket, the district court docket today, I didn't see any

4   response to the motion by you or your firm.  You've sent a

5   letter to me today.  The letter doesn't identify any authority

6   that would support a privilege or protection from disclosure

7   for information provided to an examiner.

8        I certainly remember this iss -- when I was in

9   practice, the issue would frequently arise as to whether

10   information that someone produced to the SEC, for example in an

11   investigation, whether that was privileged or protected from

12   disclosure in civil litigation.  And the answer, I think,

13   pretty uniformly was no.

14        Do you have any authority to support privilege or

15   protection, confidentiality in civil litigation for information

16   produced to an examiner or an investigatory agency, anyone in

17   that capacity?

18        MR. NESSER:  Your Honor, the authority is case law

19   concerning confidentiality agreements in general.  I'm not

20   aware of any authority on the specific question that you ask.

21        THE COURT:  So I take it you agree there's no

22   confidentiality order that I ever signed that protected from

23   disclosure -- from discovery, information produced to the

24   examiner.  Do you agree with that?  That's the

25   position -- that's a point that the moving party makes.

1          MR. NESSER:  That's correct.  Yes, there was no

2     confidentiality order.  There was a confidentiality agreement

3     that was signed by the examiner and all of the dozens of

4     participants in that process.

5          THE COURT:  All right.  And is it --

6          MR. NESSER:  That is the basis.

7          THE COURT:  Is it -- I think it's clear, at least this

8     point was made in the brief in the district court -- the

9     defendants' brief in the district court, that the only thing

10    that this motion concerns is MBIA's submission to the examiner

11    and not any other party's submission.  Is that correct?

12         MR. LEVIN:  That is correct, Your Honor.

13         MR. NESSER:  That is not all that's at issue on this

14    motion.  There is a parallel motion in which they are seeking

15    the same thing with respect to Ally's submission.

16         And Your Honor, what I was indicating earlier is that

17    if we are going to have one-sided productions, right, in which

18    the defendants are going to have MBIA's position on the

19    strength of subject claims, and counsel can use that in order

20    to make arguments at trial about the strength of MBIA's claims,

21    we're going to need to have, presumably, the response or the

22    opposition so that we could say, well, look, that's what MBIA

23    submitted in its advocacy piece, in its brief, and here's the

24    other side of the story.

25         And so I think what we're talking about right now is

1  just the MBIA submission.  But on the doorstep is Ally, and on

2  the doorstep of that is all of the responses and all of the

3  context around it.  And that's, I think, why you're concerned

4  about this, because it does seem to open the door to all sorts

5  of discovery after confidential information that leaves -- at

6  best, it's of marginal relevance.  And I am not, Your Honor,

7  arguing that the standard in Telligent to list mediation

8  privilege is the same --

9             THE COURT:  Well, I already addressed them in the --

10             MR. NESSER:  -- thing applicable --

11             THE COURT:  I addressed the mediation privilege myself

12  in an opinion so I'm --

13             MR. NESSER:  Correct.

14             THE COURT:  -- very aware of what mediation

15  privilege --

16             MR. NESSER:  Yeah, and that's a completely -- and I

17  agree with counsel that -- no, and that's why I raised it,

18  because I agree with counsel that that is a specific standard

19  applicable there.

20             But I do think it's relevant what Your Honor held in

21  the decision on mediation privilege, which is Your Honor held

22  that the claims here are going to be assessed on the basis of

23  whether the settlement was objectively reasonable.  And that

24  isn't a question that can be answered based on the actual

25  evidence.  You don't need, in order to make those arguments pro

 1  or con --

 2              THE COURT:  Mr. Nesser?  Whatever I rule today --

 3              MR. NESSER:  -- to have argument that MBIA employees

 4  can't be --

 5              THE COURT:  Whatever I rule -- it may not be today.

 6  Whatever I rule doesn't determine whether a district judge in

 7  Minnesota, whether it's Judge Nelson or another district judge,

 8  or whether I, in the cases that remain pending before me, would

 9  permit the evidence to be admitted at trial.  That's a totally

10  separate issue.  But based on the moving party's brief, I

11  certainly understand their argument why it's relevant and

12  material to the issues in dispute in the pending litigation.

