1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              March 24, 2016

19              9:20 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2   Doc # 9226 Trial Regarding The ResCap Liquidating Trust's and

3   ResCap Borrower Claims Trust's Objection to Claim No.s 112,

4   114, 416, and 417 Filed by Erlinda Abibas Aniel, Fermin Solis

5   Aniel, and Marc Jason Aniel.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  Sharona Shapiro

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

3

1

2 A P P E A R A N C E S :

3 MORRISON & FOERSTER LLP

4       Attorneys for ResCap Borrower Claims Trust

5       250 West 55th Street

6       New York, NY 10019

7

8 BY:   JORDAN A. WISHNEW, ESQ.

9       JESSICA J. ARETT, ESQ.

10

11

12 WILLIAMS & CONNOLLY LLP

13       Attorneys for Non-party HSBC trial subpoena recipients

14       725 Twelfth Street N.W.

15       Washington, DC 20005

16

17 BY:   MEGHAN A. FERGUSON, ESQ.

18

19

20 APPEARING PRO SE:

21 ERLINDA ABIBAS ANIEL, Pro Se

22

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.                                    4

1                    P R O C E E D I N G S

2              THE COURT:  All right.  The Court is back in session.

3      We're here in connection with the trial of the contested matter

4      of the ResCap Borrower Claims Trust's objection to claims of

5      Erlinda Abibas Aniel, Fermin Solis Aniel, and Marc Jason Aniel.

6              The Court entered the pre-trial conference or joint

7      pre-trial order on February 25th, 2016.  A little further

8      background:  on June 30, 2015, the Court entered a written

9      opinion -- memorandum opinion and order sustaining, in part,

10     and overruling, in part, the ResCap Liquidating Trust and

11     ResCap Borrower Claims Trust objections to claims numbers 112,

12     114, 416 and 417, filed by the Aniels.

13             That opinion sustained the Trust's objections to most

14     of the Aniel's claims and overruled the objection, in part, to

15     certain of the Aniel claims for wrongful foreclosure, whether

16     the debtors had the power to foreclose under the Aniel deed of

17     trust, and with respect to -- also as to set aside a trustee

18     sale; there doesn't appear to have been a sale that's occurred,

19     and also as to certain portions of a fraudulent concealment

20     claim.

21             As that opinion set out, the only factual issue that

22     remained in dispute was the allegation that Mira Smoot had no

23     authority to execute the 2011 Aniel assignment and that

24     therefore the debtors lacked authority to foreclose on the

25     Aniel property.  The remaining claims all revolve around

1    whether Mira Smoot had authority to execute the assignment.

2           In the joint pre-trial order which the Court entered,

3    on page 16 of the pre-trial order, four issues were identified

4    to be tried.  Those are the only issues.  And the parties

5    agreed in the joint pre-trial order that those are the only

6    issues that are to be tried.  And those are clearly the only

7    issues that survived the Court's prior opinion.

8           In the joint pre-trial order, at pages 2 through 12,

9    Aniel sets forth the claimant's description of the nature of

10   the case, most of which is absolutely irrelevant to what's

11   going to be tried today.  In the claimant's contentions, on

12   page 13 through the very top of page 15, most of those

13   contentions are irrelevant to the issues that are going to be

14   tried today.  Many of the exhibits listed by the claimant in

15   the joint pre-trial order are irrelevant to the issues that are

16   going to be tried today.

17          The Court has reviewed the declaration, under penalty

18   of perjury, as the direct testimony of Erlinda Abibas Aniel.

19   It was filed on March 9th, 2016, thirteen pages in length.

20   Most of the alleged facts contained in that declaration are

21   irrelevant to the issues that are going to be tried.  The

22   issues left open by the Court's prior decision are narrow; that

23   is what the Court is going to hear evidence about today.  I'm

24   making that clear before we start so that neither side can be

25   surprised.

RESIDENTIAL CAPITAL, LLC, et al.                                6

1         Ms. Aniel, you can make an opening statement if you
2    wish.  Yes, please?
3         MS. ANIEL:  Good morning, Your Honor and everyone
4    here.  Thank you very much for coming here in New York, and
5    it's a very nice city and very friendly.  My second time to
6    come here; I was here in July, I think, 11, when I got the
7    subpoena for the witnesses.  And do you want me to do my
8    opening?
9         THE COURT:  Yes, you can do your opening now.
10        MS. ANIEL:  Oh, okay.
11        THE COURT:  Okay?
12        MS. ANIEL:  I already said good morning, Judge, again,
13   and so also to the other parties.  I stand before you in
14   connection with the claims against GMAC Mortgage and ETS that I
15   filed in bankruptcy petition by Residential Capital, LLC and
16   the ResCap Borrower Trust, docketed as case number 12-12020,
17   wherein I, as a claimant, filed a proof of claim that
18   petitioner in said bankruptcy case owed me some amount of money
19   in the form of damages on several causes of action including
20   wrongful foreclosure, fraudulent concealment, declaratory
21   relief, violation of UCL, and trustee sale.
22        To be brief about it, Honorable Court, the Borrower
23   Claims Trust, the ResCap Trust to serve as trustee for the work
24   was attending to and facilitating payment of claims of
25   claimants that they believe had been established, and objecting

1    to those claims that they believe is contestable.

2          When my claims were considered by them, they presented

3    their objection to my claims for a reason already made on the

4    record.  This Honorable Court, acting on this objection,

5    sustained several of these objection but overruled its

6    objection against my claim of wrongful foreclosure, fraudulent

7    concealment, declaratory relief, as I mentioned a while ago,

8    claims of wrongful foreclosure, for the very reason that it

9    failed to substantiate its factual allegation in respect to the

10   authority of Mira Smoot to accept the 2011 assignment of the

11   deed of trust.

12          This is now the very issue that should be resolved in

13   this trial.  As you may know, burden of proof as to the issue

14   of whether Ms. Smoot is sufficiently authorized to execute the

15   2011 assignment fall on the objector, as the Rule of Evidence

16   provides.  Nonetheless, since I am the claimant, I took upon

17   myself to prove to the Honorable Court, by preponderance of

18   evidence, that Ms. Smoot has never been authorized to execute

19   the 2011 assignment, and if ever such document exists, the same

20   is a void document that confers no right to impose no

21   obligation.  And allow me, Your Honorable Judge Glenn, to

22   explain my point and argument as follows.

23          Preliminarily, I'm saying that without admitting any

24   truth about it, that objector reason for denying my proof of

25   claim is based on its assumption that my loan and deed of trust

RESIDENTIAL CAPITAL, LLC, et al.                              8

1   is part of the pool loans covered by the pooling and servicing

2   agreement which was transferred to the securitized trust on or

3   before the cutoff date of July 1st, 2007 as the PSA mandated,

4   pooling agreement mandated.  In the mortgage loan that included

5   mine shall be put forth with all similar mortgages loan and

6   transferred to the Trust on or before July 1st, 2007.  But as

7   my evidence will later establish, there is no available black-

8   and-white document or records that shows this facts that is

9   that my loan was included in the pool loans and transferred to

10  the Trust on or before July 1st, 2007, per the PSA.  It is just

11  an assumption not supported by any evidence of records.

12          Similarly, my evidence will show that contrary to the

13  supposition made by objector that my loan was included in the

14  pooled loans and transferred to the Trust on or before July

15  1st, 2007, per the pooling and servicing agreement, my said

16  loan was still under the name of MERS, as beneficiary of

17  mortgage in 2008, as evidenced by documents, per substitution

18  of trustee, dated August 28, 2008.

19          Why did I say that this document contradict the theory

20  of objector?  It is very clear from this document that, as of

21  2008, my loan is not transferred to the trustee HSBC because if

22  it were so, then the assign on said 2008 document should have

23  been HSBC and not MERS, as said document reflects.

24          One more thing.  As my evidence will later show, no

25  document mentioned that HSBC is the trustee of my loan, except

1   under the 2009 assignment of the deed of trust dated September

2   21, 2009, the validity of which I am not admitting at this

3   point because I will show later its invalidity by reason of its

4   defective notary acknowledgment.  Wherein MERS, as a signer on

5   face of said document, presumably dated all its beneficiary

6   interests to HSBC in said deed of trust.  Therefore, this

7   evidence likewise contradict the very position taken by

8   objector that as of 2007 my loan was already owned by HSBC as

9   trustee.

10          Now, why did I say that?  The 2009 assignment is void,

11  as I hinted earlier, and perhaps this may be the reason why

12  objector attempted to correct such defect of invalidity in a

13  later document that I will discuss later.  The notary of

14  management is defective since a mere reading of the notary

15  acknowledgment shows that the notary public committed a

16  criminal act because she notarized a document prepared in

17  California when she is a notary public having jurisdiction in

18  the State of Pennsylvania.  Simply stated, the notary public

19  committed a very basic no when she notarized a document outside

20  of her notarial jurisdiction.  Now, what is the effect of this?

21  This patent defect makes said 2009 assignment void that if

22  confers no right and imposes no implication.  This means that

23  the said document is nothing.

24          Let me go forward.  Since this 2009 assignment that

25  mentioned HSBC for the first time is void, there is no black-

RESIDENTIAL CAPITAL, LLC, et al.                    10

1   and-white document that will support the theory as far as my

2   objector has earlier mentioned that HSBC owned my loan as early

3   as July 1st 2007.  Neither did it own it in 2008 and 2009.  And

4   how about in 2010?  There is, again, a dearth of any record

5   that would support the view that my loan was owned by HSBC in

6   that year.

7         How about the following year, in 2011?  There is a

8   document extant to the record that the deed of assignment was

9   executed by Ms. Smoot, presumably on behalf of HSBC, whereas

10  HSBC, through her, as its authorized officer, allegedly

11  assigned, for value received, meaning there is a money

12  consideration, all beneficial interest to GMAC Mortgage, LLC,

13  formerly known as GMAC Mortgage Corporation.  This is now the

14  very document that is the subject of the trial.  The 2011

15  assignment specifically for the purpose of determining whether

16  Ms. Smoot is armed with sufficient authority to execute it.  I

17  answer this question.  No, she is not authorized, and I am ever

18  asserting the fact now that HSBC has no right to execute said

19  document as there is no evidence whatsoever that as of 2011 it

20  is or become the owner of my loan.

21        As my evidence will and has established, the 2009

22  assignment is void by reason of defective material

23  acknowledgment.  Therefore, HSBC did not become the owner of my

24  loan by virtue of said assignment.  For that reason, and since

25  it's not the owner of my loan in 2009, it has no right to make

1  an assignment in 2011 in favor of GMAC.  And you have to

2  remember that Mira Smoot is also an employee of GMAC, and

3  there's a conflict of interest in that, Your Honor.

4       Now the issue as to the authority of Ms. Smoot is that

5  it's mooted.  That is because her principal, HSBC, is not

6  empowered to assign my loan to GMAC.  Therefore she is likewise

7  not empowered as to the 2011 assignment.  As the saying goes, a

8  stream cannot rise above its source.  Since Ms. Smoot's

9  authority is based on the assumption that HSBC is the owner of

10 my loan, and the evidence shows the negative, then by all means

11 it is presumed that Ms. Smoot has no authority to execute the

12 2011 assignment of the deed since she derived, obviously, her

13 authority from HSBC which is not even allowed to execute the

14 2011 assignment of the deed.

15      Finally, my evidence would establish that HSBC is

16 aware of the legal implication of the void document in 2009

17 assignment, had attempted to execute a corrected deed of

18 assignment in 2015 by virtue of document misleading start

19 corporate assignment of the deed of trust apparently signed by

20 one Rebecca Domb (ph.) and authorized before a notary public

21 who admittedly properly notarized it not the proper entity for

22 the purpose of expressly correcting the 2009 assignment of the

23 deed.

24      My question is this:  did this execution resurrect the

25 2009 assignment, which is proven to be void?  Of course not.

1  You cannot correct a void document by the later execution of

2  another document.  It is my honest feeling that it could not

3  validly confer to HSBC what it lacks in 2009, the ownership of

4  my loan.  And because my note and my deed of trust was

5  securitized, it became separated from each other.  GMAC put --

6  entered my loan -- original loan number on my deed of trust,

7  and they sold my note to Wells Fargo, who owns my note now,

8  with a loan number -- where is that?  I will tell you what's

9  the loan number, Your Honor; it's on there, okay?  My note -- I

10 think its end up with 4254 on the Wells Fargo side, okay.

11 Wells Fargo has that note with different note number in 2008,

12 October 2008, when GMAC instigated for me to default on the

13 loan so that I could be -- so that to be approved for the loan

14 modification.

15      So they told me in 2008, August 2008, that I have no

16 hardship; I had to default within ninety days and then call

17 them back.  It was the debtor, GMAC, who instigated that in

18 order for me.  And the reason why I say that because I talked

19 to the customer service and then all of a sudden I saw on the

20 Wells Fargo remittance that they reported my note defaulted as

21 of October 2008.  And I have that as part of my exhibit, and it

22 has already proven, Your Honor, that debtor, after Department

23 of Justice penalized debtor for 200 million for wrongful

24 foreclosure because of those fraudulent documentation that they

25 filed all over the nation, filed in bankruptcy court, in the

RESIDENTIAL CAPITAL, LLC, et al.                    13

1   court of state court, federal court, a document that has been

2   updated, document that has been robo-signed, signing without

3   the knowledge of this document what they're assigning.  Until

4   now they have still continuing it.  The 2013 limited power of

5   attorney that was filed in the court -- I hope Mr. Brian

6   Monasoto (sic).

7          Are you Brian Monasoto (sic)?

8          THE COURT:  No, these are my law clerks.

9          MS. ANIEL:  Oh, no.  I'm sorry.

10          THE COURT:  That's okay.

11          MS. ANIEL:  I even called him.  I said there was a

12   document that was filed in bankruptcy court 2013 that's

13   supposed -- that they gave to the Court.  If you remember that,

14   Your Honor, that I objected because they have attachment saying

15   that my loan was on the trust, which is HSBC as trustee for

16   Deutsche Alt Loan Trust Mortgage 2007-OA -- that's OA -- 2007,

17   that's OA5.  And you told the debtor to produce another

18   document to show that Mira Smoot has the authority to sign, and

19   this was -- the document was filed also in 2000 -- the limited

20   power of attorney in 2008, which was signed by Susie Moy,

21   witnessed by Nancy Luong and Doris Wong.  And the 2013

22   assignment of limited power of attorney signed by Fernando

23   Acebedo and authorized by Audrey Zabriskie had not

24   really -- Your Honor, was already expired since 2011.  So this

25   step -- I'm not the only one victim by the debtor until after

RESIDENTIAL CAPITAL, LLC, et al.                    14

 1  their bankruptcy in 2012.

 2         THE COURT:  May I ask you this?  I'm looking at the

 3  August 28th, 2008 limited power of attorney that HSBC executed

 4  by Ms. Moy, and you said it had expired.  I don't see

 5  anything --

 6         MS. ANIEL:  No, in 2013 --

 7         THE COURT:  No, stop.

 8         MS. ANIEL:  Okay.

 9         THE COURT:  I don't see anything in the limited power

10  of attorney that has a date -- an expiration date.  Do you

11  understand what I'm asking?

12         MS. ANIEL:  Oh, yeah, yes, yes, because yes, when in

13  California, Your Honor, when you have the power of attorney

14  there must be an expiration for that because that is only a

15  limited power of attorney.

16         THE COURT:  But this is --

17         MS. ANIEL:  But there was none.

18         THE COURT:  This is not a California limited power of

19  attorney.

20         MS. ANIEL:  I understand that.

21         THE COURT:  It's a New York limited power of attorney

22  that was granted.  And the issue isn't whether it continues

23  forever; the issue is whether this was in effect when Mira

24  Smoot executed the assignment.  But I just -- that's why

25  I'm -- I'm asking because you said it expired.  I don't see any

1   expiration date.

2          MS. ANIEL:  On my statement there was no expiration on

3   the limited power of attorney in 2008.  There was none.  So it

4   looks like it's limit -- it says "limited power of attorney".

5          THE COURT:  Okay.  Go ahead with your argument.

6          MS. ANIEL:  Okay.

7          THE COURT:  I just --

8          MS. ANIEL:  That's the reason why I mentioned that

9   power of attorney by Acebedo, signed and executed by Acebedo is

10  that that is the substituted document that was part, again, the

11  2008.  So if they do the 2013 assignment of the -- you know,

12  the power of attorney of 2013, signed by Acebedo, Mr. Acebedo,

13  who might think the 2008 is legitimate, is effective document.

14  That's my question, you know?

15         THE COURT:  Okay.

16         MS. ANIEL:  And also we have the issue this morning,

17  Your Honor.  I talked to the counsel for the debtor, Jessica --

18         THE COURT:  Arett, yes.

19         MS. ANIEL:  Mr. Wishnew.

20         THE COURT:  Yes.

21         MS. ANIEL:  Did I say it right?

22         THE COURT:  It's okay.  Go ahead.  I know who you're

23  talking about.

24         MS. ANIEL:  And so they asked for the -- I asked for

25  their --

1        THE COURT:  You wanted to see originals of some

2   documents?

3        MS. ANIEL:  Yes -- yes, Your Honor.  And she says that

4   Kathy Priore --

5        THE COURT:  Yes.

6        MS. ANIEL:  -- forgot it in Pennsylvania.  I said you

7   still make -- this is not original.  If you could produce an --

8        THE COURT:  Well, I ordered them to provide you with

9   the originals, and if they didn't they're going to have to

10  explain to me why they didn't do it.

11       MS. ANIEL:  What did you say?

12       THE COURT:  I ordered them to provide you with the

13  originals.

14       MS. ANIEL:  Exactly.

15       THE COURT:  And if they didn't do it they'll have to

16  explain to me why.

17       MS. ANIEL:  Okay.

18       THE COURT:  I said if they didn't do it they had to

19  have a witness to testify why.

20       MS. ANIEL:  Oh, yes.

21       THE COURT:  Leaving it behind in Pennsylvania is not a

22  valid excuse.

23       MS. ANIEL:  And I told them that, you know, from

24  Pennsylvania -- I was there in Pennsylvania in January, and

25  then I travelled two hours.

1        THE COURT:  Yeah.

2        MS. ANIEL:  You know?  It took only --

3        THE COURT:  Well, let's see -- we'll address that when

4   it comes up.

5        MS. ANIEL:  Okay.  And that's it, Your Honor, and

6   thank you very much for listening --

7        THE COURT:  Okay.  Thank you very much.

8        MS. ANIEL:  -- my opening statement.

9        THE COURT:  Okay.  I just want to make one other

10  comment.  I don't think we should have a time problem.  In the

11  pre-trial order, Ms. Aniel, I set a total of ten hours for the

12  trial, five hours today, five hours tomorrow.  So my law clerks

13  and I keep track of how much time you use, but I don't think

14  that should be a problem.

15       Mr. Wishnew, do you wish to make an opening statement?

16       MR. WISHNEW:  Your Honor, I'll waive an opening

17  statement.  I'd like to address one housekeeping matter.

18  And --

19       THE COURT:  Yes, go ahead.

20       MR. WISHNEW:  Sure.  First, Your Honor, with regards

21  to -- it's actually Ms. Aniel's witness, Nancy Luong --

22       THE COURT:  Yes.

23       MR. WISHNEW:  -- she has an obstetric appointment at 3

24  o'clock --

25       THE COURT:  Okay.

1          MR. WISHNEW:  -- this afternoon in Tribeca.

2          THE COURT:  Okay.

3          MR. WISHNEW:  My understanding is she has to leave no

4    later than 2:15.

5          THE COURT:  Okay.

6          MR. WISHNEW:  I don't want to tell Ms. Aniel how to

7    conduct her case --

8          THE COURT:  Yeah.

9          MR. WISHNEW:  -- but if we can accommodate Ms.

10   Luong --

11         THE COURT:  Yeah.

12         MR. WISHNEW:  -- it would certainly be appreciated.

13         THE COURT:  That's one of the HSBC --

14         MR. WISHNEW:  That's correct, Your Honor.

15         THE COURT:  -- witnesses.  And I usually try and

16   accommodate scheduling on witnesses, so I hope that's okay with

17   you, Ms. Aniel.

18         MS. ANIEL:  Yeah, it's okay for me.  I even told --

19         THE COURT:  My suggestion --

20         MS. ANIEL:  I'm sorry, I --

21         THE COURT:  My suggestion is:  you subpoenaed HSBC

22   witnesses; if you don't object, I think you should call them as

23   your first witnesses, let's get that out of the way, and then

24   they can be relieved and go back to their jobs or doctor's

25   appointments.

1          MS. ANIEL:  Is that okay if I do --

2          THE COURT:  Is that okay with you?

3          MS. ANIEL:  Yeah, I'm okay with it, but I don't have

4     the original copy of the --

5          THE COURT:  Yeah, I want to hear about that.

6          MR. WISHNEW:  I'll address that, Your Honor.

7          MS. ANIEL:  So tomorrow it is okay for them to --

8          THE COURT:  Well --

9          MR. WISHNEW:  Your Honor, so there is one original

10    copy; it is in Ms. Smoot's possession.  Ms. Smoot had it in her

11    bag this morning.  Long story short, her bag broke; she had to

12    switch bags.  It was inadvertently left in her bag which is

13    currently at her home in Philadelphia.  We are arranging to try

14    and get a courier to her house --

15         THE COURT:  Okay.

16         MR. WISHNEW:  -- to have it brought back to the court

17    presumably by about 3 p.m.

18         THE COURT:  Okay.  Well, we're scheduled for today and

19    tomorrow, so we'll -- but it better be here.

20         MR. WISHNEW:  Understood, Your Honor.  I'll just make

21    one more point that the exhibit that is in our binder as

22    Exhibit D, as in dog, it is the 2008 limited power of attorney.

23    It is a color copy of the original.  And we'll have Ms. Smoot

24    testify however she testifies, but that is the closest thing to

25    the original that we have currently in the courtroom.

RESIDENTIAL CAPITAL, LLC, et al.                    20

1          THE COURT:  Well, we'll get an explanation for it.

2          MR. WISHNEW:  Okay.

3          THE COURT:  Okay.  All right.  Thank you.

4          Okay.  Ms. Aniel, do you want to call your first

5    witness?  I would suggest that let's get the HSBC witnesses to

6    testify first so that they can be released and go back to their

7    jobs or doctor's appointment, okay?  Is that all right, Ms.

8    Aniel?

9          MS. ANIEL:  Yes, will we just use the copy?

10         THE COURT:  Yes.  Yes.

11         MS. ANIEL:  Okay.  But they could state just that --

12         THE COURT:  They have to.

13         MS. ANIEL:  Yeah.  Thank you very much, Your Honor.

14         THE COURT:  They have to.  Okay.  All right.

15         So who is your first witness?

16         MS. ANIEL:  I would like to call -- Nancy, right?

17         THE COURT:  Okay.

18         MS. ANIEL:  Thank you, Nancy, for coming.

19         THE COURT:  Come on up to the witness stand.  You'll

20   stand and raise your right hand and you'll take the oath, okay?

21      (Witness sworn)

22         THE COURT:  All right.  Please have a seat.  What is

23   your name?

24         THE WITNESS:  Nancy Luong.

25         THE COURT:  I'm sorry, I didn't -- you have to keep

1  your voice up.  The last name I didn't hear.

2          THE WITNESS:  Luong.

3          THE COURT:  Luong, okay.  And you have water in front

4  of you.

5          THE WITNESS:  I do.  Thank you.

6          THE COURT:  There's a water pitcher there if you --

7          THE WITNESS:  Thank you, Your Honor.

8          THE COURT:  -- if you want some.

9          All right.  Go ahead, Ms. Aniel.

10          MS. ANIEL:  Is this okay?

11          THE COURT:  You ask your questions from there.  If you

12  want to show her some documents you can --

13          MS. ANIEL:  Okay.

14          THE COURT:  -- you can come up to her and give her the

15  documents.

16          MS. ANIEL:  Hi, Ms. Luong.

17          THE WITNESS:  Thank you.

18          THE COURT:  And what you need to do is identify the

19  exhibit number -- go back to the microphone, if you will, okay?

20  And tell us what exhibit you've put in front of her.

21  DIRECT EXAMINATION

22  BY MS. ANIEL:

23  Q.  Ms. Luong -- is that right, [Long]?

24  A.  Yeah.

25  Q.  Or [Lu-ong']?

RESIDENTIAL CAPITAL, LLC, et al.                    22

1    A.   [Lu-ong'] is fine.

2    Q.   Oh, okay.  So anyway, thank you for coming here, but we

3    have to find out the truth, okay?  You have the copy, right, I

4    gave you, the power of attorney --

5              THE COURT:  Could you tell me what it is you've put in

6    front of her?

7              MS. ANIEL:  It's a 2008 limited power of attorney.

8              THE COURT:  Okay, this is the Trust's Exhibit D, as in

9    David?

10             MS. ANIEL:  Yes, I believe so.

11             THE COURT:  Okay.

12             MS. ANIEL:  Yes.

13             THE COURT:  So the Trust had a small binder with

14   exhibits.

15             MS. ANIEL:  Oh, because I'm looking on my --

16             MR. WISHNEW:  Your Honor, it's number 6 in this --

17             THE COURT:  Is it the same document?

18             MR. WISHNEW:  I believe so, Your Honor, yes.

19             THE COURT:  Okay.

20             MS. ANIEL:  Sorry.

21             THE COURT:  That's okay.  All right.

22             MS. ANIEL:  The one that I have is --

23             THE COURT:  All right.  So it appears to me that Ms.

24   Aniel's Exhibit number 6 is the same as the Trust's Exhibit D

25   as in David.

RESIDENTIAL CAPITAL, LLC, et al.                          23

1          MS. ANIEL:  Exactly, Your Honor.

2          THE COURT:  Okay.  All right.  And that's in front of

3    the witness?

4          MS. ANIEL:  Yes.

5    BY MS. ANIEL:

6    Q.  Hello, Nancy.

7    A.  Hello.

8    Q.  Can I call you Nancy or Ms. Luong?

9    A.  Yeah, Nancy's fine.

10   Q.  Just Nancy.  Okay.  Could you state your name for the

11   record, please?

12   A.  Nancy Luong.  Nancy Luong.

13   Q.  Okay.  Before -- congratulations for the new baby.

14   A.  Thank you.  Thank you.

15   Q.  Okay.  Where do you work right now?

16   A.  I work at HSBC.

17   Q.  How long have you work --

18         THE COURT:  Hang on.  Just pull the microphone a

19   little closer to you.  That's it.

20         THE WITNESS:  Okay.

21         THE COURT:  Okay?  How long have you worked there?

22   A.  Almost eight years.

23   Q.  Almost what?

24   A.  Eight years.

25   Q.  Oh, that was way back in --

1    A.  2008.

2    Q.  2008?  Oh, do you know what date was that?  You know what

3    date when you were hired by HSBC?

4    A.  The date I was hired?

5    Q.  The date that you --

6    A.  August 25th, 2008.

7    Q.  August?

8    A.  Yes, 25th.

9    Q.  25th?

10   A.  Yeah.

11   Q.  Hum.  And after three days you signed as a witness, huh?

12   A.  Yes.

13   Q.  Okay.  Can you tell me what is your position in HSBC?

14   A.  Corporate trust specialist.

15   Q.  Corporate trust specialist.  What is your duties and

16   responsibilities being a corporate trust --

17           THE COURT:  Corporate trust specialist.

18   Q.  -- specialist?

19           THE COURT:  Yes.  Go ahead.

20   A.  We -- we're a trustee for these indenture agreements.  We

21   perform limited duties.  We -- we sign documents -- we review

22   them, sign them, and we process them, and we provide them to

23   the servicers upon request.

24   Q.  So is -- I really -- but can you speak louder, please?

25           MS. ANIEL:  And also I want the Court to note, Your

RESIDENTIAL CAPITAL, LLC, et al.                    25

1    Honor, English is also my second language.

2            THE COURT:  Okay.

3            MS. ANIEL:  So --

4            THE COURT:  You're doing fine.

5            MS. ANIEL:  Oh, thank you very much.  But sometimes

6    when I speak, like, just correct me if I'm -- if you don't

7    understand.

8            THE COURT:  If I don't understand, I'll ask.  If the

9    witness doesn't understand, she'll ask.  We'll get it all just

10   fine, okay?

11           MS. ANIEL:  Okay.

12   Q.  So can you repeat that?  What is --

13           THE COURT:  No, they're my law clerks.

14           MS. ANIEL:  Who is this?

15           THE COURT:  It's a recording, but it's a voice

16   recording system, so it's not really feasible to read it back.

17   Go ahead and repeat your question, okay?

18   Q.  Okay.  What is your responsibilities and duties as a

19   corporate trust specialist?

20   A.  Well, we have a lot of responsibilities, but one of the

21   responsibilities is reviewing documents, signing documents,

22   pretty much under the agreement that we're -- we're contracted.

23   Q.  Is signing as a witness on a limited power of attorney is

24   one of your duties too?

25   A.  Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    26

1   Q.   Okay.  Did you -- so you were only three days when you

2   were -- you seem to sign -- witness this document.  So are you

3   trained?  Were you trained at that time?

4   A.   Yes.

5   Q.   So three days after you were hired you signed as a

6   witness?

7   A.   Correct.

8   Q.   Witnessing Susie Moy?

9   A.   Yes.

10  Q.   Oh, okay.  So you're so fast at learning things.  Okay.

11          MR. WISHNEW:  Objection, Your Honor.

12          THE COURT:  Overruled.

13  Q.   Did you see Susie Moy signing this document?

14  A.   Yes.  Yes.

15  Q.   Where?

16  A.   In the office where we worked --

17  Q.   What office?  Can you tell me what's the address of that

18  office that you -- you signed this 2008 limited power of

19  attorney?

