1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              April 7, 2016

19              10:27 AM

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2   Motion to compel discovery in a miscellaneous matter

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Sharona Shapiro

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

```
 1   A P P E A R A N C E S :

 2   QUINN EMANUEL URQUHART & SULLIVAN LLP

 3        Attorneys for Residential Capital Liquidity Trust

 4        51 Madison Avenue, 22nd Floor,

 5        New York, New York 10010

 6

 7   BY:   ISAAC NESSER, ESQ.

 8

 9

10   PATTERSON BELKNAP WEBB & TYLER, LLP

11        Attorneys for MBIA Insurance Corp.,

12        Third Party Respondent

13        1133 Avenue of the Americas

14        New York NY 10036

15

16   BY:   MICHELLE W. COHEN, ESQ.

17        STEPHANIE TEPLIN, ESQ.

18

19

20   BUCKLEYSANDLER LLP

21        Attorneys for PNC Bank, N.A.

22        100 Wilshire Boulevard, Suite 1000

23        Santa Monica, CA 90401

24

25   BY:   FREDRICK S. LEVIN, ESQ.
```

```
 1              P R O C E E D I N G S
 2         THE COURT:  All right.  Please be seated.  We're here
 3  in Residential Capital, 12-12020, here in connection with a
 4  motion to compel compliance with subpoena issued in Minnesota.
 5  The motions to compel were filed in the district court as a
 6  miscellaneous matter and then referred to this Court.
 7         Who's going to speak for the moving party?
 8         MR. LEVIN:  Good morning, Your Honor.  Frederick Levin
 9  for BuckleySandler -- the movants.  BuckleySandler, my firm.
10  Sorry.
11         THE COURT:  Let me get the other appearances as well.
12         MS. COHEN:  Yes, Your Honor.  Michelle Cohen from
13  Patterson Belknap Webb & Tyler, on behalf of MBIA.
14         MS. TEPLIN:  Stephanie Teplin from Patterson Belknap
15  Webb & Tyler, also on behalf of MBIA.
16         MR. NESSER:  Isaac Nesser, Quinn Emanuel, for the
17  Residential Capital Liquidity Trust.
18         THE COURT:  Thanks very much.
19         All right.  Go ahead, Mr. Levin.
20         MR. LEVIN:  So, Your Honor, two matters -- two
21  discrete issues before the Court.  One is the request to compel
22  production of MBIA's examiner's submission.  The other related
23  to certain e-mails from three custodians that were identified
24  by MBIA.
25         THE COURT:  Yeah, let me deal with that first.  And I
```

## Residential Capital, LLC, et al.                                              5

1    don't know whether any of you were on the phone when I had the

2    telephone hearing regarding the Ally subpoena, but I raised it

3    then.

4           I don't know, Ms. Cohen, whether you or any of your

5    colleagues were on the phone.

6           MS. COHEN:  I was not, Your Honor.

7           THE COURT:  And the question I asked them -- let me

8    put it on the table now -- was whether -- and I guess this

9    really is addressed to MBIA.  When I asked the question at the

10   last hearing, I asked it of both parties, whether they consent

11   to the transfer of the motion to compel, and here it would be

12   insofar as the e-mails are concerned, to transfer the motion to

13   the district court in Minnesota.  I had expressed, in that

14   phone call concerning the Ally motion, I do intend to address

15   the issues and decide the issues myself as to whether the

16   so-called MBIA submission paper -- whether that's protected

17   from discovery.  It seems to me that that's really -- the

18   examiner was appointed pursuant to my order in the ResCap

19   cases, the examiner conducted his investigation under the

20   supervision of the Court, and the protective -- at least one

21   protective order was entered by the Court.  And so it does seem

22   appropriate to me that I decide that issue.  But the issue

23   about the e-mails is different, and that really seems to me to

24   go really to the issues pending in the Court in Minnesota.

25          I had indicated in the phone call last week, with

1   respect to Ally -- it may have been earlier; I'm losing track

2   of time -- that I intended to talk to Judge Nelson, before whom

3   the actions are pending.  I did speak with her.  And she

4   supported the notion of me transferring the e-mail issue to

5   her.  I told her I would keep the -- and decide the issue about

6   the submission agreement -- submission paper.

7          Rule 45(f) of the Federal Civil Procedure gives me the

8   authority to transfer it, but it does two things.  One, it says

9   with the consent of the responding party, and then it says if

10  they don't consent I can still do it.

11         But so let me ask whether you would consent to

12  transferring the portion of it that deals with the e-mails to

13  the Minnesota court.

14         MS. COHEN:  Of course, Your Honor.  I will confess

15  this is not an issue I've discussed with my client.  I was

16  unaware that that came up --

17         THE COURT:  Yeah.

18         MS. COHEN:  -- in that call regarding the Ally motion.

19  I will say that at this point a large portion of my client's

20  objection here has to do with the burden.  We have prepared the

21  motion papers here.  We prepared both for the argument before

22  Your Honor --

23         THE COURT:  Would you be able to ship that all out

24  to --

25         MS. COHEN:  Of course, Your Honor.

1            THE COURT:  -- the Court?

2            MS. COHEN:  But it would, again, require additional

3    expense on my client's part for me to prepare and to travel

4    to --

5            THE COURT:  Well, that may be true --

6            MS. COHEN:  -- Minnesota.

7            THE COURT:  -- but I want an answer by the end of the

8    day whether your client consents.  And the rule

9    actually -- this is 45(f), "When the court, where compliance is

10   required, did not issue the subpoena, it may transfer a motion

11   under this rule to the issuing court if the person subject to

12   the subpoena consents or if the court finds exceptional

13   circumstances."  I won't read the rest of it.  But that's -- so

14   I think I have the authority, with or without your consent.

15           Judge Nelson has -- I don't know; Mr. Nesser, how many

16   cases are out there?  It was close to seventy; some of them

17   were settled.

