# Exhibit 1

# PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT

I, Evan Hendricks, provide the following Expert Report pursuant to Federal Rules of Civil Procedure 26(a)(2) in connection with the action entitled ***Mary Perkins White v. Green Servicing LLC, GMAC Mortgage LLC, Trans Union LLC, Equifax Information Services, LLC & Experian Information Solutions, Inc.,***: U.S. District Court for the Western District of Washington [Tacoma Div.]; No.: 3:11-CV-005439RBL

**Part 1** of this report addresses issues that are specific to this case, including a context and history that robustly put Defendants on notice of the problems in this case and why Defendants should have prevented them, and how  Defendants' failures damaged Plaintiff.   **Part 2** includes my qualifications, list of prior cases in which I have testified, my fee, and more general opinions, such as the nature and purpose of credit scores and credit reports, and damages.  If appropriate, and if justified by the production of additional evidence in discovery, I reserve the right to supplement this report at a future date.

## Opinions – Introduction

In Mary Perkins White's ("Plaintiff's") case, several unfortunate realities, that is, *de facto* standards of care, which are at the foundation of long-standing routine, policies, practices and procedures, converge.

The first *de facto* standard that drives the long-standing routine, policies, practices and procedures, of the "Big Three" (Equifax, Defendant CRAs & TransUnion) credit/consumer reporting agencies (CRAs), is that they see as their primary duty as putting on the consumer's report that information which the furnisher (i.e., creditor or collector, paying customer) dictates.

The second *de facto* standard is that they see as their primary duty as keeping on the consumer's report that information which the furnisher (i.e., creditor or collector, paying customer) dictates.

The third *de facto* standard is that credit reporting is a very effective and cost effective tool for collecting debts.

When Defendant CRAs operate according to these *de facto* standards, as they did in this case, and the information regarding the consumer is inaccurate and should not be included in her consumer report and should not be used in any way to collect from her a debt which she does not owe, as they did in this case, Defendant CRAs run afoul of their duties under the Fair Credit Reporting Act (FCRA).

To be clear, this introduction is not intended to express any legal conclusions or opinions. Instead, it is intended first to address the issues of notice to Equifax and Trans Union of problems in their routine practices and procedures and the foreseeability of the fact that Equifax and Trans Union would continue inflicting damage on innocent consumers like Plaintiff if they failed to change its routine practices and procedures.

On July 21, 2010, in the trial of *__Eric Drew v. Equifax__*, as Plaintiff Drew's expert, I testified that despite what Equifax did to Eric Drew, it had no intention of changing its routine practices and procedures because Equifax was " … very satisfied with the way its system works. It's made a calculation that it's the right thing for it to do."

The following week the jury returned a verdict awarding Mr. Drew $700,000 in punitive damages, $315,000 in emotional distress damages, and $6,326.60 in economic damages, for a total of $1,021,326.60.  In response to Equifax's subsequent motion to vacate the jury award, Judge Susan Illston, denying the motion, wrote:

> Moreover, Mr. Hendricks testified that defendant long ago acknowledged these problems when it entered into agreements with the FTC and several states about reinvestigation of mixed files. TR 620:20–621:4, 621:16–621:24. And while Mr. Hendricks agreed that identity theft was not a problem at the time of the FTC order and the Agreement of Assurances, he also testified that defendant faces the same general problems with reinvestigating mixed files and identity theft because in both instances the reporting banks are confused about identity.  Mr. Hendricks concluded his direct examination by saying the following:

>> Everything in my experience, including other cases I've worked and the history I've talked about and what we see here, leads me to the inescapable opinion that Equifax is very satisfied with the way its system works. It's made a calculation that it's the right thing for it to do. And it has no intention of making the changes that I think are necessary to avoid the kind of problems that happened to Mr. Drew. TR 624:14–624:20.

> Defendant objects to the admissibility of the FTC and state Agreement of Assurances documents, and to Mr. Hendricks's testimony regarding them. Defendant argues that the documents are irrelevant, since they relate to mixed files and not identify theft, and because they predate any serious problems with identity theft. As discussed above, however, Mr. Hendricks's testimony explained why mixed files and identity theft present problems that are similarly difficult to resolve for a credit reporting agency. *See* TR 621:5–621:15. This shows that the documents are, in fact, relevant to the question of foreseeability and thus the question of willfulness.[3]

> Even if the agreements themselves (and Mr. Hendricks's testimony regarding them) were not admissible, the logic of Mr. Hendricks's conclusion would be supported by his expertise and the record.

> A *reasonable jury could determine that a credit reporting agency runs an unjustifiable risk of violating FCRA's reinvestigation requirement when it asks a bank to reconfirm the existence of a challenged account simply by asking the bank to reconfirm the account,* without even indicating that the consumer has reported that his identity was stolen. Such a conclusion would be particularly

reasonable in this case, where fraud alerts were placed on the account and other credit cards had been deleted.[4]

Defendant is not entitled to JMOL on the question of willfulness. [Emphasis added.]      [*End of Excerpts From Judge Illston's Opinion*]

Some five months later, and again 17 months later, Equifax continued to engage in "parroting" and told Plaintiff it has "verified" information that was in fact inaccurate, meaning it would remain on her Equifax report.

Plaintiff's case underscores how Equifax continues to fail to make obviously needed changes to avoid inflicting foreseeable damage to consumers arising from mixed files and inadequate reinvestigations.  It also underscores how the verdicts in Eric Drew, as well as the verdicts in Kirkpatrick, Valentine, and Williams, were not sufficient to prompt such changes.

Trans Union knew or should have known about the Eric Drew case, as some of the policies, practices and procedures that the jury found fault with – like "parroting" – are common to Trans Union.

Moreover, Trans Union (TU) was hit with a $5 million punitive damages jury verdict in the Judy Thomas case for causing and perpetuating mixed files and failing to conduct reasonable reinvestigations after receiving her disputes.  In Soghomonian, a federal jury hit TU $330,000 in actual damages and $660,000 in punitive damages for its inaccuracy- and reinvestigative-related failures.  In Cortez, a federal jury found $50,000 in actual damages and $750,000 in punitive damages. The jury foreperson voluntarily wrote the following at the end of the verdict form: "THE TRANS UNION BUSINESS PROCESS NEEDS TO BE COMPLETELY REVAMPED WITH MUCH MORE FOCUS ON CUSTOMER SERVICE AND THE CONSUMER."

Accordingly, Plaintiff's case underscores how Trans Union continues to fail to make obviously needed changes to avoid inflicting foreseeable damage on consumers.  It also underscores how the verdicts in Judy Thomas, Soghomonian, and Cortez were not sufficient to prompt such changes.

### Summary of Opinions

- A well-known and long-standing cause of credit report inaccuracy is creditors furnishing inaccurate data to consumer reporting agencies ("CRAs"). (See "History & Context.") Defendants Green Tree Servicing ("Green Tree") and GMAC Mortgage ("GMAC") knew or should have known that they were furnishing false information to Defendant CRAs, but nonetheless continued.

- Despite having this knowledge, Green Tree and GMAC wrongly "verified" or otherwise instructed Defendant CRAs that false, highly damaging information should remain in the credit bureau files of Mary Perkins White ("Plaintiff").

- Similarly, Defendants Trans Union ("TU"), Equifax ("Equifax"), and Experian ("EXP") – (collectively, "Defendant CRAs") wrongly allowed Green Tree and GMAC to dictate the results of their CRA reinvestigations of Plaintiff's disputes – resulting in inaccurate, highly damaging information remaining in Plaintiff's files.  If

Defendant CRAs would have conducted reasonable reinvestigations, they would have removed the inaccurate information Plaintiff's file.

- Defendants failed to perform their accuracy- and investigative-FCRA-related duties in regards to Plaintiff's disputes. Those duties included, but were not limited to, conducting a reasonable investigation with respect to the disputed information, and reviewing all relevant information, including that which was already in their own possession, and that information which was provided by the consumer, and in the cases of Green Tree and GMAC, that information which was provided by the CRAs. In the case of GreenTree and GMAC, the duties also included instructing CRAs to delete the disputed information after it was unable to verify it, and no longer furnishing information to CRAs that GreenTree knew or should have known was false.

- In Plaintiff's case, Defendants disregarded a series of "red flags" indicating that the delinquency-related information regarding Plaintiff was inaccurate. The red flags included Green Tree's inconsistent furnishings and misrepresentations, inconsistencies between Green Tree and GMAC's furnishings, and GMAC's reputation for unreliability, and information in Defendants' possession.

- A fundamental flaw in the Defendants' policies, practices and procedures was their over-reliance on the "ACDV-exchange," which meant they did not conduct true investigations in response to Plaintiff's numerous disputes. Defendants over-relied on the ACDV-exchange despite substantial notice that their operation of the system had serious defects.

- For decades, Defendant CRAs were put on notice by a variety of events of the importance of credit report accuracy and their duty to conduct reasonable reinvestigations. Yet despite the abundance of notice, Defendant CRAs failed to adopt practices and procedures that would have prevented and/or cured the inaccuracies that damaged Plaintiff.

