**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE RESIDENTIAL CAPITAL, LLC, *et al.*,

Debtors.

Case No. 12-12020 (MG)
Chapter 11
Jointly Administered

### DECLARATION OF MARK A. STRAUSS IN SUPPORT OF FINAL APPROVAL OF PROPOSED *ROTHSTEIN* CLASS ACTION SETTLEMENT (CLAIM NOS. 4074 AND 3966), PLAN OF ALLOCATION, AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS FOR NAMED PLAINTIFFS

I, MARK A. STRAUSS, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm of Kirby McInerney LLP, counsel for Named Plaintiffs Landon Rothstein, Jennifer Davidson, Robert Davidson, and Ihor Kobryn ("Plaintiffs") in connection with Plaintiffs' Bankruptcy Proofs of Claim[1] and the related lawsuit brought by Plaintiffs in the District Court, *i.e.*, *Landon Rothstein et al., v. GMAC Mortgage, LLC, et al.*, No. 12-cv-3412 (AJN) (S.D.N.Y.) (the "*Rothstein* Action."). I was actively involved in the prosecution and resolution of the Bankruptcy Proofs of Claim and in the prosecution of the *Rothstein* Action, am intimately familiar with each of those proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision and active participation in such prosecution.[2]

2.      I respectfully submit this Declaration in support of Plaintiffs' motion pursuant to Fed. R. Bankr. P. 7023 and 9019 for final approval of the class action Settlement and Plan of Allocation. I also submit this Declaration in support of the motion by Plaintiffs' Counsel, Kirby

---

[1] Plaintiffs' Bankruptcy Proofs of Claim are Claim No. 4074 against GMAC Mortgage, LLC ("GMACM") and Claim No. 3966 against Residential Capital, LLC.

[2] All capitalized terms not otherwise defined shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement with Rothstein Plaintiffs, dated December 29, 2015 (the "Stipulation"), which is attached as Exhibit 1 to the Declaration of Mark A. Strauss dated January 11, 2016, which was filed with the Court on January 11, 2016. *See* Doc. 9491-2.

McInerney LLP, and Plaintiffs' Special Bankruptcy Counsel, Hogan McDaniel (collectively, "Class Counsel"), for an award of attorney's fees and reimbursement of expenses incurred in connection with the filing, prosecution and resolution of Plaintiffs' Bankruptcy Proofs of claim and the filing and prosecution of the claims against GMACM and Ally in the *Rothstein* Action.

## I.    THE BENEFITS OF THE SETTLEMENT TO THE CLASS

3.    Plaintiffs are residential mortgagors whose loans were serviced by GMACM and who were charged by GMACM for Lender-Placed Insurance ("LPI").  Plaintiffs claimed that GMACM — together with certain other defendants named in the *Rothstein* Action, *i.e.*, the Balboa Defendants — perpetrated a scheme to overcharge Plaintiffs for LPI in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), and applicable state law.

4.    The Settlement resolves Plaintiffs' Bankruptcy Proofs of Claim in exchange for an allowed unsecured claim not subject to subordination, represented by Claim No. 4074, in the amount of $13 million, against GMACM.[3]

5.    The face value of the Allowed Claim is equal to 16% of the approximately $80 million in aggregate out-of-pocket losses that Plaintiffs' Counsel, assisted by Plaintiffs' Forensic Accounting Expert, estimate were suffered by the Class as a result of the alleged scheme.

6.    The Allowed Claim will be an "Allowed Borrower Claim" in Class GS-5, as set forth in the Chapter 11 Plan.  Such claims are estimated under the Disclosure Statement to yield a $0.30 per $1.00 recovery from the Borrower Claims Trust.  Given this payout rate, the Allowed Claim is expected to yield a distribution by the Borrower Claims Trust to Plaintiffs and the Class of $3.90 million.

---

[3] Claim No. 3966 will be disallowed and expunged on the Settlement Effective Date.

7.      Plaintiffs and Class Counsel believe that the Settlement represents an excellent result for the Class.  It establishes a non-reversionary common fund which will be distributed to qualified Class Members.  Accordingly, the Class will receive cash, and not coupons or *cy pres* relief as in many consumer class action settlements.

8.      Furthermore, Class Members will not be required to file claims.  Rather, Plaintiffs' Counsel, with the assistance of Plaintiffs' Forensic Accounting Expert, has already identified each Class Member and determined their respective Recognized Losses.  This was accomplished through computerized, algorithmic analysis of loan payment data and LPI records of GMACM (the "Class Data") that were supplied by the Liquidating Trust.  Under the Plan of Allocation, Class Members whose allocation of the Net Settlement Fund is $10 or more, as calculated from the Class Data, will receive a distribution without having to do anything.  By this procedure, it is anticipated that, once the Settlement is finally approved, the Borrower Claims Trust distributes the Distribution Amount to the Escrow Agent, and the Court enters the Class Distribution Order, the Settlement Administrator will issue approximately 61,788 distribution checks to qualified Class Members.

9.      Hence, Class Members will participate in the Settlement to the fullest extent possible.  There is no question that Settlement Class Members will receive a significant recovery in this case.

10.     The Settlement is exemplary compared to other recent LPI class action settlements, which almost uniformly have been "claims made," and did not involve a common fund. [4]  In those cases, there has been no assurance that the defendants would pay any material

---

[4] *See, e.g., Casey. v. Citibank*, No. 12 Civ. 00820, Settlement Agreement and Release, ECF. No. 144-4, at 7 (N.D.N.Y. Feb. 5, 2014; *Diaz v. HSBC Bank USA, et al.*, No. 13 Civ. 21104, Stipulation and Settlement Agreement, ECF No. 101-1, at 8 (S.D. Fla. Feb. 28, 2014; *Fladell et al., v. Wells Fargo Bank, et al.*, No. 13 Civ. 60721, **[footnote continued on next page]**

consideration apart from the plaintiffs' attorneys' fees. Understandably, many of those settlements have been challenged as collusive and unfair.[5]

11.     In comparison, only a single Class Member has opted out of, or objected to, the Settlement in this case to date.

12.     The Settlement is also an excellent result in light of the difficulties that Plaintiffs and the Class faced in proving their claims. GMACM vigorously denied liability, and had numerous potentially availing defenses, including that: (i) Plaintiffs' claims were barred by the filed-rate doctrine; (ii) the proposed class did not meet the requirements of Bankruptcy Rule 7023; and (iii) Plaintiffs failed adequately to allege, and could not prove, their RICO claims.

13.     Indeed, in *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256 (2d Cir. 2015), the Second Circuit held that the filed-rate doctrine barred Plaintiffs' claims against the Balboa Defendants, *i.e.*, GMACM's former co-defendants in the *Rothstein* Action. Those claims were essentially identical to those asserted by Plaintiffs against GMACM. Accordingly, had there been no Settlement, it is highly likely that the Court would have determined that this binding authority mandated dismissal of the Bankruptcy Proofs of Claim.

14.     Additionally, the Settlement was reached only after extensive litigation by Plaintiffs in both the District Court and the Bankruptcy Court, and after months of arm's-length, vigorous negotiations between the Settling Parties.

_____

Stipulation and Settlement Agreement, ECF No. 158-1, at 24 (S.D. Fla. Mar. 5, 2014; *Saccoccio v. JP Morgan Chase Bank*, No. 13 Civ. 21107, Stipulation and Settlement Agreement, ECF No. 59-1, at 23 (S.D. Fla. Sept. 6, 2013; *Hall v. Bank of Am., et al*., No. 12 Civ. 22700, Settlement Agreement, ECF No. 376-1, at 22 (S.D. Fla. Apr. 3, 2014).

[5] *See Casey*, No. 12 Civ. 820, Campbell Objection, ECF No. 183, at 11 (N.D.N.Y July 7, 2014); *Diaz*, No. 13 Civ. 21104, Kirktindoll Objection, ECF No. 165, at 12 (S.D. Fla. Aug. 27, 2014); *Fladell*, No. 13 Civ. 60721, Vanskyock Objection, ECF No. 193, at 5 (S.D. Fla. Aug. 19, 2014); *Saccoccio*, No. 13 Civ. 21107, Aquino Objection, ECF No. 97, at 5 (S.D. Fla. Jan. 15, 2014); *id*., Pearson Objection, ECF No. 93, at 9 (S.D. Fla. Jan. 13, 2014); *Hall*, No. 12 Civ. 22700, Trapasso Objection, ECF No. 412, at 2 (S.D. Fla. Sept. 26, 2014).

