**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE RESIDENTIAL CAPITAL, LLC, *et al.*,<br><br>　　　　　　　　Debtors. | Case No. 12-12020 (MG)<br>Chapter 11<br>Jointly Administered<br><br>Objection Date: May 10, 2016@ 4:00 p.m. (ET)<br>Hearing Date:  May 24, 2016 @ 10:00 am. (ET)<br><br>Re: Docket No.  9866 |

**MOTION AND INCORPORATED MEMORANDUM OF LAW OF THE *ROTHSTEIN***
**PLAINTIFFS (CLAIM NOS. 4074 AND 3966) IN SUPPORT OF MOTION FOR**
**FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT**
**AND PLAN OF ALLOCATION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

I.      PROCEDURAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ................. 4

        A.      Procedural Background ........................................................................................ 4

        B.      Nature and History of Plaintiffs' Claims ............................................................ 4

                1.      The Rothstein Action ............................................................................... 4

                2.      The Bankruptcy Proceeding ..................................................................... 5

                3.      Plaintiffs' Counsel's Successful Efforts To Obtain, And To Identify The
                        Class Members And Determine Their Recognized Losses From, the Class
                        Data ......................................................................................................... 7

II.     REASONS FOR THE SETTLEMENT ....................................................................... 8

III.    THE TERMS OF THE SETTLEMENT AND PLAN OF ALLOCATION ................... 9

IV.     THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND FINAL
        APPROVAL SHOULD BE GRANTED ...................................................................... 9

        A.      The Applicable Standard ..................................................................................... 9

        B.      The Settlement Is Procedurally Fair as It Was Negotiated at Arm's-Length and Is
                Supported by Plaintiffs and Experienced Counsel ............................................ 11

        C.      The Settlement Satisfies the Second Circuit's *Grinnell* Factors for Approval ..... 13

                1.      Continued Litigation Would be Complex, Expensive, and Protracted ..... 13

                2.      Reaction of the Class to the Settlement .................................................. 14

                3.      Plaintiffs Had Sufficient Information to Make Informed Decisions as to
                        Settlement ............................................................................................. 15

                4.      Plaintiff Faced Significant Risks in Establishing Liability and Damages 16

                5.      Risks of Maintaining Class Action Status Through Trial ........................ 19

                6.      Ability to Withstand Greater Judgment .................................................. 19

                7.      The Settlement Amount is in the Range of Reasonableness in Light of the
                        Best Possible Recovery and All the Attendant Risks of Litigation .......... 20

D.    The Plan of Allocation Should Be Approved as it is Fair, Reasonable, and
      Adequate ............................................................................................................ 23

E.    Notice to the Class Satisfies Due Process Requirements...................................... 24

CONCLUSION............................................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

**Cases**

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
    722 F.2d 988 (2d Cir. 1983) ................................................................. 10

*In re Am. Family Enters.*, 256 B.R. 377, 420 (D.N.J. 2000) ........................................ 19

*In re AT&T Corp. Secs. Litig.*,
    455 F.3d 160 (3d Cir. 2006) ................................................................. 21

*In re Austrian & German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2002) ................................................................. 16

*Bayat v. Bank of the W.*,
    No. 13 Civ. 02376, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) ......................................... 21

*In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*,
    909 F. Supp. 2d 259 (S.D.N.Y. 2012) ................................................................. 15

*Beecher v. Able*,
    575 F.2d 1010 (2d Cir. 1978) ................................................................. 23

*Behrens v. Wometco Enters..*, Inc.,
    118 F.R.D. 534 (S.D. Fla. 1988), *aff'd* 899 F.2d 21 (11th Cir. 1990) ....................................... 21

*In re BGI, Inc. Sec. Litig.*,
    465 B.R. 365 (Bankr. S.D.N.Y. 2012) ................................................................. 10

*Bouaphakeo v. Tyson Foods, Inc.*,
    765 F.3d 791 (8th Cir. 2014) ................................................................. 24

*Cagan v. Anchor Sav. Bank FSB*,
    No. CV-88-3024, 1990 U.S. Dist. LEXIS 11450 (E.D.N.Y. May 22, 1990) ......................... 21

*Chatelain v. Prudential-Bache Sec., Inc.*,
    805 F. Supp. 209 (S.D.N.Y 1992) ................................................................. 18, 19

*In re Chicken Antitrust Litig.*,
    669 F.2d 228 (5th Cir. 1982) ................................................................. 23

*Cinelli v. MCS Claim Servs., Inc.*,
    236 F.R.D. 118 (E.D.N.Y. 2006) ................................................................. 16

*In re Citigroup Inc. Sec. Litig.*,
    No. 07 Civ. 9901, 2014 WL 2445714 (S.D.N.Y. May 30, 2014) ................................................ 24

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ................................................................ 11, 19, 21

*City of Livonia Emp. Ret. Sys. V. Wyeth*,
    No. 07 Civ. 10329, 2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013) ............................................ 24

*City of Providence v. Aeropostale, Inc.*,
    No. 11 Civ. 7132, 2014 WL 1883494 (S.D.N.Y. May 9, 2014)................................. 12, 15, 16

*Cohen v. American Sec. Ins. Co.*,
    735 F.3d 601 (7th Cir. 2013) ................................................................ 19

*Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*,
    785 F.Supp. 411 (S.D.N.Y. 1992) ................................................................ 18

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974).................................................................................. 25

*Farinella v. Paypal, Inc.*,
    611 F. Supp. 2d 250 (E.D.N.Y. 2009) ................................................................ 13

*Feaz v. Wells Fargo Bank, N.A.*,
    745 F.3d 1098 (11th Cir. 2014) ................................................................ 19

*Fisher Bros. v. Cambridge-Lee Indus., Inc.*,
    630 F. Supp. 482 (E.D. Pa. 1985) ................................................................ 21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    No. 02 Civ. 3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ............................................ 14

*In re Four Seasons Secs. Laws Litig.*,
    58 F.R.D. 19 (W.D. Okla. 1972)................................................................ 21

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ................................................................ 13, 16, 23

*Gooden v. Suntrust Mortg., Inc.*,
    No. 11 Civ. 02595, 2013 WL 6499250 (E.D. Cal. Dec. 11, 2013)......................................... 18

*Gordon v. Chase Home Fin., LLC*,
    No. 11 Civ. 2001, 2013 WL 436445 (M.D. Fla. Feb. 5, 2013) ................................................ 18

*Gustafson v. BAC Home Loans Serv., LP*,
    294 F.R.D. 529 (C.D. Cal. 2013)................................................................ 18

*Hall v. Children's Place Retail Stores, Inc.*,
    669 F. Supp. 2d 399 (S.D.N.Y. 2009) ................................................................ 21

*In re Hibbard Brown & Co., Inc.*,
    217 B.R. 41 (Bankr. S.D.N.Y. 1998) .................................................................. 17

*In re IMAX Sec. Litig.*,
    283 F.R.D. 178 (S.D.N.Y. 2012) ......................................................................... 15

*In re Ikon Office Solutions v. Stuart*,
    194 F.R.D. 166 (E.D. Pa. 2000) .......................................................................... 21

*In re WorldCom, Inc.*,
    347 B.R. 123 (Bankr. S.D.N.Y. 2006) ................................................................. 10

*In re Ins. Brokerage Antitrust Litig.*,
    282 F.R.D. 92 (D.N.J. 2012) ............................................................................... 13

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007) ......................................................................... 10, 13

*In re Ivan F. Boesky Sec. Litig.*,
    948 F.2d 1358 (2d Cir. 1991) ............................................................................... 9

*Joel A. v. Giuliani*,
    218 F.3d 132 (2d Cir. 2000) ................................................................................. 9

*Kolbe v. BAC Home Loans Serv'g, LP*,
    738 F.3d 432 (1st Cir. 2013) ............................................................................... 19

