Exhibit F

January 25, 2012 Transcript of Deposition of Timothy Halloran

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF SAN FRANCISCO

 3

 4    BERNARD WARD and COLLEEN

      HALLORAN,

 5

              Plaintiffs,

 6      vs.                            CASE NO. CGC-11-511574

 7    GMAC MORTGAGE, LLC and DOES

      1-20,

 8

              Defendants.

 9

10

11    _____

12

13              DEPOSITION OF TIMOTHY HALLORAN

14                 San Francisco, California

15               Wednesday, January 25, 2012

16                      Volume I

17

18

19

20

21    Reported by:

      LORI STOKES

22    CSR No. 12732

23    Job No. 131752

24

25    PAGES 1 - 105
```

Page 1

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2     FOR THE COUNTY OF SAN FRANCISCO

3

4 BERNARD WARD and COLLEEN

 HALLORAN,

5

6     Plaintiffs,

7  vs.       CASE NO. CGC-11-511574

8 GMAC MORTGAGE, LLC and DOES

 1-20,

9

     Defendants.

10 ————————————————————————————

11

12   Deposition of TIMOTHY HALLORAN, Volume I, taken on

13 behalf of Defendant, at One Embarcadero Center, Suite

14 2500, San Francisco, California, beginning at 10:34

15 a.m. and ending at 2:40 p.m. on January 25, 2012,

16 before LORI STOKES, Certified Shorthand Reporter No.

17 12732.

18

19

20

21

22

23

24

25

             Page 2

```
 1    APPEARANCES:

 2

 3    For the Plaintiffs

 4          MURPHY, PEARSON, BRADLEY & FEENEY

 5          BY:  KAREN STROMEYER

 6          Attorney at Law

 7          88 Kearney Street

 8          10th Floor

 9          San Francisco, California 94108

10          E-mail:  Kstromeyer@mpbf.com

11          Phone:  415-788-1900

12

13    For the Defendant

14          SEVERSON & WERSON

15          BY:  EDWARD R. BUELL III

16          Attorney at Law

17          One Embarcadero Center

18          Suite 2600

19          San Francisco, California 94111

20          E-mail:  Erb@severson.com

21          Phone:  415-398-3344

22

23

24

25
```

Page 3

```
1                              INDEX
2    WITNESS                              EXAMINATION
3    TIMOTHY HALLORAN
     Volume I
4
5                    MR. GADDIS                   5
6
7                    EXHIBITS
8
9    EXHIBIT       DESCRIPTION                    PAGE
10   EXHIBIT 17    Amended Notice of Deposition    6
                   Subpoena and Amended Request for
11                 Production of Documents and Things
                   of Timothy J. Halloran
12
     EXHIBIT 18    August 11, 2010 letter to Sir or   18
13                 Madam from Bernard Ward re 3300
                   Kirkham Street, San Francisco, CA
14                 94122 Account No. ████8940 Bates
                   stamped PLF 00003
15
     EXHIBIT 19    August 24, 2010 letter to Loss    21
16                 Mitigation from Timothy J. Halloran
                   re Bernard Ward/Colleen Halloran
17                 Account No. ████8940 Bates stamped
                   WARD 000020 through 000035
18
     EXHIBIT 20    September 9, 2010 letter to Loss   31
19                 Mitigation from Timothy Halloran re
                   Ward v GMAC, GMAC Account No.
20                 ████8940, our File No.
                   ZZTM.989105.1 Bates stamped WARD
21                 000087 through 000088
22   EXHIBIT 21    November 10, 2010 letter to Loss   38
                   Mitigation from Timothy J. Halloran
23                 re Ward v GMAC, GMAC Account No.
                   ████8940, our File No.
24                 ZZTM.989105.1 Bates stamped WARD
                   000070, 000071 and 000073
25


                                              Page 4
```

```
 1                        EXHIBITS (continued)
 2
 3      EXHIBIT        DESCRIPTION                          PAGE
 4
 5      EXHIBIT 22     November 16, 2010 letter to Loss       40
                       Mitigation from Timothy J. Halloran
 6                     re Ward v GMAC, GMAC Account No.
                       ████8940, our File No.
 7                     ZZTM.989105.1 Bates stamped 00017
                       through 00021
 8
        EXHIBIT 23     January 7, 2011 letter to Mike at      51
 9                     GMAC Mortgage from Timothy J.
                       Halloran re Ward v GMAC, GMAC
10                     Account No. ████8940, Bates
                       stamped WARD 000085
11
        EXHIBIT 24     January 14, 2011 letter to Bernard     53
12                     Ward from GMAC re Loan No.
                       ████8940
13
        EXHIBIT 25     April 22, 2011 letter to Loss          73
14                     Mitigation from Timothy J. Halloran
                       re Ward:GMAC, GMAC Account No.
15                     ████8940, our File No.
                       ZZTM.989105.1 Bates stamped WARD
16                     000017
17      EXHIBIT 26     Copy of Check #7156 written to GMAC    91
                       Mortgage from Collen Halloran re
18                     Loan #████8940
19
20
21
22
23
24
25
                                                     Page 5
```

1    San Francisco, California, Wednesday, January 25, 2012

2                     10:34 a.m.

3

4                 TIMOTHY HALLORAN,

5    having been administered an oath, was examined and

6    testified as follows:

7

8                     EXAMINATION

9

10   BY MR. BUELL:

11       Q    Good morning.  Could you state your name for

12   the record.

13       A    Timothy Halloran.

14            MR. BUELL:  Let's just go ahead and start off

15   the easy way and mark for Exhibit 17 the depo notice.

16            (Deposition Exhibit 17 was marked for

17             identification by the court reporter.)

18   BY MR. BUELL:

19       Q    Mr. Halloran, could you state for the record

20   what your occupation is.

21       A    Licensed attorney practicing in California.

22       Q    And as a result, have you participated in

23   depositions before?

24       A    Yes.

25       Q    Have you ever had your deposition taken

                                              Page 6

```
 1  before?

 2       A    I may have.

 3       Q    Recently, in the last five years?

 4       A    Probably not.

 5       Q    I assume you're comfortable with the process

 6  of a deposition seeing how you've taken some yourself?

 7       A    Yes.

 8       Q    So if you're comfortable with it, we can skip

 9  the opening admonitions, as you know how the process

10  works.

11       A    Yes.

12       Q    Only thing I will ask you is, is there any

13  reason today that you can't give accurate and true

14  testimony?

15       A    No.

16       Q    Moving forward, you've been presented with

17  what's been marked as Exhibit 17.

18            Have you seen this document before?

19       A    Yes.

20       Q    Could you tell us what it is, please.

21       A    It's an Amended Notice of Deposition Subpoena

22  and Amended Request for Production of Documents and

23  Things of Timothy J. Halloran.

24       Q    Have you reviewed this document before?

25       A    Yes.
```

Page 7

1      Q     And if you wouldn't mind turning to Page 2.

2             Have you produced or brought with you today

3      any of the documents listed on Pages 2 and 3?

4             MS. STROMEYER:  Yes.  We're producing

5      documents that are marked 1 to...

6             MR. BUELL:  85.

7             MS. STROMEYER:  Thank you.

8             MR. BUELL:  All right, thank you.

9      Q     All right.  You stated for the record that

10     your occupation is an attorney.

11            Does your practice currently entail any work

12     in the mortgage area?

13     A     It's sort of a vague question, but I do

14     litigation involving mortgage work, yes.

15     Q     Have you ever worked on -- let's clarify.

16            In the last five years, have you worked on a

17     case involving a loan or loan modification?

18     A     Yes.

19     Q     Would you say a majority of your practice

20     involves disputes involving loans?

21     A     As opposed to mortgages?

22     Q     Let's clarify for the record, just for

23     purposes of my question going forward, I will try to

24     use the term loans just to make it more broad in

25     general.

Page 8

1              As California is a Deed of Trust state,

2      mortgage can be somewhat confusing, so I'll refer to

3      the term loan, and if I use the term mortgage, I do

4      mean a loan.   I apologize for that.

5          A    Yeah.

6          Q    I'll rephrase the question and just make the

7      record more clear.

8              In the last five years, would you say a

9      majority of your practice has been in litigation

10     involving loans or loan modifications?

11         A    No.

12         Q    Would you say just 5 percent of your

13     practice?

14         A    I don't know.   I can't give you an estimate.

15         Q    Okay.  Have you, as part of your practice,

16     done any loan modification negotiations on behalf of a

17     client where there was no litigation?

18         A    Yes.

19         Q    Other than this case?

20         A    Yes.

21         Q    Would you say you've done that more than five

22     times in the last five years?  I'm looking for an

23     estimate.

24         A    I don't think so.

25         Q    And these are estimate questions, I'm not

                                              Page 9

```
 1    going to pin you on specifics.
 2        A    Yeah.
 3        Q    And those instances where you have had
 4    negotiations on loan modifications, you've been
 5    directly negotiating with the lender with regards to
 6    obtaining a modification for your client?
 7        A    That would typically be the case, or the
 8    attorney representing the lender, yes.
 9        Q    So through that practice, are you somewhat
10    familiar with loans and how they work?
11        A    Sure.
12        Q    And do you generally understand the terms of
13    loans, rate, maturity date, unpaid principle balance,
14    et cetera?
15        A    I don't know what you mean by that question.
16             MS. STROMEYER:  Objection.  Vague and
17    ambiguous as to the terms of loans.
18    BY MR. BUELL:
19        Q    Sure.  Let me be more specific, and then I'll
20    go down each one.
21             Do you generally understand what an unpaid
22    principle balance is?
23        A    I understand that term.
24        Q    And what would you define that term to mean?
25        A    I don't know that I would define the term.  I
```

Page 10

```
 1    know what it means.

 2         Q    Okay.  What do you understand that to mean?

 3         A    It's the money still owned on the principle

 4    loan.

 5         Q    And as part of your negotiation practice,

 6    have you taken part in negotiating the unpaid principle

 7    balance on a loan?

 8         A    Sometimes.

 9         Q    In an attempt to reduce or modify the

10    principle balance?

11         A    Sometimes.

12         Q    And are you familiar with the term interest

13    rate?

14         A    Yes.

15         Q    And as part of your modification negotiation

16    practice, have you had discussions relating to lowering

17    or modifying the interest rate on a loan?

18         A    Sometimes.

19         Q    Are you familiar with the term stepped rate?

20         A    Not as you state it, no.

21         Q    That's fine.  Fixed rate?

22         A    Sure.

23         Q    And adjustable rate?

24         A    Sure.

25         Q    What would you define adjustable rate to
```

Page 11

```
1   mean?

2       A    It adjusts.

3       Q    Periodically, depends on the terms?

4       A    Yeah, I guess that's a pretty fair statement

5   about what an adjustable rate is?

6       Q    Have you personally had any involvement in a

7   modification of a loan for yourself?

8       A    -- have I personally ever --

9       Q    For yourself.  Have you ever obtained a loan?

10      A    Sure.

11      Q    Have you ever personally -- for the loan that

12  you obtained, have you ever attempted to obtain a

13  modification?

14           MS. STROMEYER:  Objection.  Relevance.

15           THE WITNESS:  I don't know if I've obtained a

16  modification.

17  BY MR. BUELL:

18      Q    Have you ever had need to negotiate for a

19  modification?

20           MS. STROMEYER:  For himself?

21           MR. BUELL:  Yes.

22           THE WITNESS:  I don't know.  I don't think

23  so.

24  BY MR. BUELL:

25      Q    Okay.  The next sort of line of questioning I
```

Page 12

1    want to hit is it appears from your complaint that --

2    and some of the documents that have been produced in

3    the case -- that you began representing Ms. Halloran

4    sometime around August of 2010.

5            Is that a fair statement?

6            MS. STROMEYER:  I'm going to object to the

7    characterization of your complaint.  It's Ms. Halloran

8    and Mr. Ward's complaint.  They are parties to this

9    action.

10            MR. BUELL:  Sure.  I'll be more specific.

11    Q    Pursuant to the complaints made filed in this

12    action, there's a statement made in there -- or it

13    appears from that complaint, along with some of the

14    documents that have been produced in this action, that

15    your representation of Ms. Halloran and Mr. Ward began

16    sometime in August of 2010.

17            Would you say that's accurate?

18    A    If that's what the documents demonstrate.

19    Q    When did you begin your -- when do you

20    believe you began representing Ms. Halloran?

21    A    I don't have a specific recollection.

22    Q    What about Mr. Ward?

23    A    I don't have a specific recollection.  But

24    the representation would have been contemporaneous

25    since they're husband and wife.

Page 13

1       Q    Do you have a retainer agreement with

2   Mr. Ward?

3       A    I have the retainer agreement with the Ward

4   Halloran group, yes.

5       Q    Do you have -- have you produced a copy of

6   that retainer agreement?

7       A    No.  As a lawyer, you have the responsibility

8   to maintain your client confidence to some degree under

9   the Business and Professions Code and the Rules of

10  Professional Conduct.

11      Q    Do you know the date that you entered into

12  that retainer agreement?

13      A    I don't off the top of my head, no.

14      MR. BUELL:  I'm going to state for the record

15  that there is a chance that we may be seeking to move

16  to compel production of that agreement as it may

17  pertain to issues specific to the case.

18      THE WITNESS:  Good luck.

19      MS. STROMEYER:  I would also, for the record,

20  state that I don't believe it's been requested in any

21  facet so far in this litigation.  So we honestly

22  have --

23      MR. BUELL:  That's fair.

24      Q    Turning to -- so, currently, just so I'm

25  clear, you currently are attorney of record for both

Page 14

1    Ms. Halloran and Mr. Ward; is that correct?

2        A    The record speaks for itself.

3        Q    I will assume that the answer to that then is

4    in affirmative then?

5        A    If I filed a lawsuit on behalf of two

6    parties, and I'm the attorney of record, then the

7    activity of filing a lawsuit speaks for itself.

8        Q    Okay.

9        A    I have not substituted out of the case.

10       Q    And you do not know, as you sit here today,

11   what day you were retained by them?

12            MS. STROMEYER:  That's been asked and

13   answered.

14            THE WITNESS:  I don't have the specific

15   recollection of a specific date, no.

16   BY MR. BUELL:

17       Q    Would you state that -- does August of 2010

18   sounds like a reasonable date that your representation

19   began?

20       A    I couldn't tell you off the top of my head.

21       Q    August 2011?  Just trying to get a general

22   range of when you began --

23       A    I think that, fairly early on in my

24   representation, I made phone calls to GMAC.  And that

25   would be certainly within the time frame.  And I don't

Page 15

1    know if that was August of 2010, July of 2010 or

2    September of 2010.  But obviously, suffice it to say

3    I'm here, and I'm representing these people.

4        Q    Was the first action that you recall taking

5    with regards to representation of Ms. Halloran and

6    Mr. Ward to contact GMAC with regards to a loan

7    modification?

8            MS. STROMEYER:  I'm going to object to the

9    extent that they may call for attorney-client

10    communications or work product communications.

11            If you're talking only about his external

12    communications with GMAC, I'll allow him to answer.

13            THE WITNESS:  I'm sure that very early on, I

14    made contact with GMAC.

15            MR. BUELL:  And with regards to your

16    objection, as I believe was stated in Monday's

17    deposition, but we'll state it again here.

18            We believe there's a chance that we will

19    likely challenge the attorney-client privilege with

20    regards to that and seek further information with

21    regards to those communications between you and your

22    client.

23            If you don't mind, I would like to sort of

24    raise that with you now.  I think we can probably

25    circumvent a lot of time going forward if we address

Page 16

1    that now if you're comfortable.

2              For the record, I would like to state that I

3    do believe that the basis for our request is that the

4    attorney-client privilege can be waived -- there is

5    case law supporting it -- on grounds that the party

6    claiming the privilege has placed the privileged

7    communications directly at issue and disclosures

8    essential for fair adjudication of the matter.  We do

9    believe there's case law supporting this, and we will

10   likely bring a motion to compel.

11             I assume your objection will maintain?

12             MS. STROMEYER:  For now, yes, the objection

13   is maintaining.  I would also state that that's an

14   incredibly broad statement of case law.  And I think,

15   applicable to specific communications at issue here,

16   some may or may not be covered arguably by what you're

17   presenting.

18             But, generally, that's not going to waive

19   every single privileged communication.  And certainly

20   asking what the first thing that he did with

21   representation to his clients, that's not at issue in

22   this case.  So the objections are going to stand for

23   now.

24             MR. BUELL:  Can we go off record for one

25   second.

                                              Page 17

```
1              (Short Break Taken.)
2              MR. BUELL:  Counsel had a conversation off
3    the record regarding the objection raised with regards
4    to the attorney-client privilege.
5              The parties have agreed that they will
6    maintain a general objection to any communications
7    between attorney and client under the premise of the
8    attorney-client privilege.
9              As a result, we will forego questioning today
10   with regards to communications between attorney and
11   client and reserve our right to continue questioning
12   should the Court compel further testimony on that
13   grounds.
14             Is that accurate?
15             MS. STROMEYER:  Yes.
16             (Deposition Exhibit 18 was marked for
17             identification by the court reporter.)
18   BY MR. BUELL:
19        Q    So let's move forward into the sort of direct
20   line of questioning here I had for you.
21             I've handed you what's been marked as
22   Exhibit 18.
23             Have you seen this document before?
24        A    Yes.
25        Q    Could you explain for the record what it is,
```

Page 18

```
 1    please.
 2         A    The document speaks for itself.  But it's a
 3    letter that was -- a requirement of GMAC before they
 4    would let me speak to them about the transaction and
 5    the loan.
 6         Q    Does this refresh your recollection in any
 7    way about when your representation of Mr. Ward and
 8    Ms. Halloran began?
 9         A    No.
10         Q    Is it your understanding that this letter was
11    the requirement of GMAC to allow you to have any
12    discussions with them in regards to the loan?
13         A    Correct.
14         Q    And are you aware if there were any
15    additional pages to this document?
16         A    I do not know.
17         Q    Last question on that document, actually.
18         Do you recall as you sit here today if there
19    were any prior communications with GMAC prior to that
20    letter being drafted and sent.
21         MS. STROMEYER:  Related to this property and
22    loan?
23         MR. BUELL:  Correct.
24         THE WITNESS:  Yes.  I know that there were
25    earlier communications.
```

                                               Page 19

1   BY MR. BUELL:

2       Q    Do you recall what any of those were?

3       A    That they would not speak to me as attorney

4   until such time as I identified that I was authorized

5   to do so.

6       Q    Do you have any idea as you sit here today

7   when those communications took place?

8       A    No.

9       Q    Was the purpose for your communication to

10  GMAC -- prior to this letter when they instructed you

11  that they couldn't discuss the loan with you since you

12  lacked authorization, was the purpose of those calls to

13  discuss the loan of Bernie Ward?

14      A    I'm sorry, the purpose of my communicating

15  with them?

16      Q    Correct.

17      A    Yeah.  I was their attorney, and I was

18  representing them.  And GMAC told me that they would be

19  happy to speak with me, but they needed verification of

20  that fact.

21      Q    But the purpose of your contact with GMAC was

22  to discuss the account -- the loan of Bernie Ward?

23      A    That is correct, yes.

24      Q    Do you recall when your next communication

25  with GMAC was following this letter that's been marked

Page 20

```
1    as Exhibit 18?

2         A    No.

3         Q    Do you recall if you had further phone

4    conversations with them regarding that authorization?

5         A    Don't know.

6         Q    And do you recall if you ever got either

7    written or verbal communication that this was

8    sufficient for you to work on the account?

9              MS. STROMEYER:  Objection.  Calls for

10   speculation.  They started communicating with him, so

11   presumably, they accepted it.

12             MR. BUELL:  Just if you don't mind, if we

13   could have testimony from the witness.

14             THE WITNESS:  I had multiple conversations

15   with them.

16   BY MR. BUELL:

17        Q    Following this letter?

18        A    On the substance of the communications

19   concerning the loan, yes.

20             MR. BUELL:  Let's have this marked.

21             (Deposition Exhibit 19 was marked for

22             identification by the court reporter.)

23   BY MR. BUELL:

24        Q    I've handed you a document that's been marked

25   Exhibit 19.
```

Page 21

1              Could you please tell us what this document

2    is.

3         A    The document speaks for itself.  But the

4    cover page of this document with a Bates stamp WARD

5    00020 through 000035 is a August 24th, 2010 cover

6    letter to the Loss Mitigation Department of GMAC in

7    Horsham, Pennsylvania.

8         Q    Is the letter from you?

9         A    Yes.

10        Q    Do you recall drafting or preparing this

11   letter?

12        A    No.

13        Q    Do you recall the purpose of this

14   communication?

15        A    Not independent of what the document says.

16        Q    Do you recall any prior conversations -- so

17   by prior, I mean before August 24th, 2010, the date on

18   this document Exhibit 19.

19             Do you recall any prior communications with

20   GMAC regarding the subject of this?

21        A    Specifically, no.

22        Q    Do you have any notes in your possession or

23   in your file regarding communications with GMAC?

24        A    You mean handwritten notes that I took?

25        Q    Correct.

                                            Page 22

1       A    I don't know.

2       Q    And just to clarify, if you did, you have not

3   produced those today; is that correct?

4       A    If I had handwritten notes of my work

5   product, I would not produce it today, that's correct.

6            If I had any written communications from

7   GMAC, I would have produced that because it would have

8   been responsive and not privileged.

9            But whatever I -- whatever I produced here,

10  which is this exhibit, was as a result of discussions

11  with GMAC concerning what needed to be done in order to

12  begin the process of negotiations of the loan

13  modification.

14      Q    Did you review anything in preparation for

15  today's deposition?

16      A    The Examiner sports section this morning.

17      Q    So you did not review your files or anything

18  else in preparation for today's deposition?

19      A    I answered completely in the previous

20  question what I reviewed before today's deposition.

21      Q    And that's not just today.

22           So in every day since the deposition was

23  noticed, the only thing you've -- you've reviewed in

24  preparation of today's deposition is the sports section

25  of the Examiner?

                                            Page 23

1          A      The deposition notice that I received was

2     January 12th and mailed January 12th.  And since

3     January 12th, I have not reviewed anything for the

4     preparation for this deposition, no.

5          Q      Okay.  If you would turn, please, in

6     Exhibit 19, to what's Bates marked WARD 00034, the last

7     two pages of the exhibit.

8               Have you seen this document before?

9          A      Yes.

10         Q      For the record, could you read what the title

11    of the document is, please.

12         A      General Power of Attorney.

13         Q      What is your understanding as to what this

14    General Power of Attorney provides?

15              MS. STROMEYER:  Objection.  The document

16    speaks --

17              THE WITNESS:  I don't have a general

18    understanding of what it provides.  I just stated what

19    it was for.

20    BY MR. BUELL:

21         Q      Could you please state what it's for, then?

22         A      To confirm that Bernard Ward's wife, Colleen

23    Halloran, had the Power of Attorney to negotiate for

24    the family on the loan modification.

25         Q      Do you know why this was provided as an

                                                    Page 24

1    attachment to your cover letter of August 24th, 2010?

2         A    I know it was asked for by somebody.  Some

3    first name at GMAC because the GMAC people don't give

4    you their last names.  They refuse to do that.  I don't

5    know if you're aware of that or not.

6         Q    So that document was produced at the request

7    of GMAC?

8         A    As I just answered.

9         Q    Do you recall a phone conversation on

10   August 25th that you placed to GMAC with regards to

11   following up this letter marked as Exhibit 19?

12        A    I don't have a specific recollection.

13        Q    Do you think that you would have any notes in

14   your file with regards to such a phone call?

15        A    I don't know.

16        Q    Do you -- as a normal course of your

17   practice, do you keep logs of each phone call that you

18   make?

19        A    No.

20        Q    Do you keep notes as to each phone call that

21   you make?

22        A    No.

23        Q    Informal or formal?

24        A    I may keep notes.  But if it's an important

25   discussion I've had, I often follow up with a letter

                                            Page 25

1    confirming it.

2         Q    And do you have a computer system or any

3    other form that tracks or monitors phone calls that you

4    have made out --

5         A    No.

6         Q    -- as part of your practice?

7         A    No.  No, we do not have that kind of a

8    computer system.

9         Q    Similarly with messages that were left for

10   you from an outside third party, would you have any

11   system of tracking or maintaining records of those

12   messages being left for you?

13        A    If somebody leaves me a voice mail message, I

14   don't routinely keep a voice mail message.

15        Q    Is there a practice at your firm of leaving a

16   paper notation message if somebody else receives a

17   message?

18        A    There is such a practice.  It is extremely

19   rare in the field today to have a written message from

20   a receptionist.

21        Q    I don't disagree.  Just trying to cover the

22   bases here.

23             So what I'm getting at here, the purpose of

24   this line of questioning, if there was a phone call

25   made to you or a message was left in August of 2010, I

                                                Page 26

1    don't anticipate that you would specifically recall

2    somebody leaving you a message then.

3         And all I'm trying to get at is, is there any

4    documentation, electronic record, et cetera, that's

5    kept in the normal course of your practice that might

6    reflect that message being left to you?

7    A    I wouldn't -- I don't have -- we don't have a

8    system that would normally retain that.  And I don't

9    recall that I saved any voice messages, if any, from

10   any GMAC agent.

11   Q    Okay.

12   A    Yeah.

13   Q    Thank you.  That clarifies what I was looking

14   for.

15   A    Yeah.

16   Q    Do you recall placing a call to GMAC on

17   August 30th of 2010 with regards to missing documents

18   or the foreclosure proceedings that had been started

19   against your client?

20   A    Not specifically, no.

21   Q    Do you recall receiving a call from GMAC with

22   regards to the status of the foreclosure sale on or

23   around August 30th of 2010?

24   A    Not specifically, no.

25   Q    Do you recall a phone call you placed to GMAC

Page 27

1  on September 8th regarding additional information that

2  was requested for the financial package that you

3  submitted?

4          To clarify, financial package you submitted,

5  I mean Exhibit 19.

6     A    I have a general recollection of submitting

7  some additional documents as was requested by the

8  lender.

9     Q    So you have a general recollection of sort of

10 back and forth phone calls with GMAC about, hey, we

11 need some additional documentation?  We received your

12 package, but we need some more stuff, and there was

13 some back and forth on that grounds?

14    A    I don't know if I would describe it as back

15 and forth.  The general practice with GMAC was, absent

16 you phoning them, you received no information back.

17         And absent you reminding them on several

18 occasions that the borrower, their client, was

19 represented by counsel, they would attempt to

20 oftentimes communicate with a represented party.

21         But I do know that there were some

22 discussions about some additional documents that needed

23 to be given to me them.  And we did that, I believe.

24    Q    In regards to this case, do you specifically

25 recall informing GMAC that -- let me back up.

Page 28

1          In regards to this action, do you -- or this

2     file, Bernard Ward's loan, do you recall ever

3     specifically having a conversation with GMAC about them

4     directly contacting your clients?

5          A     Yes.  And I told them to please provide me

6     with every document or bit of information that they

7     felt was necessary.

8          Q     Do you recall offhand when that occurred?

9          A     In the very beginning.  And it was reiterated

10    probably every time I found out that they weren't

11    complying with it.

12         Q     So based on your response, I'm understanding

13    that there were multiple instances where they

14    communicated directly with your clients and not with

15    you after your representation?

16         A     There were certainly circumstances in which

17    they did not communicate with me but did with my

18    clients.  Those communications exclusively would have

19    been in writing.  Not via -- in other words, the only

20    communication that GMAC did which I believe to be

21    contrary to what my request was was they would continue

22    to write letters to my client rather than send them to

23    me.

24         Q     Okay.  And just to close the loop on that,

25    are you aware of any -- after your representation

                                                    Page 29

1    began -- so let's just call your representation

2    beginning for clarification purposes, what was that --

3    was it August 11th --

4        A    Why don't we just say after my representation

5    began, and that makes it easier.

6        Q    And we understand collectively, by that I

7    mean the date that you mailed this authorization

8    letter, we'll call it August 11th, 2010.

9            Are you aware of any instances after your

10   representation began of GMAC calling -- phone

11   calling -- your clients directly as opposed to calling

12   you?

13       A    Might be.  But I don't -- I'm not sure who

14   the entity was that was calling.

15       Q    Okay.  But your recollection is more -- and

16   not a hundred percent -- but more that their practice,

17   if they did not communicate directly with you, was to

18   communicate by way of written communication rather than

19   verbal on the phone directly to your clients?

20       A    That would be correct.

21       Q    Okay.  So I think we were at -- are we on

22   September 8th phone call, I believe.

23            Yeah, I believe we were on the September 8th

24   phone call?

25            MR. BUELL:  So the next document I would like

                                                  Page 30

```
 1   to mark is going to be 20.
 2               (Deposition Exhibit 20 was marked for
 3               identification by the court reporter.)
 4   BY MR. BUELL:
 5       Q    So I've presented you with what's been marked
 6   as Exhibit 20.
 7       A    Sure.
 8       Q    Could you state for the record what your
 9   understanding of this document is.
10       A    It's a two-page letter Bates stamped WARD
11   000087 and 000088.  And it's a September 9th, 2010
12   letter to Loss Mitigation from me on the Ward loan.
13       Q    Does this letter convey a settlement offer --
14       A    Yes.
15       Q    -- from your clients?
16       A    Yes, it does.
17       Q    Could you please state for the record what
18   that settlement offer was.
19               MS. STROMEYER:  The document speaks for
20   itself.
21   BY MR. BUELL:
22       Q    If you wouldn't mind reading it into the
23   record, please.
24       A    In order to avoid any further issues or
25   potential litigation, my client is prepared to offer
```

Page 31

1    the following terms for resolution of this matter:

2    The total outstanding reinstatement balance

3    of 31,033.93 as of September 1st, 2010, according to

4    your company.  My client will immediately pay $6,800 of

5    that sum, leaving a balance of $24,233.93.

6    My client will continue to make monthly

7    payments of $3,400, which includes an impound for taxes

8    and insurance.

9    My client will make an additional payment of

10    $403 per month over five years to pay off the current

11    arrearages of the sum.  The totally -- sic -- totally

12    monthly payments beginning in October will be

13    $3,808.90.

14    Q    Do you recall ever getting a response to that

15    offer?

16    MS. STROMEYER:  Hold on.  Could you please

17    clarify --

18    BY MR. BUELL:

19    Q    From GMAC.

20    A    I did not get a response to this offer.

21    Q    Do you ever recall having a conversation with

22    GMAC with regards to this offer?

23    A    Sure.

24    Q    Do you remember the contents of that

25    discussion?

Page 32

```
 1        A    The minion who I spoke to said that that was
 2   in the special Loss Mitigation Department loan review
 3   process, and they would determine what the terms of the
 4   proposal would be.
 5        Q    But you don't remember any further
 6   communications with regards to that settlement offer,
 7   no counteroffer, no further discussions to the terms
 8   or --
 9        A    No.  What I understood was there was a
10   department -- apparently in Horsham, Pennsylvania --
11   which was going to be my contact on that.
12        Q    The letter also reflects or states that
13   there's some additional documents which demonstrate
14   that Mr. Ward will be eligible for a pension.
15             Do you recall if those were provided pursuant
16   to request from GMAC?
17        A    I know the documents were provided.
18        Q    Do you know if you provided that information
19   based on a request from GMAC?
20        A    I don't know if it was they needed
21   verification; I was prepared to give them verification.
22   But in any event, whatever I gave them satisfied their
23   inquiry as to the likelihood of that money coming in
24   for purposes of the modification.
25        Q    Just to clarify, you said they were satisfied
```

Page 33

1    based on what was produced along with this letter?

2            MS. STROMEYER:  Objection --

3            THE WITNESS:  No.  I think what I said --

4    just to clarify the record, whatever it was that was

5    produced eventually satisfied their requirements

6    because they modified the loan.

7        Q    Do you recall what your next communication

8    was --

9        A    No.

10       Q    -- with GMAC following this letter?

11           Do you recall at the time that you sent this

12   letter what the status of the foreclosure sale was?

13       A    No.

14       Q    Do you recall if GMAC -- whoever you were

15   having communications with at GMAC during this time,

16   September of 2010 -- discussed with you the correlation

17   between the modification process and the sale date?

18           Let me rephrase that question.  Do you recall

19   any communications with GMAC during this time,

20   September of 2010, around the time of this letter,

21   regarding the modification review and its impact on the

22   pending foreclosure sale?

23           MS. STROMEYER:  Objection.  Assumes facts not

24   in evidence.  Calls for speculation.  Lacks foundation.

25           THE WITNESS:  I believe that the system that

Page 34

1    they had in place was that the computer screen, which

2    was telling this person who was talking to me what to

3    do, would describe when the foreclosure date was going

4    to be continued to pending their discussion.

5    BY MR. BUELL:

6        Q    In the course of your communications with

7    GMAC, did you frequently discuss the sale date.

8        A    I don't know if I frequently discussed it.

9    Generally speaking, the custom and practice of your

10   client was that you would have to call them to

11   ascertain what the status of the sale date was.

12           They would never call me back to let me know

13   if it was being changed or it was staying.  That was

14   their business practice.

15       Q    Do you recall any conversations with GMAC

16   regarding your concerns with the foreclosure process?

17       A    No one with any authority to discuss any such

18   activity -- even though I suggested that they send it

19   to corporate counsel -- would discuss that matter with

20   me.

21           You basically had an individual that was

22   reading a computer screen.  That was my impression of

23   what was going on.

24       Q    So you had communications beyond these last

25   four, five paragraphs that are contained in your letter

                                           Page 35

```
 1    dated September 9th, 2010?

 2              MS. STROMEYER:  Vague and ambiguous.  At some

 3    point in time, he had communications.

 4              MR. BUELL:  Let me tailor that question down

 5    a little bit.

 6        Q    Did you have communications with GMAC

 7    regarding the foreclosure process and your concerns

 8    about the foreclosure process in September of 2010

 9    beyond this letter?

10        A    You mean did I --

11              MS. STROMEYER:  I'm also going to say vague

12    and ambiguous as to concerns and what that means.

13              But go ahead.

14              THE WITNESS:  The letter I wrote was my

15    putting in writing what my concerns were.  Subsequent

16    to that, I don't know if I had an oral discussion with

17    somebody on the violation.

18              But based on my discussions with the

19    individual who you call on the 1-800, you know, got

20    foreclosure line from GMAC, they weren't authorized to

21    disclose anything of that nature.

