**Exhibit G**

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                  FOR THE COUNTY OF SAN FRANCISCO

3

4    BERNARD WARD and COLLEEN
     HALLORAN,

5
             Plaintiffs,

6      vs.                          CASE NO. CGC-11-511574

7    GMAC MORTGAGE, LLC and DOES
     1-20,

8
             Defendants.

9

10

11   _____

12

13              DEPOSITION OF COLLEEN HALLORAN

14                 San Francisco, California

15                 Monday, January 23, 2012

16                       Volume I

17

18

19

20

21   Reported by:
     LORI STOKES

22   CSR No. 12732

23   Job No. 131749

24

25   PAGES 1 - 109

                                                    Page 1

1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                   FOR THE COUNTY OF SAN FRANCISCO

3

4    BERNARD WARD and COLLEEN

     HALLORAN,

5

6                   Plaintiffs,

7      vs.                              CASE NO. CGC-11-511574

8    GMAC MORTGAGE, LLC and DOES

     1-20,

9

10                  Defendants.

     _____

11

12        Deposition of COLLEEN HALLORAN, Volume I, taken on

13   behalf of Defendant, at One Embarcadero  Center, Suite

14   2500, San Francisco, California, beginning at

15   10:04 a.m.  and ending at 2:40 p.m. on January 23, 2012,

16   before LORI STOKES, Certified Shorthand Reporter No.

17   12732.

18

19

20

21

22

23

24

25

                                                     Page 2

```
 1    APPEARANCES:

 2

 3    For the Plaintiffs

 4         MURPHY, PEARSON, BRADLEY & FEENEY

 5         BY:  KAREN STROMEYER

 6         Attorney at Law

 7         88 Kearney Street

 8         10th Floor

 9         San Francisco, California 94108

10         E-mail:  kstromeyer@mpbf.com

11         Phone:  415-788-1900

12

13    For the Defendant

14         SEVERSON & WERSON

15         BY:  CLAYTON GADDIS

16         Attorney at Law

17         One Embarcadero Center

18         Suite 2600

19         San Francisco, California 94111

20         E-mail:  cg@severson.com

21         Phone:  415-398-3344

22

23

24

25
```

Page 3

```
 1                            INDEX
 2  WITNESS                              EXAMINATION
 3  COLLEEN HALLORAN
    Volume I
 4
 5                    By Mr. Gaddis                6
 6
 7                       EXHIBITS
 8
 9  EXHIBIT       DESCRIPTION                    PAGE
10  EXHIBIT 1     Adjustable Rate Note dated October   11
                  25, 2006 for property located at
11                3300 Kirkham Street, San Francisco,
                  California Bates stamped WARD 000412
12                through 000416
13  EXHIBIT 2     Deed of Trust dated October 25, 2006   11
                  for property located at 3300 Kirkham
14                Street, San Francisco, California
                  Bates stamped WARD 000417 through
15                000436
16  EXHIBIT 3     Amended Notice of Deposition of      11
                  Colleen Halloran with Amended
17                Request for Document Production
18  EXHIBIT 4     Complaint in the case Bernard Ward   19
                  and Colleen Halloran vs GMAC
19                Mortgage, LLC
20  EXHIBIT 5     Chart Bates stamped WARD 000167      27
21  EXHIBIT 6     Chart Bates stamped WARD 000172      28
22  EXHIBIT 7     Chart Bates stamped WARD 000174      29
23  EXHIBIT 8     Notice of Default and Election to    31
                  Sell Under Deed of Trust
24
25
                                              Page  4
```

EXHIBITS (continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 9 | August 24, 2010 letter to Loss Mitigation from Timothy J. Halloran re Bernard Ward/Colleen Halloran Account Number ▓▓▓8940 Bates stamped WARD 000020 through 000035 | 51 |
| EXHIBIT 10 | September 9, 2010 letter to Loss Mitigation from Timothy J. Halloran re Ward v GMAC GMAC Account Number ▓▓▓8940 Bates stamped WARD 000087 through 000088 | 56 |
| EXHIBIT 11 | November 10, 2010 letter to Loss Mitigation from Timothy J. Halloran re Ward v GMAC GMAC Account Number ▓▓▓8940 Bates stamped WARD 000070 through 000073 | 59 |
| EXHIBIT 12 | November 16, 2010 letter to Loss Mitigation from Timothy J. Halloran re Ward v GMAC GMAC Account Number ▓▓▓8940 Bates stamped WARD 000080 through 000084 | 61 |
| EXHIBIT 13 | April 7, 2011 e-mail to Michael Porter from Deborah Curry re ▓▓▓8940 Ward Bates stamped WARD 000041 through 000042 | 84 |
| EXHIBIT 14 | August 15, 2011 e-mail string between Clayton Gaddis, Karen Stromeyer and Ted Buell re Ward vs GMAC, San Francisco Superior Court Case No. CGC-11-511574 | 89 |
| EXHIBIT 15 | Deed of Trust and Assignment of Rents dated December 5th, 2007 | 103 |
| EXHIBIT 16 | Uniform Residential Loan Application dated October 27, 2006 Bates stamped WARD 000324 through WARD 000328 | 105 |

Page 5

```
 1              San Francisco, California, Monday, January 23, 2012
 2                            10:04 a.m.
 3
 4                        COLLEEN HALLORAN,
 5      having been administered an oath, was examined and
 6      testified as follows:
 7
 8                          EXAMINATION
 9
10      BY MR. GADDIS:
11          Q    Good morning.  This is Clayton Gaddis.  I
12      represent GMAC Mortgage, case Bernard Ward and Colleen
13      Halloran versus GMAC Mortgage LLC, Case Number
14      CGC-11-511574.
15              Good morning, Dr. Halloran.
16          A    Good morning.
17          Q    How are you today?
18          A    I've had better days.
19          Q    I understand.  This is not exactly fun, but
20      it won't be terrible, either.
21              Have you ever given a deposition before?
22          A    I don't think so.
23          Q    Okay.  Have you ever gone by another name
24      besides Halloran?
25          A    My husband calls me Ward, but I've never
```

Page 6

1    taken his name.

2        Q    Okay.  Some just rules of the road for a

3    deposition.  This is being recorded via transcript.

4    I'll do my best to ask clear and concise questions.  If

5    you don't understand my question, please don't attempt

6    to answer it.  Just ask me to clarify, and I'll do my

7    best to make it a clear question for you.

8        Kind of the same vein, if I'm asking a

9    question, please allow me to finish asking the question

10   before you begin your answer, and I'll do my best to

11   try and keep from answering a subsequent question when

12   you're asking.  It will just make for a better record.

13       And because this is being recorded, let's do

14   verbal answers whenever we can.  I know in normal

15   conversation, head nods tend to give yes or no

16   responses, but let's try to do our best to give verbal

17   responses and try to refrain from uh-huhs, huh-uh, and

18   such.

19       If you ever need a break, please ask for a

20   break.  I'm sure I'll need a number of breaks myself

21   today.  The only caveat to that is, if I have a

22   question on the table, please respond to the question

23   before we take a break.

24       Are you familiar with the term perjury?

25       A    Yes.

Page 7

```
 1        Q     So this is just like if we were before a
 2    court of law giving live testimony, so the rules of
 3    perjury will apply to this deposition, as well.  I'm
 4    just required to inform you of that, okay.
 5              Prior to November of 2006, had you ever taken
 6    out a mortgage loan before?
 7        A     Personally, no.
 8        Q     No.  Had you ever been a signatory on a Deed
 9    of Trust or a note prior to November 2006?
10        A     Yes.
11        Q     Do you recall when that was?
12        A     No.
13        Q     No.  Was that a -- a mortgage loan, though?
14        A     Yes.
15        Q     Yes.  Did it cover the property at issue
16    here?
17              And let me clarify that.  When I say property
18    at issue, I mean the property located at 3300
19    Kirkham -- I believe it's Kirkham Avenue, or is it
20    Kirkham Street?
21        A     Street.
22        Q     Kirkham Street.
23        A     Don't recall.
24        Q     But you are somewhat familiar with the
25    mortgage loan process?
```

Page 8

1          A     Somewhat.

2          Q     Okay.  Did you cosign for a 2006 Deed of

3     Trust covering the subject property?

4          A     I don't recall.

5          Q     You don't recall.

6                Are you familiar with the note or Deed of

7     Trust covering the subject property at all?

8          A     I don't understand your question.

9          Q     Are you familiar with the original terms of

10    the November 2006 note?

11         A     No.

12         Q     Are you familiar with the original terms of

13    the November 2006 Deed of Trust?

14         A     I just answered no.

15         Q     Those were -- they were two separate things.

16    One is a note and the other is a Deed of Trust.

17         A     And the answer is still no.

18         Q     The answer is still no, that is fine.

19                Would it refresh your memory if I produced

20    the note and Deed of Trust to you at this point?

21         A     What relevance would that have?

22         Q     This concerns a mortgage note and a Deed of

23    Trust.

24         A     Do I remember the legal wording of a document

25    from six years ago?  I do not.

Page  9

1        Q    Okay, that's fine.  Let's just pull them out,

2    and we can review them right now.

3        A    I have a medical degree, not a law degree, so

4    I'm not sure I can understand the verbiage.

5        Q    That's fine.  I'm not asking you to interpret

6    any of the legal terms.  When I say terms, principal

7    amount, what you would be obligated to pay every month,

8    things like that.

9        A    Again, what relevance does that have to

10   anything?

11       Q    Ma'am, that is a yes or no question.

12       A    What question?

13       Q    Do you remember any of the terms, like the

14   principle amount or what you were obligated to pay on a

15   monthly basis under the Deed of Trust?

16       A    No.  And I'm not ma'am.

17       Q    Should I address you as Doctor --

18       A    Yes.

19       Q    I don't mean to be offensive, if that is.

20       A    In medicine, it is offensive to be called

21   ma'am.

22       Q    Okay, I will do my best to call you Doctor.

23       A    Thank you.

24            MR. GADDIS:  So I would like to offer in

25   evidence Defendant's Exhibit 1, and that is the

                                          Page 10

```
 1   Adjustable Rate Note from October 25th, 2006.
 2              (Deposition Exhibit 1 was marked for
 3              identification by the court reporter.)
 4        MR. GADDIS:  Let's go ahead and introduce as
 5   Defendant's 2 a a copy of the Deed of Trust as executed
 6   on October 25th, 2006 covering Loan Number 84102.
 7              (Deposition Exhibit 2 was marked for
 8              identification by the court reporter.)
 9        MR. GADDIS:  Let me back up a second.  I
10   would like to offer as Defendant's 3 the Amended Notice
11   of Deposition of Colleen Halloran with Amended Request
12   for Document Production.
13              (Deposition Exhibit 3 was marked for
14              identification by the court reporter.)
15   BY MR. GADDIS:
16        Q    And, Doctor, what documents have you brought
17   today?
18        MS. STROMEYER:  We are producing these
19   documents.
20        MR. GADDIS:  Okay.  It looks like Plaintiffs
21   have produced documents with the Bates stamp numbers
22   PLF00001 through PLF00125.
23        Q    Doctor, have you had a chance to look over
24   the note or Deed of Trust?
25        A    You want me to go through all of these
```

Page 11

1   things?

2        Q    You probably don't need to go over the Notice

3   of Deposition.  Feel free to, of course.  But take a

4   second, if you would, to look over the Adjustable Rate

5   Note and review it, please.

6            MS. STROMEYER:  You just want her to review

7   it, she's not looking for anything in particular?

8            MR. GADDIS:  No.

9            THE WITNESS:  You might note that nowhere on

10  here is my signature or my initial.  I haven't seen it

11  before.

12           MS. STROMEYER:  Wait until he asks the

13  question.  He just asked to you review it.

14  BY MR. GADDIS:

15       Q    All right, Dr. Halloran.  Now that you've had

16  a chance to review some of the terms, provisions of the

17  Adjustable Rate Note and the Deed of Trust, I'd like to

18  turn to Defendant's 1, the Adjustable Rate Note.

19           Right under Section 1, do you see where it

20  says Borrower's Promise to Pay?

21       A    No.  Oh, right.  Yeah.

22       Q    Okay.  Now, correct me if I read this wrong.

23  "In return for a loan that I have received, I promise

24  to pay U.S. $905,000, plus interest, to the order of

25  the Lender."

                                              Page 12

```
 1              Did I read that correctly?

 2      A       Yes.

 3      Q       So this is a $905,000 note; is that correct?

 4              MS. STROMEYER:  The document speaks for

 5      itself.

 6              MR. GADDIS:  Okay.

 7      Q       Now, this is an adjustable rate note.

 8              Are you familiar with that term?

 9      A       I'm familiar with the term.

10      Q       Okay.  So you understand that the interest

11      actually adjusts on this note?

12      A       I did not know that before I read this.

13      Q       Okay.  If we can turn to the second page,

14      Page 2 of 4.

15              On the very top, it states, "Interest Rate

16      and Monthly Payments Changes."

17              Do you see that?

18      A       Yes.

19      Q       Do you see where it states when the interest

20      rate will actually adjust on this note?

21      A       December 1st, 2016.

22      Q       Right here at the top, under 4, 4A, "Change

23      Dates."

24              Does it read that it will change

25      November 1st, 2011?
```

Page 13

1          MS. STROMEYER:  That's what the document

2     says.

3          THE WITNESS:  Yeah.

4     BY MR. GADDIS:

5     Q     So now after reviewing this document, is it

6     your understanding that, under the terms of the

7     original note, the interest rate would have adjusted

8     November 1st, 2011?

9          MS. STROMEYER:  Objection.  The document

10    speaks for itself.

11    BY MR. GADDIS:

12    Q     Are you a signatory on this adjustable rate

13    note?

14    A     On this note here?

15    Q     Yes, Doctor.

16    A     My name is nowhere on it.

17    Q     Okay.  Who has signed this?

18    A     Bernard V. Ward.

19    Q     Okay.  Now, if we could turn to the Deed of

20    Trust, it's Defendant's Exhibit 2.

21          Without going through the terms, I'm just

22    going to ask, are you a signatory on the Deed of Trust?

23    A     As you can read, my name is right there.

24    Q     So is that a yes, you are a signatory on this

25    Deed of Trust?

Page 14

1          A      The document speaks for itself.

2          Q      Is that your signature, ma'am?

3          A      Yes, it is.  And please don't call me ma'am.

4          Q      I apologize.  It's more of a habit.  I really

5      don't mean any offense by it.

6                 Are you aware that, in May 2007, there was a

7      HELOC -- when I say HELOC, I mean Home Equity Line of

8      Credit -- taken out on the subject property?

9          A      Say that again.

10         Q      In May of 2007, there was a Home Equity Line

11     of Credit taken out covering the subject property.

12                Were you aware of that?

13         A      I don't think so.

14         Q      Are you aware that, in December 2007, a

15     subsequent Deed of Trust was taken out covering the

16     subject property for $125,000?

17         A      No.

18         Q      Did you handle any of the finances for the

19     house?

20                MS. STROMEYER:  Objection.  Vague and

21     ambiguous as to finances.

22     BY MR. GADDIS:

23         Q      Do you understand my question?

24         A      No.

25         Q      Did you pay -- were you in charge -- excuse

                                                    Page 15

1    me.

2            Were you in charge of paying bills?

3        A    Some.

4        Q    Some.  Do you recall which bills you were in

5    charge of paying?

6            MS. STROMEYER:  Can you please specify a time

7    frame.

8    BY MR. GADDIS:

9        Q    In 2006.

10       A    Can I -- can I remember every bill I paid in

11   2006?  No.

12       Q    Okay.  Did you pay electricity bills in 2006?

13       A    Sometimes.

14       Q    Did you pay gas bills in 2006?

15       A    Sometimes.

16       Q    Did you pay car payments in 2006?

17       A    Sometimes.

18       Q    Did you make payments on the mortgage at any

19   time in 2006?

20       A    Sometimes.

21       Q    How about in 2007 with regards to the

22   mortgage?

23       A    Sometimes.

24       Q    How about 2008 with regards to the mortgage?

25       A    Sometimes.

Page 16

1        Q    How about 2009 with regards to the mortgage?

2        A    Yes.

3        Q    How about 2010 with regards to the mortgage?

4        A    Yes.

5        Q    When did you start having difficulties making

6   your timely mortgage payments on the Deed of Trust?

7        A    On the Deed of Trust or the mortgage?

8        Q    Let's go with the mortgage.

9        A    Actually, I don't understand the difference

10   between Deed of Trust and mortgage.

11           MS. STROMEYER:  That's fine.  If you don't

12   understand, ask him to clarify what he's talking about.

13           THE WITNESS:  What are you talking about?

14   BY MR. GADDIS:

15       Q    When did you start having trouble making your

16   mortgage payments?

17           MS. STROMEYER:  Lacks foundation.

18           Do you recall?

19           THE WITNESS:  It was spring -- late spring,

20   early summer, I think, of 2010.

21   BY MR. GADDIS:

22       Q    Do you recall what issues in your life in the

23   spring or summer of 2010 made it difficult for you to

24   make your timely mortgage payments?

25       A    I'm a single mother of a youngster who was

                                              Page 17

1    diagnosed with cancer.

2        Q    Is it my understanding that you're saying

3    that you had hospital bills that made it difficult to

4    make your timely mortgage payments?

5        A    Partially.

6        Q    Partially.

7            Are there other issues besides the partial

8    hospital bills that made it difficult for you to make

9    your timely mortgage payments in the spring or summer

10    of 2010?

11        A    Have you ever been the sole supporter of a

12    child with cancer?

13        Q    No.  And that was not my question, ma'am.

14            Excuse me, Doctor.  I apologize.  Doctor.

15        A    There's quite a lot of stuff to do when your

16    child has cancer.  I'm the sole emotional support of

17    the whole family.  I'm dealing with not only medical

18    costs financially but emotionally.

19            Things that would be routine are no longer

20    routine.  Things that are easy to do when you are just

21    being a mother and a doctor are no longer easy to do.

22        Q    I understand.  Were there other financial

23    considerations, such as loss of income that the

24    household experienced?

25        A    Yes.

Page 18

```
 1         Q    Can you describe some of those financial

 2   issues.

 3              Do you understand my question, ma'am?  Excuse

 4   me, Doctor.

 5              MS. STROMEYER:  Do you mind if we -- I know a

 6   question is pending, but do you mind?

 7              MR. GADDIS:  That's fine, that's fine.

 8              (Short Break Taken.)

 9              THE WITNESS:  My husband lost his job.

10   BY MR. GADDIS:

11         Q    Do you recall when your husband lost his

12   employment?

13         A    No.  Not the precise date.

14         Q    Do you remember the time of year?

15         A    No.

16         Q    Do you remember the year?

17         A    No.  Not precisely.

18         Q    That's fine.

19              MR. GADDIS:  I'd like to introduce as

20   Defendant's Number 4 a copy of the complaint in Case

21   Number CGC-11-511574.

22              (Deposition Exhibit 4 was marked for

23              identification by the court reporter.)

24   BY MR. GADDIS:

25         Q    Doctor, have you seen this document before?
```

Page 19

```
 1        A      Yeah.

 2        Q      Would you like a minute to just kind of

 3   review it?

 4        A      Am I getting quizzed on it?

 5        Q      Would you like a minute to review it?

 6        A      No.

 7        Q      Okay.  Let's look at Paragraph Number 13.

 8   It's Page 3.

 9               Paragraph 13 states, "Plaintiffs make each

10   payment due under the mortgage loan."

11               Did I read that correct?

12        A      Correctly, yes.

13        Q      Is that still your contention, that you have

14   made all payments due under the mortgage loan?

15               MS. STROMEYER:  Objection.

16   BY MR. GADDIS:

17        Q      As of the filing of this complaint?

18               MS. STROMEYER:  I'm going to object that, A,

19   that asks for all Plaintiffs' contentions, which are in

20   the proper venue for a contention interrogatory.

21               I'm also going to object that that statement

22   is read in the entire -- complete as a whole, and taken

23   out of context.  Plaintiff may not be able to respond

24   to that.

25               You can respond to that if you can.
```

Page 20

1          It may also call for attorney-client work

2     product information.

3     BY MR. GADDIS:

4          Q    Do you understand the question?

5          THE WITNESS:  Am I supposed to answer?

6          MS. STROMEYER:  I'm going to say no to that

7     one, actually.

8          MR. GADDIS:  On what grounds, Counselor?

9          MS. STROMEYER:  That you're asking whether or

10    not that's a statement -- whether or not she's

11    supporting that contention.

12         Can you repeat that question, please.

13    BY MR. GADDIS:

14         Q    Sure.  In Paragraph 13 in your complaint

15    against GMAC, you state that you have made payments due

16    under the mortgage loan.

17         Is that correct?  This complaint was filed

18    June 8th, 2011.

19         MS. STROMEYER:  And the question is did she

20    make payments due under the loan?

21         THE WITNESS:  I made payments due under the

22    loan but not until this date.  GMAC started sending my

23    checks back.

24    BY MR. GADDIS:

25         Q    As of June 8, 2011?

Page 21

1          A      I don't know the specific date.

2          Q      Okay.  I ask you this because it says,

3     "Plaintiffs made each payment due under the mortgage

4     loan."

5                 And I'm asking if you made each payment due

6     under the mortgage loan up until June 8th, 2011.

7          A      I don't recall.

8          Q      Let's look at Paragraph 15.

9                 "In approximately May, 2009, Plaintiffs began

10    experiencing financial difficulties in making their

11    monthly payments."

12                Did I read that correctly?

13         A      Yes, you did.

14         Q      Does this refresh your memory as to when

15    either your husband lost his job or you had difficulty

16    making payments?

17         A      No.

18         Q      Let's look at Paragraph 16.

19                "In or about December 2009, GMAC began

20    non-judicial foreclosure procedures related to the

21    subject property."

22                Did I read that correctly?

23         A      Yes.

24         Q      Do you recall any of those nonjudicial

25    foreclosure procedures --

                                              Page 22

```
1        A    No.

2        Q    -- in December of 2009?

3        A    I just said no.

4        Q    Thank you.

5             MS. STROMEYER:  Try and wait for him to

6    finish his question.  It will make for a clearer

7    transcript.

8             THE WITNESS:  Well, he said it twice.

9    BY MR. GADDIS:

10       Q    Do you recall what your phone number was --

11   let me restate.

12            Did you have a landline in 2009 at the

13   subject property?

14       A    Yes.

15       Q    Do you recall what that phone number was?

16       A    I'm not getting why you're asking that.

17       Q    That's not for you to decide.

18            Do you recall what the phone number was?

19       A    Yes.

20       Q    Can you state what your landline phone number

21   was in 2009?

22       A    731-8936.

23       Q    And what's the area code for that one?

24       A    San Francisco.

25       Q    Is that a 415 area code?
```

Page 23

1          A     Correct.

2          Q     Is that the same number as of today?

3          A     Yes.

4          Q     Was it the -- so it's been the continuous

5     phone number from 2009 up until this point; is that

6     correct?

