IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT NEW YORK

RESIDENTIAL CAPITAL, L.L.C., et al.                    Chapter 11
    Debtors                                      Administratively Consolidated

RESCAP BORROWER CLAIMS TRUST,
Objector
v.
RICHARD D. RODE,
Creditor-Beneficiary

DECLARATION OF BILL PAATALO OFFERED AS DIRECT TESTIMONY

    Bill Paatalo declares under penalty of perjury pursuant to 28 U.S.C. sec. 1746:

    1. I am a competent adult, more than 18 years of age, and am a citizen of the State of Montana and the United States of America.

    2. My qualifications are set forth on my attached Report.

    3. Exhibit A attached hereto, and the Exhibits in support thereof are true and correct copies of what they purport to be.

Dated this 31st day of March, 2016.

**CONFIDENTIAL**

The information contained in this report is intended only for the person or entity to which they are addressed and may contain confidential and/or privileged information. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient may be prohibited by state or federal law. If you received this report in error, please contact BP Investigative Agency @ 406-328-4075, or email info.bpia@gmail.com, and delete the material from any computer or server where electronic information is stored. Thank you.

## This report was prepared by:
## William J. Paatalo
## Private Investigator – Oregon PSID# 49411
## BP Investigative Agency, LLC
## P.O. Box 838
## Absarokee, MT 59001
## (406) 328-4075
## Bill.bpia@gmail.com

## QUALIFICATIONS OF WILLIAM J. PAATALO

### Curriculum Vitae

William Paatalo has been a licensed private investigator since September of 2009. He has 17 years combined experience in both law enforcement and the mortgage industry which he has utilized to become a leading expert in the areas of chain of title analyses and securitization. He was a police officer with the St. Paul, Minnesota Police Department from 1990-1996 where he was assigned "Field Training Officer" duties in only his second year on the job, and also received multiple commendations.

Mr. Paatalo worked in the mortgage industry as a "loan officer" with Conseco Home Finance from 1999 – 2000, followed by two years of being a branch manager for multiple mortgage brokering firms. From 2002 – 2008, he became the President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota. As President of Wissota Mortgage, LLC, Mr. Paatalo was responsible for overseeing the origination, processing, and underwriting of mortgage loans, as well as managing a staff of 17 employees.

1. Rode Case: Expert Witness Report – William J. Paatalo

Mr. Paatalo has worked exclusively since 2010 investigating foreclosure fraud, chain of title, the securitization of residential and commercial mortgage loans, and accounting issues relevant to alleged "defaults."  Mr. Paatalo is also a Certified Forensic Mortgage Loan Auditor through ("CFLA"), and has spent more than 10,000 hours conducting investigatory research specifically related to mortgage securitization and chain of title analysis. He has performed such analyses for residential real estate located in many states, including but not limited to, Washington, Oregon, California, Nevada, Florida, Montana, Texas, Arizona, Ohio, New Jersey, and several other states. To date, Mr. Paatalo has conducted nearly 900 investigations and has provided written expert testimony in the form of affidavits and declarations in approximately 90 -100 cases nationwide.  Mr. Paatalo has been qualified in both state and federal courts as an expert, and personally appeared and testified at trial in the four cases outlined below. This experience has lead to Mr. Paatalo becoming one of the leading experts in this field.

 Mr. Paatalo's specific areas of expertise allowed by the courts in the cases referenced below are as follows:

- Knowledge of the "Pooling & Servicing Agreements" and various Securities & Exchange Commission (SEC) filings associated with mortgage-backed securitized trusts.
- Specific language in the PSA's and Prospectus / Prospectus Supplements involving securitization participants, key dates, "Servicer Advances," sources of third-party payments, and transfer and conveyancing requirements to name a few.
- Knowledge and use of MBSData, and the interpretation of its internal accounting data showing "advance payments" made to the certificateholders / investors, as well as other information specific to accounting, chain of title, and other aspects of securitization.
- Chain of Title analyses based upon publicly recorded documents, documents produced in discovery, and documents attached as exhibits to foreclosure complaints. Documents typically include mortgages, deeds of trust, assignments, notes, and allonges; in addition to documents filed under penalty of perjury with the SEC.

## Relevant Experience:

- Police Officer / "Field Training Officer" – St. Paul, MN 1990-1996.
- Oregon licensed private investigator under ORS 703.430, and has met the necessary requirements under ORS 703.415. To obtain his PI license, Mr. Paatalo met the requirement of 5,000 hours of investigation experience in the law enforcement field, and passed a thorough background investigation and criminal history check.
- Member of the "Oregon Association of Licensed Investigators" (OALI.)
- President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota from 2002 – 2008.

