**Hearing Date and Time:  TBD**
**Response Date and Time: TBD**

Frank Reed
817 Matlack Drive
Moorestown, NJ 08057
Telephone:  (856) 956-6950
*Creditor, Pro Se*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Case No.  12-12020  (MG) |
| RESIDENTIAL CAPITAL LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**CREDITOR FRANK J. REED'S MOTION *IN LIMINE* TO EXCLUDE
THE EXPERT REPORT AND TESTIMONY OF OSCAR MARQUIS**

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

Creditor Frank Reed ("Reed") hereby submits this Motion *In Limine* to exclude the purported expert report and testimony of Oscar Marquis ("Mr. Marquis"), offered by The ResCap Borrower Claims Trust (the "ResCap Trust").

## PRELIMINARY STATEMENT

In his August 20, 2014 report (the "Report") issued in connection with this litigation, Mr. Marquis, who has been designated by the ResCap Trust as a rebuttal expert with respect to one of Reed's proposed experts, Evan Hendricks, purports to: "rebut the Expert Report of Evan Hendricks[1]"; and "deals with the Fair Credit Reporting Act ("FCRA") and the impact the manner [*sic*] in which GMAC Mortgage, LLC ("GMAC Mortgage") reported Plaintiff's mortgage account to the consumer reporting agencies had on Plaintiff's credit [*sic*], and any resultant damages". See Report at pg.1.[2]

More specifically, the Report indicates the Mr. Marquis purports to opine as to "[w]hat impact the filing of the foreclosure action by GMAC Mortgage had on the ability of the Reeds to get new credit", requiring "an analysis of how credit reports and credit scores work, and damages from the reporting of the foreclosure action." See Report at pg.1. Mr. Marquis ultimately concludes that there is nothing in the record to support Mr. Hendrick's conclusions regarding the damage to Reed's credit, that there is nothing in the record to indicate that GMACM inaccurately reported the foreclosure action to credit reporting agencies, and that Reed cannot state a cause of

---

[1] Evan Hendricks ("Mr. Hendricks") issued written opinions dated November 9, 2011 and July 13, 2014, which the Reed provided to the ResCap Trust earlier in this litigation. Mr. Hendricks also testified as an expert witness during the first evidentiary hearing held in this matter on September 15-16, 2014.

[2] A true and correct copy of the Report is attached hereto as Exhibit "A".

action for violation of the FCRA. Notably, I have never made a claim under the FCRA. Mr. Marquis was deposed in connection with this litigation on July 19, 2016.[3]

As a threshold matter, by notice provided herein, I am formally withdrawing Mr. Hendricks as an expert witness with respect to the scheduled further evidentiary hearing. This being so, the report and testimony of Mr. Marquis – who is designated by the ResCap Trust as a rebuttal witness relevant to Mr. Hendricks – are no longer necessary nor relevant to this matter.

Furthermore, I respectfully submit that the Report does not pass muster under the rules governing expert testimony, and on this additional basis, the Report must be stricken and Mr. Marquis should be precluded from testifying. Specifically, Mr. Marquis' report and testimony are irrelevant to the limited issues that remain in this case as a result of the October 6, 2014 Memorandum Opinion and Order issued by this Court [ECF Doc # 7619], and the December 23, 2015 Memorandum Opinion and Order issued by the District Court. [15-cv-02375-GHW, Document 16, pg.18-19]. This Court has already determined that debtor GMACM violated the New Jersey Consumer Fraud Act ("CFA"), and that it breached the mortgage contract and note with Reed.

The only issue remaining to be tried during the scheduled evidentiary hearing is the extent of my damages – under breach of contract and the CFA – related to properties and ventures other than the improperly-foreclosed-upon Matlack property. In that regard, during the course of discovery during the last few months I have identified, and the parties have conducted discovery regarding, four specific items/business transactions with respect to which I ultimately suffered damages as a result of GMACM's fraudulent foreclosure. These included the loss of my renovation/construction projects that I already owned and that were underway, and also the loss of my rental properties. These are not speculative or hypothetical transactions – they are all supported by deposition testimony and/or declarations.

---

[3] A true and correct copy of the Deposition Transcript is attached hereto as Exhibit "B".

More specifically, the relevant transactions are as follows: (1) a line of credit that TD Bank was willing to issue, but declined to do so, in whole or in part, because of the existence of GMACM's fraudulent foreclosure action; (2) a private loan from a private individual, Joan Kline, who would have lent money to Reed, as she had done so before, but in fact did not do so in 2009 due solely due to GMACM's fraudulent foreclosure; (3) a partnership to complete 9717 Old Dell Trace was not consummated by and between Frank Reed and Robert Maines, a third generation builder of homes routinely valued up to and beyond $2 million, solely because of GMACM's fraudulent foreclosure; and, (4) the loss of Reed's three rental properties (rented long term to the Oxford House national nonprofit).

It is readily apparent that the report and intended testimony of the ResCap Trust's rebuttal credit expert, Mr. Marquis, is unnecessary and irrelevant. Indeed, Mr. Marquis testified to the following at his deposition: (a) that he does not have ANY knowledge about TD Bank and its underwriting policies or guidelines; (b) that he does not know any person named Joan Kline or anything about her; and, (c) that he does not know any person named Robert Maines or anything about him. See Exhibit B. This being so, Mr. Marquis can realistically provide no relevant testimony as to my claimed damages as they now stand.

Mr. Marquis' intended rebuttal of Mr. Hendricks' opinions, his opinion regarding the existence or lack of damage caused by credit reporting, his conclusion that I have no FCRA cause of action[4], and his conclusion that GMACM did not inaccurately report the improper foreclosure filing, have absolutely no bearing on or relevance to my specific claimed damages at this juncture. Accordingly, Mr. Marquis' report and his expert testimony must be excluded.

Additionally, even if some portion of Mr. Marquis' analysis were somehow deemed relevant to the limited issues remaining in this case, his report does not meet the standards for admissibility of expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

---

[4] In fact, I have never asserted a FCRA violated or cause of action, yet Mr. Marquis inexplicably expends a considerable portion of his report on the FCRA and concludes that a FCRA cause of action cannot be sustained.

U.S. 579 (1993) and subsequent case law and rules. The Report is essentially devoid of any reliable, consistent, or testable methodology. Moreover it cites to and relies on little actual evidence of any specifically identified credit report or credit score. And as noted, even if Mr. Marquis' Report could be liberally construed to pass muster under the rules governing expert testimony – which it cannot – it should nevertheless be stricken for providing opinion testimony that is of no relevance to the issues remaining in this case. For these and the reasons that follow, Mr. Marquis' Report should be stricken and he should be precluded from testifying at trial.

## BACKGROUND

The crux of my claims and contentions is straightforward – when I missed two mortgage payments with respect to a residential property located at 817 Matlack Drive, Moorestown, New Jersey, debtor GMACM filed a foreclosure action against me without any prior notice, in direct contravention of the terms of the mortgage contract and New Jersey statutory obligations. The only immediate right of action that GMACM had upon the mortgage default was the right to send a notice of an intention to foreclose, with an opportunity to cure. The mortgage contract specifically enjoined the parties from taking "any judicial action" without first giving notice.

However, the Debtor instead filed a foreclosure action without having providing the statutorily and contractually-required notice. It was also discovered, during the course of this bankruptcy proceeding, that the Debtor did not even have standing to file the foreclosure action in that it had not been assigned the mortgage and note when it filed the foreclosure action, yet the Debtor stated that it did. [ECF Doc # 7619, pg.12[5]]

---

[5] The Court stated in its October 6, 2014 opinion that: "the record before this Court establishes that GMACM did not have standing to bring the Foreclosure Action when it was filed for three reasons: First, GMACM did not obtain an assignment of the Mortgage until after the Foreclosure Action was filed; second, the assignment to GMACM that was executed on behalf of MERS by GMACM's employee, Jeffrey Stephan, falsely stated that MERS transferred the Note to GMACM, an impossibility since MERS did not own or have authority to transfer the Note; and third, GMACM did not hold the Note or demonstrate that it was given authority to bring the Foreclosure Action on behalf of the noteholder. These grounds would have been fatal to GMACM's effort to foreclose on the Property when it commenced the Foreclosure Action, apart from GMACM's failure to provide the Reeds with the NOI under New Jersey's FFA."

