## Exhibit J

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 2 of 103

1

1             UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4

5    GERARD WIENER, individually,

6    and as Personal Representative

7    of the Estate of Roland C. Wiener,

8                Plaintiff,

9         vs.                    Case No. 11-10770

10                               Hon. George Caram Steeh

11   BANKERS TRUST COMPANY, ET AL.,

12               Defendants.

13   _____

14   AND RELATED CROSS-ACTIONS

15   _____

16

17           The Deposition of PATRICIA L. SCULLY,

18           Taken at 280 West Maple Road, Suite 300,

19           Birmingham, Michigan,

20           Commencing at 8:36 a.m.,

21           Thursday, November 29, 2012,

22           Before Amy Tobias Lenga, CSR-4625.

23

24

25



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 3 of 103

2

1    APPEARANCES:

2

3    DAVID J. BROWN

4    David J. Brown

5    1135 Ulloa Street

6    San Francisco, California  94127

7    415.716.7786

8        Appearing on behalf of the Plaintiff.

9

10    FRANK M. DeLUCA

11    McKelvie DeLuca, PC

12    280 West Maple Road, Suite 300

13    Birmingham, Michigan  48009

14    248.952.5100

15        Appearing on behalf of the Defendants Bankers Trust

16        and GMAC.

17

18    JASON MILSTONE

19    Lefkofsky & Gorosh, PC

20    31500 Northwestern Highway, Suite 105

21    Farmington Hills, Michigan  48334

22    248.855.5508

23        Appearing on behalf of Jeffrey Baskin and Lauren

24        Newman.

25    ALSO PRESENT:  Christine Buen - via telephone



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 4 of 103

3

1                    TABLE OF CONTENTS

2    WITNESS                                  PAGE

3    PATRICIA L. SCULLY

4    EXAMINATION

5    BY MR. BROWN:                               4

6

7                         EXHIBITS

8    EXHIBIT                                  PAGE

9    (Exhibits attached to transcript.)

10   DEPOSITION EXHIBIT 1                      21

11   DEPOSITION EXHIBIT 2                      56

12   DEPOSITION EXHIBIT 3                      62

13   DEPOSITION EXHIBIT 4                      65

14   DEPOSITION EXHIBIT 5                      67

15   DEPOSITION EXHIBIT 6                      74

16   DEPOSITION EXHIBIT 7                      77

17   DEPOSITION EXHIBIT 8                      79

18   DEPOSITION EXHIBIT 9                      79

19   DEPOSITION EXHIBIT 10                     84

20   DEPOSITION EXHIBIT 11                     90

21   DEPOSITION EXHIBIT 12                     91

22   DEPOSITION EXHIBIT 13                     93

23   DEPOSITION EXHIBIT 14                     94

24   DEPOSITION EXHIBIT 15                     99

25   DEPOSITION EXHIBIT 16                    100



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 5 of 103

4

1    Birmingham, Michigan

2    Thursday, November 29, 2012

3    8:36 a.m.

4

5                        PATRICIA L. SCULLY,

6         was thereupon called as a witness herein, and after

7         having first been duly sworn to testify to the truth,

8         the whole truth and nothing but the truth, was

9         examined and testified as follows:

10                       EXAMINATION

11   BY MR. BROWN:

12   Q.   Could you state your full name for the record, please?

13   A.   Patricia Scully.

14   Q.   Do you have a middle name?

15   A.   Louise

16   Q.   And have you ever used any other names?

17   A.   No, I haven't.  Well, Patricia Harvey when I was a

18        little girl.  So I've been married -- I've been

19        Patricia Scully for 37 years, so.

20   Q.   Okay.  And for purposes of just things we might look

21        at on the record do you have any nicknames that are

22        used in business?

23   A.   No.

24   Q.   Are you represented by an attorney here today?

25   A.   No, I'm not.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 6 of 103

5

1           MR. DeLUCA: Well, I would let the record

2       reflect that I'm here on behalf of General Motors

3       Acceptance Corporation and Bankers Trust, and as a

4       witness I am representing her in this deposition.

5           MR. BROWN: Okay.

6   BY MR. BROWN:

7   Q.   Do you agree with that, Ms. Scully?

8   A.   Yes.

9   Q.   Have you ever had your deposition taken before?

10  A.   Yes.  On this case?

11  Q.   No.  Any case?

12  A.   Yes.

13  Q.   How many times would you say?

14  A.   Once.

15  Q.   And how long ago was that?

16  A.   Two or three years.

17  Q.   Was it in connection with business?

18  A.   Yes.

19  Q.   And how long did it last?

20  A.   A day.

21  Q.   And do you remember the name of the case involved?

22  A.   No, I don't.

23  Q.   Do you remember the name of -- you don't need to tell

24      us, but do you remember the name of the customer of

25      GMAC if, in fact, the customer from GMAC was involved?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 7 of 103

6

1    A.    No, I don't.

2    Q.    Was a customer from GMAC involved?

3    A.    Yes.

4    Q.    As you may recall, you're under oath and you need to

5          tell the truth, which I'm sure is what you intend to

6          do, correct?

7    A.    Yes.

8    Q.    Okay.  And what you need to give me is your best

9          recollection in response to the questions I ask.  If

10         you have some recollection but it's not as complete as

11         if it happened earlier this morning or something, give

12         me the recollection you have and if you want to label

13         it as vague or not complete or you think there's more

14         but you don't remember, just tell me that so I have a

15         sense of what your level of recollection is.  On the

16         other hand, I don't want you just guessing or

17         speculating.  I want what you, in fact, recall.  Okay?

18   A.    Yes.

19   Q.    At some point in time you will have an opportunity to

20         review the transcript which comes out as a booklet

21         looking like a play script, your name, my name and

22         whoever else speaks, and what this court reporter's

23         recording as to what you say; and you'll have a chance

24         to correct or change any mistakes you think you made.

25         But at the same time I may later then have an



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 8 of 103

7

1   opportunity to ask you about your corrections and/or

2   point them out to somebody during a court proceeding

3   that here's what you originally said and here's what

4   you did to correct.  Do you understand that?

5  A. Yes.

6  Q. One of the things that we both have to do is be

7   audible, and you're doing well in that regard so far.

8   So I don't see it as a problem.  But shaking your head

9   or nodding or making more conversational kind of

10   gestures with your arms or head or something doesn't

11   get easily recorded by the court reporter.  So

12   speaking is a key to all this.  Okay?

13  A. Yes.

14  Q. And I'll try and ask that you let me finish my

15   questions before you answer them so you hear the full

16   question, and I'll try and make sure you've completed

17   your answer before I ask my next question.  If for

18   some reason I interrupt your answer because you, one,

19   interrupted or, two, you paused so I thought you were

20   done, just tell me and we'll let you get the complete

21   answer to the question that's pending before we go to

22   the next question.  But I need your help in that if I

23   don't know that you hadn't finished.  Okay?

24  A. Yes.

25  Q. If you don't understand a question tell me and I'll



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 9 of 103

8

1          try to help clarify the question.  Okay?

2  A.    Yes.

3  Q.    During the course of the deposition from time to time

4          attorneys may make objections to a question, often as

5          to the form of the question, occasionally for some

6          other reason.  But unless your attorney, for purposes

7          of being a witness at the deposition, tells you not to

8          answer or instructs you not to answer you have to go

9          ahead and answer even after he's objected.  Okay?

10  A.    Yes.

11  Q.    Are you under the influence of any substance, and that

12          could range from prescription medication to drugs to

13          alcohol, to whatever, that you believe would affect

14          your ability to recall or testify today?

15  A.    No.

16  Q.    Okay.  Let me ask you another routine question that I

17          ask everybody, so please don't be offended.  Have you

18          ever been convicted of a felony?

19  A.    No.

20  Q.    Have you ever in your life seen or talked with Roland

21          Wiener?

22  A.    Yes.

23  Q.    Not Gerard, Roland.

24  A.    Oh, Roland's the father?

25               MR. DeLUCA: Yes.



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 10 of 103

9

1    BY MR. BROWN:

2    Q.    Roland's the father.

3    A.    No.

4    Q.    And have you ever -- I know you talked with Gerard

5         Wiener and corresponded with him by e-mail and

6         otherwise in writing, have you ever actually met him

7         face-to-face?

8    A.    No.

9    Q.    How about Walter Pookrum?

10                   MR. DeLUCA: How about what?

11   BY MR. BROWN:

12   Q.    Have you ever met or seen him?

13   A.    No.

14   Q.    You have corresponded with him, correct?

15   A.    Yes.

16   Q.    And you've talked with him on the telephone?

17   A.    Yes.

18   Q.    What, if anything, did you do to prepare for this

19         deposition today?

20   A.    I went over some notes and e-mails that were provided

21         to me.

22   Q.    Who provided them to you?

23   A.    Our counsel from GMAC.

24   Q.    Which counsel was that?

25   A.    Christine Buen, B-u-e-n.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 11 of 103

10

1   Q.   Anything else?

2   A.   No.

3   Q.   And what were the nature of the notes you looked at

4        that you just referred to?

5   A.   E-mails that went back and forth from Pookrum and

6        myself and Wiener and myself.

7   Q.   Okay.  In that regard, can you and I agree that if we

8        refer to Wiener or Mr. Wiener we mean Gerard; and if

9        for some reason we're referring to the father we'll

10       use his full name, Roland Wiener, so we can tell the

11       difference with having two Wiener names in the case;

12       is that agreeable?

13  A.   That's agreeable.

14  Q.   And other than what you've told me did you do anything

15       else in preparation for the deposition?

16  A.   I prepped with Frank and Christine.

17  Q.   When you prepped with Christine was there anyone else

18       present in addition to Christine and yourself?

19  A.   I don't recall.

20  Q.   And when you prepped with Frank was there anyone in

21       addition to yourself and Mr. DeLuca present?

22  A.   By phone Christine was.

23  Q.   Okay.  When did you first learn that there was a

24       lawsuit that Mr. Wiener had brought against GMAC and

25       others with respect -- that has evolved in the lawsuit



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 12 of 103

11

1          that you're here for the deposition for?

2    A.    I don't recall that date.

3    Q.    Do you recall the general timeframe even if you don't

4          recall the specific date?

5    A.    2011 sometime.  I'm not sure.

6    Q.    If it helps you at all the case was filed in mid 2010.

7          Do you think you first heard about it shortly after it

8          was filed or do you know if it was sometime well after

9          it was filed?

10   A.    I don't recall.

11   Q.    If you could give me a very brief synopsis of what

12         your education after high school has been?

13   A.    I have a Michigan real estate license.

14   Q.    Anything else?

15   A.    No.

16   Q.    Have you had any training or educational courses

17         offered by your employers as part of your employment?

18   A.    Yes.

19   Q.    And what are the nature of those educational courses?

20   A.    Through Allied Bank we have to take courses, money

21         laundering, office etiquette.  They're just courses

22         that we take online that are mandatory learning

23         assignments through Allied Bank.

24   Q.    Any other kinds of courses you've taken --

25   A.    No.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 13 of 103

12

1    Q.    -- in your employment?  If you could give me a brief

2          employment history starting with your first job after

3          you were 18 and proceeding thereafter?

4    A.    My first job was at Budd Wheel in Detroit.  Then in

5          1978 I worked for -- I got into the mortgage business

6          for James T. Barnes.  Then I drove a bus for East

7          Detroit Public Schools.  Went back into the mortgage

8          business around 1985 for Community Central Savings

9          Bank.  From '85 to -- let's see.  '85 to probably in

10         the early nineties I worked for Community Central

11         Savings Bank.  Then I went to Mortgage Corporation of

12         America.  Mortgage Corporation of America to Financial

13         Enterprises.  I worked for Shore Bank.  I was a

14         bartender at the same time for Am Vet's Post 57 in

15         Harper Woods, Michigan.  Then in 1986 I was hired by

16         GMAC.

17   Q.    Does that complete your answer?

18   A.    That would conclude my answer.

19   Q.    Okay.  I think you said '85 to early nineties Mortgage

20         Corp. of America, is that correct?

21   A.    That's correct.

22   Q.    And then you went to Financial Enterprises?

23   A.    Correct.

24   Q.    How long were you there?

25   A.    About a year.  The company went defunct.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 14 of 103

13

1   Q.   Okay.  And then Shore Bank, how long were you at Shore

2        Bank?

3   A.   I worked as a freelance collections inspector for two

4        years for Shore Bank.

5   Q.   And then from '86 you went to work for GMAC and remain

6        employed in various capacities by them since then?

7   A.   That's correct.

8   Q.   And you're employed by them today, correct?

9   A.   Correct.

10  Q.   If you could give me a listing of your various jobs at

11       GMAC over time, please.

12  A.   Loss mitigation, community relations specialist is the

13       only job I've had since I've been there in 1986.

14  Q.   And sorry, can you tell me again, loss --

15  A.   Loss mitigation and community relations specialist.

16  Q.   And over the time from '86 to present has the nature

17       of that job changed as time has passed?

18  A.   It's remained pretty consistent since I became

19       employed.  More travel was involved than I ever

20       thought, but the logistics of the job are the same.

21  Q.   And what are the logistics of the job?

22  A.   Working with borrowers to help mitigate any kind of

23       loss, if they're having a financial hardship, working

24       with nonprofits in the community and doing community

25       outreach.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 15 of 103

14

1    Q.    What sort of work do you do with nonprofits?

2    A.    Put on educational functions for borrowers, explain to

3          them about their mortgage, work with a lot of

4          nonprofits that borrowers go to see.  They refer the

5          client to me so I can be the liaison between the

6          nonprofit and GMAC, loss mit.

