**Exhibit 8**

1

2 UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
3 SOUTHERN DIVISION

4

5 GERARD WIENER, individually, and as
Personal Representative of the Estate of
6 Roland C. Wiener,

7                                    Plaintiff,

8        v.

9 BANKERS TRUST COMPANY, et al.

10                                  Defendants.

11 AND RELATED CROSS-ACTIONS

12

13

CASE No. 11-10770

Hon. George Caram Steeh

**PLAINTIFFS' OPPOSITION TO
GMAC'S RENEWED MOTION
FOR SUMMARY JUDGMENT**

14 *Gavin J. Fleming (P68366)*
*Attorneys for Plaintiffs*
15 *Hubbard Snitchler & Parzianello PLC*
16 *30665 Northwestern Highway, Ste. 100*
*Farmington Hills, MI 48334*
17 *248-932-1101*

18 David J. Brown (CA56628)
19 Attorney for Plaintiffs
1135 Ulloa Street
20 San Francisco, CA 94127
(415) 716-7786
21

22 Frank M. Deluca (P41604)
Attorneys for Defendants Bankers Trust
23 And GMAC Mortgage
24 McKelvie DeLuca, PC
280 West Maple Road
25 Suite 300 ·Birmingham, MI 48009

26

27

28

248-952-5100
Bruce M. Gorosh (P35455)
Attorneys for Jeffrey Baskin and Lauren
Newman
Lefkofsky & Gorosh PC
31500 Northwestern Highway
Suite 105
Farmington Hills, MI 48334
248-855-5508

Daniel P. Perk (P39004)
Miller Johnson
Attorneys for Freddie Mac
303 North Rose Street
Suite 600
Kalamazoo, MI 49007
269-226-2958

i

# TABLE OF CONTENTS

Table of Authorities iii

I.  Note Regarding an Independent Reason for Not Granting GMAC'S Renewed Motion—GMAC Did Not Fulfill All the Prerequisites to Bringing the Renewed Motion 1

II.  Introduction to Summary Judgment Opposition 6

III.  Background 11
  A.  GMAC's Initial Dealings with Gerard Wiener 11

IV.  Argument 15
  A.  Much Is Already Briefd 15
  B.  GMAC's Makes a False Claim on Page 10 of Its Brief 15
  C.  Additional Relevant Law and Argument 16

V.  Conclusion 19

# TABLE OF AUTHORITIES

CASES:

| AUTHORITY | PAGE |
|---|---|
| *Alexander v. FBI*, 186 F.R.D. 148, 152 (D.D.C. 1999) | 6 |
| *Triple Crown America, Inc. v. Biosynth AG*, 1999 WL 492661, (E.D.Pa. July 12, 1999) | 6 |
| *Raineyv. American Forest & Paper Ass'n*, 26 F. Supp. 2d 82, 94 (D.D.C. 1998) | 6 |
| *Int'l Casings,* 358 F.Supp.2d 863, 875 (W.D. MI, 2005) | 17, 18 |
| *Opdyke Investment Co. v. Norris Grain Co.* 413 Mich. 354, 367-368, 320 N.W.2d 836 (1982) | 18 |
| *McMath v. Ford Motor Co.,* 259 N.W.2d 140, 142 (Mich. Ct. App. 1977) | 18 |
| *Schmidt v Bretzlaff,* 528 N.W.2d 760, 762 (Mich. Ct. App. 1995) | 18 |
| *State Bank of Standish v Curry,* 500 N.W.2d 104, 107 (Mich. 1993)) | 18 |

STATUTES AND RULES:

| AUTHORITY | PAGE |
|---|---|
| FEDERAL RULE OF CIVIL PROCEDURE – RULE 30(B)(6) | 6 |
| MCL 6003.3163 | 17 |
| MCL §450.832(h) | 17 |

## PLAINTIFFS' OPPOSITION TO GMAC'S RENEWED MOTION FOR SUMMARY JUDGMENT

### I.    NOTE REGARDING AN INDEPENDENT REASON FOR NOT GRANTING GMAC'S RENEWED MOTION—GMAC DID NOT FULFILL ALL THE PREREQUISITES TO BRINGING THE RENEWED MOTION

GMAC brought the renewed summary judgment motion prematurely because GMAC never provided a qualified PMK (person most knowledgeable) for the agreed upon PMK deposition.  Providing such a person was an absolute pre-requisite to GMAC being permitted to seek determination of its summary judgment motion in this Court.  The PMK deposition agreement described as: "One deposition of GMAC Mortgage's person most knowledgeable ("PMK"), conducted in accordance with the Federal Rules of Civil Procedure, to take place in Detroit, Michigan, about the following agreed upon subjects (the "PMK Topics") with appropriate follow-up on any questions not answer because of assertion of a privilege by means of Movant's motion to compel:  [followed by the list of PMK topics noted below].[1]

At the purported PMK deposition, GMAC produced as its PMK witness, Roberto Montoya.  Mr. Montoya while presented as and purporting to be a PMK was virtually useless because he did not prepare sufficiently to bring himself up to speed on the facts known by GMAC with respect to the PMK Topics.  While the PMK Topics were broad in scope by their nature, they were topics to which GMAC had agreed by stipulation.  GMAC hence had a duty to have its PMK witness up to speed on those topics.

The PMK Topics were:

a. Administration of the loan after made

---

[1] Exhibit A to this Opposition comprising the Stipulation and Order with Respect to Motion of Gerard Wiener for Relief from Automatic Stay as to GMAC Mortgage, LLC.

1

1      b.  All aspects of any foreclosure actions regarding the loan

2      c.  Communications with owner of loan, Freddie Mac, once payments on the

3  loan ceased, including up to GMAC's bankruptcy filing

4      d.  Who, in terms of persons and entities made decisions regarding the

5  Wiener loan after payments ceased, specifically including how the decisions were

6  communicated to GMAC if they were not GMAC decisions

7      e.  How the GMAC relationship with Freddie Mac worked with respect to the

8  Wiener loan and the foreclosure sale, the attempts to modify the loan, who made

9  decisions regarding the handling of the loan, and how, if at all, the Freddie Mac

10  Single Family Seller/Servicer Guide played any role in these activities

11      f.  How and why GMAC, directly and indirectly was communicating with

12  Gerard Wiener and his attorney after the foreclosure sale occurred

13      g.  What authority GMAC had from time-to-time with respect to the Wiener

14  loan to modify the loan, to negotiate possible modification of the loan, and from

15  whom or what in terms of communications that authority came

16      h.  GMAC's reference to and following of Freddie Mac's loan modification

17  policies and procedures

18      i.  GMAC's policies and procedures as used in connection with the

19  foreclosure on the Wiener loan

20      j.  GMAC's policies and procedures regarding post foreclosure activities on

21  the Wiener loan

22      k.  GMAC's policies and procedures regarding the Federal Home Loan

23  Modification program as it was applied or considered to be applied to the Wiener

24  loan.

25      Other than spending  at most an aggregate of three hours with attorneys for

26  GMAC (one inside attorney and one outside attorney), Mr. Montoya talked with

27  absolutely no one at GMAC, GMAC's outside foreclosure attorneys or anyone else

28  about any of the topics he was designated to be most knowledgeable of and

address.  He did not talk with the outside foreclosure attorneys' personnel who handled the GMAC's foreclosure efforts on the Wiener loan.  He talked with no one at GMAC who were persons who were involved regarding the Wiener loan, despite the fact that in its discovery response to the plaintiffs, GMAC had in October of 2011 asserted when asked then to identify a PMK most knowledgeable about the Wiener loan:  "GMAC submits that there is no one person that is most knowledgeable regarding the loan made to Roland Wiener.  GMAC submits that numerous individuals/departments within GMAC may possess information regarding the applicable loan file."[2]  Taking this interrogatory response at face value, for Mr. Montoya to become knowledgeable about what GMAC knew about each of the PMK Topics obviously would reasonably require that he consult with a number of GMAC's and its agents' people to learn about the PMK Topics sufficiently to qualify as a PMK as to each of those topics.

Mr. Montoya's failure to obtain sufficient knowledge to be a PMK was confirmed by the following facts:

- Prior to being designated as the PMK deponent in this case, Mr. Montoya knew nothing about the Wiener loan.  We was designated to be the PMK witness about a couple of months prior to the deposition.  Exhibit C, hereto, at the Montoya deposition page 7, lines 16-21.
- He has never ever met Patricia Scully and does not know her.  Exhibit C, hereto, at Montoya deposition page 11, lines 2-5.
- Mr. Montoya never talked with anyone at GMAC about the Wiener loan (setting aside the attorneys earlier mentioned).  Exhibit C, hereto, at Montoya deposition page 14, lines 5-8.
- When Mr. Montoya reviewed the computer stored GMAC "service notes" on the Wiener loan, he did not seek to identify who made any

_____

[2] GMAC's response to Plaintiffs' Interrogatory No. 1 – a true copy of which is Exhibit B hereto together with the signature page of the GMAC discovery responses which included the response to Interrogatory No. 1.

service noted entries nor make any attempt to contact any of the persons who made the service note entries to learn more about the substance of the service notes and what was occurring at the time. Exhibit C, hereto, at Montoya deposition page 29, line 17 to deposition page 30, line 15.

- Mr. Montoya did not talk with anyone at Freddie Mac about the Wiener loan.  Exhibit C, hereto, at Montoya deposition page 14, lines 9-11.

- Mr. Montoya did not talk with anyone else outside of GMAC about the Wiener loan.  Exhibit C, hereto, at Montoya deposition page 14, lines 12-14.

- Mr. Montoya did not talk with anyone at the Orlans' firm in preparing for his deposition.  Exhibit C, hereto, at Montoya deposition page 14, line 25 to deposition page 15, line 3.

