**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900
Norman S. Rosenbaum
Jordan A. Wishnew

*Counsel for the ResCap Borrower Claims Trust*

**REED SMITH LLP**
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08540
Telephone:    (609) 987-0050
Facsimile:    (609) 951-0824
Diane A. Bettino
Barbara K. Hager, *admitted pro hac vice*

*Co-Counsel for the ResCap Borrower Claims Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------
                                                    )
In re:                                              )   Case No. 12-12020 (MG)
                                                    )
RESIDENTIAL CAPITAL, LLC, et al.,                   )   Chapter 11
                                                    )
                                    Debtors.        )   Jointly Administered
                                                    )
-------------------------------------------------------------------

### THE RESCAP BORROWER CLAIMS TRUST'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF STEVIE WATSON

The ResCap Borrower Claims Trust (the "Borrower Trust") submits this Reply in Support of Its Motion *In Limine* to Exclude The Testimony of Stevie Watson ("Ms. Watson") offered by the Claimant Frank J. Reed III ("Claimant" or "Mr. Reed").

### PRELIMINARY STATEMENT

In her opinion dated June 20, 2012 (the "Letter") issued in connection with this matter, Ms. Watson opines on the "economic loss Mr. Reed had relating to his property at 9717 Old Dell Trace, Richmond, Virginia" ("Old Dell Trace"). *See* Declaration of Stevie Watson ("Watson Decl.") at ¶ 3. A true and correct copy of the Declaration of Stevie Watson attaching the Letter is attached hereto as **Exhibit A**. In paragraphs 3, 4 and 5 of the Declaration she references her opinion. *See* Exh. A. There can be no other interpretation of Mr. Reed's intention to offer Ms.

Watson as an expert witness because she has been held out at one throughout the course of discovery and indeed to consider her as a fact witness now is improper because she was not disclosed as such.[1]

Mr. Reed cannot circumvent the Court's procedures to obtain direct testimony from Ms. Watson that is not included in her Declaration. Ms. Watsons' direct testimony should be limited at trial to those matters addressed in her Declaration.

Limited to her Declaration, Ms. Watson should be precluded from testifying to Old Dell Trace's value because she did not appraise Old Dell Trace and did not provide her own independent value in the Declaration. She merely regurgitated a third-party appraisal – an action this Court is more than qualified to do (assuming the third-party appraisal is admitted into evidence at all). Ms. Watson's testimony is not helpful to the finder of fact because specialized knowledge is not required for conclusions that are merely "guestimates" and "approximations" of various expenses for Old Dell Trace, including taxes, insurance, and amount spent on renovations, and because it invades the province of the fact-finder.[2]

Ms. Watson admittedly guesses at many of her figures and has no reasonable explanation as to how she arrived at her damages amount. See generally, May 19, 2016 Deposition of Stevie Watson ("Watson Dep."), relevant portions attached hereto as **Exhibit B**. She relies on other figures without making her own assessment and does not limit her testimony and opinions to her knowledge or experience, but instead goes far beyond such testimony by conveying her own

---

[1]    Notably, Mr. Reed has consistently referred to Ms. Watson as an expert and submitted only the Letter and Declaration in support of her testimony. As such it was reasonable to conclude the Letter was intended to serve as an expert report and prudent to seek to exclude it under Daubert as this Court has previously held similar reports would not be admissible at trial as "they are filled with impermissible hearsay; they stray into areas beyond the witnesses' apparent expertise…[and] they contain faulty analysis and unsupported conclusions."

[2] As an expert, Ms. Watson's testimony is obviously insufficient as she cites to what she "felt" was the amount Mr. Reed likely spent on various efforts, including taxes and renovations, and completely failed to acknowledge numerous other factors that would impact her analysis.

subjective belief and interpretations based on third-party estimates and information she received from Mr. Reed.

Ms. Watson's Declaration and Letter do not offer any opinion testimony that is relevant to whether the Claimant suffered any cognizable damages caused by the Matlack Foreclosure. And as noted, Ms. Watson's opinion does not pass muster under the rules governing expert testimony. For these and the reasons that follow, Ms. Watson should be precluded from testifying at trial.

## **ARGUMENT**

### I. The Opinions Expressed By Ms. Watson Are Irrelevant To The Issues At Hand And Will Not Assist The Trier Of Fact In Her Capacity As An Expert Witness

Throughout her Letter, Ms. Watson merely acts as a conduit for Mr. Reed and other witness testimony and documents, which will not assist the trier of fact and should be excluded as hearsay.

Initially, an expert witness may not offer opinions falling outside of the areas in which she is qualified as an expert by knowledge, skill, experience, training, or education. See Fed. R. Evid. 702; Gray v. Briggs, 45 F. Supp. 2d 316, 323-24 (S.D.N.Y. 1999) (finding expert, whose expertise resided primarily in the securities industry, lacked sufficient knowledge of and experience with ERISA to offer opinions involving ERISA, and thereby excluding opinions). Moreover, a fact witness may not testify as to matters outside his or her personal knowledge. See Fed. R. Evid. 701; In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig., 643 F. Supp. 2d 482, 496 (S.D.N.Y. 2009) (stating "fact witnesses…will only be able to testify concerning matters within their personal knowledge").

Ms. Watson's opinions purport to represent the value of Old Dell Trace at two different points in time, as well as the difference between those numbers, but her total lack of experience should prevent her from testifying concerning an area where she possesses no expertise. Specifically, Ms. Watson is not a licensed appraiser, she has never done an appraisal report, and she did not have any personal familiarity with the appraiser who created the report that she relied on. Watson Dep. at 25:19-26:15. She has never previously calculated a loss on a property as she did in this case, id., at 27:13-17, she offers no basis for her calculations and even admits the one thing she may be qualified to do, she did not do here. Id. at 31:11 (" I don't do appraisals. I do market analysis. Q. Did you do a market analysis? A. No").[3]

Moreover, the Letter merely repeats facts reported by Mr. Reed, and third parties, all of which Ms. Watson simply assumes are correct for purposes of formulating her damage calculation. Ms. Watson also admits to guessing about a number of monetary amounts for purposes of calculating damages. Blatantly uneducated guesswork is the antithesis of expert opinion. Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000) (citing New York law) (holding projections of future profits based upon "a multitude of assumptions" that require speculation and conjecture and few known factors do not provide the requisite certainty).

Additionally, Ms. Watson's opinion concerning the value of Old Dell Trace is entirely speculative and not based on personal knowledge. Ms. Watson summarizes a number of facts she obtained from Mr. Reed and third parties, indicating that Mr. Reed intended to sell Old Dell Trace "for a profit"; that Old Dell Trace was appraised for $1,725,000.00 in 2008; and that the

---

[3] Further, "[a]lthough the Rules permit experts leeway with respect to hearsay evidence, Fed. R. Evid. 703, a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 136 (2d Cir. 2013) (quotation omitted).

same property is now assessed (for purposes of taxes) at $608,400.00.[4]  Despite testimony to the

contrary, Ms. Watson then summarily concludes that Mr. Reed would have, in fact, sold Old Dell

Trace for a profit, such that his damages would be the difference between the appraised value

and the assessed value – two figures she admits are not comparable.  Ms. Watson explains her

damages calculation by indicating that in her opinion "the house would have sold for the

appraised value of $1,725,000.00."  After performing some simple addition and subtraction of

numbers she admits were guesses and approximations, Ms. Watson opines that Claimant suffered

a total of $1,116,600.00 in economic damages.  This valuation falls short of the standard required

for admissible testimony, and unquestionably is inadmissible expert testimony.

Mr. Reed's argument that Ms. Watson should be permitted to testify as a fact witness

with regard to the initial sale of Old Dell Trace to Mr. Reed is tangential to the information

sought to be excluded by the Borrower Trust.  Ms. Watson should not be permitted to testify as

to the Richmond, Virginia real estate market because she did not provide that anticipated

testimony in her Declaration.

Mr. Reed argues that Ms. Watson's lay testimony is relevant and helpful to the fact finder

because Ms. Watson "was possibly going to be the agent when Reed re-sold the property."  See

Claimant's Opposition to The Borrower Trust's Motion Exclude Testimony of Stevie Watson

("Cl.'s Opp") at ¶ 28.  This statement makes clear Ms. Watson did not have personal knowledge

concerning the value of Old Dell Trace.  First, Old Dell Trace was never sold by Mr. Reed.

Second, Ms. Watson was merely "possibly going to be the agent." Third, Old Dell Trace was

never completely renovated and, as such, Ms. Watson's testimony regarding its saleability is

inapposite.

---

[4]    Ms. Watson explained that the assessment is "typically what the county uses to base their taxes on that
individual property….It is different that an appraised value [and]… does not, in our area, mean market value."
Watson Dep. at 30:12-15.

II.    **Ms. Watson's Testimony Will Not Satisfy The Standards For Admissibility Under
       <u>Daubert</u> As She Fails To Account For Numerous Factors Impacting Mr. Reed's
       Damages Amount And Her Damages Estimates Are Admittedly Guesswork**

Ms. Watson does not adequately account for any external factors such as the ongoing financial crisis. Expert testimony will be rejected where there is "too great an analytical gap between the data and the opinion proffered." <u>General Electric Co. v. Joiner</u>, 522 U.S. at 146 (1997); <u>Boucher v. U.S. Suzuki Motor Corp.</u>, 73 F.3d 18, 21 (2d Cir. 1996) (finding that expert testimony will not be admitted where it is "speculative or conjectural," "conclusory," or "without factual basis"). While she acknowledges that "there was a period of some decline," Ms. Watson opines that Old Dell Trace would have sold at its appraised value. Watson Dep. at 13:4-5. Even assuming there was a buyer, which there was not, Old Dell Trace was not fully renovated and the "kitchen had not been replaced" when she saw it. Watson Dep. at 18:8-11. Ms. Watson makes no attempt to explain why those factors are not included in her analysis. Further, Ms. Watson indicated that she had no information concerning the number of liens Mr. Reed had on the property, the chances that a buyer would have been interested in purchasing the property for the list price in 2009, and did not know why Mr. Reed had not finished the renovations. <u>Id.</u> at 33:25-36:1.

As noted above, her specific opinion as to Claimant's economic damages is nothing more than simple calculations based on "[Mr. Reed's] investment in the 900, what [she] felt he had put already into the house, what he was probably paying in taxes, maybe insurance premiums." <u>Id.</u> at 27:20-23. Even worse, Ms. Watson continuously admitted that she did not know the true figures for any of her variables as they were all "***guesstimate[s]***." <u>Id.</u> at 28:11 (emphasis added). In fact, the numbers that she used were not "based on any data," they were just based on "the visual of what [Ms. Watson] recalled." <u>Id.</u> at 29:5-7; <u>see also</u> <u>id.</u> at 28:22-30:10 ("Q. In the

appraisal that is attached that was prepared by Uminski, what did he do to come up with the appraised value? A. I have no idea. I was not involved with that").

Additionally, Ms. Watson calculations of the value of any damages allegedly suffered by Claimant are subject to arbitrary comparators. Specifically, the appraisal from 2008 is an entirely distinct evaluation from the county assessment completed later. In other words, any comparison of these figures is akin to an "apples and oranges" assessment. Id. at 33:10-11 ("I think assessed value and appraised value are two different things"). When pressed on the fact that these figures were different, Ms. Watson admitted that the assessed value was never equal to an appraisal. Id. at 31:14-16.

Despite these important variables for determining the actual profit realized from selling Old Dell Trace, Ms. Watson improperly considered only her "guestimate" figures to come up with her $1,116,600.00 damages amount. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); see also E.E.O.C. v. Bloomberg L.P., No. 07 Civ. 8383 (LAP), 2010 WL 3466370, at *15 (S.D.N.Y. Aug. 31, 2010) (involving social psychologist, and excluding expert opinion "supported by what appears to be a 'because I said so' explanation"); Dev. Specialists, Inc. v. Weiser Realty Advisors LLC, 09 Civ. 4084, 2012 U.S. Dist. LEXIS 11701, at *22 (S.D.N.Y. Jan. 26, 2012) (excluding real estate appraiser's expert testimony where, among other things, his methodology "'connected to existing data only by the ipse dixit of the expert.'").

Ms. Watson simply provides no reliable basis for her conclusion that Mr. Reed would have realized a profit after the market crashed. Davis, 937 F. Supp. 2d at 60-62, 69 (striking art appraiser's valuation under Daubert where the expert failed to link his personal knowledge and experience to the issue in a non-speculative manner). Thus, any such testimony on these points

would not "assist the trier of fact to understand the evidence or to determine a fact in issue."

Fed. R. Evid. 702.

## <u>CONCLUSION</u>

For the foregoing reasons, the Borrower Trust respectfully requests that Stevie Watson be precluded from testifying at trial about Mr. Reed's damages.

Dated:  September 13, 2016
       New York, New York

*/s/ Barbara K. Hager*

Diane A. Bettino
Barbara K. Hager, *admitted pro hac vice*
REED SMITH LLP
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08540
Telephone: (609) 987-0050
Facsimile:  (609) 951-0824

*Co-Counsel for The ResCap Borrower Claims Trust*

-and-

Norman S. Rosenbaum
Jordan A. Wishnew
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for The ResCap Borrower Claims Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

### [PROPOSED] ORDER

It is **HEREBY ORDERED** that the ResCap Borrower Claims Trust's Motion *In Limine*

To Exclude the Testimony of Ms. Stevie Watson, is **GRANTED**.


The Trust's counsel shall serve a copy of this Order on Frank Reed.



**IT IS SO ORDERED.**


Dated: _____
New York, New York

_____
MARTIN GLENN
United States Bankruptcy Judge

# EXHIBIT A

Frank Reed
817 Matlack Drive
Moorestown, NJ 08057
Telephone: (856) 956-6950
*Creditor, Pro Se*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL LLC et al., | Chapter 11 |
| Debtors. | Jointly Administered |

### DECLARATION OF STEVIE WATSON

I, Stevie Watson under penalty of perjury, declare as follows:

1.    I am a Realtor who has done a variety of real estate transactions with Frank Reed.

2.    My Offices are in Henrico, VA.

3.    On June 20, 2012 I prepared an opinion regarding an economic loss Mr. Reed had relating to his property at 9717 Old Dell Trace Richmond, Virginia.

4.    That opinion is contained herein below.

5.    I stand by my opinion and understand that Mr. Reed's loss may be greater, as he has since lost the property to foreclosure.

