1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   RESIDENTIAL CAPITAL, LLC, et al.,

9

10             Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14             United States Bankruptcy Court

15             One Bowling Green

16             New York, New York

17

18             September 26, 2016

19             9:06 AM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

1
2   Trial regarding Reed Claims Objection.  Trial set for September
3   26 at 9:00 AM, continuing day to day on September 27th,
4   September 28th, September 29th and September 30th.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20   Transcribed by:  David Rutt
21   eScribers, LLC
22   700 West 192nd Street, Suite #607
23   New York, NY 10040
24   (973)406-2250
25   operations@escribers.net

1

2  A P P E A R A N C E S :

3  FRANK REED, PRO SE CREDITOR

4

5

6  REED SMITH LLP

7      Co-Counsel for The ResCap Borrower Claims Trust

8      136 Main Street

9      Suite 250

10     Princeton, NJ 08540

11

12  BY:   BARBARA K. HAGER, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  All right, please be seated.  We're here

3    in Residential Capital, 12-12020.  We're here in connection

4    with the trial of a contested matter involving the claim of

5    Frank Reed.  Let me have the appearances, please; Mr. Reed

6    first.

7            MR. REED:  Frank Reed, creditor pro se.

8            THE COURT:  Okay.

9            MS. HAGER:  Barbara Hager with Reed Smith, co-counsel

10   for the Borrower Claims Trust.

11           THE COURT:  All right.  Mr. Reed, do you wish to make

12   an opening statement?

13           MR. REED:  I do, Your Honor, but as a matter of

14   procedure, I don't know if there's -- when I do -- I have an

15   issue.  A witness who's been subpoenaed for trial, who I

16   believe's within the hundred-mile radius, has sent me a letter,

17   and from her employer, that she can't attend.  But I want to

18   seek an order to compel her to --

19           THE COURT:  Well, you can file a motion to hold her in

20   contempt for failure to appear, but your witnesses are here or

21   they're not here.  Do you wish to make an opening statement?

22           The subpoena is an order for her to appear and, if she

23   fails to appear, you'll have to take what action you think is

24   appropriate.  I mean, I'm not sending the marshal out to find

25   her.  Who's the witness?

1          MR. REED:  It's a private lender.  She's a distant

2    relative of my wife.

3          THE COURT:  What's her name?

4          MR. REED:  Joan Kline.  And she was examined under

5    deposition.  I don't -- I was looking at the rules and I saw a

6    rule that said in the interest in (sic) justice that you could

7    allow us to use her deposition if she doesn't appear.  I'd

8    rather her be here.

9          THE COURT:  Where does she live?

10          MR. REED:  Philadelphia.

11          THE COURT:  Is that a hundred mile -- is that within

12    the hundred miles?

13          Ms. Hager?

14          MS. HAGER:  Offhand I don't know.

15          THE COURT:  Sure she lives within a hundred miles?

16          MR. REED:  I'm not sure, actually, Your Honor.

17          THE COURT:  Well, you told me she lives within a

18    hundred miles, so you better find that out.  If she's outside

19    the hundred miles, you're out of luck.  I thought it's more

20    than a hundred miles, but I --

21          MR. REED:  But we have her deposition to use.

22          THE COURT:  Let's begin with your opening statement,

23    Mr. Reed.  Do you wish to make an opening statement?

24          MR. REED:  I do.

25          THE COURT:  All right.

1          MR. REED:  For close to twenty years, I routinely
2    flipped and rented properties for both taxable and nontaxable
3    gain.  For almost that entire time, I did business with TD Bank
4    and its predecessor, Commerce Bank.  In all of those years, I
5    borrowed millions of dollars from the bank and always paid back
6    the money I borrowed, often leaving me with property completely
7    mortgage-free.  Additionally, I borrowed and paid back private
8    loans from individuals as well, totaling in the hundreds of
9    thousands.  These pursuits were successfully maintained through
10   many downturns in the economy in general, as well.
11          As a result of this fact, TD Bank continued to lend me
12   money, regardless of my credit scores, as I had proven to them
13   my business acumen and ability to weather economic storms.
14   This opinion of my capabilities and accomplishments was not
15   unique to TD Bank; it was widely held by those I did business
16   with.  And this Court will hear testimony to that effect, from
17   a myriad of seasoned professionals, confirming my history and
18   abilities.
19          Now, as this Court knows and has found, in 2008 the
20   debtor filed an illegal foreclosure against me.  It is my
21   assertion that the debtor's bad act caused me ascertainable
22   losses pursuant to the New Jersey Consumer Fraud Act.  The
23   Court has been charged, by the district court, with the task of
24   estimating the dollar value of my claims, and to that end I
25   will endeavor to prove the following:

1          The debtor's fraudulent foreclosure was a poisonous

2    bad act that ruined my reputation with lenders and others,

3    resulting in the loss of cash and property, as well as the

4    incurrence of debt, all of which are recoverable under the New

5    Jersey Consumer Fraud Act.

6          The lost cash is represented in figures based on the

7    loss of rents, loss of loan proceeds, and the loss of the sale

8    of property.  The lost property is the equity that I had or

9    should have had -- should have had but for the contributing bad

10   act of the debtor.  The debt I reference is debt that would

11   have otherwise been extinguished but for the contributing bad

12   act of the debtor, leaving me holding the proverbial bag.  This

13   debt will be shown to be:  a) debt that was actively being

14   retired and would have eventually been extinguished by tenants'

15   rental payments, b) debt that would have been extinguished at

16   the sale of property, c) bills for legal work related to the

17   effects the illegal foreclosure had on my properties and

18   business, and d) unpaid balances for the work done on the

19   property, due to the debtor's bad act.

20         To make the debtors liable for each of the -- each

21   ascertainable loss, I have to prove that their bad act was a

22   contributing cause to that loss and that the loss is

23   ascertainable, i.e., quantifiable in some sense.

24         Now at this critical juncture I must take a moment to

25   remind the Court what type of evidence legally satisfies both

1   causation and the ascertainability under the New Jersey

2   Consumer Fraud Act.  First let's be clear:  legal causation,

3   under the NJCFA, is merely a showing that the bad act was a

4   cause of harm, not the cause or the majority cause but merely a

5   cause, like the -- a straw in the proverbial bundle of straw

6   that breaks the camel's back.

7           Citing from Arkan (ph.) v. Brother International, the

8   wrongful conduct need not be shown to be the sole cause of

9   plaintiff's loss but may be shown merely to be contribut --

10  merely to have contributed to the loss, noting that this is not

11  the rule for common-law fraud.  As far as causation is

12  concerned, the Court will hear testimony from lenders, a

13  potential business partner, and myself, unequivocally affirming

14  that the debtors' bad act was not only a cause of harm to me

15  but often the cause.

16          Second, the legal proof required to satisfy

17  ascertainability is not the same as that under other legal

18  rules of law.  The CFA is intended to be applied broadly --

19  quoting -- excuse me -- from Gonzalez v. Wilshire Credit Corp.,

20  "The CFA is intended to be applied broadly in order to

21  accomplish its remedial purpose, namely, to root out consumer

22  fraud," citing, within that case, Lemelledo v. Beneficial

23  Management Corp. of America, "and therefore to be liberally

24  construed in favor of the consumer."  "... CFA has been one of

25  constant expansion of consumer protection."  Gennari v.

1   Weichert Realtors.

2          As a result of this strongly settled public policy, a
3   victim of consumer fraud merely has to provide an estimate of
4   his loss.  New Jersey law provides ample guidance on this issue
5   as well as to what this means in regard to evidence.  Specific
6   to the New Jersey Consumer Fraud Act, the 2013 New Jersey
7   Appellate case, Pope v. Craftsman, clearly states that a
8   contractor's estimate is sufficient.  And as evidenced by my
9   almost twenty years of contracting, I'm just such a contractor
10  and I will give an estimate.

11         Aside from specific NJCFA cases, which are more
12  liberally construed as a matter of law and well-settled law of
13  New Jersey -- no, excuse me -- as a matter of law, the well-
14  settled law of New Jersey in general is articulated in Floors
15  (sic) Inc., 3L v. Westminster Communities, Inc. and is as
16  follows: "In fact, we do permit considerable speculation by
17  the trier of fact as to damages.  In Tessmar v. Grosner, ...,
18  the Court stated that '[t]he rule relating to the uncertainty
19  of damages applies to the uncertainty as to the fact of damages
20  (sic) and not as to their amount'" -- "'its amount, and where
21  it is certain that damage has resulted, mere uncertainty as to
22  the amount will not preclude the right of recovery.'"

23         Additionally, as this Court already knows, under the
24  Rules of Evidence I am qualified to render an opinion as to the
25  value of my property and the elements of that value, both

 1  positive and negative, by the very fact that I am the owner of

 2  the property.  It is also of no small note that the value of

 3  property can be properly derived from its market value or its

 4  intrinsic value, which could include as valu -- include in its

 5  valuation its value as a generator of revenue.

 6         In regard to my ascertainable damages, the Court has

 7  equitable powers granted to it in conjunction with legal

 8  remedies under the NJCFA.  As such, I will demonstrate that my

 9  family's imminent homelessness can qualify as an ascertainable

10  loss to be remedied.

11         Now I must turn to a glaring fatal -- glaring and

12  fatal flaw in the debtors' defense as described in their

13  memo -- pre-trial memo.  The debtor has no evidence, let alone

14  qualified admissible evidence, to rebut the direct and

15  unequivocable testimony as to causation by the very decision-

16  makers themselves who decided to not do business with me

17  because of the debtors' fraudulent foreclosure.  And the

18  debtors have no evidence, let alone qualified admissible

19  evidence, to rebut the value of the ascertainable losses.

20         The debtors propose to espouse hollow conjecture and

21  pure speculation at best and, as such, I will likely be

22  objecting frequently, as there is no witness on their list who

23  can testify to these matters, and counsel should not be allowed

24  to testify for the debtors.  To allow such bold and unsupported

25  speculation to be bandied about unabated would be highly

1    prejudicial and legally wrong.

2            Finally, in regard to the 9717 Old Dell Trace

3    property, the debtors have indicated in their pre-trial brief

4    that they intend to prove that I had sufficient funds to

5    complete the renovations but chose to do otherwise.  This flies

6    in the face of my self-interests and my motives, and I will

7    demonstrate that I actively continued to try and complete the

8    renovations and protect my assets practically down to my last

9    dollar, even to the peril of my wife and children.  I did this

10   as a matter of course.

11           Also, it is of no small legal significance that the

12   debtors have no qualified witness to offer an opinion via

13   testimony whether I could or could not have finished the

14   property.  As such, should -- and as such, they should be

15   barred from arguing an opinion that does not exist.

16           Finally, if the Court does consider what my actions

17   were, it must again consider this:  the debtors' bad act merely

18   has to be a cause, and that must be liberally construed as a

19   matter of law -- settled law and public policy.  And I must

20   also point out that there is no obligation to mitigate my

21   damages, although I tried, under the NJCFA.

22           I think that's it.

23           THE COURT:  Okay.

24           Ms. Hager, do you wish to make an opening statement?

25           MS. HAGER:  Yes, Your Honor.  Your Honor, no evidence

1   was produced during discovery that could prove Mr. Reed's

2   assertion that he has any ascertainable losses caused by the

3   foreclosure on the Matlack property.  You'll hear testimony

4   concerning Mr. Reed's failure to sell or rent the Old Dell

5   Trace property, which is located in Richmond, Virginia.

6   However, there's no proof of any causal link between the issues

7   with Old Dell Trace and the foreclosure on Matlack.  To the

8   contrary, the failure of Mr. Reed to sell or rent the Old Dell

9   Trace property hinged on decisions made by Mr. Reed concerning

10  his renovation of that property.

11          You will also hear testimony concerning Mr. Reed's

12  inability to finish the renovations on the Old Dell Trace

13  property.  Again, however, there's no causal link between such

14  failure and the foreclosure on the Matlack property.  To the

15  contrary, the failure to finish the renovations is attributable

16  to other factors, such as Mr. Reed's decisions concerning how

17  to spend his available funds.

18          You'll hear testimony concerning the amount of damages

19  attributable to the loss of the Old Dell Trace property;

20  however, those are largely unsubstantiated, unquantifiable and

21  speculative.

22          You'll hear testimony concerning Mr. Reed's inability

23  to continue renting three properties in New Jersey.  However,

24  there will be conflicting testimony from the tenant, explaining

25  the real motive behind moving out of those properties.

1      You'll hear testimony about Mr. Reed's claim that the
2  trust is liable for Mr. Reed's mortgage note on the New Jersey
3  properties.  However, to the contrary, only Mr. Reed is liable.
4  There's no action, by GMAC or the trust, that caused harm --
5  excuse me -- that caused him to owe the money due to TD Bank,
6  on those three New Jersey rental properties.  Mr. Reed claims
7  that the trust is liable for his deficiency judgment to TD Bank
8  with respect to those three New Jersey properties, but that
9  claim defies logic, since he is the one on the note.

10      You'll hear testimony concerning attorney's fees.
11  With respect to those fees, in Your Honor's October 2014
12  opinion, Your Honor found that fees incurred in prosecuting the
13  affirmative claim against GMAC are not recoverable attorney's
14  fees.

