1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


            Debtors.


- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            September 27, 2016

            9:33 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

1

2   Trial regarding Reed Claims Objection.  Trial set for September

3   26 at 9:00 AM, continuing day to day on September 27th,

4   September 28th, September 29th and September 30th.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  David Rutt

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

3

1

2  A P P E A R A N C E S :

3  FRANK REED, PRO SE CREDITOR

4

5

6  REED SMITH LLP

7       Co-Counsel for The ResCap Borrower Claims Trust

8       136 Main Street

9       Suite 250

10      Princeton, NJ 08540

11

12  BY:   BARBARA K. HAGER, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.                    4

1                    P R O C E E D I N G S

2              THE COURT:  All right, please be seated.

3              Mr. Reed, you may want to stay up, since you're going

4    to take the witness stand.  I leave it up to you.

5              All right, we're here in Residential Capital,

6    12-12020.  First let me say, Mr. Reed had contacted my

7    courtroom deputy to say that he was stuck in traffic and was

8    going to be late.

9              Mr. Reed, you just have to leave home earlier.  I

10   mean, I don't tolerate lawyers appearing late; I can't tolerate

11   pro ses appearing late.  There's traffic; leave earlier.  I

12   don't know what else to say.

13             All right.  Second, when Mr. Reed arrived in court

14   today, he went to the Clerk's Office to file a motion pursuant

15   to FRCP 45(g) to compel compliance with trial subpoena or for

16   contempt.  That's in the process of being filed on the docket.

17   It includes a copy of the subpoena that Mr. Reed served on Joan

18   Kline on September 26th at 1 p.m.  It includes proof of

19   service, which also indicates that the one-day's attendance and

20   mileage fee in the amount of $88.30 were paid.  It also

21   attaches a September 22, 2016 letter to Mr. Reed from Joan

22   Kline, substance of which said, due to -- quote, "Due to

23   unforeseen circumstances, I am unable to comply," close quote.

24   Has some other attachments.

25             The Court is in the process of entering an order.  My

1   courtroom deputy will bring copies into the courtroom, both for

2   Mr. Reed and for counsel, the substance of which is to order

3   Ms. Kline to appear here in person on Thursday morning, either

4   to testify or to explain why she shouldn't be held in contempt.

5   You'll both have copies of that order shortly as soon as it's

6   filed.  It explains the basis for my ruling.

7            If Ms. Kline fails to appear on Thursday morning at

8   9 a.m., and if she appears and is unwilling to testify, I will

9   at that point consider a renewed application from Mr. Reed to

10  offer Ms. Kline's deposition testimony in evidence.  The order

11  I prepared explains the showing that has to be made in order --

12  for the use of a deposition over a hearsay objection, where --

13  well, it describes what "unavailable" means within the meaning

14  of Federal Rule of Evidence 804(a)(2).  So you'll see that.  So

15  that will deal with the issue of Ms. Kline.

16          MR. REED:  Your Honor --

17          THE COURT:  Mr. Reed.

18          MR. REED:  -- you also ordered yesterday that I be

19  prepared to give you the page and line numbers for Watson and

20  Clampitt first thing in the morning, and I'm ready to do that.

21          THE COURT:  Okay, let me just finish one last thing.

22          With respect to this order as to Ms. Kline, my order

23  requires that you serve a copy of the order on Kline on or

24  before 6 p.m. today by email or facsimile.  Do you have either

25  a facsimile or an email address for her?

1        MR. REED:  Yes.  I have an email for her.

2        THE COURT:  You have an email for her.  During a

3   break, I can arrange for you to get a PDF electronic copy of

4   the order so that you can serve it on her by email, attach it

5   to an email.  And the order's going to require that you

6   promptly file a certificate of service of this order, on the

7   docket.  So, after you -- if you serve her by email, which I've

8   authorized, you'll have to -- I'll certainly accept your

9   representation today that you did so.  And tomorrow file a

10  certificate of service that you did serve her by email by the

11  deadline.  Okay, so I just want to finish covering that.

12       MR. REED:  I file a certificate the next Wednesday

13  morning?  Tomorrow morning?

14       THE COURT:  Yeah.

15       MR. REED:  Yeah.  Okay.

16       THE COURT:  Okay?  Right, because you're here;

17  you'll --

18       MR. REED:  Yeah.  Yeah.

19       THE COURT:  -- prepare a certificate of service and --

20  but I am permitting it to be served by email, and so we can

21  provide both of you -- once the order is entered, my courtroom

22  deputy can provide each of you with a PDF copy of what gets

23  filed on ECF, and that will permit you to serve Ms. Kline by

24  email; you can attach it to an email to her.

25       Just bear with me a second.

1          So, with respect to the Clampitt deposition

2    designations, counterdesignations, what I would ask you to do

3    is, during the first recess this morning -- have you given

4    Ms. Hager those designations yet?

5          MR. REED:  Your Honor, I thought I -- I thought I was

6    to tell you what they are and --

7          THE COURT:  You are, but here's what I would like you

8    to do:  when we take a recess this morning, go over them with

9    Ms. Hager so that she can see whether she has objections to

10   what it is you've designated, or not.  Okay?  There's nothing

11   I -- I'm not going to do anything immediately at this moment

12   with it, but that's what I want you to do is go over -- you

13   have page and line references --

14         MR. REED:  I do.

15         THE COURT:  -- of it.  You can go over it with

16   Ms. Hager during a recess.  She can hopefully conclude whether

17   she's going to -- usually the objections, if there are any, are

18   pretty clear and we can at an appropriate point go through on

19   the record with what the designations are.

20         And I'll ask you, Ms. Hager, whether you have

21   objections to it or not.  And I think what you were also going

22   to tell me was there are portions that you want to designate as

23   well, that you wanted -- you correctly wanted to know -- before

24   you decided that, you wanted to know what Mr. Reed was

25   offering.

1          All right?  So, without further delay, let's proceed

2     with Mr. Reed's testimony, okay?

3          So, Mr. Reed, you need to come up to the witness

4     stand.  Bring whatever exhibits, books, notes you want, so that

5     you don't have to go get out of the witness stand, go back to

6     get your materials.  Okay?  All right, so let's do that now.

7     And you'll be sworn when you come up, okay?  But bring your

8     stuff up now, okay?

9          Ms. Hager, is there any preliminaries that you want to

10    raise?

11         MS. HAGER:  No, Your Honor.

12         THE COURT:  Okay.

13         MR. REED:  Is there --

14         THE COURT:  No, you --

15         MR. REED:  Is there shelves or -- two books --

16         THE COURT:  In front.  You'll put -- yeah.  You

17    need -- don't bring any more chairs; just bring yourself and

18    your books and --

19         MR. REED:  I got another one of these.

20         THE COURT:  Well, there's a shelf in front of the

21    seat; you can put some stuff there, and other stuff you can put

22    on the bunch.

23      (Pause)

24         MR. REED:  Judge?

25         THE COURT:  Yes, go ahead, please.  I appreciate it.

1    Thank you.

2         (Pause)

3              THE COURT:  All right, ordinarily the witness would

4    have to stand, but I'll allow Mr. Reed to take the oath sitting

5    down.

6         Okay?

7              MR. REED:  Sorry.

8              THE COURT:  Just -- if you'd just raise your right

9    hand, Mr. Reed.

10        (Witness sworn)

11             THE COURT:  All right.  And just point -- turn the

12   microphone a little bit more toward the front --

13             MR. REED: Yes.

14             THE COURT:  -- Mr. Reed.  Okay.  I heard you and I

15   think the recorder did, but I just want to make sure that your

16   testimony comes through clearly.

17             All right, as I explained yesterday that Mr. Reed's

18   done this before, the first trial, I'm permitting him to

19   testify in the narrative form.

20             And if -- Mr. Reed, if counsel objects to your

21   questions, you just need to stop until I rule -- not your

22   questions -- objects to any of your answers, you need to stop

23   and wait until I've ruled.  Okay?

24             MR. REED:  Okay.

25             THE COURT:  All right.  So, Mr. Reed, you're under

1    oath and you can testify in the narrative form, meaning, you

2    can -- hopefully you've got some notes as to how -- you've

3    organized your thoughts and you know what you -- go ahead.  And

4    obviously, you testify about facts.  We're not going to deal

5    with legal arguments.  Legal arguments -- there'll be time to

6    make those after.  So your testimony should be confined to the

7    facts.

8                MR. REED:  Your Honor, I -- you said that in the trial

9    before.  When is the time for the legal argument?

10               THE COURT:  After all the evidence is in, Mr. Reed.

11   After the evidence is closed, when both sides have rested, put

12   in whatever facts they wanted to, I will ask -- after you've

13   completed your case, I will ask whether you rest, meaning that

14   you've offered whatever evidence you want to offer.  Then

15   Ms. Hager'll have an opportunity to put in whatever evidence

16   she wishes to offer; when she completes, I will ask whether she

17   rests.  If there is appropriate rebuttal, you'll have an

18   opportunity to put in further evidence at that point and you'll

19   rest.  When all the evidence is in and the record's closed,

20   then I will ask both sides whether they wish to make final

21   argument.  All right, so this is about facts, not legal

22   arguments.

23               MR. REED:  Oh, the closing argument is the legal

24   argument?

25               THE COURT:  That's time for legal argument.  Okay?

1          MR. REED:  Okay.

2          THE COURT:  All right, so let's go ahead, Mr. Reed.

3      (Pause)

4          MR. REED:  In the fifteen years preceding the 2008

5  foreclosure action brought by GMAC Mortgage, I continually over

6  that span bought, sold, or flipped and rented, residential real

7  estate in New Jersey and Virginia.  As, I guess you'd call it,

8  corroborating proof of that kind of activity, I brought, in my

9  exhibits, deeds that were produced by the county; they're self-

10 authenticating, I believe; government records about property,

11 that I'd like to admit as evidence -- admit as evidence

12 demonstrating that kind of activity, beyond my, just, testimony

13 to that effect.

14          If we can look to tab 36 in book 2.

15          THE COURT:  Mr. Reed, I just want to be clear that my

16 understanding is that the tab numbers are essentially the

17 exhibit numbers that you're assigning to each of these

18 exhibits.  Is that a fair statement?  Do you understand my

19 question?  You're supposed to stamp the exhibits with an

20 exhibit number.  These are not stamped but you did provide the

21 Court with binders, and each exhibit is behind a tab with a

22 number on it.  And unless you disagree, for example, what's

23 behind tab 3 (sic), the deed, you intend that as Claimant's

24 Exhibit 36, am I correct?

25          MR. REED:  Yes.  That was my understanding of what

1   that meant.

2           THE COURT:  Ms. Hager, did you understand it the same

3   way?

4           MS. HAGER:  Yes, Your Honor.

5           THE COURT:  All right.  So I have open in front of me

6   Claimant's Exhibit 36, marked for identification.

7   (Deed of property purchased in 1995 was hereby marked for

8   identification as Claimant's Exhibit 36, as of this date.)

9   (Claimant's Exhibits were marked for identification, as of this

10  date.)

11          THE COURT:  Go ahead, Mr. Reed.

12          What is the deed of, Mr. Reed?

13          MR. REED:  This is a deed of a property I bought in

14  1995.  Page 3 of the document shows the price I purchased it

15  for, of 399,265.

16          THE COURT:  Ask you this, Mr. Reed:  is this property

17  one of the properties as to which you're claiming damages, or

18  you're just using this to show that over time you purchased

19  properties?

20          MR. REED:  Yes, that I purchased and sold them,

21  purchased and sold them, and at consistently higher prices --

22          THE COURT:  This is not one of the properties for

23  which you're seeking damages?

24          MR. REED:  Correct.

25          THE COURT:  Okay.

1          MR. REED:  I just wanted to give the Court some

2    objective evidence, not just my story of me being -- doing

3    these kinds of things.

4          THE COURT:  Mr. Reed, one last point -- preliminary

5    point I would make is that until you offer a document in

6    evidence, it's not in evidence.  Okay?  You can point me to it

7    for identification.  To some extent, you can testify about it.

8    But you need to actually offer -- whether it's this exhibit or

9    others, you need to offer exhibits in evidence --

10          MR. REED:  I remember that.

11          THE COURT:  -- and I need to rule on it.  While I

12   don't necessarily require that you offer it when you first

13   discuss it, it makes for a clearer record if you do so.  I'm

14   leaving that to you.  But you're going to be responsible, at

15   the end of the day, for making sure whatever you want in

16   evidence has been offered and I ruled on it.

17          MR. REED:  Okay.  I see.

18          THE COURT:  And if you offer it, Ms. Hager has an

19   opportunity to object to it.  But -- go ahead.

20          MR. REED:  Okay.  So, I offer Exhibit 36.

21          THE COURT:  Ms. Hager?

22          MS. HAGER:  No objection.

23          THE COURT:  All right, Exhibit 36 is in evidence.

24   (Deed of property purchased in 1995 was hereby received into

25   evidence as Claimant's Exhibit 36, as of this date.)

1          THE COURT:  Go ahead, Mr. Reed.

2       (Pause)

3          MR. REED:  I would ask the Court to turn to tab and

4    Exhibit number 38.

5          On the first page of this document -- this document is

6    a -- again, a -- I believe, a self-authenticating government

7    document, regarding property.

8          THE COURT:  Where's this property?

9          MR. REED:  This is the same property that we just

10   looked at in the preceding exhibit.

11         THE COURT:  Okay, you sold the property?

12         MR. REED:  I sold the property.  As I said, I'm trying

13   to demonstrate the history -- a sampling.  It's not entirely

14   inclusive of everything, but a sampling.

15         So I sold the property, and this -- if we look on the

16   first page, was for 840,000 dollars.

17         THE COURT:  So you bought it in January of 1995 and

18   you sold it in April of 2005?

19         MR. REED:  Yes.  But I didn't just buy it and then

20   sell it.  I would -- I improved it; I added square footage,

21   bathrooms, architectural treatments, which is what the -- the

22   things I typically do to my houses.  Later today when

23   Mr. Maines comes, you'll hear him talk about that as well.

24         So I move for Exhibit 38 to be admitted into evidence.

25         THE COURT:  Any objection, Ms. Hager?

1          MS. HAGER:  No objection.

2          THE COURT:  All right, Exhibit 38 is in evidence.

3  (Government document evidencing sale of property purchased in

4  1995 was hereby received into evidence as Claimant's Exhibit

5  38, as of this date.)

6          MR. REED:  If we can turn to tab and Exhibit 24.

7          Have to give me a moment; want to refresh what I have

8  here.

9      (Pause)

10          MR. REED:  If you'd turn to page -- 1 -- 2, this is,

11  again, records from County of Henrico; I believe they're self-

12  authentic --

13          THE COURT:  What tab are you looking at?

14          MR. REED:  I'm sorry.  This is -- should be 24.

15          THE COURT:  All right.  I'm sorry.  Okay.

16          MR. REED:  These are records from the County of

17  Henrico, regarding property certified to by a director in the

18  County of Henrico, as to their authenticity.

19          If we look to page -- 1, 2, 3, 4 -- 5 -- let's see; is

20  this right?  6, 7 -- 8.  Page 8.

21      (Pause)

22          MR. REED:  This is for 900 (sic) Spring Brook Court.

23  I bought this in --

24          MS. HAGER:  Excuse me.  The page 8 I'm looking at is

25  for 4817 Cobblestone Landing.

RESIDENTIAL CAPITAL, LLC, et al.                    16

1              MR. REED:  Oh.  Let me make sure I --

2              MS. HAGER:  Unless I'm on the wrong page.

3              THE COURT:  Describe what's on the page, Mr. Reed.

4              MR. REED:  Says, "County of" -- top of the page, it

5     says, "County of Henrico, Finance Department, Real Estate

6     Assessment Division" --

7              THE COURT:  Well --

8              MR. REED:  -- "Transfer and Assessment".

9              THE COURT:  All right, you see that, Ms. Hager?  The

10    upper left-hand corner of the page, it says, "Transfer and

11    Assessment".

12             MR. REED:  Your Honor, is this what your page looks

13    like?

14             THE COURT:  Yes, it is.

15             MR. REED:  Okay.  They provided this --

16             MS. HAGER:  Oh, on the header --

17             THE COURT:  Yes.

18             MS. HAGER:  Okay.

19             THE COURT:  In the upper left-hand corner it says,

20    "Transfer and Assessment".

21             MS. HAGER:  Okay.  And the address is 9000 Spring

22    Brook Court?

23             MR. REED:  Yes.

24             MS. HAGER:  Okay.  Sorry.

25             MR. REED:  It's okay.

1        If you look at the top table, I purchased the property

2   in 2003 for 300,000 dollars, and we did site work to it and

3   then I wound up selling it for 580,000 dollars.

4        (Pause)

5        MR. REED:  If we move two pages forward in the same

6   exhibit -- I believe, page 9 -- 10, as we count them; there are

7   no page numbers on -- this should be for 48 (sic) Cobblestone

8   Landing Place.

9        MS. HAGER:  Excuse me.  Is that 4817?

10       MR. REED:  Yes.

11       (Pause)

12       MR. REED:  If we look at the purchase and sale

13  price -- I'm putting in the record, the contract price recorded

14  with the deed that I purchased was 522-.  But I will testify

15  that that was -- and I thought it would be reflected here; we

16  had a sales rebate, from the builder, that was 60,000 dollars,

17  that I negotiated.  And so, in essence, there was a -- we held

18  it, did some more improvements to it, and then I sold it, as

19  you could see, in a short amount of time.

20       THE COURT:  Did you make improvements to the property?

21       MR. REED:  Yeah, we did work to it, on that property.

22  We added, again, some square footage to it --

23       THE COURT:  Is there any exhibit that shows how much

24  you invested to do the improvements?

25       MR. REED:  No, Your Honor.  I --

1          THE COURT:  How do I know you made a profit?  You told

2   us what you paid, you told us what you sold it for, but you

3   didn't tell us how much you put in, in improvements.

4          MR. REED:  I can do an estimate from my memory,

5   because I -- I'm just trying to show you that I was in the

6   business of that.  This --

7          THE COURT:  Okay.  All right.

8          MR. REED:  I'm not seeking to -- I didn't think I had

9   to seek -- I'm not seeking the profits for these.

10         THE COURT:  Okay.  But you're -- never mind.  Go

11  ahead.

12         MR. REED:  Like, on 4817, we -- I added a bedroom;

13  that was about 7,000 dollars, because it was an internal space

14  but an expansion of the square footage, which adds to the

15  appraised value.  We did interior architectural work in terms

16  of moldings and treatments and, I think, trace ceilings; that

17  was about 4,000 dollars.  So --

18         THE COURT:  All right, let me not divert you from

19  you -- I understand this is not property you're seeking damages

20  with respect to.

21         MR. REED:  Correct.

22         THE COURT:  Go ahead, Mr. Reed.

23         MR. REED:  And I wasn't -- I do this as a continual

24  losing proposition over fifteen years.  I mean, I did it for a

25  reason.  We were making a living off of that.

1      THE COURT:  Did you have any other business or

2  employment during that fifteen-year period, other than buying,

3  selling, flipping homes?

4      MR. REED:  At different times.  Yeah, I -- for fifteen

5  years I also designed, built and renovated and owned

6  restaurants in Six Flags and Paramount movie-studio theme

7  parks.  In the '90s I designed, built and owned the chain of

8  Taco Bells.  I actually was responsible for putting the Taco

9  Bell in the World Trade Center, putting that deal together.

10  KFC.  Mrs. Field's Cookies.  Things like that.

11      And I was recruited to -- later, I was recruited to --

12  I -- a regional manager for Citibank, Smith Barney, and I wound

13  up with them for a while, as well.

14      We -- where was I?

15      (Pause)

16      MR. REED:  11, 12, 13, 14.

17      If you look at the same exhibit and move forward

18  couple pages -- let's see.  Again.  11, 12, 13 -- 14.  Page 14,

19  I believe.  Again it says, "Transfer and Assessment" up in the

20  left-hand corner.  It's for Parcel 133 Brookschase.  That's --

21  I bought that property in '06, and in '08 we sold the property.

22  That one was less profitable because we did site work to that

23  property because it needed to be raised and moved for a flood

24  zone in the tail end of the property.  But it was still --

25  there was still some profit to that one.

1          I believe page 16 of the same tab in the exhibit,

2    again transfer and assessment.  And that property was for

3    11617 Cobblestone Landing Court, purchased for 456,785 dollars.

4    We sold it for 619-.  And, again, we did some work to that one;

5    did some exterior work, architectural work, interior

6    architectural work, some countertops, and some reconfiguration

7    of internal space.

8          (Pause)

9          MR. REED:  If we go back and go to page 3 of that

10   document, it shows the purchase of Old Dell Trace, which is

11   the -- that property is subject to what we're going to be

12   discussing in terms of -- I believe to be ascertainable --

13   excuse me -- losses.  But at this moment, the proposition for

14   this document is to show that it was purchased for 899-.  And

15   it's my testimony that upon improvements that I planned for the

16   property and engaged in and pursued doing to the property

17   expansion and improvements, we had expected to have a value

18   that could either be held or liquidated, of about a million-

19   seven.  And we had an appraisal done; four million seven and a

20   quarter, subject to the completion of the improvements that

21   were filed for at the county and permits were drawn for and the

22   work was being done for.  That appraisal has been submitted to

23   the Court, and that's the -- in conjunction with the Uminski

24   deposition and exhibits.

25          THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    21

1          (Pause)

2              MR. REED:  If we go to the second page of this --

3              THE COURT:  We're still talking about --

4              MR. REED:  The same --

5              THE COURT:  Exhibit 24?

6              MR. REED:  Correct.  There's sketch details underneath

7    a floorplan, or a diagram, of the property.  They had living

8    square footage, first and second floor.  And so I want to -- I

9    want to point out to the Court that the house -- I don't see

10   where -- there's something here.  When we purchased the house,

11   it was 4,000 square feet, and I added the -- an extensive

12   addition off the back.

13             If you look at this drawing, there's three primary

14   squares or rectangles, and on the back of the house -- when we

15   purchased the house, it was the main house and then only a

16   first-floor element immediately off the back of the house.  If

17   you look at that chart, it'll be, like, a twenty -- I think

18   it's a twenty-nine-by-twenty-four room.  It was actually couple

19   rooms there.

20             And what I did to the property is I built completely

21   above that space and going back further.  So if you see the

22   back box -- when I say "back box", it's actually the top in

23   this drawing.  But, adding thousands of square feet to this

24   property.

25             We -- Stevie Watson, in her testimony, when you read

1    that, talks about what I added, as well.  And I'm going to

2    now -- and the appraisal talks about that as well.

