1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 12-12020-mg

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


RESIDENTIAL CAPITAL, LLC, et al.,


          Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          September 28, 2016

          9:03 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

2

1

2  Trial regarding Reed Claims Objection.  Trial set for September

3  26 at 9:00 AM, continuing day to day on September 27th,

4  September 28th, September 29th and September 30th.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Transcribed by:  David Rutt

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

3

```
 1
 2  A P P E A R A N C E S :
 3  FRANK REED, PRO SE CREDITOR
 4
 5
 6  REED SMITH LLP
 7       Co-Counsel for The ResCap Borrower Claims Trust
 8       136 Main Street
 9       Suite 250
10       Princeton, NJ 08540
11
12  BY:   BARBARA K. HAGER, ESQ.
13
14
15  POLSINELLI PC
16       Co-Counsel for The ResCap Borrower Claims Trust
17       600 Third Avenue
18       42nd Floor
19       New York, NY 10016
20
21  BY:   JASON A. NAGI, ESQ.
22
23
24
25
```

**4**

1

2  DUANE MORRIS LLP

3       1540 Broadway

4       New York, NY 10036

5

6  BY:  KEVIN P. POTERE, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  All right, please be seated.  We're here

3    in Residential Capital, number 12-12020.  Before we begin

4    today, a couple of housekeeping matters.  Actually, let me -- I

5    left one inside; let me grab it.  I'll be right -- everybody

6    stay seated.

7              Okay, with respect to the housekeeping matters,

8    Mr. Reed, what -- did you file an opposition to the motion to

9    quash the subpoena?

10             MR. REED:  I did not, Your Honor.

11             THE COURT:  And what's your position with respect to

12   the subpoena?

13             MR. REED:  I will withdraw the subpoena.

14             THE COURT:  All right.  And that was the subpoena

15   for --

16             MR. REED:  Mr. McCaffrey.

17             THE COURT:  Mr. McCaffrey.  All right.  The subpoena

18   for McCaffrey is withdrawn.

19             A motion to quash the subpoena was filed by Derrick

20   Rosser.  It's at ECF 10147.  Have you seen it, Mr. Reed?

21             MR. REED:  I have not.

22             THE COURT:  Mr. Rosser says he was served with a

23   subpoena by you and that he resides in Hanover County,

24   Virginia.  He's a self-employed attorney.  He was served with a

25   subpoena on September 22nd to appear at trial on Thursday,

RESIDENTIAL CAPITAL, LLC, et al.                                          6

1   September 28th.  And since this -- he basically says, because

2   the subpoena requires him to travel more than a hundred miles

3   from where I (sic) reside, am employed or legally transact

4   business, he moves to quash.

5          I have extra copies for Mr. Reed and Ms. Hager of

6   Mr. Rosser's motion to quash.  If you plan to oppose

7   Mr. Rosser's motion to quash, you will file your opposition by

8   2 o'clock today and I will rule on it today.  On the face of

9   it, the subpoena is invalid but, if you're going to insist on

10  proceeding with it, I just warn you that you risk sanctions for

11  serving subpoenas that on their face are clearly not

12  enforceable.  But we'll -- I'll wait till 2 o'clock to see

13  whether you file a written opposition to Mr. Rosser's motion to

14  quash.

15         MR. REED:  Your Honor, if you wish, I can put it on

16  the record.

17         THE COURT:  All right.  Put it on the record now.

18         MR. REED:  I -- as with the other ones that I

19  misunderstood --

20         THE COURT:  I just want to know do you withdraw the --

21         MR. REED:  I withdraw that subpoena.

22         THE COURT:  All right.

23         Deanna, if you're listening, would you please inform

24  Mr. Rosser that the subpoena for his appearance has been

25  withdrawn?

RESIDENTIAL CAPITAL, LLC, et al.                    7

1              All right.  Additional housekeeping matter:  my

2      courtroom deputy handed me a little while ago an email that you

3      sent at 8:43 this morning, addressed to me -- it came to my

4      courtroom deputy -- that has a supplemental Curley declaration

5      attached.

6              Ms. Hager, have you seen this?

7              MS. HAGER:  Just a few moments ago, Your Honor.

8              THE COURT:  All right.  Your email to me is inaccurate

9      in one important respect; it says in paragraph numbered 3,

10     "Yesterday Your Honor said additional declarations could be

11     filed after the due date of the scheduling order, but I found

12     no such provision in the court's previous order."  That's

13     because I didn't say that.  You could have filed additional

14     testimony for Mr. Curley, or any other witness, by the deadline

15     for submitting the testimony.  You didn't do that.  I did not

16     say -- and let me make it crystal clear.  I was quite clear

17     about the deadline for submitting direct testimony of

18     witnesses.  You did not submit any additional proposed

19     testimony for Mr. Curley by the deadline.

20             Your email -- this is going to be filed on ECF by my

21     courtroom deputy.  But the supplemental -- leave to file the

22     supplemental declaration of Robert E. Curley, III, dated

23     September 28, 2016, is denied.  You do not, in the middle of

24     trial, add purported testimony.  This is a witness you called.

25     This is a witness -- you say you learned facts in his

RESIDENTIAL CAPITAL, LLC, et al.                                    8

1   deposition.  You said the debtor learned facts.  Well, you

2   should have known the facts before.  And your effort, on the

3   third day of trial, to supplement the direct testimony of

4   Mr. Curley is not permissible and it's denied.

5              Okay.  Are we proceeding with Mr. Curley's testimony?

6              MR. REED:  Yes.

7              THE COURT:  Okay.  Mr. Curley, would you come on up,

8   be sworn?

9              If you would raise your right hand, you'll be sworn.

10        (Witness sworn)

11             THE COURT:  All right, please have a seat, Mr. Curley.

12   Good morning.

13             Let's see.  There's water there, if you'd like some

14   water.

15             All right, Mr. Reed, you're going to offer his direct

16   testimony?

17             MR. REED:  I do.

18             THE COURT:  And what tab -- what exhibit number is

19   that?

20             Tab 4 is the declaration, exhibits.  So this is

21   Claimant's Exhibit 4.  Am I correct, Mr. Reed?

22             MR. REED:  Yes.

23             THE COURT:  All right, do you offer that into

24   evidence?

25             MR. REED:  Yes.

1              THE COURT:  Ms. Hager?

2              MS. HAGER:  Yes, Your Honor.  Your Honor, we object to

3     the letters that are attached to the affidavit; specifically,

4     there's one letter dated August 20th, 2012 and a letter dated

5     August 8th, 2014.  Your Honor has already held --

6              MR. REED:  July 8th, 2014?

7              MS. HAGER:  Excuse me.  July 8th, 2014.  Your Honor's

8     already held that these letters are hearsay, and that finding

9     was upheld by the district court, on appeal.

10             THE COURT:  Well, they were hearsay because Mr. Reed

11    couldn't introduce them without -- Mr. Curley's here, so I'll

12    wait and hear testimony.  Well, hold on.

13             MS. HAGER:  Well, they're hearsay because they don't

14    satisfy the business-records exception.  These are not

15    documents that were made at or near the time of the events.

16        (Pause)

17             THE COURT:  Mr. Reed, you wish to respond?

18             MR. REED:  They're still documents.  And the --

19    whether they're a business record or not, if they're a document

20    offered into evidence and the author of the documents are here

21    to corroborate them, it gets in under that.  It's not hearsay.

22    It's -- he's here.  If he wrote me a personal letter, it'd be

23    the same thing.

24             THE COURT:  All right, the objection to the two -- the

25    two exhibits to the Curley declaration are the August 20th,

RESIDENTIAL CAPITAL, LLC, et al.                    10

1   2012 letter to Frank Reed, and the July 8th, 2014 letter

2   addressed To Whom It May Concern.  The objection to those two

3   exhibits is sustained.  Under Federal Rule of Evidence 801 --

4   801(c), hearsay is defined as -- means a statement that, quote,

5   "the declarant does not make while testifying at the current

6   trial or hearing".  So these two letters are -- and (2) a party

7   offers in evidence to prove the truth of the matter asserted in

8   the statement.  Other than for the purported truth, these two

9   letters are irrelevant.  So both of these letters constitute

10  hearsay within the meaning of Section -- of Federal Rule of

11  Evidence 801(c).

12          That raises, then, the question of whether these

13  letters fall within any of the exceptions to the rule against

14  hearsay, under Rule 803.

15      (Pause)

16          THE COURT:  Rule 803, subsection (6), Records of a

17  Regularly Conducted Activity, provides that a record of an act,

18  event, condition, opinion, or diagnosis if:  (A) the record was

19  made at or near the time by -- or from information transmitted

20  by -- someone with knowledge; the record was kept in the

21  ordinary course of a regularly conducted activity of a

22  business, organization, occupation, or calling, whether or not

23  for profit; (C) making the record was a regular practice of

24  that activity; (D) all these conditions are shown by the

25  testimony of the custodian or another qualified witness," goes

 1    on from there, and (E) the opponent does not show that the

 2    source of the information or method or circumstances of

 3    preparation indicate a lack of trustworthiness.  This is

 4    essentially the business-records issue.  And these two letters

 5    clearly are not the record made at or near the time, by or from

 6    information transmitted by someone with knowledge.

 7            The August 20, 2012 letter, by its text alone, reports

 8    back something that occurred four years earlier, in 2008.  So

 9    it does not satisfy the Requirements of 803(6), Records of a

10    Regularly Conducted Activity.

11            MR. REED:  Your Honor?

12            THE COURT:  No.  Don't interrupt me.

13            And it clearly was not a record that was made at or

14    near the time of the act or events that it purports to cover.

15    So, neither of these letters satisfies the business-records

16    exception to the hearsay rule.

17            There's a third letter.

18            MS. HAGER:  There is a third letter, Your Honor, to

19    which we also object on the grounds of hearsay.  I separated

20    them out, only because Your Honor had already seen the first

21    two letters --

22            THE COURT:  Right.

23            MR. REED:  -- in the prior trial.  This March 31st,

24    2016 letter is new to the Court.  Clearly, it was not written

25    at the time of the events.  The letter also refers to 2008 and

RESIDENTIAL CAPITAL, LLC, et al.                    12

1    does not fall within any exception to the hearsay rule.

2            THE COURT:  All right.  The objection to the March 31,

3    2016 letter that's addressed to care of Frank Reed, To Whom It

4    May Concern, appears to have Mr. Curley's signature.  The

5    hearsay objection is sustained as well.

6            Cross-examination?

7            MS. HAGER:  Thank you, Your Honor.  Your Honor, I have

8    a conflict with cross-examining TD Bank; it's a firm client.

9    So I have co-counsel with me today, Jason Nagi; he entered an

10   appearance yesterday, and I'll --

11           THE COURT:  Okay.

12           MS. HAGER:  -- ask him to introduce himself to the

13   Court and proceed.

14           THE COURT:  All right, thank you.

15       (Pause)

16           MR. NAGI:  Good morning, Your Honor.

17           THE COURT:  Good morning.

18           MR. NAGI:  Jason Nagi from Polsinelli PC.

19   CROSS-EXAMINATION

20   BY MR. NAGI:

21   Q.   Good morning, Mr. Curley.

22   A.   Good morning.

23   Q.   I'd like to direct your attention to paragraph 3 of your

24   affidavit; it references loan applications.  If you could just

25   say -- if you could just acknowledge that you're aware, on the

RESIDENTIAL CAPITAL, LLC, et al.                    13

1   record, so that we know.

2   Q.    Is this from my subpoena -- or my deposition?

3   A.    From the affidavit of Robert Curley that's been moved

4   into --

5           THE COURT:  Do you have it in front of you --

6           THE WITNESS:  No.

7           THE COURT:  -- Mr. Curley?

8           Okay --

9           MR. NAGI:  I'm sorry Your Honor.  I'll get a book --

10          THE COURT:  I'm not sure I said it clearly on the

11  record.  You had objections to the exhibits to the Curley

12  affidavit.  I take it you didn't have an objection to the

13  declaration itself?

14          MS. HAGER:  That's right, Your Honor.

15          THE COURT:  All right, so the Claimant's Exhibit 4,

16  the declaration -- affidavit of Robert Curley's admitted into

17  evidence.

18  (Affidavit of Robert E. Curley, III was hereby received into

19  evidence as Claimant's Exhibit 4, as of this date.)

20  Q.    Does paragraph 3 reference a loan that was -- a loan

21  request or application that was made for the Matlack property

22  in Moorestown, New Jersey?

23  A.    Yes.

24          MR. NAGI:  Your Honor, I'd move to strike number 3

25  because the Court had held in its prior decision that, on any

1  testimony regarding the Matlack property, that --

2          THE COURT:  Mr. Nagi, I said yesterday I wanted to

3  hear all of the testimony and then I'll decide, at the

4  conclusion of it, if it's appropriate for a portion of it to be

5  stricken.

6          MR. NAGI:  Loud and clear, Your Honor.  I didn't

7  understand that.

8          THE COURT:  Okay.  Go ahead with your cross.

9  Q.   Even if there was no foreclosure on the Matlack property,

10 the bank would never have advanced the line of credit in the

11 first half of 2008, using the Matlack property as collateral,

12 correct?

13 A.   Not solely as collateral.

14         THE COURT:  I'm sorry; you have to speak up and --

15 A.   Not solely as collateral by itself.

16 Q.   Do you remember I took your deposition on this?  Okay.

17         THE COURT:  You have to answer audibly.  Let --

18 A.   Yes.

19         THE COURT:  Let's make sure we get a clear record,

20 okay, Mr. Nagi?

21         MR. NAGI:  I'm sorry, Your Honor.

22 Q.   I'm going to be asking you numerous questions today;

23 they're mostly going to be in the yes-or-no format.  So if you

24 could just answer yes or no as opposed to nodding your head, so

25 we have a record, it would be appreciated.

1    A.    Understood.

2    Q.    Thank you.

3        So I'd like to turn your attention to page 125 of your

4    deposition.

5            MR. NAGI:  Your Honor --

6            THE COURT:  Where's the deposition?

7            MR. NAGI:  I'm going to go bring it up now.

8            THE COURT:  Okay.  All right.  I have the transcript.

9            For the record, the transcript of the deposition of

10   Mr. Curley appears behind tab 5 in the binders.

11           MS. HAGER:  Your Honor, is there a copy of Mr. Reed's

12   exhibits, up there?

13           THE COURT:  Yes.

14           MS. HAGER:  Can exhibit book 1 be shown to the

15   witness?  There's not a witness copy?

16           THE WITNESS:  I don't have a witness copy.  I have my

17   own copy.

18           MS. HAGER:  Okay.

19           MR. NAGI:  I have a copy, Your Honor --

20           THE COURT:  Okay.

21           MR. NAGI:  -- an extra --

22           THE COURT:  Go ahead.

23       (Pause)

24           THE COURT:  What page are you referring to, Mr. Nagi?

25           MR. NAGI:  Page 125, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                    16

1          THE COURT:  Okay.

2          MR. NAGI:  Line 21.

3  BY MR. NAGI:

4  Q.    Let me know when you're there, Mr. Curley.

5  A.    Line 21?

6  Q.    Yes.  Are you there?

7  A.    Yep.

8          MR. NAGI:  Your Honor, do you want me to read it into

9  the record?  That's how I typically do it.  If Your Honor has

10  different procedures, I could just give the quotations.

11          THE COURT:  Let's get a clear transcript.

12          MR. NAGI:  Okay.

13  Q.    Page 125, line 21:

14  "Q.  So let me just make sure that I understand what all of

15  these things are here.  Let's list them out.  So if there were

16  payment defaults on the Matlack property, for February, payment

17  default" --

18  Q.    We are now on 126, line 1.

19  "Q.  -- for March, payment default for April, payment default

20  for May, if Mr. Reed still had tight cash flow, if the monthly

21  debt service on the first lien on the Matlack property had

22  increased to what it was prior to the personal financial

23  statement being provided, if there were released tax liens on

24  the Matlack property, if the Reeds still had the credit scores

25  in the 500s, you would still have made the loan?

RESIDENTIAL CAPITAL, LLC, et al.                    17

1   "A.   If the loan was that delinquent as you just referenced, we

2   would not have made the loan."

3   Q.   Do you recall those questions and giving those answers?

4   A.   I do.

5   Q.   That hasn't changed today, correct?  That's still the

6   same?

7   A.   Same.

8   Q.   Okay, so when I had asked you before about whether you

9   would have made a loan on the Matlack property if there were

10  all these defaults and you said "Not that" -- "solely as

11  collateral" --

12  A.   I -- I misunderstood.  I didn't hear you say "delinquent

13  payments", which at the time we did not -- we were not aware

14  of.

15  Q.   Thank you.  I understand that.

16          THE COURT:  When you say you were not aware, at what

17  time were you not aware of the delinquent payments?

18          THE WITNESS:  When -- if we were considering a new

19  loan back at that time, we were not aware that he was

20  delinquent for those four months; plus, real-estate taxes were

21  added -- delinquent real-estate taxes were added to his

22  payment.

23  Q.   Thank you.  When you say "at that time", are you talking

24  about when Mr. Reed had requested to make a loan, using the

25  Matlack property as collateral?  Is that correct?

RESIDENTIAL CAPITAL, LLC, et al.                    18

1   A.   Correct.

2   Q.   Now, the reason why you wouldn't make a loan if the

3   property had two or three defaulted payments on a senior loan

4   is because that would put your status as a lender in jeopardy,

5   since there's a senior lien ahead of your position, correct?

6   A.   Correct.

7   Q.   And the payment defaults for a senior mortgage on Matlack,

8   in and of themselves, would have stopped the bank from lending,

9   with the Matlack property's underlying collateral, beginning,

10  middle, end, that's it, correct?

11  A.   Correct.

12  Q.   And once a loan request for a loan on Matlack went into

13  the due-diligence stage, you would have known that the first-

14  lien mortgage on the Matlack property was in default, because

15  you actually had that information when you made the loan

16  consolidation in June of 2008, correct?

17  A.   When we made the loan consolidation in June of 2008, we

18  were unaware that it was that chronically delinquent.

19  Q.   But nonetheless, you knew that there were delinquent

20  payments on the Matlack property, according to the due

21  diligence -- I believe you called it an approval packet.

22  A.   Yes.  Yes.

23  Q.   Thank you.

24         THE COURT:  When you say the -- what loan were you

25  considering consolidation of at the time?

1        THE WITNESS:  So, at that time, TD Bank had three

2    loans that we were consolidating into a new loan.

3        THE COURT:  These were on the three rental

4    properties --

5        THE WITNESS:  Correct.

6        THE COURT:  -- Mr. Reed had in New Jersey?

7        THE WITNESS:  Correct.

8        THE COURT:  And what was the period of time that

9    you -- you did consolidate it into a single loan, correct?

10       THE WITNESS:  Correct.

11       THE COURT:  And when was that?

12       THE WITNESS:  The loan approval was done in April of

13   2008, and the actual consolidation occurred in June of 2008.

14       THE COURT:  All right, thank you.

15       Go ahead, Mr. Nagi.

16       Did you know, at the time that you did the

17   consolidation, that taxes on the Matlack property had not been

18   paid since 2006?

19       THE WITNESS:  We were not aware.

20       MR. NAGI:  Your Honor, if I could approach to show the

21   witness Exhibit II?

22       THE COURT:  Sure.  Which Exhibit?

23       MR. NAGI:  Double-I.

24       THE COURT:  Okay.

25       Mr. Reed, do you have those exhibits in front of you?

1          MR. REED:  Hold on.  I think so.

2          Yes.

3          MR. NAGI:  Okay.  May I approach, Your Honor?

4          THE COURT:  Yes, please.  Go ahead.

5   BY MR. NAGI:

6   Q.    I've just handed you Exhibit II, Mr. Curley; do you see

7   it?

8   A.    Yes.

9   Q.    What is it?

10  A.    It is a loan-approval package.

11  Q.    And this loan-approval package was created as part of the

12  bank's decision to lend money to the Reeds for a loan

13  consolidation in June 2008, correct?

14  A.    Correct.

15  Q.    We'll call that the June 2008 loan or the loan

16  consolidation, so it's easier to reference it, okay?

17  A.    Correct.

18  Q.    And it's the bank's business -- one of the bank's

19  business's (sic) lines is to lend money to people with

20  collateral, correct?

21  A.    Correct.

22  Q.    And the documents that are in Exhibit I (sic), they were

23  made at or near the time that they record, correct, in April of

24  2008?

25  A.    At the time of -- sorry; misunders --

1  Q.    The documents that is Exhibit 1 (sic), it's a

2  contemporaneous record that the bank created in April of 2008,

3  when it's dated --

4  A.    Correct.

5  Q.    -- in order to lend money, correct?

6  A.    Correct.

7  Q.    And any information it contained was accurate as of the

8  time that it was made, correct --

9  A.    Assuming our --

10 Q.    -- to the bank's knowledge?

11 A.    Yes.  Assuming our underwriters did it correctly and

12 gathered all the information, correct.

13        MR. NAGI:  Your Honor, I'd request to move this

14 application packet in as Exhibit II.

15        THE COURT:  Exhibit II is in evidence.

16 (TD Bank loan-approval packet was hereby received into evidence

17 as Borrower Trust's Exhibit II, as of this date.)

18        MR. NAGI:  Thank you.

19 Q.    This approval packet concerns a request to --

20        MR. NAGI:  Withdrawn.

21 Q.    The bank made the June 2008 loan, correct?

22 A.    Yes.

23 Q.    And while the approval packet was for April of 2008, it

24 was actually made in June, right?

25 A.    Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    22

1  Q.   And this application contains all of the due diligence
2  that the bank conducted when it -- prior to making the June
3  2008 loan, correct?
4  A.   Correct.
5  Q.   It looks at debt-service-coverage ratios, or DSCR for
6  short, right?
7  A.   Correct.
8  Q.   And for this loan, the DSCR was a 1.16, correct?  Feel
9  free to look at the document.  I believe it's actually on the
10 first page, too.
11 A.   It -- yes.  It was 1.13 prior to the consolidation, and
12 1.16 after the consolidation.
13 Q.   And it has an -- it has a term sheet as well?  It's a page
14 and a half, I believe, correct?  It's maybe three pages in.
15 A.   Yes.
16 Q.   And the term sheet has an interest rate, correct?
17 A.   Yes.
18 Q.   And it contains a principal amount, and here it's, I
19 believe, 645,000 dollars; correct?
20 A.   I'm sorry, what was the question?
21 Q.   I said it has a principal amount; that's 645,000 dollars
22 here, correct?
23 A.   Yes.
24 Q.   And that principal is later increased to around 665,000
25 dollars, correct?

RESIDENTIAL CAPITAL, LLC, et al.                               23

1  A.   Correct.

2  Q.   Okay.  It also provides the monthly payment that would be,

3  once the regular principle and interest payments were made,

4  correct?

5  A.   Correct.

6  Q.   And according to this term sheet, it's $5,170.45 a month

7  through the monthly June 2008 loan payments, correct?

8  A.   Correct.

9  Q.   And the monthly payment prior to closing was actually

10  increased to $5,357.19 as a result of the increase in the

11  665,000-dollar loan principal, correct?

12  A.   I -- I don't have that in front of me, but I assume:

13  correct.

14  Q.   I could refresh your recollection if you'd like.  Would

15  you -- I can show you some documents.  Would that help you?

