1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 12-12020-mg

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7   RESIDENTIAL CAPITAL, LLC, ET AL.,

8           Debtors.

9

10  - - - - - - - - - - - - - - - - - - - -x

11

12              United States Bankruptcy Court

13              One Bowling Green

14              New York, New York

15

16              September 29, 2016

17              9:02 AM

18

19

20

21  B E F O R E:

22  HON. MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25

1

2     Trial Regarding Reed Claims Objection.   Trial Set for September

3     26 at 9:00 AM, Continuing Day to Day on September 27th,

4     September 28th, September 29th and September 30th.

5

6     Hearing RE:  Order Requiring Joan Kline to Appear and Testify

7     at Trial on Thursday, September 29, 2016, or in the

8     Alternative, to Show Cause at that Time Why She Should Not Be

9     Held in Contempt Pursuant to Federal Rule of Civil Procedure

10    45(g).

11

12

13

14

15

16

17

18

19

20    Transcribed by:  Aliza Chodoff

21    eScribers, LLC

22    700 West 192nd Street, Suite #607

23    New York, NY 10040

24    (973)406-2250

25    operations@escribers.net

3

1

2  A P P E A R A N C E S:

3  REED SMITH, LLP

4          Attorneys for The ResCap Borrower Claims Trust

5          1717 Arch Street

6          Suite 3100

7          Philadelphia, PA 19103

8

9  BY:   BARBARA K. HAGER, ESQ.

10

11

12  FRANK REED, PRO SE CREDITOR

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  All right, please be seated.

3              Good morning.  We're here in Residential Capital,

4    number 12-12020.  This is a continuation of the trial of a

5    contested matter concerning the claim of Frank Reed.

6              Good morning.

7              MS. HAGER:  Good morning.

8              MR. REED:  Good morning, Your Honor.

9              THE COURT:  Mr. Reed, I gather that Ms. Kline is here;

10   is that correct?

11             MR. REED:  Yes, Your Honor.

12             THE COURT:  All right.  You wish to call her as a

13   witness?

14             MR. REED:  I do, Your Honor.

15             THE COURT:  All right.

16             MR. REED:  And I guess -- what is it -- we move her

17   declaration?

18             THE COURT:  Yes, if you would -- let's have her come

19   on up.

20             Ms. Kline, if you'll come on up?  You'll come up to

21   the witness box, and you'll be sworn.  There should be water

22   and a pitcher as well.

23        (Witness sworn)

24             THE COURT:  All right, please have a seat.  Move the

25   microphone close enough to you that we can ensure that your

 1  voice gets picked up.

 2          THE WITNESS:  Sure.  Better?

 3          THE COURT:  All right.  The client declaration is

 4  Claimant's Exhibit 10.

 5  (Ms. Kline's declaration was hereby marked for identification

 6  as Claimant's Exhibit 10, as of this date.)

 7          THE COURT:  Mr. Reed, you wish to offer the

 8  declaration into evidence?

 9          MR. REED:  I'm sorry, Your Honor?

10          THE COURT:  Do you wish to offer Ms. Kline's

11  declaration in evidence?

12          MR. REED:  Yes, Your Honor.

13          THE COURT:  Any objection?

14          MS. HAGER:  Your Honor, objections to paragraphs 4 and

15  5 only to the extent that they mention the property at 133

16  Brookschase, which is no longer part of the case.  The

17  insinuation is that money from Ms. Kline would have gone to be

18  used for both of those properties.

19          THE COURT:  Overruled.

20          MR. REED:  Okay.

21          THE COURT:  The declaration is in evidence.

22  (Ms. Kline's declaration was hereby received into evidence as

23  Claimant's Exhibit 10, as of this date.)

24          THE COURT:  All right.  And we begin with your cross-

25  examination, and then Mr. Reed will have an opportunity to

1  question you after that, okay?

2           THE WITNESS:  Thank you.

3           THE COURT:  All right.

4           Go ahead, Ms. Hager.

5  CROSS-EXAMINATION

6  BY MS. HAGER:

7  Q.    Good morning, Ms. Kline.

8  A.    Good morning.

9  Q.    At the time that Mr. Reed approached you for a loan, he

10 was living in Virginia.  Is that right?

11 A.    To my recollection, yes, he was.  And I may -- I may have

12 the timeline off by --

13 Q.    Do --

14 A.    -- a few months.  I believe we talked during the summer.

15 Q.    Okay.  Do you remember testifying in your deposition that

16 he lived in Virginia at the time he --

17 A.    I --

18 Q.    -- approached you for a loan?

19 A.    I believe had moved to Virginia, yes.

20 Q.    Okay.  And I'll just remind you, let me finish my question

21 before you start --

22 A.    Oh, sorry.

23 Q.    -- to answer, or it doesn't leave a clear record, okay?

24 A.    No problem.

25 Q.    And Mr. Reed asked you for a loan of 300,000 dollars; is

1  that right?

2  A.   Yes, we were in discussion.

3  Q.   And this loan would have been an unsecured loan; is that

4  right?

5  A.   Yes.

6  Q.   And Mr. Reed wanted to use the funds to work on property

7  in Virginia; is that right?

8  A.   To the best of my knowledge.

9  Q.   And you considered lending to him; is that right?

10 A.   Yes, I did.

11 Q.   Now, you've never leant money to anyone besides Mr. Reed;

12 is that right?

13 A.   Correct.

14 Q.   And in 1993, you leant him 9,000 dollars, correct?

15 A.   I can prove that -- that's the amount I can prove.

16 Q.   Okay.  And in 1996, you leant him 14,000 dollars; is that

17 right?

18 A.   Again, that's what I have proof of.

19 Q.   And he paid these amounts back, correct?

20 A.   Yes, he did.

21 Q.   And did he pay them back in a lump sum or in payments?

22 A.   I believe they were installments.

23 Q.   And were there terms associated with the repayment?

24 A.   You mean like a length, a -- I -- to expect the payment

25 back?

1  Q.   So what I mean by terms, was there an interest rate or a

2  length of time within which he had to repay the funds?

3  A.   So what I can recall it was five percent rate, and I don't

4  remember talking about a term that -- the date that he was

5  going to repay by.

6  Q.   Now, when you mentioned that you had proof of the 9,000-

7  dollar loan and proof of the 14,000-dollar loan, I think you're

8  referring to cancelled checks that --

9  A.   Yes.

10  Q.   -- you shared with me during your deposition; is that

11  right?

12  A.   That's correct.

13  Q.   Okay.  And besides the cancelled checks that you shared

14  with me for the amounts of 9,000 dollars and two separate

15  checks that totaled 14,000 dollars, you don't have any other

16  records of any other loans.  Is that correct?

17  A.   No, I don't have proof.

18  Q.   Okay.  Now, besides the loans for 19,000 (sic) and 14,000,

19  have you ever leant Mr. Reed more money?

20  A.   Yes.

21  Q.   And when was that?

22  A.   I believe it was associated with the two checks for 9,000

23  and 5,000 in '96.  Do I have that correct?

24  Q.   Now, do you remember when I asked you that question in

25  your deposition and you testified that there weren't any other

1  loans that you could recall?

2  A.   I thought you were speaking about the amount.  Could you

3  please rephrase your question?

4  Q.   Sure.  Have you ever leant -- besides the 9,000 dollars

5  and the 14,000 dollars --

6  A.   Right.

7  Q.   -- you just testified to, did you ever lend Mr. Reed

8  additional funds?

9  A.   Yes.

10  Q.   Okay.  And when did you do that?

11  A.   It was around -- in '96, in the neighborhood of April, the

12  same time that the -- these checks are dated.

13  Q.   And how much was that?

14  A.   It was 100,000.

15  Q.   But you don't have a check for that?

16  A.   No, ma'am, I don't.

17  Q.   Okay.  And do you keep copies of your checks all in the

18  same place?

19  A.   Not from twenty years ago, no.

20  Q.   Okay.  How --

21  A.   These were found serendipitously.

22  Q.   Yeah, but you came upon the one from 1993 and two from --

23  A.   Right.

24  Q.   --1996, though, right?

25  A.   Yes.

KLINE - CROSS                                          10

1    Q.    Okay.  So when he --

2             MS. HAGER:  Excuse me, strike that.

3    Q.    At the time that he asked you for the 300,000 dollars, you

4    had approximately 863,000 dollars in various bank and

5    investment accounts; is that right?

6    A.    That's what I could prove, yes.

7    Q.    And you came into this money from an inheritance as the

8    only child after your parents passed away some years ago; is

9    that right?

10   A.    Correct.

11            THE COURT:  Can you just tell me again, how much did

12   you have in total?

13            THE WITNESS:  I can find the paper.

14            THE COURT:  You -- just -- I -- just whatever you

15   told --

16            THE WITNESS:  Over 800,000.

17            THE COURT:  Okay, thank you.  All right.

18            THE WITNESS:  That I could prove at that time.

19            THE COURT:  Yeah, okay.  And when was it that he asked

20   for the 300,000 dollars?

21            THE WITNESS:  He asked me in '08.

22            THE COURT:  Okay.  Go ahead.

23   Q.    So when you actually inherited the funds, you inherited

24   between 500- and 700,000 --

25   A.    Right.

1  Q.    -- is that right?

2  A.    That was my -- correct, that was my estimate.

3  Q.    Okay.  And that had increased over time to the 863- that

4  you told me about --

5  A.    Yes.

6  Q.    -- is that right?  Okay.

7         And this inheritance that we're talking about, that's your

8  nest egg, so to speak, correct?

9  A.    Yes, it is.

10 Q.    You're presently employed as a Catholic school teacher,

11 correct?

12 A.    Correct.

13 Q.    And how long have you been doing that?

14 A.    This is my fortieth year.

15 Q.    Okay.  And what's your annual salary as a Catholic school

16 teacher?

17 A.    Oh, in the neighborhood of 45-, 46,000.

18 Q.    And do you invest any of your annual salary, or do you use

19 it for your living expenses and our day-to-day?

20 A.    I invest parts of my salary, yes.

21 Q.    But if you were to lose part of your investment, you

22 really wouldn't have much income and cash flow from salary to

23 replenish it; is that right?

24 A.    Yes.

25 Q.    Now, when Mr. Reed approached you for the 300,000-dollar

1    loan, you were not aware that he was late on his mortgage

2    payments, were you?

3    A.    I don't believe I had that knowledge at that time.  I'm

4    not sure of the timeline when he was late on his payments.

5    Q.    And had you been -- excuse me, had you been made aware

6    that Mr. Reed was late paying his mortgage for a number of

7    months, you wouldn't have considered lending him 300,000

8    dollars, would you?

9    A.    I would say probably not, but I didn't have the knowledge.

10   Q.    But you would have -- had you had that knowledge, you

11   would have viewed that as a risky investment, wouldn't you?

12   A.    I -- yes, there would be risk involved.  There's always

13   risk involved.

14   Q.    And you would have been concerned about being repaid,

15   wouldn't you?

16   A.    Over two missed mortgage payments?  I think the

17   circumstances needed to be more grave than just two missed

18   mortgage payments.

19   Q.    Well, I don't think I said two, but let me just clarify

20   the question.

21   A.    Okay.

22   Q.    When in 2008 was this conversation?

23   A.    Well, Mr. Reed and I had many conversations.  I believe it

24   was during the summer when we spoke.

25        THE COURT:  The summer of 2008?

1           THE WITNESS:  Yes.  I'm sorry, thank you.

2           THE COURT:  It's okay.  No, it's all right.

3    Q.   Okay.  So somewhere between -- and there may have been

4    more than one conversation, but --

5    A.   Oh, that's not --

6    Q.   -- throughout -- let's say throughout June, July, and

7    August of 2008, somewhere in there?  Would that be fair?

8    A.   That seems to be an accurate --

9    Q.   Okay.  So if I told you that he was six

10   months -- approximately six months behind on his mortgage when

11   you had that payment, had you known that, would you have been

12   concerned --

13          THE COURT:  I think you misspoke.

14          MS. HAGER:  Okay.

15          THE COURT:  I think you said, when you had that

16   payment.

17          MS. HAGER:  Let me just strike that.  Let me just

18   start over.

19   Q.   If I told you that at the time he approached you for a

20   loan of 300,000 dollars, which was sometime, you're saying, in

21   the summer of 2008, if you had the knowledge that he was

22   approximately six months behind on his mortgage payment on his

23   primary mortgage on Matlack, would you have been concerned --

24          MR. REED:  Objection.  Speculative.

25   Q.   -- about being --

KLINE - REDIRECT                                      14

1           THE COURT:  Overruled.

2    Q.   -- repaid?

3           THE COURT:  Overruled.  Go ahead.

4           THE WITNESS:  You want me to answer?

5    A.   I knew that he had also owned other properties.

6    Q.   Okay.  My question, would you have been concerned about

7    being repaid knowing that he was six months' delinquent on his

8    primary mortgage?

9    A.   Yes, I would have concern.

10   Q.   Okay.  And he was asking you for a long of 300,000

11   dollars, which was more than one-third of your entire liquid

12   net wealth; is that correct?

13   A.   Correct.

14   Q.   Okay.

15          MS. HAGER:  Thank you.  No further questions.

16          THE COURT:  All right.  Mr. Reed.

17   REDIRECT EXAMINATION

18   BY MR. REED:

19   Q.   What other assets did you have at that time besides the

20   liquid assets?

21   A.   I know I had the house.  I'm sure I had retirement funds.

22   Q.   Can you -- was there a mortgage on the -- on the house?

23   A.   No, there wasn't.

24   Q.   Can you give an approximate value, in your mind, of what

25   you think the house was worth at that time?

1  A.    No, I'm sorry.  I haven't -- I have no basis to pull from.

2  I'm sorry.  I can tell you what I paid.  I can tell you

3  approximately what it's worth today.  Could I tell you what the

4  in between?  No.

5          MS. HAGER:  Objection.  Move to strike the portion of

6  the nonresponsive answer.

7          THE COURT:  Overruled.

8  Q.    I'd like to hear those numbers.

9  A.    Okay, I bought it for 190,000, and today properties of a

10  similar size and shape in my neighborhood are worth around

11  350,000.

12  Q.    Okay.  Do you have an idea how much your retirement -- and

13  you said -- you mentioned other money, too?

14  A.    Right.  I know it was in the statement that I gave --

15          THE WITNESS:  Am I allowed to look up things?  Your

16  Honor, I have paperwork with me.

17          THE COURT:  What do you want to look up?  Yeah, go

18  ahead.

19          THE WITNESS:  It was what I submitted to the Court at

20  my --

21          THE COURT:  Yeah, I'll --

22          THE WITNESS:  -- deposition.

23          THE COURT:  -- permit you to do that.  If Ms. Hager

24  wants to see it, then you can show it to her.

25          THE WITNESS:  Okay.

KLINE - REDIRECT                                16

1           MS. HAGER:  I have that.  No objection.

2           THE COURT:  All right, go ahead.

3           THE WITNESS:  Okay.  I don't have my glasses her.

4           THE COURT:  This is not a memory contest.

5           THE WITNESS:  Okay, thank you.  I'd lose.

6  A.   At that time, there -- in one retirement account, there

7  was 132,000 dollars.  I know that I had been saving in another

8  company.  Money is withdrawn from my salary every two weeks.  I

9  don't know the value of that account.

10          THE COURT:  May I just ask you this?

11          THE WITNESS:  Sure.

12          THE COURT:  Is that 132,000 in your retirement

13  account, is that included in the 863,000?

14          THE WITNESS:  No, it's not.  Okay.

15          MR. REED:  Your Honor, may I approach?

16          THE COURT:  Yes, you can.

17          THE WITNESS:  Can I --

18          MR. REED:  Get your papers.

19          THE WITNESS:  You just want to ask if it's the same

20  paper?  Yes, we're pulling out the same paper, Your Honor.

21          THE COURT:  Okay.

22          THE WITNESS:  All right.

23          THE COURT:  Just show Ms. Hager what you're looking

24  at.

25          THE WITNESS:  It was --

1          MS. HAGER:  Is there a stamp on it?

2          THE WITNESS:  Yes.

3          MS. HAGER:  What is it?

4          THE WITNESS:  It is the total of my assets that I had

5    a record -- oh, what is it?  Kline 2.

6          MS. HAGER:  That's fine, thank you.

7          THE COURT:  Okay, go ahead.

8          Ms. Kline.

9          THE WITNESS:  Thank you.

10         MR. REED:  Your Honor, I have a Claimant 2 to make

11   sure -- documents that are the second exhibit to her

12   deposition.

13         THE COURT:  All right, I have it open in front of me.

14   Go ahead.

15   BY MR. REED:

16   Q.   Can you look through these and make sure these are the

17   ones that you believe you handed in that deposition?

18         THE COURT:  That's your signature; is that correct?

19         THE WITNESS:  Yes, that's my signature, sir.

20         THE COURT:  Okay.

21         THE WITNESS:  I know I had my tax statement, and then

22   I numbered the papers through to correlate to addition on the

23   other one.

24         THE COURT:  All right, so the 863,507 is the thing --

25         THE WITNESS:  Yes, sir.

1          THE COURT:  -- that you testified about?

2          THE WITNESS:  Yes.

3          THE COURT:  And the 132,767, that's the --

4          THE WITNESS:  It's the retirement --

5          THE COURT:  -- retirement account?

6          THE WITNESS:  -- that I have one set of paperwork for.

7          THE COURT:  Okay, that's fine.

8          THE WITNESS:  Okay?  Thank you.

9          THE COURT:  Go ahead.

10         THE WITNESS:  Okay.

11   A.    I believe they're all here.

12   Q.    You --

13         THE COURT:  You need to be near a microphone, so you

14   either --

15         MR. REED:  Right, I'm just --

16         THE COURT:  -- have to go back -- don't crawl through

17   the room, okay?

18         MR. REED:  I'm sorry, Your Honor.

19   Q.    So in the first page of Claimant 2, there's a total number

20   that you signed your name under.  That number is

21   all -- virtually a million dollars?

22   A.    Correct.

23   Q.    What is -- am I to understand that this is your liquid

24   amount or your cash that you thought you had?  Cash, not --

25         MS. HAGER:  Objection to form.

1             THE COURT:  Sustained.

2             This doesn't include whatever value you had in the

3    house?

4             THE WITNESS:  Correct.

5             MR. REED:  Yes.

6             THE COURT:  It does not include the house.

7             THE COURT:  All right.

8             MR. REED:  That's what I was trying to say.

9             THE WITNESS:  And there's other retirement accounts

10   also that I did not include.

11   Q.   Do you have any recollection of how much maybe those other

12   retirement accounts, cumulatively, might be?

