1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - -x

5    In the Matters of:

6    RESIDENTIAL CAPITAL, LLC, et al.,        Case No.

7                 Debtors.                    12-12020-mg

8    - - - - - - - - - - - - - - - - - -x

9    GMAC MORTGAGE, LLC,                       Case No.

10                Debtor.                      12-12032-mg

11   - - - - - - - - - - - - - - - - - -x

12   ROSEBERRY,

13                       Plaintiff,

14      -against-                             Adv. Proc. No.

15   GMAC MORTGAGE, LLC, et al.,              16-01202-mg

16                       Defendants.

17   - - - - - - - - - - - - - - - - - -x

18                 United States Bankruptcy Court

19                 One Bowling Green

20                 New York, New York

21                 October 13, 2016

22                 2:09 PM

23   B E F O R E:

24   HON. MARTIN GLENN

25   U.S. BANKRUPTCY JUDGE

2

1

2  Re: Adv. Proc. No. 16-01202-mg:

3  (CC: Doc. no. 1) Pre-Trial Conference

4

5  Re: Case No. 12-12020-mg:

6  Doc# 10136 Motion to Approve / Motion of ResCap Borrower Claims

7  Trust for Order Authorizing Interim Distribution and

8  Establishing Disputed Claims Reserve.

9

10  Doc# 10168 Case Management Conference on ResCap Borrower Claims

11  Trusts Seventy-Fifth Omnibus Objection to Claims (No-Liability

12  Borrower Claims) Solely as it Relates to the Claim filed by

13  Rhonda Gosselin.

14

15  Doc# 10092 Motion for Objection to Claim(s) Number: 2892.

16

17  (CC: Doc# 10068, Doc. 10085) Joint Motion to Vacate the Opinion

18  and Order Sustaining in Part and Overruling in Part the ResCap

19  Borrower Claims Trusts Objection to Claim Nos. 5610 and 5612.

20

21  (CC: Doc# 9980, 10132) ResCap Borrower Claims Trusts Objection

22  to Claim No. 684.

23

24

25

1

2    Doc# 10136 Motion of ResCap Borrower Claims Trust for Order

3    Authorizing Interim Distribution and Establishing Disputed

4    Claims Reserve.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  David Rutt

21   eScribers, LLC

22   700 West 192nd Street, Suite #607

23   New York, NY 10040

24   (973)406-2250

25   operations@escribers.net

4

1

2    A P P E A R A N C E S :

3    MORRISON & FOERSTER LLP

4         Attorneys for the ResCap Borrower Claims Trust

5         250 West 55th Street

6         New York, NY 10019

7

8    BY:   JORDAN A. WISHNEW, ESQ.

9          NORMAN S. ROSENBAUM, ESQ.

10

11

12   ACCESS LEGAL SERVICES

13        Attorneys for Richard D. Rode and Tia Smith

14        310 Fourth Avenue South

15        Suite 5010

16        Minneapolis, MN 55415

17

18   BY:   WENDY ALISON NORA, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

```
 1
 2   DUANE MORRIS LLP
 3         Attorneys for Ocwen Loan Servicing, LLC and Deutsche Bank
 4         30 South 17th Street
 5         Philadelphia, PA 19103
 6
 7   BY:   BRIAN J. SLIPAKOFF, ESQ. (TELEPHONICALLY)
 8
 9
10   LAIRD J. HEAL, ATTORNEY AT LAW
11         Attorneys for Rhonda Gosselin
12         120 Chandler Street
13         Suite 2R
14         Worcester, MA, 01609
15
16   BY:   LAIRD J. HEAL, ESQ.
17
18
19   MURPHY PEARSON BRADLEY & FEENEY
20         Attorneys for Bernard Ward and Colleen Halloran
21         88 Kearny Street
22         10th Floor
23         San Francisco, CA 94108
24
25   BY:   KAREN K. STROMEYER, ESQ. (TELEPHONICALLY)
```

1

2   SEVERSON & WERSON, APC

3        Attorneys for GMAC Mortgage, LLC

4        One Embarcadero Center

5        Suite 2600

6        San Francisco, CA 94111

7

8   BY:   GREGORY L. HUBER, ESQ. (TELEPHONICALLY)

9

10

11  POLSINELLI PC

12       Attorneys for Peter S. Kravitz in His Capacity as Trustee

13        of the ResCap Borrower Claims Trust

14       900 Third Avenue

15       21st Floor

16       New York, New York 10022

17

18  BY:   DANIEL J. FLANIGAN, ESQ.

19

20

21  ALSO APPEARING (TELEPHONICALLY):

22       PETER S. KRAVITZ, Trustee of the ResCap Borrower Claims

23        Trust

24       ERLINDA ABIBAS ANIEL, PRO SE

25       RICHARD D. RODE, PRO SE

1                   P R O C E E D I N G S

2           THE COURT:  All right, please be seated.  All right,

3    we're here in Residential Capital, 12-12020.  And I guess

4    there's one adversary proceeding:  Roseberry v. GMAC Mortgage,

5    LLC, 16-01202.

6           Mr. Wishnew?

7           MR. WISHNEW:  Good afternoon, Your Honor.  With

8    regards to the first matter going forward, Your Honor, item 2

9    on page 2 of today's agenda, as you noted, the pre-trial -- or

10   scheduled pre-trial conference for the adversary proceeding

11   commenced by Roseberry against GMAC Mortgage and others, GMAC

12   Mortgage was never actually served with this complaint.  Others

13   have filed a motion to dismiss.  We would be in a position to

14   possibly join the motion to dismiss, and we can carry it to the

15   next omnibus hearing.  But at this point in time, Your Honor,

16   this is Roseberry's pre-trial conference to go forward with,

17   and GMAC is not a participant as of yet, since we've never been

18   served.

19          THE COURT:  What's -- tell me -- I didn't look at the

20   complaint in this.  Tell me what this is about.

21          MR. WISHNEW:  It's a complaint to determine liens and

22   nonstructurability of debt, Your Honor.  There's been motions

23   to dismiss for failure to state a claim.  And Deutsche Bank has

24   also responded.  But at this point, GMAC Mortgage has no record

25   of being served.

1              THE COURT:  Okay.  Is Plaintiff's counsel here, then?

2              MR. WISHNEW:  No, Your Honor.

3              THE COURT:  Plaintiff's counsel on the phone?

4              Anybody appearing for Roseberry in Roseberry v. GMAC

5    Mortgage, LLC, adversary proceeding 16-01202?

6              No appearance made by the plaintiff.  Any of the other

7    defendants represented are here?

8              On the phone or in court, any of the other defendants

9    in this adversary proceeding represented in court?

10             MR. SLIPAKOFF:  Your Honor, this is Brian Slipakoff

11   from Duane Morris.  We represent Ocwen Loan Services and

12   Deutsche Bank.

13             THE COURT:  Yes.

14             MR. SLIPAKOFF:  Ms. Roseberry is pro se.

15             THE COURT:  Okay.  And you filed a motion to dismiss,

16   is that correct?

17             MR. SLIPAKOFF:  Your Honor, we filed an answer.  We

18   intend to file a motion for summary judgment --

19             THE COURT:  Okay.  All right.

20             MR. SLIPAKOFF:  -- once we get a little further down

21   the line.

22             THE COURT:  What's the gist of this complaint?

23             MR. SLIPAKOFF:  The gist, Your Honor, is Ms. Roseberry

24   asserts that -- Ocwen Loan Servicing is the servicer.  Deutsche

25   Bank is the current holder of a mortgage.  She asserts very

1   broadly that Deutsche Bank has invalid assignments and doesn't

2   actually own the debt, based on allegations -- they seem to be

3   very general, broad allegations about industry-wide practices.

4   No specific allegation about what happened in her particular

5   case.

6           THE COURT:  And did this alleged misconduct occur at a

7   time when GMAC was servicing the loan?

8           MR. SLIPAKOFF:  Yes, Your Honor; it would have started

9   when GMAC was servicing the loan, and it continued to this

10  current day.  The essence of the complaint is a violation of

11  the Fair Debt Collection Practices Act, allegedly based upon

12  GMAC and Deutsche Bank, and Ocwen on behalf of Deutsche Bank's

13  attempts to collect the obligation.

14          THE COURT:  Okay.

15          MR. SLIPAKOFF:  The assertion is that because the

16  assignments are invalid, therefore there's no right to attempt

17  to collect the obligation.

18          THE COURT:  So, Mr. Wishnew, if you -- what is it that

19  you're offering to do, since you say you haven't -- your client

20  hasn't been served?

21          MR. WISHNEW:  Yeah, I guess, Your Honor, at this point

22  I leave it up to the Court, from a scheduling standpoint,

23  whether you want to carry the motions to the next omnibus

24  hearing.  And then if we are served, we may choose to join in

25  the motion to dismiss.  But we're simply trying to accommodate

1  the Court's calendar and move the matter forward to the best of

2  our ability.

3           THE COURT:  Yes, I understand.  So, I didn't -- let me

4  see.

5           MR. WISHNEW:  I don't know -- it wasn't -- it would

6  not have been in the materials that our office provided --

7           THE COURT:  Yeah --

8           MR. WISHNEW:  -- to Your Honor, since this was --

9           THE COURT:  So I don't know what pleadings have been

10 filed --

11          MR. WISHNEW:  Right.

12          THE COURT:  -- in the case.

13          MR. WISHNEW:  Right.

14          THE COURT:  So I'm told there's an answer but not a

15 motion to dismiss.

16          MR. WISHNEW:  Well --

17          THE COURT:  Mr. Rosenbaum, is there a motion to

18 dismiss?

19          MR. ROSENBAUM:  Sorry; do you mind, Your Honor?

20          THE COURT:  No.  Please.

21          MR. ROSENBAUM:  Apologies.

22          THE COURT:  That's okay.

23          MR. ROSENBAUM:  Your Honor, the plaintiff named also

24 the law firm, Aldridge Pite.

25          THE COURT:  Yes.

1              MR. ROSENBAUM:  Aldridge Pite filed a motion to

2     dismiss.

3              THE COURT:  Okay.  All right.  Yes, I see that.

4              MR. ROSENBAUM:  I think what we propose to do, Your

5     Honor, irrespective -- and as Mr. Wishnew indicated,

6     irrespective of whether -- and to the best of our knowledge, we

7     weren't sure -- really to move this along and hopefully resolve

8     it, we feel it's no grounds for this lawsuit whatsoever.  We'll

9     file a motion to dismiss.

10             THE COURT:  Okay.  So, let's get all the motions to

11    dismiss on for the same day.  If there's sufficient time to

12    schedule -- to serve your motion, or joinder and a motion, and

13    to get it on for the next omnibus-hearing day or the one after

14    that -- let's try and move this forward and get the whole

15    thing --

16             MR. ROSENBAUM:  We'll do that, Your Honor.  I'll

17    communicate with counsel for Deutsche Bank as well as Aldridge

18    Pite.

19             THE COURT:  That's fine.  Let's try and deal with this

20    in one lump so we can get it --

21             MR. ROSENBAUM:  Absolutely, Your Honor.

22             THE COURT:  -- see if we can get it disposed of.

23    Thanks very much.

24             THE COURT:  Okay, Mr. Wishnew?

25             MR. ROSENBAUM:  Cede the podium back to --

1          THE COURT:  Sorry for that, but I just --

2          MR. WISHNEW:  I appreciate Mr. Rosenbaum's --

3          THE COURT:  And counsel for any of the other

4    defendants on the phone, if you wish to be excused, you may.

5    Talk with Morrison & Foerster.  We'll get it all scheduled for

6    the same date, okay?

7          MR. SLIPAKOFF:  Thank you, Your Honor.

8          THE COURT:  Okay.

9          All right, go ahead, Mr. Wishnew.

10          MR. WISHNEW:  Thank you, Your Honor.  That brings us

11    to the next matter on today's agenda:  item 3 under the heading

12    "Status Conference".  Your Honor, this concerns the claim filed

13    by Ms. Rhonda Gosselin --

14          THE COURT:  I thought it settled.

15          MR. WISHNEW:  Well, that's why we're in court here,

16    Your Honor.

17          THE COURT:  Okay.

18          MR. WISHNEW:  There was --

19          MR. HEAL:  Laird Heal for Ms. --

20          THE COURT:  Let me get the appearances.  Go ahead.  I

21    got Mr. Wishnew's.  Mr. Heal?

22          MR. HEAL:  Laird Heal for Ms. Gosselin.

23          THE COURT:  Okay.

24          MR. WISHNEW:  Your Honor, we're here on a status

25    conference because there was a bit of a hiccup as we were

1   trying to document the settlement.

2           THE COURT:  Okay.

3           MR. WISHNEW:  During negotiations over the settlement

4   terms, Mr. Heal informed us for the first time that he was

5   concerned the settlement agreement would prevent him from

6   pursuing attorney's fees after the settlement agreement is

7   executed.  We explained to him the settlement covered all

8   attorney's fees and that it was not part of the -- his

9   position -- I'll let him speak -- was that it was not part of

10  the agreements.

11          We have -- we're unclear on what basis Mr. Heal'd be

12  entitled to attorney's fees on account of the settlement; it's

13  something that, again, was contemplated to have been a part of

14  the global resolution of Ms. Gosselin's claim.  We are ready to

15  perform under the proposed terms of our settlement agreement

16  but, if Mr. Heal is not ready to proceed in that regards and

17  will not allow his client to sign the settlement that we

18  propose, then we want to put this matter back on the trial

19  calendar.

20          THE COURT:  Mr. Heal, let me hear from you.

21          MR. HEAL:  Your Honor, when we did the settlement

22  negotiation, we did not mention the attorney fees.  And it's --

23          THE COURT:  Could I just say that I find that highly

24  surprising that you would engage in settlement negotiations and

25  endeavor to reach a settlement and, only after that, tell other

1  counsel, oh, by the way, we have a separate claim for

2  attorney's fees?

3          MR. HEAL:  I understand what the -- the concern of the

4  Court.  But if you want to look at the Massachusetts law, the

5  first case I looked at, yes, exactly.  No, if you have a

6  settlement --

7          THE COURT:  Oh, it might be that if you went to trial

8  and prevailed, you would have been entitled to attorney's fees.

9  But when you settle a case, you settle it.  You don't settle it

10 and then say, oh, by the way, we got a separate claim for

11 attorney's fees.  I've never heard of something like this.

12         MR. HEAL:  Exactly, Your Honor, but on the other --

13         THE COURT:  When would you like to -- when are you

14 ready to go to trial?

15         MR. HEAL:  Well --

16         THE COURT:  I don't force -- if your client's not

17 prepared to sign the settlement, there's no settlement.

18         MR. HEAL:  Yes.

19         THE COURT:  But I'm not going to put up with this

20 stuff --

21         MR. HEAL:  Okay.

22         THE COURT:  -- I'll tell you right now, Mr. Heal.

23         MR. HEAL:  Your Honor --

24         THE COURT:  I've got a trial starting Monday that's

25 lasting three weeks, so you're not going to have a trial in the

1   next three weeks.  But --

2           MR. HEAL:  Okay.

3           THE COURT:  And Ms. Gosselin's going to come to court.

4           MR. HEAL:  Okay.

5           THE COURT:  We're not --

6           MR. HEAL:  Thank you.

7           THE COURT:  This stuff stops.  We go forward with the

8   trial.  If she wants to settle, that's great.

9           MR. HEAL:  Okay.

10          THE COURT:  But otherwise, you're here, she's here --

11          MR. HEAL:  Yes.

12          THE COURT:  -- we go forward with the trial.  I will

13  get you a date as soon as I can.

14          MR. HEAL:  Okay.  And, Your Honor, it's commonplace --

15  and we have three cases from the Massachusetts bankruptcy --

16          THE COURT:  Maybe you didn't hear what I said.

17          MR. HEAL:  Yes, Your Honor.

18          THE COURT:  If you don't settle, you don't settle.

19          MR. HEAL:  Well, I'm --

20          THE COURT:  You don't settle --

21          MR. HEAL:  -- I'm --

22          THE COURT:  -- you go to trial.

23          MR. HEAL:  I'm just explaining.

24          THE COURT:  You go to trial, you do it in this

25  courtroom.  I will get you -- we were supposed to have gone to

1  trial.  I was ready to go to trial.  With a busy trial

2  calendar, I carved out the time for trial.  Then I was -- then

3  it was reported that the matter settled.  No one said anything

4  about, oh, it settled except for this issue of attorney's fees

5  that we believe we're entitled to.

6          If you're entitled to attorney's fees and you prevail,

7  you'll get attorney's fees.  If you don't prevail, you're

8  batter out.  It's really that simple.

9          MR. HEAL:  I think -- yeah, as I was explaining, I

10 was -- I have case law that supports my position.  But if the

11 Court --

12         THE COURT:  You'll raise that -- you'll raise your

13 case law at trial.

14         MR. HEAL:  And then the Court --

15         THE COURT:  You'll actually raise it in a pre-trial

16 brief that you'll file.

17         MR. HEAL:  Yes.

18         THE COURT:  I will get you a trial date.  I have trial

19 starting Monday; it's at least three weeks.  So, I can't give

20 you a trial date now.  But I'll give you a trial date and I

21 will expect both sides to be ready and appear in the courtroom.

22 Your client will be here.  We're not doing telephone trials;

23 we're doing a trial in this courtroom.  And if you want to

24 brief -- when can you file a brief on the issue of attorney's

25 fees?

RESIDENTIAL CAPITAL, LLC, et al.                    17

1          MR. HEAL:  Certainly within a week.

2          THE COURT:  Okay.  A week from today.

3          And, Mr. Wishnew, I'll give you a week to reply to

4    that -- respond to that brief.

5          I want to see that law.  And we'll go to trial.  It's

6    as simple as that, Mr. Heal.

7          MR. HEAL:  Right.  Okay.

8          THE COURT:  I'm not -- that's not intended as a threat

9    or anything.  If you settle, fine.  If you don't settle, you

10   don't settle.  You don't settle, there were disputed issues of

11   fact, the case was ready for trial, it was on the trial

12   calendar.  You came just shortly before the trial date and said

13   that it settled, and I was quite pleased with that.  I was

14   happy that your client was -- that a settlement had been

15   reached.  But no settlement, we go to trial; simple as that.

16         So, you better -- it won't be in the next three weeks

17   but it may be the week or two after that.  I'll give you at

18   least two weeks' notice of a trial date.

19         MR. HEAL:  Yes.  So, as I said, that -- essentially

20   retired and so my calendar is open.

21         THE COURT:  Okay.

22         Please advise me, counsel, both of you, if you're able

23   to reach a final settlement of the matter.  From the Trust's

24   standpoint, I don't -- I don't want to know today what the

25   amount of the dispute remains.  It's going to cost the Trust

RESIDENTIAL CAPITAL, LLC, et al.                    18

1    money to try this case.  Take your best shot at seeing whether

2    you can get everything resolved.  I'm not asking you to change

3    your position, but I just -- it's going to cost both sides

4    money to go to trial in the case.  And based on my prior

5    ruling, there clearly was an issue for trial.

6              So, I'll let you know, Mr. Heal, when the trial date

7    is.

8              MR. HEAL:  Well, thank you, Your Honor.

9              THE COURT:  Okay.

10             What's the next matter, Mr. Wishnew?

11             MR. WISHNEW:  Thank you, Your Honor.  Your Honor, item

12   4 on page 3, under the heading "Uncontested Matters with

13   Certificates of No Objection", Your Honor, this is the Trust's

14   objection to claim 2892 filed by Gerard Wiener for himself and

15   as representative for the Estate of Roland Wiener.  Objection

16   was filed.  No response was received.  I believe we filed a

17   certificate of no objection.  Happy to walk through the

18   arguments, Your Honor, or else we would ask that -- for the

19   reasons set forth in the objection and supporting declarations,

20   that the matter be granted.

21             THE COURT:  Okay, the objection to claim number 2892

22   filed by Gerard Wiener for himself and as representative of the

23   Estate of Roland Wiener -- the objection to the claim was filed

24   as ECF docket number 10092 and it's claim number 2892.  In the

25   objection, the Trust filed the declaration of Sarah Lathrop,

RESIDENTIAL CAPITAL, LLC, et al.                    19

1   which is at ECF 10092-3.  No pleadings have been filed in

2   response to the objection.  On October 6, 2016, the Trust filed

3   a certificate objection, which is -- a certificate of no

4   objection; it's at ECF 10170.

5          The Court has reviewed the objection, and my general

6   view when there're uncontested motions and a CNO filed is to

7   review the moving papers to determine whether it has

8   established a prima facie basis for the relief the Trust is

9   seeking, here the expungement of the claim.

10         This claim asserted claims under MCL Section 600.3205,

11  allegations of irregularities in the foreclosure sale, breach-

12  of-contract claim, negligence, conversion, slander of title,

13  and declaratory and injunctive relief.  The Court has reviewed

14  the moving papers; again, no response was filed.  The moving

15  papers establish a prima facie basis for the -- factual and

16  legal, for the relief that's being sought.  The objection is

17  sustained and the claim is expunged.

18         MR. WISHNEW:  Thank you very much, Your Honor.

19         Your Honor, that brings us to item number 5 on page 3

20  of today's agenda, and I will cede the podium to my colleague,

21  Mr. Rosenbaum.

22         THE COURT:  Okay.

23         MR. ROSENBAUM:  Your Honor, Norm Rosenbaum, Morrison &

24  Foerster, for the ResCap Borrower Claims Trust.

25         THE COURT:  All right, let me see.

RESIDENTIAL CAPITAL, LLC, et al.                    20

1          Mr. Rode, are you on the phone?

2          MS. NORA:  Oh.  This is Attorney Wendy Alison Nora,

3    and I know he was on the phone when we checked in with your

4    clerk, Your Honor.

5          THE COURT:  Okay.  I see it checked on the list.

6          THE COURTCALL OPERATOR:  And this is the operator.

7          THE COURT:  Yes.

8          THE COURTCALL OPERATOR:  He is not currently

9    connected, but I do see another line dialing in; so he may be

10   back with us in just a moment.

11         THE COURT:  Okay.  Thanks very much.

12         THE COURTCALL OPERATOR:  Um-hum.

13         THE COURT:  All right.  Mr. Rosenbaum, go ahead.

14         MR. ROSENBAUM:  Your Honor, this was a joint motion

15   filed by counsel for Mr. Rode and the Trust, to vacate this

16   Court's opinion entered in the Rode matter; it was entered on

17   September 2nd, 2015, docket number 9094.  As Your Honor may

18   recall, we were -- we had completed discovery with Mr. Rode and

19   we were on the road to trial.  I don't believe a trial had been

20   scheduled, but we had basically completed discovery, and then

21   we were able to reach a settlement with Mr. Rode, who's

22   represented by Ms. Nora.  We documented and completed that

23   settlement and consummated that settlement.

