**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | NOT FOR PUBLICATION |
|  | ) |  |
|  | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) |  |
|  | ) | Chapter 11 |
| Debtors. | ) |  |
|  | ) | (Jointly Administered) |

**MEMORANDUM OPINION AND ORDER SUSTAINING THE RESCAP BORROWER
CLAIMS TRUST'S REMAINING OBJECTION TO CLAIM NO. 3759
FILED BY FRANK REED**

*A P P E A R A N C E S :*

REED SMITH LLP
*Co-Counsel for the ResCap Borrower Claims Trust*
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, NJ 08540
By:     Barbara K. Hager, Esq.

FRANK REED
*Pro Se Claimant*
P.O. Box 12139
817 Matlack Drive
Moorestown, NJ 08057
By:     Frank Reed

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

   Frank Reed ("Reed") is a builder and contractor.  After developing several real estate

properties in New Jersey, including his primary residence on Matlack Drive in Moorestown,

New Jersey, Reed ventured into the Virginia real estate market.  In Richmond, Virginia, Reed

purchased a plot of land on Brookschase Lane and a large house on Old Dell Trace.  After

investing time, energy, and money into the Old Dell Trace property, Reed experienced

difficulties in 2008 paying his monthly mortgage payments on his properties, and in May of

2008, Reed's loan servicer at the time, GMACM Mortgage LLC ("GMACM"), initiated a

foreclosure action in New Jersey state court relating to the property on Matlack Drive ("Matlack" or the "Matlack Property").  This foreclosure action was eventually dismissed because GMACM failed to prove it complied with New Jersey noticing requirements prior to the foreclosure action, and Reed brought suit against GMACM alleging, among other things, wrongful foreclosure.[1] Soon thereafter, Residential Capital, LLC ("ResCap") and various related entities (collectively, the "Debtors") filed chapter 11 bankruptcy petitions.  Reed timely filed claims in the ResCap bankruptcy case.[2]

In September of 2014, this Court conducted an evidentiary hearing on Reed's claims against GMACM, and ultimately awarded Reed $17,469 under the New Jersey Consumer Fraud Act (the "CFA").  Discussed in more detail below, Reed successfully appealed to the District Court, which found that this Court improperly excluded certain evidence relating to alleged damages resulting from the wrongful foreclosure action initiated by GMACM.  Now, on remand, this Court must determine whether Reed suffered any cognizable damages caused by the foreclosure unrelated to the property on Matlack Drive.  The Court conducted an evidentiary hearing from September 26, 2016 to September 29, 2016 (the "Trial"), and following the Trial, took the matter under submission.

As explained below, the Court finds that Reed failed to prove by a preponderance of the evidence that he suffered any cognizable damages recoverable on his remaining CFA claim beyond what he was previously awarded.  Therefore, the Trust's objection to Reed's claim is sustained and Reed's claim is expunged.

---

[1]    In this foreclosure action, GMACM asserted that it was the holder of the note and mortgage on the Matlack Property.  *In re Residential Capital,* 517 B.R. 462, 470–71 (Bankr. S.D.N.Y. 2014).

[2]    Reed and his wife filed a total of four claims in these bankruptcy cases.  Two claims were filed against ResCap (claims 3708 and 4759), then later asserted against RFC, and ultimately expunged.  Two claims were filed against GMACM (claims 3759 and 4736), but one of these claims was disallowed as duplicative, and at present only claim 3759 remains before the Court.  *Residential Capital,* 517 B.R. at 467, n.3.

This decision includes certain background information, and the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable to this contested matter under Fed. R. Bankr. P. 7052. The findings of fact include the Court's determinations relating to credibility.

## I.    BACKGROUND

An exhaustive recitation of the facts of this case can be found in this Court's previous opinion relating to Reed. *See In re Residential Capital*, 517 B.R. 462, 469–84 (Bankr. S.D.N.Y. 2014) (hereinafter, "*Rescap I*"). The facts relevant to the issues currently pending before the Court are set forth below. To the extent that this Court's findings of fact and conclusions of law in *ResCap I* were affirmed, the Court will not revisit those determinations.

### A.    The Debtors' Bankruptcy

On May 14, 2012 (the "Petition Date"), ResCap and various related entities filed chapter 11 bankruptcy petitions. On August 29, 2012, the Court entered an order setting the bar date of November 9, 2012 for filing non-governmental proofs of claim in the chapter 11 cases (ECF Doc. # 1309). On December 11, 2013, the Court entered an *Order Confirming Second Amended Joint Chapter11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* (the "Confirmed Plan," ECF Doc. # 6065). The Confirmed Plan became effective on December 17, 2013. (ECF Doc. # 6137.) Since the confirmation, the Trust has filed objections, omnibus and singular, to proofs of claims filed by creditors, including borrower claimants such as Reed. This contested matter arises out of the Trust's objection to Reed's proof of claim 3759.

### B.    The Reeds

Frank and Christina Reed were in the business of "buying, improving, and selling

homes." *Reed v. ResCap Borrower Claims Trust (In re Residental Capital)*, 552 B.R. 50, 54

(S.D.N.Y. 2015) (hereinafter, "*Rescap II*.").  They reside in some of the properties they purchase

for a period of time, while others serve as rental properties.  *Id.*

> On May 31, 2006, the Reeds took out a $1,000,000 loan (the "Loan") from
> Metrocities Mortgage, LLC ("Metrocities"), evidenced by a note (the "Note") and
> secured by a mortgage (the "Mortgage") on property located at 817 Matlack
> Drive, Moorestown, New Jersey. . . .  They made their last monthly payment on
> the Loan on January 4, 2008, and defaulted on the Loan in March 2008 after they
> had failed to make their payments for thirty days.
>
> The Loan was, at various times, owned by one entity but serviced by another.
> Metrocities conveyed ownership of the Loan to GMAC Bank; Residential
> Funding Corporation ("RFC") later acquired the Loan from GMAC Bank; and on
> February 6, 2013, RFC transferred ownership of the Loan to 21st Mortgage
> Corporation.   GMACM began servicing the Loan on June 27, 2006; the
> Mortgage, however, was not assigned to GMACM until May 22, 2008; and
> GMACM never owned the Note.  GMACM continued servicing the Loan until
> February 15, 2013, when Ocwen Loan Servicing, LLC ("Ocwen") took over
> servicing; Ocwen, in turn, transferred servicing to 21st Mortgage Corporation on
> October 1, 2013.  On October 6, 2014 . . . 21st Mortgage Corporation both owned
> and serviced the Loan.
>
> On May 19, 2008, GMACM, then the servicer of the Loan, initiated a foreclosure
> action (the "Foreclosure Action") in [New Jersey Superior Court].  On May 28,
> 2008, GMACM recorded a *lis pendens* on the Property.  The Superior Court
> dismissed the Foreclosure Action without prejudice on February 9, 2009 because
> GMACM could not prove that it had sent the Reeds a Notice of Intent to
> Foreclose ("NOI") as required under the New Jersey Fair Foreclosure Act (the
> "FFA") and the terms of the Mortgage.  The Reeds spent $5,823.00 on attorneys'
> fees to defend against the Foreclosure Action.

