UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

In re:

RESIDENTIAL CAPITAL, LLC, et al.,

                                Debtors.

------------------------------------------------------------------X
------------------------------------------------------------------X

PATRICIA J. MCNERNEY and SUSAN M. GRAY,

                             Appellants,

        -v-

RESCAP BORROWER CLAIMS TRUST,

                             Appellee.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11-30-16

16 Civ. 1955 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      This decision resolves claims against a bankruptcy estate first made by a homeowner, Patricia J. McNerney, as counterclaims to a foreclosure action brought against her by the bankruptcy debtor after she failed to repay a $108,000 home mortgage refinance loan for her Ohio house. In a February 29, 2016 decision, the United States Bankruptcy Court in this District (Hon. Martin Glenn) disallowed, for failure to state a claim, McNerney's claims against the estate, as well as the claims for attorney's fees made by McNerney's lawyer, Susan M. Gray, and sustained the objection to those claims[1] made by the ResCap Borrower Claims Trust (the "Trust"). Dkt. 1, at *4–36 ("Decision"). For the reasons that follow, the Court agrees with the bankruptcy court's well-reasoned decision, and affirms.

---

[1] For brevity's sake, the Court henceforth refers to all claims as McNerney's and to McNerney as the appellant here, except where it is necessary to differentiate between her claims and Gray's.

I.      **Background**[2]

A.      **Procedural Background**

On May 14, 2012, the debtors, including Residential Capital, LLC ("ResCap"), filed a

voluntary petition in the bankruptcy court in this District for relief under chapter 11 of the

Bankruptcy Code.  On November 14, 2012, McNerney and Gray filed proofs of claim against

debtors Homecomings Financial LLC ("Homecomings") and GMAC Mortgage ("GMACM").

Both debtors are entities for which the Trust, established pursuant to the December 11, 2013,

chapter 11 plan, effective December 17, 2013, is the successor in interest with respect to

borrower claims.  McNerney sought $600,000 against each of Homecomings and GMACM, and

Gray sought $122,481.59 in attorneys' fees from each arising out of her representation of

McNerney.

On October 23, 2015, the Trust filed an objection to these claims in bankruptcy court, for

failure to state a claim.  On November 16, 2015, McNerney filed an opposition, and, on

December 9, 2015, the Trust filed a reply.  On December 16, 2015, the bankruptcy court held a

hearing on the objection.  Its February 29, 2016 Decision sustained the Trust's objection.  *See*

Decision at 2–8.

On March 16, 2016, McNerney filed a notice of appeal in this Court.  Dkt. 1.  On May 4,

2016, she filed an opening appellate brief, Dkt. 8 ("McNerney Br."); on June 6, 2016, the Trust

---

[2] The following summary of the facts is drawn from the Court's review of the Decision and the
case record.  For ease of reference, the Court occasionally refers to the pagination provided by
the ECF system, indicated with an asterisk (*).  Otherwise, the Court refers to a document's own
pagination.  Where the Court cites portions of the designated record on appeal and references the
ECF docket number from the bankruptcy court, the Court refers to that court's ECF pagination
with two asterisks (**).

filed an opposition, Dkt. 9; and, on July 11, 2016, McNerney filed a reply, Dkt. 17 ("McNerney

Reply Br."). On August 30, 2016, the Court heard argument.

### B.    Factual Background

McNerney's claims were made as counterclaims in a foreclosure proceeding against her

after she failed to repay a $108,000 home mortgage refinance loan from Homecomings made in

connection with her Lakewood, Ohio house (the "Property"). McNerney had obtained the loan,

secured by a mortgage on the Property, on December 27, 2002.[3] Homecomings serviced the loan

until January 1, 2003, at which time servicing was transferred to GMACM. *See* Servicing

Transfer Letter, Lathrop Decl., Bnkr. Dkt. 9280-2, Ex. E, at 1–2. GMACM serviced the loan

until February 16, 2013.

The loan was a refinance of an earlier loan McNerney and her husband had with

Household Realty Corporation, which carried a 13% interest rate and required a $1,245.81

monthly payment. *See* Ohio District Court Counterclaims, Declaration of David Wallace

("Wallace Decl."), Bnkr. Dkt. 9280-4, Ex. I, ("District Court Counterclaims"), at ¶ 66 (monthly

payment of $985, escrow payment for insurance of $30, and property tax liability payment of

$230.81). When McNerney divorced, the divorce decree required her to refinance the earlier

loan. *See* Ohio State Court Trial Transcript, November 10, 2008, Wallace Decl., Ex. A, at 227–

28. McNerney retained a local mortgage broker, Ohio Mortgage Company ("OMC"), to obtain

the loan on her behalf. *See id.* at 196–97. Under a broker agreement between OMC and

Homecomings, OMC served as an independent contractor for Homecomings, except that, when

it delivered notices, it served as Homecomings' agent. *See* Broker/Lender Agreement, Lathrop

---

[3] The mortgage named Homecomings as lender and Mortgage Electronic Registration Systems, Inc. ("MERS"), as mortgagee and nominee for Homecomings's successors and assigns. *See* Mortgage, Declaration of Sara Lathrop ("Lathrop Decl."), Bnkr. Dkt. 9280-2, Ex. C, at 1–2.

Decl., Bnkr. Dkt. 9280-2, Ex. G, at ¶ 1.  OMC submitted the application to Homecomings, which

assessed the application using an automated underwriting program.  It calculated McNerney's

loan to income ratio (34%) and debt to income ratio (46%) as within approved limits.  *See*

Lathrop Decl., Bnkr. Dkt. 9280-2, at ¶ 8 & Ex. H.  At the closing, Homecomings gave

McNerney a Truth in Lending Statement, a Notice of the Right to Cancel, a HUD-1 Settlement

Statement, a First Payment Notice, and a disclosure regarding private mortgage insurance.  *See*

Exs. I, J, K, L, and M, respectively, Lathrop Decl., Bnkr. Dkt. 9280-2.  Each document was

dated December 27, 2002 and signed by McNerney.  *See id.*; *see generally* Decision at 2–4.

The loan's proceeds were used to pay off the $98,349.94 balance of the prior loan, past

due taxes of $5,847.18, and $4,533.16 of credit card debt.  *See* HUD-1 Settlement Statement,

Lathrop Decl., Bnkr. Dkt. 9280-2, Ex. K, at ¶¶ 1303–09.  The new loan required McNerney to

make a $1,232.28 monthly payment, which reflected principal and interest payments totaling

$792.47, based on an interest rate of 8%, *see* Note, Lathrop Decl., Bnkr. Dkt. 9280-2, Ex. B, at 1,

with the balance reflecting other costs, such as escrow payments for real estate taxes, property

insurance, and private mortgage insurance, *see* District Court Counterclaims ¶ 66.

