1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 12-12020-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matters of:

7  RESIDENTIAL CAPITAL, LLC, et al.,

8          Debtors.

9  - - - - - - - - - - - - - - - - - - - -x

10

11

12

13              United States Bankruptcy Court

14              One Bowling Green

15              New York, New York

16

17              May 8, 2017

18              9:18 AM

19

20

21

22

23  B E F O R E:

24  HON. MARTIN GLENN

25  U.S. BANKRUPTCY JUDGE

1

2   (CC Doc. #10273) Trial in connection with the with the claim(s)

3   of Alan Moss

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  David Rutt

21   eScribers, LLC

22   352 Seventh Avenue, Suite #604

23   New York, NY 10001

24   (973)406-2250

25   operations@escribers.net

3

1

2    A P P E A R A N C E S:

3    MORRISON & FOERSTER LLP

4         Attorneys for the ResCap Borrower Claims Trust

5         250 West 55th Street

6         New York, NY 10019

7

8    BY:   JESSICA J. ARETT, ESQ.

9         NORMAN S. ROSENBAUM, ESQ.

10

11

12   ALAN MOSS

13        In Propria Persona

14        P.O. Box 721

15        Moss Beach, CA 94038

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  All right, please be seated.  We're here

4    in Residential Capital, number 12-12020.  We're here in

5    connection with the ResCap Borrower Claims Trust's objection to

6    the claim of Alan Moss.  Good morning, everybody.  Let me get

7    the appearances.

8              Mr. Moss?

9              MR. MOSS:  Alan Moss, in pro per, Your Honor.

10             MS. ARETT:  Jessica Arett and Norman Rosenbaum on

11   behalf of the Borrower Claims Trust.

12             THE COURT:  Okay.  All right, are there any

13   preliminary matters we need to deal with before we start,

14   Mr. Moss?

15             MR. MOSS:  I don't think so.

16             THE COURT:  You need to move over in front of the

17   microphone --

18             MR. MOSS:  Okay.

19             THE COURT:  -- at least -- what -- so, we don't have a

20   traditional court stenographer; we use an electronic voice-

21   recording system.  Everything that's said on the record is

22   recorded and the transcript can be prepared from it.  But it's

23   important that you be near the microphone when you're speaking.

24   That's all I have to say.  Just --

25             MR. MOSS:  Okay.

1          THE COURT:  Go ahead, Mr. Moss.

2          MR. MOSS:  Is that better?

3          THE COURT:  Yes, it is.

4          MR. MOSS:  Okay.

5          THE COURT:  Do you have any preliminary matters?  I'm

6  sorry.

7          MR. MOSS:  I don't, except I have a question on the

8  order of -- that this proceeding will take place.

9          THE COURT:  Okay, the order is you've got the burden

10  of proof, so you go first.

11          MR. MOSS:  Okay, that was my question, because it's

12  their objection and, absent some --

13          THE COURT:  No, but you have --

14          MR. MOSS:  -- their proving --

15          THE COURT:  -- you have the burden of proving your

16  claim by a preponderance of the evidence.  We're here in remand

17  from the district court.  The district court found that your

18  amended claim sufficiently alleged malice to permit the claim

19  to go forward.  I declined to grant summary judgment to the

20  Trust.  And, so, you have the burden of proof to establish all

21  of the necessary elements of your claim.

22          Ms. Arett, any preliminaries you want to raise?

23          MS. ARETT:  No, Your Honor.

24          THE COURT:  Okay.  Mr. Moss, do you wish to make an

25  opening statement?

1          MR. MOSS:  I do, briefly.

2          THE COURT:  If you do, you ought to go to the podium

3    and speak from the podium.

4          MR. MOSS:  Thank you, Your Honor.  I want to make a

5    brief opening statement, which is that this is -- my claim is

6    based on negligence, negligence under California law.  It is

7    not based precisely on the issuance of notices.  It is based on

8    negligence and a duty on the part of the trustee, ETS.  And

9    thereafter, because of that negligence, they issued the

10   notices.  But this claim and the amended claim that you allowed

11   me asserts negligence, simple negligence, against the trustee,

12   for failing to adhere to its duty -- and that duty is said as

13   precisely as I can -- to treat both the beneficiary and the

14   trustor, who is me, equally.  And in this case, the evidence

15   will show that they did not do that and, because of that, they

16   breached that duty and caused harm.

17         THE COURT:  Mr. Moss, have you read both my decision

18   of August 24, 2015 and the district court's decision of June

19   2nd, 2016?

20         MR. MOSS:  I have.

21         THE COURT:  Isn't it clear from -- let's just take the

22   district-court decision; that the only basis on which your

23   claims can go forward is if you prove malice, not negligence;

24   malice?  The -- I read the district court's decision as quite

25   clear on that, and certainly I read my decision as clear on

1  that.  The matter was reversed and remanded from the district

2  court, solely on the issue of whether you had satisfactorily

3  pled malice.  I believe that the district court affirmed with

4  respect to finding that negligence is not a sufficient basis

5  for claim.  How do you respond to that?

6          MR. MOSS:  Well, that's -- with all due respect,

7  that's not my reading of the case.  What --

8          THE COURT:  Show me where in either of those decisions

9  you're permitted to go forward on the basis of negligence.

10         MR. MOSS:  All right.  Well, first, if I -- if I may;

11 the district court reversed and remanded with directions based

12 on a finding of malice that the district court --

13         THE COURT:  No, no, no, no, no, no, no, no, no.  The

14 district court reversed in finding that your amended claim

15 sufficiently alleged malice.  I had expunged your claim on the

16 basis that I concluded that the amended claim did not

17 sufficiently allege malice.  The district court gave at least

18 four examples of what it thought were sufficient to raise

19 issues of malice sufficient to permit the claim to go forward.

20 But nowhere in the district-court decision does the judge

21 suggest that you're permitted to go forward on the basis of

22 negligence claims.  If you think so, show me where that is.

23         MR. MOSS:  Well, I don't think the district court

24 addressed that specific issue; it went to malice.  What I'm --

25 what I'm saying to this Court is --

RESIDENTIAL CAPITAL, LLC, et al.                                    8

1          THE COURT:  Mr. Moss, I'm telling you I'm not

2     permitting you -- well, I'll hear from Ms. Arett first.  You

3     say you're going forward on negligence alone, not on malice.

4     You've just told me that the basis of your claim is negligence

5     under California law.  I already specifically held that ETS

6     owed you no duty, and I was affirmed on that.  The only thing

7     that the district court reversed on was whether you had

8     sufficiently alleged malice.  Do you have the decision with

9     you?  Do you have --

10         MR. MOSS:  I do.

11         THE COURT:  Show me where -- in either my decision or

12    the subsequent decision on appeal, where it says that you can

13    proceed on the basis of negligence.

14         (Pause)

15         MR. MOSS:  Well, Your Honor, I can't show you that.

16    The district court did not actually -- and I say discussed it.

17    They went straight to malice, because, as I read the decision,

18    if the negligence claim that I made concerned only the issue of

19    notices, then it looked to the malice determination to see if

20    it was privileged or not.  And the language of the district-

21    court opinion, I think, is fairly clear that they found several

22    factors that would form a basis for a finding of malice.

23         THE COURT:  All right, anything else --

24         MR. MOSS:  I mean, so --

25         THE COURT:  -- you want to say in the preliminary?  I

1    want to hear from --

2              MR. MOSS:  No.

3              THE COURT:  -- Ms. Arett.

4              MR. MOSS:  No.

5              THE COURT:  Well, let me first -- are you prepared to

6    go forward to seek to prove your claim based on malice under

7    California law?  Yes or no?  You told me that the basis of your

8    claim is negligence, and what I want to be clear about is are

9    you prepared to go forward today to address the issues that the

10   district court raised with respect to malice; yes or no?

11             MR. MOSS:  Yes.

12             THE COURT:  I'm sorry?

13             MR. MOSS:  Yes.

14             THE COURT:  Okay, let me hear from --

15             MR. MOSS:  Yeah.

16             THE COURT:  -- Ms. Arett.

17             And my question to you is, is Mr. Moss permitted to go

18   forward on negligence claims?

19             MS. ARETT:  It would be the Trust's position that

20   negligence does not meet the standard of what would constitute

21   malice in the law of California.  I would also add that, to

22   date, the only damages that Mr. Moss seems to be able to be

23   putting forward are emotional-distress damages, which, as we've

24   briefed, we don't think are available under a negligence

25   theory.

RESIDENTIAL CAPITAL, LLC, et al.                    10

1          THE COURT:  Well, he's also seeking attorney's fees

2    for --

3          MS. ARETT:  Correct, yes, and to date we haven't -- I

4    guess we will see what is put forward today, but to date we

5    have not seen any evidence of those.

6          THE COURT:  All right, let me hear from Mr. Moss

7    again.

8          Finish your opening statement, and I want to know

9    specifically what evidence you believe you're prepared to show

10   to establish that ETS acted with malice or reckless disregard

11   of your rights.

12         MR. MOSS:  The reason that ETS issued three notices

13   was because they acted as trustee when they should not have.

14   There is no authority that they had for them to be able to

15   issue any notices.  They didn't have authority and, as the

16   district court pointed out, they had no, even, apparent

17   authority, under the recorded documents, to issue any notices.

18         In short, the Trust has admitted in discovery

19   responses that they performed no due diligence to decide -- to

20   figure out whether or not they had authority.  There are no

21   documents that they produced in discovery that shows they did

22   any kind of due diligence.  They could have gone onto the

23   website of the San Mateo County Recorder's Office and in about

24   three minutes figured out they had no authority.  They did none

25   of that, and that's been admitted, Your Honor.

1          So, they proceeded to act as trustee and keep this

2    alive, with no apparent authority and no actual authority to do

3    it.  All of the title documents in this case that have been

4    forward -- been put forward to the Court show that there was no

5    chain of title.  In this case, the Trust has admitted there's

6    no adequate chain of title so that ETS could have acquired the

7    authority to act, which is in direct contradiction, by the way,

8    to the actions in the prior litigation in this matter, which is

9    entitled "Bank of New York" but was really run by -- as we now

10   know, by GMAC.  They controlled the litigation, they kept it

11   going, and at no time in four years of litigation did they

12   admit that there was a break in the chain of title.  And it was

13   part of that that then -- I then discovered that ETS had no

14   authority to act.  That is the primary basis of their malice

15   and showing of their malice.  And they can't prove that they

16   didn't do that.

17         They acted in reckless disregard of my rights when

18   they proceeded with this.  To the extent that they proceeded

19   with it at all, it's not really very clear from the documents

20   that have been produced what exactly they did or did not do.  I

21   received a total of 771 pages of documents and discovery from

22   the Trust, of which twelve percent supposedly came from ETS.

23   Not one of those pieces of paper, none of them, had anything to

24   do with investigation by ETS as to their authority.  None of

25   them had anything to do with taking any actions whatsoever, in

1    any regard.  And -- to investigate whether they had authority.

2    And it's my position here that they had to do that.  They were

3    under a duty to do that.

4           And whether you now consider, in this proceeding,

5    whether I can proceed on negligence or not, in determining the

6    existence or absence of malice, I believe the Court has to look

7    at what actions they took or did not take, because, as trustee,

8    they were under a burden to -- an equal burden to both the

9    beneficiary and to myself.  And they provided no action to me

10   whatsoever.  And indeed, one of the reasons for that is that

11   ETS is owned by GMAC.  And what their procedure was exactly, I

12   can't tell from the documents.

13          I can tell that something may have happened to start

14   this, but I don't know what.  And there isn't one piece of

15   paper, not one, in that twelve percent of that document dump,

16   that shows what that was; not a one.  There's not -- usually in

17   California, a foreclosure proceeding starts with a written

18   declaration from the beneficiary, saying start the foreclosure.

19   Just because someone may be in default doesn't automatically

20   cause a foreclosure proceeding to advance.  The beneficiary has

21   to ask that that be done.  There's no evidence of that, not in

22   GMAC's records that were produced, not in ETS's records; not a

23   page; nothing in 771 pages.

24          They can't prove that that was done.  And if that

25   wasn't (sic) done, none of this should have happened.  And if

1    that is not reckless disregard, I just don't know what is.  It

2    just seems to me that that has to be taken as malice,

3    because --

4            THE COURT:  Address the damage issue, please.

5            MR. MOSS:  So, my damages are twofold:  number one,

6    attorney's fees --

7            THE COURT:  But you didn't put in any proof of

8    attorney's fees.  This came up in the last telephone call.  You

9    haven't put forward any invoices you received from any

10   attorneys who represented you.

11           MR. MOSS:  Well, actually I just found a couple days

12   ago before I left --

13           THE COURT:  Well, that's --

14           MR. MOSS:  Ms. --

15           THE COURT:  -- nice, but --

16           MR. MOSS:  Okay.

17           THE COURT:  -- the pre-trial order expressly provided,

18   as all my pre-trial orders do, that if you fail to list an

19   exhibit, you don't get to put them in.

20           MR. MOSS:  Okay, well, the other -- the exhibit I did

21   put in was an official document I submitted to the Superior

22   Court in San Mateo County that listed my attorney's fees --

23           THE COURT:  How much --

24           MR. MOSS:  -- in sum total.

25           THE COURT:  How much were your attorney's fees?

1         MR. MOSS:  The sum total listed in that document was

2    16-, roughly, -900 dollars.  That's approximate but that's very

3    close.

4         THE COURT:  And was that in representation -- did that

5    include the representation in the -- you had an action

6    against -- with Bank of New York?

7         MR. MOSS:  I'm sorry, I didn't hear you.

8         THE COURT:  You had another lawsuit pending.

9         MR. MOSS:  Right.

10        THE COURT:  And that was against whom?  Bank of New

11   York?

12        MR. MOSS:  That was against the Bank of New York.

13        THE COURT:  Okay.  And was that affidavit about

14   attorney's fees put in in connection with your action against

15   Bank of New York?

16        MR. MOSS:  It was -- one figure's listed, but that

17   document was filed in the Moss v. ETS litigation, not in the

18   Bank of New York litigation, and it was submitted on an

19   official court form -- that's what California does; they have

20   all these official court forms -- that had to be served

21   personally --

22        THE COURT:  That's what -- there's an exhibit -- you

23   have that marked as an exhibit, right?

24        MR. MOSS:  I do.

25        THE COURT:  Okay, well, we'll get to it when you --

RESIDENTIAL CAPITAL, LLC, et al.                    15

1           MR. MOSS:  I can give you that number.

2           THE COURT:  Any -- what other damages?

3           MR. MOSS:  The other damages are emotional-distress

4    damages that flow from a negligence action.

5           THE COURT:  Does California permit recovery of

6    emotional-distress damages for negligence?

7           MR. MOSS:  Oh, absolutely.

8           THE COURT:  Absolutely not.  You have a case that

9    supports you?

10          MR. MOSS:  I have a lot of cases that support me.  I

11   mean, it's the biggest -- in a lot of cases in California, the

12   biggest part of negligence damages are emotional distress.

13          THE COURT:  For negligence?

14          MR. MOSS:  Absolutely.  Absolutely.  And absent

15   physical harm.

16          THE COURT:  Do you have those cases cited in your

17   pre-trial memorandum --

18          MR. MOSS:  I believe I do.

19          THE COURT:  -- in your trial brief?

20          You -- at page 21, you brief intentional infliction of

21   emotional distress; that's the claim you pled.

22          MR. MOSS:  No, I pled both.  That's a -- there were

23   three causes --

24          THE COURT:  Where --

25          MR. MOSS:  -- of action.

1    THE COURT:  Where in your brief do you address it?  I

2  see on page 21 the only thing you address is intentional

3  infliction of emotional distress.  All right, I see it on page

4  17.  All right, I see your argument.  Okay.  And what do you

5  believe your damages for emotional distress are?

6    MR. MOSS:  The way that emotional-distress damages are

7  calculated in California -- I mean, there's essentially two

8  ways; it's up to the attorney to make a choice.  One way is to

9  just say to the jury whatever you think is right.  Another way

10 to do it is to say, I believe that you should assess, based on

11 the evidence, X amount of dollars per day or per week or per

12 some kind of unit.  That is the method I used when I filled in

13 the emotional-distress damages on my damage form that went to

14 the court that was going to hear the default prove-up hearing.

15 And that -- that's part of the official form and that is

16 Exhibit 19.

17   THE COURT:  Okay.  All right, anything else you want

18 to say in your opening statement?

19   MR. MOSS:  No, except one of those items there is

20 for -- number 2 is emotional distress.

21   THE COURT:  Okay.  All right.

22   Ms. Arett, are you going to do the opening statement?

23   MS. ARETT:  The Trust will waive an opening statement,

24 unless the Court has questions.

25   THE COURT:  I do have questions.

1              MS. ARETT:  Okay.

2              THE COURT:  What's not clear to me, and I hope you'll

3    do this in your proof, assuming that I agree that ETS had no

4    duty to do a title search or check the official records in any

5    way, what I want to know is what if any documents ETS had in

6    its records and when ETS received them, regarding the

7    substitution as trustee.

8              Bear with me a second.

9              Judge Schofield, in her decision reversing and

10   remanding, in the section on malice, and she didn't necessarily

11   make this exclusive, but she identified four facts or

12   circumstances which she concluded were sufficient for Mr. Moss'

13   claim to survive the objection to the claim.  And she says,

14   "First, ETS recorded the first notice of default, the 2006 NOD,

15   on June 20, 2006.  At that time, TCF (sic) had not yet (even

16   invalidly) substituted ETS as trustee.  The Substitution of

17   Trustee by which TCIF purported to substitute ETS as trustee is

18   dated September 21, 2006, and was recorded November 10, 2006."

19   What I'm interested in knowing is what if any documents ETS had

20   in its files, purporting to show that it had been substituted

21   as trustee and when it received those documents.

22             Judge Schofield says, "Second, the Trust claims that

23   TCIF was assigned the Property and thereby received authority

24   to appoint ETS as trustee pursuant to a document dated

25   September 15, 2007.  However, the document bears both a

1   typewritten date and a notarization date of May 7, 2008.  The

2   first date is crossed out and September 15, 2007, is written

3   above it, but the notarization date of May 7, 2008, remains the

4   same."  What I'm trying to ascertain is when did ETS receive

5   whatever documents it had within its files.  Assuming it had no

6   duty to investigate outside its own files, that doesn't address

7   whether it needs to look at its own files to determine whether

8   it's been appointed or appears to have been appointed.

9           Judge Schofield said, "Third, ETS should not have

10  conducted the foreclosure sale of the Property, but did so 'in

11  error,' according to the Trust, 'due to a failure to timely

12  communicate conditions that would have warranted a cancellation

13  of the foreclosure.'"  I haven't seen anything yet about what

14  those reasons were that ETS hadn't communicated, and I want to

15  know.

16          And then she said, "Fourth, the documents reflect

17  other irregularities that, together with the above ..., call

18  into question whether ETS acted with reckless disregard of

19  [Mr.] Moss's rights."  And I want the Trust to address that

20  specifically.  And, I mean, of course we'll see what proof

21  Mr. Moss puts in.

22          Could you address briefly the issue of emotional-

23  distress damages under California law?

24          MS. ARETT:  I think that our papers discussed this, so

25  I -- but based on the case law that we have looked at, it is

1   our -- it is our argument and our belief that damages --

2   emotional-distress damages are not permitted in a negligence

3   action where the damages are the result of economic harm.  And,

4   so, I think that there's a distinction to be made, under

5   California law, between negligence that causes some sort of

6   noneconomic harm, like if you're injured, and the emotional

7   distress that comes with that, compared to emotional distress

8   that is the result of economic harm, such as, in this case,

9   threat to a -- threat to Mr. Moss' property.  I think that is

10  the distinction that is made within California, with regards to

11  negligence and emotional-distress damages.

12              THE COURT:  Okay.  Anything else you want to say now?

13              MS. ARETT:  No.

14              THE COURT:  Okay.  All right, Mr. Moss, I assume

15  you're -- since you're -- you're the only witness that you're

16  calling, is that right?

17              Could you answer me?

18              MR. MOSS:  I'm sorry.  I apologize, Your Honor.

19              THE COURT:  You're the --

20              MR. MOSS:  I'm the only one.

21              THE COURT:  Okay.  So, you need to come up to the

22  witness box.  You can bring your exhibits or any notes that you

23  wish to use.  When a pro se party -- even a lawyer, but when

24  any pro se party appears before me on a trial, I permit the

25  plaintiff to testify in what's referred to as the narrative

1   form, meaning you don't have to ask yourself questions, then
2   answer the questions.  But your testimony obviously needs to be
3   relevant, material, competent, and it's subject to objections.
4   But basically, it's your opportunity to put in whatever
5   evidence -- affirmative evidence you wish.  Obviously you'll
6   get to cross-examine the Trust witness, but -- so, bring up
7   whatever you want.
8           If you use any notes other than the exhibits,
9   Ms. Arett'll have an opportunity to look at them; I'll just
10  tell you that.  So, don't refer to anything, while you're
11  testifying, that you don't want Ms. Arett to be able to look
12  at.  But otherwise I'll permit you to use in your testimony
13  whatever documents that you want to use.  But I just don't want
14  you to labor under the misimpression that you can look at your
15  notes as a basis for your testimony and not permit the Trust
16  counsel to look at them.  Okay?
17          MR. MOSS:  All right.
18          THE COURT:  All right, so, come on up and you'll be
19  sworn.
20      (Claimant sworn)
21          THE COURT:  Okay, please have a seat.  There is water
22  up there, Mr. Moss, and you --
23          MR. MOSS:  I was just going to ask about that.  There
24  is water there.
25          THE COURT:  There should be.  Just --

1           MR. MOSS:  Thanks.  Just give me a second.

2           THE COURT:  Absolutely.

3           Okay?  All right, and let's make sure you speak into

4  the microphone and -- so we get a clear transcript on it, okay?

5           MR. MOSS:  Okay.

6           THE COURT:  Can I just --

7           MR. MOSS:  So --

8           THE COURT:  Are you a practicing lawyer in California?

9           MR. MOSS:  No.

10          THE COURT:  Okay.

11          MR. MOSS:  No.

12          THE COURT:  Did you -- have you ever practiced in

13  private -- have you ever been in private or public --

14          MR. MOSS:  I have.  I have.

15          THE COURT:  And what kind of practice did you have?

16          MR. MOSS:  Mostly negligence.

17          THE COURT:  Okay.  You were basically a trial lawyer,

18  primarily negligence cases?

19          MR. MOSS:  That is correct.

20          THE COURT:  For what years did you do that?

21          MR. MOSS:  Roughly 1976 to -- seventeen -- 2011, I

22  think.

23          THE COURT:  Okay.  All right, go ahead.  I just wanted

24  to get that because I -- it's been on the record on -- at prior

25  hearings that you were -- you are an -- are you still a member

1    of the bar?

2              MR. MOSS:  No.

3              THE COURT:  No.  Okay.  All right, go ahead.

4              MR. MOSS:  I've never done it like this before; it's a

5    little --

6              THE COURT:  It's a little odd.

7              MR. MOSS:  Yeah.  Yeah.

8              THE COURT:  I understand.  But it would be odder if I

9    had you ask yourself --

10             MR. MOSS:  Yeah.

11             THE COURT:  -- questions and answer your questions.

12             MR. MOSS:  That's correct.

13             THE COURT:  What I typically do is, when a pro se has

14   a trial before me, is to permit them to testify in the matter

15   before me.

16             MR. MOSS:  All right.  So, I found out about ETS when

17   I was litigating against a case entitled "Bank of New York",

18   and that case alleged primarily wrongful foreclosure, and that

19   is, I think -- I believe the latest operative complaint in that

20   case, at the time that it resolved, was the fourth amended

21   complaint, and I believe that is Exhibit 40.

22             As I said, that --

23             THE COURT:  I just -- also, if -- for me to consider

24   an exhibit, it needs to be in evidence.  So, you need to --

25             MR. MOSS:  Okay.

1        THE COURT:  You need to be sure, before you finish

2   your testimony, that you've moved into evidence any exhibit

3   that you wish me to consider, and then we'll see whether the

4   Trust has an objection to it, or not, okay?

5        MR. MOSS:  Okay.  So, the --

6        THE COURT:  So, I'm looking at Claimant's Exhibit 40.

7        MR. MOSS:  And I believe, by the way, that the -- it

8   is one of the Trust exhibits as well.

9        THE COURT:  Okay.

10       MR. MOSS:  I'm not sure of the -- that they used the

11  latest, the fourth, or not, but the complaint is there.

12       THE COURT:  Okay.

13       MR. MOSS:  That litigation went on for four years,

14  during which time the litigation was controlled by not Bank of

15  New York but it was controlled by Ally Financial, which is the

16  parent company of GMAC; and we know that from another exhibit,

17  which is the declaration of one Carol Bonello -- I'm not sure

18  of the pronunciation, B-O-N-E-L-L-O, and --

19       MS. ARETT:  Objection to this exhibit, Your Honor.

20       THE COURT:  Well, I haven't even seen it yet.  Which

21  exhibit is that?

22       MS. ARETT:  That is Exhibit -- I apologize.  Ah, that

23  is Exhibit 18.

24       THE COURT:  Let me find it before you proceed.

25       MR. MOSS:  Okay.

RESIDENTIAL CAPITAL, LLC, et al.                    24

 1        (Pause)

 2             THE COURT:  Bear with me a second, okay?

 3             MR. MOSS:  Um-hum.

 4             Go ahead.  I have it.

 5             MR. MOSS:  Okay.  And what Ms. Bonello averred to

 6    under oath was that she was an employee of Ally Financial,

 7    which was the parent company of GMAC, and that she was the

 8    litigation-case manager and controlled the litigation in the

 9    BONY litigation and also the subsequent ETS litigation, both of

10    them.  And this declaration, Exhibit 18, was filed with the San

11    Mateo County Superior Court to try and set aside the default

12    that was entered against ETS in that matter.

13             THE COURT:  And what is it about the declaration

14    specifically that you're focusing on here?

15             MR. MOSS:  What I'm specifically focusing on is the

16    fact that she controlled -- it was Ally that controlled the

17    litigation, hired the lawyers, made all the litigation

18    decisions in both of these cases, that it was not controlled by

19    BONY, it was a matter for GMAC.  And --

20             THE COURT:  Where do you find that?  I see in

21    paragraph 6 where she says she was assigned the case on May

22    11th, 201.

23             MR. MOSS:  That would be paragraph 3, second sentence:

24    "Ally Financial has been tendering legal defense to the current

25    holder of Plaintiff's loan, the Bank of New York Mellon Trust

RESIDENTIAL CAPITAL, LLC, et al.                          25

1   Company, N.A., to Plaintiff's parallel" -- I'm sorry, "to

2   Plaintiff's peril to the present action."

3         THE COURT:  All right, Ms. --

4         MR. MOSS:  So --

5         THE COURT:  -- Arett, you had an objection?

6         MS. ARETT:  Yes.  We would object on grounds of

7   hearsay, because it's being put forth for the truth of the

8   declaration and the declarant is not here.

9         THE COURT:  I view this as an admission and the

10  objection's overruled.

11        Are you offering Exhibit 18 in evidence?

12        MR. MOSS:  I am.

13        THE COURT:  All right.  The objection's overruled and

14  Exhibit CE-18 is in evidence.

15     (Declaration of Carol Bonello was hereby received into

16  evidence as Claimant's Exhibit 18, as of this date.)

17        THE COURT:  Go ahead, Mr. Moss.

18        MR. MOSS:  Thank you.  The -- therefore, based on this

19  declaration, the litigation continued for four years before it

20  was finally resolved; this was the Bank of New York

21  litigation --

22        THE COURT:  This --

23        MR. MOSS:  -- in which --

24        THE COURT:  This declaration was filed in your case

25  against ETS?

