UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | **NOT FOR PUBLICATION** |
|  | ) | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) |  |
|  | ) | Chapter 11 |
| Debtors. | ) |  |
|  | ) | (Jointly Administered) |

**MEMORANDUM OPINION AND ORDER SUSTAINING THE RESCAP BORROWER
CLAIMS TRUST'S OBJECTION TO CLAIM NO. 8334
FILED BY ALAN I. MOSS**

*A P P E A R A N C E S :*

MORRISON & FOERSTER
*Counsel for the ResCap Borrower Claims Trust*
250 West 55th Street
New York, NY 10019-9601
By:    Norman S. Rosenbaum, Esq.
       Jessica J. Arett, Esq.

ALAN I. MOSS
*Pro Se Claimant*
P.O. Box 721
Moss Beach CA, 94038
By:    Alan I. Moss

**MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the objection (the "Objection," ECF Doc. # 8502) by the Residential

Capital Borrower Claims Trust (the "Trust") to the amended claim number 8334 (the "Claim,"

ECF Doc. # 8502–5) of Alan I. Moss ("Moss"), a *pro se* claimant and former member of the

California bar.  The Claim is a contingent unliquidated $750,000 claim against a co-debtor,

Executive Trustee Services[1] ("ETS"), arising from a lawsuit Moss filed in the Superior Court of

---

[1]    ETS acted as trustee in completing foreclosure processes for GMACM.  (Trial Tr. 69:3–8.)  ETS is a separate entity from GMACM with its own employees.  (*Id.* 69:15–18.)  Sara Lathrop ("Lathrop"), the senior claims analyst for the ResCap borrower claims, testified that ETS generally did not have access to GMACM's records,

California, County of San Mateo (the "Superior Court") before ETS filed for bankruptcy. The

lawsuit alleged state law causes of action for (i) negligence and negligence per se; (ii) fraud; and

(iii) intentional and negligent infliction of emotional distress.

After initially sustaining the Trust's objection to Moss's claim but granting him leave to

amend, the Court sustained the Trust's objection and expunged Moss's amended claim. *In re*

*Residential Capital, LLC*, 2015 WL 5025284 (Bankr. S.D.N.Y. Aug. 24, 2015) (hereinafter

"*Moss I*"). The Court concluded that, in order to state a cognizable claim, California law

required Moss to plead malice because ETS had qualified immunity when it published the

Notices (defined herein), and conducted the nonjudicial foreclosure sale. *Moss I*, 2015 WL

5025284 at *8. Moss appealed and the District Court reversed in part and remanded, concluding

that the amended claim sufficiently alleged malice. *Moss v. ResCap Borrower Claims Trust (In*

*re Residential Capital, LLC)*, 2016 WL 3136869 at *8 (S.D.N.Y. June 2, 2016) (hereinafter,

"*Moss II*"). After remand and following discovery, the Trust moved for summary judgment, but

the Court denied the motion and the contested claim proceeded to trial.

On May 8, 2017, this Court held an evidentiary hearing to determine whether (i) Moss

could prove that ETS acted with "malice," as defined under California law, when it issued a 2007

notice of default (the "2007 NOD," Ex. BT-N),[2] a 2008 notice of sale (the "2008 NOS," Ex. BT-

W), and the trustee's deed upon sale (the "Trustee Deed," Ex. CE-8, together with the 2007 NOD

---

including the Servicing Notes (defined herein), unless GMACM provided them to ETS at the time of foreclosure
referral. (*Id.* at 69:19–22.) Although ETS's chapter 11 case is now closed, the order closing the case explicitly
provided that ETS would preserve its records through these proceedings and that funds would have been available if
Moss received a judgment in his favor. (ECF Doc. # 10353.)

[2]      The Trust's Exhibits introduced as evidence will be denominated as Ex. BT __ and those of Moss as Ex.
CE __.

and the 2008 NOS, the "Notices,") and (ii) if Moss could establish that ETS acted with malice, what damages he could recover.

Based on the evidence at the hearing, and the Court's evaluation of the credibility of the witnesses, the Court finds that Moss failed to prove his Claim by a preponderance of the evidence. Specifically, Moss failed to prove that ETS acted with malice in issuing the Notices. Furthermore, even if Moss had established that ETS acted with malice, Moss offered no competent evidence that he suffered compensable damages. For these reasons, the Court **ORDERS THE CLAIM DISALLOWED AND EXPUNGED.**

## I.    BACKGROUND[3]

### A.    Factual Background

#### 1.    The Loan, Note, Deed of Trust, and Assignments

On June 22, 2005, Moss, a California resident, obtained a $612,500.00 loan (the "Loan") from non-debtor CJ Mortgage, Inc., a California corporation ("CJM"), evidenced by an endorsed adjustable rate note (the "Note," Ex. BT-C) and secured by a deed of trust (the "Deed of Trust," Ex. BT-D) that identified CJM as the lender and Alliance Title as the trustee.

On June 27, 2005, CJM assigned the Deed of Trust to Option One Mortgage (the "Option One Assignment," Ex. BT-E). The Option One Assignment was recorded on April 4, 2007. (*See* Option One Assignment at 1.)

The genesis of this dispute stems, in part, from a corporation assignment of deed of trust from Option One Mortgage to TCIF, LLC. (the "TCIF, LLC Assignment," Ex. BT-F).[4]

---

[3]    This Opinion includes the Court's findings of fact under FED. R. CIV. P. 52, made applicable to this proceeding by FED. R. BANK. P. 7052. The findings of fact also include the Court's findings with respect to the credibility of the two witnesses who testified at trial—Moss (on his own behalf) and Lathrop (for the Trust).

Numerous irregularities appear in this document. (*Id.* at BCT000386.) The typed date with the signature reads "May 07, 2008," but that date is crossed out and replaced with a handwritten date of "Sept 15, 2007." (*Id.*) The document is notarized, but again the typed date, May 7, 2008, has been altered, with the "8" in the year written over with what appears to be a "7."[5] (*Id.*)

The Deed of Trust was further assigned by TCIF, LLC. to the Bank of New York Trust Company ("BNY"), through an assignment of deed of trust dated April 29, 2008 (the "BNY Assignment," Ex. BT-G) and notarized the following day. (*Id.* at BCT000387.)

Also central to this dispute is a substitution of trustee dated September 21, 2006 (the "Substitution of Trustee," Ex. BT-H), executed by TCIF REO2, LLC. The Substitution of Trustee incorrectly represents that TCIF REO2, LLC. was the present beneficiary under the Deed of Trust. No evidence has been provided that TCIF REO2, LLC. (or TCIF, LLC.) had become a beneficiary of the Deed of Trust as of that date. Because of this defect, the Trust acknowledges that the Substitution of Trustee was ineffective to substitute ETS as trustee. Although, it further asserts that ETS was unaware of that defect when it received the substitution.

