Claimant Porter's EXHIBIT I

Matter 11632

| | | |
|---|---|---|
| STATE OF TENNESSEE<br>30th JUDICIAL DISTRICT<br>CHANCERY COURT AT<br>MEMPHIS | **SUMMONS** | DOCKET NUMBER<br>CH. 10-1929-3 |

| Plaintiff | Defendant |
|---|---|
| LOLINA PORTER | GMAC Homecomings, AURORA Loan, Genworth et. al. |

TO: (NAME AND ADDRESS OF DEFENDANT)

AURORA LOAN SERVICES, LLC
10350 Park Meadows Drive
Littleton, CO 80124
720-945-4649

**Method of Service:**

☒ Certified Mail
☐ Shelby County Sheriff
☐ Comm. of Insurance*
☐ Secretary of State*
☐ Out of County Sheriff*
☐ Private Process Server
☐ Other
*Attach Required Fees

You are summoned to defend a civil action filed against you in the Chancery Court of Shelby County, Tennessee. Your answer to this action must be made within thirty (30) days from the date this summons is served upon you. You must file your answer with the Clerk of the Court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action within thirty (30) days of service, judgment by default can be rendered against you for the relief sought in the complaint.

| Attorney for plaintiff or plaintiff if filing Pro Se:<br>(Name, address & telephone number) | ISSUED 25 of October |
|---|---|
| LOLINA PORTER<br>832 Monterey Rd.<br>Glendale, CA 91206<br>818-571-9092 | Dewun R. Settle, Clerk and Master<br><br>By: _____<br>Deputy Clerk & Master |

| TO THE SHERIFF: | Came to hand<br><br>_____ day of _____, 20____<br><br>Sheriff |
|---|---|

*Submit one original and one copy for each defendant to be served.

| Questions regarding this summons and the attached documents should be addressed to the Attorney listed above.

§ For ADA assistance only, call (901) 379-7895

09/18/07


EXHIBIT
C

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served)

☐ Served _____    ☐ Not Found _____

☐ Not Served _____    ☐ Other _____

DATE OF RETURN: This ____ day of _____    By: _____
20____                                                      Sheriff or other authorized person to serve process

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the ____ day of _____ 20____, I sent, postage prepaid, by registered return

receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case CH. ____ to

the defendant _____ On the ____ day of _____ 20____, I received the return

receipt, which had been signed by _____ on the ____ day of _____ 20____.

The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

Sworn to and subscribed before me on this ____ day of _____    Signature of plaintiff, plaintiff's attorney or other person
, 20____                                                      authorized by statute to serve process.

Signature of ____ Notary Public or ____ Deputy Court Clerk

My Commission Expires: _____

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S):

Tennessee law provides a four thousand dollar ($4,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to: Clerk & Master
140 Adams Ave.
Room 308
Memphis, TN 38103

Please state file number on list.

ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

## CERTIFICATION (IF APPLICABLE)

I, Dewun R. Settle, Clerk & Master of the Chancery Court in the State of Tennessee, Shelby County, do certify this to be a true and correct copy of the original summons issued in this case.

Dewun R. Settle, Clerk & Master

By: _____

D.C. & M.

09/18/07

*Matter 11032*

| STATE OF TENNESSEE<br>30th JUDICIAL DISTRICT<br>CHANCERY COURT AT<br>MEMPHIS | **SUMMONS** | DOCKET NUMBER:<br>CH-10-1989-2 |
|---|---|---|
| Plaintiff<br><br>LOLINA PORTER | Defendant.<br><br>GMAC Homecomings, AURORA Loan, Genworth et. al. | |

TO:    (NAME AND ADDRESS OF DEFENDANT)

AURORA LOAN SERVICES, LLC
10350 Park Meadows Drive
Littleton, CO 80124
720-945-4649

Method of Service:

☒ Certified Mail
☐ Shelby County Sheriff
☐ Comm. of Insurance*
☐ Secretary of State*
☐ Out of County Sheriff*
☐ Private Process Server
☐ Other
*Attach Required Fees

You are summoned to defend a civil action filed against you in the Chancery Court of Shelby County, Tennessee. Your answer to this action must be made within thirty (30) days from the date this summons is served upon you. You must file your answer with the Clerk of the Court and send a copy to the plaintiff's attorney at the address listed below. If you fail to defend this action within thirty (30) days of service, judgment by default can be rendered against you for the relief sought in the complaint.

| Attorney for plaintiff or plaintiff if filing Pro Se:<br>(Name, address & telephone number)<br><br><br>LOLINA PORTER<br>832 Monterey Rd.<br>Glendale, CA 91206<br>818-571-9092 | ISSUED 25 of October<br><br>Dewin R. Settle, Clerk and Master<br><br>By: _____<br>Deputy Clerk & Master |
|---|---|
| TO THE SHERIFF: | Came to hand<br><br>_____ day of _____, 20___<br><br>Sheriff |

**Submit one original and one copy for each defendant to be served.

! Questions regarding this summons and the attached documents should be addressed to the Attorney listed above.

◊ For ADA assistance only, call (901) 379-7895

09/16/07

## RETURN ON SERVICE OF SUMMONS

I hereby return this summons as follows: (Name of Party Served) _____

☐ Served _____    ☐ Not Found _____
☐ Not Served _____    ☐ Other _____

DATE OF RETURN: This ____ day of ____    By: _____
20____                                    Sheriff or other authorized person to serve process.

## RETURN ON SERVICE OF SUMMONS BY MAIL

I hereby certify and return that on the ____ day of _____ 20____ I sent postage prepaid, by registered return receipt mail or certified return receipt mail, a certified copy of the summons and a copy of the complaint in case CH. ____ to the defendant _____. On the ____ day of _____ 20____ I received the return receipt, which had been signed by _____ on the ____ day of _____ 20____. The return receipt is attached to this original summons to be filed by the Chancery Court Clerk & Master.

Sworn to and subscribed before me on this ____ day of _____    Signature of plaintiff, plaintiff's attorney or other person
20____                                                                authorized by statute to serve process.
Signature of ____ Notary Public or ____ Deputy Court Clerk

My Commission Expires: ____

### NOTICE OF PERSONAL PROPERTY EXEMPTION

TO THE DEFENDANT(S):

Tennessee law provides a four thousand dollar ($4,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

Mail list to: Clerk & Master
140 Adams Ave;
Room 308
Memphis, TN 38103

Please state file number on list.

ATTACH
RETURN
RECEIPT
HERE
(IF APPLICABLE)

## CERTIFICATION (IF APPLICABLE)

I, Dewun R. Settle, Clerk & Master of the Chancery Court in the State of Tennessee, Shelby County, do certify this to be a true and correct copy of the original summons issued in this case:

Dewun R. Settle, Clerk & Master

By: _____    D.C.&M.

09/18/07

## CHANCERY COURT CLERK'S OFFICE
### MEMPHIS, TENNESSEE

LOLINA PORTER
_____
Plaintiff(s)

Vs.

AURORA LOAN SERVICES, LLC
_____
Defendant(s)

TO  Aurora Loan Services, LLC

You are hereby notified that application for ___ Injunctive relief ___
will be heard before the Chancery Court, Part III, on Tuesday
the 9th day of November, 20 10 at 10:00 o'clock A. M. as prayed for in
the Complaint filed in this cause, a copy of which accompanies this writ and upon which, Fiat has been granted.
HEREIN FAIL NOT.

Witness Dewun R. Settle, Clerk and Master of said Court at office, the ___ day of
_____, 20 10.

DEWUN R. SETTLE, C. & M.

by _____
Deputy C. & M.

### RESTRAINING ORDER

In the meantime,
the Defendants are barred
from the sale of real property
at 6131 Woodstock View Dr. Millington, TN 38053
until further Orders of this Court to the contrary.

KENNY W. ARMSTRONG
_____
Chancellor
Chancery Court Shelby County, Tennessee
OCT 2 5 2010
_____ M.
Date

A TRUE COPY-ATTEST.
Dewun R. Settle, Clerk & Master
By _____ D.C. & M.

NO. CH-10-1924-3

CHANCERY COURT

NOTICE OF APPLICATION FOR

LOUNA PORTER

vs.

AMENDA LOAN SERVICING

Issued 25 day of October 2010

Dewun & Seale, C. & M.

Came to hand.

LOUNA PORTER
Attorney for Plaintiffs

*Matter 11632*

SHELBY COUNTY
CHANCERY COURT
F I L E D
OCT 22 2010
DEWUN R. SETTLE, C & M
TIME:           BY:

1   Lolina Porter
2   832 Monterey Rd.
    Glendale, CA 91206
3   901-347-0372
    818-571-9092

4
5            IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
             FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS
6

7   Lolina Porter,

8            Plaintiff

9   vs.                              Case No. C-14-10-1929-3

10  GMAC HOMECOMINGS FINANCIAL
    NETWORK and/or his successor/s/,        COMPLAINT AND EMERGENCY MOTION
11  individually, and in his official       TO SET ASIDE FORECLOSURE
    capacity as, Beneficiary, and/or        JUDGMENT AND SALE OF REAL
12  Substitution Trustee, Trustee,          PROPERTY
    other titles unknown to Plaintiffs,
13  an ens legis being used to conceal fraud,
                                            AND
14  AURORA LOAN SERVICES, LLC and/or
    his successor/s/, individually, and     MOTION FOR PERMANENT INJUNCTIVE
15  in his official capacity as,            RELIEF BARRING FUTURE SALE OF
    Beneficiary, and/or Substitution        REAL PROPERTY BY DEFENDANTS;
16  Trustee, Trustee, other titles          (Enjoin Defendants from Resale of Real
    unknown to Plaintiffs, an ens legis     Property)
17  being used to conceal fraud,
                                            AND
18  GENWORTH FINANCIAL (Private Mortgage
    Insurance Company) and/or his           MOTION FOR PLAINTIFFS' AWARD
19  successor/s/, individually, and in      FOR PUNITIVE DAMAGES INCLUDING
    his official capacity as, Beneficiary,  LEGAL AND EQUITABLE RELIEF
20  and/or Substitution Trustee, Trustee,
    other titles unknown to Plaintiffs,
21  an ens legis being used to conceal
    fraud,
22
    AND JOHN DOES (unknown parties
23  claiming rights to said Deed of Trust and
    Note herein, ( 1-10,000), Et al, an ens legis
24  being used to conceal fraud
25
    Defendants
26

27       To the Honorable Chancellors of Shelby County, Tennessee for the Thirteenth

28  Judicial District at Memphis:


         PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

1    I, Lolina Porter Plaintiff, *pro se*, do hereby respectfully submit the following

2    *Complaint and Emergency Motion to Set Aside Foreclosure Judgment and Sale of*

3    *Real Property, AND, Motion for Permanent Relief Barring Future Sale (Enjoin) of Real*

4    *Property,* pursuant to Tenn. Civ. Rule, 65, as well as *Motion for Punitive Damages*

5    *Including Legal and Equitable Relief for Plaintiffs by defendants*

6

7

8    **I. INTRODUCTION**

9    "Plaintiff"

10

11   FIRST AMENDED COMPLAINT

12       Come now the plaintiff, Lolina Porter acting on her own behalf and through pro se

13   action. And First Amended Complaint/Motions against the defendants hereby complain and

14   Allege as follows:

15       This cause is brought to action before this court.

16

17

18   II. CLAIM - FACTUAL ALLEGATIONS:

19       The real property which is the subject of this dispute is located at 6131 Woodstock

20   View Dr. Millington, TN 38053. Plaintiff purchased this home by obtaining a loan from

21   Defendants GMAC Homecomings Financials Network in or about July 2005. Plaintiff's initial

22   mortgage Payment was a little over $500.00 a month plus a Private Mortgage Insurance

23   payment of a Little over $100.00 per month. Plaintiff, filed for Chapter 7 Bankruptcy in 2007

24   after suffering from eclampsia during her first pregnancy. A copy of Bankruptcy discharged

25   is appended to this complaint as **Exhibit 1.**

26

27

28

Plaintiff, loss her six (6) year old job at Washington Mutual, now JP Morgan Chase on January 29, 2009. She took over the property management of their Tennessee rental homes from their hired property management company to cut down expenses and make this livelihood her source of income to help support her family while looking for a reasonable job. A copy of plaintiff's EDD Unemployment Certification is appended to this complaint as Exhibit 2.

Plaintiff realized a big loss of rental income since early of 2008 for this real property when a tenant failed to pay rent consistently to the hired property manager of the plaintiff and has owed $14,661.50. Plaintiff evicted that tenant immediately and a copy of judgment on May 27, 2009 against plaintiff's tenant is appended to this complaint as Exhibit 3.

Plaintiff's husband, Mr. Brett Porter, eligibility worker at the Los Angeles County Department of Children and Family Services, had suffered from a severe ischemic stroke on his right brain hemisphere on July 10, 2009, was paralyzed, and he is recovering, but is still on disability and is medically refrained from going back to work until his condition improves. A copy of Medical MRI of plaintiff's spouse condition is appended to this complaint as Exhibit 4.

Plaintiff's total amount in delinquency for the subject real property is 11,229.92 as of February 3, 2010 per Defendant's HOPENOW employee, it's the amount Defendant said Plaintiff needed to pay to stop the foreclosure set and happened on February 4, 2010.

III. SECOND CLAIM: WRONGFUL FORECLOSURE
    "Predatory Lending"

1.   Defendant GMAC Homecomings Financial Network's loan officer named Greg Scott
2.   who processed plaintiff's loan, has entered plaintiff into a Stated Income program despite
3.   plaintiff has provided all the necessary proof of income and other documents the agent
4.   requested in order to obtain a good loan type. Defendant's loan officer Greg Scott, made the
5.   plaintiff believe that she cannot get a good interest rate; hence, she was forced to settle on
6.   what the Defendant's Loan Officer were giving. Plaintiff, realized later on after purchasing
7.   one property through GMAC loan officer Greg Scott was after that attractive incentives or
8.   commission every time he sells an Option Arm. It is alleged by way of his email to the
9.   Plaintiff, that he is insisting to sell another predatory loan. A copy of the email thread is
10.  appended to this complaint as Exhibit 5.
11.  
12.      Plaintiff alleges Defendant GMAC Homecomings Financial Network, as the driving
13.  source in pushing these predatory lending strategies and loan products; hence, this is the
14.  very same reason our economy is in recession.   A copy of the email thread where Mr. Greg
15.  Scott was really forcing plaintiff with threats to use him again for plaintiff's next property
16.  purchase is appended to this complaint as Exhibit 5.
17.  
18.      Plaintiff has phoned GMAC Homecomings Financial Network, on numerous
19.  occasions, requesting to modify the Option Arm variable interest rate loan into fixed rate.
20.  Defendant, GMAC Customer Service staff directed plaintiff's call to their Bankruptcy
21.  department staff. The bankruptcy staff promised that if plaintiff releases the loan from
22.  bankruptcy that Defendant will modify the loan, until then the defendants cannot offer any
23.  assistance.
24.  
25.      However, few months after bankruptcy court releases and approved their motion for
26.  relief from automatic stay of this real property from plaintiff's chapter 7 Bankruptcy,
27.  
28.  

---

-4-

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

1    defendant GMAC Homecomings Financial Network transferred the loan to Aurora Loan

2    Services, LLC. Thus, Defendant did not fulfill its promise to plaintiff to restructure the loan as

3    what Defendant GMAC Homecomings Financial Network employee had promised her.

4          Plaintiff phoned the defendant persistently to find out the status of the requested loan

5    modification, but to no avail.  In the latter part of 2008, plaintiff received a notice from

6    Homecomings that this loan has been transferred to Aurora Loan Services, LLC, and is the

7    new "servicer" to handle the subject real property mortgage.

8          Plaintiff struggled to make the payments in 2008 when the tenant of the subject real

9    property did not make consistent payments for over a year, and ended up owing

10   $14,881.50. A copy of eviction judgment is appended to this complaint as Exhibit 3.

11

12

13

14   IV. DECEPTIVE PRACTICES

15         Plaintiff had no complete understanding of what Private Mortgage Insurance (PMI)

16   really was at the time, plaintiff acknowledges that ignorant of it is no excuse. Hence, plaintiff

17   phoned the Defendant Genworth Financial Private Mortgage Insurance to inquire.  Plaintiff

18   has paid PMI premium every time she made a mortgage payment. Plaintiff thought PMI is

19   her ally, since she has been paying for it; she called Genworth Financial (the Private

20   Mortgage Insurance Company) to find out more about PMI and to seek help in making the

21   loan modification a reality.  Defendant, Genworth Financial, did not explain to plaintiff upon

22   inquiry that the beneficiary of PMI is none other than the lender/servicer and not the

23   borrower.  Defendant, Genworth Financial staff made plaintiff believe that they can help in

24   making the loan modified, but November 2008 has passed, plaintiff did not hear anything

25   from them, until plaintiff called again in December of 2008, a certain customer

1   representative named "Ruth" told her that they cannot help at all as the PMI is for the

2   lender's benefits only and not for borrowers. Plaintiff, in desperation to save her investment

3   real property phoned the new "servicer" Aurora Loan Services, LLC, the "servicer" to seek

4   help in modifying her Option Arm loan to fixed interest rate Principal and Interest payment.

5

6       Defendant Aurora Loan Services, LLC was the alleged "servicer" yet in all the

7   "workout agreement" they claimed as the "lender" of a loan on the Plaintiff's rental house at

8   6131 Woodstock View Dr. Millington, TN 38053.  Defendant is a "servicer", upon information

9   and belief, a subsidiary of Aurora Loan Bank FSB under the ownership of Lehman Brothers.

10  A federally chartered bank regulated by the Office of Thrift Supervision.

11

12      Defendant, Aurora Loan Services, LLC, told plaintiff that in order for them to do the

13  loan modification, that plaintiff must enter into a "Forbearance Agreement" with the servicer

14  for 3 months and then they will do a loan modification even though it is a rental house.

15  Plaintiff agreed and signed to a "Forbearance Agreement" with $1,000 initial deposit and a

16  payment of $938.51 per month for 3 months, starting on February 2009 through April 2009.

17      Plaintiff received a letter of denial of forbearance for non-payment of forbearance

18  amount of $938.51 in May of 2009, that plaintiff has breached the contract. Plaintiff, cannot

19  believe so because plaintiff's husband Brett Porter sent a cashier check amounting to

20  $938.51 via FedEx with tracking number on it.

21

22      Plaintiff called and faxed the proof of cashier check and the FedEX tracking number

23  to defendant.  Defendant, Aurora Loan Servicer, LLC researched the check and found out

24  that they are returning the cashier check because the loan number was incorrect, although

25  the check has the property address. Defendant did not honor the cashier check. A copy of

26

---

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

1    email thread showing plaintiff's intent and action to pay the forbearance is appended to this

2    complaint as Exhibit 5A.

3

4          Plaintiff continually requested help even after numerous denials yet persisted and

5    finally got reinstated, but later on Aurora Loan Services, LLC has used this incident not to

6    allow plaintiff to get approved for loan modification and accused plaintiff of breaking two

7    more payments that were not true. Plaintiff resumed paying the forbearance payment of

8    $938.51 in May 2009, despite income is scarce as plaintiff has to incur court costs in

9

10   evicting the tenants that owed back rents on this subject property. Plaintiff phoned the

11   Defendant Aurora Loan Services, LLC in June 2009 to inquire about Aurora Loan Services'

12   promise of Loan Modification once the Forbearance Agreement is completed.  Plaintiff was

13   told by a Customer Service that they are processing her loan modification request at that

14   time and will notify her as soon as they are done reviewing her file.  *Plaintiff was told not*

15   *to send any payment since her Forbearance Agreement has been completed and*

16   *expired while they are reviewing her loan modification request.  In the meantime, I*

17   *found a tenant for the subject property and they moved in on July 1, 2009.*

18

19

20

21   **V: INFLICTION OF EMOTIONAL DISTRESS**

22         On July 10, 2009, Plaintiff 's husband suffered from ischemic stroke and plaintiff has

23   been in the hospital from that time with the husband and has not been able to open her

24   mails until later of July 2009.  Plaintiff got a call from defendant, Aurora Loan Services' staff,

25   asking plaintiff to pay the July 2009 forbearance payment; plaintiff told the staff that back in

26   June 2009, a staff has advised plaintiff not to pay until the loan modification review is

27   completed.  Plaintiff got confused on Defendant's employees conflicting advices; some staff

28

---

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

1   had advised plaintiff not to pay while under review for loan modification, and then later on

2   some staff is trying to collect and advising plaintiff to pay immediately. Since plaintiff was in

3   the emergency room with the spouse who just had a stroke, she told the defendant's staff

4   that she cannot make the payment because that day was actually the day when her

5   husband was admitted to the hospital due to stroke and was taken by 911 to emergency

6   room. These deceptive and derogatory business practices have caused emotional stress

7   and distress to the plaintiff and her family. Plaintiff, after significant time in disposed due to

8   spouses' sudden illness and Plaintiffs' undue stress form this as well as shortly received a

9   letter from Defendant Aurora Loan Services, LLC towards the last week of July 2009. This

10  letter stated Defendants decision of denying plaintiff's loan modification application because

11  defendant accused plaintiff of missing one payment during the forbearance agreement (the

12  April 2009 incident). The letter also states that the subject property is now in foreclosure,

13  scheduled for sale on August 4, 2009.  Plaintiff did not on top her knowledge receive any

14  formal Foreclosure Notice sent to her at that time. Plaintiff phoned Defendant Aurora Loan

15  Services, LLC immediately asking and begging the Defendant to review her application for

16  Loan Modification, and informed them of the current hardships being faced at present, but

17  Defendants; did not assist immediately.  So Plaintiff stayed persistent and therefore decided

18  to send an overnight letter to the defendant's then President and CEO Tom Wind,

19  requesting to review her situation for loan modification.

20

21

22

23

24

25

26

27

28

---

- 8 -

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

## VI. SLANDER OF TITLE / SLANDER OF CREDIT / VIOLATIONS OF THE CONSUMER PROTECTION ACT

Defendant, Aurora Loan Services, after receiving the correspondence assigned her request to Ms. Alicia Hodson, a customer advocate from the Executive Office of the defendant Aurora Loan Services. Ms. Hodson called the plaintiff, and told her that she will postpone the foreclosure sale for 30 days and had asked the plaintiff to speak with one of the Customer Service staff for plaintiff to give financial information over the phone. Ms. Hodson transferred the call to a certain staff named "Elizabeth". Plaintiff, suggested to Elizabeth over the phone if plaintiff can fax the financial statement document before the interview starts so that information can be in synch accurately. Defendant's staff Elizabeth did not want the financial profit and loss statement faxed; instead she wants it taken over the phone. She said that it was better and faster to take information over the phone than mailing or faxing what the plaintiff have in paper. Plaintiff adhered to the defendant's staff Elizabeth and gave information over the phone figure by figure as per plaintiff's financial statement in paper. Plaintiff has no way to check whether the staff has entered the information accurately into the Defendant computer system, but plaintiff, trusted anyway. Defendant's staff Elizabeth, after phone interviewing plaintiff, immediately declared to plaintiff she does not qualify for loan modification because according to defendant's staff Elizabeth, the plaintiff is in deficit of -$5,500. Plaintiff, phoned Ms. Alicia Hodson, again and as the foreclosure sale date was postponed to September 4, 2009, to ask for reconsideration. However, Ms. Hodson, did not want to give plaintiff anymore opportunity to modify the loan.

Defendant's Executive Customer Advocate, Ms. Alicia Hodson, offered the plaintiff her only solution is a repayment plan payment of over $3,500 per month for 4 months, then

-9-

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

1    after the repayment plan according to Ms. Hodson, it is not a guarantee that the plaintiff will

2    be given a chance of loan modification or if plaintiff do not take her offer, Ms. Hodson

3    declared that she can no longer postpone the foreclosure sale on Sept. 4, 2009. Plaintiff,

4    insisted to Ms. Hodson, that the information taken does not seem to be accurate as in the

5    information the plaintiff has in her file. However, Defendant's executive customer advocate,

6    Ms. Hodson, did not bother reviewing the information entered by "Elizabeth" that the plaintiff

7    was trying to dispute. Plaintiff sent another letter to the defendant's President and CEO Tom

8    Wind, to ask for another foreclosure postponement. It was moved to October 1, 2009.

9    Defendant's executive staff Alicia Hodson, called plaintiff again and offered her another

10   option to pay $2,800 in repayment plan for 10 months. Plaintiff, in distress told Ms. Hodson

11   that she could not afford that large payment. Plaintiff phoned and emailed the Defendant's

12   ALS HOPE Now Customer Service HOPENOW@alservices.com phone nos, (866)-521-3828

13   to request for reconsideration. Plaintiff was hoping that they would review the information

14   taken by the previous Customer Service referred by Defendant's Executive Customer

15   Advocate Ms. Alicia Hodson. Plaintiff's call was taken by a Customer Service staff named

16   Tony Henderson. Mr. Henderson took a look at the plaintiff's information in Defendant's

17   computer system as entered in by the previous staff named "Elizabeth". Defendant's ALS

18   Hope Now staff, Mr. Henderson, asked the plaintiff if the huge credit card payments over

19   $500 was true or not. Plaintiff denied as she was so surprised of that revelation; told Mr.

20   Henderson, that she has no credit card payment expense since she filed for Chapter 7

21   bankruptcy in October of 2007. Defendant's staff Mr. Henderson was kind enough to delete

22   all the entries of plaintiff's records in their system and started interviewing the plaintiff again.

