# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------

| | ) | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

-------------------------------------------------------------------------

### DECLARATION OF KATHY NYE IN SUPPORT OF THE RESCAP LIQUIDATING TRUST'S OBJECTION TO THE NOTICE OF CONFLICTS OF INTEREST, FRAUD AND FRAUD UPON THE COURT BY DEBTORS IN CONSPIRACY WITH CREDITOR LNV CORPORATION, RESCAP LIQUIDATING TRUST AND SPECIAL INSURANCE COVERAGE COUNSEL FOR THE DEBTORS PERKINS COIE LLP

I, Kathy Nye, hereby declare as follows:

1.       I serve as Associate Counsel for the ResCap Liquidating Trust (the "<u>Liquidating Trust</u>"), established pursuant to the terms of the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors* [Docket No. 6030] confirmed in the above-captioned Chapter 11 Cases.  During the Chapter 11 Cases, I served as Associate Counsel in the legal department of Residential Capital, LLC ("<u>ResCap</u>"), a limited liability company organized under the laws of the state of Delaware and the parent of the other debtors in the above-captioned Chapter 11 Cases (collectively, the "<u>Debtors</u>").  I joined ResCap on May 1, 2008 as in-house litigation counsel.  Prior to my in-house litigation counsel position, I held various roles within the legal department at ResCap.

2.       In my role as Associate Counsel at ResCap, I was responsible for the management of litigation, including, among others, residential mortgage-related litigation.  In connection with ResCap's chapter 11 filing, I also assisted the Debtors and their professional advisors in connection with the administration of the Chapter 11 Cases, including the borrower

1

litigation matters pending before this Court.  In my current position as Associate Counsel to the

Liquidating Trust, among my other duties, I continue to assist the Liquidating Trust in

connection with the claims reconciliation process.  I am authorized to submit this declaration (the

"<u>Declaration</u>") in support of the *ResCap Liquidating Trust's Objection to the Notice of Conflicts*

*Of Interest, Fraud and Fraud Upon The Court by Debtors in Conspiracy With Creditor LNV*

*Corporation, ResCap Liquidating Trust and Special Insurance Coverage Counsel for the*

*Debtors Perkins Coie LLP* (the "<u>Objection</u>").[1]

       3.       Except as otherwise indicated, all facts set forth in this Declaration are

based upon my personal knowledge of the Debtors' operations, information learned from my

review of relevant documents and information I have received through my discussions with other

former members of the Debtors' management or other former employees of the Debtors, the

Liquidating Trust's professionals and consultants.  If I were called upon to testify, I could and

would testify competently to the facts set forth in the Objection on that basis.

       4.       I have reviewed the list of the Movants' Litigation identified by the

Movants at page 4 of the Motion. Based on my review of the Debtors' case management system

none of the Debtors have been or are currently parties to the Movants' Litigation. In addition,

none of the Debtors are named in any pending litigation with the Movants.  The case

management system reflects that Movant Catherine Gebhardt commenced a separate lawsuit

against Debtor GMAC Mortgage, LLC and a non-Debtor, MGC Mortgage, Inc. in the U.S.

District Court for the Eastern District of Tennessee, <u>Gebhardt v. GMAC Mortgage, LLC</u> (D.

Tenn No. 09-CV-00425-TWP-HBG).  In that action Ms. Gebhardt asserted various claims in

defense of a pending foreclosure.  Pursuant to a Memorandum and Order, filed on July 21, 2010,

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Objection.

the complaint was dismissed with prejudice.  A copy of the Memorandum and Order is annexed hereto as Exhibit 1.   No appeal was taken.

5.       On or about February 7, 2013, Movant Denise Subramanian caused to be served on the Debtors a complaint filed in the United States District Court for the District of Oregon in Subramanian v. Beal, (D. Or. No. 12-CV-1681) (the "Subramanian Action"), in which Movant named several of the Debtors as defendants, albeit with erroneous names. A copy of the document served upon the Debtors is annexed hereto as Exhibit 2. The Subramanian Action was commenced on September 18, 2012. See copy of Subramanian Action case docket annexed hereto as Exhibit 3. On or about April 1, 2013, counsel for the Debtors filed a Notice of Bankruptcy and Suggestion of Automatic Stay in the Subramanian Action.  A copy of the notice is annexed hereto as Exhibit 4. The Subramanian Action was ultimately dismissed with prejudice as to all named and unnamed defendants. See Subramanian Action case docket at docket entries 138 and 139.   Movant's subsequent efforts to challenge the dismissal were denied. See Subramanian Action case docket.

6.       On or about March 6, 2013, Movant Robynne Fauley caused to be served on the Debtors a complaint filed in the Circuit Court of the State of Oregon, County of Clackamas in Fauley v. Washington Mutual Bank, FA. et al. (No. CV13010433) (the "Fauley Action") in which Movant named Debtor Residential Funding Company as a defendant. The Fauley Action was removed to the United States District Court for the District of Oregon (case no. 13-CV-00581).  A copy of the document served upon the Debtors is annexed hereto as Exhibit 5.  On or about April 18, 2013, counsel for the Debtors filed a Notice of Bankruptcy and Suggestion of Automatic Stay in the Fauley Action.  A copy of the notice is annexed hereto as Exhibit 6.  The parties subsequently stipulated to the dismissal of the claims asserted against

ny-1317059

Debtor Residential Funding Company without prejudice.  *See* copy of Fauley Action case docket annexed hereto as <u>Exhibit 7</u> at entries 71 and 72.

       7.       Following the occurrence of the effective date of the Plan, the Trust retained PC to represent the Trust with respect to insurance coverage matters.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 2, 2018

/s/ Kathy Nye          
Kathy Nye
Associate Counsel for ResCap Liquidating
Trust

4

## **Exhibit 1 to Nye Declaration**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

|  |  |  |
|---|---|---|
| **CATHERINE GEBHARDT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.  3:09-CV-425** |
| | ) | **(Phillips)** |
| **GMAC MORTGAGE, LLC, and** | ) | |
| **MGC MORTGAGE, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on the Motions to Dismiss filed by GMAC Mortgage, LLC ("GMAC") [Doc. 3], and MGC Mortgage, Inc. ("MGC") [Doc. 5].  Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, defendants GMAC and MGC move to dismiss this lawsuit.

The following issues are before the Court.  First, has Plaintiff alleged sufficient facts to support her adhesion contract and unconscionability claims?  Second, has Plaintiff satisfied Rule 9(b)'s pleading requirement with regard to her deceptive practices claim?

For the following reasons, defendants' Motions to Dismiss [Docs. 3, 5] are **GRANTED**, whereby Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

## I.     BACKGROUND

As a preliminary matter, the Court recognizes that it has jurisdiction pursuant to 28 U.S.C. § 1332.  The following facts are taken mostly from Plaintiff's complaint [Plaintiff's "Amended Verified Petition to Require Respondent to Cure Mortgage Default and Set Aside the Pending

1

Foreclosure," Doc. 1-2 at 24-6].

On or about November 7, 2002, Catherine Gebhardt ("Plaintiff") entered into a loan agreement with Sebring Capital. [Id.]. Plaintiff used the loan to purchase real property located at 3753 Thomas Cross Road, Sevierville, Tennessee, 37876. [Id.]. After down payment and closing costs, Plaintiff was left with a principle balance of $243,100.00. [Id.]. The loan was transferred to GMAC for servicing, and then subsequently transferred to MGC. [Id.].

On August 7, 2009, Plaintiff filed a "Verified Petition to Require Respondent to Cure Mortgage Default and Set Aside the Pending Foreclosure" ("Verified Petition") in the Circuit Court for Sevier County, Tennessee. [GMAC's Memorandum in Support of Its Motion to Dismiss, Doc. 4 at 1-2]. On August 26, 2009, Plaintiff filed her "Amended Verified Petition to Require Respondent to Cure Mortgage Default and Set Aside the Pending Foreclosure" ("Amended Verified Petition"). [Id. at 2]. On September 25, 2009, this action was removed to federal court. [Doc. 1].

Plaintiff has filed two claims against defendants. First, Plaintiff argues that the loan agreement was an adhesion contract. Second, Plaintiff argues that the loan agreement was unconscionable. Plaintiff also requests punitive damages in the amount of $300,000 for deceptive practices. In support, Plaintiff alleges the following:

> Petitioner [Plaintiff] avers that contract to purchase home has proven to be grossly unfair and offensive to the public conscience. Petitioner avers that contract has proven to be one-sided clearly favoring the drafter of the document. Whereas Petitioner wanted to provide a real home for her family, she really did not understand that the contract she entered into was what appears to be an interest only loan in which she has paid an average of 11.23% interest for the existence of this loan.

[Plaintiff's Amended Verified Petition, Doc. 1-2 at 25]. Plaintiff has not provided any additional facts. In particular, Plaintiff has not explained the circumstances surrounding the signing of the loan agreement.

2

On October 2, 2009, defendant GMAC filed a Motion to Dismiss [Doc. 3]. Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendant GMAC argues that Plaintiff's claims should be dismissed because Plaintiff has not alleged sufficient facts. [GMAC's Memorandum in Support of Its Motion to Dismiss, Doc. 4 at 8-9]. Defendant GMAC also argues that Plaintiff's request for punitive damages should be dismissed because Plaintiff did not plead fraud with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure. [Id. at 10-11]. On October 8, 2009, defendant MGC filed a Motion to Dismiss [Doc. 5] in which it adopted defendant GMAC's Motion to Dismiss [Doc. 3]. Thus, the Motions to Dismiss [Docs. 3, 5] are identical in content.

On June 22, 2010, Plaintiff responded to the Motions to Dismiss [Doc. 12]. Plaintiff states that she was previously unaware of the Motions to Dismiss. [Id.]. Plaintiff states that she "was never informed that filings would be available only through the Court's electronic filing system." [Id. at 1]. In addition, Plaintiff states that she did not receive notices about the electronic filings because she provided an incorrect email address to the Court Clerk. [Id.]. In her Response [Doc. 12], Plaintiff does not address the arguments raised in defendants' Motions to Dismiss [Docs. 3, 5]. [Id.]. Instead, Plaintiff states that "dismissing this case would be unjust to the Petitioner as her claim against the Respondent's is still a valid one and dismissing this action would not be in the interest in justice." [Id.].

## II.    STANDARD OF REVIEW

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." DIRECTV, Inc. v. Treesh, 487 F.3d 471, 476 (6th

3

Cir. 2007).  To survive a motion to dismiss, the "[f]actual allegations contained in [the] complaint must 'raise a right to relief above the speculative level.' " Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430 (6th Cir. 2008) (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)).  This does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  Twombly, 127 S. Ct. at 1974.  The court, however, "need not accept as true legal conclusions or unwarranted factual inferences." Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010) (quoting Gregory v. Shelby County, 220 F.3d 433, 446 (6th Cir. 2000)).

## III.    ANALYSIS

### A.    Plaintiff Has Not Alleged Sufficient Facts to Support Her Adhesion Contract Claim

The Supreme Court of Tennessee has defined an adhesion contract as being "a standardized form offered on what amounts to a 'take it or leave it' basis, without affording the weaker party a realistic opportunity to bargain, and under conditions whereby the weaker party can only obtain the desired product or service by submitting to the form of the contract." Buraczynski v. Eyring, 919 S.W.2d 314, 320 (Tenn. 1996).  Plaintiff argues that the "contract for home was an unconscionable and an adhesive contract which put the Petitioner at a severe disadvantage when seeking and securing financing for her home."  [Plaintiff's Amended Verified Petition, Doc. 1-2 at 25-6].  In addition, Plaintiff argues that "GMAC Mortgage Company and MGC Mortgage, have taken full advantage of Petitioner's desire to own a home."   [Id. at 25].

In support of her adhesion contract claim, Plaintiff states that she did not understand the loan agreement.  [See Id., stating that Plaintiff "really did not understand that the contract she entered into was what appears to be an interest only loan."].  However, Tennessee courts recognize that a party

is presumed to understand the contents of a contract.  Philpot v. Tennessee Health Mgmt., Inc., 279 S.W.3d 573, 579 (Tenn. Ct. App. 2007) (citations omitted).  "The law imparts on parties to a contract to learn the contents and stipulations of a contract before signing it, and signing it without learning such information is at the party's own peril."  Id.  Plaintiff has not alleged any exceptional circumstances explaining why she did not understand the contract.  For example, Plaintiff has not alleged that her "educational background or abilities" prohibited her from understanding the loan agreement.  Id.  Moreover, Plaintiff's claim fails because she did not explain the circumstances surrounding the signing of the loan agreement.  For example, Plaintiff does not explain whether she signed the loan agreement on a "take it or leave it" basis.

In sum, the Court finds that Plaintiff has not alleged sufficient facts to support her adhesion contract claim.  Accordingly, defendants' Motions to Dismiss [Docs. 3, 5] are **GRANTED**, whereby Plaintiff's adhesion contract claim is **DISMISSED WITH PREJUDICE**.

### B.    Plaintiff Has Not Alleged Sufficient Facts to Support Her Unconscionability Claims

Even if the Court had found that the loan agreement was an adhesive contract, Plaintiff would still have to show that the terms of the contract were unreasonable- that is, unconscionable.  *See* Buraczynski, 919 S.W.2d at 320 (holding that adhesion contracts are unenforceable only when the terms are "beyond the reasonable expectations of an ordinary person, or oppressive or *unconscionable*.") (emphasis added).  Tennessee recognizes two types of unconscionability:

party    Unconscionability may arise from a lack of meaningful choice on the part of one (procedural unconscionability) or from contract terms that are unreasonably harsh (substantive unconscionability).  In Tennessee we have tended to lump the two together and speak of unconscionability resulting when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.

5

Trinity Indus., Inc. v. McKinnon Bridge Co., 77 S.W.3d 159, 170-71 (Tenn. Ct. App. 2001)

(citations omitted). A contract is substantively unconscionable when its terms "are beyond the

reasonable expectations of an ordinary person, or oppressive. . . ." Buraczynski, 919 S.W.2d at 320.

A contract is procedurally unconscionable if there is "some impropriety during the process of

forming the contract that deprives a party of a meaningful choice." Baptist Mem'l Hosp. v. Argo

Constr. Corp., 308 S.W.3d 337, 346 (Tenn. Ct. App. 2009) (citations omitted).

Plaintiff's claim fails because she has not explained why the loan agreement was

unconscionable. Plaintiff has not identified what provision was "grossly unfair" or "offensive to the

public conscience." In fact, Plaintiff has not identified any of the contract's terms.

In addition, Plaintiff has not alleged that the loan agreement was unclear, or that the "grossly

unfair" provisions (which again, Plaintiff has failed to identify) were hidden in the document.

Because Plaintiff has not identified any of the contract's terms, her "substantive unconscionability"

claim must fail.

Finally, Plaintiff has failed to explain the circumstances surrounding the signing of the loan

agreement. As Tennessee courts have recognized, "[w]hether a contract is [procedurally]

unconscionable is determined based on the circumstances as they existed at the time the parties

executed the contract." Vintage Health Res., Inc. v. Guiangan, 309 S.W.3d 448, 461 (Tenn. Ct. App.

2009) (citations omitted). Because Plaintiff has not alleged any facts surrounding the signing of the

loan agreement, her "procedural unconscionability" claim must fail.

Accordingly, defendants' Motions to Dismiss [Docs. 3, 5] are **GRANTED**, whereby

Plaintiff's unconscionability claims are **DISMISSED WITH PREJUDICE**.

### C.    Punitive Damages Will Not Be Awarded For Deceptive Practices

6

Plaintiff requests punitive damages in the amount of $300,000 for deceptive practices.  As courts within the Sixth Circuit have recognized, these claims are subject to Rule 9(b) of the Federal Rules of Civil Procedure.  *See* <u>McKee Foods Corp. v. Pitney Bowes, Inc.</u>, No. 1:06-CV-80, 2007 WL 896153, at *5-6 (E.D. Tenn. Mar. 22, 2007); <u>Scraggs v. La Petite Academy, Inc.</u>, No. 3:05-CV-539, 2006 WL 2711689, at *4 (E.D. Tenn. Sept. 21, 2006) (dismissing claim because the plaintiff failed to allege how the defendant's alleged misrepresentation was deceptive).  Thus, the Court must determine whether Plaintiff's deceptive practices claim satisfies Rule 9(b)'s pleading requirement.

Rule 9(b) states that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  To satisfy this requirement, "a plaintiff must, at a minimum, allege the time, place and content of the alleged misrepresentation upon which he or she relied; the fraudulent intent of the defendants and the injury resulting from the fraud." <u>Calipari v. Powertel</u>, 231 F.Supp. 2d 734, 735-36 (W.D. Tenn. 2002) (citations omitted).

In this case, Plaintiff has not identified the content of the deceptive practice, when the practice occurred, where it occurred, or who committed it.  In short, Plaintiff has failed to identify the deceptive practice with the particularity required under Rule 9(b).  Accordingly, defendants' Motions to Dismiss [Docs. 3, 5] are **GRANTED**, whereby Plaintiff's request for relief based upon deceptive practices is **DISMISSED WITH PREJUDICE**.

## IV.    CONCLUSION

In sum, the Court finds that Plaintiff has not alleged sufficient facts to support her claims.  In particular, Plaintiff did not explain the circumstances surrounding the signing of the loan agreement, or the content of that agreement.

In addition, Plaintiff has not responded to the arguments raised in defendants' Motions to

Dismiss [Docs. 3, 5].  Accordingly, defendants' Motions to Dismiss [Docs. 3, 5] are **GRANTED**, whereby Plaintiff's complaint is **DISMISSED WITH PREJUDICE**.


      **IT IS SO ORDERED**.


             **ENTER:**


                _____s/ Thomas W. Phillips_____
                  United States District Judge

## Exhibit 2 to Nye Declaration

# ● CT Corporation

**Service of Process Transmittal**
03/15/2013
CT Log Number 522324225

**TO:**    Timothy Devine
Ally Financial Inc.
MC 482-B09-B11, 200 Renaissance Center
Detroit, MI 48265-2000

**RE:**    **Process Served in Michigan**

**FOR:**    Ally Financial Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Denise Subramaniam, etc., Pltf. vs. D. Andrew Beal, et al, including Homecomings Financial Network and Residential Funding LLC aka GMAC aka Ally Financial, etc., Dfts. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Scheduling Order, Agreement, Schedules, Amended Complaint, Exhibit(s) |
| **COURT/AGENCY:** | United States District Court - District of Oregon - Portland Division, OR Case # 312CV1681ST |
| **NATURE OF ACTION:** | Conspiracy to Defraud: In Mortgage Foreclosure, Mail and Wire Fraud, In Mortgage Origination, Securitization and Servicing and Libor Fraud, Fraudulent Collections and Breach of Contract - Seeking Declaratory and Injuctive Relief |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Company, Bingham Farms, MI |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/15/2013 at 12:40 |
| **JURISDICTION SERVED :** | Michigan |
| **APPEARANCE OR ANSWER DUE:** | Within 21 days after service, not counting the day served (See documents for additional dates and deadlines) |
| **ATTORNEY(S) / SENDER(S):** | Denise Subramaniam 13865 SW Walker Rd. Beaverton, OR 97005 503-764-5300 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex 2 Day , 799302533722 Image SOP |
| **SIGNED:** **PER:** **ADDRESS:** | The Corporation Company Stephanie Hendrickson 30600 Telegraph Road Suite 2345 Bingham Farms, MI 48025-5720 |
| **TELEPHONE:** | 248-646-9033 |



RECEIVED

MAR 1 9 2013

ALLY LEGAL STAFF

Page 1 of  1 / JS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**Wolters Kluwer**
Corporate Legal Services

30600 Telegraph Road
Suite 2345
Bingham Farms MI 48025

248.646.9033 tel
www.ctcorporation.com

# Please note:

# The documents were underlined/changed/amended to denote the entity being served.

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Oregon

| | |
|---|---|
| Denise Subramaniam<br>~~"ex rel." on behalf of the "United States"~~<br>*Plaintiff*<br><br>v.<br><br>Beal, et al<br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.  3:12-CV-1681-ST

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* ~~Michael Carpenter the~~ Ally Financial Inc. *et al*

*Homecomings Financial Network & Residential Funding LLC aka*

200 Renaissance Court
Detroit, MI 48243

313-556-5000

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
Denise Subramaniam
13865 SW Walker Rd.
Beaverton, OR 97005
503-764-5300

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: 02/07/2013

MARY L. MORAN, Clerk of Court

By Elizabeth C. Potter, Deputy Clerk

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

DENISE SUBRAMANIAM                            Case No.: 3:12-cv-01681-MO
Plaintiff(s),

v.

D. ANDREW BEAL, et al.
Defendant(s).

_____ /

### Discovery and Pretrial Scheduling Order

In order to facilitate and expedite discovery and the effective management of this case, the Court orders that:

(a)    **Corporate Disclosure Statement:** In accordance with Fed. R. Civ. P. 7.1, any non-governmental corporate party must file a corporate disclosure statement concurrently with the filing of a first appearance.

(b)    **Initial Conference of Counsel for Discovery Planning:**

(1)    Except in cases exempted under Fed. R. Civ. P. 26(a)(1)(B), upon learning the identity of counsel for Defendant(s), counsel for the Plaintiff(s) must initiate communications with counsel for Defendant(s).

(2)    All counsel must then confer as required by Fed. R. Civ. P. 26(f) within thirty (30) days after all Defendants have been served (See LR 26-1).

(3)    Counsel should also discuss their client's positions regarding consent to a Magistrate Judge and Alternate Dispute Resolution options.

(4)    If counsel for all of the parties agree to forgo the initial disclosures required by Fed. R. Civ. P. 26(a)(1), they can use the Court form issued with this order (See LR 26-2). Whether or not the parties agree to forgo the initial disclosures, they may seek discovery once the initial conference of counsel for discovery planning contemplated by Fed. R. Civ. P. 26(f) has occurred (See LR 26-1).

(c)    **Rule 16 Court Conference for Scheduling and Planning:** Counsel for Plaintiff(s) and for Defendant(s) must, during or promptly after the conference of counsel referred to in the prior paragraph, contact the assigned judge's deputy clerk and schedule a LR 16-2 conference for scheduling and planning.

At the conference the parties will be prepared to discuss discovery, consent to a Magistrate Judge, scheduling or other issues presented by this action, including proposed modifications to the initial schedule set forth below (See LR 16-2).

(d). **Pretrial and Discovery Deadlines:** At the Initial Discovery Planning Conference referenced in paragraph (b) above, counsel should attempt to agree on one or more dates when they must:

    (1)    File all pleadings pursuant to Fed. R. Civ. P. 7(a) and 15;

    (2)    Join all claims, remedies and parties pursuant to Fed. R. Civ. P. 18 and 19;

    (3)    File all pretrial, discovery and dispositive motions;

    (4)    Complete all discovery; and

    (5)    Confer as to Alternate Dispute Resolution pursuant to LR 16–4(c).

The dates agreed upon by counsel should be communicated to the Court, and the Court will then issue a scheduling order which may include the agreed upon dates and/or set a Rule 16 Conference. Until the Court enters a subsequent scheduling order, the deadline for items (1) through (5) above will be 120 days from the date of this order.

    (e)    **Pretrial Order Deadline:** Unless otherwise ordered by the court, not later than 30 days from the date discovery is to be completed (item(4) above), counsel must lodge a Joint Pretrial Order (See LR 16–6), and file a Joint Alternate Dispute Resolution Report (See LR 16–4(d)).

    (f)    **Service of this Order:** Counsel for the Plaintiff must serve this order, and all attachments, upon all other parties to the action.

**DATED:  October 9, 2012.**

                                     **MARY L. MORAN,**
                                     **Clerk of Court**

                                     by: /s/ E. Potter

                                     E. Potter, Deputy Clerk

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

DENISE SUBRAMANIAM                                    Case No.: 3:12–cv–01681–MO
Plaintiff(s),

v.

D. ANDREW BEAL, et al.
Defendant(s).

_____ /

### Fed. R. civ. P. 26(a) Discovery Agreement

    In accordance with LR 26–2, I state that the parties who have been served and who are not in default, have agreed to forego the disclosures required by Fed. R. Civ. P. 26(a)(1).

**DATED:** _____

Signature: _____

Name and OSB ID: _____

E-mail Address: _____

Firm Name: _____

Mailing Address: _____

City, State, Zip: _____

Parties Represented: _____

cc: Counsel of Record

**U.S. District Court – Oregon**
**Civil Case Management Time Schedules**

| Local Rule | Event or Requirement | Time Frame | Comment |
|---|---|---|---|
| LR 16–1(d) | Discovery and Pretrial Scheduling Order (with attachments) | Issued by the clerk's office at the time of filing, along with the summons | Required to be served on all parties by the filing party |
| LR 26–1 | Initial Conference for Discovery Planning | Within 30 days from service of the last defendant | Held between parties |
| LR 16–2(a) | Rule 16(b) Conference | Scheduled by the assigned judge after the required LR 26–1 Discovery Conference | Affirmative duty on all counsel to contact the assigned judge's courtroom deputy (*See* LR 16–2(a) |
| LR 16–4(c) | ADR Conference Requirements | Within 120 days from the date the discovery order is issued | Parties must confer with other attorneys and unrepresented parties to discuss ADR options |
| | Joint Status Report | Within 120 days from the date the discovery order is issued | Required in cases assigned to Judges Hogan and Jones |
| LR 16–2(e) | Completion of Discovery | Unless otherwise ordered by the court, within 120 days from the date the discovery order is issued | Discovery deadlines are set forth in the Discovery and Pretrial Scheduling Order |
| LR 16–4(d) | Joint ADR Report | Within 150 days from the date the discovery order is issued | The parties must file a Joint ADR Report |
| LR 16–6 | Joint Pretrial Order | Unless otherwise modified pursuant to LR 16–6(a), within 150 days from the date the discovery order is issued | PTO filing deadline is established in the Discovery and Pretrial Scheduling Order |
| LR 16–4(f)(1)(D) | Notice to the Court that the Parties Are Unable to Select a Volunteer Mediator | Within ten (10) days after entry of a court order directing reference to a volunteer mediation | Plaintiff's attorney is responsible for notifying the court |
| LR 16–4(h)(1) | Notification of Private ADR Results | Within seven (7) days after the conclusion of private ADR proceedings | Plaintiff's attorney is responsible for notifying the court |
| LR 16–4(h)(2) | Report of Court Appointed Private or Volunteer Mediation | Promptly if no settlement is achieved | Court appointed private or volunteer mediator is responsible for notifying the court |

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

Denise Subramaniam, pro se

**Plaintiff,**

**v.**

D. Andrew Beal; MGC Mortgage et al; LNV Corporation et al;
Dovenmuehle Mortgage Inc. et al; Quality Loan Service et al;
Northwest Trustee Services Inc. et al; Fidelity National Title Company et al
Homecomings Financial Network and Residential Funding LLC
aka GMAC aka Ally Financial et al; Cal-Western Reconveyance Corporation et al;
EMC Mortgage and Bear Stearns aka JP Morgan Chase et al, James Dimon;
Litton Loan Servicing LP aka Ocwen Financial Corporation et al;
LSI Title Company of Oregon et al; James Danforth Quayle; John W. Snow;
Sanford I. Weill; Phil Gramm; Unnamed/yet unknown parties

**Defendant(s),**

Civil Case No. 3:12 – CV – 1681 ST

AMENDED
COMPLAINT

**Jury Trial Demanded**

☒ Yes    ☐ No

# I. PARTIES

**Plaintiff**     Name:     Denise Subramaniam

Street Address:     13865 SW Walker Rd

City, State & Zip Code:     Beaverton, OR 97005

Telephone No.     503-764-5300

**Defendant No. 1**     Name:     D. Andrew Beal, c/o Beal Bank

Street Address:     6000 Legacy Drive

City, State & Zip Code:     Plano, TX 75024

Telephone No.     469-467-5000

**Defendant No. 2**     Name:     MGC Mortgage, et al

Street Address:     7195 Dallas Pkwy.

City, State & Zip Code:     Plano, TX 75024

Telephone No.     469-467-5000

**Defendant No. 3**    Name:   LNV Corporation, et al

Street Address:   1 Corporate Drive, Suite 360

City, State & Zip Code:   Lake Zurich, IL 60047

Telephone No.   847-550-7550


**Defendant No. 4**    Name:   Dovenmuehle Mortgage Inc., et al

Street Address:   1 Corporate Drive, Suite 360

City, State & Zip Code:   Lake Zurich, IL 60047

Telephone No.   847-550-7300


Homecomings Financial Network and Residential Funding Company, LLC

**Defendant No. 5**    Name:   aka GMAC-RFC aka GMAC aka Ally Financial Inc., et al

Street Address:   200 Renaissance Court

City, State & Zip Code:   Detroit, MI 48243

Telephone No.   313-556-5000 or 646-781-2692


**Defendant No. 6**    Name:   James Danforth Quayle, c/o Cerberus Capital Management L.P.

Street Address:   875 Third Avenue

City, State & Zip Code:   New York, NY 10022

Telephone No.   212-891-2100


**Defendant No. 7**    Name:   John W. Snow, c/o Cerberus Capital Management L.P

Street Address:   875 Third Avenue

City, State & Zip Code:   New York, NY 10022

Telephone No.   212-891-2100


**Defendant No. 8**    Name:   Litton Loan Servicing aka Ocwen Financial Corporation, et al

Street Address:   1661 Worthington Road, Suite 100

City, State & Zip Code:   West Palm Beach, FL 33409

Telephone No.   561-682-8000


**Defendant No. 9**    Name:   Cal-Western Reconveyance Corporation, et al

Street Address:   525 East Main Street, P.O. Box 22004

City, State & Zip Code:   El Cajon, CA 92022-9004

Telephone No.   (619) 590-9200

**Defendant No. 10**    Name:    EMC Mortgage aka Bear Stearns aka JP Morgan Chase, et al

Street Address:    270 Park Avenue

City, State & Zip Code:    New York, NY 10017

Telephone No.    212-270-6000

**Defendant No. 11**    Name:    James Dimon, c/o JP Morgan Chase

Street Address:    270 Park Avenue

City, State & Zip Code:    New York, NY 10017

Telephone No.    212-270-6000

**Defendant No. 12**    Name:    Northwest Trustee Services Inc et al

Street Address:    13555 SE 36th St, Suite 100

City, State & Zip Code:    Bellevue, WA 98006

Telephone No.    425-586-1900

**Defendant No. 13**    Name:    Phil Gramm, c/o American Enterprise Institute

Street Address:    1150 17th St NW

City, State & Zip Code:    Washington, DC 20036

Telephone No.    202-862-5800

**Defendant No. 14**    Name:    Sanford I. Weill

Street Address:    15 Central Park West, Sixth Floor

City, State & Zip Code:    New York, NY 10023

Telephone No.    212-489-1500

**Defendant No. 15**    Name:    Fidelity National Title Company, et al

Street Address:    900 SW 5th Ave.

City, State & Zip Code:    Portland, OR 97204

Telephone No.    503-222-2424

**Defendant No. 16**    Name:    Quality Loan Service, et al

Street Address:    2141 Fifth Ave.

City, State & Zip Code:    San Diego, California 92101

Telephone No.    619-645-7711, 866-645-7711

**Defendant No. 17**    Name:    LSI Title Company of Oregon, et al

Street Address:    2141 Fifth Ave.

City, State & Zip Code:    San Diego, California 92101

Telephone No.    619-645-7711, 866-645-7711

## II. JURISDICTION

*Federal courts are courts of limited jurisdiction. Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. A case involving the United States Constitution or federal laws or treaties is a federal question case. A case in which a citizen of one state sues a citizen of another state and the amount in damages claimed is more than $75,000 is a diversity of citizenship case.*

A.  What is the basis for federal court jurisdiction (*check all that apply*)

[X] Federal Question          [X] Diversity of Citizenship

B.  If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory, or treaty right is at issue?

18 USC 63 et seq., (Mail Fraud and Other Fraud Offenses); 18 USC § 1961 et seq., (Racketeer Influenced and Corrupt Organizations Act); 12 U.S.C. 27 et seq., (Real Estate Settlement Procedures Act); 15 U.S.C. 1601 et seq., (Consumer Credit Protection and Truth in Lending Acts); 18 USC 47 et seq. (Fraud and False Statements); 18 USC § 1348 et seq. (Securities and Commodities Fraud); 15 U.S.C. § 77a, et seq., (Securities Act of 1933); 18 USC Chapter 11, et seq., (Bribery, Graft, and Conflicts of Interest); 42 U.S.C. § 3601 et seq., (Fair Housing Act); 15 U.S.C. § 1691 et seq., (Equal Credit Opportunity Act ); Fifth and Fourteenth Amendments to the United States Constitution; ORS § 162.065, (Perjury); Oregon § 164.085, (Theft by Deception); Oregon § 164.172, (Engaging in a financial transaction in property derived from unlawful activity)

C.  If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?

Plaintiff(s) state of citizenship ___Oregon___

Defendant(s) state(s) of citizenship ___New York, Illinois, Texas, Florida, Michigan, District of Columbia, California, Washington, Oregon___

The court has jurisdiction over all defendants and Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants conduct business and can be found in this district, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

1                         ## III. STATEMENT OF CLAIMS

2                                    **COUNT I**
3              **Defendants: D. Andrew Beal, et al; Northwest Trustee Services, Inc.;**
4               **LNV Corporation; Dovenmuehle Mortgage Inc.; MGC Mortgage Inc.**

5    **<u>Foreclosure Fraud</u>**

6    On or about May 20, 2012 Defendant Northwest Trustee Services, Inc. (hereafter referred to

7    as "Northwest") caused to be posted on Plaintiff's home a "Notice" dated May 16, 2012. The

8    contents of this notice stated:

9          "Pursuant to the Federal Fair Debt Collection Practices Act: If you are the

10         consumer who originally contracted the debt or if you assumed the debt, then

11         you are notified that:

12         1. As of the date of this notice you owe $307,385.36. Because of the interest,

13         late charges, and other charges that may vary from day to day, the amount due

14         of the day you pay may be greater. Hence, If you pay the amount shown above,

15         an adjustment may be necessary after we receive your check. For further

16         information write or call: Northwest Trustee Services, Inc. P.O. Box 997,

17         Bellevue, WA 98009-0997 (425) 586-1900.

18         2. The creditor to whom the debt is owed is LNV Corporation/Dovenmuehle

19         Mortgage Inc.

20         3. Unless within 30 days after receipt of this notice you dispute the debt or any

21         portion of it, we will assume the debt is valid.

22         4. If you notify us within 30 days after receipt of this notice that you dispute the

23         debt or any part of it, we shall obtain verification of the debt and mail it to you.

1    5. If you request within 30 days after receipt of this notice, we will provide you

2    with the name and address of the original creditor, if different from the current

3    creditor."

4    Attached to this notice was a notice of Trustee's sale on Plaintiff's property and her home

5    scheduled in September 2012.

6    Within a few days of the posting of this notice Plaintiff wrote a letter to Northwest stating

7    that she did not owe any debt to LNV Corporation, (hereafter referred to as LNV), or

8    Dovenmuehle Mortgage Inc., (hereafter referred to as Dovenmuehle.)

9    Plaintiff received no reply from Northwest providing any proof to the contrary as requested

10   and on September 12, 1212 she filed this complaint to prevent a fraudulent trustee sale of her

11   home. Neither LNV nor Dovenmuehle have legal standing to sell Plaintiff's home.

12   In or around March 2009 Plaintiff's prior attorney wrote numerous letters identified as

13   "qualified written requests" under the Real Estate Settlement Procedures Act [12 U.S.C. 27 et

14   seq.] ("RESPA") to MGC Mortgage Inc., (hereafter referred to as MGC), another company

15   owned by defendant D. Andrew Beal, (hereafter referred to as Beal), that also claimed to

16   have acquired Plaintiff's mortgage, requesting proof that they in fact owned Plaintiff's

17   mortgage and had legal standing to collect payments from her; and requesting an itemized

18   accounting of how payments she already made to their predecessors were applied to the

19   loan's principal.  These qualified written requests additionally stated that a long history of

20   misappropriation and misallocation of Plaintiff's payments existed.

21   MGC failed to respond within the required 60-days; it was more than a year before MGC

22   replied and they did not provide the requested information. To date defendants have never

1   produced proof they in fact legally own Plaintiff's mortgage or Deed of Trust ("DOT")

2   and/or Note; nor have they provided an accurate accounting of how her payments were

3   applied to the mortgage from its inception.

4   Defendant Beal is the President/Director of LNV. Beal is the primary beneficiary of profits

5   derived from LNV's business activities. Beal has established hundreds to thousands of

6   companies, including LNV and MGC, which appear to have shady practices.

7   **FURTHERMORE:**

8   Plaintiff suffers from multiple chemical sensitivity disorder and environmental illness,

9   (hereafter referred to as MCS/IE), in addition to other disabilities. The U.S. Department of

10  Housing and Urban Development ("HUD") recognizes MCS/IE as a disability requiring

11  special accommodation under the American with Disabilities Act and the Fair Housing Act.

12  A memorandum outlining HUD's legal opinion that MCS/IE meets the statutory and

13  regulatory definition of a "handicap" under the ADA is attached as Exhibit A.

14  (http://www.hud.gov/offices/adm/hudclips/lops/GME-0009LOPS.pdf)

15  Plaintiff's home accommodates for her disability and is the only safe environment for her.

16  Allowing Northwest, LNV and/or Dovenmuehle to hold a trustee sale or in any other way

17  remove her from her home would cause Plaintiff irreparable injury and could result in her

18  death.

19  As a direct and proximate result of the actions and course of conduct of these Defendants,

20  and all others named herein, the Plaintiff has suffered personal injury, including but not

21  limited to injury to her health.

1    Although Plaintiff does not wish to make her medical records public, she will permit the

2    Honorable Judge to review them in camera as they will bear out Plaintiff's claims. Plaintiff

3    can produce expert witnesses with knowledge specific to her disabilities, personal injuries

4    and her medical conditions.


5                                                **COUNT II**

6                    **Defendants: D. Andrew Beal, et al; LNV Corporation; Dovenmuehle**
7                    **Mortgage Inc.; MCG Mortgage Inc. et al; Litton Loan Servicing LP**
8                    **aka Ocwen Financial Corporation et al; Cal-Western Reconveyance**
9                    **Corporation; Homecomings Financial Network and Residential**
10                   **Funding Company LLC aka GMAC-RFC aka GMAC aka Ally**
11                   **Financial Inc., et al.**

12   **Conspiracy to Defraud in Mortgage Foreclosure; Mail and Wire Fraud**

13   Beal, LNV, Dovenmuehle and MGC along with Litton Loan Servicing LP (hereafter referred

14   to as Litton) and Cal-Western Reconveyance Corporation (hereafter referred to as Cal-

15   Western) together with Homecomings Financial Network, (hereafter referred to as

16   Homecomings), and Residential Funding Corporation (GMAC-RFC), both subsidiaries of

17   GMAC now known as Ally Financial Inc., (hereafter collectively referred to a GMAC), did

18   knowingly and willfully combine, conspire, confederate and agree with themselves and with

19   others including but not limited to defendants Fidelity National Title Company, (hereafter

20   referred to as Fidelity), and LSI Title Company of Oregon, (hereafter referred to as LSI), and

21   Quality Loan Services, (hereafter referred to as QLS), to commit certain offenses and acts of

22   fraud to execute and attempt to execute a scheme and artifice to defraud, and to obtain money

23   and property by means of material false and fraudulent pretenses, representations, and

24   promises, by utilizing the United States mail and private and commercial interstate carriers,

25   for the purpose of executing such scheme and artifice, in violation of Title 18, United States

1    Code, Section 1341. The defendants' acts of fraud include, but are not limited to, the

2    following:

3    a)  Beginning in or about 2005, the defendants began forging and falsifying signatures on

4        mortgage-related documents and/or conspired with others to do so as their agents in order

5        to prepare and file with property recorders' offices throughout the United States; and

6        specifically with Washington County Oregon's recorder's office where defendant's filed

7        various mortgage related documents specific to Plaintiff's property.

8    b)  Defendant's or their agents and/or cohorts hired temporary workers to sign as Authorized

9        Signers and thereby misrepresent their signatures as those of the Authorized Signers.

10       These mortgage-related documents were fraudulently notarized by defendants'

11       employees and/or employees of their agents who knew the Authorized Signer did not

12       actually sign the documents.

13   c)  These unauthorized signing and notarization practices allowed defendants, and others to

14       generate greater profit and make more money at the expense of their victims, including

15       the Plaintiff.

16   d)  After these false documents were signed and notarized, defendants filed them through the

17       mails or by electronic methods with local county property records offices, including the

18       Plaintiff's county. Many of these documents, particularly mortgage assignments and lost

19       note or assignment affidavits, including those pertaining to Plaintiff's property, were later

20       relied upon in non-judicial foreclosure proceedings and court proceedings, including

21       property foreclosures and in federal bankruptcy court. Defendants knew that these

22       property recorders, as well as those who received the documents such as courts, title

23       insurers, and homeowners/borrowers, relied on these documents as genuine.

1    e) Defendants their agents and cohorts and others also took various steps to conceal their

2        actions from detection from consumers/borrowers/homeowners (including the Plaintiff),

3        courts, law enforcement authorities, our government and others.

4    f) On or about June 28, 2006, Litton and GMAC and Cal-Western and/or their agents

5        caused to be delivered to Hillsboro, Oregon, by United States Postal Service or by

6        commercial interstate carrier from Litton and/or Fidelity, a Substitution of Trustee and an

7        Assignment of Deed of Trust filed with the County Recorder for Washington County

8        Oregon, with false and fraudulent signatures of Authorized Signers and which bore a

9        false and fraudulent notarization attestation and which contained other false

10       representations.

11   g) On or about August 27, 2008 Litton and GMAC along with LNV, MGC and Beal and/or

12       their agents caused to be delivered to Hillsboro, Oregon, by United States Postal Service

13       or by commercial interstate carrier from MGC, a Corporation Assignment of Deed of

14       Trust filed with the County Recorder for Washington County Oregon, with false and

15       fraudulent signatures of Authorized Signers and which bore a false and fraudulent

16       notarization attestation and which contained other false representations.

17   h) On or about February 24, 2011 Litton, Cal-Western along with LNV, MGC, LSI, QLS

18       and Beal and/or their agents caused to be delivered to Hillsboro, Oregon, by United

19       States Postal Service or by commercial interstate carrier from Litton, a Rescission of

20       Notice of Default filed with the County Recorder for Washington County Oregon, with

21       false and fraudulent signatures of Authorized Signers and which bore a false and

22       fraudulent notarization attestation and which contained other false representations.

1    i)    On or about April 22, 2011 LNV, MGC, Dovenmuehle and Beal and/or their agents LSI

2          and Quality and/or other yet unknown agents and cohorts caused to be delivered to

3          Hillsboro, Oregon, by United States Postal Service or by commercial interstate carrier

4          from QLS and/or LSI, an Appointment of Successor Trustee document and a Notice of

5          Default and Election to Sell instrument filed with the County Recorder for Washington

6          County Oregon both with false and fraudulent signatures of Authorized Signers and

7          which bore a false and fraudulent notarization attestation and which contained other false

8          representations.

9    j)    Defendants knew that these documents would be relied on and considered as genuine by

10         attorneys, courts and law enforcement officials to the detriment of the Plaintiff. Such

11         false representations were made willfully by defendants with intent to unjustly deprive

12         Plaintiff of her property.

13   k)    In fact defendants used these fraudulent documents to initiate trustee sales on Plaintiff's

14         home via Oregon's non-judicial foreclosure laws in September 2006, again in September

15         2011 and again in September 2012 when they knew they in fact did not have legal

16         standing to do so.

17   Plaintiff suffered significant pecuniary loss, personal injury, inconvenience, discomfort, and

18   substantial mental distress as a result of the defendants' acts of intentional and willful fraud

19   perpetrated toward her with intent of defrauding her of her money and property.

20

1                                        COUNT III

2                    **Defendants: EMC Mortgage and Bear Stearns aka JP Morgan Chase et**
3                    **al; Litton Loan Servicing LP aka Ocwen Financial Corporation et al;**
4                    **Goldman Sachs et al, Homecomings Financial Network and Residential**
5                    **Funding, GMAC aka Ally Financial Inc., et al; D. Andrew Beal, et al**

6        **Conspiracy to Defraud in Mortgage Origination, Securitization and Servicing**

7        Throughout 2003 Plaintiff received numerous advertisements mailed to her home and phone

8        calls from mortgage brokers encouraging her to refinance her mortgage. They offered her

9        exceptionally low interest rates, lowered monthly payments and cash-out options.

10       Plaintiff was targeted for these advertisements and phone solicitations because she met certain

11       criteria, including but not limited to:

12                    a.   She was a senior over age 50 with long-term home ownership and approximately

13                         $150,000 equity in her home.

14                    b.   She was a female head-of-household and the sole signer on her mortgage.

15       This criterion was used by defendants to target minorities and other vulnerable consumer groups

16       (including seniors and female head of households) for highly predatory mortgage loans and for

17       financial fraud.

18       Plaintiff relied on the material misrepresentations made in these advertisements and phone

19       solicitations and was thus swayed into refinancing mortgage to her detriment.

20       Defendants did knowingly and willfully combine, conspire, confederate and agree with

21       themselves and with others to commit certain offenses and acts of fraud to execute and attempt to

22       execute a scheme and artifice to defraud, and to obtain money and property by means of material

23       false and fraudulent pretenses, representations, and promises for the purpose of executing such

1    scheme and artifice which directly caused Plaintiff to suffer significant pecuniary loss, personal

2    injury, inconvenience, discomfort, and substantial mental distress as a result.

3    Beginning in January 2004 People's Choice Home Loan, Inc. (hereafter referred to as

4    "People's") continually postponed the closing of Plaintiff's mortgage refinance to a date they

5    knew would place her in duress, on or about February 9, 2004.

6    People's deceptively inserted additional pages into the closing documents with terms that were

7    different from that those agreed to by Plaintiff. Additionally, signature pages were included in

8    the closing documents that contained only Plaintiff's signature and name. These pages were not

9    dated; they did not contain witness signatures although lines were included for them; and these

10    pages contained no content that would identify them as belonging to a specific contract or as

11    validation for a specific contract. People's and/or the other defendants and or their agents later

12    used these blank signature pages to fabricate Plaintiff's signature so as to make it appear she had

13    agreed to contract terms that she in fact did not.

14    Plaintiff had agreed to a 6.99% fixed rate loan with no early pre-payment penalty. Terms

15    fraudulently changed by People's included, but were not limited to, a change in the interest terms

16    and a pre-payment penalty. The initial pages of the documents Plaintiff signed at closing stated

17    the agreed to fixed rate; however pages inserted into the middle of the stack of documents she

18    was asked to sign at closing stated an ARM rate and included a substantial pre-payment penalty.

19    These changed terms caused Plaintiff a significant increase in the overall cost of the loan.

20    Therefore the loan costs were misrepresented and not disclosed as required by TILA. These

21    changed terms also trapped Plaintiff into a predatory situation created deliberately by the

22    defendants so as to allow them to perpetrate their scheme and artifice to defraud the Plaintiff.

1   The documents signed by Plaintiff at closing were dated February 9, 2004, while the "Deed of

2   Trust" filed in Washington County by People's Choice on March 1, 2004 was dated February 10,

3   2004. Omissions, misrepresentations and false claims made by People's include but are not

4   limited to:

5   1. People's Choice Home Loan, Inc. was stated as the "Lender" on the Deed of Trust when

6       in fact People's was not the true and actual "lender" / "creditor", but rather People's was

7       acting as a "Table-Funder." Table funding is generally defined as:

8           *"A lending method employed when a loan originator does not have access*

9           *to the money necessary to make loans and then hold them until it has*

10          *enough to sell on the secondary market. The originator forms a relationship*

11          *with a lender/investor that provides the funds for closing and immediately*

12          *takes an assignment of the loan. This is called table funding. Under*

13          *regulations of the Department of Housing and Urban Development, table-*

14          *funded loans must disclose service release premiums, i.e. profit received by*

15          *the originator on the loan closing settlement statement." (Source: The Free*

16          *Dictionary by Farflex, which can be found at http://financial-*

17          *dictionary.thefreedictionary.com/table+funding. This website cites "The*

18          *Complete Real Estate Encyclopedia by Denise L. Evans, JD & O. William*

19          *Evans, JD. Copyright © 2007 by The McGraw-Hill Companies, Inc. as a*

20          *source for its information." Id.)*

21  None of these facts were disclosed to Plaintiff. (Discovery of these facts was not until

22  November 2012.) Plaintiff relied on People's misrepresentation of them self as a "lender"

23  to her detriment.

1    Plaintiff is not a first time home buyer. She purchased her first home prior to 1999 with a

2    mortgage from a Savings and Loan. She made her payments directly to that same lender.

3    Each month she mailed her payment with its matching monthly payment coupon from a

4    payment booklet supplied by the lender. Several years later her mortgage was sold to a

5    different bank. The acquiring lender claimed she made late payments to the original

6    lender and owed an excessive amount in late fees. Her original lender never claimed her

7    payments were received late, so she disputed this. The acquiring lender refused to correct

8    the mistake, so Plaintiff phoned the Office of the Comptroller of the Currency and

9    complained. Within a few days of this call she received an apology letter from the

10   acquiring lender admitting they were mistaken.

11   Plaintiff relied on People's as being a "lender" within the same context as her prior

12   experiences with mortgage lenders. Plaintiff relied on People's as being a "lender" that

13   would have an interest in properly recording her monthly payments and accurately

14   applying them to the loan's balance when in fact People's had no interest in doing so

15   because their intent was to immediately sell her mortgage into the secondary securitized

16   mortgage market.

17  2. Shortly after origination, evidence shows that Plaintiff's mortgage was sold to the "Bear

18   Stearns Asset Backed Securities I Trust 2004-HE4" (hereinafter "BSABS 2004-HE4" or

19   "the Trust".) However, there are no admissions or evidence by way of assignments filed

20   with Plaintiff's county recorder's office that this ever happened. In fact, the entire sale of

21   the Plaintiff's loan, and its presence within the Trust, were intentionally glossed over and

22   hidden in the loan's chain of title history; this was done with intent to defraud. The goal

1   in this scheme was / is to expedite or manufacture a so-called default by the borrowers of

2   the underlying loans in order to trigger the insurance clauses in the Trust's Prospectus.

3   We know that the loan was indeed sold to EMC and consequently sold to the Trust

4   because it shows up in the Bloomberg Terminal data for the Trust and because EMC

5   states in a letter dated April 18, 2006 in paragraph 2 – "According to our records, EMC

6   acquired the above referenced loan from People's Choice Home Loan on May 1, 2004."

7   What EMC's letter fails to state is that EMC was the "Seller" of the loan to the

8   "Depositor" (Bear Stearns Asset Backed Securities I LLC, a Delaware limited liability

9   company and a limited purpose finance subsidiary of The Bear Stearns Companies Inc.

10   and an affiliate of Bear, Stearns & Co. Inc.) on that very same day. Also on that same

11   day, the Depositor was to sell the loans to "LaSalle Bank, N.A. as Trustee for the BSABS

12   2004-HE4 Trust.

13   None of the Trust entities ever perfected their security interests and EMC's statement in

14   their April 18, 2006 letter also incriminates the recorded assignments of the Deed of

15   Trust ("DOT"). Only three assignments of the DOT were recorded in the Washington

16   County land records between 2004 and 2008:

17   **Assignment #1** was recorded on June 28, 2006 as document No. 2006-077542. This

18   assignment was allegedly executed on December 29, 2005 whereby People's sells,

19   assigns, transfers, and conveys the Plaintiff's Note and DOT to "Homecomings Financial

20   Network, Inc.," (hereinafter referred to as "Homecomings.") This assignment

21   circumvents the entire sale to EMC that occurred on May 1, 2004. This assignment also

22   occurs within the same month that the Plaintiff's loan was "paid off" within the BSABS

23   2004-HE4 Trust. There are two possible explanations for this:

1      a. People's fraudulently retained the Plaintiff's loan on its own books as an asset

2         after having sold it to the Trust, and was defrauding the Trust and the investors by

3         re-selling stolen goods to Homecomings.

4      b. The Trust entities from the originator (People's), to the seller (EMC), to the

5         depositor (Bear Stearns & Co. Inc.), to the Trustee (LaSalle Bank), weren't

6         concerned about whether or not the assets were legally conveyed to the Trust

7         because they bet on the loans ultimately defaulting. Massive amounts of

8         insurance, credit enhancements, default swaps, etc., were supporting the phantom

9         asset, i.e Plaintiff's mortgage. The investors continued to receive their payments

10        through "advances" and insurance proceeds and would never question whether or

11        not the asset(s) ever legally made it to the Trust. This was insurance and securities

12        fraud and a massive "Ponzi Scheme" as per the Trust's Prospectus.

13     **Assignment #2 and Assignment #3** of the DOT are simultaneous. The 2nd assignment is

14     recorded on August 27, 2008 as doc No. 2008-073971 whereby Homecomings attempts

15     to assign, sell, convey, and deliver the Note and DOT to "Residential Funding Company,

16     LLC" also named in this document as GMAC-RFC, (hereinafter "GMAC-RFC.") The

17     3rd assignment is also recorded on August 27, 2008 as doc No. 2008-073972 whereby

18     GMAC-RFC attempts to assign, sell, convey, and deliver the Note and DOT to "LVN

19     Corporation." The first "Notice of Default" which was recorded against the property on

20     June 28, 2006 as Doc. No. 2006-077544 (attached in the county records) states in

21     paragraph 3, "CAL-WESTERN RECONVEYANCE CORPORATION as Trustee,

22     hereby certifies that no assignments of the trust deed by the trustee or by the beneficiary

23     and no appointments of a successor trustee have been made except as recorded in the

1    mortgage records of the county or counties in which the above described real property is

2    situate[d."] **This statement confirms that no assignment was ever recorded**

3    **evidencing a sale from People's to any other Trust entity or the Trust itself. THIS**

4    **REPRESENTS A NON-CURABLE BREAK IN THE CHAIN OF TITLE.**

5    Furthermore, the Trust's Prospectus states, "Assignments of the mortgage loans provided

6    to the custodian on behalf of the trustee will be recorded in the appropriate public office

7    for real property records," pg. S-24.

8    Loans that made up "pools" in the Trust were essentially converted into stock certificates.

9    Investors in the Trust purchased certificates that did not provide them with an undivided

10    interest in any one particular loan/mortgage. Thus the original terms and conditions of the

11    mortgages and deeds of trust were changed without the borrowers' (i.e. Plaintiff's)

12    consent. This constitutes breach of contract, and violates the Truth in Lending Act

13    ("TILA") and RESPA.

14    Plaintiff's property after this point was no longer collateral for the loan.

15    Because the Plaintiff's loan has been paid off, a deed of reconveyance should have been

16    issued in the Plaintiff's county extinguishing the DOT. No other party can now have

17    standing to attempt a foreclosure.

18    Constitutional standing under Article III requires, at a minimum, that a party must have

19    suffered some actual or threatened injury as a result of the Plaintiff's conduct, that the

20    injury be traced to the challenged action, and that it is likely to be redressed by a

21    favorable decision. Valley Forge Christian Coll. v. Am. United for Separation of Church

1    and State, 454 U.S. 464, 472 (1982); United Food & Commercial Workers Union Local

2    751 v. Brown Group, Inc., 517 U.S. 544, 551 (1996).

3    Standing requires that a party, in this case LNV or Dovenmuehle will suffer financial loss

4    derived from non-performance (i.e., nonpayment) of the Plaintiff's contract with

5    People's.

6    The "Seller" of the loans into the Trust, EMC, purchased Plaintiff's loan/mortgage from

7    People's on May 1, 2004. People's was paid for Plaintiff's loan so therefore People's

8    cannot claim it will suffer financial loss derived from Plaintiff's non-performance after

9    May 1, 2004.

10   Furthermore, People's filed bankruptcy and dissolved in 2007, thus no harm or injury

11   occurred to People's by Plaintiff's refusal in 2009 to make any further payments to

12   alleged successors MGC, LNV or Dovenmuehle until they could prove they in fact

13   "bought" or otherwise legally acquired her loan, and that all her previous payments were

14   actually accredited to her loan.

15   EMC received payment for Plaintiff's loan from the Depositor when her loan was sold

16   into the Trust. The Depositor sold certificates to investors and used the proceeds to

17   purchase the loans. The certificate holders / investors were made "whole" and were not

18   harmed as a result of any borrower's failure to make monthly payments. EMC therefore,

19   was not harmed by any alleged non-performance by Plaintiff. (Note: Plaintiff never failed

20   to make payments while her loan was in the Trust.)

21   None of the sale transactions were documented or recorded; although the Trust's

22   prospectus required them to be recorded.

1      The Note and Deed of Trust for Plaintiff's mortgage were created and used to perpetuate

2  a fraud. Plaintiff's loan went into the BSABS 2004-HE4 Trust as a "hologram" and was

3  eventually "paid off" in December of 2005 by insurance. The goal in this massive "Ponzi

4  Scheme" was / is to expedite or manufacture a so-called default by the borrowers of the

5  underlying loans in order to trigger the insurance clauses.

6      The failure to record the assignments and sales to the Trust entities, and the failure to

7  disclose the Trust's interest in the Plaintiff's Note and DOT and subsequent payoff of

8  such, creates a fatal defect in the chain of title and chain of trustee that cannot be re-

9  engineered. Any party attempting to claim ownership of the Plaintiff's note and DOT

10  after December 2005 has "unclean hands."

11  3. People's was paid in full for the sale of Plaintiff's loan to EMC in 2004 yet apparently it

12      fraudulently retained the sold loan on its own books and records as an asset and waited

13      for the fabricated "default trigger" and insurance payoff in the Trust to happen before it

14      apparently "sold" Plaintiff's loan a second time to GMAC. People's can't legally sell

15      something it no longer owns.

16  4. Alternatively GMAC may have acquired Plaintiff's loan as a creditor of People's in

17      anticipation of People's bankruptcy in filed in March 2007. The website for the law firm

18      of Faegre Baker Daniels states that their client, Residential Funding Company, LLC, a

19      warehouse lender, was a member of "the **unsecured creditors**" and one of the largest

20      creditors in the People's Choice Home Loan, Inc. bankruptcy. (Case No. 07-10765)

21      (http://www.faegrebd.com/8006).

22      Either way fraud was committed because GMAC would have or should have known that

23      People's already received payment for selling Plaintiff's loan to EMC; and GMAC, as an

1    "unsecured" creditor of People's had no expectation for Plaintiff's property being

2    collateral for any loan they may have made to People's because as an "unsecured

3    creditor" they loaned funds to People's without collateral attached to those loans; and

4    furthermore any loan and/or contract GMAC made with People's was between them and

5    did not involve the Plaintiff or her property.

6    Beal, LNV, Dovenmuehle and MGC acquired Plaintiff's loan as stolen goods from

7    GMAC. The August 27, 2008 Assignment whereby GMAC-RFC attempts to assign, sell,

8    convey, and deliver the Note and DOT to "LVN Corporation" states true and actual

9    consideration as $10.00 for the transaction. This is reminiscent of someone buying a

10   stolen car or other property that's "hot" for a "too good to be true" price. Whether or not

11   these defendants knew they were buying stolen goods, they are not legally entitled to

12   keep stolen property. They can seek remedy for losses they may have suffered from the

13   party that sold them the stolen goods.

14   5. All the Assignments, Substitutions of Trustee, Notices of Default," etc. filed with

15   Plaintiff's county contain forgeries and "robo signed" signatures and other material

16   misrepresentations in an attempt to obfuscate the truth. These legal instruments were

17   fabricated to steal Plaintiff's home through fraud. If these defendants in truth had legal

18   standing to foreclose they would not have needed to fabricate all these fraudulent

19   instruments to give the appearance of such standing.

20   The entities that created and/or ordered the creation of these documents are all affiliated

21   and tied to Litton (a subsidiary of Goldman Sachs in 2006, and now owned by Ocwen)

22   and GMAC and its subsidiaries (aka Ally.) Defendant Beal is a major shareholder in

1    General Motors (hereafter referred to as GM) and GMAC; and this may explain LNV's

2    involvement in this fraud scheme.

3    To further cloud the title, the Plaintiff's loan was assigned a MERS "MIN#1000221-

4    0009722547-8" at some point after origination. The existence of MERS means that

5    another assignment is missing from the chain of title, as some entity would have had to

6    assign the Plaintiff's Note and Deed of Trust to the MERS entity if registered in the

7    MERS system.

8    The MERS Member directory shows that this number was assigned to "JPMorgan Chase

9    Bank, N.A. fka EMC." The Plaintiff's loan is shown as "inactive" in the MERS Registry

10    with JPMorgan Chase Bank, N.A. fka EMC as both the servicer and the investor.

11    The MERS Quality Assurance Procedures Manual Glossary defines "deactivation" where

12    a loan becomes inactive on the MERS System only for very specific reasons; and the

13    only defined reason that could possibly apply to the Plaintiff's loan is that it was paid off.

14    The Plaintiff's loan similarly shows up in Fannie Mae as being "paid off." This is

15    indicative of additional fraud likely perpetrated against the United States government and

16    its taxpayers, including the Plaintiff, by GMAC, Beal, LNV and Beal's many other sham

17    companies. LNV is known to be a primary purchaser of Fannie Mae distressed loans. It is

18    likely GMAC made false material misrepresentations with the result that Plaintiff's loan

19    was included in Fannie Mae where it was then "paid off" AGAIN by the government and

20    re-sold to LNV for a consideration of $10. Beal has a significant financial interest in GM,

21    and in GMAC which received $16.3 billion in TARP funds that have not been repaid.

22    GM initially got $49.5 billion from the U.S. government, and it paid back only $23.1

1    billion of that after its stock went public in 2010. That left $26.4 billion GM still owes the

2    government.

3    Plaintiff suffered significant pecuniary loss, personal injury, inconvenience, discomfort, and

4    substantial mental distress as a result of the defendants' acts of intentional and willful fraud

5    perpetrated toward her with intent of defrauding her of her money and her property.

6

7                                   **COUNT IV**

8          **Defendants: EMC Mortage and Bear Stearns aka JP Morgan Chase et**
9          **al; Litton Loan Servicing LP aka Ocwen Financial Corporation et al;**
10         **Goldman Sachs et al, Homecomings Financial Network and Residential**
11         **Funding aka GMAC-RFC aka GMAC aka Ally Financial Inc.**

12   **Conspiracy to Defraud in Mortgage Servicing: Fabricated Default**

13   In or around September 2005 EMC made a false claim that Plaintiff had missed five payments

14   and threatened to foreclose on her property if she did not pay them an additional monthly amount

15   equal to or exceeding $300 to make up the alleged arrearage. Plaintiff had to drop her health

16   insurance premiums to pay what EMC demanded and avoid foreclosure.

17   Between October 2005 and January 2006 Plaintiff continually requested EMC's payment records

18   for her loan so she could reconcile them with hers. EMC never provided the requested

19   accounting of her payments. Then in or around February 2006, just before the pre-payment

20   penalty expired, Plaintiff applied to refinance her mortgage with a bank she trusted; thinking this

21   would force EMC to reconcile their records with hers for an accurate pay off balance.

22   Plaintiff was told she would be unable to refinance because EMC had been falsely reporting her

23   payment history as more than 90 days late to the three major credit reporting agencies almost

24   from the time they acquired her loan in May 2004. Plaintiff was in fact never 90 days late.

1    Plaintiff phoned EMC several times a day until they finally returned her calls and informed her

2    that they had sold her loan to GMAC. Plaintiff phoned GMAC in or around March 2006 with the

3    phone number EMC provided her and provided GMAC with the information EMC had provided

4    her regarding her loan. GMAC told her they did not have her loan.

5    Plaintiff had received no written communication from EMC informing her about the sale or

6    transfer of her loan as required by 12 U.S.C. § 2605.

7    In the months following her communications with EMC and GMAC Plaintiff phoned every

8    government agency she could think of for help and was told EMC was not regulated. She hired

9    an attorney after receiving a letter from Litton stating they had acquired her loan and after Litton

10   caused a Notice of Default and Election to Sale to be posted on Plaintiff's door on or around

11   May 2006.

12   Litton and GMAC knew or should have known that Plaintiff's loan was not five months in

13   default as they claimed in May/June 2006 because Plaintiff's loan had actually already been paid

14   off in the Trust. The Bloomberg database records show Plaintiff's loan was current at the time it

15   was paid off in December 2005. Yet Litton and EMC continued with false representations of

16   missed payments throughout 2006 causing Plaintiff to suffer significant pecuniary loss, personal

17   injury, inconvenience, discomfort, and substantial mental distress.

18   Plaintiff hired an attorney and even after she and her attorney proved all payments were made

19   from the inception of the loan through the end of 2006 Litton refused to postpone the trustee sale

20   and specifically stated in communications with Plaintiff's attorney that even though she was not

21   in default there was enough equity in her home to satisfy what they wanted, (i.e. Litton wanted to

22   steal Plaintiff's equity and her home.)

1    Plaintiff and her attorney relied on material misrepresentations made by defendants Litton and

2    EMC regarding their legal standing to foreclose on Plaintiff's property in 2005 and 2006 to

3    Plaintiff's detriment.

4    EMC stated in its letter dated April 18, 2006, pg 1 § 3 referring to the Plaintiff's loan: "... the

5    loan was transferred to GMAC-RFC/Homecomings (GMAC) on February 9, 2006."

6    Yet in or around March 2006 in a phone conversation GMAC told Plaintiff they did not have her

7    loan, and in a letter dated April 3, 2006 GMAC states: "GMAC Mortgage does not currently, and

8    did not previously service a loan for you on the above referenced property, therefore we do not

9    have access to any of your account information." They go on to state that "Homecomings

10   Financial" was at one time the servicer of your account, which is now being serviced by Litton

11   Loan Servicing." GMAC fails to convey in this letter that Homecomings is a subsidiary of

12   GMAC.

13   Plaintiff never made any payments to Homecomings and they never communicated with her

14   about payments or anything else, so at the time these letters were received who "owned"

15   Plaintiff's loan and/or who "serviced" it or even the concept of a "servicer" other than the lender

16   was incomprehensible to her based on her prior mortgage experiences; only after November

17   2012 was it discovered this confusion regarding who was lender, owner and servicer was done

18   with deliberate intent to confuse, deceive and defraud.

19   To protect her home from a fraudulent trustee sale in 2006 Plaintiff was forced to file Chapter 13

20   bankruptcy. This destroyed Plaintiff's credit and caused her significant financial damage and

21   personal injury.

22

## COUNT V

**Defendants: EMC Mortgage and Bear Stearns aka JP Morgan Chase et al; Litton Loan Servicing LP aka Ocwen Financial Corporation et al; Goldman Sachs et al, Homecomings Financial Network and Residential Funding aka GMAC-RFC aka GMAC aka Ally Financial Inc**

### <u>Conspiracy to Defraud: Libor Fraud, Fraudulent Collections, and Breach of Contract</u>

While Plaintiff's bankruptcy filed in 2007 remained in force she continued to make payments to Litton in behalf of GMAC. (Note: it was not known at this time that her payments were being made to Litton in behalf of GMAC, nor was it known at this time that GMAC lacked standing to collect payments from her because they had not legally acquired her loan/DOT, nor was it known that her loan had been securitized into the Trust and had not been legally recorded as such as required by the Trust's Pooling and Servicing Agreement – the binding contract for the Trust – and had finally been paid off in the Trust in December 2005.)

In or around March 2009 Plaintiff received a delinquent property tax notice from her county. Her property taxes for 2008 had not been paid; Litton was to have paid them as per the mortgage escrow agreement in the mortgage contract. Litton's failure to do so is a breach of contract.

Additionally during this time Litton raised Plaintiff's interest rate from its original 6.99% to more than 16% when even the fraudulently switched terms state that the interest rate could never exceed 12%. This is another breach of contract by defendants.

Plaintiff paid her property taxes. Plaintiff's bankruptcy attorney at the time advised her to stop making payments to Litton because considering the long history of improper accounting of her payments by the many "servicers" of her mortgage we had no idea where the payments were going or whether they were being credited to the loan.

Plaintiff had received no written communication from Litton informing her about a sale or transfer of her loan as required by 12 U.S.C. § 2605. Sometime after Plaintiff received the

1   delinquent property tax notice she received a letter from MGC Mortgage claiming that they had

2   acquired her mortgage. The letter contained no information about where or how payments were

3   to be made.

4   Beginning in or around March 2009 and continuing into 2010 Plaintiff's attorney mailed several

5   written requests to MGC that he identified as "qualified RESPA requests" for a complete

6   itemized accounting of her mortgage payment history. MGC failed to reply within the 60 days

7   required by RESPA; they didn't reply for more than a year! MGC never provided Plaintiff with

8   the requested proof. Nor has LNV or Dovenmuele.

9   The only information available online about MGC Mortgage in 2009 was that they were a

10  securities holding company; then in late 2010 through 2011 Plaintiff was in contact with several

11  other consumers who experienced problems with MGC. From March 2009 until May 2010 MCG

12  did not respond to any customer mail and they were unable to be reached via phone numbers

13  provided to their customers.

14  This is also when Plaintiff learned about D. Andrew Beal, his connection with MGC, LNV and

15  Dovenmuehle.and about MGC's extremely shady business practices. MGC made and continues

16  to makes material misrepresentations about what type of business it is and how it acquires and/or

17  "services" mortgages to the detriment of all its customers.

18  Long before MGC emerged claiming to "own" Plaintiff's mortgage, GMAC, Litton, EMC and

19  People's all nullified the contract Plaintiff entered into with People's through breach. The most

20  basic of performance expectations a borrower holds when they take out a mortgage to finance

21  their home, the largest investment they are likely to make in their lifetime, is that the mortgage

22  holder will record their payments and apply them accurately to the loan's balance from its

23  inception to its conclusion; and when mistakes are made that they will be corrected. This did not

1    happen with the Plaintiff's mortgage. The expectation of such performance for a mortgage lender

2    is an implied covenant of good faith and fair dealing. Defendants breached the implied covenants

3    of their contract with the Plaintiff as early as 2004.

4    Additionally every consumer, including the Plaintiff, has an expectation that the lender will

5    accurately report their payment history to credit reporting agencies and when mistakes are made

6    that they will be corrected. This expectation of contract performance for a mortgage lender is an

7    implied covenant of good faith and fair dealing. Thus, these defendants breached the implied

8    covenants of their contract with the Plaintiff as early as 2004.

9    Defendant Chase along with other Wall Street banks rigged the Libor rate. Libor affects the price

10   and availability of capital. The higher Libor goes, the greater the borrowing cost for business,

11   individuals, real estate and other loans.

12   These defendants conspired and colluded with each other and with other large banks including,

13   but limited to, the Swiss UBS Bank and London's Barclays Bank to submit artificially high or

14   artificially low Libor (rates).

15   Methods used by these defendants and/or their employees or agents include market

16   manipulation, insider trading, front-running, theft and conspiracy, misrepresentation, Ponzi

17   schemes, false accounting, embezzling, appointing industry favorites as regulators, tax frauds,

18   profiting from loans that fail, and creating phony financial products.

19   These Wall Street defendants rigged the Libor rate to facilitate their mortgage backed racket and

20   scheme. Lowered interest rates prior to 2008 induced many consumers into buying homes or

21   refinancing their existing mortgage, which allowed these defendants to perpetrate their fraud

22   scheme against these borrowers. Borrowers, including the Plaintiff, were never informed about

1    the true nature of their "loans"; had they been informed they would likely have said "no thanks."

2    Plaintiff definitely would have.

3    Later they rigged the Libor rate to facilitate mortgage defaults by increasing interest rates so that

4    eventually the resultant increase in monthly payments, oft times two to three times the amount of

5    a borrower's payment at origination, would force borrowers into default. Additionally the

6    increased interest rates and tighter credit following the economic downturn in 2008 meant that

7    smaller businesses would begin to fail; creating a loss of jobs; again designed to increase the

8    probably of default by borrowers.

9    Between 2007 and 2008 while Plaintiff's Chapter 13 bankruptcy was in effect Litton raised her

10   interest rate to more than 16% thus claiming her monthly payment had increased nearly three

11   times its original amount. This increase was in violation of the terms specified in the mortgage

12   contract and therefore constituted yet another breach of the contract between Plaintiff and

13   People's; furthermore this increased interest rate was based on Plaintiff's damaged credit

14   willfully caused by EMC and Litton.

15   None of the defendants named thus far had any intention or motivation to properly account for

16   Plaintiff's payments because they never intended to perform on the contract. They intended to

17   put the Plaintiff's loan into default within the initial two year period while Plaintiff was locked

18   into their scheme due to the prepayment penalty (a term that People's deceptively changed

19   during closing) so they could trigger a series of pre-planned events that would result in them

20   earning three to five times the value of Plaintiff's loan plus the value of her home, which was at

21   least $150,000 more than the value of her loan, within a five year period by cashing in on credit

22   default swaps and "selling" and "re-selling" the loan multiple times, before finally foreclosing on

1   and selling the Plaintiff's property. All defendants in this case have "unclean hands" and they

2   participated in a conspiracy to defraud.


3                                   **COUNT VI**

4              **Defendants: All named and yet unnamed and unknown defendants**

5   **Pattern of Criminal Activity Prohibited Under 18 USC Chapter 96**

6   This action is brought pursuant to the provisions of the Racketeer Influenced and Corrupt

7   Organizations Act ("RICO") 18 U.S.C. § 1961 et seq. This Court has subject matter jurisdiction

8   under 28 U.S.C. § 1331 and 18 U.S.C. § 1964.

9   Defendants named in this complaint are engaged in a regular and systematic course of conduct in

10  Oregon, and across the United States that included but was and is not limited to: false claims and

11  representations in the origination of mortgage loans; false claims and representations regarding

12  mortgage loan costs; false claims and representations regarding Libor and mortgage rates; false

13  claims and representations regarding mortgage loan defaults; false claims and representations

14  regarding mortgage securitizations; false claims of the acquisition of mortgage loans relating to

15  real property; the institution of fraudulent threats of foreclosure and fraudulent foreclosure

16  proceedings based on false and fraudulent misrepresentations; the fraudulent collection, through

17  one or more agents including but not limited to the named and yet unknown and unnamed

18  defendants of monies allegedly owed on secured promissory notes as to mortgage loans through

19  false and fraudulent misrepresentations; and the perpetration of frauds upon the Courts of the

20  United States, including this Court, through false and fraudulent misrepresentations in

21  connection with the filing of foreclosure actions and the prosecution of non-judicial foreclosure

22  actions which conduct, in the aggregate and in the manner executed, constituted a pattern of

23  criminal activity.

1   The actions and course of conduct of Defendants named in this complaint were executed, as to

2   the Plaintiff, in the same manner and means (fraudulent misrepresentations in the origination of

3   mortgages); (fraudulent misrepresentations in the securitization of mortgages); (fraudulent

4   misrepresentations in documents filed in courts, public records, and through the mails); with the

5   same motive (to institute fraudulent foreclosure proceedings) and the same intended class of

6   victims (owners of real property) and the same intended consequences (wrongfully foreclosing

7   on real property), pursuant to a well-planned and orchestrated scheme to defraud which was

8   executed on a national scale throughout the United States through the institution of fraudulent

9   foreclosure actions and regular and systematic violations of foreclosure laws in both judicial and

10  non-judicial foreclosure jurisdictions, resulting in a nationalized fraud which has resulted in

11  damages to the Plaintiff and to hundreds of thousands of other homeowners in Oregon and other

12  States.

13  This pattern of fraudulent origination of mortgages, fraudulent securitization of mortgages,

14  insurance fraud, servicing fraud, filing false declarations in foreclosures for purposes of

15  manufacturing legal standing and causing the execution of false and fraudulent "Assignments" of

16  mortgages and DOTs and failure to provide proof of legal ownership of the full and

17  unencumbered interest in the Note and Mortgage to further fraudulent foreclosures nationwide is

18  consistent with defendants' pattern of criminal activity prohibited under 18 USC Chapter 96 -

19  RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS; 18 USC § 1962 -

20  Prohibited activities.

21  Defendants GMAC, Chase, James Dimon (hereafter referred to as Dimon), Sanford I. Weill,

22  (hereafter referred to as Weill), and Beal and others bribed, conspired and colluded with

23  Defendants former Senator Phil Gramm, (hereafter referred to as Gramm), former Vice President

1   James Danforth Quayle (hereafter referred to as Quayle), former Treasury Secretary John W.

2   Snow (hereafter referred to as Snow), and others who accepted or offered bribes to draft and pass

3   legislation, including but not limited to, the Gramm–Leach–Bliley Act of 1999 and the

4   Commodity Futures Modernization Act of 2000 that permitted Defendants to unleash their fraud

5   conspiracy on Plaintiff and other homeowners.

6   Bribery of public officials and witnesses and compensation to Members of Congress, officers,

7   and others in matters affecting the Government are violations of 18 USC Chapter 11; Bribery,

8   Graft, and Conflicts of Interest. According to 18 USCS prec § 201(b), whoever directly or

9   indirectly, corruptly gives, offers or promises anything of value to any public official with intent

10  to influence that person's official act will be fined for the offence of bribery.

11  Defendants GMAC, Chase, Dimon, Weill and Beal unduly influence and/or bribe members of

12  Congress, members of the Senate, other elected Representatives, officers or employees of

13  agencies of the United States, and other executive, legislative, or judicial branches of the United

14  States Government to draft and pass legislation to deregulate their industries at the expense of

15  the Plaintiff and other homeowners for their own benefit in violation of 18 USC § 203.

16  Income earned by Defendants Dimon, Weill and Beal increased about 700 times after 1999 as a

17  direct result of the actions and course of conduct of the other herein named and unnamed

18  Defendants under their direction.

19  As a direct and proximate result of the actions and course of conduct of Defendants the Plaintiff

20  has suffered damages and personal injury.

1    Defendant Dimon is the chairman, president and chief executive officer of JPMorgan Chase.

2    Dimon has served as a "class A director" of the Board of Directors of the New York Federal

3    Reserve since January 2007.

4    The Federal Reserve website: www.federalreserveconsumerhelp.gov states "If you have a

5    problem with a bank or other financial institution, contact the Federal Reserve for help." How

6    can the Plaintiff and other harmed consumers/borrowers trust the Federal Reserve to "help" them

7    when the very culprits who've harmed them sit on the Federal Reserve's Board? This is a

8    conflict of interest that denies Plaintiff and other citizens harmed by graft and corruption in the

9    banking and financial industry any remedy and deprives them of due process.

10    Specific material facts as to Plaintiff include, but are not limited to, the specific pattern of

11    criminal activity of Defendants named in this complaint, which has been perpetrated upon the

12    Plaintiff herein through bribery, undue influence on Members of Congress and the Senate,

13    Presidents and other elected Representatives, officers or employees of agencies of the United

14    States, and other executive, legislative, or judicial branches of the United States Government and

15    through fraudulent practices and the use of the mails and, in certain instances, actions involving

16    perjury, is demonstrated by the specific instances of conduct set forth in this complaint, which

17    conduct was executed with the same intent and in the same manner and means and with the same

18    intended class of victims and intended results; and with no evidence that defendants EMC and/or

19    Bear Stearns aka Chase, Litton, GMAC, MGC, LNV and/or Dovenmuehle had legally acquired

20    an ownership or holder interest in the loan.

21    At all times material hereto, the Defendants named in this complaint had actual knowledge that

22    their written statements as to alleged ownership of the Plaintiff's mortgage loans and the legal

23    entitlement to demand monies from Plaintiffs and institute foreclosure proceedings were false

1  statements of material fact which were false when made and known by said Defendants to be

2  false when made.

3  Defendants made the subject false statements with the specific intent that Plaintiff rely thereon

4  and with the separate specific intent, which separate specific intent was unknown to the Plaintiff

5  at the time, to defraud the Plaintiff.

6  Plaintiff, not being in the mortgage lending or mortgage loan acquisition businesses, reasonably

7  relied upon the written statements of Defendants and acted thereon, including but not limited to

8  paying monies to said Defendants when demanded thereby.

9  As a direct and proximate result of the actions and course of conduct of Defendants the Plaintiff

10  has suffered damages and personal injury.

11  The fraudulent conduct engaged in by the Defendants constitutes a separate and independent tort

12  separate and apart from any breach of any contract.

13  Defendants' CONSPIRACY TO DEFRAUD includes, but is not limited to: At all times material

14  hereto, Defendants agreed, between and among themselves and in combination with each other

15  and various agents identified herein, as to each overt act in furtherance of the conspiracy and

16  enterprise, to engage in unlawful actions for a common purpose, to wit: to perpetrate a fraud

17  upon Plaintiff and others through fraudulent mortgage origination practices, through fraudulent

18  mortgage securitization practices, through fraudulent mortgage servicing practices, through

19  fraudulent threats of foreclosure and fraudulent foreclosure filings whereby the Defendants

20  would obtain the use and benefit, under fraudulent pretenses, of the Plaintiff's real property at

21  the expense of the Plaintiff and without compensating the Plaintiff therefor; to unlawfully

22  convert the Plaintiff's real property and permanently deprive the Plaintiff thereof; and to cause

1  all deleterious consequences of the Defendants' actions to be saddled upon the Plaintiff, which

2  consequences include but are not limited to the loss of real property; the incurring of expenses;

3  personal injury; and the adverse effects of claimed defaults and foreclosures placed on the

4  Plaintiff's credit report.

5  Defendants agreed to engage in these unlawful actions with various agents including but not

6  limited to Northwest, Cal-Western, Fidelity, LSI and Quality for purposes of instituting and

7  furthering fraudulent foreclosures in non-judicial jurisdictions, which Defendants and their

8  agents being involved in the various transactions and with the Defendants participating in each

9  overt act in furtherance of the conspiracy to defraud and convert, and did so in order to

10  accomplish the objective of defrauding Plaintiff and misappropriating monies and real property

11  from the Plaintiff.

12  18 USC § 1962 provides, in pertinent part, that it is unlawful for any person:

13  1)  who has received any income derived, directly or indirectly, from a pattern of racketeering

14     activity to use or invest, directly or indirectly, any part of such income, or the proceeds of

15     such income, in acquisition of any interest in, or the establishment or operation of, any

16     enterprise.

17  2)  through a pattern of criminal activity, acquired or maintained, directly or indirectly, any

18     interest in or control of any enterprise or real property;

19  3)  employed by, or associated with, any enterprise to conduct or participate, directly or

20     indirectly, in such enterprise through a pattern of criminal activity;

21  4)  to conspire or endeavor to violate any of the provisions of subsections (1), (2), or (3).

22  Defendants have engaged in "racketeering activity" as defined by 18 USC § 1961.

1   As set forth above, the Defendants intentionally manufactured a scheme to defraud homeowners

2   on a nationalized level whereby the Defendants, through the use of the mails, the public records,

3   and the Courts, intentionally devised false and fraudulent documents relating to the claimed and

4   alleged ownership and "holder" status of mortgage loans when the Defendants had actual

5   knowledge that they had no such status, doing so through perjured documents and material

6   misrepresentations with the specific intent to commit theft of residential real property.

7   As set forth above, the Plaintiff relied upon the Defendants' representations (as any reasonably

8   and similarly-situated homeowner would), which directly and proximately caused the Plaintiff to

9   suffer specific damages and personal injury.

10  The actions of the Defendants were specifically directed to the named Plaintiff herein.

11  In order to accomplish their objective, Defendants developed and were part of an enterprise,

12  which consisted of the Defendants and their agents including but not limited to various law

13  Firms and "Trustee Sale" companies, which worked together and in concert at the direction of

14  the Defendants for the specific purpose of furthering the pattern of criminal activity set forth

15  herein, including notary fraud and a regular pattern and practice of filing false and perjured

16  documents in the public records to institute and further fraudulent foreclosures and steal

17  residential real property from its owners.

18  18 USC Chapter 96 defines "pattern of criminal activity" as engaging in at least two incidents of

19  criminal activity that have the same or similar intents, results, accomplices, victims, or methods

20  of commission or that otherwise are interrelated by distinguishing characteristics and are not

21  isolated incidents and that the last of such incidents occurred within 5 years after a prior incident

22  of criminal activity. As set forth herein, the pattern of criminal activity engaged in by the

23  Defendants did not arise out of a single contract or transaction, and in fact involved numerous

1    contracts and transactions which spread across the United States, including those pertaining to

2    the Plaintiff identified herein.

3    As set forth herein, the Defendants, through their predicate acts and pattern of criminal activity

4    which the Defendants engaged in throughout the United States on a regular and continuous basis

5    and with a defined and intentional purpose, conducted a nationalized fraud, the victims of which

6    were the American homeowner including the Plaintiff herein.

7    As set forth hereinabove and further hereinbelow, Defendants Chase, GMAC aka Ally, Dimon,

8    Weill and Beal, as the controlling RICO and controlling enterprise Defendants, together with the

9    active aid, assistance, and agreement of additional RICO and enterprise Defendants Litton,

10   MGC, LNV, Dovenmuehle, Northwest, Cal-Western, Fidelity, LSI and Quality and their

11   respective agents, repeatedly, deliberately, intentionally, conspiratorially and with criminal intent

12   received proceeds both directly and indirectly from a pattern of criminal activity through theft,

13   fraudulent practices, false pretenses, fraud, and perjury in the acquisition of title to and claimed

14   rights, interest, and equity in real property.

15   As further set forth herein, the RICO Defendants who were employed by and associated with the

16   enterprise conducted and participated in such enterprise through a pattern of criminal activity

17   including but not limited to a nationalized pattern of filing false and perjured documents in the

18   public records; instituting false and fraudulent foreclosure proceedings; and deliberately ignoring

19   and failing to comply with applicable foreclosure laws.

20   As set forth hereinabove and hereinbelow, the RICO Defendants also conspired and endeavored

21   to violate the activities prohibited by 18 USC § 1961 sections (1), (2), and (3).

1    The actions of the RICO Defendants are interrelated by the distinguishing characteristic of the

2    fact that RICO Defendants Chase, Dimon, Weill, GMAC aka Ally and Beal were related persons

3    as to all of the RICO Defendants by the fact that RICO Defendants Litton, MGC, LNV,

4    Dovenmuehle, Northwest, Cal-Western, Fidelity, LSI, Quality, Gramm, Quayle, and Snow and

5    their respective agents were substantially under the direction, ownership, or control, either

6    directly or indirectly, of RICO Defendant s Chase, Dimon, Weill, GMAC aka Ally and Beal.

7    The RICO Defendants specifically engaged in their pattern of criminal activity at the expense of

8    the Plaintiff and for their own benefit.

9    As a direct and proximate result of the overt, concerted, and conspiratorial actions of the

10    Defendants through and with their agents, Plaintiff has suffered significant damages and personal

11    injury well in excess of the jurisdictional limit of this Court.

12    The conspiracy to defraud and convert engaged in by the Defendants constitutes a separate and

13    distinct independent tort which is separate and apart from any breach of any contract.

14    As set forth above, Plaintiff has been injured and has suffered significant damages by reason of

15    the RICO Defendants' numerous violations of Federal and State laws regulating fraud,

16    racketeering, theft, forgery, perjury, bribery, graft and corruption.

17    Plaintiff is thus entitled to demand and does demand threefold actual damages against the RICO

18    Defendants.

19

## COUNT VII

**Defendants: All named and yet unnamed and unknown defendants**

**Discrimination Under 42 U.S.C. § 3601 et seq. and 15 U.S.C. § 1691 et seq.**

Defendant Bear Stearns aka Chase and GMAC have discriminated against Plaintiff on the basis of her age and gender.

Defendants deployed policies and practices that enabled and encouraged the origination of exceedingly high-cost and high-risk residential mortgage loans for the purpose of purchasing, pooling and secuitizing those loans for profit.

During the time period when Plaintiff's mortgage loan was originated the primary connection between large investment firms like Bear Stearns (aka Chase) and individual home mortgages was through the creation of mortgage backed securities.

Companies like People's who originated mortgages for inclusion/conversion into mortgage backed securities were the first link in the securitization chain and the link that interacted directly with consumers, including the Plaintiff.

Investment firms, like Bear Stearns aka Chase, then purchase mortgage loans from originators, like People's, to be packaged and sold as securities.

As the sponsor of the a mortgage-backed security, the investment firm, Bear Stearns aka Chase in this case, is typically responsible for selecting the type of loan products that will be included in the package, reviewing the lending practices of the originator(s) and the quality of the loan products to be included in the package, and assessing the risks associated with the loans in the package.

1    The investment firm sponsoring the securitization creates a trust, referred to as a "special purpose

2    entity" or a "special purpose vehicle" and assigns the loans purchased for the security to that

3    trust. These special purpose entities are established pursuant to the Tax Reform Act of 1986,

4    which created a new kind of tax vehicle, a Real Estate Mortgage Investment Conduit

5    ("REMIC"). REMICs allow for the tax-free pass-through of cash flows from home loans to

6    mortgage-backed securities.

7    There is no legal definition of "subprime loan," although the federal government has provided

8    guidance on how to identify subprime loans. For example, the U.S. Department of Housing and

9    Urban Development ("HUD") has published lists of lenders deemed "subprime." People's is

10   included in this list.

11   In 2008 the Office of the Comptroller of the Currency published a document identifying the

12   "Worst Ten in the Worst Ten," i.e. a list of the subprime lenders with the highest number of

13   loans in foreclosure in the ten metropolitan areas experiencing the highest rates of foreclosure.

14   People's was included in this list.

15   The Home Mortgage Disclosure Act ("HMDA") required mortgage lenders to disclose certain

16   information about each mortgage loan originated or purchased in a fiscal year. Pursuant to

17   regulations promulgated by the Federal Reserve Board, since 2004 the HMDA data has included

18   a designation for "high-cost" loans. Indentifying certain loans as "high-cost" operates as a proxy

19   for identifying subprime loans. A "high-cost" loan is defined as a first-lien loan with an annual

20   percentage rate and borrowing costs that exceed by more than 3 percentage points Treasury

21   securities of comparable maturity.

22   Although the distinction between prime and subprime lending ostensibly tracks differences in a

23   borrower's creditworthiness, in fact many lenders and brokers simply tried to maximize the share

1    of loans they originated on subprime terms. One analysis conducted for the Wall Street Journal

2    found that, in 2005, 55% of subprime mortgages were given to borrowers with sufficiently high

3    credit scores to qualify for prime loans. See Rick Brooks & Ruth Simon, Subprime Debacle

4    Traps Even Very Credit-Worthy, Wall Street Journal, Dec. 3, 2007, at A1.

5    Not all subprime loans are predatory, but nearly all predatory loans are subprime. Most

6    fundamentally, predatory loans place a borrower at an elevated risk of default or foreclosure. The

7    interagency Statement on Subprime Mortgage Lending enumerates certain tactics that may

8    indicate predatory lending. Nonprofit groups have also published widely accepted guidance on

9    the kinds of practices that may constitute predatory lending. *See, e.g., NAT'L COMMUNITY*

10   *REINVESTMENT COAL., THE BROKEN CREDIT SYSTEM: DISCRIMINATION AND UNEQUAL ACCESS TO*

11   *AFFORDABLE LOANS BY RACE AND AGE 4 (2004).* Like the Combined-Risk Loan at issue in this

12   complaint, predatory loans typically combine risky loan features, thereby placing the borrower at

13   an excessive risk of default and foreclosure.

14   For purposes of this complaint, "Combined-Risk Loans" are loans that meet the definition of

15   high-cost loan under the HMDA and also contain two or more of the following high-risk terms:

16   (a) the loan was issued based upon "stated income," rather that the verified income, of the

17   borrower; (b) the debt-to-income ratio exceeds 55%; (c) the loan-to-value ratio is at least 90%;

18   (d) the loan has an adjustable interest rate; (e) the loan has "interest only" payment features; (f)

19   the loan has negative loan amortization features; (g) the loan has "balloon" payment features;

20   and/or (h) the loan imposes prepayment penalties.

21   Individually these loan features make loans riskier and costlier to the borrower. When multiple

22   such features are layered within the same loan, the riskiness and the costliness of the loans

23   increase dramatically.

1    The age and gender disparities giving rise to this action/cause were a direct consequence of Bear

2    Stearns' policies for securitizing People's loans. People's' intensive focus on originating

3    subprime loans classified as "high-cost" under HMDA was a result of higher fees offered by

4    Bear Stearns for such loans. Because its receipt of fees had little of no connection to how

5    securities performed, and because it saw financial advantages for itself in buying and packaging

6    Combined-Risk Loans in particular, Bear Stearns, focused heavily on increasing the volume of

7    Combined-Risk Loans it purchased. The predominant standard for loan quality for People's and

8    other loan originators like them, became whether the loans they originated could be initially sold

9    or securitized in the secondary market. Bear Stearns understood the key role that securitization

10    played in shaping the practices of "lenders" like People's.

11    During the time period when Plaintiff's loan was originated, Bear Stearns required People's, as a

12    condition of the companies' lucrative business relationship, to issue large volumes of Combined-

13    Risk Loans. The high risk features of these loans increased the costs of the loans for borrowers

14    and placed them at greater risk of default, delinquency, and foreclosure.

15    Specific to Plaintiff's case she was deliberately and fraudulently deceived into a subprime

16    mortgage when her credit score was sufficiently high enough to qualify for a prime loan; and she

17    had agreed to low-risk loan features of fixed interest rate and no prepayment penalty. People's

18    motivation to aggressively originate Combined-Risk Loans was so high that they resorted to

19    fraudulently switching these low risk terms to meet the high-risk criteria required for

20    securitization.

21    Defendants' aggressive development of these loan pools disproportionally impacted minorities,

22    female head-of-households, the disabled and seniors over the age of 50 who were more likely to

1   receive these categorically harmful loans than other borrowers. As a result, the Plaintiff faced a

2   greater risk of default and foreclosure.

3   The racial, gender and age disparities giving rise to this action were a direct consequence of Bear

4   Stearn's policies for securitizing loans originated by People's and other subprime "lenders."

5   Defendants' policies and practices have resulted in considerable racial, gender and age

6   disparities. Plaintiff seeks, through this action, to obtain injunctive relief preventing defendants

7   from engaging in this discriminatory conduct in the future.

8   She also seeks to disgorge unjust enrichment Defendants derived from its discriminatory conduct

9   and to remedy economic harms suffered as a result of the policies challenged in this lawsuit.

10   Defendants' discrimination violates the Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA"), the

11   Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. ("ECOA").

12   This Court has original subject matter jurisdiction over the FHA and ECOA claims pursuant to

13   28 U.S.C. § 1331, 42 U.S.C. § 3613(a)(1)(A), and 15 U.S.C. § 1691e(f).

14   Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants conduct

15   business and can be found in this district, and a substantial part of the events or omissions giving

16   rise to the claims alleged herein occurred in this district.

17   **FURTHERMORE;**

18   Plaintiff is filing this complaint pro-se because she has no choice. She is doing so at a horrific

19   disadvantage, but is helpless to do otherwise. Due to the named Defendant's criminal actions and

20   the impact of their criminal activities on the general economy which in turn impacts the

21   resources available to government agencies appointed with the duty of protecting consumers

1  against fraud, no funding exists to provide effective legal assistance to homeowners victimized

2  by the Defendants' crimes or to provide them with recourse to seek effective legal remedy.

3  According to The National Center for State Courts, courts are continuing to see an increase in the

4  numbers of litigants who represent themselves and statistics regarding pro-se litigants are very

5  disturbing for those who know the issues regarding the courts and legal counsel in this country.

6  Slightly over 88% of judges surveyed believed that the extent to which litigants committed

7  procedural errors was a problem for pro se litigation. Studies of the trends in pro-se litigants

8  show that the vast majority of them have modest incomes. *Source: the website for The National*

9  *Center for State Courts: http://www.ncsconline.org/wc/publications/memos/prosestatsmemo.htm*

10  Most homeowners victimized by the actions of the RICO Defendants named in this complaint

11  Chase, Dimon, Weill, GMAC aka Ally, Beal, Litton aka Ocwen, MGC, LNV, Dovenmuehle,

12  Northwest, Cal-Western, Fidelity, LSI, Quality, MGC, LNV, Dovenmuehle, Gramm, Quayle,

13  and Snow and their respective agents and other RICO cohorts not named in this complaint, have

14  no choice but to litigate pro-se because the very actions perpetrated against them by these

15  defendants have caused them to become impoverished.

16  These cases are all very complex; made so deliberately by the criminal activities of the

17  defendants with intent to thwart consumers' ability to seek legal redress and to prevent them

18  from prevailing whenever they do. Even trained attorneys struggle to adequately represent their

19  clients' rights in such cases; yet pro-se litigants must take on these very complex cases without

20  training in the law and without confidence in their ability to adequately present their case or

21  follow expected procedures.

22  Justice in the United States is not supposed to be for sale to the highest bidder.

1    The corruption of members of Congress, officers or employees of agencies of the United States,

2    and other executive, legislative, or judicial branches of the United States Government by these

3    named RICO defendants and their cohorts, unnamed in this complaint, has made the United

4    States Government an accomplice in depriving Plaintiff of her property, and other American

5    homeowners of their property, without due process of law.

6    Therefore, Plaintiff's Fifth and Fourteenth Amendment rights under the Constitution of the

7    United States are violated by the named Defendants in this complaint; and by the United States

8    government.

9    This Court has original subject matter jurisdiction over Constitutional claims pursuant to 28

10   U.S.C. § 1331.

11   Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants conduct

12   business and can be found in this district, and a substantial part of the events or omissions giving

13   rise to the claims alleged herein occurred in this district.


14                              **V. PRAYER FOR RELIEF**

15   **WHEREFORE,** Plaintiff prays for relief as follows:

16        1.  That the Court determines that it has jurisdiction over this action;

17        2.  That a judgment be entered against Defendants in favor of Plaintiff for injunctive relief

18            and declaratory relief, and for equitable monetary relief in the nature of disgorgement, in

19            amounts to be determined at trial;

20        3.  That the Court award damages for tortious injury and personal injury and other equitable

21            relief to Plaintiff, in amounts to be determined at trial;

1      4.  That the Court award actual damages to Plaintiff, in amounts to be determined at trial;

2      5.  That the Court awards threefold actual damages to Plaintiff, as per the RICO Statutes.

3      6.  That the court appoint a pro-bono counsel(s) to assist Plaintiff in discovery and at trial;

4      7.  That the Court order Defendants to pay litigation costs Plaintiff is unable to pay due to

5          her being indigent.

6      8.  That the Court order and investigation into in the RICO activities of the Defendants and

7          other unknown or unnamed parties that have conspired and continue to conspire as

8          participants in the pattern of criminal activities specified in this complaint as to other

9          Oregon homeowners in the Portland district facing foreclosures; and that the Court order

10         a moratorium on all foreclosures in Oregon for a period of at least three years until the

11         merits of each case can be determined and other homeowners so victimized can be made

12         whole.

13     9.  That the Court appoint a monitor to ensure that Defendants comply with the injunction

14         provisions of any decree that the Court orders and an order retaining jurisdiction over this

15         action to ensure that Defendants comply with such a decree;

16     10. That the Court award pre-judgment and post-judgment interest, to the extent allowable by

17         law; and

18     11. That the Court grant for all other and further relief as this Court may deem necessary,

19         appropriate and which is just and proper under the totality of the circumstances.

20     Plaintiff requests a jury on the claims so triable.

# EXHIBIT A

### Case # 3:12 – CV – 1681 ST

### Subramaniam vs Beal, Chase, GMAC et al

## U.S. Department of Housing and Urban Development ("HUD")

## Legal Opinion: GME-0009
## Index: 9.207

## March 5, 1992

## MCS Disorder and Environmental Illness as Handicaps

| | |
|---|---|
| **MEMORANDUM FOR:** | Frank Keating, General Counsel, G |
| **FROM:** | Carole W. Wilson, Associate General Counsel for Equal Opportunity and Administrative Law, GM |
| **SUBJECT:** | Multiple Chemical Sensitivity Disorder and Environmental Illness as Handicaps |

Legal Opinion: GME-0009

Index:  9.207
Subject:  MCS Disorder and Environmental Illness as Handicaps

March 5, 1992

MEMORANDUM FOR:  Frank Keating, General Counsel, G

FROM:  Carole W. Wilson, Associate General Counsel for
    Equal Opportunity and Administrative Law, GM

SUBJECT:  Multiple Chemical Sensitivity Disorder and
    Environmental Illness as Handicaps

This memorandum analyzes whether Multiple Chemical
Sensitivity Disorder ("MCS") and Environmental Illness ("EI") are
or can be "handicaps" within the meaning of subsection 802(h) of
the Fair Housing Act (the "Act"), 42 U.S.C.   3602(h), and the
Department's implementing regulation, 24 C.F.R.   100.201 (1991).

In sum, we conclude that MCS and EI can constitute handicaps
under the Act.  Our conclusion is consistent with the weight of
both federal and state judicial authority construing the Act and
comparable legislation, the Act's legislative history, as well as
the interpretation of other Federal agencies, such as the Social
Security Administration and the Department of Education,
construing legislation within their respective domains.  The
Civil Rights Division of the Department of Justice has also
informed us that it believes MCS and EI can be handicaps under
the Act.  In addition, HUD has consistently articulated this
position, and FHEO agrees with our conclusion.

I.  Ordinary Allergies, Unlike MCS and EI, Generally Are Not
Handicaps

Before turning to whether MCS and EI can fit within the
definition of "handicap" under the Act, it is useful to define
MCS and EI and distinguish these conditions from ordinary
allergies.  This memorandum uses the term MCS to refer to a
condition that causes a person to have severe hypersensitive
reactions to a number of different common substances.  This
memorandum uses the term EI to refer more generally to a
condition that causes a person to have any type of severe
allergic reaction to one or more substances.

At least one court has accepted the following definition for
MCS:

 A n acquired disorder characterized by recurrent
symptoms, referable to multiple organ systems,
occurring in response to demonstrable exposure to many
chemically unrelated compounds at doses far below those
established in the general population to cause harmful
effects.  No single widely accepted test of physiologic

function can be shown to correlate with symptoms.

Ruether v. State, 455 N.W.2d 475, 476 n.1 (Minn. 1990) (quoting
Cullen, The Worker with Multiple Chemical Sensitivities:  An
Overview, 2 Occupational Medicine:  State of the Art Reviews 655,
657 (1987)).
Ordinary allergies, as opposed to MCS and EI, generally
would not constitute a "handicap" because, in most cases,
ordinary allergies do not substantially limit a major life
activity.  Indeed, the National Academy of Sciences ("NAS")
defines MCS to exclude reactions to more common types of
allergens.  Thus, while we conclude that MCS or EI can be
handicaps under the Act, ordinary allergies generally would not
be such.

The practical difference between a person with MCS and one
with ordinary allergies is described in a decision which held
that MCS is a "disability" under the Social Security Act:

Everyone knows someone with an allergy.  If allergic to
eggs, don't eat eggs and you will be fine.  If you do
eat an egg, have some Kleenex available.  But  the
plaintiff with MCS  represents the extreme.  These
extreme cases in the past were either ignored, sent to
a psychiatrist, let die, or treated for other ailments.
It has only been recently that the medical profession
itself has recognized the degree of the problem and the
numbers of persons involved....

... A severe exposure  of the plaintiff to the elements
to which she reacts  causes us to reach not.for a
Kleenex box but for the telephone to summon an
ambulance and this has happened in the past.

Slocum v. Califano, No. 77-0298, slip op. (D. Haw. Aug. 27,
1979).

Ordinary allergies are like a host of other common
characteristics, which, although they may pose challenges to
individuals with the characteristic, do not constitute handicaps
because they either are not impairments or do not substantially
impair major life activities.  Judicial or other authority have
found that the following characteristics do not constitute
handicaps:

-    left-handedness is not an impairment under Sections 501
     and 504 of the Rehabilitation Act of 1973
     ("Rehabilitation Act"), 29 U.S.C.    791 and 794,
     because it is physical characteristic, not a impairment
     - Torres v. Bolger, 781 F.2d 1134, 1138 (5th Cir.
     1986), aff'g, 610 F. Supp. 593 (N.D. Tex. 1985) (ruling
     that left-handedness is not an impairment and does not
     substantially impair major life activities);

-    shortness is not a disability or impairment under
     Wisconsin employment discrimination law - American
     Motors Corp. v. Labor and Industry Review Commission, 8

F.E.P. Manual 421:661 (No. 82-389)  cited in Torres v.
Bolger, 610 F. Supp. 593, 596 (N.D. Tex. 1985) ;

- "For purposes of the definition of 'disability' in
section 3(2), homosexuality and bisexuality are not
impairments and as such are not disabilities under this
Act." - Section 511 of the Americans with Disabilities
Act ("ADA"), 42 U.S.C.   12211.

II.  MCS and EI Generally Meet the Statutory and Regulatory
Definition of Handicaps

Subsection 802(h) of the Act defines "handicap" as follows:

(h)  "Handicap" means, with respect to a person --

    (1)  a physical or mental impairment which
substantially limits one or more of such person's major life
activities,

    (2)  a record of having such an impairment, or

    (3)  being regarded as having such an impairment, but
such term does not include current, illegal use of or
addiction to a controlled substance (as defined in section
102 of the Controlled Substances Act (21 U.S.C. 802)).

As under the Rehabilitation Act's definition of handicap, 29
U.S.C.   706(6), a definition substantially similar to that in
the Act, the determination of whether any particular condition
constitutes a "handicap" necessarily involves a case by case
determination of all facts and circumstances relevant to whether
the condition meets the Act's definition.  Forrisi v. Bowen, 794
F.2d 931, 933 (4th Cir. 1986) (case brought under the
Rehabilitation Act); E.E. Black, Ltd. v. Marshall, 497 F. Supp.
1088, 1100 (D. Haw. 1980) (same).  Those with MCS or EI generally
attempt to meet the definition by virtue of paragraph (1) of the
Act's definition, i.e., by maintaining that their condition
constitutes a physical impairment which substantially limits one
or more of their major life activities.  As shown below, our
understanding of the usual effects of MCS and EI is that persons
with these conditions generally meet the Act's definition of
persons with a "handicap."

A.   Physical or Mental Impairment

The Act does not define its term, "physical or mental
impairment," but the Department's regulations define that term as
follows:

"Physical or mental impairment" includes:

    (1)  Any physiological disorder or condition,
cosmetic disfigurement, or anatomical loss affecting
one or more of the following body systems:
Neurological; musculoskeletal; special sense organs;
respiratory, including speech organs; cardiovascular;

reproductive; digestive; genito-urinary; hemic and
lymphatic; skin; and endocrine; or

(2)  Any mental or psychological disorder, such as
... emotional or mental illness ....  The term
"physical or mental impairment" includes, but is not
limited to, diseases and conditions as ... visual,
speech and hearing impairments, ...  and  emotional
illness ....

24 C.F.R.  100.201.

As discussed at more length, infra, at Parts III, V, and VI,
courts and administrative agencies (including HUD) have found
persons with MCS and EI to have a physiological disorder or
condition, which, upon exposure to certain substances, causes the
person to suffer substantial impairment of various body systems.
Listed below are some of the systems that we understand can be
affected, as well as some of the ways each can be affected:

1.   neurological - blurred vision and black spots, ear
     ringing, incoherent speech, and seizures;

2.   musculoskeletal - muscle aches, fatigue, muscle spasms;

3.   special sense organs - blurred vision, ear ringing;

4.   respiratory (including speech organs) - incoherent
     speech, shortness of breath;

5.   hemic - unusually high T-cell count;

6.   digestive - pancreas damage;

7.   immunological - extreme sensitivity to various
     chemicals which can be life threatening.

B.   Major Life Activities

The Act does not define the term "major life activities,"
but HUD regulations define it as follows:

"Major life activities" means functions such as
caring for one's self, performing manual tasks,
walking, seeing, hearing, speaking, breathing, learning
and working.

24 C.F.R.  100.201.

People with MCS and EI can have one or more major life
activities affected by their condition.  We understand these to
include, but not be limited to:

1.   working - such persons may be disabled under the Social
     Security Act, 42 U.S.C.  416(i)(1);

2.   speaking - incoherent speech when exposed to chemicals;

3.   breathing - extreme shortness of breath when exposed to
     chemicals;

4.   caring for themselves; performing manual tasks - may be
     substantially impaired by chronic fatigue and the need
     to avoid exposure, they are often bed-ridden;

5.   walking - loss of muscle control;

6.   seeing - blurred vision and black spots;

7.   hearing - ear ringing.

8.   learning - blurred vision, ear ringing, seizures, and
     chronic fatigue, all of which may substantially impair
     a person's ability to learn.

C.   Substantially Limited

Neither the Act itself nor HUD's implementing regulations
define what it means to be "substantially limited" in a major
life activity.  Case law, however, provides some guidance.

The Fourth Circuit in Forrisi v. Bowen, 794 F.2d 931 (4th
Cir. 1986), ruled that, under the Rehabilitation Act, in order
for an impairment to substantially limit a major life activity,
"the impairment must be a significant one." Id. at 933-34.

E.E. Black, Ltd. v. Marshall, 497 F. Supp. 1088 (D. Haw.
1980) ("Black"), ruled that a person who is disqualified from
employment in his chosen field has a substantial handicap in
employment and is substantially limited in his major life
activity of working.  Id. at 1099.  In contrast, where a person
is disqualified only from certain subfields of work, the
determination of whether the impairment is substantial must be
viewed in light of certain factors.  Id. at 1101-02.  These
factors are:

1.   the number of types of jobs from which the impaired
     individual is disqualified;

2.   the geographical area to which the individual has
     reasonable access to find alternative employment; and

3.   the individual's own job expectations and training.

Id.

The Sixth Circuit in Jasany v. United States Postal Service,
755 F.2d 1244 (6th Cir. 1985), in discussing the "substantially
limiting" requirement, stated that " a n impairment that affects
only a narrow range of jobs can be regarded either as not
reaching a major life activity or as not substantially limiting
one."  Id. at 1249 note 3.
Federal agencies appear to have adopted a similar approach
to the "substantially limited" requirement, as have state

courts.

Persons with MCS and EI may be substantially limited in
major life activities due to their handicap. For such persons,
exposure to a variety of common substances may cause them
significant limitations to their major life activities, such as
those listed, supra, at Part IIB. Moreover, due to the frequency
that ordinary living normally brings people into contact with the
commonly found substances to which persons with MCS and EI
typically react, persons with these disabilities may be severely
constrained in their daily living and must make major adjustments
to avoid exposure. Since it is critical that people with MCS and
EI minimize their exposure to common substances found in or near
most housing facilities, they generally face a significantly
limited choice of housing.

III. Case Precedent Recognizes MCS and EI as Handicaps

The weight of judicial precedent supports the conclusion
that MCS and EI can be handicaps.

A.    Federal Case Law Recognizes MCS and EI as Handicaps

Vickers v. Veterans Administration, 549 F. Supp. 85, 86-87
(W.D. Wash. 1982), held that a Veterans Administration ("VA")
employee who was hypersensitive to tobacco smoke was handicapped
under the Rehabilitation Act. The court ruled that the ability
to work where one will be subject to an ordinary amount of smoke
is a major life activity. Id. at 87. The court specifically
found that the plaintiff had a physical impairment that
substantially limited his ability to work in an environment that
was not completely smoke free, and thus, he was handicapped.

Rosiak v. Department of the Army, 679 F. Supp. 444 (M.D. Pa.
1987), aff'd, 845 F.2d 1014 (3d Cir. 1988), held that a carpentry
worker who was hypersensitive to "hydrocarbon-type fumes or
dust," including those from contact cement, was handicapped under
the Rehabilitation Act due to his hypersensitivity.

Kouril v. Bowen, 912 F.2d 971, 974 (8th Cir. 1990), held
that a woman with MCS was disabled under the Social Security Act,
42 U.S.C.    416(i)(1). She suffered numbness in the legs,
dizziness, light headedness, headaches, nausea, and various skin
rashes and sores when exposed to common chemicals, such as ink,
perfume, tobacco smoke, photocopier odors, engine exhaust fumes,
new carpet, new clothes, and hydrocarbons. The court found her
"complex allergy state" to require substantial restrictions in
her daily activities and interfere with her ability to engage in
substantial gainful activity. 912 F.2d at 976.

Kornock v. Harris, 648 F.2d 525, 527 (9th Cir. 1980),
involved a truck driver, diagnosed as having severe allergies to
environmental pollutants and bronchial asthma, and, who, as a
consequence, suffered disabling respiratory attacks. The court
ruled that he was disabled from substantial gainful activity
under the Social Security Act, and, thus, his widow was entitled
to collect his Social Security disability benefits.

On the other hand, Lawson v. Sullivan, 1990 U.S. Dist. LEXIS
18758 (N.D. Ill. 1990) (magistrate's decision), adopted, 1991
U.S. Dist. LEXIS 1560 (N.D. Ill. 1991), affirmed a decision of
the Secretary of Health and Human Services, which denied the
claimant Social Security disability benefits based on a failure
to produce adequate, objective, clinical evidence supporting her
complaints of incapacitating migraine headaches, allegedly
brought about by exposure to various common chemicals.

B.    State Case Law Recognizes MCS and EI as Handicaps

Pennsylvania, California, and Ohio state courts have
interpreted their state civil rights statutes prohibiting
discrimination against the handicapped to apply to persons with
MCS and EI.  We have been unable to find any state court holding
to the contrary.

Most noteworthy, because it involves housing discrimination,
is a case interpreting the Pennsylvania Human Relations Act
("Pennsylvania Act").  Lincoln Realty Management Co. v.
Pennsylvania Human Relations Commission, 598 A.2d 594 (Pa. Commw.
1991) ("Lincoln").  In that case, a Pennsylvania trial court
affirmed, in part, the decision of the Pennsylvania Human
Relations Commission.  The court affirmed, without analysis of
this issue, the finding that the plaintiff, a tenant unable to
tolerate the presence of various chemical compounds (including
certain pesticides and herbicides), was handicapped under the
Pennsylvania Act.  Id. at 597, 601.

The California Court of Appeals held in County of Fresno v.
Fair Employment and Housing Commission of the State of
California, 226 Cal. App. 3d 1541, 1550, 277 Cal. Rptr. 557, 563
(Cal. App. 5th Dist. 1991), that the state human relations
commission did not abuse its discretion in determining that
hypersensitivity to tobacco smoke, was a handicap under the
California Fair Employment and Housing Act ("California Act").
While this case involved employment discrimination, the
California Act's definition of handicap applies equally to
housing.  Thus, the holding that hypersensitivity to tobacco
smoke qualifies as a handicap would apply in housing
discrimination cases also.

In Kallas Enterprises v. Ohio Civil Rights Commission, 1990
Ohio App. LEXIS 1683 (Ohio Ct. App. May 2, 1990), the Court of
Appeals of Ohio, citing Vickers, discussed, supra, at 10-11,
ruled that "occupational asthma" and "a hypersensitivity to
rustproofing  chemicals," are handicaps within the meaning of
the Ohio Civil Rights Act ("Ohio Act"), Ohio Rev. Code   4112 et
seq.  The court affirmed the trial court's ruling that the
plaintiff was illegally discharged because of his handicap and
affirmed the trial court's reinstatement order.

In Kent State University v. Ohio Civil Rights Commission, 64
Ohio App. 3d 427, 581 N.E.2d 1135 (1989), a different district of
the Court Appeals of Ohio held in favor of a person with
laryngeal stridor with laryngospasm, diagnosed as a condition

making her unable to breath when subjected to pesticides,
cleaning solutions, natural gas, asphalt, auto exhaust, cigarette
smoke, hair spray, cosmetics, rubber products, petrochemicals,
and other common substances.  581 N.E.2d at 1137.  The court
found that her condition was a handicap under the Ohio Act.

IV.   Legislative History Supports the Conclusion that MCS and EI
Can Be Handicaps

The Act's legislative history also demonstrates that
Congress intended that the Act's definition of handicap be broad
enough to include MCS and EI.  Congress intended that the term
"handicap," as used in the Act, be interpreted consistently with
judicial interpretations of the term "handicap," as used in the
Rehabilitation Act.  In the preamble to the regulations
implementing the Act, HUD noted "the clear legislative history
indicating that Congress intended that the definition of
'handicap' be fully as broad as that provided by the
Rehabilitation Act."  24 C.F.R. Subtitle B, Ch. 1, Subch. A, App.
1 at 704 (1991).  To support this conclusion, the preamble cited
portions of the House Report and floor debate on the Act which
reflected Congress's desire that the two definitions be
interpreted consistently.  Before Congress passed the Fair
Housing Amendments Act, lower federal courts had interpreted the
Rehabilitation Act to cover MCS and EI as handicaps.

Statutory construction principles lead us to conclude that,
because Congress used substantially the same definition of
handicap in the Act as it did in the Rehabilitation Act, Congress
intended chemical hypersensitivity to be a handicap under the
Act, as courts at that time had determined it to be under the
Rehabilitation Act.  It is a generally accepted principle of
statutory construction that where the judiciary has given
"contemporaneous and practical interpretation" to "an expression"
contained in a statute, and the legislature adopts the expression
in subsequent legislation, the judicial interpretation is "prima
facie evidence of legislative intent."  This principle "is based
on the theory that the legislature is familiar with the
contemporaneous interpretation of a statute."  Sutherland Stat.
Const.   49.09 (4th ed. 1984) at 400.  The Supreme Court has
applied this principle to interpreting civil rights statutes.
Cannon v. University of Chicago, 441 U.S. 677 (1979) ("Cannon")
and Lorillard, A Division of Loew's Theatres, Inc. v. Pons, 434
U.S. 575 (1978) ("Lorillard").

In addition, the Act's legislative history generally
demonstrates that Congress intended that the Act's definition of
handicap be interpreted broadly.  During consideration of the
Fair Housing Amendments Act, Congress considered proposals to
limit the category of "handicaps" to more traditionally
recognized ones, such as those affecting only sight, hearing,
walking, or living unattended; Congress rejected those proposals.
For example, Senator Hatch proposed a more restrictive definition
of the term handicap in S. 867, 100th Cong., 1st Sess.  See Fair
Housing Amendments Act of 1987:  Hearings on S. 558 Before the
Subcomm. on the Constitution of the Senate Comm. on the
Judiciary, 100th Cong., 1st Sess. 520-22, 523 (1987) (statement

of Bonnie Milstein, former Deputy Assistant General Counsel for
Civil Rights in Departments of HEW and HHS). By adopting the
definition it did, Congress rejected the more restrictive
proposals. Interpreting the Act's definition to include persons
with MCS and EI is consistent with that Congressional intent.

V.   Other Federal Agencies Recognize MCS and EI as Handicaps

At least two other Federal agencies, the Social Security
Administration ("SSA") and the Department of Education ("DOE"),
recognize that MCS and EI can be handicaps. In addition, the
Civil Rights Division of the Department of Justice has informed
us that it believes MCS and EI can be handicaps under the Fair
Housing Act.

As discussed, supra, at Part IIIA, two Circuit Courts of
Appeals have ruled that MCS and EI are "disabilities" under the
Social Security Disability Act. An increasing number of SSA
administrative law judges are "becoming aware" of these disabling
conditions. Matthew Bender, Social Security Practice Guide, vol.
2,  14.03 8 at 14-49 (1991). If a person is disabled under the
Social Security Act, a fortiori, he or she is handicapped under
the Fair Housing Act, because the former definition is a more
limited definition than the latter.

DOE has issued two agency letters of finding under the
Rehabilitation Act concluding that MCS and EI can be handicaps.
In San Diego (Cal.) Unified School District, 1 National
Disability Law Reporter ("NDLR") para. 61, p. 311 (May 24, 1990),
DOE concluded that a school district violated the Rehabilitation
Act by refusing to reasonably accommodate a school bus driver who
was chemically sensitive to petrochemical fumes. In that case,
the school district refused to allow the driver to wear a
respirator while driving. DOE concluded that the bus driver was
handicapped and that the accommodation he requested was
reasonable. In Montville (Conn.) Board of Education, 1 NDLR
para. 123, p. 515 (July 6, 1990), DOE concluded that a guidance
counselor with MCS was handicapped under the Rehabilitation Act.
DOE concluded, however, that the school district had provided
reasonable accommodations to the counselor.

In addition, the Merit Systems Protection Board ("MSPB") has
suggested that, at least in some circumstances, severe chemical
sensitivities could be a handicap under the Rehabilitation Act.

VI.   HUD's Prior Interpretations Have Recognized That MCS and EI
Can Be Handicaps

On several occasions, HUD, including OGC and FHEO, has
recognized that MCS and EI can be handicaps under Section 504 of
the Rehabilitation Act and subsection 802(h) of the Fair Housing
Act. OGC, Fair Housing Division, issued a determination,
authorized by the General Counsel, in another fair housing case,
Corcelli v. Gilbane Properties, Inc., (Case Nos. 01-90-0255-1-5,
01-90-0512-1) (Dec. 11, 1990) ("Corcelli") (Attachment A) stating
that the complainant, a person suffering from environmental
illnesses immune dysfunction syndrome and chronic fatigue, was

handicapped under the Act.  In Corcelli, medical evidence
substantiated that the complainant was hypersensitive to common
chemicals such as pesticides, petroleum products, perfumes,
exhaust fumes, fresh paint, pine, soaps, chemical spraying of
lawns, and most strong odors.  When exposed to these substances,
her reaction was severe or even life threatening.  Based on this
information, HUD found that the complainant's condition was a
handicap and that the Act's provision on reasonable
accommodations was fully applicable.  Corcelli at 3.

Even before OGC issued the Corcelli determination, HUD had
stated that MCS was a handicap under Section 504 of the
Rehabilitation Act, entitling those with the disability to
reasonable accommodations.  See Oct. 26, 1990 letter from Timothy
L. Coyle, Assistant Secretary for Legislation and Congressional
Relations to Senator Frank R. Lautenberg (Attachment B).  Since
Corcelli, HUD has continued to reaffirm its position that MCS and
EI are or can be handicaps.  For example, the FHEO provided all
regional FHEO Directors a draft technical guidance memorandum
dated June 6, 1991, stating that persons disabled by MCS and EI
are handicapped within the meaning of the Fair Housing Act and
Section 504.  See Draft Technical Guidance Memorandum (Attachment
C).  In addition, HUD's recent report to Congress, written by the
Assistant Secretary for FHEO and cleared by the Secretary,
listed, as a handicap discrimination case, one involving the
"refusal to delay fumigation to permit a temporary absence for an
individual with chemical sensitivities."  Report to the Congress
Pursuant to Section 808(e)(2) of the Fair Housing Act (1990): The
State of Fair Housing (Nov. 1991) at 5 (Attachment D).

As explained above, persons with MCS and EI generally will
meet the statutory and regulatory definitions of persons with a
"handicap."  In addition, HUD's interpretation to date is fully
consistent with case precedent, the interpretations of other
Federal agencies, and the Act's legislative history.

VI.  Conclusion

MCS and EI can be handicaps under the Act.  This position is
consistent with the statutory language, the weight of judicial
authority, the interpretation of other Federal agencies, and the
Act's legislative history.  HUD also has been consistent in
articulating this position on prior occasions.  Thus, HUD's
current interpretation seems correct, and there appears to be no
compelling reason to change it now.

Attachments

## Exhibit 3 to Nye Declaration

IFP, TERMINATED,

# U.S. District Court
## District of Oregon (Portland (3))
## CIVIL DOCKET FOR CASE #: 3:12-cv-01681-MO

Subramaniam v. Beal et al
Assigned to: Chief Judge Michael W. Mosman
Cause: 15:1601 Truth in Lending

Date Filed: 09/18/2012
Date Terminated: 09/27/2013
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Federal Question

**Plaintiff**

**Denise Subramaniam**                    represented by    **Denise Subramaniam**
                                                           13865 SW Walker Rd
                                                           Beaverton, OR 97005
                                                           503-764-5300
                                                           Email: deesyfert@gmail.com
                                                           PRO SE

                                                           **Damon James Petticord**
                                                           Damon J. Petticord, PC
                                                           7175 S.W. Bevelend St.
                                                           Suite 210
                                                           Tigard, OR 97223
                                                           503-620-7461
                                                           Fax: 503-670-0343
                                                           Email: damon@apantac.com
                                                           *TERMINATED: 01/30/2013*
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**D. Andrew Beal**

**Defendant**

**Jacob Cherner**
*TERMINATED: 01/14/2013*

**Defendant**

**Molly Curl**
*TERMINATED: 01/14/2013*

**Defendant**

**MGC Mortgage**                      represented by **Christopher A. Wright**
                                              Carney Badley Spellman
                                              701 Fifth Avenue,
                                              Suite 3600
                                              Seattle, WA 98104
                                              206-622-8020
                                              Fax: 206-467-8215
                                              Email: wright@carneylaw.com
                                              *LEAD ATTORNEY*
                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**LNV Corporation**

**Defendant**

**William Mynatt**
*TERMINATED: 01/14/2013*

**Defendant**

**David Allison**
*TERMINATED: 01/14/2013*

**Defendant**

**Ian Benedict**
*TERMINATED: 01/14/2013*

**Defendant**

**Mary Przybyla**
*TERMINATED: 01/14/2013*

**Defendant**

**Dovenmuehle Mortgage Inc.**

**Defendant**

**Beal Bank**
*TERMINATED: 01/14/2013*

**Defendant**

**Beal Financial**
*TERMINATED: 01/14/2013*

**Defendant**

**Ally Financial**                      represented by **Andrew W. Noble**
                                              Severson & Werson, APC
                                              One Embarcadero Center
                                              Suite 2600
                                              San Francisco, CA 94111
                                              415-398-3344

Fax: 415-956-0439
Email: awn@severson.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Owen Campbell**
Severson & Werson
19100 Von Karman Ave.
7th Floor
Irvine, CA 92612
(949) 442-7110
Fax: (949) 442-7118
Email: joc@severson.com
*ATTORNEY TO BE NOTICED*

**William G. Fig**
Sussman Shank, LLP
1000 SW Broadway
Suite 1400
Portland, OR 97205
(503) 227-1111
Fax: (503) 248-0130
Email: wfig@sussmanshank.com
*TERMINATED: 05/10/2013*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bruce Pardis**
*TERMINATED: 01/14/2013*

**Defendant**

**Tom Donatacci**
*TERMINATED: 01/14/2013*

**Defendant**

**Michael Carpenter**
*TERMINATED: 01/14/2013*

**Defendant**

**Mark F. Bole**
*TERMINATED: 01/14/2013*

**Defendant**

**Masse Adjety**
*TERMINATED: 01/14/2013*

**Defendant**

**Rosalyn Hall**
*TERMINATED: 01/14/2013*

<u>**Defendant**</u>

**Mary K. Olson**
*TERMINATED: 01/14/2013*

<u>**Defendant**</u>

**Diane M. Meistad**
*TERMINATED: 01/14/2013*

<u>**Defendant**</u>

**Minnesota Office of Secretary of State**
*TERMINATED: 01/14/2013*

<u>**Defendant**</u>

**Laura Herrera**
*TERMINATED: 01/14/2013*

<u>**Defendant**</u>

**Texzas Office of Secretary of State**
*TERMINATED: 01/14/2013*

<u>**Defendant**</u>

**Greg Sullins**
*TERMINATED: 01/14/2013*

<u>**Defendant**</u>

**Docx LLC**
*TERMINATED: 01/14/2013*

<u>**Defendant**</u>

**IBM Lender Business Process Services, Inc.**
*TERMINATED: 01/14/2013*

<u>**Defendant**</u>

**Seterus, Inc.**
*TERMINATED: 01/14/2013*

<u>**Defendant**</u>

**Virginia M, Rometty**
*TERMINATED: 01/14/2013*

<u>**Defendant**</u>

**IBM**
*TERMINATED: 01/14/2013*

**Defendant**

**Lloyd Craig Blankfein**
*TERMINATED: 01/14/2013*

**Defendant**

**Goldman Sachs & Co.**
*TERMINATED: 01/14/2013*

**Defendant**

**Fidelity National Title Company**

**Defendant**

**Fidelity National Financial**
*TERMINATED: 01/14/2013*

**Defendant**

**Litton Loan Servicing LP**                 represented by    **Carlos A. Rasch**
*also known as*                                                Houser & Allison, APC
OCWEN Financial Corporation                                    9600 SW Oak Street
                                                               Suite 570
                                                               Portland, OR 97223
                                                               (503) 914-1382
                                                               Fax: (503) 914-1383
                                                               Email: crasch@houser-law.com
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Emilie K. Edling**
                                                               Houser & Allison, APC
                                                               9600 SW Oak St.
                                                               Suite 570
                                                               Portland, OR 97223
                                                               503-914-1382
                                                               Fax: 503-914-1383
                                                               Email: eedling@houser-law.com
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**Ocwen Finanical Corporation**
*TERMINATED: 01/14/2013*

**Defendant**

**Debra Lyman**
*TERMINATED: 01/14/2013*

**Defendant**

**Betty Wright**

**Defendant**

**Larry B. Litton, Jr.**
*TERMINATED: 01/14/2013*

**Defendant**

**Larry B. Litton, Sr.**
*TERMINATED: 01/14/2013*

**Defendant**

**Quality Loan Service**

**Defendant**

**Suzanne Eaton**
*TERMINATED: 01/14/2013*

**Defendant**

**John Kee**
*TERMINATED: 01/14/2013*

**Defendant**

**Pamela Campbell**
*TERMINATED: 01/14/2013*

**Defendant**

**Cal-Western Reconveyance**          represented by **Timothy B. Hering**
**Corporation**                                        Dunn Carney Allen Higgins & Tongue,
                                                       LLP
                                                       851 SW Sixth Avenue
                                                       Suite 1500
                                                       Portland, OR 97204-1357
                                                       (503) 224-6440
                                                       Fax: (503) 224-7324
                                                       Email: thering@dunncarney.com
                                                       *ATTORNEY TO BE NOTICED*

**Defendant**

**Prommis Solutions**
*TERMINATED: 01/14/2013*

**Defendant**

**Lorrie Womack**
*TERMINATED: 01/14/2013*

**Defendant**

**Monica Mora**
*TERMINATED: 01/14/2013*

**Defendant**

**Tina Jones**
*TERMINATED: 01/14/2013*

**Defendant**

**Josh Magnuson**
*TERMINATED: 01/14/2013*

**Defendant**

**Stephen A. Feinberg**
*TERMINATED: 01/14/2013*

**Defendant**

**John W. Snow**

**Defendant**

**Cerberus Capital Management L.P.**
*TERMINATED: 01/14/2013*

**Defendant**

**Sanford I. Weill**

**Defendant**

**Phil Gramm**                    represented by   **James E. Cox , Jr.**
                                                   U.S. Attorney's Office
                                                   District of Oregon
                                                   1000 SW Third Ave.
                                                   Suite 600
                                                   Portland, OR 97204
                                                   (503) 727-1026
                                                   Fax: (503) 727-1117
                                                   Email: jim.cox@usdoj.gov
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Defendant**

**James E. Cayne**
*TERMINATED: 01/14/2013*

**Defendant**

**James Dimon**                    represented by   **Michael J. Farrell**
                                                    MB Law Group, LLP
                                                    117 SW Taylor St.
                                                    Suite 200
                                                    Portland, OR 97204
                                                    503-914-2015
                                                    Fax: 503-914-1725

Email: mfarrell@mblglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas W. Purcell**
MB Law Group LLP
117 SW Taylor Street
Suite 200
Portland, OR 97204
503-914-2015
Fax: 503-914-1725
Email: tpurcell@mblglaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**EMC Mortgage**                    represented by **Michael J. Farrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas W. Purcell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bear Sterns**                    represented by **Michael J. Farrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas W. Purcell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JP Morgan Chase**                    represented by **Michael J. Farrell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas W. Purcell**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kevin R. McCarthy**
*TERMINATED: 01/14/2013*

**Defendant**

**Theresa Russell**
*TERMINATED: 01/14/2013*

**Defendant**

**Stephen Routh**
*TERMINATED: 01/14/2013*

**Defendant**

**David E. Fennell**
*TERMINATED: 01/14/2013*

**Defendant**

**Northwest Trustee Services Inc**          represented by     **John M. Thomas**
                                                              McCarthy & Holthus
                                                              920 SW Third Avenue
                                                              First Floor
                                                              Portland, OR 97204
                                                              971-201-3203
                                                              Fax: 971-201-3202
                                                              Email: jthomas@mccarthyholthus.com
                                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**James Danforth Quayle**

**Defendant**

**CT Corporation**
*TERMINATED: 01/14/2013*

**Defendant**

**CT Corporation System**
*TERMINATED: 01/14/2013*

**Defendant**

**Nancy McKinstry**
*TERMINATED: 01/14/2013*

**Defendant**

**Wolters Kluwer**
*TERMINATED: 01/14/2013*

**Defendant**

**Bernadette McDonnell**
*TERMINATED: 01/14/2013*

**Defendant**

**Lori Beddard**
*TERMINATED: 01/14/2013*

District of Oregon CM/ECF LIVE Release Version 6.1       Page 10 of 23
12-12020-mg    Doc 10482-1    Filed 03/02/18    Entered 03/02/18 20:29:43    Exhibit A
Pg 90 of 208

**Defendant**

**B. Bernadine**
*TERMINATED: 01/14/2013*

**Defendant**

**Enedina O. Sanchez**
*TERMINATED: 01/14/2013*

**Defendant**

**KATU TV Portland**
*TERMINATED: 01/14/2013*

**Defendant**

**American Broadcasting Company
(ABC)**
*TERMINATED: 01/14/2013*

**Defendant**

**unnamed/yet unknown parties**

**Defendant**

**Homecomings Financial Network and
Residential Funding LLC**
*also known as*
GMAC
*also known as*
Ally Financial

represented by **William G. Fig**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**LSI Title Company of Oregon**

represented by **Tamara K. Nelson**
Merrick, Hofstedt & Lindsey
3101 Western Avenue
Suite 200
Seattle, WA 98121
206-682-0610
Fax: 206-467-2689
Email: tnelson@mhlseattle.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Peter Steilberg , III**
Merrick Hofstedt & Lindsey, PS
3101 Western Avenue, Suite 200
Seattle, WA 98121
206-682-0610
Fax: 206-467-2689

Email: psteilberg@mhlseattle.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/18/2012 | 1 | Complaint. Jury Trial Requested: Yes. Filed by Denise Subramaniam against All Defendants (Attachments: # 1 Exhibits, # 2 Civil Cover Sheet). (sm) (Entered: 09/21/2012) |
| 09/18/2012 | 2 | Application for Leave to Proceed IFP. Filed by Denise Subramaniam. (sm) (Entered: 09/21/2012) |
| 09/18/2012 | 3 | Motion for Appointment of Pro Bono Counsel. Filed by Denise Subramaniam. (sm) (Entered: 09/21/2012) |
| 09/21/2012 | 4 | Notice of Case Assignment to Magistrate Judge Janice M. Stewart and Discovery and Pretrial Scheduling Order. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3-5**. Discovery is to be completed by 1/22/2013. Joint Alternate Dispute Resolution Report is due by 2/19/2013. Pretrial Order is due by 2/19/2013. Ordered by Magistrate Judge Janice M. Stewart. (sm) (Entered: 09/21/2012) |
| 09/21/2012 | 5 | Clerk's Notice of Mailing to Plaintiff of Notice of Case Assignment Order and Discovery and Pretrial Scheduling Order 4 . (sm) (Entered: 09/21/2012) |
| 10/05/2012 | 6 | Notice of Case Reassignment: This case has been reassigned from Magistrate Judge Janice M. Stewart to Judge Michael W. Mosman. Copy mailed to plaintiff. (eo) (Entered: 10/05/2012) |
| 10/09/2012 | 7 | **ORDER:** GRANTING Motion for Leave to Proceed in Forma Pauperis 2 . Ordered by Judge Michael W. Mosman. (dls) (Entered: 10/09/2012) |
| 10/09/2012 | 8 | **ORDER:** DENYING Motion for Appointment of Pro Bono Counsel 3 . Ordered by Judge Michael W. Mosman. (dls) (Entered: 10/09/2012) |
| 10/09/2012 | 9 | Notice of Case Assignment to Judge Michael W. Mosman and Discovery and Pretrial Scheduling Order. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3-5**. Discovery is to be completed by 2/6/2013. Joint Alternate Dispute Resolution Report is due by 3/8/2013. Pretrial Order is due by 3/8/2013. Ordered by Judge Michael W. Mosman. (ecp) (Entered: 10/09/2012) |
| 10/09/2012 | 10 | Clerk's Notice of Mailing to Plaintiff regarding Order on motion/application for leave to proceed ifp 7 , Discovery order, 9 , Order on Motion for Appointment of Counsel 8 . (ecp) (Entered: 10/09/2012) |
| 10/16/2012 | 11 | ORDER: The court entered an Order 7 granting the Motion for Leave to Proceed in Forma Pauperis 2 . The court STAYS any service on any defendant until the filing of an Amended Complaint. Ordered by Judge Michael W. Mosman. (dls) (Entered: 10/16/2012) |

| 10/16/2012 | 12 | ORDER: Upon further review GRANTING Motion for Appointment of Pro Bono Counsel 3 for the purpose of reviewing plaintiff's claims and filing an Amended Complaint excluding those claims which fail to comply with FRCP 11(b) and excluding those defendants over whom this court lacks personal jurisdiction. Ordered by Judge Michael W. Mosman. (dls) (Entered: 10/16/2012) |
| 10/19/2012 | 13 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order 12 and Order 11 . (dls) (Entered: 10/19/2012) |
| 10/23/2012 | 14 | Order Appointing Damon James Petticord for Denise Subramaniam as Pro Bono Counsel *(Specific Purpose Appointment)* If representation is accepted, counsel is to file the attached Notice of Completion of Pro Bono Appointment upon completion of the specific purpose(s) of reviewing plaintiff's claims and filing an Amended Complaint excluding those claims which fail to comply with FRCP 11(b) and excluding those defendants over whom this court lacks personal jurisdiction.. Counsel is to file the attached response form if representation is accepted, if a conflict of interest exists, or if termination of the appointment is requested for a reason other than a conflict of interest by 11/9/2012. Signed on 10/23/12 by Judge Michael W. Mosman. (dls) (Entered: 10/23/2012) |
| 11/01/2012 | 15 | Pro Bono Appointment Response. Representation is accepted as specified in the Order Appointing *Pro Bono* Counsel. Filed by Denise Subramaniam. (Related document(s): Order Appointing Pro Bono Counsel,,, 14 .) (Petticord, Damon) (Entered: 11/01/2012) |
| 11/15/2012 | 16 | Motion for Extension of Time . Filed by Denise Subramaniam. (Petticord, Damon) (Entered: 11/15/2012) |
| 11/15/2012 | 17 | **ORDER:** GRANTING Motion for Extension of Time 16 . Amended Complaint is due 12/31/2012. Defendants are instructed not to file any answers until after receipt of the amended complaint. Ordered by Judge Michael W. Mosman. (dls) (Entered: 11/15/2012) |
| 12/28/2012 | 18 | Second Motion for Extension of Time *to file Pro Se Amended Complaint*. Filed by Denise Subramaniam. (Attachments: # 1 Attachment) (Petticord, Damon) (Entered: 12/28/2012) |
| 01/07/2013 | 19 | **ORDER:** GRANTING Motion for Extension of Time 18 . Amended Complaint is due 1/15/2013. Ordered by Judge Michael W. Mosman. (dls) (Entered: 01/07/2013) |
| 01/14/2013 | 20 | Amended Complaint. Filed by Denise Subramaniam against D. Andrew Beal, Bear Sterns, Cal-Western Reconveyance Corporation, James Dimon, Dovenmuehle Mortgage Inc., EMC Mortgage, Fidelity National Title Company, Phil Gramm, JP Morgan Chase, LNV Corporation, Litton Loan Servicing LP, MGC Mortgage, Northwest Trustee Services Inc, Ocwen Financial Corporation, Quality Loan Service, James Danforth Quayle, John W. Snow, Sanford I. Weill, unnamed/yet unknown parties, Homecomings Financial Network and Residential Funding LLC, LSI Title Company of Oregon. (msk) (Entered: 01/16/2013) |

| 01/29/2013 | 21 | Notice re Order Appointing Pro Bono Counsel 14 , Pro Bono Appointment Response Form 15 Filed by Denise Subramaniam (Related document(s): Order Appointing Pro Bono Counsel 14 , Pro Bono Appointment Response Form 15 .) (Petticord, Damon) (Entered: 01/29/2013) |
|---|---|---|
| 01/30/2013 | 22 | Order Terminating Damon James Petticord as Pro Bono Counsel. Signed on 1/30/13 by Judge Michael W. Mosman. (dls) (Entered: 01/30/2013) |
| 01/30/2013 | 23 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order Terminating Pro Bono Counsel 22 . (dls) (Entered: 01/30/2013) |
| 02/07/2013 | 24 | Summons Issued as to D. Andrew Beal, Cal-Western Reconveyance Corporation, James Dimon, Dovenmuehle Mortgage Inc., Fidelity National Title Company, Phil Gramm, Homecomings Financial Network and Residential Funding LLC, JP Morgan Chase, LNV Corporation, LSI Title Company of Oregon, Litton Loan Servicing LP, MGC Mortgage, Northwest Trustee Services Inc, Quality Loan Service, James Danforth Quayle, John W. Snow, Sanford I. Weill. (Summons, USM 285 form(s), and copies of the Complaint and Order to Proceed *in forma pauperis* forwarded to the U.S. Marshals Service for service.) (ecp) (Entered: 02/07/2013) |
| 02/22/2013 | 25 | Notice *of Appearance* Filed by Northwest Trustee Services Inc (Thomas, John) (Entered: 02/22/2013) |
| 02/22/2013 | 26 | Corporate Disclosure Statement . Filed by Northwest Trustee Services Inc. (Thomas, John) (Entered: 02/22/2013) |
| 02/28/2013 | 27 | Waiver of Service of Summons Returned Executed by EMC Mortgage waiver sent on 2/27/2013. Filed by Bear Sterns; EMC Mortgage; JP Morgan Chase; James Dimon. (Purcell, Thomas) (Entered: 02/28/2013) |
| 02/28/2013 | 28 | Waiver of Service of Summons Returned Executed by Bear Sterns waiver sent on 2/27/2013. Filed by Bear Sterns; EMC Mortgage; JP Morgan Chase; James Dimon. (Purcell, Thomas) (Entered: 02/28/2013) |
| 02/28/2013 | 29 | Waiver of Service of Summons Returned Executed by JP Morgan Chase waiver sent on 2/27/2013. Filed by Bear Sterns; EMC Mortgage; JP Morgan Chase; James Dimon. (Purcell, Thomas) (Entered: 02/28/2013) |
| 02/28/2013 | 30 | Waiver of Service of Summons Returned Executed by James Dimon waiver sent on 2/27/2013. Filed by Bear Sterns; EMC Mortgage; JP Morgan Chase; James Dimon. (Purcell, Thomas) (Entered: 02/28/2013) |
| 02/28/2013 | 31 | Motion to Dismiss for Failure to State a Claim *(Plaintiff's Amended Complaint)*, Motion to Dismiss for Lack of Jurisdiction . Oral Argument requested. Filed by Northwest Trustee Services Inc. (Thomas, John) (Entered: 02/28/2013) |
| 02/28/2013 | 32 | Memorandum in Support *of Motion to Dismiss Plaintiff's Amended Complaint*. Filed by Northwest Trustee Services Inc. (Related document(s): Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction 31 .) (Thomas, John) (Entered: 02/28/2013) |
| 02/28/2013 | 37 | |

| | | |
|---|---|---|
| | | Return of Service Executed as to Northwest Trustee Services Inc served on 2/20/2013. Filed by Denise Subramaniam. (cib) (Entered: 03/11/2013) |
| 02/28/2013 | 39 | Return of Service Executed as to Fidelity National Title Company served on 2/22/2013. Filed by Denise Subramaniam. (cib) (Entered: 03/11/2013) |
| 03/07/2013 | 33 | Notice *of Appearance* Filed by Cal-Western Reconveyance Corporation (Hering, Timothy) (Entered: 03/07/2013) |
| 03/08/2013 | 34 | Corporate Disclosure Statement . Filed by Cal-Western Reconveyance Corporation. (Hering, Timothy) (Entered: 03/08/2013) |
| 03/08/2013 | 35 | Return of Service Unexecuted as to LSI Title Company of Oregon. Filed by Denise Subramaniam. (cib) (Entered: 03/11/2013) |
| 03/08/2013 | 36 | Return of Service Executed as to Cal-Western Reconveyance Corporation served on 2/22/2013. Filed by Denise Subramaniam. (cib) (Entered: 03/11/2013) |
| 03/08/2013 | 38 | Return of Service Executed as to Quality Loan Service served on 2/22/2013. Filed by Denise Subramaniam. (cib) (Entered: 03/11/2013) |
| 03/11/2013 | 40 | Plaintiff's Opposition to Northwest Trustee's Motion to Dismiss for Failure to State a Claim *(Plaintiff's Amended Complaint)* Motion to Dismiss for Lack of Jurisdiction 31 . Filed by Denise Subramaniam. (Attachments: # 1 Exhibit Exhibit A) (ecp) (Entered: 03/12/2013) |
| 03/14/2013 | 41 | Unopposed Motion *for Extension of Time to Answer Plaintiff's Amended Complaint*. Filed by Cal-Western Reconveyance Corporation. (Hering, Timothy) Modified on 3/18/2013 (dls). (Entered: 03/14/2013) |
| 03/14/2013 | 42 | Declaration of Timothy B. Hering *in Support of Defendant Cal-Western Reconveyance Corporation's Unopposed Motion for Extension of Time to Answer Plaintiff's Amended Complaint*. Filed by Cal-Western Reconveyance Corporation. (Related document(s): Motion - Miscellaneous 41 .) (Hering, Timothy) (Entered: 03/14/2013) |
| 03/14/2013 | 48 | Return of Service Unexecuted as to Phil Gramm. (sss) (Entered: 03/18/2013) |
| 03/15/2013 | 43 | Unopposed Motion for Extension of Time *to File Responsive Pleading*. Filed by Litton Loan Servicing LP. (Edling, Emilie) (Entered: 03/15/2013) |
| 03/15/2013 | 44 | Corporate Disclosure Statement . Filed by Litton Loan Servicing LP. (Edling, Emilie) (Entered: 03/15/2013) |
| 03/18/2013 | 45 | **ORDER:** GRANTING for Extension of Time to Answer Plaintiff's Amended Complaint 41 . Answer is due by 5/14/2013. Ordered by Judge Michael W. Mosman. (dls) (Entered: 03/18/2013) |
| 03/18/2013 | 46 | **ORDER:** GRANTING to File Responsive Pleading 43 . Answer is due by 4/29/2013. Ordered by Judge Michael W. Mosman. (dls) (Entered: 03/18/2013) |
| 03/18/2013 | 47 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on motion for extension of time to answer a Complaint/Petition 45 , Order on motion for extension of time 46 . (dls) (Entered: 03/18/2013) |
| | | |

| 03/22/2013 | 49 | Application for CM/ECF Registration as a Self-Represented Party (*certifications submitted*). Filed by Denise Subramaniam. (ecp) (Entered: 03/25/2013) |
| 03/25/2013 | 50 | Reply *in Support* to Motion to Dismiss for Failure to State a Claim *(Plaintiff's Amended Complaint)* Motion to Dismiss for Lack of Jurisdiction 31 Oral Argument requested. Filed by Northwest Trustee Services Inc. (Thomas, John) (Entered: 03/25/2013) |
| 03/28/2013 | 51 | Summons Issued as to Phil Gramm, LSI Title Company of Oregon. (Summons, USM 285 form(s), and copies of the Complaint and Order to Proceed *in forma pauperis* forwarded to the U.S. Marshals Service for service.) (ecp) (Entered: 03/28/2013) |
| 03/28/2013 | 52 | Clerk's Notice of Mailing to Plaintiff regarding Summons Issued 51 . (ecp) (Entered: 03/28/2013) |
| 03/28/2013 | 54 | Return of Service Executed as to James Dimon served on 3/1/2013. Filed by Denise Subramaniam. (ecp) (Entered: 04/04/2013) |
| 03/28/2013 | 55 | Return of Service Executed as to John W. Snow served on 3/1/2013. Filed by Denise Subramaniam. (ecp) (Entered: 04/04/2013) |
| 03/28/2013 | 56 | Return of Service Executed as to James Danforth Quayle served on 3/1/2013. Filed by Denise Subramaniam. (ecp) (Entered: 04/04/2013) |
| 03/28/2013 | 57 | Return of Service Executed as to JP Morgan Chase served on 3/1/2013. Filed by Denise Subramaniam. (ecp) (Entered: 04/04/2013) |
| 03/28/2013 | 58 | Return of Service Executed as to Litton Loan Servicing LP served on 3/11/2013. Filed by Denise Subramaniam. (ecp) (Entered: 04/04/2013) |
| 03/28/2013 | 59 | Return of Service Executed as to Sanford I. Weill served on 3/1/2013. Filed by Denise Subramaniam. (ecp) (Entered: 04/04/2013) |
| 04/01/2013 | 53 | Notice *of Bankruptcy and Suggestion of Automatic Stay* Filed by Homecomings Financial Network and Residential Funding LLC (Fig, William) Modified on 4/10/2013 (dls). (Entered: 04/01/2013) |
| 04/04/2013 | 60 | Motion for Extension of Time to Answer *Complaint*. Filed by Ally Financial, Homecomings Financial Network and Residential Funding LLC. (Fig, William) (Entered: 04/04/2013) |
| 04/04/2013 | 61 | Declaration of William G. Fig *in Support of Motion for Extension of Time to File Response to Plaintiff's Complaint*. Filed by Ally Financial, Homecomings Financial Network and Residential Funding LLC. (Related document(s): Motion for Extension of Time to Answer a Complaint/Petition 60 .) (Fig, William) (Entered: 04/04/2013) |
| 04/08/2013 | 62 | Summons Returned Unexecuted as to D. Andrew Beal. Filed by Denise Subramaniam. (ecp) (Entered: 04/08/2013) |
| 04/08/2013 | 63 | Clerk's Notice of Mailing to Plaintiff regarding Summons Returned Unexecuted 62 . (ecp) (Entered: 04/08/2013) |
| | | |

| 04/08/2013 | 64 | Corporate Disclosure Statement . Filed by MGC Mortgage. (Wright, Christopher) (Entered: 04/08/2013) |
| 04/08/2013 | 65 | Memorandum of Law in Support of Defendant MGC Mortgage, Inc.'s Motion to Dismiss Amended Complaint; Motion to Strike; or in the Alternative, Motion for More Definite Statement 66 . Filed by MGC Mortgage. (Wright, Christopher) Modified on 4/16/2013 to correct docket text. (ecp) (Entered: 04/08/2013) |
| 04/08/2013 | 66 | Motion to Dismiss for Failure to State a Claim, Filed by MGC Mortgage (Related document(s): Memorandum in Support of Motion to Dismiss for Failure to State a Claim, 65 .) (Wright, Christopher) Modified on 4/16/2013 to correct docket text(ecp). (Entered: 04/08/2013) |
| 04/08/2013 | 67 | Request for Judicial Notice Motion to Dismiss for Failure to State a Claim, 65 . Filed by MGC Mortgage. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Wright, Christopher) (Entered: 04/08/2013) |
| 04/09/2013 | 68 | **ORDER:** DENYING 49 Application for CM/ECF Registration as a Self-Represented Party. Ordered by Judge Michael W. Mosman. (dls) (Entered: 04/09/2013) |
| 04/09/2013 | 69 | **ORDER:** GRANTING Motion for Extension of Time to Answer 60 . Answer is due by 5/3/2013. Ordered by Judge Michael W. Mosman. (dls) (Entered: 04/09/2013) |
| 04/09/2013 | 70 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on motion for extension of time to answer a Complaint/Petition 69 , Order on Application for CMECF Registration as a Self-Represented Party 68 . (dls) (Entered: 04/09/2013) |
| 04/10/2013 | 71 | ORDER: The court construes the Notice of Bankruptcy and Suggestion of Automatic Stay 53 as a Motion to Stay. Ordered by Judge Michael W. Mosman. (dls) (Entered: 04/10/2013) |
| 04/10/2013 | 72 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order 71 . (dls) (Entered: 04/10/2013) |
| 04/10/2013 | 73 | Return of Service Executed as to LSI Title Company of Oregon served on 4/5/2013. Filed by Denise Subramaniam. (ecp) (Entered: 04/11/2013) |
| 04/17/2013 | 74 | Return of Service Executed as to D. Andrew Beal served on 3/18/2013. Filed by Denise Subramaniam. (ecp) (Entered: 04/23/2013) |
| 04/17/2013 | 75 | Return of Service Executed as to MGC Mortgage served on 3/18/2013. Filed by Denise Subramaniam. (ecp) (Entered: 04/23/2013) |
| 04/25/2013 | 76 | Joint Request for Judicial Notice *in Support of* Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction 31 , Motion to Dismiss for Failure to State a Claim 66 . Filed by MGC Mortgage, Northwest Trustee Services Inc. (Attachments: # 1 Attachment Rescission of Notice of Default) (Wright, Christopher) (Entered: 04/25/2013) |
| 04/26/2013 | 77 | |

|  |  | Notice of Appearance of Peter Steilberg, III appearing on behalf of LSI Title Company of Oregon Filed by on behalf of LSI Title Company of Oregon (Steilberg, Peter) (Entered: 04/26/2013) |
|---|---|---|
| 04/26/2013 | 78 | Notice of Appearance. Filed by LSI Title Company of Oregon. (Steilberg, Peter) Modified on 5/3/2013 to correct title of filing (gw). (Entered: 04/26/2013) |
| 04/26/2013 | 81 | Plaintiff's Motion for Extension of Time to File an Objection to MGC Mortgage Inc.'s Motion to Dismiss for Failure to State a Claim 66 and Motion for In Camera Review of Plaintiff's Medical Records. Filed by Denise Subramaniam. (ecp) (Entered: 04/30/2013) |
| 04/29/2013 | 79 | Unopposed Motion for Extension of Time to Answer *or Otherwise Respond to Plaintiff's* Amended Complaint,, 20 . Filed by Bear Sterns, James Dimon, EMC Mortgage, JP Morgan Chase. (Purcell, Thomas) (Entered: 04/29/2013) |
| 04/29/2013 | 80 | Unopposed Motion for Extension of Time *to file responsive pleading*. Filed by Litton Loan Servicing LP. (Edling, Emilie) (Entered: 04/29/2013) |
| 04/30/2013 | 82 | **ORDER:** GRANTING Plaintiff's Motion for Extension of Time to File an Objection to MGC Mortgage Inc.'s Motion to Dismiss for Failure to State a Claim 66 and Motion for In Camera Review of Plaintiff's Medical Records 81 . Response is due by 4/30/2013. Ordered by Judge Michael W. Mosman. (dls) (Entered: 04/30/2013) |
| 04/30/2013 | 83 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on motion for extension of time to file Response/Reply, Order on Motion - Miscellaneous 82 . (dls) (Entered: 04/30/2013) |
| 04/30/2013 | 84 | **ORDER:** GRANTING Motion for Extension of Time to Answer 79 ; GRANTING Motion for Extension of Time 80 . Answers due by 5/29/2013. Ordered by Judge Michael W. Mosman. (dls) (Entered: 04/30/2013) |
| 04/30/2013 | 85 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on motion for extension of time to answer a Complaint/Petition 84 . (dls) (Entered: 04/30/2013) |
| 04/30/2013 | 86 | Answer to 20 Amended Complaint. Filed by LSI Title Company of Oregon. (Steilberg, Peter) (Entered: 04/30/2013) |
| 04/30/2013 | 87 | Certificate of Service by LSI Title Company of Oregon. Filed by LSI Title Company of Oregon. (Related documents: Notice of Appearance 78 and Answer to Amended Complaint 86 (Steilberg, Peter) Modified on 5/3/2013 to link to other documents (gw). (Entered: 04/30/2013) |
| 04/30/2013 | 88 | Plaintiff's Opposition to MGC Mortgage Inc.'s Motion to Dismiss for Failure to State a Claim 66 . Filed by Denise Subramaniam. (Attachments: # 1 Exhibit AA, # 2 Exhibit A-F, # 3 Exhibit G-K, # 4 Exhibit L-Q) (ecp) (Entered: 04/30/2013) |
| 04/30/2013 | 89 | Plaintiff's Objection to MGC's Request for Judicial Notice of Exhibits in Support of MGC's Motion to Dismiss. Filed by Denise Subramaniam. (Related document(s): Request for Judicial Notice 67 .) (ecp) (Entered: 04/30/2013) |

| 04/30/2013 | 90 | Plaintiff's Objection to Joint Request for Judicial Notice in Support of Northwest Trustee Services, Inc.'s and MGC's Motion to Dismiss. Filed by Denise Subramaniam. (Related document(s): Request for Judicial Notice, 76 .) (ecp) (Entered: 04/30/2013) |
|---|---|---|
| 04/30/2013 | 91 | Declaration of William J. Paatalo. Filed by Denise Subramaniam. (ecp) (Entered: 04/30/2013) |
| 04/30/2013 | 92 | Plaintiff's Request for Judicial Notice of the Declaration of William J. Paatalo 91 In Support of Her Objection to MGC's and NWTS's Motions to Dismiss and her Amended Complaint. Filed by Denise Subramaniam. (ecp) (Entered: 04/30/2013) |
| 05/01/2013 | 93 | Motion for Leave to Appear Pro Hac Vice *for Attorney Tamara K. Nelson* . Filing fee in the amount of $100 collected; Agency Tracking ID: 0979-3272977. Filed by LSI Title Company of Oregon. (Steilberg, Peter) (Entered: 05/01/2013) |
| 05/01/2013 | 94 | Corporate Disclosure Statement . Filed by LSI Title Company of Oregon. (Steilberg, Peter) (Entered: 05/01/2013) |
| 05/02/2013 | 95 | **ORDER:** GRANTING Request for Judicial Notice Motion to Dismiss for Failure to State a Claim 65 67 ; GRANTING Joint Request for Judicial Notice in Support of Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction 31, Motion to Dismiss for Failure to State a Claim 66 76 ; DENYING Plaintiff's Request for Judicial Notice of the Declaration of William J. Paatalo 91 In Support of Her Objection to MGC's and NWTS's Motions to Dismiss and her Amended Complaint 92 . Ordered by Judge Michael W. Mosman. (dls) (Entered: 05/02/2013) |
| 05/02/2013 | 96 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on Request for Judicial Notice 95 . (dls) (Entered: 05/02/2013) |
| 05/02/2013 | 97 | Motion for Extension of Time to Answer *Complaint*. Filed by Ally Financial, Homecomings Financial Network and Residential Funding LLC. (Fig, William) (Entered: 05/02/2013) |
| 05/02/2013 | 98 | Declaration of William G. Fig *in support of Motion for Extension of Time to File Response to Plaintiff's Complaint*. Filed by Ally Financial, Homecomings Financial Network and Residential Funding LLC. (Related document(s): Motion for Extension of Time to Answer a Complaint/Petition 97 .) (Fig, William) (Entered: 05/02/2013) |
| 05/02/2013 | 99 | **ORDER:** GRANTING Motion for Extension of Time to Answer 97 . Answer is due by 5/17/2013. Ordered by Judge Michael W. Mosman. (dls) (Entered: 05/02/2013) |
| 05/02/2013 | 100 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on motion for extension of time to answer a Complaint/Petition 99 . (dls) (Entered: 05/02/2013) |
| 05/02/2013 | 101 | Return of Service Executed as to Phil Gramm served on 4/15/2013. Filed by Denise Subramaniam. (ecp) (Entered: 05/06/2013) |
|  |  |  |

| 05/03/2013 | 102 | Order Granting Application for Special Admission Pro Hac Vice of Tamara K. Nelson for LSI Title Company of Oregon. Application Fee in amount of $100 collected. Receipt No. 0979-3272977 issued. Signed on 5/3/2013 by Judge Michael W. Mosman. (ecp) (Entered: 05/06/2013) |
|---|---|---|
| 05/09/2013 | 103 | Unopposed Motion *for Extension of Time to Answer Plaintiff's Amended Complaint*. Filed by Cal-Western Reconveyance Corporation. (Hering, Timothy) (Entered: 05/09/2013) |
| 05/09/2013 | 104 | Declaration of Timothy B. Hering *in Support of Defendant Cal-Western Reconveyance Corporation's Second Unopposed Motion for Extension of Time to Answer Plaintiff's Amended Complaint*. Filed by Cal-Western Reconveyance Corporation. (Related document(s): Motion - Miscellaneous 103 .) (Hering, Timothy) (Entered: 05/09/2013) |
| 05/09/2013 | 109 | Motion for Extension of Time for Sevice of Complaint. Filed by Denise Subramaniam. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (ecp) (Entered: 05/13/2013) |
| 05/10/2013 | 105 | Motion to Dismiss *and Motion to Strike First Amended Complaint; Memorandum of Points and Authorities In Support*. Filed by Ally Financial. (Campbell, John) (Entered: 05/10/2013) |
| 05/10/2013 | 106 | Supplement *Defendant Ally Financial Inc.'s Request for Judicial Notice In Support of Motion to Dismiss and Motion to Strike First Amended Complaint*. Filed by Ally Financial. (Related document(s): Motion to Dismiss 105 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Campbell, John) (Entered: 05/10/2013) |
| 05/10/2013 | 107 | Notice *Certification of Interested Parties* Filed by Ally Financial (Campbell, John) (Entered: 05/10/2013) |
| 05/10/2013 | 108 | Notice of Attorney Substitution:Attorney J. Owen Campbell is substituted as counsel of record in place of Attorney William G. Fig Filed by Ally Financial (Campbell, John) (Entered: 05/10/2013) |
| 05/13/2013 | 110 | Reply to Motion to Dismiss for Failure to State a Claim 66 . Filed by MGC Mortgage. (Wright, Christopher) (Entered: 05/13/2013) |
| 05/15/2013 | 111 | **ORDER:** GRANTING Unopposed Motion for Extension of Time to Answer Plaintiff's Amended Complaint 103 . Answer is due July 15, 2013. Ordered by Judge Michael W. Mosman. (dls) (Entered: 05/15/2013) |
| 05/15/2013 | 112 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on Motion - Miscellaneous 111 . (dls) (Entered: 05/15/2013) |
| 05/16/2013 | 113 | **ORDER:** DENYING Motion for Extension of Time for Service of Complaint 109 . Ordered by Judge Michael W. Mosman. (dls) (Entered: 05/16/2013) |
| 05/16/2013 | 114 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on motion for extension of time 113 . (dls) (Entered: 05/16/2013) |
| 05/16/2013 | 115 | Motion for Leave to Appear Pro Hac Vice *for Attorney Andrew W. Noble* . Filing fee in the amount of $100 collected; Agency Tracking ID: 0979-3290018. Filed by Ally Financial. (Campbell, John) (Entered: 05/16/2013) |

| 05/17/2013 | 116 | Order Granting Application for Special Admission Pro Hac Vice of Andrew W. Noble for Ally Financial. Application Fee in amount of $100 collected. Receipt No. 0979-3290018 issued. Signed on 5/17/2013 by Judge Michael W. Mosman. (ecp) (Entered: 05/20/2013) |
| 05/20/2013 | 117 | Clerk's Notice of Mailing to Plaintiff regarding Order on Motion for Leave to Appear Pro Hac Vice 116 . (ecp) (Entered: 05/20/2013) |
| 05/24/2013 | 118 | Motion for In Camera Review of Medical Records. Filed by Denise Subramaniam. (ecp) (Entered: 05/28/2013) |
| 05/29/2013 | 119 | Unopposed Motion for Extension of Time to Answer *(Second Extension Request)* Amended Complaint,, 20 . Filed by Bear Sterns, James Dimon, EMC Mortgage, JP Morgan Chase. (Purcell, Thomas) (Entered: 05/29/2013) |
| 05/29/2013 | 120 | Motion to Dismiss . Oral Argument requested. Filed by Litton Loan Servicing LP. (Attachments: # 1 Memorandum of Law in Support) (Edling, Emilie) (Entered: 05/29/2013) |
| 05/30/2013 | 121 | **ORDER:** GRANTING Unopposed Motion for Extension of Time to Answer (Second Extension Request) Amended Complaint 119 .The new deadline for defendants' response to plaintiff's amended complaint should be 7/29/2013. This applies to defendants JPMorgan Chase Bank, N.A., EMC Mortgage, The Bear Stearns Companies, LLC, and James Dimon. Ordered by Judge Michael W. Mosman. (dls) (Entered: 05/30/2013) |
| 05/30/2013 | 122 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on motion for extension of time to answer a Complaint/Petition 121 . (dls) (Entered: 05/30/2013) |
| 06/07/2013 | 123 | Motion for Extension of Time. Filed by Denise Subramaniam. (ecp) (Entered: 06/07/2013) |
| 06/07/2013 | 124 | Response in Opposition *to Plaintiff's Motion for In Camera Review of Medical Records* to Motion 118 . Filed by Northwest Trustee Services Inc. (Thomas, John) (Entered: 06/07/2013) |
| 06/12/2013 | 125 | **ORDER:** GRANTING Motion for Extension of Time 123 . Reply is due by 8/12/2013, regarding Motion for In Camera Review of Medical Records 118 . Response is due by 8/12/2013, regarding Motion to Dismiss and Motion to Strike First Amended Complaint; Memorandum of Points and Authorities In Support 105 and Motion to Dismiss 120 . Ordered by Judge Michael W. Mosman. (dls) (Entered: 06/12/2013) |
| 06/12/2013 | 126 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on motion for extension of time 125 . (dls) (Entered: 06/12/2013) |
| 06/14/2013 | 127 | Motion to Dismiss for Failure to State a Claim , Motion to Dismiss for Lack of Jurisdiction . Filed by Phil Gramm. (Cox, James) (Entered: 06/14/2013) |
| 06/14/2013 | 128 | Memorandum in Support . Filed by Phil Gramm. (Related document(s): Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction 127 .) (Cox, James) (Entered: 06/14/2013) |

| 06/14/2013 | 129 | Declaration of James E. Cox, Jr. . Filed by Phil Gramm. (Related document(s): Motion to Dismiss for Failure to State a Claim, Motion to Dismiss/Lack of Jurisdiction 127 .) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Cox, James) (Entered: 06/14/2013) |
|---|---|---|
| 07/16/2013 | 130 | Notice *of Bankruptcy and Automatic Stay* Filed by Cal-Western Reconveyance Corporation (Attachments: # 1 Exhibit) (Hering, Timothy) (Entered: 07/16/2013) |
| 07/22/2013 | 131 | Notice *of Unavailability* Filed by LSI Title Company of Oregon (Nelson, Tamara) (Entered: 07/22/2013) |
| 07/26/2013 | 132 | Unopposed Motion for Extension of Time to Answer *Plaintiff's* Amended Complaint,, 20 . Filed by EMC Mortgage. (Purcell, Thomas) (Entered: 07/26/2013) |
| 07/26/2013 | 133 | Unopposed Motion for Extension of Time to Answer *(Refiling to Add the Additional Defendants we Represent) to Plaintiff's* Amended Complaint,, 20 . Filed by Bear Sterns, James Dimon, JP Morgan Chase. (Purcell, Thomas) (Entered: 07/26/2013) |
| 07/29/2013 | 134 | **ORDER:** DENYING AS MOOT Motion for Extension of Time to Answer 132 . GRANTING Motion for Extension of Time to Answer 133 . Answer is due by 9/27/2013. Ordered by Judge Michael W. Mosman. (dls) (Entered: 07/29/2013) |
| 07/29/2013 | 135 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on motion for extension of time to answer a Complaint/Petition 134 . (dls) (Entered: 07/29/2013) |
| 09/11/2013 | 136 | Motion for Inclusion of Exhibit A to Plaintiff's Amended Complaint. Filed by Denise Subramaniam. (Attachments: # 1 Exhibit) (ecp) (Entered: 09/12/2013) |
| 09/26/2013 | 137 | Unopposed Motion for Extension of Time to Answer Amended Complaint,, 20 . Filed by Bear Sterns, James Dimon, EMC Mortgage, JP Morgan Chase. (Purcell, Thomas) (Entered: 09/26/2013) |
| 09/27/2013 | 138 | **OPINION AND ORDER:** I have already given Ms. Subramaniam one opportunity to amend her complaint with the assistance of appointed pro bono counsel. Despite this assistance, she has failed to allege the facts necessary to survive the defendants motions to dismiss, even under the liberal constructionI have applied to this pro se complaint. I therefore grant the defendants respective motions to dismiss [31, 66, 105, 120, 127] and dismiss Ms. Subramaniams complaint with prejudice as to all named and unnamed defendants. Signed on 9/27/13 by Judge Michael W. Mosman. (dls) (Entered: 09/30/2013) |
| 09/27/2013 | 139 | Judgment. As provided by my Opinion and Order, IT IS ORDERED AND ADJUDGED that defendants motions to dismiss [31, 66, 105, 120, 127] are GRANTED and the complaint is DISMISSED with prejudice as to all named and unnamed defendants. All other pending motions are DENIED AS MOOT. Signed on 9/27/13 by Judge Michael W. Mosman. (dls) (Entered: 09/30/2013) |
| 09/30/2013 | 140 | |

| | | Clerk's Notice of Mailing to Denise Subramaniam regarding Judgment, 139 , Order on Motion to Dismiss for Failure to State a Claim, Order on Motion to Dismiss/Lack of Jurisdiction 138 . (dls) (Entered: 09/30/2013) |
|---|---|---|
| 10/01/2013 | 141 | Motion to Dismiss without Prejudice Against Certain Defendants. Filed by Denise Subramaniam. (ecp) (Entered: 10/03/2013) |
| 10/03/2013 | 142 | Motion for Reconsideration of Electronic Filing. Filed by Denise Subramaniam. (Order on Application for CMECF Registration as a Self-Represented Party 68 ) (ecp) (Entered: 10/07/2013) |
| 10/08/2013 | 143 | **ORDER:** DENYING AS MOOT Motion to Dismiss 141 and Motion for Reconsideration 142 . Ordered by Judge Michael W. Mosman. (dls) (Entered: 10/08/2013) |
| 10/08/2013 | 144 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on Motion to Dismiss and Motion for Reconsideration 143 . (dls) (Entered: 10/08/2013) |
| 12/02/2014 | 145 | Motion to Vacate Judgment, 139 (Titled as Motion for Relief of Judgment Under Rule 60). Filed by Denise Subramaniam. (Attachments: # 1 Exhibit 1 and 2) (ecp) (Entered: 12/04/2014) |
| 12/16/2014 | 146 | Response in Opposition to Motion to Vacate Judgment, 139 145 . Filed by Northwest Trustee Services Inc. (Thomas, John) (Entered: 12/16/2014) |
| 12/17/2014 | 147 | Response in Opposition to Motion to Vacate Judgment, 139 145 Oral Argument requested. Filed by Litton Loan Servicing LP. (Rasch, Carlos) (Entered: 12/17/2014) |
| 12/18/2014 | 148 | Response in Opposition to Motion to Vacate Judgment, 139 145 . Filed by Bear Sterns, James Dimon, EMC Mortgage, JP Morgan Chase. (Purcell, Thomas) (Entered: 12/18/2014) |
| 12/19/2014 | 149 | Response in Opposition to Motion to Vacate Judgment, 139 145 . Filed by MGC Mortgage. (Wright, Christopher) (Entered: 12/19/2014) |
| 01/07/2015 | 150 | **ORDER:** DENYING Motion to Vacate Judgment, 139 (Titled as Motion for Relief of Judgment Under Rule 60) 145 . Ordered by Judge Michael W. Mosman. (dls) (Entered: 01/07/2015) |
| 01/07/2015 | 151 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on motion to Vacate 150 . (dls) (Entered: 01/07/2015) |
| 01/08/2015 | 152 | Motion for Extension of Time to File a Response to Objections. Filed by Denise Subramaniam. (Attachments: # 1 Exhibit A, # 2 Proposed Order) (sss) (Entered: 01/09/2015) |
| 01/15/2015 | 153 | **ORDER:** DENYING AS MOOT Motion for Extension of Time 152 . Ordered by Judge Michael W. Mosman. (mjp) (Entered: 01/15/2015) |
| 01/15/2015 | 154 | Clerk's Notice of Mailing to Denise Subramaniam regarding Order on motion for extension of time 153 . (mjp) (Entered: 01/15/2015) |

District of Oregon CM/ECF LIVE Release Version 6.1      Page 23 of 23
12-12020-mg    Doc 10482-1    Filed 03/02/18    Entered 03/02/18 20:29:43    Exhibit A
Pg 103 of 208

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 03/02/2018 12:56:17 | | | |
| PACER Login: | mf1354:2923879:3945828 | Client Code: | 73304-0000012-13849 |
| Description: | Docket Report | Search Criteria: | 3:12-cv-01681-MO Start date: 1/1/1970 End date: 3/2/2018 |
| Billable Pages: | 14 | Cost: | 1.40 |

**<u>Exhibit 4 to Nye Declaration</u>**

**William G. Fig, OSB No. 952618**
wfig@sussmanshank.com
SUSSMAN SHANK LLP
1000 SW Broadway, Suite 1400
Portland, OR  97205-3089
Telephone: (503) 227-1111
Facsimile: (503) 248-0130
      Attorneys for GMAC Mortgage, LLC, Residential Funding Corporation, LLC and
      Homecomings Financial LLC

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| **DENISE SUBRAMANIAM,** | **Case No. 3:12-CV-1681-ST** |
| Plaintiff, | |
| v. | **GMAC MORTGAGE, LLC, RESIDENTIAL FUNDING COMPANY, LLC, AND HOMECOMINGS FINANCIAL LLC'S NOTICE OF BANKRUPTCY AND SUGGESTION OF AUTOMATIC STAY** |
| **BEAL, et al,** | |
| Defendants. | |

Plaintiff has erroneously named "Homecomings Financial Network and Residential Funding, LLC, aka GMAC, aka Ally Financial, et. al.," as a party defendant, and further makes reference to such party(ies) as, "Homecomings Financial Network (hereinafter referred to as Homecomings) and Residential Funding Company (GMAC-RFC) both subsidiaries of GMAC now known as Ally Financial, LLC (herein collectively referred to as GMAC)," (Lines 15-17, Page 8 of 46 of Complaint).   Proper party defendants, Residential Funding Company, LLC; Homecomings Financial LLC; and GMAC Mortgage, LLC, by and through their undersigned counsel, in accordance and

Page 1 – NOTICE OF BANKRUPTCY AND SUGGESTION OF STAY

consistent with section 362(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), respectfully submit this Notice of Bankruptcy and Suggestion of Automatic Stay, and state as follows:

1.    On May 14, 2012 (the "Petition Date"), Residential Capital, LLC and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), including Residential Funding Company, LLC, Homecomings Financial LLC, and GMAC Mortgage, LLC, filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408 (the "Bankruptcy Court").

2.    The Debtors' Chapter 11 cases being jointly administered are indexed at case number 12-12020 (MG), and are captioned as follows:

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Case No. 12-12020 (MG) |
|        Debtors. | Jointly Administered |

3.    As a result of the Bankruptcy Filing, on the Petition Date, the protections of the automatic stay codified in § 362(a) of the Bankruptcy Code arose with regard to the Debtors.  Section 362(a), among other things, operates as an automatic stay of: (i) "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding" against the Chapter 11 Debtors (11 U.S.C. § 362(a)(1)); (ii) acts to "obtain possession of property" of the Debtors' Chapter 11 estates (11 U.S.C. § 362(a)(3)); and (iii) acts to "collect, assess, or

Page 2 – NOTICE OF BANKRUPTCY AND SUGGESTION OF STAY

Case 3:12-cv-01681-MO    Document 53    Filed 04/01/13    Page 3 of 24

recover a claim" against the Debtors arising prior to the Petition Date (11 U.S.C. § 362(a)(6)).

4.    On July 13, 2012, the Bankruptcy Court entered a final supplemental order granting, among other things, the Debtors' motion for limited relief from the automatic stay to permit non-Debtor parties in foreclosure and eviction proceedings, borrower bankruptcy cases, and title disputes to continue to assert and prosecute certain defenses, claims, and counterclaims (the "Final Supplemental Order").  Paragraphs 14, 15, 16, and 17 of the Final Supplemental Order identify the categories of defenses, claims, and counterclaims for which the automatic stay has been modified (the "Permitted Claims").  A copy of the Final Supplemental Order is annexed hereto as Exhibit 1.

5.    To the extent that the defenses, claims, and counterclaims do not constitute Permitted Claims, they remain subject to the automatic stay, and the continued prosecution of these claims is prohibited.

6.    Residential Funding Company, LLC, Homecomings Financial LLC, and GMAC Mortgage, LLC claim no interest in the property at issue, nor do they currently service any loan held by plaintiff relating to the property at issue.  Plaintiff's Amended Complaint appears to assert claims against Residential Funding Company, LLC, Homecomings Financial LLC and GMAC Mortgage, LLC for events occurring pre-petition that do not constitute Permitted Claims under the Final Supplemental Order.  It is Residential Funding Company, LLC, Homecomings Financial LLC, and GMAC Mortgage, LLC's position that all of plaintiff's claims against them are subject to the automatic stay, and the continued prosecution of these claims is prohibited.

7.    Pursuant to paragraph 23 of the Final Supplemental Order, any dispute regarding the extent, application, and/or effect of the automatic stay under the Final Supplemental Order must be heard and determined in the United States Bankruptcy

Page 3 – NOTICE OF BANKRUPTCY AND SUGGESTION OF STAY

Court for the Southern District of New York, jointly administered under Case No. 12-12020, in accordance with the Case Management Order entered in the Debtors' case [Docket No. 141], and such other and further orders as may be entered by the United States Bankruptcy Court for the Southern District of New York.[1]

       8.     This notice has been sent, with a cover letter, to plaintiff.

Dated this 1st day of April, 2013.

                SUSSMAN SHANK LLP

                By: */s/ William G. Fig*
                    William G. Fig, OSB No. 952618
                    billf@sussmanshank.com
                    Attorneys for Residential Funding Company, LLC,
                        Homecomings Financial LLC and GMAC
                        Mortgage, LLC

---

[1] A copy of the Case Management Order may be obtained at no charge at http://www.kccllc.net/rescap.

Page 4 – NOTICE OF BANKRUPTCY AND SUGGESTION OF STAY

Docket #0774  Date Filed: 7/13/2012

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**FINAL SUPPLEMENTAL ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a), 362, 363, 502, 1107(a), AND 1108 AND BANKRUPTCY RULE 9019 (I) AUTHORIZING THE DEBTORS TO CONTINUE IMPLEMENTING LOSS MITIGATION PROGRAMS; (II) APPROVING PROCEDURES FOR COMPROMISE AND SETTLEMENT OF CERTAIN CLAIMS, LITIGATIONS AND CAUSES OF ACTION; (III) GRANTING LIMITED STAY RELIEF TO PERMIT FORECLOSURE AND EVICTION PROCEEDINGS, BORROWER BANKRUPTCY CASES, AND TITLE DISPUTES TO PROCEED; AND (IV) AUTHORIZING AND DIRECTING THE DEBTORS TO PAY SECURITIZATION TRUSTEE FEES AND EXPENSES**

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of a

supplemental order under Bankruptcy Code sections 105(a), 362, 363, 1107(a) and 1108, and

Bankruptcy Rule 9019 (i) authorizing the Debtors to continue implementing loss mitigation

programs; (ii) approving procedures for the compromise and settlement of certain claims,

litigations and causes of action in the ordinary course of the Debtors' business; (iii) granting

limited stay relief to permit (w) borrowers or their tenants, as applicable, to prosecute direct

claims and counter-claims in foreclosure and eviction proceedings (including in states in which

non-judicial foreclosure is followed), (x) borrowers to prosecute certain actions in borrower

bankruptcy cases, (y) the Debtors to prosecute foreclosure actions in those circumstances where

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion. Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief granted herein may refer to http://www.kccllc.net/rescap for additional information.


EX _1_
PAGE _1_ OF _19_


12120201207130000000000011

ny-1046923

they service senior mortgage loans and own the junior mortgage loans on the underlying

property, and (z) third party lien holders to prosecute direct claims and counter-claims in actions

involving the amount, validity or priority of liens on properties subject to foreclosure

proceedings; and (iv) authorizing and directing the Debtors to pay certain securitization trustee

fees and expenses; and the Court having considered the Whitlinger Affidavit and the Bocresion

Declaration; and the Court having entered the Interim Supplemental Order on June 15, 2012

[Docket No. 391]; and the Court having entered a final order on June 15, 2012 granting the GA

Servicing Motion on a final basis [Docket No. 401]; and the Court having entered a final order

on June 15, 2012 granting the Non-GA Servicing Motion on a final basis [Docket No. 402]; and

it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334; and it appearing that venue of these Chapter 11 cases and the Motion in this district is

proper pursuant to 28 U.S.C §§ 1408 and 1409; and it appearing that this proceeding on the

Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion

having been given and it appearing that no other or further notice need be provided; and the

National Association of Consumer Bankruptcy Attorneys, on its own behalf and in a

representative capacity, two individuals who are debtors under Chapter 13, and Edward Boltz,

counsel for those individuals, having filed jointly the Limited Omnibus Objection To The

Servicing Orders And Debtors' May 31, 2012 Motion For A Supplemental Order [Docket No.

221] (the "NACBA Objection"); and the Committee having filed the Omnibus Response And

Reservation Of Rights Of The Official Committee Of Unsecured Creditors To Certain Of The

Debtors' First Day Motions [Docket No. 240]; and the Debtors having filed the Omnibus Reply

To Objections To Entry Of Final Orders For Specific "First Day" Motions And Related Relief

[Docket. No. 254]; and upon the record of the hearing; and it appearing that the relief requested


Exhibit _____ 1
Page ___ 2 of 19

by the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in

interest; and after due deliberation thereon; and any objections to the Motion, including the

NACBA Objection, having been withdrawn, resolved, or overruled on the merits; and sufficient

cause appearing therefor, it is hereby

### ORDERED, ADJUDGED, AND DECREED THAT:

1.     The Motion is GRANTED on a final basis, as set forth herein, and any

objections to the Motion are hereby overruled;

Loss Mitigation Programs

2.     The Debtors are authorized, but not directed in their sole and absolute

discretion and subject to available funding, to continue developing and implementing loss

mitigation programs and procedures in the ordinary course of their businesses *nunc pro tunc* to

the Petition Date, including, but not limited to, making incentive payments to borrowers in

connection with the closing of short sales, or vacating properties in lieu of foreclosure or eviction

proceedings, or in the form of borrower rebates for loan payoffs including honoring all

obligations related thereto that accrued in whole or in part prior to the Petition Date (collectively,

the "Loss Mitigation Programs"); provided, however, that the aggregate cash payments made by

the Debtors to individual borrowers under the Loss Mitigation Programs that are not reimbursed

to the Debtors shall not exceed $550,000 per month (the "Monthly Cap"), absent consent of the

Committee or further order of the Court; provided, further, however, that to the extent the

Debtors do not exceed the Monthly Cap in any month they shall be entitled to utilize the

difference between the actual amount and the Monthly Cap in any succeeding month.  The

Debtors shall provide monthly reports to the Committee and the Office of the United States

Trustee for the Southern District of New York (the "U.S. Trustee"), which reports shall be in a

form agreed to by the Debtors and the Committee and such additional information as shall be reasonably requested by the Committee, in each case, concerning the Loss Mitigation Programs.

3.    Cash payments made by the Debtors to individual borrowers under the Loss Mitigation Programs for which the Debtors are not reimbursed shall not exceed $4.2 million in the aggregate, absent consent of the Committee or further order of the Court. For the avoidance of doubt, the limitation on the amount of cash payments provided for in this paragraph 3 is in addition to the limitation on the amount of cash payments provided for in paragraph 12 hereof.

Settlement Procedures

4.    The Debtors are authorized, but not directed to compromise and settle certain claims brought by the Debtors against any non-insider third parties in connection with foreclosure, eviction, or borrower bankruptcy proceedings (each a "Settling Party") or by a Settling Party against any of the Debtors (each, a "Claim") in accordance with the following two-tiered procedures (the "Settlement Procedures"):

Tier I:  The Debtors, in their sole discretion, may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts not to exceed $40,000 in full settlement of such Claim (each, a "Tier I Settlement").

Tier II:  The Debtors may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts exceeding $40,000 but less than $100,000 in full settlement of such Claims (each, a "Tier II Settlement"); provided, that in each case:

(a) The Debtors must provide advance written notice (by formal or informal means, including by e-mail correspondence) of the terms of any Tier II Settlement to (x) the U.S. Trustee, 33

Exhibit _1_
Page _4_ of _19_

Whitehall Street, 21st Floor, New York, New York 10004, Attn:
Brian S. Masumoto, (y) counsel for the Committee, Kramer Levin
Naftalis & Frankel LLP, 1177 Avenue of the Americas New York,
NY 10036, Attn: Kenneth H. Eckstein and Douglas H. Mannal;
and (z) counsel to the administrative agent for the Debtors'
providers of debtor in possession financing, Skadden, Arps, Slate,
Meagher & Flom LLP, 4 Times Square, New York, New York
10036, Attn: Kenneth S. Ziman and Jonathan H. Hofer
(collectively the "Notice Parties")

(b) Those Notice Parties wishing to object to any proposed
Tier II Settlement must serve a written objection (by formal or
informal means, including by e-mail correspondence) on the
Debtors, so that it is received by no later than 4:00 p.m. (prevailing
Eastern Time) on the day that is seven (7) calendar days from the
date the Notice Parties received written notice of such Tier II
Settlement (the "Settlement Objection Deadline"). Objections
should be addressed to the proposed attorneys for the Debtors,
Morrison & Foerster LLP, 1290 Avenue of the Americas, New
York, New York 10104, Attn: Larren M. Nashelsky
(LNashelsky@mofo.com) and Norman S. Rosenbaum
(NRosenbaum@mofo.com).

(c) If the Debtors receive a timely objection from a Notice
Party, the parties will confer and attempt to resolve any
differences. Failing that, the Debtors may petition the Court for
approval of the Tier II Settlement in accordance with any case
management orders entered in the Chapter 11 cases. An objection
by a Notice Party with respect to a given Tier II Settlement shall
not delay the finality or effectiveness of any other settlement to
which an objection has not timely been delivered.

(d) If the Debtors do not receive a written objection to a
Tier II Settlement from a Notice Party by the Settlement Objection
Deadline, then such Tier II Settlement shall be deemed approved
and the Debtors and Settling Parties may carry out the terms of
such Tier II Settlement without further notice or Court approval.

5.     The Debtors shall be required to seek approval from the Court in order to

enter into and consummate any proposed settlement of a Claim with a settlement amount in

excess of $100,000.

6.     The Debtors are authorized in their sole discretion, but not directed, to

settle claims where some or all of the consideration is being provided by a third party and/or

Exhibit   1
Page   5 of 19

where the Debtors are releasing claims against creditors or third parties provided the Debtors otherwise comply with the Settlement Procedures.

7.     The Settlement Procedures are without prejudice to the right of the Debtors to seek an order of this Court approving additional or different procedures with respect to specific claims or categories of claims. For claims relating to matters specified in paragraphs 14(a) and 15(a) of this Order that were resolved pursuant to a settlement prior to the Petition Date, but where such settlement has not been consummated, the Debtors are authorized, but not directed to, consummate said settlements in accordance with the Settlement Procedures set forth in this Order.

8.     Notwithstanding anything to the contrary contained herein, this Order shall not affect, impair, impede or otherwise alter the right of the Debtors to resolve any prepetition or postpetition controversy arising in the ordinary course of the Debtors' businesses, or resolve any controversy authorized by any other order of the Court.

9.     Nothing in this Order or the Motion shall constitute a determination or admission of liability or of the validity or priority of any claim against the Debtors, and the Debtors reserve their rights to dispute the validity or priority of any claim asserted.

10.     The authority granted in this Order shall not replace or obviate the need to comply with the Debtors' internal procedures, legal or otherwise, for authorizing the settlements contemplated in the Motion. All settlements made pursuant to the Settlement Procedures shall, to the extent applicable, be made in accordance with the Debtors' settlement procedures in effect as of the Petition Date (the "Internal Settlement Protocol") and as may be amended from time; provided, however, that the Debtors shall provide the Committee and the U.S. Trustee with notice of any material changes to the Internal Settlement Protocol.



11.    The Debtors shall provide monthly reports to the Committee and the U.S.

Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such

additional information as shall be reasonably requested by the Committee, in each case,

concerning settlements of any Claims pursuant to the Settlement Procedures.

12.    Cash payments made by the Debtors under the Settlement Procedures shall

not exceed $4 million in the aggregate, absent consent of the Committee or further order of the

Court.

13.    Any period prescribed or allowed by the Settlement Procedures shall be

computed in accordance with Bankruptcy Rule 9006.

Limited Relief from Automatic Stay

*Borrower Foreclosure And Eviction Proceedings*

14.    The stay imposed by section 362(a) of the Bankruptcy Code applicable to

(a) pending and future foreclosure actions initiated by the Debtors or in those states providing for

non-judicial foreclosures, by a borrower; and (b) pending and future eviction proceedings with

respect to properties for which a foreclosure has been completed or is pending, is hereby

modified pursuant to the following terms and conditions:

(a)    except as set forth herein, a borrower, mortgagor, or lienholder

(each, an "Interested Party") shall be entitled to assert and prosecute direct claims and

counter-claims relating exclusively to the property that is the subject of the loan owned or

serviced by a Debtor for the purposes of defending, unwinding, or otherwise enjoining or

precluding any foreclosure, whether in a Judicial State or a Non-Judicial State, or eviction

proceeding, where a final judgment (defined as any judgment where the right to appeal or

seek reconsideration has expired or has been exhausted) permitting the foreclosure or



Exhibit ___1___
Page ___7___ of _19_

eviction has not been awarded or, with respect to completed foreclosure sales in Non-

Judicial States, where any applicable challenge period has not yet expired, and to prosecute

appeals with respect to any such direct claims or counter-claims;

(b)     absent further order of the Court, the automatic stay shall remain in

full force and effect with respect to all pending and future Interested Party direct claims

and counter-claims:  (i) for monetary relief of any kind and of any nature against the

Debtors, except where a monetary claim must be plead in order for an Interested Party to

assert a claim to defend against or otherwise enjoin or preclude a foreclosure (each a

"Mandatory Monetary Claim"); (ii) for relief that if granted, would not terminate or

preclude the prosecution and completion of a foreclosure or eviction; or (iii) asserted in the

form of a class action or collective action;

(c)     absent further order of the Court, the stay shall remain in full force

and effect with respect to any party seeking to intervene to assert related claims against the

Debtors or any class action or collective action brought by any Interested Party on behalf

of any other Interested Party or class of Interested Parties;

(d)     under no circumstances shall an Interested Party be entitled to

enforce against, recoup, setoff or collect from the Debtors any judgment or award related

to any direct claim or counter-claim for which the automatic stay has been lifted by the

terms of this Order, including, without limitation, a Mandatory Monetary Claim;

(e)     the Debtors shall retain the right, upon appropriate motion and

notice to any affected Interested Party, to seek to impose any provision of section 362(a) of

the Bankruptcy Code modified by this Order and to the extent such relief is sought, the

Debtors will not object to the Interested Party's telephonic participation at any hearing on the motion; and

(f)       nothing set forth herein shall preclude or limit any Interested Party from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Borrower Bankruptcy Proceedings*

15.       The automatic stay imposed by section 362(a) of the Bankruptcy Code applicable against a borrower who currently has filed, or in the future files, for bankruptcy protection under any chapter of the Bankruptcy Code (a "Bankruptcy Borrower"), is hereby modified pursuant to the following terms and conditions:

(a)       except as set forth herein, a Bankruptcy Borrower or a trustee duly appointed under the Bankruptcy Code in the Bankruptcy Borrower's bankruptcy case (a "Bankruptcy Trustee") shall be entitled to:  (i) assert and prosecute or continue to prosecute an objection to the Debtors' proof of claim filed in the Bankruptcy Borrower's bankruptcy case; (ii) assert and prosecute or continue to prosecute an objection to the Debtors' motion for relief from the automatic stay filed in the Bankruptcy Borrower's bankruptcy case; (iii) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to determine the validity, priority or extent of a Debtor's lien against the Bankruptcy Borrower's property; (iv) commence or continue to prosecute against the Debtors a motion or adversary proceeding, as applicable, to reduce (including to reduce to $0) or fix the amount of the Debtors' claim or lien against the Bankruptcy Borrower's property; (v) prosecute appeals with respect to items (i) through (iv) above; (vi) seek an accounting from the Debtors with respect to the Bankruptcy

Exhibit    1
Page    9 of 19

Borrower's loan; and (vii) enter into, execute and consummate a written agreement of

settlement with the Debtors where the Debtors elect to enter into such settlement in their

sole discretion (but subject to the Settlement Procedures), to resolve items (i) through (vi)

above;

          (b)        except as set forth herein, a Bankruptcy Borrower shall be entitled to

(i) engage in court-supervised or court-authorized loss-mitigation programs regarding the

Bankruptcy Borrower's loan; and (ii) engage in discussions with the Debtors and execute a

modification of the Bankruptcy Borrower's loan or otherwise discuss, enter into and

consummate settlements of claims and liens in accordance with the ordinary course of the

Debtors' business and applicable law;

          (c)        absent further order of the Court, the automatic stay shall remain in

full force and effect with respect to all Bankruptcy Trustee's and Bankruptcy Borrower's

direct claims, counter-claims, motions or adversary proceedings:  (i) for monetary relief of

any kind and of any nature against the Debtors; (ii) for violation of any local, state or

federal statute or other law in connection with the origination of the Bankruptcy

Borrower's loan; (iii) for relief that if granted, would have no effect on the amount,

validity or priority of the Debtors' claim or lien against a Bankruptcy Borrower or the

property of the Bankruptcy Borrower securing such claim or lien of the Debtors; or

(iv) asserted in the form of a class action or collective action; provided however, a

Bankruptcy Trustee or Bankruptcy Borrower, solely in connection with their objections to

Debtors' proof of claim permitted by paragraph 15(a)(i) or proceedings permitted by

15(a)(iii), may assert claims of the type covered by subsection (i) or (ii) of this paragraph

15(c);

       (d)     absent further order of the Court, the automatic stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Bankruptcy Borrower on behalf of any other class of borrowers;

       (e)     with the sole exception of objections to Debtors' proofs of claim permitted by paragraph 15(a)(i) above and proceedings described in 15(a)(iii) above and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankruptcy Borrower or Bankruptcy Trustee be entitled to recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of this Order;

       (f)     the Debtors shall retain the right, upon appropriate motion and notice to any Bankruptcy Borrower or Bankruptcy Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order and to the extent such relief is sought, the Debtors will not object to the Interested Party's telephonic participation at any hearing on the motion; and

       (g)     nothing set forth herein shall preclude or limit any Bankruptcy Borrower or Bankruptcy Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Foreclosures By The Debtors On Senior Loans*

       16.     The stay imposed by section 362(a) of the Bankruptcy Code applicable to pending and future foreclosure actions initiated by the Debtors in cases where they act as

servicer for the Senior Loan and also own (or for which the applicable public land records otherwise reflect that the Debtors hold an interest) the Junior Loan with respect to the underlying property (collectively, the "Junior Foreclosure Actions") is hereby modified pursuant to the following terms and conditions:

        (a)     except as otherwise set forth herein, the Debtors shall be entitled to assert and prosecute Junior Foreclosure Actions, whether in a Judicial State or a Non-Judicial State;

        (b)     the Debtors shall be entitled to take such actions as are necessary to extinguish the lien with respect to a Junior Loan or to otherwise ensure clear and marketable title with respect to the property underlying a Senior Loan in connection with any sale or other disposition of such property;

        (c)     the Debtors shall be entitled to seek all appropriate relief with respect to a Senior Loan in connection with the bankruptcy cases of a Bankruptcy Borrower without further order of the Court; and

        (d)     the Debtors shall provide monthly reports to the Committee and the U.S. Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such additional information as shall be reasonably requested by the Committee, in each case, concerning Junior Foreclosure Actions.

D.    *Actions Involving Amount, Validity Or Priority Of Liens*

        17.     The stay imposed by section 362(a) of the Bankruptcy Code applicable to actions involving the amount, validity, and/or priority of liens commenced by third parties purporting to have a lien interest or other claim ("Third Party Claimants") with respect to

properties that are subject to mortgages owned or serviced by the Debtors ("Title Disputes") is hereby modified pursuant to the following terms and conditions:

      (a)    except as otherwise set forth herein, a Third Party Claimant shall be entitled to assert and prosecute direct claims and counter-claims relating exclusively to the property that is the subject of the loan owned or serviced by a Debtor in connection with any Title Dispute, and to prosecute appeals with respect to any such direct claims or counter-claims;

      (b)    absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all pending and future Third Party Claimant direct claims and counter-claims: (i) for monetary relief of any kind and of any nature against the Debtors; (ii) for relief that is not necessary for the resolution of the Title Dispute; or (iii) asserted in the form of a class action or collective action;

      (c)    absent further order of the Court, the stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Third Party Claimant on behalf of any other Third Party Claimant or class of Third Party Claimants;

      (d)    under no circumstances shall a Third Party Claimant be entitled to enforce against, recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of the Order;

      (e)    the Debtors shall be entitled to take such actions as are necessary to clear title with respect to property that is subject to a Title Dispute or to otherwise ensure

clear and marketable title with respect to such property in connection with any sale, foreclosure or other disposition of such property;

(f)    the Debtors shall retain the right, upon appropriate motion and notice to any affected Third Party Claimant, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by the Order; and

(g)    nothing set forth herein shall preclude or limit any Third Party Claimant from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

Payment of Securitization Trustee Fees and Expenses

18.    The Debtors shall continue to perform all of their respective servicing duties and servicing related duties, including, but not limited to, their duties as master servicer, under all the governing agreements (including, without limitation, pooling and servicing agreements, servicing agreements, or any other agreements concerning or relating to the Debtors' obligations to reimburse and/or indemnify for reasonable fees, costs, expenses, liabilities, and/or losses) (collectively, the "Agreements") relating to Debtor-sponsored securitization transactions and non-Debtor sponsored securitization transactions to which any of The Bank of New York Mellon Trust Company, N.A., Wells Fargo Bank, N.A., Deutsche Bank Trust Company Americas, Deutsche Bank National Trust Company, or U.S. Bank National Association, or any affiliate of such entities acts as trustee for which any Debtor performs servicing duties, in each of their respective capacities as trustee (collectively, the "Trustees") and one or more of the Debtors is a party, including but not limited to, making all principal, interest or other servicing advances (including property protection advances) and reimbursing, indemnifying, defending and holding harmless the Trustees and the securitization trusts for any liability, loss, or reasonable fees, cost

Exhibit   1
Page   14 of 19

or expense (including fees and disbursements of counsel or agents) incurred by any of the

Trustees in the performance of their duties or their administration of the trusts or other agencies

under the Agreements to the extent required by the Agreements.  For the avoidance of doubt, the

Debtors shall pay the reasonable, actual out-of-pocket costs and expenses of the Trustees in

connection with reviewing and analyzing the request by the Debtors to approve the MBS

Settlement Agreement, and in connection with reviewing and analyzing amendments to the

Agreements as necessary or appropriate in connection with any proposed Chapter 11 plan, the

MBS Settlement Agreement or the Platform Sale.  Notwithstanding the foregoing, nothing in this

paragraph 18 shall require any Debtor (i) to repurchase any mortgage loans on the basis of

alleged breaches of representations, warranties or other requirements of the Agreements, or make

any make-whole payments with respect to any mortgage loans pursuant to the Agreements; or

(ii) to enforce, as against any other Debtor entity or any non-Debtor affiliate, any provision of the

Agreements under which such other Debtor entity or non-Debtor affiliate are required to

repurchase any mortgage loans on the basis of alleged breaches of representations, warranties or

other requirements of the Agreements, or make any make-whole payments with respect to any

mortgage loans pursuant to the Agreements; and nothing in this paragraph 18 shall be deemed to

impose liability on any Debtor with respect to such alleged breaches or make-whole payment

requirements.

19.     The Trustees shall submit invoices to (a) counsel to the Debtors,

(b) counsel to the Committee, and (c) the U.S. Trustee, and all such invoices shall include (i) an

itemization of all professional fees by task with a detailed description of the work performed in

connection with such task, (ii) a description of related expenses, and (iii) a description of any

indemnity claims.  Thereafter, within thirty (30) days of presentment of such invoices, if no

written objections to the reasonableness of the fees and expenses charged in any such invoice (or portion thereof) is made by the Debtors, the Committee, or the U.S. Trustee, the Debtors are authorized and directed to pay all reasonable fees, costs and expenses and all indemnity claims referred to in paragraph 18 (including without limitation, attorney, financial advisor, consultant and expert fees and costs) incurred postpetition by any of the Trustees relating to the performance of each of the Trustees' duties or the administration of the trusts or other agencies under the Agreements (the "Trustee Expenses") that are not subject to an objection by the Debtors, the Committee, or the U.S. Trustee without further order from the Court. Any objection to the payment of the Trustee Expenses shall be made only on the basis of "reasonableness," and shall specify in writing the amount of the contested fees and expenses and a detailed basis for such objection. To the extent an objection only contests a portion of an invoice, the undisputed portion thereof shall be promptly paid. If any such objection to payment of an invoice (or any portion thereof) is not otherwise resolved between the Debtors, the Committee, or the U.S. Trustee and the issuer of the invoice, either party may submit such dispute to the Court for a determination as to the reasonableness of the disputed amounts. This Court shall resolve any dispute as to the reasonableness of any fees and expenses.

20.    To the extent either the Committee, or the RMBS Trustees determine that the Trustee Expenses were improperly or mistakenly allocated to an RMBS trust or to the Debtors' estates, the Committee and the RMBS Trustees reserve the right to seek to correct the allocation of the Trustee Expenses as between the RMBS trusts or the Debtors' estates in accordance with the applicable Agreement, and such adjustment shall be the Committee's and RMBS Trustees' sole remedy arising from a misallocation. All Trustee Expenses for which (a) no objection under paragraph 19 has been interposed, or (b) where such an objection has been

Exhibit    1
Page    16 of 19

interposed and the amount of Trustee Expenses determined by the Court to be reasonable, shall

be entitled to administrative expense priority in the Debtors' Chapter 11 cases notwithstanding

the entry of an order authorizing the assumption and assignment or rejection of any Agreement.

However, the Debtors will not be responsible for any fees, costs and expenses incurred with

respect to any Agreement after the entry of an order in the Debtors' Chapter 11 cases authorizing

the rejection of such Agreement.

21.     If any or all of the provisions of this Order are hereafter reversed,

modified, limited, vacated or stayed, such reversal, stay, modification or vacatur shall not affect

the validity, priority or enforceability of any Trustee Expenses incurred prior to the actual receipt

of written notice by the Trustees of the effective date of such reversal, stay, modification or

vacatur (the "Notice Date").  Notwithstanding any such reversal, stay, modification or vacatur,

the payment of any Trustee Expenses incurred prior to the Notice Date and reimbursed prior to

or after the Notice Date by the Debtors shall be governed in all respects by the original

provisions of this Order, and the Trustees shall be entitled to all of the rights, remedies,

privileges and benefits granted in this Order with respect to payment of Trustee Expenses.

22.     Notwithstanding the Debtors' obligations set forth in paragraphs 18 and

19, nothing in this Order shall be deemed to limit, extinguish, or prejudice the Debtors' rights in

any way to assume and assign or reject any Agreement in accordance with Bankruptcy Code

section 365.

Other Relief

23.     Any disputes regarding the extent, application and/or effect of the

automatic stay under this Order shall be heard and determined in the Debtors' jointly

administered bankruptcy cases pending in the United States Bankruptcy Court for the Southern

District of New York, Case No. 12-12020 in accordance with the Case Management Order entered in the Debtors' cases [Docket No. 141] and such other and further orders as may be entered by the Court.

24. The Debtors are authorized and empowered to take all actions and execute such documents as may be necessary or appropriate to carry out the relief granted herein.

25. Nothing herein shall be deemed to limit the rights of the Debtors to operate their business in the ordinary course, and no subsequent order shall be required to confirm such rights.

26. Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or otherwise.

27. Notwithstanding anything to the contrary in this Order, any action to be taken pursuant to the relief authorized in this Order is subject to the terms of any cash collateral order or debtor in possession financing order entered in these chapter 11 proceedings. All amounts authorized to be paid pursuant to this Order are subject to the limitations and restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit Agreement). To the extent that there is any inconsistency between the terms of this Order and the terms of any order relating to postpetition financing or cash collateral, the terms of the orders relating to postpetition financing or cash collateral shall govern.

28. Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board

of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among

AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal

Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment

entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012,

(c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the

Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

29.    Nothing in this Order shall discharge, release, or otherwise preclude any

setoff or recoupment right of the United States of America, its agencies, departments, or agents.

30.    The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

31.    Notwithstanding the possible applicability of Bankruptcy Rules

2002(a)(3), 6004(h), 7062 or 9014, the terms and conditions of this Order shall be immediately

effective and enforceable upon its entry.

32.    This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Order.


Dated:    July 13, 2012
          New York, New York


                                        /s/Martin Glenn
                                        MARTIN GLENN
                                United States Bankruptcy Judge

Exhibit____1____
Page___19_of_19

ny-1046923

<u>CERTIFICATE OF SERVICE</u>

I certify that on April 1, 2013, I served, **via first class mail**, a full and correct copy of the foregoing **GMAC MORTGAGE, LLC, RESIDENTIAL FUNDING COMPANY, LLC, AND HOMECOMINGS FINANCIAL LLC'S NOTICE OF BANKRUPTCY AND SUGGESTION OF AUTOMATIC STAY**, to the interested parties of record, addressed as follows:

> Denise Subramaniam
> 13865 SW Walker Road
> Beaverton, OR  97005

Dated:        April 1, 2013

*/s/ William G. Fig*
William G. Fig, OSB No. 952618

20809-055\SUBRAMANIAN NOB (01556929)-DLB (01557119);1

Page 5 – NOTICE OF BANKRUPTCY AND SUGGESTION OF STAY

## Exhibit 5 to Nye Declaration



**CORPORATION SERVICE COMPANY®**

**TMM / ALL**
**Transmittal Number: 10916032**
**Date Processed: 03/06/2013**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Sheryl Mlaker<br>GMAC/Residential Funding<br>8400 Normandale Lake Blvd<br>Suite 350<br>Bloomington, MN 55437 |

| | |
|---|---|
| **Entity:** | Residential Funding Company, LLC<br>Entity ID Number  2506899 |
| **Entity Served:** | Residential Funding Company, LLC |
| **Title of Action:** | Robynne A. Fauley vs. Washington Mutual Bank, FA |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Clackamas County Circuit Court, Oregon |
| **Case/Reference No:** | CV13010433 |
| **Jurisdiction Served:** | Oregon |
| **Date Served on CSC:** | 03/06/2013 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | David P. Smith<br>503-657-6550 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882   |   sop@cscinfo.com

1            IN THE CIRCUIT COURT OF THE STATE OF OREGON

2                        COUNTY OF CLACKAMAS

3    ROBYNNE A. FAULEY, an individual,        Case No. CV13010433

4                    Plaintiff,               **SUMMONS**

5        v.

6    WASHINGTON MUTUAL BANK, FA;
7    RESIDENTIAL FUNDING COMPANY,
     LLC; DEUTSCHE BANK TRUST
8    COMPANY AMERICAS AS TRUSTEE; LNV
     CORPORATION; and DOES 1-20,
9
                     Defendants.
10
         TO:    Residential Funding Company, LLC
11              c/o Registered Agent Corporation Service Company
                285 Liberty Street NE
12              Salem, OR  97301

13   **NOTICE TO DEFENDANT:  READ THESE PAPERS CAREFULLY!**

14       **You are hereby required to appear and defend
     the complaint filed against you in the above-entitled**
15   **cause within thirty (30) days from the date of service**
     **of this summons upon you, and in case of your**             _____
16   **failure to do so, for want thereof; plaintiffs will**        David P. Smith, OSB #96430
     **apply to the court for the relief demanded in the**          Attorney for Plaintiff
17   **complaint.**
         **You must "appear" in this case or the other side**
18   **will win automatically.  To "appear" you must file**
     **with the court a legal paper called a "motion" or**
19   **"answer".  The "motion" or "answer" must be given**
     **to the court clerk or administrator within 30 days**        The undersigned hereby certifies that
20   **along with the required filing fee.  It must be in**          the foregoing is an exact and
     **proper form and have proof of service on the**               complete copy of the original
21   **plaintiff's attorney or, if the plaintiff does not have an**  Summons in the above-entitled cause.
     **attorney, proof of service upon the plaintiff.**
22       **If you have any questions, you should see an**
     **attorney immediately.  If you need help finding an**         _____
23   **attorney, you may call the Oregon State Bar's Lawyer**        David P. Smith, OSB #96430
     **Referral Service at (503) 684-3763 or toll-free in**         Attorney for Plaintiff
24   **Oregon at (800)452-7636.**

25

Page 1 – SUMMONS                                    THE SMITH FIRM, P.C.
                                                        *Attorneys at Law*
                                                    1754 Willamette Falls Drive
                                                      West Linn, OR 97068
                                                        (503) 657-6550
                                                      Fax: (866) 710-0666

1   **TO THE OFFICER OR OTHER PERSON SERVING THIS SUMMONS:**

2      You are hereby directed to serve a true copy of this
Summons mentioned herein upon the defendant, and

3   to make your proof of service upon a separate
document, which you shall attach hereto.

David P. Smith, OSB #96430
Attorney for Plaintiff

4

5

Post office address at which papers in the above matter may be served by mail:

6

David P. Smith, OSB #96430, The Smith Firm, P.C., 1754 Willamette Falls Dr., West Linn, OR

7   97068, Telephone: (503) 657-6550, Facsimile: (866) 710-0666.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2 – SUMMONS

THE SMITH FIRM, P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666

TRUE COPY

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

| | |
|---|---|
| ROBYNNE A. FAULEY, an individual,<br><br>          Plaintiff,<br><br>vs.<br><br>WASHINGTON MUTUAL BANK, FA;<br>RESIDENTIAL FUNDING COMPANY,<br>LLC; DEUTSCHE BANK TRUST<br>COMPANY AMERICAS AS TRUSTEE;<br>LNV CORPORATION; and DOES 1-20,<br><br>          Defendants. | Case No. CV13010433<br><br>**FIRST AMENDED COMPLAINT**<br><br>**UNLAWFUL BUSINESS TRADE PRACTICES**<br>**ORS CHAPTER 646**<br><br>**FRAUD**<br><br>**DECLARATORY JUDGMENT**<br>**ORS CHAPTER 28**<br><br>**PRELIMINARY AND PERMANENT INJUNCTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff ROBYNNE A. FAULEY ("Plaintiff"), by and through the undersigned counsel,

files this First Amended Complaint for claims of relief and damages against the above named

defendants and in support thereof states as follows:

## INTRODUCTION

As with any dispute regarding any loan transaction, real facts about real money is what

really counts.  This is a case of deceit and a scheme to defraud that was covered up by

voluminous paperwork, none of which had any authenticity, validity or value because the

transaction was never completed by funding.  There was no meeting of the minds and therefore

no offer, no acceptance and no consideration in any of the paperwork as the real lenders/creditors

who were undisclosed to the Plaintiff, were presented with an entirely different set of terms of

repayment than the ones presented to the Plaintiff at closing.

Page 1 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

Defendant Washington Mutual Bank, FA ("WaMu"), the party named as the "Lender," was an actor that never funded the transaction and was nothing more than a naked nominee whose name was rented, and who never owned any loan receivable in connection with the funding of this loan and never acquired any stake in said loan afterwards. This very fact and act set forth a series of documentary events wherein each and every created and recorded instrument filed reliant upon the Deed of Trust is false, misleading, and fraudulent and must be deemed unenforceable.

## PARTIES, JURISDICTION AND VENUE

### 1.

Plaintiff is a resident of Clackamas County, Oregon. The Fauley Property and its real beneficiary is the subject of dispute and the Court has personal jurisdiction over each of the parties as alleged throughout this Complaint.

### 2.

The property that is the subject of this declaratory and quiet title action is defined as "Parcel 1, Partition Plat No. 1999-041, in the County of Clackamas and State of Oregon" which currently has the address of 12125 S.E. Laughing Water Road, Sandy, Oregon 97055 ("Subject Property"). As all the Subject Property lies within Clackamas County, Oregon, the Plaintiff shows that this court has jurisdiction and venue in this matter.

### 3.

Washington Mutual Bank, FA ("WaMu") is identified on the alleged Note and Deed of Trust ("DOT") as the Lender. WaMu was a Florida foreign business corporation registered to do business in the State of Oregon.

### 4.

WaMu was nothing more than a naked nominee whose name was rented, and who never owned any loan receivable in connection with the funding of this loan and never acquired any

Page 2 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
Attorneys at Law
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

stake in said loan afterwards. An examination of the books and records of WaMu will show that they were paid a fee for service to act as an interested party.

5.

Deutsche Bank Trust Company Americas ("DBTCA") is a U.S. chartered commercial bank registered to do business in the State of Oregon. DBTCA is a custodian with respect to the WaMu mortgage loans of the Trust.

6.

Residential Funding Company, LLC ("RFC") is a Delaware corporation registered to do business in the State of Oregon.

7.

LNV Corporation ("LNV") is a Texas corporation that is not registered to do business in the State of Oregon.

8.

The parties named in Paragraphs 3 through 7 are parties, who upon information or belief, have or may have a record right, title or interest in the Subject Property.

**GENERAL FACTUAL ALLEGATION**

9.

On or about June 12, 2002, Plaintiff offered to enter into contracts identified as the Note and Deed of Trust ("DOT"), to obtain a loan in the amount of $330,000.00 from WaMu, however, their acceptance was different than what Plaintiff had offered, and Plaintiff did not receive consideration for the contract. WaMu is listed as the lender according to their own disclosures and representations including the alleged Note and DOT. The DOT securing the note was recorded on June 20, 2002, as document number 2002-057800 in the Official Records of Clackamas County, Oregon. The DOT and the Note are attached hereto as Exhibit "A" and Exhibit "B" and incorporated by reference herein.

///

Page 3 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

10.

According to the Florida Secretary of State website that allows the public to search the existence and status of corporate business entities, there is no listing of a legal entity named Washington Mutual Bank nor is there a fictitious/assumed name filing of such. Rather, there are several different variations of entities containing the words Washington Mutual Finance, etc. however, none of these different variations exist on the Note and DOT.

11.

On or before June 20, 2002, Defendants WaMu, RFC, and DBTCA all knowingly and with the intent to misrepresent, mislead and defraud, falsely claimed to have a beneficial interest in the subject Note and Mortgage.

12.

On or about June 12, 2002, before the Note and DOT had been signed, WaMu assigned the Note to RFC. The Note Allonge is attached hereto as Exhibit "C" and incorporated by reference herein. Although Plaintiff had never even heard of DBTCA, the Note Allonge was purportedly signed by it.

13.

Despite purported ownership of the Note in RFC, on or about July 29, 2002, WaMu purportedly assigned the Mortgage, DOT, and Note to DBTCA. This assignment was recorded on April 3, 2003, as document number 2003-041141 in the Official Records of Clackamas County, Oregon, and is attached hereto as Exhibit "D" and incorporated by reference herein.

14.

Despite purported ownership of the Note in DBTCA, on or about April 11, 2007, RFC purportedly assigned the Mortgage, DOT, and Note to WaMu. This assignment was recorded on May 3, 2007, as document number 2007-038181 in the Official Records of Clackamas County, Oregon, and is attached hereto as Exhibit "E" and incorporated by reference herein.

///

Page 4 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
Attorneys at Law
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

15.

Despite purported ownership of the Note in WaMu, on or about October 27, 2008, DBTCA purportedly assigned (reciting consideration of $10.00) the Mortgage, DOT, and Note to RFC. This assignment was recorded on October 31, 2008, as document number 2008-074676 in the Official Records of Clackamas County, Oregon, and is attached hereto as Exhibit "F" and incorporated by reference herein.

16.

On or about March 10, 2008, RFC purportedly assigned (without reciting any consideration) the Mortgage, DOT, and Note to LNV Corporation. This assignment was recorded on October 31, 2008, as document number 2008-074677 in the Official Records of Clackamas County, Oregon, and is attached hereto as Exhibit "G" and incorporated by reference herein. On or about April 17, 2012, LNV Corporation purportedly re-recorded this very same document, as document number 2012-023399 in the Official Records of Clackamas County, Oregon, which document is attached hereto as Exhibit "H" and incorporated by reference herein.

17.

Plaintiff at all times denies the documents (recorded or otherwise) are true and correct and presents them only for the purpose of showing several parties claim an interest in the subject loan and only a full and accurate accounting will determine who, if anyone, actually has a valid claim.

18.

Defendant LNV has knowingly and falsely claimed a right to payment of the Note and Mortgage through the use of U.S. mail alleging to be the servicer.

19.

Each defendant is engaged in some aspect of the mortgage industry and has, together, operated in concert as the facts relate to this case. Specifically, they operate, and operated, mortgage originating and mortgage servicing businesses that solicit, cater, and service millions

THE SMITH FIRM, P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

of home loans annually, including debt collecting on alleged defaulted mortgages. Based on an understanding and belief, certain defendants and their agents, officers, affiliates, attorneys, and/or employees have operated as a common enterprise and in concert while engaging in the unlawful acts and practices alleged below, including collection of alleged defaulted debts.

## COUNT I

### Violation of Uniform Unfair Trade Practices Act

### (Against Defendants WaMu, DBTCA, RFC, LNV, and DOES 1-20)

20.

Plaintiff realleges and incorporates the paragraphs above as if set forth in their entirety in this Cause of Action.

21.

This is an action for violation of Oregon's Uniform Unfair Trade Practices Act, ORS 646.608.

22.

Recent amendments to the UTPA by the Oregon Legislature bring Plaintiff's claim within the scope of the UTPA. *See* H.B. 3706, 75th Leg., 1st Spec. Sess. (Or. 2010) (adding "loans and extensions of credit" to definition of "Real estate, goods or services").

24.

Defendants are in the lending and/or real estate transaction business. Each and every one of the Defendants identified under this Count willfully engaged in an unlawful trade practice (as defined in the statute) through their alleged conduct in identifying or allowing to identify Defendant WaMu as the "lender" when they knew WaMu was nothing more than a naked nominee whose name was rented, and who never owned any loan receivable in connection with the funding of this loan and never acquired any stake in said loan afterwards.

///

///

Page 6 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

25.

Defendants identified under this Count knew or should have known that by identifying or allowing WaMu to be identified as the "lender", such was a false, fraudulent and material misrepresentation designed to deceive the Plaintiff and was an unconscionable act designed to facilitate and proffer a profit.

26.

In addition, each and every one of the Defendants identified under this Count willfully engaged in an unlawful trade practice (as defined in the statute) through their alleged conduct in identifying or allowing to identify WaMu as the "beneficiary" under the DOT, an entity that did not even exist.

27.

At all times relevant, each and every one of the Defendants identified under this Count knew the requirement is that "any assignments of the trust deed by the trustee or the beneficiary" must be "recorded in the mortgage records in the counties in which the property described in the deed is situated." ORS 86.735(1).

28.

By using and identifying WaMu as the "beneficiary" under the DOT, Defendants intended to knowingly and willfully circumvent the statutory requirements of ORS 86.735(1).

29.

For purposes of the OTDA, "beneficiary" is a defined term; ORS 86.705 provides:

As used in ORS 86.705 to 86.795, unless the context requires otherwise:

(1) 'Beneficiary' means *the person named or otherwise designated in a trust deed as the person for whose benefit a trust deed is given,* or the person's successor in interest, and who shall not be the trustee unless the beneficiary is qualified to be a trustee under ORS 86.790(1)(d). (Emphasis added.)

///

Page 7 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

30.

Yet, before the Note and DOT were even signed by the Plaintiff, the Defendants had already schemed and agreed that any entity other than WaMu (even if it did exist) would receive Plaintiff's payments.

31.

Oregon Revised Statutes Section 86A.103 states a license is required to engage in residential mortgage transactions as a mortgage banker or mortgage broker and that:

> (1) **It is unlawful for any person to engage in residential mortgage transactions in this state** as a mortgage banker or mortgage broker **unless the person is licensed** under ORS 86A.095 to 86A.198. A person who is a mortgage banker or mortgage broker under ORS 86A.100, but who does not engage in residential mortgage transactions in this state, is not required to obtain a license under ORS 86A.095 to 86A.198 and;
>
> (2) For purposes of this section, a person "engages in residential mortgage transactions in this state" when any act constituting the business of a mortgage banker or mortgage broker and involving **a residential mortgage transaction originates from this state** or is directed to and received in this state or when the real estate that is the subject of the activities of the mortgage banker or mortgage broker **is located in this state.** [Formerly 59.845]. (Emphasis added.)

32.

The assignment to LNV of the Deed of Trust is in violation of Oregon state laws in that LNV's actions are considered a residential mortgage transaction under ORS 86A.103, but LNV is neither licensed to conduct business in the State of Oregon nor licensed to perform these transactions in the State of Oregon. On information and belief, one or more of the other Defendants also violated this statute.

33.

Defendants are in the lending and/or real estate transaction business. Each and every one of the Defendants identified under this count willfully engaged in an unlawful trade practice (as defined in the statute) through their alleged conduct in identifying or allowing to identify Defendant WaMu as the "lender" when they knew WaMu was nothing more than a naked

Page 8 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

nominee whose name was rented, and who never owned any loan receivable in connection with the funding of this loan and never acquired any stake in said loan afterwards.

34.

All of the acts above were made with the intent to deceive Plaintiff and for the purpose of securitizing the loan into the secondary market. Each and every one of the Defendants allowed, engaged and benefitted from allowing Defendant WaMu to act as the "lender" when it was nothing more than a naked nominee whose name was rented, and who never owned any loan receivable in connection with the funding of this loan and never acquired any stake in said loan afterwards.

35.

In addition, for the purpose of being able to circumvent the statutory requirements of ORS 86.735(1), each and every one of the Defendants named in this Count knew or should have known that by identifying or allowing WaMu to be identified as the "beneficiary" under the DOT, such was a false, fraudulent and material misrepresentation designed to deceive the Plaintiff and was an unconscionable act designed to facilitate and proffer a profit.

36.

Plaintiff's credit has been severely damaged as a result of the foregoing acts resulting in her credit score being lowered significantly and preventing her from obtaining credit. In addition, the Plaintiff has lost payments received[1] on the subject loan and bears the cost of attorney fees, consultants and experts to identify the issues herein and bring this action to protect Plaintiff's rights under the law.

37.

ORS § 646.638 provides damages for violation of ORS § 646.608 which include actual damages, statutory damages, punitive damages and other equitable relief.

///

---

[1] Subject to Discovery this amount may change.

Page 9 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
Attorneys at Law
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

## COUNT II

## COMMON LAW FRAUD

(Against All Defendants and Does 1-20)

38.

Plaintiff realleges and incorporates by reference each and every allegation in the preceding paragraphs of this Complaint.

39.

Defendant WaMu falsely represented itself as the lender on the purported Note and Deed of Trust while knowingly and willfully omitting the name of the real lender/creditor.

40.

Defendants have caused to be filed in public records, false and misleading documents to wit, Exhibits A through H. These documents attempted to allege and convey a beneficial interest where none lawfully existed.

41.

The misrepresentation that forms the backbone of an intentional deceit claim can be either a positive statement or the failure to disclose a fact that is true. An affirmative false representation or a knowing concealment of information material to the circumstance will provide the necessary misrepresentation element.

42.

Deceit may be negative as well as affirmative, arising out of the suppression of information that should have been revealed, as well as by the expression of information that is false.

43.

Defendants have made numerous misrepresentations consisting of suggestion as a fact, which are not true, while all along the Defendants knew such fact to be false. In addition, Defendants knowingly and willfully omitted, concealed and/or suppressed material facts and

Page 10 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax. (866) 710-0666
Email: dave@thesmithfirmpc.com

information even though Defendants were bound to disclose such material facts under a false promise made without any intention of performing it.

44.

Defendants' misrepresentations were made with the knowledge of its falsity and/or a knowledge of the effect of concealment of the material facts mentioned throughout the preceding paragraphs.

45.

Defendants made false representations described in this Complaint as specified with knowledge of their falsity and in contemplation of Plaintiff's reliance upon them.

46.

Plaintiff was ignorant of Defendants' false representations and relied upon the truth of Defendants' representations.

47.

The deceptive and self-dealing conduct of the Defendants and agents and/or employees as alleged herein was harmful to and caused injury to Plaintiff.

48.

Although the Defendants were aware or should have been aware of the misconduct of their agents and/or employees, no action was taken to correct or cure same.

49.

The Defendants' failure to correct the bad behavior constitutes fraud in the inducement.

50.

As a result of the Defendants' fraud in the inducement, the Plaintiff sustained damages in an amount to be determined at trial and seeks full restitution of said enrichment.

51.

Plaintiff also intends to amend the complaint at the earliest opportunity to add a claim for punitive damages.

THE SMITH FIRM, P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

## COUNT III

### Declaratory Judgment

(Against All Defendants and DOES 1-20)

52.

Plaintiff realleges and incorporates the paragraphs above as if set forth in their entirety in this Cause of Action.

53.

This is an action for Declaratory Judgment.

54.

Plaintiff became the owner of the subject property on or about August 14, 2000, and has been the owner of the Subject Property to present.

55.

The Plaintiff, as a matter of law, holds the Fee Simple title to the subject property.

56.

On or about June 2002, Plaintiff offered to enter into contracts identified as the Note and Deed of Trust, to obtain the loan from WaMu; however, their acceptance was different than what Plaintiff had offered and Plaintiff did not receive consideration for the contract.

57.

WaMu is listed as the lender according to their own disclosures and representations including the alleged Note and DOT.

58.

The Note and DOT, even if legally enforceable instruments, have taken two distinctly different paths. The Note was assigned to DBTCA, and on information and belief was securitized into a Home Equity Trust. The County records do not reflect any record of assignment of the Deed of Trust being transferred to the Trust. Thus, the DOT cannot secure the Note.

Page 12 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
Attorneys at Law
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

59.

The promissory note in this case became trust property in compliance with the requirement set forth in the pooling trust. The Trust agreement is filed under oath with the Securities and Exchange Commission. The acquisition for the assets of the subject Trust and the PSA are governed under the law.

60.

There is no record of Assignment, as required by the Pooling and Servicing Agreement.

61.

Plaintiff is entitled to a determination and a declaratory finding of the status and the ownership of the subject property, and to an order of this Court decreeing such findings.

## COUNT IV

### Injunctive Relief - Preliminary & Permanent Injunction

(Against All Defendants and DOES 1-20)

62.

Plaintiff realleges and incorporates the paragraphs above as if set forth in their entirety in this Cause of Action.

63.

This is an action for Injunctive Relief.

64.

The Oregon Rules of Civil Procedure (ORCP) articulate the standards for the Court to apply when considering requests for injunctive relief. ORCP 79 states:

> . . . a temporary restraining order or preliminary injunction may be allowed under this rule:

> When it appears that a party is entitled to relief demanded in a pleading, and such relief, or any part thereof, consists of restraining the commission or continuance of some act, the commission or continuance of which during the litigation would produce injury to the party seeking the relief; or

Page 13 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
Attorneys at Law
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

> When it appears that the party against whom a judgment is sought is doing
> or threatens, or is about to do, or is procuring or suffering to be done,
> some act in violation of the rights of a party seeking judgment concerning
> the subject matter of the action, and tending to render the judgment
> ineffectual.

ORCP, Rule 79(A)(1)(a) and (b).

65.

The Note and Deed of Trust ("DOT") purposefully misrepresent who the real and true

creditor is/was thus rendering the DOT unperfected. By placing WaMu as the "lender" and the

"beneficiary", a series of false and misleading information was placed on the Note and DOT and

a false authority was created. Thus, every document thereafter reliant upon and filed in public

records selling, transferring or conveying an interest where none existed by WaMu, renders each

and every document void.

66.

The case law that has interpreted the scope of the equitable powers of the courts indicates

that this Court has the authority to protect the Plaintiff from the harm that she will suffer absent

the granting of temporary and preliminary relief. The Oregon Supreme Court has described that

authority as follows:

> Equity will not suffer a wrong without a remedy. Even the common law
> has a rule in near counterpart: Where law is, there is a remedy (*ubi jus, ibi*
> *remedium*). In a case made appropriate by the facts, equity looks to the
> substance and not the shadow, to the spirit and not the letter. Equity seeks
> justice rather than technicality, truth rather than evasion, common sense
> rather than quibbling.

*State ex rel. Tidewater Shaver Barge Lines v. Dobson*, 195 Or 533, 245 P.2d 903, 923 (OR 1952)

(en banc). To obtain equitable relief, Plaintiffs must demonstrate that the action being taken

appears likely to produce irreparable injury.

67.

Irreparable injury is defined as injury that "cannot be adequately compensated" or where

there exists no certain measurement of damages.

Page 14 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

Whether or not an injury is irreparable depends, not upon the magnitude of the injury, but upon the completeness of a remedy in law. The rule is correctly stated in 22 Cyc. 763, 764, in this language: "An injury to be irreparable need not be such as to render its repair physically impossible; but it is irreparable when it cannot be adequately compensated in damages, or when there exists no certain pecuniary standard for the measurement of damages * * * due to the nature of the injury itself or to the nature of the right or property injured." 32 C. J. 52, 53, § 3.

*Winslow v. Fleischner*, 110 Or 554, 563 (1924).  Further, the case law makes clear that the injury need not be proven, rather a "probable or threatened harm" will suffice. *Josephine County v. Garnier*, 987 P.2d 1263, 1265 (Or App. 1999).

68.

Given WaMu was not the "lender" and was nothing more than a pretender, its acts at best, as defined in the Note and DOT, describe the acts of a "broker" however, WaMu was not licensed as a "broker" in the State of Oregon.

69.

LNV would have been required to be licensed by the State of Oregon before it could legally bind itself or another to any contractual obligations if its acts are deemed to be a residential mortgage transaction that originated in this state.  As such, LNV was not licensed and any assignment to it would be deemed void in ab initio.

WHEREFORE, Plaintiff prays as follows:

i.     find that the Defendants named in Count I violated ORS § 646.608;

ii.    find that the Defendants named in Count II are liable for damages;

iii.   declare a full accounting of all Defendants as it applies to the subject Note;

iv.    declare WaMu did not provide any consideration for the Note or DOT;

v.     declare WaMu was not a beneficiary to the DOT;

vi.    declare the Note is void in ab initio;

vii.   declare the DOT is void in ab initio;

viii.  grant the injunctive relief requested herein;

ix.    grant Plaintiff attorney fees, costs and any other relief as this Court deems proper.

Page 15 – FIRST AMENDED COMPLAINT

THE SMITH FIRM. P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

1

## JURY TRIAL DEMAND

2      Plaintiff hereby demands a trial by jury.

3      DATED this 25th day of February, 2013.

4                                                    THE SMITH FIRM, P.C.

5

6

7                                                    David P. Smith, OSB#96430
                                                     1754 Willamette Falls Drive
8                                                    West Linn, OR 97068
                                                     Telephone: (503) 657-6550
9                                                    Facsimile: (866) 710-0666
                                                     Email: dave@thesmithfirmpc.com
10                                                   Attorney for Plaintiff Robynne A. Fauley

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 16 – FIRST AMENDED COMPLAINT

THE SMITH FIRM, P.C.
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com

RECORDED IN CLACKAMAS COUNTY
JOHN KAUFFMAN, COUNTY CLERK                2002-057800

0031157820202005780000170174              $106.00

                                          06/20/2002 03:31:39 PM
M-TD  Cnt=1  Stn=3  BEVERLY
$85.00 $11.00 $10.00

When recorded mail to:
WASHINGTON MUTUAL BANK, FA
7757 BAYBERRY RD., 1ST FLOOR
JACKSONVILLE, FL  32256
ATTN CUSTODIAL LIAISON, MAILSTOP BBCL3

LOAN #: ▇▇▇▇

[Space Below This Line For Acknowledgment]

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "**Security Instrument**" means this document, which is dated **JUNE 12, 2002,**                together with all Riders to this document.

(B) "**Borrower**" is  ROBYNNE A FAULEY.

Borrower is the trustor under this Security Instrument.

(C) "**Lender**" is  WASHINGTON MUTUAL BANK, FA.

Lender is a  **FEDERAL SAVINGS BANK**                            organized and existing under the laws of
**THE UNITED STATES OF AMERICA.**          Lender's address is  **7301 BAYMEADOWS WAY,**
**JACKSONVILLE, FL 32256.**

Lender is the beneficiary under this Security Instrument.

(D) "**Trustee**" is  **STEWART TITLE GUARANTY COMPANY.**

(E) "**Note**" means the promissory note signed by Borrower and dated  **JUNE 12, 2002.**          The Note states that Borrower owes Lender **************************************THREE HUNDRED THIRTY THOUSAND AND NO/100
*********************************************** Dollars (U.S.          $330,000.00  ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **JULY 1, 2032.**

(F) "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify] |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

OREGON–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3038 1/01                                Page 1 of 8

Initials: _____
ORUDEED 0109

*[Vertical text in left margin]* First American Title Insurance Company of Oregon   No. 050881 7



PLAINTIFF'S
EXHIBIT
A

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY** [Type of Recording Jurisdiction] of **CLACKAMAS**
[Name of Recording Jurisdiction]:
**SEE ATTACHMENT A.**

which currently has the address of    **12125 SOUTHEAST LAUGHING WATER ROAD, SANDY,**
[Street] [City]

Oregon    97055    ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any

OREGON—Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3038 1/01    Page 2 of 8

Initials: _____
ORUDEED

2

remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3038 1/01
Page 3 of 8

Initials: _____
ORUDEED

acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding

OREGON–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3038 1/01

Page 4 of 8

Initials: _____
ORUDEED

4

the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available. is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing. may receive (directly or indirectly) amounts that derive from (or Might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to a refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/ or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11.  Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons. entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security

OREGON--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3038 1/01                                         Page 5 of 8

Initials: _____
ORUDEED

5

Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18. any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law. the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law. such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender. (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note. the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

OREGON–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3038 1/01                                                              Page 6 of 8

Initials: 
ORUDEED

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Attorneys' Fees.** As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

26. **Protective Advances.** This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

27. **Required Evidence of Property Insurance.**

**WARNING**

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will

OREGON–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3038 1/01                                    Page 7 of 8                                    Initials: _____
                                                                                                    ORUDEED

7

apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
ROBYNNE A FAULEY

State of ~~OREGON~~ California            County of: Marin

This instrument was acknowledged before me on June 14, 2002
by Robynne A. Fauley

KATHLEEN D. VARGAS
Commission # 1286476
Notary Public - California
Marin County
My Comm. Expires Jan 2, 2005

Signature of Notarial Officer

Title (and Rank)

My commission expires Jan. 02, 2005

OREGON–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3038 1/01                          Page 8 of 8                          ORUDEED

Exhibit "A"


Parcel 1, Partition Plat n0. 1999-041, in the County of
Clackamas and State of Oregon


9

# NOTE

| JUNE 12, 2002 | PORTLAND, | OREGON |
|---|---|---|
| [Date] | [City] | [State] |

12125 SOUTHEAST LAUGHING WATER ROAD, SANDY, OR 97055
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.    $330,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is WASHINGTON MUTUAL BANK, FA.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    7.125%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1ST    day of each month beginning on AUGUST 1, 2002. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JULY 1, 2032,    I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. BOX 7198
PASADENA, CA 91109-7198

or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S.    $2,223.27.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000%    of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

Initials:

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mac/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
© 1999-2001 Online Documents, Inc.    Page 1 of 2    F3200NOT 0105



PLAINTIFF'S
EXHIBIT
B.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_Roxynne A. Fauley_ (Seal)
ROXYNNE A. FAULEY

PAY TO THE ORDER OF
RESIDENTIAL FUNDING CORPORATION
WITHOUT RECOURSE
WASHINGTON MUTUAL BANK, FA

_signature_
BRENDA F. BRENDLE
VICE PRESIDENT

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
Residential Funding Corporation
BY _signature_
Judy Faber, Vice President

[Sign Original Only]

MULTISTATE FIXED RATE NOTE–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3200 1/01
© 1999-2001 Online Documents, Inc.    Page 2 of 2    F3200NOT

BC: 619513

## NOTE ALLONGE

     This Allonge is to be attached to and made a part of that certain Promissory Note made by Robynne A. Fauley, in the original principal amount of $330,000.00, dated June 12, 2002, and payable to Washington Mutual Bank, FA., as amended or modified (the "Note").

     Pay to the order of Residential Funding Company, LLC, ("Assignee"), without recourse and without representation or warranty whether express, implied or created by operation of law.

DEUTSCHE BANK TRUST COMPANY AMERICAS, as
Trustee Company FKA Bankers Trust Company of
California, N.A. as Trustee Residential Funding Company,
LLC formerly known as Residential Funding Corporation
Attorney-in Fact

By: _____

Michael Mead, Limited Signing Officer



After Recording Return To:

PEELE MANAGEMENT CORPORATION
ASSIGNMENT JOB #90822
P.O BOX 30014
RENO, NV. 89520-3014
(775) 827-9600

WM Loan No.   4967689

THIS DOCUMENT WAS PREPARED BY:

WASHINGTON MUTUAL BANK. FA
P.O. BOX 44090
JACKSONVILLE, FL 32231-9930
ATTN:  CUSTODIAL LIAISON BB-CL3

Clackamas County Official Records
Sherry Hall, County Clerk          **2003-041141**

||||||||||||||||||||||||||||||||          **$31.00**
0045704320030041141002002B   04/03/2003 01:21:47 PM

M-TDA       Cnt=1  Stn=1  ELIZABETH
$10.00 $11.00 $10.00

## ASSIGNMENT OF MORTGAGE/DEED OF TRUST

For good and valuable consideration, the sufficiency of which is hereby acknowledged, the undersigned,

### WASHINGTON MUTUAL BANK, FA

36-005

whose address is 7301 Baymeadows Way, Jacksonville, Florida  32256-6833.          (GRANTOR)

By these presents does convey, grant, bargain, sell, assign, transfer and set over to:

Deutsche Bank Trust Company Americas as Trustee
3 Park Plaza, Sixteenth Floor, Irvine, CA 92614-8539          (GRANTEE)

the described Mortgage/Deed of Trust, together with the certain note(s) described therein with all interest, all liens and any rights
due or to become due thereon.

Said Mortgage/Deed of Trust is recorded in the County of   **Clackamas** State of   **Oregon**

Official Records on:
Original Mortgagor:          **ROBYNNE  A FAULEY**

Original Loan Amount:          **$330,000.00**

Property Address:          **12125  SOUTHEAST LAUGHING  WATER ROAD, SANDY, OR 97055**

Legal Municipality:                    SEE ATTACHED LEGAL DESCRIPTION
Document #:  2003-057800          BOOK:                    PAGE:
Recorded 6-20-02
Date:    **July 29, 2002**          **WASHINGTON MUTUAL BANK, FA**

O. Simmons _____ Witness

D. Santana _____ Witness

M. Free _____ Assistant Vice President

Lori A. Brown          Assistant Secretary

**STATE OF FLORIDA**
**COUNTY OF DUVAL**

**29ᵀᴴ day of July , 2002**

The foregoing instrument was acknowledged before me this
by *M. Free* and *Lori A. Brown, Assistant Vice President* and *Assistant Secretary* of Washington Mutual Bank, FA.
A Federal Savings Bank, on behalf of the corporation. He/She is personally known to me and did take an oath.



Regina W. Anderson
MY COMMISSION #DD048265 EXPIRES
October 12, 2005
Bonded Thru Troy Fain Insurance, Inc.

Regina W. Anderson          Notary Public
State of Florida At Large
My Commission Expires:          October 12, 2005

3-041141



PLAINTIFF'S
EXHIBIT

Exhibit "A"


Parcel 1, Partition Plat n0. 1999-041, in the County of
Clackamas and State of Oregon

003-041141




Recording requested by:

When recorded mail to:

Litton Loan Servicing LP
4828 Loop Central Drive
Houston, TX 77081

**Clackamas County Official Records**
**Sherry Hall, County Clerk**                     **2007-038181**

$26.00

01098354200700381810010012   **05/03/2007 10:09:23 AM**

M-TDA      Cnt=1 Stn=10 LESLIE
$5.00 $11.00 $10.00

FATCO. NO. 1019082-TD

Space above this line for recorders use

TS # OR-07-79188-JB                Order # 3290940                Loan # ███

## Assignment of Deed of Trust

For value received, the undersigned corporation hereby grants, assigns, and transfers to WASHINGTON
MUTUAL BANK, FA all beneficial interest under that certain Deed of Trust dated **6/12/2002** executed by
**ROBYNNE A FAULEY**, as Trustor(s) to **STEWART TITLE GUARANTY COMPANY**, as Trustee and
recorded as Instrument No. 2002-057800, on 6/20/2002, in Book xxx, Page xxx of Official Records, in the
office of the County Recorder of **CLACKAMAS** County, **OR** together with the Promissory Note secured by
said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

Dated: _____**APR 11 2007**_____

Residential Funding Company, LLC

By: _Denise Bailey_                    **Denise Bailey**
Assistant Secretary

State of _Texas_          )
                          ) ss
County of _Harris_        )

On **APR 11 2007** before me, _____**Brenda F. McKinzy**_____ the
undersigned Notary Public, personally appeared _____Denise Bailey_____ personally known to me (or
proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which
the person(s) acted, executed the instrument.

WITNESS my hand and official seal

Signature _Brenda F. McKinzy_ (Seal)



BRENDA F. MCKINZY
Notary Public, State of Texas
My Commission Expires
December 05, 2010



PLAINTIFF'S
EXHIBIT
E



Clackamas County Official Records
Sherry Hall, County Clerk                2008-074676

0125953720080074676003037

$41.00

10/31/2008 02:17:25 PM

M-TDA        Cnt=1  Stn=10  ELIZABETH
$15.00 $16.00 $10.00

This Document Prepared By and
After Recording Please Return To:
MGC Mortgage, INC.
Attn: Allison Martin, Manager
Document Control
7195 Dallas Parkway
Plano, Texas 75024

# CORRECTIVE ASSIGNMENT OF DEED OF TRUST
### (This Assignment is being recorded to corrected chain of assignments.)

**Grantor:**   **Deutsche Bank Trust Company Americas (formerly known as Bankers Trust Company) as Trustee**
**1761 East St. Andrew Place, Santa Ana, Ca 92705**

**Grantee:**   **Residential Funding Company, LLC**
**One Meridian Crossings, Suite 100, Minneapolis, MN 55423**

**Property Address:**   **12125 Southeast Laughing Water Road, Sandy, OR 97055**

**Legal Description: Parcel 1, Partition Plat No. 1999-041, in the County of Clackamas and State of Oregon.**

BC:619513                                    1

PLAINTIFF'S
EXHIBIT

F

## ASSIGNMENT OF DEED OF TRUST

THIS ASSIGNMENT OF DEED OF TRUST (this "Assignment") is made by DEUTSCHE BANK TRUST COMPANY AMERICAS (formerly known as Bankers Trust Company) as Trustee, whose address is 1761 East St. Andrew Place, Santa Ana, CA 92705, ("Assignor"), to and in favor of RESIDENTIAL FUNDING COMPANY LLC., whose address is One Meridian Crossings, Suite 100, Minneapolis, Minnesota 55423 ("Assignee").

THIS ASSIGNMENT WITNESSES THAT, in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by Assignee, Assignor hereby assigns, transfers, sets over and conveys to Assignee and its successors and assigns, without recourse and without representation or warranty, whether express, implied or created by operation of law, except as expressly set forth in the Purchase Agreement, the following:

1.  that certain Deed of Trust from Robynne A. Fauley, dated June 12, 2002, and recorded June 20, 2002, as Instrument No 2002-057800, in the Clerk's Office of the County of Clackamas, State of Oregon, (the "Deed of Trust"), which Deed of Trust secures that certain Promissory Note dated June 12, 2002, in the original principal amount of $330,000.00, executed by Robynne A. Fauley and payable to the order of Washington Mutual Bank, FA., as modified or amended (the "Note");

2.  Assigned to Deutsche Bank Trust Company Americas as Trustee by Assignment dated July 29, 2002, recorded on April 3, 2003, as Instrument No. 2003-041141, in the Clerk's Office of the County of Clackamas, State of Oregon.

3.  Assigned to Washington Mutual by Assignment dated April 11, 2007, recorded on May 3, 2007, as Instrument No. 2007-038181, in the Clerk's Office of the County of Clackamas, State of Oregon.

4.  as such other documents, agreements, instruments and other collateral that evidence, secure or otherwise relate to Assignor's right, title or interest in and to the Deed of Trust and/or the Note and/or the loan evidenced by the Note, including without limitation the title insurance policies and hazard insurance policies relating thereto that are in effect.

BC:619513                                    2

IN WITNESS WHEREOF, Assignor has caused this Assignment to be executed and delivered by its Authorized Representative as of the 27ᵗʰ day of October, 2008.

Deutsche Bank Trust Company Americas (formerly known as Bankers Trust Company) as Trustee, Residential Funding Company, LLC formerly known as Residential Funding Corporation Attorney-in Fact

WITNESS: Pamela L. Spencer

By: _____
Name: Michael Mead
Title:   Limited Signing Officer

WITNESS: B. Zahn

**POA recorded on 2/7/2003, as Instr. No. 2003-016512.**

## ACKNOWLEDGMENT

STATE OF MINNESOTA              §
                                §
COUNTY OF HENNEPIN              §

       Before me, the undersigned, a Notary Public, on this day personally appeared Michael Mead, who is personally well known to me (or sufficiently proven) to be the Limited Signing Officer of Residential Funding Company, LLC formerly known as Residential Funding Corporation and the person who executed the foregoing instrument by virtue of the authority vested in him/her, and he/she acknowledged to me that he/she executed the same for the purposes and consideration therein expressed and in the capacities therein stated.

Given under my hand and seal this 27ᵗʰ day of October, 2008.



Notary Public, State of Minnesota
My commission expires: 01-31-2008

        A F F I X   NOTARY SEAL

DIANE M. MEISTAD
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2010

BC:619513                          3

Clackamas County Official Records    **2008-074677**
Sherry Hall, County Clerk

$36.00

0125953820080074677002002 7    10/31/2008 02:17:25 PM

M-TDA          Cnt=1  Stn=10  ELIZABETH
$10.00 $16.00 $10.00

This Document Prepared By and
<u>After Recording Please Return To</u>:
MGC MORTGAGE, INC.
Attn: Allison Martin, Manager
Document Control
7195 Dallas Parkway
Plano, Texas 75024

## ASSIGNMENT OF DEED OF TRUST

**Grantor:**    **RESIDENTIAL FUNDING COMPANY, LLC**
**One Meridian Crossings, Suite 100, Minneapolis, Minnesota 55423**

**Grantee:**    **LNV CORPORATION**
**7195 Dallas Parkway, Plano, Texas 75024**

**Property Address:    12125 Southeast Laughing Water Road, Sandy, OR 97055**

Legal Description: Parcel 1, Partition Plat No. 1999-041, in the County of Clackamas and
State of Oregon.

BC 619513



PLAINTIFF'S
EXHIBIT
G

CORPORATION ASSIGNMENT of DEED OF TRUST

RFC Loan Number:
Seller Loan Number:

FOR VALUE RECEIVED, 'Residential Funding Company, LLC fka Residential Funding Corporation'

the undersigned hereby grants, assigns and transfers to

all beneficial interest under that certain Deed of Trust dated 6/12/2002
executed by ROBYNNE A FAULEY

TO/FOR:

and recorded in Book _h/a_ on Page _u/a_ as Instrument No. _2002-057800_ on _6/20/2002_
of official Records in the County Recorder's Office of _Clackamas_ County, Oregon.

Property Address:    12125 SE SOUTHEAST LAUGHING WA  SANDY, OR  97055
MORTGAGE AMOUNT:  $330,000.00
TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Deed of Trust.

'Residential Funding Company, LLC fka Residential Funding Corporation'

BY:
NAME: Jeanne J. Smith

STATE OF                    Minnesota )
COUNTY OF                 Hennepin )      TITLE: Assistant Vice President

On 3/10/2008  before me, the undersigned, a Notary Public in and for said State personally appeared Jeanne J.
Smith, Assistant Vice President of 'Residential Funding Company, LLC fka Residential Funding Corporation'
personally known to me to be the person whose name is subscribed to the within instrument and acknowledged
to me that s/he executed the same in his/her authorized capacity, and that by his/her signature on the instrument
the entity upon behalf of which the person acted, executed the instrument.  WITNESS my hand and official seal.

This instrument was drafted by Diane Meistad,
Residential Funding Company, LLC, One Meridian
Crossings, Suite 100, Minneapolis, MN 55423,
(952) 979-4000.

Notary Public in and for said State

DIANE M. MEISTAD
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2010

(Area to right reserved for Recording)

WHEN RECORDED MAIL TO:

Prepared By and when recorded
Please return to:MGC Mortgage Inc.
Document Control Dept.
7195 Dallas Parkway
Plano, TX 75024
BC 44513



Clackamas County Official Records          2008-074677
Sherry Hall, County Clerk

$36.00

0125953820  074677000   27   10/3?  J08 02:17:25 PM

M-TDA          Cnt=1 Stn=10 ELIZABETH
$10.00 $16.00 $10.00

Clackamas County Official Records     2012-023399
Sherry Hall, County Clerk

$52.00

01574444201200233990020029     04/17/2012 12:01:27 PM

M-TDA          Cnt=1 Stn=5 CONNIEBRO
$10.00 $16.00 $16.00 $10.00

This Document Prepared By and
After Recording Please Return To:
MGC MORTGAGE, INC.
Attn: Allison Martin, Manager
Document Control
7195 Dallas Parkway
Plano, Texas 75024

# ASSIGNMENT OF DEED OF TRUST

**Grantor:**  **RESIDENTIAL FUNDING COMPANY, LLC**
One Meridian Crossings, Suite 100, Minneapolis, Minnesota  55423

**Grantee:**  **LNV CORPORATION**
7195 Dallas Parkway, Plano, Texas  75024

**Property Address:**   12125 Southeast Laughing Water Road, Sandy, OR 97055

**Legal Description:** Parcel 1, Partition Plat No. 1999-041, in the County of Clackamas and
State of Oregon.

Re-recorded at the request of LNV Corporation
to add Grantee name & address on Original
Assignment.
Previously Recorded: 10/31/08, as dnst. No. 2008-0746677

BC 619513



PLAINTIFF'S
EXHIBIT
A

CORPORATION ASSIGNMENT of DEED OF TRUST

RFC Loan Number: ▮
Seller Loan Number:

FOR VALUE RECEIVED, 'Residential Funding Company, LLC fka Residential Funding Corporation'

the undersigned hereby grants, assigns and transfers to

LNV Corporation
7195 Dallas Pkwy
Plano, Tx 75024

all beneficial interest under that certain Deed of Trust dated 6/12/2002
executed by ROBYNNE A FAULEY

TO/FOR:

and recorded in Book __n/a__ on Page __n/a__ as Instrument No. __2002-057800__ on __6/20/2002__
of official Records in the County Recorder's Office of __Clackamas__ County, Oregon.

Property Address:     12125 SE SOUTHEAST LAUGHING WA . SANDY, OR 97055
MORTGAGE AMOUNT: $330,000.00
TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Deed of Trust.

'Residential Funding Company, LLC fka Residential Funding Corporation'

BY: _____
NAME: Jeanne J. Smith
TITLE: Assistant Vice President

STATE OF                          Minnesota )
COUNTY OF                         Hennepin )

On 3/10/2008 before me, the undersigned, a Notary Public in and for said State personally appeared Jeanne J.
Smith, Assistant Vice President of 'Residential Funding Company, LLC fka Residential Funding Corporation'
personally known to me to be the person whose name is subscribed to the within instrument and acknowledged
to me that s/he executed the same in his/her authorized capacity, and that by his/her signature on the instrument
the entity upon behalf of which the person acted, executed the instrument. WITNESS my hand and official seal.

This instrument was drafted by Diane Meistad,
Residential Funding Company, LLC, One Meridian
Crossings, Suite 100, Minneapolis, MN 55423,
(952) 979-4000.

_____
Notary Public in and for said State

DIANE M. MEISTAD
NOTARY PUBLIC - MINNESOTA
MY COMMISSION EXPIRES 01/31/2010

(Area to right reserved for Recording)

WHEN RECORDED MAIL TO:

Prepared By and when recorded
Please return to:MGC Mortgage Inc.
Document Control Dept.
7195 Dallas Parkway
Plano, TX 75024
BC 614513



STATE OF OREGON       }
COUNTY OF CLACKAMAS   } ss.

I, SHERRY HALL, County Clerk of the
State of Oregon for the County of Clackamas,
do hereby certify that the foregoing copy of
__2012-023279__ __2pcp__
__Mortgage Rec__
has been by me compared with the original, and
that it is a correct transcript therefrom, and the
whole of such original, as the same appears on the
file and record in my office and under my care,
custody and control.

IN TESTIMONY WHEREOF, I have hereunto set
my hand and affixed my official seal

this __10__ day of
__October__, 20 __12__
                        SHERRY HALL, County Clerk
By: _____ Deputy

## Exhibit 6 to Nye Declaration

**William G. Fig, OSB No. 952618**
billf@sussmanshank.com
SUSSMAN SHANK LLP
1000 SW Broadway, Suite 1400
Portland, OR  97205-3089
Telephone: (503) 227-1111
Facsimile: (503) 248-0130
Attorneys for Residential Funding Company, LLC

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| ROBYNNE A. FAULEY, an individual, | Case No. **3:13-cv-00581-AC** |
| Plaintiff, | |
| | NOTICE OF BANKRUPTCY AND SUGGESTION OF AUTOMATIC STAY |
| WASHINGTON MUTUAL BANK, FA; RESIDENTIAL FUNDING COMPANY, LLC; DEUTSCHE BANK TRUST COMPANY AMERICAS AS TRUSTEE; LNV CORPORATION; and DOES 1-20, | |
| Defendants. | |

Defendant Residential Funding Company, LLC, by and through its undersigned

counsel, in accordance and consistent with section 362(a) of the United States

Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), respectfully

submits this Notice of Bankruptcy and Suggestion of Automatic Stay, and states as

follows:

1.     On May 14, 2012 (the "Petition Date"), Residential Capital, LLC and

certain of its direct and indirect subsidiaries (collectively, the "Debtors"), including

Residential Funding Company, LLC, filed voluntary petitions for relief under Chapter 11

Page 1 – NOTICE OF BANKRUPTCY & SUGGESTION OF STAY

of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004-1408 (the "Bankruptcy Court").

2.      The Debtors' Chapter 11 cases being jointly administered are indexed at case number 12-12020 (MG), and are captioned as follows:

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

3.      As a result of the Bankruptcy Filing, on the Petition Date, the protections of the automatic stay codified in section 362(a) of the Bankruptcy Code arose with regard to the Debtors.  Section 362(a), among other things, operates as an automatic stay of: (i) "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding" against the Chapter 11 Debtors (11 U.S.C. § 362(a)(1)); (ii) acts to "obtain possession of property" of the Debtors' Chapter 11 estates (11 U.S.C. § 362(a)(3)); and (iii) acts to "collect, assess, or recover a claim" against the Debtors arising prior to the Petition Date (11 U.S.C. § 362(a)(6)).

4.      On July 13, 2012, the Bankruptcy Court entered a final supplemental order granting, among other things, the Debtors' motion for limited relief from the automatic stay to permit non-Debtor parties in foreclosure and eviction proceedings, borrower bankruptcy cases, and title disputes to continue to assert and prosecute certain defenses, claims, and counterclaims (the "Final Supplemental Order").  Paragraphs 14, 15, 16, and 17 of the Final Supplemental Order identify the categories of defenses,

Page 2 – NOTICE OF BANKRUPTCY & SUGGESTION OF STAY

Case 3:13-cv-00581-MO    Document 14    Filed 04/18/13    Page 3 of 24

claims, and counterclaims for which the automatic stay has been modified (the "Permitted Claims").  A copy of the Final Supplemental Order is annexed hereto as Exhibit 1.

5.    To the extent that the defenses, claims, and counterclaims do not constitute Permitted Claims, they remain subject to the automatic stay, and the continued prosecution of these claims is prohibited.

6.    Residential Funding Company, LLC claims no interest in the property at issue, nor does it service the loan at issue.  Plaintiff's First Amended Complaint appears to assert claims against Residential Funding Company, LLC for events occurring pre-petition that do not constitute Permitted Claims under the Final Supplemental Order.   It is Residential Funding Company, LLC's position that all of plaintiff's claims against it are subject to the automatic stay, and the continued prosecution of these claims is prohibited.

7.    Pursuant to paragraph 23 of the Final Supplemental Order, any dispute regarding the extent, application, and/or effect of the automatic stay under the Final Supplemental Order must be heard and determined in the United States Bankruptcy Court for the Southern District of New York, jointly administered under Case No. 12-12020, in accordance with the Case Management Order entered in the Debtors' case [Docket No. 141], and such other and further orders as may be entered by the United States Bankruptcy Court for the Southern District of New York.[1]

/ / /

/ / /

/ / /

/ / /

---

[1] A copy of the Case Management Order may be obtained at no charge at http://www.kccllc.net/rescap.

Page 3 – NOTICE OF BANKRUPTCY & SUGGESTION OF STAY

8.    This notice has been sent, with a cover letter, to counsel for the plaintiff.

Dated this 18th day of April, 2013.

SUSSMAN SHANK LLP


By /s/ William G. Fig
William G. Fig, OSB No. 952618
(503) 227-1111
Attorneys for Residential Funding Company, LLC

20809-088\FEDERAL COURT NOB (01569533);1

Page 4 – NOTICE OF BANKRUPTCY & SUGGESTION OF STAY

Docket #0774  Date Filed: 7/13/2012

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---

**FINAL SUPPLEMENTAL ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a),**
**362, 363, 502, 1107(a), AND 1108 AND BANKRUPTCY RULE 9019 (I) AUTHORIZING**
**THE DEBTORS TO CONTINUE IMPLEMENTING LOSS MITIGATION PROGRAMS;**
**(II) APPROVING PROCEDURES FOR COMPROMISE AND SETTLEMENT OF**
**CERTAIN CLAIMS, LITIGATIONS AND CAUSES OF ACTION; (III) GRANTING**
**LIMITED STAY RELIEF TO PERMIT FORECLOSURE AND EVICTION**
**PROCEEDINGS, BORROWER BANKRUPTCY CASES, AND TITLE DISPUTES TO**
**PROCEED; AND (IV) AUTHORIZING AND DIRECTING THE DEBTORS TO PAY**
**SECURITIZATION TRUSTEE FEES AND EXPENSES**

Upon the motion (the "Motion")[1] of Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "Debtors") for entry of a

supplemental order under Bankruptcy Code sections 105(a), 362, 363, 1107(a) and 1108, and

Bankruptcy Rule 9019 (i) authorizing the Debtors to continue implementing loss mitigation

programs; (ii) approving procedures for the compromise and settlement of certain claims,

litigations and causes of action in the ordinary course of the Debtors' business; (iii) granting

limited stay relief to permit (w) borrowers or their tenants, as applicable, to prosecute direct

claims and counter-claims in foreclosure and eviction proceedings (including in states in which

non-judicial foreclosure is followed), (x) borrowers to prosecute certain actions in borrower

bankruptcy cases, (y) the Debtors to prosecute foreclosure actions in those circumstances where

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
granted herein may refer to http://www.kccllc.net/rescap for additional information.





1212020120713000000000011

ny-1046923

they service senior mortgage loans and own the junior mortgage loans on the underlying

property, and (z) third party lien holders to prosecute direct claims and counter-claims in actions

involving the amount, validity or priority of liens on properties subject to foreclosure

proceedings; and (iv) authorizing and directing the Debtors to pay certain securitization trustee

fees and expenses; and the Court having considered the Whitlinger Affidavit and the Bocresion

Declaration; and the Court having entered the Interim Supplemental Order on June 15, 2012

[Docket No. 391]; and the Court having entered a final order on June 15, 2012 granting the GA

Servicing Motion on a final basis [Docket No. 401]; and the Court having entered a final order

on June 15, 2012 granting the Non-GA Servicing Motion on a final basis [Docket No. 402]; and

it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334; and it appearing that venue of these Chapter 11 cases and the Motion in this district is

proper pursuant to 28 U.S.C §§ 1408 and 1409; and it appearing that this proceeding on the

Motion is a core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion

having been given and it appearing that no other or further notice need be provided; and the

National Association of Consumer Bankruptcy Attorneys, on its own behalf and in a

representative capacity, two individuals who are debtors under Chapter 13, and Edward Boltz,

counsel for those individuals, having filed jointly the Limited Omnibus Objection To The

Servicing Orders And Debtors' May 31, 2012 Motion For A Supplemental Order [Docket No.

221] (the "NACBA Objection"); and the Committee having filed the Omnibus Response And

Reservation Of Rights Of The Official Committee Of Unsecured Creditors To Certain Of The

Debtors' First Day Motions [Docket No. 240]; and the Debtors having filed the Omnibus Reply

To Objections To Entry Of Final Orders For Specific "First Day" Motions And Related Relief

[Docket. No. 254]; and upon the record of the hearing; and it appearing that the relief requested


Exhibit____1____
Page___2__of_19

by the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in

interest; and after due deliberation thereon; and any objections to the Motion, including the

NACBA Objection, having been withdrawn, resolved, or overruled on the merits; and sufficient

cause appearing therefor, it is hereby

### ORDERED, ADJUDGED, AND DECREED THAT:

1.    The Motion is GRANTED on a final basis, as set forth herein, and any

objections to the Motion are hereby overruled;

<u>Loss Mitigation Programs</u>

2.    The Debtors are authorized, but not directed in their sole and absolute

discretion and subject to available funding, to continue developing and implementing loss

mitigation programs and procedures in the ordinary course of their businesses *nunc pro tunc* to

the Petition Date, including, but not limited to, making incentive payments to borrowers in

connection with the closing of short sales, or vacating properties in lieu of foreclosure or eviction

proceedings, or in the form of borrower rebates for loan payoffs including honoring all

obligations related thereto that accrued in whole or in part prior to the Petition Date (collectively,

the "<u>Loss Mitigation Programs</u>"); <u>provided</u>, <u>however</u>, that the aggregate cash payments made by

the Debtors to individual borrowers under the Loss Mitigation Programs that are not reimbursed

to the Debtors shall not exceed $550,000 per month (the "<u>Monthly Cap</u>"), absent consent of the

Committee or further order of the Court; <u>provided</u>, <u>further</u>, <u>however</u>, that to the extent the

Debtors do not exceed the Monthly Cap in any month they shall be entitled to utilize the

difference between the actual amount and the Monthly Cap in any succeeding month.  The

Debtors shall provide monthly reports to the Committee and the Office of the United States

Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>"), which reports shall be in a



Exhibit ___1___
Page __3_ of _19_

form agreed to by the Debtors and the Committee and such additional information as shall be

reasonably requested by the Committee, in each case, concerning the Loss Mitigation Programs.

    3.    Cash payments made by the Debtors to individual borrowers under the

Loss Mitigation Programs for which the Debtors are not reimbursed shall not exceed $4.2

million in the aggregate, absent consent of the Committee or further order of the Court.  For the

avoidance of doubt, the limitation on the amount of cash payments provided for in this paragraph

3 is in addition to the limitation on the amount of cash payments provided for in paragraph 12

hereof.

<u>Settlement Procedures</u>

    4.    The Debtors are authorized, but not directed to compromise and settle

certain claims brought by the Debtors against any non-insider third parties in connection with

foreclosure, eviction, or borrower bankruptcy proceedings (each a "<u>Settling Party</u>") or by a

Settling Party against any of the Debtors (each, a "<u>Claim</u>") in accordance with the following two-

tiered procedures (the "<u>Settlement Procedures</u>"):

> Tier I:  The Debtors, in their sole discretion, may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts not to exceed $40,000 in full settlement of such Claim (each, a "<u>Tier I Settlement</u>").

> Tier II:  The Debtors may enter into, execute and consummate written agreements of settlement with respect to Claims that will be binding on the Debtors and their estates without further action by this Court or notice to any party and grant such Settling Parties cash payments or allowed prepetition claims in amounts exceeding $40,000 but less than $100,000 in full settlement of such Claims (each, a "<u>Tier II Settlement</u>"); <u>provided</u>, that in each case:

>     (a) The Debtors must provide advance written notice (by formal or informal means, including by e-mail correspondence) of the terms of any Tier II Settlement to (x) the U.S. Trustee, 33

4

Exhibit _____1_____
Page _4_ of _19_

Whitehall Street, 21st Floor, New York, New York 10004, Attn: Brian S. Masumoto, (y) counsel for the Committee, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas New York, NY 10036, Attn: Kenneth H. Eckstein and Douglas H. Mannal; and (z) counsel to the administrative agent for the Debtors' providers of debtor in possession financing, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, Attn: Kenneth S. Ziman and Jonathan H. Hofer (collectively the "Notice Parties")

(b) Those Notice Parties wishing to object to any proposed Tier II Settlement must serve a written objection (by formal or informal means, including by e-mail correspondence) on the Debtors, so that it is received by no later than 4:00 p.m. (prevailing Eastern Time) on the day that is seven (7) calendar days from the date the Notice Parties received written notice of such Tier II Settlement (the "Settlement Objection Deadline").  Objections should be addressed to the proposed attorneys for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, Attn: Larren M. Nashelsky (LNashelsky@mofo.com) and Norman S. Rosenbaum (NRosenbaum@mofo.com).

(c) If the Debtors receive a timely objection from a Notice Party, the parties will confer and attempt to resolve any differences.  Failing that, the Debtors may petition the Court for approval of the Tier II Settlement in accordance with any case management orders entered in the Chapter 11 cases.  An objection by a Notice Party with respect to a given Tier II Settlement shall not delay the finality or effectiveness of any other settlement to which an objection has not timely been delivered.

(d) If the Debtors do not receive a written objection to a Tier II Settlement from a Notice Party by the Settlement Objection Deadline, then such Tier II Settlement shall be deemed approved and the Debtors and Settling Parties may carry out the terms of such Tier II Settlement without further notice or Court approval.

5.    The Debtors shall be required to seek approval from the Court in order to enter into and consummate any proposed settlement of a Claim with a settlement amount in excess of $100,000.

6.    The Debtors are authorized in their sole discretion, but not directed, to settle claims where some or all of the consideration is being provided by a third party and/or

where the Debtors are releasing claims against creditors or third parties provided the Debtors

otherwise comply with the Settlement Procedures.

7.      The Settlement Procedures are without prejudice to the right of the

Debtors to seek an order of this Court approving additional or different procedures with respect

to specific claims or categories of claims.  For claims relating to matters specified in paragraphs

14(a) and 15(a) of this Order that were resolved pursuant to a settlement prior to the Petition

Date, but where such settlement has not been consummated, the Debtors are authorized, but not

directed to, consummate said settlements in accordance with the Settlement Procedures set forth

in this Order.

8.      Notwithstanding anything to the contrary contained herein, this Order

shall not affect, impair, impede or otherwise alter the right of the Debtors to resolve any

prepetition or postpetition controversy arising in the ordinary course of the Debtors' businesses,

or resolve any controversy authorized by any other order of the Court.

9.      Nothing in this Order or the Motion shall constitute a determination or

admission of liability or of the validity or priority of any claim against the Debtors, and the

Debtors reserve their rights to dispute the validity or priority of any claim asserted.

10.     The authority granted in this Order shall not replace or obviate the need to

comply with the Debtors' internal procedures, legal or otherwise, for authorizing the settlements

contemplated in the Motion.  All settlements made pursuant to the Settlement Procedures shall,

to the extent applicable, be made in accordance with the Debtors' settlement procedures in effect

as of the Petition Date (the "Internal Settlement Protocol") and as may be amended from time;

provided, however, that the Debtors shall provide the Committee and the U.S. Trustee with

notice of any material changes to the Internal Settlement Protocol.



Exhibit ____1____
Page ___6 of __19

11.     The Debtors shall provide monthly reports to the Committee and the U.S. Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such additional information as shall be reasonably requested by the Committee, in each case, concerning settlements of any Claims pursuant to the Settlement Procedures.

12.     Cash payments made by the Debtors under the Settlement Procedures shall not exceed $4 million in the aggregate, absent consent of the Committee or further order of the Court.

13.     Any period prescribed or allowed by the Settlement Procedures shall be computed in accordance with Bankruptcy Rule 9006.

<u>Limited Relief from Automatic Stay</u>

*Borrower Foreclosure And Eviction Proceedings*

14.     The stay imposed by section 362(a) of the Bankruptcy Code applicable to (a) pending and future foreclosure actions initiated by the Debtors or in those states providing for non-judicial foreclosures, by a borrower; and (b) pending and future eviction proceedings with respect to properties for which a foreclosure has been completed or is pending, is hereby modified pursuant to the following terms and conditions:

(a)     except as set forth herein, a borrower, mortgagor, or lienholder (each, an "<u>Interested Party</u>") shall be entitled to assert and prosecute direct claims and counter-claims relating exclusively to the property that is the subject of the loan owned or serviced by a Debtor for the purposes of defending, unwinding, or otherwise enjoining or precluding any foreclosure, whether in a Judicial State or a Non-Judicial State, or eviction proceeding, where a final judgment (defined as any judgment where the right to appeal or seek reconsideration has expired or has been exhausted) permitting the foreclosure or



Exhibit ___1___
Page ___7___ of _19_

eviction has not been awarded or, with respect to completed foreclosure sales in Non-

Judicial States, where any applicable challenge period has not yet expired, and to prosecute

appeals with respect to any such direct claims or counter-claims;

(b)     absent further order of the Court, the automatic stay shall remain in

full force and effect with respect to all pending and future Interested Party direct claims

and counter-claims:  (i) for monetary relief of any kind and of any nature against the

Debtors, except where a monetary claim must be plead in order for an Interested Party to a

assert a claim to defend against or otherwise enjoin or preclude a foreclosure (each a

"Mandatory Monetary Claim"); (ii) for relief that if granted, would not terminate or

preclude the prosecution and completion of a foreclosure or eviction; or (iii) asserted in the

form of a class action or collective action;

(c)     absent further order of the Court, the stay shall remain in full force

and effect with respect to any party seeking to intervene to assert related claims against the

Debtors or any class action or collective action brought by any Interested Party on behalf

of any other Interested Party or class of Interested Parties;

(d)     under no circumstances shall an Interested Party be entitled to

enforce against, recoup, setoff or collect from the Debtors any judgment or award related

to any direct claim or counter-claim for which the automatic stay has been lifted by the

terms of this Order, including, without limitation, a Mandatory Monetary Claim;

(e)     the Debtors shall retain the right, upon appropriate motion and

notice to any affected Interested Party, to seek to impose any provision of section 362(a) of

the Bankruptcy Code modified by this Order and to the extent such relief is sought, the

ny-1046923


Exhibit  1
Page  8 of 9

Debtors will not object to the Interested Party's telephonic participation at any hearing on

the motion; and

    (f)    nothing set forth herein shall preclude or limit any Interested Party

from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code

on appropriate motion and notice to the Debtors and parties in interest.

*Borrower Bankruptcy Proceedings*

    15.    The automatic stay imposed by section 362(a) of the Bankruptcy Code

applicable against a borrower who currently has filed, or in the future files, for bankruptcy

protection under any chapter of the Bankruptcy Code (a "<u>Bankruptcy Borrower</u>"), is hereby

modified pursuant to the following terms and conditions:

    (a)    except as set forth herein, a Bankruptcy Borrower or a trustee duly

appointed under the Bankruptcy Code in the Bankruptcy Borrower's bankruptcy case (a

"<u>Bankruptcy Trustee</u>") shall be entitled to:  (i) assert and prosecute or continue to

prosecute an objection to the Debtors' proof of claim filed in the Bankruptcy Borrower's

bankruptcy case; (ii) assert and prosecute or continue to prosecute an objection to the

Debtors' motion for relief from the automatic stay filed in the Bankruptcy Borrower's

bankruptcy case; (iii) commence or continue to prosecute against the Debtors a motion or

adversary proceeding, as applicable, to determine the validity, priority or extent of a

Debtor's lien against the Bankruptcy Borrower's property; (iv) commence or continue to

prosecute against the Debtors a motion or adversary proceeding, as applicable, to reduce

(including to reduce to $0) or fix the amount of the Debtors' claim or lien against the

Bankruptcy Borrower's property; (v) prosecute appeals with respect to items (i) through

(iv) above; (vi) seek an accounting from the Debtors with respect to the Bankruptcy

9


Exhibit ___1___
Page ___9___ of ___19___

Borrower's loan; and (vii) enter into, execute and consummate a written agreement of settlement with the Debtors where the Debtors elect to enter into such settlement in their sole discretion (but subject to the Settlement Procedures), to resolve items (i) through (vi) above;

        (b)     except as set forth herein, a Bankruptcy Borrower shall be entitled to (i) engage in court-supervised or court-authorized loss-mitigation programs regarding the Bankruptcy Borrower's loan; and (ii) engage in discussions with the Debtors and execute a modification of the Bankruptcy Borrower's loan or otherwise discuss, enter into and consummate settlements of claims and liens in accordance with the ordinary course of the Debtors' business and applicable law;

        (c)     absent further order of the Court, the automatic stay shall remain in full force and effect with respect to all Bankruptcy Trustee's and Bankruptcy Borrower's direct claims, counter-claims, motions or adversary proceedings: (i) for monetary relief of any kind and of any nature against the Debtors; (ii) for violation of any local, state or federal statute or other law in connection with the origination of the Bankruptcy Borrower's loan; (iii) for relief that if granted, would have no effect on the amount, validity or priority of the Debtors' claim or lien against a Bankruptcy Borrower or the property of the Bankruptcy Borrower securing such claim or lien of the Debtors; or (iv) asserted in the form of a class action or collective action; provided however, a Bankruptcy Trustee or Bankruptcy Borrower, solely in connection with their objections to Debtors' proof of claim permitted by paragraph 15(a)(i) or proceedings permitted by 15(a)(iii), may assert claims of the type covered by subsection (i) or (ii) of this paragraph 15(c);

ny-1046923

Exhibit____1____
Page____10 of 19

(d)      absent further order of the Court, the automatic stay shall remain in full force and effect with respect to any party seeking to intervene to assert related claims against the Debtors or any class action or collective action brought by any Bankruptcy Borrower on behalf of any other class of borrowers;

(e)      with the sole exception of objections to Debtors' proofs of claim permitted by paragraph 15(a)(i) above and proceedings described in 15(a)(iii) above and solely for purposes of reducing any such claim and not for the purpose of obtaining an affirmative recovery or award, under no circumstances shall a Bankruptcy Borrower or Bankruptcy Trustee be entitled to recoup, setoff or collect from the Debtors any judgment or award related to any direct claim or counter-claim for which the automatic stay has been lifted by the terms of this Order;

(f)      the Debtors shall retain the right, upon appropriate motion and notice to any Bankruptcy Borrower or Bankruptcy Trustee, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by this Order and to the extent such relief is sought, the Debtors will not object to the Interested Party's telephonic participation at any hearing on the motion; and

(g)      nothing set forth herein shall preclude or limit any Bankruptcy Borrower or Bankruptcy Trustee from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

*Foreclosures By The Debtors On Senior Loans*

16.      The stay imposed by section 362(a) of the Bankruptcy Code applicable to pending and future foreclosure actions initiated by the Debtors in cases where they act as

servicer for the Senior Loan and also own (or for which the applicable public land records otherwise reflect that the Debtors hold an interest) the Junior Loan with respect to the underlying property (collectively, the "Junior Foreclosure Actions") is hereby modified pursuant to the following terms and conditions:

(a)     except as otherwise set forth herein, the Debtors shall be entitled to assert and prosecute Junior Foreclosure Actions, whether in a Judicial State or a Non-Judicial State;

(b)     the Debtors shall be entitled to take such actions as are necessary to extinguish the lien with respect to a Junior Loan or to otherwise ensure clear and marketable title with respect to the property underlying a Senior Loan in connection with any sale or other disposition of such property;

(c)     the Debtors shall be entitled to seek all appropriate relief with respect to a Senior Loan in connection with the bankruptcy cases of a Bankruptcy Borrower without further order of the Court; and

(d)     the Debtors shall provide monthly reports to the Committee and the U.S. Trustee, which reports shall be in a form agreed to by the Debtors and the Committee, and such additional information as shall be reasonably requested by the Committee, in each case, concerning Junior Foreclosure Actions.

D.     *Actions Involving Amount, Validity Or Priority Of Liens*

17.     The stay imposed by section 362(a) of the Bankruptcy Code applicable to actions involving the amount, validity, and/or priority of liens commenced by third parties purporting to have a lien interest or other claim ("Third Party Claimants") with respect to



Exhibit____1____
Page___12_of__19

Case 3:13-cv-00581-MO   Document 14   Filed 04/18/13   Page 17 of 24

12-12020-mg   Doc 10482-1   Filed 03/02/18   Entered 03/02/18 20:29:43   Exhibit A
Pg 188 of 208
12-12020-mg   Doc 774   Filed 07/13/12   Entered 07/13/12 17:05:30   Main Document
Pg 13 of 19

properties that are subject to mortgages owned or serviced by the Debtors ("Title Disputes") is

hereby modified pursuant to the following terms and conditions:

      (a)    except as otherwise set forth herein, a Third Party Claimant shall be

entitled to assert and prosecute direct claims and counter-claims relating exclusively to the

property that is the subject of the loan owned or serviced by a Debtor in connection with

any Title Dispute, and to prosecute appeals with respect to any such direct claims or

counter-claims;

      (b)    absent further order of the Court, the automatic stay shall remain in

full force and effect with respect to all pending and future Third Party Claimant direct

claims and counter-claims:  (i) for monetary relief of any kind and of any nature against the

Debtors; (ii) for relief that is not necessary for the resolution of the Title Dispute; or

(iii) asserted in the form of a class action or collective action;

      (c)    absent further order of the Court, the stay shall remain in full force

and effect with respect to any party seeking to intervene to assert related claims against the

Debtors or any class action or collective action brought by any Third Party Claimant on

behalf of any other Third Party Claimant or class of Third Party Claimants;

      (d)    under no circumstances shall a Third Party Claimant be entitled to

enforce against, recoup, setoff or collect from the Debtors any judgment or award related

to any direct claim or counter-claim for which the automatic stay has been lifted by the

terms of the Order;

      (e)    the Debtors shall be entitled to take such actions as are necessary to

clear title with respect to property that is subject to a Title Dispute or to otherwise ensure



Exhibit ___1___
Page___13_of_19___

clear and marketable title with respect to such property in connection with any sale, foreclosure or other disposition of such property;

(f)    the Debtors shall retain the right, upon appropriate motion and notice to any affected Third Party Claimant, to seek to impose any provision of section 362(a) of the Bankruptcy Code modified by the Order; and

(g)    nothing set forth herein shall preclude or limit any Third Party Claimant from seeking relief from the automatic stay under section 362(a) of the Bankruptcy Code on appropriate motion and notice to the Debtors and parties in interest.

<u>Payment of Securitization Trustee Fees and Expenses</u>

18.    The Debtors shall continue to perform all of their respective servicing duties and servicing related duties, including, but not limited to, their duties as master servicer, under all the governing agreements (including, without limitation, pooling and servicing agreements, servicing agreements, or any other agreements concerning or relating to the Debtors' obligations to reimburse and/or indemnify for reasonable fees, costs, expenses, liabilities, and/or losses) (collectively, the "<u>Agreements</u>") relating to Debtor-sponsored securitization transactions and non-Debtor sponsored securitization transactions to which any of The Bank of New York Mellon Trust Company, N.A., Wells Fargo Bank, N.A., Deutsche Bank Trust Company Americas, Deutsche Bank National Trust Company, or U.S. Bank National Association, or any affiliate of such entities acts as trustee for which any Debtor performs servicing duties, in each of their respective capacities as trustee (collectively, the "<u>Trustees</u>") and one or more of the Debtors is a party, including but not limited to, making all principal, interest or other servicing advances (including property protection advances) and reimbursing, indemnifying, defending and holding harmless the Trustees and the securitization trusts for any liability, loss, or reasonable fees, cost

ny-1046923

Exhibit _____1_____
Page____14_of_19

or expense (including fees and disbursements of counsel or agents) incurred by any of the

Trustees in the performance of their duties or their administration of the trusts or other agencies

under the Agreements to the extent required by the Agreements.  For the avoidance of doubt, the

Debtors shall pay the reasonable, actual out-of-pocket costs and expenses of the Trustees in

connection with reviewing and analyzing the request by the Debtors to approve the MBS

Settlement Agreement, and in connection with reviewing and analyzing amendments to the

Agreements as necessary or appropriate in connection with any proposed Chapter 11 plan, the

MBS Settlement Agreement or the Platform Sale.  Notwithstanding the foregoing, nothing in this

paragraph 18 shall require any Debtor (i) to repurchase any mortgage loans on the basis of

alleged breaches of representations, warranties or other requirements of the Agreements, or make

any make-whole payments with respect to any mortgage loans pursuant to the Agreements; or

(ii) to enforce, as against any other Debtor entity or any non-Debtor affiliate, any provision of the

Agreements under which such other Debtor entity or non-Debtor affiliate are required to

repurchase any mortgage loans on the basis of alleged breaches of representations, warranties or

other requirements of the Agreements, or make any make-whole payments with respect to any

mortgage loans pursuant to the Agreements; and nothing in this paragraph 18 shall be deemed to

impose liability on any Debtor with respect to such alleged breaches or make-whole payment

requirements.

      19.    The Trustees shall submit invoices to (a) counsel to the Debtors,

(b) counsel to the Committee, and (c) the U.S. Trustee, and all such invoices shall include (i) an

itemization of all professional fees by task with a detailed description of the work performed in

connection with such task, (ii) a description of related expenses, and (iii) a description of any

indemnity claims.  Thereafter, within thirty (30) days of presentment of such invoices, if no

Case 3:13-cv-00581-MO   Document 14   Filed 04/18/13   Page 20 of 24

12-12020-mg   Doc 10482-1   Filed 03/02/18   Entered 03/02/18 20:29:43   Exhibit A
Pg 191 of 208
12-12020-mg   Doc 774   Filed 07/13/12   Entered 07/13/12 17:05:30   Main Document
Pg 16 of 19

written objections to the reasonableness of the fees and expenses charged in any such invoice (or

portion thereof) is made by the Debtors, the Committee, or the U.S. Trustee, the Debtors are

authorized and directed to pay all reasonable fees, costs and expenses and all indemnity claims

referred to in paragraph 18 (including without limitation, attorney, financial advisor, consultant

and expert fees and costs) incurred postpetition by any of the Trustees relating to the

performance of each of the Trustees' duties or the administration of the trusts or other agencies

under the Agreements (the "Trustee Expenses") that are not subject to an objection by the

Debtors, the Committee, or the U.S. Trustee without further order from the Court.  Any objection

to the payment of the Trustee Expenses shall be made only on the basis of "reasonableness," and

shall specify in writing the amount of the contested fees and expenses and a detailed basis for

such objection.  To the extent an objection only contests a portion of an invoice, the undisputed

portion thereof shall be promptly paid.  If any such objection to payment of an invoice (or any

portion thereof) is not otherwise resolved between the Debtors, the Committee, or the U.S.

Trustee and the issuer of the invoice, either party may submit such dispute to the Court for a

determination as to the reasonableness of the disputed amounts.  This Court shall resolve any

dispute as to the reasonableness of any fees and expenses.

     20.     To the extent either the Committee, or the RMBS Trustees determine that

the Trustee Expenses were improperly or mistakenly allocated to an RMBS trust or to the

Debtors' estates, the Committee and the RMBS Trustees reserve the right to seek to correct the

allocation of the Trustee Expenses as between the RMBS trusts or the Debtors' estates in

accordance with the applicable Agreement, and such adjustment shall be the Committee's and

RMBS Trustees' sole remedy arising from a misallocation.  All Trustee Expenses for which

(a) no objection under paragraph 19 has been interposed, or (b) where such an objection has been

interposed and the amount of Trustee Expenses determined by the Court to be reasonable, shall

be entitled to administrative expense priority in the Debtors' Chapter 11 cases notwithstanding

the entry of an order authorizing the assumption and assignment or rejection of any Agreement.

However, the Debtors will not be responsible for any fees, costs and expenses incurred with

respect to any Agreement after the entry of an order in the Debtors' Chapter 11 cases authorizing

the rejection of such Agreement.

21.    If any or all of the provisions of this Order are hereafter reversed,

modified, limited, vacated or stayed, such reversal, stay, modification or vacatur shall not affect

the validity, priority or enforceability of any Trustee Expenses incurred prior to the actual receipt

of written notice by the Trustees of the effective date of such reversal, stay, modification or

vacatur (the "Notice Date").  Notwithstanding any such reversal, stay, modification or vacatur,

the payment of any Trustee Expenses incurred prior to the Notice Date and reimbursed prior to

or after the Notice Date by the Debtors shall be governed in all respects by the original

provisions of this Order, and the Trustees shall be entitled to all of the rights, remedies,

privileges and benefits granted in this Order with respect to payment of Trustee Expenses.

22.    Notwithstanding the Debtors' obligations set forth in paragraphs 18 and

19, nothing in this Order shall be deemed to limit, extinguish, or prejudice the Debtors' rights in

any way to assume and assign or reject any Agreement in accordance with Bankruptcy Code

section 365.

Other Relief

23.    Any disputes regarding the extent, application and/or effect of the

automatic stay under this Order shall be heard and determined in the Debtors' jointly

administered bankruptcy cases pending in the United States Bankruptcy Court for the Southern



Exhibit ___1___
Page__17_of_19

District of New York, Case No. 12-12020 in accordance with the Case Management Order

entered in the Debtors' cases [Docket No. 141] and such other and further orders as may be

entered by the Court.

24.     The Debtors are authorized and empowered to take all actions and execute

such documents as may be necessary or appropriate to carry out the relief granted herein.

25.     Nothing herein shall be deemed to limit the rights of the Debtors to

operate their business in the ordinary course, and no subsequent order shall be required to

confirm such rights.

26.     Notwithstanding the relief granted herein and any actions taken hereunder,

nothing contained herein shall constitute, nor is it intended to constitute, the assumption of any

contract or agreement under Bankruptcy Code section 365 or the waiver by the Debtors or their

non-Debtor affiliates of any of their rights pursuant to any agreement by operation of law or

otherwise.

27.     Notwithstanding anything to the contrary in this Order, any action to be

taken pursuant to the relief authorized in this Order is subject to the terms of any cash collateral

order or debtor in possession financing order entered in these chapter 11 proceedings.  All

amounts authorized to be paid pursuant to this Order are subject to the limitations and

restrictions imposed by the Approved DIP Budget (as defined in the DIP Credit Agreement).  To

the extent that there is any inconsistency between the terms of this Order and the terms of any

order relating to postpetition financing or cash collateral, the terms of the orders relating to

postpetition financing or cash collateral shall govern.

28.     Notwithstanding anything herein to the contrary, this Order shall not

modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board


Exhibit     1
Page     18 of 19

of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among

AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal

Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment

entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012,

(c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the

Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

     29.    Nothing in this Order shall discharge, release, or otherwise preclude any

setoff or recoupment right of the United States of America, its agencies, departments, or agents.

     30.    The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

     31.    Notwithstanding the possible applicability of Bankruptcy Rules

2002(a)(3), 6004(h), 7062 or 9014, the terms and conditions of this Order shall be immediately

effective and enforceable upon its entry.

     32.    This Court shall retain jurisdiction with respect to all matters relating to

the interpretation or implementation of this Order.


Dated:      July 13, 2012
           New York, New York


                                  **/s/Martin Glenn**
                                 MARTIN GLENN
                  United States Bankruptcy Judge

Exhibit _____1_____
Page_____19_of_19

ny-1046923

<u>CERTIFICATE OF SERVICE</u>

I certify that on April 18, 2013, I served, **VIA ECF**, a full and correct copy of the

foregoing **NOTICE OF BANKRUPTCY AND SUGGESTION OF AUTOMATIC STAY** to

the interested parties of record, addressed as follows:

| | |
|---|---|
| David P. Smith | dave@thesmithfirmpc.com |
| Michael J. Farrell | mfarrell@martinbischoff.com |
| Thomas W. Purcell | tpurcell@martinbischoff.com |
| Christopher A. Wright | cwright@wthf.com |

Dated:        April 18, 2013

*/s/ William G. Fig*
William G. Fig, OSB No. 952618

20809-088\FEDERAL COURT NOB (01569533);1

Page 5 – NOTICE OF BANKRUPTCY & SUGGESTION OF STAY

## Exhibit 7 to Nye Declaration

TERMINATED,

# U.S. District Court
## District of Oregon (Portland (3))
## CIVIL DOCKET FOR CASE #: 3:13-cv-00581-MO

Fauley v. Washington Mutual Bank FA et al          Date Filed: 04/04/2013
Assigned to: Chief Judge Michael W. Mosman          Date Terminated: 11/04/2014
Case in other court: Clackamas County Circuit Court,          Jury Demand: Plaintiff
           CV13010433          Nature of Suit: 370 Other Fraud
Cause: 28:1332 Diversity-Petition for Removal          Jurisdiction: Diversity

**Plaintiff**

**Robynne A. Fauley**          represented by          **Robynne A. Fauley**
                                          12125 S.E. Laughing Water Road
                                          Sandy, OR 97055
                                          503-381-6937
                                          Email: ihomm@ihomm.org
                                          PRO SE

                                          **David P. Smith**
                                          The Smith Firm, PC
                                          1754 Willamette Falls Drive
                                          West Linn, OR 97068
                                          503-657-6550
                                          Fax: 866-710-0666
                                          Email: dave@thesmithfirmpc.com
                                          *TERMINATED: 06/22/2015*

V.

**Defendant**

**Washington Mutual Bank FA**          represented by          **Michael J. Farrell**
*TERMINATED: 10/09/2014*                                   MB Law Group, LLP
                                            117 SW Taylor St.
                                          Suite 200
                                          Portland, OR 97204
                                          503-914-2015
                                          Fax: 503-914-1725
                                          Email: mfarrell@mblglaw.com
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **Thomas W. Purcell**
                                          MB Law Group LLP
                                          117 SW Taylor Street

Suite 200
Portland, OR 97204
503-914-2015
Fax: 503-914-1725
Email: tpurcell@mblglaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Deutsche Bank Trust Company Americas**
*as Trustee*

represented by **Emilie K. Edling**
Houser & Allison, APC
9600 SW Oak St.
Suite 570
Portland, OR 97223
503-914-1382
Fax: 503-914-1383
Email: eedling@houser-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Farrell**
(See above for address)
*TERMINATED: 07/03/2013*

**Thomas W. Purcell**
(See above for address)
*TERMINATED: 07/03/2013*

**William G. Fig**
Sussman Shank, LLP
1000 SW Broadway
Suite 1400
Portland, OR 97205
(503) 227-1111
Fax: (503) 248-0130
Email: wfig@sussmanshank.com
*TERMINATED: 04/02/2014*

**Defendant**

**LNV Corporation**

represented by **Erick J. Haynie**
Perkins Coie, LLP
1120 NW Couch Street
10th Floor
Portland, OR 97209-4128
503-727-2017
Fax: 503-727-2222
Email: ehaynie@perkinscoie.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kirsten A. Worley**
Worley Law Corp., P.C.
26632 Towne Centre Drive
Suite 300
Foothill Ranch, CA 92610
949-420-3706
Fax: 949-420-3707
Email: kw@wlawcorp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher A. Wright**
Carney Badley Spellman
701 Fifth Avenue,
Suite 3600
Seattle, WA 98104
206-622-8020
Fax: 206-467-8215
Email: wright@carneylaw.com
*TERMINATED: 06/16/2014*

**Jeffrey M. Peterson**
Perkins Coie, LLP
1120 NW Couch Street
10th Floor
Portland, OR 97209-4128
503-727-2075
Email:
jeffreypeterson@perkinscoie.com
*TERMINATED: 01/24/2017*
*ATTORNEY TO BE NOTICED*

**John M. Thomas**
McCarthy & Holthus
920 SW Third Avenue
First Floor
Portland, OR 97204
971-201-3203
Fax: 971-201-3202
Email: jthomas@mccarthyholthus.com
*TERMINATED: 06/29/2015*

**Gabrielle D. Richards**
Martin & Richards, LLP
111 SW Fifth Avenue
Suite 3150
Portland, OR 97204
503-444-3449

Fax: 503-296-5834
Email: gabby@cascadialawyers.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Does 1 through 20**

**Defendant**

**Residential Funding Company, LLC**          represented by    **Emilie K. Edling**
*TERMINATED: 10/21/2014*                                      (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **William G. Fig**
                                                             (See above for address)
                                                             *TERMINATED: 04/02/2014*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 04/04/2013 | 1 | Notice of Removal of Case Number CV13010433 from Circuit Court - Clackamas County. Filing Fee in amount of $350 collected. Agency Tracking ID: 0979-3243745 issued.. Filed by LNV Corporation (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Civil Cover Sheet). (Wright, Christopher) (Entered: 04/04/2013) |
| 04/04/2013 | 2 | Notice of Case Assignment to Magistrate Judge John V. Acosta and Discovery and Pretrial Scheduling Order. Discovery is to be completed by 8/2/2013. Joint Alternate Dispute Resolution Report is due by 9/3/2013. Pretrial Order is due by 9/3/2013. Ordered by Magistrate Judge John V. Acosta. (sm) (Entered: 04/04/2013) |
| 04/11/2013 | 3 | Answer to Complaint following a Notice of Removal (Related Doc. 1 ) . Filed by Deutsche Bank Trust Company Americas, Washington Mutual Bank FA. (Purcell, Thomas) (Entered: 04/11/2013) |
| 04/11/2013 | 4 | Corporate Disclosure Statement . Filed by Deutsche Bank Trust Company Americas, Washington Mutual Bank FA. (Purcell, Thomas) (Entered: 04/11/2013) |
| 04/11/2013 | 5 | Memorandum of Law In Support Of Defendant LNV Corp's Motion to Dismiss Counts of the First Amended Complaint; Motion to Strike; or in the alternative Motion for More Definite Statement 6 . Filed by LNV Corporation. (Wright, Christopher) Modified on 4/15/2013 to correct docket text from Motion to Memorandum (ecp). M (Entered: 04/11/2013) |
| 04/11/2013 | 6 | Motion to Dismiss for Failure to State a Claim, Filed by LNV Corporation (Related document(s): Memorandum of Law In Support Of Defendant LNV Corp's Motion to Dismiss Counts of the First Amended Complaint; Motion to Strike; or in the alternative Motion for More Definite Statemen, 5 .) (Wright, |

| | | |
|---|---|---|
| | | Christopher) Modified on 4/15/2013 to correct docket text from Notice to Motion (ecp). (Entered: 04/11/2013) |
| 04/11/2013 | 7 | Request for Judicial Notice *in Support of* Motion to Dismiss for Failure to State a Claim, 5 . Filed by LNV Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I) (Wright, Christopher) (Entered: 04/11/2013) |
| 04/11/2013 | 8 | Corporate Disclosure Statement . Filed by LNV Corporation. (Wright, Christopher) (Entered: 04/11/2013) |
| 04/15/2013 | 9 | Consent Notice re Notice of Removal, 1 Filed by Deutsche Bank Trust Company Americas, Washington Mutual Bank FA (Related document(s): Notice of Removal, 1 .) (Purcell, Thomas) (Entered: 04/15/2013) |
| 04/15/2013 | 10 | Amended Request for Judicial Notice *in Support of* Motion to Dismiss for Failure to State a Claim, 5 . Filed by LNV Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I) (Wright, Christopher) (Entered: 04/15/2013) |
| 04/16/2013 | 11 | **ORDER** by Judge Acosta - DENYING as MOOT Defendant LNV's Request for Judicial Notice 7 in light of LNV's filing of an amended request for judicial notice 10 . (peg) (Entered: 04/16/2013) |
| 04/16/2013 | 12 | SCHEDULING ORDER by Judge Acosta - Defendant LNV's Amended Request for Judicial Notice 10 and Motion to Dismiss 6 will both be taken under advisement as of 5/20/2013. (peg) (Entered: 04/16/2013) |
| 04/18/2013 | 13 | Notice *of Residential Funding Company, LLC's Consent to Removal* Filed by Residential Funding Company, LLC (Fig, William) (Entered: 04/18/2013) |
| 04/18/2013 | 14 | Notice *of Bankruptcy and Suggestion of Automatic Stay* Filed by Residential Funding Company, LLC (Fig, William) (Entered: 04/18/2013) |
| 04/24/2013 | 15 | Stipulated Motion To Stay LNV Corporation's Motion To Dismiss First Amended Complaint, Etc. Filed by Robynne A Fauley, LNV Corporation. (Wright, Christopher) Modified event type to motion for stay on 4/25/2013 (cib). (Entered: 04/24/2013) |
| 04/25/2013 | 16 | **ORDER** by Judge Acosta - GRANTING stipulated motion 15 to extend the time for parties' to respond to LNV's motion 6 to dismiss and motion to strike or alternatively for a more definite statement and amended request for judicial notice 10 up to and including 6/17/13. The reply deadline to motion 6 and request 10 will be due within the time frame allowed by the local rules. Motion 6 and Request 10 will now be taken under advisement as of 7/8/13. The parties have stated in motion 15 that they tend to use a significant portion of this time to explore settlement of this matter. (peg) (Entered: 04/25/2013) |
| 06/12/2013 | 17 | Second Motion for Order *To Stipulated Motion to Dismiss First Amended Complaint*. Filed by LNV Corporation. (Wright, Christopher) (Entered: 06/12/2013) |
| 06/13/2013 | 18 | |

|  |  |  |
|---|---|---|
|  |  | **ORDER** by Judge Acosta - GRANTING the parties second stipulated motion [17](#) to stay briefing and court's ruling on LNV Corporation's motion to dismiss first amended complaint for an additional 30 days. DATED this 13th day of June, 2013, by United States Magistrate Judge John V. Acosta. (peg) (Entered: 06/17/2013) |
| 07/03/2013 | 19 | Notice of Attorney Withdrawal: *Michael J. Farrell & Thomas W. Purcell*, Notice of Attorney Substitution:Attorney William Fig is substituted as counsel of record in place of Attorney Michael J. Farrell and Thomas W. Purcell Filed by Deutsche Bank Trust Company Americas (Farrell, Michael) (Entered: 07/03/2013) |
| 07/15/2013 | 20 | Third Motion for Order *To Stipulated Motion to Dismiss First Amended Complaint* Motion for Order 17 , Motion to Dismiss, 6 , Motion for Stay 15 . Filed by LNV Corporation. (Wright, Christopher) (Entered: 07/15/2013) |
| 07/15/2013 | 21 | **ORDER** by Judge Acosta - GRANTING the parties third stipulated motion 20 to stay this matter, including briefing on the pending motions to dismiss up to and including 8/15/13. If this case has not reached a settlement by 8/15/13, the parties are to submit a proposed briefing and scheduling order by 8/16/13. (peg) (Entered: 07/15/2013) |
| 08/15/2013 | 22 | Stipulation re Motion to Dismiss 6 *Stipulation for Briefing Order* by LNV Corporation. Filed by LNV Corporation. (Attachments: # 1 Proposed Order) (Wright, Christopher) (Entered: 08/15/2013) |
| 08/20/2013 | 23 | ORDER on Stipulation 22 for Briefing Order on LNV Corporation's Motion 6 to Dismiss First Amended Complaint - (1) Plaintiff's opposition, if any is due on or before 9/30/13. (2) LNV's reply, if any, is due by 10/7/13. (3) No later than 9/30/13, the parties shall file a proposed scheduling order with respect to discovery, requested trial date and all other appropriate court deadlines in this matter. DATED this 20th day of August, 2013, by United States Magistrate Judge John V. Acosta. (peg) (Entered: 08/26/2013) |
| 08/26/2013 | 24 | SCHEDULING ORDER by Judge Acosta - Defendant's Motion to Dismiss 6 will be taken under advisement as of 10/15/13. (peg) (Entered: 08/26/2013) |
| 09/30/2013 | 25 | Memorandum in Opposition *TO DEFENDANT LNV CORPORATION'S* to Motion to Dismiss 6 . Filed by Robynne A Fauley. (Smith, David) (Entered: 09/30/2013) |
| 09/30/2013 | 26 | Stipulated Stipulation *Scheduling Order* by All Parties. Filed by All Parties. (Smith, David) (Entered: 09/30/2013) |
| 10/01/2013 | 27 | Amended Motion for Extension of Discovery & PTO Deadlines *Stipulated*. Filed by All Plaintiffs. (Smith, David) (Entered: 10/01/2013) |
| 10/02/2013 | 28 | **ORDER** by Judge Acosta - GRANTING the parties' amended stipulated motion 27 to extend the case management deadlines as follows: (1) Discovery to be completed and a joint ADR report filed by 4/30/14. (2) Any dispositive motions to be filed by 6/6/14. (3) No trial related dates will be set before Judge Acosta unless or until all parties have conventionally filed their consent to jurisdiction by a United States Magistrate Judge forms. (peg) (Entered: 10/02/2013) |
|  |  |  |

| 10/07/2013 | 29 | Reply *to Plaintiff's Memorandum in Opposition* to Motion to Dismiss 6 . Filed by LNV Corporation. (Wright, Christopher) (Entered: 10/07/2013) |
| 11/22/2013 | 30 | Motion for Leave to Appear Pro Hac Vice *for Attorney Kirsten A. Worley* . Filing fee in the amount of $100 collected; Agency Tracking ID: 0979-3496627. Filed by LNV Corporation. (Wright, Christopher) (Entered: 11/22/2013) |
| 11/26/2013 | 31 | Order Granting Application for Special Admission Pro Hac Vice of Kirsten A. Worley for LNV Corporation. Application Fee in amount of $100 collected. Receipt No. 0979-3496627 issued. Signed on 11/26/2013 by Magistrate Judge John V. Acosta. (ecp) (Entered: 12/03/2013) |
| 12/18/2013 | 32 | Notice of Appearance of Kirsten A. Worley appearing on behalf of LNV Corporation *and Request for Special Notice,* Filed by on behalf of LNV Corporation (Worley, Kirsten) (Entered: 12/18/2013) |
| 02/19/2014 | 33 | FINDINGS and RECOMMENDATION - For the reasons stated, LNV Corp.'s motion for judicial notice 10 should be GRANTED; its motion 6 to dismiss Fauley's UTPA and common law fraud claims should be GRANTED without prejudice so Fauley can refile a complaint that conforms to federal pleading standards; LNV Corp.'s motion to dismiss the equitable relief claims and motions to strike should be DENIED, and its motion for a more definite statement should be GRANTED. The Findings and Recommendation will be referred to a district judge. Objections if any, are due by 3/5/14. If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement. DATED this 19th day of February, 2014, by United States Magistrate Judge John V. Acosta. (peg) (Entered: 02/19/2014) |
| 02/19/2014 | 34 | ORDER by Judge Acosta - REFERRING Findings & Recommendation 33 to the Honorable Michael W Mosman for review. (peg) (Entered: 02/19/2014) |
| 03/21/2014 | 35 | **OPINION AND ORDER:** Upon review, I agree with Judge Acostas recommendation, and I ADOPT the F&R 33 as my own opinion. Defendant LNV Corp.s Motion for Judicial Notice 10 is GRANTED and its Motion to Dismiss 6 is GRANTED in part and DENIED in part. Signed on 3/21/14 by Judge Michael W. Mosman. (dls) (Entered: 03/21/2014) |
| 03/24/2014 | 36 | SCHEDULING ORDER by Judge Acosta - In light of the adopting of this court's Findings & Recommendation 33 , by Opinion and Order 35 on 3/21/14, Plaintiff may file an amended complaint by 4/14/14. The complaint must conform to federal pleading standards and according to the rulings as contained in the Opinion and Order. (peg) (Entered: 03/24/2014) |
| 04/02/2014 | 37 | Notice of Attorney Withdrawal: *William G. Fig and Sussman Shank LLP and Substitution of Emilie K. Edling and Houser & Allison APC* Filed by Deutsche Bank Trust Company Americas, Residential Funding Company, LLC (Fig, William) (Entered: 04/02/2014) |
| 04/07/2014 | 38 | Notice of Case Reassignment: This case has been reassigned from Magistrate Judge John V. Acosta to Judge Michael W. Mosman. (eo) (Entered: 04/07/2014) |

| 04/14/2014 | 39 | Second Amended Complaint . Filed by Robynne A Fauley against All Defendants (Attachments: # 1 Exhibit A - H). (Smith, David) (Entered: 04/14/2014) |
| 04/15/2014 | 40 | Stipulated Motion for Extension of Discovery & PTO Deadlines *Stipulation by All Parties and Joint Request for Entry of Revised Scheduling Order*. Filed by Robynne A Fauley. (Smith, David) (Entered: 04/15/2014) |
| 04/17/2014 | 41 | **ORDER:** GRANTING Motion for Extension of Discovery & PTO Deadlines 40 . Discovery is extended from 4/30/2014, to be completed by 10/31/2014. Expert Discovery to be completed by 10/31/2014. Dispositive Motions are extended from 6/6/2014, due by 12/31/2014. Joint Alternate Dispute Resolution Report and Pretrial Order due 30 days after the resolution of dispositive motions. Ordered by Judge Michael W. Mosman. (dls) (Entered: 04/17/2014) |
| 05/05/2014 | 42 | Stipulation *to Allow Extension of LNV Corporation's Time to Respond to Second Amended Complaint, by Plaintiff and* by LNV Corporation. Filed by LNV Corporation. (Worley, Kirsten) (Entered: 05/05/2014) |
| 05/07/2014 | 43 | Stipulated Motion *for Extension of Time*. Filed by Deutsche Bank Trust Company Americas, Residential Funding Company, LLC. (Edling, Emilie) Modified on 5/8/2014 (dls). (Entered: 05/07/2014) |
| 05/08/2014 | 44 | **ORDER:** GRANTING Motion for Extension of Time to Answer 43 . Answer is due by 6/2/2014. Ordered by Judge Michael W. Mosman. (dls) (Entered: 05/08/2014) |
| 05/08/2014 | 45 | Stipulated Motion for Extension of Time *to Respond to Second Amended Complaint*. Filed by Washington Mutual Bank FA. (Purcell, Thomas) (Entered: 05/08/2014) |
| 05/14/2014 | 46 | **ORDER:** ORDER: Defendant LNV Corp.'s Stipulated Motion for Extension 42 and Defendant Washington Mutual's Stipulated Motion for Extension of Time 45 are GRANTED. Answers from all Defendants are due 6/2/2014. Ordered by Judge Michael W. Mosman. (dls) (Entered: 05/14/2014) |
| 05/22/2014 | 47 | Stipulated Motion for Extension of Time to Answer *Second* Amended Complaint 39 . Filed by Washington Mutual Bank FA. (Purcell, Thomas) (Entered: 05/22/2014) |
| 05/28/2014 | 48 | **ORDER:** GRANTING Motion for Extension of Time to Answer 47 . Answers from all Defendants are extended from 6/2/2014, due by 7/2/2014. Ordered by Judge Michael W. Mosman. (dls) (Entered: 05/28/2014) |
| 06/16/2014 | 49 | Notice of Attorney Substitution:Attorney John Thomas is substituted as counsel of record in place of Attorney Christopher A. Wright Filed by LNV Corporation (Thomas, John) (Entered: 06/16/2014) |
| 07/02/2014 | 50 | Motion to Dismiss for Failure to State a Claim *Against Second Amended Complaint*. Oral Argument requested. Filed by LNV Corporation. (Thomas, John) (Entered: 07/02/2014) |
| 07/02/2014 | 51 | Motion to Dismiss . Oral Argument requested. Filed by Deutsche Bank Trust Company Americas, Residential Funding Company, LLC. (Attachments: # 1 |

|  |  | Attachment Defendant Deutsche Bank as Trustee's Memorandum of Law in Support of Motion to Dismiss) (Edling, Emilie) (Entered: 07/02/2014) |
|---|---|---|
| 07/02/2014 | 52 | Stipulated Motion for Extension of Time to Answer *Second* Amended Complaint 39 . Filed by Deutsche Bank Trust Company Americas, Residential Funding Company, LLC. (Edling, Emilie) (Entered: 07/02/2014) |
| 07/08/2014 | 53 | **ORDER:** GRANTING Motion for Extension of Time to Answer 52 . Answer is due by 8/4/2014. Ordered by Judge Michael W. Mosman. (dls) (Entered: 07/08/2014) |
| 07/16/2014 | 54 | Stipulated Motion for Extension of Time to File a Response/Reply to Motion to Dismiss for Failure to State a Claim *Against Second Amended Complaint* 50 , Motion to Dismiss 51 . Filed by Robynne A Fauley. (Smith, David) (Entered: 07/16/2014) |
| 07/17/2014 | 55 | **ORDER:** GRANTING Motion for Extension of Time to File Response/Reply to Motion to Dismiss for Failure to State a Claim *Against Second Amended Complaint* 50 filed by LNV Corporation, Motion to Dismiss 51 filed by Residential Funding Company, LLC, Deutsche Bank Trust Company Americas. Responses due by 8/15/2014. Ordered by Judge Michael W. Mosman. (dls) (Entered: 07/17/2014) |
| 08/04/2014 | 56 | Notice *of Bankruptcy Status* Filed by Deutsche Bank Trust Company Americas, Residential Funding Company, LLC (Edling, Emilie) (Entered: 08/04/2014) |
| 08/12/2014 | 57 | Stipulated Motion for Extension of Time to File a Response/Reply to Motion to Dismiss for Failure to State a Claim *Against Second Amended Complaint* 50 , Motion to Dismiss 51 . Filed by Robynne A Fauley. (Smith, David) (Entered: 08/12/2014) |
| 08/22/2014 | 58 | **ORDER:** GRANTING 57 Plaintiff's Unopposed and Stipulated Motion for Extension of Time to File Response to Defendants' Motion to Dismiss for Failure to State a Claim *Against Second Amended Complaint* 50 filed by LNV Corporation, Motion to Dismiss 51 filed by Residential Funding Company, LLC, Deutsche Bank Trust Company Americas. Plaintiff's Response is due by 9/19/2014. Ordered by Judge Michael W. Mosman. (mjp) (Entered: 08/22/2014) |
| 09/19/2014 | 59 | Memorandum in Opposition *Defendants LNV Corp.'s and Deutsche Bank Trust Co. America's* to Motion to Dismiss for Failure to State a Claim *Against Second Amended Complaint* 50 , Motion to Dismiss 51 . Filed by Robynne A Fauley. (Smith, David) (Entered: 09/19/2014) |
| 10/02/2014 | 60 | Unopposed Motion for Extension of Time to File a Response/Reply *File Reply in Support* to Motion to Dismiss for Failure to State a Claim *Against Second Amended Complaint* 50 . Filed by LNV Corporation. (Thomas, John) (Entered: 10/02/2014) |
| 10/06/2014 | 61 | Stipulated Motion for Extension of Time to File a Response/Reply *In Support of Motion to Dismiss* to Motion to Dismiss 51 . Filed by Deutsche Bank Trust Company Americas, Residential Funding Company, LLC. (Edling, Emilie) (Entered: 10/06/2014) |
| 10/06/2014 | 62 |  |

|  |  |  |
|---|---|---|
|  |  | **ORDER:** GRANTING Motion for Extension of Time to File Response/Reply to Motion to Dismiss for Failure to State a Claim *Against Second Amended Complaint* 50 filed by LNV Corporation, Unopposed Motion for Extension of Time to File a Response/Reply *File Reply in Support* to Motion to Dismiss for Failure to State a Claim *Against Second Amended Complaint* 50 60 filed by LNV Corporation. Reply is due by 10/14/2014. Ordered by Judge Michael W. Mosman. (dls) (Entered: 10/06/2014) |
| 10/06/2014 | 63 | **ORDER:** GRANTING Motion for Extension of Time to File Response/Reply to Motion to Dismiss 51 filed by Residential Funding Company, LLC, Deutsche Bank Trust Company Americas. Reply is due by 10/14/2014. Ordered by Judge Michael W. Mosman. (dls) (Entered: 10/06/2014) |
| 10/09/2014 | 64 | Stipulated Notice of Dismissal of Party *Defendant Washington Mutual Bank, FA* Filed by Robynne A Fauley (Smith, David) (Entered: 10/09/2014) |
| 10/14/2014 | 66 | Stipulated Motion for Extension of Time to File a Response/Reply *in Support of Motion to Dismiss* to Motion to Dismiss 51 . Filed by Deutsche Bank Trust Company Americas, Residential Funding Company, LLC. (Edling, Emilie) (Entered: 10/14/2014) |
| 10/14/2014 | 67 | Reply *in Support* to Motion to Dismiss for Failure to State a Claim *Against Second Amended Complaint* 50 Oral Argument requested. Filed by LNV Corporation. (Thomas, John) (Entered: 10/14/2014) |
| 10/17/2014 | 68 | **ORDER:** DENYING AS MOOT Motion for Extension of Time to File Response/Reply to Motion to Dismiss 51 filed by Residential Funding Company, LLC, Deutsche Bank Trust Company Americas ; GRANTING Motion for Extension of Time to File Response/Reply to Motion to Dismiss 51 filed by Residential Funding Company, LLC, Deutsche Bank Trust Company Americas. Reply is due by 10/20/2014. Ordered by Judge Michael W. Mosman. (dls) (Entered: 10/17/2014) |
| 10/20/2014 | 69 | Stipulated Motion to Dismiss *Defendant Residential Funding Company, LLC Without Prejudice*. Filed by Robynne A Fauley. (Smith, David) (Entered: 10/20/2014) |
| 10/20/2014 | 70 | *Defendant Deutsche Bank as Trustee's* Memorandum in Support *of Motion to Dismiss*. Filed by Deutsche Bank Trust Company Americas, Residential Funding Company, LLC. (Related document(s): Motion to Dismiss, 51 .) (Edling, Emilie) (Entered: 10/20/2014) |
| 10/21/2014 | 71 | **ORDER:** Granting Stipulated Motion 69 to Dismiss Defendant Residential Funding Company, LLC, without prejudice. Ordered by Judge Michael W. Mosman. (sm) (Entered: 10/21/2014) |
| 10/27/2014 | 72 | Stipulated Motion for Extension of Discovery & PTO Deadlines *Stipulation by All Parties and Joint Request for Entry of Revised Scheduling Order*. Filed by Robynne A Fauley. (Smith, David) (Entered: 10/27/2014) |
| 11/04/2014 | 73 | **OPINION AND ORDER:** I GRANT Defendant LNV Corporations 50 and Deutsche Banks 51 motions to dismiss Ms. Fauleys UTPA and fraud claims WITHPREJUDICE. Ms. Fauleys claims for declaratory and injunctive relief are |

District of Oregon CM/ECF LIVE Release Version 6.1      Page 11 of 12
12-12020-mg    Doc 10482-1    Filed 03/02/18    Entered 03/02/18 20:29:43    Exhibit A
Pg 207 of 208

|  |  | dependent on her UTPA and fraud claims and are likewise DISMISSED WITH PREJUDICE. All other pending motions are DENIED AS MOOT. Signed on 11/4/14 by Judge Michael W. Mosman. (dls) (Entered: 11/05/2014) |
|---|---|---|
| 11/04/2014 | 74 | Judgment. Based upon my Opinion and Order, IT IS ORDERED AND ADJUDGED that this case should be DISMISSED WITH PREJUDICE for failure to state a claim. I GRANT Defendant LNV Corporations 50 and Deutsche Banks 51 motions to dismiss Ms. Fauleys UTPA and fraud claims WITH PREJUDICE. Plaintiffs claims for declaratory and injunctive relief are also DISMISSED WITH PREJUDICE. All pending motions are DENIED AS MOOT. Signed on 11/4/14 by Judge Michael W. Mosman. (dls) (Entered: 11/05/2014) |
| 06/18/2015 | 75 | Request for Judicial Notice of Information and Criminal Indictment and Plea Agreement of Lorraine Brown. Filed by Robynne A Fauley. (Attachments: # 1 Exhibit) (ecp) (Entered: 06/18/2015) |
| 06/18/2015 | 76 | Notice of Related Cases. Filed by Robynne A Fauley (Attachments: # 1 Exhibit) (ecp) (Entered: 06/22/2015) |
| 06/18/2015 | 77 | Motion for Relief of Judgment. Filed by Robynne A Fauley. (Attachments: # 1 Exhibit) (ecp) (Entered: 06/22/2015) |
| 06/22/2015 | 78 | Notice of Attorney Withdrawal: *for Plaintiff* Filed by Robynne A Fauley (Smith, David) (Entered: 06/22/2015) |
| 06/29/2015 | 79 | Notice of Attorney Substitution:Attorney Erick J. Haynie is substituted as counsel of record in place of Attorney John M. Thomas Filed by LNV Corporation (Richards, Gabrielle) (Entered: 06/29/2015) |
| 06/29/2015 | 80 | Motion for Extension of Time to File a Response/Reply *to Plaintiff's Motion for Relief of Judgment* to Motion 77 . Filed by LNV Corporation. (Richards, Gabrielle) (Entered: 06/29/2015) |
| 06/29/2015 | 81 | Declaration of Gabrielle D. Richards *in Support of Defendant LNV Corporation's Motion for an Extension of Time to Respond to Plaintiff's Motion for Relief of Judgment*. Filed by LNV Corporation. (Related document(s): Motion for Extension of Time to File Response/Reply to a Motion 80 .) (Richards, Gabrielle) (Entered: 06/29/2015) |
| 07/02/2015 | 82 | Amended Certificate of Service by Robynne A. Fauley of Request for Judicial Notice 75 , Notice 76 , Motion 77 Filed by Robynne A. Fauley. (ecp) (Entered: 07/02/2015) |
| 07/02/2015 | 83 | **ORDER:** GRANTING Motion for Extension of Time to File Response/Reply to Motion 77 filed by Robynne A. Fauley, Request for Judicial Notice 75 filed by Robynne A. Fauley. Responses due by 7/16/2015. Ordered by Judge Michael W. Mosman. (dls) (Entered: 07/02/2015) |
| 07/02/2015 | 84 | Response *Defendant LNV Corporation's Response Memorandum in Opposition to Plaintiff's Notice of Related Cases*. Filed by LNV Corporation. (Related document(s): Notice 76 .) (Richards, Gabrielle) (Entered: 07/02/2015) |
| 07/02/2015 | 85 |  |

District of Oregon CM/ECF LIVE Release Version 6.1     Page 12 of 12
12-12020-mg    Doc 10482-1    Filed 03/02/18    Entered 03/02/18 20:29:43    Exhibit A
Pg 208 of 208

| | | |
|---|---|---|
| | | Response *Defendant LNV Corporation's Response Memorandum in Opposition to Plaintiff's Motion for Judicial Notice of Information and Criminal Indictment and Plea Agreement of Lorraine Brown*. Filed by LNV Corporation. (Related document(s): Request for Judicial Notice 75 .) (Richards, Gabrielle) (Entered: 07/02/2015) |
| 07/07/2015 | 86 | Clerk's Notice of Mailing to Robynne A. Fauley regarding Order on motion for extension of time to file Response/Reply, 83 . (dls) (Entered: 07/07/2015) |
| 07/16/2015 | 87 | Response *Defendant LNV Corporation's Response Memorandum in Opposition to Plaintiff's Motion for Relief from Judgment* to Motion 77 . Filed by LNV Corporation. (Richards, Gabrielle) (Entered: 07/16/2015) |
| 07/16/2015 | 88 | Declaration of *Gabrielle D. Richards in Support of Defendant LNV Corporation's Response Memorandum in Opposition to Plaintiff's Motion for Relief of Judgment*. Filed by LNV Corporation. (Related document(s): Motion - Miscellaneous 77 .) (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Richards, Gabrielle) (Entered: 07/16/2015) |
| 07/17/2015 | 89 | Notice of Appearance of Jeffrey M. Peterson appearing on behalf of LNV Corporation Filed by on behalf of LNV Corporation (Peterson, Jeffrey) (Entered: 07/17/2015) |
| 08/04/2015 | 90 | **ORDER:** DENYING Request for Judicial Notice of Information and Criminal Indictment and Plea Agreement of Lorraine Brown 75 . Ordered by Judge Michael W. Mosman. (dls) (Entered: 08/04/2015) |
| 08/04/2015 | 91 | **ORDER:** DENYING Motion for Relief of Judgment 77 . Ordered by Judge Michael W. Mosman. (dls) (Entered: 08/04/2015) |
| 08/04/2015 | 92 | Clerk's Notice of Mailing to Robynne A. Fauley regarding Order on Request for Judicial Notice 90 and Order on Motion - Miscellaneous 91 . (dls) (Entered: 08/04/2015) |
| 01/24/2017 | 93 | Notice of Attorney Withdrawal: *Jeffrey M. Peterson* Filed by LNV Corporation (Peterson, Jeffrey) (Entered: 01/24/2017) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/02/2018 12:59:53 | | |
| **PACER Login:** | mf1354:2923879:3945828 | **Client Code:** 73304-0000012-13849 |
| **Description:** | Docket Report | **Search Criteria:** 3:13-cv-00581-MO Start date: 1/1/1970 End date: 3/2/2018 |
| **Billable Pages:** | 9 | **Cost:** 0.90 |