Vito Genna
Clerk of the Court
U.S. Bankruptcy Court Southern District New York
One Bowling Green
New York, NY 10004-1408

March 26, 2018

RE: In re RESIDENTIAL CAPITAL, LLC, et al.
U.S. Bankruptcy Court Southern District New York, Case No: 12-12020

# TO THE IMMEDIATE ATTENTION: Honorable Judge Martin Glenn

## Sworn Declaration of Denise Subramaniam

### In Support of Doc. 10469
In Objection to (Doc 10482)
Filed by ResCap Liquidating Trust, Perkins Coie joined by LNV Corporation (Doc 10485)

Dear Honorable Judge Martin Glenn:

This letter is my declaration to support our Notice of Fraud (Doc. 10469) and is made under oath and penalty of perjury. I hereby state that I, Denise Subramaniam, declare that I am over the age of eighteen (18) years and have personal knowledge of the facts set forth in this letter/declaration, and if called as a witness, could and would competently testify to the facts set forth herein.

I was not served with the responses in objection (Doc. 10482 and Doc. 10485) to our **"Notice of conflicts of interest, fraud and fraud upon the court by debtors in conspiracy with creditor LNV Corporation, ResCap Liquidating Trust and special insurance Coverage counsel for the debtors Perkins Coie LLP,** (Doc 10469). The parties authoring these objections filed Affidavits of Services: Doc. 10486 sworn by Locke Lord paralegal Erin Wegner and Doc. 10483 Sworn by Morrison & Foerster LLP employee Laura Guido; however these law firms knew, or reasonably should have known, I could not be served at 13865 SW Walker Road, Beaverton, OR 97005 because LNV illegally took possession of and forcibly evicted me from this property in February 2016; and my beloved home that specifically accommodated my disabilities has now been demolished by Washington County to widen a road.  LNV Corporation (LNV) and Perkins Coie LLP (PC) were in recent litigation with me and know my current mailing address because it is on record with the courts.  They also know service to other class members at the addresses below would not be deliverable:

|  |  |
|---|---|
| Tuli Molina-Wohl | Catherine Gebhardt |
| 1321 E Luke Avenue | 3753 Thomas Cross Road |
| Phoenix, AZ 85014 | Sevierville, TN 37876 |

RECEIVED
APR - 2 2018
U.S. BANKRUPTCY COURT, SDNY

Marcia Swift recently told me, and other Beal victims that in her foreclosure case Beal Bank USA during discovery specifically requested my phone number, address and other personal information as well as that of Cathy Gebhardt and Tuli Molina-Wohl and the other Beal/LNV victims she knows about. She was compelled by her attorney to give them whatever LNV asked for. We don't understand why Beal Bank USA the parent company of LNV (both owned by Daniel Andrew Beal) needs this information when our contact information is in court records. Nor do we understand why Marcia's attorney didn't object to disclosing this personal information which is not specific to the Swift case. Regardless LNV's owner most certainly has our contact information so Locke Lord and Morrison & Foerster and their clients LNV and PC and the ResCap Liquidating Trust (ResCap) knew, or reasonably should have known we could not receive Doc. 10482 and Doc. 10485 at the addresses where they were mailed. It appears LNV, ResCap and PC willfully attempts to deceive this court, as they have other courts, with intent to deprive us of our fundamental civil rights.

Other Beal victims told me they were very upset about Marcia's disclosure of our personal information to Beal. Many of us have been targeted for retaliation by Beal. Beal's attorneys have sent letters to my children in violation of personal privacy laws. His attorneys send me letters threatening to sue me on a regular basis whenever I post anything online that he doesn't like. I've seen similar threatening letters mailed to other Beal victims. Some of those letters are a matter of public record in court cases. The disabled child of one Beal victim was targeted. She is too fearful now to fight back. If she were provided guaranteed assurance of protection I'm sure she would disclose to Your Honor what was done to her and her child. My family and friends are concerned for my safety and are protective about disclosing my whereabouts. Although I am not the "leader" of our group apparently Beal thinks I am.

Each of the Beal victims is a leader in their own right.

Collectively we have discovered and understood much more than any one of us could ever have done alone. We come from different social-economic backgrounds, different cultures, different religions, and we hold differing political beliefs. We have all suffered greatly through this and have become like a family. We cry each time someone loses their home in court or get's evicted. We console each other. Only those who've been through it can really understand our grief. Just like in any family we have our fights because our fates are so intertwined. What happens in one case effects what happens in other cases; when Beal wins with fraud it sets precedence that makes it that much harder for the others to win.

Because I lived near Robynne I know her personally. I care deeply about whether she gets evicted. I have been through it. The emotional pain is beyond description. For more than a year I suffered terrible physical pain moving the remains of my personal property, three generations of family history, from storage unit to more affordable storage unit. See *LNV v. Subramaniam*, U.S. 9th Circuit, Case 15-35963,

Doc. 20-2. Photographs don't show the pain. I have fibromyalgia which magnifies pain to a level many times beyond what a person without fibromyalgia feels. A person with cancer, like Robynne, has such a weaken immune system that I fear she may not survive what I went through. The emotional anguish she is certain to experience will negatively affect her recovery and her chances of survival.

This should not be happening in the United States; the world's pillar of democracy. Five of my ancestors fought in the American Revolution so we could be a nation ruled by law. Democracy and a government by the people for the people was a novel idea in an era where for centuries countries were ruled by abusive monarchs who could take your property for no reason other than they could. My father was a combat veteran of WWII, the Korean War and the Vietnam War. He served his entire career in the military to protect our great Constitution and our democracy. My family made sacrifices so my father could serve our county. Many childhood Christmases all I wanted was my father to come home. Now in my old age we appear to be on the verge of losing our democracy. My heart aches more for the loss of what my grandchildren may never know, our democracy, that for the loss of my home.

We are again at a place in history where the very wealthy can take our property with false claims of defaults and forged documents; where the very judges that the people turn to uphold the law refuse to examine the evidence or apply the rule of law and summarily grant possession of our property to the very wealthy. We hang on to an ever dwindling thread of hope that we will someday get justice.

After Litton Loan Servicing LP, aka Ocwen (Litton) in behalf of ResCap Debtor Homecomings Financial Network Inc. (Homecomings) refused to cancel a non-judicial trustee sale of my home in November 2006 in spite of the fact that my attorney proved I did not miss a single mortgage payment: and Litton told her the reason was because the equity I had in my home would give their client what they wanted (see **Exhibit A**: letter from my attorney Elizabeth Lemoine to Litton attorney Donald Gallardo dated October 25, 2006); and I was forced to file a Chapter 13 bankruptcy to save my home I began to search for other homeowners who had similar experiences with Litton. One man I followed posted frequently online; then his posts stopped abruptly. I found his wife on Facebook. She told me they lost their home to foreclosure and her husband died of a heart attack. Knowing how much my own health was affected by my foreclosure ordeal I asked her if she thought the foreclosure had anything to do with it. She told me she was sure of it. If Robynne Fauley is evicted from her home there may likely be another death by fraudulent foreclosure. Why are they not held accountable?

No one should be deprived of life, liberty or property without due process of law and a jury trial. We've each experienced the trauma of actually being victimized by judges who refuse to acknowledge our substantial irrefutable admissible evidence that tends to show the documents LNV/Beal submit to courts as "original" promissory notes are instead forgeries; they refuse to allow us to have these

documents examined by forensic document examiners; and these judges refuse to apply the law to this evidence. They instead grant summary judgments to foreclosing parties thus depriving us of a merits based trial before a jury (our constitutional right under the 7th Amendment). It appear that their minds were made up to do so as soon as the foreclosure complaint was filed to rule in favor of the foreclosing party. Their orders never reference essential facts, precedence or arguments raised by non-foreclosing parties in their summary judgment orders. It is as if these judges never even read court documents submitted by non-foreclosing parties. When summary judgments are used as weapons like this to shut down large groups of Americans and to deny them their fundamental civil rights there is something very seriously wrong in this country. This is as much a constitutional crisis as anything we hear about daily in the news. If something isn't done to stop this injustice our democracy is gone. We'll be ruled by abusive oligarchs who take your property for no reason other than they can.

Our **Constitution of the United States** is the supreme law of our Republic. The authors of our Constitution were very concerned about protecting our property rights. Judges take an oath of office, mandated by the Constitution, to uphold the Constitution.

I am not an attorney. I have no formal training in law. None of the other representative class members are attorneys and none of them have formal training in law. Most of us started out represented by attorneys. None of us wanted to represent ourselves but were forced to so because our financial resources and our ability to pay for legal counsel were intentionally undermined by willful deception and fraud upon the court by the parties involved in this scheme and artifice to defraud. The exceptionally wealthy parties opposing us use their wealth to gain control of our elected representatives and to change or enact laws that gave them advantages over us. They used their wealth to influence our elected representatives into defunding programs that provide legal assistance to modest means Americans. We have no options but representing ourselves; and as a result we are denied access to justice.

Former 7th Circuit Court of Appeals Judge Richard Posner articulates how most judges treat pro se litigants in "Caught In Pro Se Hell" Huffington Post, by Joel Sucher, October 19, 2017: https://www.huffingtonpost.com/entry/caught-in-pro-se-hell_us_59d7f5c5e4b0705dc79aa7d1:

> ***"Most judges regard these people as a kind of trash, not worth the time of a federal judge."***

In 2006 the ABA recognized the government's obligation to provide counsel to low-income individuals in civil proceedings. See "TASK FORCE ON ACCESS TO CIVIL JUSTICE...REPORT TO THE HOUSE OF DELEGATES **RECOMMENDATION**" at the URL:

http://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/ls_sclaid_06
A112A.authcheckdam.pdf:

> *RESOLVED, That the American Bar Association urges federal, state, and territorial governments to provide legal counsel as a matter of right at public expense to low income persons in those categories of adversarial proceedings where basic human needs are at stake, such as those involving shelter, sustenance, safety, health or child custody, as determined by each jurisdiction.*

**SEVEN YEARS later** in a July 2014 report titled: EQUAL ACCESS TO JUSTICE: ENSURING MEANINGFUL ACCESS TO COUNSEL IN CIVIL CASES, INCLUDING IMMIGRATION PROCEEDINGS, endorsed by: National Legal Aid & Defender Association, Sargent Shriver National Center on Poverty Law, Western Center on Law & Poverty, Detention Watch Network, National Center for Access to Justice at Cardozo School of Law, Citizen Works, Public Justice Center, Northern Manhattan Coalition for Immigrant Rights, Kathryn O. Greenberg Immigration Justice Clinic at Cardozo School of Law, American University Washington College of Law Center for Human Rights & Humanitarian Law Local Human Rights Lawyering Project, prepared by: Columbia Law School Human Rights Institute and Northeastern University School of Law Program on Human Rights and the Global Economy, on page 11 under the headline: THE U.S. GOVERNMENT FAILS TO MEET ITS INTERNATIONAL OBLIGATIONS REGARDING ACCESS TO JUSTICE it states:

> *In its report to the CERD Committee, the United States acknowledges the inequities that exist within the justice system for individuals who are unable to afford civil representation, conceding that "there is no right to counsel at government expense for civil matters." U.S. Government Report, supra note 45, at ¶ 61.*

In the **CONCLUSION** on page 24 it states:

> *By ratifying CERD, the United States committed itself to ensuring meaningful and equal access to justice. As part of this commitment, the United States must ensure meaningful access to counsel in civil cases, especially where lack of counsel has a disparate impact on vulnerable communities and where core human needs are at stake.*

We should not be discriminated against and denied access to justice because the exceptionally wealthy parties opposing us who forge mortgage instruments and lie to courts have created circumstances which, by intent, made us too poor to afford legal counsel.

*Gideon v. Wainwright*, 372 U.S. 335 (**1963**) is a landmark case where United States Supreme Court unanimously ruled that states are required under the U.S. Constitution to provide an attorney to defendants in criminal cases who are unable to afford their own attorneys. Criminal cases are no more adversarial than civil cases and foreclosure cases, particularly, can result in deprivation of life, liberty and/or property. The Justices reasoning in their *Gideon v. Wainwright* opinion aptly applies to defendants in foreclosure cases:

*"[A]ny person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth....[Plaintiffs] spend vast sums of money....Lawyers...are everywhere deemed essential to protect the public's interest in an orderly society....few defendants...fail to hire the best lawyers they can get to prepare and present their defenses. That [Plaintiffs] and defendants who have the money hire lawyers to defend are the strongest indications of the widespread belief that lawyers...are necessities, not luxuries."*

[Plaintiffs] added.



Black's Law Dictionary defines EQUITY:

*"[I]n its broadest and most general signification, this term denotes the spirit and the habit of fairness, justness, and right dealing."*

The image and quote above represents the spirit is the essence of the due process and equal protection clauses of the U.S. Constitution. Summary judgments issued in our cases favoring LNV were done in blatant contradiction to fundamental rights guaranteed to us by the Fifth, Seventh and Fourteenth Amendments to the Constitution of the United States; and they in fact deprived these Beal/LNV victims of their civil rights under color of law. These judgments are void as a matter of law.

I firmly believe we have a constitutional right to be heard in this matter; and to be represented by appointment of a **certified class counsel with experience in complex financial matters**. Fed. Rule 23(a) of Civ. Proc. provides for class actions when the following prerequisites are met:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

I personally have seen at least 200 of the suspect assignments of deed of trust or mortgage recorded in each of our counties that purport to convey beneficial interest in our mortgage notes and security instruments from RFC-LLC to LNV each notarized by Diane M. Meistad on March 10, 2008 before LNV was incorporated in Nevada. These assignments raise questions about the true nature of the transaction and the representation of assets conveyed (or not conveyed) during that transaction; (the Questioned Transaction). There could be, and probably are, many more such assignments and therefore the number of class members may well be more than 200 into the thousands. **This fact meets the first prerequisite.**

In each case LNV and PC used these suspect assignments along with equally suspect allonges endorsed by Jason J. Vecchio that purport to convey a note from RFC-LLC to LNV as evidence attached to LNV's foreclosure complaints against us in federal and state courts to prove LNV was the "owner" and "holder" of our notes. They won summary judgments against us with those claims and evidence.  It certainly seems they wanted judges in our courts to believe the Questioned Transaction was a sale of assets.  Yet now the ResCap Liquidating Trust (ResCap or ResCap Trust) and PC and LNV wants Your Honor Judge Martin to believe the Questioned Transaction was a servicing agreement between the ResCap Debtors and LNV; see Pg 13 of Doc. 10482:

> "As noted above, **_LNV is identified as a party to loan servicing agreement_**s to which the Debtors were parties."

LNV cannot be both the beneficiary of the note and deed of trust and a servicer for the ResCap Debtors; these are mutually exclusive claims. Only examination of the documents that make up the Questioned Transaction will flesh out the truth of the matter.  There are in fact questions of law or fact common to the class, **meeting the second prerequisite.**

The claims or defenses of the representative parties are typical of the claims or defenses of the class.  They each lost their homes either through a non-judicial foreclosure or a summary judgment decision in a judicial proceeding based exclusively on the same suspect recorded assignment stemming from the Questioned Transaction.  If an official examination of the terms and conditions of the Questioned Transaction were performed by a qualified counsel appointed by the court then that counsel could make a presentation of fact to the court as to whether the Questioned Transaction was a sale of assets or a servicing agreement; and whether LNV and the ResCap Debtors and their attorneys and/or others conspired to misrepresent the nature of the Questioned Transaction with intent to deceive courts in order to win summary judgments to deprive Beal/LNV victims of their homes and their fundamental civil rights; and that counsel could then make a proper motion or complaint with appropriate argument of law based on his findings of fact; therefore **meeting the third prerequisite.**

The representative parties will fairly and adequately protect the interests of the class because after full briefing on the issues Your Honor could then make a determination as to whether the Questioned Transaction was a sale of assets or a servicing agreement; and whether LNV, RFC-LLC, PC, Locke Lord and other Beal attorneys litigating judicial foreclosures committed fraud on the court (many courts) to obtain those summary judgments of foreclosure knowing judges relied on the suspect assignments notarized by Diane M. Meistad, and suspect Jason J. Vecchio endorsed allonges to LNV's purported "original" promissory notes purporting to convey beneficial interest from RFC-LLC to LNV as being genuine. If this were to be Your Honor's determination then those summary judgments would be void and

Your Honor could issue an order vacating them and vacating any non-judicial trustee sales perfected with those suspect recorded assignments; and could order any other just remedy including restitution to be paid to the members of the class; therefore **meeting the fourth and final prerequisite.**

I believe that all the requirements of FRCP 23(b) are met for this particular class action to be maintained; but I make particular mention of FRCP 23(b)(2) because it resonates so much with our class members. The parties opposing the class, LNV, Beal and the Beal/LNV attorneys have acted or refused to act on grounds that apply generally to the class, i.e. they abuse process and they submit documents to courts they know or reasonably should know are or have a high probability of being forgeries with intent to win summary judgments while they steadfastly refuse to allow any forensic examination of the suspect documents they claim are "original" promissory notes. Final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole and this court already has jurisdiction over the opposing parties and their transactions and assets (specifically the Questioned Transaction) so it seems appropriate to bring this matter to Your Honor's attention.

Hiding or misrepresenting assets and transactions in a bankruptcy has criminal consequences. Although the Questioned Transaction appears to have occurred in 2008 if a misrepresentation of that transaction was made to hide assets or illegal profits and that misrepresentation was carried through into the bankruptcy then that fraud has tainted these bankruptcy proceedings from inception and continues to taint these proceedings as of today. The substantial evidence we bring to Your Honor's attention and the discrepancy of whether LNV is a servicer for the ResCap Debtors or whether the Questioned Transaction was a sale of assets suggests deceit. I believe that a judicial determination of the exact nature of the Questioned Transaction is in order; and that this court is the appropriate venue to make such a judicial determination.

Another factor that makes this court the appropriate venue is that our mortgages were securitized into mortgage backed security trusts. Cathy Gebhardt and I have forensic securitization audits done which I will discuss in detail further below. Cathy's was securitized into the RASC 2003-KS1 Trust and mine was securitized into the Bear Stearns Asset Backed Securities I Trust 2004-HE4 (BSABS 2004-HE4). Common to most pooling and servicing agreements is the following excerpt from the BSABS 2004-HE4 pooling and servicing agreement on 129th Page of 246 at http://www.secinfo.com/dqTm6.114m.d.htm:

### Section 11.03 GOVERNING LAW.

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE **LAWS OF THE STATE OF NEW YORK** APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF

THE PARTIES HERETO AND THE CERTIFICATEHOLDERS SHALL BE
DETERMINED IN ACCORDANCE WITH SUCH LAWS WITHOUT REGARD TO
THE CONFLICTS.  [Emphasis added]

Because we are not attorneys we can't possibly understand the nuances of proper court procedure. We certainly have tried but according to a conversation Robynne Fauley told me she had at 8:45 AM on Friday February 2, 2018 with attorney Nina Cook representing PC in *Fauley v. Mosman*, Case 3:17-cv-01656-RJB, U.S. Dist. Court OR which she wrote down as soon as the call ended and shared with me the conversation went like this:

> **Miss Fauley:** *Miss Cook you or LNV have never EVER addressed the substance of my motion or any facts of case I have ever filed. All you have ever done is dismiss everything and go around the substance.*
>
> **Miss Cook:** *Well Miss Fauley, the reason you keep losing in all the courts one court after another, is because you have never ever overcome any of the barriers that would allow the substance of your case to be addressed.*

Due process of law as mandated by the U.S. Constitution guarantees us substantive due process. If we cannot reach substantive due process and merit because we are unable to overcome "barriers" without representation of counsel; then counsel must be appointed for us. Courts are supposed to be about getting to the truth but it seems, based on our experiences, the objective instead is obfuscation of truth.

I know I've probably spent too much time pointing out the need for appointment of class counsel but I am 100% certain that without it we will only get more of the same: barriers that prevent us from accessing justice and deprivation of our fundamental civil rights. We don't want to ask the court for anything without counsel to represent us and to protect our rights because it is abundantly clear we do not know how to do that. We have substantial and weighty evidence. We thought we had presented our evidence and facts surrounding the evidence in plain and clear language to other courts. So far no court has even considered our evidence or applied the governing law to our evidence. We would have to be insane to believe that if we ask this court for anything as pro se litigants that we would get any other outcome than what we have gotten so far.

Locke Lord, Morrison & Foerster, Perkins Coie and the army of other attorneys who work for Beal against us most certainly know the difference between a "NOTICE" and a "motion." This is just one of the many ways they take advantage of our status as pro se litigants. I'm very grateful that Robynne, being the only one of us who actually received service of Doc. 10482 and Doc. 10469 was able to convince the court to give us more time to reply to these documents. Still I am struggling to control tears while I write this. I've been so ill. I need rest and peace more than anything in the world; but like Tuli said in her declaration, when something this horrible and unjust happens you cannot get past it.

We filed our "NOTICE" as a communication with the court (Doc 10469), as opposed to a "motion" because we didn't know what to ask the court for yet; or what rights we might have. We already know we cannot ask the court for anything without representation of counsel or it will be denied no matter how meritorious. Without appointment of counsel we maintain that we are not making any motion but just informing the court and the U.S. Bankruptcy Trustee and creditors about evidence we have and that we can testify about which tends to show that PC, Residential Funding Company LLC (RFC-LLC) and LNV, along with ResCap Debtors and others, have conspired to commit fraud against us and the United States and that the manner and means of their scheme and artifice to defraud has in fact caused us to suffer significant harm that includes deprivation of our property, significant degradation of our lives and deprivation of our liberty without due process of law and has deprived us of our fundamental civil rights; and has caused injury to our government and to public trust in our institutions of democracy. When the public perceives our judges as servants doing the bidding of a wealthy few, foreclosing parties, who take their homes away from them with false claims of default and forged documents our democracy is in serious trouble because oppression like this opens the door to tyranny.

Even if this court refuses to appoint counsel so we might seek remedy for the injury caused to us by the    I hope and pray Your Honor will ask the FBI, the IRS and the U.S. Attorney General to investigate because forgery, intimidation of witnesses, misrepresentation of facts with intent to defraud are all felony crimes. At least protect others and prevent them from experiencing the suffering we have endured. 18 U.S.C. § 4 "Misprision of Felony" states:

> *Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.*

I'm not going to pretend I know how to write something like this I'm just doing the best I can. Now I'm going to switch to presenting the evidence we have and trying to tie things together in a way that should make sense to anyone reading it.

## THE EVIDENCE

The Declaration of William J. Paatalo was filed on 4/30/2013 into Subramaniam v. Beal et al, Case 3:12-cv-01681-MO, Document 91. He is an Oregon licensed private investigator under ORS 703.430, meeting the necessary requirements under ORS 703.415. His Oregon PSID number is 49411. He had 17 years combined experience in law enforcement and the mortgage industry at the time the declaration was sworn. He is a Certified Forensic Mortgage Loan Auditor (CFLA). He is still available to testify as to these matters.

