Alberto Rodriguez and
Maria Rodriguez
Plaintiffs,
1232 Wissmann Drive
Ballwin, Missouri republic
near [63011]



RECEIVED
JUL 1 2 2019
U.S. BANKRUPTCY COURT
SO DIST OF NEW YORK

## IN THE US BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

In re: Residential Capital, LLC, )
                Debtor )   **Case No.:** 12-12020mg
                 )
                 )
_____ )
                 ) Adversarial Proceeding Case No.
                 )
                 )_____

Alberto Rodriguez and Maria Rodriguez )
    Plaintiffs, Claimants at law, ) Claim Filed: For Declaratory
Aggrieved Parties ) Relief and an Order of cease
                 ) and Desist
                 ) Action of Trespass on the
                 ) Case, Action of Trover,
                 ) Action of Covenant, Action
            v. ) to Quiet title

Residential Capital, LLC, Homecomings )
Financial, LLC, FKA Homecomings )
Financial Network, Inc.,  OCWEN LOAN )
SERVICING, LLC, DOES 1 through 15, )
inclusive, ) TRIAL BY THE JURY
        Defendants ) DEMANDED
_____ )

## I. STATEMENT OF FACTS OF THE CASE

1. We, the Plaintiffs, hereby file this claim as a law case pursuant to Article III, Section 2 of the

Constitution For the United States of America. I, Alberto Rodriguez and one of the people of

New York in this Court of Record, and I, Maria Rodriguez, am one of the people of New York in this court of record. OCWEN LOAN SERVICING, LLC is a Florida Corporation and is domiciled in Florida. The original lender, HOMECOMINGS FINANCIAL, LLC was placed into receivership and the loan servicing rights for their Loan Servicing Company, GMAC Mortgage, LLC, an affiliate was purchased by OCWEN LOAN SERVICING, LLC. The subject property is located at 1232 Wissmann Drive, Ballwin, Missouri. The Plaintiff purchased a home with a loan from Homecomings Financial, LLC and the subject loan was apparently informally transferred into a REMIC, sometime after the initial loan documents were signed. The term REMIC, is an acronym for Real Estate Mortgage Investment Conduit. At no time has there been any record filed in the St Louis County Recorder of Deeds Office, where public real estate documents are normally filed, that discloses and records an assignment of the Deed of Trust and thereby identifies an assignee to the note and the Deed of Trust.

### Delayed Assignment of the Deed of Trust Makes the alleged Assignment Ineffective under Missouri Law.

3. Under Federal law, a Mortgage assignment is invalid when the Deed of Trust is not assigned to the REMIC within 90 days of the start-up date of the REMIC, see Title 26 US Code, §§ 860D and 860G. See also Glasky v. Bank of America, 218 Cal App 4th 1079 (2013). In Glasky v. Bank of America, NA, supra, the court of Appeals ruled that the Assignment of the Deed of Trust to a REMIC was signed several years after the cut-off date and was an ineffective transfer of the Deed of Trust. Homecomings Financial, LLC, who is a Depositor of numerous REMICS, failed to arrange to have the Deed of Trust assigned to a trustee, as required under Federal law, see Title 15 US Code, § 1641(g), Title 26 US Code § 860D and 860G many years

after the cut-off date of the REMIC that was created by them, violating the Pooling and servicing agreement and the above cited Federal laws.

4. When there is no Assignment of the Deed of Trust, the loan servicer and the assignee lacks standing because their status as a lender is without force and effect, every subsequent assignment of the Deed of Trust and other document filed at the County Recorder's Office, such as a Substitution of Trustee document is void and without force and effect in law given the gap in the chain of title. The original Trustee is Milsap & Singer, P.C., a Missouri Corporation. The alleged current Trustee is Substitute Trustee Corporation, with no formal Assignment of the Deed of Trust and no written Substitution of Trustee document filed in the County Recorder Of Deeds Office. The assignments of the Loan must be in writing according to Federal Statutes cited above, Title 15, US Code §§ 1641(f) and 1641(g), Title 26 US Code §§ 860D and 860G. Those statutes in Title 15 US Code were enacted in 2009 and went into effect at that time. It is many years after 2009, and consequently these statutes apply to the case at bar. As a result, the failure to record an assignment of the Deed of Trust is a violation of Federal and State law. In addition, the Trustees that have been informally substituted by the alleged Assignees are not trustees, and thereby they cannot exercise the powers of a trustee identified in the Deed of Trust, since they were never appointed as substituted Trustees under the terms of the Deed of Trust. The informal Trustees appointment, described above is thereby void and that trustee cannot issue a valid Notice of Default, Notice of Trustee Sale, nor can they conduct a trustee's sale under the powers given under the Deed of Trust.

5. In Federal Court, the common law of England is the rule of decision in the federal courts, see Article III, Section 2 of the Constitution for the United States of America, and Commentaries on the Constitution by Joseph Storey.

7. While an informal assignment **may** have occurred in 2006 to an undisclosed REMIC, a

formal written assignment was never executed until many years after a REMIC was formed by

FREDDIE MAC or whatever trustee created the Trust. Title 15 US Code, § 1641(g) requires the

loan to be assigned to the assignee and recorded within the real estate records as follows:

**(g) Notice of new creditor**

**(1) In general**

In addition to other disclosures required by this subchapter, not later than 30 days after the
date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the
creditor that is the new owner or assignee of the debt shall notify the borrower in writing of
such transfer, including-

(A) the identity, address, telephone number of the new creditor;

(B) the date of transfer;

(C) how to reach an agent or party having authority to act on behalf of the new creditor;

(D) the location of the place where transfer of ownership of the debt is recorded; and

(E) any other relevant information regarding the new creditor.

8. This assignment did not occur within 90 days of the start-up date of the REMIC. **IN**

**FACT THIS ASSIGNMENT DID NOT OCCUR AT ALL.** The Deed of Trust was signed on

September 14, 2006, see **Exhibit A**, attached and incorporated by reference. The question still

arises how can anyone, including, but not limited to OCWEN LOAN SERVICING, LLC or a

principal or agent exercise powers of a mortgage creditor under these circumstances. A written

assignment to FREDDIE MAC or FANNIE MAE or some other REMIC trustee was never made

within 90 days of the start-up date of the REMIC as required under Title 26 US Code, § 860D

and 860G.

9. Banks and their agents cannot assign a Deed of Trust when they do not have an interest

in the mortgage loan and the original lender is currently in bankruptcy. HOMECOMINGS

FINANCIAL NETWORK, INC. was restructured by its parent company GMAC

ACCEPTANCE, and they changed their name to HOMECOMINGS FINANCIAL, LLC, before

filing bankruptcy along with affiliated companies such as GMAC MORTGAGE, LLC and their

holding company RESIDENTIAL CAPITAL, LLC.

10. The Assignment is required to be made in writing and recorded in the Real Estate

Records in the County where the subject property is located, see Title 15 US Code, Section

1641(g), as discussed above. See also Title 26 US Code, §§ 860D and 860G. It is likely that a

REMIC may have listed or included this loan within its schedule of assets without an actual

assignment. The recorded Assignment of Deed of Trust was never signed and recorded and many

years after any REMIC was required to have the loan assigned to them there is no record of an

assignment. FREDDIE MAC is the possible Trustee of a REMIC that was possibly informally

assigned the Deed of Trust. We discovered that FREDDIE MAC has claimed on their website

that they are the owner of this loan, without any formal assignment or documentation of any

kind. **The original lender, Homecomings Financial Network, Inc., which changed their

name to Homecomings Financial, LLC and is no longer operating as a business and cannot

assign the mortgage as a bankrupt entity under Chapter 11.** As a result, any subsequent

Assignment of the Deed of Trust and the Substitutions of Trustee that may exist currently, are

void ab initio having been signed by someone who lacked standing and capacity to execute such

documents. Also, all of the actions taken by the substituted trustees who were informally

appointed by parties who are a stranger to the transaction without benefit of a written

Assignment of Deed of Trust are void ab-initio. Any such appointment of new trustees will

render them powerless  to act on behalf of a bankrupt lender, HOMECOMINGS FINANCIAL

NETWORK, INC. AKA HOMECOMINGS FINANCIAL, LLC.