13              All right, here is what I'm -- I'm going to give --

14              MR. NESSER:  Judge, can I make one --

15              THE COURT:  Go ahead, Mr. Nesser.

16              MR. NESSER:  Can I make one other point?  And they're

17  both really procedural points.  The first is that we have a

18  stipulation with the defendants pursuant to which our

19  opposition to their brief is due to be filed on Friday

20  afternoon.  I think MBIA's opposition is also due on Friday

21  afternoon.  And so that's the schedule on which we believed

22  that we were proceeding and we had scheduled this call pursuant

23  to Your Honor's rules.

24              The second point is, as I indicated before, we do have

25  some concern about how all this happened.  There is a document

1   request by the defendants to us in Minnesota in which they ask

2   for these documents because we have them, and we objected to

3   producing them.  We refused to produce them.  It would seem to

4   me that if we were going to have a dispute about whether those

5   documents ought to be produced, the logical place to do it

6   would have been between the parties in Minnesota.  And I ask --

7           THE COURT:  Well, except that MBIA is not a party.

8           MR. NESSER:  -- instead we have a --

9           THE COURT:  Mr. Nesser, MBIA is --

10          MR. NESSER:  No, that's --

11          THE COURT:  Okay, let me just stop you again.

12          MR. NESSER:  But we have the document.

13          THE COURT:  Mr. Nesser?

14          MR. NESSER:  We have the document and it was requested

15   that we produce it.  Yes, I'm sorry.

16          THE COURT:  Okay, so the record is clear, Judge Nelson

17   and I had a conversation earlier this afternoon.  I wanted to

18   find out from her whether she had addressed this issue in the

19   cases pending before her, and she's indicated that the issue

20   had not arisen before her.  So I did, so the record's clear, we

21   didn't speak about the merits of the issue, but I did call her

22   to find out whether, as you know, Mr. Nesser, and certainly as

23   counsel for the parties in the cases before me know, that from

24   time to time Judge Nelson and I speak:  not about the substance

25   of the matter, but procedural issues, and how to proceed.  So I

RESIDENTIAL CAPITAL, LLC, et al.                              32

1    did place a call to Judge Nelson earlier this afternoon and did

2    speak with her to find out whether she had been presented with

3    this issue and ruled on it, and she indicated she had not.

4              So let me -- I am going to give -- Mr. Nesser, under

5    the agreed -- I wasn't going to rule today so I'm -- what was

6    the schedule that the parties agreed on for further

7    submissions?

8              MR. NESSER:  I believe our briefs are due on Friday

9    afternoon.  That was, of course, subject to whatever Your Honor

10   wanted to do, including whatever Your Honor wants to do with

11   respect to Ally.

12             THE COURT:  Well, I don't know about that.

13             MR. LEVIN:  Your Honor, that briefings, that schedule

14   also included a stipulation for a reply brief.  I don't want

15   to -- I just wanted that fact also part of the discussion on

16   the briefing.  I don't mean it --

17             THE COURT:  When were the reply briefs to be due?

18             MR. LEVIN:  I don't have -- I think it was two weeks

19   later.

20             MS. COHEN:  April 4th, Your Honor.

21             MR. LEVIN:  April 1st (sic).

22             MS. COHEN:  April 4th.

23             MR. LEVIN:  4th, excuse me.

24             THE COURT:  Okay.  I'm going to permit this additional

25   briefing to go forward.  Obviously, Mr. Nesser, any authority

1   that you're able to submit that would support privilege or

2   protection from disclosure or discovery subject to

3   confidentiality order that's in place in the Minnesota cases or

4   that's in place in the cases here.  That's -- obviously, I'm

5   most interested in that.

6           The other issue I want addressed in the briefing, and

7   I think MBIA and the defendants, moving parties have the

8   greatest interest in this, I want the parties to address

9   whether the Court may shift the cost of responding to a third-

10  party subpoena, and most particularly with respect to the

11  privilege log to the moving parties.  And just to be clear what

12  I had in mind is not reserving -- if I order the production and

13  the preparation of the privilege log, I don't plan at this

14  stage to enter an order shifting the cost.  MBIA will have to

15  keep track of the cost.