20  A.   Yes.

21          THE COURT:  Tell us what the address of the office

22  was?

23          THE WITNESS:  The actual address?

24          THE COURT:  Yes --

25          THE WITNESS:  Okay.

1            THE COURT:  -- the physical address of the office.

2            THE WITNESS:  At that time it was 10 East 40th Street,

3    New York, New York.

4            THE COURT:  Okay.

5            MS. ANIEL:  Your Honor, I forgot to ask also -- the

6    witnesses are here?

7            THE COURT:  They are.

8            MS. ANIEL:  Yeah, isn't it that they're supposed to be

9    secluded while she is testifying, right?

10           THE COURT:  Are you requesting that the witnesses be

11   excluded from the courtroom?

12           MS. ANIEL:  No, while she is testifying, Your Honor,

13   because she might --

14           THE COURT:  Okay.  All right.

15           MS. ANIEL:  Sorry, Your Honor.

16           THE COURT:  So who are the other witnesses?

17           MS. FERGUSON:  Your Honor, Meghan Ferguson from

18   Williams & Connolly.  I'm here with the HSBC witnesses.

19           THE COURT:  Okay.  So the HSBC witnesses should

20   be -- all the witnesses should step out into the hall.  I

21   apologize, but that's what we have to do.

22           MS. FERGUSON:  Okay, no problem.

23           THE COURT:  If the request to exclude witnesses from

24   the courtroom is made, it's permissible, so --

25           MS. FERGUSON:  Yes, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                    28

1            THE COURT:  Okay?  See, unless you request that, it

2    doesn't happen?

3            MS. ANIEL:  Oh, you know what?  I forgot and --

4            THE COURT:  No, I really --

5            MS. ANIEL:  That's on my mind, of course.

6            THE COURT:  No, but I'm --

7            MS. ANIEL:  Thank you, Your Honor.

8    BY MS. ANIEL:

9    Q.  So you saw her signing the limited power of attorney in

10   2008?

11           THE COURT:  She said that already.  Go ahead.  Ask

12   your -- we don't want to repeat questions.  Just ask new

13   questions.

14   Q.  Okay.  Repeat your ques -- repeat your answer, please.

15           THE COURT:  She already told you that she -- the

16   witness -- Ms. Moy came to you and you signed as a witness, is

17   that right?

18           THE WITNESS:  Correct.

19           THE COURT:  Okay.  She said that before.  Go ahead.

20   Q.  Okay.  Did you see Ms. Moy sign it in front of a notary

21   public?

22   A.  Can you repeat that question?

23   Q.  Did you see Moy signing it in front of a notary public?

24   A.  We -- we sit in the same office, and we -- we signed

25   the -- the document.

1      THE COURT:  May I suggest just that the notary shown

2   is Nina Nassar.

3      THE WITNESS:  Yes.

4      THE COURT:  Was she in the office as well?

5      THE WITNESS:  Yes, she was.

6      THE COURT:  In the same office?

7      THE WITNESS:  Same office.

8   Q.  So did you see her signing in front of a notary public?

9      THE COURT:  Did you see who sign in front of a notary

10  public?

11  A.  Who sign?

12  Q.  Susie Moy.

13  A.  Will you repeat that?

14  Q.  Okay.  Did you see Susie Moy signing it in front of Nina

15  Nassar, who is a notary public?

16  A.  I'm -- we -- we signed in the same office so I'm not sure

17  what you're saying "in front of" her.

18  Q.  Is it that you said that she signed it -- you see Susie

19  Moy signing it, right?

20      THE COURT:  Was Nina Nassar in the same office?

21      THE WITNESS:  Yes, she was.

22      THE COURT:  And at the time that this was signed?

23      THE WITNESS:  Yes.

24      THE COURT:  Ask your next question.

25  Q.  So she signed it?  Okay.  What about Doris Wong; did she

RESIDENTIAL CAPITAL, LLC, et al.                30

1  sign it?  Did you see an actual -- did you see Doris Wong sign

2  it in front of Susie Moy as a witness?

3  A.  We signed it in -- in the same office.

4  Q.  Yeah, but is that together?  I know that you're in the

5  same office, but did you sign it together with Doris Wong?

6  A.  Well --

7  Q.  In front --

8  A.  No, I sign it and then I pass it to Doris to sign as well.

9         THE COURT:  And she signed it?

10        THE WITNESS:  Yes.

11 Q.  So you just passed it to Doris Wong?

12 A.  Correct.

13 Q.  To have it signed, right?

14 A.  Correct.

15 Q.  Okay.  So Doris Wong --

16        THE COURT:  Can I just understand?  Susie Moy, you,

17 Nancy Luong, Doris Wong, and Nina Nasser were all in the same

18 physical office space --

19        THE WITNESS:  Correct, Your Honor.

20        THE COURT:  -- when this was signed?

21        THE WITNESS:  Correct.

22        THE COURT:  Okay.

23 Q.  So they just -- my question is did you sign -- did you see

24 Doris Wong also signing it in front of Susie Moy?  Were you

25 seeing Susie Moy signing the --

RESIDENTIAL CAPITAL, LLC, et al.                    31

1   A.  We -- we all signed this limited power of attorney in the

2   same office in the same space.

3   Q.  Yeah, in the same office; it's like, you know, in the same

4   office, but of course Susie Moy has her own room for -- right?

5   Because she's -- according to the documents, she's a vice

6   president.  She must have her own suite, right?

7           THE COURT:  Were you all in the same -- did you all

8   share the same office?

9           THE WITNESS:  Yes, we did, the same space --

10          THE COURT:  The same space?

11          THE WITNESS:  -- in the office.

12  Q.  The same space?  She doesn't have -- the -- it's just an

13  open space?

14  A.  Yes, it's an open space.

15  Q.  She doesn't have her own office?

16          MR. WISHNEW:  Objection, Your Honor.  Asked and

17  answered.

18          THE COURT:  Overruled.  Give her a little leeway.

19          Ask your next question.

20  Q.  Okay.  Where is Nina Nassar now?

21  A.  She's not here right now.  She's not in the same --

22          THE COURT:  Does she still work at HSBC?

23          THE WITNESS:  Oh, she -- yes, she -- yes, she does.

24          THE COURT:  Okay.

25  Q.  She does work still in HSBC New York?

RESIDENTIAL CAPITAL, LLC, et al.                    32

1    A.  Not in New York.

2    Q.  Where?

3    A.  She works in Chicago of HSBC.

4    Q.  Oh, okay, because that's what information I got from

5    shared office, okay.

6           THE COURT:  Okay.  Let's leave the commentary out.

7           MS. ANIEL:  Oh, I'm sorry.

8           THE COURT:  You're entitled to ask questions and

9    that's all.

10          MS. ANIEL:  Okay.  Thank you, Your Honor.

11   Q.  Okay.  So did you see Susie Moy reading the limited power

12   of attorney before she signed this?  Did you see her reading

13   the doc -- reading the contents of the limited power of

14   attorney before she signed it?

15   A.  I see that she did sign this power of attorney.

16   Q.  So she --

17          THE COURT:  Did you see her read it before she signed

18   it?

19          THE WITNESS:  No.

20          THE COURT:  Okay.

21   Q.  Did you read the limited power of attorney?

22   A.  Yes, when I signed it.

23   Q.  You read it before you sign it?

24   A.  Yes.

25   Q.  But you didn't see Susie Moy --

1          THE COURT:  Okay, you asked that she answered it one

2    time.  Ask your next question.

3          MS. ANIEL:  Okay.

4    Q.  Do you know what time you signed this?  Do you remember

5    what time you signed this?

6    A.  I don't recall the time.

7    Q.  Is it in the morning, the afternoon?

8    A.  I don't recall.  It's been eight years ago, approximately.

9    Q.  Okay.  Is this -- this was your -- part of your duties,

10   right?

11         THE COURT:  Asked and answered.  Ask your next

12   question.  You already asked this.

13         MS. ANIEL:  No, I say --

14         THE COURT:  You did.  You asked the question --

15         MS. ANIEL:  Yeah?

16         THE COURT:  -- early on in the examination.

17   Q.  What other documents did you sign aside from limited power

18   of attorney?

19   A.  Letters -- letters for the bank.  Letters for the bank.

20   Q.  Letters for the bank?  Can you speak, because I have also

21   hearing --

22   A.  Okay.  No problem.

23   Q.  -- problem.  Letters to the bank?

24   A.  Letters for the bank.

25         THE COURT:  For the bank.

RESIDENTIAL CAPITAL, LLC, et al.                    34

1          THE WITNESS:  For the bank.

2          THE COURT:  Letters for the bank.

3          MS. ANIEL:  For the bank, oh, okay.

4   Q.  Did you send letters to the loan servicer, GMAC?  You sent

5   them in your --

6          THE COURT:  Okay.  This witness' relevance to this

7   proceeding was as one of the witnesses to the limited power of

8   attorney.  I'm going to limit what you can ask this witness

9   about.  So confine your questions to the reason the witness is

10  here.  There was a motion to squash the subpoena.  I denied

11  that motion with respect to several of the HSBC witnesses

12  because of their relevance to the power of attorney that was

13  signed.  And that's what I'm going to permit your examination

14  about.  Do you have any other questions you wish to ask about

15  that?

16         MS. ANIEL:  Okay, Your Honor.

17  Q.  How long do you know Doris Wong?

18  A.  For almost eight years.

19  Q.  Oh, okay.  Are you a notary public, Nancy?

20  A.  No.

21  Q.  Are you a notary public?

22  A.  Notary, you're saying?

23         THE COURT:  Yeah, are you a notary --

24  A.  Notary public?

25         THE COURT:  Are you a notary public?

RESIDENTIAL CAPITAL, LLC, et al.                    35

1    A.  No.

2    Q.  No, you're not?  Is Doris Wong a notary public?

3    A.  Yes, I'm aware she is.

4    Q.  Is there notary publics under HSBC Bank, corporate?

5    A.  I don't understand that question.

6              THE COURT:  Okay, look --

7              MS. ANIEL:  I will ask her other --

8              THE COURT:  Ms. Aniel?

9              MS. ANIEL:  Yeah.

10             THE COURT:  You have Doris Wong here --

11             MS. ANIEL:  Oh, yes, yes.

12             THE COURT:  -- as a witness.  You have Susie Moy

13   here --

14             MS. ANIEL:  Okay.

15             THE COURT:  -- as a witness.

16   Q.  Okay.  What is your understanding of this limited power of

17   attorney in 2008?

18   A.  This limited power of attorney was signed so that it could

19   be given to the servicer to perform their duties as servicer

20   for loans that they service.

21   Q.  Okay.  Do you know that this limited power of attorney has

22   an attachment from you guys?

23   A.  Yes, I -- I see that.  It was -- there's an Exhibit A

24   attached to this limited power of attorney.

25   Q.  Did you go through all this -- the name of the trust that

RESIDENTIAL CAPITAL, LLC, et al.                    36

1   was attached to the limited power of attorney?

2   A.  I -- I read it, yes.

3   Q.        Okay.  It says here one of the trusts that was listed

4   on this power of attorney it says HSBC Bank USA National as

5   trustee for Deutsche Alt-A Securities Mortgage Loan Trust,

6   Series 2007-OA5

7   A.    Yes.

8   Q.  Is that correct?  Is that correct name of the trust?

9   A.  Yes, I see that on the Exhibit A of the limited power of

10  attorney.

11  Q.  Okay.  Is DALT 2007-OA, is that the same as the name of

12  this trust, DALT, say DALT, D-A-L-T 2007-OA5?

13  A.  You mean -- would you repeat that again?

14  Q.  Is that the same name Deutsche Alt-A Securities Mortgage

15  Loan Trust Series 2007-OA5?  Is that the same as HSBC as

16  trustee for DALT, D-A-L-T, 2007-OA5?  Is that the same trust

17  name?

18  A.  You say -- did you say that -- you said HSBC --

19  Q.  I --

20  A.  -- as trustee --

21  Q.  D as in dog.

22  A.  Um-hum.

23  Q.  A, apple, L, Larry, T, Tom, 2 --

24  A.  Yes.

25  Q.  -- 00 -- oh, yes, okay.  Okay.  If you go to, on the page

RESIDENTIAL CAPITAL, LLC, et al.                    37

1  second, it says "Exhibit A continued".

2  A.  Um-hum.

3  Q.  It says "updated as of October 5, 2006".  Is that correct?

4  A.  Yes, I see that here on the Exhibit A.

5  Q.  Is that correct?  This is the continuation of Exhibit A,

6  the first page?

7  A.  Correct.

8  Q.  Okay.

9        THE COURT:  Did you have all three pages of this

10  exhibit at the time that you witnessed it?

11        THE WITNESS:  Yes.

12  Q.  Okay.  So this is -- is this genuine?  Is this a genuine

13  limited power of attorney from your office, HSBC?

14  A.  Yes.

15  Q.  Okay.  So can you explain why it was updated as of October

16  5, 2006, on the attachment they updated that, and tell me why

17  is it updated as of October 6, 2000 -- I'm sorry, 2000, October

18  5 -- updated October 5, 2006.  Can you explain why it was

19  updated as of October 5th, 2006?

20  A.  The wording "updated as of October 5, 2006", I believe it

21  was in the header of the Word doc, so it printed out when -- as

22  we printed this limited power of attorney.

23  Q.  So why is it that the trust name, Deutsche Alt Securities

24  Mortgage Loan Trust, Series 2007-OA was included in this if

25  this attachment was updated on October 5, 2006?

RESIDENTIAL CAPITAL, LLC, et al.                    38

1   A.  The last page -- the third page to the limited power of

2   attorney has the old -- has that header there, but the limited

3   power of attorney is -- that we -- we dated was August 28,

4   2008.

5   Q.  What is your expl -- can you repeat your explanation,

6   please?  I'm asking you:  you said a while ago that Exhibit A

7   is the continuation of exhibit -- on the second page.  So

8   Exhibit A continued, and it was updated in October 5, 2006.

9   A.  That was just a header.  It wasn't -- it wasn't -- it was

10  a header to the -- to the third page.

11  Q.  So you want the Court to believe this was a header.  What

12  kind of header?  It was the time when you put up this name of

13  the trust, is that what it is?

14  A.  No.  Just -- can you repeat that again?

15           THE WITNESS:  She's saying -- is she asking for --

16  A.  Are you asking the date of the limited power of attorney

17  was signed?

18  Q.  No, the -- when we're talking about the power of attorney,

19  we're talking about the attachment on the power of attorney --

20  A.  Okay, yeah.

21  Q.  -- the two pages.

22  A.  Okay.

23  Q.  There are thirty names of the trust that were attached to

24  the power of attorney.  Forget about the power -- the

25  attachment.

1  A.   Okay.

2          THE COURT:  Ms. Aniel, I'll ask this:  do you agree

3  that your mortgage was included in the Series 2007-OA5?

4          MS. ANIEL:  I believe Your Honor --

5          THE COURT:  Do you agree that your mortgage was

6  securitized and included in the entry for -- I won't read the

7  entire entry but it's Deutsche Alt-A Securities Mortgage Loan

8  Trust, Series 2007-OA5?  It's the next to the last entry on the

9  first page of Exhibit A.  Do you agree that your mortgage was

10 included -- was securitized and included in that securitization

11 trust?

12         MS. ANIEL:  I don't agree that my loan -- my

13 particular loan was included in the trust.  That's why I was

14 asking if this was updated in October 5th, 2006, why is it that

15 the 2007 trust was not born yet, okay?

16         THE COURT:  She said that when she signed as a witness

17 in August of 2008, the two-page attachment, Exhibit A, was

18 attached to it.  That's what she said.  You called her as a

19 witness about her witnessing this document.  She's testified

20 about it.  She testified about her signing it.  She testified

21 about Ms. Moy signing it.  She testified about Ms. Luong

22 signing it.  She testified about Ms. Nasser notarizing it.

23 What other relevant questions do you have of this witness?

24         MS. ANIEL:  The relevant question is that I believe

25 that this document was updated as of 2006, Your Honor, so I'm

1    ask --

2            THE COURT:  She wasn't even there in 2006.  She

3    testified --

4            MS. ANIEL:  Oh, yes --

5            THE COURT:   -- what she saw, read it, signed -- you

6    know, signed as a witness, saw the other people sign it.

7            MS. ANIEL:  She just follow signing it --

8            THE COURT:  Do you have any other questions?

9            MS. ANIEL:  That's it, Your Honor.

10           THE COURT:  Okay.

11           MS. ANIEL:  Thank you, Your Honor.

12           THE COURT:  Cross-examination?

13           MR. WISHNEW:  Your Honor, I have no questions for Ms.

14   Luong.

15           THE COURT:  Okay.  You're excused.  Thank you very

16   much.

17           MS. ANIEL:  You're excused, Nancy.

18           THE WITNESS:  Thank you.

19           THE COURT:  All right.  Who is your next witness, Ms.

20   Aniel?

21           MS. ANIEL:  I think Doris Wong, Your Honor.

22           THE COURT:  Okay.

23           MS. ANIEL:  Doris Wong.

24           THE COURT:  Ms. Wong?  Let's get -- could you get Ms.

25   Wong to come back in?

RESIDENTIAL CAPITAL, LLC, et al.                41

1         If you would come up to the witness stand, Ms. Wong,
2    you'll be sworn, and then you -- first raise your right hand
3    and you'll be sworn and then you'll be able to sit down, okay?
4         (Witness sworn)
5         THE COURT:  All right.  Please have a seat.  If you'd
6    like some water, there's water there as well.
7         THE WITNESS:  Okay.  Thank you.
8         THE COURT:  Okay?
9         All right.  You have to try and keep your voice up
10   when you speak, okay?
11        THE WITNESS:  Okay.
12        THE COURT:  All right.  Thank you very much.
13        Go ahead, Ms. Aniel.
14   DIRECT EXAMINATION
15   BY MS. ANIEL:
16   Q.  Good morning.
17   A.  Good morning.
18   Q.  Do you want me to call you Ms. Wong or Ms. Doris?
19   A.  Doris is fine.
20   Q.  Doris, good.  Thank you.  Easy to remember.
21        MS. ANIEL:  Is there any way that I could ask their
22   identification I.D., Your Honor?
23        THE COURT:  I'm sorry; I don't understand.
24        MS. ANIEL:  Is there any way I could ask their
25   identity through their driver license?  Is that okay?

1          THE COURT:  No, I'm not going to allow it.  There's no

2     reason to.

3          Tell me what's your full name, where do you work, how

4     long have you worked there?  Let's get that.

5          THE WITNESS:  My name is Doris Wong.  I work at HSBC.

6     This coming May will be ten years at HSBC.

7          THE COURT:  Okay.

8     Q.  What year you were hired by HSBC?

9     A.  2006.

10    Q.  Pardon, again?

11    A.  2006.

12    Q.  2006.  Do you know what year was that?

13         THE COURT:  I don't understand.

14    Q.  Do you know what month was that?

15    A.  May.

16    Q.  May 2006.

17         THE COURT:  What is your position at HSBC?

18         THE WITNESS:  Currently it's controller reporting

19    manager.

20         THE COURT:  And what was it in August of 2008?

21         THE WITNESS:  I was a senior corporate trust

22    specialist.

23         THE COURT:  Okay.  All right.  Go ahead, Ms. Aniel.

24    Q.  Can you tell me what is your responsibility as of 2008 as

25    a manager corporate of the trust?

RESIDENTIAL CAPITAL, LLC, et al.                    43

1   A.  I -- I was a senior corporate trust specialist.  I

2   reviewed documents.  I processed any requests from our client

3   accordance to our documents.

4   Q.  So how many trust did you handle?  Did you handle the

5   trust itself?

6   A.  I handle a few, yes, trusts, but I can't recall how many.

7   Q.  In 2008 you don't recall how many trusts did you handle?

8   A.  No, I can't recall.

9   Q.  Okay.  I'll give you a copy of the limited power of

10  attorney.

11          THE COURT:  I think she probably has it up there.

12          MR. WISHNEW:  It's in the small binder.

13          MS. ANIEL:  I think you have that.

14          THE COURT:  Yeah, if you'd look at Exhibit D, as in

15  David, in that binder, it's the same as Exhibit 6 in Ms.

16  Aniel's binder, okay?

17          THE WITNESS:  Okay.

18          THE COURT:  Go ahead, Ms. Aniel.

19  Q.  Okay.  Ms. Wong, you signed this as -- did you see Susie

20  Moy signing this in front of you?

21  A.  We sat very close to each other and -- in the office, and

22  I recognize her signature.

23  Q.  So how close you are from Ms. Moy?

24  A.  We sat just cubes away.

25  Q.  So --

RESIDENTIAL CAPITAL, LLC, et al.                    44

1    A.  Just right behind me.

2    Q.  So you have a cubes -- it's like a -- you have a cubes?

3    You have your own cubes in the office?

4    A.  It's an open office.

5    Q.  Open office, okay.  So how far are you when you -- how far

6    are you from Ms. Moy, from where you were located in the second

7    office.  How far?  Can you estimate, just estimate?

8    A.  Just a desk or two away.

9    Q.  Is that two feet?  Two feet?

10   A.  No, I --

11   Q.  Three feet?

12   A.  I don't know in feet.

13   Q.  But it's close, right?

14   A.  Yeah.

15   Q.  So when she signed this power of attorney, are you there,

16   or she already signed it when she gave it to you?

17   A.  She has -- I would receive the POAs with the signature

18   signed.

19   Q.  So she brought it to you with her signature signed?

20   A.  Yes.

21   Q.  Okay.  Did you see her signing in front of the notary

22   public, the name of Nina Nassar?

23   A.  We have -- it's common practice that we have -- we have a

24   system that we basically sign.  She -- Susie would prepare the

25   POAs and we will sign as witnesses, and then it'll be brought

RESIDENTIAL CAPITAL, LLC, et al.                    45

1   to the notary.

2   Q.  So in other words, Susie Moy signed this limited power of

3   attorney without somebody witnessing it, not in front of the

4   notary, so you have -- she didn't sign it -- you didn't see her

5   signing it in front of Nina Nassar, a notary public?

6   A.  We were in the same open office.

7   Q.  But you did not sign it -- but you did not see her signing

8   it in front of Nina Nassar?

9   A.  No.

10  Q.  Did you see her signing it in front of Nancy, though?

11  A.  No.

12  Q.  Okay.  So I assume that the papers were already signed by

13  Susie Moy, given to Nancy Luong, and given to you, is that the

14  right --

15  A.  Yes.

16  Q.  And then give it to Nina Nassar who would notarize the

17  document?

18  A.  Yes.

19  Q.  Okay.  Did you sign this?  Is this your signature in 2008?

20  A.  Yes.

21  Q.  Can I ask you a specimen of your signature to show to the

22  Court if this is actually your signature?  Can you sign it?

23         MR. WISHNEW:  Objection, Your Honor.  Asked and

24  answered.

25         THE COURT:  No, she wants an exemplar of Ms. Wong's

1  signature.  Do you have a plain piece of paper?  Please bring

2  the piece of paper up to Ms. Wong and I'll ask her to sign it.

3          Go ahead and sign it.

4          We're going to mark that as a court exhibit.  I'm

5  going to mark it as Court Exhibit 1, and it is a piece of lined

6  paper on which Ms. Wong has signed.

7  (Signature specimen of Doris Wong was hereby marked for

8  identification as Court's Exhibit 1, as of this date.)

9          THE COURT:  Would you like to look at it, Ms. Aniel?

10  I've examined it.  Yeah, if you'd like to compare it.  I'll

11  just say I've compared it to the signature on the limited power

12  of attorney, which is Aniel Exhibit 6, and the Trust Exhibit D,

13  and it appears to be identical.

14          MS. ANIEL:  Yes, I would just like this when I receive

15  the original copy of the limited power of attorney.

16          THE COURT:  Well, you'll give it back to the Court.

17          MS. ANIEL:  Okay.

18          THE COURT:  And the Court will -- give it to one of my

19  law clerks, Ms. Aniel.  We'll hold it, and you'll be able to

20  compare it when you see the original, okay?

21  Q.  On the copy from the Trust that you were provided, you

22  both signed it in a blue color, is that correct?

23  A.  Well, what I'm seeing here, it's in color.  And -- and

24  according to this copy it's blue, but I -- I can't recall what

25  I signed -- in what color I signed in 2008.

RESIDENTIAL CAPITAL, LLC, et al.                    47

 1   Q.  Okay.  Because --

 2           THE COURT:  Ask your next question.

 3   Q.  Okay.  Did you read this limited power of attorney before

 4   signing it?

 5   A.  Briefly read.

 6   Q.  Did you understand what it is?

 7   A.  It's a limited power of attorney --

 8           THE COURT:  Did you understand then what it was?

 9           THE WITNESS:  Yes.

10   Q.  Can you explain what is your understanding of this limited

11   power of attorney?

12   A.  As a part of HSBC as trustee on -- on these trusts, we

13   are -- we review the doc -- our documents to ensure that when

14   the servicer requests for a POA we are allowed to give the

15   servicer a POA.  And the POA is basically allowing the servicer

16   to sign on behalf of HSBC for performing whatever they need as

17   a servicer.

18   Q.  Is that including also assigning and assignment of the

19   deed?

20   A.  I -- yes.

21   Q.  So you authorized, on this limited power of attorney, it

22   means that HSBC, your employer, as a principal, and then

23   appointing GMAC Mortgage, LLC as their agent to do all these

24   administrative duties, is that correct?

25   A.  HSBC has limited duties, and the servicers have a lot of

1   responsibilities where we sign the POA for them to perform.

2   Q.  Why is it that -- who usually -- did the trustee, HSBC

3   trustee do the assignment of the deed?  Did you designate that

4   with the loan servicer?  Who's supposed to record executed

5   assignment of the deed?

6   A.  Servicer.

7   Q.  Servicer?  Okay.  So do you know Mira Smoot?

8   A.  No.

9   Q.  You don't know her?

10   A.  Well, I don't know her and I -- I don't handle the deals

11   that were -- where GMAC was the servicer.

12   Q.  Oh, I see.  Okay.  Do you know -- is it -- on this limited

13   power of attorney, is this your -- the interpretation of this

14   limited attorney, you're only -- the trustee only giving this

15   limited administrative duties to do their job, am I right?

16   GMAC job to sign for it, to execute, acknowledge, and deliver

17   another one.

18   A.  So the POA allows the GMAC to sign on our -- on our

19   behalf.

20   Q.  Okay.  GMAC, as a corporation?

21   A.  The servicer.

22   Q.  Okay.  Does it mean that the employee -- any employee of

23   GMAC could sign it on behalf of HSBC as authorized officer?

24   A.  I'm not too sure I understand your question.

25   Q.  Does the trustee -- HSBC, as trustee, authorize also GMAC

RESIDENTIAL CAPITAL, LLC, et al.                    49

1  employees to sign on behalf of the trustee, on behalf of HSBC?

2  A.  It allows the servicer to sign, but I don't know what the

3  company's practice is.

4  Q.  So in other words, HSBC did not authorize Mira -- because

5  Mira is an employee of GMAC.

6  A.  In order for -- so I can only attest to what the bank

7  does, right?  The bank has a -- we sign based off of whatever

8  we're allowed to because of -- of an authorization provided by

9  the bank.  So I can't say what -- I can't say what GMAC is

10  allowed and not allowed except for the fact that we provided a

11  POA to allow GMAC to sign on behalf of HSBC.

12  Q.  So in your understanding, only GMAC, as a corporation of

13  limited liability, could only do that act, not the employee of

14  GMAC?

15         THE COURT:  I don't understand.

16         MS. ANIEL:  Because she's saying, Your Honor, that

17  they empower GMAC.

18         THE COURT:  She can testify about what HSBC's

19  practices were, not about GMAC's.  She was a witness to a

20  document.  She's testified about witnessing it and about it

21  being notarized and who signed it.  Ask your next question.

22  Q.  Okay.  Did you have any document to show that Mira Smoot

23  is authorized officer of HSBC --

24         MR. WISHNEW:  Objection, Your Honor.

25  Q.  -- Bank as trustee?

RESIDENTIAL CAPITAL, LLC, et al.                    50

1          THE COURT:  Sustained.  Ask your next question.

2    Q.  Are you a notary public?

3    A.  Yes.

4    Q.  When was your --

5          THE COURT:  She didn't sign this as a notary.  It's

6    not relevant.

7          MS. ANIEL:  Okay.

8          THE COURT:  Ask a question that's relevant.

9          MS. ANIEL:  Oh, okay, Your Honor.  Okay.  I have one

10   more question.

11   Q.  On the limited power of attorney, there are two

12   attachments.  Did you see that there?

13   A.  Yes.

14   Q.  Okay.  And according to this limited of attorney that you

15   witnessed, signed as witness, there are, like, thirty trust --

16   named trusts that were serviced the GMAC, giving authority to

17   service by GMAC the name of this trust.  So can you review

18   that?  Would you agree that HSBC is actually the trustee of all

19   these trusts named here?

20   A.  Yes.

21   Q.  That it?  Okay.  Can you explain that Exhibit A continued

22   on the second page?

23   A.  It is part of Exhibit A --

24   Q.  Yes.

25   A.  -- because it's continued.

 1  Q.  So can you read that to the Court, please?

 2          THE COURT:  I've read it.  She doesn't have to read it

 3  to me; I've read it.  Go on.  Ask your next question.