18           MR. NESSER:  I think we're in the forties.

19           THE COURT:  Oh, you got into the forties?  Okay.  So I

20   have four other cases, the underlying mortgage purchase

21   litigation cases, and she's got forty some odd cases.  And

22   consistency in rulings with respect to burden and

23   cost-shifting, I believe, is quite important and may satisfy

24   the exceptional circumstances provision of 45(f).  But get back

25   to me in writing by the end of the day as to whether your

Residential Capital, LLC, et al.                                        8

1  client consents to the transfer, because it may happen anyway.

2        MS. COHEN:  We will absolutely do that, Your Honor.

3        THE COURT:  Okay?  All right.  So what I want to deal

4  with, to hear argument about today is not the e-mail burden

5  portion of it, which what I think is not particularly important

6  but I think you probably overreached with the scope of your

7  subpoena for e-mails, but whether it's me or Judge Nelson, or

8  one of the magistrate judges in Minnesota who is handling

9  discovery would decide the issue, we'll see.  But so what I

10 want to hear today is about the motion to compel production of

11 the submission paper.

12        MR. LEVIN:  Yes, Your Honor.  Where we left off on the

13 submission papers was the Court had recognized that the

14 difference between a confidentiality agreement and a protective

15 order, at the time it was acknowledged that there was no

16 protective order with respect to the examiner's submissions,

17 and there was no authority contradicting the otherwise

18 black-letter law that a New York confidentiality agreement

19 would not preclude discovery of another -- in an otherwise

20 proper subpoena.

21        THE COURT:  May I ask you this?  The subpoena sought

22 the -- well, as I understand it, the MBIA submission consisted

23 of some document that I've not seen, plus it referred to

24 attached forwarded a large volume of other documents.  And am I

25 correct that the documents that accompanied the submission

1   paper have been produced?

2           MR. LEVIN:  Yes, Your Honor.

3           THE COURT:  Okay.  So we're talking about the

4   submission paper?

5           MR. LEVIN:  The submission itself, in which the MBIA

6   presumably martialed the evidence that it attached and made

7   argument, and we don't know what's in that.  But the document

8   itself, and the examiner's submissions -- and I think there are

9   several -- are relevant.  And the question that was posed --

10          THE COURT:  I don't know whether they're relevant or

11  not.  I mean, if the standard you're asking is relevance, I

12  have no idea whether they'd be admissible at trial.  But that's

13  not the same issue about discovery.

14          MR. LEVIN:  Well, they're relevant for purposes of

15  discovery, which was the point that the Court made on the

16  preliminary conference call, which is there is a difference

17  between discoverability and admissibility.  Our assertion is

18  they're relevant for purposes of discovery and there is no

19  privilege or other protection afforded to the examiner's

20  submissions.

21          And at the end of the call, the purpose of

22  supplemental briefing was to afford the only objecting

23  party -- MBIA is not objecting on its own; the only objecting

24  party here are the plaintiffs in the underlying

25  litigation -- the opportunity to submit some authority that

1    examiner's submissions are entitled to some sort of privilege.

2    And those submissions -- that supplemental briefing occurred,

3    and no authority was submitted.

4           THE COURT:  But what they rely on is the district

5    court opinion in the Ionosphere Club's case and the

6    Baldwin-United opinion.

7           MR. LEVIN:  Yes, and in each of those cases there was

8    a protective order.  In the In re: Ionosphere case, not only

9    was there a protective order, but one of the movants seeking

10   to, in effect, modify the protective order was reporters from

11   Dow Jones who wanted to publish, presumably report upon the

12   contents of the submissions to the examiner.  Obviously that's

13   not going to happen here.  There's a protective order in the

14   underlying case that would of course be honored.  It would be

15   treated as confidential --

16          THE COURT:  Yeah, I don't have that --

17          MR. LEVIN:  -- and would not be published.

18          THE COURT:  I don't have that protective order.  Could

19   you submit a copy to the Court?

20          MR. LEVIN:  I'm sorry; I can't hear you.

21          THE COURT:  Could you submit a copy to me of --

22          MR. LEVIN:  Of course.

23          THE COURT:  -- the protective order that's in place in

24   the Minnesota case?

25          MR. LEVIN:  Absolutely.  And so there is no risk of

1  public disclosure, which was what was at issue in In re:

2  Ionosphere, and there was a court order specific to the

3  examiner that prohibited the dissemination of the examiner

4  materials.  And so the issue there was the enforcement of the

5  court order which, in the preliminary conference, it was

6  admitted on the record that no protective order exists in this

7  case with respect to the examiner's submissions.

8          And likewise, in In re: Baldwin, there was a specific

9  protective order that specifically protected the examiner's

10  submissions in that case.  So that case, like In re:

11  Ionosphere, which In re: Ionosphere relies on, also turns on

12  the existence of a protective order specific to the situation.

13  And that's the distinction in those cases.  And so the absence

14  of that order, or any authority indicating that some other kind

15  of privilege exists, the ordinary rules of civil discovery

16  apply, and we submit that the examiner's submission should be

17  produced.