- The inaccurate data provided by Green Tree and GMAC remained on Plaintiff's credit reports, in part, because Defendants did not take the necessary investigative or corrective steps in response to Plaintiff's disputes. This greatly compounded the economic and non-economic damage to Plaintiff.

- The inaccurate accounts permitted and perpetuated by Defendants seriously damaged Plaintiff's creditworthiness. In fact, they destroyed her creditworthiness as long as they remained. This is because the inaccurate Green Tree and GMAC accounts constituted significant, "fresh" derogatories under the FICO scoring model. It was also because the tradelines furnished by Defendants wrongly portrayed Plaintiff as "past due."

- It is well known in our field that victims of chronic credit report inaccuracy endure a common pattern of harms. The damages suffered by plaintiff were consistent with

those experienced by other victims. In addition, Defendant violated Plaintiff's privacy in several ways.

- Green Tree disregarded its duty to notate Plaintiff's accounts as "disputed by consumer" following her direct disputes it.

### Green Tree

There were a myriad of problems, including systemic failure, in Green Tree's responses to Plaintiff's disputes. For starters, Green Tree polluted Plaintiff's loan file with misinformation and then sent that polluted misinformation "downstream" into the credit reporting system, thereby compounding her damages.

Another problem with Green Tree is that when Plaintiff disputed information, thereby requiring Green Tree to conduct a reasonable investigation, Green Tree did not consider that it *needed to investigate*. Instead, it viewed the dispute as a "request from the requester was that we *verify* the amounts, the account information on the account." [Moore, pg. 32] To "verify," Green Tree merely conducted the data comparison described above.

> Q. Now -- And why did it verify 60 days past due?
> A. Because our loan servicing system said it was 60 days past due at the end of December.
> Q. Did Green Tree do anything beyond review the information on its database?
> A. Beyond its database, no. [Moore, pg. 33]

> A. What I would tell you is that if we verify accounts payment history status, we'll check in the Green Tree servicing system, the payment history file, to see what status was of that account at month end --
> Q. Okay.
> A. -- of that month.
> Q. And so Green Tree, in this case, did not look beyond the -- the database. Is that right? Of the payment status?
> A. We did not look beyond the database. [Moore, pgs. 41-42]

Green Tree's approach of only looking at its own database was thoroughly rebuked by a federal court seven years ago (see below, <u>MBNA v. Johnson</u>). Green Tree failed to "remember what it already knew." That is, Green Tree knew (or should have known) that Plaintiff repeatedly and vehemently disputed directly to Green Tree its inaccurate records regarding her loan. To conduct a reasonable investigation, Green Tree needed to review all information in its possession that was relevant to Plaintiff's dispute. Green Tree needed to have a mechanism to ensure it remembered what it already knew before sending the ACDV back to the CRAs. Not only did Green Tree not do this, it never considered doing so, which reflected its reckless disregard for Plaintiff's rights, as well as its own duties, under the FCRA. ("A. There is no record of anybody ever accessing anything in imaging." [Moore, pg. 43.])

Q. Now, did -- in its system -- In Green Tree's system, they had a copy of her modified loan at that point, didn't they?
A. I don't know.
Q. At the time you didn't know or -- or now --
A. I don't know if we had a copy of the both parties signed modified agreement in our servicing system or not.
Q. Are you -- are you aware that Mary White had provided it at this point?
A. I'm aware that Mary White had provided us a copy of a modified agreement that she had signed. And I don't know the date that she had provided that, I'm sorry.
Q. Okay. Now, in closings, people usually have their own signed agreements. Isn't that right?
A. Yes.
Q. So did Green Tree expect her to go into the County records and -- and pull the -- the records herself?
MS. BEANE: Objection to form. And you're outside the 30(b)(6) topics for this witness.
MR. GREEN: You can answer.
THE WITNESS: Oh, I don't know --  … Yes, we expect the customer to provide us documentation of something that occurred prior to us servicing the loan for us to have that information to review and respond to, yes.
BY MR. GREEN: Q. And it will mark her late not paying her mortgage until it receives it from her. Is that fair to say?
A. Yeah.   [Moore, pgs. 41-42]

Moreover, Green Tree and GMAC had Plaintiff's contact information.  Green Tree did not hesitate to use Plaintiff's contact information to communicate with her directly when it sought to collect money (which, in fact, Plaintiff did not owe.) Green Tree and GMAC not only failed to use Plaintiff's contact information to reasonably investigate her dispute, they never considered doing so, which further reflected their reckless disregard for Plaintiff's rights, as well as its own duties, under the FCRA.

Thus, Green Tree did nothing more than check its own records, which were causing the inaccuracy in the first place.  This did not amount to a reasonable investigation.  Given the context, Green Tree's failure to do so was reckless.

Green Tree, as a matter of policy, does not consider checking other relevant records that are easily accessible.

Q. Does anyone who's conducting consumer dispute verifications have access to the County records to see if someone did have a modified loan or what the terms are?
A. The people in the correspondence department do not have access to County records associated with this account. [Pg. 47-48]

Of course, another problem was that Green Tree's records were neither accurate nor up-to-date. In response to one of Plaintiff's follow-up disputes that it received from TU, Green Tree merely changed the derogatory status from 60-days to 30-days past due.  [TU 155 ]

6

Since Green Tree's records regarding the tradeline were filled with inaccurate and derogatory data disputed by Plaintiff, Green Tree needed to conduct a reasonable investigation to determine if and why its records were inaccurate.  To do this, Green Tree , at minimum, needed to review the information already in its possession, starting with the documents reflected in in GT397-402, 532-537, 538-574, 577-589, 596, 643-654, 655-668, 706, 716, 739,766, 779-790, 791-804, 1024-1028, 1086, 1114-1139, 1141, 1143-1167, 1169, showing that Plaintiff repeatedly notified Green Tree that this was a modified loan and was disputing its derogatory characterization of it.

As mentioned above, however, under its policy and practices, Green Tree failed to even review some of its own records that were directly relevant to Plaintiff's disputes.  Moreover, it's almost certain that Green Tree never even considered doing so. This is one more reckless aspect of the Green Tree's conduct in Plaintiff's case.

Several of the ACDVs informed Green Tree that Plaintiff claimed the account was being paid on time and that the inaccuracy was caused by erroneous furnishing by Green Tree. Nonetheless, Green Tree proceeded to mindlessly compare data points rather than conduct a true investigation, which for starters, should have commenced with a careful examination of records in Green Tree's possession that clearly would have supported Plaintiff's disputes.

Thus, Green Tree didn't investigate Plaintiff's disputes and doesn't investigate consumers' disputes as a matter of policy, procedure and/or practice.  Rather, Green Tree merely compared data with the goal of verifying them.

### GMAC, Unreliable Source of Consumer Information

It's important to remember that GMAC was the source of Plaintiff's information for both Green Tree and Defendant CRAs, and that GMAC was unreliable.

On December 7, 2009, the U.S. Treasury Dept., following an audit, told GMAC that some of its decisions regarding loan modifications were unreliable, and that all action on them should be halted until Treasury Dept. officials could meet with GMAC.  (See letter from, Paul J. Heran, Program Executive, Making Home Affordable-Compliance (MHA-C), December 7, 2009, to Mr. Joseph A. Pensabene, Executive Vice President, Chief Servicing Officer, GMAC; "However for loans [loan number redacted under FOIA Exemptions] either our review did not agree with the decision of the loan for HAMP or we were not provided with sufficient information to draw a conclusion… [W]e will be scheduling an onsite visit in the very near term to further discuss the loans referenced above. Unless action has already taken place, *we expect that no further action on these loans be taken until we meet to discuss*. [Emphasis added.] http://projects.propublica.org/docdiver/documents/253411-gmac-mha-c-audits-2nd-looks#finding-13)

**Additional Federal Standards Violated By Defendant Green Tree**

From the evidence I have reviewed thus far, it appears that Green Tree also violated
The following Federal Standards:

**15 USC § 1639f - Requirements for prompt crediting of home loan payments**

(a) **In general**
In connection with a consumer credit transaction secured by a consumer's principal
dwelling, no servicer shall fail to credit a payment to the consumer's loan account as of
the date of receipt, except when a delay in crediting does not result in any charge to the
consumer or in the reporting of negative information to a consumer reporting agency,
except as required in subsection (b).

(b) **Exception**
If a servicer specifies in writing requirements for the consumer to follow in making
payments, but accepts a payment that does not conform to the requirements, the servicer
shall credit the payment as of 5 days after receipt.

**§ 623. Responsibilities of furnishers of information to consumer reporting agencies**
[15 U.S.C. § 1681s-2] (See below)

**Why Do Defendant CRAs Persist With Legally Questionable Practices Known To Be
Damaging?**

Given that Defendant CRAs know that their long-standing practices continue:

(1) to cause erroneous data to be verified and systematically perpetuate inaccuracies, and

(2)  to risk additional adverse court opinions and jury awards on liability and damages, and
sizeable legal settlements,

then why do Defendant CRAs persist with such legally questionable practices and policies that are
known to be damaging?