## II.    THE COURT'S PRELIMINARY APPROVAL ORDER AND PLAINTIFFS' DISSEMINATIONOF PRE-HEARING NOTICE

15.    Plaintiffs moved for preliminary approval of the Settlement on January 11, 2016.

*See* Doc. 9491.  On February 9, 2016, Plaintiffs filed a certificate of no objection, and the Court

issued the Order Preliminary Approving Proposed Settlement with the *Rothstein* Plaintiffs (the

"Notice Order") (annexed as Exhibit A hereto).  *See* Docs., 9606, 9609.

16.    In the Notice Order, the Court made the following findings, determinations, and

directives, among others:

> a.    granting preliminary approval of the Settlement as sufficiently fair, reasonable and adequate to warrant dissemination of notice to the Class and a hearing on the fairness of the Settlement;
>
> b.    certifying the Settlement Class for settlement purposes, appointing the Named Plaintiffs as class representatives, and appointing Plaintiffs' Counsel, Kirby McInerney LLP, as counsel for the Settlement Class;
>
> c.    scheduling a hearing (the "Final Approval Hearing") for May 24, 2016, at 10:00 a.m., to consider, among other things, whether the Proposed Settlement is fair, reasonable, and adequate and should be finally approved; whether the proposed Plan of Allocation is fair and reasonable and should be approved; whether the Final Approval Order as provided under the Stipulation should be entered; whether the application by Class Counsel for an award of attorneys' fees and reimbursement of Litigation Expenses should be granted; and whether Class Counsel's application for incentive awards for the Named Plaintiffs should be granted;
>
> d.    approving the form, substance and requirements of the notice of the proposed Settlement, including the Notice, the Summary Direct U.S. Mail Postcard Notice, and the Publication Notice;
>
> e.    appointing KCC Class Action Services ("KCC") as the Settlement Administrator to administer the notice program and Settlement under the supervision of Plaintiffs' Counsel, and directing that the notices be disseminated; and
>
> f.    establishing procedures and deadlines for Class Members to exclude themselves from or to object to the Settlement, Plan of Allocation, or the attorneys' fees and reimbursement of expenses requested by Class Counsel.

17.    Annexed hereto as Exhibit B is the Declaration of Jay Geraci on behalf of KCC regarding the notice procedures conducted in this case, dated April 25, 2016 (the "KCC Decl.").[6] In his Declaration, Mr. Geraci attests to, among other things, the efforts made to disseminate the Notice, the Publication Notice, and the Summary Direct U.S. Mail Postcard Notice, all in compliance with the Notice Order.  KCC Decl. ¶¶ 5.

18.    The Notice contains a thorough description of the Settlement and the proposed Plan of Allocation.  *See* KCC Decl. Ex. A.  The Notice also apprises Class Members of their rights to participate in the Settlement, to object to the Settlement, the Plan of Allocation or the application for attorneys' fees and expenses, or to exclude themselves.  *See id.*  The Notice also informs Class Members of the intention of Class Counsel to apply for an award of attorneys' fees in an amount that will not exceed 35% of the Settlement Fund, and for reimbursement of expenses in the approximate amount of $250,000.  *See id*.

19.    The Notice fairly apprises Class Members of their rights with respect to the Settlement and therefore is the best notice practicable under the circumstances, and complies with the Court's Notice Order, Federal Rule of Civil Procedure 23, and due process.

20.    As Mr. Geraci attests, KCC caused 143,973 copies of the Summary Direct U.S. Mail Postcard Notice to be mailed to those persons whose names appear on the Class Member List provided by the Borrowers Claims Trust pursuant to the Notice Order.[7]  *See* KCC Decl. ¶ 15.

---

[6]  KCC serves in two capacities in connection with this Settlement.  In addition to being the Court-approved Settlement Administrator, KCC has been Plaintiffs' Database Hosting Provider in connection with the storage and analysis of the Class Data, as described more particularly in Mr. Geraci's declaration and below.

[7] As described in the Stipulation and the Notice, the Liquidating Trust initially produced the Class Data to KCC in anonymized form, *i.e.*, each borrower was assigned a unique identifying number, with all Personally Identifiable Information ("PII"), including names, mailing addresses, property addresses, and loan account numbers removed. *See* Doc. 9491-3, Strauss Decl. Ex. 1 at ¶ 28.  On or about February 14, 2016, KCC generated a computerized list of the anonymized numbers corresponding to the Settlement Class Members as determined from the Class Data.  KCC caused such list to be provided it to the Borrower Claims Trust on behalf of Plaintiffs in accordance with the Notice **[footnote continued on next page]**

Before causing this mailing, KCC caused the addresses in the Class Member List to be updated using the National Change of Address system, which updates addresses for all people who had moved during the previous four years and filed a change of address with the U.S. Postal Service. New addresses were found for 10,581 Class Members.  The Class Member List was updated with these new addresses.  *See* KCC Decl. ¶¶ 10, 16-20.

21.    In order to provide Class Members with information concerning the Settlement, as well as downloadable copies of the Notice, KCC also established a dedicated website, www.GMACMortgageLenderPlacedInsuranceClassActionSettlement.com.  *See* KCC Decl. ¶ 13.

22.    KCC also caused the Publication Notice to be published in the USA Today on February 23, 2016 and transmitted over the PR Newswire on February 23, 2016.    *See* KCC Decl. ¶ 14.

23.    KCC also caused an Interactive Voice Response system to be established at a toll-free number (844-830-5220) to provide information about the Settlement and to record requests for copies of the Notice.  *See* KCC Decl. ¶ 12.

24.    As directed by the Court, Plaintiffs' Counsel has actively monitored the progress of the notice program through telephone and conferences and email communications with KCC. Accordingly, Plaintiffs' Counsel has been able to monitor the: (i) the number of copies of the Summary Direct U.S. Mail Postcard Notice mailed by KCC, (ii) the number of copies of the Summary Direct U.S. Mail Postcard Notice re-mailed to updated addresses; (iii) the number of copies of the Summary Direct U.S. Mail Postcard Notice returned as undeliverable; and (iv) the number of exclusions requested.

---

Order.  *See* KCC Decl. ¶¶ 7-8, 10.  On or about February 19, 2016, the Borrower Claims Trust provided KCC with a computerized list of the Settlement Class Members in de-anonymized form, *i.e.*, the Class Member List.

25.    To date, 143,973 copies of the Summary Direct U.S. Mail Postcard Notices have been mailed by KCC, 24,358 have been re-mailed to an updated address, 1,904 have been returned as undeliverable, and 1 valid request for exclusion have been received.

26.    Plaintiffs' Counsel has also established a team of paralegals to handle inquiries about the Settlement from Settlement Class Members.    To date, the team has handled approximately 4,605 contacts from Class Members and provided copies of the Notice to 395 Class Members.

## III.    THE SUBSTANCE OF PLAINTIFFS' CLAIMS

27.    Plaintiffs initially asserted their claims against GMACM in the *Rothstein* Action which was filed on April 30, 2012.    *See Rothstein* ECF No. 1.    In their 44-page complaint, Plaintiffs claimed that GMACM and the Balboa Defendants[8] perpetrated a fraudulent scheme in violation of RICO to overstate GMACM's LPI costs, and, thereby, to recoup inflated reimbursements from Plaintiffs, who were obligated to indemnify those costs under their mortgages.    Plaintiffs alleged that the Balboa Defendants gave GMACM secret premium "rebates, *i.e.*, kickbacks," but that GMACM nevertheless charged Plaintiffs and the Class based on the full premiums.    *See id.*, ECF Nos. 1, 25, 39 at ¶¶ 17-22.    Plaintiffs further alleged that the defendants concealed the rebates/kickbacks by funneling them through certain related-party transactions.    In particular, under an undisclosed agreement between Newport and GMACM, Newport provided GMACM with millions of dollars in outsourced services at no charge. Meanwhile, Balboa and Meritplan secretly compensated Newport for the provision of such

---

[8] The Balboa Defendants consisted of GMACM's LPI carriers, Balboa Insurance Company ("Balboa") and Meritplan Insurance Company ("Meritplan"), and their affiliate, Newport Management Corporation ("Newport"). *See* Doc. 9491-3 at 3; *Rothstein* ECF No. 39, at 8-9.

services through "intercompany expense allocations" which were derived from GMACM's LPI premiums. *See id.,* ECF No. 39 at ¶¶ 9, 71, 74, 257, 263.