*Kunzelmann v. Wells Fargo Bank, N.A.*,
    No. 11 Civ. 81373, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ........................... 18

*Lane v. Wells Fargo Bank*, N.A.,
    No. 12 Civ. 04026, 2013 WL 3187410 (N.D. Cal. June 21, 2013) ......................... 18

*Lazy Oil Co. v. Witco Corp.*,
    95 F. Supp. 2d 290 (W.D. Pa. 1997) .................................................................... 21

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    205 F.R.D. 369 (D.D.C. 2002) ............................................................................ 24

*Maley v. Del Global Techs. Corp.*,
    186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................................................. 24

*In re McDonnell Douglas Equip. Leasing Sec. Litig.*,
    838 F. Supp. 729 (S.D.N.Y. 1993) ...................................................................... 23

*In re Mexico Money Transfer Litig.*,
    164 F. Supp. 2d 1002 (N.D. Ill. 2000) ................................................................ 21

*In re MF Global Inc.*,
    466 B.R. 244 (Bankr. S.D.N.Y. 2012) ................................................................... 10

*In re Milken and Assoc. Sec. Litig.*,
    150 F.R.D. 46 (S.D.N.Y. 1993) ............................................................................. 18

*Myers v. Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996) .................................................................................... 10

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997) ............... 13, 20

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
    986 F. Supp. 2d. 207 (E.D.N.Y. 2013) .................................................................. 21

*In re Prudential Sec. Inc. L.P. Litig.*,
    MDL No. 1005, 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995) ................................. 21

*In re Residential Capital, LLC*,
    497 B.R. 720 (Bankr. S.D.N.Y. 2013) .................................................................. 10

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
    No. 94 Civ. 5587, 2003 WL 21136726 (S.D.N.Y. May 15, 2003) .......................... 14

*Shapiro v. JPMorgan Chase & Co.*,
    Nos. 11 Civ. 8331, 11 Civ. 7961, 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ............. 10, 15

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) ..................................................................... 10, 15

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008) ............................................................. 10, 23

*Toyota v. Toyota Motor Company, Ltd.*,
    1971-1 Trade Cases P74, 398, at 93, 821 (S.D.N.Y. 1973) .................................... 22

*In re Toys R Us-Del., Inc. – Fair & Accurate Credit Transactions (FACTA) Litig.*,
    295 F.R.D. 438 (C.D. Cal. 2014) .......................................................................... 21

*Trief v. Dun. & Bradstreet Corp.*,
    840 F. Supp. 277 (S.D.N.Y. 1993) ........................................................................ 10

*In re Trinsum Grp., Inc. Sec. Litig.*,
    No. 08 Civ. 12547, 2013 WL 1821592 (Bankr. S.D.N.Y. Apr. 30, 2013) ............... 13

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
    718 F. Supp. 1099 (S.D.N.Y. 1989) ..................................................................... 11

*United States v. Rodolitz,*
  786 F.2d 77 (2d Cir. 1986) .................................................................... 18

*In re Urethane Antitrust Litig.,*
  768 F.3d 1245 (10th Cir. 2014) ............................................................. 24

*In re Veeco Instruments Inc. Sec. Litig.,*
  No. 05 MDL 1695, 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ......................... 13, 14, 15, 24

*In re Visa Check/Master Money Antitrust Litig.,*
  297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...................................................... 9

*In re Vitamins Antitrust Litig.,*
  No. 99 Civ. 197, 2000 U.S. Dist. LEXIS 8931 (D.D.C. Mar. 30, 2000) ................. 23

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
  396 F.3d 96 (2d Cir. 2005) .................................................... *passim*

*In re Warfarin Sodium Antitrust Litig.,*
  212 F.R.D. 231 (D. Del. 2002) ............................................................... 24

*Weinberger v. Kendrick,*
  698 F.2d 61 (2d Cir. 1982) .................................................................... 11

*Williams v. Wells Fargo Bank*, N.A.,
  280 F.R.D. 665 (S.D. Fla. 2012) .......................................................... 18

*Yang v. Focus Media Holding Ltd.,*
  No. 11 Civ. 9051, 2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ..................... 11

**Federal Statutes**
Fed. R. Bankr. P. 7023 ...................................................................... 9, 25

Fed. R. Bankr. P. 7023(c) ................................................................ 19

Fed. R. Bankr. P. 9019(a) ............................................................... 10

Fed. R. Civ. P. 23(c)(2) .................................................................... 25

**Other Authorities**
*Gulf In re Gulf Oil/Cities Serv. Tender Offer Litig.,*
  142 F.R.D. 588 (S.D.N.Y. 1992) ...................................................... 23

Mayer Brown LLP, *Do Class Actions Benefit Class Members, An Empirical Analysis of Class
  Actions*, at 6 (2013) .......................................................................... 22

# INTRODUCTION

Plaintiffs Landon Rothstein, Jennifer Davidson, Robert Davidson, and Ihor Kobryn (collectively, the "*Rothstein* Plaintiffs" or "Plaintiffs") (Claim Nos. 4074 and 3966) respectfully submit this motion and incorporated memorandum of law pursuant to Fed. R. Bankr. P. 7023 and 9019 requesting final approval of Plaintiffs' proposed class action Settlement and Plaintiffs' proposed Plan of Allocation.[1]  In accordance with this Court's Order Preliminarily Approving the Proposed Settlement with the *Rothstein* Plaintiffs (the "Notice Order") (Doc. 9609), the court-appointed Settlement Administrator, KCC Class Action Services LLC ("KCC"), duly has effectuated notice to the Class.  Decl. ¶ 16.[2]  The Final Approval Hearing is scheduled for May 24, 2016 at 10:00 a.m.  *See* Doc. 9609.[3]

Plaintiffs and Class Counsel respectfully submit that the proposed Settlement satisfies all the relevant standards for final approval.  Plaintiffs are residential mortgagors whose loans were serviced by GMAC Mortgage LLC ("GMACM") and who were charged by GMACM for Lender-Placed Insurance ("LPI").  Plaintiffs alleged that GMACM — together with certain other defendants named in the *Rothstein* Action, *i.e.*, the Balboa Defendants — perpetrated a scheme to overcharge Plaintiffs for LPI in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO"), and applicable state law.  *See* Decl. ¶ 3.

---

[1] All capitalized terms not otherwise defined shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement with Rothstein Plaintiffs, dated December 29, 2015 (the "Stipulation"), which is attached as Exhibit 1 to the Declaration of Mark A. Strauss dated January 11, 2016, and which was filed with the Court on January 11, 2016.  *See* Doc. 9491-2.

[2] References to "Decl._" or the "Supporting Declaration" are to the Declaration of Mark A. Strauss in Support of Final Approval of Proposed Rothstein Class Action Settlement (Claim No. 4074), Plan of Allocation, Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards for Named Plaintiffs, which is filed concurrently herewith.

[3] Plaintiffs' Counsel and Plaintiffs' Special Bankruptcy Counsel (collectively, "Class Counsel") concurrently have filed a motion for an award of attorneys' fees, reimbursement of Litigation Expenses, and incentive awards for named plaintiffs.

The Settlement resolves Plaintiffs' Bankruptcy Proofs of Claim in exchange for an allowed unsecured claim not subject to subordination in the amount of $13 million against GMACM. *See* Decl. ¶ 4; Doc. 9491-3, Strauss Decl. Ex. 1 at ¶ 2. The face value of the Allowed Claim is equal to 16% of the approximately $80 million in aggregate out-of-pocket losses that Plaintiffs' Counsel, assisted by Plaintiffs' Forensic Accounting Expert, estimate were suffered by the Class as a result of the alleged scheme. *See* Decl. ¶ 5. As an "Allowed Borrower Claim" in Class GS-5, the Allowed Claim is estimated to yield a $0.30 per $1.00 recovery from the Borrower Claims Trust. Accordingly, the Allowed Claim is expected to yield a distribution by the Borrower Claims Trust to Plaintiffs and the Class of $3.90 million. *See id*. ¶¶ 6, 94, 99, 111.