22              Which is why I asked them to please send it

23    up to their litigation department.  Because everybody

24    was aware of what was going on with the Federal Reserve

25    and the practices in question.
```

Page 36

1        Q     Do you recall any conversations with GMAC

2    between September 1st of 2010 and November 1st of 2010

3    specifically?

4        A     Specifically --

5        Q     With regards to the Bernard Ward loan.

6        A     You know what, if you focus your questions,

7    I'm sure I might be able to help you out, but that's

8    overbroad.

9        Q     Do you recall speaking with GMAC on

10   September 13th, 2010 with regards to foreclosure fees

11   and request -- do you recall requesting to speak with

12   the supervisor with regards to foreclosure fees?

13       A     I may well have.

14       Q     And just to clarify the record, the prior

15   question, you shook your head.  I assume that was a --

16   no was your answer?

17            MS. STROMEYER:  Will you read the question

18   back so he can be sure what he said.

19            (Record Read.)

20   BY MR. BUELL:

21       Q     Do you recall speaking with GMAC in

22   mid-September of 2010 regarding missing financial

23   information that was required to complete the

24   modification review?

25            MS. STROMEYER:  And can we just have like a

                                          Page 37

```
 1    standing agreement that all these pertain to the Ward
 2    loan, just to --
 3              MR. BUELL:  Yes.
 4              MS. STROMEYER:  Because otherwise I'm going
 5    to keep --
 6              MR. BUELL:  Fair enough.
 7              THE WITNESS:  I don't have a specific
 8    recollection right now on that.
 9    BY MR. BUELL:
10        Q    Do you recall as you sit here today if you
11    had any written communications with GMAC between your
12    September 9th letter, which was marked as Exhibit 20,
13    and November 1st of 2010?
14        A    I don't know off the top of my head.
15        Q    If they were, would you have produced them as
16    part of your production today?
17        A    If they were to GMAC, I would have produced
18    them, sure.
19        Q    To clarify, my question is if there were
20    communications to GMAC.
21        A    If there were communications to GMAC and I
22    wrote them, we would have produced them.
23              MR. BUELL:  Let's go ahead and mark 21.
24              (Deposition Exhibit 21 was marked for
25              identification by the court reporter.)
```

Page 38

1    BY MR. BUELL:

2        Q    Please state for the record what Exhibit 21

3    is.

4        A    This is WARD 000070 through 000073.

5    November 10th, 2010 letter to Loss Mitigation, Horsham,

6    Pennsylvania enclosing payroll and pension benefit

7    deposits.

8        Q    And was this letter sent by you?

9        A    Yes.

10        Q    Do you recall sending or drafting this

11    letter?

12        A    I don't have a specific recollection of it,

13    but I did send it.

14        Q    Do you recall if this letter was prepared and

15    sent pursuant to a conversation you had with GMAC

16    requesting information contained herein?

17        A    I don't have a specific recollection of the

18    conversation.  But I only would have sent this if GMAC

19    had requested further documentation for purposes of the

20    negotiations.

21        Q    Is the reason for your statement now sort of

22    what you said earlier at the beginning of today's

23    deposition, that it's your practice, your customary

24    practice, to follow up a phone conversation with a

25    letter?  An important -- I think as you put it -- an

Page 39

1    important conversation with a letter?

2        A    Well, I don't know -- I would think generally

3    speaking, my practice is if I'm going to confirm

4    something that I believe is material, that I would

5    follow up.

6            And, in this instance, if someone has --

7    that's why I prefaced my last answer with I probably

8    only would have sent this as the result of a request

9    from somebody to provide it.

10            And since the preamble to this letter is

11    pursuant to our negotiations, that infers that we were

12    discussing the subject matter, and therefore, that's

13    why I sent this on November 10th, 2010.

14        Q    Thank you for clarifying that.

15            MR. BUELL:  Let's go ahead and mark 22.

16            (Deposition Exhibit 22 was marked for

17            identification by the court reporter.)

18    BY MR. BUELL:

19        Q    You've been handed what's been marked

20    Exhibit 22.

21            Could you please state for the record what

22    you understand this document to be.

23        A    Well, the first page of this document is

24    Bates stamped 00017, and it's a November 16th, 2010

25    letter from me to sir or madam because they wouldn't

Page 40

1    give me their name.

2              Per your request, enclosed please find the

3    letter from the non-borrowing spouse, who will be

4    making payments on the mortgage and bank depositions of

5    the pension for Mr. Ward.  That's the first page of

6    Exhibit 22.

7              MR. BUELL:  Can we go off the record for one

8    second.

9              (Short discussion off the record.)

10              MR. BUELL:  To clarify, we have amended

11    Exhibit 22 to be the production that was produced by

12    Mr. Halloran today pursuant to the Notice of Amended

13    Deposition, as the copy that I brought with me today

14    did not have the cover letter on it.

15              Therefore, Exhibit 22 will be Bates stamps

16    00017 through 00021.  This is the document that he has

17    been looking at, except for the attachments, which are

18    pages 00018 through 00021.  And we will refer to this

19    as Exhibit 22 from here forward.

20        Q    Do you recall sending or preparing this

21    letter?

22        A    No.

23        Q    Based on the signature, is this a letter that

24    you believe you sent?

25              MS. STROMEYER:  Just for the record, by sent,

                                                Page 41

1    you mean prepared?  He probably caused it to be sent --

2    BY MR. BUELL:

3       Q    Prepared, caused it to be sent.

4       A    Yeah.  I'm relatively sure I produced it to

5    GMAC.  It was in documents they produced to me.

6       Q    Was this letter prepared in response to a

7    conversation that you had with GMAC?

8       A    I have no independent recollection of that.

9       Q    Was the information -- well, let's backtrack.

10          The document states that, enclosed is a

11    letter from the non-borrowing spouse who will be making

12    payments on the mortgage and bank deposits of the

13    pension for Mr. Ward.

14          Do you recall being requested by GMAC to

15    provide this information?

16       A    I have no independent recollection.

17       Q    But you do recall providing it?  Excuse me, I

18    take it back.  You did not testify that you recall

19    providing it.

20          You do believe that this is a letter that you

21    prepared and had sent to GMAC?

22       A    Sure.

23       Q    Okay.  Do you recall any conversations with

24    GMAC in November of 2010 regarding the status of the

25    modification and postponement or request to postpone

                                                    Page 42

1    the foreclosure sale date?

2        A    Not specifically, no.

3        Q    Do you recall any conversations in December

4    of 2010 with regards to postponing the sale date?

5        A    I have no specific recollection of

6    discussions on that subject matter right now.

7        Q    Do you recall any discussions with GMAC in --

8    let's broaden it a little bit -- from November through

9    December of 2010 -- regarding a trial payment plan for

10   Mr. Ward or Ms. Halloran?

11       A    I know that there were discussions on the

12   subject matter, and the proposal was submitted by GMAC,

13   which my client complied with.

14       Q    Do you recall what those terms were?

15       A    Not off the top of my head, no.

16       Q    Do you recall having any negotiation with

17   them?

18            And I'll define what I mean by negotiation.

19   Any back and forth discussions with regards to the

20   terms of that payment plan.

21       A    It was a take-it-or-leave-it proposal.

22       Q    Do you recall if you requested a trial

23   payment plan at any time?  We'll say prior to

24   January 1st of 2011.

25       A    No.  My recollection of the circumstances was

                                              Page 43

```
 1    that GMAC's Loss Mitigation special unit from Horsham,

 2    Pennsylvania were suggesting this trial payment plan as

 3    part of what their criteria is, which was an actual

 4    business model that GMAC and some other major banks

 5    had, as well, to get some monthly mortgage payments

 6    from people who were nonperforming assets to boost

 7    revenue and then were actually -- subsequently charged

 8    by the Federal Reserve Bank with violating the honor

 9    and spirit of the loan that the national government

10    gave them by not following through and honoring the

11    modification programs.  That's what I remember.

12        Q    Do you remember those specific conversations

13    with them?

14        A    That's not conversation with them --

15             MS. STROMEYER:  That misstates his testimony.

16    That's not what he said.

17    BY MR. BUELL:

18        Q    Do you remember having a specific

19    conversation with GMAC about those issues?

20        A    Not from the low-level person who was

21    providing me information about what GMAC's program was,

22    no.

23        Q    Do you recall having those conversations with

24    anyone who was not, as you put it, a low-level

25    employee?
```

Page 44

```
1              MS. STROMEYER:  Objection.  He said he was
2    aware of certain things going on; he didn't say that he
3    had conversations with anyone regarding specifically
4    those issues.
5    BY MR. BUELL:
6         Q    You can go ahead and answer my question.
7         A    No.
8         Q    No, you do not recall any discussions?
9         A    Why don't you read the question back and my
10   answer.
11        Q    That's fair enough.  I'll move forward with
12   that.
13             Do you recall how many different employees at
14   GMAC you believe you spoke with?
15             MS. STROMEYER:  At any point in time?
16             MR. BUELL:  Yes.
17             THE WITNESS:  Well, having been in your seat
18   a couple of times, I cannot give you a precise number,
19   but I will try and estimate.
20             More than five and less than 50.
21   BY MR. BUELL:
22        Q    Are there particular names that stand out to
23   you as people you communicated with more than others?
24        A    Not really.  And, you know, I know there was
25   a telephone log that GMAC had which identified, by
```

Page 45

1    number, the people.

2            But I don't have a recollection -- they would

3    not give their last names.  And sometimes they didn't

4    identify their name at all, in fact.

5        Q    And the telephone log you mentioned, I assume

6    that's something that you've reviewed as your role as

7    attorney in this action?

8        A    Yes, absolutely.  And your PMK, your person

9    most knowledgable, couldn't identify by number the

10   people, even though that was part of his requested

11   knowledge of that subject matter.  So we'll get it -- I

12   mean, we know who they are.  Eventually, we'll get it.

13       Q    But your testimony today -- as witness not as

14   attorney representing the case -- is you do not

15   specifically recall the names of any individuals that

16   you spoke with at GMAC?

17       A    Not the names right now, no.

18       Q    All right.  Let's --

19       A    But, to aid you, it may well have been that,

20   at some point, when I did establish some kind of

21   rapport with one individual, I may have actually put

22   their first name on a letter at some point in time.  I

23   don't know when.

24       Q    And sitting here right now, without looking

25   at the letter, that name doesn't jump out at you?

                                              Page 46

1          A    No, it doesn't.

2          Q    Fair enough.

3               Do you -- did you have any communications --

4     let me ask it a different way.

5               Were your communications with GMAC in

6     writing?  Just walk through each of them.

7               Did you communicate with GMAC in writing at

8     any time during the scope of this, August of 2010

9     through, let's say, today?

10         A    Sure, we've established that.

11         Q    Did you have communications orally on the

12    telephone?

13         A    Yes, we've established that.

14         Q    Did you have any face-to-face or

15    person-to-person meetings with GMAC?

16         A    No.  Didn't have a chance to get to Horsham,

17    Pennsylvania, sorry.

18         Q    Was there any other form of communication you

19    had with GMAC?

20         A    They would not communicate in any other

21    fashion.

22         Q    Did you send -- and I'm sorry, I used the

23    term written communication, that's somewhat broad.

24    Obviously, we've established that you sent letters.

25              Did you also have a course to send faxes to

Page 47

```
 1   GMAC?

 2        A     I'm sure I sent faxes to get the documents

 3   appropriately.  They gave me a fax number.

 4        Q     E-mail, as well?

 5        A     Never.

 6        Q     Never e-mailed?

 7        A     Never.  Wouldn't give me an e-mail for that

 8   purpose.  Only fax.

 9        Q     So, just so I'm hearing you correctly, had

10   you been given the opportunity to send e-mail, you

11   probably would have sent e-mails, you just were never

12   given an e-mail address to send to?

13        A     That's correct.

14        Q     Which makes it kind of hard to send an e-mail

15   if you don't have an address.

16        A     Yes, it does.

17        Q     All right.  When you provided documentation

18   that was required or requested by GMAC for the purposes

19   of reviewing your clients for modification, were those

20   then provided by mail letter, or did you provide them

21   by way of fax?

22        A     The mode of transportation of the information

23   was both.

24        Q     And when you -- when you provided those by

25   mail, was it sent to an address that you were provided
```

Page 48

```
1    by whoever you had been speaking with at GMAC that
2    requested that information?
3         A    That's correct.
4         Q    Same thing with regards to fax.
5              Would you fax to a number that the person you
6    had been communicating with at GMAC specifically
7    provided to you?
8         A    Correct.
9         Q    Was there any -- ever an instance that you
10   recall during your communications with GMAC where they
11   said they had not received something that you had sent
12   to them?
13        A    That may well have happened.
14        Q    But nothing -- you don't recall a specific
15   instance of that?
16        A    It may well have happened, and then we resent
17   it, yeah.
18        Q    Okay, fair enough.
19             Let's move forward to January of 2011.  Do
20   you recall a conversation with GMAC on January 6 with
21   regards to additional documents required for
22   modification specifically regarding this trial payment
23   plan?
24        A    I may well have, I don't know.
25        Q    Do you recall specifically any conversations
```

Page 49

1    you had with GMAC in January of 2011?

2        A    Not particularly.

3             Although, I would like to correct the record.

4    At one point, I was given the

5    FinancialPackage@GMACmortgage.com e-mail to send some

6    documents.

7             So maybe, at some point, someone did give me

8    that information.  But that's not an individual.

9        Q    What document are you looking at?

10       A    Exhibit 21.

11       Q    Okay.  And I see on the top it says by fax

12   and e-mail; is that correct?

13       A    Yes.  So I correct that.  I must have

14   communicated with the company, at least, with this

15   general financial package; although, I don't think that

16   that's an individual's name, which would be

17   customary --

18       Q    And it looks, too, as though you also sent

19   that letter by fax.

20       A    Yeah.

21             So anyway, yeah, trial modification plan

22   January, yeah.  I mean, I know we had discussions about

23   them.  I don't know what they were.

24       Q    And you don't recall specifics about any of

25   those communications --

Page 50

```
 1        A     No.

 2        Q     -- as you sit here today?

 3        A     No.  I do remember the gentleman who gave me

 4   the information when I spoke to him about it was

 5   pleased to announce that, that there was a trial

 6   modification.

 7        Q     In January --

 8        A     Whenever it was.

 9        Q     -- 2011?

10              As you sit here today, do you know if you

11   have any specific notes that you have taken with

12   regards to conversations on the trial plan with GMAC?

13        A     I don't.

14              MR. BUELL:  Let's go ahead and mark next 23.

15              (Deposition Exhibit 23 was marked for

16              identification by the court reporter.)

17   BY MR. BUELL:

18        Q     You've been handed what's been marked

19   Exhibit 23.

20              Would you please state for the record what

21   you believe this document to be.

22        A     This was a WARD 000085 letter of January 7th,

23   2011 sent by facsimile to GMAC mortgage.

24        Q     Is the letter from you?

25        A     It is.
```

Page 51

```
 1          Q    Do you recall preparing or sending this

 2    letter to GMAC?

 3          A    I -- I know I prepared the letter and sent it

 4    to Mike.

 5          Q    Do you recall any conversations with Mike

 6    with regards to the substance of this letter?

 7          A    I believe that Mike wanted to get

 8    confirmation that the -- what the status was of the

 9    cancer expense treatments for the Wards' son who had

10    the Hodgkin's lymphoma.

11          Q    Do you recall speaking with a Mike now that

12    you see the name?

13          A    I know I spoke to a gentleman.  That must

14    have been his name.  That's why I sent him this

15    information.

16          Q    As you sit here, now that you see the name

17    Mike, do you recall speaking with Mike on more than one

18    occasion?

19          A    I may well have.  I know at one point in

20    time -- and I think this was probably consistent with

21    impressions from the Federal Reserve -- GMAC was trying

22    to get one person sort of on these documents.

23               So I don't know.  But I think I had more than

24    one conversation with Mike.

25          Q    And the substance of this letter is
```

Page 52

1    additional information regarding the treatment of

2    Ms. Ward's son, as you mentioned for lymphoma; is that

3    correct.

4         A    Right, yeah.  As you may recall, that was --

5    unfortunately, for this family, some very bad things

6    happened, and one of their children had cancer.

7              And so what GMAC wanted to know is, well, if

8    it's really expensive, they won't be able to make our

9    mortgage payments.

10             So we were trying to tell them that the

11   lymphoma was in remission, and that the expenses

12   weren't going to be such that GMAC wouldn't get its

13   money.

14             MR. BUELL:  Let's move on to the next

15   document.

16             (Deposition Exhibit 24 was marked for

17             identification by the court reporter.)

18   BY MR. BUELL:

19        Q    You've been handed what's been marked

20   Exhibit 24.  As you can see from the bottom right-hand

21   corner, it has a marking of Exhibit 1.  The Exhibit 1

22   reference is the exhibit to the complaint that was

23   filed in this action.

24             Do you recall this document -- seeing this

25   document prior to today?

                                              Page 53

```
 1        A    I have.  Although, I'm not sure the stamp

 2   that says Exhibit 1 is something that I saw on the

 3   document when I saw it.

 4             I also note that there isn't any Bates stamp

 5   number demonstrating that this was a GMAC document that

 6   was produced by GMAC in response to request for

 7   production of documents.

 8        Q    Have you reviewed this document -- have you

 9   seen this document before?

10        A    Well, I have received and reviewed in the

11   past a GMAC Mortgage document, which described itself

12   as a Trial Modification Agreement, yes.

13        Q    Since this specific document does not have

14   the Bates stamp or the production from GMAC, would you

15   like to take a moment to review it to make sure it was

16   the document you reviewed in the past?

17        A    I couldn't do it without comparing it to the

18   document I did review in the past or we produced

19   previously.

20             (Short discussion off the record.)

21             THE WITNESS:  Exhibit 24, we've established,

22   now appears to be an accurate, representative copy of a

23   document, which was attached as an exhibit to my

24   complaint on behalf of my clients.

25
```

Page 54

```
 1   BY MR. BUELL:

 2        Q    Have you reviewed this document prior to

 3   today?

 4        A    I did review it prior to today.

 5        Q    As you sit here right now, do you understand

 6   the purpose of this document as it was presented to

 7   your clients?

 8        A    I believe I understood what GMAC was

 9   purporting to do with this, yes.

10        Q    And what's your understanding as to what GMAC

11   was purporting to do with this?

12        A    The representation of what they were

13   purporting to do is to demonstrate that the borrower

14   could make mortgage payments for three months sort of

15   as a trial to whether or not the permanent modification

16   would be made.

17             And that, upon the completion of the trial

18   period, that then the modification would become a

19   permanent modification.

20        Q    Do you recall having a conversation with your

21   clients regarding this document?  I'm not asking

22   about --

23        A    Well, of course I would have discussed with

24   my clients any proposal that was provided by GMAC.

25        Q    Do you specifically recall discussing this
```

Page 55

1    trial payment plan with them?

2        A    Well, in the course of my representation of

3    my clients, any material aspect of the case, my custom

4    and practice would be to discuss it with them, of

5    course.

6        Q    I'll just ask it one more time.  Maybe I'm

7    phrasing it not correctly.

8            But my question to you is, specifically this

9    document, do you specifically recall having a

10   communication or a discussion with your clients about

11   this document?

12       A    Here is the difficulty with what -- I've run

13   across this a few times in my life.

14           When you ask an attorney whether or not he

15   had a discussion on the subject matter of a document,

16   right, by the question itself, it's asking for a

17   subjective communication with the client.

18           So I cannot answer that question without

19   divulging attorney-client privileged communication,

20   because the subject matter, which is the premise of

21   your question is included in the question.

22           So the easiest way for me to answer that

23   without invading that attorney-client privilege is to

24   state to you that it would have been my custom and

25   practice -- and I always communicate with my clients,

Page 56

1    every material aspect of a transaction in which another

2    party has communicated to me for my client's benefit

3    terms of a proposed agreement, okay.

4        Q    So just to clarify for my side of the record,

5    I understand that your direct response to my question

6    about a specific communication with your client --

7    whether you recall a specific conversation with your

8    client about this document is you're objecting on

9    grounds of attorney-client privilege.  And, instead of

10   directly answering the question, you're providing a

11   more general response?

12       A    I am generally answering a question, which is

13   responsive to your question's subject matter without

14   specifically affirming what communications I had with

15   respect to the subject matter, which itself is

16   attorney-client privileged.

17       Q    Do you understand this document to be a

18   written contract?  This document, to clarify, I mean

19   Exhibit 24.

20       A    I don't have a present opinion about what

21   this is or isn't.  Since I'm not here as an expert, I'm

22   not going to give you answers to that unless you start

23   paying me, which you can't because we're in conflict of

24   interest.

25       Q    That would be a conflict, wouldn't it?

                                              Page 57

```
1        A    It would.

2        Q    If I turn to Page 3 of Exhibit 24, it's the

3    signature page for this document.

4             Could you please read for the record how it's

5    signed.

6        A    Well, the document speaks for itself.  And

7    how it's signed is, please sign and return this

8    agreement.  And it says, Colleen M. Halloran, Power of

9    Attorney for Bernard Ward, 1/23.

10       Q    Is it your understanding that the Power of

11   Attorney that she's referring to is the Power of

12   Attorney that is an attachment to an exhibit that we

13   discussed earlier, Exhibit 19?

14       A    I don't know.

15       Q    If you wouldn't mind pulling out Exhibit 19.

16       A    In other words, you asked me whether or not I

17   understood --

18            MS. STROMEYER:  Objection.  The document

19   speaks for itself.

20            MR. BUELL:  I understand.

21            THE WITNESS:  I don't know.

22   BY MR. BUELL:

23       Q    Do you recall reviewing the general Power of

24   Attorney in regards to the authority or ability of

25   Ms. Halloran to sign on behalf of Bernard Ward?
```

Page 58

```
1              MS. STROMEYER:  Attorney.  May call for
2     attorney-client work product --
3              THE WITNESS:  I don't know.  I don't know if
4     I looked at it one way or the other.  Certainly
5     estoppel in pais would make it irrelevant.
6         Q    What is -- do you believe Exhibit 24 --
7              THE WITNESS:  That's P-A-I-S, by the way,
8     estoppel in pais is P-A-I-S.
9              THE REPORTER:  Thank you.
10    BY MR. BUELL:
11        Q    Let me stop and rephrase this question.  I'm
12    trying to phrase it without getting to the purpose of
13    your prior objection regarding communications with your
14    client.
15             If you take a look at Exhibit 24, does it
16    list out the original principle balance of the -- of
17    the loan?
18        A    Don't know.
19        Q    If you look at Paragraph 3 on Page 1 of
20    Exhibit 24, could you please review that paragraph.
21        A    I'm sorry, which paragraph?
22        Q    I'm sorry, it's not paragraph.  It's itemized
23    Number 3.
24        A    Okay, I see that.
25        Q    It's actually the sixth paragraph.
```

Page 59

```
1        A    Okay.

2        Q    Now that you read that, do you -- what do you

3   believe the original principle balance of the loan was

4   according to this document?

5            MS. STROMEYER:  Objection.  The document

6   speaks for itself.  Mr. Halloran's understanding of the

7   principle balance is irrelevant.

8            THE WITNESS:  I don't know.  This is what the

9   document says.

10  BY MR. BUELL:

11       Q    What is your understanding today as to what

12  the principle balance of the loan is?

13       A    I don't have one.

14       Q    Do you recall what your understanding as to

15  the principle balance of the loan at the time of this

16  letter in January of 2011 was?

17       A    I don't have recollection of that.

18       Q    Do you recall looking at the principle

19  balance as a term in your negotiations with GMAC?

20       A    At what point in time?

21       Q    Let's say January 2011.

22       A    No.  I think that that discussion was about

23  the trial loan modification.

24       Q    Do you recall discussing -- as part of your

25  negotiations with GMAC, do you recall discussing the
```

                                                    Page 60

1    principle balance at any point in time?

2        A    I know I talked with them early on about what

3    the principle balance was, yeah.  But I don't know off

4    the top of my head what that was.

5        Q    Do you recall any discussions with regards to

6    reducing the principle balance?

7        A    Discussions, no.

8        Q    Do you recall any other communications

9    regarding or requests -- let's say that.

10        Do you recall making a request to GMAC for a

11    principle reduction?

12        MS. STROMEYER:  At any point in time?

13        MR. BUELL:  At any point in time.

14        THE WITNESS:  Yes.

15    BY MR. BUELL:

16        Q    Do you recall when that request was made?

17        A    I don't.

18        Q    If the request was made in writing -- was the

19    request made in writing?

20        A    Yes.

21        Q    So, conceivably then, the request would be in

22    one of these documents that we have in front of us that

23    was produced today?

24        A    I'm sorry?

25        Q    If you made the request for principle

                                            Page 61

1   reduction in writing, then we should find it in one of

2   the documents that was produced today.

3            Is that accurate?

4       A    No.

5       Q    Where else would that communication be then?

6            MR. GADDIS:  Can we go off the record.

7            (Short discussion off the record.)

8   BY MR. BUELL:

9       Q    Do you recall having any direct

10  communications with GMAC with regards to a request in

11  reduction principle loan balance?

12       A    Define direct with GMAC.

13       Q    With a representative, an employee with GMAC?

14       A    Other than Severson & Werson?

15       Q    Is it your understanding that Severson &

16  Werson is a direct employee with GMAC?

17       A    I don't have an understanding of what their

18  relationship is with GMAC, except to the extent that

19  the scuttlebutt is you're doing these cases on a flat

20  rate.  But other than that, I don't know.

21       Q    Any of the conversations that you had with

22  employees of GMAC, where you called someone in Horsham,

23  Pennsylvania -- since you've used that location

24  before -- do you recall having any written

25  communications with an individual from GMAC Mortgage

                                        Page 62

```
1    out of their Horsham, Pennsylvania office with regards

2    to a reduction of principle balance?

3         A    I don't have any recollection of that.

4         Q    Do you have any recollection of having a --

5    making a request for principle balance reduction to an

6    attorney at Severson & Werson?

7         A    I know there were settlement negotiations in

8    that manner, yes.

9         Q    But you're not able to differentiate between

10   Severson & Werson employees and GMAC employees in the

11   context of making a request for principle reduction?

12        A    I wouldn't.

13        Q    Okay.  If you turn to Page 2 of Exhibit 24,

14   please.

15             Itemized Numbers 5, 6, and 7 contain terms of

16   the repayment plan.

17             Would you agree with that statement?

18             Take your time to review it, please.

19             MS. STROMEYER:  I'm going to object that the

20   document speaks for itself.  And it may call for an

21   expert opinion or legal conclusion, which is not

22   Mr. Halloran's capacity here today.

23             THE WITNESS:  You asked me to read it, and

24   then while I was reading it, you asked me a question.

25             What was your question?
```

Page 63

1    BY MR. BUELL:

2         Q    Go ahead and review Items 5, 6 and 7, and

3    please let me know when you're completed.

4         A    Okay.  Okay.

5         Q    Do you understand -- is it your understanding

6    that 5, 6 and 7 are terms to this payment plan?

7         A    What my understanding is currently?

8         Q    Yes.

9         A    I don't know if I have an understanding

10   currently.

11        Q    Based on your review of the document, is it

12   your belief that, say, for example, Item 7 is a

13   schedule of the payments required to be made pursuant

14   to this agreement?

15             MS. STROMEYER:  I'm going to --

16             THE WITNESS:  Well, the document appears to

17   state what is required under the terms of the

18   agreement.

19   BY MR. BUELL:

20        Q    And I believe I may have asked you this

21   before, so I apologize if I did.

22             But on Page 3 of this document, is there a

23   specific place for Bernard V. Ward to sign and date

24   this document?

25        A    Not on the document that you're showing me.

Page 64

```
 1              MS. STROMEYER:  On the last page.
 2     BY MR. BUELL:
 3        Q     Page 3 of the document.
 4              MS. STROMEYER:  The document speaks for
 5     itself.
 6              THE WITNESS:  There is a signature line for
 7     Bernard Ward, yes.
 8     BY MR. BUELL:
 9        Q     And in your review of this document, this
10     document has been signed -- for the purposes of this
11     question, I understand that it is not signed by Bernard
12     Ward.
13              But do you agree that this document has been
14     signed with what appears to be someone with the
15     authority to sign on his behalf.
16        A     Clearly.  And, clearly, GMAC accepted each
17     one of these three payments in conformity with this
18     modified agreement.
19        Q     And what's the basis for that testimony?
20        A     Canceled checks.
21        Q     Have you produced copies of those canceled
22     checks?
23        A     Oh, and in addition, the documentary evidence
24     from GMAC evidencing receipt of that.  And yes, we have
25     produced canceled checks.
```

Page 65

```
 1              MS. STROMEYER:  I don't believe that they
 2    were produced as part of the production today.
 3              MR. BUELL:  That's fine.
 4        Q    Do you recall your next communication with
 5    GMAC following the trial payment plan being -- excuse
 6    me.
 7              Do you recall the next communication you had
 8    with GMAC following this January 14th, 2011
 9    communication that we've previously marked as
10    Exhibit 24?
11              MS. STROMEYER:  I'm going to object that that
12    misstates his testimony that indicates Mr. Halloran was
13    in direct communication to Mr. Bernard Ward.  He did
14    not testify that it was a communication through him.
15              MR. BUELL:  Fair enough.
16        Q    Do you recall the next communication that you
17    had with GMAC Mortgage after January 14th, 2011?
18        A    No.
19        Q    Do you recall the basis of your next
20    communication you had with GMAC following the trial
21    payment plan being entered into?
22        A    Not independent of what you might show me to
23    refresh my recollection, no.
24        Q    Do you recall any conversations with GMAC in
25    February of 2011 regarding the pending sale date,
```

                                              Page 66

1    foreclosure sale date?

2        A    After the execution of this modified program?

3        Q    Correct.

4        A    I can only say generally that I had to

5    continue to follow up to make sure that they were

6    continuing to delay the foreclosure consistent with

7    their obligations under this agreement.

8        Q    As you said, you continued to follow up to

9    make sure.

10        Do you recall any reason for being concerned

11    the sale date had not been continued?  For example,

12    receiving a notice of sale, receiving a communication

13    from GMAC that said the sale will be going forward on X

14    date, et cetera?

15        A    Well, GMAC never sent a communication in

16    writing that they were going to sell anything.  So that

17    didn't happen.

18        And I don't know what would have prompted me

19    to check, except that my recollection with what their

20    business practice was is that they wouldn't call to let

21    you know that it was being continued; you had to call

22    them.

23        Q    So is it a fair -- I understand this is an

24    assumption -- is it a fair assumption that what you're

25    testifying to today is that you were calling GMAC -- if

Page 67

1    you called -- because you don't recall specific

2    communications after this -- but if you made a

3    communication to them, it was out of an abundance of

4    caution to make sure the sale wasn't going to occur?

5        A    Yes.  And I know, as an example -- and this

6    is just an example -- that the kind of people that sit

7    on the courthouse steps and buy people's property, I

8    know that, after the Loan Modification Agreement that I

9    believe was entered into was entered into with a

10   payment received and accepted by GMAC, that someone in

11   my client's family received a phone call from somebody

12   about trying to get -- you know, the sale or buy the

13   property or something like that.

14            And that was at a time when GMAC didn't even

15   notify me or the borrowers that the property had

16   already gone into sale.

17       Q    And just to be clear, that's exactly what I'm

18   getting at.  Other than that example that you provided,

19   do you recall any other situations during the course of

20   this negotiation -- meaning August 13th, 2010 through

21   the present time -- when you were given any

22   communication -- notice from third party, GMAC,

23   anyone -- that a sale was going to take place, which

24   required you to take some affirmative action to make

25   sure that sale date had been postponed?

Page 68

1                I know that's a compound question, but that's

2      what I'm getting at.

3          A    Yeah.  My general recollection, generally

4      speaking, is that, as an example, I have a series of

5      phone calls about a loan modification and then call to

6      find out where the modification like this pilot program

7      is, and I find out that -- in lieu of sending it to me,

8      as I requested -- they send it to this house.

9                I'm sure there are instances where there were

10     some communications about foreclosure issues and sale

11     dates, but I have no specific recollection right now.

12     I just know that their modus operandi was that, if you

13     want to find out about it, you had to call us, we

14     weren't going to let you know.

15         Q    And just to clarify for my own understanding,

16     the example you just gave was not specific to this

17     case, that's your general dealings with GMAC.

18               Is that accurate?

19         A    Well, that was consistent with what my

20     dealings with GMAC were in this case.  It apparently is

21     consistent with their modus operandi business practice

22     because what happened with the Federal Reserve

23     demonstrated that it must have been going on

24     countrywide, which is why they wanted to enter into the

25     stipulation that they did.

                                                    Page 69

1          Q      And is that -- your testimony there based on

2    your experience from working on other cases regarding

3    loan modifications that may have involved GMAC?

4          A      And looking at the 60 or 70 cases in

5    California filed against GMAC for exactly the same kind

6    of conduct which we're dealing with here today.

7                 As well as looking at the stipulated order

8    and judgment with the Federal Reserve Bank that GMAC

9    entered into.  So it's pretty clear what was going on

10   there.

11         Q      Have you, in the course of your

12   representation, had any conversations with other

13   counsel -- since you've referenced I think you said 60

14   or 70 other cases in California against GMAC, have you,

15   in the course of your representation here, had

16   conversations with any other attorneys who have filed

17   actions against GMAC?

18         A      I probably have had some conversations with

19   them, yeah.  And I may have -- no, I probably haven't

20   had that yet.

21         Q      Was your review of those 60 to 70 cases a

22   result of this case?

23         A      Well, I was appalled by what GMAC did in this

24   case.  And then I was further surprised that -- to find

25   out that this was happening so prevalently.  And

Page 70

1    obviously, Kamala Harris, our Attorney General, is

2    seeking their own cases against them, as well as other

3    Attorney Generals in the U.S.  And, obviously, the

4    Federal Reserve has been concerned enough about it.

5         Q    Have you had any conversations --

6    communications of any sort -- with Kamala Harris or any

7    AG office regarding this?

8         A    Not her directly, I don't believe so.

9         Q    And, obviously, I'm not getting to the basis

10    of the communications, just whether or not there were.

11        A    But the Federal Reserve is keeping an eye on

12    you guys.

13        Q    And have you had any conversations or

14    communications with the Federal Reserve regarding this

15    case or --

16        A    Oh, yeah.

17        Q    You have?

18        A    Oh, yeah.

19        Q    When did you have those communications with

20    the Federal Reserve?

21        A    When I thought it was appropriate.

22        Q    Do you have a date?  An estimated date range?

23        A    Not off the top of my head.

24        Q    Last week?  Last month?

25        A    Are you going to ask me for an estimate when

Page 71

1    these conversations occurred?  Within the last year.

2        Q    Have you had multiple conversations with the

3    Federal Reserve?

4        A    My office has had multiple conversations with

5    the Federal Reserve, yes.

6        Q    You personally or your office collectively?

7        A    My office collectively.

8        Q    Have you personally had multiple calls with

9    the Federal Reserve?

10       A    Not me personally, no.

11       Q    And the purpose of your call, was it directly

12   related to this case, or was it related to your general

13   handling of the matters regarding GMAC as a defendant?

14       A    Both.

15       Q    Have you had any written communications with

16   the Federal Reserve regarding these issues?

17       A    Don't know.

18       Q    Only phone calls is your recollection right

19   now?

20       A    Currently.

21       Q    How about your office?  Do you know if anyone

22   from your office has had written communications with

23   the Federal Reserve regarding this?

24       A    Don't know off the top of my head.

25       Q    All right.

Page 72