7          A     Actually, since 1960.

8          Q     1960.  Do you recall if Mr. Ward had a cell

9     phone number in 2009?

10              MS. STROMEYER:  Objection.  Irrelevant.

11              MR. GADDIS:  Can we go off the record real

12     quick.

13              (Short discussion off the record.)

14              THE WITNESS:  I don't recall what his phone

15     number was.

16     BY MR. GADDIS:

17          Q     Okay.  I won't ask you what your cell phone

18     was, though.  That would probably be unnecessary.

19              Did you ever have communications with GMAC --

20          A     Not to my knowledge.

21          Q     I'm sorry.  I tend to ask half a question --

22     I'll try to formulate the whole question without a

23     pause.

24              Prior to April of 2011, did you have

25     communications with GMAC?

                                              Page 24

1                MS. STROMEYER:  Objection.  That's vague and

2    ambiguous to the extent that you were probably making

3    payments to GMAC.

4                Does that constitute communications?

5                MR. GADDIS:  I'll clarify.  That's fine.

6        Q    Outside of making mortgage payments, prior to

7    April of 2011, did you have communications with GMAC?

8        A    Not to my knowledge.

9        Q    Not to your knowledge.

10               Is it your understanding that, prior to April

11   of 2011, outside of mortgage payments, any

12   communication that would have gone or have been made to

13   GMAC would have been made by your husband, Mr. Ward?

14       A    I don't understand that question.

15       Q    Sure, that's fine.

16               If there was an issue with mortgage payments,

17   would you have been the one to contact GMAC, or would

18   that have been something your husband normally would

19   have done?

20       A    I've never talked to GMAC, so I can't tell

21   you what my husband would have done.

22       Q    That's fine.

23               Just to clarify, when you say you've never

24   talked to GMAC, are you including --

25               MS. STROMEYER:  No, she's not --

Page 25

```
 1   BY MR. GADDIS:

 2       Q    -- any communication post 2011 up to this

 3   point?

 4            MS. STROMEYER:  No.  Objection.  Because that

 5   includes attorney-client communications and

 6   communications by your authorized agents to GMAC.

 7            THE WITNESS:  No.

 8   BY MR. GADDIS:

 9       Q    No, okay.  In order -- let me clarify.

10            I'm not asking you -- even if my question is

11   ambiguous -- to ever tell me anything that you and your

12   attorneys have talked about.  That is attorney-client

13   privilege.  And I'm sure your counsel will object.

14            In this case, I'm asking if you had any

15   communication yourself with GMAC after April of 2011.

16       A    No.

17       Q    No.

18            MS. STROMEYER:  Can I back up with that.

19            By communications with GMAC, are you

20   including communications from GMAC, or just

21   communications that she initiated?

22            THE WITNESS:  I have never spoke to GMAC.

23            MR. GADDIS:  Okay.

24            MS. STROMEYER:  Okay.

25            MR. GADDIS:  That's fine.
```

Page 26

```
 1              THE WITNESS:  At least I don't recall.
 2              MR. GADDIS:  I'd like to introduce
 3    Defendant's 5.  It is Bates stamped Number WARD 000167.
 4              (Deposition Exhibit 5 was marked for
 5              identification by the court reporter.)
 6    BY MR. GADDIS:
 7         Q    I apologize.  These columns aren't numbered,
 8    so I'll do my best to point out.
 9              If you would look at Line 8, the eighth line
10    from the top.  It should be dated 9/11/2009.
11              Do you see that, Doctor?
12         A    Yes.
13         Q    And to the far right, there's a statement
14    saying, "Delinquent 30 days."
15              Do you see that, Doctor?
16         A    Yes.
17         Q    Is it your understanding that, as of
18    9/11/2009, your mortgage loan was delinquent 30 days?
19              MS. STROMEYER:  Objection.  This document was
20    not prepared by Plaintiffs.  It lacks foundation.
21              If it refreshes your recollection, please let
22    him know.
23              THE WITNESS:  No.
24    BY MR. GADDIS:
25         Q    Do you recall at all in 2009 having trouble
```

Page 27

1    making your mortgage payments?

2        A    No.

3        Q    Do you recall in 2009 making any mortgage

4    payments?

5        A    Yes.

6        Q    If you recall, can you tell me what months

7    you made mortgage payments --

8        A    No.

9        Q    -- in the calendar year of 2009?

10       A    No.

11           MR. GADDIS:  I'd like to offer into evidence

12    Defendant's 6.

13           (Deposition Exhibit 6 was marked for

14           identification by the court reporter.)

15           MR. GADDIS:  This is Bates stamped WARD

16    000172.

17    BY MR. GADDIS:

18       Q    If you could look at Line 12 from the bottom.

19    This should be dated January 15th, 2010.

20           Do you see that, Doctor?

21       A    Yes.

22       Q    Do you see where the statement reads,

23    "Delinquent 60 days"?

24       A    Yes.

25       Q    Do you recall in January of 2010 having

Page 28

1    failed to make mortgage payments --

2        A    No.

3        Q    -- on the subject property?

4        A    No.

5            (Telephonic Interruption.)

6            MR. GADDIS:  And, Doctor, I understand your

7    profession.  If you need to step out and take a phone

8    call, please do so.

9            I would like to introduce as Defendant's No.

10   7 a document Bates stamped WARD 000174.

11           (Deposition Exhibit 7 was marked for

12           identification by the court reporter.)

13           (Telephonic Interruption.)

14           MR. GADDIS:  Let's go off the record.

15           (Short Break Taken.)

16   BY MR. GADDIS:

17       Q    Going from the top now, let's look at Line 12

18   from the top.

19           This is dated February 23rd, 2010.

20           Do you see that, Doctor?

21       A    Yes.

22       Q    And the statement on the right-hand side

23   reads, "Delinquent 90 days;" is that correct?

24       A    Correct.

25       Q    Do you recall in February of 2010 having

Page 29

1    failed to make three months' of mortgage loan payments

2    on the subject property?

3        A    No.

4        Q    Maybe I can make this easier with just one

5    question.  Do you ever recall being delinquent on the

6    mortgage loan covering the subject property?

7        A    Were you listening when we talked about my

8    son?

9        Q    Ma'am, do you ever recall being delinquent on

10    the mortgage payments covering the subject property?

11        A    I answered the question already.

12        Q    Do you recall what that answer was?

13            THE WITNESS:  Do you want to read it back to

14    him?

15            THE REPORTER:  I don't know which answer you

16    would like me to read back.

17            THE WITNESS:  My son had cancer.  I was

18    rather overwhelmed as a single mother.

19    BY MR. GADDIS:

20        Q    Ma'am, I understand that.  I'm asking if you

21    recall being delinquent on the subject loan covering

22    the subject property.

23        A    I don't recall precisely how many days it

24    was.  I can tell you precisely when I diagnosed him.  I

25    can recall precisely many things.

                                            Page 30

1           Do I precisely remember how many days I was

2    late with the mortgage?  No.

3           MR. GADDIS:  We're going to go off the

4    record.

5              (Short Break Taken.)

6           MR. GADDIS:  I'd like to introduce as

7    Defendant's Number 8 a recorded document entitled,

8    Notice of Default -- off the record for a minute.

9    Excuse me.

10             (Short Break Taken.)

11          MR. GADDIS:  I'd like to introduce

12   Defendant's 8, recorded document entitled Notice of

13   Default and Election to Sell Under Deed of Trust.

14             (Deposition Exhibit 8 was marked for

15             identification by the court reporter.)

16   BY MR. GADDIS:

17      Q    Doctor, please take a second to review that

18   document, if you would.

19          MS. STROMEYER:  Are you okay?  Ready?

20   BY MR. GADDIS:

21      Q    Doctor, after reviewing this document,

22   Defendant's 8, Notice of Default and Election to Sell

23   Under Deed of Trust, does it refresh your recollection

24   as to when you were actually in default concerning the

25   mortgage loan?

                                              Page 31

```
1        A    No.

2        Q    Would it help if I directed your attention to

3   the second full paragraph that starts "This amount is

4   $17,806.02"?

5        A    No.

6        Q    It does not help refresh your recollection?

7        A    I just answered.

8             MR. GADDIS:  Okay.  We'll just go ahead and

9   point out that the Notice of Default identifies that,

10  as of May 24th, 2010, the borrower was $17,806.02 in

11  arrears.

12            MS. STROMEYER:  Objection.  The document

13  speaks for itself.

14            MR. GADDIS:  Okay.

15       Q    Doctor, is Tim Halloran your brother?

16       A    Relevance?

17       Q    Is Tim Halloran your brother, Doctor?

18       A    Is -- is that relevant to this case?

19            Yes, he's my brother.

20       Q    Okay.  Is he your older brother or younger

21  brother?

22            Do you understand my question?

23       A    I do.  You're asking me to reveal my age?

24       Q    No, I'm asking you if Tim Halloran is your

25  older brother.  How about that?
```

Page 32

```
 1        A    No.

 2        Q    Is Tim Halloran your younger brother?

 3        A    Obviously.

 4        Q    Okay, Tim Halloran is your younger brother,

 5   great.

 6             Did you -- let me restate.

 7             Do you recall when you contacted Tim Halloran

 8   to contact GMAC on your behalf?

 9        A    No.

10        Q    Are you aware that, in your complaint,

11   Paragraph Numbers 17, 18 and 19 -- if you could, just

12   for a second, review Paragraphs 17, 18 and 19.

13             Do these paragraphs refresh your recollection

14   as to when you contacted Tim Halloran to contact GMAC

15   on your behalf?

16        A    Not precisely.

17        Q    Do you recall that, in August 2010,

18   Mr. Halloran contacted GMAC on your behalf?

19        A    I can't tell you when he did that.  You would

20   have to ask him.

21        Q    Did you ask Tim Halloran to contact GMAC on

22   your behalf?

23             MS. STROMEYER:  Objection.  Attorney-client

24   privilege.

25             You can answer if it doesn't include any
```

                                                    Page 33

1    conversations between you and Mr. Halloran regarding

2    this litigation.

3              THE WITNESS:  Ask that again.

4    BY MR. GADDIS:

5        Q    Did you contact Mr. Halloran -- excuse me,

6    Tim Halloran -- let me restate.

7              Did you request that Tim Halloran contact

8    GMAC mortgage on your behalf?

9              MS. STROMEYER:  Objection.  May call for

10    attorney-client privilege and work product information.

11              You can answer if you do not disclose any of

12    the communications between you and Mr. Halloran related

13    to this litigation.

14              THE WITNESS:  I wouldn't know how to answer

15    without revealing something.

16    BY MR. GADDIS:

17        Q    I'm not asking the substance of any

18    conversation; I'm asking if you made a request to

19    Mr. Halloran to contact GMAC on your behalf.

20        A    I think that would be revealing what I

21    shouldn't reveal.

22              MR. GADDIS:  Counselor, are you contending

23    that all communications, even those preceding the

24    filing of this complaint in the lawsuit are covered by

25    attorney-client privilege with regards to

                                          Page 34

```
 1   communications between Dr. Halloran and Tim Halloran?

 2           MS. STROMEYER:  Related to the -- yes,

 3   related to the subject matter.

 4   BY MR. GADDIS:

 5       Q    Doctor, did all loan modification

 6   conversations concerning modification of the 2006 Deed

 7   of Trust take place between Tim Halloran and GMAC

 8   and/or its employees?

 9           MS. STROMEYER:  Objection.  Vague and

10   ambiguous as to time.

11   BY MR. GADDIS:

12       Q    Do you understand my question, Doctor?

13       A    No.

14       Q    In 2010, is it your understanding that any

15   negotiation concerning modification of the 2006 Deed of

16   Trust took place between Tim Halloran and GMAC?

17       A    I have no way of knowing that.

18       Q    At any time in 2010, did you have a

19   communication with GMAC regarding modification of the

20   2006 Deed of Trust?

21           MS. STROMEYER:  And by communication, you

22   mean verbal communication?

23           MR. GADDIS:  At this point, any type of

24   communication.

25           THE WITNESS:  Not to my knowledge.
```

Page 35

```
 1   BY MR. GADDIS:

 2       Q    In 2011, did you have any communication with

 3   GMAC concerning modification of the 2006 Deed of Trust?

 4       A    They sent me a note at some point in that

 5   year that if I made three payments in February, March

 6   and April, I think, that they would reconsider the

 7   loan.  And I sent those checks, and I had no verbal

 8   communication with anybody.

 9       Q    Were those three checks and receipt of the

10   note, as you're referencing it, the only communications

11   you had with GMAC?

12       A    To my knowledge.

13       Q    Doctor, do you have Power of Attorney over

14   one Bernard Ward?

15       A    Bernard Ward.

16       Q    Bernard, excuse me.

17            MS. STROMEYER:  Objection.  May call for a

18   legal conclusion.  But to the best of your knowledge,

19   you can answer that.

20            THE WITNESS:  Yeah.

21   BY MR. GADDIS:

22       Q    Do you recall when Mr. Ward executed that

23   Power of Attorney in your name?

24       A    I don't recall.

25       Q    Let's turn to your complaint again, and
```

Page 36

1    that's Defendant's 4.  It's still in front of you.  And

2    review Paragraphs 20 through 24.  I believe these

3    reference the note from GMAC that you mentioned a

4    second ago.

5              Paragraph 20 identifies that, "On or about

6    January 14th, 2011, Plaintiffs and GMAC entered into a

7    written Repayment Agreement."  And that Repayment

8    Agreement is attached as Exhibit 1 to the complaint.

9              Let's review Exhibit 1, if you would.  Please

10   take a second and review Exhibit 1, if you'd like.  Or

11   not.

12             Let's look at the second full paragraph,

13   please.  And it states, "Borrower acknowledges that

14   Lender is the legal holder and the owner, or

15   agent/servicer for the legal holder and owner, of the

16   Note and Security Instrument and further acknowledges

17   that if Lender transfers the Note, as amended by this

18   Agreement, the transferee shall be the Lender as

19   defined in this Agreement."

20             Did I read that correctly?

21        A    Yes.

22        Q    Do you see where the very first line of that

23   paragraph states that, "Lender is identified as the

24   legal holder and the owner or the agent/servicer for

25   the legal holder and owner"?

Page 37

```
 1              MS. STROMEYER:  You're asking her if that's
 2    what that document says?
 3              MR. GADDIS:  I'm asking her if she sees that,
 4    yes.
 5              THE WITNESS:  Yeah, I can read.
 6    BY MR. GADDIS:
 7        Q    Okay, thank you.
 8              Let's jump over to Paragraph 41 of your
 9    complaint, please.
10              Paragraph 41 reads, "At all times, GMAC
11    represented to Plaintiffs and Plaintiffs' agents that
12    they were the lender and held the promissory note and
13    had the actual and final authority to enter into
14    contracts related to the mortgage loan for the subject
15    property."
16              Did I read that correctly, Doctor?
17        A    Yes.
18        Q    Let's go back to Paragraph 25 of the
19    complaint, please.
20              Paragraph 25 reads, "On or about April 21,
21    2011, an individual who identified himself as an agent
22    at Loss Mitigation at GMAC informed counsel for
23    Plaintiff in a telephone conference that Plaintiffs
24    have been approved as of April 21, 2011 for a permanent
25    modified transitional modification to the loan with an
```

Page 38

```
 1    APR of 2.88 percent."

 2             In this telephone conference, were you

 3    present, Doctor?

 4        A    No.

 5        Q    How did you first learn that you were

 6    approved for a modified mortgage?

 7        A    My attorney called me.

 8        Q    He called you.

 9             Did he call you on April 21st, 2011 --

10        A    I don't --

11        Q    -- do you recall?

12        A    I don't recall the date.

13        Q    Did Mr. Halloran tell you over the phone the

14    proposed terms of the modification?

15        A    Yes.

16        Q    Do you recall what the proposed terms of that

17    modification were?

18        A    Not precisely.

19        Q    Let's please turn to Exhibit 3 of the

20    complaint.  It should be a letter dated April 22nd,

21    2011.

22             If you could read out loud that second full

23    paragraph for the record, please.

24        A    Who are you addressing?

25        Q    You, Doctor.
```

Page 39

1       A    "I understand that, while it has been

2   approved, the paperwork may not arrive in time for a

3   May 1 payment date, and that my clients will proceed to

4   make the first payment on May 1 in a timely basis."

5       Q    Did Mr. Halloran ever explain to you what he

6   believed the paperwork as identified in that paragraph

7   to be?

8           MS. STROMEYER:  Objection.  May call for

9   attorney-client communication.

10          MR. GADDIS:  Counsel, are you instructing her

11  not to answer on that?

12          MS. STROMEYER:  If you can answer without --

13          THE WITNESS:  I can't answer the question.

14  BY MR. GADDIS:

15      Q    For clarification sake, are you saying you

16  can't answer the question because you do not recall or

17  because you're nervous or anxious of divulging

18  privileged information?

19      A    Both.

20      Q    Did Mr. Halloran have conversations with you

21  about the alleged proposed modification of your

22  mortgage loan?

23      A    I can't answer the question.

24      Q    Why can't you answer that question, Doctor?

25      A    Because I would be divulging something

Page 40

1    between myself and my attorney.

2         MS. STROMEYER:  You can tell him whether or

3    not you had the conversations; don't tell him the

4    content of the conversations.

5    BY MR. GADDIS:

6         Q    Would you like me to restate the question?

7         A    We had a conversation about it.

8         Q    Okay.  What did you guys talk about in that

9    conversation?

10        A    That I'm not telling you.  It's

11   attorney-client privilege.

12        Q    Okay.  What were your expectations with

13   regards to the proposed modification of your 2006 Deed

14   of Trust?

15        A    Can you state that more specifically?

16        Q    I will attempt.

17             What were your expectations as to agreeable

18   terms concerning any proposed modification of your 2006

19   Deed of Trust?

20        A    What were my expectations?

21        Q    Uh-huh.

22        A    Define that.

23        Q    You don't understand my question?

24        A    Expectations?

25        Q    Of the terms of any proposed modification to

                                        Page 41

1    the 2006 Deed of Trust.

2        A    My expectations were for the contract to be

3    modified, as they stated to my attorney.  My

4    expectation was for GMAC to live up to the contract

5    they made.  My expectation was to keep my home.

6            Is there any other expectation that you would

7    like me to delineate?

8        Q    Yes, there are.

9        A    What?

10       Q    Prior to the communications that you claim

11   were privileged of April 21st and 22nd, there had been

12   no proposed modification, correct?

13       A    I don't know.

14       Q    My question has to do with what terms were

15   you expecting to be able to pay on a modified mortgage

16   loan?

17       A    I don't know.

18       Q    You don't know because you are

19   unknowledgeable of the terms of the Deed of Trust?

20       A    I don't know what you're asking.

21   Expectations.  It's such a broad term.

22            What are you getting at?

23       Q    Of the terms.

24       A    What are you getting at?  You're not --

25   you're not understandable.

Page  42

1        Q      Okay.   The -- let's look at Defendant's

2    Exhibit No. 2.   I believe that's the Deed of Trust.

3    And let's also pull Defendant's Exhibit No. 1, which is

4    the Adjustable Rate Note.

5            Let's look at the Adjustable Rate Note first.

6    Let's look at Paragraph 1, "Borrower's Promise to Pay."

7    The document states that you promise to pay $905,000

8    back to the lender; is that correct?

9            MS. STROMEYER:   Objection.   The document

10   speaks for itself.

11   BY MR. GADDIS:

12       Q    My question is, you have a $905,000 note and

13   Deed of Trust.

14           Did you have any expectations as to the

15   amount, the principle amount, on a modified mortgage?

16       A    No.

17       Q    Let's look at Paragraph No. 2 under

18   "Interest."

19           The document states that there's an initial

20   fixed interest rate of 7.250 percent.

21           My question is, did you have any expectations

22   as to an interest rate --

23       A    No.

24       Q    -- for a modified mortgage?

25       A    No.

Page 43

1        Q    Let's look at Paragraph -- excuse me,

2    Section 3B.

3            It states that the initial monthly payment

4    under your 2006 adjustable rate note would be

5    $2,740.57.

6            My question is, did you have any expectations

7    as to an estimated monthly mortgage payment for any

8    modified mortgage?

9        A    No.

10       Q    Let's stay under Section 3, go to 3A.

11           It states that the maturity date under your

12   Adjustable Rate Note is November 1, 2046.

13           My question is, did you have any expectation

14   as to a maturity date under a modified mortgage note?

15       A    No.

16       Q    Do you recall in May of 2010 what your

17   obligated monthly mortgage payments were under the 2006

18   Deed of Trust?

19       A    No.

20       Q    Doctor, if you had no expectations of what

21   terms would be agreeable under the modified Deed of

22   Trust, how would you be able to judge what you could

23   could afford under a modified Deed of Trust?

24       A    What are you asking me?

25       Q    Do you not understand that question?

                                            Page  44

1          A      I do not understand your question.

2          Q      You had no expectations --

3          A      Can you not use expectations.

4          Q      What about that term do you find confusing?

5          A      It's such a broad term, I don't know what

6     you're asking me.

7          Q      I believe you do, Doctor.

8          A      No, I don't.

9          Q      Okay.  I'll try and come up with a better

10    term.

11         A      Use a synonym.

12         Q      Well, I'm probably not as bright as you, so

13    it takes me a moment to come up with something, so hold

14    on please.

15         A      That's rather hostile.

16              MS. STROMEYER:  Is now a good time for a

17    break because I can use a restroom --

18              MR. GADDIS:  Yes.

19              (Short Break Taken.)

20    BY MR. GADDIS:

21         Q      Doctor, my question is, how could you know if

22    an offered modified loan would be agreeable in terms of

23    your ability to repay that loan if you were unaware of

24    the original terms of the Deed of Trust?

25              MS. STROMEYER:  Objection.  Compound.  Lacks

Page 45

```
 1    foundation.
 2    BY MR. GADDIS:
 3         Q    Do you understand my question?
 4         A    No.
 5         Q    When Tim told you -- excuse me.
 6              When Mr. Tim Halloran told you the terms as
 7    offered under the proposed modified mortgage, how did
 8    you know if you were going to be able to abide by those
 9    new terms and make timely monthly payments?
10              MS. STROMEYER:  Objection.  Assumes facts not
11    in evidence.  Lacks foundation.
12    BY MR. GADDIS:
13         Q    Do you understand my question?
14         A    Are you asking me what my salary is?
15         Q    No.  We'll get to that.
16              I'm asking if you had any ability to
17    understand the proposed modified terms.
18         A    The -- if somebody handed me a piece of paper
19    that's saying this is the loan amount you have to pay,
20    I know what my salary is, and I know what I can pay.
21         Q    Okay.  Did you make that determination when
22    Tim told you the terms -- the proposed terms under the
23    alleged modification?
24         A    Do I know what my salary is and what I can
25    cover?  Yeah.
```

Page 46

1    Q    That's not what my question was.

2    A    Then you're going to have to restate the

3    question.