## Education:

A.A.S. – Law Enforcement – Normandale C.C., Bloomington, MN – 1986
Marketing Management Certificate – Concordia University, St. Paul, MN 2001
Forensic Loan Auditor Certification Training Course (CFLA) – 32 hrs. – San Diego, CA 2011

## Expert Testimony (Trial):

### FEDERAL CASES

*Robert T. Fanning, Debtor – U.S.Bankruptcy Court, District of Montana – BK Case No. 10-61660*

*Rivera v. Deutsche Bank National Trust Company, U.S. BK Court, Northern CA – Oakland – Case No. 14-54193-MEH-13.*

### STATE CASES

### OHIO

*Washington Mutual Bank fka Washington Mutual Bank, F.A. v. Jon A. Smetana, et al.,In The Court of Common Pleas, Cuyahoga County, Ohio Case No.CV-08-652392.*

## OREGON

*U.S. Bank, N.A.as Trustee v. Natache D. Rinegard-Guirma, et al. - Circuit Court For The State Of Oregon, County Of Multnomah - Case No. 1112-16030*

In developing the opinions in this report, I relied upon documents filed under penalty of perjury with the U.S. Securities & Exchange Commission (SEC), publicly recorded documents, information found on the Internet which is readily available to the general public, and data using "MBS Data;" a globally recognized software program used by institutional investors in mortgage-backed securities. "MBS Data" requires an annual subscription fee of up to $75,000.00, and is not a resource readily available to the general public. In fact, homeowners cannot access MBS Data without going through a professional source such as myself.

## LIST OF DOCUMENTS INSPECTED AND/OR MARKED AS EXHIBITS

**Exhibit 1** - (Rode) Deed of Trust dated 03/18/2003 in the amount of $265,175.00 (Lender – Southtrust Mortgage Corporation.)

**Exhibit 2** - (Rode) "Note" -  loan amount $265,175, loan number 40932750.

**Exhibit 3** - Allonge to Note loan number: Ocwen# 7435631023 – (A-2)

**Exhibit 4** - Allonge to Note loan number: 40932750 – (A-1)

**Exhibit 5** - Assignment of Deed of Trust recorded 05/11/2010 as Doc. No. 2010-0192001.

**Exhibit 6** - Substitution of Trustee recorded 04/05/2010 as Doc. No. 2010-0129512.

**Exhibit 7** - Loan Level Data – MBSData – Origination Data

**Exhibit 8** – Loan Level Data – MBSData – Remittance Data – February 2016

**Exhibit 9** – Loan Level Data – MBSData – Remittance Data – March 2016

**Exhibit 10** - LinkedIn Profile – Donna Fitton – Executive Trustee Services

**Exhibit 11** – UTA eNews – Donna Fitton – Executive Trustee Services

unitedtrustees.com/enews/680.php

- 424(B)(5) Prospectus Supplement for the "RALI 2003-QS12 Trust" filed with the Securities & Exchange Commission (SEC) on 02/20/2008 located at: http://www.secinfo.com/d1zj61.t9q.htm#1stPage

Based upon my review of the above, my professional opinions are as follows:

# OPINION #1

The subject loan was "Table-Funded." For the sake of clarity, table funding is generally defined as:

A lending method employed when a loan originator does not have access to the money necessary to make loans and then hold them until it has enough to sell on the secondary market. As a result, the originator forms a relationship with a lender who provides the funds for closing and immediately takes an assignment of the loan. This is called table funding. Under regulations of the Department of Housing and Urban Development, table-funded loans must disclose service release premiums—profit received by the originator—on the loan closing settlement statement. Loans sold on the secondary market do not have to make those disclosures.

Table-funding occurs when the money used to fund the transaction comes from an undisclosed party, with the intent of selling the contract to that party and making fees without the borrower's knowledge or permission.

Congress enacted RESPA in 1974 "to effect certain changes in the settlement process for residential real estate." 12 U.S.C. § 2601(b). The purpose of those changes was, among other things, to cause "(1) ... more effective advance disclosure to home buyers and sellers of settlement costs; [and] (2) ... the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." *Id.*

The original "lender" / creditor (the actual source of funds for the Rode loan) was not disclosed to the Borrower. The actual "Originator" of the subject loan was "RFC Mortgage Conduit" according to the trust's internal data being reported to the investors. (**Exhibit 7, pg.2**) The name of the "Lender" on the subject Note and DOT is "Southtrust Mortgage Corporation." It is my professional opinion that "RFC Mortgage Conduit" provided the actual funding for the Rode loan, and as a "Conduit" entity, likely was using funds from even another undisclosed source; all of which the intended purpose was to make undisclosed profits and kickbacks through the securitization of the loan without the borrower's knowledge and consent.

# OPINION #2

There is no evidence to support that the alleged beneficiary of the Rode Note and Deed of Trust (the RALI 2003-QS12 Trust) ever perfected its alleged interest in the subject Note and Deed of Trust. First, there are missing parties in the chain of title; specifically, the "Depositor" (Residential Accredit Loans Company, LLC), who was the seller of all loans to the trust, and the originator (RFC Mortgage Conduit.) These entities are not reflected in any assignments or endorsements.

There is one assignment of the subject DOT in the public record whereby "Mortgage Electronic Systems, Inc., as nominee for Southtrust Mortgage Corporation" assigns the note and DOT to Deutsche Bank Trust Company Americas as trustee for the RALI 2003-QS12 Trust on April 16, 2010. (**Exhibit 5**). This is more than 2-years beyond the trust's "closing date" of February 29, 2008. In addition, the assignment is executed by "Donna Fitton, Limited Signing Officer – Mortgage Electronic Registration Systems, Inc., solely as nominee for lender Southtrust Mortgage Corporation." Evidence shows that Ms. Fitton was actually an employee of Executive Trustee Services, LLC at the time of the assignment's execution. (**Exhibits 10-11**). Also, Ms. Fitton appears to have executed the subsequent Appointment of Substitute Trustee on March 18, 2010 as the "Assistant Secretary - Mortgage Electronic Registration Systems, Inc., solely as nominee for lender Southtrust Mortgage Corporation."