An evidentiary hearing regarding my permitted claims was held by the Court on September 15 and 16, 2014. [ECF Doc # 7560, 7561].

The Court issued a Memorandum Opinion and Order on October 6, 2014, dismissing numerous of my claims, but also holding in part that the Debtor's conduct in filing the foreclosure action was wrongful, and awarding as damages the attorney fees I incurred in the underlying state court action. [ECF Doc # 7619] This Court specifically held that GMACM breached its contract with Reed by failing to send a Notice of Intent prior to bringing the Foreclosure Action, and that GMACM had violated the New Jersey Consumer Fraud Act when it misrepresented in the Foreclosure Action that it owned the Note, and that as a result it had standing to foreclose.

I filed a Notice of Appeal on October 20, 2014, asserting numerous grounds for appeal, including my position that the Court erred when, prior to the evidentiary hearing, it *sua sponte* dismissed a large portion of my damage claims and ordered that I could only seek damages regarding, and present evidence with respect to, the foreclosure property. [ECF Doc # 7674]

On appeal, the District Court agreed, holding that the Court erred when it summarily excluded my indirect damage claims and remanding "for further proceedings to determine whether the Reeds suffered any cognizable damages caused by the Foreclosure Action, but not directly related to the Property". [15-cv-02375-GHW, Document 16, pg.18-19][6]

Accordingly, the remanded claims are to be heard and tried by this Court.

## ARGUMENT

It is well-settled that a district court judge has wide discretion in determining the qualification and competency of a witness to express an opinion as an expert. See generally,

---

[6] The District Court stated in its December 23, 2015 decision that: "New Jersey law requires that the Reeds' damages be "ascertainable" or "foreseeable." But the law does not support the exclusion of indirect damages, such as lost profits, so long as they meet those requirements. The court's conclusory culling of a category of damages prior to the evidentiary hearing created the possibility that an ascertainable or foreseeable loss directly caused by the Foreclosure Action was overlooked".

*U.S. v. Bermudez*, 526 F.2d 89 (2d Cir. 1975), cert. denied 96 S.Ct. 2166, 425 U.S. 970; *U.S. v.*

*Green*, 523 F.2d 229 (2d Cir. 1975), cert. denied 96 S.Ct. 858, 423 U.S. 1074.

### A. The Opinions Expressed By Mr. Marquis Are Irrelevant To The Issues At Hand And Will Not Assist The Court

Mr. Marquis' report and expert testimony will not assist the Court in assessing the

damages resulting from and relevant to the wrongful foreclosure by GMACM, by which

GMACM committed a breach of contract and violated the CFA.

Rule of Evidence 702, titled "Testimony by Expert Witness", states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"Federal Rule of Evidence 702 permits a district court to allow the testimony of a witness whose

knowledge, skill, training, experience or education will assist a trier of fact in understanding an

area involving specialized subject matter." *United States v. Molina*, 172 F.3d 1048, 1056 (8th

Cir. 1999).

As noted, I am withdrawing Mr. Hendricks as an expert witness with respect to the

scheduled further evidentiary hearing. This being so, the report and testimony of Mr. Marquis –

who is designated by the ResCap Trust as a rebuttal witness relevant to Mr. Hendricks – are no

longer necessary nor relevant to this matter.

Moreover, it is clear that this Court does not need "credit expert" testimony to understand

and interpret the fact testimony that will be provided by my damage witnesses. See e.g., *U.S. v.*

*Didomenico*, 985 F.2d 1159, 1163 (2d Cir. 1993) (concluding "that the district court was well

within the bounds of discretion in excluding [claimant's psychiatric expert's] testimony because

the testimony did not meet the helpfulness criterion of Rule 702")(citations omitted); *Grdinich v.*

*Bradlees,* 187 F.R.D. 77, 82 (S.D.N.Y. 1999) (excluding claimant's expert and finding that

"[e]xpert testimony is not admissible when it addresses 'lay matters which a jury is capable of

understanding and deciding without the expert's help")(citations omitted).

It is respectfully submitted that Mr. Marquis' report and testimony, as an expert on the

effect of inaccurate credit actions, will not be relevant and will not assist the trier of fact.

### B. Mr. Marquis' Opinion Does Not Meet The Standards For Admissibility Of Expert Testimony Under Federal Rule Of Evidence 702

Mr. Marquis' report does not meet the standards for admissibility of expert testimony

under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rule of Evidence

702.[7] The Report is not relevant so as to assist the trier of fact, and it does not employ relevant

or reliable methods. Indeed, the vast majority of the Report simply either restates certain

evidence, draws factual conclusions, and/or draws legal conclusions. See Exhibit A. The Report

does not cite to scientific or expert techniques or to relevant data, but rather, embraces and

opines as to ultimate factual and legal issues.

An expert opinion must be "relevant" so as to assist the trier of fact, and also must have

"a reliable basis in the knowledge and experience of [the expert's] discipline." *Daubert,* 509

U.S. at 591-92. See also Fed. R. Evid. 702 (permitting expert testimony only if, among other

things, "(c) the testimony is the product of reliable principles and methods and the expert has

reliably applied the principles and methods to the facts of the case"). Although there is no

---

[7] In 2000, Rule 702 of the Federal Rules of Evidence was amended to codify the factors outlined in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) regarding the admissibility of expert testimony. In Daubert, the Supreme Court announced that trial courts must perform a gate-keeping function in determining the admissibility of expert testimony. The Daubert factors, which were not intended to be exhaustive nor to be applicable in every case, include: (1) whether the technique or theory utilized by the expert can be tested and had been tested; (2) whether the technique or theory had been the subject of peer review and publication; (3) the potential rate of error and "the existence and maintenance of standards controlling the techniques operation;" and (4) the general acceptance of the expert's theory or technique in the relevant scientific community.

definitive test for determining the reliability of expert testimony, the Supreme Court has identified a number of factors bearing on reliability, including "(1) whether a theory or technique 'can be (and has been) tested,' (2) 'whether the theory or technique has been subjected to peer review and publication,' (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)(quoting *Daubert*, 509 U.S. at 593-94)(internal citations omitted).   The Supreme Court has expressly extended *Daubert* and its reliability requirements beyond scientific testimony to encompass all expert testimony. See also *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Davis v. Carroll*, 937 F. Supp. 2d 390, 417 (S.D.N.Y. 2013)("Neither Daubert nor Kumho Tire tolerates expert testimony that departs from scientific or professional standards and cannot be independently justified as a reliable analytical tool").

It is respectfully submitted that Mr. Marquis' report and testimony will not in any way be relevant so as to assist the trier of fact, and have no reliable basis in the knowledge and experience of his discipline, and so, will not satisfy the standards for admissibility of expert testimony under Rule of Evidence 702.

### C. Mr. Marquis Is Not Qualified To Weigh In As An Expert On The Issues At Hand In This Matter

As noted, the only issue remaining to be tried during the scheduled evidentiary hearing is the extent of my damages – under breach of contract and the CFA – related to properties and ventures other than the improperly-foreclosed-upon Matlack property.  I have identified, and the parties have conducted discovery regarding, four specific items/business transactions with respect to which I ultimately suffered damages as a result of GMACM's fraudulent foreclosure. These included the loss of my renovation/construction projects that I already owned and that were underway, and also the loss of my rental properties.

Specifically, the relevant transactions are as follows: (1) a line of credit that TD Bank was willing to issue, but declined to do so, in whole or in part, because of the existence of GMACM's fraudulent foreclosure action; (2) a private loan from a private individual, Joan Kline, who would have lent money to Reed, as she had done so before, but in fact did not do so in 2009 due solely due to GMACM's fraudulent foreclosure; (3) a partnership to complete 9717 Old Dell Trace was not consummated by and between Frank Reed and Robert Maines, a third generation builder of homes routinely valued up to and beyond $2 million, solely because of GMACM's fraudulent foreclosure; and, (4) the loss of Reed's three rental properties (rented long term to the Oxford House national nonprofit). These transaction/items of damage are supported by direct deposition testimony and/or declarations; they are not hypothetical nor do they implicate or require the knowledge of an expert.