7    Q.    And for your loss mitigation activities directly with

8          borrowers what is it you do?

9    A.    Meet face-to-face, collect information, their

10         financial information, their hardship information and

11         submit it to GMAC loss mit.

12   Q.    And when you submit it to GMAC loss mit, and loss mit

13         means loss mitigation, correct?

14   A.    Correct.

15   Q.    When you submit it to GMAC loss mit who are you

16         submitting it to and what are they to do with it?

17   A.    We have a platform and we have several locations.  We

18         have a Dallas location, a Waterloo, Iowa location, and

19         that goes through depending on who the investor is or

20         the type of loan it is, it filters through to the Loss

21         Mitigation Department that would handle that specific

22         investor loan type, et cetera.

23   Q.    And what does loss mit do with it after you've

24         submitted whatever it is?

25   A.    They evaluate the financials in accordance with the



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 16 of 103

15

1        guidelines.

2   Q.   And what is their purpose -- for what purpose are they

3        evaluating the financials?

4   A.   To see if we can mitigate any loss and get the

5        borrower back on track in some form.

6   Q.   So work out a plan where the borrower can financially

7        find a way to get back on track without failing in

8        that and leaving the owner of the loan with a problem

9        of what to do with it or whether to foreclose, is that

10       correct?

11  A.   Correct.

12  Q.   And you say meet guidelines, whose guidelines are you

13       trying to meet?

14  A.   It depends on the loan type it is.  If it's a

15       government subsidized entity, if it's GMAC's own loan.

16       There's several.  We service loans for investors.

17  Q.   Okay.  When Roland Wiener's loan became being

18       administered by Gerard Wiener after Roland had died,

19       and the loss mitigation efforts in that regard, were

20       you looking at any specific guidelines in that regard?

21  A.   I don't --

22            MR. DeLUCA: Do you understand the question?

23            THE WITNESS:  Not really.

24  BY MR. BROWN:

25  Q.   Let me try this.  Let me make it more direct.  That



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 17 of 103

16

1    will help.  With respect to the Wiener loan were the

2    guidelines involved those of Freddie Mac because

3    Freddie Mac was the owner of the loan?

4    A.    We, as GMAC, on part of the Freddie Mac portfolio had

5    delegated authority so we could make our own

6    decisions.

7             MR. DeLUCA: But listen -- Pat, listen to

8    the question.  Do you understand the question that he

9    was asking?

10   A.    Can you repeat it?

11   BY MR. BROWN:

12   Q.    Well, the question is that if in doing loss

13   mitigation, you or the loss mitigation group with whom

14   you worked, were looking at what had been submitted

15   and what the guidelines were for doing some kind of

16   loss mitigation plan, whose guidelines were you

17   looking at with respect to the Wiener loan?

18   A.    It would have been Freddie Mac.

19   Q.    Am I correct that those guidelines periodically change

20   from time to time?

21   A.    I can't answer that question.  I'm not sure of it.

22   Q.    Okay.  When did you first become involved in the

23   Wiener loan?

24   A.    If I recall correctly, August of 2010.  Or maybe it

25   was 2009.  Yeah.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 18 of 103

17

1    Q.    2009?

2    A.    Yeah.

3    Q.    Okay.  And how did you become involved?

4    A.    Received a phone call, but I don't recall if it was

5          from Gerald or Pookrum.

6    Q.    By Gerald do you mean Gerard?

7    A.    Correct.

8    Q.    Do you have any understanding as to how the phone call

9          went to you, without regard to whether it was Gerard

10         or Mr. Pookrum, as opposed to going to somebody else

11         in loss mitigation?

12   A.    Orlans, the attorney of record for GMAC that handles

13         our foreclosures, gave my name and number to Gerard or

14         Pookrum.

15   Q.    Do you have any understanding as to why Orlans gave

16         your name as opposed to somebody else's name?

17   A.    Because I am the local presence for GMAC.

18   Q.    At the time Orlans gave you that did they give you any

19         background as to what had been going on with the

20         Wiener loan and Mr. Pookrum and Mr. Wiener that

21         appeared to have Mr. Wiener and Mr. Pookrum somewhat

22         frustrated at trying to deal with GMAC?

23   A.    No.

24   Q.    Is it correct that at the time Orlans referred them to

25         you that Orlans was somewhere in a foreclosure process





BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 19 of 103

18

1    mode on the loan?

2 A. Correct.

3 Q. To your knowledge, and setting aside Orlans for the

4    moment, who else, if anyone, had been involved in

5    trying to deal with the Wiener loan prior to you?

6 A. To my knowledge of today?

7 Q. To your knowledge today, yeah.

8      MR. DeLUCA: Do you understand the question,

9    Patty?

10 A. I would have never known anybody was involved until I

11    would have started looking at this, you know, knowing

12    the facts of the case.

13 BY MR. BROWN:

14 Q. Let me rephrase the question.

15 A. Okay.

16 Q. With the knowledge you have today who prior to you,

17    and setting aside Orlans for the moment, had been

18    dealing with Mr. Wiener and Mr. Pookrum with respect

19    to the Wiener loan?

20 A. I don't know of any individuals by name that were

21    dealing with them.

22 Q. Do you know of any of GMAC's units or groups,

23    divisions, or whatever they choose to call them, who

24    were dealing with them, obviously when you became

25    involved and loss mitigation became involved, any



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 20 of 103

19

1      other groups that might have been involved?

2   A.   With the knowledge that I know of today it's my

3        understanding he was in contact with the Assumption

4        Department.

5   Q.   What's your understanding back in the 2009 timeframe

6        did the Assumptions Department do when it was dealing

7        with customers?

8                MR. DeLUCA: If you know, Patty.

9   A.   Yeah, I don't have any knowledge of that.

10  BY MR. BROWN:

11  Q.   Well, do you have any general knowledge as to what,

12       how the Assumption Department differs from the Loss

13       Mitigation Department?

14  A.   You want me to explain to you what the difference is

15       with an assumption as to loss mit?

16  Q.   Well, in terms of how GMAC then chose to do business

17       they had apparently an Assumption Department and a

18       Loss Mitigation Department.  You've given me a brief

19       description of what loss mitigation did and does.

20       What did assumption do or now do?

21               MR. DeLUCA: You mean as to this part --

22               MR. BROWN: As a group.

23  A.   Of the Assumption Department?

24  BY MR. BROWN:

25  Q.   Yes.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 21 of 103

20

1  A.   People that want to assume a loan have to send in

2       particular documentation.  The requirements that are

3       needed to assume a particular loan, and the Assumption

4       Department guides them along with that.

5  Q.   In that general timeframe of 2009 did GMAC have a

6       department that was called collections or some word

7       that would be a substitute for the word Collections

8       Department where they were just trying to collect as

9       to a loan?

10          MR. DeLUCA: I am going to object to the

11      form of the question.  It lacks foundation.  Go ahead.

12      If you understand you can answer.

13 A.   As a bank or as a mortgage company we have a

14      Collections Department.

15 BY MR. BROWN:

16 Q.   Would it have dealt with customers on delinquent loans

17      to your knowledge?

18 A.   Yes.

19 Q.   Do you know if the Wiener loan had been dealt with at

20      all by the GMAC Collections Department?

21 A.   No, I don't.

22 Q.   Did GMAC have a Foreclosure Department?

23 A.   Yes.

24 Q.   And to your knowledge, did the Wiener loan get handled

25      at all by the Foreclosure Department?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 22 of 103

21

1    A.    Yes.

2    Q.    What's your understanding of what the handling of the

3          Wiener loan by the Foreclosure Department was?

4                  MR. DeLUCA: Objection.  Lack of foundation.

5          Go ahead and answer if you can.

6    A.    It was sent to attorney Orlans' office to commence

7          with foreclosure proceedings.

8    BY MR. BROWN:

9    Q.    And was it, to your understanding, the Foreclosure

10         Department that would decide when and under what

11         circumstances it would pass a loan to the Orlans Law

12         Firm for foreclosure?

13                 MR. DeLUCA: Objection.  Lack of foundation.

14   A.    I can't answer that question.

15   BY MR. BROWN:

16   Q.    Why can't you answer that question?

17   A.    I don't know the procedures that go on with the

18         Foreclosure Department before they make a decision to

19         send it to the attorney.

20                 MR. BROWN:  Okay.  Why don't we take a very

21         brief break just so I can get a document out.

22                     (Off the record at 9:07 a.m.)

23                     (Back on the record at 9:12 a.m.)