All Mr. Montoya did was look at some documents he was provided by Mr. DeLuca and a few that he could see on portions of GMAC's system he had the ability to view, and talk with Mr. DeLuca for about 1.5 hours and Ms. Buen of GMAC's legal department for about the same amount of time.  Exhibit C, hereto, at Montoya deposition page 15, lines 11-15.

His failure to seek to learn or be presented with materials or people who knew facts relevant to the agreed upon PMK Topics for which GMAC designated him as the person most knowledgeable is staggering and proves that once again that GMAC is not really trying to deal fairly with its customers or former customers.

Mr. Montoya's lack of knowledge regarding the PMK Topics for which he was designated abounds.  One example is

Mr. Montoya was asked:  "Is it correct that you don't know who, if anyone, dealing on the Wiener loan made reference to the Freddie Mac Seller Servicer

1  Guide, correct?  He responded:  "I don't know, that's correct".  Exhibit C, hereto, at
2  Montoya deposition page 94, lines 6-9.

3      Another example occurred when Mr. Montoya was being asked about entries
4  in the GMAC service notes.  One note said "DEF-options to avoid foreclosure."  "Q.
5  Do you know what that entry means?"  "A.  I don't, sir."  Exhibit C, hereto, at
6  Montoya deposition page 35, lines 13-20.

7      A further example is whether Mr. Montoya as the PMK knew if GMAC or its
8  foreclosure folks ever notified Gerard Wiener, Gerard Wiener's attorney or his
9  sisters that the foreclosure sale would occur on January 5 , 2010: "Q.  Okay.  In
10  your review of materials preparing for this deposition did you see or hear anything
11  that indicated that Mr. Wiener or his attorney Mr. Pookrum or either of his sisters,
12  were ever informed that the foreclosure sale date was going to be January 5th,
13  2010?"
14  "A.  I don't know if there was, sir.  I don't know if there was any letters that were
15  sent out to Mr. Wiener notifying him of the sale on January the 5th, 2010."  "Q.
16  Okay.  You don't know and you don't recall seeing any, correct?"  "A.   Correct."
17  "Q.  And would that same answer be true if the question were broad enough to
18  communications, be it by letter, by e-mail, by fax or verbally, if a verbal – if a
19  record was made of the verbal conversation in the notes?"  "A.  That's correct."
20  Exhibit C, hereto, at Montoya deposition page 75, lines 7-24.

21      Importantly, the stipulation and order that allows GMAC to bring this
22  renewed includes a requirement that a PMK deposition on the PMK Topics occur.
23  The PMK was to have knowledge about what GMAC knew concerning the PMK
24  Topics.  This purported PMK did not have any real knowledge and made no
25  meaningful effort to learn.

26      Mr. DeLuca inadvertently summed up Mr. Montoya's problem as a PMK
27  witness when at Mr. Montoya's deposition he said:  "Well, he's not a fact witness,
28  Counselor.  He's here as a corporate designated witness 30(b)(6) witness.  He does

1    not have intimate knowledge of what actually transpired in this case."  Exhibit C,

2    hereto, at Montoya deposition page 71, lines 6-9.

3        Mr. Montoya was not prepared.  He was not a PMK.  He was not prepared to

4    "testify about information known or reasonably available to the organization"

5    as required by Federal Rule of Civil Procedure 30(b)(6).

6        The Rule facilitates the securing of a corporation's testimony, to limit

7    "bandying" and to reduce the overall number of depositions needed. See Fed. R.

8    Civ. P. 30(b)(6) advisory committee's note; *Alexander v. FBI*, 186 F.R.D. 148, 152

9    (D.D.C. 1999). Thus, **the Rule requires a corporation when necessary to**

10   **prepare a witness with pertinent information reasonably available to**

11   **it**. [Emphasis added]  *See*, *Triple Crown America, Inc. v. Biosynth AG*, 1999 WL

12   492661, (E.D.Pa. July 12, 1999); *Raineyv. American Forest & Paper Ass'n*, 26 F.

13   Supp. 2d 82, 94 (D.D.C. 1998).  The burden is on a corporation seeking to avoid

14   compliance on the basis that the information sought is not known or reasonably

15   knowable to move for and justify a protective order.

16

17       Here, not only did GMAC not seek a protective order.  To the contrary by

18   stipulation it fully agreed to the topics, made no objections, and sought no

19   limitation on the topics.  However, having made the agreement, GMAC did not live

20   up to it.  Instead it did not have Mr. Montoya adequately prepared.  Since a Rule

21   30(b)(6) witness must testify to the entity's knowledge, he must learn that

22   knowledge to fulfill the entity's obligation under the Rule.

23

24

25   **II.    INTRODUCTION TO SUMMARY JUDGMENT OPPOSITION**

26       GMAC Mortgage ("GMAC") was the servicer of a loan owned by Freddie

27   Mac.  Roland Wiener had purchased a condominium home for his family in May,

28   1972.  In 1997 he refinanced the loan to obtain cash, while keeping the home for

6

his three children, Gerard Wiener, Alice Wiener and Charlotte Wiener.[3]  This

refinancing loan is the subject matter of this case.

Roland Wiener passed away on January 23, 2009.[4]  Shortly after Roland

Wiener's death, his son, Gerard Wiener,  undertook to learn the status of the loan

from GMAC, inform GMAC of Roland Wiener's death, provide GMAC his contact

information and initiate a discussion with GMAC about what the Roland Wiener

Estate could do with the loan and home going forward.[5]

What followed was over a year of frustration experienced,  mis-information

given, and stalling, all done by GMAC.  It had the result of totally thwarting Gerard

Wiener's attempts to learn about and deal with the loan and property on behalf of

his father's Estate.[6]

The situation must be evaluated with the understanding that GMAC was and

is a giant company which brazenly asserts its wishes in a manner which makes life

difficult for borrowers and their successors.  GMAC as a matter of course,

forcefully asserted itself in a bombastic and pretentious manner, rather than

rationally dealing with Gerard Wiener as the successors' representative.  GMAC's

actions directly resulted in a significant cost to the Estate and Gerard Wiener, and

GMAC ignored the concepts of fairness, evenhandedness  and truthfulness.

---

[3]. *See* Note and Mortgage, Exhibits B and C to GMAC's  Renewed Summary Judgment.
[4]  Declaration of Gerard Wiener in Opposition to GMAC's Renewed Motion for Summary Judgment ("Renewed Wiener Declaration"), Exhibit D hereto, at ¶ 3.

[5] Renewed Wiener Declaration, Exhibit D hereto, at ¶ 4.

[6] Renewed Wiener Declaration Exhibit D hereto, at ¶ 5.

GMAC  in asserting its summary judgment position relies on (1) a first forbearance attempt's purported failure in October and early November of 2009, and then (2) its incorrect characterization of a 2nd forbearance plan it offered, which never came to fruition.

The second forbearance plan offered by GMAC failed not because of the Wieners, but because GMAC's spokesperson to the Wieners, Ms. Scully, abandoned the proposed forbearance plan and them, apparently to take her Christmas break.  She left without (1) making any arrangements for coverage of her desk or personal office fax machine while she was gone, or (2) reviewing the file to see if she needed to do something to make sure some other element of GMAC did not take any foreclosure sale action until she returned and looked at communications from the Wieners relevant to the forbearance offer.

Gerard Wiener and his sister Charlotte Wiener fulfilled their obligation to provide certain information to GMAC's representative, but she abandoned her effort and through gross negligence stopped functioning as GMAC's representative dealing with the Wiener Estate and family.  That abandonment occurred  just when the Wieners had sent her the final papers (Charlotte Wiener's credit and income information) Ms. Scully had requested and which Ms. Scully wanted before a forbearance agreement was to be offered and tendered to the Wieners for signature and payment.  *See,* Exhibit I hereto, Excerpts from the November 29, 2012, Deposition of Ms. Scully, at page 60, line 18-page 61, line 8; page 77, line 20; page 84, lines 13-14; page 85, line 1-page 86, line 7; page 88, lines 6-11 [Exhibit 10 referenced in the Scully Deposition is The Charlotte Wiener Materials axed on

December 23, 2009]; page 88, lines 12-24; page 89, line 15-page 90, line 2. It is interesting that Ms. Scully said that if she had seen Charlotte Wieners' submission on December 23rd, she would have looked at it and would have tried to evaluate it or tell Charlotte Wiener if she needed to send more information or anything else in. *Id.*

Way after the fact, Ms. Scully now claims that the attempt to put together a forbearance agreement had morphed into an assumption plan, but that characterization is contrary to what GMAC noted in its "service notes" concerning the loan, when after the foreclosure sale had occurred, a GMAC senior representative told Gerard Wiener's attorney that the foreclosure sale took place because the Wieners had not made a payment or confirmed acceptance of a forbearance plan then on the table (the second attempt) and that he learned that fact from the loss mitigation person involved.[7] Specifically, the service note said: "spoke to A3p [authorized third party]. Sttd [stated] tht[that] custmr believe he was on forb [forbearance] agreement. Advised 3p forb [forbearance] was offered but accoiring [according] to Det HOPE rep info on forb not received. Advised file went to sale due to this. Advised 3p sale adjourned twice. 3p sttd tht sale shld have been adjorned again due to forb although cust didn't make pymt and no confirm on plan recd."

---

[7] Exhibit G is a copy of some excerpts of GMAC's Service Notes which were kept on a computer system as a contemporaneous record of many of GMAC's activities concerning the Wiener Loan. Both Ms. Scully and GMAC's PMK, Mr. Montoya, testified to facts that qualify these notes as business records of GMAC. See, Exhibit H, hereto, comprising deposition excerpts of Ms. Scully and Mr. Montoya to those facts.