06/25/2012  21:04    8047843328              STEVIE WATSON TEAM                    PAGE  02/02



**Stevie Watson**
Tuckahoe Sales
Long and Foster Real Estate
8804 Patterson Avenue
Richmond, VA 23229-6381

June 20, 2012

Re: **Lost Sale Profit for 9717 Old Dell Trace Richmond, Virginia 23238**

To Whom It May Concern:

I am Stevie Watson. I am, and continue to be, a successful realtor in the Richmond, Virgina marketplace. Some of my credentials of note are:

- **Award-Winning Top-Producer**
- **Ranked in the TOP 1% of all Realtors in America**
- **A TOP TEAM for Long and Foster in the Richmond area**

*(see: published bio attached)*

For a number of years now, I have known Frank Reed. During this time, I have known him to purchase, renovate and / or build and sell for a profit both residential and commercial property. I have also participated in several transactions with Mr. Reed as either the buyer's and/or seller's agent.

As a result, I have a first-hand familiarity with Mr. Reed's property located at 9717 Old Dell Trace Richmond, Virginia 23238. This property in particular has even been featured in a published article about "Notable Neighborhoods" in the Richmond, Virginia area. *(see: article attached)*.

Now, I am aware that during 2008 Mr. Reed was in the middle of an extensive expansion and capital renovation of this property. I am also aware that Mr. Reed intended to sell the property for a profit as it had recently appraised for a minimum of $1,725,000. *(see: appraisal attached)* Unfortunately, Mr. Reed did not finish this project and the market has since drastically declined. The current 100% assessed value of Mr. Reed's property is $608,400 *(see both: Henrico County Tax Department Value attached and Henrico County valuation methodology indicating 100% market valuation process attached)*.

However, if Mr. Reed had finished the work on his house at 9717 Old Dell Trace Richmond, Virginia 23238, and had offered it for sale from June 2008 through the summer of 2009, it is my opinion that the house would have sold for the appraised value of $1,725,000. Therefore, it is my estimation that Mr. Reed has currently lost a value of at least $1,116,600.

If you have any questions please feel free to contact me.

Sincerely,

*Stevie Watson*

Stevie Watson
Associate Broker, GRI, RRI
Long and Foster Real Estate, Inc.







Frank Reed Property
9717 Old Dell Trace
Richmond, VA 23238

# NOTABLE
## NEIGHBORHOODS

*T*he WORD "NEIGHBORHOOD" COMES FROM THE MIDDLE ENGLISH, NEIGHBOR, a *bur* (buer) who lived close (nigh), and hood, a suffix which denoted one's unique condition or character. Ultimately then, the first neighborhoods developed among people who felt a close affinity for one another, both in terms of shared responsibility and social class. Neighbors looked out for one another, lent a hand, swapped stories, offered solace. Neighborhoods reflected the aspirations of the residents and recreated the values of their social class in the children who grew up there.

How good it is to find a home that reflects your highest aspirations; how much better to find it in a neighborhood that embraces you, draws you in, makes you and your family better and more involved. In Henrico County, many such neighborhoods beckon.

### River Road

For many, Richmond, Virginia conjures up images of the Old South: stately homes situated on gracious, tree-lined streets, a slow pace of life where iced tea or a Mint Julep can be savored on a screened porch during a long sleepy afternoon, children playing on broad green lawns under a sultry summer sun. Remarkably, the image lives on in one of Henrico County's oldest neighborhoods.

The River Road corridor, stretching from the Richmond city line at its eastern terminus to Goochland County in the west, charts a course along the James River. Along the way, it encompasses many of Metropolitan Richmond's most prestigious addresses. Drive west on River Road into Henrico County and the first impression you get is "Old Money." These homes are not the cookie-cutter construction of new development, but uniquely personal creations, each situated on a spacious lot with long-established trees and gently manicured plantings. While a few are the definition of ostentatious display, most of the homes along this stretch of road are the model of understated elegance.

HENRICO 28



WINDSOR ON THE



TWIN HICKORY

*"Kids ride bikes
and roller blade
down the bike
path, teens play
stickball in the
end of the cruci-
ble cul-de-sacs,
new moms push
strollers on the
sidewalks —
you can't help
but smile."*

With homes starting at $200,000 to Twin Hickory and sprawling into various hot houses in Windsor on the Lawns, newcomers to Henrico County have a budget of options to fit their wallets.

16 HENRICO

As River Road passes the newly redesigned Tuckahoe Course of the Country Club of Virginia, tony shops give way to the ivy-covered homes and stunning campus of the University of Richmond. As you pass Forest Avenue, take a left onto the secluded Windsor on the James. The all-brick mansions in this small, exclusive neighborhood are meant to impress with vast manicured lawns and Georgian grandeur.

More typical of the homes along River Road, however, is the well-established neighborhood of Mooreland Farms. Every lot is different and every home is unique. The architecture runs from '70s era tri-levels, Dutch Colonials, and traditional Cape Cods to energy-efficient homes with vast walls of windows, and multi-storied homes that seem to mold themselves to the terrain. With creative land scaping, homeowners have put to advantage the steeply rolling hills that rise up from the James River, creating shade gardens and terraced lawns. The mood here is gracious living. A long established neighborhood, Mooreland Farms is an area in transition. Long time residents share the streets with young, well-to-do families. The result is a real neighborhood feel.

**Grayson Hill**

Don't want the hassle of a lawn? Prefer to spend your money on the inside of your home than the outside? Condo living may be for you. In the past five years, the Richmond area has become crazy for luxury condos and townhomes, and Henrico County is helping to scratch that itch. Development has begun in the east end of the County at Rocketts Landing. In the west end, Gumenick Properties is meeting market demand with Grayson Hill.

Situated on 30 acres of prime real estate at the corner of Patterson Ave. and Gaskins Road, Grayson Hill offers five distinct floor plans in a wide range of prices, from the upper $300s to the $600s. The brick architecture is reminiscent of traditional 18th century colonial buildings with amenities that are typical of upscale, luxury living: hardwood floors throughout the common areas, granite countertops in the kitchen, and massive master suites.

Grayson Hill is trying hard to create ample open spaces to give the feel of a rambling English country garden to its layout. All of the homes feature 2-car garages, so the property will avoid the look of a parking lot. With a large lake bisecting the planned layout, and a concerted effort to maintain as many of the trees as possible, the developers have tried hard to match the elegance of the landscaping to the elegance of the homes.

The first homes went on sale a year ago and response was strong, with deposits on more than 40% of the homes offered in the first phase. Another 18 homes were offered for sale this spring with reservation agreements on another 18. Less than a quarter of the homes have yet been offered for sale. With shopping and dining nearby, easy access to all the major highways, and ample recreation just minutes away, demand is sure to be strong for the remaining homes.

**Twin Hickory**

When new businesses move to town, their employees are understandably concerned. Where will we live? How much will it cost? Are the schools good? Are there good restaurants, nice shops, friendly people? A drive to Henrico County's Twin Hickory development answers all of their questions.

In the far west end of Henrico County, Twin Hickory is a mixed, residential development of

apartments, town homes, affordable single family homes, and upscale residences. This new development abounds in the feel of home. Drive down the streets and you know you are in a well-planned community. Most of the homes are brick front Transitionals, and family is the theme. Everywhere you look there are children. Basketball hoops line the side of the road. Wood-towered playgrounds dominate many backyards. Frisbees are flying. Kids ride bikes and roller blade down the bike path, trees plus stickball at the end of the countless cul-de-sacs, new mums push strollers on the sidewalks (a new development with sidewalks!)— you can't help but smile.

Students at the Twin Hickory zone attend Deep Run High School and its excellent feeder schools. Only in its fourth year, Deep Run has already made a name for itself. It is consistently one of the top scoring schools in Virginia on State Standards of Learning tests. In addition, the school has also already won multiple state championships in athletics.

For recreation, the location can't be beat. Movie theaters, soccer fields, an ice skating rink, bowling alleys, driving ranges, and a top-rated golf course are all just minutes away. Dining options are endless, with the upscale Short Pump Town Center and all its perimeter shops just down the street. At one end of the development, the Shady Grove YMCA draws hundreds of people every day; a new Recreation Center is under construction across the street. At the other end of the development, the Short Pump Community Center is also under construction.

The suburbs are about family: providing the best for your children and taking advantage of all the amenities at an affordable price. Twin Hickory has all of this and is an attractive option for people relocating to Richmond.

At its best, a home is an extension of a family's personality. For some, the quest for privacy manicured boxwoods and razor sharp edges between their



perfect lawn is the highest aspiration, a form of genteel elegance that once was the purview of only the wealthiest country squire. For others, nothing more fully expresses that bliss than an endless array of primary-colored toys strewn about a well-traveled yard: part playpen, part dog run. For others, an elegantly appointed house, maintenance free, in a close-knit urban community of like-minded souls is the ideal.

Henrico County has it all and prides itself on being a great place to live, work, and raise a family, with friendly people, an affordable cost of living, great schools, and an ideal location. In an era when neighborhoods have become geographical expressions only, it is nice to know that there are still places you can live and work where you feel connected, not cut off. Stuck within our McMansions, frozen to stone by the Medusan glare of cable TV, desperately seeking connection and solace in internet chatrooms with people we will never see, we may never even know the people next door. But it doesn't have to be that way. Open your doors, meet your neighbors, share your dreams. ■

The luxurious feel of Grayson Hill (above) is helping to meet the demand for upscale condos and townhomes in Henrico County.

*In an era when neighborhoods have become geographical expressions only, it is nice to know that there are still places you can live and work where you feel connected, not cut off.*



SHORT PUMP $400,000

## Uniform Residential Appraisal Report

File # R0803120

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| Property Address | 9717 Old Dell Trace | City | Richmond | State | Va. | Zip Code | 23233 |

Borrower: Frank Reed    Owner of Public Record: Reed, Frank    County: Henrico

Legal Description: Lot 15 Block A Section A Country Club Colony

Assessor's Parcel # 740-730-9162    Tax Year 2008    R.E. Taxes $ 7,280.41

Neighborhood Name: West End    Map Reference: Henrico 23233    Census Tract

Occupant: Owner / Tenant / Vacant    Special Assessments $ N/A    PUD / HOA $ ___ per year / per month

Property Rights Appraised: Fee Simple / Leasehold / Other (describe)

Assignment Type: Purchase Transaction / Refinance Transaction / Other (describe)

Lender/Client: To Be Determined    Address: To Be Determined

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  Yes  No

Report data sources used, offering price(s), and date(s).  The subject was listed in January 2007 and sold to the current owner in March 2007.

I did / did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ ___    Date of Contract ___    Is the property seller the owner of public record?  Yes  No  Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?  Yes  No
If Yes, report the total dollar amount and describe the items to be paid.

**Note: Race and the racial composition of the neighborhood are not appraisal factors.**

### Neighborhood Characteristics

| | | One-Unit Housing Trends | One-Unit Housing | Present Land Use % |
| --- | --- | --- | --- | --- |
| Location: Urban / Suburban / Rural | Property Values: Increasing / Stable / Declining | PRICE / AGE | One-Unit 60 % |
| Built-Up: Over 75% / 25-75% / Under 25% | Demand/Supply: Shortage / In Balance / Over Supply | $ 000 / (yrs) | 2-4 Unit % |
| Growth: Rapid / Stable / Slow | Marketing Time: Under 3 mths / 3-6 mths / Over 6 mths | 400 Low / New | Multi-Family % |
| | | 2,500 High / 80 | Commercial % |
| Neighborhood Boundaries: The subject's marketing area is generally bounded by Patterson Ave to the north, Parham Road to the east, the James River to the south, and Goochland County to the west. | | 700 Pred. / 20 | Other 40 % |

Neighborhood Description: The subject is located in the prestigious far west end. Demand for real estate is consistently some of the highest in the Richmond Metro Area. All amenities are convenient to this area. Major amenities offered by the Downtown Central Business District are within a twenty minute commute. Good quality to moderate quality homes comprise the neighborhood.

Market Conditions (including support for the above conclusions): Current market conditions are considered to be favorable at this time. Conventional, FHA and VA loans are typical for the area with sellers contributions to closing being minimal. Supply and demand appears to be in balance. Exposure time is deemed to be equal to marketing time.

| Dimensions: See Plat | | Area: 1.21 Ac +/- | | Shape: Basically Rectangle | View: Average |
| Specific Zoning Classification: R-O | | Zoning Description: Single Family Residential | | | |
| Zoning Compliance: Legal / Legal Nonconforming (Grandfathered Use) / No Zoning / Illegal (describe) | | | | | |

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?  Yes  No  If No, describe

### Utilities

| | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Electricity | | | Water | | | Street: Asphalt | | |
| Gas | | | Sanitary Sewer | | | Alley: None/Typical | | |

FEMA Special Flood Hazard Area  Yes  No    FEMA Flood Zone    FEMA Map #    FEMA Map Date

Are the utilities and off-site improvements typical for the market area?  Yes  No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?  Yes  No  If Yes, describe
The site is very well landscaped with mature trees and shrubs. There is an exposed aggregate walk to the circular drive.