15      Lastly, Your Honor, we'll hear testimony concerning
16  claims regarding future loss of Matlack and possible
17  homelessness.  However, this trial is just about other
18  properties, not the Matlack property.  And as the property is
19  not yet sold and Mr. Reed has not yet been evicted, such
20  arguments are moot.

21      Thank you, Your Honor.

22      THE COURT:  All right.  Before we begin with the
23  evidence, Mr. Reed, you raised the issue about Ms. Kline.  And
24  did you file a proof service of the subpoena on Ms. Kline, on
25  the docket at this court?

1      MR. REED:  I did not.  I served the subpoena with my

2  adversary, Ms. Hager.

3      THE COURT:  Yes, but Rule 45(b)(4), Proof of Service:

4  "Proving service, when necessary, requires filing with the

5  issuing court a statement showing the date and manner of

6  service and the names of the persons served.  The statement

7  must be certified by the server."  So you didn't file a proof

8  of service, am I correct?

9      MR. REED:  No, Your Honor.  I can do it today.

10      THE COURT:  But let me ask a couple more questions.

11  Who served Ms. Kline?

12      MR. REED:  I did, Your Honor.

13      THE COURT:  Personally?

14      MR. REED:  Yes.

15      THE COURT:  And did you tender a one-day's -- did you

16  tender the fees for one day's appearance and the mileage for

17  her to travel to New York?

18      MR. REED:  I did, Your Honor.

19      THE COURT:  Rule 45(g), Contempt, provides that "[t]he

20  court for the district where compliance is required", I'll

21  leave some words out, "may hold in contempt a person who,

22  having been served, fails without adequate excuse to obey the

23  subpoena or an order related" thereto.  Do you wish to file a

24  motion to hold Ms. Kline in contempt?

25      MR. REED:  If that would compel her, yes.  Or, yes.

RESIDENTIAL CAPITAL, LLC, et al.                    15

1              THE COURT:  Well, I can sanction her.  I can fine her.

2    I'm not going to have her arrested.  Do you wish to file --

3    you're going to have to file a written motion; you're going to

4    have to serve her to hold her in contempt for -- first of all,

5    you're going to have to file an affidavit of service, and

6    you're going to have to establish that you -- in the affidavit,

7    you should indicate if you provided her with the fee for

8    attendance and the distance to the court.

9              While you were speaking, I Googled the distance from

10   the court to her home.  In her deposition at page 9, lines 9

11   and 10, she testified that her deposition (sic) is 250 Brae

12   Bourn Road, Huntingdon Valley, Pennsylvania; and according to

13   Google Maps, that's 85.2 miles from the courthouse, within the

14   100 miles, so that if a subpoena was properly served on

15   Ms. Kline, it is enforceable.  She may contest that the service

16   was proper but, if -- assuming that you file an affidavit that

17   you served her personally and paid her the witness fee and

18   mileage, the subpoena would be enforceable, it would appear.

19             And I don't know when you were planning to call her,

20   in what order you were planning to call her, but my suggestion

21   is during a recess you call her and you tell her if this is

22   your intention to file a motion to have her held in contempt

23   for failure to comply with the subpoena.  And you can report

24   back to me what she says.  This trial is scheduled to go on for

25   this week, so -- I don't know in what order you plan to call

1   her, but that's the starting point, Mr. Reed.

2            And if she contests the distance, she can.  As I say,

3   I took her address from the deposition, at page 9, lines 9 and

4   10, and just Googled it from the distance to the courthouse.

5   As I say, it shows 85.2 miles; within the 100 miles.  But she

6   has an opportunity to -- if you file a motion to hold her in

7   contempt, you need to serve her with it; and if she wants to

8   oppose it, she can.  But I'll accept at this point that you

9   served her the subpoena personally and paid her the fee for one

10  day's attendance and the mileage, as required by Rule 45.

11           So I think where you go from here is the first thing

12  to do is call her and see whether she has a change in view as

13  to whether she's going to appear.

14           Let's now move on to the evidence.  Want to call --

15  who's your first witness, Mr. Reed?

16           MR. REED:  Hold on, Your Honor.  Give me a minute.

17       (Pause)

18           MR. REED:  I guess the first one is Russow Beck, III.

19  And Mr. Beck is beyond the hundred miles of the court and I

20  have his deposition.  Ms. Hager --

21           THE COURT:  Did you designate page and line numbers

22  from his deposition, to offer in evidence?

23           MR. REED:  I thought I had to offer the whole

24  deposition.

25           THE COURT:  No.  No.  I don't allow parties to just

1    dump a whole deposition in; that's why I require designations,

2    counterdesignations.  Have you talked with Ms. Hager about

3    this?

4              MR. REED:  Ms. Hager and I talked about -- I guess --

5              Was it Saturday, Barb?

6              -- about the deposition.  She said that I didn't have

7    to read the whole deposition.  She said that I can pick

8    sections but to just make sure we're all on the same page when

9    we're doing that.

10             THE COURT:  Ms. Hager, tell me what your position is.

11   It's a short deposition.

12             MS. HAGER:  Your Honor, Mr. Reed and I spoke yesterday

13   midday about these depositions.  There are a number of

14   witnesses on Mr. Reed's list that are from Virginia and

15   Maryland --

16             THE COURT:  Right.

17             MS. HAGER:  -- and, therefore, not subject to trial

18   subpoena.  And Mr. Reed asked me how he should go about

19   offering them.  I noted that he did supply in his exhibit

20   binder entire copies of some of these depositions.  I told him

21   that that's not the way it works.  From my perspective, if he

22   were to read in what he wants to read in, if I could then read

23   in any cross, that would be okay.  Obviously, he didn't

24   designate any portions prior, but he's --

25             THE COURT:  All right.

1      MS. HAGER:  -- pro se and didn't realize how to go

2   about that.

3      THE COURT:  This is a very short deposition.

4      MS. HAGER:  Many of the Virginia ones are short; I

5   think four or five of them are contractors.  The deps are

6   probably ten minutes long.  There are a few others that are

7   longer.  There's a gentleman who's in Maryland:  Paul Molloy.

8   His deposition's longer, so I don't know how Your Honor would

9   feel about that.  But there're certainly four or five that are

10  particularly short.

11     THE COURT:  All right.  Mr. Reed, I'll permit you to

12  read the portions of the Beck deposition into evidence that you

13  wish to offer.  You need to tell me the page and line numbers

14  that you're offering, all right?  Ordinarily, Mr. Reed, where

15  depositions are being used, I require that the parties, in

16  advance of trial, designate by page and line number the

17  portions of the deposition that are being offered.

18     At least we'll proceed for now.  I see Mr. Beck's

19  deposition appears at tab 21 of Mr. Reed's binder, the first --

20  it's in volume 2, exhibit book 2 of 2, that Mr. Reed provided

21  to the Court.  Let's go ahead, Mr. Reed; and tell me page and

22  line number.

23     So I'm going to permit you to read it into the record,

24  but you need to tell me page and line number where you're

25  reading from.

RESIDENTIAL CAPITAL, LLC, et al.                    19

1          MR. REED:  Okay, you're going to have -- like you

2     said, Your Honor, I'm going to have to do that as best I can

3     here.  I thought I had to read the whole thing, so you're going

4     to -- bear with me while I do this.

5          THE COURT:  This deposition in the binder -- I guess

6     the deposition itself is twelve pages, according to the

7     transcript.  It only fills three pages in the binder.

8          Ms. Hager, what's your view as to -- do you object to

9     his offering this full transcript?  By doing that, I'm not

10    necessarily permitting him to offer all of his transcripts, but

11    what portions are -- you have your cross-examination there as

12    well.

13         I didn't anticipate, Mr. Reed, that we were going to

14    be taking up trial time to go through this exercise.

15         What's your position, Ms. Hager, with the Beck

16    deposition?

17         MS. HAGER:  Your Honor --

18         THE COURT:  What --

19         MS. HAGER:  I would intend to read in the majority of

20    my cross-exam, which is beginning on page 7, line 22, and

21    ending page 11, line 11, which is, I think, the bulk of the

22    transcript.  There's one item, one exchange, that I would have

23    an objection to on hearsay grounds but, beyond that, I wouldn't

24    have an objection to him offering the whole transcript.

25         THE COURT:  Tell me what portion you object to on

1    hearsay grounds.

2            MS. HAGER:  Sure.  Page 6, line 18.  Did Your Honor

3    want me to read --

4            THE COURT:  No, let me read it --

5            MS. HAGER:  -- them in or just --

6            THE COURT:  -- to my --

7            MS. HAGER:  Sure.

8            THE COURT:  To what?

9            MS. HAGER:  To page 7, line 5.

10           THE COURT:  All right, just give me a sec.

11           All right, Ms. Hager's objection to the portion of the

12   Beck transcript, page 6, line 18, through page 7, line 5, the

13   hearsay objection's sustained.  That portion of the transcript

14   is not admitted in evidence.

15           That's the only objection you have, Ms. Hager?

16           MS. HAGER:  Yes, Your Honor.

17           THE COURT:  Mr. Reed, do you have any objection to any

18   portion of Ms. Hager's cross-examination?

19       (Pause)

20           MR. REED:  No, Your Honor.

21           THE COURT:  All right.  The Beck deposition

22   transcript, which as I said appears at tab 21 of Mr. Reed's

23   exhibit binders -- it's the deposition of Russow, R-U-S-S-O-W,

24   R. (sic) Beck, III, taken on August 9th of 2016.  The

25   deposition transcript is admitted in evidence, except for the

1  portion as to which I sustained the objection -- the hearsay

2  objection:  page 6, line 18, through page 7, line 5.

3  (Deposition transcript of Russow E. Beck, III, excepting page

4  6, line 18, through page 6, line 5, was hereby received into

5  evidence as a Reed's exhibit, as of this date.)

6           THE COURT:  All right, what's your next witness?

7           MR. REED:  Your Honor, I -- do I -- this is a

8  procedural question.  I would like to -- don't know if it's

9  necessary but, if so, I move to admit the exhibits -- I'm

10 sorry -- the declaration and the documents that Mr. Beck

11 testified regarding their authenticity and the origin.

12          THE COURT:  Ms. Hager?

13          MS. HAGER:  Which exhibit is Mr. Reed referring to?

14          MR. REED:  If I do them one at a time, the first

15 exhibit is the -- well, I guess it's one exhibit; it's the --

16          THE COURT:  This is the -- the only thing I see in the

17 book is Beck 1 was the declaration with many, many pages

18 attached --

19          MR. REED:  Yes.  That's it, Your Honor.

20      (Pause)

21          THE COURT:  Mr. Reed, the copies in my binder are

22 illegible.  Are they -- I don't even -- are they referenced in

23 the deposition?

24          MR. REED:  Yes.  They're referenced in the -- the

25 declaration --

1          THE COURT:  No, are they referenced in the deposition?

2          MR. REED:  Yes.

3          THE COURT:  Tell me.  Show me the page and line

4     number.

5        (Pause)

6          MR. REED:  It is the -- page -- starts on page 4 of

7     the deposition, line 25.  They were attached to the declaration

8     and I handed him his declaration and the exhibits.  So that's

9     why the exhibit is the declaration with the -- all the

10    invoices.

11       (Pause)

12         THE COURT:  Ms. Hager?

13         MS. HAGER:  Your Honor, during cross-exam I asked

14    about the support for Mr. Beck's number in his declaration.  He

15    stated in his declaration that he was owed $18,954.28.  And on

16    page 7, line 24, I asked, "Do you have any supporting records

17    for that?"  He said, "Yes."  I asked on page 8, "Are they with

18    you today?", and his answer was, "I've got some."  And he went

19    on for a few pages to talk about what he had with him and the

20    support for it, and he never quite had -- never quite seemed to

21    have support for the 18,000-dollar number that was in the

22    declaration.

23         And so I don't know if what is attached to the

24    declaration is actually what is support for the 18,000 or if

25    that's something different.  When I look at those documents, I

1   don't see a total.  He talked in his cross about some records

2   from 2002, which he admitted would have to come out of there

3   because that's not the right time frame.  So I'm not -- I'm

4   really not sure what is attached to the declaration.

5         THE COURT:  I can't read them.

6         MR. REED:  Your Honor, I can read the ones I have, and

7   I don't --

8         THE COURT:  Well, it doesn't do me any good, Mr. Reed,

9   if you're offering in evidence copies of illegible exhibits.

10        First, Ms. Hager, are you objecting, or not, to the

11   exhibits attached to the declaration that's appended to the

12   deposition transcript?

13        MS. HAGER:  I'm objecting on relevance grounds.

14        THE COURT:  All right, that objection's overruled.

15        MS. HAGER:  Hearsay.

16        THE COURT:  Take them for what it's -- well, he

17   testified that Mr. Reed owed him $18,954.28, based on the

18   examination of his books and records.  And at page 8, lines 2

19   through 8, I think he's saying that there're invoices for

20   $13,402.37.  I'm going to overrule the objection both on

21   relevance and hearsay.