3            So I essentially added first-floor space or framed it

4    all out for first-floor space.  It was intended to be enclosed

5    but our project was stopped before it was able to.  That's

6    where you'll see in the -- that top box, which is the most rear

7    part of that house, it says, "Pat" for patio.  And that was all

8    supposed to be a -- an enclosed heated space.  We did all the

9    work for that.  We just didn't -- I didn't -- I ran out of the

10   money before I could finish enclosing all of that.

11           And above -- so, behind that, then above that entire

12   double rectangle -- that double square, which is the entire

13   back half.  And then a third floor on top of that.  In the

14   chart, the sketch details, the third floor is not the full size

15   of the second floor, but it's 924 feet.  The patio they have

16   listed as 1,000 square feet; that's -- was supposed to be

17   enclosed.

18           And then the second floor of that double square, which

19   is a rectangle, was a landing, like, a -- you know, a mezzanine

20   kind of space that allowed the staircase to go -- a receive

21   (ph.) staircase from below, and the staircase up to the third

22   floor.  It had a lot -- we finished the laundry room completely

23   in there; we floored that.  All in that area, sheetrock,

24   drywall, all the molding was done, the painting was done.

25           Then behind that, the remainder of it was a massive

RESIDENTIAL CAPITAL, LLC, et al.                    23

1   master bedroom; I want to say it was about 1,200 square feet.

2   It had a sitting room, big bay window, columns.  There's going

3   to be some photographs.  I'm going to show you some of the work

4   that I did in that property.  A large bedroom itself.  Two-

5   story vault.  That's why the third story is not same square

6   footage as the second floor.

7           THE COURT:  Did you live in Virginia while you were

8   doing the renovations?

9           MR. REED:  Part of the time, Your Honor.  Part of the

10  time.

11          THE COURT:  Where'd you live?

12          MR. REED:  In the property and in the hotel.  We moved

13  out -- I don't know if you recall from our previous trial;

14  Mr. Brett Cooper went under contract to lease and purchase my

15  New Jersey house.  And so we moved out.

16          So I don't want to --

17          THE COURT:  That's where you moved?  You moved to this

18  Henrico, Virginia property?

19          MR. REED:  Yeah, I went to a hotel first.

20          THE COURT:  Okay.

21          MR. REED:  And then we continue -- we had -- I had

22  done a lot of work.  You can see, from the appraisal with --

23  you mind if I stand up for a second?

24          THE COURT:  Please do.  You just got to make sure

25  you're close enough to the microphone --

1            MR. REED:  Yeah, yeah.

2            THE COURT:  -- that we pick up your voice.

3            MR. REED:  Not a problem.  This'll be helpful for a

4   bit.

5            THE COURT:  Yeah, just so the record is clear:

6   Mr. Reed is standing near the witness box.  I've permitted him

7   to stand.  Mr. Reed has health problems which make it difficult

8   for him to stand for long periods, so I have no problem about

9   his standing there.

10            Is that a fair statement?

11            MR. REED:  Yeah.

12            THE COURT:  Go ahead, Mr. Reed.

13            MR. REED:  Down to all the gory details, yes, Your

14   Honor.

15            THE COURT:  Okay.

16            MR. REED:  The appraisal that Uminski did will also

17   show -- I'd like -- because I'm going to like to refer to that.

18   It's been admitted into evidence, I guess, second -- I'm going

19   to like to refer to that -- show that construction that I did

20   took place in -- primarily in two big spurts.  There was work

21   in between as well, but not as consistently.  We -- in '07 --

22   in '07, I think it's the latter half, all that demolition and

23   framing took place.  It's 30,000 dollars in framing, lumber.

24   The cost to have it actually framed was about 40,000 dollars,

25   which 37,000 -- I think 37,500 or something like that, I paid.

1    The windows and doors, I think, were about 20,000 dollars.

2              Do you need me to repeat anything?

3              UNIDENTIFIED SPEAKER:  (Indiscernible).

4              THE COURT:  You better say it again, Mr. Reed.  The

5    microphone'll pick up your voice if you're close to it, but not

6    if you're not.

7              MR. REED:  Okay.  So the framing materials, like the

8    studs, the beams, that was about 30,000 dollars.  The framing

9    work was about 40,000 dollars, 37.5- of which I paid for the

10   lumber, I paid for the -- you know, the windows and doors,

11   those were about 20,000 dollars.  The drywall and paint, best

12   of my memory -- I can't remember the painting cost, because it

13   was -- you know, it wasn't as large as these numbers.  The

14   drywall -- I remember us picking up a ton of supplies -- that

15   was about 6,000 dollars.

16             And so in '07 we had dem -- did the demolition off

17   the -- you know, removing the roof of that whole back area, the

18   original one-story back area.  And I bought all the materials

19   to frame and install windows and put the weather --

20   weatherproofing on the roof.

21             And then when we came down from New Jersey, I

22   continued that work.  We did the -- in the -- when I came from

23   New Jersey, we did the drywall, because the house was framed

24   and it would sheathe -- sheathing is the exterior -- is the

25   exterior plywood, Your Honor; I don't know if you know that,

RESIDENTIAL CAPITAL, LLC, et al.                    26

1  but that's the -- when you frame the house, it's all the --

2  it's all the skeleton; then you sheathe it, which is your

3  exterior -- is your plywood.  And then you insert your win --

4  you insert your windows and then -- and exterior doors and then

5  you wrap the property in the weatherproofing underlaying it.

6  This goes below the siding we -- you can -- we can look at the

7  appraisal that was done in the beginning of '08; you could see

8  at that stage where we were.

9          Then when I -- we went to Virginia, we discovered

10  some -- there was some storm damage.  There had been a leak in

11  the weatherproofing layer to the roof; I believe it was between

12  the -- where the old -- the new roof tied into the old roof,

13  and this wrecked a space in the main foyer.  So we had to pay

14  for that.  And we were in a hotel for a good amount of time,

15  because -- because of that.  And I'll be showing you some

16  pictures of the house, interior, and afterwork that we did --

17  you know, we did to the house.

18          When we moved in, we then moved to the -- or as I was

19  in the hotel, and then we -- and then we moved in, we started

20  working on the interior space more heavily; we had the

21  insulation done.  I can't remember the exact price of that.

22  That was -- I estimated it.  I think that was about 3,000

23  dollars.

24          We did, you know, the drywall inside the interior

25  architecture; the interior moldings, interior doors.  A lot of

RESIDENTIAL CAPITAL, LLC, et al.                    27

1   the stuff in this property was dated.  You'll see, to

2   corroborate my assessment of that and then my statement to that

3   effect, the Stevie Watson deposition will have testimony that

4   I've indicated, for the record, that talks about the -- what my

5   intentions were to buy the property.  Ms. Watson was the

6   listing agent on that property and contacted me, knowing what I

7   had done with other properties that she was involved with, me

8   buying, selling and improving these properties.  And she

9   thought that my talents and skill set would be appropriate

10  and -- for this particular property or just like it had been

11  for numerous others.

12          MS. HAGER:  Objection.  Move to strike some of that

13  testimony to the extent that it's hearsay and calls for

14  speculation on the part of Ms. Watson, as to Mr. Reed's

15  intentions.

16          THE COURT:  Sustained.

17          MR. REED:  Okay.

18          THE COURT:  That portion of the testimony's stricken.

19          Go ahead, Mr. Reed.

20          MR. REED:  Okay.

21          THE COURT:  You can't testify about what somebody said

22  to you, at least without establishing a hearsay exception.

23          MR. REED:  Okay.

24          THE COURT:  What Ms. Watson did or didn't say to you

25  would be hearsay unless it falls within a hearsay objection.

1    But go ahead with your --

2              MR. REED:  Okay, well, she says it --

3              THE COURT:  -- account.

4              MR. REED:  -- in her testimony, so I'll leave it --

5              THE COURT:  Go --

6              MR. REED:  -- to that.

7              THE COURT:  Go ahead.

8              MR. REED:  My train of thought now.

9              So I had a -- I had a pretty good vision of what we

10   were going to need to do to the property to bring the value of

11   the property to its potential.  The property has a tremendous

12   curb appeal; it had a tremendous physical architecture; not

13   finished architecture.  And I don't know if the -- to explain

14   to the Court the difference between what I call physical

15   architecture versus the finish.  The physical is the -- like,

16   the actual layout of the property:  a room to the left, a room

17   to the right, a foyer in the middle, a curved staircase,

18   two-story foyer; mezzanine and balcony areas.

19             What was missing in the property was that it was

20   undersized for that immediate marketplace, in my opinion.  It

21   was -- and based on my experience, it was -- and research, by

22   the way, extensive research.  And the interior treatments,

23   because the property was built in the '80s, were outdated for

24   the demands, I think, of the -- that current consumer pool or

25   base.

1      So, now we are looking at that and then having rough

2  ideas and then researched ideas as to how much it would cost to

3  do the work -- design, build and renovate and do the work to

4  the property.  And then with all that in mind, I moved forward

5  with my wife to purchase the property; pulled the -- had the

6  design work done, pulled -- paid for all that design work --

7  that's what Mr. Sowder's deposition and exhibits are about --

8  and proceeded in -- along those -- along that path.

9      (Pause)

10      MR. REED:  I think I'm done with this particular

11  exhibit.  Let me look, Your Honor; I want to -- because I'm

12  going to continue to talk about that property, but I want to

13  look at a different exhibit.  So, give me a moment before I

14  move to enter.

15      (Pause)

16      MR. REED:  Your Honor, I think I'm -- at this -- I

17  have a procedural question.  I can ref -- once it's admitted,

18  it doesn't mean I can't refer back to that exhibit again, is

19  that correct?

20      THE COURT:  That's correct.

21      MR. REED:  Okay.  So I move to admit Exhibit 24.

22      THE COURT:  Any objections?

23      MS. HAGER:  No objections.

24      THE COURT:  All right, Exhibit 24 is in evidence.

25  (Documents from County of Henrico re: 9000 Spring Brook Court,

1   4817 Cobblestone Landing Place, 133 Brookschase Lane, and 11617

2   Cobblestone Landing Court properties were hereby received into

3   evidence as Claimant's Exhibit 24, as of this date.)

4        (Pause)

5             THE COURT:  May I ask you, Mr. Reed, are you changing

6   subjects now?

7             MR. REED:  No.  I'm going to try and stay on topic,

8   Your Honor, on the house.

9             THE COURT:  All right.

10            MR. REED:  That's what I'm going to try and do so I

11  don't --

12            THE COURT:  Okay.

13            MR. REED:  -- I don't confuse --

14            THE COURT:  What we'll do is we'll continue until

15  11 o'clock; we'll take a recess -- a fifteen-minute recess at

16  11 o'clock.  Just be careful with your computer.  You --

17            MR. REED:  I know; I was just -- I was --

18            THE COURT:  You put it on the ledge behind you.  I

19  just want to be sure --

20            MR. REED:  Can I?

21            THE COURT:  Yes, you can.  I want to be sure that you

22  don't knock it off.

23            MR. REED:  That's what I was just afraid of, because

24  when I flipped the book, it just moved --

25            THE COURT:  You could set it on --

1          MR. REED:  Thank you.

2          THE COURT:  This okay?

3          MR. REED:  Thank you.

4      (Pause)

5          MR. REED:  Your Honor, if we can turn to tab 12.  I

6  believe this is correct.  Is tab 12 the deposition of Steve

7  Watson?

8          THE COURT:  No.

9          MR. REED:  Or is it the --

10          THE COURT:  It's tab 13.

11          MR. REED:  Tab 13.  It's in a duplicate spot, for me.

12  Well, if we can look to 13.  It should be an exhibit.  It is

13  embedded within Ms. Watson's declaration.  This is not about --

14  this is not about her -- the -- what I'm going to -- about to

15  discuss is not -- a reference is not the substance of her

16  stricken valuation and loss that was stricken in the motion in

17  limine prior to trial.  This is a document that's contained

18  within her documents that I had a copy -- that I kept a copy of

19  as well, that she and I both had.  And so I would like to refer

20  to that section of this exhibit.

21          THE COURT:  I --

22          MS. HAGER:  Excuse me.

23          THE COURT:  I don't know what you're talking about.

24          MS. HAGER:  Yeah.  Sorry, Your Honor.  Excuse me.  In

25  my tab 13, I have the deposition transcript of Stevie Watson,

 1  and the back page says, "See Watson declaration", but I

 2  don't -- in this tab, I don't have her declaration or any of

 3  the attachments thereto.

 4          THE COURT:  The Watson declaration and exhibits to it

 5  are behind tab 12.

 6          MS. HAGER:  So we're talking about tab 12?

 7          THE COURT:  I don't know what we're talking about.

 8          MR. REED:  Yeah.  It would be --

 9          THE COURT:  Mr. --

10          MR. REED:  It would be --

11          THE COURT:  Stop.

12          Mr. Reed directed the Court's attention to the Watson

13  deposition, which is not in evidence.

14          But when you started talking about exhibits to it, the

15  Court notes that the declaration of Stevie Watson, with

16  exhibits, the entirety of which is twenty-eight pages long,

17  appears behind tab 12, which is not in evidence, Mr. Reed.  If

18  there're portions of the exhibits -- you're going to refer to

19  the Watson declaration, refer to the -- the page numbers at the

20  bottom of the Watson declaration and exhibits show pages 1 of

21  28, 2 of 28, through 28 of 28.  Refer to page numbers at the

22  bottom of the page if you want to refer to portions of an

23  exhibit.

24          MR. REED:  I would refer to tab -- again, so we're all

25  on the same page literally, tab 12, which was Exhibit 12, page

1  4 of 28.  Should be the cover of an article of a -- of a

2  magazine.

3           THE COURT:  I see it.

4           MR. REED:  This -- to give you some sense of the

5  neighborhoods that I bought property in, this article was --

6  this magazine was given to me by Ms. Watson back in '07, I

7  believe it is, when we bought the house.  If you look through

8  the article, the -- page 5 of 28 is the leading photo of the --

9  hold on a second.  The magazine had an article within it,

10  called "Notable Neighborhoods", and page 5, 6 -- I don't know

11  why there's a blank in 7 -- 7 of -- 8 and 9, is the article

12  within the magazine that I -- is -- front cover, which is

13  depicted on page 4.  The leading photograph of that article is

14  Old Dell Trace.  The article discusses notable neighborhoods in

15  the Richmond market, in Henrico.

16           If we look at the -- page 6 of 28, paragraph -- you

17  can read the whole article.  Paragraph 3 I'd like to draw the

18  attention to:  "The River Road Corridor, stretching from the

19  Richmond city line and its eastern terminus, to Goochland

20  County in the west, charts a course along the James River.

21  Along the way, it encompasses many of metropolitan Richmond's

22  most prestigious addresses."  Another sentence in that

23  paragraph:  "These homes are not cookie-cutter construction of

24  new development but unique personal creations, each situated on

25  a spacious lot with well-established trees."  I'm discussing

1  this article to give the Court an idea of the -- an

2  understanding of the actual neighborhoods that I bought lots

3  and houses in to do the work.

4      If we turn to page 8 of 28, the top photograph is

5  noted with the name "Windsor on the James".  Windsor on the

6  James is where I owned an improved lot for 133 Brookschase.

7      (Pause)

8      MR. REED:  Interestingly enough, also on page 8 of 28,

9  the lower-priced houses that were not above the million-dollar

10  range that I worked on and improved were also mentioned; that

11  neighborhood was mentioned in this article as a notable

12  neighborhood as well.  If you look at the bottom of that

13  article, lower right, Twin Hickory is the subdivision where I

14  had the two Cobblestone properties that I -- they were part of

15  that facts record.  I bought them and sold them.

16      And then the article talks about Henrico County

17  itself, the schools, the -- and the amenities and the

18  infrastructure, as to why it's a desirable -- is the desirable

19  county within the greater Richmond metropolitan market.  Again,

20  I would like to offer this article and this section of this

21  Exhibit 12 into evidence to give the purpose of -- which is

22  solely to give the Court an understanding of the marketplace in

23  the neighborhoods in which I invested in, in Richmond.

24      THE COURT:  So as I understand it, your offer is pages

25  4 of 28, to 9 of 28, in Claimant's Exhibit 12?

1            MR. REED:  Yes.

2            THE COURT:  Ms. Hager?

3            MS. HAGER:  Your Honor, I have an objection.

4            THE COURT:  Just -- I only listen to -- make your

5    legal objection.  I don't want to hear speaking objections.

6            MS. HAGER:  Authenticity.  It's missing a page.  And

7    there seems to be an addition on page 5.

8            THE COURT:  The addition on page 4 is the box that

9    says, "Frank Reed property" with the address?

10            MS. HAGER:  I would think so.

11            MR. REED:  Your Honor, I -- in my record, I had -- I

12    used this -- like, a label --

13            THE COURT:  All right.

14            MR. REED:  -- to put that on.

15            THE COURT:  So you added the box with the street

16    address -- your name and the street address?

17            MR. REED:  Correct.  Correct, Your Honor.

18            THE COURT:  All right.  What are your other

19    objections, Ms. Hager?

20            MS. HAGER:  No further objections.

21            THE COURT:  All right, then in Claimant's Exhibit 12,

22    pages 4 of 28, to 9 of 28, are in evidence; only that portion.

23    (Pages 4 of 28, to 9 of 28, of Claimant's Exhibit 12, were

24    hereby received into evidence, as of this date.)

25            All right, let's take our morning recess until 11:15.

1  You can leave all your papers there if you want.  Then talk

2  with Ms. Hager about the portions of the testimony -- I guess

3  it's both -- it's from two depositions, really; it's both the

4  Clampitt testimony and the Watson testimony.

5          MS. HAGER:  Your Honor, if Mr. Reed wants -- I know he

6  wrote out a list of the pages and lines.  If he wants to leave

7  that with me when he goes to use the restroom, I can -- I don't

8  think I need time to discuss it with him.  I can --

9          THE COURT:  That's fine.

10          MS. HAGER:  -- go through it.

11          THE COURT:  Okay.  Could you do that, Mr. Reed?  Could

12  you give the designations to Ms. Hager and let her look at

13  it --

14          MS. HAGER:  I promise --

15          THE COURT:  -- while you --

16          MS. HAGER:  -- I won't look at any other pages --

17          MR. REED:  No -- can I photograph them and email them

18  to you.  I'll just --

19          THE COURT:  No, just --

20          MR. REED:  -- take a picture --

21          THE COURT:  Could you just let her look at it?

22          MR. REED:  Yeah.  It's in a book of other stuff;

23  that's --

24          MS. HAGER:  I won't turn the page.

25          MR. REED:  Okay.

 1              THE COURT:  Okay.  Let's take our recess.  We're going

 2      to take a recess until twenty after 11, okay?  All right.

 3          (Recess from 11:02 a.m. until 11:28 a.m.)

 4              THE COURT:  All right.  Court's back in session.

 5              Mr. Reed, you're still under oath.

 6              MR. REED:  Your Honor, Ms. Hager and I went through

 7      and clarified something on one of the depositions as well,

 8      during the break, for Clampitt.

 9              THE COURT:  All right, so you want --

10              Ms. Hager, you're prepared to address that now?

11              MS. HAGER:  I'm not completely through Clampitt, but I

12      can do Watson.

13              THE COURT:  All right, let's -- why don't we do this:

14      let's -- we'll do both, either -- we'll do it right after

15      lunch, okay?

16              MS. HAGER:  Okay.

17              THE COURT:  So you can finish going through -- we'll

18      do both right after the lunch break, okay?

19              MR. REED:  Okay.

20              THE COURT:  All right.

21              MR. REED:  Your Honor, at this time I want to remind

22      the Court that -- I was asked to make sure I had an additional

23      witness.  Mr. Maines is, I understand, on his way.

24              THE COURT:  Okay.  What we'll do is, when Mr. Maines

25      comes, we'll take his testimony out of order, even if Mr. Reed

1    hasn't completed his testimony, so that Mr. Maines doesn't --

2                MR. REED:  He'll be --

3                THE COURT:  -- doesn't have to wait; we'll put him on.

4    Hopefully it'll be faster.  And when his testimony's complete,

5    Mr. Reed, if he hasn't finished his testimony, will resume the

6    stand.  Okay?

7                MR. REED:  Your Honor, is -- this is a logistics

8    question:  Mr. Maines provided a declaration.  Are we doing

9    that standard format where his declaration is offered and then

10   they do the --

11               THE COURT:  Cross-examination.

12               Ms. Hager?

13               MS. HAGER:  That's fine, Your Honor.

14               THE COURT:  Okay.  All right, so we'll -- he'll take

15   the witness stand, he'll be sworn, you'll offer his declaration

16   as his direct testimony, Ms. Hager can conduct her cross-

17   examination and then, if there are appropriate subjects for

18   redirect, you're entitled to do that.  Okay?

19               All right, so you can tell Mr. Maines, when he comes,

20   the logistics of how that'll be handled, and we'll take him out

21   of order to make sure that his testimony occurs expeditiously.

22   Okay?

23               All right, so let's go back, Mr. Reed, back to your --

24   and let me just add:  if Mr. Maines is here ready to go before

25   we deal with the Clampitt and Watson depositions, we'll wait

RESIDENTIAL CAPITAL, LLC, et al.                           39

```
 1   until Mr. Maines is finished.  So we'll take him as soon as we
 2   can.
 3          Okay.  Go ahead, Mr. Reed.
 4          MR. REED:  Believe it or not, I don't -- where did we
 5   end?  We ended with the -- was it the --
 6          MS. HAGER:  The --
 7          MR. REED:  Was it the submission of the article?  Is
 8   that where we left off?
 9          THE COURT:  The portion of the article in Claimant's
10   Exhibit 12, pages 4 of 28, to 9 of 28, are in evidence.  That's
11   where we concluded, according to my notes.
12          MR. REED:  Okay.
13          THE COURT:  I know, Mr. Reed, that you need to --
14   you're entitled to, and I'm trying to give you, leeway in
15   providing your testimony, but you need to try and move it along
16   faster.
17          Are you finished with the article?
18          MR. REED:  I am done with the article.
19          THE COURT:  Okay.
20          MR. REED:  Okay.  I would like to turn to the Uminski
21   deposition and exhibits; tab and Exhibit 19.
22      (Pause)
23          MR. REED:  I would like to turn to page 2 of 18, at
24   the bottom of the page of the -- it has the -- it's the first
25   page of the appraisal.  Hopefully we all have the legible
```

1    copies now.

2              THE COURT:  Yes.  Go ahead.

3              MR. REED:  I'd like to note, in a notation of the

4    neighborhoods, so it's the -- there're sections to an

5    appraisal.  On the left-hand side of the appraisal, you'll

6    see -- they're in a black bar, written vertically:  Subject,

7    Contract, Neighborhood.  So, Neighborhood, there're some notes

8    in there.  Second -- says, "Neighborhood description:  The

9    subject is located in the prestigious far west end.  Demand for

10   real estate is consistently some of the highest in the Richmond

11   metro area."