16  A.   Sure.

17       MR. NAGI:  Your Honor, may I approach the witness?

18       THE COURT:  Yes.  Go ahead.

19  (Pause)

20  Q.   Just take a look at those documents and let me know when

21  you're ready.

22       THE COURT:  Can you tell me what you put in front of

23  him?

24       MR. NAGI:  Oh.  I can give you a copy if you like,

25  Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                    24

1        THE COURT:  I would.  And give Mr. Reed a copy, too.

2        MR. NAGI:  I've given a copy to Mr. Reed and counsel.

3        THE COURT:  Thank you.  These are not marked for

4    identification?

5        MR. NAGI:  No, they are marked.  They weren't in

6    evidence.  It's just to --

7        THE COURT:  All right.

8        MR. NAGI:  -- refresh recollection.

9        THE COURT:  Okay.

10   Q.   Are you ready, Mr. Curley?

11   A.   Yes.

12   Q.   Does that refresh your recollection as to the amount of

13   the --

14       THE COURT:  Yes.

15   Q.   -- monthly payment?

16   A.   Yes.

17   Q.   And was it $5,357.19?

18   A.   Correct.

19   Q.   If a loan is made -- you can put those to the side.  If a

20   loan is made and there're issues with it that are not in

21   compliance with the bank's guidelines, the packet explains why,

22   correct --

23   A.   Correct.

24   Q.   -- the approval packet?

25       And the bank calls that a guideline exception, correct?

1    A.    Correct.

2    Q.    And there are references to guideline exceptions, in the

3    approval packet, that is in evidence as Exhibit II, correct?

4    A.    Correct.

5    Q.    And the June 2008 loan had a guideline exception relating

6    to the DSCR, correct?

7    A.    Yes, it did.

8    Q.    Meaning that the DSCR was lower than the bank would have

9    liked --

10   A.    Yes.

11   Q.    -- when you made the loans?

12        And the due diligence that you did --

13            THE COURT:  What page is the exception?

14            MR. NAGI:  The DSCR exception --

15            THE COURT:  Yes.

16            MR. NAGI:  One second, Your Honor.

17            THE COURT:  Use the --

18            THE WITNESS:  It's on the first page.

19            THE COURT:  -- Bates number on the lower right corner,

20   if you would.

21            MR. NAGI:  This document isn't Bates-numbered, because

22   it was produced to us without a Bates number.  But the first

23   page of Exhibit II -- if you go into the second --

24            THE COURT:  It does have Bates number; the lower

25   right-hand corner; an RFC number.

RESIDENTIAL CAPITAL, LLC, et al.                    26

1              MS. HAGER:  This copy does, Jason.

2              MR. NAGI:  Oh.  I'm sorry, Your Honor.

3              THE COURT:  Okay.

4              MR. NAGI:  I looked at the one from the deposition,

5    Judge.

6              THE COURT:  Sure.  Okay.

7              MR. NAGI:  So, RFC-889.  If you look at the column on

8    the right, about two-thirds of the way down in the first box,

9    it says, "Exceptions:  Yes - DSCR".

10             THE COURT:  Okay.

11   BY MR. NAGI:

12   Q.   Your due diligence covered other things as well, correct,

13   Mr. Curley?

14             THE COURT:  Tell me what "DSCR" is.

15             THE WITNESS:  It's debt-service-coverage ratio.

16             THE COURT:  Go ahead, Mr. Nagi.

17   Q.   So the due diligence also looks at the cash flow on the

18   properties, to see if it can cover debt service, correct?

19   A.   Correct.

20   Q.   It also looks at the collateral -- the underlying

21   collateral that is going to be collateral for the loan,

22   correct?

23   A.   Correct.

24   Q.   And you obtained credit reports for the borrowers,

25   correct?

RESIDENTIAL CAPITAL, LLC, et al.                    27

1    A.    Correct.

2    Q.    Now, both Mr. and Mrs. Reed had credit scores in the 500s,

3    correct?

4    A.    Yes.

5    Q.    551, I believe, for Mrs. Reed, and 511 for Mr. Reed?

6    A.    Yes.

7    Q.    And that's a bad credit number, correct?

8    A.    Yes, it is.

9    Q.    The bank also conducts what it calls risk rating, correct?

10   A.    Yes.

11   Q.    And that analyzes the level of the risks that it believes

12   the borrowers have, correct?

13   A.    Correct.

14   Q.    The June 2008 loan had a risk rating that was bad, right?

15   A.    Yes.

16   Q.    While it's listed as an 8, you don't recall if that was an

17   8 out of 9, or 8 out of 13, but you are clear that either way

18   it was a bad risk rating, correct?

19   A.    Yes.  It was a -- it was considered a criticized loan.

20   Q.    Now, actually I'd like you to look at -- I believe it's

21   page 15 of the exhibit.

22         THE COURT:  Could you give me the Bates stamp --

23         MR. NAGI:  Yes, Your Honor.  I'm going to do that

24   right now.

25         THE COURT:  Okay.  Thank you.

1           MR. NAGI:  It's RFC-897, Your Honor.

2           THE COURT:  Thank you.

3           MR. NAGI:  The top is "Risk-rating form".

4    Q.   Let me know when you're there, Mr. Curley.

5    A.   I'm there.

6           MR. REED:  Where are we?  I'm sorry.

7           897.  Is that in a different exhibit?  897.

8           MR. NAGI:  Sorry.  That's RFC-897.

9    Q.   If you'd look at the bottom of the risk-rating form, where

10   it says, "Risk rating and LIED justification", and under that,

11   "Frank and Christina Reed".  And you look in the column

12   underneath that says "A rating".  Does that refresh your

13   recollection as to whether it was an 8-out-of-9 or 8-out-of-13

14   risk rating?

15   A.   I don't recall.

16   Q.   I only ask because if you look, the FICO says 9 out of 9,

17   and all of the other ratings -- the DSCR, the liquidity, the

18   O/S&W (ph.) -- they're all rated 8.  So I wonder if perhaps it

19   is 8 out of 9 versus 8 out of 13.

20           THE COURT:  Don't speculate.  Do you know what it is?

21           THE WITNESS:  I don't know what it is.

22           THE COURT:  Okay.  Ask your next question.

23   Q.   You looked at the Reeds' tax returns, correct, for the due

24   diligence?

25   A.   I did not, but the bank did.

1   Q.   When I say "you" -- I'll be clearer.  The bank looked at

2   it?  Because you didn't in fact look at any of the underlying

3   due diligence; you didn't create the due diligence?

4   A.   Correct.

5   Q.   So the bank looked at tax returns and leases, too,

6   correct?

7   A.   Correct.

8   Q.   And it created personal --

9        MR. NAGI:  Withdrawn.

10  Q.   It looked at personal financial statements, correct?

11  A.   Yes.

12  Q.   And it also has a fairly detailed credit memo; it's about

13  three pages, single-spaced, right?  It's, I believe, right in

14  the middle of the packet.  I'll give the Bates number.  It's

15  RFC-890 to RFC-892; that's the credit memo.

16  A.   Correct.

17       THE COURT:  Let me stop you for a second.

18       Back on RFC-897, under this risk-rating and LIED

19  justification, the text "BRR of 8", what is BRR?

20       THE WITNESS:  BRR is borrower -- borrower risk rating.

21       THE COURT:  All right.  It says, "BRR of 8 will remain

22  appropriate based on credit history type DSCR and the lack of

23  an updated PFS."  Is "PFS" personal financial statement?

24       THE WITNESS:  Yes.

25       THE COURT:  So had you not received a current personal

1  financial statement?

2          THE WITNESS:  Yes.  We do -- we do not have a summary

3  of a personal financial statement in this package, so I assumed

4  we did not have an updated personal financial statement.

5          THE COURT:  Go ahead.

6  Q.   Now, I'd like you to go to the second --

7          THE COURT:  I do have one other question.

8          MR. NAGI:  Yes, Your Honor.

9          THE COURT:  This consolidation loan -- you had three

10  existing loans on the three separate rental properties,

11  correct?

12          THE WITNESS:  Correct.

13          THE COURT:  And the effect of this consolidation was

14  that Mr. Reed would be able to take 24,000 dollars in cash from

15  this consolidation, correct?

16          THE WITNESS:  Correct.

17          THE COURT:  That was -- was that the only new money

18  that actually was being extended?

19          THE WITNESS:  I believe the original approval package

20  provided 24,000 cash out and then, when we increased it, it was

21  an additional 20,000.  So it would have been a forty-four

22  thou --

23          THE COURT:  44,000 in --

24          THE WITNESS:  -- forty --

25          THE COURT:  -- additional cash that was being put out

1  by the bank?

2          THE WITNESS:  Correct.  And we lowered his payments by

3  6,000 per year --

4          THE COURT:  Thank you.

5          THE WITNESS:  -- annually.

6          THE COURT:  Go ahead.

7  BY MR. NAGI:

8  Q.   Now I'd like to point you to the second to last paragraph

9  of the credit memo.

10          THE COURT:  What page are you on?

11          MR. NAGI:  Apologies, Your Honor.  When I created my

12  cross, I didn't have the Bates numbers in front of me to

13  reference.  It's my fault.  It's --

14          THE COURT:  This 891?

15          MR. NAGI:  892, Your Honor.

16          THE COURT:  Okay.

17  Q.   So the paragraph that starts, "The Reeds currently have",

18  what --

19  A.   I'm sorry; page 890?

20  Q.   892.  It says, "The Reeds currently have two delinquent

21  accounts related to the mortgage on the Moorestown, New Jersey

22  property, and CBNA CL (ph.)", and there's a number after that.

23  The Moorestown property, that's the Matlack property, correct?

24  A.   Correct.

25  Q.   The approval packet -- excuse me.  The approval packet

RESIDENTIAL CAPITAL, LLC, et al.                    32

1    also contains a personal-cashflow analysis, correct?

2    A.   Yes, it does.

3    Q.   And that personal-cashflow analysis was created by the

4    bank, and based on financial information provided by the Reeds,

5    right?

6    A.   Correct.

7         MR. NAGI:  Your Honor, I want to give the Court the

8    Bates number for that document right now.

9         THE COURT:  Okay.  Looks like, perhaps, the 896.

10        MR. NAGI:  You're faster than me, Judge.

11   A.   896?

12   Q.   896.

13        Now, the personal-cashflow analysis has a rental income

14   listed as 47,690 a year, correct?

15   A.   Yes.

16   Q.   And that amount included depreciation of the properties,

17   right?

18   A.   Depreciation and interest expense on existing loans.

19   Q.   And that's what it says at the chart at the very bottom

20   where you get those numbers from, correct?

21   A.   Yes.

22   Q.   And when you divide the number by twelve, what that means

23   is the income from that -- you get the income from the

24   property, correct?

25        MR. NAGI:  And so, Your Honor, I'll just represent to

1    the Court that when you divide the 47,000-and-change by 12, you

2    get $3,974.17 a month in rental income.

3              I can ask that question to the witness, or the Court

4    can just accept that; whatever you'd like.

5              THE COURT:  Mr. Reed, do you agree that's correct?

6              MR. REED:  I'm trying to find it, Your Honor.  I'm on

7    896; I'm sorry.

8              THE COURT:  That's okay.  I want to be sure you're

9    able to follow what he's -- no, take your time because I got --

10   let him show you.  Let him show you.  When I say "him," Mr.

11   Nagi's going to show you what he's referring to.

12             MR. NAGI:  And for the record, I just pointed Mr. Reed

13   to the very bottom of the personal financial summary and

14   cashflow analysis where it says "totals" and in the right

15   column, the far right column where it says "total," the total

16   number there is 47,690, and it's a detail of the rental

17   property per 2007 tax return.

18             Do we have agreement, Mr. Reed, as to what the monthly

19   cash flow was on that; $3,974.17 a month in rental income?

20             MR. REED:  Are you -- are you -- I'm sorry; you're

21   asking me to --

22             MR. NAGI:  Your Honor, I'll just do this by cross.

23             THE COURT:  Yes.  Okay.

24             MR. NAGI:  Okay.

25             THE COURT:  Your point is you divide the 47,690 by 12.

RESIDENTIAL CAPITAL, LLC, et al.                    34

1          MR. NAGI:  Correct, Your Honor.

2  BY MR. NAGI:

3  Q.    And that's what you do, Mr. Curley, to get the monthly

4  rental income for the properties, correct?

5  A.    Correct.

6  Q.    Okay.  So the number that I have is $3,974.17.  Does that

7  sound about right to you?

8  A.    Sounds about right.

9  Q.    Okay.  But the monthly debt service on the loan that you

10  made, the June 2008 loan, was $5,357.19 a month, correct?

11  A.    Which is the 62,045, on line 11, divided by 12.

12  Q.    No, no, that's not where I'm getting that number from.

13  A.    Oh, I'm sorry.

14  Q.    I'm getting that number from the updated 665,000 dollar

15  monthly payment.

16  A.    I'm sorry; what was that payment again?

17  Q.    $5,357.19 a month for the June 2008 loan.

18  A.    Correct.

19  Q.    And in addition to that amount that we just spoke about,

20  the Reeds also had other debt which is listed as note 12,

21  correct, in the personal-cashflow analysis?

22  A.    Correct.

23  Q.    And that monthly debt was 5,677 dollars a month, correct?

24  A.    Correct.

25  Q.    So by my numbers, when you take the June 2008 monthly loan

1   payments of $5,357.19 and you take the other debt monthly loan

2   payments of 5,677 dollars, then the Reeds would owe monthly

3   debt service of $11,034.19, is that fair to say?

4   A.   Yes.

5   Q.   But their cash flow from the real estate they owned was

6   only $3,974.17 a month, correct?

7   A.   Correct.

8   Q.   And Mr. Reed's income from the job that's also referenced

9   in this approval packet was listed as 65,000 dollars a year,

10  correct?

11  A.   64,715.

12  Q.   You take the number of the income on the property and Mr.

13  Reed's anticipated income from his salary, which never came to

14  bear, if I understand that's correct; is that correct?

15  A.   I don't know.

16  Q.   Okay.  Either way, the debt service and the income on

17  65,000 dollars a year is not enough to cover $11,034.19 a

18  month, correct?

19  A.   Correct.

20  Q.   And in fact, the credit memo on the second page references

21  tight cash flow on it.

22       MR. NAGI:  And I'll get you the number as well, Your

23  Honor.  Bates RFC-891 in Exhibit II.

24  Q.   Is that correct?

25  A.   I'm sorry.

RESIDENTIAL CAPITAL, LLC, et al.                    36

1   Q.   The credit memo references tight cash flow on page 2.

2   A.   Yes.

3   Q.   And so if you were to --

4           THE COURT:  On page 3 or page 2?  There are page

5   numbers on the credit memo.

6           MR. NAGI:  I'm sorry; let me be clear, Your Honor.

7   Give me one second to find the specific paragraph and section

8   so that it's clear on the record.

9           THE COURT:  Can you give me the Bates number and page,

10  or use the page numbers on the exhibits -- on the documents?

11          MR. NAGI:  It's on page 2 of the actual credit memo

12  which is -- the first page of the credit memo, it's RFC-890,

13  the fourth bullet point under the section "what."

14          It says, "Additionally, the proposed request will

15  provide 24,000 dollars in cash out to the Reeds to alleviate

16  their tight cash flow."

17          THE COURT:  All right.

18          MR. NAGI:  That's what I'm referencing.

19          THE COURT:  Okay.

20          MR. REED:  Where are we again, Jason; I'm sorry?

21          MR. NAGI:  Your Honor, I'm just giving time for Mr.

22  Reed to read it.

23          THE COURT:  Please do.  Be sure he knows where we are.

24          MR. NAGI:  Mr. Reed?

25          MR. REED:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                                37

1    BY MR. NAGI:

2    Q.    So the cash flow from the property and Mr. Reed's salary,

3    is also not enough to cover; he would have put an additional

4    100,000 dollar line of credit on top of the pre-existing debt,

5    correct?

6    A.    Correct, but we were also factoring in capital gains on

7    buying and selling of rental properties.

8    Q.    I'm sorry, but that wasn't -- the capital gains are all

9    factored into your analysis, when you do the credit memo and

10   you did the personal-cashflow analysis, correct?

11   A.    Correct.

12   Q.    Okay.  So that's already accounted for in the numbers that

13   we spoke about because we got those numbers from the personal-

14   cashflow analysis, correct?

15   A.    Right.  That's how we obtained the 1.16 debt-service --

16   Q.    Okay.  So --

17   A.    -- coverage ratio.

18   Q.    So the numbers that I'm using is $11,034.19 a month in

19   debt-service payments between the June 2008 loan and the pre-

20   existing debt, correct?  That's what we're talking about here.

21   You understand that, right?

22   A.    Can you repeat that?

23   Q.    Sure.  $11,034.19 a month was the debt-service-coverage --

24   I'm sorry; was the amount of monthly payments that the Reeds

25   had to make after the June 2008 loan which accounts for the

RESIDENTIAL CAPITAL, LLC, et al.                    38

1    other debt that they had that's referenced in note 12 of the

2    personal-cashflow analysis, correct?

3    A.    Correct.

4    Q.    Okay.  So what I'm asking you is if you throw another

5    100,000 dollars in debt on that, it's clearly not -- the income

6    that they have from their properties does not satisfy, and it

7    does not account for an additional 100,000 dollars in debt,

8    correct?

9    A.    Based on your numbers yes; but that's not how we would

10   have underwrote it.

11   Q.    But I'm using your numbers, that's what I'm asking you.

12   And in fact, you didn't underwrite them --

13   A.    And you're --

14   Q.    -- on any loan of amount on that property.

15           THE COURT:  Don't interrupt him when he's answering

16   your question.

17           Go ahead, Mr. Curley.

18   A.    You're not using the 261,000 dollars of capital gains.  If

19   you divide that by twelve, that increases the monthly income

20   much higher than the number you're providing.

21   Q.    Well, I'm looking at numbers that you gave in your due

22   diligence packet, correct?

23   A.    Right.

24   Q.    So is that accounted for in your due diligence packet,

25   because when I deposed you we spoke about this and it wasn't

RESIDENTIAL CAPITAL, LLC, et al.                                39

```
 1  raised either.
 2  A.   It's line 2 at the top.
 3            THE COURT:  What page are you?
 4            THE WITNESS:  RFC-896, capital gains --
 5            THE COURT:  Just wait till I get there, okay?
 6            THE WITNESS:  Yeah.
 7            THE COURT:  Okay.
 8  A.   The number you're providing is, basically, the wages from
 9  Smith Barney and the rental income, but we're not factoring in
10  the capital gains income of 261,274 dollars per year which,
11  divided by 12, would increase that monthly income sufficiently
12  higher than what you're asking me to attest to.
13  Q.   What would it increase it to?
14  A.   I don't have a calculator but 261,274 divided by 12 is
15  what the additional income would be.
16            THE COURT:  Could you tell -- I see -- referring to
17  the capital gains on RFC-896, and there's footnote 2, notes to
18  personal financial summary and cashflow analysis, and it says,
19  "Capital gains are included as Mr. Reed is in the business of
20  'flipping' real estate properties and has been for the past
21  twenty years.  Therefore, it is deemed reasonable to assume
22  capital gains are a recurring source of income."
23            Is there anything in this credit memorandum, or
24  analysis package, to show that Mr. Reed had capital gains in
25  the year in which this loan was being made or the way the loan
```

1  was being consolidated?

2            THE WITNESS:  Well, I mean --

3            THE COURT:  You were using an assumption; not

4  actual --

5            THE WITNESS:  No, it was from -- it would have been

6  taken out of his 1040 -- federal tax 1040 for 2007.  It must

7  have been in there.  I mean, our typical practice is we don't

8  normally add back capital gains on sale of real estate unless

9  it's -- there's a history of it.

10            So the underwriter, which I was not privy to the

11  actual tax returns, but typically, the underwriter would look

12  at the last three years of tax returns and determine if that is

13  a normal source of income for somebody who buys and flips real

14  estate and then they would add that back in.

15            THE COURT:  All right.  Do you know whether Mr. Reed

16  sold real estate in 2008 and had capital gains income during

17  2008?

18            THE WITNESS:  I don't know, but I don't think so.

19            THE COURT:  Okay.  In this financial analysis, I don't

20  know who did it; somebody at the bank --

21            THE WITNESS:  Right.

22            THE COURT:  -- put this together, used an assumption

23  for what his capital gains would be in that year based on his

24  past experience, is that a fair statement?

25            THE WITNESS:  Yes.

1          THE COURT:  All right.  But it doesn't -- there's

2    nothing in here that documents that in 2008, the year in which

3    this consolidation was being done that Mr. Reed actually had

4    capital gains income, is that a fair statement?

5          THE WITNESS:  Yes.

6          THE COURT:  Go ahead, Mr. Nagi.

7    BY MR. NAGI:

8    Q.    Now, let's go back to the Matlack property, the bank

9    doesn't have a single piece of paper from the alleged request

10   that the bank -- loan request the banks says it denied,

11   correct?

12   A.    Correct.

13   Q.    There's not a single electronic record of their request to

14   make a loan, correct?

15   A.    Correct.

16   Q.    In 2008, you were no longer Mr. Reed's relationship

17   manager, correct?

18   A.    Correct.

19   Q.    You didn't conduct any of the analysis in this approval

20   packet for the June 2008 loan, correct?

21   A.    Correct.

22   Q.    You don't even remember signing the approval form, which

23   is the first page of Exhibit II, for the June 2008 loan,

24   correct?

25   A.    I remember the deal, but I don't remember when I actually

RESIDENTIAL CAPITAL, LLC, et al.                    42

1   signed it.

2   Q.   And you, in fact, signed hundreds of these types of loan

3   approval packets, correct?

4   A.   Yes.

5   Q.   And as of 2008, you've been -- you had been involved with

6   1,500 to 2,000 loan applications, correct?

7   A.   Over the course of several years, yes.

8   Q.   Correct.  From your entire time as a -- that you worked at

9   TD Bank?

10  A.   Correct.

11  Q.   And you weren't there when Mr. Reed made the oral request

12  for a loan secured by the Matlack property, correct?

13  A.   I was.

14  Q.   You were there?  I'd just like to go back to your

15  deposition.  If you could look at page 76, and let me know when

16  you're there.

17  A.   I'm there.

18         MR. NAGI:  Your Honor, can I proceed?

19         THE COURT:  Yes.  Go ahead.

20  Q.   Page 76, line 4.

21  "Q.  It was approved in April, closed in June.  Now, we'll be

22  discussing the letters and this stuff that was submitted

23  relating to this.  But Mr. Reed says that asked you for a loan

24  in 2008 to collateralize Matlack, correct?

25  "A.  Correct.

RESIDENTIAL CAPITAL, LLC, et al.                    43

1    "Q.  And do you recall that?

2    "A.  I -- again, he would have had to ask my lender, and I

3    would have been involved because I had a long term relationship

4    with Frank, and I knew him since 1993 or so, but I don't recall

5    the -- when I was asked for."

6    Q.   Were you asked those questions and did you give that

7    answer?

8    A.   Yes.

9    Q.   And you also weren't exactly sure whether the loan request

10   was a cash out business loan or a line of credit when I deposed

11   you as well, correct?

12   A.   My recollection was it was a line of credit.

13   Q.   Right, but when I asked you if you knew whether it was one

14   or the other, you said it was your recollection but you weren't

15   exactly sure.