13            MS. HAGER:  Objection.  Calls for speculation.

14   A.   We're going back twenty years, sir.

15            THE COURT:  You -- I don't want you to guess.

16            THE WITNESS:  Okay.  I don't -- I --

17            THE COURT:  All right.  Are you able to approximate

18   how much --

19            THE WITNESS:  No.

20            THE COURT:  -- you have in the accounts --

21            THE WITNESS:  Not without a calculator --

22            THE COURT:  -- without --

23            THE WITNESS:  -- and a pen.

24            THE COURT:  Okay.

25            THE WITNESS:  Okay?

1            THE COURT:  Ask your next question, Mr. Reed.

2            THE WITNESS:  I can tell you that I have 250 dollars

3      withdrawn from my paycheck, and I've worked for the same

4      institution since they initiated this process.

5            THE COURT:  What school do you teach at?

6            THE WITNESS:  St. Laurentius.

7            THE COURT:  And where is that?

8            THE WITNESS:  It's in the neighborhood of Fishtown.

9            THE COURT:  Okay, thank you.  I'd love to know whether

10     the students have changed so much over forty-five years, but we

11     don't have to go into that.

12            Go ahead, Mr. Reed.  Ask --

13            THE WITNESS:  Yes, they have.

14            THE COURT:  -- your next question.

15     BY MR. REED:

16     Q.   So you mentioned to the Court that you would have had

17     concerns about my -- lending me money, and I believe you said

18     there's risk always involved in lending money.  Can you say

19     definitively here today why you decided not to lend me money?

20     What was the reason in your mind why you did not lend me the

21     money?

22            MS. HAGER:  Objection to form.

23            THE COURT:  Overruled.  You can answer.

24            THE WITNESS:  Okay, thank you.  I wasn't sure.

25            THE COURT:  Yeah.

1   A.   As time progressed and we had more conversations, I found

2   out that there was a buyer interested in your property in

3   Moorestown.  And then, that deal evaporated.  And there were

4   other issues going on, and then the foreclosure came.  And I

5   ran.  I'm going to be honest.  I ran.

6           THE COURT:  Do you know why a foreclosure proceeding

7   was started on the Moorestown home?

8           THE WITNESS:  Should I guess?

9           THE COURT:  No, you -- did Mr. Reed tell you?  I don't

10  know what he said, but I'm -- I'd like to know, did you know

11  why a foreclosure proceeding was started with respect --

12          THE WITNESS:  Do I have --

13          THE COURT:  -- to the Moorestown --

14          THE WITNESS:  -- one -- with one hundred percent

15  accuracy?  No, I can't tell you why.  I can make an educated

16  guess.

17          THE COURT:  Did you have -- at the time that you

18  decided to run from it --

19          THE WITNESS:  Right.

20          THE COURT:  -- did you have a view as to why the

21  foreclosure had been started?

22          THE WITNESS:  More than likely, as I said before,

23  Frank and I talk.  He was above board with giving me

24  information, and he himself told me that the foreclosure was

25  happening and that the buyer who he had lined up for his house

1  disappeared.  Foreclosure was enough to -- for me to end the

2  process.

3          THE COURT:  What was your under -- did you have an

4  understanding of why a foreclosure proceeding had been started?

5          THE WITNESS:  A general idea that --

6          THE COURT:  What was your --

7          THE WITNESS:  My general idea was there wasn't enough

8  to money to go around to finance the repairs on the house in

9  Virginia plus pay for the other property in Virginia.  And I

10  know Frank had rental properties in addition to that, so it

11  seemed like the house in Moorestown maybe was at the bottom of

12  the list.

13          THE COURT:  Okay, all right.

14          Mr. Reed, go ahead.

15          You're done?

16          MR. REED:  Yeah.

17          THE COURT:  Okay.  Ms. Hager, do you have any other

18  questions?

19          MS. HAGER:  Yes.

20  RECROSS-EXAMINATION

21  BY MS. HAGER:

22  Q.   With respect to your retirement account, you wouldn't have

23  liquidated that to lend money to Mr. Reed, would you?

24  A.   That would seem rather foolish.

25  Q.   And you testified that your residence was owned free and

KLINE - FURTHER REDIRECT                                             23

1   clear.  You wouldn't have taken out a mortgage on that property

2   to lend proceeds to Mr. Reed, would you?

3   A.    That would be highly unlikely.

4   Q.    Okay, thank you.

5         THE COURT:  All right.

6         MS. HAGER:  Oh, sorry.  I'm very sorry.  One other

7   thing.

8   Q.    Are you positive that these conversations happened in the

9   summer of '08?

10  A.    No, I'm not a hundred percent positive.  What --

11  Q.    Is --

12  A.    -- I -- as a teacher, I'm off during the summer.

13  It -- I'm much more available for conversations with Frank.  We

14  get on, and we chat away twenty minutes, a half hour at a time.

15  Q.    Would it be possible that they might have happened in the

16  summer of '09?

17  A.    Oh, I don't believe so.

18  Q.    Okay.  Thank you.

19        MS. HAGER:  Nothing further.

20        THE COURT:  All right.  Mr. Reed, anything further?

21        MR. REED:  Yeah, about the timeline, Your Honor.

22  FURTHER REDIRECT EXAMINATION

23  BY MR. REED:

24  Q.    You said the word "conversations"?

25  A.    Right.

1   Q.    Would you say --

2              THE COURT:  Don't ask a leading question.

3              MR. REED:  Yes.  Let -- how --

4              THE COURT:  That's just --

5   A.    We --

6              THE COURT:  A formal question.

7   A.    Do we speak often?  Yes.  Do two weeks go by without us

8   speaking?  That's the rare case.  Is that what you wanted to

9   know?  No?  Okay, sorry.

10  Q.    Was my request made in -- or the discussion about the need

11  for money and a request -- was it just like one instance in

12  time, or how would you describe that --

13             THE COURT:  Let me ask it this way.  Did you have one

14  conversation or more than one conversation?

15             THE WITNESS:  We definitely had more than one

16  conversation.  You -- if you know anything about Mr. Reed, he's

17  a man of words.  Okay?  And yes, we would have talked quite a

18  few times about it.  I don't jump into anything easily or

19  lightly without due consideration.

20             MR. REED:  Okay, Your Honor, I think that's it.

21             THE COURT:  All right.  Ms. Hager, anything else?

22             MS. HAGER:  No, Your Honor.  Thank you.

23             THE COURT:  Thank you very much for your testimony.

24             THE WITNESS:  Thank you.

25             THE COURT:  Okay.

1          All right, we'll take a ten-minute recess.

2          Mr. Reed, you'll resume in the witness box.  I'll give

3    you a chance to get up there.  Bring whatever papers -- well,

4    Ms. Hager, what papers do you want him to have up there so he

5    doesn't have to go back and forth?

6          MS. HAGER:  The --

7          THE COURT:  Well, you can bring him whatever you want.

8          MS. HAGER:  I'm going to give him a binder --

9          THE COURT:  Okay.

10         MS. HAGER:  -- of deposition transcripts, which I also

11   have to share with the Court, and my -- the trust's --

12         THE COURT:  All right.

13         MS. HAGER:  -- exhibits.

14         THE COURT:  We're going to take our ten-minute recess.

15   You give Mr. Reed anything that you're going to want him to

16   look at so we don't have to go back and forth, okay?  And

17   you'll --

18         MS. HAGER:  Okay.  And may I leave a --

19         THE COURT:  Absolutely.

20         MS. HAGER:  -- binder for the Court?

21         THE COURT:  Just put it up on the --

22         MS. HAGER:  Okay, thank you.

23         THE COURT:  -- on the ledge, okay?

24         Thank you.

25         MR. REED:  What is it you want me to have?

1           MS. HAGER:  I'll give it to you.

2           THE COURT:  She's going to give you whatever you need.

3   Just bring yourself and --

4           MR. REED:  Okay.

5       (Recess from 9:26 a.m. until 9:42 a.m.)

6           THE COURT:  We're ready for the cross-examination of

7   Mr. Reed.

8           Mr. Reed, you're still under oath.

9           Ms. Hager, go ahead.

10          MS. HAGER:  Just one quick matter of housekeeping

11  before get started.

12          THE COURT:  Yes.

13          MS. HAGER:  At some point I think I'll be referencing

14  some of Mr. Reed's depositions transcript, and I've given a

15  binder of those to Your Honor.  I have extras.  Do your law

16  clerks need a bound copy?

17          THE COURT:  Is it in the binders?

18          MS. HAGER:  It -- it can be.  I have one copy that's

19  bound and one that isn't.  I can give the unbound copy to Mr.

20  Reed and the bound copy to the clerks.

21          THE COURT:  It doesn't matter.  You can give them

22  bound or unbound.

23          MS. HAGER:  Okay.

24      (Pause)

25          MS. HAGER:  Sorry, my mistake.  Okay.

1   CROSS-EXAMINATION

2   BY MS. HAGER:

3   Q.   Mr. Reed, you moved from the Matlack property to Old Dell

4   Trace in November of 2008, correct?

5   A.   Yes.

6   Q.   And that coincides with when Mr. Cooper moved into Matlack

7   and paid you the 400,000 dollars, correct?

8   A.   Yes.

9   Q.   And at that time --

10          THE COURT:  Just tell me again one more time.  What

11   was the date?

12          MS. HAGER:  November 2008.

13          THE COURT:  Thank you.

14   Q.   And at that time, you already owned the property on Old

15   Dell Trace, correct?

16   A.   Yes.

17   Q.   And you had a first on that property with Taylor, Bean &

18   Whitaker and a second on that property with Chase, correct?

19   A.   Yes.

20   Q.   And at that time, November 2008, you didn't own any other

21   properties in Virginia, correct?

22   A.   Right, I think so, yes.

23   Q.   Right, because you had sold Brookschase in June of 2008,

24   correct?

25   A.   Whatever date it was, it was in '08.

1   Q.   Okay.  So in November of 2008, you owned the property on

2   Old Dell Trace in Virginia but no other properties in Virginia,

3   correct?

4   A.   Yes.

5   Q.   And since 2008, you haven't owned any other properties in

6   Virginia, correct?

7   A.   No, that's not correct.  No, I'm sorry --

8           THE COURT:  You have to --

9           MS. HAGER:  I'll try again.

10          THE COURT:  So clarify.  Go ahead.

11  Q.   Since November of 2008, you haven't owned any other

12  properties in Virginia?

13  A.   Since 2000- -- no, I did not own any other properties in

14  Virginia.

15  Q.   Yesterday and the day before, you talked a lot about the

16  various improvements that you had done to Old Dell Trace.  You

17  testified that you began work at some point in 2007 and into

18  early 2008.  And then, you stopped construction for a while,

19  and then you resumed when you moved in November 2008 and

20  thereafter into 2009, 2010.  Do I have that timeline correct?

21  A.   I have issue with the word "stopped".  I believe it

22  was -- we -- it became sporadic, much less -- it wasn't

23  continuous.

24  Q.   Okay.  So through the early to mid-part of 2008, until

25  November of 2008, it was sporadic construction?

1  A.    Yes.

2  Q.    Is that right?  Okay.

3        Now, in April of 2008 or thereabouts, did you seek 350,000

4  dollars from Jeffrey Krum to use for the improvements on Old

5  Dell Trace?

6  A.    I don't even remember that -- that name.  You mentioned it

7  once before, but I don't remember that name at all.

8  Q.    Okay.  I'll ask if you could turn to the Trust's Exhibit

9  II, and, specifically, within that exhibit to RFC890?  And just

10 let me know when you get there.

11 A.    Okay.

12 Q.    And --

13 A.    Okay.

14 Q.    -- if you -- if you remember this is a document that we

15 talked about yesterday when Mr. Curley was testifying.  This is

16 the TD Bank credit memo.  You remember that from yesterday?

17 A.    Yes.

18 Q.    Okay.  If you look at the sixth bullet point down, it says

19 the following:  "Mr. Reed is currently seeking approximately

20 350,000 dollars in funds from Jeffrey S. Krum, Financial

21 Consultants, Inc., which he will use for an addition to an

22 investment property in Richmond, Virginia.  Subsequent to the

23 addition, Mr. Reed plans on listing the property for sale."

24       You don't know why TD would have this statement in their

25 credit memo, do you?

1  A.    No.  I think we talked about this before.  I didn't see

2  this in the memo, but I was asked about Mr. Krum's name before.

3  And I still don't -- I don't know -- I think I -- I think I

4  had -- had maybe testified to the fact that I recalled Mr.

5  Curley had said, look, you can look for other people, too, who

6  might lend out-of-state or something like that specifically for

7  that property.  And he may have gave me some names.

8  This -- maybe this is someone he referred me to at that time.

9       But I don't recall actively going through a real process.

10  Maybe I made a call from -- I don't even remember the person,

11  but I do remember the fact that Mr. Curley said, you know,

12  there's, you know, other people, too.  And that was

13  maybe -- maybe this was one of them because I do remember them

14  referring --

15          THE COURT:  You're speculating, though?

16          THE WITNESS:  Oh, I'm --

17          THE COURT:  Are you speculating?

18          THE WITNESS:  What I recall is Curley giving me a name

19  or two or something like that at the time of maybe other places

20  that I can get money as well or -- I think it was more to the

21  effect that if I wanted not to tie up all the properties, just

22  something specific for Virginia.  That's the extent of my

23  memory in that regard.

24          MS. HAGER:  I move to strike those portions of his

25  answer which were hearsay.  There were a couple of times he

1  said what Mr. Curley said.

2       THE COURT:  Overruled.  They're not offered for the

3  truth.

4  Q.   Okay.  So you testified in your deposition -- and I

5  believe in your direct exam as well -- about when you moved

6  down to Old Dell Trace from Matlack in November of 2008 that

7  you discovered some property damage, right?

8  A.   Correct.

9  Q.   And you showed us some photos in your Exhibit 44 that show

10  that damage; is that right?  And please feel free to refer to

11  your Exhibit 44 to make sure I have the right exhibit.  It's

12  right in front of you.

13  A.   Oh, okay.  Correct.

14  Q.   Okay.  So each of the pictures in Exhibit 44 you took at

15  the time that you saw the damage to the property when you

16  arrived in November of 2008, correct?

17  A.   Yes, I believe that's correct.

18  Q.   Okay.  And that damage was covered by insurance; is that

19  right?

20  A.   Correct.

21  Q.   You testified yesterday that some of what the insurance

22  company paid was to pay for your hotel bill; is that correct?

23  A.   Correct.

24  Q.   Is it your testimony that whatever the amount was that the

25  insurance paid it was enough to cover the hotel, roof repair,

1   the dry wall repair, and the repair to the stairs; is that
2   right?
3   A.    No, because I didn't have all the receipts.  I couldn't
4   separate out all the receipts, so we settled on an amount.  So
5   there was --
6   Q.    Okay.
7   A.    It covered the hotel, and then it -- and there was some
8   funds towards the construction, because I couldn't identify the
9   difference -- they were going to argue about, you know, what
10  was the dry waller's -- how much was the dry waller's bill was
11  just for that section, because this is dry wall, because I was
12  using for the whole house.  And, you know, what was that much,
13  so, you know, I think the adjuster came up with a formula for
14  some -- in his records for some kind of a square footage, and
15  he says, and will you accept this number.  And you know,
16  I -- that's what we wound up doing.
17  Q.    And at the time of the damage, you hadn't yet done work on
18  the stairs, correct?
19  A.    At the time of the damage, I had not done -- no.
20  Q.    Am I right that at the time of the damage you hadn't yet
21  done any renovations to the stairs?
22  A.    Correct.
23  Q.    Okay.  So the last work that was done by a contractor on
24  the Old Dell Trace property was when?
25        (Pause)

1   A.   The last guy, I think, was the heating and conditioning

2   guy.  I'm trying to remember when that work was done.

3   Maybe -- I don't know, September or October -- I don't

4   know -- of '08, something like that.  I --

5   Q.   September of (sic) October of '08?  Was that your answer?

6   A.   Yeah, I think so.

7   Q.   Okay.  So then, there was more work done, though?  You

8   moved in at the end of '08.  You testified yesterday that you

9   did more work at the end of '08 and throughout '09, didn't you?

10   A.   Yes.

11   Q.   Okay.  So -- and ultimately, you then moved out and moved

12   back to Matlack, correct?

13   A.   Correct.

14   Q.   Okay.  So at the end of the day, you had a lot of

15   renovations that you testified about.  What was the very last

16   work that was done, and when was it done?

17   A.   I think there was some plumbing work done after I moved

18   out, and I don't remember.  Something was -- I think we had a

19   problem with a line that ran up to the third floor through the

20   kitchen.  I'm trying to remember, I think it's -- I think it

21   was -- I'm pretty sure that was done after the -- after I moved

22   out.

23   Q.   Okay, so you moved out in May of 2010, correct; do I have

24   that date right?

25   A.   No, I thought we moved out in -- I thought we moved out in

1   November.

2   Q.   I might have that wrong.  Okay, so you moved from Old Dell

3   Trace to Matlack in November of 2010?

4   A.   Maybe, I think so.

5   Q.   Okay, and I think you're right, I'm sorry; that was my

6   mistake.

7   A.   Sure.

8   Q.   And after that, you had some minimal work done that was

9   plumbing work; is that right?

10  A.   Yeah, there might have been something done to the basement

11  or the garage, too, I'm trying to -- I'm trying -- I'm trying

12  to remember.

13          THE COURT:  Just clarify, when do you think you moved

14  back to New Jersey?

15          MR. REED:  I think, Your Honor -- I think it was -- I

16  think it was, again, in November.  I think --

17          THE COURT:  So it was after you finally got Cooper out

18  of the house?

19          THE WITNESS:  Yeah.

20  BY MS. HAGER:

21  Q.   So you used cash on hand to start the renovations at Old

22  Dell Trace, correct?

23  A.   Yes.

24  Q.   And that cash on hand was primarily from the sale of other

25  properties; is that right?

1    A.    I -- I mean, I had some -- I had some savings, I -- you
2    know, and there was cash from rental properties, I had gotten
3    some money from a patent that I had, there was some -- some
4    money down on that.  I don't remember if my wife had gotten
5    some money from selling some stuff that she was involved in
6    with some artwork and stuff like that, but I -- I can't
7    remember the exact, but maybe the big chunk of it -- the
8    biggest chunk, that was in reserve was some, you know,
9    properties and things like that, but it wasn't like the -- I
10   mean, there was other money, too.
11   Q.    Okay.  And you testified in one of your depositions that
12   the money for the renovation originally was supposed to come
13   from the sale of the Matlack property; do you recall that
14   testimony?
15   A.    I don't know what the word -- I don't the word
16   "originally", I mean, I -- at a -- at a -- I know for certain
17   at a certain point, there was money that I thought was going to
18   come from the Matlack property, but you know, there was, you
19   know, money -- money that I had, there was money that I was
20   expecting from other -- other things that we were working on,
21   and so I can't -- I don't know where the word "originally"
22   starts with, and -- and I don't know if I used that word
23   "originally" with intent, or -- or, you know, at that moment.
24        I mean, my long-term plan, you know, is always -- you
25   know, there's rule, capital -- there's a rule that I -- you

1   know, that I was taught in college --

2   Q.   Okay, I --

3   A.   -- capital money is for capital projects.  You know, and

4   short-term money or income is for, you know, living.  So you

5   know, in my mind, they -- they flow, but if there's a dip you

6   fund it with -- with other things.