24         As part of that settlement, the parties agreed -- I

25   will add, Your Honor, that the settlement stipulation itself is

1  confidential.  The provision I'm about to describe to you as to

2  why we're here this afternoon is not confidential.  If Ms. Nora

3  agrees -- disagrees, I'd appreciate it if she let me know

4  now -- let the Court know now, before I continue.

5          THE COURT:  Do you disagree, Ms. Nora?

6          MS. NORA:  There are circumstances under which the

7  confidentiality of the agreement would be nullified and among

8  them is if we have to litigate matters that we are seeking to

9  have the Court vacated.  That will result, according to the

10 terms of the settlement agreement, of the settlement agreement

11 becoming public, except for the amount of the settlement.

12         THE COURT:  Mr. Rosenbaum, is vacating my prior

13 decision a condition to the effectiveness of the settlement?

14         MR. ROSENBAUM:  No, it's not, Your Honor.  The

15 condition was that the parties file this --

16         THE COURT:  Seek --

17         MR. ROSENBAUM:  -- joint --

18         THE COURT:  Okay.

19         MR. ROSENBAUM:  -- joint motion seeking this request.

20         THE COURT:  Okay.

21         MR. ROSENBAUM:  And that we're able to disclose under

22 the terms of the settlement.

23         THE COURT:  Okay.  All right.  Go ahead.

24         I'll tell both sides, and I'll hear from both of you,

25 I know of no legal basis for you to seek to have the opinion of

1    this Court vacated.   The opinion was handed down a very long

2    time ago; it was -- I think it sustained in part and overruled

3    in part the Trust's objection to the Rode claim.   There was

4    then discovery.   And I guess initially Mr. Rode was pro se and

5    then Ms. Nora appeared for him.

6              What's the legal basis for seeking to have me vacate

7    my opinion?

8              MS. NORA:   It is no longer that the -- just and

9    appropriate that the Court's prior order continue to be in full

10   force and effect.   It's an equitable argument under the Federal

11   Rules of Civil Procedure 60(b) -- I believe it's (5); I think

12   we used both (5) and (6), Your Honor -- because we settled and

13   we gave up our right to appeal, and there has been discovery of

14   new evidence that we tried to bring in and weren't allowed to

15   amend.   And the real problem with this is that, for purposes of

16   defending Mr. Rode's homestead, we don't want to have to argue

17   with the successors-in-interest, as to any claim or issue

18   preclusion, also known as res judicata and collateral estoppel,

19   arising from the Court's prior order, because it was an

20   interlocutory order and was not final.   And it would be a

21   burden to Mr. Rode to have to engage in litigation where the

22   new parties involved in the transaction might seek to rely on

23   the Court's interlocutory order.

24             THE COURT:   Anything you want to add, Mr. Rosenbaum?

25             MR. ROSENBAUM:   I don't, Your Honor.   As we said in

RESIDENTIAL CAPITAL, LLC, et al.                    23

1    the joint motion, we're relying on Rule 60(b)(4) and (5).  And

2    I would agree that the order --

3            THE COURT:  Well, (4) is the judgment is void.  The

4    judgment is clearly not void.  (5) is the judgment has been

5    satisfied, released or discharged; it is based on an earlier

6    judgment that has been reversed or vacated or applying it

7    prospectively as no longer equitable.  The judgment --

8            MS. NORA:  That's our ground --

9            THE COURT:  -- hasn't been satisfied, released or

10   discharged; it hasn't been reversed or vacated.  I suppose your

11   argument is applying it prospectively is no longer equitable?

12           MR. ROSENBAUM:  That's correct, Your Honor.

13           MS. NORA:  That is -- yes, Your Honor.  We ask the

14   Court to use its equitable powers to relieve us from

15   interlocutory judgment that could create problems with the

16   defense of Mr. Rode's homestead, because we settled this matter

17   for very good reasons that the parties participating in the

18   settlement felt were in the best interests of both Mr. Rode and

19   the Trust; was also in the interest of judicial economy.  But

20   to have an interlocutory order be how to -- possibly being res

21   judicata or collateral estoppel, is a burden to Mr. Rode and

22   will result in the terms of the settlement becoming public,

23   except for the amount.

24           THE COURT:  Mr. Rosenbaum, I don't remember now, was

25   the Rode opinion a published opinion?

1           MR. ROSENBAUM:  It --

2           THE COURT:  Is there a B.R. cite for it?

3           MR. ROSENBAUM:  No, there isn't, Your Honor.  Let

4   me -- I can turn to it now.  If you'd bear with me for a

5   second.  I don't believe it was submitted for publication, Your

6   Honor.

7           THE COURT:  Well, it's still on Westlaw, even if it

8   wasn't designated for publica -- I don't remember.  I just

9   didn't -- I mean, I didn't go back to look.  It usually says

10  right on the first page whether it's for publication or not.

11          MR. ROSENBAUM:  It's at docket number 9094 and it's

12  not for publication.

13          THE COURT:  Okay.  The issue -- my concern is that in

14  the course of the ResCap case, I have had to resolve questions

15  of law under twenty-six different states' law, Texas being a

16  repeat state, meaning by "a repeat state" that there have been

17  multiple claims asserted that have hinged on -- that were

18  determined under Texas state law.

19          I have often -- when a new one comes up, I frequently

20  cite to a prior opinion of mine that resolves questions of

21  state law.  And so my reluctance -- it certainly is nothing

22  personal to Mr. Rode or Ms. Nora, but the issue becomes whether

23  I rely on my own prior decisions in reaching questions of, in

24  this case, Texas law.  That's my reluctance in doing so.

25          What's the date of the opinion?

1          MS. NORA:  September 2nd of 2015, Your Honor.

2          MR. ROSENBAUM:  That's correct, Your Honor.

3          THE COURT:  Um-hum.

4          MS. NORA:  And I would like to draw the Court's

5    attention to subsection (6) of Rule 60(b), which is any other

6    reason that justifies relief.  And --

7          THE COURT:  Yes, and I've given you the reason that

8    doesn't justify relief:  that I have multiple issues arise

9    under state law in ResCap.  I don't know how many of the

10   remaining unresolved claims arise under Texas law, but I

11   tend -- how many pages was the first decision, Mr. Rosenbaum?

12         MS. NORA:  It was substantial.  It was over twenty

13   pages, Your Honor.

14         THE COURT:  Right.

15         MS. NORA:  I'm pulling it up right now.

16         THE COURT:  Right.  Mr. Rosenbaum has it in front of

17   him.

18         MR. ROSENBAUM:  Thank you, Your Honor.  It is a forty-

19   page opinion, Your Honor.

20         THE COURT:  Right.  The request for relief is denied.

21   It may not have any -- I'm not -- in denying the request, I

22   want to make it crystal clear that I am not addressing the

23   issue of what, if any, preclusive effect that decision may have

24   on any other matter that's pending.  It certainly is not my

25   intention to limit or restrict Mr. Rode's rights against any

RESIDENTIAL CAPITAL, LLC, et al.                    26

1    other parties, but -- and if this -- when I say if it were a

2    one-off matter, the issues of Texas law that I had to address

3    in reaching that first opinion were unlikely ever to occur

4    again before me.  I would probably have much less -- I wouldn't

5    have the same level of opposition to vacating it.

6            While it says, "Not for publication", you can go to

7    Westlaw; you'll find it.  It's there.  So, the motion to vacate

8    the opinion is denied.

9            MR. ROSENBAUM:  Thank you, Your Honor.  Your Honor,

10   the next --

11           MS. NORA:  Thank you, Your Honor.

12           MR. ROSENBAUM:  -- the next matter on the agenda is

13   the first contested matter.

14           THE COURT:  Okay.

15           MR. ROSENBAUM:  It's the ResCap Borrower Claims

16   Trust's objection to claim number 684 filed by Bernard Ward and

17   Colleen Halloran.

18           THE COURT:  Okay, is --

19           MR. ROSENBAUM:  And --

20           THE COURT:  -- the --

21           MR. ROSENBAUM:  -- I'll cede the podium to

22   Mr. Wishnew.

23           THE COURT:  Okay.  Is Ward -- Halloran's counsel on

24   the phone?

25           MS. STROMEYER:  Yes.  Good morning, Your Honor.  Karen

RESIDENTIAL CAPITAL, LLC, et al.                                    27

1   Stromeyer for Bernard Ward and Colleen Halloran.

2           THE COURT:  I'm sorry; just tell me your last name

3   again.

4           MS. STROMEYER:  My last name, Your Honor?

5           THE COURT:  Yes.

6           MS. STROMEYER:  Stromeyer, S-T-R-O --

7           THE COURT:  Okay.

8           MR. HUBER:  And good afternoon, Your Honor.  This is

9   also Gregory Huber, attorney for Defendant GMAC Mortgage in the

10  state-court action.  I submitted a declaration in support of

11  the objection and I'm here to answer any questions Your Honor

12  may have about that.

13          THE COURT:  Okay.

14          Mr. Wishnew, go ahead.

15          MR. WISHNEW:  Good afternoon, Your Honor.  Jordan

16  Wishnew, Morrison & Foerster, for the ResCap Borrower Claims

17  Trust.

18          Your Honor, as Mr. Rosenbaum noted, this is item 6 on

19  today's agenda.  The objection filed by the Borrower Claims

20  Trust was filed at docket number 9980.  Claimants filed a

21  response at docket number 10132 and a reply was filed in

22  further support of the objection.

23          Your Honor, through the objection and after thoroughly

24  examining the debtors' books and records, the Borrower Trust

25  seeks to expunge the claimant's proof of --

1          THE COURT:  The debtors -- when you examined the

2    debtors' books and records, I take it you found that GMAC made

3    a giant mistake in foreclosing on the Ward-Halloran loan after

4    it had approved a loan modification.  Was that reflected in the

5    books and records?

6          MR. WISHNEW:  It was, Your Honor.

7          THE COURT:  And so why wasn't it a -- either a

8    negligent misrepresentation or just pure negligence when GMAC

9    erroneously -- you've acknowledged, erroneously foreclosed on

10   the property shortly after agreeing to a loan modification?

11         MR. WISHNEW:  The reason why, Your Honor, is that

12   under applicable case law in California, we don't believe that

13   there was an approp -- there's an underlying duty of care owing

14   from GMAC Mortgage --

15         THE COURT:  For negligent misrepresentation?  GMAC --

16   you're not disputing that GMAC represented to, I guess,

17   Mr. Halloran, who was the attorney, that -- who was not one of

18   the borrowers, represented that the Ward-Halloran loan-

19   modification request had been approved?

20         MR. WISHNEW:  I'm not disputing that, Your Honor.

21         THE COURT:  Okay.

22         MR. WISHNEW:  In paragraph 22 --

23         THE COURT:  So, didn't -- even if there hadn't been a

24   duty before that --

25         MR. WISHNEW:  Sure.

RESIDENTIAL CAPITAL, LLC, et al.                                29

1          THE COURT:  -- you can't avoid liability for negligent

2    misrepresentation by arguing we didn't have a duty to say to

3    them what we did.  Do you agree with that?  I mean, you aren't

4    a stranger to this.  GMAC was the servicer.

5          MR. WISHNEW:  Correct, Your Honor.

6          THE COURT:  They applied for modification.

7          MR. WISHNEW:  Correct.

8          THE COURT:  GMAC approved it --

9          MR. WISHNEW:  Correct, Your Honor.

10          THE COURT:  -- and then screwed up, is the best way to

11    say it --

12          MR. WISHNEW:  There --

13          THE COURT:  -- and went ahead and foreclosed.

14          MR. WISHNEW:  There was an internal accounting error a

15    few days after advising the Hallorans of the modification.

16          THE COURT:  Okay.

17          MR. WISHNEW:  That preceded -- or that led to a

18    foreclosure, which was subsequently rescinded --

19          THE COURT:  Yes.

20          MR. WISHNEW:  -- within days.

21          THE COURT:  It was -- do I understand correctly that

22    the foreclosure was rescinded after the borrowers brought an

23    action in state court against GMAC and others?  They did

24    bring --

25          MR. WISHNEW:  Yes, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                    30

1          THE COURT:  -- an action?

2          MR. WISHNEW:  Yes.

3          THE COURT:  And --

4          MR. WISHNEW:  They filed the complaint June 8th, and

5     the rescission followed June 8th.

6          THE COURT:  Okay.  And, so, let me ask you this:  if

7     they incurred attorney's fees --

8          MR. WISHNEW:  Um-hum.

9          THE COURT:  -- in bringing an action to cause GMAC to

10    fix its mistake --

11         MR. WISHNEW:  Sure.

12         THE COURT:  -- wouldn't those attorney's fees be --

13    couldn't those attorney's fees be recoverable damages for the

14    negligent misrepresentation --

15         MR. WISHNEW:  To --

16         THE COURT:  -- assuming it was negligent

17    misrepresentation?

18         MR. WISHNEW:  To the extent they incurred attorneys'

19    fees between the filing of the complaint and the rescission,

20    which is a matter of weeks, possibly, Your Honor.

21         THE COURT:  Okay.

22         MR. WISHNEW:  But what they're seeking --

23         THE COURT:  So that's a disputed issue of fact --

24         MR. WISHNEW:  Disputed issue of fact.

25         THE COURT:  -- of what their damages might be?

1              MR. WISHNEW:  Correct, Your Honor.

2              THE COURT:  Okay.  And with respect to negligent

3      misrepresentation, I think your duty argument is you

4      acknowledge that GMAC made a representation --

5              MR. WISHNEW:  Correct.

6              THE COURT:  -- to the borrowers or their

7      representative -- legal representative that the loan

8      modification had been approved?

9              MR. WISHNEW:  Yes, Your Honor.  There was a letter

10     sent by the customer care division --

11             THE COURT:  When was that?

12             MR. WISHNEW:  -- in April 28th, which --

13             THE COURT:  Well, I think on April 22nd, Lawyer

14     Halloran sent a letter to GMAC --

15             MR. WISHNEW:  Correct, Your Honor.

16             THE COURT:  -- setting out -- confirming GMAC's

17     agreement to a loan modification, and the letter on the 28th --

18             MR. WISHNEW:  The 28th responded.

19             THE COURT:  -- was a response to Mr. Halloran's

20     letter.

21             MR. WISHNEW:  That's correct, Your Honor, yes.

22             THE COURT:  And so Halloran's letter confirmed the

23     oral representation that had been made to him that GMAC had

24     approved the loan modification.

25             MR. WISHNEW:  That's correct, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                          32

1        THE COURT:  I take it you would agree that having

2   represented that their loan modification was approved, it's at

3   least an implied representation; you're not going to foreclose.

4   Would you agree with that?

5        MR. WISHNEW:  Yes, Your Honor.

6        THE COURT:  Okay.

7        MR. WISHNEW:  And I'll -- to fall further on the

8   sword --

9        THE COURT:  Yeah, I think you should.

10       MR. WISHNEW:  -- we acknowledged in paragraph 22 of

11   our objection --

12       THE COURT:  You do.  You were straightforward.

13       MR. WISHNEW:  -- that there was an internal accounting

14   error.

15       THE COURT:  Yeah.  Well --

16       MR. WISHNEW:  So --

17       THE COURT:  -- that's what you described it as.

18       MR. WISHNEW:  So I mean, I think what it comes down

19   to, Your Honor, is yes, mistakes were made, but there are a

20   litany of causes of action here that are just completely

21   inapplicable.

22       THE COURT:  There are.  There are, but would you agree

23   that they properly stated a claim for negligent

24   misrepresentation -- damages are an issue, I agree -- but that

25   they properly stated a claim for negligent misrepresentation?

1          MR. WISHNEW:  I think I'd have a hard time arguing to

2     the contrary, Your Honor.

3          THE COURT:  So with the pure -- they have a pure

4     negligence claim.

5          MR. WISHNEW:  Sure.

6          THE COURT:  And I understand you argue -- you set out

7     California law with respect to it, and I understand there's a

8     split.  The thing -- so whether a lender or a loan servicer --

9     I think where the issue under California law is does the lender

10    or loan servicer have a duty enforceable in negligence to

11    negotiate a loan modification?  There you'd be on fairly solid

12    ground.

13         MR. WISHNEW:  Right, Your Honor.

14         THE COURT:  But that doesn't address whether you have

15    a duty and negligence once you've agreed to a loan

16    modification.

17         MR. WISHNEW:  Right.

18         THE COURT:  Okay.  I'm not sure it would make a

19    difference anyway.  If the negligent misrepresentation claim

20    survives, I don't think there's a difference with the

21    negligence claim surviving.  They only get to prove up damages

22    once.

23         MR. WISHNEW:  Right.  But then there's fraud, there's

24    intentional misrepresentation, there's wrongful foreclosure --

25         THE COURT:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    34

1              MR. WISHNEW:  -- breach of contract, all --

2              THE COURT:  So you -- you've acknowledged that it was

3    wrongful foreclosure.  Your argument is --

4              MR. WISHNEW:  But it was rescinded, Your Honor.

5              THE COURT:  Yes, but that doesn't mean that the

6    initial act of foreclosure wasn't wrongful --

7              MR. WISHNEW:  But that --

8              THE COURT:  -- just that they recognize the error of

9    their ways and rescinded the foreclosure, and corrected his

10   credit report so it wouldn't adversely reflect the foreclosure.

11             MR. WISHNEW:  Correct, so there would really be no

12   damages, Your Honor.

13             THE COURT:  Well, I don't know whether there would be

14   damages.

15             MR. WISHNEW:  Well, they'd potentially only be

16   duplicative of the negligence.

17             THE COURT:  The same issue -- stop.  Wouldn't -- if

18   they incurred legal fees --

19             MR. WISHNEW:  Sure.

20             THE COURT:  -- to bring the action --

21             MR. WISHNEW:  Sure.

22             THE COURT:  -- why wouldn't -- and if they were able

23   to prove it that they had incurred legal fees for it -- why

24   wouldn't that be compensable damages for the wrongful

25   foreclosure?  Maybe you stopped the running of damages when

RESIDENTIAL CAPITAL, LLC, et al.                    35

1    GMAC rescinded the foreclosure.

2              MR. WISHNEW:  Um-hum.

3              THE COURT:  But would that mean that -- I can

4    understand some issues may become moot where the foreclosure is

5    rescinded.

6              MR. WISHNEW:  Right.

7              THE COURT:  But if they had incurred damages between

8    the foreclosure and when it's rescinded, why wouldn't that be

9    compensable -- at least for purposes of a -- this is,

10   essentially, a motion to dismiss.

11             MR. WISHNEW:  Right, Your Honor.

12             THE COURT:  Okay.  Why wouldn't they be on solid

13   ground arguing that they suffered compensable damages in

14   connection with wrongful foreclo -- you acknowledge the

15   foreclosure was wrongful.

16             MR. WISHNEW:  I acknowledge the foreclosure should not

17   have gone forward because it was derivative of an accounting

18   error that GMAC --

19             THE COURT:  I can't wait to hear the proof about that.

20             Where I think you are possibly on stronger grounds --

21   and I do want to hear you -- is first, on the breach of

22   contract claim.  Do you want to address that?

23             MR. WISHNEW:  Oh, sure, Your Honor.

24             It's our position that there was no written contract

25   here.  There was -- as we've gone through the chronology and

1    oral representation, there was a letter confirming the terms

2    that that the Hallorans believed them to be.

3            There was a conflicting letter a few days later

4    concerning the terms.

5            THE COURT:  Why was it conflicting?

6            MR. WISHNEW:  There was a difference of opinion, Your

7    Honor, between material terms and to speak --

8            THE COURT:  Well, no, I didn't think so.  I looked at

9    both letters this morning.  So when Halloran sent the letter to

10   GMAC, it set out various terms.

11           MR. WISHNEW:  Correct, Your Honor.

12           THE COURT:  The letter that GMAC sent back didn't

13   dispute any of the terms in Halloran's letter; it simply

14   recounted a few of the terms.  The interest rate, Halloran had

15   arguably rounded the interest rate to 2.88 percent, and it was

16   actually 2. --

17           MR. WISHNEW:  875.

18           THE COURT:  -- 875.

19           MR. WISHNEW:  Right, Your Honor.

20           THE COURT:  But is there anything in the letter that

21   GMAC sent that conflicted with any of the terms -- other than

22   giving the borrowers a slight benefit in the interest rate, was

23   there anything that conflicted?

24           MR. WISHNEW:  Other than the interest rate, there

25   wasn't a conflict, but it's more about the absence of material

1    terms concerning a loan agreement between two parties.

2            The two letters do not provide for the modified

3    principal balance to the loan.  They don't speak to the

4    maturity date.  They don't speak to when the payments are due.

5    They don't speak to the party's respective obligations.

6            THE COURT:  So it was a loan modification and not an

7    entirely new loan.  To what extent would the absence of the

8    terms that you're describing simply mean that the terms in the

9    original loan as to when payments are due remain in effect?

10           MR. WISHNEW:  Well, again, Your Honor, it's about

11   manifesting, essentially, or going forward with an unambiguous

12   contract.

13           THE COURT:  Okay.

14           MR. WISHNEW:  And for there to be an enforceable

15   contract relating to a loan on real property, it should speak

16   to these material terms.  And the fact of the matter is, there

17   was an expression in the letter that the full modification

18   agreement would follow and that these letters were simply a

19   manifestation of a willingness to enter into a future bargain.

20           So the fact of the matter is, it was clear to both

21   parties that this was simply just saying you've been approved;

22   here's the modified interest rates; and a formal agreement,

23   which is required under law, would follow.

24           THE COURT:  Well, that doesn't -- a formal agreement

25   isn't required under the law; an agreement signed by the

RESIDENTIAL CAPITAL, LLC, et al.                                         38

1   parties -- your argument is the statute of frauds applies

2   because it applied to the original loan, and the case law would

3   say it would apply to a modified loan.

4               MR. WISHNEW:  That's correct, Your Honor.

5               THE COURT:  Okay.  And one aspect of it that I was --

6   that I do question is when -- and I know there's an issue

7   whether the first modification agreement was ever received by

8   the borrowers.

9               MR. WISHNEW:  Um-hum.

10              THE COURT:  They say it wasn't.  And wouldn't the loan

11  servicing notes show that it was mailed?