*ResCap II*, 552 B.R. at 54–55 (internal citations omitted).

On May 10, 2010, Reed filed a five count complaint in New Jersey Superior Court

against GMACM, RFC, and certain other unnamed defendants seeking damages on account of

negligently and/or recklessly filing the Foreclosure Action and recording a *lis pendens* against

Matlack, breach of contract, and alleging certain other theories of recovery.  *ResCap I*, 517 B.R. at 474–75.  Reed amended the complaint on January 6, 2012 to add claims for economic and non-economic losses caused by the Foreclosure Action, punitive damages, and consumer fraud under the New Jersey Consumer Fraud Act.  *Id.* at 475.  On February 9, 2012, the New Jersey court presiding over the dispute granted Reed's request to voluntarily dismiss the action without prejudice in order to participate in the Independent Foreclosure Review examination conducted by certain government regulatory agencies investigating alleged foreclosure abuses by mortgage servicing companies, including the Debtors.  *Id*. at 476.  Reed received a $500 payment in connection with the Independent Foreclosure Review.[3]  Following the Petition Date, Reed asserted his claims in the Bankruptcy Court.  Reed continues to reside at Matlack, and has not made a mortgage payment on Matlack since January of 2008, or paid property taxes on Matlack since the third quarter of 2006.  (Sept. 27, 2016 Tr. at 78:15–23; 70:1–3.)

    **C.**    **Procedural Background**

Reed timely filed proof of claim 3759 seeking relief for the following: violation of the New Jersey Fair Foreclosure Act (Claim 1), negligence (Claim 2), breach of contract (Claim 3), punitive damages related to actual malice (Claim 4), violation of the CFA (Claim 5), and malicious use of process (Claim 6).  Reed also sought to establish a constructive trust to avoid alleged unjust enrichment (Claim 7) and to be "made whole" (Claim 8).  *ResCap I*, 517 B.R. at 467.  Through the objection (the "Objection," ECF Doc. # 7017) of the ResCap Borrower Claims Trust (the "Trust") to proof of claim 3759 (the "Claim") filed by Reed, the Trust objected to Reed's claim in its entirety.

---

[3]    As noted in *ResCap I*, the $500 payment under the Independent Foreclosure Review represents "the lowest payout provided for in the [Independent Foreclosure Review] Waterfall" and "does not indicate or represent any determination or acknowledgement by the Debtors that the Reeds' Claims have merit or that they suffered any harm caused by the Debtors."  *ResCap I*, 517 B.R. at 477.

After conducting a hearing on the Objection on July 9, 2014, the Court sustained the

Objection in part and overruled the Objection in part in an order entered on July 11, 2014.  (*See*

*Order Sustaining in Part and Overruling Without Prejudice in Part the ResCap Borrower*

*Trust's Objection to the Reed Claims and Setting Evidentiary Hearing* (the "July 11, 2014

Order," ECF Doc. # 7246).)  The only surviving claims following the entry of the July 11, 2014

Order were Reed's claims for negligence, breach of contract, punitive damages based upon

actual malice, and the CFA claim.  *ResCap I,* 517 B.R. at 482*.*  The CFA claim survived solely

as it related to GMACM's misrepresentation that it owned the Note when, in fact, it did not.

(*See* July 11, 2014 Order at 8.)

On September 15 and 16, 2014, the Court conducted an evidentiary hearing on Reed's

remaining claims and the Trust's remaining objections.  *Id*. at 468.  The Court issued an opinion

dated October 6, 2014 finding GMACM liable for breach of contract and violation of the CFA.

*Id.*  The breach of contract claim arose out of GMACM's inability to prove that it sent Reed a

Notice of Intent prior to filing the Foreclosure Action on the Matlack Property; the CFA claim

related to the fact that GMACM did not have standing to foreclose on Matlack because it could

not demonstrate that it was the holder of the Note as of May 19, 2008, and was not assigned an

interest in the Mortgage until May 22, 2008.  *ResCap I,* 517 B.R. at 487, 493.  The Court held

that Reed did not prove his entitlement to damages for the breach of contract claim.  The Court

also held that Reed was entitled to recover damages on the CFA claim in the amount of $5,823

on account of attorneys' fees incurred in defending the improper foreclosure action on the

Matlack Property.  *Id.* at 496.  The Court trebled these damages under the CFA, resulting in an

award to Reed of an allowed unsecured claim in the amount of $17,469.  *Id.*  Reed then appealed

to the United States District Court for the Southern District of New York.  In a Memorandum

Opinion and Order dated December 23, 2015, Judge Woods affirmed *Rescap I* in part and

reversed it in part. *ResCap II*, 552 B.R. 50 (S.D.N.Y. 2015). Judge Woods found that at the

September 15 and 16, 2014 evidentiary hearing, this Court improperly excluded evidence offered

by Reed relating to potential damages suffered *other than* at the Matlack Property, and remanded

the matter to this Court to determine whether Reed sustained any cognizable damages as a result

of the Foreclosure Action beyond the damages relating to Matlack on which the Bankruptcy

Court had already heard and evaluated evidence. *Id.* at 65.

In advance of trial on the matters remanded to this Court, the Court ruled on several

motions *in limine* filed by the parties.[4] On September 9, 2016, Reed withdrew his claim for

breach of contract. (ECF Doc. # 10116.) Additionally, Reed is no longer seeking to recover

---

[4]      These motions *in limine* were ruled on in the following orders:

- Order Denying Creditor Frank Reed's Motion in Limine to Exclude Expert Report and Testimony of Oscar Marquis (ECF Doc. # 10117).

- Order Denying the ResCap Borrower Claims Trust's Motion in Limine to Exclude Evidence Not Previously Produced (ECF Doc. # 10118).

- Order Granting the ResCap Borrower Claims Trust's Motion in Limine to Exclude the Expert Testimony of Christy Soltun Donati (ECF Doc. # 10119).