McNerney defaulted on the loan almost immediately—failing to make a first payment.  In

November 2003, MERS brought a foreclosure action against McNerney in Ohio state court, and

McNerney brought statutory and tort counterclaims.  However, in September 2009, after years of

litigation, MERS's state-court action was dismissed without prejudice for lack of standing.[4]

---

[4] MERS filed the state-court foreclosure action on November 10, 2003 in the Cuyahoga Court of
Common Pleas (the "Ohio State Court"), some five months after McNerney's June 1, 2003
default.  *See* State Court Foreclosure Action Complaint, Wallace Decl., Bnkr. Dkt. 9280-3, Ex.
D.  On June 16, 2004, McNerney filed an answer and counterclaims, and, on November 6, 2006,
an amended answer and counterclaims.  *See* State Court Foreclosure Action Docket/Case
Information, Wallace Decl., Bnkr. Dkt. 9280-4, Exs. C, at **258–90 ("State Court
Counterclaims"), and F ("Amended State Court Counterclaims").  The note and mortgage were

On October 14, 2009, Homecomings filed a new foreclosure action—the one relevant

here—in federal district court in the Northern District of Ohio.  *See* 09-cv-2383-LW (N.D.

Ohio).  On January 18, 2010, McNerney moved to dismiss.  On September 24, 2010, the court

denied that motion.  On January 23, 2011, McNerney filed an answer and statutory and tort-law

counterclaims (the "District Court Counterclaims").  Homecomings moved for judgment on the

pleadings and summary judgment, which McNerney opposed.  These motions were pending

when, on August 7, 2012, Homecomings, which had filed for bankruptcy on May 4, 2012, filed a

notice of bankruptcy in the District Court.  The following day, August 8, 2012, the district court

stayed the case pursuant to 11 U.S.C. § 362(a), the bankruptcy code's automatic stay provision.

The underlying foreclosure claims against McNerney were dismissed in August 2013,

essentially due to McNerney's abandonment of the Property.[5]  As to McNerney and Gray's

counterclaims against the debtors, on November 14, 2012, they each filed proofs of claim in the

bankruptcy court against Homecomings and GMACM.  McNerney's claims (numbers 4762 and

---

transferred from Homecomings/MERS to GMACM on December 31, 2007; GMACM was
substituted as plaintiff on January 31, 2008; and, after the note and mortgage were transferred
back to Homecomings on October 14, 2008, Homecomings was substituted as plaintiff for
GMACM.  Appellees' Objection, Bnkr. Dkt. 9280, at ¶ 23.  The state court held a bench trial in
December 2008.  But, before a decision was rendered, the court, on September 14, 2009,
dismissed the case without prejudice.  Journal Entry, Wallace Decl., Bnkr. Dkt. 9280-4, Ex. G.
The dismissal was based on an intervening ruling by an Ohio appeals court that, to have standing
in a state-court foreclosure action, a plaintiff must show that, at the time the case was filed, it
was the mortgagee or assignee of the mortgage and also the holder of the note.  Homecomings's
failure to meet those requirements required dismissal.  *Id.*

[5] In November 2010, the debtors discovered that McNerney had not lived in the Property for
some time and that the house's interior had deteriorated and that the house was uninhabitable.  In
April 2011, McNerney deeded the house to a local land reutilization corporation.  Homecomings
released its lien in July 2011, but McNerney remained obligated to pay the debt.  Later as part of
a nationwide settlement by GMACM, Homecomings offered to extinguish McNerney's debt, an
offer McNerney accepted.  Homecomings then sought, and obtained, dismissal of its foreclosure
claims.  *See* Decision at 7.

4764), based on the 12 District Court Counterclaims[6], were each for $600,000; Gray's (numbers

4757 and 4758), for legal fees, were each for $122,481.59. *See* Claims, Designated Record

Tab 2.

As noted, on February 29, 2016, the bankruptcy court disallowed McNerney's claims.

The Court reviews the bankruptcy court's reasoning, as relevant, in the course of addressing each

claim. Relevant here, McNerney pursues only six of her 12 counterclaims in this appeal.[7] The

six claims she pursues assert: (1) violations of the Truth in Lending Act ("TILA"); (2)

negligence and improvident lending; (3) intentional and negligent misrepresentation; (4) civil

conspiracy; (5) violations of the Ohio Consumer Sales Practices Act ("CSPA"); and (6) breach of

privacy. *Id.* In addition to reviewing these claims, the Court also considers McNerney's

November 16, 2015, motion in the bankruptcy court to strike the declaration of Sara Lathrop,

Bnkr. Dkt. 9334, which the bankruptcy court did not rule on and which McNerney's treats as

having been denied by implication.

---

[6] These alleged: (1) violations of the Truth in Lending Act ("TILA"), District Court
Counterclaims ¶¶ 126–51; (2) violations of the Real Estate Settlement Procedures Act
("RESPA"), *id.* at ¶¶ 152–59; (3) breach of fiduciary duty, *id.* at ¶¶ 168–79, 270–79; (4)
negligence and improvident lending, *id.* at ¶¶ 160–67, 180–87; (5) intentional and negligent
misrepresentation, *id.* at ¶¶ 188–203, 235–69; (6) unconscionability, *id.* ¶¶ 204–06; (7) civil
conspiracy, *id.* at ¶¶ 207–12, 288–92, 303–16; (8) violations of the Ohio Mortgage Loan Broker
Act ("OMBA"), *id.* at ¶¶ 213–31; (9) failure to engage in loss mitigation, *id.* at ¶¶ 232–34; (10)
violations of the Ohio Consumer Sales Practices Act ("CSPA"), ¶¶ 280–87, 308–16, 322–31;
(11) fraud on the court, *id.* at ¶¶ 293–302; and (12) breach of privacy, *id.* at ¶¶ 317–21.

[7] Of the 12 claims listed in footnote 6, *supra*, McNerney has waived the claims numbered (2),
(3), (6), (8), (9), and (11). *See* McNerney Br. at 7 & n.2.

6

## II.     Discussion

### A.     Jurisdiction and Standard of Review

The district court has jurisdiction to hear appeals from rulings of the bankruptcy court, including to disallow claims against the bankruptcy estate.  28 U.S.C. § 158(a).  Final orders of the bankruptcy court, including orders such as that here disallowing claims, are appealable to the district court.  *Id.*; *see Morse v. Rescap Borrower Claims Tr.*, No. 14 Civ. 5800 (GHW), 2015 WL 353931, at *3 (S.D.N.Y. Jan. 26, 2015).