1          MR. MOSS:  That's correct.  And it was an attempt to

2    say, oops, I made a mistake, I thought that the complaint I was

3    served with, entitled "Moss v. ETS", was really Moss v. BONY.

4          THE COURT:  But this addressed the issue of whether a

5    default judgment should be entered against ETS.

6          MR. MOSS:  No.  No, whether the default should be set

7    aside --

8          THE COURT:  Okay.

9          MR. MOSS:  -- on the basis of a mistake.

10          THE COURT:  Well, a default had been entered but not a

11    default judgment.

12          MR. MOSS:  That is correct.

13          THE COURT:  But this declaration was filed in

14    connection with whether the default should be set aside,

15    correct?

16          MR. MOSS:  That is correct.

17          THE COURT:  Right?

18          MR. MOSS:  Um-hum.

19          THE COURT:  Which both my prior decision and the

20    district-court decision indicated that there's no preclusive

21    effects --

22          MR. MOSS:  That's correct.

23          THE COURT:  -- from a default.

24          MR. MOSS:  I understand that.

25          THE COURT:  Is there something on the substance of

1   your claim that you think that this Bonello declaration

2   addresses?

3           MR. MOSS:  I do, and that is the admission that she

4   was controlling the litigation, had done so for four years and

5   had --

6           MS. ARETT:  Objection.

7           THE COURT:  Let him finish his sentence; then you

8   can --

9           MR. MOSS:  -- and had -- and as part of that

10  litigation, the -- in that litigation, discovery responses were

11  filed, saying that the entire foreclosure process was proper.

12          THE COURT:  But she says that -- I'm looking at

13  paragraph 3 -- that Allied Financial has been tendering legal

14  defense to the current holder of plaintiff's loan, the Bank of

15  New York Mellon Trust Company.  She doesn't say that she was

16  controlling any litigation.  She's explaining her view about

17  why ETS hadn't responded to your complaint.  Where do you see

18  that she says that Allied Financial was controlling the defense

19  of the litigation -- your litigation against Bank of New York

20  Mellon?

21          MR. MOSS:  She does -- she does not use those exact

22  words, but tendering --

23          THE COURT:  No, not those -- show me -- I want you to

24  show me the precise language in Ms. Bonello's declaration that

25  you believe supports your argument that Allied Financial Inc.

1   was controlling the defense of your action against the Bank of

2   New York Mellon Trust Company.

3            MR. MOSS:  I can't show you that.  That language is

4   not in there.  My --

5            THE COURT:  All right.  Go on with your --

6            MR. MOSS:  My understanding of what that means is that

7   she was -- that's what it means.

8            THE COURT:  Well, you say that, but it doesn't say

9   that.

10            Go on with your testimony.

11            MR. MOSS:  The -- my Exhibit 21 are responses filed on

12   behalf of BONY.  And on page 10, in their response to special

13   interrogatory number 61 --

14            THE COURT:  Let me take it out.  Hold on.

15            MR. MOSS:  Okay.

16            THE COURT:  So we're looking at Claimant's Exhibit 21.

17            MR. MOSS:  Correct.

18            THE COURT:  Let me get it out of the foler.  Okay,

19   what are you pointing me to?

20            MR. MOSS:  To page 10 of that document, response to

21   interrogatory number 61, line 9.

22            THE COURT:  Let me read it.  Hold on.

23       (Pause)

24            THE COURT:  What specifically -- I'm looking -- I've

25   read the answer.  What is it that you're --

1    MR. MOSS: On line 9. It was and is BONYMT's position

2    that the foreclosure proceedings were proper. So this is three

3    years into the litigation and they --

4    THE COURT: This is not -- we're not here on your

5    action against the Bank of New York Trust Company. We're here

6    on your action against ETS.

7    MR. MOSS: I under -- I understand that, Your Honor.

8    But it's part of my evidence that that litigation was carried

9    on, and with that posture, which carried on and caused the ETS

10    litigation. And the discrepancy is that the Trust decided not

11    to take that position and admit that the chain of title had

12    been broken and the foreclosure process should be stopped and

13    the notices that were issued should be rescinded because of

14    that.

15    THE COURT: All right. Are you offering Exhibit 21?

16    MR. MOSS: I am.

17    MS. ARETT: No objection, Your Honor, other than

18    relevance, I suppose.

19    THE COURT: Well, when you say "other than relevance",

20    do you have an objection --

21    MS. ARETT: Objection, relevance. Sorry.

22    THE COURT: Mr. Moss, why is the Bank of New York

23    Mellon Trust Company's response to an interrogatory addressed

24    to them in the action you filed against them -- why is it

25    relevant here?

RESIDENTIAL CAPITAL, LLC, et al.                    30

1          MR. MOSS:  It's relevant because it shows that the

2   delay and period of time it took to get to the place where it

3   was admitted the chain of title was broken, took four years and

4   essentially caused the ETS litigation.  And it was in

5   researching that case that I came across the authority that the

6   trustee could be sued for negligence for breaching its duties.

7          And it's my position that this was four wasted years,

8   and that is why I'm offering it into evidence, because that

9   ultimately is part of my damages, which is to say, the time

10  between the filing of the BONY lawsuit and where we are today.

11  It goes to a pertinent fact in this litigation, and that's its

12  relevance.

13          THE COURT:  Ms. Arett, do you want to respond?

14          MS. ARETT:  No.

15          THE COURT:  All right.  Exhibit 21 is in evidence.

16     (Discovery responses of Bank of New York Mellon was hereby

17  received into evidence as Claimant's Exhibit CE-21, as of this

18  date.)

19          THE COURT:  Go ahead, Mr. Moss.

20          MR. MOSS:  I'm sorry, is in evidence?

21          THE COURT:  Yes, it is in evidence.  I will give it

22  such weight as I think it is entitled to.

23          Go ahead.

24          MR. MOSS:  As the -- as the district court stated, it

25  was on the face of the very documents that were publicly

1    recorded, all of which I have offered in evidence, and most of

2    which the Trust has also offered, and we have agreed to --

3          THE COURT:  Okay, but you need to -- if you're going

4    to offer exhibits in evidence, you need to identify

5    specifically which exhibits you're referring to.  You need to

6    offer them.  And I'll see whether there's an objection.  If

7    there's not, in all likelihood, they'll get admitted into

8    evidence.  So --

9          MR. MOSS:  So I am, at this time, offering Exhibits 1,

10   2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12.

11         I have on my witness list, to aid the Court, the third

12   column says in shorthand "stipulated to" with check marks.

13   Those check marks signify that the Trust and I have stipulated

14   to their admission.

15         THE COURT:  All right.  Ms. Arett, do you agree that

16   1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12 come in evidence?

17         MS. ARETT:  Yes.

18         THE COURT:  All right.  So Exhibits 1 through 12 are

19   in evidence, Mr. Moss.  Go ahead.

20        (4/4/07 assignment of deed of trust was hereby received

21   into evidence as Claimant's Exhibit CE-1, as of this date.)

22        (2/3/06 substitution of trustee was hereby received into

23   evidence as Claimant's Exhibit CE-2, as of this date.)

24        (9/21/06 substitution of trustee was hereby received into

25   evidence as Claimant's Exhibit CE-3, as of this date.)

RESIDENTIAL CAPITAL, LLC, et al.                    32

1     (6/16/08 assignment of deed of trust was hereby received

2  into evidence as Claimant's Exhibit CE-4, as of this date.)

3     (Document was hereby received into evidence as Claimant's

4  Exhibit CE-5, as of this date.)

5     (Document was hereby received into evidence as Claimant's

6  Exhibit CE-6, as of this date.)

7     (Document was hereby received into evidence as Claimant's

8  Exhibit CE-7, as of this date.)

9     (Document was hereby received into evidence as Claimant's

10 Exhibit CE-8, as of this date.)

11    (Assignment of deed of trust to TCIF, LLC was hereby

12 received into evidence as Claimant's Exhibit CE-9, as of this

13 date.)

14    (Notice of rescission of trustee's deed upon sale was

15 hereby received into evidence as Claimant's Exhibit CE-10, as

16 of this date.)

17    (Notice of rescission of notice of default was hereby

18 received into evidence as Claimant's Exhibit CE-11, as of this

19 date.)

20    (Notice of rescission of notice of default was hereby

21 received into evidence as Claimant's Exhibit CE-12, as of this

22 date.)

23        MR. MOSS:  Okay.  These documents were all publicly

24 recorded with the recorder of the San Mateo -- of San Mateo

25 County.  They're available online, and they can be perused in

RESIDENTIAL CAPITAL, LLC, et al.                              33

1   less than five minutes.  And unlike other cases that were

2   offered in this matter where the trustee could not have known

3   that it didn't -- that it lacked authority, in this case, these

4   documents are easily available, apparent to the public and to

5   anyone else; and ETS could have seen them within five minutes,

6   and as the district court says, ascertained that they had no

7   apparent authority to act as trustee, because they were

8   appointed by an entity by the name of TCIF -- which is Exhibit

9   3 -- when TCIF would not become the beneficiary, would not be

10  assigned the note and deed of trust until what appears to be a

11  week -- I'm sorry -- a year later.

12          And that is Exhibit 4.  Exhibit 4 is an assignment

13  from -- to an entity called TCIF.  What is interesting to note

14  is on the other Exhibits 1 through 12, I'd have to go through

15  them -- the entity is actually called TCIF REO2.  And I don't

16  know their relationship.  The Trust did not offer any

17  information in that regard, and said they couldn't.  But I will

18  leave that issue aside now.

19          What is important is that TCIF would not take a

20  beneficial interest that would have, under California law,

21  empowered them to substitute a trustee for a year.  And that

22  exhibit is -- and I believe this is Exhibit 4 -- is Exhibit 4.

23  And as the district court pointed out, there are several dates

24  on this.

25          First there's a typed date for the signatory of May

RESIDENTIAL CAPITAL, LLC, et al.                    34

1    7th, 2008, which is then crossed out with the date of September

2    15th, 2007 put in there.  But the -- interesting, the notary

3    who notarized that signature, this actually did say May 7,

4    2008, but that was whited out and someone wrote in the 7.

5            I have offered -- that notary is Mr. Salazar, and I

6    have offered his declaration attesting to the fact --

7            THE COURT:  Where is that?  What exhibit number?

8            MR. MOSS:  That is Exhibit 17.

9            THE COURT:  Let me flip to there.

10           MR. MOSS:  Um-hum.  And in particular, paragraph 2

11   thereof.

12           THE COURT:  Hold on.  Are you offering Exhibit 17?

13           MR. MOSS:  I am offering Exhibit 17.

14           THE COURT:  Ms. Arett?

15           MS. ARETT:  We object on grounds of hearsay.

16           THE COURT:  Sustained.  It's not in evidence, Mr.

17   Moss.

18           MR. MOSS:  I understand.  Absent that declaration, the

19   district court found it persuasive that the changes on the

20   assignment that we were just discussing showed that there was a

21   irregularity that needed to be addressed.  But in fact,

22   whatever date you use, that's possible to be used on this

23   document, was -- came after and subsequent to the appointment

24   of ETS as trustee.

25           What it does show, at a minimum, is the -- for lack of

RESIDENTIAL CAPITAL, LLC, et al.                    35

1   a better word -- the hanky-panky that went on in trying to

2   validate the chain of title documents so as to attempt to make

3   the appointment -- the substitution of ETS to be valid.  And

4   noting your sustaining that prior objection, I think the

5   handwriting on this document together with the --

6           THE COURT:  You're referring to Exhibit 4, now?

7           MR. MOSS:  I am.  Lends credence and reliability to

8   the pertinent and operative dates on Exhibit 4.  And this

9   declaration came about from --

10          THE COURT:  I don't want to know how it came about,

11  because it's not in evidence.

12          MR. MOSS:  Okay.  As further evidence of what was

13  going on here is Exhibit -- is Exhibit 9.

14          THE COURT:  Just bear with me just one second.

15          MR. MOSS:  Sure.

16          THE COURT:  Let me just flip to Exhibit 9.  Okay, I'm

17  at Exhibit 9.  It's an assignment of deed of trust.

18          MR. MOSS:  And this is an attempt to redo Exhibit 4.

19  It is done by something called Sand Canyon Corporation,

20  formerly known as Option One, which was the signatory on

21  Exhibit 4.  And they were asked to go back, redo the assignment

22  to try and make a chain of title proper --

23          THE COURT:  What evidence do you have that they were

24  asked to redo the assignment?

25          MR. MOSS:  Well, the existence --

1        THE COURT:  You're testifying about other people.  It

2   may be your argument, but I'm trying to separate out argument

3   from evidence.  Do you have any evidence that Sand Canyon was

4   asked to redo, do again, an assignment of deed of trust?  I see

5   what the document is.

6        MR. MOSS:  Yeah, yeah.

7        THE COURT:  But --

8        MR. MOSS:  I do.  And that will now get a little bit

9   complicated.  But it's Exhibit 39.

10        THE COURT:  Let me switch books.

11        MR. MOSS:  And --

12        THE COURT:  Hold on.  What is 39?

13        MR. MOSS:  39 is either Exhibit 1 or 2 of the Trust

14   exhibits, and it is --

15        THE COURT:  These are the loan-servicing notes,

16   Ms. Arett?

17        MS. ARETT:  These are the Trust's -- a copy of -- or

18   pages from the Trust's servicing notes -- or GMAC Mortgage's

19   servicing notes.

20        THE COURT:  Are you offering Exhibit 39, Mr. Moss?

21        MR. MOSS:  I am.

22        THE COURT:  Ms. Arett?

23        MS. ARETT:  No objection.

24        THE COURT:  All right.

25        (Pages from GMAC Mortgage's servicing notes was hereby

1    received into evidence as Claimant's Exhibit CE-39, as of this

2    date.)

3            MR. MOSS:  And --

4            THE COURT:  Just bear with me a second, okay?

5            MR. MOSS:  Sure.

6            THE COURT:  Hold on.

7        (Pause)

8            THE COURT:  All right, is there a specific portion of

9    Exhibit 39 you're referring to, Mr. Moss?

10           MR. MOSS:  There is.  And I have underlined -- on the

11   bottom right-hand corner, there's a Bates stamp, BCT-000 and

12   some number.

13           THE COURT:  443.  This is page 18 of 131 of the loan-

14   servicing notes?  Is that in the very --

15           MR. MOSS:  This is --

16           THE COURT:  -- lower right-hand corner of the first

17   page?

18           MR. MOSS:  Yeah.  Yeah, what is -- well, the first

19   page is --

20           THE COURT:  I'm asking that because there is something

21   underlined.

22           MR. MOSS:  Yeah.  So there are two numbers in the

23   lower right-hand corner.  My first page says page 101 of 131.

24           THE COURT:  Yes.

25           MR. MOSS:  But above that is BCT-526.

1          THE COURT:  That's the Bates number, yes.

2          MR. MOSS:  Yeah.  So --

3          THE COURT:  Is this the page you're referring to,

4     this?

5          MR. MOSS:  No.  I'm referring to --

6          THE COURT:  Let me get the document out.  Okay?

7          MR. MOSS:  I'm sorry?

8          THE COURT:  I have to pull the document out --

9          MR. MOSS:  Okay.

10          THE COURT:  -- of the sleeve; it's -- okay, what page

11     are you referring to?  You can give me the Bates --

12          MR. MOSS:  Sure.

13          THE COURT:  -- the last digits of the Bates page.

14          MR. MOSS:  Sure.  It is page Bate stamp 503.

15          THE COURT:  All right, let me flip to it.

16          I'm almost there.  Hold on.  I'll tell you when I get

17     there.

18          All right, I'm at page 50 -- Bates page ECT, and then

19     the last three digits are 503.  Go ahead.

20          MR. MOSS:  I -- I profoundly apologize.  I want to

21     change that to Bates stamp 469.

22          THE COURT:  You don't have to profoundly apologize.

23     469?

24          MR. MOSS:  Yes.  The underlined language.

25          THE COURT:  Just let me find it, okay?

1          MR. MOSS:  Um-hum.

2          THE COURT:  Okay.

3          MR. MOSS:  "Assignment of deed of trust by Option One

4    Mortgage, we cannot sign."  On the following page is the same

5    language:  "we cannot sign."  Also on -- on Bates 461,

6    underlined language -- it's -- and this is only partial, so

7    that's all we know right now.

8          THE COURT:  Let me get to that page.  Hold on.

9          MR. MOSS:  Um-hum.

10          THE COURT:  Okay, I'm at page 461.

11          MR. MOSS:  Okay.  The underlined language kind of in

12   the middle of the page, and I quote:  "An assignment from Sand

13   Canyon, formerly known as Option One?"  And then below that:

14   "This is an intervening assignment that is missing from the

15   beneficial chain."

16          So they were aware of the problem.  They were trying

17   to fix it.  And the conclusion becomes -- and also together

18   with page 456, the underlined language:  "We need an assignment

19   from Sand Canyon f/k/a Option One to TCIF."

20          THE COURT:  What page is that on?

21          MR. MOSS:  456.  That language is repeated on page

22   Bates 454.

23          THE COURT:  Hold on.

24          Go ahead.

25          MR. MOSS:  So I think even though that language is

RESIDENTIAL CAPITAL, LLC, et al.                    40

1  partial in these notes, it makes clear that they were

2  requesting an -- as I testify at this moment, I don't know if

3  these notes were created by ETS or by ResCap.  But whatever --

4          THE COURT:  ETS or General Motors Acceptance

5  Corporation.

6          MR. MOSS:  Yeah.  Yeah.  So they were requesting that

7  that assignment be redone to try and correct and make valid the

8  chain of title documents.  And that's why there is in

9  existence --

10          THE COURT:  Okay.  We need to separate out your

11  testimony versus your argument.  You'll have a chance to argue

12  what you believe it means.  This is the time --

13          MR. MOSS:  Yeah.

14          THE COURT:  -- that you have to give competent

15  testimony.

16          MR. MOSS:  Okay, so --

17          THE COURT:  Okay.  So Exhibit 39 is in evidence,

18  and -- okay, what else do you want to tell me, other testimony?

19          Let me put it back in its sleeve so it doesn't get

20  lost.

21          Go ahead.

22          MR. MOSS:  Thank you.  So as I was saying, ETS could

23  have and should have --

24          THE COURT:  I don't want to hear your argument.  I

25  want to hear your evidence.  You'll have a chance to argue what

1  you believe --

2          MR. MOSS:  Okay.

3          THE COURT:  -- it means.

4          MR. MOSS:  Okay, I apologize.

5          THE COURT:  Right now, this is for your evidence.

6          MR. MOSS:  Information was available online, readily

7  available for ETS to determine the legality of its

8  substitution.

9          THE COURT:  Go ahead.

10          MR. MOSS:  As further evidence is Exhibit 10 and 11 --

11          THE COURT:  Hold on.

12          MR. MOSS:  -- which are --

13          THE COURT:  Hang on just a second.  All right, 10 and

14  11 are in evidence, but go ahead and tell me what you

15  believe --

16          MR. MOSS:  10 -- Exhibit 10 is a recorded document

17  entitled "Notice of rescission of trustee's deed upon sale", in

18  which the Trust or GMAC, as the case may be, rescinded the sale

19  that took place and returned the party -- at least me, to the

20  status quo ante, and did so in language that the district court

21  found to be wanting, when it --

22          THE COURT:  I don't know if it's a fair statement of

23  what the district court said.

24          MR. MOSS:  Well, at paragraph 5, the word that the

25  district court said was "obfuscate".  That's the word it used.

RESIDENTIAL CAPITAL, LLC, et al.                    42

1          THE COURT:  Go on with your evidence.

2          MR. MOSS:  Okay.

3          THE COURT:  And then you can argue from the evidence.

4          MR. MOSS:  Okay.  So --

5          THE COURT:  No, what the district court said was:

6    "The Trust's statement obfuscates whether the failure to

7    communicate was innocent, reckless, or intentional, in any role

8    ETS -- any role of ETS leading up to the improper sale."

9          I assume that's what you're referring to?

10         MR. MOSS:  It is.

11         THE COURT:  Go ahead.

12         MR. MOSS:  And the second --

13         THE COURT:  And that's at --

14         MR. MOSS:  -- Exhibit 11 --

15         THE COURT:  Excuse me a second.  That's at page *7 of

16   the district-court opinion.  Go ahead.

17         MR. MOSS:  And then I wanted to point out Exhibit 11,

18   which is entitled notice of rescission of notice of default.

19   It is in evidence.  But under California law --

20         THE COURT:  I don't want argument.  Just point me

21   to -- you'll have a chance to argue.

22         MR. MOSS:  Well, the significance of Exhibit 11 is

23   that they also rescinded at the same time, not only the

24   trustee's deed, but also a step prior to that, which is

25   recording a notice of default.

RESIDENTIAL CAPITAL, LLC, et al.                    43

1        THE COURT:  All right, go ahead.

2     (Pause)

3        MR. MOSS:  I included in my exhibits at Exhibit 25

4  through 34 --

5        THE COURT:  Let me flip there.

6        MR. MOSS:  Um-hum.

7        THE COURT:  Bear with me a second.

8        MR. MOSS:  Sure.

9     (Pause)

10        THE COURT:  Ms. Arett, do you have objections to 29

11  through 34?

12        MR. MOSS:  25 to 34.

13        THE COURT:  Excuse me, 25 to 34?

14        MS. ARETT:  No, Your Honor.

15        THE COURT:  You're offering them, Mr. Moss?

16        MR. MOSS:  I am.

17        THE COURT:  All right, Exhibits 29 -- Claimant's

18  Exhibits 25, excuse me; to be clear -- Claimant's Exhibits 25

19  to 34 are in evidence.

20     (Responses to discovery requests were hereby received into

21  evidence as Claimant's Exhibits CE-25 to CE-34, as of this

22  date.)

23        MR. MOSS:  These exhibits are the responses to my

24  discovery requests.  I have underlined certain passages.  I

25  don't think I need to go through them here.  They stand for the

1    proposition that -- without trying to argue, but to summarize

2    briefly what's in all of these pages, is that the ETS files do

3    not contain any documentation whatsoever that ETS was told they

4    were improperly appointed or that ETS conducted any kind of

5    investigation into their status or that ETS was given any

6    document that stated we want you to start the foreclosure

7    process.  There's no -- there's an admission that there's no

8    demand in here.

9            So that's why I offered all of these.  I can go

10   through them all for the Court.

11           THE COURT:  No, they're in evidence.  You'll get a

12   chance to argue about it in closing statements.

13           So what other evidence do you wish to offer?

14           MR. MOSS:  Exhibits 23 and 24 are two complaints for

15   what is called unlawful detainer in California.

16           THE COURT:  Just let me find them.  Hold on.

17           MR. MOSS:  Um-hum.

18           THE COURT:  They're not in any of your -- they're not

19   in your case against ETS.  What's the relevance of 23 and 24?

20           MR. MOSS:  There's -- the relevance is twofold.  One

21   is it shows that they were attempting to evict me from my home.

22   The first, 23, that complaint was dismissed by the court for

23   lack of personal service, notwithstanding that the process

24   server averred that he had personally served me and I was able

25   to prove that he couldn't possibly have done that.

RESIDENTIAL CAPITAL, LLC, et al.                    45

1         And the second verified complaint was likewise

2    dismissed, but not before that case for unlawful detainer was

3    stayed by the superior court.  And this goes to the second

4    basis for my offering these two exhibits, are because it goes

5    to damages.

6         THE COURT:  You already settled with Bank of New York

7    Mellon, and both 23 and 24 are verified complaints that Bank of

8    New York Mellon filed against you in San Mateo Superior Court.

9         MR. MOSS:  Correct.

10        THE COURT:  Your claims -- your dispute with Bank of

11   New York Mellon was resolved by settlement, correct?

12        MR. MOSS:  Correct.

13        THE COURT:  Are you offering 23 and 24?

14        MR. MOSS:  I am.

15        MS. ARETT:  No objection, Your Honor.

16        THE COURT:  All right.  In evidence.

17        (Verified complaint CLJ199935 was hereby received into

18   evidence as Claimant's Exhibit CE-23, as of this date.)

19        (Verified complaint CLJ199552 was hereby received into

20   evidence as Claimant's Exhibit CE-24, as of this date.)

21        THE COURT:  Go ahead.  What other evidence do you want

22   to offer?

23        MR. MOSS:  Exhibits 13 through 16 --

24        THE COURT:  I'm sorry, 13 through --

25        MR. MOSS:  13 through 16 are letters that I wrote with

 1  proof of reception by GMAC to the individual at GMAC that I

 2  worked out a resolution with to forestall a sale.  And they

 3  have proof that they were faxed to him and received.

 4          THE COURT:  All right.  So you're offering 13, 14, 15,

 5  and 16?

 6          MR. MOSS:  I am.

 7          THE COURT:  Ms. Arett?

 8          MS. ARETT:  No objection.

 9          THE COURT:  All right.  Claimant's Exhibits 13, 14,

10  15, and 16 are in evidence.

11      (Claimant's letters to Alfred Hudspeth at GMAC were hereby

12  received into evidence as Claimant's Exhibits CE-13 to CE-16,

13  as of this date.)

14          THE COURT:  Go ahead, Mr. Moss.

15          MR. MOSS:  Exhibit 13 goes directly to one of the

16  issues in this case which is that -- where I state in the

17  second paragraph:  "You have represented you will cancel the

18  sale set for tomorrow."  So that is a dispute between us here.

19  And the Trust argues that it wasn't canceled, it was postponed

20  and that I caused my own damages.  So I wanted to get these

21  into evidence.

22          The other interesting thing to note --

23          THE COURT:  Did the sale go forward the following day

24  or not?

25          MR. MOSS:  It didn't.  But it ultimately did go

1  forward --

2           THE COURT:  I know that.

3           MR. MOSS:  -- without notice to me.

4           THE COURT:  I see each of these are on stationery of

5  Law Offices of Alan Moss.

6           MR. MOSS:  Correct.

7           THE COURT:  Were you a sole practitioner?

8           MR. MOSS:  I was.  Um-hum.

9           The other interesting thing to note about these

10 Exhibits 13 through 16 is they don't appear in the loan-

11 servicing notes which are Exhibit 39.

12          And -- one moment.  Let me see if I have that here.

13 There's another exhibit that the Trust is offering, I think

14 they call it LPS -- I don't know what it is.  But it's some

15 kind of chronology of events.  I don't know who prepared it.

16 But it's not in there either.  So the only records that they

17 have -- are putting forward, none of these letters which we

18 know they received because of the fax reception notation,

19 was -- are in there.

20          THE COURT:  Just bear with me one moment.

21      (Pause)

22          THE COURT:  Ms. Arett, do you have an exhibit with a

23 complete copy of the loan-servicing notes?

24          MS. ARETT:  Yes.

25          THE COURT:  Because I'm looking at Mr. Moss', and so

RESIDENTIAL CAPITAL, LLC, et al.                    48

1    this is Exhibit CE-39.  And I'm looking at the bottom right

2    corner of the pages, not the Bates numbers, but below that, the

3    numbers that were printed page blank of blank of 131.  And I

4    see that Bates page 480, it's page 55 of 131; and the next page

5    Bates page 481 -- I'm sorry, it's 56 of 131, and then -- Mr.

6    Moss, you don't even seem to have a complete copy here.  You go

7    from Bates page 481 to Bates page 503.  And that's what I was

8    looking for.

9                MR. MOSS:  Right, I was --

10               THE COURT:  You didn't offer a complete document?

11               MR. MOSS:  I did not offer a complete document in the

12   interest of brevity, because I knew that the Trust was offering

13   the complete document, and I just --

14               THE COURT:  All right.

15               MR. MOSS:  -- offered the pages --

16               THE COURT:  What you have is an excerpt of pages

17   you've selected?

18               MR. MOSS:  They are pages that I selected because of

19   the language I underlined on those documents; that is correct.

20               THE COURT:  Okay.  Ms. Arett, which is the exhibit

21   that has the complete loan-servicing notes?