GMAC Mortgage ("GMACM"), another Debtor in this case, serviced the Loan from March 14, 2006, until servicing was transferred to Ocwen Loan Servicing, LLC ("Ocwen,") on February 16, 2013.

---

[4]     There are two TCIF entities, TCIF, LLC. and TCIF REO2, LLC., involved in this dispute. As the district court noted, "[t]he distinction is not explained and does not appear to be material." *Moss II*, 2016 WL 3136869, at *1 n.1. The district court used the two TCIF entities interchangeably in its opinion, and as discussed below, the Trust appears to use the two interchangeably. This Court, following the district court, assumes without deciding that the distinction is immaterial. (Trial Tr. 165:15–25.)

[5]     GMACM's loan servicing notes, introduced in evidence at trial, contain an entry showing receipt of the TCIF, LLC. Assignment on May 8, 2008. ("Servicing Notes," Ex. BT–A, at BCT000501.)

2.    *The First Foreclosure*

The Servicing Notes indicate that on April 13, 2006, Moss was due and owing for a payment due on March 1, 2006. (*Id.* at BCT000433.) GMACM sent a letter to Moss indicating that he was in breach; GMACM also attempted to contact Moss multiple times via telephone through the month of April, reaching his answering machine. (*Id.* at BCT000554–55.) As of May 15, 2006, the account was current only through March, meaning that two payments were then owing. (*Id.* at BCT000433.) GMACM again sent breach letters, and left voicemails for Moss.[6] (*Id.* at BCT000553–54.)

Moss made no payments and, on June 16, 2006, GMACM referred Moss's account to ETS for foreclosure. (*Id.* at BCT000551.) On June 20, 2006, ETS issued a notice of default (the "2006 NOD," BT–U) (the "First Foreclosure"). Because the Substitution of Trustee is dated September 21, 2006, and because the Substitution of Trustee only gave ETS apparent authority as of that date (at the earliest), ETS lacked even apparent authority to issue the 2006 NOD. *See Moss II*, 2016 WL 3136869, at *7.

Despite referring Moss's Loan to ETS for foreclsosure, GMACM was still attempting to contact Moss. (Servicing Notes at BCT000550.) By November 2006, Moss had made no payments since March 2006. (*Id.* at BCT000432.) On November 15, 2006, an entry, made by GMACM employee Susan Turner, reads "[p]lease obtain assignment from [CJM] . . . ." (*Id.* at BCT 000547.) Before any further developments, however, GMACM and Moss agreed to a repayment plan. (*Id.* at BCT 000545–46.) The terms of that plan are not in evidence.

---

[6]    The Trust introduced multiple breach letters into evidence. *See* Ex. BT–J (breach letter dated May 15, 2006); Ex. BT–K (breach letter dated June 4, 2007); Ex. BT–L (breach letter dated July 3, 2007); Ex. BT–M (breach letter dated August 2, 2007).

### 3.  The Second Foreclosure

Moss, however, did not remain consistently current under this repayment plan.  (*Id.* at BCT000431.)  No earlier than April 28, 2007, the Servicing Notes indicate that GMACM was attempting to "access the Option One Assignment."  (*Id*. at BCT000536.)  No testimony was offered as to what was meant by trying to "access an assignment."  On May 4, 2007, ETS issued a rescission of the 2006 NOD (the "2007 NOR," Ex. BT-V).  Throughout the month of June, GMACM attempted to communicate options to Moss to avoid a foreclosure.  (Servicing Notes at BCT000531–32.)  This pattern continued throughout July and August and GMACM continued attempting to contact Moss to discuss his delinquent payments.  (*Id.* at BCT000527–29.)

Moss's account was again referred to foreclosure on September 17, 2007.  (*Id.* at BCT000526.)  According to Lathrop, ETS would only have access to information on Moss's account when it received the referral from GMACM.  *See supra* n.1.  On September 17, 2007, ETS issued the 2007 NOD (the "Second Foreclosure").

GMACM apparently had problems obtaining a title insurance policy, as noted in the Servicing Notes on October 25, 2007.  (*Id.* at BCT000523–24.)  On October 29, 2007, GMACM notified ETS that the title policy had been obtained.  (*Id.* at BCT000522.)  According to the Servicing Notes, on November 29, 2007, GMACM became aware of the existence of an assignment—"OPTION ONE MORTGAGE TO TCIF REI2 LLC."  (*Id.* at BCT000520.)

A foreclosure sale was originally scheduled for January 8, 2008, but title issues regarding GMACM's seniority appear to have delayed the sale.[7]  (*Id.* at BCT000516–17.)  Furthermore, GMACM's January 23, 2008 Servicing Notes indicate that "[the] assignment [was] not available[]"; however, it is unclear which one of the assignments was unavailable.  (*Id.* at

---

[7]    No testimony at trial was offered regarding GMACM's priority *vis-à-vis* other creditors.

BCT000514.)  It is likely that either the Option One Assignment or TCIF, LLC Assignment was unavailable.

Furthermore, GMACM continued to have problems verifying that it would be able to convey marketable title in a sale, with its records stating, "[p]lease find an authorized signer . . . from Option One Mortgage." (*Id.* at BCT000513.)  An individual identified only in the Servicing Notes as "dee," inquired of GMACM about the status of the assignment on February 29, 2008.  (*Id.* at BCT000511.)  From the context of the Servicing Notes, it appears that "dee" may have been an ETS employee, as "dee" stated, "we are holding publication due to this requirement." (*Id.*)  However, neither party offered evidence at trial to prove the identity of "dee."  Sale of the property scheduled in March (*Id.* at BCT000510) and April (*Id.* at BCT000511) never occurred, because priority issues prevented GMACM from completing the sale.  (*Id.*)

On April 28, 2008, GMACM was waiting to obtain the TCIF, LLC Assignment, though the Servicing Notes refer to the assignment as being from Option One to TCIF REO2.  (*Id.* at BCT000504–05.)  In May, GMACM received notification that the BNY Assignment was mailed to GMACM and that GMACM was still waiting for the TCIF, LLC Assignment.  (*Id.* at BCT000503.)  On May 8, 2008, GMACM's Servicing Notes indicated it had the TCIF, LLC Assignment and it "went out"[8] to ETS.  (*Id.* at BCT000501.)