23
24
25
26
27
28

1    After interview, Mr. Henderson, said he can setup the plaintiff on a repayment plan
2  for nine (9) months then on the 10th month, Mr. Henderson told plaintiff that she can
3  resume the regular monthly payment of about $568 per month depending on the interest
4  rate applicable at the end of 9 months.  The repayment plan setup by Mr. Henderson over
5  the phone was at $1,876.00 for nine (9) monthly payments with an initial plan payment of
6  $1,392.08. Mr. Henderson specifically says it is a Repayment Plan and did not mention any
7  "workout agreement". Mr. Henderson also specifically stated over the phone that at the end
8  of nine (9) months repayment plan, that plaintiff will resume to regular payment of about
9  $600 depending on the interest rate prevailing at that future time.  Plaintiff was so grateful
10  and happy that someone had finally listened.  In plaintiff's gratefulness, she asked Mr.
11  Henderson of his supervisor's email address, Mr. Henderson gave it to the plaintiff.
12
13    Plaintiff, send a commendation letter via email to Mr. Tony Henderson's boss named
14  Ms. Renae Hinman. A copy of the email plaintiff sent to Ms. Hinman commending Mr.
15  Henderson is appended to this complaint as Exhibit 6.
16
17
18  VII. PLAINTIFFS MEMORANDUM -CAUSE OF ACTION
19    "Wrongful/Defective Workout Agreement"
20    1.    Defendant, Aurora Loan Services, LLC. sent plaintiff the "workout agreement"
21  and repayment plan dated September 14, 2009. Plaintiff received the document on
22  September 15, 2009. A copy of the "workout agreement" and repayment plan is appended
23  to this complaint as Exhibit 7.
24
25
26
27
28

- 11 -

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

2.      Plaintiff was confused as to why she was given two kinds of agreement. The first one was the "workout agreement", and then there is an Attachment A called "Repayment Plan". Plaintiff attempted to contact Mr. Henderson, but he was not available at that time. He emailed Mr. Henderson's boss Renae Hinman for explanation before plaintiff signs the binding workout agreement and repayment plan, but did not hear any reply from her. A copy of the email sent to Ms. Renae Hinman dated 9/15/2009 is appended to this complaint as Exhibit 8.

3.      Plaintiff examined the "workout agreement" and repayment plan thoroughly and was surprised that at the end of 9 months, plaintiff will still owe $10,585.66 as balloon payment. This dollar figure was never discussed to Plaintiff by Mr. Tony Henderson.

4.      Plaintiff, was so clear in her understanding that Mr. Tony Henderson was so sure that plaintiff can resume regular monthly payment at the end of 9 months.

5.      Plaintiff also noticed that in the attached Repayment Plan, Defendant was requiring the plaintiff to remit an initial installment of $1,892.08 on or before 09/15/2009. Plaintiff alleges that the workout agreement is faulty. The Defendant purposely made the deadline so tight for the plaintiff to fail and break the agreement right on the very first day plaintiff receives the agreement. Plaintiff alleges that defendant is trying to set up plaintiff for failure again, because the agreement was dated 9/14/2009, and was not received by plaintiff until 9/15/2009 in the afternoon.

6.      Plaintiff alleges Defendant, Aurora Loan Services, and LLC as truly a participant in this foreclosure mill by setting up plaintiff for sure failure that Defendant may

-12-

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

1   execute foreclosure. A copy of the "workout agreement" and repayment plan is appended to

2   this complaint as Exhibit 7.

3

4       7.      Plaintiff, immediately phoned Defendant's ALS Hope Now staff, Mr. Tony

5   Henderson, he was not available at that time, but plaintiff got hold of the staff named

6   "Timika".

7

8       8.      Plaintiff explained to Defendant Timika the wrongful "workout agreement" with

9   faulty deadline date of remitting the initial payment. Defendant's staff was even confused

10  and advised the plaintiff not to sign it until staff "Timika" gets back to plaintiff.   Defendant's

11  staff who is compassionate and is willing to help. Timika works in the same department as

12  Mr. Tony Henderson, according to the information she provided plaintiff.

13

14      9.      Plaintiff did not want to break the agreement set by Tony Henderson over the

15  phone with her, but did not want to sign a written "workout agreement" and repayment plan

16  that is faulty or wrongfully written.  Plaintiff's concerns on the inconsistencies of the

17  agreement against the verbal agreement set by Defendant's staff Mr. Tony Henderson and

18  what was written is very important.

19

20      10.     Defendant's staff Timika called back and directed plaintiff to Mr. Jason

21  Cramer, upon information given was the manager of Mr. Henderson and Tamika's

22  department called the Foreclosure Prevention.

23

24      11.     Defendant's staff Mr. Jason Cramer, agreed that the document was very

25  confusing with the deadline on 9/15/2009 same date as this document was delivered to

26  plaintiff.  Mr. Cramer, advised the plaintiff to remit via western union the initial installment of

27  $1,392.06 as soon as possible in exchange of extending the deadline. Defendant's staff Mr.

- 13 -

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

Cramer, here is making guarantees and promises verbally. Defendant, Mr. Cramer advised the plaintiff to sign the agreement, so that the subject real property will not be foreclosed and then Mr. Cramer advised plaintiff to dispute the agreement later.

12.    Plaintiff, followed the advised of Defendant's staff Mr. Jason Cramer. A copy of the Western Union remittance of $1,392.08 dated 9-21-2009 to Defendant is appended to this complaint as Exhibit 8.

13.    Plaintiff, sent a letter of request to Defendant's Executive staff Ms. Alicia Hodson. in plaintiff's goal to find out the answers to all her concerns on the inconsistencies of the written "workout agreement", to find out why there is even a need for a balloon payment after the repayment plan. Defendant's staff Ms. Hodson did not respond.

14.    Plaintiff sent the first repayment plan payment of $1,875 on 10-13-2009 with another letter of request asking for the detailed explanation and answers to the inconsistencies in the "workout agreement", on why the very high balloon payment. Plaintiff overnight the payment and letter of request via FedEx to Defendant's executive staff Ms. Alicia Hodson.  Defendant's Ms. Hodson did not respond. A copy of cashier check amounting to $1,875 dated 10-13-2009 is appended to this complaint as Exhibit 10.

15.    Plaintiff received a very disappointing letter of breach of "forbearance agreement" from defendant, accusing plaintiff of non-payment of the forbearance payment. Plaintiff was really confused, the agreement plaintiff signed with reservation is the "workout agreement" and repayment plan, and not forbearance agreement. In plaintiff's understanding a forbearance payments goes into suspense account, whereas, a repayment plan goes into the principal balance. Notice the inconsistencies of Defendants in their

-14-

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

employees and in writing. A copy of the Notice of non-payment of Forbearance Agreement
is appended to this complaint as Exhibit 11.

16.    Plaintiff, in distress phone defendant's Ms. Hodson, and complained as to why
the notice or letter of breach of repayment plan is necessary, given that plaintiff has sent the
payment via FedEx. Defendant, Ms. Hodson added more to the distress of the plaintiff when
she declared, payment has not been received and that defendant can no longer assist as
foreclosure will pushed through.

17.    Plaintiff left her husband at the hospital, just to gather herself, wrote a
complaint letter in tears and sent it with proof of payments and the signature proof of who,
received plaintiff's FedEx mail with cashier check as her first "repayment plan payment"
and not "forbearance agreement payment", address to the CEO and President Tom
Wind. Plaintiff requested again for the explanation of all the charges in addition to what is
clearly the delinquent amount that is written in the workout agreement. Another stressful,
tensed, and anxiety day filled the plaintiff because of this wrongful accusations. A copy of
plaintiff's email to Defendant's Attorney and the proof of payment is appended to this
complaint as Exhibit 12.

18.    Defendant's staff Ms. Hodson, did not reply, nor reaffirm the receipt of her
payment. Plaintiff did not receive any phone call or letter from Defendant's Customer
Service or Research Department that they have found her payment.

19.    Plaintiff, initiated to call defendant to find out if the payment for October 2009
has been posted.  Only then, that plaintiff found out that her payment was found. Plaintiff
alleges that Defendants does not have quality screened and respectful staff or customer

service, because none of the employees has informed or even acknowledged plaintiff's presentation of evidence or proof or payment. Not even a letter of apology. This wrongful conduct of Defendant should not deny plaintiff's motion for emergency injunctive relief as Plaintiff alleged that Defendant failed to credit her payments in an accurate and timely manner.

20.    Plaintiff, did not know how to make a Qualified Written Request at that time, but plaintiff sent her November 2009 payment and has been sending a Letter of Request to Defendant, for the concerns she has found in the faulty "workout agreement".

21.    Plaintiff, got tired and ran out of options on how to get Defendants to respond to plaintiff's inquiry on overly high charges and unknown source of balloon payment charges and other concerns on this faulty and wrongful "workout agreement". Plaintiff, sent via FedEx in December 2009, a check for a regular monthly mortgage payment of about $569.00 instead of the $1,876.00, in hope to catch the Defendant's attention.

22.    Plaintiff, decided to mail a payment less than the "workout agreement" plan stated payment because defendant has not been returning all her requests of explanation of the faulty and wrongfully written "workout agreement", plaintiff has raised these questions before signing the "workout agreement" and repayment plan, as well as during the 3 months of sending the plan payments, but Plaintiff receive no response from Defendants in all those times.

23.    Defendant, Aurora Loan Services, LLC upon receipt of plaintiff's payment less than what was in the "workout agreement", immediately instructed to have its executive staff Ms. Alicia Hodson to phone the plaintiff to remind her of the consequences of breaking this

faulty "workout agreement". Defendant's Ms. Hodson never even discus or explain or acknowledged plaintiff's questions, inquiry, or request for explanation of the "workout agreement", which plaintiff is entitled to. Ms. Hodson, initiated foreclosure proceedings again. Therefore, Plaintiff alleges that this non-responsiveness of Defendants to valid inquiries of plaintiff is but another strategy of Defendant to pursue foreclosure.

24.    In Plaintiff's opinion, she did not break any agreement because there was no good agreement, the "workout agreement" prepared by Defendant is faulty and cannot even explained by the Defendant, thus, it nullifies every word written in it.

## VIII. PLAINTIFFS MEMORADUM CAUSE OF ACTION CONTINUED

### "Wrongful Foreclosure"

1.    Plaintiff alleges that Defendant, Aurora Loan Services, LLC, is a "servicer", an affiliate of Aurora Bank, Federal Savings Bank (FSB); a federally chartered institution, who operates a "foreclosure mill" in exchange of a big incentive per home foreclosed.

2.    Plaintiff alleges that Defendant, Aurora Loan Services restarted the foreclosure proceedings through the Nationwide Trustee Services, Inc. having no basis at all because their faulty "workout agreement" is null and void. Hence, it is a wrongful foreclosure.

3.    Plaintiff did not get any formal foreclosure Notice at all at her home address in California; instead Nationwide Trustee Services, Inc. sent all the formal foreclosure notices and posted to the door of the plaintiff's tenant who was occupying the real property at 6131 Woodstock View Dr. Millington, TN 38053 in January 2010.

4.      Plaintiff received no foreclosure notice that has a sale date of February 4, 2010. Plaintiff's tenants however, communicated to plaintiff, that some unknown individual posted the Foreclosure Notice at tenant's door at 6131 Woodstock View Dr, Millington, TN 38053.

5.      Defendant's strategy to foreclose homes faster is to fraudulently set up plaintiff for failure by forcing plaintiff to enter into faulty "workout agreement". It is further alleges that this "workout agreement" is misleading as it was sent to the plaintiff on the same day as defendant is expecting to receive the funds for initial repayment plan.

6.      In addition, when Plaintiff seek help from a legal counsel on January 28, 2010, the counsel and Plaintiff phoned the Defendant's HOPENOW team to find out if foreclosure can be stopped. Defendant's employee named Tony told us on a speaker phone that Plaintiff's loan is being reviewed again for loan modification and foreclosure on February 4, 2010 will be postponed, he claimed that approval of loan mod is dependent on the investors. Plaintiff also ask Defendant's employee Tony of the total delinquency amount and how much Plaintiff needs to reinstate the loan. The Defendant Tony told plaintiff that the amount in delinquency was $11,229.92. A copy of Plaintiff's email to HOPE Now Team is appended to this complaint as Exhibit 13.

7.      Plaintiff, immediately reviewed her loan documents and found out that the Trustee was named as "Arnold Weiss". Plaintiff immediately searches for the trustee's phone number and email. Plaintiff emailed the known trustee of the subject property that was purchased in 2005. Mr. Arnold Weiss's secretary replied via email that Mr. Weiss might have been the original trustee before, but has no vested interest anymore. A copy of email thread is appended to this complaint as Exhibit 17.

- 18 -

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

8.    Plaintiff alleges that Defendant's faulty "workout agreement" and Defendant's executive staff and others who were harassing and threatening her that if she does not sign the faulty "workout agreement", that defendant will foreclose the home, has terribly caused her harm mentally, physically, emotionally and financially. A copy of this faulty "workout agreement" and repayment plan is appended in this complaint as Exhibit 7.

9.    Plaintiff alleges that Defendant's Executive Office played a major role in implementing foreclosure despite some employees has shown plaintiff of some hope and chances, that it was whatever Mr. Alicia Hodson had stated prevailed. A copy of plaintiff's email thread with Mr. Jason Cramer who advised plaintiff to sign workout agreement then dispute later, is appended to this complaint as Exhibit 18.

10.    Sometime in May of 2010, after the subject property has been foreclosed by Aurora Loan Services, LLC. Defendant, Genworth Financial sent somebody to interview the plaintiff and to verify the validity of Defendant, Aurora Loan Services claims for Private Mortgage Insurance regarding the subject real property.

11.    Plaintiff was told by Defendant, Genworth Financials hired agent to interview Plaintiff, because Aurora Loan Services, LLC are claiming against the Private Mortgage Insurance since the plaintiff, as the borrower failed to pay the mortgage. During this time is when plaintiff found out the forged income of plaintiff stated by GMAC Homecomings loan officer during the loan application.

12.    Plaintiff alleges Genworth Financial of invading plaintiff's privacy by having an agent knocks at the plaintiff's door to solicit some confidential information without notifying plaintiff ahead of time in writing.

13.    Plaintiff alleges Defendant Genworth Financial of trying to collect from plaintiff some or all the monies in place of what they will or have reimbursed the Defendant Aurora Loan Services, LLC for their claim on this real property in dispute. A sickening cycle of these Defendants to really torn plaintiff apart and yet who wins in the end is basically the Defendants themselves after stripping plaintiff off what little she has left.

## IX: PLAINTIFFS ALLEGATIONS IN SUPPORT OF COMPLAINT.

1.    Plaintiff alleges Defendant Genworth Financial to having this strategy in place to participate in getting the homeowners or borrowers get lost in the process called "helping homeowners" or having employees with lack of know-how in helping customers, in which case Defendants action on plaintiff's inquiries has delayed furthermore the plaintiff's goal to get a loan modification. Instead of helping the customer who pays PMI premium of a good understanding of what the product is all about, Defendants employees does not help in educating customers that are asking for this information.

2.    The Defendants, GMAC Homecomings Financial Network have imposed a predatory loan which was calculated from the outside to prompt defaults and stripping the Plaintiff of her money, and any equity that she might have in the real property.

3.    Plaintiff alleges that Defendant GMAC Homecomings Financial Network and its loan officers, Greg Scott, has fraudulently declared plaintiff's income over and beyond what was stated in plaintiff's paystub given by plaintiff and entered plaintiff in an Option ARM loan product type, which Plaintiff alleges the loan officers get paid more incentives selling subprime loans than offering a traditional loan type with Principal and Fixed Interest

1    payment. Same loan officer, Greg Scott, who would like to earn another business from the

2    plaintiff, has shown unprofessional, immature, and unacceptable behavior, when plaintiff

3    turned his offer down for the next purchase, as plaintiff realized that with her credit, she got

4    a better traditional loan type from Washington Mutual Bank. A copy of the email thread

5    showing plaintiff got approved for a 15-year term fixed P&I from Washington Mutual is

6

7    appended to this complaint as Exhibit 5.

8

9        4.    Plaintiff alleges that Defendants, GMAC Homecomings Financial Network has

10   made false promises to the plaintiff which Defendant intentionally did not want to fulfill,

11   hence, Defendant immediately transfer subject property's servicing to Aurora Loan Services,

12   LLC.

13

14       5.    Plaintiff alleges that the transfer to Aurora Loan Servicing of GMAC

15   Homecomings was not recorded anywhere in the public registry of records of the registry of

16   deeds, not even a record that GMAC Homecomings has transferred the deed to Nationwide

17   Trustee whom Aurora Loan Services hired to act as the Trustee and who foreclosed the

18   subject property. Hence, Aurora Loan Services or Nationwide Trustee is alleged to have no

19   right to foreclose the subject real property. A copy of Deed of Trust recorded from Registry

20

21   of Deed is appended to this complaint as Exhibit 20.

22       6.    Plaintiff alleges that the notices were faulty in that they sought the wrong

23   amount and balance in payment from her and that her default, if any, was grossly

24

25   overstated by the Defendants.

26       7.    Plaintiff alleges that the charges and fees which have been run up on the

27   account are excessive, duplicative, and have led to further and additional defaults.

28

-21-

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

8.    Plaintiff alleges that the Deed of Trust in this instance is a contract of adhesion not contemplated, read or negotiated by the parties, and that the process in Tennessee of foreclosure by a Trustee on the courthouse steps denies citizens of rights they would otherwise have to due process under law. It renders substantial or complete control in the hands of the lender with few, if any rights, for the consumers, borrowers and home buyers.

9.    Plaintiff alleges that Defendants, Aurora Loan Services feed into this foreclosure mill a thousands of foreclose homes in a non-judicial states. In exchange of incentives without regard to the result of their wrongful conduct to the well being of the homeowners. An inventory of real estate properties they can use to file a claim against the Private Mortgage Insurance, once claim has been paid, then Defendants can turn around and get more bail out money from the government, and/or sell the real estate property at a very reduced price for profit again, even though their claim against Private Mortgage Insurance has already been paid.

10.    Defendant, Genworth Financial is hereby requested to answer with proof of any paid claims to Defendant, Aurora Loan Services, LLC and for how much in terms of dollar amount was given to Aurora Loan Services, LLC as the claim amount approved by Genworth to reimburse, pertaining to the real property disputed in this complaint.

11.    Plaintiff alleges that Defendants wrongful conduct has violated the Tennessee Consumer Protection Act and they are guilty of false and misleading practices in violation of T.C.A. 47-18-101 et seq. It is specially alleged that the solicitation of funds when publishing and pursuing a foreclosure is a misleading practice, especially as in this case when it is

-22-

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

coupled with suggestions of a loan repayment and/or the "workout agreement" plan in which Defendants apparently had no intention in proceeding with or completing.

12.     Plaintiff alleges that it is misleading to debtors and consumers to have a collection department that is soliciting inquiries and telling debtors and consumer's one thing, and a defendant's lawyer who is foreclosing on the property at the same time.  In this case, there was no notice of anything except the payments which were due with unbelievably high amount were incorrect.

13.     As a result of not receiving proper notices, the Defendants have left Plaintiff with no timetable that is manageable for the reinstatement of her loan. In fact, she has been told it is impossibility.

14.     Plaintiff alleges that the Attorney hired by Defendant Aurora Loan Services to represent them is guilty of being a puppet or somewhat like a robo-signer, a robo-agree to whatever Defendant declare, thus nullifying his education as an attorney expected to uphold the law, in just and fair manner. That just because he is being paid, he disregarded to even mediate between and advise his client of what is fair and just. The Attorney's name is Justin D. Balser from Akerman Senterfitt based at 511 Sixteenth Street, Suite 420 Denver, CO 80202. A noble man of the law will look at all angles and corners and find any fault his client may have committed and advise client of what is fair and just to do, not just bombarding the plaintiff with a repetition of words the Defendant had told him, he did not even looked at the wrongful "workout agreement" and repayment plan his client encouraged and/or forced Plaintiff to sign.  A copy of Defendant's hired lawyer's email is appended to this complaint as Exhibit 13.

- 23 -

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

15.    Plaintiff alleges that Atty. Balser, Defendants Attorney has failed to answer her inquiry of what are these four (4) broken loan workouts that Aurora Loan Services were accusing Plaintiff about. It was 24 hours before the foreclosure date, though Plaintiff continued to email, Defendants Attorney did not even reply to answer the inquiry of Plaintiff. A copy of plaintiff's email to Atty Balser is appended to this complaint as Exhibit 14.

16.    Plaintiff further alleges that the Defendant Aurora Loan Services, LLC had insufficient staff to work on loan modification proposals or not equip to even do a quality control on data gathered from plaintiff; that one was expressly solicited from her, and declined the same day before the alleged foreclosure sale.

17.    The Plaintiff was denied a reasonable review of a loan modification on her rental home. This was done in part because the fees and costs which the lender paid were excessive and unnecessary, and ran the defaulted amount skyward with little or no explanation. Plaintiff went all avenues to find out answers, even spoke to a certain Elizabeth Santoro who emailed Plaintiff a spreadsheet but really not much of an explanation to answer all her questions as far as unpaid balance goes. Defendant staff, Ms. Santoro emailed a spreadsheet as her response to plaintiff's inquiry expecting plaintiff to understand all the columns, but with another twist to the effect of proceeding with foreclosure on October 1, 2009 as scheduled if funds are not received in their office in full by end of 9-25-2009. A copy of Ms. Santoro's email and spreadsheet is appended to this complaint as Exhibit 15.

18.    Plaintiff requests permanent injunction as to the eviction of her and/or her tenants. At this time the tenants of plaintiff were relocated as the Defendant, and

- 24 -

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

defendant's agents enforced the eviction on plaintiff's tenants even though she has a one

(1) year valid lease agreement. Instead of honoring the lease agreements, defendant's

agents offered plaintiff's cash to move out, which plaintiff's tenants did not accept. The

denial of injunctive relief will result in irreparable harm to Plaintiffs. A copy of tenants lease

agreement and Plaintiff's letter sent to Shelby County General Session Court Room 106 is

appended to this complaint as Exhibit 19.

19.    Plaintiff alleges that as a result of the all Defendant's concerted wrongful

conduct, the Plaintiff has been damaged, has no peace of mind with respect to this property,

and has lost financing opportunities and other avenues of relief.

20.    Plaintiff has no full, complete and adequate remedy at law for the wrongs

complained herein. Only this court has jurisdiction to evaluate the fairness and the

appropriateness of the foreclosure, the eviction courts do not entertain issues as to the

legality of the foreclosure or as issues to title.

21.    A copy of a similar case with judgment including a list of similar cases is

appended to this complaint as Exhibit 21.

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

## X. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, PLAINTIFF PRAYS:

RELIEF

1. Defendants and that they are required to answer this suit or suffer a judgment by default.

2.    For Defendant, GMAC Homecomings Financial Network to prove in this court that its loan officer, underwriters, and other agents did not purposely forged, stated and approved plaintiff's monthly gross income higher than what was reported by plaintiff in the paystubs submitted to the loan officer, in order for the loan officer to get the loan approved even though plaintiff could have been qualified to a better conservative type of loan, for the very reason that loan officers will be receiving higher incentives or commission.

3.    For this court to determine appropriate punishment under the law if the alleged fraudulent act of the Defendant GMAC Homecomings Financial Network in forging borrower's financial information for their ultimate financial gains and engaging in predatory lending. In addition, for Defendant GMAC Homecomings Financial Network to present Plaintiff's Loan Application, Good Faith Estimate, Loan Documents, Deed of Trust and other documents pertaining to the Plaintiff obtaining the loan from Defendant in purchasing the subject real property.

4.    For all the Defendants to prove in court the actual owner(s) and trustees of the plaintiff's Note as recorded in the registry of deeds, securitized or not, from the time plaintiff obtained the loan from GMAC Homecomings Financial Network up to the time Aurora Loan Services, LLC and its attorneys foreclosed on this subject real property, Defendant GMAC

1  Homecomings sold the loan to Aurora Loan Services, but did not record any of these sale in

2  the registry of deeds for public access. A copy of the only two transfer activities recorded in

3  the Shelby County Registry of Deeds is appended in this complaint as Exhibit 18.

4

5      5.    For GMAC Homecomings Financial to hire and finance the cost of a 3rd party

6  qualified expert(s) in the field of business and computer systems analysis, whose

7  qualification is presented, screened, and approved by plaintiff. For Plaintiff be allowed to

8  recommend a qualified expert in the field of business and computer systems analysis.

9

10     6.    For these "experts" hired by GMAC Homecomings to present/demonstrate in

11  this court the federal and states legal requirements, process and proper way of selling a

12  loan to another bank or servicer with system flowcharts and business and  federal and

13  states legal requirements of "selling a loan". process before they initiate investigation of the

14  old and current system practice of GMAC Homecomings Financial Network's "selling a loan"

15  process.

16

17

18     7.    For this expert to analyze GMAC Homecomings Financial's system process.

19  Present and/or demonstrate with proof of that analysis findings  of  the actual action taken

20  when GMAC Homecomings Financial had sold to Aurora Loan Services, LLC this subject

21  real property's mortgage loan.

22

23     8.    Plaintiff demands a conclusion from the expert that would determine if

24  Defendant had adhere or not to the federal and state legal requirement of "selling a loan".

25

26     9.    For Defendant Aurora Loan Services, LLC to provide in court all  the investors,

27  their names, mailing address and phone numbers that owns the subject real property's note

28  as of February 3, 2010; the day before the foreclosure date.

-----

- 27 -

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

10. For the Defendant Aurora Loan Services, LLC to provide in court as to who among the investors has legitimate rights to foreclose on this subject real property on February 4, 2010.

11. For Aurora Loan Services, LLC to hire and finance the cost of a 3rd party qualified expert(s) in the field of business and computer systems analysis, whose qualification is presented, screened, and approved by plaintiff. For Plaintiff be allowed to recommend a qualified expert in the field of business and computer systems analysis.