As per his Declaration my mortgage was securitized into the Bear Stearns Asset Backed Securities I Trust 2004-HE4 (BSABS 2004-HE4). The pooling and servicing agreement filed June 9, 2004 is at: http://www.secinfo.com/dqTm6.114m.d.htm.  On the 51st page of 246 it states:

> *The Seller has entered into this Agreement in consideration for the purchase of the Mortgage Loans by the Depositor pursuant to the Mortgage Loan Purchase Agreement and has agreed to take the actions specified herein.*
>
> *The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the use and benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund.*
>
> *In connection with such sale, the Depositor has delivered to, and deposited with, the Trustee or the Custodian, as its agent, the following documents or instruments with respect to each Mortgage Loan so assigned: (i) the original Mortgage Note, including any riders thereto, endorsed without recourse to the order of "LaSalle Bank National Association, as Trustee for certificateholders of Bear Stearns Asset Backed Securities I LLC Asset Backed Certificates, Series 2004-HE4," **and showing an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee**...* [Emphasis added]

On the 201st Page of 246 it states:

> **Section 2.2. Recordation of Assignments.** *If any Mortgage File includes one or more assignments of Mortgage that have not been recorded pursuant to the provisions of Section 2.01 of the Pooling and Servicing Agreement and the related Mortgage Loan is not a MOM Loan or the related Mortgaged Properties are located in jurisdictions specifically excluded by the Opinion of Counsel delivered to the Trustee pursuant to Section 2.01 of the Pooling and Servicing Agreement, **each such assignment shall be delivered by the Custodian to the Seller for the purpose of recording it in the appropriate public office for real property records**, and the Seller, at no expense to the Custodian, shall promptly cause to be recorded in the appropriate public office for real property records each such assignment of Mortgage and, upon receipt thereof from such public office, shall return each such assignment of Mortgage to the Custodian.* [Emphasis added]

The Oregon Trust Deed Act (OTDA) requires lenders to record all deed of trust assignments before initiating non-judicial foreclosures.  In June 2006 Litton aka Ocwen initiated a non-judicial foreclosure as evidenced by the Notice of Trustee Sale, recorded Instrument # 2066-077544, Washington County Oregon, see page 5 of **Exhibit B** attached hereto. On page 7 of the Paatalo Declaration it states:

> *There have been 3 assignments of the DOT recorded in the county land records. Assignment# 1 was recorded on 06/28/06 as document No. 2006-077542. This assignment was allegedly executed on 12/29/05 whereby People's sells, assigns, transfers, and conveys the subject Note and DOT to "Homecomings Financial Network, Inc." (hereinafter "HFN.") This assignment circumvents the entire sale to EMC that was to have occurred on 05/01/04.*
>
> *This assignment also occurs within the same month that the subject loan was "paid off" within the BSABS 2004-HE4 Trust...*
>
> *The first "Notice of Default" which was recorded against the property on 06/28/06 as Doc. No. 2006-077544 states in paragraph 3, "CAL-WESTERN RECONVEYANCE*

*CORPORATION as Trustee, hereby certifies that no assignments of the trust deed by the trustee or by the beneficiary and no appointments of a successor trustee have been made except as recorded in the mortgage records of the county or counties in which the above described real property is situate[d."1 This statement confirms that no assignment was ever recorded evidencing a sale from People's to any other Trust entity or the Trust itself. This represents a fatal break in the chain of title.*

On page 8 of the Paatalo Declaration it states:

*22. The Trust's Prospectus states, "Assignments of the mortgage loans provided to the custodian on behalf of the trustee will be recorded in the appropriate public office for real property records," pg. S-24. See: http://www.secinfo.com/dqTm6.1122.htm*

*23. To further cloud the title, the subject loan was assigned a MERS identification number "MIN# 1000221-000972254 7-8" at some point after origination. A check of the MERS Member directory showed that this number was assigned to "JPMorgan Chase Bank, N.A. fka EMC." MERS Captures 1&2 are attached as an exhibit and show the subject loan as "inactive" in the MERS Registry with JPMorgan Chase Bank, N.A. fka EMC as both the servicer and investor...*

*25. The existence of MERS means that another assignment is missing from the chain of title, as some entity would have had to assign the subject note and DOT to MERS if registered in the MERS system. Because the MERS system shows "JPMorgan Chase Bank, N.A., fka EMC" as the owner and investor, both assignments #2 & #3 are inconsistent with the facts.*

The question about how my mortgage was entered into MERS was answered on September 3. 2015 by Dana Lantry in a phone conversation I had with her. An audio tape of that 19 minute phone conversation was entered as an exhibit into LNV's foreclosure case against me, *LNV V. Subramaniam,* Case 3:14-cv-01836-MO 09/28/15, U.S. Dist. Court Oregon, Document 104 Filed 09/28/15. It was Exhibit B to Defendant's SurReply or Supplement to her Objection to LNV's Motion for Summary Judgment. (See **Exhibit C**, Doc.104, originally filed ass 101-2 – of course the audio tape is not attached but you can see it is in court record.) In that conversation Dana Lantry told me that she was not an executive officer with People's Choice so she would not have endorsed any notes, she also told me that People's Choice used MERS exclusively and this was another reason she would not have endorsed any notes or assignments because MERS did that for them. I had asked her if she knew what a canceled stamp on an endorsement of a note meant. She told me she did not know. I asked if she remembered endorsing any notes with a canceled stamp (her endorsement on the document LNV purports to be the "original" note in my case had a canceled stamp on it.) She told me that she did not.

I phoned Dana Lantry because I received a phone call from Denise Price from the JP Morgan Chase (Chase) executive office the day before. I had mailed a letter to Chase's legal department asking them about the canceled stamp on the questioned Dana Lantry endorsement and Ms. Price phoned me in response. She told me that the Dana Lantry endorsement was not on the copies of my mortgage documents in Chase's archives. This gives credibility to my claim that the questioned Dana Lantry

endorsement is a forgery. In" DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT" in Case 3:14-cv-01836-MO, Document 94, filed on 9/08/15 I wrote on pages
3 and 4:

> *Defendant denies Plaintiff LNV's claim:*
>
>> *"In April 2007, more than eight years ago, Defendant defaulted on the note and
>> trust deed by failing to make her monthly payment when it was due."*
>
> *In fact Defendant continued to make payments to Litton, until at least March 24, 2008.
> (See Defendant's Exhibit C attached herein.) Also see Defendant's motion to strike the
> declaration of Michelle Conner in support of LNV's motion for summary judgment [Doc
> 80 page 20 of 20]. Michelle Conner does not show up in the Texas Comptroller's list of
> Officers and Directors for MGC Mortgage. [Doc 80 pages 11 – 19 of 20]. If Michelle
> Conner truthfully had personal knowledge of Defendant's loan as she claims under penalty
> of perjury then she would have known about Defendant's March 24, 2008 payment on her
> mortgage.*
>
> *Evidence shows Defendant never defaulted on her mortgage. Plaintiff LNV has a
> demonstrated history of fabricating or making up false payment histories and false claims
> to courts about the payment histories of its victims with intent to wrongfully deprive them
> of their property under color of law as evidenced by Defendant's March 2008 bank
> statement showing her mortgage payment was processed and in fact paid by her bank; and
> by the sworn affidavit testimony of LNV/MGC/Beal victims JoAnn Breitling, Catherine
> Gebhardt and Marcia Swift.*
>
> *Defendant has motioned this court to take judicial notice of <u>Beal Bank, SSB v. Sarich</u>, No.
> 05-2-11440-1SEA (King County Super. Ct. Sept. 8, 2006) because it shows a propensity for
> corporations owned by Daniel Andrew Beal aka D. Andrew Beal to alter Notes; and
> Defendant has claimed LNV Corporation, which is owned by D. Andrew Beal, has altered
> the Note it claims was conveyed to it by Residential Funding Company LLC aka
> Residential Funding Corporation ("GMAC-RFC"). This is the conveyance LNV claims
> gives it standing to foreclose on Defendant's property.*
>
> *LNV is not the "holder of the corresponding note and trust deed" as it claims because the
> Note shown to Defendant in the law offices of Perkins Coie is in fact a computer generated
> forgery with a recently forged signature of Dana Lantry on the backside of the last page of
> the alleged "original" Note. This Dana Lantry endorsement is a forgery for the following
> reasons:*
>
> 1. *In a tape recorded phone conversation (with consent) on September 3, 2015 the same
>    Dana Lantry who was employed by People's Choice Home Loans in 2004 until they
>    filed for bankruptcy in 2007 told Defendant she could "confidently say that she never
>    signed any deed assignments or allonges to Notes while employed by People's
>    Choice" because she was not an executive officer when she worked for People's
>    Choice. See Defendant's sworn affidavit testimony [Doc. 93] in support of this
>    objection to LNV's motion for summary judgment.*
>
> 2. *In a tape recorded phone conversation (with consent) with Denise Price with the
>    Executive Office for JPMorgan Chase on September 2, 2015 in response to a request
>    sent to their Legal Papers Served department which has control of the Bear Steans
>    records told Defendant that Chase could not tell her why the word "cancelled" was
>    stamped above the alleged endorsement to the Note bearing the Dana Lantry
>    signature with "LaSalle Bank National Association, as Trustee for cetificateholders of*

*Bear Stearns Asset Backed Securities I LLC Asset Backed Certificates Series 2004-HE4" stamped above the signature [Doc. 5-1 page 5 of 7] which Defendant attached to her request for Chase's review because "they didn't do it" and it wasn't on their documents.*

It is 100% certain that if I had been granted appointment of pro bono counsel LNV Corporation would not have prevailed in summary judgment. If an attorney had made that phone call to Dana Lantry he/she would have known to get her to sign a declaration as to the details of the conversation. He would have sent her ALL of the documents (purported "original" note, the allonge **AND** the recorded assignment Instrument # 2006-077542) that each bear her signature for review and her opinion as to whether she authored the signatures. It is certain that IF she had been shown recorded Instrument # 2006-07754 she would have understood that there was a serious problem with a recorded assignment executed on 12/29/2005 purporting to convey to Homecomings and a suspect allonge purporting to convey to RFC-LLC before it existed on 10/6/2008. She would have realized that she would not have endorsed the suspect allonge.

On 10/9/2015 Judge Michael Mosman entered an order, Document 109 granting me until November 9, 2015 to get an affidavit from Dana Lantry. Perkins Coie attorney Gabriel Richards beat me to it. She got a declaration from Dana Lantry, see **Exhibit D**, Document 108 and 108-1. Notice that recorded Instrument # 2006-07754 signed by Dana Lantry and notarized on 12/29/2005 is missing from the exhibits Dana Lantry testifies under oath about. This is a deliberate omission of material fact intended to deceive. Either PC attorney Richards omitted the recorded assignment endorsed by Dana Lantry or the two women conspired to enter into court record a perjured declaration to win summary judgment of PC's client (whether that client is LNV or RFC-LLC or ResCap.) This intentional act of fraud deprived me of life, liberty and property without due process of law; and was intentionally meant to interfere with my fundamental civil rights under color of law. This would never have happened had I been represented by counsel.

On 10/14/2015 Judge Mosman struck the order he issued on 10/9/2015 and granted LNV summary judgment. The willful omission of material fact in by PC attorney Richards, in possible conspiracy with Dana Lantry and others, in the preparation of a false declaration made by Dana Lanry, Documents 108 and 108-1 (Exhibit D), caused me to suffer significant financial loss, physical injuries, extraordinary emotional distress and metal anguish so they, and their client(s) LNV or RFC-LLC or ResCap could each personally profit from the injuries and suffering they caused me.

My case is not an isolated incident but just one in a pattern of such cases where the fraud is blatantly obvious to any rational person. See the chart below that shows why it is IMPOSSIBLE for LNV to be the owner of the Fauley "note" or a PETE under UCC Articles 3 & 9:



# FAULEY

Purported Conveyance of Purported NOTE    RECORDED Assignments



Full page versions of these charts are attached hereto as **Exhibit E**.

The evidence speaks volumes yet we have been attacked in the most egregious ways by PC attorneys, Locke Lord attorneys, and attorneys from other law firms that have represented LNV in numerous other Beal/LNV victim foreclosure cases as well as by judges in U.S. District Courts simply because we continue to fight for our fundamental civil rights under the United States Constitution. We will do so until the day we die. This is about preserving our democracy!

We already entered as exhibits to our Notice of Fraud the Fauley recorded assignments, Exhibit 7 to Doc. 10469·and the purported "accurate" copy of the Fauley note LNV and PC submitted to LNV's foreclosure complaint in her case, Exhibit 8 to Doc. 10469. (I think the clerk who entered Doc. 10469 into PACER added all the exhibits at the end of the "NOTICE" so it is just one big file but there is a cover sheet before each exhibit.) I will attach to this letter **Exhibit F** that includes accurate copies of my recorded instruments and **Exhibit D** which includes copies the purported "accurate" copy of the Subramaniam note LNV and PC submitted into LNV's foreclosure complaint against me.

In addition to the audio tape of my September 3, 2015 phone conversation with Dana Lantry I have an audio tape of the phone conversation with PC attorney Ms. Richard when she phoned to attempt to intimidate me into withdrawing the Dana Lantry audio tape. She told me I had committed a crime because California law requires all parties to a conversation to be notified that they are being taped. I had not committed a crime because even though I didn't initially tell Dana Lantry I was taping the call she asked and I told her I was and she continued to talk with me. There is also legal precedence I found later that supports my position. She filed a motion to strike it, but it was not stricken.

Substantial and weighty evidence, i.e. prima facie facts on the suspicious publically recorded assignments that resulted from the Questioned Transaction show LNV and RFC-LLC certainly wanted judges to believe that LNV is the beneficiary of the note and deed of trust and not merely a servicer for RFC-LLC. Under Articles 3 and 9 of the Uniform Commercial Code if LNV where a servicer LNV could still be a party entitled to enforce the security instrument (PETE) in behalf of ResCap Debtors. This begs the question of why these parties engaged in such a ruse. Admittedly I have struggled to grasp the intricacies of what Cathy Gebhardt has been trying to explain to me for years. Some of us in the group, myself included, urged her not to put anything about this stuff into her court pleadings because we feared the Beal attorneys who love to portray us as lunatic conspiracy theorists would eat it up and spit it back at us in court making us all suffer. But once she finally put it onto paper for her letter to the court it makes sense. If attorneys with experience in accounting, financial fraud and international money laundering and/or FBI agents and/or IRS criminal investigators had the opportunity to review our evidence we believe they could make an air-tight RICO case against D. Andrew Beal, key people in his organization, his attorneys and others including the ResCap Debtors.

Many of the victims of this property heist scheme are senior citizens who spent their entire lives working to pay down their mortgages and counted on the equity they built into their homes over those years to finance their retirement. Instead their homes are stolen out from under them. They become paupers as a result of this theft trying to survive on below poverty social security benefits. They become a burden on their children and an additional burden to middle class taxpayers. The ill-gotten profits from this scheme goes into the pockets of a very few of the world's wealthiest individuals, directly siphoned out of the pockets of average hard working Americans. It gives the world's wealthy individuals enormous power to unduly influence politics, elections and legislation.

As already stated my mortgage was securitized into the BSABS 2004-HE4 Trust and the pooling and servicing agreement filed June 9, 2004 is governed by New York law. Catherine Gebhardt also had a securitization audit done by William J. Paatalo, see **Exhibit H**:

> *The most important issue identified and outlined in this report is the fact that the subject loan was securitized into the "RASC 2003-KS1 Trust" in 2003, and was paid off within this trust on or about 07/01/2007 with the trust declaring "zero losses." Evidence shows that this particular trust obtained insurance policies on the loan pools to which there were multiple beneficiaries of these policies.*
>
> *The evidence also suggests that the subject loan was involved in "hypothecation fraud" whereby the Note and Deed of Trust where pledged and sold in multiple directions simultaneously. There have been no assignments of the subject DOT recorded in the County Land Records, and there does not appear to be any disclosures that the subject loan was securitized and paid off.*
>
> *2. Common "securitization" - Private label MBS trust fact pattern where the subject Note and Deed of Trust were pledged as collateral to a securitized trust, yet the legal conveyance of the asset to the trust either never occurred, or was illegal and in direct contravention of the trust's governing document (the "Pooling & Servicing Agreement").*

We (class members) were victims of origination fraud, securitization fraud, servicing fraud and then finally foreclosure fraud by Locke Lord, PC, LNV, ResCap Trust, RFC-LLC and other ResCap Debtors. We can only hope and pray Your Honor will appoint a class counsel to represent us.

I, Denise Subramaniam, declare under penalty of perjury under the laws of the State of Oregon and New York that the foregoing is true and correct.

Respectfully Submitted,

Denise Subramaniam

Dated: March 26, 2018

# EXHIBIT A

## LAW OFFICES OF
## KEVIN W. LUBY, P.C.
7360 SW Hunziker St., Suite 206
Tigard, Oregon, 97223

| | | |
|---|---|---|
| Kevin W. Luby | 503-620-3342 | Pamela L. Sullivan, Paralegal |
| James C. Hilborn, Of Counsel | 503-620-3356 (fax) | Jan Larson, Legal Assistant |
| Elizabeth Lemoine, Of Counsel | www.lubylaw.org | Christi Smith, Secretary |

This document contains confidential information which is intended only for the individual recipient named. Unless you are such named recipient or the authorized agent thereof, you are prohibited from reading, copying, distributing or otherwise disseminating this information. If you received this communication in error, please contact the sender immediately and destroy or return the communication. Thank you.

Date           :    October 25, 2006
To             :    Donald Gallardo
Company        :    Litton Loan Servicing
Facsimile No   :    1-713-218-3519
Total pages    :    <u>10</u> (including cover)
Original       :    not mailed
Re:    *Denise Subramaniam re Loan Number 180999663*
       Our File No. SUBRAM.301

Dear Mr. Gallardo:

    This fax is to confirm our conversation of today in which you informed me that your company has refused to postpone or otherwise continue the trustee's sale, scheduled for next Thursday, November 2, 2006, due in part to your requirements that my client send additional proof to substantiate bank statements provided to you showing proof of payments for EMC Mortgage's failure to credit these payments to my client's account.

    Your other reason for the refusal is apparently due to the fact that my client received notice of the foreclosure in June, 2006 and had "plenty of time" to address these issues. Please be advised that we can and will substantiate the our client has been addressing these issues for more than a year. In addition, when we proposed a settlement with your company on August 30, 2006, Mr Benny Hibler informed me that your company had no "incentive" to settle, as the equity our client possessed in the residence was "more than adequate" to satisfy the amount you sought in the sale.

    The amounts alleged as owed in the trustee's notice of sale are incorrect. To the extent that you have forced our client to file suit to prevent the sale, rather than agree to postpone the sale, we will seek attorney fees and costs associated with such a suit.

                    Sincerely,

                    Elizabeth Lemoine
                    elizlemoine@yahoo.com

C Timothy Spencer Oregon Dept. of Consumer and Business Services        Faxed only to 503-947-7862
  Denise Subramaniam via Email

# EXHIBIT B

FILED 30 APR '13 12:39 USDC-ORP

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

In re:

DENISE SUBRAMANIAM, pro se,

    Plaintiff.

Case No. 3:12-CV-1681 MO

D. Andrew Beal et al.

    Defendants,

**DECLARATION OF
WILLIAM J. PAATALO**

I, WILLIAM J. PAATALO, HEREBY DECLARE AS FOLLOWS:

1. I am an Oregon licensed private investigator under ORS 703.430, and have met the necessary requirements under ORS 703.415. My Oregon PSID number is 49411.

2. I am over the age of eighteen years, am of sound mind, having never been convicted of a felony or a crime or moral turpitude. I am competent in all respects to make this Declaration. I have personal knowledge of the matters declared herein, and if called to testify, I could and would competently testify thereto.

3. I have 17 years combined experience in law enforcement and the mortgage industry.

4. I worked in the mortgage industry from 1999 to 2008. I was a "loan officer" with Conseco Home Finance from 1999 to 2000 before becoming a "mortgage broker" from 2000 to 2008. I was the President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota from 2002 – 2008.

1. Declaration of William J. Paatalo

1  My company was strictly a "broker" for numerous lending institutions to
2  which I would originate loans on their behalf. I was not a "lender," nor was I
3  involved in "Table-Funding" loans.

4  5. I have worked exclusively over the last 30 months investigating foreclosure
5  fraud and issues related to the securitization of residential and commercial
6  mortgage loans.

7  6. I am a Certified Forensic Mortgage Loan Auditor (CFLA), and have spent
8  more than 4,500 hours conducting investigatory research specifically related to
9  mortgage securitization and chain of title analysis. I have performed such
10  analyses for residential real estate located in many states, including, but not
11  limited to Washington, Oregon, California, Nevada, Florida, Montana,
12  Arizona, Ohio, New Jersey, and several other states.

13  7. As a result of the above education and experience I am familiar with issues
14  involving securitization and foreclosure, and I have sufficient training and
15  expertise to qualify as an expert.

16  8. My securitization and chain of title analyses here involve the factual aspects of
17  securitization and chain of title.

18  9. In the performance of my securitization and chain of title audits I rely, as do
19  all persons who perform specialized investigative work relating to the
20  securitization of mortgage loans and chain of title issues, on a multitude of
21  sources. These sources include, but are not limited to my Bloomberg
22  subscription; ABSNet; Edgar (a search tool for Securities and Exchange
23  Commission Filings); other paid subscription sources, including those related
24  to known robosigners and foreclosure related documents.

25  10. I was retained by Denise Subramaniam to research the chain of title and
26  securitization of her loan and to provide evidence pertaining to the

27
28  2. Declaration of William J. Paatalo

1   securitization of said loan. I was also asked to provide an opinion as to the

2   beneficiary status of the Subramaniam deed of trust and promissory note.

3   11. The following publicly recorded documents were inspected on the Securities

4   & Exchange Commission's (SEC) government website at

5   http://www.sec.gov/ :

6

7   A. The "BSABS 2004-HE4 Trust" 424b Prospectus Supplement filed May 26,

8   2004: http://www.secinfo.com/dqTm6.1122.htm

9

10  B. The "BSABS 2004-HE4 Trust" Pooling & Servicing Agreement filed June

11  9, 2004: http://www.secinfo.com/dqTm6.114m.d.htm

12

13  12. In addition, the following exhibits were inspected and marked as follows:

14

15  C. "BP Investigative Agency Exhibits A-C" – Bloomberg Evidence

16  D. "BP Investigative Agency Exhibit D" – EMC Letter

17  E. "BP Investigative Agency Exhibit E" – MERS captures

18

19  13. After examining the above documents, my opinion is that the Subramaniam

20  loan was sold into the "BSABS 2004-HE4 Trust" on or before May 1, 2004;

21  the "Cut-off Date" for all loans to have been sold to the Trust.

22  14. The subject loan was originated on or about February 10th, 2004 with the

23  "Lender" on the Deed of Trust being named "People's Choice Home Loan,

24  Inc., a Wyoming Corporation" (hereinafter "People's.")

25  15. Shortly after origination, the evidence shows that the subject loan was sold to

26  the "Bear Stearns Asset Backed Securities I Trust 2004-HE4" (hereinafter

27  "BSABS 2004-HE4.") However, there are no admissions or evidence by way

3. Declaration of William J. Paatalo

28

of assignments that this ever happened. In fact, the entire sale of the subject loan, and its presence within the Trust, have been glossed over and hidden in the loan's chain of title history.

16. The following parties were named as Trust participants per the Trust's governing document (the "Pooling & Servicing Agreement" – PSA):

**Originators:**
The principal originators of the mortgage loans are:
Encore Credit Corporation,with respect to approximately 30.38% of the mortgage loans and People's Choice Home Loans, Inc., with respect to approximately 58.78% of the mortgage loans. The remainder of the mortgage loans were originated by various originators, none of which have originated more than 10% of the mortgage loans.

**Depositor:**
Bear Stearns Asset Backed Securities I LLC, a Delaware limited liability company and a limited purpose finance subsidiary of The Bear Stearns Companies Inc. and an affiliate of Bear, Stearns & Co. Inc.

**Seller:**
EMC Mortgage Corporation, a Delaware corporation and an affiliate of the depositor and Bear, Stearns & Co. Inc., which will sell the mortgage loans to the depositor.