11. MERS is identified in the deed of trust as the nominee. Durable power of attorney, is required for MERS to act as the original lender's agent. The Word "NOMINEE" does not empower MERS to effectuate an assignment of the mortgage. MERS may not validly assign a mortgage based on its nominee status, absent some evidence of specific authority to assign the deed of trust and the note and does not empower MERS to effectuate an assignment of the deed of trust. Although there is currently no MERS document that has been recorded as an assignment, if a MERS "assignment" emerges it should be understood that this type of assignment is void, especially given some of the more recent New York appellate court cases that have been handed down regarding MERS lack of capacity to assign mortgages. This was also the conclusion that was made by the Missouri Court of Appeals, Eastern District in Bellistri v. Ocwen Loan Servicing, L.L.C. 284 S.W. 3d 619, (2009), when the court ruled that MERS was not given the power to assign the note and, therefore, the assignment of the deed of trust was ineffective because the assignor cannot split the assignment of Deed of Trust from the note so that there are two owners, one for the note and the other for the Deed of Trust. The court in Bellistri v. Ocwen Loan Servicing, L.L.C., stated:

> When it assigned the deed of trust, MERS attempted to transfer to Ocwen the
> deed of trust "together with any and all notes and obligations therein described or referred
> to, the debt respectively secured thereby and all sums of money due and to become due."
> The record reflects that BNC was the holder of the promissory note. There is no
> evidence in the record or the pleadings that MERS held the promissory note or that BNC
> gave MERS the authority to transfer the promissory note. MERS could not transfer the
> promissory note; therefore the language in the assignment of the deed of trust purporting
> to transfer the promissory note is ineffective.

12. Similarly, the Alberto and Maria Rodriguez note and Deed of Trust was not assigned to anyone and thus the analogy to the Bellistri v. OCWEN LOAN SERVICING, LLC is a good example of a parallel case because the alleged creditors lacked standing for almost the same reasons. Today the original creditor is in Chapter 11 bankruptcy and cannot assign the Deed of Trust and note because they need permission from the bankruptcy judge to do so. Given the current case law regarding MERS attempts to transfer or assign a mortgage in New York, see Bank of New York v. Silverberg, 86 AD 3d 274, 926 N.Y.S. 2d 532 (New York Appellate Div., 2nd Dept., 2011)The New York Supreme Court Appellate Division stated:

> In sum, because MERS was never the lawful holder or assignee of the notes described and identified in the consolidation agreement, the corrected assignment of mortgage is a nullity, and MERS was without authority to assign the power to foreclose to the plaintiff. Consequently, the plaintiff failed to show that it had standing to foreclose.

12. Whether this court relies upon Missouri Law or New York law we have the same result: MERS cannot assign a mortgage or a deed of trust. Also, under Missouri law the borrower can challenge the validity of the procedures followed by the lender and can challenge and enforce the faithful application of the conditions precedent to foreclosure, which, of course includes the full disclosure of the payment of a claim of a defaulted mortgage under a Primary mortgage insurance policy, see Bellistri v. Ocwen Loan Servicing, LLC, Supra; Yvanova v. New Century Mortgage, 62 Cal 4th 919 (2016).

13. The Plaintiffs are homeowners, whose rights have been set aside by certain administrative actions taken by the Defendants.

14. The Defendants have acted in absolute defiance of the common law and Uniform Commercial Code, and have acted as if they have powers to enforce the note even though they have not proven their ownership interest in the note and have not proven their possession of the original note. The Defendant OCWEN LOAN SERVICING, LLC, as an alleged creditor, has a common-law duty to bring forward evidence that they are in possession of the note, see Missouri Commercial Code RSMO § 400.3-501(6) and are either (1.) acting in their capacity as an assignee of the note and Deed of Trust; or (2.) acting on behalf of the assignee of the note and Deed of Trust. The original note was executed by the Plaintiffs, with HOMECOMINGS FINANCIAL NETWORK, INC. The Deed of Trust was apparently informally assigned to a REMIC, that is sponsored by FREDDIE MAC, see **Exhibit B**, a statement from the Freddie Mac website asserting that Freddie Mac owns the Alberto and Maria Rodriguez loan, attached and incorporated by reference, described above, however the assignment was never memorialized by a written assignment by the original lender, and is ineffective. We, the Plaintiffs went onto the FREDDIE MAC website and discovered that FREDDIE MAC is claiming to be the lender and the assignee of the note and deed of trust, which they describe as the loan, see **Exhibit B**, attached and incorporated by reference. Based upon the foregoing there is more than one alleged creditor claiming to be the lender or the assignee of the Alberto Rodriguez loan, Ocwen Loan Servicing, LLC and FREDDIE MAC are both claiming to be mortgage creditors. These notes are generally endorsed in blank, in violation of Missouri Commercial Code § 400.3-110, which requires the note to be endorsed to the Trustee whenever the assignee is a trust. This statute applies to FREDDIE MAC and any other claimant that emerges, who states that they are the trustee of a REMIC that owns the deed of trust and note.

15. OCWEN LOAN SERVICING, LLC as Claimant, participated in contract and

commercial activity in respect to a Non-Negotiable Instrument Note, which is attached to a bond, which is expressly governed by Federal law and the Uniform Commercial Code which are uniform statutory laws of all of the United States of America including the District of Columbia and all fifty states. As the Plaintiffs, we make the claim that the instrument/obligation became void when the Defendants participated in fraudulent and illegal activity, violating the rules and the laws under which the note/instrument bond is expressly governed. According to the FREDDIE MAC website discussed above, this loan was securitized and sold to an undisclosed REMIC [REAL ESTATE MORTGAGE INVESTMENT CONDUIT] that is under the management control of FREDDIE MAC, who is the Indenture Trustee of said REMIC. Given the fact that these notes, when assigned to REMICS are almost always endorsed in blank, the parties cannot foreclose because of the lack of a proper endorsement and the lack of a written assignment of the Deed of Trust recorded in the County Real Estate Records, see Missouri Commercial Code § 400.3-110. Additionally, the note and deed of Trust cannot be irreparably split, see Belllistri v. Ocwen Loan Servicing, LLC, supra.

16. If an assignee has been assigned the note and deed of trust they have to have possession of both instruments and be the holder-in-due-course of these instruments, pursuant to the relevant sections of the UCC and Missouri Commercial Code. OCWEN LOAN SERVICING, LLC has steadfastly refused to bring forward evidence that they are in possession of the note and deed of trust, nor have they identified the actual assignee of the note and deed of trust, which is required under Federal law, see Title 15 US Code, § 4(f). This means that the entire foreclosure process at this point is void ab initio. This demonstrates that the Defendants claims as a mortgage creditor are inaccurate and incomplete at best or fraudulent at worst. The Defendants have failed to rebut, refute, challenge or deny the allegations related to their fact that

they lack standing, see Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W. 3d 619, (2009). The
Defendants in this case lack standing because the note and Deed of Trust is split and the
foreclosing party is not the assignee of the note and deed of trust and Homecomings Financial,
LLC is under bankruptcy and cannot foreclose.

17. Furthermore, the Defendants never brought forward evidence that they provided the
proper notification regarding any alleged assignment of the note or specifically what rights were
assigned, which is required under Uniform Commercial Code, see Kirby v. Palos Verdes Escrow
Company, 183 Cal App. 3d 57, at 227 (Calif. Court of Appeal First, 1986). Also, there was no
evidence advanced by OCWEN LOAN SERVICING, LLC about who the assignee is in
violation of Title 15 US Code §§ 1641(f) and 1641(g), requiring the assignee to give notice of
the identity, address and phone number of the assignee within 30 days of the assignment. In
addition, Title 15, US Code, § 1641(f) mandates that the loan servicer cannot function as an
assignee of the loan for administrative convenience. These laws have been in effect since 2009,
perhaps it is time to enforce them. The assignee has to give notice that the alleged assignee or
others were in possession of the note or security instrument, as a requirement for enforcement,
see Matter of Staff Mortg. & Inv., 550 F 2d 1228 (Ninth Circuit, 1977), also cited in Kirby,
Supra. This is a requirement in all 50 states, pursuant to each states version of the UCC. There is
a no Substitution of Trustee document substituting the Trustee, therefore the trustee has acted
without standing as well.