16          I've been told today that they've, at least

17  preliminarily, identified ten gigabytes of data as potentially

18  privileged.  I haven't been told that the believed ten

19  gigabytes are privileged.  What Ms. Cohen told me was 22,000 of

20  the documents, using the search string, included either

21  attorneys' names or advisors, I think -- that wasn't the exact

22  term -- 17,000 of them had attorneys' names.  I would

23  certainly -- if there's been an overprotection of documents,

24  I'm not going to shift the entire cost of doing a review.  I

25  mean, it's MBIA's decision to go ahead -- and I'm not faulting

RESIDENTIAL CAPITAL, LLC, et al.                    34

1    them for this, but to go ahead and do a privilege review.  Some

2    of that cost, I would consider shifting to the moving parties.

3            So I want any of the parties who wish to address it in

4    their briefs on the schedule that's been agreed.  The RFC or

5    Trust brief is due this Friday afternoon; reply briefs, August

6    4.  MBIA's counsel, Ms. Cohen, are you going to file a brief by

7    this Friday; does that include you?

8            MS. COHEN:  Yes, that includes us, as well, Your

9    Honor.

10           THE COURT:  Okay, so address the issue of cost-

11   shifting, as well.  I don't -- just to be clear, I'm not -- I

12   know that the rules provide for potential cost-shifting as a

13   sanction; I'm not contemplating a sanction.  But dealing here

14   with a third party, not a stranger by any means -- when I say

15   not a stranger, they have a very large allowed claim for which

16   the Trust is seeking indemnity, so they're hardly a stranger to

17   the proceeding or disinterested in the proceeding, but I will

18   consider -- and the parties -- since I don't plan to actually

19   enter a cost-shifting order at this time, but any order I enter

20   would be subject to later determination of cost-shifting, the

21   parties, they should in their briefs, address the issue of

22   whether the Court has the power to do that.  And they can

23   address, in a preliminary fashion, the principles that the

24   Court should apply in doing so.

25           Given the scope of the requests in at least the search

RESIDENTIAL CAPITAL, LLC, et al.                    35

1    string -- and I assume the search strings were agreed upon; is

2    that true, Ms. Cohen?

3            MS. COHEN:  The search strings were not agreed upon.

4    The defendants provided us with search terms that they would

5    like us to use, and in the interest of meeting and conferring

6    and trying to reach a resolution, we agreed to run the search

7    terms so that both sides could have an understanding of what

8    the potential scope of review was.

9            THE COURT:  Okay, just give me a second.

10           MS. COHEN:  Your Honor, if I may, I have one

11   additional request when you have a moment.

12           THE COURT:  Yeah, I was looking -- and I thought I

13   noted in your brief before the district court that you had had

14   discussion about potential cost-shifting; you hadn't agreed

15   upon it, but you had had a discussion about partial cost-

16   shifting.  So I'm not basing any ruling on it; I'm not ruling

17   on it.  But anyway, I want the parties to address the cost-

18   shifting element in their briefs.

19           But go ahead, Ms. Cohen, you had an additional point

20   you wanted to raise.

21           MS. COHEN:  Yes, Your Honor.  In light of the need to

22   both research and brief the cost-shifting issue, we would

23   respectfully request an extension of the briefing schedule that

24   was contemplated in the stipulation that the parties filed.

25           THE COURT:  That's not necessary.  Ms. Cohen, I'm

1  comfortable; Friday at 5 o'clock is the deadline.  I'm not

2  looking for voluminous briefs.  And let me say, typically, on

3  discovery matters, I have the parties do letter briefs.  If you

4  want to do it as an actual pleading, that's fine.  I don't

5  expect a tome.

6       I think that you'll be able to point to some authority

7  one way or the other on this.  I'm not going to extend the

8  deadlines; we're going to go forward on that.

9       Let me ask, have you had discussions about a briefing

10  schedule with Ally?

11       MR. NESSER:  Your Honor, I believe there are ongoing

12  discussions.

13       THE COURT:  Okay.  All right, after I get the -- after

14  the briefing is closed -- I want to see the briefs

15  first -- I'll set another hearing.  I may have you all come in

16  here rather than doing it over the telephone, when we actually

17  have argument.