 4          MS. ANIEL:  Oh, okay.

 5  Q.  What does it mean "updated as of October 5, 2006"?

 6  A.  Typically, this is a header.  If we have any revisions on

 7  the header, we'll update that the date said October -- whatever

 8  the date that we revised it on.  But this is a Word document.

 9  It's common that, you know, headers can be forgotten to be

10  updated.

11  Q.  So in other words, it was dated as October 5, 2006?

12  A.  Not -- yes, but not necessary because, as I mentioned,

13  this is a Word document, and it's common that headers can be

14  forgotten to be updated.

15          THE COURT:  Can I ask you this?  Were the two pages of

16  Exhibit A attached to the limited power of attorney when you

17  witnessed it?

18          THE WITNESS:  Yes.

19          THE COURT:  Okay.

20  Q.  If this is updated as of October 5, 2006, you should know

21  better that there are --

22          THE COURT:  Don't argue with her; ask a question.

23          MS. ANIEL:  Okay.

24          THE COURT:  When you tell her you should know better

25  you're arguing with her.

1           MS. ANIEL:  Okay.

2           THE COURT:  Ask a question.

3  Q.  Where is it that the DALT 2007-OA5, the Deutsche Alt, was

4  included in this updated exhibit?  Why is it included in 2006

5  updated --

6           THE COURT:  It happens to appear on a page that

7  doesn't bear that header about updated.  There's no header on

8  the first page of Exhibit A, and that's where the Series 2007-

9  OA5 appears.

10           MS. ANIEL:  Yeah, Your Honor, but it says Exhibit A --

11           THE COURT:  Go ahead and ask your next question.

12  Let's not argue about it.

13           MS. ANIEL:  Continue?  Okay.  This is just the

14  evidence that shows -- I'm just confused, Your Honor.

15           THE COURT:  Okay.  Ask questions.  Your confusion is

16  not a question.

17           MS. ANIEL:  Okay.

18  Q.  Why is this limited power of attorney was not recorded in

19  the county of New York?

20  A.  It's not HSBC's process to record anything.

21  Q.  But HSBC is the principal.  You have to -- you know, as

22  the principal, when you have this limited power of attorney,

23  you executed limited power of attorney, you become the

24  principal and you are appointing --

25           THE COURT:  Listen.

RESIDENTIAL CAPITAL, LLC, et al.                        53

1  Q.  -- an agent.

2          THE COURT:  Wait a second.  Ms. Aniel, you don't tell

3  anybody what the law is, okay?  You ask questions of this

4  witness.  You ask her if it was recorded.

5          Was it recorded?

6          THE WITNESS:  I said that it's -- we don't have duties

7  to record anything.

8          THE COURT:  Okay.  All right.  Ask your next question.

9          MS. ANIEL:  Okay.

10  Q.  Do you know Susie Moy?

11  A.  Yes, she's a colleague.

12  Q.  How long she was employed by HSBC?

13  A.  She has been employed even prior to me starting at HSBC.

14  Q.  Before you, right, in 2006 -- May 2006?

15  A.  She started before I started, I know.

16  Q.  Okay.

17  A.  I don't know how long she's been working for the bank,

18  though.

19          THE COURT:  We can --

20  Q.  Is she --

21          THE COURT:  We can ask her when she testifies.

22          THE COURT:  Okay.

23  Q.  Is she a vice president in 2008?

24  A.  Yes, she was.

25          MS. ANIEL:  Okay, I think, Your Honor, we've covered

RESIDENTIAL CAPITAL, LLC, et al.                    54

1  everything.

2          THE COURT:  Okay.  Any cross-examination?

3          MR. WISHNEW:  Very briefly, Your Honor.

4          THE COURT:  Go ahead.

5          MS. ANIEL:  Doris, thank you very much for coming.

6          THE COURT:  Okay.  Go ahead, cross-examination.

7          We're going to let Mr. Wish -- you finished your

8  questions.  He has a chance to cross-examine.

9          MR. WISHNEW:  I stand up there.

10         MS. ANIEL:  Pardon me?

11         MR. WISHNEW:  I stand up there.

12         MS. ANIEL:  Oh, yeah, I'm sorry, Your Honor.

13         THE COURT:  Yeah.  Go ahead and have a seat.  That's

14  okay.  Have a seat.

15         MS. ANIEL:  It looks like on the podium.

16         THE COURT:  Well, yeah, that's fine.

17         MS. ANIEL:  Okay.  I'll give it to him.

18         THE COURT:  That's okay.  Have a seat.

19         Go ahead, Mr. Wishnew.

20         MR. WISHNEW:  Thank you, Your Honor.

21  CROSS-EXAMINATION

22  BY MR. WISHNEW:

23  Q.  Good morning.  How are you?

24  A.  Good.

25  Q.  Very briefly.  In 2008, you testified you were a corporate

RESIDENTIAL CAPITAL, LLC, et al.                    55

1  trustee specialist with HSBC?

2  A.  Yes.

3  Q.  Okay.  As part of your responsibilities, were you often

4  asked to witness Ms. Moy's signature?

5  A.  Yes.

6  Q.  Okay.  And would you say that you are familiar with Ms.

7  Moy's signature?

8  A.  Yes.

9  Q.  Okay.  And in your opinion, is the signature on the

10  document we've been looking at Ms. Moy's signature?

11  A.  Yes.

12          MR. WISHNEW:  No further questions, Your Honor.

13          THE COURT:  All right.  Okay.

14          Do you have any other questions of the witness?  It

15  has to relate to what Mr. Wishnew asked.  Okay.  You don't have

16  to, but you have the opportunity.

17          MS. ANIEL:  I have no more questions, Your Honor.

18          THE COURT:  Okay.  Thank you.

19          MS. ANIEL:  Thank you.

20          THE COURT:  You're excused.  Thank you very much.

21  Okay?

22          All right.  So we're going to have Susie Moy come and

23  testify next?  Okay.

24          MS. ANIEL:  Yes, Your Honor.

25          THE COURT:  All right.

RESIDENTIAL CAPITAL, LLC, et al.                    56

1          MS. ANIEL:  I would like to call Susie Moy, Your

2     Honor.

3          THE COURT:  Yeah, she's bringing her in, okay?

4          THE COURT:  If you would come up to the witness stand,

5     Ms. Moy, and stand and you'll be sworn, and then you'll be able

6     to sit, all right?  Thank you very much.

7          If you'd raise your right hand.

8        (Witness sworn)

9          THE COURT:  All right.  Please have a seat.  You have

10    to make sure you keep your voice up.  Okay?  Thank you very

11    much.

12         Go ahead, Ms. Aniel.

13    DIRECT EXAMINATION

14    BY MS. ANIEL:

15    Q.  Good morning, Ms. Susie Moy.  Do you want me to call you

16    Susie or Ms. Moy?

17    A.  Susie is fine.

18    Q.  Susie, can you talk louder so that --

19    A.  Susie is fine.

20    Q.  Okay.  Thank you.  So I'm going to address you Susie,

21    right?

22         THE COURT:  Let me ask just to get the basics.  Tell

23    me your name, where you work, how long you've worked there,

24    what your position is now, what it was in 2008, okay?

25         THE WITNESS:  My name is Susie Moy.  I work at HSBC

RESIDENTIAL CAPITAL, LLC, et al.                    57

1    Bank.  I've worked there since 2001, okay.  And I --

2           THE COURT:  What was your position in August of 2008?

3           THE WITNESS:  Possibly assistant treasurer.

4           THE COURT:  Okay.

5           THE WITNESS:  And currently I'm vice president there

6    right now.

7           THE COURT:  Okay.  All right.  Go ahead, Ms. Aniel.

8    Q.  When did you become the vice president?

9    A.  Very -- well, let's see.  I don't know the exact promotion

10   date but --

11   Q.  How long have you been vice president of the Trust?

12   A.  I became AVP and then vice president during the years I've

13   been there, so --

14   Q.  So you --

15   A.  -- probably within one or two years that I'd been there --

16   Q.  So you --

17   A.  -- promoted to AVP and then after that I was promoted to

18   vice president.

19   Q.  So in 2008, what is your position?

20   A.  Vice president.

21   Q.  Pardon me?

22   A.  Vice president.

23   Q.  Oh, vice president, okay.  Do you have a copy of your

24   power of attorney?

25          THE COURT:  If you look in that little binder, it's

1   Exhibit D, as in David, in there.  There's a tab.  If you look

2   at it, it's the same as the Aniel Exhibit 6 that we're talking

3   about, okay?

4           THE WITNESS:  Okay.

5           THE COURT:  Go ahead, Ms. Aniel.

6           MS. ANIEL:  Can I ask the Court to have Ms. Moy sign a

7   specimen for her signature, please?

8           THE COURT:  Bring up a piece of paper.

9           She wants to compare your signature.

10          THE WITNESS:  I don't have a pen.  Do you have a pen?

11          THE COURT:  Okay.  If you would just write your

12   signature.

13          THE WITNESS:  I mean, do you want me to -- I have

14   various signatures sometimes.  I mean, I fill it out or

15   sometimes I just do it this way.

16          THE COURT:  You have to keep your voice up, so --

17          THE WITNESS:  I have various signatures.  Sometimes

18   the longer version, the shorter version.

19          THE COURT:  Well, she wants to compare it to what you

20   signed on --

21          THE WITNESS:  Oh, okay.

22          THE COURT:  -- on the power of attorney.

23          THE WITNESS:  Sure.

24          THE COURT:  Okay.

25   BY MS. ANIEL:

RESIDENTIAL CAPITAL, LLC, et al.                    59

1  Q.  This is the only signature that --

2        THE COURT:  You have to go back to -- ask questions

3  back there.

4        MS. ANIEL:  Okay.

5        THE COURT:  But let me mark that.  I'm going to mark

6  this as Court Exhibit 2.

7        THE WITNESS:  Sorry.

8        THE COURT:  And I'll give it back to you in a second,

9  okay?

10 (Signature specimen of Susie Moy was hereby marked for

11 identification as Court's Exhibit 2, as of this date.)

12       THE COURT:  All right.  On Court Exhibit 2, there are

13 four places in which Ms. Moy has put her signature.

14       Show it to Mr. Wishnew and Ms. Arett as well, and

15 before you complete your questioning, you can give it to my law

16 clerks, and they'll have it available for you tomorrow.

17 Q.  Is this the only signature that you have?

18 A.  Yes.

19 Q.  These four?  Okay.  Never had any signature at all?  No?

20 Okay.  Thank you.

21       THE COURT:  All right.  Why don't you hand it up to my

22 law clerks, okay?  Ms. Aniel, hand Court Exhibit 2 to my law

23 clerks, okay?  We'll have it here.  Thank you.

24 Q.  Susie or Ms. Moy -- Susie, right?

25 A.  Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    60

1    Q.  Susie.  Susie, did you sign this?

2    A.  Yes.

3    Q.  When did you sign this?

4    A.  The date August 28th.

5    Q.  Did you sign it in front of the notary public by the name

6    Nina Nassar?

7    A.  Yes.

8    Q.  In front of her?

9    A.  Yes, she's in our office, Nina.

10   Q.  Okay.  What about Nancy Luong?

11   A.  Yes, Nancy's in the office as well.

12   Q.  Did Nancy Luong witness you signing this?

13   A.  Yes, she's in the office.

14   Q.  In the office?  What part of the office?  In your office

15   or --

16   A.  We're on the same floor, in the same area.  We have

17   cubicles.

18   Q.  Yeah, we're in the same area --

19   A.  Yes.

20   Q.  -- here now.  I have to go to the judge chamber in order

21   for the judge to sign anything, right?

22          THE COURT:  Okay.  Let's ask questions.

23          MS. ANIEL:  Okay.

24   Q.  Do you know the meaning of this limited power of attorney?

25   A.  Yes.  It's giving GMAC the limited duties to do everything

1  that's stated here in the power of attorney.

2  Q.  To GMAC?

3  A.  Yes.

4  Q.  Do you know Mira Smoot?

5  A.  I'm sorry?

6  Q.  Do you know Mira Smoot?

7  A.  I don't know her personally, but I've gotten

8  various -- various -- I recall getting requests in the past for

9  POAs, and she's a servicer at GMAC.

10  Q.  Where is she located when you talk to her?  Do you know

11  where is she located?

12  A.  No.

13  Q.  No, you don't know?

14  A.  We correspond through e-mail.

15  Q.  But you were able to talk to -- have correspondence with

16  her during that time?

17  A.  No, she send -- we correspond through e-mail.  She would

18  request a power of attorney, limited power of attorney, and

19  that's --

20  Q.  Did HSBC, as trustee, authorize Mira Smoot to sign on

21  behalf of HSBC?

22  A.  Yes, we're giving her the limited power of attorney to

23  sign whatever she needs to do, all these duties that are stated

24  here.

25  Q.  You mean that on this limited power of attorney she could

RESIDENTIAL CAPITAL, LLC, et al.                    62

1  sign on behalf of GMAC as an authorized officer?

2  A.  Yes.

3  Q.  But it says here that only GMAC has the authority to sign.

4  It doesn't say here that Mira Smoot would be also authorized to

5  sign on behalf of HSBC.  Does it says here Mira Smoot?

6  A.  It -- it appoints GMAC the limited power of duties to do

7  everything here.

8  Q.  Yeah, only --

9  A.  And so --

10 Q.  -- GMAC was given the power, not for Mira Smoot.

11 A.  She's an authorized signer.

12 Q.  How did she become an authorized signer of HSBC?  Who gave

13 her the power to --

14 A.  No, usually the servicer would come and request a limited

15 power of attorney, and we would check if they have the duty to

16 do that.  We would check to see if she -- GMAC is a servicer

17 under this trust deal.

18 Q.  My question is that is she authorized an officer of HSBC,

19 Mira Smoot?

20 A.  No, she's -- under this limited power of attorney, we're

21 giving GMAC the duties -- power of attorney to do these limited

22 duties on behalf of the trust.

23 Q.  Only to GMAC Mortgage, LLC.

24         THE COURT:  Don't argue with the witness.  Just ask

25 your questions.

RESIDENTIAL CAPITAL, LLC, et al.                    63

1    Q.  What about Mira Smoot -- that Mira Smoot has a special

2    power of attorney from HSBC for her to sign as authorized HSBC?

3    A.  I don't understand your question.

4    Q.  Does she have -- does HSBC give her a special power of

5    attorney to sign on behalf of HSBC as trustee for DALT 2007-OA?

6         MR. WISHNEW:  Objection, Your Honor.  Asked and

7    answered.

8         THE COURT:  Overruled.

9    A.  Well, she signed as an authorized officer of GMAC.  So

10   we're giving GMAC the authority to do certain duties under this

11   limited power of attorney.

12   Q.  Okay.  So this limited power of attorney, any employee of

13   GMAC are authorized to sign on behalf of HSBC?

14   A.  Yes, if they are an authorized officer of GMAC.

15   Q.  On this limited power of attorney?

16   A.  I would think so.

17   Q.  Is that your understanding?

18   A.  Yes.

19   Q.  Okay.  What is your duties and job at HSBC?

20   A.  I'm an administrator on certain -- I guess, a set of

21   deals, administrator.

22   Q.  Can you talk louder, please?

23   A.  I'm an administrator on certain deals called the debt

24   deals.  We do interest payments, trades, and various duties

25   like that.

RESIDENTIAL CAPITAL, LLC, et al.                    64

1   Q.  Is also -- signing a limited power of attorney is also

2   part of your duties?

3   A.  Sure.

4   Q.  Who gave you that power of attorney?  Who empower you to

5   give that power of attorney to sign the limited power of

6   attorney?

7   A.  Well, the documents -- the pooling and servicing that

8   governs this trust allows the trustee to give limited power of

9   attorneys to servicers.

10  Q.  Allow you to who?  Because this -- HSBC is a corporation,

11  am I right?

12  A.  Yes.

13  Q.  Isn't that supposed for you to get this authority to sign

14  a limit -- the corporation should empower you to have that

15  authority to sign on behalf of GMAC.

16  A.  Yes.

17  Q.  Did you have the -- is the board of director of HSBC

18  allowed you to have that power to sign a limited power on

19  behalf of the trust?

20  A.  Sure.  As an officer of the bank, you are given certain

21  authority to sign certain documents, so there is -- the bank

22  also has a list of authorized --

23  Q.  No, who give -- who empowered you --

24        THE COURT:  Don't interrupt her when she's still

25  speaking.

RESIDENTIAL CAPITAL, LLC, et al.                    65

1  A.  The bank also has a list of authorized officers that can

2  sign for certain things.

3          THE COURT:  Were you an authorized officer --

4          THE WITNESS:  Yes.

5          THE COURT:  -- to sign?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.

8  Q.  Who gave you the power --

9          THE COURT:  She just answered that.  She just

10 answered.

11         MS. ANIEL:  She didn't answer that, Your Honor.

12         THE COURT:  She did answer it.

13 Q.  What is your answer?

14 A.  My --

15 Q.  Because you know, like, your voice is kind of, like, I

16 cannot hear it travelling.

17 A.  I said the bank has a list of authorized officers that can

18 sign on its behalf as well.

19         THE COURT:  And you're one of them?

20         THE WITNESS:  Yes.

21 Q.  Do you have a document to show that you are one of the

22 signer of the bank?

23 A.  I don't have it here.

24         MR. WISHNEW:  Your Honor, this is her witness.  She --

25         THE COURT:  Mr. Wishnew, legal objections only.

RESIDENTIAL CAPITAL, LLC, et al.                    66

1          Ask your next question.

2   Q.  Do you handle trusts of the HSBC bank?

3   A.  Corporate trust deals, yes.

4   Q.   Do you handle this particular trust, the DALT 2007-OA5?

5   A.  Yes.  Yes.

6   Q.  You do?  So you know what is the duty of the trustee?

7   A.  Yes.

8   Q.  What are the duties of the trustee?

9   A.  Very ministerial duties, receiving annual reports, officer

10  certificates, but there is not a lot of day-to-day things,

11  inquiries.  There's other parties that are involved in the

12  trust that do the other, like, payments, interest payments or

13  anything like that.  So --

14  Q.  Usually --

15  A.  -- as trustee regarding ministerial duties.

16  Q.  You usually deal with the mortgage payment of the trust

17  that was the trust?

18  A.  No.  No.  I'm sorry.  No.

19  Q.  No?  Just ministerial duty as the --

20  A.  Of the --

21  Q.  -- trustee?

22  A.  Of the trust itself --

23  Q.  I see.

24  A.  -- the DALT 2007.

25  Q.  So are you familiar with the pooling and servicing

RESIDENTIAL CAPITAL, LLC, et al.                    67

1    agreement?

2    A.  Yes.

3    Q.  On this particular trust?

4    A.  Yes.

5    Q.  Do you know the value of the trust?

6    A.  No, that's not relevant for us.  We're reviewing value.

7    Q.  How much the value of that trust?  There must be a value

8    of the trust?

9         MR. WISHNEW:  Objection, Your Honor.  Relevance.

10        THE COURT:  Sustained.

11   A.  I guess the value will be --

12        THE COURT:  I sustained the objection.  It means you

13   don't have to answer the question.

14        THE WITNESS:  Oh, I'm sorry.

15        THE COURT:  Okay?  Ask your next question.

16   Q.  Do you know who is the depositor of this pooling and

17   servicing agreement?

18   A.  I can't recall.  I'm sorry.

19   Q.  Did you read the pooling and servicing agreement?

20        MR. WISHNEW:  Objection, Your Honor.  Relevance.

21        THE COURT:  Sustained.  The issues are defined in the

22   pre-trial order.  They're narrow, as I said at the start of the

23   trial.  You need to confine your questioning to what's an issue

24   in this contested matter.

25        MS. ANIEL:  My questions -- because there is an

RESIDENTIAL CAPITAL, LLC, et al.                                68

1  alleged by the debtor that my loan was put into the trust on

2  this particular trust.

3          THE COURT:  Don't argue with me.  Ask your next

4  question.

5  Q.  Do you know the asset of the trust?

6          MR. WISHNEW:  Objection.

7  Q.  What kind of asset is the trust having?

8          MR. WISHNEW:  Objection, Your Honor.  Relevance.

9          THE COURT:  Sustained.

10 Q.  Okay.  On the limited power of attorney it says here there

11 are three pages.

12 A.  Okay.

13 Q.  And there is an Exhibit A that says that the trust

14 Deutsche Alt-A Securities Mortgage Loan Trust, Series 2007-OA5

15 was included on this limited power of attorney that was

16 serviced by the loan servicer, which is GMAC.  Is this

17 accurate?

18 A.  Yes.  Yes.

19 Q.  Do you know when did you -- did you know when did you pull

20 this information, the attachment for this limited power of

21 attorney 2008?

22 A.  I'm sorry.  What are you -- what do you mean?

23 Q.  There's three pages of the limited power of attorney,

24 right?  One is limited power of attorney, the other one is

25 Exhibit A and it says here "Exhibit A continued".

RESIDENTIAL CAPITAL, LLC, et al.                                  69

1   A.  Okay.

2   Q.  Okay?

3   A.  Yes.

4   Q.  When you signed this document notarized by Nina Nassar,

5   witnessed by Doris Wong and Nancy Luong, did you give them the

6   attachment?

7   A.  Yes.

8   Q.  When did you pull this attachment?

9   A.  Whenever they request this --

10  Q.  Whenever --

11  A.  When they would request a POA, we would have an attachment

12  with it.

13  Q.  Okay.  So when you give this, it should be a complete

14  attachment and the power of attorney?

15  A.  Yes.  Yes.

16  Q.  So that was the time you pulled it -- updated the

17  attachment, right?

18  A.  Um-hum.

19  Q.  Can you go on page 7, please?

20  A.  Yes.

21  Q.  Can you read this one, "Exhibit A continued"?

22  A.  Yes.

23  Q.  What does it says?

24  A.  2006 -- October 5th, 2006.

25  Q.  Okay.  So when you give this, it should be completed, the

RESIDENTIAL CAPITAL, LLC, et al.                    70

1  attachment and the power of attorney?

2  A.  Yes.  Yes.

3  Q.  So that was the time you pooled it, that dated attachment,

4  right?

5  A.  Um-hum.

6  Q.  Can you go on page 7, please?

7  A.  Yes.

8  Q.  Can you read this one, Exhibit A continued?

9  A.  Yes.

10  Q.  What does it says?

11  A.  2006.  October 5th, 2006.

12  Q.  So is it -- is this correct?

13  A.  When there is requests for this, we update every time we

14  get a request from the servicers.  I would think that this is a

15  footer that someone did not update.

16  Q.  So in other words, you could be mistaken also, right?

17  A.  There's no mistake.

18  Q.  The trustee -- HSBC trustee of DALT 2007, that my loan

19  doesn't belong in the trust.  It could be -- you could make

20  mistake because --

21        THE COURT:  Ask questions.  Don't argue.

22  Q.  So is there any explanation for this, Ms. Moy?

23  A.  The explanation is that when we had a request -- we

24  probably had a request in 2006.

25  Q.  Oh, okay.

1  A.  And then we continuously handle the request.  And perhaps

2  in 2008 the exhibit was not the footer -- the header, I'm

3  sorry, was not updated.

4  Q.  If this was updated on 2006, October, why is it that the

5  trust belongs to the 2008?  Isn't that -- okay.  Isn't

6  that -- this attachment was updated as of 2006, right?  And

7  then why you said that the DALT -- the trust DALT 2007-OA5 was

8  included in this, if it was updated as of October '07?  What

9  was the reason?

10  A.  They may have other trust deals.  GMAC may have other

11  trust deals that were 2006 trusts.

12  Q.  So if the trust 2007 was born in 2007, why isn't the trust

13  included in 2006 updated?  Is there any explanation of that?

14  A.  Because it gives GMAC a limited power of attorney for all

15  their trusts --

16  Q.  I understand that.  Because you secured that in 2008.  I

17  understand that, Ms. Moy.  I really understand that.  My

18  question is that the attachment, I have problem, I have issue

19  with the attachment.  In the attachment it says "updated as of

20  2006".  The question, why is it, if it's updated more than a

21  year prior to the birth of this trust in 2007, why is it that

22  this trust was included in 2006?  Is there any explanation for

23  that?

24  A.  I'm saying that the exhibit was not corrected on the first

25  page, perhaps.  They just didn't update the header.

RESIDENTIAL CAPITAL, LLC, et al.                                72

1          THE COURT:  May I ask you?  Both pages of Exhibit A

2     were attached when you signed it?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.

5     Q.  Is -- what do you mean by assignment of the deed?

6          THE COURT:  I didn't hear your questions.

7     Q.  What do you mean -- do you understand the assignment of

8     the deed?

9     A.  I'm sorry --

10         THE COURT:  I still don't -- I still don't understand

11    your question.

12         MS. ANIEL:  No, it's she's the trustee.  She's the --

13         THE COURT:  But I don't understand your question.  I

14    don't allow questions to be asked that I don't understand.

15         MS. ANIEL:  Really?  Okay.  Because HSBC as trustee is

16    giving power to GMAC to service all this trust.  And there was

17    a duties that GMAC would perform.  Number two -- number one, it

18    says:  "to execute, acknowledge, seal, and deliver deed of

19    trust, mortgage note endorsement, lost note affidavit,

20    assignment of deed of trust, mortgage and other recorded

21    documents, satisfactions, releases, reconveyance of the deed of

22    trust, mortgage subordination and modification," and so on.

23         So these are the duties that was given to GMAC by

24    the -- by the bank.

25    Q.  So my question is this.  Do you understand that assignment

1  of the deed?  What is the purpose of the assignment of the

2  deed?

3  A.  That would be a duty of the servicer.  I wouldn't be able

4  to exactly explain what they're doing.

5  Q.  Okay, I understand.  Do you know if the -- do you know if

6  Aniel was -- do you know, just like I asked before, you

7  serviced -- HSBC is the trustee of the trust, and you service

8  the trust; do you know what kind of asset the trust has?

9          MR. WISHNEW:  Objection, Your Honor.  Relevance.

10          THE COURT:  Sustained.

11          MS. ANIEL:  You know, Your Honor, it's very important

12  because --

13          THE COURT:  Ms. Aniel, the pre-trial -- I ruled

14  previously in an opinion.  There's a pre-trial order that

15  defines the issues for trial.  I made it clear before we

16  started the trial today that many of your contentions are

17  outside the scope of the issues for this trial.  They've

18  already been determined by the Court.

19          You have to proceed today solely with respect to the

20  issues for this trial.

21          As, your next question.

22  Q.  Do you know if my loan was included in the trust?  Do you

23  know if my loan was included in the trust?

24  A.  If it's in the deed of 2007/08, yes.

25  Q.  So how did you know that my loan was defaulted?  Do you

RESIDENTIAL CAPITAL, LLC, et al.                    74

1  know when was the loan defaulted?

2  A.  I wouldn't have that information, because we're not the

3  servicer.

4  Q.  So only the servicer has the knowledge of the default?

5  A.  Yes.

6  Q.  So does -- loan servicer will not notify the trustee if

7  there's a default?

8          MR. WISHNEW:  Objection, Your Honor.  Relevance.

9          THE COURT:  Overruled.

10  A.  No.

11  Q.  So the trustee doesn't know if the loans is in default in

12  the trust, doesn't know?  Only the loan servicer?

13  A.  Yes, the day-to-day servicing of the loans are done by the

14  servicer.

15  Q.  Okay.  So the point an agreement -- the pooling and

16  servicing agreement says that they have also duties, once the

17  loan was defaulted in the trust, within ninety days, they

18  should be removed from the trust itself, and you as the trustee

19  would stand as the one who would -- you have to pick out that

20  loan in the trust if the -- you have to kick out the particular

21  loan in the trust within ninety days, so that you will not be

22  penalized by IRS, because this is a residential mortgage --

23          THE COURT:  That's not a -- you're not asking a proper

24  question.

25          THE WITNESS:  Not a question.

RESIDENTIAL CAPITAL, LLC, et al.                    75

1              THE COURT:  Okay.

2              MS. ANIEL:  Because she is the trustee, Your Honor.

3     She handles the --

4              THE COURT:  You're not asking -- that's not a

5     question.  If you have a question ask a straightforward

6     question and the witness will answer it.  Otherwise --

7              MS. ANIEL:  So only the loan ser --

8              THE COURT:  -- otherwise you'll conclude your

9     examination.

10             MS. ANIEL:  Okay.

11    Q.  In other words, only the loan servicer knew about the

12    default?

13    A.  I'm sorry?

14    Q.  Only GMAC as a loan servicer knows about the default?

15    A.  If we're notified of anything that we need to do per the

16    pooling and servicing, we would follow what --

17             THE COURT:  May I ask you this?  Do you recall ever

18    being advised that the Aniels had defaulted on their loan?

19             THE WITNESS:  I can't recall.

20             THE COURT:  Okay.  Do you recall ever being advised

21    that GMAC or anyone else had initiated foreclosure on the

22    Aniels' loan?

23             THE WITNESS:  I can't recall.

24             THE COURT:  Okay.

25    Q.  Did loan servicer advise you that they executed a 2009

RESIDENTIAL CAPITAL, LLC, et al.                    76

 1  assignment of the deed?

 2          THE COURT:  It's an assignment of deed of trust, not

 3  of the deed.

 4          MS. ANIEL:  A deed of trust, yes, thank you, Your

 5  Honor.

 6  Q.  Assignment of deed of trust.  Did they not tell you as a

 7  trustee of the trust that they executed an assignment of the

 8  deed in 2009 and 2011?  Did the trust have knowledge --

 9  A.  I can't recall that in 2009 and 2011.  I can't recall,

10  sorry.

11  Q.  You don't remember, right?

12          THE COURT:  You ask it once, and that's all you get to

13  ask it.