18          THE COURT:  Okay.  Let me hear Ms. Cohen.

19          In reading your papers, am I correct that MBIA does

20  not object to the production of the submission paper if the

21  Court overrules the plaintiff's objection?

22          MS. COHEN:  That is correct, Your Honor.

23          THE COURT:  All right.  Mr. Nesser?

24          MR. NESSER:  Good morning, Your Honor.

25          THE COURT:  Good morning.  Can I ask you this

Residential Capital, LLC, et al.                                    12

1   question, Mr. Nesser?

2           MR. NESSER:  Yes.

3           THE COURT:  Have you -- do you have a copy -- have you

4   read the submission paper?

5           MR. NESSER:  We do have a copy, and I have read it.

6           THE COURT:  Okay.

7           MR. NESSER:  All of the submission papers were

8   distributed as among the parties.

9           THE COURT:  Well, they were distributed as among the

10  parties, and your firm represented different parties.

11          MR. NESSER:  Correct.

12          THE COURT:  So you didn't receive it in your capacity

13  as representing plaintiffs, and you had Allstate and some other

14  parties, as I recall.

15          MR. NESSER:  No, I mean the debtor -- I believe the

16  debtor received a copy.

17          THE COURT:  Well, but your firm -- and maybe you

18  weren't the lawyer doing it, but your firm represented a large

19  number of parties during the ResCap --

20          MR. NESSER:  Yes.

21          THE COURT:  -- bankruptcy case.  And I believe -- bear

22  with me a second --

23          MR. NESSER:  Allstate, Prudential --

24          THE COURT:  Yeah --

25          MR. NESSER:  -- AIG and the debtor.  The last one is

1   the most important.  MassMutual.

2        THE COURT:  They were all parties to the -- I don't

3   know whether they all were, but MassMutual, Allstate and others

4   that you represented, they were parties to the confidentiality

5   agreement regarding examiner submission paper?

6        MR. NESSER:  Yes.

7        THE COURT:  So I assume that your firm got

8   a -- whether you did or not, your firm had a copy of the MBIA

9   submission paper?

10        MR. NESSER:  I don't know the answer to that question.

11   What I know is that I've seen it --

12        THE COURT:  Okay.

13        MR. NESSER:  -- because the trust has a copy of it.

14        THE COURT:  Okay.

15        MR. NESSER:  And --

16        THE COURT:  Let me ask you this.  I probably should

17   have asked Ms. Cohen this, but I'll ask you.  Does that

18   submission paper cover issues other than RMBS-related issues?

19        MR. NESSER:  I don't recall.

20        THE COURT:  Ms. Cohen, do you know?

21        MS. COHEN:  I'm sorry, Your Honor.  I don't know the

22   answer to that.

23        THE COURT:  Okay.  Go ahead, Mr. Nesser.

24        MR. NESSER:  Your Honor, so I was prepared to argue

25   the motion on the terms that it had been briefed.  With my hat

1    in my hand -- I don't know if the Court is aware that we filed

2    our opposition to the Ally motion yesterday morning.

3            THE COURT:  I've read it.

4            MR. NESSER:  And we developed an argument there that

5    had not been made here, candidly, which is that actually the

6    submission, we believe, would be covered by Your Honor's

7    protective order.

8            THE COURT:  Well, I don't think so.

9            MR. NESSER:  Okay.

10            THE COURT:  Let me tell you why.  Okay?  And none of

11   you have briefed this.  There were two protect -- there was the

12   uniform protective order --

13            MR. NESSER:  Yes.

14            THE COURT:  -- that I did approve, and had provisions

15   on preservation of attorney-client privilege and work product.

16   And it's approved by the Court.  And then without the knowledge

17   or submission to the Court -- I'm not faulting anybody for

18   that -- there was the confidentiality agreement regarding

19   examiner submission paper.  That's the one where I read the

20   list of your clients who were --

21            MR. NESSER:  Yes.

22            THE COURT:  -- your firm's clients that were

23   signatories.  And they're different.  They're different in a

24   number of important respects.  One, there's nothing in that

25   confidentiality agreement regarding examiner submission paper

Residential Capital, LLC, et al.                    15

1   that, by its terms, purports to preserve attorney-client

2   privilege or work product protection.

3           MR. NESSER:  That's true.

4           THE COURT:  And as you've acknowledged, it was not

5   approved by the Court.  An issue that nobody addressed, I don't

6   think, deals with Federal Rule of Evidence 502(d) and (e).  Are

7   you aware what those rules provide, Mr. Nesser?

8           MR. NESSER:  Not as I'm standing here, Your Honor.

9           THE COURT:  Okay.  Well, I'll tell you.  502(d) is

10  labeled "Controlling Effect of a Court Order":  "A federal

11  court may order the privilege or protection that" -- "that the

12  pro" -- let me back up.  Read it again.  "A federal court may

13  order that the privilege or protection is not waived by

14  disclosure connected with the litigation pending before the

15  court, in which event the disclosure is also not a waiver in

16  any other federal or state proceeding."  That's 502(d).

17          MR. NESSER:  Yes.

18          THE COURT:  And then 502(e), "Controlling Effect of a

19  Party Agreement.  An agreement on the effect of disclosure in a

20  federal proceeding is binding only on the parties to the

21  agreement, unless it is incorporated in a court order."  Okay.