The first answer goes to the *de facto* standards discussed in the introduction.

(1)  Defendant CRAs see as their primary duty as putting on the consumer's report that
information which the furnisher (i.e., creditor or collector, paying customer) dictates.

(2)  They see as their primary duty as keeping on the consumer's report that information which
the furnisher (i.e., creditor or collector, paying customer) dictates.

8

The second answer relates to Defendant CRAs' fundamental goal of "maximum possible information."

In other words, a central aspect of Defendant CRAs' business model is to meet its customers' expectation that it will not "miss out" on any derogatory information that might pertain to the consumer. That means that if a derogatory piece of information *possibly* relates to a consumer, Defendant CRAs' systems are designed to ensure its inclusion in the credit report that is sold to a subscriber. Thus, Defendant CRAs' systems are designed to capture the "maximum possible information" concerning the consumer and then include that information in the consumer's file.

The problem with Defendant CRAs' approach is that there are times that it is in direct contradiction of the FCRA's central goal of "**Maximum Possible Accuracy**." (15 U.S.C. § 1681 (e)(b)). This is particularly true when Defendant CRAs' have reason to believe that the information in question does not belong in the consumer's file. Defendant CRAs' reason to believe that information does not belong in a consumer's file is strong when the consumer has disputed information, and even stronger when Defendant CRAs' already have information supporting the consumers' dispute, as they had in Plaintiff's case.

Defendants will continue to resist changing practices that are known to systematically cause and perpetuate inaccuracies until a major change in the current paradigm persuades them finally to make long-needed changes, in my opinion.

Everything in my experience as an expert in this field, including other cases I've worked and the history and context I discuss in this report, and what we see in Plaintiff's case, leads me to the inescapable opinion that Defendant CRAs are very satisfied with the their credit reporting-related practices and procedures. They have made a calculation that their current practices and procedures are the right thing for them to do. And they have shown no intention of making the changes that are necessary to avoid the kind of problems that happened to Plaintiff, in my opinion.

### Defendants & The 'ACDV Exchange'

It is important to understand that Defendants rely on the ACDV-exchange as its principal means of responding to a consumer's dispute. As several Defendants are well aware, I have been critical that they sometimes over-rely on the ACDV-exchange for disputes – particularly cases like this one, involving erroneous furnishing – that require careful consideration or true investigation in order to be resolved satisfactorily.

In this case, Defendants relied on a sometimes-defective ACDV-exchange system, and then compounded the problem and damage to Plaintiff by operating it defectively.

The ACDV-exchange is inadequate for many disputes requiring careful consideration because it essentially consists of an exchange of messages known as "Automated Consumer Dispute Verifications" (ACDVs). When the consumer sends his dispute to the CRA, the CRA populates the ACDV form with his identifying information (name, address, city-state-zip, SSN,

sometimes previous address),[1] and information showing how the account is reflected in the CRA records, which is based entirely upon the furnisher's furnishing, and a two-or three-digit, or alpha-numeric code that categorizing the dispute.

Upon receipt of the ACDV form, the furnisher will compare the information in its system to the information on the ACDV. If the information on the ACDV matches sufficiently with the furnisher's file, the furnisher will then "verify" the information to the CRA, or"instruct" it to make modifications so the bulk of the damaging information remains, or instruct the CRA to delete the information.

Thus, this process is better described as a ***comparison*** of each entity's existing data on the consumer, rather than an independent evaluation or investigation of the consumer's dispute.

As this case illustrates, there can be several problems with the ACDV-exchange serving as the principal means of responding to consumer disputes. First, a cursory exchange of messages does not amount to an investigation under any normal sense of the word. The Webster's New Collegiate Dictionary defines "investigate" as, "v. To observe or study by close examination and systematic inquiry. Systematic—adj. Marked by thoroughness and regularity." An exchange of messages is neither a "study by close examination" nor "marked by thoroughness and regularity," in my opinion. Thus, in the Plaintiff's case, Defendants never truly investigated their disputes.

Second, because of the emphasis on exchanging ACDVs and comparing existing account information, coupled with the hurried, conveyer-belt-styled environment in which that occurs, under Defendants' policy and practices, they almost certainly failed to take the time to review and consider readily available information that supported Plaintiff's disputes.

For example, Plaintiff's 12/07/09 dispute to Trans Union provided a thorough, detailed dispute, which fully explained how and why the GMAC and Green Tree tradelines were inaccurate. In addition, Plaintiff attached supporting documentation that compellingly supported her dispute. But because TU's policy was to allow the furnisher to dictate the results of TU's reinvestigation, TU, at best, did not pay adequate regard to Plaintiff's dispute package, and at worst, disregarded much if not all – of it. Given the context, this disregard was reckless.

Furthermore, after Equifax finally corrected the Green Tree account, pursuant at least in part to Green Tree's communications, Equifax failed to correct the GMAC account – despite the fact that the GMAC account had the same "opened" date (10/20/06), the same type of loan (Code "89," home equity), the same "credit limit" ($200,000), and the same ECOA code (" I "), and significantly, GMAC told Equifax that Plaintiff's "account [was] transferred to another lender."

But when Plaintiff disputed the account, and told Equifax to compare it to the Green Tree account, Equifax likely disregarded these important, identical data items because in the ACDV-exchange, Equifax permitted the furnisher to dictate the results of its so-called "reinvestigation" – even when two furnishers' contradictory furnishings supported the Plaintiff's dispute.

---

[1] The CRAs often refer to identifiers as "indicative data"

In other words, it should have been clear to Defendant CRAs that Plaintiff was disputing all derogatory data that Green Tree and GMAC had furnished regarding these tradelines.

Thus, we can see that Defendant CRAs' responses to Plaintiff's disputes, which were a direct result of their policies and practices, were not reasonably calculated to determine whether Plaintiff's disputes would be investigated or should have been honored. Given the context, this was reckless.

Fourth, because the Defendants in this case relied principally on the ACDV-Exchange, they did not consider taking other reasonable investigative steps that could have been more effective for dealing with Plaintiff's disputes. For example, given that the ACDV informed Green Tree and GMAC that the inaccuracies were caused by Green Tree's and GMAC's erroneous furnishing, Green Tree and GMAC should have either (1) examined records in their possession that supported Plaintiff's claim (i.e., remember what they already knew); or, alternatively (2) interviewed Plaintiff for any additional information they thought it needed. After all, Defendants had the Plaintiff's contact information.

Fifth, Defendant CRAs' dispute handling processes are biased in favor of furnishers over the word of consumers, which in my opinion, reflects disregard for the FCRA's goals of fairness and impartiality. There are times when the furnisher is right and the consumer is wrong. However, there are times when the consumer is correct in pointing out that errors exist on his credit report and the furnisher is incorrect in "verifying" false data. In Plaintiff's case, it was Defendant CRAs' responsibility to analyze all available data – that from the consumer, from the creditor, and that which are in its own files – and then decide which disputed data should remain, which should be removed and which should be modified from the consumer's report. But instead of doing this, Defendant CRAs' operation of the ACDV-exchange results in "parroting."

Sixth, Defendant CRAs assuredly failed to provide GMAC and Green Tree with all relevant information regarding Plaintiff's disputes. For example, Plaintiff's 12/07/09 dispute to TU exceeded 12 pages, and included attachments that provided compelling support for her dispute. But it's unlikely that TU – or any of the Defendant CRAs' – provided this information to GMAC or Green Tree, despite a requirement that they provide all relevant information regarding a consumer's dispute to the furnisher. For starters, the system known as E-OSCAR, created by Defendant CRAs to handle disputes, does not permit Defendant CRAs to forward attachments to furnishers.

It should be no surprise then that I have previously been involved in cases like this one in which the result of an ACDV-exchange was Defendant furnishers, like Green Tree and GMAC, wrongly instructing Defendant CRAs that inaccurate and highly damaging information should remain in the consumer's CRA file, and Defendant CRAs unquestioningly obliging. This is a *de facto* industry standard, which does not comport with the FCRA's goals of fairness and accuracy.

## Damaging Nature of Inaccuracies

The inaccuracies on Plaintiff's credit reports caused by Defendants were damaging in several ways. All told, the inaccuracies destroyed her creditworthiness.

First, the inaccurate Green Tree and GMAC accounts on Plaintiff's credit reports qualified as serious derogatories that ensured profound damage to her credit score. The more recent a derogatory tradeline, the more damaging it is to a consumer's credit score. A derogatory tradeline showing "currently past due," like both the GMAC and Green Tree tradelines, is particularly damaging. (See below, "Nature and Purpose of Credit Scores.")

Second, at times the inaccurate data furnished by Defendant portrayed Plaintiff as having debts that were at the time "past due." When this happens, it typically means that a creditor will not extend credit to applicants until they "resolve" the outstanding debt. A consumer sometimes can "resolve" it by disputing it and removing it from his credit report. However, given the difficulty that this can entail, it is often easier and faster to resolve it by paying it. But Plaintiff justly refused to do this.