28.    Plaintiffs alleged that the services that Newport provided to GMACM constituted undisclosed, in-kind rebates conferred by the Balboa Defendants as a *quid pro quo* for GMACM's agreement to purchase its LPI exclusively from Balboa and Meritplan.  Plaintiffs further alleged that, in light of the rebates, GMACM paid less than the full premiums for the LPI, yet had no right under the mortgages to be indemnified more than it actually spent.  Plaintiffs thus alleged that the rebates, which materially reduced GMACM's expense, should have been deducted from what Plaintiffs were charged.  *See Rothstein*, ECF No. 39 at ¶¶ 7, 69, 83, 113, 118, 272, 318.

29.    On May 14, 2012, two weeks after Plaintiffs commenced the *Rothstein* Action, GMACM and certain of its affiliates filed this Chapter 11 Bankruptcy proceeding.

30.    Following the bankruptcy filing, on September 28, 2012, Plaintiffs filed a 91-page First Amended Class Action Complaint in the *Rothstein* Action.  On January 22, 2013, Plaintiffs filed a 108-page Second Amended Complaint (the "SAC") in the *Rothstein* Action.  *See Rothstein* ECF Nos. 25, 39.

31.    In their amended pleadings, Plaintiffs withdrew their claims against GMACM due to the automatic stay in the bankruptcy.  However, Plaintiffs named GMACM's non-debtor affiliates, Ally Bank ("Ally Bank") and Ally Financial, Inc. ("AFI") (collectively, "Ally"), as new defendants based on theories of veil-piercing, alter-ego liability, and agency law.  *See Rothstein*, ECF No. 39, at ¶ 190.

32.    Specifically, Plaintiffs alleged that AFI exercised "complete domination and control" over GMACM such that piercing the corporate veil and holding AFI responsible for

GMACM's conduct was warranted.  In support of their veil piercing allegations, Plaintiffs set forth more than a hundred paragraphs of allegations.[9]  Plaintiffs alleged that AFI, through its dominion and control over GMACM, caused GMACM to engage in the subject unlawful conduct alleged, thereby misusing GMACM's corporate form to perpetrate a fraud upon and injure Plaintiffs and the Class.  *See Rothstein* ECF No. 39, at ¶ 147.

33.     As for Ally Bank, Plaintiffs alleged that, in committing the misconduct alleged, GMACM and Newport had been acting in the course and scope of their authority as the agent and sub-agent, respectively, of Ally Bank, which had contracted with GMACM to service approximately 690,000 loans.  Plaintiffs further alleged that Ally Bank was aware of or recklessly disregarded GMACM's misconduct, while ratifying, and retaining the fruits, thereof. Plaintiffs alleged that the fact that Ally Bank paid GMACM below-market rates for GMACM's loan servicing services, as admitted by the Debtors, raised an inference of *scienter* against Ally Bank.  *See Rothstein* ECF No. 39, at ¶¶ 21, 66, 141.

## IV.    RELEVANT PROCEDURAL HISTORY

### A.    The *Rothstein* Action

34.     As set forth above, Plaintiffs filed their 44-page initial complaint in the *Rothstein* Action on April 30, 2012, their 91-page First Amended Class Action Complaint on September 28, 2012, and their 108-page SAC on January 22, 2013.  *See Rothstein* ECF Nos. 1, 25, and 39.

---

[9] Plaintiffs alleged, *inter alia*, that: (i) AFI conducted the affairs of GMACM as part of a "'vertically integrated single enterprise'"; (ii) AFI caused GMACM to file for Bankruptcy; (iii) prior to the bankruptcy petition, AFI had improperly stripped ResCap, GMACM's parent, of billions of dollars of assets; (iv) AFI admitted that it controlled GMACM in public filings and regulatory consent orders; (v) AFI shared resources, management and employees with ResCap and GMACM; (vi) AFI disregarded corporate formalities in dealing with ResCap and GMACM, treating them as "business units" rather than separate entities; and (vii) AFI had agreed with regulators to monitor and control the activities of GMACM to ensure compliance with applicable law.  *See Rothstein* ECF No. 39, at ¶¶ 147-242.

35.     On February 25, 2013, the Balboa Defendants moved to dismiss the SAC.  *See Rothstein* ECF No. 43.   The Balboa Defendants' motion raised numerous issues that were potentially dispositive of Plaintiffs' claims against the Balboa Defendants' alleged co-conspirator, GMACM.   For example, the Balboa Defendants argued that the filed-rate doctrine barred Plaintiffs' claims, and that the SAC inadequately pled any RICO violations.[10]  *See Rothstein* ECF No. 44.   The Balboa Defendants also maintained that any alleged fraud was committed by GMACM, not by the Balboa Defendants.  *Id*. at 2-3, 12-20.

36.     On March 25, 2013, Plaintiffs filed a 35-page brief in opposition to the motion to dismiss.  *See Rothstein* ECF No. 50.

37.     On September 30, 2013, the District Court denied the motion.  Judge Alison J. Nathan held that the filed-rate doctrine did not apply and that the SAC adequately pled RICO violations.  *See Rothstein* ECF No. 58.

38.     The Chapter 11 Plan was filed on August 23, 2013.

39.     On March 5, 2014, in light of the Third Party Releases in the Chapter 11 *Plan*, Plaintiffs voluntarily dismissed their claims against Ally.  By this time, however, as described in detail below, Plaintiffs had reached an agreement in principle with the Settling Debtors to resolve Plaintiffs' Bankruptcy Proofs of Claim, and were working toward the finalization of the Settlement.

40.     On June 25, 2014, the Second Circuit granted a petition previously filed by the Balboa Defendants for interlocutory appeal of the District Court's decision denying the motion to dismiss.

---

[10] Plaintiffs agreed to stay their claims against Ally pending a ruling on the motion filed by Ally in the bankruptcy pursuant to Section 362 of the Bankruptcy Code to stay and enjoin those claims.  *See Rothstein* ECF No. 112.

41.     On July 22, 2015, after extensive briefing, the Second Circuit reversed the District Court.  Specifically, the Second Circuit held that the filed-rate doctrine barred Plaintiffs' claims, and reversed and remanded for dismissal.  *See Rothstein*, 794 F.3d at 259, 262-64.

### B.     The Bankruptcy Proceeding

42.     On November 9, 2012, Plaintiffs, on behalf of themselves and the putative class, filed their Bankruptcy Proofs of Claim.  In the Bankruptcy Proofs of Claim, Plaintiffs asserted the same claims against GMACM that Plaintiffs previously had pled against GMACM in the *Rothstein* Action.

43.     On December 21, 2012, Ally filed a motion (which was subsequently joined by the Debtors) requesting a determination that the claims pled against Ally in the *Rothstein* Action were stayed and enjoined pursuant to Section 362 of the Bankruptcy Code.  *See* Docs. 2511, 2793.

44.     On or about February 25, 2013, Plaintiffs' Counsel associated with Plaintiffs' Special Bankruptcy Counsel, the law firm of Hogan McDaniel, to assist Plaintiffs' Counsel in understanding and navigating the relevant bankruptcy issues and procedures, and in litigating and collecting on Plaintiffs' claims against the Debtors in the bankruptcy.