The Settlement represents an exceptional result for the Class. It establishes a non-reversionary common fund which will be distributed to qualified Class Members. Accordingly, the Class will receive cash , and not coupons or *cy pres* relief as in many consumer class action settlements. *See* Decl. ¶¶ 7, 90.

Furthermore, Class Members will not be required to file claims. Rather, Plaintiffs' Counsel, with the assistance of Plaintiffs' Forensic Accounting Expert, has already identified each Class Member and determined their respective Recognized Losses. *See* Decl. ¶¶ 8, 90. This was accomplished through algorithmic analysis of borrower payment data and LPI records of GMACM (the "Class Data") that was supplied by the Liquidating Trust. Under the Plan of Allocation, Class Members whose allocation of the Net Settlement Fund is $10 or more, as calculated from the Class Data, will receive a distribution without having to do anything. *See id*. ¶¶ 8, 93. By this procedure, it is anticipated that the Settlement Administrator will issue approximately 61,788 distribution checks to qualified Class Members. *Id*. ¶¶ 8, 94. Hence, there

is no question that the Class will receive a significant recovery, and that Class Members will be able to participate to the fullest extent possible.

This Settlement is also an excellent result in light of the difficulties that Plaintiffs and the Class faced in proving their claims. GMACM vigorously denied liability, and had numerous potentially availing defenses, including that: (i) Plaintiffs' claims were barred by the filed-rate doctrine; (ii) the proposed class did not meet the requirements of Bankruptcy Rule 7023; and (iii) Plaintiffs failed adequately to allege, and could not prove, their RICO claims.

Indeed, the filed-rate doctrine defense in particular loomed as potentially fatal to Plaintiffs' claims. In *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256 (2d Cir. 2015), the Second Circuit, reversing the District Court, held that the filed-rate doctrine barred Plaintiffs' claims against the Balboa Defendants. Those claims were essentially identical to those asserted by Plaintiffs against GMACM. Accordingly, had there been no Settlement, it is highly likely that the Court would have determined that this binding authority mandated dismissal of the Bankruptcy Proofs of Claim. Had this occurred, the Class would have received nothing. *See* Decl. ¶ 74.

Additionally, the Settlement was reached only after extensive litigation by Plaintiffs in both the District Court and the Bankruptcy Court, and after months of arm's-length, vigorous negotiations between well-represented parties. *See* Decl. ¶¶ 29, 42-57.

Accordingly, as detailed below, the proposed Settlement is fair, equitable and in the best interest of the Class and the Debtors' estates, and should be approved.

3

I.    **PROCEDURAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS**

A.    **Procedural Background**

The Supporting Declaration, which is expressly incorporated herein by reference, details the factual and procedural background, the events that led to the Settlement, and the details of the Settlement.

B.    **Nature and History of Plaintiffs' Claims**

1.    **The Rothstein Action**

Plaintiffs commenced the *Rothstein* Action on April 30, 2012, alleging that GMACM and the Balboa Defendants had engaged in a fraudulent scheme to overstate GMACM's LPI costs, and, thereby to recoup inflated reimbursements from Plaintiffs, who were obligated to indemnify those costs under their mortgages. *See* Decl. ¶ 27. Specifically, Plaintiffs alleged that the Balboa Defendants, which consisted of GMACM's LPI carriers and an affiliate of theirs, gave GMACM secret rebates, *i.e.*, kickbacks, but that GMACM nevertheless charged Plaintiffs and the Class for the LPI based on the full premiums. *Id.* Plaintiffs further alleged that GMACM and the Balboa Defendants concealed the rebates/kickbacks by funneling them through related-party transactions involving the affiliate. *Id.*

Two weeks after Plaintiffs commenced the *Rothstein* Action, on May 14, 2012, GMACM and certain of its affiliates filed this Chapter 11 proceeding. Thereafter, on September 28, 2012, Plaintiffs filed their First Amended Class Action Complaint in the *Rothstein* Action, and, on January 22, 2013, Plaintiffs filed their Second Amended Complaint in the *Rothstein* Action. Decl. ¶¶ 29-30.

In their amended pleadings, Plaintiffs withdrew their claims against GMACM due to the automatic stay under the Bankruptcy Code. However, Plaintiffs named non-debtors Ally Bank

4

("Ally Bank") and Ally Financial, Inc. ("AFI") (collectively, "Ally") as new defendants based on theories of veil-piercing, alter-ego liability, and agency. *See* Decl. ¶ 31.

On February 25, 2013, the Balboa Defendants filed a motion to dismiss the claims pled against them in the *Rothstein* Action. Such motion involved numerous issues potentially dispositive of Plaintiffs' claims against GMACM, *e.g.*, the applicability of the filed-rate doctrine and the sufficiency of Plaintiffs' RICO claims, which alleged a conspiracy between, and concerted deceptive activity by, GMACM and the Balboa Defendants. *See* Decl. ¶ 35.

On September 30, 2013, after full briefing, the District Court denied the Balboa Defendants' motion to dismiss, holding that the filed-rate doctrine did not apply and sustaining Plaintiffs' RICO claims. *See* Decl. ¶ 37.

On June 25, 2014, the Second Circuit granted interlocutory appeal of the District Court's order. *See* Decl. ¶ 40. On July 22, 2015, after extensive briefing and argument, the Second Circuit reversed the District Court, holding that the filed-rate doctrine barred Plaintiffs' claims. *See* 794 F.3d, at 259, 262-64; Decl. ¶ 41.

### 2.    The Bankruptcy Proceeding

Plaintiffs filed their Bankruptcy Proofs of Claim on November 9, 2012. *See* Decl. ¶ 42.

On December 21, 2012, Ally filed a motion (which was subsequently joined by the Debtors) pursuant to Section 362 seeking to stay Plaintiffs' claims against Ally in the *Rothstein* Action. *See* Decl. ¶ 43; Docs. 2511, 2793.

On April 2, 2013, Plaintiffs filed their opposition and cross-motion for relief from any applicable stay. *See* Decl. ¶ 45; Doc. 3343. Plaintiffs submitted that the claims against Ally were direct and personal, not derivative. *See id.*

On August 28, 2013, Ally, the Debtors, and the Committee filed an amended motion to stay Plaintiffs' claims against Ally. *See* Decl. ¶ 47; Doc. 4871.[4]

On August 8, 2013, Plaintiffs filed an Objection and Reservation of Rights with respect to the Debtors' Disclosure Statement. *See* Decl. ¶ 49; Doc. 4578. Plaintiffs stated that they intended to object to the proposed plan to the extent that it enjoined Plaintiffs from prosecuting their claims against Ally. Plaintiffs also submitted that the proposed Third Party Releases were improper because insufficient funding was provided for the release of borrower claims. *See id.*

In or around July 2013, Class Counsel and counsel for the Settling Debtors and the Committee began discussing the potential settlement of Plaintiffs' Bankruptcy Proofs of Claim. After much back and forth, the discussions culminated in a nearly day-long, arm's-length, face-to-face negotiation session on September 9, 2013. *See* Decl. ¶ 51. This meeting was followed by additional phone calls and email exchanges between Plaintiffs' Counsel and counsel for the Settling Debtors and the Committee. *See* Decl. ¶ 52.

Finally, on September 20, 2013, Plaintiffs' Counsel and the Settling Debtors, with the consent of the Committee, reached an agreement in principle to resolve the claims asserted in the Bankruptcy Proofs of Claim. Such agreement was memorialized in an exchange of emails. *See* Decl. ¶ 53.

As part of the agreement in principle, Plaintiffs consented to support the Chapter 11 Plan. On December 11, 2013, the Chapter 11 Plan was confirmed with Plaintiffs' support, and, on December 17, 2013, the Plan Effective Date occurred. *See* Decl. ¶ 54.