```
1                MR. BUELL:  Let's mark this.
2                  (Deposition Exhibit 25 was marked for
3                  identification by the court reporter.)
4    BY MR. BUELL:
5        Q    Marked as Exhibit 25, could you please tell
6    us what this document is.
7        A    WARD 00017.  April 22nd, 2011 letter sent via
8    facsimile and e-mail to Loss Mitigation, Horsham,
9    Pennsylvania.
10       Q    And was this letter sent and prepared by you?
11       A    Yes.
12       Q    Could you tell me what your understanding of
13   the purpose of this communication is?
14       A    I'd received an offer from GMAC for a
15   permanent loan modification in a telephone conversation
16   with a person who was a supervisor, whose name I don't
17   have off the top of my head.
18            And I went -- I'm pretty sure it was a
19   male -- told me what the modification terms were going
20   to be and was pleased to let me know that I could
21   convey this to my client.
22            And so I wanted to confirm in writing the
23   terms of the offer and that, you know, it would be
24   accepted.
25       Q    Do you recall taking handwritten notes during
```

Page 73

1    your conversation with the supervisor at GMAC?

2        A    Yeah.  I'm almost positive I would have taken

3    notes of this, because I then translated it into this

4    letter.

5        Q    And again, this goes back to your general

6    practice.  You don't know sitting here now if you did

7    that or not.

8            So your general practice would be -- am I

9    accurate in saying that you would take notes during the

10   course of a phone call and use those notes to prepare a

11   letter such as this?

12       A    Yeah, that would be consistent.  Now whether

13   or not I kept that note in this file, I don't know.

14   And then, parenthetically, one issue that we will have

15   to deal with is there is a representation by GMAC on

16   every phone call that they are recording these

17   conversations.

18           And, to date, we have not received any

19   recorded conversation of any conversation I had.  I

20   don't know if those recorded conversations have been

21   looked for or exist, but we will be asking for those.

22       Q    Last question before we take a brief break

23   here is, so as you sit here right now is the basis of

24   my question here.

25           As you sit here right now, does this

Page 74

1   April 22nd, 2011 letter form the basis for the

2   modification that is -- that this action is based on?

3        Let me rephrase that.  Does this letter

4   contain all of the terms of the modification?

5        MS. STROMEYER:  Objection.  May call for

6   legal conclusion.  May call for expert testimony.

7        MR. BUELL:  That's fine.

8        THE WITNESS:  This conveys what the offer was

9   from GMAC for a permanent loan modification.  This was

10  their offer.  And this was our acceptance of their

11  offer.  Offer, acceptance -- first year contracts.

12  Offer, acceptance, consideration, paid, estoppel in

13  pais.  That's what this was.

14        MR. BUELL:  Okay.  Let's take a break.

15          (Short Break Taken.)

16  BY MR. BUELL:

17    Q    We were talking about, before a short break

18  here, Exhibit 25.  Just to recap so we're all back on

19  the same page, correct me if I'm misspeaking here.

20  This is a letter drafted and sent to GMAC from you on

21  April 22nd, 2011.

22        I believe your testimony was -- and correct

23  me if I'm wrong -- that this letter was confirmation of

24  a conversation you had with a supervisor at GMAC with

25  regards to an offer to modify the loan for Bernard

                                            Page 75

1  Ward.

2          Is that correct?

3      A    Yeah.  For a traditional loan modification.

4      Q    And just for purposes of keeping the record

5  clean, would you mind -- you don't have to read the

6  letter, but would you mind just reading the terms that

7  are stated in your letter for the agreement?

8      A    Yeah.  Dear sir or madam, this will confirm

9  my recent conversation with your unit confirming that

10  the borrower has been approved as of April 21st, 2011

11  for a modified traditional modification with an APR

12  rate of 2.88 percent.  The 432 modified payments of

13  principle, interest and PMI amount to $3,253.24 per

14  month, the principle and interest payment of that sum

15  being $2,678.12.

16          That was what was told to me, and that's what

17  I confirmed.

18      Q    And do you recall this conversation took

19  place on the 22nd?  On the 21st?

20          MS. STROMEYER:  It's compound.

21          THE WITNESS:  Well, I don't know if it was

22  the 21st or the 22nd.  But you know, it was either the

23  21st or the 22nd.

24  BY MR. BUELL:

25      Q    It was recent, right?  Is what your letter

Page 76

```
 1    says?
 2        A     Yeah.
 3        Q     Do you -- as you sit here right now, without
 4    taking a look at the handwritten notes that you may or
 5    may not have taken on this phone call, do you recall
 6    any specifics about the conversation that you had with
 7    the supervisor prior to this letter being drafted?
 8              MS. STROMEYER:  That may be vague and
 9    ambiguous.
10              Is your question does he recall anything
11    additional to what he's already testified to?
12              MR. BUELL:  Correct.
13              THE WITNESS:  No.
14    BY MR. BUELL:
15        Q     Do you recall the name of the supervisor that
16    you spoke with?
17        A     You know what, I don't.
18        Q     Do you recall --
19        A     I think he was 107.  I don't know.
20        Q     Do you recall if -- prior to speaking with
21    the supervisor for the purpose of this phone call
22    that's referenced in this letter, do you recall if you
23    spoke with another individual who then passed you on to
24    a supervisor or if you communicated directly with the
25    supervisor?
```

Page 77

1         A    No.  At one point in time, the communications

2    on this part of the loan modification came -- I had at

3    least two conversations with this individual.

4         Q    Okay.  But you don't recall what that

5    individual's name was?

6         A    No.  But if you look at those records from

7    the internal records of GMAC, you'll probably know.

8    And he was -- whoever that person was.  But in any

9    event, he was pleased to provide the information and

10   happy that it happened.  He was enthusiastic about

11   helping the Ward family.

12         MS. STROMEYER:  You don't have to speculate

13   to the person, but you don't remember the person?

14         THE WITNESS:  I do not.

15   BY MR. BUELL:

16         Q    Am I correct that you specifically remember

17   him saying something to the effect -- or I may be

18   paraphrasing -- but I'm pleased to inform you that

19   you've been applied for a loan modification?

20         MS. STROMEYER:  You've been approved.

21         THE WITNESS:  Congratulations, something

22   along those lines, sure.

23   BY MR. BUELL:

24         Q    Do you recall any conversations with GMAC

25   between the trial payment plan -- so we'll call that,

Page 78

1    from the exhibit we looked at earlier January 14th just

2    for ease of giving it a time frame.

3         Between January 14th, 2011 and your

4    conversation that forms the basis of this letter, so

5    we'll call it April 21st, 2011.

6         Between that time span, do you recall any

7    specific conversations with GMAC regarding the loan

8    modification?

9    A    No.  I know that there were some inquiries as

10   to what the status was of the evaluation of the

11   permanent loan modification.

12   Q    Did you -- you don't recall any specifics of

13   those?

14   A    I don't believe there were any specifics

15   beyond what's going on.  And it was sort of like, I'm

16   trying to get some information from the Wizard of Oz.

17   It was, we'll tell you in good time.  That was kind of

18   my --

19   Q    As a more general broad question, so this

20   question will span the scope again of August 2010 to

21   present.

22        As a general matter, were most of your

23   conversations -- phone conversations with GMAC -- five

24   minutes?  Two hours?  Totally varied?

25   A    I never had a two-hour conversation with

Page 79

1    anybody at GMAC.

2        Q    Did most of them tend to be very brief, on

3    the order of, say, less than ten minutes?

4        A    I probably -- the longest conversation I had

5    was probably on the order of a half-hour.  And the

6    shortest may have been on the order of two or three

7    minutes.

8        Q    And I understand I'm asking you to generalize

9    here.  Generally speaking, were they on the shorter end

10   of the spectrum?

11           In other words, the 30-minute call was more

12   the exception rather than the norm?

13       A    Yeah.  I don't know if I can tell you what

14   the normal was.

15       Q    That's fine.

16       A    But there was a range, obviously.

17       Q    Do you have a recollection of GMAC calling

18   you directly during the full span of this August 2010

19   through present?

20           MS. STROMEYER:  And just -- you're speaking

21   about GMAC; you're not talking about Severson & Werson?

22           MR. BUELL:  Correct.

23           MS. STROMEYER:  Okay.

24           THE WITNESS:  Yes.  GMAC was capable of

25   calling me and capable of leaving a voice message,

Page 80

```
 1    which they did, including a phone number to call the
 2    individual back.
 3           Which is why it's extraordinary that, when it
 4    came time for GMAC to foreclose on the property
 5    after -- in my belief they reneged on the deal -- they
 6    didn't leave a message on my answering machine at the
 7    office to let me know that.
 8    BY MR. BUELL:
 9       Q    When you say reneged on the deal, just to
10    clarify the record, what's the deal you're referring
11    to?
12       A    Well, there was a permanent loan modification
13    offer made by GMAC, the terms of which I read into the
14    record.
15           There was an agreement that the payments
16    should begin effective May 1st.  Those payments -- that
17    first payment was made.  That first payment was
18    accepted by GMAC and paid by GMAC.
19           And then, without announcing -- without
20    announcing that that was no longer a deal, GMAC went
21    forward and foreclosed on the property without
22    notifying anyone of it and then wrote a letter not to
23    me, the attorney of record in this negotiation, but
24    sent a form letter to my client saying that the loan
25    modification had been disapproved.
```

Page 81

1              Not because they couldn't get the documents

2      on time, which was the unofficial GMAC statement as to

3      why this deal didn't go through based on the PMK's

4      deposition testimony that I took.  But rather that

5      Wells Fargo, which was never involved in any

6      discussions about this modification, had not approved

7      it, which was untrue.  Because they had approved it.

8              So that's the reneging I'm talking about.

9      Q    You just testified that Wells Fargo had

10     approved the Loan Mod.

11             Is that accurate?

12     A    That's an accurate statement of your PMK

13     telling me what had happened, yes.

14     Q    So is the basis for that testimony the

15     testimony provided by the PMK in the deposition that

16     you took?

17     A    Well, it has to be.  Because prior to that

18     time, GMAC had represented that it was negotiating the

19     loan modification, and that it had approved the loan

20     modification.

21             And never in writing or orally said as a

22     precondition that there was any other entity that

23     needed to approve it.

24             And, in fact, in not going forward with the

25     deal, didn't so state, but wrote a letter after the

                                                    Page 82

1    property had been foreclosed upon.

2       Q    Other than this letter, were there any other

3    written communications we'll say confirming what you

4    are -- what you are considering the offer?

5          MS. STROMEYER:  And by this letter, you're

6    referring to Exhibit 25?

7          MR. BUELL:  Exhibit 25.

8          THE WITNESS:  Well, there was a payment that

9    was made timely by my client that was cashed by GMAC.

10   I don't know if there's any other letters that I sent

11   to GMAC after that point.

12         You know I certainly did send a letter after

13   the house had been foreclosed upon without notice.

14   BY MR. BUELL:

15      Q    Did you ever receive a letter in response to

16   this April 22nd letter, which is marked as Exhibit 25?

17      A    I don't remember off the top of my head.

18      Q    Do you recall ever receiving a written

19   contract laying out the terms of the loan modification

20   for your clients?

21      A    You mean in a proposed contract?  I don't

22   know if I ever saw a proposed contract until I was

23   doing discovery in this case and was told that by the

24   PMK for GMAC, that they unilaterally made the decision

25   not to send any agreement to my client or to me because

Page 83

1    they have an unwritten, unstated policy, that if it

2    can't get returned within the same month that they

3    don't send it out.

4        Q    Just to clarify for the record, could you

5    just define for me, when you say proposed contract as

6    opposed to contract?

7        A    Well, by definition, a contract -- if you say

8    something is a contract, it presupposes that it's been

9    executed by both parties.

10           So my viewpoint is that there was a contract

11   at the time that an offer was made by GMAC and accepted

12   by my client, communicated by me what the acceptance

13   was and payment made.  So that's the contract I'm

14   talking about.

15           If there were any other proposed contracts, I

16   didn't see them.

17       Q    Did you have a communication with your

18   clients following your phone call with GMAC?  And by

19   phone call I mean the phone call that forms the basis

20   for your April 22nd letter.

21       A    Well, I certainly would have always

22   communicated with my clients an important situation

23   such as this where GMAC was offering -- asking for an

24   agreement for a modified loan term for a permanent loan

25   modification.

Page 84

1              And the inference or deduction, I guess, to

2    be drawn by the fact that my client paid the first

3    month of the agreement would infer that that probably

4    did happen.

5        Q    Did you have a communication with Bernard

6    Ward about accepting the terms of the offer presented

7    by GMAC?

8        A    I would consistently always provide material

9    information to my clients on important matters.

10             And, obviously, there would be no doubt in my

11   mind that I, as counsel, would make sure that my

12   clients were aware of offers, proposals, and one can

13   draw inferences when people have made payments under

14   the agreement that those kinds of things happened.  But

15   I can't specifically testify about what my

16   communications were with my client.

17       Q    And is that because you don't recall the

18   specific communication?

19       A    No.  That's because if I asked you, did you

20   talk to GMAC about the bad acts of GMAC in relation to

21   your defense, you would probably say, I can't do that,

22   Mr. Halloran, that's attorney-client privilege.

23       Q    So just to make the record clear, are you

24   stating an objection that you will not respond to the

25   question on the grounds of attorney-client privilege?

Page 85

1            MS. STROMEYER:  You're asking about

2    communications that Mr. Halloran had with his client.

3    And, as we previously stipulated at the beginning,

4    there's a standing objection on the grounds of

5    attorney-client privilege.

6            Go ahead.

7            MR. BUELL:  That's fair.  Just to be clear, I

8    want to put this -- because obviously this

9    communication, we feel, is germane to this case.

10           I would just like to make clear that --

11           THE WITNESS:  Can you explain to me why its

12    germane.

13    BY MR. BUELL:

14       Q    Sure.  The communications with your client

15    are essential to establishing that an acceptance of the

16    contract was, in fact, made.  That there was, in fact,

17    a meeting of the minds.

18       A    Do you know what the authority of disclosed

19    principal -- agent principal relationship is under the

20    law?

21       Q    What do you mean by authority?

22       A    Well, GMAC represented that they had the

23    authority to enter into a contract.  They did.  I am an

24    attorney for somebody negotiating a contract.  End of

25    story.

                                              Page 86

1        Q      Do you have --

2        A      Attorney-client privilege for every

3    discussion I had with my clients under the subject

4    matter, the negotiations of which I had been retained.

5    So that's my subject matter on that.

6        Q      Are you aware of any writings that contain

7    significance of either Bernard Ward or Colleen Halloran

8    accepting the terms of this proposed modification

9    offer?

10              MS. STROMEYER:   I'm sorry, can you repeat the

11   question.

12              MR. BUELL:   I'll rephrase it.   I'll rephrase

13   it.

14       Q      For ease of this question, I'm going to

15   define the proposed offer as the offer that you have

16   stated in your letter, which is marked as Exhibit 25.

17              Is that fair?   So the offer will be --

18   proposed offer for the purposes of this question will

19   be the terms that you have laid out in your April 22nd

20   letter.

21              Is that fair?

22       A      Yeah.   I understand what you're saying.

23       Q      Okay.   So with that foundation -- sorry, I

24   lost my train of thought there in explaining the term.

25              Is it -- are you aware of any writings signed

                                                Page 87

1    by either of your clients that reflect the terms -- the

2    proposed offer, as we just be defined?

3        A    Yes.

4        Q    And what are those writings?

5        A    A signed check payable to GMAC cashed by GMAC

6    consistent with the terms of the agreement that GMAC

7    had proffered to us, which was you have to start making

8    new monthly mortgage payments beginning in May

9    consistent with the offer that GMAC made to my clients,

10    which I communicated had been accepted.

11        Q    Does that check reference the specific terms

12    of the modification as agreed between the parties?

13        A    The check speaks for itself, Counsel.  I

14    don't know what the check says.  You asked me about a

15    handwriting.

16        Q    Are you aware of any other written -- written

17    communications or written documents -- signed by either

18    of your clients, other than the check, that reflect the

19    terms of the proposed offer as defined earlier?

20        MS. STROMEYER:  And by his client, you mean

21    apart from him as the authorized agent, an attorney?

22        MR. BUELL:  Correct.  And if you'd like, we

23    can split it out separately.

24        THE WITNESS:  I'm not aware of any signatures

25    on any documents that I received from GMAC that my

                                                    Page 88

1    clients had that altered or changed or did anything to

2    the terms that were agreed upon in the letter, which I

3    sent to GMAC.

4    BY MR. BUELL:

5        Q    That wasn't my question, though.  I'm going

6    to rephrase my question to you.

7            Are you aware of any documents, written

8    documents, that contain the proposed offer as we

9    described that have been signed by Bernard Ward?

10       A    I'm not aware of any proposed offer that

11   you're describing.

12           I'm only aware of the fact that I, acting on

13   my client's behalf, okay, confirmed and accepted an

14   offer made by your clients.

15           And that there was never any contract

16   purportedly -- confirming those terms in the letter

17   that I sent from GMAC for my clients to sign.

18           So, therefore, there couldn't have been any

19   document that my client signed because your client

20   never sent one.

21       Q    So I'm just going to ask it in a different

22   way, because I'd like to make this a clear question.

23   And I'm not going to use --

24       A    I'm not going to answer it again.

25       Q    Okay, that's fine.  I'm going to state the

Page 89

1    question anyway.

2              Are you aware by any writings signed by

3    Colleen Halloran -- either individually or as Power of

4    Attorney for Bernard Ward -- that reflect an acceptance

5    of an offer to modify the loan to an interest rate of

6    2.88 percent, with PMI as you have stated in your

7    letter amounts to be paid of $3,253.24 per month for

8    432 modified payments?

9         A    Yes.

10        Q    You are?  What are those documents?

11        A    My client signed a check, which your client

12   cashed, for the first monthly mortgage payment, which

13   was consistent with the letter that you just read into

14   the record, which was that she was to pay $3,252.24 per

15   month.  And then I know of a second monthly payment

16   that was made.  And I don't know if it was sent or not.

17        Q    Other than the check that you've referenced,

18   are you aware of any other writings --

19        A    Yes.

20        Q    -- signed by Colleen Halloran that reflect

21   these terms?

22        A    Other than what I've testified to, no.

23             MR. BUELL:  Can we have this marked as the

24   next exhibit in line.  I believe it's 26.

25

                                                  Page 90

```
 1                    (Deposition Exhibit 26 was marked for
 2                    identification by the court reporter.)
 3    BY MR. BUELL:
 4        Q    What's been marked as Exhibit 26 is a
 5    document that was provided as part of the production of
 6    the documents that you brought with you here today.
 7              Is that correct?
 8        A    I don't know.  But if the Bates stamp number
 9    00077 is consistent with what we produced, then yes.
10              MS. STROMEYER:  Yes.
11              MR. BUELL:  Thank you, Counsel.
12        Q    Please tell me what has been marked as
13    Exhibit 26.
14        A    It looks like it's a photocopy of a check
15    4/26/11, pay to the order of GMAC Mortgage company,
16    $3,253.24.  Loan ██████8940.
17        Q    Is this -- meaning Exhibit 26 -- the check
18    that you've been referencing as the payment made by
19    your client in regards to a writing or written
20    communication accepting the terms of the offer proposed
21    by GMAC?
22        A    Could be.
23        Q    Are you aware of any other checks that your
24    client sent after April 22nd, 2011?
25        A    There may have been.
```

Page 91

1      Q      Could you please take a look at and review

2    what's been marked as Exhibit 26 and let me know when

3    you're done.

4      A      I've looked at it.

5      Q      Does this check reference a loan number?

6      A      I just read it off.

7      Q      Does this check reference any of the proposed

8    terms that are contained in your April 22nd letter,

9    which has been marked as Exhibit 25?

10     A      Yes.

11     Q      What?

12     A      $3,253.24.

13     Q      Does it contain any other terms?

14     A      I don't know if it contains any other terms.

15   It references the amount that is to be paid under the

16   offer made by GMAC beginning May 1st.

17     Q      To complete my question, does it contain any

18   of the other terms that you list in your April 22nd

19   letter.

20     A      I don't know if it contains any other terms.

21   That's one term it contains.

22     Q      Does it contain any of the other terms that

23   are listed in your April 22nd letter?

24     A      I can't see whether the document contains it

25   or not.  The document speaks for itself.

Page 92

1       Q    As you review Exhibit 26, do you see any

2  reference to an APR rate of 2.88 percent?

3       A    I don't see that the document has any

4  reference to an APR rate.

5       Q    Do you see that Exhibit 26 has any reference

6  to the term or -- any reference to 432 modified

7  payments?

8       A    I do not see any reference to 432 modified

9  payments.

10      Q    Do you see any reference on Exhibit 26 to a

11  principle and interest payment of that sum being

12  $2,678.12?

13      A    No.  I only see that the principle of

14  $2,678.12 plus the PMI is $3,253.24, which is what my

15  client paid to GMAC.  And because of the stamp there,

16  it was cashed by GMAC.  Looks like on April 29th.

17      Q    And, for clarification purposes, going back

18  to Exhibit 25 in your letter, you reference what you

19  just mentioned, PMI amount of.

20           What does PMI stand for?

21      A    It's an impound account that was required of

22  GMAC for this particular loan, that that impound

23  account be paid to GMAC so they could assure that the

24  taxes and insurance were paid on the property.

25      Q    So am I understanding correctly then that the

                                              Page 93

1    two numbers referenced in your April 22nd letter, the

2    PMI amount and the principle and interest payment, the

3    difference between those two numbers would be the

4    impound amount?

5        MS. STROMEYER:  Objection.  Calls for

6    speculation.  May call for a legal conclusion.

7        THE WITNESS:  I think I specified in the

8    letter what the principle and interest payment was and

9    what the PMI and impound account was because that was

10   the number they gave me.

11   BY MR. BUELL:

12       Q    So this -- then I'm hearing you correctly

13   that this letter -- since you drafted it, I think it's

14   a fair question to ask you -- was simply just a

15   recitation of what was told to you and not necessarily

16   a computation of your own?

17       A    Not at all, no.  This was an offer to me for

18   my clients to review and accept or reject.  They

19   accepted it.  They paid the money.

20       Q    And your understanding of PMI is that it's

21   the principle and interest amount plus the amount

22   required to make this monthly impound account?

23       A    Yes.  That's what the number was that was

24   proffered, yeah.

25       Q    In the conversation you had prior to writing

Page 94

1    this letter, were there any questions that you had and

2    posed to the individual you were speaking with with

3    regards to these terms?

4        A    Did I pose any questions to him on that

5    subject matter?  I don't believe I -- I don't know if I

6    did or didn't.

7        Q    Do you recall how long that conversation was?

8        A    I do not.

9        Q    Do you recall asking for clarification on any

10    terms that were proposed to you?

11        A    I have no recollection one way or the other

12    on that.

13        Q    Do you recall discussing what the principle

14    balance of the loan would be?

15        A    I don't believe that was part of the offer.

16        Q    Do you recall any conversations regarding

17    whether or not the interest rate would adjust at any

18    point?

19        A    It was not an adjustable interest rate.

20        Q    Do you recall the individual specifically

21    using the words fixed rate?

22        A    I recall the individual saying that it was a

23    rate of a certain amount for a certain period of time

24    with certain number of payments.

25        Q    Were you -- do you recall -- as you sit here

Page 95

1    today, do you recall if you were aware on April 22nd

2    when you prepared this letter what the principle

3    balance of the loan was?

4         A    I don't have a state of mind now as to what

5    my state of mind was then.

6         Q    Would you have been able to determine that?

7         A    No, I couldn't have determined that.

8         Q    What the principle balance was?

9         A    No.

10        Q    Did you ever -- do you recall if you ever

11   posed the question -- if you ever inquired to GMAC

12   about what the principle balance was during this time

13   frame, say April 1st through April 30th of 2011?

14        A    I don't know if that -- I don't believe that

15   issue came up because it was a modified program -- a

16   permanent modified program, in which they were telling

17   me how many monthly payments were going to be made and

18   how much they were for.  That was their offer.

19        Q    So based on that statement, is it currently

20   your understanding that if you were to simply multiply

21   this PMI amount by 432 payments, you would get the

22   principle balance of the loan or the amount required to

23   pay off the loan?

24            MS. STROMEYER:  Objection.  Irrelevant as

25   to -- what his personal understanding is is completely

                                        Page 96

1    irrelevant.

2         THE WITNESS:  I don't have an understanding

3    of that one way or the other.

4    BY MR. BUELL:

5         Q    Have you ever run an amortization schedule on

6    a loan?

7         A    If I have on this case, it would be work

8    product.

9         Q    But do you have any experience in preparing

10    an amortization schedule?

11        A    Well, in other words, can I get somebody to

12    make the calculations for me, yes.  Do I personally get

13    on the computer and do it?  No.

14        Q    Have you ever?

15        A    Have I ever what?

16        Q    Done an amortization schedule yourself?

17        A    No.  I just told you, I wouldn't get on the

18    computer and do an amortization schedule myself; I

19    would have somebody else do it.

20        Q    Do you know if an amortization schedule was

21    run following this proposed offer being made to you?

22             MS. STROMEYER:  Objection.  Vague and

23    ambiguous.  By Mr. Halloran or by anybody --

24             MR. BUELL:  By Mr. Halloran.

25             THE WITNESS:  An amortization schedule by me?

Page 97

BY MR. BUELL:

Q    Yes.  By anyone in your office.

A    No.  The only entity which would have run an amortization schedule would have been the lender, who was offering these terms to me.

So my belief was that, since the lender was offering these terms, that they ran whatever schedule they were going to make because they were offering these terms.  And my client accepted them and made her first payment on them.

Q    And so you didn't go any deeper with an analysis as to whether or not these terms were reasonable?

A    They are reasonable.

Q    And what do you base that statement on?

A    Because, obviously, my client accepted them and was willing to abide and honor the obligations that were contained in this agreement.

And the only entity that didn't honor the obligations is GMAC.

Q    Now, this question, I'm not asking you what your communication to your client was, I'm prefacing it with that.  That's not the purpose of my question.

Prior to having any communication with your client following your conversation with GMAC regarding

Page 98

1    this proposed offer, did you run -- did you conduct any

2    analysis, review the terms that were proposed to you or

3    consider if they were terms that were reasonable, good

4    terms and you should -- and determine whether or not

5    you should recommend it to your client?

6         MS. STROMEYER:  I'm going to object that that

7    is going to be work product.

8         THE WITNESS:  Before I got the offer, did

9    I --

10   BY MR. BUELL:

11   Q    No.  Between the offer being presented to you

12   by GMAC and you conveying the offer to your client for

13   review, did you conduct any analysis on the terms that

14   were provided to you?

15   A    I don't know what you mean by analysis, but

16   if you did, it would be work product.  But remember,

17   to give you some context of where you think you guys

18   are going in this case, the loan modification program

19   that GMAC had created was premised upon them looking

20   at income and expense and what the borrower could

21   afford.

22        And because GMAC wouldn't exist except for

23   the fact that you and you and you, me and her and all

24   the other taxpayers in this country bailed out GMAC to

25   the point that, at this time, 72 percent of the

Page 99

1    ownership of GMAC was the United States Government, at

2    this time, okay, it wouldn't exist unless we bailed

3    them out.

4         And as the quid pro quo for them to do that

5    was that they were supposed to help the little guy who

6    had fallen on hard times, just as GMAC had done.

7         And so GMAC had represented to President

8    Obama's administration that they were going to help

9    people who couldn't afford their loans by modifying

10   them.

11        Therefore, they set up a system in which they

12   had three monthly payments.  And if they could make

13   those three monthly payments, and if the income and

14   expense under their own criteria -- their own

15   criteria -- was okay, they would offer a permanent loan

16   modification.

17        They offered a permanent loan modification,

18   which was consistent with the prior temporary

19   modification program -- consistent with it -- and

20   said, this is good for the rest of this period of

21   time.

22        So that's where my client and I were coming

23   from.  And that's where we're at.  And it was GMAC that

24   reneged on this, not my client.

25        Q    I apologize if I've asked this before.  I

Page 100

1    don't think I have.  But do you recall any specific

2    conversations with GMAC regarding the interest rate

3    contained in your letter confirming a 2.88 percent APR

4    as ever adjusting under this modified loan?

5        A    You asked me that question already.

6            MS. STROMEYER:  Asked and answered.

7    BY MR. BUELL:

8        Q    Do you recall having any conversation after

9    April 22nd with GMAC about the rate adjusting?

10           MS. STROMEYER:  I'm going to object that

11    that is vague and ambiguous.  There's been

12    settlement communications, everyone has been

13    talking about --

14           MR. BUELL:  Between GMAC.  So let's ignore

15    litigation.  Not with Severson & Werson, not with

16    attorneys for GMAC, but with GMAC directly.

17           THE WITNESS:  Here is the fraudulent aspect

18    of where GMAC is coming from, okay.  If GMAC believed

19    that there was a misunderstanding about the terms after

20    they got this letter, nothing stopped GMAC from writing

21    a confirming letter saying, oh, no, no, no, that isn't

22    what we meant.  It doesn't exist, okay.

23           Before they foreclosed on my client's

24    property and hired a San Diego law firm to begin

25    evicting my clients after GMAC had promised that they

                                        Page 101

```
 1    wouldn't proceed with evictions pending our discussion

 2    about this, nothing would have stopped GMAC from

 3    saying, you know, we actually had a different proposal

 4    that wasn't properly communicated.  Didn't happen.

 5         Does that answer your question?

 6    BY MR. BUELL:

 7      Q    I'll say indirectly.

 8      A    Yeah.

 9         MS. STROMEYER:  That's generous.

10    BY MR. BUELL:

11      Q    We'll go for about ten more minutes, then

12    we'll let you get out of here.

13      A    Thank you.

14         (Short discussion off the record.)

15         MR. BUELL:  Off the record we've had a

16    discussion that we're going to conclude the deposition

17    for today but the deposition will remain open.

18         The parties will meet and confer following

19    this deposition about continuing the deposition likely

20    at a time next week.  I think that's it.

21         THE REPORTER:  Do you want a copy?

22         MS. STROMEYER:  Yeah, but no rush.

23         THE REPORTER:  Is there a rush on your end?

24         MR. BUELL:  Yeah.  Why don't you get it to us

25    when you can, please.
```

Page 102

1              THE REPORTER:  So Friday then, is that good?

2              MR. BUELL:  That would be great.

3

4         (TIME NOTED:  12:55 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 103