4    Q    Okay.

5    A    Because I don't understand it.

6    Q    When Tim told you those terms, did you --

7    A    Are you talking about this -- these terms?

8    Q    No, that's fine.  Let me be more precise.

9         Let's look at the letter dated April 22nd,

10   2011.  I believe it's Exhibit 3 -- no, excuse me.  Yes,

11   Exhibit 3 to the complaint.

12        Do you see where it lists terms?

13   A    Yes.

14   Q    Knowing your salary as you did in April 2011,

15   did you make the determination that, under these terms,

16   this was going to be a modified mortgage loan that you

17   could afford to make payments on?

18   A    Yes.

19   Q    Thank you.

20        That was based -- excuse me.

21        Was that based purely off your salary?

22   A    The family income.

23   Q    The family income.

24        What would be included in the title family

25   income?

Page 47

1      A      The two jobs I have to work to keep things

2  going and my husband's retirement.

3      Q      Your husband's retirement.

4              Do you recall what the salary of the first

5  job would be?

6      A      No, not off the top of my head.

7      Q      Can you ballpark it for me?

8      A      About a hundred thousand.

9      Q      Would that be your position with -- I'm

10  sorry, I forget the hospital you're with.

11      A      No, I'm not with a hospital; I'm with a

12  private office.

13      Q      With a private office, okay.

14              What's the name of that office, Doctor?

15      A      Pediatric Medical Group of San Francisco.

16      Q      That's what I thought.  I apologize for not

17  remembering.

18              So the hundred thousand --

19      A      Approximately.

20      Q      Approximately would be your salary with

21  Pediatric Medical Group of San Francisco.

22              What's the title of your second position?

23      A      I'm still an M.D. It's Pediatric Referral

24  Group.

25      Q      Can you describe some of your

                                              Page 48

1    responsibilities with the Pediatric -- I'm sorry, is it

2    Association of San Francisco?

3        A    No.   Pediatric Medical Group of

4    San Francisco.

5        Q    Excuse me.

6        A    I'm a doctor.

7        Q    You're a doctor.

8            Does that mean you receive patients, treat

9    patients?

10        A    Yes.

11        Q    How does that differ from -- or it may not.

12            Can you describe some of your duties with the

13    Pediatric Referral Group.

14        A    I see patients.

15        Q    You see patients.

16            Is it a similar practice as to your practice

17    with Pediatric Medical Group of San Francisco?

18        A    No, it's an after-hours group.

19        Q    Okay.   And do you recall ballpark about what

20    your salary was with that medical group?

21        A    There is no salary; it's hourly.

22        Q    Okay.   What do you make an hour?

23        A    Seventy-five dollars.

24        Q    Approximately how many hours a week do you

25    work at the Pediatric Referral?

                                        Page 49

1          A       It varies depending on shifts.  I can't

2    estimate.

3          Q       You can't estimate, okay.  Is it 5 to 30

4    hours?

5          A       No.  It depends on when they need

6    pediatricians.  We call it a moonlighting job.

7          Q       Moonlighting job.

8                  Do you recall -- and if you don't recall,

9    that's fine -- can you say approximately how many days

10   a week you do that?

11         A       I -- it isn't days per week.

12         Q       What would that be?  Sorry.

13         A       It's -- it's nights, it's evenings.  And

14   sometimes it's once a month; sometimes it's once every

15   two months; sometimes it's twice a week.  So it varies

16   depending on the need.

17         Q       Okay.  So those are the two positions of

18   employment that you currently hold.

19                 Did you hold these positions of employment in

20   April of 2011, as well?

21         A       Yes.

22         Q       And there was another consideration of the

23   family income, correct?

24         A       Yes.

25         Q       What was that third consideration?

Page 50

```
 1        A     My husband's retirement.

 2        Q     This would be his pension --

 3        A     Yes.

 4        Q     -- is that correct?

 5              And do you recall what his pension amount is?

 6        A     I don't know what the yearly amount is.  I

 7   don't have it in here.  It's about -- I want to say

 8   about 3200 a month.  And I could be wrong on specifics.

 9        Q     That's fine.

10              MR. GADDIS:  I'm going to offer as

11   Defendant's 9 a letter from Mr. Timothy J. Halloran to

12   the Loss Mitigation Department dated August 24th, 2010.

13   This letter is Bates stamped WARD 000020 through WARD

14   000035.

15              (Deposition Exhibit 9 was marked for

16              identification by the court reporter.)

17              THE WITNESS:  I can't read what it says

18   except for, "Please be aware."  I have no idea what it

19   says.

20              MR. GADDIS:  I understand.  It's hard for me

21   to read, as well.

22        Q     So the title page, the first full paragraph

23   reads, "Enclosed please find the request for loan

24   modification of Bernard Ward and Colleen Halloran.  I

25   have also attached a copy of the legal authorization
```

Page 51

1    for negotiation on behalf of my clients in this regard.

2    Please respond as soon as possible so that we may

3    discuss the potential loan modification.

4            Very truly yours, Timothy J. Halloran."

5            Do I read that correctly, Doctor?

6    A    Yes.

7    Q    Do you recall Mr. Halloran sending this

8    packet to the Loss Mitigation Department on your

9    behalf?

10   A    No.

11   Q    If you could turn to WARD 000022.

12           I know it's difficult to read, but if we can

13   look at the first block, and the very last section of

14   that block.

15           Do you see where it's handwritten with some

16   additional type?

17   A    I can't read it.

18   Q    Yeah, I'm sorry.  It's terrible.

19           It states, "If there are additional

20   liens/mortgages or judgments on this property, please

21   name persons, company or firm and their telephone

22   numbers."

23           And it looks like someone has handwritten in

24   number one, "Chase Second Mortgage, $58,000."

25           Do you see that?

Page 52

1       A    It could be.

2       Q    Do you see right below that, where it's

3    number two, and it states, "Lien, $100,000 from U.S.

4    District Court as bail for Bernard Ward"?

5            Do you see that, Doctor?

6       A    Yes.

7       Q    So these are the additional liens as of

8    filing -- I should say as of the submission of this

9    letter encumbering the subject property?

10           MS. STROMEYER:  Objection.  Lacks foundation.

11           Did you fill this out?

12           THE WITNESS:  It looks like it could be my

13    handwriting, but I really can't read it.

14    BY MR. GADDIS:

15       Q    Do you recall filling a modification packet

16    out?

17       A    I do recall.

18       Q    Okay.  There's some more handwriting on 23,

19    if you could review that.

20           Is that your handwriting?

21       A    I -- I do -- I can identify the bottom part

22    here.  I can recall writing this.  This is cut off.  So

23    I don't know what that says.

24       Q    After because of, that becomes illegible?

25       A    And I can't read any of this stuff.

                                            Page 53

1      Q      Are you able to discern if this is your

2    handwriting, Doctor?

3      A      This is my handwriting.  I don't know about

4    this.

5            MS. STROMEYER:  By this, you mean the top

6    portion?

7            THE WITNESS:  The top portion.

8            MS. STROMEYER:  Just for the record.

9            MR. GADDIS:  Fine, thank you.

10     Q      And if you could turn to Ward 27.

11            Do you see the signature line, Doctor?

12     A      That I can read.

13     Q      Okay.  Can you please read that into the

14    record.

15     A      Colleen M. Halloran, Power of Attorney for

16    Bernard V. Ward.  Colleen M Halloran, 8 something 10.

17     Q      Okay.  So that is your signature as Power of

18    Attorney for Mr. Ward under Borrower's signature block.

19    And then again, is that your signature under

20    Co-Borrower signature block?

21     A      Yes.

22     Q      If you could turn to Ward Number 31, please.

23            Can you identify that for the record?

24     A      It looks like a pay stub.

25     Q      Is that a pay stub from the Pediatric Medical

Page 54

1    Group?

2        A    Yeah.  I think so.  Yeah, it says it right

3    here.

4        Q    There we go, thank you.

5             And does it give a basic -- excuse me -- a

6    pay rate?  Does it identify pay rate?

7        A    It identifies gross.

8        Q    Does it identify a net pay?

9        A    3189 net pay.

10       Q    $3,189.94; is that correct, Doctor?

11       A    Correct.

12       Q    So as of August 2010, that's your net pay,

13   looks to be a bi-monthly pay schedule; is that correct?

14       A    That's correct.  There's been a pay raise

15   since then, but yeah.

16       Q    Do you recall what that raise is?

17       A    No.

18       Q    Is it a couple hundred dollars raise or a

19   substantial thousand dollars raise?

20       A    I don't recall.

21       Q    Don't recall, that's fine.

22            MR. GADDIS:  I'd like to offer Defendant's

23   10, a letter dated September 9th, 2010 from Timothy

24   Halloran to the Loss Mitigation Department identified

25   as WARD 000087 through WARD 000088.

Page 55

```
 1                (Deposition Exhibit 10 was marked for

 2                identification by the court reporter.)

 3   BY MR. GADDIS:

 4       Q    Once again, it's in small print, but, Doctor,

 5   are you able to read this document?

 6       A    All right.  What's your question?

 7            MS. STROMEYER:  Are you able to read the

 8   document?

 9            THE WITNESS:  Yes.

10   BY MR. GADDIS:

11       Q    Let's look at the first page, the last

12   paragraph, where it begins "Accordingly."

13            Do you see that, Doctor?

14       A    Yes.

15       Q    It says, "Accordingly, in order to avoid any

16   further issues or potential litigation, my client is

17   prepared to offer the following terms for resolution of

18   this issue."

19            Term Number 1, "The total outstanding

20   reinstatement balance is $31,033.93 as of September 1,

21   2010, according to your company.  My client will

22   immediately pay $6,800 of that sum, leaving a balance

23   of $24,233.93."

24            Did I read that correctly, Doctor?

25       A    Yes.
```

Page 56

1        Q    Were you aware that, in September of 2010,

2    you were $31,033.93 in arrears on your subject mortgage

3    loan?

4        A    No.

5        Q    Were you aware in September 2010 that you

6    were in arrears on your mortgage loan?

7        A    Yes.

8        Q    Let's look at Item Number 2 on the next page,

9    please.

10            "My client will continue to make monthly

11    payments of $3,400, which includes an impound for taxes

12    and insurance."

13            Did I read that correctly, Doctor?

14        A    Yes.

15        Q    Had you begun making monthly payments of

16    $3,400 prior to September 2010?

17            MS. STROMEYER:  That's a little vague.

18    Immediately prior or at some point prior?

19            MR. GADDIS:  I was going to get to that.

20            THE WITNESS:  I don't recall.

21    BY MR. GADDIS:

22        Q    You don't recall.

23            In August of 2010, do you recall making a

24    monthly mortgage payment of $3,400?

25        A    No.

Page 57

1        Q    At any time in the calendar year of 2010, do

2    you recall making a monthly mortgage payment of $3,400?

3        A    No.

4        Q    Item Number 3, please.  "My client will make

5    an additional payment of $403 per month over five years

6    to pay off the arrearages on the sum.  Totally monthly

7    payments beginning in October will be $3,808.90."

8            Did I read that correctly?

9        A    Yes.

10       Q    So at that time -- let me restate.

11           Did you believe in September of 2010 that you

12   could make monthly mortgage payments of $3,808.90 on

13   your monthly mortgage payments?

14       A    I don't remember ever seeing this.  But I

15   probably could have.

16       Q    When you say you don't remember seeing this,

17   do you mean this document, Doctor?

18       A    Yes.

19       Q    Do you recall having conversations with Tim

20   Halloran about negotiating payments so as to pay off

21   your arrears due on your monthly mortgage?

22       A    I don't recall specifically this number.

23       Q    Do you recall taking part in drafting this

24   document?

25       A    No.

Page 58

1          MR. GADDIS:  I'm going to offer as

2  Defendant's 11 a letter from Tim Halloran to the Loss

3  Mitigation Department dated November 10th, 2010

4  identified as WARD 000070 through WARD 000073.

5          (Deposition Exhibit 11 was marked for

6          identification by the court reporter.)

7  BY MR. GADDIS:

8      Q    Feel free to review if you'd like.

9          MS. STROMEYER:  Are you ready?

10          THE WITNESS:  What's the question?

11          MS. STROMEYER:  He just wants to give you

12  enough time.  So when you're ready.

13          THE WITNESS:  Yeah.

14  BY MR. GADDIS:

15      Q    First paragraph, first page reads, "Pursuant

16  to our negotiations, enclosed please find a copy of

17  payroll and pension benefit deposits."

18          Did I read that correctly, Doctor?

19      A    Yes, you did.

20      Q    Do you know what negotiations Mr. Halloran is

21  referring to here?

22      A    No.

23      Q    Had you taken part in any negotiations with

24  GMAC concerning modification of your mortgage loan?

25      A    No.

                                        Page 59

1        Q    Had Mr. Halloran spoken to you about any

2    previous negotiations?  When I say previous, I mean

3    prior to November 10th, 2010.

4        A    I don't recall.

5        Q    Let's turn to the third page.  It should be

6    Bates stamped Ward 000072, but apparently that is cut

7    off.  There is a page with no Bates stamp number.

8             Does this appear to be another pay stub from

9    the Pediatric Medical Group, Doctor?

10       A    Appears to be.

11       Q    And do you see where it identifies net pay?

12       A    Yeah.

13       Q    What's the amount under net pay, Doctor?

14       A    3357.87

15       Q    Is that your current rate of pay, or have you

16   had another increase?

17       A    I don't recall.  I don't recall exactly.

18       Q    That's fine.  And the pension benefit there

19   we've been alluding to concerning your husband,

20   Mr. Ward, is that amount identified on the second page

21   of this document under Bates stamped number WARD 71?

22       A    It doesn't give monthly.  It's year to date.

23       Q    But it's your understanding that the monthly

24   amount is approximately $3200 a month?

25       A    Approximately after they take taxes out.

Page 60

1     Q     Okay.

2     A     Or -- 32 to 34, something like that.

3     Q     Okay.  I apologize, I spoke over you.

4           Did you say 32 to 34?

5     A     Yeah.  I don't know the precise amount

6     because I changed the register in my -- in my

7     checkbook.  So I don't have the last deposit.

8     Q     That's just fine.

9           Five more minutes, and we'll break.

10          MR. GADDIS:  I'd like to offer Defendant's

11    12, a document dated November 16th, 2010.  It's a

12    letter from Timothy J. Halloran to the Loss Mitigation

13    Department.  It's identified as Ward 000080 through

14    WARD 000084.

15          (Deposition Exhibit 12 was marked for

16          identification by the court reporter.)

17    BY MR. GADDIS:

18    Q     Once again, I apologize for the small print.

19    But, Doctor, if you'd like to review this document for

20    a moment.

21    A     I can't read it.

22    Q     Do you recall submitting financial documents

23    to your brother, Tim Halloran, so that he could submit

24    a modification package to the Loss Mitigation

25    Department at GMAC?

                                        Page 61

1    A    I recall, but I don't know whether these are

2    they because I can't read them.

3    Q    I understand.

4         Did you take any part in the drafting of the

5    November 16th, 2010 letter in front of you?

6    A    No.

7    Q    To back up, did you take any part in the

8    drafting of the November 10th, 2010 letter previously

9    identified as Defendant's Exhibit 11?

10   A    No.

11   Q    Once again, I apologize if you already

12   answered, but did you take part in the drafting of the

13   September 9th, 2010 letter identified as Defendant's

14   Exhibit 10?

15   A    No.

16        MR. GADDIS:  That's a fine place to stop

17   right there.  Let's say come back at 1:15.

18        MS. STROMEYER:  Okay.

19        (Lunch Break Taken.)

20   BY MR. GADDIS:

21   Q    Let's turn to the complaint.  I believe that

22   is Defendant's Number 4.

23        And let's look at Exhibit No. 3, please.

24   It's the April 22nd, 2011 letter.

25        Now, you may have already answered this

                                              Page 62

1    question.  If you have, I apologize.  But for

2    clarification sake, the conversation that is mentioned

3    in this letter was not a conversation that you were a

4    party to is that correct, Doctor?

5         A    Correct.

6         Q    And the information that was divulged in that

7    conversation concerning your mortgage -- excuse me,

8    concerning the modification of your mortgage was a

9    conversation between loss mitigation and Timothy

10   Halloran; is that correct?

11             MS. STROMEYER:  If you know.

12             THE WITNESS:  Well, it wasn't with me.  I

13   don't know if it was with Tim.

14   BY MR. GADDIS:

15        Q    And what information did Tim convey to you

16   about that conversation?

17             MS. STROMEYER:  Objection.  May call for

18   attorney-client communications.

19             However, to the extent it involves the terms

20   of the loan, if you relied on that as a communication

21   from your mortgage holder, GMAC, you can answer the

22   question.

23             THE WITNESS:  I don't recall any specifics.

24   I -- I don't recall any specifics of the conversation.

25   I was between patients, and he called me and just said

                                          Page 63

1    they approved the modification.  So it wasn't a long

2    conversation.

3    BY MR. GADDIS:

4        Q    Okay.  Did he express any terms in that

5    conversation that you recall?

6        A    Not that I recall.

7        Q    And do you remember -- let me restate, excuse

8    me.  Did you discuss the terms of the proposed

9    modification with Mr. Halloran after he phoned you to

10   inform you that the modification had been approved?

11       A    We probably did.  I just don't remember when.

12       Q    You don't remember a conversation like that

13   at all, Doctor?

14       A    I -- I -- you know, he probably told me.  I

15   just don't remember when or what the specifics were.

16       Q    Okay.  Did Mr. Halloran -- when I say

17   Mr. Halloran, I'm referring to Tim -- did he tell you

18   what paperwork you should be expecting concerning the

19   proposed modification of your mortgage loan?

20       A    No.  Not that I recall.

21       Q    Do you have any understanding of what the

22   term the paperwork in the April 22nd, 2011 letter

23   references?

24       A    No.

25       Q    Did Tim ever tell you what they told him the

Page 64

1    paperwork would be?

2        A    I -- I really don't know.  I don't recall.

3        Q    Okay.

4             MS. STROMEYER:  Can I talk to you for a

5    second?

6             THE WITNESS:  Uh-huh.

7              (Short Break Taken.)

8             MR. GADDIS:  Can you read the last question

9    and answer back, please.

10             (Record Read.)

11             MR. GADDIS:  Thank you.

12             THE WITNESS:  Can I go back for just a

13    second?

14             MR. GADDIS:  Of course.

15             THE WITNESS:  Although I don't remember a

16    specific conversation, he said there would be paperwork

17    coming, which I would assume to be something from the

18    company saying how much the mortgage was going to be,

19    what the terms were.

20             MR. GADDIS:  Okay.

21             THE WITNESS:  I don't remember specifically

22    when he told me that.  And I can't tell you exactly

23    what he told me.  But I was expecting papers confirming

24    the new contract.

25        Q    Okay.  I understand.  And feel free, if you

                                            Page 65

1    feel like you need to amend an answer, give a fuller

2    answer to any question I ask, just let me know, and we

3    can always go back on the record and correct it.  Don't

4    feel like you're stuck with your first answer.

5            Let's look at Paragraph 28 of the complaint,

6    please.  That's Page 5.  It reads, "On or about

7    April 28th, 2011, GMAC sent the paperwork --

8        A    Where are you?

9        Q    I'm sorry.  Paragraph 28 --

10       A    Okay.

11       Q    -- start over.

12           "On or about April 28th, 2011, GMAC sent the

13   paperwork to Plaintiffs' counsel via United States mail

14   in the form of a letter confirming that the traditional

15   permanent loan modifiation was approved on April 21,

16   2011, with an effective date of May 1, 2011."

17           Did I read that first sentence correctly,

18   Doctor?

19       A    Yeah.

20       Q    So from your allegation, you believed the

21   letter dated April 28th, 2011 from GMAC and attached as

22   Exhibit 5 to your complaint to be the paperwork that

23   was referenced in Mr. Halloran's April 22nd letter?

24           MS. STROMEYER:  Objection.  Assumes facts not

25   in evidence.  Lacks foundation.  She wasn't the author

Page 66

1    of Mr. Halloran's letter and doesn't know what

2    Mr. Halloran meant by the paperwork, and she's already

3    testified to that effect.

4    BY MR. GADDIS:

5        Q    Doctor, to the extent you're alleging in

6    Paragraph 28 that that is, in fact, the paperwork?

7            MS. STROMEYER:  Again, just because the word

8    paperwork is used in two different places, that doesn't

9    necessarily mean it means the same thing.  She doesn't

10    know what Mr. Halloran meant, and she's already

11    testified to that effect.

12            Have you reviewed that?

13            THE WITNESS:  Yes, I've read that.

14            MS. STROMEYER:  Okay.

15    BY MR. GADDIS:

16        Q    And my question, Doctor, is it your

17    understanding that this letter is, in fact, the

18    paperwork as referenced in April 22nd, 2011 letter from

19    Mr. Halloran?

20        A    I'm not really sure what paperwork GMAC was

21    talking about, but that's the only paperwork that I

22    saw.

23        Q    Okay.  And it's also your allegation that

24    this, in fact, is the loan modification agreement, this

25    April 28th, 2011 letter; is that true?

                                            Page 67

1         A     It sure looks like it to me.

2         Q     So this, in your mind, was the paperwork that

3    you were expecting from GMAC regarding the modification

4    agreement concerning your mortgage loan?

5              MS. STROMEYER:  Objection.  Misstates her

6    testimony.

7              THE WITNESS:  I don't know what paperwork was

8    alluded to here.  The only paperwork I saw was that

9    letter.

10   BY MR. GADDIS:

11        Q     Is there a signature on the April 22nd, 2011

12   letter?

13             MS. STROMEYER:  That's Exhibit 5?

14             MR. GADDIS:  Yes, ma'am.

15             THE WITNESS:  Where is that?  Is there a

16   signature on it?

17   BY MR. GADDIS:

18        Q     Uh-huh.

19        A     There are two initials.

20        Q     What do those initials read, please?

21        A     DC.

22        Q     Do you have any idea who DC is?

23        A     I didn't write the letter.  I don't know who

24   DC is.

25        Q     Okay.  Is your signature on this letter

                                        Page 68

1    anywhere?

2        A    No.

3        Q    Is Mr. Ward's signature on this letter

4    anywhere?

5        A    No.

6        Q    Is Mr. Halloran -- Mr. Timothy J. Halloran's

7    signature on this letter anywhere?

8        A    No.

9        Q    Let's go back to Exhibit 3 quickly, please.

10       A    Does that --

11       Q    Is your signature on this document?

12       A    No.

13       Q    Is Mr. Ward's signature on this document?

14       A    No.

15       Q    Who is the only signature that you see on

16   this document?

17       A    Timothy Halloran.

18       Q    And this April 22nd, 2011 letter, did you

19   take any part in drafting this letter?

20       A    No.

21       Q    Did you know that Mr. Halloran was sending

22   this letter off on your behalf?