Two undated allonges have been presented in an attempt to support the RALI 2003-QS12 Trust's ownership of the Rode loan. From experience investigating allonges, these types of supplemental documents are to be used when there is no room left for endorsements on the signature page of the promissory notes, and they are to be permanently affixed to the original note. When analyzing the allonges in this case, one noticeable anomaly stands out. One allonge (**Exhibit 4**) (**"A-1"**) has "punch-hole" markings on the top while the other allonge (**Exhibit 3**) (**"A-2"**) has no such markings. This evidence suggests that these pages have not been affixed together with the note.  In addition, there was adequate room on the signature page of the note to have applied an endorsement(s.)

Two direct endorsements have been placed on **A-1**. One of these endorsements is from "Residential Funding Corporation" to "Deutsche Bank Trust Company Americas, as Trustee." As Trustee of what? No specific trust entity to which this named company is acting as trustee has been identified. From experience investigating "Deutsche Bank Trust Company Americas," this entity was acting as trustee for hundreds of various REMIC or mortgage-backed securitized trusts. The **A-2** endorsement is then signed by an Ocwen Loan Servicing, LLC employee ("Sharina William") as attorney-in-fact, but again is undated. It is becoming common knowledge that mortgage servicers such as Ocwen have created, and continue to create, dubious assignments, endorsements, and allonges for purposes of conducting foreclosures, and that the people executing these documents have no personal knowledge as to what they are signing and executing.

## OPINION #3

According to the loan level data drawn from MBSData, the subject loan / debt appears to have a balance currently in decline.  The "Ending Debt Balance" owed to the investors (as of February, 2016) is "$48,274.33" (**Exhibit 8, pg.3**.) The ending debt balance represents what is currently owed to the investors. The "Ending Debt Balance" owed to the investors (as of March, 2016) is "$46,341.40" (**Exhibit 9, pg.3**.)

(Note: The presence of the loan data within the RALI 2003-QS12 Trust's remittance data does not prove ownership of the loan/debt, it only shows an intent to have securitized the loan/debt.)

The internal data reveals that undisclosed third-parties are making the payments on the alleged Rode loan / debt to the investors of the RALI 2003-QS12 Trust, and continue to do so. Having investigated this specific fact pattern in hundreds of cases throughout the United States, it is common for the Trustees and servicers to hide and conceal the full and complete accounting of these securitized debts which often show the debts having been fully or partially "paid off" or extinguished due to "Credit Default Swaps" and / or other various forms of credit enhancements and insurance.

Discovery needs to be conducted to determine why the Trustee and/or Servicer representing the investors has declared a default on behalf of the investors, when the evidence shows no arrears were /are currently owed to said investors.

Specific discovery is also needed to determine the source(s) of all payments made on the subject loan / debt, why the payments are continuing, and whether the source(s) of these payments have any contractual connection to the borrower(s) and the subject DOT.

March 31, 2016

/S/ Bill Paatalo

BP Investigative Agency
Exhibit 1

40932750

· After Recording Return to:

SOUTHTRUST MORTGAGE CORPORATION

210 Wildwood Parkway, Suite 100
Birmingham, AL 35209

03/27/03  W533365
100100009

$33.00

———————————— [Space Above This Line For Recording Date] ————————————

# DEED OF TRUST

**DEFINITIONS**                                                    **MIN No. 100021700409327507**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **March 18, 2003** together with all Riders to this document.

(B) **"Borrower"** is **Richard D. Rode, a married man, being joined herein proforma by my wife, Barbara O. Rode, to perfect lien only.** Borrower is the grantor under this Security Instrument.

(C) **"Lender"** is **SOUTHTRUST MORTGAGE CORPORATION**. Lender is a **corporation** organized and existing under the laws of **Delaware.** Lender's address is **210 Wildwood Parkway, Suite 100, Birmingham, AL 35209.** Lender includes any holder of the Note who is entitled to receive payments under the Note.

(D) **"Trustee"** is **Robert D. Gardner, Jr..** Trustee's address is **1635 NE Loop 410, Suite 100 San Antonio, TX 78209.**

(E) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P. O. Box 2026, Flint, MI 48501-2026, tel. (888)679-MERS.

(F) **"Note"** means the promissory note signed by Borrower and dated **March 18, 2003**. The Note states that Borrower owes Lender **Two Hundred Sixty Five Thousand One Hundred Seventy Five and no/100** Dollars (U.S. **$265,175.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **April 1, 2018.**

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

|   |   |
|---|---|
| [ ] Adjustable Rate Rider | [ ] Condominium Rider |
| [ ] 1-4 Family Rider | [X] Planned Unit Development Rider |
| [ ] Biweekly Payment Rider | [ ] Balloon Rider |
| [ ] Second Home Rider | |
| [X] Other(s) [specify] **Renewal and Extension Exhibit** | |

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale

TEXAS Deed of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3044 1/01
(Page 1 of 11 pages)

5/17/02

transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and    renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of **Harris** County, Texas:

**LOT 5, IN BLOCK 1, OF PARK PLACE, SECTION ONE (1), A SUBDIVISION IN**              **COUNTY,**
**ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED AT FILM CODE NO. 391092**            **BY**
**CODE NO. 395038, BOTH OF THE MAP RECORDS OF HARRIS COUNTY, TEXAS.**

which currently has the address of **2301 West Lawther Lane, Deer Park, TX 77536** ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower    this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose    sell the Property; and to take any action required of Lender, including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the              is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM              Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of,    interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument    made    U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or    Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under

TEXAS    of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                                      MERS Modified Form 3044 1/01
(Page 2 of 11 pages)

5/17/02

the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to        Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived     Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained    this Security Instrument,    the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest

TEXAS Deed of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                                                MERS Modified Form 3044 1/01
(Page 3 of 11 pages)

5/17/02

or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection    this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur    hich reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but    or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard    liability    might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of    insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed    Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies    be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any    proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the    if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is

TEXAS Deed of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                                    MERS Modified Form 3044 1/01
(Page 4 of 11 pages)

5/17/02

completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior such an interior inspection specifying such reasonable cause.

8. **Borrower's    Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained    this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or    under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower    abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the    and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the    includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and    drain water    pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed    Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured    Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

TEXAS Deed of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    MERS Modified Form 3044 1/01
(Page 5 of 11 pages)

5/17/02

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage                    in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is                    Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the No e.

Mortgage Insurance reimburses Lender (or any entity) that purchases the Note) for certain losses    may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer    have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that    from (or    be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or    the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of    insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance."

(a) Any such agreements will not affect the amounts that Borrower    agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any –    respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage    to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is    lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in    Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower    interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible    Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in    the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by    following fraction: (a) the total amount of the sums secured immediately before the

TEXAS Deed of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3044 1/01
(Page 6 of 11 pages)

5/17/02

partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.      to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the

TEXAS Deed of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    MERS Modified Form 3044 1/01
(Page 7 of 11 pages)

5/17/02

Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and Security Instrument, and Borrower's obligation to the sums secured by this Security Instrument, shall continue Lender may require that Borrower pay such reinstatement sums and expenses in one or more of following forms, as selected by Lender: (a)      (b) money order; (c)      check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

TEXAS Deed of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                   MERS Modified Form 3044 1/01
(Page 8 of 11 pages)

5/17/02

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit  other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to,     spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by     presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified   any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance     Enviromnental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of   right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 22, the term "Lender" includes any holder of the Note who is entitled to receive payments under the Note.

If Lender invokes the power of sale, Lender or Trustee shall give notice of the time, place and terms of sale by posting and filing the notice at least 21 days prior to sale as provided by Applicable Law. Lender shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be made at public vendue. The sale must begin at the time stated in the notice of sale or not later than three hours after that time and between the hours of 10 a.m. and 4 p.m. on the first Tuesday of the month. Borrower authorizes Trustee to sell the Property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty     Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

TEXAS    of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                                MERS Modified Form 3044 1/01
(Page 9 of 11 pages)

5/17/02

If the Property is sold pursuant to this Section 22, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee; Trustee Liability.** All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, powers and duties conferred upon Trustee herein and by Applicable Law.

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

**25. Subrogation.** Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property      been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured      liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities      claimed      any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired      Lender by assignment or are released by the holder thereof upon payment.

**26. Partial Invalidity.** In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

**27. Purchase Money; Owelty of Partition; Renewal and Extension of Liens Against Homestead Property; Acknowledgment of Cash Advanced Against Non-Homestead Property. Check box as applicable:**

[ ]      **Purchase Money.**
The funds advanced to Borrower under the Note were used to pay all or part of the purchase price of the Property. The Note also is primarily secured by the vendor's lien retained in the deed of even date with this Security Instrument conveying the Property to Borrower, which vendor's lien has been assigned to Lender, this Security Instrument being additional security for such vendor's lien.

[ ]      **Owelty of Partition.**
The Note represents funds advanced by Lender at the special instance and request of Borrower for the purpose of acquiring the entire fee simple title to the Property  nd the existence of an owelty of partition imposed against the entirety of the Property by a court order or by a written agreement of      parties to the partition to secure the payment of the Note is expressly acknowledged, confessed and granted.

[X]      **Renewal and Extension of Liens Against      Property.**
The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens and remedies securing the original holder of a note evidencing Borrower's indebtedness and      original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal  nd extension of the indebtedness.

[ ]      **Acknowledgment of Cash Advanced Against Non-Homestead Property.**
The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds. Borrower states that Borrower does not now and does not intend ever to reside on, use in any manner, or claim the Property secured by this Security Instrument as a business or residential homestead. Borrower disclaims all homestead rights, interests and exemptions related to the Property.