An expert witness may not offer opinions falling outside of the areas in which he is qualified as an expert by knowledge, skill, experience, training, or education. See Fed. R. Evid. 702; *United States v. Chang,* 207 F.3d 1169, 1172-73 (9th Cir. 2000)(affirming exclusion of defense expert because he lacked the "specific" expertise necessary to offer helpful testimony). See also, *Garnac Grain Co., Inc. v. Blackley*, 932 F.2d 1563, 1566 (8th Cir. 1991)(finding witnesses' practical knowledge, including employment in claimant-company's accounting department for twenty-two years and role in implementing company's internal controls, did not provide them with requisite expertise in auditing or accounting to opine as to auditing issues or compliance with GAAS, and affirming exclusion of their testimony); *Gray v. Briggs*, 45 F. Supp. 2d 316, 323-24 (S.D.N.Y. 1999)(finding expert, whose expertise resided primarily in the securities industry, lacked sufficient knowledge of and experience with ERISA to offer opinions involving ERISA, and thereby excluding opinions).

Mr. Marquis describes himself as being "engaged in a law practice that focuses on consumer reporting, privacy and credit issues", and he states that he "also provide[s] Expert Reports in matters involving FCRA". Report at p. 1. None of these areas of purported expertise

have any bearing on, and cannot offer the Court any assistance with respect to, the limited issues to be tried before the Court. "[T]he 'touchstone' of admissibility is helpfulness to the trier of fact." *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991). Clearly, Mr. Marquis' purported expertise has no place in the trial which will take place in this matter.

## CONCLUSION

Based upon the foregoing, I respectfully request that this Court grant my Motion *In Limine* to exclude the expert report and testimony of Oscar Marquis.

Dated: Moorestown, New Jersey
      August 11, 2016

Respectfully Submitted,

By: _____
   Frank Reed, *pro se*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL LLC et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) |  |

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, a true and correct copy of Frank Reed's

Motion *in Limine* to exclude expert Oscar Marquis was served by hand upon the following:

Clerk of the Court
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004-1408

I further certify that a copy of the foregoing was emailed on the date set forth below to

the following:

MORRISON & FOERSTER LLP
Attorneys for ResCap Borrower Claims Trust
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Jordan A. Wishnew, Esq.

REED SMITH LLP
Attorneys for ResCap Borrower Claims Trust
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08540
Telephone: (609) 987-0050
Barbara K. Hager, Esq.

Dated: Moorestown, New Jersey
     August 12, 2016

Respectfully Submitted,

By:

Frank Reed, *pro se*

2

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

－ － －

In Re:                    :    CASE NO.
                               12-12020(MG)
                          :

RESIDENTIAL CAPITAL,      :
LLC, et al.,
                          :

                          :    CHAPTER 11
        Debtors.


        － － －
        July 19, 2016
        － － －


        Oral Deposition of OSCAR MARQUIS,
ESQUIRE, taken pursuant to notice, was
held at REED SMITH, Three Logan Square,
1717 Arch Street, Suite 3100,
Philadelphia, Pennsylvania, commencing at
9:56 a.m. on the above date, before
Edward J. Ruggeri, Registered Professional
Reporter, Certified Court Reporter and
Notary Public.

        － － －

        MAGNA LEGAL SERVICES
          (866) 624-6221
          www.MagnaLS.com



Page 2

1  APPEARANCES:
2
3
4  REED SMITH, LLP
   BY: BARBARA K. HAGER, ESQUIRE
5     Three Logan Square
      1717 Arch Street, Suite 3100
6     Philadelphia, PA 19103
      (215) 851-8100
7        Counsel for Residential Capital, LLC
8
9
10 FRANK REED, PRO SE
      817 Matlack Drive
11    Moorestown, NJ 08057
      (856) 956-6950
12    frankreednj@aol.com
13
14
15 ALSO PRESENT:
16
18
19
20
21
22
23
24

Page 4

1  EXHIBITS
2
3
4  NUMBER      DESCRIPTION      PAGE
5
6  1      Expert Report      7
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1  INDEX
2
3
4  WITNESS:            PAGE
5
6  OSCAR MARQUIS, ESQUIRE
7
8  By: Mr. Reed          6
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1  DEPOSITION SUPPORT INDEX
2
3
4  Direction To Witness Not To Answer
5  Page  Line
6  (None)
7
8
9  Request For Production Of Documents
10 Page  Line
11 (None)
12
13
14 Stipulations
15 Page  Line
16 (None)
17
18
19 Questions Marked
20 Page  Line
21 (None)
22
23
24



2  (Pages 2 to 5)

Page 6

1  OSCAR MARQUIS, ESQUIRE, after
2  having been duly sworn by Edward J.
3  Ruggeri, a Notary Public within and
4  for the State of Pennsylvania, was
5  examined and testified as follows:
6  ---
7  EXAMINATION
8  ---
9  BY MR. REED:
10  Q.  Good morning, Mr. Marquis. I'm
11  Frank Reed, the creditor pro se in these
12  proceedings. We're going to be here just
13  a short time I think today. I have a few
14  questions for you regarding your report
15  which you have provided in this matter.
16  Could you state your name and
17  address for the record?
18  A.  Oscar Marquis, 120 North Dee
19  Road, D-E-E Road, Park Ridge, Illinois
20  60068.
21  Q.  Mr. Marquis, I have this
22  report. It's been given to me. I
23  understand you are the author of it.
24  A.  Yes.

Page 7

1  MR. REED: Do we mark that one
2  as the exhibit?
3  MS. HAGER: You can mark
4  whichever copy you want and then have
5  him testify off of the one that's
6  been marked.
7  MR. REED: Okay.
8  Can we mark this, the report in
9  Mr. Marquis' hand, as Exhibit-1?
10  ---
11  (At this time, a document was
12  marked for identification as
13  Exhibit-1.)
14  ---
15  BY MR. REED:
16  Q.  Mr. Marquis, can you take a
17  moment and look through that report and
18  make sure that this is indeed the report
19  that you prepared and submitted for this
20  matter?
21  ---
22  (At this time, the witness
23  complies with request.)
24  ---

Page 8

1  THE WITNESS: This looks like
2  it.
3  BY MR. REED:
4  Q.  So you can confirm -- are you
5  confirming for the record that this is the
6  report that you prepared?
7  A.  Yes.
8  Q.  Mr. Marquis, could you read
9  just paragraph one of your report?
10  A.  I have been asked by counsel
11  for ResCap Borrower Claims Trust, Borrower
12  Trust, in parens, to provide an export
13  report in the above matter of In re
14  Capital -- In re Residential Capital, LLC,
15  et al., ResCap, and to rebut the expert
16  report of Evan Hendricks for Frank and
17  Christina Reed, the Reeds, prepared in the
18  case, Reed versus GMAC Mortgage, LLC.
19  My report deals with the Fair
20  Credit Reporting Act, FCRA, and the impact
21  the manner in which GMAC Mortgage, LLC,
22  GMAC Mortgage, reported Plaintiff's
23  mortgage account to the consumer reporting
24  agencies had on Plaintiff's credit and any

Page 9

1  resultant damages.
2  Q.  Mr. Marquis, I read through
3  your report and I want to ask you
4  something.
5  Do you have any personal
6  knowledge of the confidential and
7  proprietary underwriting standards of TD
8  Bank, formerly known as Commerce Bank?
9  A.  No, I don't.
10  Q.  Do you know anything about a
11  person named Joan Kline?
12  A.  No.
13  Q.  Do you know anything about a
14  person named Robert Maines?
15  A.  No.
16  Q.  Are you aware that the
17  litigation that you prepared this report
18  for is -- does not allege a violation of
19  the Fair Credit Reporting Act?
20  A.  I don't recall that.
21  MR. REED: I have no further
22  questions. That's it. That's all I
23  have.
24  MS. HAGER: You brought this



3 (Pages 6 to 9)