24                 MARKED BY THE REPORTER:

25                 DEPOSITION EXHIBIT 1



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 23 of 103

22

```
 1                      9:12 a.m.

 2                      MR. BROWN: Let's go back on.  We have

 3           started with now Exhibit 1 to the Scully deposition.

 4           Let me describe briefly what it is.  It's a document

 5           or a group of pages produced by GMAC in this case with

 6           Bates numbers 0545 through 0600.  It is one of the few

 7           documents that I have multiple copies of so I can

 8           actually give you one.

 9                      MR. DeLUCA: Oh, okay.

10      BY MR. BROWN:

11      Q.   It has the -- we'll all take our time because it has

12           the disadvantage that it's not exactly what you call

13           in bold print.  It's in rather small print.  It is

14           what it is.  Here's the original exhibit, Ms. Scully,

15           if you want to look at this.

16      A.   You know, I have to get my other glasses.  I have to

17           bring them out.

18      Q.   Ms. Scully, do you now have Exhibit 1 before you?

19      A.   Yes.

20      Q.   If you could just sort of briefly glance through and

21           tell me if you believe you've seen this before or not?

22      A.   I've never seen this before.

23      Q.   Okay.  If you notice on the first page, and, in fact,

24           I think it's on every page.  At the top it says

25           display/history.  Do you know what a display/history
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 24 of 103

23

1        is?

2    A.    Yes.

3    Q.    What is it?

4    A.    It's a history of transactions on the loan from the

5          inception of the loan to the present.

6    Q.    And how is the history collected, if you know, in

7          general terms?

8                    MR. DeLUCA: I am going to place an

9          objection on the record.  At this point this witness

10         is a fact witness, is not called to testify as to

11         policies and procedures of GMAC, and to the extent it

12         goes beyond her knowledge I think that there's a lack

13         of foundation.  And I think that this witness is not

14         capable of testifying as to those specifics.  You can

15         answer.

16   BY MR. BROWN:

17   Q.    Do you have any knowledge as to how the information is

18         collected that ends up being, in this instance, placed

19         on a display/history if someone chooses to print it

20         up?

21   A.    Well, it's not my department.  No.

22   Q.    Do you ever make entries, to your knowledge, that

23         would end up on a display/history if one were drawn up

24         after you made entries?

25                    MR. DeLUCA: Objection.  Lack of foundation.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 25 of 103

24

1        Do you understand the question?

2   A.   Can you repeat it again?

3            MR. BROWN: Would you read it back.

4            (The requested portion of the record was

5            read by the reporter at 9:16 a.m..

6            "Question:  Do you ever make entries, to

7            your knowledge, that would end up on a

8            display/history if one were drawn up after

9            you made entries?")

10  A.   Yes.

11  BY MR. BROWN:

12  Q.   What kinds of entries in your loss mitigation work

13       would you do that would end up on the display/history

14       in the usual course of business?

15  A.   It would be my conversation with the borrower that I

16       would enter to reflect.

17  Q.   That would be a brief synopsis of your conversation

18       with the borrower?

19  A.   Correct.

20  Q.   And do you do that with all conversations with all

21       borrowers or just certain conversations?

22  A.   Try to do it with most.  It just depends.

23  Q.   What does it depend on?

24  A.   If I record -- if I put it on or not.

25  Q.   Okay.  And do you have any criteria you use in



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 26 of 103

25

1          deciding whether to put it on or not?

2     A.   No.

3     Q.   If you look at the part that's in reverse type where

4          it's black background and white type at the top, do

5          you see that?  It reads like transaction, add a date

6          or trans add a date, trans type, et cetera.  Do you

7          see that?

8     A.   Yes.

9     Q.   Under trans type when you make entries what trans type

10         would appear there?

11    A.   It just depends on how I enter it.  If it's an -- most

12         of mine would be NT's, notes.

13    Q.   That stands for note?

14    A.   Correct.

15    Q.   Are some of these entries made mechanically from a

16         computer program that exists in GMAC's computer

17         system, do you know?

18    A.   I can't answer that.  I don't know.

19    Q.   If I could direct your attention to page 0566.  It's

20         close to halfway through.  Do you have that page

21         before you?

22    A.   I do.

23    Q.   If you look at the set of entries for 4/14/2009, that

24         would be the date of the activity, correct?

25    A.   Correct.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 27 of 103

26

1    Q.    And the NT would be -- transaction type would be a

2          note, correct?

3    A.    Correct.

4    Q.    And under the area ID that originated the message,

5          here it's ASM.  Is that the Assumption Department?

6    A.    Yes.

7    Q.    If you look over to the transaction it appears to be

8          somebody's synopsis of an interaction with Gerard

9          Wiener, correct?

10   A.    Correct.

11   Q.    When these kinds of notes were made -- let me narrow

12         the question.  When you make notes similar to what we

13         see here where it's an NT and then you put in some

14         interaction with borrower, do you make that entry

15         usually at or near the time that the conversation

16         occurred?

17   A.    Yes.

18   Q.    And you are attempting to make it as accurate as you

19         can, correct?

20   A.    Yes.

21   Q.    If you look on the line that's -- if you go down two

22         rows below where the last ASM is you'll see the note

23         about interacting with Mr. Wiener.  It goes on and

24         says "advised B1 is deceased."  Do you see that?

25   A.    Yes.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 28 of 103

27

1    Q.    In the normal course of things at GMAC would B1 be the

2          borrower one, prime borrower?

3    A.    Yes.

4    Q.    If you look at the next to last row under NT, in that

5          row of NT entries, it says, "For further

6          assist.justlink."  Do you know what that means?

7    A.    No.

8    Q.    If you look at the fourth row from the bottom the

9          transaction type is a D28.  Any idea what a D28 is?

10   A.    No.

11   Q.    And you'll see that the transaction is a forced

12         billing statement from report R628.  Do you know what

13         a forced billing statement is?

14   A.    No.

15   Q.    Do you have any idea -- strike that.  Do you know what

16         a transaction -- if you turn to the next page, which

17         is 567, do you know what a DMD is for transaction

18         type?

19   A.    No.

20   Q.    If you'll see for the third one down on page 567

21         there's in all caps "left MSG," presumably meaning

22         left message.  Do you know if that's someone from GMAC

23         calling the borrower or his representative or is that

24         the borrower representative calling GMAC?

25              MR. DeLUCA:  Are you finished?



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 29 of 103

28

1          MR. BROWN: Yes.

2          MR. DeLUCA: Again, I am going to object.

3     This witness is not here to testify about this

4     particular computer entry or documentation of notes

5     that she did not make.  I don't think there's any

6     foundation laid that she can testify as to what these

7     various acronyms mean, these various different notes

8     mean that she did not make into the system.  So to the

9     extent that she doesn't have that knowledge I think

10    there's no foundation here for her to answer these

11    questions.

12         MR. BROWN:  Well, asking her if she knows

13    what it means is asking her if she has that knowledge.

14    She says she doesn't know, she doesn't know.  In the

15    past in asking about this document I've moved on.  So

16    I'm not quite sure why you're making an objection.

17         MR. DeLUCA: Well, again, to the extent that

18    you continue to ask these questions I am going to have

19    a continuing objection on the record that there's a

20    lack of foundation.

21    BY MR. BROWN:

22    Q.   On the entry that I was just discussing, the third one

23         down on 567, do you know what left message means in

24         terms of who left the --

25    A.   No.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 30 of 103

29

1   Q.   -- message to whom?

2   A.   No.

3   Q.   If you turn to page 570, do you have that in front of

4        you?

5   A.   Yes.

6   Q.   If you look at the first entry where the transaction

7        type is NT for 6/24/09.  Do you see that?

8   A.   Yes.

9   Q.   And there the area ID that originated the message is

10       HMPS.  Do you know what HMPS is?

11  A.   No.

12  Q.   You'll see that several places in this page,

13       essentially all but one of the transaction types on

14       the next page, are FOR.  Is that having to do with

15       foreclosure, to your knowledge?

16  A.   I can't answer that question.

17  Q.   And why can't you answer that question?

18  A.   I'm not sure.

19  Q.   All right.  If you go to page 573, please.  At the

20       bottom of the page there are a number of entries for

21       7/27/2009, transaction type DM.  Do you know what DM

22       is?

23  A.   No, I don't.

24  Q.   If you'd read the entries that's associated with those

25       rows where the transaction type is DM, looking at it



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 31 of 103

30

1       do you know if that's an entry you made?

2 A.  I did not make those entries because it's not my

3       teller number.

4 Q.  Am I correct that you don't know whose teller number

5       it is?

6 A.  Correct.

7 Q.  And would a teller number be a number that identifies

8       specific individuals within the bank?

9 A.  Yes.

10 Q.  On the next page, which is 574, if you go down to

11       where there's a series of NT transaction types notes,

12       on 7/27/09 there are a number that were made by LMT.

13       Do you know who LMT is?

14 A.  No.

15 Q.  Has your teller number remained the same since you've

16       been at GMAC?

17 A.  Yes.

18 Q.  And what is it?

19 A.  20798.

20 Q.  20798, correct?

21 A.  Correct.

22 Q.  And so for any entry made that would show up in a

23       display/history that you made it should have your

24       teller number, which is the number you just gave me,

25       correct?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 32 of 103

31

1    A.    Correct.

2    Q.    If you'd turn to page 578.  About halfway down there

3          begins a series of entries, all of which are on

4          8/25/2009, with the area that originated the message

5          is LMT and the teller number is 20798.  Do you see

6          that?

7    A.    Correct.  Yep.

8    Q.    And that's you, correct?

9    A.    Yes.

10   Q.    And LMT is loss mitigation?

11   A.    I'm not sure.  I don't know what that code -- I don't

12         see that code.

13   Q.    Do you have any idea as to how that code got placed

14         and linked to your teller number?

15   A.    No.

16   Q.    Looking at the entries for those notes do you recall

17         making them?

18   A.    Yes.

19   Q.    If you look at the fourth entry up from the bottom in

20         the transaction there's a word account and then "P.

21         Scully/HOPE."  P. Scully is you, correct?

22   A.    Correct.

23   Q.    What's HOPE?

24   A.    That's the department I work in, HOPE.  Homeownership

25         Preservation Enterprise, all caps.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 33 of 103

32

1    Q.    And the notes says, "Help the borrower find a way to

2          retain ownership of their home in some kind of workout

3          scenario"?

4    A.    Yes.

5    Q.    If you look at entries on page 0579 you'll see about

6          the sixth one down there's a entry with your teller

7          number, correct?

8    A.    Yes.

9    Q.    I see that there the ID that originated the message is

10         HARR.  Do you have any idea what that is?

11   A.    That's a code that I entered.

12   Q.    What's that code mean?

13   A.    It was referred to me by an attorney.

14   Q.    Who was that?

15   A.    Orlans.

16   Q.    Do you recall who at Orlans?

17   A.    No.

18   Q.    Without telling me specifically what the communication

19         was between you and Orlans, do you know how you came

20         to be discussing anything with Orlans with respect to

21         the Wiener loan such that the attorney told you that

22         code to use?

23   A.    No.  This code is the code that I put in so we know --

24         how do I.  We have a code -- a code that gets entered

25         so we know where it came from.  It either came from a



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 34 of 103

33

1      nonprofit, an attorney's office, some -- you know, we

2      have a couple of codes that we enter ourself (sic).

3              MR. DeLUCA: Does this mean a referral?

4              THE WITNESS:  Yeah.  Like HCRP would mean

5      it came from a nonprofit.

6  BY MR. BROWN:

7  Q.   So HARR means it came from an attorney's office?

8  A.   Yes.

9  Q.   And if you look at the entry under transaction you say

10      referral from Orlans, correct?

11 A.   Yes.

12 Q.   And what did you record the referral from Orlans on --

13      what did you have to do to get it into the system or

14      to put it into the system, if you know?

15 A.   Enter the code, type my message, hit enter updates

16      the system.

17 Q.   Okay.  And then later on if you wanted to refer back

18      as to what had happened with the loan you could pull

19      this, what's now a hard copy display you can pull up

20      on your computer screen and look at it, correct?

21 A.   Enter my teller number and see all -- everything that

22      I did on this loan.

23 Q.   Could you see everything anybody did?

24 A.   If I know their teller number.

25 Q.   But you have to have a teller number to see more than



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 35 of 103

34

1      your own entries?

2    A.   No.  You can look at the history.  You can go back and

3        look at the history.  You can scroll forward or scroll

4        backwards.

5    Q.   So that if you chose to look at the entry you made

6        that we've just been discussing and you wanted to look

7        back to see what had happened the week before you

8        could physically do that on the computer?

9    A.   Correct.

10   Q.   Okay.  Looking at the bottom of this page you'll see

11       towards the bottom there's some more entries you made.

12       You see where the teller is 20798?

13   A.   Correct.

14   Q.   And on the first line you entered it says "send CI to

15       Detroit HOPE office, is going to meet."  Correct?

16   A.   Correct.

17   Q.   What's the CI mean?

18   A.   Called in.

19   Q.   A couple lines down, I assume where it says poo mini

20       you meant pool money, correct, and that's just a typo?

21   A.   Yes.

22   Q.   Then the next line it says "and PIF."  Who or what is

23       PIF?

24   A.   Pay in full.

25   Q.   A couple lines down you say -- well, one line you say,


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 36 of 103

35

1        "disclosure submitted with either requests for loan

2        MOD."  That's modification, correct?

3   A.   Correct.

4   Q.   Or SPO.  What's SPO?

5   A.   Short payoff.

6   Q.   And what's a short payoff?

7   A.   When it's agreed upon that the bank will accept less

8        than what's due on the loan.

9   Q.   You then say "B1 understood."  B1's referring to whom?

10   A.   Must have been Gerard.

11   Q.   And would he become B1 since he was the estate

12        representative?