Although Gerard Wiener and his sister sent the materials requested y Ms. Scully in, they did not sign an agreement or make a payment because Ms. Scully never gave them a payment amount or sent them an agreement to sign. *See,* Exhibit I hereto at page 96, line 18-page 97, line 17. Also *see,* Exhibit D, hereto, at ¶ 15, in which Mr. Wiener notes: " With respect to the second forbearance attempt Ms. Scully never sent me a forbearance agreement to sign, and never provided me with the final exact payment to be made as the initial payment or for any other subsequent payments. I believed one would come after she and her group had reviewed my sister's and my submissions."

Additionally, Mr. Wiener was never informed of the January 5, 2010, foreclosure sale date. *See,* Exhibit D at ¶ 17. As noted above, Mr. Montoya never saw in what he looked at any record of such a communication.

The net result of all of GMAC's conduct was a series of foreclosure misdeeds and actions bringing great harm to the Wieners. The attitude of not fairly dealing with or caring about the Wiener family after Roland Wiener's death was repeated often and justifies holding GMAC liable in tort for its wrongful actions. Even if the Court continues to accept the notion that the sale of the property to its current owners cannot be undone, the harm to the Wieners is recompensable.

No matter how else things are cut, there is at a minimum a triable issue of material fact as to whether the foreclosure was premature because from all that Ms. Scully did, the Wiener family was reasonably waiting for a response to its submissions, the Wieners were never given an agreement to sign or an amount to pay, and they were never informed of the upcoming revised foreclosure date.

# III.   BACKGROUND

A.    GMAC's Initial Dealings with Gerard Wiener

On February 4, 2009, Gerard Wiener called GMAC to tell it of his father's death, supply his contact information, and inquire into a loan payoff figure for his childhood home.  Unbelievably, this phone call was the first of no less than 53 unsuccessful attempts by Gerard Wiener to obtain critical information to which he was entitled and to provide GMAC information which logically one would think it wanted, to wit:  The name and contact information of an alive person with whom it could deal.[8]

The first call, however, was a vivid foreshadowing of future events.  GMAC put Gerard Wiener on hold for 46 minutes, then transferred him to GMAC's Assumptions Department.  The Assumptions Department told him that no one could speak with him unless GMAC received a probate court letter of authority for Gerard Wiener or, since in this case an estate had not yet been opened, a filed death certificate regarding Roland Wiener.  Gerard Wiener agreed to send his father's death certificate immediately.  He also provided all of his contact information and requested that GMAC add it to the loan file.[9]

Gerard Wiener promptly sent his father's death certificate to GMAC's Assumptions Department by mail, along with all of the Estate's contact information.  On behalf of the Estate he  continued to make timely mortgage

---

[8] Exhibit D, at ¶ 19.

11

payments on the loan.  GMAC without question or comment accepted those

payments but would do and did nothing in response to Gerard Wiener's request to

discuss the loan with GMAC.[10]

When Gerard Wiener called to discuss the mortgage shortly after sending in

the death certificate and contact information, GMAC said that it's system did not

reflect receipt of  the death certificate and thus it could not speak to him.  GMAC

advised Gerard Wiener that it could take some time for the death certificate he had

sent to be reflected in GMAC's system even though it had physically been received.

GMAC pretended it did not exist because even though it had received it, GMAC's

people had not caused it to be entered into GMAC computer system.  It then asked

him to wait and call back later.[11]  GMAC's runaround had begun.

This scenario repeated itself dozens of times.  It took over six months before

GMAC finally "discovered" and acknowledged its receipt of Roland Wiener's death

certificate.  In the meantime, Plaintiff called GMAC at least once, sometimes

several times a week, in the weeks and months following his initial contact, to

discuss the mortgage.  He also on March 3, 2009, sent a letter to GMAC's

Waterloo, Iowa, Assumptions Department, explaining the status of matters and

asking for assistance.  He received no response.  Exhibit D at ¶ _____

From Gerard Wiener's point of view, the Estate urgently needed answers to

certain questions, including: (1) whether there was life insurance in place on the

---

[9] Exhibit D at ¶ 20.

[10] Exhibit D at ¶ 21.

[11] Exhibit D at ¶ 22.

mortgage; (2) an exact payoff figure; and (3) how to remove certain unnecessary (and improper, as Gerard Wiener believed) recurring charges from the mortgage payment (to which Roland Wiener may not even have consented but which in any event were no longer needed, including so-called "credit protection" coverage). Gerard Wiener was asking about these subjects because in one of his early phone calls to GMAC, a GMAC person told him that the loan had a credit protection plan and other possible features, e.g., a legal advice provision.[12]

Each time Gerard Wiener asked about these things, he was either told that GMAC had still not received the death certificate and, therefore, could not speak with him, was disconnected, or was improperly routed to some unit that could not provide any help.[13]

He was told to fax the death certificate again. He did so, and also mailed it to the Assumptions Department. During one of Gerard Wiener's follow-up phone calls, the GMAC Assumptions agent advised him that it could take up to three weeks for a fax to "hit the system" and advised him to "relax and wait a few weeks" and then call back.[14]

In each instance when Gerard Wiener called GMAC, he was advised that without the death certificate being in GMAC's file, he could not be given any information or response either on the phone or in writing.[15]  GMAC refused to

_____

[12] Exhibit D at ¶¶ 23 & 24.

[13] Id.

[14] Id.

[15] Id.

13

address his monetary offer to pay-off the loan.[16]  Not only was this communication

incredible, it was stupid not to consider, discuss or otherwise take the offer.

Finally, in April 2009, out of sheer frustration, Gerard Wiener had the Estate

suspend mortgage payments in an attempt to get GMAC's attention and cause it

once and for all to deal with him.  That effort too failed.  When, on April 15, 2009,

Gerard Wiener called GMAC's Assumptions Department and explained that the

Estate was having difficulty justifying making mortgage payments without knowing,

for one thing, whether there was mortgage insurance.  The GMAC representative

advised him that it had no proof in its system that Gerard Wiener was authorized to

discuss the loan, but that nonetheless the best solution would be for him to

quitclaim the house directly over to GMAC without any compensation, in order to

protect his dead father's credit.  "Don't you want to protect his memory?" taunted

the GMAC agent.  Appalled, Gerard Wiener asked to speak to a supervisor or

someone else in authority.  His request was denied, then he was put on hold for 42

minutes, and then disconnected.[17]

The events that occurred up to mid-November, 2009, including the initial

foreclosure attempt based on letters sent to Roland Wiener after he had died are

articulated in Plaintiffs' earlier Summary Judgment responses, incorporated by

this reference, and will not be repeated here.[18]

Factually, what is important to say is that while GMAC was advising Gerard

Wiener to give GMAC more time to process and enter into its system, his father's

death certificate, Gerard Wiener's Court letters of authority making him the

representative of the Estate of Roland Wiener, and additional attempts to find

someone who would discuss the loan with him, GMAC without notice of any sort to

_____

[16] Id.

[17]  Exhibit D at ¶ 25.

[18] See Docket Items Nos. 48, 64, 66, 74 and their Exhibits.

14

Gerard Wiener, via its foreclosure attorneys at the Orlans law firm, had initiated

proceedings to foreclose on the property.  That wrongful conduct was further proof

of GMAC callus and pompous attitude about its customers.  Even though GMAC

had been given verbal and written notice of Roland Wiener's death numerous

times and had been sent Roland Wiener's death certificate a number of times,

GMAC chose to give notice of its foreclosure activities to the deceased Roland

Wiener and not to Gerard Wiener or his sisters.

## IV.   ARGUMENT

### A.   Much Is Already Briefed

As this Court may recall, many of GMAC's current arguments were made

before and have been briefed by both sides already.  Rather than repeat the

plaintiffs' arguments, we asks the Court to look at the following pleadings and their

exhibits that address much of what GMAC now argues.  Those pleadings are

Docket Numbers  48, 64, 66, 74and their Exhibits.

### B.   GMAC's Makes a False Claim on Page 10 of Its Brief

GMAC argues that "Scully, agreed to adjourn the November foreclosure sale

and sent Plaintiff a **second foreclosure agreement** for Plaintiff to execute.  Per

the proposed agreement, Plaintiff was to submit the necessary paperwork and

documentation.  Again, Plaintiff failed to submit the required documentation."

[Emphasis added]  This is pure garbage and GMAC offers no evidence whatsoever

to support its assertion that it sent a second foreclosure agreement for Plaintiff to

execute.

Ms. Scully did adjourn the November foreclosure sale upon receipt of certain

factual information forms that were filled out and returned by Gerard Wiener a

day after she asked for them.  None of those documents were a foreclosure

agreement, a forbearance agreement or anything close to that.  Ms. Scully wanted

similar documents from Charlotte Wiener who at Ms. Scully's insistence was going to live at the house to fulfill what Ms. Scully had told Gerard Wiener was a requirement that needed to be fulfilled for a forbearance to occur.[19] After taking the time necessary to gather and prepare the documents, those were sent to Ms. Scully. No "foreclosure agreement" or "forbearance agreement" was a part of the documentation Ms. Scully sent to the Wieners or otherwise asked for.[20]

What was to occur was upon receipt and review of that documentation, GMAC was going to send an agreement and payment table to the Wieners. Instead, GMAC via Ms. Scully, went silent and foreclosed on the property without bothering to tell the Wiener's of he new foreclosure sale date.

The offensive and wrongful game played here by GMAC was to ask for factual information documentation to be completed and returned to it for review, and then silently have a foreclosure sale (without notice to the Wieners) while the Wieners were waited for the documentation review to be completed. GMAC's *three card monte* should not be allowed to be successful here.

Among other things, GMAC's combination of purportedly considering a forbearance agreement silently foreclosing is an unfair business practice. M.C.L. § 445.901, *et seq.*

C.    Additional Relevant Law and Argument

Beyond what is in the prior briefs, we note:

*       The statute of frauds upon which GMAC relies does not require a signature of the borrower, only the lender. And, as noted before, that "signature" can be via e-mail.