### General Description / Foundation / Exterior Description / Interior

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Units: One / One with Accessory Unit | | Concrete Slab / Crawl Space | | Foundation Walls | Brick&Block/Good | Floors | Carpet/Wd/Cer/Good |
| # of Stories 2.5 | | Full Basement / Partial Basement | | Exterior Walls | Hrdbd/Hrdpl/panel/Good | Walls | Drywall/Wood |
| Type: Det. / Att. / S-Det./End Unit | | Basement Area ___ sq.ft. | | Roof Surface | Ced/Shk/Dim/Shg/Good | Trim/Finish | Ext. Wd/Wood |
| Existing / Proposed / Under Const. | | Basement Finish ___ % | | Gutters & Downspouts | Aluminum/Good | Bath Floor | Ceramic/Good |
| Design (Style): Colonial | | Outside Entry/Exit / Sump Pump | | Window Type | Wood Dbl Hng/Good | Bath Wainscot | Ceramic/Good |
| Year Built 1966 | | Evidence of: / Infestation | | Storm Sash/Insulated | Insulated/Good | Car Storage | None |
| Effective Age (Yrs) 3 | | Dampness / Settlement | | Screens | Yes | Driveway | # of Cars 4+ |
| Attic: / None | | Heating: FWA / HWBB / Radiant | | Amenities | / Woodstove(s) # | Driveway Surface | Asphalt |
| Drop Stair / Stairs | | Other / Fuel: Gas | | Fireplace(s) # 2 / Fence | | Garage | # of Cars 2 |
| Floor / Scuttle | | Cooling: Central Air Conditioning | | Patio/Deck Rear / Porch Front | | Carport | # of Cars |
| Finished / Heated | | Individual / Other | | Pool | / Other Balcony | Att. / Det. / Built-in |

Appliances: Refrigerator / Range/Oven / Dishwasher / Disposal / Microwave / Washer/Dryer / Other (describe)

Finished area above grade contains: 13 Rooms / 7 Bedrooms / 7.5 Bath(s) / 7,269 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). See attached addenda.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). The subject is a very well construction colonial style dwelling that has recently been renovated and had a rear addition added. As of the date of inspection, construction was approximately 95%.  No functional or external obsolescence was observed.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?  Yes  No  If No, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?  Yes  No  If No, describe

Freddie Mac Form 70 March 2005    Page 1 of 6    Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Doc No.: B0903170I Page #3

## Uniform Residential Appraisal Report

File # R0R03120

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 5717 Old Oak Tree Trace Richmond, Va 23235 | 1001 Middle Quarter Ct | 10 Nomias Lane | 9130 River Road |
| Proximity to Subject | | 0.56 miles SW | 0.74 miles NW | 0.75 miles E |
| Sale Price | $ | $ 1,800,000 | $ 1,962,000 | $ 1,450,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 279.41 sq.ft. | $ 448.91 sq.ft. | $ 256.73 sq.ft. |
| Data Source(s) | | Public Records, MLS | Public Records, MLS | Public Records, MLS |
| Verification Source(s) | | Visual | Visual | Visual |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | None Known Conventional | | None Known Conventional | | None Known Conventional | |
| Date of Sale/Time | | 01/4/2037 | | 02/19/2007 | | 01/12/2007 | |
| Location | Good | Superior | -100,000 | Good | | Average | +125,000 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | Average/1 ac. | Average/1 ac | | Sub/2.1ac+ of | -350,000 | Superior/1.85ac | -50,000 |
| View | Average | Average | | Average | | Average | |
| Design (Style) | Colonial | Colonial | | Contemporary | | Colonial | |
| Quality of Construction | Good/Frame | Sup/Brick | -75,000 | Equa/Stucco | | Sup/Brick | -275,000 |
| Actual Age | 20 Yrs/3 Eff | New | -50,000 | 22 Yrs/3 Eff | | 18 Yrs/8 Eff | +50,000 |
| Condition | V Good | New | -10,000 | V Good | | Good | +10,000 |
| Above Grade | Tot Bdrms Baths | Tot Bdrms Baths | | Tot Bdrms Baths | | Tot Bdrms Baths | |
| Room Count | 13 7 7.5 | 14 5 5.5 | +12,500 | 17 7 7.5 | | 13 5 6.5 | +16,000 |
| Gross Living Area | 7,289 sq.ft. | 6,800 sq.ft. | +36,675 | 4,400 sq.ft. | +216,675 | 5,848 sq.ft. | +123,075 |
| Basement & Finished | 1,736 Sq.ft. | None | +50,000 | 4,400 Sq Ft | -77,000 | None | +50,000 |
| Rooms Below Grade | Basement | Crawl Space | | Basement | | Crawl Space | |
| Functional Utility | Good | Good | | Good | | Good | |
| Heating/Cooling | FWA/CAC | FWA/CAC | | FWA/CAC | | FWA/CAC | |
| Energy Efficient Items | Fully Insulated | Fully Insulated | | Fully Insulated | | Fully Insulated | |
| Garage/Carport | 2 car BrI Gar | 3 Car Att Garg | -6,000 | 3 Car Att Garg | -6,000 | 2 Car Att Gar | |
| Porch/Patio/Deck | PGA Brl Deck | Cov Slp, Deck | +8,000 | Pch Deck, Pto | | C/S Deck Pto | -40,000 |
| | | | | Pool,Gaz Shds | -45,000 | Pool | |
| Net Adjustment (Total) | | + - $ -173,825 | + - $ -261,325 | + - $ 202,075 |
| Adjusted Sale Price of Comparables | | Net Adj. 9.6 % Gross Adj. 17.1 % | $ 1,786,175 | Net Adj. 13.3 % Gross Adj. 38.4 % | $ 1,700,675 | Net Adj. 14.4 % Gross Adj. 37.1 % | $ 1,658,975 |

I did did not research the sale or transfer history of the subject property and comparable sales. If did, explain

My research did did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)  Public Records, MLS

My research did did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)  Public Records, MLS

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 3/19/2007 | No known transfers in the | No known transfers in the | December 2002 |
| Price of Prior Sale/Transfer | $809,000 | past year. | past year. | $1,450,000 |
| Data Source(s) | Public Records, MLS | Public Records, MLS | Public Records, MLS | Public Records, MLS |
| Effective Date of Data Source(s) | March 22, 2008 | March 22, 2008 | March 22, 2008 | March 22, 2008 |

Analysis of prior sale or transfer history of the subject property and comparable sales   Comparable sale three was a corporate relocation. The relocation company took possession of the property just before it was sold.

Summary of Sales Comparison Approach   See attached white pages.

Indicated Value by Sales Comparison Approach $ 1,725,000

Indicated Value by: Sales Comparison Approach $ 1,725,000   Cost Approach (if developed) $   Income Approach (if developed) $
The Cost Approach and Income Approach to value were deemed not applicable. The Direct Sales Comparison Approach was deemed to yield meaningful results because it directly reflects the actions and motivations of both buyers and sellers.

This appraisal is made  "as is",  subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed,  subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or  subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair.  Final inspection by MG Miller and Associates is required.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 1,725,000, as of March 18, 2008, which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005    Page 2 of 6    Fannie Mac Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. R0603120 Page # 2

## Uniform Residential Appraisal Report

File # R0603120

This is a Summary Appraisal Report which is intended to comply with the reporting requirements under Standard Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal Report. It presents only summary discussions of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation that is not provided with this report concerning the data, reasoning and analyses is retained in the appraiser's file. The depth of the discussion contained in this report is specific to the needs of the client and for the intended use stated in the report. The appraiser is not responsible for unauthorized use of this report.

I certify that, to the best of my knowledge and belief, the reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

I certify that the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

As of the effective date of this appraisal, Alex J. Uminski, SRA has completed the continuing education requirements of the Appraisal Institute.

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.
Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)  The cost approach was deemed not applicable to the sign of the subject.

| ESTIMATED | REPRODUCTION OR | REPLACEMENT COST NEW | OPINION OF SITE VALUE | | = $ |
| --- | --- | --- | --- | --- | --- |
| Source of cost data | | | DWELLING | Sq.Ft. @ $ | = $ |
| Quality rating from cost service | | Effective date of cost data | | Sq.Ft. @ $ | = $ |
| Comments on Cost Approach (gross living area calculation, depreciation etc.) | | | | | = $ |
| | | | Garage/Carport | Sq.Ft. @ $ | = $ |
| | | | Total Estimate of Cost-New | | = $ |
| | | | Less | Physical | Functional | External |
| | | | Depreciation | | = $ |
| | | | Depreciated Cost of Improvements | | = $ |
| | | | "As-is" Value of Site Improvements | | = $ |
| Estimated Remaining Economic Life (HUD and VA only) | | 60  Years | INDICATED VALUE BY COST APPROACH | | = $ |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $ | X  Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
| --- | --- | --- | --- |

Summary of Income Approach (including support for market rent and GRM)

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?    Yes    No    Unit type(s)    Detached    Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.
Legal name of project

| Total number of phases | Total number of units | Total number of units sold |
| --- | --- | --- |
| Total number of units rented | Total number of units for sale | Data source(s) |
| Was the project created by the conversion of existing building(s) into a PUD? | | Yes | No  If Yes, date of conversion. |
| Does the project contain any multi-dwelling units? | Yes | No  Data source |
| Are the units, common elements, and recreation facilities complete? | Yes | No  If No, describe the status of completion. |

Are the common elements leased to or by the Homeowners' Association?    Yes    No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Freddie Mac Form 70 March 2005    Page 2 of 6    Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 909013120 Page # 6

## Uniform Residential Appraisal Report

File # 100803120

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Freddie Mac Form 70 March 2005                Page 4 of 6                Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. R0803120 Page # 5

## Uniform Residential Appraisal Report

File # R0803120

APPRAISER'S CERTIFICATION: The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in the report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Freddie Mac Form 70 March 2005                    Page 5 of 6                    Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. R0903120 Page #18

## Uniform Residential Appraisal Report

File # R0903120

21.  The lender/client may disclose or distribute this appraisal report to the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory Appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22.  I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23.  The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25.  Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:**  The Supervisory Appraiser certifies and agrees that:

1.  I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2.  I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3.  The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4.  This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Alex J. Urquhart, SRA | Name |
| Company Name  MG Miller Valuations | Company Name |
| Company Address  5316 Patterson Ave, Richmond, VA 23226 | Company Address |
| Telephone Number  804-288-9582 | Telephone Number |
| Email Address  alexu@mgmiller.com | Email Address |
| Date of Signature and Report  March 25, 2008 | Date of Signature |
| Effective Date of Appraisal  March 18, 2008 | State Certification # |
| State Certification #  4001-001459 | or State License # |
| or State License # | State |
| or Other (describe)                        State # | Expiration Date of Certification or License |
| State  Virginia | |
| Expiration Date of Certification or License  02/26/2010 | SUBJECT PROPERTY |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 9717 Old Dell Trace | Date of Inspection |
| Richmond, Va 23233 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $  1,725,000 | Date of Inspection |
| LENDER/CLIENT | |
| Name | COMPARABLE SALES |
| Company Name  To Be Determined | |
| Company Address  To Be Determined | ☐ Did not inspect exterior of comparable sales from street |
| | ☐ Did inspect exterior of comparable sales from street |
| Email Address | Date of Inspection |

Freddie Mac Form 70 March 2005                Page 6 of 6                Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. R0803120, Page #7

## Uniform Residential Appraisal Report

File # R0803120

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 9717 Old Dell Trace | 9606 Claremont Drive | | | | | |
| | Richmond, Va 23233 | Richmond, Va 23235 | | | | | |
| Proximity to Subject | | 0.31 miles NE | | | | | |
| Sale Price | $ | | $ 1,295,000 | | $ | | $ |
| Sale Price/Gross Liv. Area | $    sq.ft. | $  216.51 sq.ft. | | $  sq.ft. | | $  sq.ft. | |
| Data Source(s) | | Public Records/MLS | | | | | |
| Verification Source(s) | | Visual | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | None Known | | | | | |
| Concessions | | Conventional | | | | | |
| Date of Sale/Time | | Cl 12/2007 | | | | | |
| Location | Good | Good | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | Average/1 ac | Average | | | | | |
| View | Average | Average | | | | | |
| Design (Style) | Colonial | Colonial | | | | | |
| Quality of Construction | Good/Frame | Sup/Brick | -25,000 | | | | |
| Actual Age | 30 Yrs/3 Eff | 11 Yrs/5 Eff | +10,000 | | | | |
| Condition | V.Good | Good | +10,000 | | | | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 13  7  7.5 | 12  5  3F2 | +22,500 | | | | |
| Gross Living Area | 7,289 sq.ft. | 6,009 sq.ft. | +98,600 | sq.ft. | | sq.ft. | |
| Basement & Finished | 1,736 Sq.Ft. | None | +50,000 | | | | |
| Rooms Below Grade | Basement | Crawl Space | | | | | |
| Functional Utility | Good | Good | | | | | |
| Heating/Cooling | FWA/CAC | FWA/CAC | | | | | |
| Energy Efficient Items | Fully Insulated | Fully Insulated | | | | | |
| Garage/Carport | 2 car RR Gar | 2 car att Gar | | | | | |
| Porch/Patio/Deck | Prch,Bar,Deck | Cv.Stp.Deck | +5,000 | | | | |
| Net Adjustment (Total) | | [ ]+ [ ]- $ | 158,900 | [ ]+ [ ]- $ | | [ ]+ [ ]- $ | |
| Adjusted Sale Price | | Net Adj   3.2  % | | Net Adj   % | | Net Adj   % | |
| of Comparables | | Gross Adj  20.1 % $ | 1,413,800 | Gross Adj   % $ | | Gross Adj   % $ | |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 3/19/2007 | no known transfers in the | | |
| Price of Prior Sale/Transfer | $896,000 | past year | | |
| Data Source(s) | Public Records, MLS | Public Records, MLS | | |
| Effective Date of Data Source(s) | March 22, 2008 | March 22, 2008 | | |

Analysis of prior sale or transfer history of the subject property and comparable sales

Analysis/Comments

Form 1004 (4C) — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. R0803120, Page #6

## Supplemental Addendum

File No. R0803120

| Date | Reed, Frank | | | |
|------|-------------|--|--|--|
| Property Address | 9717 Old Deer Trace | | | |
| City | Richmond | County Henrico | State Va | Zip Code 29233 |
| Lender | To Be Determined | | | |

- **URAR : Improvements - Additional Features**
No Personal Property Appraised. Extensive trim throughout, marble flooring in foyer, granite countertops, top of the line kitchen appliances, whirlpool tub, steam shower, trayed ceilings, B/I bookcases/entertainment centers, electric garage door openers, circular drive that is granite lined, federal style colonial porch.

- **URAR : Sales Comparison Analysis - Summary of Sales Comparison Approach**
All sales are high end homes in the subjects marketing area. Comp Sale one is a new dwelling transfer from a nearby development of new homes. Demand for this new development is superior to that of the subjects development as reflected in the location adjustment. Comp sale two is a similar renovated dwelling on a larger site. This sale is located in a similar established development near the subject. It was selected for its basement. This sale also included an adjoining lot that can be sold off separately. The site adjustment reflects the site difference and the additional lot. This adjustment causes the gross adjustments to exceed 25%. Comp sale three is an unrenovated dwelling that is located along a heavily traveled road. The location adjustment was made to reflect the external obsolescence caused by this main road. This adjustment causes the gross adjustments to exceed 25%. Comp sale four is supplied as additional support. This sale is located very close to the subject. This sale lacks a basement. The actual age of this sale is less than the subject, but the subject is totally renovated with a lower effective age. All sales were given adequate consideration when arriving at a final value estimate.