22        All right, and --

23        So, do I understand that Mr. Beck operates a lumber

24   and building-supply company and that over some period of time

25   Mr. Reed purchased items from him and what he's testified to

1    was that Mr. Reed didn't pay 18,000 dollars of the bills?  Is

2    that a fair statement, Ms. Hager?

3              MS. HAGER:  I believe so, although at one place he

4    testifies about 13,000, but then I think at the end he comes

5    back around to the 18 -- some --

6              THE COURT:  You got --

7              MS. HAGER:  -- a number just short of --

8              THE COURT:  He came with --

9              MS. HAGER:  -- 18.9.

10             THE COURT:  -- invoices that backed up about 13,000,

11   but he said --

12             MS. HAGER:  That's --

13             THE COURT:  -- the number from their --

14             MS. HAGER:  That's correct.

15             THE COURT:  -- books and records was the 18,000.

16             MS. HAGER:  That's correct.

17             THE COURT:  All right.  So the exhibit attached to the

18   deposition transcript as Beck 1 is in evidence.

19   (Exhibit 1 to deposition transcript of Russow E. Beck, III was

20   hereby received into evidence as a Reed's exhibit, as of this

21   date.)

22             THE COURT:  Relevance is going to depend -- I don't --

23   can't even read the dates that these invoices cover, Mr. Reed.

24   Where're the dates?

25             MR. REED:  It'd be on the line, Your Honor, above

RESIDENTIAL CAPITAL, LLC, et al.                    25

1    each -- so, below my address, in the first line it will say

2    "Cash", then I'll have some kind of code number, then "Cash"

3    again.  And Bill Foster, for example; I'm looking at one and it

4    has an '09 date.  Let's see.  If you look to the first one --

5              THE COURT:  Ms. Hager, did you explore -- what's the

6    time period that it covered, by the unpaid invoices?

7              MS. HAGER:  The time period is 2009, with the

8    exception of two that he testified about during his deposition,

9    that I did not see in the exhibit, which were from 2002.

10             MR. REED:  Your Honor, I did not do business with them

11   in 2002, that I can remember.

12             THE COURT:  So what's the date, Mr. Reed, of the very

13   first invoice that appears behind Beck's declaration?

14             MR. REED:  That looks like the -- 10/30/02.

15             THE COURT:  That's -- I can barely make that out.

16   That looks like a 2002 invoice.

17             MR. REED:  Yes.

18             MS. HAGER:  Well, the first one I'm looking at looks

19   like it's from 1/30/09.  Am I -- are we on Exhibit 20?

20             THE COURT:  21.

21             MS. HAGER:  Oh, 21.

22             THE COURT:  The declaration.

23             MR. REED:  That should be a duplicate of that.

24             MS. HAGER:  It --

25             MR. REED:  Oh, yeah.  Barb --

1          MS. HAGER:  It isn't.

2          THE COURT:  It's not a duplicate, Mr. Reed.  It does

3    look like it's a 2002.

4       (Pause)

5          THE COURT:  The second one looks like it's from 2005.

6          MR. REED:  Yes, Your Honor, there are -- I find

7    them --

8          THE COURT:  How is it you're trying to recover for a

9    bill you didn't pay in 2005 or 2002?

10          MR. REED:  No, Your Honor, I'm asking for what I paid

11   for regarding the Old Dell Trace, which I believe took place

12   all within 2009.  Mr. --

13          THE COURT:  So --

14          MR. REED:  If Mr. --

15          THE COURT:  So why are there bills from 2002 and 2009

16   (sic) in your exhibits?

17          MR. REED:  If Mr. Beck supplied them at the -- for the

18   deposition --

19          THE COURT:  I thought he supplied them to show how

20   much you owed.

21          MR. REED:  I understand that, Your Honor.  If he

22   accidentally --

23          THE COURT:  So if you didn't pay bills from 2002 and

24   2005, on what basis do you think you can recover that here?

25          MR. REED:  The bills from 2002 and 2005 -- I do not

RESIDENTIAL CAPITAL, LLC, et al.                    27

1    object to those invoices being removed; I said that to Mrs. --

2    Ms. Hager --

3             THE COURT:  Mr. Reed, Mr. Reed --

4             MR. REED:  And I paid those --

5             THE COURT:  It's a fraud on the Court when you try to

6    tender bills, invoices, from periods not involved here.  You

7    know, you just -- are you just dumping stuff in?

8             MR. REED:  No, Your Honor, I'm not.  I think you're --

9    two stray invoices that a third party put in there, that we

10   examined in the deposition, that I -- I had -- I had -- I did

11   not advocate for those two invoices or -- I don't even know if

12   there was any more than that.  But I believe we discovered two.

13            So I'm not seeking that.  Really?  "Dumping".

14            THE COURT:  Really?  You think you can put in evidence

15   in this court, to support your damage claim, exhibits from 2002

16   and 2005?

17            MR. REED:  No -- no, Your Honor.  I'm supposed to -- I

18   believe I'm supposed to put in evidence what's been gathered,

19   and then allow the Court to see what is relevant.

20            THE COURT:  And I'm supposed to pick and choose among

21   things that are irrelevant and things that you contend are

22   relevant?

23            MR. REED:  No, Your Honor.  Ms. Hager and I even -- in

24   the deposition, there were -- the ones that were not relevant

25   were stated.  This started because Ms. Hager was identifying

1   the ones that were not.

2           THE COURT:  Did you identify in the transcript,

3   Ms. Hager, that there were -- Mr. Beck provided exhibits

4   from -- documents from 2002 and 2005?

5           MS. HAGER:  I did, Your Honor.

6           THE COURT:  Where is that?

7           MS. HAGER:  I -- sure.  Give me one moment.

8       (Pause)

9           THE COURT:  See on page --

10          MS. HAGER:  The first --

11          THE COURT:  -- 10, there's a reference to 2002.

12          MS. HAGER:  Right.  I went back a little before that.

13  On page 9 he references 2009 on line 1, as he's going through

14  the invoices.  And then I questioned him at line 6:  "But did

15  you mention 2002?"  Then he says he has "a couple of invoices

16  that I don't -- I'd have to go back and research why, because,

17  I mean" --

18          "Were you buying back then?"

19          THE COURT:  All right, I'll deal with this separately.

20  What's your next witness, Mr. Reed?

21          MR. REED:  And, Your Honor, for the record, this is

22  not offered into evidence as a debt that I did not pay.  These

23  were paid.

24          THE COURT:  Everything in these invoices was paid?

25          MR. REED:  Yes.  There's some costs in the property.

1          THE COURT:  All right, let's go; next witness.

2          MS. HAGER:  Excuse me.  Just for clarification:  was

3     Exhibit 21 offered into evidence and accepted?

4          THE COURT:  That's the deposition transcript.

5          MS. HAGER:  Deposition transcript with those --

6          THE COURT:  Yeah.

7          MS. HAGER:  -- exhibits?

8          THE COURT:  Yes.

9          MS. HAGER:  Is that right?  Okay.  Thank you.

10         MR. REED:  Let's go; next witness.

11         MR. REED:  The next witness, Your Honor, is Nathan

12    Sowder.  Same thing with his -- he's outside the hundred-mile

13    radius, in Virginia, so I looked for his deposition.

14        (Pause)

15         THE COURT:  Ms. Hager, what's your position on

16    admitting this transcript?

17         MS. HAGER:  Your Honor, I would read in, as my cross,

18    certain designations, which I could provide.  I would also

19    object to Exhibit 2 of the transcript, which is -- which are

20    documents that were not produced during discovery and in

21    addition may pre-date the relevant time period.

22         THE COURT:  Did you produce Exhibit 2 to the

23    deposition, during discovery?

24         MR. REED:  I'm sorry, Your Honor?

25         THE COURT:  Did you produce Sowder Exhibit 2 during

1  discovery?

2          MR. REED:  It wasn't a document that I was aware that

3  it existed, Your Honor.  It was produced under the subpoena to

4  bring any records by the individual, held by the individual,

5  under the deposition subpoena.  And it was produced at the time

6  of the --

7          THE COURT:  Is it on your exhibit list?

8          MR. REED:  Yes.

9          THE COURT:  What number is it on your exhibit list?

10          MR. REED:  It would be under 23, deposition and

11  exhibits.

12          THE COURT:  And what is Exhibit 2 to it?  Tell me what

13  it is.

14          MR. REED:  It's the -- they're the invoices that were

15  paid for the design work on the properties in Virginia.  They

16  are in -- paid for in prior time, but are relevant because

17  they're sunk costs in the property.

18          THE COURT:  Ms. Hager?

19          MS. HAGER:  Your Honor, Mr. Sowder's declaration and

20  the basis for his deposition had to do with two properties in

21  Virginia.  One is the property at Old Dell Trace in Richmond.

22  The other is a property on Brookschase Road (sic).  Mr. Sowder

23  was the draftsman.  He did some architectural drawings with

24  respect to both properties.

25          Mr. Reed has since withdrawn his claim for damages

1    relating to the Brookschase property, so to the extent that any

2    testimony about Brookschase comes in, that should be -- well,

3    it shouldn't come in.  That should be stricken from the

4    deposition, and he should be limited to the amount that he

5    testified to, which only relates to the Old Dell Trace

6    property.

7              THE COURT:  Well, then you need to make more specific

8    objections to page and line references.

9              MS. HAGER:  Sure.  On page 6, line 4, he testifies he

10   was paid a total of $2,003.75 for the plans relating to Old

11   Dell Trace, and I would object to the remainder of that

12   sentence as it relates to the different property.

13             In addition, line 8, there's -- the sentence beginning

14   with "133 Brookschase plans were for a completed home," I would

15   object to that clause.

16             Line -- still page 6, line 15, after the comma, that

17   he began site preparation for 1333 (sic) Brookschase Lane, but

18   did not complete that project as well.

19             And on page 6 -- excuse me -- page 8 line 17 through

20   page 9 line 8, all reference the Brookschase Lane property.

21             THE COURT:  All right.  Look, you're going to have to

22   file an objection specifically identifying page and line

23   references to this deposition that you're objecting to.

24             And Mr. Reed, I note with respect to Exhibit 2 that

25   you're offering, it specifically relates to -- the 7,236

1  dollars that's shown on that invoice specifically relates to

2  Brookschase that's shown on page 6 of the transcript.

3              MR. REED:  Your Honor, I do not object to the

4  elimination of the Brookschase stuff.  This was --

5              THE COURT:  This is exactly why, Mr. Reed, I require

6  page and line references to depositions that are being offered

7  and not just putting a transcript in a binder that may have

8  some things that are relevant and some that are not.

9              You made an argument five minutes ago why the exhibit

10  marked as Exhibit 2 to this deposition should come into

11  evidence.  And after Ms. Hager points out that Brookschase is

12  out of the case and I reference back to page 6 of the

13  transcript, I see specifically that the 7,236 dollars which

14  you've offered this exhibit, relates to Brookschase that's not

15  in the case.  I don't know what the 691 dollars -- the next

16  invoice that totals 1,513 dollars -- I have no idea what that

17  is for.

18              MR. REED:  It says "Dell Trace project".  And --

19              THE COURT:  All right, Ms. Hager, you're going to have

20  to file a writing that identifies specifically page and line

21  reference objections to this transcript.

22              MR. REED:  I'm sorry --

23              MS. HAGER:  Yes, Your Honor.

24              THE COURT:  And the exhibits attached to it.

25              MS. HAGER:  Yes, Your Honor.  The timing on that, Your

RESIDENTIAL CAPITAL, LLC, et al.                              33

1    Honor?

2            THE COURT:  Well, we're in trial this week.  I want it

3    this week.  I mean, get somebody in your office to go ahead and

4    dictate it.  I don't know, use the Morrison & Foerster office

5    and -- this is the whole purpose of trial.  I want everything

6    clear as to what's in evidence and what's not in evidence.  I

7    don't want to go through an exercise like this.

8            MS. HAGER:  I understand, Your Honor.

9            THE COURT:  I want it by the end of the day tomorrow.

10            MS. HAGER:  Thank you, Your Honor.

11            THE COURT:  Which portions of your -- and indicate

12    which portions of your cross-examination you're offering in

13    evidence.

14            MS. HAGER:  Yes, Your Honor.

15            THE COURT:  What's the next one, Mr. Reed?

16            I'm reserving the ruling as to which, if any, portions

17    of the deposition of Nathan Sowder come into evidence.  What's

18    your next witness, Mr. Reed?

19        (Pause)

20            MR. REED:  Pryor deposition and exhibit.  Mr. Pryor is

21    a witness who, again, is outside the --

22            THE COURT:  Just hang on a second, Mr. Reed.

23            MR. REED:  Oh, there's no exhibit.

24            THE COURT:  Which exhibit?

25            MR. REED:  There is no exhibit, Your Honor.  I

1    misspoke.  The exhibit -- I'm sorry.  The exhibit that I meant

2    was the declaration.  I thought it had to be an exhibit.  So

3    his deposition has the declaration itself as a -- as an

4    exhibit.

5             THE COURT:  Which witness?

6             MR. REED:  Mr. Pryor -- Fred --

7             THE COURT:  Where in the binder do I find --

8             MR. REED:  Fred Pryor.

9             THE COURT:  Where in the binder do I find it?

10            MR. REED:  27 should be Mr. Fred Pryor's deposition

11   with his -- with a declaration as an exhibit.