12             Further down, it talks about market conditions.  Says,

13   "Current market conditions are considered to be favorable at

14   this time.  Supply and demand appears to be in balance."

15             We go down to the Site section.  "The site is very

16   well landscaped, with mature trees and shrubs.  There's an

17   exposed aggregate walk to the circular drive."

18        (Pause)

19             MR. REED:  If we go down to "Improvements", this time,

20   as I testified, we had already done the framing and sheathing.

21   I'll point to photographs that indicate that.

22             The -- finished; above grade.  Contains thirteen

23   rooms, seven bedrooms, seven and a half baths; 7,289 square

24   feet; above grade.

25             Little bit below that, describe the condition of the

RESIDENTIAL CAPITAL, LLC, et al.                    41

1   property.  In that section, it's written, "The subject is a

2   very well-constructed colonial-style dwelling that has recently

3   been renovated; had a rear addition added.  As of the date of

4   inspection, construction was approximately sixty percent.  No

5   functional or extreme absolescence" -- "obsolescence was

6   observed".  And it says, "Are there any physical deficiencies

7   or adverse conditions that affect the livability, soundness or

8   structure or integrity of the property?"  "No."

9        (Pause)

10        MR. REED:  I'd like to note on page 3 of 18 under

11   Sales Comparison Approach, the value was placed by the

12   appraiser at 1,725,000 dollars.  And I would like to also note,

13   so the Court understands, we asked for this appraisal at the

14   time to firm up the value of the property upon completion.

15        If you look at "Reconciliation" on the next bottom

16   section, it's called a "subject-to" appraiser.  They will often

17   relate -- people in the profession will refer to it, and based

18   on us completing the work.

19        (Pause)

20        THE COURT:  What work remained to be done at the time

21   that this appraisal was done, Mr. Reed?

22        MR. REED:  As I was saying, this -- the -- at this

23   time -- we can go through -- let's go to the photographs.  That

24   should show some of that.

25        THE COURT:  Could you just describe it for me and --

1   just describe it briefly for me, if you would?

2           MR. REED:  Sure.  As a said before, we did the

3   framing, the sheathing -- if you go to 10 of 18 -- 10 and 11 of

4   18.  Subject rear -- this is the back of that --

5           THE COURT:  You're looking at page 10 of 18 --

6           MR. REED:  Yes.

7           THE COURT:  -- the middle photograph.

8           MR. REED:  Yes.

9           THE COURT:  Subject rear.  It appears to show the

10  ongoing construction at the rear of the house.  And the framing

11  and sheathing has been done?

12          MR. REED:  Yes.  And if you want to look at page 11 of

13  18, subject side view, addition --

14          THE COURT:  All right, I see these photographs.  I

15  think you've answered my question.  Go ahead with your --

16          MR. REED:  Yeah, yeah.  So just to -- just to clarify

17  something on that, Your Honor.  The very bottom right-hand

18  section there's a -- you see a chimney and a window and a wall

19  there.  That was the original first floor back section of the

20  house.  So you had the full house into the front to the right,

21  and then you only had this little back room area.  And the

22  chimney was a short chimney.

23          So we excavated to the left into the hillside, poured

24  all the foundations, the concrete, brick -- a knee wall, a

25  retaining wall, raised the chimney, framed out all the addition

1   above, sheathed it, waterproofed it, put all the windows in it.

2   The only interior living space that wasn't done at that time,

3   because the windows we had wanted were not available like we

4   thought they would be, is the -- is the -- what was going to be

5   the sunroom.

6         So if you see the next section, you see the chimney

7   then the window to the left of the chimney, and then there's

8   this whole dark area in the photograph where you could see a

9   couple of columns in there.  The house is not floating in the

10  air.  It's all supported --

11        THE COURT:  May I ask you this?  How many square feet

12  did you add?

13        MR. REED:  3,500 square feet.

14        THE COURT:  All right.  And when this appraisal was

15  done, can you give me an estimate of how long you anticipated

16  until completion of the addition and remodeling?  You were

17  acting as the general contractor?

18        MR. REED:  Yes.  Yeah.

19        THE COURT:  Did you -- can you provide me with an

20  estimate of how much time you anticipated to complete the

21  addition and renovations at the time this as-of appraisal was

22  done -- or subject-to appraisal, not as-of.  Subject-to.

23        MR. REED:  Yeah.  Yeah.  It depends on the -- Your

24  Honor, that was -- that's dependent on the contract -- the

25  subcontractors and the -- and the permitting authority, when

1    they can come and see this.  I mean, it varies widely --

2            THE COURT:  It's really -- I'm asking you a pretty

3    simple question.  If you don't have an answer, that's okay.  Do

4    you have -- did you, at that time -- at the time that this

5    subject-to appraisal was done, what was your best estimate of

6    how much time was going to be required to complete the addition

7    and renovations to the property?  And if you didn't have an

8    opinion about it, just tell me that.

9            MR. REED:  I don't remember.  I mean --

10           THE COURT:  Okay.  Go through all of your testimony.

11           MR. REED:  I mean, we thought it -- thought it'd be a

12   few months, but I can't tell you if it was --

13           THE COURT:  Okay, just go on with your testimony, Mr.

14   Reed.  You've answered my question.

15       (Pause)

16           MR. REED:  If you can -- if you go to 15 of 18, you

17   can see the -- you know, the footprints of the -- of the living

18   space.  The -- oh, I'm sorry, let me try this.

19           You can see -- I'm sorry, let's go to 14 of 18.  I

20   apologize for that.  14 of 18, the appraiser indicates, based

21   on our conversations and the plans that were submitted, if you

22   look at the top footprint, it says -- the very top word in the

23   very back section of the house is that area that didn't get

24   framed in and sheathed because we didn't have the right -- or

25   the windows had been not available or discontinued.  So -- but

1    it was supposed to be, in the terms of the work, like a

2    sunroom.  He calls it a den.  But that's the -- that space that

3    was uncovered -- that was unenclosed yet, at that time.  But

4    the intention was to -- to enclose it, so.

5            And in the 15 of 18, you can see on the second floor

6    how I was describing the layout, that there was an upper -- he

7    calls it a foyer.  It's an -- in that whole section in the

8    back, starting from the bottom of that section going forward,

9    he calls it a foyer.  It was an overlook looking down into the

10   curved staircase.  There's a laundry room right -- to the

11   right, stairs going up.  There's a sitting room, and then the

12   master room -- bedroom is in the back, and then there's a full

13   bath.  That full bath was plumbed out, framed out, drywalled in

14   the bathroom.  The Jacuzzi tub was dropped in and attached.

15   All the -- all the plumbing for the showers -- it had multiple

16   heads and sprays -- were all roughed in.  There was two

17   toilets, one his and hers, were roughed in.  The double -- two

18   vanities and sinks were roughed in.

19           For the record, I don't know if the court means what

20   "roughed in" means, but --

21           THE COURT:  I do.

22           MR. REED:  Okay.

23           THE COURT:  Go ahead.

24           MR. REED:  All right.  But the walls themselves were

25   painted, moldings were in, doors were hung, closets stuff were

1  hung.  In the -- in the back master bedroom, the hardwood floor

2  was in.  The fireplace was in.  The drywall painted.  But

3  the -- but the marble for the sitting room, the marble for the

4  master bath, the marble for the walk-in closet, that wasn't

5  done.  And the hardwood staining wasn't done for the second

6  store -- second floor foyer.

7          The laundry room was done.  That was tiled.  The

8  cabinets were in.  The washer and dryer were functional.  You

9  know, I actually -- like I said, we had to stay there for a

10  while.

11          The third floor, which is page 16 of 18, that's a

12  bedroom -- a big -- a large third-floor like in-law suite

13  bedroom.  Big -- had its own little -- little foyer, coming up

14  the top steps to the right.  It had double doors.  Big -- big

15  boxed out window.  You can see -- on those exterior side

16  pictures, you can see the large windows that were put in.  And

17  that was a high vaulted ceiling.  It had a full bath, double

18  sinks, built-in seat for the -- for the bathroom.  That was all

19  done.  All that -- that was living -- you could live in that

20  space -- excuse me.

21          I think that's it for now on the -- on the -- in my

22  references to the -- to the appraisal.  Let's see.

23      (Pause)

24      MR. REED:  I want to make sure I'm doing -- it's the

25  right one.  And that -- let's see.

RESIDENTIAL CAPITAL, LLC, et al.                    47

1          The Uminski appraisal was just -- just to understand,

2    was admitted into evidence.

3          THE COURT:  Yes, it was.

4          MR. REED:  Yeah, okay.  So forty -- sorry I'm trying

5    your patience, Judge.  I want -- these are a lot of details I

6    think -- I thought you need to know.  Tab 44 --

7          THE COURT:  Claimant's Exhibit 44 are five

8    photographs.  Is that correct, Mr. Reed?  Is that what you're

9    referring to?

10         MR. REED:  Yes.  I wish I had more.  This is offered

11   to show the -- a condition of the house existing and during

12   work.  This also shows the water damage that was done in the

13   house from that roof leak.  It was contained to the foyer area

14   right below -- the primary floor area, right below --

15         THE COURT:  This was in the existing construction

16   rather than the addition that you were putting on?

17         MR. REED:  Yes.  Yeah.  But I -- but I had to -- you

18   know, when this happened, I had to pay cash out-of-pocket for,

19   you know, the work.  You know, it's something we had to -- we

20   had to deal with.

21         THE COURT:  How old was the house?  Obviously I'm

22   referring to the original construction?

23         MR. REED:  Twenty -- twenty years.

24         THE COURT:  All right.  When were these photographs

25   taken?

1           MR. REED:  These were -- in '08.  I can't remember
2   when.  Later in '08.

3           THE COURT:  They were taken sometime in 2008?

4           MR. REED:  Correct.  So in other -- in other words,
5   Your Honor, as I had said before, we had done this work, and I
6   believe the tie-in of the roof from the addition to the back of
7   the house and the existing house, the roofing guy told me that
8   it was -- I don't know if I could say what he told me but he
9   said -- we determined that it appeared to be failure of
10  flashing or something like that in the roofing area there.

11          THE COURT:  Where the old roof met the new roof?

12          MR. REED:  Yes.  But it -- you know, trying to also
13  show that -- if you go to page --

14          THE COURT:  Did you have insurance that covered the
15  damage?

16          MR. REED:  Eventually they did.  We did.

17          THE COURT:  How much did you collect on the insurance?

18          MR. REED:  I don't remember.

19          THE COURT:  All right, go ahead.

20          MR. REED:  It was -- 20,000, 30- -- I don't remember.
21  That was much later.  I think that was in two-thousand -- by
22  the time that happened -- '10 or '11.

23          Because we had construction insurance on it too.  I
24  mean, it's not the regular insurance.  I had -- we had did
25  additional insurance because you're -- you know, you're doing

1     renovations to it too.  You want to make sure it's declared and

2     everything, you're going to be working on it.

3                    THE COURT:  Who took the photographs?

4                    MR. REED:  I thought I -- I took these photographs.

5     And then the -- if you look at the number 2 -- no -- yeah.

6     Number 2 --

7                    THE COURT:  Is that insulation material that was

8     pulled out?

9                    MR. REED:  Yeah, yeah.  That's where the roof fell

10    through.

11                   But if you look in the back, you can kind of see -- to

12    the back to the next section --

13                   THE COURT:  I don't know what you mean.

14                   MR. REED:  If you look at page number 2, picture

15    number 2, to the right --

16                   THE COURT:  Yes.

17                   MR. REED:  -- look to the room behind the foyer, and

18    it's just -- I'm just drawing your attention to the -- like we

19    had to do supporting columns.  And you could look out the

20    window, and you'll see the brick wall that was put in, the

21    retaining wall for that expansion, you know, that den area.

22                   Okay.  And this -- I want you to see the -- if you

23    look at page 1 --

24                   THE COURT:  The first photograph?

25                   MR. REED:  Yes, page -- the first photograph.  When

1    you walk in the front door, I want you to notice how this --

2    there's just a railing, like a -- like a thinner oak railing

3    with some white spindles.  And I'm going to do a comparison

4    with some photographs.  I'm going to then show the work that we

5    did in the -- in the -- as part of the overall renovation.

6    And --

7              THE COURT:  Is that looking up at a balcony on the

8    second floor?

9              MR. REED:  Correct.  So when you walk in the front

10   door -- if you look at page 2, Your Honor --

11             THE COURT:  That's the stairway up to the second

12   floor?

13             MR. REED:  Correct.  The stairway comes -- this is a

14   bridge that runs in front of the stairway, and the stairway

15   comes up --

16             THE COURT:  Is that between the existing construction

17   and the new addition?

18             MR. REED:  Correct.  The new addition is in the back.

19             The last photo, for example, is if you're standing in

20   the new addition looking down -- there was like a -- there was

21   a front foyer and a back foyer.  This is like looking down the

22   spiral staircase and that's the back end of the foyer and

23   that's the front end of the foyer.  The foyer was -- you can

24   count the tiles -- I think it was ten by twenty-four, twenty-

25   six, or something like that.

1              And then you'll -- in this photograph, you can see the
2     dining room to the left and the opening to the formal living
3     room to the right.  And if you want to look at that, there's
4     even -- you can see that -- where we cut that opening further.
5     We have the base plates there that were existing, and we later
6     cut those out.  And I'm going to show you some photographs of
7     that same area, and you'll see the kind of work that we did at
8     that -- what kind of progress we made.
9              So if there are no objections, I'd like to offer the
10    photos of 44.
11              THE COURT:  Ms. Hager?
12              MS. HAGER:  No objection.
13              THE COURT:  All right.  Claimant's Exhibit 44,
14    consisting of five photographs, are admitted into evidence.
15    (Five photos were hereby received into evidence as Claimant's
16    Exhibit 44, as of this date.)
17              MR. REED:  Let's see.
18         (Pause)
19              MR. REED:  If we can turn to tab 34?  Your Honor, I --
20    on the matter of, again, logistics, I was -- I wanted you to
21    have the color copies.
22              THE COURT:  I'm fine with the black-and-white copies.
23              So Claimant's Exhibit 34 consists of, I think it's
24    seven photographs.  Is that correct, Mr. Reed?
25              MR. REED:  Yes.  Oddly enough, if we can look at the

RESIDENTIAL CAPITAL, LLC, et al.                    52

1   back, the last photograph, I guess number 7.

2            Your Honor, I'd really like it if you had the color

3   ones.

4            THE COURT:  We can substitute them later.  Go ahead.

5   I'm looking at it.  I think I see it pretty clearly.  Go ahead,

6   Mr. Reed.

7            MR. REED:  That's the same view that those two

8   photos -- yeah, if you --

9            THE COURT:  All right.  I see which way it goes.  I

10  see the stairway going up and the chandelier.

11           MR. REED:  Yeah.

12           THE COURT:  I see it.

13           MR. REED:  Okay.  That's the -- that's the same view,

14  now, of those two photos we were just discussing.

15           THE COURT:  Is this after the roof was fixed?

16           MR. REED:  This is after the roof was fixed.  This is

17  after we continued our -- you know, our work.  You could see,

18  we replaced the staircase, we did all the moldings, the -- I

19  custom designed the -- many of those moldings.  Mr. Suhr was a

20  millwright that we -- I taught him my templates to things that

21  I wanted done.  He worked extensively on the properties, among

22  a plethora of other contractors.

23           But there's -- you know, there's -- you can see the

24  difference -- I would hope you could see the difference between

25  a bare oak railing and now, you know, walls being built with

1   custom molding, openings.  If you could see back through that

2   staircase to the addition in back, it's -- that's what I'm

3   saying about the color, Your Honor.  Because you can see the

4   painting is done.

5          THE COURT:  All right.  I'll tell you what, Mr. Reed.

6   Do you have all seven photographs?

7          MR. REED:  I do.  I do.  Please.  I am sorry.  I know

8   it's bugging me.

9          THE COURT:  That's all right.

10         MR. REED:  And one of your books has it.  I'm pretty

11  sure.  It's probably the extra --

12         THE COURT:  Actually, my clerks have it, and I'll

13  switch pages with them.  I now have the color copies, Mr. Reed.

14         MR. REED:  Thank you so much.  I think they really

15  make a difference.

16         THE COURT:  Okay.  I have the color copies in my book.

17  So we're clear, for Claimant's Exhibit 34, I've just

18  substituted the seven pages with my law clerk who had the same

19  binders but with color copies.  I had black-and-white.  Now I

20  have the color copies in front of me.

21         MR. REED:  Your Honor, if you look at the lower right

22  part of that photograph --

23         THE COURT:  Which photograph?

24         MR. REED:  I'm sorry.  I'll wait till you're done

25  there.

RESIDENTIAL CAPITAL, LLC, et al.                      54

1            THE COURT:  Yeah, just tell me which one?

2            MR. REED:  The page 7 that we were just looking at.

3            THE COURT:  All right.  Just let me get them in my

4    binder.  Go ahead, Mr. Reed.

5            MR. REED:  Remember those two bare columns in the

6    concrete floor that I pointed to in the previous picture

7    showing that we had put structural columns in because of the

8    expansion?  You can see those are finished.  The family room

9    flooring is in.  It's a livable space.

10           If you go to page 6 you could see that -- the family

11   room, the ceilings are done, the moldings are in.

12           THE COURT:  Is the family room part of the old

13   construction or the new construction?

14           MR. REED:  This is all -- this space existed when I

15   purchased the house.  It was a single-floor space.  We ripped

16   the roof off completely.  The only thing that was left in this

17   space was bare concrete floor and sunshine.  You understand?

18   There was no drywall.  It was taken down to the studs.  There

19   was just sheathing.

20           THE COURT:  But this -- I understand the work you said

21   you did in it.  But this was part of the existing old

22   structure?  This room was in the existing old structure.  This

23   was part of the remodeling as opposed to the addition.  Am I

24   correct in that?

25           MR. REED:  Right.  The addition was above it --

1              THE COURT:  Okay, all right.

2              MR. REED:  -- and behind it.

3              THE COURT:  Okay.

4              MR. REED:  But this was -- the only thing that

5    remained of this exist -- of the existing space was the actual

6    studs in the walls.

7              THE COURT:  Okay.  You furnished the room?

8              MR. REED:  Yes.  If you see through the --

9              THE COURT:  Because the photograph 1, is that a

10   television that's on the mantle?

11             MR. REED:  Yes, sir.

12             THE COURT:  It's a wide-screen television on the

13   mantle.  And the room appears, in the photograph, to be

14   completely furnished.  You furnished the room?

15             MR. REED:  This is furnishings I owned before, but --

16             THE COURT:  Okay.

17             THE COURT:  From New Jersey?

18             MR. REED:  Correct, Your Honor.  I didn't buy it new.

19             THE COURT:  Right, you moved out of the house, the

20   Matlack property you thought Cooper was renting -- Cooper was

21   renting.  So that's when you moved down to Virginia?

22             MR. REED:  Yes.

23             THE COURT:  And these were your -- had been your

24   furnishings at the Matlack property?

25             MR. REED:  Correct.  We didn't buy new.

1        THE COURT:  Okay.  I'm just trying to understand.

2   Okay.  Go ahead.

3        MR. REED:  Yeah, I mean --

4        THE COURT:  Go ahead.

5        MR. REED:  Spending was limited to living expenses and

6   construction.

7        THE COURT:  Okay, just go on.  I'm just trying to

8   understand, because you showed me a completed room, renovated

9   in the old structure, furnished, and that was the reason for my

10  questions.  Go ahead.

11       MR. REED:  Okay.  But you can see the extent -- the

12  extent -- the moldings that we would do, that are commensurate

13  with those kind of properties in that area.  This was discussed

14  with the appraiser.  This was discussed with the realtors.

15  This was, you know, and in my opinion, relevant or appropriate

16  for all the -- that market and pricing of the properties that

17  customers would want.  It had found success with these types of

18  work prior.  And they include, you know, not just wall trim.

19  It's the windows, the surrounds around the windows, the

20  fireplace stuff.

21       Now, if you look out the back window, this is a clear

22  example of that back section.  And you'll see the brick wall

23  that the land had been excavated from and the brick retaining

24  wall, just beyond the structure of the addition.  And the

25  ceiling, that's insulation.  If you --

1          THE COURT:  Which photograph are you looking at?

2          MR. REED:  This is number 6, the family room.

3          THE COURT:  Okay.

4          MR. REED:  Yeah, that's -- but see, I was just showing

5   outside you can see that space and it was not yet completed.

6          THE COURT:  All right.  Go ahead.

7          MR. REED:  So if we could go to 2 of -- the second

8   page --

9          THE COURT:  The second photograph?

10         MR. REED:  The second photograph, yeah.

11         THE COURT:  Okay.

12         MR. REED:  The front door is to the left.  If you go

13  through that archway, the front door is to the left.  So you

14  would come in, the staircase and the bridge were above -- you

15  know, in front of you.  There was actually a mezzanine right

16  above your head, too.  It connected two bedrooms and had a door

17  to the front exterior second-floor balcony.

18         This is -- these moldings you see here, the arches are

19  the ones I designed.  I do the drawings for it itself. The

20  built-ins, if you look through to the formal living, the built-

21  ins, fireplace, all that -- all that design work I do, and I

22  hire the local skilled craftsmen to execute my drawings.

23         If you go to the first page --

24         THE COURT:  Could you just tell me, on that second

25  photograph, from what room is the photograph taken?

1          MR. REED:  It is taken from the dining room, but

2     looking across to the --

3          THE COURT:  The entrance hallway crossing to the

4     living room?

5          MR. REED:  Yeah.

6          THE COURT:  Okay.

7          MR. REED:  Yeah, to the formal living room.  Here's

8     the formal living room.

9          THE COURT:  The first photograph is the formal living

10    room?

11         MR. REED:  Formal living room, yes.  And the --

12         THE COURT:  Again, that's within the original

13    construction?

14         MR. REED:  That's within the original, which was, you

15    know, in the scope of what we were doing from the -- from the

16    beginning.  The ceiling -- the ceiling treatments -- like when

17    I say "treatments" -- see the coffering in the ceiling?  That's

18    what I would do, too.

19         (Pause)

20         MR. REED:  Five, Your Honor, is -- is this the photo

21    you have for 5, the fifth picture?

22         THE COURT:  Looking into the dining room?  Yes.

23         MR. REED:  Now, this is not -- this is standing in the

24    dining room.  So in that -- in that original -- when you said

25    what perspective it was, we're standing in the formal dining

RESIDENTIAL CAPITAL, LLC, et al.                    59

1    room looking across the -- the entry foyer into the formal

2    living room.  If you were standing in this space and turned

3    right, you would see this, another matching archway.  This

4    space is the kitchen space and the breakfast room.