16   A.   Correct.

17   Q.   Okay.  You don't know when the alleged loan request for

18   the Matlack property loan was made other than after the June

19   2008 loan, correct?

20   A.   Yes.

21   Q.   And you didn't know whether it was a week, or a month, or

22   six months?

23   A.   I know it wasn't six months, but I don't know if it was

24   within two months.

25            THE COURT:  Who was the Reed relationship manager in

1    June -- April or June 2008?

2              THE WITNESS:  He was on my team.  His name is Greg

3    Cieslik.

4    Q.   So could you turn to page 85 of the transcript, line 15,

5    and let me know when you're there and I'll read it to you and

6    we can move forward.

7    A.   Yes.

8    Q.   The question;

9    "Q.  I understand that.  I'm not quarreling with you about

10   that, I'm just asking if there's anything that you think you

11   could use to refresh your recollection to get an accurate

12   timing on when the request was submitted.

13   "A.  I mean, it was an oral conversation.  So I mean, my

14   recollection was it was sometime within six months of closing

15   the refinance."

16   Q.   Were you asked that question and did you give that answer?

17   A.   Yes.

18   Q.   So you thought it was -- it could have been up to six

19   months after, correct?

20   A.   Correct.

21   Q.   Okay.  Now, you don't know how much time elapsed from when

22   the alleged request was made and the bank declined the loan,

23   correct, on the Matlack property?

24   A.   Correct.

25   Q.   And you don't remember anything about the day that Mr.

1   Reed's loan request on the Matlack property was declined,

2   correct?

3   A.    No, my rec -- I just remember getting a call from my

4   lender, Greg Cieslik, that he had uncovered a lis pendens

5   during his due diligence of the loan on Matlack, and that was

6   when everything stopped and we transferred it to our workout

7   department and we were pretty much removed from the

8   relationship at that point.

9   Q.    Okay, now -- so who managed the loan from the time that --

10  up until it went into the loan workout?

11  A.    The primary relationship manager was Greg Cieslik.

12  Q.    Okay.  Did anyone else manage the loan at all?

13  A.    We had -- at that time, we had account managers who

14  assisted the commercial loan officers, and Greg had an

15  assistant named George Ritter at that time.

16  Q.    So Greg or George Ritter were the people that were

17  responsible for the loan until the loan was transferred; this

18  is the June 2008 loan, is that correct?

19  A.    Correct.

20  Q.    All right.  Do you remember when it was transferred?  Do

21  you remember the date, the time of the year, the month,

22  anything?

23  A.    I do not.

24  Q.    Okay.  Do you know who Richard Napierkowski is?

25  A.    Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    46

1    Q.    He worked for you with -- he worked with you at TD Bank,

2    correct?

3    A.    Yes.

4    Q.    And he was a loan workout officer, correct?

5    A.    He was a loan -- yes, he was a loan workout officer.

6    Q.    Okay.  And he was working there in 2008 and 2009.  "There"

7    being TD Bank, correct?

8    A.    Yes.

9    Q.    When a loan goes to workout -- well, let's just use the

10   proper terminology.  I believe you said it was called "asset

11   recovery" at the time, correct?

12   A.    Yes.

13   Q.    So it was transferred to asset recovery, correct?

14   A.    Yes.

15   Q.    Okay.

16         MR. NAGI:  Your Honor, can I approach the witness?

17         THE COURT:  Yes.

18         MR. NAGI:  And for the record, I've just handed some

19   documents over to Mr. Reed.

20         THE COURT:  Okay.

21         MR. NAGI:  And I'll give one to the Court too.

22         THE COURT:  Thank you.

23   Q.    You see that, sir?

24   A.    Yes.

25   Q.    That's an email from you, correct?

RESIDENTIAL CAPITAL, LLC, et al.                    47

1    A.    It's not from me.

2    Q.    But you're on the email?

3    A.    No.

4    Q.    This is a document that was --

5    A.    It's an email from Victor Slaiciunas who was the head of

6    asset recovery, and he was sending it to Richard Napierkowski

7    and Greg Cieslik; copied them.

8    Q.    All right.  And what is it -- it says, "Please place on

9    nonaccrual" correct?

10   A.    Yes.

11   Q.    What does that mean to you?

12   A.    That is when the loan becomes nonperforming and we start

13   legal action.

14   Q.    Okay.  So what's the date of that communication?

15   A.    August 27th of 2009.

16   Q.    And it says it should be transferred to Rich Napierkowski,

17   correct?

18   A.    Yes.

19   Q.    So was the loan transferred to your asset recovery, then,

20   in August of 2009?

21   A.    Yes.

22   Q.    Okay.  Does that refresh your recollection --

23   A.    Yes.

24   Q.     -- as to when it was transferred?

25   A.    Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    48

1    Q.    Thank you.

2    A.    I'd never seen this before.

3    Q.    That was a document that was produced after your

4    deposition.  I didn't have it in front of me.  It came based

5    upon a supplemental request that was made during the deposition

6    that was produced.

7    A.    Right.

8    Q.    So I understand if you hadn't seen it.  There were over

9    200 documents prepared.

10        And there are also no documents made at the time of the

11   Matlack loan request that you could have used to refresh your

12   recollection about any of your testimony that you gave today or

13   your deposition, correct?

14   A.    I'm sorry; the question again.

15   Q.    There were no documents that you had relating to the

16   alleged request for a loan on the Matlack property in 2008 that

17   you could use to refresh any of the testimony you gave today,

18   correct?

19   A.    For the additional hundred thousand or 300 -- whatever the

20   number was, correct, I don't have any documentation.

21   Q.    Right.  And what I've been referring to as -- we've just

22   been calling it the Matlack --

23   A.    Yes.

24   Q.    -- property loan, or the Matlack loan request.  So I'll

25   just -- so we have a clear record.  So you don't have a single

RESIDENTIAL CAPITAL, LLC, et al.                    49

1   piece of paper that you could have used to review or prepare

2   for your testimony that relates to the loan request that Mr.

3   Reed claims he made on the Matlack property in 2008, correct?

4   A.    Correct.

5   Q.    There was no term sheet created for that loan request?

6   There was no maturity date set for the loan request?

7             THE COURT:  I'm sorry; I didn't hear your answer.

8             THE WITNESS:  No, not that I'm aware of.

9             THE COURT:  Okay.

10  Q.    You didn't determine whether there was a debt-service-

11  coverage ratio or anything like that relating to the Matlack

12  loan request?

13  A.    No.

14  Q.    And you don't remember anything about the underlying

15  defaults for the Matlack property, correct, on the senior loan?

16  A.    The defaults with the first mortgage order?

17  Q.    Yes.

18  A.    I do not, no.

19  Q.    You don't remember if there was a second name on the

20  Matlack property in June of 2008 or any time in 2008 or 2009,

21  correct?

22  A.    There was a sec -- there was a home equity loan referenced

23  in our analysis, but it does not say which property it was

24  associated with.  It could have been associated with Matlack or

25  Virginia.  It's not specific as to which property that was

RESIDENTIAL CAPITAL, LLC, et al.                    50

1   secured by.

2   Q.    And for that reason, when I asked you at your deposition

3   about that, you said you really didn't know whether there was a

4   second --

5   A.    Correct.

6   Q.     -- lien on the Matlack property.

7   A.    Correct.

8   Q.    And you don't remember if there were tax liens on the

9   Matlack property?

10  A.    The only -- as far as real estate tax liens?

11  Q.    Correct.

12  A.    No, the only liens that were disclosed in our underwriting

13  document were released tax -- released federal tax liens.

14  Q.    And before a tax payment on a property can be delinquent

15  before it goes to a tax lien, correct?

16  A.    Yes.

17  Q.    So you're not aware if there were any delinquencies on the

18  Matlack property because it certainly wasn't referenced in the

19  due diligence packet that we do have, correct?

20  A.    Correct.

21           THE COURT:  Did the bank have procedures, or

22  requirements, for loan applications before it would consider

23  refinancing loans on a property which it did not have the

24  original loan?

25           THE WITNESS:  A formal written application?

1              THE COURT:  Yes.

2              THE WITNESS:  At that time, no.  This was -- we had

3     commercial lending, and most of it was verbal communication

4     with customers and prospects.  There was no formal written

5     application other than a personal financial statement, but

6     that's changed now.  We do have applications for loans under a

7     million dollars.  But for loans over a million dollars, it's

8     still oral, verbal communication.

9              THE COURT:  But what documents would be prepared

10    within the bank when it was evaluating whether to refinance a

11    loan -- I think this was over a million dollars.

12             THE WITNESS:  At that time --

13             THE COURT:  Yes.

14             THE WITNESS:  -- we would have had a meeting with

15    Frank.  We would have talked about what the loan request was,

16    and then we would have went right to this loan approval packet

17    which was dated April 11th, and that was just a compilation of

18    all the underwriting and data that we had and the verbal

19    conversations that we had.

20             THE COURT:  Would a loan approval package have been

21    prepared for the proposed refinancing of the Matlack property?

22             THE WITNESS:  Yes.

23             THE COURT:  All right.  And there is no such document,

24    is that correct?

25             THE WITNESS:  Yes.  My recollection is that they never

1   got that far.

2               THE COURT:  Go ahead, Mr. Nagi.

3               THE WITNESS:  And then the reason that -- is because

4   somewhere during that underwriting process to get to this

5   approval package, something was disclosed.  In this case, was a

6   lis pendens, and that's when it went to workout.

7   BY MR. NAGI:

8   Q.   But there's also no documents referencing the existence of

9   the lis pendens, the reports, or notes in the system, correct?

10  A.   I have not seen any.

11  Q.   You didn't know, also, that the underlying issues related

12  to the sale of the Matlack property and why it fell through,

13  correct?

14  A.   Why did --

15              MR. NAGI:  I'll withdraw the question.  I don't think

16  I posed it properly.

17  Q.   You didn't know the underlying issues related to the sale

18  of the Matlack property that fell through which is referenced

19  in the due diligence packet for the June 2008 loan, correct?

20  A.   The pending sale from earlier, I guess  -- I think it was

21  December of 2007.

22  Q.   That's correct.

23  A.   Yes, my only knowledge was what Frank told me, and that

24  was that there was an appraisal issue with the buyer.  They did

25  a new appraisal, but by that point, the buyer had backed out.

1    Q.    And you didn't know the date that the contract was

2    supposed to have closed either, correct?

3    A.    No.

4    Q.    And you didn't know that there was litigation involving

5    the sale that had fallen through, correct?

6    A.    No.

7              THE COURT:  It's that there is an ambiguity.  He asked

8    whether it's correct; and you answered no.  Let's get a better

9    record.

10             THE WITNESS:  I'm sorry.

11             THE COURT:  This is a common problem.  Can you re-ask

12   your question again?

13             MR. NAGI:  Correct, Your Honor, I think that's the

14   best way.

15   Q.    You didn't know that there was litigation involving the

16   sale that fell through?

17   A.    Between the buyer and seller?

18   Q.    On the Matlack property, correct.

19   A.    Correct.

20   Q.    And just one clarification, when we spoke about the timing

21   that the loan was transferred to asset recovery, that's the

22   June 2008 consolidated loan, that was because of payment

23   defaults, correct?

24   A.    I'm sorry.

25   Q.    When the loan was placed on nonaccrual, according the

RESIDENTIAL CAPITAL, LLC, et al.                    54

1  email that you reviewed, that means that there were payment

2  defaults, correct?

3  A.   I don't --

4  Q.   For the underlying loan?

5  A.   I don't know.  Because a memo dated August 27th of 2009

6  where we say, "Please place on nonaccrual" does not reference

7  why it was being placed on nonaccrual.

8        MR. NAGI:  Thank you, Your Honor.  I have no further

9  questions.

10        THE COURT:  All right.  Mr. Reed?

11        MR. REED:  Your Honor, I ask for a short recess

12 because there's a lot of information for me to try and go

13 through it and prepare for this.

14        THE COURT:  All right.  We'll resume at 10:25.

15        You can step down.  Just come on back here.

16     (Recess from 10:12 a.m., until 10:31 a.m.)

17        THE COURT:  All right, Mr. Curley, come on back up, if

18 you would.

19        All right.  You're still under oath, Mr. Curley.

20        Mr. Reed?

21 REDIRECT EXAMINATION

22 BY MR. REED:

23 Q.   Mr. Curley, during your testimony today, you talked about

24 what the bank did when it learned of the foreclosure on

25 Matlack.  Can you elaborate on what the bank did?

RESIDENTIAL CAPITAL, LLC, et al.                    55

1   A.    Okay.  Yes, my recollection was the relationship manager

2   at the time, Greg Cieslik, was in the process of underwriting a

3   request, and doing the due diligence found out there was a lis

4   pendens in process on your house and that immediately stopped

5   the request and that's when the relationship was transferred to

6   workout.

7   Q.    Can you -- for clarity's sake, the relationship

8   transferred to workout, and I believe you used the word "asset

9   recovery" also to -- interchangeably with recovery, what was

10  transferred to asset recovery or workout?

11          MR. NAGI:  Objection, Your Honor.

12          THE COURT:  Overruled.

13          THE WITNESS:  Does that mean I can answer?

14          THE COURT:  Yes.

15  A.    When the lis pendens was found out about, it was in event

16  of default, so your loan that was done in June of 2008, the

17  restructured consolidated loan was transferred to workout at

18  which point it was put on nonaccrual, and I assume legal

19  proceedings started at that time.

20  Q.    Okay.

21          THE COURT:  Do you know whether legal proceedings were

22  started or not?

23          THE WITNESS:  I do not -- I was not privy to that.

24  Once it's transferred to work -- to asset recovery, you know,

25  we're sort of removed from the process.

RESIDENTIAL CAPITAL, LLC, et al.                    56

1          THE COURT:  All right.  Thank you.  Go ahead.

2          THE WITNESS:  I should say I know that now.  Preparing

3     for this, I know what happened but --

4          THE COURT:  You didn't know that.

5          THE WITNESS:  -- at that time, I did not.

6          THE COURT:  Go ahead, Mr. Reed.

7     Q.   In regard to, in your testimony today, in regard -- in

8     your questioning -- excuse me; let me start again.

9          My adversary's counsel today has questioned you and used

10    the term "Matlack loan" to describe a contemplated loan, and

11    you indicated during your testimony today regarding that loan

12    that that loan did not solely relate to Matlack.  Can you

13    elaborate about that?

14         MR. NAGI:  Objection.

15         THE COURT:  Sustained.

16         Did you have an understanding in 2008 what loan Mr.

17    Reed was seeking that related, in any way, to the Matlack

18    property?

19         THE WITNESS:  Well, I mean, this email that when it

20    was transferred to asset recovery, sort of has me thinking that

21    it happened later than 2008 when we discovered the lis pendens,

22    but the loan request on Matlack was -- he had requested a

23    higher dollar amount based on the equity in that property, and

24    we -- the relationship manager was looking at a smaller request

25    of about 100,000 dollars because that's what the cash flow in

RESIDENTIAL CAPITAL, LLC, et al.                    57

1   the 2008 -- April 2008 loan approval justified.

2              THE COURT:  Okay.  Let me -- I saw it, I want to be

3   clear -- there was a document that was used to refresh your

4   recollection that's not marked for identification.  It was an

5   email from -- I'm going to butcher the name -- Victor --

6              THE WITNESS:  Victor Slaiciunas.

7              THE COURT:  Yes.  Okay.  S-L-A-I-C-I-U-N-A-S.  And the

8   date of that email is August 27th, 2009.  Is your understanding

9   that August 2009 was when the loan was transferred to workout?

10             THE WITNESS:  Yes, according to that email.

11             THE COURT:  And do you believe it was transferred to

12  workout at or about the time the bank learned of the lis

13  pendens?

14             THE WITNESS:  Yes.

15             THE COURT:  Go ahead, Mr. Reed.

16  BY MR. REED:

17  Q.   To the best of your recollection did the Matlack loan that

18  was contemplated or under underwriting or underway, was it

19  going to use other properties as collateral besides just

20  Matlack?

21  A.   Yes.  We were to make an additional loan for working

22  capital we'll call it, to help you through the process of

23  trying the three properties that you had listed for sale.  It

24  would have been cross-collateralized with the 665,000 term loan

25  which listed three rental properties.  So we would have filed

1    mortgages on the three properties in a cross-collateral, cross-
2    default agreement, and we would have had the Matlack property
3    as additional collateral.
4    Q.    So this wasn't just a solely a Matlack loan; it was a
5    business loan?
6    A.    Yes.
7    Q.    Earlier, my adversary's counsel asked you given the
8    certain set of circumstances whether or not you would have made
9    a -- this contemplated loan we're discussing and you responded
10   no.  There's a section in your deposition that seems to
11   contradict that.
12              THE COURT:  Mr. Reed, that's not a proper form of
13   question.
14              MR. REED:  Okay.
15              THE COURT:  You ask a question of the witness, you can
16   show him a portion of the deposition if you wish to refresh his
17   recollection about something, but the form of the question that
18   you were asking is not a proper question.
19              MR. NAGI:  Okay.  So let me --
20              THE COURT:  Is there a page and line reference --
21              MR. REED:  Yes.
22              THE COURT:  -- you can point him to?
23              MR. REED:  Yes.
24   Q.    Page 74, line 2 through, I guess, 21.
25              MR. NAGI:  Judge, he has no question.

1                THE COURT:  What's your question, Mr. Reed?

2    Q.    This testimony seems to indicate that there was a path

3    given like --

4                MR. NAGI:  Objection.

5                THE COURT:  You just have to ask a question.  You

6    can't argue about it.  What's your question, Mr. Reed?

7    Q.    Given this -- was there a path available to complete a

8    loan but for the foreclosure?

9                MR. NAGI:  Objection.

10               THE COURT:  I don't understand the question, Mr. Reed.

11   I'm not foreclosing this line of questioning; I just need as

12   clear question.

13               MR. REED:  Yeah, I'm trying to figure out how I can --

14   Q.    Given the financial conditions in 2008, based on the

15   credit memorandum that you had used for that approval of the

16   restructuring of my rental properties, given that information,

17   is that why you were considering doing the additional loan that

18   we were discussing?

19               MR. NAGI:  Objection.

20               THE COURT:  Sustained.

21               Can you tell me when the bank was going through an

22   underwriting process with respect to a possible loan that would

23   include the Matlack property security?

24               THE WITNESS:  Well, when I did my deposition, I was

25   thinking it was within a six month time frame of the

RESIDENTIAL CAPITAL, LLC, et al.                    60

1   consolidation loan in June of 2008. I'm thinking it's beyond

2   that again now because I've seen this email when the loan was

3   transferred to workout, or asset recovery, that that might have

4   happened sometime in 2009.

5          THE COURT: You think that it was sometime in 2009

6   when the bank was undertaking an underwriting process or a

7   possible new loan that would include the Matlack property as

8   security?

9          THE WITNESS: Right. I distinctly remember having a

10  conversation with Frank myself. I don't remember if the

11  relationship manager was present or not, where he came to us

12  and said I have not sold Matlack, I have not sold Virginia, and

13  I have not sold the land yet, and I've run out of cash. I need

14  an additional loan to continue to allow me to get through this

15  phase, to sell one of these properties. I just don't remember

16  the date of when that was or when that occurred.

17         THE COURT: There was an earlier trial in this case; I

18  think you're aware of that?

19         THE WITNESS: Yes.

20         THE COURT: And in the decision that was handed down

21  by me after the trial, it discusses the evidence that came in

22  about three specific efforts by Mr. Reed to sell the property.

23  Were you aware of what his efforts had been to sell the Matlack

24  property?

25         THE WITNESS: The only effort I'm aware of, that I was

RESIDENTIAL CAPITAL, LLC, et al.                    61

1  privy to or talked about was the one that happened at the end

2  of '07 that fell through over the appraisal issue.

3         THE COURT:  Okay.

4         THE WITNESS:  And the reason I was aware of that one

5  is the buyer was going through our bank for a mortgage.

6         THE COURT:  Scott and Traci Jacobs?

7         THE WITNESS:  I don't recall the name.  It wasn't my

8  area.  I just know that it was an applicant.

9         THE COURT:  Go ahead, Mr. Reed.

10        MR. REED:  Your Honor, I don't have anything more.

11        THE COURT:  All right.  Any recross?

12        MR. NAGI:  Thank you, Your Honor.

13 RECROSS-EXAMINATION

14 BY MR. NAGI:

15 Q.   So Mr. Curley, when I deposed you in May of 2016, you said

16 that the longest outside date there could have been from the

17 time that the loan request for Matlack was made, the outside

18 date was six months from June of 2008, and today before I

19 showed you that, you thought it was, maybe, two months at the

20 outset.  Now, you think that after looking at the documents,

21 you think it could be not just six months out, but almost a

22 year and two months out.  That's fourteen months out, correct?

23 A.   Correct.

24 Q.   You really don't know when it happened?  You have no way

25 to know, do you?

1   A.    No.

2   Q.    And in -- do you know how many times -- how many sales

3   fell through on the Matlack property?

4   A.    I just note the one.

5   Q.    The one from 2007, correct?

6   A.    Correct.

7   Q.    So that means that you would have known when the Matlack

8   property was -- so you had a -- I'm sorry -- 261,000 dollars in

9   anticipated appreciation in the June 2008 loan -- I'm sorry --

10  capital gains tax, correct?

11  A.    Correct.

12  Q.    And you would have known if he was asking you about the

13  Matlack property, that he wouldn't have sold the property from

14  December 2007 all the way through August -- at the end of

15  August of 2009, correct?  So --

16          THE COURT:  Is there an answer to that?

17          MR. NAGI:  I'm sorry.

18          THE COURT:  You asked a question, but you started to

19  ask another question before you got an answer.

20          MR. NAGI:  You're right, Your Honor.  He nodded his

21  head, but he didn't speak.

22          THE COURT:  Why don't you ask another question?  I

23  want a clear record.

24          MR. NAGI:  Okay.  Can I have that question read back?

25          THE COURT:  No.

1          MR. NAGI:  Okay.  Give me one second, Your Honor.

2     Q.    So if there was -- if a loan request is made in August --

3     around the 27th of 2009, you would have known that Mr. Reed had

4     been trying to sell his property as of December 2007 through

5     that date which is over a year-and-a-half and he hadn't sold it

6     at that time, correct?

7     A.    Correct.

8     Q.    Would that have figured into your calculations of whether

9     or not you should make the loan with Matlack as collateral?

10    A.    We were anticipating one of three properties selling.

11    Q.    But none of them had sold as of August --

12          THE COURT:  Stop.  Which properties were you

13    anticipating being sold?

14          THE WITNESS:  We were anticipating -- he had three

15    properties under -- that were listed for sale:  Matlack, a

16    P.A.T.H. (ph.) built house in Richmond, Virginia, and a piece

17    of ground in Richmond, Virginia.

18          THE COURT:  Okay.  Thank you.

19    Q.    And none of those parcels were sold as of August of 2009,

20    correct?

21    A.    As far as I know.

22    Q.    What does nonaccrual mean to you?

23    A.    Nonaccrual means the loan gets placed in a status where

24    interest stops.  You know, it's accrued but it's not -- you

25    know, the loan is not performing and it's in legal status.  We

RESIDENTIAL CAPITAL, LLC, et al.                    64

1   engage lawyers to exercise our rights against the collateral.