7   Q.   Okay, so before any work started on Old Dell Trace, you

8   had plans and you had a list of all the work and estimates for

9   how much it would cost by line item, and you had an overall

10   cost; is that right?

11   A.   I mean, I had plans.  I mean, there was no -- there was

12   no -- you know, I had in my mind -- I mean, it's not like I had

13   a physical list.

14   Q.   So isn't it typical to know the total cost of a project

15   ahead of time so that you can evaluate whether you'll be able

16   to cover your investment and make a profit?

17   A.   I -- I have estimates in my mind when I look at them, and

18   then I compare them to the final -- the final end, you know, in

19   my mind.  I think I testified to my margins in my mind -- you

20   know, in my past projects even vary.

21   Q.   Okay.

22   A.   So --

23   Q.   Thank you, I didn't mean -- go ahead if you weren't done;

24   sorry.

25   A.   No, it's all right.

1  Q.   So as you sit here, do you remember what your total was in

2  your mind of how much the work would start -- sorry, let me

3  strike that.

4       Before you started any of the work, what was the number

5  that you had in your mind of how much all the work was going to

6  cost in total?

7  A.   It -- it depended on which direction I was going to go.

8  That's why I had the appraisal done in '08 when we framed it

9  because, you know, the cost for the project could -- could take

10 a turn left or right, depending on what you're going to put

11 into the project.  I use the kitchen for an example; it's

12 80,000 dollars, 70,000 or 120,000 dollars, and is that money

13 going to generate return or not.  And that's something you look

14 at, you know, what -- in compared to what you think the market

15 price is going to be --

16 Q.   Okay.

17 A.   -- so I don't know, 2- or 300,000 dollars; something like

18 that.

19 Q.   So you thought, before you got started on the work that

20 all the work in its entirety would cost somewhere in the

21 neighborhood of 2- to 300,000 dollars; is that right?

22 A.   I mean, it could be a little bit low, too, if we went

23 with, you know -- you know, less --

24 Q.   Okay.

25 A.   -- you know, expansion; that kind of thing.  But -- but

1  that's -- you know, that's -- you had to make a decision at a

2  certain rate points what you're -- what you're going to

3  continue to do.

4  Q.    So yesterday you talked about the funds that you paid to

5  various contractors, the funds that you were invoiced for and

6  didn't pay, and then you also talked about a category of work

7  that had not been completed; do you remember that?

8  A.    Yes.

9  Q.    Okay, and the work that you talked about that still

10  remained was two items in the master, the kitchen, and four

11  different items in the sunroom; do you remember that?

12  A.    Yes.

13  Q.    And you testified that you couldn't sell the property

14  because you couldn't get a CO, right?

15  A.    Yes.

16  Q.    And you couldn't get a CO because the kitchen was

17  incomplete, right?

18  A.    Yes.

19  Q.    All right, and --

20  A.    Well, not only a -- no, not only the kitchen.

21  Q.    What else?

22  A.    Well, as I testified, and -- and as -- and as my

23  experience to be a fact, is even a bare underlayment floor will

24  prevent you from getting a CO.  And we had unfinished -- and I

25  don't mean unpainted, I mean, subflooring exposed in -- in

1   multiple rooms; we had unfinished rooms.  The sunroom was an

2   unfinished space in its entirety, it only had the framing

3   lumber.

4   Q.   Okay, but we're still just talking about unfinished space

5   in the sunroom and in the master; you're not now talking about

6   other rooms, right?  It was just those other two rooms that

7   weren't finished?

8   A.   Right, and I think I -- I may have --

9   Q.   And we have -- I'm sorry.

10   A.   Go ahead.

11   Q.   Go ahead.

12   A.   I may have mentioned that -- if I didn't, it's my

13   mistake -- there was a part of the basement had -- had been

14   taken apart for the -- for the bathroom, and that -- that was

15   under the staircase where the -- you know, in the main -- in

16   the main foyer.  So that was -- you know, that in itself would

17   have prevented the CO because it was -- you know, that was

18   disassembled to the point -- so there were multiple areas that

19   would have prevented us from getting a CO, no question about

20   it.

21   Q.   And before you demoed the kitchen, the property had a

22   functioning kitchen, correct?

23   A.   When we -- when I purchased the property it got a CO and

24   had a functioning kitchen.  And -- and I guess, my hesitancy

25   is, the demo of the kitchen took place in -- in two parts.

1    There was in -- in the -- the first phase, they took -- they

2    ripped out the -- the -- you know, our -- you know, again,

3    being -- trying to be cautious about things as we progressed,

4    we ripped out the -- you know, the appliances, and the sinks,

5    but left the cabinets and the -- you know, the floor and the

6    ceiling and stuff like that.  But the -- but the dishwasher

7    was -- we -- the dishwasher and the cabinetry section for the

8    dishwasher, which was next to the sink -- we removed the sinks

9    because they were -- they were dated, but that was -- that was

10   before -- that was -- that was before we moved in; that was in

11   like -- that was in -- that's when we were doing the main

12   demolition work.  Oh, my God, that was probably in the end of

13   '07 or something like that.  And that -- if we're

14   talking -- you're asking me about the CO, we --

15   Q.   No, I didn't, I asked you before you demoed the kitchen,

16   the property had a functioning kitchen, correct?  That's all I

17   asked you.

18   A.   Yes, and my response -- I'm sorry, my response to the demo

19   was the demo took place in two parts:  it -- you know, the

20   original demolition, the first phase of it was in '07 --

21           THE COURT:  When you bought the house, it had a

22   functioning kitchen?

23           THE WITNESS:  Yes.

24   Q.   And you remember your testimony and your deposition where

25   you said you decided to take out the kitchen after you got the

1   money from Brett Cooper in November of 2008?

2   A.    Yes, and that -- that refers to -- you know, to taking out

3   the remainder of the cabinets and -- and deciding to change out

4   the floor.

5   Q.    And you decided to go ahead with that work in the kitchen

6   in reliance on receiving the rental payments for Mr. Cooper

7   that were called for in his lease-purchase agreement, right?

8   A.    Oh, one of the -- that was -- that's why I felt -- let's

9   see, that was in -- that would be -- at that --

10           THE COURT:  May I make a suggestion, Mr. Reed?  We'll

11  move faster, to the extent she asked a very specific question,

12  and you need to answer the question, shorter is often better

13  than longer.  If you can answer the question yes or no, you

14  should try to do that.  I'm not preventing you from where

15  necessary, to give an explanation, but this is not intended as

16  a conversation.

17           MR. REED:  Okay.

18           THE COURT:  Okay.  I just -- so just try and do that:

19  Listen to the question carefully and see if you can just answer

20  the question, if Ms. Hager has a follow-up question she wants,

21  she'll ask that, okay.

22           Go ahead, Ms. Hager.  Just -- it'll move along a lot

23  faster.

24           MR. REED:  Okay.

25           THE COURT:  Thank you.

1          I didn't want to throw you off stride, Ms. Hager.

2    Q.    If I could refer you to your deposition transcript from

3    May 9th, 2016, which is tab 5 in the deposition binder.

4    A.    I'm sorry, say that -- tab 5?

5    Q.    Right, it's your deposition transcript from May 9th of

6    2016.

7    A.    Okay.

8    Q.    Page 77, starting at line 5 going until line 9, question:

9    "When did you take the kitchen out?"

10        Answer:   "When Brett Cooper signed the six month lease

11   extension in the beginning of 2000 --

12        "When did he do that?

13        "It's either the end of '08 or the beginning of '09."

14        So was the answer that you gave that I just read, a

15   correct statement?

16   A.    No, and that's why I tried to clarify it because

17   it's -- it was in two -- two parts, the kitchen.

18   That -- that's --

19   Q.    So your deposition testimony was inaccurate?

20   A.    I don't think it was detailed enough.

21   Q.    So how much did you spend on the kitchen demolition?

22   A.    Demolition.   I --

23   Q.    Do you know?

24   A.    I don't know how to cut the guy's -- the laborer's hours

25   out.

1  Q.   Okay, so you have a -- you know how much you spent on demo

2  all together, but you don't know what specificity for the

3  kitchen, right?

4  A.   I -- I'd have to really think about demo overall because

5  it occurred over --

6  Q.   Okay, I withdraw that question.

7       Did you put in new floors in the kitchen?

8  A.   Yes.

9  Q.   Did you put in plumbing in the kitchen?

10 A.   Yes.

11 Q.   And you put in lighting, correct?

12 A.   Yes.

13 Q.   And you put in drywall?

14 A.   Yes.

15 Q.   And it was painted, correct?

16 A.   Yes.

17 Q.   And you testified yesterday that all you had remaining to

18 do was install the appliances and the countertops and finish

19 the cabinets, I believe; is that correct?

20 A.   Well, there's -- it was only roughed in plumbing and

21 electric, you had to do all that connect -- connection, as

22 well, too, just so you understand the scope of that.

23 Q.   Okay, anything else besides connecting up the plumbing,

24 adding the countertops, adding the appliances, and finishing

25 the cabinets?

1          MR. REED:  I want to -- I want to refer to a

2    photograph, Your Honor, in my book.

3          THE COURT:  Can you answer Ms. Hager's question?

4          MR. REED:  I can't remember.  I think that's probably

5    it because that's -- that's in the picture, I think that's,

6    too.

7    Q.   And it's your testimony that those items would have cost

8    between 80 and 100,000 dollars?

9    A.   U.S. high is 120.

10   Q.   As of March of 2008, would you agree with me that the work

11   on Old Dell Trace was more than halfway finished?

12   A.   I can't agree with that, work --

13   Q.   Would you --

14   A.   Go ahead.

15   Q.   Would you agree that your appraiser indicated that in

16   March of 2008, the property was sixty percent renovated?

17   A.   Is that a finance -- see, that's -- the -- it's not

18   a -- it's a question of financial --

19          THE COURT:  Do you agree or not?

20          MR. REED:  I don't know that.  I don't know if it's a

21   financial statement, or if it's a physical work statement.

22          THE COURT:  All right, next --

23          MR. REED:  I mean, you can spend a lot of money on

24   this --

25          THE COURT:  Next question.

1          MR. REED:  -- a small space.

2          THE COURT:  Next question.

3       (Pause)

4  Q.    If you could turn to tab 19 in your exhibit book.

5  A.    Page 9.

6  Q.    It's page 2 of 18, the first page of Mr. Uminski's

7  appraisal.

8          THE COURT:  All right.

9  Q.    Do you have that page --

10  A.    I do.

11  Q.    -- Mr. Reed?  Okay, in the bottom section in the black bar

12  on the left-hand side says "improvements" about midway, it

13  says, "description of the condition of the property -- and I'm

14  skipping what's in parenthesis -- the subject is a very well-

15  constructed colonial style dwelling that has recently been

16  renovated, and had a rear addition added.  As of the date of

17  inspection, construction was approximately sixty percent."

18       Do you agree with that?

19  A.    I -- I can't disagree with the statement.

20          MR. REED:  Should I -- Your Honor, I'd like to --

21          THE COURT:  You answered; next question.

22          MR. REED:  Can I make a note, Your Honor, maybe I

23  could make this simpler, can I make a note for the costs?  I'm

24  not going to remember for the redirect or whatever you call

25  it --

1          THE COURT:  Yes, you can go ahead and make notes.

2          MR. REED:  That -- that may help me.

3          THE COURT:  You bet, go ahead and make notes.

4          MR. REED:  All right.

5          THE COURT:  Move along.

6   Q.   So if you turn to the next page, page 3 of 18 at the very

7   bottom --

8   A.   Wait, I'm sorry, give me a second.

9          THE COURT:  Ask your question, Ms. Hager.

10          MR. REED:  Okay.

11   Q.   At -- at the very bottom of page 3 of 18 in the

12   reconciliation section, the appraiser provides a value of

13   1,725,000 dollars as of March 18th, 2008; do you see that?

14   A.   Yes.

15   Q.   And then it goes on to say, "which is the date of

16   inspection, and the effective date of this appraisal," do you

17   see that?

18   A.   Yes.

19   Q.   So would you agree with me that your appraiser says that

20   as of March 18th, 2008, the property renovations were

21   approximately sixty percent complete?

22          THE COURT:  I see what it says, just the

23   document -- documents don't speak, but it's clear what the

24   document says.  The deposition and the exhibits are in

25   evidence; next question.

1   Q.   You testified on Tuesday that you worked at Smith Barney

2   for a while; do you remember that testimony?

3   A.   Yes.

4   Q.   And in fact, you worked there approximately four to six

5   weeks; isn't that more accurate?

6   A.   That's -- that is correct.

7   Q.   Okay.  In March of 2008, you started working at Smith

8   Barney as a financial advisor, correct?

9   A.   Yes.

10  Q.   And that's located in Marlton, New Jersey; is that right?

11  A.   Mount Laurel, I think.

12  Q.   Mount Laurel, okay.  And when you started, you were

13  earning a base salary of 65,000 dollars, correct?

14  A.   With -- with -- with a -- with a contract for bonuses that

15  would be done based on the -- the -- the -- the -- the -- my

16  performance, also bonuses for the office's performance, and

17  bonuses for the region's performance.

18  Q.   And you were, at the time, studying for your Series 7

19  license, correct?

20  A.   Yes.

21  Q.   And you needed that in order to be able to sell the

22  financial products, correct?

23  A.   Yes, and my component of my bonuses would be conditioned

24  upon that, but the -- the other portions, which would be

25  this -- this office and the -- and the region or the market or

1   whatever they call it, would not.

2   Q.   And you ceased employment with Smith Barney when you fell

3   at a work function at a Chance Restaurant in April of 2008,

4   correct?

5   A.   Correct.

6   Q.   And you sued Chance Restaurant, correct?

7   A.   Correct.

8   Q.   And you settled with them, ultimately, correct?

9   A.   Correct.

10  Q.   And when was that settlement?

11  A.   I don't remember.

12  Q.   Was it in 2009?

13  A.   No.  No.  No.

14  Q.   Was it in 2010?

15  A.   I -- I thought it was in 2012.

16  Q.   And what was the amount of the settlement?

17  A.   That's under seal.

18       THE COURT:  And you still have to tell it; you're in

19  court, you're testifying, you answer the question.

20  A.   I think it was 4- something.

21       THE COURT:  4 what?

22       MR. REED:  400,000 something.

23  Q.   The date that you fell is the same date as your disability

24  started, correct?

25  A.   Yes.

1  Q.   The income that you currently receive is disability

2  payments through the federal government; is that correct?

3  A.   Yes.

4  Q.   All right, now, you made a claim for long-term disability

5  through Citigroup, which was -- which had determined that you

6  were eligible for benefits; is that correct?

7  A.   Correct.

8  Q.   and MetLife was the plan administrator of the Citibank

9  disability plan, correct?

10 A.   Yes.

11 Q.   And MetLife initially paid you 3,250 dollars per month

12 based on an income of 65,000 dollars a year, which was your

13 base salary, right?

14 A.   Yes.

15 Q.   And you then informed MetLife in February of 2009 that

16 your salary was actually 265,000, correct?

17 A.   I -- I did not, the HR department informed them that that

18 was my total compensation agreed to going forward in a package

19 with -- with Smith Barney.

20 Q.   Okay, and MetLife indicated in September of 2008 that your

21 benefits were approved through July of 2013, correct?

22 A.   I can't remember.

23 Q.   Okay.  And MetLife indicated in March of 2009 that your

24 benefits were approved through October 30th, 2031, correct?

25 A.   Again, I can't remember that.

1    Q.    Okay.  MetLife later terminated all benefits on November

2    3rd, 2009, and you appealed that decision and subsequently sued

3    Citigroup and MetLife, correct?

4    A.    Yes.

5    Q.    Is it true that after you received the approval of the

6    long-term disability benefits that you purchased a home in

7    Virginia, moved there, and undertook extensive renovations?

8    A.    I'm sorry, say that again?

9    Q.    Sure.  Is it true that after you received the approval for

10   your long-term disability benefits that you purchased a home in

11   Virginia, moved there, and undertook extensive renovations?

12   A.    Yes.

13   Q.    When did you receive approval of your long-term disability

14   benefits?

15   A.    I believe it was in September or October, but it wasn't --

16             THE COURT:  Of which year?

17             MR. REED:  Of -- of '08.

18   Q.    Now, you already owned your home at Old Dell Trace in

19   2008, correct?

20   A.    Yes.

21   Q.    So what home was it that you purchased after you got

22   approval of your long-term disability benefits?

23   A.    I don't understand, what -- what -- what --

24   Q.    Well, I'll do something in a minute that will clarify; if

25   you don't know the answer I'll just move on.

1          THE COURT:  Can you answer the question?

2          State your question again, Ms. Hager, and then listen

3    carefully and then answer.

4          MS. HAGER:  Sure.

5    Q.    So is it true that after you received approval of your

6    long-term disability benefits, you purchased a home in

7    Virginia, moved there, and undertook extensive renovations?

8    A.    Purchased -- no, I didn't purchase at that time.  We

9    purchased Old Dell Trace was purchased before.

10   Q.    Okay.  And is it true that after you received the

11   termination of benefits, you could no longer afford to fund the

12   renovations or payments, and the house went into foreclosure?

13   A.    Like, say that again, let me hear --

14   Q.    Sure.  Is it true that after you received the termination

15   of benefits that you could no longer afford to fund the

16   renovation or the payments, and the house went into

17   foreclosure?

18   A.    It -- it had an effect, yes.

19         THE COURT:  Can you answer the question, yes or no?

20         MR. REED:  It was one of --

21         THE COURT:  It's a very clear question.  You can -- if

22   you -- can you answer it yes or no?

23         MR. REED:  Okay, say the question again?

24   Q.    Sure.  Is it true that after you received the termination

25   of benefits, you could no longer afford to fund the renovations

1   or payments, and the house went into foreclosure?

2            THE COURT:  Do you have a deposition reference, Ms.

3   Hager?

4   A.    Yeah.

5            MS. HAGER:  I don't, but I do have some other

6   materials.

7            THE COURT:  All right.  Mr. Reed, let's stop fencing;

8   it's a clear question, can you answer it, yes or not?

9            MR. REED:  Yes, I started --

10           THE COURT:  All right, you've answered the question;

11  next question.

12  Q.    Do you recall your declaration in support of your summary

13  judgment motion in the Reed v. Citigroup case?

14  A.    No.

15  Q.    Okay, I'd ask you to turn to Exhibit C.

16  A.    C.

17        (Phone ringing)

18           MR. REED:  Oh, geez.

19  Q.    Let me know when you have that.

20  A.    Got it.

21  Q.    Okay, Exhibit C is plaintiff's motion for summary judgment

22  in a case styled Frank Reed v. Citigroup, Inc.; it was filed in

23  the United States District Court for the District of New

24  Jersey, civil action 12-2934.  If you could turn to

25  page -- it's Bates stamp RFC-561; it looks like a few of the

1    pages don't have the Bates stamp, but it's the page immediately

2    before 562, and it has paragraphs 10, 11, 12, 13, 14, 15 on it.