12              MR. WISHNEW:  Yes, Your Honor.  One moment.

13              THE COURT:  I know there's a dispute about it.

14              MR. WISHNEW:  Sure, Your Honor.

15              THE COURT:  Your papers show that it was mailed, and

16  they say they didn't receive it.

17              MR. WISHNEW:  Yes, we -- our servicing notes show that

18  it was mailed and there was an exhibit attached to, I think,

19  one of our original declarations with a copy of that letter.

20              THE COURT:  Okay.  So one aspect of it that's not

21  addressed in either letter is the modification provided for a

22  StepUP loan.

23              MR. WISHNEW:  Um-hum.

24              THE COURT:  So the interest rate was going to increase

25  in the future, correct?

1          MR. WISHNEW:  Right.

2          THE COURT:  Okay.  And that wasn't reflected in the

3    correspondence.

4          MR. WISHNEW:  Um-hum.

5          THE COURT:  And I'll ask the borrowers' counsel, when

6    she gets to argue, but it looked to me that they don't dispute

7    that this was going to be a StepUP loan, at least I didn't see

8    anything where they disputed that it was a StepUP loan.

9          MR. WISHNEW:  I believe that's right, Your Honor.

10          THE COURT:  And those terms are not set forth in the

11   letters.

12          MR. WISHNEW:  Right.

13          THE COURT:  And I don't know what California law is.

14   New York certainly will enforce preliminary agreements under

15   certain circumstance.  I don't know whether California does or

16   not, but I think the material terms have to be set out.  And

17   your position is there's nothing in writing signed by either --

18   well, signed by either party, I guess, with all of the material

19   terms of the proposed modification, right?

20          MR. WISHNEW:  Right, Your Honor.

21          THE COURT:  Okay.  But in the absence of a contract,

22   tort claims may be actionable; do you agree with that?

23          MR. WISHNEW:  Tort claims might be actionable, Your

24   Honor, yes.

25          THE COURT:  And they've asserted tort claims?

1          MR. WISHNEW:  They've asserted tort claims.

2          THE COURT:  Asserted a variety of tort claims.

3          MR. WISHNEW:  Both negligence and intentional.

4          THE COURT:  Right.

5          MR. WISHNEW:  And I think by -- there's a complete

6   absence of proof from their side to suggest that there is any

7   intent by GMAC Mortgage to deceive the Hallorans.

8          It was -- again, it's disputed issue of fact, Your

9   Honor, but this was nothing more than a simple mistake

10  mainly --

11         THE COURT:  Well, that's your position.

12         MR. WISHNEW:  That is my position, Your Honor.

13         THE COURT:  That's your position.

14         MR. WISHNEW:  But I think that the suggested

15  inferences being made by claimant don't rise to the

16  necessity --

17         THE COURT:  Let me ask you this:  do the loan

18  servicing notes reflect an entry for telephone conversation

19  advising the borrowers' representative that a loan modification

20  had been approved?

21         MR. WISHNEW:  One moment, Your Honor.

22         THE COURT:  Could you stop typing in the background on

23  the phone or put your phone on mute?

24         MR. WISHNEW:  I think Ms. Lathrop is on the phone.

25         THE COURT:  Ms. Lathrop, can you address that issue

1   for me?  Was there an entry in the loan servicing notes

2   reflecting that GMAC advised the borrowers' representative that

3   a loan modification had been approved?

4          MR. WISHNEW:  Your Honor, if she's not on the phone, I

5   believe, what is represented on page 67 of 126 --

6          THE COURT:  Yes.

7          MR. WISHNEW:  -- in Exhibit E to Ms. Lathrop's initial

8   declaration at docket number 9980, is an entry, April 22nd,

9   where it says, Timothy -- and this is roughly ten lines down

10   from the top -- Timothy --

11          THE COURT:  Right, wait just a second.

12          Whoever's on the phone, put your phone on mute or

13   you're going to get cut off.  I'm picking up both typing and

14   heavy breathing into the phone.

15          Go ahead, Mr. Wishnew.

16          MR. WISHNEW:  Sure, Your Honor.  It says, "Timothy J.

17   Halloran, CL," which I'm assuming means call, "advance in

18   foreclosure, advance mod, new terms, advised ADV, needs to

19   notarize, allow time to receive it, agreed."

20          THE COURT:  Okay.

21          MR. WISHNEW:  So --

22          THE COURT:  So that's before the foreclosure.

23          MR. WISHNEW:  That is before the foreclosure, Your

24   Honor.

25          THE COURT:  And whoever authorized the foreclosure

1    would have had access to the loan servicing system -- the loan

2    servicing notes?

3              MR. WISHNEW:  I can't say that standing here.  I don't

4    know that for certain, Your Honor.

5              THE COURT:  Isn't that a reasonable inference that

6    someone authorizing GMAC to foreclose on property would have

7    access to the loan servicing notes to see whether there were

8    any entries that were relevant to it?  I mean, the elements of

9    fraud in California are:

10             The defendant made a false representation as to a past

11   or existing material fact.  So GMAC, the arguable false

12   representation is, we approved a loan modification, which seems

13   to me, the implicit in that is we're not going to foreclo --

14   we're not proceeding with foreclosure.

15             The defendant knew the representation was false at the

16   time it was made.  Well, they did know it was false at the time

17   it was made.  Well, they did -- at the time they foreclosed,

18   they certainly knew, or should have known, that -- just look at

19   the loan servicing notes and see the entry.  The question is,

20   in making the representation, the defendant intended to deceive

21   the plaintiff.  And I don't have proof of that at this point.

22   The question is whether reasonable inferences can be drawn

23   sufficient to survive, essentially, a motion to dismiss.

24             And the last element -- the last two elements -- the

25   plaintiff justifiably relied on the representation and the

RESIDENTIAL CAPITAL, LLC, et al.                    43

1   plaintiff suffered resulting damages.  All of those five

2   elements are from West v. JPMorgan Chase Bank N.A., 154

3   Cal.Rptr.3d 285 (Cal. Ct. App. 2013).  That's where I'm

4   deriving that from.

5            I think that the claimants are going to have a hard

6   time proving fraud.  I don't know if they'd need to, because

7   negligent misrepresentation -- (1) the misrepresentation of

8   past or existing material fact, (2) without reasonable grounds

9   for believing it to be true, (4) (sic) with intent to induce

10  another's reliance on the fact misrepresented, (4) ignorance of

11  the truth and justifiable reliance thereon by a party to whom

12  the misrepresentation was directed, and (5) damages.  That's

13  from Fox v. Pollack, 226 Cal. Rptr. 532 (Ct. App. 1986).  And I

14  don't think -- I mean, I think there's lots of cases that deal

15  with those elements.

16           The undisputed facts really do show that -- because

17  you don't dispute it -- that they were told they were approved

18  for a modification, and then what you ascribe as an error,

19  likely to be of some sort of an error, but one that should have

20  been apparent to someone before they foreclosed on somebody's

21  home.  So I think, whether they've satisfactorily pled fraud, I

22  don't know.  I'm not deciding it now.

23           MR. WISHNEW:  Sure.

24           THE COURT:  Negligent misrepresentation, negligence, I

25  think they have.

1         The California Unfair Business and Professions Code,

2    Section 17200, I do want you to address that.  And I guess one

3    point you make is the only relief available under 17200 is an

4    injunction or restitution.

5         MR. WISHNEW:  Correct, Your Honor.

6         THE COURT:  And they're seeking damages.

7         MR. WISHNEW:  Correct, Your Honor.

8         THE COURT:  Okay, I think I understand your argument

9    there.

10        Let me hear from the borrower's counsel.

11        MS. STROMEYER:  Good morning, Your Honor.  Or I'm

12   sorry; I guess good afternoon for you.  All right, would you

13   like me to --

14        THE COURT:  Just identify yourself again.

15        MS. STROMEYER:  So my name is Karen Stromeyer.

16        THE COURT:  Okay.

17        MS. STROMEYER:  Would you like me to address just the

18   17200 claim?

19        THE COURT:  No, I would like you -- I'd like you to

20   address the fraud claim, because there we do require that fraud

21   be pled with particularity and I -- put it this way:  you don't

22   need to address the negligent misrepresentation claim or the

23   negligence claim.  But you do need to address the fraud claim

24   and the B&P 17200 claim.

25        MS. STROMEYER:  All right.  I would agree with Your

RESIDENTIAL CAPITAL, LLC, et al.                    45

1   Honor that it was pled broadly, encompassing a lot of causes of
2   action.  And at this point, we're not particularly concerned
3   with the 17200 claim, given the negligent misrepresentation
4   claim.

5           THE COURT:  Okay, so let me ask -- I do want to know
6   clearly.  Are you withdrawing the 17200 claim?  And I think
7   California law is pretty clear that the only remedies available
8   are injunctive relief or restitution, and I didn't read your --

9           MS. STROMEYER:  Yes, Your Honor, and at the time
10  the --

11          THE COURT:  Go ahead.

12          MS. STROMEYER:  -- pardon, yeah.  At the time the
13  complaint was -- I mean, it could have been revised -- but at
14  the time that it was filed, the claimants were in foreclosure.
15  They were being evicted.  Those proceedings had started, and so
16  the complaint had to be filed at that point to --

17          THE COURT:  That's fair.

18          MS. STROMEYER:  -- preserve the status quo.

19          THE COURT:  Okay.

20          MS. STROMEYER:  So that's why everything was pled at
21  that junction.  Regarding the fraud --

22          THE COURT:  But let me ask.  I do want to clearly --
23  are you withdrawing the California Business and Professions
24  Code 17200 claim now?

25          MS. STROMEYER:  Yes, Your Honor.

1              THE COURT:  Okay, all right.  So we've resolved that.

2      Okay, go ahead.

3              MS. STROMEYER:  With regard to the fraud, there is

4      some intentionality it would appear or, at a minimum, an

5      absolute reckless disregard to the knowledge that GMAC, as an

6      institution, had regarding what was happening on this

7      particular file.  The servicing notes, I find it hard to

8      believe weren't available to anybody who picked up the file.

9      According to the servicing notes, at least ten people touched

10     it in the interim.  And there was a clear misrepresentation

11     that was made when the borrowers were sent a letter stating

12     that the foreclosure proceedings were about to begin, when in

13     fact --

14             THE COURT:  It had already happened.

15             MS. STROMEYER:  -- three days prior GMA --

16             THE COURT:  Yeah, I --

17             MS. STROMEYER:  Yeah, they had already actually

18     foreclosed on the home.  I mean, they were basically telling

19     them to hold on, wait, maybe we can still work this out when,

20     in fact, they were no longer the owners of the home.  And so

21     that's --

22             THE COURT:  I saw that.  They sent a letter saying

23     we're about to start foreclosure, after they'd already

24     foreclosed.

25             MS. STROMEYER:  Yes, Your Honor.  And so if that

1   doesn't speak to some type of intentionality and intent to

2   deceive -- I mean, it seems pretty clear that they should be

3   responsible for that particular misrepresentation --

4            THE COURT:  All right.

5            MS. STROMEYER:  -- if not some of the other ones.

6            THE COURT:  And your argument would be that would

7   establish reckless disregard at a minimum.

8            MS. STROMEYER:  At a minimum, an extreme reckless,

9   yes, Your Honor.

10            THE COURT:  Okay.  Can I ask you this question?  What

11   relief do you think you would be entitled to on a fraud claim

12   that you wouldn't be entitled to on a negligent

13   misrepresentation claim?

14            MS. STROMEYER:  I don't know that they would

15   necessarily be different, Your Honor.

16            THE COURT:  Because I've -- earlier in this case, on

17   multiple occasions, I have ruled out punitive damages because

18   it's not the debtor who would suffer; it's other creditors.

19   There's a fixed amount to be distributed to borrowers, and

20   every additional dollar one borrower gets is that much less

21   available for others.  I mean, it goes beyond that, but I have

22   ruled that punitive damages are not available.  So that's

23   why -- I mean, it does seem to me that if your negligent

24   misrepresentation claim survives, you're really adding nothing

25   to it, other than carrying a much heavier burden by also

1    asserting a fraud claim.  Do you disagree with that?

2              MS. STROMEYER:  No, Your Honor.

3              THE COURT:  Okay.  Could you address the breach of

4    contract claim, because it -- there are -- it does seem to me

5    that there's no writing signed by both parties -- and I know

6    you raise the issue of promissory estoppel, but estoppel as to

7    what?  There's no writing that I've seen that sets out the

8    terms of the proposed agreement.

9              Your client says they didn't receive the first

10   modification agreement.  They did receive the second one.

11   Other than the unpaid balance, which some months had passed

12   already, so the unpaid balance had actually increased, the

13   interest rate actually was reduced.  It actually looked to me

14   that the terms of the second modification were, in effect,

15   slightly more beneficial to your clients.

16             So I don't see how they were -- what harm they

17   suffered.  They didn't agree to it, and I understand that

18   negotiations ultimately broke down over the attorneys' fees

19   issue.  Go ahead.  So what's the contract that was breached?

20             MS. STROMEYER:  I'm sorry, Your Honor.

21             THE COURT:  What's the contract?

22             MS. STROMEYER:  I'm uncertain about what modifications

23   specifically you're referring to.  I know in their objection to

24   the claim, GMAC references two specific modifications which

25   they claim were sent to claimants.  Again, oddly claimants and

1    not the counsel they had been dealing with for months.

2              THE COURT:  Right.

3              MS. STROMEYER:  But they claim those were sent -- my

4    clients didn't receive either one of them.  One they have

5    evidence of only in the servicing notes which is odd that they

6    couldn't produce any documentation on it.  And the second one

7    my clients never received.  Like, they are good terms.

8              THE COURT:  Okay.

9              MS. STROMEYER:  They would have agreed to them.  And,

10   in fact, we tried to work out terms to that effect.

11             THE COURT:  Okay.  All right.  I misunderstood.

12             MS. STROMEYER:  So --

13             THE COURT:  I thought they got the second one but not

14   the first one.

15             MS. STROMEYER:  No, Your Honor.  They received neither

16   one of them.

17             THE COURT:  Okay.

18             MS. STROMEYER:  And those were all terms that we were

19   exactly working for throughout the course of this entire

20   litigation, but it was one -- it was still pending in state

21   court.  But it was very difficult to achieve.

22             THE COURT:  Sure.

23             MS. STROMEYER:  And as to the terms, I would agree

24   with Your Honor as we're thinking it through, I mean, this was

25   a modification.  Sure, in general, these do need to be signed

1   by the parties and there needs to be formal documentation.

2   Again, the formal documentation never took place only because

3   GMAC, for whatever reason, be it an error in not sending it

4   because they started the foreclosure proceedings, whatever,

5   again, internal error of theirs, they never sent the formal

6   documentation.  Otherwise, we would have that documentation.

7   The only reason it never existed is because of GMAC's error.

8   They prevented it from being put into writing.

9           THE COURT:  Let me ask this.

10          MS. STROMEYER:  And a contract --

11          THE COURT:  Is there any -- do you have a witness

12  who's going to testify about each of the terms of the

13  modification that was reportedly agreed upon?  So the letters,

14  the exchange of letters between, I guess, Mr. Halloran or his

15  counsel dealt with the initial interest rate.  And actually,

16  when GMAC sent their letter back, they actually included a

17  slightly lower rate.  Instead of the 2.88, it was 2.875,

18  obviously more favorable -- slightly more favorable to your

19  clients.  But there's nothing in those letters or in anything

20  that I've seen that deals with the number of payments, what the

21  StepUP interest rates would be, and when they would kick in.

22          So how could there be a contract -- estoppel, when

23  applied, would prevent GMAC here from disputing the existence

24  of a contract.  But the contract would have to be certain as to

25  its terms.  And I haven't seen anything that would establish

1    any certainty as to terms.

2          Now -- and Mr. Halloran's letter certainly doesn't --

3    other than putting in what he understood the initial interest

4    rate to be, it didn't say anything about StepUP or when the

5    higher rates would kick in.  Could you address that?

6          MS. STROMEYER:  It does not say anything about the

7    StepUPs.  That's correct, Your Honor.  It did say that the term

8    was 432 months --

9          THE COURT:  Right.

10         MS. STROMEYER:  -- I believe.

11         THE COURT:  But what about the Step -- because at

12   least I didn't read your papers as disputing that the

13   modification was to provide for a StepUP loan.  And that always

14   raises the issue, stepped up to what interest rate and when.

15   And those would be -- it seems to me those would be material

16   terms that would have to be reflected.  How could I estop GM

17   from denying the existence of a contract when there's nothing

18   that sets out what the terms of the contract were supposed to

19   be?

20         MS. STROMEYER:  The terms of the -- under California

21   law, what is required is for the terms to be set forward

22   sufficiently to provide a rational basis for the assessment of

23   damages.  And --

24         THE COURT:  Okay.  How am I supposed to be decide

25   whether the terms were set forth reasonably to allow estimation

1    of damages when you haven't disputed that it was going to be a

2    StepUP loan?  But how did -- there's nothing in anything you've

3    put in about -- including a declaration or an affidavit of

4    Attorney Halloran who allegedly had the conversation about, you

5    know, I was told the terms of the modification were the

6    following:  initial interest rate of X, interest rate to

7    increase at month whatever to a different rate and to increase

8    again thereafter.  There's none of that.

9            So those would all be, it seems to me, material terms.

10   You haven't contended that Halloran was told April 22nd, the

11   loan was modified, it would have an interest -- a fixed

12   interest rate of 2.88 percent for however many months or years.

13   That's not what's been alleged here.

14           MS. STROMEYER:  That's correct, Your Honor.

15           THE COURT:  Okay.  So what is it that saves your

16   breach of contract claim?

17           MS. STROMEYER:  I think that the terms set forth in

18   numerous places by GMAC shows that they intended to enter into

19   this contract, that these terms are sufficient enough, and that

20   their representation that formal documentation was forthcoming,

21   that is enough for the formation of a contract and for them to

22   be precluded from denying the existence, because promissory

23   estoppel prevents them from denying the existence of a contract

24   when it would result in an injustice.

25           THE COURT:  Yes.  But the terms of the contract would

1   have to be reasonably ascertainable from something, and that's

2   what I haven't seen.  Let me --

3            MS. STROMEYER:  Even --

4            THE COURT:  Let me ask Mr. Wishnew a question.

5            Mr. Wishnew, who owns the loan now?

6            MR. WISHNEW:  I know it's currently being serviced by

7   Ocwen, Your Honor.

8            THE COURT:  Okay.

9            MR. WISHNEW:  The owner, I'm not entirely certain.  It

10   might be Wells Fargo.

11            THE COURT:  Okay.  That's who the papers -- I didn't

12   know whether it was further sold.

13            MR. WISHNEW:  Not to my knowledge, Your Honor.

14            THE COURT:  Because there was -- I saw an internal

15   email that was produced as part of the documents that --

16   internal from GMAC to Wells Fargo, where Wells Fargo

17   approved -- this is the email; it doesn't set out all the

18   terms -- but gives its approval to going ahead with the

19   modification.

20            MR. WISHNEW:  Sure.  Sure, Your Honor.

21            THE COURT:  But it doesn't set out all the terms

22   either.

23            MR. WISHNEW:  Right.

24            THE COURT:  It doesn't talk about StepUP and when the

25   dates -- what the stepped up rates would be.  But I'm trying to

1   understand what relief can this Court -- assuming that the

2   Court were to find in favor of the claimants --

3                MR. WISHNEW:  Sure.

4                THE COURT:  When did the modification negotiations

5   break off?  I mean, I gather that the party -- I don't want to

6   know what the details of the negotiations were.

7                MR. WISHNEW:  Sure.

8                THE COURT:  But it sounded liked you tried to get it

9   resolved that the borrowers were going to get their loan

10  modification.

11               MR. WISHNEW:  Right.

12               THE COURT:  When did that stop?

13               MR. WISHNEW:  So, Your Honor, there was -- there

14  were -- as we note on pages 9 and 10 of our objection,

15  notwithstanding counsel's contention that our clients didn't

16  receive the second or third loan modification offers, there

17  were offers made June 2011.  And then they were approved again

18  for a modification March of 2012.  That would have -- the

19  modification was denied shortly after GMAC Mortgage commenced

20  the Chapter 11 because the claimants didn't return the

21  modification documents.

22               THE COURT:  Right.

23               MR. WISHNEW:  Beyond that, the litigation was stayed

24  in May of 2012.  I know, without getting into too much detail,

25  that the parties are trying -- or Ocwen is considering a

1  modification right now, but they have not come to a final

2  decision just yet, Your Honor.

3          THE COURT:  Okay.  Look.  This case is going forward.

4          MR. WISHNEW:  Sure.

5          THE COURT:  At a minimum, it's going forward on the

6  negligent misrepresentation and negligence claims.  I haven't

7  finally decided whether it would go forward on fraud.  I don't

8  know that it makes any difference, frankly, at this stage, but

9  I'm not -- I have to go back and look.  I'm not satisfied that

10 it adequately pleads fraud.  I do believe it's adequately

11 pleaded negligent misrepresentation and negligence, but I think

12 those would lead to the same result.  And my questions

13 earlier -- you raised the question, well, could any different

14 relief be awarded if the Court ultimately found fraud.  I don't

15 think so, but I'm not making a final decision on that.

16         So I think we made progress because the California

17 Business and Professions Code 17200 claim has been dropped.

18         MR. WISHNEW:  Right.

19         THE COURT:  And so it leaves the question -- and

20 again, I don't know that it would make a whole lot of

21 difference in the outcome whether there's a breach of contract

22 claim or not a breach of contract claim.

23         MR. WISHNEW:  Right.

24         THE COURT:  I don't want to know the details of the

25 negotiation, but it does strike me that to the extent ResCap --

RESIDENTIAL CAPITAL, LLC, et al.                    56

1  the Trust has any influence in having a modification agreed

2  upon -- I have another question.

3          Have any loan payments -- and maybe the borrower's

4  counsel can answer that -- have any loan payments been made

5  since 2012?

6          MR. WISHNEW:  I'll defer to counsel.

7          MS. STROMEYER:  No, Your Honor.  Each time claimants

8  have tried to make a loan payment, it's been returned.

9          THE COURT:  How often have they tried to do that?  I

10  mean, here's the reason --

11          MS. STROMEYER:  I would say --

12          THE COURT:  -- for my question.  I mean, even if a

13  modification was granted by somebody at this point, and I don't

14  think -- the Trust can't do it, but if a modification was

15  doing, the unpaid balance has grown quite substantially because

16  there haven't been any payments made.  And I don't know whether

17  your clients have sort of put that money aside so that they

18  could satisfy -- if they were in agreement, that they could pay

19  a substantial amount toward a modification that would reduce

20  the balance or not.  But I guess -- and I don't get involved in

21  settlement negotiations.