- Order Granting in Part the ResCap Borrower Claims Trust's Motion in Limine to Exclude the Expert Report and Testimony of Stevie Watson (ECF Doc. # 10120).

- Order Denying the ResCap Borrower Claims Trust's Motion in Limine to Exclude Evidence of Damages at Trial (ECF Doc. # 10121).

- Order Granting in Part and Denying in Part the ResCap Borrower Claims Trust's Motion in Limine to Exclude Evidence Concerning Claimant's Attorney's Fees Incurred in Defense of the Foreclosure Action (ECF Doc. # 10122).

- Order Denying the ResCap Borrower Claims Trust's Motion in Limine to Exclude Evidence of Claimant's Attempts to Refinance the Matlack Property (ECF Doc. # 10123).

- Order Granting the ResCap Borrower Claims Trust's Motion in Limine to Exclude Evidence Concerning Claimant's Expert Witness Fees as Damages (ECF Doc. # 10124).

damages related to the property located at 133 Brookschase Lane, Richmond, VA.[5]  (Sept. 27,

2016 Tr. at 142:14–15.)

In preparation for trial, the Trust and Reed submitted a joint pre-trial order (the "Pre-Trial

Order," ECF Doc. # 10043) setting forth certain stipulated facts, the parties' contentions, and the

issues to be tried.  Reed also filed a *Statement of Cognizable Damages*[6] (the "Statement of

Damages," ECF Doc. # 9598).  As such, the sole issue tried by the Court was whether Reed

suffered cognizable damages caused by GMACM's violation of the CFA which are not directly

related to Matlack.  (Pre-Trial Order at 7.)

After reviewing all of the evidence presented by Reed and the Trust at Trial, the Court

concludes that with respect to the CFA claim, Reed has failed to prove a "causal nexus" between

the Foreclosure Action and the requested damages.  Reed has also failed to prove that the

purported damages he suffered were "ascertainable," and not merely hypothetical or illusory.

Therefore, Reed is not entitled to any additional recovery under the CFA, and no additional

damages will be awarded.

## II.   FACTUAL FINDINGS

As noted above, the factual background of this case is set forth in this Court's *ResCap I*

opinion.  Because the sole issue before the Court is to determine what, if any, ascertainable

damages were suffered by Reed as a result of GMACM's violation of the CFA, the factual

details set forth below relate primarily to the evidence produced at Trial relating to these

purported damages suffered by Reed.  Reed's damage claims relate to (1) three rental properties

---

[5]     Reed purchased this property on March 3, 2006 for $400,000, then sold it on June 2, 2008 for $550,000, yielding a profit of between $50,000 and $100,000.  (Sept. 29, 2016 Tr. at 87:5–88:7.)

[6]     An identical statement was filed by Reed at ECF Doc. # 9639.

he owned in New Jersey, upon which TD Bank, the holder of a $665,000 mortgage secured by the three properties, successfully foreclosed on sometime after June 2010; and (2) the Old Dell Trace property (as defined below) in Richmond, Virginia, upon which Taylor, Bean and Whitaker, the holder of a $719,000 mortgage secured by the property, successfully foreclosed on in 2011 or 2012. The Court finds below that any losses suffered by Reed in connection with the New Jersey rental properties and the Old Dell Trace property were the result of Reed's mortgage defaults on those properties. The Court further finds that no action, inaction, or conduct of ResCap (or any of the Debtors) was a cause or contributory cause to Reed's losses with respect to these properties.

### A.    Matlack

In *ResCap I*, this Court was presented with evidence relating to Reed's potential damages resulting from the Foreclosure Action related to Matlack. The Court held that Reed was not entitled to any such damages other than his attorney's fees in successfully defending the Foreclosure Action. On appeal, the District Court held that a "review of the record confirms that the Bankruptcy Court did not err in concluding that [Reed] failed to show that the decrease in value [of Matlack] was a result of the Foreclosure Action." *ResCap II*, 552 B.R. at 69. The District Court affirmed this Court on this point. *Id.* As such, this Court did not entertain evidence at Trial relating to any damages or diminution in value of Matlack.[7]

Reed testified that he had ceased making mortgage payments on Matlack as of February of 2008. (Sept. 28, 2016 Tr. at 89:20–24.) Reed's financial predicament was unfortunate, but it was not the fault of any of the Debtors. GMACM improperly cut corners when it filed the

---

[7]       The Court did, however, receive into evidence certain photographs of the ceiling and molding treatments that Reed had designed and implemented at Matlack. (*See* Plaintiff's Ex. 35.) Reed offered these photographs to show the ceiling and molding treatments that were also being constructed at the Old Dell Trace property. These photos demonstrate that Reed was indeed an able designer of molding treatments.

Matlack Foreclosure Action, but it was Reed's payment defaults (continuing to this day) that led

to the filing of the Foreclosure Action.  As explained below, it was Reed's payment defaults that

also led to the foreclosure on his three New Jersey rental properties and on the Old Dell Trace

property.  The Court finds that the loss of these other properties was not in any way caused by

the filing of the Matlack Foreclosure Action.

### B.    Old Dell Trace

At the Trial, Reed presented evidence relating to the property he owned at 9717 Old Dell

Trace in Richmond, Virginia ("Old Dell Trace").  In March of 2007, Reed purchased Old Dell

Trace for approximately $899,000, and took out a loan secured by a first lien on the property in

the amount of $719,000.  (*See* Plaintiff's Ex. 43, U.S. Dep't of Housing & Urban Development

Settlement Statement at 1.)  Reed also took out a second mortgage on Old Dell Trace in the

amount of $89,900.  (*Id*. at 3.)  In November of 2008, Reed and his family moved from Matlack

to Old Dell Trace while Reed worked on renovations to Old Dell Trace.  (Sept. 29, 2016 Tr. at

27:3–5.)  Sometime near the beginning of 2009, Reed moved back to Matlack.  (Sept. 29, 2016

Tr. at 33:5–13.)