In reviewing such judgments by the bankruptcy court, the district court functions as an appellate court.  *See In re CBI Holding Co., Inc.*, 529 F.3d 432, 448–49 (2d Cir. 2008).  Thus, the district court reviews the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo*.  *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir. 1990); *see also* Fed. R. Bankr. P. 8013 (advisory committee note); Fed. R. Civ. P. 52(a)(6).  Clear error exists when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *In re CBI Holding Co., Inc.*, 529 F.3d at 449 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  Harmless error, meaning an error not inconsistent with substantial justice or that does not affect the parties' substantial rights, is not grounds for reversal.  *In re Cavalry Const., Inc.*, 428 B.R. 25, 41–42 (S.D.N.Y. 2010) (citation omitted); *In re Adler, Coleman Clearing Corp.*, 204 B.R. 99, 106 (Bankr. S.D.N.Y. 1997) (quotation and citation omitted); *see also* Fed. R. Bankr. P. 9005; Fed. R. Civ. P. 61.  The district court may affirm "on any ground that finds support in the record, and need not limit its review to the bases raised or relied upon in the decisions below," *Freeman v. Journal Register Co.*, 452 B.R. 367, 369 (S.D.N.Y. 2010), but it may not consider evidence outside of the bankruptcy court record.  *See In re Bear Stearns High-Grade Structured Credit Strategies*

*Master Fund, Ltd.*, 389 B.R. 325, 339 (S.D.N.Y. 2008). Arguments not raised in the bankruptcy

court are considered waived and, unless waiver would result in manifest injustice, are not to be

considered by the district court. *See In re Lionel Corp.*, 29 F.3d 88, 92 (2d Cir. 1994).

### B.   Standards Applicable to Proofs of Claim and Objections

In a bankruptcy proceeding, a creditor may assert a right to payment from the debtor by

filing a proof of claim. Fed. R. Bankr. P. 3001; 11 U.S.C. § 501. A "claim" is a right to

payment or to an equitable remedy for breach of performance if such a breach provides a right to

payment, "whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured." *See* 11

U.S.C. § 101(5). Relevant here, a "creditor" is an "entity that has a claim against the debtor that

arose at the time of or before the order for relief concerning the debtor." 11 U.S.C.

§ 101(10)(A).

A properly filed proof of claim is deemed allowed against the estate unless a party in

interest objects. 11 U.S.C. § 502(a). An objection triggers a burden-shifting framework to

determine whether to allow a claim. A properly filed and executed proof of claim constitutes

prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f). "To

overcome this prima facie evidence, the objecting party must come forth with evidence which, if

believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak*

*(In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000). When the burden is then shifted back to

the claimant, the claimant must prove by a preponderance of the evidence that the claim should

be allowed under applicable law. *Rozier v. Rescap Borrower Claims Trust (In re Residential*

*Capital, LLC, et al.)*, 15 Civ. 3248 (KPF), 2016 WL 796860, at *9 (S.D.N.Y. Feb. 22, 2016)

(citation omitted).

If an objection to a claim is made, the bankruptcy court, following notice and a hearing, shall allow the claim and determine its amount unless "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). To determine whether a claim is unenforceable "under any agreement or applicable law," *id.*, the bankruptcy courts apply the applicable non-bankruptcy law. *See Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20 (2000). This follows from the "basic federal rule" in bankruptcy that state law governs the substance of claims—as if the parties were not involved in a bankruptcy proceeding—unless some federal interest requires a different result. *Id.* (quoting *Butner v. United States*, 440 U.S. 48, 57 (1979)); *see also Butner*, 440 U.S. at 54–55 ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law," such that, "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

Accordingly, federal pleading rules also apply in assessing a proof of claim's validity. *See Morse*, 2015 WL 353931, at *4 (citing *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009)); *see also In re 20/20 Sport, Inc.*, 200 B.R. 972, 978 (Bankr. S.D.N.Y. 1996) ("In bankruptcy cases, courts have traditionally analogized a creditor's claim to a civil complaint, a trustee's objection to an answer and an adversarial proceeding to a counterclaim.") (citing, *inter alia*, *Nortex Trading Corp. v. Newfield*, 311 F.2d 164, 164 (2d Cir. 1962)).

Here, because the bankruptcy court dismissed McNerney's claims as facially defective, the Court's analysis of her challenges to the disallowance of six of her claims is guided by the familiar standards applicable to a motion to dismiss. A complaint must plead "enough facts to

state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely

consistent with' a defendant's liability, it 'stops short of the line between possibility and

plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). A district court

must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in

the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir.

2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)).

This tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of

the elements of a cause of action, supported by mere conclusory, do not suffice." *Id.* "[R]ather,

the complaint's '[factual] allegations must be enough to raise a right to relief above the

speculative level,' *i.e.*, enough to make the claim 'plausible.'" *Arista Records, LLC v. Doe 3*,

604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 500 U.S. at 555, 570). A complaint is

properly dismissed when, as a matter of law, "the allegations in [the] complaint, however true,

could not raise a claim of entitlement to relief. *Twombly*, 550 U.S. at 558.

## II.    Discussion

As noted, McNerney challenges on appeal the disallowance of six claims. The Court

discusses these in turn, and then addresses her motion to strike the declaration of Sara Lathrop.

### A.    TILA

McNerney originally alleged that Homecomings violated TILA, entitling her to damages,

in two ways: by failing to provide required disclosures to McNerney at the time of the loan's

origination and by failing to rescind. McNerney, however, has foregone the first claim. *See*

10

McNerney Reply Br. at 1, 4.  Her remaining TILA claim, for failure to rescind, asserts that

Homecomings failed to rescind the loan after McNerney, on July 16, 2004, exercised her

statutory right to rescind by filing counterclaims in the first foreclosure action in state court.  *See*

State Court Counterclaims ¶ 35; District Court Counterclaims ¶¶ 131, 143–51.  The bankruptcy

court held that this TILA claim is barred by the statute of limitations.  Decision at 22–23.

The relevant limitations periods under TILA are as follows.  A TILA claim for actual or

statutory damages must be brought within one year of the date of the occurrence of the violation.

15 U.S.C. § 1640(e).  As to rescission, the borrower ordinarily has until midnight of the third

business day after the consummation of the transaction to seek rescission of the loan, 15 U.S.C. §

1635(a), but where the lender has made deficient disclosures at the time of the transaction, the

borrower's right to rescind is extended until three years after the transaction's consummation.