22               MS. ARETT:  Exhibit A.

23               THE COURT:  Exhibit A to what?  Because it's not in my

24   binder as Exhibit A.

25               MS. ARETT:  It should be Exhibit BT-A of the exhibits

1      that the Trust provided.

2              THE COURT:  Say that -- I'm sorry.

3              MS. ARETT:  Exhibit B -- Exhibit BT-A is the exhibit

4      that the Trust provided.

5              THE COURT:  I was given a binder May 8, 2017 trial

6      materials that your office --

7              MS. ARETT:  I think there should have been another

8      binder with the Trust exhibits.

9              THE COURT:  Oh, I may have it here.  Hold on.  Okay.

10     I do.

11             MS. ARETT:  Okay.

12             THE COURT:  All right.  Exhibit A?

13             MS. ARETT:  Yeah, the trial materials were the

14     proposed pre-trial order and those sorts of things.

15             THE COURT:  Got it.  Got it.  All right.  Just bear

16     with me.

17         (Pause)

18             THE COURT:  All right, go ahead, Mr. Moss.

19             MR. MOSS:  And I wanted to offer Exhibits 37 and 38

20     which are --

21             THE COURT:  Just hold on for a second, okay?

22             MR. MOSS:  Sure.

23         (Pause)

24             THE COURT:  All right.  I'm at 37 and 38.  What are

25     these?

RESIDENTIAL CAPITAL, LLC, et al.                    50

1          MR. MOSS:  37 and 38 are two orders from the U.S.

2    District Court in San Francisco regarding the underlying case.

3          THE COURT:  Well, not the underlying -- the underlying

4    case that I'm thinking about is against ETS.  This was the

5    case --

6          MR. MOSS:  Oh.

7          THE COURT:  -- against Bank of New York Mellon.

8          MR. MOSS:  Okay.  I stand corrected.  And in that --

9    in these two orders, what was discussed is whether I could

10   maintain a cause of action for intentional infliction of

11   emotional distress.  This set forth the standard; and the

12   second order 38 denies the motion to dismiss and allows me to

13   proceed with the IIED cause of action in the fourth amended

14   complaint, which is -- which is Exhibit 40.

15         MS. ARETT:  Objection, Your Honor.

16         THE COURT:  Well, Ms. Arett, do you have an objection

17   to 37 and 38?

18         MS. ARETT:  Yes.  On relevance grounds.  This is

19   not -- and also that it's a legal argument, it's not --

20         THE COURT:  I want to know what your objection -- your

21   objection is relevance?

22         MS. ARETT:  Yes.

23         THE COURT:  What's the relevance of two orders entered

24   in your action against Bank of New York?

25         MR. MOSS:  That the same argument was made there as

1  here, that IIED does not lie, and that the district court there

2  determined that I could proceed with that cause of action.

3  That's its relevance.

4          THE COURT:  All right, the objection is sustained.

5  It's two orders of the District Court for the Northern District

6  of California in an action against -- by Mr. Moss against Bank

7  of New York Trust.  It's not in this case.  So the objection to

8  37 and 38 are sustained.

9          Next?

10          MR. MOSS:  Next is Exhibit 41 which was a declaration

11  I prepared in the Moss v. ETS litigation as part of the -- when

12  the bankruptcy here was filed, I had pending a motion to enter

13  a default judgment.  I understand the issues there, but this is

14  only the evidence submitted under oath from me detailing my

15  damages.

16          THE COURT:  All right.

17          MS. ARETT:  Objection.  Mr. Moss is here to testify on

18  this.

19          THE COURT:  Yeah, the objection is sustained.  Your

20  declaration is hearsay.  You're permitted to testify here about

21  your damages, but the declaration that you filed in superior

22  court in San Mateo is hearsay.  I'm not precluding you from

23  testifying here.  I'm not objecting to you having your

24  declaration in front of you.  But the declaration itself is not

25  admissible.  Next.

1          MR. MOSS:  Next is the opinion and order of the U.S.

2     District Court, the appeal here, and --

3          THE COURT:  What exhibit number?

4          MR. MOSS:  42.  I want to make sure that's part of the

5     record.

6          THE COURT:  Ms. Arett?

7          MS. ARETT:  Objection in that it's not evidence, but

8     it's already in the record, so no objection.

9          THE COURT:  The objection is sustained.  The Court

10    will take -- obviously I'm bound by what the district court

11    rules.  You've attached her opinion as an exhibit.  It's not

12    properly evidentiary material.  It clearly sets forth -- it's

13    law of the case for this case.

14         Go ahead.

15         MR. MOSS:  So that is what I'm offering in terms of

16    documentary evidence.

17         THE COURT:  For the record, the district-court opinion

18    can be found at 2016 WL 3136869 (S.D.N.Y. June 2, 2016).

19         What other evidence do you wish to offer, Mr. Moss?

20         MR. MOSS:  Well, I wish to offer -- that's it in terms

21    of documentary evidence.  I have testimony to offer as to

22    damages.

23         THE COURT:  Let's go.

24         MR. MOSS:  So this was -- the actions of ETS in

25    issuing these notices caused extreme emotional distress to me.

RESIDENTIAL CAPITAL, LLC, et al.                    53

1   It continued through the course of this litigation into this

2   bankruptcy.  They undertook actions that were illegal.  They

3   hired process servers that came to my house at 2 o'clock in the

4   morning pounding on the door.  I live in a quiet country

5   setting where everything reverberates.

6           MS. ARETT:  Mr. Moss, could you just speak a little

7   louder?  It's just -- it's hard to hear you.

8           MR. MOSS:  Sorry.  Is this better?

9           MS. ARETT:  Yes, thank you.  Sorry, I didn't mean to

10  interrupt.

11          MR. MOSS:  That's fine.  And this carried through the

12  neighborhood.  This went on interminably, really.  On one

13  event, I was able to prove that when the process server said

14  that he had served me that he couldn't possibly have.  On

15  another, the -- I woke up actually in the middle of the night

16  when the unlawful detainer action had been stayed, realizing

17  that the Monday trial date, they might still try and take

18  advantage of that, and in fact, they did.  And if I had not

19  gone to court, that trial would have gone forward.  They had

20  witnesses prepared.  They all showed up, and they were all

21  there.

22          And this just went on and on and on, and no matter any

23  of my efforts in the BONY litigation to get this sorted out and

24  to go through the illegalities of the chain of title, it

25  didn't -- did not work.

1           This has just really created havoc.  It's hard to
2    really detail all of it.  But it has been profound.  And it's
3    for that reason that I am proceeding with this, and it is for
4    this reason that I have made the calculations that I have.  And
5    the way it would happen in California, and that would be a
6    certain figure of damages per day for a certain period of time
7    when this action was at its extreme and carried on at a lesser
8    figure for a time thereafter.

9           I retained an attorney at some point to help with the
10   BONY litigation and then the ETS litigation.  And we ultimately
11   separated ways for reasons not relevant here, but I was forced
12   by this action to do that.  And I paid -- of the total bill,
13   which was roughly 16,900, I paid about 8,000 dollars of that.

14          And that is what I have to say about damages at this
15   time.

16          THE COURT:  Now is the time, so whatever you're going
17   to say --

18          MR. MOSS:  Well, that's what I -- that's what I have
19   to say.

20          THE COURT:  Okay.  Anything else you want to testify
21   to?

22          MR. MOSS:  No.

23          THE COURT:  All right.  Cross-examination.

24          Let's take a ten-minute recess, and then we'll begin
25   with cross-examination, okay?

RESIDENTIAL CAPITAL, LLC, et al.                    55

1          MS. ARETT:  Thank you, Your Honor.

2       (Recess from 10:51 a.m. until 11:13 a.m.)

3          THE COURT:  Okay, please be seated.  Mr. Moss come

4    back to the witness chair.

5          Cross-examination.

6    CROSS-EXAMINATION

7    BY MS. ARETT:

8    Q.    Good morning, Mr. Moss.

9    A.    Good morning.

10   Q.    I just have a -- I just have a few questions.  First off,

11   just to clarify for the record, in Exhibit 39 --

12   A.    Give me one second, please.

13   Q.    Take your time.

14   A.    Okay.

15   Q.    The underlining and highlighting in there, you did that,

16   correct?

17   A.    That's correct.

18   Q.    Okay.  And then you talked about the unlawful detainer

19   action?

20   A.    Yes.

21   Q.    Who was the plaintiff in the unlawful detainer action?

22   A.    Bank of New York --

23   Q.    So --

24   A.    -- Trust Company, N.A.

25   Q.    So not ETS?

1  A.   Not ETS.

2  Q.   So to your knowledge, ETS had no involvement in the

3  unlawful detainer action?

4  A.   I have no idea.

5  Q.   And you mentioned the process servers that came to your

6  house?

7  A.   Um-hum.

8  Q.   They were trying to serve you in connection with the

9  unlawful detainer action, correct?

10  A.   That is correct.

11  Q.   Okay.  And since Bank of New York was the plaintiff, they

12  were serve the were acting on behalf of Bank of New York in

13  trying to serve you, correct?

14  A.   I guess that's correct.

15  Q.   All right.  And you settled your lawsuit with Bank of New

16  York?

17  A.   The answer is yes, but it was also settled with -- at the

18  same time with Ocwen Loan Servicing.

19  Q.   Right.

20  A.   They were named in the document.

21  Q.   And at no point was the unlawful detainer action

22  successful in the sense that you were not evicted from the

23  property?

24  A.   In the sense that I was not evicted, that is correct.

25  Q.   Okay.

1              THE COURT:  Are you still living in the house?

2              MR. MOSS:  I am.

3    Q.   And you mentioned your attorneys' fees.  Do you have any

4    evidence of -- that you made payment on those attorneys' fees?

5    Sorry, that you incurred attorneys' fees in relation to the

6    Bank of New York action; do you have any evidence that you paid

7    those?

8    A.   I do, but they are -- it is on the invoices that I just

9    found that I have with me with copies for everybody, if I can

10   use them.

11             MS. ARETT:  One moment.

12             That's it.  No further questions.

13             THE COURT:  Okay.  Mr. Moss if you had rebuttal -- if

14   you had any redirect, it would have to be in response to what

15   Ms. Arett asked you.

16             MR. MOSS:  I know, and I don't.

17             THE COURT:  You've probably tried a lot of cases over

18   the years, so I think you probably know that.  Do you have

19   any --

20             MR. MOSS:  I have no redirect.

21             THE COURT:  Okay.  All right.  So you're excused as a

22   witness.

23             Let me -- before you step down.  Do you rest?

24             MR. MOSS:  Do I rest?

25             THE COURT:  Yes.

RESIDENTIAL CAPITAL, LLC, et al.                                        58

1          MR. MOSS:  I rest.

2          THE COURT:  Okay.  Just so we're clear, you are a

3     lawyer.  I mean, I know you're not practicing currently, but

4     you practiced for quite a few years.

5          MR. MOSS:  Um-hum.

6          THE COURT:  So I gave you an opportunity to offer

7     whatever evidence you had in support of your claims.  You've

8     introduced a lot of exhibits and you've testified.  And so when

9     I'm asking whether you rest, you have no more evidence that you

10    wish to offer as part of your direct case, correct?

11         MR. MOSS:  With the exception that since I was just

12    asked on cross whether I have any evidence that I paid any of

13    these attorneys' fees, I have that proof, which was not part of

14    the pre-trial order.  There is an escape clause in there that

15    if it's available to me I would offer it, but --

16         THE COURT:  Well, let's --

17         MR. MOSS:  -- other than that.

18         THE COURT:  -- find that and I'll see.  Okay?  Do you

19    have it -- where do you -- do you have copies of it?

20         MR. MOSS:  I do right here.

21         THE COURT:  Why don't you go get it and let's see.

22    I'm not ruling yet.  I want to see what it is.

23         And you have copies for the Trust as well?

24         MR. MOSS:  I do.

25      (Pause)

1           THE COURT:  Your last numbered exhibit was 42.

2           MR. MOSS:  Correct.

3           THE COURT:  So I'm going to mark this as CE-43 for

4   identification.

5        (Invoices for attorneys' fees was hereby marked for

6   identification as Claimant's Exhibit CE-43, as of this date.)

7           MR. MOSS:  Okay.

8           THE COURT:  Tell me what this is?

9           MR. MOSS:  This is the invoices for the attorney that

10  I hired to help me in this litigation, both the underlying and

11  ETS, as far as it went.  And what this shows is on the first

12  page that I paid 2,100 dollars.

13          THE COURT:  On May 28th, 2009?

14          MR. MOSS:  That is correct.

15          THE COURT:  Okay.

16          MR. MOSS:  And then on the third page at the bottom

17  6/10/09, I paid 5,000.  And I think that is it in terms of

18  payment.  Let me just make sure.  Yes, I think that's it.

19          THE COURT:  So all of these -- each of these invoices

20  from Michael B. Allen Law Group Inc., dates in -- when dates

21  are shown, they're addressed to you.  And the "re" line on each

22  of those "vs. Bank of New York".

23          MR. MOSS:  Correct.

24          THE COURT:  Are there any entries in these invoices

25  that reflect services in connection with your action against

1  ETS?

2          MR. MOSS:  I don't think there's any that denote that

3  per se, as you asked the question.  Integral to all of this was

4  the role of ETS.  And for example, the first meeting that I had

5  with them, I brought a complete set of chain of title documents

6  that we had marked here as exhibits.  And --

7          THE COURT:  But that was part of your defense to the

8  Bank -- that was part of your claim against Bank of New York?

9          MR. MOSS:  It was.  But it was also whether that was

10  actionable in and of itself.

11          MS. ARETT:  Mr. Moss, could you just speak up?  Sorry,

12  again.

13          THE COURT:  Yeah, speak into the microphone.  I can

14  hear you but --

15          MR. MOSS:  I'm sorry.

16          THE COURT:  Let me ask:  in your exhibits, in your San

17  Mateo County action against ETS, are there any exhibits that

18  you've marked that reflect Michael B. Allen as making an

19  appearance on your behalf?

20          MR. MOSS:  No.

21          THE COURT:  And did he appear on your behalf in the

22  action?

23          MR. MOSS:  He did not appear officially, no.

24          THE COURT:  Okay.  All right.  You're offering CE-43?

25          MR. MOSS:  I am.

1      MS. ARETT:  Objection on grounds that they weren't

2   part of the pre-trial order.

3      THE COURT:  All right.  I'm going to sustain the

4   objection on multiple grounds.  First, the pre-trial order,

5   which was entered on April 19th, 2017, as in all of my pre-

6   trial orders -- this is on page 17 -- it reads the following:

7   "No exhibit not listed by claimant or the Trust may be used at

8   trial except:  A) for cross-examination purposes; B) for

9   rebuttal; or C) if good cause for its exclusion from the pre-

10  trial order is shown."

11      The Court would retain discretion to permit the use of

12  exhibits that had not been listed in the pre-trial order.

13  During the final pre-trial conference, which was by telephone,

14  but for which there would be a transcript available -- it was

15  on the record -- the issue of whether Mr. Moss had any invoices

16  from counsel was raised by me because of the absence of a

17  listing of any on the exhibit list in the pre-trial order.  Mr.

18  Moss indicated that he had not listed any.  And I don't

19  remember for sure whether he said he did or didn't have any,

20  and he was going to look.

21      I'm sustaining the objection, because the invoices

22  that are marked as CE-43 -- Ms. Arett, have you seen them

23  before?

24      MS. ARETT:  No.

25      THE COURT:  All right.  Mr. Moss has given them to the

RESIDENTIAL CAPITAL, LLC, et al.                    62

1   Court and to the Trust's counsel for the first time during the

2   hearing.  As Mr. Moss indicated -- well, as I indicated, each

3   of the invoices show that it's Allen Law Group's representation

4   of Mr. Moss in connection with the Bank of New York action, and

5   Mr. Moss has indicated that there's nothing in the invoices

6   reflecting services performed in the separately filed ETS

7   action.    And when I asked Mr. Moss whether Mr. Allen made an

8   appearance on Mr. Moss' behalf in the San Mateo County ETS

9   action, he indicated no.

10          The Bank of New York action, Mr. Moss settled that.

11   The terms of the settlement aren't relevant to what -- at this

12   stage at least.  They may become relevant, but at this stage, I

13   don't consider them relevant.

14          So Mr. Moss' recovery through settlement in the Bank

15   of New York action, he certainly had the opportunity, if

16   damages were recoverable, to recover in connection with that

17   action.  So the objection to CE-43 is sustained.

18          Okay.  So I think that concludes your evidence?  Do

19   you rest?

20          MR. MOSS:  I rest, yes.

21          THE COURT:  All right.  Go ahead back.

22          Okay, Ms. Arett, the Trust's evidence?

23          Let's give Mr. Moss a chance to get back to his place.

24          MS. ARETT:  Mr. Moss, do you have a copy of the

25   Trust's exhibits?

1          MR. MOSS:  I do.

2          MS. ARETT:  Okay, good.

3          THE COURT:  So Mr. Moss, when was the last time you

4    got to cross-examine a witness?  It's been some years since

5    you've been practicing.

6          MR. MOSS:  I don't know; probably five years ago.

7    Something like that.

8          THE COURT:  All right.  We'll get to that.

9          Go ahead, Ms. Arett.

10          MS. ARETT:  One minute, Your Honor.

11          THE COURT:  So Mr. Moss, is Moss Beach, California, is

12    it coincidence that the name of the town is your last name?  It

13    this --

14          MR. MOSS:  It was my grandfather.

15          THE COURT:  Your grandfather?

16          MR. MOSS:  No.  Just joking.

17          THE COURT:  Just coincidence?

18          MR. MOSS:  Pure coincidence.

19          THE COURT:  Pure coincidence.  Did you have to search

20    long and hard to find a piece of property in a town with the

21    same name as yours?

22          MR. MOSS:  No.  If you're not familiar with it --

23          THE COURT:  I used to live in California, but I'm not

24    familiar with Moss Beach.

25          MR. MOSS:  -- it's about twenty miles south of San

RESIDENTIAL CAPITAL, LLC, et al.                    64

1    Francisco on the coast.  It's maybe five miles north of Half

2    Moon Bay, which you've probably heard.

3              THE COURT:  That I -- Half Moon, that --

4              MR. MOSS:  That's the area.  And just to round out the

5    story really quickly.  I was living someplace that required me

6    to go across the bridge every day, which got old really quick,

7    and --

8              THE COURT:  I bet it did.

9              MR. MOSS:  -- so I looked for someplace where I didn't

10   have to go over a bridge.  That's the story.

11             THE COURT:  Okay.  All right, Ms. Arett?

12             And I have your binder with the exhibits, now.

13             MS. ARETT:  Fabulous.  We call Sara Lathrop to the

14   stand.

15             THE COURT:  Ms. Lathrop, do you want to --

16             MS. ARETT:  And I'm just going to also bring up a copy

17   of our exhibits for Ms. Lathrop.

18             THE COURT:  Please, go ahead.

19             Ms. Lathrop, if you'd stand, raise your right hand,

20   and be sworn.

21        (Witness sworn)

22             THE COURT:  All right, please have a seat.

23             Go ahead, Ms. Arett.

24             MS. ARETT:  All right.

25   DIRECT EXAMINATION

RESIDENTIAL CAPITAL, LLC, et al.                    65

1   BY MS. ARETT:

2   Q.   Good morning, Ms. Lathrop.  We're here today in connection

3   with the claim objection the Borrower Trust filed against Alan

4   Moss.  Can you please state your name for the record?

5   A.   Sara Lathrop.

6   Q.   Can you describe your educational background?

7   A.   I hold a business marketing B.A. from Upper Iowa

8   University.

9   Q.   Please describe your employment history?

10  A.   I started with GMAC Mortgage in June 2006 as a default

11  call center associate.  From there -- I was in that position

12  for about a year-and-a-half -- worked up to a quality assurance

13  specialist, where I was for a year.  Then I was a default

14  supervisor for approximately three years, moved on to loss

15  mitigation short sale supervisor for a few months, prior to the

16  department transferring to another location, and then took over

17  as a triage supervisor in the loss mitigation department.  From

18  there it -- the company was sold to Ocwen via bankruptcy sale

19  in February 2013, and I continued with ResCap Liquidating Trust

20  after that.

21  Q.   What is your --

22          THE COURT:  What is a triage supervisor?

23          THE WITNESS:  I managed the process of the workout

24  packages the borrowers would send in for loan modification

25  review, and just to ensure that they were properly reviewed,

RESIDENTIAL CAPITAL, LLC, et al.                    66

 1  completed, and then sent on to our underwriters for

 2  consideration for a permanent loan modification as well as for

 3  the trial modification plans that were set up.

 4          THE COURT:  Go ahead.

 5  Q.   What's your current position?

 6  A.   I'm currently the senior claims analyst for the ResCap

 7  borrower claims.

 8  Q.   And when did you begin your employment with GMAC Mortgage?

 9  A.   June 2006.

10  Q.   And what city and state was the GMAC Mortgage office

11  located in?

12  A.   My office was in Waterloo, Iowa.

13  Q.   And can you just describe your responsibilities as an

14  associate in the default division?

15  A.   The entry-level position or -- what position are you

16  referring to?

17          THE COURT:  In June 2006 you said you were a default

18  associate?

19          THE WITNESS:  Yep, in the call center.  So that I

20  received and made phone calls to borrowers who were considered

21  in default, so that means they had not made the payment due on

22  the 1st of the month.  And we would receive calls from that for

23  delinquency apps through foreclosure.  And we would try to set

24  up plans and arrangements, if possible, to help keep them in

25  the property.

RESIDENTIAL CAPITAL, LLC, et al.                    67

1   Q.   Great.  And can you describe your responsibilities as

2   supervisor and then manager of the loss mitigation division?

3   A.   As -- in loss mitigation, as a supervisor, I worked short

4   sales.  So if anyone was trying to sell their property for less

5   than the valued owed, for the principal balance, or whatever

6   the payoff amount was, we would try and see if we could accept

7   the offer that came in based on the investor guidelines for

8   that loan.  That was mainly specialized within FHA and VA

9   loans.

10      And then for the loss mitigation manager triage, I had

11  explained that to Judge Glenn as the work -- the workout

12  process and reviewing loans for possible loan modifications.

13  Q.   And what is your responsibility in your current position?

14  A.   I currently have been reviewing the claims against ResCap

15  Borrower Trust just to help with reviewing the documents that

16  we have available, finding the documents that are still

17  available within the different systems I have access to, to try

18  and validate whether or not the claim is accurate.

19  Q.   And as part of your employment with the Borrower Trust, do

20  you have access to GMAC Mortgage's business records?

21  A.   Yes.

22  Q.   And what kind of records do you have access to?

23  A.   I have access to loan-servicing notes and payment history

24  as well as our Looking Glass application, which has letters

25  that were sent to as well as received from the borrower, and

1    Xnet, which is mainly letters that were sent to the borrower on

2    behalf of the debtor.

3    Q.    And were those records maintained electronically?

4    A.    Yes.

5    Q.    Okay.  And what are the names of the different computer

6    systems?  I know you mentioned some of them, but just for the

7    record.

8    A.    Fiserv, it's also known as LoanServ; we also have Looking

9    Glass.

10              THE COURT:  I'm sorry.

11              THE WITNESS:  Yes.

12              MR. MOSS:  Excuse me.  Could you repeat that:  line?

13              THE WITNESS:  Sure.  LoanServ.  It's when Fiserv

14   revamped, they renamed themselves.  Looking Glass, Xnet, and

15   then there is also Business Objects which is the application

16   we've used to pull the servicing notes out of that used to be

17   on Fiserv.

18   Q.    And are you generally familiar with GMAC Mortgage's

19   record-keeping system?

20   A.    Yeah, generally.

21   Q.    And generally, were documents entered into GMAC Mortgage's

22   servicing system at or near the time of -- or from information

23   transmitted by someone with knowledge of their preparation or

24   receipt.

25   A.    I believe so.  They were usually entered in the -- at the

RESIDENTIAL CAPITAL, LLC, et al.                    69

1   time of them being created or within the next business day,

2   depending on the time of day they were made.

3   Q.   Okay.  And can you describe ETS's relationship to GMAC

4   Mortgage?

5   A.   ETS would act as a trustee in completing foreclosure sales

6   or foreclosure processes, I should say, or perhaps even

7   bankruptcy, depending on the state and if they were assigned by

8   GMAC Mortgage or the debtor.

9   Q.   All right.  So we're here to discuss certain events

10   related to Mr. Moss' loan.  Are you familiar with this loan?

11   A.   Yes.

12   Q.   And are you aware that Mr. Moss filed a claim against ETS

13   in the ResCap bankruptcy cases?

14   A.   Yes.

15        THE COURT:  May me ask you this, before you go on?

16   Did ETS have its own employees separate from GMAC?

17        THE WITNESS:  My understanding is that they were a

18   separate entity.

19        THE COURT:  Did ETS employees have access to the loan-

20   servicing files?

21        THE WITNESS:  Not unless they were provided by GMAC at

22   the time of the foreclosure referral.  But I worked on the

23   high-level end, so I didn't know all of the intricacies and the

24   internal workings behind how they obtained them.  I just know

25   that they were separate.  And when foreclosures started, they

RESIDENTIAL CAPITAL, LLC, et al.                    70

1  would have to be -- submit certain files to move forward.

2            THE COURT:  Go ahead, Ms. Arett.

3            MS. ARETT:  Okay.

4  Q.    Okay, so are you aware that the ResCap Borrower Claims

5  Trust filed an objection against Mr. Moss' proof of claim?

6  A.    Yes.

7  Q.    Have you reviewed that objection?

8  A.    Yes.

9  Q.    So looking at the exhibits that were left up there in

10  front of you, can you take a look at Exhibit labeled BT-A?

11  A.    Yes.

12  Q.    Okay.  What is this document?

13  A.    This is the loan-servicing notes and payment history.

14  Q.    And have you seen it before today?

15  A.    Yes, I have.

16  Q.    Can you identify the name of the borrower or borrowers

17  whose account those servicing notes reflect?

18  A.    Yep.  On the top left-hand side of page 1 it states:

19  "Primary borrower, Alan Irving Moss."

20  Q.    Okay.  And can you identify the time period that these

21  servicing notes cover?

22  A.    Based on the notes, it looks like on page 131 of 131, it

23  starts March 2006 and goes through February 2013, as listed on

24  page 2 of the servicing notes.

25  Q.    And was this document maintained in GMAC Mortgage's system

RESIDENTIAL CAPITAL, LLC, et al.                    71

1   of records -- system of business records?

2   A.    Yes.

3   Q.    Okay.  Can you explain how it would have been maintained?

4   A.    These would have been entered and kept through the

5   Fiserv/LoanServ system.  And then in order for us to be able to

6   review them, we had to pull them through our Business Objects

7   application.

8   Q.    To the best of your knowledge, as part of GMAC Mortgage's

9   regular business practices, what sort of information would have

10   been included in the servicing notes?

11   A.    The servicing notes would have included conversations

12   between the borrower and the debtor as well -- or excuse me,

13   the servicer -- as well as any letters that were sent to them,

14   record of letters that were received by them, the payment

15   history, payments that had come in, as well as internal

16   workings that were done behind the scenes to try and just keep

17   an accurate record of how the loan was being handled.

18   Q.    Okay.  And I think you maybe mentioned this before, but

19   just to clarify for this specific document, when was such

20   information ordinarily entered into the servicing notes?

21   A.    It was usually entered at the time it was completed, but

22   it could have been entered the following business day,

23   depending on what time the action was being done.

24   Q.    Okay.  And when a letter is sent to a borrower, how is it

25   recorded?

RESIDENTIAL CAPITAL, LLC, et al.                          72

1    A.   It would have been recorded on the date or the next

2    business date and labeled with a shorthand of the name of the

3    letter within the transcription description.