On May 9, 2008, a computer-generated message stating "FORECLOSURE STARTED DELINQUET 180+ DAYS" appeared.  (*Id.*)  A sale was scheduled for June 13, 2008.  (*Id.* at BCT000500.)  On May 19, 2008, after GMACM indicated that it had the TCIF, LLC

---

[8]        These are terms which are apparently used within GMACM, but the record does not establish what these terms specifically mean.

Assignment, and after it "went out" to ETS, ETS published the 2008 NOS.  On June 11, 2008,

however, for reasons of hardship,[9] GMACM approved a loan modification for Moss (the

"Foreclosure Repayment Agreement," Ex. BT-O).  (*Id.* at BCT000498–99.)  (*See* Foreclosure

Repayment Agreement, dated June 13, 2008, at BCT000016.)  Moss made the $50,000 down

payment required by the Foreclosure Repayment Agreement.  (Servicing Notes at BCT000430.)

The Servicing Notes contain an entry stating "[please] postpone sale we have a repay plan in

place."  (*Id.* at BCT000496.)  The record does not indicate whether ETS received this

communication from GMACM.

### 4.  *The Continuing Failure By Moss to Stay Current*

Although Moss made the required down payment, he was again delinquent on the Loan

as of July 16, 2008.  (*Id.* at BCT000493.)  GMACM resumed foreclosure two days later.  (*Id.*)

GMACM received a partial payment in the form a personal check from Moss on August 21,

2008.  (*Id.* at BCT000491.)  Four days later, GMACM returned the payment because it was

untimely and less than the full amount owed.  (*Id.* at BCT000491–92.)

Although the Servicing Notes previously indicated that GMACM had all necessary

assignments, on February 17, 2009, an entry appears stating: "Need assignment from Option One

to TCIF REO2, LLC to file with TDUS."  (*Id.* at BCT000481.)  However, that assignment was

"unavailable"; the Servicing Notes did not explain why.  (*Id.* at BCT000480.)  Nevertheless,

"[f]oreclosure [was] sent to [ETS]" on February 24, 2009.  (*Id.*)  On April 15, 2009, GMACM

indicated it lacked "signing authority" for the TCIF REO2, LLC assignment.  (*Id.* at

BCT000469–470.)

---

[9]    Some states, including California, have programs to assist homeowners who fall behind in their mortgage.
*See* http://www.calhfa.ca.gov/myaccount/hardship/cmp.htm.  Moss represented to GMACM that he was ill and had

Multiple requests by unknown individuals were sent to have the "assignor read Sand Canyon Corporation, f/k/a Option One Mortgage." (*Id.* at BCT 000466–67.) No testimony was offered as to what was meant by this entry or why GMACM requested it be made. The only evidence Moss offered regarding this entry was the Servicing Notes themselves. (Trial Tr. 36:2-9.) The sale went forward and closed on May 7, 2009. (*Id.* at BCT000465.) The Trustee Deed was recorded on May 18, 2009.

Discussions about the assignments continued. On June 5, 2009, Mira Smoot, a GMACM employee, asked Elizabeth Ogbomon, not otherwise identified, "Do you still need [the TCIF LLC Assignment]?" (*Id.* at BCT000461.) Unambiguous evidence in the record shows that it was only then that GMACM realized that the TCIF LLC Assignment was "an intervening assignment that is missing from the beneficial chain." (*Id.*) The assignment, however, appears to have been "uploaded," though it is not clear to which system, by August 31, 2009. (*Id.* at BCT000456.)

5.    *The Pre-Petition Lawsuits*

On July 22, 2009, Moss filed a complaint in the Superior Court, asserting various state law causes of action against BNY. *Moss II,* 2016 WL 3136869, at *2. Specifically, the complaint alleged the following causes of action: "(i) to set aside the trustee sale; (ii) fraud; (iii) quiet title; and (iv) declaratory relief." *See Moss I*, 2015 WL 5025284, at *3. Because the account was involved in litigation, GMACM was unable to have contact with Moss or the property. (Servicing Notes at BCT000449.) The litigation with BNY ultimately settled. (*See* Ex. BT-S, the "BNY Settlement.")

---

"lawsuits tied up in the court system." (Servicing Notes at BCT000498.) The record only indicates that Moss was eligible for assistance for reasons of "hardship," and no additional testimony confirms the basis of this agreement.

On May 5, 2011, Moss filed the action against ETS in the Superior Court which forms the basis of his Claim (the "ETS Complaint," Ex. BT-Z). Although a default was entered against ETS after it failed to appear, this Court previously ruled, and the district court affirmed, that the default had no preclusive effect because the Debtors filed their chapter 11 cases before a default judgment was entered. *Moss I*, 2015 WL 5025284, at *6; *Moss II*, 2016 WL 3136869, at *4.

On May 14, 2012, the Debtors filed for relief under chapter 11 of the Bankruptcy Code, which stayed Moss's lawsuit against ETS. ETS subsequently issued a notice rescinding the Trustee Deed, dated September 13, 2012 (the "Notice of Rescission," Ex. BT-Q), and a notice rescinding the 2007 NOD on January 9, 2013 (the "Notice Rescinding the 2007 NOD," Ex. BT-R). As already mentioned, Moss remains in possession of the property. (*See* BNY Settlement.)

### B.    The Prior Proceedings

When the Court initially heard the Trust's objection to Moss's Claim, the Court concluded that to overcome California's "qualified interest privilege," Moss had to plead and prove malice on the part of ETS. Moss's original Claim did not do so, but the Court granted Moss leave to amend the Claim. He amended the Claim, but the Trust renewed its objection to the amended Claim, arguing that Moss still failed to plead malice. In *Moss I*, this Court held that Moss failed to *allege* facts supporting a reasonable inference that ETS acted with malice, a requirement of California law for Moss to prevail on his Claim. *See Moss I*, 2015 WL 5025284, at *1. The Court also rejected Moss's argument that the default entered against ETS in the Superior Court had preclusive effect. *Id.* at *6.

The district court in *Moss II* affirmed in part and reversed in part. *See Moss II*, 2016 WL 3136869, at *8. The district court affirmed the ruling that the default in the Superior Court had no preclusive effect. *Id.* at *4 ("The Bankruptcy Court correctly held that the Superior Court's

entry of default against ETS does not have preclusive effect.").  The district court also held, as

did this Court, that the quaified privilege is available to ETS, and that in order to prevail on his

Claim, Moss must *prove* that ETS acted with malice when it published the notices.  *Id.* at *6

("The qualified privilege afforded trustees in nonjudicial foreclosure proceedings is available to

ETS as a putative trustee, except on a showing of malice.").

 The district court reversed and remanded, however, because it found that Moss

sufficently *alleged* malice.  *Id.* at *6 ("Several facts in the record at a minimum raise a serious

question as to whether ETS acted with malice.").  The district court did not find that Moss

proved ETS acted with malice.  *See id.* at *6.