12. For these "experts" hired by Aurora Loan Services, LLC to present/demonstrate in this court the federal and states legal requirements, process and proper way of "servicing a loan" , "workout process" and "foreclosing a loan" with system flowcharts, business requirements and federal and states legal requirements. In addition, for the experts to present list of legal rights of servicers over a borrowers loan and real property, limitations and/or constraints of "servicing a loan" , "forbearance agreement system", "workout agreement system", "repayment plan system" and "foreclosure system", and experts presentation and/or demonstration of the legal and proper system process in court be done before the experts initiate investigation of the old and current system practice of Aurora Loan Services, LLC in "servicing a loan", "workout process" and "foreclosing a loan".

13. For the expert(s) to analyze Aurora Loan Services' "servicing system process", "workout system process", and "foreclosure system process". Present and/or demonstrate with proof of findings of experts analysis of the actual action taken when Defendant Aurora

Loan Services, LLC handles its servicing process, its workout process, and foreclosure process of this subject real property's mortgage loan.

14.    Plaintiff demands a conclusion from the expert that would determine if Defendant had adhere or not to the federal and state legal requirement of "servicing process", "workout process" and "foreclosure process".

15.    For Defendant Aurora Loan Services, LLC to provide in court their proof that plaintiff intentionally broke four (4) workout agreements as the basis of Defendant to deny loan modification assistance to the plaintiff reaffirmed by their counsel Atty. Justin D. Balser.

16.    For Defendant Genworth Financial to provide proof of Defendant Aurora Loan Services' application of claim against Private Mortgage Insurance policy paid for by plaintiff for this subject real property, and proof of payment to the claim of Aurora Loan Services, LLC with accurate figures and date claim was paid.

17.    For a Motion to Set Aside Foreclosure Judgment so plaintiff can continue with civil as well as possible criminal filings in regards to this action.

18.    For an emergency permanent injunction as well as permanent injunction motion be granted based on the wrongful conduct and behavior of Defendant Aurora Loan Services its agents, counsel and employees, and to protect the rights of the Plaintiff and keep her in her rental home, allow her to rent it to tenants for her livelihood after the foreclosure and until this litigation can be resolved. It is well settled that a deprivation of a person's legally protected property right will result in irreparable harm.

19.    In the instant case, Defendants' wrongful conduct has severely invaded Plaintiffs' legally protected property rights. Moreover, the harm resulting from Defendants' wrongful conduct is continuing, making any assessment of monetary damages even more uncertain and difficult.

20.    Accordingly, Plaintiffs' Complaint clearly establishes that a denial of injunctive relief will result in immediate and continuing irreparable harm to Plaintiffs.

21.    For the redemption of the real property and/or permanently reverse the foreclosure of the real property in dispute as it was wrongfully foreclosed on February 4, 2010 as a result of concerted wrongful conduct of Defendants in damaging the plaintiff, leaving her with no peace mind, as plaintiff has lost source of livelihood, lost financing opportunities and other avenues of relief and plaintiff's lost of her retirement money used in purchasing this subject real property.

22.    For the judge to order Defendant to reverse foreclosure return real property to plaintiff free and clear since Defendant is alleged to have already been paid by Genworth Financial for their claim of the total value of the home as insured in the policy as a result of their wrongful conduct that damages plaintiff.

23.    For all the Defendants to prove in court that they have not backdated, nor notarized in advance or later, any documents pertaining to this subject real property from the time plaintiff purchased or obtain the loan from GMAC Homecomings Financials up to the time Aurora Loan Services, LLC and its attorneys foreclosed on this subject real property.

24.    For Defendant Aurora Loan Services, LLC to provide in court an explanation/ reason why they sold the subject real property in an auction for a high price of $146,000 on February 4, 2010 given that real property value has gone down, hence, nobody bought the subject real property at an auction but none other than the Defendant Aurora Loan Services for approximately $117,000. Now, selling the same property to public for the price of $76,000. To explain why they did not sold the same for the price of $76,000 at the auction on Feb.4, 2010.

25.    Plaintiff alleges that Defendant must have really been paid for the value of the real property by Genworth, and therefore by disposing the real property at a lower price means additional financial gain to the Defendant.

26.    For Defendant Aurora Loan Services, LLC to provide in court an accounting of who received that less than $118,000 funds that Aurora Loan Services, LLC paid to purchase the subject real property.

27.    For Defendant Aurora Loan Services, LLC to provide in court an accounting of what incentives and how much they have received for foreclosing this subject property and the source of these incentive funds.

28.    For Defendant Aurora Loan Services, LLC to provide in court an accounting of how much was received from Genworth Financials as a result of their claims for this subject property.

29.    For Defendant Aurora Loan Services, LLC to provide in court any proof on how they handle the foreclosure process of this subject real property from the beginning to the acquisition and transferring of title to the name of the Defendant. To show proof that

-31-

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

Defendant and their attorneys did not use MERS or robo-signers to expedite this foreclosure process.

30.    For Defendant Aurora Loan Services, LLC to provide reason in court why they are selling the subject real property to an innocent buyer, where in they are delinquent in their payment of Homeowners Association dues and they have not disclose HOA fees to the new buyer until three days before their planned escrow closing.

31.    For Defendant Aurora Loan Services, LLC to provide an accounting of where would the proceeds of selling this subject real property go once it is sold.

32.    For Defendant Aurora Loan Services, LLC to provide in court the incentives they receive per one home they successfully foreclose, and from whom are these funds coming from.

33.    For the Judge of this court to help plaintiff to be heard in the Jury, and to be given justice from all the harmful concered strategies executed by these Defendants to setup plaintiff for failure so that they can smoothly foreclose on the subject real property in exchange of an incentive, and/or financial gains for themselves and the owners of the companies.

34.    For the Judge of this court to be informed that these Defendants, especially Aurora Loan Services (owned by Lehman Brothers) has caused severe damage to thousands of Americans by taking their homes through lies, deceit, fraud, and wrongful foreclosures, just like they did to Plaintiff as stated in the above.

- 32 -

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

35.    For the Judge of this court to be informed that Plaintiff has and is in communication with all these victims who have lost their homes to wrongful foreclosure by Defendant Aurora Loan Services, yet cannot fight for their rights to file a complaint due to lack of finances or just merely lost hope in our Judicial System.

36.    For Defendant Aurora Loan Services to present/demonstrate to the court the difference by definitions and functions of "Forbearance Agreement", "Workout Agreement", and "Repayment Plan" and what these does to borrowers account once payment from borrower is received, and what happened to suspense accounts after "Forbearance Agreement" is satisfied.

37.    For Defendant Aurora Loan Services, LLC to pay the Woodstock Hills Homeowners Association (HOA) delinquencies of $6,220 including legal cost and other administrative cost, for non-payment of HOA fees from the time they acquired the subject property on February 4, 2010.

38.    For the honorable Judge to be informed that Plaintiff happens to be the HOA administrator of the subdivision where the subject real property is located and a member or a part of the Association. However, Defendant Aurora Loan Services has been ignoring the invoices or bills sent from February 2010 to present.

39.    Plaintiff alleges that Defendant purposely does not want to pay the dues, in the meantime, plaintiff and the homeowners association has been shouldering all the expenses incurred. HOA Administration was only notified three (3) days before they were closing the sale. It was only then that they feel obliged to find out about HOA dues.

---

- 33 -

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

However, as of the filing of this lawsuit, the Defendant has not paid the HOA dues and other costs as billed to them.

40.    For the Judge to be informed that HOA Administrator, who happens to be the same as the Plaintiff, has already filed a lien against the property because of their wrongful conduct in ignoring their obligations to pay the HOA fees.

41.    For the Judge to give Plaintiff permission to include this issue in the Plaintiff's complaint as part of Plaintiff's demonstration on how wrongful, abusive, unfair, and fraudulent this Defendant Aurora Loan Service, LLC in dealing with their small HOA fees obligation, yet they keep foreclosing on humble citizen of America who has valid and reasonable excuses due to unexpected and unavoidable circumstances in their lives, jobs and their finances. A copy of email thread from the closing attorney of Defendant is appended to this complaint as Exhibit 16.

42.    For this court that has jurisdiction to investigate further the Defendant, GMAC Homecomings Financial Network's alleged predatory lending practice and be judged if found guilty to return stolen equity to the Plaintiff, other borrowers or homeowners.

43.    For this court that has jurisdiction to investigate Defendant Aurora Loan Services's practice of faulty procedure in framing up homeowners who requested for loan modification but rather direct them to a trap of wrongful foreclosure and may Defendant be judged to reverse all these foreclosures including plaintiffs brought about by their wrongful conduct of framing homeowners who are just merely wanting to get their payments modified so as for the plaintiffs and homeowners to keep their homes.

44.    For this court that has jurisdiction to investigate Defendant Aurora Loan Services practice of overcharging homeowners beyond what is the reasonable and appropriate such as excessive foreclosure fees over and over again due to their wrongful conduct, on how Defendant handles foreclosure, and be judged to return all the proven overcharges, foreclosure fees that is merely due to their wrongful conduct of business.

45.    For Defendant GMAC Homecomings Financial Network to prove that when they transfer all responsibilities for this real property to Aurora Loan Services that they recorded in the registry of deeds the said transfer and/or a transfer to another trustee.

46.    For TWO MILLION DOLLARS ($2,000,000.00) in punitive damages from the Defendants GMAC Homecomings Financial Network and Defendant Aurora Loan Services for the wrongful conduct and losses which is detailed above, so that Defendants may refrain from abusing, victimizing, threatening another innocent, striving, humble citizen of America.

47.    For the right to amend this complaint after discovery and additional information uncovered...

48.    For such further and other relief as to which the Plaintiff may be entitled.

49.    For a Jury Trial.

So help the truth to prevail God.

1   RESPECTFULLY SUBMITTED: This 22nd day of October, in the year, 2010 .

2

3

4   BY:

5       Lolina Porter, *pro per*

6       Signed reserving all my rights at UCC 1-308

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATE OF TENNESSEE

COUNTY OF SHELBY

    I, Lolina Porter, hereby state under oath that the facts and allegations of the complaint filed herein, and the facts and matters set forth are true and correct to the best of my knowledge, information, and belief, and that I am justly entitled to the relief sought.

LOLINA PORTER

Sworn and subscribed to before me this the 22 day of October, 2010.



Kiley M Nichols
Notary Public

My commission expires:
September 2, 2012

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

## LIST OF EXHIBITS

1. Plaintiff's Proof of Bankruptcy Discharged 4-1-2009          EXHIBIT 1

2. Plaintiff's EDD Unemployment Certification          EXHIBIT 2

3. Plaintiff's Tenant owing $14,861.50 Court Judgment          EXHIBIT 3

4. Plaintiff's husband's MRI Result of ischemic stroke          EXHIBIT 4

5. Defendant Loan Officer email thread when turned down          EXHIBIT 5

6. Plaintiff's email thread on Cashier Check with incorrect

    Loan Number, but with correct Property Address          EXHIBIT 5A

7. Plaintiff's commendation letter for Defendant's

    Staff Henderson sent to his boss  Hinman          EXHIBIT 6

8. The faulty "Workout Agreement" & "Repayment Plan"          EXHIBIT 7

9. Plaintiff's inquiry to Hinman after reading Exhibit 7          EXHIBIT 8

10. Plaintiff's proof of initial repayment plan payment

    Of $1,392.08 to Defendant via Western Union          EXHIBIT 9

11. Plaintiff's copy of cashier check of $1,876 sent to

    Defendant Attn: Alicia Hodson which Defendant

    did not post in accurate and timely manner          EXHIBIT 10

12. Notice of Breach of Non-Payment of Forbearance

    Agreement from Defendant          EXHIBIT 11

13. Plaintiff's email to Defendant's attorney and proof of

    Payment          EXHIBIT 12

- 38 -

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

14. Plaintiff's email to Defendant's HOPE Now team      EXHIBIT 13

15. Plaintiff's email to Defendant's Atty Balser      EXHIBIT 14

16. Defendant's Elizabeth Santoro's email and

     a very difficult to understand spreadsheet      EXHIBIT 15

17. Defendant's closing attorneys email on HOA fees      EXHIBIT 16

18. Original Trustee's reply to Plaintiff's inquiry      EXHIBIT 17

19. Plaintiff's email thread to Defendant's Jason Cramer who

     Advised Plaintiff to just sign the "workout agreement"

     In September 2009 and dispute it later.      EXHIBIT 18

20. Plaintiff's tenant's Lease Agreement and Plaintiff's

     Letter to Shelby County General Session

     Court Room 108 Attn: A.C. Guiless      EXHIBIT 19

21. A copy of Deed of Trust after Nationwide Trustee

     Transferred the deed to Aurora Loan Services,LLC.      EXHIBIT 20

22. A copy of similar case with completed judgment

     Containing the list of similar other cases

     as referenced in this actual example case in NY      EXHIBIT 21

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

FIAT

To the Clerk of the Court:

Please issue the emergency motion to set aside foreclosure judgment and sale of real property and motion for permanent injunctive relief barring future sale of real property by Defendants, enjoin Defendants from Resale of Real Property and motion for Plaintiff's award for punitive damages including legal and equitable relief as prayed for by the Plaintiff in this complaint for property at 6131 Woodstock View Dr. Millington, TN 38053, and/or set this matter for a hearing on the _____9th_____ day of _____November_____ 2010 at __9:00am___ and issue or serve notice upon Defendants.

Set the bond for the injunction at _____

Chancellor _____

Date _____10-25-10_____

A TRUE COPY-ATTEST
Dewun R. Settle, Clerk & Master
By _____ D.C., & M.

-40-

PORTER v. GMAC, AURORA LOAN SERVICES, LLC, GENWORTH et al.

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

LOLINA PORTER

    Plaintiff,

v.

                                 DOCKET NO.  CH-10-1929-3

GMAC HOMECOMINGS FINANCIALS ET AL

    Defendant,

**ENTERED** NOV 0 9 2010  M.B. _____

ORDER EXTENDING TEMPORARY RESTRAINING ORDER

      This cause came to be heard on the Plaintiff's Complaint and Emergency Motion

to Set Aside Foreclosure Judgment and Sale of Real Property before the Honorable

Kenny Armstrong, Chancellor of Part III.  It appears to the Court that since the

Defendants have not responded to the service of process of the Plaintiff's request for

injunctive relief, the Court has extended the Temporary Restraining Order until

November 18, 2010 at 10:00 a.m.

      IT IS THEREFORE ORDERED ADJUDGED AND DECREED that the

Temporary Restraining Order issued on October 25, 2010 shall remain in full force and

effect until November 18, 2010 at 10:00 a.m.

                            _____
                            Chancellor Kenny Armstrong

                            _____
                            Date

A TRUE COPY-ATTEST
Devvun A. Settle, Clerk & Master
By _____  D.C. & M

Approved for Entry

Lolita Porter
832 Monterey Rd
Glendale, CA 91206

## Certificate of Service

I hereby certify that I have mailed a copy of this order to all parties on November 18, 2010.

Lolita Porter

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

**ENTERED**
**NOV 1 8 2010**
M.B.

LOLINA PORTER

    Plaintiff,

v.                                    DOCKET NO. CH-10-1929-3

GMAC HOMECOMINGS FINANCIAL ET AL

    Defendant,

---

### ORDER GRANTING TEMPORARY INJUNCTION

    This cause came to be heard on the Plaintiff's Complaint and Emergency Motion to Set Aside Foreclosure Judgment and Sale of Real Property before the Honorable Kenny Armstrong, Chancellor of Part III on Thursday, November 18, 2010 at 10 a.m. The Defendants have been served, but have not responded to the Plaintiff's request for injunctive relief. For this reason the Court is granting a temporary injunction enjoining the sale of Plaintiff's real property that is the subject matter of this dispute pending a further hearing from the Court. The bond set in this matter will continue at one hundred dollars ($100.00).

    IT IS THEREFORE ORDERED ADJUDGED AND DECREED that a temporary injunction be entered enjoining the sale of Plaintiff's real property pending further hearing from the Court.

Chancellor Kenny Armstrong

Date

Approved for Entry

Lolita Porter
832 Monterey Rd
Glendale, CA 91206

A TRUE COPY-ATTEST
Dewun F. Settle, Clerk & Master

By_____
                        D.C. & M.

## Certificate of Service

I hereby certify that I have mailed a copy of this order to all parties on November 18, 2010.

Lolita Porter

EXHIBIT I

B18 (Official Form 18)
(Rev 01/00)

# United States Bankruptcy Court
## Central District Of California

255 East Temple Street, Los Angeles, CA 90012.

## DISCHARGE OF DEBTOR

**DEBTOR INFORMATION:**                                    BANKRUPTCY NO. 2:07-bk-19088-ER
Lolina Moran Porter
aka Lolina Cabungcag Moran                                 CHAPTER 7

Last four digits of Social-Security or individual Taxpayer-Identification (ITIN) No(s)., (if any):  ▮▮▮▮▮
Employer Tax-Identification (EIN) No(s).(if any):   N/A
Debtor Discharge Date: 4/1/09.

Address:
822 Monterey Rd
Glendale, CA 91206

It appearing that the debtor is entitled to a discharge, IT IS ORDERED: The debtor is granted a discharge under section 727
of title 11. United States Code, (the Bankruptcy Code).

                                                           FOR THE COURT,

Dated: April 1, 2009                                       Jon D. Ceretto
                                                           Clerk of the Court

### SEE THE BACK OF THIS ORDER FOR IMPORTANT INFORMATION

* Set forth all names, including trade names, used by the debtor(s) within the last 8 years. For joint debtors, set forth the last
four digits of both social-security numbers or individual taxpayer-identification numbers.

Form No. 11908 VAN-VI                                      f04 / LRL





RIVERSIDE CALL CENTER
P O BOX 12007
RIVERSIDE CA 92502-2207

Mail Date:    02/26/2010

EDD Telephone Numbers:
English    1-800-300-5616
Spanish    1-800-326-8937
Cantonese  1-800-547-3506
Mandarin   1-866-303-0706
Vietnamese 1-800-547-2058
TTY        1-800-815-9387

LOLINA N PORTER
832 MONTEREY RD
GLENDALE CA 91206-2139

## NOTICE OF UNEMPLOYMENT INSURANCE AWARD

1. Claim Beginning Date:    01/31/2010        2. Claim Ending Date:    01/29/2011

3. Maximum Benefit Amount:    $11700           4. Weekly Benefit Amount:    $450

5. Total Wages:    65,459.97                   6. Highest Quarter Earnings:    45,197.19

7. This item does not apply to your claim.

8. You must look for full time work each week. Please see your handbook, A Guide to Benefits and Employment Services, DE1275A, for more information about looking for work.

9. To qualify for this claim you must meet further eligibility requirements. You will receive additional information on what you need to do to qualify. Please see your handbook, A Guide to Benefits and Employment Services, DE1275A, for more information.

| 10. Employee Name | 11. Employee Wages for the Quarter Ending: | | | | 12. Employer Name |
| | DEC. 2008 | MAR. 2009 | JUN. 2009 | SEP. 2008 | |
| L PORTER | 20,262.78 | 45,197.19 | | | JP MORGAN |
| 13. Totals: | 20,262.78 | 45,197.19 | 0.00 | 0.00 | |

## Important Information On The Reverse Of This Form

DE429/2/ Rev. 8 (2-07)

RIVERSIDE CALL CENTER
P O BOX 12007
RIVERSIDE CA 92502-2207

EX HIBIT  2


Employment
Development
Department
State of California

Mail Date:    02/26/2010

EDD Telephone Numbers:
English     1-800-300-5616
Spanish    1-800-326-8937
Cantonese  1-800-547-3506
Mandarin   1-866-303-0706
Vietnamese 1-800-547-2058
TTY        1-800-815-9387

LOLINA M PORTER
832 MONTEREY RD
GLENDALE CA 91206-2139

## NOTICE OF UNEMPLOYMENT INSURANCE AWARD

1. Claim Beginning Date:    01/31/2010    2. Claim Ending Date:    01/29/2011

3. Maximum Benefit Amount:  $11700    4. Weekly Benefit Amount:    $450

5. Total Wages:    65,459.97    6. Highest Quarter Earnings:    45,197.19

7. This item does not apply to your claim.

8. You must look for full time work each week. Please see your handbook, A Guide to Benefits and Employment Services, DE1275A, for more information about looking for work.

9. To qualify for this claim you must meet further eligibility requirements. You will receive additional information on what you need to do to qualify. Please see your handbook, A Guide to Benefits and Employment Services, DE1275A, for more information.

| 10. Employee Name | 11. Employee Wages for the Quarter Ending: | | | | 12. Employer Name |
|---|---|---|---|---|---|
| | DEC. 2008 | MAR. 2009 | JUN. 2009 | SEP. 2009 | |
| L PORTER | 20,262.78 | 45,197.19 | | | JP MORGAN |
| 13. Totals: | 20,262.78 | 45,197.19 | 0.00 | 0.00 | |

Important Information On The Reverse Of This Form

DE498/z/ Rev. 3 (2-07)

EXHIBIT 3

## IN THE COURT OF GENERAL SESSIONS
### SHELBY COUNTY, TENNESSEE

DOCKET No. 1357290

### FORCIBLE ENTRY AND DETAINER WARRANT

To any lawful officer to execute and return: State of Tennessee, County of Shelby, to the Sheriff of said county whereas complaint has been made to me by the plaintiff(s) LOLINA PORTER, OWNER AND KATHRYN TICKLE RENTALS, LEASING AGENT a certain forcible entry and detainer, or an unlawful detainer, made by the defendant(s) CALVIN HALL of certain lands or premises, in this county, described as follows, to wit: 8131 WOODSTOCK VIEW DR., MILLINGTON, TN 38053 to which plaintiff(s) claims the right of possession, and that defendant(s) unlawfully detain same. You are therefore commanded to summon the above named defendant(s) to appear before the Shelby County Court of General Sessions on WEDNESDAY, at 1:30 P.M., to answer the above complaint and further plea of debt in the amount of $20,786.50 plus accrued rent, damages, and attorney fees, possession of the described real property and the cost of the cause, private process fees and any other sums which may become due before the hearing of this cause.

Issued this 6 day of May year 2009        OTIS JACKSON, JR., General Sessions Court Clerk

By _____ Deputy Clerk

### PLAINTIFF'S ATTORNEY INFORMATION

Name    JOE McILVAIN, JR.                     G.S. Code No. 6150050
Address  5415 Crumpler Blvd, Suite K          BPR # 7727
OLIVE BRANCH, MS 38654                         Phone No. 662-890-7180    Fax No. 901-476-9168

### JUDGMENT

Judgment for the _____ that he/she be restored to the possession of the land or premises described in this warrant, and that a Writ of Possession issue therefor and also for $ 14,861.5 and cost of the cause, for which let execution issue. Judgment is _____ or is not _____ based on a breach of contract for failure to pay rent.

This _____ day of MAY 27 2009 _____ year _____

_____ Judge of Division

### OFFICER'S RETURN

Received _____ day of _____ year 2009  Executed _8_ day of May, year 2009

On an adult person found in possession of premises, who gave the name of:

Posted

And serving notice that the case is set for trial before the court of General Sessions on:

### COURT HEARING

Day, WEDNESDAY, DATE:    MAY 27 2009 _____  Year 2009 Time 1:30 o'clock P.M.

Room 106, Shelby County Courthouse, 140 Adams Avenue, Memphis, Tennessee

A TRUE COPY ATTEST
COURT OF GENERAL SESSIONS

MARK LUTTRELL, Sheriff  By _____  Deputy Sheriff

_____ DEPUTY CLERK

*EXHIBIT 3*

## AFFIDAVIT OF SERVICE

STATE OF TENNESSEE                    COUNTY OF SHELBY

I, KELVIN N. COOPER, BEING SWORN MAKES OATH AS FOLLOWS:

I HAVE PERSONALLY SERVED THE DOCUMENT(S) ON THE RECIPIENT.

COURT & DOCKET:        GENERAL SESSIONS 1372290

RECIPIENT:             POSTED

DATE & TIME SERVED:    5/8/09 3:43 PM

ADDRESS SERVED:        6131 WOODSTOCK VIEW DR

I HAVE SERVED SAID DOCUMENT IN COMPLIANCE WITH ALL THE LAWS OF THE
STATE OF TENNESSEE AND THE RULES OF COURT.
I HAVE FURTHER NOTIFIED THE RECIPIENT THAT THIS MATTER IS SET FOR
HEARING AT THE PLACE STATED ON THE DOCUMENT.

ON THE 27 DAY OF MAY 2009 AT 1:30 PM

SIGNED _____

PROCESS SERVER # B-298

SWORN AND SUBSCRIBED BEFORE ME THIS DATE MAY 11, 2009

MY COMMISSION EXPIRES MAY 2, 2012

NOTARY PUBLIC

I HAVE POSTED A COPY OF SAID WARRANT IN COMPLIANCE WITH THE LAWS OF
THE STATE OF TENNESSEE AND THE RULES OF THE COURTS OF SHELBY COUNTY
TENNESSEE. I HAVE NOTIFIED THE DEFENDANT THAT THIS MATTER IS SET FOR
HEARING AT THE PLACE AND TIME STATED ON THE WARRANT BY U.S. MAIL.

ATTEMPTS: 1. 5/6/09 7:02 PM 2. 5/7/09 12:08 PM 3. 5/8/09 3:43 PM

*EXHIBIT 3*

Dear:    CALVIN HALL

Docket Number    1357390

Pursuant to T.C.A. rules and House Bill Number 1674, three (3) attempts have been made to serve a Detainer Warrant to you at your address within a ten (10) day period, and we have posted the said warrant on your door and mailed a copy to you, setting the court date at least ten (10) days in advance.

Your court date is: WED, MAY 27 2009 AT 1:30 PM

Sincerely, *KELVIN COOPER*

Process Server SI-298

A TRUE COPY ATTEST
COURT OF GENERAL SESSIONS

BY: DEPUTY CLERK



Armen Cherik, MD
1215 S. Central Ave. #350
Glendale, CA 91204

PATIENT NAME:        PORTER, BRETT
BIRTH DATE:          07/21/1970
PATIENT ID #:        073699

Dear Dr. Cherik

EXAM DATE: 07/20/2009

EXAM:  MRI brain without contrast

Indication: History of stroke approximately one week ago. Left-sided weakness.