**Master Servicer:**
EMC Mortgage Corporation.

17. The "Cut-Off Date" for the loans to be transferred, sold, and conveyed to the Trust was May 1st, 2004. Here is what was supposed to happen per the PSA:

*CONVEYANCE OF TRUST FUNDREPRESENTATIONS AND WARRANTIES*

*Section 2.01 CONVEYANCE OF TRUST FUND.*

*Pursuant to the Mortgage Loan Purchase Agreement, the Seller sold, transferred, assigned, set over and otherwise conveyed to the Depositor, without recourse, all the right, title and interest of the Seller in and to the assets in the Trust Fund.*

4. Declaration of William J. Paatalo

*The Seller has entered into this Agreement in consideration for the purchase of the Mortgage Loans by the Depositor pursuant to the Mortgage Loan Purchase Agreement and has agreed to take the actions specified herein.*

*The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the use and benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund.*

*In connection with such sale, the Depositor has delivered to, and deposited with, the Trustee or the Custodian, as its agent, the following documents or instruments with respect to each Mortgage Loan so assigned: (i) the original Mortgage Note, including any riders thereto, endorsed without recourse to the order of "LaSalle Bank National Association, as Trustee for certificateholders of Bear Stearns Asset Backed Securities I LLC Asset Backed Certificates, Series 2004-HE4," and showing an unbroken chain of endorsements from the original payee thereof to the Person endorsing it to the Trustee,*

**Section 11.04 INTENTION OF PARTIES.**

*It is the express intent of the parties hereto that the conveyance of the Mortgage Notes, Mortgages, assignments of Mortgages, title insurance policies and any modifications, extensions and/or assumption agreements and private mortgage insurance policies relating to the Mortgage Loans by the Seller to the Depositor, and by the Depositor to the Trustee be, and <u>be construed as, an absolute sale thereof to the Depositor or the Trustee, as applicable. It is, further, not the intention of the parties that such conveyance be deemed a pledge thereof by the Seller to the Depositor, or by the Depositor to the Trustee.</u>*

18. Subject loan was identified within the above referenced Trust using the Bloomberg Terminal. Bloomberg Exhibits A-C contain the following:

**Exhibit A** - Subject loan identified as loan number "9722547" within the BSABS 2004-HE4 Trust, Group 0. (Note: Loan numbers often vary and change from the original loan numbers assigned to the original loan. Also, the "Orig Date" is typically the month following the actual month of origination. This particular loan number matches the loan number on the "EMC correspondence letter" dated 04/18/06 attached as an exhibit.)

5. Declaration of William J. Paatalo

**Exhibit B** - List of 15 "Tranche" Classes within the BSABS 2004-HE4 Trust showing 6 of the 15 tranches being "paid off."

**Exhibit C** – Loan level history / data within the BSABS 2004-HE4 Trust. Subject loan is # 108. The data runs perpendicular in the additional pages of the exhibit. The exhibit shows that the subject loan was "paid off" in December of 2005. The "pay history" shows that the subject loan was current ("C") as of November of 2005, 90-days past due ("9") as of October 2005, 60-days past due as of September 2005, and in foreclosure status ("F") as of August 2005. This coincides with the "EMC" letter dated 04/18/06, paragraph 4 – "Ms. Subramaniam's loan entered foreclosure proceedings on August 9, 200[5.]"

19. The EMC letter also states in paragraph 2 – *"According to our records, EMC acquired the above referenced loan from People's Choice Home Loan on May 1, 2004."* What this letter fails to state is that EMC was the "Seller" of the loans to the "Depositor" (Bear Stearns Asset Backed Securities I LLC, a Delaware limited liability company and a limited purpose finance subsidiary of The Bear Stearns Companies Inc. and an affiliate of Bear, Stearns & Co. Inc.) on that very same day.  Also on that very same day, the Depositor was to sell the loans to "LaSalle Bank, N.A. as Trustee for the BSABS 2004-HE4 Trust. This statement contradicts the recorded assignments of the DOT.

20. The Trust's Prospectus does however state, *"EMC Mortgage Corporation purchased the mortgage loans directly in privately negotiated transactions."* pg.22

6. Declaration of William J. Paatalo

21. None of these events took place, and none of the Trust entities ever perfected their security interests for the following reasons:

A. There have been 3 assignments of the DOT recorded in the county land records. Assignment #1 was recorded on 06/28/06 as document No. 2006-077542. This assignment was allegedly executed on 12/29/05 whereby People's sells, assigns, transfers, and conveys the subject Note and DOT to "Homecomings Financial Network, Inc." (hereinafter "HFN.") This assignment circumvents the entire sale to EMC that was to have occurred on 05/01/04.

This assignment also occurs within the same month that the subject loan was "paid off" within the BSABS 2004-HE4 Trust.

B. The 2nd and 3rd assignments of the DOT are simultaneous. The 2nd is recorded on 08/27/08 as doc No. 2008-073971 whereby HFN attempts to assign, sell, convey, and deliver the Note and DOT to "Residential Funding Company, LLC" (hereinafter "RFC.") The 3rd is recorded on the same date as doc No. 2008-073972 whereby RFC attempts to assign, sell, convey, and deliver the Note and DOT to "LVN Corporation."

The first "Notice of Default" which was recorded against the property on 06/28/06 as Doc. No. 2006-077544 states in paragraph 3, "*CAL-WESTERN RECONVEYANCE CORPORATION as Trustee, hereby certifies that no assignments of the trust deed by the trustee or by the beneficiary and no appointments of a successor trustee have been made except as recorded in the mortgage records of the county or counties in*

7. Declaration of William J. Paatalo

1    *which the above described real property is situate[d."]* This statement

2    confirms that no assignment was ever recorded evidencing a sale from

3    People's to any other Trust entity or the Trust itself. <u>This represents a fatal</u>

4    <u>break in the chain of title.</u>

5

6    22. The Trust's Prospectus states, *"Assignments of the mortgage loans provided to*

7    *the custodian on behalf of the trustee will be recorded in the appropriate*

8    *public office for real property records,"* pg. S-24.

9

10    23. To further cloud the title, the subject loan was assigned a MERS identification

11    number "MIN#1000221-0009722547-8" at some point after origination. A

12    check of the MERS Member directory showed that this number was assigned

13    to "JPMorgan Chase Bank, N.A. fka EMC." MERS Captures 1&2 are

14    attached as an exhibit and show the subject loan as "inactive" in the MERS

15    Registry with JPMorgan Chase Bank, N.A. fka EMC as both the servicer and

16    investor.

17    24. Originated by MERS, the Mortgage Identification Number (MIN) is a unique

18    18-digit number used to track a mortgage loan throughout its life, from

19    origination to securitization to pay off or foreclosure. The MERS Quality

20    Assurance Procedures Manual Glossary defines "Deactivation" as follows:

21    "When a loan becomes inactive on the MERS System for one of the

22    following reasons:

23        • <u>Paid in Full </u>(includes payoff, deed in lieu, short sale, etc.)

24        • Transfer to non-MERS Status

25        • Involuntary transfer/default by Servicer

26        • Involuntary transfer/default by Subservicer

27        • Foreclosure Complete

8. Declaration of William J. Paatalo

28

• Reinstated or modified (option 1), not assigned back to MERS

25. The existence of MERS means that another assignment is missing from the chain of title, as some entity would have had to assign the subject note and DOT to MERS if registered in the MERS system. Because the MERS system shows "JPMorgan Chase Bank, N.A., fka EMC" as the owner and investor, both assignments #2 & #3 are inconsistent with the facts.

26. The failure to record the assignments and sales to the Trust entities, and the failure to disclose the Trust's interest in the subject Note and DOT and subsequent payoff of such, creates a fatal defect in the chain of title. Because the loan was sold to the BSABS 2004-HE4 Trust, as evidenced by the Bloomberg exhibits, and the fact that the subject loan was subsequently "paid off" within the trust, the parties now seeking to foreclose the Subramaniam DOT have no standing to seek such relief.

27. I declare under penalty of perjury under the laws of the State of Oregon and the laws of the United States that the foregoing is true and correct and that this declaration was executed on the 26th day of April, 2013.

William J. Paatalo
Private Investigator – OR PSID# 49411
5200 SW Meadows Rd. #150
Lake Oswego, OR 97035
(503) 726-5954
Bill.bpia@gmail.com

9. Declaration of William J. Paatalo

CONFIDENTIAL



<HELP> for explanation.

| | | Residential Loan Search |
|---|---|---|
| Search By | | |
| ■ Orig Loan Amount | Orig Date | ZIP |
| ■ Loan Number | | Found 30 loans |

| Loan Number | Issuer | Series | | Status | Orig Amount | Rate | Type | Date | ZIP |
|---|---|---|---|---|---|---|---|---|---|
| 9722547 | BSABS | 2004-HE4 | 0 | Paid Off | 176,000 | 6.99 | ARM | 03/2004 | 97005 |
| 0001502541 | RMSPL | 2004-1E | 0 | PIF | 176,000 | 8.24 | FIXED | 03/2004 | |
| C11404736B | CRGT | 2003-1 | 0 | PIF | 176,000 | 7.18 | FIXED | 03/2004 | |
| E43609031A | CRGT | 2006-1 | 0 | PIF | 176,000 | 9.27 | FIXED | 03/2004 | |
| D13574392B | CRGT | 2004-2 | 0 | PIF | 176,000 | 6.90 | FIXED | 03/2004 | |
| D10431169A | CRGT | 2004-2 | 0 | PIF | 176,000 | 5.71 | FIXED | 03/2004 | |
| E43609671A | CRGT | 2004-2 | 0 | PIF | 176,000 | 7.30 | FIXED | 03/2004 | |
| 0001488816 | RMSPL | 2004-1E | 0 | Current | 176,000 | 8.91 | FIXED | 03/2004 | |
| 0001502848 | RMSPL | 2004-1E | 0 | PIF | 176,000 | 7.86 | FIXED | 03/2004 | |
| D13574392A | CRGT | 2004-2 | 0 | PIF | 176,000 | 6.37 | FIXED | 03/2004 | |
| B13646801A | CRGT | 2006-1 | 0 | PIF | 176,000 | 7.49 | FIXED | 03/2004 | |
| 0001366673 | MSAC | 2004-NC6 | 0, 2 | Paid Off | 176,000 | 7.95 | ARM | 03/2004 | |
| 7018478342 | GMSL | 2005-A | 0 | Paid Off | 176,000 | 6.00 | FIXED | 03/2004 | |
| 7018473426 | GMSL | 2005-A | 0 | PIF | 176,000 | 6.00 | FIXED | 03/2004 | |
| 0402113404 | MSAC | 2004-HE5 | 0, 1 | Paid Off | 176,000 | 7.13 | ARM | 03/2004 | |
| 0401202429 | MSAC | 2004-HE5 | 0, 1 | Paid Off | 176,000 | 7.75 | ARM | 03/2004 | |
| 44250234 | CWL | 2004-5 | 0, 3 | PIF | 176,000 | 4.99 | ARM | 03/2004 | |
| 55439583 | CWL | 2004-BC3 | 0, 1 | PIF | 176,000 | 6.70 | ARM | 03/2004 | |
| 55219871 | CWL | 2004-BC3 | 0, 1 | PIF | 176,000 | 6.85 | ARM | 03/2004 | |
| 1695092266 | FNW | 2004-W3 | 0, 3,7,8 | Current | 176,000 | 6.25 | FIXED | 03/2004 | |
| 1695089562 | FNW | 2004-W3 | 0, 1,4,5,8 | PIF | 176,000 | 6.13 | FIXED | 03/2004 | |
| 1695090600 | FNW | 2004-W3 | 0, 2,4,6,8 | Paid Off | 176,000 | 6.25 | FIXED | 03/2004 | |

# CONFIDENTIAL

BP Investigative Agency
EXHIBIT   B

<HELP> for explanation.
Security not found

N Options

BSABS 2004-HE4   BEAR STEARNS ASSET BACKED SECURITIES TRUST                    15 Classes
Template

| | Class | Orig Bal (000) | Cur Bal (000) | Cpn | WAL | Mat Date | Cusip | Description |
|---|---|---|---|---|---|---|---|---|
| 1) | Pd A1 | 128,126 | 0 | 4.993 | 1.50 | 6/25/31 | 073879AW8 | FLT, IRC |
| 2) | Pd A2 | 75,000 | 0 | 5.318 | 1.50 | 6/25/31 | 073879AX6 | FLT, IRC |
| 3) | Pd A3 | 33,884 | 0 | 5.840 | 7.03 | 6/25/34 | 073879AY4 | FLT, STEP, IRC |
| 4) | Pd M1 | 17,776 | 0 | 1.019 | 5.02 | 6/25/34 | 073879AZ1 | MEZ, FLT, STEP, IRC |
| 5) | * M2 | 14,220 | 11,265 | 2.086 | 4.83 | 6/25/34 | 073879BA5 | MEZ, FLT, STEP, IRC |
| 6) | * M3 | 4,444 | 4,118 | 2.536 | 4.73 | 6/25/34 | 073879BB3 | MEZ, FLT, STEP, IRC |
| 7) | * M4 | 3,259 | 698 | 3.211 | 4.68 | 6/25/34 | 073879BC1 | MEZ, FLT, STEP, IRC |
| 8) | * M5 | 3,555 | 1,096 | 3.736 | 4.63 | 6/25/34 | 073879BD9 | MEZ, FLT, STEP, IRC |
| 9) | * M6 | 2,963 | 1,234 | 6.211 | 4.56 | 6/25/34 | 073879BE7 | MEZ, FLT, STEP, IRC |
| 10) | * M7 | 5,332 | 487 | 6.211 | 0.00 | 6/25/34 | 073879BF4 | MEZ, FLT, STEP, IRC |
| 11) | R1 | 0 | 0 | 0.000 | 0.00 | 6/25/34 | 073879BJ6 | R |
| 12) | R2 | 0 | 0 | 0.000 | 0.00 | 6/25/34 | 073879BK3 | R |
| 13) | RX | 0 | 0 | 0.000 | 0.00 | 6/25/34 | 073879BL1 | R |
| 14) | Pd P | 0 | 0 | 0.000 | 0.00 | 6/25/34 | 073879BG2 | SUB, EXE |
| 15) | Pd CE | 0 | 0 | 0.000 | 0.00 | 6/25/34 | 073879BH0 | SUB |

# CONFIDENTIAL

BP Investigative Agency
EXHIBIT   C

<HELP> for explanation.
<MENU> Return to Previous Screen.

| Group: | | | | | | As of: 10/12 | | |
|---|---|---|---|---|---|---|---|---|
| Inactive Loans | 1,722 | 0 | 0 | 77.94 | 276,151,269 | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 109. 9722547 | C96F63663CCCCC3CCC3CC^C | 0 | 12/2005 | 12/2005 | | | |
| 110. 9722539 | CCCCCCCCCCCCCCCCCCCCCCCCC | 0 | 07/2006 | 07/2006 | | | |
| 111. 9722521 | CCCCCCCCCCCCCCCCCCCCCCCC | 0 | 04/2006 | 04/2006 | | | |
| 111. 9722513 | CRRRRRRRRRRRRRRRRFFF999FF | 0 | 02/2007 | 02/2007 | | | |
| 112. 9722505 | CC3CCCCCCCCCCC^^C | 0 | 05/2005 | 05/2005 | | | |
| 113. 9722497 | C9999F63CCCCCCCC^C | 0 | 08/2005 | 08/2005 | | | |
| 114. 9722489 | CCCCC^C | 0 | 09/2004 | 09/2004 | | | |
| 115. 9722463 | CCCCCCC^C | 0 | 11/2004 | 11/2004 | | | |
| 116. 9722455 | CCCCCCCCCCCC^C | 0 | 04/2005 | 04/2005 | | | |
| 117. 9722448 | C33C3CCCC33CCC3CCCCCCCCC^ | 0 | 03/2006 | 03/2006 | | | |
| 118. 9722430 | C9663C6333CCCCCCCC^C | 0 | 10/2005 | 10/2005 | | | |
| 119. 9722422 | CCCCCCCCCC^C | 0 | 02/2005 | 02/2005 | | | |
| 120. 9722414 | CCCCCCCCCCCC^C | 0 | 04/2005 | 04/2005 | | | |
| 121. 9722406 | CCCCCC^C | 0 | 10/2004 | 10/2004 | | | |
| 122. 9722398 | CCCCCCCCCCCCCCCCCCCCCCC^ | 0 | 03/2006 | 03/2006 | | | |
| 123. 9722380 | CCCCC^^C | 0 | 09/2004 | 09/2004 | | | |
| 124. 9722372 | CCCCCCCCCCCCC^G | 0 | 06/2005 | 06/2005 | | | |
| 125. 9722364 | CCCCCCCCCCCCCC^C | 0 | 05/2005 | 05/2005 | | | |
| 126. 9722349 | CCCCCCCCCCCCCCCCCCCCCCC^ | 0 | 03/2006 | 03/2006 | | | |

<HELP> for explanation.
Screen Printed

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Group: | | | | | | | As of: 10/12 | |
| Inactive Loans | 1,722 | 0 | 0 | 77.94 | | 276,151,269 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 108. 9722547 | C96F63663CCCC3CCC3CC^C | 0 | | | | 176,000 |
| 109. 9722539 | CCCCCCCCCCCCCCCCCCCCCCCCC | 0 | | | | 373,500 |
| 110. 9722521 | CCCCCCCCCCCCCCCCCCCCCCCCC | 0 | | | | 279,200 |
| 111. 9722513 | CRRRRRRRRRRRRRRRRFFF999FF | 0 | | | | 45,000 |
| 112. 9722505 | CC3CCCCCCCCCCC^^C | 0 | | | | 151,725 |
| 113. 9722497 | C9999F63CCCCCCCCC^C | 0 | | | | 108,000 |
| 114. 9722489 | CCCCC^C | 0 | | | | 519,000 |
| 115. 9722463 | CCCCCCC^C | 0 | | | | 300,000 |
| 116. 9722455 | CCCCCCCCCCCCC^C | 0 | | | | 58,650 |
| 117. 9722448 | C33C3CCCC33CCC3CCCCCCCCC^ | 0 | | | | 182,400 |
| 118. 9722430 | C9663C6333CCCCCCCC^C | 0 | | | | 75,200 |
| 119. 9722422 | CCCCCCCCCC^C | 0 | | | | 180,000 |
| 120. 9722414 | CCCCCCCCCCCCC^C | 0 | | | | 346,750 |
| 121. 9722406 | CCCCC^C | 0 | | | | 48,500 |
| 122. 9722398 | CCCCCCCCCCCCCCCCCCCCCCCCC^ | 0 | | | | 311,000 |
| 123. 9722380 | CCCCC^^C | 0 | | | | 25,000 |
| 124. 9722372 | CCCCCCCCCCCCCCC^C | 0 | | | | 328,000 |
| 125. 9722364 | CCCCCCCCCCCCCC^C | 0 | | | | 249,432 |
| 126. 9722349 | CCCCCCCCCCCCCCCCCCCCCCCC^ | 0 | | | | 326,950 |

\<HELP\> for explanation.
Screen Printed

| | 99 Short/Bc None | 90 Export | SSARS 2033 IE4 | | Loan Details |
|---|---|---|---|---|---|
| Group: | | | | | As of: 10/12 |

| | | Sch'l Amt Prin (K 00) | Rm... | Type 6 I... | Flr Con. | R... | Rev.. | LTV |
|---|---|---|---|---|---|---|---|---|
| Inactive Loans | 1,722 | 0 | 0 | 77.94 | 276,151,269 | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1N. 9722547 | C96F63663CCCC3CCC3CC^C | 0 | 6.99 | 0 | | | Full | 78.2 |
| 1N. 9722539 | CCCCCCCCCCCCCCCCCCCCCCCC | 0 | 8.50 | 0 | | | Full | 90.0 |
| 1N. 9722521 | CCCCCCCCCCCCCCCCCCCCCCCC | 0 | 7.85 | 0 | 32 | | Unknown | 80.0 |
| 1N. 9722513 | CRRRRRRRRRRRRRRRRFFF999FF | 0 | 11.65 | 0 | 35 | | Full | 90.0 |
| 112. 9722505 | CC3CCCCCCCCCCC^^C | 0 | 8.50 | 0 | | | Full | 85.0 |
| 113. 9722497 | C9999F63CCCCCCCCC^C | 0 | 9.20 | 0 | | | Full | 83.1 |
| 114. 9722489 | CCCCC^C | 0 | 6.65 | 0 | | | Unknown | 79.8 |
| 115. 9722463 | CCCCCCC^C | 0 | 6.85 | 0 | | | Full | 84.5 |
| 116. 9722455 | CCCCCCCCCCCC^C | 0 | 8.45 | 0 | | | Full | 85.0 |
| 117. 9722448 | C33C3CCCC33CCC3CCCCCCCC^ | 0 | 6.85 | 0 | | | Unknown | 80.0 |
| 118. 9722430 | C9663C6333CCCCCCCC^C | 0 | 9.25 | 0 | | | Unknown | 20.0 |
| 119. 9722422 | CCCCCCCCCC^C | 0 | 7.25 | 0 | | | Unknown | 90.0 |
| 12N. 9722414 | CCCCCCCCCCCC^C | 0 | 7.99 | 0 | | | Full | 93.7 |
| 121. 9722406 | CCCCCC^C | 0 | 10.25 | 0 | | | Unknown | 69.3 |
| 122. 9722398 | CCCCCCCCCCCCCCCCCCCCCCC^ | 0 | 6.60 | 0 | | | Unknown | 79.7 |
| 123. 9722380 | CCCCC^^C | 0 | 11.50 | 0 | | | Full | 23.8 |
| 124. 9722372 | CCCCCCCCCCCCC^C | 0 | 6.38 | 0 | | | Unknown | 80.0 |
| 125. 9722364 | CCCCCCCCCCCCC^C | 0 | 6.65 | 0 | | | Unknown | 80.0 |
| 12N. 9722349 | CCCCCCCCCCCCCCCCCCCCCC^ | 0 | 6.30 | 0 | | | Unknown | 87.2 |

<HELP> for explanation.
Screen Printed

| | | | | BSABS 2001-EH | | Loan Details |
|---|---|---|---|---|---|---|
| Group: | | | | | | As of: 10/12 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Inactive Loans | 1,722 | 0 | 0 | 77.94 | | 276,151,269 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 108. 9722547 | C96F63663CCCC3CCC3CC^C | 0 | Full | 78.2 | .0 | 58.5 |
| 109. 9722539 | CCCCCCCCCCCCCCCCCCCCCCCC | 0 | Full | 90.0 | .0 | 57.6 |
| 110. 9722521 | CCCCCCCCCCCCCCCCCCCCCCCC | 0 | Unknown | 80.0 | .0 | 57.1 |
| 111. 9722513 | CRRRRRRRRRRRRRRRFFF999FF | 0 | Full | 90.0 | .0 | 82.6 |
| 112. 9722505 | CC3CCCCCCCCCCC^^C | 0 | Full | 85.0 | .0 | 59.4 |
| 113. 9722497 | C9999F63CCCCCCCC^C | 0 | Full | 83.1 | .0 | 79.2 |
| 114. 9722489 | CCCCC^C | 0 | Unknown | 79.8 | .0 | 67.3 |
| 115. 9722463 | CCCCCCC^C | 0 | Full | 84.5 | .0 | 79.2 |
| 116. 9722455 | CCCCCCCCCCCC^C | 0 | Full | 85.0 | .0 | 71.7 |
| 117. 9722448 | C33C3CCCC33CCC3CCCCCCCCC^ | 0 | Unknown | 80.0 | .0 | 73.9 |
| 118. 9722430 | C9663C6333CCCCCCCC^C | 0 | Unknown | 20.0 | .0 | 18.3 |
| 119. 9722422 | CCCCCCCCCC^C | 0 | Unknown | 90.0 | .0 | 69.9 |
| 120. 9722414 | CCCCCCCCCCCCCC^C | 0 | Full | 93.7 | .0 | 73.3 |
| 121. 9722406 | CCCCCC^C | 0 | Unknown | 69.3 | .0 | 67.9 |
| 122. 9722398 | CCCCCCCCCCCCCCCCCCCCCCCC^ | 0 | Unknown | 79.7 | .0 | 51.0 |
| 123. 9722380 | CCCCC^^C | 0 | Full | 23.8 | .0 | 21.2 |
| 124. 9722372 | CCCCCCCCCCCCCC^C | 0 | Unknown | 80.0 | .0 | 61.6 |
| 125. 9722364 | CCCCCCCCCCCCCC^C | 0 | Unknown | 80.0 | .0 | 59.0 |
| 126. 9722349 | CCCCCCCCCCCCCCCCCCCCCCC^ | 0 | Unknown | 87.2 | .0 | 61.2 |