18. There is no admissible evidence that the Defendant OCWEN LOAN SERVICING,
LLC is the lawful assignee of the note and deed of trust. The evidence that has been supplied in
this regard appears to be pure hearsay and unsupported claims and lacks the kind of genuineness
and authentication that is expected in mortgage documents generally. The approach has been

trust us we are your assignee. FEDERAL HOME LOAN MORTGAGE CORPORATION, aka

FREDDIE MAC, in their capacity as the trustee of an undisclosed REMIC is claiming to be the

mortgage creditor is without a proper chain of title to the note and deed of trust, and, therefore, is

a stranger to the transaction and does not have the right of enforcement of the note and Deed of

Trust as a stranger. OCWEN LOAN SERVICING, LLC has essentially the same status as

FREDDIE MAC and is positioning themselves for a foreclosure action.

19. This court has a duty to honor and uphold the Missouri law, and various sections of

Missouri Commercial Code, especially Missouri Commercial Code § 400.3-301, which makes it

mandatory for the assignee to be in possession of the note and deed of trust. If FREDDIE MAC,

in their capacity as trustee, is the actual mortgage creditor there is no recorded chain of title

showing that FREDDIE MAC was ever the actual holder of the note and Deed of Trust as

required under Title 15, US Code, § 1641(g). There is also no admissible evidence from

OCWEN LOAN SERVICING, LLC is a creditor. Missouri Commercial Code requires the

trustee of a REMIC to be the assignee of a note, see Missouri Commercial Code § 400.3-110 and

UCC § 3-110. Without assignment and endorsement of the note to the trustee of the REMIC, the

REMIC, or their legal representative the alleged assignee lacks standing. The chain of title is

incomplete and does not supply the kind of affirmation of creditor status that there should be

when a mortgage or Deed of Trust is assigned. The Defendants have collected money in the form

of a payment of a mortgage insurance claim from the mortgage insurance carrier, after the loan

went into default and was delinquent. The Defendants were paid by the mortgage insurance

carrier, and now seek to be paid a second time by foreclosing, which is double recovery.

20. Given that the failure to bring forward the note as requested, and required under UCC

3-501 and the equivalent under Missouri law, Missouri Commercial Code § 400.3-501, and the

defective claims by the Defendants, and the lack of a recorded Assignment of Deed of Trust, signed by the original lender, in which the alleged holder of the Deed of Trust is claimed to be FREDDIE MAC, we have a lawful right to enforce our rights to prevent irreparable harm, discussed above.

21. In our Qualified Written Request, we asked the loan servicer to "exhibit the Instrument", which is **a lawful demand to bring forward the original note for our inspection, in order to ascertain the genuineness of the Defendants claim**. Uniform Commercial Code Section 3-501(b)(2) makes it mandatory for the creditor, making demands for payment to **EXHIBIT THE INSTRUMENT,** see UCC 3-501(b)(2), and Missouri Commercial Code § 400.3-501(b)(2), see **Exhibit E,** attached and incorporated by reference. That Section of law **makes the production of the note mandatory**. The ownership of the note and mortgage cannot be split. The claims of the Defendants to be a creditor with the right to enforce the note and deed of trust cannot be relied upon as authentic, given the fact that there is no recorded assignment of the Deed of Trust. As a result they cannot act in the capacity as an alleged creditor and then supply the courts with an unsupported and unverified claim for the status as holder in due course. The lack of a proper Assignment of the Deed of Trust to FREDDIE MAC or whoever the assignee may be violated TITLE 15, US CODE § 1641(g) and was omitted in defiance of Title 15, US Code § 1641(g).

22. There is also a great deal of doubt as to whether or not the Defendants, have the note in their possession. The question of ownership of the note is a vital part of determining who has the right to foreclose and sell the property. This calls into question the validity of the foreclosure and demonstrates that the title is not duly perfected. **We are told that the Defendant OCWEN LOAN SERVICING, LLC is the holder of the note and Deed of Trust, with only hearsay**

**evidence.** The loan servicer, OCWEN LOAN SERVICING, LLC, claims to have powers to enforce the note and the Deed of Trust based upon NO documentation whatsoever, since there is no assignment of the deed of trust as discussed, see **Exhibit A,** attached and incorporated by reference.

23. As a result of the foregoing, the title is not duly perfected, the Defendants do not have good and perfected title to the note and Deed of Trust and the foreclosure is invalid and void, meaning that the Courts, when asked to hear a foreclosure/eviction case, will not have jurisdiction to hear this foreclosure/ eviction case.

24. The attorneys acting on behalf of the alleged assignees has never sent us the contract or agreement signed and executed by salaried employees of HOMECOMINGS FINANCIAL NETWORK and FREDDIE MAC under the REAL PROPERTY Laws of Missouri, the Missouri Statute of Frauds, authorizing MERS and subsequently OCWEN LOAN SERVICING under the Laws of Agency to transfer and assign an Ownership Interests in the Alberto Rodriguez Real Property as a Nominee for HOMECOMMINGS FINANCIAL NETWORK. A power of Attorney is required under Missouri law, see Missouri Revised Statutes §§ 404.700 through 404.737.

25. There was no contract or agreement between HOMECOMINGS FINANCIAL NETWORK, FREDDIE MAC, and MERS under the Missouri Statute of Frauds, granting OCWEN LOAN SERVICING, LLC powers of attorney as Assignors as agents to sign an Assignment of Deed of Trust. Therefore, any foreclosure action does not state conditions precedent under Missouri law for the Defendants to act as either creditors or as Trustees. OCWEN LOAN SERVICING, LLC literally has no legal right to foreclose and no legal foundation to claim to be acting as a creditor or acting on behalf of a creditor. The actions to threaten foreclosure fails to state a Claim upon which the state and federal courts May Grant

Relief as Affirmative Defenses and as a Threshold Issue under Article 111 §§ 1 & 2 of the Federal Constitution. I have a right to challenge the alleged status of an attorney in fact before assuming that the attorney in fact has the powers that they allege.

26. The alleged assignee's attorney has never sent me a certified copy of the Durable Power of Attorney as required under The Missouri Statute of Frauds Act, see Missouri Revised Statutes § 432.010. Durable power of attorney, is required for MERS or OCWEN LOAN SERVICING, LLC to act as the original lender's agent, see Missouri Revised Statutes §§ 404.700-404.737. The Word "NOMINEE" does not empower MERS or OCWEN LOAN SERVICING, LLC to effectuate an assignment of the mortgage. MERS may not validly assign a mortgage based on its nominee status, absent some evidence of specific authority to assign the deed of trust and does not empower MERS to effectuate an assignment of the deed of trust.

27. Because MERS's members, the beneficial note holders, purported to bestow upon MERS interests in real property sufficient to authorize the appointments of substitute trustees, and to assign the Deed of Trust, the alleged agency relationship must be committed to writing by application of the statute of frauds, see Missouri Revised Statutes § 432.010 cited above. A power of attorney is necessary to show how the agent is vested with authority to assign a mortgage, HSBC BANK, USA, NA v, Yeasmin, 866 NY S 2d 92(2008). In addition, the Defendants have collected money for mortgage insurance, given the fact that we supplied no down payment when we financed the subject property this would have triggered the requirements by FREDDIE MAC to buy mortgage insurance, see **Exhibit C**, attached and incorporated by reference, an article about the business practices by Fannie Mae and Freddie Mac regarding mortgage insurance, attached and incorporated by reference.

## JURISDICTIONAL STATEMENT

28. In Missouri, the common law of England is the rule of decision in the courts that state, see RSMO Missouri Revised Statutes § 1.010, which states:

> -1. The common law of England and all statutes and acts of parliament made prior to the fourth year of the reign of James the First, of a general nature, which are not local to that kingdom and not repugnant to or inconsistent with the Constitution of the United States, the constitution of this state or the statute laws in force for the time being are the rule of action and decision in this state, any custom or usage to the contrary notwithstanding, but no act of the general assembly or law of this state shall be held to be invalid, or limited in its scope or effect by the courts of this state for the reason that it is in derogation with or in conflict with the common law, or with such statutes or acts of parliament; but all acts of the general assembly or laws shall be liberally construed, so as to effect the true intent and meaning thereof.

29. The jurisdiction of this case is under Article III of the Constitution, which states and provides for at Article III, Section 2, that the courts must hear cases filed under common law. This is also stated in the Seventh Amendment. See Joseph Story "Commentaries on the Constitution", published in 1833. Judge story writes about this in Volume III at Page 506-7 of his book Commentaries on the Constitution. We are invoking common law in this matter pursuant to Article Three, Section Two of the US Constitution, see Callan v. Wilson, 127 U.S. 540, (1888) "And as the guaranty of a trial by jury, in the third article, implied a trial in that mode, **and according to the settled rules of common law**". Commentaries on the Constitution by Joseph Story, Volume III, Pages 506-507. See also Robinson v. Campbell, 3 Wheat R. 212, 221, 223. The Seventh Amendment to the US Constitution also requires that this case be adjudicated under the rules of the common law in front of a jury, whenever the amount of the controversy exceeds twenty dollars, see 443 Cans of Frozen Egg Product v. United States of America, 226 US 172 (1912).