18       MR. NESSER:  So I'm sorry, Your Honor, just to be

19  clear, we should continue to negotiate a briefing schedule with

20  Ally?

21       THE COURT:  Absolutely, and I haven't seen -- I wasn't

22  aware that the Ally matter had been referred to me.  That's not

23  a particular problem, but I don't necessarily see that as a

24  reason to slow this one down.  I don't know that the arguments

25  or are going to be any -- if there are different arguments,

1  well, they'll deal with it there.  What I'm dealing with

2  currently is this subpoena to MBIA.

3          MR. NESSER:  Understood.

4          THE COURT:  All right, anything else?

5          MR. JOHNSON:  Your Honor, this is Mr. Johnson, Matt

6  Johnson.  I would just narrow it, and it sounds like Your Honor

7  is dealing with these two different issues concerning MBIA and

8  the Ally separately, but Simpson, Thacher & Bartlett is the

9  lead firm on the Ally motion briefing, and they obviously are

10 not on the call.

11         THE COURT:  Yes.

12         MR. JOHNSON:  So I just wanted to make that clear for

13 Your Honor.

14         THE COURT:  No, that's fine; I understand that.  I'm

15 not addressing it.  I think the parties involved in the Ally

16 motion, A, meet and confer, see if you can resolve it at all.

17 If not, it'll get briefed.  I think if it is referred to me,

18 what I would tell the people involved in that negotiation, if

19 they have a proposed briefing schedule, is you put it in the

20 form of a stipulation and present it to me, and I'll decide

21 whether to go with that schedule.

22         And discovery is being set, and I think those of you

23 who have appeared before me know that I don't let these matters

24 linger; I try to get these resolved very quickly.  Most of the

25 time I don't even want briefs, but since you all agreed on a

RESIDENTIAL CAPITAL, LLC, et al.                    38

1  briefing schedule below, and I have read the moving party's

2  brief, the other parties are entitled to brief it, as well.

3           MR. JOHNSON:  I'm happy to --

4           MR. NESSER:  Your Honor, may I --

5           THE COURT:  Sure, Mr. Nesser?

6           MR. NESSER:  Your Honor, yeah, I just wanted to,

7  before you hung up, ask your indulgence on a couple of

8  housekeeping issues relating to the adversary.

9           THE COURT:  I'm sorry, you cut out.

10          MR. NESSER:  I was hoping that I could take two

11 minutes of Your Honor's time on the housekeeping issue with

12 respect to the adversary proceedings.  Actually, two:  the

13 first is --

14          THE COURT:  Well, I'm not -- if you're talking about

15 the adversarial proceedings that have been coming before me, I

16 don't want to discuss it unless all parties in the cases were

17 on the phone, and they're not.

18          If there are issues you'd want to raise, Mr. Nesser,

19 I'm happy to arrange a call with Deanna and give notice to all

20 the parties in the adversary proceedings, and I'll be happy to

21 have a conference with you.

22          MR. NESSER:  That's fine; I only thought because Mr.

23 Johnson was on the line it might be all right, but

24 I -- understood.

25          THE COURT:  I know, but there are other counsel who

1   represent parties in those cases, and I'm happy to have Mr.

2   Johnson take the lead as he frequently has done, but they've

3   always had an opportunity appear.  And so I don't want to

4   go -- I don't want to talk about the adversaries pending before

5   me unless those parties have notice of the hearing.

6            MR. NESSER:  Fair enough.

7            THE COURT:  Okay.  And as you know, it doesn't -- it

8   can be fairly short notice, but I want to accommodate as many

9   of the parties as possible and have it as -- we could have it

10  as quickly as possible, okay?

11           MR. NESSER:  And frankly, I don't think it's a

12  disputed issue, but we're happy to do that.

13           THE COURT:  I just don't -- I'm not comfortable doing

14  it with other parties not represented.

15           MR. NESSER:  Yeah.

16           THE COURT:  Okay?

17           MR. NESSER:  Of course.

18           THE COURT:  Thanks very much.  We're adjourned.

19           MR. NESSER:  Thank you.

20           IN UNISON:  Thank you, Your Honor.

21      (Whereupon these proceedings were concluded at 5:01 PM)

22

23

24

25

1

2                        C E R T I F I C A T I O N

3

4    I, Aliza Chodoff, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   ALIZA CHODOFF

12   AAERT Certified Electronic Transcriber CET**D-634

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  March 24, 2016

19

20

21

22

23

24

25