14  Q.  Is this DALT Trust -- is this a performing trust right

15  now?

16  A.  I believe it is.  I don't handle this particular deal

17  anymore.

18  Q.  When was the last time you handled the trust?

19  A.  I can't recall, but it was several years ago.  I moved to

20  another group.

21  Q.  How long ago was that?  Two years, three?

22  A.  Possibly, yes.  Possibly.  I'm sorry.

23  Q.  How many years?

24  A.  Possibly two year, yeah.

25  Q.  Two or three?

RESIDENTIAL CAPITAL, LLC, et al.                    77

1  A.  I don't recall.  I don't have the exact date.

2  Q.  Okay.  I'll show you -- did you remember signing a proof

3  of claim on behalf of the ResCap -- filing a proof of claim on

4  behalf of -- on behalf of all the stress, did you remember that

5  in 2012?

6  A.  It's possible.

7        THE COURT:  Do you remember -- it's yes or no.

8        THE WITNESS:  I -- I'm sorry.  I don't recall.  It's

9  possible.

10  Q.  Okay, I'm going to show you a document which you remember.

11        THE COURT:  Well, maybe she will, maybe she won't.  If

12  you want put a document in front of her, identify what it is.

13  Is it one of the exhibits that you marked?  If it's not, you're

14  not using it.

15        MS. ANIEL:  No, Your Honor.

16        THE COURT:  Ms. Aniel, is it an exhibit that you

17  previously marked?

18        MS. ANIEL:  No, Your Honor.

19        THE COURT:  Okay.

20        MS. ANIEL:  I just want to confirm that --

21        THE COURT:  No, you're not going to do it.  Because

22  you were required to list all of your exhibits in the pre-trial

23  order; and you listed thirty-six of them.  And the pre-trial

24  order on page 19 provides that no exhibit not listed by

25  claimants or the trust may be used at trial except for cross-

1  examination purposes, for rebuttal, or if good cause for its

2  exclusion from the pre-trial order is shown.

3         But for what purpose do you want to show her --

4         MS. ANIEL:  I just want it for rebuttal, Your Honor.

5         THE COURT:  I can't hear you.  Speak to the

6  microphone.

7         MS. ANIEL:  I'm just going to do it as the rebuttal.

8         THE COURT:  Let's see the -- do you have copies of the

9  document for Mr. Wishnew?

10         MS. ANIEL:  Yes, because is part, also, of our docket.

11  And I --

12         THE COURT:  Well, I don't care whether it's part of

13  your docket, you didn't list it as an exhibit.  This is a

14  witness that you've called.  This is a witness you've called.

15  This is not cross-examination.  You were required to list all

16  of your exhibits.  Is it all of those papers?

17         MS. ANIEL:  No, I just copy it so she --

18         THE COURT:  Let me see what it is before you give it

19  to the witness.

20         MS. ANIEL:  It's the --

21         THE COURT:  This proof of claim refers to a Nomura

22  Asset Acceptance Corp, 2006-AR3.  What does that have to do

23  with this case?

24         MS. ANIEL:  Because it has her signature on --

25         THE COURT:  Well, it has her signature, but -- you

RESIDENTIAL CAPITAL, LLC, et al.                    79

 1  have to go back here.  Go back to the microphone.

 2          You're trying to place a document in front of the

 3  witness that Ms. Moy executed, but doesn't relate to the trust

 4  in which your loan was put.  What's the relevance?

 5          MS. ANIEL:  Her signature is evidence of her

 6  signature.

 7          THE COURT:  We've already seen her signature.  The

 8  document, which is not listed among your exhibits, is not a

 9  proof of claim that relates to the trust in which your loan is

10  included.  I'm not going to permit you to use the document.

11          MS. ANIEL:  Okay.

12          THE COURT:  Do you have any other questions?

13          MS. ANIEL:  I think that's it, Your Honor.

14          THE COURT:  Okay.  Cross-examination, Mr. Wishnew?

15          MR. WISHNEW:  Very briefly, Your Honor.

16  CROSS-EXAMINATION

17  BY MR. WISHNEW:

18  Q.  Good morning, Ms. Moy.

19  A.  Good morning.

20  Q.  Very briefly.  If I could ask you to turn back to the

21  limited power of attorney?

22  A.  Yes.

23  Q.  The two pages that are attached, do those two pages

24  reflect all of the trusts that GMAC was servicing as of the

25  date you signed the limited power of attorney?

1    A.  I believe so.

2              MR. WISHNEW:  No more questions, Your Honor.

3              THE COURT:  All right.  Okay, you're excused as a

4    witness.  Thank you very much.

5              THE WITNESS:  Thank you.

6              THE COURT:  Okay.  All right.  We're going to take a

7    ten-minute recess, and then who are you going to call as your

8    next witness?

9              MS. ANIEL:  I think Kathy, Your Honor.

10             THE COURT:  Kathy Priore?

11             MR. WISHNEW:  Your Honor, Ms. Aniel neither subpoenaed

12    Ms. Smoot nor Ms. Priore.

13             THE COURT:  Well, is Ms. Priore here?

14             MR. WISHNEW:  She is here, yes.

15             THE COURT:  She's on your witness list.  She's here,

16    she can call her as a witness.

17             MR. WISHNEW:  Okay.

18             THE COURT:  She listed her on her witness list.  She

19    doesn't -- she's physically present.  She doesn't need a

20    subpoena to get her here.  You knew that she listed Ms. Priore

21    as a witness; and she can call Ms. Priore as a witness.

22             MR. WISHNEW:  Okay.

23             THE COURT:  Get Ms. Priore ready to come to the

24    witness stand.

25             MR. WISHNEW:  Okay.

1          THE COURT:  All right, we're taking a ten-minute

2   recess.

3        (Recess from 11:06 a.m. until 11:23 a.m.)

4          THE COURT:  Okay, please be seated.

5          Ms. Priore?

6          MS. PRIORE:  Yes.

7          THE COURT:  Can you come on up to the witness stand?

8   If you'd stand and be sworn?

9        (Witness sworn)

10          THE COURT:  All right, please have a seat.  There's

11   water there if you'd like.

12          THE WITNESS:  Thank you.

13          THE COURT:  Okay, thank you.

14          Go ahead, Ms. Aniel.

15   DIRECT EXAMINATION

16   BY MS. ANIEL:

17   Q.  Hi, good morning, Kathy.

18          MS. ANIEL:  If I may begin now, Your Honor?

19          THE COURT:  Yes, please, go ahead.

20          MS. ANIEL:  Okay, thank you.

21   Q.  Good morning, Kathy.  It's nice to see you again.

22       I have a question.  Since January '11 and based on your

23   declaration, okay, do you still insist that Aniel loan was on

24   the trust on or before July 1st, 2007?

25   A.  Yes.

RESIDENTIAL CAPITAL, LLC, et al.                                    82

1          THE COURT:  You have to speak up, okay?

2  A.  Yes.

3  Q.  Okay.  What are the basis for that conclusion that my loan

4  was transferred to the trust on 2001 -- July 1st, 2007?

5          MR. WISHNEW:  Objection, Your Honor.

6          THE COURT:  Overruled.

7  A.  The pooling and servicing agreement is dated 2007.

8  Q.  So does it mean that that's the cutoff date of the pooling

9  and servicing agreement?

10 A.  The date on the pooling and servicing agreement was 2007,

11 yes.

12 Q.  Okay.  Based on your declaration that you submitted to the

13 Court -- and I have copy of it -- dated March 16 -- I'm sorry,

14 March 9 --

15         THE COURT:  Okay, the declaration --

16         MS. ANIEL:  Yes.

17         THE COURT:  -- appears as the Trust's Exhibit A.

18         MS. ANIEL:  Exhibit A.  Yes, Your Honor.

19         THE COURT:  Yes, okay?

20 Q.  And you say that based -- your declaration says:  "Based

21 either upon my personal knowledge of the debtors' operation,

22 information learned from a review of relevant documents, or

23 information I have received through my discussions with other

24 former members of the debtors' management or other employees of

25 the debtor, the liquidating trust, and the Borrower Trust's

1    professional consultants, if I were called to testify I would,"

2    and you are testify here the truth; is that correct?

3    A.   Yes.

4    Q.   Okay.  What you said: "I am intimately familiar with the

5    debtors' claim reconciliation process.  Except as otherwise

6    indicated, all statements in this declaration are based upon my

7    familiarity with the debtors' books and records, as well as the

8    debtors' schedule of assets and liabilities and statements of

9    financial affairs filed in this Chapter 11."

10        So you have familiarity with all those procedures and the

11   books of debtors assets?

12   A.   I am familiar with the debtors' books and records, yes.

13   Q.   Okay.  So based on your statement that my loan was entered

14   the trust on or before the cutoff date of July 1st, 2007, and

15   you are saying that that was based on the pooling and servicing

16   agreement.  Am I right?

17   A.   The assignments that indicate it went to Deutsche Bank as

18   trustee along with the pooling and servicing agreement.

19   Q.   Based on pooling.  Did you read the pooling and servicing

20   agreement?

21   A.   Not in its entirety, no.

22   Q.   So what makes you think that the Aniel loan was put on

23   that particular date on 2007, what was the evidence to

24   provide -- there was a pooling and servicing agreement, right?

25   So the cutoff date is July 1st, 2007.  So you insist that my

RESIDENTIAL CAPITAL, LLC, et al.                        84

1   loan was put into the trust before cutoff date.  The question

2   is, how did you know that my particular loan was into the trust

3   on the pooling and servicing agreement?

4   A.  Generally, your servicing notes indicate an investor

5   number.  And the investor number is tied to a pooling and

6   servicing agreement.

7   Q.  Investor's number?  Who is the investor of this trust?

8   A.  The trustee is HSBC.

9   Q.  Is there a list or schedule of mortgage loans that was

10  included in that pooling and servicing agreement?

11  A.  I am -- I don't know.

12  Q.  So you don't know?

13          THE COURT:  May I ask this question?

14          THE WITNESS:  Yes.

15          THE COURT:  Your testimony that the Aniel loan was

16  included in this securitization trust was based on what, your

17  review of the servicing notes?

18          THE WITNESS:  Yes.  Well, the servicing notes have an

19  investor code number.

20          THE COURT:  Yes.

21          THE WITNESS:  And that code number is associated with

22  a pooling and servicing agreement.  So that --

23          THE COURT:  Okay, so you compared the investor number,

24  and that's how you determined that the Aniel loan -- is that

25  how you determined that the Aniel loan was included in this

RESIDENTIAL CAPITAL, LLC, et al.                    85

1  specific securitization trust?

2          THE WITNESS:  Yes, in the 2007 --

3          THE COURT:  All right.

4          THE WITNESS:  -- servicing agreement.

5          THE COURT:  And did you look at any other documents,

6  as well, to support your conclusion that the Aniel loan was

7  included?

8          THE WITNESS:  The assignments of the deed of trust

9  list the HSBC and the deal series number, which matches the

10 pooling and servicing agreement.

11         THE COURT:  Okay.

12         All right, go ahead, Ms. Aniel.

13 BY MS. ANIEL:

14 Q.  So you just -- your conclusion is based on the pooling and

15 servicing agreement, but when you go to the pooling and

16 servicing agreement, it doesn't say the mortgage schedule.  It

17 just --

18         MR. WISHNEW:  Objection, Your Honor.  She's referring

19 to a document that's not before the witness.

20         THE COURT:  Sustained.

21 Q.  What about the prospectus -- supplemental prospectus.

22 Have you read it?

23         MR. WISHNEW:  Objection, Your Honor.  Relevance.

24         THE COURT:  Sustained.

25 Q.  Since you are familiar, and you are saying based on 2009

RESIDENTIAL CAPITAL, LLC, et al.                    86

1    assignment of the deed, your conclusion says that it belongs to

2    the DALT 2007-OA5?  Is that what your conclusion is?

3    A.  Yes.

4    Q.  Okay.  Let's go to 2008 substitution of trustee.

5            MR. WISHNEW:  Is there a specific exhibit number?

6            MS. ANIEL:  Exhibit --

7            THE COURT:  Just be patient, Mr. Wishnew.

8            MR. WISHNEW:  My apologies, Your Honor.

9            MS. ANIEL:  It's Exhibit E of the Trust.

10           THE COURT:  Okay.  We're looking at Trust Exhibit E --

11           THE WITNESS:  Okay.

12           THE COURT:  -- substitution of trustee.  Do you have

13   that in front of you?

14           THE WITNESS:  Yes.

15           THE COURT:  Okay, go ahead.

16   Q.  Okay.  This exhibit says that in 2008 there was a

17   substitution of trustee executed by Mortgage Electronic

18   Registration System Inc., and signed by a certain Rosalie

19   Solano.  And it was executed in Los Angeles and recorded in San

20   Mateo County, California where the property is located,

21   document number 2008-108476.

22      This was prepared by ETS Services, LLC, one of the debtors

23   in these bankruptcy proceedings.  And it says here TS number

24   GL164602-C.  And the loan number is 0713388492.  Is that

25   correct information in the loan number and the TS number?

RESIDENTIAL CAPITAL, LLC, et al.                    87

1   A.   The loan number that's starting with 071 is the GMAC

2   Mortgage servicing loan number.  I don't know what the TS

3   number refers to.

4   Q.   Do you know the Aniels' original loan number on the deed

5   of trust on her promissory note?  Do you know that?

6   A.   I could look at it.

7   Q.   Okay, we'll go on then.  Okay?

8        What does it mean "substitution of trustee"?  In September

9   29, 2008, it was still MERS -- it was still Mortgage Electronic

10  Registration System, Inc., without any mentioning on Mortgage

11  IT or HSBS as trustee DALT.  They were the ones who substituted

12  the trustee in the name of ETS, meaning that as of September

13  2008, there's no evidence to prove that HSBC as trustee for

14  DALT 2007-OA --

15          THE COURT:  No, no.  You don't get to make arguments.

16  You get to ask questions.  Ask a question, don't make an

17  argument.

18          MS. ANIEL:  Okay.

19  Q.   Why is it that Mortgage Electronic -- still Mortgage

20  Electronic Registration System, Inc. was the one who

21  substituted a trustee and recorded it?  Why is it not the HSBC

22  as trustee for DALT 007-0A5 (sic).

23  A.   Okay.  So at this time, the deed of trust was still

24  located and sitting within the MERS system, and it wasn't

25  assigned out to HSBC until the later assignment of the deed of

RESIDENTIAL CAPITAL, LLC, et al.                    88

1    trust.  So this is just a substitution of the original trustee

2    that was on the deed of trust from Fidelity to ETS.

3    Q.  Oh, so in other words, you testify here that my mortgage

4    was transferred to the trust in 2007.  Isn't that supposed the

5    trustee will be the one to substitute that.  They only know my

6    mortgage and deed as of 2007 July 1st.  So why is it that my

7    previous -- the previous lender with this mortgage -- and you

8    know Mortgage IT is the lender --

9           THE COURT:  Stop.  You're making speeches.

10          Can you explain the chain of transfers of who the

11   trustee was, who it became?  Can you do that for us?

12          THE WITNESS:  Yes.  So your original deed of trust

13   listed Mortgage IT as the original lender, and it also lists

14   MERS as the original nominee for the lender, so you can see

15   there's a MIN number attached to the deed of trust when it was

16   originated.  That deed of trust sits within the MERS system,

17   the electronic registration system, until it needs to be

18   assigned out for a number of reasons:  a default or a

19   bankruptcy.

20          So it was sitting in MERS.  It doesn't mean that it

21   wasn't securitized in 2007.  It just means that the deed of

22   trust was sitting still in the MERS system until it was

23   assigned out of MERS to HSBC.

24          THE COURT:  Okay.  Do you know why the trustee -- why

25   ETS was substituted as the trustee?

RESIDENTIAL CAPITAL, LLC, et al.                    89

1          THE WITNESS:  Yes.  So when GMAC Mortgage would start

2    servicing a loan and it went into default or needed some other

3    reason for something to happen to the loan in servicing-related

4    terms, it would -- in a nonjudicial state you have to appoint a

5    substitute trustee from the original one.  So the appointment

6    is done by MERS since the deed of trust is still registered

7    with MERS.  And we appointed ETS, who acts as a nonjudicial

8    trustee for foreclosure-related activities.

9          THE COURT:  All right.  And do you know whether, at

10   the time the substitution of trustee was executed in September

11   2008, was the Aniel loan in default?  Do you know from the

12   books and records of the debtors?

13          THE WITNESS:  Yes, I believe it was.

14          THE COURT:  Okay.  Go ahead, Ms. Aniel.

15   BY MS. ANIEL:

16   Q.  Why is it that HSBC as trustee was never mentioned in that

17   substitution of trustee in 2008 by MERS?

18   A.  Because the deed of trust hadn't been assigned out of MERS

19   yet, which is not uncommon, that they -- the deed of trust

20   would sit within MERS until it needed to be assigned out for

21   some foreclosure-related activity.

22          MS. ANIEL:  Do I always have to ask question, Your

23   Honor, to her?

24          THE COURT:  Yes, you do.  You have to ask questions.

25          MS. ANIEL:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    90

1   Q.   What was the reason why the original loan number of my

2   deed of trust and my promissory note were altered?

3          MR. WISHNEW:   Objection, Your Honor.

4          THE COURT:   I'm going to sustain the objection to that

5   question.   But I think what Ms. Aniel is asking

6   about -- because I see this in her contentions, that there were

7   different numbers either assigned to the loan -- could you

8   explain why there were different numbers in various documents

9   for the Aniel loan?

10          THE WITNESS:   Yes.  So --

11          THE COURT:   That's what you were trying to get at,

12   isn't it?

13          MS. ANIEL:   Yes, Your Honor.

14          THE COURT:   Okay, go ahead, Ms. Priore.

15          THE WITNESS:   So the origination of your loan did not

16   happen with GMAC Mortgage or HSBC.   So when it was originated

17   by Mortgage IT in June of 2007, Mortgage IT, as the lender,

18   assigned it a loan number.   So that's the loan number that you

19   see on the top of your note.   And you also see it on top of the

20   recorded deed of trust.

21          When the loan moves to a new servicer to service the

22   loan, GMAC Mortgage would assign it a servicing loan number.

23   So that's the loan number that you would see in correspondence

24   from GMAC Mortgage related to payment information, default

25   information.

 1          THE COURT:  Same loan but because GMAC is servicing

 2   it, it assigns a new number to it?

 3          THE WITNESS:  Correct.

 4          THE COURT:  All right.  And then what happen -- were

 5   the subs -- when it's assigned to HSBC, is there a different

 6   number that's assigned again, or --

 7          THE WITNESS:  GMAC Mortgage would keep the same loan

 8   number the entire time.  So --

 9          THE COURT:  The entire time that it services the loan?

10          THE WITNESS:  It serviced the loan, yes.

11          THE COURT:  Okay.

12   BY MS. ANIEL:

13   Q.  Are you authorized to change the loan original mortgage?

14   Are you authorized, the loan servicer are authorized to alter

15   borrower's --

16          THE COURT:  She didn't say she altered anything.  She

17   said that GMAC assigned a number to the loan it was servicing.

18          Am I right on that?

19          THE WITNESS: Correct.  Yes.

20          THE COURT:  Okay.  She didn't alter anything.  GMAC

21   assigned a number to your loan at the time that GMAC began

22   servicing the loan.

23          The loan didn't change, right?

24          THE WITNESS:  Correct.

25   Q.  But it was -- does it -- did my deed of trust wording

RESIDENTIAL CAPITAL, LLC, et al.                    92

1   allow that to change the loan number?

2          MR. WISHNEW:  Objection.

3          THE COURT:  No, it didn't change.  Look, I understand,

4   you don't have a lawyer and I'm giving you leeway.  But this

5   issue you've raised in your contentions about different loan

6   numbers it's a different party assigning a different number to

7   it for a different purpose.  It's the same loan.  The loan

8   didn't change.

9          When GMAC began servicing your loan, it assigned a

10  number to it.  That was the number it used in its servicing

11  records.  You have other issues that you can raise.  This is

12  not a valid issue.  Okay?  You're wasting everybody's time on

13  this.  Okay?

14         I'm giving you leeway to pursue it, but the different

15  numbers that were assigned for different purposes to the same

16  loan is not an issue in this trial.

17         MS. ANIEL:  Yeah, I just want to let the Court know

18  that because of the --

19         THE COURT:  I understand that they assigned a

20  different number to it.  Okay?  That's not a valid issue for

21  this trial.  It's entirely clear from the record what happened

22  here.  You have different issues.  It's not over what number

23  they used to keep track of your loan and the loan payments and

24  when it was in default and what they did after that.  Okay?

25         MS. ANIEL:  Okay --

RESIDENTIAL CAPITAL, LLC, et al.                    93

1          THE COURT:  I don't want to lose my patience with you,

2   but you need to confine your questioning to proper issues

3   raised by the pre-trial order and by my prior opinion.  Okay?

4          Whether they assigned a number for purposes of

5   servicing the loan is not among the issues.

6          MS. ANIEL:  Okay, I understand what you're saying.

7   But my perspective is totally different.  That's why we have a

8   trial.

9          THE COURT:  Your perspective may be different, but

10  it's not the perspective of what the issues for this trial are.

11  Okay?  I'm willing to give you leeway, so long as you confine

12  your questioning to the issues relevant to this trial -- the

13  issues in this trial.

14         MS. ANIEL:  Okay, let's go to 2009.

15  BY MS. ANIEL:

16  Q.  Assignment of the deed.  The assignment -- do you have

17  that in front of you?

18  A.  Which exhibit number is that?

19         THE COURT:  It's Exhibit F.

20  Q.  In 2009, it was recorded number -- the assignment of the

21  deed of trust 2009-125757.  It was recorded on 9/21/2009.  And

22  it was signed by certain Janine Yamoah, executed in August 24,

23  '09.  And it was notarized by certain Zahirah Sweet on August

24  24, '09.  The question is that do you know Janine Yamoah?

25  A.  I do not.

RESIDENTIAL CAPITAL, LLC, et al.                    94

1    Q.  Is she an employee of GMAC?

2    A.  Are you were asking if she was an employee at the time --

3    Q.  Of GMAC?

4    A.  -- that she signed it?  I don't have those records in

5    front of me to verify that.

6    Q.  Do you know Zahirah Sweet?

7    A.  What's the --

8    Q.  Do you know her, the notary public?

9    A.  I don't personally know her; no.

10   Q.  Is she an employee of GMAC in Pennsylvania?

11   A.  And I don't have those records in front of me right now,

12   but I believe that we talked about them in one of the earlier

13   declarations or the original objection.  But I would need to

14   look at that.

15   Q.  Have you reviewed this 2009 assignment of the deed?

16   A.  I have it right here, yes.

17   Q.  You did?

18   A.  Yes.

19   Q.  So you said you are familiar with all the books and

20   records of the debtors.  Is that correct contention?

21   A.  Yes.

22   Q.  So in other words, you don't recognize Janine Yamoah as an

23   employee of GMAC in Pennsylvania?

24   A.  In 2009, GMAC Mortgage probably had 3- or 4,000 employees.

25   I don't personally know her.

RESIDENTIAL CAPITAL, LLC, et al.                    95

1   Q.  Did you ever inquire if Janine -- because this is

2   important.  Did you even inquire --

3         THE COURT:  Don't tell me what's important.  Ask

4   questions.

5   Q.  Did you inquire if Janine is an employee of GMAC in

6   Pennsylvania?

7   A.  Yes.  So during the original -- original objection

8   process, I reviewed all of these documents that we attached as

9   exhibits, and I would have verified that these people worked at

10  GMAC.  What I don't know right now as I sit here, are they

11  dates of her employment.  But she would have worked for GMAC

12  Mortgage at the time this was done, because we were the

13  servicer, at this time.

14        THE COURT:  All right.  You, at the time -- because

15  you provided the declaration in support of the original

16  objection, correct?

17        THE WITNESS:  Yes.

18        THE COURT:  And this was one of the exhibits that you

19  included?

20        THE WITNESS:  I believe so.

21        THE COURT:  All right.  And did you check the records

22  to verify that Janine Yamoah was an employee of GMAC at the

23  time she signed the assignment of deed of trust?

24        THE WITNESS:  Yes.

25        THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    96

1   Q.  What about Zahirah Sweet?

2        THE COURT:  Seal -- Sweet -- okay, I'm sorry.  It's

3   the notary, Zahirah Sweet.

4   Q.  Is she also an employee of GMAC?

5   A.  The normal process -- and I did not work in the

6   foreclosure area -- but the normal process was the notaries

7   were also employees of GMAC Mortgage.  I know that when I did

8   the original objection, I would have verified that Janine had

9   authority for MERS to do an assignment.

10       THE COURT:  What would you do to verify that?

11       THE WITNESS:  MERS would grant signing authority to

12  individuals at GMAC Mortgage through a -- I think it's called a

13  corporate secretary certificate.  And they would list employees

14  who had authority, at that time, to sign for MERS.

15       THE COURT:  And was that part of the books and records

16  of GMAC?

17       THE WITNESS:  Yes.

18       THE COURT:  And did you look at those records to

19  confirm that Janine Yamoah was an authorized signatory?

20       THE WITNESS:  Yes, at that time, in 2009.  Yes.

21  Q.  So you review and read all this contents of the 2009

22  assignment of the deed?  Isn't that it?

23  A.  I have reviewed this assignment, yes.

24  Q.  Is there any defect that you noticed in this 2009

25  assignment of the deed of trust?

RESIDENTIAL CAPITAL, LLC, et al.                    97

1  A.  You're asking me if it's defective?

2        THE COURT:  Yeah, she's asked do you know of any

3  defect in Exhibit D, this assignment of a deed of trust?

4  A.  No.

5  Q.  I thought you review and read this, and you did not see

6  anything?

7        MR. WISHNEW:  Objection, Your Honor.  Asked and

8  answered.

9        THE COURT:  Overruled.

10 Q.  Can you read the notary public information, start from

11 "State of Pennsylvania"?

12 A.  You want me to read this entire paragraph?

13       THE COURT:  She doesn't have to read it.  I can read

14 it.  I see it in front of me.

15       MS. ANIEL:  Okay, thank you.

16       THE COURT:  Ask your question.  It's not a reading

17 contest.  Okay, if you have a question about the notary stamp,

18 ask it.

19 Q.  You didn't notice any defect on this notary that was

20 executed by the notary public?  You didn't notice anything?

21       MR. WISHNEW:  Objection, Your Honor.  Asked and

22 answered.

23       THE COURT:  Overruled.

24 A.  I can see that it was notarized by Zahirah Sweet in the

25 State of Pennsylvania, in the County of Montgomery.  I do

RESIDENTIAL CAPITAL, LLC, et al.                    98

1    understand that there's a line underneath that says this was

2    under the law of the State of California.  That I -- the State

3    of -- this was prepared by counsel in California, and that

4    would generally have just been a typo, instead of California,

5    it should have been Pennsylvania.

6            THE COURT:  Well, it was filed in California, right?

7            THE WITNESS:  It was recorded in California, yes.

8            THE COURT:  Recorded in California.

9            THE WITNESS:  Right.

10           MS. ANIEL:  So I have to ask a question, Your Honor.

11           THE COURT:  Yes, you have to ask a question.

12           MS. ANIEL:  Okay.

13   Q.  So they think it was okay, it was notarized in

14   Pennsylvania, and it was under perjury under the California?

15   Do you think this would not make the document void?

16   A.  I don't believe so.  It was recorded -- the original was

17   recorded in the County of San Mateo in California.

18   Q.  Okay.  So in other words, the assignment of the deed for

19   value received in 2009, did you --

20           MS. ANIEL:  I will reserve that question, because this

21   is for -- okay.

22   Q.  Is there money involved in this assignment of the deed in

23   2009?  Do you know?

24           THE COURT:  I don't understand your question.

25           MS. ANIEL:  It says on the assignment of the deed in

RESIDENTIAL CAPITAL, LLC, et al.                    99

1   2009, Your Honor, "For value received, the undersigned hereby

2   grants, assigns, and transfers to HSBC Bank, USA National

3   Association as trustee for DALT 2007-OA5, all beneficial

4   interest under that second deed of trust."

5           THE COURT:  I see what it says.  What's your question?

6   Q.  My question is, is there any money consideration that

7   was -- are you aware if there's a money consideration given to

8   MERS from HSBC?  Are you aware of that?

9   A.  I am not.

10  Q.  You are not aware.  Okay.  So in --

11          MS. ANIEL:  Just question, Your Honor, right?  I just

12  ask questions.

13          THE COURT:  Just questions, yes.

14          MS. ANIEL:  Okay.  You have to remind me sometimes,

15  you know.

16  Q.  Okay, let's go 2011.  Assignment of the deed, which is

17  now -- that's why we are here at trial because of this 2011

18  assignment of the deed that was signed by Mira Smoot.

19          THE COURT:  Looking at Exhibit G?

20          MS. ANIEL:  Yes -- yeah, I think it's, yeah, G, Your

21  Honor.

22          THE COURT:  G, okay.

23          MS. ANIEL:  That's the Trust exhibit.

24  Q.  So there was another assignment of the deed of trust that

25  recorded number 2011-016800, recorded on February 9, 2011,

RESIDENTIAL CAPITAL, LLC, et al.                    100

1   executed by Mira Smoot on February 1st, 2011.  And it was

2   notarized in the State of Pennsylvania, County of Montgomery,

3   by certain Mary Lynch, whose notary expiration date was

4   November 3, 2014.

5       My question to you, Kathy, are you aware if there

6   is -- you are an employee and you are familiar with the books

7   and records of the debtor.  Did you review this also, the 2011

8   assignment of the deed?