22  And you can read the commentary.

23          MR. NESSER:  Sure.

24          THE COURT:  This was part of 2007 --

25          MR. NESSER:  Yes.

1      THE COURT:  -- amendment to the Federal Rules of

2   Evidence, and it dealt with this issue of trying to preserve

3   privilege and --

4      MR. NESSER:  Um-hum.

5      THE COURT:  -- and work product protection.  So the

6   Uniform Protective Order has the language, it is approved by

7   the Court, and it would, in my view, arguably, protect a

8   submission.  It's a different issue whether MBIA wants to

9   assert that privilege; it would be their protection to assert,

10  and they're not asserting an objection.  But it would carry

11  forward.

12      But there was the second confidentiality -- paragraph

13  17 of the confidentiality agreement says, "This agreement

14  supersedes any confidentiality agreements entered into by a

15  party with any parties-in-interest in connection with the

16  submission papers."

17      MR. NESSER:  Yes.

18      THE COURT:  So with respect to the submission papers,

19  the confidentiality agreement says it supersedes any of that.

20  So I don't see how you can have an argument that the Uniform

21  Protective Order covers the submission agreement when there was

22  a separate agreement that specifically said it supersedes any

23  other agreement.

24      MR. NESSER:  Your Honor, so if I may, the argument is

25  not one about privilege, and so I don't believe that the

Residential Capital, LLC, et al.                    17

1   evidentiary rules Your Honor mentioned are what we are relying

2   upon or not relying upon.  The issue is one of confidentiality.

3   And the way that we read the protective order that Your Honor

4   entered governing the examiner process, that order, by its

5   terms, clearly stated that materials that are

6   proprietary -- materials that are designated as proprietary and

7   confidential may not be disclosed.

8         THE COURT:  And that agreement doesn't apply to the

9   submission paper.

10        MR. NESSER:  Your Honor, that order that Your Honor

11  entered doesn't say anything about submissions to the examiner,

12  because at that point there had been no -- that was the outset

13  of the examiner process.

14        THE COURT:  And when the examiner requested the

15  submissions and a separate agreement was negotiated and signed

16  and not submitted to the court --

17        MR. NESSER:  Yeah.

18        THE COURT:  -- and at paragraph 17 said the agreement

19  supersedes any confidentiality agreements into by a party, with

20  any parties-in-interest in connection with the submissions

21  papers, you're -- look.  If the parties who were going to put

22  in submission papers wanted to protect them, they could've put

23  language in there and gotten a court order to do it.  But that

24  wasn't done.

25        MR. NESSER:  So the argument I'm making, Your Honor,

1   is as follows.  The order, the protective order that Your Honor

2   entered, is not an agreement between the parties.  It was a

3   court order.  And what the court order said is that

4   submission -- materials that are delivered to the examiner as

5   part of the examiner process are confidential -- if materials

6   desi -- sorry.

7          If materials that are exchanged as part of the

8   examiner process are designated as confidential, then they are

9   confidential.

10          THE COURT:  And I read that agreement --

11          MR. NESSER:  Yes.

12          THE COURT:  -- a half a dozen times in the last few

13  days.  And the other conclusion I reach is that whether it's

14  MBIA or any other party that put in a submission paper, if it's

15  their submission paper, the protective order does not

16  prevent -- and I've never seen a protective order that

17  would -- prevent the party that drafts, prepares, submits the

18  submission paper to say you can't give it to anybody else; you

19  can't produce it in discovery.  And MBIA has not objected to

20  producing it.

21          MR. NESSER:  Your Honor, respectfully, I think we

22  disagree with that.

23          THE COURT:  Okay.

24          MR. NESSER:  We have an interest as a participant in

25  the process in having the protective order that Your Honor

1    entered in the process be honored and be implemented.  And

2    if --

3            THE COURT:  There's nothing in that order that says

4    that MBIA can't do what it wants with -- this issue has been

5    briefed.  The parties did address this issue.  You made this

6    argument before.  Whether -- bear with me.

7            I've certainly looked carefully at this -- whether you

8    made it or not, I certainly looked carefully at the argument.

9    And what I read the uniform protective order as saying is that

10   the disclosing party -- no one else could, under the protective

11   order -- and I'll assume for purposes of discussion, which I

12   don't think is -- and I don't think it's so, that the

13   submission was covered by the initial protective order.  Okay?

14   If it was, I'm not sure what's the reason for doing a separate

15   one saying it supersedes any confidentiality agreement.

16           But assuming that the first -- the uniform protective

17   order applies, show me the language that says that a disclosing

18   party, which MBIA would be -- that a disclosing party, can't

19   produce whatever document it prepared as a disclosing party?

20   Show me the language.

21           MR. NESSER:  Your Honor, I don't have the document in

22   front of me.  They confiscated --

23           THE COURT:  If you were going to make this argument,

24   you should have --

25           MR. NESSER:  If you believe me, that the security

1  folks confiscated my computer.

2          THE COURT:  Why?

3          MR. NESSER:  Which is why I don't have it with me.

4  But I -- yes.

5          THE COURT:  I understand there was a -- today was the

6  first day that we're having 341 meetings in the courthouse, and

7  it's Chapter 13 day.  And I gather there was a very long line.

8  That's the reason everybody --

9          MR. NESSER:  Yes.  And I apologize for that, Your

10  Honor.

11          THE COURT:  But you showed an attorney ID and they

12  confiscated your computer?