The damage to Plaintiff caused by Defendants' unreasonable actions, and which remained because of Defendant' inadequate investigations, were the predominant reasons for the damage to the Plaintiff's creditworthiness, and consequently, for her inability to obtain credit on the favorable terms to which she would have been entitled but for Defendants' failures.

For example, because of the inaccurate derogatories, Plaintiff was unable to complete an all-important refinancing, which would have benefited her economically. Possibly more important, it would have helped her avoid, or at least mitigate, the non-economic damages caused by the inaccuracies. The inaccuracies also damaged her by causing a reduction of her credit limits by Citi MasterCard and three times by Bank of America.

## 'Non-Economic' Damages

The above cited "economic" damages are easier to identify and quantify, and therefore easier for some people to understand.

In my experience, however, in the cases of victims of chronic credit report inaccuracy, the damage to one's well-being and lifestyle are often much more profound. For starters, the vast majority of Americans are very concerned about maintaining their good names, a fact that is reflected in FTC complaint statistics. People like Plaintiff who have worked hard for years to maintain their good name in the credit world describe it as extremely hurtful to be portrayed by supposedly reputable, nationwide organizations as irresponsible deadbeats. But that is only the beginning of the harm.

To fully understand the nature of the damage, it is necessary to recognize the inter-relationship between the "economic" and "non-economic" damage. The inaccurate tradeline set off a chain reaction that ultimately cast a dark shadow over her life. As their credit reputations are besmirched, victims of chronic inaccuracy find that opportunities once taken for granted are

12

vanishing.  Plaintiff were a case in point.

The inaccuracies caused by Defendants severely stained her credit standing, and directly and persistently interfered with any hopes she had to resume a normal life.

As mentioned, because of the inaccurate derogatories, Plaintiff was unable to complete an all-important refinancing, which would have helped her avoid, or at least mitigate, the non-economic damages caused by the inaccuracies.

This assuredly impacted how Plaintiff felt about herself in particular and about life in general, as well as her interpersonal relationships.  Like other victims of chronic inaccuracy, Plaintiff's plight symbolizes the nature of, and interrelationship between, "economic" and "non-economic" damage.

Now consider the impact that such an environment would have on a reasonable person's psyche, inter-personal relationships, ability to concentrate, organize and perform at work, and ability to enjoy life.  Clearly, any reasonable person would be negatively impacted.

Greatly compounding the harm is the frustration, stress, and trepidation that victims such as Plaintiff endure as they are unsuccessful in their reasonable attempts to restore accuracy to their credit life.  The truth was that Plaintiff's account should not have been depicted as delinquent.  However, supposedly reputable institutions like Defendants were effectively telling the financial services industry through the credit reporting system that Plaintiff was an irresponsible deadbeat.  Plaintiff truthfully told Defendants she was being unfairly and inaccurately associated with derogatory data.  Yet Defendants disregarded the essence of her disputes, as well the Defendants' duty to reasonably investigate them and restore accuracy.

## Potential Areas of Testimony: Damages Known & Common To Victims of Chronic Credit Report Inaccuracy

It is important that the trier of fact understands that victims of chronic credit report inaccuracy or identity theft often experience a series of several known and common types of negative impacts.

## Some Categories of Typical Negative Impacts of & Chronic Inaccuracy

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties
(2) Improperly denied credit because of inaccurate data, or only able to obtain credit at less favorable rates
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms
(7) Sense of helplessness, loss of control over personal data

13

(8) The emotional distress stemming from, and associated, with all of the above

The following factors could be used to gauge the severity of damage within each category.

### Key Factors To Consider When Assessing Severity of Negative Impact

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

### Plaintiff's Damages Were Consistent with Other Victims of Credit Report Inaccuracy

Plaintiff's damages were consistent with other victims of chronic credit report inaccuracy. Their experiences touched on many of the eight categories cited above. In addition to the categories above, it is important for the trier of fact to understand that it can be very stressful not knowing everyone who may have associated you with highly derogatory credit data. Moreover, in my opinion, it can be difficult to maintain constructive personal relationships under stress.[2] It can be difficult to perform adequately at one's job.

### Defendant Damaged Plaintiff's Privacy

In addition to the damages described above, Defendant damaged Plaintiff's privacy. As the U.S. Supreme Court has recognized, "To begin with, both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." (See *U.S. Dept. Of Justice v. Reporters Committee*, 489 U.S. 749 [1989].)

And, as the Supreme Court also has recognized, "… the concept of personal privacy … is not some limited or 'cramped notion' of that idea." (See *Favish v. National Archives & Records Administration*, 541 U.S. 157 [2004].)

These are some of well-known, long-standing privacy interests of Plaintiff that Defendant damaged:

- The Right To Be Let Alone – The Right To Protection of Private Life
- Reasonable Control Over Personal Information
- Intrusion upon seclusion or solitude, or into private affairs
- Public disclosure of embarrassing private facts
- Publicity which places a person in a false light in the public eye

---

[2] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifying its use of credit reports in setting insurance rates.

14

**Defendant Knew or Should Have Known Their Actions Would Have Negative Impact**

The history of credit reporting cited below, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, should have made it abundantly clear to Defendant that failing to prevent Plaintiff from becoming a victim of chronic inaccuracy would have a highly negative impact on them.

**History of Significant Inaccuracy Problems**

It is essential that the trier of fact understand that there is a long-standing problem of significant inaccuracy rates in credit reporting data.  Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of  inaccuracy, and that can potentially be detrimental to the credit system as well.[3]  This history is covered in Chapter 10 of my book, "Credit Scores and Credit Reports."  As that Chapter notes, in the early 1990s, problems with inaccuracy and "mixed files," CRA non-responsiveness and inadequate reinvestigations became the cause of complaints to the FTC.

---

[3] Williams, James (CIS), "Credit File Errors, A Report," August 7, 1989 -- The first survey of 1,500 consumer reports and found serious error rate of 42% to 47%;

Consumers Union, "What Are They Saying About Me?  The Results of A review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993,
Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%).  The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" ConsumerReports.org, July 2000.

Consumer Federation of America and National Credit Reporting Association, Credit Score Accuracy and Implications for Consumers, December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer Data and Credit Reporting," Federal Reserve Bulletin, February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," June 2004

Of particular note was the 1993 study done by the U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC." Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

These and other complaints prompted the FCRA's oversight authorities – the FTC and State Attorneys General – to launch investigations and take enforcement actions. These actions resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding mixed files and the reappearance of previously deleted data, being more responsive and conducting adequate reinvestigations.

On October 26, 1992, TransUnion signed a "Consent Order" with 18 State Attorneys General (AGs).

The first problem identified by the 1992 State AG Agreement was the need to avoid the occurrence or reoccurrence of mixed files. The Agreement defined "Mixed File" as a ***"Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the Consumer Report."*** The 1994 FTC Consent Order's definition of Mixed File was identical. The Agreement also emphasized the importance of using "full identifying information," defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."

Moreover, in the 1992 agreement with the State Attorneys General, Trans Union agreed to adhere to the following practices:

iv.     Upon receipt or documentation from the Consumer which Trans Union determines is reliable and/or authentic and which supports the Consumer's version of the disputes information, correcting or deleting the dispute item…

v.      As to Consumer disputes concerning Mixed Files, assigning such disputes, for investigation and resolution, to Senior Investigators who are experienced in handling such disputes. In such cases the Investigator shall, as appropriate: 1) pull all files which may be involved in the dispute; 2) fully verify disputed tradelines to determine whether the tradeline is owned by the Consumer in whose file it resides; 3) make any changes, deletions, or additions to correct the Consumer's file and resolve the dispute; and 4) for files which are found to be mixed, prepare a summary and hard copies of the files involved to the systems support division of the Data Processing Department, for review and analysis by that Department as to the need for corrective action…

Finally, the agreement defined "Derogatory Information," as

… Information in a Consumer Report or File indicating a bankruptcy adjustment plan, bankruptcy, liquidation, reorganization, charge off,

16

collection account, charge off now paying, deed in lieu of foreclosure, foreclosure proceedings, government claim, late payment, paid by dealer, paid charge off, paid collection account, paid foreclosure, paid repossession, repossession, judgment or tax lien.

## History: Increased Attention on Role of Furnisher

This Consent Agreements are relevant because (1) they created widespread publicity about the problems of credit report inaccuracy, (2) they articulated (an agreed upon) higher and more specific standard of care to ensure accuracy and fairness, and (3) they formed the foundation for the 1996 Amendments to the FCRA.  However, Congress knew that to ensure accuracy, it needed to go beyond the Consent Agreements by placing duties on furnishers to report information accurately.

 The April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary: "Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time.  Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state.  ***Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest.  Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors."***  [Emphasis Added]

Importantly, the Consent Agreements' language on preventing reinsertion was incorporated and expanded upon in the 1996 Amendments to the FCRA.  Under Sect. 1681 (a)(5)(B), information cannot be reinserted unless it is "certified" as complete and accurate by the furnisher.  Moreover, a CRA, five business days prior to any reinsertion, must notify the consumer, and also provide the name and address of the furnisher and inform him or her of his right to add a statement.