45.     On April 2, 2013, Plaintiffs filed a 22-page opposition to Ally's motion to stay and enjoin and a cross-motion for relief from any applicable stay.  *See* Doc. 3343.  In their opposition, Plaintiffs submitted that their claims against Ally were direct and personal, not derivative or otherwise property of the estate, and, hence, were not stayed by Section 362.  *See id.*

46.     On June 26, 2013, the Court approved the Debtors' entry into the plan support agreement with the Committee, Ally, and other parties.  *See* Doc. 4098.

47.     On August 28, 2013, Ally, the Debtors, and the Committee filed an amended motion seeking an extension of the automatic stay to enjoin the claims pled against Ally in the

*Rothstein* Action. *See* Doc. 4871. Shortly before Plaintiffs' objection deadline, the matter was adjourned by agreement of the parties until the Plan confirmation hearing of the Chapter 11 Plan.

48. On June 12, 2013 and July 10, 2013, respectively, the Court held status conferences with the parties. Appearing at those conferences, Plaintiffs' Counsel sought to familiarize the Court with the nature of Plaintiffs' claims and theories against Ally, and to explain Plaintiffs' position that those claims were direct and not derivative.

49. On August 8, 2013, Plaintiffs filed an Objection and Reservation of Rights (the "Objection and Reservation") with respect to the proposed plan. *See* Doc. 4578. Plaintiffs stated that they intended to object to the proposed plan to the extent that it enjoined Plaintiffs from prosecuting their claims against Ally. Plaintiffs also submitted that the proposed Third Party Releases were improper because insufficient funding was provided for the release of borrower claims. *See id.*

50. On August 23, 2013, the proposed Chapter 11 Plan was filed.

51. In or around July 2013, Plaintiffs' Counsel began to discuss a potential settlement of Plaintiffs' Bankruptcy Proofs of Claim with counsel for the Settling Debtors and counsel for the Committee. After much back and forth, these discussions culminated in a nearly day-long, arm's-length, face-to-face negotiation session on September 9, 2013, between Plaintiffs' Counsel and Counsel for the Settling Debtors. An in-house representative of GMACM attended. Counsel for the Committee was also present and greatly assisted in the negotiations.

52. The Settling Parties' face-to-face meeting was followed by additional phone calls and email exchanges between Plaintiffs' Counsel and counsel for the Settling Debtors and the Committee.

53.     Finally, on September 20, 2013, Plaintiffs' Counsel and the Settling Debtors, with the consent of the Committee, reached an agreement in principle to resolve the claims asserted by Plaintiffs in the Bankruptcy Proofs of Claim.  The agreement in principle was memorialized in an exchange of emails.

54.     As part of the agreement in principle, Plaintiffs agreed to support confirmation of the Chapter 11 Plan.  On December 11, 2013, the Court confirmed the Chapter 11 Plan with Plaintiffs' support.  On December 17, 2013, the Plan Effective Date occurred and the Chapter 11 Plan was substantially consummated.

55.     Plaintiffs' Counsel also began drafting the Stipulation and associated documentation, including the notices, and proposed orders.  Because of the unique nature and structure of the Settlement, a number of issues arose regarding the precise terms and conditions of those documents, necessitating that the Settling Parties confer extensively and exchange multiple drafts.  Plaintiffs' Counsel took the laboring oar throughout the drafting process.

56.     On January 11, 2016, the Settling Parties executed the Stipulation, thereby formalizing the Settlement.  *See* Doc. 9491-3, Strauss Decl. at Exhibit 1.

57.     As indicated above, Plaintiffs moved for preliminary approval on January 11, 2016.  *See* Doc. 9491.  On February 9, 2016, Plaintiffs filed a certificate of no objection, and the Court issued the Notice Order.  *See* Docs. 9606, 9609.

## V.     PLAINTIFFS' COUNSEL'S SUCCESSFUL EFFORTS TO OBTAIN, AND TO IDENTIFY THE CLASS MEMBERS AND DETERMINE THEIR RECOGNIZED LOSSES FROM, THE CLASS DATA

58.     As part of the parties' agreement in principle to resolve Plaintiffs' Bankruptcy Proofs of Claim, the Settling Debtors agreed to produce to Plaintiffs data and business records (to the extent that such information was within the Debtors' control or reasonably available from the Debtors' successors) regarding GMACM's LPI transactions and the payment histories of

mortgagors, *i.e.*, the Class Data. Plaintiffs' Counsel's goal was to identify the members of the Class and determine their Recognized Losses from GMACM's own records.

59.     Plaintiffs' Counsel and the Settling Debtors engaged in extensive negotiations and discussions between October 2013 and June 2014 over the production of the Class Data. The discussions were highly technical in nature. Plaintiffs' Counsel engaged Plaintiffs' Forensic Accounting Expert to advise Plaintiffs' Counsel and to help in the negotiations. Numerous, lengthy conference calls were held. Plaintiffs' Forensic Accounting Expert actively participated and advised Plaintiffs' Counsel. The Settling Debtors were at all times very cooperative with Plaintiffs' Counsel in conferring with respect to the Class Data. Through this conferral process, Plaintiffs' Counsel and Plaintiffs' Forensic Accounting Expert developed a deep understanding of GMACM's LPI procedures and the characteristics of the databases on which the relevant borrower data were accessible.

60.     On February 11, 2014, the Settling Parties filed a Stipulation and Order of Confidentiality to protect the PII of Class Members in any Class Data produced. *See* Doc. 6462.

61.     In or about June 2014, the Liquidating Trust, pursuant to a cooperation agreement it maintains with the Borrower Claims Trust, produced the Class Data to Plaintiffs' Counsel. Plaintiffs' Counsel caused the Class Data to be loaded onto the computer system of Plaintiffs' Database Hosting Provider, KCC, for analysis. The Class Data were voluminous, consisting of in excess of 8.5 gigabytes of information.

62.     In the weeks that followed, Plaintiffs' Counsel, assisted by Plaintiffs' Forensic Accounting Expert, conducted extensive computerized analysis of the Class Data. Such analysis involved the development of an algorithm to iterate through the borrower loan payment histories, making requisite calculations. Plaintiffs' Counsel developed the algorithm with the assistance of

Plaintiffs' Forensic Accounting Expert. KCC's programmers scripted the algorithm and ran it on the Class Data. Through this process, approximately 143,973 borrowers were identified as members of the Settlement Class, and the sum of money that GMACM recouped or recovered for LPI from each member of the Settlement Class was determined.[11]

63.     The Class Data have been, and continue to be, critical to the effectuation of the Settlement. Because the Class Members have been identified based on the Class Data, it was possible to send a copy of the Summary Direct U.S. Mail Postcard Notice to each Class member. *See* KCC Decl. ¶ 15. As explained below, the Class Data have also enabled the development of a Plan of Allocation based on each Class member's proportional loss. *See* Section IX, *infra*. The Class Data will also enable the allocation and distribution of the Net Settlement Fund to Class Members. Accordingly, because of the Class Data, the Class is able to participate in the Settlement to the fullest extent possible.

64.     Notably, prior to the Second Circuit's ruling in the *Rothstein* Action that Plaintiffs' claims were barred by the filed-rate doctrine, which was not until July 2015, Plaintiffs' Counsel anticipated that the Class Data would be tremendously useful in supporting Plaintiffs' planned motion for class certification in the *Rothstein* Action. Plaintiffs' Counsel planned to cite the Class Data to establish that the proposed class was manageable and that the class was ascertainable.[12] Plaintiffs' Counsel also anticipated that the proceeds of any settlement

---

[11] Less than 1% of the borrower payment histories could not be analyzed by computer due to payment-posting errors and other discrepancies. *See* Doc. 9491-3, Strauss Decl. Ex. 1 at 16. Those transactions involved only 2,997 borrowers. *Id.* Under the Stipulation, those borrowers are deemed to be Class Members, and, for purposes of the Plan of Allocation, it is assumed that GMACM recouped or recovered 42.5% of their LPI charges, reflecting the overall rate at which GMACM recouped or recovered LPI charges from Class Members in the aggregate during the Class Period. *See* Doc. 9491-3, Strauss Decl. Ex. 1, at ¶ 30.