---

[4] On June 12, 2013 and July 10, 2013, respectively, the Court held status conferences with respect to the stay motion. *See* Decl. ¶ 48.

6

    **3.**    **Plaintiffs' Counsel's Successful Efforts To Obtain, And To Identify The Class Members And Determine Their Recognized Losses From, the Class Data**

Also as part of the agreement in principle reached between the parties, the Settling Debtors agreed to produce to Plaintiffs data and business records (to the extent that such information was within the Debtors' control or reasonably available from the Debtors' successors) regarding GMACM's LPI transactions and the payment histories of mortgagors, *i.e.*, the Class Data. *See* Decl. ¶ 58; Doc. 9491-3, Strauss Decl. Ex. 1 at ¶ 26. Plaintiffs' Counsel and the Settling Debtors engaged in extensive negotiations between October 2013 and June 2014 over such production. *See id.* ¶ 59. The discussions were highly technical in nature. Plaintiffs' Counsel engaged Plaintiffs' Forensic Accounting Expert to advise Plaintiffs' Counsel and to help in the negotiations. Numerous, lengthy conference calls were held. *See id.*[5]

In or about June 2014, the Liquidating Trust, pursuant to a cooperation agreement it maintains with the Borrower Claims Trust, produced the Class Data to Plaintiffs' Counsel. Plaintiffs' Counsel caused the Class Data to be loaded onto the computer system of Plaintiffs' Database Hosting Provider for analysis. *See* Decl. ¶ 61.

Plaintiffs' Counsel, with the assistance of Plaintiffs' Forensic Accounting Expert, performed extensive computerized analysis of the Class Data. *See* Decl. ¶ 62. The analysis required the development of an algorithm to iterate through each borrower payment history making requisite calculations. By this analysis, the members of the Class were identified, the amounts that GMACM recouped or recovered from each for LPI during the Class Period were determined, and the Recognized Loss of each Class Member was calculated. *See id.*

---

[5] Notably, the negotiations regarding the production of the Class Data of necessity involved GMACM's successor, which possessed certain of the data in question. *See* Decl. ¶ 58.

## II.    REASONS FOR THE SETTLEMENT

The principal reason for the Settlement is the significant benefit that it provides to the Class.  This benefit must be weighed against the very real risk that the Class would have received no recovery had Plaintiffs elected to continue litigating.   The benefit of the Settlement to the Class is particularly great in light of the Second Circuit's decision with respect to the applicability of the filed-rate doctrine in the *Rothstein* Action.  It is highly likely that, had there been no Settlement, Plaintiffs' Bankruptcy Proofs of Claim would have been dismissed based on this binding authority, and the Class would have received nothing.  *See* Decl. ¶¶ 73-74.

Plaintiffs' decision to settle was fully informed and the product of Plaintiffs' rigorous prosecution of Plaintiffs' claims.   The terms of the Settlement were reached after vigorous litigation in both the District Court and this Court, and through good faith, extensive, arm's length and vigorous negotiations between well-represented parties.  Those negotiations included a nearly day-long, face-to-face negotiation session between Class Counsel and counsel for the Debtors.  At all times, counsel for the Committee greatly assisted by acting as an intermediary in the negotiations.  *See* Decl. ¶¶ 14, 51.

Plaintiffs continue to believe in the merit of their claims against GMACM.  However, the Settling Debtors vigorously denied liability, and had numerous potentially availing defenses — including the potentially dispositive filed-rate doctrine defense — increasing the uncertainty of a favorable outcome absent settlement. *See* Decl. ¶ 12.  Similarly, although the Settling Debtors deny Plaintiffs' claims and contentions, they nevertheless concluded that it was desirable to fully and finally resolve Plaintiffs' Bankruptcy Proofs of Claim in the manner and on the terms set forth in the Stipulation.  *See* Doc. 9491-3, Strauss Decl. Ex. 1 at  17.

## III.    THE TERMS OF THE SETTLEMENT AND PLAN OF ALLOCATION

As indicated above, the Settlement resolves Plaintiffs' Bankruptcy Proofs of Claim in exchange for an allowed unsecured claim not subject to subordination, represented by Claim No. 4074, in the amount of $13 million, against GMACM.[6]  Assuming the rate of recovery estimated by the Plan for Class GS-5 claims, the Allowed Claim is expected to yield a distribution by the Borrower Claims Trust to Plaintiffs and the Class of $3.9 million.  *See* Decl. ¶¶ 4-6.

The Plan of Allocation provides that the Net Settlement Fund will be allocated to Class Members *pro rata* based on the Recognized Loss of each Class Member relative to the total Recognized Losses of all Class Members.  Class Members whose allocation of the Net Settlement Fund is $10 or more, as calculated from the Class Data, will receive a distribution. *See* Decl. ¶¶ 8, 93.

## IV.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND FINAL APPROVAL SHOULD BE GRANTED

### A.    The Applicable Standard

The settlement of class action claims is subject to court approval after reasonable notice and a hearing.  *See* Fed. R. Bankr. P. 7023.  A court will approve a settlement if it is "fair, adequate, and reasonable, and not a product of collusion."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (internal quotations omitted). This determination falls within the court's sound discretion.[7]  In exercising such discretion, the Second Circuit has

---

[6] Claim No. 3966 will be disallowed and expunged on the Settlement Effective Date.

[7] *See In re WorldCom, Inc.,* 347 B.R. 123, 136 (Bankr. S.D.N.Y. 2006); *Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000); *In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1368 (2d Cir. 1991); *In re Residential Capital, LLC*, 497 B.R. 720, 749 (Bankr. S.D.N.Y. 2013); *In re Visa Check/Master Money Antitrust Litig.*, 297 F. Supp. 2d 503, 509 (E.D.N.Y. 2003).

instructed that the court should be mindful of the "strong judicial policy in favor of settlements." *Wal-Mart*, 396 F.3d at 116 (internal quotations omitted).[8]

"Courts determine the fairness of a settlement by looking both at the terms of the settlement and the negotiation process leading up to it." *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008); *see Wal-Mart*, 396 F.3d at 116 (citations omitted); *see also In re WorldCom, Inc.*, 347 B.R. at 143-49 (holding that in order for a class action settlement to be approved in bankruptcy court the settlement must be both procedurally and substantively fair under Rules 7023 and 9019).

In addition, under Fed. R. Bankr. P. 9019(a), "[a] court must determine that a settlement . . . is fair, equitable, and in the best interests of the estate before approving it." *In re Residential Capital, LLC*, 497 B.R. at 749; *see also In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007). However, "the business judgment of the debtor in recommending the settlement should be factored into the court's analysis." *In re Residential Capital, LLC*, 497 B.R. at 750.

Regarding process, a class action settlement enjoys a strong "presumption of fairness" where it is the product of arm's-length negotiations conducted by experienced, capable counsel. *See Wal-Mart*, 396 F.3d at 116.[9] Indeed, "absent evidence of fraud or overreaching, [courts] consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel." *Trief v. Dun. & Bradstreet Corp.*, 840 F. Supp. 277, 281 (S.D.N.Y. 1993). This is

---

[8] *See also In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999); *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 997 (2d Cir. 1983); *see also In re MF Global Inc.*, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012) ("Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate.") (citing *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

[9] *See also City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132, 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014); *Shapiro v. JPMorgan Chase & Co.*, Nos. 11 Civ. 8331, 11 Civ. 7961, 2014 WL 1224666, at *7 (S.D.N.Y. Mar. 24, 2014); *In re BGI, Inc.*, 465 B.R. 365, 378 (Bankr. S.D.N.Y. 2012); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 461 (S.D.N.Y. 2004); *Chatelain v. Prudential-Bache Sec., Inc.*, 805 F. Supp. 209, 212 (S.D.N.Y 1992).

particularly true in complex class actions, where "the courts have long recognized that such litigation 'is notably different and notoriously uncertain,' and that compromise is particularly appropriate." *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989) (internal citations omitted).