```
 1
 2
 3
 4
 5
 6
 7        I, TIMOTHY HALLORAN, do hereby declare under
 8   penalty of perjury that I have read the foregoing
 9   transcript; that I have made any corrections as appear
10   noted, in ink, initialed by me, or attached hereto; that
11   my testimony as contained herein, as corrected, is true
12   and correct.
13        EXECUTED this_____ day of_____,
14   20____, at_____, _____.
              (City)                  (State)
15
16
17            _____
              TIMOTHY HALLORAN
18
19
20
21
22
23
24
25
                                        Page 104
```

1          I, the undersigned, a Certified Shorthand Reporter

2    of the State of California, do hereby certify:

3          That the foregoing proceedings were taken before me

4    at the time and place herein set forth; that any

5    witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand which

8    was thereafter transcribed under my direction; further,

9    that the foregoing is a true record of the testimony

10   given.

11         I further certify I am neither financially

12   interested in the action nor a relative or employee of

13   any attorney of party to this action.

14         IN WITNESS WHEREOF, I have this date subscribed my

15   name.

16

17   Dated: January 27, 2012

18

19

20                     _____

                       LORI STOKES

21                     CSR No. 12732

22

23

24

25

                                              Page 105

**[& - 9th]**

### &

**&**  3:4,14 62:14,15
63:6,10 80:21
101:15

### 0

**000017**  5:16
**000020**  4:17
**00003**  4:14
**000035**  4:17 22:5
**000070**  4:24 39:4
**000071**  4:24
**000073**  4:24 39:4
**000085**  5:10 51:22
**000087**  4:21 31:11
**000088**  4:21 31:11
**00017**  5:7 40:24
41:16 73:7
**00018**  41:18
**00020**  22:5
**00021**  5:7 41:16,18
**00034**  24:6
**00077**  91:9
█████ **8940**  4:14,17
4:20,23 5:6,10,12
5:15,18 91:16

### 1

**1**  1:25 8:5 53:21,21
54:2 59:19
**1-20**  1:7 2:8
**1-800**  36:19
**1/23**  58:9
**10**  4:22
**105**  1:25
**107**  77:19
**10th**  3:8 39:5 40:13
**11**  4:12
**11-511574**  1:6 2:7
**11th**  30:3,8
**12732**  1:22 2:17
105:21
**12:55**  103:4
**12th**  24:2,2,3

**131752**  1:23
**13th**  37:10 68:20
**14**  5:11
**14th**  66:8,17 79:1,3
**16**  5:5
**16th**  40:24
**17**  4:10 6:15,16 7:17
**18**  4:12,12 18:16,22
21:1
**19**  4:15 21:21,25
22:18 24:6 25:11
28:5 58:13,15
**1st**  32:3 37:2,2
38:13 43:24 81:16
92:16 96:13

### 2

**2**  8:1,3 63:13
**2,678.12**  93:12,14
**2,678.12.**  76:15
**2.88**  76:12 90:6 93:2
101:3
**20**  4:18 31:1,2,6
38:12 104:14
**2010**  4:12,15,18,22
5:5 13:4,16 15:17
16:1,1,2 22:5,17
25:1 26:25 27:17,23
30:8 31:11 32:3
34:16,20 36:1,8
37:2,2,10,22 38:13
39:5 40:13,24 42:24
43:4,9 47:8 68:20
79:20 80:18
**2011**  5:8,11,13
15:21 43:24 49:19
50:1 51:9,23 60:16
60:21 66:8,17,25
73:7 75:1,21 76:10
79:3,5 91:24 96:13
**2012**  1:15 2:15 6:1
105:17
**21**  4:15,22 38:23,24
39:2 50:10

**21st**  76:10,19,22,23
79:5
**22**  5:5,13 40:15,16
40:20 41:6,11,15,19
**22nd**  73:7 75:1,21
76:19,22,23 83:16
84:20 87:19 91:24
92:8,18,23 94:1
96:1 101:9
**23**  5:8 51:14,15,19
**24**  4:15 5:11 53:16
53:20 54:21 57:19
58:2 59:6,15,20
63:13 66:10
**24,233.93.**  32:5
**24th**  22:5,17 25:1
**25**  1:15 2:15 5:13
6:1 73:2,5 75:18
83:6,7,16 87:16
92:9 93:18
**2500**  2:14
**25th**  25:10
**26**  5:17 90:24 91:1,4
91:13,17 92:2 93:1
93:5,10
**2600**  3:18
**27**  105:17
**29th**  93:16
**2:40**  2:15

### 3

**3**  8:3 58:2 59:19,23
64:22 65:3
**3,252.24**  90:14
**3,253.24**  76:13 90:7
93:14
**3,253.24.**  91:16
92:12
**3,400**  32:7
**3,808.90.**  32:13
**30**  80:11
**30th**  27:17,23 96:13
**31**  4:18
**31,033.93**  32:3

**3300**  4:13
**38**  4:22

### 4

**4/26/11**  91:15
**40**  5:5
**403**  32:10
**415-398-3344**  3:21
**415-788-1900**  3:11
**432**  76:12 90:8 93:6
93:8 96:21

### 5

**5**  4:5 9:12 63:15
64:2,6
**50**  45:20
**51**  5:8
**53**  5:11

### 6

**6**  4:10 49:20 63:15
64:2,6
**6,800**  32:4
**60**  70:4,13,21

### 7

**7**  5:8 63:15 64:2,6
64:12
**70**  70:4,14,21
**7156**  5:17
**72**  99:25
**73**  5:13
**7th**  51:22

### 8

**85**  8:6
**88**  3:7
**8th**  28:1 30:22,23

### 9

**9**  4:18
**91**  5:17
**94108**  3:9
**94111**  3:19
**94122**  4:14
**9th**  31:11 36:1 38:12

[a.m. - august]

**a**

**a.m.** 2:15 6:2
**abide** 98:17
**ability** 58:24
**able** 37:7 53:8 63:9 96:6
**absent** 28:15,17
**absolutely** 46:8
**abundance** 68:3
**accept** 94:18
**acceptance** 75:10,11 75:12 84:12 86:15 90:4
**accepted** 21:11 65:16 68:10 73:24 81:18 84:11 88:10 89:13 94:19 98:9,16
**accepting** 85:6 87:8 91:20
**account** 4:14,17,19 4:23 5:6,10,14 20:22 21:8 93:21,23 94:9,22
**accurate** 7:13 13:17 18:14 54:22 62:3 69:18 74:9 82:11,12
**acting** 89:12
**action** 13:9,12,14 16:4 29:1 46:7 53:23 68:24 75:2 105:12,13
**actions** 70:17
**activity** 15:7 35:18
**acts** 85:20
**actual** 44:3
**addition** 65:23
**additional** 19:15 28:1,7,11,22 32:9 33:13 49:21 53:1 77:11
**address** 16:25 48:12 48:15,25
**adjudication** 17:8

**adjust** 95:17
**adjustable** 11:23,25 12:5 95:19
**adjusting** 101:4,9
**adjusts** 12:2
**administered** 6:5
**administration** 100:8
**admonitions** 7:9
**affirmative** 15:4 68:24
**affirming** 57:14
**afford** 99:21 100:9
**ag** 71:7
**agent** 27:10 86:19 88:21
**agree** 63:17 65:13
**agreed** 18:5 88:12 89:2
**agreement** 14:1,3,6 14:12,16 38:1 54:12 57:3 58:8 64:14,18 65:18 67:7 68:8 76:7 81:15 83:25 84:24 85:3,14 88:6 98:18
**ahead** 6:14 36:13 38:23 40:15 45:6 51:14 64:2 86:6
**aid** 46:19
**allow** 16:12 19:11
**altered** 89:1
**ambiguous** 10:17 36:2,12 77:9 97:23 101:11
**amended** 4:10,10 7:21,22 41:10,12
**amortization** 97:5 97:10,16,18,20,25 98:4
**amount** 76:13 92:15 93:19 94:2,4,21,21 95:23 96:21,22
**amounts** 90:7

**analysis** 98:12 99:2 99:13,15
**announce** 51:5
**announcing** 81:19 81:20
**answer** 15:3 16:12 37:16 40:7 45:6,10 56:18,22 89:24 102:5
**answered** 15:13 23:19 25:8 101:6
**answering** 57:10,12 81:6
**answers** 57:22
**anticipate** 27:1
**anybody** 80:1 97:23
**anyway** 50:21 90:1
**apart** 88:21
**apologize** 9:4 64:21 100:25
**appalled** 70:23
**apparently** 33:10 69:20
**appear** 104:9
**appearances** 3:1
**appears** 13:1,13 54:22 64:16 65:14
**applicable** 17:15
**applied** 78:19
**appropriate** 71:21
**appropriately** 48:3
**approve** 82:23
**approved** 76:10 78:20 82:6,7,10,19
**apr** 76:11 93:2,4 101:3
**april** 5:13 73:7 75:1 75:21 76:10 79:5 83:16 84:20 87:19 91:24 92:8,18,23 93:16 94:1 96:1,13 96:13 101:9
**area** 8:12
**arguably** 17:16

**arrearages** 32:11
**ascertain** 35:11
**asked** 15:12 25:2 36:22 58:16 63:23 63:24 64:20 85:19 88:14 100:25 101:5 101:6
**asking** 17:20 55:21 56:16 74:21 80:8 84:23 86:1 95:9 98:21
**aspect** 56:3 57:1 101:17
**assets** 44:6
**assume** 7:5 15:3 17:11 37:15 46:5
**assumes** 34:23
**assumption** 67:24 67:24
**assure** 93:23
**attached** 54:23 104:10
**attachment** 25:1 58:12
**attachments** 41:17
**attempt** 11:9 28:19
**attempted** 12:2
**attorney** 3:6,16 6:21 8:10 10:8 14:25 15:6 16:9,19 17:4 18:4,7,8,10 20:3,17 24:12,14,23 46:7,14 56:14,19,23 57:9,16 58:9,11,12,24 59:1 59:2 63:6 71:1,3 81:23 85:22,25 86:5 86:24 87:2 88:21 90:4 105:13
**attorneys** 70:16 101:16
**august** 4:12,15 13:4 13:16 15:17,21 16:1 22:5,17 25:1,10 26:25 27:17,23 30:3 30:8 47:8 68:20

[august - certain]

79:20 80:18
**authority** 35:17
58:24 65:15 86:18
86:21,23
**authorization** 20:12
21:4 30:7
**authorized** 20:4
36:20 88:21
**avoid** 31:24
**aware** 19:14 25:5
29:25 30:9 36:24
45:2 85:12 87:6,25
88:16,24 89:7,10,12
90:2,18 91:23 96:1

**b**

**back** 28:10,13,14,16
28:25 35:12 37:18
42:18 43:19 45:9
74:5 75:18 81:2
93:17
**backtrack** 42:9
**bad** 53:5 85:20
**bailed** 99:24 100:2
**balance** 10:13,22
11:7,10 32:2,5
59:16 60:3,7,12,15
60:19 61:1,3,6
62:11 63:2,5 95:14
96:3,8,12,22
**bank** 41:4 42:12
44:8 70:8
**banks** 44:4
**base** 98:15
**based** 29:12 33:19
34:1 36:18 41:23
64:11 70:1 75:2
82:3 96:19
**bases** 26:22
**basically** 35:21
**basis** 17:3 65:19
66:19 71:9 74:23
75:1 79:4 82:14
84:19

**bates** 4:14,17,20,24
5:7,10,15 22:4 24:6
31:10 40:24 41:15
54:4,14 91:8
**began** 13:3,15,20
15:19,22 19:8 30:1
30:5,10
**beginning** 2:14 29:9
30:2 32:12 39:22
86:3 88:8 92:16
**behalf** 2:13 9:16
15:5 54:24 58:25
65:15 89:13
**belief** 64:12 81:5
98:6
**believe** 13:20 14:20
16:16,18 17:3,9
28:23 29:20 30:22
30:23 34:25 40:4
41:24 42:20 45:14
51:21 52:7 55:8
59:6 60:3 64:20
66:1 68:9 71:8
75:22 79:14 90:24
95:5,15 96:14
**believed** 101:18
**benefit** 39:6 57:2
**bernard** 1:4 2:4
4:13,16 5:11 24:22
29:2 37:5 58:9,25
64:23 65:7,11 66:13
75:25 85:5 87:7
89:9 90:4
**bernie** 20:13,22
**beyond** 35:24 36:9
79:15
**bit** 29:6 36:5 43:8
**boost** 44:6
**borrower** 28:18
55:13 76:10 99:20
**borrowers** 68:15
**borrowing** 41:3
42:11
**bottom** 53:20

**bradley** 3:4
**break** 18:1 74:22
75:14,15,17
**brief** 74:22 80:2
**bring** 17:10
**broad** 8:24 17:14
47:23 79:19
**broaden** 43:8
**brought** 8:2 41:13
91:6
**buell** 3:15 6:10,14
6:18 8:6,8 10:18
12:17,21,24 13:10
14:14,23 15:16
16:15 17:24 18:2,18
19:23 20:1 21:12,16
21:20,23 24:20
30:25 31:4,21 32:18
35:5 36:4 37:20
38:3,6,9,23 39:1
40:15,18 41:7,10
42:2 44:17 45:5,16
45:21 51:14,17
53:14,18 55:1 58:20
58:22 59:10 60:10
61:13,15 62:8 64:1
64:19 65:2,8 66:3
66:15 73:1,4 75:7
75:14,16 76:24
77:12,14 78:15,23
80:22 81:8 83:7,14
86:7,13 87:12 88:22
89:4 90:23 91:3,11
94:11 97:4,24 98:1
99:10 101:7,14
102:6,10,15,24
103:2
**business** 14:9 35:14
44:4 67:20 69:21
**buy** 68:7,12

**c**

**ca** 4:13
**calculations** 97:12

**california** 1:1,14 2:1
2:14 3:9,19 6:1,21
9:1 70:5,14 105:2
**call** 16:9 25:14,17
25:20 26:24 27:16
27:21,25 30:1,8,22
30:24 35:10,12
36:19 59:1 63:20
67:20,21 68:11 69:5
69:13 72:11 74:10
74:16 75:5,6 77:5
77:21 78:25 79:5
80:11 81:1 84:18,19
84:19 94:6
**called** 62:22 68:1
**calling** 30:10,11,11
30:14 67:25 80:17
80:25
**calls** 15:24 20:12
21:9 26:3 28:10
34:24 69:5 72:8,18
94:5
**canceled** 65:20,21
65:25
**cancer** 52:9 53:6
**capable** 80:24,25
**capacity** 63:22
**case** 1:6 2:7 8:17
9:19 10:7 13:3
14:17 15:9 17:5,9
17:14,22 28:24
46:14 56:3 69:17,20
70:22,24 71:15
72:12 83:23 86:9
97:7 99:18
**cases** 62:19 70:2,4
70:14,21 71:2
**cashed** 83:9 88:5
90:12 93:16
**caused** 42:1,3
**caution** 68:4
**center** 2:13 3:17
**certain** 45:2 95:23
95:23,24

[certainly - contains]

certainly  15:25
  17:19 29:16 59:4
  83:12 84:21
certified  2:16 105:1
certify  105:2,11
cetera  10:14 27:4
  67:14
cgc  1:6 2:7
challenge  16:19
chance  14:15 16:18
  47:16
changed  35:13 89:1
characterization
  13:7
charged  44:7
check  5:17 67:19
  88:5,11,13,14,18
  90:11,17 91:14,17
  92:5,7
checks  65:20,22,25
  91:23
children  53:6
circumstances
  29:16 43:25
circumvent  16:25
city  104:14
claiming  17:6
clarification  30:2
  93:17 95:9
clarifies  27:13
clarify  8:15,22 23:2
  28:4 32:17 33:25
  34:4 37:14 38:19
  41:10 57:4,18 69:15
  81:10 84:4
clarifying  40:14
clean  76:5
clear  9:7 14:25
  68:17 70:9 85:23
  86:7,10 89:22
clearly  65:16,16
client  9:17 10:6 14:8
  16:9,19,22 17:4
  18:4,7,8,11 27:19
  28:18 29:22 31:25

32:4,6,9 35:10
  43:13 56:17,19,23
  57:6,8,9,16 59:2,14
  73:21 81:24 83:9,25
  84:12 85:2,16,22,25
  86:2,5,14 87:2
  88:20 89:19,19
  90:11,11 91:19,24
  93:15 98:9,16,22,25
  99:5,12 100:22,24
client's  57:2 68:11
  89:13 101:23
clients  17:21 29:4,14
  29:18 30:11,19
  31:15 48:19 54:24
  55:7,21,24 56:3,10
  56:25 83:20 84:18
  84:22 85:9,12 87:3
  88:1,9,18 89:1,14
  89:17 94:18 101:25
close  29:24
code  14:9
collectively  30:6
  72:6,7
colleen  1:4 2:4 4:16
  24:22 58:8 87:7
  90:3,20
collen  5:17
comfortable  7:5,8
  17:1
coming  33:23
  100:22 101:18
communicate  28:20
  29:17 30:17,18 47:7
  47:20 56:25
communicated
  29:14 45:23 50:14
  57:2 77:24 84:12,22
  88:10 102:4
communicating
  20:14 21:10 49:6
communication
  17:19 20:9,24 21:7
  22:14 29:20 30:18
  34:7 47:18,23 56:10

56:17,19 57:6 62:5
  66:4,7,9,13,14,16,20
  67:12,15 68:3,22
  73:13 84:17 85:5,18
  86:9 91:20 98:22,24
communications
  16:10,10,12,21 17:7
  17:15 18:6,10 19:19
  19:25 20:7 21:18
  22:19,23 23:6 29:18
  33:6 34:15,19 35:6
  35:24 36:3,6 38:11
  38:20,21 47:3,5,11
  49:10 50:25 57:14
  59:13 61:8 62:10,25
  68:2 69:10 71:6,10
  71:14,19 72:15,22
  78:1 83:3 85:16
  86:2,14 88:17
  101:12
company  32:4 50:14
  91:15
comparing  54:17
compel  14:16 17:10
  18:12
complaint  13:1,7,8
  13:13 53:22 54:24
complaints  13:11
complete  37:23
  92:17
completed  64:3
completely  23:19
  96:25
completion  55:17
complied  43:13
complying  29:11
compound  69:1
  76:20
computation  94:16
computer  26:2,8
  35:1,22 97:13,18
conceivably  61:21
concerned  67:10
  71:4

concerning  21:19
  23:11
concerns  35:16 36:7
  36:12,15
conclude  102:16
conclusion  63:21
  75:6 94:6
conduct  14:10 70:6
  99:1,13
confer  102:18
confidence  14:8
confirm  24:22 40:3
  73:22 76:8
confirmation  52:8
  75:23
confirmed  76:17
  89:13
confirming  26:1
  76:9 83:3 89:16
  101:3,21
conflict  57:23,25
conformity  65:17
confusing  9:2
congratulations
  78:21
consider  99:3
consideration  75:12
considering  83:4
consistent  52:20
  67:6 69:19,21 74:12
  88:6,9 90:13 91:9
  100:18,19
consistently  85:8
contact  16:6,14
  20:21 33:11
contacting  29:4
contain  63:15 75:4
  87:6 89:8 92:13,17
  92:22
contained  35:25
  39:16 92:8 98:18
  101:3 104:11
contains  92:14,20
  92:21,24

Sarnoff, A VERITEXT COMPANY
877-955-3855

[contemporaneous - discussing]

**contemporaneous**
13:24
**contents** 32:24
**context** 63:11 99:17
**continue** 18:11
29:21 32:6 67:5
**continued** 5:1 35:4
67:8,11,21
**continuing** 67:6
102:19
**contract** 57:18
83:19,21,22 84:5,6
84:7,8,10,13 86:16
86:23,24 89:15
**contracts** 75:11
84:15
**contrary** 29:21
**conversation** 18:2
25:9 29:3 32:21
39:15,18,24 40:1
42:7 44:14,19 49:20
52:24 55:20 57:7
73:15 74:1,19,19
75:24 76:9,18 77:6
79:4,25 80:4 94:25
95:7 98:25 101:8
**conversations** 21:4
21:14 22:16 35:15
37:1 42:23 43:3
44:12,23 45:3 49:25
51:12 52:5 62:21
66:24 70:12,16,18
71:5,13 72:1,2,4
74:17,20 78:3,24
79:7,23,23 95:16
101:2
**convey** 31:13 73:21
**conveying** 99:12
**conveys** 75:8
**copies** 65:21
**copy** 5:17 14:5
41:13 54:22 102:21
**corner** 53:21
**corporate** 35:19

**correct** 15:1 19:13
19:23 20:16,23
22:25 23:3,5 30:20
48:13 49:3,8 50:3
50:12,13 53:3 67:3
75:19,22 76:2 77:12
78:16 80:22 88:22
91:7 104:12
**corrected** 104:11
**corrections** 104:9
**correctly** 48:9 56:7
93:25 94:12
**correlation** 34:16
**counsel** 18:2 28:19
35:19 70:13 85:11
88:13 91:11
**counteroffer** 33:7
**country** 99:24
**countrywide** 69:24
**county** 1:2 2:2
**couple** 45:18
**course** 25:16 27:5
35:6 47:25 55:23
56:2,5 68:19 70:11
70:15 74:10
**court** 1:1 2:1 6:17
18:12,17 21:22 31:3
38:25 40:17 51:16
53:17 73:3 91:2
**courthouse** 68:7
**cover** 22:4,5 25:1
26:21 41:14
**covered** 17:16
**created** 99:19
**criteria** 44:3 100:14
100:15
**csr** 1:22 105:21
**current** 32:10
**currently** 8:11
14:24,25 64:7,10
72:20 96:19
**custom** 35:9 56:3,24
**customary** 39:23
50:17

**d**
**date** 10:13 14:11
15:15,18 22:17 30:7
34:17 35:3,7,11
43:1,4 64:23 66:25
67:1,11,14 68:25
71:22,22 74:18
105:14
**dated** 36:1 105:17
**dates** 69:11
**day** 15:11 23:22
104:13
**deal** 74:15 81:5,9,10
81:20 82:3,25
**dealing** 70:6
**dealings** 69:17,20
**dear** 76:8
**december** 43:3,9
**decision** 83:24
**declare** 104:7
**deduction** 85:1
**deed** 9:1
**deeper** 98:11
**defendant** 2:13 3:13
72:13
**defendants** 1:8 2:9
**defense** 85:21
**define** 10:24,25
11:25 43:18 62:12
84:5 87:15
**defined** 88:2,19
**definition** 84:7
**degree** 14:8
**delay** 67:6
**demonstrate** 13:18
33:13 55:13
**demonstrated** 69:23
**demonstrating** 54:5
**department** 22:6
33:2,10 36:23
**depends** 12:3
**depo** 6:15
**deposition** 1:13 2:12
4:10 6:16,25 7:6,21

16:17 18:16 21:21
23:15,18,20,22,24
24:1,4 31:2 38:24
39:23 40:16 41:13
51:15 53:16 73:2
82:4,15 91:1 102:16
102:17,19,19
**depositions** 6:23
41:4
**deposits** 39:7 42:12
**describe** 28:14 35:3
**described** 54:11
89:9
**describing** 89:11
**description** 4:9 5:3
**determine** 33:3 96:6
99:4
**determined** 96:7
**diego** 101:24
**difference** 94:3
**different** 45:13 47:4
89:21 102:3
**differentiate** 63:9
**difficulty** 56:12
**direct** 18:19 57:5
62:9,12,16 66:13
**direction** 105:8
**directly** 10:5 17:7
29:4,14 30:11,17,19
57:10 71:8 72:11
77:24 80:18 101:16
**disagree** 26:21
**disapproved** 81:25
**disclose** 36:21
**disclosed** 86:18
**disclosures** 17:7
**discovery** 83:23
**discuss** 20:11,13,22
35:7,17,19 56:4
**discussed** 34:16
35:8 55:23 58:13
**discussing** 40:12
55:25 60:24,25
95:13

[discussion - fashion]

discussion 25:25
32:25 35:4 36:16
41:9 54:20 56:10,15
60:22 62:7 87:3
102:1,14,16
discussions 11:16
19:12 23:10 28:22
33:7 36:18 43:6,7
43:11,19 45:8 50:22
61:5,7 82:6
disputes 8:20
divulging 56:19
document 7:18,24
18:23 19:2,15,17
21:24 22:1,3,4,15
22:18 24:8,11,15
25:6 29:6 30:25
31:9,19 40:22,23
41:16 42:10 50:9
51:21 53:15,24,25
54:3,5,8,9,11,13,16
54:18,23 55:2,6,21
56:9,11,15 57:8,17
57:18 58:3,6,18
60:4,5,9 63:20
64:11,16,22,24,25
65:3,4,9,10,13 73:6
89:19 91:5 92:24,25
93:3
documentary 65:23
documentation 27:4
28:11 39:19 48:17
documents 4:11
7:22 8:3,5 13:2,14
13:18 27:17 28:7,22
33:13,17 42:5 48:2
49:21 50:6 52:22
54:7 61:22 62:2
82:1 88:17,25 89:7
89:8 90:10 91:6
doing 62:19 83:23
doubt 85:10
drafted 19:20 75:20
77:7 94:13

drafting 22:10
39:10
draw 85:13
drawn 85:2
duly 105:6

e

e 3:10,20 48:4,6,7,10
48:11,12,14 50:5,12
73:8
earlier 19:25 39:22
58:13 79:1 88:19
early 15:23 16:13
61:2
ease 79:2 87:14
easier 30:5
easiest 56:22
easy 6:15
edward 3:15
effect 78:17
effective 81:16
either 21:6 76:22
87:7 88:1,17 90:3
electronic 27:4
eligible 33:14
embarcadero 2:13
3:17
employee 44:25
62:13,16 105:12
employees 45:13
62:22 63:10,10
enclosed 41:2 42:10
enclosing 39:6
entail 8:11
enter 69:24 86:23
entered 14:11 66:21
68:9,9 70:9
enthusiastic 78:10
entity 30:14 82:22
98:3,19
erb 3:20
essential 17:8 86:15
establish 46:20
established 47:10,13
47:24 54:21

establishing 86:15
estimate 9:14,23,25
45:19 71:25
estimated 71:22
estoppel 59:5,8
75:12
et 10:14 27:4 67:14
evaluation 79:10
event 33:22 78:9
eventually 34:5
46:12
everybody 36:23
evicting 101:25
evictions 102:1
evidence 34:24
65:23
evidencing 65:24
exactly 68:17 70:5
examination 4:2 6:8
examined 6:5
examiner 23:16,25
example 64:12
67:11 68:5,6,18
69:4,16
exception 80:12
exclusively 29:18
excuse 42:17 66:5
executed 84:9
104:13
execution 67:2
exhibit 4:9,10,12,15
4:18,22 5:3,5,8,11
5:13,17 6:15,16
7:17 18:16,22 21:1
21:21,25 22:18
23:10 24:6,7 25:11
28:5 31:2,6 38:12
38:24 39:2 40:16,20
41:6,11,15,19 50:10
51:15,19 53:16,20
53:21,21,22 54:2,21
54:23 57:19 58:2,12
58:13,15 59:6,15,20
63:13 66:10 73:2,5
75:18 79:1 83:6,7

83:16 87:16 90:24
91:1,4,13,17 92:2,9
93:1,5,10,18
exhibits 4:7 5:1
exist 74:21 99:22
100:2 101:22
expense 52:9 99:20
100:14
expenses 53:11
expensive 53:8
experience 70:2
97:9
expert 57:21 63:21
75:6
explain 18:25 86:11
explaining 87:24
extent 16:9 62:18
external 16:11
extraordinary 81:3
extremely 26:18
eye 71:11

f

face 47:14,14
facet 14:21
facsimile 51:23 73:8
fact 20:20 46:4
82:24 85:2 86:16,16
89:12 99:23
facts 34:23
fair 12:4 13:5 14:23
17:8 38:6 45:11
47:2 49:18 66:15
67:23,24 86:7 87:17
87:21 94:14
fairly 15:23
fallen 100:6
familiar 10:10 11:12
11:19
family 24:24 53:5
68:11 78:11
far 14:21
fargo 82:5,9
fashion 47:21

**[fax - going]**

fax   48:3,8,21 49:4,5
  50:11,19
faxes   47:25 48:2
february   66:25
federal   36:24 44:8
  52:21 69:22 70:8
  71:4,11,14,20 72:3
  72:5,9,16,23
feel   86:9
feeney   3:4
fees   37:10,12
felt   29:7
field   26:19
file   4:20,23 5:6,15
  22:23 25:14 29:2
  74:13
filed   13:11 15:5
  53:23 70:5,16
files   23:17
filing   15:7
financial   28:2,4
  37:22 50:15
financially   105:11
financialpackage
  50:5
find   41:2 62:1 69:6
  69:7,13 70:24
fine   11:21 66:3 75:7
  80:15 89:25
firm   26:15 101:24
first   16:4 17:20 25:3
  40:23 41:5 46:22
  75:11 81:17,17 85:2
  90:12 98:10
five   7:3 8:16 9:8,21
  9:22 32:10 35:25
  45:20 79:23
fixed   11:21 95:21
flat   62:19
floor   3:8
focus   37:6
follow   25:25 39:24
  40:5 67:5,8
following   20:25
  21:17 25:11 32:1

34:10 44:10 66:5,8
  66:20 84:18 97:21
  98:25 102:18
follows   6:6
foreclose   81:4
foreclosed   81:21
  83:1,13 101:23
foreclosure   27:18
  27:22 34:12,22 35:3
  35:16 36:7,8,20
  37:10,12 43:1 67:1
  67:6 69:10
forego   18:9
foregoing   104:8
  105:3,5,9
form   26:3 47:18
  75:1 81:24
formal   25:23
forms   79:4 84:19
forth   28:10,13,15
  43:19 105:4
forward   7:16 8:23
  16:25 18:19 41:19
  45:11 49:19 67:13
  81:21 82:24
found   29:10
foundation   34:24
  87:23
four   35:25
frame   15:25 79:2
  96:13
francisco   1:2,14 2:2
  2:14 3:9,19 4:13 6:1
fraudulent   101:17
frequently   35:7,8
friday   103:1
front   61:22
full   80:18
further   16:20 18:12
  21:3 31:24 33:5,7
  39:19 70:24 105:8
  105:11

**g**

gaddis   4:5 62:6
general   8:25 15:21
  18:6 24:12,14,17
  28:6,9,15 50:15
  57:11 58:23 69:3,17
  71:1 72:12 74:5,8
  79:19,22
generalize   80:8
generally   10:12,21
  17:18 35:9 40:2
  57:12 67:4 69:3
  80:9
generals   71:3
generous   102:9
gentleman   51:3
  52:13
germane   86:9,12
getting   26:23 32:14
  59:12 68:18 69:2
  71:9
give   7:13 9:14 25:3
  33:21 41:1 45:18
  46:3 48:7 50:7
  57:22 99:17
given   28:23 48:10
  48:12 50:4 68:21
  105:10
giving   79:2
gmac   1:7 2:8 4:19
  4:19,23,23 5:6,6,9,9
  5:9,12,14,14,17
  15:24 16:6,12,14
  19:3,11,19 20:10,18
  20:21,25 22:6,20,23
  23:7,11 25:3,3,7,10
  27:10,16,21,25
  28:10,15,25 29:3,20
  30:10 32:19,22
  33:16,19 34:10,14
  34:15,19 35:7,15
  36:6,20 37:1,9,21
  38:11,17,20,21
  39:15,18 42:5,7,14

42:21,24 43:7,12
  44:4,19 45:14,25
  46:16 47:5,7,15,19
  48:1,18 49:1,6,10
  49:20 50:1 51:12,23
  52:2,21 53:7,12
  54:5,6,11,14 55:8
  55:10,24 60:19,25
  61:10 62:10,12,13
  62:16,18,22,25
  63:10 65:16,24 66:5
  66:8,17,20,24 67:13
  67:15,25 68:10,14
  68:22 69:17,20 70:3
  70:5,8,14,17,23
  72:13 73:14 74:1,15
  75:9,20,24 78:7,24
  79:7,23 80:1,17,21
  80:24 81:4,13,18,18
  81:20 82:2,18 83:9
  83:11,24 84:11,18
  84:23 85:7,20,20
  86:22 88:5,5,6,9,25
  89:3,17 91:15,21
  92:16 93:15,16,22
  93:23 96:11 98:20
  98:25 99:12,19,22
  99:24 100:1,6,7,23
  101:2,9,14,16,16,18
  101:18,20,25 102:2
gmac's   44:1,21
gmacmortgage.com
  50:5
go   6:14 10:20 17:24
  36:13 38:23 40:15
  41:7 45:6 51:14
  62:6 64:2 82:3 86:6
  98:11 102:11
goes   74:5
going   8:23 10:1 13:6
  14:14 16:8,25 17:18
  17:22 31:1 33:11
  35:3,23 36:11,24
  38:4 40:3 45:2
  53:12 57:22 63:19

[going - january]

64:15 66:11 67:13
67:16 68:4,23 69:14
69:23 70:9 71:25
73:19 79:15 82:24
87:14 89:5,21,23,24
89:25 93:17 96:17
98:8 99:6,7,18
100:8 101:10
102:16
**good**  6:11 14:18
79:17 99:3 100:20
103:1
**government**  44:9
100:1
**great**  103:2
**grounds**  17:5 18:13
28:13 57:9 85:25
86:4
**group**  14:4
**guess**  12:4 85:1
**guy**  100:5
**guys**  71:12 99:17

**h**

**half**  80:5
**halloran**  1:4,13 2:4
2:12 4:3,11,16,16
4:19,22 5:5,9,14,17
6:4,13,19 7:23 13:3
13:7,15,20 14:4
15:1 16:5 19:8
24:23 41:12 43:10
58:8,25 66:12 85:22
86:2 87:7 90:3,20
97:23,24 104:7,17
**halloran's**  60:6
63:22
**hand**  53:20
**handed**  18:21 21:24
40:19 51:18 53:19
**handling**  72:13
**handwriting**  88:15
**handwritten**  22:24
23:4 73:25 77:4

**happen**  67:17 85:4
102:4
**happened**  49:13,16
53:6 69:22 78:10
82:13 85:14
**happening**  70:25
**happy**  20:19 78:10
**hard**  48:14 100:6
**harris**  71:1,6
**head**  14:13 15:20
37:15 38:14 43:15
61:4 71:23 72:24
73:17 83:17
**hearing**  48:9 94:12
**help**  37:7 100:5,8
**helping**  78:11
**hereto**  104:10
**hey**  28:10
**hired**  101:24
**hit**  13:1
**hodgkin's**  52:10
**hold**  32:16
**honestly**  14:21
**honor**  44:8 98:17,19
**honoring**  44:10
**horsham**  22:7 33:10
39:5 44:1 47:16
62:22 63:1 73:8
**hour**  79:25 80:5
**hours**  79:24
**house**  69:8 83:13
**hundred**  30:16
**husband**  13:25

**i**

**idea**  20:6
**identification**  6:17
18:17 21:22 31:3
38:25 40:17 51:16
53:17 73:3 91:2
**identified**  20:4
45:25
**identify**  46:4,9
**ignore**  101:14

**iii**  3:15
**immediately**  32:4
**impact**  34:21
**important**  25:24
39:25 40:1 84:22
85:9
**impound**  32:7 93:21
93:22 94:4,9,22
**impression**  35:22
**impressions**  52:21
**included**  56:21
**includes**  32:7
**including**  81:1
**income**  99:20
100:13
**incredibly**  17:14
**independent**  22:15
42:8,16 66:22
**index**  4:1
**indicates**  66:12
**indirectly**  102:7
**individual**  35:21
36:19 46:21 50:8
62:25 77:23 78:3
81:2 95:2,20,22
**individual's**  50:16
78:5
**individually**  90:3
**individuals**  46:15
**infer**  85:3
**inference**  85:1
**inferences**  85:13
**infers**  40:11
**inform**  78:18
**informal**  25:23
**information**  16:20
28:1,16 29:6 33:18
37:23 39:16 42:9,15
44:21 48:22 49:2
50:8 51:4 52:15
53:1 78:9 79:16
85:9
**informing**  28:25
**initialed**  104:10

**ink**  104:10
**inquired**  96:11
**inquiries**  79:9
**inquiry**  33:23
**instance**  40:6 49:9
49:15
**instances**  10:3 29:13
30:9 69:9
**instructed**  20:10
**insurance**  32:8
93:24
**interest**  11:12,17
57:24 76:13,14 90:5
93:11 94:2,8,21
95:17,19 101:2
**interested**  105:12
**internal**  78:7
**invading**  56:23
**involved**  70:3 82:5
**involvement**  12:6
**involves**  8:20
**involving**  8:14,17,20
9:10
**irrelevant**  59:5 60:7
96:24 97:1
**issue**  17:7,15,21
74:14 96:15
**issues**  14:17 31:24
44:19 45:4 69:10
72:16
**item**  64:12
**itemized**  59:22
63:15
**items**  64:2

**j**

**j**  4:11,16,22 5:5,9,14
7:23
**january**  1:15 2:15
5:8,11 6:1 24:2,2,3
43:24 49:19,20 50:1
50:22 51:7,22 60:16
60:21 66:8,17 79:1
79:3 105:17

Sarnoff, A VERITEXT COMPANY
877-955-3855

[job - making]

**job** 1:23
**judgment** 70:8
**july** 16:1
**jump** 46:25

**k**

**kamala** 71:1,6
**karen** 3:5
**kearney** 3:7
**keep** 25:17,20,24
26:14 38:5
**keeping** 71:11 76:4
**kept** 27:5 74:13
**kind** 26:7 46:20
48:14 68:6 70:5
79:17
**kinds** 85:14
**kirkham** 4:13
**know** 7:9 9:14 10:15
10:25 11:1 12:15,22
14:11 15:10 16:1
19:16,24 21:5 23:1
24:25 25:2,5,15
28:14,21 33:17,18
33:20 35:8,12 36:16
36:19 37:6 38:14
40:2 43:11 45:24,24
46:12,23 49:24
50:22,23 51:10 52:3
52:13,19,23 53:7
58:14,21 59:3,3,18
60:8 61:2,3 62:20
63:7 64:3,9 67:18
67:21 68:5,8,12
69:1,12,14 72:17,21
72:24 73:20,23 74:6
74:13,20 76:21,22
77:17,19 78:7 79:9
80:13 81:7 83:10,12
83:22 86:18 88:14
90:15,16 91:8 92:2
92:14,20 95:5 96:14
97:20 99:15 102:3
**knowledgable** 46:9

**knowledge** 46:11
**kstromeyer** 3:10

**l**

**lacked** 20:12
**lacks** 34:24
**laid** 87:19
**law** 3:6,16 17:5,9,14
86:20 101:24
**lawsuit** 15:5,7
**lawyer** 14:7
**laying** 83:19
**leave** 43:21 81:6
**leaves** 26:13
**leaving** 26:15 27:2
32:5 80:25
**left** 26:9,12,25 27:6
**legal** 63:21 75:6
94:6
**lender** 10:5,8 28:8
98:4,6
**letter** 4:12,15,18,22
5:5,8,11,13 19:3,10
19:20 20:10,25
21:17 22:6,8,11
25:1,11,25 30:8
31:10,12,13 33:12
34:1,10,12,20 35:25
36:9,14 38:12 39:5
39:8,11,14,25 40:1
40:10,25 41:3,14,21
41:23 42:6,11,20
46:22,25 48:20
50:19 51:22,24 52:2
52:3,6,25 60:16
73:7,10 74:4,11
75:1,3,20,23 76:6,7
76:25 77:7,22 79:4
81:22,24 82:25 83:2
83:5,12,15,16 84:20
87:16,20 89:2,16
90:7,13 92:8,19,23
93:18 94:1,8,13
95:1 96:2 101:3,20
101:21

**letters** 29:22 47:24
83:10
**level** 44:20,24
**licensed** 6:21
**lieu** 69:7
**life** 56:13
**likelihood** 33:23
**line** 12:25 18:20
26:24 36:20 65:6
90:24
**lines** 78:22
**list** 59:16 92:18
**listed** 8:3 92:23
**litigation** 8:14 9:9
9:17 14:21 31:25
36:23 101:15
**little** 36:5 43:8 100:5
**llc** 1:7 2:8
**loan** 5:12,18 8:17,17
9:3,4,10,16 10:4
11:4,7,17 12:7,9,11
16:6 19:5,12,22
20:11,13,22 21:19
23:12 24:24 29:2
31:12 33:2 34:6
37:5 38:2 44:9
59:17 60:3,12,15,23
62:11 68:8 69:5
70:3 73:15 75:9,25
76:3 78:2,19 79:7
79:11 81:12,24
82:10,19,19 83:19
84:24,24 90:5 91:16
92:5 93:22 95:14
96:3,22,23 97:6
99:18 100:15,17
101:4
**loans** 8:20,24 9:10
10:10,13,17 100:9
**location** 62:23
**log** 45:25 46:5
**logs** 25:17
**long** 95:7
**longer** 81:20

**longest** 80:4
**look** 59:15,19 77:4
78:6 92:1
**looked** 59:4 74:21
79:1 92:4
**looking** 9:22 27:13
41:17 46:24 50:9
60:18 70:4,7 99:19
**looks** 50:18 91:14
93:16
**loop** 29:24
**lori** 1:21 2:16
105:20
**loss** 4:15,18,22 5:5
5:13 22:6 31:12
33:2 39:5 44:1 73:8
**lost** 87:24
**lot** 16:25
**low** 44:20,24
**lowering** 11:16
**luck** 14:18
**lymphoma** 52:10
53:2,11

**m**

**m** 58:8
**machine** 81:6 105:7
**madam** 4:13 40:25
76:8
**mail** 3:10,20 26:13
26:14 48:4,7,10,12
48:14,20,25 50:5,12
73:8
**mailed** 24:2 30:7
48:6
**mails** 48:11
**maintain** 14:8 17:11
18:6
**maintaining** 17:13
26:11
**major** 44:4
**majority** 8:19 9:9
**making** 41:4 42:11
61:10 63:5,11 88:7

[male - november]

male  73:19
manner  63:8
mark  6:15 31:1
38:23 40:15 51:14
73:1
marked  6:16 7:17
8:5 18:16,21 20:25
21:20,21,24 24:6
25:11 31:2,5 38:12
38:24 40:16,19
51:15,18 53:16,19
66:9 73:2,5 83:16
87:16 90:23 91:1,4
91:12 92:2,9
marking  53:21
material  40:4 56:3
57:1 85:8
matter  17:8 32:1
35:19 40:12 43:6,12
46:11 56:15,20
57:13,15 79:22 87:4
87:5 95:5
matters  72:13 85:9
maturity  10:13
mean  9:4 10:15,24
11:2 12:1 22:17,24
28:5 30:7 36:10
42:1 43:18 46:12
50:22 57:18 83:21
84:19 86:21 88:20
99:15
meaning  68:20
91:17
means  11:1 36:12
meant  101:22
meet  102:18
meeting  86:17
meetings  47:15
mentioned  46:5
53:2 93:19
message  26:13,14,16
26:17,19,25 27:2,6
80:25 81:6
messages  26:9,12
27:9

mid  37:22
mike  5:8 52:4,5,7,11
52:17,17,24
mind  8:1 16:23
21:12 31:22 58:15
76:5,6 85:11 96:4,5
minds  86:17
minion  33:1
minute  80:11
minutes  79:24 80:3
80:7 102:11
missing  27:17 37:22
misspeaking  75:1
misstates  44:15
66:12
misunderstanding
101:19
mitigation  4:16,19
4:22 5:5,14 22:6
31:12 33:2 39:5
44:1 73:8
mod  82:10
mode  48:22
model  44:4
modification  8:17
9:16 10:6 11:15
12:7,13,16,19 16:7
23:13 24:24 33:24
34:17,21 37:24
42:25 44:11 48:19
49:22 50:21 51:6
54:12 55:15,18,19
60:23 68:8 69:5,6
73:15,19 75:2,4,9
76:3,11 78:2,19
79:8,11 81:12,25
82:6,19,20 83:19
84:25 87:8 88:12
99:18 100:16,17,19
modifications  9:10
10:4 70:3
modified  34:6 65:18
67:2 76:11,12 84:24
90:8 93:6,8 96:15
96:16 101:4

modify  11:9 75:25
90:5
modifying  11:17
100:9
modus  69:12,21
moment  54:15
monday's  16:16
money  11:3 33:23
53:13 94:19
monitors  26:3
month  32:10 71:24
76:14 84:2 85:3
90:7,15
monthly  32:6,12
44:5 88:8 90:12,15
94:22 96:17 100:12
100:13
months  55:14
morning  6:11 23:16
mortgage  1:7 2:8
5:9,17 8:12,14 9:2,3
41:4 42:12 44:5
51:23 53:9 54:11
55:14 62:25 66:17
88:8 90:12 91:15
mortgages  8:21
motion  17:10
move  14:15 18:19
45:11 49:19 53:14
moving  7:16
mpbf.com  3:10
multiple  21:14
29:13 72:2,4,8
multiply  96:20
murphy  3:4

n

name  6:11 25:3 41:1
46:4,22,25 50:16
52:12,14,16 73:16
77:15 78:5 105:15
names  25:4 45:22
46:3,15,17
national  44:9

nature  36:21
necessarily  94:15
necessary  29:7
need  12:18 28:11,12
needed  20:19 23:11
28:22 33:20 82:23
negotiate  12:18
24:23
negotiating  10:5
11:6 82:18 86:24
negotiation  11:5,15
43:16,18 68:20
81:23
negotiations  9:16
10:4 23:12 39:20
40:11 60:19,25 63:7
87:4
neither  105:11
never  35:12 48:5,6,7
48:11 67:15 79:25
82:5,21 89:15,20
new  88:8
non  41:3 42:11
nonperforming  44:6
norm  80:12
normal  25:16 27:5
80:14
normally  27:8
notation  26:16
note  54:4 74:13
noted  103:4 104:10
notes  22:22,24 23:4
25:13,20,24 51:11
73:25 74:3,9,10
77:4
notice  4:10 6:15
7:21 24:1 41:12
67:12 68:22 83:13
noticed  23:23
notify  68:15
notifying  81:22
november  4:22 5:5
37:2 38:13 39:5
40:13,24 42:24 43:8

[number - personally]

**number** 45:18 46:1
46:9 48:3 49:5 54:5
59:23 81:1 91:8
92:5 94:10,23 95:24
**numbers** 63:15 94:1
94:3

**o**

**oath** 6:5
**obama's** 100:8
**object** 13:6 16:8
63:19 66:11 99:6
101:10
**objecting** 57:8
**objection** 10:16
12:14 16:16 17:11
17:12 18:3,6 21:9
24:15 34:2,23 45:1
58:18 59:13 60:5
75:5 85:24 86:4
94:5 96:24 97:22
**objections** 17:22
**obligations** 67:7
98:17,20
**obtain** 12:12
**obtained** 12:9,12,15
**obtaining** 10:6
**obviously** 16:2
47:24 71:1,3,9
80:16 85:10 86:8
98:16
**occasion** 52:18
**occasions** 28:18
**occupation** 6:20
8:10
**occur** 68:4
**occurred** 29:8 72:1
**october** 32:12
**offer** 31:13,18,25
32:15,20,22 33:6
73:14,23 75:8,10,11
75:11,12,25 81:13
83:4 84:11 85:6
87:9,15,15,17,18
88:2,9,19 89:8,10

**offered** 100:17
**offering** 84:23 98:5
98:7,8
**offers** 85:12
**offhand** 29:8
**office** 63:1 71:7 72:4
72:6,7,21,22 81:7
98:2
**oftentimes** 28:20
**oh** 65:23 71:16,18
101:21
**okay** 9:15 11:2
12:25 15:8 24:5
27:11 29:24 30:15
30:21 42:23 49:18
50:11 57:3 59:24
60:1 63:13 64:4,4
75:14 78:4 80:23
87:23 89:13,25
100:2,15 101:18,22
**open** 102:17
**opening** 7:9
**operandi** 69:12,21
**opinion** 57:20 63:21
**opportunity** 48:10
**opposed** 8:21 30:11
84:6
**oral** 36:16
**orally** 47:11 82:21
**order** 23:11 31:24
70:7 80:3,5,6 91:15
**original** 59:16 60:3
**outside** 26:10
**outstanding** 32:2
**overbroad** 37:8
**owned** 11:3
**ownership** 100:1
**oz** 79:16

**p**

**p** 59:7,8
**p.m.** 2:15 103:4
**package** 28:2,4,12
50:15
**page** 4:9 5:3 8:1
22:4 31:10 40:23
41:5 58:2,3 59:19
63:13 64:22 65:1,3
75:19
**pages** 1:25 8:3 19:15
24:7 41:18
**paid** 75:12 81:18
85:2 90:7 92:15
93:15,23,24 94:19
**pais** 59:5,8 75:13
**paper** 26:16
**paragraph** 59:19,20
59:21,22,25
**paragraphs** 35:25
**paraphrasing** 78:18
**parenthetically**
74:14
**part** 9:15 11:5,6,15
26:6 38:16 44:3
46:10 60:24 66:2
78:2 91:5 95:15
**participated** 6:22
**particular** 45:22
93:22
**particularly** 50:2
**parties** 13:8 15:6
18:5 84:9 88:12
102:18
**party** 17:5 26:10
28:20 57:2 68:22
105:13
**passed** 77:23
**pay** 32:4,10 90:14
91:15 96:23
**payable** 88:5
**paying** 57:23
**payment** 32:9 43:9
43:20,23 44:2 49:22

56:1 64:6 66:5,21
68:10 76:14 78:25
81:17,17 83:8 84:13
90:12,15 91:18
93:11 94:2,8 98:10
**payments** 32:7,12
41:4 42:12 44:5
53:9 55:14 64:13
65:17 76:12 81:15
81:16 85:13 88:8
90:8 93:7,9 95:24
96:17,21 100:12,13
**payroll** 39:6
**pearson** 3:4
**penalty** 104:8
**pending** 34:22 35:4
66:25 102:1
**pennsylvania** 22:7
33:10 39:6 44:2
47:17 62:23 63:1
73:9
**pension** 33:14 39:6
41:5 42:13
**people** 16:3 25:3
44:6 45:23 46:1,10
68:6 85:13 100:9
**people's** 68:7
**percent** 9:12 30:16
76:12 90:6 93:2
99:25 101:3
**period** 55:18 95:23
100:20
**periodically** 12:3
**perjury** 104:8
**permanent** 55:15,19
73:15 75:9 79:11
81:12 84:24 96:16
100:15,17
**person** 35:2 44:20
46:8 47:15,15 49:5
52:22 73:16 78:8,13
78:13
**personal** 96:25
**personally** 12:6,8,11
72:6,8,10 97:12

[pertain - provided]

pertain  14:17 38:1
phone  3:11,21 15:24
  21:3 25:9,14,17,20
  26:3,24 27:25 28:10
  30:10,19,22,24
  39:24 68:11 69:5
  72:18 74:10,16 77:5
  77:21 79:23 81:1
  84:18,19,19
phoning  28:16
photocopy  91:14
phrase  59:12
phrasing  56:7
pilot  69:6
pin  10:1
place  20:7 35:1
  64:23 68:23 76:19
  105:4
placed  17:6 25:10
  27:25
placing  27:16
plaintiffs  1:5 2:6 3:3
plan  43:9,20,23 44:2
  49:23 50:21 51:12
  56:1 63:16 64:6
  66:5,21 78:25
please  7:20 19:1
  22:1 24:5,11,21
  29:5 31:17,23 32:16
  36:22 39:2 40:21
  41:2 51:20 58:4,7
  59:20 63:14,18 64:3
  73:5 91:12 92:1
  102:25
pleased  51:5 73:20
  78:9,18
plf  4:14
plus  93:14 94:21
pmi  76:13 90:6
  93:14,19,20 94:2,9
  94:20 96:21
pmk  46:8 82:12,15
  83:24
pmk's  82:3

point  36:3 45:15
  46:20,22 50:4,7
  52:19 60:20 61:1,12
  61:13 78:1 83:11
  95:18 99:25
policy  84:1
pose  95:4
posed  95:2 96:11
positive  74:2
possession  22:22
postpone  42:25
postponed  68:25
postponement  42:25
postponing  43:4
potential  31:25
power  24:12,14,23
  58:8,10,11,23 90:3
practice  8:11,19 9:9
  9:13,15 10:9 11:5
  11:16 25:17 26:6,15
  26:18 27:5 28:15
  30:16 35:9,14 39:23
  39:24 40:3 56:4,25
  67:20 69:21 74:6,8
practices  36:25
practicing  6:21
preamble  40:10
precise  45:18
precondition  82:22
prefaced  40:7
prefacing  98:22
premise  18:7 56:20
premised  99:19
preparation  23:14
  23:18,24 24:4
prepare  74:10
prepared  31:25
  33:21 39:14 42:1,3
  42:6,21 52:3 73:10
  96:2
preparing  22:10
  41:20 52:1 97:9
present  57:20 68:21
  79:21 80:19

presented  7:16 31:5
  55:6 85:6 99:11
presenting  17:17
president  100:7
presumably  21:11
presupposes  84:8
pretty  12:4 70:9
  73:18
prevalently  70:25
previous  23:19
previously  54:19
  66:9 86:3
principal  86:19,19
principle  10:13,22
  11:3,6,10 59:16
  60:3,7,12,15,18
  61:1,3,6,11,25
  62:11 63:2,5,11
  76:13,14 93:11,13
  94:2,8,21 95:13
  96:2,8,12,22
prior  19:19,19 20:10
  22:16,17,19 37:14
  43:23 53:25 55:2,4
  59:13 77:7,20 82:17
  94:25 98:24 100:18
  105:5
privilege  16:19 17:4
  17:6 18:4,8 56:23
  57:9 85:22,25 86:5
  87:2
privileged  17:6,19
  23:8 56:19 57:16
pro  100:4
probably  7:4 16:24
  29:10 40:7 42:1
  48:11 52:20 70:18
  70:19 78:7 80:4,5
  85:3,21
proceed  102:1
proceedings  27:18
  105:3,5,7
process  7:5,9 23:12
  33:3 34:17 35:16
  36:7,8

produce  23:5
produced  8:2 13:2
  13:14 14:5 23:3,7,9
  25:6 34:1,5 38:15
  38:17,22 41:11 42:4
  42:5 54:6,18 61:23
  62:2 65:21,25 66:2
  91:9
producing  8:4
product  16:10 23:5
  59:2 97:8 99:7,16
production  4:11
  7:22 14:16 38:16
  41:11 54:7,14 66:2
  91:5
professional  14:10
professions  14:9
proffered  88:7
  94:24
program  44:21 67:2
  69:6 96:15,16 99:18
  100:19
programs  44:11
promised  101:25
prompted  67:18
properly  102:4
property  19:21 68:7
  68:13,15 81:4,21
  83:1 93:24 101:24
proposal  33:4 43:12
  43:21 55:24 102:3
proposals  85:12
proposed  57:3 83:21
  83:22 84:5,15 87:8
  87:15,18 88:2,19
  89:8,10 91:20 92:7
  95:10 97:21 99:1,2
provide  29:5 40:9
  42:15 48:20 78:9
  85:8
provided  24:25
  33:15,17,18 48:17
  48:20,24,25 49:7
  55:24 68:18 82:15
  91:5 99:14

Sarnoff, A VERITEXT COMPANY
877-955-3855

[provides - relationship]

**provides** 24:14,18
**providing** 42:17,19
44:21 57:10
**pulling** 58:15
**purportedly** 89:16
**purporting** 55:9,11
55:13
**purpose** 20:9,12,14
20:21 22:13 26:23
48:8 55:6 59:12
72:11 73:13 77:21
98:23
**purposes** 8:23 30:2
33:24 39:19 48:18
65:10 76:4 87:18
93:17
**pursuant** 13:11
33:15 39:15 40:11
41:12 64:13
**put** 39:25 44:24
46:21 86:8
**putting** 36:15

**q**

**question** 8:13,23 9:6
10:15 19:17 23:20
34:18 36:4,25 37:15
37:17 38:19 45:6,9
56:8,16,18,21,21
57:5,10,12 59:11
63:24,25 65:11 69:1
74:22,24 77:10
79:19,20 85:25
87:11,14,18 89:5,6
89:22 90:1 92:17
94:14 96:11 98:21
98:23 101:5 102:5
**question's** 57:13
**questioning** 12:25
18:9,11,20 26:24
**questions** 9:25 37:6
95:1,4
**quid** 100:4
**quo** 100:4

**r**

**r** 3:15
**raise** 16:24
**raised** 18:3
**ran** 98:7
**range** 15:22 71:22
80:16
**rapport** 46:21
**rare** 26:19
**rate** 10:13 11:13,17
11:19,21,23,25 12:5
62:20 76:12 90:5
93:2,4 95:17,19,21
95:23 101:2,9
**read** 24:10 37:17,19
45:9 58:4 60:2
63:23 76:5 81:13
90:13 92:6 104:8
**reading** 31:22 35:22
63:24 76:6
**really** 45:24 53:8
**reason** 7:13 39:21
67:10
**reasonable** 15:18
98:13,14 99:3
**recall** 16:4 19:18
20:2,24 21:3,6
22:10,13,16,19 25:9
27:1,9,16,21,25
28:25 29:2,8 32:14
32:21 33:15 34:7,11
34:14,18 35:15 37:1
37:9,11,21 38:10
39:10,14 41:20
42:14,17,18,23 43:3
43:7,14,16,22 44:23
45:8,13 46:15 49:10
49:14,20,25 50:24
52:1,5,11,17 53:4
53:24 55:20,25 56:9
57:7 58:23 60:14,18
60:24,25 61:5,8,10
61:16 62:9,24 66:4
66:7,16,19,24 67:10

68:1,19 73:25 76:18
77:5,10,15,18,20,22
78:4,24 79:6,12
83:18 85:17 95:7,9
95:13,16,20,22,25
96:1,10 101:1,8
**recap** 75:18
**receipt** 65:24
**receive** 83:15
**received** 24:1 28:11
28:16 49:11 54:10
68:10,11 73:14
74:18 88:25
**receives** 26:16
**receiving** 27:21
67:12,12 83:18
**receptionist** 26:20
**recitation** 94:15
**recollection** 13:21
13:23 15:15 19:6
25:12 28:6,9 30:15
38:8 39:12,17 42:8
42:16 43:5,25 46:2
60:17 63:3,4 66:23
67:19 69:3,11 72:18
80:17 95:11
**recommend** 99:5
**record** 6:12,19 8:9
8:22 9:7 14:14,19
14:25 15:2,6 17:2
17:24 18:3,25 24:10
27:4 31:8,17,23
34:4 37:14,19 39:2
40:21 41:7,9,25
50:3 51:20 54:20
57:4 58:4 62:6,7
76:4 81:10,14,23
84:4 85:23 90:14
102:14,15 105:6,9
**recorded** 74:19,20
**recording** 74:16
**records** 26:11 78:6,7
**reduce** 11:9
**reducing** 61:6

**reduction** 61:11
62:1,11 63:2,5,11
**refer** 9:2 41:18
**reference** 53:22
88:11 92:5,7 93:2,4
93:5,6,8,10,18
**referenced** 70:13
77:22 90:17 94:1
**references** 92:15
**referencing** 91:18
**referring** 58:11
81:10 83:6
**reflect** 27:6 88:1,18
90:4,20
**reflects** 33:12
**refresh** 19:6 66:23
**refuse** 25:4
**regarding** 18:3 21:4
22:20,23 28:1 34:21
35:16 36:7 37:22
42:24 43:9 45:3
49:22 53:1 55:21
59:13 61:9 66:25
70:2 71:7,14 72:13
72:16,23 79:7 95:16
98:25 101:2
**regards** 10:5 16:5,6
16:15,20,21 18:3,10
19:12 25:10,14
27:17,22 28:24 29:1
32:22 33:6 37:5,10
37:12 43:4,19 49:4
49:21 51:12 52:6
58:24 61:5 62:10
63:1 75:25 91:19
95:3
**reinstatement** 32:2
**reiterated** 29:9
**reject** 94:18
**related** 19:21 72:12
72:12
**relating** 11:16
**relation** 85:20
**relationship** 62:18
86:19

[relative - short]

relative  105:12
relatively  42:4
relevance  12:14
remain  102:17
remember  32:24
    33:5 44:11,12,18
    51:3 78:13,16 83:17
    99:16
reminding  28:17
remission  53:11
reneged  81:5,9
    100:24
reneging  82:8
repayment  63:16
repeat  87:10
rephrase  9:6 34:18
    59:11 75:3 87:12,12
    89:6
reported  1:21
reporter  2:16 6:17
    18:17 21:22 31:3
    38:25 40:17 51:16
    53:17 59:9 73:3
    91:2 102:21,23
    103:1 105:1
representation
    13:15,24 15:18,24
    16:5 17:21 19:7
    29:15,25 30:1,4,10
    55:12 56:2 70:12,15
    74:15
representative
    54:22 62:13
represented  28:19
    28:20 82:18 86:22
    100:7
representing  10:8
    13:3,20 16:3 20:18
    46:14
request  4:10 7:22
    17:3 25:6 29:21
    33:16,19 37:11 40:8
    41:2 42:25 54:6
    61:10,16,18,19,21
    61:25 62:10 63:5,11

requested  14:20
    28:2,7 39:19 42:14
    43:22 46:10 48:18
    49:2 69:8
requesting  37:11
    39:16
requests  61:9
required  37:23
    48:18 49:21 64:13
    64:17 68:24 93:21
    94:22 96:22
requirement  19:3
    19:11
requirements  34:5
resent  49:16
reserve  18:11 36:24
    44:8 52:21 69:22
    70:8 71:4,11,14,20
    72:3,5,9,16,23
resolution  32:1
respect  57:15
respond  85:24
response  29:12
    32:14,20 42:6 54:6
    57:5,11 83:15
responsibility  14:7
responsive  23:8
    57:13
rest  100:20
result  6:22 18:9
    23:10 40:8 70:22
retain  27:8
retained  15:11 87:4
retainer  14:1,3,6,12
return  58:7
returned  84:2
revenue  44:7
review  23:14,17
    33:2 34:21 37:24
    54:15,18 55:4 59:20
    63:18 64:2,11 65:9
    70:21 92:1 93:1
    94:18 99:2,13
reviewed  7:24 23:20
    23:23 24:3 46:6

54:8,10,16 55:2
reviewing  48:19
    58:23
right  8:8,9 18:11
    38:8 43:6 46:17,18
    46:24 48:17 53:4,20
    55:5 56:16 69:11
    72:18,25 74:23,25
    76:25 77:3
role  46:6
routinely  26:14
rules  14:9
run  56:12 97:5,21
    98:3 99:1
rush  102:22,23

**s**

s  59:7,8
sale  27:22 34:12,17
    34:22 35:7,11 43:1
    43:4 66:25 67:1,11
    67:12,13 68:4,12,16
    68:23,25 69:10
san  1:2,14 2:2,14
    3:9,19 4:13 6:1
    101:24
satisfied  33:22,25
    34:5
saved  27:9
saw  54:2,3 83:22
saying  74:9 78:17
    81:24 87:22 95:22
    101:21 102:3
says  22:15 50:11
    54:2 58:8 60:9 77:1
    88:14
schedule  64:13 97:5
    97:10,16,18,20,25
    98:4,7
scope  47:8 79:20
screen  35:1,22
scuttlebutt  62:19
seat  45:17
second  17:25 41:8
    90:15

section  23:16,24
see  50:11 52:12,16
    53:20 59:24 84:16
    92:24 93:1,3,5,8,10
    93:13
seeing  7:6 53:24
seek  16:20
seeking  14:15 71:2
seen  7:18 18:23 24:8
    54:9
sell  67:16
send  29:22 35:18
    36:22 39:13 47:22
    47:25 48:10,12,14
    50:5 69:8 83:12,25
    84:3
sending  39:10 41:20
    52:1 69:7
sent  19:20 34:11
    39:8,15,18 40:8,13
    41:24,25 42:1,3,21
    47:24 48:2,11,25
    49:11 50:18 51:23
    52:3,14 67:15 73:7
    73:10 75:20 81:24
    83:10 89:3,17,20
    90:16 91:24
separately  88:23
september  4:18 16:2
    28:1 30:22,23 31:11
    32:3 34:16,20 36:1
    36:8 37:2,10,22
    38:12
series  69:4
set  100:11 105:4
settlement  31:13,18
    33:6 63:7 101:12
severson  3:14 62:14
    62:15 63:6,10 80:21
    101:15
severson.com  3:20
shook  37:15
short  18:1 41:9
    54:20 62:7 75:15,17
    102:14

[shorter - sure]

shorter  80:9
shortest  80:6
shorthand  2:16
  105:1,7
show  66:22
showing  64:25
sic  32:11
side  57:4
sign  58:7,25 64:23
  65:15 89:17
signature  41:23
  58:3 65:6
signatures  88:24
signed  58:5,7 65:10
  65:11,14 87:25 88:5
  88:17 89:9,19 90:2
  90:11,20
significance  87:7
similarly  26:9
simply  94:14 96:20
single  17:19
sir  4:12 40:25 76:8
sit  15:10 19:18 20:6
  38:10 51:2,10 52:16
  55:5 68:6 74:23,25
  77:3 95:25
sitting  46:24 74:6
situation  84:22
situations  68:19
sixth  59:25
skip  7:8
somebody  25:2
  26:13,16 27:2 36:17
  40:9 68:11 86:24
  97:11,19
somewhat  9:2 10:9
  47:23
son  52:9 53:2
sorry  20:14 47:17
  47:22 59:21,22
  61:24 87:10,23
sort  8:13 12:25
  16:23 18:19 28:9
  39:21 52:22 55:14
  71:6 79:15

sounds  15:18
span  79:6,20 80:18
speak  19:4 20:3,19
  37:11
speaking  35:9 37:9
  37:21 40:3 49:1
  52:11,17 69:4 77:20
  80:9,20 95:2
speaks  15:2,7 19:2
  22:3 24:16 31:19
  58:6,19 60:6 63:20
  65:4 88:13 92:25
special  33:2 44:1
specific  10:19 13:10
  13:21,23 14:17
  15:14,15 17:15
  25:12 38:7 39:12,17
  43:5 44:12,18 49:14
  51:11 54:13 57:6,7
  64:23 68:1 69:11,16
  79:7 85:18 88:11
  101:1
specifically  22:21
  27:1,20,24 28:24
  29:3 37:3,4 43:2
  45:3 46:15 49:6,22
  49:25 55:25 56:8,9
  57:14 78:16 85:15
  95:20
specifics  10:1 50:24
  77:6 79:12,14
specified  94:7
spectrum  80:10
speculate  78:12
speculation  21:10
  34:24 94:6
spirit  44:9
split  88:23
spoke  33:1 45:14
  46:16 51:4 52:13
  77:16,23
sports  23:16,24
spouse  41:3 42:11
stamp  22:4 54:1,4
  54:14 91:8 93:15

stamped  4:14,17,20
  4:24 5:7,10,15
  31:10 40:24
stamps  41:15
stand  17:22 45:22
  93:20
standing  38:1 86:4
start  6:14 57:22
  88:7
started  21:10 27:18
state  1:1 2:1 6:11,19
  9:1 11:20 14:14,20
  15:17 16:17 17:2,13
  24:21 31:8,17 39:2
  40:21 51:20 56:24
  64:17 82:25 89:25
  96:4,5 104:14 105:2
stated  8:9 16:16
  24:18 76:7 87:16
  90:6
statement  12:4 13:5
  13:12 17:14 39:21
  63:17 82:2,12 96:19
  98:15
states  33:12 42:10
  100:1
stating  85:24
status  27:22 34:12
  35:11 42:24 52:8
  79:10
staying  35:13
stepped  11:19
steps  68:7
stipulated  70:7 86:3
stipulation  69:25
stokes  1:21 2:16
  105:20
stop  59:11
stopped  101:20
  102:2
story  86:25
street  3:7 4:13
stromeyer  3:5 8:4,7
  10:16 12:14,20 13:6
  14:19 15:12 16:8

17:12 18:15 19:21
  21:9 24:15 31:19
  32:16 34:2,23 36:2
  36:11 37:17,25 38:4
  41:25 44:15 45:1,15
  58:18 59:1 60:5
  61:12 63:19 64:15
  65:1,4 66:1,11 75:5
  76:20 77:8 78:12,20
  80:20,23 83:5 86:1
  87:10 88:20 91:10
  94:5 96:24 97:22
  99:6 101:6,10 102:9
  102:22
stuff  28:12
subject  22:20 40:12
  43:6,12 46:11 56:15
  56:20 57:13,15 87:3
  87:5 95:5
subjective  56:17
submitted  28:3,4
  43:12
submitting  28:6
subpoena  4:10 7:21
subscribed  105:14
subsequent  36:15
subsequently  44:7
substance  21:18
  52:6,25
substituted  15:9
suffice  16:2
sufficient  21:8
suggested  35:18
suggesting  44:2
suite  2:13 3:18
sum  32:5,11 76:14
  93:11
superior  1:1 2:1
supervisor  37:12
  73:16 74:1 75:24
  77:7,15,21,24,25
supporting  17:5,9
supposed  100:5
sure  10:11,19 11:22
  11:24 12:10 13:10

Sarnoff, A VERITEXT COMPANY
877-955-3855

[sure - unofficial]

16:13 30:13 31:7
32:23 37:7,18 38:18
42:4,22 47:10 48:2
54:1,15 67:5,9 68:4
68:25 69:9 73:18
78:22 85:11 86:14
**surprised** 70:24
**sworn** 105:6
**system** 26:2,8,11
27:8 34:25 100:11

**t**

**tailor** 36:4
**take** 42:18 43:21
54:1 59:15 63:18
68:23,24 74:9,22
75:14 92:1
**taken** 2:12 6:25 7:6
11:6 18:1 51:11
74:2 75:15 77:5
105:3
**talk** 85:20
**talked** 61:2
**talking** 16:11 35:2
75:17 80:21 82:8
84:14 101:13
**taxes** 32:7 93:24
**taxpayers** 99:24
**telephone** 45:25
46:5 47:12 73:15
**tell** 7:20 15:20 22:1
53:10 73:5,12 79:17
80:13 91:12
**telling** 35:2 82:13
96:16
**temporary** 100:18
**ten** 80:3 102:11
**tend** 80:2
**term** 8:24 9:3,3
10:23,24,25 11:12
11:19 47:23 60:19
84:24 87:24 92:21
93:6
**terms** 10:12,17 12:3
32:1 33:3,7 43:14

43:20 57:3 63:15
64:6,17 73:19,23
75:4 76:6 81:13
83:19 85:6 87:8,19
88:1,6,11,19 89:2
89:16 90:21 91:20
92:8,13,14,18,20,22
95:3,10 98:5,7,9,12
99:2,3,4,13 101:19
**testified** 6:6 77:11
82:9 90:22
**testify** 42:18 66:14
85:15
**testifying** 67:25
105:6
**testimony** 7:14
18:12 21:13 44:15
46:13 65:19 66:12
70:1 75:6,22 82:4
82:14,15 104:11
105:9
**thank** 8:7,8 27:13
40:14 59:9 91:11
102:13
**thing** 7:12 17:20
23:23 49:4
**things** 4:11 7:23
45:2 53:5 85:14
**think** 9:24 12:22
15:23 16:24 17:14
25:13 30:21 34:3
39:25 40:2 50:15
52:20,23 60:22
70:13 77:19 94:7,13
99:17 101:1 102:20
**third** 26:10 68:22
**thought** 71:21 87:24
**three** 55:14 65:17
80:6 100:12,13
**time** 15:25 16:25
20:4 29:10 34:11,15
34:19,20 36:3 43:23
45:15 46:22 47:8
52:20 56:6 60:15,20
61:1,12,13 63:18

68:14,21 78:1 79:2
79:6,17 81:4 82:2
82:18 84:11 95:23
96:12 99:25 100:2
100:21 102:20
103:4 105:4
**timely** 83:9
**times** 9:22 45:18
56:13 100:6
**timothy** 1:13 2:12
4:3,11,16,19,22 5:5
5:9,14 6:4,13 7:23
104:7,17
**title** 24:10
**today** 7:13 8:2 15:10
18:9 19:18 20:6
23:3,5,21 26:19
38:10,16 41:12,13
46:13 47:9 51:2,10
53:25 55:3,4 60:11
61:23 62:2 63:22
66:2 67:25 70:6
91:6 96:1 102:17
**today's** 23:15,18,20
23:24 39:22
**told** 20:18 29:5
73:19 76:16 83:23
94:15 97:17
**top** 14:13 15:20
38:14 43:15 50:11
61:4 71:23 72:24
73:17 83:17
**total** 32:2
**totally** 32:11,11
79:24
**tracking** 26:11
**tracks** 26:3
**traditional** 76:3,11
**train** 87:24
**transaction** 19:4
57:1
**transcribed** 105:8
**transcript** 104:9
**translated** 74:3

**transportation**
48:22
**treatment** 53:1
**treatments** 52:9
**trial** 43:9,22 44:2
49:22 50:21 51:5,12
54:12 55:15,17 56:1
60:23 66:5,20 78:25
**true** 7:13 104:11
105:9
**trust** 9:1
**try** 8:23 45:19
**trying** 15:21 26:21
27:3 52:21 53:10
59:12 68:12 79:16
**turn** 24:5 58:2 63:13
**turning** 8:1 14:24
**two** 15:5 24:7 31:10
78:3 79:24,25 80:6
94:1,3
**typically** 10:7

**u**

**u.s.** 71:3
**undersigned** 105:1
**understand** 10:12
10:21,23 11:2 30:6
40:22 55:5 57:5,17
58:20 64:5 65:11
67:23 80:8 87:22
**understanding**
19:10 24:13,18
29:12 31:9 55:10
58:10 60:6,11,14
62:15,17 64:5,7,9
69:15 73:12 93:25
94:20 96:20,25 97:2
**understood** 33:9
55:8 58:17
**unfortunately** 53:5
**unilaterally** 83:24
**unit** 44:1 76:9
**united** 100:1
**unofficial** 82:2

[unpaid - zztm.989105.1]

**unpaid** 10:13,21 11:6
**unstated** 84:1
**untrue** 82:7
**unwritten** 84:1
**use** 8:24 9:3 74:10 89:23

**v**

**v** 4:19,23 5:6,9 64:23
**vague** 8:13 10:16 36:2,11 77:8 97:22 101:11
**varied** 79:24
**verbal** 21:7 30:19
**verification** 20:19 33:21,21
**viewpoint** 84:10
**violating** 44:8
**violation** 36:17
**voice** 26:13,14 27:9 80:25
**volume** 1:16 2:12 4:3
**vs** 1:6 2:7

**w**

**waive** 17:18
**waived** 17:4
**walk** 47:6
**want** 13:1 69:13 86:8 102:21
**wanted** 52:7 53:7 69:24 73:22
**ward** 1:4 2:4 4:13 4:16,17,19,20,23,24 5:6,9,10,12,14,15 13:15,22 14:2,3 15:1 16:6 19:7 20:13,22 22:4 24:6 31:10,12 33:14 37:5 38:1 39:4 41:5 42:13 43:10 51:22 58:9,25 64:23 65:7 65:12 66:13 73:7

76:1 78:11 85:6 87:7 89:9 90:4
**ward's** 13:8 24:22 29:2 53:2
**wards** 52:9
**way** 6:15 19:7 30:18 47:4 48:21 56:22 59:4,7 89:22 95:11 97:3
**we've** 47:10,13,24 54:21 66:9 102:15
**wednesday** 1:15 6:1
**week** 71:24 102:20
**wells** 82:5,9
**went** 73:18 81:20
**werson** 3:14 62:14 62:16 63:6,10 80:21 101:15
**whereof** 105:14
**wife** 13:25 24:22
**willing** 98:17
**witness** 4:2 12:15,22 14:18 15:14 16:13 19:24 21:13,14 24:17 34:3,25 36:14 38:7 45:17 46:13 54:21 58:21 59:3,7 60:8 61:14 63:23 64:16 65:6 75:8 76:21 77:13 78:14 78:21 80:24 83:8 86:11 88:24 94:7 97:2,25 99:8 101:17 105:14
**witnesses** 105:5
**wizard** 79:16
**words** 29:19 58:16 80:11 95:21 97:11
**work** 8:11,14 10:10 16:10 21:8 23:4 59:2 97:7 99:7,16
**worked** 8:15,16
**working** 70:2
**works** 7:10

**write** 29:22
**writing** 29:19 36:15 47:6,7 61:18,19 62:1 67:16 73:22 82:21 91:19 94:25 101:20
**writings** 87:6,25 88:4 90:2,18
**written** 5:17 21:7 23:6 26:19 30:18 38:11 47:23 57:18 62:24 72:15,22 83:3 83:18 88:16,16,17 89:7 91:19
**wrong** 75:23
**wrote** 36:14 38:22 81:22 82:25

**x**

**x** 67:13

**y**

**yeah** 9:5 10:2 12:4 20:17 27:12,15 30:23 42:4 49:17 50:20,21,22 53:4 61:3 69:3 70:19 71:16,18 74:2,12 76:3,8 77:2 80:13 87:22 94:24 102:8 102:22,24
**year** 72:1 75:11
**years** 7:3 8:16 9:8 9:22 32:10

**z**

**zztm.989105.1** 4:20 4:24 5:7,15

**February 1, 2012 Transcript of Deposition of Timothy Halloran**

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                 FOR THE COUNTY OF SAN FRANCISCO

 3

 4    _____
                                      )
 5    BERNARD WARD and COLLEEN        )
      HALLORAN,                       )
 6                                    )
                                      )
 7              Plaintiffs,           )
                                      )
 8        vs.                         )  Case No. CGC-11-511574
                                      )
 9    GMAC MORTGAGE, LLC, and         )
      DOES 1-20,                      )
10                                    )
                                      )
11              Defendants.           )
                                      )
12                                    )
      _____ )

13

14

15            DEPOSITION OF TIMOTHY HALLORAN

16               San Francisco, California

17             Wednesday, February 1, 2012

18                    Volume II

19

20

21    Reported by:

22    JENNIFER L. FURIA
      CSR No. 8394

23

      Job No. 133872

24

25    PAGES 106 - 160

                                        Page 106
```

```
 1            SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2                 FOR THE COUNTY OF SAN FRANCISCO
 3
 4    _____
                                      )
 5    BERNARD WARD and COLLEEN        )
      HALLORAN,                       )
 6                                    )
                                      )
 7              Plaintiffs,           )
                                      )
 8        vs.                         ) Case No. CGC-11-511574
                                      )
 9    GMAC MORTGAGE, LLC, and         )
      DOES 1-20,                      )
10                                    )
                                      )
11              Defendants.           )
                                      )
12                                    )
      _____ )
13
14
15
16            Deposition of TIMOTHY HALLORAN, Volume II,
17    taken on behalf of Defendant, at One Embarcadero Center,
18    Suite 2600, San Francisco, California, beginning at
19    10:34 a.m. and ending at 11:42 a.m. on Wednesday, February
20    1, 2012, before JENNIFER L. FURIA, Certified Shorthand
21    Reporter No. 8394.
22
23
24
25
                                                    Page 107
```

```
1     APPEARANCES:

2

3     For the Plaintiffs:

4          MURPHY, PEARSON, BRADLEY & FEENEY

5          BY:  KAREN STROMEYER, ESQ.

6          88 Kearney Street

7          10th Floor

8          San Francisco, California 94108

9          (415) 788-1900

10

11

12     For the Defendant:

13          SEVERSON & WERSON

14          BY:  EDWARD R. BUELL, III, ESQ.

15          and CLAYTON GADDIS, ESQ.

16          One Embarcadero Center

17          26th Floor

18          San Francisco, California 94111

19          (415) 398-3344

20

21

22

23

24

25
```