23       A    I knew he was going to send a letter off.  I

24   did not type it.  I did not preapprove it.  I did not

25   proofread it.  I knew he was going to send a letter.

Page 69

1        Q    I understand.

2             Sorry to keep flipping back and forth on you,

3    but if we could go back to Exhibit 5.

4             Do you see any term referenced in this

5    document as to the maturity date of your mortgage loan?

6        A    No.

7        Q    Do you see any term in this document

8    referencing the modified principle under a modified

9    mortgage loan?

10       A    It says it includes the principle and

11   interest.

12       Q    Now, correct me if I read this wrong, but as

13   indicated -- let me start over.  This is the second

14   full sentence of the second full paragraph, which

15   reads, "As indicated in your correspondence, the

16   scheduled monthly payment of $3,253.24 includes the

17   principle and interest payment being $2,678.12."

18            Is that correct?

19       A    That's correct.

20       Q    Is that what you're alluding to when you say

21   includes the principle and interest?

22       A    That's what the sentence reads.

23       Q    My question was, do you see anything that

24   references a modified principle in this document?

25       A    It doesn't modify -- it says, it includes the

Page 70

1    principle and interest payment being $2,678.12.

2        Q    Do you understand what I'm asking when I

3    reference to a modified principle amount?  I'm

4    referring to the principle amount of the entire loan.

5        A    No.

6        Q    You don't understand that, or you don't see

7    it in here?

8        A    Why would it be in here?  It's telling me

9    what my payment is supposed to be with interest and

10    principle.

11        Q    Are you --

12        A    The loan amount hasn't changed.

13        Q    How do you know that?

14        A    Because you --

15        Q    It modifies your mortgage loan, correct?

16        A    Because you alluded to, in one of your other

17    documents, what the principle was.

18        Q    This is the modified agreement per your

19    allegations, correct?

20        A    Correct.

21        Q    I'm asking, is there a principle amount

22    identified in this modified agreement?

23        A    There is a principle.  The principle --

24    $3,253.24 includes the principle and interest payment.

25    It says right here principle.

Page  71

1        Q    Okay.  So it's your understanding from this

2    document that the principle amount on your modified

3    mortgage loan is $3,253.24?

4        A    Correct.

5        Q    Is that correct?

6             MR. GADDIS:  Counselor?

7             MS. STROMEYER:  I'm going to object because I

8    feel like you're using these terms in different ways.

9    And that misstates the testimony.

10            He's using a term of art -- not a term of

11   art, but the total principle amount for the loan.

12            MR. GADDIS:  If you have an objection, please

13   make it.  Please don't instruct.

14            MS. STROMEYER:  Can you read back the

15   question again.

16   BY MR. GADDIS:

17            "Q    Do you understand what I'm asking

18        when I reference to the modified principle

19        amount?  I'm referring to the principle amount

20        of the entire loan.

21            "A    No.

22            "Q    You don't understand that or you

23        don't see it in here?

24            "A    Why would it be in here?  It's

25        telling me what my payment is supposed to be

Page 72

1          with interest and principle.

2              We talk over each other here for a second.

3          "Q    This is the modified agreement per

4      your allegations, correct?

5          "A    Correct.

6          "Q    I'm asking, is there a principle

7      amount identified in this modified agreement?

8          "A    There is a principle.  The principle

9      of $3,253.24 includes the principle and

10     interest payment.  It says right here

11     principle.

12              After having read that, I'll ask one more

13     time and try to be as clear as possible, do you see the

14     total amount of the modified principle identified in

15     the April 28th, 2011 letter?

16         A    It's not a very well-written letter, but I

17     imagine if that question was in my mind, I could have

18     called 1-800-850-4622.  But it looked to me that this

19     was the new agreement.

20         Q    I understand that.

21              And so is it your testimony that the

22     principle as identified is $3,253.24?

23         A    This was all the information I needed to

24     believe that this was a valid contract.

25         Q    Okay.  My question was, is it your testimony

Page  73

1    that you believe the principle of your modified

2    mortgage loan to be $3,254.24?

3        A    That would be a monthly.

4        Q    Okay.  Do you see a modified principle amount

5    in this document?

6        A    I didn't write the document.

7        Q    Ma'am, I'm asking if you see it.  Is it

8    identified in this document?

9        A    I didn't think it was important.  I don't --

10    I don't believe it's important.  I believe that this

11    told me that this was what my new payment was going to

12    be.

13        Q    Uh-huh.

14        A    I believe that they wrote this in good faith

15    and that I was going to be acting in good faith making

16    the payments until my home was paid for.

17        Q    But how would you be able to tell when your

18    home was paid for if you had no idea what the total

19    amount of the principle was on the modified mortgage?

20        A    Are you calling me stupid?

21        Q    No, I'm asking you a question, ma'am.

22        A    I don't know.

23        Q    Okay.  Outside of the statement, an effective

24    due date of May 1, 2011, do you see -- excuse me, let

25    me restate.

Page  74

1          Outside of the identified effective date of

2    the alleged modification, do you see any payment due

3    dates as identified in this April 28th, 2011 letter?

4          A     This --

5                MS. STROMEYER:  Objection as to payment due

6    dates.  Vague and ambiguous.

7    BY MR. GADDIS:

8          Q     Do you understand my question, Doctor?

9          A     I would assume that it's due the 1st of every

10   month.  Because the first one is due May 1st, 2011.

11         Q     That's your assumption based off of this

12   letter, correct?

13         A     That's my understanding from this verbiage.

14         Q     Okay.

15         Q     But you would not know for sure based off the

16   verbiage from this letter; is that correct?

17         A     Oh, I've never had a -- a lender that changed

18   due dates month to month.  So I would assume that this

19   was the permanent date, the 1st of every month.

20         Q     And you've had mortgage loans before,

21   correct?

22         A     Correct.

23         Q     Correct.  This is not your first mortgage

24   loan, correct?

25         A     No, it's not our first mortgage loan.

                                             Page  75

1      Q      Is this your first attempt to modify a

2  mortgage loan?

3      A      It's my first attempt, yeah.

4      Q      Are you alleging that this was not Mr. Ward's

5  first attempt?

6      A      I don't know if he's ever done it before.

7      Q      Being experienced -- or having previous

8  experience with mortgage loans, do you believe that

9  this April 28th, 2011 letter identifies all the

10 necessary terms for you to understand exactly what the

11 modification agreement would be between you and GMAC?

12     A      Gosh.  As a doctor, I trust that -- and

13 perhaps it's not realistic -- I trust that people are

14 being honest with me.  I'm not a banker, I'm not a

15 lawyer.

16            This, to me, honestly says these are the

17 terms of your negotiation to redo the payments.  If I'm

18 lied to, I don't know.  If they lied, I don't know.

19 But this to me says, the deal is done.

20     Q      Okay.  This to you says the deal is done even

21 though you never signed a modification agreement; is

22 that correct?

23     A      This to me says --

24     Q      That was not my question, ma'am.  Ma'am,

25 there's -- okay.  I thought you were walking out.

Page 76

1          Do you want me to have the question read

2     back?

3        A    You didn't finish it.

4        Q    My question is --

5          MR. GADDIS:  Actually, I need to have the

6     question read back.  Can you read back what my question

7     was.

8            (Record Read.)

9          THE WITNESS:  This says the deal is done.

10    BY MR. GADDIS:

11       Q    And my question was, have you ever had a

12    contract that you did not sign?

13       A    Have I ever had a contract that I haven't

14    signed?

15       Q    Let me restate.  Have you had a mortgage loan

16    contract that you have not put your signature to?

17          Are you referring to Defendant's 2, the Deed

18    of Trust.

19       A    (Witness nods head.)

20       Q    Let's go ahead and look at that one.

21          Dr. Halloran, is that your signature --

22       A    Oh, that's not the right one.  It's the other

23    one.  Where's the other one?

24       Q    You're referring to the Adjustable Rate Note

25    with Mr. Ward's signature; is that correct?

1          And this is Defendant's 1, Adjustable Rate

2     Note.

3          Do you have Power of Attorney over Mr. Ward?

4     A     I didn't then.

5     Q     I'm asking, do you have Power of Attorney

6     over Mr. Ward concerning modification of the 2006 Deed

7     of Trust?

8     A     Yes.

9     Q     As such, all negotiations were made on your

10    behalf through Mr. Ward; is that correct?

11    A     Through Mr. Ward?

12         MS. STROMEYER:  Objection.  Doesn't make

13    sense.

14         MR. GADDIS:  Sure.

15    Q     All negotiations between Mr. Halloran and

16    GMAC to modify the 2006 Deed of Trust were made to

17    Mr. Halloran based off of your Power of Attorney over

18    Mr. Ward; is that correct?

19         MS. STROMEYER:  Read it back.  I think he

20    swapped a name.

21         (Record Read.)

22         MS. STROMEYER:  I feel like that -- I don't

23    know.  That question to me is --

24    BY MR. GADDIS:

25    Q     Do you understand my question, Doctor?

Page 78

1        A    I mean, I understand English, I just don't

2    understand your question.

3        Q    My question is -- you're right.  I should

4    say, the statement is you're right, you were not a

5    signatory on the Adjustable Rate Note, Mr. Ward is.

6             You were attempting to modify the 2006 note

7    and Deed of Trust.  The only way that GMAC could

8    possibly have communications with you about modifying

9    the 2006 adjustable rate note is if you had Power of

10   Attorney over Mr. Ward.

11            You submitted that Power of Attorney through

12   your attorney, Tim Halloran, so that he could negotiate

13   modification of the 2006 Deed of Trust and note on your

14   behalf.  Otherwise, you cannot talk to --

15       A    Where is your question?

16   BY MR. GADDIS:

17       Q    -- GMAC.

18       A    Where is your question?

19       Q    My question is, you have Power of Attorney

20   over Mr. Ward?

21       A    Yes.

22       Q    You have a third authority through that Power

23   of Attorney to modify the mortgage; is that correct?

24       A    Yes.

25       Q    My question is, why is your signature not on

Page 79

1    a single document concerning modification of the

2    $900,000 Deed of Trust at issue?

3        A    The -- you're bringing up the principle.  I

4    never saw that.  You're telling me that it's not here.

5    I don't know that that's still the price.

6        Q    No, we've made that clear.  You have no idea

7    what the principle under the modified mortgage is,

8    that's correct.

9            Under the original 2006 Deed of Trust, the

10   principle amount --

11       A    At that point in time, I had no Power of

12   Attorney over my husband.

13           MS. STROMEYER:  Let him finish his question.

14   There's no question pending, so why don't you let him

15   finish his question.

16   BY MR. GADDIS:

17       Q    You were asking how I know what the principle

18   amount is, it's because it's identified in the 2006

19   Deed of Trust, which you did sign.

20       A    But that's not what you were asking.  You

21   were asking about the modification sheet.

22       Q    Yes.  And there's no principle identified

23   there, is there?

24       A    You answered your own question.

25       Q    I asked you a question.

Page 80

```
1              Is there a principle identified in the
2     April 28th --
3          A    There is a word called principle right there.
4          Q    Okay.  Okay.
5              Did you and Mr. Halloran have any
6     conversation about these terms as identified in the
7     April 28th, 2011 letter?
8              MS. STROMEYER:  Objection.  May call for
9     attorney-client conversation.  It's incredibly broad
10    saying any conversation about the terms.  I mean, we're
11    in litigation about the terms; we've been having
12    conversations for months.
13    BY MR. GADDIS:
14         Q    Do you understand my question, Doctor?
15         A    I understand.  But I don't think it's
16    something I should answer.
17             MR. GADDIS:  And I want this actually to be
18    on the record.  We believe that communications between
19    Mr. Halloran and Dr. Ward are significant --
20             THE WITNESS:  I'm Dr. Halloran.
21             MR. GADDIS:  Oh, excuse me.  You're right.  I
22    apologize.
23             Between Tim Halloran and Dr. Halloran are of
24    significance because, as she stated earlier, she has
25    never communicated with GMAC regarding modification of
```

Page 81

```
1    this GMAC loan.  All communications were made from Tim
2    Halloran to GMAC and from GMAC to Tim Halloran.
3              We need to know what those conversations
4    contained in order to determine what she thought she
5    was signing -- actually, not signing, she didn't sign
6    anything.
7              What Dr. Ward believed --
8              THE WITNESS:  Dr. Halloran.
9              MR. GADDIS:  I apologize, excuse me.
10             Dr. Halloran believed the modified terms to
11   be --
12             THE WITNESS:  This is what I believed.
13             MR. GADDIS:  I understand.
14             That's why we want to know exactly what was
15   communicated from Tim Halloran to Dr. Halloran.
16             Are you claiming that those communications
17   are privileged, as well?
18             MS. STROMEYER:  I mean, it depends -- you're
19   asking me whether or not attorney-client privilege is
20   going to be asserted for every communication between
21   Dr. Halloran and Tim Halloran regarding the terms of
22   the loan contract?
23             MR. GADDIS:  Not just the terms but just also
24   what was going on here.  The negotiations back and
25   forth.  Tim Halloran uses the term negotiation several
```

Page 82

1   times in the letters that we've already put into

2   evidence.

3         MS. STROMEYER:  Uh-huh.

4         MR. GADDIS:  And she was not party to those

5   negotiations nor a drafter of those letters or privy to

6   conversations between GMAC and Mr. Halloran.

7         MS. STROMEYER:  You're not entitled to the

8   reasons behind an attorney's negotiations, why they put

9   forth certain provisions.  She provided information to

10  him in confidence as part of this loan modification.

11  And those are attorney-client communications.

12        MR. GADDIS:  Okay.  I state this because --

13  no.  I understand your statement.  Okay.  We'll just

14  leave it as that.

15   Q    Dr. Halloran, is it your testimony that your

16  entire understanding of the alleged modification of

17  your permanent mortgage loan is contained in the

18  April 28th, 2011 letter?

19   A    It was the 22nd, wasn't it?  22nd.

20   Q    The 22nd is the letter where Tim Halloran is

21  allegedly confirming conversation that he had with a

22  GMAC employee, which you were not privy to.

23   A    So what is your question?

24   Q    Is it your testimony that the entire -- that

25  your entire understanding of the alleged modification

                                          Page 83

1    of your mortgage loan is contained in the April 28th,

2    2011 letter?

3         A    Yeah, that's my understanding.

4         Q    Okay.

5              MR. GADDIS:  Off the record real quick.

6              (Short Break Taken.)

7    BY MR. GADDIS:

8         Q    Dr. Halloran, it is your understanding that

9    you were approved in April of 2011 for a loan

10   modification; is that correct?

11        A    Correct.

12             MR. GADDIS:  I'm going to present Defendant's

13   13.  It is a document with Porter, Michael - TX at the

14   very top.  It is WARD 000041 through 000042.

15             (Deposition Exhibit 13 was marked for

16             identification by the court reporter.)

17   BY MR. GADDIS:

18        Q    Dr. Halloran, have you seen this document

19   before?

20        A    No.

21        Q    Under -- I should say at the very top, where

22   it says sent.

23             Do you see that section?

24        A    Uh-huh.

25        Q    What is that date?

Page 84

1          A     April 7, 2011.

2          Q     And I'm going to read the very top of this

3     document.  It says "Hello, Michael."

4                It looks like it should say office.

5                "Is pleased to advise you that your loan

6     modification request is approved as follows."

7                Did I read that correctly?

8          A     Yes.

9          Q     Is there a section for terms in this

10    document?

11         A     Yes.

12         Q     And under the column Modified/New, what is

13    that figure under the Modified/New column?

14         A     $1,129,853.88.

15         Q     And is there a row identified as Interest

16    Rate?

17         A     Yes.

18         Q     And under the Modified/New column, what are

19    the identified interest rates?

20         A     2.875, 3.875, 4.86.

21         Q     Is there a -- the very last row reads,

22    "Modification Effective Date"; is that correct?

23         A     That's correct.

24         Q     And what is the identified date?

25         A     4/1/2011.

Page 85

 1      Q      If we could turn to Exhibit 3 again, please.

 2             Let me change that.  Let's turn to Exhibit 5,

 3      sorry.  Of the complaint.  Excuse me.  I believe it's

 4      Defendant's 4, Exhibit 5.

 5             What's the identified effective date in this

 6      document, Dr. Halloran?

 7      A      Once again, May 1st, 2011.

 8      Q      Is that the same effective date as identified

 9      in Defendant's Exhibit 13?

10      A      What is this?

11             MS. STROMEYER:  I'm going to object in that

12      it lacks foundation.  I don't know that there's --

13      BY MR. GADDIS:

14      Q      Do you understand my question?

15      A      I don't understand why I'm looking at this.

16      It's not mine.

17      Q      No, you did not draft this document.

18             Is the identified modification effective date

19      the same as the identified modification date in the

20      April 28th, 2011 letter?

21      A      Well, this says April 1st, and this says

22      April 28th, so they can't be the same.

23      Q      Let me clarify.  The modification effective

24      date on Defendant's Exhibit  13 is identified as

25      April 1st, 2011, correct?

                                              Page 86

1          A       Correct.

2          Q       Okay.  And you have never seen this document

3     before?

4          A       It's to somebody named Michael Porter, who I

5     don't know.

6          Q       Okay.  Your counsel has not shown you this

7     document?

8          A       I don't believe I've ever seen it.

9          Q       Okay.  Were you aware that those were the

10    terms that you were approved for concerning your

11    modification?

12              MS. STROMEYER:  Objection.  Lacks foundation.

13    Assumes facts not in evidence.

14              You can answer.

15              THE WITNESS:  Well, it's written by Deborah

16    Curry, and it went to Michael Porter.  Nowhere here is

17    it sent to Colleen Halloran.

18    BY MR. GADDIS:

19         Q       So your answer would be?

20         A       Nowhere on here is it written to Tim

21    Halloran.

22              So how can my counsel have shown it to me?

23         Q       This was actually produced to your counsel at

24    a date post filing of your complaint.

25              Your counsel has not shown you that document,

Page  87

1    correct?

2        A    I've not seen -- I've never seen this.

3        Q    Okay.

4        A    I don't know who Deborah Curry is.  I don't

5    know who Michael Porter is.

6        Q    Okay.  So you're not aware of those approved

7    loan modification terms.

8            Are you aware of the approved modification

9    terms presented to your counsel in August -- excuse me,

10    on August 15, 2011?

11            MS. STROMEYER:  I'm going to object that it

12    misstates her testimony.  Her testimony was not that

13    she was aware that she was approved for this.  Her

14    testimony was that she was not aware of this document,

15    and she doesn't know what this document is.  I believe

16    that was her testimony.  And I'm also going to object

17    that that lacks foundation.

18            Go ahead.  You can answer.

19            THE WITNESS:  I've never seen this before.

20            MS. STROMEYER:  That wasn't his question.

21    BY MR. GADDIS:

22        Q    My question is, are you aware that you were

23    approved under certain terms in August 2011 to modify

24    your mortgage?

25        A    Under certain terms?

                                        Page 88

1        Q       Yes.

2        A       Verify.

3        Q       Were you aware that another offer -- a

4    modification offer -- had been presented to you on

5    August 15, 2011, to modify your mortgage?

6        A       Is there a document of that?

7        Q       Yes, there is a document of that.

8            MR. GADDIS:  As Defendant's 14, this is an

9    e-mail from Clayton Gaddis to Karen Stromeyer dated

10   Monday, August 15th, 2011.  It is not Bates stamped.

11            (Deposition Exhibit 14 was marked for

12            identification by the court reporter.)

13            THE WITNESS:  I don't remember.

14   BY MR. GADDIS:

15       Q       Do you recall having these terms presented to

16   you --

17       A       I don't remember.

18       Q       -- by your counsel?

19            MS. STROMEYER:  I'm going to object that this

20   may get into attorney-client communications.

21            THE WITNESS:  I don't remember.

22   BY MR. GADDIS:

23       Q       You don't remember.

24            You don't recall being offered these terms to

25   modify your mortgage loan; is that correct?

                                          Page 89

1         A      I just answered that.  I don't remember.

2         Q      Okay.  Do you recall having conversations --

3    not the content of conversations, but having

4    conversations with your counsel about this August 2011

5    modification offer?

6         A      I don't remember.

7         Q      What do you recall concerning the

8    modification efforts of your 2006 Deed of Trust,

9    Doctor?

10        A      What specifically are you asking?

11        Q      I'm asking because you don't recall an August

12   communication concerning modification efforts of your

13   mortgage loan --

14            MS. STROMEYER:  I'm going to object to your

15   characterization of these as modifications.  This was

16   presented to Counsel as a settlement offer.

17            MR. GADDIS:  Yes.

18            MS. STROMEYER:  And that's how it was

19   communicated to the plaintiff.  So to that extent, your

20   characterization, I think, mischaracterizes this

21   document and what it was.

22            So to the extent --

23            MR. GADDIS:  This document is identifying the

24   terms that Dr. Halloran's mortgage loan was approved on

25   the modified in August 2011.  And she is unaware of

Page 90

```
 1    these approved modification terms.
 2         Q    Is that correct?
 3         A    Are you asking me or Karen?
 4         Q    No, that was directed at you, Doctor.
 5         A    You're throwing things at me.  I don't -- I
 6    don't have -- I don't have a memory of it.  It doesn't
 7    mean it didn't happen; I just don't remember it.
 8         Q    Okay.  Did you have the final say of the
 9    terms you were willing to accept, or was this
10    Mr. Halloran -- Tim Halloran's final say?
11              MS. STROMEYER:  Objection.  Argumentative.
12    BY MR. GADDIS:
13         Q    Do you understand my question?
14         A    Do I let me little brother control my home?
15         Q    In effect, yes.
16         A    That is rather argumentative.
17         Q    Do you understand my question?
18         A    No, I don't understand why you would ask that
19    question.
20         Q    Not why I would ask it.
21              Do you understand my question?
22         A    No.
23         Q    My question is --
24         A    Would my lawyer act in my best interest?
25    Yes.  Do I trust my brother?  Without question.
```

Page 91

1        Q    Okay.  And I have no doubt about that.
2   That's not in question.
3        A    Is he a good person?  Absolutely.  Would he
4   try to screw me out of a mortgage?  No.
5        Q    Okay, Doctor.  Those aren't -- that's not my
6   line of questioning.
7        A    It sounds like it to me.
8        Q    My question is, you've had no communications
9   with GMAC concerning the modification of your mortgage
10  loan; is that correct?
11       A    To my knowledge, no.  He is my agent.
12       Q    Tim Halloran has had all communications with
13  GMAG regarding the modification of your mortgage loan,
14  correct?
15       A    Correct.  He's my lawyer; he's my agent.
16       Q    You've not been privy to a phone conversation
17  between Mr. Halloran and GMAC; is that correct?
18       A    Correct.
19       Q    You have not drafted a single document from
20  Mr. Halloran's office or on your behalf to GMAC; is
21  that correct?
22       A    I don't work at his office.
23       Q    Have you drafted a single document on your
24  behalf to GMAC?
25       A    No.