**28. Loan Not a Home Equity Loan. The Loan evidenced by the Note is not an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution. If the Property is used as Borrower's residence, then Borrower agrees that Borrower will receive no cash from the Loan evidenced by the Note and that any advances not necessary to purchase the Property, extinguish an owelty lien, complete construction, or renew      extend a prior lien against the Property, will be used to reduce the balance evidenced by the Note or such Loan      be modified to evidence the correct Loan balance, at Lender's option. Borrower agrees to execute any documentation necessary to comply with this Section 28.**

TEXAS Deed of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                                                    MERS Modified Form 3044 1/01
(Page 10 of 11 pages)

5/17/02

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witness:

(Seal)

(Seal)

-Borrower
(Seal)

**Below This Line For Acknowledgment[**

STATE OF TEXAS, **Harris** County ss:

This instrument was acknowledged before me on the ___19___ day of _March_ by **Richard D. Rode and** **wife, Barbara O. Rode.**

Notary Public

**TEXAS Deed of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**                    MERS Modified Form 3044 1/01
(Page 11 of 11 pages)

5/17/02

# RENEWAL AND EXTENSION EXHIBIT TO DEED OF TRUST
### DATED March 18, 2003
### EXECUTED BY Richard D. Rode, a married man
#### FOR THE BENEFIT OF SOUTHTRUST MORTGAGE CORPORATION

This Deed of Trust and the Note secured by it are given in renewal and extension of the following described indebtednesses and all of the liens, rights, assignments, and security interests securing them, including without limitation, those created, made, or granted by the following described instruments, all of which are now owned and held by Lender or will be transferred and assigned to Lender and which Borrower expressly acknowledges to be valid and existing against the Property:

Promissory Note dated **March 6, 2001** in the original principal sum of $272,850.00 executed by **Richard D. Rode and spouse, Barbara O. Rode** payable to **North American Mortgage Company** and described in and secured by the instruments(s) recorded in the following Volumes and Pages and/or County Clerk's File Numbers of the Real Property Records of **Harris** County, Texas:

**County Clerk's File No(s) U928317; County Clerk's File No(s). V133993**

SIGNED FOR IDENTIFICATION:

Richard D. Rode

Barbara O. Rode

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **eighteenth** day of **March, 2003,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to **SOUTHTRUST MORTGAGE CORPORATION** (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

**2301 West Lawther Lane**
**Deer Park, TX 77536**
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in THE COVENANTS, CONDITIONS, AND RESTRICTIONS TO WHICH THE PROPERTY IS SUBJECT (the "Declaration"). The Property is a part of a planned unit development known as

**Park Place**
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

Richard D. Rodd -Borrower                                    -Borrower

Barbara O. Rodd -Borrower                                    -Borrower

MULTISTATE PUD RIDER-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                                    Form 3150 1/01
(1 of 1 page)

8/8/00

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL
PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in File Number Sequence on the date and at the time
stamped hereon by me; and was duly RECORDED, in the Official Public Records of Real Property of Harris
County, Texas on

MAR 2 7 2003



Beverly B. Kaufman
COUNTY CLERK
HARRIS COUNTY, TEXAS

40932750

# NOTE

March 18, 2003

ORIGINAL

Deer Park, Texas

ORIGINAL

2301 West Lawther Lane
Deer Park, TX 77536
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $265,175.00(this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **SOUTHTRUST MORTGAGE CORPORATION** . I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **5.375%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the first day of each month beginning on May 1, 2003. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on April 1, 2018, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at

**SOUTHTRUST MORTGAGE CORPORATION**
**210 Wildwood Parkway, Suite 100**
**Birmingham, AL 35209**

or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $2,149.16.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

Form 3200   1/01 (page 1 of 3 pages)

08/16/00

BP Investigative Agency
Exhibit 2

to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However,

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200    1/01 (page 2 of 3 pages)

08/16/00

. this option shall not be exercised    _ender if such exercise is prohibited by A    able Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.    The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S)  AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Richard D. Rode                         -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

_____ (Seal)
                                        -Borrower

[Sign original only]

MULTISTATE  FIXED RATE NOTE—Single Family—Fannie Mac/Freddie Mac UNIFORM  INSTRUMENT        Form 3200   1/01 (page 3 of 3 pages)

08/16/00

Ocwen#: 7435631023
RFC#:

## ALLONGE

This endorsement is a permanent part of the Note dated 3/18/03 in the amount of $265,175.00

**BORROWER:**          Richard D. Rode

**PROPERTY:**          2301 West Lawther Lane
                       Deer Park, TX 77536

**PAY TO THE ORDER OF:**

Deutsche Bank Trust Company Americas, as Trustee for Residential Accredit Loans, Inc.,
Mortgage Asset-Backed Pass-Through Certificates, Series 2003-QS12

**WITHOUT RECOURSE**

Deutsche Bank Trust Company Americas, as Trustee by Ocwen Loan Servicing, LLC its
Attorney in Fact

Signor: SHARINA WILLIAMS
Title: AUTHORIZED SIGNER

## ALLONGE

**COMPANY NAME:**      SOUTHTRUST MORTGAGE CORPORATION

**LOAN NUMBER:**       40932750

**BORROWERS' NAMES:**  RICHARD D. RODE

**PROPERTY ADDRESS:**  2301 WEST LAWTHER LANE , Deer Park, TX 77536

**LOAN AMOUNT:**       $265,175

**INTEREST RATE:**     5.375%

**TERM:**              180 Months

**FIRST PAYMENT:**     05/01/2003

**MATURITY DATE:**     04/01/2018

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Corporation

BY _Judy Faber_
Judy Faber, Vice President

PAY TO THE ORDER OF

RESIDENTIAL FUNDING CORPORATION

WITHOUT RECOURSE
SOUTHTRUST MORTGAGE CORPORATION

By: _Sherry J. Hayes_
SHERRY J HAYES
Title: Assistant Secretary

BP Investigative Agency
Exhibit 4 - (A-1)