Page 10

1    witness all the way from Illinois --
2         THE WITNESS:  No, Wisconsin.
3         MR. REED:  I did not --
4         MS. HAGER:  Actually -- excuse
5    me.  I need to do this.
6         -- all the way from actually
7    Wisconsin and interrupted his
8    vacation to ask him five questions,
9    maybe four.
10        MR. REED:  Barb, I didn't know
11   that's all I had.
12        MS. HAGER:  You couldn't have
13   done that over the phone?
14        MR. REED:  I did not know.
15   Evan Hendricks led me to believe that
16   there were more questions, and when I
17   got into the meat with him yesterday
18   and -- or over the weekend and
19   looking into it, that's what I had.
20   I don't think that other questions
21   are things that are relevant
22   according to what Judge Glenn is
23   asking for.
24        MS. HAGER:  I don't necessarily

Page 11

1    disagree with that, but some prior
2    knowledge of it to save the expense
3    would have been nice.  Under other
4    circumstances, you would be on the
5    hook to pay for his travel.  Only
6    because the judge is bending over
7    backwards and gave you the concession
8    to force the trust to pay for this --
9         MR. REED:  I agree.
10        MS. HAGER:  -- did you make him
11   come, right?
12        So there will be, at the end of
13   all this, a motion to recover the
14   expenses the trust is going to incur
15   for bringing Mr. Marquis here from
16   his vacation in Wisconsin for
17   literally a five-minute, if even,
18   deposition.
19        MR. REED:  I --
20        MS. HAGER:  That's absurd.
21        MR. REED:  Barb, I am not
22   fighting about that now.  It is not
23   and was not my intention to do that.
24   I am aware that the judge has

Page 12

1    reserved whether or not I pay for
2    this.  It is a concern that came
3    across my mind when I realized the
4    limited scope of what we actually had
5    to propose to him so much that it
6    upset me.
7         It was not something that I
8    think that -- it was not done
9    purposely especially as you put it,
10   and I am aware that I have a risk of
11   paying for this.
12        MS. HAGER:  If the judge hadn't
13   ordered the trust to bring him here,
14   it seems to me that you would have
15   somehow located my phone number or
16   e-mail address to let me know that
17   you really didn't have any questions
18   or you would have asked to have it
19   telephonically, which is something
20   that I proposed initially, which
21   would have saved an awful lot of time
22   and expense and his vacation time
23   with his family.  I mean it's, among
24   other things, just rude and --

Page 13

1         MR. REED:  If I had known
2    prior, then --
3         MS. HAGER:  Prior to what?
4         Prior to yesterday would have
5    saved him the trouble of coming here.
6    I find that to be a bit
7    disconcerting, so we'll leave it at
8    that.
9         MR. REED:  Okay.
10        - - -
11        (Whereupon, the witness was
12   excused.)
13        - - -
14        (Whereupon, the deposition
15   concluded at approximately
16   10:05 a.m.)
17        - - -
18
19
20
21
22
23
24



4  (Pages 10 to 13)

Page 14

```
 1          C E R T I F I C A T I O N
 2
 3
 4          I, Edward J. Ruggeri,
 5   Registered Professional Reporter,
 6   Certified Court Reporter and Notary
 7   Public, do hereby certify that the
 8   foregoing is a true and accurate
 9   transcript of the stenographic notes taken
10   by me in the aforementioned matter.
11
12          - - -
13
14
15
16
17
18
19
20
21
22
23   DATE:   _____
24          Edward J. Ruggeri, RPR, CCR
```

Page 15

```
 1          - - - - - - - -
 2          LAWYER'S NOTES
 3          - - - - - - - -
 4   PAGE  LINE
 5   --- --- ----------------
 6   --- --- ----------------
 7   --- --- ----------------
 8   --- --- ----------------
 9   --- --- ----------------
10   --- --- ----------------
11   --- --- ----------------
12   --- --- ----------------
13   --- --- ----------------
14   --- --- ----------------
15   --- --- ----------------
16   --- --- ----------------
17   --- --- ----------------
18   --- --- ----------------
19   --- --- ----------------
20   --- --- ----------------
21   --- --- ----------------
22   --- --- ----------------
23   --- --- ----------------
24   --- --- ----------------
```



5 (Pages 14 to 15)

## A

absurd 11:20
account 8:23
accurate 14:8
act 8:20 9:19
address 6:17 12:16
aforementioned 14:10
agencies 8:24
agree 11:9
al 1:8 8:15
allege 9:18
answer 5:4
aol 2:12
approximately 13:15
arch 1:17 2:5
asked 8:10 12:18
asking 10:23
author 6:23
aware 9:16 11:24 12:10
awful 12:21

## B

b 4:1
backwards 11:7
bank 9:8,8
bankruptcy 1:2
barb 10:10 11:21
barbara 2:4
believe 10:15
bending 11:6
bit 13:6
borrower 8:11,11
bring 12:13
bringing 11:15
brought 9:24

## C

c 2:1 14:1,1
capital 1:7 2:7 8:14 8:14
case 1:5 8:18
ccr 14:24
certified 1:21 14:6

certify 14:7
chapter 1:9
christina 8:17
circumstances 11:4
claims 8:11
com 1:25 2:12
come 11:11
coming 13:5
commencing 1:18
commerce 9:8
complies 7:23
concern 12:2
concession 11:7
concluded 13:15
confidential 9:6
confirm 8:4
confirming 8:5
consumer 8:23
copy 7:4
couldnt 10:12
counsel 2:7 8:10
court 1:2,21 14:6
credit 8:20,24 9:19
creditor 6:11

## D

d 3:1
damages 9:1
date 1:19 14:23
deals 8:19
debtors 1:10
dee 6:18,19
deposition 1:14 5:1 11:18 13:14
description 4:4
didnt 10:10 12:17
direction 5:4
disagree 11:1
disconcerting 13:7
district 1:3
document 7:11
documents 5:9
dont 9:9,20 10:20 10:24
drive 2:10
duly 6:2

## E

e 2:1,1,15,15 3:1 4:1 14:1
edward 1:20 6:2 14:4,24
email 12:16
especially 12:9
esquire 1:15 2:4 3:6 6:1
et 1:8 8:15
evan 8:16 10:15
examination 6:7
examined 6:5
excuse 10:4
excused 13:12
exhibit 7:2
exhibit1 7:9,13
expense 11:2 12:22
expenses 11:14
expert 4:6 8:15
export 8:12

## F

f 14:1
fair 8:19 9:19
family 12:23
fcra 8:20
fighting 11:22
find 13:6
five 10:8
fiveminute 11:17
follows 6:5
force 11:8
foregoing 14:8
formerly 9:8
four 10:9
frank 2:10 6:11 8:16
frankreednj 2:12
further 9:21

## G

given 6:22
glenn 10:22
gmac 8:18,21,22
going 6:12 11:14

good 6:10

## H

h 4:1
hadnt 12:12
hager 2:4 7:3 9:24 10:4,12,24 11:10 11:12 12:12 13:3
hand 7:9
held 1:16
hendricks 8:16 10:15
hook 11:5

## I

identification 7:12
illinois 6:19 10:1
im 6:10
impact 8:20
incur 11:14
index 5:1
initially 12:20
intention 11:23
interrupted 10:7

## J

j 1:20 6:2 14:4,24
joan 9:11
judge 10:22 11:6,24 12:12
july 1:12

## K

k 2:4
kline 9:11
know 9:10,13 10:10 10:14 12:16
knowledge 9:6 11:2
known 9:8 13:1

## L

l 2:15
lawyers 15:2
leave 13:7
led 10:15
legal 1:24

limited 12:4
line 5:5,10,15,20 15:4
literally 11:17
litigation 9:17
llc 1:8 2:7 8:14,18 8:21
llp 2:4
located 12:15
logan 1:16 2:5
look 7:17
looking 10:19
looks 8:1
lot 12:21

## M

m 1:19 13:16
magna 1:24
magnals 1:25
maines 9:14
manner 8:21
mark 7:1,3,8
marked 5:19 7:6,12
marquis 1:14 3:6 6:1,10,18,21 7:9 7:16 8:8 9:2 11:15
matlack 2:10
matter 6:15 7:20 8:13 14:10
mean 12:23
meat 10:17
mg 1:6
mind 12:3
moment 7:17
moorestown 2:11
morning 6:10
mortgage 8:18,21 8:22,23
motion 11:13