13   A.   No.  That's an error.  I shouldn't have referred to

14        him as B1.

15   Q.   What would you call him?

16   A.   A3P, authorized third party.

17   Q.   And it's your conclusion that he understood what you

18        were telling him, correct?

19   A.   Correct.

20   Q.   That's what B1 understood?

21   A.   Correct.

22   Q.   So certainly at that point one of the options when you

23        made this entry, one of the options Mr. Wiener

24        considered was paying the loan off, correct?

25   A.   Again?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 37 of 103

36

1    Q.    Let me say it again.  At or around the time you made

2          this entry in late August of 2009 Mr. Wiener told you

3          that one of the options he and his family were

4          considering would be just to do a payoff of the loan,

5          correct?

6    A.    That's correct.

7    Q.    Do you recall what other options he was considering?

8    A.    No, I don't.

9    Q.    Do you recall if he was considering other options?

10   A.    No, I don't.

11   Q.    If you look at the last entry on the page just tell me

12         if you have any understanding as to how that entry was

13         made?

14   A.    I'm sorry, what entry are you talking about?

15   Q.    The last one, the one where the transaction type is OL

16         and there's no teller number.

17   A.    I don't know.

18   Q.    Okay.  Turn to page 581.  Then about the next ten plus

19         entries are made by you, correct?

20   A.    Correct.

21   Q.    I know that and you know that because of your teller

22         number being there?

23   A.    Correct.

24   Q.    It starts with, "Please send a family transfer package

25         to."  Is that -- what did you intend by that?  Are you



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 38 of 103

37

1            telling somebody to send a package or is that Mr.

2            Wiener telling you -- asking you to send a package?

3    A.    I am typing a message there.

4    Q.    Were you directing somebody to send something I guess

5          is my question?

6    A.    Yes.

7    Q.    Who were you directing?

8    A.    It should have been the Assumption Department.

9    Q.    What you were intending is to get them to send the

10          collection of papers they would want for Gerard and

11          his sisters to assume the loan, correct?

12    A.    Correct.

13    Q.    And you, in fact, then provided an address, correct?

14    A.    Correct.

15    Q.    If you look at the next to last row where you were

16          making your entries on September 15th, "rep requests

17          sent via e-mail to R. Modade," is that correct?

18    A.    Correct.

19    Q.    And R. Wirz.  Are those people?

20    A.    Yes.

21    Q.    And are they people that you understood to be in the

22          Assumption Department?

23    A.    Yes.

24    Q.    Do you know if they ever did send an assumption group

25          of papers to Mr. Wiener?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 39 of 103

38

1    A.    Yes.

2    Q.    And how do you know that?

3    A.    Through my knowledge of this loan.

4    Q.    Okay.  Do you have any more specific recollection as

5          to how you know that particular piece of information?

6    A.    No.

7    Q.    Okay.  The next entry for you appears to be on

8          10/8/2009 starting at the bottom of page 581 and going

9          on for a fair amount, to 582.  Do you see that?

10   A.    Yes.

11   Q.    And those your entries, again, because of your teller

12         number, correct?

13   A.    Yes.

14   Q.    Starting back at the beginning of that entry it says,

15         "Upon receipt of the first installment on the

16         forbearance I can cancel the FCC."  That means

17         foreclosure sale?

18   A.    Correct.

19   Q.    How would you go about canceling a foreclosure sale?

20         What would you do?

21   A.    Contacting Orlans' office.

22   Q.    And the Orlans' office would take your direction in

23         that regard?

24   A.    Yes.

25   Q.    Did you have to contact anyone at Freddie Mac in that



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 40 of 103

39

1        regard?

2    A.    No.

3    Q.    So you had the authority on behalf of the owner of the

4          loan at that point, to your understanding, to cancel

5          the foreclosure?

6    A.    Yes.

7    Q.    How did you know you had that authority?

8    A.    We had delegated authority at that time.

9    Q.    And you'd done it times before?

10   A.    Yes.

11   Q.    And nobody had ever complained about you doing it,

12         correct?

13   A.    Yes.

14   Q.    And in what written document, if any, to your

15         knowledge, was that delegated authority written?

16   A.    I have no knowledge of that.

17   Q.    How do you know you had delegated authority?

18   A.    Through supervision, talks with management.

19   Q.    And this would be supervision by -- from people at

20         GMAC?

21   A.    Correct.

22   Q.    And talks with management from people at GMAC?

23   A.    Correct.

24   Q.    And in that regard with respect to your delegated

25         authority to, if you wanted to or felt it appropriate,



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 41 of 103

40

1        cancel a foreclosure, do you recall who in management

2        authority told you that?

3   A.   My immediate supervisor at the time.

4   Q.   And who was that?

5   A.   Gary Neauman.

6   Q.   Can you spell his last name?

7   A.   N-e-a-u-m-a-n.

8   Q.   Do you know where Mr. Neauman is these days?

9   A.   He's working with another company.

10   Q.   Which one?

11   A.   Fannie Mae.

12   Q.   Do you know where geographically?

13   A.   In Dallas, Texas.

14   Q.   Do you know in what department or function?

15   A.   No.

16   Q.   Was his background in loss mitigation?

17   A.   I can't answer that question.

18   Q.   You don't know?

19   A.   I don't know.  No.

20   Q.   Have you stayed in contact at all with Mr. Neauman?

21   A.   Occasionally.

22   Q.   Continuing on with looking at this entry.  You seem to

23        be saying that if you received the first installment

24        on the proposed forbearance you can cancel the

25        foreclosure sale, then the estate will have time to



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 42 of 103

41

1        decide how they wish to proceed.  Do you see that?

2  A.  Yes.

3  Q.  And what is your understanding as to what options the

4        estate was considering in trying to decide how it

5        would wish to proceed?  In other words, they wanted

6        more time, you were going to give more time if they

7        did certain things.  What did they want more time to

8        do?  What were the alternatives, if you know, they

9        were considering?

10  A.  I don't know what they were considering.

11  Q.  You don't recall whether Mr. Wiener ever told you what

12        options they were considering?

13  A.  No.

14  Q.  He may have, is that correct?

15              MR. DeLUCA:  The witness testified she

16        doesn't recall.

17  A.  Yeah, I don't recall.

18              MR. BROWN:  Well, she may feel positive he

19        never told her.  I'm trying to find out whether she

20        doesn't recall or whether --

21              MR. DeLUCA: I think she answered the

22        question.

23  BY MR. BROWN:

24  Q.  And later in these entries, which are now on 582, you

25        describe your six month proposal, correct?


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 43 of 103

42

1    A.    Correct.

2    Q.    A ways down in your entry you refer to Mr. Wiener's

3          health issue.  That was his stroke, correct?

4                MR. DeLUCA: I'll object.  Lack of

5          foundation.

6    BY MR. BROWN:

7    Q.    It says, "I have sent a family transfer back to

8          Gerard, but with his health issue we've been unable to

9          get anything done."  Do you see where you wrote that?

10   A.    On page 582?

11   Q.    Yes.  It's probably about 12 or so entries down from

12         the top.

13   A.    Oh, I see.  All right.  Your question to me again,

14         please?

15   Q.    You refer to a health issue.  I'm asking if you knew

16         what the health issue was?

17   A.    I don't recall.

18   Q.    Do you recall that he had a stroke?

19   A.    I can't remember what Pookrum told me.

20   Q.    Do you have a recollection that it was, whatever it

21         was it was a relatively serious health issue?

22   A.    Yes.

23   Q.    After what we've just been reading it goes on, and

24         you'll see towards the bottom of your entry starting

25         with, I guess, the fourth line from the end of your



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 44 of 103

43

1     entry.  It starts, and I can't quite tell whether it's

2     TT or --

3   A.   Talked to.

4   Q.   Talked to?

5   A.   Authorized third party, attorney Pookrum.

6   Q.   Pookrum.  "Advised him I need some sort of loss mit in

7        place to adjourn this sale any longer.  He understood

8        and will get back to me."  Correct?

9   A.   Correct.

10  Q.   Why did you need some sort of loss mit in place to

11       adjourn the foreclosure?

12  A.   Because of the delinquency of this loan was going on

13       and on.

14  Q.   Was the decision yours or was there some guideline

15       that mandated you'd have to go forward with the

16       foreclosure if you didn't get a loss mitigation plan

17       in place?

18  A.   In being a prudent employee of GMAC I knew I had to

19       have some kind of plan in place.

20  Q.   Okay.  What I'm asking is, without questioning whether

21       it was a good decision, a bad decision or whatever

22       kind of decision it was, was it your decision or was

23       there something in guidelines or some other mandate

24       that required you to do that without regard to what

25       the decision was?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 45 of 103

44

1    A.    It was my decision.  At that time there could be

2          guidelines in place.  I have to answer to the GMAC

3          platform.  I had to get loss mit in place.

4    Q.    Okay.  When you say you had to answer to the GMAC

5          platform, what are you referring to when you say GMAC

6          platform?

7    A.    The Loss Mit Department.

8    Q.    Okay.  So you had to be prepared to explain why you

9          made whatever decision you made, correct?

10   A.    Yes.

11   Q.    And the group to whom you had to make that explanation

12         was your management above you in the Loss Mit

13         Department --

14   A.    Yes.

15   Q.    -- correct?

16               MR. DeLUCA: Let him finish the question.

17   BY MR. BROWN:

18   Q.    If you look at the entry we've just been looking at

19         you'll see in about the fifth line up from the bottom

20         it says "FC sale is set for 10/20/2009."  Do you see

21         that?

22   A.    Yes.

23   Q.    And that foreclosure sale set on that date was set

24         aside, correct?

25   A.    I don't remember if we had set it aside or I adjourned



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 46 of 103

45

1        it.

2    Q.    It didn't happen?

3    A.    Right.

4    Q.    The foreclosure didn't happen?

5    A.    It didn't happen that day.

6    Q.    And it didn't happen that day to your understanding at

7        your direction, correct?

8    A.    Yes.

9    Q.    Okay.  But at the time you did not have a signed

10       forbearance agreement, correct?

11   A.    Yes.

12   Q.    And you hadn't received a payment, correct?

13   A.    Yes.

14   Q.    Why did you adjourn, set aside, postpone, or whatever

15       you did, to cause foreclosure not to happen on October

16       20th, 2009?  Why did you make a decision to have it

17       not happen even though no payment had come in and no

18       signed agreement had come in?

19   A.    To allow time for that first payment to come in I gave

20       him the payment date of 11/1.

21   Q.    Okay.  If you'd turn to page 583 you'll see towards

22       the bottom, starting at the third line from the bottom

23       if you look in the transaction column.  Something that

24       says, "Patty, this is a Freddie Mac loan.  We need

25       approval from them for this 10/14/09."  Do you recall



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 47 of 103

46

1          receiving that message from somebody?

2    A.   No.

3    Q.   Do you have any belief that the Patty being referred

4         to there is somebody other than you?

5    A.   I believe it's me.

6    Q.   Do you have any understanding what the "this" is in

7         the sentence "We need approval from them for this"?

8    A.   This would be the loan, the Wiener loan.

9    Q.   It would be the postponement of the foreclosure,

10        correct?

11   A.   Yes.

12   Q.   And do you know, it's not clear to me here because

13        there's no teller numbers even, who sent you that

14        message?

15   A.   The attorney's office.

16   Q.   Is it the Orlans?

17   A.   Orlans.

18   Q.   If you look at the next page, and recognizing you may

19        not know because of the way entries are made in this

20        system, was it Lindsey Fendrich that sent you the

21        message?

22   A.   Yes.

23   Q.   Does that refresh your recollection as to who it was?

24   A.   Yes.

25   Q.   Who is Lindsey Fendrich, F-e-n-d-r-i-c-h?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 48 of 103

47

1   A.   She's an employee at that time of Orlans.

2   Q.   Do you know what her capacity at Orlans was, what she

3        did?

4   A.   No.

5   Q.   Going further down in that entry there's something

6        that appears to be an explanation to allow more time

7        for loss mit options I approve all adjournment fees

8        and costs.  Please confirm.  Is that something you

9        said or something Orlans was saying you said or

10       something that Orlans was saying?

11            MR. DeLUCA: Can you tell?

12   A.   I'm trying to read this.  I would put something like

13       this sometimes, but they would do the same.  That

14       would have been my entry, "To allow more time for loss

15       mit options I approve all adjournment fees and costs.

16       Please confirm."

17   BY MR. BROWN:

18   Q.   So it's your understanding you had the authority to

19       approve that Orlans got paid for what it did even

20       though it didn't lead to completion of the

21       foreclosure, correct?

22   A.   Yes.

23            MR. BROWN: Can we take about a five or

24       seven minute break.

25            MR. DeLUCA:  Sure.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

1           (Off the record at 10:02 a.m.)

2           (Back on the record at 10:11 a.m.)

3     BY MR. BROWN:

4     Q.   If you turn to page 588.  If you look towards the

5          lower half there's a bunch of transaction types that

6          are FOO, FOR.  And if you look over starting at the

7          second one of those it says, "FNMA/FHLMC sale

8          suspended to allow time for loss mit."  It appears to

9          be referring to a sale at or near November 25th, 2009.

10         Do you see the entry?

11    A.   Yes.

12    Q.   And you were still handling this matter for loss mit

13         in late November of 2009, correct, the Wiener matter?

14    A.   Yes.

15    Q.   And when, if ever, say inside the lawsuit now, but

16         when if ever did your involvement with the Wiener loan

17         end?

18    A.   The day it went to sale.

19    Q.   So January 5th, 2010 or thereabouts?

20    A.   Yes.

21    Q.   I will represent it sold on January 5th, 2010.

22    A.   I'm sorry?

23    Q.   I'll represent that it sold on January 5th, 2010,

24         because that's the date on the sheriff's deed.

25    A.   Yes.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com


12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 50 of 103

49

1   Q.   Okay.  If you look on page 589 you'll see entries at

2        the bottom, 12/14/2009, where the area is INQ75.

3                 MR. DeLUCA: What's the date?

4                 MR. BROWN: December 14th, 2009 at the

5        bottom.  589 is the page.  I'm looking at the last six

6        entries on the page.

7   BY MR. BROWN:

8   Q.   Do you see those?

9   A.   Yes.

10  Q.   Do you know who INQ75 is, was or might have been?