*       The Sheriff's Deed as recorded has a significant irregularity that

---

[19] Exhibit D at ¶ 12.
[20] Exhibit J hereto contains the packages of documentation Scully asked for, which were sent to her private office fax machine.

caused the title to the property to be slandered by GMAC with the Sheriff being the inadvertent tool of GMAC through its foreclosure attorneys who prepare the documentation.  The Sheriff's Deed notes that notice was published that a private foreclosure sale would be made on January 5, 2010 at the Courthouse in Pontiac, Michigan. [21]  That Deed's attachments purporting to prove that a notice of sale for that January 5, 2010, was published, the attached notices only prove that such a notice was published for a sale on September  8, 2009.  That issue plus the fact that Gerard Wiener also was not provided with the January 5, 2010 foreclosure sale date makes the sale suspect and an issue of fact exists as to whether or not GMAC's foreclosure attorneys properly conducted the sale with appropriate notices.   A reasonable inference from the Sheriff's Deed is that the notice was not proper and Gerard Wiener's testimony by his Declaration under penalty of perjury, coupled with the Montoya testimony at his deposition that he say nothing that indicated any notice of the January 5, 2010 sale was given to Mr. Wiener all lead to the conclusion that the foreclosure sale was not proper.

 *      Judicial foreclosure was necessary because there was not sufficient compliance with MCL 6003.3163.

 *      If considered, the Mallory affidavit fails to show a basis for how she knows that she says.  That is necessary.

 *      Unlike what happened in the Hartop v. Deutsche Bank case Oct 13. 2010, after foreclosure sale was postponed, and the 'new' date was changed to December 5, 2010, no notice given of new date to Wieners.

 *      The statute of frauds does not eliminate the wrongful foreclosure issue. The statements upon which we rely are written and the e-mail signature of Ms. Scully satisfies the signature requirement of the statute of frauds.  *See* MCL §450.832(h). It can include e-mails. *Int'l Casings,* 358 F.Supp.2d 863, 875 (W.D.

---

[21]  Exhibit K, copy of the recorded Sheriff's Deed with attachments purporting to prove notice publication.

MI, 2005).  Whether considered a contract or promissory estoppel[22], there is a signed writing.  The Michigan Supreme Court notes the factual complexity of application of the statute of frauds and that it is not as rigid as the defendants suggest. Rather than apply fixed rules for compliance with the statute of frauds, the Court adopted a case-by-case approach. In *Opdyke Investment Co. v. Norris Grain Co.* 413 Mich. 354, 367-368, 320 N.W.2d 836 (1982) it stated: We decline to accept the defendants' invitation to adopt narrow and rigid rules for compliance with the statute of frauds. Instead, we affirm the standard espoused by Professor Corbin and adopted by this Court in ]: "Let us proceed, therefore, with a general consideration of what constitutes a sufficient note or memorandum. We may well start with this one general doctrine:  There are few, if any, specific and uniform requirements. The statute itself prescribes none; and a study of the existing thousands of cases does not justify us in asserting their existence. Some note or memorandum having substantial probative value in establishing the contract must exist; but its sufficiency in attaining the purpose of the statute depends in each case upon the setting in which it is found.... That is the rule of law to be applied with intelligence and discrimination and not like a pedant playing a game of

---

[22] Promissory estoppel consists of four elements: 1) a promise; 2) that the promisor should reasonably expect to induce the promisee into action of a definite and substantial character; 3) which in fact produced reliance or forbearance of that nature; 4) in circumstances such that the promise must be enforced if injustice is to be avoided. *McMath v. Ford Motor Co.,* 259 N.W.2d 140, 142 (Mich. Ct. App. 1977). "A promise is a manifestation of intention to act or refrain from acting in a specified manner, made in a way that would justify a promisee in understanding that a commitment had been made." *Schmidt v Bretzlaff,* 528 N.W.2d 760, 762 (Mich. Ct. App. 1995). Moreover, "reliance is reasonable only if it is induced by an actual promise." *State Bank of Standish v Curry,* 500 N.W.2d 104, 107 (Mich. 1993)). The Michigan Supreme Court states: Variables such as the nature of the relationship between the parties, the clarity of the representation, as well as the circumstances surrounding the making of the representation, are important to the determination of whether the manifestation rises to the level of a promise. Both traditional contract and promissory estoppel theories of obligation use an objective standard to ascertain whether a voluntary commitment has been made. To determine the existence and scope of a promise, we look to the words and actions of the transaction as well as the nature of the relationship between the parties and the circumstances surrounding their actions.

logomachy."

Ms. Scully's e-mail of November 19, 2009 satisfies the statute of frauds when it states: "Here is the bottom line . . . I can get the payment reduced for 6 months to $755.07 to give the estate time to figure out what they want to do.

"The Unpaid Principal Balance at this time is $60,684.22, the current I/R is 8.75. The loan is currently due for the 04/01/2009 payment. I need the paper work I sent over Tuesday back to me by tomorrow . . . I am off tomorrow, but I will sent it off to our loss Mitt dept in Waterloo, IA to request the Special Forbearance. I HAVE to have that paperwork, otherwise under the Freddie Mac guidelines I cannot adjourn the sale any longer. These are formal arrangements, and our set up on our servicing system. If I do not receive the paper work as requested, I will assume the Estate has decided to let the property go to FC sale on 11/24, and proceed with the 6 month redemption period.

"Regards,

"**Patty L. Scully**"

Gerard Wiener sent in his paperwork, the foreclosure sale was adjourned, and that it would take Charlotte Wiener longer to get her paperwork in did not bother Ms. Scully at all.

## V.     CONCLUSION

GMAC's foreclosure sale was flawed and did not comport with Ms. Scullly's 2nd forbearance proposal, the initial terms of which were filled by the Wieners. Certainly triable issues of fact exist as to what occurred.

Without regard to the substance of GMAC's motion, the motion is premature because the prerequisite to having the motion heard was not satisfied because a PMK was not provided for deposition.

1        GMAC's actions were done with ill-will, and reckless disregard of the

2    Wiener's rights, justifying treatment of GMAC's actions as being actions in tort.

3

4

5

6

7

8

9

10   Dated:  February 5, 2012

11                                           By:     s/David J. Brown

12

13                                           David J. Brown (CA 56628)

14                                           Attorney for Plaintiffs

15                                           1135 Ulloa Street

                                        San Francisco, CA 94127

16                                           415-716-7786

17

18

19

20

21

22

23

24

25

26

27

28

2:11-cv-01070-GCS-PJW    Doc # 94-13    Filed 02/06/13    Pg 1 of 5    PG ID 1652

## TABLE OF EXHIBITS

| Exhibit | Content |
|---------|---------|
| A | Stipulation and Order with Respect to Motion for Relief From Automatic Stay |
| B | GMAC's Response to Plaintiffs' Interrogatory No. 1 |
| C | Excerpt's from the November 30, 2012, Deposition of Roberto Montoya |
| D | Declaration of Gerard Wiener in Opposition to GMAC's Renewed Motion for Summary Judgment |
| E | Roland Wiener's Death Certificate |
| F | Lis Pendens Recorded with Respect to This Lawsuit |
| G | Excerpts of GMAC's Service Notes Relating to the Wiener Loan |
| H | Excerpts from the Scully and Montoya Depositions |
| I | Excerpts from the November 29, 2012, Deposition of Ms. Scully |
| J | Gerard Wiener's and Charlotte Wiener's Documentation Sent to Ms. Scully Regarding the 2nd Forbearance Attempt |
| K | January 5, 2010 Sherriff's Deed and Accompanying Documents |

# EXHIBIT A

## TO PLAINTIFFS' OPPOSITION TO GMAC'S RENEWED MOTION FOR SUMMARY JUDGMENT

Stipulation and Order with Respect to Motion of Gerard Wiener for Relief from Automatic Stay as to GMAC Mortgage, LLC.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------  )
                                                                   )
In re:                                                             )      Case No. 12-12020 (MG)
                                                                   )
RESIDENTIAL CAPITAL, LLC, et al.,                                  )      Chapter 11
                                                                   )
                                          Debtors.                 )      Jointly Administered
                                                                   )
-----------------------------------------------------------------  )

### STIPULATION AND ORDER WITH RESPECT TO
### MOTION OF GERARD WIENER FOR RELIEF FROM
### AUTOMATIC STAY AS TO GMAC MORTGAGE, LLC

Subject to the approval of this Court (the "Court"), this Stipulation and Order (the

"Stipulation and Order") is made and entered into by, between and among the debtors and

debtors in possession in the above-captioned bankruptcy cases (collectively, the "Debtors") and

Gerard Wiener ("Movant" and, with the Debtors, each a "Party" and together, the "Parties").

**RECITALS**:

A.       On May 14, 2012 (the "Petition Date"), each of the Debtors filed a voluntary

petition in this Court for relief under Chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors are managing and operating their businesses as debtors and

debtors in possession

B.       Movant is a plaintiff, on behalf of his deceased father's estate, in a civil action

(the "Action") against GMAC Mortgage, LLC ("GMAC Mortgage"), one of the above-captioned

Debtors, and non-Debtor defendants Bankers Trust Company ("Bankers Trust"), Federal Home

Loan Mortgage Corporation ("Freddie Mac"), Fifth Third Mortgage-MI, LLC ("Fifth Third"),

Jeffrey Baskin and Lauren Newman (collectively, with Freddie Mac, Fifth Third, Bankers Trust,

and GMAC Mortgage, the "Defendants"), pending in the United States District Court for the
Eastern District of Michigan (the "Michigan Federal Court"), Case No. 11-10770-GCS-PJK.

C.       In May 1972, Movant's father, Roland Wiener purchased the real property located
at 1946 Parmenter Boulevard, Apartment 305, Building 53, Segment 19 Royal Oak, Michigan
(the "Property").  In 1997, to refinance the purchase of the Property, Roland Wiener obtained a
loan secured by a mortgage (the "Mortgage") on the Property.  In 2003, Freddie Mac purchased
the Mortgage from Bankers Trust and was the owner of the Mortgage until foreclosure in early
2010.  GMAC Mortgage was the servicer of the Mortgage at all relevant times to the allegations
raised in the Action.