Form TADD — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE



## Subject Photo Page

| Owner | Reed, Frank | | | | |
|---|---|---|---|---|---|
| Property Address | 9717 Old Dell Trace | | | | |
| City | Richmond | County | Henrico | State | Va | Zip Code | 23233 |
| Lender | To Be Determined | | | | |



**Subject Front**

| 9717 Old Dell Trace | |
|---|---|
| Sales Price | |
| Gross Living Area | 7,280 |
| Total Rooms | 13 |
| Total Bedrooms | 7 |
| Total Bathrooms | 7.5 |
| Location | Good |
| View | Average |
| Site | Average/1 ac |
| Quality | Good/Frame |
| Age | 20 Yrs/3 Eff |



**Subject Rear**



**Subject Street**

Form PICPIX.SR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Photograph Addendum

| Owner | Reed, Frank | | | | |
|---|---|---|---|---|---|
| Property Address | 9717 Old Dell Trace | | | | |
| City | Richmond | County | Henrico | State | Va | Zip Code | 23233 |
| Lender | To Be Determined | | | | |



Side View of Addition



Alternative Rear View of Dwelling

Form GPIC7OL — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

### Comparable Photo Page

| | | | | | |
|---|---|---|---|---|---|
| Owner | Reed, Frank | | | | |
| Property Address | 9717 Old Dell Trace | | | | |
| City | Richmond | County  Henrico | | Style  Val | Zc Code  23243 |
| Lender | To Be Determined | | | | |



**Comparable 1**
1001 Middle Quarter Ct
| | |
|---|---|
| Prox. to Subject | 0.96 miles SW |
| Sales Price | 1,900,000 |
| Gross Living Area | 6,800 |
| Total Rooms | 14 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5F2 |
| Location | Superior |
| View | Average |
| Site | Average/1 ac |
| Quality | Sup/Brick |
| Age | New |



**Comparable 2**
10 Nomas Lane
| | |
|---|---|
| Prox. to Subject | 0.74 miles NW |
| Sales Price | 1,960,000 |
| Gross Living Area | 4,460 |
| Total Rooms | 17 |
| Total Bedrooms | 7 |
| Total Bathrooms | 7.5 |
| Location | Good |
| View | Average |
| Site | Sup/2.2ac+Lot |
| Quality | Equiv/Stucco |
| Age | 23 Yrs/3 Eff |



**Comparable 3**
9130 River Road
| | |
|---|---|
| Prox. to Subject | 0.78 miles E |
| Sales Price | 1,450,000 |
| Gross Living Area | 5,648 |
| Total Rooms | 13 |
| Total Bedrooms | 5 |
| Total Bathrooms | 4.5 |
| Location | Average |
| View | Average |
| Site | Superior/1.85ac |
| Quality | Sup/Brick |
| Age | 19 Yrs/8 Eff |

Form: PICPIX.CR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 5060018 Page #12

## Comparable Photo Page

| Owner | Reed, Frank | | | |
|---|---|---|---|---|
| Property Address | 9717 Old Dell Trace | | | |
| City | Richmond | County Henrico | State Va. | Zip Code 23233 |
| Lender | To Be Determined | | | |



### Comparable 4

| | |
|---|---|
| 9606 Craigsbont Drive | |
| Prox. to Subject | 0.31 miles NE |
| Sales Price | 1,295,000 |
| Gross Living Area | 6,609 |
| Total Rooms | 12 |
| Total Bedrooms | 5 |
| Total Bathrooms | 3F 2 |
| Location | Good |
| View | Average |
| Site | Average |
| Quality | Stud/Brick |
| Age | 11 Yrs/5 Eff |

### Comparable 5

| | |
|---|---|
| Prox. to Subject | |
| Sales Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sales Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

Form PICPIX.CR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE



### Building Sketch

| Owner | Reed, Frank | | | |
|---|---|---|---|---|
| Property Address | 9717 Old Oak Trace | | | |
| City | Richmond | County Henrico | State Va | Zip Code 23237 |
| Lender | To Be Determined | | | |



| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA2 | Second Floor | 3308.0 | 3216.0 |
| | Second Floor | -100.0 | 176.0 |
| P/P | Balcony | 176.0 | |
| | | | |
| | Net LIVABLE Area | (Rounded) | 3278 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| Second Floor | | |
| 33.0  x  50.0 | | 1650.0 |
| 26.0  x  60.0 | | 1560.0 |
| 4.0  x  44.0 | | 176.0 |
| 10.0  x  11.0 | | -110.0 |
| 4 Items | (Rounded) | 3278 |

Form SKT.BldSKI — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE



### Building Sketch

| Owner | Reed, Frank | | | | |
|---|---|---|---|---|---|
| Property Address | 9717 Old Deer Trace | | | | |
| City | Richmond | County Henrico | State VA | Zip Code 23293 |
| Lender | To be Determined | | | | |

**Comments:**

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Net Size | Net Totals |
| GLA1 | Third Floor | 826.5 | 826.0 |
| BSMT | Basement | 1033.0 | |
| | Garage | 703.4 | 1736.4 |
| | | | |
| | | | |
| Net LIVABLE Area | | (Rounded) | 827 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| Third Floor | | |
| 5.5 x 8.5 | | 43.6 |
| 28.0 x 28.0 | | 784.0 |
| | | |
| 2 Items | (Rounded) | 827 |

Form SKT.BLDSKI — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE



Location Map

| Owner | Hoxit, Frank |
| Property Address | 9717 Old Deli Trace |
| City | Richmond | County Henrico | State Va | Zip Code 23233 |
| Lender | To Be Determined |

Form MAP.LOC — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Base                                                                                          Page 1 of 1



**COUNTY OF HENRICO - FINANCE DEPARTMENT**
**REAL ESTATE ASSESSMENT DIVISION**

Address: 4301 E. Parham Rd
Henrico, VA 23273-2745
Phone: 804-501-4300
Fax: 804-501-5420

**Base Information**

| | | |
|---|---|---|
| Parcel ID | 740-735-8162 | Parcel Address 9717 OLD DELL TRCE |
| State Code | Resid (Urban) | Appraiser X |
| Tax Type | Reg Taxable | Neighborhood 1-970 |
| Zone | R-O | Acreage 0 |
| Tax Dist | Regular | Owner (Jan 1) REED FRANK J III & C A |
| Magisterial | Tuckahoe | Owner (Cur) REED FRANK J III & C A |
| Subdivision | Country Club Colony | Mailing Address |
| Section | A | 817 MATLACK DR |
| Block | A | MOORESTOWN NJ |
| Lot | 16 | Zip 08057-1443 |
| Map Page # | 172 | Old Map # 0110050000A 0016 |
| Vision PID # | 11995 | Pre 1992 Map # 61 A1 34 |

Last Photo Update 02/01/1997

**Residential Information**

| | | | |
|---|---|---|---|
| Usecode | 210 Res - Subd (1 Fam) | Year Built 1985 | Sq Ft Finished Living 4,166 |
| Style | 01 Colonial | No. of Stories 2 | Finished Attic 0 |
| Grade | AA | Total Rooms 10 | Unfinished Living 0 |
| Ext. Walls | 02 Composition | Bedrooms 4 | Basement 1,736 |
| Roof | 2 Wood Shingle | Half Bathrooms 2 | Finished Basement 938 |
| Heating | 02 Forced Air | Full Bathrooms 5 | Bsmt Type W Walkout |
| Air Cond. | 01 Yes | Fireplace(s) 3 | Basement Garage 2 |



**Last Transfer**

| Sale Date | Sale Price | Deed Book | Page | Previous Owner | Validity of Sale | # of Parcels |
|---|---|---|---|---|---|---|
| 03/30/2007 | $899,000 | 4315 | 186 | POLLARD MATTHEW E & E L | | 1 |

**Current Assessment**

| Year | Date | Land | Land Use | Improvements | Total |
|---|---|---|---|---|---|
| 2011 | 03.10.2011 | $250,000 | | $358,400 | $608,400 |

**Additions and Outbuildings**

| Type | Improvement | Measurement |
|---|---|---|
| Addition | Deck | 264 Square Feet |
| Addition | Porch Covered | 528 Square Feet |

**Land Information**

| Type | # Units | Unit Type | Sqft | Zone |
|---|---|---|---|---|
| 04 | 1 | LOTS | 0 | R-O |

**Notes**

9-24-2003....Pollard, Matthew E, & Elizabeth L......DB 3545-2288 .... 3-30-2007 Reed, Frank J, III & Christina A DB 4315-186

**Sketch Details**

| Code | Desc | Gross | Living |
|---|---|---|---|
| VLT | Vaulted Area | 110 | 0 |
| 1FF | 1st Fl Finished | 2,432 | 2,432 |
| 2FF | 2nd Fl Finished | 1,734 | 1,734 |
| BGR | Bsmt Garage | 786 | 0 |
| BMF | Basement Finished | 938 | 0 |
| BMU | Basement Unfinished | 110 | 0 |
| PCO | Porch Covered | 528 | 0 |
| WDK | Deck | 264 | 0 |

Map

Current Value of Virginia House --methodology for valuation

http://www.co.henrico.va.us/finance/divisions/real-estate-division/real-estate-assessment.html



### HENRICO COUNTY VIRGINIA

SEARCH

Wednesday, Nov 2, 2011

#### Real Estate Assessment

Title 58.1-3201 of the Code of Virginia provides for the assessment of real property at 100% of fair market value. Fair market value is the probable amount a property would sell for today if exposed to the market for a reasonable period. Henrico County employs an annual reassessment program to ensure that property is assessed uniformly and at its market value. The Real Estate Assessment Division is part of the Department of Finance and is charged with the review and reassessment of all real property, effective January 1 of each year.

#### How Assessments are Determined

Real estate assessments are based on the typical selling price of comparable properties and reflect the actions of buyers and sellers in the local market. The Real Estate Assessment Division is responsible for reviewing market transactions and using this data to assess each property accordingly. Each year staff analyzes thousands of real estate transactions, of which the majority are residential properties. Additionally, transactions for previous years are examined. Sales information is gathered from recorded deeds, buyers, sellers, real estate professionals and the selling prices are compared to the assessed values to determine an assessment/sales ratio. A neighborhood is selected for reassessment when its assessment/sales ratio is significantly below or above 100 percent. There is a determinant that an area shall be reassessed, three valuation approaches, i.e. sales comparison, cost, and income are considered. Typically, the sales comparison approach is chosen for residential properties. Comparable sales information is used as a basis for the assessment of individual properties after the transactions are carefully analyzed to consider differences in size, quality, condition, location and other amenities.

Due to the limited number of local commercial property transactions, regional and national information must be collected for analysis. In addition to replacement cost data and market data, commercial properties are selected for reassessment based on potential rental income, occupancy levels, and market demand.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 30th, 2016.