12            THE COURT:  What's your position, Ms. Hager, with

13   respect to the Pryor transcript?

14            MS. HAGER:  Your Honor, I wouldn't have an issue with

15   the deposition transcript coming in.  I would read in my cross,

16   which starts page 6 line 11 and ends page 7 line 9, with one

17   exception.  Page 7 line 2 through 4, I have a hearsay

18   objection.

19            THE COURT:  Sustained.

20            MS. HAGER:  Thank you.

21            THE COURT:  All right, the transcript of Frank Pryor

22   is in evidence, with the exception of page 7 line 2 to 4.

23   (Pryor deposition transcript, with the exception of page 7,

24   lines 2 to 4, was hereby received into evidence as a Reed's

25   exhibit, as of this date.)

RESIDENTIAL CAPITAL, LLC, et al.                    35

1              THE COURT:  What's your next witness, Mr. Reed?

2              MR. REED:  Derrick Rosser deposition and exhibits.

3    Mr. Rosser --

4              THE COURT:  Just give me the exhibit number -- what

5    tab number in your binder?

6              MR. REED:  31.

7              THE COURT:  Ms. Hager, what's your position with

8    respect to the Rosser transcript?

9              MS. HAGER:  No objection to that, Your Honor.

10             THE COURT:  Do you have any cross in here?

11             MS. HAGER:  Right, my cross starts on page 10 line 2.

12             THE COURT:  All right, do you have any objections to

13   anything in the transcript?

14             MS. HAGER:  No, Your Honor.

15             THE COURT:  All right.  The Rosser transcript is in

16   evidence.

17   (Rosser deposition transcript was hereby received into evidence

18   as a Reed's exhibit, as of this date.)

19             THE COURT:  Next, Mr. Reed?

20        (Pause)

21             THE COURT:  Who's your next witness, Mr. Reed?

22             MR. REED:  It's Dennis Whelan.  And that would be --

23   Mr. Whelan is outside, again, the court.  He's in Virginia.

24   It's outside the court's jurisdiction.  29, I believe, is the

25   tab.

 1          THE COURT:  Bear with me a second.

 2          Ms. Hager?

 3          MS. HAGER:  Your Honor, I object on relevance grounds.
Mr. Whelan is an attorney who represented the Reeds in
connection with litigation relating to the Old Dell Trace
property more than a year after the foreclosure on Matlack and
more than a year after the purported turn-down by TD Bank.

 8          Mr. Whelan's fees are specifically related to:  1) the
Old Dell Trace -- excuse me, the foreclosure on Old Dell Trace,
and 2) an affirmative case against Taylor, Bean & Whitaker,
which is the mortgage-holder on the Old Dell Trace property.

12          THE COURT:  Mr. Reed, you want to respond?

13          MR. REED:  The interruption of our cash flow from
lenders had an impact on our ability to service the debt on
properties, and as such, the resulting damage that came from
that, which is foreclosure and loss of the property.  We
attempted to halt that, stay that, and do whatever we could to
prevent the loss.

19          THE COURT:  Who is the mortgagee for Old Dell Trace?

20          MR. REED:  My wife and I are mortgagee.

21          THE COURT:  No, who gave -- who provided the mortgage?
You're the mortgagor.  Who was the mortgagee?

23          MR. REED:  Oh.  Taylor, Bean & Whitaker.

24          THE COURT:  And they successfully foreclosed on the
loan on that property, correct?

1          MR. REED:  Yes.

2          THE COURT:  And Mr. Whelan defended you in the

3    foreclosure action?

4          MR. REED:  Yes.

5          THE COURT:  And did you bring a claim against Taylor

6    Bean as well?

7          MR. REED:  Yes.

8          THE COURT:  And he represented you in that?

9          MR. REED:  Yes.

10          THE COURT:  What was the outcome of your claim against

11    Taylor Bean?

12          MR. REED:  It was -- with Mr. Whelan, it was withdrawn

13    to be filed again under the Virginia rules of nonsuit.

14          THE COURT:  Did you sue Taylor Bean?

15          MR. REED:  That's what we -- that's --

16          THE COURT:  And what was the outcome of that case?

17          MR. REED:  It was nonsuited by Mr. Whelan, which --

18    which allows for it to be refiled.

19          MS. HAGER:  Your Honor, if I may?

20          THE COURT:  Go ahead.

21          MS. HAGER:  After it was nonsuited, it was refiled and

22    the defendants, mortgage companies, moved to dismiss, and the

23    court granted that motion.

24          MR. REED:  That was done by me.  That was not done by

25    Mr. Whelan.

1           THE COURT:  What was done -- what was done by you?

2           MR. REED:  The refiling.

3           THE COURT:  And Taylor Bean succeeded in having it

4    dismissed?

5           MR. REED:  Without prejudice, allowing me to refile.

6           THE COURT:  Ms. Hager?

7           MS. HAGER:  I'd have to check the documents.  Offhand,

8    I don't recall.

9           THE COURT:  Did you make a motion in limine with

10   respect to Whelan?

11          MS. HAGER:  I did not, Your Honor.

12          THE COURT:  Other than relevance, do you have other

13   objections to the transcript, Ms. Hager?

14          MS. HAGER:  I did have some objections through the

15   transcript, Your Honor, and I can point Your Honor to them.

16   They're where --

17          THE COURT:  I want --

18          MS. HAGER:  -- I made objections --

19          THE COURT:  -- I want it in writing by noon tomorrow.

20          MS. HAGER:  Yes, Your Honor.

21          THE COURT:  Okay.  I'm going to reserve decision

22   whether any of the Whelan transcript comes into evidence.  And

23   by noon tomorrow, I want any objections, page and line

24   references.

25          Did you cross-examine?

1           MS. HAGER:  Yes, Your Honor.

2           THE COURT:  And your writing should also indicate, if

3   any of the transcript comes in, which portions of your cross-

4   examination you're offering, page and line reference.

5           MS. HAGER:  Yes, Your Honor.

6           THE COURT:  I'm reserving decision on the Dennis

7   Whelan transcript.

8           MR. REED:  Your Honor, I apologize.  I need to use the

9   restroom.

10          THE COURT:  All right.  We're going to take a ten-

11  minute recess.  Let's make it a fifteen-minute recess.

12       (Recess from 10:24 a.m. until 10:48 a.m.)

13          THE COURT:  Court's back in session.  During the

14  recess, my courtroom deputy advised me that she received a

15  telephone call from Stevie Watson a realtor in Richmond,

16  Virginia.  Ms. Watson told my courtroom deputy that when she

17  came to the office this morning there was a subpoena in her

18  mailbox at her office demanding her presence in court tomorrow.

19          My courtroom deputy advised Ms. Watson that we do not

20  give legal advice.  We are permitting Ms. Watson to email a

21  letter to the court.  To my knowledge it has not been received

22  at this point.  I will leave it to counsel and Mr. Reed to

23  address the issues.  Obviously, Richmond is not within a

24  hundred miles of the courtroom, but I will leave it to the

25  parties to figure out how to respond, if at all.

1          Who's your next witness, Mr. Reed?

2          MR. REED:  James Suhr, and that's number 17 -- Mr.

3     Suhr is in Virginia, is outside the jurisdiction of the court.

4          THE COURT:  What's the tab number?

5          MR. REED:  17.

6          THE COURT:  This transcript is somewhat longer than

7     the others.  What's your position, Ms. Hager?

8          MS. HAGER:  Your Honor, my copy of the exhibit book

9     doesn't have the deposition transcript in it.  But as long as

10    yours does --

11         THE COURT:  Do you have a copy of the transcript?

12         MS. HAGER:  I do have a copy of it.

13         THE COURT:  Okay, it's behind tab 17 in my binder.

14         MS. HAGER:  Yeah, it's not in here, but I do have a

15    copy.

16         THE COURT:  All right.  This transcript has seventeen

17    pages.  Actually, it's fewer than that.  It's thirteen pages of

18    testimony.

19         MS. HAGER:  Your Honor, I had an objection on page 11,

20    line 3 --

21         THE COURT:  Let me just get there, okay?

22         MS. HAGER:  Sure.

23         THE COURT:  It's page 11 line 3.  What's wrong with

24    the question on line 3 and the answer on line 5?

25         MS. HAGER:  You know --

1          THE COURT:  It doesn't look objectionable to me.

2          MS. HAGER:  My apologies.  This was done over the

3    phone and actually my objection was to the prior question.  You

4    can see that the court reporter interrupted us at page 11 line

5    6 and said, "Ms. Hager, did you object after the last

6    question?"  So my objection was actually to page 10 lines 20

7    through 25.

8          THE COURT:  Hold on.  The objection is overruled.

9          MS. HAGER:  Also page 11 lines 23 through 25, and my

10   objection is at the top of page 12.

11         THE COURT:  Hold on.  Through what page -- through

12   what line on page 12?

13         MS. HAGER:  Page 12, 1 through 4.  It looks like Mr.

14   Reed withdrew the question --

15         THE COURT:  Your objection is overruled in any event.

16   He's testifying about his observations at the job site.

17         MS. HAGER:  Okay.  No further objections.  My cross

18   starts on page 15 and goes through page 16 line 11.

19         THE COURT:  Are you offering all of it?

20         MS. HAGER:  Yes, Your Honor.

21         THE COURT:  All right.  So the deposition of James

22   Suhr is in evidence.

23   (Suhr deposition transcript was hereby received into evidence

24   as a Reed's exhibit, as of this date.)

25         THE COURT:  What's your next exhibit, Mr. Reed -- next

1  witness?

2          MR. REED:  Well, Your Honor, I don't -- again, I'm

3  going to make sure I don't accidentally leave something out.

4  The exhibits to the declara -- to the deposition that Mr. Suhr

5  testified to within the deposition.

6          THE COURT:  Do you have any objection to those, Ms.

7  Reed -- I'm sorry, Ms. Hager?

8          MS. HAGER:  If I could just have clarification on one

9  thing.

10         THE COURT:  There's two exhibits.

11         MS. HAGER:  Well --

12         THE COURT:  At least what I have is two exhibits

13  attached to the -- his declaration is attached to the

14  deposition, and attached to the declaration are two exhibits.

15         MS. HAGER:  Okay.  If they're the two exhibits

16  attached to the declaration, that's fine.  I only asked for

17  clarification because I don't have a copy from Mr. Reed of the

18  deposition transcript.  I just wanted to make sure we're

19  talking about the same thing.

20         THE COURT:  I'll tell you what I have.  Attached to

21  the deposition transcript is the declaration of James Suhr

22  dated 10 April 2016.  And attached to that are two exhibits,

23  two invoices:  one for $1,462.87 and one for $303.75.

24         MS. HAGER:  Yes, those are what I have attached to the

25  declaration.  Thank you.

1          THE COURT:  That's the only thing here.  All right,

2     that's in evidence.

3     (Two exhibits to Suhr deposition were hereby received into

4     evidence as a Reed's exhibit, as of this date.)

5          THE COURT:  Go ahead, Mr. Reed, who's next?

6        (Pause)

7          MR. REED:  Number 15 -- tab 15 in book 1, the witness

8     is Martha Clampitt.

9        (Pause)

10         THE COURT:  All right.  Now, we're dealing with forty-

11    seven pages of transcript.  Who's Ms. Clampitt, Mr. Reed?  I

12    haven't read this.  It's not in evidence.  Who is she?

13         MR. REED:  Ms. --

14         THE COURT:  What are you offering her for?

15         MR. REED:  Ms. Clampitt is a realtor in Virginia that

16    I worked with to, at the time, analyze what were the best

17    courses of action regarding the property at Old Dell Trace to

18    salvage value from it or get value from it.  In this

19    particular -- out of that relationship and interaction, Ms.

20    Clampitt had advised, you know, if we could get it done, that

21    renting it was an option.  And she did an analysis of what we

22    could get for rents on the property.

23         So this -- this testimony talks about if we had

24    been -- if we could complete the house, that this is what the

25    house should be able to rent for.  And she did a mark -- had

1    done a market analysis of it and what was renting, how much it

2    was renting for, comparables in the -- in the relevant market.

3             THE COURT:  Now, you submitted a declaration for Ms.

4    Clampitt --

5             MR. REED:  Yeah, and --

6             THE COURT:  -- and Ms. Hager took her deposition?

7             MR. REED:  Correct.

8             THE COURT:  Ms. Hager, what's your position on the

9    deposition?

10            MS. HAGER:  Well, Your Honor, the deposition, in large

11   part, exceeds the scope of the declaration.  It was my

12   deposition.  Mr. Reed did --

13            THE COURT:  Well, she's not -- the declaration isn't

14   coming in.  She's not here.  If she was here for cross-

15   examination, it would be one thing.  You took her deposition.

16   Some of it may be admissible, and some of it not.

17            MS. HAGER:  Right.  So --

18            THE COURT:  Tomorrow at noon, give me any objections,

19   page and line reference to the deposition, on whatever grounds.