5            THE COURT:  Okay.

6            MR. REED:  So this was demolitioned and all the new

7    flooring was put in, all these moldings were put in -- because

8    remember, all the ceiling -- that's all new back there.  And so

9    the breakfast room ties into the kitchen.  The kitchen is in

10   the foreground, the breakfast room is in the back, again.

11   You're looking out the rear of the property.  There's that

12   brick retaining wall again and the -- out that window is the --

13   where the appraiser called it the den, but I refer to it as

14   a -- it was going to be a big enclosed sunroom.

15           And then even the ceiling, all that -- all the

16   beadboard on the ceiling, we had done that.  The kitchen was at

17   a point where we needed the countertops, cabinets, and

18   appliances.

19           Number 4 -- unfortunately I don't have more of these

20   pictures -- but number 4 is a photograph of the fireplace in

21   the master bedroom.  Again, this is all -- and it shows the

22   moldings, the architecture --

23           THE COURT:  Was the master bedroom in the old

24   construction?

25           MR. REED:  No, that's in -- remember that's --

RESIDENTIAL CAPITAL, LLC, et al.                    60

1              THE COURT:  In the new construction.

2              MR. REED:  -- that's all in the new --

3              THE COURT:  All right.

4              MR. REED:  -- that's all in the -- remember I said it

5    was a vaulted ceiling.  You can look to the left of the

6    fireplace the top picture.

7              THE COURT:  Is this master on the main floor or the

8    second floor?

9              MR. REED:  The second.  It's above the -- it's

10   above -- it starts above the family room.

11             THE COURT:  All right.

12             MR. REED:  And then it goes -- this particular back

13   section where the bed -- where the bed is, the fireplace is,

14   past the sitting room, is above that den area that wasn't

15   finished, you know, that last part.  And that's what I --

16   that's what I have in terms of the pictures of Old Dell Trace.

17             And I have a text that Mr. Maines is here.  We're now

18   about lunch --

19             THE COURT:  Well, we're going to take a lunch break at

20   12:30.

21             MR. REED:  Okay.  And I move that we --

22             THE COURT:  If you want to text -- if you want to take

23   just a second and text him back, go ahead and do that.

24             MR. REED:  Okay.

25             THE COURT:  You can tell him we're going to take a

1  lunch break at 12:30.

2          MR. REED:  You know, Your Honor, I don't know if he's

3  getting this.  I'll wait and see.  I'll tell you.  Because if

4  he came through security, they would have taken his phone.

5          THE COURT:  They would have taken his phone.

6          MR. REED:  So --

7          THE COURT:  Did you tell him where the courtroom is?

8          MR. REED:  It's in the subpoena.

9          THE COURT:  Okay.  All right.

10          MR. REED:  I put the courtroom number.

11          THE COURT:  All right.  Well, we'll see whether he

12  comes up.  Go ahead.  We're going to take -- ten more minutes,

13  we're going to take the lunch break.

14          MR. REED:  Your Honor, I have a -- I'd like to -- I'd

15  like to show you what's 35 -- tab 35.

16          THE COURT:  All right.  Claimant's Exhibit 35?

17          MR. REED:  Oh, did I move these -- get entered into

18  evidence?

19          THE COURT:  No.

20          MR. REED:  Let's do that before I get distracted.

21          THE COURT:  Ms. Hager?

22          MS. HAGER:  No objection.

23          THE COURT:  All right.  Claimant's Exhibit 34, it's

24  seven photographs, is in evidence.

25  (Seven photos were hereby received into evidence as Claimant's

1   Exhibit 34, as of this date.)

2         THE COURT:  Mr. Reed, I mean -- I'm giving you a lot

3   of leeway, and I know you believe it's important to show all of

4   the work and construction in the photographs.  I'm not sure

5   that Ms. Hager is -- I don't know that the Trust is disputing

6   the work you did or the addition, the renovations you did to

7   the property.  But I'm not -- I'm letting you put your evidence

8   in.  But you're taking a lot of time showing the work you did

9   on the Old Dell Trace property.  I'm not going to cut you off,

10  but I just -- go ahead.

11        Are you -- Ms. Hager, are you disputing the

12  substantial work and renovations that were done on Old Dell

13  Trace?

14        MS. HAGER:  No.

15        THE COURT:  Okay.  I didn't understand from the pre-

16  trial order or otherwise that the work you did, the addition,

17  the remodeling, the beautiful construction your photographs

18  show, is really in dispute.  So but go ahead.

19        MR. REED:  Okay.  I'm trying to comprehend how that --

20  what that means in terms of what I think I'm doing here.

21        THE COURT:  Well, you can --

22        MR. REED:  So at lunch I'll think about what you're --

23  what you said and try and process that.

24        THE COURT:  I mean, I think -- Ms. Hager can speak for

25  herself, but from reading the papers, my understanding is the

1    Trust disputes that the purchase or renovation costs for the

2    Old Dell Trace property are in any way compensable losses or

3    damages in the trial we have.  Is that a fair statement, Ms.

4    Hager?

5            MS. HAGER:  Yes, Your Honor.

6            THE COURT:  And on your theory of the case, you -- I'm

7    not precluding you from putting in what you believe -- I think

8    you've already put in what you paid for it.  And you put in

9    yesterday through deposition testimony from the lumberyard, the

10   amount that you had put in and things that they had supplied

11   and various other evidence you put in yesterday.  So I mean,

12   that's in evidence.

13           I think what I understood the Trust's position to be

14   is none of that is compensable damages.  I'm not making any

15   decision about that now, but I don't think the Trust is

16   disputing the work you did in the renovations -- and when I say

17   renovations, the substantial addition.  You testified about

18   that.  While it hadn't been completed, you showed many of the

19   photographs of work that was completed.

20           So I'm not -- again, I'm not cutting you off, Mr.

21   Reed, but there are issues that are disputed, but I didn't

22   think this was among them.  But go ahead.  We've got five

23   minutes before the lunch break.

24           Is that a fair statement, Ms. Hager, what I just said?

25           MS. HAGER:  Yes, Your Honor.

1         THE COURT:  Okay.

2         MR. REED:  I think that's -- to that point, I think

3  we'll be discussing -- Mr. Curley, Mr. Maines, Joan Kline --

4  and how those things had an impact on my ability to finish.

5  I'm trying to demonstrate to the Court how -- what stages

6  were --

7         THE COURT:  Sure.

8         MR. REED:  -- we're at, and what had to be done.

9  Because you know, if -- hypothetically speaking, if all I had

10  to do was put a welcome mat on the front door for 5.99, then

11  how could their acts interfere with that.  But if there was

12  more substantial work that had to be done, and their acts

13  interfered with my funding of that -- that's what I've been

14  putting forth here -- then that's where the --

15         THE COURT:  Okay.  I'm not -- again, Mr. Reed, I'm not

16  precluding you.

17         MR. REED:  So I thought I had to show the foundation

18  of that.

19         THE COURT:  Go ahead.

20         MR. REED:  On 35, this is a -- just some interior

21  photos.  Again, these go to demonstrating, just like the

22  property records show that I'm in the business of buying and

23  selling and renovating, this is just some photographic evidence

24  of work that I did --

25         THE COURT:  You're now referring to Exhibit 35?

1            MR. REED:  Yes, 35.

2            THE COURT:  Okay.

3            MR. REED:  And this is historical work.  This is

4    from -- this is from the Matlack property.

5            THE COURT:  These are photo -- Exhibit 35 are

6    photographs of Matlack?

7            MR. REED:  Yes.  And Matlack, I had purchased -- all

8    the real estate that I purchased, to be clear, whether -- if

9    it -- I don't reside in it or I just rent it or I reside in it

10   and then sell it and rent it, I look to buy a property that is

11   improvable.  Even if it's new, it's improvable in the val -- in

12   the sense that it will bring true market and comp value as

13   well.

14           So like Old Dell Trace was an older neighborhood, more

15   mature neighborhood.  Twin Hickory, some of those houses were

16   in a newer neighborhood.  That was a newer neighborhood.

17   Matlack was a -- was a new construction house.  But Matlack had

18   the larger houses in that neighborhood that allowed me to

19   invest more money to expand the square footage and the -- and

20   the accoutrements, the architecture in it, to bring up the

21   value of that property.  It's just about the -- again, the

22   history.

23           And I'll tie that in later in a quantifiable,

24   ascertainable -- I believe it plays into the ascertainability

25   of my damages under the NJCFA.  So that's the relevance, and

RESIDENTIAL CAPITAL, LLC, et al.                    66

1    hopefully I can draw all that together without putting everyone

2    to sleep.

3            So this -- and this picture -- this sheet -- I think

4    it's one sheet -- is it one sheet in your --

5            THE COURT:  Yes, it is.

6            MR. REED:  Okay.

7            THE COURT:  We're referring to Exhibit 35?

8            MR. REED:  Yeah.  And you'll see some of the same kind

9    of treatments, ceiling treatments, molding treatments,

10   beadboard ceilings, archways, columns, and finishes.  These are

11   the same kind of -- I bring this up for the proposition, too,

12   that these are the same kind of pictures -- or these

13   photographs are ones that I shared with -- or similar -- to the

14   appraiser, when we discussed the treatments, the finishing, so

15   when he did the subject-to, he knew what we were -- I wasn't

16   just going to throw wall-to-wall carpet in there and some

17   paint.  This is the kind of flooring and molding treatments,

18   finishes.

19           And Your Honor, if you -- I'd like to -- when you look

20   at this particular picture or this page, if you look to the

21   upper right photograph --

22           THE COURT:  Yes.

23           MR. REED:  -- if you want to go back, you're welcome

24   to go back and look.

25           THE COURT:  No.  It looks similar to the Old Dell

RESIDENTIAL CAPITAL, LLC, et al.                    67

1    Trace.

2              MR. REED:  Yeah, it's all the same furnishings.

3              So even in front of that -- in the center picture on

4    the bottom, there's a little sitting -- a settee on the right-

5    hand side that's in front of the fireplace in my master bedroom

6    photo of Old Dell Trace.

7              So I move to put this into evidence as to the -- you

8    know, again, supporting the historical business practice.

9              THE COURT:  Did you take the photographs in Exhibit

10   35?

11             MR. REED:  I'm sorry?

12             THE COURT:  Did you take the photographs in Exhibit

13   35?

14             MR. REED:  Yes.

15             THE COURT:  Ms. Hager?

16             MS. HAGER:  No objection.

17             THE COURT:  All right.  Exhibit 35 is in evidence.

18   (Photos of Matlack property were hereby received into evidence

19   as Claimant's Exhibit 35, as of this date.)

20             THE COURT:  We're going to break for lunch now.  When

21   we resume at 2 o'clock, we'll resume with the testimony of --

22   what is his name again?

23             MR. REED:  Robert Maines.

24             THE COURT:  Mr. Maines' testimony.  And when he

25   concludes his testimony, Mr. Reed will resume the witness

RESIDENTIAL CAPITAL, LLC, et al.                    68

1   stand.

2          All right.  We're in recess.

3      (Recess from 12:30 p.m. until 2:01 p.m.)

4          THE COURT:  All right.  Court's back in session.

5   We're here in Residential Capital, number 12-12020.

6          All right.  Mr. Reed, call your next witness.  We're

7   taking a witness out of order.  Mr. Reed?

8          MR. REED:  Yeah, I call Mr. Maines.

9          THE COURT:  All right, Mr. Maines, come on up.  If you

10  could come up to the witness box and you'll be sworn.  Okay?

11      (Witness sworn)

12         THE COURT:  All right, please have a seat, Mr. Maines.

13  If you would state your name for the record, please?

14         THE WITNESS:  Robert Maines.

15         THE COURT:  Thank you.  All right, you're going to

16  offer his written declaration, Mr. Reed?

17         MR. REED:  Yes, Your Honor.  The copy I have in my

18  file -- in my book, is in --

19         THE COURT:  Is this the declaration that appears as

20  Exhibit 1 to the Maines deposition?

21         MR. REED:  Correct.

22         THE COURT:  Which is Exhibit --

23         MR. REED:  25.

24         THE COURT:  -- 25.  And the two-page declaration

25  appears as the last two pages of the exhibit.  Correct?

1           MR. REED:  Yes, Your Honor.

2           THE COURT:  All right.  And are you offering the

3   Maines declaration that appears as Exhibit 1 to the deposition?

4           MR. REED:  Yes, Your Honor.

5           THE COURT:  Any objections?

6           MS. HAGER:  No, Your Honor.

7           THE COURT:  All right.  The declaration of Robert

8   Maines is in evidence.

9   (Declaration of Robert Maines, which is Exhibit 1 to the Maines

10  deposition, was hereby received into evidence as a Claimant's

11  exhibit, as of this date.)

12          THE COURT:  Ms. Hager, cross-examination.

13  CROSS-EXAMINATION

14  BY MS. HAGER:

15  Q.   Good afternoon, Mr. Maines.  I'm Barbara Hager.  We met a

16  month or so ago when I took your deposition.

17       Mr. Maines --

18          THE COURT:  You have to keep your voice up.  Just pull

19  the microphone a bit closer to you.  Thank you very much.

20          Would you like any water?

21          THE WITNESS:  I'm good, thank you.

22          THE COURT:  Okay.

23  Q.   Mr. Maines, you were in the business of home building for

24  about thirty years.  Is that right?

25  A.   Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    70

1   Q.   And in fact, you built the subdivision in which Mr. Reed

2   currently resides, correct?

3   A.   That is correct.

4   Q.   And you live there as well.  Is that right?

5   A.   Yeah, I do.

6   Q.   And you know Mr. Reed personally, correct?

7   A.   Yes, I do.

8   Q.   And you're friends with Mr. Reed, right?

9   A.   Yes.

10  Q.   And you've known him for a number of years, ever since you

11  were working with him --

12  A.   Yes.

13  Q.   -- for his purchase of the house in your subdivision,

14  correct?

15  A.   Correct.

16  Q.   In fact, you both live on Matlack Avenue, right?

17  A.   Drive, yes.

18  Q.   Drive, excuse me.  So when was it that you had the

19  inclination or desire to enter into a business relationship

20  with Mr. Reed?

21  A.   I've done them in the past.  I've joint ventured with

22  different people, builders and -- and when the opportunity

23  presented itself.  So this was, I think, after things had

24  slowed up a little, so it would probably be -- things started

25  slowing up in '07 -- probably '08/'09, something like that, we

1  might have been talking.  I've talked to him throughout

2  everything.  So I'm not exactly sure of -- you know, other than

3  he presented, you know, a joint venture.

4  Q.    Okay, so I'm just going to ask that again, because I

5  wasn't sure of your answer.

6  A.    Okay.

7  Q.    When was it that you had the inclination or desire to

8  enter into a business relationship with Mr. Reed?

9  A.    You know, it's not solid in my mind.  I would -- my best

10  guess is '08/'09, you know, that type of thing.

11  Q.    Am I right that whatever discussions you had with him

12  about this business relationship took place at a time that your

13  construction business was winding down as a result of the

14  recession?

15  A.    It was slowing up, yes, definitely.

16  Q.    These discussions also took place at a time when you were

17  finishing construction on your residence at 800 Matlack,

18  correct?

19  A.    That sounds right, yep.

20  Q.    Okay.  And so to your recollection, when did you finish

21  construction on 800 Matlack?

22  A.    2008 -- I think it's 2008.  It's not sooner than that.  It

23  might be a little later.

24  Q.    Do you remember the time of year in 2008?

25  A.    I think it was fall.

RESIDENTIAL CAPITAL, LLC, et al.                    72

1  Q.   You testified a moment ago that the market had slowed down

2  in '07/'08.  Is that right?

3  A.   Yes.

4  Q.   Do you remember your testimony in your deposition where

5  you testified that, in fact, the market was dead by 2009?

6  A.   Yeah, I probably used that term.

7  Q.   So somewhere in '08/'09 time frame, Mr. Reed asked you for

8  money for the purpose of finishing construction or renovations

9  on a property in Richmond, Virginia.  Is that right?

10  A.   Yes.

11  Q.   And how much did he ask for?

12  A.   I don't know.  Off the top of my head I would --

13          THE COURT:  I'm sorry, I didn't hear that.

14  A.   I'm -- I'm guessing around 300,000.

15  Q.   But you don't know?

16  A.   I don't.  I really don't.

17  Q.   And you don't have any documentation --

18  A.   No.

19  Q.   -- to support this?  No, okay.

20  A.   No.

21  Q.   At the time of these discussions, were you aware of how

22  much Mr. Reed paid for the property at Old Dell Trace in

23  Richmond, Virginia?

24  A.   He told me.  I want to -- I'm just guessing, but I think

25  it was around 8- or 900.

RESIDENTIAL CAPITAL, LLC, et al.                                73

1    Q.    So I don't want --

2    A.    7- to 9-.  I don't -- if he told -- I'm sure he told me.

3    I just don't remember.

4    Q.    Okay.  And just for clarification, I don't want you to

5    guess; you either know or you don't.

6    A.    Yeah.

7    Q.    Okay.  So you think, though, at the time, he would have

8    told you?

9    A.    Pretty --- I'm pretty sure of that.  Yeah, I'm guessing.

10   So I shouldn't guess.  But that would have been part of:  I

11   have this much into it, I need this much to finish it, and then

12   we split whatever.

13   Q.    At the time, were you aware of the amount of liens that

14   were existing on the Old Dell Trace property?

15   A.    I guess I'd have to say now, he probably told me, but I

16   don't remember.  I don't -- I don't know, I guess.

17   Q.    And at the time, were you aware of how much work was

18   needed to finish the renovations on the Old Dell Trace

19   property?

20   A.    I remember it needed a kitchen.  The kitchen was all torn

21   out.  I remember there was -- there was a lot of work to be

22   done; trim to be done, et cetera.  So that's the best that I

23   can remember.

24   Q.    The kitchen and trim work?

25   A.    I think so.  Because he -- yeah, I think there was a

1  substantial amount to do.

2        THE COURT:  Did you go down to visit the property?

3        THE WITNESS:  I did not.  No.  I saw pictures.  That

4  was the extent of it.

5  Q.   At the time, were you aware of the cost of the remaining

6  work?

7  A.   His estimate, maybe, but so -- I don't know how -- that's

8  the best -- I don't -- to the best of my knowledge.  I seem to

9  remember 300,000 was the number, and that he needed to finish

10 it.

11 Q.   So your testimony is that 300,000 dollars was needed to

12 finish the kitchen and the trim work?

13 A.   Well, there was more -- I think there was more stuff.  You

14 know, there's probably siding.  I think he put an addition on

15 and et cetera, et cetera.  But you know, there was -- it didn't

16 seem outrageous for what had to be done at the time.

17 Q.   Well, how far along was the construction at the point that

18 you and he were discussing whether or not you were going to

19 enter into a joint venture?

20 A.   Well, as like I said that -- I don't know how -- I don't

21 know what he put into it.  I know he was down there

22 deconstructing so that he could start the improvements.  So --

23        THE COURT:  What do you mean "deconstructing"?

24        THE WITNESS:  Taking the kitchen out, taking the old

25 trim off, doing whatever -- whatever else was there, you know.

1   That's -- I -- again, I think -- I think he made it larger.  I

2   think he put an addition on it, too.

3           THE COURT:  Do you know what the status of the

4   addition was at the time?

5           THE WITNESS:  I think it was sealed in, but -- like

6   the outside was waterproofed, but the inside was maybe in bare

7   studs or sheetrock, something like that.

8           THE COURT:  Go ahead, Ms. Hager.

9   Q.   And at the time of your discussions with Mr. Reed, was he

10  still living in your neighborhood or was he living --

11  A.   Yes.

12  Q.   -- in Virginia?

13  A.   No.  I think he was in Moorestown, in the neighborhood.

14  Q.   You mentioned that, at the time of your discussions, the

15  kitchen had been -- I don't want to put words in your mouth,

16  but the kitchen had been demoed; is that right?

17  A.   Yeah.  I -- I -- I think it was removed and -- you know,

18  off the top of my head, as I recall, it was big -- it could

19  have been a 70 -- a 70,000-dollar kitchen, easy, from -- from

20  what I -- from what memory -- how memory serves me.

21  Q.   And if I told you that he demoed the kitchen after

22  November of 2008, would that refresh your recollection as to

23  when you had these conversations with Mr. Reed?

24  A.   November 2008 -- not -- I don't know -- not -- I couldn't

25  say yes to that.

RESIDENTIAL CAPITAL, LLC, et al.                    76

1   Q.   It wouldn't refresh your recollection?

2   A.   Well, I -- Lord.  I think I saw photographs -- I'm -- I'm

3   confident, but I wouldn't bet my life on it, that I saw the

4   kitchen removed.  I think the kitchen was gone.

5   Q.   I'm not saying you didn't see it.  What I'm saying is if I

6   told you that he demolished the kitchen -- tore it all out --

7   A.   Right.

8   Q.   -- in November of 2008 --

9   A.   Um-hum.

10  Q.   -- does that refresh your recollection as to the timing of

11  your conversations with Mr. Reed?

12  A.   I guess it would.  I -- I --

13  Q.   Well, I mean, it either does or it doesn't.

14  A.   Well, if I saw the photograph -- if you're telling me the

15  -- the kitchen was done -- it was gone in -- at the end of

16  November '08?  Is that what you said?  Is that the --

17  Q.   Correct.

18  A.   -- date you're using?  Then -- then I guess that's the

19  timeline.  I don't -- my -- I'm not good with those dates at

20  all, but if you say the kitchen was gone then, then that would

21  be the timeline.

22  Q.   And I'm not trying to put any words in your mouth.  I'm

23  just trying to establish timing.

24  A.   Yeah, and I -- and I apologize, but I don't really know

25  the exact dates.  I -- I -- I'm not in a -- it wasn't like I --

RESIDENTIAL CAPITAL, LLC, et al.                    77

1    I filed those in my mind well.

2    Q.    So your experience as a builder is limited to your area in

3    New Jersey?

4    A.    Yes.

5    Q.    Is that right?  And you're not familiar with real estate

6    in Virginia, correct?

7    A.    I am not.

8    Q.    You're not familiar with Richmond, Virginia --

9    A.    No.

10    Q.    -- in particular?

11    A.    No.

12    Q.    And you didn't research real estate in Richmond, Virginia,

13    correct?

14    A.    I did not.

15    Q.    So there was actually no deal with Mr. Reed at the time of

16    these discussions?  They were just some generic talks?

17    A.    Yes.

18    Q.    Is that right?

19    A.    That's correct.

20    Q.    And would you lend money to someone or enter into a joint

21    venture with someone who was unable to pay their bills?

22    A.    No.

23    Q.    And would you have lent money or entered into a joint

24    venture, knowing that Mr. and Mrs. Reed had not paid their

25    mortgage payments on the Matlack property since January of

RESIDENTIAL CAPITAL, LLC, et al.                    78

1   2008?