2   Q.   Was Mr. Reed making payments when the loan was transferred

3   to asset recovery on the June 2008 loan?

4   A.   That, I don't know.

5   Q.   What's the most common reason for something to --

6           THE COURT:  I'm not going to let him speculate.

7           MR. NAGI:  I have no further questions, Your Honor.

8           THE COURT:  All right.  Mr. Reed, any further

9   questions?

10  FURTHER REDIRECT EXAMINATION

11  BY MR. REED:

12  Q.   Do I understand your testimony today to be that the bank

13  would have considered the line of credit Matlack loan if one of

14  the three properties that were listed for sale had sold?  That

15  was a condition precedent?

16  A.   Yes.

17  Q.   Okay.

18          THE COURT:  Are you done?

19          MR. REED:  Yeah.

20          THE COURT:  All right.  Thanks very much, Mr. Curley.

21          THE WITNESS:  Do I just leave these papers here?

22          THE COURT:  Yes, you can just leave everything.

23          All right.  I'll come back on the bench at 11 o'clock.

24          Mr. Reed, you need to resume the witness chair.

25          MR. REED:  Your Honor, I need -- I would like to use

RESIDENTIAL CAPITAL, LLC, et al.                        65

1  the bathroom and to get some more water.

2          THE COURT:  Yes.  You have ten minutes to do that.

3          MS. HAGER:  And Your Honor, before we start back with

4  Mr. Reed, after the break, can we finish up with Clampitt?

5          THE COURT:  Sure.  Good.

6          MS. HAGER:  Okay.

7          THE COURT:  You've worked it out?

8          MS. HAGER:  Yes.

9          THE COURT:  Okay.  We'll resume at 11 o'clock.

10        (Recess from 10:51 a.m., until 11:08 a.m.)

11         THE COURT:  All right.  Court's back in session.  Mr.

12  Reed is in the witness chair.  Just give me a second, Mr. Reed.

13         MR. REED:  I just need to get settled.

14         THE COURT:  Okay.  So my notes, Mr. Reed, show that we

15  ended -- when we ended your testimony yesterday, you were

16  talking about Joan Kline in your effort to get a loan from her,

17  and the last thing in my notes was you told her that a

18  foreclosure proceeding had started.

19         MR. REED:  Your Honor, are we doing the Clampitt

20  action you said first --

21         THE COURT:  Yes, okay.  I'm sorry.  Let's deal with --

22  you're right.  Let's resolve the Clampitt issue.

23         What tab is the Clampitt transcript?

24         MR. REED:  521.

25         MS. HAGER:  15.

1          THE COURT:  15, yes.  Okay.  Let me turn there.  Let

2   me go back to those notes.  Hold on.

3          So with Mr. Reed's designations, the last one I had

4   was page 17, line 16 through 25, and I gather there were

5   additional designations by Mr. Reed that were on different page

6   in his notes that you didn't have at that time?

7          MS. HAGER:  That's right.

8          Page 18, lines 1 through 7 are objectionable because

9   they call for hearsay.

10         THE COURT:  Let me turn there.

11      (Pause)

12         THE COURT:  Let me just orient myself, okay, in the

13  transcript.

14      (Pause)

15         THE COURT:  Just bear with me.

16         MS. HAGER:  Sure.

17      (Pause)

18         THE COURT:  I overrule the objection.  Next.

19         MS. HAGER:  The following, I don't have any objections

20  to.

21         THE COURT:  Okay.

22         MS. HAGER:  Page 18, line 13 through page 20, line 19.

23         THE COURT:  Okay.  In evidence.

24  (Page 18, line 13 through page 20, line 19 of Martha Clampitt

25  deposition was hereby received into evidence as part of

RESIDENTIAL CAPITAL, LLC, et al.                    67

1   Claimant's Exhibit 54, as of this date.)

2              MS. HAGER:  Page 20 --

3              THE COURT:  Just to be clear --

4              MS. HAGER:  Sorry.

5              THE COURT:  -- the designation, page 18, lines 1

6   through 7 are in evidence.

7   (Page 18, lines 1 through 7 of Martha Clampitt's deposition was

8   hereby received into evidence as part of Claimant's Exhibit 54,

9   as of this date.)

10             THE COURT:  Go ahead.  Next.

11             MS. HAGER:  Page 22, line 6 through page 22, line 13,

12  no objection.

13             THE COURT:  All right. In evidence.

14  (Page 22, line 6 through page 22, line 13 of Martha Camplitt's

15  deposition was hereby received into evidence as part of

16  Claimaint's Exhibit 54, as of this date.)

17             MS. HAGER:  Page 24, line 24 through page 26, line 12,

18  no objection.

19             THE COURT:  Just give me that again.  I'm sorry, Ms.

20  Hager.  24 what?

21             MS. HAGER:  Sorry.  24/24 through 26/12.

22             THE COURT:  All right.  In evidence.

23  (Page 24, line 24 through page 26, line 12 of Martha Clampitt's

24  deposition was hereby received into evidence as part of

25  Claimant's Exhibit 54, as of this date.)

RESIDENTIAL CAPITAL, LLC, et al.                    68

1            MS. HAGER:  26/16 through 26/24, no objection.

2            THE COURT:  In evidence.

3   (Page 26, line 16 through page 26, line 24 of Martha Clampitt's

4   deposition was hereby received into evidence as part of

5   Claimant's Exhibit 54, as of this date.)

6            MS. HAGER:  27/22 through 28/7, no objection.

7   (Page 27, line 22 through page 28, line 7 of Martha Clampitt's

8   deposition was hereby received into evidence as part of

9   Claimant's Exhibit 54, as of this date.)

10            THE COURT:  All right.  In evidence.

11   (Page 28, line 25 through page 29, line 19 of Martha Clampitt's

12   deposition was hereby received into evidence as part of

13   Claimant's Exhibit 54, as of this date.)

14            MS. HAGER:  28/25 through 29/19, no objection.

15   (Page 28, line 25 through page 29, line 19 of Martha Clampitt's

16   deposition was hereby received into evidence as part of

17   Claimant's Exhibit 54, as of this date.)

18            THE COURT:  In evidence.

19            MS. HAGER:  Page 30, line 4 through line 7, no

20   objection.

21            THE COURT:  Okay.  In evidence.

22   (Page 30, line 4 through line 7 of Martha Clampitt's deposition

23   was hereby received into evidence as Claimant's Exhibit 54, as

24   of this date.)

25            MR. REED:  Wait, can see that?  Page 30 --

RESIDENTIAL CAPITAL, LLC, et al.                                69

1              THE COURT:  30, line 4 through 7.

2              MS. HAGER:  And, Mr. Reed, for clarification, I added

3    the question.

4              MR. REED:  Oh, I did that?  Oh, because --

5              MS. HAGER:  -- to that --

6              MR. REED:  Yeah, I did that.

7              MS. HAGER:  Right.  Is that okay?

8              MR. REED:  Page 30, line 4?  Yes, okay.  I see -- I

9    did that before.

10             THE COURT:  Go ahead, Ms. Hager.

11             MS. HAGER:  Page 31, line 13 through page 31, line 22;

12   no objection.

13             THE COURT:  Okay, in evidence.

14   (Page 31, line 13 through page 31, line 22, of Martha

15   Clampitt's deposition was hereby received into evidence as part

16   of Claimant's Exhibit 54, as of this date.)

17             MS. HAGER:  33/25 through 34/4, no objection.

18             THE COURT:  All right, in evidence.

19   (Page 33, line 25 through page 34, line 4, of Martha Clampitt's

20   deposition was hereby received into evidence as part of

21   Claimant's Exhibit 54, as of this date.)

22             MS. HAGER:  36, line 1 through 37/23; no objection.

23             THE COURT:  All right, in evidence.

24   (Page 36, line 1 through page 37, line 23, of Martha Clampitt's

25   deposition was hereby received into evidence as part of

RESIDENTIAL CAPITAL, LLC, et al.                    70

1    Claimant's Exhibit 54, as of this date.)

2            MS. HAGER:  47/3 through 47/15; no objection.

3            THE COURT:  Okay, in evidence.

4    (Page 47, line 3 through page 47, line 15, of Martha Clampitt's

5    deposition was hereby received into evidence as part of

6    Claimant's Exhibit 54, as of this date.)

7            MS. HAGER:  Page 40, line 8 through page 46, line 19,

8    I have several objections.

9            THE COURT:  All right.  Let me get to that, okay?

10            MS. HAGER:  Sure.  Just for clarification, I only have

11    objections to certain portions of that.

12            THE COURT:  Just let me familiarize --

13            MS. HAGER:  Sure.

14            THE COURT:  -- myself --

15            MS. HAGER:  Sure.

16            THE COURT:  -- with the designation.

17        (Pause)

18            THE COURT:  All right.  Tell me what your objections

19    are.

20            MS. HAGER:  Page 42, line 14 through page 43, line 14,

21    leading.

22            THE COURT:  All right.

23            MR. REED:  Wait, which one is it?

24            MS. HAGER:  Page 42, line 14 through page 43, line 14.

25            MR. REED:  42, line 14 through -- what was it through?

1          MS. HAGER:  43/14.

2          THE COURT:  The objection's overruled.

3  (Page 42, line 14 through page 43, line 14 of Martha Clampitt's

4  deposition was hereby received into evidence as part of

5  Claimant's Exhibit 54, as of this date.)

6          MS. HAGER:  The next objection is page 44, line 18

7  through page 45, line 15, leading.

8          THE COURT:  You stated no objection to form of the

9  question at the time.  Your objection's overruled.

10  (Page 44, line 18 through page 45, line 15 of Martha Clampitt's

11  deposition was hereby received into evidence as part of

12  Claimant's Exhibit 54, as of this date.)

13          MS. HAGER:  Okay.  That concludes Mr. Reed's

14  designations.

15          THE COURT:  Okay.

16          MS. HAGER:  And then I had some on cross.

17          THE COURT:  You had given me your cross designations

18  yesterday.

19          MS. HAGER:  Well --

20          THE COURT:  Do you have additional ones?

21          MS. HAGER:  -- I have additional, based on his --

22          THE COURT:  All right, go ahead.

23          MS. HAGER:  Okay.  21 through -- excuse me, page 21,

24  line 12 through 22.

25          MR. REED:  All right.  I get to read these too, Your

1    Honor, and --

2            THE COURT:  I'm sorry?

3            MR. REED:  Do I get to read this to see if I object to

4    hers?

5            THE COURT:  Yeah, yeah.  Go ahead.

6            MR. REED:  All right.  But I'm --

7            MR. REED:  21, line 12 through what?

8            MS. HAGER:  22.

9            MR. REED:  22, line what?  Oh --

10           MS. HAGER:  Sorry, page --

11           MR. REED:  21, lines 12 through 22?

12           MS. HAGER:  Yes.

13           MR. REED:  Okay, hold on.

14       (Pause)

15           THE COURT:  Do you have an objection, Mr. Reed?

16           MR. REED:  No, Your Honor.

17           THE COURT:  You're shaking your head no.

18           MR. REED:  No, Your Honor.

19           THE COURT:  Okay, next?

20   (Page 21, line 12 through page 21, line 22, of Martha

21   Clampitt's deposition was hereby received into evidence as part

22   of Claimant's Exhibit 54, as of this date.)

23           MS. HAGER:  Page 26, lines 13 through 15.

24           THE COURT:  Next?

25   (Page 26, line 13 through page 26, line 15, of Martha

1  Clampitt's deposition was hereby received into evidence as part

2  of Claimant's Exhibit 54, as of this date.)

3          MS. HAGER:  Page 27, lines 9 through 21.

4          MR. REED:  27/9 through 21?

5          MS. HAGER:  Yes.

6          MR. REED:  I have no objection.

7          MS. HAGER:  Page 29, lines 20 through 25.

8          MR. REED:  29, lines -- what are they again -- the

9  lines?  29 --

10          MS. HAGER:  20 through 25.

11          MR. REED:  20 through 25.

12          THE COURT:  All right.  Just so we're clear, there's

13  additional designations page 21, lines 12 through 22 is in

14  evidence; 26, lines 13 through 15 are in evidence; 27, lines 9

15  through 21 are in evidence; and 29, lines 20 through 25 are in

16  evidence.

17  (Page 27, line 9 through page 27, line 21 and page 29, line 20

18  through page 29, line 25, of Martha Clampitt's deposition were

19  hereby received into evidence as part of Claimant's Exhibit 54,

20  as of this date.)

21          THE COURT:  Next?

22          MS. HAGER:  Page 30, lines 1 through 3.

23          THE COURT:  All right, it's in evidence.

24  (Page 30, line 1 through page 30, line 3, of Martha Clampitt's

25  deposition was hereby received into evidence as part of

RESIDENTIAL CAPITAL, LLC, et al.                    74

1    Claimant's Exhibit 54, as of this date.)

2            MS. HAGER:  Page 31, line 23 through page 33, line 24.

3            THE COURT:  All right.  Give him a chance to read it.

4            MR. REED:  I'm going to ask you again.  When I'm

5    flipping the page, I'm not remembering the line numbers.

6            MS. HAGER:  Page 31, line 23 through page 33, line 24.

7            MR. REED:  33, line 24?

8            MS. HAGER:  Yes.

9            MR. REED:  I've got to read that.

10        (Pause)

11            THE COURT:  All right.  That's -- all right, next?

12    (Page 31, line 23 through page 33, line 24 of Martha Clampitt's

13    deposition was hereby received into evidence as part of

14    Claimant's Exhibit 54, as of this date.)

15            MS. HAGER:  Page 34, lines 5 through 22.

16            THE COURT:  Next?  That's in evidence.

17    (Page 34, line 5 through page 34, line 22, of Martha Clampitt's

18    deposition was hereby received into evidence as part of

19    Claimant's Exhibit 54, as of this date.)

20            MS. HAGER:  Page 35, lines 2 through 13.

21            THE COURT:  All right.  It's in evidence.

22    (Page 35, line 2 through page 35, line 13, of Martha Clampitt's

23    deposition was hereby received into evidence as part of

24    Claimant's Exhibit 54, as of this date.)

25            MS. HAGER:  Page 37, line 24 through page 39, line 12.

1          MR. REED:  Barbara, I'm going to ask you to repeat

2     that again.  37 --

3          MS. HAGER:  Sure, page 37, line 24 through page 39,

4     line 12.

5          MR. REED:  37/24 through 39, line -- page 39, what?

6          MS. HAGER:  Line 12.

7          THE COURT:  All right, it's in evidence.

8     (Page 37, line 24 through page 39, line 12, of Martha

9     Clampitt's deposition was hereby received into evidence as part

10    of Claimant's Exhibit 54, as of this date.)

11         THE COURT:  Next?

12         MS. HAGER:  Page 47, lines 19 through 21.

13         THE COURT:  All right, it's in evidence.

14    (Page 47, line 19 through page 47, line 21, of Martha

15    Clampitt's deposition was hereby received into evidence as part

16    of Claimant's Exhibit 54, as of this date.)

17         MS. HAGER:  Okay, nothing further.

18         THE COURT:  All right.

19         MR. REED:  Your Honor, I don't know how to do this.

20    There's a chart that Ms. Clampitt had provided, in part.  It's

21    a list -- analysis, she calls it.  She also included it in page

22    2 of her declaration.  How do I excerpt it -- move to just

23    excerpt just the chart?

24         THE COURT:  Let me ask you, Ms. Hager, do you have any

25    objections to paragraph 8 of the Clampitt declaration, which is

1  attached to the deposition transcript?  I think that's the

2  chart Mr. Reed is referring to.  I think that's what you were

3  asking your questions about.

4        MS. HAGER:  Just for clarification, because I'm not

5  sure I understood Mr. Reed's question, there's -- there is that

6  analysis that's in paragraph 8 of the declaration, but

7  separately, Ms. Clampitt brought something with her.  So which

8  one are you asking about, Mr. Reed -- because it was different.

9        MR. REED:   Yeah, that chart she brought with her,

10  I --

11        THE COURT:  Did it get marked as an exhibit?

12        MR. REED:  We did have it marked.  Didn't we have it

13  marked?  No?

14        MS. HAGER:  No.

15        MR. REED:  Then that's okay.  Then this, right here --

16        THE COURT:  Do you have any objection to paragraph 8

17  of Ms. Clampitt's declaration, which is attached as an exhibit

18  to her deposition transcript?

19        MS. HAGER:  No, Your Honor.

20  (Paragraph 8 of Martha Clampitt's deposition was hereby

21  received into evidence as part of Claimant's Exhibit 54, as of

22  this date.)

23        THE COURT:  All right.  So paragraph 8, rental

24  analysis -- in-market rental comparables, this series of bullet

25  points has the information.  So that's in evidence.

1          Okay, Mr. Reed?

2          MR. REED:  Yes.

3          THE COURT:  All right.  Does that complete the

4    discussion of the Clampitt deposition?

5          MS. HAGER:  Yes, Your Honor.

6          THE COURT:  All right.  All right, Mr. Reed, as I --

7    now moving back to your testimony, as I indicated earlier, my

8    notes, at least, reflect that we ended your testimony with the

9    discussion of your loan request from Joan Kline.  And the last

10   thing in my notes is that you told her that foreclosure has --

11   a foreclosure proceeding had started.

12         And I asked this before.  Did you have any

13   communication with Ms. Kline?  Is she going to show up

14   tomorrow?

15         MS. HAGER:  Oh --

16         MR. REED:  She doesn't want to.

17         THE COURT:  Well, I -- well, she'll either be here or

18   she won't.  What I'd say is this, if Ms. Kline fails to

19   appear -- and I think I made a comment about this yesterday --

20   if Ms. Kline fails to appear, I believe that Mr. Reed will have

21   satisfied the requirements of showing reasonable efforts to get

22   her here.  In which case, both sides should be prepared to

23   provide designations and counter-designations, if any, to the

24   Kline deposition transcript.  If she doesn't appear, I will

25   enter sanctions against her.

1          So if you speak to her -- I know she says -- you said
2     she's one of your wife's -- you only have one wife, but she's a
3     relative of your wife -- you might communicate to her I'm
4     serious about sanctions if she fails to comply with my order in
5     failing to appear.  But I don't want to take a lot of time, so
6     both of you ought to look at -- in the event she doesn't show
7     up -- give me page and line references in her deposition
8     transcript that you're going to offer.  It will only be
9     admissible if she doesn't show up.  And there will be
10    consequences to her if she doesn't appear.

11          Let's go on with the testimony.

12          MR. REED:  Your Honor, wait.

13          THE COURT:  No, no further discussion about it.  Let's
14    go on with your testimony.

15          MR. REED:  I can't remember -- I told this --

16          So I remember talking to Ms. Kline -- I just remember
17    talking to Joan and I had asked her if she would be interested
18    in lending money like before.  We discussed the amount; she
19    said she was interested in lending the money to me.

20          MS. HAGER:  Move to strike, hearsay.

21          MR. REED:  Oh.

22          THE COURT:  Sustained.

23          MR. REED:  That's right.

24          The amount was 300,000 that I wanted -- I had asked
25    from her, and she declined it -- eventually declined it.  I

1    don't know what else to say about it because I think I'm going

2    to be quoting what she said to me and that's --

3              THE COURT:  All right.

4              MR. REED:  -- hearsay.

5              THE COURT:  What's next, Mr. Reed?

6              MR. REED:  Let me get --

7              THE COURT:  Can I just ask you this, when did you seek

8    to borrow the 300,000 dollars from Joan Kline?  Do you remember

9    when that was, because we had Mr. Maines' testimony yesterday;

10   we have Mr. Curley today.  When did you make a request for a

11   loan from Ms. Kline?

12             MR. REED:  I thought it was at the end -- it was not

13   like one day.  We had several conversations, I think, about it.

14   And I think it was at the end of '08.

15             THE COURT:  Was it before or after you were

16   unsuccessful in getting loans from Mr. Maines or from TD Bank?

17             MR. REED:  I believe it was after the TD -- it was

18   after TD Bank.  Like, Mr. Maines and Ms. Kline were at the same

19   time.  In fact, if they would have lent me money -- both -- I

20   would've taken both loans to continue working on other -- more

21   property.  I think I testified that I was even looking at more

22   property.  I mean, we were contemplating that.

23             THE COURT:  I got the -- I'm getting the chronology.

24   Go ahead with your testimony.

25             MR. REED:  I'm sorry?

RESIDENTIAL CAPITAL, LLC, et al.                                80

1          THE COURT:  Go ahead.  You've answered my question

2    about the chronology.

3          MR. REED:  Okay, okay,

4          I'm not sure, you know?  Let's say -- okay.

5          Your Honor, to really -- I'm thinking about the

6    chronology.  I want to be clear about something in relation to

7    TD Bank.  My recollection is I thought TD Bank had -- the way

8    it worked with our conversation was I wanted X amount of

9    dollars, as much as -- I would tell Rob I wanted as much as

10   he -- you know, whatever you can give me, the most you can give

11   me, whatever you can do for me.

12         MS. HAGER:  Objection as to Mr. Reed's testimony on

13   Matlack, which the Court has already made rulings on.

14         THE COURT:  I overrule it.  I'm going to listen to the

15   testimony.

16         MR. REED:  And if I recall it correctly, Rob was

17   talking -- how can I say this?

18      (Pause)

19         MR. REED:  I'm going to -- it was a different

20   proposition that Commerce Bank and TD Bank came back at me

21   with.  It was for less money -- it involved all the

22   properties -- than what I had hoped for.  And I believe that I

23   turned to Mr. Maines and Joan Kline and then followed up with

24   TD Bank when they declined me.  So it was a complete go

25   through -- I don't know what you want to call it -- of all my

1    options -- an inventory of all my options.

2            And I believe when I got back to TD Bank -- man, the

3    dates on this -- so even -- like, so in other words, if I had

4    my druthers, I wanted more money.  TD Bank wasn't going to give

5    me as much; it involved different properties.  Then I went to

6    Maines, went to Kline -- well, Kline and Maines.  I can't

7    remember the exact order there.  They eventually declined.

8            Then, hat in hand, I thought, well, I may as well take

9    what I  -- whatever I can get to keep going and everything from

10   TD Bank.  And that's when TD Bank said it wasn't an option for

11   them.  I cannot give you, like, when that happened but that's,

12   in my mind, the sequence why I did what I did.

13           THE COURT:  Let's just -- Mr. Curley testified that TD

14   Bank transferred your consolidated loan to work out, or asset

15   recovery in late August of 2009.  As of that time, had you

16   defaulted in the monthly payments on the consolidated loan?

17           MR. REED:  No, I -- no.  No, Your Honor, because we

18   had an infusion of cash from Brett Cooper.  We also had some

19   money from Min (ph.).  So as I explained to you before, at that

20   time, it was like being on the Titanic, I think I said.  I

21   didn't realize that eventually, things were going to fall

22   apart.

23           We -- the house in Virginia was current.  I believe

24   the rental properties were all current.  We were spending a ton

25   of money on the Old Dell Trace house.  I was showing you the

RESIDENTIAL CAPITAL, LLC, et al.                    82

1   pictures of all the work that we did.  There was testimony, I

2   think, from people who visited the house.  And I said that it

3   was a condition from, so no.  No, I don't believe so.