3    Do you see where I am?

4    A.    Okay.

5    Q.    And actually for completeness, I guess we should turn back

6    two pages, which would be RFC-559 entitled "declaration of

7    Frank Reed in support of plaintiff's motion for summary

8    judgment"; do you see that?

9    A.    Yes.

10    Q.    Okay.  And so this is a declaration that you gave in

11    support of your summary judgment motion in the Reed v.

12    Citigroup case, correct?

13    A.    Okay, yes.

14    Q.    All right, and the Reed v. Citigroup case was your case

15    against Citigroup for payment of your disability benefits; is

16    that right?

17    A.    Yes.

18    Q.    And you were represented by a lawyer, John Mann, correct?

19    A.    Yes.

20    Q.    Okay.  So now, if we look -- well, let's go back -- we'll

21    look on RFC-560 to clarify the dates because you said you

22    weren't sure of those.  Paragraph 6, you said:  "In viewing the

23    MetLife website and the information it contained about my

24    claim, I observed the ongoing activity, and MetLife produced

25    information relevant to my long-term disability benefits, which

1   MetLife had approved for me.  This included an entry made by

2   MetLife on September 29th, 2008, stating that my long-term

3   disability benefits were 'approved through' July 9th, 2013.

4   This also included an entry made by MetLife on March 23rd,

5   2009, stating that my long-term disability benefits were

6   'approved through' October 30th, 2013 (sic), the date of my

7   65th birthday."

8        Does that refresh your recollection as to the dates that

9   your benefits were approved?

10  A.    Yeah, sure, that -- if that's what I -- well, it was

11  probably taken -- my lawyer probably took them from the file.

12  Q.    Okay, so then if you turn the page to RFC-561, is that

13  your signature at the bottom?

14  A.    Yes.

15  Q.    Okay.  Paragraph 12 states as follows:  "In reliance on

16  MetLife's indications that my benefits were 'approved through'

17  July 9th, 2013, and then October 30th, 2031, I undertook

18  certain actions, including moving my family to Virginia and

19  purchasing a home there.  I also undertook extensive

20  renovations of the home, and spent through my savings and cash

21  reserves to accomplish the move, the purchase, and to initiate

22  the restoration and renovation work."

23       Is paragraph 12 an accurate statement?

24  A.    The only -- the only thing I think I would say is in

25  between "in" and "reliance", it was "partial reliance", but

1  yes.

2  Q.   You go on in paragraph 13 to say:   "Notwithstanding its

3  numerous affirmative indications to the contrary, MetLife"

4  determined my long-term disability -- excuse me -- "terminated

5  my long-term disability benefits on November 3rd, 2009."

6         Paragraph 14:   "As a result, I could no longer afford the

7  payments for the Virginia home and could not complete the

8  renovation work.  My family and I were forced to leave the

9  Virginia home, which was lost to foreclosure."

10         Paragraph 15:   "But for MetLife's approval of my long-term

11  disability benefits through July 9th, 2013, and then October

12  30th, 2031, I would not have uprooted my family or taken on the

13  financial burden of a home purchase and significant home repair

14  and renovation work."

15         Is it true that you purchased a home in Virginia after you

16  started receiving disability payments?

17  A.   No, that's incorrectly phrased.

18  Q.   All right, did you mislead the court as to your reliance

19  on the long-term disability payments?

20  A.   For the repair and the -- at that time, and the -- and the

21  work, no because it was new -- it was -- it was -- it was

22  a -- of course, a cash flow that I -- I thought was coming in

23  and would be using.

24         THE COURT:   Is the reference of this declaration to

25  the Old Dell Trace property?

1          MR. REED:  Yeah.  Yeah.

2          THE COURT:  Okay, next question.

3    Q.   And you indicate in the declaration that you made to the

4    District Court that you wouldn't have undertaken any of the

5    renovations had you not received approval of your disability

6    benefits; is that right?

7    A.   Undertaken, this is where it's bad; they were underway and

8    I would not have embraced them, you know -- you know,

9    if -- so -- you know, so strongly, and you know, it would've

10   been more cautiously proceeding like it -- like it was.  I

11   mean, you know, every time I thought we were -- we -- you know,

12   we -- I thought we had an original plan; that -- then fall,

13   then the next, then the next, then the next.  So

14   it's -- it's -- it's -- I don't know how to explain that right

15   now.

16   Q.   Okay, so you attributed the foreclosure on Old Dell Trace

17   to the termination of benefits; is that right?

18   A.   Well, it's -- it's one of the reasons why I

19   couldn't -- I -- I -- I could not -- I --

20   Q.   Well, in paragraph 14 on page 561, you did, right?  You

21   told the court, "my family and I were forced to leave the

22   Virginia home, which was lost to foreclosure."  You made that

23   statement, right, under --

24   A.   Yeah, but see, at --

25   Q.   -- penalty of perjury?

1  A.    -- at the -- at the ultimate end, I think that was the

2  last income that I was getting, and then that was -- that was

3  the end of -- you know, that -- when -- when we no longer were

4  getting our financing, you know, I had cash on hand, Cooper

5  stopped paying.  The last line of cash that I had, Your Honor,

6  was the -- you know, the -- the disability payments, so we had

7  our cash on hand in the beginning, then the financing that

8  we -- we thought we would get didn't happen.  We got some money

9  from Cooper; Cooper stopped paying, and then -- I don't know if

10  you recall that from -- you know -- you know, he put money down

11  to get me to move out of the house, and the combination of him

12  putting money down and being approved for MetLife, was able to

13  convince my wife, okay, let's -- let's move down

14  and -- and -- and move forward with this, you know, project.

15      You know, we didn't get the -- I think it's -- the house

16  didn't sell immediately; that fell through.  Then we didn't get

17  our financing, but then, you know, I've been approved for

18  my -- my -- my benefits, and it looks like it's been approved

19  stably.  Cooper has now come to the table with some money, then

20  Cooper came up with some rent money, and so, you know, we

21  decided, let's move.

22      Then Cooper stops paying me the rent, even though we did

23  an extension.  Then I was still getting my disability payments,

24  which I'm using to service -- not just money that I had from

25  savings, then Cooper, and you know, because money is fungible.

1  Then -- then MetLife's payments are, also -- and then finally,

2  it dwindles down; all the lump sum money is gone, and I'm

3  using -- I'm left using my -- my disability payments, you know,

4  for that.  And then when they terminate it, all right,

5  there's -- that's it, I am -- I'm at the end of the alley, at

6  the brick wall; there's nothing more to do it.

7       So do I list all of that stuff, that history, in here?

8  That's the last thing; they were a -- you know, a reason.  They

9  are -- if they kept paying me, they paid me enough to keep

10 going even after I hit -- I hit my financing after this, I kept

11 on finding money to keep going.  But you know, it's like Jenga,

12 you know, you keep pulling out -- out the rug.  This -- and you

13 can say, okay, well, if you got money from this place, or if

14 you got money from that place, we're only one of the bricks in

15 the wall why he didn't finish this project.  MetLife is one of

16 those reasons why I couldn't finish the project.

17          MS. HAGER:  Move to strike as nonresponsive.

18          THE COURT:  Oh, I'm going to let it stand.  Go on.

19 Q.   Nevertheless, you represented to the New Jersey District

20 Court that you lost your house in Virginia to foreclosure

21 because of MetLife's actions, correct?

22 A.   Ultimately, that was one of -- or that was one of the

23 reasons why I did, yes.

24 Q.   Okay, and you attributed your inability to complete the

25 renovation to the termination of benefits, as well, correct?

REED - CROSS                                                                    59

1   A.    I'm sorry, say that question?

2   Q.    You attributed your inability to complete the renovation

3   on the termination of benefits, correct?

4   A.    At that stage, yes.

5   Q.    And now in your case against the trust, you're attributing

6   these things to the trust, correct?

7   A.    Yes, because if I had obtained sources of funds from those

8   alternatives, it wouldn't even matter if MetLife terminated me,

9   I would've been able to complete it.

10  Q.    Okay.  So if you turn to --

11          THE COURT:  Are you offering this exhibit into

12  evidence?

13          MS. HAGER:  Yes, I will, I do have something further

14  in the exhibit, though.

15          THE COURT:  That's fine.

16  Q.    Starting at RFC page 571, same exhibit, Exhibit C, is

17  plaintiff's memorandum of law in support of motion for summary

18  judgment, and so if I could direct your attention to RFC-610,

19  which is page 40 of your summary judgment motion.

20  A.    Which -- I'm sorry, which one is it?

21  Q.    It's Exhibit C --

22  A.    C, um-hum.

23  Q.    -- RFC-610 --

24  A.    Okay.

25  Q.    -- which is page 40 of your summary judgment motions.

1    A.    Okay.

2    Q.    The first full paragraph:  "As a result of MetLife's

3    affirmative indications that Reed's benefits were 'approved

4    through' July 9th, 2013, and then October 30th, 2031, Reed

5    changed his economic position, including moving his family to

6    Virginia and undertaking extensive renovation of a home there.

7    Indeed, but for MetLife's affirmative indication that Reed

8    would have received long-term disability benefits through July

9    9th, 2013, and then October 30th, 2031, he would not have

10   uprooted his family or taken on the financial burden of

11   significant home repair and renovation."

12   A.    At that --

13   Q.    Do you agree or disagree with that paragraph?

14   A.    Yeah, I agree at that time, it's correct, I was in -- in a

15   holding mode.

16   Q.    So the court denied your summary judgment motion, and you

17   appealed to the Third Circuit, correct?

18   A.    Yes.

19         MS. HAGER:  Okay, so Your Honor, I'd like to offer

20   Exhibit C into evidence.

21         THE COURT:  Exhibit C is in evidence.

22   (Plaintiff's memorandum of law in support of motion for summary

23   judgment in case of Reed v. Citigroup, Inc. was hereby received

24   into evidence as Trust's Exhibit C, as of this date.)

25   Q.    So if you could now turn to Exhibit F, and let me know

1   when you're there.

2   A.    I'm there.

3   Q.    Okay, so Exhibit F is your submission to the Third

4   Circuit; do you recognize this?

5   A.    Yes.

6   Q.    Okay, and this was submitted January 21st, 2016, correct?

7   A.    Yes.

8   Q.    And you're pro se in the appeal, right?

9   A.    Yes.

10  Q.    Okay, if you turn to RFC-1610, let me know when you're

11  there.

12  A.    I'm there.

13  Q.    For the fourth full paragraph reads as follows:  "So it is

14  with understanding that I am viewed by the plan administrator

15  and all my physicians as permanently and irreversibly impaired,

16  and that" I have my LTD -- excuse me -- "and that my LTD have

17  been correspondingly approved for as long as they can be done

18  so that I move my family and spend through my nest egg to

19  renovate a comparably sized home for me, my wife, and my five

20  kids, but in a less expensive area, as I was now going to be

21  only receiving my LTD benefits, not what I was earning before.

22  This was relied upon to my severe detriment."

23        So you wrote that paragraph, didn't you?

24  A.    Yes.

25  Q.    And you wrote it as recently as the beginning part of

 1   2016, correct?

 2   A.    Yes.

 3   Q.    And you agree with what you said in that paragraph?

 4   A.    Yeah, at that time, that's the -- right, that's -- at that

 5   time what that, right.

 6   Q.    And when you say "at that time", what time?  At the time

 7   you wrote this or at the time in 2009 -- excuse me, 2008?

 8   A.    Well, in -- in '08 when I -- when I -- when -- after I was

 9   approved, it -- it -- we thought that cash -- that that was the

10   cash flow that was now coming forward, like, that we would

11   be -- that we -- that I would -- I would be getting.

12   Q.    So you wouldn't have moved out of -- according to what

13   you're saying to the court in the Third Circuit papers and in

14   the District Court papers, you wouldn't have moved from the

15   Matlack property into the Old Dell Trace property if you hadn't

16   been approved for long-term disability benefits, correct?

17   A.    I'm -- that and Cooper, those were the reasons that

18   I -- that I -- that I moved to Virginia.  That -- those two

19   combined things because I was approved first, and I didn't move

20   out of the house, you know, I was approved in, like, September.

21   I didn't say, I'm approved, let's move with --

22   Q.    Right.

23   A.    -- you know, the Beverly Hillbillies, it was that plus

24   Cooper coming to the table that made -- that wound up making

25   us.

1  Q.    Okay.  Do you think it was misleading to state to the

2  court under penalty of perjury that you moved out of Matlack in

3  reliance on the disability payments?

4  A.    No, because they were -- they -- they were combined, that

5  was --

6  Q.    Okay.

7  A.    -- it was a combination reason.  I mean, I don't know if I

8  should have put in Cooper, too, but you know, I remember

9  discussing with my wife about it, it's like, okay, it's not

10 just this lump sum, what if Cooper fails, what are we going to

11 do then, you know, because he's -- he already missed the

12 settlement; what do we do then?  Okay, well, it looks like this

13 is better because we've got -- you know, it's more stable, it's

14 been, you know, approved.

15 Q.    Okay, so if you turn to RFC-1611, the last paragraph, you

16 say:  "It must also be said that I lost my house to foreclosure

17 and my entire life savings with it, as I was not able to either

18 complete the renovations on the house we moved to, or continue

19 making the mortgage payments because" -- and that's in capital

20 letters -- "the plan administrator wrongfully ceased my

21 payments after leading me to believe that they would continue."

22 A.    Right, because the payments, if they had continued the

23 payments --

24        MS. HAGER:  Okay, I move to strike because I hadn't

25 asked the question yet.

1          MR. REED:  Oh, I'm sorry.

2          THE COURT:  Repeat your question again.

3          MS. HAGER:  Yeah, I hadn't asked one yet.

4  Q.   So I read in that paragraph, and then my question is, in

5  that statement that you made to the Third Circuit, you

6  indicated that you lost your house to foreclosure, and your

7  entire life savings because you couldn't complete renovations

8  on the house, or make mortgage payments because of the denial

9  of your benefits, correct?

10  A.   That was the last source of income that I had, and when

11  it -- when it disappeared, that was the natural conclusion of

12  what happened to me.

13          MS. HAGER:  Okay, Your Honor, I move to admit Exhibit

14  F.

15          THE COURT:  Exhibit F is in evidence.

16  (Appeal to Third Circuit Court for Reed v. Citigroup, Inc. was

17  hereby received into evidence as Trust's Exhibit F, as of this

18  date.)

19  Q.   There came a time when you and your wife stopped making

20  payments on the Taylor, Bean & Whitaker on the Virginia

21  property, correct?

22  A.   I think there were two times.

23  Q.   Okay.  And you stopped making those payments because you

24  ran out of cash, correct?

25  A.   I don't remember -- I don't remember what the

1  circumstances were.

2  Q.   And you made a choice -- an affirmative choice -- to stop

3  paying Taylor, Bean & Whitaker, correct?

4  A.   At the end, it would've been -- it would've been no

5  choice.

6        THE COURT:  I don't understand your answer.

7        MR. REED:  The -- the -- go back to the MetLife line

8  of revenue, so I moved down there, I no longer get the money

9  from Cooper, and I now have run out of money from MetLife.  How

10  do I pay -- how do I make a payment?  I mean, I get Social

11  Security Disability, but how do I make the --

12        THE COURT:  Okay, ask your next question, Ms. Hager.

13        MR. REED:  It physically wasn't there.

14  Q.   Do you remember your testimony from your recent deposition

15  where I asked you why the loan went into default and you told

16  me it was because you ran out of cash?

17  A.   I think that's what I'm saying here, right?

18  Q.   And then you went on to say -- well, let me -- this is the

19  deposition transcript from May 9th, 2016, which is tab 5 in the

20  binder.

21  A.   20 -- tab 5.

22  Q.   Right, so I'm on page 36, just let me know when you get

23  there.

24        Are you on page 36?

25  A.   Oh, I'm sorry.  Go ahead.

1  Q.   Okay, page 36 starting at line 14:  "Ultimately, Taylor,

2  Bean & Whitaker foreclosed on Old Dell Trace, right?"

3       Answer:  "Yes."

4       Question:  "Why did that loan go into default?"

5       Answer:  "Well, we ran out of cash, and the way we were at

6  that point in time, we were, you know, working on the -- you

7  know, the properties, and that was, you know, where we were

8  making the most money, and my liquidity was drying up and you

9  just made choices."

10  A    Choices --

11  Q.   Do you remember -- wait -- do you remember that testimony?

12  A.   Yes.

13  Q.   Okay, and what were the choices that you're referring to

14  there?

15  A.   Feeding the children or paying Taylor, Bean & Whitaker.

16  Q.   Okay, so going on, page 37, line 3, question:  "You said

17  that you were working on the properties and that's where you

18  were making the most money; what do you mean by that?"

19       Answer:  "Over the course of the -- I don't know when

20  Taylor, Bean foreclosed, I think it may have been 2011 or 2012,

21  so I don't remember at what point the mortgage was stopped

22  being paid.  But we were making the most of our money with the

23  properties that were being sold, like the flipped properties,

24  the ones that I'm talking about -- I mentioned a few minutes

25  ago.  So the -- unlike going to work every day and knowing your

1  income, this incomes in in lumps, and you have a pile of money,

2  and then it dwindles -- dwindles down.  So with, as they say,

3  seeing the handwriting on the wall, when you know that you're

4  not getting" anywhere -- excuse me -- "when you know that

5  you're not getting any more financing cash, and you don't have

6  enough to finish the project, you -- you know, we stopped

7  paying TBW.  And we actually" -- well, I should stop there,

8  it's not relevant to what I'm asking.

9           THE COURT:  Why don't we stop for a second and let me

10 read the rest.

11          For completeness, read the rest of the answer.

12          MS. HAGER:  I'm sorry?

13          THE COURT:  For completeness, please read --

14          MS. HAGER:  Sure.

15          THE COURT:  -- the rest of the answer.  I don't like

16 people to stop in the middle of it.

17          MS. HAGER:  Right, I just hesitate because it

18 wasn't --

19          THE COURT:  I understand.

20          MS. HAGER:  -- directly in --

21          THE COURT:  I just want --

22          MS. HAGER:  Sure.

23          THE COURT:  -- it for completeness.

24          MS. HAGER:  So this is the top of page 33, I'll just

25 restart --

1          THE COURT:  38.

2          MS. HAGER:  -- 38, restart line 1.

3   Q.    "Paying TBW.  And we actually went to do a refinance with

4   them, which is a whole other interesting story, and then they

5   went into -- they were shut down -- raided by the FBI and shut

6   down.  They fired all 4,000 employees and they -- even though

7   they said they were going to do a refinance, they didn't

8   complete it and they weren't supposed to foreclose, and they

9   wound up foreclosing because they never completed the work

10  that -- you know, the promised refinance."