22          But it seems to me that they're -- foreclosure has not

23  happened yet.  They're still in the house.  If there's going to

24  be a modification, it ought to happen.  If there isn't a

25  modification, then the question is -- okay, and the litigation

RESIDENTIAL CAPITAL, LLC, et al.                    57

1   goes forward, what, if any, damages are recoverable by the

2   claimants.  From the papers, I see that you were close to

3   settling it but were fussing about attorneys' fees.  And it

4   does seem to me -- I don't know how much in the way of

5   attorney's fees.  But it was clear from the papers I saw that

6   you foreclosed.  They brought an action.  They retained

7   counsel, brought an action.  And at some point fairly soon but

8   not right away, you vacated -- you rescinded the foreclosure,

9   modified the credit report.

10          So it does seem to me -- I don't know what they can

11  prove or not, but on theory or another, their attorneys' fees

12  incurred in getting the foreclosure rescinded are, arguably,

13  consequential damages that they suffered that are recoverable.

14  When I read -- I'm not blaming anybody, Mr. Wishnew.  I want to

15  make clear.  But when I read one like this, boy, this is one

16  that really ought to be settled.

17          MR. WISHNEW:  Understood, Your Honor.

18          MS. STROMEYER:  And, Your Honor, honestly, my client

19  are just interested in getting a modification and making

20  payments and just getting something along the lines of what

21  they were promised so many years ago.  We're not trying --

22          THE COURT:  Well, but so many years ago, they were

23  making mortgage payments.  And they haven't been making

24  payments in quite a few years.  So the unpaid balance has grown

25  quite substantially.

1            MS. STROMEYER:  Agreed, Your Honor.  But like, there

2    has been absolutely no effort to settlement of this matter.  I

3    understand that there's -- Ocwen is now involved, but my

4    clients have been forced to go through loan modifications,

5    applications that they're clearly unqualified for.  It's

6    been -- it's not entirely -- and they've made offers to Ocwen's

7    counsel and received absolutely no response, not counterterms,

8    not nothing.  So there have been many efforts to do that.

9            We absolutely agree that it should be settled.  We

10   would like to keep this pending just in an effort to try and

11   keep the pressure and the momentum toward getting some type of

12   settlement and resolution given that it has been so long.

13           THE COURT:  Well, let me ask this.  Okay.  What, if

14   any, discovery do you wish to take?  I told you that a least

15   two of your claims will survive.  I haven't decided about the

16   breach of contract or the fraud.  But at least two of your

17   claims will survive.  What, if any, discovery do you wish to

18   undertake?

19           MS. STROMEYER:  I think it would be very limited.  I

20   think a couple of the people, if they still exist at GMAC, that

21   are involved at the time, that's what we were set up to do.

22           THE COURT:  I'm sure they don't.  I mean, people may

23   be alive, but they won't be employed by GMAC.

24           MS. STROMEYER:  Right.  Right.

25           THE COURT:  I hope they're still alive for their sake,

1   but I just -- I can just tell you from prior experience, a lot

2   of water under the bridge that gets us to this point.  So what

3   you may well -- Mr. Wishnew has attached loan servicing notes

4   as exhibits.  I'm not sure you're going to find much more than

5   what's in loan servicing notes.

6           But, Mr. Wishnew, what discovery do you wish to

7   undertake?

8           MR. WISHNEW:  Your Honor, we would probably want to

9   take -- I'm sorry -- discovery related to damages first and

10  foremost.  Beyond that -- and obviously, their proofs on

11  there's different causes of -- whatever causes of action

12  survive.

13          If I could make one suggestion, Your Honor.

14          THE COURT:  Sure.

15          MR. WISHNEW:  To save both the Trust fees, as well as

16  to save counsel fees and the claimants fees for counsel,

17  perhaps we preserve a status quo for, say, thirty days, allow

18  them to see if they can make headway with Ocwen.  And then

19  if -- let's say -- so today is the 13th.  Perhaps if we get --

20          THE COURT:  Do we have another omnibus day next month?

21          MR. WISHNEW:  We do.  November 17th, I think, Your

22  Honor.

23          THE COURT:  Okay.

24          MR. WISHNEW:  So I was going to say -- I was going to

25  try and go as far out as December 1st and say if they haven't

1   reached -- if there has not been an agreement with Ocwen and a

2   settlement, then we start discovery.

3            THE COURT:  Well, let me ask you this.  Does the Trust

4   have any influence that it can exert?  Can you get Ocwen --

5            MR. WISHNEW:  We --

6            THE COURT:  Could you get Ocwen and the Trust and the

7   claimant's counsel together -- it may be hard physically

8   because they're in California, but all together on the phone in

9   one or more calls to try to see if you can move this forward?

10  Because the problem is if you send off on email --

11           MR. WISHNEW:  Sure.

12           THE COURT:  -- to somebody at Ocwen --

13           MR. WISHNEW:  Sure.

14           THE COURT:  -- maybe they'll send you an email back in

15  a few days and --

16           MR. WISHNEW:  We will certainly --

17           THE COURT:  -- you use up a month before you know it.

18           MR. WISHNEW:  We will certainly make our best efforts,

19  Your Honor.  We will reach out to our contacts at Ocwen and see

20  if we can move this forward.

21           THE COURT:  Okay.  Put this on the calendar for the

22  November omnibus hearing date.  Submit a written status report

23  at least two business days before that hearing.  It ought to be

24  a joint status report.  If you can't report to me at the next

25  omnibus hearing date that the parties have made substantial

RESIDENTIAL CAPITAL, LLC, et al.                    61

1    progress to settling the case --

2            MR. WISHNEW:  Sure.

3            THE COURT:  I'm not saying that you have to have -- if

4    you settled it, great.  But if you haven't made substantial

5    progress, you need to try and agree on a case management and

6    scheduling order providing for fact discovery -- it doesn't

7    strike me as a case for expert discovery -- and we'll go from

8    there.

9            MR. WISHNEW:  Okay.

10            THE COURT:  Counsel, my template for case management

11    scheduling orders is on the court's website, under my chamber's

12    rules.  We use basically the same format in all -- for both

13    contested matters and adversary proceedings.  This would be a

14    contested matter.  And then we'll move it forward because we've

15    got to get this resolved.

16            I just -- my last comment, I know that one of the

17    things that claimant argued about, potential damages of 400,000

18    dollars at the difference between, I guess, what their loan

19    interest rate is and what they believe the modified rate would

20    be, I don't know whether they made any effort to present value

21    or not.

22            MR. WISHNEW:  Sure.

23            THE COURT:  I mean, that just -- I saw what they

24    included.  I didn't spend a whole lot of time dwelling on it

25    because this wasn't going to be an evidentiary hearing.  But

RESIDENTIAL CAPITAL, LLC, et al.                          62

1    just that raw number didn't do a lot for me.

2                MR. WISHNEW:  Understood, Your Honor.

3                THE COURT:  All right.  So I'll permit the borrower's

4    counsel to appear at the next omnibus hearing by telephone as

5    well.  Okay?

6                MR. WISHNEW:  Very good, Your Honor.

7                THE COURT:  All right.

8                MS. STROMEYER:  Thank you, Your Honor.

9                THE COURT:  Thanks very much.

10               MR. WISHNEW:  Your Honor, the next and last item on

11   today's agenda is the motion of the ResCap Borrower Claims

12   Trust for an order authorizing interim distribution and

13   establishing a disputed claim reserved filed at docket number

14   10136.

15               I will cede the podium to Mr. Flanigan from the

16   Polsinelli firm.

17               THE COURT:  Okay.

18               MR. FLANIGAN:  Thank you, Judge.

19               THE COURT:  And before you do that, is anyone

20   appearing today in opposition to the motion to authorize a

21   distribution and establish a disputed claim reserve?

22               MS. NORA:  On a limited basis, Your Honor.  Tia Smith,

23   appearance by Wendy Allison Nora.

24               THE COURT:  Okay.  Anybody else?

25               MR. HEAL:  Laird Heal for --

RESIDENTIAL CAPITAL, LLC, et al.                    63

1          MS. ANIEL:  Yes.  Good afternoon, Your Honor.  This is

2    Erlinda Abibas Aniel.

3          THE COURT:  Okay.  Anybody else?

4          MS. ANIEL:  I'm appearing for myself.

5          THE COURT:  I understand.

6          Anybody else?

7          MR. HEAL:  Laird Heal for Thomas La Casse.

8          THE COURT:  Okay.  Go ahead.

9          MR. FLANIGAN:  Thank you, Your Honor.

10         MR. KRAVITZ:  Your Honor, Peter Kravitz on the phone.

11         THE COURT:  I'm sorry.  I couldn't hear you.

12         MR. KRAVITZ:  Your Honor, this is Peter Kravitz

13   appearing by phone.

14         THE COURT:  Okay.  Thanks, Mr. Kravitz.

15         Go ahead.

16         MR. FLANIGAN:  Your Honor, the confirmation order in

17   this case was entered December 2013.  As Your Honor will

18   recall, early in the case, in June of 2014, we filed a motion

19   requesting establishment of a reserve and making a distribution

20   based on statistical analysis.  We withdrew that motion after a

21   colloquy with you at the hearing on the motion.

22         THE COURT:  That's a charitable way of describing it.

23         MR. FLANIGAN:  I'm not going to ask what the right

24   way would be, Your Honor.

25         But we are now close to three years away from

1   confirmation.  We began the case with 3,000 borrower claims.

2   As of confirmation, there were just under 600.  And now as of

3   the motion, there were twenty-five claims left.  And that's

4   all.

5         The pool has now been reduced to a manageable amount

6   where we can make a distribution, but not if we reserve for

7   those who have already had their day in court and were

8   disallowed and now are on appeal.

9         THE COURT:  Well, not disallowed in the amount of

10  their claims, but.

11        MR. FLANIGAN:  But their claims were disallowed.

12        THE COURT:  Yes.

13        MR. FLANIGAN:  Yes.

14        THE COURT:  Okay.  But I know you asked that I, if

15  necessary, estimate their claims at zero.  But go ahead.

16        MR. FLANIGAN:  Yes, Your Honor.  That's an alternative

17  pleading.  The confirmation order is what governs this

18  situation.

19        THE COURT:  I know what the confirmation order -- and

20  I know I can do it.

21        MR. FLANIGAN:  Say again.

22        THE COURT:  I know I can do it.

23        MR. FLANIGAN:  Yes.  Okay.

24        THE COURT:   And I know -- look, I'm in -- because

25  I've said this on multiple occasions.  There have been no

1   distributions to borrowers to date.  There are a lot of allowed

2   borrower claims, most consensual, some after evidentiary

3   hearings, but most consensual.  There are a handful that are on

4   appeal.  And I've said often that the borrowers -- everybody is

5   being held hostage -- all of the borrowers who have allowed

6   claims, their distributions are being held hostage to an

7   increasingly small number of claims that haven't been resolved.

8   Either there are some that haven't come on for hearing yet.

9   There are some where I've expunged claims and they're on

10  appeal.  Some of those have been affirmed by the district court

11  and now are on appeal to the court of appeals.

12          MR. FLANIGAN:  We just had cert denied at the Supreme

13  Court on one of them.

14          THE COURT:  In which one?

15          MR. FLANIGAN:  That was Morris, who's -- he's on

16  Exhibit C in fact.

17          THE COURT:  Yes.  Gregory Morris.

18          MR. FLANIGAN:  Yeah.  So he's over.

19          THE COURT:  I guess --

20          MR. FLANIGAN:  I think.

21          THE COURT:  Okay.  All right.

22          MR. FLANIGAN:  Your Honor, our basic point is whether

23  you look at it as the confirmation order provision or the

24  burden in the case of a claims estimation in this situation,

25  none of the objectors have come forward and even attempted to

1    do anything reasonable or propose anything or even acknowledge

2    that there was a burden.  We've got a 3 million dollar claim,

3    nice round number from Tia Smith; a 2,650,000-dollar claim from

4    Mr. Mack.  Mr. La Casse has a --

5            THE COURT:  Six-million-dollar claim, I know.

6            MR. FLANIGAN:  -- 26,250,000-dollar claim.  And it's

7    just -- when they cannot meet their burden, don't try to meet

8    their burden, don't even acknowledge there's a burden, we think

9    it's time to let us --

10           THE COURT:  So you propose a disputed claim reserve,

11   how much?

12           MR. FLANIGAN:  I'm sorry.  What?  Disputed claim

13   reserve would be 4,400,000 dollars approximately, Your Honor.

14           THE COURT:  All right.

15           MR. FLANIGAN:  And to make a point about that, Your

16   Honor, given the experience in this case in terms of how many

17   disputed claims that the Trust has won versus the claimants,

18   you can be pretty certain that that number will -- that that

19   number is way more than is necessary.

20           THE COURT:  Well, the issue for me is for those that

21   I've ruled on and are on appeal either in the district court or

22   the circuit court, what happens to them if I get reversed if

23   the distributions are made?  I suppose there's a reserve that,

24   if didn't get used up on those claims you're reserving for,

25   could be used for these additional -- the objectors.

1          MR. FLANIGAN:  Yes, Your Honor.

2          THE COURT:  But maybe you or one of the Morrison &

3     Foerster people can --

4          Aniel, and I guess she's on the phone, has objected.

5     And what I'm somewhat confused about is I wrote two opinions

6     with respect to the Aniels:  a June 30th, 2015 opinion and an

7     April 20th, 2016 opinion.  Aniel appealed from my June 30th,

8     2015 opinion, and Judge Gardephe affirmed in an order entered

9     on September 26, 2016.  I wouldn't have thought -- and he says

10    that it's an appeal from my June 30th, 2015 order.  It was

11    actually an interlocutory order.  I sustained the objection in

12    part and overruled it in part.  They appealed.  He went ahead

13    and decided it.  So the only thing the second opinion -- the

14    April 20th, 2016, it recites -- it recites the fact of the

15    earlier opinion.  And it said there was four issues to be

16    tried.  It was a factual issue about whether Mira Smoot had

17    authority to execute a 2011 assignment and also whether GMAC

18    and ETS had sufficient authority to commence the foreclosure

19    and the extent of actual damages.  And I went ahead and decided

20    that.  But I don't --

21         Mr. Wishnew, can you enlighten me about --

22         MR. WISHNEW:  Sure.

23         THE COURT:  So I was -- and I guess the second appeal

24    is before a different -- not before Judge Gardephe.  It's

25    before somebody else.

RESIDENTIAL CAPITAL, LLC, et al.                    68

1        MR. WISHNEW:  Yeah.  Your Honor, so Ms. Aniel filed

2    four claims.  And we -- the Trust, plural, determined that two

3    of the claims were properly asserted against the Liquidating

4    Trust.

5        THE COURT:  Okay.

6        MR. WISHNEW:  And so your first opinion expunged those

7    claims against the Liquidating Trust because Ms. Aniel lacked

8    the standing to bring those claims.

9        THE COURT:  Right.

10       MR. WISHNEW:  We then continued with the Borrower

11   Claim Trust which were the ones that went to trial and we had

12   Ms. Smoot and the others from HSBC testify.  She then took an

13   appeal of that decision.  And it's those two claims that would

14   be addressed as part of Mr. Flanigan's DCR motion.

15       THE COURT:  Okay.  Mr. Flanigan, you want to address

16   that?  I just -- it was unclear to me about why it's still --

17   the June -- the earlier opinion was interlocutory because it

18   sustained in part and overruled in part.  But the district

19   court heard the appeal and affirmed me, but I'm not sure it was

20   appealable.

21       MR. FLANIGAN:  I'm not sure what to say about it, Your

22   Honor.

23       THE COURT:  No, that's not -- I'm not asking you to

24   address that.

25       MR. FLANIGAN:  I'll say this.  It's an unliquidated

                        RESIDENTIAL CAPITAL, LLC, et al.                    69

 1  claim at this point.

 2          THE COURT:  Yeah.  And the second opinion, which was

 3  after trial, was all based on facts as to the authority of an

 4  employee to execute documents.  And I addressed it and made

 5  factual findings.  Good luck getting that reversed.

 6          MR. WISHNEW:  Your Honor, I'm sorry.  Just one more

 7  point.  I would add that with regards to the two claims

 8  asserted against the Liquidating Trust, your decision, I think,

 9  would be probably considered as final as to those two.  And

10  then with regards to the Borrower Claims Trust --

11          THE COURT:  That's for the district court to figure it

12  out.  Okay.

13          MR. WISHNEW:  Right.  But with the Borrower Claims

14  Trust, those two went forward on the merits.  So --

15          THE COURT:  Yeah, okay.  All right.  So look.  I

16  reread my decisions, and I read Judge Gardephe's decision.  And

17  I know there's an appeal pending.  Do you want to address --

18          Well, Ms. Aniel, do you want to address the issues

19  that are on appeal?

20          MS. ANIEL:  Oh, yeah.  Regarding the claim number 112

21  and 114 that is under ResCap Liquidating Trust, it was affirmed

22  by the district court I think last September 26th.  And then I

23  filed my appeal in the court of appeals which was docketed on

24  October 4.  And I think it was sent out on October 11, okay, to

25  the court of appeals.

RESIDENTIAL CAPITAL, LLC, et al.                    70

1          And then this claim 416 and 417, it's still pending

2    right now in district court.  And whatever the decision is by

3    the district court, my intention is still to appeal that in the

4    court of appeals.

5          THE COURT:  All right.  I've heard you.  Okay.

6          Mr. Flanigan, go ahead.  Why don't you address the Tia

7    Smith objection?  And then I'll let Ms. Nora respond.

8          MR. FLANIGAN:  The Tia Smith objection is in the same

9    category as the other objections in terms of not undertaking in

10   any way to meet any kind of burden to show what reserve they

11   were entitled to.  The Tia Smith objection goes one step

12   further and challenges the Polsinelli firm's -- my ability to

13   represent the Trust in this matter.  And it's very simple, Your

14   Honor.

15         THE COURT:  That's okay.  Ms. Nora has objected to

16   everybody's involvement in this case including mine.  So --

17         MR. FLANIGAN:  There's no adversity, so it's --

18         THE COURT:  Go ahead.

19         MR. FLANIGAN:  -- that's all that matters.

20         And I think that's all I have to say about it.

21         THE COURT:  Okay.  Ms. Nora, go ahead briefly.

22         MS. NORA:  Yes, Your Honor.  Our objection is limited

23   to the Polsinelli law firm appearing as --

24         THE COURT:  Okay.  That's overruled.  That's

25   overruled.

1          MS. NORA:  Thank you, Your Honor.

2          THE COURT:  I read your papers, so I know what your

3    argument is.  And it's overruled.  I don't need to hear further

4    argument about it.

5          MS. NORA:  All right.  But there's some language in

6    the orders where -- we're reserving the issue with respect to

7    Polsinelli, of course.  But there's some language that has been

8    used on the record today saying that Ms. Smith has not dealt

9    with her burden.  It was our understanding that the allocation

10   of reserves for the claim were simply being denied to any

11   person who is presently on appeal.  And we don't think that's

12   equitable.  And the Court already addressed that earlier in its

13   statements that it seemed to the Court that the amount being

14   held for future payments for people whose claims have not yet

15   been heard, are on remand from appeal, that there would be four

16   million there.  And that could be allocated to those claimants

17   whose appeals are pending.  And we would be satisfied with that

18   language.

19         THE COURT:  Let me ask you this.

20         MS. NORA:  And also --

21         THE COURT:  Mr. Flanigan, what's your view on that?

22   Do you understand?

23         MR. FLANIGAN:  No.

24         THE COURT:  And I understand the point that Ms. Nora

25   has made.  You proposed a reserve.  You got to it by

1   discounting the amount of the claims that have been yet to be

2   resolved by roughly the percentages that they would stand to

3   recover here.  But is the reserve available for all remaining

4   claims?  In other words, if Ms. Smith's -- if my expunging of

5   the Smith claims is reversed on appeal, and it comes back, and

6   she gets an allowed claim, do the reserves -- are there

7   reserves available to satisfy the Smith claim?

8          MR. FLANIGAN:  The reserves would be available to

9   satisfy that claim after those who have been specifically

10  reserved for have collected whatever they may be entitled to.

11  We believe there will be substantial dollars on that basis left

12  in that reserve, given the whole experience of that.

13         THE COURT:  All right.

14         Go ahead.  Ms. Nora, anything else you want to add?

15         MS. NORA:  Yes, Your Honor.  I think we need to have a

16  different form of order, then, that provides for the

17  reallocation because that does not appear in the proposed

18  order.  And Ms. Smith also wanted to object to the contention

19  that her claims were for an excessive and highly inappropriate

20  amount and that she's preventing holders of allowed claims from

21  receiving distributions.  That certainly is not and never has

22  been her intention.  It's the Claims Trust that is supposed to

23  allocate and distribute by court order appropriately from the

24  amount that was put into the trust.

25         THE COURT:  Okay.  Does anybody --

1          MS. NORA:  So we would like that --

2          THE COURT:  All right.  Stop.

3          Anybody else wish to be heard on this motion?  Go

4    ahead, Mr. Heal.

5          MR. HEAL:  Yes.  If you'd permit, I believe I have

6    information that may help the -- as you mentioned, there was a

7    26,500,000 claim.  And I asked it to be amended.  And when I

8    put it in civil RICO terms, it was about the same amount.

9          Now, one of the issues was whether or not the Trust

10   owned the note or was able to foreclose at the time.  And in

11   the second opinion, you said, well, I already decided that.  I

12   asked the Court to reconsider based on the attorney in the

13   state court that said, well, we admit that we didn't own it.

14         At this point, in the past couple of weeks, the case

15   has ended.  And when I say -- understand I can only divulge the

16   contents if the judge orders.  But --

17         THE COURT:  When you say it's been ended, tell me what

18   you mean by that.

19         MR. HEAL:  The Trust -- Residential Capital withdrew.

20   HSBC came in as a substituted plaintiff, and they've withdrawn

21   the case.  And as soon as -- we are waiting for a document to

22   be filed in the records of the Town of Weston; then we will ask

23   Judge Gardephe --

24         THE COURT:  Gardephe.

25         MR. HEAL:  -- to move along with his appeal which has

RESIDENTIAL CAPITAL, LLC, et al.                    74

1    been lingering.  And then we would be at least reducing the

2    amount of claim on the Trust.  But it's a still substantial

3    amount.