First, Reed introduced evidence detailing Reed's costs incurred in renovating Old Dell

Trace.  Reed introduced into evidence the deposition of James Suhr ("Suhr"), a general

contractor, who indicated that Reed paid Suhr $31,441 for contracting services, and that Reed

still owes Suhr roughly $1,766 for services rendered.  (Depo. of James Suhr at 7: 8–9.)  Reed

also introduced evidence that Reed had purchased roughly $18,900 of building materials for the

expansion and renovation of Old Dell Trace.  (Depo. of Russow R. Beck III at 10:19–25.)  Reed

introduced evidence relating to other construction costs including hauling ($3,485 was paid to

Pryor Hauling, with $2,243 still outstanding), roofing (a judgment of over $26,000 against Reed

is due to a roofing company on account of outstanding balances), and drafting (roughly $2,000 was paid to Nathan Sowder for drafting plans related to Old Dell Trace). Additionally, Reed testified at trial regarding the total approximate expenses and costs relating to the expansion of Old Dell Trace—including on account of electrical work, insulation, plumbing, drywall, labor, and other construction-related costs collectively totaling over $230,000.

Second, Reed also introduced an appraisal of Old Dell Trace prepared by Alex Uminsky (the "Uminsky Appraisal") when Old Dell Trace was still under construction. (Exhibit to Decl. of Alex Uminsky at 2–18.) The Uminsky Appraisal notes that "[c]urrent market conditions are considered to be favorable" and that in the appraiser's opinion, by using a sales comparison approach, Old Dell Trace has a market value of $1,725,000. (Uminsky Appraisal at 2–3.) The Uminsky Appraisal also notes that "construction was approximately 60%" completed at the time the appraiser inspected the property. (*Id*. at 2.)

Reed also introduced a letter from Stevie Watson, a realtor in Virginia, stating that if Reed had finished the work on Old Dell Trace, and offered it for sale, she would have sold it for $1,725,000, but because the sale did not occur, he has a lost value of $1,116,600. (Exhibit to Decl. of Stevie Watson at 2.) The declaration of Martha Clampitt (the "Clampitt Declaration"), a real estate broker in Virginia, also states that Reed suffered lost rental value of Old Dell Trace as a result of lost cash flow.

Reed also testified that he was unable to sell the Old Dell Trace property because he couldn't get a certificate of occupancy. (Sept. 29, 2016 Tr. at 38:13–15.) Reed testified further that he couldn't get a certificate of occupancy because the kitchen was incomplete following Reed's demolition of the kitchen, and also because there was some "bare underlayment floor" in certain rooms. (Sept. 29, 2016 Tr. at 38:16–39:3.) When Reed purchased Old Dell Trace, it had

a functioning kitchen, and there were no large-scale renovations in progress. (Sept. 29, 2016 Tr. at 40:15–20.) He couldn't complete construction because he ran out of money.

In 2009, Reed stopped making payments on the Old Dell Trace mortgage to Taylor, Bean and Whitaker ("TBW"), the then owner of Reed's mortgage on Old Dell Trace. (Sept. 29, 2016 Tr. at 68:16–21.) Sometime thereafter, Reed entered into a forbearance agreement with TBW, whereby Reed paid TBW somewhere between $32,000 and $38,000. (*Id.* at 69:12–23.) Reed maintains that TBW did not honor the forbearance agreement, and foreclosed nonjudicially. (*Id.* at 69:24–70:5.) Reed then sued TBW, alleging that this foreclosure was improper. Reed employed the services of Dennis Whelan, an attorney, in connection with the TBW lawsuit. Reed seeks to recover Whelan's fees in connection with his lawsuit against TBW.

Reed argued in his lawsuit against TBW that TBW was responsible for his inability to sell Old Dell Trace. In a pleading submitted on October 22, 2015, Reed alleged that "defendants' failure substantially interfered with plaintiffs' ability to enter into beneficial contracts relating to the subject property including financing, contracts of marketing and sale, as well as rental agreements." *Reed v. Taylor Bean and Whitaker, et al.,* U.S.D.C., E.D.Va., No 15-00529, Plaintiff's Objection to Defendant's Motion to Dismiss (Bates # 1747). Ultimately, Reed's lawsuit against TBW was nonsuited; Reed then filed another complaint against TBW, and the suit was dismissed. (Sept. 29, 2016 Tr. at 72:5–12.) At Trial, Reed admitted that TBW's actions in foreclosing on Old Dell Trace interfered with his ability to sell or rent Old Dell Trace. (Sept. 29, 2016 Tr. at 70:23–71:3.)

## C.    New Jersey Rental Properties

Reed was also the owner of three properties in New Jersey that he had historically rented to the Oxford House, a national organization of addiction recovery houses. These properties are

located at 52 Stone Hollow Drive in Sicklerville, New Jersey; 318 Columbia Avenue in

Stratford, New Jersey; and 21 Darien Drive in Cherry Hill, New Jersey (collectively, the "New

Jersey Rental Properties").

The deposition of J. Paul Molloy (the "Molloy Deposition") was introduced into evidence

at Trial. Molloy is the Chief Executive Officer of Oxford House, and his deposition testimony is

relevant in connection with Reed's argument that he lost rental income from the New Jersey

Rental Properties as a result the Foreclosure Action. When asked whether Molloy knew why

Oxford House stopped renting the three New Jersey Rental Properties from Reed, Molloy simply

stated that he didn't know. (Molloy Depo. at 42:16–19). Further, when asked whether "a

foreclosure of a property owned by the landlord but not the house that was being rented" would

factor into Oxford House's decision to rent from that landlord, Molloy indicated that Oxford

House wouldn't care, and that "all [they] would care about is [their] houses." (Molloy Depo. at

43:4–9.) The Court finds that Oxford House did not stop renting from Reed because of the

Foreclosure Action.

In April 2008, TD Bank approved the consolidation of the mortgages on each of the New

Jersey Rental Properties into a single loan, and in June 2008, this consolidation was executed.

(Sept. 28, 2016 Tr. at 19:1–13.) The principal amount of the consolidated loan was originally

$645,000 but was later increased to approximately $665,000, in addition to a cash-out payment

of $24,000, which was later increased to approximately $44,000. (Sept. 28, 2016 Tr. at 22:18–

23; 30:9–23.) At the time of this consolidation, a representative from TD Bank noted that Reed

had a credit score of 511, and was viewed by TD Bank to have a poor loan risk rating. (Sept. 28,

2016 Tr. at 27:2–19.) At the time the consolidation was executed, TD Bank was not aware that

the taxes on the Matlack property had not been paid since 2006, but documentation relating to

the approval of the loan consolidation indicates that TD Bank did know that the Reeds had two
delinquent accounts related to the Matlack Property.  (Sept. 28, 2016 Tr. at 19:16–20; 31:17–24.)