*See* 15 U.S.C. § 1635(f); 12 C.F.R. § 226.15(a)(3); *Barrett v. JP Morgan Chase Bank, N.A.*, 445

F.3d 874, 875–76 (6th Cir. 2006).[8]  A lender presented with a timely notice of rescission from

the borrower must rescind the transaction with 20 days of receipt of that notice, barring a court

order to the contrary.  15 U.S.C. § 1635(b).  A failure to rescind as required is a separate TILA

violation, giving rise to claims for damages.  *Jenkins v. Mercantile Mortg. Co.*, 231 F. Supp. 2d

737, 745 (N.D. Ill. 2002) (citation omitted); *Mount v. LaSalle Bank Lake View*, 886 F. Supp. 650,

651 (N.D. Ill. 1995).  Section 1640(e)'s one-year limitations period governing damages claims

begins to run upon the lender's failure to rescind as required.  *See* 15 U.S.C. § 1640(e); *see also*

*Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 896, 902–03 (3d Cir. 1989) (damages claim

---

[8] A borrower may therefore retain a right to rescind even though her damages claim from the failure to provide the required disclosures is barred by § 1640(e)'s one-year limitations period running from consummation.  *See McCoy v. Harriman Utility Bd.*, 790 F.2d 493, 496 (6th Cir. 1986).

from failure to rescind was timely filed five months after lender's refusal, after timely notice from borrower, to rescind).

In disallowing McNerney's claim based on failure to rescind, the bankruptcy court did not determine whether the disclosures provided to her at the loan's origination were inadequate, finding her rescission claim time-barred even if they were. The Court here similarly assumes *arguendo* that McNerney remained within the period when she could timely exercise her right to rescind on June 16, 2004, when she purported to do so in her State Court Counterclaims. *See* District Court Counterclaims ¶ 131.[9] The bankruptcy court held, however, that McNerney's damages claim from Homecomings's failure to rescind the loan fell outside § 1640(e)'s one-year limitations period.

That ruling was clearly correct. Assuming that McNerney had a right to rescind within three years of the loan transaction, her rescission request in her State Court Counterclaims on June 16, 2004 was timely. Homecomings then had 20 days—until July 6, 2004—to rescind. Its failure to do so would then give McNerney a cause of action, the one-year statute of limitations for which began to run on that date. McNerney thus had until one year later, July 6, 2005, to claim damages from Homecomings's failure to rescind. McNerney, however, did not bring a TILA claim for failure to rescind until she filed her Amended State Court Counterclaims on November 6, 2006, some 16 months after the limitations period had run. *See* Amended State Court Counterclaims ¶¶ 91–99; *see also* State Court Docket, Wallace Decl., Bnkr. Dkt. 9280-4, Ex. E., at 11. Her damages claim based on Homecomings' failure to rescind is, therefore, time-barred.

---

[9] The Trust's position at argument was that all required disclosures were made and that McNerney's right to rescind therefore lasted only three days, making a rescission notice on June 16, 2004 untimely.

McNerney makes two arguments to the contrary, each unpersuasive.  First, she argues that her June 16, 2004 state court counterclaims did bring such an action.  *See* McNerney Reply Br. at 5.  But that argument fails for two reasons.  First, such a claim, if made, would not have been ripe, because Homecomings, having as of then not previously been asked to rescind, could not yet have been in breach of a duty to rescind, and indeed, by statute, had 20 days to rescind following McNerney's June 16, 2004 notice.  Second, the aspects of McNerney's state-court counterclaims to which she points (paragraphs 36 and aspects of the prayer for relief) cannot, in fact, be plausibly read to assert a claim based on Homecomings' failure to rescind, and nor can any other part of that filing.  The cited portions instead merely seek damages for Homecomings' alleged failures of disclosure.  *See* State Court Counterclaims ¶¶ 31–37 (detailing alleged disclosure lapses).  Paragraph 36's general reference to Homecomings's "failure to comply with the Truth in Lending Act," cannot, without more, be fairly read to claim a failure to rescind. Instead, it is referring only to failure to provide the required disclosures; no factual content regarding Homecomings future failure to rescind is alleged.  *See id.* at ¶ 36.  The prayer for relief, while demanding rescission, similarly does not allege a claim for an extant failure to rescind.[10]  Instead, it requests that the transaction be rescinded and mentions specific aspects of the rescission, such as the termination of Homecomings's security interest in McNerney's property.  *Id.* at ¶ 41.[11]

---

[10] The Court assumes *arguendo*, that a request for rescission made in such a court pleading is a permissible method of pursuing rescission under TILA.

[11] McNerney separately argues—that the TILA statute of limitations should be equitably tolled. McNerney Br. at 14–16.  There is no cause to do so.  McNerney's TILA claims, for improper disclosure and as to failure to rescind, were untimely, and no circumstances justify a toll. Section 1640(e)'s limitations period is subject to equitable tolling in appropriate circumstances. *Borg v. Chase Manhattan Bank USA, N.A.*, 247 Fed. App'x 627, 635 (6th Cir. 2007) (citing *Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1043 (6th Cir. 1984)).  The Sixth Circuit has

Accordingly, the Court affirms the bankruptcy court's disallowance of McNerney's claim for damages based on from Homecomings's failure to rescind the loan.

## B.    Negligence and Improvident Lending

McNerney separately brought state-law claims for negligence by Homecomings for failing to exercise reasonable care in processing the loan to McNerney and for improvident lending. *See* District Court Counterclaims ¶¶ 160–67, 180–87. The bankruptcy court properly disallowed these claims because Homecomings did not owe McNerney a duty of care in the loan transaction under Ohio law, and because Ohio law does not recognize a cause of action for improvident lending. *See* Decision at 15–16.

Under Ohio law, to establish negligence, a plaintiff must show the existence of a legal duty, the defendant's breach of that duty, and an injury proximately caused by the breach. *Wallace v. Ohio Dept. of Commerce*, 773 N.E.2d 1018, 1025–26 (Ohio 2002) (citation omitted). The duty element "refers to the relationship between the plaintiff and the defendant from which arises an obligation on the part of the defendant to exercise due care toward the plaintiff." *Id.* Whether a particular legal duty exists is "a question of law for the court to determine." *Id.*

No such duty existed here. In Ohio, "'the relationship of debtor and creditor, without more, is not a fiduciary relationship,' and 'a bank and its customers stand at arm's length in negotiating terms and conditions of a loan.'" *425 Beecher, L.L.C. v. Unizan Bank, Natl. Assn.*, 927 N.E.2d 46, 59 (Ohio Ct. App. 2010) (quoting *Blon v. Bank One, Akron, N.A.*, 519 N.E.2d

---

identified five relevant factors: (1) "lack of notice of the filing requirement;" (2) "lack of constructive knowledge of the filing requirement;" (3) "diligence in pursuing one's rights;" (4) "absence of prejudice to the defendant;" and (5) "the plaintiff's reasonableness [in] remaining ignorant of the particular legal requirement." *Truitt v. County of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998). But McNerney has not argued that any of these factors support tolling here. Nor has she identified anything that inhibited her from discovering her injury and timely seeking relief.