4    Q.   When a payment was received from a borrower, how would

5    that be recorded?

6    A.   It would have been recorded in the payment history.  It

7    would have been recorded on the date that it was received or

8    the next business day, depending on when it was processed, for

9    the amount that was received and how the money was allocated.

10   Q.   Okay.  And when a payment is returned to a borrower, how

11   was that recorded?

12   A.   That would depend how far in the process it got.  If the

13   payment was returned to a borrower after the money had been

14   applied to the account, it would be visible within the payment

15   history via transaction codes, and then we'd see the money

16   being applied on the day it was received and then reversed

17   whenever it was removed.  If it didn't hit that stage, then it

18   would just be documented within the servicing notes on the date

19   that it was received and then on the date that it was returned,

20   with an explanation of why.

21          MS. ARETT:  Okay.  Your Honor, I'd like to introduce

22   the servicing notes and payment history into evidence as

23   Exhibit BT-A.

24          THE COURT:  Any objection, Mr. Moss?

25          MR. MOSS:  And I object, and we're --

RESIDENTIAL CAPITAL, LLC, et al.                    73

1          THE COURT:  What's the objection?

2          MR. MOSS:  That it's hearsay and it's --

3          THE COURT:  You used --

4          MR. MOSS:  -- there's no objection to the hearsay

5   record under her testimony, and I have some argument on that,

6   some questions for her.

7          THE COURT:  Well, you'll get your chance to cross-

8   examine her.  But I want to know what your legal objection is.

9   Hearsay?

10         MR. MOSS:  It's hearsay, because it's not a valid

11  business record.  She can't testify as to who entered these

12  notes.  If you look at what the entries are, there's -- the

13  entries are incomplete.  There's just snippets of them,

14  evidently.  And as for example, the letters that I introduced

15  that I sent to --

16         THE COURT:  Okay.

17         MR. MOSS:  -- them.

18         THE COURT:  The objection is overruled.  The Court

19  concludes that the Trust has established that the loan-

20  servicing notes were a business record of GMAC Mortgage

21  prepared in the ordinary course of business.  Additionally,

22  Mr. Moss offered and was introduced into evidence CE-39, which

23  is an excerpt of the loan-servicing records.  And based on the

24  document completeness, there's another basis for overruling the

25  objections.

RESIDENTIAL CAPITAL, LLC, et al.                    74

1          You can't offer it yourself, the excerpts, and then

2    prevent the rest of it from coming in.  And in addition, the

3    Court concludes it's a business record.

4          (Loan-servicing notes and payment history was hereby

5    received into evidence as Borrower Trust's Exhibit BT-A, as of

6    this date.)

7              THE COURT:  Go ahead, Ms. Arett.

8              MS. ARETT:  All right.

9    BY MS. ARETT:

10   Q.    Ms. Lathrop, please take a look at Exhibit BT-C.

11   A.    Okay.

12   Q.    Do you recognize this document?

13   A.    Yes.

14   Q.    What is this document?

15   A.    This is the adjustable-rate note.

16   Q.    Can you just for -- who was the borrower under the note?

17   A.    According to the first page -- hold on one second.  I

18   can't recall where the name is listed.  According to the final

19   page of the docu -- of the full document, I think it's -- it's

20   his sign -- there's a signature for Alan Irving Moss.  It's

21   page 5 of the note.

22   Q.    Okay.  Have you seen this document before today?

23   A.    Yes.

24   Q.    And when is -- or what is the date on the document?

25   A.    On the first page, it lists it at June 22nd, 2005.

1  Q.   Was this document maintained in GMAC Mortgage's system of

2  records?

3  A.   Yes.

4  Q.   Okay.  Is this a business record that is maintained in the

5  ordinary course of business?

6  A.   Yes.

7        MS. ARETT:  Your Honor, I'd like to introduce the note

8  as Exhibit BT-C.

9        THE COURT:  Looking at the pre-trial order --

10        MS. ARETT:  Yeah.

11        THE COURT:  -- on page 17, Mr. Moss stipulated to the

12  authenticity of the document.  Do you have any objection?

13        MR. MOSS:  I have no objection.

14        THE COURT:  All right.

15        MS. ARETT:  Okay.

16        THE COURT:  BT-C is in evidence.

17     (Adjustable-rate note was hereby received into evidence as

18  Borrower Trust's Exhibit BT-C, as of this date.)

19        MS. ARETT:  Okay.

20  Q.   All right, I'd like to turn your attention to Exhibit

21  BT-D.

22  A.   Okay.

23  Q.   Do you recognize this document?

24  A.   Yes.

25  Q.   Okay.  And what is this document?

RESIDENTIAL CAPITAL, LLC, et al.                    76

1   A.   It's listed as the deed of trust.

2   Q.   Okay.

3         THE COURT:  All right.  Again, the pre-trial order

4   indicates no objection to this one as well.  Is that correct,

5   Mr. Moss?

6         MR. MOSS:  Correct.

7         THE COURT:  Okay.  All right.

8         MS. ARETT:  Okay.

9         THE COURT:  So you're offering it?

10         MS. ARETT:  Yes, offering it into evidence.

11         THE COURT:  Exhibit BT-D is in evidence.

12      (Deed of trust was hereby received into evidence as

13   Borrower Trust's Exhibit BT-D, as of this date.)

14   Q.   Okay.  So let's turn now to the history of the ownership

15   of Mr. Moss' loan.  So I'd like you to turn to Exhibit BT-E.

16   A.   Okay.

17   Q.   Do you recognize this document?

18   A.   Yes.

19   Q.   Have you seen it before today?

20   A.   Yes.

21   Q.   And I think we've also stipulated to this document; but

22   what is this document?

23   A.   It's an assignment of the deed of trust.

24   Q.   An assignment of the deed of trust from who to whom?

25   A.   This is to Alliance Title -- or I apologize.  I skipped

RESIDENTIAL CAPITAL, LLC, et al.                    77

1    it.  This is to Option One Mortgage from CJ Mortgage,

2    Incorporated.

3    Q.   Okay.

4         MS. ARETT:  Your Honor, I'd like to introduce this

5    assignment into evidence as Exhibit BT-E.

6         THE COURT:  All right.  The stipulation as part of the

7    pre-trial order likely shows no objection to this, correct, Mr.

8    Moss?

9         MR. MOSS:  No objection.

10        THE COURT:  All right.  BT-E is in evidence.

11        (Assignment of deed of trust from CJ Mortgage to Option

12   One was hereby received into evidence as Borrower Trust's

13   Exhibit BT-E, as of this date.)

14   Q.   And now turning to Exhibit BTF --

15        MS. ARETT:  Actually, I believe all of these were just

16   admitted under --

17        THE COURT:  I think they were

18        MS. ARETT:  -- Mr. Moss.  So we can just refer to his.

19        THE COURT:  Mr. Moss put them in evidence.

20        MR. MOSS:  I have no objection to F nor to G.  H, no

21   objection.

22   Q.   Okay, so looking at Exhibits BT-E, F, and G, and -- Ms.

23   Lathrop -- and BT -- the assignments of the deed of trust.

24   A.   Okay.

25   Q.   Would ETS have had access to these documents?

RESIDENTIAL CAPITAL, LLC, et al.                    78

1  A.    What do you mean?

2            THE COURT:  Was a copy of BT-F in the files and

3  records of ETS?

4            THE WITNESS:  I honestly don't know what they had

5  available to them.  I didn't have access to ETS's records.

6            THE COURT:  Was a copy of BT-F in GMAC's records?

7            THE WITNESS:  Yes.

8            THE COURT:  When was a copy of BT-F included in GMAC's

9  records?

10            THE WITNESS:  All I would have is the date on the

11  document -- the date it was recorded especially --

12            THE COURT:  Is there any entry in the loan-servicing

13  notes that reflects the receipt of BT-F into the books and

14  records of GMAC?

15            THE WITNESS:  Let me check the servicing notes.

16            THE COURT:  Could you do that?

17       (Pause)

18            THE WITNESS:  I don't show anything within the

19  servicing notes, Your Honor.

20            THE COURT:  I couldn't hear you.

21            THE WITNESS:  I don't show anything within the

22  servicing notes.

23  Q.    Ms. Lathrop, if I could just direct your attention to --

24            MR. MOSS:  Could I interrupt for one second?  You

25  couldn't see Exhibits E through F?  Is that what you said?

1          THE COURT:  No, we were just talking about Exhibit F.

2          MR. MOSS:  Just -- oh.

3          THE COURT:  Go ahead, Ms. Arett.

4    Q.   If I could direct you to page 78 of 131?

5    A.   Yes.  In --

6    Q.   Halfway down the page when it talks about the assignment

7    from TCIF to -- from May 2nd?

8          THE COURT:  I'm sorry, where are you?

9          MS. ARETT:  Let's see.  It's --

10         THE COURT:  Well, which date?

11         MS. ARETT:  May 2nd, 2008.  So I believe it starts, I

12   guess, on page 77.  I'm not as good at reading these as Ms.

13   Lathrop is.

14   A.   I see the date.

15         THE COURT:  I don't see where you're referring to.

16   Sorry.  Can you clarify for me?  If you're looking at page 77,

17   how many lines up from the bottom?

18         MS. ARETT:  Four lines up from the bottom.

19         THE COURT:  On page 77?

20         MS. ARETT:  Page 77 of 131.  I believe it starts May

21   2nd, 2008.

22         THE COURT:  Yeah, but what's the entry?

23         MS. ARETT:  It starts --

24         THE COURT:  The fourth line on what I have is --

25         MS. ARETT:  Early IND.

RESIDENTIAL CAPITAL, LLC, et al.                    80

1           THE COURT:  -- Early IND 4 --

2           MS. ARETT:  Yes, yes.  That's the beginning.

3    Q.   Is there anything on these two page, Ms. Lathrop, that

4    talks about the assignment -- the assignments that we just

5    mentioned?

6    A.   Yep, it discusses the assignment, but doesn't state the

7    receipt.  On page 78, fourth line down of the 5/2/2008 date, it

8    says:  "Our investor is working with Option One to obtain an

9    assignment from Option One Mortgage to TCIF, LLC."  And then

10   the note directly under that states that -- I'll read the whole

11   thing -- "Assignment from TCIF, LLC to Bank of New York as

12   trustee for Truman Capital Mortgage Loan Trust 2006-1 is going

13   out tonight via FedEx."  And that provides the FedEx tracking

14   number of 791057505763.

15        And then it says:  "This assignment must -- must record

16   after Option One assignment is recorded.  I'm waiting to

17   receive the assignment."  But it doesn't state it was received.

18   Q.   And when you say it doesn't state it was received, it

19   doesn't state it was received by who?  By GMAC Mortgage?

20   A.   I don't see a note that says it was received at all.

21   Q.   Okay.

22           THE COURT:  Just let me read these notes over again.

23        (Pause)

24           THE WITNESS:  I apologize, Your Honor.  I didn't go

25   far enough into the notes.  If you look on page 75 of 131 --

1          THE COURT:  Yes.

2          THE WITNESS:  -- in the middle of that page -- I'll

3   try and help you -- it's dated May 8th, 2008 -- it starts with

4   "To Irma Erickson."

5          THE COURT:  I'm sorry, which page are you on?

6          THE WITNESS:  75.

7          THE COURT:  Okay.

8          THE COURT:  On May 8th, 2008, I think -- the note

9   starts "To Irma Erickson", it's right in the middle of the

10  page.

11         MS. ARETT:  I think -- do you mean page 76?

12         THE WITNESS:  Oh, sorry, I'm -- I apologize.  It is

13  76.  I read it wrong.

14         THE COURT:  All right.  I'm looking at page 76.

15         THE WITNESS:  5/8/2008 --

16         THE COURT:  Yes.

17         THE WITNESS:  -- To Irma Erickson.

18         THE COURT:  All right.

19         THE WITNESS:  And directly under that it says:  "I

20  have the Option One assignment, and it's going out tonight for

21  your attention via FedEx," and provides the tracking number.

22         THE COURT:  Who is Irma Erickson?

23         THE WITNESS:  I can't answer for if that was ETS or

24  GMAC, Your Honor.

25         MR. MOSS:  I'm sorry, I'm having trouble hearing.

1              THE COURT:  Yeah, you have to --

2              THE WITNESS:  I'm sorry.  I can't answer for if that

3    was GMAC Mortgage or ETS who that was written to.

4              MR. MOSS:  Who entered it or was referring to?

5              THE WITNESS:  Who it was sent to.

6              THE COURT:  Do you know who made the entry?

7              THE WITNESS:  Let me see if it's listed.  It doesn't

8    say on that note.

9              THE COURT:  Was the entry on the line before from Mira

10   Smoot, is that an unrelated entry?

11             THE WITNESS:  The one that says "To Mira Smoot"?

12             THE COURT:  From Mira Smoot.

13             THE WITNESS:  From Mira Smoot.  It may be from Mira

14   Smoot at GMAC to Irma Erickson at Exec message.  I'm looking at

15   hose the notes are lined out from -- because these would have

16   been our LPS records as we transitioned -- or transferred over

17   to LoanServ.  It looks like they would have been the intercom

18   message from Mira Smoot at GMAC to Irma Erickson at the Exec --

19   at the trust.

20   BY MS. ARETT:

21   Q.   At ET --

22   A.   Since that was who -- yeah, at ETS, because that's who was

23   handling the foreclosure.  But that's just based on the

24   interpretation of the notes.

25             The one right above that is from Executive Trust to GMAC,

1    acknowledging the note on that same date.

2              THE COURT:  A little further down on that page is an

3    entry also from May 8th, "No signing authority comments."

4    Then, "The Option One assignment is going out tonight" --

5    again, it has the same FedEx tracking number -- "to ETS,

6    attention Irma Erickson"?

7              THE WITNESS:  Yes.  I see that also.

8              THE COURT:  Is that related.

9              THE WITNESS:  I assume that -- I assume it is related

10   since the tracking number is the same, but I don't know what

11   they mean by "no signing authority".

12             THE COURT:  And then second line from the bottom of

13   that page:  "To Sandra Garcia (ph.):  message, I just heard

14   from Option" -- and then it carries over to the next page -- "I

15   just heard from Option One today.  They are sending out the

16   assignment tonight.  They didn't say it was overnight or

17   second-day."

18             THE WITNESS:  And would have been a note prior to the

19   ones we just read, because it goes -- it's confusing.

20             THE COURT:  It goes, the first --

21             THE WITNESS:  It goes in reverse.

22             THE COURT:  And then on page 76, the entry for May

23   9th:  "Foreclosure started"?

24             THE WITNESS:  That is a credit bureau reporting note.

25   That's what that CBR in the Trans Type column stands for.

1          THE COURT:  Yes.

2          THE WITNESS:  So that would have been an automated

3    note on reporting to the credit bureau what the status of the

4    delinquency of the account was at that point.

5          THE COURT:  Is that an indication that GMAC had

6    started a foreclosure action with respect to this loan?

7          THE WITNESS:  Yes.

8       (Pause)

9          THE COURT:  Do you know whether the entries for May

10   8th, 2008 and the days before that -- because we looked on page

11   78 where there were entries for -- starting with May 2nd -- are

12   those the earliest entries in GMAC's records indicating that it

13   was awaiting -- it or ETS was awaiting receipt of the

14   assignment from Option One?

15         THE WITNESS:  I would have to review the records.

16         THE COURT:  Could you do that?

17         THE WITNESS:  I can.

18         THE COURT:  Ms. Arett, can you help me on this?

19         MS. ARETT:  So --

20         THE COURT:  Look, I'm asking -- this document is now

21   in evidence, and it really goes to questions I asked you during

22   the time of the openings.  What I'm trying to ascertain is when

23   ETS and GMAC, for that matter, received the assignment or the

24   substitution of trust deed.

25         I guess this assignment is what?

1        MS. ARETT:  This is the assignment of the deed of

2   trust.

3        THE COURT:  The deed?

4        MS. ARETT:  Yes.

5        THE COURT:  The deed of trust.

6        MS. ARETT:  Yes, this is the assignment of the deed of

7   trust.

8        THE COURT:  Okay.

9        MS. ARETT:  We have not -- but if you look at page 79,

10  there's some more discussion of the assignment.

11       THE COURT:  Where do I find that?  I'm on page 79.

12       MS. ARETT:  If you go down --

13       THE COURT:  I see on the second line it starts on

14  April 29th:  "Please ask Option One Mortgage" --

15       MS. ARETT:  Right.

16       THE COURT:  -- "to provide an executed assignment to

17  see".

18       MS. ARETT:  Right.

19       THE WITNESS:  Your Honor, reviewing the notes, I

20  started back in 2007 and just worked my way forward, and on

21  page 93, that's the first note that I came across of waiting on

22  an assignment pending.  It's date --

23       THE COURT:  Let me find -- let me get to 93.

24       Go ahead.

25       THE WITNESS:  It's dated January 7th, 2008.  It's the

1  second one of that date from the bottom of the page.

2  Technically the "A" for the assignment portion starts about

3  four lines up, but that's where it shows the first inklings of

4  the need for the assignment.

5          THE COURT:  I'm sorry, the date being what, now?

6          THE WITNESS:  January 7th, 2008, the note starts with:

7  "1/9/08 reason other, comments," and then "assignment pending

8  status active."

9          MR. MOSS:  On what page is that, please?

10          THE WITNESS:  93.

11          THE COURT:  Ms. Arett, why don't you show Mr. Moss

12  where.  These are not easy to read.

13          THE COURT:  What does the entry:  "Approval not

14  required" mean?

15          THE WITNESS:  I honestly don't know.  That would've

16  been on ETS and the foreclosure department's side.

17          THE COURT:  That's the earliest entry you've found?

18          THE WITNESS:  That's the earliest entry I found going

19  through the notes.

20          THE COURT:  Did you find any entries between then and

21  April of 2008?

22          THE WITNESS:  I stopped as soon as I found this one.

23  I can continue to go forward, if you would like.

24          THE COURT:  Please do.

25          THE WITNESS:  All right.

1        (Pause)

2            THE COURT:  While Ms. Lathrop is looking at that, did

3    you also offer -- my notes are incomplete -- BT-F, G, and H?

4            MS. ARETT:  We haven't gotten to H yet, but --

5            THE COURT:  Okay, F and G?

6            MS. ARETT:  Yes.

7            THE COURT:  Those were already offered and introduced

8    by Mr. Moss?

9            MS. ARETT:  Yes.

10           THE COURT:  All right, F and G are in evidence.

11       (Assignment of deed of trust was hereby received into

12   evidence as Borrower Trust's Exhibit BT-F, as of this date.)

13       (Assignment of deed of trust was hereby received into

14   evidence as Borrower Trust's Exhibit BT-G, as of this date.)

15           THE WITNESS:  On page 91 of 131 --

16           THE COURT:  Yes.

17           THE WITNESS:  -- dated January 9th, 2008, middle of

18   the page starting with "Christina Parlapiano" -- actually

19   that's the middle of the note.

20           THE COURT:  I see her name, and then it says "resolve

21   title issue."  Is that what you're referring to?

22           THE WITNESS:  Yes.  This is them going through trying

23   to review the title issues on the loan.  I'm trying to find the

24   start of that note, though.  I accidentally referred you to the

25   middle of it.

1          (Pause)

2              THE WITNESS:  It's difficult to tell where the note

3    starts.  But according to -- if we were to start where that

4    note is, where I just referred to, it says:  "If by chance the

5    title claim is denied, please re-raise the title resolution

6    issue and advise further Option One's title claim is filed.

7    Please advise by re-raising title resolution."

8              So they were trying to go through and clear up those

9    issues.

10         (Pause)

11             THE WITNESS:  There's a note on page 89 of 131 dated

12   January 23rd, 2008.

13             THE COURT:  Hold on.  All right, I'm on page 89.  What

14   is the entry?

15             THE WITNESS:  January 23rd, 2008, the first entry.

16   It's about the middle of the page.  It says:  "This assignment

17   is not available.  Please prepare and submit the signature

18   required.  Thank you.

19             THE COURT:  Hold on.

20         (Pause)

21             THE COURT:  Do you know which assignment it refers to?

22             THE WITNESS:  It does not say.

23             On page 88 it also -- I'll give you the dates.  On

24   February 5th, 2008.  It starts with:  "Process level issue for

25   this loan."  It's the fourth line down.  "Copy power of

1  attorney issue comments.  Mira, please find authorized signor

2  for assignment of deed of trust from Option One Mortgage."

3  BY MS. ARETT:

4  Q.   Ms. Lathrop, do you know who Mira Smoot was employed by?

5  A.   I believe I read a note -- I read a note that said which

6  one she was employed by.  Just give me --

7       I apologize, I don't remember where it was within the

8  notes we've reviewed.

9           THE COURT:  She testified in my court.

10          MS. ARETT:  Yeah, she testified.  And I believe

11  she's --

12          THE COURT:  Mr. Moss, Mira Smoot testified as a

13  witness in a prior trial of a claim objection.

14  A.   It looks like on page 79 she has an email address of

15  GMACM.com.  So I would assume a GMAC employee.  That's in the

16  middle of that page, dated April 29th, 2008.  That's maybe ten

17  lines up.  It's underlined, since it's an email address.

18          THE COURT:  Go ahead, Ms. Arett.

19          MS. ARETT:  Okay.

20  BY MS. ARETT:

21  Q.   I'm going to now direct your attention to BT-H.

22  A.   Okay.

23  Q.   Do you recognize this document?

24  A.   Yes.

25  Q.   Have you seen it before today?

1    A.    Yes.

2    Q.    Was this document maintained in GMAC Mortgage's system of

3    record?

4    A.    Yes.

5    Q.    Okay.  Is this a business record that is maintained in the

6    ordinary course of business?

7    A.    Yes.

8    Q.    And what is this document?

9    A.    It's the substitution of trustee.

10   Q.    And what's the date of the document?

11   A.    The date is September 21st, 2006.

12   Q.    And who is the -- what entity is being appointed as a

13   result of this document?

14   A.    Executive Trustee Services, LLC.

15   Q.    Okay.

16         MS. ARETT:  I think this has already been admitted as

17   well, Your Honor.  But we'd like to admit Exhibit BT-H.

18         MR. MOSS:  No objection.

19         THE COURT:  All right, BT-H is in evidence.

20       (Substitution of trustee was hereby received into evidence

21   as Borrower Trust's Exhibit BT-H, as of this date.)

22         THE COURT:  Just bear with me a second, though.

23       (Pause)

24         THE COURT:  Is there any entry in the loan-servicing

25   records to show whether TCIF REO2, LLC had the authority on

1   September 21, 2006, to substitute ETS as the trustee under the

2   deed of trust?

3          THE WITNESS:  I don't show anything documented in the

4   servicing notes, Your Honor, on that date.

5          THE COURT:  Is there any entry in the loan-servicing

6   records showing that this substitution of trustee was provided?

7          MR. MOSS:  The substitution of trustee was?

8          THE COURT:  Whether it was provided?

9          THE WITNESS:  Provided to?

10          THE COURT:  Well, to GMAC?

11          THE WITNESS:  I don't -- I don't know if that would be

12   in the notes, Your Honor.

13          THE COURT:  Well, look.

14       (Pause)

15          THE COURT:  Ms. Arett, is there anything in the books

16   and records of GMAC or ETS that would show that TCIF REO2, LLC,

17   was anything other than a stranger to the Moss loan in

18   September 2006?

19          MS. ARETT:  I mean, on the substitution of trustee, it

20   says:  "Whereas the undersigned is the present beneficiary

21   under the deed of trust."

22          THE COURT:  Well, is there a deed of trust that shows

23   that TCIF REO2 was the beneficiary under a deed of trust as of

24   that date?

25          MS. ARETT:  Not that we have found, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                    92

1          THE COURT:  Is there anything in the records that

2     would show that GMAC or ETS had any idea whatsoever as to who

3     TCIF REO was in relation to the Moss loan?

4          If the answer's no, then --

5          MS. ARETT:  No, Your Honor.  The answer is no.  I

6     would point out on the second page of the substitute trustee is

7     an affidavit of mailing from ETS showing that ETS at least had

8     this substitution of trustee at that point.

9          THE COURT:  Let me ask this question.  Is this the

10    first document in any of the debtors' records that gives any

11    indication that TCIF or TCIF REO had any connection with the

12    Moss loan?

13         MS. ARETT:  That is my understanding.

14         THE COURT:  Okay.  All right, go ahead with your

15    examination.

16         MS. ARETT:  Okay.

17    BY MS. ARETT:

18    Q.   All right, Ms. Lathrop.  So let's turn now to Mr. Moss'

19    payment history on his loan.  What was Mr. Moss' monthly

20    payment?

21    A.   The easiest way to def -- to determine that would be

22    looking at the note rather than the payment history.

23    Q.   Okay.

24    A.   Because that would have included escrow.  What number do

25    you want?

1   Q.   The entire monthly payment, including the escrow

2   payment -- principal, interest, and escrow?  If that's

3   available.

4   A.   Okay, one second.  I apologize, there is no escrow on this

5   loan as of the date I have available.  I show the monthly

6   payment on page 8 of the servicing notes dated April 13th,

7   2006, as $5,488.62.

8   Q.   Okay.  And when was Mr. Moss' monthly payment due?

9   A.   It's listed as the 1st of the month.

10  Q.   And where are you finding that?

11  A.   The third column on the payment history, it says "date

12  interest paid current".  And it --

13            THE COURT:  This is page 3?

14            THE WITNESS:  On page 8 of the payment history, is

15  where I am, Your Honor.

16            THE COURT:  Where is the payment history, Ms. Lathrop?

17            THE WITNESS:  It's within the Exhibit A.  It's page 8

18  of 131.

19            THE COURT:  All right.  Let me just get to it.

20            Okay.  And it's which entry?

21            THE WITNESS:  I am referring to the first one --

22  that's not the first one on that date.  The eighth entry from

23  the bottom of the payment history, dated 4/13/2006, under

24  "Trans Amount" -- that's transaction amount -- of $5,488.62.

25  Q.   If I could also just direct your attention to Exhibit

RESIDENTIAL CAPITAL, LLC, et al.                    94

1    BT-C?

2    A.    Yes.

3    Q.    Does that also indicate the first -- the date that the

4    payments are due?

5    A.    Yes.  Under section 3 on that first page it states:

6    "Payments:  I will make my monthly payment on the first day of

7    each month beginning August 1st, 2005."

8              THE COURT:  So on page 8, about six lines up from the

9    bottom, there's a payment of $7,684.06?

10             THE WITNESS:  Yes, Your Honor.

11             THE COURT:  Is there any indication why that payment

12   exceeded the amount of the regular monthly payment?

13             THE WITNESS:  Based on the payment history we have in

14   front of us, if we go all the way to the right of that

15   column --

16             THE COURT:  Yes.

17             THE WITNESS:  -- it shows that's the late -- two --

18   late charge amount column.  And it shows $2,195.44.

19             THE COURT:  Okay.

20             THE WITNESS:  And also below that there is additional

21   monies that are going into an unapplied suspense account.

22   Transaction type is UFU of $461.46.

23             THE COURT:  Okay.  In any event, you read this as

24   saying his regular monthly payment was $5,488.62?

25             THE WITNESS:  Yes.

1          THE COURT:  Go ahead, Ms. Arett.

2    BY MS. ARETT:

3    Q.   Ms. Lathrop, did Mr. Moss become delinquent on his loan

4    payment?

5    A.   Based on the payment history, yes.

6    Q.   When did he become delinquent?

7    A.   The payment history, where it starts it shows the paid-to

8    date as July 1st, 2005, which means it was still waiting for

9    the August 1st, 2005 payment to be received.

10   Q.   Okay.  So the first payment that Mr. Moss was supposed to

11   make under the loan, he did not pay on time?