 The district court pointed to several facts in the record supporting the possibility that ETS

acted with malice.  First, ETS recorded the 2006 NOD on June 20, 2006, and at that time, TCIF

LLC had not yet, even invalidly, substituted ETS as trustee.  *Id.*  That is because the Substitution

of Trustee is dated September 21, 2006, after the date of the 2006 NOD.  Thus, "ETS lacked

even apparent authority to issue the 2006 NOD."  *Id.*

 Second, the district court said that given the irregularities in the TCIF LLC Assignment

discussed above, Moss could properly allege that someone attempted to change the document, in

the district court's language, "to make it appear that TCIF was granted the authority to appoint

ETS as trustee in 2007 before ETS issued the 2007 NOD on September 18, 2007."  *Id.*  The

district court believed the alteration of the date to be significant because "May 7, 2008 postdates

the BNY Assignment [on April 29, 2008.]"  *Id.*

 Third, the district court stated that ETS's admission that it, in essence, "sold Moss's

property when it should not have, because of a 'failure' to communicate, intentional or not, by an

unidentified person to another unidentified person," was "obfuscate[d]" because the statement

11

does not clarify whether the failure to communicate was innocent, reckless, or intentional.  *Id.*

Further, ETS's role, now known to be the trustee in foreclosure proceedings for GMACM with

limited contact prior to foreclosures, was not known.  *Id.*

> Fourth, the district court stated that:

>> Attached to the Substitution of Trustee appointing ETS is an affidavit of mailing, reciting that the document was mailed on November 8, 2006, and containing a certification under penalty of perjury by the Trustee Sale Officer that the foregoing is correct; but the document is dated November 7, 2006, one day before the attested-to mailing. Another irregularity occurred on May 7, 2009, when ETS recorded the Trustee's Deed Upon Sale with the 2006 NOD and the 2007 NOD.  However, the 2006 NOD had been rescinded two years earlier in a Notice of Rescission dated May 4, 2007.  Despite providing these documents to the Bankruptcy Court, the Trust did not provide a copy of the 2007 NOD itself to the Bankruptcy Court.

*Id.*  The Trust has provided a copy of the 2007 NOD—which was not part of the record before

the trial—and the parties stipulated to its admission in evidence at trial.  (*See* Ex. BT-N.)

## II.    LEGAL STANDARDS

### A.    Negligence

#### 1.  *Negligence, and Duty of Care, Under California Law*

Moss argues that before acting to foreclose on property, California law imposes a duty on

a trustee to investigate the validity of a substitution of trustee that it receives, and that ETS's

failure to investigate permits Moss to recover damages from ETS for negligence.  Both this

Court and the district court have already rejected this argument.  *See Moss II*, 2016 WL 3136869,

at *5–6; *see also Moss I*, 2015 WL 5025284, at *4.

In California, "[t]o state a cause of action for negligence, a plaintiff must allege (1) the

defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, and (3) the

breach proximately caused the plaintiff's damages or injuries."  *Thomas v. Stenberg,* 206 Cal.

App. 4th 654, 662 (2012).  "Whether a duty of care exists is a question of law to be determined on a case-by-case basis." *Lueras v. BAC Home Loans Servicing, LP*, 221 Cal. App. 4th 49, 62 (2013) (internal citation omitted).  "Absent special circumstances a loan transaction is at arms-length and no duties arise from the loan transaction outside of those in the agreement." *Grant v. WMC Mortg. Corp.*, 2010 WL 2509415, at *3 (E.D. Cal. June 17, 2010) (internal citations omitted).  Furthermore, "[a] nonjudicial foreclosure sale is accompanied by a common law presumption that it was conducted regularly and fairly." *Cabanilla v. Wells Fargo Bank, N.A.*, 2013 WL 1633626, at *3 (Cal. Ct. App. Apr. 17, 2013).  As the district court ruled, "ETS's actions here are protected by the qualified privilege in [Cal. Civ. Code] §§ 2924(d) and 47(c) absent a showing of malice." *Moss II*, 2016 WL 3136869, at *7.

It is black-letter law in California that barring a special agreement, the trustee in a nonjudicial foreclosure owes no special duty.

> The trustee in nonjudicial foreclosure is not a true trustee with fiduciary duties, but rather a common agent for the trustor and beneficiary.  The scope and nature of the trustee's duties are exclusively defined by the deed of trust and the governing statutes. No other common law duties exist.

*Kachlon v. Markowitz*, 168 Cal. App. 4th 316, 335 (2008).  It is well settled that, "[t]he nonjudicial foreclosure process is commenced when a trustee, mortgagee, or beneficiary, or any of their authorized agents files a [n]otice of [d]efault." *Moss I*, 2015 WL 5025284, at *6 (citing *Rockridge Tr. v. Wells Fargo, N.A.*, 985 F.Supp.2d 1110, 1145 (N.D. Cal.2013) (quoting Cal. Civ. Code § 2924(a)(1))).

    2. *California Civil Code Section 2924(d)*

California Civil Code Section 2924(d) provides:

> (d) All of the following shall constitute privileged communications pursuant to Section 47:

(1) The mailing, publication, and delivery of notices as required by this section.

(2) Performance of the procedures set forth in this article.

(3) Performance of the functions and procedures set forth in this article if those functions and procedures are necessary to carry out the duties described in Sections 729.040, 729.050, and 729.080 of the Code of Civil Procedure.

CAL. CIV. CODE § 2924(d).  Under California law, the "statutorily required [pursuant to Civil Code section 2941, subdivision (b)(3),] mailing, publication, and delivery of notices in nonjudicial foreclosures are privileged communications."  *Kachlon,* 168 Cal. App. 4th at 333.  There is an exception if "the publication was motivated by hatred or ill will towards the plaintiff or a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard for the plaintiff's rights."  *See id.* at 336 (internal citations and quotations omitted).

In *Moss II*, the district court wrote that the following was required to overcome the statutory privilege:

> For purposes of overcoming the qualified privilege, malice means actual malice, meaning that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights.  [N]egligence in making a sufficient inquiry into the facts on which the statement was based does not, of itself, relinquish the privilege.  Mere inadvertence or forgetfulness, or careless blundering, is no evidence of malice.  [T]o constitute malice the negligence must be such as evidenced a wanton and reckless disregard of the consequences and of the rights and of the feelings of others.

*Moss II*, 2016 WL 3136869, at *6 (internal quotation marks and citations omitted).

Moss can prove "malice" by showing that (i) ETS was motivated by hatred or ill will towards Moss, or (ii) that ETS lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of Claimant's rights. *See id.* at *7.