Technique: Sagittal T1 and T2 FLAIR, axial T1, T2, T2* GRE, FLAIR and diffusion, and coronal T2 and FLAIR.

No prior study was submitted for comparison.

Findings:

There is T2 and FLAIR hyperintensity which extends from the right frontoparietal opercular region to the lateral parietal cortex, associated with smaller areas of restricted diffusion at the parietal cortex. Mild mass-effect with partial effacement of adjacent cortical sulci. No midline shift. No definite signs of hemorrhage.

No area of abnormal signal intensity is seen within the left cerebral hemisphere or throughout the posterior fossa structures.

The ventricles are normal in size.

Impression:

Acute to subacute ischemic change with cortical infarcts involving the right frontoparietal operculum to lateral parietal cortex.

Thank you for referring this patient to us for this examination.

    Very truly yours,


    STEVEN WONG, M.D.

Print                                    **EXHIBIT 5**    Page 1 of 5

From: Porter, Lolina (lolina.porter@wamu.net)
To: gscott890@bellsouth.net;
Date: Fri, August 12, 2005 1:00:49 AM
Cc: austin@collins-maury.com; arthinker@yahoo.com;
Subject: Thank You!!!

Greg;

Once and for all, I want you to know that I am thankful for your hardwork, but please do let me exercise my right as a customer without words of "threat", because everything I tried to negotiate with you, you are always concern about "what is it going to cost you?" and how you indirectly want me to be locked in to you ONLY, don't you know that if you GIVE freely, you will RECEIVE it a hundredfolds even without asking for it. God knows what you need even before you ask.

I may have asked you if you would do my loan should I thought of purchasing the 5th property without Misty, (because I am already purchasing the 4th or even 5th with Misty's on it), so what's the big deal about that.

I willingly signed contracts with Misty on the first four or five, because I chose her as my agent, but I don't think you should judge me when I decide not to go with Misty to purchase additional properties I wanted to buy further down the road, I reserve my right to refuse to be serviced.

I apologize if I had hurt your feelings, I didn't mean to, I am just trying to be a regular customer trying to be as wise as I could be. You don't need to bet that something will catch up on me someday, if it is God's will for me to be in a situation so be it, be it good or bad, I am not worried. We will only live once, and life is too short to be so worried about accessories in life. It is not about money you know, it is about establishing good relationship without expecting anything in return.

I came from nothing; therefore I am not afraid to lose anything and everything God allowed me to gain in this world, I worked hard to get where I am right now, but it is not because I am good, but because God allowed me to. I will survive no matter what for as long as God will allow me to and none of these properties will come with me when I die, equities may help pay for my funeral but that's about it.

So, I hope we will still cross our path and you will have a good attitude at that time towards business deals, I am sure you are a good person, but you are taking it so personal, when your office can only give me one type of loan which is of no advantage to me, but because you want to sell it, you are forgetting what your customer really needs and the relationship you are building doesn't have the foundation yet. I think you should look into selling other type of loans as well so you can propose better deals than what GMAC is allowing you to offer. Just my 2 cents!

More power to you Greg and may God bless you.

Thank you,

Lolina
-----Original Message-----
From: gscott890@bellsouth.net [mailto:gscott890@bellsouth.net]
Sent: Thu 08/11/2005 5:53 PM
To: Porter, Lolina
Cc: austin@collins-maury.com;
Subject: RE: RE: Got your OPB

Print                                                                    Page 2 of 5

EXHIBIT 5

Lolina for some reason you forget everything that you say. You need to realize that everything that you
say end do has an end result. Could be good, could be bad. You sign contracts, make commitments and
then change the rules. Lolina I am glad I do not have deal with you anymore but I am sure this is has
been your normal way to do business your whole life. I am glad it makes you feel better and but some
day it will catch up with you. This is just the truth Lolina so deal with it!!!!!!
>
> From: "Porter, Lolina" <lolina.porter@wnmu.net>
> Date: 2005/08/11 Thu PM 07:00:27 EDT
> To: <gscott890@bellsouth.net>,
>       <austin@collins-maury.com>
> Subject: RE: RE: Got your GFE
>
>
>
> Hi Misty/Greg
>
> I am getting confused. When did I admit that I am purchasing the 5th
> property? Can you please tell me when and who did you hear it from? I
> am getting upset at what I am hearing from you Greg.
>
> This is not a mature dealings. Misty, I never said nor express I am
> getting 5th property; and if in case I do that is my business not
> anybody's, but why would that matter to you Greg?. Despite that I met
> Ronnie first through my cousin, I still brought in Misty in the picture.
> I thought I would like Misty to earn something from this, but with all
> these going on.... now I will just shut my door on those who cannot
> comprehend what a good customer service should be. I hope everyone is a
> good sport!!!!
>
> Thank you.
>
> Lolina
>
>
> -----Original Message-----
> From: gscott890@bellsouth.net [mailto:gscott890@bellsouth.net]
> Sent: Thursday, August 11, 2005 3:44 PM
> To: Porter, Lolina
> Cc: austin@collins-maury.com
> Subject: RE: RE: Got your GFE
>
> Just like the original deal you got with CW// That has been modified
> They also pay for your appraisals//// But you had to:
> You admitted to going behind Misty to Ronnie Tickle for a 5th purchase.
> That was, nice!!!!
> That I guess really shows your character!!!!
> Well Lolina it looks like you have really got a good deal from what you
> say//
> So the Wa-Mu loan person is giving you a free loan////
> That person must not need to be compensated for there hard work!!!!

Print                                                                        Page 3 of 5

EXHIBIT 5

> They do it for free.
> Well I am sorry that you would not except my offer to finance "7931
> Harrold"
> I will be sad that I want be dealing with you anymore//////
> But I will get by some how!!!!
>
> Check your fax..............................Ba-By
> Now!!!!
>>
>> From: "Porter, Lolina" <lolina.porter@wamu.net>
>> Date: 2005/08/11 Thu PM 06:01:38 EDT
>> To: <gscott890@bellsouth.net>
>> CC: "Misty Austin" <austin@collins-maury.com>
>> Subject: RE: RE: Got your GFE
>>
>> Hi Greg:
>>.
>> I got the fax, and thank you for helping me out and thanks for letting
>> me know the door has been shut.  I don't know why you are upset, but I
>> guess that is just your personality.  Instead of being competitive you
>> decided to give up.
>>
>> I got locked in today for 5.875% NO ORIGINATION POINTS NO DISCOUNT
>> POINTS, 15 year loan. NO PMI.
>>
>> Have a nice day!
>>
>> Thank you.
>>
>> Lolina
>>
>>
>> -----Original Message-----
>> From: gscott890@bellsouth.net [mailto:gscott890@bellsouth.net]
>> Sent: Thursday, August 11, 2005 2:50 PM
>> To: Porter, Lolina
>> Subject: Re: RE: Got your GFE
>>
>> check your fax!!!
>> Did you think I was bluffing you about your credit report??
>> you are just about out of time!!
>> Player,Player// Your playing on my field//
>> If its to tough throw in the towell
>> I have aready closed 4 other investment loans this month and only the
>> 11th
>> Maybe your just smarter than those people
>> Or maybe those people have a better game plan
>> Or maybe you like to waist my time
>> Lolina you are own worst enemy
>> Hey this has been fun!!!!!!
>> But guess what/// you just ran out of time///

Print                                                                Page 4 of 5

EXHIBIT 5

> > Yes I mean its over/// The clock just stopped
> > The door has been shut///
> > I am sending you your turn down letter!!!!!
> > Sorry, but have a great life.
> > Ba-By-Now!!!!
> > >
> > From: "Porter, Lolina" <lolina.porter@wamu.net>
> > Date: 2005/08/11 Thu PM 04:30:08 EDT
> > To: gscott890@bellsouth.net>
> > CC: <austin@collins-maury.com>
> > Subject: RE: Got your GFE
> > >
> > > Hey Greg:
> > >
> > > I am a player but just wanted to used all the good deals first if I
> > could, you know you will do the same thing if you were in my shoes.
> > >
> > > I don't want to waste your time either, but I ran my credit report
> > yesterday and it doesn't look like the same as the credit score you
> > got
> > > when you pulled it recently. I was hoping you would fax me a copy of
> > it
> > > when I asked you yesterday, but I have not received it so that I can
> > review.
> > >
> > > If you are also a player you would give me a good deal since I have
> > told
> > > you I will be buying some more. Remember, with these Old Millington
> > > properties the seller is only crediting me 3% of closing cost and
> > that
> > > something I have to keep an eye is on the remaining funds I have.
> > >
> > > With your cost, I think I will be able to come back to you when I
> > have
> > > exhausted all the good deals that is being offered to me at the
> > moment
> > > with my current qualification by other lending companies.
> > >
> > > I hope you won't close your door on me as well!
> > >
> > > Thank you.
> > >
> > > Lolina
> > >
> > > -----Original Message-----
> > > From: gscott890@bellsouth.net [mailto:gscott890@bellsouth.net]
> > > Sent: Thursday, August 11, 2005 12:58 PM
> > > To: Porter, Lolina
> > > Cc: austin@collins-maury.com
> > > Subject: Re: Got your GFE
> > >

Print

Exhibit 5

Page 5 of 5

>>> Your clock is ticking///Time will run out//
>>> I know your still shopping!!!!
>>> r-u-n or r-u-out
>>> I do not have your updated doc's
>>> I have not ordered the appraisals.
>>> I am not playing with around this time
>>> You can see that I hope
>>> You have to pay to play in the Investment game
>>> r-u a player
>>>
>>>>
>>>> From: "Porter, Lolina" <lolina.porter@wamu.net>
>>>> Date: 2005/08/10 Wed PM 07:01:30 EDT
>>>> To: <gscott890@bellsouth.net>
>>>> Subject: Got your GFE
>>>>
>>>> Hi Greg:
>>>>
>>>> I got the fax and geeeezff!!! 3% Loan Origination fee??!??? You
> just
>>> charged me 1% for the previous transaction. What was changed? Is
> this
>>> due to 15 year term fixed. Is it because of the product type?
>>>>
>>>> Hey, will you charged me 1% Loan Orig Fee if I keep the Opt ARM?
>>>>
>>>> Please reply...
>>>>
>>>> Thank you.
>>>>
>>>> Lolina
>>>>
>>>>
>>>>
>>>>
>>>>
>>>
>>>
>>
>
>
>
>

Print                                                                   Page 1 of 2

EXHIBIT 5A

From: Lolina Porter (arthinker@yahoo.com)
To: brettmporter721@yahoo.com; PORTEB@dcfs.lacounty.gov;
Date: Wed, April 8, 2009 6:48:26 AM
Cc:
Subject: Re: For Cashiers Check

For Aurora Loan pls send FedEx overnight -
Aurora Loan Services
Attn: Cashiering
10350 Park Meadows Drive
Littleton, CO 80124

From: Lolina Porter <arthinker@yahoo.com>
To: Brett Porter <brettmporter721@yahoo.com>; PORTEB@dcfs.lacounty.gov
Sent: Wednesday, April 8, 2009 8:37:02 AM
Subject: For Cashiers Check

Hi Sweetheart,

Please go to US Bank and please get three Cashier's Check;

1) Payable to Countrywide Home Loans
Amount: $3,815.95
Memo: 03/2009 ██████████ -464 W Wilson Ave

2) Payable to Countrywide Home Loans
Amount: $2,260.42
Memo: 03/2009 ██████████ -508-510 W Elk

FedEx all Countrywide Cashier's Check to:

450 American St
Simi Valley, CA 93065
ATTN: Zachary Harrod
805-520-5144

5) Payable to Aurora Loan Services
Amount: $938.51
Memo: 04/2009 ██████████ -6131 Woodstock View TN


Plaintiffs' mistake on loan number

I will be the one to FedEx this as I don't have the address with me; at least just get the
Cashier's Check ready...

Your total Withdrawal from US Bank ArThinker Business Account ██████████ is

Print                                                                Page 2 of 2

*EXHIBIT 5A*

$6,015.88

Thank you, 143.

Lolima

Print

EXHIBIT'S         Page 1 of 1
(not included
in the service copies)

From: Lolina Porter (artthinker@yahoo.com)
To: PORTEB@dcfs.lacounty.gov;
Date: Tue, April 28, 2009 12:19:28 PM
Cc:
Subject: Fw: For Cashiers Check

Not your fault, it was mine....

---- Forwarded Message ----
From: Lolina Porter <artthinker@yahoo.com>
To: Brett Porter <brettmporter724@yahoo.com>; PORTEB@dcfs.lacounty.gov
Sent: Wednesday, April 8, 2009 6:57:02 AM
Subject: For Cashiers Check

Hi Sweetheart,

Please go to US Bank and please get three Cashier's Checks.

1) Payable to Countrywide Home Loans
Amount: $2,816.95
Memo: 03/2009 ▓▓▓▓▓▓ - 464 W Wilson Ave

2) Payable to Countrywide Home Loans
Amount: $2,260.42
Memo: 03/2009 Loan# ▓▓▓▓▓ - 508-510 W Elk

FedEx all Countrywide Cashier's Check to:

| 450 American St |
| Simi Valley, CA 93065 |
| ATTN: Zachary Harrod |
| 805-520-5144 |

5) Payable to Aurora Loan Services
Amount: $938.51
Memo: 04/2009 Loan# ▓▓▓▓▓▓ - 6131 Woodstock View TN

I will be the one to FedEx this as I don't have the address with me, at least just get the Cashier's Check ready....

Your total Withdrawal from US Bank ArThinker Business Account ▓▓▓▓▓▓ is $6,015.88

Thank you, 143.

Lolina

Print                                                                 Page 1 of 1

*EXHIBIT S*
*Not INCLUDED*

From: Lolina Porter (arihinker@yahoo.com)
To: PORTEB@dcfs.lacounty.gov; porteb@dcfs.co.la.ca.us;
Date: Tue, April 28, 2009 12:17:50 PM
Cc:
Subject: Cashier Check Issue

Hi Sweetheart,

The Cashier Check you sent to Aurora Loan Services has a different Loan Number on the
memo, am on hold for almost 2 hours now with Aurora Loan Services as they try to
research the check.

Girl They are foreclosing the property on me...am trying to negotiate.

Just an FYI.

Lolina

Print                                    EXHIBIT C                        Page 1 of 2

From: Lolina Porter (arthinker@yahoo.com)
To: renae.hinman@aurorabankfsb.com;
Date: Wed, September 9, 2009 5:03:09 PM
Cc:
Subject: Commending Mr. Tony Henderson on Loan# ▮▮▮▮▮▮▮▮

Dear Ms. Renae Hinman:

I would like to email you on how much I appreciated Mr. Tony Henderson for helping
me out in getting all the financials accurately and getting me a Loan Workout to save my
property in Tennessee with the Loan# ▮▮▮▮▮▮▮

I have been in contact with different Loan Workout representatives for the past 3 weeks
at Aurora Loan Services, but none of them has the caring attention, sympathy and sense
of accuracy that Mr. Henderson has given me,

My husband recently had a stroke on July 10th, and I had never been late in my previous
forbearance agreement, just because I was late in getting my paperwork sent as I was in
the hospital taking care of him, my property was set to foreclosure.

I did not want to foreclose on this property, I thank God that I called your office today
and God put me through Mr. Tony Henderson and he was used by God to put our faith
together in action.

I am emailing this to you that you may recognize him as someone who can be an asset to
your office, as someone who setting a good example in saving people's homes, I hope
that other Loan Workout Specialist would learn from Tony in dealing with borrowers
who are in distress, stress, cannot sleep at night and are in agony of loosing their homes.

To be honest with you I have spoken to a couple of Loan Workout Specialists just
yesterday who were not sympathetic, but were pressuring me and insisting that I will
loose my home. That person actually had told me that there is no other solution to my
problem or plans that can work out but to pay the entire delinquency. They both seem to
be unhappy with the job their doing and therefore are not feeling the shoes of us
"borrowers".

Today, Tony had set me up on a Loan Workout that had given me hope, peace and
anticipation of seeing the gold at the end of the rainbow.

For me, Tony has made my life free from fear of loosing our property. He was very kind
and compassionate. Very thorough and I strongly believe employees like him should
become a leader in this field of Loan Workouts and Consumer Relations especially in this
time of economic turmoil.

Print                                   Exhibit C                    Page 2 of 2

Please recognize his effort as I strongly believe him to be the right person for the job and even recommend him to become a leader someday so he can share his strategies on how to help the consumer while helping the bank as well.

He has mentioned to me in a lot of times "foreclosure is the last thing the bank wants", whereas the other representative I dealt with they are not practicing it in fact they are promoting foreclosure as they scare me that I will definitely loose my property if I don't pay the entire amount.

The representatives I spoke with has taken my financials over the phone but was so fast that they are entering the data in the wrong field of the system, the other one has taken my data from the excel sheet I send via FedEx and yet entered the wrong information as well.

For example, I never had a credit card payment, never used credit since 2007, yet she put the value in the credit card line item. The accuracy when at the bottom of our conversation I tried to correct her, she does not want to correct her entries and went off and judged me using the entries she made. It was just disappointing to communicate with people that has no patience and is not happy to help.

I apologize for the long email, I am just so inspired to let you know how Mr. Henderson has helped me, because he believed in my ability to pay and accurately entered the financial data I told over the phone which I can provide proof when asked.

Thank you for reading my email. May God bless you and your team.

Sincerely,


Lolina Moran Porter
Borrower



EXHIBIT 7



# Aurora Loan Services

VANCOUVER/P.O. BOX ONE · SCOTTSDALE, AZ 85261-1706
PHONE 800-550-0508 · FAX 800-735-3545

WORKOUT AGREEMENT

BY AND BETWEEN AURORA LOAN SERVICES LLC

AND

Lolina V Porter

Property Address: 8131 Woodstock View Dr                Loan No.: ▓▓▓▓
Millington TN 38053

This Workout Agreement is made September 14, 2008, by and between AURORA LOAN
SERVICES LLC ("Lender") located at 1417 College Park, Scottsdale, AZ 85251,
and Lolina V Porter ("Customer").

WHEREAS, Lender is the servicing agent and/or the owner and
holder of a certain Note dated 07-27-05, executed and delivered by
Customer, in the original principal amount of $ 222,400 (the "Note").
The Note is secured by a mortgage, deed of trust or comparable security
instrument dated 07-27-05, (the "Security Instrument"), on the property
located at the address specified above (the "Property"). The Note and
Security Instrument are collectively referred to as the "Loan Documents".

WHEREAS, Customer is in default under the Loan Documents,
has failed to make payment of monthly installments of principal,
interest, and escrow, if any, and has incurred additional expenses
authorized under the Loan Documents, resulting in a total arrearage
now due of $ 14,889.88, as more particularly set forth below:

Unpaid monthly payment(s) of PITI* from 12-01-08 through and including
09-14-08                                                $   10,152.72
Accrued Late Charges                                         118.13
NSF Charges                                                     .00
Legal Fees                                                  3,201.52
Corporate Advances**                                       2,529.87
Other Fees***                                                  .00
Minus Credit (suspense balance/partial payment)             112.86
Total Amount Due (the "Arrearage")         $    14,889.88

*   "PITI" means the monthly payment of principal, interest, and escrow,
    required, for taxes and insurance premium installments.
**  "Corporate Advances" include, but are not limited to, property
    inspection fees, property preservation fees, legal fees, foreclosure
    fees and costs, appraisal fees, BPO (i.e. broker price opinion) fees,
    title report fees, recording fees, and subordination fees.
*** "Other fees" include, but are not limited to, short payment advances
    and speed ACH fees.

WHEREAS, as a result of Customer's default, Lender (i) has the
right to accelerate, and to require Customer to make immediate payment in
full, all of the sums owed under the Note and secured by the Security

EXHIBIT 7

## Aurora ▪ Loan Services

10350 PARK MEADOWS DR • LITTLETON, CO 80124
PHONE 800-550-0508 • FAX 303-714-7454

Loan No: ████████                                      Page 2 of 5

Instrument, (ii) has so accelerated and declared due in full all such
sums, and (iii) may have already commenced foreclosure proceedings to
sell the Property.

WHEREAS, as of the date of execution of this Agreement,
Lender commenced foreclosure proceedings to sell the property on 08/10/09 A fore
by legal filing in the county and state where the property is located.
closure sale has been scheduled for 10/01/09;

WHEREAS, Customer has requested Lender's forbearance in
exercising its rights and remedies under the default provisions of the
Loan Documents and with regard to any foreclosure action that may now
be pending.

WHEREAS, Customer has requested and Lender has agreed to allow
Customer to repay the Arrearage pursuant to a loan work-out arrangement
on the terms set forth herein.

NOW, THEREFORE, in consideration of the promises and mutual
covenants herein contained, the parties hereto agree as follows:

1. Bankruptcy. If the Customer was discharged in a Chapter 7
proceeding subsequent to the execution of the Loan Documents, Lender
agrees that the Customer will not have personal liability on the debt
pursuant to this Agreement.

2. Term. This Agreement shall expire on the "Expiration Date,"
as defined in Attachment A.

3. Lender's Forbearing. Lender shall forbear from exercising any
or all of its rights and remedies now existing or arising during the
term of this Agreement under the Loan Documents, provided there is no
"Default", as such term is defined in paragraph 6.

4. Customer's Admissions. Customer admits and agrees that any and
all postponements of a foreclosure sale, made during the term of this
Agreement or in anticipation of this Agreement, are done by mutual
consent of the Customer and Lender and that, to the extent allowed
by applicable law, any such foreclosure sale may be postponed from
time to time until the loan evidenced by the Note is fully reinstated,
or the foreclosure sale is consummated. Lender shall be under no
obligation to dismiss a pending foreclosure proceeding until such time
as all terms and conditions of this Agreement and Attachment A have been
fully performed.

5. Terms of Workout. See Attachment A, which is made a part hereof.

EXHIBIT 7

**Aurora · Loan Services**

Loan No. [redacted]                                                     Page 3 of 5

6. **Default.** If Customer fails to make any of the payments specified in Attachment A on the due dates and in the amounts stated, or otherwise fails to comply with any of the terms and conditions herein or therein (any such even hereby defined as a "Default"), Lender, at its sole option, may terminate this Agreement without further notice to Customer. In such case, all amounts that are then owing under the Note, the Security Instrument, and this Agreement shall become immediately due and payable, and Lender shall be permitted to exercise any and all rights and remedies provided for in the Loan Documents, including, but not limited to, immediate commencement of a foreclosure action or resumption of a pending foreclosure action without further notice to Customer.

7. **No Waiver.** Nothing contained herein shall constitute a waiver of any of all of the Lender's rights or remedies, including the right to commence or resume foreclosure proceedings. Failure by Lender to exercise any right or remedy under this Agreement or as otherwise provided by applicable law shall not be deemed to be a waiver thereof.

8. **Status of Default and Foreclosure.** Customer acknowledges that if the Lender previously notified the Customer that the account was in default, that the Note and Security Instrument are accelerated and the debt evidenced by the Note is due in full, the account remains in default, such Loan Documents remain accelerated, and such debt due in full, although Customer may be entitled by law to cure such default by bringing the loan evidenced by Note current rather than paying it in full. Lender's acceptance of any payments from Customer which, individually, are less than the total amount due to cure the default described herein shall in no way prevent Lender from continuing with collection action, or require Lender to renotify Customer of such default, re-accelerate the loan, re-issue any notice, or renew any process prior to Lender proceeding with collection action if Customer Defaults. Customer agrees that a foreclosure action if commenced by the Lender against Customer will not be withdrawn unless Lender determines to do so by applicable law. In the event Customer Defaults, the foreclosure will commence, or resume from the point at which it was placed on hold, without further notice.

9. **Limited Modification.** Except as otherwise provided in this Agreement, the Note and Security Instrument, and any amendments thereto, are ratified and confirmed and shall remain in full force and effect.

---

1 A typical example of this would be, if Lender decides to accept a partial or untimely payment from Customer instead of returning such payment or terminating this Agreement as provided herein, Lender shall not be precluded from rejecting a subsequent partial or untimely payment, terminating this Agreement, or taking any other action permitted by applicable law.

EXHIBIT 7

## Aurora · Loan Services

Loan No. ▓▓▓▓▓▓▓

10. _Application of Payments._ The payments received by Lender from Customer pursuant to this Agreement shall be applied, at Lender's sole option, first to the earliest monthly payment under the Note that is due. Any amounts received by Lender that are less than the full payment under then due and owing under this Agreement shall be, at Lender's sole option, (i) returned to Customer, or (ii) held by Lender in partial or suspense payment balance until sufficient sum is received by Lender to apply a full payment. If this Agreement is canceled and/or terminated for any reason, any remaining funds in this partial or suspense payment balance shall be credited towards Customer's remaining obligation owing in connection with the loan and shall not be refunded.

11. _Methods of Making Payments._ All payments made to Lender under this Agreement shall (i) contain the Lender's loan number shown above; (ii) unless otherwise agreed to by the Lender, be payable in certified funds by means of cashier's check, Western Union (code city: ▓▓▓▓▓), money order, or certified check, and (iii) be sent to AURORA LOAN SERVICES as specified in Attachment A. Any payment made other than strictly pursuant to the requirements of this paragraph 10 and Attachment A shall not be considered to have been received by Lender, although Lender may, in its sole discretion, decide to accept any non-conforming payment.

11. _Credit Reporting._ The payment status of Customer's loan in existence immediately prior to execution of this Agreement will be reported monthly to all credit reporting agencies for the duration of this Agreement and thereafter. Accordingly, Lender will report the loan subject to this Agreement as delinquent if the loan is not paid current under the loan documents, even if Customer makes timely payments to Lender under this Agreement. However, Lender may disclose that Customer is in a repayment or workout plan. This Agreement does not constitute an agreement by Lender to waive any reporting of the delinquency status of loan payments.