<HELP> for explanation.
Screen Printed

| 99 Shipping Note | 99 Exact | BSABS 2001 HE4 | Loan Details |
|---|---|---|---|
| Group: | | | As of: 10/12 |

| Inactive Loans | 1,722 | 0 | 0 | 77.94 | 276,151,269 | | | |
|---|---|---|---|---|---|---|---|---|

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1⅙ | 9722547 | C96F63663CCCC3CCC3CC^C | 0 | 21 | 0 | ARM | T1Y | -79 | 12.99 | 6.99 |
| 1⅙ | 9722539 | CCCCCCCCCCCCCCCCCCCCCCCCC | 0 | 28 | 0 | ARM | T1Y | -79 | 13.75 | 6.75 |
| 11⅙ | 9722521 | CCCCCCCCCCCCCCCCCCCCCCCCC | 0 | 25 | 0 | ARM | T1Y | -79 | 12.85 | 5.85 |
| 111 | 9722513 | CRRRRRRRRRRRRRRRFFF999FF | 0 | 39 | 0 | FIXED | | | | |
| 112 | 9722505 | CC3CCCCCCCCCCC^^c | 0 | 15 | 0 | ARM | T1Y | -80 | 14.5 | 8.5 |
| 11⅓ | 9722497 | C9999F63CCCCCCCC^C | 0 | 17 | 0 | FIXED | | | | |
| 11⅘ | 9722489 | CCCCC^C | 0 | 6 | 0 | ARM | T1Y | -79 | 12.65 | 6.65 |
| 11⅚ | 9722463 | CCCCCCC^C | 0 | 8 | 0 | ARM | T1Y | -79 | 12.85 | 6.85 |
| 11⅙ | 9722455 | CCCCCCCCCCC^C | 0 | 13 | 0 | ARM | T1Y | -79 | 14.45 | 8.45 |
| 11⅞ | 9722448 | C33C3CCCC33CCC3CCCCCCCC^ | 0 | 24 | 0 | ARM | T1Y | -79 | 12.85 | 6.85 |
| 11⅛ | 9722430 | C9663C6333CCCCCCCC^C | 0 | 19 | 0 | FIXED | | | | |
| 11⅑ | 9722422 | CCCCCCCCCC^C | 0 | 11 | 0 | FIXED | | | | |
| 12⅛ | 9722414 | CCCCCCCCCCCC^C | 0 | 13 | 0 | ARM | T1Y | -67 | 13.99 | 7.99 |
| 121 | 9722406 | CCCCCC^C | 0 | 7 | 0 | ARM | T1Y | -79 | 16.25 | 10.25 |
| 12⅔ | 9722398 | CCCCCCCCCCCCCCCCCCCCCCCC^ | 0 | 24 | 0 | FIXED | | | | |
| 12⅓ | 9722380 | CCCCC^^C | 0 | 7 | 0 | FIXED | | | | |
| 1⅘ | 9722372 | CCCCCCCCCCCCC^C` | 0 | 15 | 0 | ARM | T1Y | -79 | 12.375 | 6.375 |
| 1⅚ | 9722364 | CCCCCCCCCCCCC^C | 0 | 14 | 0 | ARM | T1Y | -67 | 12.65 | 6.65 |
| 12⅙ | 9722349 | CCCCCCCCCCCCCCCCCCCCCC^ | 0 | 24 | 0 | ARM | T1Y | -79 | 12.3 | 6.3 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2012 Bloomberg Finance L.P.
SN 123028 EST    GMT-5:00 H109-6-0 13-Nov-2012 12:23:07

<HELP> for explanation.
Screen Printed

| | 5) Sort by: None    -1  99 Export | | BSABS 2004 HE4 | | | | Loan Details |
|---|---|---|---|---|---|---|---|
| **Group:** | | | | | | | **As of: 10/12** |
| | Loan | in Init HPA? | | Term | | in WA | |
| **Inactive Loans** | 1,722 | 0 | 0 | 77.94 | 276,151,269 | | |

| # | Loan | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| → 108. 9722547 | C96F63663CCCC3CCC3CC^C | 0 | 1 | 5.25 | | OR | - | Paidoff |
| 109. 9722539 | CCCCCCCCCCCCCCCCCCCCCCCCC | 0 | 1 | 3.75 | | CA | - | Paidoff |
| 110. 9722521 | CCCCCCCCCCCCCCCCCCCCCCCCC | 0 | 1 | 3.75 | | CA | - | Paidoff |
| 111. 9722513 | CRRRRRRRRRRRRRRRRFFF999FF | 0 | | | | IN | - | Paidoff |
| 112. 9722505 | CC3CCCCCCCCCC^^C | 0 | 1 | 5.7 | | NV | - | Paidoff |
| 113. 9722497 | C9999F63CCCCCCCCC^C | 0 | | | | MI | - | Paidoff |
| 114. 9722489 | CCCCC^C | 0 | 1 | 6 | | CA | - | Paidoff |
| 115. 9722463 | CCCCCCC^C | 0 | 1 | 5.55 | | IL | - | Paidoff |
| 116. 9722455 | CCCCCCCCCCCC^C | 0 | 1 | 5.25 | | FL | - | Paidoff |
| 117. 9722448 | C33C3CCCC33CCC3CCCCCCCC^ | 0 | 1 | 6 | | CO | - | Paidoff |
| 118. 9722430 | C9663C6333CCCCCCCC^C | 0 | | | | TX | - | Paidoff |
| 119. 9722422 | CCCCCCCCCC^C | 0 | | | | CA | - | Paidoff |
| 120. 9722414 | CCCCCCCCCCCC^C | 0 | 1 | 5.25 | | CA | - | Paidoff |
| 121. 9722406 | CCCCCC^C | 0 | 1 | 6 | | MI | - | Paidoff |
| 122. 9722398 | CCCCCCCCCCCCCCCCCCCCCCCC^ | 0 | | | | CA | - | Paidoff |
| 123. 9722380 | CCCCC^^C | 0 | | | | FL | - | Paidoff |
| 124. 9722372 | CCCCCCCCCCCC^C | 0 | 1 | 5.25 | | CA | - | Paidoff |
| 125. 9722364 | CCCCCCCCCCCC^C | 0 | 1 | 5.25 | | CA | - | Paidoff |
| 126. 9722349 | CCCCCCCCCCCCCCCCCCCCCCCC^ | 0 | 1 | 5.25 | | CA | - | Paidoff |

<HELP> for explanation.
Screen Printed

| | | | | | BSABS 2004-HE1 | | | Loan Details |
|---|---|---|---|---|---|---|---|---|
| Group: | | | | | | | | As of: 10/12 |

| Inactive Loans | 1,722 | 0 | 0 | 77.94 | 276,151,269 | | | |
|---|---|---|---|---|---|---|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 188. 9722547 | C96F63663CCCC3CCC3CC^C | 0 | Paidoff | Single Housing | Own | Equity takeout |
| 189. 9722539 | CCCCCCCCCCCCCCCCCCCCCCCCC | 0 | Paidoff | Condo | Own | Purchase |
| 118. 9722521 | CCCCCCCCCCCCCCCCCCCCCCCCC | 0 | Paidoff | PUD (Planned Unit Develop | Own | Purchase |
| 111. 9722513 | CRRRRRRRRRRRRRRRRFFF999FF | 0 | Paidoff | Single Housing | Inv | Purchase |
| 112. 9722505 | CC3CCCCCCCCCCC^^C | 0 | Paidoff | Single Housing | Own | Refinance |
| 113. 9722497 | C9999F63CCCCCCCC^C | 0 | Paidoff | Single Housing | Own | Refinance |
| 114. 9722489 | CCCCC^C | 0 | Paidoff | Multi_Family-2F | Own | Equity takeout |
| 115. 9722463 | CCCCCC^C | 0 | Paidoff | Single Housing | Own | Equity takeout |
| 116. 9722455 | CCCCCCCCCCCC^C | 0 | Paidoff | Single Housing | Inv | Purchase |
| 117. 9722448 | C33C3CCCC33CCC3CCCCCCCC^ | 0 | Paidoff | Single Housing | Own | Purchase |
| 118. 9722430 | C9663C6333CCCCCCCC^C | 0 | Paidoff | Single Housing | Own | Purchase |
| 119. 9722422 | CCCCCCCCCC^C | 0 | Paidoff | Single Housing | Own | Equity takeout |
| 128. 9722414 | CCCCCCCCCCCC^C | 0 | Paidoff | Single Housing | Own | Refinance |
| 171. 9722406 | CCCCC^C | 0 | Paidoff | Single Housing | Inv | Purchase |
| 172. 9722398 | CCCCCCCCCCCCCCCCCCCCCCCC^ | 0 | Paidoff | Multi_Family-2F | Own | Equity takeout |
| 123. 9722380 | CCCCC^^C | 0 | Paidoff | Single Housing | Own | Purchase |
| 124. 9722372 | CCCCCCCCCCCCC^C | 0 | Paidoff | Single Housing | Own | Purchase |
| 125. 9722364 | CCCCCCCCCCCCCC^C | 0 | Paidoff | Single Housing | Own | Purchase |
| 126. 9722349 | CCCCCCCCCCCCCCCCCCCCCCCCC^ | 0 | Paidoff | Single Housing | Own | Equity takeout |

<HELP> for explanation.
Screen Printed

| Group: | | | | | | | | As of: 10/12 |
|---|---|---|---|---|---|---|---|---|
| Inactive Loans | 1,722 | 0 | 0 | 77.94 | 276,151,269 | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 108. 9722547 | C96F63663CCCC3CCC3CC^C | | 0 | 03/2004 | 97005 | Portland-Vancouver-Beave | 0.50 |
| 109. 9722539 | CCCCCCCCCCCCCCCCCCCCCCCC | | 0 | 03/2004 | 91302 | Los Angeles-Long Beach-S | 0.50 |
| 110. 9722521 | CCCCCCCCCCCCCCCCCCCCCCCC | | 0 | 03/2004 | 94544 | San Francisco-Oakland-Fre | 0.50 |
| 111. 9722513 | CRRRRRRRRRRRRRRRFFF999FF | | 0 | 11/2003 | 46803 | Fort Wayne, IN | 0.50 |
| 112. 9722505 | CC3CCCCCCCCCC^^C | | 0 | 02/2004 | 89142 | Las Vegas-Paradise, NV | 0.50 |
| 113. 9722497 | C9999F63CCCCCCCC^C | | 0 | 03/2004 | 48237 | Detroit-Warren-Livonia, MI | 0.50 |
| 114. 9722489 | CCCCC^C | | 0 | 03/2004 | 90241 | Los Angeles-Long Beach-S | 0.50 |
| 115. 9722463 | CCCCCCC^C | | 0 | 03/2004 | 60076 | Chicago-Naperville-Joliet, | 0.50 |
| 116. 9722455 | CCCCCCCCCCCC^C | | 0 | 03/2004 | 32206 | Jacksonville, FL | 0.50 |
| 117. 9722448 | C33C3CCCC33CCC3CCCCCCCC^ | | 0 | 03/2004 | 80211 | Denver-Aurora, CO | 0.50 |
| 118. 9722430 | C9663C6333CCCCCCC^C | | 0 | 03/2004 | 77007 | Houston-Sugar Land-Bayto | 0.50 |
| 119. 9722422 | CCCCCCCCC^C | | 0 | 03/2004 | 92335 | Riverside-San Bernardino- | 0.50 |
| 120. 9722414 | CCCCCCCCCCCC^C | | 0 | 03/2004 | 93065 | Oxnard-Thousand Oaks-Ve | 0.50 |
| 121. 9722406 | CCCCCC^C | | 0 | 03/2004 | 48215 | Detroit-Warren-Livonia, MI | 0.50 |
| 122. 9722398 | CCCCCCCCCCCCCCCCCCCCCCC^ | | 0 | 03/2004 | 91731 | Los Angeles-Long Beach-S | 0.50 |
| 123. 9722380 | CCCCC^^C | | 0 | 02/2004 | 34659 | | 0.50 |
| 124. 9722372 | CCCCCCCCCCCC^C | | 0 | 03/2004 | 94303 | San Jose-Sunnyvale-Santa | 0.50 |
| 125. 9722364 | CCCCCCCCCCCCC^C | | 0 | 03/2004 | 95363 | Modesto, CA | 0.50 |
| 126. 9722349 | CCCCCCCCCCCCCCCCCCCCCCC^ | | 0 | 03/2004 | 95023 | San Jose-Sunnyvale-Santa | 0.50 |

BP Investigative Agency
EXHIBIT
D



**EMC**
Mortgage Corporation
*Proven Performance*

April 18, 2006

State of Oregon
Department of Consumer and Business Services
Attention: Timothy C. Spencer
P.O. Box 14480
Salem, OR 97309-0405

Re:   Loan Number:       0009722547
      Mortgagor:         Denise Subramaniam
      Property Address:  13865 S.W. Walker Rd.
                         Beaverton, OR 97005

Dear Timothy C. Spencer:

EMC Mortgage Corporation (EMC) is dedicated to providing the highest level of customer service. Your concerns are very important to us, and we appreciate the opportunity to provide you with the following information regarding the servicing of this account.

According to our records, EMC acquired the above-referenced loan from People's Choice Home Loan on May 1, 2004. We have enclosed a copy of the Welcome Letter we mailed to Ms. Subramaniam following the transfer. In addition, we have enclosed a copy of our mortgagor's loan history. The first payment EMC received for this loan, in the amount of $1,169.76, was applied on July 1, 2004 as the May 2004 installment. The June 2004 installment was applied to the loan on July 6, 2004, and a payment in the amount of $2,339.52 was applied toward the July 2004 and August 2004 installments on August 23, 2004. Our records indicate that we did not receive a payment in September 2004, October 2004, March 2005, July 2005 or August 2005. If our mortgagor is in dispute of our findings, she may forward front and back copies of cancelled checks for the payments in question to the mailing address below. If our research confirms that any payments are missing, we will make the appropriate adjustments to our credit reporting.

Ms. Subramaniam's loan entered foreclosure proceedings on August 9, 2005, at which time the loan was past due for the May 2005 installment. Foreclosure action was suspended on September 16, 2005, when our mortgagor entered a forbearance agreement. Under the terms of this agreement, our mortgagor was required to pay $1,349.76 by the 12th of each month from October 2005 through September 2006. Please be advised that we allowed our mortgagor to remit several of her payments after the stipulated due date, and we maintained this agreement with our mortgagor until the loan was transferred to GMAC-RFC/Homecomings (GMAC) on February 9, 2006.

Mac Arthur Ridge II, 909 Hidden Ridge Drive, Suite 200, Irving, Texas 75038
MAILING ADDRESS: P.O. Box 141358, Irving, Texas 75014-1358

State of Oregon
April 18, 2006
Page Two


Our records reflect that Ms. Subramaniam's property insurance policy was cancelled on March 15, 2005, requiring EMC to establish lender-placed insurance and create an escrow account for payment of this coverage. A disbursement for this insurance in the amount of $1,486.00 was paid from our mortgagor's escrow account on May 25, 2005. A partial refund in the amount of $139.00 was forwarded to GMAC on February 15, 2006 for the unused portion of this policy. If our mortgagor is in possession of evidence of continuous coverage since March 2005, she may forward it to our mailing address so that we may disburse an additional refund to GMAC to reimburse Ms. Subramaniam's account. In addition, our records reflect that EMC issued a disbursement from the escrow account to our mortgagor's county tax office in the amount of $2,107.34 for delinquent taxes due in October 2004 on October 17, 2005, and a separate disbursement for taxes due in October 2005 in the amount of $2,269.74 on November 10, 2005. Please be advised that our mortgagor's forbearance agreement did not include repayment for the tax and insurance escrow advances.

According to the enclosed Note, this loan has an adjustable interest rate, starting at 6.99 percent at the origination of the loan, and subject to change after two years. In a letter dated January 26, 2006, we informed Ms. Subramaniam that her interest rate would increase to 9.99 percent effective with the April 2006 installment. Please be advised that our mortgagor's forbearance agreement did not change the interest rate terms of the Note. In addition, the Note reflects a prepayment penalty in effect for the first two years of the mortgage.

Please note that we are unable to provide Ms. Subramaniam with a payoff statement, as we are no longer servicing her loan. If Ms. Subramaniam would like to obtain a payoff statement, or if she has any questions regarding the current servicing of her loan, she may contact GMAC at 1-800-247-9727.

Should you have any further questions regarding EMC's servicing of this mortgage loan, please call our Customer Service Executive Desk at 1-800-695-7695, extension 7377, Monday through Friday between the hours of 7:30 a.m. and 4:30 p.m. Central Time.

Sincerely,

Matt Pearce
Research Specialist


Enclosures:    Welcome Letter
               Loan History
               Note

cc:            Denise Subramaniam
               13865 S.W. Walker Rd.
               Beaverton, OR 97005

BP Investigative Agency
EXHIBIT
E

**MERS**
ServicerID
www.mers-servicerid.org

MERS® ServicerID - Investor - Windows Internet Explorer

https://www.mers-servicerid.org/sis/investor

**Process Loans, Not Paperwork™**

Select borrower type and enter borrower information to see investor for MIN 1000221-0009725447-8.

● **Investor for Individual Borrower**

Your entries may be either upper or lower case.
Fields marked * are required.

Last Name:  subramaniam  *

SSN:  __  __  __  *

☑ By checking this box, the borrower or borrower's authorized representative is attesting to the fact that, he or she is in fact the borrower or borrower's authorized representative for the loan in question. Additionally, borrowers wishing to learn the identity of their loan's investor must confirm their identity by entering their last name or corporation name as well as their SSN or TIN. (If this information does not match the information contained in the MERS® System for the borrower of the loan, the investor information will not be displayed. Borrowers should verify the results with their loan servicer. *

[ Submit ]

© **Investor for Corporation/Non-Person Entity Borrower**

Servicer:  JPMorgan Chase Bank, N.A.fka EMC
Monroe, LA

Investor:  JPMorgan Chase Bank, N.A.fka EMC

Phone: (800) 848-9136

Need help?

Status: Inactive

(800) 848-9136

Verify the Investor name.

www.mersinc.org



**MERS**
ServicerID
www.mers-servicerid.org

## Process Loans, Not Paperwork™

*Need help?*

**1 record matched your search:**

MIN: 1000221-0009722547-8          Note Date: 02/10/2004          MIN Status: **Inactive**

Servicer: JPMorgan Chase Bank, N.A. fka EMC          Phone: **(800) 848-9136**
Monroe, LA

If you are a borrower on this loan, you can click here to enter additional information and display the Investor name.

Return to Search

For more information about Mortgage Electronic Registration Systems, Inc. (MERS) please go to www.mersinc.org

Copyright© 2012 by MERSCORP Holdings, Inc.

# Salesxp00893

**Affidavit–Denise–Subramaniam.pdf**
**04/30/13   10:44 AM**



# AFFIDAVIT

RE: Subramaniam v. Beal, et al
Case No. 3:12-cv-1681

I, Denise Subramaniam, being duly sworn state as follows:

I am the Plaintiff in this case. Before I became too disabled to work I enjoyed a long career as a software engineer. I earned a six figure yearly income from my profession; verifiable with financial records.

I had an underlying disability all my life. However, I learned to compensate for it and through much hard work I acquired an education and built a career as a software engineer to support my family as a single mother after my husband was unable to cope following the death of our youngest son and left us.

The prolonged and excessive stress and anxiety caused by fear of losing our home due to the Defendants' unlawful actions undermined my ability to compensate for my disabilities and caused a major downturn in my overall health. Defendants' unlawful actions and unlawful damage to my credit affected my ability to re-obtain health insurance and that in turn delayed or prevented me from obtaining medical treatment that could have prevented permanent physical damage and severe chronic pain; these delays caused additional personal injury; and this in turn eventually led to my inability work. This also caused me to pay significant out-of-pocket medical expenses above what I would have paid in insurance premiums had my credit not been unlawfully damaged. These facts can be verified with medical and financial records.

Prior to becoming too disabled to work, unlawful damage to my credit caused loss of employment as credit checks are routine for professional employment. Unlawful damage to my credit barred me from obtaining contracts through my own technology company. In 2008 and 2009 I built a good credit history for my company hoping to overcome the hardships of my damaged personal credit. I spent thousands of dollars and hundreds of hours of my time to prepare and submit bid proposals. I paid for travel expenses to bring team members with me to meet prospective clients when my company was selected among the top bidders, only to learn a check of my personal credit was still required before they would select my company as their vendor. Financial and other records will prove this.

I have suffered significant financial damage, personal injury and extreme mental distress as direct and indirect results of the named Defendants', including MGC Mortgage's conspiracy to defraud me and to collect an illegal debt from me; and by their other unlawful actions with intent to unlawfully deprive me of my property which is my home and which accommodates the specific needs of my disabilities.

I am in regular contact with numerous other victims of fraudulent foreclosures initiated by the MGC Mortgage, LNV Corporation and Dovenmuehle Mortgage trio of companies. These victims are predominately minorities, female heads of household and seniors. Each of these victims experienced similar false claims of missed payments or misappropriated payments either with MGC or with a predecessor that in turn led to false default, false mortgage related documents, and fraudulent foreclosure. Additionally MGC and LNV have committed a pattern of "fraud upon the court" because as they have done here and because they continue to submit false documents, of which they know to be false, to State and Federal courts across our country.

I have personally spoken with an elderly couple that paid their final mortgage payment to MGC. When after six months they had not received the canceled note and clear title to their property from MGC they complained and were told they still owed $2,500. The couple paid this, yet still did not receive the

canceled note. When they complained again they received a Notice of Default and trustee sale. This couple and other witnesses with similar experiences with MGC are available to testify.

I have personally spoken with a person willing to testify and present evidence in the form of a memo between a Texas State official and an attorney in the employ of D. Andrew Beal regarding complaints made by consumers against MGC. The memo is a threat made to the Texas official regarding disclosure of certain incriminating information about MGC. This witness also has printed confirmation of a consumer's wire transfer for nearly $200,000 made payable to Homecomings Financial Network, Inc. that was deposited into a personal account for Stephen Costas, a senior executive officer for many of Beal's companies and corporations. This person fears his/her life will be in jeopardy if his/her name is disclosed.

Collectively with other MGC/LNV victims, some with open cases in State and Federal courts, I have investigated these companies and their ultimate parent corporation Beal Bank, and its sole owner, D. Andrew Beal. We have amassed a collection of documentary evidence that we are prepared to present to this court to prove my RICO claims against these defendants. Other victims are willing and able to testify as to their knowledge of MGC's fraudulent business practices and their RICO conspiracy to defraud me and other homeowners of our real property. Some of these victims gave me permission to use their documentary evidence as exhibits to my Objection to MGC's Motion to Dismiss so as to conclusively show this court that evidence does in fact exist to prove my RICO claims.