30. For the Definition of a court of record see Black's Law Dictionary, Fourth Edition pages 425 and 426 for further discussion of the court of record as follows; "Courts of record are those whose acts and judicial proceedings are enrolled or recorded for a perpetual memory and testimony and which have the power to fine and imprison for contempt........ A "court of record" is a judicial tribunal having attributes and exercising functions independently of the Magistrate designated generally to hold it, **and proceeding according to the course of the common law, its acts and proceedings being enrolled for a perpetual memorial.** Jones v. Jones; 188 Mo. App.220 175 S.W. 227, 229; Ex Parte Gladhill, 8 Metc., Mass. 171, per Shaw, C. J. See also Ledwith v Rosalski; 244 N.Y. 406,155 N.E.688, 689." (emphasis mine). Common law supersedes equity jurisdiction.

31. See Ex parte Watkins, 3 Pet., at 202-203. [cited by SCHNECKLOTH v. BUSTAMONTE, 412 U.S. 218, 255 (1973): "The judgment of a court of record whose jurisdiction is final, is as conclusive on all the world as the judgment of this court would be. It is as conclusive on this court as it is on other courts. It puts an end to inquiry concerning the fact, by deciding it."

32. I: a man, am Alberto Rodriguez, one of the people of Missouri in this court of record. And I, a woman, Maria Rodriguez, am one of the people of Missouri in this court of record.

### The Law of The Case

33. The law of the Case is the Common law of Missouri and the Constitution for the United States of America, and the US Constitution, especially the Fourth Amendment, **And the Rules of the Common law.**

- said wrongdoer(s) trespass upon Aggrieved party property by making unverified claims (See Exhibit A, B, C etc);

- the causal agent(s) of the trespass on the case, comes by way of unverified claims, while refusing to confirm or verify their claims on the property of the man and woman named above as the Plaintiff;

- 'Verified' in this matter is defined as: Appearing and swearing to the alleged debt or duty under oath but the party with firsthand knowledge to the facts.

- 'Property' in this matter includes: all commercial energy, rights, marriage property and offspring, land and buildings and any possessions of the Aggrieved Party.

- the continued trespass on the case did and does harm and injury to the Aggrieved Party property;

- the commencement of the wrong and harm began November 1, 2011;

- the wrong and harm continues to this day, and specifically aggravated by the failure to Assignment of the Deed of Trust to OCWEN LOAN SERVICING, LLC or any other agent or principal that OCWEN LOAN SERVICING, LLC acts on behalf of or for whom OCWEN LOAN SERVICING, LLC, while at the same time claiming to be a mortgage creditor. Additionally, OCWEN LOAN SERVICING, LLC has refused to supply under oath or affirmation notice of their possession of the original note endorsed properly and failed to supply the 2046 balance sheet, which resulted in administering our property without rights and violated Aggrieved Party commercial energy; title to the property, and breach of covenant.

- wrongdoers did use US mail on many occasions to collect on a fraudulent debt and make false claims exceeding their jurisdiction, see **Exhibit F**, a copy of the Mortgage

statement. The Defendants, received payment once already, by way of the 2046 Balance
Sheet, which states that the Mortgage debt is paid in full, thereby seeking to collect
double a recovery as follows: (1.) The Defendants were paid once from the 2046 Balance
Sheet and once from their planned foreclosure and subsequent sale of the subject
property. They were also paid from the proceeds of the payment of an insurance claim for
the foreclosure of the Rodriguez loan, which was part of the mortgage insurance policy
that was purchased as part of the loan management process. The Defendants additionally
used threats of intimidation, double recovery, and extortion using the mail, see **Exhibit
D**, a mortgage statement, attached and incorporated by reference.

- No man, woman, or inferior agency shall be authorized to remove this case or trespass
  upon it, by attempting to change jurisdiction to other than this 'court of record' venue
  chosen by the Plaintiff/ Prosecutor/ Aggrieved Party.

- Defendants/Wrongdoers are required to verify their claim under oath before this 'court of
  record', as a party who is damaged, and who has firsthand knowledge to the facts. Any
  party who does not have firsthand knowledge of the facts or cannot verify a contract,
  shall not be authorized to speak. Failure to come forth by the deadline and appear shall
  constitute default by Defendants/ Wrongdoers.

- Third party representation of the Defendants/ Wrongdoers is not authorized to speak for
  them, unless that representative will also be under oath and swear to their claims, as a
  first hand material witness.

- It is ordered that the Defendants/Wrongdoers and their representatives are required to
  submit their BAR member numbers, Badge#, surety bonds, and Oath of Office, when
  they respond to this claim.

- This further requires the **release of property** in the foreclosure case, until this matter is ruled upon by this court then holding said property causes further injury, and the jurisdiction of that case is now challenged. The release of property is so ordered.

- Statutes of limitations do not apply as plaintiffs/prosecutors are not proceeding according to statute. This court proceeds as a 'court of record' according to common law not inferior venue statutes, and further stated the Law of the Case.

- Defendant/Wrongdoers have 30 days from receipt of notice or summonses to appear and speak on the record.


## BILL


34. We, require compensation for the initial and continual trespass upon our property;

- compensation due: release of all claims, liens, and damages two hundred sixty-eight thousand, dollars; additional compensation due should a fraudulent claim be found.

- Plus $1000 per day for time and legal expenses, calculated beginning 21 days after the date of notice to appear.

- Exhibits, A, B, C, D, E, F, G attached.

# First Cause of Action

Action of Trespass on the Case, Trespass Quare Clausum Fregit

**Against the OCWEN LOAN SERVICING, LLC**

35. The Plaintiffs do hereby incorporate by reference all of the previous paragraphs presented in this claim as if fully incorporated herein.

36. The Plaintiffs do hereby aver and State the following: The Defendants are the causal agents of the trespass on the case because they do not have a verified claim and do not have any evidence of any ownership of the loan that is the subject of this complaint. The Defendants are not assignees of the subject loan and have supplied no admissible evidence that they are assignees of said loan, nor do they have any documented enforceable interest in the subject loan except for hearsay, in violation of the rules of the common law. They have thereby violated the laws of Missouri, see Bellistri v. Ocwen Loan Servicing, LLC.

37. The Defendants continue to trespass on the property of the Plaintiffs by demanding payment of a debt for which they are strangers to the transaction and not lawfully entitled to payment of money or property. They seek exclusive right, title and interest in the subject property as strangers to the transaction with unverified claims. They have only a defective unrecorded assignment of the subject loan and do not meet the REQUIREMENTS UNDER THE COMMON LAW. This is a **TRESPASS QUARE CLAUSUM FREGIT.** This is a remedy, which lies to recover damages when the defendant has unlawfully and wrongfully trespassed upon the real estate of the plaintiff. The flawed documents make the attempted foreclosure

a conversion.

38. The Defendants are attempting to acquire the subject property by way of a defective and unverified claim, with no written assignment from the original lender. The Plaintiffs seek Declaratory relief in the nature of an order of cease and desist and an order stating that the Defendants do not have any right, title or interest in the subject property, as stated above. Additionally, because they have received payment in full of the mortgage from 2046 Balance Sheet by the doctrine of laches and by tacit admission, as stated above, they do not have any valid claim to collect any further, even if they could supply verification of their claims, assuming that their unverified claims were valid. The Defendants are trespassers because of abuse of legal process and are presenting themselves as mortgage creditors even though they are not mortgage creditors because of the double recovery by way of the 2046 Balance Sheet described herein. The Defendants are causal agents of the trespass because of the broken chain on title and the failure to disclose the payment on the 2046 Balance Sheet. In addition, the Defendants have collected Mortgage insurance premiums from the Plaintiffs for a mortgage insurance police that is in place, given that the Plaintiffs did not put any money down on the subject property, which triggered the purchase of mortgage insurance, see **Exhibit C**, attached and incorporated by reference.