9   A.  Yes.

10  Q.  Are you aware that GMAC Mortgage is trying -- is paying

11  HSBC as trustee?

12          THE COURT:  Can you say that again?  I didn't hear the

13  question?

14  Q.  Are you aware if there is a money changed by consideration

15  in this assignment of the deed of trust in 2011?

16  A.  GMAC Mortgage was acting as the servicer for the loan at

17  this time.  I'm not sure I understand your question.

18  Q.  Understand it because it says here:  "For value received,

19  the undersigned corporation hereby grants assignment and

20  transfers to GMAC Mortgage LLC, formerly known as GMAC Mortgage

21  Corporation, all beneficial interests, under the certain deed

22  of trust dated 6/4/2007, executed by the Aniels."

23      So is there a money consideration involved in this

24  assignment of the deed of trust way back in 2011?

25  A.  You're -- are you asking me if GMAC Mortgage received

1   money from HSBC?

2   Q.  No.

3           THE COURT:  Paid money.

4   A.  Paid money?  No.

5   Q.  No, well, what my understand -- what I'm saying is that

6   HSBC sold the beneficial interest to GMAC in 2011.  So is there

7   a money exchange between HSBC as trustee for DALT 2007-OA5 to

8   GMAC Mortgage, LLC.  Is there a money transferred?

9   A.  No.  The pooling and servicing agreement would generally

10  allow the trustee to appoint its subservicer to conduct the

11  foreclosure on its behalf.  There wouldn't have been a -- it

12  wasn't being sold -- the loan wasn't being sold to GMAC

13  Mortgage.  The deed of trust was just being assigned to them to

14  complete the foreclosure.

15  Q.  So your under --

16          THE COURT:  Did the beneficial ownership of the

17  mortgage change?  It was just who the trustee was that was

18  going to go ahead and attempt to foreclose?

19          THE WITNESS:  Right.  The assignment of the deed of

20  trust for foreclosure purposes.  But the loan itself including

21  the note didn't transfer to GMAC Mortgage.

22  Q.  So the assignment of the deed of mortgage is just

23  transferring anything without any money consideration?

24          MR. WISHNEW:  Objection, Your Honor.  It

25  mischaracterizes the testimony.

RESIDENTIAL CAPITAL, LLC, et al.                                  102

1            THE COURT:  Overruled.

2     A.  There wouldn't have been a payment to -- from HSBC to GMAC

3     Mortgage, no.

4     Q.  So what is the purpose of this assignment of the deed if

5     there's no money consideration exchanged between HSBC and GMAC?

6     What was the purpose of this?

7     A.  The purpose of the assignment of the deed of trust is to

8     assign the deed to the servicer to conduct the foreclosure on

9     its behalf.

10    Q.  So the assignment of the deed -- the purpose of the

11    assignment of the deed is to transfer --

12            THE COURT:  Don't repeat her -- she answered your

13    question.  Ask another question.  She just answered your

14    question.

15    Q.  How long Mira Smoot works for GMAC?

16    A.  I will have to look back at the exact dates.  Is there a

17    document you want me to look at?  I know she --

18            THE COURT:  She's going to be here to testify.

19            THE WITNESS:  Right.

20            THE COURT:  Do you know how -- without looking at the

21    documents, do you know how long she worked for GMAC?

22            THE WITNESS:  She worked for GMAC until the sale to

23    Ocwen in February of 2013.

24    Q.  Would you go to Exhibit -- there's an exhibit that you put

25    the -- how do you call that -- Mira Smoot's information.  Okay,

1  let's go to --

2          THE COURT:  Exhibit H.

3          THE WITNESS:  Okay.

4          MS. ANIEL:  H.

5  Q.  Maybe you could recall?  You blacked out some information

6  here, but it says, appointment held, GMAC Mortgage LLC, and

7  then quick reference for GMACM, Mortgage, and it says category

8  3 authorized officer as of August 9, 2010 ended 2/15/2013.

9      And then and under here it says category 4 authorized

10 officer on August 9, 2010 ended on 2/15/2013.  Is this the

11 history -- employment history of Mira Smoot?

12 A.  It's not her entire employment history.  This is related

13 to authority she had as an authorized officer of GMAC during

14 these time periods.  She was employed by GMAC before 2010.

15         THE COURT:  May I ask you, where does this individual

16 profile come from?

17         THE WITNESS:  It's from our corporate secretary's

18 office.  So they keep track of signing authority for

19 individuals at different subsidiaries.

20         THE COURT:  All right.  And what's redacted out from

21 the copy that --

22         THE WITNESS:  Those would be other subsidiary or

23 affiliate companies for which she had authority for some level.

24         THE COURT:  But everything in this document, Exhibit

25 H, relates to Mira Smoot, right?

RESIDENTIAL CAPITAL, LLC, et al.                                    104

1           THE WITNESS:  Yes.

2           THE COURT:  And what you've left in here is what her

3   authority was for GMACM?

4           THE WITNESS:  Correct, yes.

5   Q.  Is Mira Smoot -- isn't Pennsylvania office where she

6   signed this 2011 --

7           THE COURT:  When she signed what?

8   Q.  When she executed it, was she in Pennsylvania at that

9   time?

10  A.  Yes.  Our primary office, for this area -- and you can see

11  it above in the profile -- was the Fort Washington,

12  Pennsylvania address.

13  Q.  Then let's look at the 2009 assignment of the deed again.

14          THE COURT:  I'm sorry, what exhibit do you want to

15  look at?

16  Q.  Okay, why is -- why is --

17          THE COURT:  What exhibit are you looking at?

18          MS. ANIEL:  We're looking on Exhibit F, Your Honor.

19          THE COURT:  Okay, that's fine.

20          THE WITNESS:  Okay.

21  Q.  Okay, why is it that only in 2009, MERS

22  Electronic -- Mortgage Electronic Registration System, Inc.,

23  solely as nominee for Mortgage IT was only able to transfer

24  that beneficial interest to HSBC?  Isn't that -- they're

25  supposed to do that in 2007, as you insisted that the loan on

RESIDENTIAL CAPITAL, LLC, et al.                    105

1   your loan was on the trust for 2007?  Why was the -- what was

2   the reason why in 2009, the MERS just only assigned, executed

3   by certain Janine Yamoah, recorded in September 21, 2009, why

4   is it only on that year that it was assigned?  Isn't that

5   suppose -- you insisted that the loan of Aniel was in

6   2007 -- July 1st, 2007, and the cutoff date is July 1st, 2007,

7   isn't that suppose -- the one who is going to transfer that is

8   HSBC?

9   A.  Well, this goes back --

10  Q.  Can you answer that?

11  A.  This goes back to what I said a little bit ago related to

12  the deed of trust sitting in the MERS system until it was

13  recorded out.

14  Q.  What do you mean sitting -- what do you mean sitting in

15  the MERS?  Is it idle there?  It was idle?  What do you mean by

16  sitting?  Can you tell me -- can you tell the Court what it

17  means, sitting?

18  A.  Your deed of trust, originally originated by Mortgage IT,

19  listed MERS as the original nominee.  When you sign that

20  original deed of trust, it is registered with the MERS system.

21  The MERS system is an electronic registration where the deed of

22  trust would sit until it needed to be assigned out in the

23  public records to whoever the trustee was or the servicer,

24  whoever was going to conduct some activity on the deed of

25  trust.

RESIDENTIAL CAPITAL, LLC, et al.                    106

1  Q.  Why only in in 2009, for two years from 2007, why only the

2  2009 was done by MERS, it was just lying on the MERS system?

3  So why is it not in 2008?  Why is it it took two years?

4          THE COURT:  Just ask a simply question, okay?

5  Q.  Why is it it took two years --

6          THE COURT:  Why wasn't it assigned until 2009?

7          THE WITNESS:  Sure.  Loans -- deeds of trust normally

8  sit in the Mortgage Electronic Registration system until

9  something needs to happen.  So it could be that loans could sit

10 for ten years in MERS and not get assigned out.  This one

11 happened to not need any activity to happen with -- related to

12 a foreclosure or a bankruptcy or something like that, until

13 2009.

14 Q.  So isn't that -- the only reason why MERS was transferred

15 it in 2009, when the Aniel loan was in default?  Is that the

16 reason why MERS transferred it to HSBC as trustee in 2009?  Is

17 that one of the reason also?

18 A.  That would be one of the reasons, right, that some

19 activity needed to take place, and they needed to assign it out

20 of MERS to do -- take some foreclosure-related activity.

21 Q.  Is the deed of trust and the note of Aniel -- was the

22 original deed of trust and the note of Aniel was on

23 the -- sitting on the MERS, Mortgage Electronic, from 2007 to

24 2009?

25 A.  The deed of trust is registered with MERS.

RESIDENTIAL CAPITAL, LLC, et al.                    107

1  Q.  The original deed of trust and the original note of this

2  Aniel loan was just sitting there between 2007 and 2009 in the

3  MERS?

4  A.  A promissory note is not assigned into MERS.  The

5  promissory note is not going to be recorded anywhere.  So the

6  deed of trust which was -- the original would have been

7  recorded in the county records, and then because you signed it

8  as an original MERS loan, it sits there until it needs to get

9  assigned out in the public records.

10 Q.  My question is that what was the reason why MERS held that

11 original deed of trust --

12         THE COURT:  Okay, asked and answered.  Let's move on.

13 Q.  Do you know where is the promissory note goes?

14 A.  The pro -- yes.

15 Q.  Do you know where?

16 A.  The promissory note, the original, is held in a collateral

17 file held by a custodian.

18 Q.  Who is the custodian?

19 A.  I don't know the custodian of the note today, because I'm

20 not the servicer.

21 Q.  Do you know the custodian is Fidelity?

22 A.  The custo -- I don't know if that's the custodian today.

23 I don't know.

24 Q.  So you're testifying here that you have familiar with the

25 documents --

1        THE COURT:  Who the custodian of the note is today is

2    not relevant to this proceeding.  Ask your next question.

3        MS. ANIEL:  The next question, Your Honor, is that the

4    reason why I'm asking -- probably you don't like to

5    hear -- because of her credibility.  The witness'

6    credibility --

7        THE COURT:  Please ask questions.

8    Q.  So you -- so you testify in this court that the original

9    deed of trust was on MERS, just sitting down and --

10       THE COURT:  Okay, stop -- stop for a second.  More

11   than a second.

12       You get to cover your questions once.  You don't keep

13   going over the same ground multiple times.  If you have new

14   questions that you wish to ask Ms. Priore, you can do that.

15   Otherwise finish your questioning.

16       MS. ANIEL:  Okay, so just direct question that the

17   cross -- okay.

18   Q.  Okay.  Let's go to -- to 2011 Exhibit -- assignment of the

19   deed, Your Honor, that was signed by Mira Smoot.  Is she an

20   authorized --

21       THE COURT:  This is back to Exhibit G?

22       MS. ANIEL:  Yeah, Exhibit G.

23       THE COURT:  Okay, go ahead.

24   Q.  Is she authorized officer of HSBC Bank USA?

25   A.  Mira Smoot was an authorized officer of GMAC Mortgage.

RESIDENTIAL CAPITAL, LLC, et al.                    109

1   Q.  Okay.

2   A.  She had -- HSBC gave power of attorney to GMAC Mortgage to

3   sign documents on its behalf.  So from the company profile we

4   talked about before, you can see she had an authorized officer

5   designation next to her during this time period.

6   Q.  So in other words, with the limited power of attorney that

7   was signed by Susie Moy, giving all the rights to the employee

8   of GMAC to sign as an authorized HSBC?  So any employee could

9   just sign on behalf of that limited power of attorney that was

10  given to you, to the debtors?

11  A.  Do you want me to look at the power of attorney?

12  Q.  No, just say --

13          THE COURT:  Can you tell me this?

14          MS. ANIEL:  Yes.

15          THE COURT:  In Exhibit H --

16          THE WITNESS:  Yeah.

17          THE COURT:  -- Ms. Smoot was listed as "authorized

18  officer".  What does that term authorized officer mean?

19          THE WITNESS:  It generally --- and I -- and I don't

20  know the specifics.  But they would have authority

21  to -- categories were different levels of documents that they

22  could execute.  But the power of attorney doesn't list out what

23  your title had to be.  It did give people at GMAC Mortgage who

24  had -- who were authorized officers to sign documents on their

25  behalf.

RESIDENTIAL CAPITAL, LLC, et al.                    110

1           THE COURT:  Is it your understanding that Mira Smoot,

2     as a category 3 and category 4 authorized officer of GMAC was

3     authorized to sign documents which HSBC had granted a limited

4     power of attorney to GMAC?

5           THE WITNESS:  Yes.  There's a whole listing of

6     documents that they would allow us to sign in that power of

7     attorney, and an assignment --

8           THE COURT:  And --

9           THE WITNESS:  -- was one of those.

10          THE COURT:  -- and somebody who was a category 3 and

11    category 4 authorized officer of GMAC could sign whatever

12    documents HSBC had authorized in the limited power of attorney?

13          THE WITNESS:  Yes.

14          THE COURT:  Okay.

15    BY MS. ANIEL:

16    Q.  Does HSBC give authority to Mira Smoot -- special power of

17    attorney to sign on behalf of the trust?

18    A.  They -- the power of attorney is general in nature.  It

19    doesn't give individual people, it gives employees of GMAC

20    Mortgage authority.

21    Q.  Can you explain what is that category 3 and category 4?

22    Can you differentiate that --

23    A.  No, I --

24    Q.  -- authorize?

25    A.  -- I can't.  I don't know.

RESIDENTIAL CAPITAL, LLC, et al.                    111

1  Q.  On this deed of trust, you know, if I have go to through

2  my loan history -- familiar with the loan history?  It's on my

3  exhibit -- I think that's number 3.

4          MS. ANIEL:  You go by Exhibit 3, Your Honor, on my

5  list.

6          THE COURT:  Okay, so Aniel Exhibit 3.  It's in volume

7  1.  You'll have to bring up a copy to Ms. Priore.

8          MS. ANIEL:  You have a copy of that?  I give you a

9  copy of that.

10          THE COURT:  Somebody will have to bring it up.

11          There is no copy in front of the witness.

12          MS. ANIEL:  Your Honor, I provided --

13          THE COURT:  Okay, they'll bring -- but wait until the

14  witness gets a copy, okay?  It's in volume 1.

15          MS. ANIEL:  I think I have it.  I have it.

16          THE COURT:  That's the right one?  Bring it up.  Go

17  ahead.

18          It's Exhibit 3.  Do you have that in front of you now?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay, go ahead, Ms. Aniel.

21  BY MS. ANIEL:

22  Q.  You provided a part of the loan history and it was filed

23  on February 15 -- I'm sorry, it was filed on April 10th, '15,

24  docket number 8475-3.

25          THE COURT:  We all have it in front of us.  Go ahead.

RESIDENTIAL CAPITAL, LLC, et al.                    112

1   A.  Yep, I have it.

2   Q.  You have it, right?

3   A.  Yes.

4   Q.  Okay.  Thank you.  One of the -- on the pages of this long

5   history, I find it so odd that I put that in my pre-trial

6   document that I filed in the court, that says that -- if you

7   could see the -- so much document, Your Honor, I have to --

8        There was mention in 2009 that there was no assignment of

9   the deed of trust -- there was assignment of deed of trust from

10  MERS and then --

11        THE COURT:  I don't understand what you just said.

12        MS. ANIEL:  No, on the loan history, Your

13  Honor -- this is the history of my loans, okay, between 2007

14  and 2013.  Okay?  And it has pages of 264.

15        THE COURT:  Yes, 262.

16        MS. ANIEL:  Yeah.  Mine is 264.  There is --

17        THE COURT:  Look in the lower right-hand corner.  What

18  does it say?

19        MS. ANIEL:  Oh, it says, Your Honor, 262 -- probably

20  it's included all those other exhibit.

21        THE COURT:  Go by those -- if you want to refer to

22  pages, in the lower right corner --

23        MS. ANIEL:  264.  It says page --

24        THE COURT:  It says 7 of -- I'm looking -- it says of

25  262.  Do we have the same document?

RESIDENTIAL CAPITAL, LLC, et al.                    113

1          THE WITNESS:  I have 262, yes.

2          MS. ANIEL:  I know I have that but due to --

3          THE COURT:  The loan history pages, in what's marked

4    as Exhibit 3 in your binders shows the page number of 262

5    pages.  I want to be sure we're all looking at the same

6    documents.

7          MS. ANIEL:  I don't have the -- I didn't make a copy

8    of my pre-trial motion, Your Honor, but what it says is

9    identified --

10          THE COURT:  Ms. Aniel, do you have Exhibit 3 in front

11    of you?

12          MS. ANIEL:  Yes, but --

13          THE COURT:  Look in the lower right-hand corner.  What

14    does it say?  Lower right-hand corner of the page?

15          MS. ANIEL:  Oh, it says --

16          THE COURT:  It says page something of what?

17          MS. ANIEL:  26- page something -- it says 262.

18          THE COURT:  262.  Okay.

19          MS. ANIEL:  Yes.

20          THE COURT:  We're all looking at the same document.

21    So when you want to refer to specific pages, refer --

22          MS. ANIEL:  Yeah, I put -- is there any way can I

23    borrow your copy of the pre-trial motion, because I put that.

24          THE COURT:  Ms. Aniel, this is the exhibit.  This is

25    what you got to use.  It's the exhibit that the Court has.

RESIDENTIAL CAPITAL, LLC, et al.                    114

1    That's what you need to use.  If there's something -- they're

2    dated.  The entries are dated, if there are specific entries

3    you want to look at.

4          MS. ANIEL:  There was -- I don't know what page of

5    that, Your Honor, but it's my duty to do that, forgive me for

6    not being --

7          (Pause)

8          MS. ANIEL:  Can we -- I don't have the pre-trial

9    motion, that I could go through, Your Honor.

10         THE COURT:  I don't know what pre-trial motion you're

11   talking about.

12         MS. ANIEL:  No, because it says there on my

13   exhibit -- my under penalty, my information, it says go to page

14   149.  Because the one that I have is just like totally a lot of

15   documents that are totally the same and the same date and

16   totally the same.  So there -- it's easier for me to point it

17   out, Your Honor.  I really apologize for not bringing that.

18         I think I have it.  Okay.  I have a copy, Your Honor.

19   I'm sorry.  This is on pre-trial order, which is 122 -- I just

20   print it out.  But my statement here, my claim of description

21   of nature of the case, I included -- my note says that --

22         THE COURT:  What number are you looking at?

23         MS. ANIEL:  Okay, I'm still looking, Your Honor.  Oh,

24   here, here, Your Honor.

25         Let's go to page 7.

RESIDENTIAL CAPITAL, LLC, et al.                    115

1          THE COURT:  You have paragraphs numbered.  What
2   paragraph number?

3          MS. ANIEL:  Paragraph 42.

4          THE COURT:  What does that have to do with the loan
5   servicing notes?  As I say, what -- your contentions or a
6   description of the case is not evidence.  And that doesn't
7   refer to the loan.

8          MS. ANIEL:  But I just want to --

9          THE COURT:  If you want to refer to something in the
10  loan servicing notes, refer to the loan servicing notes.

11         MS. ANIEL:  Okay.  Let's go to page 9, Your Honor.  I
12  think this the one.

13         THE COURT:  I'm sorry, page what?

14         MS. ANIEL:  9 of 22, at paragraph 54.

15         THE COURT:  So you want to look at the entry for July
16  27th, 2009?

17         MS. ANIEL:  You go to page 235.

18         THE COURT:  Okay, the entries in the loan servicing
19  notes for July 27, 2009, it appears to me, that they are at
20  page 235 of 262.

21         THE WITNESS:  Yes, I found them.

22         THE COURT:  Mr. Wishnew, see if you can help Ms. Aniel
23  out and find it.

24         MS. ANIEL:  Thanks.

25  BY MS. ANIEL:

RESIDENTIAL CAPITAL, LLC, et al.                          116

1    Q.  Okay, under the loan history --

2         MS. ANIEL:  I'm sorry.  Okay.

3    Q.  Under the loan history, Your Honor, there was a -- there

4    was a statement here --

5         THE COURT:  I don't want to know.  If you have a

6    question of the witness, go ahead and point her to it.  I don't

7    want to hear argument.  I don't want to hear your testimony.

8    You'll get a chance.

9    Q.  Okay, the question --

10        THE COURT:  If you have a question about an entry --

11        MS. ANIEL:  Yeah.

12        THE COURT:  -- on the loan servicing notes for July

13   7th (sic), 2009, go ahead and ask it.

14   Q.  Can you tell me why in 2009, July 27, 2009, that I am

15   still waiting for the assignment to be signed and notarized?

16   Can you tell me why in July 2009, they are still waiting for

17   the assignment of the deed to be signed and notarized?

18   A.  I am not sure I understand the question.  You're asking

19   why they're waiting?  I don't know.  I mean --

20   Q.  Are you aware of that?  Did you read this loan history?

21   A.  I can read the entries that are on July 27th.

22        THE COURT:  May I ask you this?

23        THE WITNESS:  Yes.

24        THE COURT:  What is the transaction type BKR?

25        THE WITNESS:  Yeah.  So that means that this was

RESIDENTIAL CAPITAL, LLC, et al.                    117

1  related to a bankruptcy.  So --

2          THE COURT:  The Aniels' bankruptcy in California?

3          THE WITNESS:  Yes.  Yeah.  So they're coded by either

4  foreclosure or correspondence or bankruptcy.  So this -- it

5  appears that this entry is talking about the assignment needed,

6  likely related to the bankruptcy that the Aniels had filed.

7          THE COURT:  Okay.

8  Q.  The reason of the 2- -- is the reason of 2009 assignment

9  of the deed, is the reason why you have to execute the debt,

10 just to show to the judge that you have an assignment of the

11 deed in order to file a proof of claim on Aniels' bankruptcy?

12 A.  Right.  So as I had mentioned before, the assignment of

13 the deed of trust normally happens because of foreclosure or a

14 bankruptcy activity is taking place.  And if you look at this

15 note from July 27th, it appears that the assignment was being

16 done related to the bankruptcy.

17 Q.  According to this statement there, it's currently waiting

18 for assignment to be signed and notarized.  Once that has been

19 completed, we will continue to process.  That was the statement

20 here in July 27, 2009.  In other words, it was not -- there was

21 no assignment of the deed as of July 27, 2009.  The only reason

22 that they have that is to -- for foreclosure -- for proof of

23 claim that GMAC is initiating on Aniel bankruptcy in 2009.

24         And then if you read in 20- -- if you read on August -- go

25 in (a) August 5, 2009, it says here why is it that they have to

1  create an assignment of deed for signature and recordation at

2  cost of 100 dollars?  What is it that GMAC would pay 100

3  dollars just to create this 2009 assignment of the deed of

4  trust and record it?  What if -- why do you have -- why do you

5  have to let someone create the assignment of the deed in 2009

6  on August 5th?  And remember on August 5th, that was -- August

7  24th, it was executed by certain Janine --

8          THE COURT:  Okay, stop.  Tell me how this question

9  relates to one of the four issues to be tried listed on page 16

10 of the pre-trial order?

11         MS. ANIEL:  Because the 2009 assignment of deed was

12 fabricated, manufactured, Your Honor.  And --

13         THE COURT:  Look at the pre-trial order that you

14 signed and it lists the issues to be tried under (V) on page

15 16.  There are four issues listed there.

16         First:  1) whether Mira Smoot had sufficient authority

17 to execute the 2011 assignment as an authorized officer of

18 HSBC.  2) Whether GMACM and ETS had sufficient authority to

19 commence the foreclosure action against the property when it

20 caused the notice of default to be recorded on April 27, 2012.

21 3) The extent of actual damages, if any, proximately caused to

22 the claimants by GMACM's and ETS's alleged wrongful foreclosure

23 of the property in April 2012 under the theories of wrongful

24 foreclosure, fraud, and unlawful competition law.  4) The Court

25 to declare whether the assignment of deed of trust is void.

1      Those are the only issues that are in this trial.  I
2  tried to give you leeway in what you question about.  You've
3  strayed well beyond those issues.

4      MS. ANIEL:  In 2011, it was part of 2009 assignment of
5  the deed, Your Honor.  If the 2009 assignment of the deed is
6  fabricated and manufactured, based on the evidence that we
7  have --

8      THE COURT:  Okay, here's what we're going to do.
9  We're going to --

10      MS. ANIEL:  When --

11      THE COURT:  Stop.  Stop.  We're going to recess for
12  lunch until 1:30.  During the lunch break, Ms. Aniel, you need
13  to go over your questions and you need to be sure that your
14  questions specifically are focused on the issues that are to be
15  tried.  Okay?  We're not rehashing your entire loan history,
16  the history of your bankruptcy, all that went before.  We're
17  here -- I've already ruled in a prior opinion about most of the
18  claims that you asserted.

19      Most of the -- the objection was sustained to most.
20  It was overruled with respect to specific claims all focused on
21  the validity of the 2011 assignment and the 2012 notice of
22  default, and what, if any, damages you suffered if there was
23  any wrongful conduct.

24      We're going to take a recess now.  When you come back
25  at 1:30, you need to be sure to focus your questions on the

RESIDENTIAL CAPITAL, LLC, et al.                    120

1  issues that are part of this contested matter.  We'll resume at

2  1:30.

3            MS. ANIEL:  Thank you, Your Honor.

4       (Recess from 12:23 p.m. until 1:37 p.m.)

5            THE COURT:  All right, please be seated.

6            Ms. Priore, you know you're still under oath.

7            THE WITNESS:  Yes.

8            THE COURT:  Okay.  Ms. Aniel, go ahead.

9  RESUMED DIRECT EXAMINATION

10 BY MS. ANIEL:

11 Q.  Kathy, you mentioned before we go on break that the

12 original deed of trust was just sitting in 2009 on MERS.  Can

13 you explain to me what is MERS means, Mortgage Electronic

14 System -- what are this MERS's duties?

15 A.  The duties of MERS?

16 Q.  Yes, why is it that my deed of trust, the original deed of

17 trust was sitting -- in 2009, was sitting for a period of two

18 years, according to your testimony, it was just sitting there

19 with MERS?  Is there any reason why?

20           MR. WISHNEW:  Objection, Your Honor, as to relevance.

21           THE COURT:  Sustained.

22           MS. ANIEL:  Your Honor, I would --

23           THE COURT:  Ask your next question.

24 Q.  Mortgage Electronic -- is Mortgage -- is MERS also a

25 beneficiary -- who is the beneficiary of MERS on Aniels' deed

RESIDENTIAL CAPITAL, LLC, et al.                    121

1  of trust?  Do you know?

2         THE COURT:  That question doesn't make sense.

3  Q.  Isn't that MERS is the --

4         THE COURT:  Could you explain what MERS is?

5         THE WITNESS:  Yes.  So MERS --

6         THE COURT:  Just listen carefully.  Okay?  She'll

7  explain to you what MERS is.  Okay?

8         THE WITNESS:  So MERS is nothing more than electronic

9  registration system.  Your original deed of trust that you sign

10  gets sent to the county to be recorded.  It also gets

11  registered on the MERS system.  MERS was generally created to

12  track when mortgages or deeds of trust would be transferred to

13  different beneficiaries.  So the original deed of trust is

14  recorded.  It's registered in MERS.  And then, as you know, it

15  gets assigned out, out of MERS, to whoever the beneficiary is

16  at that time, and in this case it was HSBC.

17  Q.  So your testimony says it's just a register system, that

18  MERS has a company and an office that handles this original

19  deed of trust?

20  A.  MERS does not get the original deed of trust.  The

21  original deed of trust is sent to whichever county it needs to

22  be recorded in.  Then the original that comes back from the

23  county is put with the collateral file, just like I mentioned,

24  it's put with the original note.  The registration system only

25  tracks when the deed of trust is transferred or sold to other

1   beneficiaries.

2   Q.  So the deed of trust is with -- with MERS?

3   A.  No.  The original deed of trust is in a collateral file

4   with the custodian.  MERS is an electronic registration system

5   only.  It doesn't hold original documents.

6   Q.  So I asked you before where is the original deed of trust.

7   You said it's with MERS sitting down.  So now you're changing

8   your --

9         THE COURT:  No, she's not changing it.

10  Q.  -- testimony?

11        THE COURT:  No.

12  Q.  And you also mentioned the promissory note was with the

13  custodian.  And I asked you who is the custodian, and you said

14  you don't know.

15        THE COURT:  Ms. Aniel, I'm giving you leeway because

16  you're not represented by an attorney.  Okay?  But that only

17  goes so far.  Okay?

18        Ms. Priore has testified, I think, quite clearly.  I

19  understand the concepts may be difficult.  What I understood

20  her to say -- she'll correct me if I'm wrong -- that the

21  promissory note does not go to MERS.  It's held by whoever

22  either owns the note or a custodian for it.  So when the note

23  was originally signed, the original lender would have had it.

24  When the note was transferred, it would have gone to the

25  transferee or a custodian holding it for the transferee.

1        Is that essentially correct?

2        THE WITNESS:  Yes, that's correct.

3        THE COURT:  Okay.  So the note does not go -- MERS

4   doesn't get the note.  MERS never had the note.  MERS never

5   gets the notes.  Okay?  The note is either held by the owner of

6   the note or by a custodian for the owner of the note.

7   Typically, if it's in a securitization trust, it's a custodian

8   that's holding the note.

9        Is that correct?

10       THE WITNESS:  Yes.

11       THE COURT:  Okay.  The deed of trust has to be

12   recorded.  Okay?  And MERS is identified as the beneficiary

13   when it's involved.  Is that correct?