13          MR. NESSER:  I had -- I didn't have a business card.

14  I had my work ID, and it was deemed insufficient.  But in any

15  event, Your Honor we read the protective order as saying that

16  materials that are exchanged as part of the examiner process

17  are confidential, period.

18          THE COURT:  I don't see that.  I don't -- I mean, it's

19  up to the disclosing party to decide whether they want to claim

20  something -- the uniform protective order had different levels

21  of protection built in.  Okay?  But it all hinged on a

22  disclosing party claiming a level of protection.  It's unheard

23  of -- I'm sorry, Mr. Nesser, I've never heard of anybody trying

24  to keep someone else from producing their own document because

25  you say I entered a protective order.  You've got to be kidding

1    me.

2            MR. NESSER:  Because it's our documents that are

3    discussed in the brief.

4            THE COURT:  It's not yours.

5            MR. NESSER:  It's our confidential documents that are

6    discussed in the brief.  And so we have a straightforward

7    interest in having the discussion of those confidential

8    documents of ours being treated as confidential pursuant to

9    Your Honor's order.

10            THE COURT:  You know, it would have been nice if you

11    had made some of these arguments to me, but you haven't.

12            MR. NESSER:  I --

13            THE COURT:  No, you're standing there now --

14            MR. NESSER:  -- absolutely --

15            THE COURT:  -- making arguments to me that are not in

16    the papers, were not raised when I had a telephone call about

17    this.

18            How many pages is the submission, Ms. Cohen?

19            MS. COHEN:  I'm not sure, Your Honor.  I don't know

20    how many pages it is in total.

21            MR. NESSER:  Your Honor, if I recall it was in the

22    twenty- to thirty-page range.  It's a brief.

23            Your Honor, may I make one point?

24            THE COURT:  Go ahead.

25            MR. NESSER:  Only because Your Honor has focused a

Residential Capital, LLC, et al.                    22

1    number of times on the provision in the protective order saying

2    it supersedes prior agreements.

3            THE COURT:  In the -- in the confidentiality order.

4            MR. NESSER:  In the confidentiality order, saying it

5    supersedes prior agreements.  And I just want to make the

6    point, and I think it's consistent with what Your Honor's

7    suggesting, that the protective order that Your Honor entered

8    was an order that Your Honor entered by contrast to the

9    confidentiality agreement that everybody, including Your Honor,

10   has emphasized, is not an order, it's an agreement.

11           And so if the parties had been intending the

12   confidentiality agreement to supersede the order, they would

13   have had to have said we were superseding the order, and we

14   would have to had submitted it to Your Honor, so that it could

15   be entered as an order, because only Your Honor has the

16   authority to supersede the prior order.

17           And so none of that was done.  And the fact that none

18   of that was done confirms, in our view, that what the

19   confidentiality agreement was meant to be was a supplement to

20   the order to clarify what perhaps had not been clear, which was

21   that when Your Honor entered a protective order months prior

22   governing an examiner process, and months later --

23           THE COURT:  Point --

24           MR. NESSER:  -- the examiner said --

25           THE COURT:  -- point to me the -- but you can't even

1  point to me -- look, you didn't brief it.  You say they

2  confiscated your computer, so you can't even point to me the

3  language in the protective order that you say applies.

4          MR. NESSER:  Yes.

5          THE COURT:  I'd give you my copy but I have notes on

6  it.

7          MR. NESSER:  I -- Your Honor, I'm embarrassed as it's

8  possible to be, standing here.  I will say that we briefed it

9  in the Ally motion which Your Honor has, which the defendants

10 have.  If it would be easier to argue and decide the issue in

11 the context of --

12         THE COURT:  I have the Ally briefs right here.

13         MR. NESSER:  -- that motion, we're happy to do it that

14 way.

15     (Pause)

16         THE COURT:  This is plaintiff's joinder in opposition

17 to movant-defendants' motion to compel compliance with subpoena

18 issued by Ally Financial, Inc.?

19         MR. NESSER:  Yes, Your Honor.

20     (Pause)

21         MR. NESSER:  Your Honor, counsel for MBIA has

22 graciously given me a copy of our brief, the joinder.  And I

23 believe the relevant language is on page 4.  I'm sorry -- I'm

24 sorry.

25         THE COURT:  I think it's the first -- the paragraph

Residential Capital, LLC, et al.                    24

1   begins at the beginning of page 1 and carries over to page 2 at

2   the top of the page.

3           MR. NESSER:  Yes.

4       (Pause)

5           THE COURT:  Of course you don't address what you say

6   was used in the submission that was confiden -- that's why I'm

7   sort of left to speculate about all this.

8           MR. NESSER:  Well, we --

9           THE COURT:  You say you have it, but you didn't say

10  MBIA in its submission relied on numerous documents that

11  parties submitted pursuant to the protective order.

12          MR. NESSER:  Well, what we do say, Your Honor, is that

13  MBIA has produced documents underlying the brief.  And so those

14  had been produced; they know what they are.

15          THE COURT:  MBIA produced the documents that -- and

16  you sat quietly by when that happened?

17          MR. NESSER:  Either had been or will be produced.

18          THE COURT:  Ms. Cohen?

19          MR. NESSER:  They have been produced, Your Honor.

20          THE COURT:  Okay.  And those -- so the documents that

21  you're now -- you're saying those shouldn't have been produced?

22          MR. NESSER:  No.  The underlying documents were

23  documents that are sort of original source materials, if you

24  will.  And we did not object to those being produced.