Despite these Consent Decrees, the problems of mixed files, inadequate reinvestigations and reappearance did not go away.  Throughout the early 1990s, Congress held a series of hearings in which numerous consumers and consumer advocates described problems with inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations.  This resulted in the 1996 legislative amendments to the FCRA.

I cite this brief history because it makes clear that for many years, that Defendant CRAs and furnishers like Green Tree and GMAC have been on notice from Congress, the FTC, State AGs, the media and the public that it is important to ensure accuracy, and to reasonably investigate consumer disputes, and that it can be highly damaging when inaccurate information is not removed.

## Notice: 2003 FACT Act Amendments, Congressional Testimony

In fact, Congress re-visited the FCRA, devoting all of 2003 to extensive hearings and concluding with sweeping amendments to bolster consumers' rights to accuracy and fairness.

Included in the amendments were new provisions that strengthened the duty on furnishers like GMAC to ensure the accuracy of the information they furnish to CRAs. Below is the original standard from the 1996 Amendments, which is then followed by the 2003 strengthened, amended provision, which Congress felt was necessary because furnishers like Green Tree and GMAC continued to be a consistent source of inaccuracy:

**§ 623. Responsibilities of furnishers of information to consumer reporting agencies**    [15 U.S.C. § 1681s-2]

(a) Duty of Furnishers of Information to Provide Accurate Information
(1) Prohibition
(A) *Reporting information with actual knowledge of errors.* A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate.

In the 2003 FCRA Amendments, known as the FACT Act, Congress tightened this standard by replacing the rather weak "knows or consciously avoids knowing" standard with the "knows or has reasonable cause to believe" standard.

During the 2003 House hearings on the FACT Act Amendments, several witnesses testified about some furnishers' consistent failure to live up to their accuracy duties, both in furnishing and in responding to consumer disputes.

Leonard Bennett, a consumer attorney specializing in FCRA cases who previously had sued other furnishers over inadequate investigations, was sharply critical of their "investigations" procedures in his testimony, stating that these furnishers "confessed to a policy of automated investigations in which the consumer has almost no hope of obtaining relief. The furnishers merely proofread the form from the CRA and match it to the data within their computer's account screen."  (Testimony Leonard Bennett before the Subcommittee on Financial Institutions And Consumer Credit of the Committee on Financial Services, Regarding, "Fair Credit Reporting Act: How it Functions for Consumers and the Economy;" June 4, 2003.  http://financialservices.house.gov/media/pdf/060403lb.pdf)

### Notice – 4th Circuit's Opinion in Johnson v. MBNA

Two federal courts – U.S. District Court for the Eastern District of Virginia and the U.S. Court of Appeals for the Fourth Circuit – issued opinions that held unequivocally that the type of ACDV-Exchange-and-ID-data-comparison conducted by a furnisher did not amount to a reasonable investigation under the FCRA.  I quote at length from these two opinions not to express any legal opinions or conclusions, but because, in my expert opinion, these very important court rulings provided important notice to furnishers regarding the need to change their investigation procedures.

By way of background, the FCRA lawsuit, filed by Leonard Bennett, stemmed from an MBNA MasterCard opened by plaintiff Linda Johnson's ex-husband, Edward Slater, in 1987 – four years before he married her. They had since divorced. Johnson said she was only an authorized user, which meant she

18

was not responsible for paying the account. In December 2000, Slater filed for bankruptcy, and MBNA promptly removed his name from the account. That same month, MBNA contacted Johnson and informed her that she was responsible for the approximately $17,000 balance on the account. After obtaining copies of her credit report from Experian, Equifax, and Trans Union, Johnson disputed the MBNA account with each of them. Experian and Trans Union sent automated consumer dispute verifications (ACDVs) to MBNA specifically indicating Johnson's claim that she was not a co-obligor on the account.

MBNA agents responded by conducting the ACDV-Exchange, comparing the disputed data with the account information contained in MBNA's computerized Customer Information System (CIS). Since the two were identical, MBNA "verified" that the disputed information was correct.  In other words, MBNA did nothing more than confirm that it indeed reported the original (inaccurate) data. The CRAs continued to report it on Johnson's credit report.

Tricia Furr, an MBNA credit reporting specialist, confirmed that MBNA's "Desktop Procedure" manual directs specialists to confirm a match of two out of three identifiers – name, address and/or SSN. Once a two-out-of-three match is established, MBNA can inform the CRA that the disputed information is "verified as reported." Ms. Furr said that MBNA's "reinvestigations" did not go beyond the information contained in its own CIS.[4]

Reading from MBNA's internal records, MBNA Vice President Edward Hughes quoted an MBNA employee's communication to a customer's attorney: "It would be up to (c)ard holder to prove MBNA was reporting wrong, not MBNA proving right."

The jury disagreed with MBNA's argument that its actions did not violate the FCRA, and awarded Johnson $90,300 in damages.

Judge Richard Williams affirmed the jury verdict.  "According to [MBNA], the duty to investigate means that any investigation is sufficient, no matter how cursory.  Such a construction is illogical.  There would be no point in having the statute, and the requirement of an investigation, if there was no qualitative component to the investigation.  The statute itself does impose a qualitative component to the [MBNA's] negligence," Judge Williams said.[5]

MBNA appealed Judge Williams' decision.  But on February 11, 2004, a three-member panel of the U.S. Court of Appeals for the Fourth Circuit affirmed, finding that MBNA's standard response to consumer disputes did not amount to a true "reinvestigation" under the FCRA.

"MBNA argues that the language of § 1681s-2(b)(1)(A), requiring furnishers of credit information to 'conduct an investigation' regarding disputed information, imposes only a minimal duty on creditors to briefly review their records to determine whether the disputed information is correct," the panel wrote, in an opinion authored by Chief Judge William W. Wilkens. "Stated differently, MBNA

---

[4] The depositions of MBNA personnel were taken in the case, <u>Linda Johnson v. MBNA America Bank, N.A.</u>,  Slip Op. No. 3:02 cv 523, U.S. District Court For The Eastern District of Virginia (Richmond Division).
[5] <u>Johnson v. MBNA</u>, op. cit., bench ruling February 24, 2003

contends that this provision does not contain any qualitative component that would allow courts or juries to assess whether the creditor's investigation was reasonable."[6]

"The key term at issue here, 'investigation,' is defined [by the dictionary] as 'a detailed inquiry or systematic examination.' Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors," he wrote.

Further, he said, the statute "uses the term 'investigation' in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute – and, ultimately, correct – inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, unreasonable inquiries by creditors. We therefore hold that § 1681s-2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified."

MBNA also tried to argue that its investigation in Johnson's case was reasonable. But the court pointed to the specific nature of Johnson's dispute, and the testimony of MBNA agents that their investigation was primarily limited to (1) confirming that the name and address listed on the ACDVs were the same as the name and address contained in the Customer Information System, and (2) noting that the CIS contained a code indicating that Johnson was the sole responsible party on the account.

"The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications. Based on this evidence, a jury could reasonably conclude that MBNA acted unreasonably in failing to verify the accuracy of the information contained in the CIS," Judge Wilkens wrote.

When read in conjunction with the Third Circuit's opinion in *Cushman v. Trans Union Corp.*, (115 F. 3d 220, 225 (3d Cir. 1997)), which held that "parroting" did not amount to an adequate investigation, Johnson should have made it perfectly clear to Defendant that they needed to conduct a true, qualitative investigation in response to Plaintiff's disputes.

## Automation & Credit Reporting

Like other creditors, Green Tree and GMAC use automated data processing systems that are set up to systematically furnish information on consumer accounts ("tradelines") to CRAs. As long as the data on consumers are accurate from beginning to end, the systems work relatively well. However, when erroneous information stemming from say, a creditor's reckless or negligent errors, enters the system, pollution in the form of inaccuracy travels "downstream" into the credit reporting system, which in turn, is channeled back to any creditor that views the credit report of the victim. When this happens, the consumer finds himself on the "wrong side of the system."

While this system is efficient at processing millions upon millions of transactions, it often proves intractable to victims of inaccuracy who seek to correct obvious errors. There are systematic reasons for

---

[6] Johnson v. MBNA America Bank: 357 F.3d 426 (4th Cir. 2004).

this.  A fundamental reason is that most of the data input and processing is automated, while corrections require human involvement.  Another reason is that the system, as operated by the CRAs and furnishers like Wachovia, can be very resistant to acknowledging mistakes and to correcting errors.

It need not be this way.  As was discussed above, there were years of history and robust notice to both CRAs and furnishers like GMAC of the types of common wrongs that were afflicted upon Plaintiff, and the damage they cause.   There was also robust notice as to how policy makers expected Defendant CRAs and furnishers like Green Tree and GMAC to make the necessary changes to prevent such problems.

But Defendant essentially disregarded this history and notice and repeated the wrongs that previously were inflicted on other consumers.  Consequently, Plaintiff found themselves on the wrong – and therefore quite damaging – side of the system.