[12] Class certification in other LPI cases had been denied in the past for failure to so establish. *See, e.g., G*ooden v. SunTrust Mortgage, Inc.*, No. 11 Civ. 02595 (JAM), 2013 WL 6499250 (E.D. Cal. Dec. 11, 2013); *Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310 (C.D. Cal. 2015).

or recovery in the *Rothstein* Action would be combined with the proceeds of the instant
Settlement, and allocated and distributed together in an efficient manner based on the Class Data.
Accordingly, Plaintiffs' Counsel strongly believed that the time and expense associated with
obtaining and analyzing the Class Data were in the best interests of the Class, even independent
of the benefits to the Class in connection with the Settlement.

## VI.    PLAINTIFFS' COUNSEL'S INVESTIGATION

65.    Plaintiffs' Counsel conducted an extensive investigation of the facts and legal
principles relating to Plaintiffs' claims prior to reaching the Settlement.  Plaintiffs' Counsel's
investigation included the review and analysis of hundreds of pages of transcripts, including
testimony of representatives of GMACM and the Balboa Defendants, from hearings on LPI
conducted by the New York State Department of Financial Services (the "NYDFS") in May
2012.

66.    Plaintiffs' Counsel also filed requests with the NYDFS for disclosure under New
York's Freedom of Information Law.  Plaintiffs' Counsel thereby obtained hundreds of pages of
documents relating to GMACM and the Balboa Defendants which Plaintiffs' Counsel also
reviewed and analyzed.

67.    Plaintiffs' Counsel also gathered, reviewed and analyzed numerous relevant
documents from available public sources, including public filings, media reports and other
materials.  Plaintiffs' Counsel also conferred with a confidential witness who previously worked
in the LPI industry.

68.    Plaintiffs' Counsel also conducted extensive research and investigation into the
legal foundation of Plaintiffs' claims prior to reaching the Settlement.  As described above,
Plaintiffs' Counsel prepared and filed Plaintiffs' 44-page initial complaint, 91-page First
Amended Class Action Complaint, and 108-page SAC in the *Rothstein* Action.  Plaintiffs'

Counsel thoroughly researched the legal bases for the causes of action therein prior to filing those pleadings. Plaintiffs' Counsel also thoroughly researched the theories of recovery that Plaintiffs asserted against Ally, *i.e.*, veil-piercing, alter-ego liability, and agency.

69.     Plaintiffs' Counsel also researched, prepared and filed Plaintiffs' 35-page brief in opposition to the Balboa Defendants' motion to dismiss. As described above, that motion involved issues that were potentially dispositive of Plaintiffs' Bankruptcy Proofs of Claim, including whether the filed-rate doctrine applied and whether Plaintiffs' RICO allegations were sufficient. As a measure of the persuasiveness of Plaintiffs' Counsel's brief in opposition — and the thoroughness of the research that it reflected — the District Court denied the motion in a 34-page decision, *see Rothstein* ECF No. 58, although the Second Circuit later reversed the District Court, remanding for dismissal, as described above, *see Rothstein* ECF No. 118.

70.     Plaintiffs' Counsel also researched, prepared and filed Plaintiffs' 22-page brief in opposition to Ally's motion to stay Plaintiffs' claims against Ally pursuant to Section 362, and in support of Plaintiffs' cross-motion for relief from any stay. Plaintiffs' Counsel worked closely with Plaintiffs' Special Bankruptcy Counsel to research and draft these papers, and to develop an understanding of the bankruptcy issues and devise a strategy for maximizing Plaintiffs' recovery from the Debtors.

## VII.    ASSESSMENT OF STRENGTHS AND WEAKNESSES

71.     Plaintiffs believe they could well have prevailed on the merits of the claims set forth in the Bankruptcy Proofs of Claim. The Settling Defendants were just as adamant that Plaintiffs would fail. Having considered Plaintiffs' claims, and evaluated the Settling Defendants' defenses, it is the informed judgment of Plaintiffs' Counsel, based upon all proceedings to date and their extensive experience in litigating class actions, that the proposed Settlement is fair, reasonable and adequate, and in the best interests of the Class. Indeed,

18

Plaintiffs' Counsel believes that the Settlement is exceptional under all the circumstances.  At minimum, the Settlement appropriately balances the risks, costs, and delay inherent in continuing to prosecute the Bankruptcy Proofs of Claim, falls within the range of reasonableness, and warrants approval.

72.    Plaintiffs' Counsel's endorsement of the Settlement is informed by a thorough understanding of the strengths and weaknesses of the claims and defenses.  Plaintiffs' Counsel's understanding was gained through Plaintiffs' Counsel's factual and legal investigation, as well as Plaintiffs' extensive litigation in the District Court and this Court, as set forth above.  Plaintiffs' Counsel additionally considered the benefit to Class Members under the terms of the Stipulation.

73.    Plaintiffs faced significant risks were they to continue to prosecute the Bankruptcy Proofs of Claim.

74.    There was also a risk that the filed-rate doctrine barred Plaintiffs' claims.  Indeed, the Second Circuit, reversing the District Court in the *Rothstein* Action, held that the filed-rate doctrine barred Plaintiffs' claims against the Balboa Defendants.  *See Rothstei*n, 794 F.3d at 259, 262-64.  As described above, those claims arose out of the same transactions as Plaintiffs' claims against GMACM.  Accordingly, had there been no Settlement, it is highly likely that the Court would have determined that Second Circuit's decision mandated dismissal of the Bankruptcy Proofs of Claim.  Had this occurred, the Class would have received nothing.

75.    The uncertain outcome of the Balboa Defendants' motion to dismiss in the *Rothstein* Action also loomed as a large risk.  That motion — which, as described above, involved issues that were potentially dispositive of the Bankruptcy Proofs of Claim (*see Rothstein* ECF No. 44) — was fully briefed and pending at the time that Class Counsel was attempting to negotiate the Settlement.  Class Counsel was keenly aware that, were the District

Court to grant the motion, it very likely would have torpedoed Plaintiffs' chances of getting any settlement from the Debtors, and rendered the Bankruptcy Proofs of Claim of little or no value. Plaintiffs' Counsel therefore sought to mitigate this risk by trying to reach the agreement in principle prior to the District Court's issuing its decision. As indicated above, the Settling Parties reached their agreement in principle just *three weeks* before the District Court decision came out. *Id*., *Rothstein* ECF No. 58.

76.     Plaintiffs also faced a large risk that the Court would refuse to certify the proposed nationwide Class which Plaintiffs sought. Numerous courts have declined class certification in LPI cases or limited the proposed class to a single state.[13] Had class certification been denied, any Class Members who timely filed proofs of claim in the Bankruptcy would have been forced to proceed individually. Other Class Members (presumably the vast majority) would have been barred by the Chapter 11 Plan releases.

77.     Plaintiffs also faced risks with respect to the applicable statutes of limitations. Had Plaintiffs been unable to prove their equitable tolling allegations, which GMACM was likely to dispute, the Class Period and recoverable damages would have been substantially reduced.

78.     Plaintiffs also would have been hampered by the fact that much of their case depended on the testimony of hostile witnesses – employees of GMACM and of the Balboa Defendants.

---

[13] *See Gooden v. Suntrust Mortg., Inc.*, No. 11 Civ. 02595, 2013 WL 6499250, at *9 (E.D. Cal. Dec. 11, 2013) (denying certification); *Gustafson v. BAC Home Loans Serv., LP*, 294 F.R.D. 529, 550 (C.D. Cal. 2013) (same); *Gordon v. Chase Home Fin., LLC*, No. 11 Civ. 2001, 2013 WL 436445, at *12 (M.D. Fla. Feb. 5, 2013) (same); *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11 Civ. 81373, 2013 WL 139913, at *13 (S.D. Fla. Jan. 10, 2013) (same); *Lane v. Wells Fargo Bank*, N.A., No. 12 Civ. 04026, 2013 WL 3187410, at *16 (N.D. Cal. June 21, 2013) (certifying only single-state class); *Williams v. Wells Fargo Bank*, N.A., 280 F.R.D. 665, 675 (S.D. Fla 2012) (same).