With respect to the substantive terms of a settlement, courts in this Circuit analyze the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), which include:

> (1) The complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Wal-Mart*, 396 F.3d at 117 (quoting *Grinnell*, 495 F.2d at 463) (citations omitted)).

In applying the *Grinnell* factors, the Second Circuit has indicated that a court should not substitute its judgment for those of the parties who negotiated the settlement, or conduct a "mini-trial" on the action's merit. *See Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982).

Here, the proposed Settlement clearly is fair, reasonable and adequate under the pertinent standards and merits approval.

## B.     The Settlement Is Procedurally Fair as It Was Negotiated at Arm's-Length and Is Supported by Plaintiffs and Experienced Counsel

A strong initial presumption of fairness attaches to a proposed settlement reached by experienced counsel after arm's-length negotiations. *See Wal-Mart*, 396 F.3d 116. "To determine procedural fairness, courts examine the negotiating process leading to the settlement." *Yang v. Focus Media Holding Ltd.,* No. 11 Civ. 9051, 2014 WL 4401280, at *4 (S.D.N.Y. Sept. 4, 2014) (*citing Wal-Mart*, 396 F.3d at 116). Where a settlement is the "product of arm's length

11

negotiations conducted by experienced, capable counsel," it enjoys a "presumption of correctness." *Id.* (citations omitted); *see City of Providence*, 2014 WL 1883494, at *4 ("[a] strong initial presumption of fairness attaches to a proposed settlement if it is reached by experienced counsel after arm's-length negotiations.").

The strong initial presumption applies here. As described in the Supporting Declaration, the Settlement was negotiated at arm's-length by experienced counsel acting in an informed manner. *See* Decl. ¶¶ 14, 51; Doc. 9491 at ¶¶ 16-17, 37-41. Furthermore, at all times, counsel for the Committee greatly assisted in the negotiations. *See* Decl. ¶ 87. Additionally, Plaintiffs' Special Bankruptcy Counsel assisted Plaintiffs' Counsel in navigating the relevant bankruptcy issues and procedures. *Id.* ¶¶ 44, 70. The negotiations included a nearly day-long, arm's-length, face-to-face session on September 9, 2013. *Id.* ¶ 51. Prior to reaching the Settlement, Plaintiffs' Counsel conducted an extensive investigation of the facts relating to Plaintiffs' claims.[10] *Id.* ¶ 65.[11] Plaintiffs' Counsel additionally conducted extensive research into the legal theories asserted. *Id.*

In the opinion of Plaintiffs' Counsel, who have a great deal of experience litigating class actions, the Settlement is not merely fair, reasonable and adequate, but represents an excellent result for the Class. *See* Decl. ¶¶ 7, 12, 71. This opinion is entitled to "great weight." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d

---

[10] Plaintiffs' Counsel's factual investigation included (i) reviewing and analyzing hundreds of pages of transcripts from public hearings on LPI held by regulators; (ii) filing requests under New York's Freedom of Information Law and reviewing and analyzing hundreds of documents obtained pursuant thereto; (iii) gathering, reviewing and analyzing numerous relevant documents from available public sources; and, (iv) conferring with a confidential witness. *See* Decl. ¶¶ 65-67.

[11] That the plaintiffs took formal discovery is not required to satisfy the element of procedural fairness. *See City of Providence*, 2014 WL 1883494, at *6; *see also Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d. 358, 363 (S.D.N.Y. 2002); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y. 2002) ("it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the Settlement" and observing "[w]hile no formal discovery has been conducted in this case, the parties have engaged in extensive informal discovery") (internal citations omitted) (alterations in original).

Cir. 1997) (citation omitted); *see also In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 1695, 2007 WL 4115809, at *12 (S.D.N.Y. Nov. 7, 2007).

### C.    The Settlement Satisfies the Second Circuit's *Grinnell* Factors for Approval

In determining whether the substantive terms of a settlement are fair, reasonable, and adequate, courts in this Circuit look to the nine *Grinnell* factors as set forth above.  All nine factors need not be satisfied.  Instead, the court should look to the totality of these factors in light of the specific circumstances involved.  *In re Global Crossing*, 225 F.R.D. at 456.  As demonstrated below, the Settlement clearly warrants approval in light of the *Grinnell* factors.

### 1.    Continued Litigation Would be Complex, Expensive, and Protracted

Courts have consistently recognized that the complexity, expense, and likely duration of litigation are critical factors in evaluating the reasonableness of a settlement.  *See In re Trinsum Grp., Inc.*, No. 08 Civ. 12547, 2013 WL 1821592, at *3-4 (Bankr. S.D.N.Y. Apr. 30, 2013) (citing *In re Iridium Operating LLC*, 478 F.3d at 462).

Here, the Settlement precluded potentially protracted litigation over Plaintiffs' Bankruptcy Proofs of Claim.  Those claims raised complex legal and factual issues which likely would have required extensive third-party discovery (*i.e.*, of the Balboa Defendants).  The issues included, *inter alia*, whether the filed-rate doctrine applied – a question with respect to which the Second Circuit granted interlocutory appeal and which was fully briefed and argued at the appellate level in the *Rothstein* Action.  *See* Decl. ¶¶ 35, 37, 41, 74.  The issues also included whether Plaintiffs could prove their RICO claims, which are notoriously complex and time-consuming to litigate on a class basis.  *See In re Ins. Brokerage Antitrust Litig.*, 282 F.R.D. 92, 102-03 (D.N.J. 2012); *Farinella v. Paypal, Inc.*, 611 F. Supp. 2d 250, 265-66 (E.D.N.Y. 2009).

The Settlement also precluded the necessity to fully litigate Ally's stay motion.  *See* Decl. ¶¶ 45, 47-48; Docs. 2834, 3343, 4871.  Such motion raised complex issues regarding the

derivative versus direct nature of Plaintiffs' claims that would have entailed substantial litigation. *See id.* ¶ 48; Docs. 2834, 3343, 4871.

The Settlement also removed a potential impediment to confirmation of the Chapter 11 Plan. *See* Decl. ¶¶ 47, 50-54; Doc. 4941-3, Strauss Decl. Ex. 1 at 14-15. In return for the Settlement, Plaintiffs agreed to drop their objections and consent to the Chapter 11 Plan, which was confirmed with Plaintiffs' support. *Id.*

## 2.    Reaction of the Class to the Settlement

The reaction of the class to the Settlement is a significant factor in assessing its fairness and adequacy. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02 Civ. 3400, 2010 WL 4537550, at *16 (S.D.N.Y. Nov. 8, 2010); *Veeco*, 2007 WL 4115809, at *7. The absence of valid objections to a settlement provides evidence of class members' approval of the terms of the Settlement and desire to share in the proceeds thereof. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2003 WL 21136726, at *1 (S.D.N.Y. May 15, 2003).

Here, as indicated above, the court-appointed Settlement Administrator, KCC, duly issued notice to the Class in accordance with the Notice Order. *See* Decl. ¶¶ 16, 20-26, Ex. A; Doc. 9606. Notably, this included mailing more than [143,973] copies of the Summary Direct U.S. Mail Postcard Notice to Class Members. *Id.* ¶¶ 20, 25, 62, 94. The Notice apprised Class Members of their rights to participate in the Settlement, to object to the Settlement, the Plan of Allocation or the application for attorneys' fees and Litigation Expenses, or to exclude themselves. *See id.* ¶ 18 ; Doc. 9609, at 6-7.

To date, no objections have been received to the Settlement, the Plan of Allocation, or the amount of Class Counsel's fee requests or expenses. Decl. at ¶¶ 89, 120. Furthermore, the Settlement Administrator has only received one valid request for exclusion from the Settlement. *Id.* at ¶ 11, 89.