Page 108

```
 1                            INDEX

 2   WITNESS                                  EXAMINATION

 3   TIMOTHY HALLORAN

 4   Volume II

 5                      BY MR. BUELL                  112

 6

 7                          EXHIBITS

 8   NUMBER               DESCRIPTION             PAGE

 9   EXHIBIT 27   A letter dated May 23, 2011 to Loss  120

10                Mitigation Attention: Brett Re:

11                Mortgager:  Bernard V. Ward Account

12                Number     ████8940 Property Address:

13                3300 Kirkham Street, San Francisco,

14                CA 94112 Our File: ZZTM.989105.1

15                from Timothy J. Halloran Bates

16                stamped WARD 000014 and WARD 000015

17

18   EXHIBIT 28   A letter dated May 25, 2011 to Loss    125

19                Mitigation Attention: Brett Re:

20                Mortgager:  Bernard V. Ward Account

21                Number     ████8940 Property Address:

22                3300 Kirkham Street, San Francisco,

23                CA 94112 Our File: ZZTM.989105.1

24                from Timothy J. Halloran Bates stamped

25                WARD 000018
```

Page 109

```
 1                    INDEX (Continued):

 2

 3    NUMBER                 DESCRIPTION                 PAGE

 4    EXHIBIT 29    A letter dated June 1, 2011 to Loss      127

 5                  Mitigation Attention: Brett Re:

 6                  Mortgager:  Bernard V. Ward Account

 7                  Number ████8940 Property Address:

 8                  3300 Kirkham Street, San Francisco,

 9                  CA 94112 Our File: ZZTM.989105.1

10                  from Timothy J. Halloran Bates stamped

11                  WARD 000011 through WARD 000013

12

13    EXHIBIT 30    A letter dated June 3, 2011 to Jason      133

14                  Short, Michael Kraheneuhl, Renee

15                  Belcastro of Pite Duncan, LLP and to Loss

16                  Mitigation Attention: Brett Becker Re:

17                  Mortgager:  Bernard V. Ward Account

18                  Number ████8940 Property Address:

19                  3300 Kirkham Street, San Francisco,

20                  CA 94112 Our File: ZZTM.989105.1

21                  from Timothy J. Halloran and Karen

22                  Stromeyer Bates stamped WARD 000008

23                  and WARD 000009

24

25
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

```
 1                    INDEX  (Continued):

 2

 3     NUMBER                   DESCRIPTION              PAGE

 4     EXHIBIT 31      A letter dated April 28, 2011 to     151

 5                     Timothy J. Halloran from GMAC Mortgage

 6                     Customer Care Loan Servicing DC Bates

 7                     stamped WARD 000016

 8

 9                     PREVIOUSLY MARKED EXHIBITS

10     EXHIBIT 25      A letter dated April 22, 2011 to     113

11                     Loss Mitigation Re: Ward: GMAC

12                     Account Number ███████8940 Our File

13                     No.: ZZTM.989105.1 Bates stamped

14                     WARD 000017

15

16

17                    REQUEST FOR INFORMATION

18     Page      Line(s)

19     114          5-7

20

21                    INSTRUCTION NOT TO ANSWER

22     Page      Line(s)

23     146          2-4

24

25

                                          Page  111
```

```
 1    San Francisco, California, Wednesday, February 1, 2012

 2                    10:34 a.m.