                                              Page 92

1          Q    So I ask these questions because you've had

2    no role in negotiating this modification.

3              And so I'm asking who has final say in

4    accepting terms or rejecting terms?

5          A    I can't interpret GMAC's hostility towards me

6    and my family, and my brother has helped me do that.

7          Q    When you say hostility, do you mean three

8    separate --

9          A    Trying to take my home.

10         Q    -- modification approvals?

11             Do you see that as hostility?

12         A    I think they are absolutely hostile.

13         Q    Did you default on this 2006 Deed of Trust,

14   Doctor?

15         A    Did you ever listen to why I was late?

16         Q    Ma'am, that was not my question.

17             MS. STROMEYER:  Well, it's asked and answered

18   anyway.  She's already answered the question.

19   BY MR. GADDIS:

20         Q    Okay.  Did you default on the 2006 Deed of

21   Trust?

22             MS. STROMEYER:  She's already answered that

23   question on several occasions.

24   BY MR. GADDIS:

25         Q    That answer is yes, correct?

                                        Page 93

```
 1              MS. STROMEYER:  She's already answered that
 2     question.
 3     BY MR. GADDIS:
 4         Q     Per the 2006 Deed of Trust, is GMAC entitled
 5     to foreclose upon your breach?  Is that correct?
 6              MS. STROMEYER:  Objection.  Calls for a legal
 7     conclusion.  She's not probably aware of every single
 8     term in the loan document.
 9     BY MR. GADDIS:
10         Q     Did you have any --
11              MS. STROMEYER:  To the extent you know, you
12     can answer.
13     BY MR. GADDIS:
14         Q     Can you answer that question, Doctor?
15         A     No.
16         Q     Did you know that if you didn't pay your
17     mortgage, there was a risk of foreclose upon your
18     house?
19         A     Yes.
20         Q     Yes, okay.
21              Doctor, what do you want out of this lawsuit?
22         A     I want my home.
23         Q     Are you currently in your home?
24         A     I think you know that.
25         Q     Ma'am -- excuse me.
```

                                              Page 94

1          Doctor, are you currently residing in your

2   home?

3       A    I am.

4       Q    Has there been a point since November of 2006

5   until the present date to where you have not resided in

6   your home?

7       A    No.

8       Q    Honestly, what are you specifically wanting

9   from GMAC from this lawsuit?

10      A    I want a loan modification.  I want them to

11  get off my back.  I want them to live up to the

12  contract they gave me.

13      Q    And by contract, you're referring to the

14  April 28th, 2011 letter; is that correct?

15      A    Yes.

16          MR. GADDIS:  Counselor, I'm looking through,

17  but you know may off the top of your head, is

18  Dr. Halloran making claims for emotional distress?

19          MS. STROMEYER:  Not over and above associated

20  with...

21          MS. STROMEYER:  We'll look at Paragraph 51 of

22  the complaint.

23      Q    Paragraph 51 alleges, "Plaintiffs have

24  suffered constant anxiety and severe emotional

25  distress."

Page 95

```
 1              Do you see that, Dr. Halloran?

 2       A    I do.

 3       Q    What -- what proof of this severe emotional

 4  distress do you have?

 5       A    What do you want?

 6       Q    Exactly.  You've made an allegation.  I want

 7  to know what proof you have that you suffered severe

 8  emotional distress.

 9       A    Well, I don't have any doctor bills, if

10  that's what you're asking.

11       Q    Well, that would be included, yes.  But

12  that's not the extent of what I'm asking.

13       A    I don't understand.  I haven't committed

14  suicide.  I haven't done myself bodily harm except for

15  the fact that I'm not using the gym as often as I

16  should, I guess.

17              What -- what do you want?  A receipt for

18  documentation of my blood pressure?  What is it you're

19  looking for?

20       Q    Well, I just want to know --

21       A    I don't have any psychiatric bills.

22       Q    Should this go to trial, Doctor, you've made

23  a claim that you've constant anxiety and severe

24  emotional distress --

25       A    I'm afraid to answer the phone.  I'm afraid
```

                                              Page 96

1    to look at my mail.  I'm afraid, afraid, afraid, of the

2    big bad banker.  That's constant emotional distress.

3       Q    Okay.  What documentation have you received

4    from GMAC --

5       A    I have not --

6            MS. STROMEYER:  Wait, let him finish his

7    question.

8    BY MR. GADDIS:

9       Q    After the filing of this lawsuit, what

10   documentation have you received?

11      A    I don't know.

12      Q    Have you received letters in the mail?

13      A    I am afraid of my own shadow economically

14   because of what they've done to my credit report,

15   credit cards that have been canceled.  My children are

16   stressed out because they don't know if their home is

17   going to be foreclosed upon.

18           They tacked up a sign to my house that was --

19   that it was going to be up for auction for all the

20   neighbors to see.  It's stressful.

21      Q    My question was, what letters have you

22   received from GMAC --

23      A    I haven't received any letters currently.

24   What is it your looking for?

25      Q    Have you received any telephone calls from

Page 97

```
 1    GMAC --

 2        A    I don't answer the phone.

 3             MS. STROMEYER:  Colleen, let him finish his

 4    question.

 5             THE WITNESS:  Okay.  Finish your question.

 6    BY MR. GADDIS:

 7        Q    That was it.  If you don't answer the phone,

 8    then you would not be aware of any efforts --

 9        A    I'm afraid to answer the phone.

10        Q    Communications between GMAC and yourself have

11    been going through Mr. Halloran since August of 2010;

12    is that correct?

13        A    That's correct.

14        Q    And you've received no -- let me restate.

15             Since that time, have you received any

16    letters from GMAC?

17        A    Not that I'm aware of.

18        Q    Have you received any phone calls from GMAC?

19        A    I don't answer the phone.

20        Q    Okay.  Then, ma'am, how would you know that

21    GMAC has been --

22        A    I'm afraid.  Do you get it?  Afraid.

23    Somebody is trying to take my house away from me.  I'm

24    afraid.

25        Q    And why are they trying --
```

Page 98

1       A     It's stressful.

2       Q     Why are they trying to --

3       A     It's stressful.

4       Q     -- take your house away --

5       A     It's really stressful.

6             MS. STROMEYER:  Okay.  Do you want to --

7    let's step outside for a moment.

8             MR. GADDIS:  No, there's a question pending.

9       Q     Why were they trying to take your house away,

10   Dr. Halloran?

11      A     Because they're mean and evil people.

12      Q     Is it because --

13            MS. STROMEYER:  No, no, no.  The question is

14   done.  We're going to step outside.

15            (Short Break Taken.)

16   BY MR. GADDIS:

17      Q     Dr. Halloran, do you recall when you made

18   your last mortgage payment?

19      A     No.  However, there are returned checks -- or

20   there are -- which one is that?  There are these checks

21   that I made, and the first mortgage payment on the

22   renegotiated loan was 4/26/11.

23      Q     And that's a check you wrote and identified

24   as renegotiated loan; is that correct?

25      A     Correct.

                                              Page 99

1          Q    Okay.  Let me couch it this way then:  Do you

2    recall the last time you made a mortgage payment

3    pre-April 28th, 2011?

4          A    We have documentation of that someplace.  But

5    I'm not sure where.  I can't recall a specific date.

6          Q    Would you be surprised to learn that it was

7    late 2009, early 2010?

8          A    I don't know.  Would I be surprised?  I don't

9    know.

10         Q    Now, I'm not asking for an account number or

11   a dollar value.  Since you've not made payments on your

12   2006 mortgage loan in the calendar year of 2010 up

13   until the point of April 2011, I'm asking if you have

14   taken that money that you would have paid and placed

15   into some sort of account.

16             Have you done that, Doctor?

17         A    No.

18         Q    Have you put money aside that otherwise you

19   would have paid or used to pay your mortgage loan since

20   I'll say January of 2010 up until April of 2011?

21         A    No.

22         Q    Right now, what amount could you afford under

23   a monthly mortgage payment?

24         A    Including taxes and insurance?

25         Q    Let's do principle and interest first.

                                              Page 100

```
 1        A     32 -- no.

 2        Q     Probably Exhibit 5 is what you're looking

 3   for.   To the complaint.

 4        A     $2,678.12.

 5        Q     That's the amount you could afford to make a

 6   monthly mortgage payment at this point; is that

 7   correct, Doctor?

 8        A     That's what I just said.

 9        Q     Could you afford to make a $3,000 a month

10   principle and interest payment?

11        A     I think I would rather have this one.

12        Q     I understand what you'd rather have.  That

13   makes sense.

14              Could you afford to make a $3,000 a month

15   mortgage payment?

16        A     Probably.

17        Q     Could you afford to make a $3200 a month

18   mortgage point?

19        A     Principle and interest, yes.

20        Q     How about a $3500 a month --

21        A     No.

22        Q     -- principle and interest?

23        A     No.

24        Q     32 is your cut off?

25        A     No, I would say 2678 is my cut off.
```

Page 101

1        Q        2678.    You just stated that you could afford

2    to make a $3200 principle and interest mortgage

3    payment, correct?

4        A        Maybe.

5        Q        Now it's a maybe?

6        A        Maybe.

7        Q        Maybe.    Are you making this determination off

8    of your two places of employment as well as your

9    husband's pension account?

10        A        Correct.

11        Q        Okay.    And that is your ceiling, 2700

12    principle and interest; is that correct?

13        A        I don't know that it's my ceiling.    I'm not

14    very trusting of GMAC right now.    I -- I don't know

15    what my ceiling would be because I wouldn't want them

16    to go above the ceiling.    Or suppose another kid gets

17    sick.    Or suppose I die.

18        Q        It would be hard to make those payments if

19    that happened.

20        A        It would be.

21        Q        It would be difficult.

22        A        GMAC sure would have its way with me, though.

23                MR. GADDIS:    We can go off the record.    I'm

24    just going to think for a minute.

25                (Short Break Taken.)

```
 1   BY MR. GADDIS:

 2        Q    We stated earlier in the day -- I should

 3   restate that.

 4             Earlier in the day, I identified that in

 5   December of 2007, there was a Deed of Trust placed on

 6   the property from the judicial -- excuse me -- from the

 7   clerk of the U.S. District Court, and you did not

 8   recall that.

 9        A    No.  I know that.

10        Q    Oh, you remember that?

11        A    I didn't ever deny I didn't know that.  I

12   just said I couldn't read it.

13        Q    Well, that's fine.

14        A    Because it's a very tiny, very blurry copy.

15        Q    You may be referring back to another exhibit.

16   I probably know which ones those were, very scrunched

17   up.

18             MR. GADDIS:  I'll go ahead and offer as

19   Defendant's -- this is a Recorded Deed of Trust and

20   Assignment of Rents with the San Francisco Assessor

21   Recorder's Office dated December 5th, 2007.

22             It's a Deed of Trust encumbering the

23   property, the subject property, for $125,000.

24             (Deposition Exhibit 15 was marked for

25                identification by the court reporter.)
```

Page 103

1   BY MR. GADDIS:

2       Q    Doctor, do you recall this Deed of Trust?

3       A    I do.  Do you have a question about it?

4       Q    That was it.

5       A    Oh.

6       Q    Doctor, when did your husband lose his

7   position of employment?

8       A    I'm not exactly sure what his termination

9   date was.

10      Q    Do you recall the year?

11      A    It was maybe 2008.  I don't know.

12      Q    Do you remember the period which -- excuse

13  me.  Let me restate.

14           Do you remember when he was incarcerated?

15      A    I think it was August 29th, 2008.

16      Q    Is it your recollection that he lost his

17  position of employment sometime around that

18  incarceration date, or was it months prior to?

19      A    It was prior to.

20      Q    Do you recall how many months prior to?

21      A    I don't know.  Maybe seven or eight,

22  something like that.

23      Q    Okay.

24           MR. GADDIS:  I'll go ahead and offer as

25  Defendant's 16 Uniform Residential Loan Application

Page 104

1    signed by one Bernard Ward.

2              (Deposition Exhibit 16 was marked for

3              identification by the court reporter.)

4          If you can turn to the second page, which is

5    identified as WARD 000325.

6          Do you see at the bottom where it lists out

7    borrower's gross monthly income?  Do you see those

8    columns?

9    A    No.  Am I on the right page?

10   Q    Yes, you are.  It's right here.

11   A    Oh, okay.

12   Q    And there's a row that states, Base Empl.

13   Income.

14         Do you see that, Doctor?

15   A    Yeah.

16   Q    And this tiny print looks to read $18,642; is

17   that correct?

18         MS. STROMEYER:  Is that correct that's what

19   the document says?

20         MR. GADDIS:  Yes.

21         THE WITNESS:  I can't really read the -- if

22   that's a 6 or a 5.  18,542 or 18,642.

23   BY MR. GADDIS:

24   Q    Sure.  One of those.  This print is

25   atrocious.

                                        Page 105

```
 1              From this loan application, is it your
 2    understanding that the 2006 Deed of Trust was based
 3    primarily off of -- excuse me -- primarily or solely
 4    off of your husband's income at that time?
 5         A    I don't know.  I didn't review it.
 6         Q    You didn't review the loan application?
 7         A    I didn't review the loan.
 8         Q    You didn't review the loan.
 9         A    So I don't know whose --
10              MS. STROMEYER:  It lacks foundation.
11              Objection.  Lacks foundation.  She doesn't
12    know what the loan was based off of.  She's already
13    testified that she didn't take part in drafting the
14    loan application.  You've not laid the foundation that
15    she's seen this document before or had any part in
16    drafting it.
17    BY MR. GADDIS:
18         Q    But you did state that you had no part in the
19    actual process of obtaining the 2006 mortgage loan; is
20    that correct?
21         A    Right.
22         Q    Okay.
23              MR. GADDIS:  Okay.  I can't think of anything
24    else.
25              THE REPORTER:  Would you like a copy of the
```

Page 106

```
 1   transcript?
 2          MS. STROMEYER:  Yes, I would, please.  I will
 3   take an electronic and a condensed.
 4          MR. GADDIS:  I would like the same, please.
 5          THE REPORTER:  Are there any time
 6   constraints?
 7          MS. STROMEYER:  No, not for me.
 8          MR. GADDIS:  Yes.
 9          THE REPORTER:  When do you need it?
10          MR. GADDIS:  If I can get it tomorrow, that
11   would be great.  Or a draft.  Yeah, if I can get the
12   rough and then the final as soon as possible after
13   that.
14          THE REPORTER:  Okay.  And you don't need a
15   rough or a rush?
16          MS. STROMEYER:  No.
17          THE REPORTER:  Okay, thank you.
18
19      (TIME NOTED:  2:40 p.m.)
20
21
22
23
24
25
```

Page 107

1

2

3

4

5

6

7

8      I, COLLEEN HALLORAN, do hereby declare under

9  penalty of perjury that I have read the foregoing

10  transcript; that I have made any corrections as appear

11  noted, in ink, initialed by me, or attached hereto; that

12  my testimony as contained herein, as corrected, is true

13  and correct.

14      EXECUTED this_____ day of_____,

15  20_____, at_____, _____.

             (City)                    (State)

16

17

18              _____

                COLLEEN HALLORAN

19

20

21

22

23

24

25

Page 108

1          I, the undersigned, a Certified Shorthand Reporter

2     of the State of California, do hereby certify:

3          That the foregoing proceedings were taken before me

4     at the time and place herein set forth; that any

5     witnesses in the foregoing proceedings, prior to

6     testifying, were duly sworn; that a record of the

7     proceedings was made by me using machine shorthand which

8     was thereafter transcribed under my direction; further,

9     that the foregoing is a true record of the testimony

10    given.

11         I further certify I am neither financially

12    interested in the action nor a relative or employee of

13    any attorney of party to this action.

14         IN WITNESS WHEREOF, I have this date subscribed my

15    name.

16

17    Dated: January 25, 2012

18

19

20                    _____

                      LORI STOKES

21                    CSR No. 12732

22

23

24

25

                                              Page 109

**[& - 3,253.24]**

| & |
| --- |
| **&**  3:4,14 |

| 0 |
| --- |
| **000020**  5:7 51:13 |
| **000022**  52:11 |
| **000035**  5:7 51:14 |
| **000041**  5:18 84:14 |
| **000042**  5:18 84:14 |
| **000070**  5:12 59:4 |
| **000072**  60:6 |
| **000073**  5:13 59:4 |
| **000080**  5:15 61:13 |
| **000084**  5:16 61:14 |
| **000087**  5:9 55:25 |
| **000088**  5:10 55:25 |
| **000167**  4:20 27:3 |
| **000172**  4:21 28:16 |
| **000174**  4:22 29:10 |
| **000324**  5:25 |
| **000325**  105:5 |
| **000328**  5:25 |
| **000412**  4:11 |
| **000416**  4:12 |
| **000417**  4:14 |
| **000436**  4:15 |
| ▮**8940**  5:6,9,12 |
| 5:15,18 |

| 1 |
| --- |
| **1**  1:25 4:10 10:25 |
| 11:2 12:18,19 37:8 |
| 37:9,10 40:3,4 43:3 |
| 43:6 44:12 56:19,20 |
| 66:16 74:24 78:1 |
| **1,129,853.88.**  85:14 |
| **1-20**  1:7 2:8 |
| **1-800-850-4622** |
| 73:18 |
| **10**  5:8,11 54:16 |
| 55:23 56:1 62:14 |
| **100,000**  53:3 |
| **103**  5:22 |
| **105**  5:24 |

**109**  1:25
**10:04**  2:15 6:2
**10th**  3:8 59:3 60:3
62:8
**11**  4:10,13,16 5:11
59:2,5 62:9
**11-511574**  1:6 2:7
5:21 6:14 19:21
**12**  5:14 28:18 29:17
61:11,15
**125,000**  15:16
103:23
**12732**  1:22 2:17
109:21
**13**  5:17 20:7,9 21:14
84:13,15 86:9,24
**131749**  1:23
**14**  5:19 89:8,11
**14th**  37:6
**15**  5:19,22 22:8
88:10 89:5 103:24
**15th**  28:19 89:10
**16**  5:14,24 22:18
104:25 105:2
**16th**  61:11 62:5
**17**  33:11,12
**17,806.02**  32:4,10
**18**  33:11,12
**18,542**  105:22
**18,642**  105:16,22
**19**  4:18 33:11,12
**1960**  24:7,8
**1:15**  62:17
**1st**  13:21,25 14:8
75:9,10,19 86:7,21
86:25

| 2 |
| --- |
| **2**  4:13 11:5,7 13:14 |
| 14:20 43:2,17 57:8 |
| 77:17 |
| **2,678.12.**  70:17 71:1 |
| 101:4 |
| **2,740.57.**  44:5 |

**2.875**  85:20
**2.88**  39:1
**20**  37:2,5 108:15
**2006**  4:10,13 5:24
8:5,9 9:2,10,13 11:1
11:6 16:9,11,12,14
16:16,19 35:6,15,20
36:3 41:13,18 42:1
44:4,17 78:6,16
79:6,9,13 80:9,18
90:8 93:13,20 94:4
95:4 100:12 106:2
106:19
**2007**  5:23 15:6,10
15:14 16:21 103:5
103:21
**2008**  16:24 104:11
104:15
**2009**  17:1 22:9,19
23:2,12,21 24:5,9
27:25 28:3,9 100:7
**2010**  5:5,8,11,14
17:3,20,23 18:10
28:19,25 29:19,25
32:10 33:17 35:14
35:18 44:16 51:12
55:12,23 56:21 57:1
57:5,16,23 58:1,11
59:3 60:3 61:1
62:5,8,13 98:11
100:7,12,20
**2011**  5:17,19 13:25
14:8 21:18,25 22:6
24:24 25:7,11 26:2
26:15 36:2 37:6
38:21,24 39:9,21
47:10,14 50:20
62:24 64:22 66:7,12
66:16,16,21 67:18
67:25 68:11 69:18
73:15 74:24 75:3,10
76:9 81:7 83:18
84:2,9 85:1 86:7,20
86:25 88:10,23 89:5
89:10 90:4,25 95:14

**100:3,13,20**
**2012**  1:15 2:15 6:1
109:17
**2016**  13:21
**2046**  44:12
**21**  38:20,24 66:15
**21st**  39:9 42:11
**22nd**  39:20 42:11
47:9 62:24 64:22
66:23 67:18 68:11
69:18 83:19,19,20
**23**  1:15 2:15 6:1
53:18
**23rd**  29:19
**24**  5:5 37:2
**24,233.93.**  56:23
**24th**  32:10 51:12
**25**  4:10,13 38:18,20
109:17
**2500**  2:14
**25th**  11:1,6
**2600**  3:18
**2678**  101:25 102:1
**27**  4:20 5:24 54:10
**2700**  102:11
**28**  4:21 66:5,9 67:6
**28th**  66:7,12,21
67:25 73:15 75:3
76:9 81:2,7 83:18
84:1 86:20,22 95:14
100:3
**29**  4:22
**29th**  104:15
**2:40**  2:15 107:19

| 3 |
| --- |
| **3**  4:16 11:10,13 20:8 |
| 39:19 44:10 47:10 |
| 47:11 58:4 62:23 |
| 69:9 86:1 |
| **3,000**  101:9,14 |
| **3,189.94**  55:10 |
| **3,253.24**  70:16 |
| 71:24 72:3 73:9,22 |

[3,254.24 - apologize]

**3,254.24** 74:2
**3,400** 57:11,16,24
    58:2
**3,808.90** 58:12
**3,808.90.** 58:7
**3.875** 85:20
**30** 27:14,18 50:3
**31** 4:23 54:22
**31,033.93** 56:20
    57:2
**3189** 55:9
**32** 61:2,4 101:1,24
**3200** 51:8 60:24
    101:17 102:2
**3300** 4:11,13 8:18
**3357.87** 60:14
**34** 61:2,4
**3500** 101:20
**3a** 44:10
**3b** 44:2

**4**

**4** 4:18 13:14,22
    19:20,22 37:1 62:22
    86:4
**4.86.** 85:20
**4/1/2011** 85:25
**4/26/11** 99:22
**403** 58:5
**41** 38:8,10
**415** 23:25
**415-398-3344** 3:21
**415-788-1900** 3:11
**4a** 13:22

**5**

**5** 4:20 27:3,4 50:3
    66:6,22 68:13 70:3
    86:2,4 101:2 105:22
**51** 5:5 95:21,23
**56** 5:8
**58,000** 52:24
**59** 5:11
**5th** 5:23 103:21

**6**

**6** 4:5,21 28:12,13
    105:22
**6,800** 56:22
**60** 28:23
**61** 5:14

**7**

**7** 4:22 5:17 29:10,11
    85:1
**7.250** 43:20
**71** 60:21
**731-8936** 23:22

**8**

**8** 4:23 21:25 27:9
    31:7,12,14,22 54:16
**84** 5:17
**84102** 11:6
**88** 3:7
**89** 5:19
**8th** 21:18 22:6

**9**

**9** 5:5,8 51:11,15
**9/11/2009** 27:10,18
**90** 29:23
**900,000** 80:2
**905,000** 12:24 13:3
    43:7,12
**94108** 3:9
**94111** 3:19
**9th** 55:23 62:13