20100192001
05/11/2010  RP3  $20.00

Requested and Prepared by:
**Executive Trustee Services, LLC**

When Recorded Mail To:
**Executive Trustee Services, LLC**
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**

Loan No.: **7435631023**
TS NO: **TX-240297-C**

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:

Deutsche Bank Trust Company Americas as Trustee for RALI 2003QS12

**all beneficial interest under that certain Deed of Trust dated: 3/18/2003 executed by RICHARD D. RODE A MARRIED MAN BEING JOINED HEREIN PROFORMA BY MY WIFE ,BARBARA O. RODE TO PERFECT LIEN ONLY , as Trustor(s), to ROBERT D. GARDNER JR. , as Trustee, and recorded as Instrument No. W532365, on 3/27/2003, in Book , Page   of Official Records, in the office of the County Recorder of Harris County, Texas together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.**

DATE: 4/16/2010                  MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,
                                 SOLELY AS NOMINEE FOR LENDER SOUTHTRUST
                                 MORTGAGE CORPORATION

                                 _____
                                 **Donna Fitton, Limited Signing Officer**

**State of California        } SS.**
**County of Los Angeles             }**

On **4/16/2010** before me, **Jessica Jenkins** Notary Public, personally appeared **Donna Fitton, Limited Signing Officer** who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
          Jessica Jenkins

JESSICA JENKINS
Commission # 1867586
Notary Public - California
Los Angeles County
My Comm. Expires Oct 9, 2013

BP Investigative Agency
Exhibit 5

TS NO:  **TX-240297-C**

## EXHIBIT "A"

LOT 5, IN BLOCK 1, OF PARK PLACE, SECTION ONE (1), A SUBDIVISION IN HARRIS COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF, RECORDED AT FILM CODE NO. 391092 OF THE MAP RECORDS OF HARRIS COUNTY, TEXAS.

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNFORCEABLE UNDER FEDERAL LAW.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in file number Sequence on the date and at the time stamped hereon by me; and was duly RECORDED, in the Official Public Records of Real Property of Harris County Texas on

**MAY 1 1 2010**

COUNTY CLERK
HARRIS COUNTY, TEXAS

2010 MAY 11  AM 8:40
COUNTY CLERK
HARRIS COUNTY, TEXAS

FILED

RP 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

### RECORDER'S MEMORANDUM:

At the time of recordation, this instrument was found to be inadequate for the best photographic reproduction because of illegibility, carbon or photo copy, discolored paper, etc. All blackouts, additions and changes were present at the time the instrument was filed and recorded.

20100129512
04/05/2010  RP1  $25.75

# APPOINTMENT OF SUBSTITUTE TRUSTEE

TX-240297-C

STATE OF Texas                    §

                                     §    KNOW ALL MEN BY THESE PRESENTS THAT:

COUNTY OF Harris                  §

WHEREAS, on 3/18/2003, RICHARD D. RODE A MARRIED MAN BEING JOINED HEREIN PROFORMA BY MY WIFE ,BARBARA O. RODE TO PERFECT LIEN ONLY executed and delivered that Deed of Trust, to ROBERT D. GARDNER JR. , the original trustee, which is recorded on 3/27/2003 in Instrument No. W532365, Volume , Page of the real property records of Harris County, Texas,  to secure the payment of a Promissory Note in the principal amount of $265,175.00 payable to the order of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., SOLELY AS NOMINEE FOR LENDER SOUTHTRUST MORTGAGE CORPORATION ; and is described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

WHEREAS, default, as same is defined in the Promissory Note and/or the Deed of Trust, has occurred the majority thereof has been accelerated, and the outstanding Debt on same is now wholly due; and

THEREFORE, the undersigned, the legal owner of the Promissory Note, for reasons satisfactory to itself, does hereby remove ROBERT D. GARDNER JR.  the Trustee(s) named in the Deed of Trust, and all successors thereto, and does hereby appoint and constitute Jeff Leva, Audrey Lewis, Pattie Sullivan ,Sandy Dasigenis, Noel McNally, Cassandra Inouye or Erika Puentes, as Substitute Trustee, who shall have all the powers and estates delegated to the original Trustee(s) in such Deed of Trust, and hereby requests that the Substitute Trustee, or any one of them, exercise the power of sale described in the Deed of Trust in accordance with the terms and provisions thereof.

EXECUTED EFFECTIVE AS OF        3/18/2010

                               MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., SOLELY AS NOMINEE FOR LENDER SOUTHTRUST MORTGAGE CORPORATION

                               By: _____

                               Name:   DONNA FITTON,  ASSISTANT SECRETARY

**FILED FOR RECORD**
B:00 AM

APR -5 2010

County Clerk, Harris County, Texas

BP Investigative Agency
Exhibit 6

| GROUP_NUMBER | SERIES_ID | LOAN_NUMBER | LIEN_POSIT | TRUSTEE_SERIES_POO |
|---|---|---|---|---|
| RFC | RALI03-QS12 | 8596015 | 1 | 47102003-QS12 |

BP Investigative Agency
Exhibit 7, pg.1

| PROPERTY_CITY | PROPERTY_ | PROPERTY_ZIP_CODE | ORIGINATOR_NAME | SERVICER_ |
|---|---|---|---|---|
| DEER PARK | TX | 77536 | RFC Mortgage Conduit | Ocwen |