## N

n 2:1,15 3:1 14:1
name 6:16
named 9:11,14
necessarily 10:24
need 10:5



new 1:3
nice 11:3
nj 2:11
north 6:18
notary 1:22 6:3
    14:6
notes 14:9 15:2
notice 1:15
number 4:4 12:15

**O**

o 2:15 14:1
okay 7:7 13:9
oral 1:14
ordered 12:13
oscar 1:14 3:6 6:1
    6:18

**P**

p 2:1,1,15
pa 2:6
page 3:4 4:4 5:5,10
    5:15,20 15:4
paragraph 8:9
parens 8:12
park 6:19
pay 11:5,8 12:1
paying 12:11
pennsylvania 1:18
    6:4
person 9:11,14
personal 9:5
philadelphia 1:18
    2:6
phone 10:13 12:15
plaintiffs 8:22,24
prepared 7:19 8:6
    8:17 9:17
prior 11:1 13:2,3,4
pro 2:10 6:11
proceedings 6:12
production 5:9
professional 1:20
    14:5
propose 12:5
proposed 12:20

proprietary 9:7
provide 8:12
provided 6:15
public 1:22 6:3
    14:7
purposely 12:9
pursuant 1:15
put 12:9

**Q**

questions 5:19 6:14
    9:22 10:8,16,20
    12:17

**R**

r 2:1,15 14:1
read 8:8 9:2
realized 12:3
really 12:17
rebut 8:15
recall 9:20
record 6:17 8:5
recover 11:13
reed 1:16 2:4,10
    3:8 6:9,11 7:1,7
    7:15 8:3,17,18
    9:21 10:3,10,14
    11:9,19,21 13:1,9
reeds 8:17
regarding 6:14
registered 1:20
    14:5
relevant 10:21
report 4:6 6:14,22
    7:8,17,18 8:6,9,13
    8:16,19 9:3,17
reported 8:22
reporter 1:21,21
    14:5,6
reporting 8:20,23
    9:19
request 5:9 7:23
rescap 8:11,15
reserved 12:1
residential 1:7 2:7
    8:14

resultant 9:1
ridge 6:19
right 11:11
risk 12:10
road 6:19,19
robert 9:14
rpr 14:24
rude 12:24
ruggeri 1:20 6:3
    14:4,24

**S**

s 2:1,15,15 4:1
save 11:2
saved 12:21 13:5
scope 12:4
se 2:10 6:11
services 1:24
short 6:13
smith 1:16 2:4
southern 1:3
square 1:16 2:5
standards 9:7
state 6:4,16
states 1:2
stenographic 14:9
stipulations 5:14
street 1:17 2:5
submitted 7:19
suite 1:17 2:5
support 5:1
sure 7:18
sworn 6:2

**T**

t 2:15 4:1 14:1,1
take 7:16
taken 1:15 14:9
td 9:7
telephonically
    12:19
testified 6:5
testify 7:5
thats 7:5 9:22,22
    10:11,19 11:20
things 10:21 12:24

think 6:13 10:20
    12:8
three 1:16 2:5
time 6:13 7:11,22
    12:21,22
today 6:13
transcript 14:9
travel 11:5
trouble 13:5
true 14:8
trust 8:11,12 11:8
    11:14 12:13

**U**

understand 6:23
underwriting 9:7
united 1:2
upset 12:6

**V**

vacation 10:8 11:16
    12:22
versus 8:18
violation 9:18

**W**

want 7:4 9:3
way 10:1,6
weekend 10:18
whichever 7:4
wisconsin 10:2,7
    11:16
witness 3:4 5:4 7:22
    8:1 10:1,2 13:11
www 1:25

**X**

x 3:1 4:1

**Y**

yesterday 10:17
    13:4
york 1:3

**Z**

**0**

05 13:16
08057 2:11

**1**

1 4:6
10 13:16
11 1:9
120 6:18
1212020 1:6
1717 1:17 2:5
19 1:12
19103 2:6

**2**

2016 1:12
215 2:6

**3**

3100 1:17 2:5

**4**

**5**

56 1:19

**6**

6 3:8
60068 6:20
6246221 1:24

**7**

7 4:6

**8**

817 2:10
8518100 2:6
856 2:11
866 1:24

**9**

9 1:19
9566950 2:11



# EXPERT REPORT
## By
## Oscar Marquis

### In re:

### Residential Capital, LLC, et al., Debtors.
United States Bankruptcy Court for the Southern District of New York
Case No. 12-12020 (MG) Chapter 11

I have been asked by counsel for The ResCap Borrower Claims Trust ("Borrower Trust") to provide an Expert Report in the above matter of In re Residential Capital, LLC, et al. ("ResCap") and to rebut the Expert Report of Evan Hendricks for Frank and Christina Reed (the "Reeds") prepared in the case, Reed v. GMAC Mortgage LLC. My report deals with the Fair Credit Reporting Act ("FCRA")[1] and the impact the manner in which GMAC Mortgage, LLC ("GMAC Mortgage") reported Plaintiff's mortgage account to the consumer reporting agencies had on Plaintiff's credit, and any resultant damages.

I was General Counsel of Trans Union, one of the nationwide consumer reporting agencies, for over 24 years and am now engaged in a law practice that focuses on consumer reporting, privacy and credit issues. I also provide Expert Reports in matters involving FCRA. I am thoroughly familiar with the way consumer reporting works, how credit scoring is conducted and the impact of various elements of a consumer's credit report has on an individual's ability to get credit. My detailed credentials are listed at the end of this report.

## I.    Issues

The issues I have been asked to address are interrelated:

- A. What impact the filing of the foreclosure action by GMAC Mortgage had on the ability of the Reeds to get new credit. This will require an analysis of how credit reports and credit scores work, and damages from the reporting of the foreclosure action.
- B. Reply to the Reeds' expert report prepared by Evan Hendricks ("Hendricks").

## II.    Conclusion

For the reasons stated below, it is my opinion that there is no basis in the record for Hendricks' conclusions that, GMAC "abused the credit reporting system by filing the foreclosure action"; the foreclosure "stood out as a 'scarlet letter' and scuttled (Reed's) soon-to-be-completed efforts to refinance his mortgagee and avoid foreclosure"; that Reed's economic damages included "the loss of time and opportunity stemming from dealing with the unfair and incomplete/inaccurate credit reporting"; that Reed suffered from "loss of control over such crucial personal

---

[1] 15 U.S.C. 1681 et seq.

1



information, making him a victim of chronic credit report inaccuracy"; and that Reed suffered damages "consistent with those experienced by other victims" of "chronic credit report inaccuracy."[2]

In addition, the impact of a foreclosure on a credit report and credit score can only be determined in the context of other information on a credit report.[3] But, months of non-payment of a mortgage, which Mr. Reed has admitted,[4] has a negative effect on a credit report and credit score. A high level of indebtedness also has a negative impact. So does a high debt to income ratio; so does the failure to pay taxes.[5] All negative items are interrelated and one item alone does not determine a credit score.

Finally, there is nothing in the record I have seen to indicate that the foreclosure action was reported inaccurately by GMAC Mortgage to the consumer reporting agencies, or that the Reed's ever obtained their credit report after the GMAC Mortgage foreclosure was filed, or disputed any information in any such report with a consumer reporting agency. As such, there is no cause of action under FCRA against GMAC Mortgage if it reported information inaccurately to a consumer reporting agency. The Reeds cannot recover any damages based on inaccurate reporting of information by GMAC Mortgage.

## III.  Facts

The relevant facts related to this matter appear to be the following: The Reeds are in the business of buying and selling real estate, often after fixing up properties that they had bought, and they extracted equity from the properties to use for additional ventures.[6] They owned a number of properties in early 2008 including one at 817 Matlock Drive in Moorestown, NJ (the "Matlock Property") and GMAC Mortgage was the servicer of the loan for the Matlock Property. The Reeds stopped paying the mortgage in January, 2008 and in May, 2008 GMAC Mortgage filed a foreclosure action against the property. No record has been found of GMAC Mortgage sending the Reeds a Notice of Intent to Foreclose, as required by New Jersey law, and the Superior Court of New Jersey dismissed the GMAC Mortgage foreclosure action without prejudice, for failure to provide the notice.