11  A.   No.

12  Q.   Okay.  If you look at the entry that says, "Gerard A.

13       Wiener called in.  Would like to receive copy of MTG."

14       Is that mortgage note?

15  A.   Yes.

16  Q.   Was it you he called or do you know?

17  A.   No.

18  Q.   No meaning it wasn't you?

19  A.   It was not me.

20                MR. DeLUCA: Let the record reflect that

21       that's not her teller number next to the entry.

22                MR. BROWN: I understand that.

23  BY MR. BROWN:

24  Q.   If you look on page 591 at about the middle, maybe a

25       little bit below the middle of the entries on that


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 51 of 103

50

1        page you'll see that in the transaction area there's a

2        reference to a person Helen Houser McDermott.  Do you

3        see that?

4    A.  Yes.

5    Q.  Do you know who Helen Houser McDermott is?

6    A.  No.

7    Q.  Following her name there's a note that, Until after

8        1/3/10 due to the moratorium declared by Fannie and

9        Freddie."  Do you know what moratorium is being

10       referenced there?

11   A.  The moratorium would be between Christmas and New

12       Year's no sales would be held, to the best of my

13       knowledge.

14   Q.  So your memory is that they were having a moratorium

15       so they weren't foreclosing right around Christmas?

16   A.  Yes.

17   Q.  If you look at page 597, and tell me when you're

18       there.

19   A.  I have reached.  I'm here.

20   Q.  Towards the bottom you'll see there are a bunch of

21       entries by somebody with teller number 2, I think it's

22       6519.  It might be 285.  I think it's 26519.  Do you

23       know who that is?

24   A.  No.

25   Q.  Do you know somebody named Gordon Clinkscales,



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 52 of 103

51

1      C-l-i-n-k-s-c-a-l-e-s?

2   A.    Yes.

3   Q.    Who is Gordon Clinkscales?

4   A.    He was my manager at one time.

5   Q.    Do you recall the timeframe he was your manager?

6   A.    Let me think.  During 2011.  I can't give specific

7      months.

8   Q.    Do you have any recollection that he was involved in

9      loss mitigation any time in 2010?

10   A.    No.

11   Q.    You don't know one way or the other?

12   A.    He was a team -- he was on the -- on the HOPE team

13      with me.

14   Q.    In 2010?

15   A.    Yes.

16   Q.    Was he doing similar kinds of things as to what you

17      were doing?

18   A.    Yes.

19   Q.    When was the last time you communicated with Mr.

20      Pookrum, to your recollection?

21   A.    I don't recall.

22   Q.    Do you have any recollection even as to month or year?

23   A.    2009.

24   Q.    How about when was the last time you ever communicated

25      with Gerard Wiener?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 53 of 103

52

1    A.   2009.

2                  MR. BROWN:  Counsel, I'm through with

3       Exhibit 1.

4                  MR. DeLUCA: Okay.

5    BY MR. BROWN:

6    Q.   Ms. Scully, what I am going to do is give you a blank

7       piece of paper that has lines on it.  What I would

8       like to do would be to try in a very big picture, if

9       you will, basic terms, sketch out where loss

10      mitigation fit within the GMAC hierarchy in the latter

11      half of 2009 and the first part of 2010.  So if you

12      were drawing some sort of a chart that would have a

13      circle for loss mitigation, kind of what was under it

14      and what was above it.

15               MR. DeLUCA: I am going to object to that.

16      I mean this witness is a fact witness.  She's not a

17      corporate witness.  There's no foundation that she has

18      the remote ability to answer that question, let alone

19      sketch out a chart for you.  So I'm going to object to

20      that.  I'm not going to let her do it without proper

21      foundation being laid.

22    BY MR. BROWN:

23    Q.   Ms. Scully, in 2009 and -- well, for 2009 and 2010 do

24      you have any understanding of who the Loss Mitigation

25      Department reported to?


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 54 of 103

53

1    A.    No.

2    Q.    Do you have any understanding of what units, if any,

3          reported to loss mitigation?

4    A.    No.

5    Q.    Do you know if any units at all reported to loss

6          mitigation?

7    A.    No.

8    Q.    What relationship, if any, in that timeframe did loss

9          mitigation have with the Assumptions Department?

10               MR. DeLUCA: Object to that.  Can you be

11         more specific?  What do you mean by relationship?

12         It's vague and ambiguous.

13   BY MR. BROWN:

14   Q.    Did they interact with each other?

15   A.    Your question again, please.

16   Q.    Did the Loss Mitigation Group and the Assumptions

17         Department interact with each other as a part of their

18         normal course of business from time to time in 2009

19         and 2010?

20   A.    In a general term you want me to answer that?

21   Q.    Yes.

22   A.    I can't answer that question.

23   Q.    Can you think of any specific instances in which they

24         interacted with each other, types of instances?

25   A.    No.



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 55 of 103

54

1   Q.   Would one be what you talked about earlier where you

2        would ask them to send a borrower an assumption

3        package if the borrower wanted it or you thought that

4        was an appropriate alternative for the borrower to

5        consider?

6   A.   Yes.

7   Q.   Can you think of any other kinds of examples where you

8        would interact with the Assumptions Department?

9   A.   No.

10  Q.   In your work with the Loss Mitigation Department as a

11       part of your business did you interact with GMAC's

12       Legal Department?

13  A.   No.

14  Q.   In your work for the Loss Mitigation Department at

15       GMAC did you from time to time interact with the

16       people handling foreclosures for GMAC?

17  A.   Yes.

18  Q.   And were your interactions with people at GMAC or with

19       Orlans, the outside attorneys, or both?

20  A.   Orlans.

21  Q.   Is there -- back in 2009 were there a group of people

22       at GMAC who handled, as a matter of their occupation,

23       calls coming in from customers at 800 numbers that

24       were given out as customer service numbers?

25  A.   As a Call Center?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 56 of 103

55

1    Q.    Yes.

2    A.    We have a Call Center.

3    Q.    When you say we do you mean --

4    A.    GMAC has a Call Center.

5    Q.    And would you interact with the Call Center from time

6          to time?

7    A.    No.

8    Q.    Would the Call Center, to your recollection, ever

9          refer matters to loss mitigation because of whatever

10         the nature of the call was they thought loss

11         mitigation was the appropriate area to which to direct

12         the person?

13               MR. DeLUCA: I'm going to object to lack of

14         foundation.  She's already testified she didn't

15         interact with those departments.

16               MR. BROWN:  Well, I'm asking -- she may not

17         have considered any interaction.  So I am asking her

18         specific.  You can go ahead and answer.

19    A.    The question again, please?

20               MR. BROWN: Would you read it, please.

21               (The requested portion of the record was

22               read by the reporter at 10:28 a.m..

23               "Question:  Would the Call Center, to your

24               recollection, ever refer matters to loss

25               mitigation because of whatever the nature



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 57 of 103

56

1                         of the call was they thought loss

2                         mitigation was the appropriate area to

3                         which to direct the person?")

4    A.   I can't answer that question.

5    BY MR. BROWN:

6    Q.   And you can't answer it because you don't know?

7    A.   Correct.

8    Q.   Any other reason?

9    A.   That's the only reason.

10                       MR. BROWN: I am going to mark as Scully 2 a

11        set of documents.  I'll describe them and then I'll

12        give them to the reporter to actually mark.  These

13        were all Freddie Mac bulletins.  I am going to refer

14        to them by their numbers because each one of them has

15        a number.

16                       The first is number 2008-1, eight pages;

17        the second is 2009-23, ten pages; the third is

18        2009-24, seven pages; next is 2009-26, six pages; next

19        is 2010-1, six pages, followed by Attachment A to

20        Bulletin 2010-1, eight pages.  Those will all be

21        Scully 2.

22                       MARKED BY THE REPORTER:

23                       DEPOSITION EXHIBIT 2

24                       10:31 a.m.

25                       MR. BROWN: If you want to take about a five



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 58 of 103

57

1          minute break if you want look through these real

2          quick.  I don't know if you've seen them before this.

3                    MR. DeLUCA: No.  Is there another set

4          you're going to --

5                    MR. BROWN: Just one set.  I have mine.

6          It's got my notes on it.

7                    MR. DeLUCA: All right.  I am going to make

8          a copy for everybody.

9                    (Off the record at 10:32 a.m.)

10                   (Back on the record at 10:37 a.m.)

11   BY MR. BROWN:

12   Q.    Ms. Scully, have you had a chance to look through

13         Exhibit 2 at all?

14   A.    No.

15   Q.    Again, I'm not going to immediately ask any questions

16         about the details of these, but have you seen these or

17         similar Freddie Mac bulletins before today?

18   A.    No.

19   Q.    Do you have any understanding as to what they are?

20   A.    No.

21   Q.    The initial loss mitigation plan that you attempted to

22         complete with Mr. Wiener that was around October 8th

23         and thereafter ultimately didn't happen, correct?

24   A.    Correct.

25   Q.    And then there was a new proposal that was being



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 59 of 103

58

1           considered for which you asked for some documentation

2           from both Mr. Wiener and one of his sisters, correct?

3      A.   Correct.

4      Q.   And that plan was sort of formulated to pull together

5           in November of 2009, correct?

6      A.   Correct.

7      Q.   And in pulling that plan together and trying to see if

8           you could come up with something that would work for

9           loss mitigation for the Roland Wiener estate with

10          Gerard Wiener and his sisters, did you directly

11          consult ever with anyone at Freddie Mac?

12     A.   No.

13     Q.   To your knowledge did anyone in loss mitigation

14          directly consult with Freddie Mac?

15     A.   No.

16     Q.   As a matter of normal operating practices for loss

17          mitigation would it have consulted with an owner of a

18          loan with regard to a loss mitigation plan under any

19          circumstances?

20     A.   I have no -- I can't answer that question.  I don't

21          know.

22     Q.   Do you have --

23     A.   No.

24     Q.   My question was meant to be broad.  With respect to

25          any loss mitigation activity you did?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 60 of 103

59

1    A.    I'm sorry?

2    Q.    Well, I wanted to make sure you understood my

3          question.  So let me ask it slightly differently.

4          With respect to any loss mitigation activity you were

5          working with respect to a customer did you ever

6          consult with Freddie Mac as to the appropriateness of

7          the loss mitigation program you were proposing?

8    A.    No.

9    Q.    Did you consult with other folks in loss mitigation at

10         some point about a specific plan you were proposing?

11              MR. DeLUCA: Are we talking about this?

12              MR. BROWN: No, I'm talking about generally.

13   A.    No.

14   BY MR. BROWN:

15   Q.    Ms. Scully, even though you've never seen any of these

16         Freddie Mac bulletins before were you aware there were

17         such things?

18   A.    Yes.

19   Q.    How did you become aware that there were such things?

20   A.    Because I have 30 years of mortgage banking.  In my

21         capacity I know that there's Freddie Mac bulletins and

22         FHA bulletins.

23   Q.    To your knowledge, did anybody within the Loss

24         Mitigation Department look at or consult or evaluate

25         or attempt to understand what was in the Freddie Mac


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 61 of 103

60

1    bulletins?

2                    MR. DeLUCA: Again, this is

3        post-transaction?

4                    MR. BROWN: Generally.

5    A.   I'm sorry, can you -- I don't understand your

6        question.

7    BY MR. BROWN:

8    Q.   What I'm asking is to your knowledge, if you don't

9        know you don't know, did anybody in loss mitigation

10       when you've been working in loss mitigation ever look

11       at, evaluate, even read Freddie Mac bulletins?

12   A.   I don't know.

13   Q.   What you do know is you didn't, correct?

14   A.   Correct.

15   Q.   And you don't know of anybody who did; they may have

16       but you don't know that, correct?

17   A.   That's correct.

18   Q.   Ms. Scully, is it correct that from time to time in

19       the course of your work with customers for the Loss

20       Mitigation Department of GMAC customers will be faxing

21       you documents?

22   A.   Yes.

23   Q.   And you give them a fax number to send them to,

24       correct?

25   A.   Correct.



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 62 of 103

61

1    Q.   And is that a fax number unique to the Loss Mitigation

2         Department or not?

3    A.   It's unique to me.

4    Q.   It's unique to you?

5    A.   Correct.

6    Q.   And where is the fax machine located with respect to

7         where your office is?

8    A.   It's in my office.

9    Q.   If a customer for whatever reason had a more general

10        GMAC fax number to send a fax addressed to you but to

11        a GMAC fax number other than the one in your office,

12        to your understanding was there any system of

13        ultimately getting the fax to you?

14   A.   I wouldn't come to me.  If it was faxed to the --

15        another fax number it would just go through the system

16        that way.

17   Q.   But was the system setup so ultimately it would be

18        sent to you internally within GMAC?

19   A.   No.

20   Q.   Is it okay with you if we call the second effort to do

21        a loss mitigation plan with Mr. Wiener and his sisters

22        that started in November of 2009 the second attempt,

23        just so we can distinguish it from the earlier one?

24   A.   Yes.

25   Q.   And with respect to the second attempt did you ever



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 63 of 103

62

1      have any direct discussions with either of Mr.

2      Wiener's sisters?

3   A.    No.

4   Q.    And for that second attempt was there a requirement

5      that one of the Wieners be occupying the house?

6   A.    I don't recall that.

7   Q.    Could be, but you don't remember one way or the other?

8   A.    Correct.

9           MR. BROWN:  I am now going to go through

10      some of the documents in the document number 0677

11      group.

12           MR. DeLUCA: Okay.

13           MR. BROWN: But I am not going to put them

14      all in.  I'll put them in a bit piecemeal, and I

15      apologize for that.  But it seems to make sense unless

16      you made copies.  The first group will be 0677 through

17      0681.

18           MR. DeLUCA: Is that Exhibit 3?

19           MR. BROWN: That will be Exhibit 3.

20           MARKED BY THE REPORTER:

21           DEPOSITION EXHIBIT 3

22           10:48 a.m.

23   BY MR. BROWN:

24   Q.   Ms. Scully, let me hand you Exhibit 3.

25           MR. BROWN: Let's go off the record just



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

63

1          very briefly.

2                    MR. DeLUCA: Okay.