D.       The Property was sold at a Sheriff's sale to Freddie Mac on January 5, 2010.

E.       Subsequently, on June 22, 2010, Movant, as personal representative of his father's
estate, filed the Action against GMAC Mortgage and Bankers Trust in Michigan state court
seeking damages and equitable relief for wrongful foreclosure on the Property.

F.       On September 21, 2012, the Property was sold by Freddie Mac to Baskin and
Newman.

G.       Thereafter Movant added Freddie Mac, Baskin, Newman and Fifth Third, the
current holder of a Mortgage from Baskin and Newman, as defendants to the Action and Freddie
Mac removed the case to the Michigan Federal Court.

H.       Pursuant to section 362 of the Bankruptcy Code, the commencement of the
Debtors' Chapter 11 cases automatically stayed the Action against GMAC Mortgage.

I.       Each of the Defendants has filed and fully briefed a motion for summary
judgment (the "Summary Judgment Motions") against Movant.  Movant has not filed a cross-

motion for summary judgment against any of the Defendants.  Movant has opposed each of the

Summary Judgment motions.

J.      Except as to GMAC Mortgage, by virtue of the automatic stay, the Summary

Judgment Motions were argued before and taken under advisement by the Michigan Federal

Court on June 18, 2010.  On September 17, 2012, the Michigan Federal Court issued a written

opinion and order granting the Summary Judgment Motions as to each of the non-debtor

Defendants and on October 17, 2012, Movant filed a notice of Appeal of such order.  GMAC

Mortgage's Summary Judgment Motion (the "GMAC SJ Motion") is fully briefed, but not yet

argued, and is currently pending before the Michigan Federal Court.

K.      On July 18, 2012, Movants filed a motion pursuant to section 362 of the

Bankruptcy Code for relief from the automatic stay seeking relief from the automatic stay to

continue prosecuting the Action against GMAC Mortgage, including the taking of certain

discovery from the Debtors [Docket No. 813] (the "Motion").

L.      In order to resolve the risk and expense of litigating the Motion, the Debtors have

reached agreement with Movant under which the Debtors shall consent to a limited modification

of the automatic stay pursuant to section 362(a) of the Bankruptcy Code subject to the conditions

set forth herein and to this Court's approval of this Stipulation and Order.

NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among the

Parties, as follows:

**AGREEMENT:**

1.      Upon entry of this Stipulation and Order by the Court, the automatic stay imposed

by section 362(a) of Bankruptcy Code shall be modified solely for the limited purpose to permit

(i) GMAC Mortgage and Movant to argue the GMAC SJ Motion before the Michigan Federal

Court and any appeals taken in connection therewith, (ii) the Michigan Federal Court to render a

ruling on the GMAC SJ Motion, and (iii) the Debtors to produce certain agreed-upon documents

and witnesses pursuant to the terms and subject to the terms and conditions set forth herein;

provided, however, that GMAC Mortgage may seek no sooner than ten days after the completion

of the Agreed Discovery (as defined below), on appropriate notice to schedule argument on the

GMAC SJ Motion before the Michigan Federal Court.

2.      The Debtors agree to produce only the discovery set forth on Exhibit A annexed

hereto (the "Agreed Discovery").  The Debtors shall not be required to provide any other

documents, items or witnesses to Movant under this Stipulation and Order.

3.      Except as provided herein, the provisions of the automatic stay, including, without

limitation, those provisions prohibiting execution, enforcement or collection of any judgment

that may be obtained against the Debtors and/or assets or property of the Debtors' estates (as

defined in section 541 of the Bankruptcy Code) shall remain in full force and effect, and

Movants, together with their respective agents, attorneys, or representatives, shall not take any

action to execute, enforce or collect all of or any portion of any such judgment from the Debtors

or its estates or properties.

4.      Upon entry of this Stipulation and Order, the Motion shall be deemed withdrawn

without prejudice to renew.

5.      This Stipulation and Order shall not become effective unless and until it is entered

by the Bankruptcy Court.

6.      This Stipulation and Order may not be modified other than by a signed writing

executed by the Parties hereto or by further order of the Bankruptcy Court.

7.      This Stipulation and Order is the entire agreement between the Parties in respect of the subject matter hereof.

8.      Each person who executes this Stipulation and Order on behalf of a Party hereto represents that he is duly authorized to execute this Stipulation and Order on behalf of such Party.

9.      This Stipulation and Order may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

10.     The 14-day stay period under Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure is hereby waived and this Stipulation and Order shall be immediately effective upon its entry.


[The remainder of this page is left intentionally blank]

11.    This Court shall retain jurisdiction to resolve all matters relating to the

implementation of this Stipulation and Order.

Dated: New York, New York
        October 23, 2012

| GMAC MORTGAGE, LLC | GERARD WIENER, FOR HIMSELF AND AS REPRESENTATIVE OF THE ESTATE OF ROLAND WIENER |
|---|---|
| /s/ Norman S. Rosenbaum | |
| Gary S. Lee | /s/ David J. Brown |
| Norman S. Rosenbaum | David J. Brown |
| MORRISON & FOERSTER LLP | 1135 Ulloa Street |
| 1290 Avenue of the Americas | San Francisco, CA 94127 |
| New York, New York 10104 | Telephone: (415) 716-7786 |
| Telephone: (212) 468-8000 | |
| Facsimile: (212) 468-7900 | |
| | |
| *Counsel for Debtors* | |
| *and Debtors in Possession* | *Counsel for Gerard Wiener* |

APPROVED AND SO ORDERED
this 27th day of November, 2012 in New York


                            _____/s/Martin Glenn_____
                               MARTIN GLENN
                         United States Bankruptcy Judge


i

## Exhibit A

## Agreed Upon Discovery

1.  One deposition of Patricia L. Scully, a GMAC Mortgage employee, conducted in accordance with the Federal Rules of Civil Procedure, with appropriate follow-up on any questions not answered because of assertion of a privilege by means of Movant's motion to compel.

2.  One deposition of GMAC Mortgage's person most knowledgeable ("PMK"), conducted in accordance with the Federal Rules of Civil Procedure, to take place in Detroit, Michigan, about the following subjects (the "PMK Topics") with appropriate follow-up on any questions not answer because of assertion of a privilege by means of Movant's motion to compel:

Loan made to Roland Wiener, including without limitation,

a.  Administration of loan after made

b.  All aspects of any foreclosure actions regarding the loan

c.  Communications with owner of loan, Freddie Mac, once payments on the loan ceased, including up to the Debtors' bankruptcy filing

d.  Who, in terms of persons and entities made decisions regarding the Wiener loan after payments ceased, specifically including how the decisions were communicated to GMAC Mortgage if they were not GMAC decisions.

e.  How the GMAC Mortgage relationship with Freddie Mac worked with respect to the Wiener loan and the foreclosure sale, the attempts to modify the loan, who made decisions regarding the handling of the loan, and how, if at all, the Freddie Mac Single Family Seller/Servicer Guide played any role in these activities

f.  How and why GMAC Mortgage, directly and indirectly was communicating with Gerard Wiener and his attorney after the foreclosure sale occurred

g.  What authority GMAC Mortgage had from time-to-time with respect to the Wiener loan to modify the loan, to negotiate possible modification of the loan, and from whom or what in terms of communications that authority came

h.  GMAC Mortgage's reference to and following of Freddie Mac's loan modification policies and procedures

i.  GMAC Mortgage's policies and procedures as used in connection with the foreclosure on the Wiener loan

j. GMAC Mortgage's policies and procedures regarding post foreclosure activities on the Wiener loan

k. GMAC Mortgage's policies and procedures regarding the Federal Home Loan Modification program as it was applied or considered to be applied to the Wiener loan

3.  No later than five calendar days prior to the PMK deposition, GMAC Mortgage will produce to Movant's counsel, in hard copies or electronically, any documents not yet produced that are relevant to each of the subjects matter of the PMK Topics.

# EXHIBIT B

## TO PLAINTIFFS' OPPOSITION TO GMAC'S RENEWED MOTION FOR SUMMARY JUDGMENT

GMAC's Response to Plaintiffs' Interrogatory No. 1

8100/3416

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERARD WIENER, individually, and as
Personal Representative of the Estate of
Roland C. Wiener,

        U.S. Dist. Ct. Case No. 11-10770-GCS-PJK

        Plaintiff,

v.                      Oakland County Case No. 10-111283-CH

BANKERS TRUST COMPANY, a foreign company,
GMAC MORTGAGE, LLC, a Delaware corporation,
and FEDERAL HOME LOAN MORTGAGE CORPORATION,
a foreign corporation, and JEFFREY BASKIN, an individual,
and LAUREN NEWMAN, an individual,

        Defendants,
and

JEFFREY BASKIN, an individual, and LAUREN NEWMAN,
an individual,

        Defendants/Counter-Plaintiffs/Cross-Plaintiffs,

v.

GERARD WIENER, individually, and as Personal Representative
of the Estate of Roland C. Wiener,

        Plaintiff/Counter-Defendant,
and

FEDERAL HOME LOAN MORTGAGE CORPORATION, a foreign corporation,

        Defendant/Cross-Defendant.