_Stevie Watson_
Stevie Watson

# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

~~~~~~~~~~~~~~~~~~~~~~~~

IN RE:

RESIDENTIAL CAPITAL, LLC,

et al,

        Debtors.

                    Case No.:

                    12-12020(MG)


DEPOSITION OF STEVIE WATSON

May 19, 2016

1:50 p.m.


Taken at:

3900 Westerre Parkway
Suite 300
Richmond, Virginia


REPORTED BY:  TRACEY SLYE, COURT REPORTER



Page 2

1       APPEARANCES OF COUNSEL
2   BARBARA K. HAGER, ESQ.
    REED SMITH, LLP
3   Three Logan Square, 1717 Arch Street
    Suite 3100
4   Philadelphia, Pennsylvania 19103
    Bhager@reedsmith.com
5   215.851.8864
6   Counsel for the Residential Capital, LLC
7
    FRANK REED, PRO SE
8   856.956.6950
    Frankreednj@aol.com
9
    Counsel for the Defendant(s)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2           E X A M I N A T I O N S
3   Witness:                    Page
    STEVIE WATSON
    By MS. HAGER                  4
4
5
6           E X H I B I T S
7   Exhibit      Description      Page
    1            Declaration      22
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1           DEPOSITION OF STEVIE WATSON
2               May 19, 2016
3               STEVIE WATSON,
4       having been duly sworn, testified as follows:
5               EXAMINATION
6   BY MS. HAGER:
7       Q   Could you please state your full name and
8   business address for the record?
9       A   My name is Stevie Watson.  My business
10  address is 8804 Patterson Avenue, Richmond, Virginia
11  23229.
12      Q   Have you ever given a deposition before?
13      A   Once.
14      Q   What case was that?
15      A   My personal divorce.
16      Q   So you may recall from the time you gave a
17  deposition that there are a couple of ground rules.
18  We are going to do some talking today.  The court
19  reporter is here taking down what we're saying.  In
20  order for her to do that, it's important that we're
21  not talking at the same time.  So I'll ask you a
22  question, please wait until I finish that question
23  before you start your answer and, likewise, I'll let
24  you finish your answer before I start a new question.
25          In common conversation sometimes we end up

Page 5

1   anticipating or thinking we can anticipate what the
2   other person is going to say.  Here that doesn't work
3   as well.  We both need to wait for each other.
4       A   Certainly.
5       Q   You are under oath today.  Even though we're
6   here in this informal setting, it's the same as though
7   we are in the courtroom.
8       A   Understood.
9       Q   If you need to take a break at any time, let
10  me know.  This shouldn't be all that long.  I know
11  you're not represented by an attorney today, but it is
12  important that you realize that I'm not here to answer
13  any questions.  So when I ask you a question, I need
14  an answer from you.  If you don't understand the
15  question, let me know that you don't understand it.
16  I'll try to rephrase it.
17          If you don't remember something, let me know.
18  If you do have a question and ask me, I won't be able
19  to answer so I'm not trying to be rude, but it's just
20  the way these things works.
21          Do you have any questions about the ground
22  rules before we get started?
23      A   No.
24      Q   Did you speak with anyone about your
25  deposition before today?

2  (Pages 2 to 5)


MAGNA
LEGAL SERVICES

Page 6

1    A    No, nothing of substance other than was I
2  going to make it, be here.
3    Q    Did you speak with Mr. Reed?
4    A    I did speak with him.
5    Q    When did you talk with him?
6    A    On his drive here this morning.
7    Q    What did you talk about with him?
8    A    Mostly whether or not I was going to be here
9  and a little refreshing of the appraiser and the
10  appraised value of the house.
11    Q    What do you mean by refreshing of the
12  appraiser and the appraised value of the house?
13    A    I had received a copy of an appraisal and I
14  don't know who delivered it to me along with some
15  other documents -- and you're welcome to look at
16  them -- and it was hardly legible.  So I was asking
17  what was the appraised value on the appraisal that I
18  received.
19    Q    And do you remember doing a declaration in
20  this case for Mr. Reed?
21    A    I do.  I remember doing a one-page
22  declaration.
23    Q    Did you do both a declaration and a letter?
24    A    Yes.
25    Q    Prior to speaking with Mr. Reed on the phone

Page 7

1  today, had you looked back at your declaration?
2    A    Yes.
3    Q    Had you reviewed the letter that you
4  supplied?
5    A    Yes.
6    Q    And had you reviewed the appraisal that is
7  attached to your letter?
8    A    I didn't fully appraise it other than to look
9  at the appraiser's value.
10    Q    Did you go back and review the appraiser's
11  value on your own outside of talking with Mr. Reed?
12    A    Not really.  I looked at the number, the
13  final number.
14    Q    Have you ever given expert testimony?
15    A    No.
16    Q    Have you ever given an expert report in
17  connection with any case?
18    A    No.
19    Q    Who is your present employer?
20    A    Long and Foster.
21    Q    And what is your job title?
22    A    I am an associate broker and a sales person.
23    Q    And how long have you been an associate
24  broker?
25    A    Probably 23 years.

Page 8

1    Q    Can you describe your job duties?
2    A    I've been a realtor for 27.  And before you
3  can become an associate broker, you need three or four
4  years of being in the business.  And although we say I
5  work for Long and Foster, it's sort of just an
6  umbrella name over my head that I'm an independent
7  contractor and I don't receive any salary from them,
8  I'm fully commissioned.  So I don't really have a job
9  title.
10    Q    What are your job duties?
11    A    To represent my buyers and sellers.
12    Q    Your buyers and sellers of what?
13    A    Real estate.
14    Q    So if someone wants to sell a property, they
15  could call you?
16    A    Yes.
17    Q    What would you do for them?
18    A    I would do a market analysis.
19    Q    Which is what?
20    A    To assess the value of their property by
21  comparing it to other comparable properties.
22    Q    What do you mean by that?
23    A    Similar size, location, condition, square
24  footage.
25    Q    And if someone wants to buy a property, what

Page 9

1  would you do for them?
2    A    Similar, assess the values around them
3  representing their best interest.
4    Q    Well, you show them properties, right?
5    A    I do show them properties that meet their
6  criteria or wants and desires.
7    Q    Are you licensed in the State of Virginia?
8    A    Yes.
9    Q    Do you have any certifications?
10    A    Yes.
11    Q    What are those?
12    A    One is called a GRI.  It's a Graduate Realtor
13  Institute.  The other is the identification of being
14  an associate broker.  It requires higher education and
15  passing of the test.
16    Q    And did you attend college?
17    A    Yes.
18    Q    Do you have a degree?
19    A    Yes.
20    Q    What is your degree in?
21    A    Community service.
22    Q    Where did you go to college?
23    A    Virginia Commonwealth University.
24    Q    How is the real estate market now?
25    A    It's relatively good.

3 (Pages 6 to 9)



Page 10

1    Q    So sales are pretty good right now?
2    A    Yes.
3    Q    And when we say that sales are good, what do
4    you mean by that?
5    A    If houses are in good condition and good
6    location and priced reasonably or to market value,
7    they are selling and there are buyers out there again
8    looking for properties and interest rates are still
9    low.
10   Q    You say there are buyers again looking for
11   properties.  Was there a time when there weren't
12   buyers looking for properties?
13   A    Just a very small time period.
14   Q    Which was when?
15   A    After 9/11 things came to a halt for a while.
16   Q    So 2001?
17   A    Yes.
18   Q    How many houses did you sell in 2015?
19   A    I wouldn't be able to tell you.
20   Q    Why not?
21   A    I don't have the number in front of me.
22   Q    So was it more than 10?
23   A    Yes.
24   Q    Was it more than 20?
25   A    I would guess so.  That is a combination of

Page 11

1    listing and sales.  We consider them all selling of
2    houses.  Some would be my listing, some would be
3    outright sales of other agent's listing.
4    Q    So where you're the buyer's agent?
5    A    I would say 50 percent of what I do, maybe
6    not quite.
7    Q    You would consider a house that you sell to
8    one of your buyers a sale?
9    A    I would consider a listing that I have, if
10   another agent brings in the buyer, it's still
11   considered a sale with my name on it as well.
12   Q    Right.  When it's your listing?
13   A    Yes.
14   Q    What if you're just the buyer's agent?
15   A    It's considered my sale as well.
16   Q    So in 2015 you would say you had more than 20
17   sales; is that right?
18   A    Yes, I think so, yes.
19   Q    And what about in '12, how many sales did you
20   have that year?
21   A    I really don't remember.
22   Q    Do you think it was more than 10?
23   A    Yes.
24   Q    More than 20?
25   A    Probably.  I'm pretty consistent between 20

Page 12

1    and 30 or sometimes a little more.
2    Q    How many sales did you have in 2009?
3    A    I don't remember.
4    Q    Was it more than 10?
5    A    Yes.
6    Q    More than 20?
7    A    I can't remember if it would be more than 20.
8    Sorry.
9    Q    And what about in 2008, how many sales did
10   you have?
11   A    I really can't recall.
12   Q    Was it more than 10?
13   A    Yes.
14   Q    Was it more than 20?
15   A    Possibly.
16   Q    How was the market in 2008?
17   A    The market, I really can't remember honestly.
18   It was a long time ago.  I'm a busy, active agent and
19   I stay consistently busy, even perhaps when other
20   agents don't.  So it's really hard for me to remember
21   exactly.
22   Q    So not just with respect to your own sales,
23   but the market generally in 2008, you can't remember
24   whether it was good or bad?
25   A    Not specifically.

Page 13

1    Q    Would you agree with me that the market
2    drastically declined from 2007 to 2012?
3    MR. REED:  Leading; objection.
4    THE WITNESS:  I would say there was a period
5    of some decline.
6    MS. HAGER:  By the way, Mr. Reed, while
7    you're not an attorney, I'm not going to stop you from
8    making objections, but you should know she's not my
9    witness so I can lead her.  Make your objections.
10   That's fine.
11   (The reporter read the record as requested.)
12   BY MS. HAGER:
13   Q    You know Frank Reed; is that correct?
14   A    Yes.
15   Q    How do you know him?
16   A    Through business relationships of having sold
17   previous properties for him.
18   Q    Are you aware of when Mr. Reed lived in
19   Virginia?
20   A    Yes.
21   Q    When was that?
22   A    Well, it was prior to his purchase, the
23   property on Old Dell so I would guess that would be in
24   2005, 2006.
25   Q    And just for clarification -- I don't want

4 (Pages 10 to 13)



MAGNA
LEGAL SERVICES

Page 14

1   you to take guesses of anything.  If you're not sure,
2   that is a fine answer.
3       A   Okay.
4       Q   Guessing doesn't really get us anywhere.  If
5   you're not sure, tell me you're not sure, you don't
6   remember.
7       Q   For which Mr. Reed's properties were you the
8   listing agent?
9       A   There were two properties in Twin Hickory in
10  Glen Allen, Virginia that I sold for him.
11      Q   Do you recall the addresses?
12      A   I do not.
13      Q   When were those listings?
14      A   They were prior to 2007.
15      Q   So those were houses of Mr. Reed's that you
16  sold to other parties?
17      A   Yes.
18      Q   And for which properties of Mr. Reed's were
19  you his agent, meaning acting as a buyer's agent?
20      A   I can't recall.
21      Q   Were there any?
22      A   I may have been the agent on his second
23  purchase in Twin Hickory.  I was the selling agent on
24  his purchase of Old Dell.
25      Q   When was that?

Page 15

1       A   I did go into the attic of our office and
2   retrieved that file so I have a settlement date for
3   his purchase of Old Dell, March 29, 2007.
4           MR. REED:  Can we go off the record for one
5   second?
6           MS. HAGER:  Sure.
7           (Discussion off the record.)
8   BY MS. HAGER:
9       Q   So you were the selling agent for 9717 Old
10  Dell Trace in 2007, correct?
11      A   Yes, I believe it was my listing and Frank
12  had been a client and I called him about the property
13  and I thought it was an opportunity for him.
14      Q   Is that something that you have independent
15  recollection of?
16      A   Not the conversation itself, but when I
17  called him, yes, it was my listing at the time.
18      Q   And what was the condition of 9717 Old Dell
19  Trace when you sold it to Mr. Reed?
20      A   It needed a lot of of repair and it needed a
21  lot of updating.
22      Q   Such as what?
23      A   Outdated kitchen and baths, floor plan was
24  somewhat unfunctional on the second level.
25      Q   What do you mean by that?

Page 16

1       A   I believe you had to go through one bedroom
2   to get to another bedroom.  There was something quirky
3   about it.
4       Q   How were you aware that Mr. Reed expanded and
5   renovated the property?
6       A   When he purchased the property from time to
7   time, he would encourage me to come visit to see what
8   was being done.
9       Q   What was being done?
10      A   He was making tremendous additions which
11  increased the square footage and the improvements that
12  I saw were very upscale.
13      Q   What improvements did you see?
14      A   I saw that he had reconfigured the second
15  floor to make it more functional.  He added a
16  tremendous master suite on the second level with a