20   This is what I try to avoid, what we're doing now.

21            MR. REED:  Well, we're going to be done a lot quicker

22   this -- Your Honor, I hate to say it, because we're nearing the

23   end of my -- the witnesses that are outside the scope --

24            THE COURT:  These comments are really addressed to Ms.

25   Hager, because what am I supposed to do, Ms. Hager?  You took a

1   deposition, you didn't give me what you want to offer.  I've

2   got a deposition in a binder.

3           MS. HAGER:  Well, Your Honor, I mean, it's his

4   witness, and --

5           THE COURT:  Mr. Reed, which portions of the deposition

6   do you want?  I'm not dumping the whole thing in evidence.

7   Okay?  Mr. Reed, I'm giving you until noon tomorrow to give me

8   in writing specific page and line references in the Clampitt

9   deposition transcript that you're offering into evidence.

10          And you can't just throw in -- look, I bent over

11  backwards.  The other transcripts were short.  This one's

12  longer now.  I don't know what is relevant, what's not

13  relevant, what comes in.  The fact that Ms. Hager took her

14  deposition doesn't make it admissible at trial.

15          Ms. Hager, if there are portions of the transcript

16  that you want to offer, I want to see it in writing, page and

17  line references, tomorrow at noon.

18          MR. REED:  Your Honor, the Watson declaration is

19  similar.

20          THE COURT:  Let's deal with Clampitt first, Mr. Reed.

21  Do you understand what you have to do?

22          MR. REED:  Yes, I have to go through the -- through

23  the depo -- let me restate it to make sure I understand it.  I

24  have to go through the deposition and make a list of citations

25  to the deposition which include page and line references --

RESIDENTIAL CAPITAL, LLC, et al.                    46

1          THE COURT:  Correct.

2          MR. REED:  -- as to what I'm going to submit.

3          THE COURT:  By tomorrow at noon.

4          MR. REED:  I would -- Your Honor, I would -- to make

5   this all simpler, I would ask us to adjourn and allow me to do

6   that --

7          THE COURT:  I'm not adjourning, Mr. Reed.  I made

8   clear, we have four trial days, okay.  You want to do it during

9   your lunch break, do it during your lunch break.  You can do it

10  before tomorrow at noon, fine.  But we're going on.  Okay?  I

11  don't waste trial time.  I have a busy schedule.  Okay?

12         MR. REED:  Your Honor, I was just offering to do it

13  for the remaining ones that are -- that are lengthy depositions

14  as well, so that I --

15         THE COURT:  You'll run into the same roadblock, okay?

16  I'm not putting entire transcripts in evidence.  I bent over

17  backwards when the transcripts were less than ten pages, but

18  now we're up to a forty-eight-page transcript.

19         MR. REED:  You know, I'm not saying I don't want to do

20  it.  I would like to do the next three for the Court so that it

21  will be simpler and more streamlined, instead of -- I don't

22  want to aggravate you.  And so the Oxford one is -- the Paul

23  Molloy one is lengthy, the Stevie Watson one that she's outside

24  the hundred-mile radius is lengthy.

25         THE COURT:  She seems to think you subpoenaed her.  I

RESIDENTIAL CAPITAL, LLC, et al.                    47

1    don't know whether you tried or not.  It doesn't sound like you

2    served her personally, but --

3              MS. HAGER:  Your Honor, with respect to this universe

4    of witnesses that we're talking about here, until last Friday

5    afternoon or some point on Friday, my understanding was that

6    Mr. Reed was intending to subpoena them and did intend to have

7    them come here personally.

8              I did not weigh in on that, but he did send me

9    subpoenas that he either served or tried to serve on all these

10   people.  So I did not know that they were not coming.  I will

11   certainly have my references in as Your Honor has ordered.  But

12   from my perspective, I didn't know that they weren't coming.

13             THE COURT:  Okay.  Okay.

14             MR. REED:  And the reason -- Your Honor, the reason

15   why I subpoenaed them is because I -- again, it's just a

16   mistake on my part.  I thought I had to try to get them to

17   come, even though they were outside the hundred-mile radius,

18   and that was some condition precedent to using their

19   depositions.  I didn't realize just the mere fact that they

20   were outside the hundred-mile radius --

21             THE COURT:  Well, the question is, are they available?

22   And if they're outside -- if they voluntarily come, that's one

23   thing.  You can't compel their attendance.

24        (Pause)

25             THE COURT:  All right.  With respect to the use of

1    depositions, Federal Rule of Evidence 804(b), B as in boy,

2    provides that:

3           "The following are not excluded by the rule against

4    hearsay if the declarant is unavailable as a witness:  (1)

5    Former Testimony.  Testimony that:  (A) was given as a witness

6    at a trial, hearing, or lawful deposition, whether given during

7    the current proceeding or a different one; and, (B) is now

8    offered against a party who had -- or, in a civil case, whose

9    predecessor in interest had -- an opportunity and similar

10   motive to develop it by direct, cross-, or redirect

11   examination."

12          So if a witness is beyond the subpoena power of the

13   court, their testimony can't -- their appearance can't be

14   compelled.  And former testimony in a deposition is not

15   excluded on the basis of hearsay.  The testimony has to be --

16   offered has to be relevant and otherwise meet the rules --

17   satisfy the rules of evidence.

18          We'll complete going through these depositions,

19   Mr. Reed.  We've done the Clampitt deposition, and as to

20   Clampitt, Ms. Clampitt is beyond the subpoena power, can't be

21   compelled to appear.  Her deposition is not made inadmissible

22   because it's hearsay.  But I require page-and-line-reference

23   offers by both sides by tomorrow at noon.

24          Let's go on to your next one.  I tried with the

25   shorter ones -- I tried to avoid what I'm having to do now.

1    When I say the shorter -- the shorter transcripts.  What's the

2    next transcript, Mr. Reed?

3        (Pause)

4            MR. REED:  Your Honor, the witness is Stevie Watson.

5    The deposition is at tab 13.  It is similar in length.  It's

6    thirty-seven pages.

7        (Pause)

8            THE COURT:  Where's the Watson deposition transcript?

9    Oh, it's behind tab 13?

10           MR. REED:  Yes.

11           THE COURT:  All right.  With respect to Ms. Watson,

12   the Court entered an order on September 14th, 2016 granting the

13   Trust's motion in limine with respect to Ms. Watson's

14   testimony, to the extent that Watson's expert report will be

15   excluded from evidence.

16           I won't read the entire order, but the order said, in

17   part, "The Court concludes that Watson's expert report is not

18   admissible.  Reed also argues that Watson will also testify as

19   a fact witness regarding her work in marketing the Dell Trace

20   property.  Whether Watson can offer competent, admissible

21   evidence as a fact witness will be determined at trial."

22           So with respect to the Watson transcript, Mr. Reed, by

23   tomorrow at noon, you need to indicate by page and line number

24   the portions of Ms. Watson's testimony that you believe are

25   admissible for her testimony as a fact witness.  I've excluded

1    her testimony as an expert.

2            There any portions of the transcript, Ms. Hager, that

3    you wish to offer?  I mean, a lot of your cross-examination was

4    about the purported expert report, which I've excluded.

5            MS. HAGER:  Right, and Your Honor, I'm trying to

6    recall even any testimony that Mr. Reed might be able to offer,

7    so I'm going to say no.  And I did have one, perhaps, question.

8    Direct exam in this case is to be limited by the witness'

9    declarations.  So given Your Honor's order on the motion in

10   limine and looking at her declaration, there are only two

11   potential areas that are included in her declaration that she

12   could testify about.  I realize the declaration is not in

13   evidence, but she says, number one, "I'm a realtor who has done

14   a variety of real estate transactions with Frank Reed"; number

15   two, "My offices are in Henrico, Virginia."

16           So my understanding would be that any dep mentions

17   that Mr. Reed submits would be limited to those two --

18           THE COURT:  No, let me make clear.  She's not here.

19   He can't compel her to be here.  If she comes voluntarily, it's

20   a different story.  I will listen to Mr. Reed tomorrow as to

21   what portions, if any, of the transcript that are not excluded

22   by my prior order should be admitted, and you can make your

23   objections to it.  Like other witnesses who were being offered

24   by deposition, I'll rule on the admissibility when the offer is

25   made.

1          For completeness of the record, my order, granting in

2    part the Trust's motion in limine with respect to the Stevie

3    Watson testimony and expert report, is at ECF docket number

4    10120.  And I gave Mr. Reed copies of those orders before he

5    left court at the last -- my courtroom deputy gave him copies

6    of those orders when you were both last here at the final pre-

7    trial conference.

8          So tomorrow noon, put page-and-line references to the

9    portions of the transcript that are being offered.  You need to

10   provide Ms. Hager with that page-and-line reference so that, if

11   she's going to object, she can specifically object.  The only

12   thing I'm going to consider admitting are those things that you

13   specifically designate and that are not inconsistent with the

14   order granting in part the motion in limine.

15         Who's next?

16      (Pause)

17         MR. REED:  Tab 19, Your Honor, a witness outside of

18   the jurisdiction of the Court in Virginia, Alex Uminski.  This

19   is a very short deposition.  It's ten pages of actual content.

20   Page 11 is the certification of the courtroom -- or court

21   reporter.

22         THE COURT:  What are you offering Mr. Uminski for?

23   Well, what's quite confusing to me, Mr. Reed, you've attached

24   to the Uminski deposition a declaration of Stevie Watson, which

25   is not a declaration of Stevie Watson; it's a declaration of

1    Alex Uminski.

2              MR. REED:  Yeah, it was because I -- in talking to the

3    witnesses, a number of them wanted me to take down what they

4    said, draft it, send it to them, have them review it.  And I --

5    it was a -- the header.  I did it for several of them.

6    That's --

7              THE COURT:  All right, fine.  What are you offering

8    Mr. Uminski to prove?

9              MR. REED:  I'm sorry, Your Honor.  I --

10             THE COURT:  What are you offering Mr. Uminski's

11   testimony for?

12             MR. REED:  Mr. Uminski is an appraiser in the Richmond

13   market who did a subject-to appraisal on the 9717 Old Dell

14   Trace property, and it was done in 2008.  I offer it to

15   demonstrate to the Court the lost value that we otherwise would

16   have been able to realize had not the debtors' bad act

17   interfered with the completion of the property.

18             THE COURT:  All right.

19             Ms. Hager, what's your position with respect to the

20   Uminski transcript?

21             MS. HAGER:  Your Honor, I have an objection on page 7,

22   line 18 through page 8, line 3.

23             MR. REED:  Can you repeat that, please?

24             MS. HAGER:  Page 7, line 18 through page 8, line 3.

25             MR. REED:  Page 7, line 18 through, again?

1              MS. HAGER:  Page 8, line 3.

2              THE COURT:  Overruled.

3              MS. HAGER:  Then I would offer in my cross, which

4    starts on page 8, line 10, through page 10, line 7.

5              THE COURT:  What about with respect to the appraisal

6    that's attached?

7              MS. HAGER:  Your Honor, the appraisal itself, which is

8    attached to the declaration, which is Exhibit 1 to the

9    deposition transcript, is objectionable on the grounds of

10   hearsay.

11        (Pause)

12             THE COURT:  All right.  The objection to the appraisal

13   is overruled, subject to the following.  I can't read it, Mr.

14   Reed.  The copy you've put in the binder is illegible, other

15   than a few pages of it.  Most of it, in the copying, it's just

16   not possible to read it.  If you don't provide the Court with a

17   better copy, I'm excluding it.  To be specific, pages 1 of 6, 2

18   of 6, 3 of 6 --

19             MR. REED:  Hold on, Your Honor.  I'm going to --

20             THE COURT:  Stop.  And 6 of 6.  And then there are --

21   let me go back, because there are pages all the way at the

22   bottom of the declaration and exhibits, so I'll use those

23   instead.  2 of 18, 3 of 18, 4 of 18, 7 of 18, 8 of 18, 9 of 18

24   can't be read in the copy that's been provided to the Court.

25   Unless legible copies are provided to the Court, the exhibit

RESIDENTIAL CAPITAL, LLC, et al.                    54

1  will be excluded.

2              MR. REED:  Your Honor?

3              THE COURT:  Yes.

4              MR. REED:  If we turn to page 18 or tab 18, I included

5  in the book the declaration itself with the exhibit itself.  In

6  my book, it's strikingly clearer.

7              THE COURT:  It is.  Talk to Ms. Hager during the

8  recess and -- I'm not going to go through it and compare every

9  page -- that may satisfy my concern.  The one that's attached

10 to the deposition transcript, I can't read the pages I've

11 referenced.

12             MR. REED:  I think that has --

13             THE COURT:  It does look to me that they're legible

14 behind tab 18, but I'm not going to go through it and compare

15 it now.  Talk to Ms. Hager.  If during the lunch break, she

16 agrees that it's the same and I can substitute the pages in the

17 exhibits to the transcript, that's fine.

18             What's the next witness?

19             MR. REED:  Your Honor, I'd like to make a comment

20 about the logistics of this.  It appears to me that the

21 exhibits attached to the deposition, those were copied and

22 scanned in by the court reporting service.

23             So for example, the Russ -- the Beck declaration.  I

24 would take a look at that to see also, because the Beck

25 declaration itself, the original, may be clear as well, because

1   that declaration with its attachments was copied by the court

2   reporting service.  And we were all looking at the exhibits of

3   the deposition, which seems like, as a second-generation copy,

4   it's fading out, but that's happening with the court reporting

5   service, not with the original documents.