2   A.    That would have been a big negative, sure.  Yeah.

3   Q.    But would you have entered into a joint venture with --

4   A.    If I had --

5   Q.    -- Mr. Reed?

6   A.    -- known that, I guess --

7   Q.    Hold on.  Let me finish my question.

8   A.    All right.

9   Q.    Would you have entered into a joint venture with Mr. Reed,

10  as we've discussed, knowing that he and his wife had not made

11  any mortgage payments on their property -- on Matlack -- since

12  January of 2008?

13  A.    I would say no.

14           MR. REED:  I object to hypothetical.

15           THE COURT:  Overruled.  The Court has already

16  expressly found, in the first trial, that the Reeds made their

17  last monthly payment on the loan on January 4, 2008; had not

18  paid property taxes since the third quarter of 2006; and that,

19  in October of 2007, Moorestown Township informed GMAC that the

20  property was going to be sold in a tax sale.  Unpaid property

21  taxes total $1,892.44 for 2006 and $32,683.61 for 2007 through

22  October 18, 2007.  There's nothing hypothetical about Ms.

23  Hager's question.

24  Q.    So Mr. Maines, despite the decline in the real estate

25  market, you consider -- is it your testimony that you

RESIDENTIAL CAPITAL, LLC, et al.                                79

1  considered a joint venture with Mr. Reed whereby you would lend

2  him 300,000 dollars to finish work on a house in Virginia, not

3  knowing the amount of liens on the property, the amount of work

4  that had been done, the amount of work that needed to be done,

5  the cost of the work to be done, or how much Mr. Reed put into

6  the improvements, or whether there was a buyer's market in

7  Virginia?

8  A.    Long question.  I guess there's a part of me that thought

9  that -- sometimes buying opportunities present themselves when

10 the market is declining or off, so I would consider that.  I

11 didn't -- I -- I didn't get far enough to do my due diligence

12 to find out how many -- you know, what liens there were or --

13 or what have you.

14 Q.    Entering into an arrangement, such as the one we're

15 discussing, though, you would intend to recover your

16 investment, correct?

17 A.    Yes.

18 Q.    And you would intend to recover some sort of a profit,

19 correct?

20 A.    That would be the plan, yes.

21 Q.    Okay.  But you hadn't gotten to the stage where you knew

22 what that would be; is that right?

23 A.    Yeah, I -- yes, exactly.

24 Q.    And you're not aware of whether Mr. Reed was past due on

25 his mortgage on the Old Dell Trace property, were you?

RESIDENTIAL CAPITAL, LLC, et al.                    80

1    A.    No.

2    Q.    You don't know whether he was in foreclosure on the Old

3    Dell Trace property, correct?

4    A.    No.

5    Q.    And you don't know whether Mr. Reed was past due on the

6    mortgage on the Matlack property, correct?

7    A.    Correct.

8          MS. HAGER:  Okay.  Thank you.  No further questions.

9          THE COURT:  Mr. Reed?

10   REDIRECT EXAMINATION

11   BY MR. REED:

12   Q.    Mr. Maines, you know that I -- at the time of our

13   discussions to go into a joint venture, would you say that, at

14   that time, you felt that you were going to do this deal with

15   me, but for a certain -- let me rephrase this.

16         Is it fair to say that until you learned that I was

17   actually in foreclosure, your mindset -- your inclination was

18   to work with me on and to complete the project in Virginia?

19         MS. HAGER:  Objection.  Leading.

20         THE COURT:  Sustained.  You have to answer -- you have

21   to ask open questions.  You can't ask leading questions.

22         Let me ask you this, Mr. Maines:  is it your practice

23   to do due diligence before you make a 300,000-dollar

24   investment?

25         THE WITNESS:  Absolutely, yeah.

1          THE COURT:  And what would your typical due diligence

2     consist of?

3          THE WITNESS:  A -- a review of, you know, basically,

4     some of the things she -- she suggested, like talk to the --

5     find out what the local market was doing -- and -- and from

6     Frank -- this isn't -- this is from Frank and his realtor, I

7     knew what things were selling for, but I'd confirm that, right?

8     The -- things were -- what he suggested it would sell for was

9     in the range of what one could target.

10          THE COURT:  Would you do due diligence about what

11     existing mortgages or liens were on --

12          THE WITNESS:  Yes.

13          THE COURT:  -- the property?

14          THE WITNESS:  I would -- I would get an attorney to

15     draw up a contract and -- and -- and -- and help me, you know.

16          THE COURT:  And would you look to see whether there

17     were mortgage arrears on the property that he was asking you to

18     invest in?

19          THE WITNESS:  Absolutely, yeah.  I'd research them.

20          THE COURT:  Go ahead, Mr. Reed.

21          And you didn't do any of that?

22          THE WITNESS:  I did not.  I didn't -- I did not.

23     BY MR. REED:

24     Q.   Was me being -- was the fact that I was in foreclosure a

25     factor in your decision not to go forward with our proposed

1  business transaction?

2          MS. HAGER:  Objection.  Leading.

3          THE COURT:  I'm going to overrule it.

4          Go ahead, Mr. Maines.  You can answer it.

5  A.   Yes.  I -- I guess what -- and I don't know the timeline

6  of what -- when I found out, but yes, absolutely.

7          THE COURT:  How did you find out that a foreclosure

8  action had been filed against Mr. Reed?

9          THE WITNESS:  I -- you know, honestly, I don't

10  remember.  I know there -- there's websites that -- there's --

11  there was a lot of gossip in the neighborhood.

12          THE COURT:  Yeah.

13          THE WITNESS:  You know, people would -- I knew things

14  were going wrong, right?  So I might have heard it from a

15  neighbor or it was on a website or something like that, that --

16  that posts foreclosures.  And I -- I never personally looked it

17  up.

18          THE COURT:  Okay.  Did you know that Mr. Reed hadn't

19  made any mortgage payments since January 2008 on the Matlack

20  property?

21          THE WITNESS:  2- -- no, I wouldn't have known that.

22          THE COURT:  Did you know that he hadn't paid any

23  property taxes since 2006 on the Matlack property?

24          THE WITNESS:  I did not.  No, I don't think I knew --

25  I -- I don't see -- no.

RESIDENTIAL CAPITAL, LLC, et al.                    83

1              THE COURT:  Go ahead, Mr. Reed.

2   Q.   How did learning that I was in foreclosure affect your

3   thoughts in relation to our contemplated deal?

4   A.   Oh, it stopped them pretty abruptly, right?  I -- I mean,

5   that -- that was -- that -- that's a wild card or a variable

6   that I wasn't -- you know, it's -- complicated it too much.  It

7   complicated the situation too much.

8   Q.   Do you recall me offering to -- offering you to have a

9   lien position on the property for your contribution with --

10             MS. HAGER:  Objection.  Leading.

11             THE COURT:  Sustained.

12             MR. REED:  How do I do this?

13             THE COURT:  Did you discuss with Mr. Reed obtaining a

14   security interest in the Old Dell Trace property?

15             THE WITNESS:  I would say yes.  I -- I'm very

16   conservative -- I -- on a way to try to get -- if I'm

17   investing, I like -- when -- as a builder, I would hold onto

18   the property until settlement, for example, so I'm -- I'm sure.

19             MR. REED:  Yeah, I'm --

20             THE COURT:  What's your best recollection --

21             THE WITNESS:  Okay.

22             THE COURT:  Did you discuss with Mr. Reed obtaining a

23   security interest or a lien on the Old Dell Trace property?

24             THE WITNESS:  My best memory would be yes.

25             THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                          84

1          Ask your next question, Mr. Reed.

2  Q.    Can you describe, in your words, why you wanted to --

3  about me, that made you want to contemplate doing business with

4  me?

5  A.    I sold Frank a -- you know, when I sold Frank my house --

6  or the house I was building on spec, he -- Frank had come to

7  things from a different angle than, say, I would.  And I had a

8  certain formula for building, and Frank had another way of

9  coming at the project -- or a project.  So he had a way of

10 doing things that added value, like, for example, he added a

11 lot of value to the house that -- that I sold him.

12          THE COURT:  The Matlack property?

13          THE WITNESS:  The Matlack property.

14          THE COURT:  Okay.

15 A.    And, you know, and he just -- just, you know, I witnessed

16 that he got a high offer on -- on the house at one point.  And

17 it's like, oh my gosh.  It's -- you know, it's pretty amazing,

18 you know, for what he did.  He also has a -- has a way -- we

19 weren't particularly -- the cheap -- we weren't the cheapest

20 builders around, right?  And -- but he had a way of doing a

21 very nice product for -- for less.  And that appealed to me

22 because we -- we -- it wasn't something our company was very

23 good at.  You know, we did a nice product, but it was -- it

24 cost a lot.

25          THE WITNESS:  When you sold Mr. Reed the Matlack home,

1  had construction been completed?

2          THE WITNESS:  Yes.  Yes.  And then he added, say, a

3  third floor.  He added different trims and so forth, and I --

4  trims on the outside, and I'm pretty sure, trims on the inside,

5  and -- and --

6          THE COURT:  Did you do that work or did he --

7          THE WITNESS:  Oh, no.

8          THE COURT:  -- do it himself?

9          THE WITNESS:  No, that was Frank.  That was after the

10  sale.

11          THE COURT:  All right.  Go ahead, Mr. Reed.

12  Q.   How much in increase of value would you say I brought to

13  the Matlack house that you were impressed with?  How --

14          MS. HAGER:  Objection. It exceeds --

15          THE COURT:  Sustained.

16          MR. REED:  Your Honor, I don't know if it's the

17  foundation of how --

18          THE COURT:  Mr. Reed --

19          MR. REED:  -- how --

20          THE COURT:  -- you asked a question.  There was an

21  objection.  I ruled.  Ask your next question.

22      (Pause)

23  Q.   Do you remember when I had -- or let me rephrase this.  Do

24  you recall that I had several -- you said I had a high offer on

25  the house.  Do you recall that I had several offers on the

RESIDENTIAL CAPITAL, LLC, et al.                    86

1  house that exceeded the sale price that you made to me?

2          MS. HAGER:  Objection.

3          THE COURT:  Sustained.

4          MR. REED:  Oh, God.  How do I ask this?

5  Q.   You said I had a -- you recall me having a high offer on

6  the house.  Do you recall how much?

7          MS. HAGER:  Objection.

8          THE COURT:  Sustained.

9          MR. REED:  What am I doing wrong?

10         THE COURT:  Mr. Reed, whatever you told him is called

11 hearsay.

12         Did you negotiate any of the prospective sales on the

13 property yourself?

14         THE WITNESS:  I did not.

15         THE COURT:  Whatever information you have, you got

16 from Mr. Reed?

17         THE WITNESS:  Yes.

18         THE COURT:  Okay.  Objection sustained.

19         THE WITNESS:  Makes sense.

20 Q.   Is there any way you got that information from our common

21 realtor?

22 A.   It's possible.

23         MS. HAGER:  Objection.  It exceeds the scope of cross.

24         THE COURT:  Sustained.

25         MR. REED:  It exceeds the scope of cross.

1          THE COURT:  Whether he got it from you or a realtor,

2     it's still hearsay, Mr. Reed.

3          MR. REED:  Okay.

4       (Pause)

5   Q.   Let's see if I can do this.  You testified that the market

6   was slowing up after 2007, and you contemplated doing this

7   partnership with me, and I think you testified that it was

8   after 2007.  Why were you motivated to entertain that

9   partnership?

10          MS. HAGER:  Objection.  Leading.

11          THE COURT:  Overruled.

12  A.   Well, I -- I also had a house for sale in that

13  neighborhood -- somewhere in that neighbor -- somewhere around

14  the same time.  I don't remember.

15          THE COURT:  Was it your house you built on spec?

16          THE WITNESS:  Yes.  Well, and I moved into, myself.

17  And then -- and so I was -- so that's why we were talking.  To

18  be --

19          THE COURT:  All right.  How many houses did you build?

20  This was a subdivision?

21          THE WITNESS:  Subdivision.

22          THE COURT:  How many houses did you build?

23          THE WITNESS:  I want to say they were, like, forty-

24  some -- forty-two lots in there and maybe -- some of them, like

25  I said -- mentioned, we did joint ventures, so I didn't -- I

1  supplied the capital and the ground.  And then so I would get

2  -- some of them, we sold out when we were cash flow -- we sold

3  to independent people for cash flow.  And so I -- I would think

4  at least thirty-some -- mid-thirties.

5            THE COURT:  Okay.

6            THE WITNESS:  Something like that.

7            THE COURT:  Go ahead, Mr. Reed.

8            THE WITNESS:  And so -- so I don't know if -- stop me

9  if this is hearsay, but -- but this -- the -- so we were

10  talking about, you know, okay, who -- we're both getting ready

11  to sell, so we both had the same realtor.

12            THE COURT:  When you say both getting ready to sell --

13            THE WITNESS:  Well, he was on the market; I was

14  getting ready.

15            THE COURT:  His Matlack house was on the property; you

16  were getting ready to sell your Matlack house?

17            THE WITNESS:  That's right.  That's how I remember it,

18  yes.  And I was -- and -- I -- if -- just strike this if it --

19  if it's wrong, but I saw that him -- his house was -- model was

20  something like a million-and-a-half, something like that.  And

21  we had a mutual realtor, and he -- you know, he got offers for

22  over 200.  Now, I -- I don't remember -- two million, excuse

23  me.

24            THE COURT:  Right.  You can't tell me about the offers

25  he got because that's hearsay.

RESIDENTIAL CAPITAL, LLC, et al.                    89

1        THE WITNESS:  Yeah, because that's hearsay.  Strike

2   that, but the -- but the -- that's what peaked my interest.

3   I'm trying to explain why it peaked my interest.

4        THE COURT:  I'll just say that -- because this is the

5   second trial involving Mr. Reed -- in the first trial, there

6   was evidence about the various offers he got.

7        THE WITNESS:  Okay.

8        THE COURT:  So --

9        THE WITNESS:  Okay.

10       THE COURT:  It's not a mystery.

11       THE WITNESS:  Okay.

12       THE COURT:  I mean, there's a record that shows a

13   series of prospective purchasers and why they didn't close and

14   that sort of testimony.

15       THE WITNESS:  Okay, which -- but the price astounded

16   me because we could never get it, you know.  So I -- I

17   attributed that to his improvements.

18       THE COURT:  Okay.

19       MS. HAGER:  I want to -- I'm not even sure what

20   question he's responding to, but --

21       THE COURT:  Well --

22       MS. HAGER:  -- I want to move to strike.

23       THE COURT:  -- Mr. Reed can ask his next question.

24       MS. HAGER:  I want to move to strike that last --

25       THE COURT:  Overruled.

RESIDENTIAL CAPITAL, LLC, et al.                    90

1           MS. HAGER:  -- exchange.

2           THE COURT:  Mr. Reed can ask his next question.

3           Ms. Hager, the first opinion recounts, at great

4    length, each of the offers Mr. Reed had and what were the

5    circumstances that led to the sales not closing.  So there's no

6    mystery about any of that, Ms. Hager.

7           Ask your next question.

8           MS. HAGER:  I certainly --

9           THE COURT:  Ask your --

10          MS. HAGER:  I certainly under --

11          THE COURT:  -- next question, Mr. Reed.

12   BY MR. REED:

13   Q.   What was your impression of the Virginia market, where the

14   house was, at that time?

15          MS. HAGER:  Objection.

16          THE COURT:  Sustained.

17          He didn't even go down and visit it, Mr. Reed.  He --

18   sustained.

19          Do you have any more questions for the witness, Mr.

20   Reed?

21          MR. REED:  I'm trying to think, Your Honor.

22          No, Your Honor.

23          THE COURT:  All right.  Any redirect -- recross?

24          MS. HAGER:  Yes.

25          THE COURT:  Go ahead, Ms. Hager.

RESIDENTIAL CAPITAL, LLC, et al.                              91

1  RECROSS-EXAMINATION

2  BY MS. HAGER:

3  Q.   Mr. Maines, besides the foreclosure on Matlack, you didn't

4  enter into a joint venture because of the recession as well,

5  correct?

6  A.   That's a factor, yes.

7  Q.   And if you had learned about the default on the Matlack

8  property, you would not have entered into the joint venture,

9  correct?

10  A.   I pres -- I would say yes.

11  Q.   And that's information that Mr. Reed withheld from you,

12  correct?

13  A.   I don't -- I don't -- I -- to be completely candid, I

14  don't know.  It was possible that if there's a default and I'm

15  the money that brings it out of default, maybe.  I don't know.

16  I don't know enough about that.  I didn't get far enough into

17  it.

18          MS. HAGER:  Okay.  Thank you.

19          THE COURT:  All right.  Mr. Reed, any further

20  questions, limited to the subject that Ms. Hager just asked

21  about?

22          MR. REED:  No, Your Honor.

23          THE COURT:  All right.  You're excused.  Thank you

24  very much, Mr. Maines.

25          THE WITNESS:  Thank you.

1           THE COURT:  I appreciate your coming to testify.

2           All right.  We'll take a ten-minute recess, and when

3    we're ready to resume --

4           THE WITNESS:  Me?

5           No, not -- you're done.  You're done.

6           THE WITNESS:  Thank you.

7           THE COURT:  You're welcome to stay or leave.  That's

8    completely up to you, Mr. Maines.

9           THE WITNESS:  I'll stay.

10          THE COURT:  When we resume, you'll come back up to the

11   witness stand, so we'll give you a chance to get your papers

12   back up there in full.

13          MR. REED:  Okay.  Okay.

14          THE COURT:  All right.

15      (Recess from 2:37 p.m. until 3:00 p.m.)

16          THE COURT:  Court is back in session.

17          Mr. Reed, my courtroom deputy handed me a motion to

18   quash the subpoena that was just filed on behalf of Peter

19   McCaffrey, who you've apparently subpoenaed to testify on

20   September 30th.  If you're going to file an opposition -- I'll

21   hand you a copy, since you don't have access to ECF.  I'll hand

22   you a copy of the motion papers.  It was just docketed as ECF

23   docket number 10145.

24          If you're going to respond to the motion, you need to

25   do so in writing by the beginning of court tomorrow, at 9 a.m.

RESIDENTIAL CAPITAL, LLC, et al.                          93

1  You can read Mr. McCaffrey moved to quash on the basis of his

2  age -- 76 years of age -- and not in good health, describes

3  three hospitalizations.

4           I'm handing you a copy.  But you need to -- if you're

5  going to oppose the motion, you need to respond in writing by

6  tomorrow morning at the start of court and serve a copy on Mr.

7  McCaffrey's attorney.  I'll permit you to serve your

8  opposition, if you do oppose, by email.

9           Was Mr. McCaffrey deposed, Ms. Hager?

10          MS. HAGER:  No.

11          THE COURT:  Apparently, he did an appraisal at some

12 point.

13          MS. HAGER:  Right.  He --

14          THE COURT:  Didn't he?

15          MS. HAGER:  I believe he did an appraisal of the

16 Matlack property, so I'm not sure what the relevance of this

17 is, anyway.  But no, I didn't depose him.

18          THE COURT:  I'm not sure, either.  I'm not commenting

19 on that, but because he's subpoenaed for September 30th, it's

20 my intention to act on the motion, probably, by the close of

21 business tomorrow.  That's why I'm requiring a response to be

22 filed tomorrow.

23          Okay.  Mr. Reed, you're back on the witness stand.

24 You're still under oath.

25          MR. REED:  Your Honor, I thought you had said you were

1  going to, before I continue, you were going to address the

2  Clampitt and Watson.

3         THE COURT:  Fine.  Let's do that now.  Have you -- Ms.

4  Hager, have you resolved those issues?

5         MS. HAGER:  I think so.

6         THE COURT:  Okay.

7         MS. HAGER:  If we want to do Watson first?

8         THE COURT:  Okay.

9         MS. HAGER:  And if I may, I'll just -- well, I don't

10 know how you want to handle it, but I could just say what Mr.

11 Reed wants to offer --

12        THE COURT:  Okay.

13        MS. HAGER:  -- and what issues I have with it.

14        THE COURT:  What's the tab?

15        MS. HAGER:  Or did you want him to go first?

16        THE COURT:  What's the tab?  What's the exhibit number

17 for the Watson depo?

18        MS. HAGER:  13.

19        THE COURT:  13.  Okay, hold on.  Let me get it.

20        All right.  Claimant's Exhibit 13 is the Watson

21 deposition transcript.  Go ahead, Ms. Hager.

22        MS. HAGER:  So with respect to Watson, Your Honor,

23 this is the one that we had filed a motion in limine on, and

24 Your Honor had ruled that any of her testimony could come in as

25 long, as it's limited to marketing on Old Dell Trace.

RESIDENTIAL CAPITAL, LLC, et al.                    95

1          THE COURT:  Right.

2          MS. HAGER:  So the first section that Mr. Reed wanted

3   to offer is page 8, line 1, through page 18, line 23, and I

4   would object to that to the extent that, by and large, it

5   exceeds the scope of the permissible testimony, except for page

6   15, lines 9 through 17, which seem to address more of a

7   marketing element.

8          THE COURT:  Let me read those pages over.

9      (Pause)

10         THE COURT:  All right.  The objection to page 8, line

11  1, through page 18, line 23 is overruled.

12  (Page 8, line 1, through page 18, line 23, of the Watson

13  deposition was hereby received into evidence as part of

14  Claimant's Exhibit 13, as of this date.)

15         THE COURT:  What's next?

16         MS. HAGER:  Page 19, line 25 through page 20, line 3,

17  I believe also exceeds scope, so I'm objecting to that.

18         THE COURT:  All right.

19         MR. REED:  Could you repeat that or --

20         MS. HAGER:  Sure.  Page 19, line 25, through page 20,

21  line 3.

22         MR. REED:  Okay, so that whole cite.

23         MS. HAGER:  Well, it's only four sentences.

24         MR. REED:  Oh.  I'm sorry.

25         MS. HAGER:  Or four lines.

RESIDENTIAL CAPITAL, LLC, et al.                    96

1          THE COURT:  You're objecting to page 19, line 25 to

2    20, line 3?

3          MS. HAGER:  Page 19, line 25, through page 20, line 3,

4    I am objecting, as it exceeds the scope of Your Honor's order.

5          THE COURT:  Overruled.

6    (Page 19, line 25 through page 20, line 3, of the Watson

7    deposition was hereby received into evidence as part of

8    Claimant's Exhibit 13, as of this date.)

9          THE COURT:  Next?

10         MS. HAGER:  Page 20, line 11, through page 21, line

11   24.  As an initial matter, I think Mr. Reed is missing the

12   question, which would actually start on line 9 on page 20.

13         THE COURT:  Right.

14         MS. HAGER:  So if it's okay with Mr. Reed, I think if

15   we go from page 20, line 9, through page 21, line 24, that that

16   would be acceptable.