4          MS. HAGER:  Your Honor, I move to strike Mr. Reed's

5   testimony as it relates to efforts to refinance the TD Bank in

6   2009.  Your Honor found, in our prior trial, that Mr. Reed

7   applied -- that Mr. Reed's testimony was that he asked Commerce

8   Bank to complete the cash-out refinance at the time that the

9   Jacobs loan -- or, excuse me, the Jacobs deal was not in

10  dispute, in the event that the sale to Jacobs did not close.

11         THE COURT:  All right.  Your motion's overruled.

12         Let's go on, Mr. Reed.

13      (Pause)

14         MR. REED:  Your Honor, in my notes, I'd like to

15  confirm something to see if 40 and 41 are in as evidence.  In

16  my notes, it's missing a mark -- a notation.  I don't remember

17  if I talked about these.

18         41, okay.  That's not -- I see that's not, so I

19  withdraw the question about 41.

20         THE COURT:  My notes do not show 40 or 41 being in

21  evidence.

22         MR. REED:  And I think 39 was -- was that objected to

23  and --

24         THE COURT:  It was, and I sustained the objection.

25         MR. REED:  Okay.  That's what I --

1          THE COURT:  Mr. Reed, we've got to get on with your

2   testimony.

3          MR. REED:  Okay.  I don't -- I'd like to move to tab

4   9.

5          MS. HAGER:  Your Honor, for the record, I don't have

6   anything behind tab 9.  I see what it's supposed to be on the

7   index.

8          Is there an extra copy, Mr. Reed?

9          MR. REED:  I don't know.  There should -- do you have

10  it, Your Honor?

11         THE COURT:  I do.  Well, I have something behind tab

12  9.  I have -- the first page is a deed and the second page

13  begins, "this indenture".

14         MR. REED:  Your Honor, could you return two and then

15  I'll go look in my brief and see if there's one for Ms. -- I

16  don't know why it's not in Ms. Hager's.

17         THE COURT:  Maybe we'll -- I'll just -- you don't have

18  it either?

19         MR. REED:  Oh, it was --

20         THE COURT:  Stay there, Mr. Reed.  Why don't you give

21  that to Ms. Hager -- my copy?

22         Plaintiff's Exhibit 9 is a deed and an indenture.

23     (Pause)

24         THE COURT:  Do you need time to read through that?

25  Can you tell me what it is, Mr. Reed?

1          MS. HAGER:  No, go ahead.

2          MR. REED:  These -- let's see, they should be -- these

3   are the deeds -- they should be the deeds that I obtained from

4   Camden County Clerk's Office recording of deeds.  It would

5   indicate the properties -- my rental properties:  318 Columbia

6   in -- I'm trying to see the addresses on them -- 21 Darien

7   Drive -- 318 Columbia in Stratford, New Jersey, 21 Darien Drive

8   in Cherry Hill, New Jersey, and 52 Stone Hollow Drive in --

9          THE COURT:  What are you offering these to show?

10         MR. REED:  Maybe I'll -- I don't know if it's just a

11  matter of record that -- this is the house that was foreclosed

12  on.  And that's all, Your Honor.  I've got -- I don't know.

13  Maybe it's judicial notice that the houses were foreclosed on.

14         THE COURT:  TD Bank foreclosed on --

15         MR. REED:  Yes.

16         THE COURT:  -- one of the houses?

17         MR. REED:  Yeah.

18         THE COURT:  They had a blanket mortgage --

19         MR. REED:  Yeah, yeah.

20         THE COURT:  -- on the three properties?

21         MR. REED:  Um-hum.

22         THE COURT:  And I think you had already testified that

23  they foreclosed on those.

24         MR. REED:  Yeah.  Okay, so maybe I don't need that --

25         THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    85

1          MR. REED:  -- because we have it.

2          THE COURT:  But let's move on.

3          MR. REED:  Okay.  All right, so that -- forget that

4    one.

5          THE COURT:  These are the three rental properties?

6          MR. REED:  Yes.

7          THE COURT:  Did you sue them before or after the

8    foreclosure?  There was testimony yesterday you sued TD Bank.

9    I am correct about that, right?

10         MR. REED:  Your Honor, I think it was in the -- as I

11   said to you, I think it was in -- there are two actions that TD

12   Bank took:  law division on the note and chancery for

13   foreclosure.  I don't remember if we -- if the action I'm

14   referring to is like an answer and counterclaim to --

15         THE COURT:  You objected when they wanted to --

16         MR. REED:  And then they wanted --

17         THE COURT:  -- take the rents.

18         MR. REED:  It was -- in one of those litigations, was

19   a motion to take rents.

20         THE COURT:  Okay.

21         MR. REED:  And we objected to that and we succeeded.

22         THE COURT:  But New Jersey is a judicial foreclosure

23   state.  They had to get a judge's order permitting to

24   foreclose; is that correct?

25         MR. REED:  Correct.

RESIDENTIAL CAPITAL, LLC, et al.                    86

1          THE COURT:  All right.  Go ahead.

2          MR. REED:  Let's see.  Number 8, Your Honor, is the --

3    I understand this to be the law division judgment relating to

4    the properties -- rental properties.  I obtained this from the

5    clerk -- the clerk of New Jersey -- the superior court clerk.

6          THE COURT:  If I understand this correctly, February

7    8th, 2010, TD Bank got a judgment against you for $747,206.57?

8          MR. REED:  Yes, on the note, I think.  And I don't

9    know what else.  I don't remember what else.

10         THE COURT:  All right.  Are you offering this exhibit?

11         MR. REED:  Sure, Your Honor.

12         THE COURT:  Any objection?

13         MS. HAGER:  No objection.

14         THE COURT:  All right.  Claimant's Exhibit 8 is

15   evidence.

16   (TD Bank judgment for $747,206.57 was hereby received into

17   evidence as Claimant's Exhibit 8, as of this date.)

18      (Pause)

19         MR. REED:  Three --

20      (Pause)

21         MR. REED:  Your Honor, are you waiting for --

22         THE COURT:  No, go ahead.

23         MR. REED:  Oh, okay.

24         THE COURT:  I'm waiting for you to continue.

25         MR. REED:  Oh, sorry.  Sorry.

1        In 2010 -- let's see, 2010, I returned -- as I was

2   testifying, the -- in 2000 -- by 2009, it started to become

3   clear to me that the Titanic had -- we had a problem.  The --

4   as I explained to you, the foreclosure action had been

5   important to other people.  Other businesses had affected us

6   negatively.

7        So one of the things that I did, besides trying to

8   manage our cash flow and diligently trying to get the house

9   done in Virginia, was I hired an attorney to help me -- in New

10  Jersey, to help us with the ramifications of the foreclosure,

11  now, my interruption of cash, my business relationships.  And

12  TD Bank, we know, was -- I did business with them for decades.

13  My wife's cousin I did business with for a number of years and,

14  of course, numerous transactions -- me personally.  Mr. Maines

15  was interested in doing business with me.  It became very clear

16  to me -- I think I made some phone calls, even, to other

17  lenders -- I can't remember to who -- with now being -- the

18  first statement off of my list being, recently, we had this

19  foreclosure situation; do you have any programs that could

20  accommodate financing for someone like that.

21        And I realized very quickly that -- or not very

22  quickly, but I started to realize, what am I going to do;

23  there's nothing available for us.  And that's when I talked to

24  you a bit yesterday about -- like, an expungement.  Like, in a

25  judicial system for foreclosures in New Jersey, I prepared --

1  like, a criminal case, for example, you get charged with

2  something criminally and you defeat the charges or it's

3  dismissed.  You are -- you can have it expunged in New Jersey

4  and no one will ever know that that's what happened.  With the

5  foreclosure, even though you -- I had it dismissed, it's a

6  matter of record.

7              THE COURT:  But, Mr. Reed, you got a summary judgment

8  in New Jersey --

9              MR. REED:  Yes.

10             THE COURT:  -- in early February of 2009, for a

11 dismissal of the foreclosure action, without prejudice,

12 correct?

13             MR. REED:  Yes.  I'm not sure of the date.

14             THE COURT:  GMAC filed a foreclosure action on May

15 28th, 2008.  And on February 9, 2009, you got a summary

16 judgment, determining that the foreclosure action should be

17 dismissed without prejudice.

18             MR. REED:  We're not --

19             THE COURT:  You haven't been paying your mortgage or

20 your real estate --

21             MR. REED:  We're not re-litigating whether they were

22 rightful.

23             THE COURT:  But you haven't been paying your mortgage

24 or your real estate taxes.  That wouldn't change the dismissal

25 in the foreclosure action.  They could turn around and refile

1    it.  You owed them money; isn't that true?

2              MR. REED:  Right, but there's --

3              THE COURT:  Is that true?  You owed them money; do you

4    agree?

5              MR. REED:  No.  I won't agree to that because there's

6    set-off and recoupment claims --

7              THE COURT:  All right.

8              MR. REED:  -- that arose from their wrongful act.  And

9    that's what we start to litigate.  And along with that, we

10   tried so -- I can't just say to you, yes.

11             THE COURT:  All right.  You believe -- you think you

12   had set-off or recoupment claims.  You agree you haven't paid

13   your mortgage.  You haven't made any mortgage payments since

14   February of 2008; is that correct?

15             MR. REED:  How is that germane?

16             THE COURT:  Is that correct?  Could you just answer my

17   question?  Is that correct?  You haven't made a single mortgage

18   payment since February 2008 on the Matlack property?

19             MR. REED:  In the breach of contract --

20             THE COURT:  Could you answer my question?  You either

21   answer my question or your testimony is completed, okay?  Am I

22   correct that you have not made a single mortgage payment since

23   February 2008 on the Matlack property?

24             MR. REED:  Correct.

25             THE COURT:  And you haven't paid property taxes since

1    2006 on the Matlack property?

2            MR. REED:  I don't know that date.

3            THE COURT:  And you haven't paid insurance premiums on

4    the Matlack property since 2008, correct?

5            MR. REED:  I don't believe that to be correct.

6            THE COURT:  When do you think you made an insurance

7    premium payment, since 2008?

8            MR. REED:  I'd have to ask my wife, but I'm under the

9    impression we were insured through when we came back from New

10   Jersey.  I don't remember -- I don't know how long after that.

11           THE COURT:  You couldn't -- all right.  Just go on

12   with your testimony.  I'm not going to argue.

13           MR. REED:  Your Honor, what is the --

14           I want to say this, how is the non -- how is GMAC

15   Mortgage re-litigating?  They had -- they're wrongful.  They

16   had no right to it.

17           THE COURT:  And I awarded you damages because they

18   wrongfully filed a foreclosure action.  You got it dismissed in

19   New Jersey and I've awarded you damages for your attorneys'

20   fees in connection with that action.  Getting that case

21   dismissed didn't change the fact whether you were paying your

22   mortgage or not.

23           MR. REED:  To --

24           THE COURT:  Let's go on with your testimony, Mr. Reed.

25   Let's not argue about it.

RESIDENTIAL CAPITAL, LLC, et al.                    91

1           MR. REED:  How are you missing the point?

2           THE COURT:  What's the next subject you want to cover?

3           MR. REED:  The hiring of Jeffrey Walters to take

4  affirmative actions against GMAC Mortgage for the damage that

5  their wrongful act caused.  So as I was saying, there was --

6  man, I'm flustered now.

7           So Mr. Walters was someone who was familiar with the

8  foreclosure situation.  And I had relayed to him the various

9  facts I thought that were happening, and Mr. Walters was then

10 retained.  I paid him some of his fees -- or his fees that he

11 requested initially, and I think subsequently, on a couple of

12 occasions.  Mr. Walters first did this -- the lawsuit against

13 GMAC Mortgage in the law division.  It was challenged by GMAC

14 for not stating, I guess, cognizable claims and it was -- our

15 action was sustained.  If I recall correctly, we were allowed

16 to amend the complaint, later in proceedings after some

17 discovery.  And then we -- we then -- there was extensive

18 discovery.  There were some depositions.  There were -- there

19 was a mediation that took place.  And I think there were

20 several challenges to that litigation.

21          And then we were approached by the Federal Reserve to

22 participate in the Federal Reserve action against GMAC

23 Mortgage.  We felt the crux of our claims, which were similar

24 to the claims that we have here in these proceedings, regarding

25 the same facts and law, I believe.  The --

1          THE COURT:  Did you pay Mr. Walters any fees other

2     than in connection with defending the foreclosure action?

3          MR. REED:  Yes, it was not in -- oh, in defending the

4     foreclosure --

5          THE COURT:  Other than in defending the foreclosure

6     action?

7          MR. REED:  Mr. Walters' fees were primarily in trying

8     to -- filing a lawsuit against GMAC, as I'm doing here in the

9     bankruptcy proceedings, in trying to get a judgment for my

10    consequential damages from their bad act.  So we were trying to

11    seek, like the judgment that you gave here in these

12    proceedings, at the state court, and then consequential damages

13    based on those, sort of the same as we're doing here.

14         THE COURT:  Okay, so let's go to whatever evidence you

15    think you have that shows that you paid Mr. Walters' fees and

16    what they were in connection.

17         MR. REED:  Okay, I -- Mr. Walters provided a -- just

18    like, I guess, Mr. McCrink did for the foreclosure case, Mr.

19    Walters provided me with all his bills relating to the

20    litigation, and he's outlined in all the bills -- or he did at

21    the time, I mean, I -- what they were for -- I asked him to

22    provide me what the litigation was for, and this is what he

23    provided me.  It's in tab 33.

24         Your Honor, I think I left something on my desk, if I

25    can go over there and get it?

1            THE COURT:  Sure.

2        (Pause)

3            THE COURT:  Ms. Hager, did you take Mr. Walters'

4    deposition?

5            MS. HAGER:  No, Your Honor.

6            THE COURT:  Is he coming to testify, Mr. Reed?

7            MR. REED:  Mr. Walters in on my witness list, and I

8    wasn't sure if he had to.  He said he would, but he told me

9    that he thought that this was a certification of his records

10   and that that should be acceptable to the Court.  So just

11   like -- and as I said to you, the two attorneys who did the

12   work on my foreclosure case, Mr. McCrink didn't come and

13   neither did -- I can't remember the lady's other name -- they

14   provided all their bills and a sworn statement that those were

15   their bills.

16           So I was prepared to do it that way, and I was -- put

17   him on the list just in case, because I didn't know, I mean,

18   even though Mr. Walters probably is -- but this is -- he's

19   prosecuting in here -- everything that we're doing here in this

20   bankruptcy proceeding.  This is what we were doing at the state

21   court.

22           THE COURT:  Ms. Hager?

23           MS. HAGER:  Well, for point of clarification, I mean,

24   I -- the attach -- so Mr. Walters basically provided a business

25   records affidavit.  He didn't really call it that, but that's

RESIDENTIAL CAPITAL, LLC, et al.                    94

1  basically what it is.  So I think that the documents that he

2  attached have been authenticated, but they're still hearsay.

3          But beyond that, it's unclear exactly what Mr. Walters

4  was handling.  And it is not the same thing as we're doing

5  here.  Mr. Reed was successful on the CFA claim.  I don't know

6  if there was a CFA claim below once the complaint was amended.

7  There's not evidence to that, so it's not the same.  There

8  was -- in the Court's opinion in an order from October, there

9  was discussion about the CFA claim and specifically, concerning

10 the fact that -- with respect to the action that we're dealing

11 with right now, Mr. Reed was not entitled to collect any

12 attorney's fees, obviously, since he's pro se.

13         Your Honor was kind of I think trying to cover that

14 base and making the point that, because Mr. Reed was successful

15 on the CFA claim, and the CFA is a consumer protection statute

16 which provides for fee shifting, in the event that the consumer

17 is successful, right, but here, Mr. Reed --

18         THE COURT:  Can we deal with this one step at a time?

19 Are you objecting to Claimant's Exhibit --

20         MS. HAGER:  Well, I am --

21         THE COURT:  -- 33?

22         MS. HAGER:  -- if he's offering it, I am objecting to

23 it as hearsay.

24         THE COURT:  You going to have to bring Mr. Walters as

25 a witness.

RESIDENTIAL CAPITAL, LLC, et al.                                    95

1              So the objection's sustained.

2              You're going to need to bring Mr. Walters as a

3       witness.  You better arrange for him to get here.

4              MR. REED:  Okay.  I can call him at lunch and --

5              THE COURT:  Fine.

6              Sometimes Ms. Hager, be careful what you ask for,

7       because you'll get it.

8              Let's move on.

9              MR. REED:  I have some notes; I'm almost there , Your

10      Honor.

11          (Pause)

12             MR. REED:  Your Honor, you heard -- you saw -- you've

13      seen a lot of -- I've given you a lot of -- I think I've given

14      you a lot of evidence.  You've seen evidence that I was in the

15      regular business of buying and selling and flipping properties

16      for a long time, fifteen, twenty -- it's twenty years.  I would

17      like to say to you that my typical kind of margin on those

18      projects were about twenty percent, sometimes sixteen, fifteen,

19      and occasionally over twenty percent; it would be twenty-five

20      percent.

21             The Old Dell Trace property was something that I -- we

22      expected a little higher end margin on it.  The -- I'll say one

23      thing I get this straight --

24          (Pause)

25             MR. REED:  I'm trying to do this so -- and I want to

RESIDENTIAL CAPITAL, LLC, et al.                                   96

 1  be accurate as best I can from my memory.  Hold on.

 2        (Pause)

 3              MR. REED:  Your Honor, I feel guilty.  I'm trying

 4  to -- I'm getting -- making progress, trying to remember

 5  everything so that I can tell that what we put into the

 6  property, because I have to offer that -- I want to offer that

 7  to you, and I want to -- and then tell you how that affected

 8  what we thought we were -- I was going to get from the

 9  property --

10              THE COURT:  Talking about Old Dell Trace?

11              MR. REED:  Yeah.  Yeah, and it's complicated, and it's

12  a lot of it -- a lot of little numbers add up too, like --

13  but --

14              THE COURT:  All right.  We're going to break for

15  lunch.  It's 11 -- it's 12:25.  Mr. Reed, you better come back

16  at 2 o'clock prepared to tell -- whatever evidence you've got

17  about -- you're trying to add up the total you spent on Old

18  Dell Trace?

19              MR. REED:  What I spent on it, and then we're also

20  going to talk about what I was yet to spend on it.  And --

21              THE COURT:  Okay.  Mr. Reed --

22              MR. REED:  But it should be very quick.  I'm going to

23  give you like a list.

24              THE COURT:  It will be quick, if you come prepared to

25  do it.  What other subjects do you plan to cover in your

1  testimony?  I do want to hear what you spent on Old Dell Trace.

2  I know what you paid for it, 899, with some adjustments in the

3  escrow, but yesterday it came in that the purchase price was

4  899.  And then you did work on it, but I don't know what that

5  adds up to.  That's what you're going to get to me?

6          MR. REED:  Yes, that's what I'm trying to get to

7  you --

8          THE COURT:  Okay.

9          MR. REED:  -- because I think you need to know.

10         THE COURT:  What other subjects are you planning to

11 cover in your testimony?

12         MR. REED:  I think there's something I wanted to talk

13 to you about the Oxford House and our relationship there,

14 because we entered their deposition, but I don't think I

15 discussed my interactions with the Oxford House at all in my

16 notes.  I don't think I testified to anything regarding my

17 relationship with them and the foreclosure.  I don't think I

18 did any of that.

19         THE COURT:  What other subjects do you plan to cover,

20 Mr. Reed?

21         MR. REED:  I think we didn't talk about Dennis Whelan

22 as well in this either.  I think we entered his declaration

23 pending your further evidence, and I think I got -- I took that

24 to be, that I need to explain his role in this as well.

25         MS. HAGER:  That was taken under advisement for

RESIDENTIAL CAPITAL, LLC, et al.                    98

1  clarification.

2          MR. REED:  Yes.

3          THE COURT:  What else, Mr. Reed?

4          MR. REED:  I don't know.  I thought that's what I was

5  doing -- I thought that would be today.  I didn't --

6          THE COURT:  Just tell what Mr. Reed -- I just want to

7  know what other -- what subjects you still intend to cover in

8  your testimony?

9      (Pause)

10         MR. REED:  I don't remember.  I thought there was more

11 that I had to talk about with regard to Old Dell Trace and the

12 mortgage -- the primary mortgage on that.  I'm going to look --

13 I'm not sure.

14         THE COURT:  Mr. Reed, so you need to figure out

15 exactly what it is you're going to cover, because we've spent a

16 lot of time over the last few days, most of you while you try

17 to figure out what subjects you want to cover.  I told you

18 before the start of this that you need to come organized

19 about -- and go through crisply about the testimony you want to

20 give, the exhibits you want to mark and offer.

21         All right.  We're going to break for lunch.  We resume

22 at 2 o'clock.

23         We're not going to ramble along, Mr. Reed.  You need

24 to crisply go through the evidence that you want to provide.

25         All right.  We're in recess.

1          (Recess from 12:30 p.m. until 2:02 p.m.)

2              THE COURT:  All right, Court's back in session.

3    ResCap, 12-12020.

4              Before we begin the afternoon, with respect to the

5    deposition transcript of Dennis Whelan, which is Exhibit 29, as

6    to why I had reserved decision.  I'm going to conditionally

7    admit in evidence the deposition transcript and the invoices of

8    Mr. Whelan.

9    (Mr. Whelan's deposition transcript and invoices were hereby

10   received into evidence as Claimant's Exhibit 40, as of this

11   date.)

12             THE COURT:  It seems to me that the issue is going to

13   be a legal issue.  Whether Mr. Whelan's fees in protecting Mr.

14   Reed's interests with respect to the Old Dell Trace property

15   could, on any theory, form part of the compensable damages as a

16   result of GMAC's conduct in initiating the foreclosure

17   proceeding.  And on that I'm reserving decision.  That seems to

18   me to be fundamentally a legal issue.

19             I've reviewed -- I've read the transcript -- both the

20   direct examination and the cross-examination, and looked

21   through quickly Mr. Whelan's invoices.  I think those invoices

22   are business records.  And whether or not they're -- whether or

23   not Mr. Reed is entitled to recover any of the fees incurred --

24   not paid but incurred -- to Mr. Whelan is a legal issue that

25   I'm going to have to deal with.  But that's my ruling with

1    respect to -- so that -- the entire transcript.  I'm not going

2    to go through page and line number.  It's not that long a

3    transcript.

4             I should say there's -- there are portions of it,

5    that, if offered for the truth, would be hearsay.  But I think

6    on notice or knowledge theories, not hearsay purpose, they come

7    in.  I'm not going to accept the hearsay for the truth of the

8    matter as asserted, but I understand from the transcript what

9    Mr. Whelan viewed his retention to be, and I'll deal with it in

10   a decision.

11            So let's go Mr. Reed; take the witness stand.

12            MR. REED:  Your Honor, I'd like to say something for

13   the record that I apologize if I'm slow today.  I had to -- I'm

14   embarrassed to say it, but in the bathroom downstairs in the

15   first floor, right before court started, I got tangled in my

16   pants from using the restroom, and I fell, smashed my head

17   against the wall, and destroyed the toilet -- I shattered the

18   toilet.  And I've been out of sorts this whole day because of

19   that.  And I just wanted to let you know that.

20            THE COURT:  All right, let's proceed with your

21   testimony, Mr. Reed.

22            Just before you do that, we're going to break at 4:25.

23   I've got probably a lot of orders coming in here at 4:30 for a

24   4:30 hearing, so we'll break at 4:25.  Go ahead, Mr. Reed.