11      So my question has more to do with the first portion of

12  that answer --

13          THE COURT:  Okay.

14  Q.    -- where you were saying at the bottom of page 37 --

15  A.    Let me see it.

16  Q.    -- you saw the handwriting on the wall, you weren't

17  getting any more financing, and you stopped making payments.

18  Does that refresh your recollection as to why you weren't

19  making payments to Taylor, Bean & Whitaker?

20  A.    Yeah, I believe we stopped making payments to Taylor, Bean

21  & Whitaker in '09.

22  Q.    But you made a choice to stop paying them, right?

23  A.    Well, the -- the choice was we were running out of money.

24  As I said, we --

25  Q.    Okay.

1  A.    -- you know, now, it becomes, do we eat, keep the electric

2  on, feed the kids.

3  Q.    Okay, so your answer is yes?

4  A.    I mean, it's not a choice, it's -- how is -- what's --

5          THE COURT:  Ask your next question, Ms. Hager.

6  Q.    So then you entered into a forbearance agreement with

7  Taylor, Bean & Whitaker, right?

8  A.    That -- that was before then.  The forbearance

9  agreement -- the choice you're talking about was later.

10  Q.    Okay.

11  A.    The forbearance agreement is first.

12  Q.    All right, so at some point, you entered into a

13  forbearance agreement with Taylor, Bean & Whitaker, right?

14  A.    Um-hum.  Um-hum.

15  Q.    I'm sorry?

16  A.    Yes.

17  Q.    Okay, and you paid them around 20,000 dollars pursuant to

18  that forbearance agreement, correct?

19  A.    I thought it was in two parts, I thought it was maybe

20  14,000 and then 20,000.  I thought it was like somewhere in the

21  neighborhood of thirty-some-thousand.

22  Q.    Okay.

23  A.    In between 32-, 38-, 34-, somewhere in that area.

24  Q.    Okay, but ultimately, Taylor, Bean & Whitaker, after you

25  made whatever payments you made, they didn't uphold their end

1    of the forbearance agreement, correct?

2    A.    Correct, but that's my assertion.

3    Q.    Right, Taylor, Bean & Whitaker then foreclosed

4    nonjudicially, correct?

5    A.    Eventually, yes.

6    Q.    And you and your wife then sued Taylor, Bean & Whitaker

7    because the foreclosure was improper, correct?

8    A.    Yes, I didn't think they had the authorization to do it.

9            THE COURT:  The only question is, did you sue

10   Taylor --

11           MR. REED:  Yes.

12           THE COURT:  -- Bean & Whitaker?

13           MR. REED:  Yes, Your Honor.

14   Q.    You were initially represented in that case by Mr. Waylan

15   (ph.), and then ultimately, you were pro se, correct?

16   A.    Yes.  Yes.

17   Q.    And the basis of the claims in your suit against Taylor,

18   Bean & Whitaker were the Real Estate Settlement Procedures Act

19   and breach of contract for failure to apply the money that you

20   had paid and for failure to abide by the agreement; is that

21   correct?

22   A.    Yes.

23   Q.    And Taylor, Bean & Whitaker's actions in foreclosing

24   interfered with your ability to sell or rent Old Dell Trace,

25   didn't they?

1    A.    I mean, yeah, at the end they took it; I couldn't do

2    anything with it.  Absolutely, they foreclosed on it and

3    they -- they took it.  There was also -- there was also an --

4              THE COURT:  You've answered the question; next

5    question.

6    Q.    Right, so your contention is that Taylor, Bean & Whitaker

7    improperly foreclosed on Old Dell Trace, correct?

8    A.    Yes.

9    Q.    And because they improperly foreclosed, you couldn't then

10   sell the property or rent the property because they foreclosed

11   it, right?

12   A.    At the -- at the end, yes, at the end.  There was -- there

13   was -- Taylor -- you -- you can't -- it doesn't exist -- that's

14   not a blanket statement.  At a certain point, their actions

15   interfered with my ability to do that.

16   The -- not -- not -- you know, since I had the house forever,

17   or I don't think in 2009 I don't think it was interfering with

18   it, in my recollection.  I think the foreclosure actions took

19   place several years later, and that -- that caused a problem.

20   Q.    Okay, what was Taylor, Bean & Whitaker supposed to do

21   pursuant to the forbearance agreement after you made your

22   payments?

23   A.    My understanding is they made a -- my understanding was

24   that in the agreement they affirmatively committed to no

25   foreclosure until they -- they reworked the mortgage, which

1  they never did.

2  Q.   And so you sued Taylor, Bean & Whitaker for damages,

3  correct?

4  A.   Yeah.  Yup, yup.

5  Q.   Now, your -- you had filed a complaint, which ended up

6  getting nonsuited, correct?

7  A.   Yes.

8  Q.   Then you filed another complaint, and that was dismissed,

9  correct?

10  A.   Yes.

11  Q.   Okay.

12  A.   Without prejudice.

13  Q.   If you could turn to Exhibit J, which is -- I'll wait

14  until you get it in front of you.

15  A.   Okay.

16  Q.   Okay, Exhibit J is plaintiff's objection to defendant's

17  LNV and MGC's 12(b)(6) motion to dismiss, filed in the

18  Christina Reed and Frank Reed v. Taylor, Bean & Whitaker

19  Mortgage Corp., et al. case in the United States District Court

20  for the Eastern District of Virginia, case number 3;15-CV-529.

21  Do you recognize this document?

22  A.   And it looks familiar.

23  Q.   Okay.  And so you were the plaintiff in this case, right?

24  So, this is your objection, is that right?

25  A.   Okay.  What page?  I'm sorry.  I'm looking at --

1  Q.   So, I'm on the -- just on the first page of Exhibit J,

2  RFC-1745.  This is --

3  A.   Yes.

4  Q.   The document we're looking at is plaintiff's objection to

5  defendant's motion to dismiss, right?

6  A.   Yes, I believe so.

7  Q.   You are your --

8  A.   Yes.

9  Q.   Sorry.  I didn't mean to talk over you.  You and your wife

10 were the plaintiffs in this case, right?

11 A.   Yes.

12 Q.   Okay.  And if you turn to RFC-1752, which is the last page

13 of this objection, does your signature appear on that document?

14 A.   Yes.

15 Q.   Okay.  So, you were pro se at this point in the case,

16 right?

17 A.   Yes.

18 Q.   The document is dated October 22nd, 2015, right next to

19 your signature, right?

20 A.   Yes.

21 Q.   Okay.  And just for clarification on the record, it

22 appears to have been filed on October 23rd.

23      Now on page 1747 of this objection in what is the end of

24 paragraph -- in what is the second half of paragraph 1 but

25 starting with the first full sentence, "Specifically."  Do you

1   see where I am?  The third line from the top.  Do you see where

2   I am, Mr. Reed?

3   A.    Yes.

4   Q.    Okay.  So you said, "Specifically, defendants' failures

5   substantially interfered with plaintiffs' ability to enter into

6   beneficial contracts relating to the subject property including

7   financing, contracts of marketing and sale, as well as rental

8   agreements.  Prospective counterparties to these types of

9   actions contemplated and pursued by plaintiffs would not engage

10  in commerce with plaintiffs as the status of the subject

11  property was unverifiable.  Additionally, plaintiffs were not

12  able to sell or rent their other house located in New Jersey,

13  as they had to flee to it from the subject property, as their

14  condition remained perniciously precarious due to the

15  defendants' callous failure to respond."

16       So, with respect to that statement that you made to the

17  Court in this case, am I right that you're indicating to the

18  Court that your failure to be able to rent Old Dell Trace or

19  sell Old Dell Trace is attributable to Taylor, Bean &

20  Whitaker's foreclosure action?

21  A.    For -- for a certain point in time when they were

22  unresponsive after they were shut down and raided and there was

23  no one available to -- to -- and did not respond.  I mean, it's

24  all -- you know, we sent letters through counsel even.  There

25  was no one that responded to talk about, you know, can we

1  finish this financing deal, which would lead to an exact dollar

2  amount, what would be the exact dollar amount due on the note,

3  so that we can get clear title.  There wasn't even someone to

4  answer the phone to tell you, you know, like a settlement

5  department that said here's what clear title would be.  And

6  that went on for I don't remember how long.

7  Q.    Okay.  And so one of the other things that you said to the

8  Court in paragraph 1 that I just read was that you attributed

9  your inability to sell your property in New Jersey to Taylor,

10  Bean & Whitaker.  Was that an accurate representation to the

11  Court?

12  A.    Right, because at that -- there came a time during that

13  time where it was clear I couldn't sell the -- the house at

14  that moment and then we -- they wound up -- once they finally

15  responded to us and the record is probably clear on this, once

16  Taylor, Bean & Whitaker or their subsequent company became

17  involved -- you know, now had the files, their response was we

18  don't care about that agreement.  We're just selling the house.

19  So, I couldn't -- you know, I had to go back to New Jersey and

20  just live -- and we wound up living -- if I am not mistaken,

21  that's when they was -- responded.  We had to go back to New

22  Jersey.  Now I am living in that house and then we have to sell

23  it.  So, I couldn't sell New Jersey right away.  Where was I

24  going to go, back into a hotel?  You know, I had to -- I had to

25  go play Monopoly here.  I got to go back to New Jersey because

1    now this company who has come out of the woodwork, no one

2    responds because they're all shut down and then finally when

3    someone bothers to care, to respond to us, to our good faith

4    efforts to get in touch with them to resolve it, you know,

5    that's it.  And the parties didn't want to converse -- the

6    realtors that we wanted -- we tried to talk to about what can

7    we do with this property at this point, they're like well, we

8    need -- we need clear title.

9    Q.   Well, when you moved back into the Matlack property, it

10    was still on the market, wasn't it?

11    A.   I don't remember.

12    Q.   So, isn't it true that you couldn't sell the Matlack

13    property because you didn't have buyers for the Matlack

14    property, not because you were living in it?

15    A.   As I said, there was a time period -- what was it, like a

16    couple of months.  So, in other words, we couldn't sell Matlack

17    for a number of months because I -- you know, we had to go to

18    it.  We had to get resettled, get our bearings.

19    And -- and -- and then go from there.  So, it was not an option

20    to sell that property because where would we live?

21    Q.   So, in Exhibit 1 to your objection, which starts on RFC-

22    1753 --

23    A.   Okay.

24    Q.   -- which is a letter from your lawyer at the time, Dennis

25    Whalen, dated December 19th, 2011 or excuse me, it's from Mr.

1   Whalen.  I beg your pardon.  I have the wrong exhibit.  Bear

2   with me one second.  Exhibit 3 which starts, RFC-1758, is a

3   letter from Mr. Whalen to various mortgage companies and a

4   lawyer.  The subject line is, "Notice of lenders and servicing

5   agents breach and demand for cancelation of scheduled

6   foreclosure."  This letter is dated January 5th, 2012.  Have

7   you seen this letter before?

8   A.    I believe so.

9   Q.    Okay.  And if you turn to RFC-1761, the last paragraph on

10  that page of the letter, Mr. Whalen says as follows, "Further,

11  my client's payment of $19,801.10 in January of 2009, 'fully

12  reinstated the loan' is without merit.  The Reeds made the

13  January 2009 payment pursuant to the terms of the forbearance

14  agreement but my client's payment did not automatically

15  reinstate the loan.  As noted above, the forbearance agreement

16  expressly requires the subsequent affirmative act of the lender

17  of its authorized servicing agent to, (1) reinstate, (2)

18  execute a loan modification or (3) enter into a written

19  repayment plan.  Without completion of the forbearance

20  agreement, there exists no vested and actionable interest upon

21  which acceleration or foreclosure lies."

22        So, does this refresh your recollection as to the

23  substance of the arguments against Taylor, Bean & Whitaker?

24  A.    Yeah, I think I am -- I think I've been saying that.  I --

25  Q.    Well, I thought you had said you didn't remember exactly

1    what they were supposed to do on their end of the forbearance

2    agreement.  So now I am just asking Mr. Whelan has laid out

3    three different things that he thinks Taylor, Bean& Whitaker

4    should have done and does that refresh your recollection as to

5    what your contention was, that they should have done after you

6    made your payment?

7    A.    Yes, they were supposed to take action after receiving the

8    funds.

9    Q.    And if you turn to the next page, RFC-16 -- excuse me,

10   1762, the sixth paragraph down.

11   A.    Okay, so say that again?

12   Q.    I just want to make sure you're with me.  Are you on

13   the --

14   A.    1762?

15   Q.    Yeah.

16   A.    Where do you want me to go?

17   Q.    Sixth paragraph down.

18   A.    Sixth paragraph down.

19   Q.    Yeah, "The Reeds commenced a substantial expansion and

20   renovation of the property in 2007.  They invested over 300,000

21   dollars in a 3,500 square foot expansion of the property,

22   almost doubling its size, along with significant improvements

23   to the quality of the property and the Reeds intended to sell

24   the property at a substantial profit.  After making the payment

25   due under the forbearance agreement, the Reeds attempted to

1    list the property for sale with the local listing agent.

2    However, the Reeds' realtor advised at the time and has

3    continually advised ever since, that the property could not be

4    listed, nor would it close in light of the cloud created by the

5    uncompleted forbearance agreement."

6         Do you have a recollection of after making this payment

7    pursuant to the forbearance agreement, trying to list your

8    property for sale?

9    A.    Yeah, I -- I talked to realtors about it and they -- they

10   had said to me -- the opinion was one that I held.  I mean,

11   there was two elements, one, you know, only investors would be

12   able to buy it at a very reduced price because of the C -- not

13   having a CO and two, we're going to need to have someone to

14   respond to from -- this is a practical matter.  We need someone

15   at the -- whoever the mortgage company is at that time, to be

16   able to -- to be able to release the liens to get clear title,

17   to actually, physically consummate a sale.

18   Q.    So, even if you had a cash infusion which was significant

19   enough such that you could have completed the renovations and

20   gotten a CO because your renovations were completed, you still

21   couldn't have sold the property, right?

22   A.    At what point?  According to the successor-in-interest,

23   for Taylor, Bean & Whitaker, their position is during 2009,

24   that we were just somehow confused as to who we should have

25   contacted and they presented records or files indicating that

REED - CROSS                                                      80

1   there was someone -- there was a gap in 2009 which no one was

2   available but in 2009, that there was another entity, as I

3   said, a successor-in-interest, an administrator, I don't know

4   what it was, was then available to do that.

5   Q.   All right. In this case, you're blaming your inability to

6   sell Old Dell Trace on the trust, right?

7   A.   Yes.

8   Q.   And you're blaming the foreclosure on Old Dell Trace on

9   the trust, right?

10  A.   Financially, yes.

11  Q.   But at the same time, you've already blamed Taylor, Bean

12  and Whitaker for the foreclosure on Old Dell Trace because it

13  was improper, correct?

14  A.   Well, it was a defense to the foreclosure.

15  Q.   Okay.

16  A.   I think it was a few things.

17  Q.   Okay.  It was an improper foreclosure form your

18  perspective, wasn't it?

19  A.   At that moment in time, yes.

20  Q.   Okay.  And --

21  A.   But could they have prevented that.

22  Q.   There's not a question.  And the fact that you didn't

23  complete the renovations --

24         MS. HAGER:  Strike that.

25  Q.   You testified yesterday that your realtor told you that or

1   there was some discussion with your realtor about putting Old

2   Dell Trace on the market and the realtor had expressed a

3   concern because she said you wouldn't be able to list it

4   without a CO.  Do I have that right?

5           MS. HAGER:  Let's strike that.

6   Q.   Your realtor had a conversation with you at some point

7   about Old Dell Trace, correct?

8   A.   Several realtors did.

9   Q.   Okay.  And you were looking to put Old Dell Trace on the

10  market, correct?

11  A.   Always, in all of my properties, I always contemplate

12  that.

13  Q.   You were looking to put Old Dell Trace on the market,

14  correct?

15  A.   Yes.

16  Q.   And you testified yesterday that the reason that you

17  couldn't put it on the market as per the realtor was that it

18  didn't have a CO, right?

19  A.   To the general -- right, because the reason is the -- what

20  market --

21  Q.   Right, but that was your testimony yesterday, right?

22  A.   Yeah, that it couldn't go on because of the CO.  It would

23  not be available to a regular homeowner buyer.

24  Q.   Right, but there was actually a separate issue which is

25  this Taylor, Bean & Whitaker forbearance agreement, correct?

1   A.   For a certain segment of time.

2   Q.   So, with respect to the forbearance agreement, it created

3   a cloud on your title which would have prevented you from being

4   able to sell the property, correct?

5   A.   For a segment of time.

6   Q.   Okay.  And what was that segment of time?

7   A.   According to my adversaries, it --

8   Q.   According to you.

9   A.   I don't want to concede their point in court but it

10  appears that -- it appears that it may have only been a segment

11  of time in 2009 based on information that I learned later.  I'm

12  not convinced of it a hundred percent but it appears that

13  that -- you know, from the time they were shut down to the time

14  the successor in interest took place, that's the effective

15  interference time frame.

16  Q.   So, if you turn to RFC-1767, is this the forbearance

17  agreement we've been talking about?  And is that your signature

18  on the second page, page 1768?

19  A.   Yes.

20  Q.   And it's dated November 11th, 2008?

21  A.   And on the first page, it required payments due in their

22  office on November the 12th, 2008 in the amount of 20,000

23  dollars, do you see that?

24  A.   Yes.

25  Q.   Okay.  You were delinquent on the loan to Taylor, Bean &

REED - CROSS                                                          83

1    Whitaker at this point in time, correct?

2    A.    I found out that it appeared that we were delinquent by

3    notice that I received in the mail.

4    Q.    So, at this time you were delinquent on the Taylor, Bean &

5    Whitaker loan, correct?

6    A.    I think so.

7    Q.    Well, if you weren't delinquent, why were you --

8    A.    Yeah, well, that's why I am --

9    Q.    -- referring to a forbearance agreement --

10   A.    That's what I am saying.

11   Q.    -- with them.

12   A.    Yes, yes.  I believe that we were.  That's why I tendered

13   the 20,000 dollars.

14   Q.    How far past due were you?

15   A.    I don't recall.

16   Q.    How much --

17   A.    Because I believe that some of the money was paid not in

18   delinquency payments, it was a -- a -- I don't remember the

19   name they called it.  It was a restructure fee or something

20   like that but I can't remember the breakdown.

21   Q.    So, after you paid them the funds required by the

22   forbearance agreement, they nevertheless initiated their

23   foreclosure, correct?

24   A.    Yeah, there was an additional payment too.  There was a

25   second payment that was due by --

REED - CROSS                                                        84

1  Q.   Okay.  There was a second payment due but they still

2  foreclosed, right?

3  A.   Yes.

4  Q.   You did what you needed to do and they didn't do what they

5  needed to do, right?

6  A.   Yes.

7  Q.   None of that has anything to do with GMAC, does it?

8  A.   Other than if they are correct and I did owe them money,

9  which they were demanding and the foreclosure going through is

10 the ultimate, I guess you would say measure of that,

11 they -- GMAC does because my cash -- it was cash that I -- I

12 didn't have to pay them.