4          The point is that they are counting not only that

5    there will be no distribution to any of these appeal claimants,

6    but I don't believe the civil RICO would be paid at the

7    discount.

8          THE COURT:  You don't?

9          MR. HEAL:  I believe that.

10         THE COURT:  You really don't?

11         MR. HEAL:  That was -- well, now that you said that, I

12   think I'll go do my -- the last time I was -- the first time I

13   was here before you, I had to do my homework.  And I may have

14   to do that again.

15         So at any rate, it's still a substantial amount.  And

16   this is at least to offer you that's a fair reason for this one

17   to come back to you.  And it's a substantial amount.

18         THE COURT:  All right.  Thank you, Mr. Heal.

19         MR. HEAL:  Thank you, Your Honor.

20         THE COURT:  Now, Mr. Flanigan, I'm going to require

21   the Trust to increase the reserve by a general 500,000-dollar

22   additional reserve available to satisfy claims of any of the

23   matters remaining on appeal.  In reaching that decision, I've

24   gone back and looked at my prior decisions expunging or

25   disallowing claims that are on appeal; to the extent that there

1   are appellate rulings that have been rendered by district court

2   with appeals pending in the court of appeal, I've considered

3   that.  And to the extent that district courts have not resolved

4   the appeals, I've also considered that.

5           And while there may well be funds available from the

6   amount that you proposed to reserve that is specific to

7   identified claims, and whether you're correct that there will

8   be funds available from that pool of funds or not, I don't

9   know.  But in determining the amount of the additional reserve

10  that I'm estimating or requiring here, I considered what I

11  consider to be the merits of any of the remaining pending

12  matters.  I'm not going to talk about each one specifically.  I

13  think I was correct in the decisions that I rendered.  But it's

14  important that there be distributions to borrowers as soon as

15  possible.

16          I think that with the reserve that you proposed and

17  the additional reserve that I'm ordering, you'll need to

18  present a revised order on it that the remaining amounts can go

19  ahead with distributions to allowed claims.

20          MR. FLANIGAN:  Yes, Your Honor.  And since there's

21  been misunderstandings every once in a while in this case,

22  500,000 dollars, that's --

23          THE COURT:  500,000 dollars total --

24          MR. FLANIGAN:  Total, yes.

25          THE COURT:  -- for the claims that are on appeal,

RESIDENTIAL CAPITAL, LLC, et al.                    76

1  those three as to which I have objections:  Mack -- Mack was

2  affirmed by the district court; it's on appeal to the

3  circuit -- Tia Smith, and Erlinda Abibas Aniel.

4          MR. FLANIGAN:  Very good.

5          THE COURT:  Okay.

6          MR. FLANIGAN:  Thank you, Your Honor.

7          THE COURT:  All right.  So submit me a revised order.

8          MR. FLANIGAN:  Will do.

9          THE COURT:  All right.  Mr. Wishnew, does that

10  complete our agenda?

11          MR. WISHNEW:  It does, Your Honor.  Yes.

12          THE COURT:  Okay.  The Court is in recess until 4

13  o'clock.

14          MR. WISHNEW:  Thank you, Your Honor.

15          MR. FLANIGAN:  Thank you, Your Honor.

16      (Whereupon these proceedings were concluded at 3:44 PM)

17

18

19

20

21

22

23

24

25

1

2                          I N D E X

3

4                          RULINGS

5                                        Page      Line

6  Borrower Claims Trust's objection to      19        17

7  claim no. 2892 is sustained, and the

8  claim is expunged.

9  Joint motion filed by counsel for         25        20

10  Mr. Rode and the Trust, to vacate this

11  Court's opinion entered in the Rode

12  matter denied.

13  Re: Motion of ResCap Borrower claims Trust   74        20

14  for Order Authorizing Interim Distribution

15  and Establishing Disputed Claims reserve, the

16  Trust is required to increase the reserve

17  by a general 500,000-dollar additional

18  reserve available to satisfy claims of any

19  of the matters remaining on appeal.

20

21

22

23

24

25

1

2                        C E R T I F I C A T I O N

3

4    I, David Rutt, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10   _____

11   DAVID RUTT

12   AAERT Certified Electronic Transcriber CET**D 635

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  October 14, 2016

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, et al.

Case No. 12-12020-mg

October 13, 2016

# #

**#607 (1)**
3:22

# A

**ABIBAS (3)**
6:24;63:2;76:3
**ability (2)**
10:2;70:12
**able (5)**
17:22;20:21;
21:21;34:22;73:10
**absence (4)**
36:25;37:7;39:21;
40:6
**absolute (1)**
46:5
**Absolutely (4)**
11:21;58:2,7,9
**access (2)**
42:1,7
**accommodate (1)**
9:25
**according (2)**
21:9;46:9
**account (1)**
13:12
**accounting (3)**
29:14;32:13;35:17
**achieve (1)**
49:21
**acknowledge (5)**
31:4;35:14,16;
66:1,8
**acknowledged (3)**
28:9;32:10;34:2
**Act (2)**
9:11;34:6
**action (10)**
27:10;29:23;30:1,
9;32:20;34:20;45:2;
57:6,7;59:11
**actionable (2)**
39:22,23
**actual (1)**
67:19
**actually (11)**
7:12;9:2;16:15;
36:16;46:17;48:12,
13,13;50:15,16;
67:11
**add (4)**
20:25;22:24;69:7;
72:14
**adding (1)**
47:24
**additional (5)**
47:20;66:25;
74:22;75:9,17
**address (16)**

**26:2;33:14;35:22;**
**40:25;44:2,17,20,22,**
**23;48:3;51:5;68:15,**
**24;69:17,18;70:6**
**addressed (4)**
38:21;68:14;69:4;
71:12
**addressing (1)**
25:22
**adequately (2)**
55:10,10
**admit (1)**
73:13
**Adv (2)**
2:2;41:18
**advance (1)**
41:17,18
**adversary (5)**
7:4,10;8:5,9;61:13
**adversely (1)**
34:10
**adversity (1)**
70:17
**advise (1)**
17:22
**advised (2)**
41:2,18
**advising (2)**
29:15;40:19
**affidavit (1)**
52:3
**affirmed (5)**
65:10;67:8;68:19;
69:21;76:2
**afternoon (6)**
7:7;21:2;27:8,15;
44:12;63:1
**again (15)**
13:13;19:14;26:4;
27:3;37:10;40:8;
44:14;48:25;50:2,5;
52:8;54:17;55:20;
64:21;74:14
**against (6)**
7:11;25:25;29:23;
68:3,7;69:8
**agenda (7)**
7:9;12:11;19:20;
26:12;27:19;62:11;
76:10
**ago (3)**
22:2;57:21,22
**agree (12)**
23:2;29:3;32:1,4,
22,24;39:22;44:25;
48:17;49:23;58:9;
61:5
**agreed (7)**
20:24;33:15;
41:19;49:9;50:13;
56:1;58:1
**agreeing (1)**
28:10

**agreement (17)**
13:5,6,15;21:7,10,
10;31:17;37:1,18,22,
24,25;38:7;48:8,10;
56:18;60:1
**agreements (2)**
13:10;39:14
**agrees (1)**
21:3
**ahead (22)**
12:9,20;20:13;
21:23;27:14;29:13;
41:15;45:11;46:2;
48:19;53:18;63:8,
15;64:15;67:12,19;
70:6,18,21;72:14;
73:4;75:19
**Aldridge (3)**
10:24;11:1,17
**Alison (1)**
20:2
**alive (2)**
58:23,25
**allegation (1)**
9:4
**allegations (3)**
9:2,3;19:11
**alleged (2)**
9:6;52:13
**allegedly (2)**
9:11;52:4
**Allison (1)**
62:23
**allocate (1)**
72:23
**allocated (1)**
71:16
**allocation (1)**
71:9
**allow (4)**
13:17;41:19;
51:25;59:17
**allowed (6)**
22:14;65:1,5;72:6,
20;75:19
**along (3)**
11:7;57:20;73:25
**alternative (1)**
64:16
**always (1)**
51:13
**amend (1)**
22:15
**amended (1)**
73:7
**among (1)**
21:7
**amount (18)**
17:25;21:11;
23:23;47:19;56:19;
64:5,9;71:13;72:1,
20,24;73:8;74:2,3,
15,17;75:6,9
**approp (1)**

**amounts (1)**
75:18
**analysis (1)**
63:20
**ANIEL (11)**
6:24;63:1,2,4;
67:4,7;68:1,7;69:18,
20;76:3
**Aniels (1)**
67:6
**another's (1)**
43:10
**APC (1)**
6:2
**Apologies (1)**
10:21
**App (2)**
43:3,13
**apparent (1)**
43:20
**appeal (24)**
22:13;64:8;65:4,
10,11;66:21;67:10,
23;68:13,19;69:17,
19,23;70:3;71:11,15;
72:5;73:25;74:5,23,
25;75:2,25;76:2
**appealable (1)**
68:20
**appealed (2)**
67:7,12
**appeals (7)**
65:11;69:23,25;
70:4;71:17;75:2,4
**appear (4)**
16:21;46:4;62:4;
72:17
**appearance (2)**
8:6;62:23
**appearances (1)**
12:20
**appeared (1)**
22:5
**APPEARING (6)**
6:21;8:4;62:20;
63:4,13;70:23
**appellate (1)**
75:1
**applicable (1)**
28:12
**applications (1)**
58:5
**applied (3)**
29:6;38:2;50:23
**applies (1)**
38:1
**apply (1)**
38:3
**applying (2)**
23:6,11
**appreciate (2)**
12:2;21:3

**28:13**
**appropriate (1)**
22:9
**appropriately (1)**
72:23
**approval (1)**
53:18
**Approve (1)**
2:6
**approved (13)**
28:4,19;29:8;31:8,
24;32:2;37:21;
40:20;41:3;42:12;
43:17;53:17;54:17
**approximately (1)**
66:13
**April (6)**
31:12,13;41:8;
52:10;67:7,14
**arguable (1)**
42:11
**arguably (2)**
36:15;57:12
**argue (3)**
22:16;33:6;39:6
**argued (1)**
61:17
**arguing (3)**
29:2;33:1;35:13
**argument (9)**
22:10;23:11;31:3;
34:3;38:1;44:8;47:6;
71:3,4
**arguments (1)**
18:18
**arise (1)**
25:8,10
**arising (1)**
22:19
**ascertainable (1)**
53:1
**ascribe (1)**
43:18
**aside (1)**
56:17
**aspect (2)**
38:5,20
**asserted (7)**
19:10;24:17;
39:25;40:1,2;68:3;
69:8
**asserting (1)**
48:1
**assertion (1)**
9:15
**asserts (2)**
8:24,25
**assessment (1)**
51:22
**assignment (1)**
67:17
**assignments (2)**
9:1,16

**assuming (3)**
30:16;41:17;54:1
**attached (2)**
38:18;59:3
**attempt (1)**
9:16
**attempted (1)**
65:25
**attempts (1)**
9:13
**attention (1)**
25:5
**ATTORNEY (7)**
5:10;13:22;20:2;
27:9;28:17;52:4;
73:12
**Attorneys (5)**
5:3,11,20;6:3,12
**attorneys' (4)**
30:18;48:18;57:3,
11
**attorney's (14)**
13:6,8,12;14:2,8,
11;16:4,6,7,24;30:7,
12,13;57:5
**authority (3)**
67:17,18;69:3
**authorize (1)**
62:20
**authorized (1)**
41:25
**Authorizing (4)**
2:7;3:3;42:6;62:12
**available (11)**
44:3;45:7;46:8;
47:21,22;72:3,7,8;
74:22;75:5,8
**Avenue (1)**
6:14
**avoid (1)**
29:1
**awarded (1)**
55:14
**away (2)**
57:8;63:25

## B

**B&P (1)**
44:24
**back (11)**
11:25;13:18;
20:10;24:9;36:12;
50:16;55:9;60:14;
72:5;74:17,24
**background (1)**
40:22
**balance (6)**
37:3;48:11,12;
56:15,20;57:24
**Bank (8)**
5:3;7:23;8:12,25;
9:1,12;11:17;43:2

**bankruptcy (1)**
15:15
**Bank's (1)**
9:12
**bargain (1)**
37:19
**based (7)**
9:2,11;18:4;23:5;
63:20;69:3;73:12
**basic (1)**
65:22
**basically (3)**
20:20;46:18;61:12
**basis (8)**
13:11;19:8,15;
21:25;22:6;51:22;
62:22;72:11
**batter (1)**
16:8
**bear (1)**
24:4
**become (1)**
35:4
**becomes (1)**
24:22
**becoming (2)**
21:11;23:22
**began (1)**
64:1
**begin (1)**
46:12
**behalf (1)**
9:12
**believing (1)**
43:9
**beneficial (1)**
48:15
**benefit (1)**
36:22
**Bernard (3)**
5:20;26:16;27:1
**best (6)**
10:1;11:6;18:1;
23:18;29:10;60:18
**better (1)**
17:16
**beyond (3)**
47:21;54:23;59:10
**bit (1)**
12:25
**blaming (1)**
57:14
**books (3)**
27:24;28:2,5
**Borrower (20)**
2:6,10,12,19,21;
3:2;6:13,22;19:24;
26:15;27:16,19,24;
47:20;62:11;64:1;
65:2;68:10;69:10,13
**borrowers (12)**
28:18;29:22;31:6;
36:22;38:8;46:11;

47:19;54:9;65:1,4,5;
75:14
**borrowers' (3)**
39:5;40:19;41:2
**borrower's (3)**
44:10;56:3;62:3
**both (14)**
16:21;17:22;18:3;
21:24,24;22:12;
23:18;36:9;37:20;
40:3;41:13;48:5;
59:15;61:12
**boy (1)**
57:15
**BR (1)**
24:2
**BRADLEY (1)**
5:19
**breach (7)**
34:1;35:21;48:3;
52:16;55:21,22;
58:16
**breach- (1)**
19:11
**breached (1)**
48:19
**break (1)**
54:5
**breathing (1)**
41:14
**BRIAN (2)**
5:7;8:10
**bridge (1)**
59:2
**brief (4)**
16:16,24,24;17:4
**briefly (1)**
70:21
**bring (4)**
22:14;29:24;
34:20;68:8
**bringing (1)**
30:9
**brings (2)**
12:10;19:19
**broad (1)**
9:3
**broadly (2)**
9:1;45:1
**broke (1)**
48:18
**brought (3)**
29:22;57:6,7
**burden (10)**
22:21;23:21;
47:25;65:24;66:2,7,
8,8;70:10;71:9
**Business (4)**
44:1;45:23;55:17;
60:23
**busy (1)**
16:1

## C

**CA (2)**
5:23;6:6
**Cal (2)**
43:3,13
**calendar (6)**
10:1;13:19;16:2;
17:12,20;60:21
**California (12)**
28:12;33:7,9;
39:13,15;42:9;44:1;
45:7,23;51:20;
55:16;60:8
**call (1)**
41:17
**calls (1)**
60:9
**CalRptr3d (1)**
43:3
**came (2)**
17:12;73:20
**can (30)**
7:14;11:20,22;
15:13;16:24;18:2;
24:4;26:6;35:3;
40:25;42:22;46:19;
47:10;54:1;56:4;
57:10;59:1,18;60:4,
4,9,20;64:6,20,22;
66:18;67:3,21;
73:15;75:18
**Capacity (1)**
6:12
**Capital (2)**
7:3;73:19
**care (2)**
28:13;31:10
**carry (2)**
7:14;9:23
**carrying (1)**
47:25
**carved (1)**
16:2
**Case (30)**
2:5,10;9:5;10:12;
14:5,9;16:10,13;
17:11;18:1,4;24:14,
24;28:12;38:2;
47:16;55:3;61:1,5,7,
10;63:17,18;64:1;
65:24;66:16;70:16;
73:14,21;75:21
**cases (2)**
15:15;43:14
**Casse (2)**
63:7;66:4
**category (1)**
70:9
**cause (1)**
30:9
**causes (4)**

32:20;45:1;59:11,
11
**CC (3)**
2:3,17,21
**Cede (4)**
11:25;19:20;
26:21;62:15
**Center (1)**
6:4
**cert (1)**
65:12
**certain (5)**
39:15;42:4;50:24;
53:9;66:18
**Certainly (9)**
17:1;24:21;25:24;
39:14;42:18;51:2;
60:16,18;72:21
**certainty (1)**
51:1
**certificate (3)**
18:17;19:3,3
**Certificates (1)**
18:13
**challenges (1)**
70:12
**chamber's (1)**
61:11
**Chandler (1)**
5:12
**change (1)**
18:2
**Chapter (1)**
54:20
**charitable (1)**
63:22
**Chase (1)**
43:2
**checked (2)**
20:3,5
**choose (1)**
9:24
**chronology (1)**
35:25
**circuit (2)**
66:22;76:3
**circumstance (1)**
39:15
**circumstances (1)**
21:6
**cite (2)**
24:2,20
**Civil (3)**
22:11;73:8;74:6
**CL (1)**
41:17
**Claim (65)**
2:12,19,22;7:23;
12:12;13:14;14:1,
10;18:14,21,23,24;
19:9,10,12,17;22:3,
17;26:16;32:23,25;
33:4,19,21;35:22;

44:18,20,22,23,23,
24;45:3,4,6,24;
47:11,13,24;48:1,4,
24,25;49:3;52:16;
55:17,22,22;62:13,
21;66:2,3,5,6,10,12;
68:11;69:1,20;70:1;
71:10;72:6,7,9;73:7;
74:2
**claimant (2)**
40:15;61:17
**Claimants (13)**
27:20;43:5;45:14;
48:25,25;54:2,20;
56:7;57:2;59:16;
66:17;71:16;74:5
**claimant's (2)**
27:25;60:7
**Claims (60)**
2:6,8,10,11,12,15,
19,21;3:2,4;6:13,22;
19:10,24;24:17;
25:10;26:15;27:16,
19;39:22,23,25;40:1,
2;55:6;58:15,17;
62:11;64:1,3,10,11,
15;65:2,6,7,9,24;
66:17,24;68:2,3,7,8,
13;69:7,10,13;71:14;
72:1,4,5,19,20,22;
74:22,25;75:7,19,25
**clear (7)**
25:22;37:20;45:7;
46:10;47:2;57:5,15
**clearly (5)**
18:5;23:4;45:6,22;
58:5
**clerk (1)**
20:4
**client (6)**
9:19;13:17;16:22;
17:14;48:9;57:18
**clients (7)**
48:15;49:4,7;
50:19;54:15;56:17;
58:4
**client's (1)**
14:16
**close (2)**
57:2;63:25
**CNO (1)**
19:6
**Code (3)**
44:1;45:24;55:17
**collateral (2)**
22:18;23:21
**colleague (1)**
19:20
**collect (2)**
9:13,17
**collected (1)**
72:10
**Collection (1)**

9:11
**Colleen (3)**
5:20;26:17;27:1
**colloquy (1)**
63:21
**commence (1)**
67:18
**commenced (2)**
7:11;54:19
**comment (1)**
61:16
**commonplace (1)**
15:14
**communicate (1)**
11:17
**compensable (3)**
34:24;35:9,13
**complaint (9)**
7:12,20,21;8:22;
9:10;30:4,19;45:13,
16
**complete (2)**
40:5;76:10
**completed (3)**
20:18,20,22
**completely (1)**
32:20
**concern (2)**
14:3;24:13
**concerned (2)**
13:5;45:2
**concerning (2)**
36:4;37:1
**concerns (1)**
12:12
**concluded (1)**
76:16
**condition (2)**
21:13,15
**Conference (6)**
2:3,10;7:10,16;
12:12,25
**confidential (2)**
21:1,2
**confidentiality (1)**
21:7
**confirmation (6)**
63:16;64:1,2,17,
19;65:23
**confirmed (1)**
31:22
**confirming (2)**
31:16;36:1
**conflict (1)**
36:25
**conflicted (2)**
36:21,23
**conflicting (2)**
36:3,5
**confused (1)**
67:5
**connected (1)**
20:9

**connection (1)**
35:14
**consensual (2)**
65:2,3
**consequential (1)**
57:13
**consider (1)**
75:11
**considered (4)**
69:9;75:2,4,10
**considering (1)**
54:25
**consummated (1)**
20:23
**contacts (1)**
60:19
**contemplated (1)**
13:13
**contended (1)**
52:10
**contention (2)**
54:15;72:18
**contents (1)**
73:16
**contested (3)**
26:13;61:13,14
**continue (1)**
21:4;22:9
**continued (2)**
9:9;68:10
**contract (23)**
34:1;35:22,24;
37:12,15;39:21;48:4,
19,21;50:10,22,24,
24;51:17,18;52:16,
19,21,23,25;55:21,
22;58:16
**contrary (1)**
33:2
**conversation (2)**
40:18;52:4
**conversion (1)**
19:12
**copy (1)**
38:19
**corrected (1)**
34:9
**correctly (1)**
29:21
**correspondence (1)**
39:3
**cost (2)**
17:25;18:3
**counsel (21)**
8:1,3;11:17;12:3;
14:1;17:22;20:15;
26:23;39:5;44:10;
49:1;50:15;56:4,6;
57:7;58:7;59:16,16;
60:7;61:10;62:4
**counsel's (1)**
54:15
**counterterms (1)**