Robert Curley ("Curley"), a representative of TD Bank (formerly Commerce Bank in
2008) testified that in August 2009, the consolidated loan was placed into "asset recovery"[8] on
account of nonperformance.  (Sept. 28, 2016 Tr. at 47:4–21.)[9]  Reed, however, stated at Trial
that in August 2009 he was current on payments for the New Jersey Rental Properties, as well as
on payments on Old Dell Trace.  (Sept. 28, 2016 Tr. at 81:23–24.)  Reed testified that he was
current on the consolidated loan "through the end of the year" 2009.  (Sept. 29, 2016 Tr. at
92:10–24.)  On cross-examination, however, counsel for the Trust presented Reed with *his* sworn
testimony from a deposition taken on April 26, 2011, where Reed stated that he was "ten months
behind" or possibly "more than a year" behind on mortgage payments on the consolidated loan.
(Sept. 29, 2016 Tr. at 96:15–25.)  At Trial, Reed eventually stated that he couldn't remember
when he stopped making payments on the consolidated loan.  (*Id.* at 97:12–21.)  This was one of
many instances in cross-examination when Reed's trial testimony was shown to be inconsistent
with his own prior sworn testimony or pleadings.

### D.    Potential Lenders

At Trial, Robert Maines ("Maines") and Joan Kline ("Kline") were called to testify by
Reed regarding Reed's inability to borrow money following the Foreclosure Action.  Reed
testified that both Maines and Kline would have lent Reed money to complete renovations at Old

---

[8]    Reed employed the services of Jeffrey Walters, an attorney, and maintains that he incurred attorney's fees
in connection with this proceeding.  During trial, Reed dropped his effort to recover any fees paid to Walters.  (Sept.
29, 2016 Tr. at 99:25–100:19.)

[9]    On February 8, 2010, TD Bank obtained a judgment against Reed for $747,206 in connection with the
consolidiated loan.  (Sept. 28, 2016 Tr. at 86:6–17.)

Dell Trace but for GMACM's filing of the Foreclosure Action on the Matlack Property. The testimony of Maines and Kline does not support this assertion.

Maines is the owner of a construction business in New Jersey, and an acquaintance of Reed's. Maines was familiar with the improvements and renovations that Reed had done on the Matlack Property, but was not familiar with the Virginia real estate market, had never been to Virginia to visit the Old Dell Trace property, and importantly, was not aware of Reed's precarious financial position at the time when Reed claims GMACM spoiled his borrowing prospects. (Sept. 27, 2016 Tr. at 77:2–22.) Indeed, Maines' testimony at trial demonstrates that while Maines was generally aware of the status of the Old Dell Trace renovations, Maines had not conducted any form of due diligence on a potential lending arrangement, and was certainly not aware that Reed was past due on the mortgage payments and real estate taxes on the Matlack Property. Moreover, Maines testified that he would not have lent money or entered a joint venture with anyone who couldn't pay their bills, and specifically, would not have entered a joint venture with Reed had Maines known that Reed had not made any payments on the Matlack property since January 2008. (Sept. 27, 2016 Tr. at 77:20–22.) The Court finds that Maines' testimony plainly demonstrates that GMACM's actions were not causally tied to Maines' refusal to loan money to Reed, and that Maines would not have loaned money to Reed in any form once Maines became apprised of all relevant facts relating to a potential loan or joint venture.

Kline, on the other hand, is Reed's wife's cousin, and has lent Reed money on several occasions. In 2008, Kline had in excess of $800,000 in various accounts, along with certain other assets. As demonstrated by certain checks produced by Kline, in 1993, Kline loaned Reed $9,000, and in 1996, Kline loaned Reed a total of $14,000. Reed repaid Kline all of these amounts. Kline also testified that she believes she loaned Reed $100,000 in 1996, which Kline

believes he repaid.  (Sept. 29, 2016 Tr. at 9:4–16.)  Kline had never lent money to anyone other

than Reed.  (Sept. 29, 2016 Tr. at 7:11–13.)  As was the case with Maines, Kline stated that she

was unaware that Reed was late on his mortgage payments when he approached her for a loan,

and that she probably would not have loaned Reed money in 2008 if she had known Reed was

late in making payments on his mortgage.  (Sept. 29, 2016 Tr. at 11:25–12:9.)  Kline, however,

also testified that the Foreclosure Action on the Matlack Property factored into her decision not

to loan Reed the $300,000 he was requesting, an amount substantially more than she had loaned

him in the past.  The Court finds that the equivocal testimony of Joan Kline, related to Reed by

marriage, fails to establish by a preponderance of the evidence that the Foreclosure Action was a

legal cause for recoverable damages by Reed.

Also on the issue of lost borrowings (specifically related to the New Jersey Rental

Properties), Curley of TD Bank, with a years-long relationship with Reed, testified that TD Bank

would not have loaned Reed funds with Matlack as collateral if there were outstanding

delinquent payments on the Matlack mortgage.  (Sept. 28, 2016 Tr. at 17:8–18:1).  Moreover,

Curley indicated that TD Bank was not aware that Reed was in default on Matlack mortgage

payments.  (Sept. 28, 2016 Tr. at 17:16–22.)  Nonetheless, when asked whether the payment

defaults on the Matlack mortgage would have prevented the bank from lending with the Matlack

Property as underlying collateral, Curley testified that with defaults on the mortgage, TD Bank

would not have loaned money to Reed with Matlack as collateral.  (Sept. 28, 2016 Tr. at 18:7–

11).  Curley's testimony indicates that whatever loan requests Reed had made to TD Bank, those

loan requests would have been denied after due diligence was performed on the loan request on

account of the delinquent payments, and not because of the Foreclosure Action.  (*Id.* at 18:12–

18).  The Court expressly finds that there was no causal relationship between the Foreclosure

Action and Reed's ability to borrow from TD Bank.  In any event, this Court held in *ResCap I*

that Reed did not establish "that he was denied a cash-out refinancing on the [Matlack] Property

due to the Foreclosure Action."  *ResCap I*, 517 B.R. at 482.  This holding was not reversed by

the District Court, and remains this Courts determination on this issue.

> **E.      Reed's Lawsuit against Citibank and Smith Barney**

During Reed's cross-examination at Trial, the Trust's counsel further undercut Reed's

claim that GMACM's conduct caused Reed to lose the Old Dell Trace property.  In March 2008,

Reed began working at Smith Barney, with an annual base salary of $65,000 plus certain

possible bonus payments based on performance.  (Sept. 29, 2016 Tr. at 47:7–17.)  In April 2008,

Reed ceased working at Smith Barney when he fell at a work function at a Champs Restaurant.