14

363, 367–68 (Ohio 1988)).  Ohio statutory law similarly creates an arms-length relationship

between lenders and borrowers.  Ohio Rev. Code Ann. § 1109.15(E) ("Unless otherwise

expressly agreed in writing, the relationship between a bank and its obligor, with respect to any

extension of credit, is that of a creditor and debtor, and creates no fiduciary or other relationship

between the parties.").  A lender negotiating a loan agreement thus does not owe a borrower a

duty of care.  *Provident Bank v. Adriatic, Inc.*, No. CA2004-12-108, 2005 WL 2840741, at *4

(Ohio Ct. App. Oct. 31, 2005) (citing *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen.*

*Hosp. Ass'n*, 560 N.E.2d 206, 211 (Ohio 1990)).

In light of this doctrine, McNerney's negligence claim fails, because it presupposes a

legal duty that does not exist.  She alleges that Homecomings failed to exercise reasonable care

when it processed McNerney's loan application and loaned to her.  District Court Counterclaims

¶¶ 180–87.  But as the bankruptcy court recognized, Homecomings did not owe McNerney, as a

borrower, a duty of care.  McNerney counters that she "paid for correct underwriting,"

McNerney Br. at 24–25, but that allegation, while potentially supporting a contract claim, did not

give rise to a duty of care.  McNerney separately notes that it was foreseeable to Homecomings

that a borrower would expect such services, *id.*, but that claim, while potentially addressing the

element of causation, also does not give rise to a legal duty.  The bankruptcy court was therefore

right to disallow the negligence claim.

As for McNerney's claim of improvident lending, it similarly claims that Homecomings

did not exercise reasonable care in lending to McNerney, in that the terms of the loan made her

default more likely.  District Court Counterclaims ¶¶ 160–67.  But Ohio does not recognize

improvident lending as a distinct cause of action.  *See Price v. EquiFirst Corp.*, No. 09-CV-

1960, 2009 WL 917950, at *8 (N.D. Ohio Apr. 1, 2009) (improvident lending "not recognized

under Ohio law").  The one case construing such a claim to be actionable recast it as a claim of

substantive unconscionability based on the borrower's limited disability income.  *See City Fin.*

*Serv. v. Smith*, No. 97 CVF 00679, 2000 WL 288469, at *2 (Ohio Mun. Ct. Jan. 4, 2000).  No

similar claim is made here, and McNerney has renounced any unconscionability claims in this

appeal.  McNerney Br. at 7 n.1.  The Court accordingly affirms the disallowance of McNerney's

improvident lending claim.

### C.    Intentional and Negligent Misrepresentation

McNerney also brought state-law claims for negligent and intentional misrepresentation.

*See* District Court Counterclaims ¶¶ 188–203.  These claims are based on allegations that OMC

(as an agent for Homecomings) misrepresented to McNerney that she qualified for the loan and

its monthly payments.[12]  The bankruptcy court disallowed these claims for failure to state a

claim, for multiple reasons.  First, they do not adequately plead an agency relationship between

OMC, which dealt with McNerney, and Homecomings.  Second, Homecomings and McNerney

were not in a special relationship giving rise to a legal duty.  Third, on the facts pled,

Homecomings had no contact with McNerney prior to the loan and was not responsible for any

misrepresentations to her that led to the loan.

On this point, too, the bankruptcy court's reasoning was persuasive.  Under Ohio law, a

claim of intentional misrepresentation requires "(1) a representation, (2) which is material to the

transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard

and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the

---

[12] *E.g.*, *id*. at ¶ 192 ("Homecomings, through its agent, manipulated the information to make it
appear that Ms. McNerney qualified for a loan for which she did not qualify at all."); *id.* at ¶ 198
("Homecomings, through its agent, misrepresented to Ms. McNerney that she qualified for a loan
for which, on her actual anticipated income, she was not in fact qualified.").

intent of misleading another into relying upon it, (5) justifiable reliance upon the representation

or concealment, and (6) a resulting injury proximately caused by the reliance." *Brewer v.*

*Brothers*, 611 N.E.2d 492, 495 (Ohio Ct. App. Aug. 31 1992) (citation omitted).  A claim of

negligent misrepresentation, in turn, requires that a person, in the course of a transaction in

which he had a pecuniary interest, have "supplie[d] false information for the guidance of others

in their business transactions" without exercising "reasonable care or competence in obtaining or

communicating the information," and on which information the recipient "justifiabl[y] relied,"

causing pecuniary loss. *Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989)

(citation omitted).  A "core requirement" in a negligent misrepresentation claim is "a special

relationship under which the defendant supplied information to the plaintiff for the latter's

guidance in its business transaction." *Ford v. New Century Mortg. Corp.*, 797 F. Supp. 2d 862,

872 (N.D. Ohio 2011) (quotation omitted).  "[A] bank and its customers stand at arm's length in

negotiating terms and conditions of a loan. . . .  This sort of relationship does not, by itself, give

rise to the existence of a duty necessary to maintain a negligent misrepresentation claim." *Id.*

Applying these standards of Ohio law, the bankruptcy court correctly determined that

OMC and Homecomings were not in an agency relationship, thereby defeating the intentional

misrepresentation claim insofar as it was based on alleged acts by OMC. *See* Decision at 11–13.

And on appeal, McNerney appears appear to abandon a claim of agency liability, now claiming

that "[t]he negligence was the negligence of Homecomings in failing to fulfill its own obligation

as a lender." McNerney Br. at 22; *see also* McNerney Reply Br at 8–9.  And because McNerney

did not allege any direct misrepresentations from Homecomings to her—indeed, she did not

allege any contact with Homecomings prior to the loan's closing—no claim of intentional

misrepresentation could lie.  McNerney seeks to re-focus the inquiry on what McNerney was

told by others such as OMC, McNerney Br. at 24, but absent conduct by Homecomings or for
which it is legally accountable, no claim of intentional misrepresentation can lie.

For the same reasons, the bankruptcy court also properly disallowed McNerney's
negligent misrepresentation claim. Moreover, there was no pleading of facts giving rise to a
special relationship between McNerney and Homecomings, who instead had the arms-length
relationship of debtor and creditor.

### D.    Civil Conspiracy

McNerney next asserts three civil conspiracy claims. The first two are based upon an
alleged conspiracy between OMC and Homecomings in the origination of the loan, *see* District
Court Counterclaims ¶¶ 207–12, 288–92; the third is based on the filing of various documents in
the first foreclosure action by the debtors, *see id.* at ¶¶ 303–16. The bankruptcy court held that
the first two claims failed as a matter of law because McNerney failed adequately to allege facts
supporting the claim that Homecomings had agreed with OMC to participate in OMC's alleged
wrongdoing, and that the third claim failed under the witness immunity doctrine, which provides
immunity from civil suits for statements made in the course of a judicial proceeding.