12   A.   According to the history, that's what it says.

13   Q.   Did GMAC Mortgage ever inform Mr. Moss of his delinquency?

14   A.   I'd have to look at the notes.

15   Q.   Okay.

16          MR. MOSS:  Your Honor, if I might.  I object to this

17   line of questioning about the payment history.  I don't believe

18   it's relevant to any issue in this claim or its objection.

19          THE COURT:  Overruled.

20          MR. MOSS:  It has nothing to do with whether ETS was

21   empowered or acted maliciously or not.

22          THE COURT:  Well, part of their defense is that you

23   were in default throughout this and if you suffered any

24   emotional-distress damage, which they dispute, it was a result

25   of the fact that your loan was long in default and subject to

RESIDENTIAL CAPITAL, LLC, et al.                    96

1   foreclosure, perhaps not in the manner that it was done here.

2        So your objection is overruled.

3   A.   According to page 130 of 131, the third from the top dated

4   April 14th, 2006, it states:  "Breach Alan Irving Moss," which

5   would have indicated a breach letter being sent.

6   Q.   Okay.  I'd like to turn your attention, then, to Exhibit

7   BT-I.

8   A.   Okay.

9   Q.   Do you recognize this document?

10  A.   Yes.

11  Q.   And have you -- what is this document?

12  A.   This is a breach letter.

13  Q.   Okay.  And have you seen it before today?

14  A.   Yes.

15  Q.   Was this document maintained in GMAC Mortgage's system of

16  record?

17  A.   Yes.

18  Q.   Do you know which system it would have been maintained in?

19  A.   This -- the copy of this letter would have been housed in

20  our Xnet system.

21  Q.   And is this a business record that is maintained in the

22  ordinary course?

23  A.   Yes.

24        MS. ARETT:  Your Honor, I'd like to introduce the

25  letter Exhibit BT-I as a true and correct copy of the letter

RESIDENTIAL CAPITAL, LLC, et al.                    97

1 dated April 12, 2006, sent to Mr. Moss.

2          MR. MOSS:  I would object to the entry of this

3 exhibit.  It's says it's generic on the top.  And there's no

4 letterhead.  There's no anything to say that this is an

5 accurate representation of what was sent out, if anything was

6 sent out.  And on that basis I would object.

7          THE COURT:  The objection is overruled.

8          MR. MOSS:  Which is --

9          THE COURT:  Exhibit BT-I is in evidence.

10     (4/12/06 breach letter from GMAC to Mr. Moss was hereby

11 received into evidence as Borrower Trust's Exhibit BT-I, as of

12 this date.)

13 Q.    According to this letter, how much did Mr. Moss owe on the

14 loan as of the date that it was sent?

15 A.    The total amount due listed on the front of the letter is

16 $52,056.99.

17 Q.    Okay.  And did Mr. Moss make any payments on the loan

18 after this letter was sent?

19 A.    Give me a moment.  I need to look at the history.  There

20 was a payment received on page 8 of 131 of the LoanServ history

21 notes dated April 13th, 2006.

22          THE COURT:  How much was received?

23          THE WITNESS:  I would need a calculator to calculate

24 the total amount received.  But I can tell you what payments it

25 covered offhand.

RESIDENTIAL CAPITAL, LLC, et al.                    98

1              THE COURT:  Why don't you --

2              MS. ARETT:  I can provide Ms. Lathrop with a

3      calculator.

4          (Pause)

5              THE COURT:  Ms. Lathrop, on page 8 of 131 --

6              THE WITNESS:  Yes.

7              THE COURT:  -- six lines up from the bottom of the

8      page, April 13th, 2006.

9              THE WITNESS:  Yes.

10             THE COURT:  First let's walk across the columns and

11     explain to me what it shows.

12             THE WITNESS:  Your Honor, the easiest way to explain

13     it is if I start at the top of the transac -- it's weird how

14     the payment history would apply, but if we were to go up eight

15     more columns to the one that shows --

16             THE COURT:  Eight more rows?

17             THE WITNESS:  Eight more rows -- I apologize, to

18     column 3, where it says 8/1/2005.  That would show the

19     beginning of which payments were paid with the monies that came

20     in.  It's dated April 13th, 2006 in the second column, and then

21     the third column under "Date Interest Paid Current" it says

22     August 1st, 2005.

23             THE COURT:  Hold on.  Okay.

24             THE WITNESS:  So that shows the August 1st, 2005

25     payment being paid on the account for a total amount of

RESIDENTIAL CAPITAL, LLC, et al.                                    99

1  $5,488.62, with $256.85 of that going to principal, and

2  $5,231.77 of that being applied to interest due.

3            THE COURT:  Yes.

4            THE WITNESS:  Going down to the next one, if we

5  go -- that is a balance being applied to the account.  If we go

6  all the way over to the right, we show a balance being added as

7  due to the late-charge amount of $2,195.44, because late

8  charges would accrue on the date the payments were received for

9  whatever was delinquent at that point.

10           The next row down is dated as September 1st, 2005

11  payment being applied of $5,488.62 with $259.04 being applied

12  to principal and $5,229.58 being applied to interest.  The next

13  column down --

14           THE COURT:  Next row down?

15           THE WITNESS:  I'm sorry.  Yes, the next row down is

16  the October 1st, 2005 payment being applied for the same amount

17  of $5,488.62 with $261.26 being applied to principal and

18  $5,227.36 being applied to interest.

19           The following row is November 1st, 2005 payment being

20  applied in the amount of $5,488.62, with $263.49 being applied

21  to principal and --

22           THE COURT:  Let me just make sure I understand.  Is

23  that on April 13th, 2006 --

24           THE WITNESS:  Yes.

25           THE COURT:  -- the payment was received.  It was

1    applied beginning with the interest payment that would have

2    been due on November 1st, 2005.

3              THE WITNESS:  With the entry that we're currently

4    looking at, yes.  The interest payment due and then a portion

5    of that would have also gone to unpaid principal balance.

6              THE COURT:  All right.  So on April 13th there were

7    payments received from Mr. Moss.

8              THE WITNESS:  Yes.

9              THE COURT:  That were applied starting with the

10   payment due for the -- the oldest payment for which was in the

11   fall.

12             THE WITNESS:  Yes.  It would always pay the most

13   delinquent payment first and then pay every payment after that

14   that it would cover.

15             THE COURT:  So in this series of entries, on April

16   13th, 2006 payments were received from Mr. Moss.  They were

17   applied first to the August 1st, 2005, then September 1st,

18   2005, then October 1st, then November 1st.  Is it -- am I

19   reading these correctly then?

20             THE WITNESS:  Yes.  You are.  It also paid for

21   December 1st, 2005, January 1st, 2006, and December 1st,

22   2006 --

23             MS. ARETT:  You mean February 1st.

24             THE WITNESS:  I'm sorry, and February 1st 2006, and

25   there wasn't enough left to pay another payment for March, so

1    then we show those monies being applied to the late charges in

2    the far column for that last entry of the total transaction

3    amount of $7,684.06.  And that was going toward paying off

4    those late charges we showed being applied to the account of

5    219544 (ph.).

6              THE COURT:  Okay.

7    BY MS. ARETT:

8    Q.    So as of that payment, Ms. Lathrop, what payment was Mr.

9    Moss owing for at that time, for what month?

10   A.    The account would have -- after all the transactions were

11   applied, the account would have been due for a March 1st, 2006

12   and April 1st, 2006 payments.

13   Q.    And when did Mr. Moss make his next mortgage payment?

14   A.    The servicing notes on the same page show funds coming in

15   on May 15th, 2006, an amount of $5,488.62 cents, which would

16   have paid for the -- it shows being paid for March 1st, 2006

17   payment.

18   Q.    And at that point, would Mr. Moss have been considered

19   delinquent under the terms of the loan?

20   A.    Yes.

21   Q.    Could you just explain?

22   A.    Since that paid for the March 1st, 2006 payment, the

23   account still would have been showing due for the April 1st,

24   2006 payment as well as the May 1st, since we had passed May

25   1st.

RESIDENTIAL CAPITAL, LLC, et al.                    102

1    Q.    Did GMAC Mortgage inform Mr. Moss of this delinquency?

2    A.    I'd have to go back to the notes.  On page 127 of 131 in

3    the servicing notes, the third line from the bottom dated May

4    16th, 2006 shows "Breach Alan Irving Moss" and that would have

5    been the breach that are going out based on the transaction

6    type D19.

7    Q.    I'd like to turn your attention to Exhibit BT-J.

8    A.    I'm there.

9    Q.    Do you recognize this document?

10   A.    Yes.

11   Q.    What is this document?

12   A.    This is a breach letter.

13   Q.    And is it the same breach letter that you identified was

14   sent out in the -- as recorded in the servicing notes?

15   A.    The dates coincide.

16   Q.    Have you seen this document before today?

17   A.    Yes.  I have.

18   Q.    And was this document maintained in GMAC Mortgage's system

19   of record?

20   A.    Yes.

21   Q.    Which system?

22   A.    It would have been in the Xnet system.

23   Q.    Has this business record been maintained in the ordinary

24   course of business for GMAC Mortgage?

25   A.    Yes.

1           MS. ARETT:  Your Honor, I'd like to introduce BT-J to

2    evidence.

3           THE COURT:  Does this system reflect letters that are

4    mailed to the borrower?

5           THE WITNESS:  Yes, sir.

6           THE COURT:  Any objection?

7           MR. MOSS:  I object, as I have objected to the last

8    exhibit.

9           THE COURT:  All right.

10          MR. MOSS:  I don't believe that this is --

11          THE COURT:  Objection is overruled.  BT-J is in

12   evidence.

13          MR. MOSS:  Could I finish, Your Honor, please -- just,

14   I'm almost finished.

15          THE COURT:  I'm sorry?

16          MR. MOSS:  Could I finish my sentence?

17          THE COURT:  I said I overruled the objection.  It's in

18   evidence.

19      (5/15/06 breach letter from GMAC to Mr. Moss was hereby

20   received into evidence as Borrower Trust's Exhibit BT-J, as of

21   this date.)

22          THE COURT:  Let me ask you this, Ms. Lathrop.

23          THE WITNESS:  Yes.

24          THE COURT:  Where GMAC is the loan servicer, and ETS

25   is the trustee, does GMAC have to give the direction to the

RESIDENTIAL CAPITAL, LLC, et al.                    104

1   trustee to commence foreclosure?

2           THE WITNESS:  My understanding from how we would work

3   and how I would see it progress is all I can answer to, Your

4   Honor.

5           THE COURT:  What's your understanding?

6           THE WITNESS:  In my understanding was that once an

7   account hit that stage of delinquency, and the time when the

8   breach letter had passed to allow them time to rectify what was

9   delinquent, then GMAC would notify the trustee or the

10  bankruptcy attorney -- not bankruptcy -- or the foreclosure

11  attorney that it was time to commence foreclosure proceedings.

12  And then there's a note within the servicing notes stating that

13  the account was referred to foreclosure.

14          THE COURT:  So it would be GMAC that would refer the

15  account to foreclosure in what it believed was the appropriate

16  time.

17          THE WITNESS:  Yes.

18          THE COURT:  All right.  We're going to take our lunch

19  recess and do you have an estimate about how long you're going

20  to be on your direct?  I don't want to interrupt you with

21  lunch.

22          MS. ARETT:  We're about a third of the way through my

23  questions, but I'm hoping it will be faster --

24          THE COURT:  Okay.

25          MS. ARETT:  -- as we go.

1          THE COURT:  We'll resume at 2 o'clock.  We'll resume

2     at 2 o'clock.

3          MS. ARETT:  Thank you, Your Honor.

4        (Recess from 12:35 p.m. until 2:03 p.m.)

5          THE CLERK:  All rise.

6          THE COURT:  All right.  Please be seated.

7          MR. MOSS:  Good afternoon, Your Honor.

8          THE COURT:  Let's continue with the examination of Ms.

9     Lathrop.

10    BY MS. ARETT:

11    Q.    Good afternoon, Ms. Lathrop.

12    A.    Hi.

13    Q.    So before the break we had talked about a letter that was

14    mailed from GMAC Mortgage to Mr. Moss on May 15th, 2006,

15    regarding his delinquency.  When was the next contact that GMAC

16    Mortgage had with Mr. Moss?

17    A.    I'd have to review the servicing notes.

18    Q.    Okay.

19    A.    On page 121 of 131 in the servicing notes, dated December

20    1st, 2006.

21    Q.    And what was the contact that Mr. Moss had?

22    A.    It was via telephone.

23    Q.    And at that time, had Mr. Moss made any payments on his

24    mortgage since receiving the letter in May of 2006?

25    A.    Give me one second to pull the payment history.  According

RESIDENTIAL CAPITAL, LLC, et al.                    106

1    to pages 7 and 8 of the loan-servicing notes and payment

2    history, I don't show any payments being received.

3    Q.    And during the phone conversation on December 1st, 2006,

4    what did Mr. Moss and GMAC Mortgage discuss?

5    A.    Just the notes verbatim say, "Spoke to borrower." It's in

6    the middle of the notes because there's two different entries,

7    just so you know.  It says, "Spoke to borrower and verified all

8    personal info.  He lives in home and wants to keep property.

9    Negotiated 30,000 dollars be December 8th, 2006.  Took

10   financials" -- which would have been his financial information

11   "over the phone.  Borrower can bring loan current in six months

12   and requested attorney fees and costs go through the 8th of

13   December through Executive Trustee." So yes, he -- the --

14   there was a secondary conversation on that day as well.

15   Q.    And what was the secondary conversation?

16   A.    It states right above that, the very top entry starting

17   with December 1st, 2006 states, "Spoke to borrower again.

18   Confirmed he can support a six-month repay with initial deposit

19   of 30,000 by December 8th, 2006, and five remaining payments

20   approximately 11,700 dollars per month.  Approved six-month

21   plan.  Will send out plan overnight when Executive Trust

22   confirms the outstanding unbilled attorney fees and costs."

23   Q.    And did Mr. Moss bring his account current after agreeing

24   to the repayment agreement?

25   A.    I'd have to look at this history.

1  Q.    Okay.

2  A.    According to page 6 of the servicing notes, dated April

3  23rd, 2007 -- it's the second entry on that page, it shows

4  $6,500.11 -- $6,511.38 being applied to pay the April 1st, 2007

5  payment, which would have been making that payment within the

6  month due, bringing it current.

7  Q.    Did Mr. Moss become delinquent again on his loan after

8  that?

9  A.    Yes.  It looks like on page 5 it shows that there was not

10  a payment received in the month of May.

11  Q.    Did GMAC Mortgage receive the payment due for June 1st of

12  2007?

13  A.    One second.  It looks like on that same -- on page 5 of

14  the servicing notes, it shows the June 1st, 2007 payment being

15  received on August 1st, 2007.

16  Q.    So prior to that, Mr. Moss would have been delinquent on

17  the loan.

18  A.    Yes.  Prior to August 1st.

19  Q.    Did GMAC Mortgage ever inform Mr. Moss of that

20  delinquency?

21  A.    Give me one moment.  Prior to August 1st, I show two

22  different breach letters that were sent on the account.  The

23  first one is on page 108 of 131, dated June 5th, 2007 that

24  states "Breach Alan Irving Moss" with the D19 transaction type,

25  which would have shown a letter being sent.  And the second

 1  one --

 2  Q.    Well, let's stop at just that one right now.

 3  A.    I apologize.

 4  Q.    No, it's all good.  So I'm going to turn your attention

 5  now to Exhibit BT-K.

 6  A.    Okay.

 7  Q.    Do you recognize this document?

 8  A.    Yes.

 9  Q.    What is this document?

10  A.    This is a breach letter.

11  Q.    And does this breach letter reference what you had just

12  discussed in the servicing notes?

13  A.    Yes.  It's dated June 4th, 2007.

14  Q.    Have you seen this document before today?

15  A.    Yes.

16  Q.    And was this document maintained in GMAC Mortgage's system

17  of record?

18  A.    Yes.

19  Q.    Which system was it maintained in?

20  A.    It would have been in the Xnet system.

21          THE COURT:  Does this reflect a letter that was sent

22  to Mr. Moss?

23          THE WITNESS:  Yes.  Accord -- well, it coincides with

24  the date in the servicing notes.

25  Q.    And is this a business record that is maintained in the

1   ordinary course?

2   A.   Yes.  Xnet is.

3           MS. ARETT:  Your Honor, I'd like to introduce Exhibit

4   BT-K.

5           THE COURT:  In evidence.

6           MS. ARETT:  Okay.

7       (6/4/07 breach letter sent by GMAC to Mr. Moss was hereby

8   received into evidence as Borrower Trust's Exhibit BT-K, as of

9   this date.)

10  Q.   So after the June 5th letter, did Mr. Moss make a payment

11  that cured this deficiency?

12  A.   One moment.  There was on page 5 of the payment history

13  dated June 25th, 2007, it shows the May 1st, 2007 payment being

14  received.

15  Q.   And so as of July 1st, 2007, would Mr. Moss have been

16  delinquent, since you said his next payment came in August?

17  A.   Yes, because the June payment wasn't received within the

18  month due, and payment history on page 5 doesn't show a payment

19  was received in the month of July.

20  Q.   And so did GMAC Mortgage information Mr. Moss of this

21  delinquency?

22  A.   Yes.  I found that in the servicing notes on page 106 of

23  131, at the top of that page, dated July 4th, 2007.

24  Transaction message is:  "Breach Alan Irving Moss" and the

25  transaction type is D19, showing a letter was sent.

RESIDENTIAL CAPITAL, LLC, et al.                    110

1    Q.    So I'd like to return your attention to Exhibit BT-L.

2    A.    Okay.

3    Q.    Do you recognize this document?

4    A.    Yes.

5    Q.    And what is this document?

6    A.    This is a breach of contract letter.

7    Q.    And is this document -- who is it sent to?

8    A.    The top left of the letter says Alan Irving Moss.

9    Q.    And is it your understanding that this letter corresponds

10   to the letter that -- the note in the servicing notes that we

11   just referenced from July 4th?

12   A.    Yes.  The date on the top is July 3rd, 2007.

13   Q.    Have you seen this document before today?

14   A.    Yes.

15   Q.    Was this document maintained in GMAC Mortgage's system of

16   record?

17   A.    Yes.

18   Q.    Is this a business record that's maintained in the

19   ordinary course for GMAC Mortgage?

20   A.    Yes.

21          MS. ARETT:  Your Honor, I'd like to introduce Exhibit

22   BT-L.

23          THE COURT:  All right, BT-L is in evidence.

24       (7/3/07 breach letter from GMAC to Mr. Moss was hereby

25   received into evidence as Borrower Trust's Exhibit BT-L, as of

RESIDENTIAL CAPITAL, LLC, et al.                      111

1  this date.)

2  Q.    Did Mr. Moss make a payment on the loan after this letter

3  was sent?

4  A.    I believe he did on August 1st.  Yeah, on page 5, August

5  1st the June 1st, 2007 payment was received.

6  Q.    So does that mean that as of August 1st the loan was still

7  delinquent because the July 1st payment had not been received?

8  A.    That's correct.  At that point in July and August would

9  have been due.

10  Q.    Did GMAC Mortgage inform Mr. Moss of this delinquency?

11  A.    Give me one moment.  On page 104 of 131 in the servicing

12  notes, dated August 3rd, 2007, it's the fourth line down.  It

13  says, "Breach Alan Irving Moss" and has the transaction type

14  D19 showing a letter was sent.

15  Q.    I'd like to turn your attention to Exhibit BT-M.

16  A.    Okay.

17  Q.    Do you recognize this document?

18  A.    Yes.

19  Q.    What is this document?

20  A.    It's a breach of contract letter.

21  Q.    And again, who is it addressed to?

22  A.    Alan Irving Moss.

23  Q.    And does this document correspond to the notation in the

24  servicing notes that we just mentioned?

25  A.    This one is dated August 2nd, 2007, which would have been

RESIDENTIAL CAPITAL, LLC, et al.                    112

1    the one that's referred to on the 3rd.

2    Q.    Have you seen this document before today?

3    A.    Yes.

4    Q.    And was this document maintained in GMAC Mortgage's system

5    of record?

6    A.    Yes.

7    Q.    What system was it maintained in?

8    A.    Xnet.

9    Q.    And is this a business record that is maintained in the

10   ordinary course at GMAC Mortgage?

11   A.    Yes.

12          MS. ARETT:  Your Honor, I'd like to introduce Exhibit

13   BT-M.

14          THE COURT:  All right, Exhibit BT-M is in evidence.

15      (8/2/07 breach letter from GMAC to Mr. Moss was hereby

16   received into evidence as Borrower Trust Exhibit BT-M, as of

17   this date.)

18   Q.    And Ms. Lathrop, pursuant to this letter from August 2nd,

19   how long did Mr. Moss have to cure the delinquency?

20   A.    According to the pa -- the first page of this letter, the

21   paragraph that starts "You may," it says, "You may cure the

22   default by paying the total amount due indicated above within

23   thirty days from the date of this letter."  So he would have

24   had thirty days from the 2nd of August.

25   Q.    And did the letter warn Mr. Moss that foreclosure

RESIDENTIAL CAPITAL, LLC, et al.                    113

1  proceedings would commence if he didn't pay the full amount

2  due?

3  A.    That's on the second page of the letter.  The paragraph

4  that starts "Unless".  "Unless we receive full payment of all

5  past-due amounts, we will accelerate the maturity of the loan,

6  declare obligation due and payable, without further demand and

7  begin foreclosure proceedings."

8  Q.    Did Mr. Moss make a payment curing the deficiency within

9  thirty days?

10 A.    I'd have to look at the payment history.  Page 5 of the

11 servicing notes doesn't show funds were received within thirty

12 days of the 2nd.

13 Q.    And so did GMAC Mortgage do anything after those thirty

14 days to commence foreclosure?

15 A.    I'd have to check the servicing notes.

16 Q.    On page 101 of 131 dated September 13th, 2007, it's the

17 fifth from the bottom of that page.  It states:  "Approve for

18 foreclosure."  And two lines above that it says, "Foreclosure

19 referral review completed and management approved."  And then

20 two lines above that shows "Referred to foreclosure attorney."

21           THE COURT:  What's the date of that?  I'm sorry.

22           THE WITNESS:  I apologize.  September 13th, 2007.

23 Q.    And what does it mean for -- let me step back.  The notes

24 that are in the servicing notes, are those -- is that GMAC

25 Mortgage that was referring the loan to foreclosure?

RESIDENTIAL CAPITAL, LLC, et al.                    114

1   A.   Based on the "Trans Username" that's in the far right-hand

2   column, it shows that it was made -- whenever an individual's

3   name is listed there, that would have been someone at GMAC or

4   someone who has access to Fiserv. So I would assume it was

5   someone at GMAC who made that note.

6   Q.   And what does it mean when GMAC refers a loan to

7   foreclosure?

8   A.   It means that the loan has -- the time on the breach

9   letter has passed, and now they're pursuing foreclosure action.

10   And it would have been sent on to the foreclosure attorney or

11   trustee, whoever was handling the foreclosure process for the

12   servicer.

13   Q.   So because Mr. Moss's loan was in California, and --

14   sorry.  So in this instance, you're saying that on September

15   13th, 2007, GMAC Mortgage was referring the foreclosure to ETS

16   in this instance?

17   A.   Yes, it would.  ETS is who handled the foreclosure in this

18   case.

19   Q.   Are there any circumstances that you're aware of where ETS

20   would be the one to initiate the foreclosure by referring it?

21   A.   No.  I believe ETS would have been informed of the

22   foreclosure process needing to take place by the servicer, but

23   in my experience foreclosure doesn't begin, and that process

24   doesn't start until the servicer or GMAC has notified them that

25   the loan has hit that delinquency stage, and it's time to

1   pursue foreclosure proceedings.

2   Q.    So I'd like to turn your attention to Exhibit BT-N.

3   A.    Okay.

4   Q.    Do you recognize this document?

5   A.    Yes.

6   Q.    What is this document?

7   A.    A notice of default.

8   Q.    I'm sorry.  I can't remember if this was one that Mr. Moss

9   introduced earlier, but --

10          MR. MOSS:  It is.

11          MS. ARETT:  It is?  Okay.

12          THE COURT:  You want to offer it, BT-N?

13          MS. ARETT:  Yeah.  I'll offer BT-N into evidence.

14          THE COURT:  All right.  It's already in evidence.

15   It'll come on record in evidence again.

16      (Notice of default was hereby received into evidence as

17   Borrower Trust Exhibit BT-N, as of this date.)

18          MS. ARETT:  Okay.

19          THE COURT:  Go ahead.

20   Q.    And Ms. Lathrop, what's the date on this document?

21   A.    The second paragraph on the document states September

22   17th, 2007.

23   Q.    Did Mr. Moss make up the payment that was due on August

24   1st, 2007 -- or sorry, on September 1st, 2007?

25   A.    Sorry, one second.

RESIDENTIAL CAPITAL, LLC, et al.                    116

1  Q.    Let me rephrase.  Did Mr. Moss timely make the payment

2  that was due on September 1st, 2007?

3  A.    I don't show any payments received in the month of

4  September 2007.  That's on page 5 of the servicing notes.

5            THE COURT:  Turn to the second page of BT-N.

6            THE WITNESS:  BT-N?  Yes, sir.

7            THE COURT:  This is a document prepared by ETS; is

8  that right?

9            THE WITNESS:  Based on the signature line it looks

10  like ETS prepared the document.

11            THE COURT:  And I'm looking on that second page, the

12  paragraph "Notice is hereby given that Executive Trustee

13  Services is either the original trustee, the duly appointed

14  substituted trustee, or acting as agent for the trustee and

15  beneficiary under a deed of trust dated 6/22/2005."  Won't read

16  any further.  Do you know where ETS obtained that information

17  that's included in that paragraph?

18            THE WITNESS:  I personally don't know where they would

19  have pulled it, just because I wouldn't have had experience

20  filling out these documents.  But if I'm recalling correctly, I

21  think the mortgage note originated on June 22, 2005.  So they

22  may be referring to the origination of the loan with that date.

23            THE COURT:  Do you know who held the note as of

24  September 17th, 2007?

25            THE WITNESS:  I don't know offhand, no, sir.

RESIDENTIAL CAPITAL, LLC, et al.                    117

1        THE COURT:  Do you know who the beneficiary under the

2   deed of trust was as of November -- excuse me, September 17th,

3   2007?

4        THE WITNESS:  Not offhand, sir, no.

5        THE COURT:  Can you find out in the records?

6        THE WITNESS:  I can see if it's -- I'd have to look at

7   just the assignments.  That wouldn't be in the payment history.

8   The only assignment that I show near that date is Exhibit F,

9   sir, which shows Option One going to CGA Mortgage, Incorporated

10  (ph.), but I don't see anything beyond that that would give me

11  information.

12       THE COURT:  All right.

13       THE WITNESS:  Unless I'm missing something.  Give me

14  one more second.  I'll see what else I have here.

15       THE COURT:  Well, in this Exhibit F, BT-F is the

16  document that --

17       THE WITNESS:  Yeah.

18       THE COURT:  -- the type dates have been crossed out,

19  and a handwritten date written in.

20       THE WITNESS:  Yes, sir.

21       THE COURT:  Although I think you showed me earlier in

22  the servicing notes that an entry for this corporate assigned

23  and deed of trust in the servicing notes -- I think was either

24  May 7th or May 8th, 2008.

25       THE WITNESS:  Yes, sir.

1          THE COURT:  Could you find where that is again?

2          THE WITNESS:  The document --

3          THE COURT:  Find where --

4          THE WITNESS:  -- in the service --

5          THE COURT:  -- in the servicing notes that appears.

6          THE WITNESS:  It was on page 76 of the servicing

7     notes, in the middle of the page.

8          THE COURT:  And what does it show?

9          THE WITNESS:  It states to Erma from Mir Smoot -- GMAC

10    to Irma Erickson at Exec.  "I have the Option One assignment

11    and it's going out tonight to your attention with the FedEx

12    tracking number."