### B.    Fraud

The elements for sustaining an action for fraud in California are "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Herrejon v. Ocwen Loan Servicing*, LLC, 980 F. Supp. 2d 1186, 1202 (E.D. Cal. 2013) (quoting *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 974 (1997)); *see also Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996); CAL. CIV. CODE § 1709 ("One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."). "A suit for fraud obviously does not involve an attempt to recover on a debt or note. As such, it stands separate and apart from any action . . . legislation seeks to preclude." *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1237–38 (1995).

Regarding damages in an action for fraud dealing with property:

> In fraud cases involving the purchase, sale or exchange of property, the Legislature has expressly provided that the out-of-pocket rather than the benefit-of-the-bargain measure of damages should apply. This . . . does not apply, however, when a victim is defrauded by its fiduciaries. . . . A clear exception to section 3343 has emerged in cases involving fraudulent fiduciaries. *In the absence of a fiduciary relationship, recovery in a tort action for fraud is limited to the actual damages suffered by the plaintiff.*
>
> Punitive damages are recoverable in those fraud actions involving intentional, but not negligent, misrepresentations. The jury also has discretion to award prejudgment interest on the plaintiff's loss from the time the plaintiff parted with the money or property on the basis of the defendant's fraud. A plaintiff is not entitled, however, to attorneys' fees as an element of damages in actions for fraud in which the defendant is a fiduciary.

*Id.* at 1240–41 (internal quotation marks, footnotes and citations omitted; emphasis added).

### C.    Intentional Infliction of Emotional Distress

#### 1.    *The Prima Facie Case*

In California, a *prima facie* case of intentional infliction of emotional distress includes, "(1) extreme and outrageous conduct by the defendant with the intent of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991). The conduct standard is high; to be outrageous, conduct must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* (internal citation omitted); *see also Campbell v. Santa Cruz Cty.*, 2016 WL 6822081, at *12 (N.D. Cal. Nov. 18, 2016) (internal citations omitted).

Under California law, a wrongful foreclosure is not, by itself, enough to sustain a cause of action for IIED. *See Smith v. Wachovia*, 2009 WL 1948829, at *4 (N.D. Cal. July 6, 2009) ("Plaintiff has alleged that defendant has wrongfully and intentionally initiated non-judicial foreclosure proceedings against him . . . .  Taking this allegation as true, this conduct was not so extreme as to exceed the bounds of civilized society, nor has plaintiff alleged it to be.").

#### 2.    *Recklessness Demands Additional Elements*

Where recklessness is the basis for the complaint, "[t]he defendant must have engaged in 'conduct intended to inflict injury or engaged in with the realization that injury will result.'" *Christensen*, 54 Cal. 3d at 903 (1991) (internal citation omitted).  The mental distress that is caused by the conduct must be "of a very serious kind." *Id.* at 904–05.  Reckless conduct also must be directed at the plaintiff, in contrast to negligence, because "[t]he requirement that the

16

defendant's conduct be directed primarily at the plaintiff is a factor which distinguishes intentional infliction of emotional distress from the negligent infliction of such injury." *Id.* at 904.

Furthermore, when recklessness is the basis for the complaint, "the plaintiff is usually present at the time of the conduct and is known by the defendant to be present." *Id.* at 905. This contrasts with simple negligence, because "[w]here reckless disregard of the plaintiff's interests is the theory of recovery, the presence of the plaintiff at the time the outrageous conduct occurs *element establishing a higher degree of culpability* which, in turn, justifies recovery of greater damages by a broader group of plaintiffs than allowed on a negligent infliction of emotional distress theory." *Id.* at 906 (emphasis added).

### 3. *Negligent Infliction of Emotional Distress in California Is Available When a Defendant Has a Special Duty to the Plaintiff*

For *negligent* infliction of emotional distress, "there is no duty to avoid negligently causing emotional distress to another, and that damages for emotional distress are recoverable only if the defendant has breached some other duty to the plaintiff." *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 984 (1993). "Unless the defendant has assumed a duty to plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if the emotional distress arises out of the defendant's breach of some other legal duty and the emotional distress is proximately caused by that breach of duty." *Id.* at 985. In addition to proving that there is a special duty, the plaintiff must show a threat of physical injury. *See id.* However, under California law, negligent infliction of emotional distress is simply a convenient way of describing the tort of negligence; it is not an independent tort. *See Christensen v.*

*Superior Court*, 54 Cal. 3d at 894 ("Negligent infliction of emotional distress is not an independent tort.").

### 4. *Damages*

California courts also restrict damages in actions for NIED when they claim mere economic loss; as California courts have put it, "recovery for worry, distress and unhappiness as the result of damage to property . . . is not permitted [when defendant is merely negligent]." *Branch v. Homefed Bank*, 6 Cal. App. 4th 793, 801 (1992) (internal citations omitted). The rule in California squarely prohibits damages for consequential injuries as a result of economic loss in terms of emotional distress. *Id.* Damages can be made available to persons with a statutory right. *Christensen v. Superior Court*, 54 Cal. 3d at 894.

### III.    DISCUSSION

The evidentiary hearing centered around malice and damages. The Court finds that Moss failed to prove by a preponderance of the evidence that ETS acted with malice (including reckless disregard). Additionally, even if Moss had established malice, he failed to establish damages.

### A.  Malice

Malice was an essential element for Moss to establish, because, as the district court concluded, the publishing of the Notices was privileged absent a showing of malice. *Moss II,* 2016 WL 3136869 at *7 ("ETS's actions here are protected by the qualified privilege in §§ 2924(d) and 47(c) absent a showing of malice."). Specifically, the district court instructed this court that Moss must show that *ETS* (and not any other entity) *acted with malice when it published the Notices*. *See id.* Absent this specific showing, Moss's Claim fails.

The Court finds that the Trust has offered reasonable explanations for the concerns that the district court determined raised issues regarding ETS's conduct; these explanations (which the Court credits) defeat any argument that ETS acted with malice (including reckless disregard). The Court finds and concludes that Moss failed to meet his burden of proving that ETS acted with malice.  The record as a whole clearly demonstrates that Moss's problems were the result of his financial travails, repeated loan payment defaults, and his inability to remain current on the Loan after GMACM, on several separate occasions, entered into loan repayment and forbearance plans designed to allow Moss to avoid foreclosure and keep his home.  Moss did not complain when he sought and GMACM granted these loan repayment and forbearance plans.  ETS mailed notices of default and scheduled foreclosure sales after GMACM—its sister company and the loan servicer—directed ETS to proceed with foreclosure when Moss's loan defaults continued. There is no doubt a defect in the Substitution of Trustee existed, invalidating ETS's actions in initiating and then foreclosing on the property.  But there is no evidence that ETS was aware of the defect when it issued the notices and proceeded to foreclose on the property.  Those foreclosure sales were reversed and Moss remains in possession of the property.  Under California law, contrary to Moss's arguments, ETS had no duty to conduct a title search and investigate the validity of the Substitution of Trustee it received from TCF REO2, LLC, which appeared regular on its face.