13. _Property Taxes, Insurance, and Other Amounts._ If Customer's loan is not escrowed for taxes and insurance premium payments, it is Customer's responsibility to pay all property taxes, premiums for insurance, and all other amounts Customer agreed to pay as required under the terms of the loan documents. Customer's failure to pay property taxes, amounts owed on any senior lien security instrument, other amounts that may attain priority over the security instrument, or insurance premiums, in each case before their due date, shall constitute a default hereunder.

14. _The Entire Agreement._ This Agreement sets forth all of the promises, covenants, agreements, conditions and understandings between the parties hereto with respect to the subject matter hereof. This Agreement supersedes all prior understandings, inducements or conditions, express or implied, oral or written, with respect thereto except as contained or referred to herein. This Agreement may not be amended, waived, discharged or terminated orally but only by an instrument in writing.

*Exhibit 7*

## Aurora · Loan Services

THE COLLECTION · P.O. BOX 1706 · SCOTTSBLUFF, NE 69363
ATTACHMENT A · REPAYMENT PLAN NOTE ADDENDUM · CUSTOMER PLAN

a.1  For purposes of repayment of the Arrearage, Customer shall remit an initial installment of $1301.00, on or before 09/15/2009, and 9 monthly payments each in the amount of $1076.00 (each, a "Plan payment") in accordance with the schedule set forth in paragraph a.2 below. In addition to the Plan payments, Customer shall remit a final payment in the amount of $10,585.66/(the "Balloon payment") on the date set forth in paragraph a.2 below.

On or before 09/15/2009 (the "Agreement Return Date"), Customer shall execute and return the Agreement, including this Attachment A, in accordance with the following instructions:

| Overnight Mail: | US Mail: |
| Aurora Loan Services | Aurora Loan Services |
| Attention: Loss Mitigation | Attention: Loss Mitigation |
| 2617 College Park | P.O. Box 1706 |
| Scottsbluff, NE 69361 | Scottsbluff, NE 69363-1706 |

The Agreement will be of no force and effect unless Lender receives the executed agreement, including Attachment A, as well as the first Plan payment by the Agreement Return Date. Customer shall remit to Lender the first Plan payment, in the amount specified above, made payable to Aurora Loan Services in certified funds by means of cashier's check, money order, Western Union (code city) Bluff, NE), or certified check. All Plan payments, including the first Plan payment, shall contain the Lender's loan number shown in the Agreement and, unless otherwise agreed to by the Lender, shall be payable in certified funds as described above and are to be sent to Lender's Payment Processing Center in accordance with the following instructions:

| Overnight Mail: | US Mail: |
| Aurora Loan Services | Aurora Loan Services |
| Attention: Cashiering | Attention: Cashiering |
| 10350 Park Meadows Drive | P.O. Box 5180 |
| Littleton, CO 80124 | Denver, CO 80217-5180 |

a.2  Plan payments are to be paid on or before the 15th day of every month. Lender must receive each Plan payment by the 15th day of each month. The Balloon payment described in Paragraph a.1 above must be remitted on or before 07/15/10. The Agreement shall expire on the date the Balloon payment is due ("the Expiration Date").

b.  In the event Customer cures the Arrearage by making all Plan payments, and the Balloon payment, on or before the Expiration Date, and is current with the payments then due, and no default then exists under the Loan Documents and the Agreement, Lender shall consider the Note and Security Instrument to be current and in effect according to their original terms and conditions. Monthly account statements that Customer shall receive thereafter will reflect the current status of the Loan evidenced by the Note and Customer's regular monthly payment amount. Customer agrees to then resume making the regular monthly payments required under

EXHIBIT 7


### Aurora · Loan Services

September 14, 2009

RE: Loan No.
Borrower(s): Lelina M Potter

Property Address: 6131 Woodstock Vine Dr
Millington TN 38053

ITEMIZATION OF FEES, COSTS AND OTHER CHARGES

Dear Customer(s):

This Addendum supplements the attached letter.

Below is a detailed itemization of the unpaid fees, costs and other charges due on the above-referenced loan.

| Description | Unpaid Balance |
|---|---|
| Bankruptcy Attorney Fee | $650.00 |
| Bankruptcy Court Fees | $150.00 |
| Foreclosure Fees | $1,237.67 |
| Post Liquidation Transaction | $132.00 |
| Property Value Fee | $160.00 |

EXHIBIT 7

Aurora Loan Services

Loan No. ▓▓▓▓▓▓

the Note. Due to adjustments that periodically occur to tax and
insurance premium payments, and, if applicable, in interest
rates on adjustable rate mortgage loans, over the course of an
agreement such as this one it is possible that some adjustment
to the regularly scheduled monthly payments under the Note may
occur which could impact the cure of the Arrearage. Customer
acknowledges that this may occur and that an adjustment may be
necessary to the Balloon payment that will be due at the
Expiration Date. In the event such an adjustment is necessary,
the Note and Security Instrument shall not be considered current
until Customer has paid any additional amounts required to cure
the Arrearage as a result of the adjustment(s).

IN WITNESS WHEREOF, the parties hereto have caused this Attachment
to be duly executed as of the date signed below.

Dated: _____          _____
                                    William X Forbes Borrower

Dated: _____          _____

Aurora Loan Services

Dated: _____          _____

Print ...                                              Page 1 of 1

From: Lolina Porter (arthinker@yahoo.com)
To: renee.hinman@aurorabankfsb.com;
Date: Tue, September 15, 2009 2:14:28 PM
Cc:
Subject: Inquiry on Loan Workout Documents

Dear Ms. Hinman:

I just received today the loan workout/forbearance agreement that Tony Henderson
(PL6A1) had sent me. I just have a question on one of the agreement items. How do I get
hold of him, or how do I go about clarifying items in this document?

I can be reached at 818-571-9092 (cell) or landline 818-548-7586.

Please help as my deadline to fax this back is today as well; I just want to clarify one item
before I sign them.

I would really appreciate your help on this matter.

Sincerely,


Lolina Porter
Loan# ▇▇▇▇▇▇▇ - 6131 Woodstock View Dr. Millington, TN 38053.

EXHIBIT 9

# PAYMENT via Quick Collect

**Agent Use Only**

0 7 1 2 4 1 1 5 1 5 7 2

**1 Payment Information**

JASON KRAMER

**2 Sender Information**

818. 571 9092

arthinker@yahoo.com

832 Monterey Rd

Glendale                    CA                    91206

**3 Customer Signature**

Customer Copy                    QFMOCCDOMB 04/08

JASON KRAMER

ar fhmker@yahoo.com
832 Monterey Rd
Glendale                                  CA                    91706

818,579-9092

Customer Copy







2817 COLLEGE PARK • P.O. BOX 1706 • SCOTTSBLUFF, NE 69363 1706
PHONE: 800-550-0508 • FAX: 303-728-7688

October 28, 2009                                                    L


Lolina M Porter
812 Monterey Rd
Glendale CA 91206-2139

RE: Loan No:

Dear Customer(s):

As requested, Aurora Loan Services has reviewed your mortgage loan
account for possible loan workout options.  Unfortunately, your request
has been denied for the following reason(s):
We did not receive all payments required under your forbearance agreement.

If your current financial situation changes or you are able to provide
additional information that you believe would affect the decision to
deny your loan workout request, please provide that information within
14 days of the date of this letter.  However, if a duly noticed
foreclosure sale has been scheduled, documentation must be received
by Aurora Loan Services no later than 5 business days prior to the
foreclosure sale date.

As of the date of this letter, your request for a loan workout option
is considered closed.  To discuss the status of your loan and any
amounts that may now be due, please call 1-800-550-0509.

You should be aware that any pending foreclosure action may be
immediately resumed from the date of this letter. No new notice of
default, notice of intent to accelerate, notice of acceleration, or
similar notice will be necessary to continue the foreclosure action.
If you do not bring your loan current immediately, any foreclosure
action will resume from the point at which it was suspended without
further notice.

If you can bring your loan current or if you have any questions
concerning this letter, please contact Aurora Loan Services at the
address given above or by calling 1-800-550-0509.  PLEASE ACT NOW
TO SAVE YOUR HOME!!



LENDER.  AURORA LOAN SERVICES LLC

**Aurora · Loan Services**

EXHIBIT 11

2617 COLLEGE PARK • P.O. BOX 1706 • SCOTTSBLUFF, NE 62363-1706
PHONE: 800-660-0508 • FAX: 303-728-7646

Loan No. [redacted]                                Page 2 of 2

**Equal Credit Opportunity Act Notice**
The federal Equal Credit Opportunity Act (ECOA) prohibits creditors
from discriminating against credit applicants on the basis of race,
color, religion, national origin, sex, marital status, age (provided that
the applicant has the capacity to enter into a binding contract), because
all or part of the applicant's income derives from any public assistance
program, or because the applicant has in good faith exercised any right
under the Consumer Credit Protection Act. The federal agency that
administers compliance with this law concerning this creditor is:

            Office of Thrift Supervision
            Consumer Response Unit
            1700 G Street, NW
            Washington, DC 20552

Sincerely,

Loss Mitigation
Aurora Loan Services

Aurora Loan Services is a debt collector. Aurora Loan Services is
attempting to collect a debt and any information obtained will be
used for that purpose. However, if you are in bankruptcy or received
a bankruptcy discharge of this debt, this communication is not an
attempt to collect the debt against you personally, but is notice
of a possible enforcement of the lien against the collateral property.



Aurora Loan Services LLC

Print.                                                                          Page 2 of 3

EXHIBIT 12

From: Lolina Porter <arthinker@yahoo.com>
To: justin.balser@skerman.com
Sent: Tue, February 2, 2010 2:38:58 PM
Subject: Re: FORECLOSURE DATE is on FEB. 4, 2010 on Loan #0021460589

Atty. Balser,

Another accusations, Aurora Loan sent me a set of notice accussing me that I broke the
repayment plan because I did not pay the payment of $1,876 on October 2009.

That was not true. Ms. Alicia Hodson was the recipient of that FedEx document containing my
cashier check amounting to $1,876.00 and a letter requesting her to explain to me why there
is a balloon payment in the Repayment Plan agreement that was not discussed to me verbally
by Tony Henderson who approved me for this Repayment Plan. Mr. Tony Henderson even told
me that after payment of $1,876 that I should get caught up and will resume my regular
payment of $605.00 (depending on interest rate) by end of that 9 months.

Ms. Alicia Hodson failed to post that payment, hence the Aurora Loan Services does not have a
record of my payment which in truth it was received on time per FedEx proof of Tracking and
Cashier Check copy. I called Ms. Hodson, and asked her what happened to my payment, she
said she will researched and I never heard back from her. I had to call her again, and she just
told me that it is already posted. However, they mark it as ME WHO BROKE THE LOAN
WORKOUT. This is not FAIR.

Please explain to me the result of the research of the cashier check that was ATTN. to Ms.
Alicia Hodson. Did she just not post the payment in purpose? why? Is it because she wanted
me to really fail this agreement?

Please ask Aurora Loan why my payment did not get posted in October 2009 and why I am
accused that I broke the loan workout during that time. I have a letter they sent me accusing
me that I broke the loan workout which should have been erased. I do not deserve to be
accused of something I did not do.

Looking forward to your reply on my above inquiry because I felt fraudulently accused with
prejudice.

Thank you.

Sincerely,

http://us.mg2.mail.yahoo.com/dc/launch?.gx=1&.rand=8ee8snk0ejp75              10/19/2010

EXHIBIT 12



FedEx
Express

FedEx Express
Customer Support Trace
3875 Airways Boulevard
Module H, 4th Floor
Memphis, TN 38116

U.S. Mail: PO Box 727
Memphis, TN 38194-4643

Telephone 901-369-3600

November 2, 2009

Dear Customer:

The following is the proof-of-delivery for tracking number 870461763028.

Delivery Information:

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivery date: | Oct 15, 2009 09:07 |
| Signed for by: | M. DINWIDDIE | | |
| Service type: | Priority Envelope | | |



Shipping Information:

| | | | |
|---|---|---|---|
| Tracking number: | 870461763028 | Ship date: | Oct 14, 2009 |

| | |
|---|---|
| Recipient: | Shipper: |
| US | GLE US |

Thank you for choosing FedEx Express.

FedEx Worldwide Customer Service
1.800.GoFedEx 1.800.463.3339

EXHIBIT 12
Page 1 of 1

Detailed Results.

Enter tracking number

Tracking no.: 870461763028

**Delivered**

Delivered
Signed for by: M.DING

Ship date: Oct. 14, 2009
Delivery date: Oct. 15, 2009 9:07 AM

**Shipment Facts**

| Service type | Priority Envelope | Delivered to | Mailroom |

**Shipment Travel History**

| Date/Time | Activity | Location | Details |
|-----------|----------|----------|---------|
| Oct 15, 2009 9:07 AM | Delivered | | |
| Oct 15, 2009 9:21 AM | On FedEx vehicle for delivery | ENGLEWOOD, CO | |
| Oct 15, 2009 7:19 AM | At local FedEx facility | ENGLEWOOD, CO | |
| Oct 15, 2009 6:13 AM | At dest sort facility | DENVER, CO | |
| Oct 15, 2009 4:01 AM | Departed FedEx location | MEMPHIS, TN | |
| Oct 14, 2009 6:07 PM | Left FedEx origin facility | LOS ANGELES, CA | |
| Oct 14, 2009 11:30 AM | Picked up | GLENDALE, CA | Tendered at FedEx Kinko's and FedEx Office |

EXHIBIT 12





EXHIBIT I    Page 1 of 1

Print date | Close

# FedEx

## Detailed Results

Tracking no.: 870451783026                    Select time format: 12H

| Delivered | Delivered |
|---|---|
| | Signed for by: M.DINWIDDIE |

| Shipment Dates | | Destination |
|---|---|---|
| Ship date  Oct 14, 2009 | | LONE TREE, CO. |
| Delivery date  Oct 15, 2009 9:07 A.M. | | Signature Proof of Delivery |

## Shipment Options

Hold at FedEx Location
Hold at FedEx Location service is not available for this shipment

## Shipment Facts

| Service type | Priority Overnight |
|---|---|

## Shipment Travel History

Select time zone: Local Scan Time

All shipment travel activity is displayed in local time for the location

| Date/Time | Activity | Location | Details |
|---|---|---|---|
| Oct 15, 2009 9:07 A.M. | Delivered | LONE TREE, CO. | |

Print EXHIBIT 13 Page 1 of 2

From: Lolina Porter (artthinker@yahoo.com)
To: HOPENOW@alservices.com; Jason.Cramer@aurorabankfsb.com;
Date: Mon, February 1, 2010 1:22:36 PM
Cc:
Subject: Fw: FORECLOSURE DATE is on FEB. 4, 2010 on Loan# ▓▓▓▓▓ - Please help I do not
want to FORECLOSE this home, but I was accused wrongly...

To whom it may concern:

I got an email from this attorney that I do not qualify for a loan workout or loan modification,
whereas, last Thursday my counsel spoke to some in HOPENOW Team and according to Tony
my file is currently being reviewed for modification and had asked me to call on Tuesday
(which is tomorrow) to make sure they p▓▓▓▓e the foreclosure on Feb. 4, 2010.

I am again confused as to what to believe. Please let me know if HOPENOW Team is still
reviewing my file for loan modification.

Thank you in advance.

Sincerely,

Lolina Porter

----- Forwarded Message -----
From: "justin.balser@akerman.com" <justin.balser@akerman.com>
To: artthinker@yahoo.com
Sent: Mon, February 1, 2010 12:51:59 PM
Subject: RE: FORECLOSURE DATE is on FEB. 4, 2010 on Loan# ▓▓▓▓▓ - Please help I do not want to
FORECLOSE this home, but I was accused wrongly...

Ms. Porter:

As I have mentioned to you before, Aurora Loan Services has retained me to represent it concerning your loan.
However, you continue to email Aurora employees despite my instruction not to contact Aurora directly as it is
represented by legal counsel. Please do not send any further emails to Aurora concerning your loan. I
appreciate you understanding in this regard.

I will reiterate that unfortunately you do not qualify for a loan workout or modification on this rental property in
Tennessee. The reasons for this denial have been explained in prior communications. You have now presented
to Aurora a financial statement (emailed today) that you prepared after, as you describe, you "let" two California
properties go to foreclosure. However, this does not in qualify you for a loan workout or modification concerning
this loan. Aurora is unable to confirm any of the information presented in this self-prepared financial statement.

Justin D. Balser
AKERMAN SENTERFITT LLP
The Kittredge Building
511 Sixteenth Street, Suite 420
Denver, Colorado 80202
303.260.7712 (Office)
303.260.7715 (Direct)
303.260.7714 (Facsimile)
Email: justin.balser@akerman.com

Print                         EXHIBIT 13                    Page 2 of 2



www.akeman.com | Bio | VCard

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential information, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

CIRCULAR 230 NOTICE: To comply with U.S. Treasury Department and IRS regulations, we are required to advise you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this transmittal, is not intended or written to be used, and cannot be used by any person for the purpose of (i) avoiding penalties under the U.S. Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this e-mail or attachment.

Print 

EXHIBIT/14                     Page 1 of 3

From: Lolina Porter (arthinker@yahoo.com)
To: justin.balser@akerman.com;
Date: Wed, February 3, 2010 9:58:46 AM
Cc: Elizabeth.Santoro@aurorabankfsb.com;
Subject: Re: FORECLOSURE DATE is on FEB. 4, 2010 on Loan#⬛⬛⬛⬛

Atty. Balser:

I still have not heard from you at this point. I will have my counsel Liberty Law Firm represent
me effective immediately.

Sincerely,

Lolina Porter

From: Lolina Porter <arthinker@yahoo.com>
To: Lolina Porter <arthinker@yahoo.com>; justin.balser@akerman.com;
Cc: Elizabeth A Santoro Aurora Loan Services <Elizabeth.Santoro@aurorabankfsb.com>;
Sent: Wed, February 3, 2010 8:45:35 AM
Subject: Re: FORECLOSURE DATE is on FEB. 4, 2010 on Loan#⬛⬛⬛⬛

Atty. Balser:

I have not heard from you until now on what were those four (4) broken loan workouts that
Aurora Loan Services are accusing me of and in which they based their decision not to allow
me to offer a cure of default on the home loan# ⬛⬛⬛⬛

Please note --
**Borrowers Right to Cure (THLPA, Section 4):**  affords borrowers the right to cure a
default on a high-cost home loan up to 3 days before foreclosure. Requires that actual notice
of right to cure be sent to borrower.

Also, the second mortgage lender on this property was not even formally informed by the
lender of the foreclosure date.

I have not received a Notice of Right to Cure. All I got was information that there is no more
cure.

Please get back to me before the foreclosure of this subject property takes place tomorrow,
February 4, 2010.

I look forward to hear from you Attorney Balser.

Thank you,

Lolina Porter


http://us.mg2.mail.yahoo.com/dc/launch?.gx=1&.rand=8ee8snk0ojp73          10/19/2010

Print                                                                    Page 1 of 4

EXHIBIT 15

From: Santoro, Elizabeth A (Elizabeth.Santoro@aurorabankfsb.com)
To: arthinker@yahoo.com;
Date: Mon, September 21, 2009 11:57:28 AM
Cc: Jason.Cramer@aurorabankfsb.com; ANNFRIEDMAN@allstate.com;
Subject: RE: Hi Anne - please help ASAP

Ms. Porter,

Please see the payment spread sheet breakdown we sent to you. We have not had forced placed hazard insurance on this loan since 2005, the first payment was made on March 21, 2008, the next payment was made on June 30, 2008. Once we received proof of insurance both the payments were refunded to your escrow. We again had to force place insurance on 08/17/09 because we do not have proof of current coverage. Please provide proof of a current hazard insurance policy as soon as possible and we can have the forced place insurance removed.

I think you are confusing Hazard insurance with PMI (principle mortgage insurance), this not something that can be removed. Tax and PMI are the only debits out of your escrow account until we had to force place the insurance in September.

We show that the signed payment plan was received by our office today, please confirm that the certified check for the down payment has been sent. If we do not receive the down payment in full by the end of the day September 25, 2009, we will be forced to proceed with the foreclosure sale as scheduled on October 1, 2009.

Please contact me with any questions you may have and provide the proof of insurance as soon as possible.

thank you!

*Elizabeth Santoro*
High Risk/ Business Litigation/Escalation Team
Aurora Loan Services LLC
10350 Park Meadows Dr, 1st floor
Littleton, CO 80124
phone: 720.945.4650
Fax 866.923.1785
elizabeth.santoro@aurorabankfsb.com
Please consider the environment before printing this e-mail.

Aurora Loan Services is a debt collector. Aurora is attempting to collect a debt and any information obtained will be used for that purpose. However, if you are in bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally, but is notice of a possible enforcement of the lien against the collateral property.

From: Lolina Porter [mailto:arthinker@yahoo.com]
Sent: Friday, September 18, 2009 3:44 PM
To: FRIEDMAN, ANN
Subject: Re: Hi Anne - please help ASAP

Hi Anne,

Print                                                                      Page 1 of 1

*EXHIBIT 15*

From: Cramer, Jason W (Jason.Cramer@aurorabankfsb.com)
To: ARThinker@yahoo.com;
Date: Thu, September 17, 2009 4:44:24 PM
Cc:
Subject: Documents from Aurora Bank FSB

Documents from Aurora Bank FSB.
This message is intended only for the personal and confidential use of the designated recipient(s) named.
If you are not the intended recipient of this message, you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly prohibited. This communication is for
information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to
buy any financial product, an official confirmation of any transaction, or as an official statement of
Aurora Bank FSB. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do
not represent that this information is complete or accurate and it should not be relied upon as such. All
information is subject to change without notice.

Print                                                                    Page 1 of 6

EXHIBIT /6

From: Lolina Porter (arthinker@yahoo.com)
To: closer@LOGS.com; michelewestenn@bigriver.net; jerrydavidson@earthlink.net;
Date: Thu, October 21, 2010 9:33:22 PM
Cc: arthinker@yahoo.com;
Subject: Re: FedEx Tracking of the Return Check to Aurora Loan Services/6131 WOODSTOCK
VIEW DRIVE.

Corea,

Just to inform you that we have not received any payment from Aurora Loan Services as promised
as of this date and as of this time, CA time is 7pm.

Please send me a tracking number.

Thank you,

Lolina
HOA Administrator
for Woodstock Hills Association
Managed by Arthinker Property Management

From: prvs=90304f769=closer@LOGS.com [mailto:prvs=90304f769=closer@LOGS.com] On Behalf Of Corea
Lester
Sent: Thursday, October 21, 2010 9:48 AM
To: Lolina Porter
Cc: Michele Beyersdorf; jerrydavidson@earthlink.net
Subject: RE: FedEx Tracking of the Return Check to Aurora Loan Services/6131 WOODSTOCK VIEW DRIVE

Hello Lolina,

The seller has overnight check to your office in CA, please make sure that you provide us a copy of the
release of lien or a letter with your signature stating that you received payment in order for the buyer's
attorney to proceed with closing this property before the end of the month. Thanks for your cooperation
in this matter in order to expedite this closing in a timely manner.

Corea Lester

REO Closer/ REO Department

Shapiro & Kirsch, LLP

Member of the Fannie Mae Retained Attorney Network (TN)

6055 Primacy Parkway Suite 410

http://us.mg2.mail.yahoo.com/dc/launch?.gx=1&.rand=5ggsa9bkqm5mrn          10/22/2010

Print                                                                          Page 2 of 6

Memphis, TN 38119                                              *EXHIBIT 16*

M-F 8:30-5pm

Work: 901-260-6963

Fax 901-273-2536

For escalated issues, please contact my manager, Scadelia McAfee at smcafee@logs.com

We must receive signed docs by email or fax immediately after closing or the seller will require the property to re-close.  Funds also have to be wired, ASAP.

Pursuant to the Fair Debt Collection Practices Act, you are advised that this office is deemed to be a debt collector and any information obtained may be used for that purpose.  Confidentiality Notice: The information contained in this e-mail is intended solely for the use of the named addressee and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this email or through the contact information above, then permanently delete the original and any copy of any e-mail and any printout thereof.

---

From: Lolina Porter [mailto:artthinker@yahoo.com]
Sent: Wednesday, October 20, 2010 4:26 PM
To: Corea Lester
Subject: RE: FedEx Tracking of the Return Check to Aurora Loan Services/6131 WOODSTOCK VIEW DRIVE

My contact number is 901-347-0372 or 818-571-9092. I can see you are calling but the signal here in TN is bad.

---

From: Corea Lester <clester@LOGS.com>
To: Lolina Porter <artthinker@yahoo.com>
Sent: Wed, October 20, 2010 2:22:12 PM
Subject: RE: FedEx Tracking of the Return Check to Aurora Loan Services/6131 WOODSTOCK VIEW DRIVE

Please provide your contact number. Thanks!

Corea Lester

REO Closer/REO Department

http://us.mg2.mail.yahoo.com/dc/launch?.gx=1&.rand=5gga9bkqm5mra          10/22/2010

Print                                                                                   Page 3 of 6

EXHIBIT IG

Shapiro & Kirsch, LLP

Member of the Fannie Mae Retained Attorney Network (TN)

6055 Primacy Parkway Suite 410

Memphis, TN 38119

M-F 8:30-5pm

Work: 601-260-0963

Fax: 901-273-2536

For escalated issues, please contact my manager, Scadella Mcelee at smcelee@lcss.com

We must receive signed docs by email or fax immediately after closing or the seller will require the property to re-close. Funds also have to be wired, ASAP.