My direct financial losses exceed $4,000,000. Loss of income and future income accounts for more than half of this estimate; but also included is the increased cost of insurance and interest expenses due to unlawful credit damage; out-of-pocket medical costs above what health insurance would have cost prior to the defendants' bad acts; cost of future medical care; attorney fees paid prior to my becoming impoverished by my inability to work; loss in property value etc. Not included in this estimate is the cost of personal injury and emotional duress caused by the Defendants unlawful actions. I have no idea how to place a monetary value on the horrific physical pain and suffering I have had to endure since 2006, but there are professionals who can make such a determination; and this is a matter for discovery. This entire mess could have been avoided if any one of these Defendants had conducted their businesses in an honest and ethical manner and addressed my complaints about misappropriated payments back in 2005 and again in 2008 and 2010; this did not happen because they made more money from defaults and foreclosures. I never was in default; the evidence will prove this fact. These Defendants have destroyed my life for their own unjust financial gain.

These Defendants have caused me to suffer significant losses and by law I am entitled to compensation for loss or injury. Considering the Defendants egregious lack of concern for the human suffering they cause through their fraud and their "above the law" attitude I believe punitive damages should also be awarded. Furthermore, these Defendants have unjustly enriched themselves through a RICO conspiracy to defraud me and others; these wrongs create an obligation for them to make restitution to their victims.

I have evidence to prove my claims stated in my Amended Complaint. I can present witnesses to the court, including expert witnesses, who can testify as to their knowledge of facts material to my complaint and to the culpability of the named Defendants, including MGC. I believe my rights to due process under the Fifth and Fourteenth Amendments of our Constitution would be denied if MGC's Motion to dismiss were granted.


Denise Subramaniam

# Salesxp00893

**Affidavit–Denise–Subramaniam.pdf**
**04/30/13   10:44 AM**



# AFFIDAVIT

RE: Subramaniam v. Beal, et al
Case No. 3:12-cv-1681

I, Denise Subramaniam, being duly sworn state as follows:

I am the Plaintiff in this case. Before I became too disabled to work I enjoyed a long career as a software engineer. I earned a six figure yearly income from my profession; verifiable with financial records.

I had an underlying disability all my life. However, I learned to compensate for it and through much hard work I acquired an education and built a career as a software engineer to support my family as a single mother after my husband was unable to cope following the death of our youngest son and left us.

The prolonged and excessive stress and anxiety caused by fear of losing our home due to the Defendants' unlawful actions undermined my ability to compensate for my disabilities and caused a major downturn in my overall health. Defendants' unlawful actions and unlawful damage to my credit affected my ability to re-obtain health insurance and that in turn delayed or prevented me from obtaining medical treatment that could have prevented permanent physical damage and severe chronic pain; these delays caused additional personal injury; and this in turn eventually led to my inability work. This also caused me to pay significant out-of-pocket medical expenses above what I would have paid in insurance premiums had my credit not been unlawfully damaged. These facts can be verified with medical and financial records.

Prior to becoming too disabled to work, unlawful damage to my credit caused loss of employment as credit checks are routine for professional employment. Unlawful damage to my credit barred me from obtaining contracts through my own technology company. In 2008 and 2009 I built a good credit history for my company hoping to overcome the hardships of my damaged personal credit. I spent thousands of dollars and hundreds of hours of my time to prepare and submit bid proposals. I paid for travel expenses to bring team members with me to meet prospective clients when my company was selected among the top bidders, only to learn a check of my personal credit was still required before they would select my company as their vendor. Financial and other records will prove this.

I have suffered significant financial damage, personal injury and extreme mental distress as direct and indirect results of the named Defendants', including MGC Mortgage's conspiracy to defraud me and to collect an illegal debt from me; and by their other unlawful actions with intent to unlawfully deprive me of my property which is my home and which accommodates the specific needs of my disabilities.

I am in regular contact with numerous other victims of fraudulent foreclosures initiated by the MGC Mortgage, LNV Corporation and Dovenmuehle Mortgage trio of companies. These victims are predominately minorities, female heads of household and seniors. Each of these victims experienced similar false claims of missed payments or misappropriated payments either with MGC or with a predecessor that in turn led to false default, false mortgage related documents, and fraudulent foreclosure. Additionally MGC and LNV have committed a pattern of "fraud upon the court" because as they have done here and because they continue to submit false documents, of which they know to be false, to State and Federal courts across our country.

I have personally spoken with an elderly couple that paid their final mortgage payment to MGC. When after six months they had not received the canceled note and clear title to their property from MGC they complained and were told they still owed $2,500. The couple paid this, yet still did not receive the

canceled note. When they complained again they received a Notice of Default and trustee sale. This couple and other witnesses with similar experiences with MGC are available to testify.

I have personally spoken with a person willing to testify and present evidence in the form of a memo between a Texas State official and an attorney in the employ of D. Andrew Beal regarding complaints made by consumers against MGC. The memo is a threat made to the Texas official regarding disclosure of certain incriminating information about MGC. This witness also has printed confirmation of a consumer's wire transfer for nearly $200,000 made payable to Homecomings Financial Network, Inc. that was deposited into a personal account for Stephen Costas, a senior executive officer for many of Beal's companies and corporations. This person fears his/her life will be in jeopardy if his/her name is disclosed.

Collectively with other MGC/LNV victims, some with open cases in State and Federal courts, I have investigated these companies and their ultimate parent corporation Beal Bank, and its sole owner, D. Andrew Beal. We have amassed a collection of documentary evidence that we are prepared to present to this court to prove my RICO claims against these defendants. Other victims are willing and able to testify as to their knowledge of MGC's fraudulent business practices and their RICO conspiracy to defraud me and other homeowners of our real property. Some of these victims gave me permission to use their documentary evidence as exhibits to my Objection to MGC's Motion to Dismiss so as to conclusively show this court that evidence does in fact exist to prove my RICO claims.

My direct financial losses exceed $4,000,000. Loss of income and future income accounts for more than half of this estimate; but also included is the increased cost of insurance and interest expenses due to unlawful credit damage; out-of-pocket medical costs above what health insurance would have cost prior to the defendants' bad acts; cost of future medical care; attorney fees paid prior to my becoming impoverished by my inability to work; loss in property value etc. Not included in this estimate is the cost of personal injury and emotional duress caused by the Defendants unlawful actions. I have no idea how to place a monetary value on the horrific physical pain and suffering I have had to endure since 2006, but there are professionals who can make such a determination; and this is a matter for discovery. This entire mess could have been avoided if any one of these Defendants had conducted their businesses in an honest and ethical manner and addressed my complaints about misappropriated payments back in 2005 and again in 2008 and 2010; this did not happen because they made more money from defaults and foreclosures. I never was in default; the evidence will prove this fact. These Defendants have destroyed my life for their own unjust financial gain.

These Defendants have caused me to suffer significant losses and by law I am entitled to compensation for loss or injury. Considering the Defendants egregious lack of concern for the human suffering they cause through their fraud and their "above the law" attitude I believe punitive damages should also be awarded. Furthermore, these Defendants have unjustly enriched themselves through a RICO conspiracy to defraud me and others; these wrongs create an obligation for them to make restitution to their victims.

I have evidence to prove my claims stated in my Amended Complaint. I can present witnesses to the court, including expert witnesses, who can testify as to their knowledge of facts material to my complaint and to the culpability of the named Defendants, including MGC. I believe my rights to due process under the Fifth and Fourteenth Amendments of our Constitution would be denied if MGC's Motion to dismiss were granted.

Denise Subramaniam

**EXHIBIT C**

Name: Denise Subramanian
Address: 13865 SW Walker Rd.
Beaverton OR 97005
Phone: 503-764-5300

FILED 28 SEP '15 1401USDC-ORP

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

LNV Corporation
                    Plaintiff(s),

vs.

Denise Subramanian
                    Defendant(s).

Civil Case No: 3:14-CV-01836-MO

Exhibit B to Defendants'
Sur reply or Supplement to
her Obj. to LNVs motion
for Summary Judgment

This is a thumb drive with audio file (mp3)
(.mp3) of a telephone conversation on
Sept. 3, 2015 between Defendant and Dana
Lantry the person who LNV alleges signed/
endorsed the note, an allonge to the note,
and an assignment of trust deed to either
Home comings Financial Network, Residential Funding Corp.
or other parties. In this audio tape Dana Lantry
says she never signed any allonges or assignments
of trust deeds when employed by People's Choice.

Dated: Sept. 28, 2015                    _____

### Defendant's EXHIBIT B

This Exhibit contains an audio file of the tape recorded phone conversation Defendant had with Dana Lanty who unequivocally says she never signed any deed assignments or allonges when employed by People's Choice because she was not an executive officer.

The thumb or jump drive containing this audio file will be hand delivered to the courthouse on Monday September 25, 2015.



Phone # 714-847-5919
19 minutes

**Defendant's <u>EXHIBIT B</u> Page 1 of 1**

# EXHIBIT D

Erick J. Haynie, OSB No. 982482
EHaynie@perkinscoie.com
Gabrielle D. Richards, OSB No. 114992
GRichards@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Telephone: 503.727.2000
Facsimile: 503.727.2222

Attorneys for Plaintiff
LNV Corporation

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LNV CORPORATION, a Nevada corporation,<br><br>           Plaintiff,<br><br>    v.<br><br>DENISE SUBRAMANIAM,<br><br>           Defendant. | Case No. 3:14-cv-01836-MO<br><br>DECLARATION OF DANA B. LANTRY IN SUPPORT OF PLAINTIFF'S OBJECTION TO AND MOTION TO STRIKE AUDIO RECORDING OF DANA LANTRY |

I, Dana B. Lantry, declare as follows:

1.    I am a resident of Fountain Valley, California.

2.    I was employed in the mortgage industry for 35 years before retiring in 2013.

3.    I was an officer at People's Choice Home Loan from approximately April 2000 until March 2007. I held various titles while employed by People's Choice, including Vice President and Assistant Vice President.

4.    In my role as an officer at People's Choice, I routinely endorsed mortgage

1-   DECLARATION OF DANA B. LANTRY

Perkins Coie LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

79707-0017/128125662.1

documents, including allonges to notes and deed of trust assignments.

5.    On or about September 3, 2015, I received a call from a woman who said she was conducting research on behalf of a group. She repeatedly refused to identify herself and did not disclose that she was recording the call until about 10 minutes into our conversation. I was not told that the information sought was going to be used in a lawsuit.

6.    The caller asked me numerous general questions about the mortgage industry and the companies for which I worked. The caller also specifically asked me whether, prior to 2012, I ever endorsed allonges and deed assignments. I told her that I had endorsed allonges and deed assignments for all three companies for which I worked, including People's Choice, and then I corrected my statement. I never endorsed allonges or deed assignments for UBS because I was never an officer for UBS. I most definitely endorsed allonges and deed assignments on behalf of People's Choice. This point is not entirely clear on the audio recording of the conversation, which was provided to me by Gabrielle Richards, an attorney for LNV Corporation.

7.    I reviewed the Note and allonges at issue in this lawsuit at the request of Ms. Richards. Although I have no specific recollection of signing the allonge that bears my name (I signed thousands of allonges during my career), I can definitively say that the signature on the allonge is my own. The Note and allonges are attached to this declaration as Exhibit 1.

*I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.*

Dated: October 7, 2015.

Dana B. Lantry

2-    DECLARATION OF DANA B. LANTRY

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

79707-0017/128125662.1

Loan Number ████7572

## ADJUSTABLE RATE NOTE
(LIBOR Six-Month Index (As Published In The Wall Street Journal)-Rate Caps)
Including Prepayment Penalty

### NOTICE TO BORROWER
Do not sign this loan agreement before you read it. This loan agreement
provides for the payment of a penalty if you wish to repay the loan prior
to the date provided for repayment in the loan agreement (Ore Rev Stat
§82.160; Or Admin R §441-870-0040.)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY
INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE
AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE I MUST PAY.

| 02/10/2004 | IRVINE | CALIFORNIA |
|------------|--------|------------|
| [Date] | [City] | [State] |

**13865 SW WALKER ROAD, Beaverton, OREGON 97005**
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 176,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is PEOPLE'S CHOICE HOME LOAN, INC. a WYOMING CORPORATION.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.990% . The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the 1st day of each month beginning on April 1, 2004. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on March 1, 2034, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O.Box 512809, Los Angeles, CA 90051-5128 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 1,169.76 . This amount may change.

**(C) Monthly  Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Date(s)**

The interest rate I will pay may change on the 1st day of March, 2006  and every  6th month(s) thereafter. Each date on which my interest rate could change is called a "Change Date."

initials QS.

EXHIBIT 1
Page 1 of 28

with the first Change Date, my interest rate will be based on an Index. The "Index" is the average offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as the Wall Street Journal. The most recent Index figure available as of the date 45 days before each ate is called the "Current Index."

the Index is no longer available, the Note Holder will choose a new index that is based upon comparable ation. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding five and one-quarter percentage points ( 5.250% ) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.990% or less than 6.990 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point(s) ( 1.000% ) from the rate of interest I have been paying for the preceding 6 months.

My interest rate will never be greater than 12.990%. My interest rate will never be less than 6.990%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only before it is due is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments then due under this Note.

The Note Holder will use my Prepayment to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to any accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial prepayment may be offset by an increase in the interest rate.

If within Twenty-four (24) months from the date of execution of the Security Instrument, I make full Prepayment or partial Prepayment, and the total of such Prepayment(s) in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to 6 months' advance interest on the amount by which the total of my Prepayment(s) within that 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

EXHIBIT 1
Page 2 of 28

...GES

...nich applies to this loan and which sets maximum loan charges, is finally interpreted so that the ...r loan charges collected or to be collected in connection with this loan exceed the permitted limits, ...such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted ...b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note ...ay choose to make this refund by reducing the Principal I owe under this Note or by making a direct ...t to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

## 8. GIVING OF NOTICES

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

EXHIBIT 1
Page 3 of 28

## SECURED NOTE

a uniform instrument with limited variations in some jurisdictions. In addition to the protections Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), me date as this Note, protects the Note Holder from possible losses that might result if I do not keep that I make in this Note. That Security Instrument describes how and under what conditions I may ed to make immediate payment in full of all amounts I owe under this Note. Some of those conditions follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a tural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, ender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.**

_____(Seal)        _____(Seal)
DENISE SUBRAMANIAM          -Borrower                          -Borrower

_____(Seal)        _____(Seal)
                          -Borrower                          -Borrower

_____(Seal)        _____(Seal)
                          -Borrower                          -Borrower

_____(Seal)        _____(Seal)
                          -Borrower                          -Borrower

[Sign Original Only]

adjnote4                          Page 4 of 4                          09/26/01

EXHIBIT 1
Page 4 of 28

Ⓡ LaSalle Bank National Association, as Trustee
for certificateholders of Bear Stearns Asset
Backed Securities I LLC Asset Backed
Certificates Series 2004-HE4\

"PAY TO THE ORDER OF

Without recourse"
PEOPLE'' CHOICE HOME LOAN, INC.
A Wyoming Corporation

By _____

Title: _____

Dana Lantry
Asst Vice President

EXHIBIT 1
Page 5 of 28

# Allonge

Account Number:         ███7572

Borrower(s):         Denise Subramaniam

Address:         13865 SW Walker Road
                 Beaverton, OR 97005

Note Amount:         $ 176,000.00

Closing Date:         02/10/2004

"Pay to the Order of:

RESIDENTIAL FUNDING COMPANY, LLC

Without recourse"

PEOPLE'S CHOICE HOME LOAN INC.

A Wyoming Corporation

By: _____

Dana Lantry
Vice President

EXHIBIT 1
Page 6 of 28

ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS
ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE

POOL:          0          LOAN ID:      ███5983

NOTE DATE:    2/10/2004    LOAN AMOUNT:      $176,000.00

BORROWER NAME:  DENISE  SUBRAMANIAM

PROPERTY ADDRESS:    13865 SW WALKER ROAD, BEAVERTON, OR  97005

PAY TO THE ORDER OF

**LNV Corporation**

WITHOUT RECOURSE

Residential Funding Company, LLC

By:

Name: Jason J. Vecchio

Title: Post Funding Manager

Residential Funding Company, LLC

EXHIBIT 1
Page 7 of 28

Washingto   unty, Oregon   **2004-019937**
03/01/2004   J:14:25 AM
D-M   Cnt=1 Stn=7 K GRUNEWALD
$85.00 $8.00 $11.00 - Total = $112.00

00540821200400199370190192

I, Jerry Hanson, Director of Assessment and Taxation
and Ex-Officio County Clerk for Washington County,
Oregon, do hereby certify that the within instrument of
writing was received and recorded in the book of
records of said county.

Jerry R. Hanson, Director of Assessment and Taxation,
Ex-Officio County Clerk

Until a change is requested all tax statements shall be sent
to the following address.

**WHEN RECORDED MAIL TO**

People's Choice Home Loan, Inc.
7515 IRVINE CENTER DR., IRVINE,
CA 92618

TAX ACCOUNT NUMBER

————————————[Space Above This Line For Recording Data]————————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **February 10, 2004**
together with all Riders to this document.
(B) "Borrower" is DENISE SUBRAMANIAM

Borrower is the trustor under this Security Instrument.
(C) "Lender" is PEOPLE'S CHOICE HOME LOAN, INC., a WYOMING CORPORATION

Lender is a CORPORATION
organized and existing under the laws of WYOMING
████7572

OREGON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3038  1/01

VMP -6(OR) (0104)
Page 1 of 15          Initials: DS.

VMP MORTGAGE FORMS - (800)521-7291

EXHIBIT 1
Page 8 of 28



2004-19937

Lender's address is 7515 IRVINE CENTER DR., IRVINE, CA 92618

Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is Paul S. Cosgrove, Lindsay Harte, Law Off, 1300 S. W. 5th Ave., #3400 Portland, OR 97201
**(E) "Note"** means the promissory note signed by Borrower and dated **February 10, 2004**
The Note states that Borrower owes Lender ONE HUNDRED SEVENTY-SIX THOUSAND AND 00/100
Dollars

(U.S. $176,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **March 1, 2034**
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

7572

VMP -6(OR) (0104)          Page 2 of 15          Initials: B.S.          Form 3038  1/01

EXHIBIT 1
Page 9 of 28



2004—18937

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | WASHINGTON | ; |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT 'A'

which currently has the address of

| 13865 SW WALKER ROAD | | [Street] |
| Beaverton | [City], Oregon 97005 | [Zip Code] |
| ("Property Address"): | | |

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

7572

D.S.
[Initials]

-6(OR) (0104)          Page 3 of 15          Form 3038    1/01

EXHIBIT 1
Page 10 of 28



2004-19937

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

7572

-6(OR) (0104)                    Page 4 of 15                    Initials: D.S.                    Form 3038    1/01

EXHIBIT 1
Page 11 of 28



2004-18937

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

▆7572

⑫-6(OR) (0104)                    Page 5 of 15                    Initials: _D.S._                    Form 3038  1/01

EXHIBIT 1
Page 12 of 28



2004-1993

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

7572

VMP®-6(OR) (0104)                    Page 6 of 15                    Initials: D.S.                    Form 3038    1/01

EXHIBIT 1
Page 13 of 28



2004-19937

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

7572

-6(OR) (0104)    Page 7 of 15    Initials: D.S.    Form 3038    1/01

EXHIBIT 1
Page 14 of 28



2004-19937

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

7572

VMP®-6(OR) (0104)                           Page 8 of 15                    Initials: D.S.                    Form 3038  1/01

EXHIBIT 1
Page 15 of 28



2004-19957

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

7572

-6(OR) (0:04)

Page 9 of 15

Initials: D.S.

Form 3038   1/01

EXHIBIT 1
Page 16 of 28



2004-19937

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

7572

-6(OR) (0104)                        Page 10 of 15                    Initials: DS.                    Form 3038  1/01

EXHIBIT 1
Page 17 of 28



J004-19937

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

7572

-6(OR) (0104)                     Page 11 of 15          Initials: B.S.          Form 3038   1/01

EXHIBIT 1
Page 18 of 28



2008-19937

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21.  **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

 7572

-6(OR) (0104)          Page 12 of 15          Initials: DS.          Form 3038  1/01

EXHIBIT 1
Page 19 of 28



2084-19937

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall give notice of sale in the manner prescribed by Applicable Law to Borrower and to other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Attorneys' Fees.** As used in this Security Instrument and in the Note, attorneys' fees shall include those awarded by an appellate court.

26. **Protective Advances.** This Security Instrument secures any advances Lender, at its discretion, may make under Section 9 of this Security Instrument to protect Lender's interest in the Property and rights under this Security Instrument.

27. **Required Evidence of Property Insurance.**

### WARNING

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

EXHIBIT 1
Page 20 of 28



2004-19937

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                         DENISE SUBRAMANIAM            -Borrower

_____        _____ (Seal)
                                                                      -Borrower

_____ (Seal)  _____ (Seal)
                        -Borrower                                     -Borrower

_____ (Seal)  _____ (Seal)
                        -Borrower                                     -Borrower

_____ (Seal)  _____ (Seal)
                        -Borrower                                     -Borrower

7572

-6(OR) (0104)                    Page 14 of 15              Form 3038   1/01

EXHIBIT 1
Page 21 of 28



2004-19937

STATE OF OREGON,    _Multnomah_    County ss:
On this  11ᵗʰ  day of _February_ 2004 personally appeared the above named

_Denise Subramaniam_

and acknowledged the foregoing instrument to be his/her/their voluntary act and deed.

My Commission Expires: 1.31.05            Before me:

(Official Seal)

_____
Notary Public for Oregon

OFFICIAL SEAL
**HEIDI M GAMELGAARD**
NOTARY PUBLIC-OREGON
COMMISSION NO. A341340
MY COMMISSION EXPIRES JAN. 31, 2005

7572

-6(OR) (0104)                    Page 15 of 15            Initials: _D.S._            Form 3038   1/01

EXHIBIT 1
Page 22 of 28



2004-15937

Loan Number ████7572

## ADJUSTABLE RATE RIDER
### (LIBOR Six-Month Index (As Published In The Wall Street Journal)-Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 10th day of February, 2004 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to PEOPLE'S CHOICE HOME LOAN, INC. a WYOMING CORPORATION ("Lender") of the same date and covering the property described in the Security Instrument and located at:

13865 SW WALKER ROAD, Beaverton, OREGON 97005
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

### A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of 6.990%. The Note provides for changes in the interest rate and the monthly payments, as follows:

### 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
**(A) Change Dates**

The interest rate I will pay may change on the 1st day of March, 2006 and on that day every 6 month(s) thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

msar1   09/28/01                       Page 1 of 3                       Initials: D.S.

EXHIBIT 1
Page 23 of 28



2004-19937

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding five and one-quarter  percentage points ( 5.250%)to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D)   Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.990 % or less than 6.990 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than  one percentage points ( 1.000% ) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 12.990%.  My interest rate will never be less than 6.990%.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.  Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

msar2    09/26/01                    Page 2 of 3                    Initials: ___

EXHIBIT 1
Page 24 of 28



.004-15937

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial prepayment may be offset by an increase in the interest rate.

If within Twenty-four (24) months from the date of execution of the Security Instrument, I make full Prepayment or partial Prepayment, and the total of such Prepayment(s) in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to 6 months' advance interest on the amount by which the total of my Prepayment(s) within that 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)            _____ (Seal)
DENISE SUBRAMANIAM    -Borrower                              -Borrower

_____ (Seal)            _____ (Seal)
                      -Borrower                              -Borrower

_____ (Seal)            _____ (Seal)
                      -Borrower                              -Borrower

misar3      09/26/01                    Page 3 of 3                    Initials: DS

EXHIBIT 1
Page 25 of 28

2804-19937

**Exhibit "A"**

Lot 4, Block 2, DEVONSHIRE, in the County of Washington and State of Oregon.