39. A man is a trespasser by his own direct action when he acts without any excuse; or he may be a trespasser in the execution of a legal process in an illegal manner; 1 Chit. Pl. 183: 2 John. Cas. 27; or when the court has no jurisdiction over the subject-matter when the court has jurisdiction but the proceeding is defective and void; when the process has been misapplied, as, when the defendant has taken A's goods on an execution against B; when the process has been abused 1 Chit. Pl. 183-187 in all these cases a man is a trespasser ab initio. And a person capable of giving his assent may become a trespasser, by an act subsequent to the tort. If, for example, a man takes possession of land for the use of another, the latter may afterwards recognize and adopt the act; by so doing, he places himself in the situation of one who had previously

commanded it, and consequently is himself a trespasser, if the other had no right to enter, nor he to command the entry. 4 Inst. 317; Ham. N. P. 215. Vide 1 Rawle's R. 121.

Bouvier's Law Dictionary, 1856.

# Second Cause of Action

### Action of Trover

**Against OCWEN LOAN SERVICING, LLC**

40. The Plaintiffs do hereby incorporate by reference all of the previous paragraphs in this answer as if fully incorporated herein. The Defendants are seeking possession of the subject property by way of a forged document, which is void and unenforceable, see La Jolla Group v. Bruce, supra.

41. The Defendants seek title to the subject property even though they have been paid by way of the 2046 Balance Sheet as discussed above, which if successfully obtained will give them flawed and defective and fraudulent title to the property as a stranger to the transaction as discussed above. Consequently, the Defendants are the causal agents of the trover, having filed a 2046 Balance Sheet with the Federal Reserve, which states that the loan is paid in full.

42. The law does not allow title to be granted to someone with unverified claims. **And it has been decided that trover lies for title deeds; 2 Yeates, R. 537; and for a copy of a record. Hardr. 111. Vide 2 T. R. 788; 2 Salk. 654; 2 New Rep. 170; 3 Campb. 417; 3 Johns. R. 432; 10 Johns. R. 172; 12 Johns. R. 484; 6 Mass. R. 394; 17 Serg. & Rawle, 285; 2 Rawle, R. 241. The Fourth Amendment prohibits any claims to result in the issuance of a court order unless the claimant has verified their claim with an oath or affirmation, see Ex Parte Burford 7 US 448 (1806); Kalina v. Fletcher, 552 US 118 (1997).**

43. I seek a court order of cease and desist ordering the Defendants to stand down and

cease any and all attempts to collect the mortgage debt with out an actual assignment of the note and deed of trust executed by the original lender. The Defendants do not have any right title or interest in the subject property based upon the foregoing and especially where they have recorded flawed documents that forms the foundation for their complaint for ownership of the subject property. In addition, I ask that the accounting records be brought forward known as the 2046 Balance Sheet so that the Defendants can supply full disclosure in discovery of all accounting and bookkeeping records relevant to accurately reflect the balance paid on the account. The Defendants have collected money in the form of a payment of a mortgage insurance claim from the mortgage insurance carrier, after the loan went into default and was delinquent. The Defendants were paid by the mortgage insurance carrier, and now seek to be paid a second time by foreclosing, which is double recovery.

### Third Cause of Action

#### Action of Covenant

### Against OCWEN LOAN SERVICING, LLC

44. The Plaintiff does hereby incorporate by reference all of the previous paragraphs presented in this claim as if fully incorporated herein.

45. In this cause of action we ask for only declaratory relief. To the extent that the Court grants any relief to the Plaintiffs we ask that the Deed of Trust be enforced so that the paragraph at Section 11 at Page 9 Section 20, at Page 11 and 12 be enforced and that only the original lender or a legitimate assignee of the note and Deed of Trust may be allowed to foreclose on the subject property. We also ask the records of the debt having been paid in full based upon the records of the 2046 Balance Sheet be brought forward and be accounted for to offset the alleged debt that they claim that they have the right to collect, although it is unverified and there is no assignment of the Deed of Trust and note. We also ask that the

records of the mortgage insurance policy and the records of all payments received by the Defendants for a payment of the claims filed under the existing mortgage insurance policy be brought forward.

46. If the Defendants are somehow able to confirm that they have a verified claim then we ask that that claim be offset by the 2046 Balance Sheet that was collected when the accounting records known as the 2046 Balance Sheet reflected the fact that the debt was paid in full. We also ask that the payment of the mortgage insurance claim be applied to the account so that the Plaintiffs can be properly credited with the full payment of the loan. It is well known that Freddie Mac has purchased mortgage insurance for all of the loans in their loan portfolio where the borrower put less than 20% down, which is the case with the Alberto Rodriguez loan.

# Fourth Cause of Action

## Action of Common Law Fraud

## Against OCWEN LOAN SERVICING, LLC

47. The Plaintiff does hereby incorporate by reference all of the previous paragraphs presented in this claim as if fully incorporated herein.

48. The Defendants engaged in overt acts of fraud by engaging in the following conduct: "The necessary elements of **fraud** are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage." (_Molko v. Holy Spirit Assn._ (1988) 46 Cal.3d 1092, 1108 [252 Cal. Rptr. 122, 762 P.2d 46]; see _Seeger_ v. _Odell_ (1941) 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291]; § 1709.)[4] Only the last two elements are at issue in this case.

49. **The Elements of Overt acts of misrepresentation and Fraud are present.** The Defendants engaged in overt acts of fraud as follows: (1.) They misrepresented their status as an assignee of the Deed of Trust and note on the subject property; (2.) They have misrepresented themselves as mortgage creditors even though they are not mortgage creditors because they have not assigned the Deed of Trust within 90 days of the start-up date of the Deed of Trust as required by the Pooling and Servicing Agreement and as required under Title 26 US Code, §§ 860D and 860G, therefore the assignment is ineffective and without force and effect in law; (3.) They have already been paid the mortgage debt in full, since the debt was paid when they prepared and executed the 2046 Balance Sheet, which documents the fact that the mortgage debt is paid in full, and; (4.) They have not supplied a verified claim as that term is defined within the body of this civil case and do not have a note endorsed in the name of the trustee of the trust that allegedly holds the note, and therefore, they have no documented enforceable interest in the note and Deed of Trust and there is no evidence that they have the note in their possession, and; (5.) they have collected money from mortgage insurance claims for the subject property and not seek double recovery by way of mortgage foreclosure. The Defendant, OCWEN LOAN SERVICING, LLC mailed us mortgage statements claiming to be a mortgage creditor, knowing that the note and deed of trust was never assigned to them or anyone else. The dates on the mortgage statements are shown and this is the date of the fraudulent claim, see **Exhibit D**, attached and incorporated by reference.

50. **The elements of full knowledge and intent are present**. The Defendants did engage in the above fraudulent actions knowingly, with full knowledge and intent, knowing that the Assignment of Deed of Trust is flawed and defective forged, and knowing that they were violating Missouri laws, recording a fraudulent document, Preparing a false document, record or instrument

in writing for any fraudulent or deceitful purpose. They failed to properly assign the Deed of Trust and record said Assignment within 90 days of the start up date of the REMIC trust and by the cut off date of the REMIC Trust, knowing the requirements of the relevant sections of Title 26 and the requirements of the Pooling and Servicing agreement. They executed the 2046 Balance Sheet, knowing that the mortgage debt was paid in full. They know that the requirements of a verified claim has not been met and they know that the do not have a properly endorsed note as required under state law, see Pribus v. Bush, 118 Cal App. 3d 1003 (1981), stating that the foreclosing party must have the note in their possession and the endorsement must be in the note itself. Also, the Defendants and all of them with full knowledge and intent did receive a mortgage insurance payoff from the mortgage insurance carrier without disclosure of this fact that they received a mortgage insurance payoff.

51. **The elements of Justifiable Reliance and resulting damage are as follows**: We justifiably relied upon the note and did not file a lawsuit against the lender immediately because we trusted their misrepresentations that they are authorized to collect the debt and enforce the note and deed of trust. We delayed filing this civil action until now because we believe their false statements and misrepresentations and now we may lose the subject property as a result. This will result in the loss of our property, which is the resulting damage. The Defendants are not mortgage creditors, and are not authorized by law for all of the foregoing reasons to foreclose and the file an unlawful detainer case against me.