14       THE WITNESS:  Yeah, so it'll say directly on your deed

15   of trust whether MERS is going to -- whether it's going to be

16   registered with MERS or not.

17       THE COURT:  Okay.

18       MS. ANIEL:  So therefore, Your Honor, this is part of

19   my exhibit.

20       THE COURT:  It's not part of this case.

21       MS. ANIEL:  It is important, Your Honor.

22       THE COURT:  You're telling me it's important, and I'm

23   telling you I'm listening to the evidence.  You ask questions

24   of this witness.  The questions have to be related to the four

25   issues that have been identified and agreed upon as the issues

RESIDENTIAL CAPITAL, LLC, et al.                    124

 1  for this trial.  Proceed.

 2          I'm not going to sit here and let you wander all over

 3  the place asking questions that don't bear on the issues.  Go

 4  ahead.

 5          MS. ANIEL:  Okay, with due respect, Your Honor, I am

 6  tendering this excluded evidence --

 7          THE COURT:  What excluded evidence?  Ask your

 8  questions.

 9          MS. ANIEL:  The question that I asked already is part

10  of the evidence.  I asked --

11          THE COURT:  Ask another question.

12          MS. ANIEL:  But I'm tendering that exhibit -- Exhibit

13  3.

14          THE COURT:  Which exhibit?

15          MS. ANIEL:  The deed of trust.

16          THE COURT:  Okay.  Exhibit 3 is the loan servicing

17  notes.  You want Exhibit 3 in evidence?  Exhibit 3 is in

18  evidence.

19          MS. ANIEL:  No, I'm sorry, Exhibit 4 is the -- for

20  loan history of my loan history.

21          THE COURT:  Exhibit 4.

22          MS. ANIEL:  Oh, Exhibit 3, I'm sorry.  Exhibit 3.

23          THE COURT:  Exhibit 3 is in evidence.

24  (Loan servicing notes was hereby received into evidence as

25  Aniel's Exhibit 3, as of this date.)

1          THE COURT:  Okay, I'm admitting it in evidence.

2          MS. ANIEL:  Yeah, it's in evidence.  But it's part of

3    my -- it's very important when it comes to my wrongful

4    foreclosure, Your Honor.  The document says on the loan history

5    that it was fabricated and manufactured by GMAC in order for

6    them to satisfy the court-ordered bankruptcy, when I filed my

7    bankruptcy --

8          THE COURT:  Don't make arguments.  You wanted Exhibit

9    3 in evidence; it's in evidence.

10          MS. ANIEL:  Yes, okay.

11          THE COURT:  Ask your next question.

12          MS. ANIEL:  Yes, thank you.

13    BY MS. ANIEL:

14    Q.  Is MERS Mortgage Servicing --

15          THE COURT:  It's not a servicer.

16    Q.  -- it's Mortgage Electronic Servicing --

17          THE COURT:  It's not a servicer.

18          MS. ANIEL:  Okay, I have --

19          THE COURT:  Tell her once more what MERS is.

20          THE WITNESS:  MERS is --

21          MS. ANIEL:  May I --

22          THE COURT:  Stop.

23          THE WITNESS:  Yes.  MERS, short for Mortgage

24    Electronic Registration --

25          THE COURT:  M-E-R-S.

RESIDENTIAL CAPITAL, LLC, et al.                           126

1       THE WITNESS:  -- Systems, Inc., is a registration

2  system which tracks a deed of trust or a mortgage, so that an

3  assignment does not need to be recorded in the county records

4  every time a deed of trust is sold or transferred.

5  Q.  So in other words, what document has HSBC as trustee for

6  that house in 2007?  You insist in 2007 that my note and my

7  deed of trust was entered -- was transferred to DALT in 2007.

8  Why is it that the deed of trust was just sitting around in

9  2009?

10      MR. WISHNEW:  Judge --

11 Q.  If you are saying that -- if you are saying that my loan

12 belongs to the trust in 2007, it was transferred in 2007, July

13 1st, why -- what kind of document the trust has?

14      MR. WISHNEW:  Objection, Your Honor.  Asked and

15 answered; relevance.

16      THE COURT:  Can you answer the question.

17 A.  I'm going to try to answer what I think you're asking me.

18 Your original deed of trust lists MERS as the original nominee

19 and has a MIN number associated with it.  That original deed of

20 trust got recorded; it also gets registered in MERS.  It will

21 stay in the registration system and it would -- MERS itself

22 would show a transfer in their system to whoever the new

23 beneficiary is, whoever that mortgage or deed of trust gets

24 sold to.

25      The reason you see a deed of trust out of MERS to HSBC two

RESIDENTIAL CAPITAL, LLC, et al.                    127

1  years later, does not mean that it didn't stay -- that it

2  didn't move to HSBC in 2007.  It's in the registration system

3  showing that it went to HSBC.

4  Q.  But you -- but you stated a while ago that the original

5  deed of trust was sitting on the MERS.  So what document can

6  you prove that my loan belongs to the trust in 2007?  What

7  document the trust received in 2007 --

8          MR. WISHNEW:  Obje --

9  Q.  -- if the deed of trust was on MERS after two years?  What

10 evidence you could prove that my loan belonged to the trust in

11 2007, and the fact of the matter, Your Honor, that's an

12 evidence --

13         THE COURT:  Just ask questions.  Don't argue.  Ask

14 questions.

15         MS. ANIEL:  Okay.

16 Q.  Well, what happened?  Why is it that the deed of trust,

17 original deed of trust was in MERS in 2009?  Why is it that it

18 doesn't -- it doesn't go to the trust in 2007?

19 A.  It --

20         MR. WISHNEW:  Objection, Your Honor.  Asked and

21 answered.

22         THE COURT:  It was.  Sustained.  You covered this

23 already.  You may not like what she's answered.  She's answered

24 this multiple times.  Okay?

25         Ask a new question.

RESIDENTIAL CAPITAL, LLC, et al.                    128

1  Q.  Is MERS a beneficiary of the trust DALT 2007-OA5?

2  A.  If you -- do you want me to read from your deed of trust

3  what MERS is?  I mean, if -- they are a nominee for the

4  beneficiary of the deed of trust.

5  Q.  Let's go on the deed of -- let's go on Exhibit 2.

6  A.  I don't have that binder.  I only have the --

7  Q.  It's also part of your exhibit.

8          THE COURT:  Let me see what --

9  A.  Which document is that?

10          THE COURT:  Hold on.  Let me look.

11          MR. WISHNEW:  C as in cat, Your Honor.

12          THE COURT:  Okay.  So we're going to look at Exhibit

13  C -- Trust's Exhibit C, which is the same document as Ms.

14  Aniel's Exhibit 2.

15          THE WITNESS:  Okay.

16          THE COURT:  Okay?  Do you see, Ms. Aniel?

17          MS. ANIEL:  Okay.

18  Q.  It says here that MERS -- page 2 of the deed of trust --

19          MS. ANIEL:  Can I read it, Your Honor?

20          THE COURT:  Yes, you can.  Go ahead.

21  Q.  Okay, it says here the trustee is Fidelity National Title.

22  And then part of this is (E), it says MERS is the Mortgage

23  Electronic Registration System, Inc.  MERS is a separate

24  corporation that is acting solely as a nominee for lender and

25  lender's successors and assigns.  MERS is the beneficiary under

RESIDENTIAL CAPITAL, LLC, et al.                    129

1   this security instrument.

2       It says here MERS is organized and existing under the laws

3   of Delaware and has an address and telephone number, such as PO

4   Box 2026, Flint, Michigan, 48501-2026 and telephone number

5   is --

6           THE COURT:  It's okay.  You're reading from paragraph

7   (E) on page 2 of Exhibit C, correct?  Is that right?

8           MS. ANIEL:  Yes, Your Honor.

9           THE COURT:  Okay.  We can see that.

10  Q.  Do you know who is the lender for this deed of trust?

11  A.  The lender is listed on the first page under (C) as

12  Mortgage IT, Inc.

13  Q.  So did you -- what do you think about a lender Mortgage

14  IT, is MERS the beneficiary of the Mortgage IT?  Is that all

15  right?

16  A.  As you just read in (E), MERS is acting solely as nominee

17  for the lender, which was Mortgage IT, and they're a

18  beneficiary under the deed of trust.

19  Q.  Is MERS acting as beneficiary of the DALT 2007-OA5?

20  A.  That -- I'm not sure that I understand that question.

21          THE COURT:  I don't either.

22  Q.  No, if MERS is beneficiary of the Mortgage IT, how could

23  MERS be a beneficiary of DALT 2007-OA5?

24  A.  Because if you read the sentence before that, it says MERS

25  is acting as nominee for the lender and lender's successors and

RESIDENTIAL CAPITAL, LLC, et al.                    130

1  assigns.  HSBS is the successor to Mortgage IT.  They were

2  assigned the deed of trust when they purchased it.

3  Q.  But you just said that the deed of trust was --

4            THE COURT:  No, no.  Listen, you can ask questions.

5  You're not there to argue.  Okay?  Just ask questions.  You get

6  to ask the questions once.  I've told you that before.

7            I recognize you're not represented by a lawyer, and

8  I'm trying to give you reasonable leeway with your questioning.

9  Okay?  I'm not going to permit you to get into arguments, to

10 make arguments.  I'm going to permit you to ask questions.

11           MS. ANIEL:  So Your Honor, I'm just limited for just

12 asking?  I cannot dispute what she said based on the evidence?

13           THE COURT:  You will have a chance to testify, if you

14 wish.

15           MS. ANIEL:  Oh, okay.

16           THE COURT:  For now, you are asking questions of the

17 witness that you called as a witness.  All you can do now is

18 ask questions, not make arguments, not get into arguments.

19 Q.  Okay, let's go to --

20           MS. ANIEL:  Thank you, Your Honor.

21 Q.  Let's go to Exhibit 3.

22           THE COURT:  Do you have the --

23           THE WITNESS:  I don't have that binder.

24           THE COURT:  The loan history.

25           MS. ANIEL:  That is the loan history.

1          THE COURT:  Okay.  Ms. Arett, could you bring the loan

2    history back up, if you would?  Thank you.  Thank you very

3    much.

4          THE WITNESS:  Okay.

5    Q.  Who is the owner of Aniel note and deed of trust?

6          THE COURT:  At what point in time?

7          MS. ANIEL:  Pardon me?

8    Q.  In 20- --

9          THE COURT:  At what point in time?

10          MS. ANIEL:  At what point in time --

11          THE COURT:  Yeah.  You have to ask her -- you're

12   asking who owned the note.  And I'm saying to you, you have to

13   be specific as to what point in time, because the

14   ownership -- the evidence has already established that the

15   ownership of the note changed.  All I'm asking you to do is

16   tell her at what point in time you want to know who the owner

17   of the note was.

18   Q.  So in 2009, who is the owner of Aniel note?

19   A.  It's HSBC as trustee.

20   Q.  In 2011 assignment of the deed that was signed by Mira

21   Smoot, who is the owner of Aniel note and deed of trust?

22   A.  Owner of the loan has always remained HSBC after it was

23   securitized.  GMAC Mortgage was the servicer.  And yes, they

24   were assigned a beneficial -- assignment of the deed of trust

25   was assigned to GMAC Mortgage in 2011, solely to do a

RESIDENTIAL CAPITAL, LLC, et al.                    132

1  bankruptcy or a foreclosure issue.

2  Q.  So your answer, it's still HSBC in --

3  A.  Yeah.

4  Q.  -- 2011?

5  A.  Yes.

6  Q.  Is that correct?  Okay.

7      So the loan history, Exhibit 3, my exhibit, okay, was

8  entered in April --

9          THE COURT:  Exhibit 3 is --

10          MS. ANIEL:  My exhibit, Your Honor, Exhibit 3.

11          THE COURT:  Yes, what about -- what do you want to

12  point to in there?

13  Q.  My question here is that there are three accounts related

14  to this loan history.  And it says here the investor number is

15  42222 and the investor's full name is Wells Fargo Bank.

16          THE COURT:  Where are you reading from?

17          MS. ANIEL:  On the first page, Your Honor, first page

18  of the loan servicer.

19          THE COURT:  Okay.  Yes, go ahead.  Ask your next

20  question.

21          MS. ANIEL:  Did you see that, Your Honor?

22          THE COURT:  I see it.  Go ahead.

23  Q.  So why is it now Wells Fargo became the owner of note?

24  A.  They didn't.  So the coding 4222 references the pooling

25  and servicing agreement for which HSBC is the trustee.  If you

1   look at the pooling and servicing agreement, you'll see that

2   Wells Fargo was acting as master servicer under that deal.

3   That's why Wells Fargo is listed there.

4   Q.  But it says here in this investor name, full name of the

5   investor is Wells Fargo Bank, National Association, as the

6   investor of the note and the deed of trust, as of date -- as of

7   this -- when you filed this in 2015 last year.  And it was

8   updated as of March 5, 2014.

9       So since 2014, it's still showing it was Wells Fargo Bank

10  who is the investor?

11  A.  You have to read both in conjunction with each other.  The

12  way that the system is set up lists investor, really, who is

13  the master servicer for whatever securitization it is, because

14  GMAC Mortgage as the subservicer would submit payments to here,

15  Wells Fargo, who would submit them to the trustee of the trust.

16  This is just the way that the system reads it.  You have to

17  read it in conjunction with the investor number.

18          THE COURT:  The investor number is the 42222?

19          THE WITNESS:  Yes.

20          THE COURT:  And you're saying that was the investor

21  number for what?

22          THE WITNESS:  That number links to the pooling and

23  servicing agreement for which the entire deal would list HSBC

24  as trustee and Wells Fargo as the master servicer.

25          THE COURT:  Thank you.

RESIDENTIAL CAPITAL, LLC, et al.                    134

1   Q.  Can the master servicer become an investor of this trust?

2   A.  They're not an -- they're not an investor in the

3   definition you're thinking of.  They're listed here primarily

4   as the master servicer of the -- I'm sorry -- of the deal.  I

5   can't tell you why the system is set up to say "investor" as

6   opposed to "master servicer".

7   Q.  You said it's about the system of how you guys, you know,

8   do your duties.  It's about the system.  So it looks like the

9   system is not really accurate, based on the information that --

10           THE COURT:  Ask questions, not make arguments.

11  Q.  Is your system is flawed or accurate?

12           MR. WISHNEW:  Objection, Your Honor.

13           THE COURT:  Overruled.

14  A.  No.  I, as someone who works for the company, I am able to

15  read this and understand that the investor code and the

16  investor name together links me to the pooling and servicing

17  agreement.

18  Q.  So who is the owner of my note and my deed of trust?  It's

19  still the trust or it's Wells Fargo?

20  A.  It's HSBC.

21  Q.  HSBC?  Okay.

22      And Wells Fargo also has his own loan number.  Is that

23  right?

24  A.  I don't -- if you're looking in this investor info area on

25  the front of the servicing notes, you have an investor number,

RESIDENTIAL CAPITAL, LLC, et al.                          135

1    investor name, and right, there is an investor number there

2    that's associated with Wells Fargo as the master servicer,

3    who's going to receive the payments to transfer up to the

4    trustee.

5    Q.  Is Wells Fargo has its own loan number and also GMAC has

6    its own number, am I correct, on this information --

7    A.  It's an identifier.  It's an account number.  Yes.

8    Q.  The identifier, what is difference between identifier

9    number as to the loan number?

10   A.  I don't know.  I mean, every company is going to identify

11   it differently.  The fact is that you have one servicing loan

12   number, which was the GMAC Mortgage loan number, which would

13   have been all of the loan numbers for which you see

14   correspondence from the servicer.

15   Q.  What kind of document the trust has when they -- when my

16   loan was transferred to the trust in 2007?  What should receive

17   the trust as document?

18        THE COURT:  I don't understand the question.

19   Q.  What document the trust should supposed to receive on 2007

20   when my loan was transferred to the trust?

21   A.  We became servicer.  We were not a party to the

22   securitization of this loan.  We are a subservicer only.  So we

23   get information once the loan was securitized by Mortgage IT or

24   HSBC, and they give us the loan file and they give us, right,

25   the information about first payments, all of that stuff.  But I

1   don't -- I'm not sure I understand what you're asking me that

2   they received.  We weren't a party to the securitization

3   agreement.

4   Q.  I understand, but you stated --

5          THE COURT:  Can I just -- stop.  This was not a

6   securitization trust that was sponsored by any of the debtors?

7          THE WITNESS:  Correct.

8   Q.  You stated before here that --

9          THE COURT:  If she stated it before, she's stated it

10  before.  Ask another question.  You're not sticking to the four

11  issues that were identified and agreed upon as the issues for

12  this trial.

13  Q.  Who created this assignment of the deed that was signed by

14  Mira Smoot?  Let's go to Exhibit number --

15         THE COURT:  This is Exhibit G.

16  A.  Can you repeat your question?

17  Q.  Who is -- who prepared --

18         THE COURT:  Is that -- I just want to make sure.

19  You're talking about Exhibit G, correct?

20         MS. ANIEL:  G, yeah.  But I have to go -- I'm sorry.

21  Mira Smoot.

22         This is the assignment of the --

23         THE COURT:  This is the 2011 assignment.  This is the

24  one that's signed by Mira Smoot.

25         MS. ANIEL:  Yes.  My --

RESIDENTIAL CAPITAL, LLC, et al.                    137

1         THE COURT:  That's the one you're talking about?

2         MS. ANIEL:  My exhibit, Your Honor, Exhibit 5.

3         THE COURT:  Same document.

4         THE WITNESS:  Okay.

5    Q.  You have that, Kathy?

6    A.  Yes.

7    Q.  Okay.  Who prepared this assignment of the deed of trust

8    in 2011?

9    A.  It -- at the top of the assignment, it says "Requested and

10   prepared by ETS Services, LLC".

11   Q.  So it was prepared by -- who prepared this document?

12   A.  I am reading from it, and it says ETS.

13   Q.  It was prepared by MERS?

14   A.  No, it was -- am I looking at the 2011 assignment of deed

15   of trust, and it says "prepared by ETS Services."

16   Q.  Well, then we have the wrong one.

17        THE COURT:  That's the Smoot document.

18        MS. ANIEL:  Oh, I'm sorry, Your Honor.  I'm reading on

19   the 9 -- okay.  I'll go --

20        THE COURT:  Okay.  Just let me advise you that you've

21   used three hours of your total of five hours.  So you have two

22   hours remaining.

23        MS. ANIEL:  Your Honor, we still have another day,

24   right?

25        THE COURT:  But you have a total of five hours.

RESIDENTIAL CAPITAL, LLC, et al.                    138

1    That's in the pre-trial order.

2            MS. ANIEL:  Each?

3            THE COURT:  Okay?  You have five hours and the other

4    side has five hours.  You've used three of your five hours

5    already.  I'm just informing you of the time that you've used.

6    You have two more hours.

7            MS. ANIEL:  Okay, Your Honor.

8    Q.  Who prepared this 2011 assignment of the deed?

9            THE COURT:  Which one are you talking about?

10   Q.  The 2011 assignment of the deed.  That's --

11           THE COURT:  That's Exhibit G.

12   Q.  -- Exhibit 5 on my --

13           THE COURT:  Which is the same thing as -- Exhibit 5

14   and Exhibit G are the identical documents.

15   A.  Yeah, so Exhibit G, the assignment of deed of trust from

16   February 2011 was prepared by ETS Services.

17   Q.  So it was ETS who prepared this document.  Am I right?

18   A.  Yes.

19   Q.  So how did Mira Smoot was able to sign this?  What

20   happened?  ETS is in California, and it was signed by Mira

21   Smoot in Pennsylvania, that was notarized in Pennsylvania.  So

22   how did Mira Smoot was able to executed this assignment of deed

23   when the fact of the matter, it was ETS was who prepared this

24   document?

25   A.  I can't speak to the exact process, but ETS would create

1  assignment and e-mail them electronically to whoever needed to

2  sign them.

3  Q.  Why is it ETS didn't sign it?  Because they are the one

4  that prepared it.  They should know.

5  A.  But ETS didn't have authority to sign for HSBC.

6  Q.  But they have authority to prepare the document?  Is that

7  what it says?

8  A.  It's no different than a foreclosure firm preparing a

9  document and the person who has authority would sign it.

10 Q.  Yeah, that's the -- the question is ETS is only authorized

11 to prepare an assignment of the deed in 2011.  Is that a fact?

12 A.  ETS is the substitute trustee for the loan.  They can do

13 all kinds of activities related to the loan that they would be

14 requested to do.  I'm not sure I am understanding your

15 question.

16 Q.  Why is it Mira Smoot in Pennsylvania sign -- executed this

17 document in 2011?

18         MR. WISHNEW:  Objection, asked and answered.

19         THE COURT:  Many times.  And you're also going to have

20 Ms. Smoot as a witness, so you can ask the question then.

21 Q.  Do you know Mary Lynch?

22 A.  Do I know who?

23 Q.  Mary Lynch, L-Y-N-C-H?

24 A.  No.

25 Q.  Is she an employee of GMAC in Pennsylvania?

RESIDENTIAL CAPITAL, LLC, et al.                    140

1    A.  I don't know.

2    Q.  I thought you're so familiar about this documentation that

3    you reviewed from the debtors' books.  So I thought you're so

4    familiar with this.  Why is it that you don't know Mary Lynch?

5           THE COURT:  That's an improper question.

6           MS. ANIEL:  Improper question.  Okay.

7           THE COURT:  That's an improper question.

8           MS. ANIEL:  Because she said she reviewed and she --

9           THE COURT:  Just --

10          MS. ANIEL:  -- very familiar.

11          THE COURT:  -- ask a question of the witness.

12   Q.  Did Mortgage IT paid money to HSBC in order to get the

13   beneficial interest?

14   A.  I wasn't a party to that transaction.

15   Q.  You were not the party of this contract?

16   A.  GMAC Mortgage was not a party to the sale between Mortgage

17   IT and HSBC.

18   Q.  Are you here witnessing as a corporate witness or as a

19   personal individual witness?

20   A.  I am testifying for the Liquidating Trust.

21   Q.  For the Borrowers Trust?

22   A.  Yes.

23   Q.  Are you familiar with the assignment of the deed based on

24   the loan history that you submitted?

25          MR. WISHNEW:  Objection, Your Honor.  Which assignment

RESIDENTIAL CAPITAL, LLC, et al.                    141

1  of deed are we talking about?

2  Q.  The assignment of 2011.

3          MR. WISHNEW:   Okay.

4  A.  The 2011 assignment of deed of trust was in our books and

5  records.

6  Q.  So are you sure this is effective in 2011?

7  A.  As --

8  Q.  Do you think this is effective?  This is properly --

9  A.  Yes, I have no reason to believe that it's not.

10  Q.  How -- how do GMAC Mortgage Corporation in 2011 get that

11  beneficial interest from HSBC?

12  A.  As part of the servicing agreement, because we are

13  subservicer for the deal, it is very typical for investors to

14  ask the subservicer to take action on their behalf in relation

15  to filing proofs of claim in the bankruptcy or starting a

16  foreclosure.

17  Q.  So why is it that there's a need to execute that -- to

18  assign the deed in 2009 -- in 2009 and 2011?  Is that necessary

19  to execute the assignment -- the two assignment deed of trust?

20  A.  In order to follow the chain, yes, it was registered with

21  MERS.  It needs to come out of MERS to whoever the trustee is.

22  And then at that point, the trustee can take action on its own

23  in its name or it can assign it to the subservicer to take

24  action for it.

25          MS. ANIEL:  I have -- we have to go to the pre-

RESIDENTIAL CAPITAL, LLC, et al.                    142

1  trial --

2          THE COURT:  Ask questions.

3  Q.  On the loan servicer -- on the loan history that you

4  provided, there was in 2011, there was a statement from the

5  loan service -- loan history -- of Aniel history that -- Aniel

6  history.  It says here --

7  A.  Which page are you looking at?

8  Q.  Can you go to page 9 on pre-trial order?

9  A.  I don't have that.  Are you talking about the servicing

10 notes?

11 Q.  Pre-trial order that we submitted to this Court.

12         MR. WISHNEW:  Your Honor, can Ms. Aniel please refer

13 to the page within the servicing notes?  I think she's

14 referring right now to a page --

15         THE COURT:  Page 235?

16         MR. WISHNEW:  -- within the pre-trial order

17         MS. ANIEL:  Yeah, page 9.

18         THE COURT:  She doesn't have the pre-trial order.

19 That's not evidence.  This is in your contentions.

20         MS. ANIEL:  Yeah, but, Your Honor --

21         THE COURT:  You need to refer to evidence.

22         MS. ANIEL:  But this is part of the exhibit; I just

23 quote it on my pre-trial statement.  But --

24         THE COURT:  That doesn't make it --

25         MS. ANIEL:  -- this is --

RESIDENTIAL CAPITAL, LLC, et al.                    143

1          THE COURT:  -- an exhibit.

2          MS. ANIEL:  No, that was in Exhibit 4, Your Honor, I

3   think, loan history.  It's part of my exhibit.

4          THE COURT:  It's Exhibit 3.  Point to --

5          MS. ANIEL:  3.

6          THE COURT:  -- something in Exhibit 3 that you want

7   her to look at.

8          MS. ANIEL:  Oh.  Okay.

9   Q.  Can you go to page 230 of the loan servicer (sic)?

10  A.  Okay.

11          (Pause)

12  Q.  Can you go to transaction date September 9, 2009?

13  A.  Okay.

14  Q.  Can you read that?

15  A.  You want me to read the -- all the entries here?

16  Q.  Or you want me to read it?

17          MS. ANIEL:  You allow me to read it, Your Honor?

18          THE COURT:  Yes.  Why don't you read the --

19          MS. ANIEL:  Thank you.

20          THE COURT:  -- the specific entry you want to cover.

21  Q.  On September 9, 2009, it says here, "Please approve the

22  fee of one hundred dollars for the preparation and recordation

23  of the assignment."  Did you hear that?

24  A.  Yes.

25  Q.  You did see that?

1  A.  Yes.

2  Q.  What does it mean to you?

3  A.  It means that the assignment was being prepared and sent

4  out for execution.

5  Q.  Who would prepare that assignment of deed of trust --

6  A.  Do you want me to look back --

7  Q.  -- in 2009?

8  A.  I have to look back at the -- the -- the assignment.

9      The assignment of deed of trust from 2009, which is

10  Exhibit F, was prepared -- it looks like it would have been

11  prepared by Pite Duncan, LLP, which is a -- a law firm in

12  California.

13  Q.  So it was not prepared by MERS, the 2009 assignment that

14  they did?

15  A.  MERS doesn't prepare documents; they're only a

16  registration -- so they would never have prepared a document.

17  Q.  But in 2009, assignment of the deed --

18          THE COURT:  Okay --

19  Q.  -- was signed by --

20          THE COURT:  -- Ms. Aniel, you've now worn out my

21  patience.  The questions you're asking now are not relevant to

22  the issues pending before the Court.  I understand you're not a

23  lawyer and you may not have a full understanding of what these

24  documents are or what they do.  I'm telling you right now

25  you're working against the clock, by which I mean that a total

1   of five hours was allocated to you to spend as you wish.  You

2   still have not examined Ms. Smoot.  You still have not

3   testified.  Each of the activities that you do in this

4   courtroom are being timed.  You were notified well in advance

5   that you had a total of five hours; you have to use it -- use

6   it as you wish, within the limits of what I permit.  But you're

7   going to cut off your own chance to testify; you're going to

8   cut off your chance to examine Ms. Smoot.  You're asking

9   questions of this witness that don't bear on the issues that

10  are pending before this trial.

11          Go on.

12          MS. ANIEL:  Okay.  I just want to establish her

13  credibility, Your Honor, that's all, because I have also the

14  right to examine her based on her answer.

15          THE COURT:  Ask your next question.

16  Q.  Do you know -- do you know Bradley -- Cager Bradley?  Do

17  you know him?

18  A.  No.

19  Q.  Do you know Maricela Solano?

20  A.  Are you looking at a document?

21  Q.  No, I'm just asking you if --

22  A.  Per --

23  Q.  -- you know.

24  A.  Personally?  No.

25  Q.  Okay.  Who prepared this loan history?  Who gave you this

RESIDENTIAL CAPITAL, LLC, et al.                    146

1  loan history?

2  A.  The loan history comes from the primary servicing system

3  that GMAC Mortgage used, which was called Fiserv or LoanServ.

4  Q.  It came from where?

5  A.  The servicing system.

6  Q.  I don't understa -- I cannot understand.  This top

7  category is --

8  A.  The -- the -- the document that you have, which lays out

9  all of the servicing, no, it's -- it comes from a system of

10  record that kept notes of all transactions or correspondence

11  that happened on the account.  So it is a system of record and

12  it will produce this type of history.

13  Q.  Who managed that system of record?  Who?  I mean, the

14  system doesn't give you right away.  What company is the system

15  of record -- handles this loan history?

16  A.  The -- the system is called Fiserv or LoanServ.  I don't

17  know the company behind it.

18  Q.  Where did you get this?  Because you filed -- the

19  Borrower's Trust filed this loan history in April '15.  So

20  where did you get this?

21          THE COURT:  May I ask you this?

22          THE WITNESS:  Yes.

23          THE COURT:  Was Fiserv a computer data system that was

24  maintained by GMAC?

25          THE WITNESS:  Yes.

RESIDENTIAL CAPITAL, LLC, et al.                147

1          THE COURT:  All right.  And you still have access to

2     it?

3          THE WITNESS:  We have access to it through Ocwen, yes.

4          THE COURT:  Yes.  Okay.

5     Q.  So in other words, the Borrower's Trust accessed this

6     information that -- whoever provided this information.  Is that

7     the third party that provided this information?