25          THE COURT:  Okay.

Residential Capital, LLC, et al.                                    25

1          MR. NESSER:  What we do object to being produced --

2          THE COURT:  And --

3          MR. NESSER:  -- is the --

4          THE COURT:  Let me ask this.  Is there something other

5   than those materials that are cited in the submission?

6          MR. NESSER:  I'm sure that there were.  I don't

7   remember --

8          THE COURT:  Do you --

9          MR. NESSER:  -- standing here what they are?

10         THE COURT:  Can you tell me, Ms. Cohen?  I would have

11  assumed that what happened when I saw that you produced the

12  underlying papers, that whatever is referenced in the

13  submission, they produced.

14         MR. NESSER:  Oh, I'm sorry.  Yes.  The answer is yes.

15  Anything that was cited in the papers, I understand MBIA has

16  agreed to product anything cited in the papers.

17         THE COURT:  Well, they said they did produce.

18         MR. NESSER:  Yes.  I misunderstood the question.

19         THE COURT:  So what's -- then I don't understand the

20  point.  If they produced, and you had no objection to their

21  producing any of the documents that they refer to in the

22  submission, how have they -- how do you claim that producing

23  the submission violates the protective order?

24         MR. NESSER:  Because, Your Honor, there's a difference

25  between producing original source materials, which are

Residential Capital, LLC, et al.                    26

1  documents, e-mails from ten years prior, and producing the

2  actual brief in which folks were making arguments to the

3  examiner as part of the examiner process, reflecting what was

4  happening as part of the examiner process, with respect to the

5  claims that the parties were making to the examiner.  The

6  arguments that the parties were making to the examiner

7  regarding the scope of liability or not liability, that was at

8  the core of the confidential examiner process that Your Honor

9  entered the protective order to govern.

10           Your Honor, it's analo --

11           THE COURT:  Why should I even listen to this argument

12  that you did not brief?

13           MR. NESSER:  Your Honor, if you choose not to listen,

14  I have no --

15           THE COURT:  Here's what I want.  I want MBIA's counsel

16  to submit to my chambers this afternoon the submission paper

17  for in camera review; and I will look at it.  And that's what

18  we're fighting about.  That's what the fight's about.  I want

19  to see it.

20           MR. NESSER:  And Your Honor, I think --

21           THE COURT:  MBIA wasn't a stranger to this.  You had

22  years of -- ResCap had --

23           MR. NESSER:  And that's --

24           THE COURT:  -- years of litigation in the state court.

25           MR. NESSER:  And that's one of the reasons why the

Residential Capital, LLC, et al.                    27

1   primary source documents were able to be produced, because

2   those had been produced as part of a state court action.

3        But Your Honor, I think the point that I -- part of

4   what we're concerned about here -- and Your Honor asked what is

5   our interest in this?  Part of our concern here is that --

6        THE COURT:  You know, when the plaintiff in the

7   lawsuit stands up in front of me and tells me that you

8   shouldn't allow production of anything that might hurt our

9   claim, that's what you're telling me.  Okay?  I always view

10  with a somewhat jaundiced eye when it's the plaintiff that's

11  trying to keep the defendant from discovering evidence or

12  arguments that may undercut a plaintiff's theory in the case.

13       MR. NESSER:  Your Honor, this is no different than

14  when Your Honor precluded disclosure of the confidentiality

15  materials as part of the mediation.

16       THE COURT:  That's because there's a recognized

17  mediation privilege.  And even if the protective order applied,

18  it doesn't mean that any of the underlying documents or

19  arguments made from them will be protected from disclosure to

20  third parties.

21       MR. NESSER:  So --

22       THE COURT:  You don't gain protection over something

23  simply because there is a protective order in place.

24       MR. NESSER:  So respectfully, we read the protective

25  order governing the examiner process, identically as the order

1   Your Honor entered governing the mediation process.  In both
2   cases --
3           THE COURT:  No, the difference, Mr. Nesser, is that
4   there's a recognized mediation privilege that I enforced.
5   Okay?  There is no recognized privilege with respect to what
6   you're trying to block production of now.
7           If it had been labeled as work product, and if an
8   order had been entered by the Court that gave protection
9   just -- the language of the protective order, if that had been
10  included about submission agreements, we'd have a different
11  case now.  Okay?  But you don't.
12          All right, we're going to put this at an end.  I want
13  the submission paper delivered to my chambers for in camera
14  review by the end of the day this afternoon.  Do you have a
15  copy in your office?
16          MS. COHEN:  I do not, Your Honor.  But I will get one
17  by the end of the day for you.
18          THE COURT:  Okay.
19          MR. LEVIN:  Your Honor, may I be heard for just --
20          THE COURT:  Go ahead.
21          MR. LEVIN:  Just -- I listened intently to this entire
22  discussion on the argument that I've not heard before.
23          THE COURT:  Yes, I understand.
24          MR. LEVIN:  I just want to make -- be sure that there
25  is an objection on the record.

1      THE COURT:  I understand.

2      MR. LEVIN:  I've had no notice of any of this.

3      THE COURT:  The language that's in the paper they

4  filed joining in the Ally objection was not so clear as -- and

5  I did read it.  But it didn't jump out at me that what was

6  being argued -- and I don't know what's in the Ally submission,

7  I don't know what's in the MBIA submission.  There was nothing

8  that suggested that this argument applied to the MBIA.