A furnisher like Green Tree or GMAC typically furnishes information to CRAs under three separate scenarios.  First, there is a monthly systematic-batch process by which it furnishes updates on all of its customers' credit histories. Second, a creditor will furnish updated information on a specific customer to a CRA after receiving a communication or dispute directly from that customer.  The creditor typically communicates this type of update to the CRA using a form known as an "AUD," (automated universal data form) or "UDF," (universal data form).  Third, creditors sometimes will provide updated information on a specific customer after that customer disputes the data to the CRA, and the CRA forwards that dispute to the creditor, and the creditor "investigates" the customer's dispute and communicates its conclusion to the CRA.  The creditor typically communicates this type of update to the CRA using a form known as an "ACDV" (automated consumer dispute verification).

If Green Tree or GMAC sends CRAs an AUD instructing CRAs to delete certain inaccurate information, and then subsequently reports the same or substantially similar information to CRAs in course of its monthly systematic-batch process, this means that Green Tree or GMAC furnished information to CRAs that it knew to be inaccurate.

All of the above sections on "context" are relevant for several reasons, including foreseeability,[7] in my opinion.

---

[7] (See *Eric R. Drew v. Equifax Information Services*, LLC: USDC-N.D. Calif. – No. C 07-00726 SI, "Order Denying Defendant's Renewed Motion For Judgment As A Matter Of Law And Alternative Motion For A New Trial," Judge Susan Illston, writing,

"Plaintiff's expert witness, Evan Hendricks, testified not only as to the unreasonableness of defendant's reinvestigation procedures, but also as to the foreseeability of the problems that arose in this case. As part of his testimony, and over defendant's objection, Mr. Hendricks discussed a 1995 consent order between defendant and the Federal Trade Commission and a 1992 "Agreement of Assurances" between defendant and a number of states." …

"Defendant objects to the admissibility of the FTC and state Agreement of Assurances documents, and to Mr. Hendricks's testimony regarding them. Defendant argues that the documents are irrelevant, since they relate to mixed files and not identify theft, and because they predate any serious problems with identity theft. As discussed above, however, Mr. Hendricks's testimony explained why mixed files and identity theft present problems that are similarly difficult to resolve for a credit reporting agency. *See* TR 621:5–621:15. This shows that the documents are, in fact, relevant to the question of foreseeability and thus the question of willfulness." …

## Potential Areas of Testimony: General Issues, Context

A.    **The Nature and Purpose of Credit Scores**
B.    **The Nature and Purpose of Credit Reports**

## Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems.  If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in time.  The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax, Experian and Trans Union and others.  The scoring range for the FICO "classic" model is 300-850.  The various types of "Beacon" scores sold by Equifax, and "Classic FICOs" sold by Trans Union and Experian, are based upon the FICO model. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

---

"Even if the agreements themselves (and Mr. Hendricks's testimony regarding them) were not admissible, the logic of Mr. Hendricks's conclusion would be supported by his expertise and the record.
A reasonable jury could determine that a credit reporting agency runs an unjustifiable risk of violating FCRA's reinvestigation requirement when it asks a bank to reconfirm the existence of a challenged account simply by asking the bank to reconfirm the account, without even indicating that the consumer has reported that his identity was stolen. Such a conclusion would be particularly reasonable in this case, where fraud alerts were placed on the account and other credit cards had been deleted." …

"Defendant is not entitled to JMOL on the question of willfulness."

In a footnote, Judge Illston added,

[Continuation of Footnote #3]: "5 Defendant argues that it is being punished for earlier, dissimilar acts that were the subject of the FTC order and the Agreement of Assurances about which Mr. Hendricks testified. Any danger that defendant was punished for the actions that were subject to the FTC order and the Agreement of Assurances is outweighed by the relevance of the documents and Mr. Hendricks's testimony to the question of foreseeability and thus willfulness, which are properly considered by a jury when calculating punitive damages."

For example, the Web site of Fair Isaac Corp., www.myfico.com,[8] gives this example of the difference that credit scores make in terms of interest and monthly payments, on a $300,000 30-year, fixed-rate mortgage:

| Your FICO® Score | Your Interest Rate | Your Monthly Payment |
|---|---|---|
| 760 - 850 | 3.581% | $1,361 |
| 700 - 759 | 3.803% | $1,398 |
| 680 - 699 | 3.980% | $1,429 |
| 660 - 679 | 4.194% | $1,466 |
| 640 - 659 | 4.624% | $1,542 |
| 620 - 639 | 5.170% | $1,642 |

A similar chart exists for auto loans.  Moreover, about half of the major credit card companies practice "Universal Default," meaning that these companies will raise their cardholders' interest rates if those cardholders' credit scores drop below certain levels – even if the cardholder never had a late payment with the company.[9]

1.    The precise workings of the FICO score are highly proprietary and therefore closely guarded.  However, the general parameters are publicly available:[10]

**35% -- Payment history.**  Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

**30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

**15% -- Length of Credit History.**  The longer you maintain a positive credit history, the better it is for your credit score.

**10% -- How Much New Credit?.**  This relates to "inquiries" that creditors make when you apply for credit.

**5% -- Healthy Mix of Credit?**  The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

2.    It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months.  The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that the more recent the delinquency, the greater negative impact.

---

[8] Visited January 9, 2012
[9] Universal default is described in detail in Chapter 22 of the 2nd Edition of "Credit Scores and Credit Reports," op. cit.
[10] These parameters are published in Chapter 1 of both Editions of "Credit Scores and Credit Reports," op. cit.

**Previous credit performance** 



Copyright © 2003 Fair Isaac Corporation. All rights reserved.

There is growing public awareness about credit scoring, but it is by no means complete. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

> Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low 500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates. http://www.consumerfed.org/092104creditscores.PDF

A March 2005 General Accounting Office study found that about one-third of respondents had obtained their credit scores. While 70 percent of respondents correctly identified the definition of a credit score and understood many of the factors that could impact credit scores, only 28 percent could provide a number within a range of possible credit scores. In addition, consumers were more familiar with some of the factors that affected credit scores than with others. For example, while most consumers knew that skipping loan payments or making late credit card payments had a negative effect on credit scores, about half did not know that using all the credit available to them, such as reaching the maximum limit on a credit card or home equity loan, had a negative effect. Also, when asked about information that had no effect on credit scores (such as a low checking account balance), about half of consumers answered the questions incorrectly or said that they did not know, the GAO found.[11]

---

[11] General Accounting Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts" (GAO-05-223). www.gao.gov/new.items/d05223.pdf

## Nature & Purpose Of Credit Reports

Similar to credit scoring, there is growing public awareness about the credit reporting system, but it is not universal.

According to a July 2003 survey by the Consumer Federation of America, "Only 25 percent of Americans – and less than 20 percent of those with incomes below $35,000 – said they knew what their credit score was. But only three percent of Americans could, unprompted, name the three main credit bureaus-Experian, Equifax, and Trans Union-that provide both lenders and consumers with information from credit reports.  Forty-three percent of Americans (35 percent of those with incomes below $35,000) said they had obtained a copy of their credit report from the three credit bureaus in the past two years."

A March 2005 General Accounting office report concluded that the public's understanding of credit reports and credit scores was improving, but that a federal education campaign was needed to better inform those segments of the population that remain unfamiliar with the systems.  The report found that 60 percent of respondents had seen their credit reports, most often because they were making a large purchase or refinancing a loan. Most of these consumers said that they understood their reports.  However, about half (53 percent) did not know that information could stay on their report for 7 or 10 years.[12]

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports.  Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN).  There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans Union and Experian.  The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others.  The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history.  It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)     A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.

---

[12] *Ibid.*

(2)    A section with the consumer's **payment history**, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.

(3)    <u>If applicable</u>, a section showing **public record** information, like bankruptcies, court judgments and tax liens.

(4)    A section showing **inquiries**, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1) A form for disputing errors, and
(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format.  A fundamental purpose of the credit report is to describe a consumer's creditworthiness.  For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan).  The code for someone who always paid her credit card on time would be "R1."  Here are the numeric codes:

- 2 : 30-59 Days Past Due
- 3 : 60-89 Days Past Due
- 4 : 90-119 Days Past Due
- 5 : Over 120 Days Past Due
- 7 : Included in Wage Earner Plan
- 8 : Repossession
- 9 : Charge Off
- Blank : No Data available for that month
- 0 : Too new to rate, or unrated
- 1 :  On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries.  It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card.  Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness.  This is known as an "Account Review."  Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers.  Some employers use consumer reports to evaluate job applicants.  Insurers use

credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

## Background & Qualifications (Curriculum Vitae Attached)

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u>, 3rd Edition, (Privacy Times 2005), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation:

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (3rd Edition, Privacy Times 2007. The book has 23 Chapters, 399 pages and 415 footnotes. As the title indicates, it describes how the credit scoring and credit

reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights.  I also am co-author of <u>Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society</u> (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts.  As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data.  In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets.  To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.  Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

I have testified numerous times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information.  (Consult CV for list of hearings and Web links to testimony.)

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[13]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[14]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[15]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[16]

---

[13] http://banking.senate.gov/03_07hrg/071003/index.htm
[14] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[15] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[16] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

I regularly present at Continuing Legal Education or professional seminars related to the FCRA. (Consult CV.)