79.     Plaintiffs also faced substantial risks in proving damages.  "In class actions, the 'complexities of calculating damages increase geometrically.'"  *Chatelain v. Prudential-BACHE Sec., Inc*., 805 F. Supp. 209, 214 (S.D.N.Y. 1992) (citation omitted); *see In re Michael Milken and Assoc. Sec. Litig*., 150 F.R.D. 46, 54 (S.D.N.Y. 1993) (observing that proving damages often becomes a "battle of experts . . . with no guarantee of the outcome").  Here, establishing damages required expert analysis of literally millions of borrower transactions.  Plaintiffs analyzed the subject transactions in connection with the Settlement, as set forth above.  Without the willing cooperation of the Settling Defendants, however, it is highly doubtful that this difficult task could have been achieved.

80.     Another risk that Plaintiffs faced was the need to rely on expert witnesses.  To establish liability and damages, expert testimony was essential.  The acceptance of expert testimony by courts, however, is always far from certain, regardless how distinguished the source.  The Settlement avoids the risk that the Settling Defendants' competing experts would prevail, resulting in a dispositive finding or ruling against Plaintiffs and the Class.

81.     Plaintiffs also faced the risk that they would be unable to prove their RICO claims.  Plaintiffs would have had to show that GMACM "participated in a scheme to defraud" and evinced a "specific intent to defraud."  *Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co*., 785 F. Supp. 411, 424 (S.D.N.Y. 1992) (*citing United States v. Rodolitz*, 786 F.2d 77, 80 (2d Cir. 1986)).  Notably, GMACM denied having anything to do with the alleged fraud, blaming the Balboa Defendants — to which GMACM supposedly had "outsourced" the relevant activities — for any alleged wrongdoing.  *See Rothstein* ECF No. 39 at ¶ 73.

82.    GMACM also would have echoed arguments made by the Balboa Defendants that disclosures included in notices issued to Plaintiffs adequately informed Plaintiffs of the circumstances, and, hence, that no deceptive conduct occurred.

83.    Plaintiffs also faced the risk of being unable to establish proximate causation or standing under RICO.  *See Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1 (2010). GMACM would have reiterated the argument made by the Balboa Defendants that Plaintiffs themselves triggered the LPI charges by failing to maintain homeowners' insurance, and, hence, that proximate cause was lacking.

84.    Indeed, courts across the country have rendered opinions illustrating the numerous risks associated with mortgagor LPI claims.  In *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014), the Eleventh Circuit dismissed lender-placed flood insurance claims brought under Alabama law.  The court held that commissions paid by the insurer to the bank did not constitute "kickbacks" because the servicer did not owe a fiduciary duty to the borrowers.  *Id.* at 1110.  In *Cohen v. American Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013), the Seventh Circuit affirmed a decision dismissing LPI claims holding that there was nothing "'unfair'" or "'deceptive'" about the defendants' allegedly improper LPI practices.  *See also Kolbe v. BAC Home Loans Serv., LP*, 738 F.3d 432,454-55 (1st Cir. 2013) (*en banc*) (affirming dismissal of LPI claims because, *inter alia*, the plaintiff "unquestionably received value for the additional cost" paid, bank gave adequate disclosures and warnings, and bank was protecting its "reasonable and legitimate economic interests," and concluding that the plaintiffs' argument that "the only reason Defendants demanded additional flood insurance was an improper effort to self-deal . . . collecting for itself or its affiliates insurance brokerage commissions and excessive premiums" did not pass *Iqbal*'s plausibility standard).

85.    Accordingly, the Class faced significant risks, compared to the certain relief provided by the Settlement.

86.    Notably, despite facing significant risks, Class Counsel demonstrably outperformed other plaintiffs' attorneys proceeding against GMACM on similar theories.  Three other LPI-related class actions were filed against GMACM – *Ulbrich v. GMAC Mortgage, LLC et al.*, No. 11 Civ. 62424 (RNS) (S.D. Fla.), *Cronk v. GMAC Mortgage, LLC*, No. 11 Civ. 05161 (E.D. Pa.), and *Throm v. GMAC Mortgage, LLC*, No. 11 Civ. 06813 (E.D. Pa.).[14]  The claims against GMACM in each were stayed pursuant to Section 362 of the Bankruptcy Code.  Unlike Class Counsel, however, the plaintiffs' counsel in those cases failed to pursue the matter further – they did not amend their pleadings to name any non-debtor affiliates of GMACM as new defendants, or develop or plead arguably direct, personal and non-derivative theories of recovery against them, or take additional steps to position themselves for maximizing their recoveries in the bankruptcy proceeding, *e.g.*, by declaring their objection to the planned Third Party Releases.  Only Class Counsel devoted the time, effort, and expertise necessary to pursue and execute such far more sophisticated strategies, which paid off in the form of the Settlement.  In comparison, the putative classes in *Ulbrich*, *Cronk* and *Throm* recovered nothing from GMACM.[15]

87.    Additionally, Plaintiffs' Counsel negotiated the Settlement with vigor.  During the course of the Settlement negotiations, all parties were represented by experienced counsel who advocated their positions forcefully and with intensity.  Moreover, the Settlement discussions were at all times adversarial and conducted at arm's length and with the involvement of counsel

---

[14] The claims in those cases differed somewhat from those here.  The plaintiffs in *Cronk* and *Throm* complained that GMACM force-placed flood insurance in amounts that exceeded government flood insurance requirements.  In *Ulbrich*, the plaintiffs claimed that GMACM improperly backdated and improperly placed wind LPI.

[15] In *Cronk* and *Throm*, the named plaintiffs secured nominal individual (non-class) settlements with GMACM.  *See* Doc. 6131.  In *Ulbrich*, the plaintiffs obtained nothing.

for the Committee, who assisted in the negotiations. The experience and guidance of counsel for the Committee contributed greatly to the ability of the Settling Parties to reach the Settlement, and to Plaintiffs' Counsel's ability to evaluate the merits of the Settlement.

88.    Furthermore, as set forth above, Plaintiffs' Counsel conducted an extensive investigation and analysis of the facts and legal principles relating to Plaintiffs' claims prior to reaching the Settlement. That investigation and analysis enabled Plaintiffs' Counsel to gain an understanding of the relevant facts and legal issues, and prepared Plaintiffs' Counsel to participate in the Settlement negotiations on a well-informed basis.

## VIII.    REACTION OF THE CLASS

89.    To date, no objections have been received to the Settlement, the Plan of Allocation, or the amount of Plaintiffs' Counsel's fee request or expenses. Furthermore, to date, the Settlement Administrator has received only 1 valid request for exclusion from the Settlement. *See* KCC Decl. ¶ 22.

## IX.    THE PLAN OF ALLOCATION

90.    As indicated above, the Settlement establishes a non-reversionary common fund that will be allocated and distributed to qualified Class Members. *See* Doc. 9491 ¶¶ 5, 58. Class Members will not be required to file claims. Rather, Class Members have been identified and their Recognized Losses determined from the Class Data. *See* KCC Decl. ¶ 4.

91.    As set forth in the Stipulation, the Net Settlement Fund will be allocated to Class Members *pro rata* based on the Recognized Loss of each Class Member relative to the total Recognized Losses of all Class Members. Each Class Member's Recognized Loss will equal 25% of the amount that GMACM recouped or recovered from that Class Member for LPI during

the Class Period, as determined from the Class Data.[16]  *See* Doc. 9491-3, Strauss Decl. Ex. 1, at ¶ 48.

92.    Class Members whose payment histories could not be analyzed by computer due to data errors or other discrepancies (less than 1% of the Class Members) will have their Recognized Losses computed based on the assumption that GMACM recouped or recovered from them 42.5% of the LPI charges imposed.  This percentage reflects the overall rate at which GMACM recouped or recovered LPI charges from Class Members in the aggregate during the Class Period.  *See* Doc. 9491-3, Strauss Decl. Exhibit 1, at ¶ 30.