14

The overwhelmingly positive reaction of the Class evidences the Class' approval. *See City of Providence*, 2014 WL 1883494, at *6 ("That almost no Class Member objected to the Settlement or chose to exclude himself from it is indeed the strongest indication that the Settlement is fair and reasonable.").[12]

### 3. Plaintiffs Had Sufficient Information to Make Informed Decisions as to Settlement

In considering the third *Grinnell* factor, "the question is whether the parties had adequate information about their claims, such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiff's causes of action for purposes of settlement." *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012) (citing *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 190 (S.D.N.Y. 2012) (internal citations, quotation marks and alterations omitted)).

Here, Plaintiffs and Plaintiffs' Counsel consider the proposed Settlement to be an excellent outcome for the Class in light of a fully-informed understanding of the strengths and weaknesses of Plaintiffs' claims. *See* Decl. ¶¶ 71-88. The Settlement was reached after extensive litigation in this Court and the District Court, and a complete investigation and analysis of the facts and legal principles relating to Plaintiffs' claims. *Id.* ¶¶ 29, 42-57. Plaintiffs' Counsel also conferred extensively with Plaintiffs' Special Bankruptcy Counsel in navigating the relevant bankruptcy issues and procedures, and in developing strategies to maximize Class's

---

[12] *See also Shapiro*, 2014 WL 1224666, at *9 ("there appear to be nine valid opt outs from a Settlement Class of nearly 2,800 members. Support for the settlement is indeed overwhelming"); *In re Sumitomo Copper Litig.*, 189 F.R.D. at 281 (that only a "minor fraction, fewer than 1%, of Class members opted out" indicated "that an overwhelming majority of the class members approve of the proposed settlements."); *Veeco*, 2007 WL 4115809, at *7 (only one request for exclusion showed that "those affected by the Settlement have overwhelmingly endorsed it. The strong favorable reaction of the class is overwhelming evidence that the Settlement is fair, reasonable and adequate.") (citations omitted).

recovery against the Debtors.  *See id.* ¶¶ 44, 70.  Counsel for the Committee also greatly contributed to Plaintiffs' Counsel's grasp of the relevant issues.  *See id.*

Accordingly, Plaintiffs and Plaintiffs' Counsel were well versed in the factual and legal aspects of the claims, and had sufficient information to intelligently negotiate the terms of the Settlement.  *See City of Providence,* 2014 WL 1883494, at *7 ("Accordingly, Lead Plaintiff and Lead Counsel have developed a comprehensive understanding of the key legal and factual issues in the litigation and, at the time the Settlement was reached, had a 'clear view of the strengths and weaknesses of their case' and of the range of possible outcomes at trial.") (internal citations omitted).[13]

### 4.    Plaintiff Faced Significant Risks in Establishing Liability and Damages

In analyzing the risk to plaintiffs in establishing liability, the Court does not "need to decide the merits of the case or resolve unsettled legal questions."  *Cinelli v. MCS Claim Servs., Inc.,* 236 F.R.D. 118, 121 (E.D.N.Y. 2006) (internal quotations and alterations omitted); *see also In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d at 177 (holding in evaluating the risks of establishing liability the Court need not, "foresee with absolute certainty the outcome of the case").  Rather, the Court is only required to weigh the likelihood of success on the merits against the relief provided by the Settlement.  *See id.*  Court routinely approve settlements where the plaintiffs would have faced significant legal and factual obstacles to establishing liability. *See In re Global Crossing*, 225 F.R.D. at 459.

Here, the risks that Plaintiffs faced were numerous and large.  There was a risk, which materialized, that GMACM would file Chapter 11, thus impairing Plaintiffs' ability to collect

---

[13] As set forth above, that the plaintiffs took formal discovery is not required for determination that the plaintiffs were adequately informed to reach the settlement.  *See* cases cited in note 11, *supra.*

any settlement or judgment. *See In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (noting that even successful claimants in bankruptcy may not be able to collect).

There was also a risk that the filed-rate doctrine barred Plaintiffs' claims. Indeed, the Second Circuit, reversing the District Court in the *Rothstein* Action, held that the filed-rate doctrine barred Plaintiffs' claims against the Balboa Defendants. *See* Decl. ¶ 74. Those claims were essentially identical to those asserted by Plaintiffs against GMACM. Accordingly, had there been no Settlement, it is highly likely that the Court would have determined that this binding authority mandated dismissal of the Bankruptcy Proofs of Claim. Had this occurred, the Class would have received nothing. *Id.*

The uncertain outcome of the Balboa Defendants' motion to dismiss in the *Rothstein* Action also loomed as a large risk. *See* Decl. ¶ 75. That motion — which involved numerous issues potentially dispositive of the Bankruptcy Proofs of Claim, such as the applicability of the filed-rate doctrine and the sufficiency of Plaintiffs' RICO claims which involved an alleged conspiracy by GMACM and the Balboa Defendants — was fully briefed and pending at the time that the Settling Parties were negotiating the Settlement. Class Counsel was keenly aware that, were the District Court to grant the motion, it very likely would have torpedoed Plaintiffs' chances of getting a settlement from the Debtors, and rendered the Bankruptcy Proofs of Claim of little or no value. *Id.* Class Counsel therefore sought to mitigate this risk by attaining the agreement in principle prior to the District Court's issuing its decision. As indicated above, the Settling Parties reached their agreement in principle just *three weeks* before the District Court decision came out. *Id.*

Plaintiffs also faced a significant risk that the Court would refuse to certify the proposed nationwide Class. Numerous courts have declined class certification in LPI cases or limited the proposed class to a single state.[14] *See* Decl. ¶ 76.

Class Counsel also faced the risk of being unable to prove damages. "In class actions, the 'complexities of calculating damages increase geometrically.'" *Chatelain v. Prudential-BACHE Sec., Inc*., 805 F.Supp. 209, 214 (S.D.N.Y. 1992) (citation omitted); *see In re Milken and Assoc. Sec. Litig*., 150 F.R.D. 46, 54 (S.D.N.Y. 1993) (observing that proving damages often becomes a "battle of experts . . . with no guarantee of the outcome"). Here, establishing damages would have required the expert analysis of literally millions of borrower transactions. While Plaintiffs ultimately conducted such an expert analysis in connection with the Settlement, it is highly doubtful that this difficult task could have been achieved without the willing cooperation of the Debtors. *See* Decl. ¶¶ 59-61.

Class Counsel additionally faced serious obstacles in proving Plaintiffs' RICO claims. Plaintiffs would have had to show that GMACM "participated in a scheme to defraud" and evinced a "specific intent to defraud." *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co*., 785 F.Supp. 411, 424 (S.D.N.Y. 1992) (*citing United States v. Rodolitz*, 786 F.2d 77, 80 (2d Cir. 1986)). Notably, GMACM sought to blame any wrongdoing on the Balboa Defendants. *See* Decl. ¶¶ 81-83; *Rothstein*, ECF No. 39 at ¶ 73.

Indeed, Courts across the country have rendered opinions illustrating the numerous risks associated with mortgagor LPI claims. In *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th

---

[14] *See Gooden v. Suntrust Mortg., Inc.*, No. 11 Civ. 02595, 2013 WL 6499250, at *9 (E.D. Cal. Dec. 11, 2013) (denying certification); *Gustafson v. BAC Home Loans Serv., LP*, 294 F.R.D. 529, 550 (C.D. Cal. 2013) (same); *Gordon v. Chase Home Fin., LLC*, No. 11 Civ. 2001, 2013 WL 436445, at *12 (M.D. Fla. Feb. 5, 2013) (same); *Kunzelmann v. Wells Fargo Bank, N.A.*, No. 11 Civ. 81373, 2013 WL 139913, at *13 (S.D. Fla. Jan. 10, 2013) (same); *Lane v. Wells Fargo Bank*, N.A., No. 12 Civ. 04026, 2013 WL 3187410, at *16 (N.D. Cal. June 21, 2013) (certifying only single-state class); *Williams v. Wells Fargo Bank*, N.A., 280 F.R.D. 665, 675 (S.D. Fla. 2012) (same).