 3

 4              TIMOTHY HALLORAN,

 5    having been administered an oath, was examined and      09:49:29

 6    testified as follows:

 7

 8                    EXAMINATION

 9    BY MR. BUELL:

10        Q  Welcome back, Mr. Halloran --               10:34:54

11        A  Thank you.

12        Q  -- for round two.  Just to jump off, the only

13    opening admonition we'll do, is there any reason you can't

14    provide accurate testimony today?

15        A  No.                                         10:35:03

16        Q  Did you review anything in preparation for

17    today's testimony?

18        A  No.

19        Q  No files, no anything else?

20        A  No.                                         10:35:13

21        Q  Let's start then.  Jump off where we sort of

22    left off last time.  I'm going to start with what's been

23    previously marked as Exhibit 25.  We'll use the exhibit

24    that was marked from last time.

25    ///                                                10:35:32
```

Page 112

```
 1              (Exhibit 25 was previously marked for
 2              identification by the court reporter and
 3              attached hereto.)
 4    BY MR. BUELL:
 5         Q  Just so we're all on the same page, could you      10:35:35
 6    please tell us what Exhibit 25 is?
 7         A  This is a April 22nd, 2011 letter from my office
 8    to the GMAC Loss Mitigation confirming an agreement with
 9    GMAC on modification for a loan for loan number
10    █████8940.                                                 10:35:52
11         Q  And, again, just to catch us all up to speed.
12    Did you send this letter as a follow-up to a conversation
13    that you had with somebody at GMAC?
14         A  That's correct.
15         Q  Do you recall any of the specifics about the      10:36:12
16    conversation you had with the individual at GMAC?  That's
17    a broad question, I can specify if you like.
18         A  You know, I got the phone call.  He, I believe
19    it was a gentleman, informed me that the modification had
20    been approved and that these were the terms of the        10:36:28
21    modification.  And I said fine.  And I confirmed the terms
22    that were provided to me in this letter, once it was
23    determined they were acceptable.
24         Q  Do you recall if you took any notes during that
25    conversation?                                              10:36:48
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

```
 1        A  I believe you asked me last time that.  I don't

 2   have a specific recollection of taking notes, but

 3   considering that there were specifics terms here, I would

 4   suggest that I did take some notes, yes.

 5        Q  Are you aware if you have any -- as you sit here   10:36:57

 6   right now -- if you have any personal notes of your own in

 7   your file regarding this matter?

 8        A  I don't off the top of my head, no.

 9        Q  If you do, that is something that we would be

10   interested in obtaining, so we'll follow up with that        10:37:13

11   after this.

12            Going forward.  Do you recall, in the process of

13   this loan modification negotiation, what occurred after

14   you sent this April 22nd letter?

15        A  My client paid the first monthly payment, which      10:37:32

16   was accepted, you know, cashed by GMAC.  What happened

17   after that?

18            MS. STROMEYER:  Well, that's the next thing in

19   time that happened.  That was your question; so do you

20   have another question?                                       10:37:54

21            THE WITNESS:  Right.

22   BY MR. BUELL:

23        Q  Do you recall what happened after she sent in

24   the check and it was cashed?

25        A  I don't know of anything that happened per se.       10:38:00
```

                                                        Page 114

```
 1    My first notification that GMAC may have done something

 2    awry, was my niece called me and said that a -- some kind

 3    of a mortgage bailout had called her on a Friday afternoon

 4    to say that the house was about to be sold and would they

 5    be interested in working out some kind of a deal.          10:38:20

 6         Q  You mentioned your niece.  Did she reside at the

 7    property?

 8         A  Yes, she did.  So she was obviously concerned

 9    about that.  Of course, I assured her that GMAC was an

10    honorable company, wouldn't have dare done that under the  10:38:33

11    circumstances.

12         Q  And, again, just to clarify.  When you refer to

13    your niece, is that the daughter of your client Ms.

14    Halloran?

15         A  That's correct.                                    10:38:44

16         Q  Makes sense why she would reside in the property

17    then.

18            So your next recollection after this is that

19    phone call.  Do you recall -- do you know what happened

20    after that phone call was received?                        10:38:57

21         A  I believe, I think the phone call was after

22    business hours.  I don't recall, but anyway the next

23    business day, I believe, I called GMAC.

24         Q  Do you have any idea, date-range, what we are

25    talking about with this phone call from your niece and     10:39:13
```

Page 115

1    then your subsequent phone call?

2        A   You know, there may be some letters that would

3    be more accurately reflective of the conversation and the

4    days, but I think that the property was sold, I believe,

5    on a Friday.  And that was the day I got the phone call.    10:39:25

6    It might have been that Monday that I called GMAC to find

7    out what had happened, what was going on.

8        Q   If I tell you the sale occurred on May 20th, I

9    believe -- May 23rd, I believe it was, does that refresh

10   your recollection about dates for those phone calls at    10:39:47

11   all?

12       A   You know what, I don't know if it specifically

13   would refresh my recollection.  I know that the phone call

14   came before I had a conversation with GMAC, which was --

15   at that point they notified me that they had decided that    10:40:01

16   there was no modification.

17       Q   And I'm sorry if you made this clear.  I may

18   have missed it.  Just so I'm clear on the exact time line,

19   because you mentioned the phone call to your niece may

20   have been after hours.  And you also mentioned that it may 10:40:14

21   have been a Friday with your communication following up to

22   GMAC on Monday.

23       A   You know, if I had a calendar, it might help.  I

24   mean, if you refresh my recollection with -- I believe I

25   wrote a letter the same day that I had a communication    10:40:27

Page 116

1    with GMAC, so whatever date that was, that would help me

2    go backwards in time as to the communications.

3        Q    Without a calendar in front of us, does that

4    sound -- seem about right that the phone call may have

5    come in after hours on a Friday and that's why you didn't    10:40:41

6    reach out to GMAC until the following Monday?

7        A    I don't know, but let me look.  I have a

8    calendar here.

9        Q    Sure.  Back to 2011.

10        A    We'll see, won't we.                                10:40:52

11            Did you say it was March?

12        Q    May.  And, I believe, 23rd is the date I gave

13    you for the foreclosure occurring.

14        A    Yes.  So looking at -- taking judicial notice of

15    my Blackberry's calendar.  I believe the phone call was on 10:41:26

16    the 20th and I believe that the conversation that I had

17    with somebody from GMAC was the 23rd or the 24th.

18        Q    And just because you're looking at your

19    Blackberry, not me, is the 20th a Friday?

20        A    Yes.                                                10:41:41

21        Q    Okay.  Thank you.

22            Following that phone call -- well, let me back

23    up and say, do you recall what your conversation was on

24    Monday the 23rd with GMAC?

25        A    Whatever day it was, whether it was the 23rd or   10:41:57

                                                        Page 117

1    not, my conversation was I have heard that the property

2    was in foreclosure or was sold and I want to confirm that

3    we still have a loan modification which was approved and

4    was paid.  And a woman informed me that I was incorrect.

5    That the loan had been not modified, that the          10:42:14

6    quote/unquote "investor group" had not approved it.

7         Q   Was that the first time you recall hearing that

8    the loan mod had not been approved?

9         A   Yes.

10        Q   And just for clarification on the record, when I  10:42:32

11   refer to "mod" I mean loan modification.

12        A   Understood.

13        Q   And, I'm sorry, your answer's yes, that was the

14   first time that you heard?

15        A   Correct.                                         10:42:44

16        Q   Do you recall what transpired after that?  So

17   what was your next communication with GMAC?

18        A   The individual, whose number I don't know, but

19   we will depose her obviously, told me that I obviously

20   didn't know what I was doing, because everyone has to have 10:43:06

21   their investor group approve loan modifications and that

22   it simply wasn't approved.  I mentioned to her that in

23   fact there had been a loan modification approved and that

24   a payment had been made.  She said that that was not true.

25        What she didn't tell me was that GMAC had any        10:43:22

Page 118

1    kind of program that they had to get the documents in the

2    same month, which is why they didn't apparently send

3    documents.  She didn't tell me that there had been a

4    resubmission.  She didn't tell me anything about that at

5    all.  She refused to tell me whether or not the house had    10:43:39

6    been sold, refused to look the information up.  Informed

7    me that I now had to contact counsel, who was in Southern

8    California, that was involved in the foreclosure

9    proceedings.  And when I asked, I think to talk to her

10   superior, she was unavailable for that purpose.  So I    10:43:56

11   wrote a letter to confirm what I considered to be the

12   tortious breach of contract conduct of GMAC.  I think

13   that's what I did.

14        Q  And just to be clear, that conversation that you

15   just explained in detail, was that all one conversation    10:44:12

16   that occurred, your first communication with GMAC after

17   learning of the potential sale?

18        A  Exactly.  Yeah.

19        Q  That was a phone call, not a written

20   communication?    10:44:26

21        A  No.  That was a phone call.  There was a written

22   communication that I drafted, I think shortly

23   thereafter.

24        Q  Do you remember if you had a direct person to

25   call at GMAC for that phone call or did you just call a    10:44:35

Page 119

1    general number that you'd been using?

2         A  I don't remember off the top of my head, but I

3    know that there had not been anyone specifically assigned

4    to this modification, even though that was part of the

5    consent decree.                                        10:44:49

6         Q  We may have the letter that you're talking about

7    for the follow-up.

8              So we are on 27.

9              (Exhibit 27 was marked for identification by the

10             court reporter and attached hereto.)           10:45:20

11   BY MR. BUELL:

12        Q  You've been handed what's been marked as Exhibit

13   27.  Are you familiar with this document?

14        A  Yes.

15        Q  Could you tell me what this document is,         10:45:34

16   please?

17        A  Well, this is my letter of May 23rd to the Loss

18   Mitigation department concerning their conduct in

19   foreclosing on the property and violating the agreement

20   that we had with them on the loan modification.          10:45:47

21        Q  Based on the testimony you just provided

22   regarding the conversation you had with GMAC, do you

23   believe this is the letter that you sent to GMAC following

24   up that conversation?

25        A  I believe so.                                    10:46:03

Page 120

1      Q   Is that accurate?

2          If you wouldn't mind just taking a brief moment

3   to review it and confirm that sort of comports with the

4   testimony you just gave.

5      A   Yeah.  This is the letter I wrote in response.    10:46:15

6   I do note that it was attention to Brett.  I do know that

7   at least one person I spoke to that day was a woman, whose

8   name escapes me.  Brett may have also had a conversation

9   with me.  It may be that Brett was the first tier and the

10  woman was the second tier.  But yeah, it confirms         10:46:30

11  basically what transpired.

12     Q   Do you recall if you made multiple phone calls

13  to GMAC or if there was only one phone call?

14     A   I can't tell you at this time.

15     Q   And, again, I'm just getting to what you were    10:46:49

16  alluding to.  You know, you don't know if Brett was the

17  first person you talked to and passed you on or vice

18  versa?

19     A   Yeah, I don't know exactly.

20     Q   Okay.  All right.  So following this, we'll call  10:46:59

21  it the May 23rd letter, which has been marked as Exhibit

22  27; do you recall what happened next?

23     A   Not specifically, no.

24     Q   What do you recall, as you sit here today as

25  being the next event that transpired following this      10:47:14

Page 121

```
1    letter?
2         A  Let me see.  GMAC stuck their head in the sand,
3    didn't do anything.  I think I had to, you know, threaten
4    a lawsuit and nothing happened.  They proceeded to -- let
5    me see, proceeded to try to evict my client from the        10:47:37
6    premises.  They notified my client's insurance carrier
7    that her home was unoccupied and, therefore, they canceled
8    her insurance.  I got a standstill agreement from GMAC
9    that we wouldn't proceed with any further activity in the
10   matter and the activity that I just described, I think,     10:48:01
11   all occurred after that standstill agreement.  And I
12   believe I had to file a lawsuit.
13        Q  And I assume -- or let me state it a different
14   way.
15        Do you recall sending any confirming letters          10:48:26
16   following any of those conversations?
17        A  I presume I must have sent some kind of paper
18   trail on that.
19        Q  Are you aware of any notes or any other
20   documentation besides written letters you have to GMAC      10:48:37
21   that might refresh your recollection as to those events or
22   any more specifics as to those events?
23        A  I don't think I have any contemporaneous notes
24   that I took with regard to my internal thinking on the
25   subject matter, no.  I know that I probably did send        10:48:54
```

Page 122

```
 1   letters to GMAC every time they did, yet, what I

 2   considered to be another offending activity, but beyond

 3   that, no.

 4       Q  And to clarify.  I'm not necessarily seeking

 5   your contemporaneous thoughts on the subject, but rather,  10:49:07

 6   you know, any notes regarding specifics of conversations,

 7   individuals you spoke to, et cetera.

 8       A  I don't know if there are any notes on that

 9   subject matter.

10       Q  Is there any way to determine if there are any   10:49:26

11   notes?  Review of your file or anything of that sort?

12       A  Well, I certainly have a file and my file

13   contains my notes and my work product, but I'm pretty sure

14   there's probably correspondence with regard to the

15   standstill issues relative to the eviction of my client   10:49:41

16   from her premises, because I believe there was a law firm

17   in Southern California that was involved in that

18   activity.

19       Q  Did you have direct interaction -- let me use a

20   different word.                                           10:49:56

21          Did you have direct communication with this law

22   firm this San Diego?

23       A  If by you, you mean my office, yes.  If by you,

24   you mean me individually, I don't know if I had any direct

25   communications.                                           10:50:07
```

Page 123

```
 1          Q  Just to clarify for the record.  Were there any

 2     other individuals at your office that had been working on

 3     this file?

 4          A  Yes.

 5          Q  And who are those other individuals?          10:50:16

 6          A  Well, there's a staff of people in my office

 7     that would be working on this file, but my associate that

 8     has been working on this file is Karen Stromeyer.

 9          Q  So Ms. Stromeyer may have had some conversations

10     or direct communications with this firm down in San          10:50:28

11     Diego?

12          A  Ms. Stromeyer did have direct communications

13     with this law firm, which is how I know that they agreed

14     to a standstill to not proceed any further in the eviction

15     of my clients.                                              10:50:40

16          Q  But you personally didn't have any direct

17     communications with them?

18          A  I think I mentioned --

19          MS. STROMEYER:  He's already testified.  Asked

20     and answered.                                               10:50:45

21          THE WITNESS:  -- I may have, but I'm not sure.

22     BY MR. BUELL:

23          Q  I think when you were providing your time line

24     you ended with "And I believe I filed a lawsuit."  Does

25     that sound accurate?                                        10:51:03
```

Page 124

```
 1          A  I believe I did file a lawsuit.

 2          Q  Do you recall any communications after filing

 3     the lawsuit with GMAC?  To clarify, I don't mean an

 4     attorney representing GMAC, I mean GMAC directly.

 5          A  I may have.  I just don't know off the top of my    10:51:17

 6     head.

 7          Q  Is there anything, any documents, notes, et

 8     cetera, that might refresh your recollection on that

 9     topic?

10          A  There might be, I don't know.                       10:51:27

11          Q  If there were, what would they be?

12          A  I don't know.  It would be speculative for me to

13     tell you what to refresh my recollection.

14          MR. BUELL:  Let's go ahead and have that marked

15     as 28.                                                      10:51:47

16          (Exhibit 28 was marked for identification by the

17           court reporter and attached hereto.)

18     BY MR. BUELL:

19          Q  You've been handed what's been marked as Exhibit

20     28.  Can you please tell us what this document is?          10:52:03

21          A  May 25th, 2011 letter that I wrote to Brett at

22     GMAC concerning loan ▓▓▓▓8940.

23          Q  Do you recall the conversation that led to this

24     letter being sent to Brett?

25          MS. STROMEYER:  Lacks foundation.                      10:52:33
```

Page 125

```
 1            THE WITNESS:  I don't have a specific
 2   recollection of each item of the discussion.  I believe
 3   that I presented what had happened.  And I believe that
 4   Brett confirmed, through his computer system, things that
 5   I was describing to him.  And I asked whether or not he      10:52:51
 6   was capable, in his capacity, of agreeing to a standstill
 7   so that the property wouldn't then be sold to some other
 8   third party or anything.  We'd just have kind of a status
 9   quo standstill agreement until he could look into it
10   further.                                                     10:53:12
11   BY MR. BUELL:
12            Q  And that was the follow-up question.  You
13   mentioned a standstill agreement earlier.  Is this your --
14   is this what you were referring to as the standstill
15   agreement?                                                   10:53:23
16            A  I believe this confirmed what I understood to be
17   the stand still agreement on the 25th of May, yeah.
18            Q  Are you aware of any other written
19   communication, written document, regarding that standstill
20   agreement or just this is confirmation of your, sort of,    10:53:33
21   call regarding that issue?
22            A  Well, clearly I had a conversation with somebody
23   who represented themselves to be authorized on behalf of
24   GMAC to enter into this.  And then, I believe subsequent
25   to that, there was some other activity which came to mind   10:53:45
```

Page 126

1    which required us to have further intervention in that

2    regard.

3        Q  Could you just expand on what you mean by

4    activity?

5        A  I think they tried to evict my client from the    10:53:56

6    property.  And there was at least one other thing that

7    came up.

8        Q  Do you recall what that other thing is?

9        A  Let me see now.  One of them that came up was

10   they tried to give back the money that they had cashed,    10:54:11

11   presumably in an effort to do an accord and satisfaction

12   issue, to stop the modification enforceability provisions.

13       They notified -- without any authority

14   whatsoever, notified the insurance company that insured,

15   my clients' home, that it was an unoccupied premises,    10:54:36

16   therefore, no longer habitable for insurability.  That was

17   another one that came up.

18       MR. BUELL:  Lets move on to 29.

19       (Exhibit 29 was marked for identification by the

20       court reporter and attached hereto.)    10:54:53

21   BY MR. BUELL:

22       Q  You've been handed what's been marked Exhibit

23   29.  Once you've had a chance to review it, could you

24   please let us know what this document is?

25       A  This was a letter which I wrote to Brett, again,    10:55:16

Page 127

1    GMAC on June 1st, 2011 in -- I guess, in relation to that

2    check that was sent by GMAC to my clients in relation to

3    their loan.

4        Q   And is this the check being returned that you

5    just referenced a few minutes ago?                          10:55:41

6        A   This was one of them.

7        Q   When you say one of them, was there another

8    check that was returned?

9        A   Oh, I believe that there was more than one.

10       Q   Would you say there's more than two checks that    10:55:49

11   were returned?

12       A   I don't know, but I know that while your law

13   firm was representing GMAC I had to contact your law firm

14   on the fact that GMAC was continuing to do this

15   activity.                                                   10:55:59

16       Q   Just to clarify, what do you mean by activity?

17       A   Trying to send back checks in an effort to

18   unwind the agreement.

19       Q   And just to make the record clear.  When you use

20   the term agreement, what are you referring to?             10:56:13

21       A   The agreement that forms the basis for the

22   lawsuit against GMAC for breach of contract.

23       Q   Again, to clarify for the record, would it be

24   accurate to say that that agreement is the agreement that

25   you describe in your April 22nd letter, which is Exhibit   10:56:27

Page 128

```
 1    25?

 2         A   It's the agreement that I've described in the

 3    Complaint which I filed against GMAC.

 4         Q   I'm not sure that's directly responsive to my

 5    question.                                          10:56:45

 6         A   I don't know if that's the agreement that you're

 7    describing.  I'm talking to you about the agreement which

 8    forms the basis for my Complaint for breach of contract,

 9    which that was specified in the Complaint.

10         Q   Would you mind taking a look at Exhibit 25?    10:56:54

11         A   Yes, I see this.

12         Q   Does this letter, Exhibit 25, refer to the terms

13    of the agreement that you're discussing right now?

14         A   I'm not discussing the terms of the agreement.

15         Q   Does this letter refer to the terms of the    10:57:09

16    agreement that, as you put it in your testimony, forms the

17    basis of the Complaint?

18         A   It certainly has those aspects, yes.

19         Q   Maybe there's something I'm missing then that

20    I'm not understanding from you.  What additional terms are 10:57:25

21    there in the agreement that forms the basis of your

22    Complaint that are not referenced in this confirming

23    letter?

24         A   I don't know what you mean by your question.

25    I'm sorry.                                          10:57:38
```

Page 129

```
1          Q  Perhaps you could explain to me then.  What I'm

2     missing is the difference between what this letter lays

3     out and the agreement that forms the basis of your

4     Complaint; what's the difference in the two?

5          MS. STROMEYER:  Objection.  Vague and ambiguous,  10:57:53

6     lacks foundation.  May call for attorney work product.

7          THE WITNESS:  Yeah, I'm not getting where you're

8     going with this.  I think we've gone over what Exhibit 25

9     was.  Your questions on Exhibit 29 were the relation

10    between the fact that checks were being sent back.  And    10:58:10

11    that this was activity which was not in compliance with

12    the standstill agreement that we had with GMAC.  And, I

13    believe, an attempt to refund money that had been paid by

14    my clients in conformity with a modification, which GMAC

15    had proposed to us, which we accepted, in which my client  10:58:28

16    sent money which GMAC cashed.  That's it.

17    BY MR. BUELL:

18         Q  And just to clarify, so we're -- I don't think

19    we're all on the same page right now.  The word agreement

20    is being used and, frankly, there's at least three         10:58:41

21    agreements that I see that are floating out there that the

22    term could attach to.  You've used the term standstill

23    agreement.  There's the alleged modification that forms

24    the basis of the Complaint.  And then there's the

25    agreement which is the actual note and deed of trust.  So  10:58:58
```

Page 130

```
 1    I'm just trying to specifically relate your testimony,

 2    when you use the term agreement, to which agreement are

 3    you referring to?

 4        A   I don't know what you mean by your question.

 5    I'm sorry.                                        10:59:12

 6        Q   Okay.  Looking at Exhibit 29.  It seems to be a

 7    time line from January 14th, 2000 -- it looks like it's

 8    been corrected to 2011 -- through May 23rd of 2011; is

 9    that correct?

10        MS. STROMEYER:  Objection.  The document speaks  10:59:47

11    for itself.

12        THE WITNESS:  Well, other than the fact that the

13    document speaks for itself, I think the letter lays out

14    what our position is in trying to get GMAC to appreciate

15    what it is they're doing and why they're doing it.  10:59:58

16    BY MR. BUELL:

17        Q   Each of these entries when -- and just to

18    clarify, again, for the record.  When I use the term entry

19    I'm referring to each of the 13 dates that you list in

20    this letter, which are each followed by a explanation of  11:00:23

21    what occurred, okay?  Each of these entries seem to be

22    fairly specific as to what occurred on those dates.

23        Do you recall, when drafting this letter, if you

24    referred to any notes in order to prepare this letter?

25        A   I couldn't tell you.                      11:00:44
```

                                                    Page 131

1          Q  Do you recall the specifics of these

2     conversations as you sit here today without reading this

3     letter first?

4          MS. STROMEYER:  I'm going to object that this

5     goes over much of the testimony.  He's already been asked    11:00:57

6     about several of these conversations before.

7          THE WITNESS:  I'm not quite sure what you mean

8     by your question, Counsel.

9     BY MR. BUELL:

10         Q  Before reading this letter, which has been    11:01:07

11     marked as Exhibit 29, could you tell me what occurred on

12     April 26th, for example, or is that something that you

13     would need to refer to either this letter or some notes

14     that you have in order to recreate?

15         A  I don't know.  I can't answer that question.  I    11:01:22

16     mean, I know I wrote a letter April 22nd confirming what

17     the offer was for the loan modification.  I don't need to

18     review anything to know that.  I know it happened.  You

19     have the letter.  We just went over it.  It's Exhibit 25.

20         Now, on May 20th, for instance, I couldn't have    11:01:38

21     known about the fact that GMAC foreclosed on the property

22     and then bought the property itself for $150,000 less than

23     it was probably valued at.  I couldn't have known that,

24     because GMAC didn't tell anybody about that, so that

25     obviously must have happened after the fact.    11:01:54

Page 132

```
1            So, I hope I answered your question.

2       Q  Do you recall -- I believe where we were in sort

3  of the time line here is you mentioned several activities,

4  as you put it, occurring leading up to this June 1st

5  letter and then all the way through to your filing of the    11:02:41

6  Complaint.  After reviewing this June 1st letter, do you

7  recall what happened next specifically?

8            MS. STROMEYER:  Objection.  Misstates the

9  witness's testimony, compound.

10           THE WITNESS:  What happened after this.  I can't    11:02:59

11  give you a specific statement about what happened next,

12  so.

13           MR. BUELL:  Okay.  Let's go with 30.

14           (Exhibit 30 was marked for identification by the

15           court reporter and attached hereto.)               11:03:30

16  BY MR. BUELL:

17      Q  You've been handed what's been marked as Exhibit

18  3.  Please take a look at it and let me know what it is,

19  once you've had a chance to review.

20      A  This is a letter of June 3rd, 2011 addressed to      11:03:39

21  Jean Short at Pite Duncan, which is the law firm in San

22  Diego, and addressed to Brett Becker, B-e-c-k-e-r, Loss

23  Mitigation concerning the loan ▮▮▮▮▮8940.

24      Q  Just to, again, clarify for the record.  If you

25  turn to page 2.  Was this letter prepared and sent by you   11:04:03
```

Page 133

```
 1    or someone else from your office?

 2         A  Well, it was signed by Karen Stromeyer of my

 3    office, my associate, obviously was authorized by our law

 4    firm in relation to -- this was -- June 3rd was when GMAC

 5    posted a notice to quit the residence of my clients'.      11:04:20

 6         Obviously this is problematic since Brett Becker

 7    had agreed to a standstill while it was -- they were

 8    investigating the modification.

 9         Q  Did you review this letter before it went out?

10    Or better question.  Were you aware of the contents of     11:04:44

11    this letter at the time that it went out?

12         A  Yeah.  Sure.

13         Q  You spoke earlier today about the eviction piece

14    and this law firm in San Diego.  Is it accurate to say

15    that this letter is confirmation of those discussions,     11:04:58

16    conversations you may have had with the San Diego

17    attorney?

18         MS. STROMEYER:  Objection.  Calls for

19    speculation, lacks foundation.

20         THE WITNESS:  I'm sorry, could you rephrase that  11:05:09

21    question?

22    BY MR. BUELL:

23         Q  Sure.  Let me rephrase it, sure.  And I'll go

24    step-by-step.

25         Is it accurate, first of all, that earlier you    11:05:14
```

Page 134

```
 1     testified about an eviction notice being received by your

 2     client?

 3         A   Correct.  Yes.

 4         Q   Would you say that this June 3rd letter is a

 5     confirmation of any conversations, communications you had   11:05:26

 6     regarding that eviction notice that was received with GMAC

 7     and the San Diego firm, those representing them?

 8         A   I don't know.  I wouldn't say it's a

 9     confirmation of anything.  I think what it was was it was

10     clearly a notification to Jason Short, Michael Kraheneuhl,  11:05:44

11     K-r-a-h-e-n-e-u-h-l, and Renée Belcastro,

12     B-e-l-c-a-s-t-r-o, that they were violating the terms of a

13     status quo agreement, which GMAC had agreed with me,

14     pending their investigation of their own conduct.  And it

15     was my attempt to get them to, you know, honor that        11:06:10

16     agreement.

17         Q   Do you recall how you were first notified of the

18     notice to quit that was posted on the residence?

19         A   Yes.

20         Q   How was that?                                      11:06:47

21         A   I believe I received a tearful phone call from

22     somebody who said I can't believe that they've nailed a

23     notice to quit on the front door of our house.

24         Q   I'm sorry if I did ask you this one before.  Do

25     you recall any specific conversations with GMAC after the  11:07:21
```

Page 135

1    lawsuit was filed?

2        A   After the lawsuit was filed.

3        Q   If it provides any context for you, your

4    Complaint was filed -- the Complaint was filed on

5    June 8th, 2011.                                    11:07:41

6        A   You know, I think I may have had a conversation

7    with somebody at GMAC that said -- and I'm not entirely

8    sure, but I may have actually said, look, here's a draft

9    of the Complaint.  Can you please get somebody from your

10   litigation department, the legal, to give me a call,    11:07:57

11   because the people I've been dealing with, obviously,

12   aren't the people that are really going to be able to make

13   decisions here.  Can I get somebody.  I don't think it

14   ever happened, so.

15       Q   So just to follow up and close that loop.  Did    11:08:09

16   you ever talk with somebody from the litigation --

17       A   I don't think I ever had a conversation with

18   anyone who represented themselves to be the legal

19   representative of GMAC.  I mean, usually you have a legal

20   department.  Everybody has a legal department.  Nothing.    11:08:21

21   So --

22       Q   And with the next several questions I'm not

23   interested in conversations you had with attorneys from

24   outside firms representing GMAC, so if that's the answer,

25   so be it.  I'm just trying to figure out where this time    11:08:33

Page 136

1    line ends.

2        A  I think the time line may have ended when your

3    office stepped into the foray and -- and that was it.  So

4    maybe that was the response, was to refer to you guys.  I

5    don't know.                                          11:08:46

6        Q  Do you recall any conversations with GMAC about

7    rescinding the foreclosure sale?

8        A  There was never a notification from us that they

9    were rescinding the foreclosure sale.  They simply did it.

10   And I don't know how I learned about it off the top of my  11:09:16

11   head, but I know I did learn about it.

12       Q  And then -- sorry I'm jumping around a little

13   bit here, but back to the unlawful detainer, the eviction

14   piece.

15       Following the June 3rd communication to Pite     11:09:29

16   Duncan and Brett Becker of Loss Mitigation at GMAC, do you

17   recall if you ever received a response to this

18   communication?

19       MS. STROMEYER:  Mr. Halloran personally?

20   BY MR. BUELL:                                        11:09:48

21       Q  When I say "this communication" I'm referring to

22   Exhibit 30.

23       A  I don't know off the top of my head.  I know

24   that somewhere along the line, the lines of communication

25   between this law firm and GMAC must have connected,  11:09:55

Page 137

1    because they ceased and desisted in that regard, trying to

2    evict my clients, so.

3        Q  Do you know if an actual Unlawful Detainer

4    Complaint was ever filed?

5        A  I do not know off the top of my head.        11:10:12

6        Q  And just to phrase it in a different way.  Do

7    you know of any action, beyond the three-day notice to

8    quit being posted on the door of the residence?  Was

9    anything else ever done regarding the eviction process?

10       A  If it was, I don't know about it.           11:10:29

11       Q  Are you aware of any current status of eviction

12   proceedings?

13       A  I'm not aware of any status right now.

14       Q  Back to our conversation regarding rescinding

15   the foreclosure sale.  I believe -- and I just want to    11:10:53

16   clarify your testimony before I go with the next question.