**a**

**a.m.** 2:15 6:2
**abide** 46:8
**ability** 45:23 46:16
**able** 20:23 42:15
    44:22 46:8 54:1
    56:5,7 74:17
**absolutely** 92:3
    93:12
**accept** 91:9
**accepting** 93:4
**account** 5:6,9,12,15
    100:10,15 102:9

**acknowledges** 37:13
    37:16
**act** 91:24
**acting** 74:15
**action** 109:12,13
**actual** 38:13 106:19
**additional** 52:16,19
    53:7 58:5
**address** 10:17
**addressing** 39:24
**adjust** 13:20
**adjustable** 4:10 11:1
    12:4,17,18 13:7
    14:12 43:4,5 44:4
    44:12 77:24 78:1
    79:5,9
**adjusted** 14:7
**adjusts** 13:11
**administered** 6:5
**advise** 85:5
**afford** 44:23 47:17
    100:22 101:5,9,14
    101:17 102:1
**afraid** 96:25,25 97:1
    97:1,1,13 98:9,22
    98:22,24
**age** 32:23
**agent** 37:15,24
    38:21 92:11,15
**agents** 26:6 38:11
**ago** 9:25 37:4
**agreeable** 41:17
    44:21 45:22
**agreement** 37:7,8,18
    37:19 67:24 68:4
    71:18,22 73:3,7,19
    76:11,21
**ahead** 11:4 32:8
    77:20 88:18 103:18
    104:24
**allegation** 66:20
    67:23 96:6
**allegations** 71:19
    73:4

**alleged** 40:21 46:23
    75:2 83:16,25
**allegedly** 83:21
**alleges** 95:23
**alleging** 67:5 76:4
**allow** 7:9
**alluded** 68:8 71:16
**alluding** 60:19
    70:20
**ambiguous** 15:21
    25:2 26:11 35:10
    75:6
**amend** 66:1
**amended** 4:16,16
    11:10,11 37:17
**amount** 10:7,14
    32:3 43:15,15 46:19
    51:5,6 60:13,20,24
    61:5 71:3,4,12,21
    72:2,11,19,19 73:7
    73:14 74:4,19 80:10
    80:18 100:22 101:5
**answer** 7:6,10 9:17
    9:18 21:5 30:12,15
    33:25 34:11,14
    36:19 40:11,12,13
    40:16,23,24 63:21
    65:9 66:1,2,4 81:16
    87:14,19 88:18
    93:25 94:12,14
    96:25 98:2,7,9,19
**answered** 9:14
    30:11 32:7 62:12,25
    80:24 90:1 93:17,18
    93:22 94:1
**answering** 7:11
**answers** 7:14
**anxiety** 95:24 96:23
**anxious** 40:17
**anybody** 36:8
**anyway** 93:18
**apologize** 15:4
    18:14 27:7 48:16
    61:3,18 62:11 63:1
    81:22 82:9

Page 2

[apparently - brother]

apparently 60:6
appear 60:8 108:10
appearances 3:1
appears 60:10
application 5:24
104:25 106:1,6,14
apply 8:3
approvals 93:10
approved 38:24
39:6 40:2 64:1,10
66:15 84:9 85:6
87:10 88:6,8,13,23
90:24 91:1
approximately 22:9
48:19,20 49:24 50:9
60:24,25
apr 39:1
april 5:17 24:24
25:7,10 26:15 36:6
38:20,24 39:9,20
42:11 47:9,14 50:20
62:24 64:22 66:7,12
66:15,21,23 67:18
67:25 68:11 69:18
73:15 75:3 76:9
81:2,7 83:18 84:1,9
85:1 86:20,21,22,25
95:14 100:3,13,20
area 23:23,25
argumentative
91:11,16
arrearages 58:6
arrears 32:11 57:2,6
58:21
arrive 40:2
art 72:10,11
aside 100:18
asked 12:13 80:25
93:17
asking 7:8,9,12 10:5
21:9 22:5 23:16
26:10,14 30:20
32:23,24 34:17,18
38:1,3 42:20 44:24
45:6 46:14,16 71:2

71:21 72:17 73:6
74:7,21 78:5 80:17
80:20,21 82:19
90:10,11 91:3 93:3
96:10,12 100:10,13
asks 12:12 20:19
asserted 82:20
assessor 103:20
assignment 5:22
103:20
associated 95:19
association 49:2
assume 65:17 75:9
75:18
assumes 46:10
66:24 87:13
assumption 75:11
atrocious 105:25
attached 37:8 51:25
66:21 108:11
attempt 7:5 41:16
76:1,3,5
attempting 79:6
attention 32:2
attorney 3:6,16 21:1
26:5,12 33:23 34:10
34:25 36:13,23 39:7
40:9 41:1,11 42:3
54:15,18 63:18 78:3
78:5,17 79:10,11,12
79:19,23 80:12 81:9
82:19 83:11 89:20
109:13
attorney's 83:8
attorneys 26:12
auction 97:19
august 5:5,19 33:17
51:12 55:12 57:23
88:9,10,23 89:5,10
90:4,11,25 98:11
104:11
author 66:25
authority 38:13
79:22

authorization 51:25
authorized 26:6
avenue 8:19
avoid 56:15
aware 15:6,12,14
33:10 51:18 57:1,5
87:9 88:6,8,13,14
88:22 89:3 94:7
98:8,17

b

back 11:9 21:23
26:18 30:13,16
38:18 43:8 62:7,17
65:9,12 66:3 69:9
70:2,3 72:14 77:2,6
77:6 78:19 82:24
95:11 103:15
bad 97:2
bail 53:4
balance 56:20,22
ballpark 48:7 49:19
banker 76:14 97:2
base 105:12
based 47:20,21
75:11,15 78:17
106:2,12
basic 55:5
basis 10:15 40:4
bates 4:11,14,20,21
4:22 5:6,9,12,15,18
5:24 11:21 27:3
28:15 29:10 51:13
60:6,7,21 89:10
began 22:9,19
beginning 2:14 58:7
begins 56:12
begun 57:15
behalf 2:13 33:8,15
33:18,22 34:8,19
52:1,9 69:22 78:10
79:14 92:20,24
believe 8:19 37:2
43:2 45:7 47:10
58:11 62:21 73:24

74:1,10,10,14 76:8
81:18 86:3 87:8
88:15
believed 40:6 66:20
82:7,10,12
benefit 59:17 60:18
bernard 1:4 2:4
4:18 5:6 6:12 14:18
36:14,15,16 51:24
53:4 54:16 105:1
best 7:4,7,10,16
10:22 27:8 36:18
91:24
better 6:18 7:12
45:9
bi 55:13
big 97:2
bill 16:10
bills 16:2,4,12,14
18:3,8 96:9,21
block 52:13,14
54:18,20
blood 96:18
blurry 103:14
bodily 96:14
borrower 32:10
37:13 54:20
borrower's 12:20
43:6 54:18 105:7
bottom 28:18 53:21
105:6
bradley 3:4
breach 94:5
break 7:19,20,23
19:8 29:15 31:5,10
45:17,19 61:9 62:19
65:7 84:6 99:15
102:25
breaks 7:20
bright 45:12
bringing 80:3
broad 42:21 45:5
81:9
brother 32:15,17,19
32:20,21,25 33:2,4

[brother - correct]

61:23 91:14,25 93:6
**brought** 11:16
**buell** 5:20

**c**

**calendar** 28:9 58:1
100:12
**california** 1:1,14 2:1
2:14 3:9,19 4:11,14
6:1 109:2
**call** 10:22 15:3 21:1
29:8 34:9 36:17
39:9 40:8 50:6
63:17 81:8
**called** 10:20 39:7,8
63:25 73:18 81:3
**calling** 74:20
**calls** 6:25 94:6 97:25
98:18
**canceled** 97:15
**cancer** 18:1,12,16
30:17
**car** 16:16
**cards** 97:15
**case** 1:6 2:7 4:18
5:21 6:12,13 19:20
26:14 32:18
**caveat** 7:21
**ceiling** 102:11,13,15
102:16
**cell** 24:8,17
**center** 2:13 3:17
**certain** 83:9 88:23
88:25
**certified** 2:16 109:1
**certify** 109:2,11
**cg** 3:20
**cgc** 1:6 2:7 5:21 6:14
19:21
**chance** 11:23 12:16
**change** 13:22,24
86:2
**changed** 61:6 71:12
75:17

**changes** 13:16
**characterization**
90:15,20
**charge** 15:25 16:2,5
**chart** 4:20,21,22
**chase** 52:24
**check** 99:23
**checkbook** 61:7
**checks** 21:23 36:7,9
99:19,20
**child** 18:12,16
**children** 97:15
**city** 108:15
**claim** 42:10 96:23
**claiming** 82:16
**claims** 95:18
**clarification** 40:15
63:2
**clarify** 7:6 8:17
17:12 25:5,23 26:9
86:23
**clayton** 3:15 5:20
6:11 89:9
**clear** 7:4,7 73:13
80:6
**clearer** 23:6
**clerk** 103:7
**client** 21:1 26:5,12
33:23 34:10,25 40:9
41:11 56:16,21
57:10 58:4 63:18
81:9 82:19 83:11
89:20
**clients** 40:3 52:1
**code** 23:23,25
**colleen** 1:4,13 2:4,12
4:3,16,18 5:6 6:4,12
11:11 51:24 54:15
54:16 87:17 98:3
108:8,18
**column** 85:12,13,18
**columns** 27:7 105:8
**come** 45:9,13 62:17
**coming** 65:17

**committed** 96:13
**communicated**
81:25 82:15 90:19
**communication**
25:12 26:2,15 35:19
35:21,22,24 36:2,8
40:9 63:20 82:20
90:12
**communications**
24:19,25 25:4,7
26:5,6,19,20,21
34:12,23 35:1 36:10
42:10 63:18 79:8
81:18 82:1,16 83:11
89:20 92:8,12 98:10
**company** 52:21
56:21 65:18
**complaint** 4:18
19:20 20:17 21:14
21:17 33:10 34:24
36:25 37:8 38:9,19
39:20 47:11 62:21
66:5,22 86:3 87:24
95:22 101:3
**complete** 20:22
**compound** 45:25
**concerning** 31:24
35:6,15 36:3 41:18
59:24 60:19 63:7,8
64:18 68:4 78:6
80:1 87:10 90:7,12
92:9
**concerns** 9:22
**concise** 7:4
**conclusion** 36:18
94:7
**condensed** 107:3
**conference** 38:23
39:2
**confidence** 83:10
**confirming** 65:23
66:14 83:21
**confusing** 45:4
**consideration** 50:22
50:25

**considerations**
18:23
**constant** 95:24
96:23 97:2
**constitute** 25:4
**constraints** 107:6
**contact** 25:17 33:8
33:14,21 34:5,7,19
**contacted** 33:7,14
33:18
**contained** 82:4
83:17 84:1 108:12
**contending** 34:22
**content** 41:4 90:3
**contention** 20:13,20
21:11
**contentions** 20:19
**context** 20:23
**continue** 57:10
**continued** 5:1
**continuous** 24:4
**contract** 42:2,4
65:24 73:24 77:12
77:13,16 82:22
95:12,13
**contracts** 38:14
**control** 91:14
**conversation** 7:15
34:18 41:7,9 63:2,3
63:7,9,16,24 64:2,5
64:12 65:16 81:6,9
81:10 83:21 92:16
**conversations** 34:1
35:6 40:20 41:3,4
58:19 81:12 82:3
83:6 90:2,3,4
**convey** 63:15
**copy** 11:5 19:20
51:25 59:16 103:14
106:25
**correct** 12:22 13:3
20:11 21:17 24:1,6
29:23,24 42:12 43:8
50:23 51:4 55:10,11
55:13,14 63:4,5,10

[correct - doctor]

66:3 70:12,18,19
71:15,19,20 72:4,5
73:4,5 75:12,16,21
75:22,23,24 76:22
77:25 78:10,18
79:23 80:8 84:10,11
85:22,23 86:25 87:1
88:1 89:25 91:2
92:10,14,15,17,18
92:21 93:25 94:5
95:14 98:12,13
99:24,25 101:7
102:3,10,12 105:17
105:18 106:20
108:13
**corrected**  108:12
**corrections**  108:10
**correctly**  13:1 20:12
22:12,22 37:20
38:16 52:5 56:24
57:13 58:8 59:18
66:17 85:7
**correspondence**
70:15
**cosign**  9:2
**costs**  18:18
**couch**  100:1
**counsel**  26:13 38:22
40:10 66:13 87:6,22
87:23,25 88:9 89:18
90:4,16
**counselor**  21:8
34:22 72:6 95:16
**county**  1:2 2:2
**couple**  55:18
**course**  12:3 65:14
**court**  1:1 2:1 5:21
8:2 11:3,8,14 19:23
27:5 28:14 29:12
31:15 51:16 53:4
56:2 59:6 61:16
84:16 89:12 103:7
103:25 105:3
**cover**  8:15 46:25

**covered**  34:24
**covering**  9:3,7 11:6
15:11,15 30:6,10,21
**credit**  15:8,11 97:14
97:15
**csr**  1:22 109:21
**current**  60:15
**currently**  50:18
94:23 95:1 97:23
**curry**  5:17 87:16
88:4
**cut**  53:22 60:6
101:24,25

**d**

**date**  19:13 21:22
22:1 39:12 40:3
44:11,14 60:22
66:16 70:5 74:24
75:1,19 84:25 85:22
85:24 86:5,8,18,19
86:24 87:24 95:5
100:5 104:9,18
109:14
**dated**  4:10,13 5:23
5:24 27:10 28:19
29:19 39:20 47:9
51:12 55:23 59:3
61:11 66:21 89:9
103:21 109:17
**dates**  13:23 75:3,6
75:18
**day**  103:2,4 108:14
**days**  6:18 27:14,18
28:23 29:23 30:23
31:1 50:9,11
**dc**  68:21,22,24
**deal**  76:19,20 77:9
**dealing**  18:17
**deborah**  5:17 87:15
88:4
**december**  5:23
13:21 15:14 22:19
23:2 103:5,21

**decide**  23:17
**declare**  108:8
**deed**  4:13,23 5:22
8:8 9:2,6,13,16,20
9:22 10:15 11:5,24
12:17 14:19,22,25
15:15 17:6,7,10
31:13,23 35:6,15,20
36:3 41:13,19 42:1
42:19 43:2,13 44:18
44:21,23 45:24
77:17 78:6,16 79:7
79:13 80:2,9,19
90:8 93:13,20 94:4
103:5,19,22 104:2
106:2
**default**  4:23 31:8,13
31:22,24 32:9 93:13
93:20
**defendant**  2:13 3:13
**defendant's**  10:25
11:5,10 12:18 14:20
19:20 27:3 28:12
29:9 31:7,12,22
37:1 43:1,3 51:11
55:22 59:2 61:10
62:9,13,22 77:17
78:1 84:12 86:4,9
86:24 89:8 103:19
104:25
**defendants**  1:8 2:9
**define**  41:22
**defined**  37:19
**degree**  10:3,3
**delineate**  42:7
**delinquent**  27:14,18
28:23 29:23 30:5,9
30:21
**deny**  103:11
**department**  51:12
52:8 55:24 59:3
61:13,25
**depending**  50:1,16
**depends**  50:5 82:18

**deposit**  61:7
**deposition**  1:13 2:12
4:16 6:21 7:3 8:3
11:2,7,11,13 12:3
19:22 27:4 28:13
29:11 31:14 51:15
56:1 59:5 61:15
84:15 89:11 103:24
105:2
**deposits**  59:17
**describe**  19:1 48:25
49:12
**description**  4:9 5:3
**determination**
46:21 47:15 102:7
**determine**  82:4
**diagnosed**  18:1
30:24
**die**  102:17
**differ**  49:11
**difference**  17:9
**different**  67:8 72:8
**difficult**  17:23 18:3
18:8 52:12 102:21
**difficulties**  17:5
22:10
**difficulty**  22:15
**directed**  32:2 91:4
**direction**  109:8
**discern**  54:1
**disclose**  34:11
**discuss**  52:3 64:8
**discussion**  24:13
**distress**  95:18,25
96:4,8,24 97:2
**district**  53:4 103:7
**divulged**  63:6
**divulging**  40:17,25
**doctor**  10:17,22
11:16,23 14:15
18:14,14,21 19:4,25
27:11,15 28:20 29:6
29:20 31:17,21
32:15,17 35:5,12
36:13 38:16 39:3,25

[doctor - filing]

40:24 44:20 45:7,21
48:14 49:6,7 52:5
53:5 54:2,11 55:10
56:4,13,24 57:13
58:17 59:18 60:9,13
61:19 63:4 64:13
66:18 67:5,16 75:8
76:12 78:25 81:14
90:9 91:4 92:5
93:14 94:14,21 95:1
96:9,22 100:16
101:7 104:2,6
105:14
**document** 4:17 9:24
11:12 13:4 14:1,5,9
15:1 19:25 27:19
29:10 31:7,12,18,21
32:12 38:2 43:7,9
43:19 56:5,8 58:17
58:24 60:21 61:11
61:19 69:11,13,16
70:5,7,24 72:2 74:5
74:6,8 80:1 84:13
84:18 85:3,10 86:6
86:17 87:2,7,25
88:14,15 89:6,7
90:21,23 92:19,23
94:8 105:19 106:15
**documentation**
96:18 97:3,10 100:4
**documents** 11:16,19
11:21 61:22 71:17
**dollar** 100:11
**dollars** 49:23 55:18
55:19
**doubt** 92:1
**dr** 6:15 12:15 35:1
77:21 81:19,20,23
82:7,8,10,15,21
83:15 84:8,18 86:6
90:24 95:18 96:1
99:10,17
**draft** 86:17 107:11
**drafted** 92:19,23

**drafter** 83:5
**drafting** 58:23 62:4
62:8,12 69:19
106:13,16
**due** 20:10,14 21:15
21:20,21 22:3,5
58:21 74:24 75:2,5
75:9,10,18
**duly** 109:6
**duties** 49:12

**e**

**e** 3:10,20 5:17,19
89:9
**earlier** 81:24 103:2
103:4
**early** 17:20 100:7
**easier** 30:4
**easy** 18:20,21
**economically** 97:13
**effect** 67:3,11 91:15
**effective** 66:16
74:23 75:1 85:22
86:5,8,18,23
**efforts** 90:8,12 98:8
**eight** 104:21
**eighth** 27:9
**either** 6:20 22:15
**election** 4:23 31:13
31:22
**electricity** 16:12
**electronic** 107:3
**embarcadero** 2:13
3:17
**emotional** 18:16
95:18,24 96:3,8,24
97:2
**emotionally** 18:18
**empl** 105:12
**employee** 83:22
109:12
**employees** 35:8
**employment** 19:12
50:18,19 102:8
104:7,17

**enclosed** 51:23
59:16
**encumbering** 53:9
103:22
**english** 79:1
**enter** 38:13
**entered** 37:6
**entire** 20:22 71:4
72:20 83:16,24,25
**entitled** 31:7,12 83:7
94:4
**equity** 15:7,10
**estimate** 50:2,3
**estimated** 44:7
**evenings** 50:13
**evidence** 10:25
28:11 46:11 66:25
83:2 87:13
**evil** 99:11
**exactly** 6:19 60:17
65:22 76:10 82:14
96:6 104:8
**examination** 4:2 6:8
**examined** 6:5
**excuse** 15:25 18:14
19:3 31:9 34:5
36:16 44:1 46:5
47:10,20 49:5 55:5
63:7 64:7 74:24
81:21 82:9 86:3
88:9 94:25 103:6
104:12 106:3
**executed** 11:5 36:22
108:14
**exhibit** 4:9,10,13,16
4:18,20,21,22,23
5:3,5,8,11,14,17,19
5:22,24 10:25 11:2
11:7,13 14:20 19:22
27:4 28:13 29:11
31:14 37:8,9,10
39:19 43:2,3 47:10
47:11 51:15 56:1
59:5 61:15 62:9,14
62:23 66:22 68:13

69:9 70:3 84:15
86:1,2,4,9,24 89:11
101:2 103:15,24
105:2
**exhibits** 4:7 5:1
**expectation** 42:4,5,6
44:13
**expectations** 41:12
41:17,20,24 42:2,21
43:14,21 44:6,20
45:2,3
**expecting** 42:15
64:18 65:23 68:3
**experience** 76:8
**experienced** 18:24
76:7
**experiencing** 22:10
**explain** 40:5
**express** 64:4
**extent** 25:2 63:19
67:5 90:19,22 94:11
96:12

**f**

**fact** 67:6,17,24
96:15
**facts** 46:10 66:24
87:13
**failed** 29:1 30:1
**faith** 74:14,15
**familiar** 7:24 8:24
9:6,9,12 13:8,9
**family** 18:17 47:22
47:23,24 50:23 93:6
**far** 27:13
**february** 29:19,25
36:5
**feel** 12:3 59:8 65:25
66:1,4 72:8 78:22
**feeney** 3:4
**figure** 85:13
**filed** 21:17
**filing** 20:17 34:24
53:8 87:24 97:9

[fill - halloran]

**fill** 53:11
**filling** 53:15
**final** 38:13 91:8,10
  93:3 107:12
**finances** 15:18,21
**financial** 18:22 19:1
  22:10 61:22
**financially** 18:18
  109:11
**find** 45:4 51:23
  59:16
**fine** 9:18 10:1,5
  17:11 19:7,7,18
  25:5,15,22 26:25
  47:8 50:9 51:9 54:9
  55:21 60:18 61:8
  62:16 103:13
**finish** 7:9 23:6 77:3
  80:13,15 97:6 98:3
  98:5
**firm** 52:21
**first** 37:22 39:5 40:4
  43:5 48:4 51:22
  52:13 56:11 59:15
  59:15 66:4,17 75:10
  75:23,25 76:1,3,5
  99:21 100:25
**five** 49:23 58:5 61:9
**fixed** 43:20
**flipping** 70:2
**floor** 3:8
**following** 56:17
**follows** 6:6 85:6
**foreclose** 94:5,17
**foreclosed** 97:17
**foreclosure** 22:20
  22:25
**foregoing** 108:9
  109:3,5,9
**forget** 48:10
**form** 66:14
**formulate** 24:22
**forth** 70:2 82:25
  83:9 109:4

**foundation** 17:17
  27:20 46:1,11 53:10
  66:25 86:12 87:12
  88:17 106:10,11,14
**frame** 16:7
**francisco** 1:2,14 2:2
  2:14 3:9,19 4:11,14
  5:21 6:1 23:24
  48:15,21 49:2,4,17
  103:20
**free** 12:3 59:8 65:25
**front** 37:1 62:5
**full** 32:3 37:12
  39:22 51:22 70:14
  70:14
**fuller** 66:1
**fun** 6:19
**further** 37:16 56:16
  109:8,11