BP Investigative Agency
Exhibit 7, pg.2

| APPRAISAL_VAL | ORIGINAL_FICO_SCORE | ORIGINAL_LTV | ORIGINAL_COMBINED_LTV |
|---|---|---|---|
| 575000 | 690 | 47 | 47 |

BP Investigative Agency
Exhibit 7. pg.3

| ISSUANCE_BALANCE | ORIGINAL_LOAN_AMOUNT | SCHEDULED_PRINCIPAL_INTERESTT |
|---|---|---|
| 263247.9 | 265175 | 2149.16 |

BP Investigative Agency
Exhibit 7, pg.4

| ORIGINATION_DATE | FIRST_PAYMENT_DATE | MATURITY_DATE | TERM |
|---|---|---|---|
| 20030318 | 20030501 | 20180401 | 180 |

BP Investigative Agency
Exhibit 7, pg.5

| AMORT_TERM | PAYMENT_FREQUE | ORIGINAL_INTEREST_R | ORIGINAL_INTEREST_F | PAYMENT_ |
|---|---|---|---|---|
| 180 | 4 | 5.375 | 5.375 | F |

BP Investigative Agency
Exhibit 7, pg.6

ORIGINAL_SERVICER_NAME
Residential Funding Corp

| GROUP_NUM | SERIES_ID | LOAN_NUMBER | TRUSTEE_SERIES_NUMBER |
|---|---|---|---|
| RFC | RALI03-QS12 | 8596015 | 47102003-QS12 |

BP Investigative Agency
Exhibit 8, pg.1

| ORIGINAL_LOAN_AMOUNT | CURRENT_LOAN_BALANCE |
|---|---|
| 265175 | 187290.87 |

BP Investigative Agency
Exhibit 8, pg.2

| ENDING_SCHEDULED_BALANCE_INVESTOR | BEGINNING_SCHEDULED_BALANCE_INVESTOR |
|---|---|
| 48274.33 | 50198.64 |

| CURRENT_PRINCIPAL_INTEREST | CURRENT_INTEREST_RATE | NEXT_INTE | DEL_STATL | NEXT_DUE |
|---|---|---|---|---|
| 2149.16 | 5.375 | 5.375 | F | 20081101 |

BP Investigative Agency
Exhibit 8, pg.4

| FORECLOSURE_END_I | DEL_STATUS_CODI | CURRENT_DISTRIBUTION_D | ACTUAL_BEGINNING_BALANCE |
|---|---|---|---|
| 20160101 | F | 20160125 | |

BP Investigative Agency
Exhibit 8, pg.5

| GROUP_NL | SERIES_ID | POOL_ID | LOAN_NUMBER | TRUSTEE_SERIES_NUM |
|---|---|---|---|---|
| RFC | RALI03-QS12 | | 8596015 | 47102003-QS12 |

BP Investigative Agency
Exhibit 9, pg.1

| ORIGINAL_LOAN_AMOUNT | CURRENT_LOAN_BALANCE |
|---|---|
| 265175 | 187290.87 |

BP Investigative Agency
Exhibit 9, pg.2

ENDING_SCHEDULED_BALANCE_INVESTOR

46341.4

BP Investigative Agency
Exhibit 9, pg.3

| BEGINNING_SCHEDULED_BALANCE_INVESTOR | CURRENT_PRINCIPAL_INTEREST | CURRENT_ |
|---|---|---|
| 48274.33 | 2149.16 | 5.375 |

BP Investigative Agency
Exhibit 9, pg.4

| NEXT_INTE | DEL_STATL | NEXT_DUE_DAT | DEL_STATUS_CODE | FORECLOSURE_END_DATE |
|-----------|-----------|--------------|-----------------|----------------------|
| 5.375 | F | 20081101 | F | 20160201 |

BP Investigative Agency
Exhibit 9, pg.5

DEL_STATUS_( CURRENT_DISTRIBUTION_DATE
F                                    20160225

BP Investigative Agency
Exhibit 9, pg.6

What is LinkedIn?     Join Today     Sign In



# Donna Fitton

Admissions Counselor - Animal Behavior College

Greater Los Angeles Area | Insurance

**123** connections

| | |
|---|---|
| Current | Animal Behavior College |
| Previous | PMA USA (Performance Matters Associates, Inc.), Bank of America: Executive Trustee Services, LLC dba ETS. LLC a subsidiary of GMAC Mortgage Corporation |
| Education | Western Governors University |

**Find a different Donna Fitton**

First Name      Last Name      🔍

**Example:** Donna Fitton

Donna Fitton
--
United States

More professionals named Donna Fitton

**People Also Viewed**


**Charles Salanga**
Previous Vendor Manager, Management, and Quality Analyst experience


**Lance Cohen**
Paralegal/Loan Processor/Quality Assurance Auditor


**Jane Martorana**
Physical Therapy Team Leader at CSU/OCPS


**Joey Grimaldi**
State Manager at PMA USA, Washington National


**Leonard Kam**
SVP at Wells Fargo Bank


**Sharina Williams**
Record Services at Ocwen Loan Servicing, LLC


**Jane Martorana**
Makeup Artist at MAKE UP STORE


**Natalia Yungerlevi**
District Manager at PMAUSA - Representing Washington National Insurance

**Judy Faber**
Manager at Wells Fargo Bank


**Leonard Kam**
Independent Banking Professional

## Join LinkedIn and access Donna's full profile. It's free!

As a LinkedIn member, you'll join 400 million other professionals who are sharing connections, ideas, and opportunities.