The Reed's had an opportunity to pay GMAC Mortgage the amount past due, but chose not to do so.[7] They claim to have applied for additional loans which were not granted, but they have not produced any applications or adverse action notices,[8] which lenders are required to provide under FCRA if the decision is based on a consumer report, or the Equal Credit Opportunity Act (ECOA)[9] if the loan application is rejected based on other information.

---

[2] Hendricks Expert Report, P. 1-2
[3] I have not seen any credit reports in this matter.
[4] Frank Reed April 26, 2011 deposition, P. 42, L. 15
[5] All of which appear to have existed based on Mr. Reed's deposition.
[6] Hendricks Expert Report, P. 3
[7] Reed Deposition, P. 46, 71
[8] See, e.g. Deposition. P. 57, 64
[9] 15 USC § 1691 et seq.

2

IV.    **Analysis**

A. **Consumer Reporting**

In order to determine the impact of the foreclosure on the Reeds credit reports, it is necessary to discuss how credit reporting works and how credit reports are used.

Consumer reporting agencies have existed in the United States for over 100 years and operate today on the same principles as they have in the past, except that the process is now automated. Creditors furnish their credit account information to consumer reporting agencies, and the consumer reporting agencies incorporate the information into their databases. The consumer reporting agencies in turn furnish the information in the form of reports that include additional information compiled from other creditors, collection agencies and relevant public records to inquirers that have a permissible purpose[10] to receive the reports. The reports contain both positive and negative information—accounts paid as agreed, delinquent, paid after collection activity, or never paid, as well as public records such as liens, bankruptcies and lawsuits. The consumer reports help creditors, insurance companies and others make credit and other risk decisions on new applicants.

Consumer reports are intended to predict the future credit performance of individuals based on their personal credit performance history. Creditors make risk decisions on credit applications by evaluating how reliably consumers lived up to their obligations in the past and assume they will perform the same way in the future. They assume that an individual's future performance will be similar to his or her past performance. Creditors want to get repaid and don't want to engage in collection activities to get paid. If an applicant has not paid prior creditors or not paid in the time period agreed to, a new creditor is less likely to approve a new credit application by the individual.

Although there are codes to report in great detail the status of an account on a credit report, the basic risk decision a creditor makes is based on the original and long standing analysis: is a person with a particular credit history a good credit risk? Creditors want to get paid back on time and as agreed without difficulty. Creditors lose money on accounts if they are not paid as agreed—if an account has to go to collection, requires litigation, or is never paid back. Credit reporting exists, not as the Reed's expert implies, to collect money from people even if it is not actually owed,[11] but to help lenders make sound lending and risk decisions.[12]

Therefore, the failure of the Reed's to make mortgage payments was an indication that they were in credit difficulty which makes it less likely that their new applications for credit would be approved, whether or not the mortgage went into foreclosure.[13]

---

[10] As specified by FCRA
[11] Hendricks Expert Report, P. 5
[12] See, 15 U.S.C. 1681(a)
[13] It should be noted that the real estate bubble collapsed in 2008, many real estate speculators were in financial difficulty, and real estate lending declined sharply at this time. See, e.g., http://www.zillow.com/nj/home-values/

## B. Credit Scoring

As the volume of credit applications, particularly for credit cards, increased in the U. S. credit industry in the 1970s, creditor's evaluation of credit applications and consumer reports became more automated, thus taking the personal and potentially discriminatory element out of the decision making process. Creditor's application evaluation systems and programs continued to become more refined and looked for predictive factors in the credit report, such as payment history, number of accounts and ratios between available and existing credit, along with information on the credit application. As the credit decision making process became more sophisticated, creditors began to develop credit scoring systems in the 1980s that gave points for the presence of information and the relationship among accounts, giving more points for information considered positive, and giving fewer or deducting points for information considered negative. The information that was positive or negative was determined by a statistical analysis of the types of data that proved statistically predictive of outcomes.

Eventually, the consumer reporting agencies developed their own credit scoring systems, or the scoring systems were developed for them by analytic companies that specialized in developing statistical models.[14] Since the credit scoring systems developed by the consumer reporting agencies were based on a larger database of information than those developed by the creditors themselves, their credit scores were more reliable and predictive.

As with manual credit reviews, the credit scoring systems are intended to predict credit worthiness by determining the likelihood of a consumer's future credit behavior based on how consumers with similar credit characteristics behaved in the past. A credit score is based on the risk, of e.g. non-payment or bankruptcy, of an individual by comparing his or her credit characteristics with those of other consumers who had the same characteristics whose performance is known. In other words, the scoring systems compare consumer reports at different time periods to determine which characteristics predicted the ultimate performance.

The credit scoring systems analyze the most predictive characteristics in a consumer report based on a statistical analysis, not intuition. The factors analyzed include positive and negative information, the relationship between credit limits and outstanding credit, the type of credit accounts, their age, missed payments, late payments, timely payments, inquiries and public records. No one factor alone determines the score. The weight of a factor is dependent on its relationship to other factors and is not always the same. "Therefore, it's impossible to measure the exact impact of a single factor in how your credit score is calculated without looking at your entire report. Even the levels of importance shown in the FICO Score chart are for the general population, and will be different for different credit profiles."[15]

In the credit scoring system in most common in use, developed by FICO, payment history counts 35% toward a credit score, amounts owed count 30%, length of credit history counts 15%, new credit and types of credit count 10% each.[16]

---

[14] The most prominent is a company formerly called Fair Isaac Company, and now, FICO
[15] http://www.myfico.com/CreditEducation/WhatsInYourScore.aspx
[16] Id.

Note that none of these categories of factors that are considered—payment history, amounts owed, length of credit history, new credit or types of credit—include anything like, "account in foreclosure." A reference, such as account in collection or in foreclosure, is a called a "remarks code." Creditors furnish "remarks code" to credit bureaus to provide more detail and complete information of the status of an account. But, the scoring system does not score the "remarks code" included in the account. The account would indicate that repayment was unsatisfactory— i.e. it is delinquent a certain number of months as in the case of the Reeds—and that would be scored, not the additional explanation.

After all, whether or not a lender elects to initiate a foreclosure is a decision it makes based on its internal policies, not a decision made by the borrower. If, for example, GMAC Mortgage elected never to file a foreclosure, or allow a year of delinquencies before doing so, but the Reeds continued to miss payments, it would not make sense to conclude that the Reeds are better credit risks because they were not in foreclosure. Their conduct which impacts their credit worthiness is their failure to make mortgage payments and that credit history impacts their credit score, not the action of GMAC Mortgage in deciding whether or not to file a foreclosure.

This is apparent if we examine the factors considered by credit scoring systems. The specific characteristics used in the FICO and other commercial credit scoring systems are proprietary. However, the Federal Reserve Board (Fed) analyzed credit scoring and presented a report to Congress as required by the Fair and Accurate Credit Transactions Act of 2003. The Fed report explains in great detail how scores are developed and what characteristics are considered by the scoring system.[17] In preparing its analysis, the Fed created a credit scoring model that closely paralleled the results achieved by the commercially available scoring systems, such as that developed by FICO or the Vantage Score.[18] Based on my experience and on the Fed analysis, the characteristics and methodology used by the Fed are very similar to the commercial systems. The characteristics used by the Fed would generally lead a creditor to make the same credit decision that it would make if it used the system developed by FICO, except possibly at the margins. The Fed considered over three hundred characteristics from the credit reports it analyzed[19] and selected 19 to use in its model.[20]

Specifically, the Fed selected the following characteristics:

1. Total number of accounts in good standing, opened 18 or more months ago
2. Total maximum credit issued on open accounts reported in the past 12 months
3. Total number of months since the most recent account delinquency
4. Percentage of total remaining balance to total maximum credit for all open revolving accounts reported in the past 12 months
5. Percentage of total remaining balance to total maximum credit for all open installment accounts reported in the past 12 months

---

[17] The report can be found at: http://www.federalreserve.gov/boarddocs/RptCongress/creditscore/creditscore.pdf
[18] Id. P. 78 The Vantage Score is a credit risk score developed by the three nationwide consumer reporting agencies to compete with the FICO score.
[19] Id. Appendix B
[20] Id. Appendix C

6. Percentage of total remaining balance to total maximum credit for all open bankcard accounts reported in the past 12 months
7. Percentage of accounts with no late payments reported
8. Number accounts that have payments that are currently or previously 30 or more days past due within the past 24 months
9. Total number of accounts currently less than 120 days past due in the past 2 months
10. Greatest amount of time a payment was late ever on an account
11. Total number of months since the most recent occurrence of a derogatory public record
12. Total number of inquiries for credit
13. Total number of months since the most recent update on an account
14. Average age of accounts on credit report
15. Total number of open personal finance installment accounts reported in the past 12 months
16. Total number of open non-installment accounts with a remaining balance to maximum credit issued ratio greater than 50% reported in the past 12 months
17. Percentage of accounts that are open and active with a remaining balance greater than $0 reported in the past 12 months
18. Total number of different credit issuers
19. Total number of public records and derogatory accounts with an amount owed greater than $100

As can be seen, the factors in credit reports that are considered are payment history, amounts owed, the relationship among accounts, public records and similar factors. None of the factors include whether late payments resulted in a foreclosure.[21] In other words, the negative effect of a delinquency in making mortgage payments on predicting credit risk does not change if the account is placed into foreclosure.