3                    (Off the record at 10:48 a.m.)

4                    (Back on the record at 10:48 a.m.)

5     BY MR. BROWN:

6     Q.   Ms. Scully, you have Exhibit 3 in front of you?

7     A.   Yes.

8     Q.   Again, because of the copying process when e-mails get

9          copied they were copied for purposes of production

10         with the entire chain that had been in the e-mail,

11         somebody corresponded by sending the chain back and

12         forth into a reprise, for example.  So you will see a

13         lot of these e-mails kind of repeating themselves as

14         we go.  The ones that I produced -- that we produced,

15         I apologize.  I'll even apologize for GMAC for the

16         ones they produced, which is the group we're dealing

17         with right now.  You're going to see a lot of

18         repetition.  Hopefully we'll avoid having to repeat

19         questions about those things.

20                    The other fact of this is that sometimes in

21         these groups because we're trying to, or at least I'm

22         trying to be a little chronological sometimes we start

23         at the back of the group instead of the front group

24         because they're in reverse chronology to some degree.

25                    If you look at page 680 towards the middle



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 65 of 103

64

1   of the page you'll see there's a e-mail that says "On

2   Mon, October 5, 2009 at 7:40 p.m., Scully, Patricia."

3   Do you see where I'm reading?

4 A. Yes.

5 Q. Okay.  And if you'll look on a little bit it says, "I

6   have been in contact with Gerard's sister.  I'll take

7   care of the upcoming sale.  I will copy you on it."

8   And this was an e-mail to Mr. Pookrum, correct?

9 A. Correct.

10 Q. And how were you in contact with Gerard's sister, as

11   recited in this e-mail?

12 A. I don't recall.

13 Q. Do you recall anything about the contact if it

14   happened at all?

15 A. I don't recall any of it.

16 Q. Okay.  As you sit here today do you recall that the

17   proposal being discussed for a loss mitigation plan

18   included having one of Gerard's sisters involved in

19   the property in some fashion?

20 A. Yes.

21 Q. What do you recall about that?

22 A. Just that, he wanted to move his sister in it.

23 Q. Do you have any reason to believe that what you said

24   in this e-mail is inaccurate?

25 A. No.



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 66 of 103

65

1    Q.   If you go to page 0679, which is the page before,

2         you'll see at the top a e-mail from you to Walter

3         Pookrum dated October 8th, 2009 at 10:16 a.m..  Do you

4         see that?

5    A.   Yes.

6    Q.   And if you look at the body you say, "Walter."  And

7         then it goes on for about a paragraph.  If you would

8         review it, read it and tell me if that was the

9         proposal you had in mind for the second attempt at

10        doing a loss mitigation?

11   A.   I believe this is the first --

12   Q.   Oh, I'm sorry.

13   A.   -- attempt.

14   Q.   You're right, the first attempt, the October 8th one.

15        My mistake.  In the body of the e-mail, about the

16        third sentence, you say, "This is a Freddie Mac loan."

17        How would you have known that?

18   A.   By the investor code on the loan.

19   Q.   So Freddie Mac had its own investor code number?

20   A.   Correct.

21             MR. BROWN: Okay.  That's it, that's what I

22        had for Exhibit 3.  We next would have pages 0685

23        through 0688.

24             MARKED BY THE REPORTER:

25             DEPOSITION EXHIBIT 4



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 67 of 103

66

1                        10:55 a.m.

2    BY MR. BROWN:

3    Q.    If you look at 0686, the second page, you'll see at

4          the top is that e-mail we just looked at in Exhibit 3,

5          the October 8th one, correct?

6    A.    Correct.

7    Q.    And then you'll see on the first page, 0685, an

8          October 14th e-mail from Mr. Pookrum to you.  And it

9          says, "Ms. Scully, thank you for our telephone

10         conversation yesterday, October 13th."  Do you have

11         any recollection as to what you discussed on October

12         13th with Mr. Pookrum?

13   A.    No.

14   Q.    Do you have any reason to doubt that you had a

15         telephone conversation with him on October 13th?

16   A.    No.

17   Q.    You'll see that he also asks the question, "Assuming

18         the monthly payments will be applied to the loan

19         balance, the estate is inclined to enter the

20         forbearance arrangement you propose."  And then he

21         asked for a change in the payment date.  And you

22         respond, if you look at the top of page 685, "Received

23         payments will be applied to the mortgage balance."  Do

24         you see that?

25   A.    Yes.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 68 of 103

67

1    Q.    And does that mean it would be applied to principal or

2          principal and interest, or what was your understanding

3          what mortgage balance meant as opposed to applying it

4          to something else?

5    A.    If the full payment is received it's applied to

6          principal then interest.

7    Q.    Principal first and then interest?

8    A.    Yes.

9    Q.    It doesn't appear, at least in this e-mail that you

10         wrote on the 14th, that you responded to the change in

11         payment date.  Did you have any problem with the

12         change in payment date?

13   A.    I don't recall.

14   Q.    If you had a problem with it would it have been your

15         practice to respond to him in writing?

16   A.    Yes.

17              MR. BROWN:  Okay.  Next exhibit will be 689

18         through 691.

19              MARKED BY THE REPORTER:

20              DEPOSITION EXHIBIT 5

21              10:59 p.m.

22   BY MR. BROWN:

23   Q.    First, if you look at the top of 689 you say, "Hi,

24         Walter, I was able to adjourn the sale for a week and

25         have escalated it to Freddie Mac."  And feel free to



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 69 of 103

68

1    look at the e-mails behind this one if you need it to

2    help you put it into context.  But my question is:

3    What was it you were escalating to Freddie Mac?

4              MR. DeLUCA: Give her a second to start with

5    the beginning of the chain.  Work your way back and it

6    tells you.

7              MR. BROWN: Sure.

8              MR. DeLUCA: 691 back is where it started.

9    Work your way up.

10   A.   And the question again, please?

11   BY MR. BROWN:

12   Q.   The question is:  You say, "I've escalated it to

13        Freddie Mac" in the top e-mail on this page.  And my

14        question was what is the "it" that you escalated?

15   A.   The adjournment of a sale, of the sale again.

16   Q.   And how did you escalate it to Freddie Mac?

17   A.   I had to go through Orlans' office, the attorney of

18        record for GMAC on the foreclosure.

19   Q.   So you called Orlans' office and asked them if it was

20        okay to adjourn it?

21   A.   They would have to send -- Orlans would have had to

22        send a request into Freddie Mac.

23   Q.   And Freddie Mac would give a thumbs up or a thumbs

24        down on it?

25   A.   To my understanding.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 70 of 103

69

1    Q.    Why in this instance did you have to escalate it to

2          Freddie Mac?

3    A.    Because of the delinquency of the loan.

4    Q.    Later in that same e-mail you say, "I am going to need

5          a HAMP PKG completed."  And what is a HAMP package?

6    A.    Home Affordable Modification Package.

7    Q.    And that would consist of the financial documentation

8          necessary to evaluate whether what was being proposed

9          was appropriate and whether the proposed borrowers at

10         this point met the requirements to do a modification?

11   A.    A forbearance.

12   Q.    A forbearance.  This was going to be another six month

13         forbearance, is that correct?

14   A.    I was proposing a forbearance.  It would be up to loss

15         mit to put the plan -- I no longer had, you know, the

16         delegated authority to put anything in place.

17   Q.    And what had changed that you no longer had the

18         delegated authority to put anything into place?

19   A.    Because of the delinquency of the loan.

20   Q.    So at some point when the loan became greatly

21         delinquent, and we'll get to what that means in a

22         second, you lost your delegated authority and had to

23         go to the owner of the loan to get authority to do

24         loss mit rather than have a foreclosure?

25   A.    I had to go through our attorney's office.



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 71 of 103

70

1    Q.    Orlans?

2    A.    Correct.

3    Q.    But you knew that Orlans was then going to go to

4          Freddie Mac, correct?

5    A.    Correct.

6    Q.    So although you were using as the conduit Orlans the

7          decider as to what to do was Freddie Mac, is that

8          correct?

9    A.    That's my understanding.

10   Q.    How did you gain that understanding?

11   A.    Just through years of being in the mortgage business.

12   Q.    Anything in those years of being in the mortgage

13         business that in this instance told you at what point

14         in time of delinquency you had to do that rather than

15         make the decision on your own?

16   A.    No.

17   Q.    Had you received any written direction from either

18         Orlans or Freddie Mac that you no longer had the

19         authority on this loan to delay foreclosures to try

20         and work a loss mit plan?

21   A.    No.

22   Q.    Had you received anything verbally either from Orlans

23         or Freddie Mac that you no longer had the authority to

24         delay foreclosures to work a loss mitigation plan?

25   A.    No.



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 72 of 103

71

1    Q.    You say that you need the hand package completed so I

2          can submit "it" for loss mitigation options.  The "it"

3          being the completed package, correct?

4    A.    Completed package.

5    Q.    And when you refer to "for loss mitigation options"

6          what are you talking about?

7    A.    The forbearance.

8    Q.    And to whom would you submit it?

9    A.    To GMAC loss mit.

10   Q.    And who at GMAC loss mit would you submit it?

11   A.    It went to a core platform.

12   Q.    What's a core platform?

13   A.    That would handle this investor.

14   Q.    Does it end up being a person ultimately who acting as

15         the core platform does something?

16   A.    Several people analyze the packet.

17   Q.    And then make a decision, is that correct?

18   A.    I'm not sure how the decisions were made.  They use a

19         calculator or whatever was used.  I'm not sure.

20   Q.    Was it your attempt in submitting the HAMP

21         documentation in this instance that, from what you

22         knew about the Wiener family that you would be

23         submitting a plan that would be accepted by loss mit?

24              MR. DeLUCA: Do you understand the question?

25              THE WITNESS:  No.



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 73 of 103

72

1    BY MR. BROWN:

2    Q.   Well, was it your desire to see a loss mit plan come

3         to fruition with respect to the Wiener loan?

4    A.   It's always my desire to see a loss mit plan come into

5         play on any loan that I work on.

6    Q.   Would you submit a loss mit plan that you had low

7         expectation would ever be approved?

8    A.   If a borrower submits the packet I have to submit it.

9         I can't -- I don't make that decision.  Any package

10        that comes in, crosses my desk gets submitted.

11   Q.   Do you ever give the borrower comments or advice as to

12        what elements of a package need to be in place so that

13        its chance of success is higher rather than lower?

14             MR. DeLUCA: Are you talking about in

15        generalities?

16             MR. BROWN: Yeah.

17   A.   I tell a borrower -- everything that needs to be

18        adhered to is right on the package; all the documents,

19        what needs to be completed, what is needed for me to

20        submit.

21   BY MR. BROWN:

22   Q.   With respect to the substance of what's in the package

23        as opposed to just physically having it completed, do

24        you ever look at a package and suggest to the borrower

25        that they make some adjustment in what's being



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 74 of 103

73

1          submitted within the bounds of, obviously being honest

2          about what they're doing, that might improve the

3          chances of it being approved?

4    A.   It's not to have the chances of it being approved.

5          It's what I need to submit so that it's looked at.  We

6          need the proof of income, we need, you know -- there's

7          things that need -- we need several items that need to

8          be provided.

9    Q.   In this instance in the HAMP package that was being,

10         and plan that was being suggested, was there an owner

11         occupancy requirement?

12   A.   Yes, I believe so.  Well, let me take that back.  We

13         weren't trying to do a loan modification on this.  We

14         were trying to just put it on a forbearance.

15   Q.   But even to do a forbearance was there an owner

16         occupancy requirement?

17   A.   No.

18   Q.   Did you ever tell Gerard Wiener that somebody from the

19         family had to occupy the home to get the forbearance?

20   A.   I don't recall that I did.

21   Q.   Do you recall that you didn't?

22   A.   I don't recall that either.  I don't recall that,

23         having that conversation.

24              MR. BROWN: Now going to the next page we're

25         going to do, the next exhibit is 701 to -- I'm sorry,



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 75 of 103

74

1    700 to 702.

2                    MARKED BY THE REPORTER:

3                    DEPOSITION EXHIBIT 6

4                    11:12 a.m.

5    BY MR. BROWN:

6    Q.    Do you have Exhibit 6 in front of you, Ms. Scully?

7    A.    Yes.

8    Q.    If you can direct your attention to page 702 you'll

9          see a November 19th entry that says on November 19,

10         2009 at 1:49 p.m., Scully, Patricia wrote.  And then

11         there's presumably the e-mail you wrote.  Do you see

12         that?

13   A.    Yes.

14   Q.    Is that an e-mail you wrote?

15   A.    Yes.

16   Q.    You say, "Here's the bottom line.  I can get the

17         payment reduced for six months to $755.07 to give the

18         estate time to figure out what they want to do."  Do

19         you see that?

20   A.    Yes.

21   Q.    How did you come up with the 755.07?

22   A.    Because it was a new payment, a forbearance that was

23         told to me by GMAC management that we could no longer

24         do the 50 percent payment but we could do 70 percent

25         payment.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 76 of 103

75

1    Q.    And who at GMAC management told you that?

2    A.    My direct supervisor at the time, Gary Neauman.

3    Q.    When you say the current IR, that's interest rate?

4    A.    Yes.

5    Q.    You say, "I need the paperwork I sent over Tuesday

6          back to me by tomorrow."  Do you see that?

7    A.    Yes.

8    Q.    That's the HAMP package and related documents?

9    A.    Yes.

10   Q.    You were going to be off, but you would cause it to be

11         sent to loss mit in Waterloo, correct?

12   A.    Correct.

13   Q.    And am I correct that loss mit in Waterloo is the

14         appropriate loss mit group for this loan?

15   A.    Yes.

16   Q.    You say, "I have to have that paperwork otherwise

17         under the Freddie Mac guidelines I cannot adjourn this

18         sale any longer."  Do you see that?

19   A.    Yes.

20   Q.    What guidelines are you referring to?

21   A.    The Freddie Mac guidelines.

22   Q.    Had you seen them?

23   A.    No.

24   Q.    Well, how did you know the Freddie Mac guidelines said