_____/

| | |
|---|---|
| Gavin J. Fleming (P68366) | Frank M. DeLuca (P41604) |
| Channelle Kizy White (P69678) | McKelvie DeLuca, P.C. |
| Beals Hubbard, PLC | Attorneys for Defendants Bankers Trust |
| Attorneys for Plaintiffs | Company and GMAC Mortgage, LLC |
| 30665 Northwestern Hwy., Ste. 100 | 280 W. Maple Road, Suite 300 |
| Farmington Hills, MI 48334 | Birmingham, MI 48009 |
| (248) 932-1101 | (248) 952-5100 |
| gfleming@bealshubbard.com | fdeluca@mckelviedeluca.com |
| ckizy@kizylaw.com | |

Daniel P. Perk (P39004)
Miller Johnson
Attorneys for Federal Home Loan Mortgage
Corporation
303 N. Rose St., Suite 600
Kalamazoo, MI 49007
(269) 226-2958
lubbenc@millerjohnson.com

Bruce M. Gorosh (P35455)
Jason M. Milstone (P53769)
Lefkofsky & Gorosh, P.C.
Attorneys for Defendants Jeffrey Baskin and
Lauren Newman
31500 Northwestern Hwy., Suite 105
Farmington Hills, MI 48334
(248) 855-5508
bgorosh@lgpclaw.com

/

## GMAC MORTGAGE, LLC'S OBJECTIONS AND ANSWERS TO PLAINTIFFS' GERARD WIENER'S AND THE ESTATE OF ROLAND WIENER'S, FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION AND REQUESTS FOR ADMISSION DIRECTED AT DEFENDANT GMAC

Defendant, GMAC Mortgage, LLC ("GMAC"), by and through its attorneys, McKelvie DeLuca, P.C., states the following as its Objections and Answers to Plaintiff's First Set of Interrogatories, Requests for Production and Requests for Admission Directed to Defendant GMAC:

### PRELIMINARY STATEMENT

Defendant GMAC's investigation and discovery in this matter is ongoing. As such, these objections and answers are provided without prejudice to GMAC's right to provide or object to the production of further documents, evidence and/or information not yet discovered.

Defendant GMAC reserves the right to amend and/or supplement these objections and answers to Plaintiff's first discovery requests as additional responsive information is found by way of discovery and/or otherwise.

### GENERAL OBJECTIONS

A.      Defendant GMAC's objections to "Plaintiff's First Set of Interrogatories, Request for Production and Requests for Admission Directed to Defendant GMAC" have been prepared

2

in accordance with the Federal Court Rules and pursuant to a reasonably diligent search for the information and/or documents requested. GMAC submits that the scope of its investigation conducted to locate responsive information and documents has been limited to making inquiries to those activities and employees most likely to be knowledgeable about the specific matters at issue, and reviewing GMAC files in which information related to such matters ordinarily would be expected to be found. To the extent that this discovery purports to acquire or define an investigation that exceeds the foregoing scope, GMAC objects thereto on the grounds that such requirement or definition (i) exceeds the scope of permissible discovery, and (ii) improperly attempts to impose upon GMAC an unreasonable burden and expense and/or duties beyond those required under the Federal Court Rules.

B.      GMAC reserves the right to amend these objections and answers and to offer related evidence, as additional facts are ascertained, research is completed and contentions become apparent.

C.      To the extent that the discovery contained herein appears to acquire information that is protected from disclosure by the attorney/client privilege and/or the attorney work product doctrine, GMAC objects to the same.

D.      By submitting these responses, GMAC does not in any way adopt Plaintiff's purported definition of words and phrases contained in this discovery. GMAC objects to those definitions to the extent that they are inconsistent with (a) the ordinary customary meaning of such words and phrases or (b) the rules governing the permissible scope of discovery.

E.      GMAC does not concede that any of the information or documents that were produced are or will be admissible evidence at trial or any evidentiary hearing. Furthermore,

3

GMAC does not waive any objection, whether or not asserted herein, to use any such documents at trial.

F.    GMAC objects to the discovery to the extent it purports to require GMAC to respond on behalf of other persons, or to provide information that is not in the possession, custody or control of GMAC.

G.    GMAC objects to providing discovery on any such documents without prior arrangements being made to reimburse GMAC for the cost of locating, extracting and copying which may be incurred.

H.    GMAC objects to these interrogatories to the extent they seek answers that call for a legal conclusion.

I.    GMAC objects to these interrogatories to the extent that they are oppressive, overly broad and unduly burdensome.

Subject to and without waiving its objections, GMAC responds to Plaintiff's First of Interrogatories, Request for Production and Requests for Admission to Defendant GMAC as follows:

**INTERROGATORY NO. 1**

Please provide the name, address, and telephone number of the person most knowledgeable about the loan made to Roland Wiener; this person should be knowledgeable regarding: how such loans were marketed or sold to seniors such as Roland Wiener and how the loans were administered after sale.

**ANSWER:**    Without waiving its General Objections as fully set forth herein, GMAC submits that there is no one person that is most knowledgeable regarding the loan made to Roland Wiener.  GMAC submits that numerous individuals/departments within GMAC may possess information regarding the applicable loan file.

4

Dated: _____10/27_____, 2011

_____
Scott Zeitz
GMAC Mortgage, LLC and
Bankers Trust Company

Respectfully submitted,

McKELVIE DeLUCA, P.C.

_____
Frank M. DeLuca (P41604)
Attorneys for Defendants GMAC
and Bankers Trust
280 W. Maple Road, Suite 300
Birmingham, MI 48009
(248) 952-5100

Dated: October 27, 2011

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon the attorneys of record of all parties to the above cause by mailing the same to them at their respective business addresses as disclosed by the pleadings of record herein, with postage fully prepaid thereon on the 31st day of October, 2011. I declare under the penalty of perjury that the statement above is true to the best of my information, knowledge and belief.

_____
Cynthia A. DeFord

K:\GMAC - Ally Financial\Wiener, Gerard\Federal Court\Answers - 1st Discovery Requests.doc

15

# EXHIBIT C

## TO PLAINTIFFS' OPPOSITION TO GMAC'S RENEWED MOTION FOR SUMMARY JUDGMENT

Excerpt's From the November 30, 2012, Deposition of Roberto Montoya

ROBERTO MONTOYA
November 30, 2012

Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF MICHIGAN

3                     SOUTHERN DIVISION

4

5    GERARD WIENER, individually,

6    and as Personal Representative        ORIGINAL

7    of the Estate of Roland C. Wiener,

8              Plaintiff,

9          vs.                    Case No. 11-10770

10                                Hon. George Caram Steeh

11   BANKERS TRUST COMPANY, ET AL.,

12              Defendants.

13   _____

14   AND RELATED CROSS-ACTIONS

15   _____

16

17          The Deposition of ROBERTO MONTOYA,

18          Taken at 280 West Maple Road, Suite 300,

19          Birmingham, Michigan,

20          Commencing at 8:51 a.m.,

21          Friday, November 30, 2012,

22          Before Amy Tobias Lenga, CSR-4625.

23

24

25



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

ROBERTO MONTOYA
November 30, 2012

Page 7

1      me that and ask for clarification, and if you need

2      clarification as to only part of it tell me what needs

3      clarifying and I will attempt to do that. All right?

4  A.  Okay.

5  Q.  Unless your attorney instructs you not to answer even

6      if he makes objections for the record you should then

7      go ahead and answer the question. All right?

8  A.  Okay.

9  Q.  Are you under the influence of any medication, drug,

10     alcohol, whatever, today that might affect your

11     ability to recall or testify?

12  A.  No.

13  Q.  The question I ask everybody, so don't be offended by

14     it, have you ever been convicted of a felony?

15  A.  No.

16  Q.  When did you first learn that you were going to be a

17     witness in this case as a person most knowledgeable?

18  A.  A couple months ago, approximately.

19  Q.  Prior to being so designated did you know anything at

20     all about the Wiener loan?

21  A.  No.

22  Q.  For purposes of the depo I'll refer to the plaintiff,

23     Gerard Wiener, as either Gerard Wiener or Mr. Wiener.

24     His father, who is the original borrower was Roland

25     Wiener and when I'm referring to him I'll call him



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

ROBERTO MONTOYA
November 30, 2012

Page 11

 1   A.   These are all residential mortgage borrowers.

 2   Q.   Do you know a Patricia Scully?

 3   A.   No.

 4   Q.   Have you ever met her?

 5   A.   No.

 6             MR. BROWN:  Let's mark as Exhibit 1 a copy

 7        of the deposition notice.

 8             MR. DeLUCA: Can we go off the record for a

 9        second?

10             MR. BROWN: Sure.

11             (Off the record at 9:02 a.m.)

12             (Back on the record at 9:04 a.m.)

13             MARKED BY THE REPORTER:

14             DEPOSITION EXHIBIT 1

15             9:04 a.m.

16             MR. BROWN:  It's my understanding that to

17        the extent I use in this deposition exhibits that were

18        in Ms. Scully's deposition yesterday I will refer to

19        them as Scully exhibit number whatever, say I am using

20        it in this deposition.  The court reporter has

21        graciously agreed that she will cause to be attached

22        to the Montoya deposition copies of the Scully

23        exhibits that I use.  Is that agreeable?

24             MR. DeLUCA: That's fine.

25             MR. BROWN: Is that agreeable with you, Miss



ROBERTO MONTOYA
November 30, 2012

Page 14

 1      foreclosure section.

 2  Q.  Anything else that you reviewed that was Freddie

 3      Mac's?

 4  A.  No.

 5  Q.  In preparing for the deposition, and setting aside

 6      attorneys for the moment, did you talk with anybody at

 7      GMAC about the Wiener loan?

 8  A.  No.

 9  Q.  Did you talk with anybody at Freddie Mac about the

10      Wiener loan?

11  A.  No, sir.

12  Q.  Did you talk with anybody outside of GMAC about the

13      Wiener loan?

14  A.  No.

15  Q.  Are you familiar with the Orlans Law Firm?

16  A.  Excuse me?

17  Q.  Are you familiar with the Orlans Law Firm,

18      O-r-l-a-n-s?

19  A.  I'm familiar in the sense where I've seen letters and

20      I've seen communications between our Foreclosure

21      Department with Orlans & Associates.

22  Q.  Have you ever yourself in your normal course of

23      business dealt with the Orlans' firm?