17  sitting room.  I think it was a laundry area.  It was
18  quite extravagant and special.  And I saw plans that
19  he was going to add a detached garage that was going
20  to be equally attractive.
21      Q   Did you see any other improvements?
22      A   I did, but I can't recall actually what they
23  were.
24      Q   When was it that you saw these renovations?
25      A   I would say it was within the year following

Page 17

1   his purchase.
2       Q   So 2008, would that be right?
3       A   Yes.
4       Q   And when was it that you saw the plans, also
5   2008?
6       A   Yes.
7       Q   How many times had you been back to Old Dell
8   Trace after you sold it?
9       A   I would say probably three.  I know you don't
10  want probably, at least two and maybe three or more.
11      Q   Were each of those visits for the purpose of
12  seeing the renovations?
13      A   Yes.
14      Q   When was the work scheduled to be completed?
15      A   I would say that within a reasonable amount
16  of time so he could get the house on the market.  He
17  had invested a lot and I'm sure he wanted to get it
18  back on the market so he could recoup his investment.
19      Q   How do you know that?
20      A   By the number of times, those two or three
21  times that I went to visit, they were relatively
22  close together.  So he was moving in a pattern of forging
23  ahead.
24      Q   So are you saying that when you went to see
25  the property that there was progress being made on the

5 (Pages 14 to 17)



Page 18

1  improvements?
2      A  Yes, every time.
3      Q  Do you know how much time in total the
4  renovations were scheduled to take?
5      A  No.
6      Q  How far along would you say the improvements
7  were on the last time that you went to Old Dell Trace?
8      A  I would say they were pretty far along in the
9  work that he was doing.  There was still -- he had
10  removed the kitchen and the kitchen had not been
11  replaced to the best of my recollection.
12      Q  Besides the kitchen, were the other
13  improvements far along?
14      A  The master was pretty far along and he had
15  done a lot of repair and improvement to the curb
16  appeal of the house.  Doing the front stairs and the
17  front of the house was a tremendous draw, the
18  appearance of a southern mansion.
19      Q  Are you aware of whether the improvements on
20  the kitchen were part of the original plan?
21      A  Yes.
22      Q  Yes, they were?
23      A  I believe they were, yes.
24      Q  Are you aware of any storm-related damage to
25  the property?

Page 19

1      A  I can't recall.
2      Q  Are you aware that the Reeds intended to live
3  in the property once it was completed?
4      A  I'm not sure that I recall that answer.
5      Q  Are you aware that the Reeds intended to rent
6  the property out on a month-to-month basis?
7      A  I'm not sure that I recall a conversation
8  regarding that.
9      Q  How do you know what he planned to do with
10  the property?
11      A  Because he -- I believe he had moved out of
12  town during the process of the renovation and we had
13  discussed from time to time the listing price that
14  could be put on the property.
15      Q  What does the fact that he moved out of town
16  have to do with how you knew what he planned to do
17  with the property?
18      A  Because he had uprooted his wife and children
19  and they were in another school and it seemed to me
20  that if he had planned to stay local, he would have
21  kept them in Richmond.
22      Q  Are you aware that he did ultimately move
23  back to Richmond?
24      A  I don't remember that.
25      Q  Without looking at the documents that you

Page 20

1  brought with you, do you recall how much the Reeds
2  paid for the property?
3      A  Yes, I believe it was 899.
4      Q  And before Mr. Reed asked you to do the
5  declaration for him in this case, did you have a
6  recollection of how much he paid for that property?
7      A  Somewhat of a recollection, yes, because it
8  had been my listing.
9      Q  Do you typically retain a recollection of the
10  sales prices for your listings?
11      A  Not all of them, but it was a very unusual
12  listing and a very prime area of the Richmond corridor
13  so, yeah, I would have remembered the approximate
14  price of what it was.
15      Q  You said it was an unusual listing.  What do
16  you mean by that?
17      A  Upper end or had a lot of curb appeal and was
18  in a very executive area.
19      Q  So was it unlike other properties around it?
20      A  The neighborhood that this particular
21  property was in was not a cookie cutter neighborhood
22  and almost all of the houses in that subdivision were
23  unique in design.
24      Q  Is the property at 9717 Old Dell Trace at the
25  time larger than the other properties in the

Page 21

1  neighborhood?
2      A  I think it was probably right in line with
3  most of them.  There may have been one or two a little
4  smaller and some that were a little larger, but he was
5  adding to that square footage.
6      Q  And you're anticipating my next question.  So
7  by making the improvements to the house, which
8  included the second floor expansion, would that have
9  made it the biggest house in the neighborhood?
10      A  No.
11      Q  Would it have been one of the biggest houses
12  in the neighborhood?
13      A  Not one of the biggest.  There would be
14  several that would have been comparable in size to the
15  best of my knowledge.
16      Q  Do you recall what the total square footage
17  would have been had the renovations been completed?
18      A  I think it would have been approximately
19  about 6,000 square feet.
20      Q  In total or is that just the renovation?
21      A  No, the total.
22      Q  Do you recall what the square footage was
23  prior to the renovation?
24      A  Maybe low four thousands.
25      Q  I believe you mentioned that -- strike that.

6 (Pages 18 to 21)



Page 22

1  Without looking at the documents that you brought with
2  you, are you aware of how much in liens were on the
3  property after Mr. Reed purchased it?
4      A   No.
5      Q   Are you aware that he had a first mortgage
6  and a second mortgage?
7      A   I can't recall if I was aware.
8      Q   Are you aware of how much money he spent on
9  the improvements?
10     A   I could only guesstimate.
11     Q   Are you aware of how much more he would have
12 needed to spend in order to complete the improvements?
13     A   I would only be able to guesstimate and
14 finishing up the kitchen and finishing up what he
15 started.
16         (Thereupon, Plaintiff's Exhibit No. 1 was
17 marked for identification.)
18 BY MS. HAGER:
19     Q   So, Ms. Watson, showing you what was just
20 marked by the court reporter as Watson 1, do you
21 recognize that document?
22     A   I do.
23     Q   In my copy anyway, can you take a look at the
24 first page and the last page?  Is that the declaration
25 that you gave to Mr. Reed?

Page 23

1      A   Yes.
2      Q   Is that your signature on the second page of
3  the declaration, which is the last page of the
4  document?
5      A   Yes.
6      Q   And you signed this declaration under oath,
7  correct?
8      A   Yes.
9      Q   On March 30, 2016, correct?
10     A   Yes.
11     Q   And am I right that in the declaration
12 essentially you say that you had previously prepared
13 an opinion regarding the loss suffered by the Reeds in
14 connection with the Old Dell Trace property; is that
15 right?
16     A   Yes.
17     Q   And you added something to the declaration,
18 which I didn't see in the letter, which was that
19 Mr. Reed had since lost the property to foreclosure;
20 is that right?
21     A   Yes.
22     Q   How did you learn about that?
23     A   Through Mr. Reed and I also saw it, I
24 believe, advertised.  There was a listing that was by
25 someone else and I believe it noted that it was going

Page 24

1  to be in foreclosure.
2      Q   Meaning there was --
3      A   In the MLS or Multiple Listing Service, we
4  post our active new listings and if I recall, I saw it
5  pop up and it was another agent who often does short
6  sales and other things and I think it mentioned, but
7  I'm not sure, in the body of the remarks that it was a
8  foreclosure.
9      Q   And would this have been at the point in time
10 that Mr. Reed still owned the property?
11     A   Yes.
12     Q   Do you know why Mr. Reed didn't use you as a
13 listing agent?
14     A   It was not his call, I believe.  It was done
15 by the bank, but I'm not sure.
16     Q   So a bank can list a property for sale before
17 it forecloses?
18     A   I don't know.
19     Q   When did Mr. Reed tell you that he lost the
20 property to foreclosure?
21     A   It was sometime during that same period of it
22 becoming active and public.
23     Q   When was that?
24     A   I have no idea.  I'm sorry.
25     Q   So attached to the declaration there is a

Page 25

1  letter from you; is that right?
2      A   Yes.
3      Q   And can you just turn to that letter and
4  confirm that this is your signature?
5      A   It is my signature.
6      Q   This is a letter that you wrote to Whom It
7  May Concern on June 20, 2012, correct?
8      A   Yes.
9      Q   Did you write this letter because Mr. Reed
10 asked you to write this letter?
11     A   Yes.
12     Q   And attached to the letter there's a couple
13 of things -- and I realize this is a bad copy, but
14 it's been copied a lot of times.  Attached to the
15 letter is your bio, an article about the neighborhood
16 that Old Dell Trace is in and then an appraisal; would
17 you agree with me?
18     A   Yes.
19     Q   Now the appraisal is from what date?
20     A   I could hardly make that out and I did not do
21 that appraisal.  It was done by an official appraiser
22 who has appraisal accreditation.
23     Q   You're not a licensed appraiser?
24     A   Correct.
25     Q   Have you ever done an appraisal report that

7 (Pages 22 to 25)


MAGNA
LEGAL SERVICES

Page 26

1    looks like this?
2        A   No.
3        Q   Do you know who this appraiser is?
4        A   I tried to read his name, but I wasn't overly
5    familiar with him at all.  It looked like Alex
6    something.
7        Q   If I told you his last name is Uminski, would
8    that sound familiar to you at all?
9        A   A little familiar.
10       Q   Do you know some of the local appraisers?
11       A   I do.
12       Q   He's not somebody that you've dealt with
13   lately?
14       A   We're don't usually get to see the appraisals
15   and they're usually called on by the banks.
16       Q   How did you get a copy of the article
17   attached?
18       A   I think I was the one that spotted that
19   article.  I'm not sure.  I'm sorry.
20       Q   What is the date of the article; do you
21   recall?
22       A   But I do think that it was relatively soon
23   after Mr. Reed purchased the property and I was
24   excited to see it for his future benefit.  It was
25   listed like that in the picture he used to the best of

Page 27

1    my recollection.
2        Q   So the picture used that you referred to, is
3    that on page 5 of 28?
4        A   Yes.
5        Q   The notation there, Frank Reed Property with
6    the address listed, is that was something that
7    appeared in the article?
8        A   I can't recall.
9        Q   What was the purpose of you writing this
10   June 20, 2012, letter?
11       A   I believe that Mr. Reed had told me that he
12   needed it for some financial or legal purpose.
13       Q   Have you ever previously calculated a loss on
14   a property in the way that you have for this Old Dell
15   Trace property?
16       A   I've never had the need or request for it
17   before.
18       Q   So can you describe the methodology of how
19   you went about figuring out the loss?
20       A   Yes, in my mind I did it based on his
21   investment of the 900, what I had felt he had put
22   already into the house, what he was probably paying in
23   taxes, maybe insurance premiums.
24       Q   Anything else?
25       A   And I don't think I put into that figure what

Page 28

1    his true loss may have been if it had been completed,
2    put on the market and sold.  I don't think I threw
3    that in.  Let me see what number you're looking at.
4        So when I saw or spotted just now the 11, I'm
5    thinking it was the 900,000, whatever he had put into
6    the house, taxes, whatever.  It easily could have been
7    another 200,000.
8        Q   When you say what he put into the house, I
9    think you previously testified that you're not sure
10   what that number is?
11       A   I don't know.  It's a guesstimate.
12       Q   But do you know what you used when you
13   prepared this letter?
14       A   The same, just from recollection of the
15   quality of what he had done, the exterior addition of
16   what he had done.
17       Q   Right.  I understand the work that you're
18   saying that was done, but when you prepared this
19   letter of June 2012, what number did you use in the
20   calculation?
21       A   I'm not sure what you mean.
22       Q   You said one of the things that you accounted
23   for was the amount he put into the house.  Did you
24   have a specific figure that you used in calculating
25   the numbers in your letter?

Page 29

1        A   It was just a general number that he may have
2    had 100, 150 in it.
3        Q   So as you sit here today, you don't know what
4    number that you used when you did your calculation?
5        A   I would say that I used the number I just
6    gave you, but it was not based on any data.  It was
7    just by the visual of what I recalled.
8        Q   And you also mentioned that you accounted for
9    taxes and insurance.  Do you know what number you used
10   when you prepared your calculation?
11       A   Not exactly, but county taxes run a little
12   under a dollar per $100,000 value and if he had been
13   carrying that all of these years.
14       Q   What would you have done with the taxes