6           THE COURT:  Talk to Ms. Hager during lunch, and if you

7   can satisfy, I'm fine with it.  If there's a better copy -- if

8   both sides agree that there's a better copy attached behind a

9   different tab, I'll permit you to substitute the better copy

10  with the exhibits to the deposition that are coming into

11  evidence.  So talk to Ms. Hager about it, okay?

12          What's next?

13          MR. REED:  The Molloy -- in my -- in the table of

14  contents, it's called the Oxford deposition and exhibits, but

15  it's the deposition of Paul Molloy, representative of the

16  Oxford organization.

17          THE COURT:  Where do I find it?

18          MR. REED:  7 -- tab 7, book 1.  I don't remember the

19  length of that one.  I think it's a little longer.

20          THE COURT:  The transcript's fifty-eight pages.  Who's

21  Mr. Molloy?

22          MR. REED:  Mr. Molloy -- for fifteen years, my three

23  New Jersey properties, the properties that I rented in New

24  Jersey -- owned and rented in New Jersey -- were rented by an

25  organization called the Oxford House.  They continually renewed

1    the leases and expanded from one house to two house (sic) to

2    three houses with me over time.  And Mr. Molloy stands for the

3    proposition that -- or his testimony does that if I hadn't lost

4    the houses in foreclosure, then they would have continued to

5    rent them infinitum.  Mr. Molloy, in his testimony, discusses

6    how they've -- there are houses within their 2000-house system

7    that they've started renting in the 70s and they're still

8    renting from the grandchildren of the people they originally

9    rented from.

10             THE COURT:  Okay, I understand what you're offering it

11    for.

12             And Ms. Hager, do you agree, Mr. Molloy is outside the

13    subpoena range of the Court?

14             MS. HAGER:  Yes, I do, Your Honor.

15             THE COURT:  Okay.

16             Mr. Reed -- well, what's your position with respect to

17    the deposition transcript, Ms. Hager?

18             MS. HAGER:  Your Honor, this is a deposition that was

19    taken by me.  There is some limited cross by Mr. Reed that

20    starts on page 52.  Mr. Molloy's testimony is contrary to that

21    which was in his -- there's a letter that was attached to his

22    declaration, wherein he said that he would've -- Oxford House

23    would have continued to rent the properties, but for the

24    foreclosure, without any description of what the foreclosure

25    was.  And he was, of course, asked about that in his

RESIDENTIAL CAPITAL, LLC, et al.                    57

1    deposition, and what he said was, he didn't care about the

2    foreclosure on Matlack or didn't care about any other

3    properties.

4              So I don't have a problem with the testimony itself

5    and with the deposition transcript.  That can come in; I'm not

6    objecting to it, except to the extent that it exceeds the scope

7    of the declaration and is, in fact, contrary to the

8    declaration.

9              And the way Mr. Reed just articulated it is new on me

10   because he's never said it that way before.  He's slightly

11   adjusting the purpose for which this was initially offered.

12             THE COURT:  Well, what did Mr. Molloy say in the

13   deposition you took?

14             MS. HAGER:  He said that the way that Oxford House is

15   broken up, corporate is not responsible or in charge of the

16   leases for individual houses, such that -- and I'll back up for

17   one second.  Oxford House finds housing for recovering

18   alcoholics and drugs addicts, okay?  So with respect to any

19   house that is rented -- essentially a halfway house -- with

20   respect to any house that is rented, the individuals residing

21   in the house constitute a unit of -- an independent unit of

22   Oxford House.

23             But the way he testified was that those individual

24   units -- so in this instance, three that were renting three

25   different properties from Mr. Reed -- wouldn't care about the

RESIDENTIAL CAPITAL, LLC, et al.                    58

1    landlord's finances, wouldn't care about whether they're in

2    foreclosure on some other property.  They have no interest in

3    any of that whatsoever.

4            And that was contrary to that which was in the letter

5    attached to his declaration, which, minimally, was misleading

6    because what it says in the letter is they would have continued

7    renting but for the foreclosure, okay?  And the fact that they

8    stopped renting those three properties has absolutely nothing

9    to do with the foreclosure on the Matlack properties.  In

10   reality, the three rental properties were foreclosed upon by TD

11   Bank a year or so later than all the events that followed from

12   the Matlack foreclosure.

13           THE COURT:  What about the exhibits to the deposition?

14           MR. REED:  Will I get to respond to that also, Your

15   Honor?

16           THE COURT:  Sure.  Go ahead.

17           MR. REED:  The response?

18           THE COURT:  Go ahead.

19           MR. REED:  Your Honor, in the deposition with Oxford

20   House, this is the first time that we really had a chance, even

21   myself, to fully clarify this misstatement that Oxford

22   provided.  And in discovery, TD Bank, in their depositions,

23   testified that it was because of the foreclosure that they

24   ceased their relationship with me and specifically sent my

25   rental property accounts to asset recovery to foreclose on

RESIDENTIAL CAPITAL, LLC, et al.                    59

1    them.  And we expect Mr. Curley to testify to that on

2    Wednesday, when he appears, linking the causation of the loss

3    of the properties and the loss of the tenants.

4              So my understanding originally, misreading it --

5    because this letter was provided as part of the Federal Reserve

6    foreclosure mediation --

7              THE COURT:  Which letter?

8              MR. REED:  Oxford House provided a letter to me.  It's

9    in -- and it was in the -- attached to their declaration.

10             THE COURT:  This is a letter, July 10th, 2012?

11             MR. REED:  Yeah.  And then when we got into it, Mr.

12   Molloy was clarifying that it's the loss of the property --

13   they would have otherwise continued renting it.  They would

14   have -- they would have stayed renting it, but since I lost the

15   properties and it went into foreclosure, that's why they would

16   no longer continue; otherwise, they would have.

17             But the causation of the loss of those properties is

18   linked by TD Bank.  TD Bank says look, we had a long-term

19   relationship.  You'll hear this testimony.  We have decades of

20   a relationship through thick and thin, but when you went into

21   foreclosure, that was it.  Our relationship was over,

22   including, expressly in the deposition -- and I understand when

23   we repeat it here in trial, through TD's counsel -- that the

24   relationship was terminated and expressly stated that they took

25   the properties back because of the foreclosure.

RESIDENTIAL CAPITAL, LLC, et al.                    60

1              THE COURT:  Did TD Bank have mortgages on the three

2       properties that Oxford rented?

3              MR. REED:  Yes.

4              THE COURT:  And you didn't pay those mortgages, so

5       they foreclosed on them; is that right?

6              MR. REED:  No.  There was a term note.  They --

7              THE COURT:  Mr. Reed, did TD Bank foreclose on the

8       three properties that Oxford rented --

9              MR. REED:  Yes.

10             THE COURT:  -- because you had not paid the mortgages

11      on the three properties?

12             MR. REED:  No, TD Bank -- there was an -- there was

13      a --

14             THE COURT:  Was there --

15             MR. REED:  -- a one-year note, and they said that they

16      were not going to renew it because of the foreclosure actions

17      on the house.

18             THE COURT:  Mr. Reed, were there separate mortgages on

19      each of the three houses --

20             MR. REED:  No, it was a --

21             THE COURT:  Stop.  Do not interrupt me.  Did TD Bank

22      hold separate mortgages on each of the three properties that

23      Oxford rented from you?

24             MR. REED:  No.

25             THE COURT:  Did they hold a mortgage on the three

1    properties that Oxford rented from you?

2            MR. REED:  Yes.  It was a blanket mortgage.

3            THE COURT:  And what properties did that mortgage

4    cover?

5            MR. REED:  318 Columbia Avenue in Stratford; 21 Darien

6    Drive in Cherry Hill, New Jersey; and 52 Stone Hollow Drive in

7    Sicklerville, New Jersey.

8            THE COURT:  And how much was that blanket mortgage

9    for?

10           MR. REED:  600,000.

11           THE COURT:  And were you in default on your payments

12   on that mortgage?

13           MR. REED:  No, not at the time of -- no.  We were --

14   at the time TD found out about the foreclosure, we were

15   current.

16           THE COURT:  Mr. Reed, when TD filed a foreclosure

17   action on the mortgage that covered the three properties that

18   Oxford rented from you, had you defaulted in payments on that

19   mortgage?  Just a yes or a no.

20           MR. REED:  I don't remember, Your Honor, if it was

21   after they said our relationship was over.  I can't remember

22   what the course --

23           THE COURT:  Ms. Hager, can you enlighten me?

24           MS. HAGER:  Your Honor, TD Bank did have a blanket

25   loan against these three properties, as of -- that loan was

1    made in June of 2008.  I'm not even sure that he -- I don't

2    know what the payment schedule was.  My understanding is before

3    TD Bank refinanced into the June -- in June of 2008, that there

4    were payment defaults on the prior loans.  So in June of 2008,

5    there was an amended and restated loan.

6             THE COURT:  This covered the three properties?

7             MS. HAGER:  That covered the three properties.  And

8    then subsequently what happened, I don't know.

9             THE COURT:  Do you know why TD initiated a foreclosure

10   action with respect to the three properties?

11            MS. HAGER:  I don't know for sure.  I do know that

12   there was testimony given by Mr. Curley regarding the 665,000-

13   dollar loan being taken to work out.

14            THE COURT:  All right.

15            MS. HAGER:  That loan was viewed --

16            THE COURT:  We'll deal when --

17            MS. HAGER:  -- by them as a business loan, so I don't

18   know if there were certain terms.

19            THE COURT:  What is your position with respect to the

20   exhibits attached to the Molloy transcript?

21            MS. HAGER:  No objection.

22            THE COURT:  All right.  The Molloy transcripts and

23   attached exhibits are in evidence.

24   (Paul Molloy transcript and attached exhibits were hereby

25   received into evidence as a Reed's exhibit, as of this date.)

1          What's next, Mr. Reed?

2          MR. REED:  It's going to take me a moment, Your Honor.

3     My blood sugar is going low.

4          (Pause)

5          MR. REED:  Your Honor, I did not expect this to happen

6     in this speed.  I thought I had to read all of these things.

7     The witnesses that I have scheduled are Robert Curley, coming

8     Wednesday; Joan Kline, who I'm going to try and compel; Mr.

9     Maines is supposed to come Wednesday.  I don't even have my

10    material to testify, myself, to --  I was planning on

11    testifying Thursday.  And there are no other witnesses.  There

12    are documents; there's some government self-authenticating

13    documents from Virginia, from New Jersey to be admitted.  And I

14    think the other documents, some of them have to be admitted

15    with the testimony of, maybe, Mr. Curley and myself and Ms.

16    Kline.  So I don't know, logistically, where to go here

17    because --

18         THE COURT:  Let me ask --

19         MR. REED:  -- we're ninety -- we're eighty percent

20    done -- seventy percent done.

21         THE COURT:  Let me ask this question, Mr. Reed.  Are

22    there any other deposition transcripts that you're offering

23    into evidence other than the ones you've already identified?

24         To be clear, the Court has admitted in evidence the

25    deposition transcript of Russow Beck with exhibits; it's behind

1   tab 21.  I reserved ruling with respect to the deposition

2   transcript of Mr. Sowder, which is behind tab 23.  I admitted

3   in evidence the deposition testimony of Fred Pryor, which is

4   behind tab 27.  I've admitted in evidence the deposition

5   transcript of Derrick Rosser, which is behind tab 31.  I

6   reserved a decision with respect to the deposition transcript

7   of Dennis Whelan, which is behind tab 29.  The deposition

8   transcript of James Suhr, S-U-H-R, behind tab 17, is in

9   evidence.

10          With respect to the deposition transcript of Martha

11  Clampit, both sides must provide, in writing, page and line

12  references to the testimony that they wish to offer.  The

13  deadline for doing so is noon tomorrow.

14          With respect to the deposition of Stevie Watson,

15  again, the parties need to provide page and line reference of

16  the portions of the Watson deposition -- the Watson deposition

17  is behind tab 13 -- that they're offering.  The deposition of

18  Alex Uminski is in evidence, subject to the parties agreeing on

19  better copies of the exhibits to the deposition.  It appears

20  that clearer copies are attached behind another tab; they

21  should be able to work that out.  With respect to the

22  deposition transcript of Molloy, the transcript and attached

23  exhibits are in evidence.

24          Are there any other deposition transcripts or portions

25  of transcripts that you're offering in evidence?

RESIDENTIAL CAPITAL, LLC, et al.                    65

1        (Pause)

2            MR. REED:  Your Honor, the Kline transcript will be

3    subject to, I guess, further proceedings.  And the Curley

4    transcript is not within -- he's within the hundred miles and

5    is scheduled to appear.  There are no other transcripts that I

6    have.

7            THE COURT:  Ms. Hager, with respect to Ms. Kline,

8    discuss with Mr. Reed whether you will agree that portions of

9    her deposition transcript can be offered in lieu of her live

10   appearance.  You can talk about that during lunch.  Otherwise,

11   she appears to be within subpoena range of the Court, therefore

12   she satisfies the availability standards under 804 -- Federal

13   Rule of Evidence 804(b) and her transcript can't be used.  Talk

14   to Mr. Reed, look at the transcript, and see whether you can

15   work that out.  You'd better try and move up Mr. Curley's

16   testimony.  I'm not waiting until -- he's coming Wednesday?