17         THE COURT:  All right.  And he just dropped the

18   question, so there's no objection to that.  It's page 20, line

19   19 --

20         MS. HAGER:  Line 9, Your Honor.

21         THE COURT:  I'm sorry.  Line 9, through 21, line 24,

22   is -- okay -- in evidence.

23   (Page 20, line 9, through page 21, line 24, of the Watson

24   deposition was hereby received into evidence as part of

25   Claimant's Exhibit 13, as of this date.)

RESIDENTIAL CAPITAL, LLC, et al.                    97

1             THE COURT:  Go ahead, what's next?

2             MS. HAGER:  Page 26 --

3             MR. REED:  I mean, did you rule on that, Your Honor?

4             THE COURT:  Yes, I said it comes in.  She withdrew her

5  objection to it.  We added the question.  Your designation had

6  missed the question.  It started --

7             MR. REED:  Oh, that's what --

8             THE COURT:  -- when they answered --

9             MR. REED:  That was the grounds for the objection?

10            THE COURT:  Well, it just --

11            MS. HAGER:  It --

12            THE COURT:  It's resolved.

13            MR. REED:  I got it.  Got it.  Got it.

14            MS. HAGER:  It wasn't really an objection.

15            THE COURT:  It wasn't really.  Go ahead.  What --

16            MS. HAGER:  Page 26, line 16 --

17            THE COURT:  Um-hum.

18            MS. HAGER:  -- through page 27, line 4.

19            THE COURT:  All right.  Let me read it.

20            MS. HAGER:  I have no objection.

21            THE COURT:  Oh, okay.  Then it's in evidence.

22  (Page 26, line 16, through page 27, line 4, of the Watson

23  deposition was hereby received into evidence as part of

24  Claimant's Exhibit 13, as of this date.)

25            THE COURT:  Okay, what's next?

1          MS. HAGER:  Okay.  Page 33, line 12, through page 33,

2   line 24, I have an objection, as it exceeds Your Honor's order

3   and is her opinion.

4          THE COURT:  All right.  Let me read it.

5      (Pause)

6          THE COURT:  All right.  Objection sustained.

7          MR. REED:  Your Honor, could I argue that for a

8   minute?

9          THE COURT:  No.

10          Go ahead, Ms. Hager.

11          MS. HAGER:  Page 34, line 9, through page 35, line 9,

12   I have objection to that because it's essentially a

13   hypothetical given to her on the basis that she was an expert,

14   so her testimony is speculative.

15          MR. REED:  34 --

16      (pause)

17          THE COURT:  The objection's overruled.

18   (Page 34, line 9, through page 35, line 9, of the Watson

19   deposition was hereby received into evidence as part of

20   Claimant's Exhibit 13, as of this date.)

21          THE COURT:  I'm not sure what's gained from the

22   testimony, but the objection's overruled.  Anything else?

23          MS. HAGER:  Okay, thank you.  And --

24          THE COURT:  Do you have a designation of your own?

25          MS. HAGER:  Sorry?

RESIDENTIAL CAPITAL, LLC, et al.                          99

1          THE COURT:  Is there any portion of the transcript

2   that you're designating?

3          MS. HAGER:  No, Your Honor.

4          THE COURT:  All right.

5          MS. HAGER:  And Mr. Reed, I covered everything that

6   was on your list; is that right?

7          MR. REED:  Page 34, line 9 --

8          THE COURT:  To page 35, line 9, and I overruled the

9   objection.  This is in evidence.

10         MR. REED:  Yep.  I think that's -- so that's in.

11         THE COURT:  All right.  So that leaves Clampitt.

12         MR. REED:  Let's see --

13         THE COURT:  Were you able to cover --

14         MS. HAGER:  Yes.

15         THE COURT:  -- Clampitt as well?

16         MS. HAGER:  Which is -- yes, which is Mr. Reed's tab

17  15.

18         THE COURT:  Right.

19         MR. REED:  Okay.

20         MS. HAGER:  Your Honor, page 5, line 22, through page

21  6, line 1, I don't have any objection to that, but just one

22  point of clarification.

23         THE COURT:  Yes?

24         MS. HAGER:  Mr. Reed had indicated to me page 5, line

25  23, so I'm just includ -- he had --

RESIDENTIAL CAPITAL, LLC, et al.                    100

 1              THE COURT:  You're using --

 2              MS. HAGER:  -- missed the question.

 3              THE COURT:  You're using the question, correct?

 4              MS. HAGER:  Okay.

 5              MR. REED:  Again, that's -- hold on a second.  I'm

 6    behind you; slow getting this.

 7              THE COURT:  Page 5, line 22.

 8              MR. REED:  Yeah.  Clampitt.  That's -- looking --

 9    there's 15.  Okay.

10              THE COURT:  Okay.

11    (Page 5, line 22, through page 6, line 1, of the Clampitt

12    deposition was hereby received into evidence as part of

13    Claimant's Exhibit 15, as of this date.)

14              THE COURT:  Next?

15              MS. HAGER:  Okay.  On page 7, lines 18 through 20, I

16    don't have any objection to that.  Mr. Reed had originally just

17    asked me for line 7 -- excuse me -- page 7, line 20, and I've

18    just included the question --

19              THE COURT:  Question.

20              MS. HAGER:  -- that goes with that.

21              THE COURT:  Okay.  That's in evidence.

22    (Page 7, lines 18 through 20, of the Clampitt deposition was

23    hereby received into evidence as part of Claimant's Exhibit 15,

24    as of this date.)

25              THE COURT:  Go ahead.

RESIDENTIAL CAPITAL, LLC, et al.                    101

1        MS. HAGER:  Page 8, line 21, through page 9, line 2,

2   no objection.

3        THE COURT:  All right.  In evidence.

4   (Page 8, line 21, through page 9, line 2, of the Clampitt

5   deposition was hereby received into evidence as part of

6   Claimant's Exhibit 15, as of this date.)

7        MS. HAGER:  Page 10, line 18, through page 10, line --

8   excuse me.  Page 10, line 18, through page 11, line 14, no

9   objection.

10        THE COURT:  All right.  In evidence.

11   (Page 10, line 18, through page 11, line 14, of the Clampitt

12   deposition was hereby received into evidence as part of

13   Claimant's Exhibit 15, as of this date.)

14        THE COURT:  Next.

15        MS. HAGER:  Page 12, line 11, through page 13, line 3,

16   no objection.

17        THE COURT:  All right.  In evidence.

18   (Page 12, line 11, through page 13, line 3, of the Clampitt

19   deposition was hereby received into evidence as part of

20   Claimant's Exhibit 15, as of this date.)

21        MS. HAGER:  Page 14, line 9, through page 15, line 15.

22   No objection, but one point that I think is worthy of

23   discussion:  this was a deposition that I took of Ms. Clampitt,

24   and in this particular section of the deposition, I'm reading

25   through her declaration with her and asking her to, basically,

1    authenticate it, et cetera.  I suppose I would like to see

2    clarification from the Court as to whether, if this comes in,

3    the declaration is also coming in.

4              THE COURT:  No.  The deposition's coming in, but 15,

5    line 15 -- you said 14 --

6              MS. HAGER:  14, 9 --

7              THE COURT:  -- 14, line 9, to --

8              MR. REED:  13 --

9              THE COURT:  -- 15.  You've only gone through a

10   question, not an answer.

11             MS. HAGER:  Right.

12             Mr. Reed, the answer on page 15, line 16 -- did you

13   want that to come in?

14             MR. REED:  Okay.  Where am I -- where am I at right

15   now?

16             MS. HAGER:  Clampitt, page 15, line 16.  You had

17   designated through line 15.  Do you want line number 16 in?

18             THE COURT:  You need the answer with the question.

19             MR. REED:  I see that.

20             THE COURT:  It's not exactly --

21             MR. REED:  Yes.

22             THE COURT:  -- an answer, but go ahead.  All right.

23   It's in evidence.

24   (Page 14, line 9, through page 15, line 16, of the Clampitt

25   deposition was hereby received into evidence as part of

1   Claimant's Exhibit 15, as of this date.)

2           MS. HAGER:  Okay.

3           THE COURT:  Next?

4           MS. HAGER:  Page 16, line 2, through page 16, line 5,

5   no objection.

6           THE COURT:  All right.  In evidence.

7   (Page 16, line 2, through page 16, line 5, of the Clampitt

8   deposition was hereby received into evidence as part of

9   Claimant's Exhibit 15, as of this date.)

10          MS. HAGER:  Page 17, lines 9 through 11.

11          THE COURT:  Yes?

12          MS. HAGER:  No objection.

13          THE COURT:  All right.  In evidence.

14  (Page 17, lines 9 through 11, of the Clampitt deposition was

15  hereby received into evidence as part of Claimant's Exhibit 15,

16  as of this date.)

17          MS. HAGER:  Page 17, lines 16 through 25, no

18  objection.

19          THE COURT:  All right.  In evidence.

20  (Page 17, lines 16 through 25, of the Clampitt deposition was

21  hereby received into evidence as part of Claimant's Exhibit 15,

22  as of this date.)

23          MS. HAGER:  And on cross, page 21, lines 23 through

24  25.

25          THE COURT:  21 -- all right, hold on.

RESIDENTIAL CAPITAL, LLC, et al.                    104

1           MS. HAGER:  It's page 21 --

2           THE COURT:  Yes, I passed it.  I see.

3           MS. HAGER:  Okay.

4           THE COURT:  All right.  In evidence.

5  (Page 21, lines 23 through 25, of the Clampitt deposition was

6  hereby received into evidence as part of Claimant's Exhibit 15,

7  as of this date.)

8           THE COURT:  Next?

9           MS. HAGER:  Page 29, lines 20 through 25.

10          THE COURT:  Okay.  In evidence.

11 (Page 29, lines 20 through 25, of the Clampitt deposition was

12 hereby received into evidence as part of Claimant's Exhibit 15,

13 as of this date.)

14          MS. HAGER:  Page 30, lines 18 through 24.

15          MR. REED:  Where?

16          THE COURT:  All right.  In evidence.

17 (Page 30, lines 18 through 24, of the Clampitt deposition was

18 hereby received into evidence as part of Claimant's Exhibit 15,

19 as of this date.)

20          MR. REED:  Well, Your Honor?

21          THE COURT:  Yes.

22          MR. REED:  There's more here on Clampitt.

23          MS. HAGER:  Okay.  I told you I wouldn't turn any

24 pages.

25          MR. REED:  Okay, okay.

1          MS. HAGER:  So I didn't that.

2          Well, can I just finish --

3          THE COURT:  Yes.

4          MS. HAGER:  -- this part?

5          MR. REED:  Now comes this.

6          THE COURT:  Yes, yes, yes, yes.

7          MS. HAGER:  And then I'll go back over that.  So I

8     think I just said page 30, lines 18 through 24?

9          MR. REED:  Yes, then I said there was more.

10          MS. HAGER:  Okay.  Page 39, lines 13 through 17.

11          THE COURT:  All right.  In evidence.

12     (Page 39, lines 13 through 17, of the Clampitt deposition was

13     hereby received into evidence as part of Claimant's Exhibit 15,

14     as of this date.)

15          MS. HAGER:  Page 46, line 25, through page 47, line 2.

16          THE COURT:  Okay.  In evidence.

17     (Page 46, line 25, through page 47, line 2, of the Clampitt

18     deposition was hereby received into evidence as part of

19     Claimant's Exhibit 15, as of this date.)

20          MS. HAGER:  And page 47, lines 16 through 18.

21          THE COURT:  All right.  In evidence.

22     (Page 47, lines 16 through 18, of the Clampitt deposition was

23     hereby received into evidence as part of Claimant's Exhibit 15,

24     as of this date.)

25          MS. HAGER:  Okay.  That's all I have.  I'm happy to

1    take a look at that other page now.

2              THE COURT:  All right.  Why don't you come on up?  Ms.

3    Hager, why don't you look at what Mr. Reed has there?

4              MR. REED:  All right.  I --

5              THE COURT:  Well, she's going to come up.  And show

6    her what you --

7              MR. REED:  Yeah, I'm sorry about that.  This was the

8    --

9              MS. HAGER:  There's a lot on here, Your Honor.  Shall

10   I look at this later?  I can finish it while he's talking.

11             THE COURT:  Okay.  Can she take that list from you?

12             MR. REED:  Sure.

13             THE COURT:  And we'll come back and finish the

14   Clampitt designations, okay?

15             All right. I think when we finished your testimony --

16   or ended your testimony before lunch, you had just introduced

17   into evidence the photos of the property that are part of

18   Claimant's Exhibit 35.  That was the last in my notes, Mr.

19   Reed.

20             MR. REED:  Okay.  Your Honor, the declaration for

21   Clampitt -- I thought that the deposition would -- validating

22   the declaration eliminates the hearsay rule.

23             THE COURT:  It doesn't with respect to the

24   declaration.  So if the witness appears in court, I admit the

25   declaration and then we have live in-court cross-examination;

1   where if the witness does not appear, the deposition is the

2   testimony.  So you designated portions and Ms. Hager has

3   designated portions, but the declaration itself doesn't come

4   into evidence.  But --

5           MR. REED:  So it's one or the -- it's one or the

6   other; that's how that works?

7           THE COURT:  Yes.

8           MR. REED:  Yes.  Okay, I see that.  Okay.

9           THE COURT:  Okay.  So as I said, when we ended your

10   testimony just before lunch, you had just introduced into

11   evidence Claimant's Exhibit 35, the photographs of the Matlack

12   property.  And that's when we broke for lunch.

13           MR. REED:  Okay.

14      (Pause)

15           MR. REED:  Okay.  I think I was done with the Matlack

16   photos.  I just want to make sure.

17           THE COURT:  I think you had finished testifying about

18   the Matlack photos in Exhibit 35 when we broke for lunch.

19           MR. REED:  Yeah, I think we did, right?

20           THE COURT:  Yes, we did.  Well, I thought you did, but

21   --

22           MR. REED:  Yeah.  We discussed it was the same

23   furnishings --

24           THE COURT:  Right.

25           MR. REED:  -- that I had.

1        THE COURT:  What I understood your point to be, you

2   compared the furnishing shown in Exhibit 35 to the photographs

3   we looked at for Old Trace (sic).

4        MR. REED:  Yeah, okay.  All right.  Okay, so I'd like

5   to visit the -- hold on, let's see if it has what we want.

6      (Pause)

7        MR. REED:  Your Honor, I would like to draw attention

8   to tab 18.  As you can see -- I believe it's 18 -- James Suhr

9   deposition.

10       THE COURT:  That's not 18.

11       MR. REED:  Is it 17?

12       THE COURT:  It is 17.

13       MR. REED:  Okay.  There's a few things I'd like to

14  highlight, I think, in this deposition.

15       THE COURT:  This is the time for your testimony.

16       MR. REED:  Okay.

17       THE COURT:  Not to argue -- when I say argue, not to

18  raise arguments about what the evidence showed from somebody

19  else's testimony.

20       MR. REED:  Okay.

21       THE COURT:  Okay.  If you want to do that in the

22  closing argument, you can, but now is the time for you to give

23  your testimony.

24       MR. REED:  Okay.  So I guess I'd like to put on the

25  record a document, and we're going to discuss that, and it's

1    Exhibit 43.

2         (Pause)

3             Oh.  Okay.  If this is correct, it should be a

4    settlement statement -- a document for the purchase of 9717 Old

5    Dell Trace.  This document -- if you'd go to page -- or item

6    number in the summary of borrower transactions --

7             Your Honor, can I switch chairs?

8             THE COURT:  Well --

9             MR. REED:  I just --

10            THE COURT:  I don't know --

11            MR. REED:  Can I have that one?  It's that one.

12            THE COURT OFFICER:  This one?

13            MR. REED:  Can I have that chair?

14            THE COURT OFFICER:  Sure.

15            MR. REED:  This is just too much.

16            Thanks.  That's wonderful.  That's great.

17            THE COURT:  Thank you very much.

18            MR. REED:  Oh, that's so much better.

19            The purchase price, line 101, for the record, is 899.

20    There were settlement charges to that.  There was a 10,000-

21    dollar earnest money deposit -- line 201.  These items are

22    being introduced to show the debt obligations on the property

23    and sunk costs into the property, besides the construction

24    costs.

25        (Pause)

RESIDENTIAL CAPITAL, LLC, et al.                    110

1    Let's see if I recall this correctly.  Cash from loan, 100,000.

2    It's my recollection that this was really ten percent down on

3    the property, which was 890 -- or 89,000 on 205.  Was that

4    eight -- it's almost eighty percent from the first mortgage and

5    ten percent from the second mortgage and ten percent down.  Let

6    me see where that indicates this.

7        (Pause)

8            MR. REED:  There are two loans that were used to

9    acquire the Matlack -- look at it this way, to acquire this

10   property.  One was the primary first mortgage 719,200.  That's

11   on line 202 of the first HUD (ph.).

12           THE COURT:  Let me make sure I understand, Mr. Reed.

13   Did you obtain a first mortgage of 719,200 dollars to purchase

14   the property?

15           MR. REED:  Yeah, my wife did.  She obtained a first

16   and second mortgage.

17           THE COURT:  And from whom?

18           MR. REED:  I think it was Metrocities -- actually

19   became Taylor, Bean & Whitaker.

20           THE COURT:  How much was the second mortgage?  The

21   first mortgage was 719?

22           MR. REED:  Yes.

23           THE COURT:  And how much was the second?

24           MR. REED:  The second mortgage is page 3 of this

25   exhibit, line 202.

1            THE COURT:  89,900?

2            MR. REED:  Yes.

3            THE COURT:  Were you at -- did you sign as an obligor

4    on the loan or just your wife?

5            MR. REED:  I don't remember being a signer to the

6    note.  I think I was a signer to the mortgage because I was on

7    the deed.

8            THE COURT:  On both the first and second?

9            MR. REED:  I have to be because I was co-owner of the

10   property.

11           THE COURT:  I know.  My question -- let me ask it more

12   clearly.  Did you sign either note for the first or the second?

13           MR. REED:  I can't remember.

14           THE COURT:  All right.  Go ahead with your testimony.

15           MR. REED:  So that the purchase price was 899-, and

16   then there were settlement charges on top of that of 21,000, so

17   the total amount that was due from us is in line 120 of the

18   first page of this exhibit, 921-.

19           And the borrowed funds for the acquisition between the

20   two loans of 719,200 from the first and 89,157 from the second,

21   comes to a total of 808,357.  So our contribution into the

22   property, sum cost in the property is -- from an acquisition

23   standpoint, I believe is an acquisition and a sum cost for

24   purchase:  $112,807.24.  The total needed to complete the

25   transaction was $921,164.24, less the two financing amounts of

RESIDENTIAL CAPITAL, LLC, et al.                    112

```
 1   719- and 89,157.

 2        (Pause)

 3            MR. REED:  I think that's what this exhibit stood for

 4   is how much that was, so I move to enter it into evidence.

 5            THE COURT:  You're offering Exhibit 43 in evidence.

 6            Ms. Hager?

 7            MS. HAGER:  No objection.

 8            THE COURT:  All right, Exhibit 43 is in evidence.

 9   (HUD purchase documentation was hereby received into evidence

10   as Claimant's Exhibit 43, as of this date.)

11            MR. REED:  And again, Your Honor, those were funds

12   that we provided for the purchase of that amount.

13            THE COURT:  Both the first and the second were at

14   Metrocities?

15            MR. REED:  Yes.

16            THE COURT:  And did you make the monthly payments for

17   a time?

18            MR. REED:  Yes, Your Honor.

19            THE COURT:  For how long?  Let me ask it differently.

20   When did you stop making the mortgage payments on the Old Dell

21   Trace property?

22            MR. REED:  Your Honor, I think -- I think my wife

23   skipped a couple payments in late '07, and this -- is that

24   right?  No, that was all made throughout '07.  Payments were

25   made into '08.
```

RESIDENTIAL CAPITAL, LLC, et al.                                113

1        I think the payments, Your Honor, were -- were stopped

2   mid '08 when we were -- when we -- when we wound up in

3   foreclosure with GMAC.  I believe that we were current all the

4   way through to that point.  And then I brought it current in

5   a -- in the few payments -- the payments that were missed, we

6   bought it -- I brought it current in '08 when I learned that

7   it -- that it was on notice -- a late notice that came to the

8   house, so I brought it -- brought it current in '08, and

9   through I guess the -- I guess the beginning of '09, so we --

10  you know, we continued to make those payments.

11       THE COURT:  I think you said -- well, Taylor Bean then

12  brought a foreclosure action, and you sued them?

13       MR. REED:  Yes, in -- in -- let's see.  Let me make

14  sure I get all this straight.  I'm like Mr. Maines sometimes

15  too -- a little in common, I need to make sure we think about

16  this stuff.

17       We were fully current I want to say in January,

18  February, March, something like that in 09.  This is when I

19  moved -- I moved from New Jersey in November 2010 -- 2008 we

20  went -- there had been a couple payments I think missed in '08,

21  then we had to -- you know, I made sure it was paid.

22       But a representative from Taylor, Bean & Whitaker --

23  was that -- I think I put it in two payments. It was like

24  15,000 dollars or 18,000 dollars or I can't remember the

25  number.  And then the representative from Taylor -- about --

1    regarding this litigation, the representative from Taylor, Bean

2    & Whitaker said you know, we can -- you know, we can do a

3    modification.  We've acquired your land.  We can do a

4    modification on your loan.  You know, no foreclosure will

5    happen in your property, if you -- if you bring the mortgage

6    current by X date.  I can't remember what the date was.  It was

7    in the beginning of 09, we will modify your mortgage and no

8    foreclosure action will take place until that's -- that's done,

9    and reinstate, you know -- we'd fully reinstate it.

10            So we -- we sent a certified check to them.  Like I

11   said, all it was -- by that point, as we had our conversation,

12   18,000 or 20,000 dollars, so everything was current.  And

13   Taylor, Bean & Whitaker, we sent -- we never got a -- a

14   package, like we expected.

15            So I contacted Taylor, Bean & Whitaker.  I -- I -- the

16   number for the -- the, you know -- the representative.  I

17   contacted them and left a voicemail, and another voicemail, and

18   I found a supervisor.  Chris Muntz's (ph.) secretary picked up.

19   I left another voicemail.  And we emailed and got no response.

20   I think -- I think -- I think I may have even employed

21   Venezuela (ph.) at that time to help me contact them.

22            And it turns out Taylor, Bean & Whitaker was -- had

23   filed a fraudulent package with the -- the TARP fund.  I think

24   the essence of their fraud was they double booked, or they

25   claimed assets that they had sold actually, for hundreds of

1  millions of dollars.  And the FBI raided them, and the next day

2  the executives fired all 4,000 employees.  They just -- you

3  know, that's why no one was answering the phone calls.