25            MR. REED:  So as I testified, Your Honor, we did an

1    extensive amount of work on Old Dell Trace.  The vast majority

2    of that work was paid for, the material or the labor of the

3    subcontractors, and there's a relatively small amount, about

4    maybe ten percent, that wasn't paid, that had outstanding

5    balances when we ran out of funding.

6            So I'd like to say what those things were.  We did

7    about 5,000-dollars worth of demolition.  The framing was about

8    40,000 dollars.  The windows and doors were about 20,000

9    dollars.  The drywall itself was about 6,000 dollars.  The roof

10   was done with two different people.  There was a stage where we

11   did the water sealing of the roof, which is the underlayment to

12   the actual roofing itself.  That was paid cash.  That was paid

13   6,000 dollars.  Part of that 6,000 was also paid to the final

14   roofing company represented by Mr. Rosser.  It was 2,500

15   dollars.  There's still an outstanding balance --

16           THE COURT:  Is the 2,500 part of the 6,000?

17           MR. REED:  Yes, that's why I'm saying that -- so that

18   left -- 3,500 was for the prep in the roof, where they cleared

19   off part of the roof for the attachment of the new section and

20   then they waterproofed that section.  Then Mr. Ross -- the

21   company that Mr. Rosser represents was about 11,000 dollars, I

22   think -- it's in his declaration -- for the metal roofing,

23   2,500 of which we paid.  There's an outstanding balance with

24   that company.  I'll discuss that in a little bit.

25           Various mechanical work from the hot water and

1    plumbing and things of that nature.  That was about 12,000

2    dollars.  The brick for the retaining wall that we did and the

3    extension of the chimney, I think, it was about 20,000 dollars.

4    The mill work that we did was -- that's about 4,000, and I

5    categorize it as mill work.  It's all moldings that you saw in

6    the photos.  There were many more.  That was the labor --

7    primarily for that was Mr. Suhr.  He has a deposition -- a

8    declaration and --

9              THE COURT:  Is that 4,000 for the material and labor

10   or just --

11             MR. REED:  No.  40,000.

12             THE COURT:  40-?  I thought I heard you say 4-.

13             MR. REED:  I'm sorry.  N.B. Goodwyn & Son is the -- a

14   Mr. Beck --

15             THE COURT:   I was only expressing surprise because I

16   heard you say 4-, and the mill work was very extensive.  That's

17   why I --

18             MR. REED:  Yeah, yeah, I know.  It's --

19             THE COURT:  -- asked the question.

20             MR. REED:  The primary supplier for the mill work

21   itself was Mr. Beck's company, N.B. Goodwyn.  It's not every

22   place we got it.  I got a lot from other retailers, but I

23   cannot -- there's no way I can reasonably give you a number for

24   the countless times we ran to Home Depot and Lowe's for extra

25   this, extra that, wiring.

1           No, as a matter of fact, I'm sitting here right here
2    now -- I mean, it's wiring.  I have to think about electric for
3    a moment.

4           Okay, so back to the mill work.  It was about 40,000
5    dollars for the mill work and the work itself.  The dumpsters,
6    just to take away stuff, we paid -- Mr. Pryor provided it -- a
7    declaration.  We paid 3,500, approximately -- it was like 3,485
8    dollars -- whatever his declaration is -- 30- -- I just roughed
9    it here 3,500 for dumpsters.  He still has an outstanding
10   balance of like 2,200 or something like that, because, it was
11   at the end that we still -- we were running out of money.  He's
12   one of four fellows that we didn't finish paying.

13          Paint -- I think for paint and painting, it was
14   about -- probably 10-; installation, 5,000 dollars.  The lumber
15   for the framing and the sheathing, that was about 30,000
16   dollars.  The install for the dry wall, it was about 3,000
17   dollars.  Taping -- I don't know if you know what taping is.

18          THE COURT:  I do.

19          MR. REED:  Okay, because I think that was about 3,000
20   dollars.

21          THE COURT:  So you had earlier -- very early, in the
22   second list that you gave us was 3,000 for framing.  Is that
23   for labor?

24          MR. REED:  Correct -- no, no, no.  The beginning --

25          THE COURT:  Well, you had given me demolition, and you

RESIDENTIAL CAPITAL, LLC, et al.                    104

```
 1   had given me framing.
 2          MR. REED:  Okay, demolition is 5,000 dollars.
 3   Framing, the labor --
 4          THE COURT:  Labor?  Okay.  That's 40- --
 5          MR. REED:  -- was 40,000 dollars.
 6          THE COURT:  You didn't give that to me before.
 7          MR. REED:  Okay, did I -- because I'm reading from
 8   my --
 9          THE COURT:  Let's go back over the list quickly.
10   Just -- here's what I have, and you'll correct me.  5,000,
11   demolition.
12          MR. REED:  Yes.
13          THE COURT:  Framing was how much?
14          MR. REED:  Framing was about 40,000 dollars
15   altogether.  It was 37,000 -- I think we paid 37,500.  There's
16   a gentleman we still owed money.  He did a declaration, but he
17   didn't show up to the deposition because we still owed him a
18   few thousand -- two-and-a-half to -- whatever the declaration
19   says, two-and-a-half thousand.
20          So back to the -- demo, 5-; framing, total labor 40-,
21   which includes also -- Your Honor, in framing, they set the
22   windows and doors for that, too.  So it's --
23          THE COURT:  Okay, here's the -- my notes -- you listed
24   framing at the beginning, and then the next to the last item
25   after -- before dry wall, you listed framing.
```

1        MR. REED:  Lumber.  Lumber is the actual framing

2    material, this 30,000.

3        THE COURT:  Okay.

4        MR. REED:  So like all the beams, all the --

5        THE COURT:  Yes, I know what the -- I know what --

6        MR. REED:  Okay, I'm sorry.

7        THE COURT:  -- framing means.

8        MR. REED:  Do you want to go -- I'm sorry if I'm -- do

9    you want to go through it again?  Demo, 5-; framing, 40- --

10       THE COURT:  That framing 40- is the labor?

11       MR. REED:  Correct.  Let me make sure -- let me write

12   that down.

13       But again, I should say 37- -- you can change it to

14   37-5 is -- let me check that on my -- the declaration because

15   he's the one who told me.  He remembered that.  I had an idea

16   how much.  Hold on.

17       (Pause)

18       MR. REED:  Okay.  So it's -- the declaration is not in

19   evidence.  But in our research in communicating and confirming

20   what I paid in cash, 37,250 dollars.

21       THE COURT:  What's that for?

22       MR. REED:  That was what was paid actually for framing

23   labor.

24       THE COURT:  Okay.  So --

25       MR. REED:  And the -- so 37,250, and I still owed that

RESIDENTIAL CAPITAL, LLC, et al.                    106

1    gentleman 2,750 dollars as -- according to -- because I knew we

2    owed him a few thousand dollars.

3              THE COURT:  And you had windows and doors 20,000.  Is

4    that materials and labor?

5              MR. REED:  No, the framing guy sets the windows and

6    doors.

7              THE COURT:  Okay.  So that -- the 20,000 windows and

8    doors for the materials?

9              MR. REED:  Yes, um-hum.  Um-hum.

10             THE COURT:  Then, you had dry wall, 6,000 dollars?

11             MR. REED:  That's for the --

12             THE COURT:  That's for the material?

13             MR. REED:  That's for the material.

14             THE COURT:  And then, you had the dry wall taping, you

15   had 3,000 dollars.

16             MR. REED:  Yes.

17             THE COURT:  Taping the seams on the dry wall?

18             MR. REED:  Yeah, and then the install is a separate --

19   that's a separate contractor.

20             THE COURT:  All right.

21             MR. REED:  The taping install was 3- -- or the dry

22   wall install was 3,000.  These are very -- this is the number

23   with a reasonable remembering of that number.

24             Where was I?  Okay.  So 5- for demo; 37,250 for

25   framing, labor; 20,000 for windows and doors and material;

1    6,000 dry wall material; 6,000 for the roof, which was the

2    under -- you know, the water part; and 2,500 that wasn't paid

3    to Mr. Welzers (ph.) --

4                THE COURT:  That's included in the 6,000?

5                MR. REED:  In the 6,000, right.  That's within the

6    6,000.  I was just identifying it.

7                It's about 12,000 in all the different mechanical --

8                THE COURT:  You had given me Mr. Rosser, the metal

9    roof 11,000.

10               MR. REED:  Right, because --

11               THE COURT:  I'm just trying to get the numbers down,

12   Mr. Reed.

13               MR. REED:  That's all right.

14               I'm talking -- the way I'm approaching this, just so

15   we're clear, I'm giving you first what I paid -- actually paid

16   out-of-pocket.  Then, I'm going -- I intend to give you a few

17   numbers of money that's still outstanding to several

18   contractors.  And then, I was intending to tell you the things

19   that still needed to be done, but in thought and how much for

20   those things.

21               So the mechanical was about 12,000.  The brick, that

22   was pretty extensive because of the chimney and the wall, that

23   was 20,000.  And that was material and labor.

24               Again, the mill work -- I put that in a general

25   combined category -- that is labor and material.  And that's a

1  portion of Jim Sher's bill and N.B. Goodwyn.

2          The dumpsters --

3          THE COURT:  Yeah, you gave me 3,500 for that.

4          MR. REED:  3,500.

5          THE COURT:  Yeah.  And 10,000 for paint.

6          MR. REED:  Paint; installation, 5-; lumber material,

7  it's 30-; 3,000 for dry wall install; 3- for taping; 3- for

8  site work.

9          Yeah, that -- I don't have that total for me now that

10 we changed --

11     (Pause)

12          THE COURT:  What you've given me so far totals 204,500

13 dollars.

14     (Pause)

15          MR. REED:  I'm sorry, Your Honor, what did you say the

16 number was?

17          THE COURT:  No, I think that was wrong.

18     (Pause)

19          THE COURT:  It's 315-.  I'll add it up later.  Let's

20 go on.

21          MR. REED:  Yeah, Your Honor, I have to -- like I said,

22 in going through this --

23          THE COURT:  I need to use a calculator.  You want

24 to -- did you total it?

25          MR. REED:  I came up with two-seven-fifty.

1              THE COURT:  All right, I'll total it up later.

2              MR. REED:  And then, as I was -- as I said earlier, as

3    I was getting lunch and I was thinking about these things, the

4    electric as well because that's not included in the mechanical.

5    The mechanical is the plumbing.

6              THE COURT:  How much was the electric?

7              MR. REED:  You know, that's including light fixtures.

8    You know, it's going to be a light number.  I'm pretty sure it

9    was like 10- or 12,000.

10             THE COURT:  Mr. Reed --

11             MR. REED:  8,000.

12             THE COURT:  -- you have any documents to back this up?

13   I mean, you're giving me numbers -- approximate numbers.

14   You're not sure --

15             MR. REED:  No, I -- look, I -- the --

16             THE COURT:  How much for electrical?

17             MR. REED:  8,000 dollars.

18             THE COURT:  What's next?

19             MR. REED:  Okay, that's what I spent.  That was out-

20   of-pocket.

21             THE COURT:  I know you gave me several of these

22   figures where you -- of the amounts I thought you said you

23   still owed.

24             MR. REED:  That's right, and I owe -- I only included

25   the amount I spent.  So for example, with the roofing, Mr. --

1  with Mr. Rosser's company he represents, I actually gave that

2  company 2,500 dollars.  The -- there is an outstanding balance.

3  The contract was for like 11,500, but there's an outstanding

4  balance that's even accrued to much larger on that because

5  there's interest and penalties and stuff like that.  But I paid

6  2,500.  I still owe that company more.

7          Mr. Sher, I paid thirty some thousand, I think,

8  dollars to, but I still owe him like 1,700.  None of the money

9  that I still owe is in the list I gave you.

10     (Pause)

11         THE COURT:  I'll check it again.  The number I get is

12  220,050 dollars, but I'll go back the 50 dollars as soon I

13  get -- it's got to be more.  But I'll go back.

14         Go ahead, Mr. Reed.  Let's go.

15         MR. REED:  I -- the outstanding amount that I owe, I

16  think, for some contractors in the -- and it's important to

17  note that the -- you know, we didn't have a -- multiple suits

18  from this property, mechanics liens.  The one that came was

19  really for the roofing, which was one of the last things we

20  did.  And when we were -- when we were close to -- I didn't

21  realize how close we were to end of money.

22         So Derrick Rosser's company is still looking for

23  $26,321.01.  That's their -- that's their judgment on the 11-

24   -- you know, the remainder of the 11,000-dollar contract, plus

25  all the interest brought forward.

RESIDENTIAL CAPITAL, LLC, et al.                    111

1          Mr. Sher was owed $1,766.62, and -- out of the 30 some
2    thousand dollars that we paid him -- I mean, on top of the 30
3    some thousand dollars we paid him.
4          The --
5          THE COURT:  You told me yesterday you collected
6    insurance from the damage in the roof.  How much did you
7    collect?
8          MR. REED:  I did, Your Honor.  I collected -- it was
9    two parts' payment:  30- -- I want to say it was like 35,000
10   dollars.  But a big portion of that was for the hotel stay that
11   we had because we weren't staying in the house.  It -- the
12   insurance company agreed that it was not livable, so they paid
13   for that extended hotel stay.  And if you give me a second, I
14   can tell you how much went to the hotel versus went into the
15   property.
16         THE COURT:  Let's move on.
17         MR. REED:  I can look that up, but that hotel stay was
18   over -- was over 20,000 dollars, 28,000 dollars or something
19   like that.  We stayed -- all seven of us stayed in a two-
20   bedroom suite at the Homewood Suites.  We stayed there from
21   when we went down to Virginia, and I saw what happened to the
22   water until, oh, man, maybe April, something like that, so five
23   months, something like that.  That was very tight, all of us in
24   that two-bedroom suite.
25         So what we --

1          THE COURT:  Let me ask you this.  Did you provide Ms.

2    Hager with any documentation showing how much money you put --

3    what added up to the approximately 220,000 dollars?  Have you

4    provided any documentation?

5          MR. REED:  Some of it, Your Honor, some of it.

6          THE COURT:  Okay.  Let's move on.

7          MR. REED:  I mean, you know --

8          THE COURT:  Let's move on.  She can take it with

9    cross-examination if she wants.

10          MR. REED:  We had -- now, what I recollect needing to

11   be done, the shower tile in the master bedroom -- in the actual

12   show -- in the shower itself.  It's like 1,000 dollars; the

13   master flooring that still had to be done, I think, it was like

14   4,000 dollars.

15          MR. HAGER:  I'm sorry to interrupt.  I just want to

16   make sure that I understand.  Did you -- and Your Honor, maybe

17   I shouldn't ask him a question.  But I thought Mr. Reed was

18   giving testimony about money that he still owes.  Are we still

19   on that list?

20          MR. REED:  Oh, yeah.

21          THE COURT:  I think he's moved on that from that.

22          MR. HAGER:  Okay.

23          MR. REED:  I didn't finish that, though.  I didn't

24   finish --

25          THE COURT:  Well, you -- finish that before you move

RESIDENTIAL CAPITAL, LLC, et al.                    113

1    on.  I thought this 1,000 dollars for the shower, this was work

2    that still needed to be done.

3              MR. REED:  Yes, but I was --

4              THE COURT:  So let's finish up on what you spent or

5    still owe.

6              MR. REED:  Okay.  So I owed contractors.  Let me --

7    there's four numbers that I owed contractors, the dollar

8    amounts that I believe that I still owe them.  I believe -- I

9    understand it to be that Derrick Rosser, the -- has provided

10   evidence that we still owe his roofing company -- this includes

11   all interest and penalties since 2000- whatever it is -- six

12   years or whatever.  It's $26,321.01.

13             And Mr. Sher, who is a -- the mill work and the

14   mechanical guy, the primary one, is $1,766.62.

15             Pryor Hauling would -- who was our dumpster service,

16   was $2,243.69.  That's what we still owed.

17             And Pedro Chica's (ph.) framing, they were 2,750

18   dollars that we still owed.

19             And oh, there's one more.  There was a Finer Floors --

20   oh, wait, they were, I think -- I mean, they were 3,000

21   dollars, but I can't tell if it was 3,100 or 3,400.  I think it

22   was 3,000 dollars or like -- or on the low side for the

23   staining and sealing of the staircase and the landing.

24             So that -- from what I understand, that's all we owe.

25   That's who we have outstanding debt to on that project.

RESIDENTIAL CAPITAL, LLC, et al.                    114

1          THE COURT:  And Mr. Rosser has a judgment; is that

2    what you said?

3          MR. REED:  That's correct, yeah.

4          THE COURT:  Anybody else have a judgment?

5          MR. REED:  No, Your Honor, they --

6          THE COURT:  Okay.

7          MR. REED:  I told them that we could -- you know, if I

8    can get in the position again, then I would gladly pay it,

9    because they did the work.  I mean, they did a good job.

10         What we -- what I at least -- what I remember needing

11   to be done was the master bathroom shower.  Again, that was all

12   framed out.  We had the bottom cement -- the bed -- the wet

13   bed, they call it, was done for the shower.  It was roughed in.

14   We already owned all the -- you know, all the fixtures.  I

15   can't tell you how much I paid for that without a reasonable

16   degree of certainty on that for sure.

17         But we owned it all.  And -- so it's like 1,000 I know

18   was needed to be done.

19         THE COURT:  Okay, let's go on to the next item.

20         MR. REED:  The master flooring, which is the sitting

21   room and the shower -- or it was the bathroom, it was like

22   4,000.

23         The kitchen was -- the minimum kitchen was at least

24   like 80,000 dollars.  This is for the cabinets, the

25   countertops --

RESIDENTIAL CAPITAL, LLC, et al.                    115

1          THE COURT:  The kitchen hadn't been installed yet?

2          MR. REED:  I'm sorry?

3          THE COURT:  The kitchen hadn't been installed yet?

4          MR. REED:  No, Your Honor, we priced it out with

5    Ferguson, which is a higher end supplier.  And we -- with --

6    and then, you know, with some big Viking ranges and stuff like

7    that.  And then, we priced it out with Home Depot, which is

8    a -- was a mixture of like the GE Profile ranges that were

9    higher and some Viking stuff.

10         So we actually had a range of, depending on how we

11   were coming in at the end, 80- to about 110,000 for the

12   kitchen.

13         THE COURT:  Did you have a working kitchen in your

14   house when you were living there?

15         MR. REED:  No, we had -- we -- you know, we had -- I

16   did all the floors.  I showed you pictures of the floors, the

17   dry wall, the ceilings, the moldings.

18         THE COURT:  But no cabinets have yet been purchased?

19         MR. REED:  No cabinets; the framing for the cabinets.

20         THE COURT:  The countertops haven't been purchased?

21         MR. REED:  No, no.  This is --

22         THE COURT:  Appliances haven't been purchased?

23         MR. REED:  No, and we lived in the house for a year,

24   and we had a -- I had some -- you know, being that I was in the

25   restaurant business before, Your Honor, I was able to go to a

RESIDENTIAL CAPITAL, LLC, et al.                    116

1  restaurant supply house.  And I was able to buy stainless steel

2  commercial kitchen tables that -- thankfully, the kids were

3  young, so they didn't think we were absolutely loonies.

4          But you know -- and you know, I had commercial

5  stainless steel tables, six-foot, four-foot, eight-foot, that

6  comprised the kitchen perimeter.  And we had Metro shelving --

7  in other words, that's what we call Metro -- it's one of the

8  brands.  It's that wire restaurant shelving.  We used that.

9  We --

10          THE COURT:  Was there plumbing in your kitchen?

11          MR. REED:  There was roughing for the plumbing for the

12  main kitchen, but we --

13          THE COURT:  I mean, did you have a sink, dishwasher?

14          MR. REED:  Dishwasher, no.  What I did was I put a

15  couple of laundry sinks.  It's the easiest way to do it.  And

16  off the kitchen, there was a nice pantry, like a walk-though,

17  like a -- I think you can call it like a butler's pantry, like,

18  it was ready for cabinets.  We had some shelving in there and

19  then a nice window.  And there, that's where we had -- I had

20  some -- also a couple stainless steel tables, a shelf.  The

21  table -- shelf, table, a couple sinks, side-by-side, and they

22  were -- the -- I -- the kind of plasticy rubber ones.  And they

23  were like a laundry room utility sink, almost.

24          And that's what we -- that's what we used.  You know,

25  that's what we used.  And there was a bathroom off of -- at the

1  end of that.  So believe me, you know, it's -- in remembering

2  this now, I want you to -- you know, if I had the money to

3  finish it, I wouldn't have had us living in that -- you know,

4  in that situation.  But I brought it as far as I could as

5  quickly as I could.

6         THE COURT:  When you moved from Old Dell Trace back to

7  Moorestown --

8         MR. REED:  See, my --

9         THE COURT:  Okay.

10        MR. REED:  I got it.

11        THE COURT:  Did you try to sell the house, Old Dell

12  Trace?

13        MR. REED:  Old Dell Trace -- what -- answer?  I

14  started down that path.

15        THE COURT:  Did you get any offers for it?

16        MR. REED:  The only kind of discussion I -- I didn't

17  list it because the realtors I talked to were all of the

18  opinion, just like I was, that the house was going to be worth

19  under what we owed, what we could -- what the existing mortgage

20  was, because of the unfinished -- even though we were so close,

21  people -- the only person who could buy that house -- and I'm

22  sure you -- you know, I don't know your extent of this kind of

23  knowledge, but a regular person with a regular conforming, even

24  investment mortgage, they need a CL on the property to be able

25  to get it.

RESIDENTIAL CAPITAL, LLC, et al.                                 118

1          Even if you have a carpet ripped up, they can't -- if

2    it's a bare under lien it, they can't get in -- they can't get

3    a mortgage for it.  So the only people who were interested in

4    the property are people who can steal it, you know, and -- for

5    like 500,000 dollars.  I couldn't give clear title -- if it was

6    up to me, I can't give clear title for 500,000 dollars.  I

7    owe --

8          THE COURT:  I just want to know; did you receive any

9    offers to purchase the house?

10          MR. REED:  I didn't list it.

11          THE COURT:  Did you receive any offers to purchase the

12    house?

13          MR. REED:  There were two guys -- two investment guys

14    who wanted to buy it, but it was that kind of number.

15          THE COURT:  Okay.

16          All right.  Is there anything -- you listed the work

17    that remained to be done.  Was there anything else in that --

18    in the list?

19          MR. REED:  Oh, yeah, okay.  Okay, okay.  Where did I

20    leave off, Your Honor?

21          THE COURT:  Kitchen, 80- to 110,000 dollars.

22          MR. REED:  Okay.

23          THE COURT:  You gave me master bath, shower, 1,000;

24    master flooring, 4,000; kitchen, you gave me a range of 80- to

25    110,000.

RESIDENTIAL CAPITAL, LLC, et al.                                    119

1         MR. REED:  The sun room in the back -- the sun room in

2    the back had -- we needed to -- we had -- we needed to do the

3    room -- you know, we had the structural framing, but we had to

4    enclose that.  That's, you know, material and labor, plus some

5    siding would have been like 5,000 dollars.  It's a nice 700-

6    square-foot space, but it's three sides and mostly some

7    windows.