13 Q.   But you were paying.  You just testified that you've made

14 payments to Taylor, Bean & Whittaker and they're the ones that

15 dropped the ball, right?

16 A.   Right, and then they demanded more money.

17 Q.   Yeah, if they did what they needed to do, they wouldn't

18 have foreclosed on you is your argument, right?

19 A.   This is a matter of --

20         THE COURT:  Could you answer the question?

21         MR. REED:  The --

22         THE COURT:  Can you answer that yes or no?

23 A.   Say that again?

24 Q.   You did what you needed to do and they dropped the ball,

25 right?

1    A.    Not according to them.

2    Q.    What about --

3          THE COURT:  What about according to you, Mr. Reed?

4    You're the one who is here testifying.

5          MR. REED:  I thought so, Your Honor.

6          THE COURT:  Okay.  Next question.

7    Q.    And does that have anything to do with GMAC?

8    A.    Yes, my understanding is I was going to have to continue

9    to make payments.  That's the ball that they dropped.  Just

10   the -- which dollar amount were those payments.  That wasn't

11   going to absolve me of payments.  I was going to need to make

12   payments.  It was just -- and it was a matter of what dollar

13   amount.  So, that's what has to do with GMAC.  That's what has

14   to do with -- the cash, my cash, my ability to pay for things.

15   Q.    Okay.

16   A.    That's what has to do with GMAC.

17   Q.    Yeah, okay.  You had made the payments though under the

18   forbearance agreement, right?

19   A.    Yes.

20   Q.    Okay.

21   A.    With the understanding that that --

22   Q.    Okay.

23   A.    -- that wasn't a payoff.

24         THE COURT:  Listen to the question.  Next question?

25         MR. REED:  I'm getting aggravated.

1          THE COURT:  How much longer do you have on your cross?

2          MS. HAGER:  Not long.

3          THE COURT:  Go ahead.

4          MS. HAGER:  Could be five minutes.

5          THE COURT:  Go ahead.  We'll take a break when Ms.

6    Hager completes.

7          MR. REED:  Okay.

8    Q.   If you could turn to your exhibit --

9          THE COURT:  Are you marking Exhibit J in evidence?

10          MS. HAGER:  I'm sorry.  Yes, Your Honor, I would like

11   to move Exhibit J into evidence.

12          THE COURT:  All right.  It's in evidence.

13   (Unidentified document was hereby received into evidence as

14   Trust's Exhibit J, as of this date.)

15   Q.   If we could turn to Mr. Reed's Exhibit 24.  Do you have

16   that in front of, Mr. Reed?

17   A.   Yes.

18   Q.   Okay.  If you could turn to the thirteenth page of that

19   exhibit which pertains to 133 Brookschase Lane.

20          THE COURT:  What does it say?

21   Q.   So, at the very top in the header, transfer and

22   assessment.  Then County of Henrico, Finance Department Real

23   Estate Assessment Division and then parcel information and it

24   gives the parcel address of 133 Brookschase Lane.

25          THE COURT:  Okay.  I have that.

REED - CROSS                                                  87

1   A.   Yes.

2   Q.   And we talked about this the other day.  Do you remember

3   that?

4   A.   Yes.

5   Q.   Okay.  And if you look down in the transfer history,

6   there's a sale date of March 3rd, 2006, sales price 400,000

7   dollars listing you as the owner.  Was that your purchase

8   price?

9   A.   Yes.

10  Q.   Okay.  And then there's above that a sale date of 6-2-08

11  sales price, 550,000 dollars.  Was that your sale of the

12  property?

13  A.   Yes.

14  Q.   Okay.  So, did you net 150,000 dollars --

15  A.   No.

16  Q.   -- from the sale?

17  A.   No.

18  Q.   What was your net?

19  A.   I -- I - - I -- we had a -- there was an amount of money

20  due for improvements on the land.  It was agreed to that I had

21  to pay from that.  There was back payments that were due on it.

22  I don't know.  I can't remember.  Hmm.

23  Q.   Do you remember your deposition testimony where you agreed

24  with me it was at least 100,000 dollars?

25  A.   It could have been.  It could have been.

```
 1   Q.    What --
 2   A.    No, I'm saying that it -- at that time -- I'm not saying
 3   it was 50,000 dollars.  I believe it was north of 50,000, maybe
 4   it was 100- -- I don't remember.  And I've been looking for
 5   these documents to try and find that out even.  I mean, the
 6   settlement documents for it, in -- for preparation for this
 7   case.
 8   Q.    And you had a second mortgage on the Matlack property that
 9   was with Homecomings, is that right?
10   A.    That's correct.
11   Q.    And you made an agreement with Homecomings to pay less
12   than the amount due to pay that off in full, is that right?
13   A.    I -- I did.  Thank God I did, yes.
14   Q.    And it was a 400,000 -- and some thousand dollar loan, and
15   you paid 167,000 to cancel it, right?
16   A.    I believe that's what they accepted.
17   Q.    Okay.  And we talked yesterday about the blanket loan with
18   TD Bank for your rental properties.
19   A.    Yes.
20   Q.    Right?  That was a 665,000 dollar loan that was made in
21   June of 2008, is that right?
22   A.    Yes.
23   Q.    And was it your testimony that that loan went into default
24   when TD learned of the Matlack foreclosure in 2008?
25   A.    I understand that that was a default and that was a reason
```

1   for that.  I --

2   Q.    But --

3   A.    Go ahead.  I'm sorry.

4   Q.    No, are you finished?

5   A.    Yeah.

6   Q.    You're finished.  Okay.  Is it your testimony that you

7   made payments to TD Bank as and when due?

8   A.    I don't remember when we made the payments.  I thought we

9   were making payments on that loan.  It's my recollection that

10  we were.

11  Q.    And you refinanced that loan in 2009, is that right?

12  A.    No, I believe that loan was in -- isn't that -- isn't it

13  the 2008 June loan?  That was the blanket mortgage because that

14  was the last transaction I did with TD Bank.

15  Q.    Right.  I am talking about the 2000- -- the loan that you

16  originally closed in 2008, didn't you refinance that in 2009?

17  A.    No, we -- no, we -- I don't have another loan with TD Bank

18  after 2008.  They settled on that loan I think in 2008.  Isn't

19  that the loan package we were examining yesterday?

20  Q.    It is.  So, if you want to take a look at your deposition

21  transcript from April 26th, 2011, which is tab 2 in the

22  deposition binder.

23  A.    Okay.  Hold on a second.

24  Q.    Sure.

25  A.    That's the transcript binder you said, right?

1   Q.   Yes.

2   A.   Okay.  And where am I?

3   Q.   Tab 2.

4   A.   Tab 2.

5   Q.   It's your deposition from April 2011.

6   A.   Yep.

7   Q.   Okay.  So, if you turn to page 33 --

8   A.   Okay.

9   Q.   Let me -- I'm sorry, we'll go back just to page 32, so I

10  can get the question.  Question -- sorry, line -- page 32, line

11  24.

12  A.   Okay.

13  Q.   "Q.  Who did you apply for credit from in 2009?"  On page

14  33.

15  "A.  That was Commerce Bank, I think it was Commerce Bank at

16  the time.

17  "Q.  When you previously mentioned Commerce in 2008, is it now

18  your testimony that it was actually 2009?

19  "A.  Different transactions.

20  "Q.  What was the transaction or the reason you were applying

21  to Commerce in 2009?

22  "A.  2009, you said

23  "Q.  Correct.

24  "A.  That was for refinancing on the three rental properties.

25  They were rentals at the time.

1    "Q.  And were you able to refinance?

2    "A.  Oh, yes.  May I take a break?"

3    And then if you turn -- consistent with this line of

4    questioning, if you turn to page 64, line 16 -- do you have

5    that?

6    A.    Yes.

7    Q.    Okay.

8    "Q.  After the 2008 Commerce and Allied refinancing, you

9    indicated there was only one other refinancing in 2009 with

10   Commerce or TD, whatever it was at the time, is that correct?

11   "A.  Yes."

12        Does that refresh your recollection as to the refinance of

13   the blanket lien in 2009?

14   A.    There -- there was no refinance.  I -- I had my year

15   wrong.  It was 2008.  I don't know why I would say that.  There

16   was no -- the only continued conversation with TD Bank and

17   their records prove it, Mr. Curley talks about it, our last

18   consummated deal was the cash-out refi on the properties in

19   2008 and then we had this way -- like I said, the dialogue, the

20   way we --

21   Q.    Okay.

22   A.    -- we contemplated the other loan, that I believe ran into

23   even as far as 2009.

24   Q.    So, you're sworn testimony in the April 2009 deposition is

25   inaccurate, is that correct?

```
 1   A.    According to the best of my recollection, that's what I am

 2   supposed to answer, and I -- I clearly made a mistake because

 3   the -- the record is true and now after being through all of

 4   these documents, that is correct.

 5   Q.    Okay.  And it's -- I asked you a few moments ago whether

 6   or not you were current on your payments to TD Bank and you

 7   answered me yes.

 8   A.    Which -- which -- please rephrase that.  Which payments

 9   are we talking about?

10   Q.    So, you had a blanket loan with TD Bank which secured the

11   rental properties.

12   A.    Which was consummated in 2008.

13   Q.    Were you current on that loan?

14   A.    For a period of time, I believe I was.  I thought it was

15   through -- until 2009, that's what I believe, until like

16   maybe -- let me think about this -- it may have even all the

17   way been -- been all the way to when MetLife terminated

18   my -- my disability in November.  So, I think TD

19   Bank -- sitting here now, thinking about how -- what position

20   we were -- again, this is like a -- man, this was like a roller

21   coaster, okay?  Oh, you know, backup again.  MetLife's -- okay.

22   I believe that TD Bank, we managed to keep paying them from the

23   refinance point through -- through November of 2009, maybe

24   through the end of the year even.  It was over a year-and-a-

25   half, we expected -- everything was going forward again and we
```

1    were paying them.  So, I believe that that -- that was current.

2    I'm not -- my memory says that that was current.

3    Q.   But at some point, you stopped paying.

4    A.   I think -- the way I remember that, yes.  At some point I

5    did stop paying, yes.

6    Q.   Okay.  Which is a default under the terms of the note and

7    mortgage, correct?

8    A.   I think it would -- I know that it was after we talked to

9    the bank and they said they were taking the properties because

10   they accelerated the whole payments.

11   Q.   Well, if they were taking the properties, why would you

12   continue paying?

13   A.   That's what I am saying to you.  This is when I stopped.

14   So, when we had the conversation, I don't remember who the guy

15   was from the asset -- I never met him, because it was a call

16   from him, not from Curley, that said look, you know, the

17   payments -- we're not seeking monthly payments anymore.  You

18   know, we're going to be accelerating -- we're going to be

19   accelerating this mortgage and you're going to have to come up

20   with the 600 and some thousand dollars and then I later found

21   out why.  Like, you know, it's all those documents and stuff

22   like that.  And -- and -- because I was like, what do you mean,

23   I thought we signed a twenty-year-, you know -- a twenty-year

24   note.  How is this happening?  And now we know why it had

25   happened.

1        So, I'm not going to, you know -- when I know that's

2    coming down the pike, when it's already been told to me that

3    this is -- they're going to take it and they're going to

4    accelerate it, then -- they don't even want me to send the

5    payments.  Maybe the accounting department doesn't know I don't

6    need those payments, so maybe there's a few months where I

7    stopped the payments and -- and it looks like I'm past due on

8    the -- on the thing but they've already told me, they're taking

9    the damn property.

10        So, I don't -- I don't know.  I can't answer to their

11    internal accounting but I am just telling you that we were

12    paying -- my recollection is that we were paying.  I was

13    getting my money from MetLife.  We were paying our bills.  We

14    were still waiting to hear from Taylor, Bean & Whitaker, and

15    then TD Bank, just out of the -- you know, I'm thinking I'm

16    riding out the storm, everything is going fine and then TD Bank

17    is like, no, we're taking the properties.

18    Q.    Your previous testimony was that you applied for financing

19    with TD Bank in the early part of 2008, correct?

20    A.    Yes.

21    Q.    And in connection with that, you were denied financing

22    because of the Matlack foreclosure, correct?

23    A.    Yes.

24    Q.    And that then once they learned of that in that process,

25    TD Bank took negative action against your blanket loan,

1  correct?

2  A.   My understanding is they accelerated the note because

3  that's what the guy told me and it -- and it demanded the

4  entire -- the payoff.

5  Q.   Well, what point in time did that happen?

6  A.   I believe -- I believe I got a call in 2009 but I don't

7  remember when.  I don't remember when.

8  Q.   So, if you could turn to page 21 of the April 26th, 2011

9  deposition transcript that we looking at, tab 2.

10  A.   Okay.

11  Q.   Page 21, line 1.

12  "Q.  How are you currently paying the taxes and carrying costs

13  for all the five properties that you mentioned?"

14  A.   Wait, where am I?

15  Q.   Sorry, this is page 21.

16  A.   Page 21.

17  Q.   Tab 2 of the April 2011 deposition transcript.

18  A.   Okay.

19  Q.   You have that?

20  A.   Yep.

21  Q.   Okay.  Page 21, line 1:

22  "Q.  How are you currently paying the taxes and carrying costs

23  for all the five properties that you mentioned?

24  "A.  We are not currently doing that.

25  "Q.  Do you have a mortgage on the Stratford property?

1   "A.  Yes.

2   "Q.  Tell me, are you current on that mortgage?

3   "A.  I am not.

4   "Q.  And how past due are you on that Stratford mortgage?

5   "A.  Ten months, I think.

6   "Q.  How about the Sicklerville property, does it have a

7   mortgage on it?

8   "A.  Yes.

9   "Q.  Are you past due on that?

10  "A.  May I please clarify?

11  "Q.  Please.

12  "A.  318, 52 and 21, are on a blanket mortgage.  It's one

13  mortgage.

14  "Q.  Just so I am clear on the recording, the properties, 318

15  Columbia, 52 Stone Hollow and the 21 Darien Drive are all under

16  one mortgage?

17  "A.  Correct.

18  "Q.  Who is that mortgage with?

19  "A.  TD Bank.

20  "Q.  What was the original amount of that mortgage?

21  "A.  660.

22  "Q.  And on that mortgage, you estimate that you're about ten

23  months behind, is that correct?

24  "A.  Could be more than a year but I am not sure.  I don't

25  know.

REED - CROSS                                    97

1    "Q.  Has foreclosure started against any of those properties?

2    "A.  Yes, it has."

3         Does that refresh your recollection as to the timing of

4    the payment default on the TD Blanket loan?

5    A.   Well, the -- as I said, yeah, the --

6    Q.   Yes or no?

7    A.   I don't think there was a payment default.

8              THE COURT:  Sir, that wasn't the question.  The

9    question was does it refresh your recollection, yes or no?

10   A.   Well, the payments, yes, I think it does.

11             THE COURT:  Next question?

12   Q.   Does it refresh your recollection as to when you stopped

13   making payments on the blanket loan?

14   A.   Let me look at this. This was taken 2011.  A year back

15   would be 2010.  2008, 2007 -- it's off compared to -- it's

16   slightly off compared to what I think -- I thought it was

17   when -- well, maybe right -- might be right because I think I

18   just said that like it was related to MetLife at that time,

19   too.  So, it would be -- MetLife was November of '09, so maybe

20   a few more months.  I can't remember.  It's -- it's similar,

21   very similar.

22             THE COURT:  Next question.

23             MS. HAGER:  Okay.

24   Q.   In your testimony, I believe on Tuesday, I just wanted to

25   clarify something that you said, I believe you said that in

1   early 2008, Cooper was in Matlack and the kitchen was demo'd.

2   And I was wondering if you meant early 2009 when you gave that

3   answer the other day.

4   A.   Yes, see -- see I confused the -- I misstated the --

5   Q.   Okay.

6   A.   -- the years sometimes.

7   Q.   The Judge had asked you a question the other day,

8   um- -- about whether or not you had enough money to cure the

9   default on the Matlack property in May of 2008 and you had

10  answered you weren't sure.  Do you remember that exchange?

11  A.   Yes, I don't remember what we had in -- available at that

12  moment.  I don't -- I don't -- we don't have any of our

13  checking account statements or anything like that.

14  Q.   Okay.  You had enough money to cure the default on Matlack

15  in June of 2008 though, right?

16  A.   I don't know.

17  Q.   Okay.  So, if you want to turn to tab 4 in the deposition

18  book, it's your deposition transcript from August --

19  A.   Okay.

20  Q.   -- 14th, 2014.

21  A.   Okay.  I'm at tab 4.  Can you say it again?

22  Q.   Right, so tab 4, page 114, starting at line 24.  Let me

23  know when you get there.

24  A.   Okay.  Page 114, tab 4.

25  Q.   Right, line 24.

1    "Q.  In June of 2008, you had the ability to bring the mortgage

2    current, didn't you?

3    "A.  Yes.

4    "Q.  And certainly in November of 2008, when Mr. Cooper made

5    his payment, you definitely had the ability to bring the

6    mortgage current at that point, right?

7    "A.  That's correct."

8         Does that refresh your recollection as to whether you had

9    enough money in May of 2008 to cure the default on Matlack?

10   A.   I guess I may have.  I don't -- I -- I don't know -- when

11   did I do this?  When was this deposition?  2014?  I guess.

12   I -- I may have had material then.  I don't know.

13   Q.   So, did you have enough money in May of 2008 to cure the

14   default on the Matlack property?

15   A.   We might have.

16   Q.   Okay.  Thank you.  I don't have anything further.

17             THE COURT:  All right.  We'll take a fifteen minute

18   recess and then, Mr. Reed, I assume you have -- you want to

19   testify again?

20             MR. REED:  Yes, just give me a -- one minute.  I want

21   to use the bathroom, a small amount of time.

22             THE COURT:  Yeah, we're going to take a fifteen minute

23   recess and then we'll resume at ten minutes to 12.

24             MR. REED:  Okay, great.

25             THE COURT:  Is Walters showing up today?

 1            MR. REED:  No, no.  Ms. Hager and I talked about what

 2    we think is the appropriate legal theory or governing law, just

 3    like we did with the expert witnesses.

 4            THE COURT:  Yes.

 5            MR. REED:  So, we're not going to -- we're not going

 6    to --

 7            THE COURT:  Ms. Hager, what's your position about Mr.

 8    Walters?

 9            MS. HAGER:  Well, as I stated on the record yesterday,

10    I think that his invoices are hearsay.

11            THE COURT:  You're continuing to object to them?

12            MS. HAGER:  Yes.

13            THE COURT:  Okay.  Your objection is sustained.

14    He's --

15            MR. REED:  Yeah, we don't care.  That's fine.  I was

16    trying to --

17            THE COURT:  It doesn't come into evidence, Mr. Reed.

18            MR. REED:  Yeah.  Yeah, I'm good with that.  That's

19    fine.