58:7
**counting (1)**
74:4
**couple (2)**
58:20;73:14
**course (3)**
24:14;49:19;71:7
**COURT (343)**
7:2,19;8:1,3,8,9,
13,15,19,22;9:6,14,
18,22;10:3,7,9,12,14,
17,20,22,25;11:3,10,
19,22,24;12:1,3,8,14,
15,17,20,23;13:2,20,
23;14:4,7,13,16,19,
22,24;15:3,3,5,7,10,
12,16,18,20,22,24;
16:11,12,14,15,18;
17:2,8,21;18:9,21;
19:5,13,22,25;20:5,
7,11,13;21:4,5,9,12,
16,18,20,23;22:1,24;
23:3,9,14,24;24:2,7,
13;25:3,7,14,16,20;
26:14,18,20,23;27:2,
5,7,13;28:1,7,15,21,
23;29:1,6,8,10,13,16,
19,21,23;30:1,3,6,9,
12,16,21,23,25;31:2,
6,11,13,16,19,22;
32:1,6,9,12,15,17,22;
33:3,6,14,18,25;
34:2,5,8,13,17,20,22;
35:3,7,12,19;36:5,8,
12,18,20;37:6,13,24;
38:5,10,13,15,20,24;
39:2,5,10,13,21,25;
40:2,4,11,13,17,22,
25;41:6,11,20,22,25;
42:5;43:24;44:6,8,
14,16,19;45:5,11,17,
19,22;46:1,14,16,22;
47:4,6,10,16;48:3,
21;49:2,8,11,13,17,
21,22;50:9,11;51:9,
11,24;52:15,25;53:4,
8,11,14,21,24;54:1,2,
4,8,12,22;55:3,5,14,
19,24;56:9,12;57:22;
58:13,22,25;59:14,
20,23;60:3,6,12,14,
17,21;61:3,10,23;
62:3,7,9,17,19,24;
63:3,5,8,11,14,22;
64:7,9,12,14,19,22,
24;65:10,11,13,14,
17,19,21;66:5,10,14,
20,21,22;67:2,23;
68:5,9,15,19,23;
69:2,11,11,15,22,23,
25;70:2,3,4,4,5,15,18,
21,24;71:2,12,13,19,
21,24;72:13,23,25;

73:2,12,13,17,24;
74:8,10,18,20;75:1,
2,23,25;76:2,5,7,9,
12,12
**COURTCALL (3)**
20:6,8,12
**courtroom (3)**
15:25;16:21,23
**courts (1)**
75:3
**Court's (7)**
10:1;20:16;22:9,
19,23;25:4;61:11
**covered (1)**
13:7
**create (1)**
23:15
**credit (2)**
34:10;57:9
**creditors (1)**
47:18
**crystal (1)**
25:22
**Ct (2)**
43:3,13
**current (2)**
8:25;9:10
**currently (2)**
20:8;53:6
**customer (1)**
31:10
**cut (1)**
41:13

**D**

**damages (22)**
30:13,25;32:24;
33:21;34:12,14,24,
25;35:7,13;43:1,12;
44:6;47:17,22;
51:23;52:1;57:1,13;
59:9;61:17;67:19
**DANIEL (1)**
6:18
**date (13)**
12:6;15:13;16:18,
20,20;17:12,18;18:6;
24:25;37:4;60:22,
25;65:1
**dates (1)**
53:25
**David (1)**
3:20
**day (5)**
9:10;11:11,13;
59:20;64:7
**days (7)**
29:15,20;36:3;
46:15;59:17;60:15,
23
**DCR (1)**
68:14

deal (2)
11:19;43:14
dealing (1)
49:1
deals (1)
50:20
dealt (2)
50:15;71:8
debt (3)
7:22;9:2,11
debtor (1)
47:18
debtors (1)
28:1
debtors' (2)
27:24;28:2
deceive (3)
40:7;42:20;47:2
December (2)
59:25;63:17
decide (1)
51:24
decided (5)
55:7;58:15;67:13,
19;73:11
deciding (1)
43:22
decision (10)
21:13;25:11,23;
55:2,15;68:13;69:8,
16;70:2;74:23
decisions (4)
24:23;69:16;
74:24;75:13
declaration (4)
18:25;27:10;41:8;
52:3
declarations (2)
18:19;38:19
declaratory (1)
19:13
Defendant (4)
27:9;42:10,15,20
defendants (3)
8:7,8;12:4
defending (1)
22:16
defense (1)
23:16
defer (1)
56:6
denied (5)
25:20;26:8;54:19;
65:12;71:10
denying (4)
25:21;51:17;
52:22,23
derivative (1)
35:17
deriving (1)
43:4
describe (1)
21:1

described (1)
32:17
describing (2)
37:8;63:22
designated (1)
24:8
detail (1)
54:24
details (2)
54:6;55:24
determine (2)
7:21;19:7
determined (2)
24:18;68:2
determining (1)
75:9
Deutsche (8)
5:3;7:23;8:12,24;
9:1,12,12;11:17
dialing (1)
20:9
difference (6)
33:19,20;36:6;
55:8,21;61:18
different (7)
24:15;47:15;52:7;
55:13;59:11;67:24;
72:16
difficult (1)
49:21
directed (1)
43:12
disagree (2)
21:5;48:1
disagrees (1)
21:3
disallowed (3)
64:8,9,11
disallowing (1)
74:25
discharged (2)
23:5,10
disclose (1)
21:21
discount (1)
74:7
discounting (1)
72:1
discovery (11)
20:18,20;22:4,13;
58:14,17;59:6,9;
60:2;61:6,7
dismiss (12)
7:13,14,23;8:15;
9:25;10:15,18;11:2,
9,11;35:10;42:23
disposed (1)
11:22
dispute (5)
17:25;36:13;
38:13;39:6;43:17
Disputed (13)
2:8;3:3;17:10;

30:23,24;39:8;40:8;
52:1;62:13,21;66:10,
12,17
disputing (4)
28:16,20;50:23;
51:12
disregard (2)
46:5;47:7
distribute (1)
72:23
distributed (1)
47:19
Distribution (7)
2:7;3:3;62:12,21;
63:19;64:6;74:5
distributions (6)
65:1,6;66:23;
72:21;75:14,19
district (10)
65:10;66:21;
68:18;69:11,22;70:2,
3;75:1,3;76:2
division (1)
31:10
divulge (1)
73:15
Doc (2)
2:3,17
Doc# (6)
2:6,10,15,17,21;
3:2
docket (7)
18:24;20:17;
24:11;27:20,21;
41:8;62:13
docketed (1)
69:23
document (2)
13:1;73:21
documentation (6)
49:6;50:1,2,6,6;
52:20
documented (1)
20:22
documents (3)
53:15;54:21;69:4
dollar (2)
47:20;66:2
dollars (5)
61:18;66:13;
72:11;75:22,23
down (5)
8:20;22:1;32:18;
41:9;48:18
draw (1)
25:4
drawn (1)
42:22
dropped (1)
55:17
DUANE (5)
5:2;8:11
due (2)

37:4,9
duplicative (1)
34:16
During (1)
13:3
duty (6)
28:13,24;29:2;
31:3;33:10,15
dwelling (1)
61:24

# E

earlier (6)
23:5;47:16;55:13;
67:15;68:17;71:12
early (1)
63:18
ECF (3)
18:24;19:1,4
economy (1)
23:19
effect (5)
22:10;25:23;37:9;
48:14;49:10
effectiveness (1)
21:13
effort (3)
58:2,10;61:20
efforts (2)
58:8;60:18
either (8)
28:7;38:21;39:17,
18;49:4;53:22;65:8;
66:21
element (1)
42:24
elements (4)
42:8,24;43:2,15
else (7)
18:18;62:24;63:3,
6;67:25;72:14;73:3
email (4)
53:15,17;60:10,14
Embarcadero (1)
6:4
employed (1)
58:23
employee (1)
69:4
encompassing (1)
45:1
endeavor (1)
13:25
ended (2)
73:15,17
enforce (1)
39:14
enforceable (2)
33:10;37:14
engage (2)
13:24;22:21
enlighten (1)

67:21
enough (2)
52:19,21
enter (2)
37:19;52:18
entered (4)
20:16,16;63:17;
67:8
entire (1)
49:19
entirely (3)
37:7;53:9;58:6
entitled (8)
13:12;14:8;16:5,6;
47:11,12;70:11;
72:10
entries (1)
42:8
entry (4)
40:18;41:1,8;
42:19
equitable (5)
22:10;23:7,11,14;
71:12
ERLINDA (3)
6:24;63:2;76:3
erroneously (2)
28:9,9
error (9)
29:14;32:14;34:8;
35:18;43:18,19;50:3,
5,7
eScribers (1)
3:21
ESQ (5)
5:7,16,25;6:8,18
essence (1)
9:10
essentially (4)
17:19;35:10;
37:11;42:23
establish (4)
19:15;47:7;50:25;
62:21
established (1)
19:8
Establishing (3)
2:8;3:3;62:13
establishment (1)
63:19
Estate (2)
18:15,23
estimate (1)
64:15
estimating (1)
75:10
estimation (2)
51:25;65:24
estop (1)
51:16
estoppel (6)
22:18;23:21;48:6,
6;50:22;52:23

**ETS (1)**
67:18
**even (7)**
24:7;28:23;53:3;
56:12;65:25;66:1,8
**everybody (1)**
65:4
**everybody's (1)**
70:16
**evicted (1)**
45:15
**evidence (2)**
22:14;49:5
**evidentiary (2)**
61:25;65:2
**exactly (1)**
14:5,12;49:19
**examined (1)**
28:1
**examining (1)**
27:24
**except (3)**
16:4;21:11;23:23
**excessive (1)**
72:19
**exchange (1)**
50:14
**excused (1)**
12:4
**execute (2)**
67:17;69:4
**executed (1)**
13:7
**exert (1)**
60:4
**exhibit (3)**
38:18;41:7;65:16
**exhibits (1)**
59:4
**exist (1)**
58:20
**existed (1)**
50:7
**existence (4)**
50:23;51:17;
52:22,23
**existing (2)**
42:11;43:8
**expect (1)**
16:21
**experience (3)**
59:1;66:16;72:12
**expert (1)**
61:7
**explained (1)**
13:7
**explaining (2)**
15:23;16:9
**expression (1)**
37:17
**expunge (1)**
27:25
**expunged (3)**
19:17;65:9;68:6
**expungement (1)**
19:9
**expunging (2)**
72:4;74:24
**extent (6)**
30:18;37:7;55:25;
67:19;74:25;75:3
**extreme (1)**
47:8

**F**

**facie (2)**
19:8,15
**fact (15)**
17:11;30:23,24;
37:16,20;40:8;
42:11;43:8,10;46:13,
20;49:10;61:6;
65:16;67:14
**facts (2)**
43:16;69:3
**factual (3)**
19:15;67:16;69:5
**failure (1)**
7:23
**Fair (3)**
9:11;45:17;74:16
**fairly (2)**
33:11;57:7
**fall (1)**
32:7
**false (4)**
42:10,11,15,16
**far (1)**
59:25
**Fargo (3)**
53:10,16,16
**favor (1)**
54:2
**favorable (2)**
50:18,18
**Federal (1)**
22:10
**feel (1)**
11:8
**FEENEY (1)**
5:19
**fees (24)**
13:6,8,12,22;14:2,
8,11;16:4,6,7,25;
30:7,12,13,19;34:18,
23;48:18;57:3,5,11;
59:15,16,16
**felt (1)**
23:18
**few (5)**
29:15;36:3,14;
57:24;60:15
**figure (1)**
69:11
**file (7)**
8:18;11:9;16:16,
24;21:15;46:7,8
**filed (31)**
2:12;7:13;8:15,17;
10:10;11:1;12:12;
18:14,16,16,22,23,
25;19:1,2,6,14;
20:15;26:16;27:19,
20,20,21;30:4;45:14,
16;62:13;63:18;
68:1;69:23;73:22
**filing (1)**
30:19
**final (5)**
17:23;22:20;55:1,
15;69:9
**finally (1)**
55:7
**find (5)**
13:23;26:7;46:7;
54:2;59:4
**findings (1)**
69:5
**fine (2)**
11:19;17:9
**firm (3)**
10:24;62:16;70:23
**firm's (1)**
70:12
**first (14)**
7:8;13:4;14:5;
24:10;25:11;26:3,
13;35:21;38:7;48:9;
49:14;59:9;68:6;
74:12
**five (1)**
43:1
**fix (1)**
30:10
**fixed (2)**
47:19;52:11
**FLANIGAN (37)**
6:18;62:15,18;
63:9,16,23;64:11,13,
16,21,23;65:12,15,
18,20,22;66:6,12,15;
67:1;68:15,21,25;
70:6,8,17,19;71:21,
23;72:8;74:20;
75:20,24;76:4,6,8,15
**Flanigan's (1)**
68:14
**Floor (2)**
5:22;6:15
**Foerster (4)**
12:5;19:24;27:16;
67:3
**follow (2)**
37:18,23
**followed (1)**
30:5
**following (1)**
52:6
**force (2)**
14:16;22:10
**forced (1)**
58:4
**foreclo (2)**
35:14;42:13
**foreclose (3)**
32:3;42:6;73:10
**foreclosed (7)**
28:9;29:13;42:17;
43:20;46:18,24;57:6
**foreclosing (1)**
28:3
**foreclosure (27)**
19:11;29:18,22;
33:24;34:3,6,9,10,
25;35:1,4,8,15,16;
41:18,22,23,25;
42:14;45:14;46:12,
23;50:4;56:22;57:8,
12;67:18
**foremost (1)**
59:10
**form (1)**
72:16
**formal (6)**
37:22,24;50:1,2,5;
52:20
**format (1)**
61:12
**formation (1)**
52:21
**forth (4)**
18:19;39:10;
51:25;52:17
**forthcoming (1)**
52:20
**forty- (1)**
25:18
**forward (18)**
7:8,16;10:1;11:14;
15:7,12;35:17;
37:11;51:21;55:3,5,
7;57:1;60:9,20;
61:14;65:25;69:14
**found (2)**
28:2;55:14
**four (3)**
15:15;68:2;71:15
**Fox (1)**
43:13
**Francisco (2)**
5:23;6:6
**frankly (1)**
55:8
**fraud (15)**
33:23;42:9;43:6,
21;44:20,20,23;
45:21;46:3;47:11;
48:1;55:7,10,14;
58:16
**frauds (1)**
38:1
**frequently (1)**
24:19
**front (1)**
25:16
**full (2)**
22:9;37:17
**funds (3)**
75:5,8,8
**further (6)**
8:20;27:22;32:7;
53:12;70:12;71:3
**fussing (1)**
57:3
**future (3)**
37:19;38:25;71:14

**G**

**Gardephe (4)**
67:8,24;73:23,24
**Gardephe's (1)**
69:16
**gather (1)**
54:5
**gave (1)**
22:13
**general (4)**
9:3;19:5;49:25;
74:21
**Gerard (2)**
18:14,22
**gets (4)**
39:6;47:20;59:2;
72:6
**giant (1)**
28:3
**gist (2)**
8:22,23
**given (5)**
25:7;45:3;58:12;
66:16;72:12
**gives (1)**
53:18
**giving (1)**
36:22
**global (1)**
13:14
**GM (1)**
51:16
**GMA (1)**
46:15
**GMAC (43)**
6:3;7:4,11,11,17,
24;8:4;9:7,9,12;
27:9;28:2,8,14,15,
16;29:4,8,23;30:9;
31:4,14,23;35:1,18;
36:10,12,21;40:7;
41:2;42:6,11;46:5;
48:24;50:3,16,23;
52:18;53:16;54:19;
58:20,23;67:17
**GMAC's (2)**

31:16;50:7
goes (3)
  47:21;57:1;70:11
Good (12)
  7:7;23:17;26:25;
  27:8,15;44:11,12;
  49:7;62:6;63:1;69:5;
  76:4
Gosselin (4)
  2:13;5:11;12:13,
  22
Gosselin's (2)
  13:14;15:3
governs (1)
  64:17
granted (2)
  18:20;56:13
great (2)
  15:8;61:4
GREGORY (3)
  6:8;27:9;65:17
ground (3)
  23:8;33:12;35:13
grounds (3)
  11:8;35:20;43:8
grown (2)
  56:15;57:24
guess (13)
  7:3;9:21;22:4;
  28:16;39:18;44:2,
  12;50:14;56:20;
  61:18;65:19;67:4,23

**H**

Halloran (11)
  5:20;26:17;27:1;
  28:17;31:14;36:9,
  14;41:17;50:14;
  52:4,10
Hallorans (3)
  29:15;36:2;40:7
Halloran's (5)
  26:23;31:19,22;
  36:13;51:2
handed (1)
  22:1
handful (1)
  65:3
happen (1)
  56:24
happened (3)
  9:4;46:14;56:23
happening (1)
  46:6
happens (1)
  66:22
happy (2)
  17:14;18:17
hard (4)
  33:1;43:5;46:7;
  60:7
harm (1)

48:16
heading (2)
  12:11;18:12
headway (1)
  59:18
HEAL (49)
  5:10,16;12:19,19,
  21,22,22;13:4,16,20,
  21;14:3,12,15,18,21,
  22,23;15:2,4,6,9,11,
  14,17,19,21,23;16:9,
  14,17;17:1,6,7,19;
  18:6,8;62:25,25;
  63:7,7;73:4,5,19,25;
  74:9,11,18,19
Heal'd (1)
  13:11
hear (8)
  13:20;15:16;
  21:24;35:19,21;
  44:10;63:11;71:3
heard (5)
  14:11;68:19;70:5;
  71:15;73:3
hearing (9)
  7:15;9:24;60:22,
  23,25;61:25;62:4;
  63:21;65:8
hearings (1)
  65:3
heavier (1)
  47:25
heavy (1)
  41:14
held (3)
  65:5,6;71:14
help (1)
  73:6
here's (2)
  37:22;56:10
hiccup (1)
  12:25
higher (1)
  51:5
highly (2)
  13:23;72:19
himself (2)
  18:14,22
hinged (1)
  24:17
hold (1)
  46:19
holder (1)
  8:25
holders (1)
  72:20
home (3)
  43:21;46:18,20
homestead (2)
  22:16;23:16
homework (1)
  74:13
honestly (1)

57:18
Honor (155)
  7:7,8,15,22;8:2,10,
  17,23;9:8,21;10:8,
  19,23;11:5,16,21;
  12:7,10,12,16,24;
  13:21;14:12,23;
  15:14,17;18:8,11,11,
  13,18;19:18,19,23;
  20:4,14,17,25;21:14;
  22:12,25;23:12,13;
  24:3,6;25:1,2,13,18,
  19;26:9,9,11,25;
  27:4,8,11,15,18,23;
  28:6,11,20;29:5,9,
  25;30:20;31:1,9,15,
  21,25;32:5,19;33:2,
  13;34:4,12;35:11,23;
  36:7,11,19;37:10;
  38:4,12,14;39:9,20,
  24;40:9,12,21;41:4,
  16,24;42:4;44:5,7,
  11;45:1,9,25;46:25;
  47:9,15;48:2,20;
  49:15,24;51:7;
  52:14;53:7,13,20;
  54:13;55:2;56:7;
  57:17,18;58:1;59:8,
  13,22;60:19;62:2,6,
  8,10,22;63:1,9,10,12,
  16,17,24;64:16;
  65:22;66:13,16;
  67:1;68:1,22;69:6;
  70:14,22;71:1;
  72:15;74:19;75:20;
  76:6,11,14,15
hope (1)
  58:25
hopefully (1)
  11:7
hostage (2)
  65:5,6
house (1)
  56:23
HSBC (2)
  68:12;73:20
HUBER (3)
  6:8;27:8,9

**I**

identified (1)
  75:7
identify (1)
  44:14
ignorance (1)
  43:10
implicit (1)
  42:13
implied (1)
  32:3
important (1)
  75:14

inapplicable (1)
  32:21
inappropriate (1)
  72:19
included (2)
  50:16;61:24
including (2)
  52:3;70:16
increase (1)
  38:24;52:7,7;
  74:21
increased (1)
  48:12
increasingly (1)
  65:7
incurred (6)
  30:7;18;34:18,23;
  35:7;57:12
indicated (1)
  11:5
induce (1)
  43:9
industry-wide (1)
  9:3
inference (1)
  42:5
inferences (2)
  40:15;42:22
influence (2)
  56:1;60:4
information (1)
  73:6
informed (1)
  13:4
initial (5)
  34:6;41:7;50:15;
  51:3;52:6
initially (1)
  22:4
injunction (1)
  44:4
injunctive (2)
  19:13;45:8
injustice (1)
  52:24
Instead (1)
  50:17
institution (1)
  46:6
intend (1)
  8:18
intended (3)
  17:8;42:20;52:18
intent (3)
  40:7;43:9;47:1
intention (3)
  25:25;70:3;72:22
intentional (2)
  33:24;40:3
intentionality (2)
  46:4;47:1
interest (17)
  23:19;36:14,15,22,

24;37:22;38:24;
48:13;50:15,21;51:3,
14;52:6,6,11,12;
61:19
interested (1)
  57:19
interests (1)
  23:18
Interim (4)
  2:7;3:3;46:10;
  62:12
interlocutory (6)
  22:20,23;23:15,
  20;67:11;68:17
internal (5)
  29:14;32:13;50:5;
  53:14,16
into (6)
  37:19;41:14;50:8;
  52:18;54:24;72:24
invalid (2)
  9:1,16
involved (4)
  22:22;56:20;58:3,
  21
involvement (1)
  70:16
irregularities (1)
  19:11
irrespective (2)
  11:5,6
issue (21)
  16:4,24;18:5;
  22:17;24:13,22;
  25:23;30:23,24;
  32:24;33:9;34:17;
  38:6;40:8,25;48:6,
  19;51:14;66:20;
  67:16;71:6
issues (7)
  17:10;25:8;26:2;
  35:4;67:15;69:18;
  73:9
item (6)
  7:8;12:11;18:11;
  19:19;27:18;62:10

**J**

join (2)
  7:14;9:24
joinder (1)
  11:12
Joint (6)
  2:17;20:14;21:17,
  19;23:1;60:24
Jordan (1)
  27:15
JPMorgan (1)
  43:2
Judge (6)
  62:18;67:8,24;
  69:16;73:16,23

12-12020-mg    Doc 10193    Filed 10/14/16    Entered 10/24/16 09:50:27    Main Document

RESIDENTIAL CAPITAL, LLC, et al.                                    Pg 85 of 92

Case No. 12-12020-mg                                                October 13, 2016

**judgment (7)**
8:18;23:3,4,4,6,7,
15
**judicata (2)**
22:18;23:21
**judicial (1)**
23:19
**junction (1)**
45:21
**June (8)**
30:4,5;54:17;
63:18;67:6,7,10;
68:17
**justifiable (1)**
43:11
**justifiably (1)**
42:25
**justifies (1)**
25:6
**justify (1)**
25:8

## K

**KAREN (3)**
5:25;26:25;44:15
**Kearny (1)**
5:21
**keep (2)**
58:10,11
**kick (2)**
50:21;51:5
**kind (1)**
70:10
**knew (2)**
42:15,18
**knowledge (3)**
11:6;46:5;53:13
**known (2)**
22:18;42:18
**Kravitz (7)**
6:12,22;63:10,10,
12,12,14

## L

**La (2)**
63:7;66:4
**lacked (1)**
68:7
**LAIRD (6)**
5:10,16;12:19,22;
62:25;63:7
**language (3)**
71:5,7,18
**last (8)**
27:2,4;42:24,24;
61:16;62:10;69:22;
74:12
**lasting (1)**
14:25
**later (1)**
36:3