(*Id.* at 48:2–5.)  Reed sued Champs Restaurant and received a settlement of approximately

$400,000.  (*Id.* at 48:6–22.)  Following Reed's fall at the Champs Restaurant, Reed also started

receiving disability payments, which Reed continues to receive through the Federal Government.

(*Id.* at 48:23–25; 49:1–3.)  Reed also made a claim for long-term disability through Citigroup,

which initially determined that Reed was eligible for benefits.  (*Id.* at 49:4–7.)  Metlife, as plan

administrator for Citigroup's disability plan, initially paid Reed $3,250 per month based on

Reed's yearly salary of $65,000, but in February of 2009, Metlife was contacted by Smith

Barney advising that Reed's actual annual compensation was $265,000.  (*Id.* at 49:11–19.)  On

November 3, 2009, Metlife terminated all of Reed's benefits.  (*Id.* at 50:1–4.)  After this

termination of Reed's benefits, Reed could no longer afford to fund the renovations or payments

on Old Dell Trace.  (*Id.* at 51:14–18.)

Reed brought suit against Citigroup following the termination of Reed's long-term

disability benefits.  After losing in the district court, Reed appealed to the Third Circuit.  In a *pro*

*se* brief filed on January 21, 2016 with the Third Circuit in the case of *Reed v. Citigroup*, U.S.

Ct. App. 3d. Cir., No. 15-2094, Reed stated that "[he] lost [his] house to foreclosure and [his]

entire life savings with it as [he] was not able to either complete the renovations on the house

[he] moved to [Old Dell Trace] or continue making mortgage payments BECAUSE the Plan

administer wrongfully ceased [his] payments after leading [him] to believe they would

continue." *Reed v. Citigroup*, U.S. Ct. App. 3d. Cir., No. 15-2094, Opening Brief at 3 (Bates #

1611) (emphasis in original).  Further, Reed stated that as a result of his reliance on his approval

of benefits, and the subsequent termination of his benefits, Reed "could no longer afford the

payments for the Virginia home and could not complete the renovation work.  [Reed and his

family] were forced to leave the Virginia home, which was lost to foreclosure."  (Sept. 29, 2016

Tr. at 55:6–9.)  As noted above, Reed admitted at Trial that the termination of these benefits did

indeed affect his ability to complete renovations at Old Dell Trace.  (*Id.* at 51:14–18.)

### III.  <u>LEGAL STANDARD</u>

As noted above, on remand, the sole issue to be tried was whether Reed "suffered any

cognizable damages caused by the Foreclosure Action, but not directly related to the Property,"

and following the withdrawal of Reed's breach of contract claim, solely with  respect to Reed's

CFA claim. *ResCap II*, 552 B.R. at 65.

The CFA provides that "[a]ny person who suffers any ascertainable loss of moneys or

property, real or personal, as a result of the use or employment by another person of any method,

act, or practice declared unlawful under this act" may bring an action for treble damages.

N.J.S.A. § 56:8-19.  Because this Court has already held that the Foreclosure Action was an

"unlawful act" under the CFA (*ResCap I*, 517 B.R. at 493), only the elements of ascertainable

damages and causation remain to be tried.

### A.    Ascertainable Damages

The plaintiff must be able to articulate "ascertainable" damages, that is, "an actual loss that is quantifiable or measureable and not hypothetical or illusory. "Where, as here, a case involves breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages." *ResCap II*, 552 B.R. at 64 (internal quotation marks and citations omitted) (quoting *Thiedemann v. Mercedes–Benz USA, LLC*, 872 A.2d 783, 792–93 (N.J. 2005)).  Put another way, the "ascertainable" standard means that the plaintiff must point to "a definite, certain and measurable loss, rather than one that is merely theoretical." *Heyert v. Taddese*, 70 A.3d 680, 697 (N.J. App. Div. 2013).  To support a claim of ascertainable damages, a plaintiff must "produce specific proofs to support or infer a quantifiable loss in respect of their benefit-of-the-bargain claim; subjective assertions without more are insufficient to satisfy the requirement of an ascertainable loss that is expressly necessary for access to the CFA remedies." *Thiedemann*, 872 A.3d at 795.  If the plaintiff can adequately prove an ascertainable loss, the CFA provides a broad remedy that may encompass attorneys' fees. *Perez v. Professionally Green, LLC*, 73 A.3d 452, 460–61 (N.J. 2013).

For example, plaintiffs who claimed they suffered losses as a result of faulty fuel gauges were unable to prove ascertainable losses because their repair costs and loaner cars were covered by the defendant at no cost to the plaintiffs. *Thiedemann*, 70 A.3d at 795.  The *Thiedemann* plaintiffs argued, among other things, that their car might suffer a diminution in value because the fuel gauge had at one time been faulty. *Id.*  But the fuel gauge had since been repaired by the defendants at no cost to the plaintiffs, and the Supreme Court of New Jersey found the "hypothetical" diminution in value to be "too speculative" to justify a finding of ascertainable

loss. *Id.* The measure of ascertainable loss is only that which would make the plaintiff "whole" by compensating him for the unlawful practice: *i.e.*, damages should not represent a windfall. *Romano v. Galaxy Toyota*, 945 A.2d 49, 58 (N.J. App. Div. 2008). The *Romano* plaintiff purchased a car with a rolled-back odometer and claimed the entire amount of the car as damages, but the court found that the appropriate measure of ascertainable damages was "the difference [in value] between the vehicle she received and the vehicle as represented at purchase." *Id.*

### B.    Causation

The plaintiff must prove not only that he suffered ascertainable damages, but that his loss occurred "as a result of" the defendant's unlawful conduct. N.J.S.A. § 56:8-19. "The statutory phrase 'as a result of' connotes a 'causal nexus requirement.'" *Dugan v. TGI Fridays, Inc.*, 135 A.3d 1003, 1011 (N.J. App. Div. 2016), *appeal granted*, (N.J. July 26, 2016) (quoting *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741 (N.J. 2009)). The plaintiff must prove only that the defendant's conduct was *a* cause of his damages; the plaintiff need not prove that the defendant's conduct was the *only* cause of his damages. *See Varacallo v. Massachusetts Mut. Life Ins. Co.*, 752 A.2d 807, 816 (N.J. App. Div. 2000.) Unlike common-law fraud, the CFA does not require reliance upon the defendant's misrepresentation. *See New Jersey Citizen Action v. Schering-Plough Corp.*, 842 A.2d 174, 178 (N.J. App. Div. 2003) ("While it is certainly true that the element of traditional reliance required to be pleaded and proven in a common law fraud or misrepresentation case need not be proven in order to recover for damages pursuant to the CFA, plaintiffs must nonetheless plead and prove a causal nexus between the alleged act of consumer fraud and the damages sustained.") (internal citations omitted).