Under Ohio law, the tort of civil conspiracy applies to "a malicious combination of two
or more persons to injure another in person or property, in a way not competent for one alone,
resulting in actual damages." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998)
(quotation omitted). "An underlying unlawful act is required before a civil conspiracy claim can
succeed." *Id.* (citation omitted). The malice required is when a person "does a wrongful act
purposely, without a reasonable or lawful excuse, to the injury of another." *Id.* (quotation
omitted). The malicious combination element does not require a showing of express agreement
between the defendants. A common understanding or design, even tacit, to commit an unlawful

18

act suffices. *Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 538 (6th Cir. 2000)

(citing *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996)).

McNerney's first two civil conspiracy claims fail as a matter of law because McNerney's

pleadings failed to adequately allege the malicious combination element.  McNerney's first such

claim, for misrepresentation, *see* District Court Counterclaims ¶ 209, and the second, for

violation of fiduciary duties owed to McNerney, *see id.* at ¶ 290, center on actions by OMC, but

only conclusorily do they allege concerted action between OMC and Homecomings.  As the

bankruptcy court recognized, McNerney's claims that Homecomings and OMC "acted in

concert," *see id.* at ¶¶ 208, 290, or that OMC acted "with Homecomings['s] participation and

knowledge," *id.* at ¶ 209, lack the factual content and concreteness to survive a motion to

dismiss.  Bare allegations of a meeting of the minds are inadequate to support a combination

between the alleged conspirators.  *See In re Nat'l Century Fin. Enters., Inc.*, 504 F. Supp. 2d

287, 329–30 (S.D. Ohio 2007) (complaint's failure to indicate relationship the parties had with

each other or how they reached a common understanding held insufficient to plead malicious

combination).

The bankruptcy court also properly disallowed the third civil conspiracy claim of

allegedly fraudulent conduct by the debtors in their filings in the first foreclosure action in state

court.  *See* District Court Counterclaims ¶¶ 303–16.  This claim alleged that "the fraud

perpetrated upon the court . . . could not have been done without all of the parties, including

Homecomings, GMAC and MERS acting in concert," *id.* at ¶ 304, and the "participation of each

in the form of fraudulent assignments, fraudulent affidavits, fraudulent appearances as 'plaintiff'

in the prior foreclosure proceeding, perpetrated a long and expensive fraud upon Ms. McNerney

and the court," *id.* at ¶ 305.  But, as the bankruptcy court rightly noted, the witness immunity

doctrine bars a claim based on such allegations.  "[J]udges, counsel, parties, and witnesses are

absolutely immune from civil suits for remarks made during the course of and relevant to a

judicial proceeding."  *DeBrosse v. Jamison*, No. 91-CA-26, 1992 WL 5851, at *2 (Ohio Ct. App.

Jan. 14, 1992) (citing *Willitzer v. McCloud*, 453 N.E.2d 693 (Ohio 1983)).  "[T]he statements of

witnesses are privileged and cannot be a basis for a subsequent civil action," and "a witness is

immune from civil liability for giving false testimony."  *Id.* (citations omitted).

Attempting to salvage this claim, McNerney relies on inapposite cases.  *Glazer v. Chase*

*Home Fin. LLC*, 704 F.3d 453 (6th Cir. 2013) ("*Glazer I*"), does not, as McNerney claims, allow

conduct by a foreclosing creditor in a foreclosure lawsuit to form the basis for a fraud claim in

another lawsuit.  *See* McNerney Reply Br. at 10.  *Glazer I* held that, under the Federal Debt

Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, mortgage foreclosure does

qualify as debt collection, and that lawyers can meet the general definition of debt collectors

under the act when regularly and principally engaged in mortgage foreclosure.  *See Glazer I*, 704

F.3d at 464.  *Glazer I* did not speak to the issue of whether litigation activity by a foreclosing

creditor could support a fraud claim.[13]

---

[13] Indeed, the *Glazer I* plaintiff did not adequately allege fraud as a result of conduct undertaken
in a foreclosure lawsuit.  The plaintiff there filed a federal-court lawsuit alleging violations of the
FDCPA and Ohio law after the defendants had begun a foreclosure proceeding against him.  The
district court dismissed the case and declined to exercise supplemental jurisdiction over the state
law claims, which were then litigated to final judgment and were on appeal in state court when
the Sixth Circuit, in the federal appeal, reinstated part of the plaintiff's federal-court case.  The
state law claims were later removed from the federal case.  *See Glazer v. Chase Home Fin. LLC*,
No. 1:09CV1262, 2014 WL 1238291, at *8 (N.D. Ohio Mar. 25 2014) ("*Glazer III*").  On appeal
in state court, the plaintiff's misrepresentation and civil conspiracy claims were dismissed for
failure to allege detrimental reliance on the defendants' alleged fraudulent misrepresentations.
*See Glazer v. Chase Home Fin., L.L.C.*, Nos. 99875, 99736, 2013 WL 7869273, at *13–16 (Ohio
Ct. App. Dec. 19, 2013) ("*Glazer II*").  In pertinent part, the court found that because the plaintiff
contested the validity of the debt in the foreclosure action, he could not have detrimentally relied
on that alleged false misrepresentation.  *Id.* at *15.  McNerney similarly contested the validity of
her debt in the first foreclosure action, alleging, for example, that the loan "contract [wa]s void

For these reasons, the bankruptcy court properly disallowed McNerney's civil conspiracy claims.

### E.        Violations of the Ohio Consumer Sales Practices Act ("CSPA")

McNerney assert three sets of CSPA violations.  The first is based on alleged unfair and deceptive practices by OMC, Homecomings's alleged agent, in originating the loan.  *See* District Court Counterclaims ¶¶ 280–87.  The second and third are based on Homecomings's and GMACM's actions related to the foreclosure action:  McNerney asserts that they filed an action without undertaking any loss mitigation, used "false front entities," and harassed McNerney and her family in their house, and that Homecomings's demand for attorney's fees in the second foreclosure action violated the CSPA.  *See id.* at ¶¶ 308–16, 328–30.