13         THE COURT:  And the date of that entry?

14         THE WITNESS:  Is May 8th, 2008, sir.

15         MR. MOSS:  I'm sorry.  What was that date?

16         THE WITNESS:  May 8th, 2008.

17         THE COURT:  Go ahead, Ms. Arett.

18    BY MS. ARETT:

19    Q.   So did Mr. Moss make payments -- we're at September, so

20    October 1st, 2007?

21    A.   Sorry.  Let me get the month of October 2007.  I show no

22    payments were received in October of 2007.

23    Q.   Did Mr. Moss make the payment due on November 1st, 2007?

24    A.   Page 5 of the servicing notes doesn't show that being

25    received either.

RESIDENTIAL CAPITAL, LLC, et al.                    119

1   Q.   Did Mr. Moss make a payment due on December 1st, 2007?

2   A.   No.   There's no payment received in the month of December

3   2007 either.

4   Q.   Did Mr. Moss make a payment due on January 1st, 2008?

5   A.   No.

6   Q.   Did Mr. Moss make the payment due on February 1st, 2008.

7   A.   No.

8   Q.   Did Mr. Moss make the payment due on March 1st, 2008?

9   A.   No.   I don't show payment received.

10  Q.   Did Mr. Moss make the payment due on April 1st, 2008?

11  A.   No.   I don't show funds coming in.

12  Q.   Did Mr. Moss make the payment due on May 1st, 2008?

13  A.   No.

14  Q.   Did Mr. Moss make the payment due on June 1st, 2008?

15  A.   I don't show payment received on that date, but I do show

16  money coming in that month.

17  Q.   Did Mr. Moss contact GMAC Mortgage regarding this

18  delinquency?

19  A.   Give me one more moment to look at the history.   On page

20  74 of the servicing notes, dated June 11th, 2008, there is

21  documents of a phone-call conversation.

22  Q.   What was discussed during that conversation?

23  A.   It looks like two different people spoke with Mr. Moss or

24  the borrower.   The first one is closer to the middle of the

25  page and starts with "TTB1," which would have stood for talked

RESIDENTIAL CAPITAL, LLC, et al.                    120

1    to B1, "verified information.  Called to seek possible mod.

2    Advised will have 25- to 30,000 ready to FedEx today."  And

3    they transferred the file -- it says the city rep, which would

4    have been someone who handled mortgage loan type or loss

5    mitigation.

6         The next conversation is right above that with Alfred

7    Hudspeth (ph.) I believe is how you might pronounce that.  And

8    I don't know for sure what the HTO (ph.) stands for.  I assume

9    it's referring to the borrower.  It says, "Said has 25,000 to

10   pay on loan.  Reason for default, RFD.  Stated he is self-

11   employed, a lawyer, and July 2007, August 2007, and September

12   2007 he was sick and has not been paid for services.  Told him

13   must pay at least half of delinquency to be considered for

14   payment plan."

15        And then it looks like on page 73 this continues, and if

16   we go -- trying to see where the next note starts, I'm sorry --

17   to the middle of the page dated June 11th, 2008 in quotations:

18   "Trial modification justification".  It appears to spell out a

19   loan modification trial plan that was approved for the account.

20   Q.   What were the terms of that plan?

21   A.   Right under the UPB number, it breaks down what the trial

22   plan was.  It says, "Mortgage proposes a six-month trial

23   modification consisting of a down payment of 50,000 and a

24   monthly contribution of $6,740.78 followed by an assessment of

25   the financials to determine if a permanent modification or

1   alternative solution would be required."   The very top line of

2   June 11th, 2008 notes is where it resumes.

3         "I have advised the terms, due date, payment options, and

4   consequences" of the plan -- "if the plan fails."  And then

5   there's additional notes regarding the reason the account fell

6   behind.

7   Q.    I'd like to turn your attention then to Exhibit BT-O.  Do

8   you recognize this document?

9   A.    It's a foreclosure repay agreement.

10  Q.    Have you seen it before today?

11  A.    Yes.

12  Q.    Does this document seem to be in line with the terms that

13  you just described that were laid out in the servicing notes?

14  A.    Give me a second just to compare the information.  The

15  date would have been directly after the phone call took place,

16  and the down payment listed in point 5 of the letter is for the

17  50,000 that was discussed.  So it appears to be in line with

18  what was discussed on that call.

19  Q.    And was this document --

20         THE COURT:  Was this ever countersigned by Mr. Moss?

21         THE WITNESS:  I don't -- I don't know if I have a copy

22  of that to show a signature of that.  Doesn't look like this

23  copy is signed.

24  Q.    So did the servicing not show that Mr. Moss ever returned

25  an executed copy?

RESIDENTIAL CAPITAL, LLC, et al.                    122

1   A.   On page 70 of 131 in the servicing notes, dated July 11th,

2   2008, there's a "Loss Mit" (ph.) transaction type note for

3   received executed documents.  It doesn't say it was that

4   document, but it looks like that was the only one pending that

5   had been sent.

6   Q.   And so turning back to Exhibit BT-O, was this document

7   maintained in GMAC Mortgage's system of record?

8   A.   Yes.

9   Q.   And what system would it have been maintained in?

10  A.   This copy would have been in Xnet.

11  Q.   And is there any record of GMAC Mortgage sending this

12  agreement to Mr. Moss?

13  A.   Give me one second.  On page 72 of the servicing notes in

14  the middle of the page, dated June 13th, 2008, there's an OL

15  transaction type that shows foreclosure repayment agreement.

16  And right below that, it shows "online repayment schedule,"

17  which would have been the repayment agreement being sent.

18       MS. ARETT:  Your Honor, I'd like to move for Exhibit

19  BT-O into evidence.

20       THE COURT:  Exhibit BT-O is in evidence.

21    (Foreclosure repayment agreement for Mr. Moss was hereby

22  received into evidence as Borrower Trust Exhibit BT-O, as of

23  this date.)

24  Q.   Did Mr. Moss make the down payment required under this

25  agreement?

RESIDENTIAL CAPITAL, LLC, et al.                    123

1   A.    On page 5 of the servicing notes at the top of the page,

2   on June 13th, 2008, it shows 50,000 dollars coming in.

3   Q.    And after that payment, when would the next monthly

4   payment have been due?

5   A.    Sorry, we don't have the schedule, so I have to go through

6   the servicing notes for that date.  On page 68 of 131 in the

7   servicing notes, dated July 14th, 2008, it's like six lines

8   from the bottom of the page.  It shows "Promise broken 7/14/08,

9   promise date 7/12/08."  I assume that that would have been the

10  date as the first payment, according to the repay agreement was

11  due on June 12th, '08 on that schedule that was sent out in

12  Exhibit O.

13  Q.    Did Mr. Moss make that payment?

14  A.    I don't -- on page 4 of the servicing notes, I don't show

15  a payment received in the month of July.

16  Q.    Did GMAC Mortgage attempt to contact Mr. Loan -- or Mr.

17  Loan -- Mr. Moss.  Excuse me.  Did GMAC Mortgage attempt to

18  contact Mr. Moss after that payment was missed?

19  A.    One moment.  On page 68 of the servicing notes, bottom

20  third of the page, there's a note on July 16th, 2008 that

21  states:  "Repay plan late.  Phoned."  But there's no

22  conversation that -- that they contact -- they actually got

23  ahold of Mr. Moss.

24  Q.    And when would the next monthly payment have been due?

25  A.    I assume it would have bene August, but we don't have that

RESIDENTIAL CAPITAL, LLC, et al.                    124

1   plan.

2   Q.    Did Mr. Moss make a payment in August of 2008?

3   A.    There's nothing that's posted in the payment history on

4   page 4 of the servicing notes.

5   Q.    Is there anything in the servicing notes that would

6   indicate that Mr. Moss attempted to make a payment?

7   A.    On page 68 of the servicing notes, dated August 21st,

8   2008 -- it's in the top third of the page, maybe seven or eight

9   down.  It states:  "Personal check received, number 1294, for

10  $6,000.  Please advise."

11  Q.    And did GMAC Mortgage cash that check or apply it to his

12  account?

13  A.    The note directly above that dated August 25th, 2008

14  states:  "Please return 6,000 as repayment plan amount is

15  $6,740.78."   So if we go up to the note near the top of the

16  page on August 27th, 2008, it shows "Returning personal check

17  1294 in amount of 6,000.  Not enough to reinstate."

18  Q.    So between that August 2008 check that was returned and

19  May 7th of 2009, did Mr. Moss make any other payments on the

20  loan?

21  A.    And what's the final date?

22  Q.    May 7th, 2009.

23  A.    I don't show anything received on page 4 of the payment

24  history.

25  Q.    Do GMAC Mortgage's servicing notes reflect that it took

RESIDENTIAL CAPITAL, LLC, et al.                        125

1   any action once Mr. Moss did not make the payments under the

2   foreclosure repayment agreement?

3   A.    Notes on page 40 of 131, dated May 7th, 2009.  It's near

4   the middle of that page.  It states:  "Foreclosure sale

5   completed."

6   Q.    Are there any notes that indicate that GMAC Mortgage

7   restarted the foreclosure sale after the payments were not

8   received under the repayment plan?

9   A.    I can go back.  On page 67 of 131, near the bottom of the

10  page, dated September 12th, 2008 it shows the loss mitigation

11  work being closed out, and it states, "Reject by borrower.

12  Reject other.  No workout in progress," which would have closed

13  out all of the loss mitigation work.

14       And then the next notes regarding foreclosure are on page

15  66, dated November 11th, 2008, referring to the foreclosure

16  sale being postponed.

17  Q.    So after the -- when was the date that the loan

18  modification process closed out that you just mentioned?

19  A.    The loss mitigation review closed out on page 67, dated

20  September 12th, 2008.

21  Q.    And did GMAC Mortgage attempt to contact Mr. Moss after

22  that date?

23  A.    It looks like there was an attempt at phone calls.  If you

24  look at October 1st, 2008 on page 67, you see a date with a

25  time and the word "no answer".  That would have been through

RESIDENTIAL CAPITAL, LLC, et al.                    126

1  GMAC's automated system attempting to go through and dial the
2  phone numbers that were on file.
3       It looks like that occurs on October 1st, 2008, as well as
4  on October 10th, 2008 on that page.  There's also a note on
5  page 59 dated February 2nd, 2009, with the same note, showing a
6  phone call was attempted with no answer.
7       On page 58, there was an attempt on -- at the bottom of
8  the page, it shows February 3rd, 2009; February 4th, 2009;
9  February 5th, 2009; February 9th, 2009 it shows busy.
10      On page 57, there's a note on February 11th, 2009 showing
11 no answer as well as on February 10th, 2009, and at the top of
12 that page, on February 13th, 2009.  Do you want me to keep
13 going through all of this?
14 Q.   I'm must wondering if we can identify the latest time that
15 GMAC Mortgage attempted to contact Mr. Moss prior to the
16 foreclosure.
17 A.   You want me to get closer to May or --
18 Q.   If that's in there.
19 A.   Okay.  On page 41 I show a note on May 5th, 2009 of no
20 answer.  And looks like the time was 1932:36 seconds.  It's in
21 the middle of that page.
22 Q.   And once the decision to recommence -- restart foreclosure
23 after the loan -- the repayment agreement ended, who would
24 have -- what entity would have made that decision?  I'm sorry.
25 Let me rephrase.  Would GMAC Mortgage have made the decision to

1  restart foreclosure, or would it have been ETS?

2  A.   It would have been GMAC Mortgage.  That was dictated by

3  the servicer.

4  Q.   All right, so let's turn now to the foreclosure that was

5  conducted.  Just for the record, was a foreclosure sale

6  conducted on Mr. Moss's property?

7  A.   Yes.  On page 41 and 40 of the servicing notes it shows

8  the foreclosure sale completed on May 7th, 2009.

9  Q.   I'd like to turn your attention to Exhibit BT-P.

10 A.   Okay.

11 Q.   Do you recognize this document?

12 A.   It's the trustee deed upon sale.

13 Q.   Have you seen it before today?

14 A.   Yes.

15 Q.   Was this document maintained in GMAC Mortgage's system of

16 record?

17 A.   Yes.

18 Q.   What system would it have been maintained in?

19 A.   I believe it was in our FileNet system.

20 Q.   Is this a business record that is maintained in the

21 ordinary course?

22 A.   Yes.

23      MS. ARETT:  I think -- this actually I think is one

24 that has already been admitted perhaps by Mr. Moss, but either

25 way, I'd like to move to admit.

1          THE COURT:  All right.  BT-P is in evidence.

2      (Trustee deed upon sale was hereby received into evidence

3  as Borrower Trust Exhibit BT-P, as of this date.)

4  Q.   After a foreclosure sale, would ETS typically continue to

5  be involved with a property or any action related to a

6  property?

7  A.   The only action I'm aware of that a foreclosure trustee or

8  attorney would ever be involved is if there was ever a

9  rescission that took place.

10          THE COURT:  In there's what?  I'm sorry.

11          THE WITNESS:  A rescission.

12  Q.   So would ETS be involved in any eviction action that would

13  have been?

14  A.   I don't believe they would have, no.

15          MS. ARETT:  And turning to Exhibit BT-Q, I think this

16  is also one that has been put into evidence by Mr. Moss.  I

17  guess I move for that one to be admitted as well.

18          THE COURT:  All right.  Exhibit BT-Q is in evidence.

19      (Document was hereby received into evidence as Borrower

20  Trust Exhibit BT-Q, as of this date.)

21          MS. ARETT:  And the same with Exhibit BT-R.

22          THE COURT:  All right.  Exhibit BT-R is in evidence as

23  well.

24      (Document was hereby received into evidence as Borrower

25  Trust Exhibit BT-R, as of this date.)

1    Q.   All right, Ms. Lathrop, I'd like to turn your attention to

2    the settlement agreement between Mr. Moss and Bank of New York,

3    which is our Exhibit BT-S.

4    A.   Okay.

5         MS. ARETT:  This is one that I believe Mr. Moss

6    stipulated to, so I'd ask that that be admitted into evidence

7    as well.

8         THE COURT:  All right.  Exhibit BT-S is admitted into

9    evidence.

10        (Settlement agreement between Mr. Moss and Bank of New

11   York was hereby received into evidence as Borrower Trust

12   Exhibit BT-S, as of this date.)

13   Q.   Ms. Lathrop, looking at this settlement agreement, can you

14   just kind briefly describe the terms as you see them?

15   A.   Of the agreement?  It looks like on page 2 of the

16   settlement it outlines a loan modification agreement with a new

17   principal balance of 725,000 dollars, an interest rate of 2

18   percent for the first five years, and then it would increase to

19   4.35 percent for the remaining term of the loan, with the

20   maturity rate of June 1st, 2035, with a down payment of

21   $4,033.50 due on December 31st, 2013.

22   Q.   In looking at this -- the terms of this loan modification,

23   is this different from the -- let's start with the interest

24   rate.  Is the interest rate different from the interest rate of

25   Mr. Moss's original loan?

RESIDENTIAL CAPITAL, LLC, et al.                    130

1    A.    Let me look at that loan, please.  Sorry. I went by it.

2    Exhibit C, the adjustable-rate note lists the interest rate

3    under point number 2 at 10.25 percent.

4    Q.    And looking at the settlement agreement, what is the

5    monthly payment as indicated on the -- under the loan

6    modification terms?

7    A.    The first five years at 2 percent lists the principal and

8    interest portion as $3,470.49, and once it increased to 4.35

9    percent, it lists the principal and interest as $4,141.50.

10   Q.    And I think we discussed this at the beginning, but just

11   to jog everyone's memory; is this monthly payment amount

12   different from Mr. Moss's original monthly payment amount?

13   A.    Yes.  In the adjustable-rate note, under section 3

14   payments, it lists the monthly principal and interest under the

15   subset (b) of $5,488.62.

16   Q.    And is the principal amount under the settlement agreement

17   different from Mr. Moss's original principal amount?

18   A.    Yes.  The original principal balance based on the mortgage

19   note is listed at 612,500, and the amount listed on page 2 of

20   the settlement agreement lists the new principal as 725,000.

21   Q.    And do you have experience with other loan-modification

22   agreements?

23   A.    Yes.

24   Q.    What would cause or is there a reason that the principal

25   balance would be higher under a loan modification agreement

1    than an original loan?

2    A.    Yes.  There are.

3    Q.    What are those reasons?

4              THE COURT:  Mr. Moss hasn't objected, but this is not

5    even -- this is not an agreement between any of the debtors and

6    Mr. Moss.  I'm not going to permit her to testify about it.  I

7    didn't hear an objection but I'm going to sustain my own

8    objection to this testimony.  Unless you think that this

9    witness is competent to testify about the negotiations between

10   Mr. Moss and Bank of New York Mellon.

11             MS. ARETT:  We were -- that is not the purpose of

12   this.  It was more to go through the difference between them --

13             THE COURT:  I can read the document and what it says.

14             MS. ARETT:  Fair enough, Your Honor.

15             THE COURT:  And I can see what the difference in the

16   payment was, but I'm not going to permit her to testify

17   generally about why a loan modification may or may not be

18   granted, and whether interest rates are or may be lowered.

19             MS. ARETT:  Understood.  Then that I think -- if we

20   will not be pursuing with that, then that's the end of our

21   testimony.

22             THE COURT:  Okay.  Cross-examination.

23   CROSS-EXAMINATION

24   BY MR. MOSS:

25   Q.    Ms. Lathrop, you are relying --

RESIDENTIAL CAPITAL, LLC, et al.                    132

1          THE COURT:  Could you do it from the podium?

2          MR. MOSS:  Oh.  Sure.

3    Q.    In your testimony from the loan-servicing notes, which is

4    Exhibit A --

5    A.    Yes.

6    Q.    -- you don't have any personal knowledge of any entry in

7    there, do you?  You were relying on what the entry actually

8    says, correct?

9    A.    Yes.  I'm interpreting what's there.

10   Q.    Well, you're reading what's there.

11   A.    Yes.

12   Q.    Okay, and do you know any of the people that put in these

13   various items on these pages?

14   A.    I don't know.  I didn't go through all of them.

15   Q.    Well, so far, you've been testifying for a couple of

16   hours.  Do you know any of them that you've seen?

17   A.    No, sir.

18   Q.    And so you are relying on the accuracy of whatever is

19   inputted into Exhibit A for the accuracy of your testimony.

20   Would that be a fair statement?

21   A.    Yes, sir.

22   Q.    Now, some time ago, do you remember preparing the

23   declaration for this Court?

24   A.    Yes, sir.

25   Q.    And do you remember saying that I was -- that there were

RESIDENTIAL CAPITAL, LLC, et al.                    133

1  no eviction proceedings?

2  A.    I believe we initially said that.

3  Q.    Well, do you believe writing that?

4  A.    Yes.  Initially, I believe that's what I input.

5  Q.    And you wrote that after reviewing Exhibit A, correct?

6  A.    Yes, the first time.

7  Q.    And you were mistaken, correct?

8  A.    Yes, sir.  I went back through.

9  Q.    And do you have any explanation of how you could miss

10  those two entries?

11  A.    When I was going through, I missed the notes.  I -- I

12  apologized for that, and I believe that was corrected.

13  Q.    The fact is, is that you did make a mistake, correct?

14  A.    Yes.  I did.

15  Q.    All right, so as to the exhibit book in front of you

16  prepared by the Trust, Exhibit I, J, K, and L, are those

17  letters denoted on Exhibit A?

18  A.    There are notes of a breach letter being sent out on or a

19  day after those -- the dates.  I believe we confirmed that.  I

20  can confirm it again if you'd like.

21  Q.    Well, let's go to Exhibit I.

22  A.    Okay.

23  Q.    Is there a note in Exhibit A about that letter going out?

24  A.    Yeah.

25  Q.    April 12th, 2006?

RESIDENTIAL CAPITAL, LLC, et al.                    134

1    A.    That was on page 130 of 131 of Exhibit A, dated April

2    14th, 2006.  It states breach, and the D19 stands for a letter

3    being generated and the transaction type.

4    Q.    I'm sorry.  On what page was that, 130?

5    A.    Yes, 130.

6                THE COURT:  I'm sorry.  What is the transaction type

7    again?

8                THE WITNESS:  D19.

9    Q.    I'm sorry.  You were referring to an entry on 4/13?

10   A.    On 4/14/2006, it's the third one from the top of the page

11   on 130, with a trans type D19 in the third column.

12   Q.    And your testimony is that that says, "Breach Alan Irving

13   Moss".  It doesn't say anything about a letter going out,

14   correct?  So you are -- is that correct?

15   A.    Yes.  The word letter is not entered in the description

16   message or transcription message.

17   Q.    So other than your testimony, there's no way for us to

18   know that that was -- actually denotes a letter going out,

19   correct?

20   A.    Correct.

21   Q.    Okay.

22                THE COURT:  What's D19, the --

23                THE WITNESS:  The trans --

24                THE COURT:  -- transaction type?

25                THE WITNESS:  The transaction type D19 would have

1    stood for a default letter being issued and sent in practice,

2    just like -- I'm sorry.  I don't --

3              THE COURT:  No, that's okay.

4              THE WITNESS:  -- according to D28 right above that --

5              THE COURT:  Yes.

6              THE WITNESS:  -- that's for a billing statement going

7    out.

8    Q.    So if we look at Exhibit J, the entry into Exhibit A would

9    not have the word letter on it.  It would just say breach?

10   A.    I believe so, but I'll confirm the note.  That one's on

11   page 127, at the bottom of the page, dated May 19th, 2006 with

12   the D19 transaction type.

13   Q.    You said on page 126?

14   A.    127.

15   Q.    127.

16   A.    Dated May 6th --

17             THE COURT:  That's what from the bottom?

18             THE WITNESS:  Third -- third from the bottom.

19   Q.    Oh, okay.

20   A.    Dated May 16th.

21   Q.    And does Exhibit A tell you who generated that, what

22   individual generated that?

23   A.    No.  That wouldn't have been created by an individual.

24   Q.    Wouldn't have been?

25   A.    No, sir.  Breach letters were generated once an account

RESIDENTIAL CAPITAL, LLC, et al.                    136

1    hit a certain stage of delinquency, per the investor guideline.

2    They would have been automatically generated by the system,

3    input with the account information and then sent out, which is

4    why we see the D19 transaction type.

5        (Pause)

6    Q.    And I believe you testified that Exhibit A contains not

7    only letters that GMAC sent out, but also letters received?

8    A.    Yes.  It should.

9    Q.    Okay.  Can you look to see of it denotes that a letter was

10   received from me on July 23rd, 2008?

11   A.    2008?

12   Q.    Um-hum.

13   A.    Give me one second.  No, sir, I show no letter on or

14   around that date.

15   Q.    So can you explain that if I have proof in my hand to show

16   you that I faxed a letter to GMAC and that it was received, why

17   it would not appear on this page?

18   A.    No, sir.  I can't.

19   Q.    So would you say that this system that you've described to

20   us as being so dependable is, in fact, not -- is, in fact,

21   fallible?

22   A.    I can't answer for that, sir.  I know that there is human

23   error that could definitely take place.

24   Q.    Have you ever experienced a situation where there was

25   human error when you were reviewing documents like this letter

1   that's been entered into evidence?

2           THE COURT:  Which exhibit number is that?

3           MR. MOSS:  That is Exhibit 14.

4           THE COURT:  All right.

5   A.   I'm sure it's happened.  I can't recall off the top of my

6   head a specific loan or proof of claim.

7   Q.   Can you look on Exhibit A for the date of August 7th,

8   2008, and tell me if there's denoted that you received a letter

9   from me via fax?

10  A.   August 7th?

11  Q.   August 7th.

12  A.   Okay.

13  Q.   2008.

14  A.   No, sir.  I don't show anything on that date either.

15  Q.   So once again, here's proof that it was sent by fax and

16  received, and it's not on Exhibit A.  So once again, for some

17  reason, the system did not work, correct?

18  A.   I -- I don't see the letter, sir, so --

19  Q.   Let me show you Exhibit 15.

20          THE COURT:  Mr. Moss, may I ask you -- I'm looking at

21  your letters.  I don't see anything on the face of the letter

22  indicating whether you've faxed it or mailed it.

23          MR. MOSS:  On Exhibit 15 it says at the top addressed

24  to Al Hudspeth, via telefax 826 --

25          THE COURT:  Okay.

1          MR. MOSS:  -- 0596.

2          THE COURT:  Go ahead.

3          MR. MOSS:  And also, it's on page 3 of that exhibit.

4    There was a machine-generated transmission report that says

5    that it was received at that number.

6    Q.   You want to read that letter, please, Exhibit 15?

7    A.   "Dear Mr. Hudspeth, I faxed you a letter on July 23rd,

8    2008 because I haven't received any instructions for follow-up

9    payments regarding the above to date.  I have not had a

10   response in a letter or otherwise from you or anyone else at

11   GMAC.  Could you please fax or call to inform me as to what I

12   would have to do to complete this matter?  I'm relying on you

13   to get me this information and keep current.  Can you please

14   advise?  Thank you very much.  Very yours truly, Alan Moss."

15   Q.   Thank you.  Can you check Exhibit A and tell me if there's

16   an entry that responds to this part --

17   A.   What was the date on that one, sir?  I'm sorry.

18   Q.   August 7th, 2008.

19   A.   No, sir.  I do show a phone call on August 12th, 2008, but

20   there's very little information as to what was discussed.  It

21   just says, "Talked to B1.  Transferred to extension 3283."  And

22   that's on page 68 of 131 of the servicing notes, but there's no

23   details or follow-up update regarding what was discussed on

24   that.

25   Q.   Can you tell from this entry that you just noted whether

RESIDENTIAL CAPITAL, LLC, et al.                    139

1   it was a call from GMAC or to GMAC?

2   A.   No, sir.

3   Q.   Let me show you exhibit 16 that has been entered, dated

4   August 19th, 2008.  Can you tell me if you show on Exhibit A

5   that letter?

6          UNIDENTIFIED SPEAKER:   So Your Honor, we can't hear

7   the question.

8          THE COURT:  Just speak a little louder.

9          MR. MOSS:  Oh.  Exhibit A --

10          THE COURT:  You have to go back -- go back to the

11   microphone.  I just want to make sure we're getting a clear --

12          MR. MOSS:  Sure.

13   Q.   Exhibit 15, which I have handed you, do you see that

14   letter entered into your system at all on Exhibit A?

15   A.   No.  I don't see that -- anything dated August 19th or

16   around that date, 2008.

17   Q.   And can you explain why that isn't notated in your system?

18   A.   No.  I can't.

19   Q.   And can you read into the record the first two paragraphs

20   of that letter, please?

21   A.   "I have attempted on multiple occasions to follow up on

22   this matter.  I have attempted to call the individual I have

23   dealt with to no avail.  I have faxed you several letters of

24   which I have proof that you received them, asking for

25   direction.

RESIDENTIAL CAPITAL, LLC, et al.                    140

1          "To date, I have received no communication from you.

2    Since I am alarmed by lack of information as to what to do

3    next, I am enclosing a payment to be applied to my account."

4          THE COURT:  Do the servicing notes reflect receipt of

5    a payment from Mr. Moss after he sent the August 19th --

6          THE WITNESS:  Yes.

7          THE COURT:  -- 2008 letter?

8          THE WITNESS:  Yes.  On page 68, it shows on -- let me

9    give you this exact date.  On August 21, 2008, it shows

10   received personal check number 1294 for 6,000.  It is -- I

11   don't know -- maybe eight lines from the top of the page.

12         THE COURT:  Is the received amount --

13         THE WITNESS:  The new CIT 827, received personal check

14   from Israel Mada (ph.), is the one who makes the note in the

15   notes, dated -- it's the Cash 10 is your area ID you're looking

16   at for August 21st.