Before diving into specific facts, the Court notes that, throughout the hearing, Moss tried to disguise what is really a negligence claim, which he may not bring, as a claim involving malice.  Notably in Moss's opening statement, he adamantly stated:

> MR. MOSS:  I want to make a brief opening statement, which is that this is—*my claim is based on negligence, negligence under California law.  It is not based precisely on the issuance of notices. It is based on negligence* and a duty on the part of the trustee, ETS.

And thereafter, *because of that negligence*, they issued the notices. *But this claim and the amended claim that you allowed me asserts negligence, simple negligence*, against the trustee, for failing to adhere to its duty—and that duty is said as precisely as I can—to treat both the beneficiary and the trustor, who is me, equally. And in this case, the evidence will show that they did not do that and, because of that, they breached that duty and caused harm.

THE COURT:   I believe that the district court affirmed with respect to finding that negligence is not a sufficient basis for claim. How do you respond to that?

MR. MOSS:   Well, that's—with all due respect, [t]hat's not my reading of the case.

(Trial Tr. 6:4–16; 7:3–7) (emphasis added). However, when the Court inquired whether Moss

could proceed on malice, he stated he would.

1.  *The 2006 NOD Forms No Basis of the Claim and Moss Proffered No Evidence of Malice Related to it.*

The first fact that the district court suggested could show "malice" was that the 2006

NOD was issued by ETS when it lacked even apparent authority. *Moss II*, 2016 WL 3136869, at

*7. The Court, however, notes that Moss never incorporated in the ETS Complaint any facts

related to the issuance of the 2006 NOD, and none of his causes of action were dependent on the

events related to the issuance of the 2006 NOD. (*See* ETS Complaint at ¶ 17 (explicitly

referencing only the 2007 NOD).) The time for filing claims has long passed; in fact ETS's case

is closed, and this Court previously allowed Moss a chance to amend his Claim. Also, Moss was

apparently unaware of the 2006 NOD, and so, it would be difficult to contemplate how his

causes of action incorporated the 2006 NOD, and how the 2006 NOD caused him to sustain any

emotional damages:

THE COURT:   Because I've been asking about the notice of default dated September 17, 2007, when, in fact, there was an earlier notice of default, which is –

> MR. MOSS:  *There was?*
>
> THE COURT:  —Exhibit U.  And it's a notice of [d]efault dated
> June 19, 2006.  And, of course, the date of that notice of default is
> before the date of the substitution of trustee.

(Trial Tr. 163:17–24) (emphasis added).  The 2006 NOD and the 2007 NOR were admitted in

evidence at trial.  Moss proffered neither supporting evidence nor argument that the 2006 NOD

and 2007 NOR were issued maliciously, and malice cannot be inferred on these bare facts.  The

burden was on Moss to show something more than an irregularity, and he failed to do so.

The Court finds that Moss failed to prove malice on the part of ETS in issuing the

Notices.

> 2.  *The Irregularities in the TCIF LLC Assignment Do Not Affect ETS's Reasonable*
> *Belief that it was the Trustee.*

The second fact that the district court suggested could evidence malice was the fact that

there were irregularities in the TCIF LLC. Assignment.  *See Moss II*, 2016 WL 3136869, at *7.

Moss described the document as evidencing "hanky-panky . . . in trying to validate the chain of

title documents . . . to make . . . the substitution of ETS [] valid."  (Trial Tr. 35:2–5.)  Moss

testified that "they were aware of the problem [with the irregularities in the TCIF LLC

Assignment]."  (Trial Tr. 39:16–19.)  However, this is not indicative of ETS's malice in

publishing the Notices for two reasons.  First, the Servicing Notes referenced by Moss in this

portion of his testimony are dated from mid to late 2009.  (Servicing Notes at BCT000456–454.)

What was or was not known in 2009 is not relevant to any facts ETS could have discovered in its

records when the Notices were published in 2006 and 2007.  Second, as Lathrop testified, ETS

did not have unfettered access to GMACM's records, only those that were provided by GMACM

to ETS (Trial Tr. 69:19–22) and Moss, by stating that "they" knew, does not distinguish between

GMACM—the Loan servicer that repeatedly reached out to Moss and entered into two loan

forbearance and repayment plans—and ETS—the putative trustee that followed the instructions

of GMACM and initiated foreclosure when Moss repeatedly defaulted on the Loan.  Moss

provided no evidentiary or legal basis to impute GMACM's knowledge to ETS.  (Trial Tr. 40:2–

3 (Moss) ("I testify at this moment, I don't know if the [Servicing Notes] were created by ETS or

by ResCap.").

The Trust also credibly showed that ETS's reasonable belief that it was substituted as

trustee is unaffected by the TCIF LLC Assignment.  The TCIF LLC Assignment, even

construing the irregularities to provide for the earliest possible date, was signed on September

15, 2007.  However, the Substitution of Trustee was recorded on November 10, 2006.  Thus, the

irregularities in the TCIF LLC. Assignment, which was signed at the earliest in 2007, would not

affect ETS's belief that it was trustee, as the Substitution of Trustee was recorded in 2006, before

any irregularities in the TCIF LLC Assignment occurred.  Once the Substitution of Trustee was

recorded, ETS had constructive notice under California law that it was the proper trustee.  *First

Bank v. E. W. Bank*, 199 Cal. App. 4th 1309, 1314 (2011) (stating that "an instrument or

document which is recorded and properly indexed imparts constructive notice").  Moreover, the

case law is clear that ETS did not owe a special duty to Moss to make further investigation as a

fiduciary might be bound to do.  *See Kachlon*, 168 Cal. App. 4th at 355 (explicitly rejecting that

a trustee in a nonjudicial foreclosure has a fiduciary, or any common-law, duty outside of those

defined by statutes).

Moss was unable to prove that ETS was even aware of the irregularities in the TCIF LLC

Assignment.  But even if he could, it would not affect ETS's reasonable belief that it was, in fact,

the proper trustee, because the TCIF LLC Assignment postdates the Substitution of Trustee.

When ETS conducted the sales, a "presumption [attached] that it was conducted regularly and

fairly." *Cabanilla*, 2013 WL 1633626, at *3. For this reason, Moss failed to prove that the

irregularities in the TCIF LLC Assignment were malicious.