Pursuant to the Fair Debt Collection Practices Act, you are advised that this office is deemed to be a debt collector and any information obtained may be used for that purpose. Confidentiality Notice: The information contained in this e-mail is intended solely for the use of the named addressee and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachments thereto, is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this email or through the contact information above, then permanently delete the original and any copy of any e-mail and any printout thereof.

From: Lolina Potter [mailto:arthinker@yahoo.com]
Sent: Wednesday, October 20, 2010 3:48 PM
To: Corea Lester
Subject: Re: FedEx Tracking of the Return Check to Aurora Loan Services/6131 WOODSTOCK VIEW DRIVE

Hi Corea,

That sounds great. Please make sure they make it payable the following and overnight to the address below:

PAYABLE to ARTHINKER PROPERTY MANAGEMENT

Please call me.....

http://us.mg2.mail.yahoo.com/dc/launch?.gx=1&.rand=5gga9bkqm5mra                10/22/2010

Print

Page 6 of 6

EXHIBIT 16

Print                              EXHIBIT 16                         Page 1 of 1

From: Corea Lester (clester@LOGS.com)
To: arthinker@yahoo.com;
Date: Wed, October 20, 2010 11:11:03 AM
Cc:
Subject: RE: FedEx Tracking of the Return Check to Aurora Loan Services/6131 WOODSTOCK VIEW DRIVE

Hello Lolina,
Per the closing coordinator advise me that she should have an update from the seller today. I will update you as soon as I hear something back. Thanks for your cooperation in this matter.

From: Lolina Porter [mailto:arthinker@yahoo.com]
Sent: Wednesday, October 20, 2010 12:46 PM
To: Corea Lester
Subject: Re: FedEx Tracking of the Return Check to Aurora Loan Services/6131 WOODSTOCK VIEW DRIVE

Hi Corea,

Any news so far? I gotta get back to my family in CA. I cannot wait here for a long time, they must pay the HOA fees.

I got to get an answer by 2pm today at least. Please let them know.

Thank you,

Lolina

From: Corea Lester <clester@LOGS.com>
To: Lolina Porter <arthinker@yahoo.com>
Sent: Tue, October 19, 2010 1:35:46 PM
Subject: RE: FedEx Tracking of the Return Check to Aurora Loan Services/6131 WOODSTOCK VIEW DRIVE

Hello Lolina,

Per closing coordinator:

We are waiting on approval from the seller. I should have something by the end of the day.

Print                            EXHIBIT IC                    Page 1 of 4

From: Lolina Porter (arthinker@yahoo.com)
To: clester@LOGS.com;
Date: Fri, October 15, 2010 3:22:05 PM
Cc:
Subject: Re: UPS Delivery Notification, Tracking Number 1ZA590X30197164140

Again, Corea, had Mr. Davidson (the realtor) had returned my call and worked with HOA and involved HOA from the start of this transaction, there should not be any delay, and this transaction should have been a smooth closing.

It is hard to chase someone to pay HOA dues...I am not a collection agency, I am just doing what I am suppose to do as HOA Administrator.

Thank you,

Lolina

From: Lolina Porter <arthinker@yahoo.com>
To: Corea Lester <clester@LOGS.com>
Sent: Fri, October 15, 2010 3:17:39 PM
Subject: Re: UPS Delivery Notification, Tracking Number 1ZA590X30197164140

The by-laws are OK now, it has been researched and the HOA is a valid HOA whether it is recorded or not as long as the members of the HOA are aware and has been disclosed a copy of it.

I will give the copy of HOA via mail to Aurora Loan Services.

What do you mean split the total amount in half? Who is going to split?  the seller and the buyer?

Corea, as long as HOA gets paid for what was owed, then we will release the lien. The total amount of which is now at $3,220+.

Please let me know if they have mailed the check already so I can immediately deposit it and once it clears then we will release the lien.

I am just doing my job.

Thank you,

Lolina

From: Corea Lester <clester@LOGS.com>
To: Lolina Porter <arthinker@yahoo.com>
Sent: Fri, October 15, 2010 3:08:49 PM
Subject: RE: UPS Delivery Notification, Tracking Number 1ZA590X30197164140

The seller is requesting the by laws and also seller has agreed to split the total amount in half.

Corea Lester
REO Closer/ REO Department
Shapiro & Kirsch, LLP
Member of the Fannie Mae Retained Attorney Network (TN)
6055 Primacy Parkway Suite 410

http://us.mg2.mail.yahoo.com/dc/launch?.gx=1&.rand=66cepp8luqoff          10/20/2010

Print                              EXHIBIT 16                Page 2 of 4

Memphis, TN 38119
M-F 8:30-5pm
Work: 901-260-0963
Fax: 901-273-2598

*For escalated issues, please contact my manager, Stedella Mcafee at smcafee@logs.com.*
*We must receive signed docs by email or fax immediately after closing or the seller will require*
*the property to re-close.   Funds also have to be wired, ASAP*
*Pursuant to the Fair Debt Collection Practices Act, you are advised that this office is deemed to be a debt*
*collector and any information obtained may be used for that purpose.  Confidentiality Notice: The information*
*contained in this e-mail is intended solely for the use of the named addressee and may contain legally privileged*
*and/or confidential information. If you are not the intended recipient of this e-mail, you are hereby notified that any*
*dissemination, distribution or copying of this e-mail, and any attachments thereto, is strictly prohibited. If you have*
*received this e-mail in error, please immediately notify the sender by replying to this email or through the contact*
*information above, then permanently delete the original and any copy of any e-mail and any printout thereof.*

**From:** Lolina Porter [mailto:arlhinker@yahoo.com]
**Sent:** Friday, October 15, 2010 4:58 PM
**To:** Corea Lester
**Subject:** Re: UPS Delivery Notification, Tracking Number 1ZA590X30197164140

Cory,

We researched it again, and it was found on the "Return to Sender" file and it is on the way back to Aurora Loan
Services...we cannot deposit this check because the payee is wrong. They were given an invoice and are
instructed to make it payable to Arthinker Property Management!

Please have them replace this check with updated amount based on the October Invoice sent via US Certified
Mail.

Thank you,

Lolina

**From:** Corea Lester <clester@LOGS.com>
**To:** Lolina Porter <arlhinker@yahoo.com>
**Sent:** Fri, October 15, 2010 12:39:26 PM
**Subject:** FW: UPS Delivery Notification, Tracking Number 1ZA590X30197164140

Please read message below is the tracking # showing that HOA payment was received by your office on
09/27 and there should have been no reason for your office to file a lien.

**From:** Siegel, Rachel R [mailto:Rachel.Siegel@lpsvcs.com]
**Sent:** Friday, October 15, 2010 2:26 PM
**To:** Corea Lester
**Cc:** Trevathan, Lauren M
**Subject:** FW: UPS Delivery Notification, Tracking Number 1ZA590X30197164140

Corea: can you call me when you get this email?

Below is the confirmation that they received on 9/27 same day they filed the lien.

**From:** Wasmer, Danielle
**Sent:** Friday, October 15, 2010 1:23 PM
**To:** Siegel, Rachel R
**Subject:** FW: UPS Delivery Notification, Tracking Number 1ZA590X30197164140

Print                                EXHIBIT 16                    Page 3 of 4

From: UPS Quantum View [mailto:auto-notify@ups.com]
Sent: Monday, September 27, 2010 10:44 AM
To: Wesmer, Danielle
Subject: UPS Delivery Notification, Tracking Number 1ZA590X30197164140

[Image removed by sender. UPS]

***Do not reply to this e-mail. UPS and LPS Asset Management Solutions will not receive your reply.

At the request of LPS Asset Management Solutions, this notice is to confirm that the following shipment has been delivered.

Important Delivery Information

Message from LPS Asset Management Solutions:
ALS301380

Tracking Number:     1ZA590X30197164140
Delivery Date / Time: 27-September-2010 / 8:56 AM

Delivery Location: RESIDENTIAL
Signed by: BRENT

Shipment Detail

Ship To:
Woodstock Hills
332 MONTEREY RD
GLENDALE
CA
91206
US
Number of Packages  1
UPS Service:          NEXT DAY AIR
Shipment Type:        Letter
Reference Number 1: Accounting


_2rr2rr2y3Bj2L0_

Print                                   EXHIBIT 16                  Page 4 of 4

Discover more about UPS:
Visit www.ups.com
Sign Up For Additional E-Mail From UPS
Read Compass Online

©2010 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are
trademarks of United Parcel Service of America, Inc. All rights reserved.
For more information on UPS's privacy practices, refer to the UPS Privacy Policy.
Please do not reply directly to this e-mail, UPS will not receive any reply message.
For questions or comments visit Contact UPS.

This communication contains proprietary information and may be confidential. If you are not the intended
recipient, the reading, copying, disclosure or other use of the contents of this e-mail is strictly prohibited
and you are instructed to please delete this e-mail immediately.
Privacy Policy
Contact UPS

[X] Image
removed by
sender.

The information contained in this message is proprietary and/or
confidential. If you are not the intended recipient, please: (i)
delete the message and all copies; (ii) do not disclose, distribute or
use the message in any manner; and (iii) notify the sender
immediately. In addition, please be aware that any message addressed
to our domain is subject to archiving and review by persons other than
the intended recipient. Thank you.

Print                                                                        Page 1 of 5

# EXHIBIT 17

From: Lolina Porter (arthinker@yahoo.com)
To: foreclosure@weiss-spicer.com; reinstatements@weiss-spicer.com;
Date: Thu, January 28, 2010 9:00:06 PM
Cc:
Subject: Fw: FORECLOSURE DATE is on FEB. 4, 2010 on Loan#███████. Please help I do not
want to FORECLOSE this home, but I was accused wrongly...

Dear Mr. Arnold Weiss:

I am forwarding to you the email I had sent to Aurora Loan Services out of desperation, I do
not want to loose this home to foreclosure Sir. Please hear me out first and hoping you would
help me keep this home.

I finally got it rented in August 2009 after suffering from a tenant hired by the previous staff
of Jack Tickle Company, which did not pay up to $14,000+ in rents. I had to take over the
management and evicted the said tenant, the court decided a final judgment of said amount
to be paid by the tenant, but until now did not even pay a dime. This is the start of my
struggle in 2008. On January 29, 2009 I got laid off from Washington Mutual as a Software
Engineer. I lost about $4,100 in monthly job income.

Then on July 2009, my husband suffered from a Ischemic stroke. He is on long term disability
at the moment, he is improving, however, our income got reduced furthermore until this
coming month of February where Long Term Disability got approved and he should be
receiving 60% of her current gross income.

In August, I finally was able to rent it to a preferred tenant for $1,025 and they have been
paying on time. I would like to seek your help since you are the Trustee to please allow me to
keep this home because the bank does not want to give me anymore work out and has been
accusing me that I broke four(4) loan work out arrangements which were not all true. As far
as I know they are circumstancial, one of them was that my husband got a cashier's check and
the bank mistakenly type in a wrong loan number in the check, after I was notified I was able
to correct the incident. The second was when my husband had a stroke and I did not know
that they had requested some documents from me by mail to update my finances, but I was
at the hospital for almost 3.5 weeks in July, on top of 2 kids that I have to take care of. When
I get to the mail in August, I called Aurora Loan and they had already closed the file and did
not want to work with me anymore.

The only instance that I had purposely broke was this last December 2009, I been asking the
bank to explain to me why they have added so much charges, but they never got back to me,
nor explain in writing what are those balloon payment. I decided to pay the regular payment
that month to get their attention.

Today, I had inquired from Aurora Loan Services what I am owing in delinquencies and they
told me that I owe $11,229.92. They said that they could not work with me anymore as again
due to the accusations that I had broken four (4) loan workouts.

Please let me know Sir, what do you think I should do to keep this property. My regular

Print                                                              Page 2 of 5

                                                          *EXHIBIT 19*

payment is $605 per month, and I am willing to pay the entire rent I am receiving until I get caught up which most likely within this year or even earlier.

I owned 4 other homes next to this property with Bank of America as my lender, and Bank of America had allowed me to modify all of them from Option Arm loans into 6.00% interest only.

I am begging you Sir, as we have put our retirement money into this homes as well.

I am praying that you would give me a chance and help me stop the foreclosure on February 4, 2010.

I can be reached at 901-347-0372 or my cell at 818-571-9092, my email is arthinker@yahoo.com.

Once I get back on my IT job, I should at least get caught up with all my delinquencies in a speedy manner.

Please also find my Financial Statement that will show you my proposed monthly payment that I can make my account current in a period of time. I will make more payment as I get extra per month.

My goal is to pay the delinquency of $11,229.92 within this year and make my monthly payment current as well, I am weeding out some properties that are not performing and I already have surrendered 3 of them as of this month. Hence, I did not include them in the list of properties that I am obligated to pay anymore effective this January 2010.

Looking forward to hear from you Sir. Please read below my request to Aurora Loan Services and the story behind the broken workouts,

Thank you so much in advance,

Sincerely,


Lolina Porter
832 Monterey Rd
Glendale, CA 91206



----- Forwarded Message -----
From: Lolina Porter <arthinker@yahoo.com>
To: Jason W Cramer - Aurora Loan Services <Jason.Cramer@aurorabankfsb.com>; HOPENOW AURORA LOAN <HOPENOW@alservices.com>; Tom Wind-Pres Aurora Loan <tom.wind@alservices.com>; Aurora Loan Services Executive Email <executivecommunications@alservices.com>
Sent: Thu, January 28, 2010 12:20:09 PM
Subject: FORECLOSURE DATE is on FEB. 4, 2010 on Loan# ██████████ Please help. I do not want to FORECLOSE this home, but I was accused wrongly...

Print                                                                    Page 1 of 2

*EXHIBIT 19*

**From:** Paula (Paula@weiss-spider.com)
**To:** arthinker@yahoo.com;
**Date:** Mon, February 1, 2010 2:07:40 PM
**Cc:**
**Subject:** RE: FORECLOSURE DATE is on FEB. 4, 2010 on Loan# ▬▬▬▬. Please help I do not
want to FORECLOSE this home, but I was accused wrongly...

Ms. Porter,

Our firm does not handle foreclosures on behalf of Aurora Loan Services. It appears that Mr. Weiss
may have been listed as the original trustee on your deed of trust when the loan was closed however,
he has no vested interest in the property.   You will need to contact the firm that is handling the
foreclosure. Unfortunately, Mr. Weiss will not be able to help you with this matter.

**From:** Lolina Porter [mailto:arthinker@yahoo.com]
**Sent:** Monday, February 01, 2010 3:26 PM
**To:** Mailroom208; Paula
**Subject:** Fw: FORECLOSURE DATE is on FEB. 4, 2010 on Loan# ▬▬▬▬. Please help I do not want to
FORECLOSE this home, but I was accused wrongly...

Dear Mr. Weiss:

I am forwarding a letter from an attorney who claims to represent Aurora Loan Services.
Please let me know Sir, as the Trustee of this property, if you may be able to help me not to
foreclose this property.

I am counting on you Sir. This is my last resort.

Thank you so much in advance.

Sincerely,


Lolina Porter

——Forwarded Message——
**From:** "justin.balser@akerman.com" <justin.balser@akerman.com>
**To:** arthinker@yahoo.com
**Sent:** Mon, February 1, 2010 12:51:59 PM
**Subject:** RE: FORECLOSURE DATE is on FEB. 4, 2010 on Loan# ▬▬▬▬. Please help I do not want to
FORECLOSE this home, but I was accused wrongly...

Ms. Porter:

As I have mentioned to you before, Aurora Loan Services has retained me to represent it concerning your loan.
However, you continue to email Aurora employees despite my instruction not to contact Aurora directly as it is
represented by legal counsel. Please do not send any further emails to Aurora concerning your loan. I
appreciate you understanding in this regard.

I will reiterate that unfortunately you do not qualify for a loan workout or modification on this rental property in
Tennessee. The reasons for this denial have been explained in prior communications. You have now presented
to Aurora a financial statement (emailed today) that you prepared after, as you describe, you "let" two California
properties go to foreclosure. However, this does not in qualify you for a loan workout or modification concerning
this loan. Aurora is unable to confirm any of the information presented in this self-prepared financial statement.

Print                                                          Page 2 of 2

EXHIBIT 19

Justin D. Balser
AKERMAN SENTERFITT LLP
The Kittredge Building
511 Sixteenth Street, Suite 420
Denver, Colorado 80202
303.260.7712 (Office)
303.260.7715 (Direct)
303.260.7714 (Facsimile)
Email: justin.balser@akerman.com

www.akerman.com | bio | V-card

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential information, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

CIRCULAR 230 NOTICE: To comply with U.S. Treasury Department and IRS regulations, we are required to advise you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this transmittal, is not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding penalties under the U.S. Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this e-mail or attachment.

*Weiss Spicer Cash PLLC is a Member of the Fannie Mae Retained Attorney Network (TN).*

Print



From: Lolina Porter (arthinker@yahoo.com)
To: Jason.Cramer@aurorabankfsb.com;
Date: Tue, February 2, 2010 7:13:40 AM
Cc:
Subject: FORECLOSURE DATE is on FEB. 4, 2010 on Loan ▓▓▓▓▓▓▓▓

Hi Jason,

It was a very exhausting new year 1st month for me. I had prayed to God and I am surrendering this property to him. I do not want to kill myself in saving this property which Aurora Loan Services does not want to modify its loan terms. I cannot bring this to my grave when I die anyway.

I still have five(5) of them which Bank of America had "loan modified" from option arm to 6% fixed. I learned how to be contented. I have attached all the Lease Agreements that is sharing walls with this property for you to see, ALS Attorney said that I am just making up the financial statement, well God knows I am not lying.

So, I don't feel comfortable giving these to ALS attorney as I do not want to give out these information to him unless I have a lawyer on my side.

I won't hire an attorney to fight for it as it would be very expensive for me at the moment. I can only hire God as my lawyer to represent me daily.

If God wants for me to keep it, then there will be a miracle. I won't huggle anymore. Whoever Ms. Alicia Hodson hired to represent Aurora Loan Services as an attorney is not going to help in anyway. He is there to defend what was written in my file record in your system even though a lot of them was not true.

Thank you Jason for reading all my emails out of frustrations. I just thought your department might still be able to help me postpone the foreclosure.

Should there be any drop of hope left, Aurora Loan is the one who knows that.

Jason, I am so sorry if I had bothered you these past week and even yesterday. I am only human who was hurt.

Again, thank you and may you have a wonderful day!

God bless,

Lolina

Print                                                              Page 1 of 3

From: Lolina Porter (arthinker@yahoo.com)
To: Jason.Cramer@aurorabankfsb.com; HOPENOW@alservices.com; tom.wind@alservices.com;
executivecommunications@alservices.com;
Date: Thu, January 28, 2010 12:20:09 PM
Cc:
Subject: FORECLOSURE DATE is on FEB. 4, 2010 on Loan#_____ - Please help I do not want
to FORECLOSE this home, but I was accused wrongly...

Hi Jason and to whom this may concern;

I just got a notice yesterday that this Loan#_____ is set for FORECLOSURE on 02-04-
2010.  Please read my situation on how much I wanted to work something out but yet, I get
accused wrongly.  All I need was an explanation yet I did not get it from Ms. Alicia Hodson.
Please DO NOT FORWARD this email to Ms. ALICIA HODSON, it seems she's got something
against me because of what happened below.

Please help me.  I don't want to let go to this property because I got a tenant renting $1,025
per month and has been paying on time since August of 2009.  Prior to this date, I have been
living in it for two weeks per month since I took over the management, before I took over,  I
had to evict a tenant who owed us $14,800+ in rents with a court judgment as my previous
property management mismanaged this property.

We really want to keep our investment property, we did not refinance it at all, we just wanted
to ask the bank to help us get an affordable payments, I called your office last Monday but the
customer representative refused, because according to them I broke four (4) agreements.
These are not all true, 2 of them were circumstancial and the other 2 were not true, in
fact, one of them was Ms. Hodson's mistake that she probably does not want to admit. Please
do not contact Ms Alicia Hodson, because I think since she has something against me. I don't
feel comfortable working with her. She wanted to get back at me I believe, this is how I feel at
the moment.

Ms. Alicia Hodson is from Executive Committee who DENIED that I can get approved for a loan
workout, other than the payment she was offering of $2,465 per month (I thought this was
ridiculous, bec. she made a mistake in entering my financial information, I wasn't agreeing to
it, but she refused to modify it.)  Therefore, I refused her offer, but she marked it as it was
my fault. I could not believe that this property will be foreclosed soon, I prayed to God and  I
called the Loss Mitigation Department and then gave all my information, I got approved for
$1,876 per month and at the end of 9 months, that I will resume my regular monthly payment
of $669.00 (approx.), this was what Mr. Tony Henderson had told me over the phone. Without
Ms. Hodson's knowledge, someone took my pleading seriously and took my information
correctly.

When I got the Special Repayment Plan package, I was surprised because there was an
additional balloon payment of $10,000+ in the document which Mr. Tony Henderson did not
even mention that it will be included.

When Ms. Hodson learned of this, I believe she got furious, I believe she has something to do

Print                                                                                      Page 2 of 3

with a balloon payment of $10,000+ at the end of 9 payments of $1,876 in the Special
Repayment Plan package, which I was forced to sign in October 1, 2009 to avoid foreclosure
scheduled on October 3, 2009, also before I signed I spoke to Mr. Jason Cramer to seek
advise and he advised me to better sign it then dispute the figures, which I did.

I sent my downpayment via Western Union (attached), then I sent my first payment via FedEx
to Ms. Alicia Hodson with a letter asking her to explain to me this confusing balloon payment
and to explain to me how does this repayment plan play against my total delinquencies.

Ms. Hodson, did not post my first payment. I got a Notice two weeks after that Aurora Loan
Services has not received my first payment to the Repayment Plan, hence they are closing my
file, I replied with proof (attached) and had called Ms. Hodson, few days came by I never
heard from Ms. Hodson if she has found the check or not, I had to do the initiative to call and
verify. Anyhow, it got posted, but Ms. Hodson did not erase the record in my account that this
is not my fault, hence this is marked against me as another offense.

November came no reply from her, but I still paid the $1,876 with Cashier Check this time I
send it to Loss Mitigation Dept. December came, I never heard from Ms. Hodson on my
request for explanation, I decided to pay my regular monthly payment of $654.80 to really
catch her attention, because I really feel like I have been fraudulently accused and not treated
unfairly.

Today, I am coming to your office because I just got the notice yesterday that my property is
set to be foreclosed on February 4, 2010. I called Aurora Loan Services, and they said that
according to my file, I have broken four (4) workout therefore they could not help me
anymore. These accusations were not all true.

The accusation of Ms. Hodson that I am in deficit of -$5,596.08 was a LIE. She did not want
to correct the financial information entered into the system, it wasn't what I gave her. My file
does not match what she entered (Please find attached my financial statement). According
to Mr. Tony Henderson while I was on the phone with him, some thousands of dollars got
entered into a CREDIT CARD field, which to my surprise I never use Credit Card since I filed
for bankruptcy in 2007.

Please find attached all the documents that you might use to determine whether I am not
qualified for a modification or not.

1. Porter Financial Statement as of 01-28-2010 with Detailed Rental Income (with payment of
$1,876 per month to Aurora Loan Services) and another copy with my regular monthly
payment (preferred) to Aurora Loan Services.
2. Pay Stubs (Lolina Only), for Brett pls. check the Bank Statement as it is Direct Deposited to
his account, he wasn't able to get the paystub since July since he has not been back to his
office since then, I have attached the July until September 2009 paystub that he got last from
his co-worker that visited him at the hospital. Also, included Brett's Disability Check, I forgot to
scan the latest one, so this copy is of 10-2009 pay. His LTD will kick in right after his sick time
gets exhausted.

Print                                                                                    Page 2 of 3

3, 2 Months Bank Statements (pls. see Brett's recent Direct Deposited Sick Time Pay from LA County). His co-workers donated sick time for Brett that he should still be receiving January Sick Time Pay.

4, Brett's MRI Result, and Doctor's Note.

** Long Term Disability has been approved and he will start receiving a check  towards the end of this month, I only have the approximate 60% of his current salary which would be the Long Term Disability pay = approx. $2,265.22.

Thank you so much in advance. May GOD reveal the truth. I am crying right now for what I am getting in exchange of asking for help and some explanation of figures that I don't understand.

Sincerely,

Lolina Porter
cell: 818-571-9092
email: arthinker@yahoo.com.



EXHIBIT
19

Lolina Porter
832 Monterey Rd.
Glendale, CA 91206
March 4, 2010

Attn: A.C. GILLESS
Sheriff
SHELBY County Courthouse
140 Adams Avenue Room# 106
Memphis, TN 38103

Re: Request for reconsideration to dismiss eviction Case filed by Aurora Loan Services –
Detainer Warrant # 1411388 – Court Hearing Date is March 10, 2010 @ 1:30pm

Dear Sir Gilless:

I just got the eviction notice today from my tenant, March 4, 2010, and am responding
with the Lease Agreement and Receipts of my tenant, they are paid up in advance up to
April 30, 2010. Please find enclosed my tenant's Lease Agreement and their copies of
Rent Receipts.

They were helping me to pay in advance so that Aurora Loan Services won't foreclose the
home on us. Aurora Loan Services got all these money as they collected $1,300 per
month in the forbearance agreement, however, Aurora Loan wanted more which I could
not possibly afford after giving them all what I had given. The Aurora Loan Services
(a.k.a Lehman Brothers) has been merciless on my situation despite my request for loan
modification due to the illness of my husband, the government has helped this company
with taxpayer money, yet they are not helping struggling borrowers like us. I cannot
afford to hire a lawyer to represent my rights, so I just let God be my lawyer and let go of
this property.

I had a difficult year last year when I got laid off from work and then 6 months after my
husband suffered from ischemic stroke. I am currently in California taking care of my
husband while driving him to doctor's appointments and therapy and taking care of my
two kids 8 & 3.