EXHIBIT 1
Page 26 of 28

Washington County, Oregon
08/27/2008 02:55:23 PM    **2008-073972**
D-MA         Cnt=1  Stn=9  C TOMPKINS
$10.00 $5.00 $11.00 - Total = $26.00

0128506120080073972002023
I, Richard Hobernicht, Director of Assessment and
Taxation and Ex-Officio County Clerk for Washington
County, Oregon, do hereby certify that the within
instrument of writing was received and recorded in the
book of records of said county.
                      Richard Hobernicht
Richard Hobernicht, Director of Assessment and
Taxation, Ex-Officio County Clerk

Return Address:
MGC Mortgage Inc
Document Control
7195 Dallas Parkway
Plano, TX 75024
BC 619600

Please print or type information **OREGON STATE RECORDER'S Cover Sheet**

**1. DOCUMENT TITLE(s)** (or transactions contained therein): (all areas applicable to your document must be filled in)

ASSIGNMENT OF DEED OF TRUST

**2. DIRECT PARTY/GRANTOR**, required by ORS 205.125(1)(b) and ORS 205.160

Residential Funding Company, LLC
8400 Normandale Lake Blvd., Suite 600
Minneapolis, MN 55437-1073

**3. INDIRECT PARTY / GRANTEE(s)** required by ORS 205.125(1)(a) and ORS 205.160

LNV Corporation
7195 Dallas Parkway
Plano, TX 75024

**4. TRUE and ACTUAL CONSIDERATION** (if any), ORS 93.030)

Ten and No/100 Dollars ($10.00)

**5. ALL TAX STATEMENTS SHALL BE SENT TO THE FOLLOWING ADDRESS:**

MGC Mortgage, Inc.
7195 Dallas Parkway
Plano, TX 75024

**6. FULL OR PARTIAL SATISFACTION ORDER or WARRANT FILED IN THE COUNTY CLERKS LIEN RECORDS**, ORS 205.121(1)(E)

**7. THE AMOUNT OF THE CIVIL PENALTY or THE AMOUNT, INCLUDING PENALTIES, INTEREST AND OTHER CHARGES FOR WHICH THE WARRANT, ORDER OR JUDGMENT WAS ISSUED.** ORS 205.125(1)© and ORS 18.325

EXHIBIT 1
Page 27 of 28

CORPORATION ASSIGNMENT of DEED OF TRUST

RFC Loan Number: ███5983
Seller Loan Number: ███7572

FOR VALUE RECEIVED, 'Residential Funding Company, LLC fka Residential Funding Corporation'

the undersigned hereby grants, assigns and transfers to

LNV Corporation
7195 Dallas Parkway
Plano, Texas 75024

all beneficial interest under that certain Deed of Trust dated 2/10/2004

executed by DENISE SUBRAMANIAM

TO/FOR: People's Choice Home Loan, Inc. a Wyoming Corporation.

and recorded in Book N|A on Page N|A as Instrument No. 2004-019937 on 3/1/04
of official Records in the County Recorder's Office of Washington County, Oregon.

Property Address:    13865 SW WALKER ROAD  BEAVERTON, OR  97005
MORTGAGE AMOUNT:   $176,000.00

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Deed of Trust.

'Residential Funding Company, LLC fka Residential Funding Corporation'

BY: _____

STATE OF                    Minnesota )    NAME: Betty Wright
COUNTY OF                   Hennepin )     TITLE: Assistant Vice President

On 3/10/2008 before me, the undersigned, a Notary Public in and for said State personally appeared Betty
Wright, Assistant Vice President of 'Residential Funding Company, LLC fka Residential Funding Corporation'
personally known to me to be the person whose name is subscribed to the within instrument and acknowledged
to me that s/he executed the same in his/her authorized capacity, and that by his/her signature on the instrument
the entity upon behalf of which the person acted, executed the instrument. WITNESS my hand and official seal.

This instrument was drafted by Diane Meistad,
Residential Funding Company, LLC, One Meridian
Crossings, Suite 100, Minneapolis, MN 55423,
(952) 979-4000.

_____
Notary Public in and for said State

DIANE M. MEISTAD
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

After Recording Return to:
MGC Mortgage Inc
Document Control
7195 Dallas Parkway
Plano, Texas 75024
BC 419600

EXHIBIT 1
Page 28 of 28

## CERTIFICATE OF SERVICE

I certify that I served the foregoing **DECLARATION OF DANA B. LANTRY** on

defendant Denise Subramaniam at 13865 SW Walker Rd., Beaverton, OR 97005 by depositing a

copy in the U.S. Mail in a sealed postage-prepaid envelope and deposited with the United States

Postal Service at Portland, Oregon on the date set forth below.

DATED: October 7, 2015

                          s/ Gabrielle D. Richards
                          Gabrielle D. Richards, OSB No. 114992
                          GRichards@perkinscoie.com

                          Attorneys for Plaintiff
                          LNV Corporation

PAGE  1-   CERTIFICATE OF SERVICE

79707-0017/128125662.1

**Perkins Coie** LLP
1120 N.W. Couch Street, Tenth Floor
Portland, OR 97209-4128
Phone: 503.727.2000
Fax: 503.727.2222

# EXHIBIT E

**LNV's Purported "original" NOTE**
Originated on June 12, 2002
Lender:
Washington Mutual Bank, F.A.

2002

**Deed of Trust**
Originated on June 12, 2002
Lender:
Washington Mutual Bank, F.A.

---

Purported
**Endorsement #1 on Purported Note**
Undated
Pay To The Order of
**Residential Funding Corporation**
Without Recourse
Washington Mutual Bank, FA

Signed byBrenda F Brendle
Vice President of Washington Mutual Bank, FA

2003

Do Not Match

Recorded **Assignment #1**
**Instrument # 2003-041141**
Recorded 4/03/2003 Clackamas County
After recording return to: Peele management (Reno NV)
Document Prepared by Washington Mutual Bank, FA

Grantor: Washington Mutual Bank, FA

Grantee: Deutsche Bank Trust Company
Americas as Trustee

Signed by M. Free, Asst. Vice President and
Lori A. Brown, Asst. Secretary
Notarized by California Notary Regina W. Anderson
**On July 29, 2002**

---

Purported
**Endorsement #2 on Purported Note**
Undated
Pay To The Order of
**Deutsche Bank Trust Company Americas
as Trustee**
Without Recourse
Residential Funding Corporation

Signed by Judy Faber
Vice President of Residential Funding Corporation

2007

Do Not Match

Recorded **Assignment #2**
**Instrument # 2007-038181**
Recorded 6/3/2007 Clackamas County
After recording return to: Litton Loan Servicing LP
Grantor: Residential Funding Company LLC

Grantee: **Washington Mutual Bank, FA**

Signed by Denise Bailey
Asst. Secretary of Residential Funding Company LLC

Notarized by Texas Notary Brenda F. McKinsey
**On April 11, 2007**

---

Do Not Match

Purported
**Allonge #1 (Unattached to Note)**
Undated
Pay To The Order of
Residential Funding Company, LLC ("Assignee"), without
recourse and without representation or warranty whether
express, implied or created by operation of law

Deutsche Bank Trust Company Americas as Trustee Company
FKA Bankers Trust Company of California, N.A. as Trustee
Residential Funding Company, LLC formerly known as
Residential Funding Corporation
Attorney –in Fact

Signed by Michael Mead
Limited Signing Officer

Recorded **Assignment #3**
**Instrument # 2008-074676**
Recorded 10/31/2008 Clackamas County
After recording return to: MGC Mortgage, Allison Martin
7195 Dallas Parkway, Plano TX 75024

Grantor: **Deutsche Bank Trust Company Americas
as Trustee**
Grantee: Residential Funding Company, LLC

Signed by Michael Mead, Limited Signing Officer
Notarized by Minnesota Notary Diane M. Meistad
**On October 27, 2008**

---

2008

Not Conveyed to RFC-LLC until Oct. 2008

Purported
**Allonge #2 (Unattached to Note)**
Undated
Pay To The Order of
LNV Corporation
Without Recourse
Residential Funding Company, LLC

Signed by Jason J Vecchio

Name: Jason J. Vecchio
Title: Post Funding Manager
Residential Funding Company, LLC

Impossible

Recorded **Assignment #4**
**Instrument # 2008-074677**
Recorded 10/31/2008 Clackamas County
After recording return to: MGC Mortgage, Allison Martin
7195 Dallas Parkway, Plano TX 75024
Grantor: Residential Funding Company, LLC

Grantee: **LNV Corporation**

Signed by Jeanne J. Smith, Asst. Vice President
Notarized by Minnesota Notary Diane M. Meistad
**On March 10, 2008**
Re-Recorded 4/17/2012 Instrument # 2012-023399

---

**RFC-LLC can't convey something it didn't have in March. 2008**

**Purported Conveyance of Purported NOTE**   **RECORDED Assignments & other Instruments**

---

**LNV's Purported "original" NOTE**
Originated on Feb 10, 2004
Lender: People's Choice Home Loans, Inc.

**2004**

**Deed of Trust**
Originated on Feb 10, 2004
Lender: People's Choice Home Loans, Inc.

**Bifurcation**

---

**Purported**
**Endorsement #1 on Purported Note**
**Undated**
Pay To The Order of
LaSalle Bank National Association, as Trustee for certificateholders of
Bear Stearns Asset Back Securities I LLC Asset Backed Certificates
Series 2004-HE4
(stamped far above the line)

Without Recourse
PEOPLE' CHOICE HOME LOAN, INC.
A Wyoming Corporation

Signed by Dana Lantry
Asst. Vice President of People's Choice Home Loans, Inc

CANCELLED stamp on "LaSalle Bank..."

**2005**

**Do Not
Match**

**Recorded Assignment #1**
**Instrument # 2006-077542**
Recorded 6/28/2006 Washington County
After recording return to: Peele management (Reno NV)
Fidelity National Title Co. 41.420467

Grantor: PEOPLE'S CHOICE HOME LOANS, INC.
Grantee: Homecomings Financial Network, Inc.

Signed by Dana Lantry, Asst. Vice President
Notarized by California Notary Sergio Lomeli
**On December 29, 2005**

---

**Purported**
**Allonge to Note #1**
**Undated**
Pay To The Order of
**Residential Funding Company, LLC**
Without Recourse
PEOPLE' CHOICE HOME LOAN, INC.
Signed by Dana Lantry
Vice President of People's Choice Home Loans, Inc

**NOTE**
Residential Funding Corporation didn't change its name to
Residential Funding Company LLC until Oct. 2006.

**Recorded Substitution of Trustee**
**Instrument # 2006-077543**
Recorded 6/28/2006 Washington County
After recording return to:
Cal-Western Reconveyance Corporation

Beneficiary: Homecomings Financial Network, Inc.

Signed by Debra Lyman, Vice President
**Homecomings Financial Network, Inc.**

Notarized by Texas Notary Laura Herrera
**On March 20, 2006**

---

This allonge if genuine
would have been executed
on Dec. 29, 2005 when
the assignment was
executed.

Residential Funding
Company LLC did not exist
until 10/6/2006

**2006**

**Recorded Notice of Trustee Sale**
**Instrument # 2006-077544**
Recorded 6/28/2006 Washington County
After recording return to:
Cal-Western Reconveyance Corporation

Beneficiary: Homecomings Financial Network, Inc.

Signed by Lori Wormack, AVP
Cal-Western Reconveyance Corporation

Notarized by California Notary Tammy Wilde
**On June 26, 2006**

---

**Recorded Assignment #2**
**Instrument # 2008-073971**
Recorded 8/27/2008 Washigton County
After recording return to: MGC Mortgage
7195 Dallas Parkway, Plano TX 75024

Grantor: Homecomings Financial Network, Inc.
Grantee: Residential Funding Company, LLC

Signed by Masse Adjetey, Vice President
Notarized by Minnesota Notary Mary K. Olson
**On April 3, 2006**

---

**Purported**
**Allonge #2 to Note**
**Undated**
Pay To The Order of
LNV Corporation

Signed by Jason J Vecchio

Name: Jason J. Vecchio
Title: Post Funding Manager
Residential Funding Company, LLC

**Impossible**

**2008**

**Recorded Assignment #3**
**Instrument # 2008-073972**
Recorded 8/27/2008 Washigton County
After recording return to: MGC Mortgage
7195 Dallas Parkway, Plano TX 75024

Grantor: Residential Funding Company, LLC
Grantee: LNV Corporation

Signed by Betty Wright, Asst. Vice President
Notarized by Minnesota Notary Diane M. Meistad
**On March 10, 2008**

---

Other Records exist that show
Homecoming to be Beneficiary into 2007

**RFC-LLC can't convey
something it doesn't have**

# EXHIBIT F



Washington County, Oregon   **2006-077542**
06/28/2006 03:24:13 PM
D-MA          Cnt=1  Stn=22 I REED
$10.00 $5.00 $11.00 - Total = $27.00

0097431020060077542002002I

I, Richard Hobernicht, Director of Assessment and
Taxation and Ex-Officio County Clerk for Washington
County, Oregon, do hereby certify that the within
instrument of writing was received and recorded in the
book of records of said county.

Richard W. Hobernicht, Director of Assessment and
Taxation, Ex-Officio County Clerk

**RECORD AND RETURN TO**
GMAC-RFC
One Meridian Crossing, Suite #100
Minneapolis, MN 55423
RECORD CENTER AND DOCUMENT
ROUTING 03-03-40
Litton # 18099663

# ASSIGNMENT OF DEED OF TRUST 10335783

For Value Received, PEOPLE'S CHOICE HOME LOAN, INC., a WYOMING CORPORATION

, holder of a Deed of Trust (herein "Assignor") whose address is

7515 IRVINE CENTER DR., IRVINE, CA 92618

, does hereby grant, sell,

assign, transfer and convey, unto     Homecomings Financial Network, Inc.

, a corporation

organized and existing under the laws of                                    (herein "Assignee"),
whose address is ONE MERIDIAN CROSSING, Suite 100, MINNEAPOLIS, MN 56423        ,
a certain Deed of Trust, dated 02/10/2004                          , made and executed by
DENISE SUBRAMANIAM

to Paul S. Cosgrove, Lindsay Harte, Law Off                                    ,
                                                              Trustee, upon the
following described property situated in WASHINGTON
of Oregon:                                                                , State
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
(A.P.N. #: R29757)
LEGAL DESCRIPTION:
LOT 4, BLOCK 2, DEVONSHIRE, IN THE COUNTY OF WASHINGTON AND STATE OF OREGON.

such Deed of Trust having been given to secure payment of ONE HUNDRED SEVENTY-SIX THOUSAND
AND 00/100                                    ($ 176,000.00                    )
                          (Include the Original Principal Amount)
which Deed of Trust is of record in Book, Volume, or Liber No.             , at page            (or
as No. 2004-019937 ) of the              Records of WASHINGTON
County, State of Oregon, together with the note(s) and obligations therein described, the money due and to
become due thereon with interest, and all rights accrued or to accrue under such Deed of Trust.
Oregon Assignment of Deed of Trust
with Acknowledgment
VMP-995W(OR) (9711).04          11/97
Page 1 of 2
    VMP MORTGAGE FORMS - (800)521-7291

# 10097572

FIDELITY NATIONAL TITLE CO.

41-420411

TO HAVE AND TO HOLD, the same unto Assignee, its successor and assigns, forever, subject only to the terms and conditions of the above-described Deed of Trust.

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment of Deed of Trust on 12-29-05

Witness   *John Cardenas*

Witness   *CARMEL MULLINS*

Attest

Seal:

PEOPLE'S CHOICE HOME LOAN, INC., a WYOMING CORPORATION
(Assignor)

By: _____
(Signature)

**Dana Lantry**
**Asst. Vice President**

This Instrument Prepared By: First American Title Insurance Company , address: 200 SW Market, #150, Portland, OR 97201                    , tel. no.:(503)790-7890

State of *CALIFORNIA*
County of *ORANGE*

This instrument was acknowledged before me on *12-29-2005*
by *DANA LANTRY, Asst. VICE PRESIDENT*

as *PEOPLE's CHOICE HOME LOAN INC.*                    of    .

*Sergio Lomeli*

.995W(OR) (9711).04

# *10097572*

Page 2 of 2

SERGIO LOMELI
Commission # 1372949
Notary Public - California
Orange County
My Comm. Expires Sep 1, 2008

RECORDING REQUESTED BY:

AND WHEN RECORDED MAIL TO:

CAL-WESTERN RECONVEYANCE CORPORATION
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON CA 92022-9004

Washington County, Oregon **2006-077543**
08/28/2006 03:24:13 PM
D-MST      Cnt=1 Stn=22 I REED
$10.00 $6.00 $11.00 - Total = $27.00

0097431120080007754300200028

I, Richard Hobernicht, Director of Assessment and Taxation and Ex-Officio County Clerk for Washington County, Oregon, do hereby certify that the within instrument of writing was received and recorded in the book of records of said county.

Richard W. Hobernicht, Director of Assessment and Taxation, Ex-Officio County Clerk

_____Space Above This Line For Recorder's use_____

Loan No.: XXXX9663
T.S. No.: 1077668-09

# SUBSTITUTION OF TRUSTEE

WHEREAS, DENISE SUBRAMANIAM      was the original Grantor, PAUL S. COSGROVE, LINDSAY HARTE, LAW OFF was the original Trustee and PEOPLE'S CHOICE HOME LOAN, INC.      was the original Beneficiary under that certain Deed of Trust dated February 10, 2004 and recorded on March 01, 2004 as Instrument No. 2004-019937, in Book XX, Page XX of the Official Records of WASHINGTON County, Oregon and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in the place and stead of present Trustee thereunder,

NOW, THEREFORE, HOMECOMINGS FINANCIAL NETWORK, INC.      hereby substitutes CAL-WESTERN RECONVEYANCE CORPORATION, A licensed Oregon Escrow agent and a California Corporation whose corporate address is 525 EAST MAIN STREET, P.O. BOX 22004, EL CAJON CA 92022-9004 as a Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

FIDELITY NATIONAL TITLE CO.   4-420467

# SUBSTITUTION OF TRUSTEE

Loan No.: XXXX9663
T.S. No.: 1077668-09

Litton Loan Servicing LP
Attorney in Fact

DATED: *March 18, 2006*

HOMECOMINGS FINANCIAL NETWORK, INC.

DEBRA LYMAN

VICE PRESIDENT

State of Texas
County of Harris

On March 20, 2006 before me,
LAURA HERRERA
a Notary Public in and for said state, personally appeared
   DEBRA LYMAN, VICE PRESIDENT,
personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s) acted,
executed the instrument.

WITNESS my hand and official seal.

(This area for Official notary seal)

Signature

Laura Herrera
Notary Public State of Texas
My Commission Expires
06-14-2008

SUBOR.DOC                        Rev. 2/16/2006                        Page 2 of 2



Washington County, Oregon   **2006-077544**
06/28/2006 03:24:13 PM
D-MDEB          Cnt=1 Stn=22 I REED
$20.00 $6.00 $11.00 - Total = $37.00



I, Richard Hobernicht, Director of Assessment and
Taxation and Ex-Officio County Clerk for Washington
County, Oregon, do hereby certify that the within
instrument of writing was received and recorded in the
book of records of said county.
                    Richard W. Hobernicht, Director of Assessment and
                    Taxation, Ex-Officio County Clerk

AFTER RECORDING RETURN TO:

CAL-WESTERN RECONVEYANCE CORPORATION
525 EAST MAIN STREET
P.O. BOX 22004
EL CAJON CA 92022-9004
(619)590-9200

_____   (Recorder's Use)_____

# NOTICE OF DEFAULT AND ELECTION TO SELL

Loan No.: XXXX9663
T.S. No.: 1077668-09

Reference is made to that certain trust deed made by
DENISE SUBRAMANIAM
as grantor,
to PAUL S. COSGROVE, LINDSAY HARTE, LAW OFF
as trustee,
in favor of PEOPLE'S CHOICE HOME LOAN, INC.
as beneficiary, dated February 10, 2004, recorded March 01, 2004, in the official records of WASHINGTON
County, Oregon, in book/reel/volume No. XX at page XX, fee/file/instrument/microfilm/reception No. 2004-
019937 (indicate which), covering the following described real property situated in said County and State, to-
wit:
LOT 4, BLOCK 2, DEVONSHIRE, IN THE COUNTY OF WASHINGTON AND STATE OF OREGON.

CAL-WESTERN RECONVEYANCE CORPORATION
as Trustee, hereby certifies that no assignments of the trust deed by the trustee or by the beneficiary and no
appointments of a successor-trustee have been made except as recorded in the mortgage records of the county
or counties in which the above described real property is situated; further, that no action, suit or proceeding
has been instituted to recover the debt, or any part thereof, now remaining secured by the said trust deed, or, if
such action or proceeding has been instituted, such action or proceeding has been dismissed except an action
to appoint a receiver pursuant to ORS 86.010, or the foreclosure of another trust deed, mortgage, security
agreement or other consensual or nonconsensual security interest or lien securing repayment of this debt.

There is a default by the grantor or other person owing an obligation, or by their successor-in-interest, the
performance of which is secured by said trust deed with respect to provisions therein which authorize sale in
the event of default of such provision; the default for which foreclosure is made is grantor's:

NODOR.DOC                          Rev. 4/07/06                          Page 1 of 3

# NOTICE OF DEFAULT AND ELECTION TO SELL

Loan No.: XXXX9663
T.S. No.: 1077668-09

Failure to pay the monthly payment due January 1, 2006 of principal and interest and subsequent installments due thereafter; plus late charges; together with all subsequent sums advanced by beneficiary pursuant to the terms and conditions of said deed of trust.

Monthly Payment: $1,169.76  Monthly Late Charge: $58.49
By reason of said default, the beneficiary has declared all obligations secured by said trust deed immediately due and payable said sums being the following, to-wit:
   The principal sum of $172,780.69 together with interest thereon at the rate of the rate of 6.990% per annum, from December 01, 2005 until paid; plus all accrued late charges thereon; and all trustee's fees, foreclosure costs and any sums advanced by the beneficiary pursuant to the terms and conditions of said deed of trust.

   Notice is hereby given that the beneficiary and trustee, by reason of said default, have elected and do hereby elect to foreclose said trust deed by advertisement and sale pursuant to Oregon Revised Statutes Sections 86.705 to 86.795, and to cause to be sold at public auction to the highest bidder for cash funds the interest in the said described property which the grantor had, or had the power to convey, at the time of the execution by him of the trust deed, together with any interest the grantor or his successors in interest acquired after execution of the trust deed to satisfy the obligations secured by said trust deed and the expenses of the sale, including the compensations of the trustee as provided by law, and the reasonable fees of trustee's attorneys.

   Said sale will be held at the hour of 1:00pm, Standard of Time as established by Section 187.110 of Oregon Revised Statutes on November 02, 2006 at the following place:
AT THE GRIFFITH DRIVE ENTRANCE TO BEAVERTON CITY HALL
4755 SW GRIFFITH DRIVE
in the City of BEAVERTON County of WASHINGTON, State of Oregon, which is the hour, date and place fixed by the trustee for said sale.

   Other than as shown of record neither the said beneficiary nor the said trustee has any actual notice of any person having or claiming to have any lien upon or interest in the real property hereinabove described subsequent to the interest of the trustee in the trust deed, or of any successor in interest to the grantor or of any lessee or other persons in possession of or occupying the property.

   Notice is further given that any person named in Section 86.753 of Oregon Revised Statutes has the right to have the foreclosure proceeding dismissed and the trust deed reinstated by payment to the beneficiary of the entire amount then due (other than such portion of said principal as would not then be due had no default occurred), together with costs, trustee's and attorney's fee by curing any other default complained of in the Notice of Default by tendering the performance required under the obligation or trust deed, at any time prior to five days before the date last set for sale.