52. There is no Substitution of Trustee document, and no Assignment of Deed of Trust document on file at the County Recorders Office, see **Exhibit B**, attached and incorporated by reference. The claim that MERS is a mortgage creditor and a beneficiary of the Mortgage is contrary to the facts and contrary to the statements made by MERS by their own attorneys in

appellate court cases, where they have asserted that they are not mortgage creditors, and do not hold the notes and deed of trust or mortgage because they only track mortgages. The Deed of Trust document, see **Exhibit A**, states that only the original lender or an assignee can foreclose on the mortgage under the terms and conditions of the Deed of Trust, where the original lender failed to assign the note and deed of trust, see Bellistri v. Ocwen Loan Servicing, LLC, supra. Evidence already presented demonstrates that (1.) The note was informally assigned to FREDDIE MAC, and (2.) The Assignment of Deed of Trust does not exist, which makes all subsequent documents, including but not limited any Substitution of Trustee void. The threat of a foreclosure made by OCWEN LOAN SERVICING, LLC who has no documented enforceable interest in the note and Deed of Trust, and does not have the note in their possession, as discussed above. Therefore, the alleged lender has no standing to foreclose.

53. If the Defendants are somehow able to confirm that they have a verified claim then I ask that that claim be offset by the 2046 Balance Sheet that was collected when the accounting records known as the 2046 Balance Sheet reflected the fact that the debt was paid in full, attached and incorporated by reference.

## Fifth Cause of Action

### Declaratory Relief

### Against OCWEN LOAN SERVICING, LLC, RESIDENTIAL CAPITAL, LLC, HOMECOMINGS FINANCIAL, LLC

54. The Plaintiff does hereby incorporate by reference all of the previous paragraphs presented in this claim as if fully incorporated herein.

55. The Defendant, OCWEN LOAN SERVICING, LLC engaged in overt acts of misrepresentation by engaging in the following conduct: They claimed to be a loan servicing after the original lender, HOMECOMINGS FINANCIAL, LLC filed for chapter 11 bankruptcy as part of the bankruptcy of their parent company, RESIDENTIAL CAPITAL, LLC. At the time of said bankruptcy, the deed of trust was not assigned and said assignment has not been recorded at the real estate records at the Recorder of Deeds Office in St. Louis County, in Missouri, which is the county where the subject property is located.

56. The Deed of Trust and note was never assigned and now it cannot be assigned under Federal bankruptcy law. Also, any assignment to a REMIC at this late date will violate the pooling and servicing agreement that is found in all of the REMIC pooling and servicing agreements, which functions as a trust indenture. Also, any assignment which is accomplished now will violate Title 26 US Code, §§ 860D and 860G, which makes the note and deed of trust unenforceable. As a result, we ask for declaratory relief in the nature of an order issued against all the defendants ordering them to cease and desist from any and all actions to assign the note and deed of trust because of the violations of Federal law discussed above and the violations of the District of Columbia Trust law, that mandates that the trust assets must be assigned to the trustee, see **§ 19-1102 of the DC Code,** which states as follows:

**§ 19-1102.  Custodial trust; general.**

**(a)** A person may create a custodial trust of property by a written transfer of the property to another person, **evidenced by registration or by other instrument of transfer, executed in any lawful manner, naming as beneficiary, an individual who may be the transferor, in which the transferee is designated, in substance, as custodial trustee under this chapter.**

**(b) A person may create a custodial trust of property by a written**

declaration, evidenced by registration of the property or by other instrument of declaration executed in any lawful manner, describing the property and naming as beneficiary an individual other than the declarant, in which the declarant as titleholder is designated, in substance, as custodial trustee under this chapter. A registration or other declaration of trust for the sole benefit of the declarant is not a custodial trust under this chapter.

(c) **Title to custodial trust property is in the custodial trustee** and the beneficial interest is in the beneficiary.

(d) Except as provided in subsection (e) of this section, a transferor may not terminate a custodial trust.

(e) The beneficiary, if not incapacitated, or the conservator of an incapacitated beneficiary, may terminate a custodial trust by delivering to the custodial trustee a writing signed by the beneficiary or conservator declaring the termination. If not previously terminated, the custodial trust terminates on the death of the beneficiary.

(f) Any person may augment existing custodial trust property by the addition of other property pursuant to this chapter.

(g) The transferor may designate, or authorize the designation of, a successor custodial trustee in the trust instrument.

(h) This chapter does not displace or restrict other means of creating trusts. A trust whose terms do not conform to this chapter may be enforceable according to its terms under other law.

**HISTORY:** (July 23, 2002, D.C. Law 14-177, § 2(b), 49 DCR 5092.)

56. Please make special notice of the fact that subsections (a), (b) and (c) all require the trustee of the trust to be the title holder of the assets of the trust, and subsection (a) also requires the trust to **register the transfer of the assets**, which, in the case of real estate is obviously done at the county Recorder of Deeds Office, as required under Title 15 US Code, Section 1641(g). As a result, in order to comply with state law, which in this case is District of Columbia law, the DC Code, the court must order the Defendants to refrain from assigning the Note and deed of trust to a REMIC, since the trust indenture requires the assignment and registration to occur and be made at the date that the trust is created, as discussed in subsection (a) above. We therefore ask the court to order the Defendants HOMECOMINGS FINANCIAL, LLC and RESIDENTIAL CAPITAL, LLC to stand down and refrain from assigning the Rodriquez loan, given the restrictions on such transfers written into bankruptcy law and the restrictions written into the trust law in the District of Columbia, described above.

57. We ask for an order of cease and desist in keeping with the above cited statutes. We ask for any other relief that the court may require and for guidance in amending this claim if that is deemed necessary.

## ORDER

54. Upon a judgment order of this court by the tribunal, or wrongdoer failing to appear and speak under oath on the record before this court by the deadline stated in the claim, it is ordered to:

a. Return all property claimed by Plaintiff/Prosecutor,

b. Award damages in the amount of costs and fees if Defendants/ Wrongdoers are found to have made false claims against a man's property without right which is fraud. Plus $1000 per day for time and legal expenses, calculated beginning 21 days after the date of notice to appear. Final amount to be calculated on the day of judgment.

c. Lift all liens and claims by Defendants/wrongdoers against property of Plaintiffs/Prosecutors  within 3

business day of judgment, if by default or by trial by jury.

This order shall only be executed by the chosen magistrate upon approval of Plaintiff/Prosecutor.

we, say here, and will verify in an open court, that all herein is true.


DATED: _July 8, 2019_


By _Alberto Rodriguez_

Alberto Rodriguez    Phone: 314-494-4896

1232 Wissmann Drive; Ballwin Missouri republic near [63011]


By: _Maria Rodriguez_

Maria Rodriguez

1232 Wissmann Drive; Ballwin Missouri republic near [63011]

## VERIFICATION

We have read the **Claim Filed For Action Of Trespass on the Case, Action of Trover, Action of Covenant and Action For Common Law Fraud** and know the contents thereof to be true; and the same is true of our own knowledge, except to the matters, which are therein stated on our information and belief, and as to those matters, we believe them to be true. The foregoing is true, correct, complete and not misleading to the best of our knowledge.

Sealed by the voluntary act of our own hand on this ___July 8, 2019___ (date).

_____

Alberto Rodriguez    Phone: 314-494-4896

1232 Wissmann Drive; Ballwin Missouri republic near [63011]

_____

Maria Rodriguez

1232 Wissmann Drive; Ballwin Missouri republic near [63011]

# EXHIBITS LIST

**Exhibit A**            Deed of Trust

**Exhibit B**            Notice posted on the Freddie mac Website that Freddie

Mac owns the Alberto Rodriguez loan.

**Exhibit C**            Copy of the Article about the fact that Freddie Mac and Fannie
Mae purchase of mortgage insurance is routine when the borrower
pays less that 20 % down at closing.

**Exhibit D**            Copy of the Mortgage Statement

# EXHIBIT A

B O O K: 1 7 3 0 5  -  P a g e:  9 1 1

*2006092101345*

## JANICE M. HAMMONDS, RECORDER OF DEEDS
### ST. LOUIS COUNTY MISSOURI
### 41 SOUTH CENTRAL, CLAYTON, MO 63105

| TYPE OF INSTRUMENT DT | GRANTOR RODRIGUEZ ALBERTO ETUX | TO | GRANTEE HOMECOMINGS FIN NETWORK INC ETAL |
|---|---|---|---|

PROPERTY DESCRIPTION:     FOREST GLEN EST LOT 3     PB 132 PG 60

| Lien Number | Notation | Locator |
|---|---|---|

**NOTE:** I, the undersigned Recorder of Deeds, do hereby certify that the information shown on this Certication Sheet as to the **TYPE OF INSTRUMENT, the NAMES of the GRANTOR and GRANTEE** as well as the **DESCRIPTION of the REAL PROPERTY affected** is furnished merely as a convenience only, and in the case of any discrepancy of such information between this Certification Sheet and the attached Document, **the ATTACHED DOCUMENT governs.** Only the DOCUMENT NUMBER, the DATE and TIME of filing for record, and the **BOOK and PAGE** of the recorded Document is taken from this CERTIFICATION SHEET.