8     A.  The -- the electronic system was one in which individual

9     employees at GMAC Mortgage could enter a note simultaneously

10    for whatever transaction was happening.  So I'm not -- a third

11    party is not inputting the information in the system.  It's

12    employees of GMAC Mortgage, as the servicer, who's entering the

13    information into the system.

14    Q.  Okay.  Do you believe this is very accurate information

15    that was put in the system?

16    A.  Yes.

17    Q.  Did you read all of this loan history?

18    A.  Have I read 260 pages of the loan history?

19    Q.  Yes.

20    A.  In its entirety, no.

21    Q.  Okay, let's go back to the first page of the loan history.

22    Do you think -- do you think Aniel loan still owe money on the

23    deed of trust and the note?

24    A.  I can't answer that question.  I don't service the loan.

25    Q.  If I show you a document that's part of the exhibit?

RESIDENTIAL CAPITAL, LLC, et al.                    148

1  A.  I can't answer any question related to the status of the

2  loan after it was transferred to Ocwen in 2013.

3  Q.  So you have no knowledge about it?

4        THE COURT:  How many times does she have to tell you

5  that she has no knowledge of what's happened to your loan if

6  their servicing was transferred to Ocwen?  Don't ask any more

7  questions about it.  Let's go on and deal with the issues that

8  are relevant and material to the issues in this trial.

9        MS. ANIEL:  But I would still have to -- you still

10  have considered this exhibit, Your Honor, the loan history.

11        THE COURT:  To the extent it's relevant, I'll consider

12  it.  It's in evidence.

13        MS. ANIEL:  Okay.

14        THE COURT:  Please ask your next question and deal

15  with the issues that are relevant and material to this trial.

16  Q.  Do you know if this assignment of the deed could establish

17  the title of Aniel Property?

18  A.  Could you repeat that?

19        THE COURT:  I don't understand your question.

20        MS. ANIEL:  Can I say something?

21        THE COURT:  No, just tell me -- first off, there are

22  two assignments of deed of trust you've been referring to.

23  Which one and what is -- I don't understand your question.

24  Q.  What -- can you explain why you needed this assignment of

25  the deed of trust to be recorded?

RESIDENTIAL CAPITAL, LLC, et al.                    149

1              THE COURT:  Which one?

2  Q.  The 2011.  It was already -- based on 2009, it was already

3  identified as the trustee as of 2009, right?  So why is it

4  needed to have that 2011 assignment of the deed to be executed

5  and to be recorded again?  What was the purpose for that?

6  A.  It's -- so it's not recorded again; it's a different

7  assignment, assigning it to GMAC Mortgage.  For whatever

8  reason, the trustee, HSBC, asked the servicer to take some

9  action on its behalf.  It's not uncommon for a deed of trust to

10  be assigned to a servicer.

11  Q.  There was notice of foreclosure in 2009; that's the reason

12  why the Aniel (sic) filed bankruptcy, because there was notice

13  of default.

14              MR. WISHNEW:  Objection, Your Honor.  Is there a

15  question?

16              THE COURT:  I haven't heard one yet.

17              You have a question?

18  Q.  Why is it that GMAC already started the foreclosure in

19  2009, February 2009?  So why is it that it needed to be -- have

20  another assignment in 2011, assignment of the deed?  GMAC

21  already started foreclosure process in 2009.  Is it necessary

22  to still have those 2011 assignment of the deed?

23  A.  I -- different jurisdictions, different time periods.  I

24  can't tell you why they decided we need to pursue this in the

25  name of GMAC Mortgage as opposed to HSBC.  Different investors

 1  did it different ways.  Different jurisdictions were different.

 2  I can't tell you why.

 3  Q.  Okay.  Did the trustee know that you are -- did the

 4  trustee know that the loan of Aniel was in default?

 5  A.  Is it re -- you're asking if the trustee, HSBC, receives

 6  information about defaulted loans in the trust?

 7  Q.  Yes.

 8  A.  I can't specifically answer that question.  I am not sure

 9  what kind of reporting they receive.

10  Q.  We just answer yes or no, if you have --

11       THE COURT:  She just answered your question.

12  Q.  Did the trustee -- HSBC trustee knew that you are

13  foreclosing the property of Aniel?

14  A.  I don't know what the trustee knew.  It would have been

15  very typical for a subservicer to report up through the master

16  servicer statuses of loans in that pool, but I do -- I'm not at

17  all familiar with the process by which that happens.

18  Q.  Is Mira Smoot familiar with that?

19  A.  I don't know.

20  Q.  Okay.

21       MS. ANIEL:  Can we go to the loan history in 2011,

22  Your Honor?

23       THE COURT:  Ask your questions.  Point her -- it's a

24  big document.  Point her where you want her to go.

25  Q.  Can we go on page 9 again, please, Kathy, on the pre-trial

RESIDENTIAL CAPITAL, LLC, et al.                    151

1   order?

2          THE COURT:  Of the pre-trial order?  That's not in

3   evidence.  What is it -- and page 9 are your contentions; it's

4   not --

5          MS. ANIEL:  Yeah, this -- my contention is that

6   page -- I'm just following because of the pages, Your Honor;

7   that's why -- this is just my guidelines.  But it's in the

8   recor -- in the exhibit.

9   Q.  Let's go to page 230 agai -- wait, wait.  Let's go to page

10  148.

11         THE COURT:  Okay, we're looking at Exhibit 3, page 148

12  of 262.

13  A.  Okay.

14  Q.  Okay.  148.  Okay, let's go to transaction date that was

15  dated January 13, 2011.

16  A.  Okay.

17  Q.  Do you want me to read it or do you want --

18         THE COURT:  It's a whole -- there're --

19  A.  It's two pages --

20         THE COURT:  -- multiple entries.  Do you have a

21  specific entry you want to point to?

22         MS. ANIEL:  Yeah, I think I want the whole date -- the

23  same date, Your Honor, but there's a lot activities at the

24  same --

25         THE COURT:  The --

1        MS. ANIEL:  -- the same date.

2        THE COURT:  The same date goes on from page 147 to

3    page 150.

4        MS. ANIEL:  49 to 50.  Yes.  There is a lot of

5    activities.

6        THE COURT:  I'm not going to let you -- you have a

7    specific question you want to ask?

8        MS. ANIEL:  Yes, there was, Your Honor.

9    Q.  And it says here that attorney-in-fact for the

10   signature --

11       THE COURT:  Which page are you on?

12       MS. ANIEL:  Page 148.  It says -- this is from Bradley

13   Cager (sic); it says -- this is to Bradley Cager.

14   Q.  It says -- the message says, "Good morning, Cager.  Please

15   advise which document is the affidavit of the debt, with the

16   graveyards (ph.) regarding the power of attorney.  Please

17   advise that the BDP (ph.) share is GMAC Mortgage, LLC and the

18   sub shows" -- which is the sub -- I believe, substitution

19   trustee -- "shows GMAC Mortgage, LLC, formerly known as GMAC

20   Mortgage Corporation, GMAC personnel.  I only included an

21   assignment and a substitution as per the verbiage regarding the

22   power of attorney."  This was dated January 13, 2011.  It does

23   not mention Mira Smoot.

24       THE COURT:  Do you have a question?

25       MS. ANIEL:  Yeah.

RESIDENTIAL CAPITAL, LLC, et al.                    153

1  Q.  Why is it that Mira Smoot was never mentioned in this?

2  A.  Because it wouldn't be typical for them to know who was

3  available to sign the assignment at the time the request is put

4  into the system.  They're creating -- the instructions in here

5  say, "Create an assignment under the power of attorney," and

6  then it gets e-mailed to GMAC Mortgage.  And depending on which

7  day it got there, who was available to sign, whoever was

8  available and had authority would have signed that.  They

9  wouldn't have known that it was going to be Mira at the time.

10  Q.  So, usually who did prepare the assignment of the deed in

11  this particular case?

12  A.  The -- the 2011 assignment?

13  Q.  Yes, yes, yes, yeah.

14  A.  Was prepared by -- by ETS.

15  Q.  Prepared by ATS (sic)?

16  A.  Yes.

17  Q.  So where did ETS get that information?  From the system?

18  A.  E -- where did they get the information about who to

19  re -- who to dra -- how to draft it?

20  Q.  Yes.

21  A.  So ETS acting as the substitute trustee would have had

22  information --

23  Q.  Uh-huh.

24  A.  -- in the servicing system related to who the trustee was.

25  They would have then asked GMAC Mortgage in whose name should

1    it be transferred to and, based on what GMAC Mortgage was

2    saying, that's how they would know how to draft it.

3    Q.  So how --

4            MS. ANIEL:  I will save this for Mira Smoot.

5    Q.  Every time there is a default on the mortgage on this

6    particular trust, does the trustee knew (sic) -- did you notify

7    the trustee about the default -- you initiate the default?  You

8    initiate the foreclosure?  Do you -- does -- is that part of

9    your duties, to notify the trustee?

10   A.  I don't know the answer to that question.

11   Q.  Who -- do you know who notified the trustee that there was

12   a default on the trust that they are servicing?

13   A.  I don't know what the process was for reporting up to the

14   trustee.

15   Q.  I thought you are familiar about the books and records of

16   the debtors.  And then you're now --

17           MR. WISHNEW:  Objection, Your Honor, as to question

18   about the books and records --

19           THE COURT:  Sustained.

20   Q.  Why did you -- why did you -- why did you have to pay one

21   hundred dollars to create an assignment of the deed?  Do you

22   need to pay just to pay the assignment of the deed?

23   A.  Well, generally you have to pay for a vendor to create

24   something, and the recording cost of the document.

25   Q.  Isn't it supposed -- the loan servicer duties, based on

RESIDENTIAL CAPITAL, LLC, et al.                    155

1   the power of attorney that was signed by Susie Moy, that you

2   have to execute the assignment of the deed, the substitution of

3   trustee?  Why is it now telling me that it was the trade

4   vendors that would do that, prepare that, that you have to pay?

5          THE COURT:  All right, I'm sustaining my own objection

6   to the question; it's not relevant to the proceeding.  Ask

7   another question or sit down.

8          MS. ANIEL:  Your Honor, she is an adverse witness in

9   this case.

10         THE COURT:  Ask questions that are relevant to this

11  proceeding.  I've given you a lot of leeway.

12         MS. ANIEL:  What is (sic) about my right, Your Honor,

13  to discredit these witnesses?  We are trying to establish --

14         THE COURT:  Okay --

15         MS. ANIEL:  -- the credibility --

16         THE COURT:  -- let me explain something to you.  I

17  have control over what questions are asked in my courtroom.

18  While you have the right to examine witnesses and you're the

19  one who called this witness, I have the right to set limits on

20  what questions you can ask and to control the length of time

21  that you can examine the witness.  I recognize you're not a

22  lawyer, and I've tried to allow you sufficient leeway,

23  recognizing that you're not a lawyer.

24         The pre-trial order -- the prior opinion of the Court

25  in the pre-trial order set the parameters for this evidentiary

RESIDENTIAL CAPITAL, LLC, et al.                    156

1   hearing.  While you're entitled to try and attack the

2   credibility of the witness, the Court concludes that your

3   questions that you're asking now do not do so; they're

4   irrelevant and are wasting time; happens to be your time.  But

5   I'm quite concerned that when you run out of your five hours,

6   you will somehow say the Court has denied you an opportunity to

7   examine witnesses and to testify.  But I set those limits;

8   those limits were in the pre-trial order.  You signed the pre-

9   trial order.  I intend to adhere to the time limits that are

10  there.  Okay?

11          You will run out of time.  I will limit what subjects

12  you can question about.  And when you run out of time, you're

13  done.  Okay?  You were on notice of that before this proceeding

14  started.  Okay?  And I can set appropriate limits on what

15  proper cross-examination -- this is actually your witness

16  you've called, but I'm permitting you to question as an adverse

17  witness.

18          If you can't live within those constraints, I will

19  make you sit down and stop asking questions.  I have told you

20  repeatedly today that you need to confine your questions to the

21  issues that remain in this case.  I think this is the last time

22  that I'll warn you about it.

23          Do you have any more questions for this witness that

24  relate to the matter and issue before this Court?  If so, go

25  ahead and ask them now.

1          MS. ANIEL:  I think that's it, Your Honor.

2          THE COURT:  Okay.  All right, Mr. Wishnew, how do you

3     wish to proceed at this point?  I would suggest -- then I'll

4     leave it to you -- go off of her direct testimony, which is in

5     written form and, if you have questions you want to ask, say

6     you wanted to repeat your examination, since Ms. Priore is up

7     there already.  But I will -- if you wish to resolve your

8     question, you can do that, but --

9          MR. WISHNEW:  I think my questions are more about just

10    getting documents into evidence, Your Honor.  So --

11         THE COURT:  Okay, go ahead.

12         MR. WISHNEW:  Go ahead, Your Honor.

13         THE COURT:  No, go ahead with what you were saying.

14         MR. WISHNEW:  I was going to say I'll just -- while

15    Ms. Priore's on the stand, I'll just work through --

16         THE COURT:  Let's go ahead and do that.  Okay.

17    CROSS-EXAMINATION

18    BY MR. WISHNEW:

19    Q.  Good afternoon, Ms. Priore.

20    A.  Good afternoon.

21    Q.  Okay.  If I could ask you to open to the small binder in

22    front of you.

23         If you could look at Exhibit E.

24    A.  Yes.

25    Q.  And what is this document?

RESIDENTIAL CAPITAL, LLC, et al.                    158

1  A.  It is a substitution of trustee.

2  Q.  Okay.  And have you seen it before today?

3  A.  Yes.

4  Q.  And was this document recorded in the county records

5  office?

6  A.  Yes, it was.

7  Q.  And when was it recorded?

8  A.  September 29th, 2008.

9  Q.  To the best of your knowledge, does the Borrower Trust

10  have access to the original version of this document?

11  A.  The Borrower Trust does not have access to the original.

12  Q.  Do you know who maintains the originals?

13  A.  Those would be with the current servicer or their

14  custodian.

15  Q.  Okay.  And who is that?

16  A.  Ocwen.

17  Q.  And did the Borrower Trust attempt to get original

18  versions from Ocwen?

19  A.  Yes.

20  Q.  And did the Borrower Trust make efforts to obtain

21  certified copies of the document recorded in the county

22  recorder's office?

23  A.  Yes.

24  Q.  Okay.  Did the Borrower Trust, to your knowledge, obtain a

25  certified copy?

RESIDENTIAL CAPITAL, LLC, et al.                    159

1   A.  Yes, they did.

2   Q.  And do you know when it was certified?

3   A.  I don't have the -- is this the date on the bottom?  March

4   2nd, 2016.

5   Q.  Okay.

6        MR. WISHNEW:  Your Honor, if I may approach.  I can --

7        THE COURT:  Okay.

8        MR. WISHNEW:  I can show the Court a raised copy

9   of -- a raised certified copy.  Exhibit E is a color copy of

10  what I have in my hands.

11       THE COURT:  I see it.  I don't need to see it --

12       MR. WISHNEW:  Okay --

13       THE COURT:  Go ahead.

14       MR. WISHNEW:  -- show it to Ms. Aniel?

15       MS. ANIEL:  What is it?

16       MR. WISHNEW:  This is a certified copy, Exhibit E.

17       MS. ANIEL:  Oh, the substitution of trustee.

18       MR. WISHNEW:  Your Honor, I'd like to move Exhibit

19  into evidence.

20       THE COURT:  Exhibit E's in evidence.

21  (Certified copy of substitution of trustee was hereby received

22  into evidence as Trust's Exhibit E, as of this date.)

23       MR. WISHNEW:  Thank you.

24  Q.  Ms. Priore, if you could turn to Exhibit F.

25  A.  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    160

1   Q.  And what is this document?

2   A.  This is an assignment of deed of trust from MERS to HSBC.

3   Q.  Okay.  Have you seen it before today?

4   A.  Yes.

5   Q.  And was this document recorded in the county records

6   office?

7   A.  Yes, it was.

8   Q.  And did the Borrower Trust have access to the original

9   version of this document?

10  A.  We do not have access --

11  Q.  Do you --

12  A.  -- without going to Ocwen.

13  Q.  Do you know who maintains the originals?

14  A.  It's either Ocwen or their custodian.

15  Q.  Okay.  Do you know if the Borrower Trust attempted to get

16  original versions from Ocwen?

17  A.  They did.

18  Q.  Okay.  And did the Borrower Trust make efforts to obtain

19  certified copies of the document from the county recorder's

20  office?

21  A.  Yes.

22  Q.  Okay.  Do you know if they successfully obtained such a

23  certified copy?

24  A.  They did.

25        MR. WISHNEW:  Your Honor, in my hand I have the

RESIDENTIAL CAPITAL, LLC, et al.                           161

1  original certified copy.

2          THE COURT:  Yeah, I see the certification on the copy

3  in the binder.

4          MR. WISHNEW:  Your Honor, I'd like to introduce

5  Exhibit F into evidence.

6          THE COURT:  In evidence.

7  (Certified copy of assignment of deed of trust from MERS to

8  HSBC was hereby received into evidence as Trust's Exhibit F, as

9  of this date.)

10  Q.  Ms. Priore, were the documents related to the Aniel loan

11  transfer to Ocwen when servicing the loan transferred to Ocwen

12  in 2013?

13  A.  Yes, they were.

14  Q.  Okay.  And in connection with this matter, did you or

15  anyone with the Borrower Trust reach out to Ocwen to ask them

16  to locate any documents to support this objection of the

17  Borrower Trust?

18  A.  Yes.

19  Q.  And what document did you request?

20  A.  I requested a copy of the limited power of attorney.

21  Q.  Okay.  If I could ask you to turn to Exhibit G.

22  A.  Okay.

23  Q.  And what is this document?

24  A.  It is the assignment of deed of trust from HSBC to GMAC

25  Mortgage.

RESIDENTIAL CAPITAL, LLC, et al.                    162

1   Q.  Okay.  And have you seen it before today?

2   A.  Yes, I have.

3   Q.  Okay.  And was this document recorded in the county

4   records office?

5   A.  Yes, it was.

6   Q.  Okay.  And does the Borrower Trust have access to the

7   original version of this document?

8   A.  We do not have direct access.

9   Q.  Do you know who maintains the originals?

10  A.  Either Ocwen or their custodian.

11  Q.  Okay.  And do you know if the Borrower Trust attempts to

12  get original versions from Ocwen?

13  A.  Yes.

14  Q.  And was there also an attempt to get a certified copy --

15  A.  Yes.

16  Q.  -- from the county records office?

17      And do you know if they're successful in getting that

18  certified copy?

19  A.  Yes, they were.

20  Q.  Okay.

21          MR. WISHNEW:  Your Honor, I have in my hand a

22  certified copy.

23          THE COURT:  I see the certification.

24          MR. WISHNEW:  I'm sorry, Your Honor?

25          THE COURT:  I see the certification.

RESIDENTIAL CAPITAL, LLC, et al.                    163

1          MR. WISHNEW:  Thank you, Your Honor.  Your Honor, I'd

2   like to introduce Exhibit G into evidence.

3          THE COURT:  Exhibit G's in evidence.

4   (Certified copy of the assignment of deed of trust from HSBC to

5   GMAC Mortgage was hereby received into evidence as Trust's

6   Exhibit G, as of this date.)

7          MR. WISHNEW:  Thank you.

8   Q.  Ms. Priore, if you could look at Exhibit H.  What is this

9   document?

10  A.  This is a company profile for Mira Smoot.

11  Q.  Okay.  And have you seen it before today?

12  A.  Yes, I have.

13  Q.  And was this document kept in the ordinary course of GMAC

14  Mortgage's business?

15  A.  Yes, it was.

16  Q.  And do you know where in the records it was kept?

17  A.  It was from the corporate secretary's office.

18  Q.  Okay.

19         MR. WISHNEW:  Your Honor, I'd like to introduce

20  Exhibit H into evidence.

21         THE COURT:  Exhibit H is in evidence.

22  (Company profile for Mira Smoot was hereby received into

23  evidence as Trust's Exhibit H, as of this date.)

24         MR. WISHNEW:  Thank you.

25  Q.  If I could ask you to turn to Exhibit I, Ms. Priore.  Do

RESIDENTIAL CAPITAL, LLC, et al.                    164

1   you recognize this document?

2   A.  Yes, I do.

3   Q.  And what is this?

4   A.  This is a substitution of trustee.

5   Q.  Okay.  And was this maintained in the debtors' books and

6   records?

7   A.  Yes.

8   Q.  Okay.  And what -- do you know what -- I'm sorry.  Was

9   there a specific system from which this document was retrieved?

10  A.  It would have come from the imaging system called Looking

11  Glass.

12  Q.  Okay.  And do you know if this document was recorded in

13  the county records office?

14  A.  It was.

15      MR. WISHNEW:  Your Honor, I'd like to introduce

16  Exhibit I into evidence.

17      THE COURT:  Exhibit I's in evidence.

18  (Substitution of trustee retrieved from Looking Glass imaging

19  system was hereby received into evidence as Trust's Exhibit I,

20  as of this date.)

21  Q.  If you could turn to Exhibit J, Ms. Priore.  Do you

22  recognize this document?

23  A.  Yes.

24  Q.  And what is this document?

25  A.  It is a notice of default.

RESIDENTIAL CAPITAL, LLC, et al.                    165

1    Q.  And what is the date on the document?

2    A.  The date of the document is April 21st, 2012.

3    Q.  Okay.  And was it recorded in the county records office?

4    A.  Yes, it was.

5    Q.  And was it maintained in the debtors' books and records?

6    A.  Yes, it was.

7    Q.  Do you know specifically in what electronic system it

8    would have been maintained?

9    A.  It would have come from the same imaging system, called

10   Looking Glass.

11   Q.  Okay.

12        MR. WISHNEW:  Your Honor, I'd like to introduce

13   Exhibit J into evidence.

14        THE COURT:  Exhibit J's in evidence.

15   (4/21/2012 notice of default retrieved from Looking Glass

16   imaging system was hereby received into evidence as Trust's

17   Exhibit J, as of this date.)

18   Q.  Ms. Priore, if you could turn to Exhibit K.  Do you

19   recognize this document?

20   A.  Yes.

21   Q.  And what is this document?

22   A.  This is the notice of trustee sale.

23   Q.  And do you know if this was recorded in the county records

24   office?

25   A.  Yes, it was.

RESIDENTIAL CAPITAL, LLC, et al.                    166

1  Q.  And was this document maintained in the debtors' books and

2  records?

3  A.  Yes, it was.

4  Q.  In a specific electronic system?

5  A.  Also from Looking Glass.

6        MR. WISHNEW:  Your Honor, I'd like to introduce

7  Exhibit K into evidence.

8  Q.  Mr. Priore --

9        THE COURT:  Exhibit K is in evidence.

10  (Notice of trustee sale retrieved from Looking Glass imaging

11  system was hereby received into evidence as Trust's Exhibit K,

12  as of this date.)

13        MR. WISHNEW:  Thank you, Your Honor.

14        Just one moment, Your Honor.

15        Your Honor, I have no further questions for

16  Ms. Priore.

17        THE COURT:  Are you going to offer Exhibit D?

18        MR. WISHNEW:  D.

19        THE COURT:  I mean, it --

20        MR. WISHNEW:  One moment, Your Honor.

21        THE COURT:  -- that's what I heard all the testimony

22  from HSBC witnesses -- not HSBC -- yeah, HSBC witnesses.

23        MR. WISHNEW:  Yeah, I would like -- yeah, I'd be happy

24  to move Exhibit D into evidence, Your Honor.

25        THE COURT:  All right.  I heard the foundation for it

1  this morning.  Exhibit D is in evidence.

2  (2009 assignment of the deed of trust was hereby received into

3  evidence as Trust's Exhibit D, as of this date.)

4          MR. WISHNEW:  Thank you, Your Honor.

5          THE COURT:  Are you offering her direct testimony or

6  not?

7          MR. WISHNEW:  I mean, she covered everything but, for

8  the sake of completeness --

9          THE COURT:  It's up to you.  Do what you want.

10         MR. WISHNEW:  Your Honor, if I could move Exhibit A,

11  Ms. Priore's declaration, into evidence.

12         THE COURT:  You believe everything in your declaration

13  is true?

14         THE WITNESS:  Yes.

15         THE COURT:  Okay, Exhibit A is in evidence.

16  (Declaration of Kathy Priore was hereby received into evidence

17  as Trust's Exhibit A, as of this date.)

18         MR. WISHNEW:  And I believe B and C have been

19  stipulated to as part of the joint pre-trial order, Your Honor.

20         THE COURT:  Okay.  So Exhibit B and Exhibit C are in

21  evidence, pursuant to the stipulation in the pre-trial order.

22  (Trust's Exhibit B was hereby received into evidence, as of

23  this date.)

24  (Deed of Trust, recorded 6/8/2007 with original loan number

25  "40761137", was hereby received into evidence as Trust's

 1    Exhibit C, as of this date.)

 2          THE COURT:  Any other questions?

 3          MR. WISHNEW:  While we're moving evidence in, I'd like

 4    to also move Exhibit E based upon the testimony thus far.

 5          THE COURT:  I already admitted it a few minutes ago.

 6          MR. WISHNEW:  Oh.  My apologies, Your Honor.

 7          THE COURT:  Didn't I?

 8          THE CLERK:  Yeah, you did.

 9          THE COURT:  Yeah.

10          MR. WISHNEW:  Oh.  My apologies.

11          THE COURT:  Exhibit E -- that's all right.  Just so

12    we're clear what the record is, and you ought to compare your

13    notes as well, okay, the documents that have been admitted into

14    evidence are the Aniel Exhibit 3, which is the loan history;

15    and then Trust Exhibits A, B, C, D, E, F, G, H, I, J and K have

16    all been admitted into evidence.

17          Okay.  Any other questions?  Okay.

18          MR. WISHNEW:  No further questions for Ms. Priore.

19          THE COURT:  Ms. Aniel, if you have questions that are

20    limited to what Mr. Wishnew asked about, you could do that, or

21    you could save your time for your other witnesses.  But your

22    questions now have to be limited to what Mr. Wishnew covered.

23          MS. ANIEL:  So is my question still limited from (sic)

24    what, when, where, how --

25          THE COURT:  Only what Mr. Wishnew -- the way it works

1  is you called your witness; you had a full examination.

2  Mr. Wishnew asked about a very limited number of things.  If

3  you have questions specifically about what he asked about, you

4  can follow up now.  But you can't go through and sort of leap

5  out of the field that you did earlier or try for new questions.

6  Do you understand what I'm saying?

7          MS. ANIEL:  Yes, Your Honor.

8          THE COURT:  Okay.  Do you have any other questions?

9          MS. ANIEL:  No more.

10         THE COURT:  Okay.

11         All right.  You're excused Ms. Priore.

12         THE WITNESS:  Thank you.

13         THE COURT:  Thank you very much.

14         All right --

15         MS. ANIEL:  I have Mira Smoot --

16         THE COURT:  Yes.

17         MS. ANIEL:  -- witness.

18         THE COURT:  Let's get Ms. Smoot.

19         And since Ms. Priore has testified, she can stay in

20  the courtroom if she wishes.

21         MS. ANIEL:  Can she just --

22         THE COURT:  She can stay.

23         MS. ANIEL:  She can stay?

24         THE COURT:  She can stay.  She's testified.  After a

25  witness has testified, they're permitted to --

1          MS. ANIEL:  Oh.

2          THE COURT:  -- remain in the courtroom.

3          MS. ANIEL:  I have a question.  Can I not -- how do

4  you call -- contract -- question them about the -- how do you

5  call that?  I forgot.  Can I -- because the one that you want

6  me to do is just direct -- just any question, right?

7          THE COURT:  You're calling Ms. Smoot as a witness.

8  You can take her -- you can ask questions that you want of

9  Ms. Smoot.  She's com --

10          MS. ANIEL:  Can I cross-examine --

11          THE COURT:  She's going to come in --

12          MS. ANIEL:  -- Mira Smoot?

13          THE COURT:  Well, you're calling her as your witness,

14  so it's really a direct examination.  But I'm permitting you to

15  ask leading questions.  She's going to come in --

16          MS. ANIEL:  Okay.

17          THE COURT:  -- she's going to get sworn, you can ask

18  her your questions.

19          So that everybody is -- well, I'll wait for

20  Mr. Wishnew to come back in.

21      (Pause)

22          THE COURT:  Ms. Smoot, why don't you come on up to the

23  witness stand, if you will.  If you'd come up to the witness

24  stand up there and you'll be sworn and then you can have a

25  seat.  You can get some water if you want.

RESIDENTIAL CAPITAL, LLC, et al.                    171

1              THE CLERK:  Please raise your right hand.

2         (Witness sworn)

3              THE COURT:  All right, please have a seat.  Why don't

4    you do this:  why don't you give me your full name and where

5    you're employed.

6              THE WITNESS:  Okay.  Mira, middle name Bernice, Smoot.

7    I'm currently employed with Ocwen Financial Corporation --

8              THE COURT:  Okay.

9              THE WITNESS:  -- for --

10             THE COURT:  And tell me what years you were employed

11   by GMAC.

12             THE WITNESS:  I started with GMAC February of 1999, up

13   and through February 16th -- or 15, 2013 when --

14             THE COURT:  When transferring --

15             THE WITNESS:  Correct.

16             THE COURT:  -- switched to Ocwen?

17             THE WITNESS:  Over to Ocwen.

18             THE COURT:  Okay.

19             All right, go ahead with your quest -- but just before

20   you begin, we're going to have to break for the day at twenty

21   after 3.  If you haven't completed your examination, you'll

22   resume at 9 tomorrow morning.  Okay?  But go ahead.