9      MR. LEVIN:  I've read the Ally submission last night.

10  I didn't even see the plaintiff's submission.  I read the Ally

11  one.  And this is --

12      THE COURT:  When you say "submission", you're talking

13  about the brief.

14      MR. LEVIN:  Their brief, excuse me.

15      THE COURT:  Not --

16      MR. LEVIN:  Yes.  Excuse me for confusing the issue.

17      THE COURT:  -- submission has got a --

18      MR. LEVIN:  It's getting to be a loaded word here.

19      THE COURT:  Yeah.

20      MR. LEVIN:  But I read the Ally brief, and this

21  argument does not appear in there.  And that's another

22  interesting fact --

23      THE COURT:  Yeah.

24      MR. LEVIN:  -- that we've now had a lot of smart

25  people look at this and --

1          THE COURT:  Right.

2          MR. LEVIN:  -- this shows up at the last hour.  But my

3    main point is just an objection --

4          THE COURT:  I understand.

5          MR. LEVIN:  The other thing I just wanted to touch on,

6    if the Court would allow me to speak to it a little bit,

7    relating to the e-mails.  One of the reasons that would

8    militate in favor of the Court keeping that issue here is

9    because one of the primary objections to producing the e-mails

10   has to do with the mediation order that Your Honor entered an

11   order with respect to --

12         THE COURT:  I thought that -- there is -- with respect

13   to Ally, Ally certainly argued that some of the materials that

14   you're seeking from Ally are covered by the mediation

15   privilege.

16         MR. LEVIN:  That is an argument they've made here.

17         THE COURT:  They haven't made that here.

18         MR. LEVIN:  Oh, absolutely.

19         THE COURT:  I thought this -- Ms. Cohen, I thought

20   this issue had been resolved with -- that the -- am I missing

21   something here?

22         MS. COHEN:  No, that's correct, Your Honor.  Our only

23   impediment to producing is the confidentiality agreement.

24         THE COURT:  Good, okay.

25         MR. LEVIN:  Then --

1          THE COURT:  I'm sorry.  I've read all these papers.

2   That argument's not made by MBIA.

3          MR. LEVIN:  Well, now it --

4          THE COURT:  With respect to the e-mails.

5          MR. LEVIN:  No, it is made with respect to the

6   e-mails.  It's not made with respect to the examiner

7   submission.  That's why I think there was confusion

8   between -- in the last question and answer with my colleague.

9          MS. COHEN:  Oh, I'm sorry.  I thought Your Honor was

10  referring to the submission.

11         THE COURT:  No.

12         MS. COHEN:  We do object to the production of e-mails

13  broadly.  At the last conference Your Honor had asked whether

14  we objected specifically to communications between MBIA and the

15  examiner.  We have since gone back and looked at, based on the

16  custodians --

17         THE COURT:  Right.

18         MS. COHEN:  -- that we've received from the defendants

19  and the search terms that they've applied.  In that 43,000

20  universe, there are 280 documents between MBIA and the examiner

21  or the examiner's advisors.  We've not reviewed those e-mails,

22  but those e-mails we would be happy to review, create a

23  privilege log for, and produce.

24         Our overarching objection is to the 43,000 e-mails

25  that they want.

Residential Capital, LLC, et al.                    32

1          THE COURT:  All right.  Let's --

2          MR. LEVIN:  But --

3          THE COURT:  Stop.  Stop.  I've already ruled with

4    respect to mediation privilege.  I don't know what -- Ms.

5    Cohen, is there some subset of e-mails that you believe are

6    protected by the mediation privilege?

7          MS. COHEN:  Yes.  Of the 43,000 e-mails, there are

8    approximately 12,000 that were exchanged during that period

9    that the mediation order covers.

10         THE COURT:  Okay.  I stand corrected, then, as to what

11   those issues are.  Okay.

12         MR. LEVIN:  Yes.

13         THE COURT:  You're not getting e-mails that are

14   subject to the mediation privilege.  And I thought you had

15   specifically disclaimed effort to get those.

16         MR. LEVIN:  No.

17         THE COURT:  People on your side tried to get me to

18   modify the mediation order.  They lost.

19         MR. LEVIN:  I fully understand that, Your Honor.  The

20   issue that's going -- that may arise -- I hope it doesn't but

21   it may arise -- is, as Your Honor stated earlier, the mere fact

22   that something is submitted in connection -- a document that's

23   not otherwise protected is submitted as part of a mediation,

24   doesn't give it protection.

25         And then there -- what we're seeking is the documents

Residential Capital, LLC, et al.                    33

1    not excluded by the mediation order.  And what they have done

2    is withheld, preliminarily, at least, any document that was

3    created after the mediation order was entered.  And that's

4    roughly five gigabytes of the e-mails, according to their

5    representation to us.  So we believe -- obviously we haven't

6    seen it -- but I think there's a substantial possibility that

7    questions will arise as to whether a particular withheld

8    document is or is not within the scope of the Court's mediation

9    order.

10          So the transfer of the matter to Judge Nelson creates

11   a situation where we'll go back to Minnesota, then we'll have

12   to come back to Your Honor for further clarification of the

13   mediation order.  Since the issue is here --

14          THE COURT:  I thought my mediation order was pretty

15   clear.

16          MS. COHEN:  We agree, Your Honor.  And what defendants

17   have insisted on is that we prepare a log of those 12,000

18   documents so that they can test each one, one-by-one, to

19   determine whether or not they are in fact covered by the

20   mediation order.