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

## Testimony & Expert Reports

I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies.  Expert report, deposition, trial testimony.  Judge Lourdes Baird presiding.  The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures.  (see 225 F.3d 1063 (2000)).

Angela P. Williams vs. Equifax Information Services, LLC, et al., Circuit Court for the Ninth Judicial Circuit, Orange County Florida.  Credit Reporting. Expert disclosure and report. Deposition. Trial Testimony.  Judge George A. Sprinkel IV presiding.

Eric Robert Drew  vs. Equifax Information Services, LLC, et al., U.S. District Court for the Northern District of California, Case No.  CV 07-00726-SI.  Expert report, Deposition, Trial Testimony. Judge Susan Illston presiding.

Dennis Hollidayoke vs. JBL Mortgage Network: In the Circuit Court for Anne Arundel County, Maryland, No. 02C10155944.  Expert report, Deposition, Trial Testimony.

Direct Data Solutions, Inc., v. Bailey & Associates Advertising, Inc.: Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, Florida; Case No.:  07-9322 CA 09.  Judge Jerald Bagley presiding.

Brenda F. Campbell v. Experian: U.S. District Court for the Western District of Missouri  (No. 07-2514).  FCRA.  Expert report, deposition. Trial Testimony.  Judge Nanette K. Laughrey presiding.

Laura Jones v. Capital One:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case 09-14499-BFK, Chapter 7. Post-bankruptcy credit reporting. Expert report. Trial Testimony.  Judge Brian F. Kenney presiding, said from the bench:

> "Before we begin with Mr. Hendricks, a brief disclosure. I had a case a few years ago. Mr. Hendricks may recall that I was representing a creditor in which Mr. Hendricks was identified as an expert witness in the Eastern District of Virginia. I believe it was the Sloane case, Mr. Hendricks. I took Mr. Hendricks' deposition and I subsequently moved to exclude him as an expert in the case on a Daubert challenge. I lost the Daubert challenge. The court allowed him to testify as an expert witness; and I will say, during the course of his deposition and the Daubert challenge, I learned quite a bit about credit reporting. Just in the interest of full disclosure, I'll disclose that to the parties."

In Re: MicroBilt Corp. et al., U.S. Bankruptcy Court for the District of New Jersey (Trenton Div.); Case No.  11-18143 (MBK).  Deposition, Trial Testimony.  (I was retained by MicroBilt counsel Bruce Luckman, who in previous years as counsel for TransUnion, unsuccessfully opposed me with a Daubert challenge in the Sandra Cortez case (see below).

Steven W. Haberman v. PNC Mortgage Company, et al.: U.S. District Court for the Eastern District of Texas [Sherman Div]. Case No. 4:11cv126.  FCRA, identity theft. Expert report. Deposition. Trial Testimony.  Magistrate Judge Amos L. Mazzant presiding.

Harold & Beryllin Gamby v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Michigan [Southern Div.] (CV-06-11020-MO).  FCRA, identity theft. Expert report. Deposition. Trial Testimony.  Judge Marianne O. Battani presiding.

Deborah Adams v. National Engineering Service Corp./Verifications Inc.,: U.S. District Court for the District of Connecticut.  3:07-cv-01035-JCH.  FCRA.  Expert report, deposition. Trial Testimony.  Judge Warren W. Eginton presiding.

Rebecca L. Valentine. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 05-801-JO. FCRA, identity theft. Expert report. Deposition. Trial Testimony.  Judge Robert E. Jones presiding.

Nicole Robinson vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  Expert reports.  Deposition. Trial Testimony   Judge Walter H. Rice presiding.

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  Expert reports.  Deposition. Trial Testimony   Judge Leonie M. Brinkema presiding.

Matthew Kirkpatrick v. Equifax, LLC,  U.S. District Court for District of Oregon, (Slip. Op. CV-02-1197-MO.  FCRA  Expert report. Trial Testimony. Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv—05684-JF.  FCRA.  Expert Report. Daubert Hearing. Trial Testimony. Senior Judge John P. Fullam qualified me to testify at trial.

Patricia Holmes vs. TeleCheck Intl., Inc., U.S. District Court for the Middle District of Tennessee (Nashville Div.).  FCRA. Expert report. Deposition. Trial Testimony.  Chief District Judge Todd J. Campbell presiding.

Dennis F. Hollidayoke v. JBL Mortgage Services, Inc., et al: Circuit Court for Anne Arundel County, Maryland; No. 02C10155944. Trial Testimony. Judge Paul A. Hackner presiding.

Tracy Terry v. Cheryl Shepard, Eve Shepard, Frank Ferro, and STAR Consulting, LLC, CAL08-03428 -- In the Circuit Court for Prince George's County, Maryland, Michele D. Hotten, Associate Judge presiding.  Breach of contract. Damage to credit. Trial testimony.  September 22, 2009.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D.  FTC Section 5.  Expert Report.  U.S. Magistrate Judge William C. Beaman rejected Defendant's motion to exclude my testimony.

31

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia: No. 4:04CV82. FCRA. Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD. FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony. Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report. Fairness hearing testimony. Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony
Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony. Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE. FCRA. Expert report, deposition, trial testimony. Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition. Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr. v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition. On the eve of trial, Judge Richard Williams rejected Defendant's motion to disqualify me. The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony.  Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22.  Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

Ilene Modica v. American Suzuki Financial Services, TransUnion, LLC, & Equifax Information Services, LLC: U.S. District Court for the District of Arizona. (2:11-CV-02183-PHX-DGC) Expert report. Deposition.

Denise Acquafredda v. Experian Information Solutions, et. al: U.S. District Court for the District of Arizona – (No. CV 2011-054368).  Expert report. Deposition.

Jose Calderon v. Experian Information Solutions: U.S. District Court for the District of Idaho (No. 1:11-cv-00386-EJL).  Expert report. Deposition.

First Carolina Bank v. Charles S. McCue, et al.:  In The Court of Common Please, Fourteenth Judicial Circuit, State of South Carolina, County of Beaufort.  Civil Action No: 07-CP-07-03027. Deposition.

Maria Pintos v. Pacific Creditors Assoc., et al.:  U.S. District Court for the Northern District of California [Oakland Div.]  C 03-5471 CW. Expert report. Deposition.

Marie Ann Fuges v. Southwest Financial Services, LTD: U.S. District Court for the Eastern District of Pennsylvania (No 09-699).  Expert report. Deposition.

Alisha Wilkes v. Experian Information Solutions, et al.: U.S. District Court for the Eastern District of Virginia (CV- 1:10-cv-01160-CMH -TRJ).  Expert report. Deposition.

Serena Beachley v. PNC Bank N.A.: U.S. District Court for the District of Maryland [Northern Div., Case No. CCB-10-1774. Expert report. Deposition.

In re: Pammalla Shannon Uplinger v. Rees Broome, P.C,,: U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria Div.); Case No. 90-13129-RGM. Expert report. Deposition.

Jose Soto v. Capital One Auto Finance, et al.: U.S. District Court for the District of Western Washington (2:08-cv-01838-RSM).  Expert report, deposition.

Terri N. White, Jose Hernandez, et al. v. Experian Information Solutions, et al.: USDC-Central Dist. Of California; Case No. 05-cv-1070- DOC (MLGx).  Declarations, Deposition.

Tara Andrews v. Equifax Information Solutions, Inc., et al.: U.S. District Court for the Western District of Washington; (No. 2:09–CV–00817–JJC).  Expert report. Deposition.

Michelle Jansen v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. 05-CV 0385-BR.  Expert report. Deposition.

James Byrd v. TransUnion LLC, Experian Information Solutions, Inc., Equifax Credit Information Services, LLC: U.S. District Court for the District of South Carolina [Columbia Div.]. Expert report. Deposition.

David L. Jackson v. Trans Union, et al.: U.S. District Court for the District of Oregon. FCRA. No. CV-08-0060-MO. Expert report. Deposition.

Richard Chakejian v. Equifax Information Services, LLC. : U.S. District Court for the Eastern District of Pennsylvania; No. 07-2211.  Bruce A. Summerfield v. Equifax Information Services, LLC. : U.S. District Court for the District of New Jersey; No. 08-1450.   FCRA.  Expert reports.  Consolidate deposition.

Marlos Uzzell v. Experian Information Systems, Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 2:08-CV-02538-CMR). Expert report. Deposition.

Baxter Robinson v. Chase Mortgage Services, Inc., et al.: U.S. District Court for the District of South Carolina (Charleston Div.) (2:08-cv-02087-PMD).  Expert report, deposition.

Risa Joyce Deutsch v. Arrow Financial Services LLC, et al: U.S. District Court for Middle the District of Florida [Tampa]; No. 8:08-cv-01469. Damage to credit.  Expert report, deposition.

Michael D. Scott, et al. v. Graphic Center, CalPERS, et al.:  Superior Court of the State of California, County of Los Angeles.  Case No. BC390593397636.  Data breach. Declaration.