93.    Once the Settlement is finally approved, the Borrower Claims Trust distributes the Distribution Amount to the Escrow Agent, and the Court enters the Class Distribution Order, the Settlement Administrator will issue distribution checks to Class Members whose allocation is $10 or more.[17]  The total of all Class Member allocations below $10 will constitute a gross-up residual.    The gross-up residual will be re-allocated among those Class Members whose allocations are $10 or more.  Plaintiffs' Counsel, with the assistance of Plaintiffs' Forensic Accounting Expert, has estimated that the gross-up residual will constitute approximately 17% of the Net Settlement Fund.  *See* Doc. 9491-3, Strauss Decl. Ex. 1, at ¶ 48.

94.    Assuming that, as estimated by the Disclosure Statement, Class GS-5 claims yield a $0.30 per $1.00 recovery, it is estimated that, by this procedure, approximately 61,788 of the approximately 143,973 Class Members will be sent distribution checks.

---

[16] Based on its investigation, Plaintiffs' Counsel has estimated that the Balboa Defendants rebated approximately 25% of GMACM's LPI premiums by virtue of the alleged scheme.  Plaintiffs' Counsel has therefore concluded that approximately 25% of the amounts recouped or recovered by GMACM from Class Members were overcharges.

[17] Because of the administrative costs of issuing checks and the fact that small checks in class action settlements often are not cashed, Settlement Class Members whose allocation is less than the $10 threshold will not receive a distribution.  *See* Doc. 9491-3, Strauss Decl. Ex. 1, at ¶¶42, 48.

95.     Plaintiffs and Plaintiffs' Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

## X.      THE FEE APPLICATION

96.     Class Counsel are requesting a fee award of 35% of the Settlement Fund (the "Fee Application").   Class Counsel also request reimbursement of expenses in the amount of $226,938.29, plus interest.

97.     Below is a discussion of some of the factors that courts generally consider when evaluating fee applications by class counsel.

### A.      The Work and Experience of Counsel

98.     Attached hereto as Exhibits C and D are declarations of Plaintiffs' Counsel and Plaintiffs' Special Bankruptcy Counsel, respectively, in support of their request for the award of attorneys' fees and reimbursement of expenses.  Included with each declaration is a schedule that summarizes the lodestar of each firm, as well as the expenses incurred by category.  The lodestar summaries indicate the amount of time spent by each attorney and paraprofessional employed by Class Counsel's firms, and the lodestar calculations based on their current billing rates.  As attested in each declaration, the declarations were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.  For attorneys who are no longer employed by Class Counsel's firms, the lodestar calculations are based upon the billing rates for such attorney in his or her final year of employment. The lodestar amounts do not reflect any work performed in connection with Class Counsel's request for approval of attorneys' fees.

99.     Class Counsel expended an aggregate total of 2,487.00 hours in connection with the investigation, prosecution, and resolution of the Bankruptcy Proofs of Claim and the investigation and prosecution of the claims against GMACM and Ally in the *Rothstein* Action.

The resulting lodestar is $1,464,942.00. Assuming that Class GS-5 claims yield a $0.30 per $1.00 recovery, as estimated by the Plan, the requested fee of 35% of the Settlement Fund is significantly less than Plaintiffs' Counsel's lodestar and represents a negative lodestar multiplier of 0.93.

100.    Appended hereto as Exhibit E are charts demonstrating that the rates submitted by Class Counsel are in line with those prevailing in the community for similar services provided by lawyers of reasonably comparable skill, experience, and reputation.

101.    Plaintiffs' Counsel is experienced in prosecuting class actions, and worked diligently and efficiently in prosecuting Plaintiffs' Claims. Plaintiffs' Counsel has a long and successful track record in class action litigation, as set forth in the firm résumé attached to the Declaration of Mark A. Strauss on Behalf of Kirby McInerney LLP in Support of Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses, which is appended hereto as Exhibit C.

102.    Plaintiffs' Special Bankruptcy Counsel is experienced in bankruptcy litigation and well trained in all aspects of bankruptcy law, as set forth in the firm résumé attached to the Declaration of Garvan F. McDaniel on Behalf of the Law Firm of Hogan McDaniel in Support of Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses, which is appended hereto as Exhibit D.

103.    At all times Class Counsel worked closely to avoid duplication of effort and to ensure efficient prosecution.

**B.      The Standing and Caliber of Defense Counsel**

99.    The quality of the work performed by Class Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. The Settling Debtors were

represented by Morrison & Foerster LLP – one of the country's most prestigious law firms.[18]

Morrison & Foerster spared no effort in the defense of their client.   In the face of this

experienced, formidable, and well-financed opposition, Plaintiffs' Counsel was nonetheless able

to allege and argue a case that was sufficiently strong to persuade the Settling Debtors to settle

the case on terms favorable to the Class.

> C.    **The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Class Action Cases**

104.    This prosecution was undertaken by Class Counsel entirely on a contingent fee

basis.  The risks assumed by Class Counsel in prosecuting the Bankruptcy Proofs of Claim and

the claims against GMACM and Ally in the *Rothstein* Action are described above.  Those risks

are also relevant to an award of attorneys' fees.  Here, the risks assumed by Class Counsel and

the time and expenses incurred without any payment, were extensive.

105.    From the outset, Class Counsel understood that they were embarking on a

complex, expensive and lengthy litigation with no guarantee of ever being compensated for the

substantial investment of time and money the case would require.   In undertaking that

responsibility, Class Counsel were obligated to ensure that sufficient resources were dedicated to

the prosecution of Plaintiffs' claims, and that funds were available to compensate staff and to

cover the considerable out-of-pocket costs that claims such as these require.  With an average lag

time of several years for these cases to conclude, the financial burden on contingent-fee counsel

is far greater than on a firm that is paid on an ongoing basis.  Indeed, Class Counsel have

received no compensation during the course of this litigation and have incurred $1,464,942.00 in

out-of-pocket expenses in prosecuting and resolving Plaintiffs' claims for the benefit of the Class.

---

[18] Similarly, Ally and the Balboa Defendants were represented in the *Rothstein* Action by top-tier defense firms – Otterbourg, Steindler, Houston & Rosen, LLP, and Buckley Sandler, LLP, respectively.

106.    Plaintiffs' Counsel also bore the risk that no recovery would be achieved.  As discussed herein, from the outset, Plaintiffs' claims presented risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation such as this is never assured.

107.    Plaintiffs' Counsel knows from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

108.    Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able lawyers bring class actions on behalf of injured consumers.  Vigorous enforcement of civil RICO and other pro-consumer laws can only occur if experienced and able attorneys take an active role to protect consumers' rights.  If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting consumer class actions.

109.    Class Counsel's extensive and persistent efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Class.  In circumstances such as these, and in consideration of the hard work of Class Counsel and the extraordinary result achieved, the requested fee of 35% of the Settlement Fund is reasonable and should be approved.

### D.    The Lodestar/Multiplier Cross-Check

110.    As set forth fully in the accompanying memorandum of law in support of Class Counsel's fee application, the requested fees are fair and reasonable under both the lodestar/multiplier methodology and the percentage methodology.

29

111.    Exhibits C and D detail the time and expenses incurred and the hourly rates of Class Counsel.  Altogether, Class Counsel worked for a total of 2,487.00 hours, for a lodestar of $1,464,942.00, and seek a fee of 35% of the Settlement Fund.  Assuming that Class GS-5 claims yield a $0.30 per $1.00 recovery, as estimated by the Plan, this translates into a fee award of $1,365,000.

112.    Notably, the resulting negative multiplier of 0.93 strongly indicates that the requested fee is reasonable and, in fact, represents a tremendous bargain for the Class.  Indeed, Courts in the S.D.N.Y routinely award percentage-based fee awards where lodestar cross-checks yield high positive multipliers.  Multipliers of nearly five have been "deemed 'common.'"  *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *17 n.7 (S.D.N.Y. July 27, 2007) (cited by *Shapiro v. JPMorgan Chase & Co.*, No. 11 CIV. 7961 (CM), 2014 WL 1224666, at *24 (S.D.N.Y. Mar. 24, 2014)); *see also Walmart Stores Inc. v. Visa USA Inc.*, 396 F. 3d 96, 123 (2d Cir. 2005) (upholding a multiplier of 3.5 as reasonable on appeal); *Van Dongen v. CNInsure Inc.*, No. 11 Civ. 07320 (S.D.N.Y. Aug. 15, 2014) (ECF No. 57) (3.11 lodestar multiplier in a case settling for $6.6 million); *Sumitomo*, 74 F. Supp. 2d at 399-400 (multiplier of 2.5 in RICO action); *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 134 (2d Cir. 2008) (noting that 2.04 multiplier was "toward the lower end of reasonable fee awards"); *In re Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03 MDL 1529, 2006 WL 3378705, at *3 (S.D.N.Y. Nov. 16, 2006) (awarding 2.89 multiplier); *Maley*, 186 F. Supp. 2d at 369 (awarding fee equal to a 4.65 multiplier as "well within the range awarded by courts in this Circuit and courts throughout the country").