Cir. 2014), the Eleventh Circuit dismissed lender-placed flood insurance claims brought under Alabama law.  The court held that commissions paid by the insurer to the bank did not constitute "kickbacks" because the servicer did not owe a fiduciary duty to the borrowers.  *Id*. at 1110.  In *Cohen v. American Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013), the Seventh Circuit affirmed a decision dismissing LPI claims holding that there was nothing "'unfair'" or "'deceptive'" about the defendants' allegedly improper LPI practices.[15]  *Id*. at 609.

Accordingly, the Class faced significant risks, compared to certain other relief provided by the Settlement.

### 5.    Risks of Maintaining Class Action Status Through Trial

Plaintiffs' Counsel is confident that the Class would have been certified.  Nonetheless, Defendants would have been entitled to challenge certification, and to seek an order limiting and/or de-certifying the Class.  *See* Fed. R. Bankr. P. 7023(c); *Chatelain*, 805 F. Supp. at 214. Thus, there was always a risk that Plaintiffs would be unable to maintain class action status through trial.  The Settlement obviates this risk.

### 6.    Ability to Withstand Greater Judgment

The court may also consider a defendant's ability to withstand a judgment greater than that secured by settlement.  *See Grinnell*, 495 F.2d at 463.  As a Chapter 11 debtor, however, GMACM *per se* could not withstand a greater judgment.  *See, e.g., In re Am. Family Enters.*, 256 B.R. 377, 420 (D.N.J. 2000) (debtor defendants "cannot withstand any significant judgment at

---

[15] *See also Kolbe v. BAC Home Loans Serv'g, LP*, 738 F.3d 432, 454-55 (1st Cir. 2013) (*en banc*) (affirming dismissal of LPI claims because, *inter alia*, the plaintiff "unquestionably received value for the additional cost" paid, bank gave adequate disclosures and warnings, and bank was protecting its "reasonable and legitimate economic interests," and concluding that the plaintiffs' argument that "the only reason Defendants demanded additional flood insurance was an improper effort to self-deal . . . collecting for itself or its affiliates insurance brokerage commissions and excessive premiums" did not pass *Iqbal*'s plausibility standard).

all, let alone a greater judgment than the . . . monetary relief being offered in compromise. Accordingly, this factor weighs most heavily in favor of the proposed settlement").

### 7.    The Settlement Amount is in the Range of Reasonableness in Light of the Best Possible Recovery and All the Attendant Risks of Litigation

"[T]here is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion . . . ."  *Wal-Mart*, 396 F.3d at 119 (internal citation omitted).

Here, as indicated above, the face value of the Allowed Claim value equals 16% of the approximately $80 million in aggregate out-of-pocket losses that Plaintiffs' Counsel, with the assistance of Plaintiffs' Forensic Accounting Expert, estimate were suffered by the Class as a result of the alleged scheme.[16]  *See* Decl. 5; Doc. 9491, at  ¶¶ 6, 56.  In light of the estimated payout rate for Class GS-5 claims, the Allowed Claim is expected to yield a distribution by the Borrower Claims Trust of $3.9 million.

This recovery falls well within the "range of reasonableness," particularly in light of the risks faced by Plaintiffs, as set forth above and in the Supporting Declaration.  *See* Decl. ¶¶ 71-83; *e.g., In re PaineWebber Litig.*, 171 F.R.D. at 130 (fairness determination turns not on a "mathematical equation yielding a particularized sum . . . but rather ... [on] the strengths and weaknesses of the plaintiff's case.") (quotation marks omitted).  Indeed, the Second Circuit has indicated that "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly

---

[16] Plaintiffs' Forensic Accounting Expert determined that GMACM recouped or recovered approximately $321 million in LPI charges from Class Members during the Class Period.  *See* Decl. ¶ 62; Doc. 9491 at 16 n.15. Plaintiffs' Counsel estimates that approximately 25% of those charges (or $80 million) constituted overcharges.  $13 million / $80 million = 16%.  *See* Decl. at 25 n.16, ¶¶ 4-5; Doc. 9491, at 8 n.8 & 15.

inadequate and should be disapproved." *Grinnell Corp.*, 495 F.2d at 455. "In fact there is no

reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even

a thousandth part of a single percent of the potential recovery." *Id* at n.2.

Courts in this Circuit and elsewhere consistently approve settlements recovering

comparable or smaller fractions of estimated damages. *See, e.g., In re Prudential Sec. Inc. L.P.*

*Litig.*, MDL No. 1005, 1995 WL 798907 (S.D.N.Y. Nov. 20, 1995) (approving settlement in

RICO class action amounting to between 1.6% and 5% of claimed damages); *In re Payment*

*Card Interchange Fee & Merchant Discount Antitrust Litig.*, 986 F. Supp. 2d. 207, 229

(E.D.N.Y. 2013) (settlement equaled 2.5% of damages); *Hall v. Children's Place Retail Stores,*

*Inc.*, 669 F. Supp. 2d 399, 402 n. 30 (S.D.N.Y. 2009) (recovering 5% to 12% of provable

damages); *Cagan v. Anchor Sav. Bank FSB*, No. CV-88-3024, 1990 U.S. Dist. LEXIS 11450, at

*9-10 (E.D.N.Y. May 22, 1990) (settlement represented less than 2% of possible damages).[17]

Indeed, courts routinely approve settlements that do not involve any cash recovery

whatsoever. *See, e.g., In re Toys R Us-Del., Inc. – Fair & Accurate Credit Transactions*

*(FACTA) Litig.*, 295 F.R.D. 438, 453-54 (C.D. Cal. 2014) (class members received vouchers

toward future purchases from the defendants); *In re Mexico Money Transfer Litig.*, 164 F. Supp.

2d 1002, 1017-18 (N.D. Ill. 2000) (class members received coupons); *see generally Grinnell*,

495 F.2d at 455 n.2 ("It might be pointed out that the settlement agreement approved in *Sunrise*

---

[17] *See Bayat v. Bank of the W.*, No. 13 Civ. 02376, 2015 WL 1744342 (N.D. Cal. Apr. 15, 2015) (approving consumer settlement recovering 0.7% of potential damages); *In re AT&T Corp. Secs. Litig.*, 455 F.3d 160, 162, 170 (3d Cir. 2006) (affirming approval of settlement representing 4% of total damages); *In re Ikon Office Solutions v. Stuart*, 194 F.R.D. 166, 183 (E.D. Pa. 2000) (approving settlement providing recovery of 5.2% to 8.7% of damages); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 319 (W.D. Pa. 1997) (recovering 5.35% of damages); *Fisher Bros. v. Cambridge-Lee Indus., Inc.*, 630 F. Supp. 482, 489-90 (E.D. Pa. 1985) (recovering less than 1% of damages); *In re Four Seasons Secs. Laws Litig.*, 58 F.R.D. 19, 36-37 (W.D. Okla. 1972) (8% of damages); s*ee generally Behrens v. Wometco Enters..*, Inc., 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("The mere fact that the proposed settlement of $0.20 a share is a small fraction of the desired recovery of $3.50 a share is not indicative of an inadequate compromise"), *aff'd*, 899 F.2d 21 (11th Cir. 1990).

*Toyota v. Toyota Motor Company, Ltd.*, 1971-1 Trade Cases P74, 398, at 93, 821 (S.D.N.Y. 1973), did not provide for the payment of any money to the class members.").

The reasonableness of the Settlement is amplified by the fact that it establishes a non-reversionary common fund that will be distributed to qualified Class Members without a claims process. *See* Decl., at ¶¶ 7, 90. This stands in marked contrast to the usual consumer class action settlement, where "claims made" or *cy pres* forms of relief that "produce negligible benefits for class members" are the norm. *See* Mayer Brown LLP, *Do Class Actions Benefit Class Members, An Empirical Analysis of Class Actions*, at 6 (2013).