17   I believe you said you never received any communication,

18   phone call, writing, et cetera, that the foreclosure had

19   been rescinded, you just -- I think you said learned of

20   it?                                                       11:11:12

21       A  I don't know how I learned of it.

22       Q  But you did learn of it in some fashion?

23       A  Yes, at some point in time I had learned that

24   they had done that.

25       Q  But you don't recall how?                    11:11:19

Page 138

1          A  Exactly.

2          Q  And you don't know what document then that you

3     saw that confirmed for you that the sale had been

4     rescinded?

5          A  Here is what I do recollect.  I think I had one     11:11:28

6     of my assistants actually go on line and check to see what

7     the status was, because I was a bit concerned, having seen

8     GMAC do a few things without notifying me, like sell the

9     property.  I wanted to see if they were adhering to the

10    honor of the status quo thing.  And at that point, I     11:11:44

11    believe somebody in my office looked it up and said, oh,

12    it looks like they rescinded the foreclosure and deeded it

13    back to your clients.  And that was how I learned about

14    it.

15         Q  Are you aware of any other foreclosure     11:11:54

16    proceedings taking place after the rescission of the

17    foreclosure sale?

18         MS. STROMEYER:  Regarding this property?

19         MR. BUELL:  Correct.

20         THE WITNESS:  I'm not sure I understand your     11:12:04

21    question.

22    BY MR. BUELL:

23         Q  I assume, based on your testimony so far, you

24    don't recall, as you sit here right now, the date that the

25    foreclosure was rescinded.     11:12:14

Page 139

1        A  No, I don't.

2        Q  So just hypothetically speaking, let's say the

3    foreclosure was rescinded, to give us a date, of June 20,

4    2011, okay?  Do you know if anything has happened post

5    June 20th regarding foreclosure of the subject property?   11:12:29

6        A  Well, I mean there's ongoing litigation

7    concerning it that relates to the foreclosure.  I know

8    that on at least one, and maybe two occasions, Clayton

9    received a letter from us that said why does your client

10   keep trying to send us money back to undo the terms of the 11:12:47

11   loan modification.  I know that that happened.

12       Q  But as far as a recorded document, for example,

13   a notice of default, notice of trustee sale, are you aware

14   of any further documents being recorded regarding a

15   sale?                                                      11:13:06

16       A  Neither you, your law firm, nor GMAC has sent

17   any such documents to me.

18           MR. GADDIS:  For the record, Clayton is Clayton

19   Gaddis, counsel for GMAC.

20   BY MR. BUELL:                                              11:13:18

21       Q  Just to put you guys at ease, I don't believe

22   anything has happened, so I'm not getting at that.  I want

23   to make sure we weren't unaware of something.

24           I think that brings us to the end of the time

25   line piece.  Is there anything else you recall from        11:13:34

                                                    Page 140

1    dealing with the Pite Duncan Law Firm or the eviction

2    piece?  I can ask a more specific question, if you like.

3         A  I'm not sure I understand what your question

4    is.

5         Q  Sure.  It was a poorly-worded question, that's    11:13:51

6    why.

7            I believe your testimony regarding the eviction

8    concluded with sort of nothing ever happened after the

9    notice to quit was posted; is that an accurate statement?

10   That you were aware of.                                    11:14:08

11        A  Yeah.  I think the way to deposit it is that

12   what appeared to be eviction proceedings were halted.

13        Q  Are you aware of any further communications

14   after they were halted, as you put it, with the Pite

15   Duncan law firm?                                           11:14:24

16           MS. STROMEYER:  Objection.  Calls for

17   speculation.  Between Pite Duncan and who?

18           MR. BUELL:  Your firm.

19           MS. STROMEYER:  Mr. Halloran?

20           MR. BUELL:  Mr. Halloran.                          11:14:33

21           THE WITNESS:  Yeah, our law firm may have had

22   some further communications with them, but I don't believe

23   I did.

24   MR. BUELL:

25        Q  And just so I understand, you may have had some    11:14:39

Page 141

1    role in it, but generally it sounds as though you weren't

2    the primary point for dealing with the eviction piece at

3    your firm; is that accurate?

4        A   I think it would be accurate to state that

5    Ms. Belcastro, who is the first, second, third person down    11:14:56

6    at the Pite Duncan Law Firm, was the person that was

7    directly involved in handling the eviction.  And I believe

8    that Ms. Stromeyer was directly involved in discussing

9    with Ms. Belcastro the conduct, which I believe was

10   unwarranted.                                                 11:15:17

11       Q   Okay.  Thank you.

12           Off the record.

13           (Discussion off the record.)

14           (Recess.)

15   BY MR. BUELL:                                                11:22:01

16       Q   All right.  I wanted to revisit the sort of

17   circumstances and events that occurred, we'll call it

18   April 20th to April 23rd, sort of time frame, of 2011.

19   For purposes of context, I want to just sort of refer back

20   to what's been marked as Exhibit 25, which is your letter.  11:22:19

21   Actually, why don't you just -- which is your letter

22   confirming a conversation you had with GMAC; is that

23   correct?

24       A   Okay.

25       Q   You've testified today, and I believe last week    11:22:51

Page 142

1    as well in part one, that this letter confirmed -- was a

2    confirmation letter following up on your conversation with

3    somebody at GMAC.  I wanted to just walk through that

4    conversation in as much detail as we possibly can.

5        Do you recall if you placed the phone call to      11:23:10

6    GMAC that started this event or did they contact you?

7        MS. STROMEYER:  Vague and ambiguous as to

8    event.

9        MR. BUELL:  Sure.

10       Q  By event -- I'm trying to think of a good way to  11:23:23

11   term this, so we're all on the same page.

12       The conversation that you had that lead to you

13   drafting this letter, this letter meaning Exhibit 25, was

14   that initiated by a phone call from you to GMAC or from

15   GMAC to you?                                            11:23:40

16       A  I don't recall.

17       Q  You've also testified you don't recall who you

18   spoke with during that conversation; is that accurate?

19       A  I don't recall the name of the person, no.

20       Q  And, again, just to clarify for the record.     11:23:54

21   When I refer to the conversation, for this line of

22   questioning, I mean the conversation that led to you

23   drafting Exhibit 25; is that fair?

24       A  Sure.  I understand.

25       Q  Do you recall if that conversation -- if you     11:24:06

Page 143

1    spoke with more than one person?

2        A  No.  The conversation that I had with the

3    individual, who I believe was a man, was one conversation

4    in which that person said "Congratulations.  Here's the

5    terms of the loan modification.  Tell your client." I,    11:24:23

6    said, "Great.  Let me confirm in a letter to you.  We'll

7    make sure we comply and pay the first payment by May."

8    They said "Okay."  So I wrote the letter to confirm it.

9        Q  Based off of that statement, do you remember

10   this being somewhat of a brief conversation?    11:24:39

11       A  It was certainly less than a half hour.

12       Q  Would you say on the order of five minutes?

13       A  I couldn't give you an opinion about that one

14   way or the other.

15       Q  Closer to five than 30?    11:24:51

16       A  It was closer to 15 than 30 and somewhere

17   between, you know, five minutes and 15 minutes.

18       Q  Do you remember if you went through each of the

19   terms?  And I can define what I mean by terms, if you

20   like.  If you went through each of the terms individually  11:25:06

21   that you've laid out in your letter with the person you

22   were having the conversation with.

23       A  I'm not quite sure what you mean by that.

24       Q  Sure.

25       A  But let me explain what I think I can best do.    11:25:17

Page 144

```
 1    I didn't select the terms.  The terms were proposed to my

 2    client.  I didn't add or delete any of the proposed terms.

 3    This was what was presented to my client as a modified

 4    permanent loan modification.  So, once I got these terms

 5    and they were acceptable, I confirmed them with this       11:25:37

 6    gentleman in this letter and instructed my client that

 7    this was what was going to -- you know, this was what you

 8    have to do.  You have to pay the first month, if you want

 9    to abide by.  That's what she did.

10        Q  You said when you determined that they were         11:25:52

11    acceptable; is that accurate of what you testified to?

12        A  Clearly, yeah.

13        Q  What was that process of you determining that

14    those terms were acceptable?

15            MS. STROMEYER:  Objection.  Calls for              11:26:04

16    attorney-client communications.

17    BY MR. BUELL:

18        Q  Did you review the terms and see if it was a

19    modification that would fit with your understanding of

20    your clients' financial abilities to repay the loan?       11:26:14

21        A  Well, I did a lot of lawyerly things, probably

22    including talking to my client about it, right.  But

23    obviously there had been some history of this, because as

24    you well know, there had been a trial loan modification

25    as well, as you may recall, so.                            11:26:31
```

Page 145

1        Q  And, again, we need to do it one more time, just

2    for the record.  What conversations did you have with your

3    clients' regarding the proposed terms that were made to

4    you in this phone call?

5        A  Well, whatever conversation --          11:26:48

6          MS. STROMEYER:  Objection.  May call for

7    attorney-client communications and attorney work

8    product.

9          THE WITNESS:  Yeah.  Clearly, my communications

10   with my client about that would be privileged.      11:26:54

11         MR. BUELL:  So are you instructing your witness

12   not to answer?

13         MS. STROMEYER:  I'm instructing him not to

14   answer this question to the extent it calls for

15   attorney-client communications, yes.         11:27:04

16   BY MR. BUELL:

17        Q  Is there -- just to wrap that up.  Is there any

18   portion of that that may not call for attorney-client

19   privilege?  You just put a condition on the objection.

20         THE WITNESS:  Any communications with my client  11:27:15

21   concerning the subject matter of this negotiation would be

22   privileged.

23         MS. STROMEYER:  Would be privileged.  If he

24   spoke with her about some other thing, that's some other

25   thing, but --                       11:27:25

```
 1              MR. BUELL:  Okay.  Then I won't press that issue

 2    anymore.  You've made your objection clear on the record.

 3         Q  Did you have, at the time, time being April

 4    22nd, 2011, did you have written authority from your

 5    clients to bind them to a contract?                    11:27:50

 6              MS. STROMEYER:  Objection.  May call for

 7    attorney-client communication.  May call for

 8    attorney-client work product.

 9              THE WITNESS:  I don't know what you mean by

10    written authority.  I was their attorney.  I was acting in 11:28:05

11    my capacity as their attorney.

12    BY MR. BUELL:

13         Q  And I believe you testified last time that you

14    did have a written retainer with the Halloran/Ward group;

15    is that accurate?                                      11:28:17

16         A  I think I did, but if I don't, I had an oral

17    agreement.  I haven't looked, but whatever there is, there

18    is an attorney relationship with my clients.  And the

19    authority that I have as a disclosed principal would be

20    the same authority that GMAC would have as the undisclosed 11:28:27

21    agent of a principal with the ability to bind, because

22    GMAC, of course, bound -- as an undisclosed agent of a

23    principal, bound themselves to an agreement which they now

24    contend, of course, they didn't have the responsibility,

25    because apparently Wells Fargo didn't approve it.      11:28:44
```

Page 147

```
 1              Of course, we know that's not true as well

 2    because Wells Fargo did approve a loan.  So in any event,

 3    go ahead.  What's your next question, Counsel?

 4    BY MR. BUELL:

 5         Q  If you did have a written retainer agreement,      11:28:55

 6    would it be maintained in the files located at your law

 7    firm?

 8         A  We do maintain fee agreements in our offices, of

 9    course.

10         Q  Was it your understanding at that time that you    11:29:03

11    had the authority to bind your clients to an agreement?

12         A  Whatever --

13              MS. STROMEYER:  He's already testified.

14              THE WITNESS:  -- authority I have with my

15    clients to bind them to any agreements, that's my         11:29:15

16    authority.

17              Let me just put it this way.  Generally I don't

18    write letters confirming agreements unless I believe I

19    have the authority to do so.

20    BY MR. BUELL:                                             11:29:28

21         Q  Back to the conversation you had with the

22    individual at GMAC.  Again, conversation refers to the

23    conversation that forms the basis for this confirming

24    letter, Exhibit 25.  Do you recall any discussion about

25    further paperwork being sent to you or your clients       11:29:45
```

Page 148

```
 1    regarding the modification?

 2         A  Well, I know in the letter I refer to the fact

 3    that he said it might take a few days for some paperwork

 4    to get through.  I do remember that.  Of course, they

 5    never sent the paperwork.                          11:30:04

 6         Q  That was the next question.  Did you ever

 7    receive any paperwork?

 8         A  No, of course not.  And we now know why.

 9         Q  Which is?

10         A  There is an unwritten rule at GMAC, which Wells  11:30:12

11    Fargo doesn't know about, apparently, that if they can't

12    get the documents to the borrower before the end of the

13    month, they unilaterally cancel the loan modification and

14    file a new application to the lender for that purpose.

15    And to date I have received no written policy from GMAC   11:30:34

16    that that's an accurate statement, but that's the

17    testimony under oath of your PMK.

18         Q  For the record, your understanding to form the

19    basis for the statement you just made; is that your own

20    understanding or does that come from the deposition       11:30:52

21    testimony of the PMK from GMAC?

22         A  That is my recollection of the deposition

23    testimony under oath of the PMK designated by GMAC to

24    testify on that basis.

25         Q  Do you recall in the conversation that forms the  11:31:09
```

Page 149

1    basis for Exhibit 25, any discussion regarding the need

2    for a modification agreement to be notarized?

3         A  No such discussion on that at all.

4         Q  Do you recall any conversation with GMAC to put

5    a time frame, January 1st, 2011 through the present about    11:31:27

6    needing a notarized signature of your client?

7         A  No, not whatsoever.  It was not a condition

8    precedent to the agreement.  That means before.

9         Q  And just to clarify, you don't recall any

10   discussion of notarization being required?                   11:31:45

11        A  No.  No, that's not correct.

12        Q  Okay.

13        A  There was no conversation about a notarization.

14   It did not happen.

15        Q  Okay.                                                 11:31:55

16        Based on your prior objection, Ms. Stromeyer,

17   I'm not going to go into any potential communications your

18   witness had with his clients after this letter either.

19   We'll reserve that, as we discussed in our stipulation on

20   record in the previous portion of this deposition, should    11:32:21

21   we bring a motion to compel; is that fair?

22        MS. STROMEYER:  Yes.

23        MR. BUELL:  Again, that is based on your

24   instruction of him not to answer the questions based on

25   your objections; is that accurate?                           11:32:38

Page 150

```
 1              MS. STROMEYER:  Based on the fact that it
 2     contains communications covered by the attorney-client
 3     privilege, correct.
 4              MR. BUELL:  Thank you for clarifying that.
 5              THE WITNESS:  There is a letter, obviously GMAC    11:32:52
 6     wrote back, which I haven't seen, but that might shed some
 7     light on this notarization issue.
 8     BY MR. BUELL:
 9          Q  Sure.  Let's do this.  31?
10              (Exhibit 31 was marked for identification by the    11:33:13
11              court reporter and attached hereto.)
12     BY MR. BUELL:
13          Q  You've been handed what's been marked Exhibit
14     31.  Have you seen this letter before?
15          A  Yes.                                                11:33:35
16          Q  Please tell us what it is.
17          A  It's an April 28th, 2011 letter that GMAC
18     Mortgage sent to my attention concerning the loan
19     modification.
20          Q  If you see at the very bottom of the letter at     11:33:46
21     the signature line.  It says "Customer Care, Loan
22     Servicing" and then there's two initials.  Do you see
23     that?
24          A  I do.
25          Q  What are those two initials?                       11:33:55
```

Page 151

```
 1        A  What do they represent?

 2            MS. STROMEYER:  You're asking him to read the

 3    document?

 4    BY MR. BUELL:

 5        Q  Read the document, to start.                11:34:02

 6        A  Oh, it says "Customer Care, Loan Servicing D.C."

 7        Q  Do you have any idea as you sit here today, who

 8    D.C. might refer to?

 9            MS. STROMEYER:  Objection.  Calls for

10    speculation, lacks foundation that D.C. is a person.    11:34:14

11            THE WITNESS:  As I sit here today, I do not know

12    who D.C. is, no.

13    BY MR. BUELL:

14        Q  It doesn't refresh your memory in any way about

15    who you may have spoken with?                        11:34:25

16        A  No.

17        Q  For example, D.C. might reference -- I have no

18    idea -- but if the individual's name you spoke with was

19    David, maybe that would refresh your recollection or

20    something to that effect; it doesn't do that?        11:34:37

21        A  No.

22        Q  Okay.  You mentioned just a few minutes ago a

23    letter that was received from GMAC Mortgage following up

24    on Exhibit 25.  Is it your understanding that Exhibit 31

25    is that letter that you --                            11:34:59
```

Page 152

```
1          A   Yeah.  This is a letter they sent me following

2     my letter to them.

3          Q   Do you recall receiving any other documents from

4     GMAC after you received this letter regarding the loan?

5          A   No.                                          11:35:16

6          Q   You testified in your prior session that there

7     were occurrences when GMAC would contact your clients

8     directly, despite knowing that you're representing them;

9     is that accurate?

10         A   It is accurate, yes.                         11:35:34

11         Q   Do you know if this letter, Exhibit 31, was sent

12    directly to them by any chance?

13         A   Well, they weren't cc'd on the document, so I

14    don't know if they received it directly.  Obviously it was

15    addressed to me.                                      11:35:49

16         Q   Do you know if they, they being your clients,

17    either Mr. Ward or Ms. Halloran, ever received a document

18    from GMAC that confirmed they'd been approved for a loan

19    mod other than this Exhibit 31 that was sent to you?

20         A   I don't know.                                11:36:09

21         Q   Is it an accurate statement that you primarily

22    negotiated with GMAC for a loan modification on behalf of

23    your clients?

24         A   Primarily as opposed to whom, I guess?

25         Q   Your clients.                                11:36:38
```

Page 153

```
 1          A  Clearly I was the person negotiating the loan

 2   modification on their behalf.  I was their attorney.

 3          Q  Just wanted to clarify that before the next line

 4   of questioning here.

 5          A  Yeah.                                           11:36:49

 6          Q  And feel free, for the purposes of responding to

 7   this question, feel free to refer to any of the exhibits

 8   that are before you now.

 9          What is your understanding of the permanent

10   modification offer that was presented by GMAC?           11:37:03

11          MS. STROMEYER:  Objection.  Mr. Halloran is not

12   here to interpret documents or the terms.  May call for

13   attorney-client work product or a legal conclusion.

14          THE WITNESS:  Well, I think I set forth from our

15   Complaint what I believe the terms were.  The terms arose 11:37:20

16   out of a conversation in a presentation by a GMAC employee

17   on or about April 22nd, 2011.

18   BY MR. BUELL:

19          Q  Let's walk through each of the terms then.

20          What is your understanding as to what the          11:37:33

21   interest rate on the modification would be?

22          A  Well, my understanding now isn't relevant.  I

23   mean, in other words, are you asking me what I understood

24   the interest rate was at the time that GMAC offered an

25   interest rate, which my client and I accepted?           11:37:52
```

Page 154

```
1        Q  Let's go through that line.  So, yes, at the

2   time it was offered, what was your understanding as to

3   what the interest rate was?

4        A  As specified in the Exhibit 25, it was an APR of

5   2.88 percent.                                    11:38:05

6        Q  And what about the term?

7        A  432 payments.

8        Q  What about the remaining balance on the loan to

9   be paid in full -- to be paid?

10       A  Don't know if there was going to be a remaining  11:38:21

11  balance, but if there was, that wasn't what my

12  modification involved.  It was a modification of loan

13  payments.

14       Q  So your understanding was the modification offer

15  was based solely on the monthly payment versus the payment 11:38:33

16  schedule over the 432 payments that would be required to

17  pay off the loan?

18       A  You're making assumptions that may or may not be

19  true, Counsel.

20       Q  Did you -- sorry.  I'm stopping myself because   11:38:48

21  you've already testified to the question as to whether or

22  not you ran an amortization schedule on the loan.

23       A  That's true.  I did testify about that.

24       Q  So I won't ask you again.

25       A  That's good.                               11:39:05
```

Page 155

1        Q  Did you review your clients' financials after

2    receiving this proposed modification from GMAC?

3        A  Well, if I did, it would be a work product.

4        Q  Do you recall if you did review their

5    financials?                                        11:39:28

6            MS. STROMEYER:  Objection.

7            THE WITNESS:  Specifically in response to this

8    offer?

9    BY MR. BUELL:

10       Q  Yes.                                         11:39:33

11       A  I don't know if I did or not.

12       Q  Do you recall if you made any determination as

13   to whether or not your clients could afford the

14   modification as presented to you?

15           MS. STROMEYER:  Objection.  Irrelevant, calls  11:39:53

16   for attorney work product.  May call for attorney-client

17   communication.

18           THE WITNESS:  Yeah, I don't know off the top of

19   my head.

20   BY MR. BUELL:                                       11:40:01

21       Q  Just to clarify.  I'm not asking what those

22   determinations were or what that process was, but simply;

23   did you do it?

24       A  Yeah, I know.  I don't -- off the top of my head

25   I don't recall.  Remember, the history of this was that  11:40:10

Page 156

1    there was a trial period in which the whole issue of

2    affordability of loan modifications existed, so if you

3    look at what this amount is, it's consistent with what the

4    prior discussions were with regard to affordability, so.

5         Q   So am I hearing you correct that the trial plan,    11:40:28

6    which I believe was from January of 2011, was when the

7    determination of affordability was made; is that

8    accurate?

9         MS. STROMEYER:  Objection.  Vague and ambiguous,

10   lacks foundation.                                          11:40:49

11        THE WITNESS:  I'm not quite sure what you mean

12   by the determination of affordability.

13   BY MR. BUELL:

14        Q   Sure.

15        A   I believe the way I would interpret this was    11:40:56

16   that, rather than negotiate a specific amount or

17   arms-length negotiations, what GMAC said was we have a

18   program and we're going to fit them into the program and

19   see if it works.  And that was the proposal that was done.

20   And then that January through March is when my client    11:41:16

21   complied with that program.  And then the next step was,

22   and here's what we are going to do for a traditional loan

23   modification given your clients' track record of payments.

24   So that's how the proposal was made.

25        Q   Thank you.  And that's exactly what I was    11:41:33

Page 157

1    looking for.  And I was banking off your use of the term,

2    you know, determination of affordability.

3        I think we're good with regards to everything,

4    other than the piece we've left open following a motion to

5    compel.                                                    11:41:55

6        THE REPORTER:  Ms. Stromeyer, would you like a

7    copy of the transcript?

8        MS. STROMEYER:  Yes.

9        (TIME NOTED:  11:42 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 158

```
 1

 2

 3          I, TIMOTHY HALLORAN, do hereby declare under

 4    penalty of perjury that I have read the foregoing

 5    transcript; that I have made any corrections as appear

 6    noted, in ink, initialed by me, or attached hereto; that

 7    my testimony as contained herein, as corrected, is true

 8    and correct.

 9          EXECUTED this _____ day of _____,

10    20_____, at _____, _____.
                      (City)                    (State)

11

12

13          _____
                          TIMOTHY HALLORAN

14                          Volume II

15

16

17

18

19

20

21

22

23

24

25
                                                    Page 159
```

1

2

3

4          I, Jennifer L. Furia, holding CSR License No.

5    8394, a Certified Shorthand Reporter, licensed by the

6    State of California, hereby certify:

7          That the foregoing proceedings were taken before

8    me at the time and place herein set forth; that any

9    witnesses in the foregoing proceedings, prior to

10   testifying, were placed under oath; that a verbatim record

11   of the proceedings was made by me using machine shorthand

12   which was thereafter transcribed by me or under my

13   direction; further, that the foregoing is an accurate

14   transcription thereof.

15         I further certify I am neither financially

16   interested in the action, nor a relative or an employee of

17   any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date subscribed

19   my name.

20

21   Dated:  February 4, 2012

22

23                          _____

                            JENNIFER L. FURIA

24                          Certified Shorthand Reporter

                            California License No. 8394

25

                                              Page 160

Sarnoff, A VERITEXT COMPANY
877-955-3855

[& - agreement]

| & |
| --- |
| & 108:4,13 |

| 0 |
| --- |
| 000008 110:22 |
| 000009 110:23 |
| 000011 110:11 |
| 000013 110:11 |
| 000014 109:16 |
| 000015 109:16 |
| 000016 111:7 |
| 000017 111:14 |
| 000018 109:25 |
| ▮8940 109:12 |
| 109:21 110:7,18 |
| 111:12 113:10 |
| 125:22 133:23 |

| 1 |
| --- |
| 1 106:17 107:20 |
| 110:4 112:1 |
| 1-20 106:9 107:9 |
| 106 106:25 |
| 10:34 107:19 112:2 |
| 10th 108:7 |
| 11-511574 106:8 |
| 107:8 |
| 112 109:5 |
| 113 111:10 |
| 114 111:19 |
| 11:42 107:19 158:9 |
| 120 109:9 |
| 125 109:18 |
| 127 110:4 |
| 13 131:19 |
| 133 110:13 |
| 133872 106:23 |
| 146 111:23 |
| 14th 131:7 |
| 15 144:16,17 |
| 150,000 132:22 |
| 151 111:4 |
| 160 106:25 |
| 1st 128:1 133:4,6 |
| 150:5 |

| 2 |
| --- |
| 2 133:25 |
| 2-4 111:23 |
| 2.88 155:5 |
| 20 140:3 159:10 |
| 2000 131:7 |
| 2011 109:9,18 110:4 |
| 110:13 111:4,10 |
| 113:7 117:9 125:21 |
| 128:1 131:8,8 |
| 133:20 136:5 140:4 |
| 142:18 147:4 150:5 |
| 151:17 154:17 |
| 157:6 |
| 2012 106:17 107:20 |
| 112:1 160:21 |
| 20th 116:8 117:16 |
| 117:19 132:20 |
| 140:5 142:18 |
| 22 111:10 |
| 22nd 113:7 114:14 |
| 128:25 132:16 |
| 147:4 154:17 |
| 23 109:9 |
| 23rd 116:9 117:12 |
| 117:17,24,25 |
| 120:17 121:21 |
| 131:8 142:18 |
| 24th 117:17 |
| 25 109:18 111:10 |
| 112:23 113:1,6 |
| 129:1,10,12 130:8 |
| 132:19 142:20 |
| 143:13,23 148:24 |
| 150:1 152:24 155:4 |
| 25th 125:21 126:17 |
| 2600 107:18 |
| 26th 108:17 132:12 |
| 27 109:9 120:8,9,13 |
| 121:22 |
| 28 109:18 111:4 |
| 125:15,16,20 |
| 28th 151:17 |

| 29 110:4 127:18,19 |
| --- |
| 127:23 130:9 131:6 |
| 132:11 |

| 3 |
| --- |
| 3 110:13 133:18 |
| 30 110:13 133:13,14 |
| 137:22 144:15,16 |
| 31 111:4 151:9,10 |
| 151:14 152:24 |
| 153:11,19 |
| 3300 109:13,22 |
| 110:8,19 |
| 398-3344 108:19 |
| 3rd 133:20 134:4 |
| 135:4 137:15 |

| 4 |
| --- |
| 4 160:21 |
| 415 108:9,19 |
| 432 155:7,16 |

| 5 |
| --- |
| 5-7 111:19 |

| 7 |
| --- |
| 788-1900 108:9 |

| 8 |
| --- |
| 8394 106:22 107:21 |
| 160:5,24 |
| 88 108:6 |
| 8th 136:5 |

| 9 |
| --- |
| 94108 108:8 |
| 94111 108:18 |
| 94112 109:14,23 |
| 110:9,20 |

| a |
| --- |
| a.m. 107:19,19 |
| 112:2 158:9 |
| abide 145:9 |
| abilities 145:20 |
| ability 147:21 |
| able 136:12 |
| acceptable 113:23 |
| 145:5,11,14 |

| accepted 114:16 |
| --- |
| 130:15 154:25 |
| accord 127:11 |
| account 109:11,20 |
| 110:6,17 111:12 |
| accurate 112:14 |
| 121:1 124:25 |
| 128:24 134:14,25 |
| 141:9 142:3,4 |
| 143:18 145:11 |
| 147:15 149:16 |
| 150:25 153:9,10,21 |
| 157:8 160:13 |
| accurately 116:3 |
| acting 147:10 |
| action 138:7 160:16 |
| 160:17 |
| activities 133:3 |
| activity 122:9,10 |
| 123:2,18 126:25 |
| 127:4 128:15,16 |
| 130:11 |
| actual 130:25 138:3 |
| add 145:2 |
| additional 129:20 |
| address 109:12,21 |
| 110:7,18 |
| addressed 133:20 |
| 133:22 153:15 |
| adhering 139:9 |
| administered 112:5 |
| admonition 112:13 |
| afford 156:13 |
| affordability 157:2 |
| 157:4,7,12 158:2 |
| afternoon 115:3 |
| agent 147:21,22 |
| ago 128:5 152:22 |
| agreed 124:13 134:7 |
| 135:13 |
| agreeing 126:6 |
| agreement 113:8 |
| 120:19 122:8,11 |
| 126:9,13,15,17,20 |
| 128:18,20,21,24,24 |

[agreement - buell]

129:2,6,7,13,14,16
129:21 130:3,12,19
130:23,25 131:2,2
135:13,16 147:17
147:23 148:5,11
150:2,8
**agreements** 130:21
148:8,15,18
**ahead** 125:14 148:3
**alleged** 130:23
**alluding** 121:16
**ambiguous** 130:5
143:7 157:9
**amortization** 155:22
**amount** 157:3,16
**answer** 111:21
132:15 136:24
146:12,14 150:24
**answer's** 118:13
**answered** 124:20
133:1
**anybody** 132:24
**anymore** 147:2
**anyway** 115:22
**apparently** 119:2
147:25 149:11
**appear** 159:5
**appearances** 108:1
**appeared** 141:12
**application** 149:14
**appreciate** 131:14
**approve** 118:21
147:25 148:2
**approved** 113:20
118:3,6,8,22,23
153:18
**apr** 155:4
**april** 111:4,10 113:7
114:14 128:25
132:12,16 142:18
142:18 147:3
151:17 154:17
**arms** 157:17
**arose** 154:15

**asked** 114:1 119:9
124:19 126:5 132:5
156:21
**asking** 152:2 154:23
156:21
**aspects** 129:18
**assigned** 120:3
**assistants** 139:6
**associate** 124:7
134:3
**assume** 122:13
139:23
**assumptions** 155:18
**assured** 115:9
**attach** 130:22
**attached** 113:3
120:10 125:17
127:20 133:15
151:11 159:6
**attempt** 130:13
135:15
**attention** 109:10,19
110:5,16 121:6
151:18
**attorney** 125:4
130:6 134:17
145:16 146:7,7,15
146:18 147:7,8,10
147:11,18 151:2
154:2,13 156:16,16
160:17
**attorneys** 136:23
**authority** 127:13
147:4,10,19,20
148:11,14,16,19
**authorized** 126:23
134:3
**aware** 114:5 122:19
126:18 134:10
138:11,13 139:15
140:13 141:10,13
**awry** 115:2

**b**

**b** 133:22 135:12

**back** 112:10 117:9
117:22 127:10
128:17 130:10
137:13 138:14
139:13 140:10
142:19 148:21
151:6
**backwards** 117:2
**bailout** 115:3
**balance** 155:8,11
**banking** 158:1
**based** 120:21 139:23
144:9 150:16,23,24
151:1 155:15
**basically** 121:11
**basis** 128:21 129:8
129:17,21 130:3,24
148:23 149:19,24
150:1
**bates** 109:15,24
110:10,22 111:6,13
**becker** 110:16
133:22 134:6
137:16
**beginning** 107:18
**behalf** 107:17
126:23 153:22
154:2
**belcastro** 110:15
135:11 142:5,9
**believe** 113:18 114:1
115:21,23 116:4,9,9
116:24 117:12,15
117:16 120:23,25
122:12 123:16
124:24 125:1 126:2
126:3,16,24 128:9
130:13 133:2
135:21,22 138:15
138:17 139:11
140:21 141:7,22
142:7,9,25 144:3
147:13 148:18
154:15 157:6,15

**bernard** 106:5
107:5 109:11,20
110:6,17
**best** 144:25
**better** 134:10
**beyond** 123:2 138:7
**bind** 147:5,21
148:11,15
**bit** 137:13 139:7
**blackberry** 117:19
**blackberry's** 117:15
**borrower** 149:12
**bottom** 151:20
**bought** 132:22
**bound** 147:22,23
**bradley** 108:4
**breach** 119:12
128:22 129:8
**brett** 109:10,19
110:5,16 121:6,8,9
121:16 125:21,24
126:4 127:25
133:22 134:6
137:16
**brief** 121:2 144:10
**bring** 150:21
**brings** 140:24
**broad** 113:17
**buell** 108:14 109:5
112:9 113:4 114:22
120:11 124:22
125:14,18 126:11
127:18,21 130:17
131:16 132:9
133:13,16 134:22
137:20 139:19,22
140:20 141:18,20
141:24 142:15
143:9 145:17
146:11,16 147:1,12
148:4,20 150:23
151:4,8,12 152:4,13
154:18 156:9,20
157:13

Sarnoff, A VERITEXT COMPANY
877-955-3855

[business - continuing]

| business 115:22,23 | certainly 123:12 | 130:14 134:5 138:2 | concluded 141:8 |
|---|---|---|---|
| **c** | 129:18 144:11 | 139:13 145:20 | conclusion 154:13 |
| c 133:22 135:12 | certified 107:20 | 146:3 147:5,18 | condition 146:19 |
| ca 109:14,23 110:9 | 160:5,24 | 148:11,15,25 | 150:7 |
| 110:20 | certify 160:6,15 | 150:18 153:7,16,23 | conduct 119:12 |
| calendar 116:23 | cetera 123:7 125:8 | 153:25 156:1,13 | 120:18 135:14 |
| 117:3,8,15 | 138:18 | 157:23 | 142:9 |
| california 106:1,16 | cgc 106:8 107:8 | close 136:15 | confirm 118:2 |
| 107:1,18 108:8,18 | chance 127:23 | closer 144:15,16 | 119:11 121:3 144:6 |
| 112:1 119:8 123:17 | 133:19 153:12 | colleen 106:5 107:5 | 144:8 |
| 160:6,24 | check 114:24 128:2 | come 117:5 149:20 | confirmation |
| call 113:18 115:19 | 128:4,8 139:6 | communication | 126:20 134:15 |
| 115:20,21,25 116:1 | checks 128:10,17 | 116:21,25 118:17 | 135:5,9 143:2 |
| 116:5,13,19 117:4 | 130:10 | 119:16,20,22 | confirmed 113:21 |
| 117:15,22 119:19 | circumstances | 123:21 126:19 | 126:4,16 139:3 |
| 119:21,25,25,25 | 115:11 142:17 | 137:15,18,21,24 | 143:1 145:5 153:18 |
| 121:13,20 126:21 | city 159:10 | 138:17 147:7 | confirming 113:8 |
| 130:6 135:21 | clarification 118:10 | 156:17 | 122:15 129:22 |
| 136:10 138:18 | clarify 115:12 123:4 | communications | 132:16 142:22 |
| 142:17 143:5,14 | 124:1 125:3 128:16 | 117:2 123:25 | 148:18,23 |
| 146:4,6,18 147:6,7 | 128:23 130:18 | 124:10,12,17 125:2 | confirms 121:10 |
| 154:12 156:16 | 131:18 133:24 | 135:5 141:13,22 | conformity 130:14 |
| called 115:2,3,23 | 138:16 143:20 | 145:16 146:7,9,15 | congratulations |
| 116:6 | 150:9 154:3 156:21 | 146:20 150:17 | 144:4 |
| calls 116:10 121:12 | clarifying 151:4 | 151:2 | connected 137:25 |
| 134:18 141:16 | clayton 108:15 | company 115:10 | consent 120:5 |
| 145:15 146:14 | 140:8,18,18 | 127:14 | considered 119:11 |
| 152:9 156:15 | clear 116:17,18 | compel 150:21 | 123:2 |
| cancel 149:13 | 119:14 128:19 | 158:5 | considering 114:3 |
| canceled 122:7 | 147:2 | complaint 129:3,8,9 | consistent 157:3 |
| capable 126:6 | clearly 126:22 | 129:17,22 130:4,24 | contact 119:7 |
| capacity 126:6 | 135:10 145:12 | 133:6 136:4,4,9 | 128:13 143:6 153:7 |
| 147:11 | 146:9 154:1 | 138:4 154:15 | contained 159:7 |
| care 111:6 151:21 | client 114:15 115:13 | compliance 130:11 | contains 123:13 |
| 152:6 | 122:5 123:15 127:5 | complied 157:21 | 151:2 |
| carrier 122:6 | 130:15 135:2 140:9 | comply 144:7 | contemporaneous |
| case 106:8 107:8 | 144:5 145:2,3,6,16 | comports 121:3 | 122:23 123:5 |
| cashed 114:16,24 | 145:22 146:7,10,15 | compound 133:9 | contend 147:24 |
| 127:10 130:16 | 146:18,20 147:7,8 | computer 126:4 | contents 134:10 |
| catch 113:11 | 150:6 151:2 154:13 | concerned 115:8 | context 136:3 |
| cc'd 153:13 | 154:25 156:16 | 139:7 | 142:19 |
| ceased 138:1 | 157:20 | concerning 120:18 | continued 110:1 |
| center 107:17 | client's 122:6 | 125:22 133:23 | 111:1 |
| 108:16 | clients 124:15 | 140:7 146:21 | continuing 128:14 |
| | 127:15 128:2 | 151:18 | |