**g**

**gaddis** 3:15 4:5 5:20
  6:10,11 10:24 11:4
  11:9,15,20 12:8,14
  13:6 14:4,11 15:22
  16:8 17:14,21 19:7
  19:10,19,24 20:16
  21:3,8,13,24 23:9
  24:11,16 25:5 26:1
  26:8,23,25 27:2,6
  27:24 28:11,15,17
  29:6,14,16 30:19
  31:3,6,11,16,20
  32:8,14 34:4,16,22
  35:4,11,23 36:1,21
  38:3,6 40:10,14
  41:5 43:11 45:18,20
  46:2,12 51:10,20
  53:14 54:9 55:22
  56:3,10 57:19,21
  59:1,7,14 61:10,17
  62:16,20 63:14 64:3
  65:8,11,14,20 67:4
  67:15 68:10,14,17
  72:6,12,16 75:7

77:5,10 78:14,24
  79:16 80:16 81:13
  81:17,21 82:9,13,23
  83:4,12 84:5,7,12
  84:17 86:13 87:18
  88:21 89:8,9,14,22
  90:17,23 91:12
  93:19,24 94:3,9,13
  95:16 97:8 98:6
  99:8,16 102:23
  103:1,18 104:1,24
  105:20,23 106:17
  106:23 107:4,8,10
**gas** 16:14
**getting** 20:4 23:16
  42:22,24
**give** 7:15,16 55:5
  59:11 60:22 66:1
**given** 6:21 109:10
**giving** 8:2
**gmac** 1:7 2:8 4:18
  5:9,9,12,12,15,15,21
  6:12,13 21:15,22
  22:19 24:19,25 25:3
  25:7,13,17,20,24
  26:6,15,19,20,22
  33:8,14,18,21 34:8
  34:19 35:7,16,19
  36:3,11 37:3,6
  38:10,22 42:4 59:24
  61:25 63:21 66:7,12
  66:21 67:20 68:3
  76:11 78:16 79:7,17
  81:25 82:1,2,2 83:6
  83:22 92:9,17,20,24
  94:4 95:9 97:4,22
  98:1,10,16,18,21
  102:14,22
**gmac's** 93:5
**gmag** 92:13
**go** 11:4,25 12:2 17:8
  24:11 29:14 31:3
  32:8 38:18 44:10
  55:4 65:12 66:3
  69:9 70:3 77:20

88:18 96:22 102:16
  102:23 103:18
  104:24
**going** 14:21,22
  20:18,21 21:6 29:17
  31:3 46:8 47:2,16
  48:2 51:10 57:19
  59:1 65:18 69:23,25
  72:7 74:11,15 82:20
  82:24 84:12 85:2
  86:11 88:11,16
  89:19 90:14 97:17
  97:19 98:11 99:14
  102:24
**good** 6:11,15,16
  45:16 74:14,15 92:3
**gosh** 76:12
**great** 33:5 107:11
**gross** 55:7 105:7
**grounds** 21:8
**group** 48:15,21,24
  49:3,13,17,18,20
  55:1 60:9
**guess** 96:16
**guys** 41:8
**gym** 96:15

**h**

**habit** 15:4
**half** 24:21
**halloran** 1:4,13 2:4
  2:12 4:3,16,18 5:5,6
  5:8,11,14 6:4,13,15
  6:24 11:11 12:15
  32:15,17,24 33:2,4
  33:7,14,18,21 34:1
  34:5,6,7,12,19 35:1
  35:1,7,16 39:13
  40:5,20 46:6 51:11
  51:24 52:4,7 54:15
  54:16 55:24 58:20
  59:2,20 60:1 61:12
  61:23 63:10 64:9,16
  64:17 67:2,10,19
  69:6,17,21 77:21

Sarnoff, A VERITEXT COMPANY
877-955-3855

[halloran - know]

78:15,17 79:12 81:5
81:19,20,23,23 82:2
82:2,8,10,15,15,21
82:21,25 83:6,15,20
84:8,18 86:6 87:17
87:21 91:10 92:12
92:17 95:18 96:1
98:11 99:10,17
108:8,18
**halloran's** 66:23
67:1 69:6 90:24
91:10 92:20
**hand** 29:22
**handed** 46:18
**handle** 15:18
**handwriting** 53:13
53:18,20 54:2,3
**handwritten** 52:15
52:23
**happen** 91:7
**happened** 102:19
**hard** 51:20 102:18
**harm** 96:14
**head** 7:15 48:6
77:19 95:17
**held** 38:12
**hello** 85:3
**heloc** 15:7,7
**help** 32:2,6
**helped** 93:6
**hereto** 108:11
**hold** 45:13 50:18,19
**holder** 37:14,15,24
37:25 63:21
**home** 15:7,10 42:5
74:16,18 91:14 93:9
94:22,23 95:2,6
97:16
**honest** 76:14
**honestly** 76:16 95:8
**hospital** 18:3,8
48:10,11
**hostile** 45:15 93:12
**hostility** 93:5,7,11

**hour** 49:22
**hourly** 49:21
**hours** 49:18,24 50:4
**house** 15:19 94:18
97:18 98:23 99:4,9
**household** 18:24
**huh** 7:17 41:21 65:6
68:18 74:13 83:3
84:24
**huhs** 7:17
**hundred** 48:8,18
55:18
**husband** 6:25 19:9
19:11 22:15 25:13
25:18,21 60:19
80:12 104:6
**husband's** 48:2,3
51:1 102:9 106:4

**i**

**idea** 51:18 68:22
74:18 80:6
**identification** 11:3,8
11:14 19:23 27:5
28:14 29:12 31:15
51:16 56:2 59:6
61:16 84:16 89:12
103:25 105:3
**identified** 37:23
38:21 40:6 55:24
59:4 60:20 61:13
62:9,13 71:22 73:7
73:14,22 74:8 75:1
75:3 80:18,22 81:1
81:6 85:15,19,24
86:5,8,18,19,24
99:23 103:4 105:5
**identifies** 32:9 37:5
55:7 60:11 76:9
**identify** 53:21 54:23
55:6,8
**identifying** 90:23
**illegible** 53:24
**imagine** 73:17

**immediately** 56:22
57:18
**important** 74:9,10
**impound** 57:11
**incarcerated** 104:14
**incarceration**
104:18
**include** 33:25
**included** 47:24
96:11
**includes** 26:5 57:11
70:10,16,21,25
71:24 73:9
**including** 25:24
26:20 100:24
**income** 18:23 47:22
47:23,25 50:23
105:7,13 106:4
**increase** 60:16
**incredibly** 81:9
**index** 4:1
**indicated** 70:13,15
**individual** 38:21
**inform** 8:4 64:10
**information** 21:2
34:10 40:18 63:6,15
73:23 83:9
**informed** 38:22
**initial** 12:10 43:19
44:3
**initialed** 108:11
**initials** 68:19,20
**initiated** 26:21
**ink** 108:11
**instruct** 72:13
**instructing** 40:10
**instrument** 37:16
**insurance** 57:12
100:24
**interest** 12:24 13:10
13:15,19 14:7 43:18
43:20,22 70:11,17
70:21 71:1,9,24
73:1,10 85:15,19
91:24 100:25

101:10,19,22 102:2
102:12
**interested** 109:12
**interpret** 10:5 93:5
**interrogatory** 20:20
**interruption** 29:5
29:13
**introduce** 11:4
19:19 27:2 29:9
31:6,11
**involves** 63:19
**irrelevant** 24:10
**issue** 8:15,18 25:16
56:18 80:2
**issues** 17:22 18:7
19:2 56:16
**item** 57:8 58:4

**j**

**j** 5:5,8,11,14 51:11
52:4 61:12 69:6
**january** 1:15 2:15
6:1 28:19,25 37:6
100:20 109:17
**job** 1:23 19:9 22:15
48:5 50:6,7
**jobs** 48:1
**judge** 44:22
**judgments** 52:20
**judicial** 22:20 103:6
**jump** 38:8
**june** 21:18,25 22:6

**k**

**karen** 3:5 5:20 89:9
91:3
**kearney** 3:7
**keep** 7:11 42:5 48:1
70:2
**kid** 102:16
**kind** 7:8 20:2
**kirkham** 4:11,13
8:19,19,20,22
**knew** 69:23,25
**know** 7:14 13:12
19:5 22:1 27:22

[know - mischaracterizes]

30:15 34:14 42:13
42:17,18,20 45:5,21
46:8,20,20,24 51:6
52:12 53:23 54:3
59:20 61:5 62:1
63:11,13 64:14 65:2
66:2 67:1,10 68:7
68:23 69:21 71:13
74:22 75:15 76:6,18
76:18 78:23 80:5,17
82:3,14 86:12 87:5
88:4,5,15 94:11,16
94:24 95:17 96:7,20
97:11,16 98:20
100:8,9 102:13,14
103:9,11,16 104:11
104:21 106:5,9,12
**knowing**  35:17
47:14
**knowledge**  24:20
25:8,9 35:25 36:12
36:18 92:11
**kstromeyer**  3:10

**l**

**lacks**  17:17 27:20
45:25 46:11 53:10
66:25 86:12 87:12
88:17 106:10,11
**laid**  106:14
**landline**  23:12,20
**late**  17:19 31:2
93:15 100:7
**law**  3:6,16 8:2 10:3
**lawsuit**  34:24 94:21
95:9 97:9
**lawyer**  76:15 91:24
92:15
**learn**  39:5 100:6
**leave**  83:14
**leaving**  56:22
**legal**  9:24 10:6
36:18 37:14,15,24
37:25 51:25 94:6

**lender**  12:25 37:14
37:17,18,23 38:12
43:8 75:17
**letter**  5:5,8,11,14
39:20 47:9 51:11,13
53:9 55:23 59:2
61:12 62:5,8,13,24
63:3 64:22 66:14,21
66:23 67:1,17,18,25
68:9,12,23,25 69:3
69:7,18,19,22,23,25
73:15,16 75:3,12,16
76:9 81:7 83:18,20
84:2 86:20 95:14
**letters**  83:1,5 97:12
97:21,23 98:16
**lied**  76:18,18
**lien**  53:3
**liens**  52:20 53:7
**life**  17:22
**line**  15:7,10 27:9,9
28:18 29:17 37:22
54:11 92:6
**listen**  93:15
**listening**  30:7
**lists**  47:12 105:6
**litigation**  34:2,13
56:16 81:11
**little**  57:17 91:14
**live**  8:2 42:4 95:11
**llc**  1:7 2:8 4:19 6:13
**loan**  5:24 8:6,13,25
11:6 12:23 20:10,14
21:16,20,22 22:4,6
27:18 30:1,6,21
31:25 35:5 36:7
38:14,25 40:22
42:16 45:22,23
46:19 47:16 51:23
52:3 57:3,6 59:24
63:20 64:19 66:15
67:24 68:4 70:5,9
71:4,12,15 72:3,11
72:20 74:2 75:24,25
76:2 77:15 82:1,22

83:10,17 84:1,9
85:5 88:7 89:25
90:13,24 92:10,13
94:8 95:10 99:22,24
100:12,19 104:25
106:1,6,7,8,12,14,19
**loans**  75:20 76:8
**located**  4:10,13 8:18
**long**  64:1
**longer**  18:19,21
**look**  11:23 12:4 20:7
22:8,18 27:9 28:18
29:17 37:12 43:1,5
43:6,17 44:1 47:9
52:13 56:11 57:8
62:23 66:5 77:20
95:21 97:1
**looked**  73:18
**looking**  12:7 86:15
95:16 96:19 97:24
101:2
**looks**  11:20 52:23
53:12 54:24 55:13
68:1 85:4 105:16
**lori**  1:21 2:16
109:20
**lose**  104:6
**loss**  5:5,8,11,14
18:23 38:22 51:12
52:8 55:24 59:2
61:12,24 63:9
**lost**  19:9,11 22:15
104:16
**lot**  18:15
**loud**  39:22
**lunch**  62:19

**m**

**m**  54:15,16
**m.d.**  48:23
**ma'am**  10:11,16,21
15:2,3 18:13 19:3
30:9,20 68:14 74:7
74:21 76:24,24
93:16 94:25 98:20

**machine**  109:7
**mail**  3:10,20 5:17,19
66:13 89:9 97:1,12
**making**  17:5,15
22:10,16 25:2,6
28:1,3 57:15,23
58:2 74:15 95:18
102:7
**march**  36:5
**marked**  11:2,7,13
19:22 27:4 28:13
29:11 31:14 51:15
56:1 59:5 61:15
84:15 89:11 103:24
105:2
**matter**  35:3
**maturity**  44:11,14
70:5
**mean**  8:18 10:19
15:5,7 35:22 49:8
54:5 58:17 60:2
67:9 79:1 81:10
82:18 91:7 93:7
99:11
**means**  67:9
**meant**  67:2,10
**medical**  10:3 18:17
48:15,21 49:3,17,20
54:25 60:9
**medicine**  10:20
**memory**  9:19 22:14
91:6
**mentioned**  37:3
63:2
**michael**  5:17 84:13
85:3 87:4,16 88:5
**mind**  19:5,6 68:2
73:17
**mine**  86:16
**minute**  20:2,5 31:8
102:24
**minutes**  61:9
**mischaracterizes**
90:20

Sarnoff, A VERITEXT COMPANY
877-955-3855

[misstates - obviously]

misstates  68:5 72:9
88:12
mitigation  5:5,8,11
5:14 38:22 51:12
52:8 55:24 59:3
61:12,24 63:9
modifiation  66:15
modification  35:5,6
35:15,19 36:3 38:25
39:14,17 40:21
41:13,18,25 42:12
46:23 51:24 52:3
53:15 59:24 61:24
63:8 64:1,9,10,19
67:24 68:3 75:2
76:11,21 78:6 79:13
80:1,21 81:25 83:10
83:16,25 84:10 85:6
85:22 86:18,19,23
87:11 88:7,8 89:4
90:5,8,12 91:1 92:9
92:13 93:2,10 95:10
modifications  90:15
modified  38:25 39:6
42:3,15 43:15,24
44:8,14,21,23 45:22
46:7,17 47:16 70:8
70:8,24 71:3,18,22
72:2,18 73:3,7,14
74:1,4,19 80:7
82:10 85:12,13,18
90:25
modifies  71:15
modify  70:25 76:1
78:16 79:6,23 88:23
89:5,25
modifying  79:8
moment  45:13 61:20
99:7
monday  1:15 6:1
89:10
money  100:14,18
month  10:7 50:14
51:8 58:5 60:24
75:10,18,18,19

101:9,14,17,20
monthly  10:15
13:16 22:11 44:3,7
44:17 46:9 55:13
57:10,15,24 58:2,6
58:12,13,21 60:22
60:23 70:16 74:3
100:23 101:6 105:7
months  28:6 30:1
50:15 81:12 104:18
104:20
moonlighting  50:6,7
morning  6:11,15,16
mortgage  1:7 2:8
4:19 6:12,13 8:6,13
8:25 9:22 16:18,22
16:24 17:1,3,6,7,8
17:10,16,24 18:4,9
20:10,14 21:16 22:3
22:6 25:6,11,16
27:18 28:1,3,7 29:1
30:1,6,10 31:2,25
34:8 38:14 39:6
40:22 42:15 43:15
43:24 44:7,8,14,17
46:7 47:16 52:24
57:2,6,24 58:2,12
58:13,21 59:24 63:7
63:8,21 64:19 65:18
68:4 70:5,9 71:15
72:3 74:2,19 75:20
75:23,25 76:2,8
77:15 79:23 80:7
83:17 84:1 88:24
89:5,25 90:13,24
92:4,9,13 94:17
99:18,21 100:2,12
100:19,23 101:6,15
101:18 102:2
106:19
mortgages  52:20
mother  17:25 18:21
30:18
mpbf.com  3:10

murphy  3:4

n

name  6:23 7:1 14:16
14:23 36:23 48:14
52:21 78:20 109:15
named  87:4
necessarily  67:9
necessary  76:10
need  7:19,20 12:2
29:7 50:5,16 66:1
77:5 82:3 107:9,14
needed  73:23
negotiate  79:12
negotiating  58:20
93:2
negotiation  35:15
52:1 76:17 82:25
negotiations  59:16
59:20,23 60:2 78:9
78:15 82:24 83:5,8
neighbors  97:20
neither  109:11
nervous  40:17
net  55:8,9,12 60:11
60:13
never  6:25 25:20,23
26:22 75:17 76:21
80:4 81:25 87:2
88:2,19
new  46:9 65:24
73:19 74:11 85:12
85:13,18
nights  50:13
nods  7:15 77:19
non  22:20
nonjudicial  22:24
normal  7:14
normally  25:18
note  4:10 8:9 9:6,10
9:16,20,22 11:1,24
12:5,9,17,18 13:3,7
13:11,20 14:7,13,14
36:4,10 37:3,16,17
38:12 43:4,5,12

44:4,12,14 77:24
78:2 79:5,6,9,13
noted  107:19 108:11
notice  4:16,23 11:10
12:2 31:8,12,22
32:9
november  5:11,14
8:5,9 9:10,13 13:25
14:8 44:12 59:3
60:3 61:11 62:5,8
95:4
number  5:6,9,12,15
6:13 7:20 11:6
19:20,21 20:7 23:10
23:15,18,20 24:2,5
24:9,15 27:3 31:7
52:24 53:3 54:22
56:19 57:8 58:4,22
60:7,21 62:22
100:10
numbered  27:7
numbers  11:21
33:11 52:22

o

oath  6:5
object  20:18,21
26:13 72:7 86:11
88:11,16 89:19
90:14
objection  14:9 15:20
20:15 24:10 25:1
26:4 27:19 32:12
33:23 34:9 35:9
36:17 40:8 43:9
45:25 46:10 53:10
63:17 66:24 68:5
72:12 75:5 78:12
81:8 87:12 91:11
94:6 106:11
obligated  10:7,14
44:17
obtaining  106:19
obviously  33:3

Sarnoff, A VERITEXT COMPANY
877-955-3855

[occasions - plf00125]

occasions  93:23
october  4:10,13 5:24
  11:1,6 58:7
offense  15:5
offensive  10:19,20
offer  10:24 11:10
  28:11 51:10 55:22
  56:17 59:1 61:10
  89:3,4 90:5,16
  103:18 104:24
offered  45:22 46:7
  89:24
office  48:12,13,14
  85:4 92:20,22
  103:21
oh  12:21 75:17
  77:22 81:21 103:10
  104:5 105:11
okay  6:23 7:2 8:4
  9:2 10:1,22 11:20
  12:22 13:6,10,13
  14:17,19 16:12 20:7
  22:2 24:17 26:9,23
  26:24 31:19 32:8,14
  32:20 33:4 38:7
  41:8,12 43:1 45:9
  46:21 47:4 48:13
  49:19,22 50:3,17
  53:18 54:13,17 61:1
  61:3 62:18 64:4,16
  65:3,20,25 66:10
  67:14,23 68:25 72:1
  73:25 74:4,23 75:14
  76:20,25 81:4,4
  83:12,13 84:4 87:2
  87:6,9 88:3,6 90:2
  91:8 92:1,5 93:20
  94:20 97:3 98:5,20
  99:6 100:1 102:11
  104:23 105:11
  106:22,23 107:14
  107:17
older  32:20,25
once  50:14,14 56:4
  61:18 62:11 86:7

ones  103:16
order  12:24 26:9
  56:15 82:4
original  9:9,12 14:7
  45:24 80:9
outside  25:6,11
  74:23 75:1 99:7,14
outstanding  56:19
overwhelmed  30:18
owner  37:14,15,24
  37:25

**p**

p.m.  2:15 107:19
package  61:24
packet  52:8 53:15
page  4:9 5:3 13:13
  13:14 20:8 51:22
  56:11 57:8 59:15
  60:5,7,20 66:6
  105:4,9
pages  1:25
paid  16:10 74:16,18
  100:14,19
paper  46:18
papers  65:23
paperwork  40:2,6
  64:18,22 65:1,16
  66:7,13,22 67:2,6,8
  67:18,20,21 68:2,7
  68:8
paragraph  20:7,9
  21:14 22:8,18 32:3
  33:11 37:5,12,23
  38:8,10,18,20 39:23
  40:6 43:6,17 44:1
  51:22 56:12 59:15
  66:5,9 67:6 70:14
  95:21,23
paragraphs  33:12
  33:13 37:2
part  53:21 58:23
  59:23 62:4,7,12
  69:19 83:10 106:13
  106:15,18

partial  18:7
partially  18:5,6
particular  12:7
party  63:4 83:4
  109:13
patients  49:8,9,14
  49:15 63:25
pause  24:23
pay  10:7,14 12:20
  12:24 15:25 16:12
  16:14,16 42:15 43:6
  43:7 46:19,20 54:24
  54:25 55:6,6,8,9,12
  55:13,14 56:22 58:6
  58:20 60:8,11,13,15
  94:16 100:19
paying  16:2,5
payment  20:10 22:3
  22:5 40:3,4 44:3,7
  57:24 58:2,5 70:16
  70:17 71:1,9,24
  72:25 73:10 74:11
  75:2,5 99:18,21
  100:2,23 101:6,10
  101:15 102:3
payments  13:16
  16:16,18 17:6,16,24
  18:4,9 20:14 21:15
  21:20,21 22:11,16
  25:3,6,11,16 28:1,4
  28:7 29:1 30:1,10
  36:5 44:17 46:9
  47:17 57:11,15 58:7
  58:12,13,20 74:16
  76:17 100:11
  102:18
payroll  59:17
pearson  3:4
pediatric  48:15,21
  48:23 49:1,3,13,17
  49:25 54:25 60:9
pediatricians  50:6
penalty  108:9
pending  19:6 80:14
  99:8

pension  51:2,5
  59:17 60:18 102:9
people  76:13 99:11
percent  39:1 43:20
period  104:12
perjury  7:24 8:3
  108:9
permanent  38:24
  66:15 75:19 83:17
person  92:3
personally  8:7
persons  52:21
phone  3:11,21 23:10
  23:15,18,20 24:5,9
  24:14,17 29:7 39:13
  92:16 96:25 98:2,7
  98:9,18,19
phoned  64:9
piece  46:18
place  35:7,16 62:16
  109:4
placed  100:14 103:5
places  67:8 102:8
plaintiff  20:23 38:23
  90:19
plaintiffs  1:5 2:6 3:3
  11:20 20:9,19 22:3
  22:9 27:20 37:6
  38:11,11,23 66:13
  95:23
please  7:5,9,19,22
  12:5 15:3 16:6
  21:12 27:21 29:8
  31:17 37:9,13 38:9
  38:19 39:19,23
  45:14 51:18,23 52:2
  52:20 54:13,22 57:9
  58:4 59:16 62:23
  65:9 66:6 68:20
  69:9 72:12,13 86:1
  107:2,4
pleased  85:5
plf00001  11:22
plf00125  11:22