- See who you know in common
- Get introduced
- Contact Donna directly

View Donna's Full Profile

## Summary

With over 15 years of successfully leading diverse groups in the financial industry, I have built empowered teams that are advocates for risk management and customer service, through mentoring and leading by example.

I have a deep knowledge of loan servicing and foreclosure trustee work. Most recently, loan servicing requirements for securing the proper beneficial interest for service released loans.

## Experience

**Admissions Counselor**
Animal Behavior College
February 2016 – Present (2 months) | Greater Los Angeles Area



**District Manager**
PMA USA (Performance Matters Associates, Inc.)
May 2015 – February 2016 (10 months) | Greater Los Angeles Area

Insurance agent representing Washington National Insurance Company. Work site marketing division. CA license 0K20538

Since 1911, Washington National has helped Americans protect themselves and their families from the financial hardship that often comes with critical illness, accidents and loss of life. Our supplemental health and life insurance products are designed to help give individuals and families peace of mind. Our customers can depend on us to be a strong, caring partner as we help provide financial security.



## Connect with co-workers

Learn more about who they are.

Add your position

BP Investigative Agency
Exhibit 10

### Manager

Bank of America

August 2011 – February 2015 (3 years 7 months)

Lead a team of 19 employees in meeting servicing level agreements and quality expectations for the research, production and execution of loan servicing documents required for securing the beneficial interest for mortgage loans. Empower and motivate team members to meet goals and provide excellent customer service while encouraging diversity and inclusion.



### Team Lead

Executive Trustee Services, LLC dba ETS, LLC a subsdiary of GMAC Mortgage Corporation

March 1998 – August 2011 (13 years 6 months)

Managed a team of 15 - 18 employees responsible for meeting strict deadlines on producing first legal action documents for delinquent loan servicing activities. Excelled in motivating and keeping the team focused on meeting deadlines while creating an environment of inclusion and dedication.

### Trustee Sales Officer

Standard Trustee Service Company

February 1992 – February 1998 (6 years 1 month)

Organized work flow for a team of 5 employees that were responsible for all aspects of the foreclosure process in 3 States according to civil code requirements, while maintaining an outstanding level of customer service.

### Foreclosure Specialist

Commonwealth Land Title Insurance Company

August 1990 – January 1992 (1 year 6 months)

Mastered the foreclosure process for California by becoming familiar with the civil code requirements. Being exposed to title officers and title plant processes allowed the opportunity to obtain property title knowledge.

Volunteer Experience & Causes

### Vestry Member (leadership role)

St. Stephen's Episcopal Church

January 2014 – Present (2 years 3 months)

Lead the ministry of new comers and growth of the church.

### Causes Donna cares about:

Children
Human Rights
Poverty Alleviation

### Organizations Donna supports:

Episcopal Relief & Development
Family Promise, Inc

What is LinkedIn?    Join Today    Sign In

Skills

Management    Diversity & Inclusion    Team Leadership    Foreclosures

Loan Servicing    Priority Management    Mortgage Servicing    Team Building

Customer Service    Process Improvement    Quality Control    Vendor Management

Chain of Title    Project Management    Leadership

Education

**Western Governors University**
Bachelor of Science (B.S.), Marketing/Marketing Management, General
2015 – 2017

**FIDM/Fashion Institute of Design & Merchandising-San Francisco**
Associate's Degree. Marketing/Merchandising
1984 – 1986

Groups

Bank of America (leg...    Default Servicing Net...    Bank of America (Bo...

## View Donna's full profile to...

- See who you know in common
- Get introduced
- Contact **Donna** directly

View Donna's Full Profile

Not the Donna you're looking for? View more

© 2016  |  User Agreement  |  Privacy Policy  |  Community Guidelines  |  Cookie Policy  |  Copyright Policy  |  Unsubscribe



UTA eNews
July, 2011

### Seven Members Pass California Certification Course

Congratulations are in order for six UTA members who have passed the California Level 1 Foreclosure Certification exam and are now "Certified Trustee Sale Officers":



Congratulations!

- Karen Agam-Macarah, Pacifica First National, Culver City
- Nicole Cannis, Trustee Corps
- Jesus Contreras, HSBC Housekey
- Donna Fitton, Executive Trustee Services
- Erika Puentes, Executive Trustee Services
- Betty Schwab, HSBC Housekey
- Timothy Yeo, Investment & Trust Services

These UTA members passed the exam on July 7th after taking the UTA course taught by **Randy Newman, Esq**. of Total Lender Solutions.

In order to earn certification as a California Trustee Sale Officer, members must pass the Level 1 Certification exam with a score of at least 70%; maintain UTA membership in good standing; and attend either the Annual Education Conference or three regional meetings within two years of certification.

Certification provides a measurement to recognize the skills and knowledge necessary to perform as a Trustee. UTA certification is designed so that employers and consumers will have confidence in the recipient's thorough knowledge of the nonjudicial foreclosure process.

**Headquarters**
2030 Main Street, Suite 1300, Irvine, CA 92614
www.unitedtrustees.com | Tel: 949.260.9020 | Send us an email

BP Investigative Agency
Exhibit 11