This conclusion is intuitively correct: the purpose of credit reports and credit scores is to predict future credit behavior based on past credit behavior. A person that does not pay his or her bills is a poor credit risk whether the creditor elected to file a foreclosure or not. As discussed above, whether or not to file a foreclosure is a decision at the discretion of the lender and is unlikely to predict an individual's credit worthiness more than the conduct under the control of the individual. Borrowers, such as the Reeds, that do not pay their mortgage; where Mr. Reed said, "I don't remember why my wife would have not written the check or made a (mortgage) payment"[22] are not good credit risks and a lender is unlikely to make a new loan.

## C. FCRA and Furnisher Liability

---

[21] Factors 11 and 19 relate to public records. Foreclosures are not typically reported as public records in credit reports. Since foreclosures are reported as part of an account, consumer reporting agencies do not go to the expense of collecting foreclosures from the public record, since that would be duplicative. The Reeds Expert is wrong in his comment in the Addendum, second page, "It is commonly known in the credit reporting industry that Foreclosure proceedings are publicly recorded as such are (sic) reported to the credit agencies."
[22] Reed Deposition, P. 42

6

GMAC Mortgage, as servicer of the loan for the Matlock Property, Was a furnisher of information to consumer reporting agencies and its legal responsibilities are spelled out in FCRA §1681s-2. The requirement regarding the manner in which information must be reported are spelled out in §1681s-2(a). Furnishers are prohibited from furnishing information to a consumer reporting agency with actual knowledge of errors,[23] or after notice and confirmation of errors.[24] Furnishers also must correct and update information previously furnished to a consumer reporting agency if they learn it is not complete or accurate.[25] There are additional requirements on furnishers spelled out in §1681s-2(a).

GMAC Mortgage filed the foreclosure action. Therefore, the information reported to the credit bureaus[26] was reported accurately. It would have been inaccurate for GMAC Mortgage to fail to report the filing of the foreclosure even if it was filed without the required notice to the Reeds.

However, notwithstanding the accuracy of the information, if a furnisher fails to perform any of the obligations contained in §1681s-2(a) and, for example, reports information to a consumer reporting agency with actual knowledge of errors, the furnisher is not liable to any injured consumer. Regulatory agencies can pursue violations of s-2(a), but not individuals in private lawsuits since there is no civil liability for violations of §1681s-2(a):

> (c) Limitation on liability
> Except as provided in section 1681s(c)(1)(B) of this title, sections 1681n and 1681o of this title do not apply to any violation of—
>> (1) subsection (a) of this section, including any regulations issued thereunder;
>> (2) subsection (e) of this section, except that nothing in this paragraph shall limit, expand, or otherwise affect liability under section 1681n or 1681o of this title, as applicable, for violations of subsection (b) of this section; or
>> (3) subsection (e) of section 1681m of this title.[27]

Numerous courts have concluded that individuals do not have a private right of action against furnishers for furnishing incorrect information to consumer reporting agencies because of this limitation:

> The FCRA expressly creates a private right of action for willful or negligent noncompliance with its requirements. (§§ 1681n & o) However, § 1681s–2 limits this private right of action to claims arising under subsection (b), ...[Except[for circumstances not relevant here], sections 1681n and 1681o of this title do not apply to any violation of ... subsection (a)[28] of this section, including any regulations issued thereunder."). Duties imposed on furnishers under subsection (a) are enforceable only by federal or state agencies.[29]

Furnishers of information to consumer reporting agencies can be liable for failure to conduct a reasonable investigation of information disputed by consumers to the consumer reporting

---

[23] §1681s-2(a)(1)(A)
[24] §1681s-2(a)(1)(B)
[25] §1681s-2(a)(2)
[26] I assume for purposes of this report that the information was reported by GMAC Mortgage to the credit bureaus. I have not seen the Reeds credit reports and therefore do not know if that occurred.
[27] §1681s-2(c)
[28] §1681s-2(a)
[29] Gorman v. Wolpoff, 584 F.3d 1147, United States Court of Appeals, Ninth Circuit, 2008

agencies, after the agencies communicate the dispute to the furnisher[30] under FCRA §1681s-2(b). But, that is not a situation in this case. The Reeds never obtained their consumer report and never disputed information with any of the consumer reporting agencies.

Therefore, GMAC Mortgage cannot be liable for any damages to the Reeds arising out of the reporting of the foreclosure to consumer reporting agencies. Reed's Expert damage calculations under FCRA are therefore entirely misplaced.

### D. The Reeds Expert's Report

Most of the points raised in the Reeds Expert's report are addressed above:

- The credit reporting system is not abused by the filing of a foreclosure action.[31] Filing a foreclosure has nothing to do with the credit reporting system.
- If the Reeds credit report contained a "remarks code" that the account was in foreclosure,[32] the delinquent payments, which are not disputed by Mr. Reed, are accurate and equally as derogatory as the "foreclosure" remarks code.
- A foreclosure remark on a delinquent account in credit report is not a "scarlet letter"[33] since scoring systems analyze all the information in the report, the amounts, the dates, inquiries, etc. and their relationship to each other. No one factor alone is determinative of a credit score.
- There is no evidence that the Reeds had any "loss of time and opportunity" dealing with any credit reporting agency or with "unfair and inaccurate credit reporting."[34] In fact, they did not get their credit report and dispute any information on it with the consumer reporting agencies.
- There is no evidence that Mr. Reed lost any control over his personal information.[35] He appears to have taken no steps to obtain his credit report or dispute any information he considered inaccurate. If he had, he would have had some control over what was reported through the FCRA process.
- There is no evidence that Mr. Reed experienced damages consistent with those "experienced by other victims" of credit report inaccuracy.[36] He was not similar to typical "victims." He was a real estate investor who was highly leveraged when the real estate bubble collapsed. That is not consistent with the types of "victims" Reed's expert has testified about in the past, or typical of those individuals that have filed other cases against data furnishers.
- Most lenders do not run automated scans for derogatory terms such as "foreclosure."[37] Most use automated scoring systems which do not score the remark "foreclosure" on an account, but rather score things like, "total number of months since the most recent

---

[30] See, e.g. Johnson v. MBNA America Bank, NA, 357 F.3d 426
[31] Hendricks Expert Report, P. 1, First Bullet Point
[32] Hendricks Expert Report, P. 1, Second Bullet Point
[33] Hendricks Expert Report, P. 1, Third Bullet Point
[34] Hendricks Expert Report, P. 1, Fifth Bullet Point
[35] Hendricks Expert Report, P. 2, First Bullet Point
[36] Hendricks Expert Report, P. 2, Forth Bullet Point
[37] Hendricks Expert Report, P. 2, Second Paragraph

account delinquency" and "percentage of accounts with no late payments reported," and so on.

- Finally, the Reeds expert implies that GMAC Mortgage reported the account to the credit bureaus to "wrench compliance with payment terms...whether or not it is actually owed by the consumer."[38] But in this case, the Reeds do not dispute that they actually owe the money and admit that they simply stopped payment and refused to make payments even though they were able to do so. The implication in the Expert's Report is completely false.