25         you couldn't adjourn the sale any longer?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 77 of 103

76

1    A.   Because of the delinquency, the length of the

2         delinquency I knew.

3    Q.   How did you learn that because of the length of the

4         delinquency that the Freddie Mac guidelines wouldn't

5         allow further adjournment of the sale?

6    A.   It was over six months delinquent at the time, at

7         least.

8    Q.   That's the amount of the delinquency, but it doesn't

9         tell how you knew that if it was over six months it

10        wouldn't be -- the foreclosure wouldn't be adjourned?

11        How did you know that?

12    A.   From my previous experience in banking I knew I had

13        to -- that it was over the limit of allowable

14        delinquency with nothing in place and no paperwork.

15    Q.   At that point in time, if you can recall on November

16        19th, 2009, did you have an expectation that you would

17        get completed paperwork from Gerard Wiener's sister in

18        the next day or two after that?

19    A.   I asked for it.

20    Q.   Did you have any expectation that you would get it

21        that fast from her?

22    A.   I can't answer that question.  I asked for the

23        paperwork.  If they sent it they sent it.

24    Q.   So you had no expectation one way or the other?

25    A.   I asked for the paperwork to be sent.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 78 of 103

77

1    Q.    Are you telling me that you don't think what your

2          expectations were were relevant or you didn't have any

3          or you don't remember whether you had any?

4    A.    I asked for the paperwork to be sent so I could submit

5          it.  So I don't recall what my expectations were.

6    Q.    If you look at page 701 do you see the e-mail to you

7          from Mr. Wiener dated November 19th, 2009 at 5:57

8          p.m.?

9    A.    Yes.

10   Q.    And you see he says, "I filled out the forms as best I

11         could and will go to Kinko's tomorrow and fax them to

12         you."  He then goes on that his sister wants to live

13         at the house and he and his stepmother would subsidize

14         her until she could get a proper job in Michigan, and

15         he's willing to talk to anyone to walk them through

16         and gives exceptions as to when he can't do that.  How

17         did you, if you did, respond to that e-mail?

18   A.    How did I respond?

19   Q.    Yes.

20   A.    It looks like I gave him my fax number, 866.690.5244.

21   Q.    Now look at page 703 which will be the next exhibit.

22                    MARKED BY THE REPORTER:

23                    DEPOSITION EXHIBIT 7

24                    11:20 a.m.

25   BY MR. BROWN:



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 79 of 103

78

1    Q.    Do you have 703 in front of you?

2    A.    Yes.

3    Q.    Can you look in the middle of the page.  There's a

4          listing of HAMP requirements.  Do you see that?

5    A.    Yes.

6    Q.    And to your knowledge as you look at it now is that,

7          in fact, what you were looking for to be sent to you?

8    A.    Yes.

9    Q.    Were all those documents, other than the IRS form,

10         documents that to your knowledge were Freddie

11         Mac-created documents?

12                    MR. DeLUCA: If you know.

13   BY MR. BROWN:

14   Q.    If you know.

15   A.    I'm sorry, the question?

16   Q.    The question is:  Setting aside the IRS tax form, were

17         the other documents, the financial hardship affidavit,

18         for example, financial analyst -- financial analysis

19         form documents that were created and provided to GMAC

20         by Freddie Mac?

21   A.    No.

22   Q.    What's your understanding as to who created them?

23   A.    The Treasury Department.

24   Q.    Okay.  This was an e-mail you sent to Walter Pookrum,

25         correct?



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J    Pg 80 of 103

79

1    A.    Correct.

2                    MR. BROWN:  Next page, 710.  This will be

3          710 through 719.

4                    MARKED BY THE REPORTER:

5                    DEPOSITION EXHIBIT 8

6                    11:23 p.m.

7    BY MR. BROWN:

8    Q.    Have you seen this grouping at page 712 that Mr.

9          Pookrum's also asking for some information from GMAC;

10         is it correct that you directed him where to contact

11         GMAC to get the paperwork?

12   A.    Yes.

13   Q.    Was it your understanding that was in connection with

14         his estate work for Roland Wiener's estate, the reason

15         he wanted the paperwork?

16                    MR. DeLUCA: If you know.

17   A.    I don't know.

18                    MR. BROWN:  Next we're doing 720 through

19         724.

20                    MARKED BY THE REPORTER:

21                    DEPOSITION EXHIBIT 9

22                    11:26 a.m.

23   BY MR. BROWN:

24   Q.    You have Exhibit 9 before you, correct?

25   A.    Yes.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 81 of 103

80

1    Q.    Let me ask you a preliminary question.  Is it correct
2          that within a day or so when you wrote Gerard Wiener
3          and said you had to have the package in quickly, that
4          he sent you a package that had information as to
5          himself?

6    A.    I'd have to see the date that that -- his information
7          came through.

8    Q.    Now directing your attention to Exhibit 9 on page 720.
9          Do you see an e-mail from you to Mr. Pookrum?

10   A.    Yes.

11   Q.    Dated November 23rd, 2009?

12   A.    Yes.

13   Q.    "Please be advised that the FC sale has been adjourned
14         to 12/29/2009.  Do you see that?

15   A.    Yes.

16   Q.    FC is foreclosure sale, right?

17   A.    Correct.

18   Q.    And how did you -- I assume you then had authority
19         from -- well, let me ask you this.  Did you have
20         authority through Orlans from Freddie Mac to adjourn
21         to the 29th?

22   A.    Authority was given to adjourn the sale.  By what
23         means I can't.

24   Q.    How did you learn that the authority had been given?

25   A.    It was communicated to me through Orlans.



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 82 of 103

81

1  Q.  Do you recall that or you're just assuming that?

2  A.  I'm assuming it.

3  Q.  But you obviously got the information, correct,

4      because you're sending it out in an e-mail?

5  A.  The information --

6  Q.  That it had been adjourned?

7  A.  Yes.

8  Q.  You tell Gerard in the next sentence that you received

9      the fax he sent over and state it appears that one of

10     his sisters is going to take over the property,

11     correct?

12 A.  Correct.

13 Q.  And then you say, "I am going do have her complete the

14     assumption package that was sent out to you at your

15     California mailing address back in September.  The

16     loan will have to be brought current for the

17     assumption to go through."  Correct?

18 A.  Correct.

19 Q.  What do you mean when you say that the loan will have

20     to be brought current for the assumption to be brought

21     through?  Are we now no longer talking forbearance but

22     an assumption?

23 A.  That's correct.

24 Q.  And when did that change?

25 A.  It must -- in conversations with somebody.  That's



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 83 of 103

82

1        what they were -- they were going to do.  He wanted

2        his sister to take over the property, it's my

3        understanding.  And the loan was going to be have to

4        be brought current, all back due payments in order to

5        do the assumption.

6   Q.   If he was going to do an assumption shouldn't you have

7        passed the -- under the GMAC practices shouldn't you

8        have passed the matter over to the Assumption

9        Department?

10  A.   The paperwork would have went to the Assumption

11       Department.  That's exactly where it would have to go.

12  Q.   Did you have any discussion that you recall verbally

13       telephonically, or otherwise, with Mr. Wiener that it

14       was no longer going to be a forbearance but it was

15       going to be an assumption?

16  A.   No, I don't.

17  Q.   You don't recall one way or the other?

18  A.   Exactly, I don't recall.

19            MR. DeLUCA: While we're at a good point I

20       need to use the restroom.

21            MR. BROWN: Let's stop now.

22            (Off the record at 11:30 a.m.)

23            (Back on the record at 11:35 a.m.)

24  BY MR. BROWN:

25  Q.   Let me ask you this.  Ms. Scully, are you aware that



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 84 of 103

83

1          ultimately Freddie Mac purchased the Wiener home at a

2          foreclosure sale on January 5th, 2010?

3  A.   Yes.

4  Q.   And you're aware that subsequent to that Freddie Mac

5          sold it to two individuals?

6  A.   No.

7  Q.   Is it then correct that you never met or talked to

8          those two individuals in connection with anything to

9          do with the Wiener house?

10  A.   Correct.

11  Q.   Or this lawsuit?

12  A.   Correct.

13  Q.   Again looking at page 720 of Exhibit 9 you'll see that

14          you say to Walter in the second paragraph, presumably

15          in reference to the requests to get some documents,

16          that he's to call the Customer Service Department and

17          request the mortgage docs he needs.  You don't

18          have access to them on the system.  "Trust me, I

19          looked."  You sent that, correct?

20  A.   Yes.

21  Q.   Why don't you have access to mortgage documents on the

22          system in your job?

23  A.   At that time I didn't.  I don't know.  It's just -- I

24          didn't have the code to get into it.

25  Q.   What would you do if there was -- if you felt you had,


BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 85 of 103

84

1        and maybe you never did, but if you felt you had a

2        need to see a mortgage document like the note, how

3        would you get a copy of it to see it if you didn't

4        have access to it directly?

5    A.  I would have had to request somebody to get it for me,

6        give me the code or whatever.

7    Q.  Do you ever recall doing that?

8    A.  Not really.

9    Q.  Do you recall ultimately getting a set of

10       documentation from Mr. Wiener's sister with respect to

11       the second attempt?

12   A.  No.

13   Q.  Are you familiar with the fax number 1-866-690-5244?

14   A.  That's my fax.

15              MR. BROWN: I don't -- let's go off the

16       record for a second.

17              (Off the record at 11:40 a.m.)

18              (Back on the record at 11:47 a.m.)

19              MR. BROWN:  Let's mark this as 10.

20              MARKED BY THE REPORTER:

21              DEPOSITION EXHIBIT 10

22              11:47 a.m.

23   BY MR. BROWN:

24   Q.  Ms. Scully, you have Exhibit 10 before you?

25   A.  Yes.



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 86 of 103

85

1    Q.    You'll see that the first page has a fax transmission

2          report, and it's addressed to you from Charlotte

3          Wiener.  It was sent to the 866.690.5244 number and it

4          shows a result okay, which I believe means that it

5          went through.  Do you recall receiving this?

6    A.    No.

7    Q.    This was sent on December 23rd, and I'll represent,

8          although it doesn't show, it was 2009.  Actually if

9          you look up at the top it says 12/23/2009.

10   A.    Yep.

11   Q.    December 23rd, 2009 was a Wednesday?

12              MR. DeLUCA: 2009?

13              MR. BROWN: 2009.

14   BY MR. BROWN:

15   Q.    Do you recall in 2009 if you were working on December

16         23rd?

17   A.    I don't -- I probably was out of the office already by

18         that time.  It's late in the day, the day before Xmas

19         Eve.

20   Q.    Would you have worked Xmas Eve or not typically?

21   A.    No.

22   Q.    When would you have been back to the office?

23   A.    January.

24   Q.    January when, do you recall?

25   A.    January 2nd or 3rd.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 87 of 103

86

1    Q.    January 1st was a Friday, the 4th was Monday, the 5th

2          was a Tuesday.  So as far as you know you never saw

3          this document before the foreclosure happened?

4    A.    Correct.

5    Q.    Would you have any records in your office at this

6          point that would show you received it?

7    A.    Just the transmittal pages, I suppose.  Nothing -- no.

8    Q.    And at some point have you looked in -- well, let me

9          ask a more general question.  What did you do with

10         your Wiener files after the foreclosure happened that

11         you had hard copy stuff?

12   A.    I kept them for two or three months and shredded

13         everything.  I have a shredder and I shred everything.

14         I can't keep that stuff.  You know, I lock it in my

15         desk.  I mean a cabinet.  And then I would go through

16         periodically and shred stuff.  After it's gone to sale

17         there's no reason for me to keep people's physical

18         stuff in my office.

19   Q.    Back then did you have any system where you made

20         electronic copies of anything before you shredded it?

21                 MR. DeLUCA: You're talking about the

22         witness personally?

23                 MR. BROWN: Or in her office.  Not the whole

24         company.

25                 MR. DeLUCA: Can you clarify what you're



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 88 of 103

87

1        asking?

2   A.   Yeah.

3   BY MR. BROWN:

4   Q.   Sure.  Did you have any system by which as a matter of

5        routine before you shredded any of the Wiener

6        documents you would have made electronic copies of

7        them for storage electronically?

8   A.   No, because -- to the best of my knowledge everything

9        that I had in the file on him had already been

10       submitted to GMAC and had been already imaged.

11  Q.   So you don't know what happened to -- if we make the

12       assumption that you received this fax you don't know

13       what happened to it, correct?

14  A.   Correct.

15  Q.   Now, do you know you didn't -- do you know you didn't

16       see it or you don't recall seeing it?

17  A.   I don't recall.

18  Q.   So you may have, you may not have, is that --

19  A.   I don't recall.

20  Q.   As you sit here today do you recall not ever seeing

21       it?  Like I can sit here today and recall I never

22       danced with the Queen of England.

23            MR. DeLUCA: I'm going to object.  The

24       question has been asked and answered.

25            MR. BROWN:  Well, I'm trying to understand



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 89 of 103

88

1    what don't recall means in this instance, Counsel.

2                    MR. DeLUCA: I think she's made it pretty

3    clear.

4    A.    Yeah, I don't recall receiving this.

5    BY MR. BROWN:

6    Q.    Okay.  Having seen Exhibit 10 today do you have any

7    doubts about whether you did receive it or not?

8    A.    No.

9    Q.    So you believe you probably did receive it even though

10    you personally didn't see the document, correct?

11    A.    Correct.

12    Q.    And as a matter of your business practice and routine

13    back in late December of 2009, if a fax came in on

14    your machine and you weren't there what happened to

15    it?

16    A.    It stayed there.

17    Q.    You didn't have anybody that assisted you with

18    period --

19    A.    I'm in an office that --

20                    MR. DeLUCA: Let him finish.

21    BY MR. BROWN:

22    Q.    You didn't have anybody to periodically look and see

23    if you got faxes and try to do something with them?

24    A.    No.

25    Q.    As you look at this document you received, Exhibit 10,



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 90 of 103

89

1           or maybe received, is that an assumption package or is

2           that a forbearance package or a HAMP package?

3    A.    It's not an assumption package because there's other

4           things that are missing.  I know part of the

5           assumption is they have to provide who the

6           insured's has, homeowner's insurances.  So this is a

7           very incomplete package.