24  A.  No, sir.

25  Q.  Is it correct that -- well, let me ask you this.  In



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

ROBERTO MONTOYA
November 30, 2012

Page 15

```
 1          preparing for this deposition did you talk with
 2          anybody at the Orlans' firm?
 3     A.   No.
 4     Q.   And don't tell me what was said at this point, but
 5          what attorneys, if any, did you communicate with
 6          either at GMAC or working for GMAC with respect to
 7          preparing for this deposition?
 8     A.   The only people I spoke to was my attorney sitting
 9          next to me, Frank DeLuca, and Christine Buen from our
10          Legal Department.
11     Q.   How much time did you spend conversing with Mr.
12          DeLuca, be it telephonically, in person or whatever?
13     A.   Approximately an hour and a half.
14     Q.   How much time did you spend with your in-house lawyer?
15     A.   Around that same time.
16     Q.   And in the course of those discussions with your
17          attorneys did they tell you what you should say
18          substantively in response to any questions in the
19          deposition?
20     A.   What I should say?
21     Q.   Yes.
22               MR. DeLUCA: Well, I am going to caution the
23          witness not to disclose any discussions that you had
24          with your attorneys, be it outside attorneys or inside
25          attorneys, as those conversations are privileged.
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

ROBERTO MONTOYA
November 30, 2012

Page 29

```
 1         know --
 2    A.   It just depends on the person entering that note.
 3         Some people might have been put -- been more specific
 4         as to what department it was transferred to.  Some
 5         people -- in this case it wasn't specific enough.
 6    Q.   Okay.  And then after it says "further assistance."
 7         There's something that says "distinct 4009."  Do you
 8         see that?
 9    A.   Yes, sir, I do.
10    Q.   Do you know what that is?
11    A.   A lot of the times after the note the individual who's
12         fielding that call will put their initials or their
13         name at the end of the note.  So one person is Justin
14         K. who entered this note.
15    Q.   Do you know what the number means, the 4009?
16    A.   I don't.
17    Q.   When you have a note like this and these calls and it
18         doesn't indicate otherwise, presumably this is a call
19         that came into ASM, whatever ASM is, correct?
20    A.   Yes.  To add to that, there is a teller ID that
21         appears before the note in the special column.
22    Q.   Okay.
23    A.   So everybody has a unique teller ID.
24    Q.   Okay.  So the first -- essentially, there are two
25         notes there that are all NT's.  One came from teller
```



ROBERTO MONTOYA
November 30, 2012

Page 30

```
 1          08899, correct?

 2     A.   Correct.

 3     Q.   Another came from teller 26436.  And I assume

 4          somewhere in the embodiment on the computer of GMAC if

 5          you have the right authority you can identify who

 6          those tellers are by name, correct?

 7     A.   Anybody who has access to the system is able to put a

 8          search into the system to find out who it is.

 9     Q.   When you were preparing for this deposition did you

10          ever look up any of the teller numbers to figure out

11          who it was?

12     A.   No.

13     Q.   Did you ever try and contact any of the tellers who

14          made entries to talk with them about the Wiener loan?

15     A.   No, sir.

16     Q.   Below the last note you'll see there's a transaction

17          type DMD.  Do you see that?

18     A.   I do.

19     Q.   What's a DMD, do you know?

20     A.   I don't know exactly what that code means.  But that

21          code, every time a call is made to the borrower and

22          there is no answer that code is logged on there.

23     Q.   So that would be an attempt?

24     A.   An attempt to call.

25     Q.   To call the borrower or anyone connected with the
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

ROBERTO MONTOYA
November 30, 2012

Page 35

```
 1          document notice ID.  What's document notice ID?

 2    A.    I don't know the meaning of those numbers.

 3    Q.    Okay.  Would that be true of the document text ID as

 4          well?

 5    A.    Yes, sir.

 6    Q.    So where it has a 05 under document ID text in that

 7          row you don't know what a 05 is, correct?

 8    A.    I don't.

 9    Q.    Same with the document text type code?

10    A.    That's correct.

11    Q.    You don't know in this instance what eight means?

12    A.    I don't.

13    Q.    And then the transaction entry is what?  Can you read

14          it?

15    A.    It says "DEF-options to avoid foreclosure."

16    Q.    Do you know what that entry means?

17    A.    I don't, sir.

18    Q.    When you were preparing for the deposition did you

19          look it up?

20    A.    No, sir.

21    Q.    If you look at an entry that's about a third from the

22          bottom under 5/18/2009, it's the last 5/18/2009 row,

23          you'll see the transaction type is FSV.  Do you see

24          that?

25    A.    I do.
```



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

ROBERTO MONTOYA
November 30, 2012

Page 71

```
1     contained in the exhibit is accurate.
2                    MR. BROWN:  Well, since he's supposed to be
3     a person most knowledgeable about all aspects of any
4     foreclosure actions regarding the loan I would
5     disagree with you.
6                    MR. DeLUCA: Well, he's not a fact witness,
7     Counselor.  He's here as a corporate designated
8     witness 30(b)(6) witness.  He does not have intimate
9     knowledge of what actually transpired in this case.
10                   MR. BROWN:  But he, in theory, is supposed
11    to find a way to become informed of facts as the
12    person most knowledgeable.
13                   MR. DeLUCA: I think we complied with the
14    court rule.
15                   MR. BROWN:  All that being said, are you
16    instructing him not to answer?
17                   MR. DeLUCA: No.  I am placing an objection
18    on the record.
19    BY MR. BROWN:
20    Q.   So going back to paragraph eight.  Do you recall the
21         question?
22    A.   I do recall the question.
23    Q.   And what's your answer?
24    A.   I've been instructed not to answer.
25                   MR. DeLUCA: No.  Excuse me.  If you have
```



ROBERTO MONTOYA
November 30, 2012

Page 75

1   A.   I can't recall if I have or not.  I don't think I

2        have.

3   Q.   So your best recollection, albeit you're not

4        absolutely positive, it wasn't in the packet of

5        materials provided to you by Mr. DeLuca, correct?

6   A.   I don't remember it being in there.

7   Q.   Okay.  In your review of materials preparing for this

8        deposition did you see or hear anything that indicated

9        that Mr. Wiener or his attorney, Mr. Pookrum or either

10       of his sisters, were ever informed that the

11       foreclosure sale date was going to be January 5th,

12       2010?

13  A.   I don't know if there was, sir.  I don't know if there

14       was any letters that were sent out to Mr. Wiener

15       notifying him of the sale on January the 5th, 2010.

16  Q.   Okay.  You don't know and you don't recall seeing any,

17       correct?

18  A.   Correct.

19  Q.   And would that same answer be true if the question

20       were broad enough to communications, be it by letter,

21       by e-mail, by fax or verbally, if a verbal -- if a

22       record was made of the verbal conversation in the

23       notes?

24  A.   That's correct.

25  Q.   Okay.  So you don't know whether it happened or not



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

ROBERTO MONTOYA
November 30, 2012

Page 94

| | | |
|---|---|---|
| 1 | | GMAC made reference to the Freddie Mac Seller Servicer |
| 2 | | Guide in dealing with the Wiener loan, right? |
| 3 | A. | I'm sorry, repeat the question one more time. |
| 4 | Q. | Let me try it again. |
| 5 | A. | Yeah. |
| 6 | Q. | Is it correct that you don't know who, if anyone, |
| 7 | | dealing on the Wiener loan made reference to the |
| 8 | | Freddie Mac Seller Servicer Guide, correct? |
| 9 | A. | I don't know, that's correct. |
| 10 | Q. | What you have done is you made an assumption that |
| 11 | | somebody did and was trying to follow it, is that |
| 12 | | correct? |
| 13 | A. | That is correct, sir. |
| 14 | Q. | Why don't you skip a topic and then read the topic |
| 15 | | after the policies and procedures regarding |
| 16 | | post-foreclosure. |
| 17 | | MR. DeLUCA: J. |
| 18 | A. | Oh, J? |
| 19 | BY MR. BROWN: | |
| 20 | Q. | Yeah. |
| 21 | A. | "GMAC's policies and procedures regarding |
| 22 | | post-foreclosure activities on the Wiener loan." |
| 23 | Q. | And what did you discover, if anything, about GMAC's |
| 24 | | policies and procedures were regarding |
| 25 | | post-foreclosure activities on the Wiener loan? |



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

# EXHIBIT D

## TO PLAINTIFFS' OPPOSITION TO GMAC'S RENEWED MOTION FOR SUMMARY JUDGMENT

Declaration of Gerard Wiener in Opposition to GMAC's Renewed Motion for Summary Judgment

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| GERARD WIENER, individually, and as Personal Representative of the Estate of Roland C. Wiener, | CASE No. 11-10770 |
| Plaintiff, | Hon. George Caram Steeh |
| v. | |
| BANKERS TRUST COMPANY, et al. | |
| Defendants. | |
| AND RELATED CROSS-ACTIONS | |

*Gavin J. Fleming (P68366)*
*Attorneys for Plaintiffs*
*Hubbard Snitchler & Parzianello PLC*
*30665 Northwestern Highway, Ste. 100*
*Farmington Hills, MI 48334*
*248-932-1101*

David J. Brown (CA56628)
Attorney for Plaintiffs
1135 Ulloa Street
San Francisco, CA 94127
(415) 716-7786

Frank M. Deluca (P41604)
Attorneys for Defendants Bankers Trust
And GMAC Mortgage
McKelvie DeLuca, PC
280 West Maple Road
Suite 300 ·Birmingham, MI  48009

248-952-5100
Bruce M. Gorosh (P35455)
Attorneys for Jeffrey Baskin and Lauren
Newman
Lefkofsky & Gorosh PC
31500 Northwestern Highway
Suite 105
Farmington Hills, MI  48334
248-855-5508

Daniel P. Perk (P39004)
Miller Johnson
Attorneys for Freddie Mac
303 North Rose Street
Suite 600
Kalamazoo, MI  49007
269-226-2958

DECLARATION OF GERARD WIENER  IN OPPOSITION TO GMAC'S RENEWED MOTION FOR SUMMARY JUDGMENT

1

2

3    I, the undersigned, declare:

4    1.    I am the plaintiff in this matter for myself and as representative of the

5    Estate of Roland Wiener.

6

7    2.    I could and would, if called upon, testify from my own personal

8    knowledge of the following facts because I was and/or am involved in each

9    of the activities described in this Declaration and I am competent to testify

10    to these facts.