15   number?  I'm not sure I understand.
16       A   Well, I'm guessing if his house was valued at
17   800,000, he would have been paying 8,000 a year for
18   taxes or close to that and if it was higher, he would
19   have been paying more.
20       Q   What would you have done with that 8,000 plus
21   number?
22       A   Probably included in that total.
23       Q   How?
24       A   Adding the 900, the million 50 that I thought
25   he may have put into his addition and improvements and



Page 30

1    adding another 50 or so for six, eight years of taxes
2    at 8,000.
3        Q    No, now you just said a million 50 for the
4    work that was done, did you mean 150,000?
5        A    Yes.
6        Q    In the appraisal that is attached that was
7    prepared by Uminski, what did he do to come up with
8    the appraised value?
9        A    I have no idea.  I was not involved with
10    that.
11        Q    What is an assessed value of a property?
12        A    It is typically what the county uses to base
13    their taxes on that individual property are.  It is
14    different than an appraised value.  So assessed value
15    does not, in our area, mean market value.
16        Q    So at any given time are the appraised value
17    and the assessed value the same?
18        A    Very rarely.
19        Q    And today is the fair market value of Old
20    Dell Trace equal to the assessed value?
21        A    I don't know what the assessed value is today
22    by the county or maybe I did.  Let me see if I pulled
23    it before I left.  The county assesses the value for
24    2016 at a million 89.
25        Q    And let the record reflect that the witness

Page 31

1    is looking at a document that she brought with her
2    today.
3        A    It is pulled straight off of public record.
4        Q    And that's the assessed value for 2016; is
5    that right?
6        A    Correct.
7        Q    And is that the same as the appraised value
8    today?
9        A    No.
10        Q    How do you know?  Did you do an appraisal?
11        A    I don't do appraisals.  I do market analysis.
12        Q    Did you do a market analysis?
13        A    No.
14        Q    Has the appraised value on Old Dell Trace
15    ever been the same as the assessed value?
16        A    No, not to my knowledge.
17        Q    In your letter you seem to use the appraised
18    value of 1.725 from the appraisal that Uminski did and
19    compare that to the assessed value in 2012, which was
20    $608,400.  Why did you use those two figures to come
21    up with the loss?
22        A    I don't recall using the assessed value or
23    the appraised value.  I recalled using what his
24    purchase price was.
25        Q    So you how do you square that with what is in

Page 32

1    the letter?
2        A    If you're asking where the approximate 11
3    something came from?
4        Q    No.  I just heard you say that you don't
5    recall using the appraised value or the assessed value
6    in coming up with the loss; is that right?
7        A    Yes.
8        Q    But in your letter it uses appraised value
9    and assessed value.  It was your testimony that you
10    don't recall coming up with a loss using those
11    numbers?
12        A    I didn't use those numbers.
13        Q    Why are they in your letter?
14        A    Because they helped to support the price that
15    I was going to probably list and market Mr. Reed's
16    house for.
17        Q    When you subtract the assessed value in 2012
18    from the appraised value in 2008, don't you come up
19    with what you say the loss was of $1,116,600?
20        A    Yes.
21        Q    So isn't that how you came up with the
22    1,116 --
23        A    Appears that way, yes.
24        Q    You previous testified that you did not use
25    the appraised value or the assessed value to come up

Page 33

1    with the loss, right?
2        A    I did it in my mind, but obviously it is
3    comparable to and close to that difference, yes.
4        Q    So did you, in fact, use the numbers that are
5    in your letter?
6        A    I did not.
7        Q    Do you think it's a good comparison to use
8    the assessed value appraised value in 2008 to the
9    assessed value value in 2012?
10        A    No, because I think assessed value and
11    appraised value are two different things.
12        Q    Is it your opinion that the fair market value
13    on Old Dell Trace would have been 1.725 million in the
14    summer of 2009?
15        A    It was.
16        Q    How do you know?
17        A    Because I had felt that we could market it at
18    the time he had done and completed everything to the
19    degree that he had said and that same 1-725, 1-750 may
20    be pushing it to 1-8 and here is why.  Because great
21    houses in that particular neighborhood and along the
22    prestigious River Road Corridor, in my opinion, if they
23    are in excellent condition with the latest amenities
24    always grab a buyer who will buy at a higher price.
25        Q    Now, if he sold the property for 1.725 or,

9 (Pages 30 to 33)



Page 34

1  frankly, any number, he would have had to have paid
2  off the liens that were on the property, correct?
3      A   Yes.
4      Q   Did you perform a market analysis of the Old
5  Dell Trace property in the summer of 2009?
6      A   Not a formal one.
7      Q   What do you mean by that?
8      A   I don't recall doing anything on paper.
9      Q   What are the chances that someone would have
10 offered -- strike that.   If in the summer of 2009
11 Mr. Reed had put the property on the market for 1.725
12 what are the chances that someone would have offered
13 less?
14     A   I have no way of knowing that that.
15     Q   Does it happen regularly that buyers will
16 offer less than the listing price?
17     A   If a house is in a great neighborhood and in
18 great condition, it usually sells within a first week
19 or two and almost always gets its full asking price.
20 If it doesn't sell in that first week or two, then,
21 yes, there are usually offers made.
22     Q   How frequently do houses sell within a first
23 week they're on the market?
24     A   Again, I have no data on that, but in my
25 experience if a house is in extremely good condition

Page 35

1  on a very nice lot and in a very premier neighborhood
2  it can and does happen.
3      Q   And would you say that that would have been the
4  case in 2009?
5      A   Yes, because even if we're thinking that the
6  market wasn't as strong as it may have been in 2003,
7  there are always an upper level echelon of buyers who
8  can afford those higher priced homes if they're
9  desirable enough.
10     Q   In your letter of 2012 you indicated that
11 Mr. Reed didn't finish the project and the market had
12 since drastically declined.   What did you mean by "the
13 market drastically declined?"
14     A   Well, it had gone through another economic
15 downturn.
16     Q   How did that bear on the real estate market?
17     A   The upper end had softened a little bit.
18     Q   What does that mean?
19     A   That there were fewer buyers for an upper end
20 properties.
21     Q   Would you consider this property at Old Dell
22 Trace to be an upper end property?
23     A   Yes.
24     Q   Are you aware of why Mr. Reed didn't complete
25 the renovations?

Page 36

1      A   No.
2      MS. HAGER:  Thank you.  I don't have any
3  further questions.
4      MR. REED:  I have nothing.
5      MS. HAGER:  Thank you.
6      MS. HAGER:  I'll order it.
7      (Signature waived.)
8      (Whereupon, at 2:42 p.m., the deposition was
9  concluded.)
10
11              * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 37

1      COMMONWEALTH OF VIRGINIA,
2      CITY OF RICHMOND, to wit:
3
4
5
6      I, Tracey A. Slye, a Notary Public for the
7  Commonwealth of Virginia at Large, do hereby certify
8  that the foregoing deposition of STEVIE WATSON was
9  duly sworn by me at the time and place set out in the
10 caption hereto.
11     Further, that the transcript of the deposition
12 is true and correct to the best of my ability.
13 Given under my hand this 3rd day of April, 2016.
14
15
16
17     _____
        Tracey Slye, Court Reporter
18     Registration No. 7521744
19
20
21
22     My Commission expires:
23     December 31, 2016
24
25

10  (Pages 34 to 37)



**A**

**ability** 37:12
**able** 5:18 10:19
  22:13
**accounted** 28:22
  29:8
**accreditation** 25:22
**acting** 14:19
**active** 12:18 24:4
  24:22
**add** 16:19
**added** 16:15 23:17
**adding** 21:5 29:24
  30:1
**addition** 28:15
  29:25
**additions** 16:10
**address** 4:8,10 27:6
**addresses** 14:11
**advertised** 23:24
**afford** 35:8
**agent** 11:4,10,14
  12:18 14:8,19,19
  14:22,23 15:9
  24:5,13
**agent's** 11:3
**agents** 12:20
**ago** 12:18
**agree** 13:1 25:17
**ahead** 17:23
**al** 1:6
**Alex** 26:5
**Allen** 14:10
**amenities** 33:23
**amount** 17:15
  28:23
**analysis** 8:18 31:11
  31:12 34:4
**answer** 4:23,24
  5:12,14,19 14:2
  19:4
**anticipate** 5:1
**anticipating** 5:1
  21:6
**anyway** 22:23

**appeal** 18:16 20:17
**appearance** 18:18
**APPEARANCES**
  2:1
**appeared** 27:7
**Appears** 32:23
**appraisal** 6:13,17
  7:6 25:16,19,21
  25:22,25 30:6
  31:10,18
**appraisals** 26:14
  31:11
**appraise** 7:8
**appraised** 6:10,12
  6:17 30:8,14,16
  31:7,14,17,23
  32:5,8,18,25 33:8
  33:11
**appraiser** 6:9,12
  25:21,23 26:3
**appraiser's** 7:9,10
**appraisers** 26:10
**approximate** 20:13
  32:2
**approximately**
  21:18
**April** 37:13
**Arch** 2:3
**area** 16:17 20:12,18
  30:15
**article** 25:15 26:16
  26:19,20 27:7
**asked** 20:4 25:10
**asking** 6:16 32:2
  34:19
**assess** 8:20 9:2
**assessed** 30:11,14
  30:17,20,21 31:4
  31:15,19,22 32:5
  32:9,17,25 33:8,9
  33:10
**assesses** 30:23
**associate** 7:22,23
  8:3 9:14
**attached** 7:7 24:25
  25:12,14 26:17

30:6
**attend** 9:16
**attic** 15:1
**attractive** 16:20
**Avenue** 4:10
**aware** 13:18 16:4
  18:19,24 19:2,5
  19:22 22:2,5,7,8
  22:11 35:24

**B**

**B** 3:5
**back** 7:1,10 17:7,18
  19:23
**bad** 12:24 25:13
**bank** 24:15,16
**banks** 26:15
**BARBARA** 2:2
**base** 30:12
**based** 27:20 29:6
**basis** 19:6
**baths** 15:23
**bear** 35:16
**becoming** 24:22
**bedroom** 16:1,2
**believe** 15:11 16:1
  18:23 19:11 20:3
  21:25 23:24,25
  24:14 27:11
**benefit** 26:24
**best** 9:3 18:11
  21:15 26:25 37:12
**Bhager@reedsm...**
  2:4
**biggest** 21:9,11,13
**bio** 25:15
**bit** 35:17
**body** 24:7
**break** 5:9
**brings** 11:10
**broker** 7:22,24 8:3
  9:14
**brought** 20:1 22:1
  31:1
**business** 4:8,9 8:4

13:16
**busy** 12:18,19
**buy** 8:25 33:24
**buyer** 11:10 33:24
**buyer's** 11:4,14
  14:19
**buyers** 8:11,12 10:7
  10:10,12 11:8
  34:15 35:7,19

**C**

**calculated** 27:13
**calculating** 28:24
**calculation** 28:20
  29:4,10
**call** 8:15 24:14
**called** 9:12 15:12
  15:17 26:15
**Capital** 1:5 2:6
**caption** 37:10
**carrying** 29:13
**case** 1:8 4:14 6:20
  7:17 20:5 35:4
**Certainly** 5:4
**certifications** 9:9
**certify** 37:7
**chances** 34:9,12
**children** 19:18
**CITY** 37:2
**clarification** 13:25
**client** 15:12
**close** 17:21 29:18
  33:3
**college** 9:16,22
**combination** 10:25
**come** 16:7 30:7
  31:20 32:18,25
**coming** 32:6,10
**Commission** 37:22
**commissioned** 8:8
**common** 4:25
**Commonwealth**
  9:23 37:1,7
**Community** 9:21
**comparable** 8:21
  21:14 33:3

**compare** 31:19
**comparing** 8:21
**comparison** 33:7
**complete** 22:12
  35:24
**completed** 17:14
  19:3 21:17 28:1
  33:18
**Concern** 25:7
**concluded** 36:9
**condition** 8:23 10:5
  15:18 33:23 34:18
  34:25
**confirm** 25:4
**connection** 7:17
  23:14
**consider** 11:1,7,9
  35:21
**considered** 11:11
  11:15
**consistent** 11:25
**consistently** 12:19
**contractor** 8:7
**conversation** 4:25
  15:16 19:7
**cookie** 20:21
**copied** 25:14
**copy** 6:13 22:23
  25:13 26:16
**correct** 13:13 15:10
  23:7,9 25:7,24
  31:6 34:2 37:12
**corridor** 20:12
  33:22
**Counsel** 2:1,6,9
**county** 29:11 30:12
  30:22,23
**couple** 4:17 25:12
**court** 1:1,24 4:18
  22:20 37:17
**courtroom** 5:7
**criteria** 9:6
**curb** 18:15 20:17
**cutter** 20:21

**D**



**damage** 18:24
**data** 29:6 34:24
**date** 15:2 25:19
  26:20
**day** 37:13
**dealt** 26:12
**Debtors** 1:7
**December** 37:23
**declaration** 3:7
  6:19,22,23 7:1
  20:5 22:24 23:3,6
  23:11,17 24:25
**decline** 13:5
**declined** 13:2 35:12
  35:13
**Defendant(s)** 2:9
**degree** 9:18,20
  33:19
**delivered** 6:14
**Dell** 13:23 14:24
  15:3,10,18 17:7
  18:7 20:24 23:14
  25:16 27:14 30:20
  31:14 33:13 34:5
  35:21
**deposition** 1:12 4:1
  4:12,17 5:25 36:8
  37:8,11
**describe** 8:1 27:18
**Description** 3:6
**design** 20:23
**desirable** 35:9
**desires** 9:6
**detached** 16:19
**difference** 33:3
**different** 30:14
  33:11
**discussed** 19:13
**Discussion** 15:7
**DISTRICT** 1:1,2
**divorce** 4:15
**document** 22:21
  23:4 31:1
**documents** 6:15
  19:25 22:1
**doing** 6:19,21 18:9

  18:16 34:8
**dollar** 29:12
**downturn** 35:15
**drastically** 13:2
  35:12,13
**draw** 18:17
**drive** 6:6
**duly** 4:4 37:9
**duties** 8:1,10

---

### E

**E** 3:1,5
**easily** 28:6
**echelon** 35:7
**economic** 35:14
**education** 9:14
**eight** 30:1
**employer** 7:19
**encourage** 16:7
**equal** 30:20
**equally** 16:20
**ESQ** 2:2
**essentially** 23:12
**estate** 8:13 9:24
  35:16
**et** 1:6
**exactly** 12:21 29:11
**EXAMINATION**
  4:5
**excellent** 33:23
**excited** 26:24
**executive** 20:18
**Exhibit** 3:6 22:16
**expanded** 16:4
**expansion** 21:8
**experience** 34:25
**expert** 7:14,16
**expires** 37:22
**exterior** 28:15
**extravagant** 16:18
**extremely** 34:25

---

### F

**fact** 19:15 33:4
**fair** 30:19 33:12
**familiar** 26:5,8,9

**far** 18:6,8,13,14
**feet** 21:19
**felt** 27:21 33:17
**fewer** 35:19
**figure** 27:25 28:24
**figures** 31:20
**figuring** 27:19
**file** 15:2
**final** 7:13
**financial** 27:12
**fine** 13:10 14:2
**finish** 4:22,24 35:11
**finishing** 22:14,14
**first** 22:5,24 34:18
  34:20,22
**floor** 15:23 16:15
  21:8
**following** 16:25
**follows** 4:4
**footage** 8:24 16:11
  21:5,16,22