17           MR. REED:  Yeah, but I'm going to be testifying, I

18   guess, for a good portion of the day tomorrow, if not all of

19   it.

20           THE COURT:  All right.  Let me ask you a question, Mr.

21   Reed.

22           MR. REED:  And I could see if Mr. Maines could come

23   tomorrow.

24           THE COURT:  Yeah, we --

25           MR. REED:  Your Honor, it was not foreseeable, from my

1    understanding, that I had to read all of this material.  I

2    mean, I looked at the specific times -- Ms. Hager and I

3    discussed, even, how long did it take for the transcript -- I

4    mean, the deposition?  That's a good reference for how long

5    it's going to take to actually read it.

6            THE COURT:  Could you tell me why I would want to have

7    you do a reading of a deposition transcript if the transcript

8    itself can come into evidence?

9            MR. REED:  I didn't know that was a --

10           THE COURT:  Okay.  All right.

11           MR. REED:  -- possible.  I thought it --

12           THE COURT:  All right.  You --

13           MR. REED:  I even consulted --

14           THE COURT:  Stop.

15           MR. REED:  -- an attorney --

16           THE COURT:  Stop.

17           MR. REED:  -- about that and he said I had to read it

18   in.

19           THE COURT:  You asked the wrong person.  You should

20   have raised it with me at the pre-trial.  Let me ask you a

21   question, Mr. Reed.  I'm looking at the Molloy transcript,

22   which is behind tab 7.  In Exhibit 3 to the Molloy transcript,

23   which is the letter from you to Oxford House, dated June 22nd,

24   2010, and in the second full paragraph, you say:  "It has come

25   to my attention that TD Bank has made a demand of your

1  organization to direct that rental payments due to me under the

2  terms of our leases be directed to them, as the mortgage

3  holder.  I direct you to disregard their notice, as it is

4  invalid.  Please take notice of the following and act in

5  accordance with it:  (1) TD Bank and I are in active litigation

6  and, at present, they do not have a legal right to your rental

7  payments."

8           What litigation were you engaged in with TD Bank in

9  June 2010?

10          MR. REED:  It was litigation under the terms of our

11  relationship.  I think the note and other relationships.  Mr.

12  Walters was handling that.  And there was actually a hearing

13  with the law division, and the law division judge ruled that TD

14  Bank didn't have a right to those payments at that point in

15  time, and --

16          THE COURT:  Just, my question is, it says you were in

17  active litigation; can you tell me in what court that was

18  pending?

19          MR. REED:  Law division, New Jersey.

20          THE COURT:  What county?

21          MR. REED:  Camden -- it was Cam -- either Burlington

22  or Camden.

23          THE COURT:  Ms. Hager, can you enlighten me further

24  about the litigation?

25          MS. HAGER:  Yeah, I don't have details on that

1   particular case.

2           THE COURT:  Did TD Bank succeed in foreclosing on the

3   mortgage that covered the three properties rented by Oxford?

4           MR. REED:  They did.

5           THE COURT:  Okay.  All right.  It's 12 noon.  We're

6   going to adjourn until 2 o'clock.  You both need to come back

7   at 2.  There were matters that I asked the two of you to confer

8   to see whether you could work the issues out.

9           High on my list is the issue about Joan Kline.

10  Mr. Reed represented that he personally served Ms. Kline, paid

11  her the witness fee, the mileage fee, et cetera.  He needs to

12  file an affidavit of service and he needs to put in his

13  affidavit evidence that --

14          MR. REED:  Maybe --

15          THE COURT:  -- a statement under oath that he paid her

16  the witness fee and the travel fee.

17          As I said earlier, Mr. Reed represented that she

18  resided within a hundred miles of the court.  And during the

19  hearing, I just searched on Google Map the distance from the

20  court to the address that she identified as her residence in

21  the deposition, and that search showed it was 85.2 miles, which

22  is within the 100-mile range.  She therefore, would not satisfy

23  the requirements of being unavailable as a witness, and

24  therefore, absent agreement, her deposition would not be

25  admissible.  The two of you should confer and see whether you

 1   can agree that Ms. Kline's transcript can be used in lieu of

 2   her appearance, and if so, what pages and line numbers can be

 3   used in lieu of her appearance.

 4          I gave each side various deadlines of noon tomorrow

 5   with respect to page and line references to Sowder and Clampit.

 6   Since it appears that we will not have any witnesses testifying

 7   this afternoon, I had set the deadline as noon tomorrow.  I'm

 8   moving the deadline up to 9 a.m. tomorrow.  You can spend the

 9   afternoon either working out an agreement or -- hopefully,

10   you'll work out an agreement, but indicate page and line

11   references, since I thought we were going until 5 o'clock

12   today, but that obviously is not the case.

13          MR. REED:  Your Honor, can I clarify something you

14   said?

15          THE COURT:  Yes.  Go ahead.

16          MR. REED:  In my notes, I have page and line

17   references for Clampit and Watson.  I merely have a notation

18   that Sowder's, you're reserving ruling on it, but with no

19   notation as to what --

20          THE COURT:  Yeah.  You're correct.  Ms. Hager is to

21   file an objection by tomorrow with page and line references to

22   her cross-examination that she was offering.  You're correct,

23   Mr. Reed; I didn't direct you to file -- I have a note here

24   about page and line references, but it refers specifically to

25   Ms. Hager.

1          MR. REED:  Okay.  I don't want to disappoint you.

2          THE COURT:  And she's going to indicate her objections

3    to the Sowder deposi -- the portion of it that you were

4    offering.

5          So it's your plan to take the witness stand first

6    thing tomorrow morning, correct?

7          MR. REED:  It wasn't originally, but I'm going to

8    try --

9          THE COURT:  Well, not try; not try.

10         MR. REED:  Yeah, I don't see a -- I don't see any --

11   where do we go from here?  We have an empty day, so my

12   intention is --

13         THE COURT:  We're not going to have --

14         MR. REED:  -- to stay up and --

15         THE COURT:  We're not going to have an empty day, Mr.

16   Reed.  We're not going to have an empty day.

17         MR. REED:  Yeah.  I'm not saying that.  I'm saying I

18   will -- my intention is to fill that empty day.

19         THE COURT:  All right.  Ms. Hager?

20         MS. HAGER:  Your Honor, I personally don't see any

21   reason why Mr. Reed can't take the stand today.  He's been

22   deposed in connection with his case.  He knows what his

23   testimony is going to be.

24         THE COURT:  From past experience --

25         MS. HAGER:  Your Honor, we could --

 1          THE COURT:  -- Ms. Hager, Mr. Reed's testimony, if he

 2  has the afternoon to better organize it, I'm hopeful that it'll

 3  come in more smoothly.  So I'm not going to make him take the

 4  witness stand this afternoon.

 5          But Mr. Reed, tomorrow you need to be -- you can have

 6  your notes in front of you; you should have your notes in front

 7  of you.  You should know exactly how you're going to proceed

 8  with your testimony, what exhibits you're going to refer to;

 9  you need to refer to them by the exhibit number and the tab

10  number in the binders, okay?  I want to be able to go through

11  it with some speed.

12          MR. REED:  Okay.

13          THE COURT:  From the prior trial, I permitted Mr. Reed

14  to testify in the so-called matter with (ph.) forum and I'm

15  permitting him to do that again.  And you're certainly able to

16  make your objections.  And since there won't be questions

17  first, if you decide to object and move to strike portions, you

18  can do that.  I urge you to do it with moderation, but you need

19  to preserve your record.  I'm not questioning that.

20          I do want you both to come back at 2 o'clock, at least

21  to see whether we can clear away some of this underbrush with

22  respect to -- it may be, Ms. Hager, you'll be able to state on

23  the record by this afternoon what objections you have to the

24  Sowder deposition.  If you can do it orally -- if you can

25  organize your notes and do it orally on the transcript, you

1   won't have to file it by tomorrow, okay?  I'll let you do it

2   orally.  I want to get as much done today as we can.

3          But we're starting tomorrow morning at 9 o'clock, Mr.

4   Reed.  And you shouldn't be certain you're going to be on the

5   witness stand all day long, and so you need to have another

6   witness here, ready to go, certainly in the afternoon.  I have

7   no doubt that you'll be testifying all morning, but I don't --

8   I go from 9 to 5 with breaks, and I don't like to stop at noon.

9   I don't like to stop at 3.

10          We're not going to go day today; that's obvious.  But

11   if your testimony finishes at 3 o'clock, you need a witness to

12   go on the witness stand tomorrow, Mr. Reed.   When I say

13   finished, it means your direct and Ms. Hager's cross-

14   examination.  If you go all day, well, you go all day, but if

15   you were represented by a lawyer, Mr. Reed, let me tell you

16   what happens.  If it's during the trial hours, and you don't

17   have a witness to call, you've rested; your case is over, okay?

18   I'm telling you now have another witness here.  And if you need

19   more than one, have more than one.

20          I just -- this trial's going from 9 to 5 with

21   appropriate recesses, and that doesn't mean that you should be

22   dragging out your own testimony.  You need to move through your

23   testimony with dispatch, and I assume Ms. Hager will do that

24   with cross-examination.

25          All right.  We're adjourned until 2 o'clock.

1          (Recess from 12:08 p.m. until 2:01 p.m.)

2              THE COURT:  Try to make it easier.

3              All right.  Court's back in session.  We're here in

4    Residential Capital, number 12-12020.

5              Ms. Hager, where are we?  And then I'll ask Mr. Reed

6    the same question.

7              MS. HAGER:  I'm sorry.  Mr. Reed's what?  I didn't

8    hear.

9              THE COURT:  No, where are we on the issues that we

10   left open when we broke?

11             MS. HAGER:  Sure.  Well, on Sowder, Your Honor asked

12   me to take a look at what is objectionable, in lieu of

13   providing something in writing, and so I have the following.

14   In Mr. Sowder's deposition transcript, page 6 --

15             THE COURT:  Let me find it, okay?

16             MS. HAGER:  Oh, sure.  It's --

17             THE COURT:  Which tab is it behind?

18             MS. HAGER:  23.

19             THE COURT:  Okay.  Page 23, yes.

20             MS. HAGER:  So page 6, line 6, after --

21             THE COURT:  Page 6, line 6.

22             MS. HAGER:  After the word "Trace", though to line 7,

23   after the word "Lane" --

24             THE COURT:  Yes.

25             MS. HAGER:  -- is objectionable because of the

RESIDENTIAL CAPITAL, LLC, et al.                    74

1     reference to Brookschase.

2               THE COURT:  That's sustained.

3               MS. HAGER:  Page 6, line 8, starting with "133"

4     through to line 9, after the word "home".

5               THE COURT:  It's the "133 Brookschase plans for a

6     complete home"?

7               MS. HAGER:  Yes, Your Honor.

8               THE COURT:  Sustained.

9               MS. HAGER:  Page 6, line 15, starting after the word

10    "Trace".

11              THE COURT:  All right:  "and that he began site

12    preparation", et cetera?

13              MS. HAGER:  Right, through to line 17.

14              THE COURT:  Okay.  Sustained.

15              MS. HAGER:  Page 8, line 17, through page 9, line 8.

16              THE COURT:  Sustained.

17              MS. HAGER:  Page -- and this is my cross-exam, but

18    page 14, line -- oh, excuse me.  So this is what I would want

19    to have come in, Your Honor, of my cross:  page 14, line 14,

20    through page 16, line 21, and page 19, lines 3 through 25.

21              THE COURT:  Okay.  Those are the only portions of it

22    that you want on the record?

23              MS. HAGER:  Yes, Your Honor.

24              THE COURT:  Okay.

25              Mr. Reed, anything you want to say on --

RESIDENTIAL CAPITAL, LLC, et al.                    75

1            MR. REED:  If she can say -- I couldn't follow that,

2    which -- on the last part of the cross?

3            THE COURT:  Sure.

4            MS. HAGER:  Page -- this is of my cross -- page 14,

5    line 14, through page 16, line 21.

6            THE COURT:  That, she's offering.

7            MR. REED:  That's -- yes, that's fine, Your Honor.

8            THE COURT:  And then she offered up page 19, lines 3

9    to 25.

10            MR. REED:  19 --

11            THE COURT:  Line 3 to 25.

12            MR. REED:  Okay.

13            THE COURT:  All right.  Okay.  All right, so we had

14    left -- before this morning -- had left the Sowder transcript

15    open and subject to Ms. Hager's objections, which I've ruled on

16    a portion of the cross-examination, who is not designated, so

17    the Sowder deposition testimony's admitted, with the exceptions

18    we've just discussed.

19    (Nathan Sowder deposition with exhibits was hereby received

20    into evidence as a Reed's Exhibit, as of this date.)

21            THE COURT:  Okay.  What else, Ms. Hager?

22            MS. HAGER:  There was the matter of the Uminski

23    appraisal that was --

24            THE COURT:  Yes.

25            MS. HAGER:  -- illegible.  And I don't have an issue

RESIDENTIAL CAPITAL, LLC, et al.                    76

1   with using the other copy.