4          So at this -- at this point, even though this was

5  going on -- I can't remember when I actually learned how that

6  was happening, we were diligently working on Old Dell.  So when

7  I came back -- when I came down to Virginia --

8          THE COURT:  You said you moved in November 2008?

9          MR. REED:  Yes.  So then -- then we -- as you saw in

10 the -- let's get the -- some of the -- let me get them fresh in

11 my mind.  In 2008 -- by 2008, we acquire -- we acquired the

12 house, and by 2008 I got my permits all approved.  We'd been

13 paying the mortgage all along, all taxes all along -- 2007,

14 2008 mostly.  Filed for all permits, did all the -- paid the

15 demolition.

16         You know, Your Honor, I -- I paid for all this.  This

17 is my testimony and I'm going to give you estimates of how much

18 I paid, but there's very little that wasn't actually paid for

19 in terms of the contract.  I mean, all this lumber, all that

20 work, I mean, doubled the size of -- that was cash that I had

21 that I actually paid.  I mean, you got Mr. Suhr, which you

22 know, and I think his testimony -- I paid these contractors

23 either by check or by cash that I had, depending on some of

24 them -- like, you know, what -- they didn't have bank accounts,

25 so they wanted -- they wanted cash.

1        So down there, now the inside of the house, I'm

2    working diligently every day, multiple contractors there

3    working to finish the house.  In the beginning of -- of '08,

4    because Mr. Cooper didn't close on the house, I had some -- I

5    had trepidation about -- you know, even though I planned on

6    ripping out the kitchen, for example, it was one of the last

7    things that I did because Mr. Cooper had missed two

8    settlements.

9        There was equity in the house, a million-eight

10   contract.  There was hundreds of thousands of dollars needed

11   that I could have used to complete the map -- you know, the 97

12   property.  We tried to juggle everything.  You know, the

13   foreclosure in New Jersey, trying to deal with that.  I

14   couldn't just bring that current because I couldn't erase --

15   and it's a good time maybe I should say something about that.

16       One of the reasons, even though there was cash like I

17   had in terms of the foreclosure in New Jersey, as to why that

18   didn't just -- I didn't like -- in Virginia, when we were

19   behind, they sent me a notice.  I just paid it.  Some people

20   say why didn't that happen in New Jersey.

21       In Virginia, a foreclosure action is a nonjudicial

22   action.  It doesn't show on your credit like that.  It --

23   unless the -- unless the insure -- unless they -- until the

24   foreclosure happens.  You understand?  In other words, when

25   they sell it, then it becomes a public record that you -- that

1    you sold.  There's not a lis pendens filed and stuff like that,

2    like there is in New Jersey, because the lis pendens is filed

3    as part of the litigation, and it's picked up by the services,

4    you know, differently.

5            So one of the -- one of the troubling things that

6    happened in New Jersey and how I -- how we didn't respond the

7    same with New Jersey is after talking to several attorneys, and

8    how -- and how this was unwinding for me, you couldn't -- you

9    can't -- you can't expunge foreclosure action that's been filed

10   as a matter of record -- public record in New Jersey as

11   litigation.

12           MS. HAGER:  Objection.  I move to strike this line as

13   irrelevant.

14           THE COURT:  Overruled.

15           MR. REED:  So we -- we -- I had no choice, in my

16   understanding, but to continue fighting about this. Like even

17   today, if I -- if I could have -- you know, if you had the

18   power to remove that from the docket -- I understand you can't,

19   like a criminal expungement.  It would have been included in my

20   request for an equitable remedy for -- for -- for this -- for

21   Matlack in the original trial.

22           But I was pursuing that as part of the -- as part of

23   the litigation, for example, that Mr. Walters filed in -- in --

24   after the -- after -- I mean, I understood I had to get the

25   foreclosure dismissed to show that it was there.  That was step

1  one.  It had to be dismissed by the court showing it was their

2  wrongful act.

3       Then it -- I understood it to be that their wrongful

4  act we'd be able to have that eliminated from the record and

5  the pall that it -- the effects that it would have on me,

6  either in a credit report, which we're not suing about now

7  because of the lack of that evidence on the record.  But in --

8  but general, with other people knowing about it, learning about

9  it, people I do business with, the banking recor -- you know,

10 people.  It was a very big concern for me because up until 2007

11 and -- and even into 2008, our credit was -- was -- I can't --

12 I mean, I don't want to say it because I don't -- it was -- it

13 was good.  That's how we got the loans that we got.

14      I mean, this is not like a sixty percent down, high-

15 interest-rate loan.  These -- these loans to acquire to

16 Matlack, to acquire Old Dell, to buy and sell the lots, buying

17 and selling lots with financing.  It's extremely difficult.

18 It's not like a regular consumer -- you know, to -- to buy a

19 house, you know, someone who has a regular job and does that

20 because --

21      MS. HAGER:  Motion to strike the testimony as it

22 relates to his credit based on Your Honor's order on our motion

23 in limine.

24      MR. REED:  I'm not seeking damages.

25      THE COURT:  I'm going to overrule it, but just move

1    on, Mr. Reed.  Okay?

2             MR. REED:  Okay.  So -- so --

3             THE COURT:  Mr. Reed, did you have the cash to satisfy

4    the default on Matlack in May 2008, when the foreclosure action

5    was filed?

6             MR. REED:  I don't know what we had liquid at that

7    moment.

8             THE COURT:  All right, let's move on.  Matlack's off

9    the table.

10            MR. REED:  Oh, I'm not -- I'm not --

11            THE COURT:  I understand, so but we're taking a lot of

12   time on this.

13            MR. REED:  Okay, I'm sorry.  I'm sorry.  I'm sorry.

14   All right so that --

15            THE COURT:  You just put in evidence of what you

16   paid --

17            MR. REED:  And we were talking about -- you were

18   asking about --

19            THE COURT:  -- for Dell Trace.

20            MR. REED:  -- the litigation regarding -- regarding --

21            THE COURT:  Yes, you sued Taylor Bean.

22            MR. REED:  Yes.  So the -- the grounds for --

23            THE COURT:  And they ultimately succeeded in

24   foreclosing on the property, correct?

25            MR. REED:  Because it's not a -- it's not a --

1        THE COURT:  But they succeeded in foreclosing.  You

2    filed an action that ultimately was dismissed.  They completed

3    the foreclosure of the Old Dell Trace property, correct?

4        MR. REED:  The action was after the foreclosure.

5        THE COURT:  All right.

6        MR. REED:  For damages.

7        THE COURT:  All right, let's move on.  Can you tell me

8    this -- how much was the amount of your default on the Old Dell

9    Trace first and second mortgages at the time that they

10   completed foreclosure?

11       MR. REED:  Of the actual foreclose -- of the actual

12   taking?

13       THE COURT:  Yes, they --

14       MR. REED:  I think we have that as an exhibit if

15   you -- I think that's the demand letter in an exhibit. I think

16   it might be tab 40, Your Honor.

17       THE COURT:  Pay off amount $922,086.80?

18       MR. REED:  If you go to the -- and that's -- that's

19   including the principal.

20       THE COURT:  Okay.

21       MR. REED:  So I think the -- the -- the back -- the

22   back -- the last page of that exhibit.  But this is now -- and

23   you can look at this, it's in 2012, the end of 2012.

24       THE COURT:  The payoff, but the amount of the -- am I

25   correct that the amount of the arrears on the Old Dell Trace

1  property loan was $157,664.41?

2          MR. REED:  That's what was in -- in November of -- of

3  2012.  And --

4          THE COURT:  When did they complete the foreclosure?

5          MR. REED:  I believe in the beginning of 2013.

6          THE COURT:  All right, but at least as of -- good

7  through November 30th, 2012, the amount of the arrears,

8  including late charges, other fees, corporate advances, legal

9  fees and costs was $157,664.41.  Is that correct?

10         MR. REED:  Yes, that's what I believe is correct.

11         THE COURT:  All right.  Go ahead with your testimony.

12     (Pause)

13         MR. REED: Foreclosure amounts --

14         THE COURT:  "In the New Jersey Superior Court Chancery

15 Division and determined that the foreclosure action should be

16 dismissed without prejudice on February 9th, 2009."  Correct?

17         MR. REED:  I don't know, Your Honor.  I don't -- I

18 don't remember.

19         THE COURT:  I'm reading from my prior opinion at 517

20 B.R. 462.

21         MR. REED:  Okay.

22         THE COURT:  At page 473.  At the top of that page it

23 reads, "Chancery Division Court denied the GMACM's summary

24 judgment motion and granted the Reed summary judgment cross-

25 motion on February 9, 2009.  The Chancery Division Court

RESIDENTIAL CAPITAL, LLC, et al.                    122

1    determined that the foreclosure action should be dismissed

2    without prejudice because GMACM could not prove that it

3    delivered an NOI in accordance with" -- gives the statutory

4    section.

5          (Pause)

6                THE COURT:  Go ahead with your testimony, Mr. Reed.

7                MR. REED:  You Honor, I think if we look to -- just

8    for the record here, if you look to -- back to Exhibit 24 that

9    as admitted, these are county records from Henrico County, page

10   3 --

11               THE COURT:  Which exhibit are you looking at?

12               MR. REED:  24.

13         (Pause)

14               MR. REED:  The -- this is for Old Dell Trace, county

15   records for Old Dell Trace.  And if it helps with the record,

16   there's a forced sale, if you look at the top table.

17               THE COURT:  How far into this exhibit is it?

18               MR. REED:  It -- it -- I'm sorry, page 3 -- page 3.

19   It says "Transfer and Assessments" up in the left-hand corner.

20               THE COURT:  Yes.

21               MR. REED:  If you look at that table --

22               THE COURT:  There's two tables on the page.

23               MR. REED:  The top table.

24               THE COURT:  Yes.

25               MR. REED:  You'll see --

1          THE COURT:  I see "Forced sale".

2          MR. REED:  Yeah, forced sale, if you look at that

3    line, it said I was -- I was the owner with my wife, and the

4    forced sale I think refers to the foreclosure, Your Honor.  As

5    I said, I believe it was in the beginning of 2013.  Here we

6    have a date 2/26.

7          THE COURT:  February 26, 2013.

8          MR. REED:  Yeah, for 935,743, which is similar in

9    number to that line.

10      (Pause)

11         THE COURT:  When did you move back to Matlack?

12         MR. REED:  I moved back to Matlack in -- we evicted

13   Cooper I think in late '09.  And I moved back to Matlack

14   because that was finished in 2010.  So Your Honor, I had two

15   houses -- I had five houses.  I had plenty -- three were rented

16   with the Oxford house, some leases that were coming -- coming

17   due, the Matlack property, and Old Dell Trace.

18         So when we -- after we had Cooper evicted, I don't

19   want to get into all the sales history -- you know that from

20   the first trial.  Then we -- we -- when it was clear I wasn't

21   going to have the funds available or couldn't get them in the

22   remainder of '09 and into 2010, that Cooper wasn't closing

23   because Cooper was going to close I think in the third quarter

24   of -- or the end of third quarter, beginning of the fourth

25   quarter of 2009.  And I -- and I didn't have the funds the

RESIDENTIAL CAPITAL, LLC, et al.                    124

1    complete Old Dell.  I started considering how we were going to

2    have to move back to Matlack.  So in -- in -- earlier in '09 --

3    in -- okay, back again.

4           THE COURT:  I'm just trying to understand the

5    chronology, Mr. Reed.  You testified earlier that you moved to

6    Old Dell Trace in November 2008.

7           MR. REED:  Yes.

8           THE COURT:  And I'm trying to understand how long you

9    lived there until you moved back to Matlack.

10          MR. REED:  The hotel and -- and -- and Old Dell I

11   think was a year and a half and a few months.

12          THE COURT:  So sometime in 2010 you moved back?

13          MR. REED:  Yes.

14          THE COURT:  And when you left Old Dell Trace, what was

15   the status of the construction on that home?

16          MR. REED:  Old Dell, we -- we had bought it to -- I

17   can't give -- I can't give you a percentage.  I can tell you

18   the interior renovations to the main house, except for the

19   kitchen cabinets -- so remember me showing you the pictures of

20   the flooring, the ceilings?  Those pictures represent like

21   the -- you know, the end stages of when we were, you know, at

22   Old Dell.

23          So bathrooms -- kids' bathroom, we'd done some work

24   there.  We -- the foyer you saw, the family room, the kitchen

25   was set.  The addition -- it was like I said all -- not just

1   framed, but you saw the pictures of the master bedroom.  We

2   were missing -- let me do it this way.

3           Start from the back of the house.  The large sunroom,

4   the foundational concrete was in, but the final slab was not.

5   All the columns were tied into the foundation.  That's why I

6   could -- it was structurally sound.  The ceiling was not done

7   but it was all insulated, but it was open insulation.  So we

8   were living in a -- you know, it was un -- it was uncompleted.

9   It was open.  Loft -- a lot of people -- we'd crack jokes like

10  living like Lincoln, with one wall missing.

11          The -- the upstairs master sitting room, the flooring

12  was all missing.  The master bath the flooring was all missing.

13  The addition hardwood flooring needed to be all finished, so it

14  was the wall -- you know, the wallboy (ph.).  You can also look

15  to Mr. Surh's (ph.) deposition.

16          THE COURT:  Let me ask a different question.  From the

17  time you left Old Dell Trace sometime in 2010, you moved back

18  to New Jersey until foreclosure of Old Dell Trace was completed

19  in February 2013.  Was there any further construction work that

20  was done on the Old Dell Trace property?

21          MR. REED:  I think we did some plumbing work because

22  we had an issue with the -- where the lines were lying (ph.).

23  You know, there was -- we had a line pop.

24          THE COURT:  Did anyone live in the Old Dell Trace

25  property from the time you moved back to New Jersey until

RESIDENTIAL CAPITAL, LLC, et al.                    126

1    foreclosure was completed in February 2013?

2            MR. REED:  No, we couldn't.  I couldn't -- we couldn't

3    because I put my family in there.

4            THE COURT:  I'm just asking a question.  I don't

5    want -- I don't need explanation.  I'm just trying to

6    understand whether anybody lived in there from the time you

7    moved back to New Jersey until it was foreclosed.

8            MR. REED:  They -- they legally couldn't.

9            THE COURT:  Okay.

10           MR. REED:  Because of the CO.

11           THE COURT:  You didn't have a CO.  You were living

12   there.

13           MR. REED:  Well, that's -- that -- that --

14           THE COURT:  CO being a certificate of occupancy.

15           MR. REED:  Yeah, a certificate of occupancy because I

16   was the -- unlike new construction, when you go for a permit

17   for an expansion, you don't have to move out of your house.

18   You can live --

19           THE COURT:  Okay, all right.  I understand so let's

20   move on.  You've answered my question.

21           MR. REED:  Okay, because you know, I couldn't put a

22   tenant in there.

23           THE COURT:  Okay.  You've answered my question.  Just

24   let's keep trying to move it along.

25           MR. REED:  Okay, now I lost my train of thought.

1           THE COURT:  You put in evidence Exhibit 43, settlement

2    statement.  You went through what you purchased, how much you

3    financed.  There was then a discussion about Taylor Bean and

4    the possible loan modification, and how your calls went

5    unanswered.  And then I asked you some questions about what the

6    amount of the arrears were.  That's where you were in your

7    testimony.

8           MR. REED:  Okay, so let me -- let me -- let me get

9    back now.

10       (Pause)

11          THE COURT:  Are we finished with Old Dell Trace?

12          MR. REED:  I -- I -- I think from the construction and

13   renovation stuff I think so.  Let me look at my list one more

14   second.

15       (Pause)

16          MR. REED:  39 -- there's something here.  Hold on a

17   second.  39 I have something related to 9717.  I'm trying to

18   remember what that was.

19       (Pause)

20          MR. REED:  Oh, okay, all right.  Let's see, where's

21   that HUD?  Purchase of HUD is 43.

22       (Pause)

23          MR. REED:  Your Honor, if you -- if you look at --

24   this -- this document was a -- a screen grab off of my phone.

25          THE COURT:  What are you looking at?

1          MR. REED:  Number -- number 39.

2          THE COURT:  All right, I have opened Claimant's

3    Exhibit 39.

4          MR. REED:  39 -- one of the -- one of the theories

5    that I -- for recovery that I had in this case is as allowable,

6    I understand, under the NJCFA is that's -- that obligations --

7    that the obligation, you know -- it has -- it's caused to exist

8    will remain because of a bad act.  So one of the things that we

9    were looking at is the -- although the obligation for the first

10   mortgage under Old Dell Trace was extinguished when they

11   foreclosed on the -- on the property, the second mortgage is

12   not.  It's foreclosed.  And so that obligation remains, from

13   what I understand, active, as -- as you know, they've actively

14   tried to -- they haven't sued, but they actively tried --

15         THE COURT:  Who's "they"?

16         MR. REED:  JPMorgan Chase.  So in this --

17         THE COURT:  When did -- your testimony earlier was

18   that the second mortgage on Old Dell Trace was ultra, I think,

19   to Metrocities.

20         MR. REED:  Yeah, and they -- and they sold it.  They

21   sold it and that loan was a second mortgage of eighty-nine-nine

22   and in this screen grab, it indicates the eighty-nine-nine

23   was -- it's still outstanding.  I testified that it's still

24   outstanding.  It is not extinguished.  It is no longer attached

25   to the property as a secured loan, but the obligation still

1    exists.

2              And I turn for corroborating evidence as to that to

3    Exhibit 43.  I guess it's page 3, and you can see the amount of

4    the loan for the acquisition of -- the second loan for the

5    acquisition of eighty-nine-nine.

6              THE COURT:  You told me earlier that you didn't

7    believe that you were an obligor on that loan, that your wife

8    signed it, not you.

9              MR. REED:  I said I couldn't remember.  When you

10   pressed me, I said --

11             THE COURT:  Oh, pressed -- I asked a question.

12             MR. REED:  And I -- and I --

13             THE COURT:  And Exhibit 39 that you've just identified

14   doesn't indicate who the obligor is.  It just -- you've

15   linked -- it shows the limit of 89,900 dollars.  What's Credit

16   Karma?

17             MR. REED:  That's a -- a credit checking app that you

18   can see what's -- you know, what -- you know, what -- what your

19   obligations are.  And -- but I'm -- I'm offering the testimony

20   that that eighty-nine-nine is still due and payable.  It was

21   not extinguished at the fore -- you know, not extinguished at

22   the foreclosure.

23             So either through Exhibit 43 and my testimony or what

24   help it would be or not, I guess the weight of your analysis as

25   to the value of this proof in Exhibit 39, I would move for it

1    to be admissible for whatever weight the Court wishes to give

2    it.

3              THE COURT:  Ms. Hager?

4              MS. HAGER:  Objection, hearsay, and it seems to be

5    some sort of a credit report.  So it would fall within the

6    order on that motion in limine.  I'd move to strike all of his

7    testimony concerning this document.

8              THE COURT:  The objection I sustained.  There's lack

9    of adequate foundation and the testimony relating to Claimant's

10   Exhibit 39 is likewise stricken.

11             MR. REED:  But not the -- the -- for clarification

12   purposes, Your Honor, I mean, it's probably obvious but I'm

13   going to ask it anyway.  Did my testimony regarding that second

14   mortgage as indicated in --

15             THE COURT:  Well, I'm going to let your testimony

16   stand that you believe you're still obligated on the second

17   mortgage, but Exhibit 39 and what, if anything, it means is

18   stricken.

19             MR. REED:  Okay.

20             THE COURT:  All right, we really need to try and move

21   along.  Why don't we do this -- let's take a ten-minute recess.

22   You really need to try and organize your --

23             MR. REED:  I'm really trying, Your Honor.  I -- I

24   really am.

25             THE COURT:  Because we're spending a long time, Mr.

RESIDENTIAL CAPITAL, LLC, et al.                    131

1    Reed, on -- I'm not telling you what you should or shouldn't

2    cover.  But we've really got to move along, so try and make

3    some notes or something, exactly what you're going to cover

4    next.  Okay?

5              MR. REED:  Okay.

6              THE COURT:  It's 4:24 on my watch.  We'll restart at

7    4:34. I think we're going to go to 5:30 today.  I've really got

8    to get on with this.

9              Is Mr. Curley coming tomorrow?

10             MR. REED:  Yeah, at 9 o'clock.

11             THE COURT:  Okay.

12             MR. REED:  And I --

13             THE COURT:  We'll take him out of order and let me

14   make some comments about Mr. Curley and his testimony.  Give me

15   a second.

16             Before I do that, did you email Ms. Kline a copy of

17   the order?

18             MR. REED:  I did, Your Honor.

19             THE COURT:  Okay.

20             MR. REED:  And you said I have to type up and file it.

21             THE COURT:  Yes, tomorrow a certificate of service,

22   but you're telling me that you did serve her by email?

23             MR. REED:  I did, and I know you said I have to do --

24   I need to have this done tomorrow morning.  So I'm concerned

25   about how much longer we're going to go because I am very slow

1   at these legal documents.

2           THE COURT:  All right, we'll stop at 5 o'clock, but

3   all you've got to do is -- a proof of service that you served

4   Ms. Kline with the order that was entered today, and that you

5   served her by email.

6           MR. REED:  And the objection, I have to research this

7   objection to the -- to the --

8           THE COURT:  If you're going to try and enforce the

9   subpoena --

10          MR. REED:  Of course I want to.

11          THE COURT:  Well, if you're going to try and enforce

12  the subpoena, then you need to file something in writing in the

13  morning.

14          Let me address briefly the issues about Mr. Curley.  On

15  September 14th, I entered an order denying the motion in limine

16  to exclude evidence at trial concerning Mr. Reed's efforts to

17  refinance the mortgage on his Matlack property, including

18  through post-testimony of Robert Curley.

19          I concluded that whether evidence about Reed's failed

20  efforts to refinance the Matlack property because of attempted

21  wrongful foreclosure with a legal cause of compensable losses

22  relating to other properties -- for example, if the Reed

23  financing failed because of the filing of the foreclosure

24  action and would have made sufficient funds available for Reed

25  successfully to complete other real estate transactions cannot

1  be determined at this time, the Court needs to hear the

2  evidence in arguments at trial.

3          So Mr. Curley's going to come tomorrow.  But what I

4  want to make clear on the record now, in the opinion and order

5  entered on October 6th, 2014, which was the memorandum and

6  opinion and order determining the amount of allowed claim of

7  Frank and Christina Reed, the opinion contains numerous

8  findings of fact regarding Mr. Reed's efforts at refinancing

9  the Matlack property.

10          My decision in that October 6, 2014 order was affirmed

11  in part and reversed in part.  The findings of fact that I made

12  in the opinion remain the findings of fact and enforceable

13  today.