8         The tile and flooring for that was 3,000 dollars.  The

9    windows and the doors that would have been set for that,

10   assuming we had some nice ones -- they were discontinued, but

11   we would have -- we looked at replacements -- those were like

12   6,000.  And the ceiling with the ceiling fans and block-out

13   trim and all that, it would be like 2,000 dollars.

14        Let me look something up.  Hold on.

15     (Pause)

16        MR. REED:  Well, Your Honor, and another thing I just

17   remembered now; I replaced the entire front steps.  We had to

18   do that, too.  That was like 3,000 dollars.  That was all

19   rotted out.

20        THE COURT:  I think you told me how many square foot

21   the addition was, but what was the total square footage of the

22   house plus the addition?

23        MR. REED:  The house, when I bought it, was 4,500

24   square feet, which included -- if I'm not mistaken, it was 4,3-

25   , 4,500 square feet.  It included part of a finished basement.

1    The house was high up, so your garage came in --

2            THE COURT:  So it was a walk-out basement?

3            MR. REED:  Huh?

4            THE COURT:  A walk-out basement?

5            MR. REED:  No, it wasn't -- it walked into the garage

6    because the backyard was higher.  The house sat up in a hill,

7    if you remember that photo.  But you came in -- your garage,

8    there's a side entry.  You came in the garage, and you walked

9    into a finished basement, and then you would go up the

10   staircase into the family room.

11           THE COURT:  So without the basement, how many square

12   feet?

13           MR. REED:  It was like just -- I guess maybe 3- --

14   just maybe 4,000 -- just under 4,000 because it was -- you

15   know, the whole house didn't have a basement.  It was just part

16   of it that hadn't been cemented.

17           THE COURT:  All right.  And then, how many -- you're

18   adding 3,500 square feet or some --

19           MR. REED:  Yeah, yeah, it -- so we were in like, you

20   know, 7,000 something.  And that -- the appraisal will show you

21   the numbers exactly.

22           THE COURT:  All right, that's fine.

23           Okay, what's next?

24       (Pause)

25           MR. REED:  Damn it.

1          So when you -- when I looked at the project and --

2    originally with Stevie Watson, who was the selling agent, I

3    looked at the neighborhood to see what houses sold.  I lived

4    there.  The other houses that I sold that I showed you in the

5    county record, Your Honor, I lived there.  It wasn't like I --

6    in New Jersey, I had the house in Matlack.  But prior to

7    Matlack, I lived in Virginia.  So I went New Jersey down to

8    Virginia and then back to New Jersey, and then back into

9    Virginia.

10          And the reason I was involved down there was because I

11   had had for six years six restaurants at the Paramount movie

12   studio park on Route 95, Kings Dominion.  So -- and I had a

13   small chain for a number of years of little poolside grills

14   that we created for the neighborhoods down there.  They had

15   these community neighborhoods, so as soon as I had the staff at

16   the theme park, we would -- we found some incremental profit.

17   I had -- you know, having little snack businesses at the pools.

18          So I became very famil -- I became familiar with the

19   Richmond market.  I liked the Richmond market.  That's how I

20   became involved with them in that area, and Stevie Watson was

21   the -- in my opinion, a premiere realtor.  She handled this --

22   these kinds of areas.  When I say these kinds of areas, you've

23   got this -- I submitted that article to give you some kind of

24   reference points to that.

25          So when I -- when she presented me with the project,

RESIDENTIAL CAPITAL, LLC, et al.                                    122

1  it was her -- it became clear to me that we could -- that I

2  should be able to do 4-, 500,000 dollars profit off of that

3  property -- you know, in the Matlack property.  I bought it

4  from the Maineses.  It's in the record.  I think it was 500- --

5  1.5 million, something like that, we paid for the house -- for

6  the Matlack property.  I purposely picked that property because

7  it wasn't the biggest in the neighborhood.  It was -- would

8  give me the ability to improve it, just like I did with all the

9  properties.

10         And that one, I added 1,100 square feet, three

11 bathrooms, a couple bedrooms, and a bunch of other treatments

12 to it inside it, externally, as well as some land -- you know,

13 good amount of -- the nice landscaping package.  And in my

14 opinion, that house was worth every bit at the top of the

15 market, two million -- you know, two million dollars or damn

16 close to it.

17         The proof that I -- I felt validated by the -- by

18 Jacobs, who was a lifelong Moorestown resident, living in town

19 and going under contract for two-million-forty.  Then --

20         THE COURT:  Mr. Reed.

21         MR. REED:  Go ahead; I'm sorry.

22         THE COURT:  Moorestown is not in this --

23         MR. REED:  No, no, I'm talking -- I'm trying to

24 just -- I'm not asking for Moorestown.  What I'm trying to tell

25 you is that's why I --

1      THE COURT:  Mr. Reed, I'll certainly listen to Ms.

2  Hager, but I don't have any doubt that the Old Dell Trace home

3  was located in a very first-class neighborhood.  You put in the

4  article, your testimony.  I don't know that that -- that's

5  not -- I don't know that that's going to be a disputed issue as

6  to whether it was a -- in a nice neighborhood.  There's been

7  testimony, I think, from you, and I think from Mr. Maines that

8  when you bought the house it was very much in need of

9  remodeling.  And you were embarking on that.

10      So I don't have any doubt at this point -- I'll listen

11  if there's cross-examination on it -- about the nature of the

12  property, the nature of the neighborhood.  The photographs you

13  showed all show first-class work in the -- where the work was

14  done.  I don't know why you're spending more time on that.

15      MR. REED:  Okay, I'm sorry.

16      THE COURT:  Okay?

17      MR. REED:  I -- it --

18      THE COURT:  Okay.

19      MR. REED:  The reason --

20      THE COURT:  You spent -- I looked at all the

21  photographs.  I saw the quality of the mill work, the quality

22  of the ceilings, the fixtures in the space that was completed.

23  If you're -- if there's a challenge to that, you'll have a

24  chance to come back on rebuttal.  But you spent a lot of time

25  going through the property, the condition of the house, what

RESIDENTIAL CAPITAL, LLC, et al.                    124

1   work you were doing on it.

2          I'm not questioning that, okay?  Let's get on to the

3   stuff that I'm -- I really don't want to cut you off on this,

4   but you spent a lot of time, and I listened carefully.  I

5   looked at all the photos.  I saw the nature of the work you

6   did, I saw the pictures, the comparison to the Matlack home.

7   You spent time doing that; I understand that.

8          It's now time to move on.

9          MR. REED:  Okay.  All right.  So my expectation was

10  that I would again see that kind of increase in value.  I saw

11  the increase of value in my Mount Laurel house and relatively

12  proportionate increases in values in smaller priced homes.  And

13  I was expecting -- and that's why I ordered the -- you know,

14  that's one of the reasons why I ordered the appraisal from Mr.

15  Uminski in the beginning of '08, because, remember, we hadn't

16  framed it.

17         But all that extra work that I wound up putting in,

18  all the detail and the finish and -- fit and finish, they call

19  it, and the fixtures, I wanted to confirm from a professional

20  that was licensed to give me that kind of confirmation that the

21  house, in my estimation, would -- is going to come in to where

22  I thought it was.  And I had thought one --

23         THE COURT:  Can I ask you something?  Did you seek a

24  construction loan for the work you were doing on Old Dell

25  Trace?

1          MR. REED:  No, because I -- the -- construction loans

2    are very hard to get.  They're -- and they're a pain in the

3    butt because of the draw -- you know, when you go for a

4    construction loan, in my experience with dealing with those

5    things, is you go and do draws on the property.  But they also

6    want -- they'd like you to be incorporated.  I'm a private

7    invest --

8          THE COURT:  Okay, you've answered my question.

9          Go ahead.

10         MR. REED:  So I didn't believe I fit that profile of

11   that -- at the moment.

12         So where was I?

13         So I expected that -- you know, a margin, a dollar

14   amount -- you know, we expected to put in like -- the purchase

15   price was nine.  You know, there was some carrying costs, but

16   rough -- you know, just take the purchase price.  The 9-,

17   that's about 300,000.  What I talked about here, look at that.

18   Again, it comes up to about 300,000 for -- or -- you know, plus

19   or minus, like less than five percent or eight percent for the

20   work that I did.  If you combine the work I did plus what they

21   didn't finish, all of that should have brought us an end value

22   of a million and -- as the appraiser put it, a million-seven-

23   two-fifty.

24         I mean, I would have taken less to just move it, would

25   have rented it if that was required.  I showed my flexibility

1  in that regard with Mr. Cooper.  My properties, I -- even the

2  properties I live in or the property I specifically buy for an

3  investment on their own -- I mean, I'm -- any property I buy,

4  I'm willing to live in -- this is an important fact, Your

5  Honor -- I'm willing to live in or rent.  So like even the

6  Oxford houses that rented from me, one of those -- I don't know

7  if I ever mentioned it.  One of those houses was my house.  It

8  was a house that I lived in prior.  You know, that was a five-

9  bedroom house, 52 Stone Hollow Drive.  I lived there.

10          We wound up renting to them.  I could have lived in

11  Stratford or Cherry Hill at the Oxford house.  So any of those

12  would have been -- this is why I get upset about the homeless

13  issue.  Any one of them I could have -- if we didn't lose

14  everything, I would -- I could have lived in any of them.

15          So my point is we were like 100,000 or thereabouts

16  short of finishing this project.  And if I could have finished

17  it, and believe me, I would have been -- I mean, I can't -- I

18  don't know how any reasonable person could think that I wasn't

19  trying to finish it with all my soul and everything I had.  If

20  I could have finished it, we would have finished it.  And the

21  value, we believe, was there.  We would have -- even just --

22  when you get the CL, you actualize the value.  You know, maybe

23  I -- there could be some argument about whether or not I could

24  have sold it or not.  But it's still value.  It's an asset of

25  value.

1          I mean, you even made me realize that kind of thinking

2    in our first half of the trial when we were talking about

3    Matlack, and you were saying, how do you know -- how are you

4    proposing a loss here; you still owned the asset that's valued.

5    So to me, whether it's liquefied or not is maybe not relevant,

6    in my understanding and opinion.  If we would have gotten that

7    CL, it would have been worth a million-seven-two-five,

8    according to the appraiser, or a million-six or a million-five.

9    If the market even slipped some, we're still talking about

10   hundreds of thousands of dollars in earned equity.

11         Now, let's not talk about just that.  How about the

12   quarter million dollars that I put actually into the project

13   catch?  How about the 100,000 dollars or whatever it is I put

14   down on the property?  How about all the carrying costs because

15   it wasn't until later that I wound up losing this property to

16   foreclosure?  We kept paying on it beyond Matlack because I

17   explained to you how -- why we did that, why I chose to fight

18   Matlack.  I was under the impression we could somehow expunge

19   that and chan -- and get a court order to deal with that and

20   the -- and that -- and the harm that could come from that

21   versus the Virginia.

22         Believe me, it was suicidal if I didn't think that I

23   was going to get or could get money to actually work on it like

24   I did.  You know what I'm saying?  It just -- I would have just

25   let it go then.  I wouldn't have -- I would have cut and ran

1    with my cash, you know, the cash-on-hand -- I wouldn't have

2    dropped all that amount of money more into the project.  It

3    makes no sense, and it make -- it's absolutely crazy.  I mean,

4    I don't know -- so -- and it's my feeling -- and I believe

5    other people have -- we're doing evidence to this effect that

6    that damn foreclosure is what was the impediment to completing

7    this.

8            I had an ongoing con -- if I -- if this was a -- if I

9    had an ice cream business selling ice cream cones and we said,

10   oh, a foreclosure stopped you from having your line of credit

11   with the bank.  And so I bought the ice cream and the cones,

12   but I didn't have enough money to keep the lights on or pay the

13   kids at the cash register.  It'd be more understandable that --

14   you know, what happened.  In real estate, it's kind -- it kind

15   of confuses that.

16           But as you saw in Mr. Curley's even notes, there's

17   this -- and how they even treated my -- in the loan write-up,

18   how the bank, as a matter of an industry standard, treats the

19   historical fact.  And that's why I've spent so much time, Your

20   Honor, on the history of the buying and the selling, and the

21   buying and selling, the buying and selling, because the

22   expectation that I will continue doing that is there.

23           THE COURT:  Can I ask you this?  Did you earn any

24   capital gains on sales of property in 2009?

25           MR. REED:  I did, in --

RESIDENTIAL CAPITAL, LLC, et al.                              129

1          THE COURT:  In 2009?

2          MR. REED:  In 2007, which Mr. Curley's report noted

3     there was capital gains in that.  I believe the year before --

4          THE COURT:  I'm asking about 2009.

5          MR. REED:  '09, I don't -- I don't know.

6          THE COURT:  Earlier in the trial you put in -- you

7     showed some deeds about properties you owned and flipped.

8          MR. REED:  I think '08.

9          THE COURT:  That's why I'm asking you about 2009; I

10    don't remember seeing anything about 2009.

11         MR. REED:  No, because I think in 2009, I think what I

12    had left --

13         THE COURT:  You had your three rental houses in New

14    Jersey.

15         MR. REED:  Right, and then Matlack and --

16         THE COURT:  And Old Dell Trace.

17         MR. REED:  -- and Old Dell Trace, yeah.

18         THE COURT:  So there wasn't anything that was sold --

19         MR. REED:  No.

20         THE COURT:  -- in 2009?

21         MR. REED:  Right.

22         THE COURT:  Okay.

23         MR. REED:  Right, because --

24         THE COURT:  Are there any other --

25         MR. REED:  -- because Mat -- because Matlack was under

1    contract, remember, it was under --

2            THE COURT:  I --

3            MR. REED:  I mean, that's not a dispute.

4            THE COURT:  It's not.

5            MR. REED:  And I don't mean -- I don't mean --

6            THE COURT:  It's not.

7            MR. REED:  I don't --

8            THE COURT:  It's not, I recounted at some length in

9    the opinion from the first trial, it was to no fault of your

10   own that the Jacobs sale didn't close, and what happened

11   thereafter.  That's -- you know.

12           What else do you wish to cover?

13           MR. REED:  Okay, so --

14           THE COURT:  Let's not go over the same ground again.

15           MR. REED:  Yes, I don't want to.

16           So if we had finished the -- if we had finished the

17   Old Dell Trace, I could've gotten a CO, I mean, if I couldn't

18   even have sold it, we could have surely mended it.  I believe,

19   because it was -- you know, the mortgage wasn't -- because the

20   house was -- you know, the mortgage was based on an -- on an --

21   my 100,000 dollar house, with down payment.  That -- you know,

22   so the -- the monthly note wasn't that big, and the taxes in

23   Virginia, you know, were -- were pretty low.  I mean, you know,

24   I can't remember if it's 800 a month, something -- 600 a month,

25   it wasn't that -- it wasn't that much money.  So you know,

1    discounting against the competition to rent the house of

2    that -- you know, on the -- the way it looked, if we had

3    finished the CO, we would've, you know, been able then, to

4    cover the monthly bill, and maintain -- we could've maintained

5    the property and kept it.  And we could've -- we wouldn't have

6    lost it, and we would've made probably a profit, maybe 1,000

7    dollars a month, something like that.

8              So that's frustrating to me, as well, because it --

9    you know, even if the market had tanked to the point where -- I

10   mean, it just -- you know, it had a long way from 1.725- down

11   to the -- I think, at that time the outstanding balance -- you

12   know, purchase price 899-, we put 100,000 dollars, so we're

13   talking roughly, it's a purchase for 900-, and we were paying

14   it at that time, so it's 800,000 dollars.  You're going to tell

15   me it's going to drop 900,000 dollars before there's nothing in

16   the project for me because, you know, there's money I put down,

17   money I put in, and the equity.  I mean, it was a hell of a big

18   spread there.  That's -- that's the -- the -- the 900-,

19   that's -- that's the kind of number I was talking about in --

20   in -- in what I was trying to seek in -- in kind of the -- you

21   know, our -- our remedy here is, okay, how about the money I

22   put in, how about -- how about the profit that I -- I would've

23   had.

24             And so it's, you know, 1.725- down to the 800- that

25   was outstanding.  Now, when we get further on, there's like

1    an -- either there's an IRS lien that I have -- that was placed

2    on the property, was placed on all my properties.  But that --

3    that lien -- you know, even if it wasn't cash to me, say I sold

4    the house, and I think the balloon was 60,000 dollars or

5    something like that, if the -- the house -- they weren't going

6    to foreclose on the house lien.  And the -- even at the sale of

7    the property, that goes to my -- that inures to my benefit;

8    that's my -- my money.  It doesn't go in my pocket, but --

9            THE COURT:  Who's --

10           MR. REED:  -- the extinguishing a debt on my -- on my

11   behalf, but wasn't something that would've, you know,

12   interfered with being able to deliver title if we -- if we sold

13   it.

14           So you know, there were -- there were several theories

15   or several things that I -- I sought here and thought that

16   we -- I needed to demonstrate.  One is, you know, how much of

17   my sunk costs there were.  So if the Court doesn't believe that

18   I could've sold it and liquefied it and got the sunk costs plus

19   my equity from the -- you know, my efforts, my sweat equity, I

20   mean, at least my sunk costs or some combination thereof.  And

21   if, you know, the fact that I lost it, you know, the rents that

22   I provided with Ms. Clampitt, you know, are primarily offered

23   to show that I wouldn't have lost the property.  You know, that

24   this is something that, you know, oh, I would've just gotten to

25   the finish line, crossed it with my CO, and -- and dropped

1    dead, you know what I'm saying, because I'm not now, you know,

2    as you said, did I sell something else in 2009.

3            And the market seized up in 2009 or 2010, or whatever,

4    and I don't have the -- you know, the continued --

5            THE COURT:  We have a lot of real estate cases in this

6    court.

7            MR. REED:  About that stuff.

8            THE COURT:  About what happened in 2008, 2009 --

9            MR. REED:  Yeah.

10           THE COURT:  -- 2010.

11           MR. REED:  And that's why I thought it important to

12   show you that it wasn't -- that the loss of the Old Dell Trace

13   is about the not finishing it because of the rental would've

14   saved it.  It was that -- you know, it's that significant.

15           THE COURT:  I take it you agree your ability to finish

16   Old Dell Trace required a lender ready, willing, and able to

17   loan you the money to do that.

18           MR. REED:  Yes.  That that -- yes.

19           THE COURT:  And you've identified what you thought

20   were three potential lenders, TD Bank or Commerce Bank,

21   whatever it was at the time, Mr. Maines and Ms. Kline.

22           MR. REED:  Yes.  So that's why if I wanted to believe

23   on the law on this, I can --

24           THE COURT:  Listen, let's not talk about the law.

25           MR. REED:  Okay.

1           THE COURT:  Yeah, okay.  What -- let's -- I want you

2    to put in any other facts that you feel you need to put in.

3           MR. REED:  Okay.  Okay.

4       (Pause)

5           MR. REED:  Okay, and you understand that I was willing

6    to lend it, I mean, I can move my family, I'm -- you know, I'm

7    willing to do it; anything to save the property.

8           All right, too many matters.  So I'm going to make the

9    point, Your Honor, this, too.  You -- you just made me say the

10   lend -- like a lender, but I -- I parallel, I still thought

11   that Mr. Cooper, you know, for a good portion of that time, and

12   I'm just tell -- I'm just tell --

13          THE COURT:  I understand about Mr. Cooper.

14          MR. REED:  Yeah.  Yeah.

15          THE COURT:  Or whatever it is his name was.

16          MR. REED:  Yeah, that's right.

17          THE COURT:  Weaver/Cooper.

18          MR. REED:  The SEC seems to think it's Cooper on the

19   convictions they just --

20          THE COURT:  Okay.

21          MR. REED:  So --

22          THE COURT:  So the record's clear --

23          MR. REED:  The record.

24          THE COURT:  -- the -- my comments about whether it's

25   Weaver or Cooper, in the first opinion, there was some issue

RESIDENTIAL CAPITAL, LLC, et al.                    135

1    about what his name really was.

2              MR. REED:  Yes.

3              THE COURT:  Not an issue from Mr. Reed's testimony.

4              MR. REED:  Okay.

5              Your Honor, if you can give me, like, it's going to be

6    like about four minutes.

7              THE COURT:  Sure.

8              MR. REED:  I'm trying -- I want to -- I'm sorry.

9         (Pause)

10             MR. REED:  Okay, that's fine, and one other -- I mean,

11   there's more things, but I think I said the next thing I wanted

12   to talk about is the history of Oxford House because I -- if I

13   mis -- if I recall --

14             THE COURT:  I looked back to my notes earlier because

15   you had mentioned that there was some brief testimony, and I'm

16   not trying to close you off on it, but let me find it in my

17   notes, okay.

18             The Molloy deposition transcript is in evidence, and

19   the exhibits to it, and that related to the Oxford House, if

20   I'm not mistaken.

21             MR. REED:  Yes.

22             THE COURT:  And that's in evidence; that came in on

23   the first day.

24             MR. REED:  There's -- there's something in there, I

25   want to double-check now, and I wanted to talk about that

1   relationship for a few minutes, as well.

2           THE COURT:  So the Molloy deposition, was it at

3   Exhibit 6?  And it attached to it, releases --

4           MR. REED:  Yeah.

5           THE COURT:  -- on behalf of the TD Bank, and for TD

6   Bank.

7           MR. REED:  Yeah, let me -- give me a minute.

8           THE COURT:  The rents, the foreclosure.

9       (Pause)

10          MR. REED:  Your Honor, I need to get Exhibit II that

11  was entered into evidence.

12      (Pause)

13          MR. REED:  Your Honor, I -- I want to point out that

14  the properties, you know, generate an income for us.  And

15  the -- I couldn't remember the exact amounts, but the -- you

16  know, the TD Bank amount is showing, you know, the cash flow

17  plus the rents, the leases on the -- on the properties.  Those

18  leases had an escalation clause, if you want to look up in

19  Exhibit 7, the Molloy attested to them, they have residential

20  leases, I don't know if you can see.

21          I think they're in Exhibit 3, it's a -- it's a

22  standard lease that I had with them.  You can go through the

23  rest, you know, the exhibit, and you'll see -- let's see, where

24  is it, hold one second.

25          THE COURT:  I'm looking at the Stratford lease, I

1   don't see an escalation clause.

2           MR. REED:  I thought that we had talked -- wait a

3   second.  Not esc -- I mean, I thought it had a clause in there

4   to allow this --

5           THE COURT:  It's a five-year lease.

6           MR. REED:  Five-year lease.  How about that, this is

7   the new -- the old one that we had with them for years had a --

8   a clause for that, these were prepared by my wife so it looks

9   like she used the standard form, not the one that we had for a

10  number of years with them.

11          THE COURT:  I'm looking at the Sicklerville lease --

12          MR. REED:  Yeah, yeah.

13          THE COURT:  -- as well --

14          MR. REED:  Yeah.

15          THE COURT:  -- it's a five-year lease, and I don't see

16  any --

17          MR. REED:  I -- I --

18          THE COURT:  -- rent escalation.

19          MR. REED:  Yeah, I agree, I see -- I -- I -- like I

20  said, Your Honor, I started to speak because I thought it was

21  the old form lease that we -- we had with them.  And my point

22  that I was trying to -- trying to make is, in -- in considering

23  the -- the -- the proffer that but for the foreclosure or being

24  a contributing clause to loss of the rental properties, we

25  would've continued to own them, rent them, rent them to Oxford

1   House.  The Oxford House in Stone Hollow was Stratford had been

2   rented from us since 1990 -- the beginning of 1993,

3   continually.  The rents originally, I think, were, you know,

4   1,295, you know, and Columbia or Stratford --

5            THE COURT:  Stratford is 1,700 in this lease.

6            MR. REED:  It went up to 17- -- it went up to 1,700 in

7   that time.  It had similar increases, as well -- you know, the

8   increase over time, these would -- would take place.  The

9   current amount -- and there's different amounts, you can see

10  the 17- -- 17-something.  Oxford House currently pays 21- to

11  2,400 in the marketplace that we are in, and it continues to

12  rise, or it had continued to rise in -- within that time.