20            THE COURT:  So, you're the last witness.

21            MR. REED:  Whoa-hoo!

22            THE COURT:  Okay.  Fifteen minute recess.

23            MR. REED:  You know what I am going to do?  I'm going

24    to come and stay and watch your courtroom one night, when this

25    is all done.  Come --

1          (Recess from 11:36 a.m. until 11:55 a.m.)

2              THE COURT:  All right.  Mr. Reed, your opportunity to

3     testify again.

4              MR. REED:  Your Honor, the --

5              THE COURT:  But let me just make clear, your testimony

6     has to be limited to the --

7              MR. REED:  Yes.

8              THE COURT:  -- cross-examination.  Go ahead.

9              MR. REED:  Your Honor, one of the things that sticks

10    out in mind that I would like to address is about the sixty

11    percent completion of the appraisal putting that in the

12    appraisal.  If you can -- if you can look at to -- just to

13    refresh your memory go to tab 44 of my book.  It's photos of

14    the property.

15             THE COURT:  This is the damage.

16             MR. REED:  Yeah, this is the damage but you can see

17    other parts of the house.  You want to --

18             THE COURT:  I have it.  No, I don't need it.  I've got

19    it right here.

20             MR. REED:  So, I am going to go to a couple of pages.

21    First, I would like to say in general, these photos were

22    taken -- I guess -- I guess it was like November of '08.  The

23    appraisal was done in March of '08.  So, my concern about the

24    appraisers use of sixty percent, I don't understand how

25    you -- what he's referring to.  Is he referring to the sixty

REED - Redirect                                            102

1    percent of the -- you know, the enclosure and stuff like that?

2    Because clearly inside the house, the -- you know, and -- and

3    the exterior of the house, the roof was on -- the siding had

4    yet been put on -- which reminds me --

5            THE COURT:  Just stay on point

6            MR. REED:  Okay.  If you look at these photographs,

7    you will see it's -- it was just a shell, the addition of all

8    that work was done.  So, it's not sixty percent.  If you -- if

9    you go to photo 1, the very top on the right hand side, you see

10   the trims aren't even on the doors.  They're framed out.  If

11   you go to photo number 2, you can see that the family room is

12   bare floor and the ceilings aren't even put in.  That's the old

13   drywall that has to still be removed in that -- in that -- in

14   those photos.

15           THE COURT:  Sir, are you suggesting that in giving an

16   appraised -- a subject to appraised value of 1.725 million

17   dollars, based on what the appraiser thought was sixty percent

18   completion, that he didn't have a sufficient basis to provide

19   an appraisal because less than sixty percent was done?

20           MR. REED:  I don't know what -- all I am trying to say

21   to you is I don't know what he means by sixty percent.

22   Sixty -- I guess he thinks physically --

23           THE COURT:  Well, you can't testify about what he

24   thought.

25           MR. REED:  Yeah, okay.  So, I -- I guess --

REED - Redirect                                         103

1          THE COURT:  You disagree with his sixty percent.

2          MR. REED:  I don't know what it means.  So, I --

3          THE COURT:  You disagree with his sixty percent.  You

4   don't think it was sixty percent complete at the time that the

5   appraisal was done.  Is that right?

6          MR. REED:  Yeah, I think -- I think we put more in

7   there.

8          THE COURT:  Okay.  Let's go on.

9          MR. REED:  And, I think, Your Honor, the primary thing

10  that I wanted to say in regard to the line of questioning Ms.

11  Hager had is, you know, clearly we had other -- other cards,

12  other possibilities.  You know, I -- I was in the drink on

13  a -- on a lifeboat and if -- if multiple possibilities,

14  multiple solutions, multiple rescue boats could have come, to

15  fix that or save -- salvage -- save me, a sale of the property

16  in that light -- TD Bank, the -- Rob Maines, my wife's own

17  cousin and more of a drawn out answer, would have been MetLife,

18  Brett Cooper coming through on that purchase for an extended

19  lease, any of these things could have been a rescue.

20          The wrongful act that -- I understand that the trust

21  will be culpable for and why I've done all this and pursued

22  others, as well, is despite the fact others could have rescued

23  me, their behavior caused three possible rescues to not occur

24  or to have a contributing factor causing them not to occur.  It

25  doesn't alleviate them just because there were other boats that

1  passed me by, doesn't -- my understanding alleviate that.

2  I'll -- so that's why I've done that -- I've done all of this.

3          You will do your analysis, I guess, in --

4          THE COURT:  Listen, this is not the time for the

5  argument.

6          MR. REED:  That's right.  That's not a time for that.

7  I just realized that.

8          THE COURT:  My plan is to have you finish your

9  testimony before lunch, break for lunch and have you both come

10  back and do closing argument.

11          MR. REED:  Okay.  Your Honor, I think that's -- I

12  think maybe that's it.

13          THE COURT:  Okay.  All right.

14          MR. REED:  Yeah.

15          THE COURT:  So, it's noon.  Come back at 2 o'clock.

16  You go first.  You give your closing argument first and then

17  Ms. Hager -- Ms. Hager?

18          MS. HAGER:  Well, I don't want to interrupt, Your

19  Honor --

20          THE COURT:  No, go ahead.

21          MS. HAGER:  -- but can we -- can I just clarify that

22  Mr. Reed is resting his case?

23          THE COURT:  Yeah, I'm going to ask you both before we

24  walk out of here.  That's how we'll proceed.  So, I think I had

25  told you earlier when each -- I ask each side if they rest.

1    You're not calling any witnesses, is that correct, Ms. Hager?

2              MS. HAGER:  That's correct, Your Honor.

3              THE COURT:  Do you rest?

4              MR. REED:  Yes, sir.

5              THE COURT:  Do you rest, Ms. Hager?

6              MS. HAGER:  Your Honor, I would move for a directed

7    verdict.  That's what I am asking.

8              THE COURT:  Denied.

9              MS. HAGER:  Thank you.

10             MR. REED:  Can I make one?

11             THE COURT:  You can, denied.  Okay.

12             All right.  So, the evidence is closed.  Whatever

13   exhibits have come into evidence are in evidence and come back

14   at 2 o'clock.

15             MR. REED:  Okay.

16             THE COURT:  And I will allow each side thirty

17   minutes --

18             MR. REED:  All right.

19             THE COURT:  -- for their closings.  And I'll see you

20   at 2 o'clock.  Okay?

21             MR. REED:  Thanks, Your Honor.

22             THE COURT:  All right.

23        (Recess from 12:02 p.m. until 2:01 p.m.)

24             THE COURT:  All right.  Please be seated.  Residential

25   Capital, 12-12020.  It's time for closing arguments in the

RESIDENTIAL CAPITAL, LLC, ET AL.                    106

 1    trial of the contested matter or the claim of Frank Reed.

 2            Mr. Reed?

 3            MR. REED:  Your Honor, I wrote -- so I am going to

 4    read it, if you can bear with me while I do it.  I might be a

 5    little dry.

 6            Let's keep a clear picture of what happened, who did

 7    what and what it means.  First, it is settled law, in fact,

 8    that GMAC Mortgage fraudulently foreclosed on me.  Okay.  Now

 9    what does that really mean?  To understand, I offer this

10    comparison.

11            GMAC Mortgage was only my servicer.  Essentially, they

12    were a middleman between the true party I owed money to and

13    myself.  And as such, I owed them no money, not a single cent

14    to GMAC Mortgage.  You know who else was a middleman between me

15    and the true party I owed money to?  My mailman.  Both GMAC

16    Mortgage and my mailman had no right ever to file a foreclosure

17    against me.  That is why GMAC was found guilty under the NJCFA.

18    They did not own my note and as such, I never owed them a

19    single dollar.

20            If I had, I am sure they would have brought a

21    countersuit here in these proceedings but they didn't.  They

22    even admitted they did not own the note.  That was the basis of

23    what our -- how we moved forward in this case.

24            Their mere knowledge or this Court's mere knowledge

25    that I had a late paying to a third party, not them -- not

1    them, but a third party, did not give them the right to

2    foreclose, just as it would not have given my mailman the right

3    to foreclose against me, if he noticed, for example, that I did

4    not send a couple of payments out because he handled my mail.

5    So, as far as GMAC Mortgage is concerned, the entity I never

6    owed any money to, this is important to identify because it

7    makes their act particularly heinous or offensive, just like it

8    would be if my mailman did it.

9         What has been --

10        THE COURT:  Your mailman is not the loan servicer for

11   the holder of the note, Mr. Reed.  GMAC was the loan servicer.

12        MR. REED:  The servicer, which is a middleman.

13        THE COURT:  It's not the mailman, Mr. Reed.

14        MR. REED:  No, the middle -- a middleman.  They didn't

15   own the note.  I never owed G -- I don't want to -- this has

16   already been found by your proceedings.  I did not owe GMAC

17   Mortgage a financial obligation.  I never did.

18        THE COURT:  Who were you making your monthly payments

19   to, Mr. Reed?  Who were you making your monthly payments to?

20        MR. REED:  GMAC Mortgage, as a collector, a bookkeeper

21   of sorts.  That's who they were.  They did not own the note.

22   This has already been determined.  They admitted it.  They did

23   not own the note and they never owned the note. GMAC Bank, an

24   ally, nonbankrupt entity, owned my note, not GMAC Mortgage or a

25   party to this bankruptcy.  That's important to keep in the

1    forefront of everyone's mind because it doesn't -- it gave them

2    no rights ever.  There's been no evidence --

3              THE COURT:  Mr. Reed, the issue in this trial --

4              MR. REED:  Is the damages.

5              THE COURT:  Yes, so get onto the damages, Mr. Reed.

6              MR. REED:  I'll get on with it, Your Honor.

7              THE COURT:  I know what I wrote in the first opinion.

8    Let's get onto the issues that were in this trial.

9              MR. REED:  I'm about there.

10             Now what did GMAC Mortgage's wrongful act cause?  It

11   caused the loss of cash and property.  Both things that are

12   ascertainable losses under the New Jersey CFA.  Now before I

13   get into the actual quantification of the loss, I feel

14   compelled to remind the Court that causation means what

15   causation means under the NJCFA.  A causal connection must be

16   shown between the defendant's unlawful conduct and plaintiff's

17   ascertainable loss, however -- see Pian (ph.) v. GreenPoint

18   Mortgage Funding -- however, the wrongful conduct need not be

19   shown to be the sole cause of plaintiff's loss, but may be

20   shown to be nearly have contributed to the loss, Arcan v.

21   Brother International Corp. (ph.), noting this is not the rule

22   for common law fraud.  To be liable, GMAC Mortgage has only to

23   be a straw in a proverbial bundle that breaks the camel's back.

24             Evidence has been entered here in these proceedings

25   that unequivocally demonstrates that the wrongful foreclosure

1  caused others to not deliver to me cash and the loss of that

2  cash further compounded my problems and loss by causing the

3  loss of property, albeit these were loans, for example, or

4  investments, that did not happen but nonetheless, they would

5  have resulted in cash in my hands.

6        I would like to take a moment to emphasize this as a

7  loss in and of itself.  Contemplate this; if GMAC Mortgage's

8  bad act caused me to lose cash from a loan that I closed on the

9  day before, after I received it, it would be a loss.  What is

10 the difference between stopping me from getting it in the first

11 place?  So, the lost loan proceeds are, in fact, a lost cash.

12 And I think they also fall within the equitable remedies

13 provided under the statute.  It's not merely just damages.

14 It's a different type of statute.  It's broader and more

15 encompassing.

16       Now as to the property in Old Dell Trace.  Evidence

17 has been put on that clearly demonstrates that I did nothing

18 but try to finish the property with whatever resources I had at

19 various times.  GMAC Mortgage's fraudulent foreclosure caused

20 the loss of the necessary funds or funds that could have

21 completed the project and allowed me to realize its value

22 through either a sale or a retention as a rental that I would

23 still own today.

24       As to the three rental properties in New Jersey rented

25 by the Oxford House and financed by TD Bank, it is the

1    unrebutted testimony from the president of TD Bank for the half

2    of the State of New Jersey that was vetted by their counsel and

3    fully researched and I would imagine corroborated internally,

4    that TD Bank took my rentals because of the foreclosure, was a

5    violation of my note.

6              THE COURT:  Mr. Reed, what about the testimony from

7    your prior deposition that counsel put in today where you

8    testified that you were twelve months in arrears on your

9    mortgage for the three properties.

10             MR. REED:  Your Honor, I believe that as I said, that

11   that was --

12             THE COURT:  You have this penchant to say what you

13   think is going to help you in whichever case you're in and in

14   your prior deposition, you testified that you believed that you

15   were approximately twelve months in arrears on the mortgage

16   with the -- it was the restructured mortgage on your three

17   rental properties.  You told me when I asked you, I asked you

18   specifically, whether you were current on those mortgage

19   payments and you told me yes.  In a prior deposition much

20   closer to the acts or events, you testified that you were

21   twelve months in arrears.

22             MR. REED:  Your Honor, that testimony that was

23   introduced today in a deposition was from 2011.  Your question,

24   if you go back to the record --

25             THE COURT:  Closer to the acts or events involved when

 1  typically a memory is better than it is today.  But you say
 2  whatever you think is convenient for you at the moment.  So you
 3  told me in answer to my questions that you were current, in
 4  terms of each --
 5          MR. REED:  In 2009.
 6          THE COURT:  -- Ms. Hager put in your deposition
 7  testimony --
 8          MR. REED:  Okay.
 9          THE COURT:  -- where you acknowledged you were twelve
10  months in arrears.  You told me you were never in arrears on
11  it.
12          MR. REED:  Your Honor, you were asking me what I was
13  in 2009 and I even elaborated.  You can look at the record.
14  I'm pretty sure I said I paid through 2009 and you asked me
15  when you had foreclosed.  I thought it was later.  So, I -- I
16  gave you approximate time that I thought I was in -- current
17  and that closely approximated what I said in the 2011.  I never
18  said I was completely current.  I even testified that I
19  believed after I was told or I know after I was told they were
20  going to take them, that I stopped the payments.
21          You can look back at that.  I'm sure you're going
22  to -- you're very critical and I know you're going to do this.
23  So, let me finish putting on the record what I would like to.
24          TD Bank themselves put on the rec -- TD Bank testified
25  they took my rentals because the foreclose was a violation.

1    The actual actor is the one who testified to that.  Thus,
2    the --

3            THE COURT:  You put that in a declaration that did not
4    come into evidence, Mr. Reed.  Those words you've just read to
5    me were in a supplemental declaration that was not admitted in
6    evidence.

7            MR. REED:  Mr. Curley stated it in his testimony.  I'm
8    upset that you don't remember that.

9            That caused the loss of the rental properties.  And as
10   they were rented by an organization that rented them long-term
11   and indicated -- as indicated in their testimony that you will
12   either read or have read, they would have continued to do so,
13   infinitum.  There must be a loss of rents figured into the
14   damage as well.

15           I'm going to also remind the Court that under the
16   NJCFA I merely have to make a showing of an estimate that the
17   Court can base damages on.  An ascertainable loss does not
18   simply limit it to a lost profit or conversions.  It's broadly
19   written and construed as equitable remedies and can include the
20   lost loans and the foreclosure of the property.  I believe that
21   I've submitted a thorough and sufficient amount of evidence in
22   regard to the Virginia property, the rentals and the lost cash.

23           Finally, I must say that GMAC Mortgage, a party I owed
24   no obligation, no money to, wrecked my life, causing great deal
25   of problems by torpedoing the business I had been doing for

1    twenty years -- you could see it in the contemporaneous

2    business records with TD Bank even -- and by causing at least,

3    or being the partial cause -- and that's all they have to

4    be -- for the at least three rescue boats, meaning Maines,

5    Kline, and TD Bank, from rescuing me.

6          And to add insult to injury, they have done nothing

7    but offer up snickering criticism of the choices I made to try

8    and salvage value for my wife and children as I climbed into

9    the lifeboat.  They criticize what I put into the boat, what

10   direction I rode and what I chose to do, whether to feed the

11   kids or row in this direction or row in that direction.  This

12   has truly upset me, as their -- especially as their actions are

13   what caused me to be in a lifeboat in the first place and

14   further stopped the rescue, again, by three parties.

15         I would like to on a personal note say that I'm sorry

16   if I aggravate this Court.  I've done my best to do this.  And

17   if the Court takes time and looks through the stuff, it should

18   understand that I genuinely have worked diligently to try and

19   do -- and represent the facts and research them and remember

20   them and present them and follow the rules of the Court to

21   properly represent what I think happened to us, and to present

22   the Court with an ability to estimate a fair resolution.  And I

23   ask the Court, if it does not agree, that it, when it

24   pronounces its decision, does so in a way that -- I don't know.

25   Just hope it doesn't upset me further.  Thank you, Your Honor.

1          THE COURT:  All right.

2          Ms. Hager?

3          MS. HAGER:  Your Honor, I don't think there's any

4    doubt that there certainly was a lot going on in Mr. Reed's

5    life in the 2007-2010 time frame.  But the issue that we're

6    here on is that Mr. Reed hasn't proven that any of the issues

7    he's talked about were caused by GMAC's actions.  He's failed

8    to submit any evidence to show a causal nexus between the

9    unlawful conduct and the alleged damages.  While Mr. Reed is

10   correct that a plaintiff is required to prove only that the

11   defendant's conduct was a cause of damages as opposed to the

12   sole cause, the cause still has to be a proximate one.  And

13   that's really one of the main key factors that's missing here.

14          The causal-nexus requirement stems from the portion of

15   the statute that requires a private plaintiff to show an

16   ascertainable loss as a result of the violation.  And even if

17   he can prove the connection, he still has to prove his

18   ascertainable loss through sufficient methodology and competent

19   evidence, which he failed to do.

20          He argues that New Jersey law -- or in his papers he

21   did anyway, that New Jersey law will not preclude recovery of

22   damages simply because a plaintiff may not be able to fix his

23   damages with precision.  However, the case law cited by

24   Mr. Reed contemplates proof, as to lost profits, consisting of

25   testimony and other evidence about the normal profit margin of

1  a business as applied to the facts and monetary figures of the

2  case.

3          THE COURT:  So Mr. Reed testified that his normal

4  margin in buying and selling houses is twenty percent.  Isn't

5  that evidence that fills that --

6          MS. HAGER:  Well --

7          THE COURT:  -- fills that gap?

8          MS. HAGER:  I don't think it's competent evidence, as

9  demonstrated by the numerous occasions on which I was able to

10  impeach Mr. Reed's testimony.  And as Your Honor so clearly

11  stated, Mr. Reed seems to testify in the way that befits him

12  under the circumstances.

13          THE COURT:  On the --

14          MS. HAGER:  So that is of course for Your Honor to

15  weigh.

16          THE COURT:  On the issue of what his usual margin is,

17  you didn't cross-examine him on that.