**Lathrop (3)**
18:25;40:24,25
**Lathrop's (1)**
41:7
**LAW (24)**
5:10;10:24;14:4;
16:10,13;17:5;24:15,
15,18,21,24;25:9,10;
26:2;28:12;33:7,9;
37:23,25;38:2;
39:13;45:7;51:21;
70:23
**lawsuit (1)**
11:8
**Lawyer (1)**
31:13
**lead (1)**
55:12
**least (12)**
16:19;17:18;32:3;
35:9;39:7;46:9;
51:12;58:14,16;
60:23;74:1,16
**leave (1)**
9:22
**leaves (1)**
55:19
**led (1)**
29:17
**left (2)**
64:3;72:11
**legal (6)**
19:16;21:25;22:6;
31:7;34:18,23
**lender (2)**
33:8,9
**less (2)**
26:4;47:20
**letter (18)**
31:9,14,17,20,22;
36:1,3,9,12,13,20;
37:17;38:19,21;
46:11,22;50:16;51:2
**letters (7)**
36:9;37:2,18;
39:11;50:13,14,19
**level (1)**
26:5
**liability (1)**
29:1
**liens (1)**
7:21
**liked (1)**
54:8
**likely (1)**
43:19
**limit (1)**
25:25
**limited (3)**
58:19;62:22;70:22
**line (2)**
8:21;20:9
**lines (2)**

41:9;57:20
**lingering (1)**
74:1
**Liquidating (4)**
68:3;7;69:8,21
**list (1)**
20:5
**litany (1)**
32:20
**litigate (1)**
21:8
**litigation (4)**
22:21;49:20;
54:23;56:25
**little (1)**
8:20
**LLC (5)**
3:21;5:3;6:3;7:5;
8:5
**LLP (1)**
5:2
**Loan (50)**
5:3;8:11,24;9:7,9;
28:3,4,10;31:7,17,
24;32:2;33:8,10,11,
15;37:1,3,6,7,9,15;
38:2,3,10,22;39:7,8;
40:17,19;41:1,3;
42:1,1,7,12,19;
51:13;52:2,11;53:5;
54:9,16;56:3,4,8;
58:4;59:3,5;61:18
**loan- (1)**
28:18
**long (2)**
22:1;58:12
**longer (4)**
22:8;23:7,11;
46:20
**look (9)**
7:19;14:4;24:9;
42:18;55:3,9;64:24;
65:23;69:15
**looked (5)**
14:5;36:8;39:6;
48:13;74:24
**lot (6)**
45:1;55:20;59:1;
61:24;62:1;65:1
**lots (1)**
43:14
**lower (1)**
50:17
**luck (1)**
69:5
**lump (1)**
11:20

## M

**MA (1)**
5:14
**Mack (3)**

66:4;76:1,1
**mailed (3)**
38:11,15,18
**mainly (1)**
40:10
**makes (1)**
55:8
**making (6)**
42:20;55:15;
57:19,23,23;63:19
**manageable (1)**
64:5
**Management (3)**
2:10;61:5,10
**manifestation (1)**
37:19
**manifesting (1)**
37:11
**many (7)**
25:9,11;52:12;
57:21,22;58:8;66:16
**March (1)**
54:18
**Massachusetts (2)**
14:4;15:15
**material (9)**
36:7,25;37:16;
39:16,18;42:11;
43:8;51:15;52:9
**materials (1)**
10:6
**matter (20)**
7:8;10:1;12:11;
13:18;16:3;17:23;
18:10,20;20:16;
23:16;25:24;26:2,12,
13;30:20;37:16,20;
58:2;61:14;70:13
**Matters (6)**
18:12;21:8;61:13;
70:19;74:23;75:12
**maturity (1)**
37:4
**may (18)**
9:24;12:4;17:17;
20:9;17;25:21,23;
27:12;35:4;39:22;
54:24;58:22;59:3;
60:7;72:10;73:6;
74:13;75:5
**Maybe (6)**
15:16;34:25;
46:19;56:3;60:14;
67:2
**MCL (1)**
19:10
**mean (20)**
24:9;29:3;32:18;
34:5;35:3;37:8;42:8;
43:14;45:13;46:18;
47:2,21,23;49:24;
54:5;56:10,12;
58:22;61:23;73:18

**meaning (1)**
24:16
**means (1)**
41:17
**meet (3)**
66:7,7;70:10
**mention (1)**
13:22
**mentioned (1)**
73:6
**merits (2)**
69:14;75:11
**might (5)**
14:7;22:22;30:25;
39:23;53:10
**million (2)**
66:2;71:16
**mind (1)**
10:19
**mine (2)**
24:20;70:16
**minimum (4)**
46:4;47:7,8;55:5
**Mira (1)**
67:16
**misconduct (1)**
9:6
**misrepresentation (22)**
28:8,15;29:2;
30:14,17;31:3;32:24,
25;33:19,24;43:7,7,
12,24;44:22;45:3;
46:10;47:3,13,24;
55:6,11
**misrepresented (1)**
43:10
**mistake (3)**
28:3;30:10;40:9
**mistakes (1)**
32:19
**misunderstandings (1)**
75:21
**misunderstood (1)**
49:11
**mod (1)**
41:18
**modification (41)**
28:4,10,19;29:6,
15;31:8,17,24;32:2;
33:11,16;37:6,17;
38:7,21;39:19;
40:19;41:3;42:12;
43:18;48:10,14;
49:25;50:13;51:13;
52:5;53:19;54:4,10,
16,18,19,21;55:1;
56:1,13,14,19,24,25;
57:19
**modifications (3)**
48:22,24;58:4
**modified (6)**
37:2,22;38:3;
52:11;57:9;61:19

**moment (3)**
20:10;38:12;40:21
**momentum (1)**
58:11
**Monday (2)**
14:24;16:19
**money (3)**
18:1,4;56:17
**month (3)**
52:7;59:20;60:17
**months (4)**
48:11;49:1;51:8;
52:12
**moot (1)**
35:4
**more (9)**
36:25;40:9;48:15;
50:18,18;59:4;60:9;
66:19;69:6
**morning (3)**
26:25;36:9;44:11
**MORRIS (4)**
5:2;8:11;65:15,17
**Morrison (4)**
12:5;19:23;27:16;
67:2
**Mortgage (12)**
6:3;7:4,11,12,24;
8:5,25;27:9;28:14;
40:7;54:19;57:23
**most (2)**
65:2,3
**Motion (30)**
2:6,6,15,17;3:2;
7:13,14;8:15,18;
9:25;10:15,17;11:1,
9,12,12;20:14;21:19;
23:1;26:7;35:10;
42:23;62:11,20;
63:18,20,21;64:3;
68:14;73:3
**motions (4)**
7:22;9:23;11:10;
19:6
**move (7)**
10:1;11:7,14;60:9,
20;61:14;73:25
**moving (3)**
19:7,14,14
**much (11)**
11:23;19:18;
20:11;26:4;47:20,
25;54:24;57:4;59:4;
62:9;66:11
**multiple (4)**
24:17;25:8;47:17;
64:25
**MURPHY (1)**
5:19
**mute (2)**
40:23;41:12
**myself (1)**
63:4

# N

**NA (1)**
43:2
**name (3)**
27:2,4;44:15
**named (1)**
10:23
**necessarily (1)**
47:15
**necessary (3)**
64:15;66:19
**necessity (1)**
40:16
**need (8)**
43:6;44:22,23;
49:25;61:5;71:3;
72:15;75:17
**needs (2)**
41:18;50:1
**negligence (12)**
19:12;28:8;33:4,
10,15,21;34:16;40:3;
43:24;44:23;55:6,11
**negligent (17)**
28:8,15;29:1;
30:14,16;31:2;32:23,
25;33:19;43:7,24;
44:22;45:3;47:12,
23;55:6,11
**negotiate (1)**
33:11
**negotiation (2)**
13:22;55:25
**negotiations (6)**
13:3,24;48:18;
54:4,6;56:21
**neither (1)**
49:15
**New (9)**
3:23;6:16,16;
22:14,22;24:19;
37:7;39:14;41:18
**next (13)**
7:15;9:23;11:13;
12:11;15:1;17:16;
18:10;26:10,12;
59:20;60:24;62:4,10
**nice (1)**
66:3
**No-Liability (1)**
2:11
**none (2)**
52:8;65:25
**nonstructurability (1)**
7:22
**NORA (29)**
20:2,2,22;21:2,5,6;
22:5,8;23:8,13;
24:22;25:1,4,12,15;
26:11;62:22,23;70:7,
15,21,22;71:1,5,20,

24;72:14,15;73:1
**Norm (1)**
19:23
**Nos (1)**
2:19
**notarize (1)**
41:19
**note (2)**
54:14;73:10
**noted (2)**
7:9;27:18
**notes (12)**
38:11,17;40:18;
41:1;42:2,7,19;46:7,
9;49:5;59:3,5
**notice (1)**
17:18
**notwithstanding (1)**
54:15
**November (2)**
59:21;60:22
**nullified (1)**
21:7
**Number (19)**
2:15;18:21,24,24;
19:19;20:17;24:11;
26:16;27:20,21;
41:8;50:20;62:1,13;
65:7;66:3,18,19;
69:20
**numerous (1)**
52:18
**NY (1)**
3:23

# O

**object (1)**
72:18
**objected (2)**
67:4;70:15
**Objection (31)**
2:11,15,19,21;
18:13,14,15,17,19,
21,23,25;19:2,3,4,5,
16;22:3;26:16;
27:11,19,22,23;
32:11;48:23;54:14;
67:11;70:7,8,11,22
**objections (2)**
70:9;76:1
**objectors (2)**
65:25;66:25
**obligation (2)**
9:13,17
**obligations (1)**
37:5
**obviously (2)**
50:18;59:10
**occasions (2)**
47:17;64:25
**occur (2)**
9:6;26:3

**o'clock (1)**
76:13
**October (3)**
19:2;69:24,24
**Ocwen (13)**
5:3;8:11,24;9:12;
53:7;54:25;58:3;
59:18;60:1,4,6,12,19
**Ocwen's (1)**
58:6
**odd (1)**
49:5
**oddly (1)**
48:25
**of-contract (1)**
19:12
**off (3)**
41:13;54:5;60:10
**offer (1)**
74:16
**offering (1)**
9:19
**offers (3)**
54:16,17;58:6
**office (1)**
10:6
**often (3)**
24:19;56:9;65:4
**Omnibus (7)**
2:11;7:15;9:23;
59:20;60:22,25;62:4
**omnibus-hearing (1)**
11:13
**once (4)**
8:20;33:15,22;
75:21
**One (36)**
6:4;7:4;11:13,20;
16:3;24:19;28:17;
38:5,12,19,20;40:21;
43:19;44:2;47:20;
48:10;49:4,4,6,13,
14,16,20;57:15,15;
59:13;60:9;61:16;
65:13,14;67:2;69:6;
70:11;73:9;74:16;
75:12
**one-off (1)**
26:2
**ones (2)**
47:5;68:11
**only (11)**
13:25;33:21;
34:15;44:3;45:7;
49:5;50:2,7;67:13;
73:15;74:4
**open (1)**
17:20
**operations@escribersnet (1)**
3:25
**OPERATOR (4)**
20:6,6,8,12
**Opinion (22)**

2:17;20:16;21:25;
22:1,7;23:25,25;
24:20,25;25:19;26:3,
8;36:6;67:6,7,8,13,
15;68:6,17;69:2;
73:11
**opinions (1)**
67:5
**opposition (2)**
26:5;62:20
**oral (2)**
31:23;36:1
**Order (23)**
2:7,18;3:2;22:9,
19,20,23;23:2,20;
61:6;62:12;63:16;
64:17,19;65:23;67:8,
10,11;72:16,18,23;
75:18;76:7
**ordering (1)**
75:17
**orders (3)**
61:11;71:6;73:16
**original (3)**
37:9;38:2,19
**others (5)**
7:11,12;29:23;
47:21;68:12
**otherwise (2)**
15:10;50:6
**ought (3)**
56:24;57:16;60:23
**out (17)**
16:2,8;31:16;33:6;
36:10;39:16;46:19;
47:17;48:7;49:10;
51:18;53:17,21;
59:25;60:19;69:12,
24
**outcome (1)**
55:21
**over (4)**
13:3;25:12;48:18;
65:18
**overruled (6)**
22:2;67:12;68:18;
70:24,25;71:3
**Overruling (1)**
2:18
**owing (1)**
28:13
**own (3)**
9:2;24:23;73:13
**owned (1)**
73:10
**owner (1)**
53:9
**owners (1)**
46:20
**owns (1)**
53:5

## P

**PA (1)**
5:5
**page (6)**
7:9;18:12;19:19;
24:10;25:19;41:5
**pages (3)**
25:11,13;54:14
**paid (1)**
74:6
**papers (9)**
19:7,14,15;38:15;
51:12;53:11;57:2,5;
71:2
**paragraph (2)**
28:22;32:10
**pardon (1)**
45:12
**Part (14)**
2:18,18;13:8,9,13;
20:24;22:2,3;53:15;
67:12,12;68:14,18,
18
**participant (1)**
7:17
**participating (1)**
23:17
**particular (3)**
9:4;46:7;47:3
**particularity (1)**
44:21
**particularly (1)**
45:2
**parties (12)**
20:24;21:15;
22:22;23:17;26:1;
37:1,21;38:1;48:5;
50:1;54:25;60:25
**party (3)**
39:18;43:11;54:5
**party's (1)**
37:5
**passed (1)**
48:11
**past (3)**
42:10;43:8;73:14
**pay (1)**
56:18
**payment (1)**
56:8
**payments (10)**
37:4,9;50:20;56:3,
4,16;57:20,23,24;
71:14
**PC (1)**
6:11
**PEARSON (1)**
5:19
**pending (8)**
25:24;49:20;
58:10;69:17;70:1;

71:17;75:2,11
**people (5)**
46:9;58:20,22;
67:3;71:14
**percent (2)**
36:15;52:12
**percentages (1)**
72:2
**perform (1)**
13:15
**perhaps (2)**
59:17,19
**permit (2)**
62:3;73:5
**person (1)**
71:11
**personal (1)**
24:22
**Peter (4)**
6:12,22;63:10,12
**Philadelphia (1)**
5:5
**phone (17)**
8:3,8;12:4;20:1,3;
26:24;40:23,23,24;
41:4,12,12,14;60:8;
63:10,13;67:4
**physically (1)**
60:7
**picked (1)**
46:8
**picking (1)**
41:13
**Pite (3)**
10:24;11:1,18
**place (1)**
50:2
**places (1)**
52:18
**plaintiff (6)**
8:6;10:23;42:21,
25;43:1;73:20
**Plaintiff's (2)**
8:1,3
**pleaded (1)**
55:11
**pleading (1)**
64:17
**pleadings (2)**
10:9;19:1
**pleads (1)**
55:10
**please (3)**
7:2;10:20;17:22
**pleased (1)**
17:13
**pled (4)**
43:21;44:21;45:1,
20
**plural (1)**
68:2
**PM (1)**
76:16

**podium (4)**
11:25;19:20;
26:21;62:15
**point (17)**
7:15,24;9:21;
42:21;44:3;45:2,16;
56:13;57:7;59:2;
65:22;66:15;69:1,7;
71:24;73:14;74:4
**Pollack (1)**
43:13
**POLSINELLI (5)**
6:11;62:16;70:12,
23;71:7
**pool (2)**
64:5;75:8
**position (9)**
7:13;13:9;16:10;
18:3;35:24;39:17;
40:11,12,13
**possible (1)**
75:15
**possibly (4)**
7:14;23:20;30:20;
35:20
**potential (1)**
61:17
**potentially (1)**
34:15
**powers (1)**
23:14
**practices (2)**
9:3,11
**preceded (1)**
29:17
**precluded (1)**
52:22
**preclusion (1)**
22:18
**preclusive (1)**
25:23
**preliminary (1)**
39:14
**prepared (1)**
14:17
**present (2)**
61:20;75:18
**presently (1)**
71:11
**preserve (2)**
45:18;59:17
**pressure (1)**
58:11
**Pre-Trial (5)**
2:3;7:9,10,16;
16:15
**pretty (3)**
45:7;47:2;66:18
**prevail (2)**
16:6,7
**prevailed (1)**
14:8
**prevent (2)**

13:5;50:23
**prevented (1)**
50:8
**preventing (1)**
72:20
**prevents (1)**
52:23
**prima (2)**
19:8,15
**principal (1)**
37:3
**prior (9)**
18:4;21:12;22:9,
19;24:20,23;46:15;
59:1;74:24
**PRO (4)**
6:24,25;8:14;22:4
**probably (3)**
26:4;59:8;69:9
**problem (2)**
22:15;60:10
**problems (1)**
23:15
**Proc (1)**
2:2
**Procedure (1)**
22:11
**proceed (1)**
13:16
**proceeding (5)**
7:4,10;8:5,9;42:14
**proceedings (5)**
45:15;46:12;50:4;
61:13;76:16
**produce (1)**
49:6
**produced (1)**
53:15
**Professions (3)**
44:1;45:23;55:17
**progress (3)**
55:16;61:1,5
**promised (1)**
57:21
**promissory (2)**
48:6;52:22
**proof (4)**
27:25;35:19;40:6;
42:21
**proofs (1)**
59:10
**properly (3)**
32:23,25;68:3
**property (3)**
28:10;37:15;42:6
**propose (2)**
11:4;13:18;66:1,
10
**proposed (7)**
13:15;39:19;48:8;
71:25;72:17;75:6,16
**prospectively (2)**
23:7,11

**prove (3)**
33:21;34:23;57:11
**provide (3)**
37:2;51:13,22
**provided (2)**
10:6;38:21
**provides (1)**
72:16
**providing (1)**
61:6
**proving (1)**
43:6
**provision (2)**
21:1;65:23
**public (2)**
21:11;23:22
**publica (1)**
24:8
**publication (4)**
24:5,10,12;26:6
**published (1)**
23:25
**pulling (1)**
25:15
**punitive (2)**
47:17,22
**pure (1)**
28:8;33:3,3
**purposes (2)**
22:15;35:9
**pursuing (1)**
13:6
**put (11)**
13:18;14:19;
40:23;41:12;44:21;
50:8;52:3;56:17;
60:21;72:24;73:8
**putting (1)**
51:3

## Q

**quite (4)**
17:13;56:15;
57:24,25
**quo (2)**
45:18;59:17

## R

**raise (4)**
16:12,12,15;48:6
**raised (1)**
55:13
**raises (1)**
51:14
**rate (17)**
36:14,15,22,24;
38:24;48:13;50:15,
17;51:4,14;52:6,6,7,
12;61:19,19;74:15
**rates (4)**
37:22;50:21;51:5;

53:25
**rational (1)**
51:22
**raw (1)**
62:1
**Re (2)**
2:2,5
**reach (4)**
13:25;17:23;
20:21;60:19
**reached (2)**
17:15;60:1
**reaching (3)**
24:23;26:3;74:23
**read (6)**
45:8;51:12;57:14,
15;69:16;71:2
**ready (6)**
13:14,16;14:14;
16:1,21;17:11
**real (2)**
22:15;37:15
**reallocation (1)**
72:17
**really (7)**
11:7;16:8;34:11;
43:16;47:24;57:16;
74:10
**reason (7)**
25:6,7;28:11;50:3,
7;56:10;74:16
**reasonable (4)**
42:5,22;43:8;66:1
**reasonably (2)**
51:25;53:1
**reasons (2)**
18:19;23:17
**recall (2)**
20:18;63:18
**receive (6)**
38:16;41:19;48:9,
10;49:4;54:16
**received (5)**
18:16;38:7;49:7,
15;58:7
**receiving (1)**
72:21
**recess (1)**
76:12
**recites (2)**
67:14,14
**reckless (3)**
46:5;47:7,8
**recognize (1)**
34:8
**reconsider (1)**
73:12
**record (2)**
7:24;71:8
**records (4)**
27:24;28:2,5;
73:22
**recounted (1)**

36:14
**recover (1)**
72:3
**recoverable (3)**
30:13;57:1,13
**reduce (1)**
56:19
**reduced (2)**
48:13;64:5
**reducing (1)**
74:1
**references (1)**
48:24
**referring (1)**
48:23
**reflect (2)**
34:10;40:18
**reflected (3)**
28:4;39:2;51:16
**reflecting (1)**
41:2
**regard (1)**
46:3
**Regarding (3)**
45:21;46:6;69:20
**regards (4)**
7:8;13:16;69:7,10
**related (1)**
59:9
**Relates (1)**
2:12
**relating (1)**
37:15
**released (2)**
23:5,9
**relevant (1)**
42:8
**reliance (2)**
43:10,11
**relied (1)**
42:25
**relief (11)**
19:8,13,16;25:6,8,
20;44:3;45:8;47:11;
54:1;55:14
**relieve (1)**
23:14
**reluctance (2)**
24:21,24
**rely (2)**
22:22;24:23
**relying (1)**
23:1
**remain (1)**
37:9
**remaining (5)**
25:10;72:3;74:23;
75:11,18
**remains (1)**
17:25
**remand (1)**
71:15
**remedies (1)**

45:7
**remember (2)**
23:24;24:8
**rendered (2)**
75:1,13
**repeat (2)**
24:16,16
**reply (2)**
17:3;27:21
**report (5)**
34:10;57:9;60:22,
24,24
**reported (1)**
16:3
**reportedly (1)**
50:13
**represent (2)**
8:11;70:13
**representation (10)**
31:4,23;32:3;36:1;
42:10,12,15,20,25;
52:20
**representative (6)**
18:15,22;31:7,7;
40:19;41:2
**represented (7)**
8:7,9;20:22;28:16,
18;32:2;41:5
**request (4)**
21:19;25:20,21;
28:19
**requesting (1)**
63:19
**require (2)**
44:20;74:20
**required (3)**
37:23,25;51:21
**requiring (1)**
75:10
**reread (1)**
69:16
**res (2)**
22:18;23:20
**ResCap (15)**
2:6,10,18,21;3:2;
6:13,22;19:24;
24:14;25:9;26:15;
27:16;55:25;62:11;
69:21
**rescinded (9)**
29:18,22;34:4,9;
35:1,5,8;57:8,12
**rescission (2)**
30:5,19
**Reserve (18)**
2:8;3:4;62:21;
63:19;64:6;66:10,13,
23;70:10;71:25;
72:3,12;74:21,22;
75:6,9,16,17
**reserved (2)**
62:13;72:10
**reserves (4)**