20

But the "causal nexus" requirement "is not infinitely elastic in a but-for sense; a [plaintiff's] losses must be 'particularly proximate to a misrepresentation or unlawful act of the defendant condemned by the [CFA].'" *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 437 (D.N.J. 2012) (quoting *Meshinsky v. Nichols Yacht Sales, Inc.,* 541 A.2d 1063, 1067 (N.J. 1988)).  New Jersey courts routinely reject CFA claims where the plaintiff cannot prove a causal nexus between the unlawful act and the loss, even if the loss is ascertainable.  *See, e.g., Feinberg v. Red Bank Volvo, Inc.,* 752 A.2d 720, 723 (N.J. App. Div.2000) (concluding that plaintiff who asserted that a car dealership unfairly denied his application to lease a new car could not claim expenses incurred when his old car broke down a month later); *Dabush v. Mercedes-Benz USA, LLC,* 874 A.2d 1110, 1121 (N.J. App. Div. 2005) (concluding that plaintiff who claimed that car dealership's false advertising caused him to buy a car with a less-than-perfect GPS navigation system, which was not programmed with every street in the United States and in turn caused him to be 40 minutes late for a business meeting, did not adequately prove that the advertising was "causally related to [his] loss").

## IV.  DISCUSSION

To be entitled to damages , Reed must show (i) that the damages he claims to have suffered are linked by a "causal nexus" with GMACM's filing of the Foreclosure Action on Matlack, and (ii) that these damages are "ascertainable," or quantifiable and measurable, and not merely hypothetical or illusory.  Reed presents a lengthy list of damages he claims he suffered on account of the Matlack Foreclosure Action, including, among others, the interruption of his cash flow, the inability to borrow funds, lost profits, and attorney's fees.  As explained below, the "causal nexus" between the attempted foreclosure on Matlack and the alleged damages is tenuous at best, and the alleged damages suffered on account of the Foreclosure Action are

largely speculative.  Even applying the relaxed causation standard applicable to CFA claims, the

Court finds that Reed failed to prove by a preponderance of the evidence that he suffered any

ascertainable loss.

### A.    No Damages at Old Dell Trace Were Caused by GMACM

With respect to the Old Dell Trace property, Reed argues that his cash flow was

interrupted and he was unable to secure additional financing because of the Foreclosure Action,

and as such, he was unable to complete ongoing renovations at Old Dell Trace.  Reed seeks

damages on account of (i) his inability to obtain additional financing, (ii) costs incurred in

renovating Old Dell Trace, and (iii) lost profits due to his inability to sell Old Dell Trace at a

premium.

The testimony of Kline and Maines plainly undermines Reed's assertions that the

Foreclosure Action impaired his ability to borrow funds for the completion of Old Dell Trace.

Both Kline and Maines indicated that had they known the full extent of Reed's precarious

financial condition, they would likely not have loaned Reed money.  Reed argues that Kline had

loaned him funds in the past, but it is exceedingly unlikely that Kline would have ever lent Reed

the $300,000 that he seeks in damages.  When Kline was asked whether or not she had

previously lent money to Reed, she recalled several small loans in 1993 and 1996 (of under

$10,000), and one larger loan for $100,000 in 1996, all of which Kline maintains Reed paid off

in full.  (Sept. 29, 2016 Tr. at 9:4–14.)  It is, however, highly speculative that Kline would have

lent him approximately 33% of her liquid assets at the time, if Kline was aware of Reed's

financial difficulties.  (Sept. 29, 2016 Tr. at 10:3–16.)  Fatally for Reed, Kline also testified that

had she known that Reed was late in paying his mortgage on Matlack in 2008, she would

"probably not" have loaned him the $300,000 he was asking for.  (Sept. 29, 2016 Tr. at 12:5–9.)

Maines's testimony likewise indicates that he would not have loaned Reed the $300,000
he was asking for. As noted above, Maines had not conducted any form of diligence on the Old
Dell Trace property, and wasn't aware of the full extent of Reed's financial problems. And
critically, Maines plainly stated that he would not lend money or enter into a joint venture with
someone who was unable to pay his bills. (Sept. 27, 2016 Tr. at 77:20–22.) Importantly, even
assuming Reed would have secured loans from either Kline or Maines but-for the Foreclosure
Action, Reed would have to show that any such loan would have turned a profit on Old Dell
Trace in order to recover damages—something Reed did not do at Trial.

Additionally, the assertions of Stevie Watson and Martha Clampitt that Reed would have
received huge profits from selling or renting Old Dell Trace are conclusory. Specifically, Reed
would—at a minimum—need to show that he had a purchaser or tenant at the time of the
Foreclosure Action ready, willing, and able to perform. No evidence has been presented to this
effect. Further, Old Dell Trace was not near completion, and as noted above, no evidence has
been presented that GMACM's Foreclosure Action was even *a* cause of the stalling of the Old
Dell Trace renovations. When the Uminsky Appraisal was furnished, the renovations on Old
Dell Trace were only 60% completed, and the Court views Reed's expected profits on Old Dell
Trace, which are based upon this appraisal, as largely speculative. And the Trust's counsel
established during Reed's cross-examination that in separate litigations filed by Reed, Reed
blamed TBW, the mortgage lender on Old Dell Trace, and Citigroup, that cut-off his disability
payments, for his inability to complete the Old Dell Trace renovations.

Similarly, with respect to all of the construction costs that Reed seeks to recover as
damages, all of these alleged damages are debts that arose after the Foreclosure Action.
Moreover, that Reed was unable to pay these individuals (who supposedly knew Reed's cash

flow was "interrupted") does not support the notion that the Matlack Foreclosure Action caused the Old Dell Trace development to fail. In fact, Reed had ceased paying the mortgage on Matlack in the early months of 2008, which presumably left him with *more* capital, not less, to invest in other ways.