The CSPA proscribes unfair, deceptive, or unconscionable acts or practices by suppliers in connection with a "consumer transaction."  Ohio Rev. Code Ann. §§ 1345.02(A), 1345.03(A).  Claims under it are subject to a two-year limitations period, running from after the occurrence of the subject violation.  Ohio Rev. Code Ann. § 1345.10(C).  Significant here, the issuing of a mortgage is a pure real estate transaction that falls outside the CSPA's scope.  *See Hanlin v. Ohio Builders and Remodelers, Inc.*, 212 F. Supp. 2d 752, 757 (S.D. Ohio 2002) (granting summary judgment to a lender on ground that issuance of a loan for home improvements in exchange for a mortgage in the house was a pure real estate transaction, outside the CSPA's scope).  Mortgage servicing, and the pursuit of foreclosure, fall outside the CSPA.  *Anderson v. Barclay's Capital Real Estate, Inc.*, 989 N.E.2d 997, 999–1002 (Ohio 2013).  These are instead "collateral services that are solely associated with the sale of real estate and are necessary to

---

for failure of consideration," State Court Counterclaims ¶ 7.  Indeed, her counterclaims do not contain any allegations of detrimental reliance—she claims only that she was damaged by having to defend the foreclosure case.  *See* District Court Counterclaims ¶ 307.

effectuate a 'pure' real estate transaction." *Id.* at 1000 (quotation omitted).  The CSPA does *not*

cover allegations of misrepresentations or other purportedly improper conduct made in the

course of pursuing foreclosure.  *See Glazer II*, 2013 WL 7869273, at *10–11.

   The bankruptcy court here dismissed McNerney's first CSPA claim as barred by the

CSPA's statute of limitations.  As the bankruptcy court recognized, McNerney's allegations arise

from the loan's origination on December 27, 2002:  For example, McNerney alleged harm from

"the making of a loan for which she could not qualify under responsible underwriting standards."

District Court Counterclaims ¶ 286.  But McNerney did not bring this claim until 2011.  As such,

it is time-barred.

   McNerney's remaining two CSPA claims were also properly disallowed, because they

fell outside the CSPA, insofar as they involved collateral services associated with a pure real

estate transaction.  McNerney counters that violations of the federal debt collection statute, the

FDCPA, may be covered under the CSPA.  She argues that Homecomings became liable under

the FDCPA when the defaulted loan was assigned back to Homecomings from GMACM in

2008, thereby making Homecomings a debt collector under the FDCPA.  *See* McNerney Br. at

16–17.  That argument fails.  Whether or not a viable claim against Homecomings could have

been brought under the FDCPA, McNerney did not bring such a claim.  And it is incorrect that

the CSPA and the FDCPA are coextensive:  "[A] violation of the FDCPA does not automatically

mean a violation of the [CSPA]," *Glazer II*, 2013 WL 7869273, at *10.  On the contrary, as the

court in *Glazer* noted, the CSPA does not apply to a "pure" real estate transaction, such that a

defendant liable under the FDCPA for debt-collection activity arising out of such a transaction would not be liable under the CSPA.  *Id.* at \*10–11.[14]

McNerney separately argues that hers was a "mixed" transaction, involving real estate and consumer goods, because McNerney used the loan to pay of $4,533.16 of credit card debt. As she notes, under *Brown v. Liberty Clubs*, 543 N.E.2d 783, 786 (Ohio 1989), the CSPA "is applicable to the personal property or services portion of a mixed transaction involving both the transfer of personal property or services, and the transfer of real property."  But *Brown* is far afield.  There, the defendant was solicited to visit a subdivision with the promise of receiving a gift of a free set of steak knives.  *Id.* at 785.  The court held that the solicitation and transfer of steak knives constituted a consumer transaction and was deceptive, such that that portion of the transaction violated the CSPA.  *Id.* at 785–86.  Here, in contrast, every portion of the transaction related to real estate—the transaction involved re-finance of a mortgage on McNerney's house. That McNerney used the proceeds to pay off, among other debts, a credit card debt, does not

---

[14] Separately, it is far from clear that Homecomings was, as McNerney claims, a "debt collector" within the meaning of the FDCPA.  "[T]he definition of debt collector pursuant to § 1692a(6)(F)(iii) includes any non-originating debt holder that either acquired a debt in default or has treated the debt as if it were in default at the time of acquisition."  *Bridge v. Ocwen Federal Bank, FSB*, 681 F.3d 355, 362 (6th Cir. 2012).  McNerney claims that Homecomings was a debt collector because the debt was assigned back to it while it was in default.  *See* McNerney Br. at 16–17; *see also* 15 U.S.C. § 1692a(6)(F)(iii).  Conceivably, however, Homecomings, would fall outside that definition, on the ground that it was the loan originator. *See* 15 U.S.C. § 1962a(6)(F)(ii).  Alternatively, it might fall within the statutory creditor exception, which applies to any person who "offers or extends credit creating a debt or to whom a debt is owed," but not to "any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another."  15 U.S.C. § 1692a(4).  Whether that exception applies would appear to depend on whether Homecomings, the original lender, received the assignment of the loan back from GMACM for the purposes of collecting a debt owed to itself and not to another.  *See Hulse v. Ocwen Federal Bank, FSB*, 195 F. Supp. 2d 1188, 1203 (D. Or. 2002).  Because it holds for the Trust on other grounds, the Court has no occasion to resolve these issues under the FDCPA, which the parties sparsely briefed.

23

change the essential character of the mortgage loan transaction.  As to this point, *Hanlin* is

instructive.  There, the mortgage was issued exclusively to enable the mortgagor to undertake

home repairs.  *See Hanlin*, 212 F. Supp. 2d at 753–54.  Yet despite this purpose, the court held

the transaction to be purely real estate, so as to fall outside the CSPA's scope.  *Id.* at 757.

The bankruptcy court therefore properly disallowed McNerney's CSPA claims as time-

barred and as falling outside the scope of the CSPA.

### F.      Breach of Privacy Claim

Finally, McNerney brought a claim for breach of privacy.  District Court Counterclaims

¶¶ 317–21.  For example, she alleged that Homecomings violated her privacy by "sending people

to [her] home to harass and intimidate her and her family in the presence and hearing of

neighbors, without [her] authorization or consent."  *Id.* at ¶ 318.  (The genesis of this claim

appears to be that, as the debtors admit, after the loan was in default, they hired third party

contractors to inspect and photograph the Property, usually monthly, to determine whether the

Property was vacant.  Appellees' Objection, Bnkr. Dkt. 9280, at ¶ 22; *see also* List of Property

Inspections, Lathrop Decl., Bnkr. Dkt. 9280-2, Ex. N.)  McNerney alleged that, during and after

the first foreclosure proceeding, "agents of Homecomings came to the home of Ms. McNerney

and publically humiliated her and her children," "came by in cars to take pictures," and "got out

of the car and came onto the Property and called out to the family and heckled them while the

family was visiting together on their front balcony, calling out in loud voices that the family

should stand up and wave and smile for the cameras," District Court Counterclaims ¶¶ 104–06.