17         THE COURT:  Okay.  This payment that was returned.

18         THE WITNESS:  Yes.

19         THE COURT:  For insufficient funds?  Insufficient

20   payment?

21         THE WITNESS:  For not enough to reinstate, yes.

22   Q.   And the prior letters that I've showed you just now said

23   that I didn't know what amount to pay.  Correct?

24   A.   Yeah.  I believe I read that off your letters.

25   Q.   All right.  Turning to Exhibit B, can you tell me what

1    that is?

2              MS. ARETT:  Objection.    Exhibit -- did you say

3    Exhibit B?

4              THE COURT:  What's what --

5              MS. ARETT:  Exhibit B is not in --

6              MR. MOSS:  Your Exhibit B.

7              MS. ARETT:  Exhibit B is not in evidence.

8              THE COURT:  He's entitled to ask about it.

9              MS. ARETT:  Okay.  It's not in evidence.

10             MR. MOSS:  I mean, it's in your exhibit book.  I

11   thought your --

12             THE COURT:  No, that doesn't put it in evidence.

13             THE WITNESS:  Yeah.

14             THE COURT:  But go ahead and ask the question.

15   A.   I believe this is LPS notes.

16   Q.   What does LPS stand for?

17   A.   I don't know what the acronym itself stands for, but it

18   would have been the communication system used between the

19   trustee and GMAC Mortgage.

20   Q.   Between the trustee, who was?

21   A.   ETS.

22   Q.   And GMAC Mortgage?

23   A.   Yeah.

24   Q.   So you --

25   A.   In this case.

RESIDENTIAL CAPITAL, LLC, et al.                    142

1    Q.    -- wouldn't expect to see on that exhibit any entries by,

2    say, Ocwen.

3    A.    Well, Ocwen took over GMAC, so depending on when this was

4    pulled, it may list Ocwen.

5    Q.    Okay.  And so you would not expect, from reviewing the

6    Trust's Exhibit B, that there would be any entry on Exhibit 2

7    from Ocwen --

8              THE COURT:  I'm sorry.  Exhibit 2?

9              MR. MOSS:  Exhibit B.  I apologize.

10             THE COURT:  Okay.

11   Q.    -- from Ocwen prior to them assuming loan-servicing.

12   Correct?

13   A.    No.  They had not taken over the loan --

14   Q.    And if they hadn't --

15   A.    -- or the --

16   Q.    If they hadn't --

17   A.    -- company.

18   Q.    -- taken over servicing of the loan, you wouldn't expect

19   any entries from Ocwen.  Correct?

20   A.    No, but this was a system generated course of history that

21   was pulled.

22   Q.    I'm sorry.  I don't understand.  Could you explain

23   further?

24   A.    Sure.  This would have been pulled as a copy from LPS, and

25   then whatever the title was at that point, that's who it's

RESIDENTIAL CAPITAL, LLC, et al.                    143

1  going to automatically update to for LPS systems.  That's my

2  understanding, anyway.  I didn't work personally within LPS.

3          THE COURT:  Are there specific entries you want to

4  focus on, Mr. Moss?

5          MR. MOSS:  In one -- I just want to ask one

6  preliminary --

7          THE COURT:  Sure.

8          MR. MOSS:  -- foundational question.

9          MS. ARETT:  Yes.  Objection, Your Honor.  This is

10  beyond the scope.

11          THE COURT:  Overruled.

12          MS. ARETT:  Okay.

13  Q.   Do you know what date GMAC stopped servicing and Ocwen

14  began servicing?

15  A.   I believe it was February 15, 2013.

16  Q.   And so, if I understand your testimony, you wouldn't

17  expect any entries by Ocwen on Exhibit B prior to that date.

18  Correct?

19  A.   Correct.

20  Q.   Okay.  So if you looked at, let's say, BCT 108, let's say,

21  as an example.

22  A.   108.

23  Q.   And they're numbered in the system, so let's say number

24  325.  And can you tell us who wrote that note, number 325?

25  A.   325?  Deanne Diaz (ph.).

1   Q.    Who belongs to?

2   A.    It says Ocwen Loan Servicing.

3   Q.    And the date of that is?

4   A.    April 4, 2007.

5   Q.    And that's prior, by several years, from Ocwen taking over

6   servicing --

7   A.    Yes.

8   Q.    -- on this note?  Can you explain why Ocwen is providing

9   servicing notes on this?

10          THE COURT:  These are not servicing notes.  Go ahead.

11  We'll explain why.

12  A.    I will say I don't understand LPS's system, but I can tell

13  you that in 2007 Deanne Diaz was employed by GMAC Mortgage,

14  because I knew her, so -- but she did transition to Ocwen

15  Servicing when Ocwen took over, which would have changed how

16  her name appeared in the system, but that is literally just --

17  Q.    Is this speculation on your part?

18  A.    I'm sorry.  What?

19  Q.    Is this speculation on your part as to why it appears this

20  way?

21  A.    Yup.  That's -- and that's what I was about to say, sir,

22  is that that's all I have for an explanation.

23          THE COURT:  Mr. Moss, read this document.  Exhibit B

24  was generated on September 5, 2014, after Ocwen had taken over

25  the servicing operations from GMAC.

1          Is there a specific entry in here you want?

2          MR. MOSS:  No.  I wanted to generate --

3          THE COURT:  Is there a specific entry you wish to

4   cross-examine this witness about?

5          MR. MOSS:  No.  I wish to cross-examine her about

6   Ocwen writing notes here if that's, in fact, what happened.

7          THE COURT:  You haven't established that Ocwen wrote

8   any notes in here.  Is there a specific entry you wish to

9   cross-examine this witness about?  Yes or no?

10          MR. MOSS:  There is not a specific --

11          THE COURT:  Then move on.  This document is not in

12   evidence.  I would permit you to cross-examine about entries,

13   if you wish.  You haven't established that Ocwen created or put

14   the entries in.

15          The document was generated after Ocwen took over the

16   system.  It's not in evidence.  Ask your next question.

17   Q.   So my next and last question about this is do you have

18   personal knowledge that Ocwen appears here in place of GMAC?

19          THE COURT:  Mr. Moss, is there anything in this

20   document that's relevant to your claim?

21          MR. MOSS:  Well, there may be.

22          THE COURT:  Yes or no?

23          MR. MOSS:  There may be.

24          THE COURT:  Then point me to where in the document

25   there's something relevant to your claim, and I will permit you

1  to examine about it.

2          The document's not in evidence.  You're conducting a

3  cross-examination.  If you can show me something within the

4  document as to which you wish to cross-examine the witness that

5  you believe is a relevant entry to your case, I will permit you

6  to do it.  Otherwise, move on.

7      (Pause)

8          MR. MOSS:  I have no further questions.

9          THE COURT:  All right.  Any redirect?

10         MR. ROSENBAUM:  One second, Your Honor.

11         THE COURT:  Yes.

12         MS. ARETT:  No further questions, Your Honor.

13         THE COURT:  All right.  You're excused, Ms. Lathrop.

14  Thank you.

15         THE WITNESS:  Thank you.

16         THE COURT:  Any further evidence?

17         MS. ARETT:  No.

18         THE COURT:  Does the Trust rest?

19         MS. ARETT:  The Trust rests.

20         THE COURT:  You have any rebuttal evidence, Mr. Moss?

21         MR. MOSS:  I do not.

22         THE COURT:  All right.  So you rest.  Is that correct?

23         MR. MOSS:  That is correct.

24         THE COURT:  All right.  Closing arguments.

25         Mr. Moss?

1          MR. MOSS:  One second.

2          THE COURT:  Sure.  I'll tell you what.  Let's take a

3   recess until 3:30.  Okay?  And then we'll begin with your

4   closing statement -- your closing argument.  Okay?

5       (Recess from 3:18 p.m. until 3:37 p.m.)

6          THE CLERK:  All rise.

7          THE COURT:  All right.  Please be seated.

8          All right.  Mr. Moss, your closing argument.

9          MR. MOSS:  Thank you, Your Honor.

10         THE COURT:  If you need any more water, you can come

11  up here.

12         MR. MOSS:  I've got some.  Thanks.

13         THE COURT:  All right.

14         MR. MOSS:  Pursuant to the Court's instructions, let

15  me talk about malice under the guise of how the statutes in

16  California regarding nonjudicial foreclosure are to be

17  construed, and that is that they are to be strictly construed,

18  taking them all into account, and that is what the case law

19  says.

20         And what we have here is just the opposite.  The

21  record now clearly shows that ETS had no authority to issue a

22  notice of default.  They had no authority until -- and it's not

23  clear, but until, at least, May the 7th of 2008.

24         They sent out the notice of default in 2007, wherein

25  there is no evidence that they received any instruction or

1  anything else from GMAC to do that.  And that is simply the

2  record.

3         So, in essence, what they did was formulate false

4  documents with knowledge of their falsity.  Otherwise, they

5  couldn't have sent out those documents.  And under Ogilvie v.

6  Select Properties (sic), 2012 WL 4891583, that equates with

7  malice.

8         THE COURT:  What was the date that they commenced the

9  first foreclosure?

10        MR. MOSS:  That would be June -- sorry.  I believe

11  it's June 17, 20 -- I'm sorry.  September 17, 2007.  That's

12  when they sent the first notice of default.

13        THE COURT:  Okay.

14        MR. MOSS:  There wasn't -- we don't know what -- on

15  what date that TCS -- TCIF was assigned the note because of the

16  appearance of that assignment.  We know the original

17  substitution of ETS by them was on September 21, 2006, but

18  according to the assignment to TCIF, the earliest date you

19  could possibly -- they could possibly get the assignment would

20  have been May the 7th, 2007, or perhaps it's September 15,

21  2007, because of the way that it was doctored, or perhaps May

22  the 7th, 2008.  We don't know.

23        So, in any event, however you read that document, they

24  do not have authority to commence any kind of foreclosure.  And

25  I would submit --

1            THE COURT:  -- is not to get this -- the --

2       Exhibit BT-F --

3            MR. MOSS:  BT-S.

4            THE COURT:  F.  F as in Frank.  The corporate

5    assignment of deed of trust to TCIF, it's the one that had the

6    typed date of May 7, 2008 crossed out, with September 15, 2007

7    written in.

8            MR. MOSS:  Frank.

9            THE COURT:  That'll be Exhibit --

10           MR. MOSS:  It's --

11           THE COURT:  Yes, I'm not sure which year is it, the

12   exhibits -- you've added --

13           MR. MOSS:  That is Exhibit 4.

14           THE COURT:  Loan-servicing notes, Exhibit A.  On page

15   BCT 501, page 76 of 131.

16           MR. MOSS:  Right.

17           THE COURT:  Has a series of entries on May 8th, all

18   relating to -- I'm reading one of them -- I have the Option One

19   assignment, and it is going out tonight, to your attention, via

20   FedEx.  That would seem to support -- and I think I asked the

21   question whether there was any earlier entry in below in

22   servicing notes to the assignment of the deed of trust from

23   Option One Mortgage to TCIF in there.  So there wasn't.  And

24   that would certainly seem to support the argument that the

25   assignment actually was executed on May 7, 2008.

1          MR. MOSS:  Two thousand and?

2          THE COURT:  8.

3          MR. MOSS:  8.

4          THE COURT:  Yes.

5          MR. MOSS:  It would suggest it, but it was FedExed on

6    that date.  ETS --

7          THE COURT:  But that was the day before, so

8    there -- it was --

9          MR. MOSS:  And the assignment has to be recorded, and

10   it wasn't recorded on that date.  It was recorded on June the

11   16th, 2008, actually.

12         THE COURT:  All right.  I haven't looked at this issue

13   on California in a while.  I've had this issue arise before in

14   ResCap with other states, and I'm not sure it has to be

15   recorded before action is taken on it, any subsequent action is

16   taken on it.

17         I'm not making any ruling on that.  But it is

18   frequently the case that there's, I have found, that there's a

19   time gap between the date that a document such as an assignment

20   of deed is executed and the date when it finally gets recorded.

21         But, you know, there's certainly an issue here the

22   district court raised as to the crossing out of the May 7, 2008

23   date and the handwriting in of the September 15, 2007 date.  I

24   have no idea when it was done.  I don't know what the recorded

25   document actually reflects.  But the loan-servicing notes would

1    support any contention that it wasn't until, in fact, May 7,

2    2008 that it was actually executed and notarized.

3           It supports your argument to a point.  So let's assume

4    that's when -- that's the earliest -- let's assume that May 7,

5    2008 is the earliest date that TCIF actually received an

6    assignment from Option One Mortgage Corporation of the

7    mortgage.  What follows from that?

8           MR. MOSS:  What follows from that is that the first

9    notice of default that ETS issued is no good.

10           THE COURT:  Well --

11           MR. MOSS:  Because that was in -- that was a year

12    earlier from that date.

13           THE COURT:  I'm not sure.  At this point, I don't

14    think the Trust disputes that that first notice of default was

15    defective.

16           Look.  I have no clue what TCIF or TCIF REO2, what

17    involvement, if any, they had with respect to your loan on

18    September 21, 2006.  The record is completely devoid of that,

19    other than that the substitution of trustee, Exhibit BT-

20    H -- you put it in as well, it's one of your exhibits -- is

21    dated September 21, 2006.  And the trustee does not dispute

22    that that substitution is ineffective, because TCIF or TCIF

23    REO2 were -- my term -- strangers to -- in terms of the

24    official record, were strangers to this transaction.

25           So let's assume that's true.  Where does that get you?

1   It shows that ETS received a defective substitution of trustee

2   signed by a party before it was a beneficiary of the deed of

3   trust.  Clearly defective, if that's so.  So what follows from

4   that?

5         MR. MOSS:  What follows from that is that the whole

6   process is defective, because --

7         THE COURT:  What would I both -- but I know -- and

8   then the district court now, when it reversed and

9   remanded -- let's focus on Judge Schofield's decision in the

10  district court.

11        In a section of her opinion on "Availability of

12  Privilege to Putative Trustee", and she uses the term putative

13  trustee because they weren't actually the trustee, because they

14  hadn't been properly substituted.  And she says, in part:

15        "A good faith assertion of an interest in the property

16  is sufficient to invoke the privilege; a valid, enforceable

17  interest is not necessary."

18        And I'm going to skip some words.  There's:

19        "In other words, those who make the communications

20  without malice are protected, whether or not they have a

21  legally valid interest."

22        And then the end of that section she -- the end of the

23  Section 3 dealing with privileges is:

24        "ETS's actions here are protected by the qualified

25  privilege in Sections 2924(d) and 47(c) absent a showing of

1  malice."

2          So the law, as both I and the district court read it,

3  was that for you to overcome ETS's privilege, you have to show

4  malice.  And she then goes on to talk about what malice means.

5          What I haven't -- and what I'd like you to point me to

6  is any evidence in the record -- record being what we have this

7  trial about today -- that would show that ETS acted with

8  reckless disregard of your rights.

9          You had been dealing -- at the time of the first

10  foreclosure and the second foreclosure, you had been dealing

11  with GMAC as the servicer of the loan for some considerable

12  period of time.  The record here shows that you were in

13  default.  You had missed payments.  You negotiated several

14  foreclosure forbearance agreements or loan modification

15  agreements, tried to perform in accordance with them for a

16  time, and then fell behind again.

17          Your dealings with GMAC, I don't see how any of those

18  would support a finding of malice.  So I'm focusing on GMAC

19  first.  Then we'll come to ETS.  So they may have been

20  careless.  They may have been negligent.  You may disagree, but

21  I read the law, and so did the district court is reading the

22  law that in order for you to prevail, you have to be able to

23  establish malice.  Malice including reckless disregard.

24          Go ahead.  That's why I want to know what

25  evidence -- I rejected, and the district court rejected, any

RESIDENTIAL CAPITAL, LLC, et al.                    154

1    duty on the part of ETS to have to go do a title search.  And

2    then she specifically said, quote -- I mean, she's quoting from

3    a case.

4            "Negligence in making 'a sufficient inquiry into the

5    facts on which the statement was based' does not, of itself,

6    relinquish the privilege.  'Mere inadvertence or forgetfulness,

7    or careless blundering, is no evidence of malice.'"

8            She's quoting from a California Court of Appeals case

9    that --

10           So that's why I want to know what evidence you believe

11   the record shows for malice.

12           MR. MOSS:  Well, the evidence that I see in the record

13   that supports malice, which is reckless disregard, or, as

14   another quote said, the district court in California said that

15   it can be defined as the degree of awareness of the probable

16   falseness or serious doubts as to its truth is that ETS

17   essentially did nothing.

18           Now, I understand that you say that argument has been

19   put aside, but I, with all due respect, don't see that in my

20   reading of the cases.  ETS can't put their head in the sand and

21   do nothing.  They are effecting, and the California Supreme has

22   held, that when a house is sold without proper authority, that

23   demonstrates harm per se.

24           THE COURT:  Show me.  I'm quite open to this.  I'm not

25   a big fan when ETS or GMAC messes up, and the result is that

RESIDENTIAL CAPITAL, LLC, et al.                    155

1  they foreclose on somebody's house when it shouldn't be, but

2  you -- I take it you don't dispute that ETS received the

3  substitution of trustee from TCIF in 2006.  They received the

4  signed form.

5          MR. MOSS:  In 2008 you mean.

6          THE COURT:  No.  I mean what I say.  Exhibit H, dated

7  September 21, 2006, substitutes --

8          MR. MOSS:  Yeah.

9          THE COURT:  -- ETS as the trustee under the deed of

10  trust.  They didn't have the authority to do it.  But they did.

11  And you're not disputing that ETS received that exhibit, are

12  you?

13          MR. MOSS:  You're asking me?  I'm not disputing that

14  they didn't received it.

15          UNIDENTIFIED SPEAKER:  Your Honor?

16          THE COURT:  And you agree that ETS received the copy

17  of BT-H?

18          MR. MOSS:  I have absolutely no idea whether they did

19  or they didn't, but for our purposes here we can assume that.

20          THE COURT:  Okay.

21          MR. MOSS:  I mean, there's no record that they did.

22  There's --

23          THE COURT:  And no.

24          MR. MOSS:  Because --

25          THE COURT:  It's a recorded document.

1          MR. MOSS:  Okay.  But -- and I don't mean to

2     argue -- but if they had received it, one could reasonably

3     expect that that document would be in ETS's file.  One could

4     reasonably expect that.  And it isn't.  There are no documents

5     attributed to ETS that say anything about when they were

6     substituted in, who they received it from, or anything else in

7     that regard.  Not one piece of paper.

8          THE COURT:  Where do I find that evidence?

9          MR. MOSS:  Because you let in --

10         THE COURT:  Is that in one of the discovery responses?

11         MR. MOSS:  It's in -- I believe it's my testimony said

12    they -- of the whole discovery responses that I received, only

13    twelve percent, supposedly, came from ETS.

14         THE COURT:  Let me ask this, Mr. Moss.  Your

15    testimony, I'm sorry, on this point is not competent.  If it's

16    in one of the discovery responses, where they acknowledge they

17    didn't have it or that they didn't produce it, that would be

18    one thing.

19         Ms. Arett, can you -- maybe this is a nonissue.

20         MR. MOSS:  Well I can --

21         THE COURT:  Do you agree that ETS did not produce in

22    its records a copy of the substitution trustee?

23         MS. ARETT:  So this was produced.  It was in the

24    Debtors, the Borrower Trust records that are for the debtor.

25    And so it was part of GMAC Mortgage's records.  I don't know.

1  We don't have a division about which records were ETS, which

2  were GMAC Mortgage, but this was --

3          THE COURT:  But the copy that's been produced came

4  from the debtors' records.

5          MS. ARETT:  It came from the debtors' records, yes.

6          MR. MOSS:  And I can highlight to you pretty quickly,

7  Your Honor, that are -- there are just Trust's discovery

8  responses in both admissions and in responses.

9          THE COURT:  Show me.  That's what I want to know.

10          MR. MOSS:  Okay.  I must beg you for just a minute.

11          THE COURT:  Sure.

12          MR. MOSS:  RFA number 1, directed to ETS, they

13  admitted that they did not get instructions from ResCap to

14  issue the notice of default.

15          THE COURT:  What I want to know specifically is did

16  you propel the request for admission to ETS regarding its

17  receipt of the substitution of trustee?

18          MR. MOSS:  I don't know if -- I don't think I asked

19  that exact question.  I approached it several different ways.

20          THE COURT:  Well, hang on, Mr. Moss.

21          MR. MOSS:  Um-hum.

22          THE COURT:  Look at the second page of BT-H.  It's an

23  affidavit of mailing dated November 7, 2006, signed by Beatriz

24  Osorio, Trustee Sale Officer.  And in substance it says:

25          "I am an officer, agent or employee of Executive

1    Trustee Services whose business address is" -- there's that.

2            And then skipping a paragraph,

3            "A copy of the attached substitution has been mailed

4    prior to the recording thereof, in the manner provided in

5    Section 2924(b)", et cetera.

6            So doesn't the document itself, which is in evidence,

7    establish that ETS had received a copy of the substitution of

8    trustee, which is BT-H, BT-Exhibit H?  You say they didn't have

9    it.  The document itself -- it's in evidence -- would seem to

10   refute that, because it's mailed on the same date.  Well it's a

11   little later.  It's dated September 21, 2006, and the affidavit

12   of mailing is dated November 7, 2006.  It doesn't say when they

13   received it, but it would follow that no later than November 7,

14   2006 Executive Trustee Services had received it, because they

15   go ahead and mail it.

16           Do you agree with that?  I don't know how you would

17   say that.

18           MR. MOSS:  I would find it difficult to not agree with

19   that.

20           THE COURT:  Okay.  All right.  So I guess the question

21   I have is --

22           MR. MOSS:  But then that begs the question, why wasn't

23   it produced?  Why isn't it in their file?  Why is nothing like

24   that in their file?

25           THE COURT:  Well, because -- I'm not going to get into

1    why.

2            MR. MOSS:  I can --

3            THE COURT:  There's one -- I'm not going to testify.

4    The ResCap Borrower's Trust has been producing voluminous

5    documents in this litigation.  Most of the debtors -- and ETS

6    was one of the debtors -- documents were preserved.

7            Okay.  I think I could only conclude from looking at

8    the documents -- the substitution of trustee itself -- that ETS

9    had it in the fall of 2006.

10            And then, I guess, the question I have is well, is

11    it's having received holding the substitution of document, does

12    that permit ETS to act -- does it have to question the

13    document?  If it receives a substitution of trustee, can it

14    rely on that document in whatever action a trustee would

15    ordinarily undertake, based on being the trustee.

16            MR. MOSS:  My answer to that is that they cannot.

17            THE COURT:  Okay.

18            MR. MOSS:  Because --

19            THE COURT:  What cases do you rely on for that?

20            MR. MOSS:  So one case is Barry Neveu (ph.).

21            THE COURT:  I'm sorry.  I couldn't hear you.

22            MR. MOSS:  Barry Neveu, which is a district-court

23    case.  I can give you the names.  I'd have to -- I would --

24            THE COURT:  Is it in your brief?

25            MR. MOSS:  Oh, it's in my brief.  Sure.

1          THE COURT:  Yes.  I'll go back and look at your brief

2     then.

3          MR. MOSS:  Okay.  Another case is Kerivan.  Another

4     case is Munger.  And another case Tamburri.  And they're all in

5     my brief.

6          THE COURT:  Okay.

7          MR. MOSS:  And I think an important fact here is that

8     the role of any that ETS being owned by GMAC or Ally has on how

9     they conduct themselves as trustee.  Their legal burden is to

10    be neutral, to treat us equally, and so it would seem very

11    easy, because they have this internal relationship, to just

12    assume that everything is correct and just go ahead and do

13    whatever.

14         THE COURT:  When was the first notice of default?

15         MR. MOSS:  The first notice of default was --

16         THE COURT:  Is that the September 17, 2007?  BT-N?

17         MR. MOSS:  The first notice of default was September

18    17, 2007.

19         THE COURT:  Okay.  So you told me a few minutes ago,

20    Mr. Moss, that ETS went ahead and served the notice of default

21    without any direction or instruction from GMAC.  When I looked

22    at BT-A, the loan-servicing notes, specifically at page 101 of

23    131, there are a series of entries -- there was testimony about

24    this earlier -- for September 13, 2007.  So that's four days

25    before the notice of default.  And Ms. Lathrop testified that

1    those entries -- those entries being for September -- the first

2    of the September 13 entries showing a transaction type FOR,

3    which is foreclosure, referred to attorney, completed 9/13/07.

4            Foreclosure approval completed 9/13/07.  Foreclosure

5    referral review completed and management approval.  Approved

6    for foreclosure 9/13/07.

7            Doesn't that -- you said that GMAC didn't instruct or

8    direct ETS to proceed with foreclosure.  But don't those

9    entries in the loan-servicing notes, Exhibit A, at page 101 of

10   131, reflect GMAC's instruction or direction to ETS to proceed

11   with the foreclosure?

12           MR. MOSS:  I can't deduce that from a note that you

13   just read.  It may be, but it doesn't say that, and there is no

14   evidence on the other end of that, that that happened.

15           THE COURT:  I've been spending the last couple of

16   years reading the loan-servicing notes, Mr. Moss.

17           MR. MOSS:  You have my --

18           THE COURT:  It wasn't my favorite spending of time.

19   But you have to -- it's not -- I'm not basing it on

20   what -- yes, I've heard about these entries before.  But we

21   heard Ms. Lathrop testify today that she can -- as a custodian,

22   she can testify about the entries, and those entries that I

23   referred to, on page 101 of 131, would seem to refute your

24   contention that GMAC didn't direct ETS to proceed with

25   foreclosure, and four days later we see the notice of default.

RESIDENTIAL CAPITAL, LLC, et al.                    162

1              But go ahead.

2              MR. MOSS:  Well, I think the response to that is that

3    she also -- Ms. Lathrop also testified that there are notations

4    in Exhibit A where there was direct communication between GMAC

5    and Executive Trustee to do certain things, but that doesn't

6    appear on this date.

7              THE COURT:  Well, all right.  So you want to dispute

8    what's foreclosure approval completed, foreclosure referral

9    review completed, and management approved -- approved for

10   foreclosure, meaning it's four days before.  The trustee goes

11   ahead and serves the notice of default.  What's your next

12   point?

13             I mean, look --

14             I think a fair question raised by the evidence is

15   whether ETS could rely upon its receipt of the substitution of

16   trustee without further investigation or inquiry.  You argue

17   they can't.  The Trust argues they can.  I'll have to decide

18   that issue.

19             If ETS can rely on it, and the loan servicer, date

20   September 2007, instructs them to proceed with foreclosure,

21   that's what they did.  They served the notice of default.

22             Clearly the notice of default, if they weren't

23   properly appointed or authorized to act as a substitute

24   trustee, would have been defective, but the sale that occurred

25   was reversed.

1        Go ahead with your argument.

2        MR. MOSS:  I must say that I am -- I find it -- let me

3   just end by this.  I appreciate the attention of the Court.

4        THE COURT:  Well, don't end yet, because I --

5        MR. MOSS:  I thought it's been disrupted, and I

6   don't -- that's not negative.  I'm just --I but -- I mean, as

7   the Court well knows, I believe ETS acted without authority.

8   They had no right to do so.  They violated my rights when they

9   did it.

10       I think, even looking at the record today, there's a

11  serious question about who the trustee is today.  Not clear

12  from the record.  Or who the beneficiary is.  Not clear from

13  the record from all this stuff.  So --

14       THE COURT:  I may have misspoken about something, and

15  I want to make sure that you get a chance to address this.

16       MR. MOSS:  Yeah.

17       THE COURT:  Because I've been asking about the notice

18  of default dated September 17, 2007, when, in fact, there was

19  an earlier notice of default, which is --

20       MR. MOSS:  There was?

21       THE COURT:  -- Exhibit U.  And it's a notice of

22  default dated June 19, 2006.  And, of course, the date of that

23  notice of default is before the date of the substitution of

24  trustee.