> 3. *ETS is Protected by a Good Faith Presumption, and Moreover, the Bulk of the Evidence in the Record Contradicts Moss's Testimony*

Third, the district court stated that ETS's statements that it conducted the sale "in error"

did not clearly show whether the mistake was innocent, reckless, or intentional. The record at

trial does not support a finding that the sale was conducted recklessly. First, as Lathrop testified,

ETS and GMACM were separate companies; Lathrop's testimony established that ETS would

not have access to all of GMACM's records. (Trial Tr. 69:19–22.) Second, the case law in

California creates a presumption that a foreclosure sale is conducted properly. *See Cabanilla*,

2013 WL 1633626, at *3. Thus, the burden rested with Moss to show not only that ETS

conducted the sale in error, but also that it did so with malice.

Significantly, Moss testified that ETS probably did *not* have any files showing that it was

improperly appointed or lacked a good faith basis to proceed with the foreclosure. Moss stated

that:

> the ETS files do not contain any documentation whatsoever that
> ETS was told they were improperly appointed or that ETS
> conducted any kind of investigation into their status or that ETS
> was given any document that stated we want you to start the
> foreclosure process.

(Trial Tr. 44:2–7.) Regarding Moss's argument that ETS did not conduct any further

investigation, the recorded Substitution of Trustee provided a basis for ETS to believe that it was

the trustee, and the district court declined to impose a duty of special inquiry on ETS. *See Moss*

*II*, 2016 WL 3136869, at *6 ("Negligence in making a sufficient inquiry into the facts on which

the statement was based does not, of itself, relinquish the privilege") (citing *Miller v. Canary*

*Asset Mgmt. Inc.*, No. B258413, 2015 WL 9437650, at *7 (Cal Ct. App. Dec. 23, 2015) (internal

citation omitted)).  Moreover, the Servicing Notes show that on September 17, 2007, GMACM *explicitly* sent the foreclosure to ETS, contrary to Moss's testimony that ETS was not notified it should start foreclosure.  (Servicing Notes at BCT000525.)

Finally, ETS's conduct after the sale supports finding that ETS acted with a reasonable belief that it was the trustee.  When conduct did occur that placed ETS on notice that it may not have been properly designated as the substitute trustee—specifically the 2011 lawsuit Moss filed against BNY—ETS, which was not a defendant in the BNY lawsuit, rescinded the foreclosure sale of Moss's property, even before BNY settled the case.

Two other facts support a finding that ETS acted without malice.  First, the sale which caused ETS to issue the Trustee Deed, and the Foreclosure Repayment Agreement (Ex. BT-O), both occurred on June 13, 2008.  ETS's defense that miscommunications caused it to conduct the foreclosure sale notwithstanding the Foreclosure Repayment Agreement are far more plausible.  Second, after an exhaustive review of the Servicing Notes, it is apparent that GMACM did not know that there was a missing assignment in the chain of title until June 5, 2009.  Though there were earlier miscommunications about the assignment, it was only then that GMACM realized that there was a defect in the chain of title, which it corrected by August 31, 2009.  Therefore, the evidence does not support that ETS acted with mailice, as it had no reason to doubt before then that it had authority to conduct the sale.

ETS had no reason to think it was not the proper trustee, and so, it proceeded with the sale.  Moreover, GMACM expressly instructed ETS to do so.  California law is clear that ETS did not owe a special duty to Moss, contrary to Moss's arguments.  And, finally, ETS rescinded the sale when it became apparent that it was not properly substituted as the trustee.

    4.   *Other Irregularities Exist, but They Have Been Corrected, and to the One*
        *Remaining Irregularity, Moss Proffered No Evidence of Malice*

Fourth, the district court noted other irregularities in the documents.  An affidavit

attached to the Substitution of Trustee recites that the Substitution of Trustee was mailed on

November 8, 2006; however, the affidavit is dated November 7, 2006.  Another irregularity

occurred when ETS Recorded the Trustee Deed on May 18, 2009; the 2006 NOD was rescinded

on May 4, 2007, before the 2007 NOD issued; but no copy of the 2007 NOD (which provided

the justification for the Second Foreclosure) was previously in the record.  It was the 2007 NOD,

not the 2006 NOD, which led to the initiation of the Second Foreclosure; and the Trustee Deed

was issued as a result of the Second Foreclosure.  The Trust corrected this gap in the evidence

when it introduced the 2007 NOD in evidence at trial.

Neither side proffered an explanation for the mismatch of the date of the affidavit of

service of the Substitution of Trustee and the date of the substitution.  (Substitution of Trustee at

2.)  On November 7, 2006, an ETS trustee sale officer signed an affidavit, dated November 7,

2006, affirming that the Substitution of Trustee, dated November 8, 2006, was mailed to "the

trustee of record."  (*Id.*)  One or the other document may have been misdated, but this fact alone

does not establish malice by ETS.  A clerical error is as (or more) likely as a nefarious

explanation.

    5.   *Conclusion*

Moss proffered no other grounds for finding that ETS acted with malice.  For these

reasons, Moss failed to prove by a preponderance of the evidence that the ETS acted with malice

or fraudulent intent when it published the Notices.

### B.  Damages Incurred as a Result of ETS Commencing the Foreclosure

Even if Moss established malice or fraud, he was unable to show any damages.  Moss sought damages for his attorney's fees in commencing the ETS action.  The only evidence Moss offered at trial was an exhibit that he failed to produce in discovery and did not list, as required, in the Joint Pretrial Order purporting to show attorney's fees he incurred.  He proffered that the exhibit showed that he incurred fees as a result of his action against ETS.  (Trial Tr. 59:9–12.) However, these documents only evidenced attorney's fees Moss incurred in his litigation with BNY.  The Court sustained the Trust's objection and refused to admit the exhibit in evidence.[10] (*Id.* 59:19–22.)

Federal Rule of Bankruptcy Procedure 3001(c) requires that attorney fees be documented or an explanation of why they cannot be documented provided.  When the Court asked whether Moss could document attorney's fees incurred as a result of his litigation with ETS, he could not do so:

> MR. MOSS:    I'm sorry.
>
> THE COURT: Let me ask: in your exhibits, in your San Mateo County action against ETS, are there any exhibits that you've marked that reflect Michael B. Allen as making an appearance on your behalf?
>
> MR. MOSS:    No.
>
> THE COURT: And did he appear on your behalf in the action?
>
> MR. MOSS:    He did not appear officially, no.