I am arranging for myself to travel to TN towards the last week of April so that I can help
my tenant to move on or before May 4, 2010. They have kids but they agreed to move

EXHIBIT 19

Attn: A.C. Gilless - Sheriff
March 4, 2010
Page 2

and I will help them maybe as well as it is my responsibility. They are a very good tenant, and I don't want them to be involved in something that is not their fault.

My husband, Brett Porter is on disability and I am currently taking care of him. All I am requesting is for sometime to be given for us to help our tenants move properly without being harassed through eviction.

I apologize that my husband and myself won't be able to attend the Court Hearing date on March 10, 2010, Wednesday at 1:30pm due to his illness. I cannot afford to hire an attorney to represent us, but per my understanding if my tenant has a bonafide lease agreement that they should not be put out for eviction. Please contact me if my understanding is true or not. All I would like to ask is sometime for me to get someone to care for my husband so I can arrange to travel to Tennessee towards the end of April 2010.

I really would like to seek your heartfelt understanding on our situation Sir, please send all your mail to my mailing address to Lolita Porter at 833 Monterey Rd. Glendale, CA 91206, my cell phone is 818-371-9092, my email is gnhluker@yahoo.com.

Sincerely,

Lolita Porter
Previous owner of 8131 Woodcock View Dr. Millington, TN 38053
Cell: 818-371-9092
Email: gnhluker@yahoo.com

Cc: Tenant

EXHIBIT 19



**Property Management Company**
e-mail: arthinker@yahoo.com

**PARTIES:**

LANDLORD: ArThinker Property Management/LaRae Porter

TENANT(S): BOBBY FIELDS and SIMONE FIELDS

PROPERTY ADDRESS: 6131 Woodstock View Dr.  Millington, TN 38053

1. RENTAL AMOUNT: Commencing Dec 1, 2002, TENANT agrees to pay LANDLORD the sum of $1,025.00 per month in advance on the 1st day of each calendar month. Said rental payment shall be delivered by TENANT to LANDLORD or his designated agent to the following location and payable to:

ArThinker Property Management Co
831 Monterey Rd.
Glendale, CA 91206

Rent must be actually received by LANDLORD, or designated agent, in order to be considered in compliance with the terms of this agreement (Check if Applicable) _____ A prorated share of rent in the sum of $ _____ is being paid to cover the period from _____ to _____

2. TERM: The premises are leased on the following lease term (please check one item only)
_____ month to month (OR) __X__ until 07/30/2009  2010

3. SECURITY DEPOSITS: TENANT shall deposit with landlord the sum of $1,800.00 as a security deposit to secure TENANT'S faithful performance of the terms of this lease. The security deposit shall not exceed two times the monthly rent. After all the TENANTS have vacated, leaving the premises vacant, the LANDLORD may use the security deposit for the cleaning of the premises, any unpaid rent and for to the premises or common areas, and any rent or other amounts owed pursuant to the lease agreement or pursuant to Civil Code Section 1950.5. TENANT may not use said deposit for rent owed during the term of the lease. Within 21 days of the TENANT vacating the premises, LANDLORD shall furnish TENANT a written statement indicating any amounts deducted from the security deposit and returning the balance to the TENANT. If TENANT fails to furnish a forwarding address to LANDLORD, then LANDLORD shall send said statement and any security deposit refund to the leased premises.

4. INITIAL PAYMENT: TENANT shall pay the first month rent of $1,025.00 and the security deposit in the amount of $1,800.00 for a total of $2,825.00. Said payment shall be made in the form of cash or cashier's check and is all due prior to occupancy.

EXHIBIT 19

5. OCCUPANTS: The premises are rented for residential purposes only and shall not be occupied by any person other than those designated above as TENANT with the exception of the following named persons:

N/A

If LANDLORD, with written consent, allows for additional persons to occupy the premises, the rent shall be increased by $100 for each such person. Any person staying 14 days cumulative or longer, without the LANDLORD'S written consent, shall be considered as occupying the premises in violation of this Agreement.

6. SUBLETTING OR ASSIGNING: TENANT agrees not to assign or sublet the premises, or any part thereof without first obtaining written permission from LANDLORD.

7. UTILITIES: TENANT shall pay for all utilities and/or services supplied to the premises with the following exception  Yard Maintenance  .

8. PARKING: TENANT  is not  X  is (check one) assigned a parking space. If assigned a parking space it shall be designated as space #  Covered Two Car Garage with Remote Control . TENANT may only park a vehicle that is registered in the TENANT'S name. TENANT may not assign, sublet, or allow any other person to use this space. This space is exclusively used for the parking of passenger automobiles by the TENANT. No other type of vehicle or item may be stored in this space without prior written consent of LANDLORD. TENANT may not wash, repair, or paint in this space or at any other common area on the premises. Only vehicles that are operational and currently registered in the State of Tennessee may park in this space. Any vehicle that is leaking any substance must not be parked anywhere on the premises.

9. CONDITION OF PREMISES: TENANT acknowledges that the premises have been inspected. Tenant acknowledges that said premises have been cleaned and all items, fixtures, appliances, and appurtenances are in complete working order. TENANT promises to keep the premises in a neat and sanitary condition and to immediately reimburse landlord for any sums necessary to repair any item, fixture or appurtenance that needed service due to TENANT'S, or TENANT'S invitee, misuse or negligence. TENANT shall be responsible for the cleaning or repair to any plumbing fixture where a stoppage has occurred. TENANT shall also be responsible for repair or replacement of the garbage disposal where the cause has been a result of bones, grease, pits, or any other item which normally causes blockage of the mechanism.

10. ALTERATIONS: TENANT shall not make any alterations to the premises, including but not limited to installing aerials, lighting fixtures, dishwashers, washing machines, dryers, or other items without first obtaining written permission from LANDLORD. TENANT shall not change or install locks, paint, or wallpaper said premises without LANDLORD'S prior written consent. TENANT shall not place placards, signs, or other exhibits in a window or any other place where they can be viewed by other residents or by the general public. TENANT shall not store any object on the property outside of the unit.

2

8012763837

*EXHIBIT 19*

**11. LATE CHARGES/BAD CHECKS:** The parties agree that it would be impractical or extremely difficult to fix the actual damage incurred by the LANDLORD if the TENANT fails to pay the rent timely. An administrative cost which is related to collecting and accounting for the late payment, will be assessed at the rate of $3.00 per day for no more than 20 days from the date the late fee began. The late charge will commence the day after the rent is due. The parties further agree that the acceptance of this provision will be conclusive evidence, in any legal proceeding, that calculating actual damage would be impractical and extremely difficult to fix. Furthermore, the late fee assessed above, is conclusive evidence in any legal proceeding that it is a reasonable administrative cost. If rent is not paid when due and landlord issues a Notice To Pay Rent Or Quit, TENANT must tender cash or cashiers check only. IF TENANT tenders a check, which is dishonored by a banking institution, then TENANT shall only tender cash or cashier's check for all future payments. This shall continue until such time as written consent is obtained from LANDLORD. In addition, TENANT shall be liable in the sum of $25 for each check that is returned to LANDLORD because the check has been dishonored. A fee of $50 will be incurred each time a the Landlord is required to serve a 3 Day Notice To Pay The Rent due to the Tenant's failure to pay rent timely.

**12. NOISE AND DISRUPTIVE ACTIVITIES:** TENANT or his/her guests and invitees shall not disturb, annoy, endanger or inconvenience other tenants of the building, neighbors, the LANDLORD or his agents, or workmen nor violate any law, nor commit or permit waste or nuisance in or about the premises. Further, TENANT shall not do or keep anything in or about the premises that will obstruct the public spaces available to other residents. Lounging or unnecessary loitering on the front steps, public balconies or the common hallways that interferes with the convenience of other residents is prohibited.

**13. LANDLORD'S RIGHT OF ENTRY:** LANDLORD may enter and inspect the premises during normal business hours and upon reasonable advance notice of at least 24 hours to TENANT. LANDLORD is permitted to make all alterations, repairs and maintenance that in LANDLORD's judgment is necessary to perform. In addition, LANDLORD has all right to enter pursuant to Civil Code Section 1954. If the work performed requires that TENANT temporarily vacate the unit, then TENANT shall vacate for this temporary period upon being given a 7 days notice by LANDLORD. TENANT agrees that in such event that TENANT will be solely compensated by a corresponding reduction in rent for those many days that TENANT was temporarily displaced. No other compensation shall be offered to the TENANT. If the work to be performed requires the cooperation of TENANT to perform certain tasks, then those tasks shall be performed upon serving 24 hours written notice by LANDLORD. (EXAMPLE - removing food items from cabinets so that the unit may be sprayed for pests)

**14. REPAIRS BY LANDLORD:** Where a repair is the responsibility of the LANDLORD, TENANT must notify LANDLORD with a written notice stating what item needs servicing or repair. TENANT must give LANDLORD a reasonable opportunity to service or repair said item. TENANT acknowledges that rent will not be withheld unless a written notice has been served on LANDLORD giving LANDLORD a reasonable time to fix said item within in the meaning of Civil Code Section 1942. Under no circumstances may TENANT withhold rent unless said item constitutes a substantial breach of the warranties of habitability as stated in Code of Civil Procedure Section 1174.2.

**15. PETS:** No dog, cat, bird, fish or other domestic pet or animal of any kind may be kept on or about the premises without LANDLORD'S written consent.

3

6137 Woodrow Way Dr
Memphis, TN 38053
Phone (901) 870-0232

635 Kenilworth Rd
Glendale, CA 91202
Phone (818) 427-0002

EXHIBIT 19

16. FURNISHINGS: No liquid filled furniture of any kind may be kept on the premises. If the structure was built in 1973 or later TENANT may possess a waterbed if he maintains waterbed insurance valued at $100,000 or more. TENANT must furnish LANDLORD with proof of said insurance. TENANT must use bedding that complies with the load capacity of the manufacturer. In addition, TENANT must also be in full compliance with Civil Code Section 1940.5. TENANT shall not install or use any washer, dryer, or dishwasher that was not already furnished with the unit. TENANT shall not have any musical instruments on the premises.

17. INSURANCE: TENANT may maintain a personal property insurance policy to cover any losses sustained to TENANT'S personal property or vehicle. It is acknowledged that LANDLORD does not maintain this insurance to cover personal property damage or loss caused by fire, theft, rain, water overflow/leakage, acts of GOD, and/or any other causes. It is acknowledged that LANDLORD is not liable for these occurrences. It is acknowledged that TENANT'S insurance policy shall solely indemnify TENANT for any losses sustained. TENANT'S failure to maintain said policy shall be a complete waiver of TENANT'S right to seek damages against LANDLORD for the above stated losses. The parties acknowledge that the premises are not to be considered a security building which would hold LANDLORD to a higher degree of care.

18. TERMINATION OF LEASE/RENTAL AGREEMENT: If this lease is based on a fixed term, pursuant to paragraph 2, then at the expiration of said fixed term this lease shall become a month to month tenancy upon the approval of LANDLORD. Where said term is a month to month tenancy, either party may terminate this tenancy by the serving of a 30 day written notice.

19. NON-CURABLE BREACH OF RENTAL AGREEMENT: It shall be considered a non-curable breach of this rental agreement, within the meaning of Code of Civil Procedure 1161 subsection 2, if tenant has not paid the rent when due, three times in any 12 month period. No notice of these delinquencies need be served on the tenant.

20. POSSESSION: If premises cannot be delivered to TENANT on the agreed date due to loss, total or partial destruction of the premises, or failure of previous TENANT to vacate, either party may terminate this agreement upon written notice to the other party at their last known address, It is acknowledged that either party shall have no liability to each other except that all sums paid to LANDLORD will be immediately refunded to TENANT.

21. ABANDONMENT: It shall be deemed a reasonable belief by the LANDLORD that an abandonment of the premises has occurred, where the, within the meaning of Civil Code Section 1951.3, where rent has been unpaid for 14 consecutive days and the TENANT has been absent from unit for 14 consecutive days. In that event, LANDLORD may serve written notice pursuant to Civil Code Section 1951.2. If TENANT does not comply with the requirements of said notice in 18 days, the premises shall be deemed abandoned.

22. WAIVER: LANDLORD'S failure to require compliance with the conditions of this agreement, or to exercise any right provided herein, shall not be deemed a waiver by LANDLORD of such condition or right. LANDLORD'S acceptance of rent with knowledge of any default unless agreement by TENANT shall not be deemed a waiver of such default, nor shall it limit LANDLORD'S rights with respect to that or any subsequent right. It is further agreed between the parties that the payment of rent at any time shall not be a waiver to any UNLAWFUL DETAINER action unless LANDLORD in writing specifically acknowledges that this constitutes a waiver to the UNLAWFUL DETAINER action.

Feb 27 10 01:58p                                    9012763337                    p.2

*EXHIBIT 19*

23. VALIDITY/SEVERABILITY: If any provision of this agreement is held to be invalid, such invalidity shall not affect the validity or enforcement of any other provision of this agreement.

24. ATTORNEY FEES: In the event action is brought by any party to enforce any terms of this agreement or to recover possession of the premises, the prevailing party shall recover from the other party reasonable attorney fees. It is acknowledged, between the parties, that jury trials significantly increase the costs of any litigation between the parties. It is also acknowledged that jury trials require a longer length of time to adjudicate the controversy. On this basis, all parties waive their rights to have any matter settled by jury trial.

25. NOTICES: All notices to the tenant shall be deemed served upon mailing by first class mail, addressed to the tenant, at the subject premises or upon personal delivery to the premises whether or not TENANT is actually present at the time of said delivery. All notices to the landlord shall be served by mailing first class mail or by personal delivery to the manager's apartment or to:

Anthinian Property Management Co.
832 Monterey Rd.
Glendale, CA 91206

26. PERSONAL PROPERTY OF TENANT: Once TENANT vacates the premises, all personal property left in the unit shall be stored by the LANDLORD for 18 days. If within that time period, TENANT does not claim said property, LANDLORD may dispose of said items in any manner LANDLORD chooses.

27. ADDITIONAL RENT: All items owed under this lease shall be deemed additional rent.

28. APPLICATION: All statements in TENANTS application must be true or this will constitute a material breach of this lease.

29. Lead Warning Statements Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips and dust pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, LANDLORDS must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. TENANTS must also receive a federally approved pamphlet on lead poisoning prevention.

LANDLORDS Disclosure (initial where appropriate)

___X_ LANDLORD has no knowledge of lead-based paint and/or lead-based paint hazards in the premises. LANDLORD has no reports or records pertaining to lead -based paint and/or lead-based paint hazards in the premises.

_____ See Attached. ( A separate form is attached disclosing LANDLORD's information.) TENANTS Acknowledgment TENANT has received the pamphlet Protect Your Family From Lead In Your Home. TENANT agrees to promptly notify LANDLORD in writing of any deteriorated and/or peeling paint.

5

Feb 27, 10 02:19p                              9012763637                        p.4

*EXHIBIT 19*

30. ENTIRE AGREEMENT: The foregoing agreement, including any attachments incorporated by reference, constitute the entire agreement between the parties and supersedes any oral or written representations or agreements that may have been made by either party. Further, TENANT represents that TENANT has relied solely on TENANT'S judgment in entering into this agreement. TENANT acknowledges having been advised to consult with independent legal counsel before entering into this Agreement and has decided to waive such representation and advice. TENANT acknowledges that TENANT has read and understood this agreement and has been furnished a duplicate original.

31. Additional terms    X    (See attachment below) Note attachment must be sign by all parties to be valid.

Per request of the tenant Mr. and Mrs. Fields, the security deposit of $1,500.00 will be paid on or before September 1, 2009. The Landlord hereby requires a initial security deposit of at least $975.00 prior to move in date of July 1, 2009 and that the remaining security deposit of $1,025.00 be paid on or before September 1, 2009.

Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides.

_____    LANDLORD/AGENT _____ DATE
Ardashier Property Management

_____    TENANT _____ DATE
McDorsey Fields

_____    TENANT _____ DATE
Mrs. Simone Fields

6.

Tom Leatherwood, Shelby County Register of Deeds; Instr. # 05126412

**EXHIBIT 2.0
CONTINUATION**



# Tom Leatherwood

### Shelby County Register

As evidenced by the instrument number shown below, this document

has been recorded as a permanent record in the archives of the

Office of the Shelby County Register.

05126412

TOM LEATHERWOOD
REGISTER OF DEEDS SHELBY COUNTY TENNESSEE

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05128412

*EXHIBIT 20*

Loan No: ▮▮▮▮▮▮▮
Borrower:  LOLINA M PORTER

Data ID: 301

m~ 05-470

This instrument was prepared by:  Middleberg, Riddle & Gianna
717 N. Harwood, Suite 2400
Dallas, TX 75201

Return to:  HOMECOMINGS FINANCIAL NETWORK, INC.
ONE MERIDIAN CROSSING, #100
MINNEAPOLIS, MN 55423

———————— [Space Above This Line For Recording Data] ————————

# DEED OF TRUST   MIN: 100062604242559049

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated July 27, 2005, together with all Riders to this document.

married

(B) "Borrower" is LOLINA M PORTER.  Borrower is the trustor under this Security Instrument.

(C) "Lender" is HOMECOMINGS FINANCIAL NETWORK, INC.  Lender is a Corporation organized and existing under the laws of the State of DELAWARE.  Lender's address is 2101 Rexford, Suite 158W, CHARLOTTE, NC 28211.

(D) "Trustee" is ARNOLD M. WEISS, a resident of 208 ADAMS AVENUE, MEMPHIS, TENNESSEE 38103;  Shelby County,  Tennessee

(E) "MERS" is Mortgage Electronic Registration Systems, Inc.  MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary under this Security Instrument.  MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated July 27, 2005.  The Note states that Borrower owes Lender ONE HUNDRED TWENTY-TWO THOUSAND FOUR HUNDRED and NO/100-----Dollars (U.S. $ 122,400.00) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than August 1, 2035.  The maximum principal indebtedness for Tennessee recording tax purposes is $ 122,400.00.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider      ☐ Condominium Rider               ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider
☒ 1-4 Family Rider           ☐ Biweekly Payment Rider
☐ Other(s) [specify]

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 03126412

EXHIBIT 20

Loan No: ▮▮▮▮▮▮▮                                          Data ID:  301

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of SHELBY:

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

EXHIBIT 20

Loan No:                              Date ID: 201

which currently has the address of 6131 WOODSTOCK VIEW DRIVE,
[Street]
MILLINGTON, TENNESSEE        38053        ("Property Address"):
[City]                        [Zip Code]

TO HAVE AND TO HOLD, the aforedescribed property, together with all the hereditaments and appurtenances thereunto belonging to, or in anywise appertaining unto the Trustee, its successors in trust and assigns, in fee simple forever.

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.
2.  Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.
If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

EXHIBIT 20

Loan No: ▮▮▮▮▮▮▮▮                                                    Data ID: 301

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

EXHIBIT 20

Loan No: ████████                                         Data ID: 301

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless

Tom Leatherwood, Shelby County Register of Deeds; Instr. # 05126412

*EXHIBIT 20*

Loan No:                                    Data ID: 301

7.  **Preservation, Maintenance and Protection of the Property; Inspections.**  Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property.  Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition.  Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage.  If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property.  If it has reasonable cause, Lender may inspect the interior of the improvements on the Property.  Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  **Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

EXHIBIT 20

Loan No: ████████████                                          Data ID: 301

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

EXHIBIT 2-0

Loan No: ▓▓▓▓▓▓▓                                    Data ID: 301

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Tom Leatherwood, Shelby County Register of Deeds: Instr.#05126412

EXHIBIT 20

Loan No: ▮▮▮▮▮▮▮▮                                                    Data ID: 301

16.  Governing Law; Severability; Rules of Construction.  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17.  Borrower's Copy.  Borrower shall be given one copy of the Note and of this Security Instrument.

18.  Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19.  Borrower's Right to Reinstate After Acceleration.  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred.  However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20.  Sale of Note; Change of Loan Servicer; Notice of Grievance.  The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower.  A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law.  There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.  If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing.  If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

EXHIBIT 22

Loan No: ███████████                                                      Data ID: 301

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Trustee shall give notice of sale by public advertisement in the county in which the Property is located for the time and in the manner provided by Applicable Law, and Lender or Trustee shall mail a copy of the notice of sale to Borrower in the manner provided in Section 15. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and under the terms designated in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

EXHIBIT 20

Loan No: ████████                                    Data ID: 301

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Waivers. Borrower waives all right of homestead, equity of redemption, statutory right of redemption and relinquishes all other rights and exemptions of every kind, including, but not limited to, a statutory right to an elective share in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has executed this Security Instrument.

_____(Seal)              _____(Seal)
BRETT M PORTER —Borrower                     LOLINA M PORTER —Borrower

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

*EXHIBIT 20*

Loan No:                                                      Data ID: 301

[Space Below This Line For Acknowledgment]

State of ~~TENNESSEE~~ California
County of Los Angeles

On this 27 day of July 2005, before me personally appeared
LOLINA M PORTER AND BRETT M PORTER, Husband & Wife
to me known to be the person described in and who executed the foregoing instrument and who
acknowledged the execution of the same to be free act and deed. Witness my hand and official seal.

(Seal)

_____
Notary Public

ANDRE Babakhanian
(Printed Name)

My commission expires July 28-2006

ANDRE BABAKHANIAN
Commission # 1362133
Notary Public - California
Los Angeles County
My Comm. Expires Jul 28, 2006

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

*EXHIBIT 20*

Loan No:                            Data ID: 201

D. "BORROWER'S RIGHT TO REINSTATE" DELETED. Section 19 is deleted.

E. BORROWER'S OCCUPANCY. Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

F. ASSIGNMENT OF LEASES. Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

G. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION. Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

H. CROSS-DEFAULT PROVISION. Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

MULTISTATE 1-4 FAMILY RIDER – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3170    4/01
(Page 2 of 3 Pages)



Tom Leatherwood, Shelby County Register of Deeds: Instr.# 05120412

*EXHIBIT 20*

Loan No: ▓▓▓▓▓▓▓                                    Data ID: 301

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____(Seal)            _____(Seal)
BRETT M. PORTER —Borrower                   LORNA M. PORTER —Borrower

MULTISTATE 1-4 FAMILY RIDER—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3170    1/01
(Page 3 of 3 Pages)

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

*EXHIBIT 20*

Loan No:
Borrower: LOLINA M PORTER

Data ID: 301

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made this 27th day of July, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to HOMECOMINGS FINANCIAL NETWORK, INC. ("Lender") of the same date and covering the property described in the Security Instrument and located at:

6141 WOODSTOCK VIEW DRIVE
MILLINGTON, TENNESSEE 38053
[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

2.    INTEREST
    (A) Interest Rate
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 2.375 %. The interest rate I will pay may change.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.
    (B) Interest Rate Change Dates
    The interest rate I will pay may change on the first day of September, 2005, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.
    (C) Interest Rate Limit
    My interest rate will never be greater than 9.9500 %.
    (D) Index
    Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the Twelve-Month Average of monthly yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.

MULTISTATE ADJUSTABLE RATE RIDER - 12-Month Average of Monthly Average Treasury Yields Index
Modified by Middleberg, Riddle & Gianna                                    Form 3184 1/01    (Page 1 of 4 Pages)



Tom Leatherwood, Shelby County Register of Deeds; Instr. # 05128412

EXHIBIT 2.0

Loan No: ███████                                                    Data ID: 301

(C) Calculation of Interest Rate Changes:

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE and ONE-FOURTH percentage points (3.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in 2(C) above, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

3.    PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on September 1, 2005. I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on August 1, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 2101 Rexford, Suite 169W, CHARLOTTE, NC 28211, or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each month of my initial monthly payments will be in the amount of U.S. $ 475.71. This amount may change.

(C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of September, 2006, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.50% greater than the amount of my last monthly payment due before the Payment Change Date.

(E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

Form 3184 1/01    (Page 2 of 4 Pages)

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

EXHIBIT 20

Loan No:██████████                                    Data ID: 301

(F) Limit on My Unpaid Principal; Increased Monthly Payment.
My unpaid principal can never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

(G) Required Full Payment.
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

4.   NOTICE OF CHANGES
The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Form 3164 1/01   (Page 3 of 4 Pages)



Tom Leatherwood, Shelby County Register of Deeds, Instr. # 05128412

EXHIBIT 20

Loan No: ███████        Data ID: 301

By Signing Below, Borrower accepts and agrees to the terms and covenants contained in this Adjustable
Rate Rider.

_____ (Seal)        _____ (Seal)
BRETT M PORTER —Borrower                        LOLINA M PORTER —Borrower

Form 3148 1/01    (Page 4 of 4 Pages)

Tom Leatherwood, Shelby County Register of Deeds: Instr. # 05126412

EXHIBIT X

File Number: m-05-1470

## FULL LEGAL

### Exhibit "A"

Lots 51-B, Woodstock Hills Subdivision, Section A, Re-Subdivision, of Lots 50 and 51, as shown on plat of record in Plat Book 202, page 46, in the Register's Office of Shelby County, Tennessee, to which plat reference is hereby made for a more particular description of said property.

Property Address: 6131 Woodstock View Drive, Millington, TN 38053

Being the same property conveyed to Tapp Enterprises, Inc., by Quit Claim Deed, from Woodstock Hills Partnership, a Partnership composed of Jack R. Tickle, Charles T. Tickle and Louis N. Tickle, a Tennessee General Partnership, dated 4/25/2001, filed in Book KZ, Page 9730, said Register's Office.

Being the same property conveyed to Lolina Moran Porter, married from Tapp Enterprises, Inc., a TN Corp., by Warranty Deed being recorded simultaneously herewith in Instrument No. 021 01411 , in the Register's Office of Shelby County, Tennessee.

Lolina Moran Porter is one and the same person as Lolina M. Porter.