NODOR.DOC                                    Rev. 4/07/06                              Page 2 of 3

# NOTICE OF DEFAULT AND ELECTION TO SELL

Loan No.: XXXX9663
T.S. No.: 1077668-09

    In construing this notice, the masculine gender includes the feminine and the neuter, the singular includes the plural, the word "grantor" includes any successor in interest to the grantor as well as any other persons owing an obligation, the performance of which is secured by said trust deed, the words "trustee" and "beneficiary" include their respective successors in interest, if any.

CAL-WESTERN RECONVEYANCE CORPORATION

By/Signature: _____

Lorrie Womack, A.V.P.

June 26, 2006

STATE OF CALIFORNIA
COUNTY OF SAN DIEGO}SS

On __06/26/2006__ before me, __Tammy Wilde__ a Notary Public in and for said state, personally appeared __Lorrie Womack, A.V.P.__ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____



TAMMY WILDE
Commission # 1453123
Notary Public - California
San Diego County
My Comm. Expires Nov 24, 2007

NODOR.DOC                 Rev. 4/07/06                Page 3 of 3

10/8
11

**Return Address:**
MGC Mortgage Inc
Document Control
7195 Dallas Parkway
Plano, TX 75024
BC 619600

Washington County, Oregon
08/27/2008 02:55:23 PM    **2008-073971**
D-MA          Cnt=1 Stn=9 C TOMPKINS
$10.00 $5.00 $11.00 - Total = $26.00



0128506020080073971002002026

I, Richard Hobernicht, Director of Assessment and
Taxation and Ex-Officio County Clerk for Washington
County, Oregon, do hereby certify that the within
instrument of writing was received and recorded in the
book of records of said county.
        Richard Hobernicht
Richard Hobernicht, Director of Assessment and
Taxation, Ex-Officio County Clerk

Please print or type information **OREGON STATE RECORDER'S Cover Sheet**

**1. DOCUMENT TITLE(s)** (or transactions contained therein): (all areas applicable to your document **must** be filled in)

ASSIGNMENT OF DEED OF TRUST

**2. DIRECT PARTY/GRANTOR**, required by ORS 205.125(1)(b) and ORS 205.160

Homecomings Financial Network

**3. INDIRECT PARTY / GRANTEE(s)** required by ORS 205.125(1)(a) and ORS 205.160

Residential Funding Company, LLC
8400 Normandale Lake Blvd., Suite 600
Minneapolis, MN 55437-1073

**4. TRUE and ACTUAL CONSIDERATION** (if any). ORS 93.030)

Ten and No/100 Dollars ($10.00)

**5. ALL TAX STATEMENTS SHALL BE SENT TO THE FOLLOWING ADDRESS:**

MGC Mortgage, Inc.
7195 Dallas Parkway
Plano, TX 75024

**6. FULL OR PARTIAL SATISFACTION ORDER or WARRANT FILED IN THE COUNTY CLERKS LIEN RECORDS.** ORS 205.121(1)(E)

**7. THE AMOUNT OF THE CIVIL PENALTY or THE AMOUNT, INCLUDING PENALTIES, INTEREST AND OTHER CHARGES FOR WHICH THE WARRANT, ORDER OR JUDGMENT WAS ISSUED.** ORS 205.125(1)© and ORS 18.325

## CORPORATION ASSIGNMENT of DEED OF TRUST

RFC Loan Number: 10335983
Seller Loan Number: 10097572



**FOR VALUE RECEIVED,** Homecomings Financial Network, Inc.

the undersigned hereby grants, assigns and transfers to

Residential Funding Company, LLC
8400 Normandale Lake Blvd Suite 600
Minneapolis, MN 55437-1073

all beneficial interest under that certain Deed of Trust dated 02/10/2004
executed by DENISE SUBRAMANIAM

TO/FOR: People's Choice Home Loan, Inc. a Wyoming Corporation

and recorded in Book _N/A_ on Page _N/A_ as Instrument No. _2004-019937_ on _3/1/04_
of official Records in the County Recorder's Office of _Washington_ County, Oregon.

Property Address:    13865 SW WALKER ROAD  BEAVERTON, OR  97005
MORTGAGE AMOUNT:  $176,000.00
TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Deed of Trust.

                                                        Homecomings Financial Network, Inc.

                                        BY: _Masse Adjetey_
STATE OF                    Minnesota )    NAME: Masse Adjetey
COUNTY OF                   Hennepin )     TITLE: Vice President

On 04/03/2006  before me, the undersigned, a Notary Public in and for said State personally appeared Masse
Adjetey, Vice President of Homecomings Financial Network, Inc.  personally known to me to be the person
whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in
his/her authorized capacity, and that by his/her signature on the instrument the entity upon behalf of which the
person acted, executed the instrument.  WITNESS my hand and official seal.

                            This instrument was drafted by Mary Olson,
                            Residential Funding Corporation, One Meridian
                            Crossings, Suite 100, Minneapolis, MN 55423,
                            (952) 979-4000.

_Mary K Olson_
Notary Public in and for said State

MARY K. OLSON
NOTARY PUBLIC-MINNESOTA
MY COMMISSION EXPIRES 1-31-2010

After Recording Return to:
**MGC Mortgage Inc**
Document Control
7195 Dallas Parkway
Plano, Texas  75024
BC 619600



Washington County, Oregon
08/27/2008 02:55:23 PM     **2008-073972**
D-MA        Cnt=1  Stn=9  C TOMPKINS
$10.00 $5.00 $11.00 · Total = $26.00

0128506120080073972020023

I, Richard Hobernicht, Director of Assessment and
Taxation and Ex-Officio County Clerk for Washington
County, Oregon, do hereby certify that the within
instrument of writing was received and recorded in the
book of records of said county.

Richard Hobernicht, Director of Assessment and
Taxation, Ex-Officio County Clerk

Return Address:
MGC Mortgage Inc
Document Control
7195 Dallas Parkway
Plano, TX 75024
BC 619600

Please print or type information **OREGON STATE RECORDER'S Cover Sheet**

**1. DOCUMENT TITLE(s)** (or transactions contained therein): (all areas applicable to your document **must** be filled in)

ASSIGNMENT OF DEED OF TRUST

**2. DIRECT PARTY/GRANTOR**, required by ORS 205.125(1)(b) and ORS 205.160

Residential Funding Company, LLC
8400 Normandale Lake Blvd., Suite 600
Minneapolis, MN 55437-1073

**3. INDIRECT PARTY / GRANTEE(s)** required by ORS 205.125(1)(a) and ORS 205.160

LNV Corporation
7195 Dallas Parkway
Plano, TX 75024

**4. TRUE and ACTUAL CONSIDERATION** (if any), ORS 93.030)

Ten and No/100 Dollars ($10.00)

**5. ALL TAX STATEMENTS SHALL BE SENT TO THE FOLLOWING ADDRESS:**

MGC Mortgage, Inc.
7195 Dallas Parkway
Plano, TX 75024

**6. FULL OR PARTIAL SATISFACTION ORDER or WARRANT FILED IN THE COUNTY CLERKS LIEN RECORDS**, ORS 205.121(1)(E)

**7. THE AMOUNT OF THE CIVIL PENALTY or THE AMOUNT, INCLUDING PENALTIES, INTEREST AND OTHER CHARGES FOR WHICH THE WARRANT, ORDER OR JUDGMENT WAS ISSUED.** ORS 205.125(1)© and ORS 18.325

## CORPORATION ASSIGNMENT of DEED OF TRUST

RFC Loan Number: 10335983
Seller Loan Number: 10097572

**FOR VALUE RECEIVED,** 'Residential Funding Company, LLC fka Residential Funding Corporation'

the undersigned hereby grants, assigns and transfers to

LNV Corporation
7195 Dallas Parkway
Plano, Texas 75024

all beneficial interest under that certain Deed of Trust dated 2/10/2004
executed by DENISE SUBRAMANIAM

TO/FOR: People's Choice Home Loan, Inc a Wyoming Corporation.

and recorded in Book _N/A_ on Page _N/A_ as Instrument No. _2004-019937_ on _3/1/04_
of official Records in the County Recorder's Office of _Washington_ County, Oregon.

Property Address:    13865 SW WALKER ROAD  BEAVERTON, OR  97005
MORTGAGE AMOUNT:  $176,000.00
TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Deed of Trust.

'Residential Funding Company, LLC fka Residential Funding Corporation'

BY:

STATE OF                              Minnesota )       NAME: Betty Wright
COUNTY OF                           Hennepin )        TITLE: Assistant Vice President

On 3/10/2008 before me, the undersigned, a Notary Public in and for said State personally appeared Betty
Wright, Assistant Vice President of 'Residential Funding Company, LLC fka Residential Funding Corporation'
personally known to me to be the person whose name is subscribed to the within instrument and acknowledged
to me that s/he executed the same in his/her authorized capacity, and that by his/her signature on the instrument
the entity upon behalf of which the person acted, executed the instrument.  WITNESS my hand and official seal.

This instrument was drafted by Diane Meistad,
Residential Funding Company, LLC, One Meridian
Crossings, Suite 100, Minneapolis, MN 55423,
(952) 979-4000.

_Diane M Meistad_
Notary Public in and for said State

DIANE M. MEISTAD
NOTARY PUBLIC-MINNESOTA
My Commission Expires Jan. 31, 2010

After Recording Return to:
**MGC Mortgage Inc**
Document Control
7195 Dallas Parkway
Plano, Texas 75024
BC 619600

# EXHIBIT H

**CONFIDENTIAL**

The information contained in this report is intended only for the person or entity to which they are addressed and may contain confidential and/or privileged information. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient may be prohibited by state or federal law. If you received this report in error, please contact BP Investigative Agency @ 503-726-5954, or email info.bpia@gmail.com, and delete the material from any computer or server where electronic information is stored. Thank you.

*This Report includes an analysis of legal defects in the chain of title. It also provides an explanation of novel legal defenses. Since foreclosure takes place in judicial and non-judicial jurisdictions in the 50 states and the District of Columbia, enacted and decisional law may be expected to vary. Accordingly, the legal defense must be adapted by the practitioner to conform to local law. The Attachments are included to provide practitioners with additional background information about securitization and mortgage defense.*

*This Report contains information, opinions, findings and remarks which are unique and proprietary. In addition, this Report was also prepared for the use of BP Investigative Agency, LLC. (BPIA), a limited liability company organized under the laws of Oregon, which is conducting securitization audits for its patrons and customers. Accordingly, it is necessary for the continued operation of BPIA's business plan to treat the Report as confidential, and a protective order will be necessary to protect the Report's confidentiality and restrict its distribution, dissemination and publication electronically or in hardcover.*

## THIS REPORT IS PROVIDED TO CTHERINE GEBHARDT FOR THE PROPERTY LOCATED AT 3753 THOMAS CROSS ROAD, SEIVERVILLE, TN 37876

## PREFACE

From: <u>*John Hancock Life Insurance Co. v. JPMorgan Chase & Co. (NY 2012)*</u>

**Pg. 132 ¶ 398.** *On November 18, 2010, Professor Levitin testified about the importance of the chain of title to investors and the consequences of faulty transfers before a hearing of the House Financial Services Committee:*

1. Case Narrative - Gebhardt

Concerns about securitization chain of title also go to the standing question; if the mortgages were not properly transferred in the securitization process (including through the use of MERS to record the mortgages), then the party bringing the foreclosure does not in fact own the mortgage and therefore lacks standing to foreclose. If the mortgage was not properly transferred, there are profound implications too for investors, as the mortgage-backed securities they believed they had purchased would, in fact be non-mortgage-backed securities, which would almost assuredly lead investors to demand that their investment contracts be rescinded[.]

*    *    *

Securitization is the legal apotheosis of form over substance, and if securitization is to work it must adhere to its proper, prescribed form punctiliously. The rules of the game with securitization, as with real property law and secured credit are, and always have been, that dotting "i's" and crossing "t's" matter, in part to ensure the fairness of the system and avoid confusions about conflicting claims to property. Close enough doesn't do it in securitization; if you don't do it right, you cannot ensure that securitized assets are bankruptcy remote and thus you cannot get the ratings and opinion letters necessary for securitization to work. Thus, it is important not to dismiss securitization problems as merely "technical;" these issues are no more technicalities than the borrower's signature on a mortgage. Cutting corners may improve securitization's economic efficiency, but it undermines its legal viability.

**Pg. 133 ¶ 399.** *On October 27, 2010, Katherine Porter, then a visiting a professor at Harvard Law School specializing in consumer credit, consumer protection regulation, and mortgage servicing, provided similar testimony before the Congressional Oversight Panel:*

2. Case Narrative - Gebhardt

The• implications of problems with transfer are serious. If the [securitization] trust does not have the loan, homeowners may have been making payments to the wrong party. If the trust does not have the note or mortgage, it may not have standing to foreclose or legal authority to negotiate a loan modification. To the extent that these transfers are being completed retroactively, it raises issues about honesty in creating and dating the assignments/transfers and about what parties can do, if anything, if an entity in the securitization chain, such as Lehman Brothers or New Century, is no longer in existence. Moreover, retroactive transfers may violate the terms of the trust, which often prohibit the addition of new assets, or may cause the trust to lose its REMIC status, a favorable treatment under the Internal Revenue Code. Chain of title

problems have the potential to expose the banks to investor lawsuits and to hinder their legal authority to foreclose or even to do loss mitigation.

\*        \*        \*

I want to share with the Panel that the lawyers that I have met over years of my research on mortgage servicing both creditor lawyers and debtor lawyers have nearly universally expressed that they believe a very large number (perhaps virtually all) securitized loans made in the boom period in the mid-2000s contain serious paperwork flaws, did not meet underwriting or other requirements of the trust, and have not been serviced properly as to default and foreclosure.

## CASE NARRATIVE

1. This is a very complex case with many issues. The most important issue identified and outlined in this report is the fact that the subject loan was securitized into the "RASC 2003-KS1 Trust" in 2003, and was paid off within this trust on or about 07/01/2007 with the trust declaring "zero losses." Evidence shows that this particular trust obtained insurance policies on the loan pools to which there were multiple beneficiaries of these policies.

The evidence also suggests that the subject loan was involved in "hypothecation fraud" whereby the Note and Deed of Trust where pledged and sold in multiple directions simultaneously. There have been no assignments of the subject DOT recorded in the

County Land Records, and there does not appear to be any disclosures that the subject loan was securitized and paid off.

2. Common "securitization" - Private label MBS trust fact pattern where the subject Note and Deed of Trust were pledged as collateral to a securitized trust, yet the legal conveyance of the asset to the trust either never occurred, or was illegal and in direct contravention of the trust's governing document (the "Pooling & Servicing Agreement"). SEC link to the trust Prospectus is provided above and as follows:

http://www.secinfo.com/dsvrn.256.htm

The trust's Pooling & Servicing Agreement was not located in the SEC website, and was not readily available for inspection.

3. The "Cut-Off Date" for assets to be transferred to the RASC 2003-KS1 Trust was "January 1, 2003."

| | |
|---|---|
| Issuer or Trust..................................... | RASC Series 2003-KS1 Trust. |
| Title of the offered certificates.................. | Home Equity Mortgage Asset-Backed Pass-through Certificates, Series 2003-KS1. |
| Depositor........................................... | Residential Asset Securities Corporation, an affiliate of Residential Funding Corporation. |
| Master servicer..................................... | Residential Funding Corporation. |
| Trustee............................................. | JPMorgan Chase Bank. |
| Mortgage Insurance Policy Provider.................. | Mortgage Guaranty Insurance Corporation. |
| Yield Maintenance Agreement Provider................ | Citibank N.A. |
| Mortgage pool...................................... | 12,056 adjustable-rate first lien mortgage loans with an aggregate principal balance of approximately $1,500,004,696 as of the close of business on the day prior to the cut-off date. |
| Cut-off date....................................... | January 1, 2003. |
| Closing date....................................... | On or about January 30, 2003. |

4. Subject loan was originated on or about November 07, 2002 with the "lender" on the Deed of Trust being "Sebring Capital Partners Limited Partnership." (herein after "Sebring.") A copy of the Note was provided which bears a blank, unexecuted endorsement by the originating entity on the bottom of the signature page. This is evidence that the note was prepared for sale immediately upon closing. I need to see the Note in its current state to render any opinions as to issues.

5. Subject loan was identified within the above referenced Trust using ABSNet. Attached exhibits contain the following:

**Exhibit – Loan Trust Capture – Gebhardt** - Subject loan identified as loan number "8263393" within the RASC 2003-KS1 Trust. (Note – Loan numbers often do not match the original assigned numbers on the notes and DOT's.)

**Exhibit – Snapshot RASC 2003-KS1, August 28, 2013-Gebhardt** - List of 8 "Tranche" / Classes within the RASC 2003-KS1 Trust showing all 8 tranches being "paid off."

**Exhibit – Loan Level Data – Gebhardt** – Loan level history / data within the RASC 2003-KS1 Trust. The data runs perpendicular in the exhibit. The current ending balance of the loan as of July 1, 2007 is $236,681.71. The trust shows a "Current Gain Loss Amount" of "0." The loan characteristics and identifiers are an identical match to the subject loan regarding the interest rate, rate caps, and margin.

**IMPORTANT: The named "Originator" in the internal data is "Residential Funding Corp" and not Sebring. How did RFC obtain the loan, and why is RFC representing to the investors that it was the loan's originator?**

**Exhibit – PDV RASC 2003-KS1, August 28, 2013-Gebhardt** – All Tranche level data within the RASC 2003-KS1 Trust showing history and paid off dates.

6. Two unrecorded assignments were provided and are attached. The first assignment is executed on 05/30/07 whereby, "For Value Received, The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank, N.A. as Trustee, Residential Funding Company, LLC fka Residential Funding Corporation" grants, assigns, and transfers the subject DOT and Note to "Residential Funding Company, LLC."

The deception and fraud in this assignment is clear. The name of the identified trust is being hidden and disguised, as the assignee is the successor "Master Servicer" of the Trust, and this Master Servicer is simply stripping Trust property from the trust. This assignment is fraudulent in that the Trust is not being disclosed, and the Trust is the only party that could sell or assign the loan out of the trust; which in most cases is a violation of the trust's governing documents (the PSA's.)

The second assignment is executed on 03/10/2008 whereby, "For Value Received, Residential Funding Company, LLC fka Residential Funding Corporation" grants, assigns, and transfers the DOT and Note to "LNV Corporation."

7. To assist in understanding the terms and legalities of assignments, the following information is provided Per Neil Garfield, Esq.:

*ASSIGNMENT: All contracts require an offer, acceptance and consideration to be enforced. An assignment is a contract. In the context of mortgage loans and litigation, an assignment is a document that recites the terms of a transaction in which the loan, note,*

5. Case Narrative - Gebhardt

*obligation, mortgage or deed of trust is transferred and accepted by the assignee in exchange for consideration. Within the context of loans that are subject to securitization claims, or claims of assignment, the documents proffered by the pretender lender are missing two out of three components: consideration and acceptance.*

*Like all contracts it must be supported by consideration. An assignment without consideration is probably void, almost certainly voidable and at the very least requires the proponent of this instrument as evidence to be admitted into the record to meet the burden of proof as to foundation.*

*The typical assignment offered in foreclosure litigation states that "for value received" the assignor, being the owner of the note described, hereby assigns, transfers and conveys all right, title and interest to the assignee. The problem is obvious — there was no value received if the loan was not funded by the assignee or was being purchased by the assignee at the time of the alleged transfer. A demand for records of the assignor and assignee would show how the parties actually treated the transaction from an accounting point of view.*

*In the same way as we look at the bookkeeping records of the "payee" on the original note to determine if the payee was in fact the "lender" as declared in the note and mortgage, we look to the books and records of the assignor and assignee to determine the treatment of the transaction on their own books and records.*

*The highest probability is that there will be no entry on either the balance sheet categories or the income statement categories because the parties were already paid a fee at the inception of the "loan" which was not disclosed to the borrower in violation of TILA. At most there might be the recording of an additional fee for "processing" the "assignment". At no time will the assignor nor the assignee show the transaction as a loan receivable, the absence of which is powerful evidence that the assignor did not own the loan and therefore conveyed nothing, and that the assignee paid nothing in the assignment "transaction" because there was no transaction.*

*Any accountant (CPA) should be able to render a report on this limited aspect. Such an accountant could recite the same statements contained herein as the reason why you are in need of the discovery and what it will show. Such a statement should not say that the evidence will prove anything, but rather than this information will lead to the discovery of admissible evidence as to whether the party whose records are being produced was acting in the capacity of servicer, nominee, lender, real party in interest, assignee or assignor.*

*The foundation for the assignment instrument must be by way of testimony (I doubt that "business records" could suffice) explaining the transaction and validating the assignment and the facts showing consideration, offer and acceptance.*

8. There are numerous defects and breaks in the chain of title. First, there is no assignment from the originator "Sebring" which is now long been gone and defunct.

6. Case Narrative - Gebhardt

http://www.inman.com/2006/12/06/sebring-capital-partners-closes-its-doors/

In addition, the only way for the subject loan to make it into the RASC 2003-KS1 Trust
was for the "Depositor" ("Residential Asset Securities Corp.") to sell and assign to the
Issuing Entity. This did not happen. Whatever entity that sold the subject loan to the
investors in the trust lied to the investors by not conveying the subject loan to the trust
and keeping the loan as an asset. What appears to have happened is the trust entities
loaded up the pool of loans, or the at least the subject loan, with default insurance to
cover the investors in the event of the borrower's "default." Some of the investors /
certificate holders were most likely the trust participants (i.e. JPMorgan Chase.)

Because the loan was paid off on or about 07/01/07, and the initial assignment is
executed on 05/30/07, it is further evidence of fraud. The amount owed on the note was
paid off. There was nothing more due on the note. How many times does a promissory
note need to get paid? Once should suffice.

Per the Prospectus:

### ASSIGNMENT OF MORTGAGE LOANS

At the time of issuance of a series of certificates, the depositor will
cause the mortgage loans or mortgage securities and any other assets being
included in the related trust to be assigned to the trustee or its nominee,
which may be the custodian, together with, if specified in the accompanying
prospectus supplement, all principal and interest received on the mortgage loans
or mortgage securities after the cut-off date, other than principal and interest
due on or before the cut-off date and any Spread. The trustee will, concurrently
with that assignment, deliver a series of certificates to the depositor in
exchange for the mortgage loans or mortgage securities. Each mortgage loan or
mortgage security will be identified in a schedule appearing as an exhibit to
the related pooling and servicing agreement. Each schedule of mortgage loans
will include, among other things, information as to the principal balance of
each mortgage loan as of the cut-off date, as well as information respecting the
mortgage rate, the currently scheduled monthly payment of principal and
interest, the maturity of the mortgage note and the LTV ratio or CLTV ratio and junior
mortgage ratio, as applicable, at origination or modification, without regard to
any secondary financing.

In addition, except as described in the accompanying prospectus supplement,
the depositor will, as to each mortgage loan other than mortgage loans
underlying any mortgage securities, deliver to the trustee, or to the custodian,
a set of legal documents relating to each mortgage loan that are in possession
of the depositor, including:

o    the mortgage note and any modification or amendment thereto endorsed
without recourse either in blank or to the order of the trustee or its
nominee;

7. Case Narrative - Gebhardt

o    the mortgage, except for any mortgage not returned from the public recording office, with evidence of recording indicated thereon or a copy of the mortgage with evidence of recording indicated thereon or, in the case of a Cooperative Loan or Mexico Mortgage Loan, the respective security agreements and any applicable financing statements;

o    an assignment in recordable form of the mortgage, or evidence that the mortgage is held for the trustee through the MERS(R) System, or a copy of such assignment with evidence of recording indicated thereon or, for a Cooperative Loan, an assignment of the respective security agreements, any applicable financing statements, recognition agreements, relevant stock certificates, related blank stock powers and the related proprietary leases or occupancy agreements and, for a mixed-use mortgage loan, the assignment of leases, rents and profits, if separate from the mortgage, and an executed re-assignment of the assignment of leases, rents and profits and, for a Mexico Mortgage Loan, an assignment of the mortgagor's beneficial interest in the Mexican trust; and

o    if applicable, any riders or modifications to the mortgage note and mortgage, together with any other documents at such times as described in the related pooling and servicing agreement.