### RECORDER OF DEEDS DOCUMENT CERTIFICATION

STATE OF MISSOURI  )
                            SS.
COUNTY OF ST. LOUIS )

| Document Number |
|---|
| 1,345 |

I, the undersigned Recorder of Deeds for said County and State, do hereby certify that the following and annexed instrument of writing, which consists of ___21___ pages, (this page inclusive), was filed for record in my office on the __21__ day of __September__ __2006__ at __03:08 PM__ and is truly recorded in the book and at the page number printed above.

In witness whereof I have hereunto set my hand and official seal the day, month and year aforesaid.

_JoAnn Reber_
Deputy Recorder

_Janice M. Hammonds_
Recorder of Deeds
St. Louis County, Missouri

Mail to:

_____N.P.
_____N.P.C.
_____N.N.C.
_____N.N.I.

RECORDING FEE   **$81.00**
(Paid at the time of Recording)

Destination code: 1      P

31

Book: 17305  -  Page:  912

Return To: HOMECOMINGS FINANCIAL NETWORK, INC.

One Meridian Crossing, Ste. 100

Minneapolis MN 55423

Loan Number: 047-000175-1

Lender address located on page 2

Trustee address located on page 2

Full Legal Description located on page 3 "Exhibit A"

———————————————— [Space Above This Line For Recording Data] ————————————————

# DEED OF TRUST

MIN 100062604700017512

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated  SEPTEMBER 14TH, 2006 together with all Riders to this document.

**(B) "Borrower"** is

ALBERTO RODRIGUEZ AND MARIA RODRIGUEZ, HUSBAND AND WIFE

whose address is  1232 WISSMANN DRIVE

SAINT LOUIS, MO 63011

Borrower is the trustor under this Security Instrument.

MISSOURI-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3026   1/01

VMP-6A(MO) (0107).01  MFM07770 (06/2006) / 047-000175-1

Page 1 of 15      Initials: A.R. M.R.

VMP Mortgage Solutions, Inc.



32

(C) "Lender" is  HOMECOMINGS FINANCIAL NETWORK INC.

Lender is a  CORPORATION
organized and existing under the laws of  DELAWARE
Lender's address is  14850 QUORUM DRIVE, SUITE 500
DALLAS, TX 75254
(D) "Trustee" is  Milsap & Singer, P.C., a Missouri Corporation

Trustee's address is  7777 Bonhomme Avenue, Suite 2300
, St. Louis                    , MO  63105
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated SEPTEMBER 14TH, 2006
The Note states that Borrower owes Lender  ONE HUNDRED NINETY FOUR THOUSAND FIVE HUNDRED SIXTY AND NO/100
                                                                                                Dollars
(U.S. $  194,560.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than OCTOBER 1ST, 2036
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

VMP -6A(MO) (0107).01

Initials: _____

Page 2 of 15

Form 3026  1/01

MFMO7770 (06/2006) / 047-000175-1

33

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants, bargains, sells, conveys and confirms to Trustee, in trust, with power of sale, the following described property located in the COUNTY                                                                of ST LOUIS                                                  :

[Type of Recording Jurisdiction]                              [Name of Recording Jurisdiction]

Legal description attached hereto and made a part hereof

Parcel ID Number: 22Q330815
1232 WISSMANN DRIVE
SAINT LOUIS
("Property Address"):

which currently has the address of
[Street]
[City]  , Missouri  63011     [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interest granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

Initials: _____

VMP®-6A(MO) (0107).01                          Page 3 of 15                          Form 3026  1/01
MFMO7770 (06/2006) / 047-000175-I

3A

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and

assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)** Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

39

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

40

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _____

BOOK: 17305 - Page: 922

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

42

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

A3

B o o k: 1 7 3 0 5  -  P a g e:  9 2 4

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall mail copies of a notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property to any later time on the same date by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Lease of the Property.** Trustee hereby leases the Property to Borrower until this Security Instrument is either satisfied and released or until there is a default under the provisions of this Security Instrument. The Property is leased upon the following terms and conditions: Borrower, and every person claiming an interest in or possessing the Property or any part thereof, shall pay rent during the term of the lease in the amount of one cent per month, payable on demand, and without notice or demand shall and will surrender peaceable possession of the Property to Trustee upon default or to the purchaser of the Property at the foreclosure sale.

**26. Homestead Exemption.** Borrower hereby waives all homestead exemptions in the Property to which Borrowers would otherwise be entitled under Applicable Law.

Initials: _A. R. YIR_

VMP -6A(MO) (0107).01

Page 13 of 15

Form 3026  1/01

MFMO7770 (06/2006) / 047-000175-1

H H

**27. Notice.** Oral agreements or commitments to loan money, extend credit or to forebear from enforcing repayment of debt including promises to extend or renew such debt are not enforceable. To protect you (Borrower(s)) and us (Creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
                                                        -Borrower
ALBERTO RODRIGUEZ

_____

✗ _____ (Seal)
                                                        -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                            -Borrower                                        -Borrower

H5

**STATE OF MISSOURI,**                                    *St. Louis*   County ss:

On this *14th* day of *September*                2006 , before me personally appeared

ALBERTO RODRIGUEZ AND MARIA RODRIGUEZ, HUSBAND AND WIFE

to me known to be the person(s) described in and who executed the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the *County* and State aforesaid, the day and year first above written.

My Term Expires: 4/10/10

Notary Public *Julia B. Jennings*

JULIA B. JENNINGS
My Commission Expires
April 10, 2010
St Louis County
Commission #06397413

-6A(MO) (0107).01
MFMO7770 (06/2006) / 047-000175-1

Page 15 of 15

Initials: _____

Form 3026   1/01

46

B o o k : 1 7 3 0 5  -  P a g e :  9 2 7

Exhibit "A"

Lot 3 of Forest Glen Estates, according to the plat thereof recorded in Plat Book 132 page(s) 60 of the St Louis County Records.

47

# FIXED/ADJUSTABLE RATE RIDER
**(LIBOR One-Year Index (As Published In *The Wall Street Journal*)- Rate Caps)**

THIS FIXED/ADJUSTABLE RATE RIDER is made this 14TH day of SEPTEMBER, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to HOMECOMINGS FINANCIAL NETWORK INC.

("Lender") of the same date and covering the property described in the Security Instrument and located at: 1232 WISSMANN DRIVE
SAINT LOUIS, MO 63011
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial fixed interest rate of 7.6250 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
**(A) Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of OCTOBER, 2013 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family - Fannie Mae Uniform Instrument**
Form 3187 6/01
MFCD6133 - (02/2005) / 047-000175-1
®-168R (0401).01
Page 1 of 4          Initials: *A.L. YJR.*
VMP Mortgage Solutions, Inc.
(800)521-7291



48

Book: 17305 - Page: 929

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE FOURTH percentage points ( 2.2500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 12.6250 % or less than 2.6250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 12.6250 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

VMP-168R (0401).01
MFCD6133 - (02/2005) / 047-000175-1

Page 2 of 4

Initials: _A.R. VTR_

Form 3187 6/01

49

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.  When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within

B o o k :   1 7 3 0 5   -   P a g e :   9 3 1

which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
ALBERTO RODRIGUEZ        -Borrower

x _____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

MFCD6133 - (02/2005) / 047-000175-1
VMP-168R (0401).01                Page 4 of 4                Form 3187 6/01

51

# EXHIBIT B

# Yes. Our records show that Freddie Mac owns your mortgage. and your note date (the date you closed your loan) – is September 14, 2006.

## What to Do Next

Please reach out to your lender (also referred to as your mortgage servicer) to discuss options that may be available to you, including the federal Home Affordable Refinance Program® (HARP). (http://myhome.freddiemac.com/refinance/understand-harp.html) Their telephone number and mailing address should be listed on your monthly statement.