23   DIRECT EXAMINATION

24   BY MS. ANIEL:

25   Q.  Do I need to call you Mira or Smoot?

RESIDENTIAL CAPITAL, LLC, et al.                          172

1   A.   Mira --

2   Q.   Oh, Mira.

3   A.   -- is my first name.  Yes.

4   Q.   Thank you very much.  Mira, we are here for you to testify

5   against particular documents --

6   A.   Um-hum.

7   Q.   -- that you executed; okay, that was the 2011 assignment

8   of the deed of trust recorded at the San Mateo County Recorders

9   in California.  And the docket number is 2011-01-6800.  And it

10  was notarized by a certain Mary Lynch, L-Y-N-C-H, at the state

11  of Pennsylvania.

12          THE COURT:  If you have this thin binder, which you

13  do --

14          THE WITNESS:  Okay.

15          THE COURT:  -- if you would look at Exhibit G.

16          MS. ANIEL:  Exhibit G.

17          THE COURT:  Okay, that's what she's talking about,

18  okay?

19          That's the document you're talking about, Ms. Aniel?

20          MS. ANIEL:  Yes, Your Honor.

21          THE COURT:  Okay.

22  A.   Okay.  Yeah --

23  Q.   Did you sign this document, Mira?

24  A.   Yes; that's my signature.

25  Q.   Can you give us a specimen, your signature?

RESIDENTIAL CAPITAL, LLC, et al.                                173

1          THE COURT:  Bring her up a piece of paper.  She wants

2    to be able to compare your signature to what's on there, okay?

3          THE WITNESS:  Have a pen?

4          THE COURT:  Yeah.  Kaitlin'll give you a pen -- loan

5    you a pen.

6          Okay.  And so I'm going to mark this as Court Exhibit

7    3.

8    (Original signature specimen of Mira Smoot was hereby marked

9    for identification as Court's Exhibit 3, as of this date.)

10         THE COURT:  If you want to --

11   Q.  Do you have --

12         THE COURT:  Do you want to look at it again?

13         MS. ANIEL:  I'm okay.

14         THE COURT:  Okay.  Mr. --

15         MS. ANIEL:  Oh, you want me to --

16         THE COURT:  -- Wishnew, do you want to look at it?

17         MS. ANIEL:  Oh, to -- yeah, yeah.

18         MR. WISHNEW:  I'll --

19         THE COURT:  Show it to Mr. Wishnew and then you'll

20   give it to my clerks; they're going to hold the exhibit

21   overnight, okay?

22         Okay.  And if you'd just bring it up to my law clerks,

23   that would be great.  Just watch your step over there.

24         Thank you.

25   Q.  Are you an employed (sic) by GMAC?  I understand you

RESIDENTIAL CAPITAL, LLC, et al.                    174

1    started at GMAC in 1999, until the end of 2013 February.

2            THE COURT:  No, till February 2013.

3            MS. ANIEL:  Yes, 20 --

4    Q.  And in 2011 you're still an employee of GMAC.  Where is

5    GMAC located at that time, 2011?

6    A.  Our offices were located at 1100 Virginia Drive in Fort

7    Washington, Pennsylvania.

8    Q.  Okay.  Are you still having your employment in that

9    building, with Ocwen?

10   A.  Correct.

11   Q.  Okay.  Did you prepare this document?

12   A.  No.  We do not --

13           THE COURT:  Could you tell me what your position was

14   in February 2011?

15           THE WITNESS:  In February 2011, I was a default

16   specialist.

17           THE COURT:  Okay.

18           Go ahead.

19   Q.  In 2011?

20   A.  In -- at the time that this document was signed, I was a

21   default specialist.

22   Q.  What do you mean by "default services (sic)"?

23           THE COURT:  No.  Default --

24   A.  Default --

25           THE COURT:  -- specialist.

RESIDENTIAL CAPITAL, LLC, et al.                    175

1    A.  -- specialist.

2    Q.  Default specialist.

3    A.  Correct.

4    Q.  What do you mean by that?  What kind of duties a default

5    specialist --

6    A.  I worked --

7    Q.  -- would do?

8    A.  -- within the foreclosure department, and there are

9    different teams within the foreclosure department.  And I was

10   a -- my job title was a default specialist.

11   Q.  What department was that foreclosure default (sic)

12   services -- department?

13   A.  I worked within the foreclosure department and my job

14   title was default specialist.

15   Q.  Okay, so you handled also default and foreclosure?

16          THE COURT:  Tell me what your responsibilities

17   included.

18          THE WITNESS:  My responsibilities at that time was to

19   review the documents put before us, for correctness and, you

20   know, actual facts, and verify those according to the note, the

21   mortgage, those items, before --

22   Q.  Okay.

23          THE WITNESS:  -- we executed and signed them.

24   Q.  Do you know who prepared this 2011 assignment of the deed?

25   A.  It would have been prepared by the foreclosure trustee,

RESIDENTIAL CAPITAL, LLC, et al.                    176

1    Executive Trustee Services.

2    Q.   Who?

3    A.   Executive Trustee Services.

4    Q.   Is that in California or in Washington --

5    A.   They --

6    Q.   -- State?

7    A.   I do not recall where their actual offices were located,

8    but they have offices in different locations; I'm not exactly

9    sure where they were, but they were, I believe, in California,

10   out on the West Coast.

11   Q.   Can you see that document?  Because it says

12   that -- "requested and prepared by ATS (sic) Services, LLC",

13   which is located in Burbank, California, just to make

14   you -- easier for you to --

15   A.   Correct.  That would have been the office that prepared

16   the document.

17   Q.   Do you know anybody in ETS?

18   A.   I don't recall any of the people as of this time; I

19   haven't worked with them for quite some time.

20   Q.   So if there is a foreclosure or default notices, it goes

21   first to the ATS -- ETS services in California where the

22   property's located?

23   A.   They would handle any documents that was needed for the

24   foreclosure process and, if they needed anyone from GMAC to

25   execute any documents on behalf of them or the investor, then

1  they would submit those to GMAC.

2  Q.  Okay.

3        THE COURT:  How did they transmit the document to you?

4  You know?

5        THE WITNESS:  We had a business application called

6  LPS.  It was a business application called LPS.

7        THE COURT:  So you would get it electronically?

8        THE WITNESS:  Correct.

9  Q.  So they would prepare this document, assignment of the

10  deed of trust?

11  A.  Correct.

12  Q.  And what happened after they prepared these documents?

13  A.  It would come through our portfolio and the documents were

14  given up amongst the different team members.  And our job is to

15  take that document and read through it and verify all the

16  information within the document, against the note, the

17  mortgage, whatever the recorded documents was, and also go

18  through the title search to verify the proper chain of

19  assignments.

20  Q.  Do you understand the assignment of the deed of trust when

21  you sign it?

22  A.  Yes.

23  Q.  Okay, good.  What is your understanding of that assignment

24  of deed in 2011?

25  A.  What is my understanding of it?

RESIDENTIAL CAPITAL, LLC, et al.                     178

1    Q.  Yes, yes.

2    Q.  My understanding of it was that I had to follow a proper

3    chain of title, which means from the mortgage originator, the

4    original beneficiary of the -- of the deed of trust, and take

5    that chain, make sure that the assignor had an assignment

6    recorded into their name, verify that assignment and then

7    execute this assignment into whoever the assignee was, which in

8    this instance was GMAC Mortgage, LLC.

9    Q.  Does it mean selling the beneficial interest of HSBC to

10   GMAC?

11   A.  It is to document a recorded lien interest.

12   Q.  So, meaning that GMAC has a beneficial interest on the

13   assignment of the deed in 2011?

14   A.  That's what this assignment was doing was giving them

15   beneficial interest.

16   Q.  Okay.  Is there money consideration?

17   A.  Is there an amount?

18   Q.  Money consideration.

19   A.  That portion, I know it's customary for that language to

20   be in the documents.  But we don't determine that amount.

21   Q.  Um-hum.  But you know what is for buyer receive, right?

22   You know that for buyer receive under assignment of the deed?

23   A.  I do not know all of the terminologies.  I just understand

24   that I have to verify the facts that was within, which was

25   mainly the recording information for the deed of trust.

RESIDENTIAL CAPITAL, LLC, et al.                              179

1   Q.  Where did you get that information?  Okay, from ETS -- ETS

2   prepared these documents, right?  For you as a spec -- default

3   specialist, would transmit it to you, right, and have it

4   signed?  And you reviewed the document, right, as part of your

5   duties is to review the document?

6   A.  Review these documents, the -- the documents within the

7   title search, and the note and the mortgage.

8          THE COURT:  Tell me -- if you could, tell me what you

9   did after receiving this document from ETS to verify the

10  accuracy of the information contained in it.

11         THE WITNESS:  First, all the documents must be

12  submitted as far as creating a supporting-document package.  I

13  would view the deed of trust, look at this document here.  I

14  see that title is coming from HSBC Bank USA; they were not the

15  original beneficial interest.  So I looked for an assignor

16  before that, giving title to HSBC Bank.  And that would have

17  been -- I'm not sure who the -- the other assignment was; think

18  it was from MERS to HSBC Bank.  So I viewed that assignment,

19  made sure it was recorded, and then viewed this one, making

20  sure that the information was correct as far as the recording

21  information on the deed of trust, verified all of that

22  information, then made sure that we had signing authority to

23  execute the assignment.

24         THE COURT:  How did you -- what'd you do to verify

25  that you had signing authority?

RESIDENTIAL CAPITAL, LLC, et al.                    180

1    THE WITNESS:  We had to check with Investor Operations

2   to see if we had a power of attorney.  And we did have power of

3   attorney and looked at a copy of it, to view it, and saw that

4   this assignment -- or this deal was covered under that limited

5   power of attorney.

6    THE COURT:  How did you do that?

7    THE WITNESS:  By viewing the actual limited power of

8   attorney, and saw that the -- this particular trust and series

9   number was covered under that power of attorney on the

10  schedule, Exhibit A.

11    THE COURT:  Okay.  And you did all of those steps

12  yourself?

13    THE WITNESS:  Yes.

14    THE COURT:  Go ahead.

15  BY MS. ANIEL:

16  Q.  I think the judge already asked you about how did you

17  determine which trusts the Aniel loan belongs.  So -- he

18  already asked that, so --

19  A.  Okay.

20  Q.  -- you already answered it, okay?

21    Do you know Mary Lynch?

22    THE COURT:  Wait, before we do that, look at Exhibit

23  D, D as in David, that's in evidence.  This limited power of

24  attorney came into evidence before.  Did you see a copy of

25  this?

1          THE WITNESS:  Yes, the -- the original was in my
2  possession.
3          THE COURT:  Okay.  And is this the document that you
4  looked at to see whether GMAC had been given authority?
5          THE WITNESS:  Yes.
6          THE COURT:  Okay.  And then -- so were you an
7  authorized signatory for GMAC?
8          THE WITNESS:  For GMAC, who were the -- was appointed
9  the attorney-in-fact for --
10          THE COURT:  Okay.
11          THE WITNESS:  -- HSBC Bank.
12          THE COURT:  All right.
13          Go ahead, Ms. Aniel.
14  Q.  Okay, do you know Mary Lynch, L-Y-N-C-H?  Do you know --
15  A.  Yes.  She was a co-worker and one of our notaries.
16  Q.  Okay, do you work at the same department?
17  A.  She's no longer with Ocwen; but for quite a few number of
18  years after that, yes.
19  Q.  No, in two thousand -- I'm sorry -- in two --
20  A.  In 2011, yes --
21  Q.  -- thousand eleven, yes.
22  A.  -- we worked within the foreclosure department as default
23  specialists.
24  Q.  So you are with her at the same department?
25  A.  Correct.

RESIDENTIAL CAPITAL, LLC, et al.                    182

1          THE COURT:  You mean the same location.

2     Q.  Location.

3     A.  Correct.  Same office.

4     Q.  In Pennsylva -- okay.  When you signed this 2011

5     assignment of the deed, you reviewed it, and did you see any

6     wrong -- any defect of the 2009 --

7     A.  No, I did not.

8     Q.  -- assignment of the deed?

9     A.  No, I did not.

10    Q.  So you followed the protocols of GMAC's mortgage --

11    A.  Correct.

12    Q.  -- your company, how to -- were you trained how to detect

13    any inconsistency based on this assignment of the deed of 2011?

14    A.  Yes.

15    Q.  Okay.  Do you know Janine Yamoah?

16    A.  Yes.

17          THE COURT:  Was she one of your co-workers?

18          THE WITNESS:  She was a co-worker from the bankruptcy

19    department.

20    Q.  From what department?

21    A.  The bankruptcy department.

22    Q.  Oh, so, you -- again, the bankruptcy department, and there

23    is also a foreclosure department right?

24    A.  Correct.

25    Q.  Okay.

1          THE COURT:  Were you in the same office building?

2          THE WITNESS:  Same office building.

3   Q.  Building, yes.  Okay.

4       After you signed this -- okay, I'll -- since Mary Lynch is

5   also a notary, an employee of GMAC -- am I right, Mira?

6   A.  Correct.

7   Q.  Okay.  When you signed this assignment of the deed in

8   2011, did you sign it in front of Mary Lynch?

9   A.  Yes.

10  Q.  Did you bring it to her desk, sign it, or --

11  A.  Yes.

12  Q.  You did?

13  A.  Yes.  We had to be present in front of a notary.

14  Q.  Do you know Jeffrey Stephan?  Jeffrey Stephan, do you know

15  her (sic)?

16         THE COURT:  Mr. Stephan has nothing to do with this

17  case.

18         MS. ANIEL:  No, I was just asking --

19         THE COURT:  Mr. Stephan has nothing to do with this

20  case.  Ask your next question.

21  Q.  Who is your supervisor, Mira?

22         MR. WISHNEW:  At what point in time, Your Honor?

23  Q.  Who is your supervisor?

24         THE COURT:  When?

25         MS. ANIEL:  No, who is her supervisor --

RESIDENTIAL CAPITAL, LLC, et al.                    184

1          THE COURT:  Now she doesn't work --

2          MS. ANIEL:  -- 2011?

3    A.  In 2011, my supervisor at the time was Lorraine Balera

4    (ph.).

5    Q.  What's the name?  Can --

6    A.  Lorraine Balera.

7    Q.  Lorraine Balera?

8    A.  Yes.

9    Q.  Does she has (sic) another name?

10   A.  No.

11   Q.  Is she Lorraine Brown?

12   A.  Lorraine Balera was there at the time, and then there

13   was -- that was quite a long time ago.  Can't remember all of

14   the different chains, 'cause we were going through a lot of

15   changes at that time.

16   Q.  I understand that.  Are you authorized to sign on behalf

17   of GMAC?

18   A.  Yes.  I was the GMAC officer.

19   Q.  Do you have -- who appointed you to become an authorized

20   officer?

21   A.  The board of directors signs off on anyone becoming an

22   officer of the company.

23   Q.  When did you become an officer?  What year?

24   A.  I want to -- it was -- I believe it was 2010.

25   Q.  What category as -- what is your category on (sic) 2010?

RESIDENTIAL CAPITAL, LLC, et al.                    185

1   A.  Was an authorized officer.

2   Q.  Yes, yes.  Uh-huh.  Yes, what is your category as of --

3   A.  I --

4   Q.  -- 2010?

5   A.  I believe our ultimate signing authority was Category III.

6          THE COURT:  Look at Exhibit H in that binder, which

7   was from your individual profile; it's in evidence.  And it

8   shows that from August 9th, 2010 to February 15th, 2013, you

9   were both a Category III and Category IV authorized officer.

10  Can you explain what those categories are?

11         THE WITNESS:  I can only tell you that that's how they

12  came up with the categories, and our title that we just use on

13  a daily basis was "authorized officer".

14         THE COURT:  Okay.

15         THE WITNESS:  So I know that we had couple of

16  different sets, but the one that we used all the time was

17  authorized officer.

18  Q.  How many of your authorized officer (sic) in that

19  department in Foreclosure?

20  A.  I cannot recall.

21  Q.  Cannot recall?  So everyone in the foreclosure department

22  is authorized to sign on behalf of GMAC?

23  A.  No.  Only specific people.  And there would be a master

24  list of those people.

25  Q.  Why is it that there is Category III and Category IV?

1   A.  I do not know.

2   Q.  You don't know that description why you become III?

3          THE COURT:  Ask your next question.  She's answered

4   the question.

5   Q.  Why did you sign -- why did you sign the assignment of the

6   deed of trust as authorized officer of HSBC?  Are you an

7   office -- are you an authorized officer of HSBC in 2011?

8   A.  No.  I'm an officer -- authorized officer of GMAC Mortgage

9   in 2011, who was the attorney-in-fact for HSBC Bank.

10  Q.  So you never authorized (sic) officer of HSBC?

11  A.  No.

12  Q.  Okay.  What do you do -- what did you do today at Ocwen?

13  A.  I'm a contract manager.

14  Q.  Uh-huh.  On what department?

15  A.  I am -- that is the department:  contract management.

16  Q.  Okay.  So the process of signing an assignment of the

17  deed, it came from ETS.  Who is ETS?  Is that a subsidiary of

18  GMAC?

19  A.  I do -- cannot recall.

20  Q.  Okay.  Did you read the limited power of attorney?  Did

21  you have this?

22  A.  Did I read it -- did I read it through and through?

23  Q.  Uh-huh.

24  A.  I read the -- I had not read it through and through in a

25  very long time.  On my --

RESIDENTIAL CAPITAL, LLC, et al.                    187

1           THE COURT:  It's Exhibit D.

2           THE WITNESS:  It's Exhibit D?

3           THE COURT:  D as in David.  We already looked at that.

4   A.  You want me to read this now?

5   Q.  Oh, that's okay.  That's okay, Mira.  That's fine.

6   A.  Okay.

7   Q.  Okay, that's fine.

8           MS. ANIEL:  I think that's enough, Your Honor.

9           THE COURT:  Okay.

10          MS. ANIEL:  Thank you very much.

11          THE COURT:  Mr. Wishnew --

12          MS. ANIEL:  Thank you --

13          THE COURT:  -- you have any cross-examination?

14          MS. ANIEL:  -- Mira.  Thank you.

15          THE COURT:  Thank you.

16          As for you?

17          MR. WISHNEW:  Very limited, Your Honor.

18          THE COURT:  Okay.

19          MR. WISHNEW:  Your Honor, also just for the record, I

20  do have the original 2008 limited power of attorney.

21          THE COURT:  Okay, show it to Ms. Aniel.

22          MS. ANIEL:  Can I have time to examine this --

23          THE COURT:  You can.

24          MS. ANIEL:  -- Your Honor?  Thank you.

25          THE COURT:  You can.

1       Go ahead, Mr. Wishnew.

2   CROSS-EXAMINATION

3   BY MR. WISHNEW:

4   Q.   Good afternoon, Ms. Smoot.

5   A.   Hello.

6   Q.   We were just talking about your role as authorized

7   officer.  Can you briefly describe what your responsibilities

8   were and your role as an authorized officer of GMAC Mortgage?

9   A.   Our role was to review any documents that were submitted

10  to us for execution --

11  Q.   Um-hum.

12  A.   -- and verify the -- the facts stated within the document

13  and making sure that we checked any supporting documentation to

14  make sure that there -- the document was error-free --

15  Q.   Um-hum.

16  A.   -- and truthful in its content.

17  Q.   And who would submit those documents to you?  Was it --

18  A.   Whoever was the assigned default counsel or foreclosure

19  trustee.

20  Q.   And what do you mean when you say the term "default

21  counsel"?  What does that refer to?  Or who does that refer to?

22  A.   That refers to whomever GMAC would hire to facilitate the

23  foreclosure process.

24  Q.   Okay.  And typically on whose behalf were the foreclosures

25  conducted?

RESIDENTIAL CAPITAL, LLC, et al.                    189

1    A.  They were conducted, if it was wholly owned by GMAC,

2    by -- for GMAC; and if it was an investor or trustee, for those

3    entities.

4    Q.  So like in this instance, it was for HSBC?

5    A.  It was for HSBC Bank, correct.

6    Q.  Did your job responsibilities including signing

7    assignments on behalf of investors of loans being serviced by

8    GMAC Mortgage?

9    A.  Yes.

10   Q.  Okay.  If I could just turn -- we've gone through it a

11   couple times, but if you can just turn to Exhibit G, a 2011

12   assignment.  Just to confirm, you do recognize this document?

13   A.  Yes.

14   Q.  And is that your signature on the document?

15   A.  It is.

16   Q.  Okay.  If I could ask you to turn to Exhibit D as in

17   David.  Have you seen this document before today?

18   A.  Yes.

19   Q.  And what is this document?

20   A.  It is a limited power of attorney from HSBC Bank to GMAC

21   Mortgage.

22   Q.  And is this document maintained at Ocwen's books and

23   records?

24   A.  Yes, it is.

25   Q.  Okay.  And were you able to retrieve the original of this

RESIDENTIAL CAPITAL, LLC, et al.                    190

1   document, for today's proceeding?

2   A.  Yes, I was.

3   Q.  Okay.  And that's the document that I've shown to

4   Ms. Aniel?

5   A.  Yes.

6   Q.  Okay.  And from where was the document retrieved?

7   A.  It was retrieved from my desk drawer.

8   Q.  Okay.  And can you say whether this power of attorney

9   was -- did you review this power of attorney prior to executing

10  the 2011 assignment?

11  A.  Yes.

12  Q.  Okay.  And just briefly, what was your understanding as to

13  the scope of authority granted to GMAC Mortgage by the limited

14  power of attorney?

15  A.  My understanding of the limited power of attorney:  that

16  it gave me authority to execute assignments of deed of trusts

17  and mortgages.

18  Q.  Um-hum.

19  A.  We had the authority to execute any deeds once a

20  foreclosure sale was completed --

21  Q.  Um-hum.

22  A.  -- and substitution of trustees.

23  Q.  Okay.  As part of your employment with Ocwen, do you have

24  records concerning loans that used to be serviced by GMAC

25  Mortgage?

RESIDENTIAL CAPITAL, LLC, et al.                    191

1   A.  I believe --

2           MR. WISHNEW:  Let me --

3           THE WITNESS:  Yes.

4           MR. WISHNEW:  Let me strike that and rephrase.

5           THE WITNESS:  Okay.

6   Q.  If GMAC Mortgage serviced a loan, Ocwen acquired a

7   servicing on that loan, do you have access to records

8   concerning those loans previously serviced by GMAC Mortgage?

9   A.  I would have to reach out to the investor operations

10  group.

11  Q.  Okay.  Did you happen to receive a request to obtain

12  original versions of three documents concerning this loan,

13  namely a 2008 substitute trustee, an assignment from August

14  2009, and an assignment from February 2011?

15  A.  Correct.

16  Q.  Okay.  And did you attempt to locate those documents?

17  A.  I did --

18  Q.  And were you --

19  A.  -- attempt to locate the -- the originals of those.

20  Q.  And were you successful in obtaining the originals before

21  today?

22  A.  No, I was not.

23  Q.  And who did the request go to?

24  A.  It went to a e-mail box for our bailey (ph.) team and our

25  vault teams.

RESIDENTIAL CAPITAL, LLC, et al.                              192

1   Q.  Okay.

2   A.  And it took a while for them to provide a response as to

3   what steps I needed to take to make those requests for those

4   documents.

5   Q.  Okay.  Got it.

6          MR. WISHNEW:  Your Honor, I have no further questions

7   for Ms. Smoot.

8          THE COURT:  All right.  You're excused.

9          THE WITNESS:  Okay.

10         THE COURT:  Thank you very much.

11         We're going to stand in recess.  We're supposed to

12  be -- the only witness that remains --

13         MR. WISHNEW:  Is Ms. Aniel.

14         THE COURT:  -- is Ms. Aniel.  And we're scheduled to

15  start at 9.  We're going to start at 9:15.  I have an 8:30

16  telephone hearing.

17         MS. ANIEL:  Thank you for the time --

18         THE COURT:  You're welcome to come into the courtroom

19  during it.  But just -- it's supposed to be about a half hour,

20  but --

21         MR. WISHNEW:  Okay.

22         THE COURT:  -- let's just -- with one witness left,

23  we'll begin at 9:15.

24         MR. WISHNEW:  Okay.  May --

25         THE COURT:  Okay?

1        MR. WISHNEW:  May I ask Your Honor just how much time

2   Ms. Aniel has left at this point?

3        THE CLERK:  An hour and two minutes.

4        THE COURT:  An hour and what?

5        An hour and two minutes left.

6        MR. WISHNEW:  Okay.

7        THE COURT:  So we'll begin tomorrow, Ms. Aniel, with

8   your testimony.

9        MS. ANIEL:  Yes, Your Honor.

10        THE COURT:  And you have your written statement.  I

11   raised the issue this morning about some of what's included in

12   the declaration I don't believe is relevant to this proceeding.

13   I don't know whether you want to -- whether you're going to

14   raise that in the morning or not.

15        MR. WISHNEW:  Yeah, we'll raise it tomorrow.

16        THE COURT:  Okay.  But she'll have an hour to testify,

17   herself, from the witness stand, and --

18        MR. WISHNEW:  Yeah.

19        THE COURT:  -- but that hour's also, if you want to

20   make a closing statement, you'll have -- closing argument,

21   you -- that hour covers whatever testimony you give, not when

22   Mr. Wishnew questions you.

23        MS. ANIEL:  Oh, okay.  Now I understand.

24        THE COURT:  Okay.  His time is his time, okay?

25        MS. ANIEL:  Okay, okay.

RESIDENTIAL CAPITAL, LLC, et al.                194

1            THE COURT:  That doesn't count -- that doesn't count

2     against you when he's questioning you.  Okay.

3            MS. ANIEL:  Oh, okay, Your Honor.

4            THE COURT:  All right?

5            I'll see you all in the morning.

6            MR. WISHNEW:  One last point --

7            THE COURT:  Yes.

8            MR. WISHNEW:  -- Your Honor, just for housekeeping.

9     Can Ms. Smoot and Ms. Priore go back to their respective homes?

10            THE COURT:  Yes; they're relieved.

11            MR. WISHNEW:  Okay.  Thank you very much.

12            MS. ANIEL:  Thank you, Your Honor.

13            THE COURT:  Okay.

14            MS. ANIEL:  Your Honor, can I just get one more

15     question, because Mr. Jordan --

16            THE COURT:  What's your question?

17            MS. ANIEL:  -- gave me the original copy of the power

18     of attorney --

19            THE COURT:  Yes.

20            MS. ANIEL:  -- Your Honor.

21            THE COURT:  Yes.

22            MS. ANIEL:  This is not the -- this is not an original

23     copy, Your Honor, because if it's a original, it should

24     be -- have a mark at the back of the --

25            THE COURT:  No.  She's testified that she brought the

RESIDENTIAL CAPITAL, LLC, et al.                          195

1   originals.  Testimony's concluded for the day.

2          MS. ANIEL:  Okay.

3          THE COURT:  See you all in the morning.

4          MS. ANIEL:  Thank you very much.

5      (Whereupon these proceedings were concluded at 3:18 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                           **I N D E X**

3

4   WITNESS              EXAMINATION BY      PAGE

5   Kathy Luong         Ms. Aniel           21

6   Doris Wong          Ms. Aniel           41

7   Doris Wong          Mr. Wishnew         54

8   Susie Moy           Ms. Aniel           56

9   Susie Moy           Mr. Wishnew         79

10  Kathy Priore        Ms. Aniel           81

11  Kathy Priore        Mr. Wishnew         157

12  Mira Smoot          Ms. Aniel           171

13  Mira Smoot          Mr. Wishnew         188

14

15                          EXHIBITS

16  COURT'S             DESCRIPTION         ID        Evid.

17  1                   Signature specimen  46

18                      of Doris Wong

19  2                   Signature specimen  59

20                      Of Susie Moy

21  3                   Signature specimen  173

22                      of Mira Smoot

23

24

25

| | EXHIBITS (Contd.) | | |
|---|---|---|---|
| ANIEL'S | DESCRIPTION | ID | Evid. |
| 3 | Loan servicing | | 124 |
| | Notes | | |
| | | | |
| TRUST'S | DESCRIPTION | ID | Evid. |
| A | Declaration of | | 167 |
| | Kathy Priore | | |
| B | (No description) | | 167 |
| C | Deed of Trust | | 167 |
| | recorded 6/8/2007 | | |
| D | 2009 assignment of | | 167 |
| | Deed of trust | | |
| E | Certified copy of | | 159 |
| | substitution of trustee | | |
| F | Certified copy of | | 161 |
| | Assignment of deed of | | |
| | trust from MERS to HSBC | | |
| G | Certified copy of the | | 163 |
| | assignment of deed of trust | | |
| | from HSBC to GMAC Mortgage | | |
| H | Company profile for | | 163 |
| | Mira Smoot | | |

| | TRUST'S | DESCRIPTION | ID | Evid. |
|---|---|---|---|---|

1                           EXHIBITS (Contd.)

3

4    I              Substitution of trustee          164

5                   retrieved from Looking

6                   Glass imaging system

7    J              4/21/2012 notice of default      165

8                   retrieved from Looking

9                   Glass imaging system

10   K              Notice of trustee sale           166

11                  retrieved from Looking

12                  Glass imaging system

13

14

15

16

17

18

19

20

21

22

23

24

25

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

1

2                         C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    *[signature: Sharona Shapiro]*

8

9    _____

10   SHARONA SHAPIRO

11   AAERT Certified Electronic Transcriber CET**D 492

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  March 28, 2016

18

19

20

21

22

23

24

25