21          MR. LEVIN:  Well --

22          THE COURT:  Well, I'm not going to rest on your just

23   telling me that you think 12,000 documents are covered by the

24   mediation order.  Okay?

25          I mean, I think that -- well, I'll think some more

Residential Capital, LLC, et al.                    34

1  about this.

2          MR. LEVIN:  And just to be clear, we have not said

3  that we are insisting on a document-by-document privilege log.

4  In fact, we've encouraged MBIA to offer us any proposal in

5  between.  There are all sorts of alternatives.  We've suggested

6  some.  Others are provided by this court's local rule.  We're

7  not -- we are not insisting on the most difficult path through

8  the forest here.  But their position is that they shouldn't

9  have to do anything; that essentially we should take it on

10 faith that 12,000 e-mails are all covered by the mediation

11 order.

12         MS. COHEN:  With all due respect, Your Honor, our

13 argument is much more nuanced than that.  To begin with, the

14 documents that they are requesting, we don't believe are

15 relevant or proportional to the needs of the case, given the

16 amount of discovery that they already have access to.

17         THE COURT:  Okay, stop.  Proportionality is going to

18 be decided by Judge Nelson.  Okay?  I'm not going to stick my

19 nose under the tent of the cases pending before her.  If there

20 are -- so you can try that out on her, and maybe they've been

21 overbroad in what they've asked for, and maybe she'll cut it

22 back.  And if -- with respect to the issue -- I thought my

23 opinion and order on mediation was pretty clear.  That doesn't

24 mean that you get free rein to just say mediation, and

25 therefore everything is protected.  It's not "trust me".

Residential Capital, LLC, et al.                35

1          So you think 12,000 e-mails or 12,000 pages are

2    subject to mediation privilege?

3          MS. COHEN:  It's 12,000 e-mails, Your Honor.

4          THE COURT:  Out of -- what's the universe of them?

5          MS. COHEN:  43,000.

6          THE COURT:  43,000.  And that conclusion is based on

7    they're in the date range when the mediation was taking place?

8          MS. COHEN:  They are in that date range.  And we're

9    only talking about three custodians here, Your Honor, who were

10   involved intimately in the litigation and the mediation as

11   well, from the business side.

12         In addition, within those 12,000 there are

13   approximately, I believe the number is, 5,500 which include

14   either inside counsel or outside counsel for MBIA as well.

15         THE COURT:  I'm sorry, how many?

16         MS. COHEN:  Approximately 5,500.  So in addition to

17   being covered by the mediation privilege, they would also

18   be -- or we suspect they will be protected by attorney-client

19   privilege or work product.

20         THE COURT:  Well, as to privilege, attorney-client

21   privilege, I think the court in Minnesota should decide that.

22   As to mediation, I'm less clear.  Let me put it that way.  I'm

23   not -- I expect to have an answer from you today on

24   referring -- transferring the motion to Minnesota, other than

25   for the submission paper.  And I'll also think some more about

Residential Capital, LLC, et al.                    36

1    the extent that MBIA contends that e-mails are covered by the

2    mediation privilege.

3         MS. COHEN:  I'm sorry, Your Honor.  I didn't

4    understand that last portion.

5         THE COURT:  I will think some more about keeping the

6    portion of the motion that relates to e-mails which you contend

7    are covered by mediation privilege, since I've already decided

8    the mediation privilege issue once.

9         The two of you need to confer further on the issue of

10   a privilege log and the extent to which it needs to identify

11   groups of documents or specific documents.  If I keep the

12   mediation privilege issue, I will seriously consider allocating

13   costs, if you insist on a privilege log of all 12,000 of those

14   documents.  I want to make it clear; I have the authority to do

15   it.  MBIA is a third party.  And I will seriously consider not

16   imposing the entire cost, but when the exercise is done, cost-

17   shifting to some degree.

18        MR. NESSER:  Yes, Your Honor.

19        THE COURT:  I intend, after I find out what MBIA's

20   position is on transfer, which I still have the authority to

21   do, even if they object, I will have another conversation with

22   Judge Nelson as well and talk further with her about it.  Okay.

23   We're adjourned.

24        IN UNISON:  Thank you, Your Honor.

25        MR. NESSER:  Your Honor?  At the risk of

Residential Capital, LLC, et al.                         37

1    getting -- given the confusion, could we put in a two-paragraph

2    letter just explaining our view on the --

3            THE COURT:  Could you go up to the microphone?  I'm

4    having difficulty hearing you.

5            MR. NESSER:  Just given the confusion, Your Honor,

6    would it be permissible for us to submit two paragraphs, just

7    explaining our view on the protective order today?

8            THE COURT:  No.

9            MR. NESSER:  Okay.

10           THE COURT:  No.  Briefing is done.

11           MR. NESSER:  Thank you.

12           THE COURT:  All right, we're adjourned.

13           MR. LEVIN:  Thank you, Your Honor.

14        (Whereupon these proceedings were concluded at 11:18 AM)

15

16

17

18

19

20

21

22

23

24

25

1

2                              I N D E X

3

4                              RULINGS

5                                           PAGE      LINE

6    MBIA's submission paper is to be        28        12

7    delivered to chambers by the end of the day

8    for in camera review

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

39

1

2                        C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    *[signature: Sharona Shapiro]*

8

9    _____

10   SHARONA SHAPIRO

11   AAERT Certified Electronic Transcriber CET**D 492

12

13   eScribers

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17   Date:  April 8, 2016

18

19

20

21

22

23

24

25