Christopher K. Jung v. Trans Union, et al.: U.S. District Court for the Eastern District of Pennsylvania (No. 07-2514). Expert report, deposition.

Robert Saindon v. Equifax Information Services, et al.: U.S. District Court for the Northern District of California (08-cv-01744 WHA).  Expert report, declaration. Deposition.

Christina Lee v. TransUnion, et al.: U.S. District Court for the District of Oregon (CV-07-0998-MO).  Expert report, deposition.

Emelia Pasternak v. TransUnion, et al.: U.S. District Court for the Northern District of California. Case No. 4:07-cv-04980-CW Expert report, deposition.

Stacy Fiano v. Experian Information Solutions, et al., U.S. District Circuit Court of the Southern District of Florida 9:08-cv-80555.  Expert report, deposition.

Alana Valerie Sheldon v. Trans Union, LLC., LVNV Funding, LLC, & Resurgent Capital Services L.P.: U.S. District Court for the District of Maryland; 8:08-cv-00057-PJM.  Expert report, deposition.

_In Re: Cellphone Termination Fee Cases_, Superior Court of the State of California, Alameda County, JCCP No. 4332.  Deposition.

_Karl Benedikt v. ChoicePoint, Inc._: U.S. District Court for the District of New Jersey [Newark Vicinage]; 07-2569. Expert report, deposition.

_Abdirizak Gayre v. CSC Credit Services, Inc., Equifax Information Services, LLC, and Afni, Inc._: U.S. District Court for the District of Minnesota (C.A. No. 07-CV-0622 [JRT/FLN]). FCRA. Expert report, deposition.

_Erin Ayles v. Experian Information Solutions, Inc._: U.S. District Court for the Eastern District of Virginia (Alexandria Division); 1:07cv 662.  Expert report, deposition.

_Maria D. v. Comcast Corp._, Sacramento Superior Court, Case No. 03AS05745. Deposition.

_Terri N. White, et al. v. Experian Information Solutions, Inc._, U.S. Dist. Ct. Central Dist. Of Calif. – Case No. 05-cv-1070- DOC (MLGx); Lead Case. Expert declarations. Depositions.

_In Re: Farmers Insurance Co., Inc., FCRA Litigation_, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F.  FCRA. Expert report, deposition.

_Steven E. Beck v. Equifax Information Services, et al._: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA.  Expert report, deposition.

_Mary Ann Whiteker, et al. v. Chase Bank, et al._.

_Ford Motor Credit Co. v. Sudesh Agrawal_, Court of Common Pleas, Cuyahoga Country, Ohio; Case No. CV04536588.  Credit reporting and credit scoring. Deposition.

_Larry Alabran v. Capital One Services, Inc._: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

_Gail Cope v. MBNA American Bank NA_: U.S. District Court for the District of Oregon; No. 04-CV-493-JE**.**  Expert report, deposition.

_Robert Gordon Peoples v. Experian Services Corp., et al._: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

_Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank_: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

_Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc_: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE.    FCRA. Expert reports. Deposition

Bruce Danielson v. Experian Information Solutions:  U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc.: USDC-Minnesota – No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

Anthony Chin v. State Dept. Federal Credit Union: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition.  Trial testimony.

James M. McKeown v. Sears Roebuck & Co., et al: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

Paulette Field v. Trans Union LLC, et al., Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div.  FCRA. Expert report.  Deposition.

Earle E. Ausherman, et al. v. Bank of America Corporation et al.: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438.  FCRA. Expert report.  Deposition.

Jesse Klco v. Elmhurst Dodge, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433.  FCRA.  Expert report, deposition.

(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis.: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.

Anthony & Alethea Preston v. MGIC, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.

Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc., U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

Karen Nienaber, et al. v.Citibank (South Dakota) N.A.,: U.S. District Court for the District of South Dakota [Southern Div.}; Civ. No. CIV 04-4054.  Declaration relied upon by court in settlement hearing.

## FEE

My fee is $300 per hour for preparation, consulting trial testimony, plus reasonable travel time, plus travel costs and expenses; $400 per hour, or a minimum of $1,200 per day, for deposition testimony, plus reasonable travel time, plus travel costs and expenses.

# *Evan D. Hendricks*

## *CURRICULUM VITAE*

**Professional Activities**

1981- Present        **Editor/Publisher** of ***Privacy Times***

      Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA).  The newsletter ranges from 8-12 pages, 23 issues per year.  Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present        Expert Witness**

Qualified by the federal courts in FCRA and identity theft cases.  (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

**1998 – Present        Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004    Member, Experian Consumer Advisory Council**

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

**July – October 2002        Consultant to U.S. Postal Service**

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks        P.O. Box 302        Cabin John, MD 20818**
**(301) 229 7002  (301) 229 8011 [fax]  <u>evan@privacytimes.com</u>**

---

**Recent Testimony Before Congress & The FTC**

"Keeping Score on Credit Scores: An Overview of Credit Scores, Credit Reports and their Impact on Consumers," House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit Hearing, March 24, 2010.[17]

"What Borrowers Need to Know About Credit Scoring Models and Credit Scores," House Financial Services Subcommittee on Oversight, July 29, 2008.[18]

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.[19]

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006[20]

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005[21]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005[22]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[23] Senate Banking Committee, March 15, 2005

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[24]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[25]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[26]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[27]

---

[17] http://www.house.gov/apps/list/hearing/financialsvcs_dem/fihrn_03242010.shtml
[18] http://www.house.gov/apps/list/hearing/financialsvcs_dem/hr072908.shtml
[19] www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml
[20] http://energycommerce.house.gov/108/Hearings/06202006hearing1938/Hendricks.pdf
[21] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[22] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[23] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[24] http://banking.senate.gov/03_07hrg/071003/index.htm
[25] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[26] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[27] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**

Credit Scores and Credit Reports: How The System Really Works, What You Can Do [3rd Edition] (Privacy Times, 2007)

Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

Former Secrets: Government Records Made Public Through The Freedom of Information Act (Campaign For Political Rights, 1982)

**International Lectures**

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales – Presentation published in conference proceedings, 2002)

The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne – Presentation published in conference proceedings, 2001)

The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)

The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).

In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and Privacy Commissioner of Australia.

**Presentations/Instruction At Recent CLE & Professional Seminars**

"Key Privacy Statutes - FCRA and Background Check Problems," Conference on Effective Consumer Privacy Enforcement, Univ. of California-Berkeley Samuelson Law, Technology & Public Policy Clinic. Oct. 13-14, 2011. Berkeley, Calif.

"Annual FCRA Conference," National Association of Consumer Advocates. May 20-21, 2011. Memphis, Tenn.

"91st Annual New York Meeting," Commercial Law League of America (CLLA) November 12, 2010

"2010 NCLC Consumer Rights Litigation Conference," National Consumer Law Center. November 13, 2010.  Boston, Mass.

"26th Annual Consumer Bankruptcy Course," State Bar of Texas. June 3, 2010. Dallas.

"Consumer Protection Law Comm. Representing Main Street: A Consumer Law Primer" Florida Bar Association; June 26, 2009.  Orlando.

"Second Law and Information Society Symposium: Enforcement, Compliance and Remedies in the Information Society," Presenter, "Credit Report Cases – Effective Remedies?"  Center on Law and Information Policy (CLIP), Fordham Law School, New York, May 29-30, 2008.)[28]

"The 1st Annual Privacy Law Scholars Conference," Presenter, "Assessing Privacy Harm: How can victims of privacy violations prove that they have been harmed?  The George Washington University Law School, Washington, DC, June 12-13, 2008.[29]

"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21, 2006 (New York City)

"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer Law Center, October 27, 2005

"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005

"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute, February 28- March 1, 2005 (New York City)

"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004

"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process," Glasser LegalWorks, Sept. 28-29. 2004

"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

**Professional Societies**

Past President & Board Member, American Society of Access Professionals www.accesspro.org

**Industry Certification**

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

**Media**

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money Magazine), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.

---

[28] http://law.fordham.edu/ihtml/eventitemPP.ihtml?id=37&idc=8943&template=clip
[29] http://privacyscholars.com

**Education**

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

**MATERIALS CONSIDERED**

In specific preparation for this case, in addition to documents cited in this report, I have reviewed the following:

Plaintiff's Second Amended Complaint
Plaintiff's credit reports
Various correspondences by Plaintiff & Defendants
Bates-stamped documents produced by Plaintiff & Defendants
Defendants' and Plaintiff's Answers and Responses to Interrogatories

I also include as foundations for my specialized knowledge the following:

The Fair Credit Reporting Act & Consumer Credit Reporting Reform Act of 1996
Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement,
National Consumer Law Center, 1998 (Boston)
Credit Scores and Credit Reports: How The System Really Works, What You Can Do
(3rd Edition, Privacy Times 2007),

My opinions in this case are also supported by my 35-year professional experience in following privacy developments, including those relating to the consumer reporting as a journalist, editor, publisher and privacy expert.  My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other cases relating to the FCRA and/or fair information practices.


**Executed This The 9th Day of October 2012 in Bethesda, Maryland**



**/s/  Evan D. Hendricks_____**
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002