## XI. REIMBURSEMENT OF THE REQUESTED LITIGATION EXPENSES IS FAIR AND REASONABLE

113.    Class Counsel seeks reimbursement of an aggregate of $226,938.29 in expenses reasonably and actually incurred on behalf of Plaintiffs and the Class. These expenses are reflected on the books and records maintained by Class Counsel. These books and records are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred.

114.    The expenses of Plaintiffs' Counsel and Plaintiffs' Special Bankruptcy Counsel are set forth in detail in the expense schedules attached, respectively, to my declaration and that of Mr. McDaniel, which are attached hereto as Exhibits C and D. The expense schedules identify the specific category of expense, *e.g.*, on-line research, expert fees, travel costs, telephone, postage expenses and other costs actually incurred for which reimbursement is sought. These expense items are billed separately by Class Counsel, and such charges are not duplicated in the respective firms' billing rates.

115.    Notably, the lion's share of the expenses consists of reimbursement of amounts paid or payable to Plaintiffs' Forensic Accounting Expert and Plaintiffs' Database Hosting Provider. Plaintiffs' Counsel seeks reimbursement of $157,285.04 with respect to Plaintiffs' Forensic Accounting Expert and $20,573.00 with respect to Plaintiffs' Database Hosting Provider. As described above, Plaintiffs' Forensic Accounting Expert assisted Plaintiffs' Counsel in negotiating to obtain and in analyzing the Class Data. Plaintiffs' Database Hosting Provider hosted the Class Data on its computer system,[19] and programmed the algorithm (which was developed by Plaintiffs' Counsel with the assistance of Plaintiffs' Forensic Accounting

---

[19] The Class Data were too voluminous to be hosted by Plaintiffs' Counsel or Plaintiffs' Forensic Accounting Experts on their systems.

Expert) to iterate through borrower payment histories, identify Class Members, and determine Class Members' Recognized Losses.

116.    As described above, the efforts of Plaintiffs' Forensic Accounting Expert and Plaintiffs' Database Hosting Provider have been, and continue to be, critical to the effectuation of the Settlement.

117.    Other expenses include the actual costs of computerized research.  These are the charges for computerized factual and legal research services such as Westlaw and Lexis-Nexis. Included in the expense request above is $36,808.77 for reimbursement of the costs of on-line computerized research.

118.    All of the litigation expenses incurred were necessary to the successful prosecution of Plaintiffs' claims and to the effectuation of the Settlement and the Plan of Allocation.

119.    Notably, from the beginning of the case, Class Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until a recovery was achieved.  Class Counsel also understood that, even assuming that Plaintiffs' claims were ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them during the litigation.  Thus, Class Counsel were motivated to, and did, take significant steps to minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of Plaintiffs' claims.

120.    In addition, the Notice apprised Class Members that Class Counsel would be seeking reimbursement of Litigation Expenses in the approximate amount of $250,000, and, to date, no objection has been raised as to this request.

121.    In view of, *inter alia*, the complex nature of Plaintiffs' claims, the litigation expenses incurred were reasonable and necessary to pursue the interests of the Class. Accordingly, Class Counsel respectfully submits that the expenses incurred are reasonable in amount and should be reimbursed in full.

122.    As the Notice indicates, approval of the Settlement and Plan of Allocation is separate from the approval of Class Counsel's application for an award of fees and expenses. Any determination with respect to Plaintiffs' Counsel's and Plaintiffs' Special Bankruptcy Counsel's application for an award of fees and expenses will not affect the Settlement, if approved.

123.    The instant request for reimbursement of expenses does not include any costs or expenses which will be incurred in the future in connection with the allocation and distribution of the Net Settlement Fund once the Settlement is finally approved and the Borrower Claims Trust Distributes the Settlement Amount.  Consistent with the Stipulation, Class Counsel will apply for reimbursement or payment of any such expenses in connection with the motion for approval of the Distribution Order.

## XII.    PLAINTIFFS' COUNSEL'S REQUEST FOR INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS

124.    Plaintiffs' Counsel seeks service awards in the amount of $2,500 for each of the following named plaintiffs:  Landon Rothstein, Jennifer Davidson, Robert Davidson, and Ihor Kobryn.  Over the course of the litigation, these four Named Plaintiffs have been in frequent contact with Plaintiffs' Counsel through written correspondence and telephone calls in order to remain informed of the status of the proceedings and to discuss substantive issues relating to the claims and the Settlement.

125.    Further, in support of their claims, the Named Plaintiffs each spent considerable time reviewing records in their possession for relevant documents which they diligently provided to Plaintiffs' Counsel.

126.    The Named Plaintiffs invested their time and energy on behalf of the Class to ensure, as best as they could, that Plaintiffs' Counsel had the information and assistance needed in order to bring and prosecute Plaintiffs' claims on behalf of all Class Members.

## XIII.    SUMMARY LIST OF EXHIBITS

127.    Annexed hereto as Exhibit A is the Notice Order providing for the issuance of notice to the Class and scheduling the Final Approval Hearing for May 24, 2016, at 10:00 a.m. before this Court.

128.    Annexed hereto as Exhibit B is the Declaration of Jay Geraci on behalf of KCC, Plaintiffs' Database Hosting Provider and the Court-approved Settlement Administrator, regarding database hosting and programming services and notice procedures in connection with the Settlement.

129.    Annexed hereto as Exhibit C is the Declaration of Mark A. Strauss on Behalf of Kirby McInerney LLP in Support of Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses.  Appended to such declaration is the lodestar summary, schedule of expenses, and résumé of my firm.

130.    Annexed hereto as Exhibit D is the Declaration of Garvan F. McDaniel on behalf of the law firm of Hogan McDaniel, Plaintiffs' Special Bankruptcy Counsel, in Support of Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses. Appended to such declaration is the lodestar summary, schedule of expenses, and résumé of Mr. McDaniel's firm.

131.     Annexed hereto as Exhibit E is a table of comparable billing rates, compiled by Plaintiffs' Counsel, which have been submitted in connection with fee applications filed in recent class action settlements in this District.

132.     Annexed hereto as Exhibit F is a true and correct copy of an article by Mayer Brown LLP entitled *Do Class Actions Benefit Class Members, An Empirical Analysis of Class Actions* (2013).

## CONCLUSION

133.     This Settlement reflects a reasoned compromise based on Plaintiffs' Counsel's knowledge of the strengths and weaknesses of the case gained through thorough review and analysis of the facts and law.   In view of the significant recovery to the Class, the very substantial risks of continuing to prosecute the Bankruptcy Proofs of Claim, the substantial efforts of Class Counsel, the quality of the work performed, the contingent nature of the fee, the complexity of the claims and the standing and experience of Class Counsel, Plaintiffs and Class Counsel respectfully submit that:  (i) the Settlement should be approved as fair, reasonable, and adequate; (ii) the Plan of Allocation should be approved as fair and reasonable; (iii) a fee in the amount of 35% of the Settlement Fund, plus reimbursement of expenses in the amount of $226,938.29, should be awarded to Class Counsel; and (iv) incentive awards in the amount of $2,500 should be awarded to each of the Named Plaintiffs.

I declare under penalty of perjury, under the laws of the State of New York, that the foregoing is true and correct.

Executed:     April 25, 2016
              New York, New York

                                                    */s/ Mark A. Strauss*
                                                   MARK A. STRAUSS