The Settlement is also exemplary compared to numerous other recent LPI class action settlements. Almost uniformly, those settlements have been "claims made," did not involve a common fund, and which have not involved the automatic distribution of settlement proceeds to class members. *See* Decl. ¶ 10. In those cases, there has been no assurance that the defendants would pay any material consideration apart from the plaintiffs' attorneys' fees. *Id.* Unsurprisingly, many of those settlements have been challenged as collusive and unfair. *Id.*

In contrast, not a single Class Member has objected to the Settlement to date. *Id.* ¶ 89, 120.

The Settlement also compares favorably to the outcomes of the three other class actions that were filed against GMACM relating to LPI — *Ulbrich v. GMAC Mortgage, LLC et al.*, No. 11 Civ. 62424 (RNS) (S.D. Fla.), *Cronk v. GMAC Mortgage, LLC*, No. 11 Civ. 05161 (E.D. Pa.), and *Throm v. GMAC Mortgage, LLC*, No. 11 Civ. 06813 (E.D. Pa.). In each case, the putative class did not recover a penny from GMACM. *See* Decl. ¶ 86.

Hence, the recovery is fair, reasonable, and adequate.  Accordingly, Plaintiffs' Counsel respectfully submits that this Court should find that the *Grinnell* factors, taken together, weigh in favor of Settlement and that the Settlement should be approved.

### D.    The Plan of Allocation Should Be Approved as it is Fair, Reasonable, and Adequate

When evaluating the fairness of a plan of allocation, courts give weight to the opinion of qualified counsel.  "When formulated by competent and experienced class counsel," a plan for distribution of net settlement proceeds "need have only a reasonable, rational basis."  *In re Telik*, 576 F. Supp. 2d at 580 (quoting *In re Global Crossing,* 225 F.R.D. at 462 (quotation marks omitted)).   "A reasonable plan may consider the relative strength and values of different categories of claims."  *Id.*; *see also In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 595-96 (S.D.N.Y. 1992) (plan of allocation that distributes greater part of settlement proceeds to those most injured is reasonable).

Here, the Plan of Allocation was devised by Plaintiffs' Counsel, who are highly experienced in class action litigation (*see* Decl. ¶¶ 90-95, 98, 101, Ex. C), and provides for the proportional allocation of the Net Settlement Fund based on each Class Member's Recognized Loss (*see* Doc. 9491, at ¶ 75).  Courts deem the apportionment of available funds according to the relative amount of damages suffered by class members to be fair and reasonable.[18]

The $10 *de minimis* threshold for the receipt of distributions is also fair and reasonable.  Courts routinely approve similar thresholds.[19]

---

[18] *See In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 838 F. Supp. 729, 733-35 (S.D.N.Y. 1993); *In re Vitamins Antitrust Litig.*, No. 99 Civ. 197, 2000 U.S. Dist. LEXIS 8931, at *32 (D.D.C. Mar. 30, 2000) (citing *Beecher v. Able*, 575 F.2d 1010, 1013-14 (2d Cir. 1978)); *In re Chicken Antitrust Litig.*, 669 F.2d 228, 240-41 (5th Cir. 1982).

[19] *See Global Crossing,* 225 F.R.D. at 463 (approving similar threshold in recognition of the fact that "settlements that distribute checks for less than $10 require disproportionately more follow-up, have a disproportionately high number of uncashed checks, require more checks to be reissued, and often involve second or third distributions of
**[footnote continued on next page]**

23

The use of an estimate to compute the Recognized Losses of those Class Members as to which computerized calculations were impossible is also fair and reasonable. Courts routinely approve the use of similar estimates and extrapolations.[20]

Accordingly, Plaintiffs and Plaintiffs' Counsel submit that the Plan of Allocation represents a fair and equitable method for allocating the Net Settlement Amount among the members of the Class, and should be given final approval by the Court. To date, not one objection to the Plan of Allocation has been filed, which also supports its approval by the Court. *See Veeco*, 2007 WL 4115809, at *14; *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002).

### E.    Notice to the Class Satisfies Due Process Requirements

As indicated above, the court-appointed Settlement Administrator, KCC, has effectuated notice to the Class in accordance with the Notice Order. *See* Decl. ¶¶ 16, 20-26, Ex. B, at ¶¶ 9-19. KCC caused a copy of the Summary Direct U.S. Mail Postcard Notice to be mailed to each of the 143,973 persons whose names appear on the computerized Class Member List provided by the Borrowers Claims Trust. Decl. ¶¶ 20, 25, Ex. B, at ¶10.[21] KCC also caused the Publication Notice to be published in *USA Today* on February 23, 2016 and to be transmitted over the *PR Newswire* on February 23, 2016. *Id.* ¶ 14; Decl. ¶ 22.

---

settlement funds."); *City of Livonia Emp. Ret. Sys. V. Wyeth*, No. 07 Civ. 10329, 2013 WL 4399015, at *2 (S.D.N.Y. Aug. 7, 2013) (same, as "very small checks, i.e. those under $10.00, are often not cashed initially, and in many cases are never cashed.").

[20] *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 260 (D. Del. 2002) (approving loss formula based on averages from available data); *In re Citigroup Inc. Sec. Litig.*, No. 07 Civ. 9901, 2014 WL 2445714, at *2 (S.D.N.Y. May 30, 2014) (allocating recovery based on estimates); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 382 (D.D.C. 2002); *see also Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 799 (8th Cir. 2014); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1256-57 (10th Cir. 2014).

[21] Before causing the mailing, KCC caused the addresses on the Class Member List to be updated using the National Change of Address system, which updates addresses for all people who had moved during the previous four years and who filed a change of address with the U.S. Postal Service. *See* Decl. ¶ 20, Ex. B at ¶ 17. New addresses were found for 10,581 Class Members. *See id.*

In order to provide Class Members with information concerning the Settlement, as well as downloadable copies of the Notice, KCC also established a dedicated website, www.GMACMortgageLenderPlacedInsuranceClassActionSettlement.com.   Both the Summary Direct U.S. Mail Postcard Notice and the Publication Notice directed Class Members to the website for the full Notice.  *See* Decl. ¶ 21, Ex. B, at ¶ 13.

KCC also caused an Interactive Voice Response (the "IVR") system to be established at a toll-free number (844-830-5220) to provide information about the Settlement and to record requests for copies of the Notice.  *See* Decl. 23, Ex. B, at ¶ 12.

The Notice apprises Class members of the proposed Settlement and Plan of Allocation, as well as the rights of Class members and the method and dates by which they can object to, or opt-out of, the Settlement.  *See* Decl. ¶ 18 ; Doc. 9609, at 6-7.  The Class has also been advised of the date of the Final Hearing at which time they will have the opportunity to be heard with respect to any objection raised.  *Id.*

Hence, the Settlement fully satisfies due process and complies with the requirements of Fed. R. Bankr. P. 7023.  The notice program clearly provides "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort."  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (citing Fed. R. Civ. P. 23(c)(2)).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (1) approve the proposed Settlement as fair, reasonable, and adequate, (2) approve the Plan of Allocation as fair, reasonable, and adequate, and (3) enter the accompanying proposed Order and Final Judgment.

Dated:  April 26, 2016
      New York, NY

Respectfully submitted,

**KIRBY McINERNEY LLP**

By: */s/ Mark A. Strauss*
Mark A. Strauss
Thomas W. Elrod
Emily C. Finestone
825 Third Avenue, 16th Floor
New York, NY 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

*Plaintiffs' Counsel*

/s/ Garvan F. McDaniel
Garvan F. McDaniel
**HOGAN McDANIEL**
1311 Delaware Avenue
Wilmington, DE 19806
Tel: (302) 656-7540
Fax: (302) 656-7599

*Plaintiffs' Special Bankruptcy Counsel*