Sarnoff, A VERITEXT COMPANY
877-955-3855

[contract - entries]

**contract** 119:12
128:22 129:8 147:5
**conversation** 113:12
113:16,25 116:3,14
117:16,23 118:1
119:14,15 120:22
120:24 121:8
125:23 126:22
136:6,17 138:14
142:22 143:2,4,12
143:18,21,22,25
144:2,3,10,22 146:5
148:21,22,23
149:25 150:4,13
154:16
**conversations**
122:16 123:6 124:9
132:2,6 134:16
135:5,25 136:23
137:6 146:2
**copy** 158:7
**correct** 113:14
115:15 118:15
131:9 135:3 139:19
142:23 150:11
151:3 157:5 159:8
**corrected** 131:8
159:7
**corrections** 159:5
**correspondence**
123:14
**counsel** 119:7 132:8
140:19 148:3
155:19
**county** 106:2 107:2
**course** 115:9 147:22
147:24 148:1,9
149:4,8
**court** 106:1 107:1
113:2 120:10
125:17 127:20
133:15 151:11
**covered** 151:2
**csr** 106:22 160:4

**current** 138:11
**customer** 111:6
151:21 152:6

**d**

**d.c.** 152:6,8,10,12,17
**dare** 115:10
**date** 115:24 117:1
117:12 139:24
140:3 149:15
160:18
**dated** 109:9,18
110:4,13 111:4,10
160:21
**dates** 116:10 131:19
131:22
**daughter** 115:13
**david** 152:19
**day** 115:23 116:5,25
117:25 121:7 138:7
159:9
**days** 116:4 149:3
**dc** 111:6
**deal** 115:5
**dealing** 136:11
141:1 142:2
**decided** 116:15
**decisions** 136:13
**declare** 159:3
**decree** 120:5
**deed** 130:25
**deeded** 139:12
**default** 140:13
**defendant** 107:17
108:12
**defendants** 106:11
107:11
**define** 144:19
**delete** 145:2
**department** 120:18
136:10,20,20
**depose** 118:19
**deposit** 141:11
**deposition** 106:15
107:16 149:20,22

150:20
**describe** 128:25
**described** 122:10
129:2
**describing** 126:5
129:7
**description** 109:8
110:3 111:3
**designated** 149:23
**desisted** 138:1
**despite** 153:8
**detail** 119:15 143:4
**detainer** 137:13
138:3
**determination**
156:12 157:7,12
158:2
**determinations**
156:22
**determine** 123:10
**determined** 113:23
145:10
**determining** 145:13
**diego** 123:22 124:11
133:22 134:14,16
135:7
**difference** 130:2,4
**different** 122:13
123:20 138:6
**direct** 119:24
123:19,21,24
124:10,12,16
**direction** 160:13
**directly** 125:4 129:4
142:7,8 153:8,12,14
**disclosed** 147:19
**discussed** 150:19
**discussing** 129:13
129:14 142:8
**discussion** 126:2
142:13 148:24
150:1,3,10
**discussions** 134:15
157:4

**document** 120:13,15
125:20 126:19
127:24 131:10,13
139:2 140:12 152:3
152:5 153:13,17
**documentation**
122:20
**documents** 119:1,3
125:7 140:14,17
149:12 153:3
154:12
**doing** 118:20 131:15
131:15
**door** 135:23 138:8
**draft** 136:8
**drafted** 119:22
**drafting** 131:23
143:13,23
**duncan** 110:15
133:21 137:16
141:1,15,17 142:6

**e**

**e** 133:22,22 135:11
135:11,12
**earlier** 126:13
134:13,25
**ease** 140:21
**edward** 108:14
**effect** 152:20
**effort** 127:11 128:17
**either** 132:13
150:18 153:17
**embarcadero**
107:17 108:16
**employee** 154:16
160:16
**ended** 124:24 137:2
**ends** 137:1
**enforceability**
127:12
**enter** 126:24
**entirely** 136:7
**entries** 131:17,21

[entry - gmac]

entry 131:18
escapes 121:8
esq 108:5,14,15
et 123:7 125:7
  138:18
event 121:25 143:6
  143:8,10 148:2
events 122:21,22
  142:17
everybody 136:20
evict 122:5 127:5
  138:2
eviction 123:15
  124:14 134:13
  135:1,6 137:13
  138:9,11 141:1,7,12
  142:2,7
exact 116:18
exactly 119:18
  121:19 139:1
  157:25
examination 109:2
  112:8
examined 112:5
example 132:12
  140:12 152:17
executed 159:9
exhibit 109:9,18
  110:4,13 111:4,10
  112:23,23 113:1,6
  120:9,12 121:21
  125:16,19 127:19
  127:22 128:25
  129:10,12 130:8,9
  131:6 132:11,19
  133:14,17 137:22
  142:20 143:13,23
  148:24 150:1
  151:10,13 152:24
  152:24 153:11,19
  155:4
exhibits 109:7 111:9
  154:7
existed 157:2

expand 127:3
explain 130:1
  144:25
explained 119:15
explanation 131:20
extent 146:14

**f**

fact 118:23 128:14
  130:10 131:12
  132:21,25 149:2
  151:1
fair 143:23 150:21
fairly 131:22
familiar 120:13
far 139:23 140:12
fargo 147:25 148:2
  149:11
fashion 138:22
february 106:17
  107:19 112:1
  160:21
fee 148:8
feel 154:6,7
feeney 108:4
figure 136:25
file 109:14,23 110:9
  110:20 111:12
  114:7 122:12
  123:11,12,12 124:3
  124:7,8 125:1
  149:14
filed 124:24 129:3
  136:1,2,4,4 138:4
files 112:19 148:6
filing 125:2 133:5
financial 145:20
financially 160:15
financials 156:1,5
find 116:6
fine 113:21
firm 123:16,22
  124:10,13 128:13
  128:13 133:21
  134:4,14 135:7

137:25 140:16
  141:1,15,18,21
  142:3,6 148:7
firms 136:24
first 114:15 115:1
  118:7,14 119:16
  121:9,17 132:3
  134:25 135:17
  142:5 144:7 145:8
fit 145:19 157:18
five 144:12,15,17
floating 130:21
floor 108:7,17
follow 113:12
  114:10 120:7
  126:12 136:15
followed 131:20
following 116:21
  117:6,22 120:23
  121:20,25 122:16
  137:15 143:2
  152:23 153:1 158:4
follows 112:6
foray 137:3
foreclosed 132:21
foreclosing 120:19
foreclosure 117:13
  118:2 119:8 137:7,9
  138:15,18 139:12
  139:15,17,25 140:3
  140:5,7
foregoing 159:4
  160:7,9,13
form 149:18
forms 128:21 129:8
  129:16,21 130:3,23
  148:23 149:25
forth 154:14 160:8
forward 114:12
foundation 125:25
  130:6 134:19
  152:10 157:10
frame 142:18 150:5
francisco 106:2,16
  107:2,18 108:8,18

109:13,22 110:8,19
  112:1
frankly 130:20
free 154:6,7
friday 115:3 116:5
  116:21 117:5,19
front 117:3 135:23
full 155:9
furia 106:22 107:20
  160:4,23
further 122:9
  124:14 126:10
  127:1 140:14
  141:13,22 148:25
  160:13,15

**g**

gaddis 108:15
  140:18,19
general 120:1
generally 142:1
  148:17
gentleman 113:19
  145:6
getting 121:15 130:7
  140:22
give 127:10 133:11
  136:10 140:3
  144:13
given 157:23
gmac 106:9 107:9
  111:5,11 113:8,9,13
  113:16 114:16
  115:1,9,23 116:6,14
  116:22 117:1,6,17
  117:24 118:17,25
  119:12,16,25
  120:22,23 121:13
  122:2,8,20 123:1
  125:3,4,4,22 126:24
  128:1,2,13,14,22
  129:3 130:12,14,16
  131:14 132:21,24
  134:4 135:6,13,25
  136:7,19,24 137:6

[gmac - know]

137:16,25 139:8
140:16,19 142:22
143:3,6,14,15
147:20,22 148:22
149:10,15,21,23
150:4 151:5,17
152:23 153:4,7,18
153:22 154:10,16
154:24 156:2
157:17
go  117:2 125:14
133:13 134:23
138:16 139:6 148:3
150:17 155:1
goes  132:5
going  112:22 114:12
116:7 130:8 132:4
136:12 145:7
150:17 155:10
157:18,22
good  143:10 155:25
158:3
great  144:6
group  118:6,21
147:14
guess  128:1 153:24
guys  137:4 140:21

**h**

h  135:11,11
habitable  127:16
half  144:11
halloran  106:5,15
107:5,16 109:3,15
109:24 110:10,21
111:5 112:4,10
115:14 137:19
141:19,20 147:14
153:17 154:11
159:3,13
halted  141:12,14
handed  120:12
125:19 127:22
133:17 151:13

handling  142:7
happen  150:14
happened  114:16,19
114:23,25 115:19
116:7 121:22 122:4
126:3 132:18,25
133:7,10,11 136:14
140:4,11,22 141:8
head  114:8 120:2
122:2 125:6 137:11
137:23 138:5
156:19,24
heard  118:1,14
hearing  118:7 157:5
help  116:23 117:1
hereto  113:3 120:10
125:17 127:20
133:15 151:11
159:6
history  145:23
156:25
holding  160:4
home  122:7 127:15
honor  135:15
139:10
honorable  115:10
hope  133:1
hour  144:11
hours  115:22 116:20
117:5
house  115:4 119:5
135:23
hypothetically
140:2

**i**

idea  115:24 152:7
152:18
identification  113:2
120:9 125:16
127:19 133:14
151:10
ii  106:18 107:16
109:4 159:14

iii  108:14
including  145:22
incorrect  118:4
index  109:1 110:1
111:1
individual  113:16
118:18 144:3
148:22
individual's  152:18
individually  123:24
144:20
individuals  123:7
124:2,5
information  111:17
119:6
informed  113:19
118:4 119:6
initialed  159:6
initials  151:22,25
initiated  143:14
ink  159:6
instance  132:20
instructed  145:6
instructing  146:11
146:13
instruction  111:21
150:24
insurability  127:16
insurance  122:6,8
127:14
insured  127:14
interaction  123:19
interest  154:21,24
154:25 155:3
interested  114:10
115:5 136:23
160:16
internal  122:24
interpret  154:12
157:15
intervention  127:1
investigating  134:8
investigation  135:14
investor  118:6,21

involved  119:8
123:17 142:7,8
155:12
irrelevant  156:15
issue  126:21 127:12
147:1 151:7 157:1
issues  123:15
item  126:2

**j**

j  109:15,24 110:10
110:21 111:5
january  131:7 150:5
157:6,20
jason  110:13 135:10
jean  133:21
jennifer  106:22
107:20 160:4,23
job  106:23
judicial  117:14
jump  112:12,21
jumping  137:12
june  110:4,13 128:1
133:3,4,6,20 134:4
135:4 136:5 137:15
140:3,5

**k**

k  133:22 135:11
karen  108:5 110:21
124:8 134:2
kearney  108:6
keep  140:10
kind  115:2,5 119:1
122:17 126:8
kirkham  109:13,22
110:8,19
know  113:18 114:16
114:25 115:19
116:2,12,12,13,23
117:7 118:18,20
120:3 121:6,16,16
121:19 122:3,25
123:6,8,24 124:13
125:5,10,12 127:24
128:12,12 129:6,24

[know - modification]

131:4 132:15,16,18
132:18 133:18
135:8,15 136:6
137:5,10,11,23,23
138:3,5,7,10,21
139:2 140:4,7,11
144:17 145:7,24
147:9 148:1 149:2,8
149:11 152:11
153:11,14,16,20
155:10 156:11,18
156:24 158:2
**knowing** 153:8
**known** 132:21,23
**kraheneuhl** 110:14
135:10

**l**

**l** 106:22 107:20
135:11,12 160:4,23
**lacks** 125:25 130:6
134:19 152:10
157:10
**laid** 144:21
**law** 123:16,21
124:13 128:12,13
133:21 134:3,14
137:25 140:16
141:1,15,21 142:6
148:6
**lawsuit** 122:4,12
124:24 125:1,3
128:22 136:1,2
**lawyerly** 145:21
**lays** 130:2 131:13
**lead** 143:12
**leading** 133:4
**learn** 137:11 138:22
**learned** 137:10
138:19,21,23
139:13
**learning** 119:17
**led** 125:23 143:22
**left** 112:22 158:4

**legal** 136:10,18,19
136:20 154:13
**lender** 149:14
**length** 157:17
**letter** 109:9,18
110:4,13 111:4,10
113:7,12,22 114:14
116:25 119:11
120:6,17,23 121:5
121:21 122:1
125:21,24 127:25
128:25 129:12,15
129:23 130:2
131:13,20,23,24
132:3,10,13,16,19
133:5,6,20,25 134:9
134:11,15 135:4
140:9 142:20,21
143:1,2,13,13 144:6
144:8,21 145:6
148:24 149:2
150:18 151:5,14,17
151:20 152:23,25
153:1,2,4,11
**letters** 116:2 122:15
122:20 123:1
148:18
**license** 160:4,24
**licensed** 160:5
**light** 151:7
**line** 111:18,22
116:18 124:23
131:7 133:3 137:1,2
137:24 139:6
140:25 143:21
151:21 154:3 155:1
**lines** 137:24
**list** 131:19
**litigation** 136:10,16
140:6
**little** 137:12
**llc** 106:9 107:9
**llp** 110:15
**loan** 111:6 113:9,9
114:13 118:3,5,8,11

118:21,23 120:20
125:22 128:3
132:17 133:23
140:11 144:5 145:4
145:20,24 148:2
149:13 151:18,21
152:6 153:4,18,22
154:1 155:8,12,17
155:22 157:2,22
**located** 148:6
**longer** 127:16
**look** 117:7 119:6
126:9 129:10
133:18 136:8 157:3
**looked** 139:11
147:17
**looking** 117:14,18
131:6 158:1
**looks** 131:7 139:12
**loop** 136:15
**loss** 109:9,18 110:4
110:15 111:11
113:8 120:17
133:22 137:16
**lot** 145:21

**m**

**machine** 160:11
**maintain** 148:8
**maintained** 148:6
**making** 155:18
**man** 144:3
**march** 117:11
157:20
**marked** 111:9
112:23,24 113:1
120:9,12 121:21
125:14,16,19
127:19,22 132:11
133:14,17 142:20
151:10,13
**matter** 114:7 122:10
122:25 123:9
146:21

**mean** 116:24 118:11
123:23,24 125:3,4
127:3 128:16
129:24 131:4 132:7
132:16 136:19
140:6 143:22
144:19,23 147:9
154:23 157:11
**meaning** 143:13
**means** 150:8
**memory** 152:14
**mentioned** 115:6
116:19,20 118:22
124:18 126:13
133:3 152:22
**michael** 110:14
135:10
**mind** 121:2 126:25
129:10
**minutes** 128:5
144:12,17,17
152:22
**missed** 116:18
**missing** 129:19
130:2
**misstates** 133:8
**mitigation** 109:10
109:19 110:5,16
111:11 113:8
120:18 133:23
137:16
**mod** 118:8,11
153:19
**modification** 113:9
113:19,21 114:13
116:16 118:3,11,23
120:4,20 127:12
130:14,23 132:17
134:8 140:11 144:5
145:4,19,24 149:1
149:13 150:2
151:19 153:22
154:2,10,21 155:12
155:12,14 156:2,14
157:23

Sarnoff, A VERITEXT COMPANY
877-955-3855

[modifications - pite]

**modifications** 118:21 157:2
**modified** 118:5 145:3
**moment** 121:2
**monday** 116:6,22 117:6,24
**money** 127:10 130:13,16 140:10
**month** 119:2 145:8 149:13
**monthly** 114:15 155:15
**mortgage** 106:9 107:9 111:5 115:3 151:18 152:23
**mortgager** 109:11 109:20 110:6,17
**motion** 150:21 158:4
**move** 127:18
**multiple** 121:12
**murphy** 108:4

**n**

**n** 135:11
**nailed** 135:22
**name** 121:8 143:19 152:18 160:19
**necessarily** 123:4
**need** 132:13,17 146:1 150:1
**needing** 150:6
**negotiate** 157:16
**negotiated** 153:22
**negotiating** 154:1
**negotiation** 114:13 146:21
**negotiations** 157:17
**neither** 140:16 160:15
**never** 137:8 138:17 149:5
**new** 149:14

**niece** 115:2,6,13,25 116:19
**notarization** 150:10 150:13 151:7
**notarized** 150:2,6
**note** 121:6 130:25
**noted** 158:9 159:6
**notes** 113:24 114:2,4 114:6 122:19,23 123:6,8,11,13 125:7 131:24 132:13
**notice** 117:14 134:5 135:1,6,18,23 138:7 140:13,13 141:9
**notification** 115:1 135:10 137:8
**notified** 116:15 122:6 127:13,14 135:17
**notifying** 139:8
**number** 109:8,12,21 110:3,7,18 111:3,12 113:9 118:18 120:1

**o**

**o** 135:12
**oath** 112:5 149:17 149:23 160:10
**object** 132:4
**objection** 130:5 131:10 133:8 134:18 141:16 145:15 146:6,19 147:2,6 150:16 152:9 154:11 156:6 156:15 157:9
**objections** 150:25
**obtaining** 114:10
**obviously** 115:8 118:19,19 132:25 134:3,6 136:11 145:23 151:5 153:14
**occasions** 140:8

**occurred** 114:13 116:8 119:16 122:11 131:21,22 132:11 142:17
**occurrences** 153:7
**occurring** 117:13 133:4
**offending** 123:2
**offer** 132:17 154:10 155:14 156:8
**offered** 154:24 155:2
**office** 113:7 123:23 124:2,6 134:1,3 137:3 139:11
**offices** 148:8
**oh** 128:9 139:11 152:6
**okay** 117:21 121:20 131:6,21 133:13 140:4 142:11,24 144:8 147:1 150:12 150:15 152:22
**once** 113:22 127:23 133:19 145:4
**ongoing** 140:6
**open** 158:4
**opening** 112:13
**opinion** 144:13
**opposed** 153:24
**oral** 147:16
**order** 131:24 132:14 144:12
**outside** 136:24

**p**

**page** 109:8 110:3 111:3,18,22 113:5 130:19 133:25 143:11
**pages** 106:25
**paid** 114:15 118:4 130:13 155:9,9
**paper** 122:17

**paperwork** 148:25 149:3,5,7
**part** 120:4 143:1
**party** 126:8 160:17
**passed** 121:17
**pay** 144:7 145:8 155:17
**payment** 114:15 118:24 144:7 155:15,15
**payments** 155:7,13 155:16 157:23
**pearson** 108:4
**penalty** 159:4
**pending** 135:14
**people** 124:6 136:11 136:12
**percent** 155:5
**period** 157:1
**perjury** 159:4
**permanent** 145:4 154:9
**person** 119:24 121:7 121:17 142:5,6 143:19 144:1,4,21 152:10 154:1
**personal** 114:6
**personally** 124:16 137:19
**phone** 113:18 115:19,20,21,25 116:1,5,10,13,19 117:4,15,22 119:19 119:21,25 121:12 121:13 135:21 138:18 143:5,14 146:4
**phrase** 138:6
**piece** 134:13 137:14 140:25 141:2 142:2 158:4
**pite** 110:15 133:21 137:15 141:1,14,17 142:6

Sarnoff, A VERITEXT COMPANY
877-955-3855

[place - refresh]

**place**  139:16 160:8
**placed**  143:5 160:10
**plaintiffs**  106:7
  107:7 108:3
**plan**  157:5
**please**  113:6 120:16
  125:20 127:24
  133:18 136:9
  151:16
**pmk**  149:17,21,23
**point**  116:15 138:23
  139:10 142:2
**policy**  149:15
**poorly**  141:5
**portion**  146:18
  150:20
**position**  131:14
**possibly**  143:4
**post**  140:4
**posted**  134:5 135:18
  138:8 141:9
**potential**  119:17
  150:17
**precedent**  150:8
**premises**  122:6
  123:16 127:15
**preparation**  112:16
**prepare**  131:24
**prepared**  133:25
**present**  150:5
**presentation**  154:16
**presented**  126:3
  145:3 154:10
  156:14
**press**  147:1
**presumably**  127:11
**presume**  122:17
**pretty**  123:13
**previous**  150:20
**previously**  111:9
  112:23 113:1
**primarily**  153:21,24
**primary**  142:2
**principal**  147:19,21
  147:23

**prior**  150:16 153:6
  157:4 160:9
**privilege**  146:19
  151:3
**privileged**  146:10
  146:22,23
**probably**  122:25
  123:14 132:23
  145:21
**problematic**  134:6
**proceed**  122:9
  124:14
**proceeded**  122:4,5
**proceedings**  119:9
  138:12 139:16
  141:12 160:7,9,11
**process**  114:12
  138:9 145:13
  156:22
**product**  123:13
  130:6 146:8 147:8
  154:13 156:3,16
**program**  119:1
  157:18,18,21
**property**  109:12,21
  110:7,18 115:7,16
  116:4 118:1 120:19
  126:7 127:6 132:21
  132:22 139:9,18
  140:5
**proposal**  157:19,24
**proposed**  130:15
  145:1,2 146:3 156:2
**provide**  112:14
**provided**  113:22
  120:21
**provides**  136:3
**providing**  124:23
**provisions**  127:12
**purpose**  119:10
  149:14
**purposes**  142:19
  154:6
**put**  129:16 133:4
  140:21 141:14

146:19 148:17
150:4

**q**

**question**  113:17
  114:19,20 126:12
  129:5,24 131:4
  132:8,15 133:1
  134:10,21 138:16
  139:21 141:2,3,5
  146:14 148:3 149:6
  154:7 155:21
**questioning**  143:22
  154:4
**questions**  130:9
  136:22 150:24
**quit**  134:5 135:18
  135:23 138:8 141:9
**quite**  132:7 144:23
  157:11
**quo**  126:9 135:13
  139:10
**quote**  118:6

**r**

**r**  108:14 133:22
  135:11,12
**ran**  155:22
**range**  115:24
**rate**  154:21,24,25
  155:3
**reach**  117:6
**read**  152:2,5 159:4
**reading**  132:2,10
**really**  136:12
**reason**  112:13
**recall**  113:15,24
  114:12,23 115:19
  115:22 117:23
  118:7,16 121:12,22
  121:24 122:15
  125:2,23 127:8
  131:23 132:1 133:2
  133:7 135:17,25
  137:6,17 138:25
  139:24 140:25

143:5,16,17,19,25
145:25 148:24
149:25 150:4,9
153:3 156:4,12,25
**receive**  149:7
**received**  115:20
  135:1,6,21 137:17
  138:17 140:9
  149:15 152:23
  153:4,14,17
**receiving**  153:3
  156:2
**recess**  142:14
**recollect**  139:5
**recollection**  114:2
  115:18 116:10,13
  116:24 122:21
  125:8,13 126:2
  149:22 152:19
**record**  118:10 124:1
  128:19,23 131:18
  133:24 140:18
  142:12,13 143:20
  146:2 147:2 149:18
  150:20 157:23
  160:10
**recorded**  140:12,14
**recreate**  132:14
**refer**  115:12 118:11
  129:12,15 132:13
  137:4 142:19
  143:21 149:2 152:8
  154:7
**reference**  152:17
**referenced**  128:5
  129:22
**referred**  131:24
**referring**  126:14
  128:20 131:3,19
  137:21
**refers**  148:22
**reflective**  116:3
**refresh**  116:9,13,24
  122:21 125:8,13
  152:14,19

[refund - speculation]

refund  130:13
refused  119:5,6
regard  122:24
  123:14 127:2 138:1
  157:4
regarding  114:7
  120:22 123:6
  126:19,21 135:6
  138:9,14 139:18
  140:5,14 141:7
  146:3 149:1 150:1
  153:4
regards  158:3
relate  131:1
relates  140:7
relation  128:1,2
  130:9 134:4
relationship  147:18
relative  123:15
  160:16
relevant  154:22
remaining  155:8,10
remember  119:24
  120:2 144:9,18
  149:4 156:25
renee  110:14
renée  135:11
repay  145:20
rephrase  134:20,23
reported  106:21
reporter  107:21
  113:2 120:10
  125:17 127:20
  133:15 151:11
  158:6 160:5,24
represent  152:1
representative
  136:19
represented  126:23
  136:18
representing  125:4
  128:13 135:7
  136:24 153:8
request  111:17

required  127:1
  150:10 155:16
rescinded  138:19
  139:4,12,25 140:3
rescinding  137:7,9
  138:14
rescission  139:16
reserve  150:19
reside  115:6,16
residence  134:5
  135:18 138:8
responding  154:6
response  121:5
  137:4,17 156:7
responsibility
  147:24
responsive  129:4
resubmission  119:4
retainer  147:14
  148:5
returned  128:4,8,11
review  112:16 121:3
  123:11 127:23
  132:18 133:19
  134:9 145:18 156:1
  156:4
reviewing  133:6
revisit  142:16
right  114:6,21 117:4
  121:20 129:13
  130:19 138:13
  139:24 142:16
  145:22
role  142:1
round  112:12
rule  149:10

s

s  111:18,22 135:12
sale  116:8 119:17
  137:7,9 138:15
  139:3,17 140:13,15
san  106:2,16 107:2
  107:18 108:8,18
  109:13,22 110:8,19

112:1 123:22
  124:10 133:21
  134:14,16 135:7
sand  122:2
satisfaction  127:11
saw  139:3
says  151:21 152:6
schedule  155:16,22
se  114:25
second  121:10 142:5
see  117:10 122:2,5
  127:9 129:11
  130:21 139:6,9
  145:18 151:20,22
  157:19
seeking  123:4
seen  139:7 151:6,14
select  145:1
sell  139:8
send  113:12 119:2
  122:25 128:17
  140:10
sending  122:15
sense  115:16
sent  114:14,23
  120:23 122:17
  125:24 128:2
  130:10,16 133:25
  140:16 148:25
  149:5 151:18 153:1
  153:11,19
servicing  111:6
  151:22 152:6
session  153:6
set  154:14 160:8
severson  108:13
shed  151:6
short  110:14 133:21
  135:10
shorthand  107:20
  160:5,11,24
shortly  119:22
signature  150:6
  151:21

signed  134:2
simply  118:22 137:9
  156:22
sit  114:5 121:24
  132:2 139:24 152:7
  152:11
sold  115:4 116:4
  118:2 119:6 126:7
solely  155:15
somebody  113:13
  117:17 126:22
  135:22 136:7,9,13
  136:16 139:11
  143:3
somewhat  144:10
sorry  116:17 118:13
  129:25 131:5
  134:20 135:24
  137:12 155:20
sort  112:21 121:3
  123:11 126:20
  133:2 141:8 142:16
  142:18,19
sound  117:4 124:25
sounds  142:1
southern  119:7
  123:17
speaking  140:2
speaks  131:10,13
specific  114:2 126:1
  131:22 133:11
  135:25 141:2
  157:16
specifically  116:12
  120:3 121:23 131:1
  133:7 156:7
specifics  113:15
  114:3 122:22 123:6
  132:1
specified  129:9
  155:4
specify  113:17
speculation  134:19
  141:17 152:10

[speculative - trying]

speculative  125:12
speed  113:11
spoke  121:7 123:7
    134:13 143:18
    144:1 146:24
    152:18
spoken  152:15
staff  124:6
stamped  109:16,24
    110:10,22 111:7,13
stand  126:17
standstill  122:8,11
    123:15 124:14
    126:6,9,13,14,19
    130:12,22 134:7
start  112:21,22
    152:5
started  143:6
state  106:1 107:1
    122:13 142:4
    159:10 160:6
statement  133:11
    141:9 144:9 149:16
    149:19 153:21
status  126:8 135:13
    138:11,13 139:7,10
step  134:24,24
    157:21
stepped  137:3
stipulation  150:19
stop  127:12
stopping  155:20
street  108:6 109:13
    109:22 110:8,19
stromeyer  108:5
    110:22 114:18
    124:8,9,12,19
    125:25 130:5
    131:10 132:4 133:8
    134:2,18 137:19
    139:18 141:16,19
    142:8 143:7 145:15
    146:6,13,23 147:6
    148:13 150:16,22
    151:1 152:2,9

154:11 156:6,15
    157:9 158:6,8
stuck  122:2
subject  122:25
    123:5,9 140:5
    146:21
subscribed  160:18
subsequent  116:1
    126:24
suggest  114:4
suite  107:18
superior  106:1
    107:1 119:10
sure  117:9 123:13
    124:21 129:4 132:7
    134:12,23,23 136:8
    139:20 140:23
    141:3,5 143:9,24
    144:7,23,24 151:9
    157:11,14
system  126:4

t

t  135:12
take  114:4 133:18
    149:3
taken  107:17 160:7
talk  119:9 136:16
talked  121:17
talking  115:25
    120:6 129:7 145:22
tearful  135:21
tell  113:6 116:8
    118:25 119:3,4,5
    120:15 121:14
    125:13,20 131:25
    132:11,24 144:5
    151:16
term  128:20 130:22
    130:22 131:2,18
    143:11 155:6 158:1
terms  113:20,21
    114:3 129:12,14,15
    129:20 135:12
    140:10 144:5,19,19

144:20 145:1,1,2,4
    145:14,18 146:3
    154:12,15,15,19
testified  112:6
    124:19 135:1
    142:25 143:17
    145:11 147:13
    148:13 153:6
    155:21
testify  149:24
    155:23
testifying  160:10
testimony  112:14,17
    120:21 121:4
    129:16 131:1 132:5
    133:9 138:16
    139:23 141:7
    149:17,21,23 159:7
thank  112:11
    117:21 142:11
    151:4 157:25
thereof  160:14
thing  114:18 127:6
    127:8 139:10
    146:24,25
things  126:4 139:8
    145:21
think  115:21 116:4
    119:9,12,22 122:3
    122:10,23 124:18
    124:23 127:5 130:8
    130:18 131:13
    135:9 136:6,13,17
    137:2 138:19 139:5
    140:24 141:11
    142:4 143:10
    144:25 147:16
    154:14 158:3
thinking  122:24
third  126:8 142:5
thoughts  123:5
threaten  122:3
three  130:20 138:7
tier  121:9,10

time  112:22,24
    114:1,19 116:18
    117:2 118:7,14
    121:14 123:1
    124:23 131:7 133:3
    134:11 136:25
    137:2 138:23
    140:24 142:18
    146:1 147:3,3,13
    148:10 150:5
    154:24 155:2 158:9
    160:8
timothy  106:15
    107:16 109:3,15,24
    110:10,21 111:5
    112:4 159:3,13
today  112:14 121:24
    132:2 134:13
    142:25 152:7,11
today's  112:17
told  118:19
top  114:8 120:2
    125:5 137:10,23
    138:5 156:18,24
topic  125:9
tortious  119:12
track  157:23
traditional  157:22
trail  122:18
transcribed  160:12
transcript  158:7
    159:5
transcription
    160:14
transpired  118:16
    121:11,25
trial  145:24 157:1,5
tried  127:5,10
true  118:24 148:1
    155:19,23 159:7
trust  130:25
trustee  140:13
try  122:5
trying  128:17 131:1
    131:14 136:25

Sarnoff, A VERITEXT COMPANY
877-955-3855

[trying - zztm.989105.1]

138:1 140:10
143:10
**turn**  133:25
**two**  112:12 128:10
130:4 140:8 151:22
151:25

**u**

**u**  135:11
**unavailable**  119:10
**unaware**  140:23
**understand**  139:20
141:3,25 143:24
**understanding**
129:20 145:19
148:10 149:18,20
152:24 154:9,20,22
155:2,14
**understood**  118:12
126:16 154:23
**undisclosed**  147:20
147:22
**undo**  140:10
**unilaterally**  149:13
**unlawful**  137:13
138:3
**unoccupied**  122:7
127:15
**unquote**  118:6
**unwarranted**
142:10
**unwind**  128:18
**unwritten**  149:10
**use**  112:23 123:19
128:19 131:2,18
158:1
**usually**  136:19

**v**

**v**  109:11,20 110:6
110:17
**vague**  130:5 143:7
157:9
**valued**  132:23
**verbatim**  160:10

**versa**  121:18
**versus**  155:15
**vice**  121:17
**violating**  120:19
135:12
**volume**  106:18
107:16 109:4
159:14
**vs**  106:8 107:8

**w**

**walk**  143:3 154:19
**want**  118:2 138:15
140:22 142:19
145:8
**wanted**  139:9
142:16 143:3 154:3
**ward**  106:5 107:5
109:11,16,16,20,25
110:6,11,11,17,22
110:23 111:7,11,14
147:14 153:17
**way**  122:14 123:10
133:5 138:6 141:11
143:10 144:14
148:17 152:14
157:15
**we've**  130:8 158:4
**wednesday**  106:7
107:19 112:1
**week**  142:25
**welcome**  112:10
**wells**  147:25 148:2
149:10
**went**  132:19 134:9
134:11 144:18,20
**werson**  108:13
**whatsoever**  127:14
150:7
**whereof**  160:18
**witness**  109:2
114:21 124:21
126:1 130:7 131:12
132:7 133:10
134:20 139:20

141:21 146:9,11,20
147:9 148:14
150:18 151:5
152:11 154:14
156:7,18 157:11
160:18
**witness's**  133:9
**witnesses**  160:9
**woman**  118:4 121:7
121:10
**word**  123:20 130:19
**worded**  141:5
**words**  154:23
**work**  123:13 130:6
146:7 147:8 154:13
156:3,16
**working**  115:5
124:2,7,8
**works**  157:19
**wrap**  146:17
**write**  148:18
**writing**  138:18
**written**  119:19,21
122:20 126:18,19
147:4,10,14 148:5
149:15
**wrote**  116:25 119:11
121:5 125:21
127:25 132:16
144:8 151:6

**y**

**yeah**  119:18 121:5
121:10,19 126:17
130:7 134:12
141:11,21 145:12
146:9 153:1 154:5
156:18,24

**z**

**zztm.989105.1**
109:14,23 110:9,20
111:13

Page 12