[plus - recall]

plus  12:24
point  9:20 24:5 26:3
   27:8 32:9 35:23
   36:4 57:18 80:11
   95:4 100:13 101:6
   101:18
porter  5:17 84:13
   87:4,16 88:5
portion  54:6,7
position  48:9,22
   104:7,17
positions  50:17,19
possible  52:2 73:13
   107:12
possibly  79:8
post  26:2 87:24
potential  52:3 56:16
power  36:13,23
   54:15,17 78:3,5,17
   79:9,11,19,22 80:11
practice  49:16,16
pre  100:3
preapprove  69:24
preceding  34:23
precise  19:13 47:8
   61:5
precisely  19:17
   30:23,24,25 31:1
   33:16 39:18
prepared  27:20
   56:17
present  39:3 84:12
   95:5
presented  88:9 89:4
   89:15 90:16
pressure  96:18
previous  60:2,2 76:7
previously  62:8
price  80:5
primarily  106:3,3
principal  10:6
principle  10:14
   43:15 70:8,10,17,21
   70:24 71:1,3,4,10
   71:17,21,23,23,24

71:25 72:2,11,18,19
   73:1,6,8,8,9,11,14
   73:22 74:1,4,19
   80:3,7,10,17,22
   81:1,3 100:25
   101:10,19,22 102:2
   102:12
print  56:4 61:18
   105:16,24
prior  8:5,9 24:24
   25:6,10 42:10 57:16
   57:18,18 60:3
   104:18,19,20 109:5
private  48:12,13
privilege  26:13
   33:24 34:10,25
   41:11 82:19
privileged  40:18
   42:11 82:17
privy  83:5,22 92:16
probably  12:2 24:18
   25:2 45:12 58:15
   64:11,14 94:7 101:2
   101:16 103:16
procedures  22:20
   22:25
proceed  40:3
proceedings  109:3,5
   109:7
process  8:25 106:19
produced  9:19
   11:21 87:23
producing  11:18
product  21:2 34:10
production  4:17
   11:12
profession  29:7
promise  12:20,23
   43:6,7
promissory  38:12
proof  96:3,7
proofread  69:25
proper  20:20
property  4:10,13
   8:15,17,18 9:3,7

15:8,11,16 22:21
   23:13 29:3 30:2,6
   30:10,22 38:15
   52:20 53:9 103:6,23
   103:23
proposed  39:14,16
   40:21 41:13,18,25
   42:12 46:7,17,22
   64:8,19
provided  83:9
provisions  12:16
   83:9
psychiatric  96:21
pull  10:1 43:3
purely  47:21
pursuant  59:15
put  77:16 83:1,8
   100:18

## q

question  7:5,7,9,9
   7:11,22,22 9:8
   10:11,12 12:13
   15:23 18:13 19:3,6
   21:4,12,19 23:6
   24:21,22 25:14
   26:10 30:5,11 32:22
   35:12 40:13,16,23
   40:24 41:6,23 42:14
   43:12,21 44:6,13,25
   45:1,21 46:3,13
   47:1,3 56:6 59:10
   63:1,22 65:8 66:2
   67:16 70:23 72:15
   73:17,25 74:21 75:8
   76:24 77:1,4,6,6,11
   78:23,25 79:2,3,15
   79:18,19,25 80:13
   80:14,15,24,25
   81:14 83:23 86:14
   88:20,22 91:13,17
   91:19,21,23,25 92:2
   92:8 93:16,18,23
   94:2,14 97:7,21
   98:4,5 99:8,13

104:3
questioning  92:6
questions  7:4 93:1
quick  24:12 84:5
quickly  69:9
quite  18:15
quizzed  20:4

## r

raise  55:14,16,18,19
rate  4:10 11:1 12:4
   12:17,18 13:7,15,20
   14:7,12 43:4,5,20
   43:22 44:4,12 55:6
   55:6 60:15 77:24
   78:1 79:5,9 85:16
rates  85:19
read  12:22 13:1,12
   13:24 14:23 20:11
   20:22 22:12,22
   30:13,16 37:20 38:5
   38:16 39:22 51:17
   51:21 52:5,12,17
   53:13,25 54:12,13
   56:5,7,24 57:13
   58:8 59:18 61:21
   62:2 65:8,10 66:17
   67:13 68:20 70:12
   72:14 73:12 77:1,6
   77:6,8 78:19,21
   85:2,7 103:12
   105:16,21 108:9
reads  28:22 29:23
   38:10,20 51:23
   59:15 66:6 70:15,22
   85:21
ready  31:19 59:9,12
real  24:11 84:5
realistic  76:13
really  15:4 53:13
   65:2 67:20 99:5
   105:21
reasons  83:8
recall  8:11,23 9:4,5
   16:4 17:18,22 19:11

Sarnoff, A VERITEXT COMPANY
877-955-3855

[recall - section]

22:7,24 23:10,15,18
24:8,14 27:1,25
28:3,6,25 29:25
30:5,9,12,21,23,25
33:7,17 36:22,24
39:11,12,16 40:16
44:16 48:4 49:19
50:8,8 51:5 52:7
53:15,17,22 55:16
55:20,21 57:20,22
57:23 58:2,19,22,23
60:4,17,17 61:22
62:1 63:23,24 64:5
64:6,20 65:2 89:15
89:24 90:2,7,11
99:17 100:2,5 103:8
104:2,10,20
**receipt**  36:9 96:17
**receive**  49:8
**received**  12:23 97:3
97:10,12,22,23,25
98:14,15,18
**recollection**  27:21
31:23 32:6 33:13
104:16
**reconsider**  36:6
**record**  7:12 24:11
24:13 29:14 31:4,8
39:23 54:8,14,23
65:10 66:3 77:8
78:21 81:18 84:5
102:23 109:6,9
**recorded**  7:3,13
31:7,12 103:19
**recorder's**  103:21
**redo**  76:17
**reference**  37:3 71:3
72:18
**referenced**  66:23
67:18 70:4
**references**  64:23
70:24
**referencing**  36:10
70:8

**referral**  48:23 49:13
49:25
**referring**  59:21
64:17 71:4 72:19
77:17,24 95:13
103:15
**refrain**  7:17
**refresh**  9:19 22:14
31:23 32:6 33:13
**refreshes**  27:21
**regard**  52:1
**regarding**  34:1
35:19 68:3 81:25
82:21 92:13
**regards**  16:21,24
17:1,3 34:25 41:13
**register**  61:6
**reinstatement**  56:20
**rejecting**  93:4
**related**  22:20 34:12
35:2,3 38:14
**relative**  109:12
**relevance**  9:21 10:9
32:16
**relevant**  32:18
**relied**  63:20
**remember**  9:24
10:13 16:10 19:14
19:16 31:1 58:14,16
64:7,11,12,15 65:15
65:21 89:13,17,21
89:23 90:1,6 91:7
103:10 104:12,14
**remembering**  48:17
**renegotiated**  99:22
99:24
**rents**  5:23 103:20
**repay**  45:23
**repayment**  37:7,7
**repeat**  21:12
**report**  97:14
**reported**  1:21
**reporter**  2:16 11:3,8
11:14 19:23 27:5
28:14 29:12 30:15

31:15 51:16 56:2
59:6 61:16 84:16
89:12 103:25 105:3
106:25 107:5,9,14
107:17 109:1
**represent**  6:12
**represented**  38:11
**request**  4:17 11:11
34:7,18 51:23 85:6
**required**  8:4
**resided**  95:5
**residential**  5:24
104:25
**residing**  95:1
**resolution**  56:17
**respond**  7:22 20:23
20:25 52:2
**responses**  7:16,17
**responsibilities**  49:1
**restate**  23:11 33:6
34:6 41:6 47:2
58:10 64:7 74:25
77:15 98:14 103:3
104:13
**restroom**  45:17
**retirement**  48:2,3
51:1
**return**  12:23
**returned**  99:19
**reveal**  32:23 34:21
**revealing**  34:15,20
**review**  10:2 12:5,6
12:13,16 20:3,5
31:17 33:12 37:2,9
37:10 53:19 59:8
61:19 106:5,6,7,8
**reviewed**  67:12
**reviewing**  14:5
31:21
**right**  10:2 12:15,19
12:21 13:22 14:23
27:13 29:22 53:2
55:2 56:6 62:17
71:25 73:10 77:22
79:3,4 81:3,21

100:22 102:14
105:9,10 106:21
**risk**  94:17
**road**  7:2
**role**  93:2
**rough**  107:12,15
**routine**  18:19,20
**row**  85:15,21 105:12
**rules**  7:2 8:2
**rush**  107:15

**s**

**sake**  40:15 63:2
**salary**  46:14,20,24
47:14,21 48:4,20
49:20,21
**san**  1:2,14 2:2,14
3:9,19 4:11,14 5:21
6:1 23:24 48:15,21
49:2,4,17 103:20
**saw**  67:22 68:8 80:4
**saying**  18:2 27:1
40:15 46:19 65:18
81:10
**says**  12:20 14:2 22:2
38:2 51:17,19 53:23
55:2 56:15 70:10,25
71:25 73:10 76:16
76:19,20,23 77:9
84:22 85:3 86:21,21
105:19
**schedule**  55:13
**scheduled**  70:16
**screw**  92:4
**scrunched**  103:16
**second**  11:9 12:4
13:13 31:17 32:3
33:12 37:4,10,12
39:22 48:22 52:24
60:20 65:5,13 70:13
70:14 73:2 105:4
**section**  12:19 44:2
44:10 52:13 84:23
85:9

Sarnoff, A VERITEXT COMPANY
877-955-3855

[security - suite]

security  37:16
see  12:19 13:17,19
  27:11,15 28:20,22
  29:20 37:22 47:12
  49:14,15 52:15,25
  53:2,5 54:11 56:13
  60:11 69:15 70:4,7
  70:23 71:6 72:23
  73:13 74:4,7,24
  75:2 84:23 93:11
  96:1 97:20 105:6,7
  105:14
seeing  58:14,16
seen  12:10 19:25
  84:18 87:2,8 88:2,2
  88:19 106:15
sees  38:3
sell  4:23 31:13,22
send  69:23,25
sending  21:22 52:7
  69:21
sense  78:13 101:13
sent  36:4,7 66:7,12
  84:22 87:17
sentence  66:17
  70:14,22
separate  9:15 93:8
september  5:8 55:23
  56:20 57:1,5,16
  58:11 62:13
servicer  37:15,24
set  109:4
settlement  90:16
seven  104:21
seventy  49:23
severe  95:24 96:3,7
  96:23
severson  3:14
severson.com  3:20
shadow  97:13
sheet  80:21
shifts  50:1
short  19:8 24:13
  29:15 31:5,10 45:19
  65:7 84:6 99:15

102:25
shorthand  2:16
  109:1,7
shown  87:6,22,25
sick  102:17
side  29:22
sign  77:12 80:19
  82:5 97:18
signatory  8:8 14:12
  14:22,24 79:5
signature  12:10
  15:2 54:11,17,18,19
  54:20 68:11,16,25
  69:3,7,11,13,15
  77:16,21,25 79:25
signed  14:17 76:21
  77:14 105:1
significance  81:24
significant  81:19
signing  82:5,5
similar  49:16
single  17:25 30:18
  80:1 92:19,23 94:7
six  9:25
small  56:4 61:18
sole  18:11,16
solely  106:3
somebody  46:18
  87:4 98:23
someplace  100:4
somewhat  8:24 9:1
son  30:8,17
soon  52:2 107:12
sorry  24:21 48:10
  49:1 50:12 52:18
  66:9 70:2 86:3
sort  100:15
sounds  92:7
speaks  13:4 14:10
  15:1 32:13 43:10
specific  22:1 65:16
  100:5
specifically  41:15
  58:22 65:21 90:10
  95:8

specifics  51:8 63:23
  63:24 64:15
specify  16:6
spoke  26:22 61:3
spoken  60:1
spring  17:19,19,23
  18:9
stamp  11:21 60:7
stamped  4:11,14,20
  4:21,22 5:7,9,12,15
  5:18,24 27:3 28:15
  29:10 51:13 60:6,21
  89:10
start  17:5,15 66:11
  70:13
started  21:22
starts  32:3
state  1:1 2:1 21:15
  23:20 41:15 83:12
  106:18 108:15
  109:2
stated  42:3 81:24
  102:1 103:2
statement  20:21
  21:10 27:13 28:22
  29:22 74:23 79:4
  83:13
states  13:15,19 20:9
  37:13,23 43:7,19
  44:3,11 52:19 53:3
  66:13 105:12
stay  44:10
step  29:7 99:7,14
stokes  1:21 2:16
  109:20
stop  62:16
street  3:7 4:11,14
  8:20,21,22
stressed  97:16
stressful  97:20 99:1
  99:3,5
string  5:19
stromeyer  3:5 5:20
  11:18 12:6,12 13:4
  14:1,9 15:20 16:6

17:11,17 19:5 20:15
  20:18 21:6,9,19
  23:5 24:10 25:1,25
  26:4,18,24 27:19
  31:19 32:12 33:23
  34:9 35:2,9,21
  36:17 38:1 40:8,12
  41:2 43:9 45:16,25
  46:10 53:10 54:5,8
  56:7 57:17 59:9,11
  62:18 63:11,17 65:4
  66:24 67:7,14 68:5
  68:13 72:7,14 75:5
  78:12,19,22 80:13
  81:8 82:18 83:3,7
  86:11 87:12 88:11
  88:20 89:9,19 90:14
  90:18 91:11 93:17
  93:22 94:1,6,11
  95:19,21 97:6 98:3
  99:6,13 105:18
  106:10 107:2,7,16
stub  54:24,25 60:8
stuck  66:4
stuff  18:15 53:25
stupid  74:20
subject  9:3,7 15:8
  15:11,16 22:21
  23:13 29:3 30:2,6
  30:10,21,22 35:3
  38:14 53:9 57:2
  103:23
submission  53:8
submit  61:23
submitted  79:11
submitting  61:22
subscribed  109:14
subsequent  7:11
  15:15
substance  34:17
substantial  55:19
suffered  95:24 96:7
suicide  96:14
suite  2:13 3:18

[sum - turn]

sum  56:22 58:6
summer  17:20,23
  18:9
superior  1:1 2:1
  5:21
support  18:16
supporter  18:11
supporting  21:11
suppose  102:16,17
supposed  21:5 71:9
  72:25
sure  7:20 10:4 21:14
  25:15 26:13 67:20
  68:1 75:15 78:14
  100:5 102:22 104:8
  105:24
surprised  100:6,8
swapped  78:20
sworn  109:6
synonym  45:11

**t**

table  7:22
tacked  97:18
take  7:23 12:3 29:7
  31:17 35:7 37:10
  60:25 62:4,7,12
  69:19 93:9 98:23
  99:4,9 106:13 107:3
taken  2:12 7:1 8:5
  15:8,11,15 19:8
  20:22 29:15 31:5,10
  45:19 59:23 62:19
  65:7 84:6 99:15
  100:14 102:25
  109:3
takes  45:13
talk  41:8 65:4 73:2
  79:14
talked  25:20,24
  26:12 30:7
talking  17:12,13
  47:7 67:21
taxes  57:11 60:25
  100:24

ted  5:20
telephone  38:23
  39:2 52:21 97:25
telephonic  29:5,13
tell  25:20 26:11 28:6
  30:24 33:19 39:13
  41:2,3 64:17,25
  65:22 74:17
telling  41:10 71:8
  72:25 80:4
tend  7:15 24:21
term  7:24 13:8,9
  42:21 45:4,5,10
  56:19 64:22 70:4,7
  72:10,10 82:25 94:8
termination  104:8
terms  9:9,12 10:6,6
  10:13 12:16 14:6,21
  39:14,16 41:18,25
  42:14,19,23 44:21
  45:22,24 46:6,9,17
  46:22,22 47:6,7,12
  47:15 56:17 63:19
  64:4,8 65:19 72:8
  76:10,17 81:6,10,11
  82:10,21,23 85:9
  87:10 88:7,9,23,25
  89:15,24 90:24 91:1
  91:9 93:4,4
terrible  6:20 52:18
testified  6:6 67:3,11
  106:13
testifying  109:6
testimony  8:2 68:6
  72:9 73:21,25 83:15
  83:24 88:12,12,14
  88:16 108:12 109:9
thank  10:23 23:4
  38:7 47:19 54:9
  55:4 65:11 107:17
thing  67:9
things  9:15 10:8
  12:1 18:19,20 30:25
  48:1 91:5

think  6:22 15:13
  17:20 34:20 36:6
  55:2 74:9 78:19
  81:15 90:20 93:12
  94:24 101:11
  102:24 104:15
  106:23
third  50:25 60:5
  79:22
thought  48:16 76:25
  82:4
thousand  48:8,18
  55:19
three  30:1 36:5,9
  93:7
throwing  91:5
tim  32:15,17,24 33:2
  33:4,7,14,21 34:6,7
  35:1,7,16 46:5,6,22
  47:6 58:19 59:2
  61:23 63:13,15
  64:17,25 79:12
  81:23 82:1,2,15,21
  82:25 83:20 87:20
  91:10 92:12
time  16:6,19 19:14
  35:10,18 40:2 45:16
  58:1,10 59:12 73:13
  80:11 98:15 100:2
  106:4 107:5,19
  109:4
timely  17:6,24 18:4
  18:9 40:4 46:9
times  38:10 83:1
timothy  5:5,8,11,14
  51:11 52:4 55:23
  61:12 63:9 69:6,17
tiny  103:14 105:16
title  47:24 48:22
  51:22
today  6:17 7:21
  11:17 24:2
told  46:5,6,22 47:6
  64:14,25 65:22,23
  74:11

tomorrow  107:10
top  13:15,22 27:10
  29:17,18 48:6 54:5
  54:7 84:14,21 85:2
  95:17
total  56:19 72:11
  73:14 74:18
totally  58:6
traditional  66:14
transcribed  109:8
transcript  7:3 23:7
  107:1 108:10
transferee  37:18
transfers  37:17
transitional  38:25
treat  49:8
trial  96:22
trouble  17:15 27:25
true  67:25 108:12
  109:9
truly  52:4
trust  4:13,23 5:22
  8:9 9:3,7,13,16,20
  9:23 10:15 11:5,24
  12:17 14:20,22,25
  15:15 17:6,7,10
  31:13,23 35:7,16,20
  36:3 41:14,19 42:1
  42:19 43:2,13 44:18
  44:22,23 45:24
  76:12,13 77:18 78:7
  78:16 79:7,13 80:2
  80:9,19 90:8 91:25
  93:13,21 94:4 103:5
  103:19,22 104:2
  106:2
trusting  102:14
try  7:11,16,17 23:5
  24:22 45:9 73:13
  92:4
trying  93:9 98:23,25
  99:2,9
turn  12:18 13:13
  14:19 36:25 39:19
  52:11 54:10,22 60:5

[turn - youngster]

62:21 86:1,2 105:4
**twice** 23:8 50:15
**two** 9:15 48:1 50:15
50:17 53:3 67:8
68:19 102:8
**tx** 84:13
**type** 35:23 52:16
69:24

**u**

**u.s.** 12:24 53:3
103:7
**uh** 7:17,17 41:21
65:6 68:18 74:13
83:3 84:24
**unaware** 45:23
90:25
**undersigned** 109:1
**understand** 6:19 7:5
9:8 10:4 13:10
15:23 17:9,12 18:22
19:3 21:4 25:14
29:6 30:20 32:22
35:12 40:1 41:23
44:25 45:1 46:3,13
46:17 47:5 51:20
62:3 65:25 70:1
71:2,6 72:17,22
73:20 75:8 76:10
78:25 79:1,2 81:14
81:15 82:13 83:13
86:14,15 91:13,17
91:18,21 96:13
101:12
**understandable**
42:25
**understanding** 14:6
18:2 25:10 27:17
35:14 60:23 64:21
67:17 72:1 75:13
83:16,25 84:3,8
106:2
**uniform** 5:24
104:25

**united** 66:13
**unknowledgeable**
42:19
**unnecessary** 24:18
**use** 45:3,11,17
**uses** 82:25

**v**

**v** 5:9,12,15 14:18
54:16
**vague** 15:20 25:1
35:9 57:17 75:6
**valid** 73:24
**value** 100:11
**varies** 50:1,15
**vein** 7:8
**venue** 20:20
**verbal** 7:14,16 35:22
36:7
**verbiage** 10:4 75:13
75:16
**verify** 89:2
**versus** 6:13
**volume** 1:16 2:12
4:3
**vs** 1:6 2:7 4:18 5:20

**w**

**wait** 12:12 23:5 97:6
**walking** 76:25
**want** 11:25 12:6
30:13 51:7 77:1
81:17 82:14 94:21
94:22 95:10,10,11
96:5,6,17,20 99:6
102:15
**wanting** 95:8
**wants** 59:11
**ward** 1:4 2:4 4:11
4:14,18,20,21,22
5:6,7,9,9,12,12,15
5:15,18,18,20,25,25
6:12,25 14:18 24:8
25:13 27:3 28:15
29:10 36:14,15,22
51:13,13,24 52:11

53:4 54:10,16,18,22
55:25,25 59:4,4
60:6,20,21 61:13,14
78:3,6,10,11,18
79:5,10,20 81:19
82:7 84:14 105:1,5
**ward's** 69:3,13 76:4
77:25
**way** 35:17 79:7
100:1 102:22
**ways** 72:8
**we've** 60:19 80:6
81:11 83:1
**week** 49:24 50:10,11
50:15
**went** 87:16
**werson** 3:14
**whereof** 109:14
**willing** 91:9
**witness** 4:2 12:9
14:3 17:13,19 19:9
21:5,21 23:8 24:14
26:7,22 27:1,23
30:13,17 34:3,14
35:25 36:20 38:5
40:13 51:17 53:12
54:7 56:9 57:20
59:10,13 63:12,23
65:6,12,15,21 67:13
68:7,15 77:9,19
81:20 82:8,12 87:15
88:19 89:13,21 98:5
105:21 109:14
**witnesses** 109:5
**word** 67:7 81:3
**wording** 9:24
**work** 21:1 34:10
48:1 49:25 92:22
**write** 68:23 74:6
**writing** 53:22
**written** 37:7 73:16
87:15,20
**wrong** 12:22 51:8
70:12

**wrote** 74:14 99:23

**y**

**yeah** 12:21 14:3
20:1 36:20 38:5
46:25 52:18 55:2,2
55:15 59:13 60:12
61:5 66:19 76:3
84:3 105:15 107:11
**year** 19:14,16 28:9
36:5 58:1 60:22
100:12 104:10
**yearly** 51:6
**years** 9:25 58:5
**younger** 32:20 33:2
33:4
**youngster** 17:25

Page 16