Accordingly, the Reeds Expert's estimate of the Reeds noneconomic damages of $350,000 appears to be without foundation.

Oscar Marquis _____    8/20/14
Oscar Marquis                             Date

---

[38] Hendricks Expert Report, P. 5

9

## CURRICULUM
## VITAE

## Oscar Marquis

### EXPERIENCE

- I am the principal of Oscar Marquis & Associates and specialize in privacy and consumer reporting legal and compliance issues.
- I was General Counsel of Trans Union, one of the nation's three nationwide consumer reporting agencies, from 1984 to 2000 when I left to go into the private practice of law. I was at Trans Union for over 24 years.
- I serve as and Independent Legal Consultant to the international law firm of Hunton & Williams on credit reporting, GLB and other privacy matters
- After leaving Trans Union, I was counsel to Hunton & Williams and then a partner in the Washington, D.C. law firm of Oldaker, Belair and Wittie.
- My clients consist of companies engaged in the consumer information business including consumer reporting agencies, employment screening companies, marketing companies, and other consumer or commercial information users and suppliers.
- I provide advice regarding privacy, the proper use of information, privacy policies and practices, and credit and credit reporting compliance issues to organizations that use consumer information and those that collect, maintain and sell consumer information as well as commercial information.
- I provide Expert Reports in litigation matters regarding privacy issues, credit, credit and insurance scoring, and the Fair Credit Reporting Act.
- While at Trans Union, I was involved in all legal, executive, legislative and compliance matters involving the company.
- I work with creditors, insurance companies, and other financial institutions regarding their use of consumer reports and their furnishing of information to consumer reporting agencies.
- While at Trans Union, I established a compliance department and a government affairs department.
- I was responsible for and oversaw Fair Credit Reporting Act and other litigation involving Trans Union.
- I helped develop forms and policies and procedures for the Trans Union consumer relations process.
- I drafted the subscriber and other agreements in use by Trans Union many of which were models for the industry.
- While at Trans Union, I participated in the development of credit scoring policy and legal compliance.
- I consulted with the Federal Trade Commission and expert attorneys throughout the country in preparing Fair Credit Reporting Act interpretations.
- I negotiated four agreements with the Federal Trade Commission and two with groups of state Attorneys General involving various Fair Credit Reporting Act compliance issues.

10

- I testified in Congress and many state legislatures about Fair Credit Reporting Act issues.
- I have appeared on Nightline, CNN and numerous radio programs discussing consumer reporting issues.
- I have participated in the development of consumer reporting agencies in Canada, Mexico, South Africa, Italy and numerous other international locations.
- I worked with the Central Bank of Kenya in preparing a compliance and licensing regime for credit bureaus operating in Kenya.
- I prepared and participated in a credit reporting training session for the Central Bank of Nigeria, and prepared an operations manual.
- I prepared a legal and operational analysis of the credit reporting system in Egypt and prepared and participated in a credit reporting training session for the Central Bank of Egypt.
- I frequently speak at credit industry and trade association meetings about Fair Credit Reporting Act and legislative issues affecting the consumer reporting and credit industries.
- I presented seminars to Congressional staffers about Fair Credit Reporting Act issues.
- I frequently meet with attorneys from the consumer reporting agencies and the national trade association, Consumer Data Industry Association, to discuss compliance issues, legislative strategy, and Fair Credit Reporting Act interpretations.
- I have written numerous articles for industry publications about consumer reporting issues.
- I speak and write German.

## EDUCATION

Northwestern University, Evanston, Illinois:   BA, Economics

University of Illinois, School of Law, Champaign, Illinois:   JD
    Harno Memorial Scholarship

## MEMBERSHIPS

Member of the Illinois Bar

Member of the National Association of Professional Background Screeners;
    Best Practices Committee

Member of the Federal Reserve Board Consumer Advisory Council, 2001-2003
    Chair of the Depository & Delivery Systems Committee

Board of Directors of MicroBilt Corporation (http://www.microbilt.com/)

Board of Directors of the Consumer Information Research Council (2001-2006)

Board of Directors, Hands of Peace (http://www.handsofpeace.org/)

11

## SPEECHES

- I have made numerous presentations at the annual meetings of the Consumer Data Industry Association.
- I have testified on consumer reporting issues in Congress and numerous state legislatures.
- I made numerous presentations at Trans Union annual meetings.
- I have appeared on Nightline, CNN and numerous radio programs.

  o  I have made presentations at programs sponsored by the following organizations:

- L2C, Inc. Customer Symposium
- International Association of Privacy Professionals
- Online Lenders Alliance
- ACA International
- University of Dayton, School of Law
- Resource Management Services
- National Association of Professional Background Screeners
- American Conference Institute
- Privacy and American Business
- Practicing Law Institute
- Internet Legal Council
- Direct Marketing Association
- Merchants Research Council
- Credit Industry Research Council
- Collection and Recover Solutions
- ID Analytics
- MarketerNet Customer Conference
- Thompson Financial
- Lorman Education Services
- Background Investigator
- The Federalist Society
- Experian Law Conference
- First Advantage
- Debt Buyers
- MicroBilt Corporation

## EXPERT REPORTS GIVEN

I have given Expert Reports in the following litigation matters:

Williams v. First Advantage, United States District Court for the
    Northern District of Florida,    Case No. 1:13-cv-00222-MW-GRJ
Henderson v. Backgroundchecks.com, United States District Court,
    ED of Virginia, Civil Action No: 3:13cv00029-REP
Banks v. Target Corporation,  United States District Court for the
    Western District of Wisconsin, No. 3:12-CV-00731
Rosenberg v. DVI Receivables, US Bank, et al., U.S. Bankruptcy Court,
    Miami, Florida, CASE NO. 09-13196-AJC
Frederic L. Edquid and Lesley H. Edquid vs. GMAC Mortgage Corporation, et al.,
    United States District Court for the District of Arizona, No. 4:11-cv-00311
DP Professionals, Inc. vs. Dunn & Bradstreet, Inc., U.S. District Court for the District of South
    Carolina (Columbia Division), CASE NO. 3:10-cv-03112-CMC
Buchanan v, GEMB Lending, 57th District Court, Bexar County, Texas
    Cause No. 2009CI12349
Wilkes v. GMAC Mortgage, USDA, ED Virginia, 1:10cv1160(CMH-TRJ)
James Ryals, Jr., et al. v. HireRight Solutions, Inc. et al. USDC, ED Virginia,
    CIVIL NO. 3:09cv625
Deutsch v. Arrow Financial Services and Target National Bank, USDC Middle
    District of Florida,  Case No. 08CV-01469-T-MAP
Lee v. Chase Bank, USA, USDC Oregon, Case No. 07-CV-998-MO
Sill v. Chase Bank USA, N.A, Arbitration, Case No. 77 148 00283 07
Boone v. I.C. Systems, United States District Court, ED of Virginia, No. 3:08-cv-817
Pittman v. American General Finance, United States District Court, ED
    Wisconsin, Milwaukee Division
Wilkerson v. Allstate Property and Casualty Insurance Company, Superior Court
    of Washington, County of Snohomish, NO. 07-2-04059-3
        Pires v. ChoicePoint, USDC, Northern District of Georgia, Atlanta Division, No. 1:07-
    cv-03112-TCB-RGV
Benedikt v. ChoicePoint, USDC, New Jersey, 2:07-cv-02569-KSH-PS
Williams v. LexisNexis, USDC, Eastern District of Virginia, No. 3:06-cv-241
Clansey v. GMAC, US Bankruptcy Court, Southern District, Texas, No. 04-40504
Federal Trade Commission v. Connelly, Central District of California, No. SACV 06-701 DOC
Manno v. American General Finance, USDC, ED, Pennsylvania, No. 05-cv-1222
Stellick v. J.P. Morgan Chase, USDC, Minnesota,  No. 5cv2902JRT/FLN
Sizemore v. OwnerGuard, South Dakota Circuit Court, Civil No. 05-906
Whiteker v. J.P. Morgan Chase, US District Court, ED Texas, Civil Action 9:06-cv-00113-TH
CSI Investment Partners v. Cendant Corporation, Southern District of New York,
Chandler v. Stonich, Northern District of California


My compensation for this matter is $525 per hour.