8    Q.    As an assumption package, correct?

9    A.    And as a forbearance.  I have no proof of income for

10          anybody.  Nobody's showing me who's got the capacity

11          or the willingness to make these payments.

12   Q.    Did you see this document as one of the documents you

13          looked at in preparation for your deposition?

14   A.    Last week I got it.

15   Q.    Under your normal business practices back in late

16          December of 2009 if you had received and looked at

17          Exhibit 10 what in the normal course of business would

18          you have typically done?

19   A.    I would have faxed it to GMAC loss mit so it would get

20          imaged.

21   Q.    Would you have looked at it and tried to evaluate it

22          in any respect or tell them they needed to send more

23          or anything?

24   A.    Yes.

25   Q.    And what would you have done, if anything, about the



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 91 of 103

90

1        impending foreclosure bid?

2    A.   I can't answer that question.  I don't know.

3    Q.   As you look at Exhibit 10 do you agree that however

4        complete or incomplete it may be it's an attempt to

5        send a HAMP package, not an assumption package?

6    A.   A HAMP package on an assumption package?

7    Q.   No.  And not an assumption package.  If you look at

8        the documents in that is that --

9    A.   This is -- yeah, the financial analysis that's

10       completed here is the same as for the HAMP.

11    Q.   Where there would be, perhaps, that documentation but

12       some different documentation for an assumption

13       package?

14    A.   Yeah, other required documentation would be needed for

15       an assumption, especially with this being an estate.

16           MR. BROWN:  Okay.  Our next exhibit which

17       is 11, page 725.

18           MARKED BY THE REPORTER:

19           DEPOSITION EXHIBIT 11

20           12:00 p.m.

21           MR. DeLUCA: Is it just one page?

22           MR. BROWN: Yes.

23  BY MR. BROWN:

24    Q.   Do you see Mr. Wiener's e-mail to you at the top of

25        the page?



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 92 of 103

91

1    A.    Yes.

2    Q.    Do you know if you ever responded to that?

3    A.    Well, yes, right below it.

4    Q.    No.  Below it is earlier dated.

5    A.    Is it?  Okay.

6    Q.    10:00 a.m. as opposed to 7:29 p.m..

7    A.    Right.  Right.

8    Q.    I'm sorry, did you answer my question?

9    A.    Oh, I'm sorry.  Did I respond to this e-mail?

10   Q.    Yes.

11   A.    It doesn't appear so.

12   Q.    And you don't recall responding to it?

13   A.    No.

14                  MR. BROWN:  I am going to mark as No. 12

15         0739.

16                  MARKED BY THE REPORTER:

17                  DEPOSITION EXHIBIT 12

18                  12:04 p.m.

19   BY MR. BROWN:

20   Q.    Do you have Exhibit 12 before you, Ms. Scully?

21   A.    Yes.

22                  MR. DeLUCA: Okay.  I don't have that in my

23         package.  Can we just take a two minute break and I'll

24         make copies of this?

25                  MR. BROWN: Yes.  It's just that one page.



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 93 of 103

92

1          Do you want to do it later or do you want to do it

2          now?  Either way.

3                      MR. DeLUCA: That's fine.  We can go ahead.

4     BY MR. BROWN:

5     Q.    Okay.  Ms. Scully, have you ever seen Exhibit 12

6          before?

7     A.    No.

8     Q.    Do you know who Leigh Frame is?

9     A.    No.

10    Q.    Have you ever -- do you know what the Servicing Risk

11         Team is?

12    A.    No.

13    Q.    Have you ever heard of it before today?

14    A.    No.

15    Q.    Do you have any understanding as to what GMAC does

16         with respect to loans if it gets sued about them in

17         terms of dealing with the loan while they're being

18         sued?  Does it take it out of whatever unit's dealing

19         with it has and do something else?

20    A.    No, I don't know what they do.

21                     MR. BROWN: Okay.  Off the record.

22                     (Off the record at 12:06 p.m.)

23                     (Back on the record at 12:06 p.m.)

24                     MR. BROWN: Let's mark the next, 737.

25                     MARKED BY THE REPORTER:



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 94 of 103

93

1                          DEPOSITION EXHIBIT 13

2                          12:07 p.m.

3      BY MR. BROWN:

4      Q.    Ms. Scully, do you recall receiving this e-mail from

5            Mr. Wiener?

6      A.    No.

7      Q.    Have you ever seen it before today?

8      A.    No.

9      Q.    Did you see it in preparation for the deposition?

10     A.    No.

11     Q.    When you're away from your office do you -- back in

12           December of 2009 did you have an ability to look at

13           your e-mails if you cared to while you were away?

14     A.    I don't recall at that time if I had the capability.

15     Q.    When you first gained that capability by what

16           methodology did you have it?  Did you have a

17           Blackberry or did you have something else?

18     A.    I don't know.  Whatever they did with our computers

19           and gave me the ability to VP in, get access to our

20           servicing system away from the main, you know.

21     Q.    You just don't recall when that started happening?

22     A.    No.

23     Q.    When it did start happening did you use it routinely

24           when you were away?

25     A.    Yes.



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 95 of 103

94

1    Q.    In your normal business practice if you had received

2          and seen this e-mail, Exhibit 13, would you have

3          contacted Mr. Wiener?

4    A.    Looking at this I had no need to contact him.

5    Q.    Okay.

6    A.    He's not asking me -- you know, asking me about

7          anything.  He's just telling me that his sister's

8          going to be faxing me the documents.  I don't need to

9          respond to this.

10                  MR. BROWN:  Let's mark as the next in

11          order.  This will be 738.

12                  MARKED BY THE REPORTER:

13                  DEPOSITION EXHIBIT 14

14                  12:09 p.m.

15   BY MR. BROWN:

16   Q.    Ms. Scully, do you have Exhibit 14 before you?

17   A.    Yes.

18   Q.    Do you recall receiving this e-mail from Mr. Pookrum

19          on or about December 28th?

20   A.    No.

21   Q.    Is it correct that, as you testified already with

22          respect to the Exhibit 13, you don't know whether at

23          the time you had the capability of getting e-mails

24          away from your office or not?

25   A.    Correct.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 96 of 103

95

1    Q.    Under your normal business practice if you had looked

2          at this e-mail what, if anything, would you have done?

3                MR. DeLUCA: Object to the form of the

4          question as a hypothetical and it calls for

5          speculation on the part of the witness.

6                MR. BROWN:  I'm just asking her what her

7          business practice was.

8    A.    What my business practice would be if I was to respond

9          to this?

10   BY MR. BROWN:

11   Q.    If you received it.  I mean your business practice

12         might have been not to respond to it.  I don't know.

13   A.    I can't answer that.  I can't speculate on how I would

14         have responded.

15   Q.    Okay.  At any time did anyone within GMAC tell you to

16         stop -- tell you at any time before the foreclosure

17         sale tell you to stop working or trying to accomplish

18         a loss mitigation plan with respect to the Wiener

19         loan?

20   A.    No.

21   Q.    At any time did anybody outside GMAC, such as Orlans

22         or whoever, tell you to stop working in trying to

23         accomplish it, workout of some sort with the Wiener

24         loan prior to the foreclosure?

25   A.    No.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 97 of 103

96

1    Q.    Give me a second.  What's your recollection as to how

2          much in late November and December of 2009 you talked

3          with Gerard Wiener telephonically?

4    A.    I have no recollection.

5    Q.    One way or the other?

6    A.    Exactly.

7    Q.    So is it correct then that you don't recall now

8          whether you talked to him, or if you did how much you

9          talked to him, correct?

10   A.    I would have to say I don't remember ever talking to

11         him later on in November and December.

12   Q.    And by later on you mean when?

13   A.    The months of November and December.  I don't recall

14         having any phone conversations with him.

15   Q.    Do you recall getting any phone messages from him in

16         November or December?

17   A.    No, I don't.

18   Q.    With respect to the second attempt at a loss

19         mitigation program that you discussed with -- and by

20         discuss I mean both verbally and through e-mail with

21         Mr. Pookrum and Gerard Wiener, do you ever recall

22         telling them exactly how much money to send and where

23         to send it to under that program?

24   A.    No.

25   Q.    That was waiting to get a program in place?



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 98 of 103

97

1   A.   The second forbearance --

2   Q.   Yes.

3   A.   We never -- I don't think I ever got a response that

4        they were going to accept that.  The 70 percent one,

5        the second one --

6   Q.   Yeah.

7   A.   -- that was put in place?  I don't recall ever --

8        they'd have to sign the agreement to get it back so I

9        could get it setup on the system.  They never --

10       nobody ever signed any agreements and got it back to

11       me so I could submit it to get it setup.

12  Q.   Did you ever send them a second agreement?

13  A.   I don't recall if I did.  I don't know if it was ever

14       really discussed, because at that point in time Gerard

15       talked about on his hardship, on the packet about his

16       sister taking over the property and the assumption was

17       back on the table.

18  Q.   I think I have an answer to this.  I may have asked it

19       already in which case I apologize.  Did you ever have

20       a face-to-face meeting with Gerard Wiener?

21  A.   No.

22  Q.   Is it also correct that you never told Mr. Wiener that

23       he and his sister didn't qualify for the forbearance

24       package you were discussing with him, the second deal?

25  A.   Did I tell them they didn't qualify?



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 99 of 103

98

1    Q.    Yes.

2    A.    I don't make those decisions.

3    Q.    No, but you might have communicated them.  Did you

4          ever tell them they didn't qualify?

5    A.    No.  No.

6    Q.    Do you know if anybody else from GMAC ever told them

7          they didn't qualify?

8    A.    No.

9    Q.    You don't know one way or the other?

10   A.    Correct.

11   Q.    Do you recall when you learned that the property had

12         been sold by foreclosure?

13   A.    I believe it's when we went back to work after the

14         Christmas break.  It must have showed up on a report

15         or something.  I can't remember.

16   Q.    But as best you can recall it was sometime close to

17         the foreclosure itself?

18   A.    It was after, you know, we went back to -- in January,

19         when I went back to work in January.

20   Q.    Do you know if Mr. Clinkscales had any discussions

21         with Mr. Pookrum after the foreclosure?

22   A.    No, I don't.

23   Q.    Have you ever met with or talked with a woman named

24         Linda Mallory at Freddie Mac?

25   A.    No.



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 100 of 103

99

1 Q. Do you know if GMAC, through you or anyone else, ever

2   refused to permit Mr. Wiener to payoff the loan if

3   that's what he chose to do?

4 A. No.

5 Q. You never told him he couldn't pay it off, correct?

6 A. I'd never tell anybody they couldn't payoff their

7   loan.  Show me the money.

8     MR. BROWN: Off the record.

9     (Off the record at 12:21 p.m.)

10     (Back on the record at 12:22 p.m.)

11     MR. BROWN: I am going to enter the next

12  documents that were produced by GMAC, I believe, and

13  it's 0519 and 520.

14     MARKED BY THE REPORTER:

15     DEPOSITION EXHIBIT 15

16     12:22 p.m.

17 BY MR. BROWN:

18 Q. Are you familiar at all with the kind of document that

19   is Exhibit 15?

20 A. No.

21 Q. Do you ever have anything to do with claims that are

22   being paid by an owner of Freddie Mac back to the GMAC

23   servicing?

24 A. No.

25     MARKED BY THE REPORTER:



12-12020-mg    Doc 10092-17    Filed 09/09/16    Entered 09/09/16 15:55:02    DeLuca
Decl. Exhibit J    Pg 101 of 103

100

1                         DEPOSITION EXHIBIT 16

2                         12:25 p.m.

3       BY MR. BROWN:

4       Q.   Exhibit 16 is a collection of documents that were in

5            connection with a presentation called Making Home

6            Affordable, Working Together to Help Homeowners,

7            September 2012.  Let me state my question so while

8            she's looking at it she can have it in mind.  Simply,

9            is this a program you participated in as a presenter?

10      A.   No.

11                        MR. DeLUCA: The document itself doesn't

12           state the author of it.  Is there somewhere on the

13           document where it indicates who the author is?

14                        MR. BROWN:  I think the author is this

15           group.  It's somewhere in the document where it says

16           presents and her name.

17                        THE WITNESS:  It says my name?

18      BY MR. BROWN:

19      Q.   Yes.  Something that's marked page 39.

20      A.   Okay.  Can I explain this?

21      Q.   Please.

22      A.   This was probably presented by, at that time the

23           National Outreach manager at a HOPE Now event that we

24           work with the Treasury Department.  It was probably

25           held in Michigan.  So that's why they were giving my



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 102 of 103

101

1     information on this, so that the folks on the local

2     presence, they would be able to contact me.  As we

3     travel through the country the HOPE team gives these

4     presentations on a slide to all the markets that we go

5     into.  This just happened to be presented at the time

6     they were in Michigan, wherever we were doing this.

7  Q.  So you were identified as the contact for GMAC?

8  A.  Correct, in 2012.

9  Q.  Had similar such identification been made of you in

10     other presentations prior to this, do you know?

11  A.  Not to my knowledge.  I didn't even know about this

12     one.  I'm usually talking to the borrower when this is

13     going on in another room.

14              MR. BROWN: No further questions.

15              MR. DeLUCA: Are you done?

16              MR. BROWN: Yep.

17              MR. DeLUCA: Do you have any?

18              MR. MILSTONE:  I have no questions.

19              MR. DeLUCA: Can we just take a five minute

20     break.

21              MR. BROWN: For whether you want to ask

22     something or not?

23              MR. DeLUCA: Yes.

24              MR. BROWN: Yes.

25              (Off the record at 12:30 p.m.)



12-12020-mg   Doc 10092-17   Filed 09/09/16   Entered 09/09/16 15:55:02   DeLuca
Decl. Exhibit J   Pg 103 of 103

102

1          (Back on the record at 12:42 p.m.)

2              MR. BROWN:  Let's put on the record that

3      Mr. DeLuca's graciously agreed to hang on to the

4      original exhibits from the Scully deposition for use

5      tomorrow at the person most knowledgeable deposition.

6      We will then give them to the court reporter who comes

7      from that, which may or may not be today's court

8      reporter.

9              MR. DeLUCA: I will hold onto them for

10     tomorrow.  Thank you.  All set.

11             (The deposition was concluded at 12:43 p.m.

12         Signature of the witness was not requested by

13            counsel for the respective parties hereto.)

14

15

16

17

18

19

20

21

22

23

24

25