11    3.    My father, Roland Wiener passed away on January 23, 2009.  Exhibit

12    E to the Plaintiffs' Opposition to GMAC's Renewed Motion for Summary

13    Judgment is a true duplicate of Roland Wiener's Death Certificate.

14    4.    Shortly after Roland Wiener's death, I undertook to learn the status of

15    the loan being administered by GMAC Mortgage ("GMAC"), inform GMAC

16

17    of Roland Wiener's death, provide GMAC my contact information and

18    initiate a discussion with GMAC about what the Roland Wiener Estate

19    could do with the loan and home going forward.

20

21    5.    What followed was over a year of frustration, mis-information, and

22    stalling by GMAC that totally thwarted my attempts to learn about and deal

23

24    with the loan and property on behalf of my Father's Estate.

25    6.    GMAC brazenly attempted to make life difficult for a borrower's

26

27    successors, rather than rationally deal with me as the successors'

28    representative.  GMAC's actions directly resulted in a significant cost to the

Estate and me, with the concepts of fairness and truthfulness being abandoned by GMAC.

7.    GMAC and its minions made no effort for consistency of position and throughout the process failed to communicate fairly  with me about GMAC's position on matters much less give me information important and necessary to protect the Roland Wiener's Estate's rights.

8.    While I was dealing with GMAC representatives who portrayed sympathy to me for the delays in GMAC's ability to talk with me and advised me just to sit tight, I later learned that other sections of GMAC had started foreclosure without telling me even though I had numerously identified myself and given GMAC my contact information.

9.    From my point of view, I was looking for the lender's servicer to explain the details of the loan, what each of the charges were, and perhaps make adjustments to the note obligations, first as a forbearance arrangement to give the Estate time to determine what course of action it wanted to follow, and then either as a loan modification or payoff as the Estate determined what it wanted to do.

10.   After 3 months of no substantive response from GMAC in response to my attempts to communicate with it, the Estate ceased making loan payments to try to get GMAC's attention and response.

11.    In late August/early September of 2009, GMAC  tendered Patricia Scully to work with me regarding the loan.  Ms. Scully represented herself in my initial discussions with her, and from time-to-time thereafter, as the person being provided to me by GMAC to work with me and my attorney in dealing with GMAC regarding the loan.  She emphasized that she was the person within whom I should deal.  Based on her statements to me that she was the person with whom I was to interact, and she was the person who offered possible forbearance plans, and who caused adjournment or continuance of purportedly established foreclosure sales dates, I relied on her statements that she was the person with whom I should deal regarding the Roland Wiener loan.  She never communicated anything else to me.

12.    After one attempt to reach a forbearance agreement, that Ms. Scully said was no longer available, a second attempt to reach a forbearance agreement was made.  That attempt was suggested in detail by Ms. Scully to me in part in exchanged e-mails and in part in telephonic conversations with her.  The attempt was started when there was an impending foreclosure sale scheduled to occur.  Ms. Scully said she was not sure she could prevent the sale from happening but she needed certain specific submissions from myself and my sister, Charlotte.  The reason she included Charlotte in the request is that Ms. Scully said that to obtain the forbearance, one of the three children had to live on the premises as a

DECLARATION OF GERARD WIENER  IN OPPOSITION TO GMAC'S RENEWED MOTION FOR SUMMARY JUDGMENT

1   condition of the forbearance.  Ms. Scully said that she needed the

2   submissions within the next day.

3

4   13.    In her timeframe, I sent my submission pertaining to myself to her.  I

5   then explained that since my sister lived in Paris, France, and had to

6   prepare certain materials to be able to complete the specific materials Ms.

7   Scully was requesting, it would take her longer to prepare the information

8

9   being sought.  Ms. Scully made no protest then or later that the fact it

10  would take my Sister some time to prepare her materials was any problem,

11  or that such additional time would thwart in any way, the effort to reach a

12

13  forbearance arrangement.  Furthermore, once she received my materials,

14  and without yet receiving my sister's materials, Ms. Scully rescheduled the

15  then pending foreclosure sale to December 29, 2009.  She in no way

16

17  presented herself as a mere conduit with respect to GMAC's loss mitigation

18  department.  She never said that she had no obligation or intention of

19  talking with other aspects of GMAC regarding the loan or that I would still

20  have to deal with them independent of her.  Rather, she consistently

21

22  presented herself as being the GMAC contact for me.  She never claimed

23  that she had no interaction with or responsibilities toward the loan with

24  respect to other GMAC departments who from time-to-time took actions

25

26  regarding the loan, including the foreclosure unit and its outside

27

28

foreclosure attorneys, the assumption department, the customer service department, or any other department.

14.    Ms. Scully never told me that since my sister was becoming involved a forbearance was no longer being considered.  She never explained to me that an assumption, rather than a forbearance was on the table instead of a and that I would have to deal directly with the assumptions department, rather than her.

15.    With respect to the second forbearance attempt Ms. Scully never sent me a forbearance agreement to sign, and never provided me with the final exact payment to be made as the initial payment or for any other subsequent payments.  I believed one would come after she and her group had reviewed my sister's and my submissions.

16.    In the latter part of December, 2009, Ms. Scully stopped communicating with me Wiener and my attorney, and grossly failed to keep us informed of the situation, including her notion that trying to do a forbearance was off the table and an assumption was going to be attempted.

17.    I was never informed by anyone that a foreclosure sale date of January 5, 2010, was set for a sale by advertisement.

DECLARATION OF GERARD WIENER  IN OPPOSITION TO GMAC'S RENEWED MOTION FOR SUMMARY JUDGMENT

18.   When I brought suit against GMAC and others, my attorney filed and recorded in Oakland County, Michigan on June 22, 2010, a lis pendens.  A true copy of that lis pendens is Exhibit F to the Opposition to the Renewed Motion.

19.   On February 4, 2009, I called GMAC to tell it of my father's death, supply my contact information, and inquire into a loan payoff figure for my childhood home.  Unbelievably, this phone call was the first of no less than 53 unsuccessful attempts by me to obtain critical information to which I was entitled and to provide GMAC information which logically one would think it wanted, to wit: The name and contact information of an alive person with whom it could deal.

20.   The first call, however, was a vivid foreshadowing of future events.  GMAC put me on hold for 46 minutes, then transferred me to GMAC's Assumptions Department.  The Assumptions Department told me that no one could speak with me unless GMAC received a probate court letter of authority for Gerard Wiener or, since in this case an estate had not yet been opened, a filed death certificate regarding Roland Wiener.  I agreed to send my father's death certificate immediately.  I also provided all of my contact information and requested that GMAC add it to the loan file.

21.   I promptly sent my father's death certificate to GMAC's Assumptions Department by mail, along with all of the Estate's contact information.  On behalf of the Estate I continued to make timely mortgage payments on the loan.

DECLARATION OF GERARD WIENER IN OPPOSITION TO GMAC'S RENEWED MOTION FOR SUMMARY JUDGMENT

GMAC without question or comment accepted those payments but would do and did nothing in response to my request to discuss the loan with GMAC.

22.    When I called to discuss the mortgage shortly after sending in the death certificate and contact information, GMAC said that it's system did not reflect receipt of the death certificate and thus it could not speak to me. GMAC advised me that it could take some time for the death certificate I had sent to be reflected in GMAC's system even though it had physically been received, It then asked me to wait and call back later.

23.    I made additional calls but each time I asked about these things, I was either told that GMAC had still not received the death certificate and, therefore, could not speak with me, was disconnected, or was improperly routed to some unit that could not provide any help.

24.    I was told to fax the death certificate again. I did so, and also mailed it to the Assumptions Department. During one of my follow-up phone calls, the GMAC Assumptions agent advised me that it could take up to three weeks for a fax to "hit the system" and advised him to "relax and wait a few weeks" and then call back. An improbable three months after my father's death, after sending my death certificate by various methods multiple times to GMAC, I continued to be unable to get anyone at GMAC to recognize me as a legitimate representative of the Estate or to discuss the loan. I persistently continued to call GMAC and pose the questions the Estate needed answered, albeit without success. I even offered GMAC $55,000 in cash to pay off the loan. In each instance I called GMAC, I

was advised that without the death certificate on file, he could not be given any information or response either on the phone or in writing. GMAC refused to address my offer to pay-off the loan.

25. Finally, in April 2009, out of sheer frustration, I had the Estate suspend mortgage payments in an attempt to get GMAC's attention and cause it once and for all to deal with him. That effort too failed. When, on April 15, 2009, I called GMAC's Assumptions Department and explained that the Estate was having difficulty justifying making mortgage payments without knowing, for one thing, whether there was mortgage insurance. The GMAC representative advised me that it had no proof in its system that I was authorized to discuss the loan, but that nonetheless the best solution would be for me to quitclaim the house directly over to GMAC without any compensation, in order to protect my dead father's credit. "Don't you want to protect his memory?" taunted the GMAC agent. Appalled, I asked to speak to a supervisor or someone else in authority. My request was denied, then I was put on hold for 42 minutes, and then disconnected.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that I have executed this Declaration as of the 4th day of February, 2013 at San Francisco, California.

By:_____/s/_____

Gerard Wiener

DECLARATION OF GERARD WIENER IN OPPOSITION TO GMAC'S RENEWED MOTION FOR SUMMARY JUDGMENT