**forecloses** 24:17
**foreclosure** 23:19
  24:1,8,20
**foregoing** 37:8
**forging** 17:22
**formal** 34:6
**Foster** 7:20 8:5
**four** 8:3 21:24
**Frank** 2:7 13:13
  15:11 27:5
**frankly** 34:1
**Frankreednj@ao...**
  2:8
**frequently** 34:22
**front** 10:21 18:16
  18:17
**full** 4:7 34:19
**fully** 7:8 8:8
**functional** 16:15
**further** 36:3 37:11
**future** 26:24

---

### G

**garage** 16:19
**general** 29:1

**generally** 12:23
**given** 4:12 7:14,16
  30:16 37:13
**Glen** 14:10
**go** 7:10 9:22 15:1,4
  16:1
**going** 4:18 5:2 6:2,8
  13:7 16:19,19
  23:25 32:15
**good** 9:25 10:1,3,5
  10:5 12:24 33:7
  34:25
**grab** 33:24
**Graduate** 9:12
**great** 33:20 34:17
  34:18
**GRI** 9:12
**ground** 4:17 5:21
**guess** 10:25 13:23
**guesses** 14:1
**guessing** 14:4 29:16
**guesstimate** 22:10
  22:13 28:11

---

### H

**H** 3:5
**HAGER** 2:2 3:3
  4:6 13:6,12 15:6,8
  22:18 36:2,5,6
**halt** 10:15
**hand** 37:13
**happen** 34:15 35:2
**hard** 12:20
**head** 8:6
**heard** 32:4
**helped** 32:14
**hereto** 37:10
**Hickory** 14:9,23
**higher** 9:14 29:18
  33:24 35:8
**homes** 35:8
**honestly** 12:17
**house** 6:10,12 11:7
  17:16 18:16,17
  21:7,9 27:22 28:6
  28:8,23 29:16

32:16 34:17,25
**houses** 10:5,18 11:2
  14:15 20:22 21:11
  33:21 34:22

---

### I

**idea** 24:24 30:9
**identification** 9:13
  22:17
**important** 4:20
  5:12
**improvement**
  18:15
**improvements**
  16:11,13,21 18:1
  18:6,13,19 21:7
  22:9,12 29:25
**included** 21:8
  29:22
**increased** 16:11
**independent** 8:6
  15:14
**indicated** 35:10
**individual** 30:13
**informal** 5:6
**Institute** 9:13
**insurance** 27:23
  29:9
**intended** 19:2,5
**interest** 9:3 10:8
**invested** 17:17
**investment** 17:18
  27:21
**involved** 30:9

---

### J

**JERSEY** 1:2
**job** 7:21 8:1,8,10
**June** 25:7 27:10
  28:19

---

### K

**K** 2:2
**kept** 19:21
**kitchen** 15:23
  18:10,10,12,20



22:14
**knew** 19:16
**know** 5:10,10,15,17
    6:14 13:8,13,15
    17:9,19 18:3 19:9
    24:12,18 26:3,10
    28:11,12 29:3,9
    30:21 31:10 33:16
**knowing** 34:14
**knowledge** 21:15
    31:16

**L**

**Large** 37:7
**larger** 20:25 21:4
**lately** 26:13
**latest** 33:23
**laundry** 16:17
**lead** 13:9
**Leading** 13:3
**learn** 23:22
**left** 30:23
**legal** 27:12
**legible** 6:16
**letter** 6:23 7:3,7
    23:18 25:1,3,6,9
    25:10,12,15 27:10
    28:13,19,25 31:17
    32:1,8,13 33:5
    35:10
**level** 15:24 16:16
    35:7
**licensed** 9:7 25:23
**liens** 22:2 34:2
**likewise** 4:23
**line** 21:2
**list** 24:16 32:15
**listed** 26:25 27:6
**listing** 11:1,2,3,9,12
    14:8 15:11,17
    19:13 20:8,12,15
    23:24 24:3,13
    34:16
**listings** 14:13 20:10
    24:4
**little** 6:9 12:1 21:3

21:4 26:9 29:11
    35:17
**live** 19:2
**lived** 13:18
**LLC** 1:5 2:6
**LLP** 2:2
**local** 19:20 26:10
**location** 8:23 10:6
**Logan** 2:3
**long** 5:10 7:20,23
    8:5 12:18
**look** 6:15 7:8 22:23
**looked** 7:1,12 26:5
**looking** 10:8,10,12
    19:25 22:1 28:3
    31:1
**looks** 26:1
**loss** 23:13 27:13,19
    28:1 31:21 32:6
    32:10,19 33:1
**lost** 23:19 24:19
**lot** 15:20,21 17:17
    18:15 20:17 25:14
    35:1
**low** 10:9 21:24

**M**

**M** 3:1
**making** 13:8 16:10
    21:7
**mansion** 18:18
**March** 15:3 23:9
**marked** 22:17,20
**market** 8:18 9:24
    10:6 12:16,17,23
    13:1 17:16,18
    28:2 30:15,19
    31:11,12 32:15
    33:12,17 34:4,11
    34:23 35:6,11,13
    35:16
**master** 16:16 18:14
**mean** 6:11 8:22
    10:4 15:25 20:16
    28:21 30:4,15
    34:7 35:12,18

**meaning** 14:19
    24:2
**meet** 9:5
**mentioned** 21:25
    24:6 29:8
**methodology** 27:18
**million** 29:24 30:3
    30:24 33:13
**mind** 27:20 33:2
**MLS** 24:3
**money** 22:8
**month-to-month**
    19:6
**morning** 6:6
**mortgage** 22:5,6
**move** 19:22
**moved** 19:11,15
**moving** 17:22
**Multiple** 24:3

**N**

**N** 3:1,1
**name** 4:7,9 8:6
    11:11 26:4,7
**need** 5:3,9,13 8:3
    27:16
**needed** 15:20,20
    22:12 27:12
**neighborhood**
    20:20,21 21:1,9
    21:12 25:15 33:21
    34:17 35:1
**never** 27:16
**new** 1:2 4:24 24:4
**nice** 35:1
**Notary** 37:6
**notation** 27:5
**noted** 23:25
**number** 7:12,13
    10:21 17:20 28:3
    28:10,19 29:1,4,5
    29:9,15,21 34:1
**numbers** 28:25
    32:11,12 33:4

**O**

**O** 3:1
**oath** 5:5 23:6
**objection** 13:3
**objections** 13:8,9
**obviously** 33:2
**offer** 34:16
**offered** 34:10,12
**offers** 34:21
**office** 15:1
**official** 25:21
**Okay** 14:3
**Old** 13:23 14:24
    15:3,9,18 17:7
    18:7 20:24 23:14
    25:16 27:14 30:19
    31:14 33:13 34:4
    35:21
**once** 4:13 19:3
**one-page** 6:21
**opinion** 23:13
    33:12,22
**opportunity** 15:13
**order** 4:20 22:12
    36:6
**original** 18:20
**Outdated** 15:23
**outright** 11:3
**outside** 7:11
**overly** 26:4
**owned** 24:10

**P**

**p.m** 1:14 36:8
**page** 3:2,6 22:24,24
    23:2,3 27:3
**paid** 20:2,6 34:1
**paper** 34:8
**Parkway** 1:17
**part** 18:20
**particular** 20:20
    33:21
**parties** 14:16
**passing** 9:15
**pattern** 17:22
**Patterson** 4:10
**paying** 27:22 29:17

29:19
**Pennsylvania** 2:4
**percent** 11:5
**perform** 34:4
**period** 10:13 13:4
    24:21
**person** 5:2 7:22
**personal** 4:15
**Philadelphia** 2:4
**phone** 6:25
**picture** 26:25 27:2
**place** 37:9
**Plaintiff's** 22:16
**plan** 15:23 18:20
**planned** 19:9,16,20
**plans** 16:18 17:4
**please** 4:7,22
**plus** 29:20
**point** 24:9
**pop** 24:5
**Possibly** 12:15
**post** 24:4
**premier** 35:1
**premiums** 27:23
**prepared** 23:12
    28:13,18 29:10
    30:7
**present** 7:19
**prestigous** 33:22
**pretty** 10:1 11:25
    18:8,14
**previous** 13:17
    32:24
**previously** 23:12
    27:13 28:9
**price** 19:13 20:14
    31:24 32:14 33:24
    34:16,19
**priced** 10:6 35:8
**prices** 20:10
**prime** 20:12
**prior** 6:25 13:22
    14:14 21:23
**PRO** 2:7
**probably** 7:25
    11:25 17:9,10



21:2 27:22 29:22
32:15
**process** 19:12
**progress** 17:25
**project** 35:11
**properties** 8:21 9:4
9:5 10:8,11,12
13:17 14:7,9,18
20:19,25 35:20
**property** 8:14,20
8:25 13:23 15:12
16:5,6 17:25
18:25 19:3,6,10
19:14,17 20:2,6
20:21,24 22:3
23:14,19 24:10,16
24:20 26:23 27:5
27:14,15 30:11,13
33:25 34:2,5,11
35:21,22
**public** 24:22 31:3
37:6
**pulled** 30:22 31:3
**purchase** 13:22
14:23,24 15:3
17:1 31:24
**purchased** 16:6
22:3 26:23
**purpose** 17:11 27:9
27:12
**pushing** 33:20
**put** 19:14 27:21,25
28:2,5,8,23 29:25
34:11

**Q**

**quality** 28:15
**question** 4:22,22,24
5:13,15,18 21:6
**questions** 5:13,21
36:3
**quirky** 16:2
**quite** 11:6 16:18

**R**

**rarely** 30:18

**rates** 10:8
**read** 13:11 26:4
**real** 8:13 9:24
35:16
**realize** 5:12 25:13
**really** 7:12 8:8
11:21 12:11,17,20
14:4
**realtor** 8:2 9:12
**reasonable** 17:15
**reasonably** 10:6
**recall** 4:16 12:11
14:11,20 16:22
19:1,4,7 20:1
21:16,22 22:7
24:4 26:21 27:8
31:22 32:5,10
34:8
**recalled** 29:7 31:23
**receive** 8:7
**received** 6:13,18
**recognize** 22:21
**recollection** 15:15
18:11 20:6,7,9
27:1 28:14
**reconfigured** 16:14
**record** 4:8 13:11
15:4,7 30:25 31:3
**recoup** 17:18
**Reed** 2:2,7 6:3,20
6:25 7:11 13:3,6
13:13,18 15:4,19
16:4 20:4 22:3,25
23:19,23 24:10,12
24:19 25:9 26:23
27:5,11 34:11
35:11,24 36:4
**Reed's** 14:7,15,18
32:15
**Reeds** 19:2,5 20:1
23:13
**referred** 27:2
**reflect** 30:25
**refreshing** 6:9,11
**regarding** 19:8
23:13

**Registration** 37:18
**regularly** 34:15
**relationships** 13:16
**relatively** 9:25
17:21 26:22
**remarks** 24:7
**remember** 5:17
6:19,21 11:21
12:3,7,17,20,23
14:6 19:24
**remembered** 20:13
**removed** 18:10
**renovated** 16:5
**renovation** 19:12
21:20,23
**renovations** 16:24
17:12 18:4 21:17
35:25
**rent** 19:5
**repair** 15:20 18:15
**rephrase** 5:16
**replaced** 18:11
**report** 7:16 25:25
**REPORTED** 1:24
**reporter** 1:24 4:19
13:11 22:20 37:17
**represent** 8:11
**represented** 5:11
**representing** 9:3
**request** 27:16
**requested** 13:11
**requires** 9:14
**Residential** 1:5 2:6
**respect** 12:22
**retain** 20:9
**retrieved** 15:2
**review** 7:10
**reviewed** 7:3,6
**Richmond** 1:18
4:10 19:21,23
20:12 37:2
**right** 9:4 10:1 11:12
11:17 17:2 21:2
23:11,15,20 25:1
28:17 31:5 32:6
33:1

**River** 33:22
**Road** 33:22
**room** 16:17
**rude** 5:19
**rules** 4:17 5:22
**run** 29:11

**S**

**S** 3:1,5
**salary** 8:7
**sale** 11:8,11,15
24:16
**sales** 7:22 10:1,3
11:1,3,17,19 12:2
12:9,22 20:10
24:6
**saw** 16:12,14,18,24
17:4 23:23 24:4
28:4
**saying** 4:19 17:24
28:18
**scheduled** 17:14
18:4
**school** 19:19
**SE** 2:7
**second** 14:22 15:5
15:24 16:14,16
21:8 22:6 23:2
**see** 16:7,13,21
17:24 23:18 26:14
26:24 28:3 30:22
**seeing** 17:12
**sell** 8:14 10:18 11:7
34:20,22
**sellers** 8:11,12
**selling** 10:7 11:1
14:23 15:9
**sells** 34:18
**service** 9:21 24:3
**set** 37:9
**setting** 5:6
**settlement** 15:2
**short** 24:5
**show** 9:4,5
**showing** 22:19
**signature** 23:2 25:4

25:5 36:7
**signed** 23:6
**Similar** 8:23 9:2
**sit** 29:3
**sitting** 16:17
**six** 30:1
**size** 8:23 21:14
**Slye** 1:24 37:6,17
**small** 10:13
**smaller** 21:4
**SMITH** 2:2
**softened** 35:17
**sold** 13:16 14:10,16
15:19 17:8 28:2
33:25
**somebody** 26:12
**somewhat** 15:24
20:7
**soon** 26:22
**sorry** 12:8 24:24
26:19
**sort** 8:5
**sound** 26:8
**southern** 18:18
**speak** 5:24 6:3,4
**speaking** 6:25
**special** 16:18
**specific** 28:24
**specifically** 12:25
**spend** 22:12
**spent** 22:8
**spotted** 26:18 28:4
**square** 2:3 8:23
16:11 21:5,16,19
21:22 31:25
**stairs** 18:16
**start** 4:23,24
**started** 5:22 22:15
**state** 4:7 9:7
**STATES** 1:1
**stay** 12:19 19:20
**Stevie** 1:12 3:3 4:1
4:3,9 37:8
**stop** 13:7
**storm-related**
18:24



**straight** 31:3
**Street** 2:3
**strike** 21:25 34:10
**strong** 35:6
**subdivision** 20:22
**substance** 6:1
**subtract** 32:17
**suffered** 23:13
**suite** 1:17 2:3 16:16
**summer** 33:14 34:5
34:10
**supplied** 7:4
**support** 32:14
**sure** 14:1,5,5 15:6
17:17 19:4,7 24:7
24:15 26:19 28:9
28:21 29:15
**sworn** 4:4 37:9

---
**T**

**T** 3:1,5
**take** 5:9 14:1 18:4
22:23
**Taken** 1:16
**talk** 6:5,7
**talking** 4:18,21
7:11
**taxes** 27:23 28:6
29:9,11,14,18
30:1,13
**tell** 10:19 14:5
24:19
**test** 9:15
**testified** 4:4 28:9
32:24
**testimony** 7:14
32:9
**Thank** 36:2,5
**things** 5:20 10:15
24:6 25:13 28:22
33:11
**think** 11:18,22
16:17 21:2,18
24:6 26:18,22
27:25 28:2,9 33:7
33:10

**thinking** 5:1 28:5
35:5
**thought** 15:13
29:24
**thousands** 21:24
**three** 2:3 8:3 17:9
17:10,20
**threw** 28:2
**time** 4:16,21 5:9
10:11,13 12:18
15:17 16:6,7
17:16 18:2,3,7
19:13,13 20:25
24:9 30:16 33:18
37:9
**times** 17:7,20,21
25:14
**title** 7:21 8:9
**today** 4:18 5:5,11
5:25 7:1 29:3
30:19,21 31:2,8
**told** 26:7 27:11
**total** 18:3 21:16,20
21:21 29:22
**town** 19:12,15
**Trace** 15:10,19
17:8 18:7 20:24
23:14 25:16 27:15
30:20 31:14 33:13
34:5 35:22
**Tracey** 1:24 37:6
37:17
**transcript** 37:11
**tremendous** 16:10
16:16 18:17
**tried** 26:4
**true** 28:1 37:12
**try** 5:16
**trying** 5:19
**turn** 25:3
**Twin** 14:9,23
**two** 14:9 17:10,20
21:3 31:20 33:11
34:19,20
**typically** 20:9
30:12

---
**U**

**ultimately** 19:22
**umbrella** 8:6
**Uminski** 26:7 30:7
31:18
**understand** 5:14,15
28:17 29:15
**Understood** 5:8
**unfunctional** 15:24
**unique** 20:23
**UNITED** 1:1
**University** 9:23
**unusual** 20:11,15
**updating** 15:21
**upper** 20:17 35:7
35:17,19,22
**uprooted** 19:18
**upscale** 16:12
**use** 24:12 28:19
31:17,20 32:12,24
33:4,7
**uses** 30:12 32:8
**usually** 26:14,15
34:18,21

---
**V**

**value** 6:10,12,17
7:9,11 8:20 10:6
29:12 30:8,11,14
30:14,15,16,17,19
30:20,21,23 31:4
31:7,14,15,18,19
31:22,23 32:5,5,8
32:9,17,18,25,25
33:8,8,9,9,10,11
33:12
**valued** 29:16
**values** 9:2
**Virginia** 1:18 4:10
9:7,23 13:19
14:10 37:1,7
**visit** 16:7 17:21
**visits** 17:11
**visual** 29:7

---
**W**

**wait** 4:22 5:3
**waived** 36:7
**want** 13:25 17:10
**wanted** 17:17
**wants** 8:14,25 9:6
**wasn't** 26:4 35:6
**Watson** 1:12 3:3
4:1,3,9 22:19,20
37:8
**way** 5:20 13:6
27:14 32:23 34:14
**we're** 4:19,20 5:5
26:14 35:5
**week** 34:18,20,23
**welcome** 6:15
**went** 17:21,24 18:7
27:19
**weren't** 10:11
**Westerre** 1:17
**wife** 19:18
**wit** 37:2
**witness** 3:2 13:4,9
30:25
**work** 5:2 8:5 17:14
18:9 28:17 30:4
**works** 5:20
**wouldn't** 10:19
**write** 25:9,10
**writing** 27:9
**wrote** 25:6

---
**X**

**X** 3:1,5

---
**Y**

**yeah** 20:13
**year** 11:20 16:25
29:17
**years** 7:25 8:4
29:13 30:1

---
**Z**

---
**0**

---
**1**

**1** 3:7 22:16,20
**1-725** 33:19
**1-750** 33:19
**1-8** 33:20
**1,116** 32:22
**1,116,600** 32:19
**1.725** 31:18 33:13
33:25 34:11
**1:50** 1:14
**10** 10:22 11:22 12:4
12:12
**100** 29:2
**100,000** 29:12
**11** 28:4 32:2
**12** 11:19
**12-12020(MG)** 1:9
**150** 29:2
**150,000** 30:4
**1717** 2:3
**19** 1:13 4:2
**19103** 2:4

---
**2**

**2:42** 36:8
**20** 10:24 11:16,24
11:25 12:6,7,14
25:7 27:10
**200,000** 28:7
**2001** 10:16
**2003** 35:6
**2005** 13:24
**2006** 13:24
**2007** 13:2 14:14
15:3,10
**2008** 12:9,16,23
17:2,5 32:18 33:8
**2009** 12:2 33:14
34:5,10 35:4
**2012** 13:2 25:7
27:10 28:19 31:19
32:17 33:9 35:10
**2015** 10:18 11:16
**2016** 1:13 4:2 23:9
30:24 31:4 37:13
37:23
**215.851.8864** 2:5



**22** 3:7
**23** 7:25
**23229** 4:11
**27** 8:2
**28** 27:3
**29** 15:3

**3**

**30** 12:1 23:9
**300** 1:17
**31** 37:23
**3100** 2:3
**3900** 1:17
**3rd** 37:13

**4**

**4** 3:3

**5**

**5** 27:3
**50** 11:5 29:24 30:1
  30:3

**6**

**6,000** 21:19
**608,400** 31:20

**7**

**7521744** 37:18

**8**

**8,000** 29:17,20 30:2
**800,000** 29:17
**856.956.6950** 2:8
**8804** 4:10
**89** 30:24
**899** 20:3

**9**

**9/11** 10:15
**900** 27:21 29:24
**900,000** 28:5
**9717** 15:9,18 20:24



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

-------------------------------------------------------------------------

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day September, 2016, I caused a true and correct copy of

the foregoing Reply in Support of Its Motion *in Limine* To Exclude The Testimony Of Stevie

Watson to be sent to the following parties via Electronic Mail:

> Frank Reed
> Pro Se Claimant
> 817 Matlack Drive
> Moorestown, NJ 08057
> frankreednj@aol.com

> */s/ Barbara K. Hager*
> Barbara K. Hager