2           THE COURT:  Just tell me where --

3           MS. HAGER:  Sure.

4           THE COURT:  -- the pages -- where this page -- can I

5   substitute the entire exhibit from another tab number?  The

6   Uminski depo was tab 19.

7           MR. REED:  Your Honor, the Uminski declara -- or

8   Uminski appraisal was imbedded within his declaration.

9           THE COURT:  That's at tab 18?

10          MR. REED:  Tab 18.

11          THE COURT:  All right.  So --

12          MS. HAGER:  So it's -- if you take tab 18, minus the

13  declaration --

14          THE COURT:  Basically, what I think you're telling me

15  I can do is I may take tab 18, pages 2 of 18 to 18 of 18, and

16  substitute those in, in the next --

17          MS. HAGER:  Yes.

18          THE COURT:  -- with the deposition.

19          Mr. Reed, do you agree?

20          MR. REED:  Yes.

21          THE COURT:  I wish everything was as easily solvable

22  as that.  All right, and that's exactly what I'm doing.  I'm

23  substituting pages 2 through 18 behind tab 19.  There's that

24  version.  And we solve that.

25          MR. REED:  Thanks.

RESIDENTIAL CAPITAL, LLC, et al.                    77

1            THE COURT:  All right.  So the Uminski deposition and

2    the appraisal is in evidence.

3    (Alex Uminski deposition and appraisal were hereby received

4    into evidence as a Reed's exhibit, as of this date.)

5            THE COURT:  Were you able to talk about the Kline?

6            MS. HAGER:  We did, Your Honor.  I indicated to

7    Mr. Reed my position that her deposition transcript is hearsay.

8            THE COURT:  Hearsay because?

9            MS. HAGER:  Because it's written statements made out

10   of court.

11           THE COURT:  And it's because she within --

12           MS. HAGER:  Within --

13           THE COURT:  -- she's available within the area of --

14           MS. HAGER:  And she's available.  Right.

15           THE COURT:  All right.  I'm going to hand down to each

16   of you -- my chambers received, from Stevie Watson, an

17   objection to the subpoena.  I'll have one of my law clerks hand

18   you copies.  This was addressed to me, but it was received by

19   email in my chambers.  And in the email itself, Ms. Watson

20   asserts that -- well, you'll both read it -- that it was left

21   in her office, she wasn't given a witness fee, et cetera, she's

22   beyond a hundred miles.

23        (Pause)

24           THE COURT:  So her email, obviously, is not under

25   oath, but based on the colloquy this morning, I'm not sure any

RESIDENTIAL CAPITAL, LLC, et al.                    78

1   of it's disputed.

2           Let me ask you, Mr. Reed, did you serve her

3   personally?

4           MR. REED:  No.

5           THE COURT:  Did you pay her a witness fee?

6           MR. REED:  I don't know if the service company did.

7           THE COURT:  You agree she's more than a hundred miles?

8           MR. REED:  Yes.

9           THE COURT:  Okay.  So I'm treating this email, which

10  will get filed on ECF -- but let me ask you, do you wish to

11  withdraw the subpoena or do you want me to rule on her

12  objection to it?  There's no pressure intended by what I've

13  just stated.

14          MR. REED:  Well, I can with -- I can withdraw it --

15          THE COURT:  All right.

16          MR. REED:  -- because she's a hundred miles away.

17          THE COURT:  Okay.  So her objection is moot.  My

18  courtroom deputy will advise her that Mr. Reed has withdrawn

19  the subpoena for Stevie Watson, and therefore, it's unnecessary

20  for me to rule on the objection to the subpoena, okay?

21          Again, Mr. Reed, I wasn't trying to pressure you

22  into --

23          MR. REED:  Okay.

24          THE COURT:  But I just --

25          MR. REED:  Okay.

1           THE COURT:  So what's --

2           MR. REED:  Your Honor, to advise you, I received an

3    email from Mr. Sowder for a similar situation.  And for the

4    record, I guess I withdraw his subpoena as well.  Because it's

5    been sent -- he emailed the clerk of the -- clerk of the court,

6    which I don't think you've received yet.

7           THE COURT:  I did not.  Would you please do me a favor

8    and let him know you've withdrawn it?

9           MR. REED:  I will.

10          THE COURT:  All right.  Okay.  What remain -- well,

11   hang on a moment.  All right, so I'm going to still receive

12   tomorrow from each of you the designations and

13   counterdesignations to the Clampit deposition.  And with

14   respect to Kline, if you're -- you need to file -- Ms. Hager is

15   entirely within her rights to --

16          MR. REED:  Yeah.

17          THE COURT:  -- assert a hearsay objection, since she's

18   within -- the client is within the hundred miles, and

19   therefore, her deposition testimony is not admissible because

20   within the meaning of the rule, she's available.  I don't know

21   what she said in her -- I think you said it was an email you

22   received from her.

23          MR. REED:  I'll attach it -- should I attach -- I'm

24   going to be filing a motion for contempt and --

25          THE COURT:  Okay.

1          MR. REED:  -- I can attach it to that.

2          THE COURT:  You want to do that?  But you definitely

3    need to put into the affidavit or declaration that you --

4    because you've indicated you served her personally and you paid

5    her the fee, in order -- you know there are requirements for a

6    subpoena to be valid.  I'm not questioning that you said you

7    did it.  You'll put it in an affidavit, and we'll go from

8    there.  Okay?

9          So are there any other housekeeping matters to deal

10   with today?

11         MS. HAGER:  Well, Your Honor, with respect to Clampit

12   and Watson -- oh, excuse me -- Clampit -- yes -- Clampit and

13   Watson, since Mr. Reed hasn't tendered his designations yet,

14   obviously, and my designations would be cross-exam or, perhaps,

15   objections to whatever he's offering, since I don't yet know

16   what the direct testimony is --

17         THE COURT:  This is true.

18         MS. HAGER:  -- I am a little -- sort of in a quandary.

19   And so I was wondering if that could be solved by having my

20   counterdesignations due Wednesday morning?

21         THE COURT:  When, tomorrow, are you going to be able

22   to give me your designations from those?

23         MR. REED:  I have to be here at 9 a.m., so I

24   imagine -- you ordered them by 9 a.m.

25         THE COURT:  Right, because we're not -- all right,

 1  I'll give you until Wednesday morning at 9 to do

 2  counterdesignations and objections.

 3          MS. HAGER:  Okay.  Thank you.

 4          THE COURT:  Let's talk a minute about how we're going

 5  to proceed with Mr. Reed's testimony.

 6          Do I have written direct testimony from you, Mr. Reed?

 7  Did you do a declaration?

 8          MR. REED:  I don't remember.

 9          MS. HAGER:  He did do one.  I don't think he included

10  it as an exhibit.

11          THE COURT:  Well, here's what I would propose, Ms.

12  Hager.  Mr. Reed'll take the witness stand and he'll give his

13  direct testimony.  Ordinarily, when I have direct testimony in

14  writing, the witness takes the stand and the first thing that

15  happens in court is cross-examination, and then redirect.

16          But I'm just going to have you testify.

17          And you can do your full cross.  I'm sure you've

18  deposed him and you know what you're going to -- what you want

19  to cover, Ms. Hager.

20          You had no -- I didn't see in the binder written

21  direct testimony, Mr. Reed.

22          Do you have a view on that subject, Ms. Hager?

23          MS. HAGER:  No, Your Honor.

24          THE COURT:  Okay.

25          So Mr. Reed, 9 o'clock, you'll take the witness stand,

RESIDENTIAL CAPITAL, LLC, et al.                    82

1   you'll be sworn.  Bring up whatever papers you plan to use.

2   I'm going to permit you to testify in the narrative form, as I

3   said.  And Ms. Hager, if she feels it appropriate, she'll make

4   objections and I'll rule on the objections if she does.  Are

5   you going to have another witness here tomorrow?

6           MR. REED:  Mr. Robert Maines is trying to arrange his

7   schedule.  He was supposed to come Wednesday, but he's trying

8   to arrange his schedule so he can come tomorrow afternoon,

9   maybe 1 o'clock, something like that.

10          THE COURT:  Okay.  I can't be sure -- I'm sure it's --

11  I'm not holding you to this, Ms. Hager.  Do you have any -- do

12  you have an estimate of how long you'll be on cross-

13  examination?

14          MS. HAGER:  I mean, about two hours.

15          THE COURT:  Okay.

16          MS. HAGER:  Two hours?  I don't know.

17          THE COURT:  All right.

18          What about Mr. Curley?  Have you tried to move him up

19  to Wednesday?

20          MR. REED:  I sent him -- as we were on our break, I --

21  he's due on Wednesday.

22          THE COURT:  He is?  Okay.  Wednesday morning?

23          MR. REED:  Huh?

24          THE COURT:  Wednesday morning?

25          MR. REED:  Yes.  His counsel said to me -- or his

1    counsel said that 9 a.m. Wednesday.

2            THE COURT:  Okay.

3            MR. REED:  And I forwarded that to Ms. Hager --

4            THE COURT:  Okay.

5            MR. REED:  -- and she said okay.

6            THE COURT:  All right.  And does he still work at TD

7    Bank?

8            MR. REED:  Yes.

9            THE COURT:  All right.  Wednesday, we are going to end

10   at 4:30 because I have another hearing scheduled for 4:30 on

11   Wednesday.  I think that was the only hearing that I had to

12   schedule this week in a matter other than this.  So you're on

13   the schedule.

14           Other than Mr. Curley, are there any other live

15   witnesses that you're calling?  Obviously, yourself --

16           MR. REED:  Yeah, no.

17           THE COURT:  -- your testifying tomorrow.

18           MR. REED:  Me, Mr. Curley, and I'm trying to have

19   Ms. Kline.  There was one other witness related to an

20   appraisal, just an authentication of the business record, but I

21   think that might be done in the paperwork or with Mr. Curley,

22   so I don't --

23           THE COURT:  Okay.

24           MR. REED:  I had that person scheduled for Thursday.

25   They objected even to the subpoena, but it may be -- it may be

1    moot anyway.  I may have it covered in another way.

2              THE COURT:  Okay.  All right.  I'll see you tomorrow

3    morning, ready to begin, at 9 o'clock with your testimony.  And

4    what is Mr. Maines' testimony about?

5              MR. REED:  Mr. Maines is a builder, who built our

6    neighborhood, who invests in prop --

7              THE COURT:  In New Jersey?

8              MR. REED:  In New Jersey.

9              THE COURT:  The Matlack payment?  Is there where

10   you're going here?

11             MR. REED:  Yes, yeah.  And Mr. Maines saw the prudence

12   I did on the Matlack property, looked at other projects that I

13   have done, talked to me at length, and made a business judgment

14   that he was interested in working with me on more projects,

15   including finishing Old Dell Trace.  But when he learned of my

16   foreclosure situation, he felt that I was too -- it was too

17   problematic; he didn't want to get involved.  And so he's

18   expressed that in his declaration.  He's willing to testify to

19   that effect.  And that's --

20             THE COURT:  Okay.

21             MR. REED:  -- that's who he is.

22             THE COURT:  All right, I see.  There's a deposition.

23   You took his deposition, Ms. Hager?

24             MS. HAGER:  Yes, Your Honor.

25             THE COURT:  Okay.  I will see you both tomorrow

1   morning.

2             MS. HAGER:  Thank you.

3             THE COURT:  There's no other housekeeping that needs

4   to be dealt with today?

5             MS. HAGER:  No, Your Honor.

6             THE COURT:  Okay.  See you both tomorrow morning,

7   9 o'clock start.  Thank you.  Thank you.

8             MR. REED:  Your Honor, are we allowed to leave certain

9   things here?

10            THE COURT:  You can leave -- there are no other

11   hearings.  The courtroom's going to be locked up; you can leave

12   your papers in the courtroom.

13            THE COURT OFFICER:  Are you leaving?

14            THE COURT:  Hm?  Yeah, we're adjourned.

15        (Whereupon these proceedings were concluded at 2:21 PM)

16

17

18

19

20

21

22

23

24

25

—

1

2                                    I N D E X

3

4                                E X H I B I T S

5   REED'S        DESCRIPTION                              I.D.    ADM.

6   --            Deposition transcript of Russow E.                21

7                 Beck, III, excepting page 6, line

8                 18, through page 6, line 5

9   --            Exhibit 1 to deposition transcript              24

10                of Russow E. Beck, III

11  --            Pryor deposition transcript, with              34

12                the exception of page 7, lines 2 to 4

13  --            Rosser deposition transcript
    35

14  --            Suhr deposition transcript                     41

15  --            Two exhibits to Suhr deposition                43

16  --            Paul Molloy transcript and attached            62

17                exhibits

18  --            Nathan Sowder deposition with                  75

19                exhibits

20  --            Alex Uminski deposition and
    77

21                appraisal

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4    I, David Rutt, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10

11    _____

12    DAVID RUTT

13    AAERT Certified Electronic Transcriber CET**D 635

14

15    eScribers

16    700 West 192nd Street, Suite #607

17    New York, NY 10040

18

19    Date:   September 27, 2016

20

21

22

23

24

25