14          I reserved decision in the order on the motion in

15  limine because I want to hear the testimony, but the result may

16  be, Mr. Reed, that Mr. Curley's testimony is going to be

17  stricken.  I don't know whether you sought to refinance Old

18  Dell Trace with TD Bank or -- I do know that through your

19  testimony that they had an approximate 600,000-dollar blanket

20  mortgage on the three rental properties.  Those were not

21  covered in the prior trial testimony or in the findings of

22  fact.  But I just want to make clear on the record that I'll

23  listen to Mr. Curley's testimony but it may well be that after

24  I hear it -- I'm not revisiting the findings of fact that I

25  made after the first trial.  In some detail, at a number of

1    places in the opinion, 517 B.R. 482, 483, 487 and 488 -- 488

2    specifically, "Lost refinance opportunities" deals with -- at

3    some length -- that's not open to be revisited again.  But I

4    just wanted to make that clear on the record before we have

5    Mr. Curley come tomorrow.  Both you, Mr. Reed, and you,

6    Ms. Hager, can shape your questions accordingly.

7            It's 4:30.  We're going to take a ten-minute recess.

8        (Recess from 4:29 p.m. until 4:41 p.m.)

9        (Audio begins mid-sentence)

10           THE COURT:  -- Residential Capital, 12-12020.

11   Mr. Reed's still on the stand; he's still under oath.

12           Mr. Reed, go ahead.  We're going to go until

13   5 o'clock.

14       (Pause)

15           MR. REED:  So, going back to 2008, in 2008 the house

16   on Old Dell Trace was framed, watertight, windows, but the

17   interior work had to be, really, done.  We showed other

18   pictures of how it was done.  It -- so I moved down to Old Dell

19   Trace in -- when Mr. Cooper moved into my property in November

20   of '08.  We diligently resumed the renovations that were being

21   conducted sporadically during '08.  You know, I think it was

22   after the foreclosure was filed in New Jersey.

23           I had -- you know, we only had so much money at that

24   time; I can't remember the amount.  Then we had acquired more

25   money, started -- continued working on the property in

1    Virginia, in '08 -- end of '08 to -- into through '09.  In the

2    beginning of '08 -- or -- excuse me -- '09, I had returned to

3    New Jersey.  Mr. Cooper had a sixty-day lease with us to -- he

4    had said they were going to close on the house, not the end of

5    November but now at the end of January.  And I went up in --

6    think it was January, for the end of that short lease with him,

7    and the realtor, to do an extension of his lease.  He wanted --

8    he said he needed more time to get money in -- overseas, in an

9    account that was somehow illiquid, or something like that.  It

10   was in a partnership; I can't remember.

11            THE COURT:  So that was all covered in the prior

12   trial.

13            MR. REED:  Yeah, so I'm not going to say --

14            THE COURT:  You don't need to go through that.

15            MR. REED:  I'm not going to discuss that at length

16   here.  I'm just refreshing my memory.

17            So when I returned, that's when I talked to

18   Mr. Maines, because, you know, Rob and I had talked a lot

19   when -- in New Jersey; lived there.  His kids didn't play with

20   my kids but, you know, we knew each other and we were in the

21   similar --in the same field in life.  What I did, we talked

22   about it.  He even incorporated things in his house, that I

23   did, because he liked them and he saw value to it.

24            So that's when we talked to him about -- you know,

25   about finishing it.  I brought pictures of the house.  I think

1    I -- I think I actually -- don't know if the appraisal was done

2    yet, or there was -- I want to look at that real quick, Your

3    Honor, because I may have shown Mr. Maines that appraisal.  I'm

4    just trying to remember by the date.

5            Uminski.

6        (Pause)

7            MR. REED:  And maybe not the apprai -- the appraisal's

8    dated in February.  I don't think I -- I may have shared it

9    to -- shared it with him afterwards; I'm not sure.  But I had

10   pictures -- I remember bringing my blueprints, you know, the

11   sealed prints, the ones that were approved, from the county.

12   We discussed -- you know, my realtor had given me some market

13   analysis as to the -- what she thought the listing price would

14   be, for him to look at.  The -- what do you call it?  You know,

15   I -- you know, the interior pictures and samples of things that

16   we were doing, as well; material lives (ph.).

17           And so Mr. Maines -- you know, Rob -- he was

18   interested.  I mean, I was candid with him; I told him -- you

19   know, he's, like, why do you want me to be involved, you know,

20   you're doing well with what you're doing.  I mean, from our

21   perspective, a contemporaneous perspective, I'd had a contract

22   for two million forty with the Jacobses fall through,

23   through -- we felt, was a -- you know, just some -- I don't

24   want to rehash, but -- all the reasons why we discussed at the

25   original trial we didn't think it was correct, what happened.

1              And then we quickly had a second buyer.  No one
2    knew --
3              THE COURT:  Mr. Reed, we've been through all this.
4              MR. REED:  Right.
5              THE COURT:  This is all discussed in the prior --
6              MR. REED:  Right.  So I was not in -- in that moment
7    in time that I was talking to Mr. Maines, I wasn't in a moment
8    of panic or -- because Cooper had brought to the table some
9    funds; he brought to the table documentation that he was going
10   to close.  The -- you know, I was actually looking at other
11   property to buy, so I wanted to finish this house quickly.
12   And, you know, if I could get -- if Rob would give me the money
13   now instead of waiting for Cooper, who now was contemplating
14   settling in the end of the summer, I'd give up some profit on
15   the house in Virginia if we were to sell it, or whatever we
16   would do with it, as -- with a partnership.  And Rob was very
17   flexible with the idea of, you know, waiting for the right
18   price; we could rent it.  He did that stuff with his house,
19   like when he sold his first house, the one he went from Coles
20   Court to 800 Matlack.  He bought another -- he bought the
21   buyer's house, held that, rented it for a while --
22             MS. HAGER:  Objection.  Hearsay.
23             THE COURT:  Sustained.
24             MR. REED:  So I asked Rob about, you know, being
25   involved, and he was interested in being involved with it, but

1    his concern was -- with me, was the foreclosure wasn't

2    resolved.

3              MS. HAGER:  Objection.  Conflicts with Mr. Maines'

4    testimony.

5              THE COURT:  Well, whether it conflicts or not, it's

6    hearsay about what Mr. Maines' concerns were.  Mr. Maines

7    testified today.  You can't testify --

8              MR. REED:  I can't tell you what he's --

9              THE COURT:  Yeah.

10             MR. REED:  I understand, but I keep running into this

11   by accident.

12             So, nonetheless, he didn't -- the reasons he

13   testified:  he didn't --

14             THE COURT:  Just want to be -- sorry about that.  Your

15   recollection of your conversations with Mr. Maines are in early

16   2009?

17             MR. REED:  They were in -- they were in '08 and then

18   they got serious at the end of '08, on the phone.  And then

19   when I came up to see Cooper, it was the -- I believe, January

20   of -- you know, of '09, when I come up about his leads.

21             You know, again, you know, thinking that the house is

22   going to sell to Cooper, and this is more of an -- you know --

23   you know, just a managing of the cash flow and the assets, to

24   maximize it.  We thought we were continuing with our ongoing

25   business.  For fifteen years, this is, you know, what I did.

1    And ups and downs.  And there were recessions during that time.

2    There were drops in housing prices, and, you know --

3              THE COURT:  In the first --

4              MR. REED:  -- not --

5              THE COURT:  In the first opinion, at page 479 it says,

6    "After Weaver failed to make his second monthly payment in

7    January 2009, Reed went to New Jersey to see the realtor.

8    While he was in New Jersey, Reed gave a default notice to a

9    person he believed to be Mr. Weaver's wife, at the property,"

10   and refers to your testimony.  So you testified that you saw

11   Weaver in -- and I should say Mark Weaver a/k/a Brett Cooper;

12   you saw him in January of 2009.  Does that refresh your

13   recollection?

14             MR. REED:  Yeah, that's what I thought; I went up

15   there in January of 2009.  That's what I -- that's what I was

16   saying.  Wasn't it?  That's the most I'm going to say.

17             THE COURT:  And that's when you had conversations with

18   Mr. Maines?

19             MR. REED:  Yes.  I mean, we had them prior, when I

20   said, look, I'm coming up to see you -- or I'm coming up just

21   to -- you know, on business related to Cooper and the house.

22   And, you know, again, he said, yeah, I'd like to see it, let's

23   talk about this, let's move -- you know, move forward with

24   this.

25             MS. HAGER:  Objection.  Hearsay.

1          MR. REED:  Oh, yeah.

2          THE COURT:  Sustained.

3          MR. REED:  So unnatural.

4          THE COURT:  Where -- I'm sorry, Mr. Reed, I don't

5   understand where you're going with this testimony.  But what is

6   the point you're trying to make?

7          MR. REED:  The point I was trying to make is that, you

8   know, Maines -- the timing.  You know, Maines was -- you know,

9   said he was, you know -- I can't say what he said.  We were

10  going to -- my understanding is we were going to likely do a

11  transaction involving the property and then, when we had the --

12  I can't say it -- the conversation about why he didn't do it.

13         At that -- in that same time period -- make sure I'm

14  saying things that are right.  I don't want to keep driving you

15  crazy.

16      (Pause)

17         MR. REED:  So the money that Maines was going to give

18  me if he -- if we had done the deal, would have been more than

19  enough to finish the property, because I had X amount of

20  dollars that we were putting into that -- to the property, to

21  get it from the shell to what you saw on the photos, later in

22  '09.  And probably, you know, in excess of it, too, because of

23  the amount of work we had already -- all the things I had

24  already purchased for it, all the materielle (sic); advances to

25  contractors, even; things of that nature.

RESIDENTIAL CAPITAL, LLC, et al.                    141

1              I discussed -- and I -- the same kind of loan and

2    dollar amount with Joan Kline.  I don't want to get into that

3    right now, because at around the same time -- think hers was at

4    the end of '08, to lend the money before.  And -- but

5    there's -- I can't say much to that, because of her declaration

6    and --

7              THE COURT:  Well, you can tell me what you said to

8    her, but she'll either -- she'll have to testify or she won't;

9    I don't know.

10             MR. REED:  Okay.

11             THE COURT:  We'll see what happens there.

12             MR. REED:  So, Joan is my wife's cousin.  Can't

13   remember -- but she's about -- I think she's, like, about

14   twelve, fifteen years older, you know, ten years older than us.

15   Maybe twelve or fif -- twelve or so.  Joan has lent me money

16   over the years, at different points, for real estate, for some

17   cash flow, for when I had the restaurants.  You know, in -- at

18   one point I think there was in excess of 100,000 out, because I

19   would ask her, for, like, you know, certain projects, you know,

20   10,000, 20,000, and I would draw -- it was almost like a draw.

21   And she would -- she would lend it to me and I would pay it

22   back.

23             But she had a -- Joan had a vicious shark

24   characteristic about her.  Her interest rates were higher, for

25   sure, than the regular lenders, like TD Bank, one of the

RESIDENTIAL CAPITAL, LLC, et al.                    142

1    mortgage companies that I -- you know, used to acquire them.

2    And, you know, obviously we want to, you know, make her -- I

3    mean, I didn't want to fight with her or -- because she's, you

4    know, my wife's relative.  So what she demanded we would -- I

5    would give.

6              So I asked her for -- maybe it was around Christmas of

7    '08 when we had moved out of Matlack.  We already had a chunk

8    of change from Cooper.  I was working on the house immediately

9    and was looking to -- again, just like with Maines a month

10   later -- weeks later, looking at other property in the mar --

11   even a lot.  There was a lot next to Old Dell Trace; it was

12   very attractive that you could have spec'd a property on.  It

13   sold.  And then I went through my records and stuff like that;

14   I had sold Brookschase and -- earlier, and that's why we -- you

15   know, I -- that was withdrawn from the suit.  And, you know, it

16   brings back -- you know, some of these things bring back my

17   memories when I start digging into them.

18             So -- but Joan had a similar question.  I mean, she

19   knew that we went into the foreclosure in New Jersey.

20             MS. HAGER:  Objection.  Calls for speculation.

21             MR. REED:  Sorry.

22             I told Joan, and my wife told me that -- I don't know

23   if that's hearsay.  She -- I could talk to her about it.

24             THE COURT:  You told Joan that a foreclosure

25   proceeding had been started?

1          MR. REED:  Yeah, I told her that.  I mean, that was --

2    2008.  I mean, you know, we mentioned it to her -- mentioned it

3    to her.  But my under -- you know, again, my understanding is,

4    you know, this is something -- the foreclosure proceeding,

5    again, Your Honor, is something that -- it's like hitting --

6    how can I explain this?  Best way to explain this -- how do I

7    do this for you?

8          My life was like I was on the Titanic, heard a noise

9    but had no idea of what it really meant and the ramifications

10   of it.  And as those people in that boat learned, hours ticking

11   by, that their actual lives were in peril and they were going

12   to die, this is a similar situation where I didn't know -- upon

13   the original foreclosure filing, my biggest concern was my

14   credit hit, my -- how it was -- that's why we wanted to find

15   out how do we get rid of it and deal with it that way.

16         You know, there's evidence that the opposite approach

17   that I dealt with -- the Old Dell Trace being behind a few

18   payments versus Matlack.  One -- I paid it, because, you know,

19   it was -- it's not something that was, like, I learned now, oh,

20   my God, this is going to have other far-reaching problems.

21         So -- and that -- that'll lead me to 2010 as we start

22   to real --

23         THE COURT:  Are you moving into another subject?

24         MR. REED:  Yeah, maybe I should stop.

25         THE COURT:  We should stop, because you had --

1        MR. REED:  Yeah.

2        THE COURT:  -- indicated -- well, it's five after 5,

3   and we'll conclude for the day now.  We'll begin at 9 a.m.

4   sharply on time, with Mr. Curley.  And then when Mr. Curley

5   concludes, you'll go back on the witness stand.

6        Let me just understand; we have the issue about Joan

7   Kline.  We'll -- I issued the order.  You say you've served it.

8   We'll see whether she appears on Thursday.

9        With respect to the motion to quash the subpoena that

10  you're going to file an opposition to, Ms. Hager had indicated

11  that -- what's his name?  McAndrews?

12        MR. REED:  McCaffrey.

13        THE COURT:  McCaffrey.  -- that Mr. McCaffrey -- he'd

14  done an appraisal on -- which property?

15        MR. REED:  Matlack.

16        THE COURT:  Okay.  What's the relevance of his

17  appraisal of Matlack?

18        MR. REED:  I understand that -- Your Honor, some of

19  this runs from the -- you know, you -- making sure you

20  understand me and that I'm credible for you and as relating

21  evidence to it; it's not me talking about things.  Mr. Maines

22  talked about how -- you know, his opinion was the work that I

23  did increased the value in property.  I've testified

24  consistently; I increased the value of properties when I worked

25  on them.  You know, there's some element to the legal argument,

RESIDENTIAL CAPITAL, LLC, et al.                    145

1    again, that -- you know, that I'm qualified not just as a

2    layperson, as the owner of property, to discuss the value of

3    property and the loss of property and the reasons why.

4              THE COURT:  But Matlack is not in the case.

5              MR. REED:  It is not.  It's just --

6              THE COURT:  That's why I want to know what's the --

7    I'll --

8              MR. REED:  Just --

9              THE COURT:  I'll ask you -- stop.  I'll ask you again

10   in the morning, when I see what's your opposition.  But the

11   motion to quash filed by someone who did an appraisal -- old

12   appraisal on Matlack, who asserts that he is not in good

13   health -- but the more fundamental question is why is it

14   relevant to what the issues are in this trial?  That's going

15   to -- that will have a bearing on how I rule.

16             MR. REED:  Okay.

17             THE COURT:  He talks about having to travel ninety-

18   five miles, or thereabouts, to get here.  And he raises issues

19   about his health.  I might approach it one way if I thought it

20   was central to the issues --

21             MR. REED:  Um-hum.

22             THE COURT:  -- in this trial.  But you've acknowledged

23   it relates to an appraisal he did of Matlack, which is not in

24   this case.  I'll wait to see tomorrow morning, but I'm just

25   cautioning you that if his testimony is at most of limited or

RESIDENTIAL CAPITAL, LLC, et al.                    146

1  marginal relevance, I'm more inclined to view with skepticism

2  your subpoena to have him appear.

3          MR. REED:  And I'll research --

4          THE COURT:  But let's --

5          MR. REED:  -- that tonight.  Maybe I'll wind up

6  withdrawing it.  I want to research.

7          THE COURT:  Okay.  I just -- I'm not ruling.

8          MR. REED:  No.  I understand.

9          THE COURT:  I'm giving you the chance.  I need to get

10 a response quickly, because you've got him coming -- scheduled

11 to come in --

12         MR. REED:  Sure.  And like --

13         THE COURT:  -- the next day.

14         MR. REED:  -- like when we did the motions on --

15         THE COURT:  Let's stop now, okay?

16         We'll be in recess until 9 a.m. tomorrow morning.

17         MS. HAGER:  Your Honor, may I clarify one thing --

18         THE COURT:  Yes, you can.

19         MS. HAGER:  -- with respect to Mr. Curley?

20         THE COURT:  Yes.

21         MS. HAGER:  Are we proceeding with his written

22 declaration in the same fashion that we did today with

23 Mr. Maines?

24         THE COURT:  That's the way it should go.

25         MS. HAGER:  Okay.

1          THE COURT:  Mr. Curley should take the witness stand,

2     you should offer his written declaration, and then Ms. Hager

3     should cross-examine, and then you'll do a redirect.  I made my

4     comments earlier, because I didn't want any confusion based on

5     my order denying the motion in limine, in saying I had to hear

6     the evidence.  But I wanted to make clear, refresh everybody to

7     what I had found as facts in the earlier opinion.  Those remain

8     operative.  I was affirmed.  The only thing I was reversed as

9     to was whether you would be permitted to offer evidence about

10    ascertainable loss and causation with damages, on other

11    ventures.

12          So we'll resume tomorrow morning.

13          MR. REED:  Your Honor, I have a question; I don't know

14    if you can answer or not.  I have to research this tonight,

15    too.  Mr. Curley's written declaration was given very early on

16    in these proceedings.

17          THE COURT:  You had an opportunity to prepare new

18    written testimony for Mr. Curley.  So -- and I think I've been

19    very clear all along that direct testimony was to be in

20    writing.  That's how we're proceeding.  We'll see where we go,

21    after I hear the cross-examination, as to how broad the

22    redirect can be.

23          We're in recess until tomorrow morning at 9 o'clock.

24    Thank you.

25          (Whereupon these proceedings were concluded at 5:10 PM)

```
 1
 2                            I N D E X
 3
 4                        T E S T I M O N Y
 5  WITNESS                  EXAM BY              PAGE
 6  Frank Reed               (In colloquy)        11
 7  Robert Maines            (By declaration)     69
 8  Robert Maines            Ms. Hager            69
 9  Robert Maines            Mr. Reed             80
10  Robert Maines            Ms. Hager            91
11
12
13                        E X H I B I T S
14  CLAIMANT'S DESCRIPTION                     I.D.   ADM.
15  12        Deed of property purchased in 1995    12    13
16  Re: 12 -  Pages 4 of 28, to 9 of 28              12    35
17  Re: 13 -  Page 8, line 1, through page 18,       12    95
18            line 23, of the Watson deposition
19  Re: 13 -  Page 19, line 25 through page 20,      12    96
20            line 3, of the Watson deposition
21  Re: 13 -  Page 20, line 9, through page 21,      12    96
22            line 24, of the Watson deposition
23  Re: 13 -  Page 26, line 16, through page 27,     12    97
24            line 4, of the Watson deposition
25
```

149

1

2                            E X H I B I T S (cont'd.)

3   CLAIMANT'S DESCRIPTION                              I.D.    ADM.

4   (cont'd.)

5   Re: 13 -    Page 34, line 9, through page 35,        12      98

6                line 9, of the Watson deposition

7   Re: 15 -    Page 5, line 22, through page 6,         12     100

8                line 1, of the Clampitt deposition

9   Re: 15 -    Page 7, lines 18 through 20, of the      12     100

10               Clampitt deposition

11  Re: 15 -    Page 8, line 21, through page 9,         12     101

12               line 2, of the Clampitt deposition

13  Re: 15 -    Page 10, line 18, through page 11,       12     101

14               line 14, of the Clampitt deposition

15  Re: 15 -    Page 12, line 11, through page 13,       12     101

16               line 3, of the Clampitt deposition

17  Re: 15 -    Page 14, line 9, through page 15,        12     102

18               line 16, of the Clampitt deposition

19  Re: 15 -    Page 16, line 2, through page 16,        12     103

20               line 5, of the Clampitt deposition

21  Re: 15 -    Page 17, lines 9 through 11, of the      12     103

22               Clampitt deposition

23  Re: 15 -    Page 17, lines 16 through 25, of the     12     103

24               Clampitt deposition

25

150

```
 1
 2                    E X H I B I T S (cont'd.)
 3   CLAIMANT'S DESCRIPTION                        I.D.   ADM.
 4   (cont'd.)
 5   Re: 15 -   Page 21, lines 23 through 25, of the   12    104
 6              Clampitt deposition
 7   Re: 15 -   Page 29, lines 20 through 25, of the   12    104
 8              Clampitt deposition
 9   Re: 15 -   Page 30, lines 18 through 24, of the   12    104
10              Clampitt deposition
11   Re: 15 -   Page 39, lines 13 through 17, of the   12    105
12              Clampitt deposition
13   Re: 15 -   Page 46, line 25, through page 47,   12    105
14              line 2, of the Clampitt deposition
15   Re: 15 -   Page 47, lines 16 through 18, of the   12    105
16              Clampitt deposition
17   24         Documents from County of Henrico      12    29
18              re: 9000 Spring Brook Court,
19              4817 Cobblestone Landing Place,
20              133 Brookschase Lane, and
21              11617 Cobblestone Landing Court
22              properties
23   34         Seven photos                          12    61
24   35         Photos of Matlack property            12    67
25
```

1

2                          E X H I B I T S (cont'd.)

3    CLAIMANT'S DESCRIPTION                          I.D.   ADM.

4    (cont'd.)

5    36          Government document evidencing sale   12     15

6                of property purchased in 1995

7    43          HUD purchase documentation            12    112

8    44          Five photos                           12     51

9    --          Declaration of Robert Maines
     69

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                           C E R T I F I C A T I O N

3

4      I, David Rutt, certify that the foregoing transcript is a true

5      and accurate record of the proceedings.

6

7

8

9

10     _____

11     DAVID RUTT

12     AAERT Certified Electronic Transcriber CET**D 635

13

14     eScribers

15     700 West 192nd Street, Suite #607

16     New York, NY 10040

17

18     Date:  September 29, 2016

19

20

21

22

23

24

25