13  Oftentimes, in bad real estate markets for buying and selling,

14  it's my opinion, my -- my experience, that rents will increase

15  because people can't qualify or can't buy properties.

16           So when considering the -- the loss of the properties,

17  I tried to put forth, you know, an estimate of how to quantify

18  that.  You know, I understand your role, Your Honor, from a --

19  a bankruptcy judge's role is to estimate values to claims,

20  period.  And then layer that with the newly -- the consumer

21  fallback law that I have to give some estimate that you can --

22  you know, some basis for which you can see that -- you know,

23  estimate the loss --

24           THE COURT:  Let's not argue about the law, this is to

25  get the facts.

1          MR. REED:  No, no, no, I'm not trying -- I'm just

2     trying to tell you what my motivation for showing you what I --

3     what I showed you in -- in -- in the evidence for these -- for

4     these things.

5          So the Columbia -- Stratford Columbia was since 1993,

6     it continued from 1,200; 520 Stone Hollow Drive was a similar

7     kind of rent, I think that was like 1,200, too, but it was

8     Stratford and Sicklerville were very close in rent, if not

9     identical for much of the time.  Cherry Hill commanded a higher

10    rent --

11        (Sneeze)

12         MR. REED:  God bless you.

13         MS. HAGER:   Thank you.

14        (Pause)

15         MR. REED:  So -- so otherwise, Oxford House had been,

16    you know, happy with us, they went from one house in '93, and

17    they went to another -- and we expanded in '95 to a second

18    house with us.  And then they -- I think it was in 2005,

19    they -- well, in 2004, they came to me and asked for another --

20    another house -- a third -- a third house.

21         TD Bank, then Commerce Bank, is the one who financed

22    the acquisition of a third house.  They -- they had financed

23    the first, then Oxford House, the second Oxford House, and the

24    same kind of relationship.  I'm sure Your Honor was quite

25    surprised today when Mr. Curley confirmed that the nature of

1  our relationship was there wasn't applications that we did;

2  their -- their banking relationship with me was one -- and I

3  was not the only one, I mean, there was nothing unique about

4  me, it's the way they do business.  I mean, it was unique, you

5  know, I fit into a category of -- of how they dealt with

6  certain thing -- you know, customers.

7          MS. HAGER:  Objection, mischaracterizes his testimony.

8          THE COURT:  Oh, well, I have the testimony in mind.

9          MR. REED:  Okay, so when we -- when we acquired, for

10  example, I -- I acquired my -- two of the Oxford Houses --

11  let's go back a little bit -- two of the Oxford Houses are paid

12  for, and I want to acquire 9000 Spring Brook Court that was put

13  into the record down in Virginia.  I called Rob Curley and

14  said, hey, I -- you know, I've got somebody who's willing to

15  sell me this lot for 300-; I think if the right improvements,

16  we -- this -- you know, it's not ready to be built upon, if I

17  do what I need to do to it, we're in a situation I think I can

18  get a few 100,000 dollars profit out of it.

19          And so Rob -- I said, I've got the two houses that are

20  paid off, he -- he -- you know, they -- they put together a

21  vehicle -- you know, in the loans on those two properties, I

22  think they were lines of credit or something like that, he drew

23  up the lines of credit, they gave us the cashiers' checks, and

24  we went -- you know, went down and -- and bought the lot.

25  Well, I had to go in and execute the papers, when they -- you

RESIDENTIAL CAPITAL, LLC, et al.                    141

1    know, when they were -- when they were ready.  I remember

2    they -- they sent them to a branch that was close to me, and

3    then it was so busy, and I just -- you know, we go in and we

4    sign them.

5              I'd like to say that I would read the terms of what

6    they did for me because we'd done this many times over -- you

7    know, over the years with different things, that I would like

8    to say that I -- you know, actually look at stuff that they

9    gave me.

10             MS. HAGER:  Objection, relevance.

11             THE COURT:  Sustained.  Look, can we go back?

12             MR. REED:  Okay.  So -- so then -- so then it comes

13   2005, Oxford -- to '04, to Oxford House wants another house,

14   you know, we have equity in the, you know, two other Oxford

15   Houses.  I called up Rob Curley again and said, look, what --

16   what -- Oxford wants a third house.  You know, I don't even

17   have a -- I don't have a lot of cash that I want to put out

18   right now, and I'm into that project because I was already

19   doing the houses down in Virginia, plus any -- any funnel cake

20   and -- and, you know, fry stands and stuff like that, and

21   the -- the theme park, we were constructing one -- you know,

22   one of those.  I said, can we do -- you know, is there enough

23   equity in the -- in the other walls -- the other Oxfords to --

24   to draw out cash and purchase 21 Darien Drive?

25             That's all I did, a phone call, after a certain amount

RESIDENTIAL CAPITAL, LLC, et al.                    142

1  of time they'd come back, yeah, we've got a package for you.

2  You had enough, we did some appraisals on the properties, we

3  feel comfortable with what your situation is; we're going to do

4  it.  You know, records of all that stuff has been provided to

5  my -- Ms. Hager.  And they -- and they -- but I didn't do -- I

6  didn't actually even come up for that transaction; I was down

7  in Virginia, and the -- and we had a realtor, a friend of mine,

8  take Oxford House around -- and this is the kind of

9  relationship we had with them, an ongoing commitment to each

10 other.  And we took them around, we let Oxford House pick the

11 house, even.  We said, look, this is the price range that we

12 can do for you if these are the rents you're going to -- you're

13 going to commit to.  You know, let's meet with the -- the

14 realtor, and she'll take you around, she's got a portfolio of

15 properties in areas that we think -- think are okay.

16         We got that and placed a bid, and got an offer -- I

17 mean, they accepted; got a contract.  TD Bank did the

18 transaction.  The realtor was my -- my power of attorney -- the

19 power of attorney for that transaction.  I didn't even, start

20 to finish, my -- my relationship with TD Bank on that

21 particular transaction, the acquisition of 21 Darien Drive, I

22 didn't go to their bank, I didn't see any documents, I

23 didn't -- and I just -- my -- my power of attorney signed them

24 because they were produced, you know, for the -- for it, and

25 then they produced the cashier's check that we used for buying

RESIDENTIAL CAPITAL, LLC, et al.                    143

1    it.  And I think that was -- that house was 365- or 364-, or

2    something like that, when we bought it, you'll see.

3                MS. HAGER:  Objection, relevance.

4                THE COURT:  Sustained.  Mr. Reed, we've got to get

5    on --

6                MR. REED:  Okay.

7                THE COURT:  -- to what you're claiming.

8                MR. REED:  So what -- what I'm -- what my claim is

9    about is valuing those properties, okay, that's why I'm trying

10   to talk about the -- how do I -- how do we -- how do I value

11   it, and what's the evidence to the value of that property if

12   they're -- if someone's accountable for the loss of that

13   property, how do we -- how do we value it?

14               Well, there's -- you know, there -- there are -- there

15   was rental income from those properties, we had long-term

16   tenants, we had a -- a bank that -- this -- and this is why

17   I -- I'm sorry -- why I talked about the history, and how I

18   acquired them, how we did financing.  And the bank worked with

19   us when restructuring things, and the financing things, to

20   keep -- to keep my business going.  They understood what I was

21   doing and how I was doing it, and we would -- you know, we

22   would talk about it.  I would take guidance even from them,

23   so -- you know, on things.

24               So we have a -- the -- the point that I'm trying to

25   make is there was an ongoing concern with the rental properties

1    at Oxford.  They would likely continue --

2                MS. HAGER:  Objection, calls for speculation.

3                THE COURT:  Sustained, you can't say what they would

4    do.  I heard Mr. Curley --

5                MR. REED:  No, I'm not --

6                THE COURT:  -- testify this morning, okay.

7                MR. REED:  Not Curley, I mean, I'm saying the --

8    the --

9                THE COURT:  Oxford?

10               MR. REED:  -- the business, yes, the business --

11               THE COURT:  Yeah, you can't testify about what

12   somebody else was going to do.

13               MR. REED:  It was my impression with regards to that

14   because of the long nature, and if you read Mr. Molloy's --

15   leave it at that, look at his deposition, and we'll talk about

16   it, you can -- you can find it if you read through it -- sorry,

17   you're going to have to read through it -- you'll see what

18   their intention is.  That we will corroborate exactly.

19               THE COURT:  When was the foreclosure completed on the

20   three rental houses?

21               MR. REED:  I don't -- I don't honest to God remember;

22   I don't remember.  I don't remember when the -- and -- when

23   that happened.

24               THE COURT:  The letter from TD Bank's lawyers, this is

25   attached to the Molloy deposition, there's a June 17th, 2010,

1   letter dealing with assignment of risks, so the foreclosure had

2   not occurred yet.  Do you know in what year the foreclosure

3   occurred?

4           MR. REED:  Wait a minute, let me think about it.  And

5   Your Honor, this letter is not in relation to the foreclosure

6   action, too.  This is -- this is the Lowell Division action,

7   right there you see the Burl. L. -- Burlington L., Lowell

8   Division -- L is the Lowell Division -- it's about monetary

9   fight.  And the foreclosure action is a F action --

10          THE COURT:  Well, it has to do with assignment of

11  rents, which is only before the foreclosure.

12          MR. REED:  No, that's not -- this is not a

13  foreclosure; this is -- this is -- Lowell Division does not

14  handle foreclosure.

15          THE COURT:  I understand, but reading the contents of

16  this letter, it appears it's before there's been any

17  foreclosure on these properties.  You still owned them, they

18  had the mortgage, they wanted an assignment of rents.

19          MR. REED:  Yes, that's correct, I understand that to

20  be the case of what you describe.

21          THE COURT:  Okay, let's move on.

22      (Pause)

23          THE COURT:  Are there any other areas that you wish to

24  cover in your testimony, Mr. Reed?  Otherwise, Ms. Hager can

25  start her cross-examination.

1          MR. REED:  Yes, I want -- I want to finish the value

2    that I think those houses had, for the record.  And -- and give

3    one more moment beyond that.

4          (Pause)

5          MR. REED:  So Your Honor, in a pre-trial memo, I -- I

6    had indicated that there was a value to the different

7    properties; these are like low market values.  That -- and the

8    TD Bank credit memorandum, Exhibit II, gives a higher value of

9    the -- of the properties.  Example, in that -- in that credit

10   memorandum, TD Bank has it -- the 365- is the value for Darien

11   Drive --

12         THE COURT:  Yes, I'm looking at the appraisal.

13         MR. REED:  Yeah, and you know, I -- I was trying to

14   take in consideration, you know, when we lost the properties

15   that there was a lower value to them.  I'm trying to give the

16   Court something to estimate the value of the loss of the

17   property.  The question I'm trying -- the conundrum I'm trying

18   to solve in -- in testifying to the value of the properties is

19   what is -- you know, what value do I -- do I assign it:  the

20   value at this point in time, the value at that point in time?

21   And the value of it, from my understanding, that I would have

22   had a continued relationship with Oxford that would have then

23   paid them off again.  Well --

24         THE COURT:  At the -- with respect to the Darien

25   Drive, as of August 17, 2005, the appraised value was 365-.

RESIDENTIAL CAPITAL, LLC, et al.                    147

1  With respect to Stone Hollow Drive, the appraised value as of
2  August 17th, 2005, was 239,000 dollars.  Is there an appraisal
3  as to the third property?
4           MR. REED:  I thought there was.  Hold on, I thought I
5  saw it in there.  Hold on.
6           THE COURT:  Yes, there is.  As to Columbia Avenue,
7  Stratford, as of date of November 5th, 2009, I don't see the
8  value they assigned.  I don't see the full appraisal; I see the
9  front page of it.  It's at RFC-950.
10          All right, anything else, Mr. Reed?
11          MR. REED:  Yeah, it's -- it's my testimony that --
12 that -- that 52 Stone Hollow Drive and 318 Columbia Drive (sic)
13 have always been very similar in -- in pricing.  And with -- so
14 since we're looking at values as of this -- of this file time,
15 then I would say it's then, you know, in the 220-, 210-, 230-
16  --
17          THE COURT:  For which one?
18          MR. REED:  This is before --
19          THE COURT:  No, which property?
20          MR. REED:  Yes, that would be for 318 Columbia.
21          THE COURT:  And what value do you place on it?
22          MR. REED:  The value, it would be slightly under 52
23 Stone Hollow, or within five percent of it, below.
24          THE COURT:  Stone Hollow appraised value was 239-.
25          MR. REED:  I would say -- I would say that --

1          THE COURT:  Do you agree with that value?

2          MR. REED:  Yeah, or -- or a little bit below it.  I

3    agree for Stone Hollow being 230- --

4          THE COURT:  Yes.

5          MR. REED:  Yeah.

6          THE COURT:  Okay, you agree with that.  And what about

7    for Columbia?

8          MR. REED:  365-, I'd say, yes, that -- that --

9          THE COURT:  365- for Columbia?

10         MR. REED:  Oh, no, I'm sorry, for Columbia, I would

11   say it's -- it's below.

12         THE COURT:  Okay, below 239-.

13         MR. REED:  Yeah, maybe 225-, 220-.

14         THE COURT:  All right, and what about Darien?

15         MR. REED:  Darien, as I said before, is a much better

16   town.  Cherry Hill is a much better town, bigger -- a little

17   bigger house; that's had a market improvement, I mean,

18   that's -- they're talking mid-three's -- mid-three's.

19         THE COURT:  The appraisal was for 365-.

20         MR. REED:  Yeah, that's --

21         THE COURT:  Do you agree with that?

22         MR. REED:  Yeah, you know.

23         THE COURT:  All right, what's next?

24         MR. REED:  Your Honor, I'm consulting with the pre-

25   trial memos for a minute to make sure I'm covering my topics

1    that we -- we went through.

2      (Pause)

3      MR. REED:  Your Honor, I test -- did I testify as to

4    the percentage, also, the profit percentage I typically got off

5    of these properties, buying and selling them; my margin?

6      THE COURT:  I think you said twenty percent.

7      MR. REED:  Okay, good, I just wanted to -- it could be

8    higher, right, exactly -- exactly.

9      THE COURT:  Okay.

10      MR. REED:  All right, okay.  Your Honor, I think I've

11    covered -- all right, I think I've covered it.  I'm really --

12    Old Dell Trace, my value, my opinion as the homeowner, also,

13    that -- that the house would be worth, you know, 1.7, even if

14    the market dipped, you know, 1.6, something like that.  But

15    that -- you know, that's a -- that's a hindsight opinion, but

16    you know, at the time, I thought 1.7.  I thought we even had a

17    shot of getting 1.8, the appraiser had a different -- a

18    different number, but that was better than the -- the normal

19    percentage on some of the smaller projects, too.  I want to

20    make sure you've got the rents.

21      (Pause)

22      MR. REED:  Your Honor, that's it.  I think that's it.

23      THE COURT:  All right, let me ask a logistics

24    question.  What witnesses remain to come testify?  Do you know

25    whether Ms. Kline is coming tomorrow?

1          MR. REED:  I did not -- she's a school teacher, so

2    she's in school, I'm going to find that out.  But I -- I'm

3    going to prompt her, that's --

4          THE COURT:  Look, I don't want to get anywhere

5    further, I'm just making clear to both of you, if she fails to

6    appear, I expect you both will have your designations and

7    counter-designations from her deposition transcript, and I

8    just -- if you speak with her, I order that she be here in

9    person.  If she doesn't, she'll bear the consequences.

10         MR. REED:  Let me ask you what that means; what should

11   I tell her?

12         THE COURT:  Just what I said.

13         MR. REED:  Okay.

14         THE COURT:  I entered an order ordering her to appear,

15   and if she fails to appear, the Court will consider holding her

16   in contempt and ordering sanctions against her.  Sanctions can

17   be either a monetary award, or it could include jail.

18         MR. REED:  Oy.

19         THE COURT:  That's in my order.

20         Who else; are you calling any other witnesses?

21      (Pause)

22         MR. REED:  So Joan Kline and Jeffrey Walters, Your

23   Honor.

24         THE COURT:  All right, so Mr. Walters, is he going to

25   be here in the morning?

1           MR. REED:  I -- I spoke to him briefly, and he said
2   that he -- he --
3           THE COURT:  You don't have him under subpoena?
4           MR. REED:  No, I didn't subpoena him, but he wants
5   to -- he indicated that he -- you know, he's concerned about
6   his fees so he wants to come, so.
7           THE COURT:  All right.
8           MR. REED:  I -- I don't know -- I -- he said he's
9   going to get back to me about what his schedule was during
10  tomorrow for how -- how to come.
11          THE COURT:  Ms. Hager, how long do you anticipate your
12  cross-examination of Mr. Reed to be?
13          MS. HAGER:  Maybe an hour.
14          THE COURT:  All right, I will propose then, that we
15  end now and you cross-examine tomorrow.  As I said, we're going
16  to end at 4:25 because of my next hearing at 4:30, so rather
17  than start, unless you have a strong preference that you want
18  to start.
19          MS. HAGER:  No, we can -- it can wait, that's fine.
20          THE COURT:  All right.  If Ms. Kline shows up, she'll
21  go on first, take her out of order.  She'll testify, and then
22  if Mr. Walter's here, we'll take him out of order, and then
23  we'll -- you may do Mr. Reed's cross-examination in one fell
24  swoop, okay?
25          MS. HAGER:  Sure.  Thank you, Your Honor.

1          THE COURT:  All right, we're in recess until 4:30.

2     (Whereupon these proceedings were concluded at 3:36 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              I N D E X

3

4                          T E S T I M O N Y

5    WITNESS                    EXAM BY              PAGE

6    Robert E. Curley, III    (By affidavit)         4

7    Robert E. Curley, III     Mr. Nagi             12

8    Robert E. Curley, III     Mr. Reed             54

9    Robert E. Curley, III     Mr. Nagi             61

10   Frank Reed                (In colloquy)        78

11

12

13                         E X H I B I T S

14   (Note: All Claimant's exhibits were marked for identification

15   at the September 27, 2016 hearing)

16   CLAIMANT'S DESCRIPTION                     I.D.    ADM.

17   4          Affidavit of Robert E. Curley, III       13

18   8          TD Bank judgment for $747,206.57         86

19   40         Mr. Whelan's deposition transcript       90

20              and invoices

21   Re: 54 -   Page 18, line 13 through page 20,        66

22              line 19 of Martha Clampitt

23              deposition

24   Re: 54 -   Page 18, lines 1 through 7 of            67

25              Martha Clampitt's deposition

```
 1

 2                         E X H I B I T S (cont'd.)

 3     CLAIMANT'S DESCRIPTION                          I.D.   ADM.

 4     (cont'd.)

 5     Re: 54 -   Page 22, line 6 through page 22,            67

 6                line 13 of Martha Camplitt's

 7                deposition

 8     Re: 54 -   Page 24, line 24 through page 26,           67

 9                line 12 of Martha Clampitt's

10                deposition

11     Re: 54 -   Page 26, line 16 through page 26,           68

12                line 24 of Martha Clampitt's

13                deposition

14     Re: 54 -   Page 27, line 22 through page 28,           68

15                line 7 of Martha Clampitt's

16                deposition

17     Re: 54 -   Page 28, line 25 through page 29,           68

18                line 19 of Martha Clampitt's

19                deposition

20     Re: 54 -   Page 28, line 25 through page 29,           68

21                line 19 of Martha Clampitt's

22                deposition

23     Re: 54 -   Page 30, line 4 through line 7             68

24                of Martha Clampitt's deposition

25
```

155

```
 1
 2                      E X H I B I T S (cont'd.)
 3   CLAIMANT'S DESCRIPTION                        I.D.   ADM.
 4   (cont'd.)
 5   Re: 54 -   Page 31, line 13 through page 31,          69
 6              line 22, of Martha Clampitt's
 7              deposition
 8   Re: 54 -   Page 33, line 25 through page 34,          69
 9              line 4, of Martha Clampitt's
10              deposition
11   Re: 54 -   Page 36, line 1 through page 37,           69
12              line 23, of Martha Clampitt's
13              deposition
14   Re: 54 -   Page 47, line 3 through page 47,           70
15              line 15, of Martha Clampitt's
16              deposition
17   Re: 54 -   Page 42, line 14 through page 43,          71
18              line 14 of Martha Clampitt's
19              deposition
20   Re: 54 -   Page 44, line 18 through page 45,          71
21              line 15 of Martha Clampitt's
22              deposition
23   Re: 54 -   Page 21, line 12 through page 21,          72
24              line 22, of Martha Clampitt's
25              deposition
```

```
 1
 2                       E X H I B I T S  (cont'd.)
 3   CLAIMANT'S DESCRIPTION                        I.D.    ADM.
 4   (cont'd.)
 5   Re: 54 -   Page 26, line 13 through page 26,          72
 6              line 15, of Martha Clampitt's
 7              deposition
 8   Re: 54 -   Page 27, line 9 through page 27,           73
 9              line 21 and page 29, line 20
10              through page 29, line 25, of
11              Martha Clampitt's deposition
12   Re: 54 -   Page 30, line 1 through page 30,           73
13              line 3, of Martha Clampitt's
14              deposition
15   Re: 54 -   Page 31, line 23 through page 33,          74
16              line 24 of Martha Clampitt's
17              deposition
18   Re: 54 -   Page 34, line 5 through page 34,           74
19              line 22, of Martha Clampitt's
20              deposition
21   Re: 54 -   Page 35, line 2 through page 35,           74
22              line 13, of Martha Clampitt's
23              deposition
24
25
```

```
 1
 2                     E X H I B I T S (cont'd.)
 3   CLAIMANT'S DESCRIPTION                          I.D.    ADM.
 4   (cont'd.)
 5   Re: 54 -   Page 37, line 24 through page 39,           75
 6              line 12, of Martha Clampitt's
 7              deposition
 8   Re: 54 -   Page 47, line 19 through page 47,           75
 9              line 21, of Martha Clampitt's
10              deposition
11   Re: 54 -   Paragraph 8 of Martha Clampitt's            76
12              deposition
13
14   BORROWER    DESCRIPTION                         I.D.    ADM.
15   TRUST'S
16   II          TD Bank loan-approval packet
21
17
18                          RULINGS
19                                     Page      Line
20   Subpoena for McCaffrey is withdrawn.        5        18
21   Mr. Reed's motion for leave to file the     7        23
22   supplemental declaration of Robert E.
23   Curley, III, dated September 28, 2016,
24   denied.
25
```

1

2                        C E R T I F I C A T I O N

3

4    I, David Rutt, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10   _____

11   DAVID RUTT

12   AAERT Certified Electronic Transcriber CET**D 635

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  September 29, 2016

19

20

21

22

23

24

25