18          MS. HAGER:  That's right.

19          THE COURT:  Okay, go ahead.

20          MS. HAGER:  That statement I made about the normal

21  profit margin is from the VAL Floors, Inc. v. Westminster

22  Communities, Inc. case, which is 810 A.2d 625 at page 631 (N.J.

23  Super. Ct. App. Div. 2002).  In that case the court goes on to

24  say that a certain standard or fixed method by which profits

25  sought to be recovered may be estimated and determined with a

1   fair degree of accuracy.  So in other words, he would still

2   have to prove his damages through sufficient methodology and

3   competent evidence.  So, even if you took him at his word on

4   his profit margin, I don't think that there are sufficient

5   other damages numbers, in the case, that you could make -- draw

6   that conclusion.  And I'll get to that in a minute.

7          Just because the Court found that GMAC violated the

8   CFA by submitting the assignments signed under oath by

9   Mr. Stephan to try to establish standing in the foreclosure

10  doesn't mean that Mr. Reed suffered any ascertainable losses

11  relating to other properties besides Matlack.  He has filed in

12  his proofs to do so.

13         With respect to Old Dell Trace, there is testimony

14  about the failure to sell or rent Old Dell Trace, and Reed

15  asserts the Trust is responsible.  Yet the evidence shows that

16  Taylor, Bean & Whitaker's foreclosure occurred because Taylor,

17  Bean & Whitaker improperly foreclosed.  That's Mr. Reed's own

18  testimony.  Exhibit J shows support for that testimony in his

19  pro se pleading and in his lawyer's letter.

20         The pleading, which is the opposition of the motion to

21  dismiss, complains that the foreclosure left the Reeds unable

22  to sell or rent Old Dell Trace.  And the letter from Mr. Whelan

23  explains why Mr. Reed thought that Taylor, Bean & Whitaker

24  still needed to perform under the forbearance agreement.

25  There's no ambiguity.  Mr. Reed attributed the foreclosure of

1   Old Dell Trace solely to Taylor, Bean & Whitaker for its

2   actions in improperly foreclosing, when it suited him.

3           As to the contractors, the evidence put forth by

4   Mr. Reed as to the amounts incurred and either paid to

5   contractors or not paid and still due, is unavailing.  Mr. Reed

6   hired contactors to perform work on Old Dell Trace, and they

7   performed that work and invoiced him.  Those contractual

8   amounts were due by Mr. Reed to the contractors, because

9   Mr. Reed was obligated to pay them.  He didn't incur these

10  costs because of GMAC's CFA violation.  He incurred these costs

11  because he contracted the work.

12          Further, the amounts themselves provided by Mr. Reed

13  are not entirely supported by the various declarations, which

14  is what I alluded to when we talked a moment ago about the

15  profit margin.  The declarations that were submitted into

16  evidence show totals that are much less than that which

17  Mr. Reed had testified to.

18          And to the extent -- and it's not clear to me now

19  based on his closing, but from his opening -- from his pre-

20  trial memo:  to the extent that he's seeking to recover

21  contractor's costs and lost equity or profits or the value of

22  Old Dell Trace, he would seem to be double-counting.

23          THE COURT:  Let me ask this hypothetical:  if GMAC had

24  filed a foreclosure action on Old Dell Trace, if it had been

25  the mortgage servicer on Old Dell Trace and filed -- did the

1  same things wrong that it did with respect to -- with respect

2  to Matlack -- I think there were three things that I identified

3  in the prior opinion -- and Mr. Reed lost his entire investment

4  in the Old Dell Trace property, would the money he put in, in

5  the renovations -- he testified about 2- or 300,000 dollars

6  that he put in -- would that be recoverable damages under the

7  CFA?  It's a hypothetical.

8           MS. HAGER:  So --

9           THE COURT:  GMAC didn't foreclose --

10          MS. HAGER:  So can I just add --

11          THE COURT:  -- on --

12          MS. HAGER:  Right.

13          THE COURT:  -- Old Dell Trace.

14          MR. REED:  If I could add to the hypothetical --

15          THE COURT:  Okay.

16          MS. HAGER:  -- that these other things weren't going

17  on, meaning, there's --

18          THE COURT:  I mean, you --

19          MS. HAGER:  Because I don't think you can look at

20  it --

21          THE COURT:  -- you're arguing two things --

22          MS. HAGER:  -- in a vacuum.  I hear what --

23          THE COURT:  You seem to be arguing two separate

24  things.  And I had clearly in mind, since it came in this

25  morning, the declarations and prior briefs with respect to Old

1    Dell Trace and the action against Taylor, Bean & Whitaker.  And
2    I'll certainly take that into account.  But you separately seem
3    to be arguing that none of the money that he put into the
4    renovations, the addition to Old Dell Trace, would be
5    recoverable under the CFA.  I'm having -- I'm pushing back a
6    little bit on that.
7            If GMAC had been the servicer and had forced a
8    foreclosure of Old Dell Trace that caused him to lose his total
9    investment that he put in the -- assume it's 300,000 dollars,
10   wouldn't that be -- if this property had been in New Jersey,
11   wouldn't that have been recoverable damages under the CFA?  The
12   loss would have been --
13           MS. HAGER:  I mean --
14           THE COURT:  -- ascertainable.
15           MS. HAGER:  I mean, maybe.
16           THE COURT:  Stop for a second.
17           MS. HAGER:  Sorry.
18           THE COURT:  The loss, 300,000 that he put in.  He had
19   100,000 dollars that he put down when he bought the house.
20   Assume that the total of what he put in was 300,000.  And if
21   there was wrongful foreclosure of that property that violated
22   that CFA, wouldn't his lost investment be ascertainable loss?
23           MS. HAGER:  Well, yes, but I -- maybe.  I want to
24   qualify it, though, because here's where I'm getting stuck:
25   because the GMAC foreclosure on the Matlack property, while

1  improperly filed --

2          THE COURT:  Well, they never did foreclose.  They

3  tried.

4          MS. HAGER:  It never got sold.

5          THE COURT:  Correct.

6          MS. HAGER:  So I'm getting stuck --

7          THE COURT:  He's still living there.

8          MS. HAGER:  I'm getting stuck a little on that.  But

9  if we kind of clear out the other stuff and just say -- I mean,

10  you could kind of change the hypothetical around and just say,

11  well, what if the Matlack property was undergoing all of these

12  renovations.  And --

13          THE COURT:  Yeah.  Assume you put --

14          MS. HAGER:  -- none of this other stuff is going on.

15          THE COURT:  Assume you put 300,000 dollars into the

16  Matlack property, for renovations, improvements to the

17  property, and GMAC had wrongfully foreclosed on it.

18          MS. HAGER:  Foreclosed.

19          THE COURT:  Wouldn't --

20          MS. HAGER:  Sold.

21          THE COURT:  Yeah.  The house is gone.  You know, it's

22  a hypothetical.

23          MS. HAGER:  Right, but just because that makes a

24  difference, right?  But, yes, if you put in that work, they

25  improperly foreclosed.  He either didn't challenge it or lost,

1   or somehow it ended up that they sold the property before his

2   claim got resolved.  I would see a closer causal nexus there.

3   I'm still -- I don't think I can say yes for sure.  But, I

4   mean, definitely a closer nexus --

5          THE COURT:  Well, what I'm trying --

6          MS. HAGER:  -- in that scenario, because now the

7   property's gone.

8          THE COURT:  What I'm trying to separate out is the

9   issue of ascertainable loss.  On the one hand, you seem to be

10  arguing that his investment in the renovations, addition, could

11  not be ascertainable loss, and separately arguing -- I

12  understand it -- the causation issue, because in the case in

13  Virginia, he argued that Taylor Bean was responsible for it.

14  And he argued in the case against MetLife and Citibank that

15  they were responsible for it.

16         So I understand there's a -- there definitely is a

17  proximate-cause issue.  But in terms of the ascertainable-loss

18  issue, do you disagree that if he invested the money for

19  improvements and then lost it all because of a wrongful

20  foreclosure, that that wouldn't amount to ascertainable loss?

21         MS. HAGER:  Well, again, I suppose where I'm getting

22  stuck is because it's for two separate properties.  And so, to

23  me, I guess it is part of the causation too.

24         THE COURT:  Oh, I recognize --

25         MS. HAGER:  I think, if it's --

1          THE COURT:  -- a big causation issue.

2          MS. HAGER:  Yeah, and that's where I'm just

3   having -- I'm not trying to not answer you, but that's here I'm

4   having a hard time quite getting to it, because as I do -- as I

5   see it as we currently sit, I see that he undertook various

6   contracts, by the way, in large part, at the end of 2008 and in

7   2009 when he knew he was denied by TD Bank.

8          So he already knew he wasn't getting money from TD

9   Bank.  Maines and Kline, I'm not sure exactly when those

10  conversations happened.  I think Kline seemed to think more

11  strongly that it was 2008, but Maines didn't know if it was

12  2008 or 2009.

13         If all those conversations happened in 2008, he went

14  down to Virginia in November of 2008 and undertook more work,

15  knowing he wasn't getting any money.

16         THE COURT:  Well, he also knew --

17         MS. HAGER:  So --

18         THE COURT:  He left one thing out in the places where

19  he was looking for money, and that was MetLife.  But I have

20  your point.  I'm just -- I'm just trying to separate out,

21  because you seem to be arguing that what he invests in

22  improvements to the property could not amount to ascertainable

23  loss.  That I'm having a problem -- that argument I'm having a

24  problem with.

25         The causation -- there are multiple steps in the

1   causation -- multiple arguments that you raised in your cross-

2   examination today and in the depositions and declarations that

3   you put in, that raise questions about causation; but I'm just

4   trying to separate out the ascertainable-loss issue from the

5   causation issue.

6            MS. HAGER:  Right.  Understood.  I think, if we're

7   assuming that everything happened on Matlack and that was the

8   house that was being improved and it ended up getting sold

9   improperly, out of foreclosure, and then he and his family are

10  out of the house and the sale shouldn't have happened, taking

11  it one step further, now some third party's in there, right?

12  So it's a situation where it's not as easy as getting the house

13  back.

14           I think there is more of an argument there that what

15  he put in could be an ascertainable --

16           THE COURT:  Okay.

17           MS. HAGER:  -- loss.

18           THE COURT:  All right, go ahead.

19           MS. HAGER:  And maybe I can't directly answer your

20  question as to Virginia, because I'm getting caught up on the

21  causation part.

22           THE COURT:  Oh, I --

23           MS. HAGER:  But as I --

24           THE COURT:  -- I understand that.

25           MS. HAGER:  But as I see it, by the time he got down

1   there in November of 2008, he knew that he wasn't getting

2   financing from any of the three main sources he's been talking

3   about.  He knew that.  And he went ahead and did the work

4   anyway.  He entered into contracts with these contractors; they

5   were there for his obligation.  It had nothing to do with GMAC.

6          At that time --

7          THE COURT:  Once you do the demolition, you go to

8   go -- I mean --

9          MS. HAGER:  Well, the testimony on the kitchen, I

10  mean, that was the first that I was hearing of that testimony

11  today.  The testimony that I took in the deposition was that he

12  ripped the kitchen out in November of 2008.  Right?  So, coming

13  in here today, the testimony, in my mind, was that when he went

14  down in November of 2008, relying on the Cooper money, he went

15  in and took out the kitchen and went down that road.

16         And so what my point on that was going to be was at

17  that point he only had about 21,000 dollars' worth of work left

18  for the master and the sunroom.  And instead of taking the

19  Cooper money and dealing with the kitchen, couldn't he have

20  just left the kitchen there and taken the Cooper money, spent

21  the twenty-one grand, finished off the master, finished off the

22  sunroom?  Then he could have gotten his CO.  Okay.  Well, in

23  testimony today, Mr. Reed testified that in fact some of the

24  kitchen demo had already taken place.  So that's to Your Honor

25  to weigh that testimony.  But if the whole kitchen was still

1    there in November, I think it's a different story.

2            With respect to the Cooper money, the reason that

3    that's important is because we know from the prior trial that

4    Mr. Reed got 400,000 and he was also -- had started to get

5    25,000 a month; he got that for two months.  And then

6    Mr. Cooper had stopped paying, which is essentially 450,000

7    dollars for nothing, because Cooper never took the property.

8            Mr. Reed testified today that he got approximately

9    100,000 dollars in June of 2008 from the sale of the

10   Brookschase lot.  During that same time, we know that he was

11   not making payments on Matlack and he was receiving disability

12   payments.  So he had cash sufficient to complete the

13   renovations at the end of 2008, early 2009, even if you're

14   counting the 80- to 100,000 dollars for the kitchen, which, for

15   the amount of work that was left on the kitchen, is, again,

16   something that Your Honor would need to weigh.

17           He made choices, conscious choices, about what to do

18   with that money.  He had hundreds of thousands of dollars.  He

19   didn't pay off Matlack.  He testified he had the money to do

20   that.  He instead put more money into Old Dell Trace.  And

21   maybe he did it because he thought he could sell it.  Maybe he

22   didn't realize what was going on in the market at the time.

23   But in any event, he made these choices.  He made a choice not

24   to pay Old Dell Trace after a certain time.  These are not

25   GMAC's fault or responsibility.

RESIDENTIAL CAPITAL, LLC, ET AL.                    126

1          Mr. Curley:  Mr. Curley really doesn't have a memory

2    of what went on.  With respect to the attempted financing on

3    Matlack, he has absolutely no documentation.  This is something

4    that maybe happened in 2008, maybe happened in 2009.  He

5    doesn't know.  But there's no documents.  And interestingly,

6    there's a lot of documents for the blanket loan.

7          So I don't know how you explain that.  But he really

8    didn't know.  He has this vague recollection of the attempted

9    refinancing sort of being in play, and hearing from someone in

10   his office, his lender in his office, that there is a lis

11   pendens.  Well, we can recall from the prior trial that there

12   were issues regarding the lis pendens and the timing of the

13   Court's dismissal of the case versus how long the lis pendens

14   stayed in play and that action was not taken to get the lis

15   pendens removed.

16         Mr. Reed testified, through his prior deposition

17   testimony, that there were significant missed payments to TD

18   Bank with respect to the blanket loan.  And even if Mr. Reed

19   had gotten a loan from TD Bank, he can't prove that he would

20   have used that money -- or he can't prove how he would have

21   used that money.  He can't prove that he would have used it to

22   make mortgage payments to one of these lenders.  He can't prove

23   that he would have used it to finish the work.  I don't know

24   that there's specific testimony on it.  My recollection of the

25   settlement is that it's kind of all over the place with all

1    these things that he had going on, all these various

2    opportunities.

3            There was definitely a lot going on, but there's no

4    clear testimony about what would have happened.  That's even

5    assuming he could have gotten that loan, because despite

6    Mr. Curley coming in and giving testimony, what was very clear

7    was that he doesn't remember what was going on with that

8    request; he doesn't remember that the blanket (sic) had serious

9    delinquencies on it.  He had no idea.

10            When he talked about Mr. Reed's financials that were

11    collected in connection with the blanket lien, he had indicated

12    that the bank would not have made a loan on Matlack with the

13    severe delinquencies that the property had on it at the time.

14    He testified that when the paperwork for the blanket loan was

15    done in April of '08, that the bank was aware that the Matlack

16    property had -- was past due for a few months.  So that's

17    documented.  So they made that loan, but that was not secured

18    by Matlack.

19            So in response to the question about Matlack and the

20    reason that that's different is because you wouldn't want to be

21    a second mortgage behind a severely delinquent first.  He

22    clarified that in his testimony.  No, TD Bank would not want to

23    be a second mortgage behind a delinquent first.

24            So he may have this recollection of this lis pendens.

25    Maybe he does; maybe he doesn't.  It's not documented.  We

1   don't know when that happened.  But we do know that the loan

2   would never have been approved.  Likewise, with respect to

3   Maines and Kline:  they both gave testimony that if they knew

4   how delinquent Mr. Reed was on his Matlack property, they would

5   not -- in the case of Ms. Kline, would not have lent him the

6   money and, with respect to Mr. Maines, would not have entered

7   into the partnership with Mr. Reed.

8           With respect to the New Jersey rental properties and

9   the Oxford House tenant, through deposition testimony, which

10  Your Honor I'm sure will have a chance to read, the CEO of

11  Oxford House, Paul Molloy, testified that the reason that they

12  moved out of the houses was because the houses were getting

13  foreclosed on.  As Your Honor saw, there was some back-and-

14  forth over the assignment of rents.  Oxford House sort of

15  didn't know who to pay, because the banks said, pay us;

16  Mr. Reed said, don't pay them.  And they didn't want anything

17  to do with it, so they moved out.  Mr. Molloy testified that

18  they didn't care about any foreclosure on Matlack and they

19  didn't know about any foreclosure on Matlack.

20          Simply stated, Mr. Reed has not established causation

21  or an ascertainable loss.  It's his burden to do so.  After

22  four days of -- well, three days of his testimony that he was

23  unable to do so, and I think we have fifteen, or so, witnesses,

24  and there's really nothing that's been put into the record that

25  can show that the specific CFA violation by GMAC caused any

RESIDENTIAL CAPITAL, LLC, ET AL.                    129

1   ascertainable loss by Mr. Reed, particularly when you consider

2   all the other things that were going on at the time, and the

3   other testimony that he has given, and the other submissions to

4   court -- to various courts, that he has made, that are

5   inconsistent among themselves and with what he has said in

6   court here this week.  Thank you.

7           THE COURT:  Thank you very much.  The Court's going to

8   take the matter under submission and I'll decide it in due

9   course, submit an opinion.  We're adjourned.

10          MS. HAGER:  Thank you.

11          (Whereupon these proceedings were concluded at 2:42 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              **I N D E X**

3

4   **WITNESS**              **EXAMINATION BY**        **PAGE**

5   Joan Kline              Ms. Hager             6

6   Joan Kline              Mr. Reed              14

7   Joan Kline              Ms. Hager             22

8   Joan Kline              Mr. Reed              23

9   Frank Reed              Ms. Hager             27

10  Frank Reed              (In colloquy)         101

11

12  CLOSING ARGUMENT

13  Frank Reed                                    106

14

15                              EXHIBITS

16  CLAIMANT's              DESCRIPTION                    PAGE

17  10                      Ms. Kline's declaration        5

18  TRUST'S

19  C                       Plaintiff's memorandum        60

20                          of law in support of

21                          motion for summary judgment

22                          in case of Reed v.

23                          Citigroup, Inc.

24  F                       Appeal to Third Circuit       64

25                          Court for Reed v.

```
 1                         Citigroup, Inc.

 2

 3   OTHER'S

 4   J                    Unidentified                    86

 5                        Document

 6

 7                         RULINGS

 8                                           PAGE      LINE

 9   Application by Ms. Hager for directed

10   verdict denied                          105         8

11   Application by Mr. Reed for a directed

12   verdict denied                          105        11

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T I O N

2

3    I, Aliza Chodoff, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    Aliza Chodoff (CET**D-634)

10   AAERT Certified Electronic Transcriber

11

12   eScribers

13   700 West 192nd Street, Suite #607

14   New York, NY 10040

15

16   Date:  September 30, 2016

17

18

19

20

21

22

23

24

25