71:10;72:6,7,8
**reserving (2)**
66:24;71:6
**Residential (2)**
7:3;73:19
**resolution (2)**
13:14;58:12
**resolve (2)**
11:7;24:14
**resolved (7)**
18:2;46:1;54:9;
61:15;65:7;72:2;
75:3
**resolves (1)**
24:20
**respect (4)**
31:2;33:7;67:6;
71:6
**respective (1)**
37:5
**respond (2)**
17:4;70:7
**responded (2)**
7:24;31:18
**response (6)**
18:16;19:2,14;
27:21;31:19;58:7
**responsible (1)**
47:3
**restitution (2)**
44:4;45:8
**restrict (1)**
25:25
**result (4)**
21:9;23:22;52:24;
55:12
**resulting (1)**
43:1
**retained (1)**
57:6
**retired (1)**
17:20
**return (1)**
54:20
**returned (1)**
56:8
**reversed (5)**
23:6,10;66:22;
69:5;72:5
**review (1)**
19:7
**reviewed (2)**
19:5,13
**revised (3)**
45:13;75:18;76:7
**Rhonda (3)**
2:13;5:11;12:13
**RICHARD (1)**
6:25
**RICO (2)**
73:8;74:6
**right (64)**
7:2,2;8:19;9:16;

10:11,13;11:3;12:9;
14:22;17:7;19:25;
20:13;21:23;22:13;
24:10;25:14,15,16,
20;33:13,17,23;35:6,
11;36:19;39:1,9,12,
19,20;40:4;41:11;
44:12,25;46:1;47:4;
49:2,11;51:9;53:23;
54:11,22;55:1,18,23;
57:8;58:24,24;62:3,
7;63:23;65:21;
66:14;68:9;69:13,
15;70:2,5;71:5;
72:13;73:2;74:18;
76:7,9
**rights (1)**
25:25
**rise (1)**
40:15
**road (1)**
20:19
**RODE (13)**
6:25;20:1,15,16,
18,21;22:3,4,21;
23:18,21,25;24:22
**Rode's (3)**
22:16;23:16;25:25
**Roland (2)**
18:15,23
**Roseberry (6)**
7:4,11;8:4,4,14,23
**Roseberry's (1)**
7:16
**Rosenbaum (36)**
10:17,19,21,23;
11:1,4,16,21,25;
19:21,23,23;20:13,
14;21:12,14,17,19,
21;22:24,25;23:12,
24;24:1,3,11;25:2,
11,16,18;26:9,12,15,
19,21;27:18
**Rosenbaum's (1)**
12:2
**roughly (2)**
41:9;72:2
**round (1)**
66:3
**rounded (1)**
36:15
**Rptr (1)**
43:13
**Rule (2)**
23:1;25:5
**ruled (1)**
47:17,22;66:21
**Rules (2)**
22:11;61:12
**ruling (1)**
18:5
**rulings (1)**
75:1

**running (1)**
34:25
**Rutt (1)**
3:20

# S

**sake (1)**
58:25
**sale (1)**
19:11
**same (8)**
11:11;12:6;26:5;
34:17;55:12;61:12;
70:8;73:8
**San (2)**
5:23;6:6
**Sarah (1)**
18:25
**satisfactorily (1)**
43:21
**satisfied (4)**
23:5,9;55:9;71:17
**satisfy (4)**
56:18;72:7,9;
74:22
**save (2)**
59:15,16
**saves (1)**
52:15
**saw (4)**
46:22;53:14;57:5;
61:23
**saying (4)**
37:21;46:22;61:3;
71:8
**schedule (1)**
11:12
**scheduled (3)**
7:10;12:5;20:20
**scheduling (3)**
9:22;61:6,11
**screwed (1)**
29:10
**SE (4)**
6:24,25;8:14;22:4
**seated (1)**
7:2
**second (11)**
24:5;41:11;48:10,
14;49:6,13;54:16;
67:13,23;69:2;73:11
**Section (2)**
19:10;44:2
**seeing (1)**
18:1
**Seek (3)**
21:16,25;22:22
**seeking (6)**
19:9;21:8,19;22:6;
30:22;44:6
**seeks (1)**
27:25

**seem (5)**
9:2;47:23;48:4;
57:4,10
**seemed (1)**
71:13
**seems (5)**
42:12;47:2;51:15;
52:9;56:22
**send (2)**
60:10,14
**sending (1)**
50:3
**sent (12)**
31:10,14;36:9,12,
21;46:11,22;48:25;
49:3;50:5,16;69:24
**separate (2)**
14:1,10
**September (4)**
20:17;25:1;67:9;
69:22
**serve (1)**
11:12
**served (5)**
7:12,18,25;9:20,24
**serviced (1)**
53:6
**servicer (4)**
8:24;29:4;33:8,10
**Services (1)**
8:11
**Servicing (17)**
5:3;8:24;9:7,9;
38:11,17;40:18;
41:1;42:1,2,7,19;
46:7,9;49:5;59:3,5
**set (11)**
18:19;33:6;36:10;
39:10,16;51:21,25;
52:17;53:17,21;
58:21
**sets (2)**
48:7;51:18
**setting (1)**
31:16
**settle (11)**
14:9,9,9;15:8,18,
18,20;17:9,9,10,10
**settled (9)**
12:14;16:3,4;
17:13;22:12;23:16;
57:16;58:9;61:4
**settlement (33)**
13:1,3,5,6,7,12,15,
17,21,24,25;14:6,17,
17;17:14,15,23;
20:21,23,23,24,25;
23:18,22;56:21;58:2,
12;60:2
**settling (2)**
57:3;61:1
**Seventy-Fifth (1)**

2:11
**SEVERSON (1)**
6:2
**shortly (3)**
17:12;28:10;54:19
**shot (1)**
18:1
**show (5)**
38:11,15,17;
43:16;70:10
**shows (1)**
52:18
**sic (1)**
43:9
**side (1)**
40:6
**sides (3)**
16:21;18:3;21:24
**sign (2)**
13:17;14:17
**signed (5)**
37:25;39:17,18;
48:5;49:25
**simple (5)**
16:8;17:6,15;40:9;
70:13
**simply (6)**
9:25;36:13;37:8,
18,21;71:10
**situation (2)**
64:18;65:24
**Six-million-dollar (1)**
66:5
**slander (1)**
19:12
**slight (1)**
36:22
**slightly (3)**
48:15;50:17,18
**SLIPAKOFF (10)**
5:7;8:10,10,14,17,
20,23;9:8,15;12:7
**small (1)**
65:7
**Smith (10)**
62:22;66:3;70:7,8,
11;71:8;72:5,7,18;
76:3
**Smith's (1)**
72:4
**Smoot (2)**
67:16;68:12
**sold (1)**
53:12
**Solely (1)**
2:12
**solid (2)**
33:11;35:12
**somebody (3)**
56:13;60:12;67:25
**somebody's (1)**
43:20
**someone (2)**

42:6;43:20
**somewhat (1)**
67:5
**soon (4)**
15:13;57:7;73:21;
75:14
**Sorry (9)**
10:19;12:1;27:2;
44:12;48:20;59:9;
63:11;66:12;69:6
**sort (2)**
43:19;56:17
**sought (1)**
19:16
**sounded (1)**
54:8
**South (1)**
5:4
**speak (7)**
13:9;36:7;37:3,4,
5,15;47:1
**specific (3)**
9:4;48:24;75:6
**specifically (3)**
48:23;72:9;75:12
**spend (1)**
61:24
**split (1)**
33:8
**stage (1)**
55:8
**stand (1)**
72:2
**standing (2)**
42:3;68:8
**standpoint (2)**
9:22;17:24
**start (2)**
46:23;60:2
**started (3)**
9:8;45:15;50:4
**starting (2)**
14:24;16:19
**state (9)**
7:23;24:16,16,18,
21;25:9;29:23;
49:20;73:13
**state-court (1)**
27:10
**stated (2)**
32:23,25
**statements (1)**
71:13
**states' (1)**
24:15
**stating (1)**
46:11
**statistical (1)**
63:20
**Status (6)**
12:12,24;45:18;
59:17;60:22,24
**statute (1)**

38:1
**stayed (1)**
54:23
**Step (2)**
51:11;70:11
**stepped (2)**
51:14;53:25
**StepUP (8)**
38:22;39:7,8;
50:21;51:4,13;52:2;
53:24
**StepUPs (1)**
51:7
**still (11)**
24:7;46:19;49:20;
56:23;58:20,25;
68:16;70:1,3;74:2,15
**stipulation (1)**
20:25
**stop (4)**
34:17;40:22;
54:12;73:2
**stopped (1)**
34:25
**stops (1)**
15:7
**straightforward (1)**
32:12
**stranger (1)**
29:4
**Street (4)**
3:22;5:4,12,21
**strike (2)**
55:25;61:7
**S-T-R-O (1)**
27:6
**STROMEYER (46)**
5:25;26:25;27:1,4,
6,6,44:11,15,15,17,
25;45:9,12,18,20,25;
46:3,15,17,25;47:5,
8,14;48:2,20,22;
49:3,9,12,15,18,23;
50:10;51:6,10,20;
52:14,17;53:3;56:7,
11;57:18;58:1,19,24;
62:8
**stronger (1)**
35:20
**stuff (2)**
14:20;15:7
**Submit (2)**
60:22;76:7
**submitted (2)**
24:5;27:10
**subsection (1)**
25:5
**subsequently (1)**
29:18
**substantial (8)**
25:12;56:19;
60:25;61:4;72:11;
74:2,15,17

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

October 13, 2016

substantially (2)
56:15;57:25
substituted (1)
73:20
successors-in-interest (1)
22:17
suffer (1)
47:18
suffered (4)
35:13;43:1;48:17;
57:13
sufficient (4)
11:11;42:23;
52:19;67:18
sufficiently (1)
51:22
suggest (1)
40:6
suggested (1)
40:14
suggestion (1)
59:13
Suite (3)
3:22;5:13;6:5
summary (1)
8:18
support (2)
27:10,22
supporting (1)
18:19
supports (1)
16:10
suppose (2)
23:10;66:23
supposed (4)
15:25;51:18,24;
72:22
Supreme (1)
65:12
sure (28)
11:7;28:25;30:11;
33:5,18;34:19,21;
35:23;38:14;41:16;
43:23;49:22,25;
53:20,20;54:3,7;
55:4;58:22;59:4,14;
60:11,13;61:2,22;
67:22;68:19,21
surprising (1)
13:24
survive (4)
42:23;58:15,17;
59:12
survives (2)
33:20;47:24
surviving (1)
33:21
sustained (4)
19:17;22:2;67:11;
68:18
Sustaining (1)
2:18
sword (1)

32:8
system (1)
42:1

**T**

Talk (3)
12:5;53:24;75:12
telephone (3)
16:22;40:18;62:4
TELEPHONICALLY (4)
5:7,25;6:8,21
telling (1)
46:18
template (1)
61:10
ten (2)
41:9;46:9
tend (1)
25:11
term (1)
51:7
terms (44)
13:4,15;21:10,22;
23:22;36:1,4,7,10,
13,14,21;37:1,8,8,
16;39:10,16,19;
41:18;48:8,14;49:7,
10,18,23;50:12,25;
51:1,16,18,20,21,25;
52:5,9,17,19,25;
53:18,21;66:16;
70:9;73:8
testify (2)
50:12;68:12
Texas (5)
24:15,18,24;
25:10;26:2
Thanks (4)
11:23;20:11;62:9;
63:14
theirs (1)
50:5
theory (1)
57:11
thereafter (1)
52:8
therefore (1)
9:16
thereon (1)
43:11
there're (1)
19:6
thinking (1)
49:24
Third (2)
6:14;54:16
thirty (1)
59:17
Thomas (1)
63:7
thoroughly (1)
27:23

thought (3)
12:14;49:13;67:9
threat (1)
17:8
three (8)
14:25;15:1,15;
16:19;17:16;46:15;
63:25;76:1
throughout (1)
49:19
Tia (6)
62:22;66:3;70:6,8,
11;76:3
Timothy (3)
41:9,10,16
title (1)
19:12
today (5)
17:2,24;59:19;
62:20;71:8
today's (5)
7:9;12:11;19:20;
27:19;62:11
together (2)
60:7,8
told (5)
10:14;43:17;52:5,
10;58:14
took (2)
50:2;68:12
top (1)
41:10
tort (5)
39:22,23,25;40:1,2
total (2)
75:23,24
touched (1)
46:9
toward (2)
56:19;58:11
Town (1)
73:22
transaction (1)
22:22
Transcribed (1)
3:20
trial (32)
13:18;14:7,14,24,
25;15:8,12,22,24;
16:1,1,1,2,13,18,18,
20,20,23;17:5,11,11,
12,15,18;18:4,5,6;
20:19,19;68:11;69:3
trials (1)
16:22
tried (6)
22:14;49:10;54:8;
56:8,9;67:16
true (1)
43:9
Trust (36)
2:7;3:2;6:13,23;
17:25;18:25;19:2,8,

24;20:15;23:19;
27:17,20,24;56:1,14;
59:15;60:3,6;62:12;
66:17;68:2,4,7,11;
69:8,10,14,21;70:13;
72:22,24;73:9,19;
74:2,21
Trustee (2)
6:12,22
Trusts (3)
2:11,19,21
Trust's (4)
17:23;18:13;22:3;
26:16
truth (1)
43:11
try (8)
11:14,19;18:1;
58:10;59:25;60:9;
61:5;66:7
trying (7)
9:25;13:1;53:25;
54:25;57:21
turn (1)
24:4
twenty (1)
25:12
twenty-five (1)
64:3
twenty-six (1)
24:15
two (15)
17:17,18;37:1,2;
42:24;48:24;58:15,
16;60:23;67:5;68:2,
13;69:7,9,14
type (2)
47:1;58:11
typing (2)
40:22;41:13

**U**

ultimately (2)
48:18;55:14
Um-hum (7)
20:12;25:3;30:8;
35:2;38:9,23;39:4
unambiguous (1)
37:11
uncertain (1)
48:22
unclear (2)
13:11;68:16
Uncontested (2)
18:12;19:6
under (22)
12:11;13:15;
18:12;19:10;21:6,
21;22:10;24:15,18;
25:9,10;28:12;33:9;
37:23,25;39:14;
44:3;51:20;59:2;

61:11;64:2;69:21
underlying (1)
28:13
understood (3)
51:3;57:17;62:2
undertake (2)
58:18;59:7
undertaking (1)
70:9
undisputed (1)
43:16
Unfair (1)
44:1
unlikely (1)
26:3
unliquidated (1)
68:25
unpaid (4)
48:11,12;56:15;
57:24
unqualified (1)
58:5
unresolved (1)
25:10
up (14)
9:22;14:19;22:13;
24:19;25:15;29:10;
33:21;41:13;46:8;
51:14;53:25;58:21;
60:17;66:24
upon (3)
9:11;50:13;56:2
use (3)
23:14;60:17;61:12
used (4)
22:12;66:24,25;
71:8
usually (1)
24:9

**V**

Vacate (4)
2:17;20:15;22:6;
26:7
vacated (5)
21:9;22:1;23:6,10;
57:8
vacating (1)
21:12;26:5
value (1)
61:20
variety (1)
40:2
various (1)
36:10
versus (1)
66:17
view (2)
19:6;71:21
violation (1)
9:10
void (2)

12-12020-mg   Doc 10193   Filed 10/14/16   Entered 10/24/16 09:50:27   Main Document

RESIDENTIAL CAPITAL, LLC, et al.
Case No. 12-12020-mg

Pg 91 of 92

October 13, 2016

23:3,4

## W

**wait (3)**
35:19;41:11;46:19
**waiting (1)**
73:21
**walk (1)**
18:17
**wants (1)**
15:8
**Ward (4)**
5:20;26:16,23;
27:1
**Ward-Halloran (2)**
28:3,18
**water (1)**
59:2
**way (9)**
14:1,10;29:10;
44:21;57:4;63:22,
24;66:19;70:10
**ways (1)**
34:9
**website (1)**
61:11
**week (4)**
17:1,2,3,17
**weeks (6)**
14:25;15:1;16:19;
17:16;30:20;73:14
**weeks' (1)**
17:18
**Wells (3)**
53:10,16,16
**Wendy (2)**
20:2;62:23
**weren't (3)**
11:7;22:14;46:8
**WERSON (1)**
6:2
**West (2)**
3:22;43:2
**Westlaw (2)**
24:7;26:7
**Weston (1)**
73:22
**What's (10)**
7:19;8:22;18:10;
22:6;24:25;48:19,
21;52:13;59:5;71:21
**whatsoever (1)**
11:8
**Whereupon (1)**
76:16
**Whoever's (1)**
41:12
**whole (4)**
11:14;55:20;
61:24;72:12
**who's (3)**
20:21;50:12;65:15

**whose (2)**
71:14,17
**Wiener (4)**
18:14,15,22,23
**willingness (1)**
37:19
**wish (5)**
12:4;58:14,17;
59:6;73:3
**Wishnew (161)**
7:6,7,21;8:2;9:18,
21;10:5,8,11,13,16;
11:5,24;12:2,9,10,
15,18,24;13:3;17:3;
18:10,11;19:18;
26:22;27:14,15,16;
28:6,11,20,22,25;
29:5,7,9,12,14,17,20,
25;30:2,4,8,11,15,18,
22,24;31:1,5,9,12,15,
18,21,25;32:5,7,10,
13,16,18;33:1,5,13,
17,23;34:1,4,7,11,15,
19,21;35:2,6,11,16,
23;36:6,11,17,19,24;
37:10,14;38:4,9,12,
14,17,23;39:1,4,9,12,
20,23;40:1,3,5,12,14,
21,24;41:4,7,15,16,
21,23;42:3;43:23;
44:5,7;53:4,5,6,9,13,
20,23;54:3,7,11,13,
23;55:4,18,23;56:6;
57:14,17;59:3,6,8,
15,21,24;60:5,11,13,
16,18;61:2,9,22;
62:2,6,10;67:21,22;
68:1,6,10;69:6,13;
76:9,11,14
**Wishnew's (1)**
12:21
**withdrawing (2)**
45:6,23
**withdrawn (1)**
73:20
**withdrew (2)**
63:20;73:19
**within (2)**
17:1;29:20
**without (2)**
43:8;54:24
**witness (1)**
50:11
**won (1)**
66:17
**Worcester (1)**
5:14
**words (1)**
72:4
**work (2)**
46:19;49:10
**working (1)**
49:19

**writing (4)**
39:17;48:5,7;50:8
**written (1)**
35:24;60:22
**wrongful (6)**
33:24;34:3,6,24;
35:14,15
**wrote (1)**
67:5

## Y

**years (5)**
52:12;57:21,22,
24;63:25
**York (4)**
3:23;6:16,16;
39:14

## Z

**zero (1)**
64:15

## 0

**01609 (1)**
5:14

## 1

**1 (2)**
2:3;43:7
**10 (1)**
54:14
**10022 (1)**
6:16
**10040 (1)**
3:23
**10068 (1)**
2:17
**10085 (1)**
2:17
**10092 (2)**
2:15;18:24
**10092-3 (1)**
19:1
**10132 (1)**
2:21;27:21
**10136 (3)**
2:6;3:2;62:14
**10168 (1)**
2:10
**10170 (1)**
19:4
**10th (1)**
5:22
**11 (2)**
54:20;69:24
**112 (1)**
69:20
**114 (1)**
69:21

**120 (1)**
5:12
**12-12020 (1)**
7:3
**12-12020-mg (1)**
2:5
**126 (1)**
41:5
**13th (1)**
59:19
**154 (1)**
43:2
**16-01202 (2)**
7:5;8:5
**16-01202-mg (1)**
2:2
**17200 (8)**
44:2,3,18,24;45:3,
6,24;55:17
**17th (2)**
5:4;59:21
**19103 (1)**
5:5
**192nd (1)**
3:22
**1986 (1)**
43:13
**1st (1)**
59:25

## 2

**2 (4)**
7:8,9;36:16;43:8
**2,650,000-dollar (1)**
66:3
**2.875 (1)**
50:17
**2.88 (3)**
36:15;50:17;52:12
**2011 (2)**
54:17;67:17
**2012 (3)**
54:18,24;56:5
**2013 (2)**
43:3;63:17
**2014 (1)**
63:18
**2015 (5)**
20:17;25:1;67:6,8,
10
**2016 (4)**
19:2;67:7,9,14
**20th (2)**
67:7,14
**21st (1)**
6:15
**22 (2)**
28:22;32:10
**226 (1)**
43:13
**22nd (3)**
31:13;41:8;52:10

**26 (1)**
67:9
**26,250,000-dollar (1)**
66:6
**26,500,000 (1)**
73:7
**2600 (1)**
6:5
**26th (1)**
69:22
**285 (1)**
43:3
**2892 (4)**
2:15;18:14,21,24
**28th (3)**
31:12,17,18
**2nd (2)**
20:17;25:1
**2R (1)**
5:13

## 3

**3 (4)**
12:11;18:12;
19:19;66:2
**3,000 (1)**
64:1
**3:44 (1)**
76:16
**30 (1)**
5:4
**30th (3)**
67:6,7,10

## 4

**4 (6)**
18:12;23:3;43:9,
10;69:24;76:12
**4,400,000 (1)**
66:13
**400,000 (1)**
61:17
**416 (1)**
70:1
**417 (1)**
70:1
**432 (1)**
51:8

## 5

**5 (6)**
19:19;22:11,12;
23:1,4;43:12
**500,000 (2)**
75:22,23
**500,000-dollar (1)**
74:21
**532 (1)**
43:13
**5610 (1)**

2:19
**5612 (1)**
2:19

## 6

**6 (4)**
19:2;22:12;25:5;
27:18
**600 (1)**
64:2
**600.3205 (1)**
19:10
**60b (2)**
22:11;25:5
**60b4 (1)**
23:1
**67 (1)**
41:5
**684 (2)**
2:22;26:16

## 7

**700 (1)**
3:22

## 8

**875 (2)**
36:17,18
**88 (1)**
5:21
**8th (2)**
30:4,5

## 9

**9 (1)**
54:14
**900 (1)**
6:14
**9094 (2)**
20:17;24:11
**94108 (1)**
5:23
**94111 (1)**
6:6
**973406-2250 (1)**
3:24
**9980 (3)**
2:21;27:20;41:8