Reed withdrew his claim for attorney's fees incurred in connection with litigation related to the New Jersey Rental Properties (Sept. 29, 2016 Tr. at 99:25–100:19), but seeks to recover the attorney's fees he incurred in connection with the eventual foreclosure on Old Dell Trace, which occurred more than a year after the Foreclosure Action on Matlack. Given the already extremely tenuous relationship (if indeed any relationship is to be gleaned) between the hardships experienced at Old Dell Trace and the Foreclosure Action on Matlack, these fees are not recoverable. The foreclosure on Old Dell Trace was caused by Reed's payment default on the Old Dell Trace mortgage, and the fees Reed incurred in connection with this foreclosure likewise resulted from Reed's payment default and his effort to avoid foreclosure of Old Dell Trace, not from any action of GMACM.

### B. No Damages at the New Jersey Rental Properties Were Caused by GMACM

With respect to the New Jersey Rental Properties, Reed argues that he suffered economic damages by losing the ability to borrow funds from TD Bank, and the loss of his existing tenant. The Court finds that TD Bank foreclosed on the three New Jersey Rental Properties because Reed defaulted on the mortgage on these properties, not because of the Foreclosure Action GMACM filed on the Matlack Property. While Reed testified at Trial that he was current on the payments on the consolidated loan covering the New Jersey Rental Properties, on cross-examination Reed was forced to admit that he was many months behind on these mortgage

payments.  It was Reed's failure to pay the mortgage on the TD Bank consolidated mortgage that brought about the foreclosure on these properties, not GMACM's CFA violation.

TD Bank, through the testimony of Curley, indicated that the bank would not have loaned money to Reed with Matlack as collateral given that Reed was several months delinquent on his mortgage payments.  (Sept. 28, 2016 Tr. 18:7–11).  With respect to the loss of his tenant, the Chief Executive Officer of Oxford House, Reed's principal tenant, indicated that he would not care one way or the other if an Oxford House landlord was in foreclosure on another property.  (Molloy Depo at 43:4–9).  As such, Reed has failed to prove that he suffered any ascertainable damages related to the New Jersey Rental Properties that were causally linked to the Foreclosure Action.

### C.    No Causal Connection to Ascertainable Damages Exists

With respect to all of the above mentioned properties, Reed cannot show a "causal nexus" or the ascertainability of the claimed damages.  First, the methods used by Reed to calculate damages are unclear, and do not constitute "definite, certain and measurable loss."  *Heyert*, 70 A.3d at 697.  To the contrary, Reed's damage calculations are almost entirely theoretical.  For example, Reed seeks recovery for certain "sunk costs" related to renovations at Old Dell Trace, but then also seeks to recover the full value of the property, which sum would presumably include the value attributed to any renovations.  And while Reed seeks millions of dollars in damages on account of lost profits related to Old Dell Trace, the property was not near completion, and it was Reed's own decisions that resulted in his inability to complete the costly renovations that he had undertaken.  For example, Reed demolished the kitchen at Old Dell Trace, resulting in his inability to promptly obtain a certificate of occupancy and necessitating the purchase of appliances and other construction.  Prior to the demolition of the kitchen,

however, Old Dell Trace had a functioning kitchen, and as Reed's cash began to dry up in 2008,

he certainly could have left the kitchen intact, foregone a costly kitchen renovation, and sought

to sell the property.  But even assuming a causal nexus exists between the Foreclosure Action

and Reed's inability to complete renovations at Old Dell Trace (which, the Court finds, Reed

failed to prove by a preponderace of the evidence) and sell or rent it, Reed did not show that he

had a buyer or tenant who was ready, willing, and able to purchase Old Dell Trace.  Moreover,

with respect to Reed's damage calculations, the Trust points out that in the purported

calculations of lost profits, Reed fails to include any mention of liens on any of the properties

that would necessarily need to be paid before Reed recovered any profit.  (Pre-Trial Order at 6.)

Also, Reed could have sold the Matlack Property at various times.  *ResCap I*, 517 B.R. at

477–81.  Such an infusion of cash may well have enabled Reed to complete renovations at Old

Dell Trace.  But Reed chose not to take this path.  His inability to profit from Old Dell Trace was

a direct result of his lack of funds, but it does not follow that GMACM's Foreclosure Action

caused this unfortunate outcome.

The record before the Court demonstrates that, while Reed appears to be a contractor

with experience in completing renovations and a skilled designer of molding treatments, the Old

Dell Trace renovation spiraled into a costly endeavor that Reed simply could not afford,

completely independent of the Foreclosure Action.  Reed failed to prove by a preponderance of

the evidence that GMACM's improper Foreclosure Action on Matlack had anything to do with

Reed's inability to complete the renovations on Old Dell Trace.  As demonstrated by Reed's

failure to make multiple mortgage payments on Matlack in 2008, Reed's financial problems

began well before the Matlack Foreclosure Action.  Each of the potential lenders identified by

Reed (Kline, Maines, and TD Bank) indicated that Reed's financial condition (independent of

the Foreclosure Action) and/or Reed's failure to make mortgage payments on Matlack would have ruled out a loan to Reed.

All of these facts preclude a finding that GMACM's CFA violation created a causal connection to the damages that Reed alleges. It was Reed's own financial predicament that resulted in his inability to borrow additional funds or complete renovations at Old Dell Trace. GMACM's violation of the CFA is inexcusable, but it did not cause the damages that Reed alleges. As noted above, the causal connection required is "not infinitely elastic in a but-for sense; a [plaintiff's] losses must be 'particularly proximate to a misrepresentation or unlawful act of the defendant condemned by the [CFA].'" *Mickens*, 900 F. Supp. 2d at 437. Here, such a causal connection simply does not exist.

Further undermining Reed's assertions that GMACM caused Reed such far-reaching damages are Reed's previous lawsuits in which he blamed others for the same financial misfortunes he seeks to hold GMACM accountable for.

Reed cites legal authority showing that the CFA has a lower standard of causation than common-law fraud. That is true—but does not obviate the need to satisfy the requirements of the causal nexus and ascertainability of damages. Reed must show that GMACM's unlawful conduct resulted in the parade of horribles that he has alleged, then go on to demonstrate the extent of the damage suffered. GMACM's CFA violation did not result in the far-reaching damages alleged by Reed. Therefore, no additional damages beyond those awarded in *ResCap I* should be awarded.

## V.  <u>CONCLUSION</u>

For the reasons set forth above, the Court finds that Reed is not entitled to recover any

additional damages.  Therefore, the Trust's Objection to Reed's Claim is **SUSTAINED** and the

Claim is **EXPUNGED.**

       **IT IS SO ORDERED.**

Dated: November 7, 2016
      New York, New York

                           *Martin Glenn*
                               MARTIN GLENN
              United States Bankruptcy Judge