To state a claim under Ohio law for invasion of privacy, a plaintiff must plead one of

three theories: (1) "the unwarranted appropriation or exploitation of one's personality;" (2) "the

publicizing of one's private affairs with which the public has no legitimate concern;" or (3) "the

wrongful intrusion into one's private activities in such a manner as to outrage or cause mental

suffering, shame or humiliation to a person of ordinary sensibilities." *Sustin v. Fee*, 431 N.E.2d

992, 993 (Ohio 1983); *see also Welling v. Weinfeld*, 866 N.E.2d 1051, 1053 (Ohio 2007). The

first theory is not implicated here—there has been no claim of misappropriation of anyone's

personality.

To state a claim under the second, the publication of private facts, the plaintiff must

allege five elements: (1) "[t]here must be publicity"—"communicating the matter to the public at

large, or to so many persons that the matter must be regarded as substantially certain to become

one of public knowledge," not just "publication" as it is understood in the context of the

defamation tort; (2) "the facts disclosed must be those concerning the public life of an individual,

not his public life;" (3) "the matter publicized must be one which would be highly offensive and

objectionable to a reasonable person of ordinary sensibilities;" (4) "the publication must have

been made intentionally, not negligently;" (5) "the matter publicized must not be a legitimate

concern to the public." *Quintile v. Medina Cnty.*, No. 1:07CV2413, 2008 WL 2484173, at *9–10

(N.D. Ohio June 17, 2008) (quoting *Killilea v. Sears, Roebuck & Co.*, 499 N.E.2d 1291, 1294–95

(Ohio Ct. App. 1985)). To state a claim under the third theory, wrongful intrusion into privacy,

the plaintiff must show that the defendant "has intruded into a private place, or has otherwise

invaded a private seclusion." *Jackson v. Playboy Enters., Inc.*, 574 F. Supp. 10, 13–14 (S.D.

Ohio 1983). The intrusion must be wrongful, meaning "of such a character as would shock the

ordinary person to the point of emotional distress[,]" "as well as done in a manner as to outrage

or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Roe ex rel.*

*Roe v. Heap*, No. 03AP–586, 2004 WL 1109849, at *18 (Ohio Ct. App. May 11, 2004) (citations

omitted).  The intrusion, physical or otherwise, must be "highly offensive to a reasonable

person."  *Id.* (quotation omitted).

The bankruptcy court disallowed appellants' breach of privacy claim.  The Court agrees

with and adopts the bankruptcy court's analysis and conclusions in its thoughtful decision.  *See*

Decision at 28–31.  In brief, as to the second theory, McNerney failed to allege both the

disclosure of any private information and disclosure to the "public at large"; instead, she alleged

only that the inspectors harassed her "in the presence and hearing of neighbors," District Court

Counterclaims ¶ 318.  As to the third theory, wrongful intrusion into privacy, McNerney failed to

allege intrusion into a private space, as the alleged intrusion occurred while McNerney and her

family were on her front porch, which is not a private place under Ohio law.  *See York v. Gen.*

*Elec. Co.*, 759 N.E.2d 865, 868 (Ohio Ct. App. 2001) (no wrongful intrusion occurred from

unauthorized video recordings taken of plaintiff while he was on his front porch and in his yard,

places that were "outside and in public view").

In this appeal, McNerney argues that the bankruptcy court improperly applied the wrong

standard by failing to credit her factual allegations as true and to view all inferences in the light

most favorable to her.  The Court holds otherwise.  A fair review of the bankruptcy court's

decision is that it carefully scrutinized the allegations and properly determined that the fairly pled

allegations did not allege facts that sufficient to meet the requirements of the breach of privacy

tort.  McNerney separately argues that her porch is a private space, such that an intrusion into it

can constitute a wrongful intrusion into privacy.  But the cases on which McNerney relies, which

involve the Fourth Amendment of the United States Constitution, *see* McNerney Reply Br. at 11

(citing, for example, *Florida v. Jardines*, 133 S. Ct. 1409 (2013)), are inapposite.  They do not

speak to the scope of this Ohio cause of action.

For the reasons given by bankruptcy court, the Court therefore affirms the disallowance of McNerney's breach of privacy claims.

### G.    The Motion to Strike the Lathrop Declaration

On November 16, 2015, McNerney moved in the bankruptcy court to strike the declaration of Sara Lathrop, *see* Bnkr. Dkt. 9334, which included information and various exhibits relevant to her claims. The bankruptcy court did not rule on the motion, and indeed cited certain information in the declaration and its exhibits in recounting the factual and procedural history of McNerney's claims, thereby impliedly denying the motion by implication. McNerney appeals the bankruptcy court's failure to strike the declaration, a decision the Court reviews for an abuse of discretion. *See In re Residential Capital, LLC, et al.*, 2016 WL 796860, at *14.

The Court finds no error. Lathrop's declaration supplied background information useful to reconstruct the long and complex history of the preceding state and federal-court litigation. It usefully reconstructed those litigation events. To the limited extent that Lathrop's declaration addressed the merits of McNerney's claims, Lathrop's factual representations of course would not have been properly considered on a motion to dismiss. But a fair review of the bankruptcy court's decision reveals that the bankruptcy did not rely on those factual representations.[15] In any event, this Court, in resolving the instant appeal, has not done so. The Court instead

---

[15] The one factual statement as to which McNerney claims the bankruptcy court relied on the Lathrop Declaration for support is that Homecomings was a servicer from December 27, 2002 until January 1, 2003. *See* McNerney Br. at 28–29, McNerney Reply Br. at 11–12. But the basis for that statement was not the product of a representation in the declaration, but a cognizable exhibit attached to it. *See* Lathrop Decl., at ¶ 6; Servicing Transfer Letter, Lathrop Decl., Bnkr. Dkt. 9280-2, Ex. E. In any event, whether the loan closed on December 27, 2002 or January 3, 2003 as McNerney contends, *see* McNerney Br. at 29, is irrelevant. Even the later date would not rehabilitate her CSPA claim.

evaluated McNerney's various claims without any consideration given to the Lathrop Declaration. The Court's determination here that the various claims as to which McNerney appeals were all properly disallowed was reached entirely independent of the Lathrop Declaration. Having not relied on the Lathrop Declaration, and having affirmed the bankruptcy court's disallowance of McNerney's claims, the Court accordingly has no occasion to rule on whether it was error not to strike that declaration.

### H.    Attorney's Fees

Gray, McNerney's attorney, seeks attorney's fees. Several statutes under which McNerney sought relief allow attorney's fees to be awarded to a prevailing party. *See, e.g.*, 15 U.S.C. § 1640(a)(3) (TILA); Ohio Rev. Code Ann. § 1345.09(F) (CSPA). McNerney, however, has not prevailed on these claims, which the Court has disallowed. The Court, therefore, disallows Gray's claim for fees.

## CONCLUSION

For the foregoing reasons, the Court affirms the bankruptcy court's order disallowing McNerney's various claims. The Clerk of Court is respectfully directed to close this case.


SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: November 30, 2016
       New York, New York