25       MS. ARETT:  I apologize for interrupting, Your Honor.

RESIDENTIAL CAPITAL, LLC, et al.                    164

1   Exhibit U, I don't believe, is in evidence, unless this is also
2   a document that is in Mr. Moss's.
3          THE COURT:  No, I guess it's not.
4          MR. MOSS:  No, it's not.
5          THE COURT:  This is in your exhibit book.
6          MS. ARETT:  Um-hum.  Uh-huh.
7          THE COURT:  Do you just -- BT-U is a notice of default
8   that ETS served in connection with Mr. Moss's loan?
9          MS. ARETT:  No.  I would also, then, if that's going
10  to be in evidence, I'd ask that Exhibit V also be in evidence.
11         THE COURT:  Exhibit B?
12         MS. ARETT: V, because it's the rescission of Exhibit
13  U.
14         THE COURT:  V.  V as in Victor.
15         MS. ARETT:  Yes.
16         MR. MOSS:  Oh, V.
17         MS. ARETT:  So if we're going to put Exhibit U, I
18  think that Exhibit V should also be in.
19         THE COURT:  Well, I'm going to admit Exhibits U and V
20  in evidence.  It's the earlier notice of default, the earlier
21  notice of rescission of notice of default.
22         Ms. Arett, it's what bothers me about this case.  So,
23  you know, they -- ETS records and serves the notice of default
24  before it even purports to have received a substitution of
25  trustee.

RESIDENTIAL CAPITAL, LLC, et al.                165

1          (6/19/06 Notice of default was hereby received into

2    evidence as Borrower Trust's Exhibit BT-U, as of this date.)

3          (5/4/07 notice of rescission of 6/19/06 notice of default

4    was hereby received into evidence as Borrower Trust's Exhibit

5    BT-V, as of this date.)

6          MR. MOSS:  What?

7          THE COURT:  Witness input.  But rescinded it May 4,

8    2007.  Almost a year later.  And, you know, quite frankly, the

9    imponderable to me in this whole thing is how TCIF gets

10   involved in this whole picture.

11         MR. MOSS:  And what further bothers me on that score

12   is whether TCIF is the same or different than TCIF REO2,

13   because they do things only in their name.  The only time that

14   TCIF appears is on that one document.  That's it.

15         THE COURT:  Well, that's not correct.  Exhibit U, the

16   June 19, 2006 notice of default, at the bottom says contact

17   TCIF REO2, LLC care of Executive Trustee Services.

18         MR. MOSS:  No, that's what I said.  The only time

19   TCIF, just that appears, is when they're assigned, supposedly,

20   the property.  Every other notation is TCIF REO2.

21         THE COURT:  I see these REO entities all the time,

22   though, Mr. Moss.  They're typically who's going to hold the

23   property that's been foreclosed until there's some disposition.

24         I'm not finding that as a fact here, obviously,

25   because there's no evidence about it --

RESIDENTIAL CAPITAL, LLC, et al.                          166

1          MR. MOSS:  Yes.

2          THE COURT:  -- put.  Anything else you want to tell

3    me?

4          MR. MOSS:  I don't think so.  Except thank you.

5          THE COURT:  Thank you, Mr. Moss.

6          MS. ARETT:  All right.  So today Mr. Moss had the

7    burden of proving two elements in order to successfully

8    demonstrate that he's entitled to a claim in these bankruptcy

9    proceedings.  First, he needed to show, as the Court just went

10   through in very good detail, he needed to show that ETS's

11   actions were not privileged under California law.  And in order

12   to do that, he needed to show that ETS acted maliciously in

13   conducting the foreclosure sale on his property.

14         THE COURT:  Or acted with reckless disregard.

15         MS. ARETT:  Or -- yes.  Acted with malice, as that is

16   defined under California.

17         Second, assuming that he made the first showing, he

18   had to show that ETS's conduct -- or showing that ETS's conduct

19   was not privileged.  He also needed to show that he was damaged

20   as a result of ETS's actions.

21         It is the Trust's position that Mr. Moss has failed on

22   both accounts.  Additionally, assuming Mr. Moss has met his

23   burden of demonstrating that ETS's actions were not privileged,

24   he has nonetheless failed to prove the reckless elements of

25   fraud, intentional infliction of emotional distress, and

1    negligence.

2           THE COURT:  What's the standard for intentional

3    infliction of emotional distress?

4           MS. ARETT:  I will quote from our brief, Your Honor.

5           THE COURT:  I guess my question, as you give me the

6    answer, is whether if I were to conclude that ETS acted with

7    reckless disregard of Mr. Moss's rights, would that showing be

8    sufficient to permit him to go forward on account of

9    intentional infliction of emotional distress?

10          MS. ARETT:  I'm just going to -- apologizes, Your

11   Honor.  I'm just trying to find our actual brief, which I know

12   has the standard in it.

13          THE COURT:  Sure.

14          MS. ARETT:  Oh, perfect.  Okay.  So:

15          "The elements of a cause of action for intentional

16   infliction of emotional distress are the defendant engaged in

17   extreme and outrageous conduct with the intention of causing,

18   or reckless disregard of the probability of causing, severe

19   emotional distress to the plaintiff."

20          The position of the Trust, and as we've briefed, I

21   think, a number of times, is that the prong of outrageous

22   conduct has not been met in this instance.

23          THE COURT:  Look.  Let's forget the words "outrageous

24   conduct".

25          MS. ARETT:  Okay.

1           THE COURT:  And focus on the "reckless" language.

2           MS. ARETT:  Okay.

3           THE COURT:  I'm not discounting that the cases say

4     what they say, but what does it say about -- read me again the

5     reckless standard.

6           MS. ARETT:  It is -- so:

7           "Intention of causing, or reckless disregard of the

8     probability of causing, severe emotional distress to the

9     plaintiff."

10          THE COURT:  So does that equate -- if Mr. Moss

11    established that ETS acted with reckless disregard of his

12    rights in commencing and foreclosing or reverse of foreclosure,

13    would that at least -- would that satisfy the standard, his

14    burden for establishing an element of the intentional

15    infliction of emotional distress?  Is it the same recklessness

16    for both the IIED claim and these other claims which malice

17    would require?

18          MS. ARETT:  Having not researched this point

19    specifically, I don't want to say one way or the other for

20    sure, because I honestly don't know, but I think there could be

21    a distinction between reckless disregard for the probability of

22    causing severe emotional distress versus reckless disregard in

23    this instance.  But I think that Your Honor is correct that

24    they are probably very close.

25          THE COURT:  Okay.  So but here's what's bothering me.

1   So as we just -- as I just looked at from Exhibit U, a June 19,

2   2006 notice of default and election to sell, which, at the

3   bottom of the first page, says contact TCIF REO2, LLC care of

4   Executive Trustee Services, LLC.  I take it you would agree the

5   evidence does not show a substitution of ETS as the trustee

6   before June 19, 2006.

7            MS. ARETT:  Agreed.

8            THE COURT:  Am I correct that the only substitution of

9   trustee is dated September 21, 2006?  That's Exhibit H.

10           MS. ARETT:  Yes.

11           THE COURT:  And I believe you've agreed that that

12  substitution of trustee is ineffective, because TCIF REO2, LLC

13  was not a beneficiary of the deed of trust at the date of the

14  substitution?

15           MS. ARETT:  Yes, I agree.

16           THE COURT:  So we have ETS giving a notice of default

17  before it has any substitution of trustee.  That's why I have

18  no clue how TCIF gets involved in this.  We have an ineffective

19  substitution on September 21, 2006, which, if ETS is permitted

20  to act in reliance on it without making any further inquiry,

21  perhaps would defeat a malice claim.  Although it's, at a

22  minimum, curious that it went ahead and served a notice of

23  default before it even got the substitution of trustee

24  assignment.

25           (Pause)

1           THE COURT:  So looking at Exhibit N, the notice of

2      default dated September 17, 2007, looking at the second page of

3      it, in paragraph:

4               "Notice is hereby given that Executive Trustee

5      Services, LLC is either the original trustee, the duly

6      appointed substitute trustee, or acting as agent for the

7      trustee or beneficiary under a deed of trust."

8               And I'll stop reading there.

9               Did ETS, in your view, have any duty to confirm the

10     accuracy of what it stated in the notice of default?

11          MS. ARETT:  I believe that it had to have a basis for

12     stating what it did in the notice of default, and I would say

13     that that basis comes from the substitute trustee.

14          THE COURT:  The substitution that we've seen in

15     Exhibit H?

16          MS. ARETT:  Right.  In Exhibit H.

17        (Pause)

18          THE COURT:  Can the knowledge of GMAC Mortgage be

19     imputed to ETS?

20          MS. ARETT:  I don't believe that there's a basis for

21     that, Your Honor, especially given Ms. Lathrop's testimony that

22     ETS did not get all of the documents that GMAC Mortgage had

23     access to.

24          THE COURT:  So she didn't really have knowledge of it.

25     She doesn't know what ETS had, does she?  Did she testify that

1   she did?

2           MS. ARETT:  She said that her understanding, I guess,

3   and maybe that's -- okay.  Fair enough.  Fair enough.  But I

4   think the fact that these are separate entities and that one

5   clearly had a certain role in these actions and one had a much

6   more limited role -- ETS clearly had a more limited role than

7   GMAC Mortgage.

8           THE COURT:  You agree that ETS only acted on the

9   direction or instruction of GMAC Mortgage?

10          MS. ARETT:  That -- yes.

11          THE COURT:  So Mr. Moss's Exhibits 14, 15, 16, those

12  are the letters that he -- in the case of 14 and 15 faxed to

13  GMACM, and in the case of 16 sent by certified mail.  And, for

14  example, Exhibit 14 includes a fax receipt as the third page of

15  the exhibit.  That would show that it was received by GMAC.

16  You agree with that?

17          MS. ARETT:  That's what it appears to be, though I

18  personally cannot confirm that that is the fax number for GMAC

19  Mortgage, but --

20          THE COURT:  Well, it's in evidence.

21          MS. ARETT:  Yes.

22          THE COURT:  And it's including the fax receipt.

23          MS. ARETT:  Um-hum.

24          THE COURT:  And Ms. Lathrop, on cross-examination,

25  acknowledged there's no entry in the loan-servicing notes to

1   reflect receipt of this letter from Mr. Moss.  Agreed?

2           MS. ARETT:  Correct.  Yes.

3           THE COURT:  And in Exhibit 14 he says, in part:

4           "Today I have not received anything from you."

5           And the loan-servicing notes do not reflect any

6   response by GMACM to Mr. Moss.  Correct?

7           MS. ARETT:  Correct.

8           THE COURT:  And Exhibit 15, again, includes as the

9   third page the fax receipt.  It's the letter dated August 7,

10  2008.

11          MS. ARETT:  Yup.

12          THE COURT:  And in Exhibit 15, the second paragraph,

13  Mr. Moss says:

14          "Could you please fax or call to inform me as to what

15  I have to do to complete this matter?  I am relying on you to

16  get me this information and keep current."

17          And neither the letter nor any response to the letter

18  is reflected in the loan-servicing notes.  Correct?

19          MS. ARETT:  The letter is not reflected.  I mean, I

20  will note that Ms. Lathrop -- and I don't know if it's in this

21  period or in a separate period -- walked through the many

22  attempts by GMAC Mortgage to call Mr. Moss.

23          THE COURT:  Well, you can show me if I'm -- I want to

24  be sure I'm fair to the --

25          MS. ARETT:  Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    173

1          THE COURT:  -- the Trust.  Can you show me where

2     there's anything --

3          MS. ARETT:  But I don't know if they -- I don't

4     know --

5          THE COURT:  -- in the loan-servicing notes for August

6     7, 2008 or the following days.

7          MS. ARETT:  No, I don't believe that there is for

8     anything showing the receipt of this letter.

9          THE COURT:  Well, or some action by GMAC that would

10    indicate a response.  A telephone call to Mr. Moss, something

11    of that nature.

12         MS. ARETT:  I mean, there are telephone calls in

13    September 17th, but that's further away.

14         THE COURT:  Yes.

15         MS. ARETT:  So, yes.

16         THE COURT:  Nothing right around August 7th.  And then

17    Mr. Moss sends the letter by certified mail on August 19, 2008.

18         MS. ARETT:  Correct.  And I believe that is the one

19    that talks about the 6,000 dollar payment.  Or a payment made.

20         THE COURT:  Receipt of the letter is not acknowledged

21    in the loan-servicing notes.  Correct?

22         MS. ARETT:  I think that it actually is, on September

23    6th, which is the same day that they talk about -- there's,

24    like, it says "received letter from borrower".  But --

25         THE COURT:  Bear with me a second.  Okay?

RESIDENTIAL CAPITAL, LLC, et al.                    174

1              What date?

2              MS. ARETT:  It's September 6, 2008.  And then,

3    obviously, returning the check.

4              THE COURT:  That's not what I found there.

5              MS. ARETT:  Oh, I'm sorry.  It's at the bottom of page

6    67.  And it looks like in the notes prior to that there's talk

7    about receiving a check and returning it, and so I assume that

8    is the check that was received in this letter.

9              THE COURT:  I'm still having trouble.  Which page?

10             MS. ARETT:  Sorry.  Page 67 of 131.

11             THE COURT:  Okay.

12             MS. ARETT:  On the bottom, September 6, 2008.

13             THE COURT:  Yes.  "Received letter from borrower".

14             MS. ARETT:  Right.  Yes.  And then if you look at the

15   next stuff after that, it's from earlier, August 27th, but it

16   talks about returning a check to Mr. Moss, which likely --

17             THE COURT:  I know that --

18             MS. ARETT:  So -- if the check was with the letter,

19   they would have both been received.

20             THE COURT:  Well, but the letter is dated August 19th.

21             MS. ARETT:  Um-hum.

22             THE COURT:  I don't doubt they received it.  The only

23   reason I don't doubt they received it is because he notes the

24   payment that came with it.

25             MS. ARETT:  Right.  Yeah.

1           THE COURT:  Right?  But what I don't see --

2           MS. ARETT:  And then if you look on September 17,

3    2008, there were attempts to contact Mr. Moss, with no answer.

4    And again on --

5           THE COURT:  So he --

6           MS. ARETT:  -- October 1st.

7           THE COURT:  Here they're telling you that it took from

8    August 19, 2008 until September 17, 2008 for GMAC to endeavor

9    to contact Mr. Moss?

10          MS. ARETT:  I don't know exactly when this letter was

11   received by GMAC Mortgage, but yes, on that.

12          THE COURT:  We know --

13          MS. ARETT:  But definitely by August 27th.  I'm sorry.

14   August 25th.

15          THE COURT:  Well, we know, actually, before that.

16   August 21st.

17          MS. ARETT:  Sorry.  Yes.

18          THE COURT:  Because --

19          MS. ARETT:  I keep, like, going -- I have -- I always

20   forget his --

21          THE COURT:  You would agree --

22          MS. ARETT:  -- number.

23          THE COURT:  -- don't you, that by August 21, 2008 they

24   had received the 6,000 dollar check?

25          MS. ARETT:  Yes.

RESIDENTIAL CAPITAL, LLC, et al.                    176

1        THE COURT:  Okay.  And you're pointing to an entry for

2    September 17, 2008, that somebody tried to call Mr. Moss and

3    there was no answer.

4        MS. ARETT:  Yes.

5        THE COURT:  Okay.  With no indication in the loan-

6    servicing notes that between August 21, 2008, when the entries

7    reflect receipt of the 6,000 dollar check, which was included

8    with Mr. Moss's August 19, 2008 letter, until September 17,

9    2008, just short of a month later, that there's any entry that

10   would reflect any effort by GMAC to contact Mr. Moss.  Correct?

11       MS. ARETT:  Right.  I would also note that there was

12   an attempt to contact Mr. Moss on July 16, 2008, "Re:  pay plan

13   late.  Phoned twice."

14       THE COURT:  Okay.  But --

15       MS. ARETT:  But that's before the letters.  Yes.

16       THE COURT:  But there's nothing between the August 7th

17   letter, the August -- July 23rd letter, August 7th letter.

18       MS. ARETT:  Well, there is a --

19       THE COURT:  -- August 19th letter.

20       MS. ARETT:  It does say on August 12th, "talked to

21   borrower 1".

22       THE COURT:  Okay.

23       MS. ARETT:  So there -- but, again, as I think Ms.

24   Lathrop testified, it wasn't clear what was discussed.

25       THE COURT:  The contents are not clear.

RESIDENTIAL CAPITAL, LLC, et al.                    177

1          MS. ARETT:  Right.  Exactly.

2          THE COURT:  So you indicate -- you pointed to the

3   September 17, 2008 unanswered phone calls, but the loan

4   file -- the servicing notes, excuse me -- reflect that on five

5   days before that, September 12, 2008, foreclosure was started.

6          MS. ARETT:  Correct.

7          THE COURT:  Whether or not Mr. Moss can recover on his

8   claim against ETS, these servicing notes and the exhibits don't

9   present a pretty picture of GMAC, as opposed to ETS, basically,

10  GMAC's handling of Mr. Moss's loan.  That's my comment.  I

11  don't even know if I agree with that or not.

12         MS. ARETT:  Yeah.  I mean, I feel like there is

13  evidence of attempts to contact him and also, I mean, after

14  that point then he just never makes payments on his loan again.

15         THE COURT:  After GMAC commences foreclosure?

16         MS. ARETT:  After he makes the payments under this

17  forpayment (sic) agreement and then --

18         THE COURT:  Well, he tried to reach out.  I mean, in

19  fairness to him --

20         MS. ARETT:  Yes.

21         THE COURT:  He would say I sent these three letters in

22  August trying to reach out to them.  I don't know what I can

23  do.  I got no response.  All I got was another foreclosure

24  returning the payment I made.  I am saying your response would

25  be payment was not in amount sufficient.

RESIDENTIAL CAPITAL, LLC, et al.                    178

1          But the issue before me is whether ETS acted with

2    malice.  There's no claim against GMAC anywhere.

3          MS. ARETT:  Right.  And I don't think that there's

4    anything to suggest that ETS was aware -- or that ETS was aware

5    of this, because this was part -- specifically servicing

6    related.  It would have been loan modifications.

7          THE COURT:  If I asked the question Ms. Lathrop

8    start -- whether ETS would have access to the loan-servicing

9    notes, and she indicated no.  It would raise more serious

10   questions to me if they did have access to the loan.

11         All right.  Anything else you want to add?  I don't

12   mean to pick on you.  I just --

13         MS. ARETT:  I can take it, Your Honor.

14         THE COURT:  No, I don't need to -- as I've said

15   frequently with the Borrower Claims trials, you take the claim

16   as you find them.

17         MS. ARETT:  Exactly.

18         THE COURT:  The record is what it is.

19         MS. ARETT:  I will just make -- well, let me just make

20   a point about the elements.  So putting aside, I think, we just

21   very much discussed the malice point, so I won't go further on

22   that.

23         I will say that with regard to Mr. Moss's fraud claim,

24   Mr. -- for fraud, he would have to introduce evidence of

25   intent.  And there's nothing in the record that would support

RESIDENTIAL CAPITAL, LLC, et al.                    179

1    any sort of knowledge that ETS knew that it wasn't properly

2    substituted.

3              I think, as we discussed with the intentional

4    infliction of emotional-distress claim, we believe that the

5    cases support that the foreclosure would not constitute an

6    extreme and outrageous conduct and therefore would fail to meet

7    one of the elements of that.

8              And then with regard to Mr. Moss's negligence claim,

9    we don't believe that ETS owed Mr. Moss a duty, and we also, as

10   was discussed in our briefing, I mean, emotional-distress

11   damages are not permitted under a negligence claim in this sort

12   of instance.

13             Putting all of that aside, Mr. Moss has also failed to

14   link his damages to any sort of ETS action.  The only damages

15   Mr. Moss has provided any evidence for concern his emotional

16   distress, but, as Ms. Lathrop testified, Mr. Moss was deeply

17   delinquent at the time of the foreclosure sale.  He would have

18   been under threat of foreclosure pursuant to the terms of the

19   deed of trust even if ETS's substitution had been proper.

20   Thus, ETS's failure to properly conduct the foreclosure sale

21   was not the cause of his alleged emotional distress.

22             And further, ETS's only role in this process was to

23   prepare the paperwork required for a nonjudicial foreclosure

24   proceeding, which we believe it -- which it believed that it

25   had the authority to do, based on the substitution of trustee

RESIDENTIAL CAPITAL, LLC, et al.                    180

1    appointing it.

2            Further, the decision as to whether to commence

3    foreclosure was not made by ETS, but rather it was made by GMAC

4    Mortgage, acting as servicer on behalf of the beneficiary.

5            Moreover, the entirety of Mr. Moss's alleged damages

6    appear to result from the initiation of an eviction action,

7    which was also initiated by Bank of New York.  And Ms. Lathrop

8    has also testified, and Mr. Moss has confirmed, that ETS had no

9    role in that eviction action.

10           And so any distress that the eviction action caused

11   Mr. Moss was due to the doing of Bank of New York, not ETS.

12   And Mr. Moss has settled with Bank of New York, and according

13   to the terms of that settlement agreement, that resolved all of

14   Mr. Moss's claims against Bank of New York.  And if you compare

15   the amount that Mr. Moss would have paid -- looking at that

16   settlement agreement, if you compare the amount that Mr. Moss

17   would have paid over the life of his loan, under his original

18   loan, compared with the amount that he would be paying -- that

19   he is now paying under the settlement agreement, it's at least

20   400,000 dollars less.  So --

21           MR. MOSS:  I'm going to object to that, Your Honor.  I

22   don't want to interrupt, but I think that is entirely improper.

23   There's no expert testimony about that.  And it's clearly

24   expert opinion area where you give something like that.

25           THE COURT:  It depends on the showing.

RESIDENTIAL CAPITAL, LLC, et al.                    181

1        MS. ARETT:  Whether or not that's true, I guess the

2    point is Mr. Moss can't turn around now and try to collect from

3    ETS damages that he admits were caused by Bank of New York.

4        So Mr. Moss did not make payments on his mortgage for

5    more than a year, and then after the foreclosure sale was

6    conducted, that the beneficiary of the loan had every right to

7    conduct, Mr. Moss successfully challenged that sale on issues

8    of the chain of title, which we admit were problematic, and as

9    a result of that challenge Mr. Moss received a loan

10   modification from Bank of New York, and he's already settled

11   with that entity.

12       And so, in summary, Mr. Moss has failed to show that

13   ETS's actions were not privileged.  He has failed to prove the

14   elements for negligence, fraud, and intentional infliction of

15   emotional distress, and he cannot show how he was ultimately

16   damaged by ETS's actions, even if he has a valid cause of

17   action against ETS.

18       So it's the Borrower Trust's position that Mr. Moss is

19   not entitled to an allowed claim against ETS, and the claim

20   should be expunged.

21       THE COURT:  Okay.  I'm going to take the matter under

22   submission.  Thank you very much for your time.

23       MS. ARETT:  Thank you for your time.

24       MR. MOSS:  Thank you, Your Honor.

25       THE COURT:  All right.  Off the record.

1              (Whereupon these proceedings were concluded at

2    4:46 PM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                         **I N D E X**

3

4    WITNESS              EXAMINATION BY        PAGE

5    Alan Moss           (Self-narrative)        22

6    Alan Moss            Ms. Arett              55

7    Sara Lathrop         Ms. Arett              64

8    Sara Lathrop         Mr. Moss              131

9

10                       **E X H I B I T S**

11   BORROWER      DESCRIPTION           MARKED  ADMITTED

12   TRUST'S

13   BT-A          Loan-servicing notes             74

14                 and payment history

15   BT-C          Adjustable-rate note             75

16   BT-D          Deed of trust                    76

17   BT-E          Assignment of deed of            77

18                 trust from CJ

19                 Mortgage to Option One

20   BT-F          Assignment of deed of            87

21                 trust

22   BT-G          Assignment of deed of            87

23                 trust

24   BT-H          Substitution of trustee          90

25

<pre>
 1
 2                    E X H I B I T S (cont'd.)
 3   BORROWER         DESCRIPTION            MARKED   ADMITTED
 4   TRUST'S (cont'd.)
 5   BT-I             Breach letter from GMAC          97
 6                    to Mr. Moss 4/12/06
 7   BT-J             5/15/06 breach letter           103
 8                    from GMAC to Mr. Moss
 9   BT-K             6/4/07 breach letter            109
10                    from GMAC to Mr. Moss
11   BT-L             7/3/07 breach letter            110
12                    from GMAC to Mr. Moss
13   BT-M             8/2/07 breach letter            112
14                    from GMAC to Mr. Moss
15   BT-N             Notice of default               115
16   BT-O             Foreclosure repayment           123
17                    agreement for Mr. Moss
18   BT-P             Trustee deed upon sale          128
19   BT-Q             Document                        128
20   BT-R             Document                        128
21   BT-S             Settlement agreement            129
22                    Between Mr. Moss and
23                    Bank of New York Mellon
24   BT-U             Notice of default dated         165
25                    June 19, 2006
</pre>

| 1 | | | | |
| 2 | | E X H I B I T S (cont'd.) | | |
| 3 | BORROWER | DESCRIPTION | MARKED | ADMITTED |
| 4 | TRUST'S (cont'd.) | | | |
| 5 | BT-V | Notice of rescission | | 165 |
| 6 | | dated May 4, 2007 | | |
| 7 | | of notice of default | | |
| 8 | | dated June 19, 2006 | | |
| 9 | | (Exhibit U) | | |
| 10 | | | | |
| 11 | CLAIMANT'S | DESCRIPTION | MARKED | ADMITTED |
| 12 | CE-1 | Assignment of deed of | | 31 |
| 13 | | trust 4/4/07 | | |
| 14 | CE-2 | Substitution of trustee | | 31 |
| 15 | | 2/3/06 | | |
| 16 | CE-3 | Substitution of trustee | | 31 |
| 17 | | 9/21/06 | | |
| 18 | CE-4 | Assignment of deed of | | 32 |
| 19 | | trust 6/16/08 | | |
| 20 | CE-5 | Document | | 32 |
| 21 | CE-6 | Document | | 32 |
| 22 | CE-7 | Document | | 32 |
| 23 | CE-8 | Document | | 32 |
| 24 | CE-9 | Assignment of deed of | | 32 |
| 25 | | trust to TCIF, LLC | | |

1

2                    **E X H I B I T S** (cont'd.)

3    CLAIMANT'S       DESCRIPTION              MARKED   ADMITTED

4    (cont'd.)

5    CE-10            Notice of rescission of            32

6                     trustee's deed upon sale

7    CE-11            Notice of rescission of            32

8                     notice of default

9    CE-12            Notice of rescission of            32

10                    notice of default

11   CE-13 to         Claimant's letters to              46

12   CE-16            Alfred Hudspeth at GMAC

13   CE-18            Declaration of Carol               25

14                    Bonello

15   CE-21            Discovery responses of             20

16                    Bank of New York

17   CE-23            Verified complaint                 45

18                    CLJ199935

19   CE-24            Verified complaint                 45

20                    CLJ199552

21   CE-25 to         Responses to discovery             43

22   CE-34            requests

23   CE-39            Pages from GMAC                    36

24                    Mortgage's servicing

25                    notes

```
1
2                    E X H I B I T S (cont'd.)
3   CLAIMANT'S       DESCRIPTION              MARKED   ADMITTED
4   (cont'd.)
5   CE-43            Invoices for attorneys'     59
6                    fees
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2                    C E R T I F I C A T I O N

3

4    I, David Rutt, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9

10   _____

11   David Rutt (CET-635)

12   AAERT Certified Electronic Transcriber

13

14   eScribers

15   352 Seventh Ave., Suite #607

16   New York, NY 10001

17

18   Date:  May 10, 2017

19

20

21

22

23

24

25