---

[10]    The Court sustained the Trust's objection to the exhibit on multiple grounds.  First, Moss failed to list the exhibit in the Joint Pretrial Order which explicitly gave the parties notice that exhibits not listed were not admissible unless used for cross examination, rebuttal, or for good cause.  (Trial Tr. 61:3–10.)  Good cause was not shown because the exhibit was offered for the first time at the hearing, and was irrelevant to the ETS action.  Moss's attorney did not appear in the ETS action, only in the action against BNY.  The exhibit clearly showed the charges were for work in the BNY action.  Moss acknowledged that the attorney represented him in his lawsuit against BNY, which Moss settled.  (*Id.* 62:2–17.)

(Trial Tr. 60:16–23.)  Moss contended that the role of ETS was integral to the BNY action, and

that he should still be compensated.  (Trial Tr. 60:3–4.)  But the attorney invoices were dated

June 10, 2009.  (Trial Tr. 59:16–17.)  The ETS Complaint was dated May 3, 2011.  (*See* ETS

Complaint at 14.)  Quite clearly, the services by Moss's attorney were performed in connection

with the BNY lawsuit which Moss settled.  Moss failed to prove that he incurred attorneys fees

as a result of any conduct by ETS.

### C.    Fraud

The Fraud claim rests on the allegations that (1) ETS knew or should have known it

lacked authority to issue the notices; (2) ETS knew or should have known it could not conduct

the sale; (3) as a result of this action, Moss was caused to believe that his property was going to

be sold at a trustee's sale, and that the sale would not be cancelled unless and until he reached an

agreement with GMAC, (4) ETS intended that Moss would rely on these misrepresentations; (5)

Moss relied on those misrepresentations when he paid $50,000 to cancel the sale and in reliance

thereupon, never received notice of any subsequently scheduled sale, and (6) Moss has been

"damaged in an amount to be determined at trial."  (ETS Complaint at 10.)

Moss failed to prove that ETS acted with fraudulent intent.  First, ETS did *not* know nor

should it have known that it lacked authority to issue the Notices.  Once the Substitution of

Trustee was properly recorded, it had constructive notice that it was the trustee.  Moreover, ETS

proceeded with issuing the Notices only after GMACM directed ETS to initiate non-judicial

foreclosure based on Moss's numerous payment defaults.  Moss was actually in default at the

time of the sale; it was not ETS's actions that led Moss to believe that he could lose his property

through foreclosure.  In any event, under California law, the Notices were privileged, and

therefore not actionable, because ETS did not act with malice.

Moss failed to show any reliance on the Notices when he paid the $50,000 as part of the Foreclosure Repayment Agreement. First, the $50,000 was paid to GMACM, not ETS, and the amount was paid pursuant to the Foreclosure Repayment Plan, designed to allow Moss to keep his property despite his defaults. Moss paid the $50,000, which he actually owed, so that GMACM would not foreclose and evict him from his house. Finally, Moss cannot show damages because the Foreclosure Repayment Agreement benefitted Moss, allowing him to split the balance of $97,608.50 owed into smaller payments of $50,000.00 and the remaining $47,608.50 according to a payment schedule. (Foreclosure Repayment Agreement at BCT000016–17.) The Foreclosure Repayment Agreement was plainly beneficial to Moss. Moss's out-of-pocket losses were zero, and under California law, his damages are therefore zero, absent a fiduciary relationship which does not exist.

### D. Emotional Distress

#### 1. Negligence

Moss failed to establish any elements of a cause of action for negligent infliction of emotional distress. First, the publication of the Notices, for the reasons explained in the discussion of malice, are privileged. Second, Moss cannot allege that ETS owed him any duty. *Kachlon* and other cases are clear that under California law, the trustee in a nonjudicial foreclosure owes no special duty to the entity being foreclosed on. *Kachlon*, 168 Cal. App. 4th at 335. California courts squarely reject Moss's argument that there is a generalized duty to avoid negligently causing emotional distress. *See Potter*, 6 Cal. 4th at 984. Because no duty was breached, it follows that Moss cannot establish either breach or injury.

*2.  IIED*

Moss's claim for IIED fails because he did not establish intent on the part of ETS; nor did

he establish that ETS engaged in "extreme or outrageous conduct."

First, ETS's publication of the Notices was protected by the common interest privilege.

It follows that the protected action of publishing the Notices cannot form a basis for Moss's

claim.  To the extent that Moss claims that a wrongful foreclosure is "extreme and outrageous"

conduct, California courts have declined to hold that a wrongful foreclosure (a cause of action

that Moss has not alleged) is conduct that amounts to IIED.  *See Smith*, 2009 WL 1948829.

Moreover, Moss failed to prove causation.  Moss claims he feared being evicted from his

home.  But the record shows that Moss was delinquet on the Loan for months at a time.  Moss

cannot establish that "but for" the erroneous substitution, he would not have suffered emotional

distress.  Ironically, because ETS was not the trustee, Moss had *less* reason to fear eviction; ETS

had no ability to successfully foreclose and evict Moss from his property unless the defect in the

Substitution of Trustee was corrected.  This fact also shows that Moss would be unable to

establish proximate cause as well.

Finally, Moss cannot prove damages from process servers attempting to serve him.

Moss's argument was supported only by his testimony.  (Trial Tr. At 53:2–5 ("[MR. MOSS:]

They hired process servers that came to my house at 2 o'clock in the morning pounding on the

door.").)  But the service of process about which Moss complained was in the unlawful detainer

action brought (unsuccessfully) by BNY, not by ETS, as shown by Moss's answers during cross-

examination:

> Q.    [By Ms. Arett] They [the process servers] were trying to
> serve you in connection with the unlawful detainer action, correct?
>
> A.    [By Mr. Moss] That is correct.

Q.      Okay.  And since Bank of New York was the plaintiff, they
        were . . . acting on behalf of Bank of New York in trying to
        serve you, correct?

A.      I guess that's correct.

(Trial Tr. 56:8–14.)

Although Moss purported to have a statement of damages resulting from his emotional

distress (marked for identification as CE–19), the exhibit was never introduced into evidence,

and Moss's trial testimony failed to provide a basis for awarding emotional distress damages,

even if such damages were recoverable in an appropriate case.  Even if the litigation privilege

did not apply to Moss's allegations about improper service of process, Moss has offered no

theory why ETS would be liable for BNY's conduct.

## IV.    CONCLUSION

For the reasons above, Moss failed to prove that ETS acted with malice, and he did not

prove that he has any recoverable damages.  Therefore, Moss's Claim is **DISALLOWED AND**

**EXPUNGED.**

**IT IS SO ORDERED.**

Dated:    May 16, 2017
          New York, New York

                                    _Martin Glenn_____
                                    MARTIN GLENN
                                    United States Bankruptcy Judge