Investment Property

Indymac Bank F.S.B. v Yano-Horoski (2009 NY Slip Op 52333(U))    http://www.nycourts.gov/reporter/3dseries/2009/2009_52333.htm



[*1]

| Indymac Bank F.S.B. v Yano-Horoski |
|---|
| 2009 NY Slip Op 52333(U) |
| Decided on November 19, 2009 |
| Supreme Court, Suffolk County |
| Spinner, J. |
| Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. |
| This opinion is uncorrected and will not be published in the printed Official Reports. |

Decided on November 19, 2009
Supreme Court, Suffolk County

| Indymac Bank F.S.B., Plaintiff<br><br>against<br><br>Diana Yano-Horoski, Wells Fargo Bank Minnesota National Association as Trustee for Soundview Home Equity Loan Trust 2001-1 and Kimberly Horoski, Defendants. |
|---|

2005-17926

Steven J. Baum P.C.

Attorney for Plaintiff

*EXHIBIT 21*

P.O. Box 1291

Buffalo, New York 14240

Diana Yano-Horoski

Defendant Pro Se

8 Oakland Street

East Patchogue, New York 11772-5767

Jeffrey Arlen Spinner, J.

This is an action wherein the Plaintiff claims foreclosure of a mortgage dated August 4,
2004 in the original principal amount of $ 292,500.00 recorded with the Clerk of Suffolk
County, New York in Liber 20826 of Mortgages at Page 285. The mortgage secures an
adjustable rate note of the same amount with an initial interest rate of 10.375%. The
mortgage encumbers real property commonly known as 8 Oakland Street, East Patchogue,
Town of Brookhaven, New York and described as District 0200 Section 979.50 Block
05.00 Lot 001.000 on the Tax Map of Suffolk County. Plaintiff commenced this action by
filing a Summons, Verified Complaint and Notice of Pendency on July 27, 2005. The
Notice of Pendency was extended by Order dated April 28, 2008 and a Judgment of
Foreclosure & Sale was granted on January 12, 2009.

    Thereafter and in accordance with the Laws of 2008, Ch. 472, Sec. 3-a and in view of
the fact that the loan at issue was deemed to be "sub-prime" or "high cost" in nature,
Defendant seasonably requested that the Court convene a settlement conference. That
request was granted and a conference was commenced on February 24, 2009 which was
continued five times in a series of unsuccessful attempts by the Court to obtain meaningful
cooperation from Plaintiff. In view of Plaintiff's intransigence in its continuing failure and
refusal to cooperate, both with the Court and with Defendant's multiple and reasonable
requests, the Court directed that Plaintiff produce an officer of the bank at the adjourned

Indymac Bank F.S.B. v Yano-Horoski (2009 NY Slip Op 52333(U))          http://www.nycourts.gov/reporter/3dseries/2009/2009_52333.htm

EXHIBIT 2.1

conference scheduled for September 22, 2009.

    At the conference held on September 22, 2009, Karen Dickinson, Regional Manager
of [*2] Loss Mitigation for IndyMac Mortgage Services, division of OneWest Bank F.S.B.
("IndyMac") appeared on behalf of Plaintiff. IndyMac purports to be the servicer of the
loan for the benefit of Deutsche Bank who, it is claimed, is the owner and holder of the
note and mortgage (though the record holder is IndyMac Bank F.S.B., an entity which no
longer is in existence). At that conference, it was ceboritously made clear to the Court that
Plaintiff had no good faith intention whatsoever of resolving this matter in any manner
other than a complete and forcible devolution of title from Defendant. Although IndyMac
had prepared a two page document entitled *"Mediation Yano-Horoski"* which contained
what purported to be a financial analysis, Ms. Dickinson's affirmative statements made it
abundantly clear that no form of mediation, resolution or settlement would be acceptable
to Plaintiff. IndyMac asserts the total amount due to be in excess of $ 525,000.00 and
freely concedes that the property securing the loan is worth no more than $ 275,000.00.
Although Ms. Dickinson insisted that Ms. Yano-Horoski had been offered a "Forbearance
Agreement" in the recent past upon which she quickly defaulted, it was only after
substantial prodding by the Court that Ms. Dickinson conceded, with great reluctance, that
it had not been sent to Defendant until *after* its stated first payment due date and hence,
Defendant could not have consummated it under any circumstances (Defendant, through
Plaintiff's duplicity, found herself to be in the unique and uncomfortable position of being
placed in default of the "agreement" even before she had received it). Plaintiff flatly
rejected an offer by Plaintiff's daughter to purchase the house for its fair market value (a
so-called "short sale") with third party financing. Plaintiff refused to consider a loan
modification utilizing any more than 25% of the income of Plaintiff's husband and
daughter (both of whom reside in the premises with her), the excuse being that "We can't
control what non-obligors do with their money" (the logical follow up to this statement is
how does the bank control what the *obligor* does with her money?). The Court found
IndyMac's position to be deeply troubling, especially since a plethora of sub-prime loans
in this County's Foreclosure Conference Part have been successfully modified with the
lender's reliance upon the income of non-obligors who reside in the premises under
foreclosure. The Plaintiff also summarily rejected an offer by both Plaintiff's husband and
daughter to voluntarily obligate themselves for payment upon the full indebtedness, thus

IndyMac Bank F.S.B. v Yano-Horoski (2009 NY Slip Op 52333(U))          http://www.nycourts.gov/reporter/3dseries/2009/2009_52333.htm

*EXHIBIT 2.1*

committing their individual incomes expressly to the purpose of a loan modification. It should be noted here that Defendant did not even request any waiver or "forgiveness" of the indebtedness aside from some tinkering with the interest rate, just a modification of terms so as to enable her to repay the same. It was evident from Ms. Dickinson's opprobrious demeanor and condescending attitude that no proffer by Defendant (short of consent to foreclosure and ejectment of Defendant and her family) would be acceptable to Plaintiff. Even a final and desperate offer of a deed in lieu of foreclosure was met with bland equivocation. In short, each and every proposal by Defendant, no matter how reasonable, was soundly rebuffed by Plaintiff. Viewed objectively, it is apparent that Plaintiff's conduct in this matter falls within the definitions set forth in 22 NYCRR § 130-1.1(c)(2), which might well warrant the imposition of monetary sanctions.

On the Court's own motion, a hearing was held on November 18, 2009 in order to explore the issues herein. At the hearing, Ms. Dickinson appeared as well as Mr. Horoski. IndyMac claimed a balance due, as of September 22, 2009 of $527,437.73 which included an escrow overdraft of $46,627.88 for taxes advanced since the date of default but did not include attorney's fees and costs. Plaintiff was unable to tell the Court the amount of the principal [*3]balance owed. Mr. Horoski advised the Court that according to two letters received from Plaintiff, the principal balance was said to be $285,381.70 as of February 9, 2009 and $283,992.48 as of August 10, 2009. Plaintiff stated was that Defendant must have made payments though it was conceded that in fact no payment had been made. Plaintiff insisted that it had remained in regular contact with Defendant in an effort to reach an amicable resolution, that it had extended two modification offers to Defendant which she did not accept and further, that due to her financial status she was not qualified for any modification, even under the Federal HAMP guidelines. Plaintiff denied that it had "singled out" Defendants, simply stating that her status was such that she fell outside applicable guidelines. All of these assertions were disputed by Defendant.

That having been said, the Court is greatly disturbed by Plaintiff's assertions of the amount claimed to be due from Defendant. The Referee's Report dated June 30, 2008, which has its genesis in a sworn affidavit by a representative of Plaintiff (presumably one with knowledge of the account), reflects a total amount due and owing of $392,983.42. The principal balance is reported to be $290,687.85 with interest computed at the rates of

IndyMac Bank F.S.B. v. Yano-Horoski (2009 NY Slip Op 52333(U))    http://www.nycourts.gov/reporter/3dseries/2009/2009_52333.htm

*EXHIBIT 21*

10.375% from November 1, 2005 through August 31, 2006 ($ 25,118.62), 12.50% from September 1, 2006 to February 28, 2007 ($ 18,018.66), 12.375% from March 1, 2007 to March 31, 2008 ($ 39,126.39) and 11.375% from April 1, 2008 to June 24, 2008 ($ 7,700.24) totalling $ 89,963.91. Plaintiff also claims $ 20.00 in non-sufficient funds charges, $ 295.00 in property inspection fees and $ 12,016.66 for tax and insurance advances. The Judgment of Foreclosure & Sale dated January 12, 2009 was granted in the amount of $ 392,983.42 with interest at the contract rate from June 24, 2008 through January 12, 2009 and at the statutory rate thereafter plus attorney's fees of $ 2,300.00 and a bill of costs in the amount of $ 1,705.00. Even computing the accrual of pre-judgment interest of $ 18,299.18 (using Plaintiff's per diem rate in the Referee's Report) together with post-judgment interest at a statutory 9% through November 19, 2009 (an additional $ 31,740.90), the application of simple addition yields a total amount due of $ 447,028.50. This figure is $ 80,409.23 less than the $ 527,437.73 asserted by Plaintiff to be due and owing from Defendant. The Court is astounded that Plaintiff now claims to be owed an escrow advance amount of $ 46,627.88 when, under oath, its officer swore that as of June 24, 2008 that amount was actually $ 34,611.22 less. Moreover, it now appears that the elusive principal balance is either $ 290,687.85, $ 285,381.70 or $ 283,992.48.

It is the province and indeed the obligation of the trial court to assess and to determine issues regarding credibility, *Morgan v. McCaffrey* 14 AD3d 670 (2nd Dept. 2005). In the matter before the Court, the pendulum of credibility swings heavily in favor of Defendant. When the conduct of Plaintiff in this proceeding is viewed in its entirety, it compels the Court to invoke the ancient and venerable principle of *"Falsus in uno, falsus in omni"* (Latin; "false in one, false in all") upon Defendant which, after review, is wholly appropriate in the context presented, *Deering v. Metcalf* 74 NY 501 (1878). Regrettably, the Court has been unable to find even so much as a scintilla of good faith on the part of Plaintiff. Plaintiff comes before this Court with unclean hands yet has the insufferable temerity to demand equitable relief against Defendant.

The Court, over the course of some six substantive appearances in seven months, has been afforded more than ample opportunity to assess the demeanor, credibility and general state [*4]of relevant affairs of Defendant and Plaintiff. Although not actually relevant to the disposition of this matter, the Court is constrained to note that Defendant is afflicted

Indymac Bank F.S.B. v Yano-Horoski (2009 NY Slip Op 52333(U))    http://www.nycourts.gov/reporter/3dseries/2009/2009_52333.htm

*EXHIBIT 2.1*

with multiple health problems which outwardly manifest in her experiencing great difficulty in ambulation, necessitating the use of mechanical supports. Moreover, Defendant's husband, Mr. Gregory Horoski, suffers from a myriad of serious medical conditions which greatly impede most aspects of his daily existence. Nonetheless, both of these persons, together with their adult daughter who resides with them and who is substantially and gainfully employed, receive income which they are more than willing to commit, in good faith, toward repayment of the debt to Plaintiff and indeed, despite their physical challenges, they have appeared at each and every scheduled conference before this Court. At each appearance, they have assiduously attempted to resolve this controversy in an amicable fashion, only to be callously and arbitrarily turned away by Plaintiff. This has been so even in spite of the Court's continuing albeit futile endeavors at brokering a settlement.

As a relevant aside, the scenario presented here raises the specter of a much greater social problem, that of housing those persons whose homes are foreclosed and who are thereafter dispossessed. It is certainly no secret that Suffolk County is in the yawning abyss of a deep mortgage and housing crisis with foreclosure filings at a record high rate and a corresponding paucity of emergency housing. While foreclosure and its attendant eviction are clearly the inevitable (and in some cases, proper) result in a number of these situations, the Court is persuaded that this need not be the case here. In this matter, Defendant is plainly willing to make arrangements for repayment and both her husband and daughter are likewise willing to allocate their respective incomes in order to reach the same end. Were Plaintiff amenable, she would presumably continue to maintain the property's physical plant, pay taxes thereon and the property would retain or perhaps increase its market value. Plaintiff would receive a regular income stream, albeit with a reduced rate of interest and without sustaining a loss of several hundred thousand dollars. In addition, no neighborhood blight would occur from the boarding of the property after foreclosure which would, in turn, avert problems of litter, dumping, vagrancy and vandalism as well as a corresponding decline in the property values in the immediate area. In short, a loan modification would result in a proverbial "win-win" for all parties involved. To do otherwise would result in virtually certain undomiciled status for two physically unhealthy persons and their daughter, leading to an additional level of problems, both for them and for society.

Indymac Bank F.S.B. v Yano-Horoski (2009 NY Slip Op 52333(U))    http://www.nycourts.gov/reporter/3dseries/2009/2009_52333.htm

*EXHIBIT 21*

Since an action claiming foreclosure of a mortgage is one sounding in equity, *Jamaica Savings Bank v. M.S. Investing Co. 274 NY 215 (1937)*, the very commencement of the action by Plaintiff invokes the Court's equity jurisdiction. While it must be noted that the formal distinctions between an action at law and a suit in equity have long since been abolished in New York (see *CPLR 103, Field Code Of 1848 §§ 2, 3, 4, 69*); the Supreme Court nevertheless has equity jurisdiction and distinct rules regarding equity are still extant, *Carroll v. Bullock 207 NY 567, 101 NE 438 (1913)*. Speaking generally and broadly, it is settled law that *"Stability of contract obligations must not be undermined by judicial sympathy..." Graf v. Hope Building Corporation 254 NY 1 (1930)*. However, it is true with equal force and effect that equity must not and cannot slavishly and blindly follow the law, *Hedges v. Dixon County 150 US 182, 192 (1893)*. Moreover, as succinctly decreed by our Court of Appeals in the matter of *Noyes v. [*5]Anderson 124 NY 175 (1890) "A party having a legal right shall not be permitted to avail himself of it for the purposes of injustice or oppression..." 124 NY at 179.*

In the matter of *Eastman Kodak Co. v. Schwartz 133 NYS2d 908 (Sup. Ct., New York County, 1954)*, Special Term stated that *"The maxim of "clean hands" fundamentally was conceived in equity jurisprudence to refuse to lend its aid in any manner to one seeking its active interposition who has been guilty of unlawful, unconscionable or inequitable conduct in the matter with relation to which he seeks relief." 133 NYS2d at 925, citing First Trust & Savings Bank v. Iowa-Wisconsin Bridge Co. 98 F 2d 416 (8th Cir. 1938), cert. denied 305 US 650, 59 S. Ct. 243; 83 L. Ed. 240 (1938); reh denied 305 US 676, 59 S Ct. 356 83 L. Ed. 437 (1939); General Excavator Co. v. Keystone Driller Co., 62 F 2d 39 (6th Cir. 1933), cert. granted 289 US 721, 53 S. Ct. 791, 77 L. Ed. 1472 (1933), aff'd 290 US 240, 54 S. Ct. 146, 78 L. Ed. 793 (1934).*

In attempting to arrive at a determination as to whether or not equity should properly intervene in this matter so as to permit foreclosure of the mortgage, the Court is required to look at the situation *in toto*, giving due and careful consideration as to whether the remedy sought by Plaintiff would be repugnant to the public interest when seen from the point of view of public morality, see, for example, *55 NY Jur. Equity § 113; Molinas v. Podloff 133 NYS2d 743 (Sup. Ct., New York County, 1954)*. Equitable relief will not lie in favor of one who acts in a manner which is shocking to the conscience, *Duggan v. Platz*

*EXHIBIT 21*

238 AD 197, 264 NYS 403 (3rd Dept. 1933), mod. on other grounds 263 NY 505, 189 NE 566 (1934); neither will equity be available to one who acts in a manner that is oppressive or unjust or whose conduct is sufficiently egregious so as to prohibit the party from asserting its legal rights against a defaulting adversary, *In Re Foreclosure Of Tax Liens 117 NYS2d 725 (Sup. Ct. Kings County, 1952), aff'd on other grounds 286 AD 1027, 145 NYS2d 97 (2nd Dept. 1955), mod. on other grounds on reargument 1 AD2d 95, 148 NYS2d 173 (2nd Dept. 1955), appeal granted 1 AD2d 784, 149 NYS2d 227 (2nd Dept. 1956).* The compass by which the questioned conduct must be measured is a moral one and the acts complained of (those that are sufficient so as to prevent equity's intervention) need not be criminal nor actionable at law but must merely be willful and unconscionable or be of such a nature that honest and fair minded folk would roundly denounce such actions as being morally and ethically wrong, *Pecorella v. Greater Buffalo Press Inc. 107 AD2d 1064, 468 NYS2d 562 (4th Dept. 1985).* Thus, where a party acts in a manner that is offensive to good conscience and justice, he will be completely without recourse in a court of equity, regardless of what his legal rights may be, *Eastman Kodak Co. v. Schwartz 133 NYS2d 908 (Sup. Ct., New York County, 1954), York v. Searles 97 AD 331, 90 NYS 37 (2nd Dept. 1904), aff'd 189 NY 573, 82 NE 1134 (1907).*

An objective and painstaking examination of the totality of the facts and circumstances herein leads this Court to the inescapable conclusion that the affirmative conduct exhibited by Plaintiff at least since February 24, 2009 (and perhaps earlier) has been and is inequitable, unconscionable, vexatious and opprobrious. The Court is constrained, solely as a result of Plaintiff's affirmative acts, to conclude that Plaintiff's conduct is wholly unsupportable at law or in equity, greatly egregious and so completely devoid of good faith that equity cannot be permitted to intervene on its behalf. Indeed, Plaintiff's actions toward Defendant in this matter have been harsh, repugnant, shocking and repulsive to the extent that it must be appropriately [*6]sanctioned so as to deter it from imposing further mortifying abuse against Defendant. The Court cannot be assured that Plaintiff will not repeat this course of conduct if this action is merely dismissed and hence, dismissal standing alone is not a reasonable option. Likewise, the imposition of monetary sanctions under 22 NYCRR § 130-1.1 et. seq. is not likely to have a salubrious or remedial effect on these proceedings and certainly would not inure to Defendant's benefit. This Court is of the opinion that cancellation of the indebtedness and discharge of

Indymac Bank F.S.B. v Yano-Horoski (2009 NY Slip Op 52333(U))    http://www.nycourts.gov/reporter/3dseries/2009/2009_52333.htm

*EXHIBIT 21*

the mortgage, when taken together, constitute the appropriate equitable disposition under the unique facts and circumstances presented herein.

After careful consideration, it is the determination of this Court that the indebtedness evidenced by the Adjustable Rate Note dated August 4, 2004 in the original principal amount of $ 292,500.00 made by Diana J. Yano-Horoski in favor of IndyMac Bank F.S.B. should be cancelled, voided and set aside. In addition, the Mortgage which secures the Adjustable Rate Note, given to Mortgage Electronic Registration Systems Inc. As Nominee For IndyMac Bank F.S.B, dated August 4, 2004 and recorded with the Clerk of Suffolk County on August 16, 2004 in Liber 20826 of Mortgages at Page 285, as assigned by Assignment recorded with the Clerk of Suffolk County in Liber 21273 of Mortgages at Page 808 should be cancelled and discharged of record. Further, Plaintiff, its successors and assigns should be forever barred and prohibited from any action to collect upon the Adjustable Rate Note. In addition, the Judgment of Foreclosure & Sale granted on January 12, 2009 and entered on January 23, 2009 should be vacated and set aside and the Notice of Pendency should be cancelled and discharged of record. For this Court to decree anything less than the foregoing would be for the Court to be wholly derelict in the performance of its obligations.

Upon the Court's own motion, it is

ORDERED that the Adjustable Rate Note in the amount of $ 292,500.00 dated August 4, 2004 made by Diana J. Yano-Horoski in favor of IndyMac Bank F.S.B, shall be and the same is hereby cancelled, voided, avoided, nullified, set aside and is of no further force and effect; and it is further

ORDERED that the Mortgage in the amount of $ 292,500.00 which secures said Adjustable Rate Note given by Diana J. Yano-Horoski to Mortgage Electronic Registration Systems Inc. As Nominee For IndyMac Bank F.S.B. dated August 4, 2004 and recorded with the Clerk of Suffolk County on August 16, 2004 in Liber 20826 of Mortgages as Page 285, as assigned to IndyMac Bank F.S.B. by Assignment recorded with the Clerk of Suffolk County in Liber 21273 of Mortgages at Page 808 shall be and the same is hereby vacated, cancelled, released and discharged of record; and it is further

*EXHIBIT 21*

ORDERED that the Plaintiff, its successors and assigns are hereby barred, prohibited and foreclosed from attempting, in any manner, directly or indirectly, to enforce any provision of the [*7]aforesaid Adjustable Rate Note and Mortgage or any portion thereof as against Defendant, her heirs or successors; and it is further

ORDERED that the Judgment of Foreclosure & Sale granted under this index number on January 12, 2009 and entered in the Office of the Clerk of Suffolk County on January 23, 2009 shall be and the same is hereby vacated and set aside; and it is further

ORDERED that the Notice of Pendency filed with the Clerk of Suffolk County on July 27, 2005 under sequence no. 172456, which was extended by Order dated September 2, 2008 shall be and the same is hereby cancelled, vacated and set aside; and it is further

ORDERED that the Notice of Pendency filed with the Clerk of Suffolk County on August 29, 2008 under sequence no. 199616, shall be and the same is hereby cancelled, vacated and set aside; and it is further

ORDERED that the Clerk of Suffolk County shall cause a copy of this Order & Judgment to be filed in the Land Records so as to effectuate of record each and every one of the provisions hereinabove set forth with respect to cancellation of the instruments and items of record; and it is further

ORDERED that Plaintiff shall pay to the Clerk of Suffolk County, within ten (10) days from the date of entry hereof, any and all fees and costs required to effect cancellation of record of the Mortgage, Notices of Pendency and any other fees so levied; and it is further

ORDERED that within ten (10) days of the date of entry hereof, Plaintiff's counsel shall serve a copy of this Order upon the Clerk of Suffolk County and the Defendant.

This shall constitute the Decision, Judgment and Order of this Court.

Dated: November 19, 2009

Riverhead, New York

Indymac Bank F.S.B. v. Yano-Horoski (2009 NY Slip Op 52333(U))          http://www.nycourts.gov/reporter/3dseries/2009/2009_52333.htm

EXHIBIT 21

ENTER:

_____

JEFFREY ARLEN SPINNER, J.S.C.

( Return to Decision List )

11.of.11                                                          11/24/09 5:26 PM

ORIGINAL

IN THE CHANCERY COURT OF SHELBY COUNTY, TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

| | |
|---|---|
| LOLINA PORTER, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GMAC HOMECOMINGS FINANCIALS | ) |
| NETWORK, AURORA LOAN SERIVCES, | ) |
| LLC, GENWORTH FINANCIAL INC., AND | ) |
| JOHN DOES, | ) |
| | ) |
| Defendants. | ) |

FILED
SHELBY COUNTY
CHANCERY COURT
NOV 23 2010
DEWUN R. SETTLE, C & M
TIME: _____ BY: _____

No. CH-10-1929-3

---

**DEFENDANT GENWORTH FINANCIAL INC.'S MOTION FOR EXTENSION OF
TIME TO RESPOND TO PLAINTIFF'S COMPLAINT**

---

TO THE HONORABLE CHANCELLORS OF THE CHANCERY COURT FOR
THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS:

Defendant, Genworth Financial Inc. ("Genworth"), respectfully moves this Court

under Tennessee Rule of Civil Procedure 6.02 for an extension of time in which

Genworth may respond to the Plaintiff's Complaint and Emergency Motion to Set Aside

Foreclosure Judgment and Sale of Real Property and Motion for Permanent Injunctive

Relief Barring Future Sale of Real Property by Defendants; (Enjoin Defendants from

Real Property) and Motion for Plaintiffs'[sic] Award for Punitive Damages Including

Legal and Equitable Relief (the "Complaint"), up to and including January 15, 2011. In

support of the motion, Genworth states as follows:

1.    Plaintiff commenced this action by filing the Complaint on or about

October 22, 2010.

2.     This Court granted Plaintiff's Temporary Restraining Order on or about October 25, 2010, enjoing the sale of certain real property as identified in the Complaint.

3.     This Court subsequently granted Plaintiff's Temporary Injunction on or about November 18, 2010.

4.     Genworth was served with the Summons and Complaint on or about November 2, 2010.

5.     Plaintiff's allegations against Genworth and the other defendants as set forth in the Complaint are extensive and lengthy, consisting of 36 pages and 21 exhibits.

6.     In order to fully and properly respond to the Complaint, and because the undersigned counsel has only recently been retained by Genworth in this matter, Genworth respectfully requests additional time in which to investigate the allegations and up to and including January 15, 2011, to file a responsive pleading.

7.     Undersigned counsel had consulted with Plaintiff, who is proceeding *pro se*, regarding the extension requested herein.  Plaintiff advised that she would not file an opposition to the instant motion or appear to contest the extension sought.

Wherefore, premises considered, Defendant Genworth respectfully requests an extension of time through and including January 15, 2011, in which to file a responsive pleading to the Complaint.

Respectfully Submitted,

Kristen C. Wright (021771)
Gabrielle A. Lewis (028271)
BASS, BERRY & SIMS PLC
100 Peabody Place, Suite 900
Memphis, Tennessee 38103
Telephone – (901) 543-5900
Facsimile – (901) 543-5999

*Attorneys for Genworth*
*Financial Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 23, 2010, a true and correct copy of the foregoing was served by regular U.S. Mail with sufficient postage affixed, upon the following:

Lolina Porter
832 Monterey Road
Glendale, California 91206

GMAC Homecomings Financials Network
1100 Virginia Drive
Fort Washington, Pennsylvania 19034

Aurora Loan Services, LLC
c/o Corporation Services Company
2908 Poston Avenue
Nashville, Tennessee 37203

Gabrielle A. Lewis

9008331.1