    The assignments may be blanket assignments covering mortgages secured by mortgaged properties located in the same county, if permitted by law. If so provided in the accompanying prospectus supplement, the depositor may not be required to deliver one or more of the related documents if any of the documents are missing from the files of the party from whom the mortgage loan was purchased.

    If, for any mortgage loan, the depositor cannot deliver the mortgage or any assignment with evidence of recording thereon concurrently with the execution and delivery of the related pooling and servicing agreement because of a delay caused by the public recording office or a delay in the receipt of information necessary to prepare the related assignment, the depositor will deliver or cause to be delivered to the trustee or the custodian a copy of the mortgage or assignment. The depositor will deliver or cause to be delivered to the trustee or the custodian such mortgage or assignment with evidence of recording indicated thereon after receipt thereof from the public recording office or from the related servicer or subservicer.

9.   The following information from the Prospectus speaks to insurance and termination of the trust, etc.:

THE TRUST

The depositor will establish a trust with respect to the Series 2003-KS1 Certificates. On the closing date, the depositor will deposit the pool of mortgage loans described in this prospectus supplement into the trust, which will be divided into two groups based on the characteristics described in this prospectus supplement. Each certificate will represent a partial ownership interest in the trust.

ADVANCES

With respect to any month, if the master servicer receives a payment on a

**8. Case Narrative - Gebhardt**

mortgage loan that is less than the full scheduled payment, or if no payment is received at all, the master servicer will advance its own funds to cover that shortfall. However, the master servicer will make an advance only if it determines that the advance will be recoverable from future payments or collections on that mortgage loan.


MORTGAGE GUARANTY INSURANCE CORPORATION

    Mortgage Guaranty Insurance Corporation, or MGIC, a Wisconsin corporation with its principal offices in Milwaukee, Wisconsin, is a monoline private mortgage insurance company and a wholly-owned subsidiary of MGIC Investment Corporation. MGIC is licensed in 50 states and the District of Columbia to offer such insurance and is approved as a private mortgage insurer by Fannie Mae and Freddie Mac. MGIC is rated "AA+" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., "AA+" by Fitch, Inc. and "Aa2" by Moody's Investors Service, Inc. with respect to its insurer financial strength. The rating agency issuing the insurer financial strength rating can withdraw or change its rating at any time. For further information regarding MGIC, please see The Consolidated Financial Statements of MGIC and Related Information attached to this prospectus supplement as Annex II. In addition, investors are directed to MGIC Investment Corporation's periodic reports filed with the Securities and Exchange Commission, which are publicly available.


THE MORTGAGE INSURANCE POLICY

    Approximately 67.5% and 61.5% of the Group I Loans and Group II Loans, respectively, by aggregate principal balance as of the cut-off date, referred to in this prospectus supplement as the Insured Mortgage Loans, will be insured by MGIC pursuant to a non-borrower paid, primary mortgage insurance policy, referred to in this prospectus supplement as the mortgage insurance policy. The beneficiary of the mortgage insurance policy will be an affiliate of the trustee, as co-trustee for the trust. Each of the Insured Mortgage Loans is individually insured by the mortgage insurance policy.

    The amount of coverage provided by the mortgage insurance policy, which is also referred to below as the "coverage percentage," is calculated to reduce the exposure on the mortgage loan down to 50% of the value of the related mortgaged property based on the LTV ratio as of the inception of the policy. This is determined by subtracting 50% from the original LTV ratio, and dividing that result by the original LTV ratio, with the result rounded to the next highest whole number.

    The mortgage insurance policy is required to remain in force with respect to each Insured Mortgage Loan until one of the following occurs:

    o    the principal balance of the Insured Mortgage Loan is paid in full;

    o    the principal balance of the Insured Mortgage Loan has amortized down to a level that results in a loan-to-value ratio for the mortgage loan of 45% or less; or


**9. Case Narrative - Gebhardt**

   o any event specified in the mortgage insurance policy occurs that allows for the termination of the mortgage insurance policy by MGIC;

S-53

provided, however, that no coverage of any Insured Mortgage Loan under the mortgage insurance policy is required where prohibited by applicable law.

The mortgage insurance policy provides that the master servicer or the related subservicer must comply with the following:

   o delinquencies on any Insured Mortgage Loan generally must be reported to MGIC by the master servicer or the related subservicer after the loan becomes four months in default, and appropriate proceedings to obtain title to the property securing the Insured Mortgage Loan must be commenced by the master servicer or the related subservicer within six months of default;

   o for the master servicer or the related subservicer to present a claim on behalf of the trust, the master servicer or the related subservicer must have acquired and tendered to MGIC on behalf of the trust, good and merchantable title to the property securing the Insured Mortgage Loan, free and clear of all liens and encumbrances, including, but not limited to, any right of redemption by the mortgagor unless such acquisition of good and merchantable title is excused under the terms of the mortgage insurance policy;

   o claims generally must be filed by the master servicer or the related subservicer within 60 days after the trustee on behalf of the trust has acquired good and merchantable title to the property securing the Insured Mortgage Loan;

   o unless approved in writing by MGIC, the master servicer or the related subservicer, on behalf of the trust, may not make any change in the terms of an Insured Mortgage Loan, including the borrowed amount, interest rate, term or amortization schedule of the Insured Mortgage Loan, except as specifically permitted by terms of the Insured Mortgage Loan; nor make any change in the property or other collateral securing the Insured Mortgage Loan; nor release any mortgagor under the Insured Mortgage Loan from liability; nor permit the Insured Mortgage Loan to be assumed.

Failure of the master servicer or the related subservicer to comply with these provisions may result in a denial or adjustment of coverage under the mortgage insurance policy. In addition, no payment for a loss will be made under the mortgage insurance policy unless the property securing the Insured Mortgage Loan is in the same physical condition as when the Insured Mortgage Loan was originally insured, except for reasonable wear and tear and unless premiums on the standard homeowner's insurance policy, real estate taxes and foreclosure protection and preservation expenses have been advanced by or on behalf of the insured.

When a claim is presented, MGIC will have the option of either (A) paying the claim in full and taking title to the property securing the Insured Mortgage Loan, which will be treated as a liquidation of the related mortgage loan or (B) paying the coverage percentage and with the trustee on behalf of the trust retaining title to the property securing the Insured Mortgage Loan,

10. Case Narrative - Gebhardt

in which case the mortgage loan will remain in the trust as an REO property. The amount of the claim generally includes unpaid principal, accrued interest to the date of the payment of the claim by MGIC, and certain expenses. A claim generally must be paid by MGIC within 60 days after the claim is filed by the master servicer or the subservicer on behalf of the trust.

The mortgage insurance policy specifically excludes coverage of:

o   any claim resulting from a default existing at the inception of coverage or occurring after lapse or cancellation of coverage;

S-54

o   certain claims where there is an environmental condition which existed on the property securing the Insured Mortgage Loan, whether or not known by the person or persons submitting an application for coverage of the Insured Mortgage Loan, as of the effective date of coverage;

o   any claim involving an Insured Mortgage Loan which is for the purchase of the mortgaged property, and for which the mortgagor did not make a down payment as described in the application for coverage;

o   any claim, if the mortgage, deed of trust or other similar instrument did not provide the insured at origination with a first lien on the property securing the Insured Mortgage Loan; and

o   certain claims involving or arising out of any breach by the insured of its obligations under, or its failure to comply with the terms of, the mortgage insurance policy or of its obligations as imposed by operation of law.

In addition, the mortgage insurance policy will not insure against a loss sustained by reason of a default arising from or involving certain matters, including:

o   fraud or negligence in origination or servicing of the Insured Mortgage Loans, including, but not limited to, misrepresentation by the borrower, lender or other persons involved in the origination of the Insured Mortgage Loan or the application for insurance; or

o   physical damage to a property securing an Insured Mortgage Loan.

Also, the mortgage insurance policy will not insure charge-offs of a mortgage loan by the master servicer or the related subservicer; however, the master servicer or the related subservicer may consider a charge-off as part of a loss mitigation strategy if it would maximize proceeds to the certificateholders, taking into account the existence of the mortgage insurance policy.

In issuing the mortgage insurance policy, MGIC has relied upon certain information and data regarding the Insured Mortgage Loans furnished to MGIC by the seller. The mortgage insurance policy may not be assigned or transferred without the prior written consent of MGIC.

**11. Case Narrative - Gebhardt**

The preceding description of the mortgage insurance policy is only a brief outline and does not purport to summarize or describe all of the provisions, terms and conditions of the mortgage insurance policy.

RESIDENTIAL FUNDING

Residential Funding will be responsible for master servicing the mortgage loans. Residential Funding's responsibilities will include the receipt of funds from subservicers, the reconciliation of servicing activity with respect to the mortgage loans, investor reporting, remittances to the trustee to accommodate distributions to certificateholders, follow up with subservicers with respect to mortgage loans that are delinquent or for which servicing decisions may need to be made, management and liquidation of mortgaged properties acquired by foreclosure or deed in lieu of foreclosure, notices and other responsibilities as detailed in the pooling and servicing agreement.

Residential Funding and its affiliates are active purchasers of non-conforming and subprime mortgage loans and have sold a substantial amount of mortgage loans that do not present some of the special risk factors presented by the mortgage loans as described in this prospectus supplement. Residential Funding serves as the master servicer for transactions backed by most of these mortgage loans. As a result of the program criteria and underwriting standards of the mortgage loans, however, the mortgage loans may experience rates of delinquency, foreclosure and loss that are higher than those experienced by other pools of mortgage loans for which Residential Funding acts as master servicer.

SALE OF DEFAULTED MORTGAGE LOANS

In addition to the actions described under "Description of the Securities--Servicing and Administration of Loans--Realization upon Defaulted Loans" in the prospectus, as to any defaulted mortgage loan, the master servicer will have the sole discretion to sell the mortgage loan to an unaffiliated person, provided that the master servicer shall first estimate the net present value of a liquidation through foreclosure or other permitted means, and may not sell the mortgage loan unless the cash proceeds are at least equal to that estimated net present value.
**(THIS DID NOT HAPPEN ACCORDING TO THE ASSIGNMENTS.)**

### MORTGAGE COLLATERAL SELLERS

The mortgage collateral to be included in a trust will be purchased by the depositor directly or indirectly, through Residential Funding Corporation or other affiliates, from mortgage collateral sellers that may be banks, savings and loan associations, mortgage bankers, investment banking firms, insurance companies, the FDIC, and other mortgage loan originators or sellers not affiliated with the depositor. The mortgage collateral sellers may include HomeComings Financial Network, Inc. and GMAC Mortgage Corporation and its affiliates, each of which is an affiliate of the depositor.

### TERMINATION

12. Case Narrative - Gebhardt

The circumstances under which the obligations created by the pooling
and servicing agreement will terminate in respect of the certificates are
described in *"The Agreements--Termination; Retirement of Securities"* in the
prospectus. The master servicer will have the option on any distribution date
when the aggregate Stated Principal Balance of the mortgage loans after giving
effect to distributions to be made on that distribution date, is less than 10%
of the initial aggregate Stated Principal Balance of the mortgage loans as of
the cut-off date, (i) to purchase all remaining mortgage loans and other assets
in the trust related thereto, except for the mortgage insurance policy, thereby
effecting early retirement of the Class A Certificates, or (ii) to purchase in
whole, but not in part, the Class A Certificates. Any such purchase of mortgage
loans and other assets of the trust shall be made at a price equal to the sum of
(a) 100% of the unpaid principal balance of each mortgage loan or, if less than
such unpaid principal balance, the fair market value of the related underlying
mortgaged properties with respect to the mortgage loans as to which title to
such underlying mortgaged properties has been acquired, net of any unreimbursed
Advance attributable to principal, as of the date of repurchase and (b) accrued
interest thereon at the Net Mortgage Rate plus the rate at which the premium for
the mortgage insurance policy is paid to, but not including, the first day of
the month in which the repurchase price is distributed. Distributions in respect
of any optional termination will be paid, first, to the Class A Certificates on
a pro rata basis, second, to each class of Class M Certificates in their order
of priority and third, except as set forth in the pooling and servicing
agreement, to the Class SB Certificates and the Class R Certificates. The
proceeds of any such distribution may not be sufficient to distribute the full
amount to a class of offered certificates if the purchase price is based in part on the fair market value
of any underlying mortgaged property and such fair market value is less than 100% of the
unpaid principal balance of the related mortgage loan.

Any such purchase of the offered certificates as discussed above, will
be made at a price equal to 100% of the aggregate Certificate Principal Balance
of the offered certificates plus one month's interest accrued thereon at the
applicable Pass-Through Rates, including any unpaid Prepayment Interest
Shortfalls and accrued interest thereon, and any previously accrued and unpaid
interest. Promptly upon the purchase of the offered certificates, the master
servicer will retire the REMICs in accordance with the terms of the pooling and
servicing agreement. Upon presentation and surrender of the offered certificates
in connection with their purchase, the holders of the offered certificates will
receive an amount equal to the Certificate Principal Balance of their class plus
one month's interest at the related Pass-Through Rate accrued thereon, plus any
Prepayment Interest Shortfalls and previously accrued and unpaid interest. The
offered certificates will not, however, receive the amount of any Basis Risk
Shortfall or Basis Risk Shortfall Carry-Forward Amount in connection with any
such purchase of the offered certificates by the master servicer.

10. The fact that the subject loan was sold to the trust, and paid off within the trust, needs to
be explained before any further attempts to foreclose.

11. <u>Arguments Under UCC-3:</u>

13. Case Narrative - Gebhardt

(A COPY OF THE NOTE IN ITS PRESENT STATE WAS NOT PROVIDED TO INVESTIGATOR FOR INSPECTION.)

IT HAS BECOME COMMON KNOWLEDGE THAT THE MAJORITY, IF NOT ALL, SECURITIZED TRUSTS WERE NOT "MORTGAGE-BACKED" AT ALL, AND THAT THE LOANS WERE SIMPLY "PLEDGED" RATHER THAN LEGALLY CONVEYED VIOLATING THE TRUSTS' REMIC STATUS [SEE ATTACHED MISC. EXHIBIT – *ONE A FAILED REMIC – NEVER A REMIC.*] THE SPONSORS AND SELLERS OF THE MBS TRUSTS WERE "DOUBLE-DIPPING" WHEREBY THEY SOLD AND PLEDGED THE ASSETS TO THE TRUSTEE OF THE MBS TRUSTS, BUT RETAINED THE ASSETS ON THEIR OWN BOOKS IN ORDER TO CONTINUE SELLING, TRADING, AND CREATING AN INSURABLE INTEREST TO OBTAIN INSURANCE POLICIES.

THE COMMON ARGUMENT BY THE "S0-CALLED LENDERS" IS THAT THEY ARE ENTITLED TO FORECLOSE BECAUSE THEY HOLD THE NOTES AS "BEARER PAPER" AND NEGOTIABLE INSTRUMENTS UNDER UCC-3. THE LEGAL ARGUMENTS IN DEFENSE ARE:

   a.  IF THE NOTE WAS PLEDGED, CAN IT BE CONSIDERED A NEGOTIABLE INSTRUMENT?
   b.  THE ASSIGNMENT OCCURRED DURING AN ALLEGED DEFAULT. THIS ALSO CONTRAVENES THE TRUST LAWS.
   c.  THE TRUST WAS FORBIDDEN FROM CONDUCTING BUSINESS AFTER THE CLOSING DATE. THUS, WHO COULD NEGOTIATE THE ASSIGNMENT, PAY CONSIDERATION, AND ACCEPTED THE TRANSFER?
   d.  IF AN "ABSOLUTE SALE" WAS THE INTENTION OF THE PARTIES, THEN A "BLANK ENDORSEMENT" DOESN'T COMPLY. THE PURPOSE OF CONVEYANCE WITH DIRECT ENDORSEMENTS TO THE TRUST WAS TO PROTECT THE ASSETS AND KEEP BANKRUPTCY REMOTE.

## § 3-308. PROOF OF SIGNATURES AND STATUS AS HOLDER IN DUE COURSE.

(a) In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings. If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity,

(THERE IS GROWING EVIDENCE THAT THE ORIGINAL "WET-INK" NOTES FROM SECURITIZED LOANS HAVE BEEN LOST OR DESTROYED, AND THAT SERVICERS HAVE BEEN ALTERING AND FORGING THE ORIGINAL NOTES WITH THE USE OF SOPHISTICATED COMPUTER PROGRAMS SUCH AS "PHOTOSHOP" AND "ADOBE ILLUSTRATOR." BPIA CONTRACTS WITH A "COMPUTER GENERATED FORGERY EXPERT" NAMED DR. JAMES KELLEY WHO HAS DETECTED THESE TYPES OF FORGERIES AND HAS TESTIFIED IN FEDERAL CASES AS TO SUCH FINDINGS.)

RECOMMENDATION: DENY THE AUTHENTICITY OF THE SIGNATURES AND THE DOCUMENTS THEMSELVES UNTIL PROPERLY AUTHENTICATED BY A COMPUTER EXPERT.)

14. Case Narrative - Gebhardt

## § 3-302. HOLDER IN DUE COURSE.

(a) Subject to subsection (c) and Section 3-106(d), **"holder in due course"** means the holder of an instrument if:

(1) the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) the holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in Section 3-306, and (vi) without notice that any party has a defense or claim in recoupment described in Section 3-305(a).

(IF THE SUBJECT LOAN IS EVENTUALLY ASSIGNED AND TRANSFERRED AT OR DURING THE TIME OF "DEFAULT," THE ASSIGNMENT COULD BE DEEMED INVALID UNDER UCC- 3.)

## § 3-203. TRANSFER OF INSTRUMENT; RIGHTS ACQUIRED BY TRANSFER.

(a) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.

(b) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.

(c) Except to the extent a transferor or predecessor in interest has rights as a holder in due course, a person does not acquire rights of a holder in due course of an instrument taken (iii) as the successor in interest to an estate or other organization.

(a) Unless otherwise agreed, if an instrument is transferred for value and the transferee does not become a holder because of lack of indorsement by the transferor, the transferee has a specifically enforceable right to the unqualified indorsement of the transferor, but negotiation of the instrument does not occur until the indorsement is made.

15. Case Narrative - Gebhardt

**(b) § 3-205. SPECIAL INDORSEMENT; BLANK INDORSEMENT; ANOMALOUS INDORSEMENT.**

(c) (b) If an indorsement is made by the holder of an instrument and it is not a special indorsement, it is a "**blank indorsement**." When indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially indorsed.

If the Note was sold by the Depositor to the Trust (and there is no such evidence), the Trustee paid the purchase price to the Depositor and the Depositor failed to deliver the mortgage portfolio purchased. The evidence shows that the securitization was a sham transaction. The third party certificate holders of the trust have been defrauded and damaged, and the Depositor (most likely) is the holder of the note and mortgage. Or rather in this instance, the owner would most likely be the insurance carrier "MGIC" to which there is most likely a no subrogation clause to go after the homeowners.  Under such circumstances, enforcement of the mortgage through foreclosure aids and abets the fraud. The parties seeking to foreclose have "unclean hands."

## 12. POTENTIAL DEFENSES TO FORECLOSURE:

**1. Because the mortgage has been used as a vehicle for fraud upon third party investors, the Deed of Trust has been rendered unenforceable as a result of the actions of the securitization participants.**

The originator  and Depositor intended to defraud the investors of the trust by their repeated acts in contravention of the trust's governing laws. Without the borrower's signature on a note and deed of trust, the fraud scheme could not have been advanced. The borrower was used as a "pawn" to help facilitate a fraud upon the investors.

**2. The cloud upon title created by the conduct of the parties to the securitization damages the Plaintiff / Defendant because it:**

(a) Wrongfully diminishes the fair market value of the mortgaged premises and

thereby the sales price of the property and the amount of financing obtained.

    (b) Clogs the equity of redemption by lowering the sales price bidders would
be willing to pay at public auction.

    (c) Prevents payoff of the mortgage because of the confusion created concerning
which party is rightfully entitled to be paid off as mortgage creditor. This
restricts the homeowner's ability to sell the mortgaged property.

### 3. **Improper Conversion: The note and deed of trust are unenforceable because the Obligor never consented to the securitization of the deed of trust.**

Securitization effectively severs financial responsibility for losses from the authority to incur or avoid losses. Under the original deed of trust, the party deciding to foreclose was the party suffering any loss resulting from foreclosure. With securitization the deed of trust is converted so the party making the decision to foreclose does not bear the loss resulting from foreclosure. By separating the incidence of loss from the authority to foreclose, the original note has been altered resulting in a change to the Deed of Trust without the consent of the Obligor.

The Obligor was neither informed of, nor asked to, consent to securitization of the deed of trust. Such consent is required. Control of the deed of trust is conveyed to a group of managers who adopt a new set of rules which modify the terms and conditions of the deed of trust. The group of managers does not control the mortgage on behalf of an extant note holder. Effectively the note is severed from a note holder after being placed under the control of a group of mangers. These managers were not a party to the originating transaction or acting as a nominee or representative of the originating mortgagee or such beneficiary's successors in interest. This is admitted in an article written by Wells Fargo's in-house counsel which is attached as an exhibit. The first paragraph states the following:



# Conduit loan servicing: Who's who and what's what?

The thing most borrowers fail to realize about conduit loans is that once a loan has been securitized, they are not working with a "lender" anymore.  The loans are pooled into a securitization called a Real Estate Mortgage Investment Conduit (REMIC).  The REMIC is a trust and it has no lenders, only fiduciaries of the "certificate holders."  Once the loans have been pooled and securitized, the players are as follows:

Past practice has always been that foreclosure is a last recourse to default; because of securitization, it has become the first resort. The securitizer to whom the PSA delegates authority to foreclose has a financial incentive in the fees generated by both foreclosure and the delays incident to foreclosure. The losses resulting from foreclosure are passed back to the certificate holders. In short, the party which profits from foreclosure, controls the decision to foreclose while the party bearing the losses winds up with no say whatsoever.

## CONCLUSION

There are many issues in this case that would require weeks of investigative work. But the evidence provided clearly shows that the loan was sold or pledged to the trust and was subsequently paid off within the trust through insurance. There is a clear attempt to conceal this fact, and no disclosure of the trust has been made by the foreclosing parties. Without an assignment from Sebring to the next entity in the chain, there is a fatal break / defect in the COT. Serious discovery needs to be conducted; especially in the area of the money trail, accounting, and insurance pay outs.

http://livinglies.wordpress.com/2013/08/29/bank-record-earnings-are-from-theft-from-investors-and-homeowners/

08/29/2013

/S/ Bill Paatalo

Bill Paatalo

18. Case Narrative - Gebhardt

Private Investigator - OR PSID# 49411
BP Investigative Agency, LLC
5200 SW Meadows Rd. #150
Lake Oswego, OR 97035
(503) 726-5954

Disclaimer:

BP Investigative Agency, LLC provides the information in this report as part of an investigation service to its client. While the information in this report deals with legal issues, it does not constitute legal advice. If you have specific legal questions related to information in this report, you are encouraged to consult a licensed attorney. Due to the rapidly changing nature of the laws pertaining to foreclosures and foreclosure defense, and our reliance on information provided by outside sources, BP Investigative Agency, LLC does not warrant or guarantee the accuracy of information in this report.

In no event will BP Investigative Agency, LLC be held liable to any party for any damages arising in any way out of the availability, use, reliance on or inability to use the information provided by BP Investigative Agency, LLC, or for any claim attributable to errors, omissions or other inaccuracies in this report.

19. Case Narrative - Gebhardt