## Steps to Get Started with HARP

You may be eligible for HARP if your note date is on or before May 31, 2009.

1. See if Freddie Mac Owns Your Loan
2. Learn More About HARP (http://myhome.freddiemac.com/refinance/understand-harp.html)
3. Check Your Eligibility for HARP (http://myhome.freddiemac.com/mortgage-help/harp-eligibility.html)
4. Get Prepared and Call Your Lender (http://myhome.freddiemac.com/mortgage-help/work-with-lender.html)
5. Find a HARP Lender (http://myhome.freddiemac.com/refinance/new-lender.html)

Visit My Home by Freddie Mac® (http://myhome.freddiemac.com/) for information and guidance on options to stay in your home, options to leave your home, working with a housing counselor or your lender, avoiding fraud and more.

53

# EXHIBIT C



News Release

# Fannie Mae and Freddie Mac Issue Revised Private Mortgage Insurer Eligibility Requirements

**FOR IMMEDIATE RELEASE**

**4/17/2015**

**Washington, D.C.** – The Federal Housing Finance Agency (FHFA) today announced that Fannie Mae and Freddie Mac (the Enterprises) are issuing revised requirements for private mortgage insurance companies that insure mortgage loans either owned or guaranteed by the Enterprises. The revised eligibility requirements set financial and operational standards that private mortgage insurers must meet to receive approved insurer status with Fannie Mae or Freddie Mac and are designed to reduce risk to the Enterprises. The requirements are effective December 31, 2015.

As Conservator of the Enterprises, FHFA directed Fannie Mae and Freddie Mac to align and strengthen their risk management requirements for mortgage insurance counterparties. In July 2014, FHFA sought broad input on draft private mortgage insurer eligibility requirements. The finalized requirements reflect a multi-year effort to produce a clear and comprehensive set of standards that incorporate a new, risk-based framework to ensure that approved insurers have sufficient financial and operational strength to weather an economic downturn. Fannie Mae and Freddie Mac are issuing these requirements after the Enterprises and FHFA consulted with a range of stakeholders, including state insurance commissioners, private mortgage insurers, consumer advocates and seller/servicers.

"The requirements announced today are prudent steps to align and strengthen Fannie Mae and Freddie Mac's operational and financial requirements for private mortgage insurance companies, which will reduce the Enterprises' overall risk and protect taxpayers," said FHFA Director Melvin L. Watt. "Completion of this requirement fulfills a key Scorecard item for the Enterprises."

Links:

Fannie Mae Statement

Freddie Mac Statement

###

1 of 2

12/21/16, 23:27

The Federal Housing Finance Agency regulates Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks. These government-sponsored enterprises provide more than $5.6 trillion in funding for the U.S. mortgage markets and financial institutions. Additional information is available at **www.FHFA.gov**, on Twitter **@FHFA**, **YouTube** and **LinkedIn**.

**Contacts:**

Media: Stefanie Johnson (202) 649-3030 / Corinne Russell (202) 649-3032

Consumers: Consumer Communications or (202) 649-3811

© 2016 Federal Housing Finance Agency

12/21/16, 23:27

56





≡

Menu   Search

Deciding Whether to Rent
Understanding What You Can Afford
Planning to Rent
Finding the Right Home
Understanding Your Rights
**Buy**
Deciding Whether to Buy
Understanding What You Can Afford
Planning to Buy
Finding the Right Home
Finding Your Team
Financing Your Purchase
Making an Offer
Inspecting & Appraising the Home
Closing the Loan
**Own**
Understanding Your Financial Obligations
Understanding Your Home's Value
Maintaining, Repairing, and Upgrading
Getting Involved in Your Community
Selling Your Home
Filing Your Paperwork
**Refinance**
Determining Whether to Refinance
Planning to Refinance
Understanding Refinance Options
Finding and Working with a Lender
**Foreclosure & Alternatives**
Assessing Your Situation
Who to Contact for Help
Options to Stay in Your Home
Options to Leave Your Home
Working With Your Lender
Knowing What to Expect After Foreclosure
My Home Has Been Foreclosed Upon
**Resources**
Calculators
Education & Assistance
Homeownership Blog ☑
Loan Lookup Tool ☑
Reference Center
What Home Means to Me

**OWN**

# Paying PMI, Property Taxes & Homeowners Insurance



Share This  🔲 🔲 🔲 🔲

12/22/16, 23:21

57

## UNDERSTANDING YOUR FINANCIAL OBLIGATIONS

**1**   **Paying Your Mortgage on Time**

**2**   **Paying Your Homeowners Association Fees**

**3**   **Paying PMI, Property Taxes & Homeowners Insurance**

**4**   **Budgeting & Planning Ahead**

**5**   **Understanding Foreclosure Warning Signs**

## WHAT YOU'LL LEARN

- Your monthly escrow payment covers property taxes and homeowners insurance that your lender will pay on your behalf.

- Escrow payments are estimates so at the end of the year you may get a refund or have to pay extra for a shortfall.

- Once you've built up enough equity in your home, you can cancel your PMI.

In addition to principal and interest, your monthly mortgage payment may also include an escrow payment (property taxes and homeowners insurance) and private mortgage insurance (PMI) payment.

# Escrow Payments

If your lender set up an escrow account for your mortgage, each month you'll also make an escrow payment to cover your property taxes and homeowners insurance. Your lender will deposit this amount into your escrow account and will pay for both of these items on your behalf when they are due.

- Lenders will estimate your homeowners insurance premium and real-estate property taxes yearly. It's important to remember that it's an estimate so at the end of the year you may get a refund or have to pay extra for a shortfall.

- Your taxes and insurance premiums will change over time and your escrow payment estimate will be adjusted yearly to reflect any changes.

- Check your year-end escrow statement carefully to make sure your bills are being paid and there are no mistakes. If you have questions or find a problem, contact your lender immediately as these

12/22/16, 23:21

payments are ultimately your responsibility.

You may have the option to cancel your escrow payments to your lender once you have built up at least 20% equity in your home and are current on your payments. If you decide to go this route it is important to remember that you'll now be responsible for paying your taxes and insurance in full and on time.

### TIP

Regularly scheduled monthly escrow payments are a good option for many homeowners because they eliminate the surprise of large annual or semi-annual payments when property taxes or insurance premiums are due.

# Private Mortgage Insurance

If you made a down payment of less than 20% to buy your home, private mortgage insurance or PMI will be part of your monthly mortgage payment.

- The cost of PMI varies based on your loan-to-value ratio – the amount you owe on your mortgage compared to its value – and credit score. You can expect to pay between $30 and $70 per month for every $100,000 borrowed.
- You'll have to pay PMI until you've built up more than 20% equity in your home. Borrowers with FHA loans are responsible for paying FHA mortgage insurance premiums for the life of the loan.
- If you are current on your mortgage payments, PMI will automatically terminate on the date when your principal balance is scheduled to reach 78% of the original value of your home. That date will be given to you in writing on a PMI disclosure form when you get your mortgage. Learn More

You can also request that your lender cancel your PMI if you have made additional payments or if rising home values have increased your home equity to more than 20%. Your request must be in writing and meet additional criteria that your lender specifies.

### TIP

It's no doubt that PMI is an added cost, but it enabled you to buy your home and begin building equity versus waiting 5 to 10 years to build enough savings for a 20% down payment.

### KEY TAKEAWAYS

1. PMI will automatically terminate on the date when your principal balance is scheduled to reach 78% of the

12/22/16, 23:21

59

original value of your home.

2. Borrowers with FHA loans are responsible for paying FHA mortgage insurance premiums for the life of the loan.

3. Your taxes and insurance premiums will change over time and your escrow payment estimate will be adjusted yearly to reflect any changes.

# OWNING RESOURCES

**Blog**

**PMI: Your Top Questions Answered** ☐

**What Home Means to Me**

**Paul - Abington, MA**

**Calculator**

**Extra Payments** ☐

Learn how advantageous extra monthly mortgage payments might be.

**Worksheet**

60

## Budget Worksheet

Use this worksheet to help you track your expenses and build a monthly budget.

Follow Us   

These webpages are for general informational purposes only. Contact your lender, your financial advisor, and/or a housing counselor for advice or information related to your specific situation.

**About Us**    **Contact Us**    **Terms of Use** ↗    **Privacy** ↗    **Loan Lookup** ↗

12/22/16, 23:21

61